IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

------------------------------------------------------------------X

JANE DOE, JANE DOE 2, JANE DOE 3 and
JANE DOE 4

|  |  |
|---|---|
| PLAINTIFFS | Civil Action No. 3:21-00477 |
| v. |  |
| SCHUYLKILL COUNTY COURTHOUSE; GEORGE HALCOVAGE (in his individual and official capacity); GLENN ROTH, (in his individual and official capacity); GARY BENDER, (in his individual and official capacity). | AMENDED COMPLAINT |
|  | Plaintiff Demands a Trial by Jury |
| DEFENDANTS |  |

------------------------------------------------------------------X

Plaintiffs, Jane Doe, Jane Doe 2, Jane Doe 3 and Jane Doe 4 by and through their attorneys, Derek Smith Law Group, PLLC, by way of this Complaint, state:

## NATURE OF THE CASE

1. This action arises out of the unlawful discrimination, hostile work environment, intimidation, and retaliation by Defendants against Plaintiffs on the basis of their sex and gender.

2. Plaintiff brings this action charging that Defendants violated Plaintiff's rights pursuant to Title VII of the Civil Rights Act of 1964 ("Title VII"), 18 U.S.C.A. §§ 1591, 18 PA CSA 3012, the Pennsylvania Human Relations Act, as

1

amended, 42 U.S. §§ 951, et seq. ("PHRA"), seeking damages to redress the injuries Plaintiffs suffered as a result of being discriminated against by their employer on the basis of their sex and gender and in retaliation for their opposition and reporting the unlawful behavior.

## JURISDICTION AND VENUE

3.   This Court has jurisdiction over this lawsuit pursuant to 28 U.S.C. §1331 because it involves questions under federal law under Title VII and 18 U.S.C.A. §§ 1591.

4.   Venue in this judicial district is proper pursuant to 28 U.S.C. §1391(b) and 42 U.S.C. §2000e-5(f)(3) because substantial part of the acts or omissions giving rise to Plaintiffs' claims occurred in Schuylkill County, Pennsylvania within the Middle District of Pennsylvania, and Defendants are subjected to personal jurisdiction here.

## EXHAUSTION OF ADMINISTRATIVE REMEDIES

5.   On August 24, 25, and 27, 2020, Plaintiffs timely filed charges of discrimination with the U.S. Equal Employment Opportunity Commission ("EEOC") and dual filed with the Pennsylvania Human Relations Commission ("PHRC") alleging violations of Title VII, the Pennsylvania

Human Relations Act, 43 P.S. §§ 951-963 ("PHRA"), and Pennsylvania state laws.

6.    Plaintiffs timely filed this action and complied with all administrative prerequisites to bring this lawsuit.

7.    On April 8, 2021, each Plaintiff was issued a "Notice of Right to Sue Within 90 Days" letter by the United States Department of Justice, Civil Rights Division. See Exhibit A.

8.    Plaintiffs' PHRA claims are still pending.

9.    Plaintiffs' PHRA and claims will be ripe on or before August 27, 2021.

10.   However, as one hundred and eighty days elapsed since the filing of Plaintiffs' Charges of Discrimination with the administrative agencies, Plaintiffs made two attempts to obtain a "Notice of Right to Sue" letter from the EEOC, and Defendants continue to violate Plaintiffs' Title VII rights, Plaintiffs argue that in interest of justice this Complaint should be deemed ripe for filing.

## **PARTIES**

11.   That at all times relevant hereto, Plaintiff Jane Doe, (hereinafter referred to as "Plaintiff Doe") is a individual female, residing in Schuylkill County in the Commonwealth of Pennsylvania.

12.  Plaintiff Jane Doe is referred to herein as Plaintiff Doe due to the extreme hardship such revelation of her identity would cause and the need to protect victims of sexual crimes.

13.  That at all times relevant hereto, Plaintiff Jane Doe 2, (hereinafter referred to as "Plaintiff Doe 2") is a individual female, residing in Schuylkill County in the Commonwealth of Pennsylvania.

14.  Plaintiff Jane Doe 2 is referred to herein as such, due to the extreme hardship such revelation of her identity would cause and the need to protect victims of sexual crimes.

15.  That at all times relevant hereto, Plaintiff Jane Doe 3 (hereinafter referred to as "Plaintiff Doe 3") is a individual female, residing in Schuylkill County in the Commonwealth of Pennsylvania.

16.  Plaintiff Doe 3 is referred to herein as such, due to the extreme hardship such revelation of her identity would cause and the need to protect victims of sexual crimes.

17.  That at all times relevant hereto, Plaintiff Jane Doe 4, (hereinafter referred to as "Plaintiff Doe 4") is a individual female, residing in Schuylkill County in the Commonwealth of Pennsylvania

18.   Plaintiff Doe 4 is referred to herein as such, due to the extreme hardship such revelation of her identity would cause and the need to protect victims of sexual crimes.

19.   Defendant Schuylkill County (hereinafter referred to as "Defendant SC"), is a public entity duly organized and existing pursuant to the laws of the Commonwealth of Pennsylvania.

20.   At all relevant times, Defendant SC has continuously, and is currently, doing business in the Commonwealth of Pennsylvania and has at least fifteen (15) employees.

21.   That at all relevant times, Defendant SC has continuously been an employer engaged in an industry affecting commerce within the meaning of Section 701(b), (g) and (h) of Title VII, 42 U.S.C. §§ 2000 (e), (g), and (h).

22.   That at all times material hereto, Defendant SC conducted business in Schuylkill County, employing four or more persons within the Commonwealth of Pennsylvania, and falls within the reach of the Pennsylvania Human Relations Act (PHRA), 43 P.S. § 955 (a).

23.   That at all times material, Defendant George Halcovage (hereinafter referred to as "Defendant Halcovage") is a County Commissioner and Chairman of the Commissioners.

24.   That at all times material, Defendant Halcovage has hiring, supervisory and firing authority over the Plaintiffs.

25.   That at all times material, Defendant Glenn Roth, Esquire (hereinafter referred to as "Defendant Roth") is First Assistant County Solicitor and Risk Manager for Defendant SC.

26.   That at all times material, Defendant Roth, has hiring, supervisory and firing authority over the Plaintiffs.

27.   That at all times material, Defendant Gary Bender (hereinafter referred to as "Defendant Bender") is County Administrator for Defendant SC.

28.   That at all times material, Defendant Roth, had hiring, supervisory and firing authority over the Plaintiffs.

29.   That at all times material, Defendant Doreen Kutzler (hereinafter referred to as "Defendant Kutzler") is a representative of Human Resources.

30.   That at all times material, Defendant Kutzler, has hiring, supervisory and firing authority over the Plaintiffs.

31.   That at all times material, Defendant Heidi Zula (hereinafter referred to as "Defendant Zula") is a representative of Human Resources

32.   That at all times material, Defendant Zula, has hiring, supervisory and firing authority over the Plaintiffs.

33.   At all times material, Defendants were the joint employers of Plaintiffs.

## MATERIAL FACTS

34.   On or around November 2011, Defendant SC hired Plaintiff Doe 3 as a Tax Claim Director.

35.   Sometime thereafter, Defendant SC hired Plaintiff Doe 4.

36.   Almost immediately after being hired, Defendant Halcovage told Plaintiffs Doe 3 and Doe 4 that if they wanted a raise or to receive promotions in their employment with Defendants, they would have to change their political party to Republican.

37.   Plaintiffs Doe 3 and Doe 4 reluctantly did as they were instructed for fear that their jobs would be in jeopardy if they refused and, additionally, that their promotion opportunities would be limited if they refused.

38.   Shortly thereafter, Defendant Halcovage requested that Plaintiffs Doe 3 and Doe 4 circulate petitions for Defendant Halcovage to be placed on the ballot for various offices that he ran for.

39.   On one occasion, Defendant Halcovage asked Plaintiff Doe 3 volunteer to work at a polling location.

40.   Defendant Halcovage required Plaintiff Doe 3 to hand out flyers to voters on their way into their polling location.

41.   Around January 2012, Defendant Halcovage started his term as County Commissioner.

42. Almost immediately after his reelection, Defendant Halcovage began frequently visiting the Tax Claims Office and subjecting the department and the female employees to unwelcome and unwanted sexual comments and/or demeaning and discriminatory, sexist comments.

43. By way of example, but by no means an extensive list, Defendant Halcovage told Plaintiff Doe 3 "Jim McNulty thinks you are really good-looking."

44. Defendant Halcovage made this comment when Plaintiff Doe 3 and Defendant Halcovage were alone in her office.

45. Defendant Halcovage's comment and conduct made Plaintiff Doe 3 extremely uncomfortable.

46. Defendant Roth, on numerous occasions told Plaintiff Doe 3, "[w]e're going to have to talk to [Defendant Halcovage] about his behavior."

47. Upon information and belief, Defendant Roth was referring to Defendant Bender and himself.

48. Upon information and belief, neither Defendant Roth nor Defendant Bender took any corrective action in regard to Defendant Halcovage unlawful, discriminatory and sexually harassing comment.

49. By way of further example, in 2012 or 2013 Plaintiff Doe learned that an employee of Defendant SC, Tom Gallagher, was accused of sexual harassment.

8

50.   Plaintiff Doe 3 stated to Respondent Halcovage, "I bet Tom did sexually harass Pam. He once said to me while I was bending down, 'hey little girl while you are down on your knees, I have a job for you'."

51.   Plaintiff Doe 3 made it very obvious that the behavior of Tom Gallagher had been sexual harassment.

52.   Defendant Halcovage at a later date then repeated Tom Gallagher's statement to Plaintiff Doe 3.

53.   Pam Biddle (the female employee of Defendant SC who had been sexually harassed by fellow Defendant SC employee, Tom Gallagher) heard the comment.

54.   Defendant Halcovage responded in a condescending tone, "I know to who and what I can say."

55.   Upon information and belief, Defendant Halcovage believed the rules and law did not equally apply to his comments and conduct and was clearly aware that he had control over certain people, specifically women.

56.   By way of further example, Plaintiff Doe 3 often observed Plaintiff Doe 4 eating a freeze pop.

57.   Plaintiff Doe 4 often ate freeze pops after her daily run to ward off dehydration.

58.   On one occasion, Plaintiff Doe 3 heard Defendant Halcovage tell Plaintiff Doe 4, "[w]ow I like the way your mouth is around that."

59.   As a result of the humiliation and embarrassment this caused her, Plaintiff Doe 4 purchased a small bowl to keep at her desk in the event Defendant Halcovage came to her office while she was eating the freeze pop, she could put it in the bowl until he left in attempts to deter his unwelcomed sexual comments.

60.   On another occasion Defendant Halcovage said, "[t]hat's a big one."

61.   Plaintiff Doe 4 reported Defendant Halcovage's behavior to her supervisor, Plaintiff Doe 3, who reported the unlawful behavior to Defendant Roth.

62.   Upon information and belief, Defendant Roth never took any corrective action regarding Defendant Halcovage unlawful, discriminatory, and sexually harassing comment.

63.   On one occasion, Defendant Halcovage purchased freeze pops for the office.

64.   When Defendant Halcovage dropped them off at Plaintiff Doe 4's office he stated, "these are BIG ONES," alluding to the fact that the freeze pop was a similar shape and size to a penis.

65.   On numerous occasions Defendant Halcovage brought families with children into the tax claim's office.

66.   Defendant Halcovage gave the children freeze pops as a treat.

67. Defendant Halcovage asked Plaintiff Doe 4 to cut open freeze pop for the children.

68. When Plaintiff Doe 4 did so before he asked, Defendant Halcovage would state, "[s]ee how I have her trained."

69. Defendant Halcovage's behavior made Plaintiff Doe 4 feel demeaned, embarrassed, and emotionally distraught.

70. By way of further example, Plaintiff Doe 4's husband often picked her up to take her to lunch.

71. On one occasion, Plaintiff Doe 4 walked into the Commissioner's office after returning from lunch with her husband.

72. Defendant Halcovage knew Plaintiff Doe 4 was lunch with her husband.

73. When Plaintiff Doe 4 walked into the Commissioner's Office, Defendant Halcovage said "where did you go after lunch? Were you and [your husband] parking?"

74. Upon information and belief, parking is a term used for parking your car in order to engage in sex.

75. When Plaintiff Doe 4 replied "no", Defendant Halcovage stated "what's all over your lips?"

76. Upon information and belief, Defendant Halcovage was implying that Plaintiff Doe 4 had just performed oral sex on her husband.

