**DEREK SMITH LAW GROUP, PLLC**
CATHERINE W. SMITH, ESQUIRE
Attorney ID No. 316291
1835 Market Street, Suite 2950
Philadelphia, PA 19103
(215) 391-4790
catherine@dereksmithlaw.com
*Attorneys for Plaintiff Jane Doe*

## IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| JANE DOE, JANE DOE 2, JANE DOE 3, and JANE DOE 4, <br><br> Plaintiffs, <br><br> v. <br><br> SCHUYKILL COUNTY; GEORGE HALCOVAGE (in his individual capacity); GLENN ROTH (in his individual capacity); GARY BENDER (in his individual capacity); HEIDI ZULA (in her individual capacity); and DOREEN KUTZLER (in her individual capacity). <br><br> Defendants. | Civil Action No. 3:21-00477 |

## <u>SECOND AMENDED AND SUPPLEMENTED COMPLAINT</u>

Plaintiffs, Jane Doe, Jane Doe 2, Jane Doe 3 and Jane Doe 4 by and through

their attorneys, Derek Smith Law Group, PLLC, by way of this Complaint, state:

1

## **NATURE OF THE CASE**

1.   This action arises out of the unlawful discrimination, hostile work environment, intimidation, and retaliation by Defendants against Plaintiffs based on their sex and gender and in retaliation for Plaintiffs' continued opposition to the unlawful comments and conduct of the Defendants.

2.   Plaintiffs bring this action charging that Defendants violated Plaintiffs' rights pursuant to Title VII of the Civil Rights Act of 1964 ("Title VII"), the Pennsylvania Human Relations Act, as amended, 42 U.S. §§ 951, et seq. ("PHRA"), Pennsylvania Common Law, and Section 1983 of the Civil Rights Act of 1871, 42 U.S.C. § 1983 ("Section 1983") and seek damages to redress the injuries Plaintiffs suffered.

## **JURISDICTION AND VENUE**

3.   This Court has subject matter jurisdiction over this case pursuant to 28 U.S.C. §1331, which gives district court jurisdiction over all civil actions arising under the Constitution, laws, and treaties of the United States.

4.   This Court has jurisdiction in that this action involves a Federal Question.

5.   This Court has supplemental jurisdiction under 28 U.S.C. §1367.

6.   This Court also has subject matter jurisdiction pursuant to 28 U.S.C. § 1343, which gives district courts original jurisdiction over (a) any civil action

authorized by law to be brought by any person to redress the deprivation,

under color of any State Law, statute, ordinance, regulation, custom or

usage, of any right, privilege or immunity secured by the Constitution of the

United States or by any Act of Congress providing for equal rights of

citizens or of all persons within the jurisdiction of the United States; and (b)

any civil action to recover damages or to secure equitable relief under any

Act of Congress providing for the protection of the civil rights.

7.   Venue is proper in this district based upon Defendants' residency and that a

substantial part of the events or omissions giving rise to the claim occurred

within the County of Schuylkill, Commonwealth of Pennsylvania, within the

Middle District of Pennsylvania. 28 U.S.C. §1391(b).

## **EXHAUSTION OF ADMINISTRATIVE REMEDIES**

8.   On August 24, 25, and 27, 2020, Plaintiffs timely filed Charges of

Discrimination with the U.S. Equal Employment Opportunity Commission

("EEOC") and dual filed with the Pennsylvania Human Relations

Commission ("PHRC") alleging violations of Title VII, the PHRA,

Pennsylvania Common laws, and Section 1983.

9.   On March 16, 2021, Plaintiffs timely filed Supplemental Charges of

Discrimination with the U.S. Equal Employment Opportunity Commission

("EEOC") and dual filed with the Pennsylvania Human Relations

Commission ("PHRC") alleging violations of Title VII, the Pennsylvania

Human Relations Act, 43 P.S. §§ 951-963 ("PHRA"), and Pennsylvania

state laws.

10.    On March 16, 2021, Plaintiffs commenced this action by filing the initial

Complaint. *See DKT 1.*

11.    On April 8, 2021, each Plaintiff was issued a "Notice of Right to Sue Within

90 Days" letter by the United States Department of Justice, Civil Rights

Division for their original Charges of Discrimination. *See Exhibit "A".*

12.    Plaintiffs' PHRA claims are ripe because more than one year has elapsed

since PHRC assumed jurisdiction over Plaintiffs' Charges.

13.    On October 27, 2021, each Plaintiff was issued a "Notice of Right to Sue

Within 90 Days" letter by the United States Department of Justice, Civil

Rights Division for their supplemental Charges of Discrimination. *See

Exhibit "B".*

14.    As this action was initially commenced prior to Plaintiffs' receipt of Exhibit

A and Exhibit B, Plaintiffs have complied with all administrative

prerequisites to bring this lawsuit.

## PARTIES

15.    At all times relevant hereto, Plaintiff Jane Doe, (hereinafter referred to as "Plaintiff Doe") is an individual female, residing in Schuylkill County in the Commonwealth of Pennsylvania.

16.    Plaintiff Doe is referred to herein as Plaintiff Doe due to the extreme hardship such revelation of her identity would cause and the need to protect victims of sexual crimes.

17.    At all times relevant hereto, Plaintiff Jane Doe 2, (hereinafter referred to as "Plaintiff Doe 2") is an individual female, residing in Schuylkill County in the Commonwealth of Pennsylvania.

18.    Plaintiff Doe 2 is referred to herein as such, due to the extreme hardship such revelation of her identity would cause and the need to protect victims of sexual crimes.

19.    At all times relevant hereto, Plaintiff Jane Doe 3 (hereinafter referred to as "Plaintiff Doe 3") is an individual female, residing in Schuylkill County in the Commonwealth of Pennsylvania.

20.    Plaintiff Doe 3 is referred to herein as such, due to the extreme hardship such revelation of her identity would cause and the need to protect victims of sexual crimes.

21.   At all times relevant hereto, Plaintiff Jane Doe 4, (hereinafter referred to as "Plaintiff Doe 4") is an individual female, residing in Schuylkill County in the Commonwealth of Pennsylvania

22.   Plaintiff Doe 4 is referred to herein as such, due to the extreme hardship such revelation of her identity would cause and the need to protect victims of sexual crimes.

23.   Defendant Schuylkill County ("Defendant SC") is a municipality of the Commonwealth of Pennsylvania. Defendant SC owns, operates, manages, directs and controls the Schuylkill County Courthouse, whose agents, servants and employees at all relevant times were acting within the course and scope of their employment under color of state law and operating pursuant to official policies, customs or practices of Defendant SC.

24.   At all relevant times, Defendant SC has continuously, and is currently, doing business in the Commonwealth of Pennsylvania and has at least fifteen (15) employees.

25.   At all relevant times, Defendant SC has continuously been an employer engaged in an industry affecting commerce within the meaning of Section 701(b), (g) and (h) of Title VII, 42 U.S.C. §§ 2000 (e), (g), and (h).

26.   At all times material hereto, Defendant SC conducted business in Schuylkill County, employing four or more persons within the Commonwealth of

6

Pennsylvania, and falls within the reach of the Pennsylvania Human Relations Act (PHRA), 43 P.S. § 955 (a).

27.   At all times material, Defendant George Halcovage (hereinafter referred to as "Defendant Halcovage") is a County Commissioner and was Chairman of the Commissioners until about June 2020.

28.   At all times material, Defendant Halcovage had and maintains hiring, supervisory and firing authority over the Plaintiffs.

29.   Pursuant to the *Stoud* Court, Defendant Halcovage, as a commissioner is, "**unquestionably [a] supervisor**." *Stoud v. Susquhanna Cty.*, 471 F.Supp.3d 606, 620 (M.D. Pa. 2020) (citing *Bumbarger v. New Enterprise Stone and Lime Co., Inc.*, 170 F.Supp.3d 801, 841 (W.D. Pa. 2016)).

30.   At all times material, Defendant Glenn Roth, Esquire (hereinafter referred to as "Defendant Roth") was and remains First Assistant County Solicitor and Risk Manager for Defendant SC.

31.   At all times material, Defendant Roth, had and maintains hiring, supervisory and firing authority over the Plaintiffs.

32.   At all times material, Defendant Gary Bender (hereinafter referred to as "Defendant Bender") was and remains County Administrator for Defendant SC.

33.  At all times material, Defendant Bender, had and maintains hiring, supervisory, and firing authority over the Plaintiffs.

34.  At all times material, Defendant Heidi Zula (hereinafter referred to as "Defendant Zula") was and remains the Human Resources Representative for Defendant SC.

35.  At all times material, Defendant Zula, had and maintains hiring, supervisory, and firing authority over the Plaintiffs.

36.  At all times material, Defendant Doreen Kutzler (hereinafter referred to as "Defendant Kutzler") was the Human Resources Representative for Defendant SC.

37.  At all times material, Defendant Kutzler had hiring, supervisory, and firing authority over the Plaintiffs.

38.  At all times material, Defendants were the joint employers of Plaintiffs.

39.  For the dates prior to September 2020, the term "Defendants" shall mean Defendants Roth, Bender, and Halcovage.

40.  For the dates after Defendant Kutzler's hire, around September 2020, through the date Defendant Kutzer's Human Resources (hereinafter referred to as "HR") contract with Defendant SC expired, around January 2021, and thereafter, the term "Defendants" shall mean Defendants Roth, Bender, Halcovage, and Kutzler.

