## IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| JANE DOE, et al., | : | Civil No. 3:21-CV-477 |
| | : | |
| Plaintiffs, | : | |
| | : | |
| v. | : | |
| | : | (Magistrate Judge Carlson) |
| SCHUYLKILL COUNTY | : | |
| COURTHOUSE, et al., | : | |
| | : | |
| Defendants. | : | |

## MEMORANDUM OPINION

### I.  Introduction

This case involves allegations of abhorrent workplace misconduct at the Schuylkill County Courthouse involving alleged sexual harassment, assault, and predation coupled with assertions of official indifference to the plight of the alleged victims of this workplace violence. The plaintiffs, four Jane Doe employees of Schuylkill County, filed this action against the County and several individual defendants. Their claims stem from the alleged sexual abuse and harassment perpetrated by County Commissioner George Halcovage over a period of several years while the plaintiffs were employed by the County. The plaintiffs assert that the County, as well as the individual defendants, knew of the sexual abuse and

harassment and did nothing to stop it. Instead, the plaintiffs contend that these defendants retaliated against them for reporting the sexual abuse and harassment.

Pending before the court is a motion to dismiss filed by two of these defendants, Gary Bender, the County Administrator, and Schuylkill County.[1] (Doc. 71). With respect to Defendant Bender, the plaintiffs allege that he discriminated and retaliated against them, and that he aided and abetted others' discriminatory conduct in violation of the Pennsylvania Human Relations Act ("PHRA"). They also assert that Bender violated their rights under the Equal Protection Clause of the Fourteenth Amendment by subjecting them to disparate treatment and a hostile work environment based upon their sex. Finally, the plaintiffs assert a claim against Bender for First Amendment retaliation, alleging that they were punished for reporting wrongdoing by Commissioner Halcovage. As to the County, the plaintiffs assert claims under Title VII of the Civil Rights Act for discrimination, retaliation, and creating a hostile work environment because of their sex, and assert similar claims under the PHRA. The plaintiffs also bring claims under the Equal Protection Clause for disparate treatment and creating a hostile work environment. Finally, the complaint asserts a First Amendment retaliation claim against the County.

---

[1] The defendants have filed five separate motions to dismiss, which will be addressed in separate memorandum opinions.

In their motion to dismiss, several of the above-mentioned claims are not contested by these defendants at this stage. Thus, in their motion, the defendants do not challenge the following claims: the Title VII and PHRA claims against the County (Counts I-III, V-VII); the claim for aiding and abetting under the PHRA against Bender (Count VII); and the claim for First Amendment retaliation against Bender and the County (Count XIII).[23] With respect to the PHRA and Equal Protection claims against Bender, he contends that the complaint is devoid of any allegations that he subjected the plaintiffs to discrimination, disparate treatment, or a hostile work environment, or that he retaliated against the plaintiffs for speaking out about discriminatory conduct. Further, the County argues that the plaintiffs have failed to state a <u>Monell</u>[4] claim against it. These defendants also challenge the request for punitive and liquidated damages. Finally, the defendants assert that the plaintiffs should not be permitted to proceed under their "Jane Doe" pseudonyms.

---

[2] Count X was misnumbered as Count XIII. Thus, for ease of reference, we will refer to the First Amendment retaliation claim as Count XIII.

[3] The defendants challenge the First Amendment retaliation claim in their reply brief, noting that they join Defendant Halcovage's brief with respect to this claim. (Doc. 93). However, it is well settled that these defendants cannot belatedly present new arguments in a reply brief that were not addressed in its opening brief or in response to the plaintiffs' opposition brief. <u>See</u> <u>Bell v. Lackawanna County</u>, 892 F.Supp.2d 647, 688 n.41 (M.D. Pa. 2012) ("A reply brief is not the appropriate forum in which to raise new issues and the court need not address issues raised for the first time therein"). Therefore, consideration of this tardy argument must await another day.

[4] <u>Monell v. Dep't of Soc. Servs. of the City of New York</u>, 436 U.S. 658 (1978).

This motion is fully briefed and is ripe for resolution. (Docs. 83, 88). For the reasons that follow, we will grant the motion as to the discrimination claim brought under the PHRA against Defendant Bender, as well as the claim for punitive damages against Bender under the PHRA, but we will deny the motion in all other respects.

## II.   <u>Background</u>

The factual background of this case is taken from the factual allegations set forth in the plaintiff's second amended complaint (Doc. 63), which we must accept as true for purposes of this motion to dismiss.

George Halcovage was elected as a Commissioner of Schuylkill County in 2012. (Doc. 63, ¶ 45). At this time, Plaintiffs Jane Doe 3 and Jane Doe 4 were employed with the County as the Tax Claim Director and Clerk Typist One, respectively. (Id., ¶¶ 43-44). The complaint alleges that upon the start of his term as County Commissioner, Halcovage frequently visited the Tax Claims Office and subjected the female employees to unwelcomed sexual harassment. (Id., ¶ 47). This harassment, which included discriminatory sexist and inappropriate comments, was sometimes directed at and witnessed by Doe 3 and Doe 4, and caused them to feel extremely uncomfortable, humiliated, and distressed. (Id., ¶¶ 47-48). The plaintiffs allege that Glenn Roth, the First Assistant County Solicitor and Risk Manager, and

Gary Bender, the County Administrator, witnessed this behavior by Halcovage but did nothing to stop it. (Id., ¶ 49).

Plaintiff Jane Doe 1 was hired by the County in February of 2014. (Id., ¶ 51). According to the complaint, Halcovage visited Doe 1's workspace often, which caused her coworkers to make comments about Doe 1 talking with Halcovage who was "a sucker for pretty girls." (Id., ¶¶ 52-53). Halcovage began making unwanted comments about Doe 1's physical appearance, which increased in frequency and intensity throughout Doe 1's first year with the County. (Id., ¶¶ 55-56). These comments about Doe 1's physical appearance eventually morphed into more forceful sexual advances, with Halcovage grabbing Doe 1 and kissing her after a fundraiser that Doe 1 attended in late 2014 or early 2015. (Id., ¶¶ 57-61). After this incident, Halcovage allegedly made comments to Doe 1 which she believed implied that her job was contingent on submitting to Halcovage's sexual advances. (Id., ¶ 64).

