## IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| **JANE DOE, et al.,** | : | **Civil No. 3:21-CV-477** |
| | : | |
| **Plaintiffs,** | : | |
| | : | |
| **v.** | : | |
| | : | **(Magistrate Judge Carlson)** |
| **SCHUYLKILL COUNTY** | : | |
| **COURTHOUSE, et al.,** | : | |
| | : | |
| **Defendants.** | : | |

## MEMORANDUM OPINION

### I.   Introduction

This case involves allegations of abhorrent workplace misconduct at the Schuylkill County Courthouse involving alleged sexual harassment, assault, and predation coupled with assertions of official indifference to the plight of the alleged victims of this workplace violence. The plaintiffs, four Jane Doe employees of Schuylkill County, filed this action against the County and several individual defendants. Their claims stem from the alleged sexual abuse and harassment perpetrated by County Commissioner George Halcovage over a period of several years while the plaintiffs were employed by the County. The plaintiffs assert that the County, as well as the individual supervisory defendants, knew of the sexual abuse

and harassment and did nothing to stop it. Instead, the plaintiffs contend that these defendants retaliated against them for reporting the sexual abuse and harassment.

Pending before the court is a motion to dismiss filed by one of the defendants, George Halcovage.[1] (Doc. 73). With respect to Defendant Halcovage, the plaintiffs allege that he discriminated and retaliated against them, and that he aided and abetted discriminatory conduct in violation of the Pennsylvania Human Relations Act ("PHRA"). They also assert that Halcovage violated their rights under the Equal Protection Clause of the Fourteenth Amendment by subjecting them to disparate treatment and a hostile work environment. The plaintiffs also assert a claim against Halcovage for First Amendment retaliation. Finally, Doe 1 and Doe 2 have asserted a state law claim against Halcovage for intentional infliction of emotional distress.

In his motion to dismiss, Halcovage contends that the plaintiffs have failed to state a claim for intentional infliction of emotional distress. He further argues that the First Amendment retaliation claim fails because the plaintiffs were speaking as employees, rather than as citizens about a matter of public concern. With respect to the PHRA claims, Halcovage contends that the discrimination and retaliation provisions do not apply to individuals, and that the plaintiffs have not stated a claim for aiding and abetting against him. Halcovage further asserts that the plaintiffs have

---

[1] The defendants have filed five separate motions to dismiss, which will be addressed in separate memorandum opinions.

failed to state an Equal Protection claim for disparate treatment and a hostile work environment. Finally, Halcovage challenges the plaintiffs' request to proceed under their "Jane Doe" pseudonyms.[2]

This motion is fully briefed and is ripe for resolution. (Docs. 84, 88, 92). For the reasons that follow, we will grant the motion to dismiss with respect to the PHRA discrimination claim but deny the motion in all other respects.

## II.   <u>Background</u>

The factual background of this case is taken from the factual allegations set forth in the plaintiff's second amended complaint (Doc. 63), which we must accept as true for purposes of this motion to dismiss.

George Halcovage was elected as a Commissioner of Schuylkill County in 2012. (Doc. 63, ¶ 45). At this time, Plaintiffs Jane Doe 3 and Jane Doe 4 were employed with the County as the Tax Claim Director and Clerk Typist One, respectively. (<u>Id.</u>, ¶¶ 43-44). The complaint alleges that upon the start of his term as County Commissioner, Halcovage frequently visited the Tax Claims Office and subjected the female employees to unwelcomed sexual harassment. (<u>Id.</u>, ¶ 47). This harassment, which included discriminatory sexist and inappropriate comments, was sometimes directed at and witnessed by Doe 3 and Doe 4, and caused them to feel

---

[2] We have addressed the plaintiffs' use of pseudonyms in a prior Memorandum Opinion, deciding that at this juncture, the plaintiffs may proceed under their Jane Doe pseudonyms. (Doc. 123).

extremely uncomfortable, humiliated, and distressed. (<u>Id.</u>, ¶¶ 47-48). The plaintiffs allege that Glenn Roth, the First Assistant County Solicitor and Risk Manager, and Gary Bender, the County Administrator, witnessed this behavior by Halcovage but did nothing to stop it. (<u>Id.</u>, ¶ 49).

Plaintiff Jane Doe 1 was hired by the County in February of 2014. (<u>Id.</u>, ¶ 51). According to the complaint, Halcovage visited Doe 1's workspace often, which caused her coworkers to make comments about Doe 1 talking with Halcovage who was "a sucker for pretty girls." (<u>Id.</u>, ¶¶ 52-53). Halcovage began making unwanted comments about Doe 1's physical appearance, which increased in frequency and intensity throughout Doe 1's first year with the County. (<u>Id.</u>, ¶¶ 55-56). These comments about Doe 1's physical appearance eventually escalated into more forceful sexual advances, with Halcovage grabbing Doe 1 and kissing her after a fundraiser that Doe 1 attended in late 2014 or early 2015. (<u>Id.</u>, ¶¶ 57-61). After this incident, Halcovage allegedly made comments to Doe 1 which she believed implied that her job was contingent on submitting to Halcovage's sexual advances. (<u>Id.</u>, ¶ 64).

Around this same time, Plaintiff Jane Doe 2 was hired by the County, and the complaint alleges that she was almost immediately subject to unwanted sexual comments from Halcovage. (<u>Id.</u>, ¶¶ 65-66). It is alleged that these sexually charged comments caused Doe 2 issues with her female coworkers, who either ignored her

or gave her one-word answers, which she believed to be due to her coworkers' incorrect impression that she was in a relationship with Halcovage. (Id., ¶¶ 68-72). The complaint further alleges that the plaintiffs witnessed Halcovage making inappropriate and sexist comments about other female coworkers. (Id., ¶¶ 76-77). According to the plaintiffs, Defendants Roth and Bender were present for some of these comments but did nothing to stop Halcovage or inform him that his behavior was inappropriate. (Id., ¶¶ 78-79). This led the plaintiffs to believe that any efforts they made to report Halcovage's conduct would be futile. (Id., ¶ 81).

