**IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| **JANE DOE, et al.,** | : | **Civil No. 3:21-CV-477** |
| | : | |
| **Plaintiffs,** | : | |
| | : | |
| **v.** | : | |
| | : | **(Magistrate Judge Carlson)** |
| **SCHUYLKILL COUNTY** | : | |
| **COURTHOUSE, et al.,** | : | |
| | : | |
| **Defendants.** | : | |

## MEMORANDUM OPINION

## I.   Introduction

This case involves allegations of abhorrent workplace misconduct at the Schuylkill County Courthouse involving alleged sexual harassment, assault, and predation coupled with assertions of official indifference to the plight of the alleged victims of this workplace violence. The plaintiffs, four Jane Doe employees of Schuylkill County, filed this action against the County and several individual defendants. Their claims stem from the alleged sexual abuse and harassment perpetrated by County Commissioner George Halcovage over a period of several years while the plaintiffs were employed by the County. The plaintiffs assert that the County, as well as the individual supervisory defendants, knew of the sexual abuse

and harassment and did nothing to stop it. Instead, the plaintiffs contend that these defendants retaliated against them for reporting the sexual abuse and harassment.

Pending before the court is a motion to dismiss filed by one of the defendants, Glenn Roth, the First Assistant County Solicitor and Risk Manager.[1] (Doc. 72). With respect to Defendant Roth, the plaintiffs allege that he discriminated and retaliated against them, and that he aided and abetted others' discriminatory conduct in violation of the Pennsylvania Human Relations Act ("PHRA"). They also assert that Roth violated their rights under the Equal Protection Clause of the Fourteenth Amendment by subjecting them to disparate treatment and a hostile work environment. Finally, the plaintiffs assert a claim against Roth for First Amendment retaliation.

In his motion to dismiss, with respect to the PHRA and Equal Protection claims lodged against Roth, the defendant contends that the complaint is devoid of any allegations that he is a supervisor, that he subjected the plaintiffs to discrimination, disparate treatment, or a hostile work environment, or that he retaliated against the plaintiffs for speaking out about discriminatory conduct. Roth

---

[1] The defendants have filed five separate motions to dismiss, which will be addressed in separate memorandum opinions.

also challenges the plaintiffs' request to proceed under their "Jane Doe" pseudonyms.[2]

This motion is fully briefed and is ripe for resolution. (Docs. 82, 88). For the reasons that follow, the motion to dismiss will be GRANTED with respect to the direct PHRA discrimination claim brought against the defendant but will be DENIED in all other respects.

## II.   **Background**

The factual background of this case is taken from the factual allegations set forth in the plaintiff's second amended complaint (Doc. 63), which we must accept as true for purposes of this motion to dismiss.

George Halcovage was elected as a Commissioner of Schuylkill County in 2012. (Doc. 63, ¶ 45). At this time, Plaintiffs Jane Doe 3 and Jane Doe 4 were employed with the County as the Tax Claim Director and Clerk Typist One, respectively. (Id., ¶¶ 43-44). The complaint alleges that upon the start of his term as County Commissioner, Halcovage frequently visited the Tax Claims Office and subjected the female employees to unwelcomed sexual harassment. (Id., ¶ 47). This harassment, which included discriminatory sexist and inappropriate comments, was sometimes directed at and witnessed by Doe 3 and Doe 4, and caused them to feel

---

[2] We have addressed the plaintiffs' use of pseudonyms in a prior Memorandum Opinion, deciding that at this juncture, the plaintiffs may proceed under their Jane Doe pseudonyms. (Doc. 123).

extremely uncomfortable, humiliated, and distressed. (Id., ¶¶ 47-48). The plaintiffs allege that Glenn Roth, the First Assistant County Solicitor and Risk Manager, and Gary Bender, the County Administrator, witnessed this behavior by Halcovage but did nothing to stop it. (Id., ¶ 49).

Plaintiff Jane Doe 1 was hired by the County in February of 2014. (Id., ¶ 51). According to the complaint, Halcovage visited Doe 1's workspace often, which caused her coworkers to make comments about Doe 1 talking with Halcovage who was "a sucker for pretty girls." (Id., ¶¶ 52-53). Halcovage began making unwanted comments about Doe 1's physical appearance, which increased in frequency and intensity throughout Doe 1's first year with the County. (Id., ¶¶ 55-56). These comments about Doe 1's physical appearance eventually escalated into more forceful sexual advances, with Halcovage grabbing Doe 1 and kissing her after a fundraiser that Doe 1 attended in late 2014 or early 2015. (Id., ¶¶ 57-61). After this incident, Halcovage allegedly made comments to Doe 1 which she believed implied that her job was contingent on submitting to Halcovage's sexual advances. (Id., ¶ 64).

Around this same time, Plaintiff Jane Doe 2 was hired by the County, and the complaint alleges that she was almost immediately subject to unwanted sexual comments from Halcovage. (Id., ¶¶ 65-66). It is alleged that these sexually charged comments caused Doe 2 issues with her female coworkers, who either ignored her

or gave her one-word answers, which she believed to be due to her coworkers'
incorrect impression that she was in a relationship with Halcovage. (Id., ¶¶ 68-72).
The complaint further alleges that the plaintiffs witnessed Halcovage making
inappropriate and sexist comments about other female coworkers. (Id., ¶¶ 76-77).
According to the plaintiffs, Defendants Roth and Bender were present for some of
these comments but did nothing to stop Halcovage or inform him that his behavior
was inappropriate. (Id., ¶¶ 78-79). This led the plaintiffs to believe that any efforts
they made to report Halcovage's conduct would be futile. (Id., ¶ 81).

