# UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| JANE DOE et al. | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | Case No.: 3:21-CV-477-MCC |
| and | ) | |
| | ) | **JURY TRIAL DEMANDED** |
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Plaintiff-Intervenor, | ) | |
| | ) | |
| v. | ) | |
| | ) | |
| SCHUYLKILL COUNTY et al., | ) | |
| | ) | |
| Defendants. | ) | |

## <u>COMPLAINT OF PLAINTIFF-INTERVENOR</u>

Plaintiff-Intervenor, the United States of America ("United States"), alleges:

1.     This action is brought on behalf of the United States to enforce Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. § 2000e, *et seq*. ("Title VII").  The United States' claims are alleged against Defendant Schuylkill County ("County") and none of the other Defendants.

2.     All conditions precedent to the filing of suit have been satisfied.

1

## JURISDICTION AND VENUE

3.      This Court has jurisdiction of the action under 42 U.S.C. § 2000e-5(f) and 28 U.S.C. §§ 1331 and 1345.  Venue is proper in this judicial district under 42 U.S.C. § 2000e-5(f)(3) because this is the district where the unlawful employment practices are alleged to have been committed.

## PARTIES

4.      Plaintiff-Intervenor is the United States of America.

5.      Defendant Schuylkill County is a government, governmental agency, and/or political subdivision in Pennsylvania.  The county seat of Schuylkill County is in Pottsville, Pennsylvania.

6.      The County is a "person" within the meaning of 42 U.S.C. § 2000e(a) and an "employer" within the meaning of 42 U.S.C. § 2000e(b).

7.      At all times relevant to this action, the Plaintiffs were "employees" of the County within the meaning of 42 U.S.C. § 2000e(f).

## STATEMENT OF EEOC CHARGES

8.      In August 2020, the U.S. Equal Employment Opportunity Commission ("EEOC") received timely charges of discrimination filed by the women identified as Jane Doe, Jane Doe 2, Jane Doe 3, and Jane Doe 4 in the Plaintiffs' Second Amended Complaint (ECF No. 63).  (The EEOC Charge

numbers for those charges of discrimination were 530-2020-5338; 530-2020-5565; 530-2020-5566; and 530-2020-5567).  The charges of discrimination alleged, among other things, that Schuylkill County Commissioner George F. Halcovage, Jr. sexually harassed the Plaintiffs.  The charges, which were dual filed with the Pennsylvania Human Relations Commission, identified the County, Halcovage, and others as Respondents.  (For ease of reference, this Complaint will refer to the Plaintiffs as Jane Doe, Jane Doe 2, Jane Doe 3, and Jane Doe 4 in the same way as Plaintiffs' Second Amended Complaint.)

9.     In March 2021, the Plaintiffs filed supplemental charges of discrimination with the EEOC which alleged, among other things, that the County had unlawfully retaliated against them in violation of Title VII.  (The EEOC Charge numbers for those charges of discrimination were 530-2021-2449; 530-2021-2451; 530-2021-2452; and 530-2021-2453).

10.     Pursuant to Section 706 of Title VII, 42 U.S.C. § 2000e-5, the EEOC investigated all of the charges of discrimination and found reasonable cause to believe, among other things, that the Plaintiffs were subjected to unlawful sexual harassment and retaliation in violation of Title VII.

11.   After unsuccessfully attempting to achieve a voluntary resolution of each of the charges through conciliation, the EEOC referred the charges to the U.S. Department of Justice.

## FACTUAL ALLEGATIONS

12.   The County subjected all four Plaintiffs to (i) severe and pervasive sexual harassment by County Commissioner Halcovage and (ii) retaliation because the Plaintiffs opposed Halcovage's sexual harassment, participated in sexual harassment investigations of Halcovage, filed charges of discrimination with the EEOC, opposed the County's retaliatory actions, and filed their Complaint with this Court.

13.   The descriptions below of some of Halcovage's sexual harassment do not encompass all acts of sexual harassment and he engaged in other acts of sexual harassment in addition to those described.

14.   Halcovage has served as a County Commissioner for Schuylkill County since 2012.

15.   The County has three Commissioners who are elected every four years and they exercise both legislative and executive powers for the County.