77.   Numerous other individuals were in the Commissioner's Office and heard Defendant Halcovage make these statements.

78.   A number of the individuals even laughed.

79.   Defendant Halcovage's comments made Plaintiff Doe 4 humiliated, uncomfortable, and distraught.

80.   After this, Defendant Halcovage's comments about "parking" became very regular.

81.   Plaintiff Doe 4, on numerous occasions, reported Defendant Halcovage's behavior to Defendant Roth.

82.   Upon information and belief, Defendant Roth and Defendant Bender were aware of these comments and failed to investigate of address the unlawful conduct.

83.   By way of further example, upon information and belief, around 2013 or 2014, Annie Morrissey, Defendant Halcovage and Defendant Halcovage's wife were at a fundraiser.

84.   Upon information and belief, Annie Morrissey approached Defendant Halcovage's wife and told her that Kelly Macalonis had been "blowing [Defendant Halcovage] in his office."

85.   Upon information and belief, Kelly Macalonis reported sexual harassment to Defendant SC employees.

86.    Upon information and belief, Respondent Roth and Respondent Bender knew about the reports by Kelly McAlonis.

87.    Upon information and belief, no disciplinary action was taken against Respondent Halcovage nor was any action taken to prevent Respondent Halcovage from engaging in similar behavior in the future.

88.    On or around February 2014, Defendant SC hired Plaintiff Doe as a Clerk One.

89.    Almost immediately, Defendant Halcovage began visiting the mailroom on a daily basis.

90.    Around the same time Plaintiff Doe's coworkers began making inappropriate and unlawful comments including but not limited to, "if you want a full-time position speak with George; he is a sucker for pretty girls."

91.    Shortly thereafter, Defendant Halcovage began sexually harassing Plaintiff Doe with repeated and unwelcome comments regarding her physical appearance.

92.    By way of example, but by no means an extensive list, Defendant Halcovage made comments to Plaintiff Doe almost daily and multiple times per day such as: "You're so beautiful," "You're so gorgeous…I bet everyone tells you that;" "You are really a knock-out;" "You are a very beautiful woman;" "You

are a jaw dropper;" "You are a headturner;" and "You've got that wow/it factor."

93. As time progressed, the frequency and intensity of Defendant Halcovage's comments increased.

94. Around, July of 2014, Defendant Halcovage called Plaintiff Doe into his office.

95. Defendant Halcovage had Plaintiff Doe shut the door behind her.

96. Once alone, Defendant Halcovage produced a picture that appeared to be printed from Plaintiff Doe's personal and private Facebook page.

97. The picture was of Plaintiff Doe and her colleague and friend Plaintiff Doe 2, holding a sign, for Brian Rich's Senate campaign.

98. Defendant Halcovage indicated that members of Defendant SC's staff were not happy about the picture and it needed to be removed from Plaintiff Doe's Facebook, leaving Plaintiff Doe self-conscious and wary about how it may impact her job.

99. Defendant Halvocage went on to discuss Plaintiff Doe's future with Defendant SC.

100. Defendant Halcovage implied that Plaintiff Doe's future was not guaranteed but that "he had her back" and "as long as she stuck with him," her

employment was secure. This only exacerbated her feelings of self-consciousness all the more.

101. Around the end of 2014 or early 2015, Defendant Halcovage requested that Plaintiff Doe work a Republican Party fundraiser.

102. Plaintiff Doe, unable to decline due to Defendant Halcovage's position, agreed.

103. During said event, Plaintiff Doe was stationed at the coatroom.

104. Defendant Halcovage purchased and brought Plaintiff Doe a number of drinks.

105. Defendant Halcovage was aware that Plaintiff Doe struggled with an alcohol problem.

106. Numerous times throughout the event, Plaintiff Doe caught Defendant Halcovage staring at her with piercing eyes.

107. Defendant Halcovage's behavior made Plaintiff Doe uncomfortable and embarrassed.

108. At the end of the fundraiser, Defendant Halcovage asked Plaintiff Doe if he could walk her to her car.

109. Again, feeling pressure by Defendant Halcovage's position at Defendant SC, within the Republican party, and in the community, and not wanting to appear disagreeable, Plaintiff Doe agreed.

110.   Once at Plaintiff Doe's car, Defendant Halcovage forcefully grabbed Plaintiff Doe in and kissed her.

111.   Plaintiff Doe Was unsure how to react.

112.   Plaintiff Doe got in her car and went home.

113.   Around late 2014 early 2015, Plaintiffs began witnessed Defendant Halcovage, on numerous occasions, make unlawful comments to or about Plaintiff Doe's supervisor, Ginny Murray.

114.   Defendant Halcovage made statements including but not limited to, "I'm going to make Ginny cry," "Ginny is a carpet muncher," and "Ginny is a lesbian."

115.   These comments were often made directly to or in the presence of Defendant Roth and/or Defendant Bender.

116.   Defendants Roth and Bender did not reprimand Defendant Halcovage nor tell him the behavior was inappropriate.

117.   Upon information and belief, neither Defendant Roth nor Defendant Bender conducted any investigation, did not report Defendant Halcovage's behavior to HR, they did not ask Ms. Murray if the comments and conduct were unwelcome, nor did they take any remedial action.

118.   Defendant Roth and Defendant Bender's failure to act left Plaintiffs feeling that reporting Defendant Halcovage unlawful treatment would be futile.

119. Around the same time Defendant Halcovage told Plaintiff Doe 3, on numerous occasions, "everyone gossips about me sleeping with [Plaintiff Doe]." and Defendant Halcovage would laugh and say, "[r]eally, look at me and look at her."

120. Plaintiff Doe 3 felt that Defendant Halcovage's comments were inappropriate.

121. Plaintiff Doe 3 informed Defendant Halcovage, "I've never heard that from anyone but you."

122. Plaintiff Doe 2 was hired in or around December of 2014.

123. Almost immediately, Defendant Halcovage began subjecting Plaintiff Doe 2 to unwelcome and unwanted sexual comments and demeaning and discriminatory sexist comments.

124. By way of example, but by no means an extensive list, Defendant Halcovage made comments to Plaintiff Doe 2 almost daily and multiple times per day such as: "You're so beautiful;" "You are a jaw dropper;" "You are a head turner," and "You've got that wow/it factor."

125. Defendant Halcovage often would also state, "woah," or "woah look at that [article of clothing]."

126. Defendant Halcovage made these statements while looking Plaintiff Doe 2 up and down.

127. Defendant Halcovage often said, "if you and I were to get together, that would be something;" "imagine if you and I were to get together, that would ruffle some feathers," and "if we got together that would really piss [Plaintiff Doe] off."

128. This caused Plaintiff Doe 2 difficulty with her colleagues.

129. By way of example, and by no means and exhaustive list, during Plaintiff Doe 2's first years of employment with Defendant SC, her female colleagues ignored her, responding with one-word answers when their job duties required interaction.

130. Plaintiff Doe 2 took this personally and was very distraught by her colleagues' behavior who were intentionally ignoring her due to Defendant Halcovage's sexual rumors and remarks.

131. Around November or December 2015, Karen Hayes, one of Plaintiff Doe 2's colleagues, approached Plaintiff Doe 2 and explained that Defendant Halcovage told Plaintiff Doe 2's coworkers that Plaintiff Doe 2 was, "one of his girls and in his inner sanctum."

132. By mid-2015, Defendant Halcovage's sexual harassment of Plaintiff Doe 2 significantly intensified.

133.   By way of example and by no means an exhaustive list, around September 21, 2015, Defendant Halcovage sent Plaintiff Doe 2 an email during work hours that stated, "eggs with a special sauce…..hmmmm."

134.   Upon information and belief, Defendant Halcovage was attempting to compare Plaintiff Doe 2's breakfast, eggs benedict, to male semen.

135.   By way of further example and by no means an exhaustive list, numerous colleagues of Plaintiff Doe 2's approached her on various occasions and asked if she was sleeping with Defendant Halcovage.

136.   Around mid-2015, Plaintiff Doe 3 began hearing rumors that Plaintiff Doe 2 was sleeping with Defendant Halcovage.

137.   Upon information and belief, Defendant Halcovage was spreading rumors that he was engaged in sexual relations with Plaintiff Doe 2.

138.   By way of example, Defendant Halcovage, Plaintiff Doe 2, and Plaintiff Doe 2's then husband all attended the same event.

139.   Defendant Halcovage stated to Plaintiff Doe 2's then husband, "thanks for letting me USE your wife for the last four hours."

140.   Upon information and belief, Defendant Halcovage was insinuating he had been having sex with Plaintiff Doe 2.

141.   Defendant Roth was present and overheard Defendant Halcovage's statement.

142. The next day, Defendant Roth told Plaintiff Doe 3 how uncomfortable Defendant Halcovage's statements made him.

143. Furthermore, Defendant Roth acknowledged that Defendant Halcovage made the statement sexual and said, "[Defendant Halcovage] didn't have to say it that way."

144. Upon information and belief, Defendant Roth did not conduct an investigation, did not report Defendant Halcovage's behavior to HR, nor did he take any remedial action.

145. Defendant Halcovage's behavior negatively impacted Plaintiff Doe 2's romantic relationships due to his incessant phone calls, text messages, and appearances at her home.

146. Thus, Plaintiff attempted to reject Defendant Halcovage's physical advances and discriminatory and sexist comments.

147. However, this only resulted in retaliation on the part of Defendant Halcovage.

148. By way of example and by no means an exhaustive list, around May 2016, Plaintiff Doe rejected Defendant Halcovage's physical advances.

149. Around the same time courthouse employees were given backpay.

150. Plaintiff Doe 2 did not similarly receive backpay.

151. Upon information and belief, Defendant Halcovage had instructed Deborah Twigg, the HR Director, not to include Plaintiff Doe 2 in the group of individuals who received backpay.

152. On numerous occasions, Defendant Halcovage showed up at Plaintiff Doe 2's personal residence, her parents' home, or the homes of her close friends.

153. By way of example and by no means an exhaustive list, around July 2016, Plaintiff Doe 2's in-laws were having a July 4th BBQ.

154. Defendant Halcovage, uninvited, showed up at Plaintiff Doe 2's in-laws house.

155. Defendant Halcovage then demanded that Plaintiff Doe 2 go with him and, "stay the course."

156. Plaintiff Doe 2 was unsure what Defendant Halcovage was referring to when he said, "stay the course."

157. Defendant Halcovage refused to take no for an answer and eventually Plaintiff Doe 2 reluctantly agreed to go with Defendant Halcovage.

158. Defendant Halcovage's appearances at her home and the homes of her family and friends was unwelcome and Plaintiff Doe 2 had never extended an invitation to Defendant Halcovage.

159. By way of further example, on another occasion Defendant Halcovage took Plaintiff Doe 2 to a picnic where there was a group of male bikers.

160. Defendant Halcovage told the group to, "watch out for [Plaintiff Doe 2] because she will take you for a ride."

161. Defendant Halcovage's comments and conduct made Plaintiff Doe 2 extremely uncomfortable and embarrassed.

162. Around July 2017, Plaintiff Doe 2 and her husband divorced.

163. Upon information and belief, Plaintiff Doe 2's husband believed she was sleeping with Defendant Halcovage which led to their divorce.

164. During this time Plaintiff Doe 2's close friend, Plaintiff Doe, was also the subject of unwanted sexual advances from Defendant Halcovage.

165. When Plaintiff Doe rebuffed Defendant Halcovage's physical advances or Plaintiff Doe opposed the unlawful comments and conduct, Defendant Halcovage responded by taking adverse employment actions against Plaintiff Doe 2.

166. Around 2017, Defendant Halcovage called Plaintiff Doe 2 into his office.

167. While Plaintiff Doe 2 was in Defendant Halcovage's office he answered his phone.

168. Defendant placed the phone on speaker and Plaintiff Doe 2 heard Defendant Halcovage's wife.

169. When Defendant Halcovage told his wife that Plaintiff Doe 2 was in his office, his wife responded, "what is that whore doing in there?"