41.   For the dates after Defendant Zula's hire, around January 2021, and

thereafter, the term "Defendants" shall mean Defendants Roth, Bender,

Halcovage, and Zula.

42.   At all relevant times, Defendants were agents and/or employees of

Defendant SC and were acting within the course and scope of their agency

and/or employment with Defendant SC.


## **MATERIAL FACTS**

43.   Around March 2008, Defendant SC hired Plaintiff Doe 4 as a Clerk Typist

One.

44.   Around November 2011, Plaintiff Doe 3 was transferred to Defendant SC's

Tax Claim Bureau as the Tax Claim Director.

45.   Around January 2012, Defendant Halcovage started his term as County

Commissioner.

46.   Almost immediately after his election, Defendant Halcovage frequently

visited the Tax Claims Office and subjected the department's female

employees to unwelcome and unwanted sexual harassment including but

limited to demeaning and discriminatory sexist comments.

47.   Defendant Halcovage's comments and conduct were observed by Plaintiff

Doe 3 and Doe 4.

48.  This caused Plaintiff Doe 3 and Doe 4 to feel extremely uncomfortable, humiliated, embarrassed, and distressed.

49.  Upon information and belief, Defendant Roth and Defendant Bender, knew that Defendant Halcovage engaged in unlawful sexually harassing behavior and took no corrective action to address it, prevent it, or to ensure Plaintiff Doe 3 and Doe 4 had a safe working environment free from discrimination and harassment.

50.  As a result of Defendant Roth and Defendant Bender's failure to take any action, Defendant Halcovage's behavior continued and intensified.

51.  Around February 2014, Defendant SC hired Plaintiff Doe as a Clerk One.

52.  Almost immediately, Defendant Halcovage visited her workspace and during work hours.

53.  Around the same time Plaintiff Doe's coworkers made discriminatory and unlawful comments including but not limited to, "if you want a full-time position speak with George; he is a sucker for pretty girls."

54.  Shortly thereafter, Defendant Halcovage sexually harassed Plaintiff Doe with repeated and unwelcome comments regarding her physical appearance.

55.  At all times, Plaintiff Doe opposed the unwelcome and unwanted sexual harassment.

56. As time progressed, the frequency and intensity of Defendant Halcovage's comments increased.

57. By way of example around the end of 2014 or early 2015, Defendant Halcovage requested that Plaintiff Doe work a Republican Party fundraiser.

58. Plaintiff Doe felt unable to decline due to Defendant Halcovage's supervisory position and thus, agreed.

59. At the end of the fundraiser, Defendant Halcovage asked Plaintiff Doe if he could walk her to her car.

60. Plaintiff Doe felt pressured by Defendant Halcovage's position at Defendant SC, within the Republican party, and in the community, and thus, reluctantly agreed.

61. Once at Plaintiff Doe's car, Defendant Halcovage forcefully grabbed Plaintiff Doe and kissed her.

62. Plaintiff Doe, unsure how to react, got in her car and went home.

63. Plaintiff Doe was extremely uncomfortable, humiliated, embarrassed, and emotionally distressed by Defendant Halcovage's conduct.

64. Thereafter, Defendant Halcovage made comments which, upon information and belief, were intended to imply that Plaintiff Doe's job was contingent upon her submission to his physical advances.

65. Around the same time, in or around December 2014, Plaintiff Doe 2 was hired by Defendant SC.

66. Almost immediately thereafter, Defendant Halcovage subjected Plaintiff Doe 2 to unwelcome and unwanted sexual comments and demeaning and discriminatory sexist comments.

67. This caused Plaintiff Doe 2 difficulty with her colleagues and at work generally.

68. By way of example, Defendant Halcovage's sexually harassing comments and conduct included an email sent to Plaintiff Doe 2 by Defendant Halcovage, during work hours, that stated, "eggs with a special sauce …. Hmmmm." *See Exhibit "C."*

69. Upon information and belief, Defendant Halcovage was attempting to compare Plaintiff Doe 2's breakfast, eggs benedict, to male semen.

70. Defendant Halcovage's sexually harassing comments and conduct directed at Plaintiff Doe 2 caused her significant issues with her female colleagues.

71. By way of example, and by no means an exhaustive list, Plaintiff Doe's female colleagues ignored her, and only responded with one-word answers when their job duties required interaction.

72.    Upon information and belief, Plaintiff Doe 2's female colleagues' treatment of her was due to their belief that she was engaged in a romantic relationship with Defendant Halcovage.

73.    Plaintiff Doe 2 was not, nor was she ever, involved in a romantic relationship with Defendant Halcovage.

74.    Plaintiff Doe 2's colleagues' beliefs were a result of Defendant Halcovage's sexually harassing comments and conduct related to and directed at Plaintiff Doe 2.

75.    Defendant Halcovage's unlawful behavior and that of her female colleagues, caused Plaintiff Doe 2 to feel extremely uncomfortable, humiliated, embarrassed, and distressed.

76.    Also, during late 2014 and/or early 2015, Plaintiffs witnessed Defendant Halcovage, on numerous occasions, make unlawful discriminatory comments to or about Plaintiff Doe's supervisor, Virginia Murray.

77.    By way of example, and by no means an exhaustive list, Defendant Halcovage often referred to Ms. Murray as a "carpet muncher" and asked numerous Defendant SC employees if they had "heard that [Ms. Murray] was a lesbian."

78.    These comments were often made directly to or in the presence of Defendant Roth and/or Defendant Bender.

79.   Defendants Roth and Bender did not reprimand Defendant Halcovage nor did they inform him the behavior was inappropriate.

80.   Upon information and belief, neither Defendant Roth nor Defendant Bender conducted any investigation, nor did they report Defendant Halcovage's behavior to Human Resources ("HR"), ask Ms. Murray if the comments or conduct were unwelcome, or take any remedial action.

81.   Defendant Roth and Defendant Bender's failure to act led Plaintiffs to feel that should they report Defendant Halcovage's unlawful treatment, it would be futile.

82.   Additionally, Defendant Halcovage's unlawful behavior caused all Plaintiffs to feel extremely uncomfortable, humiliated, embarrassed, and distressed.

83.   By mid-2015, Defendant Halcovage's sexual harassment of Plaintiff Doe and Doe 2 significantly intensified.

84.   By way of example, Defendant Halcovage, Plaintiff Doe 2, and Plaintiff Doe 2's then husband all attended the same work event.

85.   Defendant Halcovage stated to Plaintiff Doe 2's then husband, "thanks for letting me **USE** your wife for the last four hours."

86.   Upon information and belief, Defendant Halcovage's comment was intended to insinuate that he just had sex with Plaintiff Doe 2.

87.   Defendant Roth was present and overheard Defendant Halcovage's statement.

88.     The next day, Defendant Roth reported to Plaintiff Doe 3 how uncomfortable Defendant Halcovage's statements made him.

89.     Defendant Roth acknowledged that Defendant Halcovage made the statement sexual and said, "[Defendant Halcovage] didn't have to say it that way."

90.     Upon information and belief, Defendant Roth did not conduct any investigation, did not report Defendant Halcovage's behavior to HR, nor did he take any remedial action.

91.     By way of further example, around March of 2015, Plaintiff Doe and Plaintiff Doe 2 attended a political fundraiser at Defendant Halcovage's request.

92.     Defendant Halcovage insisted he drive Plaintiff Doe home.

93.     Defendant Halcovage's behavior made Plaintiff Doe uncomfortable and emotionally distressed.

94.     Upon arriving at Plaintiff Doe's home, Defendant Halcovage aggressively and inappropriately flirted with Plaintiff Doe and was verbally and physically affectionate.

95.     Defendant Halcovage kissed Plaintiff Doe and ultimately unzipped his own pants and exposed his penis.

96.     Defendant Halcovage insinuated that he wanted Plaintiff Doe to perform oral sex on him.

97.   Plaintiff Doe felt emotionally overwhelmed and uncomfortable, due to Defendant Halcovage's behavior, his substantial position with the county and within the community, and his position of authority over her. As such, she begrudgingly performed oral sex on Defendant Halcovage.

98.   After Defendant Halcovage left Plaintiff Doe's home, he called Plaintiff Doe 2 incessantly and demanded to know where she was and who she was with.

99.   Plaintiff Doe and Plaintiff Doe 2 continuously resisted Defendant Halcovage's physical advances and opposed his sexually harassing comments and conduct.

100.   However, this only resulted in retaliation on the part of Defendant Halcovage.

101.   By way of example, and by no means and exhaustive list, Defendant Halcovage inserted himself into Plaintiff Doe and Doe 2's personal and family lives. This included showing up at their marital and/or families' homes.

102.   Defendant Halcovage's appearances at Plaintiff Doe and Doe 2's homes, and the homes of their family and friends, was unwelcome and neither had extended an invitation to Defendant Halcovage.

103.   Defendant Halcovage's conduct caused Plaintiff Doe and Plaintiff Doe 2 issues with their families, marriages, and friends.

104.  Defendant Halcovage made routine appearances at Plaintiff Doe's personal residence; often late at night with alcohol or early in the morning, which caused Plaintiff Doe to be late for work.

105.  In late 2015 Plaintiff Doe's supervisors warned Plaintiff Doe about Defendant Halcovage.

106.  By way of example but by no means an exhaustive list, Commissioner Gary Hess told Plaintiff Doe, "you never have to be alone in George's office with him."