Around this same time, Plaintiff Jane Doe 2 was hired by the County, and the complaint alleges that she was almost immediately subject to unwanted sexual comments from Halcovage. (Id., ¶¶ 65-66). It is alleged that these sexually charged comments caused Doe 2 issues with her female coworkers, who either ignored her or gave her one-word answers, which she believed to be due to her coworkers' incorrect impression that she was in a relationship with Halcovage. (Id., ¶¶ 68-72). The complaint further alleges that the plaintiffs witnessed Halcovage making

inappropriate and sexist comments about other female coworkers. (Id., ¶¶ 76-77). According to the plaintiffs, Defendants Roth and Bender were present for some of these comments but did nothing to stop Halcovage or inform him that his behavior was inappropriate. (Id., ¶¶ 78-79). This led the plaintiffs to believe that any efforts they made to report Halcovage's conduct would be futile. (Id., ¶ 81).

Halcovage's alleged sexual harassment of the Doe plaintiffs continued and intensified. In 2015, Halcovage made a comment to Doe 2's husband at a fundraising event about "using" his wife, a comment which allegedly insinuated that Halcovage and Doe 2 had sexual intercourse. (Id., ¶¶ 83-86). The complaint asserts that Defendant Roth was present for this comment and later mentioned that the comment made him uncomfortable, remarking that Halcovage "didn't have to say it that way." (Id., ¶¶ 87-89). However, Roth did not report Halcovage's behavior to HR. (Id., ¶ 90).

Doe 1 and Doe 2 also attended a fundraiser in March of 2015 at Halcovage's request. (Id., ¶ 91). According to the complaint, Halcovage insisted he drive Doe 1 home after the event. (Id., ¶ 92). Upon arriving at Doe 1's home, Halcovage was verbally and physically affectionate with her, kissed her, and ultimately unzipped his pants and exposed his genitals to her. (Id. ¶¶ 94-95). Doe 1 took this to mean that Halcovage wanted her to perform oral sex on him, which made her feel overwhelmed and uncomfortable. (Id., ¶¶ 97-98). Due to his position of authority over her, Doe 1

ultimately performed oral sex on Halcovage. (Id., ¶ 97). The complaint alleges that immediately following this incident with Doe 1, Halcovage called Doe 2 demanding to know where she was and who she was with. (Id., ¶ 98).

The complaint alleges another instance of sexual assault by Halcovage in 2018, where Halcovage took Doe 1 into the tax filing room inside the courthouse, forcibly pushed her head down, exposed his genitals, and forced her to perform oral sex on him. (Id., ¶¶ 109-12). While Doe 1 and Doe 2 consistently attempted to rebuff Halcovage's sexual advances, it is alleged that Halcovage also inserted himself into their personal and family lives, particularly when they refused his sexual advances. (Id., ¶ 101). The complaint asserts that Halcovage frequently made appearances at Doe 1's home late at night with alcohol or early in the morning, causing her to be late for work. (Id., ¶ 104). Moreover, when Doe 1 rebuffed Halcovage's advances, Halcovage's harassment of Doe 2 intensified. (Id., ¶ 119). The plaintiffs allege that over time, Halcovage's requests for oral sex turned into requests for sexual intercourse. (Id., ¶ 116).

In 2019, Doe 3 became Doe 1's direct supervisor. (Id., ¶ 142). In July and November of 2019, Doe 3 twice reported incidents of Halcovage's sexual harassment to Defendant Roth. (Id., ¶¶ 145-47). According to the complaint, Roth did not document the incidents, make any inquiries, or report the incidents to HR. (Id., ¶ 148). Around this same time, Roth allegedly knew that Halcovage was

contacting Doe 1 and Doe 2 outside of work hours but did not report Halcovage's behavior to anyone. (Id., ¶¶ 154-55). In 2020, Doe 3 pleaded with Roth to intervene with respect to Halcovage's harassment, and Roth told her to take her complaints to HR. (Id., ¶¶ 156-57).

Thus, in May of 2020, Doe 1 sent Doe 3 a formal email reporting Halcovage's sexual harassment and sexual assault. (Id., ¶ 159). This email was promptly forwarded to HR, after which HR conducted formal interviews of the plaintiffs. (Id., ¶ 160-61). One month later, Halcovage stepped down as Chief Commissioner but remained in the Commissioner position. (Id., ¶ 162). At this time, the County put out a press release stating that an investigation revealed that Halcovage had violated the County's Sexual Harassment Policy, the Conduct and Disciplinary Action Policy, and the Physical and Verbal Abuse Policy. (Id., ¶ 164). This press release also stated that Halcovage could not be removed from his position as Commissioner absent a criminal conviction or impeachment. (Id.)

Following the Doe Plaintiffs' reports of sexual misconduct, they allege that they were subject to retaliation by Halcovage, the County, and the other individual defendants. On this score, it is alleged that Halcovage was not removed from the plaintiffs' work environment and was still working at the courthouse. (Id., ¶ 167). The County also permitted an employee of Doe 3 and Doe 4 to be relocated without consulting Doe 3 or Doe 4, which impacted their job performance and was believed

to be done in retaliation for their reports against Halcovage. (Id., ¶¶ 173-74). Additionally, while Halcovage was informed there was a specific place he could park, Defendant Bender allegedly authorized him to park in the same parking lot as Doe 3 and Doe 4. (Id., ¶ 177). Doe 3 and Doe 4 were also required to conduct an assessment appeal hearing in the Commissioner's suite, although they had requested not to be required to work in that location. (Id., ¶¶ 178-79). Thus, Doe 3 encountered Halcovage in August of 2020, which caused her emotional distress. (Id., ¶ 180-81).

The plaintiffs ultimately filed complaints with the Equal Employment Opportunity Commission ("EEOC") and the Pennsylvania Human Relations Commission ("PHRC") in August of 2020. (Id., ¶ 8). In these complaints, they alleged violations of Title VII, the PHRA, Pennsylvania common law, and Section 1983. (Id.)[5]

Following the filing of the EEOC complaints, Doe 3 encountered Halcovage several times, after which she reported her concerns to Doreen Kutzler, an HR representative for the County. (Id., ¶¶ 184-86). The complaint alleges that Doe 3 contact Kutzler twice regarding her concerns, but Kutzler never responded to her email or took any action to prevent the plaintiffs from further encounters with Halcovage. (Id., ¶¶ 186-87). Doe 3 also emailed Kutzler to set up specific times for

---

[5] These complaints were supplemented on March 16, 2021. (Doc. 63, ¶ 9). The plaintiffs received their Right to Sue letters on April 8, 2021 and October 27, 2021. (Id., ¶¶ 11, 13).

she and Doe 4 to come to the office so as not to encounter Halcovage, and Kutzler again ignored her emails. (Id., ¶¶ 188-89). Moreover, while Doe 1 and Doe 2 were working from home, they allege that they were not given the supplies they needed, which hindered them from performing their job duties. (Id., ¶ 192). Additionally, in October 2020, Kutzler and Bender engaged in contract negotiations with one of Doe 3 and Doe 4's employees without consulting them, which led to more responsibilities for Doe 3 and Doe 4. (Id., ¶¶ 196-200).