Halcovage's alleged sexual harassment of the Doe plaintiffs continued and intensified. In 2015, Halcovage made a comment to Doe 2's husband at a fundraising event about "using" his wife, a comment which allegedly insinuated that Halcovage and Doe 2 had sexual intercourse. (Id., ¶¶ 83-86). The complaint asserts that Defendant Roth was present for this comment and later mentioned that the comment made him uncomfortable, remarking that Halcovage "didn't have to say it that way." (Id., ¶¶ 87-89). However, Roth did not report Halcovage's behavior to HR. (Id., ¶ 90).

Doe 1 and Doe 2 also attended a fundraiser in March of 2015 at Halcovage's request. (Id., ¶ 91). According to the complaint, Halcovage insisted he drive Doe 1 home after the event. (Id., ¶ 92). Upon arriving at Doe 1's home, Halcovage was verbally and physically affectionate with her, kissed her, and ultimately unzipped

his pants and exposed his genitals to her. (Id. ¶¶ 94-95). Doe 1 took this to mean that Halcovage wanted her to perform oral sex on him, which made her feel overwhelmed and uncomfortable. (Id., ¶¶ 97-98). Due to his position of authority over her, Doe 1 ultimately performed oral sex on Halcovage. (Id., ¶ 97). The complaint alleges that immediately following this incident with Doe 1, Halcovage called Doe 2 demanding to know where she was and who she was with. (Id., ¶ 98).

The complaint alleges another instance of sexual assault by Halcovage in 2018, where Halcovage took Doe 1 into the tax filing room inside the courthouse, forcibly pushed her head down, exposed his genitals, and forced her to perform oral sex on him. (Id., ¶¶ 109-12). While Doe 1 and Doe 2 consistently attempted to rebuff Halcovage's sexual advances, it is alleged that Halcovage also inserted himself into their personal and family lives, particularly when they refused his sexual advances. (Id., ¶ 101). The complaint asserts that Halcovage frequently made appearances at Doe 1's home late at night with alcohol or early in the morning, causing her to be late for work. (Id., ¶ 104). Moreover, when Doe 1 rebuffed Halcovage's advances, Halcovage's harassment of Doe 2 intensified. (Id., ¶ 119). The plaintiffs allege that over time, Halcovage's requests for oral sex turned into requests for sexual intercourse. (Id., ¶ 116).

In 2019, Doe 3 became Doe 1's direct supervisor. (Id., ¶ 142). In July and November of 2019, Doe 3 twice reported incidents of Halcovage's sexual

harassment to Defendant Roth. (Id., ¶¶ 145-47). According to the complaint, Roth did not document the incidents, make any inquiries, or report the incidents to HR. (Id., ¶ 148). Around this same time, Roth allegedly knew that Halcovage was contacting Doe 1 and Doe 2 outside of work hours but did not report Halcovage's behavior to anyone. (Id., ¶¶ 154-55). In 2020, Doe 3 pleaded with Roth to intervene with respect to Halcovage's harassment, and Roth told her to take her complaints to HR. (Id., ¶¶ 156-57).

Thus, in May of 2020, Doe 1 sent Doe 3 a formal email reporting Halcovage's sexual harassment and sexual assault. (Id., ¶ 159). This email was promptly forwarded to HR, after which HR conducted formal interviews of the plaintiffs. (Id., ¶ 160-61). One month later, Halcovage stepped down as Chief Commissioner but remained in the Commissioner position. (Id., ¶ 162). At this time, the County put out a press release stating that an investigation revealed that Halcovage had violated the County's Sexual Harassment Policy, the Conduct and Disciplinary Action Policy, and the Physical and Verbal Abuse Policy. (Id., ¶ 164). This press release also stated that Halcovage could not be removed from his position as Commissioner absent a criminal conviction or impeachment. (Id.)

Following the Doe Plaintiffs' reports of sexual misconduct, they allege that they were subject to retaliation by Halcovage, the County, and the other individual defendants. On this score, it is alleged that Halcovage was not removed from the

plaintiffs' work environment and was still working at the courthouse. (Id., ¶ 167). The County also permitted an employee of Doe 3 and Doe 4 to be relocated without consulting Doe 3 or Doe 4, which impacted their job performance and was believed to be done in retaliation for their reports against Halcovage. (Id., ¶¶ 173-74). Additionally, while Halcovage was informed there was a specific place he could park, Defendant Bender allegedly authorized him to park in the same parking lot as Doe 3 and Doe 4. (Id., ¶ 177). Doe 3 and Doe 4 were also required to conduct an assessment appeal hearing in the Commissioner's suite, although they had requested not to be required to work in that location. (Id., ¶¶ 178-79). Thus, Doe 3 encountered Halcovage in August of 2020, which caused her emotional distress. (Id., ¶ 180-81).

The plaintiffs ultimately filed complaints with the Equal Employment Opportunity Commission ("EEOC") and the Pennsylvania Human Relations Commission ("PHRC") in August of 2020. (Id., ¶ 8). In these complaints, they alleged violations of Title VII, the PHRA, Pennsylvania common law, and Section 1983. (Id.)[3]

Following the filing of the EEOC complaints, Doe 3 encountered Halcovage several times, after which she reported her concerns to Doreen Kutzler, an HR representative for the County. (Id., ¶¶ 184-86). The complaint alleges that Doe 3

---

[3] These complaints were supplemented on March 16, 2021. (Doc. 63, ¶ 9). The plaintiffs received their Right to Sue letters on April 8, 2021 and October 27, 2021. (Id., ¶¶ 11, 13).

contact Kutzler twice regarding her concerns, but Kutzler never responded to her email or took any action to prevent the plaintiffs from further encounters with Halcovage. (Id., ¶¶ 186-87). Doe 3 also emailed Kutzler to set up specific times for she and Doe 4 to come to the office so as not to encounter Halcovage, and Kutzler again ignored her emails. (Id., ¶¶ 188-89). Moreover, while Doe 1 and Doe 2 were working from home, they allege that they were not given the supplies they needed, which hindered them from performing their job duties. (Id., ¶ 192). Additionally, in October 2020, Kutzler and Bender engaged in contract negotiations with one of Doe 3 and Doe 4's employees without consulting them, which led to more responsibilities for Doe 3 and Doe 4. (Id., ¶¶ 196-200).