Halcovage's alleged sexual harassment of the Doe plaintiffs continued and
intensified. In 2015, Halcovage made a comment to Doe 2's husband at a fundraising
event about "using" his wife, a comment which allegedly insinuated that Halcovage
and Doe 2 had sexual intercourse. (Id., ¶¶ 83-86). The complaint asserts that
Defendant Roth was present for this comment and later mentioned that the comment
made him uncomfortable, remarking that Halcovage "didn't have to say it that way."
(Id., ¶¶ 87-89). However, Roth did not report Halcovage's behavior to HR. (Id., ¶
90).

Doe 1 and Doe 2 also attended a fundraiser in March of 2015 at Halcovage's
request. (Id., ¶ 91). According to the complaint, Halcovage insisted he drive Doe 1
home after the event. (Id., ¶ 92). Upon arriving at Doe 1's home, Halcovage was
verbally and physically affectionate with her, kissed her, and ultimately unzipped

his pants and exposed his genitals to her. (Id. ¶¶ 94-95). Doe 1 took this to mean that Halcovage wanted her to perform oral sex on him, which made her feel overwhelmed and uncomfortable. (Id., ¶¶ 97-98). Due to his position of authority over her, Doe 1 ultimately performed oral sex on Halcovage. (Id., ¶ 97). The complaint alleges that immediately following this incident with Doe 1, Halcovage called Doe 2 demanding to know where she was and who she was with. (Id., ¶ 98).

The complaint alleges another instance of sexual assault by Halcovage in 2018, where Halcovage took Doe 1 into the tax filing room inside the courthouse, forcibly pushed her head down, exposed his genitals, and forced her to perform oral sex on him. (Id., ¶¶ 109-12). While Doe 1 and Doe 2 consistently attempted to rebuff Halcovage's sexual advances, it is alleged that Halcovage also inserted himself into their personal and family lives, particularly when they refused his sexual advances. (Id., ¶ 101). The complaint asserts that Halcovage frequently made appearances at Doe 1's home late at night with alcohol or early in the morning, causing her to be late for work. (Id., ¶ 104). Moreover, when Doe 1 rebuffed Halcovage's advances, Halcovage's harassment of Doe 2 intensified. (Id., ¶ 119). The plaintiffs allege that over time, Halcovage's requests for oral sex turned into requests for sexual intercourse. (Id., ¶ 116).

In 2019, Doe 3 became Doe 1's direct supervisor. (Id., ¶ 142). In July and November of 2019, Doe 3 twice reported incidents of Halcovage's sexual

6

harassment to Defendant Roth. (Id., ¶¶ 145-47). According to the complaint, Roth did not document the incidents, make any inquiries, or report the incidents to HR. (Id., ¶ 148). Around this same time, Roth allegedly knew that Halcovage was contacting Doe 1 and Doe 2 outside of work hours but did not report Halcovage's behavior to anyone. (Id., ¶¶ 154-55). In 2020, Doe 3 pleaded with Roth to intervene with respect to Halcovage's harassment, and Roth told her to take her complaints to HR. (Id., ¶¶ 156-57).

Thus, in May of 2020, Doe 1 sent Doe 3 a formal email reporting Halcovage's sexual harassment and sexual assault. (Id., ¶ 159). This email was promptly forwarded to HR, after which HR conducted formal interviews of the plaintiffs. (Id., ¶ 160-61). One month later, Halcovage stepped down as Chief Commissioner but remained in the Commissioner position. (Id., ¶ 162). At this time, the County put out a press release stating that an investigation revealed that Halcovage had violated the County's Sexual Harassment Policy, the Conduct and Disciplinary Action Policy, and the Physical and Verbal Abuse Policy. (Id., ¶ 164). This press release also stated that Halcovage could not be removed from his position as Commissioner absent a criminal conviction or impeachment. (Id.)

Following the Doe Plaintiffs' reports of sexual misconduct, they allege that they were subject to retaliation by Halcovage, the County, and the other individual defendants. On this score, it is alleged that Halcovage was not removed from the

plaintiffs' work environment and was still working at the courthouse. (Id., ¶ 167). The County also permitted an employee of Doe 3 and Doe 4 to be relocated without consulting Doe 3 or Doe 4, which impacted their job performance and was believed to be done in retaliation for their reports against Halcovage. (Id., ¶¶ 173-74). Additionally, while Halcovage was informed there was a specific place he could park, Defendant Bender allegedly authorized him to park in the same parking lot as Doe 3 and Doe 4. (Id., ¶ 177). Doe 3 and Doe 4 were also required to conduct an assessment appeal hearing in the Commissioner's suite, although they had requested not to be required to work in that location. (Id., ¶¶ 178-79). Thus, Doe 3 encountered Halcovage in August of 2020, which caused her emotional distress. (Id., ¶ 180-81).

The plaintiffs ultimately filed complaints with the Equal Employment Opportunity Commission ("EEOC") and the Pennsylvania Human Relations Commission ("PHRC") in August of 2020. (Id., ¶ 8). In these complaints, they alleged violations of Title VII, the PHRA, Pennsylvania common law, and Section 1983. (Id.)[3]

Following the filing of the EEOC complaints, Doe 3 encountered Halcovage several times, after which she reported her concerns to Doreen Kutzler, an HR representative for the County. (Id., ¶¶ 184-86). The complaint alleges that Doe 3

---

[3] These complaints were supplemented on March 16, 2021. (Doc. 63, ¶ 9). The plaintiffs received their Right to Sue letters on April 8, 2021 and October 27, 2021. (Id., ¶¶ 11, 13).

contacted Kutzler twice regarding her concerns, but Kutzler never responded to her email or took any action to prevent the plaintiffs from further encounters with Halcovage. (Id., ¶¶ 186-87). Doe 3 also emailed Kutzler to set up specific times for she and Doe 4 to come to the office so as not to encounter Halcovage, and Kutzler again ignored her emails. (Id., ¶¶ 188-89). Moreover, while Doe 1 and Doe 2 were working from home, they allege that they were not given the supplies they needed, which hindered them from performing their job duties. (Id., ¶ 192). Additionally, in October 2020, Kutzler and Bender engaged in contract negotiations with one of Doe 3 and Doe 4's employees without consulting them, which led to more responsibilities for Doe 3 and Doe 4. (Id., ¶¶ 196-200).