16.   Among other things, County Commissioners set County personnel policies; appoint County personnel; add and eliminate County employment

positions; terminate County personnel; set budgets for County departments; and set County employees' salaries.

17.    County Commissioners are the business managers for the County and no County officials are superior to them.  County Commissioners speak for the County because, among other things, they commit the County to contractual obligations and set policies which the County must follow.

**A.    Halcovage's sexual harassment of Plaintiff Jane Doe**

18.    Doe started working for the County in 2014 as a temporary employee in the mailroom of the County courthouse.

19.    Almost immediately after Doe started working for the County, Halcovage began to visit the mailroom and say things to Doe like "you're so beautiful," "you're a head turner," and "you're so gorgeous…I bet everyone tells you that."

20.    Later in 2014, around the time Doe received a promotion with the County, Halcovage spoke to Doe about her future working for the County, and told her that her future with the County was not guaranteed but if she "stuck with" him, he would "have her back."

21.    In late 2014 or 2015, Halcovage asked Doe to work at a political fundraising event.

22.     Doe did not believe she could decline Halcovage's request to work at this fundraising event because of his position over her at the County.

23.     During the fundraising event, Halcovage stared at Doe in a way that made her uncomfortable.  At the conclusion of the event, Halcovage walked Doe to her car and, once they got to her car, he forcibly kissed her.

24.     After this kiss, Halcovage began to demand sexual favors from Doe based on explicit and implicit threats to her continued employment with the County.

25.     Doe was a single mother who needed her job to support her family. She constantly feared what might happen to her employment if she did not do what Halcovage wanted.

26.     Halcovage used explicit and implicit threats to Doe's continued employment with the County and Doe's fear of losing her job to coerce her to have sex with him.  When Doe tried to rebuff Halcovage's advances he said things to her like he was "the only one who believed in" her at the courthouse, she "better be careful" or she might not have a job, and he could have her department "restructured" so that she would lose her job.  Using this pressure, Halcovage coerced Doe to perform oral sex on him and engage in sexual intercourse with him scores of times both inside and outside of the workplace.

27.     Halcovage also sometimes injected himself into Doe's personal life to demonstrate his power over her and further harass her.  For example, he showed up uninvited at her house and her gym.  He sometimes looked into her house through her bedroom window.  One night, Halcovage went so far as to climb up on to the deck of Doe's house and peer in the window while she had company.

28.     In addition to coercing Doe to perform sexual acts on him, Halcovage harassed Doe in other ways at work.  Some examples are as follows:

> a.  Starting in or around 2015, Halcovage came to Doe's office on a regular basis, sat down across from her, looked her up and down in a sexual manner, and shook his head in approval of her physical appearance.
>
> b. On multiple occasions, Halcovage pulled Doe into a boardroom and kissed her.
>
> c. On multiple occasions, Halcovage gave Doe gifts like massage oil and condoms.

29.     Due to all of the attention she received from Halcovage, some of Doe's co-workers treated her with hostility and called her a "whore."

30.     Halcovage's harassment upset Doe so much that she sometimes left her desk to get away from him when she saw him coming.  She also sometimes

broke down in tears at her desk because of the emotional distress that Halcovage caused. Because of Halcovage's position with the County and his threats to her job, Doe feared retaliation if she made a complaint against Halcovage.

31.    Halcovage's sexual harassment of Doe continued regularly from 2014 until May of 2020,  when Doe filed a written complaint with the County about Halcovage's harassment of her.

32.    Doe did not welcome Halcovage's sexual harassment, she found it extremely offensive, and she asked Halcovage multiple times to stop his harassment.

**B.    Halcovage's sexual harassment of Plaintiff Jane Doe 2**

33.    Doe 2 began her employment with the County in 2014 as a Clerk I. Almost immediately after she started to work for the County, Halcovage began to make sexually charged comments to Doe 2 and act inappropriately toward her.

34.    Halcovage made comments to Doe 2 like "you're so beautiful," "you're a jaw dropper," and "you're a head turner."

35.    Halcovage often said things like "whoa, look at that," and referred to an article of Doe 2's clothing while he looked her up and down.