170. Upon information and belief, Defendant told his wife lies about Plaintiff Doe 2's alleged sexual promiscuity.

171. Plaintiffs felt compelled to maintain a good relationship with Defendant to keep their jobs.

172. By March of 2015, Defendant Halcovage's sexual harassment of Plaintiff Doe significantly intensified.

173. In late 2015 Plaintiff Doe 's supervisors began warning Plaintiff Doe about Defendant Halcovage.

174. By way of example but by no means an exhaustive list, Commissioner Gary Hess told Plaintiff Doe, "you never have to be alone in George's office with him."

175. Upon information and belief, Commissioner Hess knew of or was fearful of Defendant Halcovage's propensities and inappropriate behavior.

176. Around March of 2015, Plaintiff Doe and Plaintiff Doe 2 attended a political fundraiser at Defendant Halcovage's request.

177. Plaintiff Doe and Doe 2, unable to decline due to Defendant Halcovage's position, agreed to attend.

178. Defendant Halcovage insisted on driving Plaintiff Doe home.

179. Defendant Halcovage's behavior made Plaintiff Doe 2 uncomfortable and embarrassed.

180. Upon arriving at Plaintiff Doe's home, Defendant Halcovage began aggressively and inappropriately flirting with Plaintiff Doe and became verbally and physically affectionate.

181. Defendant Halcovage began kissing Plaintiff Doe and ultimately unzipped his own pants and exposed his penis.

182. Defendant Halcovage was insinuating that he wanted Plaintiff Doe to perform oral sex on him.

183. Plaintiff Doe, feeling emotionally overwhelmed and uncomfortable, due to Defendant Halcovage's behavior, his substantial position with the county and within the community, and his position of authority over her, begrudgingly performed oral sex on Defendant Halcovage.

184. After dropping off Plaintiff Doe, Defendant Halcovage then began calling Plaintiff Doe 2 incessantly, demanding to know where she was and who she was with.

185. Thereafter, Defendant Halcovage routinely showed up at Plaintiff Doe's personal residence; often late at night with alcohol or early in the morning which caused Plaintiff Doe to be late for work.

186. Plaintiff Doe did not invite Defendant Halcovage to her home and his presence was unwelcome.

187.  On a few occasions Plaintiff Doe reluctantly agreed to permit Defendant into her home when he showed up unannounced and unwelcomed.

188.  These occasions were the result of manipulation tactics such as, but not limited to, Defendant telling Plaintiff Doe that he had pertinent information and intimate details that needed to be discussed immediately in person with Plaintiff Doe.

189.  Additionally, Plaintiff Doe felt compelled to maintain a good relationship with Defendant in order to keep her job secure

190.  On many occasions, Defendant Halcovage engaged in similar behavior to that of the night of the Republican Dinner event.

191.  After a few months Defendant Halcovage escalated his sexual advances from requests for oral sex to advances for intercourse.

192.  When Plaintiff Doe rebuffed Defendant Halcovage's physical advances, he responded by interjecting himself in Plaintiff Doe's personal and work life making her feel threatened.

193.  By way of example and by no means an exhaustive list, Defendant Halcovage started showing up at Plaintiff Doe's home when her kids where there and repeatedly called and text Plaintiff Doe and Plaintiff Doe's friend, Plaintiff Doe 2.

194. By way of further example, he drove past both Plaintiff Doe and her best friend's home to locate them, and he repeatedly called Plaintiff Doe's work phone for non- legitimate business reasons and sang into the phone.

195. Defendant Halcovage even joined Plaintiff Doe's gym where she workout during her personal time to try and relieve herself of the emotional distress she experienced due to Defendants' behavior.

196. Plaintiff Doe stopped working out due to Defendant Halcovage's presence at the gym.

197. Defendant Halcovage's behavior negatively impacted Plaintiff Doe's romantic relationships due to his incessant phone calls, text messages, and appearances at her home.

198. Plaintiff Doe 2 often found herself the recipient of harassment or retaliation in close temporal proximity to when Plaintiff Doe would rebuff Defendant Halcovage's sexual advances, further affirming Plaintiff Doe's fears of losing her job if she did not comply with Defendant Holcovage's sexual advances.

199. Beginning in late 2015, Defendant Halcovage continued making comments to Plaintiff Doe that caused her to fear for her job if she did not continue in the physical relationship that Defendant Halcovage desired.

200. By way of example and by no means an exhaustive list, Defendant Halcovage made statements about to Plaintiff Doe regarding what she could and could

not do, that, "he was the only one who believed in her at the courthouse," and, "she better be careful or she might not have a job."

201.  Defendant Halcovage's behavior distressed Plaintiff Doe greatly.

202.  Plaintiff Doe began to withdraw from engaging in healthy work relationships.

203.  Eventually she began withdrawing from her personal relationships.

204.  Plaintiff Doe's personal life suffered greatly.

205.  By way of example but by no means an exhaustive list, Plaintiff Doe's boyfriend began questioning her relationship with Defendant Halcovage.

206.  Plaintiff Doe's boyfriend despised Defendant Halcovage, and over time, Plaintiff Doe's relationship with her boyfriend ended as a result of Defendant Halcovage aggressive, sexist, controlling and unlawful behavior.

207.  Plaintiff Doe's relationship with her children also declined.

208.  Plaintiff Doe found it impossible to have any boundaries with Defendant Halcovage.

209.  Defendant Halcovage still showed up to her home, making sexual advances towards Plaintiff Doe, engaging in physical relations through mental control, intimidation and manipulation with Plaintiff Doe, despite her intent opposition, as well as requesting her presence both at his political fundraisers and his home for the purpose of his sexual gratification.

210. Plaintiff Doe 3 also found Defendant Halcovage became a roadblock in her duties as tax claim director after she opposed Defendant Halcovage's unlawful behavior.

211. By way of example, around April or May of 2016, a position int the Tax Claims office became available.

212. The normal procedure to fill a vacant position is to have the Human Resources office post the vacancy.

213. However, Defendant Halcovage told Plaintiff Doe 3 that he wanted to discuss with the other two commissioners whether the position needed to be filled.

214. Plaintiff Doe 3 asked on numerous occasions that Defendant Halcovage meet with her because Defendant SC was headed for a remarkably busy "Upset Sale" season and discuss the filling the position.

215. Plaintiff Doe 3 sent Defendant Halcovage a final email informing Defendant Halcovage that she would speak to the other two commissioners if he did not reply by a certain time.

216. Within hours of Plaintiff Doe 3 sending the email, Defendant Halcovage had the position posted.

217. Defendant Roth, shortly thereafter approached Plaintiff Doe 3 and told her, "you have one pissed off commissioner," and "Defendant Halcovage is furious because Plaintiff Doe 3 was not loyal."

218. Upon information and belief, Defendant Roth did not conduct an investigation, did not report Defendant Halcovage's behavior to HR, nor did he take any remedial action.

219. Upon information and belief, Defendant Halcovage often stalled filling a position so that he could be the one to control who was hired for the position.

220. Furthermore, upon information and belief, Defendant Halcovage also did so to Plaintiff Doe 3 when there were vacant positions that she constantly needed to seek him out for approval

221. Defendant Halcovage refused to speak directly to Plaintiff Doe 3 for almost a full year.

222. As a result, Plaintiff Doe 3 found it increasingly difficult to fulfill her duties.

223. Around July of 2016, Plaintiff Doe 3 overheard Defendant Halcovage state, "she's not the sharpest tool in the shed."

224. Upon information and belief, Defendant Halcovage was referring to Deni Sadusky

225. Upon information and belief, Defendant Halcovage made this statement because Deni Sadusky was a female.

226. Upon information and belief, during 2016 through 2019 supervisors such as Defendant Glenn Roth and Defendant Gary Bender witnessed inappropriate

and unlawful sexual discrimination by Defendant Halcovage and took no action to prevent or stop it.

227. During Plaintiffs' employment with Defendant SC, a new sexual harassment policy was published.

228. After the new sexual harassment policy was issued, all employees of Defendant SC were required to participate in a training.

229. Upon information and belief, Defendant Halcovage signed a form attesting to the fact that he completed the sexual harassment training.

230. Plaintiff Doe 3, curious if Defendant Halcovage had finished the training, inquired with Defendant Roth.

231. Defendant Roth immediately, without having to check any records stated, "Defendant Halcovage never finished the training."

232. Upon information and belief, Defendant Halcovage never completed the sexual harassment training.

233. Upon information and belief, Defendants Roth and Bender knew this and did nothing about it.

234. At the end of the training there was a quiz to ensure the employees retained the necessary information.

235. Defendant Halcovage approached Plaintiff Doe 4 and stated, "I see you flunked. I see you got number sixty-nine (69) wrong."

236. Upon information and belief, there was no sixty-nine (69) questions on the quiz.

237. Defendant Halcovage chose that number because of a sexual position often referred to as 69'ing.

238. Plaintiffs' colleagues witnessed frequent explosive behaviors, including Defendant Halcovage's use of foul language, fits of rage and screaming in the workplace and in his office.

239. Upon information and belief, Plaintiffs' colleagues witnessed frequent explosive behaviors, including Defendant Halcovage's use of foul language and fits of rage and screaming in the workplace and in his office.

240. On one occasion there was miscommunication surrounding Plaintiff Doe 4's payment for working the elections polls

241. Upon information and belief, there were discussions between Defendant Bender, Defendant Roth and Defendant Halcovage.

242. The afternoon after the election, Defendant Bender told Defendant Roth that Plaintiff Doe 4 would not receive pay.

243. Defendant Roth stated to Plaintiff Doe 4, "I am not fighting for you."

244. Defendant Roth's statement was made in a degrading tone.

245. Plaintiff Doe 4 was so upset by Defendant Roth's tone of voice that it brought her to tears.

246. Upon information and belief, Defendant Roth would not have similarly reacted if Plaintiff Doe 4 was a male.

247. By way of further example, Plaintiffs observed Defendant Halcovage making obscene jokes, ask Plaintiffs' female colleagues to sit on bouncing ball chairs, and force Plaintiffs' and their female colleagues to take photos with him for which he would put his arms around the females.

248. These photos humiliated and caused Plaintiffs extreme distress.

249. Upon information and belief, the other females were uncomfortable with the photos and Defendant Halcovage's physical contact.

250. Upon information and belief, Defendant Halcovage shared these photos with male colleagues including, but not limited to, Defendant Roth and Defendant Bender.

251. In or around August 2016, Defendant Halcovage ordered Plaintiff Doe 2 to go to the President Trump Rally.

252. Defendant Halcovage was able to use his position within the political party to skip the security line.

253. Defendant Halcovage then stated to Plaintiff Doe 2, "[a]nd you didn't even have to have to hike up your skirt.."

254. Plaintiff Doe 2 felt degraded and humiliated by Defendant Halcovage's statement.

255. By way of example but by no means an exhaustive list, Defendant Halcovage came into Plaintiff Doe's office during business hours and sat in the chair directly across from Plaintiff Doe.

256. Defendant Halcovage looked at Plaintiff Doe and with piercing eyes and a grin on his face, look Plaintiff Doe up and down in a sexual manner and then nod his head as if approving of her physical appearance.

257. By way of further example, Defendant Halcovage summoned her to his office and stared at Plaintiff Doe for long lengths of time without saying anything.

258. On at least on occasions Defendant Halcovage had Plaintiff Doe come in close physical proximity to his person so that she, "could smell his cologne."

259. Plaintiff Doe told him Defendant Halcovage she was really busy and it better be important because her supervisor already hated her.

260. Defendant Halcovage on numerous occasions parked his car in places where Plaintiffs would have to walk by when leaving for lunch.

261. On multiple other occasions, Defendant Halcovage pulled Plaintiff Doe into the boardroom in the courthouse, lock the door, and forcefully kiss her.

262. Plaintiff Doe repeatedly told Defendant Halcovage that she did not want to engage in such behavior and that it was inappropriate.

263. On numerous occasions Defendant Halcovage gave Plaintiff Doe gifts including, but not limited to, a necklace, massage oil, cash, and condoms.

264. On more than one occasion these gifts were given to Plaintiff Doe during work hours.

265. Defendant Halcovage also had wine delivered to Plaintiff Doe's home.

266. Upon information and belief, Defendant Roth and/or other supervisory employees of Defendant SC witnessed Defendant Halcovage take Plaintiff Doe into the boardroom alone.

267. Additionally, on numerous occasions, Defendant Roth witnessed Defendant Halcovage take various females into an empty office located in a deserted location in the courthouse.

268. Upon information and belief, Defendant Roth knew that Defendant Halcovage was likely attempting to engage in sexual relations with the various female employees of Defendant SC.