107.  Upon information and belief, Commissioner Hess knew of and/or was fearful of Defendant Halcovage's sexual propensities and inappropriate unlawful behavior.

108.  On many occasions, Defendant Halcovage sexually assaulted Plaintiff Doe.

109.  By way of example, sometime in 2018, Defendant Halcovage called Plaintiff Doe and asked her to meet him at the courthouse.

110.  Upon arrival, Defendant Halcovage whisked her into the building and pulled her into the tax filing room.

111.  Defendant Halcovage kissed Plaintiff Doe, forcibly pushed her down towards the floor, shoved her head into his crotch as he unzipped his pants and exposed his penis.

112.  Defendant Halcovage forced Plaintiff Doe to perform oral sex on him.

113.  Plaintiff Doe was so disgusted and distraught that she got up and ran from the Courthouse.

114.  Plaintiff Doe felt overwhelmed, distressed, disturbed, embarrassed, and degraded.

115.  Additionally, Plaintiff Doe's colleagues, on various occasions, insinuated to Plaintiff Doe that she was not the first female to suffer sexual harassment and gender discrimination at the hands of Defendant Halcovage.

116.  Over a period of time, Defendant Halcovage escalated his sexual advances from requests for oral sex to requests for sexual intercourse.

117.  When Plaintiff Doe rebuffed Defendant Halcovage's physical advances, he responded by interjecting himself in Plaintiff Doe's personal and work life which made her feel threatened.

118.  Defendant Halcovage's behavior negatively impacted Plaintiff Doe's romantic relationships due to his incessant phone calls, text messages, and appearances at her home.

119.  Plaintiff Doe 2, Plaintiff Doe's good friend, often found herself the recipient of harassment and/or retaliation in close temporal proximity to when Plaintiff Doe would rebuff Defendant Halcovage's sexual advances. This affirmed Plaintiff Doe and Plaintiff Doe 2's fears that they would lose their jobs if Plaintiff Doe did not comply with Defendant Halcovage's sexual advances.

120.  Defendant Halcovage's behavior distressed Plaintiff Doe and Plaintiff Doe 2 greatly.

121.  As a result, Plaintiff Doe and Plaintiff Doe 2 began to withdraw from engaging in healthy work relationships.

122.  Eventually, they began withdrawing from their personal relationships.

123.  Plaintiff Doe and Plaintiff Doe 2's work and personal lives suffered greatly.

124.  Defendant Halcovage's sexual advances towards Plaintiff Doe and forced sexual relations through mental control, intimidation, and manipulation of Plaintiff Doe continued until 2020.

125.  Defendant Halcovage engaged in such behavior despite Plaintiff Doe's opposition.

126.  All Plaintiffs, during this time, likewise experienced Defendant Halcovage's unlawful and discriminatory behavior and sexual harassment. They also each observed Defendant Halcovage's sexual harassing behavior perpetrated against other female Defendant SC employees.

127.  Plaintiffs, during 2016 through 2020, also observed Defendant Roth and Defendant Bender observe much of the inappropriate and unlawful sexual discrimination by Defendant Halcovage. Plaintiffs also observed and experienced Defendant Roth and Defendant Bender's unwillingness to

conduct an investigation, to report Defendant Halcovage's behavior to HR, or to take any remedial or corrective action.

128. They also experienced retaliation by Defendant Halcovage as they began to oppose and/or report Defendant Halcovage's unlawful behavior.

129. As a result, Plaintiffs Doe 3 and Doe 4 found it increasingly difficult to fulfill their job duties.

130. During this period of time, a new sexual harassment policy was issued, and all employees of Defendant SC were required to participate in a sexual harassment training.

131. Upon information and belief, Defendant Halcovage signed a form and attested to the fact that he completed the sexual harassment training.

132. Upon information and belief, Defendant Halcovage never completed the sexual harassment training.

133. Upon information and belief, Defendants Roth and Bender were aware of this and failed to take any action.

134. Upon information and belief, between 2012 and 2020, Plaintiffs' colleagues witnessed frequent explosive behaviors, including Defendant Halcovage's use of foul language, fits of rage, and screaming in the workplace and in his office.

135. Upon information and belief, Defendant Halcovage's explosive behavior was almost exclusively directed at females.

136. Upon information and belief, numerous Defendant SC employees reported this to various Defendant SC supervisors, including but not limited to Defendant Roth and Defendant Bender.

137. Defendant Bender, Roth, and SC's failure to respond appropriately caused Plaintiffs extreme distress.

138. Defendant Halcovage's unlawful sexual harassment directed at other Defendant SC employees occurred on Defendant SC property and was witnessed by Defendant Roth.

139. By way of example, Defendant Roth witnessed Defendant Halcovage take various Defendant SC female employees into an empty office located in a deserted location in the courthouse.

140. Upon information and belief, Defendant Roth was aware that Defendant Halcovage's actions were an attempt to engage, or Defendant Halcovage was engaging in, sexual relations with the various female employees of Defendant SC.

141. Upon information and belief, Defendant Roth never reported what he observed, nor did he take any action to prevent further unlawful conduct on Defendant Halcovage's part.

142. Around July 2019, Plaintiff Doe 3 became Plaintiff Doe's direct supervisor.

143. In July 2019, Defendant Halcovage, was still engaged in discriminatory and sexually harassing comments and conduct, about, towards, or in the presence of Plaintiff Doe 3 and Doe 4.

144. Upon information and belief, from 2012 until current, Defendant Roth and/or Defendant Bender observed, knew about, and/or should have known about Defendants Halcovage's discriminatory and unlawful behavior and provided no assistance, took no action to prevent further unlawful behavior, nor did they report the information to HR.

145. By way of example, and by no means an exhaustive list, around July 2019, Plaintiff Doe 3 requested assistance from Defendant Roth regarding Defendant Halcovage's unlawful behavior.

146. Upon information and belief, Defendant Roth provided no assistance, took no action to prevent further unlawful behavior, nor did he report the information to HR.

147. By way of further example around November of 2019, Plaintiff Doe 4 reported sexual harassment of her by Defendant Halcovage to Plaintiff Doe 3, who in turn reported it to Defendant Roth.

148. Upon information and belief, Defendant Roth did not report the incident to Human Resources, did not document the incident in any way, took no disciplinary action against Defendant Halcovage, nor did he take any action

to prevent Defendant Halcovage from engaging in similar behavior in the future.

149. Upon information and belief, Defendant Roth did not ask Plaintiff Doe 4 if the comments and conduct were unwelcome, nor did he make any effort to alleviate any concerns she may have.

150. Defendant Roth's response, or lack thereof, to the reports, and his own discrimination of female employees of Defendant SC intensified Plaintiffs' feelings that reporting Defendant Halcovage's unlawful behavior would be futile.

151. This caused Plaintiffs significant distress.

152. Defendant Halcovage's behavior and Defendant SC's lack of response was so egregious, upon information and belief, in June 2020, a Field Assessor, Witness Doe, resigned from her position because of Defendant Halcovage's discriminatory treatment of her due to her gender and the lack of Defendant SC's response.

153. Upon information and belief, this reason was placed in Witness Doe's formal letter of resignation which she gave to Defendant SC's HR Representative.

154. Additionally, around 2019, Defendant Roth learned that Defendant Halcovage had contacted Plaintiff Doe and Plaintiff Doe 2 outside of work hours and about non-work-related matters.

155. Upon information and belief, Defendant Roth did not address Defendant Halcovage's unlawful behavior or report it to anyone.

156. Around 2020, Plaintiff Doe 3 pled with Defendant Roth to do something to put an end to Defendant Halcovage's discriminatory comments.

157. Defendant Roth said, "I didn't come here to argue with you. If you have a problem with [Defendant Halvocage], go to HR and tell them."

158. Upon information and belief, Defendant Roth did not address Defendant Halcovage's unlawful behavior.

159. In May 2020, Plaintiff Doe 3 received a formal email from Plaintiff Doe reporting Defendant Halcovage's continued sexual harassment and sexual assaults.

160. Plaintiff Doe 3 promptly forwarded it to HR.

161. Thereafter, Plaintiffs participated in formal interviews and during which they appraised HR of the details of the discrimination and unlawful conduct of Defendants Halcovage, Roth and Bender.

162. Around June 29, 2020, Defendant Halcovage stepped down from his position as Chief Commissioner to the position of Commissioner.

163. Around June 30, 2020, a Press Release was issued by Defendant SC.

164. The Press Release stated, "it is apparent, based on the County's internal investigation, that Mr. Halcovage has violated the Sexual Harassment Policy

#2005-18 (Revised September 2013), the Conduct and Disciplinary Action Policy #2005-19; and the Physical and Verbal Abuse Policy #2007-02 (Revised March 2007). If this investigation involved a County department head, the department head would be suspended immediately pending investigation followed by a recommendation of employment termination. However, neither County Administration nor other county commissioners may discipline a fellow county commissioner or remove him from office absent criminal conviction or impeachment." *See Exhibit "D."*

165.   Upon information and belief, no steps towards impeachment were taken by any employee of Defendant SC including but not limited to Defendant Bender or Defendant Roth.