In October of 2020, Doe 1 again requested that she be given permission to continue to work from home and provided with the necessary supplies to do so. (Id., ¶ 204). This request was ultimately denied, and in November of 2020, Doe 1 and Doe 2 were informed that they would be required to work in the "410 building." (Id., ¶ 206). The plaintiffs brought concerns to the County regarding this work arrangement, indicating that Halcovage could access the building and that there was no parking close by. (Id., ¶ 208). The County had also arranged for Defendant Bender to provide Doe 1 and Doe 2 with keys to their offices and to answer any questions they had, but this arrangement was changed when the plaintiffs informed the County that they did not want to have contact with Bender. (Id., ¶¶ 210-11). At or around this time, Doe 1 and Doe 2 requested to use paid time off, which Kutzler denied, informing them they could only use unpaid leave. (Id., ¶¶ 216-17). Additionally, Doe 3 emailed Kutzler about the state and cleanliness of the new office

space for Doe 1 and Doe 2, concerns that were said to have been remedied but were not. (Id., ¶¶ 219-223).

The harassment and retaliation of the plaintiffs allegedly continued into 2021. Thus, on or about January 13, 2021, Doe 2 alleges that Halcovage was following her, and she reported it to both Kutzler and the police. (Id., ¶ 224). Two days later, Doe 3 and Doe 4 learned that Halcovage had been assigned a parking spot in the same lot they parked in and that he had access to where they worked in the courthouse. (Id., ¶ 226). Upon learning this, Doe 3 and Doe 4 opted to work from home that day, and they were later reprimanded for this decision by Bender. (Id., ¶ 227). They were further reprimanded by Bender and Zula for allowing their employees to work from home. (Id., ¶¶ 229-30). Thus, in February of 2021, Zula denied Doe 1's request to work from home, even though Doe 3 had approved it as her supervisor. (Id., ¶¶ 231-34). Additionally in February 2021, Kutzler permitted Bender and Halcovage to sign up for the same sexual harassment training that Doe 3 and Doe 4 had signed up for, requiring them to adjust their schedule to go to a different training. (Id., ¶¶ 235-36). At or around this time, Doe 2 had requested to work from home, and Zula denied her request. (Id., ¶¶ 237-38). Additionally, Doe 1 and Doe 2 were not assigned parking spaces for the "410 building" and had been threatened that their vehicles would be towed. (Id., ¶ 242).

Thereafter, on March 18, 2021, just two days after the initial complaint was filed in this case, Doe 3 and Doe 4 received notice that their office was being restructured, which resulted in a demotion and a decrease in their salaries. (Id., ¶ 243). The restructuring of the office was voted on by Halcovage despite others requesting that he abstain from the vote. (Id.) Moreover, the restructuring resulted in Doe 1 and Doe 2 reporting directly to Defendant Bender. (Id., ¶ 244). In April 2021, Doe 3 and Doe 4 were issued written warnings for unprofessional and inappropriate conduct. (Id., ¶ 245; Doc. 63-1, Ex. K, at 44-45). Then in May 2021, Doe 3 was suspended without pay, which was signed off by Bender. (Doc. 63, ¶ 246; Doc. 63-1, Ex. L, at 50). In July of 2021, Doe 2 was issued a written reprimand for failing to report an absence from work. (Doc. 63, ¶ 247; Doc. 63-1, Ex. M, at 56). Ultimately, in September of 2021, Doe 3 and Doe 4 were suspended indefinitely without pay. (Doc. 63, ¶ 258; Doc. 63-1, Ex. N, at 58).

As we have noted, the initial complaint in this matter was filed on March 18, 2021. (Doc. 1). The plaintiffs filed an amended complaint on April 16, 2021, and a second amended complaint was filed on October 29, 2021, which is now the operative pleading in this case. (Doc. 63). With respect to Defendant Bender and the County, the amended complaint asserts the following claims by the Doe Plaintiffs: discrimination, retaliation and hostile work environment claims under Title VII against the County (Counts I-III); discrimination, retaliation, and aiding and abetting

discrimination and retaliation under the PHRA (Counts V-VII); Fourteenth Amendment Equal Protection violations based on disparate treatment and hostile work environment (Counts VIII-IX); and retaliation in violation of the First Amendment (Count XIII).

Bender and the County have now filed a motion to dismiss, arguing that the plaintiffs have failed to state a claim against them. As we will discuss below, with the exception of the discrimination claim under the PHRA against Bender, we find that the plaintiffs have sufficiently stated causes of action against the County and Bender at this stage. Accordingly, the motion will be granted with respect to the PHRA discrimination claim against Bender, as well as the claim for punitive damages against Bender under the PHRA, but will be denied in all other respects.

## III.   <u>Discussion</u>

### A.   <u>Motion to Dismiss – Standard of Review</u>

A motion to dismiss tests the legal sufficiency of a complaint. It is proper for the court to dismiss a complaint in accordance with Rule 12(b)(6) of the Federal Rules of Civil Procedure only if the complaint fails to state a claim upon which relief can be granted. Fed. R. Civ. P. 12(b)(6). With respect to this benchmark standard for the legal sufficiency of a complaint, the United States Court of Appeals for the Third Circuit has aptly noted the evolving standards governing pleading practice in federal court, stating that:

> Standards of pleading have been in the forefront of jurisprudence in recent years. Beginning with the Supreme Court's opinion in <u>Bell Atlantic Corp. v. Twombly</u>, 550 U.S. 544 (2007), continuing with our opinion in <u>Phillips</u> [<u>v. County of Allegheny</u>, 515 F.3d 224, 230 (3d Cir. 2008)], and culminating recently with the Supreme Court's decision in <u>Ashcroft v. Iqbal</u>, –U.S.–, 129 S. Ct. 1937 (2009), pleading standards have seemingly shifted from simple notice pleading to a more heightened form of pleading, requiring a plaintiff to plead more than the possibility of relief to survive a motion to dismiss.

<u>Fowler v. UPMC Shadyside</u>, 578 F.3d 203, 209-10 (3d Cir. 2009).