In October of 2020, Doe 1 again requested that she be given permission to continue to work from home and provided with the necessary supplies to do so. (Id., ¶ 204). This request was ultimately denied, and in November of 2020, Doe 1 and Doe 2 were informed that they would be required to work in the "410 building." (Id., ¶ 206). The plaintiffs brought concerns to the County regarding this work arrangement, indicating that Halcovage could access the building and that there was no parking close by. (Id., ¶ 208). The County had also arranged for Defendant Bender to provide Doe 1 and Doe 2 with keys to their offices and to answer any questions they had, but this arrangement was changed when the plaintiffs informed the County that they did not want to have contact with Bender. (Id., ¶¶ 210-11). At

or around this time, Doe 1 and Doe 2 requested to use paid time off, which Kutzler denied, informing them they could only use unpaid leave. (Id., ¶¶ 216-17). Additionally, Doe 3 emailed Kutzler about the state and cleanliness of the new office space for Doe 1 and Doe 2, concerns that were said to have been remedied but were not. (Id., ¶¶ 219-223).

The harassment and retaliation of the plaintiffs allegedly continued into 2021. Thus, on or about January 13, 2021, Doe 2 alleges that Halcovage was following her, and she reported it to both Kutzler and the police. (Id., ¶ 224). Two days later, Doe 3 and Doe 4 learned that Halcovage had been assigned a parking spot in the same lot they parked in and that he had access to where they worked in the courthouse. (Id., ¶ 226). Upon learning this, Doe 3 and Doe 4 opted to work from home that day, and they were later reprimanded for this decision by Bender. (Id., ¶ 227). They were further reprimanded by Bender and Zula for allowing their employees to work from home. (Id., ¶¶ 229-30). Thus, in February of 2021, Zula denied Doe 1's request to work from home, even though Doe 3 had approved it as her supervisor. (Id., ¶¶ 231-34). Additionally in February 2021, Kutzler permitted Bender and Halcovage to sign up for the same sexual harassment training that Doe 3 and Doe 4 had signed up for, requiring them to adjust their schedule to go to a different training. (Id., ¶¶ 235-36). At or around this time, Doe 2 had requested to work from home, and Zula denied her request. (Id., ¶¶ 237-38). Additionally, Doe 1

and Doe 2 were not assigned parking spaces for the "410 building" and had been threatened that their vehicles would be towed. (<u>Id.</u>, ¶ 242).

Thereafter, on March 18, 2021, just two days after the initial complaint was filed in this case, Doe 3 and Doe 4 received notice that their office was being restructured, which resulted in a demotion and a decrease in their salaries. (<u>Id.</u>, ¶ 243). The restructuring of the office was voted on by Halcovage despite others requesting that he abstain from the vote. (<u>Id.</u>) Moreover, the restructuring resulted in Doe 1 and Doe 2 reporting directly to Defendant Bender. (<u>Id.</u>, ¶ 244). In April 2021, Doe 3 and Doe 4 were issued written warnings for unprofessional and inappropriate conduct. (<u>Id.</u>, ¶ 245; Doc. 63-1, Ex. K, at 44-45). Then in May 2021, Doe 3 was suspended without pay, which was signed off by Bender. (Doc. 63, ¶ 246; Doc. 63-1, Ex. L, at 50). In July of 2021, Doe 2 was issued a written reprimand for failing to report an absence from work. (Doc. 63, ¶ 247; Doc. 63-1, Ex. M, at 56). Ultimately, in September of 2021, Doe 3 and Doe 4 were suspended indefinitely without pay. (Doc. 63, ¶ 258; Doc. 63-1, Ex. N, at 58).

As we have noted, the initial complaint in this matter was filed on March 18, 2021. (Doc. 1). The plaintiffs filed an amended complaint on April 16, 2021, and a second amended complaint was filed on October 29, 2021, which is now the operative pleading in this case. (Doc. 63). With respect to Defendant Halcovage, the amended complaint asserts the following claims by the Doe Plaintiffs: intentional

infliction of emotional distress by Doe 1 and Doe 2 (Count IV); discrimination, retaliation, and aiding and abetting discrimination and retaliation under the PHRA (Counts V-VII); Fourteenth Amendment Equal Protection violations based on disparate treatment and hostile work environment (Counts VIII-IX); and retaliation in violation of the First Amendment (Count XIII).

Halcovage has now filed a motion to dismiss, arguing that the plaintiffs have failed to state a claim against him. As we will discuss below, the motion will be granted with respect to the PHRA discrimination claim but denied in all other respects.

## III.   Discussion

### A.   Motion to Dismiss – Standard of Review

A motion to dismiss tests the legal sufficiency of a complaint. It is proper for the court to dismiss a complaint in accordance with Rule 12(b)(6) of the Federal Rules of Civil Procedure only if the complaint fails to state a claim upon which relief can be granted. Fed. R. Civ. P. 12(b)(6). With respect to this benchmark standard for the legal sufficiency of a complaint, the United States Court of Appeals for the Third Circuit has aptly noted the evolving standards governing pleading practice in federal court, stating that:

> Standards of pleading have been in the forefront of jurisprudence in recent years. Beginning with the Supreme Court's opinion in Bell Atlantic Corp. v. Twombly, 550 U.S. 544 (2007), continuing with our opinion in Phillips [v. County of Allegheny, 515 F.3d 224, 230 (3d Cir.

2008)], and culminating recently with the Supreme Court's decision in
Ashcroft v. Iqbal, –U.S.–, 129 S. Ct. 1937 (2009), pleading standards
have seemingly shifted from simple notice pleading to a more
heightened form of pleading, requiring a plaintiff to plead more than
the possibility of relief to survive a motion to dismiss.

Fowler v. UPMC Shadyside, 578 F.3d 203, 209-10 (3d Cir. 2009).