In October of 2020, Doe 1 again requested that she be given permission to continue to work from home and provided with the necessary supplies to do so. (Id., ¶ 204). This request was ultimately denied, and in November of 2020, Doe 1 and Doe 2 were informed that they would be required to work in the "410 building." (Id., ¶ 206). The plaintiffs brought concerns to the County regarding this work arrangement, indicating that Halcovage could access the building and that there was no parking close by. (Id., ¶ 208). The County had also arranged for Defendant Bender to provide Doe 1 and Doe 2 with keys to their offices and to answer any questions they had, but this arrangement was changed when the plaintiffs informed the County that they did not want to have contact with Bender. (Id., ¶¶ 210-11). At

or around this time, Doe 1 and Doe 2 requested to use paid time off, which Kutzler denied, informing them they could only use unpaid leave. (Id., ¶¶ 216-17). Additionally, Doe 3 emailed Kutzler about the state and cleanliness of the new office space for Doe 1 and Doe 2, concerns that were said to have been remedied but were not. (Id., ¶¶ 219-223).

The harassment and retaliation of the plaintiffs continued into 2021. Thus, on or about January 13, 2021, Doe 2 alleges that Halcovage was following her, and she reported it to both Kutzler and the police. (Id., ¶ 224). Two days later, Doe 3 and Doe 4 learned that Halcovage had been assigned a parking spot in the same lot they parked in and that he had access to where they worked in the courthouse. (Id., ¶ 226). Upon learning this, Doe 3 and Doe 4 opted to work from home that day, and they were later reprimanded for this decision by Bender. (Id., ¶ 227). They were further reprimanded by Bender and Zula for allowing their employees to work from home. (Id., ¶¶ 229-30). Thus, in February of 2021, Zula denied Doe 1's request to work from home, even though Doe 3 had approved it as her supervisor. (Id., ¶¶ 231-34). Additionally in February 2021, Kutzler permitted Bender and Halcovage to sign up for the same sexual harassment training that Doe 3 and Doe 4 had signed up for, requiring them to adjust their schedule to go to a different training. (Id., ¶¶ 235-36). At or around this time, Doe 2 had requested to work from home, and Zula denied her request. (Id., ¶¶ 237-38). Additionally, Doe 1 and Doe 2 were not assigned

parking spaces for the "410 building" and had been threatened that their vehicles would be towed. (Id., ¶ 242).

Thereafter, on March 18, 2021, just two days after the initial complaint was filed in this case, Doe 3 and Doe 4 received notice that their office was being restructured, which resulted in a demotion and a decrease in their salaries. (Id., ¶ 243). The restructuring of the office was voted on by Halcovage despite others requesting that he abstain from the vote. (Id.) Moreover, the restructuring resulted in Doe 1 and Doe 2 reporting directly to Defendant Bender. (Id., ¶ 244). In April 2021, Doe 3 and Doe 4 were issued written warnings for unprofessional and inappropriate conduct. (Id., ¶ 245; Doc. 63-1, Ex. K, at 44-45). Then in May 2021, Doe 3 was suspended without pay, which was signed off by Bender. (Doc. 63, ¶ 246; Doc. 63-1, Ex. L, at 50). In July of 2021, Doe 2 was issued a written reprimand for failing to report an absence from work. (Doc. 63, ¶ 247; Doc. 63-1, Ex. M, at 56). Ultimately, in September of 2021, Doe 3 and Doe 4 were suspended indefinitely without pay. (Doc. 63, ¶ 258; Doc. 63-1, Ex. N, at 58).

As we have noted, the initial complaint in this matter was filed on March 18, 2021. (Doc. 1). The plaintiffs filed an amended complaint on April 16, 2021, and a second amended complaint was filed on October 29, 2021, which is now the operative pleading in this case. (Doc. 63). With respect to Defendant Roth, the amended complaint asserts the following claims by the Doe Plaintiffs:

discrimination, retaliation, and aiding and abetting discrimination and retaliation under the PHRA (Counts V-VII); Fourteenth Amendment Equal Protection violations based on disparate treatment and hostile work environment (Counts VIII-IX); and retaliation in violation of the First Amendment (Count XIII).

Roth has now filed a motion to dismiss, arguing that the plaintiffs have failed to state a claim against him. As discussed below, upon consideration this motion to dismiss will be granted with respect to the direct PHRA discrimination claim brought against the defendant but will be denied in all other respects.

## III. <u>Discussion</u>

### A. <u>Motion to Dismiss – Standard of Review</u>

A motion to dismiss tests the legal sufficiency of a complaint. It is proper for the court to dismiss a complaint in accordance with Rule 12(b)(6) of the Federal Rules of Civil Procedure only if the complaint fails to state a claim upon which relief can be granted. Fed. R. Civ. P. 12(b)(6). With respect to this benchmark standard for the legal sufficiency of a complaint, the United States Court of Appeals for the Third Circuit has aptly noted the evolving standards governing pleading practice in federal court, stating that:

> Standards of pleading have been in the forefront of jurisprudence in recent years. Beginning with the Supreme Court's opinion in <u>Bell Atlantic Corp. v. Twombly</u>, 550 U.S. 544 (2007), continuing with our opinion in <u>Phillips</u> [<u>v. County of Allegheny</u>, 515 F.3d 224, 230 (3d Cir. 2008)], and culminating recently with the Supreme Court's decision in <u>Ashcroft v. Iqbal</u>, –U.S.–, 129 S. Ct. 1937 (2009), pleading standards

> have seemingly shifted from simple notice pleading to a more
> heightened form of pleading, requiring a plaintiff to plead more than
> the possibility of relief to survive a motion to dismiss.