36.    On one occasion, while Doe 2 was eating lunch with Halcovage and Doe, Halcovage made obscene gestures under the table like he was rubbing Doe

8

2's leg and/or genitals.

37.    Halcovage told Doe 2 that he would like to have a sexual relationship with her but Doe 2 rejected his advances.

38.    Halcovage took photographs of Doe 2 multiple times even after she asked him to stop.  One time he even took a photograph of her while she was bent over.

39.    Some of Halcovage's other sexually charged comments to Doe 2 were as follows:

  a.  He made a comment that compared hollandaise sauce on Doe 2's eggs Benedict to semen.

  b.  He implied to Doe 2's then-husband that he (Halcovage) had sex with Doe 2.  Comments like this and false rumors that Halcovage spread about having sex with Doe 2 strained her marriage and were a contributing factor in her divorce.

  c.  Halcovage arrived uninvited to a cookout with Doe 2 and her family and made a comment comparing eating a hot dog or sausage to oral sex.

  d.  When Doe 2 wore a pair of jeans to work with distressed spots on them, Halcovage said they looked like holes and that he wanted to

put his finger in "one of [Doe 2's] holes," clearly likening the spots

to a vagina.

e.   On one occasion, Halcovage was able to gain entry for himself and

Doe 2 to a political event ahead of some other people and he said

to Doe 2 "and you didn't even have to hike up your skirt" to get

inside.

40.   Halcovage often demanded Doe 2 spend time with him or talk to him

on the phone outside of normal business hours about matters unrelated to work.

41.   On occasions when Doe 2 refused to speak or spend time with

Halcovage outside of work, he took actions designed to make her uncomfortable or

interfere with her personal life.  For example, Halcovage once wanted to talk to

Doe 2 and she said that she could not because she was running errands and headed

to Walmart.  When she got to Walmart, Halcovage was there waiting for her and

he insisted that Doe 2 take a picture of him with her daughter and Doe's daughter,

who was also with Doe 2 that day.  This made Doe 2 feel very uncomfortable.

42.   Halcovage spread false rumors at work that he and Doe 2 had a sexual

relationship.  For example, he told some law enforcement officers that he "got

caught up in the bell tower having sex" with Doe 2.

43.   Halcovage also spread false rumors that Doe 2 was promiscuous.

Once, at work, Doe 2 was in Halcovage's office and Halcovage put his wife on speakerphone. When Halcovage's wife learned that Doe 2 was in his office she said "what is that whore doing in there!?"

44.     The false rumor about Doe 2 and Halcovage having a sexual relationship strained Doe 2's relationship with some of her co-workers. For example, one of Doe 2's co-workers told Doe 2 that she acted coolly toward Doe 2 because Halcovage told people Doe 2 was "one of his girls."

45.     Halcovage regularly sexually harassed Doe 2 between the start of her employment in 2014 until Doe 2 went out on furlough due to COVID-19 in April 2020.

46.     Doe 2 did not welcome Halcovage's sexual harassment, she found it extremely offensive, and she expressed to him and others, multiple times, that his harassment was unwelcome.

**C.     Halcovage's sexual harassment of Plaintiff Jane Doe 3.**

47.     Doe 3 started working for the County in 2011 as the Director of the Tax Claims Office.

48.     In or around July 2019, the County's Tax Claims and Tax Assessment Offices merged and Doe 3 became the department head for the merged offices. When she took on this role, Doe 3 became Doe's and Doe 2's supervisor. Doe 3

11

supervised Doe 4 before the merger and continued to supervise her after the merger.

49.   Halcovage committed numerous acts of sexual harassment that Doe 3 witnessed and this harassment deeply offended Doe 3.  For example, Doe 3 heard Halcovage's statement to Doe 2's husband, which is discussed above, that implied Halcovage had sex with Doe 2.  Doe 3 also heard the false rumors, discussed above, about Halcovage and Doe 2 having sex.

50.   All four Plaintiffs, including Doe 3, heard Halcovage frequently make obscene jokes, ask female employees to bounce up and down on exercise ball chairs, and force female employees to take photographs with his arms around them.  These actions offended the Plaintiffs and the other women involved.