269. Upon information and belief, Defendant Roth never reported what he observed, nor did he take any action to prevent further unlawful conduct on Defendant Halcovage's part.

270. On numerous occasions, Defendant Halcovage hid in a closet and leered at Plaintiff Doe while she was conducting routine business for Respondent SC.

271. Defendant even went so far as to follow her to Plaintiff Doe to a licensing course in Harrisburg and stared and her through a large glass window while Plaintiff Doe was in the course.

272.   Plaintiff Doe was fearful of retaliation and reprisal if she were to oppose Defendant's unlawful conduct.

273.   Defendant Halcovage, through his words and behavior, made it evident that he was a powerful man in the Republican Party and in Schuylkill County and was not to be messed with.

274.   As a single mother, Plaintiff Doe could not afford to lose her job and health benefits should Defendants retaliate in the form of termination, which heavily weighted on Plaintiff.

275.   Additionally, supervisors such as Defendant Glenn Roth, Defendant Gary Bender, and Ginny Murray witnessed inappropriate and unlawful sexual harassment by Defendant Halcovage and took no action to prevent or stop it.

276.   Sometime in 2018, Defendant Halcovage called Plaintiff Doe and asked her to meet him at the courthouse.

277.   The courthouse was closed due to it being a weekend or a holiday.

278.   Plaintiff Doe reluctantly agreed.

279.   Upon arrival, Defendant Halcovage whisked her into the building and pulled her into the tax filing room.

280.   Defendant Halcovage began kissing her and forcibly pushed Plaintiff Doe down towards the floor, shoving her head into his crotch as he unzipped his pants and exposed his penis.

281. Defendant Halcovage forcibly coerced Plaintiff Doe to perform oral sex on him.

282. Plaintiff Doe was so disgusted and distraught that she got up and ran from the Courthouse.

283. Plaintiff Doe felt overwhelmingly distressed, disturbed, embarrassed and degraded.

284. Plaintiff Doe, so distraught and disgusted by Defendant Halcovage's behavior, often times found herself unable to control her emotions and was brought to tears.

285. Throughout the course of Plaintiff Doe's employment with Defendants, it became obvious and clear to Plaintiff Doe's colleagues that she was experiencing a traumatic situation in her life as they noticed behaviors that exhibited an increase of stress and anxiety, including the fact that she would cry at her desk.

286. By way of example, around December 2018, Plaintiff Doe went to the break/lunchroom where a holiday function was being held.

287. The holiday function was in the same room wgere Defendant Halcovage forced her to perform oral sex on him until she became physically distraught.

288. Plaintiff Doe began shaking uncontrollably and had difficulty breathing.

289. Plaintiff Doe's supervisors, Plaintiff Doe 3 and Plaintiff Doe 4, observed Plaintiff Doe's panic attack and escorted her back to her desk.

290. Plaintiff Doe, fearful of retaliation and loss of income continued to internalize her emotions and move forward with her work, hopeful that Defendant Halcovage's sexually aggressive and inappropriate behavior would cease.

291. At this point, Defendant Halcovage's comments and unwelcome sexual advances had become severe and pervasive, and he frequently touched Plaintiff Doe without her consent and in inappropriate and unprofessional ways.

292. Plaintiff Doe 's colleagues noticed Defendant Halcovage's behavior towards Plaintiff Doe and would refer to her as a whore, refused to work with her, and made Plaintiff Doe extremely uncomfortable reporting to work.

293. Plaintiff Doe's colleagues witnessed frequent explosive behaviors, including Defendant Halcovage's use of foul language and fits of rage and screaming in the workplace and in his office.

294. Additionally, Plaintiff Doe's colleagues and former employees of Defendant Halcovage would inquire with Plaintiff Doe about whether she had been sexual harassed by Defendant Halcovage yet.

295. It was clear from these individuals remarks that she was not the first female to suffer sexual harassment and gender discrimination at the hands of Defendant Halcovage

296. Defendant Halcovage's derogatory and discriminatory behavior continued throughout 2015, 2016, 2017, 2018, 2019, and up until March of 2020.

297. By way of example but by no means an exhaustive list, Defendant Halcovage often came to the tax office and discussed non work related issues and made the female employees serve him food and drinks.

298. On numerous occasions, Defendant Halcovage made comments about what little work the assessment office did, insinuating that because it was primarily staffed with females, it was not possible that that office could be accomplish much.

299. By way of further example, shortly before Heather Matukawicz started her employment with Defendant SC, Defendant Halcovage told Plaintiff Doe 3, "[h]old off on her because she had a wild side in the past."

300. Defendant Halcovage also told Plaintiff Doe 3 that Defendant SC employee, Tiffany Kiehl, was "living with a guy before she's married" as if to condemn her behavior.

301.   Defendant Halcovage often come over to the office around 4:25 PM and put his chair in front of the door where tax claim and assessment employees exited.

302.   The courthouse closed to the public and all employees were scheduled to leave at 4:30 PM.

303.   Thus, Plaintiff Doe 3 was forced to be alone with Defendant Halcovage.

304.   This caused Plaintiff Doe 3 significant distress.

305.   On some occasions, Defendant Halcovage shut the door to Plaintiff Doe 3's office.

306.   Plaintiff Doe 3 attempted to give every nonverbal clue that Defendant Halcovage's presence was not welcome.

307.   By way of example, she turned off her desk lights and pick up her purse and belongings as a means to show she intended to leave the office.

308.   Defendant Halcovage remained in the doorway and continued to flirt.

309.   Plaintiff Doe 4, in an effort to assist Plaintiff Doe 3, waved through the window in Plaintiff Doe 3's office.

310.   Often times, emotionally distraught and uncomfortable, Plaintiff Doe 3 signaled for Plaintiff Doe 4 to wait.

311.  When Defendant Halcovage continued to come to the tax claims and assessment office, Plaintiff Doe 3 began to vocalize her requests that he not come to the office at 4:30 PM to discuss non work topics.

312.  Upon information and belief, Plaintiff Doe 3 did so because she was uncomfortable being in an office alone with Defendant Halcovage.

313.  Defendant Halcovage's behavior often caused Plaintiff Doe 4 and Plaintiff Doe 3 to stay past 5:00 PM.

314.  Defendant Halcovage sometimes walked out with Plaintiff Doe 4 and Plaintiff Doe 3 and sit on the bench near their cars to continue conversing with them.

315.  Often times he would take a phone calls and tell Plaintiff Doe 4 and Plaintiff Doe 3 to wait until he was finished.

316.  These calls often lasted close to 15 minutes and well after Plaintiffs Doe 3 and 4's time out.

317.  Plaintiff Doe 3 eventually resorted to telling Defendant Halcovage that her husband expected her home at a certain time and/or that she had somewhere she needed to be.

318.  Sometime in 2018, Plaintiff Doe 3 and other staff of Defendant SC were in the tax claim's office.

319.  Defendant Halcovage asked Plaintiff Doe 3 and Plaintiff Doe 4, "do you know what Hillary Clinton's PUSSY smells like?"

320.   Plaintiffs refused to entertain Defendant Halcovage with a response.

321.   Defendant Halcovage walked up to Plaintiffs Doe 3 and 4, opened his mouth, and breathed heavily on them.

322.   The intended inference was that his breath smelled like Hillary Clinton's vagina because he had recently performed oral sex on her.

323.   Defendant Halcovage often parked where he could watch who came and went from the building.

324.   He often approached Plaintiff Doe 4 when she left on her lunch break.

325.   The thought that Defendant Halcovage watched her and appeared to be stalking her made Plaintiff Doe 4 very uncomfortable.

326.   On one occasion, Defendant Halcovage approached Plaintiff Doe 4 on her way out and asked her to take a bite of his sandwich.

327.   Defendant Halcovage then held up his sandwich.

328.   Plaintiff Doe 4 told Defendant Halcovage "no" numerous times. However, Defendant Halcovage insisted that Plaintiff Doe 4 take a bite.

329.   Finally, Plaintiff Doe 4, feeling as if Defendant Halcovage would not leave her alone until she did as he requested, took a bite of his sandwich.

330.   Plaintiff Doe 4 was repulsed by Defendant's actions which forced her into taking a bit of his sandwich.

331.   Upon information and belief, on numerous occasions Defendant Roth and Defendant Bender witnessed Defendant Halcovage's discriminatory treatment of Plaintiff Doe 4.

332.   Upon information and belief, Defendants never reported what they observed, nor did they take any action to prevent further unlawful conduct on Defendant Halcovage's part.

333.   Through his words and behavior, Defendant Halcovage had made it evident that he was a powerful man in the Republican Party and in Schuylkill County.

334.   By way of example but by no means an exhaustive list, on one occasion after Defendant made a discriminatory and derogatory remark Plaintiff Doe 3 told Defendant Halcovage, "you need to watch what you say."

335.   Around early 2018, Defendant Halcovage took Plaintiff Doe 2 and Plaintiff Doe to a restaurant during work hours.

336.   While at lunch Defendant Halcovage made gestures as if he was rubbing Plaintiff Doe 2's leg and/or privates under the table.

337.   Defendant Halcovage's behavior distressed Plaintiff Doe 2.

338.   Upon information and belief, Defendant Halcovage's behavior distressed Plaintiff Doe.

339. Around 2018, Plaintiff Doe 2 learned that Defendant Halcovage told numerous Drug Task Force individuals who were all males that he "got caught up in the bell tower having sex with [Plaintiff Doe 2.]."

340. By way of further example, he drove past both Plaintiff Doe 2 and her best friend's home to locate them for non-work related reasons.

341. On numerous occasions, around late 2018, Plaintiff Doe 2 observed Defendant Halcovage stealing items from Ginny Murray's desk.

342. On one occasion Defendant Halcovage sent Plaintiff Doe 2 a photo of gum he had stolen from Ginny Murray's desk.

343. Defendant Halcovage sent text along with the photo that stated, "finally got a piece from Ginny."

344. Upon information and belief, Defendant Halcovage was insinuating that engaged in sexual relations Ms. Murray.

345. On numerous occasions during her employment with Defendant SC, Plaintiff Doe 2 caught Defendant Halcovage taking her picture.

346. Plaintiff Doe 2 told Defendant Halcovage she did not want her picture taken and this was not ok.

347. By way of example, around July of 2018, Defendant Halcovage called Plaintiff Doe 2's personal phone late one night.

348. Plaintiff Doe 2 felt compelled to remain on the phone with Defendant Halcovage because he was her supervisor and often reminded her how powerful he was in the County.

349. As a result, Plaintiff Doe 2 overslept the next morning.

350. Because Plaintiff Doe 2 did not report to work on time, Deborah Twigg and Ginny Murray sent County Sheriffs to Plaintiff Doe 2's home.

351. Upon information and belief, sheriffs were never sent to a county employees' home after only an hour and a half.

352. Upon information and belief, Deborah Twigg and Ginny Murray did so at Defendant Halcovage's urging.

353. Additionally, Defendants wrote Plaintiff Doe 2 up for being late to work.

354. Defendant Halcovage's behavior distressed Plaintiff Doe 2 greatly.

355. Around July 2019, Plaintiff Doe 3 became Plaintiff Doe's direct supervisor.

356. Around 2019, Plaintiff Doe witnessed Defendant Halcovage treating other female employees in a discriminatory manner.

357. By way of example but by no means and exhaustive list, Plaintiffs witnessed Defendant Halcovage making sexually suggestive, inappropriate, and unlawful comments to Plaintiff Doe 4.

358. Plaintiff Doe observed Plaintiff Doe 4 and Plaintiff Doe 3 requesting assistance from Defendant Roth regarding Defendant Halcovage's unlawful behavior.

359. Upon information and belief, Defendant Roth provided no assistance, took no action to prevent further unlawful behavior, nor did he report the information to HR.

360. Around February 2019, Plaintiff Doe 2 again caught Defendant Halcovage taking her picture again.

361. Plaintiff Doe 2 was bending over when Defendant Halcovage snapped the picture.

362. Plaintiff Doe 2 asked Defendant Halcovage if he had taken a picture.

363. Defendant Halcovage stated, "no."

364. Plaintiff Doe 2 then snatched Defendant's phone and looked through his recent pictures.

365. Plaintiff Doe 2 observed a photo of her bending over that Defendant clearly just took.

366. Plaintiff Doe 2 demanded that Defendant delete the photo.

367. Defendant acted like he deleted the photo.

368. However, when Plaintiff Doe 2 check Defendant Halcovage's phone, the photo was still there.

369. Plaintiff Doe 2 then deleted the photo.

370. By way of example but by no means an exhaustive list, around late April 2019, Plaintiff Doe 2 was in the hallway near the Tax Claims and Assessment offices.