166.   Thereafter, Plaintiffs were subjected to significant retaliation by Defendants.

167.   By way of example, and by no means an executive list, Defendant Roth nor Defendant Bender assisted the County Sheriff in his efforts to protect Plaintiffs from retaliation by Defendant Halcovage.

168.   This emboldened Defendant Halcovage.

169.   By way of example, and by no means an exhaustive list, around July 16, 2020, Defendant Halcovage was seen emerging from a bush and climbing up a very steep and dangerous embankment.

170. Defendant Halcovage walked in the direction of Plaintiff Doe 3 and Plaintiff Doe 4; two of the females who had reported Defendant Halcovage's behavior to HR.

171. Upon information and belief, Defendant Halcovage did so in an effort to intimidate the individuals.

172. By way of further example, Defendants failed to remove Defendant Halcovage from Plaintiffs' work environment, Schuylkill County Courthouse, required Plaintiffs continue to directly engage with Defendants Roth and Bender, failed to discuss with Plaintiffs any reasonable accommodations which would alleviate their discomfort and limit any emotional distress, circumvented Defendant SC policies which made it nearly impossible for Plaintiffs to perform their job duties and/or run the Defendant SC offices that they oversaw.

173. Specifically, in July 2020, Defendant SC permitted an employee of Plaintiff Doe 3 and Plaintiff Doe 4's offices to be relocated within Defendant SC without two weeks' notice, which was Defendant SC policy and/or common practice.

174. Upon information and belief, this was done at the instruction of Defendant Halcovage, Roth, and/or Bender in an effort to negatively impact Plaintiffs' ability to perform their jobs duties.

175. By way of further example, upon information and belief, County Sheriff Joseph Groody attempted to revoke, or at least limit Defendant Halcovage's access to the Defendant SC's Courthouse, implemented protocols for Commissioner Halcovage to follow when accessing Defendant SC's Courthouse, and instructed Defendant Halcovage park in a specific location.

176. Upon information and belief, Defendant Halcovage, refused to work from a location other than the Defendant SC's Courthouse, accessed Defendant SC's Courthouse during times that he was specifically instructed not to, circumvented the protocols put in place by Sheriff Groody, lingered outside Defendant SC's Courthouse after business hours, and parked in locations other than the location specified by Sheriff Groody.

177. Around August 6, 2020, Plaintiffs learned that Defendant Bender authorized Defendant Halcovage to park in a location other than the location specified by Sheriff Groody, and in a location which put Plaintiffs at risk of coming into direct contact with Defendant Halcovage.

178. By way of further example, Plaintiff Doe 3 and Plaintiff Doe 4 had requested not to be required to perform any of their duties in the Commissioner's suite including the Commissioners boardroom.

179. Despite this request, Plaintiff Doe 3 and Plaintiff Doe 4 were required to conduct an assessment appeal hearing there.

180.   This requirement forced Plaintiff Doe 3, around August 12, 2020, to encounter Defendant Halcovage.

181.   This encounter caused Plaintiff Doe 3 significant emotional distress and concern.

182.   When Plaintiff Doe 3 attempted to report this incident, Commissioner Hetherington scheduled a meeting with Plaintiff Doe 3 in the exact location where the encounter occurred. Furthermore, Commissioner Hetherington informed Plaintiff Doe 3 that Defendant Bender would be present.

183.   As a result, Plaintiff Doe 3 felt uncomfortable and intimidated and thus cancelled the meeting.

184.   This was not the only time that Plaintiff Doe 3 was forced to encounter Defendant Halcovage.

185.   During the fall of 2020, Plaintiffs were forced to encounter Defendant Halcovage on numerous occasions as his ability to access the courthouse was not restricted.

186.   Plaintiff Doe 3 emailed Defendant Kutzler regarding Plaintiffs concern for their safety on at least two occasions.

187.   Defendant Kutzler never responded to Plaintiff Doe 3 regarding Plaintiffs' concern for their safety and failed to take any action to prevent Plaintiffs from encountering Defendant Halcovage.

188. Furthermore, Plaintiff Doe 3, on multiple occasions, emailed Defendant Kutzler to coordinate safe times for Plaintiff Doe and Plaintiff Doe 2 to come to the office for work related purposes.

189. Defendant Kutzler, again disregarded Plaintiffs' concern for their safety, ignored Plaintiff Doe 3's emails, and failed to take any action.

190. As a result, Plaintiffs felt unsafe and severely distressed.

191. By way of further example, Plaintiffs on numerous occasions requested reasonable accommodations which were ignored and/or denied.

192. Specifically, Plaintiff Doe and Plaintiff Doe 2 on numerous occasions, while still working from home, requested supplies necessary to carry out their job duties. This request was ignored for over two months, which impacted Plaintiff Doe and Plaintiff Doe 2's ability to perform their job duties. Thus, Plaintiff Doe and Plaintiff Doe 2 were unable to work their required hours.

193. This caused Plaintiff Doe and Plaintiff Doe 2 anxiety and distress due to concerns that they would lose their health benefits or even their jobs.

194. Additionally, Plaintiffs all requested the right to work from home. Defendants outright denied Plaintiff Doe and Plaintiff Doe 2's request.

195. Furthermore, Defendants engaged in a campaign of acts which were with the intention of creating an unbearable and hostile work environment and/or to,

without justification, "paper" Plaintiffs' employment files with documentation to "support" suspensions and/or terminations.

196. By way of example, around October 2020, an employee Defendant SC's Assessment Office, Witness Doe 2, requested a pay increase.

197. Defendants Bender and Kutzler engaged in contract negotiations with Witness Doe 2.

198. Plaintiff Doe 3 and Plaintiff Doe 4 were not consulted regarding this, although they were the heads of the department.

199. An addendum to Witness Doe 2's contact was drafted, and Witness Doe 2 was requested to sign it.

200. The addendum was never shown to or discussed with Plaintiff Doe 3 and Plaintiff Doe 4 despite that fact that it imposed additional duties and responsibilities upon them.

201. By way of further example, and by no means an exhaustive list, around October 22, 2020, Defendant Kutzler, along with and at the instruction of Defendant Bender, changed a consulting agreement for a consultant employee in the Defendant SC offices run by Plaintiff Doe 3 and Plaintiff Doe 4.

202. Upon information and belief, prior to the filing of the Plaintiffs' EEOC Charges, Defendant Bender had never engaged in contract negotiations with a consultant who reported to Plaintiff Doe 3.

203.  Upon information and belief, this change in protocol was because the agreement imposed additional duties and responsibilities on Plaintiff Doe 3 and Plaintiff Doe 4, which Defendant Bender added to increase their workload and impact their ability to perform their job duties.

204.  Around October 26, 2020, Plaintiff Doe emailed Defendant Kutzler to follow up on her previous request, which was sent in August of 2020, for a reasonable accommodation to work from home and to be provided with the necessary supplies to perform her job duties.

205.  Defendant Kutzler's appointment with Defendant SC began on September 4, 2020, as such, there was a fifty-three (53) day delay in responding to Plaintiff Doe's request for a reasonable accommodation and necessary supplies to work from home.

206.  Around November 23, 2020, Defendant Kutzler at the instruction of Defendant Bender, Defendant Roth, and Defendant Halcovage, informed Plaintiff Doe and Plaintiff Doe 2, that they would no longer be permitted to work from home and would be required to work from the "410 building." *See Exhibit "E."*

207.  Defendants did not engage in discussions with Plaintiffs in regard to this change prior to its implementation. No interactive process occurred in regard to their work from home request, this change, or alternatives.

208. Plaintiffs opposed the revocation of their work from home status and the relocation. Additionally, Plaintiffs brought to Defendant SC's attention, concerns that they had with the relocation, including but not limited to the fact that Defendant Halcovage could access this building and there was no parking adjacent to the building, leaving them vulnerable to encountering the Defendants.

209. Defendant SC informed Plaintiffs that there was no public access to the building and Defendant Halcovage's badge access was restricted. This however, was not true, as Plaintiff Doe 3, without using her Defendant SC badge, accessed the "410 building."

210. Furthermore, Defendant Kutzler informed Plaintiff Doe 3 that Defendant Bender would provide Plaintiff Doe and Plaintiff Doe 2 with keys to their "410 building" offices, answer any questions that they may have regarding their safety, and show them where their offices where located, despite previous agreements that Plaintiffs would not have any contact with Defendant Bender.

211. Only after Plaintiff Doe and Plaintiff Doe 2 informed Defendant SC this distressed them, and that they would not be forced to encounter Defendant Bender, did Defendant SC make other arrangements.

212. By way of further example, around December 2020, Defendant Kutzler questioned Plaintiff Doe 2's colleague, Witness Doe 3, and pressured her into signing an untruthful statement. *See Exhibit "F."*

213. Upon information and belief, Defendant Kutzler did so, under the instruction of Defendants Bender, Halcovage and Roth, in order to "paper" Plaintiff Doe 2 personnel file to use later as "grounds for termination."

214. When Witness Doe 3 later attempted to submit an accurate affidavit, she was met with push back on the part of Defendant Kutzler, again at the instruction of Defendants Bender, Halcovage, and Roth. *See Exhibits "F" and "G."*

215. Around December 2020 and January 2021, Plaintiff Doe 3, on at least three separate occasions, had to email Defendant Kutzler regarding concerns with Plaintiff Doe and Plaintiff Doe 2's new offices including the cleanliness and lack of adequate supplies as Plaintiffs concerns were not being addressed.