In considering whether a complaint fails to state a claim upon which relief may be granted, the court must accept as true all allegations in the complaint and all reasonable inferences that can be drawn therefrom are to be construed in the light most favorable to the plaintiff. <u>Jordan v. Fox, Rothschild, O'Brien & Frankel, Inc.</u>, 20 F.3d 1250, 1261 (3d Cir. 1994). However, a court "need not credit a complaint's bald assertions or legal conclusions when deciding a motion to dismiss." <u>Morse v. Lower Merion Sch. Dist.</u>, 132 F.3d 902, 906 (3d Cir. 1997). Additionally, a court need not "assume that a . . . plaintiff can prove facts that the . . . plaintiff has not alleged." <u>Associated Gen. Contractors of Cal. v. California State Council of Carpenters</u>, 459 U.S. 519, 526 (1983). As the Supreme Court held in <u>Bell Atlantic Corp. v. Twombly</u>, 550 U.S. 544 (2007), in order to state a valid cause of action, a plaintiff must provide some factual grounds for relief which "requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of

actions will not do." Id., at 555. "Factual allegations must be enough to raise a right to relief above the speculative level." Id.

In keeping with the principles of Twombly, the Supreme Court has underscored that a trial court must assess whether a complaint states facts upon which relief can be granted when ruling on a motion to dismiss. In Ashcroft v. Iqbal, 556 U.S. 662 (2009), the Supreme Court held that, when considering a motion to dismiss, a court should "begin by identifying pleadings that, because they are no more than conclusions, are not entitled to the assumption of truth." Id., at 679. According to the Supreme Court, "[t]hreadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." Id., at 678. Rather, in conducting a review of the adequacy of a complaint, the Supreme Court has advised trial courts that they must:

> [B]egin by identifying pleadings that because they are no more than conclusions are not entitled to the assumption of truth. While legal conclusions can provide the framework of a complaint, they must be supported by factual allegations. When there are well-pleaded factual allegations, a court should assume their veracity and then determine whether they plausibly give rise to an entitlement to relief.

Id., at 679.

Thus, following Twombly and Iqbal, a well-pleaded complaint must contain more than mere legal labels and conclusions; it must recite factual allegations sufficient to raise the plaintiff's claimed right to relief beyond the level of mere speculation. As the United States Court of Appeals for the Third Circuit has stated:

> [A]fter Iqbal, when presented with a motion to dismiss for failure to state a claim, district courts should conduct a two-part analysis. First, the factual and legal elements of a claim should be separated. The District Court must accept all of the complaint's well-pleaded facts as true, but may disregard any legal conclusions. Second, a District Court must then determine whether the facts alleged in the complaint are sufficient to show that the plaintiff has a "plausible claim for relief." In other words, a complaint must do more than allege the plaintiff's entitlement to relief. A complaint has to "show" such an entitlement with its facts.

Fowler, 578 F.3d at 210-11.

> As the Court of Appeals has observed:

> The Supreme Court in Twombly set forth the "plausibility" standard for overcoming a motion to dismiss and refined this approach in Iqbal. The plausibility standard requires the complaint to allege "enough facts to state a claim to relief that is plausible on its face." Twombly, 550 U.S. at 570, 127 S. Ct. 1955. A complaint satisfies the plausibility standard when the factual pleadings "allow[ ] the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." Iqbal, 129 S. Ct. at 1949 (citing Twombly, 550 U.S. at 556, 127 S. Ct. 1955). This standard requires showing "more than a sheer possibility that a defendant has acted unlawfully." Id. A complaint which pleads facts "merely consistent with" a defendant's liability, [ ] "stops short of the line between possibility and plausibility of 'entitlement of relief.' "

Burch v. Milberg Factors, Inc., 662 F.3d 212, 220-21 (3d Cir. 2011), cert. denied, 132 S. Ct. 1861 (2012).

> In practice, consideration of the legal sufficiency of a complaint entails a

three-step analysis:

> First, the court must "tak[e] note of the elements a plaintiff must plead to state a claim." Iqbal, 129 S. Ct. at 1947. Second, the court should identify allegations that, "because they are no more than conclusions, are not entitled to the assumption of truth." Id., at 1950. Finally, "where

> there are well-pleaded factual allegations, a court should assume their
> veracity and then determine whether they plausibly give rise to an
> entitlement for relief."

Santiago v. Warminster Twp., 629 F.3d 121, 130 (3d Cir. 2010) (quoting

Iqbal, 129 S. Ct. at 1950).

In considering a motion to dismiss, the court generally relies on the complaint,

attached exhibits, and matters of public record. Sands v. McCormick, 502 F.3d 263,

268 (3d Cir. 2007). The court may also consider "undisputedly authentic

document[s] that a defendant attached as an exhibit to a motion to dismiss if the

plaintiff's claims are based on the [attached] documents." Pension Benefit Guar.

Corp. v. White Consol. Indus., 998 F.2d 1192, 1196 (3d Cir. 1993). Moreover,

"documents whose contents are alleged in the complaint and whose authenticity no

party questions, but which are not physically attached to the pleading, may be

considered." Pryor v. Nat'l Collegiate Athletic Ass'n, 288 F.3d 548, 560 (3d Cir.

2002); see also U.S. Express Lines, Ltd. v. Higgins, 281 F.3d 382, 388 (3d Cir. 2002)

(holding that "[a]lthough a district court may not consider matters extraneous to the

pleadings, a document integral to or explicitly relied upon in the complaint may be

considered without converting the motion to dismiss in one for summary

judgment"). However, the court may not rely on other parts of the record in

determining a motion to dismiss, or when determining whether a proposed amended

complaint is futile because it fails to state a claim upon which relief may be granted.

Jordan v. Fox, Rothschild, O'Brien & Frankel, 20 F.3d 1250, 1261 (3d Cir. 1994).

### B. **The Defendant's Motion Should Be Granted in Part and Denied in Part.**

As we have noted, several claims brought against these defendants are not contested in the instant motion to dismiss. Thus, the defendants do not contest: the Title VII and PHRA claims against the County (Counts I-III, V-VII); the claim for aiding and abetting under the PHRA against Bender (Count VII); and the claim for First Amendment retaliation against Bender and the County (Count XIII). We will proceed with the litigation of these claims against the County and Bender. Accordingly, we will address the remaining claims against these defendants that are challenged in this motion to dismiss.