In considering whether a complaint fails to state a claim upon which relief
may be granted, the court must accept as true all allegations in the complaint and all
reasonable inferences that can be drawn therefrom are to be construed in the light
most favorable to the plaintiff. Jordan v. Fox, Rothschild, O'Brien & Frankel, Inc.,
20 F.3d 1250, 1261 (3d Cir. 1994). However, a court "need not credit a complaint's
bald assertions or legal conclusions when deciding a motion to dismiss." Morse v.
Lower Merion Sch. Dist., 132 F.3d 902, 906 (3d Cir. 1997). Additionally, a court
need not "assume that a . . . plaintiff can prove facts that the . . . plaintiff has not
alleged." Associated Gen. Contractors of Cal. v. California State Council of
Carpenters, 459 U.S. 519, 526 (1983). As the Supreme Court held in Bell Atlantic
Corp. v. Twombly, 550 U.S. 544 (2007), in order to state a valid cause of action, a
plaintiff must provide some factual grounds for relief which "requires more than
labels and conclusions, and a formulaic recitation of the elements of a cause of
actions will not do." Id., at 555. "Factual allegations must be enough to raise a right
to relief above the speculative level." Id.

13

In keeping with the principles of <u>Twombly</u>, the Supreme Court has underscored that a trial court must assess whether a complaint states facts upon which relief can be granted when ruling on a motion to dismiss. In <u>Ashcroft v. Iqbal</u>, 556 U.S. 662 (2009), the Supreme Court held that, when considering a motion to dismiss, a court should "begin by identifying pleadings that, because they are no more than conclusions, are not entitled to the assumption of truth." <u>Id.</u>, at 679. According to the Supreme Court, "[t]hreadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." <u>Id.</u>, at 678. Rather, in conducting a review of the adequacy of a complaint, the Supreme Court has advised trial courts that they must:

> [B]egin by identifying pleadings that because they are no more than conclusions are not entitled to the assumption of truth. While legal conclusions can provide the framework of a complaint, they must be supported by factual allegations. When there are well-pleaded factual allegations, a court should assume their veracity and then determine whether they plausibly give rise to an entitlement to relief.

<u>Id.</u>, at 679.

Thus, following <u>Twombly</u> and <u>Iqbal</u>, a well-pleaded complaint must contain more than mere legal labels and conclusions; it must recite factual allegations sufficient to raise the plaintiff's claimed right to relief beyond the level of mere speculation. As the United States Court of Appeals for the Third Circuit has stated:

> [A]fter <u>Iqbal</u>, when presented with a motion to dismiss for failure to state a claim, district courts should conduct a two-part analysis. First, the factual and legal elements of a claim should be separated. The

District Court must accept all of the complaint's well-pleaded facts as true, but may disregard any legal conclusions. Second, a District Court must then determine whether the facts alleged in the complaint are sufficient to show that the plaintiff has a "plausible claim for relief." In other words, a complaint must do more than allege the plaintiff's entitlement to relief. A complaint has to "show" such an entitlement with its facts.

Fowler, 578 F.3d at 210-11.

As the Court of Appeals has observed:

The Supreme Court in Twombly set forth the "plausibility" standard for overcoming a motion to dismiss and refined this approach in Iqbal. The plausibility standard requires the complaint to allege "enough facts to state a claim to relief that is plausible on its face." Twombly, 550 U.S. at 570, 127 S. Ct. 1955. A complaint satisfies the plausibility standard when the factual pleadings "allow[ ] the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." Iqbal, 129 S. Ct. at 1949 (citing Twombly, 550 U.S. at 556, 127 S. Ct. 1955). This standard requires showing "more than a sheer possibility that a defendant has acted unlawfully." Id. A complaint which pleads facts "merely consistent with" a defendant's liability, [ ] "stops short of the line between possibility and plausibility of 'entitlement of relief.' "

Burtch v. Milberg Factors, Inc., 662 F.3d 212, 220-21 (3d Cir. 2011), cert. denied,

132 S. Ct. 1861 (2012).

In practice, consideration of the legal sufficiency of a complaint entails a

three-step analysis:

First, the court must "tak[e] note of the elements a plaintiff must plead to state a claim." Iqbal, 129 S. Ct. at 1947. Second, the court should identify allegations that, "because they are no more than conclusions, are not entitled to the assumption of truth." Id., at 1950. Finally, "where there are well-pleaded factual allegations, a court should assume their veracity and then determine whether they plausibly give rise to an entitlement for relief."

15

Santiago v. Warminster Twp., 629 F.3d 121, 130 (3d Cir. 2010) (quoting

Iqbal, 129 S. Ct. at 1950).

In considering a motion to dismiss, the court generally relies on the complaint,

attached exhibits, and matters of public record. Sands v. McCormick, 502 F.3d 263,

268 (3d Cir. 2007). The court may also consider "undisputedly authentic

document[s] that a defendant attached as an exhibit to a motion to dismiss if the

plaintiff's claims are based on the [attached] documents." Pension Benefit Guar.

Corp. v. White Consol. Indus., 998 F.2d 1192, 1196 (3d Cir. 1993). Moreover,

"documents whose contents are alleged in the complaint and whose authenticity no

party questions, but which are not physically attached to the pleading, may be

considered." Pryor v. Nat'l Collegiate Athletic Ass'n, 288 F.3d 548, 560 (3d Cir.

2002); see also U.S. Express Lines, Ltd. v. Higgins, 281 F.3d 382, 388 (3d Cir. 2002)

(holding that "[a]lthough a district court may not consider matters extraneous to the

pleadings, a document integral to or explicitly relied upon in the complaint may be

considered without converting the motion to dismiss in one for summary

judgment"). However, the court may not rely on other parts of the record in

determining a motion to dismiss, or when determining whether a proposed amended

complaint is futile because it fails to state a claim upon which relief may be granted.

Jordan v. Fox, Rothschild, O'Brien & Frankel, 20 F.3d 1250, 1261 (3d Cir. 1994).

B.  **The Defendant's Motion Will Be Granted in Part and Denied in Part.**

1.  **Intentional Infliction of Emotional Distress[4]**

Plaintiffs Doe 1 and Doe 2 bring a state law claim for intentional infliction of

emotional distress against Halcovage. Under Pennsylvania law, the elements of a

claim for intentional infliction of emotional distress are as follows: "(1) the conduct

[of the defendant] must be extreme and outrageous; (2) it must be intentional or

reckless; (3) it must cause emotional distress; [and] (4) that distress must be severe."