Fowler v. UPMC Shadyside, 578 F.3d 203, 209-10 (3d Cir. 2009).

In considering whether a complaint fails to state a claim upon which relief may be granted, the court must accept as true all allegations in the complaint and all reasonable inferences that can be drawn therefrom are to be construed in the light most favorable to the plaintiff. Jordan v. Fox, Rothschild, O'Brien & Frankel, Inc., 20 F.3d 1250, 1261 (3d Cir. 1994). However, a court "need not credit a complaint's bald assertions or legal conclusions when deciding a motion to dismiss." Morse v. Lower Merion Sch. Dist., 132 F.3d 902, 906 (3d Cir. 1997). Additionally, a court need not "assume that a . . . plaintiff can prove facts that the . . . plaintiff has not alleged." Associated Gen. Contractors of Cal. v. California State Council of Carpenters, 459 U.S. 519, 526 (1983). As the Supreme Court held in Bell Atlantic Corp. v. Twombly, 550 U.S. 544 (2007), in order to state a valid cause of action, a plaintiff must provide some factual grounds for relief which "requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of actions will not do." Id., at 555. "Factual allegations must be enough to raise a right to relief above the speculative level." Id.

In keeping with the principles of Twombly, the Supreme Court has underscored that a trial court must assess whether a complaint states facts upon

which relief can be granted when ruling on a motion to dismiss. In Ashcroft v. Iqbal,

556 U.S. 662 (2009), the Supreme Court held that, when considering a motion to

dismiss, a court should "begin by identifying pleadings that, because they are no

more than conclusions, are not entitled to the assumption of truth." Id., at 679.

According to the Supreme Court, "[t]hreadbare recitals of the elements of a cause of

action, supported by mere conclusory statements, do not suffice." Id., at 678. Rather,

in conducting a review of the adequacy of a complaint, the Supreme Court has

advised trial courts that they must:

> [B]egin by identifying pleadings that because they are no more than
> conclusions are not entitled to the assumption of truth. While legal
> conclusions can provide the framework of a complaint, they must be
> supported by factual allegations. When there are well-pleaded factual
> allegations, a court should assume their veracity and then determine
> whether they plausibly give rise to an entitlement to relief.

Id., at 679.

Thus, following Twombly and Iqbal, a well-pleaded complaint must contain

more than mere legal labels and conclusions; it must recite factual allegations

sufficient to raise the plaintiff's claimed right to relief beyond the level of mere

speculation. As the United States Court of Appeals for the Third Circuit has stated:

> [A]fter Iqbal, when presented with a motion to dismiss for failure to
> state a claim, district courts should conduct a two-part analysis. First,
> the factual and legal elements of a claim should be separated. The
> District Court must accept all of the complaint's well-pleaded facts as
> true, but may disregard any legal conclusions. Second, a District Court
> must then determine whether the facts alleged in the complaint are
> sufficient to show that the plaintiff has a "plausible claim for relief." In

14

other words, a complaint must do more than allege the plaintiff's entitlement to relief. A complaint has to "show" such an entitlement with its facts.

Fowler, 578 F.3d at 210-11.

As the Court of Appeals has observed:

The Supreme Court in Twombly set forth the "plausibility" standard for overcoming a motion to dismiss and refined this approach in Iqbal. The plausibility standard requires the complaint to allege "enough facts to state a claim to relief that is plausible on its face." Twombly, 550 U.S. at 570, 127 S. Ct. 1955. A complaint satisfies the plausibility standard when the factual pleadings "allow[ ] the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." Iqbal, 129 S. Ct. at 1949 (citing Twombly, 550 U.S. at 556, 127 S. Ct. 1955). This standard requires showing "more than a sheer possibility that a defendant has acted unlawfully." Id. A complaint which pleads facts "merely consistent with" a defendant's liability, [ ] "stops short of the line between possibility and plausibility of 'entitlement of relief.' "

Burtch v. Milberg Factors, Inc., 662 F.3d 212, 220-21 (3d Cir. 2011), cert. denied, 132 S. Ct. 1861 (2012).

In practice, consideration of the legal sufficiency of a complaint entails a three-step analysis:

First, the court must "tak[e] note of the elements a plaintiff must plead to state a claim." Iqbal, 129 S. Ct. at 1947. Second, the court should identify allegations that, "because they are no more than conclusions, are not entitled to the assumption of truth." Id., at 1950. Finally, "where there are well-pleaded factual allegations, a court should assume their veracity and then determine whether they plausibly give rise to an entitlement for relief."

Santiago v. Warminster Twp., 629 F.3d 121, 130 (3d Cir. 2010) (quoting Iqbal, 129 S. Ct. at 1950).

In considering a motion to dismiss, the court generally relies on the complaint, attached exhibits, and matters of public record. Sands v. McCormick, 502 F.3d 263, 268 (3d Cir. 2007). The court may also consider "undisputedly authentic document[s] that a defendant attached as an exhibit to a motion to dismiss if the plaintiff's claims are based on the [attached] documents." Pension Benefit Guar. Corp. v. White Consol. Indus., 998 F.2d 1192, 1196 (3d Cir. 1993). Moreover, "documents whose contents are alleged in the complaint and whose authenticity no party questions, but which are not physically attached to the pleading, may be considered." Pryor v. Nat'l Collegiate Athletic Ass'n, 288 F.3d 548, 560 (3d Cir. 2002); see also U.S. Express Lines, Ltd. v. Higgins, 281 F.3d 382, 388 (3d Cir. 2002) (holding that "[a]lthough a district court may not consider matters extraneous to the pleadings, a document integral to or explicitly relied upon in the complaint may be considered without converting the motion to dismiss in one for summary judgment"). However, the court may not rely on other parts of the record in determining a motion to dismiss, or when determining whether a proposed amended complaint is futile because it fails to state a claim upon which relief may be granted. Jordan v. Fox, Rothschild, O'Brien & Frankel, 20 F.3d 1250, 1261 (3d Cir. 1994).