51.   Doe 3 and the other three Plaintiffs also heard Halcovage make offensive comments about a woman who supervised Doe and Doe 2 before they came under Doe 3's supervision.  Halcovage spoke about how he thought this woman was a lesbian and he called her a "carpet muncher."

52.   Halcovage also directed sexual harassment specifically at Doe 3.  For example, on one occasion Halcovage asked her if she and her husband went "parking" when they went out for lunch together.  "Parking" is a euphemism for having sex in a car.  Doe 3 said that she did not go "parking" with her husband and

Halcovage responded "then what's all over your lips?" implying that Doe 3 had given her husband oral sex.  Halcovage continued to regularly make references to Doe 3 going "parking" after this episode.

53.    Up until employees were furloughed in April 2020 due to the COVID-19 pandemic, Doe 3 regularly suffered from Halcovage's sexual harassment and witnessed him sexually harass other female employees consistently throughout his time as a Commissioner.

54.    Doe 3 did not welcome Halcovage's sexual harassment, she found it extremely offensive, and she expressed to him and others, multiple times, that his harassment was unwelcome.

**D.    Halcovage's sexual harassment of Plaintiff Jane Doe 4.**

55.    In January 2012, after his election as Commissioner, Halcovage began to frequently visit the Tax Claims Office where Doe 4 worked and regularly made offensive sexual and sexist comments to her and the other women who worked there.

56.     Halcovage regularly made these comments between 2012 and April 2020 when employees no longer had to hear his comments because they were furloughed due to the COVID-19 pandemic.

57.    Some examples of the offensive comments Halcovage made, and

which all four Plaintiffs heard, are as follows:

a.  Doe 4 often ate freeze pops at her desk and Halcovage made comments which implied that Doe 4 looked like she was performing oral sex when she put a freeze pop in her mouth.

b.  Halcovage once asked Doe 4, "do you know what Hillary Clinton's pussy smells like?" and, when Doe 4 refused to respond to his question, he breathed heavily on her and Doe 3 to imply that his breath smelled like Hillary Clinton's genitals because he had given her oral sex.

c.  In November 2019, Doe 4 and Halcovage got into a heated discussion about politics and Halcovage said to Doe 4, "let's just go have sex right now."

d.  In February 2020, Doe 4 was talking about the women who performed during the Super Bowl halftime show and she said she did not like how female performers are objectified.  In response to her comments, Halcovage stuck his tongue out and moved it in a manner that simulated oral sex.  Doe witnessed this act and Halcovage also stuck his tongue out at her.

58.  Doe 4 did not welcome Halcovage's sexual harassment, she found it

extremely offensive, and she expressed to him and others, multiple times, that his harassment was unwelcome.

**E.    The County did not take prompt corrective action when it learned of Halcovage's sexual harassment.**

59.    The County did not launch an investigation of or take any action to correct Halcovage's sexual harassment until after Doe filed a written complaint on or about May 21, 2020, even though the County had notice of Halcovage's sexual harassment years before that.

60.    Prior to the merger of the Tax Claims and Tax Assessment Offices, in July 2019, First Assistant County Solicitor/Risk Manager, Glenn Roth, witnessed Halcovage's sexual harassment firsthand.  He witnessed Halcovage call Doe's and Doe 2's supervisor a "carpet muncher."  He also witnessed Halcovage's comment to Doe 2's husband in which Halcovage implied that he had sex with Doe 2.  Roth admitted to Doe 3 that he understood Halcovage's comment to Doe 2's husband to be sexual in nature.

61.    Months before Doe submitted her written complaint, Doe 3 complained to Roth multiple times about Halcovage's sexual harassment.  For example, Doe 3 complained to him about Halcovage's freeze pop comments.  In July 2019, Doe 3 asked Roth to help her address Halcovage's sexual harassment

because of the effect it had on the functioning of her office.  In November 2019, Doe 4 complained to Doe 3 about Halcovage's "let's just go have sex right now" comment, discussed above, and Doe 3, in turn, passed Doe 4's complaint along to Roth.

62.     Also months before Doe filed her written complaint, Doe 2 complained to County Administrator Gary Bender about Halcovage's sexual harassment.  Bender reprimanded Doe 2 for unprofessional attire because of the jeans she had worn that prompted Halcovage to ask if he could "put his finger in one of her holes."  When Bender reprimanded Doe 2, she told him about Halcovage's comment.  Upon information and belief, Bender did not reprimand Halcovage for his comment.