371. Plaintiff Doe 2 was wearing jeans that had holes in them.

372. Defendant Halcovage, in front of numerous colleagues of Plaintiff Doe 2, stated, "[h]oly jeans," and "[l]et me put my finger in one of your holes."

373. Upon information and belief, Defendant Halcovage was likening the holes in Plaintiff Doe 2's jeans to her vagina.

374. Plaintiff Doe 2, distraught by the comment had a visceral reaction and gave Defendant Halcovage the finger.

375. The next day Defendant Bender wrote Plaintiff Doe 2 up for the incident.

376. Plaintiff Doe 2 told Defendant Bender what had occurred. However, Defendant Bender still wrote Plaintiff Doe 2 up. Defendant Halcovage received no consequences for his actions.

377. Around, June 8, 2019, Plaintiff Doe 2 went to Walmart with her daughter and Plaintiff Doe's daughter.

378. Defendant Halcovage called her numerous times and then texted her and asked where she was.

379. Plaintiff Doe 2 replied that she was running errands and headed to Walmart.

380.  Upon arriving at Walmart, she was met by Defendant Halcovage.

381.  Defendant Halcovage forced Plaintiff Doe 2's daughter and Plaintiff Doe's
      daughter to take a picture with him.

382.  Defendant Halcovage told Plaintiff Doe 2 to send the picture to Plaintiff Doe.

383.  Having Defendant Halcovage around her and Plaintiff Doe's child made her
      very uncomfortable.

384.  Upon information and belief and on numerous occasions, Defendant Roth and
      Defendant Bender witnessed Defendant Halcovage's discriminatory
      treatment of Plaintiff Doe 2.

385.  Upon information and belief, Defendant Roth never reported what he
      observed, nor did he take any action to prevent further unlawful conduct on
      Defendant Halcovage's part.

386.  Through his words and behavior, Defendant Halcovage made it evident that
      he was a powerful man in the Republican Party and in Schuylkill County.

387.  By way of example but by no means an exhaustive list, Defendant Halcovage
      "ordered" Plaintiff Doe 2 to work as the Pennsylvania Republican Caucus'
      Secretary.

388.  Plaintiff Doe 2 did not want the position and she was not paid.

389. Plaintiff Doe 2 put in long hours and often found Defendant Halcovage asking her to complete Republican Caucus' Secretary duties during her work hours for Defendant SC.

390. Around the same time that Defendant Halcovage had her doing extra duties for the Republican Caucus, Plaintiff Doe 2 saw an email from Chris Reilly, a Republican Commissioner, to "RT DOUB" referring to Plaintiff Doe 2 as [Defendant Halcovage's] "gal."

391. This email suggested that George held possession of Plaintiff Doe 2.

392. This deeply distressed Plaintiff Doe 2.

393. Around July 2019, Plaintiff Doe 3 again requested assistance from Defendant Roth regarding Defendant Halcovage's unlawful behavior.

394. Upon information and belief, Defendant Roth provided no assistance, took no action to prevent further unlawful behavior, nor did he report the information to HR.

395. In July of 2019, Plaintiff Doe 3 became Chief Assessor.

396. In that role she supervised Plaintiff Doe.

397. Immediately Plaintiff Doe 3 realized a significant amount of her time and Plaintiff Doe 4's time was devoted to Plaintiff Doe and her mental wellbeing.

398. This created issues for Plaintiff Doe 3 and Plaintiff Doe 4 regarding the time management of the office.

399. Upon information and belief, Plaintiff Doe's behavior stemmed from Defendant Halcovage's harassing behavior of her.

400. Defendant Halcobage's harassing behavior towards Plaintiff Doe impacted the time Plaintiff Doe 3 could devote to the office which created an incredibly stressful environment for Plaintiff Doe 3 and many others within the Tax Assessment office.

401. In or around October 2019, Defendant Halcovage ordered that Plaintiff Doe 2 to obtain signatures for his delegate race.

402. Plaintiff Doe 2 told Defendant Halcovage that she was unable to attend.

403. Defendant Halcovage took pictures with Plaintiff Doe 2's husband and Plaintiff Doe 2's husband's custody attorney.

404. Defendant Halcovage appeared pleased to be in their company.

405. Upon information and belief, Defendant Halcovage did so in order to let Plaintiff Doe 2 know that if she turned him down again it could have negative implications on her custody matter.

406. On numerous occasions, Defendant Halcovage called Plaintiff Doe 2 to his office and discussd her custody case.

407. Depending on Defendant Halcavoage's mood of the day, he either suggested he would help her by calling opposing counsel and offering his support of her

custody case, or alternatively, he would imply that he would negatively impact her custody case.

408.  Supervisors such as Defendant Glenn Roth, Defendant Gary Bender, and Deborah Twigg witnessed inappropriate and unlawful sexual discrimination by Defendant Halcovage and took no action to prevent or stop it.

409.  By way of further example around November of 2019 Defendant Halcovage was in Defendant SC's parking lot.

410.  Plaintiff Doe 4 was walking out of the building to go to lunch and Defendant Halcovage brought up Donald Trump.

411.  Plaintiff Doe 4, who also had been forced to change her political party when she was hired, got passionate about the subject which was evident from her change in tone of voice and mannerisms.

412.  Defendant Halcovage interrupted Plaintiff Doe 4 and stated, "let's just go have sex right now."

413.  Plaintiff Doe 4 was made extremely uncomfortable and distraught by Defendant Halcovage's statement.

414.  Plaintiff Doe 4 said "no" and walked away

415.  Plaintiff Doe 4 reported this incident to Plaintiff Doe 3, who in turn reported it to Defendant Roth. Upon information and belief, Defendant Roth did not report the incident to Human Resources, did not document the incident in any

way, took no disciplinary action against Defendant Halcovage, nor take any action to prevent Defendant Halcovage from engaging in similar behavior in the future.

416. Upon information and belief, Defendant Roth did not ask Plaintiff Doe 4 if the comments and conduct were unwelcome, nor did he make any effort to alleviate any concerns she may have.

417. Around November 2019, Plaintiff Doe 3 witnessed Defendant Roth tell Deanna Carl, county mapper, that he was going to, "punch [her] in the face."

418. Defendant Roth's treatment of female employees of Defendant SC intensified Plaintiff Doe 3's feelings that reporting Defendant Halcovage's unlawful behavior would be futile.

419. Upon information and belief, in 2020, a Field Assessor, Debra Detweiler, resigned from her position because of Defendant Halcovage's discriminatory treatment of her due to her gender.

420. When Ms. Detweiler and Plaintiff Doe 3 met, Ms. Detweiler gave Plaintiff Doe 3 a copy of her letter of resignation and informed Plaintiff that she feared for her job every day and was under tremendous stress while in the workplace due to Defendant Halcovage's comments and conduct.

421. Upon information and belief, this reason was placed in her formal letter of resignation which she gave to HR.

422. Around March 2020, Defendant Halcovage asked Plaintiff Doe 4 to give him a hug.

423. Uncomfortable with Defendant's response, Plaintiff Doe 4 said, "No. We are supposed to be socially distancing."

424. Defendant Halcovage responded with a derogatory remark about the, "China virus."

425. Plaintiff Doe 4 told Defendant Halcovage to "be careful what [he] says."

426. Around February 2020, Plaintiff Doe 4 was discussing the Superbowl halftime show.

427. Plaintiff Doe 4 indicated that she felt both female performers were beautiful, but she did not like what they require women performers to do while the male performers are not similarly objectified.

428. Defendant Halcovage stuck out his tongue moving it various directions.

429. Upon information and belief, Defendant Halcovage was simulating performing oral sex on a female.

430. Around that same time, Plaintiff Doe 4 observed Defendant Halcovage stick his tongue out at Plaintiff Doe 4's colleague, Plaintiff Doe.

431. Plaintiff Doe informed Plaintiff Doe 4 this caused her much distress because Defendant Halcovage often told her how good he was at performing oral sex

on females and this was his way of reminding her of that during business hours.

432. Around April 2020, after employees of Defendant SC were furloughed due to COVID-19, Plaintiff Doe 3 was notified that Defendant Halcovage was calling employees on weekends and after hours.

433. On one of these occasions, Plaintiff Doe 2 reported to Plaintiff Doe 3 that Defendant Halcovage called her, after business hours, and said, "[y]ou know I didn't talk to [Plaintiff Doe 3] for over a year and I'm ok with that again. Only this time, it's not going to be so easy for her."

434. Upon information and belief, Defendant Halcovage called Plaintiff Doe 2 on numerous occasions and made references to layoffs and insinuated that not everyone would be brought back.

435. Upon information and belief, Defendant Halcovage made these statements to control and pressure Plaintiff Doe 2 and Plaintiff Doe to cooperate with him.

436. Upon information and belief, Defendant Halcovage believed Plaintiff Doe 3 was behind the fact that Plaintiff Doe shut down communication with Defendant Halcovage.

437. Upon learning that Defendant Halcovage was contacting Plaintiff Doe 2 and Plaintiff Doe during off hours and about non work-related matters, Plaintiff Doe 3 told both individuals that they did not have to take calls from Defendant

Halcovage off hours and were not compelled to speak with him regarding non-work related matters.

438. Plaintiff Doe 3 reported this to Defendant Roth.

439. Upon information and belief, Defendant Roth did not address Defendant Halcovage's unlawful behavior.

440. The day before Defendant SC were furloughed as a result of COVID-19, Defendant Roth visited Plaintiff Doe 3's office.

441. Plaintiff Doe 3 was upset about Defendant Halcovage's behavior.

442. Plaintiff Doe 3 warned Defendant Roth that Defendant Halcovage needed to stop his discriminatory comments.

443. Defendant Roth said, "I didn't come here to argue with you. If you have a problem with [Defendant Halvocage], go to HR and tell them."

444. Upon information and belief, Defendant Roth did not address Defendant Halcovage's unlawful behavior.

445. In May 2020, Plaintiff Doe 3 received a formal email from Plaintiff Doe reporting Defendant Halcovage's continued sexual harassment and sexual assaults.

446. In May 2020, Plaintiff Doe 4 participated in a formal interview and reported the discrimination and unlawful conduct of Defendant Halcovage.

447. During that meeting Plaintiff Doe 4 and Plaintiff Doe 3 informed Defendant Bender and Deborah Twigg that they did not feel comfortable parking in the lower lot in their current assigned parking spaces.

448. Plaintiff Doe 4 further informed Defendants recently when she had come back from lunch, Defendant Halcovage Parked his car in the spot next to hers.

449. Upon information and belief, that spot is assigned to Heather Garrity.

450. Defendant Halcovage's parking space was open.

451. Plaintiff Doe 4 indicated that she felt as though that was some kind of message from Defendant Halcovage because they were opposing his unlawful comments and conduct.

452. A few days later, Defendant Bender approached Plaintiff Doe 4 and said he would change her and Plaintiff Doe 3's parking places and that was, "the least he could do," and it was "against [Defendant] Roth's approval."

453. It took almost two weeks for Plaintiff Doe 4's parking spot to be moved.

454. During that time, she was forced to park near Defendant Halcovage which caused her extreme emotional distress.

455. Upon information and belief, around May 2020, Defendant Bender approached Plaintiff Doe 3 and told her, "I am so sorry this happened to you. I know that [Defendant Roth] knew about some of this."

456. In May 2020, Plaintiff Doe 3 received a formal email from Plaintiff Doe reporting Defendant Halcovage's continued sexual harassment and sexual assaults.

457. In May 2020, Plaintiff Doe 3 participated in a formal interview and reported the discrimination and unlawful conduct of Defendant Halcovage.

458. Plaintiff Doe 3 then said to Defendant Bender, "[Defendant Roth] knew about some of the inappropriate behavior."

459. Plaintiff Doe 3 was informed that they were expanding the investigation.

460. Upon information and belief, Wendy Shlanta gave a statement which detailed discriminatory and derogatory comments and conduct at Defendant SC.

461. Upon information and belief, Helene O'Connor reported that on one occasion, Defendant Halcovage placed her on his lap against her will.