216. Furthermore, on December 11, 2020, Plaintiff Doe and Plaintiff Doe 2 sent paid time off requests to their supervisor, Plaintiff Doe 3, which were then forwarded to Defendant Kutzler.

217. Defendant Kutzler informed Plaintiff Doe and Plaintiff Doe 2 that their request was denied and they would only be able to use unpaid time off.

218. Thereafter, Defendants continued to engage in acts of retaliation. This includes, but is not limited to, Defendants failure to respond to Plaintiffs

correspondence and concerns, Defendants failure to engage in an interactive process in regard to reasonable accommodations that could be made to ensure Plaintiffs felt safe in their work environment and were provided with the necessary staff and/or equipment, stonewalling Plaintiffs in order to make it near if not impossible to do their work duties, and eventually Defendants writing Plaintiffs up and/or suspending Plaintiffs without pay.

219.   Around January 7, 2021, Defendant Kutzler emailed Plaintiff Doe a letter which indicated that the "secure office space at [Defendant SC's] 410 Building," would finally be ready for occupancy on January 11, 2021, and that the "office has been professionally washed and disinfected." *See Exhibit "H."*

220.   This space was originally assigned around December 16, 2020. At that time, Plaintiffs raised issues and concerns with the space.

221.   Despite those issues and concerns being raised, Defendant Doe 2's office was in disarray and unfit to serve as a working environment. *See Exhibit "I."*

222.   Additionally, contrary to Defendant Kutzler's letter which stated that it was a "secure" working environment, the building was accessible without a Defendant SC issued pass/badge.

223.   As such, Plaintiff Doe 3 emailed Defendant Kutzler Plaintiff Doe 2's concerns the photos of the unacceptable workspace. *See Exhibit "I."*

224. By way of further example, and by no means an exhaustive list, around January 13, 2021, Plaintiff Doe 2 was followed by Defendant Halcovage causing her and each of the other Plaintiffs significant emotional distress and concern for their safety. This was reported both to Defendant Kutzler and the police.

225. Defendant Kutzler failed to conduct any investigation regarding Plaintiffs' concern for their safety.

226. Two days later, Plaintiffs learned that Defendant Halcovage's parking spot was reassigned to the lot where Plaintiff Doe 3 and Plaintiff Doe 4 parked. Additionally, Plaintiffs learned that Defendant Halcovage entered Defendant SC's Courthouse through a door that they had been informed he would not and was thus safe for them to use.

227. Plaintiffs, each fearful for their safety after learning this information, elected to work from home the remainder of the day. Defendant Bender thereafter, sent formal correspondence to Plaintiff Doe 3 and Plaintiff Doe 4 which reprimanded their decision to work from home and their approval of their employees' requests to work from home.

228. Prior to the filing of Plaintiffs' EEOC Charges, Plaintiff Doe 3 was permitted to work from home as needed and was permitted to approve her employees' work from home requests.

229. Plaintiff Doe 3 and Plaintiff Doe 4 are both classified as exempt employees, which provides them additional authority within their departments, including but not limited to approve their subordinate employees work from home requests.

230. Despite this, Defendant Bender and Defendant Zula, thereafter, sent formal correspondence to Plaintiff Doe 3 and Plaintiff Doe 4 which reprimanded their decision to work from home and their approval of their employees' requests to work from home.

231. By way of further example of retaliation, around February 16, 2021, Plaintiff Doe submitted to Defendant Zula, a reasonable accommodation request which requested that she, Plaintiff Doe, be permitted to work from home. Plaintiff Doe's request was due to the immense stress she was under because of the aforementioned facts and circumstances and the significant emotional distress this caused her. Included with the request was correspondence from Plaintiff Doe's medical provider which indicate such an accommodation was in Plaintiff Doe's best medical interest.

232. Plaintiff Doe 3, around February 18, 2021, sent Defendant Zula a completed telecommuting request form for Plaintiff Doe. This form indicated that Plaintiff Doe 3 as Plaintiff Doe's supervisor, approve Plaintiff Doe's request to work from home.

233. Thereafter, Defendant Zula requested additional information from Plaintiff Doe but never responded to Plaintiff Doe 3's correspondence sent as Plaintiff Doe's supervisor,

234. Additionally, thereafter Defendant Zula denied Plaintiff Doe's work from home request. No reason was given, and Defendants made no efforts to engage in an interactive process and discuss what other options were available that would alleviate Plaintiff Doe's concerns and help her feel safe and comfortable in the workplace.

235. Around February 18, 2021, Defendant Kutzler permitted Defendant Bender and Defendant Halcovage to sign up for the same sexual harassment training that Plaintiff Doe 3 and Plaintiff Doe 4 had already signed up for. This would have required Plaintiff Doe 3 and Plaintiff Doe 4 to be in the same room as Defendant Bender and Defendant Halcovage.

236. This caused Plaintiff Doe 3 and Plaintiff Doe 4 significant emotional distress and as such, Plaintiff Doe 3 and Plaintiff Doe 4 were forced to adjust their schedule to attend another training session.

237. Around March 1, 2021, Plaintiff Doe 2 engaged in similar actions and requested, with supporting medical documentation, a reasonable accommodation to work from home. Plaintiff Doe 2's request was also made

due to the immense stress she was under because of the aforementioned facts and circumstances and the significant emotional distress this caused her.

238.   Similar to Defendant Zula and Defendant SC's response to Plaintiff Doe, they requested additional information from Plaintiff Doe 2. This information was provided by Plaintiff Doe 2's medical provider, after which, Defendant Zula denied the request.

239.   Again, Defendants made no efforts to engage in an interactive process and discuss what other options were available that would alleviate Plaintiff Doe 2's concerns and help her feel safe and comfortable in the workplace.

240.   Furthermore, not only did Defendants deny Plaintiff Doe and Plaintiff Doe 2's work from home request but they failed to even so much as provide them with an adequate and/or acceptable parking place. Rather, when Plaintiff Doe and Plaintiff Doe 2 did park in the "410 Building's" parking lot. They received emails which threated that their cars would be towed if they remained in the lot.

241.   Plaintiff Doe and Plaintiff Doe 2 have not received an assigned spot as all other Defendant SC employees who work from the "410 Building" or the Courthouse have.

242.  Upon information and belief, Defendant SC's decision not to provide Plaintiff Doe and Plaintiff Doe 2 with an assigned parking space was in retaliation for their opposition to Defendants' unlawful discrimination and retaliation.

243.  Thereafter, around March 18, 2021, Plaintiff Doe 3 and Plaintiff Doe 4's offices were restructured, they each received a demotion, and their salaries were significantly reduced. The restructuring was voted on by Defendant Halcovage, despite request that he abstain. *See Exhibit "J."*

244.  Furthermore, the restructuring caused Plaintiff Doe and Plaintiff Doe 2 to be required to directly report to Defendant Bender.

245.  By way of further example, around April 21, 2021, Plaintiff Doe 3 and Doe 4 were issued written warnings. *See Exhibit "K."*

246.  By way of further example, around May 19, 2021, Plaintiff Doe 3 was suspended without pay. *See Exhibit "L."*

247.  Plaintiff Doe 2 received a verbal warning. Thereafter, around July 2021, Plaintiff Doe 2 was written up. *See Exhibit "M."*

248.  Plaintiff Doe 3 and Plaintiff Doe 4 were both suspended, indefinitely, without pay on September 17, 2021. They both remain on suspension. *See Exhibit "N."*

249.  Plaintiffs each continue and repeatedly oppose the retaliatory behavior or Defendants.

250. Plaintiffs each repeatedly opposed the retaliatory behavior or Defendants. Plaintiffs claim that Defendants unlawfully discriminated and retaliated against Plaintiffs because of their sex/gender and because they complained and opposed the unlawful conduct of Defendants related to the above protected classes.

251. As a result of Defendants' actions, Plaintiffs felt extremely humiliated, degraded, victimized, embarrassed and emotionally distressed.

252. As a result of the acts and conduct complained of herein, Plaintiffs have suffered and will continue to suffer the loss of income the loss of salary, bonuses, benefits and other compensation which such employment entails, and Plaintiffs also suffered future pecuniary losses, emotional pain, humiliation, suffering, inconvenience, loss of enjoyment of life, and other non-pecuniary losses. Plaintiffs have further experienced severe emotional and physical distress.

253. Plaintiffs further claim aggravation, activation, and/or exacerbation of any preexisting condition(s).

254. Upon information and belief, the discrimination and retaliation will continue after the date of this complaint and Plaintiffs hereby make a claim for all continuing future harassment and retaliation.

255.  As Defendants' conduct has been malicious, willful, outrageous, and conducted with full knowledge of the law, Plaintiffs demand Punitive Damages as against all the Defendants jointly and severally.

256.  The above are just some examples of the discrimination to which Defendants subjected Plaintiffs to on a continuous and on-going basis throughout Plaintiffs' employment.

257.  Defendants have exhibited a pattern and practice of not only harassment and discrimination but also hostile work environment and retaliation.

258.  Defendant SC's vicarious liability is extended to the intentional acts of Defendant Halcovage because the conduct was within the scope of his employment or alternatively because Defendant SC ratified Defendant Halcovage's conduct by formal action or by passive acquiescence.

259.  Plaintiffs claim a continuous practice of discrimination and claims a continuing violation and makes all claims herein under the continuing violations doctrine.