#### 1. **Plaintiffs' Use of Pseudonyms**

The defendants first contend that the Doe plaintiffs are improperly proceeding under pseudonyms. However, for the reasons set forth below, we will decline at this stage to prohibit the plaintiffs from proceeding under their Jane Doe pseudonyms.

Ordinarily, "[a] plaintiff's use of a pseudonym 'runs afoul of the public's common law right of access to judicial proceedings.'" Doe v. Megless, 654 F.3d 404, 408 (3d Cir. 2011) (quoting Does I Thru XXIII v. Advanced Textile Corp., 214 F.3d 1058, 1067 (9th Cir. 2000)). Rule 10(a) of the Federal Rules of Civil Procedure does not expressly permit parties to proceed anonymously, but courts have permitted

this course in exceptional cases. <u>Megless</u>, 654 F.3d at 408. The Third Circuit has

endorsed a non-exhaustive list of factors for courts to consider when determining

whether to allow plaintiffs to pursue litigation anonymously:

The factors in favor of anonymity included:

"(1) the extent to which the identity of the litigant has been kept confidential; (2) the bases upon which disclosure is feared or sought to be avoided, and the substantiality of these bases; (3) the magnitude of the public interest in maintaining the confidentiality of the litigant's identity; (4) whether, because of the purely legal nature of the issues presented or otherwise, there is an atypically weak public interest in knowing the litigant's identities; (5) the undesirability of an outcome adverse to the pseudonymous party and attributable to his refusal to pursue the case at the price of being publicly identified; and (6) whether the party seeking to sue pseudonymously has illegitimate ulterior motives."

<u>Id.</u> at 467–68. On the other side of the scale, factors disfavoring anonymity included:

"(1) the universal level of public interest in access to the identities of litigants; (2) whether, because of the subject matter of this litigation, the status of the litigant as a public figure, or otherwise, there is a particularly strong interest in knowing the litigant's identities, beyond the public's interest which is normally obtained; and (3) whether the opposition to pseudonym by counsel, the public, or the press is illegitimately motivated."

<u>Id.</u>

<u>Id.</u> at 409-10 (quoting <u>Doe v. Provident Life and Acc. Ins. Co.</u>, 176 F.R.D. 464, 467-

68 (E.D. Pa. 1997)). On this score, the Court of Appeals cautioned that this is not a

comprehensive list of factors to be considered and endorsed the <u>Provident Life</u>

court's view that "trial courts 'will always be required to consider those [other] factors which the facts of the particular case implicate.'" Id.

Turning to the instant case, we find that the factors analysis weighs in favor of the plaintiffs proceeding using pseudonyms at this time. First, the plaintiffs have taken steps to keep their identities confidential. They have limited information in the complaint regarding their most recent positions with the County, and they have not informed any individuals about the sexual harassment and sexual assault other than individuals who needed to know this information to perform their jobs related to this case. Specifically, and significantly, Doe 1 has stated that she has not disclosed her sexual assault by Halcovage to her family, friends, or children. Moreover, while the defendants note that two of the plaintiffs have been identified in an online blog post, the plaintiffs did not give that information to the press, and they contend their attorney has been intentionally vague in any statements given about this matter in order to protect the plaintiffs' identities. Accordingly, we find that this first factor weighs in favor of anonymity.

Second, the plaintiffs' bases for proceeding anonymously—that they are victims of sexual harassment, sexual abuse, and ongoing retaliation by County officials—weighs in favor of anonymity. The plaintiffs contend that if their identities were revealed to their friends, families, and communities, they may be stigmatized in both their personal and professional lives, and they will experience increased and

ongoing embarrassment and humiliation. This is a consideration which has been held to weigh in favor of anonymity for plaintiffs who have alleged they were sexually harassed or assaulted. See e.g., Doe v. County of Lehigh, 2020 WL 7319544, at *4 (E.D. Pa. Dec. 11, 2020); Doe v. Lund's Fisheries, Inc., 2020 WL 6749972, at *2-3 (D.N.J. Nov. 17, 2020); Doe v. Trishul Consultancy, LLC, 2019 WL 4750078, at *4-5 (D.N.J. Sept. 30, 2019); Doe v. Evans, 202 F.R.D. 173, 176 (E.D. Pa. 2001).

The third factor—the magnitude of the public's interest in the plaintiffs' identities—similarly weighs in favor of anonymity, at least at the initial stages in this case. For their part, the defendants contend that the public has an interest in the plaintiffs' identities because, as taxpayers ultimately would be responsible for footing the bill for a judgment against a municipality, they should know to whom the money would be paid. However, while the public certainly has an interest in this matter, this argument misses the mark, and fails to adequately consider countervailing considerations. There is also a recognized public interest in protecting the identities of sexual assault victims. See Evans, 202 F.R.D. at 176. Further, while some courts have held that victims of sexual harassment are not entitled to proceed under a pseudonym, see Doe v. Court of Common Pleas of Butler County PA, 2017 WL 5069333, at *2 (W.D. Pa. Nov. 3, 2017), we find that this case presents a particularly concerning set of circumstances—namely, that these plaintiffs were the victims of sexual harassment, assault, and ongoing retaliation by supervisory County

officials, including the Chief County Commissioner at the time. Premature disclosure of these plaintiffs' identities, particularly at a time when we are in the preliminary stages of this litigation, could expose them to additional and on-going distress, embarrassment, and harassment. Accordingly, we find that this factor also weighs in favor of the plaintiffs at this juncture.

The final two factors also weigh in favor of the plaintiffs proceeding under a pseudonym. On this score, the plaintiffs have averred that they likely will not continue to pursue this litigation if their identities are revealed to the public. They contend that permitting them to proceed anonymously will allow them to be more forthcoming and open about the very sensitive and personal aspects of this case. We agree. Indeed, particularly in cases involving sexual assault, "there is a strong public interest to maintain the confidentiality of a plaintiff's identity due to h[er] status as an alleged victim of sexual assault and the highly sensitive and personal nature of the allegations underlying the plaintiff's complaint." Lund's Fisheries, Inc., 2020 WL 6749972, at *3 (citing Evans, 202 F.R.D. at 176). Moreover, we cannot discern any illegitimate ulterior motives for the plaintiffs' requests to proceed anonymously.