Hoy v. Angelone, 691 A.2d 476, 482 (Pa. Super. Ct. 1997). This claim also requires

an allegation of some type of physical injury, harm, or illness related to the distress.

---

[4] Defendant Halcovage belatedly argues in his reply brief that many of the events
which the plaintiffs rely on for their IIED claim are barred by the statute of
limitations. (Doc. 92, at 8). However, it is well settled that Halcovage cannot
belatedly present new arguments in a reply brief that were not addressed in his
opening brief or in response to the plaintiffs' opposition brief. See Bell v.
Lackawanna County, 892 F.Supp.2d 647, 688 n.41 (M.D. Pa. 2012) ("A reply brief
is not the appropriate forum in which to raise new issues and the court need not
address issues raised for the first time therein"). We further note that the continuing
violations exception to the statute of limitations may apply in the instant case. See
Smith v. RB Distribution, Inc., 515 F.Supp.3d 311, 318 n.7 (E.D. Pa. 2021)
("Pennsylvania courts have not addressed the applicability of continuing violation
theories to IIED claims. It is worth noting, however, that in jurisdictions that have
adopted this rule, courts have not required plaintiffs to demonstrate that the conduct
occurring within the limitations period was outrageous. Instead, judges have
examined whether the conduct was part of continuous pattern of wrongful behavior
that could support a claim for IIED if viewed collectively"). However, in our view,
these tardy arguments may not be addressed through this motion to dismiss. Rather,
this issue must await another day for consideration upon a more fulsome factually
developed record.

Robinson v. Family Dollar, Inc., No. 14-3189, 2015 WL 3400836 (E.D. Pa. May 27, 2015) (citing Corbett v. Morgenstern, 934 F.Supp. 680, 684 (E.D. Pa. 1994)). It is difficult to make out a cognizable claim for intentional infliction of emotional distress, in no small part because "the conduct must be 'so extreme in nature as to go beyond all possible bounds of decency such that it would be regarded as utterly intolerable to civilized society.' " Regan v. Twp. of Lower Merion, 36 F.Supp.2d 245, 251 (E.D. Pa. 1999). While "sexual harassment alone does not rise to the level of outrageousness necessary to make out a cause of action for the intentional infliction of emotional distress, 'blatantly abhorrent conduct' may be actionable." Smith, 515 F.Supp.3d at 319 (quoting Hoy, 720 A.2d at 754).

Here, Halcovage argues that the allegations, considered separately, do not rise to the level of extreme and outrageous conduct. Halcovage's simplified and fragmented characterization of the allegations in the amended complaint describe them as amounting to little more than unwelcome comments and encounters at the workplace. In casting the complaint in this fashion Halcovage fails to consider the truism first expressed by John Adams: "Facts are stubborn things." A necessary corollary to this proposition which applies when considering a motion to dismiss is that well-pleaded facts are also stubborn things, and we may not ignore the well-pleaded facts in the complaint in favor of Halcovage's much more anodyne and incomplete description of those facts.

When we consider the well-pleaded facts in this complaint we conclude that they set forth blatantly abhorrent conduct which may well be actionable. Read in its entirety, the amended complaint states sufficient factual allegations at this stage to state a claim for intentional infliction of emotional distress. The amended complaint alleges two instances of sexual assault on Doe 1, with one of those instances occurring at the courthouse; repeated unwelcome and sexually explicit comments; sexual propositions, to which the plaintiffs believed their jobs would be contingent upon their submission to Halcovage's sexual demands; and insistent phone calls and uninvited visits to the plaintiffs' homes when they refused Halcovage's sexual advances. The complaint further alleges that after the plaintiffs reported Halcovage's conduct, he engaged in retaliatory behavior which ultimately caused the plaintiffs to be relocated to another building so that they would not encounter Halcovage. Finally, the plaintiffs have alleged that this conduct by Halcovage has caused them extreme emotional distress resulting in physical injury.

At this stage of the proceedings, where we must accept these allegations as true, we find that the plaintiffs have sufficiently alleged facts to state a claim for intentional infliction of emotional distress against Halcovage. Indeed, these allegations show behavior by Halcovage that can be characterized as "blatantly abhorrent conduct" that is so extreme and outrageous in nature "as to go beyond all possible bounds of decency such that it would be regarded as utterly intolerable to

civilized society." Hoy, 720 A.2d at 754; Regan, 36 F.Supp.2d at 251. Accordingly, the motion to dismiss this claim will be denied.

### 2. **PHRA Claims**

The Doe plaintiffs also bring claims against Halcovage under the PHRA, alleging that he discriminated against them, retaliated against them, and aided and abetted discriminatory and retaliatory conduct. See 42 Pa. Cons. Stat. §§ 955(a), (d), (e). The PHRA makes it unlawful for an employer to discriminate with respect to compensation, hire, privileges, or other employment-related benefits against an employee because of sex. § 955(a). An "employer" is defined under the Act as "the Commonwealth or any political subdivision or board, department, commission or school district thereof and any person employing four or more persons within the Commonwealth . . ." § 954(b). The Act further prohibits employers and employees from retaliating against an individual who reports discriminatory conduct. § 955(d). In addition, the PHRA prohibits employers and employees from aiding, abetting, or inciting discriminatory or retaliatory conduct. § 955(e).

With respect to the discrimination and retaliation claims, Halcovage argues that these provisions only apply to an "employer," and since he is not an "employer" he cannot be held liable under § 955(a) and (d) for discrimination or retaliation. For their part, the plaintiffs contend that Halcovage, having supervisory authority, can

20

be considered a "joint employer" and therefore liable under § 955(a). The Third

Circuit has aptly noted in the past that, with respect to these discrimination claims,

> Generally, the PHRA is applied in accordance with Title VII. <u>Davis v. Sheraton Society Hill Hotel</u>, 907 F.Supp. 896, 899 n. 1 (E.D. Pa. 1995). Like Title VII, the definition of an employer under the PHRA cannot be construed to include "employees;" indeed, "employee" is defined as a wholly separate term under the Act. <u>See</u> 43 Pa. Cons. Stat. Ann. § 954(b) & (c). The employment discrimination provision of the PHRA declares only that "any employer" may be held liable. <u>See</u> 43 Pa. Cons. Stat. Ann. § 955(a).