B. **The Defendant's Motion Will Be Granted in Part and Denied in Part.**

1. **PHRA Claims**

As we have explained, the plaintiffs bring claims against Roth under the PHRA, alleging that he discriminated against them, retaliated against them, and aided and abetted others' discriminatory and retaliatory conduct. See 42 Pa. Cons. Stat. §§ 955(a), (d), (e). The PHRA makes it unlawful for an employer to discriminate with respect to compensation, hire, privileges, or other employment-related benefits against an employee because of sex. § 955(a). An "employer" is defined under the Act as "the Commonwealth or any political subdivision or board, department, commission or school district thereof and any person employing four or more persons within the Commonwealth . . ." § 954(b). The Act further prohibits employers and employees from retaliating against an individual who reports discriminatory conduct. § 955(d). In addition, the PHRA prohibits employers and employees from aiding, abetting, or inciting discriminatory or retaliatory conduct. § 955(e).

Thus, the PHRA recognizes four species of potential liability grounded upon sexual harassment or retaliation in the workplace. First, an employer may be directly liable for workplace discrimination. Second, "any person" may be directly liable for retaliating against a person who reports workplace discrimination. In addition to

17

these two forms of direct liability, the PHRA also forbids persons from aiding or abetting in either acts of (1) discrimination or (2) retaliation.

Recognizing these various forms of liability, with respect to a PHRA direct discrimination claim, Roth argues that he is not an "employer" as that term is used in the statute and thus cannot be held liable under § 955(a) for discrimination. For their part, the plaintiffs contend that Roth, having some supervisory authority, can be considered a "joint employer" and therefore liable under § 955(a). The Third Circuit has aptly noted in the past that, with respect to these discrimination claims,

> Generally, the PHRA is applied in accordance with Title VII. Davis v. Sheraton Society Hill Hotel, 907 F.Supp. 896, 899 n. 1 (E.D. Pa. 1995). Like Title VII, the definition of an employer under the PHRA cannot be construed to include "employees;" indeed, "employee" is defined as a wholly separate term under the Act. See 43 Pa. Cons. Stat. Ann. § 954(b) & (c). The employment discrimination provision of the PHRA declares only that "any employer" may be held liable. See 43 Pa. Cons. Stat. Ann. § 955(a).

Dici v. Commonwealth of Pa., 91 F.3d 542, 552 (3d Cir. 1996). See also McIlmail v. Pennsylvania, 381 F.Supp.3d 393, 415 (E.D. Pa. 2019) ("The PHRA is 'generally applied in accordance with Title VII,' which exposes only employers to liability while exempting individual employees. . .") (internal citations omitted).

On this score, the plaintiffs argue that Roth has supervisory authority, and thus, should be considered a "joint employer" liable for discrimination under the PHRA. However, the plaintiffs have provided no authority for this proposition, and

18

an independent search has not yielded any caselaw in this circuit which would suggest than an individual can be considered a "joint employer" of an employee. Rather, cases discussing a joint employer relationship have almost exclusively considered this joint employer relationship in the context of two *entities*, not individual persons. See e.g., Faush v. Tuesday Morning, Inc., 808 F.3d 208, 215 (3d Cir. 2015) ("Two entities may be "co-employers" or "joint employers" of one employee for purposes of Title VII"); Showers v. Endoscopy Center of Central Pa., LLC, 58 F.Supp.3d 446, 456 n.7 (M.D. Pa. 2014) ("The court notes that two corporations may also be consolidated under the 'joint employer' doctrine"); Myers v. Garfield & Johnson Enterprises, Inc., 679 F.Supp.2d 598, 607 (E.D. Pa. 2010) ("[A] finding that companies are 'joint employers' assumes in the first instance that companies are . . . independent legal entities that have merely 'historically chosen to handle joint important aspects of their employer-employee relationship'") (citations omitted).

Accordingly, we are not persuaded by the plaintiffs' assertion that Roth, an individual employee, can be considered a "joint employer" for purposes of their PHRA discrimination claim. Therefore, in the absence of any legal authority construing the PHRA in this fashion, with respect to the direct PHRA discrimination claim against Defendant Roth, we conclude that this claim fails as a matter of law, as Roth cannot be considered an "employer" under the PHRA.

However, this finding does not mean that Roth may totally avoid potential civil liability on a PHRA discrimination claim. Roth may still be liable under the PHRA if he aids or abets in sexual harassment or hostile workplace discrimination.

With respect to aiding and abetting liability under the PHRA, typically "[a]n individual employee may be exposed to liability under the aider and abettor provision only if he acts in a supervisory role because 'only supervisors can share the discriminatory purpose and intent of the employer . . . required for aiding and abetting.'" McIlmail v. Pennsylvania, 381 F.Supp.3d 393, 415 (E.D. Pa. 2019) (quoting Brzozowski v. Pa. Tpk. Comm'n, 165 F.Supp.3d 251, 263 (E.D. Pa. 2016) (internal citations omitted)); Davis v. Levy, Angestrich, Finney, Baldante, Rubenstein & Coren P.C., 20 F.Supp.2d 885, 887 (E.D. Pa. 1998) ("[A]n individual supervisory employee can be held liable under an aiding and abetting/accomplice liability theory pursuant to § 955(e) for his own direct acts of discrimination or for his failure to take action to prevent further discrimination by an employee under supervision"). Relying upon this general principle, in the instant case, Roth contends that he is not the plaintiffs' direct supervisor, and thus he cannot be held liable under an aiding and abetting theory. We disagree and find that Roth may be held liable under an aiding and abetting theory due to his position as the First Assistant County Solicitor.