63.     Roth and Bender were supervisors above the Plaintiffs in the hierarchy of County government.

64.      There is other evidence, in addition to the facts alleged in this Complaint, which proves the County had notice of Halcovage's  sexual harassment of the Plaintiffs before Doe's May 2020 complaint.

65.     The Plaintiffs complained about Halcovage's sexual harassment despite their reasonable fears that he and/or the County would retaliate against them for their complaints.  They held these fears due to, among other reasons,

Halcovage's position with the County; the fact that supervisors witnessed Halcovage's sexual harassment and did nothing in response; the fact that Doe 2 got reprimanded when she complained to Bender about Halcovage's harassment; threatening comments Halcovage made when they opposed his harassment; and Halcovage's history of retaliating against employees who disagreed with him. Furthermore, Doe reasonably feared retaliation if she complained about Halcovage's sexual harassment because he repeatedly threatened her employment anytime she rebuffed his sexual advances.

### F. The County's response to Doe's written complaint and its retaliation against the Plaintiffs

66. After Doe filed a written complaint about Halcovage's sexual harassment in May 2020, the County conducted an investigation and determined that Halcovage had violated the County's sexual harassment policy as well as other County policies. The County determined that Halcovage's conduct warranted termination but it claimed that it could not terminate him because County Commissioners could only be terminated if they were impeached or convicted of a crime. The County failed to take any disciplinary action against Halcovage in response to his conduct.

67. After the County completed its investigation of Doe's complaint, it

17

began to retaliate against the Plaintiffs in the ways described below.

### 1. Halcovage harassed the Plaintiffs in retaliation for engaging in protected activity

68.     Because the County took no disciplinary action against Halcovage, he felt emboldened and began to harass the Plaintiffs in retaliation for their opposition to his sexual harassment and because they filed charges of discrimination against him.  Some of Halcovage's retaliatory harassment is described below but an exhaustive description of all of Halcovage's retaliatory harassment is not included herein.

69.     The Plaintiffs requested that the County take steps to keep Halcovage away from them while at work as a way to remedy the hostile work environment he had created.  The County did not bar Halcovage from the courthouse but instead placed limits on his use of the courthouse, including directing him to use certain entrances and to use the courthouse at certain times of the day.

70.     In order to retaliate against the Plaintiffs, Halcovage sometimes ignored the limitations on his use of the courthouse, which meant that the Plaintiffs never knew if they would encounter him when they went to the courthouse to perform their job duties.  The County took no action against Halcovage even though it knew he ignored the limitations on his use of the courthouse.

71.     Furthermore, even though Halcovage knew that the Plaintiffs wanted him to stay away from them, he went out of his way to get near them to make them uncomfortable as further harassment and retaliation.  For example, on one occasion, when Halcovage saw Doe 2 driving someplace for work, he glared at her, and then proceeded to follow her in his car to intimidate her.

72.     The Plaintiffs promptly complained to the County, multiple times, about Halcovage's retaliatory harassment.

### 2. The County declined Doe's and Doe 2's requests to work from home and transferred them to a less desirable workplace

73.     Because of Halcovage's presence at the courthouse, Doe and Doe 2 also asked the County for permission to work from home.  After Doe's and Doe 2's repeated requests in 2020, the County began to acquire the equipment and supplies they would need to perform all of their job duties from home, going so far as to order all of the equipment. However, the County subsequently changed course, denied their requests to work from home on November 23, 2020, and relocated Doe's and Doe 2's offices from the courthouse to another building called the "410 building."

74.     With the support of their medical providers – who had treated them for the extreme emotional distress they suffered due to Halcovage's sexual and

retaliatory harassment – in February and March 2021 Doe and Doe 2 again asked to work from home at least some of the time, rather than work in the 410 building, because of the potential that they could still come into contact with Halcovage and the resulting stress.  The County again denied these requests to work from home.