462. Plaintiff Doe 3 was present and observed Defendant Halcovage place Ms. O'Connor on his lap.

463. Around June 29, 2020, Defendant Halcovage stepped down from his position as Chief Commissioner to the position of Commissioner.

464. Around June 30, 2020, a Press Release was issued by Defendant SC. See Exhibit B.

465. The Press Release stated, "it is apparent, based on the County's internal investigation, that Mr. Halcovage has violated the Sexual Harassment Policy

#2005-18 (Revised September 2013), the Conduct and Disciplinary Action Policy #2005-19; and the Physical and Verbal Abuse Policy #2007-02 (Revised March, 2007). If this investigation involved a County department head, the department head would be suspended immediately pending investigation followed by a recommendation of employment termination. However, neither County Administration nor other county commissioners may discipline a fellow county commissioner or remove him from office absent criminal conviction or impeachment."

466. Upon information and belief, no steps towards impeachment were taken.

467. Upon information and belief, around June 2020, Sheriff Groody sent Defendant Halcovage a letter detailing where Defendant Halcovage should park and how he was to access the courthouse.

468. Upon information and belief, on numerous occasions, Defendant Halcovage failed to abide by Sheriff Groody's orders.

469. Around July 2020, Defendant Roth went to Plaintiff Doe 3's office and asked her to shut her office door so they could have a conversation.

470. During the conversation, Plaintiff Doe 3 said to Defendant Roth, "[Defendant Halcovage] has destroyed these offices," and "what [Defendant Halcovage] has done and what he has been able to get away with is not ok."

471. Defendant Roth replied, "I know. I just don't know how to get rid of him."

472.  Plaintiff Doe 3 suggested, "maybe the Attorney General can help."

473.  On numerous occasions, around July 2020, Defendant Halcovage, parked in locations other than on Laurel Blvd. where Sheriff Groody instructed him to park.

474.  On numerous occasions and upon information and belief, Defendant Halcovage attempted to circumvent protocols Sheriff Groody put in place in an effort to ensure that any females who reported Defendant Halcovage's unlawful behavior felt safe.

475.  By way of example, Defendant Halcovage had a female secretary in the commissioner's office bring a bag in from his car so that he would not have to place the bag through the scanner, or have it searched when he entered the building.

476.  This incident was reported throughout the building and eventually Plaintiffs learned of it.

477.  This caused Plaintiffs extreme emotional distress for they feared Defendant Halcovage might attempt to bring a weapon into the building and cause them severe and bodily harm.

478.  Furthermore, upon information and belief, in June or July 2020, Defendant Halcovage stopped requesting Sheriff Groody's attendance at meetings

because Sheriff Groody opposed Defendant Halcovage's unlawful behavior and was taking steps to prevent it.

479.  Upon information and belief, Defendant Roth, Defendant Bender, and Deborah Twigg did not assist Sheriff Groody in his efforts to protect those individuals, including Plaintiff Doe, who reported Defendant Halcovage.

480.  Around July 16, 2020, Defendant Halcovage, was seen emerging from a bush and climbing up a very steep and dangerous embankment.

481.  Defendant Halcovage was walking in the direction of Plaintiff Doe 3 and Plaintiff Doe 4; two of the females who have reported Defendant Halcovage's behavior to HR.

482.  Upon information and belief, Defendant Halcovage did so in an effort to intimidate the individuals.

483.  Plaintiff Doe was going to stop by the courthouse that day to pick up materials from her office.

484.  Plaintiff Doe was notified about Defendant Halcovage's behavior.

485.  Plaintiff Doe had a panic attack and was unable to do any additional work that day.

486.  Plaintiffs claim that Defendants discriminated against them because of their sex/gender and because they complained and opposed the unlawful conduct of Defendants related to their sex/gender.

487. As a result of Defendants' actions, Plaintiffs felt extremely humiliated, degraded, victimized, embarrassed and emotionally distressed.

488. As a result of the acts and conduct complained of herein, Plaintiffs have suffered and will continue to suffer the loss of income the loss of salary, bonuses, benefits and other compensation which such employment entails, and Plaintiffs also suffered future pecuniary losses, emotional pain, humiliation, suffering, inconvenience, loss of enjoyment of life, and other non-pecuniary losses. Plaintiffs have further experienced severe emotional and physical distress.

489. Plaintiffs further claim aggravation, activation, and/or exacerbation of any preexisting condition(s).

490. Upon information and belief, the discrimination and retaliation will continue after the date of this complaint and Plaintiffs hereby make a claim for all continuing future harassment and retaliation.

491. As Defendants' conduct has been malicious, willful, outrageous, and conducted with full knowledge of the law, Plaintiffs demand Punitive Damages as against all the Defendants jointly and severally.

492. The above are just some examples, of some of the discrimination to which Defendants subjected Plaintiffs to on a continuous and on-going basis throughout Plaintiffs' employment.

493. Defendants have exhibited a pattern and practice of not only harassment and discrimination but also hostile work environment and retaliation.

494. Defendant SC's vicarious liability is extended to the intentional acts of Defendant Halcovage because the conduct was within the scope of his employment or alternatively because Defendant SC ratified Defendant Halcovage's conduct by formal action or by passive acquiescence.

495. Plaintiffs claim a continuous practice of discrimination and claims a continuing violation and makes all claims herein under the continuing violations doctrine.

496. Plaintiffs claim that Defendants unlawfully discriminated and retaliated against Plaintiffs because of their sex/gender and because they complained and opposed the unlawful conduct of Defendants related to the above protected classes.

497. Plaintiffs further claim constructive and/or actual discharge to the extent Plaintiff is terminated from Plaintiff's position as a result of the unlawful discrimination and retaliation.

498. Plaintiffs claim alternatively that Plaintiffs are Independent Contractors, and Plaintiffs make all applicable claims for the above conduct and facts under the applicable law pertaining to Independent Contractors. Furthermore, in such case, Plaintiffs claim that Defendants owed and breached its duty to Plaintiffs

to prevent the harassment/discrimination/retaliation and is liable therefore for negligence.

## FIRST CAUSE OF ACTION
## DISCRIMINATION
## <u>UNDER TITLE VII</u>
### (By all Plaintiffs against Defendant SC)

499.    Plaintiffs repeat and reallege each and every allegation made in the above paragraphs of this complaint.

500.    This claim is authorized and instituted pursuant to the provisions of Title VII of the Civil Rights Act of 1964, 42 U.S.C. Section(s) 2000e et seq., as amended, for relief based upon the unlawful employment practices of the above-named Defendants. Plaintiff complains of Defendants' violation of Title VII's prohibition against discrimination in employment based, in whole or in part, upon an employee's sex/gender.

501.    SEC. 2000e-2. [Section 703] states as follows:

   (a) Employer practices

It shall be an unlawful employment practice for an employer –

(1) to fail or refuse to hire or to discharge any individual, or otherwise to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment,

because of such individual's race, color, religion, sex, or national

origin; or

(2) to limit, segregate, or classify his employees or applicants for

employment in any way which would deprive or tend to deprive any

individual of employment opportunities or otherwise adversely affect

his status as an employee, because of such individual's race, color,

religion, sex, or national origin.

502.   Defendant SC engaged in unlawful employment practices prohibited by

Title VII by intentionally discriminating against Plaintiffs with respect to their

compensation, terms, conditions, training and privileges of employment

because of their sex.

503.   Defendant subjected Plaintiffs to adverse tangible employment

actions—defined as significant changes in Plaintiff's employment status,

discipline, denial of training, failure to promote, reassignment with

significantly different job responsibilities, and decisions causing changes in

significant changes in their employment benefits.

504.   Plaintiffs' protected characteristics (sex) played a determinative factor

in Defendant SC's decisions.

505.     Defendant SC cannot show any legitimate nondiscriminatory reasons for its employment practices and any reasons proffered by Defendant SC for its actions against Plaintiffs are pretextual and can readily be disbelieved.

506.     Alternatively, Plaintiffs' protected status played a motivating part in the Defendant SC's decisions even if other factors may also have motivated its actions against Plaintiffs.

507.     Defendant SC acted with the intent to discriminate.

508.     Defendant SC acted upon a continuing course of conduct.

509.     As a result of the Defendant SC's violations of Title VII, Plaintiffs have suffered damages, including, but not limited to: past and future lost wages, pain and suffering, inconvenience, mental anguish, loss of enjoyment of life, humiliation, emotional distress, reputational harm, diminishment of career opportunities, and other harm, both tangible and intangible.

**SECOND CAUSE OF ACTION**
**RETALIATION**
**UNDER TITLE VII**
**(By all Plaintiffs against Defendant SC)**

510.     Plaintiffs repeat and reallege each and every allegation made in the above paragraphs of this complaint.

511.     Title VII protects employees from retaliation for attempting to exercise their rights under the Act:

42 U.S.C. § 2000e-3. Other unlawful employment practices

(a) Discrimination for making charges, testifying, assisting, or participating in enforcement proceedings. It shall be an unlawful employment practice for an employer to discriminate against any of his employees . . . because [she] has opposed any practice made an unlawful employment practice by this subchapter, or because [she] has made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under this subchapter.

512.    The Supreme Court in Burlington v. N. & S.F. Ry. V. White, 548 U.S. 53, 68 (2006) held that a cause of action for retaliation under Title VII lies whenever the employer responds to protected activity in such a way that "might have dissuaded a reasonable worker from making or supporting a charge of discrimination."

513.    Informal complaints and protests can constitute protected activity under the "opposition" clause of 42 U.S.C. § 2000e-3(a). Moore v. City of Philadelphia, 461 F.3d 331, 343 (3d Cir. 2006) ("Opposition to discrimination can take the form of informal protests of discriminatory employment practices, including making complaints to management.").

514.    Title VII's anti-retaliation provision also protects employees who speak out about discrimination by answering questions during an employer's internal investigation. Crawford v. Metropolitan Gov't of Nashville and Davidson Cty., Tennessee, 555 U.S. 271, 277 (2009) (declaring that there is "no reason to doubt that a person can 'oppose' by responding to someone else's question just as surely as by provoking the discussion, and nothing in the statute requires a freakish rule protecting an employee who reports discrimination on her own initiative but not one who reports the same discrimination in the same words when her boss asks a question.").

515.    Retaliation need not be job-related to be actionable under Title VII— an employer can effectively retaliate against an employee by taking actions not directly related to her employment or by causing her harm outside the workplace. White, 548 U.S. at 61-62 (rejecting authority from the Third Circuit and others requiring that the plaintiff suffer an adverse employment action in order to recover for retaliation).

516.    "[A] plaintiff need not prove the merits of the underlying discrimination complaint, but only that '[s]he was acting under a good faith, reasonable belief that a violation existed.'" Aman v. Cort Furniture Rental Corp., 85 F.3d 1074, 1085 (3d Cir. 1996); Griffiths v. CIGNA Corp., 988 F.2d 457, 468 (3d Cir. 1993); and Sumner v. United States Postal Service, 899 F.2d 203, 209 (2d Cir.

1990), overruled on other grounds by Miller v. CIGNA Corp., 47 F.3d 586 (3d Cir.1995).

517.    An employee need not be a member of a protected class to be subject to actionable retaliation under Title VII. See Moore, 461 F.3d at 342 ("Title VII's whistleblower protection is not limited to those who blow the whistle on their own mistreatment or on the mistreatment of their own race, sex, or other protected class.")

518.    Title VII not only bars retaliation against the employee who engaged in the protected activity; it also bars retaliation against another employee if the circumstances are such that the retaliation against that employee might well dissuade a reasonable worker from engaging in protected activity. See Thompson v. North American Stainless, LP, 131 S. Ct. 863, 868 (2011).

519.    Here, the Defendant SC discriminated against Plaintiffs because of their protected activity under Title VII.

520.    Plaintiffs acted under a reasonable, good faith belief that their, or someone else's, right to be free from discrimination on the basis of sex/gender were violated.

521.    Plaintiffs were subjected to materially adverse actions at the time or after the protected conduct took place.

522.     There was a causal connection between the Defendant SC's materially adverse actions and Plaintiffs' protected activity.

523.     Defendant SC's actions were "materially adverse" because they were serious enough to discourage a reasonable worker from engaging in protected activity.