260.  Plaintiffs further claim constructive and/or actual discharge to the extent Plaintiffs are terminated from their positions as a result of the unlawful discrimination and retaliation.

261.  Plaintiffs claim alternatively that Plaintiffs are Independent Contractors, and Plaintiffs make all applicable claims for the above conduct and facts under the

applicable law pertaining to Independent Contractors. Furthermore, in such case, Plaintiffs claim that Defendants owed and breached its duty to Plaintiffs to prevent the harassment/discrimination/retaliation and is liable therefore for negligence.

## COUNT I
## DISCRIMINATION
## TITLE VII
## (By all Plaintiffs against Defendant SC)

262.     Plaintiffs repeat and reallege each and every allegation made in the above paragraphs of this complaint.

263.     This claim is authorized and instituted pursuant to the provisions of Title VII of the Civil Rights Act of 1964, 42 U.S.C. Section(s) 2000e et seq., as amended, for relief based upon the unlawful employment practices of the above-named Defendants. Plaintiffs complain of Defendants' violation of Title VII's prohibition against discrimination in employment based, in whole or in part, upon an employee's sex/gender.

264.     SEC. 2000e-2. [Section 703] states as follows:

 (a) Employer practices

It shall be an unlawful employment practice for an employer –

(1) to fail or refuse to hire or to discharge any individual, or otherwise to discriminate against any individual with respect to his

compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin; or

(2) to limit, segregate, or classify his employees or applicants for employment in any way which would deprive or tend to deprive any individual of employment opportunities or otherwise adversely affect his status as an employee, because of such individual's race, color, religion, sex, or national origin.

265.    Defendant SC engaged in unlawful employment practices prohibited by Title VII by intentionally discriminating against Plaintiffs with respect to their compensation, terms, conditions, training and privileges of employment because of their sex.

266.    Defendants subjected Plaintiffs to adverse tangible employment actions—defined as significant changes in Plaintiffs' employment status, discipline, denial of training, failure to promote, reassignment with significantly different job responsibilities, and decisions causing changes in significant changes in their employment benefits.

267.    Plaintiffs' protected characteristics (sex/gender) played a determinative factor in Defendant SC's decisions.

268.    Defendant SC cannot show any legitimate nondiscriminatory reasons for its employment practices and any reasons proffered by Defendant SC for its actions against Plaintiffs are pretextual and can readily be disbelieved.

269.    Alternatively, Plaintiffs' protected status played a motivating part in the Defendant SC's decisions even if other factors may also have motivated its actions against Plaintiffs.

270.    Defendant SC acted with the intent to discriminate.

271.    Defendant SC acted upon a continuing course of conduct.

272.    As a result of the Defendant SC's violations of Title VII, Plaintiffs have suffered damages, including, but not limited to: past and future lost wages, pain and suffering, inconvenience, mental anguish, loss of enjoyment of life, humiliation, emotional distress, reputational harm, diminishment of career opportunities, and other harm, both tangible and intangible.

## COUNT II
## RETALIATION
## TITLE VII
### (By all Plaintiffs against Defendant SC)

273.    Plaintiffs repeat and reallege each and every allegation made in the above paragraphs of this complaint.

274.    Title VII protects employees from retaliation for attempting to exercise their rights under the Act:

42 U.S.C. § 2000e-3. Other unlawful employment practices

(a) Discrimination for making charges, testifying, assisting, or participating in enforcement proceedings. It shall be an unlawful employment practice for an employer to discriminate against any of his employees . . . because [she] has opposed any practice made an unlawful employment practice by this subchapter, or because [she] has made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under this subchapter.

275.    The Supreme Court in *Burlington v. N. & S.F. Ry. V. White*, 548 U.S. 53, 68 (2006) held that a cause of action for retaliation under Title VII lies whenever the employer responds to protected activity in such a way that "might have dissuaded a reasonable worker from making or supporting a charge of discrimination."

276.    Informal complaints and protests can constitute protected activity under the "opposition" clause of 42 U.S.C. § 2000e-3(a). *Moore v. City of Philadelphia*, 461 F.3d 331, 343 (3d Cir. 2006) ("Opposition to discrimination can take the form of informal protests of discriminatory employment practices, including making complaints to management.").

277.     Title VII's anti-retaliation provision also protects employees who speak out about discrimination by answering questions during an employer's internal investigation. *Crawford v. Metropolitan Gov't of Nashville and Davidson Cty., Tennessee*, 555 U.S. 271, 277 (2009) (declaring that there is "no reason to doubt that a person can 'oppose' by responding to someone else's question just as surely as by provoking the discussion, and nothing in the statute requires a freakish rule protecting an employee who reports discrimination on her own initiative but not one who reports the same discrimination in the same words when her boss asks a question.")

278.     Retaliation need not be job-related to be actionable under Title VII— an employer can effectively retaliate against an employee by taking actions not directly related to her employment or by causing her harm outside the workplace. *White,* 548 U.S. 61-62 (rejecting authority from the Third Circuit and others requiring that the plaintiff suffer an adverse employment action in order to recover for retaliation).

279.     "[A] plaintiff need not prove the merits of the underlying discrimination complaint, but only that '[s]he was acting under a good faith, reasonable belief that a violation existed.'" *Aman v. Cort Furniture Rental Corp.*, 85 F.3d 1074, 1085 (3d Cir. 1996); *Griffiths v. CIGNA Corp.*, 988 F.2d 457, 468 (3d Cir. 1993); and *Sumner v. United States Postal Service*, 899 F.2d 203, 209 (2d Cir.

1990), overruled on other grounds by *Miller v. CIGNA Corp.,* 47 F.3d 586 (3d Cir.1995).

280.    "Title VII's whistleblower protection is not limited to those who blow the whistle on their own mistreatment..." *See Moore v City of Phila*, 461 F.3d at 331 (3d Cir. 2006)

281.    Title VII not only bars retaliation against the employee who engaged in the protected activity; it also bars retaliation against another employee if the circumstances are such that the retaliation against that employee might well dissuade a reasonable worker from engaging in protected activity. *See Thompson v. North American Stainless*, *LP*, 131 S. Ct. 863, 868 (2011).

282.    Here, Defendant SC discriminated against Plaintiffs because of their protected activity under Title VII.

283.    Plaintiffs acted under a reasonable, good faith belief that their, or someone else's, right to be free from discrimination on the basis of sex/gender was violated.

284.    Plaintiffs were subjected to materially adverse actions at the time or after the protected conduct took place.

285.    There was a causal connection between the Defendant SC's materially adverse actions and Plaintiffs' protected activity.

286.     Defendant SC's actions were "materially adverse" because they were serious enough to discourage a reasonable worker from engaging in protected activity.

287.     Defendant SC acted upon a continuing course of conduct.

288.     Plaintiff will rely on a broad array of evidence to demonstrate a causal link between their protected activity and the Defendant SC's actions taken against them, such as the unusually suggestive proximity in time between events, as well as Defendant SC's antagonism and change in demeanor toward Plaintiffs after Defendant SC became aware of Plaintiffs' protected activity.

289.     As a result of Defendant SC's violations of Title VII, Plaintiffs have suffered damages, including, but not limited to: past and future lost wages, pain and suffering, inconvenience, mental anguish, loss of enjoyment of life, humiliation, emotional distress, reputational harm, diminishment of career opportunities, and other harm, both tangible and intangible.


**COUNT III**
**TITLE VII HOSTILE WORK ENVIRONMENT**
**Title VII**
**(By all Plaintiffs against Defendant SC)**

290.     Plaintiffs repeat and reallege each and every allegation made in the above paragraphs of this complaint.

291.    Title VII also prohibits hostile work environment harassment, defined as unwanted comments or conduct regarding the Plaintiffs' protected characteristics that have the purpose or effect of unreasonably interfering with the terms and conditions of the Plaintiffs' employment. *Harris v. Forklift Systems*, 510 U.S. 17, 21 (1993).

292.    An employer is strictly liable for supervisor harassment that "culminates in a tangible employment action, such as discharge, demotion, or undesirable reassignment." *Burlington Industries, Inc. v. Ellerth*, 524 U.S. 742 (1998).

293.    Respondeat superior liability for the acts of non-supervisory employees exists where "the defendant knew or should have known of the harassment and failed to take prompt remedial action." *Andrews v. city of Philadelphia*, 895 F.2d 1469, 1486 (3d Cir. 1990).

294.    Employer liability for co-worker harassment also exists where "the employer failed to provide a reasonable avenue for complaint." *Huston v. Procter & Gamble Paper Prods. Corp.*, 568 F.3d 100, 105 (3d Cir. 2009).

295.    The Third Circuit has held that the retaliation provision of Title VII "can be offended by harassment that is severe or pervasive enough to create a hostile work environment." *Jensen v. Potter*, 435 F.3d 444, 446 (3d Cir. 2006).

296.     Here, Defendant SC's conduct occurred because of Plaintiffs' legally protected characteristics and was severe or pervasive enough to make a reasonable person of the same legally protected classes believe that the conditions of employment were altered and that the working environment was intimidating, hostile, or abusive.

297.     The discriminatory conduct directly refers to Plaintiffs' sex/gender.

298.     Plaintiffs' supervisors, Defendant Roth, Defendant Bender, Defendant Halcovage, and Defendant Zula had the authority to control Plaintiffs' work environment, and they abused that authority to create a hostile work environment.