Ultimately, we find that these factors weigh heavily in favor of permitting these Doe plaintiffs to continue to litigate this case under pseudonyms at this juncture. While we must take into consideration the factors disfavoring anonymity, we find that these factors are far outweighed by the factors favoring anonymity. It is

true that the public has an interest in this case, which involves allegations of sexual assault and harassment, as well as retaliation, by high-level County employees, including a County Commissioner. However, we conclude that presently, disclosure of the identity of the plaintiffs is not germane to the resolution of these issues. As the <u>Provident Life</u> court noted, the plaintiffs' "use of a pseudonym will not interfere with the public's right or ability to follow the proceedings." <u>Provident Life</u>, 176 F.R.D. at 468.

In sum, at this time we find that the plaintiffs' interest in proceeding through this lawsuit anonymously outweighs the public's interest in the identities of these plaintiffs. Accordingly, we will deny the defendants' request to prohibit the plaintiffs from proceeding under pseudonyms at this juncture.

### 2.  **PHRA Claims**

As we have explained, the plaintiffs bring claims against Bender under the PHRA, alleging that he discriminated against them, retaliated against them, and aided and abetted others' discriminatory and retaliatory conduct. <u>See</u> 42 Pa. Cons. Stat. §§ 955(a), (d), (e). The PHRA makes it unlawful for an employer to discriminate with respect to compensation, hire, privileges, or other employment-related benefits against an employee because of sex. § 955(a). An "employer" is defined under the Act as "the Commonwealth or any political subdivision or board, department, commission or school district thereof and any person employing four or

more persons within the Commonwealth . . ." § 954(b). The Act further prohibits employers and employees from retaliating against an individual who reports discriminatory conduct. § 955(d). In addition, the PHRA prohibits employers and employees from aiding, abetting, or inciting discriminatory or retaliatory conduct. § 955(e).

For his part, Bender does not contest the PHRA aiding and abetting claim in the instant motion. Therefore that claim will proceed forward. However, with respect to the discrimination claim, Bender argues that he is not an "employer" and thus cannot be held liable under § 955(a) for discrimination. For their part, the plaintiffs contend that Bender, having supervisory authority, can be considered a "joint employer" and therefore liable under § 955(a). The Third Circuit has aptly noted in the past that, with respect to these discrimination claims,

> Generally, the PHRA is applied in accordance with Title VII. Davis v. Sheraton Society Hill Hotel, 907 F.Supp. 896, 899 n. 1 (E.D. Pa. 1995). Like Title VII, the definition of an employer under the PHRA cannot be construed to include "employees;" indeed, "employee" is defined as a wholly separate term under the Act. See 43 Pa. Cons. Stat. Ann. § 954(b) & (c). The employment discrimination provision of the PHRA declares only that "any employer" may be held liable. See 43 Pa. Cons. Stat. Ann. § 955(a).

Dici v. Commonwealth of Pa., 91 F.3d 542, 552 (3d Cir. 1996). See also McIlmail v. Pennsylvania, 381 F.Supp.3d 393, 415 (E.D. Pa. 2019) ("The PHRA is 'generally

applied in accordance with Title VII,' which exposes only employers to liability while exempting individual employees. . .") (internal citations omitted).

On this score, the plaintiffs argue that Bender has supervisory authority, and thus, should be considered a "joint employer" liable for discrimination under the PHRA. However, the plaintiffs have provided no authority for this proposition, and an independent search has not yielded any caselaw in this circuit which would suggest than an individual can be considered a "joint employer" of an employee. Rather, cases discussing a joint employer relationship have almost exclusively considered this joint employer relationship in the context of two *entities*, not individual persons. See e.g., Faush v. Tuesday Morning, Inc., 808 F.3d 208, 215 (3d Cir. 2015) ("Two entities may be "co-employers" or "joint employers" of one employee for purposes of Title VII"); Showers v. Endoscopy Center of Central Pa., LLC, 58 F.Supp.3d 446, 456 n.7 (M.D. Pa. 2014) ("The court notes that two corporations may also be consolidated under the 'joint employer' doctrine"); Myers v. Garfield & Johnson Enterprises, Inc., 679 F.Supp.2d 598, 607 (E.D. Pa. 2010) ("[A] finding that companies are 'joint employers' assumes in the first instance that companies are . . . independent legal entities that have merely 'historically chosen to handle joint important aspects of their employer-employee relationship'") (citations omitted).

Accordingly, we are not persuaded by the plaintiffs' assertion that Bender, an individual employee, can also be considered a "joint employer" for purposes of their PHRA discrimination claim. Therefore, in the absence of any legal authority construing the PHRA in this fashion, with respect to the PHRA discrimination claim against Defendant Bender, we conclude that this claim fails as a matter of law, as Bender cannot be considered an "employer" under the PHRA. Of course, the plaintiff's may still pursue a PHRA discrimination claim against Bender on an aiding and abetting theory. Such claims are explicitly recognized by statute, are not contested by Bender, and properly lie here.

Moreover, we find that the plaintiffs have sufficiently alleged a claim of retaliation under the PHRA against Bender. As we have noted, the PHRA's discrimination and retaliation provisions differ significantly in terms of the scope of those who may be held culpable. Under the PHRA, discrimination claims lie only against an "employer" and those who aid and abet the employer. In contrast,  § 955(d) prohibits both employers and employees from retaliating against an individual who reports discriminatory conduct. 42 Pa. Cons. Stat. § 955(d). Thus, in order to sustain a PHRA retaliation claim, the plaintiffs must show that they engaged in protected activity, suffered adverse action at the hands of the defendants, and show a causal connection between their protected activity and the adverse action taken against them. See Fasold v. Justice, 409 F.3d 178, 188-89 (3d Cir. 2005) (noting that

"retaliation claims . . . under the PHRA typically proceed under the <u>McDonell Douglas</u> framework").[6]

In the instant case, the plaintiffs have alleged that Bender, the County Administrator, engaged in retaliatory behavior after they reported the discriminatory conduct to which they were subjected. Thus, the amended complaint alleges that Bender was present and overheard Halcovage's sexually charged and inappropriate comments and did not report it; that after the plaintiffs made reports about the sexual harassment and assault, Bender authorized Halcovage to park in the same lot as Doe 3 and Doe 4; that Bender was involved in restructuring the plaintiffs' work responsibilities when he engaged in contract negotiations, which placed more responsibilities on Doe 3 and Doe 4; that Bender was involved in the decision to move Doe 1 and Doe 2 to the 410 building and prohibit them from working from home; that Bender reprimanded Doe 3 and Doe 4 when they chose to work from home after finding out that Halcovage had access to their work space; and that Bender was involved in the restructuring of Doe 3 and Doe 4's office, which led to their demotions and led to Doe 1 and Doe 2 reporting directly to Bender; events which then promptly led to disciplinary action against these plaintiffs, disciplinary action that was approved by Bender.