<u>Dici v. Commonwealth of Pa.</u>, 91 F.3d 542, 552 (3d Cir. 1996). <u>See also</u> <u>McIlmail</u>

<u>v. Pennsylvania</u>, 381 F.Supp.3d 393, 415 (E.D. Pa. 2019) ("The PHRA is 'generally

applied in accordance with Title VII,' which exposes only employers to liability

while exempting individual employees. . .") (internal citations omitted).

On this score, the plaintiffs argue that Halcovage has supervisory authority,

and thus, should be considered a "joint employer" liable for discrimination under the

PHRA. However, the plaintiffs have provided no authority for this proposition, and

an independent search has not yielded any caselaw in this circuit which would

suggest than an individual can be considered a "joint employer" of an employee.

Rather, cases discussing a joint employer relationship have almost exclusively

considered this joint employer relationship in the context of two *entities*, not

individual persons. <u>See e.g.</u>, <u>Faush v. Tuesday Morning, Inc.</u>, 808 F.3d 208, 215 (3d

Cir. 2015) ("Two entities may be "co-employers" or "joint employers" of one

employee for purposes of Title VII"); <u>Showers v. Endoscopy Center of Central Pa.</u>,

21

LLC, 58 F.Supp.3d 446, 456 n.7 (M.D. Pa. 2014) ("The court notes that two corporations may also be consolidated under the 'joint employer' doctrine"); Myers v. Garfield & Johnson Enterprises, Inc., 679 F.Supp.2d 598, 607 (E.D. Pa. 2010) ("[A] finding that companies are 'joint employers' assumes in the first instance that companies are . . . independent legal entities that have merely 'historically chosen to handle joint important aspects of their employer-employee relationship'") (citations omitted).

Accordingly, we are not persuaded by the plaintiffs' assertion that Halcovage, an individual employee, albeit a county commissioner, can be considered a "joint employer" for purposes of their PHRA discrimination claim. Therefore, in the absence of any legal authority construing the PHRA in this fashion, with respect to the direct PHRA discrimination claim against Defendant Halcovage, we conclude that this claim fails as a matter of law, as Halcovage cannot be considered an "employer" under the PHRA. Of course, as we discuss below, Halcovage may still be held liable under the PHRA for discrimination against the plaintiffs on an aiding and abetting theory. Such an aiding and abetting claim is expressly authorized by statute and encounters none of the analytical obstacles which arise from the PHRA's limitation of direct discrimination liability to employers.

With respect to the retaliation claim, as we have noted, § 955(d) prohibits both employers and employees from retaliating against an individual who reports

discriminatory conduct. 42 Pa. Cons. Stat. § 955(d). Indeed, the statute forbids retaliation by "any person," statutory language that is sweeping in its reach. Thus, the plaintiffs must show that they engaged in protected activity, suffered adverse action at the hands of the defendant, and show a causal connection between their protected activity and the adverse action taken against them. See Fasold v. Justice, 409 F.3d 178, 188-89 (3d Cir. 2005) (noting that "retaliation claims . . . under the PHRA typically proceed under the McDonell Douglas framework").[5] Given that the PHRA retaliation provision extends to "any person" Halcovage's argument that the retaliation provision does not apply to him as an individual has no merit. Moreover, as we have noted, the amended complaint is replete with allegations that Halcovage retaliated against the plaintiffs for reporting his discriminatory conduct. Accordingly, his motion to dismiss this claim is denied.

Further, with respect to aiding and abetting, typically "[a]n individual employee may be exposed to liability under the aider and abettor provision only if he acts in a supervisory role because 'only supervisors can share the discriminatory purpose and intent of the employer . . . required for aiding and abetting.'" McIlmail v. Pennsylvania, 381 F.Supp.3d 393, 415 (E.D. Pa. 2019) (quoting Brzozowski v. Pa. Tpk. Comm'n, 165 F.Supp.3d 251, 263 (E.D. Pa. 2016) (internal citations omitted)); Davis v. Levy, Angestrich, Finney, Baldante, Rubenstein & Coren P.C.,

---

[5] McDonnell Douglas Corp. v. Green, 411 U.S. 792 (1973).

23

20 F.Supp.2d 885, 887 (E.D. Pa. 1998) ("[A]n individual supervisory employee can be held liable under an aiding and abetting/accomplice liability theory pursuant to § 955(e) for his own direct acts of discrimination or for his failure to take action to prevent further discrimination by an employee under supervision"). On this score, sexual harassment is actionable under the PHRA when the harassment "is sufficiently 'severe or pervasive' to alter the 'terms, conditions, or privileges' of his or her employment." Toth v. California Univ. of Pennsylvania, 844 F.Supp.2d 611, 627 (E.D. Pa. 2012) (quoting Meritor Savings Bank, FSB v. Vinson, 477 U.S. 57, 63–69 (1986)). The relevant inquiry is "whether the harassment is frequent or severe, whether it is 'physically threatening or humiliating,' and whether it 'unreasonably interferes with an employees' work performance.'" Id. (quoting Harris v. Forklift Systems, Inc., 510 U.S. 17, 23 (1993)).

Halcovage cannot dispute that, as a County Commissioner, he acted in a supervisory role with respect to this plaintiffs. Instead, Halcovage argues that the plaintiffs have not alleged sufficient facts to show that he engaged in discrimination against them because he did not directly alter the plaintiffs' conditions or terms of employment. However, we find that the amended complaint sufficiently alleges discriminatory actions by Halcovage which affected the conditions of the plaintiffs' employment and interfered with their work performance. At the outset, we note that Halcovage meets the definition of a "supervisor," in that he had the authority "to

effect a significant change in employment status, such as hiring, firing, failing to promote, reassignment with significantly different responsibilities, or a decision causing a significant change in benefits." Stoud v. Susquehanna County, 471 F.Supp.3d 606, 620 (M.D. Pa. 2020) (quoting Bumbarger v. New Enterprise Stone and Lime Co., Inc., 170 F.Supp.3d 801, 841 (W.D. Pa. 2016)). The Stoud court found that, as County Commissioners, the defendants in that case "were unquestionably [the plaintiff's] supervisors." Id.