At the outset, we do not believe that the PHRA's aiding and abetting provisions have the narrow, crabbed reach that Roth ascribes to this statute. While it is true that many aiding and abetting cases involve direct supervisors, a direct supervisory status is not a necessary precondition for PHRA liability. Thus, we agree that:

> [N]o court has limited the application of the PHRA to a plaintiff's direct supervisors, See Santai v. Fred Beans Ford, Inc., 2011 WL 3606836, at *3 (E.D. Pa. Aug. 16, 2011) ("[I]n our view, a supervisory employee can be found to share the intent and purpose of his or her employer and therefore can be found liable under § 955(e) for direct acts of discrimination including the ultimate decision to terminate an employee for an unlawful reason."); Glickstein, 1997 WL 660636, at *12 (holding that Dici "provides no support for the broader proposition that no individual employee may be liable under § 955(e) for his direct acts of discrimination").

Pamphile-Clerfe v. Program for Offenders, Inc., No. CV 19-1604, 2021 WL 5311970, at *7 (W.D. Pa. Feb. 23, 2021). Rather, state courts have applied agency principles when defining aiding and abetting liability under the PHRA, indicating that such liability does not automatically extend to a direct supervisor unless that supervisor had sufficient authority to be deemed the employer's agent. Hoy v. Angelone, 691 A.2d 476, 481 (Pa. Super. Ct. 1997).

Applying these agency principles to the interpretation of the PHRA, we have little difficulty concluding that by virtue of his role as a First Assistant County Solicitor, Roth was an agent of the county.

Thus, in the instant case, the fact that Roth was not the plaintiffs' direct supervisor does not mean he cannot be held liable. Rather, in our view, as the First Assistant County Solicitor, we find that Roth "possessed sufficient authority so as to classify him as [the County's] agent." Id. Section 904 of the Pennsylvania Statutes authorizes an assistant county solicitor to "perform such duties in connection with the legal affairs of the county as may be assigned by the county commissioners or the county solicitor." 16 P.S. § 904. The duties of the solicitor include defending the County in suits brought against it, as well as "render[ing] legal advice incident to the office which may be required of the solicitor by the commissioners." 16 P.S. § 902.

In the instant case, as the First Assistant County Solicitor who has a duty to defend the County and render legal advice to it, and allegedly having knowledge of the sexual assault and harassment perpetrated by Halcovage, Roth had a statutory duty as an assistant county solicitor to report Halcovage's harassment and assault to County officials, given that a solicitor's "principal job . . . [is] to render legal advice to county commissioners." Giangrieco v. Susquehanna County, 2020 WL 6047561, at *4 (M.D. Pa. Oct. 13, 2020) (Jones, J). Thus, we conclude that Roth "possessed sufficient authority so as to classify him as [the County's] agent." Hoy, 691 A.2d at 481.

In addition, Roth undoubtedly had an ethical duty under the Pennsylvania Rules of Professional Conduct to take action to stop Halcovage's harassment. On this score, Rule 1.13 instructs that:

> If a lawyer for an organization knows that an officer, employee or other person associated with the organization is engaged in action, intends to act or refuses to act in a matter related to the representation that is a violation of a legal obligation to the organization, or a violation of law which reasonably might be imputed to the organization, and is likely to result in substantial injury to the organization, the lawyer shall proceed as is reasonably necessary in the best interest of the organization. In determining how to proceed, the lawyer shall give due consideration to the seriousness of the violation and its consequences, the scope and nature of the lawyer's representation, the responsibility in the organization and the apparent motivation of the person involved, the policies of the organization concerning such matters and any other relevant considerations. Any measures taken shall be designed to minimize disruption of the organization and the risk of revealing information relating to the representation to persons outside the organization.

Pa. R. Prof. Conduct 1.13(b).

While a lawyer cannot be held civilly liable on the basis of a violation of the Rules, standing alone, we conclude that the ethical and statutory duties imposed upon Roth as an assistant county solicitor demonstrate that Roth had the requisite supervisory authority to be held liable under an aiding and abetting theory under the PHRA. The amended complaint alleges that Roth aided and abetted Halcovage's discriminatory and retaliatory behavior by failing to report the harassment and assault, which in turn, led the plaintiffs to believe that reporting Halcovage's conduct to other officials would be futile. In this setting, where Roth served as an agent of

the county, had a legal duty to ensure the county's compliance with the law, including those laws which forbid workplace discrimination, and had an ethical obligation to act upon the information he is alleged to have received, his inaction may equate with acquiescence in misconduct. Moreover, the failure to take action against Halcovage led to the continued and ongoing harassment of the plaintiffs, thus potentially aiding and abetting this misconduct. Accordingly, the motion to dismiss the PHRA aiding and abetting claim will be denied.