75.    The County normally allowed an employee's supervisor to decide whether to permit an employee to work from home.  Doe 3 was Doe's and Doe 2's supervisor and she would have approved their requests to work from home. Despite the support from Doe 3 and the 2021 requests from their medical providers, in retaliation for their protected activity, the County denied Doe's and Doe 2's requests to work from home.

76.    The 410 building was a less desirable work location than the courthouse.  The following are some of the reasons why:

a.  When they arrived at the 410 building for work, Doe and Doe 2 found that their offices were filthy, far from the level of cleanliness necessitated by the COVID-19 pandemic or even basic health standards.

b.  Doe's office in the 410 building did not have two computer monitors and a printer, which she needed to successfully perform her job duties.

    c.  Doe 2's office was so full of clutter that she could not store things in it that she needed to perform her job.

    d.  The desk chair in Doe 2's office was broken.

    e.  Pieces of water stained ceiling tiles in Doe 2's office fell on her.

    f.  The Plaintiffs still had to enter the courthouse from time to time to perform their job duties because the County did not move everything that they needed to perform their jobs to the 410 building.

77.    The County transferred Doe and Doe 2 to the 410 building in retaliation for their opposition to Halcovage's sexual harassment and their filing of charges of discrimination.

**3.  The County demoted and cut the pay of Doe 3 and Doe 4.**

78.    On March 17, 2021 – the day after the Plaintiffs filed their initial Complaint with this Court against Halcovage, the County, and other Defendants – the County Commissioners, including Halcovage, voted to restructure the Tax Claims and Assessment Office resulting in demotions and pay cuts for Doe 3 and Doe 4.

79.    The County demoted and cut the pay of Doe 3 and Doe 4 to retaliate against them because they had opposed Halcovage's sexual harassment, filed

charges of discrimination, and filed their Complaint with this Court.

80.     The Commissioners voted 2 to 1 to demote and cut the pay of Doe 3 and Doe 4 with Halcovage voting in favor of the demotions and pay cuts.  Thus Halcovage, who harbored retaliatory animus against Doe 3 and Doe 4, cast the decisive vote to demote them and cut their pay despite his obvious conflict of interest.

### 4.  The County disciplined Doe 3 and Doe 4

81.     On April 21, 2021, a week after Doe 3 and Doe 4 participated in another separate sexual harassment investigation against Halcovage, the County issued Doe 3 and Doe 4 written warnings allegedly because of unprofessional comments they made to co-workers.  The County then suspended Doe 3 for three days on May 17, 2021, for allegedly unprofessional communications with co-workers.

82.     The County issued this discipline to Doe 3 and Doe 4 to retaliate against them for opposing Halcovage's sexual harassment, participating in investigations of his sexual harassment, filing charges of discrimination, and filing their Complaint with this Court.

83.     In response to retaliation complaints from Doe 3 and Doe 4, the County retained an investigator to investigate whether these disciplinary actions

were retaliatory.

84.     The investigator determined that the County disciplined Doe 3 and Doe 4 too severely when it issued them written warnings and should have, instead, just issued them documented verbal warnings.  The County, nevertheless, refused to reduce Doe 3 and Doe 4's written warnings to verbal warnings, and falsely claimed, as to Doe 3, that she had already received numerous verbal warnings.  In fact, Doe 3's personnel file contained no disciplinary actions prior to the issuance of the written warning.

85.     As a direct and proximate result of the County's sexual harassment and retaliation, the Plaintiffs have suffered damages including, but not limited to, lost income, emotional distress, and loss of enjoyment of life.

## <u>COUNT I – SEXUAL HARASSMENT</u>

86.     The United States realleges and incorporates by reference the allegations set forth in paragraphs 1-85 above.

87.     The County subjected the Plaintiffs to a hostile work environment, based on their sex, in violation of Title VII, 42 U.S.C. § 2000e-2(a).

88.     Halcovage was the Plaintiffs' supervisor for purposes of analyzing the County's liability for his sexual harassment.

89.     Halcovage was a proxy or alter ego of the County for purposes of analyzing the County's liability for his sexual harassment.

90.     Doe's submission to Halcovage's sexual demands because of his threats to her employment constituted a tangible employment action for purposes of analyzing the County's liability.

91.     The County did not exercise reasonable care to prevent and correct promptly Halcovage's sexually harassing behavior.