524.     Defendant SC acted upon a continuing course of conduct.

525.     Plaintiff will rely on a broad array of evidence to demonstrate a causal link between their protected activity and the Defendant SC's actions taken against them, such as the unusually suggestive proximity in time between events, as well as Defendant SC's antagonism and change in demeanor toward Plaintiffs after Defendant SC became aware of Plaintiffs' protected activity.

526.     As a result of the Defendant SC's violations of Title VII, Plaintiffs have suffered damages, including, but not limited to: past and future lost wages, pain and suffering, inconvenience, mental anguish, loss of enjoyment of life, humiliation, emotional distress, reputational harm, diminishment of career opportunities, and other harm, both tangible and intangible.

## THIRD CAUSE OF ACTION
## TITLE VII HOSTILE WORK ENVIRONMENT
## 42 U.S.C. § 2000E-2
### (By all Plaintiffs against Defendant SC)

527.     Plaintiffs repeat and reallege each and every allegation made in the

above paragraphs of this complaint.

528.     Title VII also prohibits hostile work environment harassment, defined

as unwanted comments or conduct regarding the Plaintiffs' protected

characteristics that have the purpose or effect of unreasonably interfering with

the terms and conditions of the Plaintiffs' employment. Harris v. Forklift

Systems, 510 U.S. 17, 21 (1993).

529.     An employer is strictly liable for supervisor harassment that

"culminates in a tangible employment action, such as discharge, demotion,

or undesirable reassignment." Burlington Industries, Inc. v. Ellerth, 524 U.S.

742 (1998).

530.     Respondeat superior liability for the acts of non-supervisory

employees exists where "the defendant knew or should have known of the

harassment and failed to take prompt remedial action." Andrews v. city of

Philadelphia, 895 F.2d 1469, 1486 (3d Cir. 1990).

531.     Employer liability for co-worker harassment also exists where "the

employer failed to provide a reasonable avenue for complaint." Huston v.

Procter & Gamble Paper Prods. Corp., 568 F.3d 100, 105 (3d Cir. 2009).

69

532.   The Third Circuit has held that the retaliation provision of Title VII "can be offended by harassment that is severe or pervasive enough to create a hostile work environment." Jensen v. Potter, 435 F.3d 444, 446 (3d Cir. 2006).

533.   Here, Defendant SC's conduct occurred because of Plaintiffs' legally protected characteristics and was severe or pervasive enough to make a reasonable person of the same legally protected classes believe that the conditions of employment were altered and that the working environment was intimidating, hostile, or abusive.

534.   The discriminatory conduct directly refers to Plaintiffs' sex/gender.

535.   Plaintiff's supervisor, Defendant Roth, Defenadnt Bender and Defendant Halcovage, had the authority to control Plaintiff's work environment, and they abused that authority to create a hostile work environment.

536.   Derogatory and sexually explicit harassing conduct and comments, as well as sexual assault, filled the environment of Plaintiffs' work area.

537.   Defendant SC knew that the derogatory and sexually explicit harassing conduct and comments filled Plaintiffs' work environment.

538.   The derogatory and sexually explicit harassing conduct and comments occurred on an almost if not daily basis.

539.     The derogatory and sexually explicit harassing comments and conduct caused Plaintiffs to sustain severe emotional distress resulting in physical illness.

540.     Plaintiffs subjectively regarded the derogatory and sexually explicit harassing comments and conduct as unwelcome, unwanted and they objectively opposed the conduct.

541.     The conduct was both severe and pervasive.

542.     The conduct was emotionally damaging and humiliating.

543.     The conduct unreasonably interfered with Plaintiffs' work performance.

544.     The conduct was so extreme that it resulted in material changes to the terms and conditions of Plaintiffs' employment.

545.     The Defendants provided a futile avenue for a complaint.

546.     The Defendants retaliated against Plaintiff for their complaints.

547.     The Defendants acted upon a continuing course of conduct.

548.     As a result of the Defendant SC's violations of Title VII, Plaintiffs have suffered damages including but not limited to: past and future lost wages, pain and suffering, inconvenience, mental anguish, loss of enjoyment of life, humiliation, emotional distress, reputational harm, diminishment of career opportunities, and other harm, both tangible and intangible.

## FOURTH CAUSE OF ACTION
## DISCRIMINATION
## <u>UNDER STATE LAW</u>
### (By all Plaintiffs against all Defendants)

549.     Plaintiffs repeat and reallege each and every allegation made in the

above paragraphs of this complaint.

550.     Plaintiffs' PHRA claims are still pending before the PHRC.

551.     Plaintiffs will seek leave to amend this complaint at the appropriate

time to assert their PHRA claims against Defendants. See Federal R. Civ. P.

159a) (Courts "freely give leave to amend when justice so requires"), 15(c)

(Amendments "relate back" to the date of the original pleading), and 15(d)

(Plaintiff may "serve a supplemental pleading setting out any transaction,

occurrence, or event that happened after the date of the pleading to be

supplemented").


## FIFTH CAUSE OF ACTION
## RETALIATION
## <u>UNDER STATE LAW</u>
### (By all Plaintiffs against all Defendants)

552.     Plaintiffs repeat and reallege each and every allegation made in the

above paragraphs of this complaint.

553.     Plaintiffs' PHRA claims are still pending before the PHRC.

554.   Plaintiffs will seek leave to amend this complaint at the appropriate time to assert their PHRA claims against Defendants. See Federal R. Civ. P. 159a) (Courts "freely give leave to amend when justice so requires"), 15(c) (Amendments "relate back" to the date of the original pleading), and 15(d) (Plaintiff may "serve a supplemental pleading setting out any transaction, occurrence, or event that happened after the date of the pleading to be supplemented").

### SIXTH CAUSE OF ACTION
### AIDING AND ABETTING
### UNDER STATE LAW
### (By all Plaintiffs against all Defendants)

555.    Plaintiffs repeat and reallege each and every allegation made in the above paragraphs of this complaint.

556.    Plaintiffs' PHRA claims are still pending before the PHRC.

557.    Plaintiffs will seek leave to amend this complaint at the appropriate time to assert their PHRA claims against Defendants. See Federal R. Civ. P. 159a) (Courts "freely give leave to amend when justice so requires"), 15(c) (Amendments "relate back" to the date of the original pleading), and 15(d) (Plaintiff may "serve a supplemental pleading setting out any transaction, occurrence, or event that happened after the date of the pleading to be supplemented").

## SEVENTH CAUSE OF ACTION
### HOSTILE WORK
### UNDER STATE LAW
### (By all Plaintiffs against all Defendants)

558.    Plaintiffs repeat and reallege each and every allegation made in the

above paragraphs of this complaint.

559.    Plaintiffs' PHRA claims are still pending before the PHRC.

560.    Plaintiffs will seek leave to amend this complaint at the appropriate

time to assert their PHRA claims against Defendants. See Federal R. Civ. P.

159a) (Courts "freely give leave to amend when justice so requires"), 15(c)

(Amendments "relate back" to the date of the original pleasing), and 15(d)

(Plaintiff may "serve a supplemental pleading setting out any transaction,

occurrence, or event that happened after the date of the pleading to be

supplemented").


## EIGHTH CAUSE OF ACTION
### INTENTIONAL INFLICTION OF
### EMOTIONAL DISTRESS ("IIED")
### (By Plaintiffs against all Defendants Halcovage, Roth, and Bender)

561.    Plaintiffs repeat and reallege each and every allegation made in the

above paragraphs of this complaint.

562.     Plaintiffs brings this claim against Defendants for intentional

infliction of emotional distress ("IIED") and hold each vicariously liable for

the acts of the others.

563.     To prove a claim of IIED, the following elements must be established:

(1) the conduct must be extreme and outrageous; (2) it must be intentional or

reckless; (3) it must cause emotional distress; and (4) that distress must be

severe. Hooten v. Penna. College of Optometry, 601 F.Supp. 1155

(E.D.Pa.1984); Hoy v. Angelone, 691 A.2d 476, 482 (Pa.Super. 1997);

Restatement (Second) of Torts § 46.

564.     During Plaintiffs' employment, Defendants intentionally and

recklessly harassed and inflicted emotional injury on Plaintiffs by subjecting

them to outrageous treatment beyond all bounds of decency.

565.     Defendant Halcovage verbally, mentally and physically abused

Plaintiffs and treated them in a demeaning and inferior manner, which no

reasonable person could be expected to endure.

Defendant Bender and Defnendat Roth often observed this demeaning and

verbally, mentally and physically abusing behavior and did not about it.

566.     Furthermore, all engaged in retaliation when Plaintiffs opposed and

attempted to report such behavior.

567.     As a direct and proximate result of these malicious and conscious wrongful actions, Plaintiff has sustained severe emotional distress, resulting in bodily injury, and damages, including punitive damages, to be determined at trial.

**NINTH CAUSE OF ACTION**
**NEGLIGENT INFLICTION OF EMOTIONAL DISTRESS ("NIED")**
**(ALTERNATIVE PLEADING)**
**(By Plaintiffs against all Defendants Halcovage, Roth, and Bender)**

568.     Plaintiffs repeat and reallege each and every allegation made in the above paragraphs of this complaint.

569.     Defendants owed Plaintiffs a duty of care to safeguard their mental and physical health and wellbeing; and Defendants' breach of this duty directly and proximately caused Plaintiffs to suffer genuine and substantial emotional distress, which manifested itself in physical illness and serious psychological damage.

570.     Plaintiffs' injuries were foreseeable because a reasonable person would have known that Defendants' actions would cause a reasonable person substantial emotional distress.

## TENTH CAUSE OF ACTION
## VIOLATION OF A STATE PRIVACY LAW
### (By Plaintiffs against all Defendant Halcovage)

571.     Plaintiff repeats and realleges each and every allegation made in the

above paragraphs of this complaint.

572.     Under Pennsylvania Restatement (Second) of Torts §625(B) Intrusion

Upon Seclusion provides that: One who intentionally intrudes, physically or

otherwise, upon the solitude or seclusion of another or his [her] private

affairs or concerns, is subject to liability to the other for invasion of his [her]

privacy, if the intrusion would be highly offensive to a reasonable person

573.     Defendant Halcovage violated Pennsylvania Restatement (Second) of

Torts § 625(b), by forcibly entering Plaintiffs' physical space and forcing

them to engage in physical contact with him, up to an including sexual acts.


## ELEVENTH CAUSE OF ACTION
## NEGLIGENT HIRING, TRAINING AND SUPERVISION
### (By all Plaintiffs against all Defendants)

574.     Plaintiffs repeat and reallege each and every allegation made in the

above paragraphs of this complaint.

575.     At all times relevant herein, the employees and agents of Defendant

SC were acting under the direction and control, and pursuant to the rules,

regulations, policies and procedure put in place by Defendant SC.

576.     Defendants Halcovage, Bender, and Roth acted in contravention to their duty of care to Plaintiffs, negligently, carelessly and recklessly by failing to properly hire, train, supervise, control, direct and monitor their employees, security staff and agents in their duties and responsibilities.

577.     As a direct and proximate result of the acts and omissions of Defendants, Plaintiffs were wrongfully and unlawfully discriminated against, sexually harassed, and even sexually assaulted at Defendant SC Courthouse in and/or near the presence of agents and employees of Defendants.

578.     Defendants owed a duty of care to Plaintiffs.

579.     Defendants were negligent in allowing Plaintiffs to be discriminated against, sexually harassed, and even sexually assaulted at Defendant SC Courthouse.

580.     Defendants were further negligent in, inter alia, a) not removing the offending individual, Defendant Halcovage, prior to him engaging in such unlawful behavior; b) not disciplining offending individual, Defendant Halcovage, prior to him engaging in such unlawful behavior; c) not providing more security within the Courthouse to prevent the said treatment of Plaintiffs; and/or d) not having proper sexual harassment training of the employees of Defendant SC.

JURY DEMAND

Plaintiff requests a jury trial on all issues to be tried.

PRAYER FOR RELIEF

WHEREFORE, Plaintiff demands judgment against Defendants, jointly and severally, in an amount to be determined at the time of trial plus interest, including but not limited to all emotional distress and back pay and front pay, punitive damages, liquidated damages, statutory damages, attorneys' fees, costs, and disbursements of action; and for such other relief as the Court deems just and proper.