299.     Derogatory and sexually explicit harassing conduct and comments, as well as sexual assault, filled the environment of Plaintiffs' work area.

300.     Defendant SC knew that the derogatory and sexually explicit harassing conduct and comments filled Plaintiffs' work environment.

301.     The derogatory and sexually explicit harassing conduct and comments occurred on an almost if not daily basis.

302.     The derogatory and sexually explicit harassing comments and conduct caused Plaintiffs to sustain severe emotional distress resulting in physical illness.

303.     Plaintiffs subjectively regarded the derogatory and sexually explicit harassing comments and conduct as unwelcome, unwanted and they objectively opposed the conduct.

304.     The conduct was both severe and pervasive.

305.     The conduct was emotionally damaging and humiliating.

306.     The conduct unreasonably interfered with Plaintiffs' work performance.

307.     The conduct was so extreme that it resulted in material changes to the terms and conditions of Plaintiffs' employment.

308.     The Defendants provided a futile avenue for a complaint.

309.     The Defendants retaliated against Plaintiff for their complaints.

310.     The Defendants acted upon a continuing course of conduct.

311.     As a result of the Defendant SC's violations of Title VII, Plaintiffs have suffered damages including but not limited to: past and future lost wages, pain and suffering, inconvenience, mental anguish, loss of enjoyment of life, humiliation, emotional distress, reputational harm, diminishment of career opportunities, and other harm, both tangible and intangible.

**COUNT IV**
**INTENTIONAL INFLICTION OF**
**EMOTIONAL DISTRESS ("IIED")**
**(By Plaintiffs Doe and Doe 2 against Defendant Halcovage)**

312.     Plaintiffs repeat and reallege each and every allegation made in the above paragraphs of this complaint.

313.     Plaintiff Doe and Doe 2 bring this claim against Defendant Halcovage in his individual capacity for intentional infliction of emotional distress ("IIED").

314.     To prove a claim of IIED, the following elements must be established: (1) the conduct must be extreme and outrageous; (2) it must be intentional or reckless; (3) it must cause emotional distress; and (4) that distress must be severe. Hooten v. Penna. College of Optometry, 601 F.Supp. 1155 (E.D.Pa.1984); Hoy v. Angelone, 691 A.2d 476, 482 (Pa.Super. 1997); Restatement (Second) of Torts § 46.

315.     Defendant Halcovage intentionally sexually assaulted, harassed, and inflicted emotional injury on Plaintiffs by subjecting them to outrageous treatment beyond all bounds of decency outside of his employment with Defendant SC.

316.     Defendant Halcovage verbally, mentally, and physically abused Plaintiffs and treated them in a demeaning and inferior manner, which no reasonable person could be expected to endure.

317.     Furthermore, Defendant Halcovage engaged in retaliation when Plaintiffs opposed such behavior.

318.    As a direct and proximate result of these malicious and conscious

wrongful actions, Plaintiff Doe and Plaintiff Doe 2 have sustained severe

emotional distress, resulting in bodily injury, and damages, including

punitive damages, to be determined at trial.


**COUNT V**
**DISCRIMINATION**
**PHRA § 955**
**(By all Plaintiffs against all Defendants)**

319.    Plaintiffs repeat and reallege each and every allegation made in the

above paragraphs of this complaint.

320.    The PHRA § 955 provides that it shall be an unlawful discriminatory

practice:

"(a) For any employer because of the race, color, religious creed, ancestry,

age, sex, national origin or non-job related handicap or disability or the use

of a guide or support animal because of the blindness, deafness or physical

handicap of any individual or independent contractor, to refuse to hire or

employ or contract with, or to bar or to discharge from employment such

individual or independent contractor, or to otherwise discriminate against

such individual or independent contractor with respect to compensation,

hire, tenure, terms, conditions or privileges of employment or contract, if the

individual or independent contractor is the best able and most competent to perform the services required."

321.    Defendants engaged in an unlawful discriminatory practice by discriminating against Plaintiffs because of their sex/gender.

322.    As a result of the Defendant SC's violations of the PHRA, Plaintiffs have suffered damages including but not limited to: past and future lost wages, pain and suffering, inconvenience, mental anguish, loss of enjoyment of life, humiliation, emotional distress, reputational harm, diminishment of career opportunities, and other harm, both tangible and intangible.

**COUNT VI**
**RETALIATION**
**PHRA § 955(d)**
**(By all Plaintiffs against all Defendants)**

323.    Plaintiffs repeat and reallege each and every allegation made in the above paragraphs of this complaint.

324.    PHRA § 955(d) provides that it shall be an unlawful discriminatory practice: "For any person, employer, employment agency or labor organization to discriminate in any manner against any individual because such individual has opposed any practice forbidden by this act, or because such individual has made a charge, testified or assisted, in any manner, in any investigation, proceeding or hearing under this act."

325.     Defendants engaged in an unlawful discriminatory practice by discharging, retaliating, and otherwise discriminating against the Plaintiffs because of Plaintiffs' opposition to the unlawful and discriminatory employment practices of Defendants.

326.     As a result of the Defendant SC's violations of the PHRA, Plaintiffs have suffered damages including but not limited to: past and future lost wages, pain and suffering, inconvenience, mental anguish, loss of enjoyment of life, humiliation, emotional distress, reputational harm, diminishment of career opportunities, and other harm, both tangible and intangible.

**COUNT VII**
**AIDING AND ABETTING**
**PHRA § 955(e)**
**(Claimant against Individual Defendants only)**

327.     Plaintiffs repeat and reallege each and every allegation made in the above paragraphs of this complaint.

328.     PHRA § 955(e) provides that it shall be an unlawful discriminatory practice: "For any person, employer, employment agency, labor organization or employee, to aid, abet, incite, compel or coerce the doing of any act declared by this section to be an unlawful discriminatory practice, or to obstruct or prevent any person from complying with the provisions of this act

or any order issued thereunder, or to attempt, directly or indirectly, to commit

any act declared by this section to be an unlawful discriminatory practice."

329.     Defendants engaged in an unlawful discriminatory practice in violation

of PHRA § 955(e) by aiding, abetting, inciting, compelling and coercing the

discriminatory conduct.

# COUNT VIII
# DISPARATE TREATMENT
# VIOLATION OF EQUAL PROTECTION CLAUSE
# 42 U.S.C. § 1983
### (Plaintiffs against All Defendants)

330.     Plaintiffs incorporate by reference each and every allegation made in

the above paragraphs of this complaint.

331.     The Fourteenth Amendment to the United States Constitution protects

persons from being subjected to discrimination, by persons acting under

color of state law, on the basis of a protected class (e.g., sex, race, or color).

U.S. Const. amend. XIV.

332.     Section 1983 provides:

Every person who, under color of any statute, ordinance,
regulation, custom, or usage, of any State or Territory or
the District of Columbia, subjects, or causes to be

> subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress, except that in any action brought against a judicial officer for an act or omission taken in such officer's judicial capacity, injunctive relief shall not be granted unless a declaratory decree was violated or declaratory relief was unavailable. For the purposes of this section, any Act of Congress applicable exclusively to the District of Columbia shall be considered to be a statute of the District of Columbia.

42 U.S.C. § 1983.

333.    Section 1983 provides a cause of action for unconstitutional employment discrimination by both employers and individuals, so long as the plaintiff shows that the defendant acted under color of state law. *See Fitzgerald v. Barnstable School Committee*, 129 S. Ct. 788, 796 (2009) ("The Equal Protection Clause reaches only state actors, but § 1983 equal protection claims may be brought against individuals as well as municipalities and certain other state entities."); *see also Andrews v. City of Philadelphia*, 895 F.2d 1469, 1478 (3d Cir. 1990) ("Liciardello and Doyle objectively should have known the applicable legal standard, and thus are not protected by qualified immunity in treating, or allowing their subordinates to treat, female employees differently on the basis of gender in their work environment.").

334.     "[M]unicipalities and other local government units [are] included among those persons to whom § 1983 applies." *Monell v. Department of Social Services of City of New York*, 436 U.S. 658, 690 (1978). However, "a municipality cannot be held liable under § 1983 on a respondeat superior theory." Id. at 691. "Instead, it is when execution of a government's policy or custom, whether made by its lawmakers or by those whose edicts or acts may fairly be said to represent official policy, inflicts the injury that the government as an entity is responsible under § 1983." Id. at 694.

335.     Defendants violated Section 1983 by intentionally discriminating against Plaintiffs in a serious tangible way with respect to their compensation, terms, conditions or privileges of employment.

336.     Plaintiffs' protected characteristics (sex/gender and protected activity) were a determinative or motivating factor in Defendants' employment actions.

337.     Defendants cannot show any legitimate nondiscriminatory reason for their employment practices and any reasons proffered by the Defendants for their actions against Plaintiffs are pretextual and can readily be disbelieved.

338.     Plaintiffs' protected status played a motivating part in the Defendants' decisions even if other factors may also have motivated Defendants' actions against Plaintiffs.

339.     Defendants acted under color of state law.

340.     Defendants acted with the intent to discriminate.

341.     Defendants acted upon a continuing course of conduct.

342.     Moreover, this case unquestionably involves official policy:

Defendant SC, and its policymaking officials, the individual Defendants, (1)

directed that the violations occur; (2) authorized the violations; (3) agreed to

subordinates' decisions to engage in the violations; (4) provided inadequate

training; (5) provided inadequate supervision; and (6) failed to adopt needed

policies to prevent the violations.