---

[6] <u>McDonnell Douglas Corp. v. Green</u>, 411 U.S. 792 (1973).

With our review confined to these well-pleaded allegations in the plaintiffs' amended complaint, we find that these allegations are sufficient at this stage to state a claim for retaliation against Bender. The plaintiffs have alleged that they reported discriminatory behavior to their supervisors and HR, and then were subsequently subjected to a host of adverse actions, including demotions, pay decreases, and increased work responsibilities, all of which Defendant Bender is alleged to have been directly involved in. At this stage, where we must accept these factual allegations as true, these allegations are sufficient to state a claim of retaliation against Bender. Accordingly, the motion to dismiss this retaliation claim will be denied.

### 3.  **Equal Protection Claims**

Next, the defendants contend that the plaintiffs have failed to state a § 1983 claim against them for discrimination and creating a hostile work environment because of their sex in violation of the Fourteenth Amendment.

To state an equal protection claim under § 1983, the plaintiffs must show "that [they were] subjected to 'purposeful discrimination' because of [their] sex." Robinson v. City of Pittsburgh, 120 F.3d 1286, 1293 (3d Cir. 1997) (quoting Keenan v. City of Philadelphia, 983 F.2d 459, 465 (3d Cir. 1992)). Thus, the plaintiffs must allege "(1) disparate treatment in relation to other similarly situated individuals, and (2) that the discriminatory treatment was based on sex." Id. (citing Andrews v. City

of Philadelphia, 895 F.2d 1469, 1478 (3d Cir. 1990)). The complaint must further allege "some affirmative conduct by the supervisor that played a role in the discrimination." Andrews, 895 F.2d at 1478. Thus, "[t]he necessary involvement can be shown in two ways, either 'though allegations of personal direction or of actual knowledge and acquiescence.'" Id. (quoting Rode v. Dellarciprete, 845 F.2d 1195, 1207 (3d Cir. 1988)).

Further, a plaintiff alleging that a defendant created a hostile work environment on the basis of sex must allege that "(1) [S]he suffered intentional discrimination because of her [sex]; (2) the discrimination was severe or pervasive; (3) the discrimination detrimentally affected her; (4) it would have detrimentally affected a reasonable person in like circumstances; and (5) a basis for employer liability is present." Komis v. Sec'y of U.S. Dep't of Labor, 918 F.3d 289, 293 (3d Cir. 2019) (citations omitted); see Starnes v. Butler County Court of Common Pleas, 50th Judicial District, 971 F.3d 416, 428 (3d Cir. 2020) ("[W]e have been clear that § 1983 shares the same elements for discrimination purposes as a Title VII action"). "[A] hostile work environment exists 'when the workplace is permeated with "discriminatory intimidation, ridicule, and insult," that is "sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment." ' " Starnes, 971 F.3d at 428 (quoting National R.R. Passenger Corp. v. Morgan, 536 U.S. 101, 116 (2002) (internal citations omitted)).

Moreover, it is well settled that "[t]he intent to discriminate on the basis of sex in cases involving sexual propositions, innuendo . . . or sexual derogatory language is implicit, and thus should be recognized as a matter of course." Andrews, 895 F.2d at 1482 n.3.

In the instant case, as to Defendant Bender, we conclude that the plaintiffs have plausibly alleged a violation of the Equal Protection Clause against this defendant. The plaintiffs assert that as four female employees of the County, they and other female employees were subjected to sexual harassment, and in some instances sexual assault, by a male supervisor, George Halcovage. The complaint further alleges that Bender, the County Administrator, knew about this harassment and did nothing to stop it. Rather, Bender is alleged to have taken part in a series of retaliatory actions against these women who reported the sexual harassment by a male supervisor. These actions include authorizing Halcovage to park in the same lot as Doe 3 and Doe 4, reprimanding them for working from home, restructuring their employees to create a larger workload for them, and ultimately restructuring the office so as to demote Doe 3 and Doe 4, which led to Doe 1 and Doe 2 having to report to Bender. Indeed, Doe 3 and Doe 4's demotions and pay decreases came just two days after the complaint was filed in the instant case. Thereafter, the Doe plaintiffs were issued reprimands, verbal warnings, and were ultimately suspended without pay.

30

Thus, read in its entirety, the complaint alleges what is characterized as rampant sexual harassment, and in some instances sexual assault, over a period of several years of female employees by a male Commissioner. This harassment was allegedly known to Bender, who instead of acting on the harassment, engaged in behavior that led to the plaintiffs, the alleged victims, being demoted and ultimately suspended without pay after they reported this harassment of female employees. Not only were the plaintiffs penalized with work-related discipline, but they also allege that they were extremely distressed, embarrassed, and uncomfortable in the workplace because of the actions of Halcovage and inactions of others like Bender. Moreover, the Doe plaintiffs allege that they did not feel safe in the workplace because of Halcovage and because they believed it was futile to report his behavior, as other supervisory individuals such as Bender knew of the behavior and did not act to prevent it. Thus, we find that at the pleading stage, the plaintiffs haves sufficiently alleged disparate treatment and a hostile work environment based on sex against Defendant Bender.

We similarly conclude that the plaintiffs have adequately stated a <u>Monell</u> claim against the County for equal protection violations. The plaintiffs must meet an exacting standard to hold this municipal entity liable under § 1983. It is well settled that local governmental entities may not be held liable under § 1983 for the acts of others under a theory of *respondeat superior* or vicarious liability. <u>Iqbal</u>, 556 U.S.

662; see also Colburn v. Upper Darby Twp., 946 F.2d 1017, 1027 (3d Cir. 1991).

Instead, such an agency may only be held liable "when execution of a government's

policy or custom, whether made by its lawmakers or by those whose edicts or acts

may fairly be said to represent official policy, inflicts the injury that the government

as an entity is responsible under § 1983." Monell v. Dep't of Soc. Servs., 436 U.S.

658, 694 (1978). Thus, to sustain a claim against this institutional defendant, a

plaintiff must "identify a ... 'policy' or 'custom' that caused the plaintiff's injury."