Furthermore, the amended complaint sets forth events which can be characterized as rampant sexual harassment directed at all of the plaintiffs, as well as other female employees of the County. On this score, it is alleged that Halcovage consistently subjected Doe 3 and Doe 4 to harassment with inappropriate, sexually charged comments to them or around them. Halcovage is further alleged to have sexually harassed Doe 1 and Doe 2 from the beginning of their employment with the County. Thus, these plaintiffs allege that they were subjected to sexually inappropriate comments, which escalated into requests for oral sex and sexual intercourse and resulted in forced or coerced sexual acts on several occasions, one of which is alleged to have occurred in the County Courthouse. They assert that when they attempted to rebuff these requests by Halcovage, he inserted himself into their personal and family lives by showing up uninvited at their homes or calling them incessantly outside of work hours. Doe 1 and Doe 2's workspace is alleged to

have been so uncomfortable, fearful, and stressful that they requested to work from home, and when that request was denied, they were ultimately relocated to another building so that they would not have to encounter Halcovage. With respect to Doe 3 and Doe 4, they allege that after they reported Halcovage's harassment and abuse, he engaged in a pattern of retaliation and harassment which ultimately led to their demotions and suspensions in 2021.

Accordingly, given these well pleaded allegations, Halcovage's assertion that the complaint fails to include allegations that his discriminatory conduct affected the plaintiffs' workplace is meritless. Rather, these allegations, taken as true, show continuous sexual harassment perpetrated by Halcovage, which included soliciting sexual acts and ultimately forced sexual acts that occurred *in the plaintiffs' workspace*, all of which would undoubtedly affect the conditions and terms of the plaintiffs' employment. Accordingly, the PHRA's aiding and abetting provisions apply here and allow a discrimination claim against Halcovage on an aiding and abetting theory. Moreover, Halcovage may be liable for PHRA retaliation violations both directly and as an aider and abettor. Thus, we conclude that the plaintiffs have sufficiently stated a claim against Halcovage under the PHRA due to his own discriminatory and retaliatory conduct.

3.  **Equal Protection Claims**

Next, Halcovage argues that the plaintiffs have failed to state a § 1983 claim against him for discrimination and creating a hostile work environment because of their sex in violation of the Fourteenth Amendment.

To state an equal protection claim under § 1983, the plaintiffs must show "that [they were] subjected to 'purposeful discrimination' because of [their] sex." Robinson v. City of Pittsburgh, 120 F.3d 1286, 1293 (3d Cir. 1997) (quoting Keenan v. City of Philadelphia, 983 F.2d 459, 465 (3d Cir. 1992)). Thus, the plaintiffs must allege "(1) disparate treatment in relation to other similarly situated individuals, and (2) that the discriminatory treatment was based on sex." Id. (citing Andrews v. City of Philadelphia, 895 F.2d 1469, 1478 (3d Cir. 1990)). The complaint must further allege "some affirmative conduct by the supervisor that played a role in the discrimination." Andrews, 895 F.2d at 1478. Thus, "[t]he necessary involvement can be shown in two ways, either 'though allegations of personal direction or of actual knowledge and acquiescence.'" Id. (quoting Rode v. Dellarciprete, 845 F.2d 1195, 1207 (3d Cir. 1988)).

Further, a plaintiff alleging that a defendant created a hostile work environment on the basis of sex must allege that "(1) [S]he suffered intentional discrimination because of her [sex]; (2) the discrimination was severe or pervasive; (3) the discrimination detrimentally affected her; (4) it would have detrimentally

27

affected a reasonable person in like circumstances; and (5) a basis for employer liability is present." <u>Komis v. Sec'y of U.S. Dep't of Labor</u>, 918 F.3d 289, 293 (3d Cir. 2019) (citations omitted); <u>see</u> <u>Starnes v. Butler County Court of Common Pleas, 50th Judicial District</u>, 971 F.3d 416, 428 (3d Cir. 2020) ("[W]e have been clear that § 1983 shares the same elements for discrimination purposes as a Title VII action"). "[A] hostile work environment exists 'when the workplace is permeated with "discriminatory intimidation, ridicule, and insult," that is "sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment." ' " <u>Starnes</u>, 971 F.3d at 428 (quoting <u>National R.R. Passenger Corp. v. Morgan</u>, 536 U.S. 101, 116 (2002) (internal citations omitted)). Moreover, it is well settled that "[t]he intent to discriminate on the basis of sex in cases involving sexual propositions, innuendo . . . or sexual derogatory language is implicit, and thus should be recognized as a matter of course." <u>Andrews</u>, 895 F.2d at 1482 n.3.

Here, we find that the plaintiffs have sufficiently alleged discrimination and a hostile work environment claim under § 1983 against Halcovage. First, the plaintiffs have alleged that they were subjected to intentional discrimination because of their sex. As we have noted, the amended complaint asserts that Halcovage subjected the plaintiffs to unwelcome and inappropriate sexually charged comments, went as far as to solicit sexual acts from two of the Doe plaintiffs, and allegedly sexually

assaulted Doe 1 on two separate occasions, one taking place in the County Courthouse. Indeed, as the Third Circuit has explained, allegations of harassment that include sexual innuendos and propositions show the intent to discriminate based on sex. Andrews, 895 F.2d at 1482 n.3. Moreover, "[s]exual assault is the most severe form of harassment, and severe harassment is actionable under a hostile work environment claim." Vandegrift v. City of Phila., 228 F.Supp.3d 464, 485 (E.D. Pa. 2017) (citing Meritor Sav. Bank, 477 U.S. at 67). Thus, we find that the discrimination was based on sex, and that it was severe or pervasive.