As for the plaintiffs' claim of retaliation and aiding and abetting in retaliation under the PHRA against Roth, while we find this to be an exceedingly close case, with our judgment confined solely to the pleadings we conclude that the plaintiffs have alleged sufficient well-pleaded facts to allow these claims to proceed forward. As we have noted, the PHRA's discrimination and retaliation provisions differ significantly in terms of the scope of those who may be held culpable. Under the PHRA, discrimination claims lie only against an "employer" and those who aid and abet the employer. In contrast, § 955(d) prohibits both employers and employees from retaliating against an individual who reports discriminatory conduct. 42 Pa. Cons. Stat. § 955(d). Indeed, the statute forbids retaliation by "any person," statutory language that is sweeping in its reach. Thus, the plaintiffs must show that they engaged in protected activity, suffered adverse action at the hands of the defendant, and show a causal connection between their protected activity and the adverse action

24

taken against them. See Fasold v. Justice, 409 F.3d 178, 188-89 (3d Cir. 2005) (noting that "retaliation claims . . . under the PHRA typically proceed under the McDonell Douglas framework").[4]

At the outset, we note that, with respect to these retaliation claims, there is an equivocal quality to the plaintiffs' amended complaint. Fairly construed, that amended complaint alleges that Roth initially failed to act for an extended period of time in the face of information which indicated that Halcovage was sexually harassing and exploiting county workers. However, the amended complaint also avers that the June 30, 2020 announcement by the county that Halcovage had violated the county's sexual harassment policy came as a result of an investigation conducted by Roth. (Doc. 63, ¶¶ 163-64; Doc. 63-1, Ex. B). Moreover, in contrast to some other defendants, the allegations of Roth's involvement in retaliation against the plaintiffs after they initiated this inquiry are isolated.

For example, the amended complaint simply states that Roth took no steps to impeach Halcovage or assist the sheriff in protecting the plaintiffs, allegations which may fall short of stating a retaliation claim. (Doc. 63, ¶¶ 165, 167.) In other instances the allegations leveled against Roth, stating that he assisted in instigating acts of retaliation against the plaintiffs, are advanced "on information and belief." (Id., ¶¶

---

[4] McDonnell Douglas Corp. v. Green, 411 U.S. 792 (1973).

174, 213.) While such allegations may ultimately prove to be a thin reed upon which to premise liability, we are mindful that at the pleading stage of litigation:

> [A]s to the "information and belief" allegations, the Court of Appeals has explained that pleading upon information and belief is permissible "[w]here it can be shown that the requisite factual information is peculiarly within the defendant's knowledge or control"—so long as there are no "boilerplate and conclusory allegations" and "[p]laintiffs ... accompany their legal theory with factual allegations that make their theoretically viable claim plausible." McDermott v. Clondalkin Grp., Inc., 649 Fed.Appx. 263, 267–68 (3d Cir. 2016) (quotations omitted). Indeed, the Court of Appeals has acknowledged that multiple federal appellate courts "accept allegations 'on information and belief' when the facts at issue are peculiarly within the defendant's possession." Lincoln Benefit Life Co. v. AEI Life, LLC, 800 F.3d 99, 107 n.31 (3d Cir. 2015), citing Carolina Cas. Ins. Co. v. Team Equip., Inc., 741 F.3d 1082, 1087 (9th Cir. 2014); Pirelli Armstrong Tire Corp. Retiree Med. Benefits Tr. v. Walgreen Co., 631 F.3d 436, 442–43 (7th Cir. 2011); Med. Assur. Co. v. Hellman, 610 F.3d 371 (7th Cir. 2010); Arista Records, LLC v. Doe 3, 604 F.3d 110, 120 (2d Cir. 2010). In these circumstances, allegations of fact pled "upon information and belief" are entitled to the same presumption of truth as other factual allegations. McDermott, 649 Fed.Appx. at 267–68.

DePuy Synthes Sales, Inc. v. Globus Med., Inc., 259 F. Supp. 3d 225, 240 (E.D. Pa. 2017). In this case, Roth's alleged involvement in these particular actions which are pleaded "on information and belief" entail matters that are peculiarly within the defendant's knowledge. Therefore, these averments, while perhaps slender reeds, are legally sufficient.

Finally, we note that the complaint avers that Roth participated in two alleged direct acts of retaliation: a November 2020 decision to revoke Plaintiff Jane Doe 2's

work from home privileges, and a December 2020 incident in which it is alleged that Roth and others pressured a witness to sign an untruthful statement in order to obtain a pretextual justification for terminating Jane Doe 2. (Id., ¶¶ 206, 212-14.)

Taken together, at the pleading stage where we must accept as true all well-pleaded allegations made by the plaintiffs, we find that these averments are sufficient to allow the PHRA retaliation claims levelled against Roth to proceed forward. The motion to dismiss those claims will be denied.

### 2. **Equal Protection Claims**

Next, Roth argues that the plaintiffs have failed to state a § 1983 claim against him for discrimination and creating a hostile work environment because of their sex in violation of the Fourteenth Amendment.

To state an equal protection claim under § 1983, the plaintiffs must show "that [they were] subjected to 'purposeful discrimination' because of [their] sex." Robinson v. City of Pittsburgh, 120 F.3d 1286, 1293 (3d Cir. 1997) (quoting Keenan v. City of Philadelphia, 983 F.2d 459, 465 (3d Cir. 1992)). Thus, the plaintiffs must allege "(1) disparate treatment in relation to other similarly situated individuals, and (2) that the discriminatory treatment was based on sex." Id. (citing Andrews v. City of Philadelphia, 895 F.2d 1469, 1478 (3d Cir. 1990)). The complaint must further allege "some affirmative conduct by the supervisor that played a role in the discrimination." Andrews, 895 F.2d at 1478. Thus, "[t]he necessary involvement can

27

be shown in two ways, either 'though allegations of personal direction or of actual knowledge and acquiescence.'" Id. (quoting Rode v. Dellarciprete, 845 F.2d 1195, 1207 (3d Cir. 1988)).