92.     The Plaintiffs did not unreasonably fail to take advantage of any preventive or corrective opportunities provided by the County to address Halcovage's sexual harassment or to avoid harm otherwise.

93.     Halcovage's sexual harassment of the four Plaintiffs occurred both within the 300-day period immediately preceding the date that they filed their charges of discrimination and before that 300-day period.  As such, all of Halcovage's sexual harassment is actionable because of its continuous nature.

## COUNT II - RETALIATION

94.     The United States realleges and incorporates by reference the allegations set forth in paragraphs 1-93 above.

95.     The County retaliated against the Plaintiffs, in violation of Title VII, because they engaged in activity protected by Title VII.  42 U.S.C. § 2000e-3(a).

96.     The County's retaliatory actions included, but are not limited to, Halcovage's retaliatory harassment; moving Doe and Doe 2 to the 410 building; denying the work-from-home requests of Doe and Doe 2; demoting and cutting the pay of Does 3 and 4; and disciplining Does 3 and 4.

97.     Halcovage was the Plaintiffs' supervisor for purposes of analyzing the County's liability for his retaliatory harassment.

98.     Halcovage was a proxy or alter ego of the County for purposes of analyzing the County's liability for his retaliatory harassment.

99.     The County did not exercise reasonable care to prevent and correct promptly Halcovage's retaliatory harassment.

100.    The Plaintiffs did not unreasonably fail to take advantage of any preventive or corrective opportunities provided by the County to address Halcovage's retaliatory harassment or to avoid harm otherwise.

## **PRAYER FOR RELIEF**

WHEREFORE, the United States prays that the Court grant the following relief:

(a)     Enjoin the County from causing, creating, or condoning a sexually or retaliatory hostile work environment;

(b)     Order the County to develop and implement appropriate and effective measures designed to prevent and correct harassment and retaliation, including, but not limited to, policies and training for employees and managers;

(c)     Order the County to develop appropriate and effective measures to receive complaints of discrimination, harassment, or retaliation, as well as a process for investigating such complaints;

(d)     Award compensatory damages to Plaintiffs to fully compensate them for their injuries caused by the County's discriminatory and retaliatory conduct, pursuant to and within the statutory limitations in 42 U.S.C. § 1981a;

(e)     Award any additional equitable relief necessary to make the Plaintiffs whole; and

(f)     Award such additional relief as justice may require, together with the United States' costs and disbursements in this action.

## <u>JURY DEMAND</u>

The United States hereby demands a trial by jury of all issues so triable pursuant to Rule 38 of the Federal Rules of Civil Procedure and 42 U.S.C. § 1981a.

Dated: April 1, 2022                       Respectfully submitted,

                                           KRISTEN CLARKE
                                           Assistant Attorney General
                                         Civil Rights Division
                                         U.S. Department of Justice

BY:

                                         KAREN D. WOODARD
                                         Chief
                                         Employment Litigation Section
                                         Civil Rights Division
                                         U.S. Department of Justice

                                         VALERIE L. MEYER
                                         Deputy Chief
                                         Employment Litigation Section
                                         U.S. Department of Justice

                                         <u>/s/ Allan K. Townsend</u>
                                         ALLAN K. TOWNSEND
                                         (ME Bar No. 9347)
                                         AMBER TRZINSKI FOX
                                         (CA Bar No. 279380)
                                         Trial Attorneys
                                         Employment Litigation Section
                                         Civil Rights Division
                                         U.S. Department of Justice
                                         4 Constitution Square
                                         150 M Street, NE
                                         Washington, DC  20530
                                         Phone: (202) 353-5343
                                         Fax:  (202) 514-1005
                                         Allan.Townsend2@usdoj.gov
                                         Amber.Fox@usdoj.gov

JOHN C. GURGANUS
United States Attorney

/s/ Michael J. Butler
Michael J. Butler
Assistant United States Attorney
Civil Rights Coordinator
PA 81799
228 Walnut Street, 2d Floor
P.O. Box 11754
Harrisburg, PA 17108-1754
Tel: (717) 221-4482
Fax: (717) 221-2246
Michael.J.Butler@usdoj.gov

Attorneys for Plaintiff-Intervenor
United States of America