Respectfully Submitted,
**DEREK SMITH LAW GROUP, PLLC**
Attorneys for Plaintiffs
By: _Catherine W. Smith, Esq._
Catherine W. Smith, Esq.
1835 Market Street, Suite 2950
Philadelphia, Pennsylvania 19103
Dated:       April 16, 2021       (215) 391-4790

# EXHIBIT A



**U.S. Department of Justice**

Civil Rights Division

---

PSK:KDW:KLF
DJ 170-63-0

*Employment Litigation Section – 4CON*
*950 Pennsylvania Avenue, NW*
*Washington, DC  20530*
*www.usdoj.gov/crt/emp*

NOTICE OF RIGHT TO SUE WITHIN 90 DAYS

VIA EMAIL                                                    April 8, 2021

c/o Catherine W. Smith, Esquire
Derek Smith Law Group
1835 Market St., Suite 2950
Philadelphia, PA  19103

          Re:                    v. Schuylkill County, et al.
                    EEOC Charge No. 530-2020-05338

Dear Ms.

          Because you filed the above charge with the Equal Employment Opportunity Commission, and more than 180 days have elapsed since the date the Commission assumed jurisdiction over the charge, and no suit based thereon has been filed by this Department, and because you through your attorney have specifically requested this Notice, you are hereby notified that you have the right to institute a civil action under Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. 2000e et seq., against the above-named respondent.

          If you choose to commence a civil action, such <u>suit must be filed in the appropriate court within 90 days of your receipt of this Notice.</u>

          Please be advised that the Equal Employment Opportunity Commission is continuing to investigate claims that you raised in this charge on your own behalf and on behalf of other individuals.  <u>This Notice does not mean that the Department of Justice has decided whether to pursue any specific claim that may be referred if the EEOC finds cause, conciliation fails, and the charge is referred to the Department of Justice.</u>  This Notice also should not be taken to mean that the Department of Justice has made a judgment as to whether or not your case is meritorious.

          The investigative file pertaining to your case is located in the EEOC Philadelphia District Office, Philadelphia, PA.   If you or your attorney have any questions concerning this matter or wish to inspect the investigative file, please feel free to address your inquiry to:   Jamie R. Williamson, District Director, EEOC, 801 Market Street, Ste. 1300, Philadelphia, PA 19107.

Sincerely,

Pamela S. Karlan
Principal Deputy Assistant Attorney General
Civil Rights Division

By:      *Karen D. Woodard*

Karen D. Woodard
Principal Deputy Chief
Employment Litigation Section

cc:
          Schuylkill County
          Thomas Heimbach, Esquire
          Christopher L. Scott, Esquire
          EEOC, Philadelphia District Office



**U.S. Department of Justice**

Civil Rights Division

---

PSK:KDW:KLF
DJ 170-63-0

*Employment Litigation Section – 4CON*
*950 Pennsylvania Avenue, NW*
*Washington, DC  20530*
*www.usdoj.gov/crt/emp*

NOTICE OF RIGHT TO SUE WITHIN 90 DAYS

VIA EMAIL                                                April 8, 2021

c/o Catherine W. Smith, Esquire
Derek Smith Law Group
1835 Market St., Suite 2950
Philadelphia, PA  19103

      Re:                    v. Schuylkill County, et al.
                 EEOC Charge No. 530-2020-05565

Dear Ms.       :

      Because you filed the above charge with the Equal Employment Opportunity Commission, and more than 180 days have elapsed since the date the Commission assumed jurisdiction over the charge, and no suit based thereon has been filed by this Department, and because you through your attorney have specifically requested this Notice, you are hereby notified that you have the right to institute a civil action under Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. 2000e et seq., against the above-named respondent.

      If you choose to commence a civil action, such <u>suit must be filed in the appropriate court within 90 days of your receipt of this Notice.</u>

      Please be advised that the Equal Employment Opportunity Commission is continuing to investigate claims that you raised in this charge on your own behalf and on behalf of other individuals. <u>This Notice does not mean that the Department of Justice has decided whether to pursue any specific claim that may be referred if the EEOC finds cause, conciliation fails, and the charge is referred to the Department of Justice.</u> This Notice also should not be taken to mean that the Department of Justice has made a judgment as to whether or not your case is meritorious.

      The investigative file pertaining to your case is located in the EEOC Philadelphia District Office, Philadelphia, PA.   If you or your attorney have any questions concerning this matter or wish to inspect the investigative file, please feel free to address your inquiry to:   Jamie R. Williamson, District Director, EEOC, 801 Market Street, Ste. 1300, Philadelphia, PA 19107.

                  Sincerely,

                Pamela S. Karlan
        Principal Deputy Assistant Attorney General
             Civil Rights Division

      By:     *Karen D. Woodard*

               Karen D. Woodard
            Principal Deputy Chief
          Employment Litigation Section

cc:
      Schuylkill County
      Thomas Heimbach, Esquire
      Christopher L. Scott, Esquire
      EEOC, Philadelphia District Office



**U.S. Department of Justice**

Civil Rights Division

PSK:KDW:KLF

DJ 170-63-0

*Employment Litigation Section – 4CON*
*950 Pennsylvania Avenue, NW*
*Washington, DC  20530*
*www.usdoj.gov/crt/emp*

NOTICE OF RIGHT TO SUE WITHIN 90 DAYS

VIA EMAIL                                                             April 8, 2021

c/o Catherine W. Smith, Esquire
Derek Smith Law Group
1835 Market St., Suite 2950
Philadelphia, PA  19103

Re:                                         v. Schuylkill County, et al.
                    EEOC Charge No. 530-2020-05567

Dear Ms.               :

Because you filed the above charge with the Equal Employment Opportunity Commission, and more than 180 days have elapsed since the date the Commission assumed jurisdiction over the charge, and no suit based thereon has been filed by this Department, and because you through your attorney have specifically requested this Notice, you are hereby notified that you have the right to institute a civil action under Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. 2000e et seq., against the above-named respondent.

If you choose to commence a civil action, such <u>suit must be filed in the appropriate court within 90 days of your receipt of this Notice.</u>

Please be advised that the Equal Employment Opportunity Commission is continuing to investigate claims that you raised in this charge on your own behalf and on behalf of other individuals.  <u>This Notice does not mean that the Department of Justice has decided whether to pursue any specific claim that may be referred if the EEOC finds cause, conciliation fails, and the charge is referred to the Department of Justice.</u>  This Notice also should not be taken to mean that the Department of Justice has made a judgment as to whether or not your case is meritorious.

The investigative file pertaining to your case is located in the EEOC Philadelphia District Office, Philadelphia, PA.   If you or your attorney have any questions concerning this matter or wish to inspect the investigative file, please feel free to address your inquiry to:   Jamie R. Williamson, District Director, EEOC, 801 Market Street, Ste. 1300, Philadelphia, PA 19107.

Sincerely,

Pamela S. Karlan
Principal Deputy Assistant Attorney General
Civil Rights Division

By:        *Karen D. Woodard*

Karen D. Woodard
Principal Deputy Chief
Employment Litigation Section

cc:
       Schuylkill County
       Thomas Heimbach, Esquire
       Christopher L. Scott, Esquire
       EEOC, Philadelphia District Office



**U.S. Department of Justice**

Civil Rights Division

---

PSK:KDW:KLF
DJ 170-63-0

*Employment Litigation Section – 4CON*
*950 Pennsylvania Avenue, NW*
*Washington, DC  20530*
*www.usdoj.gov/crt/emp*

NOTICE OF RIGHT TO SUE WITHIN 90 DAYS

VIA EMAIL                                                          April 8, 2021

c/o Catherine W. Smith, Esquire
Derek Smith Law Group
1835 Market St., Suite 2950
Philadelphia, PA  19103

Re:                         v. Schuylkill County, et al.
                     EEOC Charge No. 530-2020-05566

Dear

    Because you filed the above charge with the Equal Employment Opportunity Commission, and more than 180 days have elapsed since the date the Commission assumed jurisdiction over the charge, and no suit based thereon has been filed by this Department, and because you through your attorney have specifically requested this Notice, you are hereby notified that you have the right to institute a civil action under Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. 2000e et seq., against the above-named respondent.

    If you choose to commence a civil action, such <u>suit must be filed in the appropriate court within 90 days of your receipt of this Notice.</u>

    Please be advised that the Equal Employment Opportunity Commission is continuing to investigate claims that you raised in this charge on your own behalf and on behalf of other individuals.  <u>This Notice does not mean that the Department of Justice has decided whether to pursue any specific claim that may be referred if the EEOC finds cause, conciliation fails, and the charge is referred to the Department of Justice.</u>  This Notice also should not be taken to mean that the Department of Justice has made a judgment as to whether or not your case is meritorious.

    The investigative file pertaining to your case is located in the EEOC Philadelphia District Office, Philadelphia, PA.   If you or your attorney have any questions concerning this matter or wish to inspect the investigative file, please feel free to address your inquiry to:   Jamie R. Williamson, District Director, EEOC, 801 Market Street, Ste. 1300, Philadelphia, PA 19107.

    Sincerely,

Pamela S. Karlan
Principal Deputy Assistant Attorney General
Civil Rights Division

By:   *Karen D. Woodard*

Karen D. Woodard
Principal Deputy Chief
Employment Litigation Section

cc:
    Schuylkill County
    Thomas Heimbach, Esquire
    Christopher L. Scott, Esquire
    EEOC, Philadelphia District Office

# EXHIBIT B

# OFFICE OF THE COUNTY SOLICITOR

George F. Halcovage, Jr., Commissioner Chair
Barron L. Hetherington, Commissioner
Gary J. Hess, Commissioner
Linda Deatrich, Chief Clerk



Alvin B. Marshall, Solicitor
Glenn T. Roth, Jr., 1st Assistant Solicitor
Christopher W. Hobbs, Assistant Solicitor
Lois A. Lebo, Paralegal

Phone: 570-628-1129
Fax:    570-628-1106

SCHUYLKILL COUNTY COURTHOUSE
401 NORTH SECOND STREET
POTTSVILLE, PENNSYLVANIA 17901-2528

FOR IMMEDIATE RELEASE:

June 30, 2020

On the morning of May 22, 2020, the Schuylkill County Human Resources Director Deborah Twigg ("HR") received serious allegations against Schuylkill County Commissioner George Halcovage including claims of sexual harassment concerning several female County Employees (the "Employees"). The County was notified that one employee in particular retained counsel and the County was directed that all questions should be directed to her attorney.

Upon receipt of the allegations, County Administrator Gary Bender ("Administrator") was notified and HR was immediately directed to conduct an internal investigation into the allegations in accordance with the County's Policies and Procedures. Interviews were conducted that day.

Commissioner Halcovage was informed that serious allegations were made against him.  Commissioners Hess and Hetherington were also notified of the allegations.  After the initial interviews took place, the Administrator directed HR and the County's First Assistant County Solicitor/ Risk Manager, Glenn Roth, Esquire ("RM") to conduct the remainder of the interviews.

The County took certain steps to accommodate the Employees to ensure that they felt comfortable in the workplace including directing Commissioner Halcovage to not have contact with the Employees.

Commissioner Halcovage informed HR that he had retained an attorney and an interview took place with Commissioner Halcovage and his attorney on June 10, 2020.  On June 16, 2020, HR and RM interviewed the County employee making the most serious allegations along with her attorney.  A follow-up interview with Commissioner Halcovage and his counsel occurred on June 23, 2020.   During the interviews of Commissioner Halcovage, he was questioned regarding specific allegations made against him by the Employees.

It is important to note that no complaints were made against Commissioner Halcovage by any of the Employees prior to May 22, 2020.  The County conducted its internal investigation through HR as it does with any other allegation involving County personnel.  This investigation was conducted as expeditiously as possible but took some time given the number of interviews that needed to be conducted and that there were multiple attorneys involved.

While many of the allegations made by the Employees were denied by Commissioner Halcovage,  it is apparent, based on the County's internal investigation, that Mr. Halcovage has violated the Sexual Harassment Policy #2005-18 (Revised September 2013), the Conduct and Disciplinary Action Policy

#2005-19; and the Physical and Verbal Abuse Policy #2007-02 (Revised March, 2007). If this investigation involved a County department head, the department head would be suspended immediately pending investigation followed by a recommendation of employment termination. However, neither County Administration nor other county commissioners may discipline a fellow county commissioner or remove him from office absent criminal conviction or impeachment. Given that this incident does involve personnel, involves multiple attorneys, and may proceed to litigation, the County may not provide specific details of the allegations made by the Employees or the specific findings of the internal investigation.

*                    *                    *