343.     Defendants acted with malice or reckless indifference to Plaintiffs'

federally protected rights and as a result there should be an award of punitive

damages against Defendants.

344.     As a result of Defendants' violations of Plaintiffs' Equal Protection

rights, Plaintiffs have suffered damages, including, but not limited to: past

and future lost wages, pain and suffering, inconvenience, mental anguish,

loss of enjoyment of life, humiliation, emotional distress, reputational harm,

diminishment of career opportunities, and other harm, both tangible and

intangible.

**COUNT IX**
**HOSTILE WORK ENVIRONMENT**
**VIOLATION OF EQUAL PROTECTION CLAUSE**

## <u>42 U.S.C. § 1983</u>
### (Plaintiffs against All Defendants)

345.     Plaintiffs incorporate by reference each and every allegation made in

the above paragraphs of this complaint.

346.     The Third Circuit has made it clear that sexual harassment can give

rise to an equal protection claim. *See, e.g., Andrews v. City of Philadelphia*,

895 F.2d 1469, 1478-79 (3d Cir. 1990) (upholding verdict for plaintiff on

sexual harassment claims against city employees, based on conclusion that

evidence supported finding of purposeful discrimination); *see also Bohen v.

City of East Chicago, Ind.,* 799 F.2d 1180, 1185 (7th Cir. 1986) ("Sexual

harassment of female employees by a state employer constitutes sex

discrimination for purposes of the equal protection clause of the fourteenth

amendment."); Cheryl L. Anderson, *"Nothing Personal:" Individual

Liability under 42 U.S.C. § 1983 for Sexual Harassment as an Equal

Protection Claim*, 19 BERKELEY J. EMP. & LAB. L. 60, 80 (1998) (citing

*Meritor Savings Bank v. Vinson*, 477 U.S. 57 (1986) as support for argument

that sex harassment can satisfy the intentional discrimination requirement for

equal protection claims).

347.     The Third Circuit has also made clear that a sexual harassment equal

protection claim can be made even if the defendant is not the plaintiff's

supervisor. *See Bonenberger v. Plymouth Twp.,* 132 F.3d 20, 24 (3d Cir. 1997).

348.     Additionally, a plaintiff can show an equal protection violation by a supervisor who fails properly to address harassment by the plaintiff's co-workers. *Andrews*, 895 F.2d at 1479.

349.     A municipal employer can be liable on the theory that it directly encouraged harassment of the plaintiff, or on the theory that it did not do enough to prevent the harassment. *See Bohen*, 799 F.2d at 1187 ("[A] plaintiff can make an ultimate showing of sex discrimination either by showing that sexual harassment that is attributable to the employer under § 1983 amounted to intentional sex discrimination or by showing that the conscious failure of the employer to protect the plaintiff from the abusive conditions created by fellow employees amounted to intentional discrimination."); *cf. Reynolds v. Borough of Avalon,* 799 F. Supp. 442, 447 (D.N.J. 1992) (holding that "a reasonable jury might find that the risk of sexual harassment in the workplace is so obvious that an employer's failure to take action to prevent or stop it from occurring--even in the absence of actual knowledge of its occurrence--constitutes deliberate indifference, where the employer has also failed to take any steps to encourage the reporting of such incidents").

350.    Defendants violated Section 1983 by subjecting Plaintiffs to sexual harassment.

351.    Defendants' conduct was not welcomed by Plaintiffs.

352.    Defendants' conduct was so severe or pervasive that a reasonable person in Plaintiffs' position would find the work environment to be hostile or abusive.

353.    Plaintiffs believed their work environment was hostile or abusive as a result of Defendants' conduct.

354.    As a result of the hostile work environment, Plaintiffs suffered a "tangible employment action" defined as a significant change in employment status, failure to promote, reassignment with significantly different responsibilities, and/or a decision causing a significant change in benefits.

355.    Defendants failed to exercise reasonable care to prevent sexual harassment in the workplace by failing to establish an explicit policy against harassment in the workplace on the basis of sex, failing to fully communicate the policy to their employees, failing to provide a reasonable way for Plaintiffs to make a claim of harassment to higher management, and failing to take reasonable steps to promptly correct the harassing behavior raised by Plaintiffs.

356.     Defendants acted under color of state law.

357.     Defendants acted with the intent to discriminate.

358.     Defendants acted upon a continuing course of conduct.

359.     Moreover, this case unquestionably involves official policy:

Defendant SC, and its policymaking officials, the individual Defendants, (1)

directed that the violations occur; (2) authorized the violations; (3) agreed to

subordinates' decisions to engage in the violations; (4) provided inadequate

training; (5) provided inadequate supervision; and (6) failed to adopt needed

policies to prevent the violations.

360.     Defendants acted with malice or reckless indifference to Plaintiffs'

federally protected rights and as a result there should be an award of punitive

damages against Defendants.

361.     As a result of Defendant's violations of Plaintiffs' Equal Protection

rights, Plaintiffs have suffered damages, including, but not limited to: past

and future lost wages, pain and suffering, inconvenience, mental anguish,

loss of enjoyment of life, humiliation, emotional distress, reputational harm,

diminishment of career opportunities, and other harm, both tangible and

intangible.

**COUNT XIII**
**RETALIATION**
**VIOLATION OF PETITION CLAUSE**

## 42 U.S.C. § 1983
### (Plaintiffs against All Defendants)

362.     Plaintiffs incorporate by reference each and every allegation made in

the above paragraphs of this complaint.

363.     The First Amendment gives persons the right to petition the

Government for a redress of grievances. U.S. Const. amend. I.

364.     "[R]etaliation by a government employer for a public employee's

exercise of the right of access to the courts may implicate the protections of

the Petition Clause." *Borough of Duryea v. Guarnieri,* 131 S. Ct. 2488, 2494

(2011); *see also Mack v. Warden Loretto FCI*, 839 F.3d 286 (3d Cir. 2016)

(holding that an inmate's oral grievance is protected under the Petition

Clause).

365.     To be protected under the First Amendment, speech by a government

employee "must be on a matter of public concern, and the employee's

interest in expressing herself on this matter must not be outweighed by any

injury the speech could cause to 'the interest of the State, as an employer, in

promoting the efficiency of the public services it performs through its

employees.'" *Waters v. Churchill,* 511 U.S. 661, 668 (1994).

366.     A report of sexual harassment by a government official can constitute

speech on a matter of public concern. *See Azzaro v. County of Allegheny*,

110 F.3d 968, 975 (3d Cir. 1997) (reasoning that the plaintiff's reports

"brought to light actual wrongdoing on the part of one exercising public authority.").

367.   The plaintiff must show a "causal link" between the protected speech and the adverse employment action. *See Azzaro*, 110 F.3d at 981 (reversing summary judgment dismissing First Amendment retaliation claim because there existed "a material dispute of fact as to whether [plaintiff's] reports were a motivating factor in the discharge decision").

368.   If the plaintiff shows that the decisionmaker was aware of the protected conduct, then the plaintiff may use the temporal proximity between that knowledge and the adverse employment action to argue causation. *Thomas v. Town of Hammonton*, 351 F.3d 108, 114 (3d Cir. 2003).

369.   Here, Plaintiffs engaged in activity that was protected by the First Amendment's Petition Clause.

370.   Plaintiffs' speech was on a matter of public concern.

371.   Defendants took materially adverse employment actions against Plaintiffs for engaging in protected activity.

372.   Plaintiffs' protected activity was a substantial or motivating factor in Defendants' decisions.

373.     Defendants cannot show any legitimate nondiscriminatory reason for its employment practices and any reasons proffered by Defendants for their actions against Plaintiffs are pretextual and can readily be disbelieved.

374.     Defendants acted upon a continuing course of conduct.

375.     Moreover, this case unquestionably involves official policy: the City, the PPD, and their policymaking officials (1) directed that the violations occur; (2) authorized the violations; (3) agreed to subordinates' decisions to engage in the violations; (4) provided inadequate training; (5) provided inadequate supervision; and (6) failed to adopt needed policies to prevent the violations.

376.     Defendants acted with malice or reckless indifference to Plaintiffs' federally protected rights and as a result there should be an award of punitive damages against Defendants.

377.     As a result of Defendants' violations of Plaintiffs' Free Speech rights, Plaintiffs have suffered damages, including, but not limited to: past and future lost wages, pain and suffering, inconvenience, mental anguish, loss of enjoyment of life, humiliation, emotional distress, reputational harm, diminishment of career opportunities, and other harm, both tangible and intangible.

## **JURY DEMAND**

Plaintiffs request a jury trial on all issues to be tried.

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiffs demand judgment against Defendants, jointly and severally, in an amount to be determined at the time of trial plus interest, including but not limited to all emotional distress, back pay, and front pay, punitive damages, liquidated damages, statutory damages, attorneys' fees, costs, and disbursements of action; and for such other relief as the Court deems just and proper.

Respectfully Submitted,
**DEREK SMITH LAW GROUP, PLLC**
*Attorneys for Plaintiffs*

By*: /s/ Catherine W. Smith, Esq.*
    Catherine W. Smith, Esq.
    1835 Market Street, Suite 2950
    Philadelphia, Pennsylvania 19103
Dated:        October 29, 2021        (215) 391-4790