Bd. of County Comm'rs of Bryan County v. Brown, 520 U.S. 397, 403 (1997). This

custom must be "so widespread as to have the force of law." Id. at 404; see also Beck

v. City of Pittsburgh, 89 F.3d 966, 971 (3d Cir. 1996) (a policy is an official

proclamation or edict of a municipality, while a custom is a practice that is "so

permanent and well settled as to virtually constitute law") (quoting Andrews, 895

F.2d at 1480). On this score,

> [A] policy or custom may exist where "the policymaker has failed to
> act affirmatively at all, [though] the need to take some action to control
> the agents of the government 'is so obvious, and the inadequacy of the
> existing practice so likely to result in the violation of constitutional
> rights, that the policymaker can be said to have been deliberately
> indifferent to the need.'"

Natale v. Camden County Correctional Facility, 318 F.3d 575, 584 (3d Cir.

2003) (quoting Brown, 520 U.S. at 417-18 (internal citations omitted)). Thus, an

avenue which a plaintiff may seek to hold a municipality liable is through the

municipality's inaction, rather than an affirmative policy which resulted in the plaintiffs' alleged injuries.

The plaintiff must further "allege that a 'policy or custom' of [the defendants] was the 'moving force' behind the [constitutional] violation." Grayson v. Mayview State Hosp., 293 F.3d 103, 107 (3d Cir. 2002) (citing Brown, 520 U.S. at 404). Therefore, analysis of a claim under Monell requires separate analysis of two distinct issues: "(1) whether plaintiff's harm was caused by a constitutional violation, and (2) if so whether the [the institutional defendant] is responsible for that violation." Collins v. City of Harker Heights, Texas, 503 U.S. 115, 120 (1992).

Here, we find that the plaintiffs' complaint adequately alleges municipal liability against the County. The complaint alleges the County failed to adopt policies to prevent the plaintiffs' injuries and failed to adequately train and supervise its employees. (Doc. 63, ¶ 359). The complaint further alleges that after the County's investigation into Halcovage, the County found that Halcovage had violated the County's Sexual Harassment Policy, the Conduct and Disciplinary Action Policy, and the Physical and Verbal Abuse Policy. (Id., ¶ 164). Thus, while the complaint does acknowledge the existence of these policies, the complaint also alleges that the County failed to train its employees or supervise them to ensure that the policies, as written, were enforced. Further, the plaintiffs contend that the supervisory

defendants failed to report any of the harassment they observed or that was reported to them, and then retaliated against the victims of this alleged harassment..

Thus, while the complaint acknowledges the existence of policies to prevent sexual harassment and workplace abuse, it also alleges that the supervisory defendants failed to abide by these polices and permitted the sexual harassment and abuse of the plaintiffs continue. The complaint asserts that the harassment and abuse by Halcovage toward female employees was widespread and well known to these supervisory defendants, who failed to report the behavior, and in some instances retaliated against the alleged victims of Halcovage's misconduct. Accordingly, taking these allegations as true, we conclude that the plaintiffs have plausibly alleged that the need for the County to take action was "so obvious, and the inadequacy of existing practice so likely to result in the violation of constitutional rights, that the policymaker can reasonably be said to have been deliberately indifferent to the need." Brown, 520 U.S. at 417-18 (internal quotations and citations omitted). Thus, the defendants' motion to dismiss will be denied with respect to the Fourteenth Amendment claims.

### 4. **Damages**

Finally, Bender and the County contest the plaintiffs' claim for punitive and liquidated damages. Their motion asserts that punitive damages are not available against the County as a municipal entity, and that liquidated and compensatory

damages are not authorized under Title VII. For their part, the plaintiffs contend that they should be permitted to seek compensatory damages against the County under Title VII and the PHRA and Bender under the PHRA, punitive damages against Bender under the PHRA, and liquidated damages against the County and Bender.

As to their request for compensatory damages, the Civil Rights Act expressly provides for an award of compensatory damages under Title VII. See 42 U.S.C. § 1981a(b). Likewise, compensatory damages are available to the plaintiffs under the PHRA. See Taylor v. Central Pa. Drug and Alcohol Servs. Corp., 890 F.Supp. 360, 373 (M.D. Pa. 1995) (citing Brown Transport Corporation v. Commonwealth of Pennsylvania, 578 A.2d 555, 562 (Pa. Commw. Ct. 1990) and Consumers Motor Mart v. Pennsylvania Human Relations Commission, 529 A.2d 571 (Pa. Commw. Ct. 1987) As such, the plaintiffs may proceed with a claim for compensatory damages against these defendants.

However, the plaintiff's request for punitive damages against Defendant Bender under the PHRA fails as a matter of law. On this score, the Pennsylvania Supreme Court has held that punitive damages are not available under the PHRA. See Hoy v. Angelone, 720 A.2d 745, 751 (1998); Tudor v. TBGHealth, Inc., 2022 WL 1004874, at *4 n.5 (M.D. Pa. April 2, 2022) (citing Hoy, 720 A.2d at 751; Klein v. Weidner, 729 F.3d 280, 288 (3d Cir. 2013) (granting summary judgment on the

plaintiff's claim for punitive damages under the PHRA). Accordingly, the plaintiff's claim for punitive damages against Bender under the PRHA will be dismissed.

Finally, with respect to the plaintiffs' claims for liquidated damages, we will deny the defendants' motion to dismiss. Courts in this circuit have differed in their conclusions regarding whether liquidated damages are permitted under the PHRA. Compare Potoski v. Wilkes Univ., 2010 WL 3811973 (M.D. Pa. Sept. 22, 2010) (liquidated damages not available under the PHRA) with Craig v. Thomas Jefferson University, 2009 WL 2038147, at *9 (E.D. Pa. July 7, 2009) (no caselaw establishing that liquidated damages are unavailable under the PHRA).As to this issue, the defendants' brief is sparse with respect to relevant caselaw in this area. Accordingly, given that the issue is not as clear-cut as the defendants suggest, we will decline to strike the plaintiffs' claim for liquidated damages at this juncture. See Bellas v. WVHCS Retention Co., 2012 WL 3961227, at *7 (M.D. Pa. Sept. 10, 2012) (declining to dismiss a liquidated damages demand at the motion to dismiss stage).

IV.    **Conclusion**

Accordingly, for the foregoing reasons, Defendant Bender and the County's motion to dismiss (Doc. 71) will be GRANTED IN PART AND DENIED IN PART as follows: The motion will be GRANTED with respect to the PHRA discrimination claim against Defendant Bender (Count V), as well as the claim for punitive damages against Bender under the PHRA. The motion will be DENIED in all other respects.

36

An appropriate order follows.

Dated: May 5,  2022

*S/ Martin C. Carlson*
Martin C. Carlson
United States Magistrate Judge