Further, we find that the discrimination would likely detrimentally affect a reasonable person in similar circumstances, and that it did detrimentally affect the plaintiffs in this case. Here, the harassment of the plaintiffs was so severe that Doe 1 and Doe 2 requested to work from home so they would not encounter Halcovage at the courthouse. When this request was denied, they were relocated to another building so that they would not have contact with him. Doe 3 and Doe 4 also requested to have no contact with Halcovage, and when they were informed he had access to their workspace, they opted to work from home so as not to encounter him. The plaintiffs have alleged that they suffered distress, embarrassment, fear, and humiliation because of Halcovage's actions. Accordingly, we find that at this stage, where we must accept these allegations as true, the plaintiffs have sufficiently alleged these elements of a hostile work environment claim.

Finally, there is a basis for employer liability. The basis for employer liability "depends on whether the harasser is the victim's supervisor or merely a coworker." Huston v. Procter & Gamble Paper Prods. Corp., 568 F.3d 100, 104 (3d Cir. 2009). Here, we have already determined that Halcovage, as a County Commissioner, is a supervisor. Thus, because Halcovage is a supervisor, "the employer may be held strictly liable." Bumbarger, 170 F.Supp.3d at 837 (citing Huston, 568 F.3d at 107).

Accordingly, we find that the plaintiffs have sufficiently stated a claim for discrimination and a hostile work environment against Halcovage under § 1983. Thus, Halcovage's motion to dismiss these claims will be denied.

### 4. **First Amendment Retaliation**

Finally, Halcovage contends that the plaintiffs have failed to state a claim against him for retaliation under the First Amendment pursuant to § 1983.

In order to state a claim of retaliation under the First Amendment, a plaintiff must show: "(1) that [she] engaged in a protected activity, (2) that defendants' retaliatory action was sufficient to deter a person of ordinary firmness from exercising his or her rights, and (3) that there was a causal connection between the protected activity and the retaliatory action." Lauren W. ex rel. Jean W. v. DeFlaminis, 480 F.3d 259, 267 (3d Cir. 2007) (citing Thomas v. Independence Twp., 463 F.3d 285, 296 (3d Cir. 2006)). Stated differently, the plaintiff must demonstrate that the protected speech was "a 'substantial factor' in the alleged retaliatory action."

McAndrew v. Bucks Cnty Bd. Of Comm'rs, 183 F.Supp.3d 713, 731 (E.D. Pa. 2016)

(citing Gorum v. Sessoms, 561 F.3d 179, 184 (3d Cir. 2009)). If a plaintiff makes

such a showing, the burden then shifts to the defendants to show that, even if the

protected speech had not taken place, it would have taken the same action.

With respect to the third element, there are three ways in which a plaintiff can

establish causation for a First Amendment retaliation claim, showing, "(1) an

'unusually suggestive temporal proximity' between the speech and the alleged

retaliatory conduct;" (2) a 'pattern of antagonism coupled with timing'; or (3) that

the 'record as a whole' permits the trier of fact to infer causation. McAndrew, 183

F.Supp.3d at 737 (quoting DeFlaminis, 480 F.3d at 267).

When the plaintiff is a public employee, there are special considerations which

we must balance to determine if their speech is protected under the First

Amendment. To be protected speech under the First Amendment, a public

employee's speech must involve a matter of public concern, in that "it can be fairly

considered as relating to any matter of political, social or other concern to the

community." Middleton v. Deblasis, 844 F.Supp.2d 556, 563-64 (E.D. Pa. 2011)

(quoting Baldassare v. New Jersey, 250 F.3d 188, 195 (3d Cir. 2001)). "When an

employee exposes malfeasance by a government official, it is a matter of public

concern." Starnes, 971 F.3d at 429 (citing Azzaro v. County of Allegheny, 110 F.3d

968, 978-79 (3d Cir. 1997)). Additionally, "[c]laims of sexual . . . discrimination can

31

constitute matters of public concern, even if plaintiff makes those claims in private."
Middleton, 844 F.Supp.2d at 564 (citing Givhan v. W. Line Consol. Sch. Dist., 439 U.S. 410, 415–16 (1979); Azzaro, 110 F.3d at 978). On this score, the Third Circuit has found that private complaints regarding sexual harassment by elected officials constituted protected speech, as the alleged conduct was "relevant to the electorate's evaluation of the performance of the office of an elected official." Azzaro, 110 F.3d at 978.

Here, Halcovage argues that because the plaintiffs allege that they made their complaints of harassment and abuse internally, their speech was not protected. At the outset, we note that the facts of the instant case are analogous to Azzaro, a case in which the plaintiff alleged that she was sexually harassed by a County Commissioner. Thus, the plaintiffs' speech in this case, although the complaints were first made privately through the internal process, similarly constitute a matter of substantial public concern, as they are "relevant to the electorate's evaluation of the performance of the office of an elected official." Id. Moreover, Halcovage's argument completely ignores the fact that the plaintiffs have alleged retaliatory conduct after the filing of their EEOC and federal civil rights complaints. See Starnes, 971 F.3d at 429 ("Starnes made her report to the EEOC as a citizen and the statement involved a matter of public concern because it dealt with sexual malfeasance and an abuse of power by a judge. Additionally, Starnes's EEOC

complaint is 'petitioning activity' because her complaint was not clearly frivolous or a sham"). The plaintiffs further allege that Doe 3 and Doe 4 were demoted two days after the initial complaint was filed in this case, and the demotion and restructuring of their office was voted on by Halcovage.[6]

Accordingly, we find at this stage that the plaintiffs have adequately alleged facts to state a claim against Halcovage for retaliation in violation of the First Amendment. Thus, his motion to dismiss will be denied.

## IV.   <u>Conclusion</u>

Accordingly, for the foregoing reasons, Defendant Halcovage's motion to dismiss (Doc. 73) will be GRANTED as to the direct PHRA discrimination claim but DENIED in all other respects.

An appropriate order follows.


Dated: May 6, 2022


<u>S/ Martin C. Carlson</u>
Martin C. Carlson
United States Magistrate Judge

---

[6] The retaliatory acts alleged to have occurred after the EEOC and federal civil rights complaints were filed cut against Halcovage's belated argument in his reply brief that the plaintiffs' retaliation claim is barred by the statute of limitations. (Doc. 92, at 6).