Further, a plaintiff alleging that a defendant created a hostile work environment on the basis of sex must allege that "(1) [S]he suffered intentional discrimination because of her [sex]; (2) the discrimination was severe or pervasive; (3) the discrimination detrimentally affected her; (4) it would have detrimentally affected a reasonable person in like circumstances; and (5) a basis for employer liability is present." Komis v. Sec'y of U.S. Dep't of Labor, 918 F.3d 289, 293 (3d Cir. 2019) (citations omitted); see Starnes v. Butler County Court of Common Pleas, 50th Judicial District, 971 F.3d 416, 428 (3d Cir. 2020) ("[W]e have been clear that § 1983 shares the same elements for discrimination purposes as a Title VII action"). "[A] hostile work environment exists 'when the workplace is permeated with "discriminatory intimidation, ridicule, and insult," that is "sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment." ' " Starnes, 971 F.3d at 428 (quoting National R.R. Passenger Corp. v. Morgan, 536 U.S. 101, 116 (2002) (internal citations omitted)). Moreover, it is well settled that "[t]he intent to discriminate on the basis of sex in cases involving sexual propositions, innuendo . . . or sexual derogatory language is

implicit, and thus should be recognized as a matter of course." Andrews, 895 F.2d

at 1482 n.3.

In the instant case, the plaintiffs assert that Roth is liable under § 1983

because Roth failed to address the harassment by Halcovage. Indeed, it is well settled

that the failure to act may constitute "acquiescence" on the part of an individual. See

Robinson v. City of Pittsburgh, 120 F.3d 1286, 1294 (3d Cir. 1997). However, it is

also well settled that,

> [W]here actual supervisory authority is lacking, mere inaction, in most
> circumstances, does not reasonably give rise to a similar inference. As
> a general matter, a person who fails to act to correct the conduct of
> someone over whom he or she has no supervisory authority cannot
> fairly be said to have "acquiesced" in the latter's conduct.

Id.; see also Ditzler v. Housing Auth. of City of Nanticoke, 171 F.Supp.3d 363, 367

(M.D. Pa. 2016); Festa v. Jordan, 803 F.Supp.2d 319, 325 (M.D. Pa. 2011).

Here, as we have explained with respect to the plaintiffs' PHRA claims, we

find that Roth had supervisory authority as the First Assistant County Solicitor. The

plaintiffs allege that Roth witnessed Halcovage's conduct on several occasions and

did not report it. The complaint further alleges that Doe 3 directly asked Roth to step

in and take action against Halcovage's conduct and that Roth failed to take any

action, leading the plaintiffs to believe that any effort to report Halcovage's behavior

to other supervisory officials would be futile. Thus, taken as true, these factual

allegations show indifference and acquiescence on the part of a high-level County

official which led to a work environment for the plaintiffs that was " 'permeated with "discriminatory intimidation, ridicule, and insult," that is "sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment." ' " Starnes, 971 F.3d at 428 (quoting National R.R. Passenger Corp., 536 U.S. at 116 (internal citations omitted)). Accordingly, we find at this stage that the plaintiffs have adequately pleaded facts to support a discrimination and hostile work environment claim against Defendant Roth.

### 3. **First Amendment Retaliation**

Finally, Roth contends that the plaintiffs have failed to state a claim against him for retaliation under the First Amendment pursuant to § 1983. In order to state a claim of retaliation under the First Amendment, a plaintiff must show: "(1) that [she] engaged in a protected activity, (2) that defendants' retaliatory action was sufficient to deter a person of ordinary firmness from exercising his or her rights, and (3) that there was a causal connection between the protected activity and the retaliatory action." Lauren W. ex rel. Jean W. v. DeFlaminis, 480 F.3d 259, 267 (3d Cir. 2007) (citing Thomas v. Independence Twp., 463 F.3d 285, 296 (3d Cir. 2006)). Stated differently, the plaintiff must demonstrate that the protected speech was "a 'substantial factor' in the alleged retaliatory action." McAndrew v. Bucks Cnty Bd. Of Comm'rs, 183 F.Supp.3d 713, 731 (E.D. Pa. 2016) (citing Gorum v. Sessoms, 561 F.3d 179, 184 (3d Cir. 2009)). If a plaintiff makes such a showing, the burden

then shifts to the defendants to show that, even if the protected speech had not taken place, it would have taken the same action.

With respect to the third element, there are three ways in which a plaintiff can establish causation for a First Amendment retaliation claim, showing, "(1) an 'unusually suggestive temporal proximity' between the speech and the alleged retaliatory conduct;" (2) a 'pattern of antagonism coupled with timing'; or (3) that the 'record as a whole' permits the trier of fact to infer causation. McAndrew, 183 F.Supp.3d at 737 (quoting DeFlaminis, 480 F.3d at 267). Furthermore, as we have explained with respect to the Equal Protection claims, it is axiomatic that a defendant have personal involvement in the alleged wrong in order to be held liable under § 1983, shown through specific allegations of personal direction or of actual knowledge and acquiescence in the challenged practice. See Robinson, 120 F.3d at 1294.

Here, we find that Roth had supervisory authority as the First Assistant County Solicitor, in that he "possessed sufficient authority so as to classify him as [the County's] agent." Hoy, 691 A.2d at 481. Moreover, as we observed with respect to the PHRA retaliation claims brought against Roth, while we regard this as a close case, at this stage of the litigation, where our evaluation is cabined by the well-pleaded facts in the amended complaint, we find that the plaintiffs have plausibly

31

alleged that Roth participated in some acts that may be construed as retaliatory. Therefore, this claim also survives.

## IV.   <u>Conclusion</u>

Accordingly, for the foregoing reasons, Defendant Roth's motion to dismiss (Doc. 72) will be GRANTED with respect to the direct PHRA discrimination claim brought against the defendant but will be DENIED in all other respects.

An appropriate order follows.


Dated: May 10, 2022


<u>*S/ Martin C. Carlson*</u>
Martin C. Carlson
United States Magistrate Judge