# EXHIBIT
# P1

```
1    ---------------------------
2    JANE DOE, et al.,          : UNITED STATES DISTRICT COURT
           Plaintiff           : MIDDLE DISTRICT OF PENNSYLVANIA
3        v.                     :
     SCHUYLKILL COUNTY          : CIVIL DOCKET NO:
4    COURTHOUSE, et al.,        : 3:21-CV-00477
           Defendants          :
5    ---------------------------
6
7
8
9                        ***
10           TRANSCRIPT MARKED CONFIDENTIAL
11                       ***
12
13
14
15
16
17
18           ORAL DEPOSITION OF DEBRA TWIGG taken at
19    the U.S. Attorney's Office, Middle District of
20    Pennsylvania, 228 Walnut Street, Harrisburg,
21    Pennsylvania 17108 on Friday, September 30, 2022 at
22    9:25 a.m. before Coleen Trifun, RPR and Notary
23    Public.
24
```

```
 1   A P P E A R A N C E S :

 2           DEREK SMITH LAW GROUP, PLLC
             BY:  CATHERINE SMITH, ESQUIRE
 3           1835 Market Street
             Suite 2950
 4           Philadelphia, Pennsylvania 19103
             catherine@dereksmith.com
 5           Counsel for the Plaintiff

 6

 7           DEPARTMENT OF JUSTICE
             CIVIL RIGHTS DIVISION
 8           BY:  AMBER FOX, ESQUIRE
                  ALLAN TOWNSEND, ESQUIRE
 9           150 M St. NE Room 9.932
             Washington, District of Columbia 20002
10           amber.fox@usdoj.gov
             allan.townsendz@usdoj.gov
11           Counsel for the Plaintiffs

12           NEWMAN WILLIAM, P.C.
             BY:  GERARD J. GEIGER, ESQUIRE
13           P.O. BOX   511
             712 Monroe Street
14           Stroudsburg, Pennsylvania 18360
             ggeiger@newmanwilliams.com
15           Counsel for George Halcovage

16           MCNERNEY PAGE VANDERLIN & HALL
             BY:  NICOLE IPPOLITO, ESQUIRE
17           433 Market Street
             Williamsport, Pennsylvania 17701
18           nippolito@mpvhlaw.com
             Counsel for Glenn Roth
19

20           JONES PASSODELIS
             MICHAEL R. LETTRICH, ESQUIRE
21           Gulf Tower, Suite 3410
             707 Grant Street
22           Pittsburgh, Pennsylvania 15219
             mlettrich@jonespassodelis.com
23           Counsel for Gary Bender and Heidi Zula

24
```

```
 1            DICKIE MCCAMEY
              BY:  PAUL G. LEES, ESQUIRE
 2            190 Brodhead Road, Suite 310
              Bethlehem, Pennsylvania 18017
 3            plees@dmclaw.com
              Counsel for additional parties
 4

 5            ALSO PRESENT:

 6            ALYSSA DEBISE, PARALEGAL
              JANE DOE 1
 7            JANE DOE 4
              GEORGE HALCOVAGE
 8            GLENN ROTH

 9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24
```

```
 1                          - - -

 2                         INDEX

 3                          - - -

 4   WITNESS              INTERROGATION BY      PAGE

 5   DEBRA TWIGG

 6                      By Ms. Smith          7, 325

 7                      By Ms. Fox            273

 8                          - - -

 9                        EXHIBITS

                           - - -

11   EXHIBIT NUMBER        DESCRIPTION          PAGE

12   Exhibit-76            Bates Stamped 1197      13

13   Exhibit-77            Bates Stamped 1200      14

14   Exhibit-78            Bates Stamped 1185      25

15   Exhibit-79            Bates Stamped 1187      43

16   Exhibit-80            Bates Stamped 1198-99   44

17   Exhibit-81            Bates Stamped 1138-1140 50

18   Exhibit-82            Bates Stamped 1077      74

19   Exhibit-83            Bates Stamped 1082      93

20   Exhibit-84            Supplement 2230-2254    217

21   Exhibit-85            SC000436-438            243

22                          - - -

23        PREVIOUSLY MARKED EXHIBITS MENTIONED

24   Exhibit-43   Page 90        Exhibit-71   Page 97
```

```
 1              DIRECTION TO WITNESS NOT TO ANSWER

 2    PAGE   LINE            PAGE   LINE            PAGE   LINE

 3                            (None)

 4

 5

 6

 7

 8

 9

10

11            REQUEST FOR PRODUCTION OF DOCUMENTS

12    PAGE   LINE            PAGE   LINE            PAGE   LINE

13                            (None)

14

15

16

17

18

19

20

21

22

23

24
```

Page 6

THE COURT REPORTER: Would you like a copy of the transcript?
MR. GEIGER: Condensed.
MR. LETTRICH: Yes.
MS. IPPOLITO: Yes.
- - -
MS. SMITH: First let me put on the record who is in the room. So Catherine Commonwealth on behalf of the plaintiff. I am here with my paralegal, Alyssa DeBise, and we have plaintiffs Jane Doe 3 and Jane Doe 4 present in the room.
MS. FOX: Amber Fox, Department of Justice.
MR. TOWNSEND: Allen Townsend, also with the Department of Justice.
MR. LETTRICH: Michael Lettrich on behalf of the county, defendants Bender and Zula.
MS. IPPOLITO: Nicole Ippolito on behalf of Glenn Roth.
MR. GEIGER: Gerry Geiger for Defendant Halcovage.
MS. SMITH: And Defendant Halcovage and Defendant Roth are also present in the room.

Page 7

The two other plaintiffs may join us at some point during the Zoom. I will notify counsel and put it on the record if and when they do.
Counsel stipulates that --
MR. LEES: Paul Lees on behalf of defendant Kutzler.
MS. SMITH: All counsel stipulate that this transcript will be marked confidential?
(All parties stipulated.)
MS. IPPOLITO: Normal stipulations.
MS. SMITH: Objection to form and privilege. If there is no privileges, Ms. Twigg defer to an attorney.
- - -
DEBORAH TWIGG, having been first duly sworn, was examined and testified as follows:
- - -
Examination
- - -
BY MS. SMITH:
Q. Ms. Twigg, do you understand that the testimony that you'll be giving today is confidential and you should not discuss it with anyone else?

Page 8

A. Sure. Yes.
Q. You agree to keep it confidential?
A. Yes.
MR. LETTRICH: Apparently you mentioned something about privilege, relative to attorney-client privilege. To the extent that it's to county's privilege to waive, I wouldn't necessarily agree that it gets waived. But we can deal with that on a case by case basis as we move forward.
MS. SMITH: Understood.
BY MS. SMITH:
Q. Ms. Twigg, do you understand that you have been placed under oath and have the obligation to testify truthfully?
A. Yes.
Q. You understand that even though we're in an informal conference room, that your testimony has the same force and effect as if you were testifying in a court of law?
A. Yes.
Q. You understand that the court reporter is going to take down everything that is said during the deposition?

Page 9

A. Yes.
Q. You understand that the court reporter cannot transcribe inaudible responses such as nod of the head, as you just mentioned?
A. Yes.
Q. So just make sure that you give an audible response.
A. Okay.
Q. Do you understand that you should wait for a complete question to be asked before you respond. And likewise, I will wait for you to finish your answer before I ask my next question.
A. Okay. Yeah.
Q. If you do not understand a question or if you think that it was ambiguous, please let me know and I will rephrase the question.
Do you understand?
A. Yes.
Q. If at any point you realize an answer given earlier in your deposition is inaccurate, incomplete, just let me know that you wish to correct or supplement it and you will be permitted to do so.
Do you understand?

Page 10

1  A.      Yes.
2  Q.      Have you recently consumed any
3  medication, alcohol, or any other substance which
4  impairs your ability to testify truthfully here
5  today?
6  A.      To impair my ability, no.  I took my
7  blood pressure medicine, my cholesterol medicine.
8  Q.      Okay.
9          But it doesn't impact your ability to
10 understand --
11 A.      No.
12 Q.      -- or testify?
13 A.      No.
14 Q.      If at any point you need a break, let me
15 know.  The only request I have is if there's a
16 question posed, that you just answer it and we
17 will take any breaks that you need.
18 A.      Okay.
19 Q.      Have you understood the instructions
20 about your deposition?
21 A.      Yes.
22 Q.      Do you have any questions?
23 A.      Not at this time, no.
24 Q.      Ms. Twigg, you are here pursuant to

Page 11

1  subpoena that I sent you?
2  A.      Yes.
3  Q.      You understand that you do have the
4  right to have an attorney present here with you?
5  A.      Yes.
6  Q.      But you do not.  Is that of your own
7  choice?
8  A.      Yes.
9  Q.      Periodic --
10 A.      Can I ask a question?
11 Q.      Sure.
12 A.      Do I need one?  And my question is, that
13 I am here because of everything that occurred
14 while I worked for to county.  So should not the
15 county attorney also be representing me?
16        MR. LETTRICH:  Well, I think -- I
17 represent the county and you're not a named
18 defendant in the matter.  There may be some
19 instances where there may be -- have been some
20 attorney-client communications with you and
21 perhaps one of the county solicitors.  We'll cross
22 that bridge when we get to it, but they're not
23 suing you.
24        THE WITNESS:  Right.

Page 12

1        MR. LETTRICH:  So at this point, I
2  wouldn't say I represent you, but what I mentioned
3  the issue about the attorney-client privilege, if
4  that comes up, I'll place an objection on, but it
5  may not.  So we can just kind of cross that bridge
6  when we get to it.
7        THE WITNESS:  Okay.
8  BY MS. SMITH:
9  Q.      So do you feel that you would like an
10 attorney?
11 A.      Not at this point.
12 Q.      Periodically throughout the deposition
13 I'm going to show you documents that have either
14 been marked as exhibits or will be marked as
15 exhibits and you'll be provided a copy to look
16 over.
17 A.      Can I get my glasses?
18 Q.      Sure.  Of course.
19        MS. IPPOLITO:  Katherine, would you
20 be able to ask her for her address so that we can
21 subpoena her later?
22        MS. SMITH:  The county should have
23 it.
24        MR. LETTRICH:  I am not so sure

Page 13

1  that we do, though.
2        MS. SMITH:  We can figure that out.
3  I'm not going to ask her for that on the record
4  with individuals in the room.
5  BY MS. SMITH:
6  Q.      I'm going to provide you a copy of the
7  exhibit.  You are going to hear me refer to Bates
8  numbers.  Those are just the numbers at the bottom
9  of the document, sometimes at the top.
10 A.      Okay.
11 Q.      You will see them.
12        MS. SMITH:  So the first exhibit I
13 am going to mark for today's purposes is 76.  It's
14 going to be Bates No. 1197.
15        Actually, now that I am looking at
16 it, everyone is not on Zoom and I only have paper
17 copies for Nicole, as she requested.
18            - - -
19      (Bates No. 1197 marked as Exhibit 76 for
20 identification.)
21            - - -
22 BY MS. SMITH:
23 Q.      Ms. Twigg, do you recognize this
24 document?

Page 14

1  A.     I do.
2  Q.     Is this an offer letter that you
3  received from Schuylkill County?
4  A.     It was.
5  Q.     It's signed by defendant George Bender?
6  A.     Uh-huh.
7  Q.     And it's dated January 2, 2018, correct?
8  A.     Yes.
9  Q.     Did you apply for this position of human
10 resources director?
11 A.     Yes.
12 Q.     How did you come to learn of the
13 position?
14 A.     I was told about it by Darlene Robins,
15 who was the president of the Manufacturers
16 Association of Schuylkill County.  I think it's
17 Schuylkill and Luzerne, but I am not sure.
18 Q.     Did you interview for the position?
19 A.     I did.
20 Q.     With whom?
21 A.     Initially I had a lunch meeting with
22 George and Darlene at Roma Pizza.  And then I went
23 and met with all three commissioners, Commissioner
24 Staudenmeier, Commissioner Hess, Commissioner

Page 15

1  Halcovage.  I met with Glenn Roth and Gary Bender.
2  I think Lisa Mahall was also involved in that
3  interview.  I can't remember, though.
4  Q.     So when you say you met with George and
5  Darlene at Roma Pizza, are you referring to
6  Defendant George Halcovage?
7  A.     Yes.  Sorry.
8  Q.     It's okay.
9        And then you said you met with all three
10 commissioners?
11 A.     Uh-huh.
12 Q.     Glenn Roth, you think Lisa Mahall was
13 involved?
14 A.     I think.
15 Q.     Was that all in one meeting or were they
16 separate?
17 A.     No.  It was two different meetings.  The
18 three commissioners was the first meeting.  Then I
19 went and met with Mr. Bender and Ms. Roth and I
20 believe Ms. Mahall.  But they also brought in the
21 three different people who worked in human
22 resources one by one after that.  But when I was
23 with Bender and Roth, they brought in this three
24 other individuals, the three people listed here.

Page 16

1  Q.     When you say listed here, you mean on
2  the top?
3  A.     Oh, sorry.  Yes.  Heather Garrity, Angel
4  Burnham Mitchell, and Paula Mushron, yes.
5  Q.     Just because we're going to end up
6  driving the court reporter crazy, just wait until
7  my full question is asked.
8  A.     Oh, sorry.
9  Q.     I know it will seem conversational, but
10 we have to be very rigid.  It's a little bit
11 uncomfortable, but just for the court reporter's
12 sanity.
13       When you met with the three
14 commissioners first, was it an interview where
15 there was questions about your capabilities and
16 your experience or was it something different?
17 A.     No, it was an interview.  They asked
18 about my -- I think, I mean, it's been how many
19 years.
20       They asked about my abilities, my
21 experience in human resources.
22 Q.     When you met with Defendant Halcovage
23 and Darlene Robinson at Roma, what was the
24 conversation like there, if you remember?

Page 17

1  A.     Again, it was questioning my knowledge,
2  skills, and abilities about human resources, but
3  it was also conversational.  I mean, he went first
4  through ninth grade with my sister, that came out
5  in the conversation.  That had nothing to do with
6  my knowledge, skills, and abilities, but it was
7  not -- it would have been a topic of conversation
8  in an interview with someone who might be
9  familiar.
10 Q.     Okay.
11       So that was perfect example, leads to my
12 next question.
13       Did you know Defendant Halcovage before
14 you met with him at Roma Delight?
15 A.     No.  I had seen him at chamber
16 functions, but I had never been introduced to him,
17 I did think, and I did not know him.
18 Q.     Did you know Defendant Gary Bender
19 before you interviewed?
20 A.     No.
21 Q.     Did you defendant Glenn Roth before you
22 interviewed?
23 A.     No.
24 Q.     After you interviewed, were those the --

Deposition of Debra Twigg - Revised                         Jane Doe, et al. v. Schuylkill County Courthouse, et al.

Page 18

1  strike that.
2      Were those interviews before this
3  January 2, 2018 --
4  A.    Yes.
5  Q.    -- offer letter?
6  A.    The initial interview with Mr. Halcovage
7  and Darlene Robbins was October time frame of
8  2017.  I then ran into Commissioner Halcovage at a
9  chamber Christmas party at the country club, which
10 was mid December maybe.  We chatted about the job.
11 Then in, had to be, early January, might of even
12 been on the same day, I don't remember, I was -- I
13 received a call to come in and meet with the
14 commissioners, Mr. Bender, Mr. Roth.
15 Q.    Okay.
16     At any point during any of the
17 interviews or conversations you had with Defendant
18 Halcovage before receiving this offer letter,
19 other than what you mentioned about him having
20 gone to school with your sister, was it?
21 A.    Uh-huh.
22 Q.    Did who you know in the county come up?
23 A.    I don't think so, because I had just
24 moved home after almost 40 years, so I didn't

Page 19

1  really know many people at that point.
2  Q.    Is Schuylkill County where you were
3  raised?
4  A.    Yes.
5  Q.    And you just indicated you had left the
6  county for a significant period of time?
7  A.    Yes.
8  Q.    When did you leave the county?
9  A.    I graduated in June of 1979 and I left
10 by that September.
11 Q.    That's high school you graduated?
12 A.    Sorry.  Yeah.
13     MS. SMITH:  We are going to put
14 this one over here and I am going to mark as
15 Exhibit 77, for the record it's Bates stamped 1200
16 Schuylkill County to 1205.
17             - - -
18     (Bates 1200 marked as Exhibit-77 for
19 identification.)
20             - - -
21 BY MS. SMITH:
22 Q.    You now have before you what's been
23 marked for today's purposes as Exhibit-77.
24     Do you recognize this document?

Page 20

1  A.    Yes, I do.
2  Q.    This is your resume, correct?
3  A.    It's an old resume, but yes.
4  Q.    Is this the resume that you provided to
5  Schuylkill County --
6  A.    Yes.
7  Q.    -- in connection with your application
8  for employment?
9  A.    Uh-huh.
10 Q.    Is that a yes?
11 A.    Well, actually I think Darlene provided
12 it because the offer letter was done at this
13 address and it had already been a year since I
14 lived there.  I believe initially my resume was
15 provided to them by -- to Mr. Halcovage by
16 Darlene.
17 Q.    Okay.
18     This resume, if we look to Page 1204 at
19 the bottom.  Yup.  Perfect.
20 A.    Uh-huh.
21 Q.    Under education it indicates that you
22 received your bachelor's in psychology from the
23 University of Alaska; is that correct?
24 A.    Correct.

Page 21

1  Q.    Did you specialize or focus in any area
2  of psychology?
3  A.    I did.  I focused on the treatment of
4  sex offenders, rehabilitation and treatment of sex
5  offenders.
6  Q.    It also indicates that you received your
7  master's from Georgia State University; is that
8  correct?
9  A.    Yes.
10 Q.    It says you majored in community
11 counseling?
12 A.    That was the degree, quote.  But for
13 the -- a year and half and then after, six months
14 after I worked with an individual by the name of
15 Jeane Able who is -- again, focusing on the
16 treatment of sex offenders.
17 Q.    In connection with your master's, did
18 you write a thesis or anything?
19 A.    No.  We didn't have to do that.  I did
20 help while working with Mr. Able to write a
21 chapter in a book, which focused on the treatment
22 of adolescent sex offenders.
23 Q.    What's the name of that book?
24 A.    I have it with me.  Can I look?

Deposition of Debra Twigg - Revised                                    Jane Doe, et al. v. Schuylkill County Courthouse, et al.

Page 22

Q.    Sure.

A.    It's called the Juvenile Sex Offender.

Q.    This indicated edited by Howard E. Barbari, William Marshall, and Steven M. Hudson.

In this book you said you assisted in writing a chapter?

A.    Yes.

Q.    What is the title of that chapter?

A.    It is sexual assault through the lifespan, adult offenders with juvenile histories.

Q.    There is -- I am beginning on Page 1, back to the exhibit. Beginning on Page 1 of this exhibit there is a professional experience, your work history listed.

Do you see that?

A.    Yes.

Q.    Your work history on this application is a true and accurate representation of where you have worked, it looks like, since 1992?

A.    Yes.

Q.    Can you tell us what is your work history do you believe made you qualified to apply for the position of human resources director for Schuylkill County?

Page 23

A.    I want to say everything that's listed here. I mean, I have had experience in pretty much all parts of human resources. I have been -- well, right now in 2022, I have been working in human resources for 30 years. I have developed leadership programs, developed performance management programs, developed compensation structures.

I have dealt with employee relations issues. I had not dealt with labor relations issues until I got to the county, but I think even if you ask them, they will say I did a very good job at that.

I did coaching. I did succession planning. Sorry, I'm looking at it to go through everything. I mean, I certainly had the knowledge, skills, and abilities for that position.

Q.    Can you tell us, do you hold any specialized license certificates related to human resources?

A.    Yes. I --

Q.    Go ahead. If you can tell us which ones.

Page 24

A.    I have my senior professions -- SPHR, senior professional in human resources certificate, which is given -- you sit for a test, it's a standardized four-hour test that you have to take. You have to take it every three years. You have to renew it. You have to have 60 continuing credit hours, education credit hours.

I have held that since November or December of 1997. This was the certifying body for the Society of Human Resource Management. Somewhere around 2014, 2015, 2014 or so, the site of Human Resources Management sort of ended their relationship with that certifying body. They came out with their own certification. And I got that in 2015, January of 2015, which was when it first came into existence from SHRM, Site of Human Resource Management. I hold a senior professional certification, I guess it's call.

Q.    So those two certification licenses that you hold, you held them at all times while you were employed by Schuylkill County?

A.    Yes. And still hold them.

Q.    Okay.

Put that document aside?

Page 25

MS. SMITH:  Mark for today's purposes as 78, it's Bates stamped Schuylkill County 1185.

- - -

(Bates Stamped 1185 marked as Exhibit-78 for identification.)

- - -

BY MS. SMITH:

Q.    Ms. Twigg, are you familiar with this type of document?

A.    I am.

Q.    This is -- it's titled personal action request, correct?

A.    Correct.

Q.    Commonly referred to in the county as a PAR?

A.    Correct.

Q.    Can you tell us what PARs are used for in Schuylkill County?

A.    They are used to -- sort of the official document to hire, to terminate, to any kind of pay increase, any kind of -- well, technically any kind of title change, I guess, should also be on this.

Deposition of Debra Twigg - Revised

Jane Doe, et al. v. Schuylkill County Courthouse, et al.

Page 26

1  Q.      The top box, for lack of a better word,
2  there's employment, termination, retirement,
3  promotion, resignation, and transfer?
4  A.      Uh-huh.
5  Q.      This form would be used for all those
6  things, correct?
7  A.      Yes.  Yes.
8  Q.      Who can complete a PAR?
9  A.      Literally fill it out, a department head
10 can.  HR can.  County administrator can.  Anyone
11 who -- any supervisor, I would assume can, but
12 they still have to get it approved by the proper
13 chain of command.
14 Q.      This one here is for you, it's your new
15 employee PAR, correct?
16 A.      Uh-huh, yes.
17 Q.      Let's say the person who is the subject
18 of the PAR, would someone who is not that person,
19 supervisor or potential new supervisor, be able to
20 complete a PAR for them?
21 A.      I'm not sure what you're asking.
22          MR. LETTRICH:  Objection to the
23 form.
24          But if you understand, you can

Page 27

1  answer.
2  BY MS. SMITH:
3  Q.      So if for instance, the person who is
4  the subject of the PAR was someone in the
5  treasurer's office?
6  A.      Uh-huh.
7  Q.      And they were transferring to, let's
8  say, the district attorney's office, would someone
9  who is neither supervisor a supervisor in the
10 treasurer's or a supervisor in the district
11 attorney's office be able to complete a PAR for
12 that transfer or should it be the current or
13 future supervisor?
14 A.      When you say complete, could they fill
15 it out, yes.  But it still should be signed off by
16 the person's supervisor.
17 Q.      Okay.
18 A.      I would think -- I would also think if
19 it were not -- determination, it's going to be
20 done by -- it can be done by human resources.  I
21 mean, human resources can do it as well.
22 Q.      Understood.
23          This PAR for you indicates that you were
24 being recommended for appointment to the position

Page 28

1  of human resources director, correct?
2  A.      Correct.
3  Q.      It indicates an effective date of
4  January 8, 2018?
5  A.      Correct.
6  Q.      It also indicates that you were to begin
7  in a pay range of nine and a step of two.
8          Do you see that?
9  A.      Yes.
10 Q.      Your starting salary was to be $64,040?
11 A.      Yup.
12 Q.      Who determines your pay range, step, and
13 starting salary?
14 A.      I would believe that would be George
15 Bender and/or the commissioners.
16 Q.      Did you negotiate or attempt to
17 negotiate that?
18 A.      Yes.
19 Q.      Who did you attempt to negotiate that
20 with?
21 A.      Mr. Bender and Mr. Roth.
22 Q.      Tell us about those conversations or
23 negotiations.
24 A.      Mr. Bender was quite stern and said it

Page 29

1  is what it was, I could take it or not.  I asked
2  if there was anyone else I could speak to about
3  it, he said I could.  I could speak to the
4  commissioners, but I knew that if I did that, it
5  would not be a positive start to a new job, so I
6  accepted the salary.
7          I was also told that you cannot -- you
8  have to start at the bottom of a pay range, which
9  clearly is not the case because people that were
10 hired after me, were hired at a much higher level.
11 Q.      When you say the bottom of a pay range,
12 what are you --
13 A.      Step 1.  Actually this is Step 2, I am
14 not sure why.
15 Q.      Okay.
16          So they told you that you could not
17 start at anything but a low level step or --
18 A.      Yes.
19 Q.      -- the bottom step?
20 A.      Yup.
21 Q.      What about the pay range, where does
22 that come from?  Did Glenn indicate that?
23 A.      There's a list that lists the different
24 salary steps -- the range and the steps.

Deposition of Debra Twigg - Revised                                    Jane Doe, et al. v. Schuylkill County Courthouse, et al.

Page 30

1  Q.      It's like a matrix, right?
2  A.      Yes, exactly.
3  Q.      You go down -- one column would be
4  range, one column would be step and you find a
5  box?
6  A.      Exactly.  And it goes from like 1 to
7  like 16 or 18.  I mean, it's been a couple years,
8  so I don't remember.
9  Q.      But the range, do you know how that's
10 determined?  Is it based off years of experience
11 or where does that --
12 A.      It was there.  I asked those questions
13 because they were clearly not current and it
14 doesn't change.  It's done and it stays there.
15 Q.      Where is your opinion of that statement,
16 the information for that coming from?  Was that
17 something someone said to you or..?
18 A.      I had a conversation with Mr. Bender at
19 one point, stating that I felt the ranges were not
20 current and he made it very clear we would not be
21 reviewing it.
22 Q.      The very bottom of this form there's a
23 human resources recommendation section.
24      Do you see that?

Page 31

1  A.      Yeah.
2  Q.      It's circled and it looks like there's
3  the initials GB.
4      Do you see that?
5  A.      Yes.
6  Q.      Do you know whose initials those are?
7  A.      Yeah.  They are Gary Bender's.
8  Q.      And he circled approved, correct?
9  A.      Correct.
10 Q.      Do you know what happens if that -- so
11 let me ask this:  After a PAR is completed by --
12 the from, so in this case it was Gary Bender at
13 the top, does it go to HR; is that the next step
14 for a PAR?
15 A.      Are you asking after it's been approved?
16 Q.      No.  So if for instance in this case, at
17 the top it says Gary Bender is the from, so he's
18 the one completing --
19 A.      Right.
20 Q.      -- the PAR, right?
21 A.      Yes.
22 Q.      Once he completes the PAR, what
23 should -- like fills it out, what should he do
24 with it?

Page 32

1  A.      It would then go to human resources to
2  be put on the agenda, the PAR list for the
3  commissioner meeting on Wednesday.
4  Q.      And in order -- before putting it on the
5  PAR list of the commission's agenda, does HR
6  review it and make a decision whether it's
7  approved, disapproved, or informational?
8  A.      Could you repeat that?
9  Q.      So before -- so you said the person
10 completing the PAR would take it down to human
11 resources.  And at some point then it would be
12 placed on the agenda for the commissioners
13 meeting?
14 A.      Yes.
15 Q.      There's this human resources
16 recommendation section with three options, does
17 human resources review the PAR to decide approve,
18 disapprove, or informational?
19 A.      Yes.  Yes.  Can I expound?
20 Q.      Sure.
21 A.      What I would do, I would sit with --
22 in this -- when I was there, it was Heather
23 Garrity who was the human resources specialist, I
24 think was her title.  We would review all of the

Page 33

1  PARs.  We would review the agenda, the list.  And
2  typically then I would indicate approved or
3  informational, whichever was the case.
4  Q.      So what's the difference between
5  approved and informational?
6  A.      Informational is something that the
7  commissioners do not have to vote on.  When I
8  started at the county, things that included
9  informational, someone who was hired in an elected
10 officials office because technically the elected
11 official under 1620, has the right to hire, fire,
12 and discipline.  So the commissioners did not
13 necessarily vote on that person being hired or
14 terminated, I guess.
15 Q.      Anything else that would have been
16 informational?
17 A.      At some point in time, it was -- the
18 process was changed and someone who resigned also
19 became informational because there's no point in
20 voting if someone resigns.  There is no point in
21 voting, they are resigning.  They can vote no, but
22 that person's resigning.
23 Q.      Understood.
24      What happens if -- when would an HR

Case 3:21-cv-00477-MCC  Document 280-1  Filed 09/20/23  Page 14 of 342
Deposition of Debra Twigg - Revised
Jane Doe, et al. v. Schuylkill County Courthouse, et al.

Page 34

1 individual circle disapproved?
2 A.    I don't know that I ever did.
3 Q.    Do you know for what reason it would be
4 used?
5 A.    I mean, I could guess, but no.
6 Q.    Okay.
7 A.    I mean, because here's -- if it's
8 disapproved, you're not -- it's not going to get
9 to the point of HR to be on the agenda, I don't
10 think.
11 Q.    So for instance, if a potential employee
12 was being recommended by someone, let's say, a
13 supervisor of a division wants to hire someone,
14 they recommend them and they send the PAR, would
15 HR interview that person?
16 A.    Not necessarily.
17 Q.    Okay.
18      If they did -- there was instances where
19 they did interview people, though?
20 A.    Not usually.  I mean, if it was a
21 management level, I would get involved.  If it was
22 someone -- no.  If someone was coming into HR, we
23 would interview them.  But if someone was coming
24 into tax claim, tax assessment, no.  I mean, we

Page 35

1 would collect resumes.  We would forward them.  I
2 don't recall that we -- we might give a typing
3 test if somebody asked us to.
4 Q.    Okay.
5      When you say forward them, you forward
6 them to --
7 A.    The department head, yeah.
8 Q.    -- the appropriate -- of where the
9 person is applying or potentially suited for?
10 A.    Uh-huh.
11 Q.    Is that a yes?
12 A.    Yes.
13 Q.    You were talking about how if it was
14 approved, that it would be placed on the agenda
15 for a vote.  Did the actual act of placing an
16 individual on the agenda for a vote require
17 approval of any or all of the commissioners?
18 A.    It required the approval of Gary Bender.
19 However, if something was initially put on the
20 agenda, it certainly was not unheard of for word
21 to come back that that person needs to be taken
22 off the agenda.
23 Q.    Do you know where that word came back
24 from?

Page 36

1 A.    The person who has the ultimate
2 authority for what's on the agenda and not on the
3 agenda is the commissioner chair, is my
4 understanding.
5 Q.    Did Defendant Halcovage serve as
6 commissioner chair at any time during your
7 employment?
8 A.    Yes.
9 Q.    Was it the entirety of your employment?
10 A.    No.  He stepped down as chair, I guess
11 it had to be late June, early July of 2020, after
12 this whole lawsuit started.
13 Q.    From the time you were hired until June
14 or July of 2020, you believe he was --
15 A.    I know he was chair.
16 Q.    Until he stepped down, he was the chair?
17 A.    Yes.
18 Q.    Was there any time that you can recall
19 that Defendant Halcovage sent word back that
20 something should be removed from the agenda?
21 A.    Yes.
22 Q.    Do you recall any specific instances?
23 A.    I knew you were going to ask that.
24      I know there were times in the clerk of

Page 37

1 courts office where things had been taken off the
2 agenda.
3 Q.    Do you know why those were taken off the
4 agenda?
5 A.    Officially, no.  I mean, can I -- if I
6 thought of a particular person, could I give my
7 perspective of it?  Yes.  But was I officially in
8 a -- told why it was coming off the agenda, not
9 necessarily.  Not that I can recall.
10 Q.    This form indicates that Gary Bender,
11 county administrator, is the point of contact.
12 During your employment with Schuylkill County, was
13 Gary Bender your supervisor?
14 A.    Yes, he was.
15 Q.    At the top of this document there are
16 two stamps of approval.
17      Do you see those?
18 A.    I do.
19 Q.    One stamp of approval is of Schuylkill
20 County's salary board and one is of Schuylkill
21 County's commissioners, correct?
22 A.    Correct.
23 Q.    Do you know, did Defendant Halcovage
24 vote on your appointment to the position of human

Page 38

1  resources director?
2  A.      I'm assuming, but I wasn't there, so I
3  don't know.
4  Q.      Okay.
5          But you were appointed and did start, so
6  you can at least confirm that there was a majority
7  vote in your favor?
8  A.      Yes.  Yes.
9  Q.      The stamps indicate work session.
10         Do you see that?
11 A.      Uh-huh.
12 Q.      I understand that there are two
13 different types of public commissioner's meeting,
14 a commissioner's meeting and a work session; is
15 that right?
16 A.      Yes.
17 Q.      Can you tell us what your understanding
18 of the difference between the two is?
19 A.      No, I can't.  One is sort of -- the
20 commissioner meeting I believe is like an
21 official -- where the official vote is taken.  But
22 if I remember right, votes were also taken in a
23 work session.
24         Although, I want to say -- yeah, I want

Page 39

1  to -- I don't...
2  Q.      That's okay.
3  A.      It's been two and a half years, I don't
4  remember that.
5  Q.      Understood.
6          There is also meetings that can -- of
7  the commissioners that can be held outside the
8  presence of the public, correct?
9  A.      Correct.
10 Q.      I understand there's two, there's
11 executive sessions and informational sessions?
12 A.      I'm aware of executive session.
13 Q.      What's your understanding of what can
14 occur during an executive session versus what must
15 be held in the presence of the public?
16 A.      My understanding is if there is an issue
17 that is not public knowledge, like a personnel
18 issue, you could -- you would meet in an executive
19 session to discuss the specifics of a situation.
20 However, you cannot take a vote in an executive
21 session.  A vote has to be held in public.
22 Q.      At executive sessions, do you know --
23 have you ever been present at an executive
24 session?

Page 40

1  A.      Yes.  Yes.
2  Q.      So then it's fair to say that
3  non-commissioners can be present at executive
4  session?
5  A.      Yes.
6  Q.      At any time when you were present during
7  an executive session, do you believe that
8  something in violation of the Sunshine Act
9  occurred?
10         MR. LETTRICH:  Object to the form.
11         You can answer if you know.
12         MS. SMITH:  Let me strike that.
13 BY MS. SMITH:
14 Q.      Do you know what the Sunshine Act is?
15 A.      I'm aware of it.  Do I specifically --
16 have I read it myself, can I tell you -- can I
17 site what it says?  No, I can't.
18 Q.      Do you generally understand that the
19 Sunshine Act is why an executive session --
20 A.      Yes.
21 Q.      -- what prohibits votes from
22 occurring --
23 A.      Yes.
24 Q.      -- in executive session?

Page 41

1  A.      Yes.
2  Q.      Have you ever been present at an
3  executive session of the Schuylkill County
4  commissioners where you believe essentially a vote
5  or a vote was take in violation of the Sunshine
6  Act?
7          MR. LETTRICH:  Objection to form.
8          You can answer.
9          THE WITNESS:  No.
10 BY MS. SMITH:
11 Q.      Okay.
12         Were you ever told of an act occurring
13 during an executive session that could possibly
14 constitute a violation of the Sunshine Act?
15         MR. LETTRICH:  Same objection.
16         You can answer.
17         THE WITNESS:  Can I ask what you're
18 objecting to?
19         MR. LETTRICH:  It's because of the
20 form of the question.  It's something that
21 necessarily relate to you, it's to the nature of
22 the question.
23         THE WITNESS:  Okay.
24         MR. LETTRICH:  And I can't explain

Deposition of Debra Twigg - Revised                        Jane Doe, et al. v. Schuylkill County Courthouse, et al.

Page 42

1  that for reasons related to the --
2          THE WITNESS:  All right.  Okay.
3          I'm sorry, can you --
4  BY MS. SMITH:
5  Q.      Did anyone ever tell you or did you ever
6  hear that something occurred an executive session
7  that may be a violation of Sunshine Act?
8  A.      Technically, no.  Can I expound on that?
9  Q.      Sure.
10 A.      Technically, no, I don't believe a vote
11 was ever taken, which my understand is a
12 violation.  Does that mean discussions didn't
13 happen and folks pretty much understood where they
14 stood on a vote that would be taken, yeah.  In
15 particular, the more I'm thinking of sitting in a
16 prison board meeting where there were a number of
17 people, including the commissioners, the
18 president, judge, the district attorney, the
19 sheriff, the deputy, chief, probably, myself, one
20 of the attorneys, you know, you would have a
21 conversation about an incident that happened and
22 you would talk about the employee relations issue.
23 You would leave.  You would go take a vote, but
24 it -- I mean, I left the room thinking, okay, this

Page 43

1  is -- I have an idea where everybody's going to
2  vote.
3          MS. SMITH:  This is 79 for today's
4  purposes.  It's Bates stamped SC-1187.
5                  - - -
6          (Bates Stamped 1187 marked as Exhibit-79
7  for identification.)
8                  - - -
9  BY MS. SMITH:
10 Q.      Ms. Twigg, have you seen this document
11 before?
12 A.      Apparently because I signed it and
13 that's my handwriting, but I don't recall seeing
14 it.
15 Q.      This is an authorization to obtain
16 information.
17          Would you agree?
18 A.      Uh-huh.
19 Q.      Is that a --
20 A.      Yes.  Sorry.
21 Q.      It's okay.
22          Essentially it's an authorization for
23 Schuylkill County in connection with your
24 application for employment to conduct a background

Page 44

1  check, including but not limited to a criminal
2  background check, correct?
3  A.      Yes.
4  Q.      Do you know, are all county employees or
5  potential employees to submit to this background
6  check?
7  A.      Yes, I believe so.
8  Q.      Does that include elected officials?
9  A.      I don't believe so.  I mean, they're
10 elected.  So if you run a background check,
11 whatever you find -- in order to get someone
12 removed, you've got to find them -- well, a
13 criminal act or impeachment.
14 Q.      Okay.
15          MS. SMITH:  80 is going to be
16 Schuylkill County 1198 and 1199.
17                  - - -
18          (Bates Stamped 1198 and 1199 marked as
19 Exhibit-80 for identification.)
20                  - - -
21 BY MS. SMITH:
22 Q.      Do you recognize this document?
23 A.      I do.
24 Q.      Is this your application for employment

Page 45

1  to --
2  A.      Yes.
3  Q.      -- the County of Schuylkill?
4  A.      Yes.
5  Q.      It's dated January 3, 2018.
6          Do you see that on the front page?
7  A.      Yes.
8  Q.      Do you know why your application for
9  employment was completed after the offer letter,
10 which you received from Mr. Bender?
11 A.      Yeah, because I filled it out after I
12 was hired.
13 Q.      As I kind of understand from your
14 testimony, correct me if I'm wrong, your resume
15 was given to Defendant Halcovage by Darlene
16 Robinson?
17 A.      Robins.
18 Q.      Robins.  I'm sorry.
19          And then you went through some interview
20 process, you were offered a position.  That's then
21 when you filled out the employment for
22 application?
23 A.      Yes.
24 Q.      The only way that they knew -- the

Deposition of Debra Twigg - Revised                                    Jane Doe, et al. v. Schuylkill County Courthouse, et al.

Page 46

1  County of Schuylkill knew that potentially wanted
2  employment was because Darlene Robins had given
3  your application to Defendant Halcovage?
4  A.      Yes.
5  Q.      You hadn't filled out another
6  application for employment and actually submitted
7  it to HR?
8  A.      No.
9          Would you like me to explain how that
10 happened?
11 Q.      Sure.
12 A.      As I said, I left the county, moved back
13 home July of 2016.  I was introduced to Darlene
14 Robins.  She runs the manufacturing association.
15 I put together some trainings for her, so I
16 started a working relationship with her that
17 summer.  I taught some trainings for her.  I did
18 some contract work for her.
19         At the time, I was -- still had my
20 consulting business.  I did HR consulting for 11
21 years in Texas or ten years in Texas.  Was
22 continuing to do consulting work, but I needed to
23 start working for -- living in Pennsylvania and
24 working for companies in Texas, I knew that was

Page 47

1  not going to last long.  So I needed to start
2  building a business.  And one of the things that I
3  was going to do was to start offering trainings
4  that I did, independently through either the
5  chamber or through my own efforts.
6          I contacted Darlene to let her know that
7  I was going to be doing that, because I knew that
8  she would not be happy because she would see it as
9  computation of for people taking her trainings.
10 And we had an agreement that I would not work with
11 anyone who was direct competition for her with the
12 trainings that I developed for her.
13         I told her through the process that I
14 was -- you know, I needed to increase business or
15 get a regular full-time job.  And she said, didn't
16 know you were looking for a full-time job.  I said
17 I'm not looking, but not, not looking if something
18 came along.  She said I think I know someone who
19 might need your services, let me call you right
20 back.  She called half an hour later and basically
21 said, what are you doing next Tuesday, I think it
22 was.  I said I don't know, what am I doing next
23 Tuesday.  She said you're going to have lunch with
24 myself and Commissioner Halcovage.

Page 48

1  Q.      Do you know, was Darlene friends with
2  Commissioner Halcovage?
3  A.      I think there certainly is a working
4  relationship with all three commissioners, no
5  matter who they are.  And the manufacturing
6  association simply because it's the manufacturing
7  association in the county, it's business.
8  Personally, I have no idea.
9  Q.      It seems a little backwards to have an
10 offer of employment letter and an application for
11 employment.  Yours is not, I will represent to
12 you, the only person on file where that is the
13 case.
14 A.      I know.
15 Q.      Can you tell us, do you have any
16 understanding of why individuals would apply for
17 employment, fill out the application for
18 employment after being offered the position?
19 A.      What was the -- do I have an
20 understanding as to why?
21 Q.      Yes.
22 A.      Yeah.  Actually it's not so uncommon in
23 business.  It's not the standard way to do it, but
24 it happens where, you know, you hear of -- of a

Page 49

1  job.  It's, hey, speak -- just like I said, she
2  called, she knew of a job.  She called, she said,
3  hey, I have a lead for you.
4          I mean, the most recent job I had the
5  same thing happen.  I got a phone call from them
6  because they found my resume online and said, hey,
7  I went in, I had the interviews, and literally
8  didn't fill out the application for employment
9  until they had to do the backgrounds check.
10 Q.      At any point during your employment with
11 the county, did you hear or come to learn that
12 Defendant Halcovage hand selected anyone for a
13 specific position at the county?
14 A.      I have heard that statement before, yes.
15 Q.      Who told you that?
16 A.      It was -- I can't remember a specific
17 person.  It wasn't like I heard it one time.
18 Q.      So it's something you heard more than
19 one time?
20 A.      Oh, yeah.
21 Q.      Would you say it was, I guess, a
22 common -- commonly talked about by county
23 employees?
24 A.      Yes, I would say that.  But in all

Page 50

1 fairness I have to say, if there was an opening, I
2 would have -- I met with Gary Bender every day
3 mostly. If there was an open position, he would
4 regularly say he would check with the
5 commissioners to see if anyone of them had a
6 particular person in mind for that position.
7 Q.    Okay.
8 A.    It wasn't just Commissioner Halcovage.
9 I think it happened with all three commissioners.
10 Q.    Do you agree Schuylkill County -- well,
11 geographically it might be large. It's a small
12 county in population?
13 A.    Absolutely.
14 Q.    An everybody knows everybody type town?
15 A.    Yes.
16        MS. SMITH: Mark this as 81. It is
17 Bates 1138 through 1140.
18             - - -
19        (Bates Stamped 1138-1140 marked as
20 Exhibit-81 for identification.)
21             - - -
22 BY MS. SMITH:
23 Q.    Now marked for the record Exhibit 81,
24 it's Bates 1138 through 1140.

Page 51

1        Ms. Twigg, do you recognize this
2 document?
3 A.    Yes.
4 Q.    This is the job classification
5 description for the position of human resources
6 director at Schuylkill County, correct?
7 A.    Yes.
8 Q.    If we turn to the last page, it is dated
9 November 17 -- November 2017. Do you see that?
10 A.    I do.
11 Q.    Does that mean that this policy -- this
12 job classification description went into effect in
13 November 2017?
14 A.    This particular version, yes.
15 Q.    So this was the job classification
16 description for your position when you started for
17 the county, correct?
18 A.    Yes.
19 Q.    Did this change at any point during your
20 employment?
21 A.    No.
22 Q.    Also on that last page it indicates, as
23 we talked about before, that the position reports
24 to the county administrator?

Page 52

1 A.    Yes.
2 Q.    And at all times during your employment
3 that was Defendant Bender?
4 A.    Yes.
5 Q.    I want you to take a look over the
6 essential duties and responsibilities, which
7 begins on Page 1.
8        Let me know when you're finished.
9 A.    Okay.
10 Q.    At any time during your employment, were
11 there any -- are any of the essential duties and
12 responsibilities that are listed there, were you
13 unable to perform them?
14 A.    I don't understand. My ability?
15 Q.    Were you always during your employment
16 able to perform any and all of these essential
17 duties and responsibilities?
18 A.    I have the knowledge, skills, and
19 abilities, yes.
20 Q.    If we look to the first essential duty
21 and responsibilities, it says: Conduct employee
22 relations, activities. Arrange and schedule
23 meetings between grieving workers, union stewards,
24 and managerial personnel to investigate and

Page 53

1 resolve grievances.
2        Do you see that?
3 A.    Yes.
4 Q.    Can you tell us what your understanding
5 and knowledge is of the grievance process. If an
6 employee who is a union member has an issue, they
7 bring it to the attention of their supervisor?
8 A.    Correct.
9 Q.    It's something that could result in the
10 filing of a grievance, what should happen?
11 A.    There was six different unions. So
12 there could be six different answers to this
13 question.
14 Q.    Okay.
15 A.    But let me --
16 Q.    So then let me specify then.
17        The union that a tax assessment employee
18 is in, the tax assessment employee says to their
19 manager or supervisor, hey, I have this issue,
20 what, if anything, should that manager and/or on
21 conjunction with the employee do next?
22 A.    If an employee had an issue, and I think
23 this would cover all of them, but they would
24 initially go to their supervisor. If they could

Page 54

1  not resolve it with supervisor, if the supervisor
2  was not the head of the department, they
3  technically would then go to the head of the
4  department.  If that couldn't be resolved, they
5  would come to HR.  We could have -- we would have
6  a formal meeting.  The union member would have the
7  ability, the right to have a union representative
8  there.  In that case, most of the time it was the
9  union steward.  If we're speaking specifically for
10 tax claims, tax assessment it was union steward in
11 the absence of the union.  We would have a
12 meeting, address the issues, come up with possible
13 solutions.
14        And it depends if -- was it the employee
15 having a problem or was it a disciplinary action
16 type situation.
17 Q.     Well, let's give you a specific example.
18        If an employee was placed on the PAR --
19 had a PAR completed and was placed on the agenda
20 for resignation and they were not resigning and
21 they brought that issue to their supervisor, hey,
22 I'm not resigning, what would the scenario be in
23 that case?
24 A.     I would assume if they went and said,

Page 55

1  hey, I'm not resigning, that a supervisor would
2  then have a discussion with them about -- I mean,
3  how did the miscommunication happen.  How did the
4  supervisor think they were resigning.  I would
5  then -- if they can't -- couldn't resolve it, I
6  would think they would go to their -- technically
7  they could go to HR and then they could call for a
8  meeting with a union representative.  And
9  obviously HR and the supervisor and everybody get
10 in the meeting.
11 Q.     So in that scenario, if the employee
12 went to the direct supervisor, so if it was an
13 assessment office employee and they went to the
14 chief assessor and said, hey, I saw it on the
15 agenda for resignation, I'm not resigning, should
16 the chief assessor ever tell the employee, you
17 need to file a grievance without engaging in any
18 interactive discussion?
19 A.     They could.
20 Q.     Okay.
21 A.     Wouldn't -- they could.
22 Q.     Do you know, does the grievance form
23 indicate that the chief assessor, the head of the
24 department, is supposed to engage in an

Page 56

1  interactive process first?
2  A.     The form itself, I don't remember.  The
3  contract itself, I don't remember.
4  Q.     Okay.
5  A.     If you have a copy of a form or a
6  contract.
7  Q.     Yup, we can get that for you during the
8  break.
9  A.     Okay.
10 Q.     The next portion of No. 1 says:  Serve
11 as equal employment opportunity officer and
12 Americans with Disabilities Act officer.  Review
13 and respond to complaints regarding employment
14 discrimination.
15        If an employee of the county during your
16 employment had filed an EEOC charge, would you be
17 tasked with filing a response or a position
18 statement, as they call it?
19 A.     Yeah.  I would be tasked with conducting
20 an investigation and then responding, yes.
21 Q.     Would that response -- would you do that
22 with -- in conjunction with any other employees of
23 the county?
24 A.     I guess it would depend.  I don't know

Page 57

1  that we ever had an EEOC claim, except the one
2  we're talking about, this one.  I can tell you, I
3  conducted the investigation, sometimes in
4  conjunction with Solicitor Roth, in particular
5  when we interviewed -- do I have to use the Jane
6  Does or can I use --
7  Q.     You can use their name.
8  A.     When we interviewed Jane Doe 2, it was
9  in conjunction with Jane Doe 3 and Jane Doe 4 and
10 Gary Bender, but that was at the request of Jane
11 Doe 2.  Otherwise I would have spoken with Jane
12 Doe 2 alone.
13 Q.     Okay.
14        And just for the record, when you're
15 referring to Jane Doe 2, that's Jane Doe 2,
16 correct?
17 A.     Sorry.  Yes.
18 Q.     It's okay.
19        It was her request that Jane Doe 3, Jane
20 Doe 4, and Mr. Bender be there or that just --
21 A.     Yes.  That's my -- well, I got that from
22 Jane Doe 3, that's my understanding.
23 Q.     Did you prepare any position statement
24 for the county in regards to this litigation, EEOC

Page 58

charge?

A.      When you say a position statement, are you talking about the final report after all the investigations were done?

Q.      A response to an EEOC charge, so something that was submitted -- did you prepare --

A.      No, because the EEOC charge hadn't been filed yet.

Q.      Okay.

Sometimes these questions might seem obvious, but we just have to make a record of everything that happened.

A.      Okay.

Q.      Because you know what happened and a lot of us from reading paperwork know what happened, but we need to make sure we have it correct and on the record.

A.      Okay.

Q.      No. 2, under essential duties:  Perform job analysis and prepare changes to classification of descriptions.  So that would be -- it indicates you might have prepared changes to something, a document that looks like this one for other positions?

Page 59

A.      Well --

MS. IPPOLITO:  Can you state for the record that it's Exhibit 81 that you're referring to when you said a document like this one.

MS. SMITH:  Yes.

BY MS. SMITH:

Q.      The document before you that we have been speaking about.

A.      There were times when a new position was created and I had to write a job description and then had to determine what would be the appropriate pay range that it would go in, like salary grade.  Yes, I did that.

Is that what you're asking?

Q.      Did you ever make any -- yes, I appreciate that answer.

But also, did you ever make any changes to already established job descriptions?

A.      Well, in particular I'm thinking about when there was a change made where at one point in time, the tax claim office was totally separate from the tax assessment office.  At some point those -- the change was made to where the two

Page 60

offices would be joined, in a sense, and they would -- there would be one person over that office, over tax claim/tax assessment, yes.

Q.      And --

A.      I revised those job descriptions, yes.

Q.      You took the chief assessor job description and the director of tax claim bureau and essentially made one hybrid --

A.      Yes.

Q.      -- description from those two?

A.      Yes.

Q.      When you did that, did anyone else provide input or was anyone else involved in that?

A.      I mean, I did it.  It was reviewed by Gary Bender.  I believe I worked in conjunction with Jane Doe 3 when I did it to make sure I had the duties and responsibilities right because there were things that she was going to -- would be in her job description.  There were things that the assistant director, who would be Jane Doe 4, that would be in her job description.  I worked with her in identifying which duties and responsibilities each of them would have to make sure I had it accurate.

Page 61

It was reviewed by Gary Bender.  I assume it was reviewed by the commissioners, I'm not sure.

Q.      In particular that instance where the two offices, for lack of a better word, were joined, this new job description, hybrid job description was created or drafted, is that something that needs to go on a PAR and then be voted on?

A.      Yes.  A creation of a new position would have to be voted on, yes.

Q.      And in voting on that, the commissioners would be provided a copy of the job description to review and consider?

A.      Yes.

Q.      If we look to No. 4, collaborates with benefit administrator to manage health and welfare plans, including enrollments and terminations, process required documents through payroll and insurance providers to ensure accurate record keeping and proper deduction.

Do you see that?

A.      I do.

Q.      If there were issues, questions,

Deposition of Debra Twigg - Revised                                    Jane Doe, et al. v. Schuylkill County Courthouse, et al.

Page 62

1 concerns with an employee's enrollment in the
2 health and welfare plans of the county, is that
3 something that their questions and concerns should
4 be directed to HR?
5 A.      Yes.
6 Q.      And HR's director should be able to
7 answer that employee's questions or concerns,
8 maybe alone or with -- at least with the
9 assistance of a benefit administrator, correct?
10 A.      I would say with the assistance of the
11 insurance broker.
12 Q.      Well, okay.  So let me get it more
13 specific so I can make sure I know who needs to be
14 involved.
15 A.      Okay.
16 Q.      Let's start with this one, if an
17 employee wanted to know if they took another
18 position within the county, if that would affect
19 their enrollment in the health and welfare plans,
20 would there be a waiting period, for instance, is
21 that something that -- who would have that
22 information to be able to answer those questions?
23 A.      I think the benefits administrator
24 might, but the HR director is going to know more

Page 63

1 about specific issues like that, I think, then the
2 benefits administrator.
3 Q.      Is that something that the insurance
4 individual would need to be involved in or is that
5 something the HR director could answer on their
6 own?
7 A.      I think that's something the HR director
8 should be able to answer on their own.  You would
9 have to look at the plan documents and what the
10 require -- the parameters and the requirements
11 are.
12 Q.      I know it's been some time and I don't
13 mean to take you back to things you may not
14 remember, but do you know if there is any county
15 policy that prohibits an employee from holding
16 more than one position with the county?
17 A.      No.
18 Q.      Is there a policy that says if you hold
19 two position, you just can't work more than 40
20 hours combined; does that sound familiar?
21 A.      Sorry.  I'm thinking about people that I
22 knew that had two jobs with the county.
23 Q.      So there are specific individuals you
24 know who held two county jobs?

Page 64

1 A.      Sure.
2 Q.      Can you tell us some of those people?
3 A.      Deb Detweiler, she worked full time in
4 tax assessment and she was also a deputy coroner.
5 Q.      Anyone else?
6 A.      I'm sure there were.  People -- yeah,
7 there were people who worked there that also are
8 tax collectors.  There are -- it's not uncommon.
9 It's not...
10 Q.      Okay.
11      And do those individuals have -- have
12 and are entitled to county health and welfare
13 plans or enrollment in those plans?
14 A.      Yes.
15 Q.      The second portion of that No. 4
16 indicates -- on Document 81 indicates, ensure
17 accurate recordkeeping and proper deductions.
18 Would this include accurate recordkeeping of an
19 employee's hours for purposes of health and
20 welfare plan enrollment?
21 A.      Yes.
22 Q.      Does the county require an employee to
23 maintain a certain threshold of hours in order to
24 be eligible?

Page 65

1 A.      Federal law does.  Person must regularly
2 work 30 hours.  If someone works regularly 30 hour
3 a week and an organization offers insurance, then
4 that person would be entitled to insurance as
5 well.  It's 30 hours a week or more.
6 Q.      In conjunction with the benefits
7 administrator, is it the HR director's job to
8 ensure accurate recordkeeping for determination of
9 an employee's FMLA eligibility?
10 A.      No.  It's in conjunction -- I don't know
11 how it is now, I have been gone for two and a half
12 years, but at the time it was conjunction with the
13 HR specialist.  Benefits administrator did not
14 handle FMLA.
15 Q.      Is there a third party -- again, when
16 I'm asking you questions, I may say is there,
17 meaning we would be talking present tense, but
18 obviously I understand you're no longer employed
19 by the county, correct?
20 A.      Right.
21 Q.      So when I am asking questions, even if I
22 am speaking in the presence sense, I'm asking for
23 what you knew at the time when you were employed
24 there.

Page 66

A.      Okay.
Q.      When you were employed with Schuylkill County, was there a third-party contractor or agency that Schuylkill County worked with to track an employees' hours?
A.      For benefit purposes?
Q.      For FMLA eligibility purposes?
A.      No.  That was also done by the HR specialist.  She had a -- she didn't like it, but we found a tracking spreadsheet, an Excel spreadsheet that could easily track.  She had to enter a lot of information, but she would track it.
Q.      If we turn to the second page of Exhibit 81, there's No. 8 at the top.
        It indicates identifies legal requirements in government reporting regulations effecting human resource functions and policies, procedures, and reporting are in compliance.
        Did this include ensuring that county policies, such as sexual harassment, anti-retaliation, those types of policies, were in compliance and up to date?
A.      Yes.

Page 67

Q.      It identifies legal requirements.
        Did you -- did the HR department at Schuylkill County have a solicitor assigned to it?
A.      No.  We -- well, the county -- I would work regularly with the county solicitor, Al Marshall, as well as the assistant solicitor, Glenn Roth, and sometime with the second assistant solicitor, Chris Hobbs.
Q.      Did any of those individuals you just named ever assist in ensuring that policies were current, up to date with legal requirements?
A.      I mean, I would confer with Solicitor Roth on a regular basis about matters, but HR -- HR matters, I mean, I kept up to date, confirmed with him or with Al Marshall.
        Is that what you're asking?
Q.      So there's actually written policies of --
A.      Yes.
Q.      -- the county, correct?
A.      Yes.
Q.      Did you ever speak with Defendant Roth about a specific policy, if it was outdated, needed updating, needed changes, revisions,

Page 68

anything like that?
A.      Yeah, I'm sure.  I don't know if you're asking about a specific policy.
Q.      Do you recall a specific policy?
A.      I can tell you one of the things that Gary Bender tasked me with doing when I first started working was going through the employee handbook and updating any policies that were not up to date.  And quite honestly, I mean, when I was -- I was given a copy of all of the policies and the weekend before I started working, I literally spent going through all the policies because I needed -- being the head of HR, I needed to familiarize myself with them.
        As I was going through, did I make notes of things that were not necessarily accurate and needed to be corrected?  Yes.
        Did -- at some point in time I was reviewing them on -- after I started working, for specific changes.  There was a point in time where myself, Solicitor Roth, Lisa Mahall, and Gary Bender started getting together because I was busy, and so it didn't move fast enough for Mr. Bender.  And so we all started meeting, initially

Page 69

started, I think, weekly or every other week.  We didn't get very far and COVID hit.  Needless to say, that went out the window.  But, yes, we met and discussed policies just to make sure everything was up to date, legal, what it needed to be.
Q.      And as a result of those meetings, were county policies updated?
A.      Yes and no.  We made the corrections.  We were waiting until the entire thing, we didn't piecemeal and take every policy before, because, again, it had to go before the commissioners for a vote.  There were a couple that got changed.  I can't tell you off the top of my head what they were.  But the idea was we would update the whole book and then take the entire employee handbook and have it approved all at once.
Q.      So let me make sure I understand.
        So they might have gotten changed, meaning they may have been discussed and revisions agreed upon in this group that you were talking about, but they were not implemented because they had not been submitted to the commissioners --
A.      Correct.

Deposition of Debra Twigg - Revised                                    Jane Doe, et al. v. Schuylkill County Courthouse, et al.

Page 70

1  Q.      And they had not then been voted on?
2  A.      Correct.
3  Q.      That was the plan that all --
4  A.      Yes.
5  Q.      -- would be discussed, changes would be
6  agreed upon, and a collective revision group would
7  be submitted to the commissioners?
8  A.      Yes.  But I do remember there was at
9  least a couple exceptions that we updated.  I
10 can't remember what that were.  I can't remember
11 what it was about.  But I remember there were
12 maybe two or three that had gotten changed and we
13 needed to -- we needed it done immediately for
14 some reason.
15 Q.      And meaning changed, they were
16 actually -- the changes were implemented?
17 A.      And voted on, yes.
18 Q.      And distributed to employees?
19 A.      Yes.
20 Q.      Okay.
21 A.      Well, it was -- it was uploaded to the
22 handbook, which was on the website.  Employees
23 were made aware.  But I can't even tell you which
24 ones they were.

Page 71

1  Q.      Okay.
2          Is it your testimony that the reason
3  that the rest of them did not get implemented is
4  because then COVID hit and obviously there were
5  more pressing things --
6  A.      Yes.  Yeah.
7  Q.      -- that needed to be addressed?
8          The next one is No. 9, coordinates
9  online training and safety, sexual harassment,
10 supervision, and other topics?
11 A.      Uh-huh.
12 Q.      Did you coordinate online training for
13 sexual harassment at the county?
14 A.      I myself didn't do it, but someone who
15 reported to me did it, yes.  The HR specialist
16 coordinated that training.
17 Q.      While you were employed with the county,
18 what was your understanding of how often staff of
19 the county should be trained regarding sexual
20 harassment?
21 A.      Every two years, every other year.
22 Q.      Did the requirement apply to -- I am
23 going to differentiate employees from elected
24 officials.

Page 72

1          Did the requirement apply to elected
2  official as well as employees?
3  A.      Yes.
4  Q.      Was there ever a time that you had an
5  issue with any employee or elected official not
6  completing a sexual harassment training?
7  A.      Yes.
8  Q.      Can you tell us about that?
9  A.      It was -- had to be 2019, a training had
10 been -- you know, I don't know the word to use.
11 We had indicated that a training had to be -- it
12 was time to complete this training again.
13 Regularly I would go to the HR specialist asking,
14 has everybody completed.  Show me the list, where
15 are we at.  And there were a number of people --
16 eventually we got it dwindled down, but there
17 were -- there were -- yeah, there was times you
18 had to chase people down to get them to complete
19 the training.
20 Q.      Was there ever a time that you had an
21 issue with Defendant Halcovage completing the
22 sexual harassment training?
23 A.      There was a time when he hadn't
24 completed it, yes.

Page 73

1  Q.      Tell us about that.
2  A.      There were -- and in all fairness, all
3  three of the commissioner hadn't completed it yet.
4  I had indicated to the HR specialist, you need to
5  send these people e-mails, you need to tell them
6  they need to complete this training.  She was
7  uncomfortable with that because they were
8  commissioners.  It's like, I don't care, they have
9  to complete it.
10         There was a point in time where I spoke
11 with Commissioner Halcovage about it.  I can't
12 remember whether he contacted me or I contacted
13 him or whether I had mentioned it to Gary Bender
14 and he contacted him.  At any rate, he was having
15 trouble logging in because it was an online
16 training.  He was having trouble logging in to
17 complete the training.  I had had a similar
18 problem, it was something I was doing.  I went to
19 him, went to his office, tried to log him in.
20         I reached out to the HR specialist who
21 was at a conference with Solicitor Roth.  She was
22 a little bit annoyed that I bothered her at a
23 conference, but this needed to be done.  She
24 walked me through the process so that I walked --

Page 74

1 I went through the process while sitting at his
2 desk on his computer and got him logged in to the
3 training.
4 Q.      Do you know if Defendant Halcovage then
5 completed that online training?
6 A.      He did not finalize, complete it, no.
7 He started watching it.  The system -- the online
8 system had -- it showed you, you could print out a
9 report and you could see if someone logged in.
10 You could see how many minutes they watched.  You
11 could see if they took the test at the end.
12 Q.      Did he take the test at the end?
13 A.      No.  He didn't complete it.  That was
14 far from completed.  This was 2019.
15 Q.      Do you know then after this training,
16 was this the C -- indulge me.
17         The local GovU/CCAP website training.
18         MS. SMITH:  We'll mark this as 82.
19 It's SC 1077.
20                  - - -
21         (Bates Stamped 1077 marked as Exhibit-82
22 for identification.)
23                  - - -
24         THE WITNESS:  Yes.  This would have

Page 75

1 been the one because I signed it when I --
2 BY MS. SMITH:
3 Q.      So this one indicates that you -- that's
4 your signature and printed name?
5 A.      Yes.
6 Q.      You completed this training in August of
7 2019?
8 A.      Yes.
9 Q.      Is this the one that --
10 A.      Yes, same one.
11 Q.      Local ProgU/CCAP website, is that the
12 training you're saying that you, as the HR
13 director, were able to view who actually went all
14 the way through the process?
15 A.      The HR specialist was able to view.  I
16 would go to her and have her pull it up.  She
17 would provide me the list and show me.
18 Q.      You looked at the list?
19 A.      Yes.
20 Q.      And it indicates that Defendant
21 Halcovage had not completed it?
22 A.      Correct.
23 Q.      After employees and elected officials
24 were to have taken this local GovU/CCAP website

Page 76

1 training, did they similarly complete, sign, and
2 acknowledge that they had done so?
3 A.      Yes.
4 Q.      Do you know, did Defendant Halcovage
5 complete, sign, and acknowledge that he had done
6 so?
7 A.      Not to my knowledge.
8 Q.      If he had, would that be a false
9 representation based of off what you observed on
10 the CCAP website list?
11 A.      Yes.  Can I state something?
12 Q.      Sure.
13 A.      I don't believe he had because once
14 this -- once this investigation started, I do
15 recall going back and pulling files of people
16 involved to see who completed, who had a signed
17 document in their files.
18 Q.      In the meantime --
19 A.      Can I ask a question?
20 Q.      Sure.
21 A.      Is it possible to get water?
22 Q.      Oh, yes.  I'm so sorry.
23         The next one on No. 10 back on 81
24 indicates:  Advises management an appropriate

Page 77

1 resolution of employee regulations issues.  During
2 your employment with Schuylkill County, did you
3 have the opportunity to do that?
4 A.      Yes.
5 Q.      Did you ever face any difficulties when
6 doing so?
7 A.      Yes.
8 Q.      Can you tell us what difficulties you
9 faced that you can recall?
10 A.      I can think of one instance in
11 particular where it was after the elections of
12 2019, Deb Detweiler had run for coroner.  An
13 individual in the -- and she worked as a deputy
14 coroner at the time, part time, she worked full
15 time in tax assessment.  There was an individual
16 admin, she was an administrative person who worked
17 part time, I believe, in the coroner's office,
18 that individual supported Deb during the election.
19         I can tell you when Deb lost the
20 election, it was -- Mr. Bender in one of our
21 4:00 meetings stated that he wanted both of them
22 terminated and it had to happen -- this was like
23 on a Tuesday or so, and it had to happen by the
24 end of the week.  And I told him that the

Deposition of Debra Twigg - Revised                                        Jane Doe, et al. v. Schuylkill County Courthouse, et al.

Page 78

1 individual who was the admin was covered under a
2 union and it was illegal to fire someone without a
3 Loudermill and I was not going to do that.
4 Q.      What was Defendant Bender's response
5 when you told him you wouldn't do it?
6 A.      He became irate. He basically told me
7 that I was a county employee and I needed to take
8 management's side and he didn't want to hear any
9 of this nonsense about HR being Switzerland,
10 because I had a regular saying that HR is like
11 Switzerland, you don't -- it's not that take
12 management's side, that's why in every union
13 contract, the last step before arbitration is that
14 there is a -- it goes to HR to review all sides
15 and then to make a determination about what the
16 appropriate resolution would be or recommend a
17 resolution.
18      But it's not -- actually what I told him
19 was we don't live in the 1960s anymore, that's not
20 HR's role. HR's role is to be there for both the
21 employee, as well as the employer. And they are
22 more independent, they're Switzerland.
23 Q.      You indicated Defendant Bender became
24 irate. Was this the only time that you observed

Page 79

1 Defendant --
2 A.      No.
3 Q.      -- Bender engage in irate behavior?
4 A.      No.
5 Q.      Would you say it was a common occurrence
6 or a non-common occurrence?
7 A.      It was more common than not. I can tell
8 you as a result of that situation, his response
9 was, do I need to call George in here because this
10 is not going to end well. I looked at him and I
11 said, yes, you do need to call George in here
12 because you're right, this won't end well.
13 Q.      What did you think or take Defendant
14 Bender to mean by it won't end well?
15 A.      My life would not be pleasant, I could
16 tell you that. He did call George in,
17 Commissioner Halcovage. Commissioner Halcovage --
18 oh, he also called in Solicitor Roth. Actually
19 Solicitor Roth showed up late because he was on
20 the phone with Attorney Marshall. And prior to
21 Solicitor Roth getting in there, Mr. Bender stated
22 that he had spoken with Mr. Roth and he -- and Mr.
23 Roth agreed with him. I told him that I had
24 spoken with solicitor Marshall and Solicitor

Page 80

1 Marshall agreed with me. I stated, it's illegal.
2 And I told you when I was hired, I will not do
3 anything illegal, unethical, immoral. If you want
4 to fire me, fire me. If you want me to quit, I
5 will quit, but I'm not doing something illegal?
6      At that point he called in -- I
7 believe -- I don't remember Commissioner Halcovage
8 was in for that part or not. But Commissioner
9 Halcovage came in. At that point, Solicitor Roth
10 showed up, apologized for being late. Stated that
11 Mr. Bender -- I don't know whether he recited the
12 whole situation, but Mr. Roth said that he was
13 late because he was on the phone with Attorney
14 Marshall and that he now agreed with me, and
15 Attorney Marshall, you cannot fire this person
16 without a Loudermill.
17 Q.      Did the person get fired?
18 A.      The person's employment ended. I'm
19 trying to think if the word fired was -- yes, I
20 believe she was, because she had already been
21 told, no sooner did I get back to my office, I had
22 gotten an e-mail from the business agent that the
23 coroner had already gone to her and told her that
24 her employment would be ending. And, yes, she was

Page 81

1 fired.
2      What happened was -- it had to be the
3 next day, next couple of days, at some point
4 Solicitor Marshall came into my office after a
5 commissioner meeting and literally sat there for
6 two hours trying to convince me, twisting words,
7 manipulating things, trying to convince me that it
8 was okay to let this person go. I said I would
9 not do it. It was illegal. I could site the case
10 that the Supreme Court made. After two hours --
11 at one point he said, look, you know, I report to
12 the same person you do, this needs to happen. I
13 said, I'm not doing it. If you want to do it, you
14 do it, but I'm not doing it.
15      He eventually said he had other things
16 to do and stood up and told me that I was
17 extremely stubborn. And basically I told him, I
18 was principle and there was a difference.
19 Q.      Was the person afforded a Loudermill
20 hearing?
21 A.      Yes and no. What happened was, in the
22 end the -- there was a grievance filed that she
23 was told she was going to be fired. There was a
24 Loudermill meeting. They conceded the grievance,

Deposition of Debra Twigg - Revised                    Jane Doe, et al. v. Schuylkill County Courthouse, et al.

Page 82

1  so that went away.  They meaning -- I sat there, I
2  did not say a word because I did not agree with
3  any of it.  So solicitor Marshall ran the meeting.
4  I can't remember whether Solicitor Roth was there
5  or not.  But he conceded the grievance and then
6  brought up a number of other issues and basically
7  the person was terminated.
8  Q.      After this discussion and your
9  unwillingness to participate in what you believe
10 was a violation of the law or ethics and morals,
11 what was your life like at the county courthouse
12 in the immediate time there after?
13 A.      Mr. Bender did not speak to me for three
14 weeks or so.  He was extremely angry.  I walked
15 into the commissioner office and the staff had
16 said, he just -- he isn't going to speak with you.
17 He made it very clear, I do not want to speak with
18 that woman, I'm busy.
19 Q.      Did any of the other individuals who
20 were involved similarly treat you?
21 A.      No.
22 Q.      Do you know why Defendant Bender wanted
23 to -- I don't know if you said this, but the
24 individual in question was Ms. Deb Detweiler,

Page 83

1  correct?
2  A.      Deb was -- Deb -- it was Deb Detweiler
3  and it was Charlene somebody or other, I can't
4  remember her last name.  Deb -- Deb as a coroner,
5  as a deputy coroner, part-time position, she also
6  worked full time in tax assessment.  Her
7  employment with the coroner's office was
8  terminated because she was not part of the union.
9         Charlene, who was an administrative
10 employee, was considered part of the union.
11        What was your question?
12 Q.      So the person -- let's start with Deb
13 Detweiler.
14 A.      Okay.
15 Q.      So he wanted to -- Defendant Bender
16 wanted Deb Detweiler terminated, correct?
17 A.      Yes.
18 Q.      She was not the one that required the
19 Loudermill hearing, correct?
20 A.      Correct.
21 Q.      Do you know why Bender wanted Deb
22 Detweiler fired or terminated?
23 A.      From the coroner's office, I guess,
24 because like I said, it was an ugly election.  She

Page 84

1  lost and that's my understanding.  She had made
2  some accusations that were probably considered
3  somewhat embarrassing about the coroner's office
4  during the election, the incompetence of it.
5  Q.      Did Deb Detweiler run as a democrat
6  candidate --
7  A.      Yes.
8  Q.      -- for the coroner's office?
9  A.      Yes.
10 Q.      Do you believe that her decision to run
11 as a democrat had any influence on Defendant
12 Bender's decision to want to have her terminated?
13 A.      I think her choice to run against the
14 current coroner had something to do with it.  I
15 guess she could have run as an independent, but I
16 don't know.
17 Q.      Did Defendant Bender give any
18 justification why he wanted the other individual
19 in that scenario -- who was the other?
20 A.      Charlene Herring, I think is her name.
21 Charlene Herring, maybe.
22 Q.      Did he give any justification for why he
23 wanted her fired?
24 A.      I think because of her relations to Deb

Page 85

1  Detweiler.  They -- there were acquisitions that
2  she was accessing information.  There was -- there
3  were all sorts of accusations.  But I -- show me.
4  Give me some sort of documentation that we can
5  bring to a Loudermill and that was never provided.
6  Q.      Did they ever ask you -- when you
7  challenged them or requested from them that
8  documentation would be needed to support this, did
9  they ever ask you to conduct an investigation?
10 A.      Well, it's an elected official.  I can't
11 do that.  It's -- the elected official has to do
12 it.  The elected official solicitor got involved.
13 He also was not the biggest fan of mine.  I
14 believe at one point, Mr. Bender came in my office
15 and said, well, you're not going to be on his
16 Christmas list.
17        The other thing he said at the same
18 conversation was that -- what's his name?  Whoever
19 it is.  He's an attorney and I looked at him and I
20 said -- no offense to all of you -- I said he's an
21 attorney, he's not God and he's wrong and I'm
22 going to tell him he's wrong.  Read the freaking
23 contract.  If you don't understand it, maybe you
24 shouldn't be an attorney.  Sorry.

Deposition of Debra Twigg - Revised                                   Jane Doe, et al. v. Schuylkill County Courthouse, et al.

Page 86

1  Q.     Did you ever observe Defendant Bender
2  engage in similar conduct when -- strike that.
3        Did you ever observe male employees or
4  males question or challenge Defendant Bender's
5  position on a topic?
6  A.     I don't -- no -- well, it's -- I don't
7  know.
8  Q.     You were just actually testifying kind
9  of to a situation.  You were saying that Al
10 Marshall eventually -- or Glenn Roth came in and
11 maybe said that Al Marshall --
12 A.     Right.
13 Q.     -- said that you were right?
14 A.     Yeah.  Uh-huh.
15 Q.     When Glenn Roth conveyed that to
16 Defendant Bender, what was Defendant Bender's
17 reaction to that?
18 A.     He wasn't happy about that either.
19 Q.     Was he similarly aggressive and irate
20 with Al Marshall's position?
21 A.     I don't think he stopped speaking to him
22 for three weeks.
23 Q.     Do you believe at any point that you
24 observed Defendant Bender treat women differently

Page 87

1  than men?
2  A.     Honestly, no.  He was -- when he was
3  mean, if he -- no.  He was nasty to everybody.
4  Don't get me wrong, he could be the nicest guy in
5  the world.  Give you an example, give you two
6  examples.  Got home one night, I had got out of
7  work, went to a meeting, got home, walked in the
8  house, it was February, first night we had below
9  zero temperatures.  I had to call him about
10 business issue.  He said, we'll talk in the
11 morning.  I told him I don't know that I'll be
12 there, here's what's happening.  No sooner did we
13 hang up the phone -- sorry, I'm going to cry.  No
14 sooner did I hang up the phone, within two minutes
15 my phone rings and it's a person from the oil
16 folks take care of my furnace and the oil company.
17 I had been trying to reach them.  Their system was
18 messing up, it wouldn't even go to a message.  It
19 wouldn't go to an emergency number, you just -- it
20 just kept ringing.
21        And no sooner did we hang up, he called
22 this man on his personal cell phone.  I answer the
23 phone, he said Deb, this is Jamie.  I understand
24 you're having a problem and he literally got

Page 88

1  someone to my house within 30 minutes.
2        So could do something that great.  I had
3  a dear friend from high school who came down with
4  cancer.  She also worked in the courthouse.  I
5  considered him a friend.  I went to him and, you
6  know, explained what was happening.  Shortly
7  thereafter, I show up at work one day and as I'm
8  walking through the office, the women in the
9  office, my staff said, oh, somebody left you a
10 present.  I go in and in a bag, it wasn't a
11 present for me, but it was a present for my friend
12 and it's -- I don't know if you've ever heard of
13 those prayer blankets or healing blankets that
14 they sell.  He had bought this for me to give to
15 her.
16        I mean, he could be the most kind,
17 compassionate man.  But if you pissed him off, he
18 could be the most angry, vindictive, nasty person
19 as well.
20 Q.     Want a tissue?  You want a break?
21 A.     I'll take on.
22 Q.     You okay?
23 A.     I'm okay.
24 Q.     Okay.

Page 89

1        If you need a break, let us know.
2  A.     I will.
3  Q.     The next item on the list is, consulted
4  managers in health care professionals to evaluate
5  the need for develop and implement accommodations
6  return to work, light duty, and other responses
7  for disability.
8        Was it the job responsibility of the HR
9  director to engage in the interactive process with
10 employees who needed reasonable accommodation
11 requests?
12 A.     Yes.
13 Q.     Who might need FMLA?
14 A.     Yes.
15 Q.     Who -- go ahead.
16 A.     Yes.
17 Q.     And did you do that at any point during
18 your job, engage in interactive discussions with
19 employees?
20 A.     Uh-huh.
21 Q.     Is that a yes?
22 A.     Yes.
23              - - -
24        (Whereupon, brief recess was held off the

Page 90

1   record at 11:07 a.m.)
2              - - -
3         (Back on the record at 11:18 a.m.)
4              - - -
5         MS. SMITH:  Pulling up Exhibit-43
6   from yesterday.
7   BY MS. SMITH:
8   Q.      This is a document that's been
9   previously marked as Exhibit-43.
10        Do you recognize this document?
11  A.      I recognize it.  Have I seen it before?
12  No, I don't think so, but I know what it is by
13  looking at it, if that makes sense.
14  Q.      It doesn't.
15        It's titled Schuylkill County
16  organizational chart.
17        Do you agree?
18  A.      Uh-huh.
19  Q.      If we -- if we look at the top, there is
20  the electorate and then we have commissioners
21  right there?
22  A.      Uh-huh.
23  Q.      From commissioners, it flows to -- the
24  second to the left in that, to solicitor.  Do you

Page 91

1   see that?  We have commissioners, then it flows to
2   solicitor.
3   A.      Oh, yes.
4   Q.      Underneath of solicitor is tax claims.
5   Do you see that?
6   A.      Yes.
7   Q.      Was it your understanding when you
8   worked for the county that tax claim bureau
9   reported to the solicitor?
10  A.      I know they worked very closely
11  together.  I guess it was a dotted line, my
12  understanding.
13  Q.      If we look over to the right, there's
14  county administrator.
15        Do you see that?
16  A.      Yes.
17  Q.      So based on this organizational chart, a
18  county administrate and solicitor were coworkers,
19  not -- neither reported to either, they were
20  coworkers?
21  A.      That's not my understanding of how it
22  is.
23  Q.      Okay.
24        So what's your understanding of how it

Page 92

1   is?
2   A.      The solicitor and the assistant
3   solicitor and the second assistant solicitor all
4   fell under county administration.
5   Q.      Then under county administrator we see
6   human resources.
7   A.      Uh-huh.
8   Q.      Second on the right, do you see that?
9   A.      Uh-huh.
10  Q.      Is that a yes?
11  A.      Yes.
12  Q.      And then down from that we see the
13  assessment office.
14        Do you agree?
15  A.      Yes.
16  Q.      So is it your understanding when you
17  worked for the county, the assessment office and
18  human resources reported to the county
19  administrator?
20  A.      Yes.
21  Q.      Do you know at the time you were
22  employed by the county, did the assessment office
23  report to the solicitor?
24  A.      No.  I believe the assessment office

Page 93

1   reported to the county administrator.
2   Q.      All of those solicitor, administrator,
3   tax claim, human resources, and assessment, all
4   reported to and were supervised by the
5   commissioners?
6   A.      Again, please.
7   Q.      Solicitor, tax claim, county
8   administrator, human resources, and assessment
9   office.
10        MR. LETTRICH:  Object to the form.
11        But you can answer that.
12  BY MS. SMITH:
13  Q.      All reported to the commissioner?
14  A.      Well, essentially everybody reports to
15  the commissioner.  But the solicitor reported to
16  the county administrator.
17  Q.      And then up to the commissioners?
18  A.      Yes.
19  Q.      Understood.
20        MS. SMITH:  Going to mark as 83, it
21  is SC-1082.
22              - - -
23        (Bates Stamped 1082 marked as Exhibit-83
24  for identification.)

Deposition of Debra Twigg - Revised                                    Jane Doe, et al. v. Schuylkill County Courthouse, et al.

Page 94

1         - - -
2 BY MS. SMITH:
3 Q.      Do you recognize this document?
4 A.      Yes.
5 Q.      And down the bottom left of this
6 document is an ABM2/2016.
7         Do you see that?
8 A.      I do.
9 Q.      Do you know what that indicates or
10 symbolizes?
11 A.     I am going to assume that it was Jane
12 Doe 3 Burnham-Mitchell, I assume she is the one
13 who created the document and she created it in
14 February of 2016.
15 Q.     Is this type of dating used by
16 Schuylkill County to symbolize or memorialize when
17 the form or policy is put into place and
18 implemented?
19 A.     That would be my guess, yes.
20 Q.     And this is your signature and date down
21 at the bottom?
22 A.     Yes.
23 Q.     Those are your initials to the left of
24 each of those policies --

Page 95

1 A.      Yes.
2 Q.      -- or items?
3 A.      Yes.
4 Q.      Do you know, were all employees of the
5 county required to complete and acknowledge their
6 receipt of these policies on a form such as this?
7 A.      Yes.
8 Q.      That would include elected officials as
9 well?
10 A.     They were expected to.  I don't know
11 that all of them ever did it.
12 Q.     Do you know, did Defendant Halcovage
13 ever do it?
14 A.     This is from when someone first begins
15 employment, so that was four years, five years,
16 six years before I ever got there, so I don't
17 know.
18 Q.     Understood.
19        Ms. Twigg, in May of 2020.
20 A.     Uh-huh.
21 Q.     Did you come to learn that Jane Doe 1
22 reported to Jane Doe 3 that she was the victim of
23 sexual harassment and a hostile work environment
24 while employed by the county?

Page 96

1 A.      That who?
2 Q.      Jane Doe 1.
3 A.      Yes.
4 Q.      She reported to Jane Doe 3 --
5 A.      Yes.
6 Q.      -- that that had happened?
7 A.      Yes.
8 Q.      At some point, did Jane Doe 3 come to
9 you and inform you that she had received this
10 report?
11 A.     Yes.
12 Q.     Do you remember how long after Jane Doe
13 3 received the report from Jane Doe 1, did Jane
14 Doe 3 inform you of that?
15 A.     Yes.  She apparently received the
16 information on Thursday evening, sent it to me, I
17 believe my e-mail said somewhere around 8:30,
18 7:00, 8:30, 9:00.  Unfortunately on my phone,
19 sometimes in my home, I don't get e-mails until I
20 go outside.  The next morning I went to work.  It
21 was Friday morning, May 22nd, I'll never forget
22 it.  I was greeted as I was entering the HR door,
23 still unlocking it, Jane Doe 3 was there, asked if
24 I had seen her e-mail from the previous evening.

Page 97

1 I said, no, I'm just getting in.  She asked me to
2 check my e-mail and then either call her or come
3 speak with her.
4        MS. SMITH:  Can I have 71 out of
5 that pile.
6 BY MS. SMITH:
7 Q.      Ms. Twigg, I am showing you what has
8 been previously marked as Exhibit 71.
9 A.      Uh-huh.
10 Q.     Take a brief look at it.  My first
11 question for you is going to be:  Do you recognize
12 it?
13 A.     Yes.
14 Q.     Is this -- was this drafted by you?
15 A.     I'm assuming it's an accurate copy, yes.
16 Q.     We're going to go through it, so for any
17 reason there's something in there that catches
18 your eye that you think was changed from what you
19 drafted, please let us know.  Okay?
20        MS. SMITH:  It's 71.  Do you have
21 that one?
22        MR. LEES:  I do.
23 BY MS. SMITH:
24 Q.     Ms. Twigg, as we look at the first

Deposition of Debra Twigg - Revised                    Jane Doe, et al. v. Schuylkill County Courthouse, et al.

Page 98

1  paragraph, it states on Friday, May 22, 2020, when
2  you arrived at your office, Jane Doe 3 was at your
3  door and that's what you just testified happened;
4  is that correct?
5  A.      Yes.
6  Q.      It indicates that she asked if you had
7  seen her e-mails.  You told her no and then she
8  asked you to check your e-mails and to call or
9  come to her office.  Is that what happened?
10 A.      Yes.
11 Q.      After you checked your e-mail, what, if
12 anything, did you do next?
13 A.      I went to Jane Doe 3's office.
14 Q.      And did you speak with Jane Doe 3 when
15 you got to her office?
16 A.      I did.
17 Q.      Was it just you Jane Doe 3 at that time
18 or was anyone else present?
19 A.      It was myself and Jane Doe 3.  She was
20 sort of recapping.  And at some point
21 everything -- very briefly.  I at some point just
22 said, stop, I need to go get a pen and paper and I
23 need to let Gary Bender know what's going on.
24 Q.      When you say recapping everything at

Page 99

1  that point, what was it that Jane Doe 3 was
2  telling you she knew -- strike that.
3         You saw Jane Doe 1 e-mail to Jane Doe 3,
4  correct?
5  A.      Which e-mail?
6  Q.      The one where she reported she was a
7  victim of sexual harassment?
8  A.      I saw -- no.  I saw -- Jane Doe 3 sent
9  me an e-mail that had the document where you had
10 listed like 80 or 90 some statements.  Is that
11 what you're talking about?
12 Q.      My question for you is:  When Jane Doe 3
13 sent you the e-mail the night of 21st of May, what
14 was it that she sent you, forwarded you, or told
15 you, the one you looked at --
16 A.      It stated that she had received this
17 letter from you and it was attached.  It might
18 have even been your e-mail to her forwarded, I
19 can't remember.  I can tell you, I remember
20 exactly what I did.  I started looking at this
21 and, sorry, but I was like, holy shit.  I got up
22 and I went to Jane Doe 3's office and said what
23 the heck is going on.
24 Q.      So was it facts about what Jane Doe 1

Page 100

1  was saying happened or what was the contents of
2  it?
3  A.      All I remember is it had the attachment
4  of that umpteen-page letter with all those
5  statements.
6  Q.      So I wasn't involved from my office
7  then, so I am trying --
8  A.      Oh, sorry.
9  Q.      And it hasn't been produced --
10 A.      You're right.  No, it wasn't you.  It
11 was -- I don't know the guy's name.  There was --
12 Q.      Ian Bryson.
13 A.      Yes.
14 Q.      It's a letter from him?
15 A.      I guess.
16 Q.      What I'm trying to figure out, because
17 again --
18 A.      I know.  I forgot about that guy.  I
19 forgot about that guy.
20 Q.      Was it the claim preservation letter
21 where it was talking about electronic data?
22 A.      Yes.  That was it, that was part of it,
23 yes.
24 Q.      In addition to that, was there anything

Page 101

1  that you received in that first e-mail that gave
2  you any indication of what the allegations were
3  beyond a more general scope?
4  A.      I thought there were statements.  You
5  know, there -- I thought there were statements.
6  Q.      What do you mean by statements?
7  A.      Well, when I did the investigations, I
8  developed the questions for Commissioner Halcovage
9  based on the 80 or 90 items that were listed in
10 the document I had received.
11 Q.      Okay.
12 A.      Of accusations of things that had
13 happened.
14 Q.      Okay.
15        So it was a fact-based document, is what
16 you are saying.  Like, it wasn't -- it wasn't just
17 legal language generalizing or summarizing the
18 type of --
19 A.      No.  I believe the fact-typed document
20 was part of it.  It started with the whole
21 preservation of any kind of e-mail or electronic
22 record or anything like that.
23 Q.      In any event, Ms. Twigg, after you went
24 to Jane Doe 3's office, you were saying you were

Deposition of Debra Twigg - Revised                        Jane Doe, et al. v. Schuylkill County Courthouse, et al.

Page 102

1 speaking with her and she started to recap.  What
2 was it, if you remember, that she told you she
3 knew at that point?
4 A.      She said she had been talking with Jane
5 Doe 1 over the past few days, maybe a week, and
6 Jane Doe 1 was opening up about things that had
7 happened, a relationship that had been going on
8 between her and Commissioner Halcovage.  She also
9 explained some issues that she, as well as Jane
10 Doe 4 had with Commissioner Halcovage.  I mean, we
11 talked for about 20 or 30 minutes before I said, I
12 need to get -- I need to start writing this stuff
13 down.
14 Q.      You said you told her you need to go get
15 a pen and talk with Defendant Bender?
16 A.      Yes.
17 Q.      Did you, in fact, go get a pen and paper
18 and speak with Defendant Bender?
19 A.      Yes, I did.
20 Q.      What did you tell Defendant Bender?
21 A.      He had somebody -- they were actually
22 looking for me.  I said, look, I need to talk with
23 you.  The IT guy left.  I said we just got a
24 document that -- from an attorney accusing George

Page 103

1 of sexual harassment and hostile work environment.
2 Q.      What was Defendant Bender's response?
3 A.      I asked if had seen Commissioner
4 Halcovage.  He said not yet.  I then told him that
5 statement.  And his comment was -- I said, look, I
6 need to go back and talk with Jane Doe 4 and Jane
7 Doe 3.  And his response was, we do this by the
8 book.  I said, you're absolutely right, we do this
9 by the book.
10 Q.      What, if anything, did you do next?
11 A.      I then told him I would -- I was going
12 to talk with Jane Doe 4 and Jane Doe 3 and I'd
13 come back and fill him in once I had done that.
14 He -- I believe he and Solicitor Roth then spoke
15 with Commissioner Halcovage.
16 Q.      Was Solicitor Roth present when you
17 spoke with Bender --
18 A.      No.
19 Q.      -- initially?
20 A.      No.
21 Q.      Where does the information come from or
22 your belief come from that Bender and Roth spoke
23 with Halcovage?
24 A.      Because after I had gone back to speak

Page 104

1 with Gary Bender, Solicitor Roth was there.  They
2 said they had spoken to him and Solicitor Roth
3 recommended that he get his own -- get an
4 attorney.
5 Q.      Did they tell you anything else they
6 spoke with Defendant Halcovage concerning?
7 A.      Well, about the document that had been
8 attached to the e-mail.  And they also said that
9 Commissioner Halcovage had received the same
10 document the night before.
11 Q.      Did either Defendant Bender or Defendant
12 Roth indicate why they believed Defendant
13 Halcovage needed his own counsel?
14 A.      I don't remember.  You would have to ask
15 him that.
16 Q.      Okay.
17 A.      He was the one that made the statement.
18 He may or may not have said a reason.  I don't
19 remember that.  It was a busy day.
20 Q.      Understandably so.
21           So you had this initial conversation
22 with Jane Doe 3 and Jane Doe 4, it looks like, in
23 the beginning -- those early hours of May 22nd.
24           And did you take handwritten notes which

Page 105

1 then you used to create this document --
2 A.      Yes.
3 Q.      -- 71 in front of you?
4 A.      Yes.
5 Q.      Did you keep a copy of this?
6 A.      The handwritten notes, no.
7 Q.      Did you keep them for purposes of when
8 you were employed by the county and left them
9 there or did they get thrown out at some point?
10 A.      They were kept -- they were part of the
11 whole file.  I didn't make a copy to keep for
12 myself.
13 Q.      But --
14 A.      But I typed -- I typed from the notes, I
15 typed this document, so...
16 Q.      Okay.
17 A.      I knew what was in the notes by what I
18 put in here.
19 Q.      Do you know, were the notes verbatim to
20 what's in here?  Like, did you just --
21 A.      No.  No.
22 Q.      The notes were as quickly as you could
23 write while they were talking?
24 A.      Yes.

Page 106

Q.      And then you put it into more formal
writing?
A.      Yes.  And part of it was as I was typing
and writing and recalled things that maybe were
said -- no maybe -- things that were said and I
may have gone back and asked, hey, did you say I
remember this, it's not mine, did you say this?
They would confirm yes or no.
Q.      Okay.
        And you said you maintained an
investigation file for this matter?
A.      Yeah.
        What do you mean -- yes.  There was a
file with everything in it, the written notes, I
believe a copy of this.
Q.      When you resigned from the county, do
you know where that was left?
A.      Yes.  It was left with all the other
documents that referred -- that were part of the
case, including like a thumb drive with video of
the whole incident with George going up the bank.
All of that was left.  As you walk into the
director's office, there were four file cabinets.
The fourth file cabinet, the one closest to me,

Page 107

the bottom drawer, and it was locked and I had the
key.  And the county commissioners office, more so
Gary Bender, also had a key to those -- to the
office, as well as, I believe, to the file
cabinet.
Q.      Who did you leave your key with?
A.      Doreen Kutzler.
Q.      But the interim HR individual?
A.      Uh-huh.
Q.      Is that a yes?
A.      Yes.  Sorry.
Q.      So after speaking -- spending some time
speaking with Jane Doe 3 and Jane Doe 4, this
report indicates the next person you spoke with
was Jane Doe 2?
A.      The next person that was interviewed,
yes.  After I spoke with them, I actually went and
spoke with Gary Bender and I believe Solicitor
Roth, just informing them, hey, this is what I
have learned.  While I was speaking with Jane Doe
3 and Jane Doe 4, we called Jane Doe 2.  She was
in her vehicle.  I asked if she had an attorney.
She said no.  I asked if she could come in that
day and speak with us, with me.

Page 108

I was then told, I think, by Jane Doe 3
and Jane Doe 4 later in the day that she would be
in, what time she'd be in, but she wanted them in
the meeting as well as Mr. Bender.  And, yes, she
was the next person that was interviewed.
Q.      Did you interview anyone else that first
day?
A.      No.
Q.      Okay.
        After --
A.      I did attempt to speak with Commissioner
Halcovage, we were supposed to.  At one point he
then said he was going to Philadelphia to speak
with his wife.
Q.      According to the notes, this was a
Friday?
A.      Yes.
Q.      So that weekend, did you conduct any
interviews or do anything over the weekend?
A.      No.
Q.      Did you resume your investigation Monday
morning when you returned to work?
A.      I think I was supposed to meet with Mr.
Halcovage that day.  He canceled and was seeking

Page 109

an attorney and said he would get back with me.
Q.      Do you know if that Monday, was
Commissioner Halcovage at the county courthouse?
A.      I don't -- I don't remember.  I don't
know.
Q.      In May of 2020, when this report was
made, were Jane Doe 4 and Jane Doe 2 still on
county furlough due to COVID-19?
A.      Yes.  A lot of people were still.  I
believe we furloughed, I think, April 20th or
somewhere thereabouts and folks didn't come back
until -- folks started coming back -- individual
departments started bringing some people --
transitioning people back mid June.  But I think
by the end of June most people were back.
Q.      Okay.
        And you were still employed there in
June of 2020?
A.      Yes.  I left September 4, 2020.
Q.      When employees started to be pulled back
furlough, given what you were investigating -- let
me ask this.  Strike that.
        In end of June 2020, were you still
actively conducting an investigation into the

Page 110

allegations?
A.      End of June, no.  I think the
investigation was pretty much complete and I was
pulling all the handwritten notes together and
typing up this document.
Q.      As a result of the investigation
concluding and you working on your final report,
did you -- and discussions regarding employees
being returned from furlough, did you have any
discussion with anyone about what to do with Jane
Doe 1 and Jane Doe 2 as it related to returning
from furlough?
A.      I know there were concerns about parking
spaces.  I know there was -- and where people
would park and getting different -- as far as Jane
Doe 3 and Jane Doe 4, getting different parking
spaces assigned.  I'm sure we had discussions.  I
can't specifically recall, but there was concern
about them feeling safe, I can tell you that.
Q.      Who had the concerns?
A.      I believe it was Jane Doe 3 and I talked
about it.
Q.      And was there a decision ever made to
allow Jane Doe 2 and Jane Doe 1 to continue to

Page 111

work from home?  Or I guess they were furloughed,
so they weren't working, correct?
A.      Correct.  Furloughed people were not
working, but there were people who were working
from home.  But I don't -- I don't know who was
working.  I mean, we had --
Q.      Right.
A.      -- 650 people that we were following.
Q.      Were there discussions and/or decisions
made regarding Jane Doe 1 and Jane Doe 2 being
able to -- instead of return for furlough, work
from home?
A.      There were discussions.  Sorry, in my
head I'm remembering the whole parking space thing
and I'm thinking they had to be -- they had to
have returned or we wouldn't have had the
conversations.  I don't know.  I'm thinking -- I
know there were discussions.  Whether they
continued to do some work from home or not, I
don't know.  I don't remember.  I know that there
were concerns about entry into the courthouse and
what doors were being used and them running into
George, so I'm thinking that I wouldn't have had
those concerns if they were not there in the

Page 112

courthouse.
Q.      And who were those conversations
regarding parking and doors and things of that
nature?
A.      Well, initially the conversations were
with Jane Doe 3 and Jane Doe 4, they requested it.
And then the conversations were with Gary Bender,
as well as Solicitor Roth.
Q.      So as I understand it, Jane Doe 3 and
Jane Doe 4 had concerns -- because Jane Doe 3 and
Jane Doe 4 were never furloughed, correct?
A.      Correct.
Q.      They were still coming in to the
courthouse to work, correct?
A.      Yes.
Q.      And they brought to you their concerns
of, hey, our parking spots are here, which were in
the lower lot at the time, correct?
A.      Yes.
Q.      And Commissioner Halcovage parks in the
lower lot?
A.      Yes.
Q.      We have concerns that we will run into
him and it makes us uncomfortable and feels

Page 113

unsafe?
A.      Yes, that's correct.
Q.      As a result of that, it's my
understanding that you went and spoke with
Defendant Bender and Defendant Roth about Jane Doe
3 and Jane Doe 4's concerns?
A.      Yes.
Q.      What was Defendant Bender's response.
Strike that.
        What was your -- did you give a
suggestion as to what should happen given the
concerns raised?
A.      Yes.  I felt, so give them a different
parking space.  It doesn't cost you any money.  It
doesn't do anything.  It shows good faith.
Q.      What was Defendant Bender's response to
your suggestion or position?
A.      Well, I think there were conversations
going on at multiple times.  He had had
conversations with Solicitor Roth.  He came into
my office, asked me my opinion.  I said, look,
it's not going to cost you anything.  It's going
to show good faith.  We have an obligation,
there's a complaint made, we have an obligation.

Page 114

He said Solicitor Roth felt that there
was absolutely no need to accommodate a parking
space. I said I disagree, for the reasons I just
stated. He then got them different parking
spaces.
Q.     Okay.
       After Jane Doe 3 and Jane Doe 4 were
given different parking spaces, there were also
conversations about Defendant Halcovage's
movements throughout the courthouse, as well as
what entrances individuals involved in this matter
should use?
A.     Yes.
Q.     Tell us about those conversations. Who
was involved? What happened?
A.     There were a ton of people there. So I
was there, the sheriff was there, Bender was
there, Commissioner Hetherington was there. I
can't remember whether Commissioner Hess was there
or not or if he was out for some reason. There
were other people there.
       Sorry. In my head I am trying to go --
we were sitting in the Hoffmann room. I'm trying
to remember who all was around that. There were

Page 115

other people, I can't remember who else was there.
Q.     Okay.
       What was --
A.     It might have. I don't remember whether
President Judge was there or not.
Q.     What was the topic of conversation?
A.     The sheriff felt that there should be --
that Commissioner Halcovage's access should be
limited. He was very concerned about safety for
the women and in general.
Q.     When you say the sheriff, you mean
Sheriff Groody?
A.     Sorry. Yes. Sheriff Groody.
Q.     He's the head sheriff, but I just wanted
to make sure we were talking about the same
person.
A.     Yes.
Q.     What was the -- what were the
individuals who participated opinions on
restricting or limiting --
A.     So Commissioner Groody -- sorry --
Sheriff Groody had concerns. And he -- and I
remember going through them on my hand, I know
there were five. He felt -- and, you know, when

Page 116

this all broke, there were -- it's Schuylkill
County, there were rumors. But he was stating --
he said how Commissioner Halcovage was getting --
that he was kicked out of his church. He had a
number of things. And he felt that with losing
all of these things that were important to him,
that he was afraid Commissioner Halcovage would do
something harmful to himself or to others.
Q.     Did you have a similar concern?
A.     At that time, no, I didn't. And I was
one of the ones -- Commissioner Hetherington went
through the five concerns or the five issues that
Sheriff Groody had brought up and he disputed and
showed how each one was not true. And based on
that, I said, look, the five reasons that you're
your saying you want to do this have just been
disputed and proven that they're not true. What
else are you making this decision? If the reason
for the decision -- if all five had been disputed,
and they had been, and verified by other people,
he didn't have a basis for the decision he was
wanting to make. No, at the time I did not share
the same concerns.
Q.     Okay.

Page 117

Do you know, did this conversation
happen before or after you spoke with Jane Doe 1
for the first time regarding her reports?
A.     I don't remember. I don't remember at
what point in time it happened.
Q.     Okay.
A.     But it was before September 4th, because
I was no longer there then.
Q.     Understood.
       And after May 22nd?
A.     Correct. Somewhere in there, yes.
Q.     At some point during -- just at some
point, I guess. Did your opinion change as to
whether you had concerns regarding Defendant
Halcovage's -- safety concerns regarding Defendant
Halcovage?
A.     Yes.
Q.     Do you know at what point in time that
change? Let's start with what point in time it
changed.
A.     I actually think that changed after I
left the courthouse.
Q.     Okay.
       Do you know what changed your opinion?

Deposition of Debra Twigg - Revised                                    Jane Doe, et al. v. Schuylkill County Courthouse, et al.

Page 118

1  A.      Yeah.  I think all of the events that
2  occurred after I left, the retaliation, the
3  nastiness, everything that transpired from, I
4  guess, September 4th through current day, yeah.
5  Q.      When or how did you decide who else at
6  the county needed to be interviewed regarding Jane
7  Doe 1's reports?
8  A.      As I was interviewing people and
9  names -- if someone stated someone was present
10 during a comment or during a conversation, then
11 obviously I had to start including those people
12 into the investigation.
13 Q.      And at some point did you come to the
14 decision or conclusion that you had interviewed
15 everybody that had information regarding the
16 allegations?  I guess my question is:  Why did you
17 start writing a final report at the point you did?
18 A.      Because I felt that I had spoken within
19 everyone that had been at least mentioned as
20 having some knowledge.  With that said, either --
21 you know, people in the maintenance department who
22 had been there on a 24/7 period, you know, did
23 they -- people alluded that they might know
24 something, but said they didn't and left it at

Page 119

1  that.
2  Q.      At the point that you decided to start
3  writing your final report, did you feel that you
4  had enough information to come to a conclusion
5  regarding Jane Doe 1 reports?
6  A.      Regarding all of them.  I think in my
7  final report, I addressed all -- because by this
8  point, you know, all four -- there were now four
9  people filing a claim, not just Jane Doe 1.  I
10 believe that I had enough information to be able
11 to determine whether or not county policies had
12 been violated.  And, yes, I felt I had enough
13 information after having spoken with Jane Doe 1
14 once and George Halcovage twice.  I believe I
15 had -- because there were discrepancies in the two
16 statements, so I did a second interview.
17 Q.      When you say discrepancy between the two
18 statements, because you mentioned Jane Doe 1 and
19 George Halcovage twice, do you mean discrepancies between
20 Jane Doe 1 and George or discrepancies between
21 George's first statement and George's second
22 statement?
23 A.      Discrepancies about situation -- things
24 that happened between the Jane Doe 1 and George.

Page 120

1  They -- I interviewed Jane Doe 1.  I interviewed
2  George.  I think I interviewed George -- I don't
3  remember who I interviewed.  I think I interviewed
4  George first because after interviewing Jane Doe
5  1, there were discrepancies and I -- somebody was
6  not being totally honest and I wanted to know who
7  was not being totally honest.  I decided to do
8  that by -- I didn't know Jane Doe 1 as well as I
9  knew George.  I didn't have as many conversations
10 with Jane Doe 1 as I had had with George, so I
11 decided to ask George additional questions that I
12 already knew the answers to because I wanted to
13 see if he would be honest.
14 Q.      Was there anything that you knew the
15 answers to that you believe Defendant Halcovage
16 was not honest about?
17 A.      Yes.
18 Q.      We'll get to that in a little bit.
19      If we look at the first page, Jane Doe
20 3, your initial conversation with Jane Doe 3.  In
21 the end of the second line, it says:  She said
22 that Jane Doe 1 had confided in her over the past
23 few days and then told her that she, Jane Doe 1,
24 had been in a relationship with George Halcovage

Page 121

1  for approximately the past seven years.  That this
2  relationship had ended in the past month or two.
3      Do you recall if Jane Doe 3 explained to
4  you that Jane Doe 1 had started to tell her about
5  characters in a book without divulging who those
6  people were?
7  A.      Yes, I do recall that.  That sounds
8  familiar.
9  Q.      That was in -- do you know if that was
10 what she had been divulging in the days leading up
11 to May 22nd or was that before that time period?
12 A.      I can't say completely.  I can say that
13 I know what you're talking about because Jane Doe
14 3 did make those -- I recall her saying those
15 things.
16 Q.      Okay.
17      Do you recall if Jane Doe 3 told you
18 that when Jane Doe 1 e-mailed her, that that was
19 the first time she knew that there was something
20 sexual involved with -- or something sexual that
21 had happened between Defendant Halcovage and Jane
22 Doe 1?
23 A.      Yes.
24 Q.      So the days leading up to it, up to

Deposition of Debra Twigg - Revised                    Jane Doe, et al. v. Schuylkill County Courthouse, et al.

Page 122

1  May 22nd, Jane Doe 3 didn't have definitive
2  information?
3  A.      No.  No.  No.  Well, that's what she
4  told me and I believe her.
5  Q.      Okay.
6        The next paragraph states:  During the
7  conversations the past few days, Jane Doe 3 asked
8  Jane Doe 1 if she remember the first time a sexual
9  advance from George Halcovage had occurred.
10       Do you know if that period of time of
11  the past few days is referring to May 21st, May
12  22nd, or something different?
13  A.      You mean here where I say during the
14  conversations of the past few days?
15  Q.      Right.
16  A.      I got the impression it was like the
17  past three, four days.  Like certainly less than a
18  week.
19  Q.      That Jane Doe 3 had spoken with Jane Doe
20  1?
21  A.      Yes.
22  Q.      I guess, if you believed Jane Doe 3 that
23  the e-mail that Jane Doe 1 sent on May 21st at
24  night was the first time, I'm trying to figure out

Page 123

1  why those aren't the same -- is this talking about
2  the book conversations, possibly?
3  A.       No.  This was -- I went to -- after I
4  got to initial e-mail, I went to Jane Doe 3's
5  office.  She started talking.  I didn't have pen
6  and paper taking notes.  She said that she had
7  been talking with Jane Doe 1 over the past few
8  days and these were the things she had learned.
9  Q.      So the e-mail from the night before was
10  not the first time that Jane Doe 3 had learned of
11  the issue?
12  A.      You'll have to ask Jane Doe 3 that.  I
13  don't know.
14  Q.      Just because it's in your wording, so I
15  am trying to figure out if maybe you were meaning
16  that the past few days, the May 21st and May 22nd,
17  like Jane Doe 3 -- let me strike that.
18       Did Jane Doe 3 tell you since receiving
19  the e-mail from Jane Doe 1 that she then alerted
20  you about, had she spoken with Jane Doe 1?
21  A.      I got the impression she had spoken with
22  her just a couple days.  Like, it was -- I
23  don't -- that's all I can tell you.
24  Q.      Okay.

Page 124

1        The next couple sentences in the next
2  paragraph are what Jane Doe 3 told you she had
3  learned from Jane Doe 1, correct?
4  A.      Yes.
5  Q.      And you don't recall, based off your
6  testimony just now, when Jane Doe 3 told you she
7  had received that information from Jane Doe 1?
8  A.      When you say received the information, I
9  know she had gotten the e-mail from someone at
10  your office, whatever his name was.  Then that
11  night before I think she forwarded to me right
12  after she got it, the e-mail.
13  Q.      Right.
14  A.      But the conversations with her and --
15  she's going to be better able to answer that than
16  I will.
17  Q.      If we turn to the next page in the
18  second paragraph, starts with Jane Doe 3.
19       Do you see that?
20  A.      Uh-huh.
21  Q.      It says, Jane Doe 3 stated that George
22  made frequent visits to the tax assessment office
23  which usually ended with Jane Doe 1 being upset.
24  A.      Uh-huh.

Page 125

1  Q.      This is Jane Doe 3's statement to you
2  about what she personally observed, correct?
3  A.      Correct, uh-huh.
4  Q.      And then it goes on to say that the
5  visits were not work related.  Again, that's Jane
6  Doe 3 observation she relayed to you?
7  A.      Yes, uh-huh.
8  Q.      If we go two paragraphs down, it says
9  that Jane Doe 3 said that she and Jane Doe 4
10  wanted to speak with me concerning things they had
11  been told and things that had been witnessed.
12       That is -- the me in that sentence is
13  you, correct?
14  A.      Yes.
15  Q.      So after Jane Doe 3 -- I guess my first
16  question is:  Is this -- this is that first period
17  of time before you went to Bender and alerted him?
18  A.      Correct.  Correct.
19  Q.      At that point, does Jane Doe 4 come into
20  the office or --
21  A.      When I came -- I went and got pen and
22  paper, spoke with Gary Bender, went back to the
23  office.  I believe Jane Doe 4 was there or Jane
24  Doe 3 called her and said she also wanted to speak

Page 126

1  with me.  So I spoke with Jane Doe 3, Jane Doe 4
2  was in the room.  I spoke with Jane Doe 4.  We
3  were all sitting in Jane Doe 3's office.
4  Q.     So the first initial --
5  A.     Was just Jane Doe 3 and myself.
6  Q.     And then -- but during that, she said,
7  hey, also, by the way, I have some information --
8  A.     Yes.
9  Q.     -- I would like to talk with you about?
10 A.     Yes.
11 Q.     And also I think you should speak with
12 Jane Doe 4?
13 A.     Yes.
14 Q.     That's when you go tell Bender, get pen
15 and paper, come back, and have a full conversation
16 with the two --
17 A.     Yes.
18 Q.     -- Jane Doe 3 and Jane Doe 4?
19 A.     Yes.  And I believe it was during that
20 second -- at the beginning of that second time I
21 went to Jane Doe 3's office that we -- I mentioned
22 that I wanted to speak with Jane Doe 2 as well.
23 We called Jane Doe 2 -- Jane Doe 2.  She was on the
24 phone -- she answered the phone.  I believe my

Page 127

1  first question to her was, have you retained an
2  attorney.  She said not yet.  I said I would like
3  to speak with you.  She agreed to come in -- well,
4  later agreed to come in that afternoon.
5  Q.     If we look to the second to last
6  paragraph before the bold, the end of it, it says
7  you told Jane Doe 3 that you were going to
8  speak with County Administrator Defendant Bender
9  and she expresses some concerns about you
10 discussing this with Bender and first assistant
11 solicitor risk manager.  So that would be Jane Doe
12 3 expressed concerns that sharing or discussing
13 the issue with Bender and Roth, correct?
14 A.     Yes.
15 Q.     Do you remember what her concerns were?
16 A.     I believe the concern was that she felt
17 it would be swept under the rug, that they would
18 cover it up.
19 Q.     Do you know why she felt that way; did
20 she tell you?
21 A.     I don't know that we specifically said.
22 You'd have to ask her that.
23 Q.     Okay.
24        It indicates in the last sentence that

Page 128

1  you didn't have -- it appears you didn't have the
2  same concern?
3  A.     I did not.
4  Q.     Why did you feel that it would be
5  handled correctly?
6  A.     Because like I said, there was a point
7  in time I considered Gary Bender a friend.  I
8  believed he was -- I believed he was a good man
9  who would do the right thing.
10 Q.     Do you still have that same feeling
11 about him now?
12 A.     No.
13 Q.     Did you have any concern, because in
14 2020, you had worked in the county --
15 A.     Two and a half years.
16 Q.     -- two and a half years.
17        Did you have any concern about Defendant
18 Bender or Defendant Roth's relationship with
19 Defendant Halcovage influencing the investigation?
20 A.     I did not have concerns at the time
21 about Gary Bender, simply because the first words
22 out of his mouth when I told him was -- and he
23 said it in his stern voice, we do this by the
24 book.  And I'm like, you're damn straight we do

Page 129

1  this by the book?
2        As far as Solicitor Roth, I can tell you
3  an incident that happened with him and I, a
4  conversation that I'll just let it speak for
5  itself.  There was an incident that happened with
6  our clerk of courts.  An individual supposedly had
7  came to my office, I wasn't there, I was in
8  teamsters meetings, union negotiation meeting.
9  This woman shows up, says she had been fired.
10 Apparently was so stressed that she -- they
11 thought she was having a stroke.  Gary Bender
12 came, pulled me out of a union negotiation
13 meeting.  Had -- I went over, this woman literally
14 couldn't move.  Her eyes were closed.  Literally
15 there -- an ambulance had been called.  They came.
16 They were treating her.  I went back, I told them
17 I would be right back.  I went back, ended the
18 union negotiation meeting.  Came back.  This woman
19 was wheeled out in an ambulance.
20        Fast forward a couple days, there were
21 discussions about -- because the clerk of courts
22 said this woman quit.  It's like when someone
23 quits, they don't leave in an ambulance.  They
24 don't end up in such a severe panic attack that

Page 130

1 they literally -- you think they're having a
2 stroke.  Solicitor Roth and I had gotten in
3 conversations about this.  I told him that if I
4 was -- I was told I didn't need to go to the
5 unemployment hearing because they knew I would say
6 I think she was fired.
7      I told him if I was subpoenaed, I would
8 go.  He told me that if I went, he would --
9      MR. LETTRICH:  Ms. Twigg, if I
10 could just stop you there.  I am not quite sure
11 where this story is going.
12      THE WITNESS:  I am going to tell
13 you.
14      MR. LETTRICH:  Okay.  But -- but --
15      THE WITNESS:  It's going to end
16 right here.
17      MR. LETTRICH:  Before you do, the
18 only thing I would caution you about is, in the
19 event he was providing you with legal advice in
20 your capacity as the human resources --
21      THE WITNESS:  No, it wasn't.
22      MR. LETTRICH:  It's not about that.
23 Okay.  Then that's fine.
24      THE WITNESS:  No.  What he told me

Page 131

1 was that he would destroy my credibility on the
2 stand if I testified.  And I said knowing that I'm
3 telling the truth and that the clerk of courts is
4 lying, you would destroy my professional
5 credibility.  He said that's my job.  And I looked
6 at him and told him his job sucks.  And I asked
7 him how he slept at night and how he looked in the
8 mirror.  He got up and walked out.
9      So, no, I don't necessarily --
10 didn't necessarily trust that Solicitor Roth, nor
11 to this day, do I trust that Solicitor Roth would
12 do the right thing because he blatantly told me he
13 wouldn't.  He would destroy someone he knew was
14 telling the truth, just to win.  And he said that
15 was his job, to defend the county.  I told him I
16 worked for the county, so who defends me.  He sort
17 of shrugged.
18      Did I answer your question?
19 BY MS. SMITH:
20 Q.      You did.  I appreciate that.  Thank you,
21 Ms. Twigg.
22      Did you have concerns -- having worked
23 in the county for two and a half years and having
24 observed courthouse operations, things that went

Page 132

1 on, did you have any concern or pause or
2 hesitation about Defendant Halcovage being able to
3 have influence over the investigation?
4 A.      No, because I was not going -- no,
5 because I was the one, for the most part, doing
6 the investigation, no.  And I do feel during that
7 time, Gary Bender was very supportive of me, or at
8 least portrayed that.
9 Q.      Okay.  That's fair.
10      If we look to the middle or towards the
11 bottom of the page, there's the bold:  Discussion
12 with Jane Doe 3, Friday, May 22, 2020, and
13 subsequent follow up over the next week.
14 A.      Uh-huh.
15 Q.      Does this section encompass both what
16 then was discussed post getting the pen and
17 notifying Bender and other conversations you --
18 A.      Well, getting the pen -- what was
19 discussed was what I remembered without writing
20 stuff down.  That was the first part.
21 Q.      Right.
22      That's that first page --
23 A.      This --
24 Q.      Hold on one second, Ms. Twigg.

Page 133

1      So before getting the pen and notifying
2 Bender where you didn't have pen and paper, is the
3 first page under the bold --
4 A.      Yes.
5 Q.      -- into the second page?
6 A.      Yes.
7 Q.      Then we have a second bolded section.
8 A.      And this is where I went back and
9 started writing things down.  I think I have
10 already said that there were times where, in my
11 memory, I remembered her saying something, but I
12 didn't necessarily have a note on it.  I went back
13 to her and said, hey, this is what I recall you
14 saying.  Is this accurate.  That's what that
15 means, subsequent follow-up conversation over the
16 next week when I was trying to go back and
17 reconstruct in a typewritten form, I had questions
18 and I said, hey, is this what you said, so that's
19 what that is.
20 Q.      So there weren't other sit-down
21 interviews in a formal sense?
22 A.      No.  It was -- no.  It was more...
23 Q.      And then a few pages later there's a
24 bolded discussion with Jane Doe 4

Page 134

1  That's similarly was that same -- this section
2  is for the conversation you had that involved
3  Jane Doe 3 and Jane Doe 4 at the same
4  time?
5  A.      Yes.
6  Q.      So if we go back to the Jane Doe 3
7  section.
8          These are all -- this first paragraph is
9  all what Jane Doe 3 relayed to you that she had
10 observed, correct?
11 A.      I believe --
12         MS. IPPOLITO:  Can you advocate
13 which page you're referring to?
14         MS. SMITH:  There's no numbers.
15 It's the bolded -- it's Page 2, though.  But it's
16 the bolded section, discussions with Jane Doe 3,
17 Friday, May 22nd, and subsequent follow up over
18 the next week.  The paragraph I'm referring to
19 starts with Jane Doe 3 started the conversation.
20 BY MS. SMITH:
21 Q.      These are all -- these are your notes as
22 it relates to what Jane Doe 3 conveyed to you she
23 had observed and/or what she saw, correct?
24 A.      Yes.  I'm just looking to see if it

Page 135

1  says -- yeah, these are what she observed.  It
2  doesn't seem to be anything that was relayed from
3  Jane Doe 1 to Jane Doe 3.
4  Q.      If we look to the next page, so Page 3,
5  the paragraphs that starts with, Jane Doe 3 talked
6  about when she was hired -- next, Jane Doe 3
7  talked about when she was hired.  This paragraph
8  talks about her request for a pay increase and her
9  having to take on additional duties.
10 A.      Uh-huh.
11 Q.      At any point in your employment with
12 Schuylkill County, did you become aware that the
13 practice of the county was that pay increases
14 would only be given if one assumed additional
15 duties?
16 A.      Yes.
17 Q.      And --
18 A.      With the exception of every year there's
19 a 3 percent increase.
20 Q.      Fair enough.  Thank you.
21         This wasn't a policy, I guess, first,
22 correct?
23 A.      It's not written policy, no.
24 Q.      Do you know where this practice came

Page 136

1  from; who established it?
2  A.      No.  It was that way when I got there.
3  But I can tell you there were exceptions.  I can
4  tell you there were -- there was a particular
5  situation in 911 where the supervisors were all
6  getting increases because I then went to Gary
7  Bender and said, hey, you know what, I'm
8  underpaid.  If you can give these guys an
9  increase, why can't you give me one.
10 Q.      What was his response?
11 A.      He basically said it couldn't be done.
12 And we had that discussion numerous times.
13 Finally I went to him and I said, why don't you
14 show me the policy that says it can't be done
15 because I haven't found one.  What you're telling
16 me is you just don't want to do it.
17 Q.      Do you know the individuals who were --
18 the 911 individuals you just --
19 A.      They were the 911 supervisors.  We had
20 just finished the union contract, they are under
21 ATSME, under the ATSME union contract.  There were
22 increases for the 911 operators.  It sort of
23 started what would formerly be called a pay
24 compression, you know, with the supervisors.  So

Page 137

1  they wanted to increase the supervisors so that
2  they -- when it came time to needing to fill a
3  supervisor position, higher salary would be an
4  incentive, where as if the operators were making
5  more than that supervisors, we wouldn't be able to
6  have anyone to move up.
7  Q.      Who is the, they, that wanted to
8  accomplish this?
9  A.      The head of 911, Scott Crater and Gary
10 Bender was in agreement with it.  I guess the
11 commissioners had to be in agreement to approve.
12 Q.      The supervisors of 911, how many, do you
13 know, were there?
14 A.      I don't.  It's 911.  They run three
15 shifts, 24/7, 365, so there are numerous
16 employees.  Maybe eight or nine.  I don't know.
17 Q.      Okay.
18         You said -- I think you mentioned
19 numerous exceptions to this practice of the
20 county.
21         Do you recall any others?
22 A.      The prison guards, again, the captains
23 got increases.  Those are the ones I can think of
24 off the top of my head.

Deposition of Debra Twigg - Revised                                    Jane Doe, et al. v. Schuylkill County Courthouse, et al.

Page 138

1  Q.      Okay.
2          If we go down two paragraphs, it starts
3  with:  Jane Doe 3 stated after this, George did
4  not speak to her for over one year.
5          Do you see that?
6  A.      Uh-huh.
7  Q.      Do you recall observing anything related
8  to Jane Doe 3's statement here in this paragraph?
9  A.      I know that they didn't speak.
10 Q.      Did you ever discuss the fact that
11 Defendant Halcovage, a commissioner in the county,
12 didn't speak with one of his department heads for
13 a year?
14 A.      We did have one conversation.  I can't
15 remember the details, but I remember having that
16 discussion.
17 Q.      With whom?
18 A.      With George.
19 Q.      Okay.
20         You don't know what -- recall it?
21 A.      No.
22 Q.      Did you know if -- did you ever hear
23 Defendant Roth or Defendant Bender make any
24 comments about it?

Page 139

1  A.      Not so much Bender, but probably Roth.
2  And just in passing, that they didn't speak.  I
3  mean, no details, none that I remember anyway.  I
4  can tell you I was surprised when Commissioner
5  Halcovage came to me, stating that he was looking
6  at -- he was -- the consideration of combining the
7  two offices and that he felt that Jane Doe 3 would
8  be the person, the good person to do that job, to
9  do both.  He felt she would be very successful at
10 it.  I was sort of surprised because I knew there
11 was sort of a rift between them.
12 Q.      If we turn to the next page, I think we
13 are on Page 4 now.  We want the section for Jane
14 Doe 4.
15 A.      Uh-huh.
16 Q.      Jane Doe 4 then, in addition to Jane Doe
17 3, relayed her own concerns and observations
18 regarding Defendant Halcovage, correct?
19 A.      Yes.
20 Q.      Do you know if -- did Jane Doe 4 at any
21 point convey to you similar concerns that Jane Doe
22 3 had related to Defendant Bender and Defendant
23 Roth being involved in the investigation?
24 A.      Yes.

Page 140

1  Q.      When you started with the county --
2  sorry.  Were you a registered Democrat or
3  Republican?
4  A.      Republican.
5  Q.      Were you informed that you needed to
6  change your party at any time?
7  A.      No.
8  Q.      Did anybody ever tell you that they had
9  been told they needed to change their party?
10 A.      I can tell you when I went to -- at the
11 end of my first year, the administrative assistant
12 in HR resigned and I wanted to hire a woman that I
13 knew from high school.  She was a single mom.  She
14 was working at the school district as an assistant
15 librarian making like $11 an hour.  She had had
16 administrative type skills, jobs in the past.  I
17 thought, you know what, this is someone I would
18 trust.  I could help her, at the same time help
19 me.  I would be able to quickly find someone to
20 replace the person that was leaving.
21         I had her come in.  I interviewed her.
22 I had Gary Bender interview her.  I wanted to hire
23 her.  Obviously Gary told me I needed, you know,
24 talk to George, make sure he doesn't have anybody

Page 141

1  who is in line, who he has in mind.  So I went to
2  George.  I asked him.  He basically told me I
3  needed to go to her and have her change her party.
4  She was listed as an independent and I stated
5  that.  And he said that he would get flack from, I
6  guess, the Republican party for hiring someone who
7  wasn't a Republican.
8          I thought about it and then I went to
9  Gary -- I typically met with Gary Bender every day
10 at 4:00, just to update him on things that were
11 going on.  I went to him, I told him I was not
12 comfortable doing this.  His response was that I
13 should go to the other two commissioners and get
14 it approved because you only need two votes.  I
15 said I'm not going to do that because that is
16 going to set up -- it just wouldn't be a good out.
17 I didn't think it was smart to do that.  So I went
18 to George and I told him I was not comfortable
19 going to Ann and asking her to change her
20 political party.  And I said that I would post the
21 job, I just wouldn't hire her.  And he told me I
22 didn't have to do that.  I, could just hire her.
23 Q.      When you went to the Defendant Halcovage
24 initially about hiring this individual, you

Page 142

1  indicated that you went to him because you wanted
2  to make sure he didn't have anyone in line for the
3  position?
4  A.    In mind, yeah.
5  Q.    What do you mean by that?
6  A.    Well, I think I mentioned earlier, if
7  there's an open position, you know, whether it was
8  George or Gary Hess or Frank Staudenmeier, if the
9  commissioners had someone in mind for a position,
10  they would obviously find that out first.
11  Q.    So if Defendant Halcovage had had
12  someone in mind, would it have been that their
13  candidate would have been the individual selected?
14  A.    I can give you an example if you'd like.
15  Q.    Sure.
16  A.    I can tell you I was not Gary Bender's
17  first choice and he made that very clear, which is
18  probably why when I asked for a higher salary, it
19  was made very clear, sternly, that that was going
20  to be the salary.  I guess that was my punishment.
21  He had -- there was a man that had interviewed who
22  apparently had, in Gary Bender's terms, put his
23  time in with the political party and he deserved
24  that -- that job.  I can tell you that it was

Page 143

1  George who was my champion, along with Darlene
2  Robins.
3        It didn't hurt that I went to high
4  school with Gary Hess -- with Gary Hess's wife, so
5  he clearly was a yes vote for me.  I had
6  interacted with him through a local business
7  association for the previous year that I worked
8  there, so he knew me.  He knew my credentials.  So
9  I can tell you typically if there's somebody they
10  have in mind, that person would usually get the
11  job, yes.
12  Q.    You indicated that when Defendant Bender
13  told you to just take your request to the other
14  two commissioners, you didn't think it would be
15  smart to do so?
16  A.    I didn't want to be on the bad side of
17  George and have him not speak to me for a year.
18  Q.    What did you think would happen to you
19  if you were on Defendants Halcovage's bad side?
20  A.    I don't know.  I don't know that I -- I
21  don't know that I ever -- I was going to say I
22  don't know that I ever got on his bad side, but
23  maybe now I am.  I don't know.  Look, I also
24  considered him a friend.  He was a friend.  I

Page 144

1  didn't know him before I got there, but I got -- I
2  was...
3  Q.    Take your time.
4  A.    I was very disappointed when all of this
5  happened because I did consider him a friend and I
6  believed him.  I stuck up for him when people
7  would make comment.  I was his champion.  And I
8  feel like -- I feel like, look, I shouldn't
9  discuss religion, but I tried to be a very good
10  Christina.  And I loved -- I believe in looking at
11  the best in people.
12        For months after I left the county,
13  because I tried -- I felt I wasn't even capable of
14  doing my job because by trying to believe the best
15  in people, I missed the red flags that I should
16  have seen and that wasn't fair to Jane Doe 1 or
17  anyone else.
18        So I struggled with that.  I really -- I
19  defended him in so many ways and I just felt
20  deceived.  I felt foolish.  I felt stupid.  I felt
21  let down.  Sorry.  Can I have another tissue?
22  Q.    You okay?  Do you need a minute?
23  A.    Yeah.  I just -- just really
24  disappointed.

Page 145

1  Q.    You said that --
2  A.    Sorry.
3  Q.    No, you're okay.  Do you want a minute?
4  A.    No.  No.  No.  Come on.  It's already
5  12:30 and we're still on the first attorney.
6  Q.    We're going to try not to overlap our
7  questions.  A lot of what I will cover --
8  A.    Okay.
9  Q.    -- hopefully will -- I know there's a
10  lot of us.  I apologize.
11  A.    It's all right.
12  Q.    You said that you saw some red flags?
13  A.    No, I said I didn't see the red flags.
14  Q.    Okay.
15  A.    Because I just looked for the best in
16  people.  You know, people would say, I have this
17  friend who I met through this business association
18  in the town that I live in.  At one point we were
19  out in the evening and, you know, the person said
20  to me, you know, what's this guy really like.  I
21  said, look -- my response was, you know, I truly
22  believe -- people say things, I said I haven't had
23  that experience.  I truly believe he really wants
24  what's best for the county.  He really is a good

Page 146

1 guy.  He really had a good heart.
2 Q.      What types of things were you hearing
3 that you felt you needed to defend Defendant
4 Halcovage?
5 A.      You know, there were the comments about
6 women, of course.  There were -- that he was
7 slimy, that he was creepy.  You know, just
8 general -- and I defended him.  I disputed it
9 regularly.
10 Q.      You said that you didn't see red flags,
11 which to me indicates that you're now looking back
12 and realizing that there were things that you
13 should have -- that were red flags.  Can you --
14 A.      You know, what I really think is my job
15 before HR.  I should have known more than the
16 average person.  When I should have seen -- you
17 know, you were there when we did Jane Doe 1
18 interview.  And at one point, one of my last
19 questions was, I turned to Jane Doe 1 and asked
20 her why she didn't come to me.  After I left, one
21 of the things I thought was, why didn't I see it.
22 Why didn't I see that something was there.  I was
23 trained at some point in life to see that, in my
24 life to see that.

Page 147

1 Q.      Understood.
2         Is there anything now as you sit here
3 today that you think -- that you observed that you
4 think was an indicater that Defendant Halcovage
5 could engage in such behavior?
6 A.      Say that again.
7 Q.      Is there anything that you observed that
8 you believe is an indicater that Defendant
9 Halcovage could engage in any such behavior,
10 sexual harassing behavior?
11 A.      I guess the only thing I could think to
12 say was -- I mean, obviously you all have the
13 notes.  You have the second interview that I did
14 with George.  There were conversations that he had
15 with me that would end, that would go to a sexual
16 nature.  I mean, heck, I even sat there and
17 discussed if I was dating somebody.  I would say,
18 oh, well, I went on a date with so and so.  We
19 were friends.  Should I have thought that if he is
20 having those types of conversations with me, is he
21 having those with other people.  Is he having -- I
22 guess I should have, but I didn't.  That's my
23 failure and I live with that.  And the fact that
24 this started years before I even got to this damn

Page 148

1 state is irrelevant, I guess.
2 Q.      Do you know what, if anything, anyone --
3 any predecessor of yours in the HR department
4 knew?
5 A.      I don't.  Well, I do know that somehow
6 the person before me was some distant -- some
7 relative of Jane Doe 1.  And why she didn't know
8 is -- I guess makes me feel a little bit better
9 about myself.
10 Q.      Did you come to know what Defendant
11 Bender and/or Defendant Roth knew about what was
12 going on at any point?
13 A.      Honestly, I can tell you I had
14 conversations -- there were times I would be in my
15 4:00 meeting with Gary Bender, George would come
16 in, the three of us would sit there and talk.
17 George would make some sort of joke.  He'd be
18 sitting there and I'd just hit him and tell him to
19 knock it off.  And after he left, Gary Bender
20 would make the statement, you know, if a woman
21 ever really approached him, he would run so fast
22 in the opposite direction.  I guess that's part of
23 why I -- I believed that.  I believed that he was
24 a loyal, faithful man, husband.  So I believe that

Page 149

1 Gary Bender also felt the same way I did.  I
2 believe he believed it.
3         I can tell you one conversation that I
4 remember with Solicitor Roth that happened just
5 days -- it had to be just a few days before this
6 whole thing, before we got the e-mail and we
7 learned about all of this.  We had come out of
8 Gary Bender's office.  There's a hall -- came out
9 of the commissioner's office, there's a hallway.
10 You turn to the right and you go into the
11 solicitor's office, you go a few more steps and
12 turn to the left and you go into HR.
13         We were standing there and it was late
14 because the cleaning people were out and the
15 building was empty.  And he made the statement, he
16 asked if -- I can't even remember how he asked it,
17 but he asked basically if I thought -- basically
18 implied that there was some -- he was starting to
19 hear something where he thought maybe there was
20 some kind of behavior going on with George of a
21 sexual nature with someone.  And I remember my
22 response to him saying, I hope that is not the
23 case because if that is true, my impression, my
24 perspective of him would drop drastically.  But I

Page 150

got the impression that he was just hearing that
for the first time as well within two days, three
days of this breaking. So I believe he did not
know either, to tell you the truth, because he
seemed just as disheartened about it as I said I
would be had it been true.
Q.      In the last paragraph on that page with
the Jane Doe 4 discussion bolded, it starts on
May 28th?
A.      Yes.
Q.      And it discusses an e-mail you received.
If we turn to the next page, the paragraph
continues and the last sentence of this paragraph
says e-mail is attached.
A.      Oh, and it's not attached.
Q.      This report was produced by Commissioner
Hess. It was not produced by the county, if I'm
correct.
        Do you know what that e-mail included in
that file, in that cabinet drawer?
A.      I -- probably not. Sorry.
Q.      But if it says attached, do you know --
I mean, because this isn't what you produced.
This was produced by Commissioner Hess. Are you

Page 151

sure that it wasn't attached to your copy of this?
A.      I don't think -- honestly, I don't know
that it was. And I'm only saying that because
this report, this was all typed up along with the
final report, along with the letter that Jane Doe
1 wrote.
Q.      Okay.
A.      And -- and I provided -- we had a
meeting, it was one of those -- we were in the
legal office, it was Gary Bender, Commissioner
Hess, Commissioner Hetherington, Solicitor Roth,
I'm not sure whether Solicitor -- Solicitor Hobbs
might have been there. And I provided them the
final report, these notes, the interview notes, I
believe, and I believe Jane Doe 1 letter was in
that as well. Those were the documents I
provided. I didn't stop to -- I don't believe I
stopped to attach that e-mail.
Q.      Okay.
A.      This was written weeks. Like, it was a
process.
Q.      Understood.
A.      I'm guessing -- honestly I truly --
because I'm guessing by the time I got to the end,

Page 152

I completely forgot about this one line that was
in the midst of all of those documents. Sorry.
Q.      No, it's okay. Understood.
        But the e-mail that you were referencing
is an e-mail from Jane Doe 4 to you?
A.      Yes.
Q.      And so it's still arguably --
A.      Should be in my e-mail, which should not
have been touched, yes.
Q.      Thank you.
A.      Yes.
Q.      If we flip back, it talks on May 28th.
That's when you received the e-mail and then flip
back to the next page, it says after receiving the
e-mail, I spoke with Jane Doe 4 at approximately
noon the same day. I told her that we would
request that George not interact or speak with
Jane Doe 4, Jane Doe 3, or anyone in their
offices.
        Do you see that?
A.      I see that sentence.
        Is that what you're asking me?
Q.      Yes.
A.      Yes.

Page 153

Q.      Did you have a conversation with
Defendant Halcovage about interaction with people
in the tax assessment or tax claims offices?
A.      No. I am sure it was with Gary Bender
and Gary Bender would have spoken with Mr.
Halcovage.
Q.      So you weren't privy to the
conversations?
A.      No.
Q.      So you don't know --
A.      Not always, no. No.
Q.      So were you ever privy to any -- were
you ever present for any conversation with
Defendant Halcovage about his interaction --
A.      About this, no.
Q.      Okay.
        Do you know why -- so you get this
e-mail from Jane Doe 4 about her safety concerns
and the parking. And you go to Defendant Bender
and speak to him about it?
A.      Yes.
Q.      Was it Bender's suggestion, your
suggestion, or something different that Bender be
the one to spoke with Halcovage?

Page 154

1  A.      I'm sure he just said I'll speak with
2  George because that was a standard.  That happened
3  a lot.
4  Q.      Do you know if Bender actually ever
5  spoke with Defendant Halcovage?
6  A.      I would assume so, but I can't -- I
7  would have assumed he would have.
8  Q.      But other than him telling you that he
9  had, you never saw it, correct?
10  A.      Not on this particular topic, no.
11  Q.      So then we're still on Friday May 22nd.
12  You then speak with Jane Doe 2, correct?
13  A.      Yes.
14  Q.      I think you walked us through that first
15  paragraph about the fact that you made sure she
16  didn't have an attorney and representation.  I
17  appreciate that.  We were not yet involved.
18        And then she tells you in Paragraph 2,
19  according to this, she tells you that Defendant
20  Halcovage showed up to her house and spoke with
21  her mom and dad on May 21, 2020?
22  A.      Yes.
23  Q.      Did Jane Doe 2 tell you that?
24  A.      Yes.  She said it in the meeting.  I

Page 155

1  mean, we were all there, yes.
2  Q.      At that point, was it your understanding
3  that Defendant Halcovage knew that he was the
4  subject of a sexual harassment claim?
5  A.      Yes, because he had received -- I had
6  learned from Gary Bender on Glenn Roth that he had
7  received -- I didn't realize he got a copy of the
8  same letter that was sent to me.
9  Q.      Okay.
10  A.      And in that letter, it stated.  So, yes,
11  he was aware.
12  Q.      Did the fact that Defendant Halcovage,
13  after being notified that he was the subject of a
14  sexual harassment claim, that he had showed up to
15  Jane Doe 2's house, did that concern you?
16  A.      Yes.
17  Q.      Did you raise your concerns with
18  Defendant Bender?
19  A.      I'm sure we discussed it, yes.
20  Q.      Do you remember what his response was?
21  A.      I think he probably -- I say I think.  I
22  don't want to -- I think he had shared a concern,
23  but, again, you would have to ask him that, but
24  that's my belief.  It's been two and a half years.

Page 156

1  Q.      I understand.
2  A.      Sorry.
3  Q.      No, you're okay.
4  A.      I am trying to be as direct and honest.
5  Q.      We appreciate that.  That's all we can
6  ask for.  And if you don't recall something or
7  don't remember --
8  A.      I believe it.  But can I sit here and
9  tell you the conversation and how it went, I
10  can't, so...
11  Q.      Okay.
12        We can turn to the next page.  So
13  this -- so the page that starts with the bolded
14  section, meeting with Jane Doe 2, Gary Bender.
15  A.      Yes.
16  Q.      This indicates that that same day,
17  Friday, May 22nd, Jane Doe 2 actually came to the
18  office and that meeting was held in the Hoffmann
19  room?
20  A.      Yes.
21  Q.      When you were speaking with Jane Doe 2
22  and she relayed this information to you, at any
23  point did you question the veracity or
24  truthfulness of what she was telling you?

Page 157

1  A.      No.  She was -- no.  She was, I want to
2  say at times -- I hesitate to use the word
3  hysterical, but she was very emotional.  She was
4  scared.  She was afraid of what could happen to
5  her.  She was afraid harm would be done to her.
6  Q.      Physical harm or something else?
7  A.      She expressed that, yes.
8  Q.      Did she think economic or job security
9  --
10  A.      Yes, that too.
11  Q.      Harm to those would come?
12  A.      Yes.
13  Q.      Same questions for Jane Doe 3 and Jane
14  Doe 4, at any point when you spoke with them for
15  the times we went through for this report, did you
16  have any reason to question the truthfulness of
17  what they were telling you?
18  A.      No.
19  Q.      If we turn to the next page, there is
20  a -- the second paragraph.  Well, it's the first
21  full paragraph.
22  A.      Okay.
23  Q.      There's an allegation about rumors
24  regarding George and Jane Doe 1 in the clock

Deposition of Debra Twigg - Revised                          Jane Doe, et al. v. Schuylkill County Courthouse, et al.

Page 158

1  tower.
2       Do you see that?
3  A.      Yes.
4  Q.      Did you ever hear rumors of Defendant
5  Halcovage taking females or Jane Doe 1 to the
6  clock tower alone?
7  A.      Yes, I have heard rumors.
8  Q.      When did you first hear those rumors?
9  A.      I was still working at the courthouse.
10 I can't tell you a month, a day.
11 Q.      Was it more than once that you heard a
12 rumor --
13 A.      Yes.
14 Q.      -- such as that?
15 A.      And I can tell you since being there,
16 there is a restaurant where one of -- an employee
17 from the courthouse worked, a maintenance employee
18 and I had been for dinner there.  I can tell you
19 even as recently as in the past year, this --
20 maybe year and a half.  This person made comments
21 about this suit because people know what's going
22 on.  And made the statement that, you know, there
23 were numerous women that were up in that clock
24 tower.

Page 159

1  Q.      Did you ever have a conversation with
2  Defendant Bender or Defendant Roth about these
3  rumors?
4  A.      I don't think so.  I don't think so.
5  Q.      Did you ever have a conversation with
6  Defendant Bender or Defendant Roth about rumors
7  that Defendant Halcovage was sleeping with Jane
8  Doe 1?
9  A.      I don't think so.  I don't think so.
10 Well, there was a conversation that was discussed
11 and I was under the impression that Jane Doe 1 and
12 Jane Doe 2 were friends with George.  I mean, I
13 get that.  They were friends.  I didn't -- I
14 didn't think that there was a sexual relationship
15 going on.  You know, Jane Doe 1 was his campaign
16 manager in, I guess, the 2019 election, I think it
17 was.
18      But, again, you know, Gary Bender and I
19 had had conversations and he said -- and I
20 believed him.  He said, you know, if anyone ever
21 really made an advance on George, he would run in
22 the opposite direction.  I believed that, so, no,
23 I didn't -- I didn't think -- no.  Had I thought
24 it, I would have said something.

Page 160

1  Q.      In the last paragraph on this page it
2  indicates that Jane Doe 2 said that Halcovage told
3  her and Frank Staudenmeier, advised against hiring
4  Jane Doe 2 back at the courthouse, stating that
5  she was a risk and a ticking time bomb.
6       Did George ever tell you something
7  similar about Jane Doe 2 or -- about Jane Doe 2?
8  A.      No.  No.  I can tell you there was a
9  time she was in -- she was in the -- looking in
10 the treasurer's office when I first met Jane Doe
11 2.  She was having problems with the treasurer,
12 Marchalk.
13      At some point I was in my office, got a
14 phone call from George, said could you please come
15 over here.  I went over.  No warning.  I go in,
16 Jane Doe 2 was there in his office, she was
17 crying, hysterical, having problems with the
18 treasurer, felt she was being picked on.  And he
19 asked me to talk with her, look at her skill sets
20 and see if there was a position somewhere else in
21 the courthouse that she would be able to move to
22 get away from -- she felt she was being picked on
23 by the treasurer, I believe.
24 Q.      Did you ever have any conversations with

Page 161

1  Commissioner Staudenmeier about Jane Doe 2?
2  A.      No.
3  Q.      If we go to the next page, this is the
4  one with some handwritten notes on it.
5       Can you tell me, the one on the right
6  with the circle, what does that say?  Is that your
7  handwriting, first?
8  A.      No.
9  Q.      So --
10 A.      Against the law.  Jane Doe 2 made
11 acquisitions that George records conversations on
12 his iPad and takes -- no, it's not my handwriting.
13 Q.      Have you ever seen a copy of your report
14 with handwriting on it?
15 A.      No.
16 Q.      Are you familiar with what Commissioner
17 Hess's handwriting looks like?  We can ask him.
18 If you're not, it's okay, because he produced it,
19 I didn't know if maybe you knew if this was his
20 handwriting.
21 A.      I think it looks like Glenn's
22 handwriting.  I could be wrong.
23 Q.      Just so everyone can hear you.
24 A.      I thought it looked like Solicitor

Case 3:21-cv-00477-MCC    Document 280-1    Filed 09/20/23    Page 46 of 342

Deposition of Debra Twigg - Revised                                    Jane Doe, et al. v. Schuylkill County Courthouse, et al.

Page 162

1  Roth's handwriting.
2  Q.      Okay.
3  A.      I don't know that -- it's not that I
4  haven't seen Commissioner Hess's handwriting, I
5  just don't know.
6  Q.      Totally fine.
7          When Jane Doe 2 made this allegation to
8  you about Defendant Halcovage recording
9  conversations on his iPad without consent of the
10  individuals being recorded, had you --
11         MS. SMITH:  Actually, can I see the
12  one, it's the black part sticking out there.
13  BY MS. SMITH:
14  Q.      Exhibit 55, from yesterday had you seen
15  this letter from my office?
16  A.      What was the --
17  Q.      Had you seen this letter from my office
18  yet?
19  A.      Before what?
20  Q.      Before speaking with Jane Doe 2?
21  A.      No, because we spoke with Jane Doe 2 on
22  the 22nd and this is dated the 29th, so I couldn't
23  have.
24  Q.      Well, this is the one from my office to

Page 163

1  Glenn Roth on behalf of the county, not from Jane
2  Doe 1 on the -- because the 20th you said you got
3  a letter.
4          So I guess my question is:  On the 22nd
5  when you got the information from Jane Doe 3 and
6  you were talking about a letter that my office had
7  prepared.
8  A.      Right.
9  Q.      Was this that letter?
10  A.      No.  This is the one on Jane Doe 3,
11  which came a week later.
12  Q.      I'm sorry.
13         Are the contents the same?  If you flip
14  through, is that --
15  A.      Oh, the same type of letter?
16  Q.      Yes.
17  A.      I mean, yes.  It had all this stuff in
18  it about preserving --
19  Q.      Okay.
20  A.      -- electronic data and imaging.  Yes, it
21  had all of that.
22  Q.      And given the language in that letter --
23  I can that one back from you -- did you -- given
24  that it's highly illegal, did you speak with

Page 164

1  Defendant Roth regarding it?
2  A.      I mean, he and Gary Bender and I spoke
3  about it.  I sent -- I know I sent a copy to Gary
4  Bender.  I don't remember whether I included --
5  but I -- I was going to say I'm sure he was given
6  a copy by Mr. Bender, but I can't verify.  I can't
7  attest that I saw that.
8  Q.      Did you or do you know if anyone on
9  behalf of the county ever took possession of the
10  devices the county issued to George Halcovage
11  after Jane Doe 1 allegations?
12  A.      Not to my knowledge.  I know that he had
13  numerous devices, iPads, whatever, laptops, like
14  four or five or something.  I don't know that even
15  by the time I left anybody had taken those -- had
16  been in possession of those, exempt for
17  Commissioner Halcovage.
18  Q.      Do you know why no one on behalf of the
19  county took possession of his items, electronic
20  devices issued by the county?
21  A.      No, I don't.
22  Q.      Did you ever have any conversations with
23  anybody about the fact that that should be done?
24  A.      We had conversations about the fact -- I

Page 165

1  know that IT was notified as far as no devices.
2  Like you couldn't delete anything from the devices
3  and things like that, those conversations I know
4  happened.
5  Q.      Between whom?
6  A.      I know that Gary Bender told me he had
7  contacted the director of IT, letting him know
8  that we had letters that information on these
9  particular devices, whether it was not just if
10  they were issued to George, if they were issued
11  to, I believe, Gary Bender, myself, and I believe
12  Solicitor Roth.
13  Q.      Do you know, did Defendant Bender ever
14  say to Defendant Halcovage, don't delete anything
15  on the devices you have?
16  A.      I'm assuming he did, but he got the same
17  letter we did, so he already knew.
18  Q.      But you don't -- you never --
19  A.      I was never part of that conversation,
20  no.  It doesn't -- I don't know whether it did or
21  didn't happen.
22  Q.      At any point during your employment with
23  Schuylkill County, were there discussions about
24  referring Defendant Halcovage to any criminal

Deposition of Debra Twigg - Revised

Jane Doe, et al. v. Schuylkill County Courthouse, et al.

Page 166

1 agency?
2 A.      Once I completed the final report, I was
3 instructed to give it to the district attorney, to
4 give him the investigation notes, as well as
5 interview notes.  The final report and the letter
6 that Jane Doe 1 wrote, to provide that to the
7 district attorney to see if there was anything
8 criminal that had been done.
9        I know that after reviewing it, the
10 district attorney turned it over to the attorney
11 general's office.
12 Q.      Other than the district attorney and the
13 referral to the attorney general's office, was
14 there any -- to your knowledge, any referral to
15 any other outside-the-county agency?
16 A.      I don't think so.
17 Q.      Do you know how the house of
18 representatives became involved?
19 A.      Oh, I think there was -- I think the
20 representatives from Schuylkill County made --
21 wrote a resolution and it was sent -- I don't know
22 how the whole process in the state house, but I'm
23 learning more about it.  From there they became
24 involved is my understanding.

Page 167

1 Q.      So do you have any knowledge of anyone
2 from the county during your employment, I guess or
3 thereafter, of referring this matter to the house,
4 the senate, or anyone for impeachment purposes?
5 A.      When you say referring this matter, I
6 don't understand.
7 Q.      Like picking up the phone and calling
8 them and saying, hey, we need to get this guy
9 removed, we can't fire him?
10 A.      I mean, there was something that --
11 there was some sort of -- oh, God.  Something that
12 comes on an app that -- like somebody did a
13 petition on an app, I know that went around.
14 People were signing that.  I know --
15 Q.      Who was signing -- who signed that, if
16 you recall?
17 A.      Well, it was sent to me, if I wanted to
18 sign it.  I don't know who.  Supposedly they
19 collected 500 or a thousand signatures, something.
20 I don't know.
21 Q.      This wasn't an official petition of the
22 county?
23 A.      No.  No.  No.  I mean, I know there
24 were -- I know what I read in the paper.  You

Page 168

1 know, the elected officials in the courthouse
2 wrote a letter suggesting that he resign.  The
3 represent -- different people, Republicans in the
4 county, I know had urged him -- or I am told --
5 had urged him to resign.
6 Q.      To your knowledge, did Defendant Bender
7 refer Defendant Halcovage for impeachment?
8 A.      Not to my knowledge.
9 Q.      Did Defendant Roth, to your knowledge,
10 refer Defendant Halcovage for impeachment?
11 A.      Not to my knowledge.
12 Q.      If we look down at the bottom of this
13 page, there's -- it looks like more bolded type.
14 Do you see that?
15 A.      Yup.
16 Q.      It says third line down at the end, it
17 starts with:  Attorney Rothman notified Casey
18 Trek(ph), claim manager with Pennsylvania county's
19 municipal court or PCoRP.  PCoRP is the county's
20 insurance correct, correct?
21 A.      I believe so.
22 Q.      Do you have any knowledge of what role
23 Defendant Halcovage plays with PCoRP?  If he's on
24 a board or has any connection?

Page 169

1 A.      I don't know.  I mean, two and a half
2 years ago I might have.  I don't know if he -- I
3 don't know.  Sorry.
4 Q.      You're fine.
5        It Indicates -- in the next paragraph,
6 I'm sorry.  It indicates:  Glenn and I were
7 advised by counsel to speak with the other two
8 commissioners to determine if they had any
9 knowledge of any concerns and/or complaints of
10 inappropriate behavior.  Who is the counsel, is it
11 an attorney for PCoRP or was it at that point
12 somebody who had been assigned to you?
13 A.      It was -- what was his name?
14 Christopher Scott, I believe was the guy.
15 Q.      And it was at his suggestion or advice
16 --
17 A.      Yeah.  I believe that's -- yes.
18 Q.      It was his suggestion and/or advice that
19 you spoke with Commissioner Hess and Commissioner
20 Hetherington?
21 A.      Yes.
22 Q.      So the next page we have, there is you
23 speaking with Commissioner Hess, correct?
24 A.      Yes.

Page 170

1  Q.      So I guess my question is: Did you
2  speak with Mr. Hetherington?
3  A.      No, because he had only literally -- in
4  some ways I feel bad for him.  The poor guy, I
5  mean, Commissioner Staudenmeier passed away very
6  late February, early March, and so commissioner
7  Hetherington had only been there a month.  By that
8  time, you know, Jane Doe 1 was always working from
9  home or furloughed or whatever it was.  There was
10 no reason to talk to him.  He had no clue.
11 Q.      Okay.
12 A.      Sorry.  If Staudenmeier had been there,
13 it would have been a whole different story, but,
14 you know, God bless him.
15 Q.      Understood.
16 A.      And I spoke with everybody in the
17 commissioner's office.
18 Q.      So those are some of these people that
19 are listed?
20 A.      Uh-huh.
21 Q.      We'll go through them.
22         At any point did Commissioner Hess
23 indicate to you that he had had concerns about
24 George's behavior?

Page 171

1  A.      Yes.  He had -- and I am trying to -- I
2  wanted to read to see if it jogs my memory.
3  Q.      Sure.  Take your time.
4  A.      When we talked to him, he had made
5  this -- well, it's like you said, he -- he knew
6  that she was in his office regularly.
7  Q.      Stop you there for a second.
8          She meaning Jane Doe 1?
9  A.      Yes.
10 Q.      Was in whose office?
11 A.      George's office.
12 Q.      Hess told you that Jane Doe 1 was
13 routinely in George's office?
14 A.      When we interviewed him.  And Glenn sat
15 with me when -- when I interviewed Commissioner
16 Hess.  He had said that, yeah, he knew that George
17 would come in, go to tax assessment.  He spent --
18 George spent a lot of time over in tax assessment.
19 And he had -- and Commissioner Hess had seen Jane
20 Doe 1 go into George's office, door was closed.
21 He doesn't know what went on.  He doesn't know
22 what conversations happened.  But he did state
23 that at one point, he told her she didn't have to
24 be in there -- she didn't have to go in there and

Page 172

1  have the door closed if she was uncomfortable, I
2  think is how he put it.  That's really all he ever
3  said.
4  Q.      The next meeting you have is with Mary
5  Beth Heffner.  Who is Ms. Heffner?
6  A.      She was the receptionist in the
7  commissioner's office.  She started after I did.
8  Q.      She indicated that she was aware, as of
9  June 12, 2020, that Jane Doe 1 had retained an
10 attorney regarding claims of sexual harassment, a
11 hostile work environment against George; is that
12 right?
13 A.      Yes.
14 Q.      Did she tell you who told her that?
15 A.      Yes.  Actually, no.  Yes and no.
16         Gary Bender told me that he had
17 informed -- because it was going to obviously take
18 up a lot of our time, he had informed his staff,
19 of which Mary Beth, Wendy, I can see her, but I
20 can't think of her name.  Who is the next one?
21 The clerk of courts, oh dear Lord.
22 Q.      Linda Dietrich?
23 A.      Linda Dietrich, yes.  And once he told
24 me that, I mean, HR was down to two people, myself

Page 173

1  and the benefits administrator.  And I also let
2  her know that we had received a claim because
3  suddenly my time -- I mean, it was just two of us
4  and we were stretched to begin with.  And it's
5  like, look, I'm going to be busy, so guess what,
6  you know, fill in as the operator, you are going
7  to have to do more of that, I am not going to have
8  time to do it because we took turns, every --
9  Q.      This was whom you were informing?
10 A.      The benefits administrator.  It was the
11 only other person in HR at that point in time
12 because everyone else was furloughed.
13 Q.      Okay.
14 A.      I wanted her to know I was going to be
15 out of the -- I was going to be spending a lot of
16 time on an issue and I said it's strictly
17 confidential, please don't discuss it with -- and
18 I trusted her that she wouldn't.
19 Q.      Do you know, did Defendant Bender take
20 the same precautions and inform Ms. Hefner that it
21 was strictly confidential and she should not
22 disclose it?
23 A.      I would assume so.  I don't know.
24 Q.      When you spoke with your staff, did you

Page 174

1  disclose the parties involved and their names or
2  just that there was a matter that you were working
3  on?
4  A.      No.  I -- I -- I simply said that we
5  received a sexual harassment, hostile work
6  environment claim against Commissioner Halcovage.
7  Q.      Do you think it was appropriate for
8  Defendant Bender to inform Ms. Hefner that the
9  sexual harassment, hostile work environment claims
10 against Halcovage were brought by Jane Doe 1?
11 A.      No, it probably wasn't appropriate.
12 Q.      HR is supposed to keep names and parties
13 confidential, correct?
14 A.      Yes.
15 Q.      In fact, I think you indicated earlier
16 that this became very well known in the county,
17 correct?
18 A.      Uh-huh.
19 Q.      Is that a yes?
20 A.      Sorry.  Yes.  Yes.
21 Q.      Do you believe that that could have been
22 avoided if individuals would not have shared names
23 with individuals who were not on the need-to-know
24 basis?

Page 175

1          MR. LETTRICH:  Object to the form.
2          But you can answer.
3          THE WITNESS:  I think it certainly
4  could have kept knowledge of the individuals to a
5  minimum, yes.
6  BY MS. SMITH:
7  Q.      Ms. Hefner indicated that she was afraid
8  of Gary Bender.  Did she tell you why?
9  A.      Look, he could be gruff.  He could be --
10 his demeanor could be gruff.  He could be
11 downright angry, vindictive.  I mean, A lot of
12 people are afraid of him, not just Mary Beth.
13         MS. SMITH:  It's about 1:00.  I
14 don't know how everyone is doing.  We're going to
15 break for lunch.  Are you okay with that?
16         THE WITNESS:  Yeah.
17              - - -
18    (Whereupon luncheon recess was held off
19 the record 1:01 p.m.)
20              - - -
21         THE COURT REPORTER:  Mr. Lees, will
22 you need a copy of the transcript?
23         MR. LEES:  I will yes, please.
24 BY MS. SMITH:

Page 176

1  Q.      We were on -- going through Exhibit-71
2  before we took lunch.  I think we were on the
3  Wendy's Slanta portion there.  I don't know what
4  page it's on, but --
5  A.      Sorry.
6  Q.      It's okay.
7          I just want to direct your attention to
8  the first sentence, I confirmed with Wendy that
9  she was aware that Jane Doe 1 had retained an
10 attorney about George Halcovage.
11         Do you know who told Wendy about --
12 A.      She also works in the commissioner's
13 office.  It's my understanding that Gary Bender
14 told his staff, so that would be Wendy, Mary Beth,
15 and Linda.
16 Q.      Going down to the last paragraph on that
17 page in the last few lines, she says -- you write,
18 she used the example of Jane Doe 1 who had gotten
19 a DUI.  She stated that George had gotten her ARD
20 and he also got her the job in tax assessment.
21 She was getting divorced.
22         Did Wendy indicate to you from whom she
23 had heard this information?
24 A.      No.  And I didn't ask.  I just listened

Page 177

1  to what she had to say.
2  Q.      It goes on to talk about something that
3  Wendy had learned about Jane Doe 2.
4          Did she tell you where she got that
5  information?
6  A.      No.  I assume, based on the fact that it
7  was something to do with the -- I assume it was
8  working in the commissioner's office, but that's
9  an assumption on my part.
10 Q.      If we go to the middle of the page, the
11 next page, not the one with the bullet about
12 Wendy, but the one you're on.
13         MS. SMITH:  For the record and for
14 those individuals in the room, I am talking about
15 the page where the first word is prison.
16 BY MS. SMITH:
17 Q.      And then if we go fifth full paragraph
18 down, Wendy said that Gary had complained about
19 the, me too comments against George Halcovage.
20         Do you know what me too comments against
21 George Halcovage she was referring to?
22 A.      I believe what she was talking about,
23 and this happened before I got there, so all I
24 know is what hearsay, what I've been told.  There

Deposition of Debra Twigg - Revised                    Jane Doe, et al. v. Schuylkill County Courthouse, et al.

Page 178

was an incident with an individual who said he
felt threatened by George, it had something to do
with, they were both in an elevator.  There was a
discussion going on.  He stopped -- he stopped the
elevator the finish the conversation.  She said
she felt threatened, I think is what it refers to.
Q.      Okay.
        The next sentence says, Wendy said that
those that have problems in life help on elections
and get ahead.
        Do you know what she was referring to
with having problems in life?
A.      No.  I didn't ask specifically again.
Q.      And then the last sentence it says, she
said she had a hard time with Christians treating
people the way they do.
        Do you know, was she referring to anyone
in particular?
A.      No.  She didn't mention anyone in
particular.  I mean, it was in the context of the
conversation, so I'm guessing maybe she was
referring to George.  I don't know.
Q.      If we go down a couple paragraphs,
Wendy' said had been called a liar.  Then it goes

Page 179

on to talk about how if she had a problem, he is
the first one to say she better get over it.
        The he is Gary Bender, correct?
A.      Right.  Yes.
Q.      And then the next sentence is:  Wendy
questioned why a man can do something, but a woman
can't.
        Do you know, was Wendy talking about why
a man can do something but a woman can't,
generally or at the county?
A.      Can you show me where it is in here so I
can read the context?
Q.      Wendy questioned why.
A.      I think she's referring -- where it
talked about -- the next sentence talks where she
had gone home sick, where she got docked for pay
even though -- when she left early, but others, in
particular guys, she felt could leave and not
suffer.
Q.      So Wendy's kind of summary there that a
man can do something but a woman can't, meant at
individual employees of the county?
A.      Right.  With work time.  But it should
also be noted that Wendy is a nonexempt employee

Page 180

and Gary obviously is an exempt employee.  So he
doesn't have to monitor his time, which is why I
didn't -- to me, it was like -- it's like, okay,
I'm not going to get into this with her, that
wasn't the point of the conversation, but I knew
that she was a nonexempt.  I knew that he was
exempt, so to me, that wasn't really an issue to
address.  It was -- I wasn't going to get into
explaining all that.  I had too much to do at that
time.  Sorry.
Q.      No.  I am just trying to understand.
        The last sentence in that paragraph,
they had a point to make.
A.      Okay.
Q.      So if we look at that last sentence,
which refers to Dave Urkle and then we look at the
next -- the paragraph two down from there, which
says Wendy said she was so frustrated?
A.      Uh-huh.
Q.      Is that the time she went to Dave Urkle
that is referred to in that earlier sentence about
George telling her she had to learn her place?
A.      Yes.
Q.      Turning to the next page.

Page 181

        The first full paragraph, Wendy stated
that George has had Mary Beth do things for his
insurance business.  It also says she's also said
he says off-color things.  She was uncomfortable.
        The he is George Halcovage?
A.      Yes.
Q.      And do you know, did she tell you any
uncomfortable things that -- things that George
had said that she believed made her uncomfortable?
A.      She didn't give specifics.
Q.      The next sentence, but it's going down
to the second part of it on the next line, George
had her put something on her computer that she was
not comfortable with, some sort of video.  She
objected and said he was the commissioner, they
won't do anything to him.
        Did you get any more specifics about the
video that he showed her?
A.      Not that I remember at this point, no.
Q.      Did you know who she was referring to
regarding the, they won't do anything to him?
A.      No.  You can't -- one thing I learned in
the county, you can't discipline a commissioner,
no matter how it is.

Deposition of Debra Twigg - Revised                                    Jane Doe, et al. v. Schuylkill County Courthouse, et al.

Page 182

1 Q.    Okay.

2 A.    Or an ed official, for that matter.

3 Q.    If we go down a couple paragraphs, the
4 one that says when Wendy switched jobs.  If you
5 look to the second line, Wendy said that she had
6 been demeaned.  There said she never in her life
7 been put down like she has been there.

8       Is this referring to the -- she's
9 never -- she said she's been demeaned there.  Is
10 that the commissioner's office?

11 A.    It was by Mark Scarbinsky.  And Mark
12 Scarbinsky was the court -- the county
13 administrator prior to Gary Bender.  She was
14 referring to things that he had said to her.

15 Q.    The next paragraph, the singular
16 sentence:  Wendy said that Jane Doe 1, Jane Doe 2,
17 and Jane Doe 3 used George Halcovage to get stuff
18 from him.

19       Did she provide you any specifics
20 regarding that?

21 A.    No.  I think she was implying
22 advancements in jobs and increases in salaries.

23 Q.    If we look to the Linda Dietrich
24 section, I think you already confirmed this, but

Page 183

1 you believe that Bender had informed her about
2 Jane Doe 1 being involved and George being the
3 subject of the investigation?  Is that a yes?

4 A.    Yes.  Oh, sorry.

5 Q.    That's okay.

6       There's a, some things were said
7 sentence.

8 A.    Sometimes things were said that she
9 thought he may not have known or well enough to
10 know whether she would be offended or not, she was
11 not offended --

12 Q.    Is that --

13 A.    That's what she had said.

14 Q.    Is that sentence that -- it talks about
15 someone saying something that might have offended
16 someone --

17 A.    Linda was saying that -- I asked if
18 he -- if George had ever made comments that she
19 found offensive.  She said there had been comments
20 made, she didn't feel he knew her well enough to
21 know whether she'd be offended or not.  She wasn't
22 offended, but he didn't know.  And she, you know,
23 thought it probably shouldn't have been said,
24 unless he knew whether or not she'd be offended.

Page 184

1 Q.    Just so I am clear, the he being George?

2 A.    Yes.

3 Q.    Defendant Halcovage?

4 A.    Yes.

5 Q.    If we go to next page, Zoom meeting with
6 Glenn Roth?

7 A.    Yes.

8 Q.    Did you decide to interview Glenn Roth
9 or did he come to you and offer to speak with?
10 You how did that transpire?

11 A.    I think I thought I should interview
12 Glenn Roth because in talking with Jane Doe 3 and
13 Jane Doe 4, they had indicated he was present for
14 certain comments that had been said and he made
15 comments, supposedly made comments to them, you
16 know, about loyalty, so I needed to get his
17 perspective.

18 Q.    At any point during your conversation
19 with Glenn Roth, did you ask him, being that he
20 had admitted to observing or learning certain
21 things, why he never came to you?

22 A.    I don't recall, unless it's in here and
23 you can point me to a paragraph.  I don't -- I
24 would think he would have felt that they could

Page 185

1 come to me directly if they had enough of an
2 issue.

3 Q.    As the HR director, do you believe that
4 Glenn Roth, in his capacity as city solicitor and
5 risk manager, if he knew of sexual harassment
6 occurring, should have reported it to someone?

7 A.    Yes.

8 Q.    Who do you believe he should have
9 reported it to?

10 A.    To me, the HR director at the time.

11 Q.    Do you believe having obtained the
12 information in this report from Glenn Roth, that
13 there are things he knew or observed that he,
14 under the county policy, was obligated to report
15 to HR?

16 A.    Can I take the time to read it?

17 Q.    Sure.

18 A.    Well, I mean, in the first paragraph it
19 talks about that he admitted he heard a joke made
20 in front of him and Jane Doe 3, made a comment
21 that she liked sex.  Glenn and Jane Doe 3 kind of
22 rolled their eyes and shook their heads.  George
23 is one that likes to joke.  He's already told
24 Glenn and his wife that they should go parking.

Page 186

1  That, I mean, I guess if he was offended, he
2  should have said something.
3       He indicates that Jane Doe 3 had relayed
4  that George had made a joke to Jane Doe 4 about
5  being on her knees and that he had made a joke
6  about popsicles.  You know, those things -- I
7  think that happened before I was there, though.
8  Q.     But in any event, he should have
9  reported it --
10 A.     Yeah.
11 Q.     -- to who was in your position?
12 A.     Yes.  I think any comments that were
13 made that concerned -- if they expressed a concern
14 to him that -- Jane Doe 3 expressed a concern to
15 him that she was offended by a comment that was
16 made, joke that was made and it was told to him, I
17 believe he should have also referred it to HR.
18 Q.     Okay.
19      If Jane Doe 3 hadn't used those words,
20 but had said, I don't like when George makes these
21 comments, would that be something that Defendant
22 Roth should have referred to HR?
23 A.     Yes.
24 Q.     If Jane Doe 3 had said, I have concerns

Page 187

1  about George's behavior and the disruptions of my
2  offices, is that something Glenn Roth should have
3  referred to HR?
4  A.     Yes.
5  Q.     If we turn to the page which begins your
6  statement, which is probably two pages later.
7  A.     Yup.
8  Q.     Above your statement is a continuation
9  of Glenn Roth?
10 A.     Uh-huh.
11 Q.     This portion discusses -- it does
12 mention an issue with the Loudermill hearing?
13 A.     Uh-huh.
14 Q.     Is that the issue you were testifying
15 about earlier regarding the coroner's office?
16 A.     Yes.
17 Q.     So Glenn was aware of the issue?
18 A.     Yes.
19 Q.     And do you believe that Glenn's
20 statements that you can always break a contract
21 and it wouldn't be considered illegal, it was just
22 one person's moral views, different from anothers,
23 do you believe that that is incorrect?
24 A.     Yes.

Page 188

1  Q.     Do you believe that what his
2  viewpoint -- Mr. Roth's viewpoint expressed to you
3  during his interview was in violation of law?
4  A.     Yes.  He said in his statement, and this
5  is exactly why I made this statement, he made the
6  statement that the county administration would
7  never, never, in that tone, tell someone, an
8  employee, a director, head department, head
9  whatever, to do something that was illegal.  And I
10 literally the next day pulled out the U.S. Supreme
11 Court case and said, okay, so Loudermill, Supreme
12 Court says this is what's going forward.  So we
13 don't really have to pay attention to that.  Then
14 I said something that really is interesting,
15 because I said, oh, Roe versus Wade, we don't have
16 to abide by that anymore.  Well, technically now
17 we don't, but that's another issue.
18      It's like -- so when the Supreme Court
19 says something, it really -- it's really not
20 important because we don't have to abide by it.
21 Needless to say, I was being facetious and I was
22 annoyed and trying to make a point.
23 Q.     Then your statement goes on to detail --
24 this is the events leading -- that kind of

Page 189

1  surround that Loudermill issue, correct?
2  A.     Uh-huh.
3  Q.     This November 2019, event?
4  A.     Yes.
5  Q.     And then we have Gary Bender's
6  information provided to you.  Who made the
7  decision to speak with Defendant Bender?
8  A.     I believe I did.  Again, it was matter
9  of interviewing everybody who was -- who may have
10 had some information.
11 Q.     The second full paragraph, there's an
12 incident that Gary recalled regarding George.  And
13 in the second to last line you write:  He said he
14 knew what George meant, however he did not think
15 it was funny.
16      Did Gary tell you what he thought George
17 meant?
18 A.     No.  Do I have my own impression?  Yes.
19 Q.     What's your impression?
20 A.     Basically of a male's physical and --
21 rubber gloves.
22 Q.     Gotcha.
23 A.     That's what I understood it to be, but
24 he never said that because that part, Gary would

Page 190

1  never make those kind of statements in mixed
2  company, I know that.
3  Q.      The next paragraph indicates that Gary
4  went out to each of the women and apologized and
5  asked them if they were uncomfortable.
6        Do you know if Gary Bender ever
7  approached Jane Doe 3, Jane Doe 4, Jane Doe 1, or
8  Jane Doe 2 and asked them if they were
9  uncomfortable by what George had done?
10 A.      No.  The only conversation I'm aware of
11 that he was in was the one that -- when we
12 interviewed Jane Doe 2, Jane Doe 2, and we were
13 all there and it was obvious she was upset.
14 Q.      What was -- after Jane Doe 2's interview
15 with Mr. Bender present, did you have a
16 conversation with him about the contents of what
17 she disclosed?
18 A.      Yes.  There were several conversations.
19 Q.      Did Defendant Bender ever tell you
20 anything about whether he believed what she had
21 reported or his feelings about it?
22 A.      Yes.  I think he did believe what she
23 said.
24 Q.      If we go back to Gary Bender's

Page 191

1  statement, the next -- the paragraph that starts
2  with Gary recalled an incident with Michelle
3  O'Connell?
4  A.      Uh-huh.
5  Q.      If we go down about midway through, it
6  indicates she said she wanted to show him
7  something, she said she was planning on showing
8  him before she left, but since she was -- since he
9  was there, she would show him now.  Then she
10 showed him a text message from her phone that was
11 sent by George Halcovage at approximately
12 2:00 a.m.  He couldn't recall the date, but while
13 it was -- but it was while she was employed by the
14 county.  The message stated, no deck party
15 tonight?
16 A.      Uh-huh.
17 Q.      Did Mr. Bender ever indicate whether he
18 had reported this to anybody?
19 A.      He mentioned -- she was -- she had --
20 she was resigning or had resigned and he mentioned
21 it to me and he wanted me to speak with her before
22 she left and I did.
23 Q.      Did she recall the same --
24 A.      Yes.

Page 192

1  Q.      -- thing for you?
2  A.      Yes.
3  Q.      Did she show you the text message?
4  A.      Yes.
5  Q.      What happened after that?  What, if
6  anything, was done?
7  A.      Well, it had happened a period of time
8  before.  By the time it got to Gary and to myself,
9  it had long since happened.
10 Q.      Okay.
11        So it wasn't --
12 A.      So it wasn't anything recent.  It was --
13 I don't think it was -- I don't remember the date
14 that it was.
15 Q.      Did you see the text message yourself?
16 A.      I didn't look at the time of it.  I
17 mean, I didn't look at the date.  I didn't -- if I
18 did, I didn't -- two and a half years later, I
19 don't remember.
20 Q.      Do you know if there was anything
21 documented in Defendant Halcovage's personnel file
22 for the county?
23 A.      No.
24 Q.      Two paragraphs down it talks about

Page 193

1  Defendant Halcovage going into Gary Bender's
2  office and requesting -- is that Michelle still
3  Michelle O'Connell?
4  A.      Yes.
5  Q.      Requesting she get signatures for him on
6  a petition?
7  A.      Yes.
8  Q.      Was it your understanding from your
9  conversation with Mr. Bender that this request by
10 Defendant Halcovage was during work hours?
11 A.      Yeah, because Michelle was sitting in
12 Gary's office when it happened, so I would assume
13 it was, yes.
14 Q.      And do you know if this request was when
15 Michelle O'Connell was still a county employee?
16 A.      Yes.
17 Q.      And do you know, did Gary before this
18 statement to you on June 12th, did Mr. Bender
19 report Defendant Halcovage's request that
20 Ms. O'Connell get him signatures to anyone?
21 A.      Not to me.  This was the first I heard
22 of it.
23 Q.      In the very last sentence it indicates
24 that Defendant Bender told Defendant Halcovage

Page 194

1 that his request was illegal.  Did Defendant
2 Bender ever tell you if he had reported this
3 illegal activity by a county commissioner to any
4 investigating agency?
5 A.      No.
6 Q.      Do you know if he did?
7 A.      No.  I don't know the time frame of when
8 that conversation happened.
9 Q.      Then we have a conversation you had with
10 Deb Detweiler on June 12th, this next page.
11        She indicates -- you write:  I asked if
12 she was aware of a conversation concerning
13 Virginia Murray's sexual orientation.
14        Did you ever speak with a Virginia
15 Murray?
16 A.      No.  She no longer worked at the
17 courthouse and I didn't want to involve her.
18 Q.      Regarding Virginia Murray, during your
19 employment with the county, did Defendant Bender,
20 Halcovage, or Defendant Roth discuss express their
21 opinion of her work performance?
22 A.      There were conversations, yes.
23 Q.      Were their opinions in those
24 conversations favorable or did they dislike

Page 195

1 Ms. Murray?
2 A.      Their opinions were not favorable, but
3 it wasn't whether they disliked her as a person.
4 They just didn't feel she was as qualified as she
5 needed to be.
6 Q.      And that was as a chief assessor?
7 A.      Yes.
8 Q.      Do you recall an incident or a
9 conversation about an error Ms. Murray had made,
10 something about a $17 million error on the
11 county's annual certification for repository
12 sales?
13 A.      It sounds familiar, but I couldn't tell
14 you the details.
15 Q.      So you don't know if you had had a
16 conversation with Defendant Roth, Bender, or
17 Halcovage about it?
18 A.      Not in detail.  I mean, there may have
19 been she made a huge mistake or something like
20 that, but it wasn't -- I didn't get all the
21 detail.
22 Q.      Okay.
23        Do you recall Defendant Bender, Roth, or
24 Halcovage being -- expressing disbelieve of how

Page 196

1 such an error could be made?
2 A.      Really what I remember are comments that
3 she just wasn't qualified.  She didn't know the
4 duties.  She didn't know how to do her job, is
5 what it sort of focused around.
6 Q.      Did you learn at any point that since
7 your resignation from the county, that Ms. Murray
8 has been, I don't know if it's rehired or brought
9 back as a contractor?
10 A.      I read it in the paper.
11 Q.      Do you believe, based off of what you
12 know and what conversations you had with Defendant
13 Bender, Roth, and/or Halcovage that she is
14 qualified to perform --
15 A.      No, I certainly don't think she is.
16 Sorry.
17 Q.      Let me finish.
18 A.      Oh, sorry.
19 Q.      Qualified to perform the duties of chief
20 assessor, assistant chief assessor?
21 A.      No.  There were so many conversations
22 about her not being qualified and her -- them
23 being happy that she was resigning.  And when I
24 read it in the paper, I was flabbergasted.  Like,

Page 197

1 why would you bring someone back that you thought
2 was so unqualified.  Sorry.
3 Q.      No, I appreciate it.  Thank you.
4        Did any of the defendants ever express
5 similar opinions or just opinions in general,
6 about Chrissy Zimmerman and her qualifications?
7 A.      Qualifications for what?  For her
8 current position or for the -- because she's in a
9 different position than when I was there.
10 Q.      So when she was -- when you were there,
11 she was just --
12 A.      She sat out in the front at one of front
13 desks.  She was, I don't know, a clerical person
14 for what I understand.
15 Q.      In assessment?
16 A.      Yes.  I believe, yeah.
17 Q.      So let me ask it this way:  Based off of
18 what you know having worked at the county and/or
19 conversations with any of the defendants, do you
20 believe that Chrissy Zimmerman is qualitied to
21 hold the position she currently holds?
22 A.      In her current position is what,
23 supervisor?
24 Q.      I believe she's interim assistant chief

Page 198

1  assessor.
2  A.      Not unless she's had a whole lot of
3  education since I left.
4  Q.      Turn to the next page.  I want to take
5  you to the first full paragraph.
6         Deb was then informed by Jane Doe 2 that
7  she was removed from the drug and alcohol advisory
8  board, not by her choosing.
9  A.      Uh-huh.
10 Q.      Do you know who removed Deb Detweiler
11 from the drug and alcohol advisory board?
12 A.      I do not.  But, again, it would have
13 been something that was voted on by the
14 commissioners.
15 Q.      This Melissa that's reference there, do
16 you know -- I'm going to butcher her last name, so
17 I am not even --
18 A.      Kalyan.
19 Q.      Was Melissa Kalyan, do you know,
20 terminated from the county?
21 A.      I believe I read that in the paper.
22 Q.      Do you have any knowledge as to why?
23 A.      Firsthand knowledge, no.
24 Q.      Do you have any reason based off your

Page 199

1  conversation with Ms. Detweiler to believe that
2  anything she relayed to you was not true?
3  A.      No.
4  Q.      There's then a conversation or the notes
5  regarding the conversation you had with Ann Craft.
6  Do you see that?
7  A.      Uh-huh.
8  Q.      Who is Ms. Craft?
9  A.      She is -- she was -- still is, the
10 administrative assistant in the human resource
11 office.  She is also the same friend that I
12 mentioned I wanted -- I'd gone to high school with
13 her, wanted to hire her in that position and where
14 I was told to have her change her political party.
15 Q.      The information that Ann Craft relays
16 regarding the text message there in that first
17 paragraph, you were actually witness to it,
18 correct?
19 A.      I was with her when she received it,
20 yes.
21 Q.      Is what Ann Craft informed you of what
22 you recall from that event?
23 A.      She -- we had been to a -- it was her
24 birthday.  We had gone to a James Taylor and

Page 200

1  Bonnie Raitt concert.  We came out, it was
2  starting to sort of sleet.  The weather was bad.
3  She checked her phone and saw that she had gotten
4  a text from Commissioner Halcovage.  She was sort
5  of creeped out about it because she said she never
6  gave him her phone number.  We talked about how he
7  could have possibly gotten her personal cell
8  phone.  I said maybe he went into the office to
9  wish you a happy -- because we left early that day
10 to go to the concert.  Maybe he went in to the
11 office to wish you a happy birthday.  Maybe they
12 gave him your number.
13        We checked with all three employees in
14 the HR office on Monday.  This was a Friday night.
15 None of them had given him her personal cell phone
16 number.
17 Q.      Going to the next page, Tiffany Mayer.
18 A.      Yes.
19 Q.      Based off of your conversation or
20 interview with Ms. Mayer, is there any reason that
21 you had to disbelieve what she relayed to you
22 during that conversation?
23 A.      No.
24 Q.      Then we have Helene O'Connor is the

Page 201

1  final.  Other than what -- other than Helen
2  O'Connor, was there anyone else -- well, Jane Doe
3  1 and George Halcovage -- that you interviewed in
4  connection with your investigation?
5  A.      I don't think so.  I would have written
6  them up.
7  Q.      Okay.
8         Again, sometimes these questions seem
9  obvious, but we just have to kind of clear some
10 things up.
11        Based off your conversation with Ms.
12 O'Connor, was there any reason that you had to
13 disbelieve her?
14 A.      No.
15 Q.      We can put that one aside.
16        We now have yesterday's 69.
17        You now have before you interview
18 questions from Jane Doe 1 concerning an
19 investigation of sexual harassment.  It's
20 previously been marked as Exhibit-69.
21        Does this document look familiar to you?
22 A.      Yes.
23 Q.      And are these questions that you asked
24 Jane Doe 1 as a result of the May 22nd e-mail?

Page 202

1  A.      Yes.
2  Q.      Were these questions pre-written before
3  you spoke with Jane Doe 1?
4  A.      Yes.  I came up with some questions to
5  ask, yes.
6  Q.      You had them written down and then took
7  notes as you spoke with Jane Doe 1?
8  A.      Yes.
9  Q.      These questions and the answers then
10 provided, the notes regarding them were for the
11 meeting between you, Jane Doe 1, in which Mr. Roth
12 and I were present, correct?
13 A.      Yes.
14 Q.      I think you already answered this, I
15 apologize, after speaking with Jane Doe 1, was
16 there any reason you had to disbelieve what she
17 relayed to you?
18 A.      No.
19 Q.      Do you recall when this interview was
20 conducted?
21 A.      No.  But I believe it's in my -- my
22 final reports.  It was some time between -- I
23 think it took a while to get your schedule and
24 hers together and Glenn's.

Page 203

1  Q.      Do you know --
2  A.      It was in the month of June, I can tell
3  you that because they were all done -- by the end
4  of June I was typing up the report, the final
5  report.
6  Q.      Do you know if your interview with Jane
7  Doe 1 occurred before or after the first interview
8  with Defendant Halcovage?
9  A.      I believe it was after because I think
10 the reason I asked for the second interview was
11 there were discrepancies between George's
12 interview and Jane Doe 1 interview and I wanted to
13 determine -- somebody -- there were discrepancies.
14 Somebody wasn't being totally honest.  I didn't
15 know Jane Doe 1 well enough and hadn't had
16 conversations with her that I could ask her
17 questions that I would -- like about conversations
18 she and I had had.  She was an acquaintance.  I
19 knew her to say hello to, to have a casual
20 conversation, but I never really had a real
21 conversation with her.
22         George I knew.  I felt I knew well.  We
23 had had numerous conversations.  I felt I could
24 ask him questions about conversations we had.  And

Page 204

1  some of them would not be seen as positive in this
2  kind of situation and I needed to know if he would
3  still be honest about the answers.  I didn't have
4  that -- that kind of -- I didn't know Jane Doe 1
5  well enough to be able to do that with her.
6  Q.      I'm going to represent to you that your
7  final report says that you interviewed Halcovage
8  on June 10th and June 23rd.  So you believe Jane
9  Doe 1 interview would have been some time --
10 A.      Somewhere between there, yes.
11 Q.      To make you feel better, I'm asking this
12 question because I don't remember and I was there.
13 A.      Okay.
14 Q.      Did you type your answers on a computer?
15 A.      I think I did because I think I was
16 typing as -- because at some point, I started --
17 and I know in George's -- I think in both of his I
18 was typing.
19 Q.      Okay.
20 A.      And I think on hers I was typing as
21 well.
22 Q.      Okay.
23 A.      Because then I didn't have to write and
24 then go back and redo it.  It's like just type and

Page 205

1  I just had to go back and correct misspellings.
2  Q.      These are as contemporaneous as you
3  could with Ms. --
4  A.      Yes.
5  Q.      -- Jane Doe 1, telling you what
6  happened, you were able to type these answers here
7  on this Exhibit-69?
8  A.      Uh-huh.  Yes.  Oh, sorry.  Yes.
9  Q.      Do you recall during the interview, did
10 Defendant Roth ask questions?
11 A.      He may have asked a couple follow up
12 somewhere in here, I believe.  I honestly can't
13 remember.  Again, I ask a question and she talked.
14 And when people did, I just took notes and let
15 them talk and wanted to be sensitive that they
16 felt they were being heard.
17 Q.      Do you know at any point when you worked
18 at the county, did you learn that Jane Doe 1
19 suffered or had an issue with alcohol or
20 alcoholism?
21 A.      Yes.
22 Q.      When did you learn that?
23 A.      I can't tell you the date and time, but
24 I can tell you it was told to me by Commissioner

Case 3:21-cv-00477-MCC   Document 280-1   Filed 09/20/23   Page 57 of 342
Deposition of Debra Twigg - Revised
Jane Doe, et al. v. Schuylkill County Courthouse, et al.

Page 206

Halcovage.

Q.    What was his reason for telling you that?

A.    You'd have to ask him that question.  I don't know the reason why he said it.  I can tell you on occasions, he would come in, sit in my office, talk.  During one of the -- and it wasn't -- it happened regularly.  It wasn't daily, it wasn't necessarily weekly, but it happened regularly.

Q.    The Defendant Halcovage told you about --

A.    That he would come in and sit down and have a conversation.

Q.    Okay.

A.    During one of those conversations, he was -- somehow Jane Doe 1 name came into it.  He talked about how -- talked about her Boyfriend Dock, one-time Boyfriend Dock, that they both were alcoholics, that Dock had taken Jane Doe 1 car, Jane Doe 1 mother's car or something, anyway, had an accident, Jane Doe 1 car and had an accident with it.

        We're going to turn to the page that has

Page 207

questions on it.

A.    Is yours different?

Q.    It's the same.  Just two people produced them, so this one was produced by the county.  This one was produced by us to the county, that's why they are different numbers.

        It's the page with Question 8 going into 9.

A.    Yup.  Okay.

Q.    Do you see the triple I?

A.    Uh-huh.

Q.    The last sentence of that:  Glenn asked if he ever told her he loved her.  She said yes, he told her he loved her.

        Do you recall Glenn asking that question?

A.    Not off the top of my head.  I'm sorry.

Q.    Going down to 12, it says:  Can I ask why you did not come to me concerning this matter.  That was you asking Jane Doe 1?

A.    Yes.  And I had tears in my eyes.  I remember that very clearly.

Q.    Jane Doe 1 told you she didn't know you well enough, George pretty much owned her, and she

Page 208

didn't feel she could.

        With your background in psychology, do you understand why Jane Doe 1 didn't feel that she could come to you?

        MR. LETTRICH:  Objection to the form.

        But you can answer.

        THE WITNESS:  Yes.  I get she was -- look, I get she was afraid.  I feel like -- I feel like I failed her because she couldn't.  Sorry.

BY MS. SMITH:

Q.    Do you understand what delayed disclosure is; are you familiar with that term?

A.    No.

Q.    Knowing what you know about the county, knowing what you know about what's happened since, do you believe that Jane Doe 1 fear of coming forward would be -- if Jane Doe 1 was fearful about coming forward, that it would have been justifiable?

A.    Yes.  Absolutely.

        MR. LETTRICH:  Objection to form.

        You can answer.

Page 209

        THE WITNESS:  Sorry.

BY MS. SMITH:

Q.    You can answer.

A.    Yes.  Absolutely.  The other thing I can tell you, in the fall of 2019, the chamber of commerce has what's known as the young entrepreneurial academy program.  At some point in late summer, early fall of 2019, I had passed Jane Doe 1 in the hall and she made the statement that her daughter was going to enter that program.  Her daughter was a sixth grader, I think.  I'm a mentor in that program so we chatted about it.  She said, oh, would you consider being her mentor.  I said I would.

        I can tell you on the first night of that program -- well, not the first night of the program, the first night that the mentors -- it's a program that goes on for months.  The mentors work with the students on developing, writing a business plan, because I had had my own business, I had been doing that for a few years.

        The first night that the mentors are there, the parents come and participate.  Jane Doe 1 introduced me to her daughter and as we said

Page 210

1 hello, she made a statement which sort of threw me
2 off and she said, oh, yeah, Kelly, this is the
3 woman who can fire me.  And I said, Jane Doe 1,
4 why would you say that.  I don't -- I can't fire
5 you.  So to me, she was fearful already and I
6 should have realized that she was in fear of her
7 job from that statement.  But, again, I just
8 thought, why would -- why would you even make that
9 statement.  Sorry.
10 Q.      You're okay.  Take your time.  If you
11 need a break, let us know.
12 A.      No.  I'm good.
13         Her daughter won, by the way.
14 Q.      This is SCDOJRP258.  It's the George
15 Halcovage questions.
16         Ms. Twigg, these are your notes and --
17 questions and notes from the interview you
18 conducted, interviews I should say, that you
19 conducted of George Halcovage, correct?
20 A.      Yes.
21 Q.      Again, I think you testified to this
22 earlier, but when you were taking -- when you were
23 conducting the interview, you believe both of
24 George Halcovage's you were typing the responses?

Page 211

1 A.      Yes.
2 Q.      Can you tell me just based off your
3 recollection, after the two sets of interviews and
4 the interview with Jane Doe 1, was there anything
5 that you believe that George Halcovage was
6 untruthful about?
7 A.      Yes.
8 Q.      Is there anything that you personally
9 know, based off of what you observed, that you
10 know George Halcovage wasn't truthful about?
11 A.      Yes.
12 Q.      Can you tell us what things you can say
13 based off your observations, he was untruthful
14 about?
15 A.      Can I --
16 Q.      Yeah, take your time.
17 A.      I am looking for the start of the second
18 set of questions, because that's really where the
19 questions about Jane Doe 1.  So that's the ones
20 that I can tell you I know for a fact are the ones
21 that have to do with things he may have said to
22 me.
23 Q.      So you are on pages --
24         MS. FOX:  For everybody else, 544.

Page 212

1         THE WITNESS:  In Question 2A, do
2 you recall being in my office, steering a
3 conversation to that of a sexual nature?  He said
4 he can't answer that at this time.  I know that he
5 did because I go on to talk about the different --
6 BY MS. SMITH
7 Q.      I'm sorry.  Keep going.
8 A.      The different instances.  He recalled
9 telling me about the sexual exploits of controller
10 Christy Joy.  He said because we received an
11 e-mail, yes.  It was either a text or e-mail to
12 all three commissioners about something going on
13 with Christy Joy.  You don't recall telling me
14 about his comments regarding sexual relations.
15 Q.      So if you are going to -- read to
16 yourself.  Either let us know --
17 A.      Okay.
18 Q.      -- because she --
19 A.      Sorry.  So if you go to Question 2 and
20 you go down to -- well, I didn't put a little
21 number there.  It's A, B, and then it starts with
22 because we received an e-mail.  The question was:
23 Do you recall telling me about some of the sexual
24 exploits of Controller Christy Joy.

Page 213

1 Q.      I'm going to stop you there.
2         The you in that sentence, you, Deb
3 Twigg?
4 A.      Do you, George Halcovage, remember --
5 Q.      I'm sorry.
6         The me?
7 A.      -- recall -- recall telling me, yes,
8 Debra Twigg.
9 Q.      So as you sit here now, can you recall
10 the incident which you --
11 A.      Yes.
12 Q.      Can you tell us what happened?
13 A.      I can't tell you how we got on the
14 sexual topic.  I can tell you he talked about --
15 and it might have been that I mentioned I have an
16 inversion, ie, exercise.  I'm getting old.  I get
17 on an inversion table to keep my back stretched
18 out.  I happened to mention the inversion table, I
19 think, that's how I'm guessing we got to there.
20 He talked about Christy Joy having an inversion
21 table and having someone performing oral sex on
22 him while he was on the inversion table, I believe
23 was the gist of the conversation.
24 Q.      Okay.

Page 214

1      Your report indicates --
2 A.     And she was the county controller.
3 Q.     Christy Joy was the county controller?
4 A.     Yes.
5 Q.     And the comment to you was made by
6 Defendant Halcovage?
7 A.     Yes.
8 Q.     Do you recall any other times that
9 Defendant Halcovage mentioned sexual exploits of
10 County Controller Christy Joy?
11 A.     No. I think that was the only time
12 about Christy Joy, I believe.
13 Q.     You go on to talk about a time that he
14 made a comment -- Defendant Halcovage made a
15 comment about the sexual exploits of District
16 Attorney Michael O'Pake?
17 A.     Yup.
18 Q.     Can you talk about that one. Where were
19 you and who made that comment?
20 A.     Again, it was in my office. He made a
21 comment again about Mike O'Pake. Basically --
22 supposedly a -- I don't know if it was this
23 particular person or not, having not being
24 necessarily able to pay for legal services and

Page 215

1 accepting oral services as payment.
2 Q.     Sorry you lost me.
3      George said who accepted oral sex for
4 payment?
5 A.     The district attorney.
6 Q.     Because --
7 A.     And this was before he was district
8 attorney. I got the impression it was earlier in
9 his career.
10 Q.     Okay.
11 A.     I don't know when. I don't know --
12 Q.     Do you even know if that's true?
13 A.     No, not at all.
14 Q.     But you know that Defendant Halcovage
15 told --
16 A.     Made that statement to me, yes.
17 Q.     If we go down to Question 4B.
18 A.     Okay.
19 Q.     It talks about -- this question and then
20 4 and then B talk about the changing of political
21 parties. You see, again, that would be because of
22 the pressure, it would just make life easier.
23      Was that Defendant Halcovage's response
24 regarding your question or statement in 4B?

Page 216

1 A.     I don't understand what you're asking.
2 Q.     Is the again, is that Defendant
3 Halcovage's response to this 4B --
4 A.     Yes.
5 Q.     -- statement?
6 A.     Yes. Sorry.
7 Q.     Do you believe that Defendant -- not
8 believe. I'm sorry.
9      Do you recall if Defendant Halcovage's
10 statement regarding Ann Craft to you was more of a
11 it would just make life easier or was it a clear,
12 she must change her political party type state,
13 explicit statement versus implied?
14 A.     Initially it was said that she would
15 need to change her party. When I came -- I came
16 back and said I'm not comfortable doing that and I
17 won't have that conversation with her, I'll just
18 post the job and hire whoever I need to hire. And
19 then he told me I didn't have to do that, I could
20 hire her.
21 Q.     Okay.
22      If we go to 9.
23 A.     Okay.
24 Q.     If we go to 9A, there's an objection and

Page 217

1 then 9B you indicate that you didn't ask the
2 question because his attorney was already quite
3 angry. Can you tell me, when did his attorney
4 start to become angry?
5 A.     I'm reading. I can't tell you
6 exactly -- I mean, he clearly was angry at this
7 point. At some point, and I don't know whether I
8 wrote this in the notes or not, I can't imagine
9 that I wouldn't have, he made a -- Halcovage's
10 attorney made the -- at some point, Mr.
11 Halcovage's attorney made the statement that he
12 was under the impression -- he said that these
13 were new questions being asked. And he made the
14 statement that he was told there would not be any
15 new questions. And I asked, who told him that.
16 He said that he was told that by Solicitor Roth.
17 Solicitor Roth was sitting next to me and I turned
18 to him and I said, look, I went over these
19 questions with you ahead of time. You knew there
20 were new questions. You even made some
21 revisions to some of them. And I looked at
22 Commissioner Halcovage's attorney and I said, the
23 fact that you would only speak to an attorney and
24 you wouldn't -- if you wanted to know whether

Page 218

1  there were new questions, you should have asked
2  me.  The fact that you spoke to Solicitor Roth
3  about it and he lied to you, not my issue.
4        MS. SMITH:  I am going to mark the
5  Supplement 2230 through 2254.  This one we'll have
6  to put on the screen.
7                - - -
8        (Supplement 2230-2254 marked as Exhibit
9  for identification.)
10               - - -
11 BY MS. SMITH:
12 Q.     I am going to put back in front of you
13 70.  This is the one you were just looking at.
14 A.     Okay.
15 Q.     This is the one the county produced.
16 A.     Okay.
17 Q.     I'm marking as 84.
18       MS. IPPOLITO:  Can you tell me
19 which one 84 is?
20       MS. SMITH:  We didn't mark it yet,
21 we are going to give you a copy, but it's
22 Supplemental 2230 through 2254.
23 BY MS. SMITH:
24 Q.     Do you recall we subpoenaed documents

Page 219

1  from you --
2  A.     Yes.
3  Q.     -- I sent you a subpoena and you
4  produced documents to me?
5  A.     Yes.
6  Q.     This is the one you gave to me pursuant
7  to that subpoena.  These are the copies we passed
8  out.
9        What I want you to do, if we look back
10 to where I just had you.
11 A.     Uh-huh.
12 Q.     So for you, 10, I think.  Here's the
13 objection.
14       I want you to look at 9A and 9B, they
15 don't have the same.
16       Do you know why these are different?
17 A.     No, I don't.
18 Q.     But the one you produced to me pursuant
19 to the subpoena would be the correct --
20 A.     Yes.
21 Q.     -- true and accurate copy?
22 A.     Yes.
23 Q.     Okay.
24 A.     To me it would be.

Page 220

1  Q.     Right.
2        Because you took the copy with you
3  maintained it, so that --
4  A.     Because I didn't trust that it wouldn't
5  be changed, yes.
6  Q.     So in September when you resigned, you
7  had concerns that the documents you prepared in
8  connection with the investigation could be altered
9  by someone?
10 A.     Let's just say I had a trust issue.
11 Q.     Who was that trust issue with?
12 A.     The county in general.
13 Q.     Can you tell us why?
14 A.     I think just things I had seen.  You
15 know, the conversation where knowing in a court of
16 law, if I was telling the truth and it was not --
17 you know, the situation I gave with the clerk of
18 courts, where if I was telling the truth, I was
19 told that I would be totally discredited, my
20 professional reputation would be attacked, knowing
21 full well I was telling the truth just because
22 they needed to defend the county.  Yeah, that's a
23 pretty clear message that I shouldn't trust that
24 they wouldn't do something that wasn't unethical,

Page 221

1  immoral, or illegal to win a case.
2  Q.     After all of these interviews were
3  conducted, these notes were typed up, you did
4  create a final report?
5  A.     Yes.  Uh-huh.
6  Q.     There was a time when you created a
7  final draft report?
8  A.     Yes.
9  Q.     And then there was a final, final --
10 A.     Yes.
11 Q.     -- report?
12 A.     Yes.
13 Q.     Was anything changed between your draft
14 and the final, final report?
15 A.     Well, yeah.  There wouldn't have had to
16 been a final, final report.
17 Q.     Did anyone tell you to take anything out
18 of your draft before publishing, I guess, for lack
19 of a better word, the final, final?
20       MS. IPPOLITO:  Objection to the
21 form.
22       THE WITNESS:  Pardon?
23 BY MS. SMITH:
24 Q.     Objection to the form is just something

Page 222

1  for attorneys for at a later time, so you don't
2  need to --
3  A.      Okay.
4  Q.      You can answer, unless someone tells you
5  not to answer, it means that.
6  A.      I can tell you there was -- during the
7  conversation with Jane Doe 2 there was an incident
8  that -- the part about her wearing jeans that
9  had -- that were shredded or ripped or whatever
10 the heck they are called.  And she had --
11 apparently Gary Bender had sent her an e-mail on a
12 Saturday, because she wore these jeans on a
13 Friday.  He apparently -- Commissioner Halcovage
14 had gone to him he sent her e-mail on Saturday.
15      At some point in that meeting, because
16 that topic came up during that discussion that he
17 was in and Jane Doe 3 and Jane Doe 4 and Jane Doe 2
18 and I were in, he -- I think she wanted water.  He
19 got -- I remember him getting up.  As he was
20 walking out the door, he apologized to her for
21 sending that e-mail.
22      I wrote that in the original notes.  He
23 took offense to that, felt like I was saying that
24 he was guilty for something.  I had had

Page 223

1  conversations with Solicitor Roth about it.  I
2  didn't think it said what he thought it said, but
3  did I change it because he was angry about it?
4  Yes, I did.
5      I tend to be a perfectionist.  So, look,
6  I'm the person that -- when I was in college,
7  professors said the first day of class you have a
8  paper due at the end, I started it that weekend
9  and I revised and revised and revised it because I
10 tend to want it to be perfect.  I'm sure some of
11 that is the version, the final version, all of
12 that type of stuff.
13      I can tell you when I was finalizing the
14 report, not the notes, but the report, both
15 Solicitor Roth and Gary Bender came in numerous
16 times because they were very anxious for the final
17 report to be written.  I can tell you that at one
18 point in time, Solicitor Roth came in to my
19 office, sat down, asked where we were.  We talked
20 about the final paragraph or so and whether I
21 should use the word that it would be recommended
22 that Commissioner Halcovage resign.
23      He made the statement, I wouldn't -- you
24 know, I don't think you should do that or I

Page 224

1  wouldn't do that.  And I said, this is my report,
2  I'm going to write what I think needs to be in
3  there.  If you want to write the report, you write
4  the report.  He got upset and left.
5      In the version that I wrote that report,
6  it does recommend that Commissioner Halcovage
7  resign.
8  Q.      Do you know why Defendant Roth suggested
9  you not include that or that he wouldn't --
10 A.      No.  You would have to ask him.  I told
11 them when I started, I would not do anything
12 illegal, unethical, immoral.  I am not going to --
13 like I said, I mean, at this point I have been
14 doing this for 30 years.  I'm not going to ruin my
15 reputation, like I said, because George couldn't
16 keep his pants up.  Sorry.
17 Q.      I appreciate that.
18      Between the date of your report, your
19 final report, it's June 26th, if I recall, of
20 2020, and when you resigned from the county
21 September 4, 2020, do you believe that you
22 observed or learned of any retaliatory behavior by
23 any of the Defendants, Bender, Roth, Halcovage?
24      MR. LETTRICH:  Objection to form.

Page 225

1      But you can answer.
2      THE WITNESS:  I believe that things
3  were -- it was becoming clear to me that things
4  weren't necessarily the way I would have done
5  them.  I think -- I can tell you felt like I was
6  being left out of conversations because I am --
7  again, to me, HR is Switzerland.  I was -- I
8  needed to be there.  I listened to both sides.  I
9  felt that Gary, in particular, possibly Glenn
10 because he tended to follow along with Gary, that
11 they started seeing me as not being on
12 management's side, shall we say.  I'm not on
13 anyone's side.  I'm here, I'm telling the truth.
14 The truth that I -- the truth, it's what it is.
15 If you don't like it, you change your behavior,
16 you do something different, but you don't lie.
17 BY MS. SMITH:
18 Q.      Do you believe that -- I think you
19 testified that you were left out of conversations?
20 A.      I felt that, yes.
21 Q.      Do you believe the conversations you
22 were left out of are ones that the HR director for
23 the county should have been involved in?
24 A.      Yes.  Yes.

Page 226

Q.    Do you believe or know why you were left
out of those conversations?
A.    I think they knew that, well, we'd
probably end up here and I would have to tell the
truth about what was said, my guess.  I don't know
that that's a fact.
Q.    Do you believe that you were left out
the conversations because you had concluded that
the plaintiffs in this case, Jane Doe 1, Jane Doe
2, Jane Doe 3, and Jane Doe 4, were being truthful
about what had occurred and that Defendant
Halcovage had violated county policies?
A.    Do I believe that was why I was left out
of the conversation because I believed that?
Sorry.  I'm struggling because I think -- I truly
think Gary Bender, as well as Solicitor Roth also
knew that those statements were true.  So I think
more it was that I wasn't going to -- I was going
to stand up and say, you can't do this, you can't
do that.  You can't do that, and it's not
necessarily what they wanted to here.
Q.    Since your resignation from the
county -- well, let's start with this.
     After you resigned from the county, you

Page 227

applied for unemployment, correct?
A.    Not until January of the following year.
Q.    Okay.
     But at some point you did --
A.    Uh-huh.
Q.    -- apply for employment?
A.    Uh-huh.
Q.    Is that correct?
A.    Yes.
Q.    The county contested your unemployment?
A.    Yes.
Q.    And you appealed?
A.    Yes.
Q.    There was eventually a hearing held?
A.    Yes.
Q.    Your reason for application for
unemployment, I believe, you sited a hostile work
environment?
A.    Yes.
Q.    What can you tell us in your mind was
hostile about the work environment?
A.    The way people were treated.  Look, I
can tell you on my last day, it was extremely
hostile.  I was told that you can't call it a

Page 228

hostile work environment unless it's because of a
discriminatory category.  So were you being
treated in a hostile fashion because you're a
woman?  No.  I think they treated everyone the
same way, in a hostile manner.  And not all the
time, but at times.
     I believe that -- you know, there were
people going around just stabbing you in the back,
people undermining you, people bullying you.  When
something would happen in the clerk of courts
office, I was -- you know, she'd send -- she would
have her attorneys send me letters, threatening to
sue me because I wanted to do an investigation
where there were things going on in her office
that were totally inappropriate.
Q.    Do you believe that the work environment
prevented you from doing your job, the director of
human resources for the county, to the best of
your abilities?
A.    Yes.
Q.    Do you believe that Defendant Bender
engaged in conduct that prevented you from fully
carrying out your duties as director of HR?
A.    Yes.

Page 229

Q.    Do you believe that --
A.    He was my boss.  You know, he would tell
me, this is the end of this story and that's it, I
don't want to hear about it.
Q.    Did Defendant Roth engage in behavior
that prevented you from carrying out your duties
to the best of your ability?
A.    He was not my supervisor, so he could
make a recommendation, but I didn't necessarily
have to adhere to what he said.  Do I think he
undermined me in certain ways?  Absolutely.
Q.    Do you think that if he would have -- I
don't want to say been on board, but if he had
been less -- trying to think how to phrase this.
     If he had engaged -- Defendant Roth had
engaged with you more to determine -- to have an
interactive discussion about what was best for the
county, do you think that that would have
benefited the county?
     MS. IPPOLITO:  Objection to the
form.
     THE WITNESS:  That's a hard
question because I think in Glenn's mind, his job
is to protect the county and it doesn't matter for

Case 3:21-cv-00477-MCC   Document 280-1   Filed 09/20/23   Page 63 of 342
Deposition of Debra Twigg - Revised
Jane Doe, et al. v. Schuylkill County Courthouse, et al.

Page 230

1 it's what's right, wrong, or indifferent.  His job
2 is to defend it.  Like in this case, his job is to
3 win and he's going to -- and if that means
4 discrediting somebody, if that means doing --
5 whether he agrees with it or not, whether it's
6 right or wrong, whether it's a lie or not.  I
7 mean, he flat out told me that to my face.  So
8 does that make it hard to do your job?  Yeah.
9 Does that make it hard to trust someone?  Yes.
10 BY MS. SMITH:
11 Q.      Are you familiar with the job duties and
12 responsibilities of the risk manager at the
13 county?
14 A.      In the sense that it relates to like
15 Workers' Comp and things like that, yes.
16 Q.      Do you believe that Defendant Roth
17 fulfilled his duties of risk manager?
18 A.      I feel once he learned of certain
19 things, he had an obligation to report them and he
20 didn't.  Again, that's a choice.  That's his
21 choice.
22 Q.      Do you believe that that choice that you
23 just talked about for Defendant Roth, was
24 actually -- could have been a detriment to the

Page 231

1 county?
2         MS. IPPOLITO:  Objection to the
3 form.
4         You can answer it.
5         THE WITNESS:  Yeah.  But I have a
6 different opinion of what is -- a benefit to me, a
7 benefit for the county is to do the right thing no
8 matter it cost.  It's not that in every situation
9 the county has to been seen as winning and
10 somebody else loses.  No.  Whoever is right should
11 win.  You do the right thing.  And if there's a
12 problem, you fix it.  You don't cover it up and,
13 hey, well, I bullied them into giving me -- I
14 bullied them, so I got the win, that's all that
15 matters.
16 BY MS. SMITH:
17 Q.      Since your resignation from the
18 county -- I'm sorry.  I want to go back to your
19 unemployment.
20         At the appeal hearing of your
21 unemployment, did the county concede and allow you
22 to obtain unemployment compensation?
23 A.      Yes.  They made a stip.
24 Q.      Stipulation?

Page 232

1 A.      Chris, what the heck is Chris's last
2 name?
3 Q.      Hobbs.
4 A.      Hobbs, Chris Hobbs.  He made a
5 statement, he said before they started
6 questioning, would I agree that -- that there
7 was -- that the environment -- how did he put it?
8 That the environment of the courthouse -- I don't
9 know that he conceded that it was hostile, but
10 basically the statement that they said was there
11 was nothing they could to change it or effect it.
12 Would I agree with that.  I said if you're asking
13 me to agree to that, yes, but the reason I agreed,
14 because I agree.  I don't Gary Bender can control
15 his behavior.  He can't change it.  Even if he
16 wanted to, I don't think he can.  He's -- when his
17 anger flairs up, it is uncontrollable.
18 Q.      Since your resignation with the county,
19 have you learned of anything that's occurred at
20 the county that you believe is retaliatory towards
21 Jane Doe 3, Jane Doe 4, and Jane Doe 1?
22         MR. LETTRICH:  Objection to form.
23         You can answer.
24 BY MS. SMITH:

Page 233

1 Q.      Jane Doe 1 or Ms.
2 A.      Yes.
3 Q.      Can you tell us what things you can
4 think of that come to mind?
5 A.      Yes.  I mean, I'm sorry this whole
6 LexusNexis thing, which you read about in the
7 papers, I have had conversations.  I think it's
8 total -- pardon me -- bullshit.  I think it's
9 retaliatory.
10 Q.      You came to work pretty closely with
11 Jane Doe 3 and Jane Doe 4, correct?
12 A.      I did.
13 Q.      Would you consider them friends?
14 A.      Yes.  I didn't know them before I
15 started at the courthouse.  This were issues in
16 the tax claim office, we worked closely together,
17 employee relation issues.  The whole reason that
18 they were promoted to take over both offices is
19 because they did such a great job of cleaning it
20 up.  Through that process, yes, we got to know
21 each other, we became friends.
22 Q.      Going to work backwards.
23         Starting with the LexusNexis, based off
24 of your relationship with them, Jane Doe 3 and

Page 234

1  Jane Doe 4, do you have any question in your mind
2  as to whether they maliciously searched
3  individuals or information using their LexusNexis
4  credentials?
5        MS. IPPOLITO:  Objection.
6        MR. LETTRICH:  Objection to form.
7        You can answer.
8        THE WITNESS:  Okay.  Now, I have --
9  with the way you asked that, I will just say, no,
10  I do not believe they did have malicious intent.
11  I don't even believe they did any searches that
12  weren't necessary.  Well, I can't say that
13  totally.  No, I don't believe there was malicious
14  intent.  I don't believe they essentially did
15  anything wrong.  I would trust them.  I just
16  would.
17  BY MS. SMITH:
18  Q.     I'm going to represent to you, and it's
19  going to be brought out in discovery so everyone
20  will find out, that Jane Doe 4 has informed
21  investigators that she may have searched some
22  individuals to send thank you cards for
23  individuals who wished their condolences on her
24  mother who had passed.

Page 235

1  A.     Okay.
2  Q.     If you as HR director had learned that
3  that was what she did, that she sent thank yous to
4  people who had sent their condolences after her
5  mother died, do you believe that a year suspension
6  would be warranted?
7  A.     No.
8        MR. LETTRICH:  Objection to form.
9        You can answer.
10        THE WITNESS:  Oh, sorry.  No.
11  Look, I can tell you -- okay.  Let me ask you all
12  a question.  Sending -- using a system to get
13  addresses to send condolences, a year suspension
14  without pay.  I can tell you, and this happened
15  while I was there, we had a director of a
16  department falsify payroll records, collect money
17  under the table, signed off on her direct reports
18  falsifying, and she received a 15-day suspension.
19  Are you kidding me?
20  BY MS. SMITH:
21  Q.     Was she put up for termination?
22  A.     No.  Absolutely not.
23  Q.     Was she put up for termination twice?
24  A.     No.

Page 236

1  Q.     Who is this director?
2  A.     Lisa Stevens.
3  Q.     You said she falsified records?
4  A.     So in children and youth, they have
5  duties -- they have -- somebody is on call all the
6  time.  Certain supervisors didn't want to,
7  didn't -- didn't -- I don't know if they didn't
8  want to, they couldn't.  They didn't want to work
9  overtime.  Lisa would offer -- in her own words,
10  she offered to do the overtime for them, but she
11  wanted to receive the pay.  She had gone to, I
12  believe, Gary Bender -- maybe it was before Gary
13  Bender, it might have been Mark, I don't know
14  which one she had gone to, asked about getting
15  overtime if she -- getting the pay if she did the
16  work.  She was told no.  Actually, I think it was
17  Gary Bender.
18        In the end what happened was she ended
19  up doing the work.  The people who were on the
20  schedule put it on their time sheet, she signed
21  off on it.  She then -- they then paid her in cash
22  for the time that she worked for them.
23  Q.     The county was aware of this?
24  A.     We became aware of it.  We did an

Page 237

1  investigation.  And the result of that was she had
2  a 15-day suspension.
3  Q.     Was Glenn Roth involved in that at all?
4  A.     Yes.
5  Q.     So Glenn Roth was aware that an
6  individual employee in children and youth stole
7  time --
8  A.     Yes.
9  Q.     -- and that she was only suspended for
10  15 days?
11  A.     It was an evening commissioner -- I can
12  tell you the people sitting around that table,
13  Frank Staudenmeier, Gary Hess, George Halcovage,
14  Glenn Roth, Al Marshall, myself.  Did I say Gary
15  Bender?  I think that was all.  I don't know
16  whether the clerk of courts was there or the -- I
17  don't know whether Linda Dietrich was there.
18  Probably not because it was probably an executive
19  session.
20  Q.     Is children and youth funded in anyway
21  by state grants?
22  A.     Yes.
23  Q.     So would her theft of time be theft of
24  state funding for the county?

Page 238

1    MR. LETTRICH:  Objection to form.
2    You can answer.
3    THE WITNESS:  Yes, I guess it would
4  have been.
5  BY MS. SMITH:
6  Q.    Is she still employed by the county?
7  A.    To my knowledge.  Sorry.  If that gets
8  15 days and you -- really, try and tell me that's
9  not retaliatory.  I'm sorry.  My opinion.
10  Q.    Understood.
11    Going back to when you were working at
12  the county, it was when you were there that the
13  offices of tax claim and tax assessment were
14  combined, correct?
15  A.    Yes.
16  Q.    Were you aware of, I want to call it, a
17  gentleman's agreement or statement by then
18  Commissioner Staudenmeier that if these offices
19  were to ever be disbanded, Jane Doe 3 would, in
20  fact, remain in tax assessment?
21  A.    I'm aware of what you're talking about.
22  It was -- when you say a gentleman's agreement
23  with Commissioner Staudenmeier, it was discussed
24  numerous times with Commissioner Halcovage,

Page 239

1  Commissioner Staudenmeier, I am not sure if
2  Commissioner Hess was included in on that, but he
3  may have been.
4  Q.    Hetherington replaced him?
5  A.    Right.
6  Q.    Okay.
7  A.    Myself, Gary Bender, Glenn Roth, that
8  if -- because there was certain -- I think
9  Staudenmeier had concerns about whether this would
10  work, combining the offices, because it had been
11  tried in the past and didn't work.  It was made
12  very clear, and in particular too, it was made
13  very clear to Jane Doe 3 and Jane Doe 4, that if
14  in fact, it didn't work, Jane Doe 3 could not go
15  back to tax claim.  She had to stay in tax
16  assessment and Jane Doe 4 would then do tax claim.
17  I know I reviewed it with each of them before the
18  move was made.
19  Q.    As I understand it, chief assessor
20  position requires by law, that the individual hold
21  a CPA license?
22  A.    That's my understanding.
23  Q.    Did Jane Doe 3 obtain a CPA license to
24  become a chief assessor?

Page 240

1  A.    Yes.
2  Q.    Before she became chief assessor?
3  A.    I don't remember that timeline.  I
4  know -- I remember her going for classes.  I
5  remember her coming down and studying, but whether
6  it was before or after, I don't recall.  Sorry.
7  Q.    It's okay.
8    But in any event, was your understanding
9  that part of the reason that Jane Doe 3 was to
10  remain in tax assessment if the offices were ever
11  split again was because the county was investing
12  in getting her a CPE license?
13  A.    Yes.
14  Q.    This is because -- do you understand
15  that CPE licenses are --
16  A.    Few and far between, yes.
17  Q.    Hard to find individuals who hold them?
18  A.    Yes.  Yes.
19  Q.    So did you come to understand that
20  shortly after you left the county, the offices
21  were disbanded?
22  A.    Yes.  I read that in the paper as well.
23  Q.    Do you know that Jane Doe 3, with her
24  CPE license, was put into the position --

Page 241

1  A.    I read that in the paper as well.
2  Q.    -- director of tax claims?
3  A.    Yes.
4  Q.    And Jane Doe 4, who did not hold a CPE
5  license, was put in -- left in assessment as the
6  assistant chief assessor?
7  A.    Okay.  I don't know whether I recall
8  reading that or not.
9  Q.    As HR director, someone who works with
10  staffing and people who hold the requisite
11  requirements and licenses, would that make any
12  sense to you?
13  A.    No.
14    MR. LETTRICH:  Objection to form.
15    You can answer.
16  BY MS. SMITH:
17  Q.    Can you think of any reason why they
18  would -- why the county, if they broke apart the
19  offices, would structure them in that nature, but
20  Jane Doe 3 in tax claims and Jane Doe 4 in tax
21  assessment?
22  A.    Yeah.  But my reason is it's
23  retaliation.
24  Q.    Would in your --

Page 242

1  A.      But that's just my opinion, personal
2  opinion.
3  Q.      Can you think of any reason other than
4  that?
5  A.      Any professional, no.  It doesn't make
6  sense.  Why would you take the person who has the
7  certification, who was restructuring the office,
8  getting it back to where it needed to be, why
9  would you do that.  Because somebody looked up an
10 address to send a card for -- no, it doesn't make
11 sense.
12 Q.      Were you present -- did you work in the
13 county when Virginia Murray tried out the dual
14 role for a brief period of time?
15 A.      No.  I worked there when Ginny was
16 there, but not when she was dual role.
17 Q.      Do you know if -- do you know of any
18 similar circumstances of removal of duties by the
19 county, such as the ones -- the votes they took on
20 Jane Doe 4 and Jane Doe 3?
21 A.      I'm not sure what you're asking.
22 Q.      So Jane Doe 4 and Jane Doe 3 had duties
23 removed from them.
24 A.      Right.

Page 243

1  Q.      When the offices were disbanded.
2  A.      Okay.
3  Q.      Are you familiar with any --
4  A.      Duties that -- I mean, I know before I
5  got there risk management was under HR.  I don't
6  know why that changed, but it did change and it
7  went to Solicitor Roth before I got there.  Trying
8  to think, were there other -- I know at one point
9  they tried to split the HR specialist position so
10 that she could move to a different position and
11 take half her job with her and they tried to do it
12 behind my back, that was not real pleasant.  So
13 it's not that it hasn't been done, but to this
14 extent, no.
15 Q.      I guess what I'm trying to find out is
16 what your feeling are as the former HR director
17 regarding not only the restructuring, but the fact
18 that the county along with it decided to cut Jane
19 Doe 3 and Jane Doe 4's pays.
20         Do you believe that was justifiable, given
21 county policies and past practices?
22 A.      No.
23         MR. LETTRICH:  Objection to form.
24         You can answer.

Page 244

1         THE WITNESS:  No.
2  BY MS. SMITH:
3  Q.      Can you tell me what you used to come to
4  the conclusion that that was not justifiable?
5  A.      Because there's no solid basis for it.
6  I mean, really if what they did was one person
7  used a system to send someone --
8  Q.      Let me stop you there.
9         I'm going to represent to you that Jane
10 Doe 3 and Jane Doe 4 were -- the offices were
11 restructured in March.
12 A.      Of what year?
13 Q.      Of 2021.
14 A.      Okay.
15 Q.      They were suspended indefinitely without
16 pay in September of 2021.  That suspension was for
17 the LexusNexis.
18 A.      Okay.
19 Q.      I will represent to you that there's
20 been testimony in this case that the catalyst for
21 their demotions was because STEB reports were not
22 being submitted in accordance with state
23 guidelines.
24 A.      Okay.

Page 245

1  Q.      So if I represent that that was the
2  reason for the restructuring or at least part of
3  the reason, catalyst for it, would that change
4  your mind regarding their -- the restructuring of
5  those two offices?
6         MR. LETTRICH:  Again, objection to
7  form.
8         You can answer.
9         THE WITNESS:  I would want to know
10 more details about what you're talking about.
11 BY MS. SMITH:
12 Q.      When you worked at the county, did you
13 have any questions about the operations of the tax
14 claim and tax assessment offices?
15 A.      No.
16 Q.      Do you believe that they operated
17 optimally?
18 A.      Tax claim, yes.  Tax assessment, I
19 think -- like I said, I can tell you management
20 was not happy with how Virginia Murray was running
21 it.  And the reason that Jane Doe 3 was put in
22 place was because she did such a good job at
23 turning around tax claim.  Do I think it ran much
24 better, at least the time when I was there when

Page 246

1 Jane Doe 3 took over, yes, I do.  I know that for
2 a fact.  I know by talking to the employees.
3        Did I answer your question?
4 Q.     You did.  Thank you.
5        To your knowledge, has there ever been
6 an indefinite unpaid suspension for greater than
7 one year in county history?
8 A.     There has never been more than the 15
9 days that I was involved with.
10 Q.    Even if you weren't involved, are you
11 aware of any --
12 A.     No.
13 Q.    -- that you weren't involved that were
14 greater than 15 days?
15 A.     No.
16 Q.    You're pretty well versed in labor laws
17 at this point, would you say?
18 A.     Yes.
19 Q.    Are you familiar with laws of regulation
20 regarding unpaid suspensions?
21 A.     To some extent, yes.
22 Q.    Are you aware that they require that the
23 individual engaged in serious misconduct?
24 A.     Oh, yeah.  Yeah.

Page 247

1 Q.    From what you know, do you believe that
2 Jane Doe 3 and/or Jane Doe 4 engaged in serious
3 misconduct?
4        MR. LETTRICH:  Objection to form.
5        You can answer.
6        THE WITNESS:  You too?
7        MS. IPPOLITO:  As long as one of us
8 gets it done.
9        THE WITNESS:  No, I don't believe
10 that this is justified.
11 BY MS. SMITH:
12 Q.    Given your training and experience both
13 with the county, before the county in HR, do you
14 believe that any of the named defendants, Defender
15 Roth, Halcovage, Zula, or Kutzer, once they were
16 named as respondents in an EEOC investigation,
17 that they should have engaged in any investigation
18 regarding complaints by Jane Doe 3, Jane Doe 4,
19 Jane Doe 2, or Jane Doe 1?
20        MR. LETTRICH:  Same objection.
21        You can answer.
22        THE WITNESS:  If they could not do
23 it independently, then they should have excused
24 themselves.  I say this because I think initially

Page 248

1 in paperwork, my name appeared, but I did the
2 investigation.
3 BY MS. SMITH:
4 Q.     What do you mean by independently?
5 A.     Sorry.  If you could do it objectively.
6 If you could do it and be objective.
7 Q.     Do you think -- go ahead.  I'm sorry.
8 A.     I believe I was objective when I went
9 through all these questions with everybody, in
10 particular with Jane Doe 1 and with George.  And
11 honestly I had a closer relationship with George
12 than I did with Jane Doe 1 when all of this
13 happened, but I still believe I did my job
14 objectively and however it turned out, it turned
15 out.  I didn't let any personal feelings get in
16 the way of it.
17        I don't -- if they could have done that,
18 because again, my name did appear on -- I have
19 letters from your office that have my name on it
20 as well.  So to say that they shouldn't have, if
21 they could do it objectively, should they have
22 excused -- yes.  Should I have excused?  Yes.  Did
23 I think about it at that time?  No, because I did
24 my job.

Page 249

1 Q.    Do you think that -- strike that.
2        If the individuals who were raising
3 issues, complaints of discrimination or
4 retaliation, made it known that they did not feel
5 the investigator, whether it be HR, Bender, Roth,
6 could be objective, do you think then that the
7 individual in question should have excused
8 themselves from involvement?
9        MR. LETTRICH:  Same objection.
10        THE WITNESS:  Can you repeat it?  I
11 didn't follow it all.
12 BY MS. SMITH:
13 Q.    Let's say Jane Doe 3 and Jane Doe 4
14 raised an issue of retaliation.
15 A.     Yes.
16 Q.    And an individual -- they raised the
17 issue of retaliation to HR, so let's say Heidi
18 Zula.  And they -- Jane Doe 3 and Jane Doe 4 in
19 raising the issue, say we don't believe that you,
20 Ms. Zula, can be impartial and we have concerns?
21 A.     Oh, then absolutely.  She should have
22 excused herself and there should have been an
23 independent investigation, absolutely.
24 Q.    Do you believe that the county policies

Page 250

1 allow or have a structure in place for third-party
2 investigators?
3         MR. LETTRICH:  Same objection.
4         Please go ahead.
5         THE WITNESS:  I don't remember what
6 the county policy -- I mean, I would hope, but I
7 would think it's common sense that if someone is
8 claiming retaliation -- you know, but I have been
9 doing this for 30 years, so...
10 BY MS. SMITH:
11 Q.      If an individual raised an issue of
12 retaliation and/or discrimination to you as HR
13 director at the county and they had asked for an
14 independent witness to be present, would you have
15 an issue with that?
16         MR. LETTRICH:  Objection to form.
17         You can answer it.
18         THE WITNESS:  Okay.  I am going to
19 say this, I guess it would depend.  And I say that
20 because I can remember a time that I actually had
21 an issue -- Jane Doe 3 had an issue with tax claim
22 and the individual wanted her husband, who also
23 worked at the county, to be her independent
24 witness that she was entitled to under a union

Page 251

1 contract.  We both agreed no, no, no.  Your
2 husband cannot sit in on this with you.  You can
3 have your union steward, you can have whoever.  Sp
4 it would depend on the situation.  But, I mean, as
5 long as it wasn't that kind of situation, I
6 wouldn't have an issue with it.
7 BY MS. SMITH:
8 Q.      In fact, when you interviewed Jane Doe
9 1, you invited or allowed me to participate,
10 correct?
11 A.      Yes.  Absolutely.  Yeah.  That's what I
12 was just going to say, if in fact, one of them
13 said I would like my attorney to be here, I would
14 have allowed it.  I would not have had a problem.
15 Q.      So if you had remained employed by the
16 county as HR director, post the finding of the
17 federal litigation, so plaintiffs and defendants,
18 there being an actual lawsuit and one of the
19 plaintiffs in the matter had an issue and wanted
20 their attorney present when discussing it with the
21 county employees, including HR, would you have
22 allowed that?
23         MR. LETTRICH:  Objection to form.
24         You can answer.

Page 252

1         MS. IPPOLITO:  Objection.
2         THE WITNESS:  Yes.  I mean, there
3 is already a lawsuit going on.  Why wouldn't you
4 want to have that -- yes, because I would have
5 nothing to hide.
6 BY MS. SMITH:
7 Q.      If they simply asked for it to be -- to
8 record it, to memorialize the truth of what
9 occurred instead of having a witness present,
10 would that have bothered you?
11         MS. IPPOLITO:  Objection to the
12 form.
13         THE WITNESS:  It might have.  I
14 don't like the idea of the recording, but I know
15 in today's day and age, it's more common than it
16 was 30 years ago when I started in HR.
17         MS. SMITH:  I'm going to take a
18 break real quick, just going to chat with my
19 clients and chat the other attorneys.  So if you
20 need to use the restroom, we can go off the
21 record.
22             - - -
23         (Whereupon brief recess was held off the
24 record at 3:22 p.m.)

Page 253

1             - - -
2 BY MS. SMITH:
3 Q.      Ms. Twigg, we just took a break.  I came
4 back and you wanted to let me know that there was
5 something different about these two reports.
6 A.      Yes.
7 Q.      I am talking about Exhibit-84 and
8 Exhibit-70.
9         What is it that you saw is different?
10 A.      This stops here, this goes on.
11 Q.      So on 84, there's the additional -- it's
12 22B.
13         You said, do you recall leaning up and
14 asking if you could blow on my neck.
15 A.      Uh-huh.
16 Q.      And he -- that's the no?
17 A.      Uh-huh.
18         MS. IPPOLITO:  Sorry.  You're on
19 the --
20         MS. SMITH:  Sorry, guys.  Last page
21 of 84 is where the additional content is that's
22 not --
23 BY MS. SMITH:
24 Q.      On Exhibit 70, which was produced by the

Deposition of Debra Twigg - Revised

Jane Doe, et al. v. Schuylkill County Courthouse, et al.

Page 254

1 county and ends at no and then there's a C, but no
2 answer.  On your production it says, no, I believe
3 he said absolutely not.  I looked at him, that's
4 you looking at Defendant Halcovage?
5 A.      Uh-huh.
6 Q.      Is that a yes?
7 A.      Yes.  Sorry.
8 Q.      And you write, actually I think I was
9 glaring and said, you and I both know that you
10 said this.  His attorney became -- again became
11 angry.  I told him that was my last question.  He
12 and George abruptly left.
13        The additional content on 84, is that
14 what happened?
15 A.      Yes.
16 Q.      Do you know why it's not in this
17 exhibit?
18 A.      No.
19 Q.      Did you remove it at any point?
20 A.      No, because I made a point of putting it
21 in there.
22 Q.      This was typed as you conducted the
23 interviews, at least the second one with George?
24 A.      Yes.

Page 255

1 Q.      It's not like you had a draft?
2 A.      No.
3 Q.      And added stuff?
4 A.      No, not at the end of the questions.
5 Q.      Ms. Twigg, I want to take you back to
6 the suspensions.
7 A.      Okay.
8 Q.      As I indicated to you, Jane Doe 3 and
9 Jane Doe 4 have been on unpaid suspension for just
10 over -- well, I guess it's just about a year and a
11 month now, unpaid.
12        Are you aware of a Mike -- I can't even
13 read my own handwriting -- Mike Van Allen?
14 A.      Yes.
15 Q.      Did Mike Van Allen?
16 A.      Yes.
17 Q.      Did Mike Van Allen do something to
18 warrant a suspension?
19 A.      While I was there?
20 Q.      Let's start with this:  Was Mike Van
21 Allen a county employee at some point?
22 A.      Yes.
23 Q.      Was he a county employee when you were
24 there?

Page 256

1 A.      Yes.
2 Q.      Are you aware that Mike Van Allen was
3 caught in a bathroom rubbing a customer's
4 shoulders?
5 A.      Yes, because that individual called me
6 at -- I was at home and he called on my county
7 cell phone.  Yes, I know exactly what you're
8 talking about.
9 Q.      It wasn't a county employee, right?
10 A.      No.  It was someone who was in the
11 courthouse.
12        MS. IPPOLITO:  Sorry.  When you
13 said he's not a county employee, are we talking
14 about the person who did the reporting or the
15 person who is being rubbed?
16        THE WITNESS:  The person who is
17 doing the reporting is the same person who was
18 rubbed in the bathroom.
19        MS. IPPOLITO:  Okay.  Gotcha.
20        THE WITNESS:  Or touched in the
21 bathroom.
22 BY MS. SMITH:
23 Q.      And the person doing the touching was
24 Mike Van Allen, who was a county employee?

Page 257

1 A.      Yes.  Yes.
2 Q.      So you get a call on your county cell
3 phone after hours?
4 A.      No.  It was during the day.  I don't
5 know if I was home for lunch or if I was just home
6 that day.
7 Q.      Okay.
8 A.      But it was during the day, yes, and I
9 got a call.
10 Q.      What did this person tell you?
11 A.      Basically that he had been in the
12 courthouse for some other reason, I don't know if
13 he went into a courtroom for something.  He had
14 passed Mike Van Allen in the hallway.  I think he
15 had asked where the restroom was.  Mike had given
16 him directions.  Very shortly after the individual
17 walked in the restroom, they said that Mike Van
18 Allen came into the restroom as well.
19        I believe there was another guy in
20 there, God bless him, the guy is now passed away,
21 so sorry.  Mario was in the restroom.  Mario was
22 just leaving.  Mike Van Allen and -- Mario was
23 like 80-plus years, 85 or something.  Mike Van
24 Allen had made a statement about the guy being so

Deposition of Debra Twigg - Revised                    Jane Doe, et al. v. Schuylkill County Courthouse, et al.

Page 258

1 old and he should be retired.  The individual who
2 was there made a statement that -- that his
3 parents retired early and it sort of caused them
4 their mental capacity disorder -- decline.
5          Anyway, mike Van Allen then touched him
6 in a way that -- I can't tell you exactly how it
7 was, something with the pinky finger or something,
8 that implied he would be looking for a hook up
9 with another guy.  And the guy took this very
10 offensive and ended up calling me.
11 Q.     Did you speak with Mike Van Allen about
12 it?
13 A.     Yes, I did.
14 Q.     What was --
15 A.     He denied it.
16 Q.     What, if any, disciplinary action was
17 taken against Mike Van Allen?
18 A.     I don't remember.
19 Q.     Do you know if he was suspended for a
20 year?
21 A.     No.  I don't even know that he was
22 suspended for a day.
23 Q.     Was he terminated?
24 A.     No.  He was still there.  He's a union

Page 259

1 member and I know I spoke with the union business
2 agent about it.  He may have received -- I don't
3 remember.  He may have gotten a warning, he may
4 have gotten a one day.  He might have gotten a one
5 day.
6 Q.     Okay.
7 A.     I don't remember.
8 Q.     But definitely not a year?
9 A.     No.  No.  No.
10 Q.     Do you know, did Defendant Halcovage,
11 Roth, or Bender know about this?
12 A.     Well, I'm sure I told Bender for sure
13 because we met every day at 4:00 and I remember
14 telling him.
15          I don't recall if -- I'm assuming they
16 did, but I don't recall.  It was known, certainly
17 the county administrator knew it.
18 Q.     Speaking about that County Administrator
19 Mr. Bender, did there come a time when there was
20 an issue with his bank account being changed by
21 Heather Garrity?
22 A.     Yes.  Sorry.  Yes.
23 Q.     Did Defendant Bender come to learn of
24 this?

Page 260

1 A.     Yes.
2 Q.     It's my understanding she got a fishing
3 e-mail or something saying to change his --
4 A.     She got -- so -- yes.  She had gotten an
5 e-mail.  I had gone over to see Gary about
6 something.  I was sitting in his office and he got
7 a phone call from Heather, who was the HR
8 specialist that worked for me.  And he had said --
9 he picked -- he said it was her, he picked it up,
10 they had a conversation, and he hung up.  And I
11 said what was that about.  He said, oh, something
12 about, you know, she said that I had gotten -- you
13 know, that she completed the request for changing
14 my banking information.  I am like what are you
15 talking about.  And he said I didn't send her a
16 request for change?
17          And I said, we need to look at that.  He
18 said no, we don't.  I said, well, not if you don't
19 mind your paycheck going to someone else.  And he
20 looked at me and I said don't you -- and I heard
21 about these things in the news.
22          And so I said, look, she just changed
23 your bank account.  Like, your paycheck is going
24 to go to this new bank account.  Well, then he

Page 261

1 realized that part of his pay, he puts a certain
2 amount into his daughter's bank account, so she
3 changed her bank account, he changed his bank
4 account.  We sent it to the district attorney.  He
5 looked into it.  It turned out the bank would have
6 been somewhere, I think, in Delaware was where it
7 would have ended up.
8          I -- and I wanted to take disciplinary
9 action.  At first he was angry, but he was fond of
10 Heather.  So at some point, he was not even going
11 to let me discipline her.  And his daughter works
12 for the state in HR.  I told him, do me a favor,
13 before you make this decision, please call your
14 daughter and see what she would do.  So he did and
15 then he came back and said that he would allow me
16 to proceed with giving her a written warning for
17 this.
18 Q.     So she wasn't suspended?
19 A.     No.  And it was made very clear I could
20 not suspend her.
21 Q.     Did Defendant Bender often reach out to
22 his daughter for HR --
23 A.     Yes.
24 Q.     -- advice?

Page 262

1  A.      Yes.
2  Q.      Would you say it was when he disagreed
3  with your advice?
4  A.      I would say it was when he was trying to
5  verify whether what I was saying was appropriate
6  or accurate or...
7  Q.      His daughter didn't work for the county,
8  correct?
9  A.      No.  She worked for the state.
10 Q.      Are you aware or have any information
11 that Defendant Bender provided -- strike that.
12         Are you aware or do you have any
13 information that Defendant Bender had the county
14 or that the county provided his daughter a stipend
15 for that advice?
16 A.      No.
17 Q.      Would the county be permitted to provide
18 a state employee with a stipend for HR advice?
19         MR. LETTRICH:  Objection to the
20 form.
21         But you can answer.
22         THE WITNESS:  I suppose if they had
23 a written contract with somebody who had a
24 business.  It would have to be voted on.  I guess

Page 263

1  they could do that if they choose to, just like
2  they hire any other independent contractor.
3  BY MS. SMITH:
4  Q.      But it would be something that would
5  need to be written, voted on in front of the
6  public, and not in violation of the Sunshine Act?
7          MR. LETTRICH:  Objection to the
8  form.
9          You can answer.
10         THE WITNESS:  I would say yes to
11 most of that.  I believe there is some sort of
12 document that any contracts that are under -- at
13 the time it was under $10,000, were just on a
14 list.  And in a meeting, this list would vote on
15 contracts on whatever this list was called and it
16 would just -- and they, I believe, all had copies
17 of what those contracts were.
18 BY MS. SMITH:
19 Q.      We spoke earlier about Ms. Murray and an
20 error she made regarding the annual certification
21 of repository sales?
22 A.      Okay.
23 Q.      Do you recall speaking about that error?
24 A.      The one where you said there was like

Page 264

1  $17 million, thousand dollars, whichever it was.
2  Q.      17 million, yeah.
3  A.      Yeah.
4  Q.      Did you work at the county when that
5  error was made?
6  A.      I don't know.
7  Q.      Do you know if Ms. Murray was suspended
8  at all for that error?
9  A.      I don't know that Ms. Murray was
10 suspended any time that I was there.  No, she
11 wasn't.  So if, in fact, it happened while I was
12 there, then, no, she wasn't suspended for it.  It
13 certainly wasn't something I did an investigation
14 on, that I can tell you.
15 Q.      Any other instances or individuals who
16 engaged in behavior that you can think of that was
17 more egregious then what you believe my clients
18 did regarding LexusNexis, was there was no or less
19 suspension issue?
20         MR. LETTRICH:  Objection to the
21 form.
22         But you can answer.
23         THE WITNESS:  I mean, the worst I
24 already -- the one with Lisa.  I mean, not that I

Page 265

1  can think of off the top of my head.
2  BY MS. SMITH:
3  Q.      Let's go with suspensions.  Can you
4  think of any other suspensions?
5  A.      Yes.  We had -- we had -- Randy Nigh had
6  been suspended.  There was an incident actually
7  that involved Jane Doe 4 that he -- I don't know
8  if he said something to her, touched her back,
9  something, and it was right about the time this
10 whole thing started.  And he was suspended without
11 pay, I believe, for ten days.
12         I know there were -- the young woman in
13 tax -- the woman in tax claim, I forget what she
14 did.  She was suspended for three days.
15 Q.      Do you know who that was?
16 A.      Yeah.  Pam.
17 Q.      Beidle?
18 A.      Yeah.  Pam Beidle.
19 Q.      Are there any times that you can think
20 of where someone should have been suspended and
21 was not?
22 A.      I think Heather should have been
23 suspended for that -- the HR specialist who
24 changed the county administrator's checking

Page 266

account.  Not that I can think of off the top of
may head.
Q.      Are you familiar with the county's or
what was the county's social media policy at the
time you were employed?
A.      Yes.
Q.      Do you believe that -- let's start with
this:  Do you know who Linda Marchalk is?
A.      Yes.
Q.      Do you believe if Linda Marchalk went on
Step Up To The Mic, a local radio show, and made
comments about the operations of county offices,
that that would violate the social media policy?
        MR. LETTRICH:  Objection to form.
        You can answer.
        THE WITNESS:  I -- I would have to
look at the social media policy to answer that.  I
would think it certainly would -- would not be
appropriate, I'll tell you that.  It certainly
would -- yeah, I just wouldn't think it's
appropriate, that's for sure.
BY MS. SMITH:
Q.      Do you think it would warrant
discipline?

Page 267

A.      You can't discipline an elected
official.
Q.      But if she wasn't elected, would it
warrant?
A.      If she had violated a policy, yes.  If
she made disparaging statements, yes.  And there
is -- there is a policy that talks about, even a
person's behavior outside of -- you know, some
people had -- while I was there, people had made
statements, well, this isn't on county time or on
county property, so there's nothing that can be
done about it.  But there is a policy, I think
it's conduct and behavior, but I'm not positive,
where it states that if you work for the county,
you are sort of representing the county and your
behavior, even outside of the workplace, reflects
on the county and therefore can bring disciplinary
action.
Q.      Did you ever hear Defendant Bender state
or tell anyone that he does not provide the
Democratic commissioner with the same information
he provides to the Republican commissioners?
A.      I can tell you during the 2019 election,
there was a debate and I know that Commissioner

Page 268

Hess asked for certain statistics and Commissioner
Staudenmeier asked for certain statistics.  And I
know this because Gary Bender told me.  And he
made the statement, if you think I gave
Commissioner Hess the same information I gave to
Commissioner Staudenmeier, you would be mistaken.
He said he knows how to manipulate numbers to make
them say what he wants them to say and he told me
that himself.
Q.      Do you believe that Defendant Bender on
any other occasions, left Commissioner -- let's
strike that.
        Let's clear this up.
        Currently, Halcovage and Hetherington
are two seated commissioners and they are
Republican, correct?
A.      Correct.
Q.      Hess is the sole Democratic
commissioner?
A.      Correct.
Q.      Do you believe that on any other
occasions, Defendant Bender withheld information
intentionally from Commissioner Hess?
A.      Yes.

Page 269

Q.      Can you tell us what information or give
us any examples?
A.      No.  But I know that I have gone to him
and asked -- like, asked him questions about
things that he knew nothing about.
Q.      When you say he, you mean Commissioner
Hess?
A.      Commissioner Hess, yes.
Q.      Is it stuff -- the stuff you asked
commissioner Hess about, which he knew nothing
about, is it stuff that you knew Defendant Bender
had shared with Commissioner Halcovage or
Commissioner Hetherington?
A.      Yes.
Q.      Is it information that Defendant Bender
should have shared with Commissioner Hess?
A.      I think -- I think all three
commissioners should get the same information in
the same fashion, irregardless of what party
they're with.  They are there to run the damn
county.  If you don't give them the information,
how are they supposed to do their job properly?
Its -- yeah.
Q.      Speaking of getting the same information

Page 270

1  to be able to do one's job properly, do you think
2  that in your time after the investigation of June
3  of 2020, until you resigned, do you believe that
4  Jane Doe 3 was being provided the assistance and
5  supplies and personnel that she needed to properly
6  run the offices she was overseeing?
7        MR. LETTRICH:  Objection to form.
8        You can answer.
9        THE WITNESS:  Can you be more
10  specific about what you're talking about?
11  BY MS. SMITH:
12  Q.     Did she have enough staff in the
13  assessment and tax claims office?
14        MR. LETTRICH:  Same objection.
15        You can proceed.
16        THE WITNESS:  I believe she was
17  wanting to hire more staff, but I don't know that
18  that happened.  I know that there was -- at one
19  point they were hiring someone and somehow it
20  turned out to be a niece or some relative of Linda
21  Marchalk and I don't know whether it was --
22  because I remember having a conversation with
23  Commissioner Hetherington about filling the
24  position.  He made it clear that Linda's --

Page 271

1  whatever, niece, whatever sister in law, I don't
2  remember what her relationship was, was the person
3  who would be filling that position.  I was
4  concerned because I knew there were tensions with
5  Jane Doe 3 and Linda Marchalk.
6  Q.     In your time with the county,
7  specifically the time watching Jane Doe 3 and Jane
8  Doe 4 oversee both assessment and tax claim
9  offices, based on that, are you able to form an
10  opinion as to whom best would know what those two
11  offices need?
12        MR. LETTRICH:  Objection.
13        You can answer.
14        THE WITNESS:  Yes.
15  BY MS. SMITH:
16  Q.     Who --
17  A.     I would think Jane Doe 3 and Jane Doe 4.
18  Q.     If they were asking --
19  A.     And in the same sense, I think I would
20  be the best person to know who should be hired in
21  HR.  And I think Scott Crater would be the best
22  person to know who should be hired in 911.  And I
23  can go through every office.  Of course the people
24  who were there, the experts, the subject-matter

Page 272

1  experts are the best one for it, in department.
2  Q.     You might have heard me mention STEB
3  earlier, the STEB reports?
4  A.     Yes.
5  Q.     Are you familiar with them?
6  A.     I have heard the name.  You told me what
7  it was and I cannot repeat it to you right now if
8  I had to, not if my life depended on it.
9  Q.     Kind of answer my question, but I'm just
10  going to get it on the record.  At any point
11  during your employment with the county, did you
12  monitor, get involved with, or have anything to do
13  with making sure the STEB reports submitted to the
14  state in compliance with the deadlines?
15  A.     No.  No, I wouldn't even know what they
16  are.
17  Q.     Is that any role of HR, in your opinion?
18  A.     No.  No.
19  Q.     Is the day-to-day operations of the
20  offices any -- should HR become involved in any of
21  the day-to-day operations of offices?
22  A.     Only as it relates to, are we adhering
23  to union contracts.
24  Q.     HR or someone in the HR office, maybe

Page 273

1  not the director, but are they responsible for
2  paying renewals of the CPE licenses for employees?
3  A.     No.  That would be -- no.  That would
4  be -- any repayment of licenses would -- I mean,
5  an expense report would be completed.  It would be
6  submitted, the department head would sign off on
7  it.  It would be signed off, I guess, by Gary
8  Bender, and then it would go to the controllers
9  office.
10        MS. SMITH:  I think I'm going to
11  defer now to Amber Fox and the DOJ.  Obviously if
12  there is time left, we will reserve collectively
13  on this side the right to continue to question
14  you.
15                - - -
16              Examination
17                - - -
18  BY MS. FOX:
19  Q.     Good afternoon, Ms. Twigg.  My name is
20  Amber Fox.  I am with the Department of Justice.
21  I think that you've heard everything before from
22  Ms. Smith as far as answering questions audibly
23  and letting me finish my questions.  I know it's
24  getting late in the day, so we will do our best.

Page 274

1  A.    Okay.
2  Q.    And myself or the court reporter will
3  remind you if we need to, but I also apologize if
4  I am skipping around a lot. Ms. Smith covered a
5  lot of ground, so I am just going to probably be
6  asking some follow-up questions to a few things.
7  A.    Okay.
8  Q.    I would like to start by starting
9  looking at Exhibit-71, which we went through in
10 quite a bit of detail. I will give you a minute
11 to get there. And these are your note about the
12 complaints against Commissioner George Halcovage
13 and Schuylkill County.
14 A.    Yes.
15 Q.    So if I can direct your attention to
16 Page 8 of this document, the page that has the
17 handwriting that says against the law, it's
18 circled.
19       And it says Jane Doe 2 made accusations
20 that George records conversations on his iPad,
21 that he takes photos of people with his phone
22 without their knowledge.
23       Did I read that correctly?
24 A.    Uh-huh.

Page 275

1  Q.    Yes or no?
2  A.    Yes. Sorry.
3  Q.    Did you know that Mr. Halcovage or
4  Commissioner Halcovage was making these
5  recordings?
6  A.    No. And I can tell you shortly after
7  this happened, I was walking outside. He was
8  sitting -- George Halcovage was sitting in his
9  vehicle, he was on his phone and he called me over
10 to ask me a question. And it became very clear, I
11 wanted to know who was on the other end of that
12 phone and who was listening to the call. And he
13 literally showed it to me to put me at ease.
14 Q.    You were concerned that he may --
15 A.    After I heard this, yes.
16 Q.    -- record you? Okay.
17       That was first time you had heard of
18 that situation?
19 A.    Yes.
20 Q.    Did you look into it in any more detail
21 or investigate that allegation?
22 A.    No.
23 Q.    Why not?
24 A.    Because I was busy doing this -- and we

Page 276

1  had COVID and we had layoffs and then we were
2  bringing people back. Honestly, I was -- and at
3  the time, there were two of us in HR. There
4  wasn't time to do all of that. I figured it would
5  get addressed with the rest of this.
6  Q.    Okay.
7        Am I right that between the date of this
8  allegation and your last date of employment, it
9  was roughly three to four months?
10 A.    No. This was end the of June. I left
11 September 4th, it was two months.
12 Q.    Turning to the next page, at the very
13 top, there's an entry here, Wednesday, May 27,
14 2020, meeting with Commissioner Gary Hess, which I
15 believe you discussed with Ms. Smith.
16       And my -- it says here that Commissioner
17 Hess stated that although he had never personally
18 seen anything between the two of them, meaning
19 Jane Doe 1 and Commissioner Halcovage, the
20 assumption was always there.
21       Did you ask him what he meant by that?
22 A.    I don't know that I did. I assumed he
23 meant the assumption was there that there was a
24 relationship.

Page 277

1  Q.    Were you surprised when he said that?
2  A.    Yes. Well, do I want to say yes? I
3  mean, at this point I don't know that I was
4  surprised by a whole lot, but I just accepted it
5  for what it was.
6  Q.    Okay.
7        So you had previously testified that you
8  interviewed Defendant Halcovage twice.
9        Can you tell me what his demeanor was in
10 your first interview with him?
11 A.    It was like a normal interaction that we
12 had had. It wasn't -- I don't think it was -- I
13 don't think it was -- it was cordial. I mean, he
14 wasn't defensive. He wasn't -- it was cordial.
15 Q.    You said that that was the normal
16 interaction you generally had with Defendant
17 Halcovage?
18 A.    Like I said, at one point in time I
19 considered him a friend, yes.
20 Q.    And then there came a time when you had
21 a second interview with Defendant Halcovage.
22       What was his demeanor in that interview?
23 A.    I think he was probably a little bit
24 more defensive. There were times where his

Case 3:21-cv-00477-MCC   Document 280-1   Filed 09/20/23   Page 75 of 342
Deposition of Debra Twigg - Revised
Jane Doe, et al. v. Schuylkill County Courthouse, et al.

Page 278

1 attorney became angry. I think George may have
2 been angry. I don't know, but it was more
3 defensive. It wasn't as cordial as the first
4 interview.
5       But my questions were a lot -- well, no.
6 They were pointed in both of them.
7 Q.      You said they were pointed?
8 A.      Pointed. They were very pointed
9 questions, yes. Direct, specific.
10 Q.     Do you have any opinion as to why
11 Defendant Halcovage seemed more defensive in his
12 second interview?
13 A.     No, I can't tell you why. Well, I have
14 my opinion, but that would just be my opinion.
15 Q.     What is your opinion?
16 A.     I was asking questions that involved --
17 most of the time, conversations that happened
18 between him and I, so I already knew the answers
19 to the questions I was asking. Maybe that caused
20 him to be uncomfortable. I don't know.
21 Q.     Okay.
22       Can I direct your attention now to
23 what's been previously marked as Exhibit-4, which
24 is supplemental 2230 to 2254.

Page 279

1 A.      Okay.
2 Q.      So directing your attention in this
3 document to Bates No. 2240, Question No. 49.
4       You had explained your answer to
5 Ms. Smith or your question, rather. Defendant
6 Halcovage answered, no, the only time I would
7 record is if I had some -- would have something
8 talking to Dr. Levine, then he would delete it.
9       Did you know who Dr. Levine is?
10 A.     No, I don't. No, I don't.
11 Q.     Did you ask who Dr. Levine is?
12 A.     No.
13 Q.     And looking a little bit further down
14 the page to Question 51.
15 A.     Uh-huh.
16 Q.     Says: What is your relationship with
17 Jane Doe 1. And the answer here, friend,
18 colleague, consensual relationship outside of
19 here.
20       Did I read that correctly?
21 A.     Uh-huh.
22 Q.     Below, I won't read it, you can read it
23 to yourself, but it says that you interrupted
24 George and you explained there could never be a

Page 280

1 consensual relationship with Jane Doe 1 due to his
2 position of power.
3       Do you see that?
4 A.      Yes.
5 Q.      What led you to explain that to him?
6 A.      Because he stated that he was in a
7 consensual relationship. As I mention ed at the
8 beginning of the day, part of what I studied in
9 school was working with -- rehabilitating sex
10 offenders. One thing that was drilled into my
11 head from that point in time is if someone is in a
12 position of power over another person, there is no
13 way there could ever be consent. And I wanted to
14 correct him and make him aware that there is no
15 way that there could be consent simply because of
16 the position of power he had over her with her
17 job.
18 Q.     That's because he was commissioner and
19 Jane Doe 1 --
20 A.     He was commissioner chair and she --
21 when she first started, was a part-time employee,
22 the lowest -- probably the lowest rung of the
23 ladder. And he was at the top of the ladder, that
24 prohibits consent.

Page 281

1 Q.      Okay.
2       Let's take a look now at 2247. And
3 about halfway through the page under Question 2,
4 you were asking questions of -- as you testified
5 earlier, you were asking Defendant Halcovage
6 questions about previous comments of a sexual
7 nature in the workplace.
8       Do you recall that testimony?
9 A.      Yes.
10 Q.     And am I correct that you overheard him
11 make these sexualized comments in the workplace,
12 as described in this document?
13 A.     Some he made to me in my office. The
14 ones where -- like this one, No. 2, previously
15 stated in Question No. 9, the original questions,
16 that he had not steered conversation with Jane Doe
17 3 and Jane Doe 4 or other members to sexual
18 names... (reading to self).
19       So, no, I was not privy to the ones that
20 he had in the tax claim, tax assessment office. I
21 was only privy to the ones that he had in my
22 office.
23 Q.     Which ones were those?
24 A.     Well, the one about Christy Joy. The

Page 282

1  one about the district attorney.  The one about
2  Ginny Murray being a lesbian.  Off the top of my
3  head, those are the ones I can think of.
4  Q.      Now, at any point in your experience of
5  overhearing those comments, did you ask him to
6  stop making those comments?
7  A.      No.
8  Q.      Why not?
9  A.      Why didn't I?  Honestly, I can remember
10 sitting there thinking, well, why is he discussing
11 this.  I don't know.  I just didn't -- I wasn't --
12 I also wasn't -- to me, the stories that I heard,
13 he couldn't even touch with a ten-foot pole, the
14 things that I heard when I was a therapist.  I
15 heard people telling stories where they had sex
16 with animals.  So, you know, listening to what --
17 this little comment about the controller, it was
18 like I just ignored it, I guess.
19 Q.      So you personally, you just kind of blew
20 off the comment?
21 A.      Yeah.  And should I have questioned
22 whether he was having similar conversations with
23 other people, yes.  In hindsight I should have and
24 I didn't and the's on me.  Sorry.

Page 283

1  Q.      Don't apologize.
2          Okay.
3          I would like you to now look at
4  Exhibit-69 and I apologize for making you skip
5  around, but trying to move quickly.
6  A.      Do I have Exhibit-69?
7          MS. IPPOLITO:  Sorry.  Which one?
8          MS. FOX:  Exhibit-69, the interview
9  notes of Jane Doe 1.
10 BY MS. FOX:
11 Q.      These are the interview questions for
12 Jane Doe 1.
13 A.      Okay.
14 Q.      On page -- what's Bates stamped No.
15 SCDOJRP556, Question No. 8 -- in the third bullet
16 point under Question 8, the very last sentence
17 says:  Glenn asked if he ever told her he loved
18 her.  She said yes, he told her he loved her.
19         Did I read that correctly?
20 A.      Yes.
21 Q.      Okay.
22         Did you ever ask Jane Doe 1 if she loved
23 Defendant Halcovage or she ever said she loved
24 Defendant Halcovage?

Page 284

1  A.      I don't remember.  It would seem like a
2  logical question after asking...
3  Q.      If she had said yes, she had said she
4  loved Defendant -- told Defendant Halcovage that
5  she loved him once -- strike that.
6          If you had asked that question of Jane
7  Doe 1 and she had answered in the affirmative,
8  that, yes, she once told Defendant Halcovage that
9  she loved him, would that have changed your
10 conclusion that Defendant Halcovage violated the
11 policies?
12 A.      No.
13 Q.      Why not?
14 A.      Because someone in power over another
15 human being cannot -- that person who is not in
16 power cannot -- their consent is taken away by the
17 nature of the power of the other person.  That's
18 basic treatment of sex offenders.  Basic.  And,
19 sorry, we would go through 35 weeks of therapy
20 with these people and it was something I had to
21 drill into their heads.  We don't -- sorry.  I'm
22 back to that.
23         The children that were molested, they
24 didn't -- they weren't necessarily molested by

Page 285

1  strangers.  They were molested by family members
2  or people that they trusted or people -- does that
3  create conflicting thoughts their head, yeah, but
4  it doesn't take away the fact that they don't
5  have -- there is no consent if someone is in a
6  position of power over you.
7  Q.      We talked a lot today about the
8  investigation you conducted into Jane Doe 1's
9  complaints of sexual harassment and hostile work
10 environment.
11         During the course of your investigation,
12 at any point during the investigation, did the
13 county tell you to do anything with which you
14 disagreed?
15 A.      Only the incident that I mentioned
16 earlier where, you know, Glenn had made the
17 statement that I shouldn't put in the report that
18 I would recommend he resign.
19 Q.      That's Glenn Roth --
20 A.      Yes.
21 Q.      -- and he resign meaning Defendant
22 Halcovage?
23 A.      Yes.  Other than -- when I went to Gary
24 Bender, his first response was we do this by the

Case 3:21-cv-00477-MCC   Document 280-1   Filed 09/20/23   Page 77 of 342
Deposition of Debra Twigg - Revised
Jane Doe, et al. v. Schuylkill County Courthouse, et al.

Page 286

book. And he was adamant the way he said it. It was in his stern voice, shall I say. But in this case, I agreed with his statement.

Do I think since I've left that things have gotten way out of control? Yes, I do.

Q. How has it gotten out of control?

A. Well, I don't necessarily think things are being done by the book anymore.

Q. Can you give me an example?

A. Well, the suspension for a year without pay, that's crazy. Do I truly believe that, like I was told, that if I was going to testify in a case that went against the county, I would be discredited. Do that I believe's what's been done to be these two women, yes, I believe that they have -- the attempt was these were credible people. These were people who had stellar employment. They had no write ups. No problems. And do I believe that the thought process there at the county is, well, we will discredit them so that they can not be considered credible witnesses, that's exactly what I believe happened. That's retaliation, I believe, in my book.

Q. So you mentioned doing things by the

Page 287

book and -- well, let me back up a little bit.

When you started working at Schuylkill County, how many years experience did you have in human resources, roughly?

A. Okay. My first job in human resources was started April 1, 1992. I started at the county January 8, 2018. So 26, 27, I'm not the best at math.

Q. Better than me, so I will go with that.

A. Okay.

Q. Roughly that time period.

A. I mean, in 2022 it's 30 years. So that was, what, five years ago, so 25 years.

Q. So in those 25 years of human resources experience, had you conducted investigations?

A. Yes.

Q. Roughly how many?

A. I can tell you from -- within my first three months, within my first six months, I know at my first job I had to conduct an investigation and I wasn't -- in my first six months, I was not -- I was trained or educated in human resources. And so what I did was I took -- I used the logic I learned in psychology, you know, to

Page 288

make sure you get the objective, you have to get all the facts, you have to look at -- you know, in a sense like a control issue. When you do testing in psychology and things like that, you always have a control subject so that you know that something isn't just an inference. It's not a coincidence. So I used all of that information on to -- at the beginning, how to conduct an investigation.

But since then, I have been through umpteen trainings. I have been through two certifications. I have been through -- so I have been doing them essentially now for pretty much 30 years or 29, let's say.

Q. So it's fair to say that you understand that doing something by the book is based upon your knowledge and experience in human resources?

A. It's -- yeah. That means you do it -- you do it, but you do it by the book. The book says you're objective, you're fair, you're honest. You don't lie, you don't bend the truth, you don't do -- yeah.

Q. Again, I am skipping around and I apologize for that.

Page 289

You had testified earlier that there were certain individuals in the 911 call center, I believe, and in the prison who had received pay raises without taking on any additional duties, which you understood to be different from the normal way that the county handled pay raises, which was to give a pay raise when someone took on additional duties.

Do you remember that?

A. Yes.

Q. Is that a fair statement of your testimony?

A. Yes.

Q. Do you recall those individuals in the 911 Call center and the prison, do you recall what gender those people were?

A. In the prison, the lieutenants, I believe they're all males. The 911, the majority of -- I believe the majority was males. I don't know if they were all males. There may have been females in the supervisor range.

Q. So the majority of those individuals were men?

A. I believe so.

Deposition of Debra Twigg - Revised
Jane Doe, et al. v. Schuylkill County Courthouse, et al.

Page 290

1  Q.     Now, can I now direct your attention to
2  Exhibit-68, which was the Supplemental 170 to 180.
3  A.     I got it.
4  Q.     Exhibit-68, this is your final report,
5  your investigation findings of sexual harassment,
6  hostile work environment claim by Jane Doe 1, Jane
7  Doe 3, Jane Doe 4, and Jane Doe 2?
8  A.     It looks like that's what it is, yes.
9  Q.     Okay.
10 A.     I would have thought the date was
11 earlier than June 24th, but I guess -- or was
12 later than June 24th, but I guess not.  Okay.
13 Q.     Now, did anyone help you write this
14 report?
15 A.     No.  I mean, I probably had Glenn review
16 it and I believe I sent it to Christopher Scott
17 for review as well.
18 Q.     Did they provide any feedback or
19 changes?
20 A.     Yes.  Christopher Scott had mentioned
21 that -- that I shouldn't include any
22 conversations, any personal things.  He said I
23 need to just have it be totally objective.  You
24 know, like any comments that were said to me by --

Page 291

1  the sexual comments and things like that.  If
2  there were instances where policies were violated
3  by something that was said, that what was said to
4  me was not to be included just because -- to be
5  objective.
6  Q.     Anything else you recall?
7  A.     I know there was -- no.  I mean, there
8  were concerns -- I know that both Glenn and Gary
9  Bender were anxious for me to finish the report.
10 It had take well over a week, but I wanted to make
11 sure I got it accurate and that I got it right and
12 that, you know, the ultimate decision on it would
13 be a fair decision based on the information that
14 was provided.
15 Q.     What was the ultimate decision?
16 A.     That -- well, I will read it to you.
17        Were these allegations made by a
18 nonexempt hourly employee against a
19 management-level employee, the management-level
20 employee would have been suspended immediately
21 pending an investigation.  Following the
22 investigation, the management-level employee would
23 have been subject to a hearing and discipline.
24 Based on these types of allegations, the

Page 292

1  discipline would have been employment termination.
2        Commissioner Halcovage is an elected
3  official and as such, is not subject to discipline
4  or removal as a commissioner by the county
5  administration.  However, based on seriousness of
6  the allegations and findings, it's recommended
7  that Commissioner Halcovage resign his position as
8  commissioner.
9  Q.     Did you make those final conclusions in
10 your report?
11 A.     Yes, this is it.
12 Q.     Okay.
13        Has anyone else outside of the county
14 questioned you about the investigation?
15 A.     Yes.
16 Q.     Who?
17 A.     What day is today?  Two weeks ago
18 yesterday, the 15th, I was across -- I believe
19 it's across the street somewhere at the house
20 judiciary subcommittee, I testified as well.
21 Q.     Okay.
22        Any other times that you've been
23 questioned about your investigation outside of the
24 county questioning you or talking to you about it?

Page 293

1  A.     You mean officially?  No, I don't think
2  so.
3  Q.     Just trying to understand.
4  A.     Yeah.  No, now you -- wait.  Did
5  anyone -- no, I don't think so.
6  Q.     Okay.
7  A.     I mean, I had questions, initial
8  questions from Ms. Smith, but...
9  Q.     Okay.
10        Are you aware that -- it looks like
11 three days following the date of your report,
12 Defendant Bender wrote to Commissioners Hess and
13 Hetherington to essentially recap the findings of
14 your investigation?
15 A.     I don't recall it.  It doesn't mean it
16 wasn't ever...
17 Q.     Okay.
18        MS. FOX:  Let's me go ahead and get
19 one exhibit.
20        - - -
21        (Whereupon brief recess was held off the
22 record.)
23        - - -
24        (SC000436-438 marked as Exhibit-5

Page 294

1  BY MS. FOX:
2  Q.      Ms. Twigg, I will hand you what's been
3  marked as Exhibit-85.  It's SCDOJRFP000436 through
4  438.
5          Have you ever seen this document before?
6  Take a minute to look at it.
7          MS. JONES:  Hello, this is Marie
8  Jones.  While you were looking at that document, I
9  just wanted to note for the record I had jumped on
10 for a little bit.
11         MR. GEIGER:  What number is this?
12         THE WITNESS:  I think I was aware
13 of -- there was a point in time where I believe he
14 was -- Gary Bender was writing this.  And on a
15 Saturday, he had Glenn and I go up there because
16 he had questions about the -- he wanted to confirm
17 that he was getting things right in the order that
18 he said.  Like he was -- so I do -- I do think I
19 knew that he was writing a statement.
20 BY MS. FOX:
21 Q.      By up there, do you mean up to the
22 courthouse?
23 A.      To the courthouse, yeah.
24 Q.      I will direct your attention to the

Page 295

1  second page.  The fifth full paragraph beginning
2  with the investigation, it says here that I,
3  meaning Defendant Bender, informed Commissioner
4  Hess and Commissioner Hetherington that we will
5  discuss the results with them Thursday, but they
6  were not available.  The meeting was set for
7  Friday, June 26th.  I reviewed the report on
8  Thursday, June, 25, 2020, and had some changes.
9          Did I read that correctly?
10 A.      Yes.
11 Q.      Earlier you had talked about having a
12 meeting with Commissioners Hetherington, Hess,
13 Defendants Bender and Roth.
14         Do you recall that testimony?
15 A.      Yes.
16 Q.      The meeting referenced in this document,
17 is that the same meeting you were testifying about
18 earlier?
19 A.      No.
20 Q.      No.  What meeting was this?
21 A.      Well, sorry.  I'm -- yes, I'm assuming
22 that Friday the 26th is where we met and I gave
23 him the document.  Sorry.  I am still stuck on, he
24 had some changes and I am wondering what those

Page 296

1  were.
2  Q.      So you disagree with Defendant Bender's
3  statement that he had some changes?
4  A.      I don't recall what they were if he did.
5  I guess I'm questioning, did he make chances
6  after -- but I was still there, so...
7  Q.      You're questioning whether he made
8  changes to the report after you completed it?
9  A.      Yes.  I am curious what those -- yeah.
10 I am questioning where he said he had -- and had
11 some changes.  I don't -- but it's been two and a
12 half years, so...
13 Q.      Sure.
14         I want to come back to that, but before
15 we do that.  I want to go to the -- back to this
16 meeting on Friday, June 26.
17         Is that the meeting you were testifying
18 about earlier when you talked to Commissioners
19 Hess, Hetherington and Defendants Bender and Roth
20 about the report?
21 A.      And where Chris Hobbs was there as well
22 and Christopher Scott was on the phone, that
23 meeting, yes.
24 Q.      That was the meeting?

Page 297

1  A.      Yes.  Yes.
2  Q.      Okay.  All right.
3          Did you take any notes during that
4  meeting?
5  A.      No.  I think we just reviewed the
6  documents, I answered any questions that they had
7  concerning all of the information I had provided
8  them.
9  Q.      Did you know whether anyone else took
10 any notes during that meeting?
11 A.      I don't think so.  I don't -- well, I
12 mean, Christopher Scott was on the phone, so I
13 have no idea what he did.
14 Q.      Okay.
15         Is there anything else in this document
16 that you question or disagree with?
17 A.      I guess I would question this, that the
18 affair began during the employee's first year with
19 the county when she was a mailroom clerk.  I
20 thought she said it started in 2014.  I thought he
21 agreed it was 2014.  I thought she was there and
22 this may be wrong.  I thought she started part
23 time in the mailroom.  I don't know when -- did
24 she start?  I don't remember when she started.

Page 298

1 Sorry.
2 Q.      I think it says that it began during her
3 first year when she was a mailroom clerk.
4 A.      Right.  But when I spoke with her, it
5 says for the last six years she had been -- being
6 harassed.
7       I won't repeat it all.  Sorry.
8       When she started here in 2014, and this
9 is saying -- didn't this just say 2012, I thought.
10 Q.      No.
11 A.      Okay.  Nevermind.
12 Q.      It's the end of the day.
13 A.      It's the end of the day.  My brain --
14 okay.  Nevermind sorry.
15 Q.      Okay.  No problem.
16 A.      I don't -- I mean, briefly looking at
17 it, no, I don't have any issues, except I'd
18 question what the -- had some changes.  Maybe they
19 were just grammatical or -- I don't know.
20 Q.      Okay.
21       So turning back to the second page
22 again, the first full paragraph, the last sentence
23 says:  We also discussed accommodations for these
24 employees, including working from home to ensure

Page 299

1 that they are comfortable working for the county.
2       Do you recall those discussions?
3 A.      I recall --
4 Q.      Were you part of those discussions?
5 A.      I'm sure I was.  I recall there were
6 conversations, I know there were conversations
7 about parking spaces.  Like I said earlier, I
8 assume there were -- yeah, I don't recall.  I'll
9 just leave it at that.
10 Q.      I think you had testified earlier that
11 there was a conversation involving Sheriff Groody
12 concerning parking; is that right?
13 A.      No.  No.  Well, parking spaces, but
14 there was a conversation with Sheriff Groody
15 concerning access to the courthouse by
16 Commissioner Halcovage and what should and
17 shouldn't be restricted.
18 Q.      Okay.
19       Do you know whether you or anyone else
20 took any notes during that meeting, the one you
21 just described?
22 A.      I don't know.  I don't know.
23 Q.      Am I right that you don't recall having
24 any discussions about accommodations for these

Page 300

1 employees or that you recall having them, but --
2 A.      I know we had a lot of discussions about
3 accommodations.  I can't tell you exactly when.  I
4 can't tell you on what day what was said, but
5 there were a lot of discussions about it.
6 Q.      With whom?
7 A.      With Gary Bender, Solicitor Roth.
8 Q.      Anyone else that you can recall?
9 A.      If we're talking about -- well, there
10 were some that the sheriff was involved -- Sheriff
11 Groody was involved with that concerned the
12 safe -- you know, these women feeling safe and
13 what could we do.  I think Brian Tobin, who is --
14 I think his official title is chief deputy, was
15 also involved in those conversations.  Yeah, I
16 can't -- trying to think who else would be
17 involved in those conversations.
18 Q.      And during those conversations, what was
19 your position about -- or what did you believe
20 should be done to keep the --
21 A.      I believe you do whatever you have to to
22 keep these people to feel safe.
23 Q.      Would working from home be one thing --
24 A.      Yes.

Page 301

1 Q.      -- you thought they should do?
2 A.      Yes.
3 Q.      You have to let me finish.
4 A.      Sorry.  Sorry.  Yes.
5 Q.      Okay.  Okay.
6 A.      Because what happened during COVID, it
7 literally, in a sense, was proven that the jobs
8 could be done remotely, because, again, a number
9 of people were furloughed, but a number of
10 people -- and I believe in claim and tax
11 assessment, there were -- they had the ability to
12 work from home and to log in through working at
13 home, and so it was proven that it could be done
14 and it could be done effectively.
15 Q.      So long as people who are working from
16 home have all the equipment that they need to
17 perform their job?
18 A.      Yes.
19 Q.      Was there a point in time during the
20 pandemic when every Schuylkill County employee was
21 working from home?
22 A.      No.  I never worked from home.
23 Q.      Did any of the commissioners ever work
24 from home?

Page 302

A.      I'm sure.  An elected official doesn't
have to be there eight hours -- seven hours a day.
Q.      Do they have to -- well, strike that.
        So could Defendant Halcovage have worked
from home following the conclusion of your
investigation, let's say?
A.      Technically he could have.  I don't know
that -- I don't believe -- how do I say this.
There were discussions at some point in time prior
to the pandemic about whether commissioners --
like if they were out of town or something during
Wednesdays normal commissioner meeting, could they
phone in, could they participate that way.  It was
not done, it was not -- there was talk about it,
but it was never put into place.
        So for any time, except for that
particular time, I believe he would need to be in
the courthouse for the commissioner meetings,
Wednesday mornings at 10:00, salary board meeting,
prison board meetings.
Q.      Was your understand that he had to be
physically present for those meetings based on
your understanding of quorum rules or something
else?

Page 303

A.      I just know they had to be physically
present.  Yes, you have to have a quorum, but --
but -- yeah, I don't know.
Q.      Are you aware of any rules that would
have permitted Defendant Halcovage to appear by
Zoom or some other sort of video conferencing
technology?
A.      No, I'm not.
Q.      So I want to shift gears a little bit.
        You had testified earlier about the
conclusion of your investigation, the submission
of your report, these meetings, and you testified
that you were left out of conversations?
A.      I felt like I was left out of
conversations.
Q.      Why did you feel like that?
A.      Because there was a point in time where
I was involved in a lot of conversations, even
ones that didn't deal with HR, but dealt with
county and county business.  And then I believe
that that happened less and less, even
conversations that I think involved HR issues.
Q.      Okay.
        Are you aware of specific conversations

Page 304

that you were left out of?
A.      No, because I wasn't in them, so I
wouldn't be able to say.
Q.      Of course.
        So did you just notice then that --
A.      It was a different feel.
Q.      That's because you had generally been
involved in several conversations throughout the
course of one day, and subsequent to your report,
you then were not involved in as many
conversations in a day; is that --
A.      I think as time went on and I think I
wasn't trusted.
Q.      Why do you think that?
A.      Because I would stand up to things that
I -- it's like, look, we need to -- this is the
right way to do this.  This is the -- and I just
think I was seen as probably siding with the
plaintiffs.
        When I gave my resignation notice, I
believe it was when I turned in my notice, I
believe Gary Bender made the statement, oh, so now
there will be five complaints.  He made an
assumption that I would join the lawsuit.  And I

Page 305

told him that that was not true.  I'm not the
person who is just going to just go and sue
somebody for the sake of doing that.  No, so
you're wrong.  And two and a half years later,
he's still wrong.
Q.      And how did you feel when he said that
to you?
A.      I felt I made the right decision by
resigning.
Q.      Why is that?
A.      Because just by making that statement,
it proved that he didn't trust me.  That he
thought I was -- that I would join the lawsuit.
Isn't that basically what he said?
Q.      Okay.
        So did you sense that -- well, strike
that.
        Did you feel that Defendant Bender
trusted you before this lawsuit and investigation?
A.      Yes.  Absolutely.  And I trusted him.
It was a two-way street, despite some of the
antics that I went through.
Q.      And is it your opinion that that trust
was broken because you came to a conclusion with

Page 306

which Defendant Bender disagreed?
A.    No, because if you read his statement,
he also seemed to with it.  I think after this as
time went on and things sort of died down and it
was -- I think people thought it would just go
away.  No, I don't think it had to do with the
decision, but I think he had this perspective
that -- to me, if they were asking for
accommodations, you make them.  It's not going
to -- if it's not costing you money, they are
getting their job done, you have to -- that's the
law.  You have to.  You have to make a reasonable
accommodation.  I think because I was advocating
the reasonable accommodation and the things they
were asking, I did not think were unrealistic, I
think I was seen as not being supportive, not
being a management member and doing -- I mean, he
made it very clear earlier during the other
situation, the county pays my paycheck and I
needed to take the county's stand and I wasn't
doing that.  He didn't say that in reference to
this case, he said it in reference to the
Loudermill about firing the individual without --
but if you think it didn't go through my head when

Page 307

all this started, it did.
Q.    Do you recall that a press release was
issued at some point after you completed your
report?
A.    Yes.
Q.    Did you write the press release?
A.    No.
Q.    Did you edit or review it?
A.    No.
Q.    Did you have anything at all to do with
it?
A.    No, I don't believe so.  I believe
Solicitor Roth wrote the press release.  I don't
recall that he -- I don't recall that he ran it
past me, but there have been times where he would
write a -- and I would do the same, where we would
write a document and run it past the other just to
get a second set of eyes to look at it.
      I don't recall that that happened in the
press release.  If I'm wrong, I'm sorry.
Q.    In your role as the human resources
director at Schuylkill County, did you ever
conduct any other investigations into Defendant
Halcovage?

Page 308

A.    No, I don't think so.
Q.    Had you ever heard that Defendant
Halcovage requested employees change political
parties to advance in a job?
A.    Yes.
Q.    When did you hear that?
A.    I heard it during this investigation
from Jane Doe 3 and Jane Doe 4.  And like I said,
it was requested of -- it was requested that I
speak with someone that I was hiring and ask them
to change their political party.  I am not sure if
there were others, but I heard others talk about
it, I just wasn't involved in it.
Q.    I think I know the answer to this based
on your prior testimony, but did you ever
investigate Defendant Halcovage for requesting
employees change political parties to advance in
their job?
A.    No.
Q.    Why not?
A.    I didn't know it was something I should
investigate, to be honest.  I had never worked in
a government-type arena.  I don't even know that
at the time -- to me it just didn't seem right and

Page 309

I wasn't comfortable with it, so that's why I
didn't do it.  Look, one thing I learned is that
when elections happen, new people come in.  A lot
of people lose their jobs, which I still find
unbelievable because you're messing with peoples
lives, peoples incomes.  And just because somebody
gets elected, people lose their jobs, that's crazy
to me.  I just felt it more of that same type of
thing.  I didn't -- I honestly didn't realize it
was something I should investigate.
Q.    During your time as HR director at
Schuylkill County, had you ever conducted any
investigations into Defendant Bender or concerning
Defendant Bender?
A.    I don't think so.
Q.    Okay.
      In your role as human resources director
at Schuylkill County, had you ever conducted any
investigations into Defendant Roth?
A.    No, I don't think so.
Q.    Do you recall any other investigations
you conducted while you were HR director at
Schuylkill County?
A.    Yeah.  There was the one we talked about

Page 310

1  with Mike Van Allen.  There was -- I mean, from my
2  second or third week that I walked in the door
3  there was an issue with the prison, with one of
4  the prison guards.  It started there.  There were
5  a ton.  There were the ones that we did in tax
6  claim with Pam Beidle, with -- who else?  Some
7  from 911.  I can't even -- I remember the guy's
8  name, but I can't even remember what he did.
9  Q.      What's his name?
10 A.      I think his name is Mistishin, last
11 name.  Don't know his first name.  Yeah, it was
12 the -- yeah, there were regularly -- Skibble,
13 maintenance guy.  I mean, there were a ton of
14 them.
15 Q.      Was there an investigation into a
16 Mr. Finnyfrock?
17 A.      Oh, yeah.  I remember that.  Yeah.  He
18 was on some sort of tax board something or other.
19 He had made some comments to Jane Doe 1, I
20 believe.  And at some point he was removed from
21 the board, I believe, from the -- I don't know
22 what the name of the board was.  It was some sort
23 of -- something to do -- I don't know if it was a
24 tax hearing thing or a tax claim board, I don't

Page 311

1  know what it was, tax assessment board, maybe.
2  Q.      You mention Mr. Skibble in maintenance.
3  What was that investigation about?
4  A.      Well, there were a couple on him.
5  One -- I would love to say I could tell you.  Was
6  it something to do with wearing a mask?  It was
7  wearing his mask during -- when COVID first
8  started.  There was an issue and then -- and he
9  had a temper and he went -- I don't know if
10 someone made a statement or someone reported that
11 he was there and he wasn't using a mask and he was
12 on scaffolding.  But there was a second one that
13 dealt with him -- something about like a
14 confrontation he had with his supervisor.
15         There was, you know, Randy Nigh, the one
16 that I talked about who had made -- had
17 inappropriate touching and made comments to Jane
18 Doe 4 and to other people, yeah.
19 Q.      Okay.
20         During the course of your employment at
21 Schuylkill County, did anyone from the county ever
22 criticize your work, your investigatory work?
23 A.      I'm sure somebody did.  I can tell you
24 there was a point in time where -- there was one

Page 312

1  where he had -- it was a COVID case.  At some
2  point, you know, the governor had that hot list of
3  when you were visiting states that were considered
4  hot lists I.  Believe it was children and youth,
5  there was and individual who -- and it was --
6  look, it was a very emotional time.  There was an
7  individual who had gone to one of those places on
8  the hot list, we had meetings with the
9  commissioners, the county administrator, Solicitor
10 Roth, the president judge, the court administrator
11 on how we were going to implement policies.  One
12 of the things that we came up with was -- that
13 everyone had agreed on was that if someone, if an
14 employee went on vacation and there was a form
15 they had to fill out if they were going on
16 vacation, where they were going, if it was a hot
17 list place.  When they -- because we couldn't tell
18 them they couldn't, but when they returned, they
19 then had to -- for ten days they could not come
20 back to work.  They had to quarantine.  They were
21 not allowed to use sick time, they had to use
22 vacation time?
23         There was an individual in children and
24 youth and she did not want to use her vacation

Page 313

1  time.  She had asked if she could take the time
2  unpaid.  I said okay, we could do that.  I spoke
3  with the union business agent, everyone was in
4  agreement.  That woman then filed for
5  unemployment, which I'll be honest, made me angry.
6  I was not happy.  It's like -- because -- it's
7  like wait a minute, you asked for this you, said
8  you wanted to take an unpaid, and now you're
9  trying to file for unemployment.  She said, well,
10 I'm entitled to it.  I said you know what, you can
11 use your vacation time.  If you wanted to be paid,
12 we told you, you could use your vacation time.
13 And I told her that and I had spoken with Gary
14 Bender about it.  He was in agreement.  I held a
15 meeting with the business agent, this individual,
16 her supervisor, and let her know that she would be
17 using vacation time for it, for the ten days.
18 That I had already notified payroll and we had
19 already contacted the unemployment office and let
20 them know, this person had an option to be paid,
21 they chose they wanted to not be paid, so now we
22 were paying them for it so they no longer needed
23 to pay her unemployment.
24         She was not happy about it.  I said it

Deposition of Debra Twigg - Revised                        Jane Doe, et al. v. Schuylkill County Courthouse, et al.

Page 314

1  probably in the same tone I'm saying now, because
2  it makes me a little pissed off when people just
3  want to cheat the system.  It's like just do --
4  it's not rocket science.  You just do the right
5  thing.  She then made a complaint to -- she filed
6  a grievance against me because I was angry in the
7  meeting.  And I went into Gary Bender's office for
8  my 4:00  meeting and he had received the grievance
9  and he asked if -- you know, if I had said this
10 and I went through the whole reiteration with him.
11 And I said the way I'm saying it right now, I was
12 probably more angry than that.  He sort of
13 chuckled and he said, well, I am glad we don't
14 have to argue about that.  And it's like okay.
15 Yeah, I'm sorry.  You know, we were bending over
16 backwards trying to deal with COVID and you have
17 got somebody who just wants to cheat the system.
18 She looks at me and she says, what do you care if
19 I get unemployment.  It's like just do the right
20 thing.  So, yeah, that was definitely one that
21 somebody complained about.
22 Q.      Okay.
23         But Defendant Bender agreed with your
24 assessment in the way you conducted yourself

Page 315

1  during that entire interaction?
2  A.      He agreed with the decision.  Whether he
3  --
4  Q.      With your decision?
5  A.      No.  He was involved in the decision.
6  We talked about it.  We were both in agreement
7  with the fact that she would have to use vacation
8  time.  He never indicated whether he was upset
9  with me that I was angry in the meeting with her.
10 I admitted I was.  I was angry.  It's just -- you
11 just -- come on, we had through the death of a --
12 we went through som many things, one right after
13 another.  Somebody trying to cheat the system,
14 yeah, sorry, had enough.
15         And quite honestly, it sort of led to my
16 resignation because one of the things that
17 happened, a grievance was filed had against me.
18 Gary Bender assigned Solicitor Roth to conduct the
19 investigation because obviously I couldn't, it was
20 a grievance against me.  And in the end, he
21 allowed her to use sick time, which went against
22 --
23 Q.      He being?
24 A.      Solicitor Roth.  I guess Gary Bender had

Page 316

1  to approve it.  But he -- actually he didn't agree
2  with it, but -- because he told me he didn't agree
3  with it.
4  Q.      He being?
5  A.      Gary Bender.
6  Q.      Thanks.
7  A.      But Solicitor Roth made an agreement in
8  that meeting in order to make the grievance go
9  away.  And I resigned.  It's all -- I believe you
10 all have my resignation letter, I am not sure.
11 It's all -- I believe it's all in there.  The
12 president judge was not happy because this is a
13 decision the president judge had -- you know, he
14 helped come up with the policy of how we were
15 going to handle this.  He then reversed every
16 single one of his people, allowed them to use sick
17 time.  Gary Bender was furious.  Furious with me.
18         President judge called a meeting, wanted
19 to talk about it because he didn't want me to
20 resign.  I guess Gary Bender threatened to resign
21 because in this meeting, he said he didn't want
22 Gary Bender to resign.  Yeah, it was not pretty.
23 But, yeah, there have been complaints about me,
24 about an investigation.  I guess I -- I don't know

Page 317

1  if that's what you were referring to or not.  I
2  know -- well, the question was at about how I
3  conduct investigations.
4  Q.      Yeah.  Yeah.  Okay.
5  A.      Obviously some of my employees were not
6  happy because I was a little more strict than the
7  person before me.
8  Q.      I want to switch gears a little bit.
9         Are you aware of any situations or are
10 you aware of any times when a Schuylkill County
11 employee was rude to another Schuylkill County
12 employee and was not disciplined?
13 A.      Yeah.  I'm sure it happened on a daily
14 basis.
15 Q.      Asking the opposite, are you aware of
16 any times when a county employee was rude to
17 another county employee and was disciplined for
18 it?
19 A.      I'm sure it's happened too.  I mean,
20 come on, you've got -- the elected official, every
21 time I tried to do my office that involved her
22 office, she threatened to sue me.  She
23 threatened -- I mean, I had downright threats and
24 you can't do anything to her.

Deposition of Debra Twigg - Revised                    Jane Doe, et al. v. Schuylkill County Courthouse, et al.

Page 318

1  Q.    Who was that?
2  A.    The clerk of courts Marie Casey.
3  Q.    Can you give me any example of any times
4  an employee was rude to another one and was not
5  disciplined, that you can recall?
6  A.    I'm sure.  You know, we talked earlier,
7  I can give you some just in HR.  The HR specialist
8  who reported to me, she also had a very close
9  relationship with Gary Bender.  And if she -- you
10 know, she didn't like something I said, she'd go
11 running to him.  Did we have -- did we get to the
12 point where I confronted her on it and we had a
13 downright, I don't want to say argument, but our
14 voices raised, absolutely.  I mean, her husband
15 used to say.  You two are like sisters.  It's like
16 that's because she doesn't get I'm her supervisor,
17 but that's a whole nother issue.
18        Yeah, there are always -- look, it's --
19 yes.  I would say on a regular basis people are
20 rude to each other in that building.  And are
21 there times -- you know, like I talked about
22 Skibble, he was rude to one of his -- to his
23 supervisor, that supervisor did take action and
24 discipline him, but does that happen all the time,

Page 319

1  no.
2  Q.    Do you recall what the discipline was
3  that the supervisor gave Skibble?
4  A.    I don't.  It might have been -- I don't.
5  I'd be guessing if I said something.
6  Q.    Don't want you to do that.
7        So earlier we talked about LexusNexis.
8  You remember that whole part of your testimony.
9  And at one point you said, and I'm paraphrasing
10 here, you said you had conversations about that?
11 A.    Uh-huh.
12 Q.    Do you recall what those conversations
13 were and with whom?
14 A.    Yes.  I believe they were with Jane Doe
15 3, just asking from an HR perspective, what I
16 thought was appropriate and not appropriate.
17 Q.    When were those conversations?
18 A.    A while ago.  I know I spoke with her
19 when she first got suspended.
20        MS. FOX:  Let's take a quick
21 two-minute break.
22             - - -
23        (Whereupon, brief recess was held off the
24 record at 5:07 p.m.)

Page 320

1             - - -
2  BY MS. FOX:
3  Q.    So, Ms. Twigg, at some point did you
4  ever become aware that Defendant Halcovage had
5  climbed up an embankment from the lower parking
6  lot to the upper parking lot?
7  A.    Yes.
8  Q.    Do you recall when you became aware of
9  that?
10 A.    No.  I know I've seen the video.  I
11 know -- I don't even remember how -- I guess it
12 wasn't too long after it happened that we became
13 aware, we meaning myself, Gary Bender, Solicitor
14 Roth became aware of it.
15 Q.    Okay.
16        And you're saying it wasn't too long
17 after he climbed the embankment that you learned
18 that he had done that?
19 A.    Yes.
20 Q.    How did you find out about it?
21 A.    That's a good question.  I don't recall.
22 I don't recall if Jane Doe 3 and Jane Doe 4 made
23 the statement.  I don't recall if I was told by
24 Gary.  I think I was told by Gary Bender, but I'm

Page 321

1  not sure.
2  Q.    You said you weren't sure when he
3  climbed up the embankment.  Was it after you
4  completed your report?
5  A.    It was after this whole thing started, I
6  can tell you that.  It was -- I don't -- I
7  honestly don't remember exactly when, but it was
8  after --
9  Q.    It was after Jane Doe 1 made her
10 complaint?
11 A.    Absolutely.  That was -- and it was
12 after all four people joined the lawsuit and it
13 was -- yeah.
14 Q.    Had you ever before heard of Defendant
15 Halcovage climbing up that embarkment --
16 A.    No.
17 Q.    -- from the lower to the upper parking
18 lot?
19 A.    Sorry.  No.
20 Q.    Had you heard of any other county
21 employee climbing up that embankment from the
22 lower to the upper parking lot?
23 A.    No.
24 Q.    Was it surprising to you that Defendant

Deposition of Debra Twigg - Revised                                    Jane Doe, et al. v. Schuylkill County Courthouse, et al.

Page 322

1  Halcovage had climbed that embankment?
2  A.    Yes.
3  Q.    Why?
4  A.    Because what was the -- because I
5  question what the purpose was, because there's
6  already enough going on, do you want to do
7  something that would cause more questions.
8  Q.    And where was Commissioner Halcovage
9  parking at the time he climbed up the embankment?
10 A.    I believe his parking was still down
11 below, but I'm not positive.  I believe it was
12 still down below.
13 Q.    Do you know where the plaintiffs were
14 parking at that time?
15 A.    They would have been parking up above
16 because very shortly after the complaints were
17 made, I mean we got the first notice that May 22,
18 2020, I think within the next week to ten days,
19 all four had joined the suit.  The request for the
20 change of their parking was very shortly after, so
21 I believe they were then up above.
22 Q.    Okay.
23       Do you know if anything was done --
24 after you learned that Defendant Halcovage had

Page 323

1  climbed this embankment, was anything done to
2  change his parking spot?
3  A.    Actually I think we watched that video,
4  I'm wondering if that isn't when we had the
5  conversation with the sheriff and the
6  commissioners about the restriction of access.
7  I'm wondering if -- and I don't know specifically,
8  but I'm thinking it may have been what prompted
9  those conversations, but I could be wrong.
10 Q.    Okay.
11       What's your opinion, if any, as to why
12 Defendant Halcovage climbed that embankment?
13       MR. LETTRICH:  Objection to form.
14       You can answer.
15       THE WITNESS:  I watched the video
16 and I can see it in my head what happened.  He
17 climbed that bank, he got to the top.  If he was
18 going to go into the entrance to the building, he
19 would have turned right, but he turned left.  I
20 know after -- I mean, I know that Jane Doe 3 and
21 Jane Doe 4 were in a vehicle that if you turned
22 left, they were very -- not very far from where he
23 was.
24       I questioned why he turned left and

Page 324

1  not right if he was going towards -- if his
2  purpose was to go into the building.
3  BY MS. FOX:
4  Q.    Did you have any concerns that Defendant
5  Halcovage was trying to intimidate Jane Doe 3 and
6  Jane Doe 4?
7  A.    Yes.  I had concerns that it was done,
8  that their claim was that he could see them from
9  down below, I can remember Gary Bender and I going
10 out, looking at where -- standing where someone
11 could actually see the vehicle that they would
12 have been in, see where it was.  Did they have a
13 clear line of sight, could they have seen someone.
14 Yes, we determined they could have.  So, yes,
15 there was concern.
16 Q.    Did anyone share that concern?
17 A.    I think Gary Bender shared it at the
18 time, yes.
19 Q.    Anyone else?
20 A.    Well, I mean, there were discussions
21 with the sheriff.  I now the sheriff had concerns
22 as well.
23 Q.    Concerns for their safety?
24 A.    Concerns for -- yes.  And why --

Page 325

1  Q.    And the safety of the plaintiffs, I
2  should say?
3  A.    Yes.  And why he would be climbing that
4  bank.  At the same time, they were sitting in a
5  vehicle talking on a phone.
6  Q.    They being Jane Doe 3 and Jane Doe 4?
7  A.    Yes.
8  Q.    Do you know if the county did anything
9  to change their parking spots after that either?
10 A.    I believe they were then moved to the
11 entrance that -- this isn't going to mean anything
12 to you, but it was to the people -- the entrance
13 that is closer to the district attorney's office,
14 if that makes sense.  I believe, but I could be
15 wrong.  I would have to ask them to verify.  It's
16 been two and a half years.
17       MS. FOX:  I have no further
18 questions.  I think Ms. Smith has a couple more
19 for you.
20       MS. SMITH:  I do and it's probably
21 only one, maybe two.
22              - - -
23            Examination
24              - - -

Case 3:21-cv-00477-MCC   Document 280-1   Filed 09/20/23   Page 87 of 342
Deposition of Debra Twigg - Revised
Jane Doe, et al. v. Schuylkill County Courthouse, et al.

Page 326

BY MS. SMITH:

Q.      Do you recall at any point having a conversation with Mr. Roth about his discomfort notarizing petitions for Commissioner Halcovage?

A.      I vaguely have a memory of that, but I couldn't tell you when.  I couldn't tell you if it happened previous to my getting there.  There was a conversation that happened.  I can't tell you when.

Q.      Can you tell me, did Defendant Roth tell you that he notarized something for Commissioner Halcovage --

MS. IPPOLITO:  Objection.

BY MS. SMITH:

Q.      -- despite feeling uncomfortable?

MS. IPPOLITO:  Objection to placing Mr. Roth in a position in which he might be incriminating himself.

MS. SMITH:  Fifth Amendment only applies to the individual who is asserting it.  Mr. Roth is the only individual who can assert it.  Ms. Twigg cannot give testimony that incriminates Mr. Roth in violation of the Fifth Amendment.  And I can sit here and you can research it and I can

Page 327

tell you that I am absolutely, positively, unequivocally correct on that.

BY MS. SMITH:

Q.      Ms. Twigg, did Mr. Roth tell you he notarized something for Commissioner Halcovage that he believed he should not have?

A.      Yes.  I -- like I said, I vaguely recall this conversation, yes.

Q.      Did he say he did it that one time, but he wouldn't do it again?

A.      I know that he was not -- I recall him saying he was not comfortable with it.  He did not appreciate being put in that position.

Q.      Did he tell you that he felt like he couldn't say no because Defendant Halcovage was the one who asked him?

A.      Did he use those exact words?  No.  Did he give me the impression that he felt he couldn't say no?  Yes.

MS. SMITH:  I don't have any further questions for you, Ms. Twigg.  Thank you.  Off the record at 5:20 p.m.

- - -

(Whereupon, deposition concluded at

Page 328

5:20 p.m.)

- - -

1                    C E R T I F I C A T I O N

2

3

4            I, COLEEN TRIFUN, RPR and Notary Public,

5    do hereby certify that the foregoing is a true and

6    accurate transcript of the stenographic notes taken

7    by me in the aforementioned matter.

8

9                           - - -

10

11

12

13

14

15

16

17

18

19

20

21    DATE:              _____

22                       COLEEN TRIFUN, RPR

23

24

EXHIBIT

P3

```
 1   ---------------------------

 2   JANE DOE, et al.,           : UNITED STATES DISTRICT
              Plaintiff          : COURT
 3           v.                  : MIDDLE DISTRICT OF
     SCHUYLKILL COUNTY           : PENNSYLVANIA
 4   COURTHOUSE, et al.,         : CIVIL DOCKET NO:
                                 : 3:21-CV-00477
 5           Defendants          :
     ---------------------------

 6

 7                      ***

 8          TRANSCRIPT MARKED CONFIDENTIAL

 9                      ***

10

11

12

13

14

15

16

17

18          VIDEOTAPE DEPOSITION OF GARY BENDER as a

19   30(b)(6) witness taken at the Hilton Garden Inn

20   Harrisburg Inn Harrisburg East, 3943 Tecport

21   Drive, Harrisburg, Pennsylvania 17111 on Thursday,

22   March 30, 2023 at 9:06 a.m. before Coleen Trifun,

23   RPR and Notary Public.

24
```

```
1    A P P E A R A N C E S :

2            DEREK SMITH LAW GROUP, PLLC
             BY:  CATHERINE SMITH, ESQUIRE
3            1835 Market Street
             Suite 2950
4            Philadelphia, Pennsylvania 19103
             catherine@dereksmith.com
5            Counsel for the Plaintiffs

6

7            NEWMAN WILLIAM, P.C.
             BY:  GERARD J. GEIGER, ESQUIRE
8            P.O. BOX   511
             712 Monroe Street
9            Stroudsburg, Pennsylvania 18360
             ggeiger@newmanwilliams.com
10           Counsel for George Halcovage
             (Via Zoom)
11

12           JONES PASSODELIS
             BY:  MARIE MILLIE JONES, ESQUIRE
13           Gulf Tower, Suite 3410
             707 Grant Street
14           Pittsburgh, Pennsylvania 15219
             mjones@jonespassodelis.com
15           Counsel for Gary Bender and Heidi Zula

16           DICKIE MCCAMEY
             BY:  PAUL G. LEES, ESQUIRE
17           190 Brodhead Road, Suite 310
             Bethlehem, Pennsylvania 18017
18           plees@dmclaw.com
             Counsel for additional parties
19           (Via Zoom)

20           MARGOLIS EDELSTEIN
             BY:  MEGHAN WYNKOOP, ESQUIRE
21               JOCELYN MENDEZ, ESQUIRE
             The Curtis Center
22           170 S. Independence Mall W.
             Suite 400E
23           Philadelphia, Pennsylvania 19106
             mwynkoop@margolisedelstein.com
24           Counsel for Glenn Roth
```

```
 1                         - - -

 2                        INDEX

 3                         - - -

 4  WITNESS            INTERROGATION BY      PAGE

 5  GARY BENDER

 6                 By Ms. Smith             9

 7                 By Mr. Townsend          307

 8                         - - -

 9                       EXHIBITS

                          - - -

11  EXHIBIT NUMBER        DESCRIPTION          PAGE

12  Exhibit-324           Notice               13

13  Exhibit-325           SC1260               52

14  Exhibit-326           SC1225               121

15  Exhibit-327           SUP0000078           123

16  Exhibit-328           Doe 46-49            243

17  Exhibit-329           Policy               249

18           PREVIOUSLY MARKED EXHIBITS

19  Exhibit-43    Page 44        Exhibit-97    Page 53

20  Exhibit-98    Page 55        Exhibit-105   Page 60

21  Exhibit-213   Page 109       Exhibit-182   Page 111

22  Exhibit-218   Page 112       Exhibit-219   Page 114

23  Exhibit-216   Page 116       Exhibit-217   Page 120

24  Exhibit-212   Page 127       Exhibit-81    Page 128
```

```
 1          DIRECTION TO WITNESS NOT TO ANSWER

 2   PAGE   LINE             PAGE   LINE              PAGE   LINE

 3                           (None)

 4

 5

 6

 7

 8

 9

10

11        REQUEST FOR PRODUCTION OF DOCUMENTS

12   PAGE   LINE             PAGE   LINE              PAGE   LINE

13                           (None)

14

15

16

17

18

19

20

21

22

23

24
```

Page 5

1  VIDEOGRAPHER:  We are now on the
2  record.  Today's date is March 30, 2023, and the
3  time is approximately 9:06 a.m.  This is the
4  recorded video deposition of the 30(b)(6) in the
5  matter of Janes Doe et al versus Schuylkill County
6  Courthouse et al.
7  This deposition is being held at 3943
8  Tecport Drive in Harrisburg, Pennsylvania.  My
9  name is Aleisha Catts from Everest Court Reporting
10 and I'm the video specialist.  The court reporter
11 today is Coleen Trifun, also from Everest Court
12 Reporting.
13 Counsel will now state their
14 appearance for the record.
15 MS. SMITH:  Good morning.
16 Catherine Smith on behalf of the plaintiffs.
17 Present in the room with me is my paralegal,
18 Alyssa Debise.  And observing by Zoom are
19 plaintiffs Jane Doe 3 and Jane Doe 4, Jane Doe 3
20 and Jane Doe 4.
21 MS. JONES:  Marie Millie Jones for
22 Schuylkill County, Gary Bender, and Heidi Zula.
23 MR. GEIGER:  Jerry Geiger here for
24 George Halcovage.

Page 6

1  MS. WYNKOOP:  Good morning.  Megan
2  Wynkoop here on behalf of Glenn Roth.  My
3  colleague Jocelyn Mendez is also on.
4  MR. LEES:  Paul Lees for defendant
5  Kutzler.
6  VIDEOGRAPHER:  Will the court
7  reporter please swear in the witness.
8  MS. SMITH:  And, Counsel, same
9  stipulations, objections as to form and privilege
10 only?
11 All counsel said yes.
12 MS. SMITH:  I know we had a date of
13 this Friday for designations, I -- I did actually
14 just send some out.  But given that obviously
15 these transcripts for yesterday's, today's, and
16 tomorrow's deposition won't be completed, there is
17 an agreement that the 30 days for those three
18 transcripts for designations of confidential
19 information will run 30 days from the receipt of
20 the transcript.
21 MS. JONES:  Yeah, I'm fine with
22 that.
23 MR. LEES:  That's fine.
24 MR. GEIGER:  Agreed.

Page 7

1  MS. WYNKOOP:  Agreed.
2  MS. SMITH:  Perfect.  Okay.  Marie,
3  I think you said you wanted to --
4  MS. JONES:  Yeah.  I just wanted to
5  identify that Gary Bender is here today in
6  response to the 30B6 deposition notice and topics.
7  As all counsel know, we had an issue raised before
8  the court about some of those topics.  The court
9  ruled that Item 1 on the list is not subject to
10 examination, but the remaining issues are.
11 I think I've made clear to -- to
12 Catherine and others that we are producing Mr.
13 Bender in an effort to provide as much as we can
14 in terms of substantive information in response to
15 the remaining topics, but that we are not of the
16 belief that he may necessarily know everything
17 under every topic, so we were trying to maximize
18 that.
19 I think I have preserved that
20 position with you, Catherine, and with the court.
21 And we'll note objections as necessary.  If we
22 think either the scope or the inquiry to Mr.
23 Bender is beyond what we believe is appropriate or
24 that there are topics that he may not be able to

Page 8

1  address in large part and then we can address
2  those issues if necessary later.
3  I think we also discussed that this
4  would -- be for the 30B6 process, it's a
5  seven-hour limit and we can either go through that
6  today or not as you deem content.
7  MS. SMITH:  Okay.
8  I'm just going to put on the
9  record, I don't think it's going to become an
10 issue, I don't think that judge precluded me from
11 Topic 1.  I think what he said was the rest of the
12 remaining 29 topics were -- pretty much covered
13 the scope of 1.  I don't have any specific
14 questions really as to 1.  It's more they are
15 ingrained in the others.  But I just think that
16 needed to be clear.
17 Otherwise, we can address the
18 issues as they -- they come up, the objections,
19 if -- if any --
20 MS. JONES:  Okay.  -- as they
21 arise.
22 - - -
23 GARY BENDER, having been first duly
24 sworn, was examined and testified as follows:

Deposition of Gary Bender 30(b)(6) - Revised                    Jane Doe, et al. v. Schuylkill County Courthouse, et al.

Page 9

BY MS. SMITH:

Q.    Mr. Bender, are you all set?

A.    I am.

Q.    Okay.

      Mr. Bender, I -- we have met in person,
I think at the courthouse.  My name is Catherine
Smith.  I represent the plaintiffs in this matter.
You might recall, I previously deposed you by
Zoom.  And I am going to ask you some questions
here today.

      Want to first run through some questions
and ground rules.  Obviously you have been deposed
before, so you understand that I will be asking
you questions and you will be providing me answers
today, correct?

A.    That is correct.

Q.    Okay.

      And you understand that you are under
oath and that your testimony, despite being here
in an informal conference room at a hotel, has the
same force and effect as if you were testifying in
a court of law?

A.    Agreed.

Page 10

Q.    This time, I know you had some -- you
struggled, but I know you tried last time, just
remember to wait until my complete question is
asked.  I, likewise, will wait until your complete
answer is provided.  I will try and talk slow, but
this woman to my right, she does need to make a
clear record.

      Do you understand?

A.    Yes.

Q.    See, you're already doing better than
the last time.

A.    Two minutes into it.

Q.    Is there -- have you consumed any drugs
or any alcohol or any other substance which impair
your ability to testify truthfully here today?

A.    No.  I did -- however, I'm on Prednisone
right now for -- for a shoulder problem.

Q.    Okay.

      Does that impact your ability to --

A.    No.

Q.    -- understand or recall or remember
things?

A.    It will not.

Q.    Okay.

Page 11

      Any reason at all that you can think of
that you would be unable to testify truthfully
here today?

A.    No.

Q.    If at any point you need a break, please
just let me know.  The only request I have is that
if there's a question posed, that you answer that
and then we will take any and all breaks that you
need.  Do you understand?

A.    Yes.

Q.    And if you do not understand a question
at some point or you think it was ambiguous,
please let me know and I will rephrase the
question.

      Do you understand that?

A.    Yes.

Q.    If at any point in the deposition you'd
like to go back to supplement, change an answer
that you previously gave because something
refreshes your recollection, please let me know
and we will allow you to do so.

      Do you understand?

A.    Yes.

Q.    Okay.

Page 12

      Mr. Bender, this morning I observed that
you were seated with your counsel and another
individual in the hotel call it, lobby area.

      Who was that other individual?

A.    My wife Melissa.

Q.    Okay.

      Did you discuss anything about the case
with your wife?

A.    No.

Q.    Did you discuss anything about the case
this morning with your counsel while your wife was
present?

A.    We did not.

Q.    Does your wife know what you're here
for?

A.    Yes.

Q.    What does she know that you're here for?

A.    A deposition.

Q.    Does she know what the case is?

A.    Yes.

Q.    Does she know who the plaintiffs are?

A.    Probably not.

Q.    Have you disclosed the names of the
plaintiffs to her?

Page 13

A.      Have not.
Q.      Mr. Bender, I'm going to show you what
I'll mark --
        MS. SMITH:  Matt, I believe we said
we're at 324.  So I will mark for today's purposes
as 324, unless Matt corrects me.
        - - -
        (Notice marked as Exhibit-324 for
identification.)
        - - -
BY MS. SMITH:
Q.      Have you seen this notice of deposition
before?
A.      Yes.
Q.      Okay.
        When did you see it?
A.      About a week ago.
Q.      Without telling me about any
conversations with any attorney, can you tell me
what you did to prepare for the deposition today?
A.      Well, I read over the 30 lines that I
had and -- and tried to, you know, just refresh
myself on -- on how to answer questions with some
of that.  I did have some questions for Marie.

Page 14

And that's pretty much about it.  Everything about
how -- what the answers would be or what sorts of
questions you would ask in regard to those.
Q.      Okay.
        Did you review any documents?
A.      I did.
Q.      Do you remember which documents you
reviewed?
        MS. JONES:  I only pose an
objection to the extent that counsel directed him
to something.  You can tell her what they are, but
not to the extent that I may or may not have
directed you to do that.
        So you may identify the documents,
but not to the extent of why or if it had to do
with a direction from counsel.
        THE WITNESS:  Okay.  There were
three policies in here, the outside employment
policy, the social media policy, and the
harassment policy that I wanted to take a look at.
BY MS. SMITH:
Q.      Okay.
        Other than those three policies that you
just named, did you review any other documents?

Page 15

A.      I did not.
Q.      Okay.
        So just those three policies?
A.      Yes.
Q.      Okay.
        Okay.
        So just -- I want to be clear on this,
you did not review the personnel files of the
plaintiffs in this matter?
A.      I did not.
Q.      You did not review the personnel files
of any of the individually named defendants in
this matter?
A.      I did not.
Q.      Did you review any personnel file that
the county may have for Deborah Twigg?
A.      I did not.
Q.      Did you review any personnel file that
the county may have for Ms. Dash?
A.      I did not.
Q.      Did you review any personnel file that
the county may have for Virginia Murray?
A.      I did not.
Q.      Did you review the contents of anyone

Page 16

including your own e-mail with the county
regarding communications related to the plaintiffs
claims or the defendants defenses in this matter?
A.      I did not.
Q.      Okay.
        Did you speak -- not -- not to any
attorney, but did you speak with any other
employees at the courthouse, whether it be an HR
individual, security, a sheriff, about the
contents of the deposition notice, which is
Exhibit-324, in order to prepare for today's
deposition?
A.      I did not.
Q.      Okay.  All right.
        So being that you reviewed the policies,
let's start with some of the county's policies.
        Does the county maintain a written
policy or written procedure regarding document
storage and/or retention?
A.      There was not a written policy, no.
Q.      Okay.
        Is there a non-memorialized -- strike
that.
        Is there a policy or procedure that is

Deposition of Gary Bender 30(b)(6) - Revised                           Jane Doe, et al. v. Schuylkill County Courthouse, et al.

Page 17

1  not memorialized in writing that the county
2  follows regard document storage and retention?
3  A.      I think it's left up to each department
4  to do that.  In other words, some people have
5  what's called a buffalo drive for a department, so
6  that all the files for the people in that
7  department are stored there, but pretty much on
8  each individual is to -- their files are on their
9  computer.
10 Q.      So are -- let's start with employee
11 personnel files.
12         Are there employee personnel files that
13 are maintained in the human resources department?
14 A.      Yes.
15 Q.      Okay.
16         Do each of the individual offices or
17 departments, so for instance, tax claim, tax
18 assessment, treasurers office, do those individual
19 offices maintain a separate and distinct employee
20 personnel file for the employees in their -- their
21 own offices?
22 A.      I don't think so.
23 Q.      Okay.
24         The contents of an employee's personnel

Page 18

1  file maintained in the HR office, is that retained
2  by the county so long as the employee remains
3  employed?
4  A.      Yes.
5  Q.      And then how long after an employee's
6  employment ends with the county does the county
7  retain the contents of those employee personnel
8  files?
9  A.      That I don't know, but I will tell you
10 that the -- the county would adhere to the
11 retention guidelines put out by the Pennsylvania
12 Historical Museum Commission.
13 Q.      Is there any written policy or procedure
14 about the retention and storage of documents
15 related to pending litigation against the county?
16 A.      A writ --
17         MS. JONES:  I'm sorry.  I'm sorry.
18 Could you just repeat that?
19 BY MS. SMITH:
20 Q.      Any there any -- is there any written
21 policy or procedure regarding the retention and
22 storage of documents related to pending litigation
23 against the county?
24 A.      There is not a written policy.

Page 19

1  Q.      Is there a policy that is not written
2  that the county follows?
3  A.      There's one that was set forth, I think,
4  in the initial complaint that all documents are to
5  be preserved.  That was given to MIS and their
6  charged with -- with that.
7  Q.      When you say in the initial complaint,
8  are you speaking specifically to this matter?
9  A.      Yes.
10 Q.      Okay.
11         But generally, not just pertaining to
12 this matter, what is the county's policy or
13 procedure, if one exists, on what -- on retaining
14 and storing documents related to pending
15 litigation?
16 A.      I guess that there would be an order
17 from the court saying you have to retain them.
18 Otherwise, I don't -- I don't know.
19 Q.      So it's your testimony that -- strike
20 that.
21         You were saying that something was given
22 to MIS.  Can you tell me what was given to MIS in
23 regards to this complaint?
24 A.      The document that -- that ordered

Page 20

1  that -- the retaining e-mails and documents
2  related to this case, that was put out, I think,
3  in something you sent early on.
4  Q.      So are you referring to the letter that
5  was on my firm, the Derrick Smith Law Group's
6  letterhead that detailed preservation of evidence
7  and data?
8  A.      Yes.
9  Q.      It was like a six-page letter with a lot
10 of computer jargon?
11 A.      Yes.
12 Q.      Okay.
13         And who gave that to MIS?
14 A.      I did.
15 Q.      Okay.
16         Do you recall when?
17 A.      I do not.
18 Q.      Do you recall -- so Jane Doe 1 reported
19 the issues by e-mail to Jane Doe 3 in May, end of
20 May, it was May 20th or 21st of 2020.  Do you know
21 if it would have been in the month of May that it
22 was given to MIS, May of 2020?
23 A.      If that letter was sent on May 20th, I
24 would have corresponded with Stan that day.

Page 21

1  Q.      Okay.
2          So is it your testimony, and then
3  correct me if I'm wrong, that whenever the letter
4  was received, within at least a day or so of
5  Schuylkill County receiving it, that letter was
6  given to MIS?
7  A.      Correct.
8  Q.      Okay.
9          Other than giving the letter to MIS, did
10 you give -- did you or anyone on behalf of the
11 county give MIS any verbal instructions?
12 A.      Yes.  To make sure the e-mails were
13 retained and to make sure that if any documents
14 were on the computer, they should clone those hard
15 drives.
16 Q.      Okay.  So let's start with e-mail.
17         Whose e-mails -- emails specifically did
18 you instruct MIS to -- to clone or to save?
19 A.      I think your letter stated all the
20 commissioners, myself, Glenn Roth, Deb Twigg,
21 whoever was named on that -- that letter that you
22 sent.
23 Q.      Okay.
24         Did it also include the plaintiff's

Page 22

1  e-mails?
2  A.      Yes.
3  Q.      Okay.
4          And that would be all four plaintiffs,
5  correct?
6  A.      Correct.
7  Q.      As it relates to computer hard drives, I
8  think you mentioned, do you know whose computers,
9  if it was different than those last individuals
10 you named, that you instructed MIS to preserve?
11 A.      Are -- any out of the ones that I just
12 mentioned?
13 Q.      So you're talking about -- let me back
14 it up and clarify it a little better.
15         You said there was computer hard drives
16 you verbally instructed MIS to ensure were
17 preserved or copied or cloned, correct?
18 A.      Correct.
19 Q.      Okay.
20         And were -- so let's start with -- let's
21 start with the plaintiffs.  The plaintiffs each
22 had county-issued desktops in their respected
23 workspaces at the courthouse, correct?
24 A.      Correct.

Page 23

1  Q.      Did you instruct MIS to clone or copy or
2  preserve the contents of those desktops?
3  A.      Oh, I see -- yes.
4  Q.      Okay.
5  A.      Yes.
6  Q.      Did you instruct -- Ms. Twigg at the
7  time, May and June of 2020, did Ms. Twigg have a
8  county-issued desktop?
9  A.      She did.
10 Q.      Okay.
11         Was her -- was MIS instructed to
12 preserve, clone her desktop?
13 A.      I would think they had done everyone
14 that I had mentioned previously.
15 Q.      Okay.
16         So -- so when you say everyone you had
17 mentioned previously, you instructed MIS to clone
18 or copy or preserve the contents of the plaintiffs
19 computers, Ms. Twigg's computer, Mr. Roth's
20 computer, your computer, and all three
21 commissioners?
22 A.      Correct.
23 Q.      Okay.
24         Now, the -- some of the commissioners

Page 24

1  possibly you, possibly Glenn Roth, and possibly
2  Ms. Twigg had -- had county-issued electronic
3  devices outside of desktops; am I correct?
4  A.      That is correct.
5  Q.      Okay.  So let's start with Ms. Twigg.
6          Other than her desktop, did she have any
7  other county-issued electronic devices?
8  A.      A cell phone.
9  Q.      Did you instruct MIS to clone or copy
10 that?
11 A.      I don't recall.
12 Q.      And, Mr. Bender, it's going to -- I'm
13 going to give you an instruction, it's going to be
14 somewhat weird today because sometimes I'm going
15 to refer to you.  When I'm -- when I'm referring
16 to you from -- moving forward, what I mean is the
17 county because you are here as a corporate
18 designee of the county, someone who can bind the
19 county when you're giving answers.
20         I am going to refer to you as Mr.
21 Bender, in the sense that I'm asking if -- do you
22 know if Mr. Bender's computer, for instance, I may
23 say -- say something like that.  The reason I am
24 saying that is because you're sitting here as the

Deposition of Gary Bender 30(b)(6) - Revised

Jane Doe, et al. v. Schuylkill County Courthouse, et al.

Page 25

1  county today, you're not sitting here as Mr.
2  Bender.  I am going to be referring to you in
3  the -- is that the third person, I think.
4      I am going to be referring to you in the
5  third person sometimes and it's going to seem
6  awkward, so I apologize for that, but I just
7  wanted to clarify.
8      Do you understand that you're here as
9  the county, not as Mr. Bender?  So I may be asking
10 you, the county, about questions about Mr. Bender?
11 A.   I am.  And it is weird.
12 Q.   I agree?
13      MS. JONES:  And -- and, Catherine,
14 to that point, you know, some of these questions
15 were very specific about what he had done.
16      MS. SMITH:  Right.
17      MS. JONES:  And I get it because
18 it's one of the topics.  I think we have to be
19 mindful of that down the road.
20      MS. SMITH:  Right.  That's what I
21 wanted --
22 BY MS. SMITH:
23 Q.   So from now on when I refer to you, I'm
24 referring to the county.  I will refer -- if I am

Page 26

1  asking what Mr. Bender did or something about Mr.
2  Bender's personnel file, I will be referring to
3  Mr. Bender, and that's why I wanted to just put
4  that on the record because it is going to be a
5  little awkward, but it is the nature of -- of what
6  we're doing today.
7      MS. JONES:  And -- and to that
8  point again, kind of my earlier objection, he may
9  not be able to say what he knows of all the
10 county, but he will say what he does know, so...
11      MS. SMITH:  Well -- so then --
12 we'll, you're -- he's here as the county today.
13      MS. JONES:  I understand --
14      MS. SMITH:  So --
15      MS. JONES:  -- but part of our
16 objection and our ongoing position is he's -- he's
17 the person in the best position to give the
18 responses.  We don't know that that's going to be
19 universal to every topic.  He may not know
20 everything to every topic.  And so therefore, when
21 he answers -- you know, and he'll -- he can
22 qualify if he has to.  But, you know, there's
23 going to be things he may not be able to know when
24 it comes to a specific act of another person.  So

Page 27

1  that's why I am trying to say about the policies
2  versus specific things that were done with respect
3  to this case.
4      MS. SMITH:  I mean, that's going to
5  be an issue we have address with the judge because
6  you are able to designate more than one
7  individual.  If Mr. Bender is not the appropriate
8  individual, but you have selected to designate Mr.
9  Bender and Mr. Bender only and produce him here
10 today, the answers I don't know are binding and
11 our position is they are binding on the county.
12 And the I don't knows about things that happened,
13 are -- then the answer is binding on the county
14 that something doesn't exist or the county doesn't
15 know.  But that's an issue we can address with the
16 court at a later date.
17      MS. JONES:  Yeah, that's the one I
18 preserved with the judge.
19      MS. SMITH:  I -- I understand --
20      MS. JONES:  And he note it in his
21 order, so...
22      MS. SMITH:  I understand he noted
23 that it his order, but it's still the county's
24 responsibility to designate the appropriate

Page 28

1  individuals to answer questions.  And they are, I
2  believe, left to -- to their fault if they didn't
3  designate the right individual.
4  BY MS. SMITH:
5  Q.   So, Mr. -- Mr. Bender, again, if I'm
6  referring to you, I will be referring to the
7  county.  If I refer to Mr. Bender, I will be
8  referring to Mr. Bender as Mr. Bender.  Again, a
9  little bit awkward, but that's -- that's how we're
10 going to move forward.
11      So, again, did you, the county, instruct
12 MIS, so for instance in this question, when I say
13 you the county, that means you could have done it,
14 Commissioner Hetherington could have done it,
15 Commissioner Hess could have done it, anyone who
16 is employed by the county or acting as an agent of
17 the county could have done it, did you the county
18 instruct MIS to preserve the contents of Deb
19 Twigg's county-issued cell phone?
20 A.   No.
21 Q.   Did you the county instruct -- strike
22 that.
23      Mr. Roth, does he have anything other
24 than -- any other county-issued electronic device,

Deposition of Gary Bender 30(b)(6) - Revised                                    Jane Doe, et al. v. Schuylkill County Courthouse, et al.

Page 29

1  other than a desktop computer?
2  A.    Yes.
3  Q.    What devices?
4  A.    He has a cell phone and a Microsoft
5  Surface tablet.
6  Q.    Did you the county instruct anyone to
7  preserve the contents of Defendant Roth's
8  county-issued cell phone or Surface?
9         MS. JONES:  I'm going to object to
10 the form.
11        You can answer.
12        THE WITNESS:  The answer would be
13 yes for the Surface.
14 BY MS. SMITH:
15 Q.    But no for the cell phone?
16 A.    I know you're going to hate this, but I
17 don't know.
18 Q.    Mr. Bender, does -- is he issued any
19 county electronic devices other than a desktop?
20 A.    Would you repeat that, please?
21 Q.    Is Mr. Bender issued any county
22 electronic devices other than a desktop?
23 A.    Yes.
24 Q.    Which devices?

Page 30

1  A.    Cell phone, an iPad, and a Microsoft
2  Surface.
3  Q.    Did you the county instruct MIS to
4  preserve or copy the contents of Mr. Bender's cell
5  phone?  And I should say, county-issued cell
6  phone.
7  A.    No.
8  Q.    Did you the county instruct MIS to
9  preserve the content of Mr. Bender's iPad,
10 county-issued iPad?
11 A.    Yes.
12 Q.    Did you the county direct MIS to
13 preserve or copy the contents of Mr. Bender's
14 county-issued Surface Pro tablet?
15 A.    Yes.
16 Q.    Moving on to Defendant Halcovage, is he
17 assigned any county-issued electronic devices,
18 other than an desktop computer?
19 A.    At the time, yes, he was issued an iPad
20 and he had in his possession at that time, a
21 Surface laptop.
22 Q.    Okay.
23        When you say at that time, what does
24 that mean?

Page 31

1  A.    He no longer has the Surface.
2  Q.    Okay.
3        Where is the Surface?
4  A.    That was handed in to MIS.
5  Q.    When?
6  A.    I can't recall now.
7  Q.    Do you know what year?
8  A.    '22.
9  Q.    2022?
10 A.    2022.
11 Q.    Okay.
12        Why was it handed in to MIS in 2022?
13 A.    It wasn't available at the office.
14 Q.    What do you mean it wasn't available?
15 A.    He didn't have it in the office.
16 Q.    Where did he have it?
17 A.    At his home.
18 Q.    Was he instructed between 2020 and
19 2022 -- 2020, when these claims were first brought
20 up against the county and 2022, did the county
21 instruct Defendant Halcovage to return any of his
22 county-issued electronic devices?
23        MS. JONES:  Object to the form.
24        You may answer.

Page 32

1        THE WITNESS:  I would say yes.
2  BY MS. SMITH:
3  Q.    Who instructed him to return those?
4  A.    I would have.
5  Q.    Okay.
6        And you, in this instance, being Mr.
7  Bender?
8  A.    Correct.
9  Q.    Do you recall when you instructed him to
10 return those?
11        MS. JONES:  I think the question is
12 preserved, not returned.
13        MS. SMITH:  He said --
14        MS. JONES:  Your question was about
15 preserving.
16        MS. SMITH:  No.  I asked him if he
17 asked him to return them.  We can have it read
18 back.
19        MS. JONES:  I thought you were
20 talking about both the Surface and the iPad and he
21 said he instructed to preserve and then you said
22 who, he said it was him.
23        MS. SMITH:  Can we have it read

Page 33

1  back?
2          - - -
3      (Whereupon, court reporter read back
4  last question.)
5          - - -
6      MS. JONES:  Okay.  I'm sorry.  I
7  thought it was the preservation question.
8      MS. SMITH:  And we can -- just
9  so --
10      MS. JONES:  No, it's clear.
11      MS. SMITH:  Okay.
12      MS. JONES:  That was your answer
13  for that question, correct?
14      THE WITNESS:  I beg your pardon.
15      MS. JONES:  That was the correct
16  answer to the question, yes?
17      THE WITNESS:  Yes.
18  BY MS. SMITH:
19  Q.      When you were answering my questions
20  just now about the Surface laptop, you were
21  answering them concerning the return of the
22  device, not the preservation, correct?
23  A.      Well, it would have to be returned in
24  order to be preserved.

Page 34

1  Q.      Okay.
2      So let make just sure this record is
3  clear.  You, the county, through you Mr. Bender
4  taking action, asked Defendant Halcovage to return
5  his county-issued electronic devices?
6  A.      Yes.
7  Q.      Okay.
8      And when did you ask him to return those
9  devices?
10  A.      Can I give you a year?
11  Q.      Sure.
12      If that --
13  A.      It would have been 2021.
14  Q.      Okay.
15      Do you recall early, middle, end?
16  A.      I don't.
17  Q.      Okay.
18      Do you recall if prior to 2021, when you
19  the county through Mr. Bender, asked Defendant
20  Halcovage to return those county-issued electronic
21  devices, did you instruct MIS to copy and/or
22  preserve their contents?
23  A.      Yes.
24  Q.      Okay.

Page 35

1      Now, I'm going to take a guess here and
2  you can correct me if I'm wrong, is -- when you
3  got the letter from my firm to preserve
4  information, you go down to MIS, tell them to
5  preserve it.  They then probably came to you some
6  time later and said we can't because we don't have
7  them, is that why you then went to Defendant
8  Halcovage and asked him to return them, so they
9  could be preserved?
10  A.      That would be correct.
11  Q.      Okay.
12      Is that why there was a delay in asking
13  him to return them, because you thought MIS would
14  be able to get them and preserve them, and until
15  you found out that they couldn't, you didn't take
16  action?
17  A.      And I also didn't realize at the time
18  that he had one because it wasn't around for a
19  while.  He had one, but I didn't realize he had it
20  yet.
21  Q.      Okay.
22      So 2021, you the county through Mr.
23  Bender, asked Defendant Halcovage to return, was
24  it both to Surface Pro and the iPad?

Page 36

1  A.      Yes.
2  Q.      Okay.
3      And he does not return, at least the
4  Surface Pro, until 2022; is that a correct --
5  A.      Correct.
6  Q.      Do you know why?
7  A.      He couldn't find it.
8  Q.      Okay.
9      Did he return the iPad?
10  A.      One.
11  Q.      How many iPads was he issued?
12  A.      He had two.
13  Q.      Has he ever returned the second one?
14      MS. JONES:  I am going to object to
15  the form.
16      But you may answer.
17      THE WITNESS:  I don't recall.
18  BY MS. SMITH:
19  Q.      Was the contents of the Surface Pro and
20  the iPad that were -- strike that.
21      The one iPad that he -- you know that he
22  did return, did MIS preserve the contents of that
23  or copy it or clone it?
24  A.      Yes.

Page 37

Q.    Okay.
      Same thing with the Surface laptop that he returned, was it copied, cloned, preserved?
A.    Yes.
Q.    Because you don't know if he returned the other iPad, is it fair to say that you don't know if it was preserved or cloned?
      MS. JONES:  Object to the form.
      You may answer.
      THE WITNESS:  Did you say yes, I may answer?
BY MS. SMITH
Q.    You can answer.
      MS. JONES:  You may answer, yes.
      THE WITNESS:  Okay.  Now, repeat -- repeat that -- sorry.  Sorry.
      MS. JONES:  It's okay.
BY MS. SMITH:
Q.    In that you don't know that he returned -- if he returned -- Defendant Halcovage returned the second county-issued iPad he had possession of, is it fair then to say you don't know if its contents were preserved, cloned, or copied?

Page 38

      MS. JONES:  Object to form.
      You may answer.
      THE WITNESS:  Correct, I would not know that.
BY MS. SMITH:
Q.    Okay.  All right.
      Commissioner Hess, is he issued any county electronic devices, other than a desktop?
A.    Yes.
Q.    What devices?
A.    A cell phone and an iPad.
Q.    Do you know if the contents of those devices, if MIS was instructed to clone, copy, or preserve the contents of those devices?
      MS. JONES:  Object to the form.
      You may answer.
      THE WITNESS:  The iPad, yes.
BY MS. SMITH:
Q.    The cell phone?
A.    No.
Q.    Why not the cell phone?
A.    I don't know that any cell phone was cloned.  I mean, that was -- when we started, I don't know that the cell phones were.

Page 39

Q.    Why did you -- you the county not instruct the individuals that were named in the letter to -- why did you not instruct MIS to clone the contents, preserve the contents of the cell phones of the individuals named in the letter?
      MS. JONES:  Object to the form.
      You may answer.
      THE WITNESS:  Well, the e-mails on the -- on the cell phone would have been preserved on other devices.
BY MS. SMITH:
Q.    What about text messages, are the cell phones issued by the county capable of text messages?
A.    Yes.
Q.    Okay.
      Are text messages recoverable from any other devices, county-issued devices?  So for e-mails, for instance, it's more the software, they can be received on a computer, they can be received on a cell phone, and you can recover them from either a hard drive.  And are text messages the same way with county-issued devices?
A.    Between an iPhone and iPad they would

Page 40

be, yes.
Q.    Okay.
      But, for instance, Mr. Roth does not have an iPad, so would his cell phone text messages, county-issued cell phone text messages be recoverable from his desktop or the Surface Pro that he was issued?
A.    They would not.
Q.    Okay.
      Ms. Twigg did not have an iPad issued by the county, correct?
A.    That is correct.
Q.    And so her cell phone text messages, her county-issued cell phone text messages would not be recoverable from any other county device, correct?
      MS. JONES:  Object to the form.
      You may answer.
      THE WITNESS:  I would think not, no.
BY MS. SMITH:
Q.    Okay.  All right.
      And then last I think is Commissioner Hetherington.  Is he issued any county devices

Page 41

1 other than a desktop?
2 A.       A cell phone.
3 Q.       He does not have an iPad or a Surface
4 Pro?
5 A.       He does not.
6 Q.       Okay.
7       Was -- were the contents of his cell
8 phone -- sorry.  Strike that.
9       Did the county instruct MIS to preserve
10 the contents of Commissioner Hetherington's
11 county-issued cell phone?
12       MS. JONES:  Object to the form.
13       You may answer.
14       THE WITNESS:  We did not.
15 BY MS. SMITH:
16 Q.       So we were just talking about e-mails.
17 What, if any, steps did the county take to retain
18 and/or store e-mails relates to each individual
19 named in the letter the county received from my
20 law firm?
21 A.       MIS has the ability to -- to hold and
22 store e-mails.
23 Q.       Does the county's e-mail server delete,
24 on any routine basis, e-mails?  So like after a

Page 42

1 year, after two years, does it automatically
2 delete the contents of any e-mails or is it only
3 if the e-mail holder deletes them?
4       MS. JONES:  Object to the form.
5       You can answer.
6       THE WITNESS:  I don't know the
7 answer to that question.
8 BY MS. SMITH:
9 Q.       Do you know if MIS preserved the
10 contents of each of the plaintiffs' county-issued
11 e-mails after you, the county, received the letter
12 from my firm regarding preservation of evidence?
13 A.       Yes.
14 Q.       Do you know, did the county preserve the
15 contents of Ms. Twigg's county-issued e-mail after
16 receiving that letter?
17 A.       Yes.
18 Q.       Did MIS preserve the contents of
19 Defendant Halcovage's e-mail after receiving
20 that -- county-issued e-mail --
21 A.       Yes.
22 Q.       -- after receiving that letter?
23 A.       Yes.
24 Q.       Did the county preserve the contents of

Page 43

1 Mr. Bender's county-issued e-mail after receiving
2 that letter?
3 A.       Yes.
4 Q.       Did the county preserve the contents of
5 Defendant Roth's county-issued e-mail after
6 receiving that letter?
7 A.       Yes.
8       MS. SMITH:  Matt, if you can pull
9 up --
10       THE WITNESS:  Can I back up just a
11 little bit?
12 BY MS. SMITH:
13 Q.       Sure.  Yeah.
14 A.       On deleted e-mails, you know, you can
15 delete an e-mail, but it still is in the server as
16 a deleted e-mail.  They would have to be wiped
17 clean by MIS.  And I know at one time when we
18 had -- sorry -- when we had a company in,
19 generally e-mails on a server are preserved
20 forever.
21 Q.       Okay.
22 A.       But don't hold me to that, but that was
23 what was said to us.  But I do know if -- if they
24 get deleted, they still are on the server in a

Page 44

1 deleted file.
2 Q.       And this is -- I'm sorry -- knowledge
3 you have because you spoke with MIS at some point?
4 A.       Yes.
5 Q.       Okay.
6       And that was not in preparation for
7 today's deposition, that was just --
8 A.       No.
9 Q.       -- at another time?
10 A.       (Indicating yes.)
11 Q.       Okay.
12       And MIS would be able to answer
13 questions about what is preserved, what was
14 preserved, what could be preserved?
15 A.       Correct.
16 Q.       Okay.
17       And is there someone specifically in MIS
18 who would best be able to answer these questions?
19       MS. JONES:  Object to the form.
20       You can answer.
21       THE WITNESS:  I would think
22 Mr. Nester.
23       MS. SMITH:  All right.  Matt, if
24 you can out previously-marked Exhibit-43 on the

Case 3:21-cv-00477-MCC   Document 280-1   Filed 09/20/23   Page 104 of 342
CONFIDENTIAL
Deposition of Gary Bender 30(b)(6) - Revised
Jane Doe, et al. v. Schuylkill County Courthouse, et al.

Page 45

screen.

- - -

(Previously marked Exhibit-43.)

- - -

BY MS. SMITH:

Q.     Defendant Bender -- or I'm sorry.
Do you recognize this document?

A.     I do.

Q.     I said sorry because I referred to you
as Defendant Bender, you are the county today, so
I apologize.
And what is this document?

A.     It's a hierarchy of the various
departments and boards at the county and who is
responsible for -- for what.

Q.     Okay.
Is this the county's current
organizational structure?

A.     I think this appears on the website
today.  It shouldn't, but I don't -- it did -- at
my deposition you brought this up and are we going
to focus in on tax claim?

Q.     No.  I just want to know --

A.     Oh, okay.

Page 46

Q.     -- if this is the county's current
organizational structure?

A.     Pretty much.  There is some incorrect
entries here.

Q.     Okay.
Has it been changed or updated?

A.     I don't know.

MS. JONES:  Did you mean on the web
or just generally.

MS. SMITH:  Just generally.

MS. JONES:  Okay.  Is that how you
answered the question?

My -- my clarification was --
was -- did she mean updated on the web, because
you had said it's on the web, or just generally,
and she said generally.  Is that the way you
answered the question, that it wasn't updated?

THE WITNESS:  I don't know if it
was updated on the web or not.

BY MS. SMITH:

Q.     Okay.
Do you know if it's been updated
internally, not on the web, just internally at the
county?

Page 47

A.     On a document such as this?

Q.     Uh-hum, yes.

A.     I don't think so.

Q.     This was submitted to the Equal
Employment Opportunity Commissioner by the county
in support of your response and opposition to the
plaintiffs charge of discrimination in May of
2021, correct?

MS. JONES:  I am going to object to
the form.
But you can answer if you know.

THE WITNESS:  I assume it was, yes.

BY MS. SMITH:

Q.     In May of 2021, was this the county's
organizational structure?

A.     Correct, with the exception of the tax
claim.

Q.     Okay.
If this was not the county's
organizational structure in May of 2021, why was
it submitted to a government agency in support of
the county's position?

MS. JONES:  Object to the form of
your question.

Page 48

But you can answer.

THE WITNESS:  I guess it just
wasn't updated on the website.

BY MS. SMITH:

Q.     But it was submitted, separate and
distinct from the website, to a governmental
agency investigating the plaintiffs claims in May
of 2021.  If this was not the county's
organizational structure in May of 2021, why was
that done?

A.     I can't answer that.

Q.     Does the county --

MS. SMITH:  Matt, you can take that
exhibit down.  Thank you.

BY MS. SMITH:

Q.     Does the county maintain something
called a staff compliment?

A.     Could you repeat that?

Q.     Does the county maintain something
called a staff compliment?

A.     Staff compliment?

Q.     Compliment.

A.     And what is that?

Q.     Well, my -- that's my question to you.

Page 49

1    Does the county maintain one?
2        MS. JONES:  Well, he can ask you to
3    define the term that you're using it for.
4    BY MS. SMITH:
5    Q.    I -- I don't know what it is.  It's
6    something that's been used in a prior deposition
7    by Ms. Zula.  It's called a staff compliment.
8        Do you know what that is?
9    A.    I do not.
10       MS. JONES:  Was there a context?
11   Maybe he could answer the question if there was a
12   context.
13       MS. SMITH:  I am getting into it.
14   BY MS. SMITH:
15   Q.    So Ms. Zula, she didn't define it, but
16   as she testified, there is a some -- a document
17   called a staff compliment that indicates the
18   number of positions and what positions are in each
19   office.
20       So, for instance, in tax claim, it might
21   say tax claim director, assistant director, three
22   field appraisers, one real -- they're not in tax
23   claim, but three clerk typists one, three clerk
24   typists two, and that's -- so if someone leaves,

Page 50

1    if there's three clerk typists two, if one left,
2    resigned, retired, the tax claim bureau would be
3    able to hire someone for that empty spot.
4        Where as if there was three clerk
5    typists two and the positions were full and the
6    director felt a fourth would be needed, they would
7    have to do something with the salary board or take
8    some other step to add another position to their
9    staff compliment.
10       Does that refresh your recollection or
11   give you a better understanding of the staff
12   compliment?
13   A.    That would be probably something that's
14   maintained in HR.  But, yes, that -- that is out
15   there.
16   Q.    Okay.
17       Does the -- so have you ever heard it
18   referred to as a staff compliment?
19   A.    Not until today.
20   Q.    Okay.
21       Do you believe that there is such a
22   document, maybe not called a staff compliment, but
23   something that -- some document that delineates
24   the number of positions that can be staffed in

Page 51

1    each office?
2    A.    Yes.
3    Q.    Okay.
4        And there exists one for tax claim
5    bureau?
6    A.    Yes.
7    Q.    And there exists one for tax assessment?
8    A.    Yes.
9    Q.    Do the staff compliments or this
10   document, does it indicate the title of the
11   department head for the division or department
12   it's -- it's referring to?
13   A.    Yes.
14   Q.    Does it indicate the title of any
15   assistant department head in the division or
16   department it's referring to?
17   A.    Yes.
18       MS. JONES:  Assuming there is one.
19       MS. SMITH:  Well, I think he
20   testified that there is one.
21       MS. JONES:  Well, I meant --
22       MS. SMITH:  Oh, those positions.
23   Okay.  Yes.
24       MS. JONES:  Because in some

Page 52

1    departments there might or might not be.
2        MS. SMITH:  Okay.  I thought you
3    meant the document.
4        MS. JONES:  No.  No.  No.
5        MS. SMITH:  Okay.  Matt, if we can
6    put up SC1260 to 1265.  It will be 325.
7                    - - -
8        (SC1260 marked as Exhibit-325 for
9    identification.)
10                   - - -
11   BY MS. SMITH:
12   Q.    Mr. -- I'm sorry.  Keep on saying Mr.
13   Bender, but you are the county.
14       This is the county's sexual harassment
15   policy that was in place beginning on September
16   14, 2005.  If we look at the -- the signature
17   page, the second to last page, it's got the date
18   on it.
19   A.    Uh-huh.
20   Q.    Being that it's signed and approved on
21   September 14, 2005, this was implemented and in
22   place beginning on that date, correct?
23   A.    Correct.
24   Q.    This policy, if we look at the first

Page 53

1  page, appears, correct me if I am wrong, to be a
2  revision of a policy -- the policy that was
3  originally issued in August of 1994; is that
4  correct?
5  A.      That's what it states, yes.
6  Q.      Okay.  Were there any -- and then it
7  looks like it supersedes a July 1999 policy; am I
8  correct?
9  A.      That's what it states, yes.
10 Q.      So this September 2005 revision would be
11 the next most recent revision after July 1999
12 correct?
13         Meaning between July 1999 and 2000 --
14 September 2005, based on this document, it appears
15 that there were no revisions during that time; am
16 I reading this document correctly?
17 A.      Correct.
18 Q.      Okay.  All right.  You can put that one
19 aside.
20         We are going to look at previously
21 marked Exhibit-97.
22                  - - -
23         (Previously marked Exhibit-97.)
24                  - - -

Page 54

1  BY MS. SMITH:
2  Q.      This is the county's -- oh, sorry.  This
3  is the county's sexual harassment policy that was
4  in place, if you look at the signature page which
5  is 1258, on September -- beginning on
6  September 25, 2013, correct?
7  A.      Correct.
8  Q.      If we look back at the first page, this
9  policy is a revision of the July 2005 policy,
10 correct?
11 A.      That's what it states, yes.
12 Q.      Okay.
13         But if we look at the last one that we
14 had up, it was a September 2005, which supersedes
15 a July 1999 policy.
16         So was there a July 2005 revision to
17 this policy?
18 A.      I wasn't there at the time.  I can't
19 answer, but I would say that it's just merely just
20 maybe we started to work on this in July, it
21 wasn't activated until September.
22 Q.      Okay.
23         So do you know then if there were any --
24 you the county, do you know if there was any

Page 55

1  revisions to this policy between September of 2005
2  and September of 2013?
3  A.      No.
4  Q.      No, there were not?
5  A.      There were not.
6  Q.      Okay.
7          Between September 14, 2005, which was
8  the first policy date we looked at, and September
9  25, 2013, which is the implementation of -- date
10 of this policy currently in front of you,
11 Exhibit-97, did the county maintain any other
12 policy related to or regarding retaliation for the
13 opposition for reports of sexual harassment?
14 A.      I'm not aware of any.
15         MS. SMITH:  We'll look at
16 previously marked Exhibit-98.
17                  - - -
18         (Previously marked Exhibit-98.)
19                  - - -
20 BY MS. SMITH:
21 Q.      This is the county's sexual
22 harassment -- well, the name changed, it became
23 the anti-harassment and non-discrimination policy,
24 but the policy numbers are the same for the last

Page 56

1  two, correct?
2  A.      Correct.
3  Q.      Okay.
4          This is the county's anti-harassment and
5  non-discrimination policy that was in place
6  beginning on February 10, 2021, if we look at the
7  signature page, correct?
8  A.      February 10th, yes.
9  Q.      2021, correct?
10 A.      Yeah.  Agreed.  Yes.
11 Q.      Okay.
12         This policy is a revision of that last
13 policy, Exhibit-97, that we just looked at that
14 was a 2013 -- September 2013 revision, correct?
15 A.      Correct.
16 Q.      Were there any revisions to this policy
17 between September 25, 2013, and February 10, 2021?
18         MS. JONES:  I'm sorry.
19         THE WITNESS:  I'm aware of none.
20         MS. JONES:  Wait.  Can you say that
21 again?
22 BY MS. SMITH:
23 Q.      Were there any revisions to the policy
24 between September 25, 2013, which is the

Page 57

1  implementation date of Exhibit-97, and
2  February 10, 2021, which is the implementation
3  date of Exhibit-98?
4  A.    No.
5  Q.    Between September 25, 2013, when the
6  revised policy, Exhibit-97 was implemented that we
7  just looked at, and February 10, 2021, the
8  implementation date of this Exhibit-98, did the
9  county maintain any other policy related to or
10 regarding retaliation for opposition and/or
11 reports of sexual harassment?
12 A.    No.
13 Q.    Looking back at the signature page, the
14 fifth page, there's four signatures that are
15 redacted out.
16       Do you see that?
17 A.    Yes.
18 Q.    Okay.
19       Did Defendant Halcovage vote to approve
20 and sign to approve the implementation of this
21 revised policy?
22 A.    Yes.
23 Q.    Who all was involved in the revision of
24 this policy, this February 2021 revision?

Page 58

1  A.    I would say Heidi Zula and Doreen
2  Kutzler.
3  Q.    Anyone else have input or review of this
4  revision?
5  A.    Well, the board.
6  Q.    When you say --
7  A.    The board of commissioners.
8  Q.    Okay.
9  A.    And myself.
10 Q.    Again, I apologize that it's third
11 person, but Mr. Bender, what was his involvement
12 in the revisions of this February 2021 policy?
13 A.    Ms. Zula and Ms. Kutzler would have
14 written it and would have brought it over to look
15 at to me before they handed it to the
16 commissioners for review.
17 Q.    Did Mr. Bender make any changes --
18 A.    No.
19 Q.    To -- to this policy --
20 A.    Sorry.
21 Q.    -- when Ms. Zula -- it's okay -- when
22 Ms. Zula and Ms. Kutzler provided it to him?
23 A.    No.
24 Q.    Was the board of commissioners provided

Page 59

1  a copy of this before they voted on it?
2  A.    Yes.
3  Q.    When?
4  A.    Went to the meeting on the 10th, so they
5  would have had it at least a week.
6  Q.    So one week before February 10, 2021?
7  A.    Yes.
8  Q.    Do you -- did -- do you the county know
9  if any of the commissioners made any changes or
10 proposed any changes to the policy which was
11 provided to them one week prior to February 10,
12 2021?
13 A.    I'm not aware of any, no.
14 Q.    At any time after February 10, 2021,
15 when this policy was implemented and today, has
16 the county maintained any other policy related or
17 regarding retaliation for opposition and/or
18 reports of sexual harassment?
19 A.    I would think this is still the active
20 document.
21 Q.    So I apologize, there is one more
22 updated one, so I'll -- I'll ask that question
23 again later.
24       I'm going to put --

Page 60

1       MS. SMITH:  Matt, if you can put
2  105 up.
3             - - -
4       (Previously marked Exhibit-105.)
5             - - -
6  BY MS. SMITH:
7  Q.    This is a May 2021 revision of that
8  policy that we just looked at, correct?
9  A.    It states that, yes.
10 Q.    Okay.
11       This one doesn't have a -- have a date
12 on that signature page.  It just has a signature
13 approving it.
14       Do you know what date this was
15 officially implemented?
16 A.    I do not.
17 Q.    And between the policy we just looked at
18 from February 10, 2021, and this policy revision
19 from May of 2021, were there any revisions to the
20 policy in between those two dates?
21 A.    There would not be.
22 Q.    Okay.
23       So from February 10, 2021, until today,
24 other than this revision, were there other -- any

Deposition of Gary Bender 30(b)(6) - Revised                    Jane Doe, et al. v. Schuylkill County Courthouse, et al.

Page 61

1 other independent written policies at the county
2 regarding retaliation or related to retaliation
3 for opposition and/or reports of sexual
4 harassment?
5 A.      Not that I'm aware of.
6 Q.      And who all was involved in the
7 revisions of this -- this May 2021 policy?
8 A.      Ms. Zula.
9 Q.      Anyone else?
10 A.      No.  But, again, it would have been
11 something she would have brought over to -- to
12 me -- to me, Mr. Bender, and -- and to the board
13 of commissioners.
14 Q.      As it relates to Mr. Bender, did he make
15 any changes to the policy that was proposed to him
16 by Ms. Zula?
17 A.      I did not.
18 Q.      Did the board of commissioners make any
19 changes to the policy that was proposed to them by
20 Ms. Zula?
21 A.      Not that I am aware of.
22 Q.      Other than the four county policies that
23 we just looked at, has the county since 2012,
24 had -- has the county since 2012 had any other

Page 62

1 written policies or written procedures regarding
2 sexual harassment?
3          MS. JONES:  Object to the form.
4          You may answer.
5          THE WITNESS:  I don't know.
6 BY MS. SMITH:
7 Q.      Other than the four county policies we
8 just looked at, did the county -- has the county
9 ever since 2012, had any other written policy or
10 written procedure regarding retaliation?
11          MS. JONES:  Object to the form.
12          You may answer.
13          THE WITNESS:  That I don't know.
14 BY MS. SMITH:
15 Q.      Other than the four county policies,
16 which we just looked at, has the county since 2012
17 had any other written policies or procedures
18 regarding discrimination?
19          MS. JONES:  Object to the form.
20          You may answer.
21          THE WITNESS:  I would say no
22 because it's in this particular policy.
23          And to the other two questions, I would
24 have to say if we saw it -- if I had a list in

Page 63

1 front of me of all the county policies, I might
2 see something there.  When I said I don't know, it
3 might be on that list.
4 BY MS. SMITH
5 Q.      Well, the notice of deposition.
6          MS. SMITH:  Matt, if you can pull
7 back up what we marked today as 324.
8 BY MS. SMITH:
9 Q.      No. 4 says:  Defendant implementation of
10 policies and/or procedures regarding sexual
11 harassment, discrimination, and/or retaliation,
12 did I read that correctly?
13 A.      No. 4, yes, you did.
14 Q.      Okay.
15          Did you review the policies that the
16 county has regarding those in preparation for
17 today's deposition?
18 A.      I -- I reviewed this policy that we're
19 looking at, the February '21 and the May '21.  I'm
20 sorry.
21 Q.      So you're -- so Exhibit-98 and 105?
22 A.      Yes.
23 Q.      Okay.
24          Other than those two, you did not review

Page 64

1 any other sexual harassment, retaliation, or
2 discrimination policies of the county?
3          MS. JONES:  I am just going to
4 object to the form and note there's no time frame
5 on your deposition exhibit.  So when your
6 questions previously went back to 2012, I think
7 there could be a fair interpretation that your
8 exhibit did not identify historical policies.
9          But he may answer the question.
10 BY MS. SMITH:
11 Q.      So just so I'm clear, you did not review
12 any other sexual harassment, discrimination, or
13 retaliation policies of the county, other than
14 Exhibit-98 and 105?
15 A.      Dealing with harassment and retaliation.
16 Q.      Okay.
17          Right.
18 A.      No.  No, but we had those other two I
19 mentioned earlier.
20 Q.      Right.
21          The outside employment and the social
22 media, correct?
23 A.      Correct.
24 Q.      Okay.

Deposition of Gary Bender 30(b)(6) - Revised                        Jane Doe, et al. v. Schuylkill County Courthouse, et al.

Page 65

1  Did you review or bring with you to
2  refresh your recollection today, a list of county
3  policies?
4  A.    I did not.
5  Q.    Did you even review before today in --
6  in preparation for today, a list of county
7  policies?
8  A.    Yes.  I -- I've seen that list and now I
9  wish I would have printed it out.  I thought maybe
10 you would have it.
11 Q.    So, again, other than the county
12 policies we have just looked at, there was four
13 for consecutive times in years that we went over,
14 did the county maintain any other policy for
15 discrimination since 2012?
16     MS. JONES:  Object to the form.
17     But you may answer.
18     THE WITNESS:  I can't answer that
19 at this time.
20 BY MS. SMITH:
21 Q.    Is that because you don't know?
22 A.    I don't remember, yeah.
23 Q.    Does the county currently have any
24 written policy or procedure regarding the

Page 66

1  dissemination of county policies and procedures to
2  its employees?
3  A.    Want to go over that one more time,
4  please.
5  Q.    Does the county have any written policy
6  or procedure regarding the dissemination of its
7  policies and procedure to its employee?
8  A.    I don't think it's a written policy, no.
9  Q.    Does the county have any non-written
10 policy or procedure regarding the dissemination of
11 its policies to its employees?
12 A.    Yes.
13 Q.    What is that?
14 A.    There are a number of them.  When an
15 employer is -- is hired when they go through
16 orientation, all the policies are reviewed with
17 the hire and the new hire would sign off on them.
18     When a policy is revised or -- or -- or
19 changed or a new one added, that gets sent out to
20 all the department heads and every employee needs
21 to sign that they have looked at it.  When there's
22 a revision made, same thing should happen.
23     For the sexual harassment policy, when
24 there was a training, the policy is included in

Page 67

1  that training and they sign a document that they
2  reviewed that policy, that training occurred, we
3  have done that mostly every two years, so any time
4  the employee gets a copy of that policy.
5  Q.    All right.  Let me unpack that a little
6  bit.
7      So it is the policy or procedure of the
8  county, not memorialized in writing, that any
9  newly-implemented policy or any policy that is
10 revised, is disseminated to all department heads,
11 who are them to disseminate to each of their
12 department employees, a copy of that and obtain a
13 signature for receipt of that policy?
14 A.    Yes.
15 Q.    And that's not just the sexual
16 harassment policy, that is all policies?
17 A.    Correct.
18 Q.    And then as I understand your answer,
19 the sexual harassment training, which includes
20 dissemination of a policy at that training, occurs
21 every two years?
22 A.    Yes.
23 Q.    Does the county utilize a form to ensure
24 that all county policies are, in fact,

Page 68

1  disseminated to county employees?  Is there a
2  standard form when someone is first hired?
3  A.    I -- I believe there is, yes.
4  Q.    Okay.
5      Do you know what that form is called?
6  A.    I do not.
7  Q.    And who at the county is responsible for
8  ensuring that a new hire receives copies of each
9  of the counties policies in effect at the time
10 that they are hired?
11 A.    Human resources.
12 Q.    So that would be the human resources
13 director would be ultimately responsible for that?
14 A.    Ultimately, but it would be the person
15 in the -- that is conducting the orientation, but
16 ultimately it's the department head who would be
17 responsible.
18 Q.    And does the county utilize a specific
19 form for the receipt of newly-implemented or the
20 receipt of revised policies by current employees?
21 A.    A form is sent around that each employee
22 signs, yes.  And that is returned to HR.
23 Q.    Okay.
24      So is there a -- a standard form --

Page 69

1 A.     Yes.
2 Q.     -- that each department uses?
3 A.     Yes.
4 Q.     And does HR provide them with that form
5 when a newly-implemented or -- or -- when a
6 newly-implemented policy is disseminated or when a
7 revised policy is disseminated?
8 A.     Yes.
9 Q.     Does the county have any written policy
10 or procedure regarding the dissemination of county
11 policies to elected officials?
12 A.     I do believe they have to sign it as
13 well, yes.
14 Q.     Sorry.  Just listen to my question,
15 though.
16        Does the county have any written policy?
17 A.     No.
18 Q.     Regard the dissemination of county
19 policies to elected officials?
20 A.     No.
21 Q.     Does the county have a policy or
22 procedure, even if not in writing, about
23 dissemination of county policies to elected
24 officials?

Page 70

1 A.     Yes.
2 Q.     And what is that policy or procedure?
3 A.     The same thing as we said, that they
4 have to read it and they sign that they read it.
5 Q.     So all county policies are disseminated
6 or should be disseminated to county elected
7 officials?
8 A.     That is correct.
9 Q.     Okay.
10       Is it the same kind of with employees,
11 where when they are new, so when elected
12 officials -- when they are newly elected, that
13 they receive a copy of all policies in effect at
14 the time of their taking office?
15 A.     That would be correct.
16 Q.     And do they -- elected officials,
17 likewise, is it the county policy that elected
18 officials are also to receive newly-implemented or
19 revised policies during their -- during their
20 terms?
21 A.     Yes.
22 Q.     Like employees, does the county utilize
23 that same form to ensure they -- or to -- to
24 memorialize their receipt of those

Page 71

1 newly-implemented or revised policies?
2 A.     Yes.
3 Q.     What is the county's policy regarding
4 the storage or retention of those signed receipt
5 forms for policies?
6 A.     The policies would be related to the
7 Pennsylvania Historical Museum Commission in terms
8 of retention of certain particular documents.
9 They would maintain them and they could dispose of
10 them according to the Pennsylvania Historical
11 Museum Commission.
12 Q.     So my question is more so:  Where are
13 they maintained?
14 A.     In the human resources office.
15 Q.     In each individual's personnel file or
16 somewhere else?
17 A.     I don't know.
18 Q.     Who would know the answer to that
19 question?
20 A.     I guess the human resources director.
21 Q.     Does the county currently have a human
22 resources director?
23 A.     We do not.
24 Q.     Does the county currently have an

Page 72

1 interim or contractor in the human resources
2 director position?
3 A.     We do.
4 Q.     And who is that?
5 A.     Ms. Kutzler.
6 Q.     Ms. Kutzler has worked for the county
7 before her current contract or stint, correct?
8 A.     Correct.
9 Q.     Does Ms. Kutzler understand where
10 documents stored in the HR department are to be
11 stored properly?
12        MS. JONES:  I will object to the
13 form.
14        You can answer if you can.
15        THE WITNESS:  I would think so,
16 yes.
17 BY MS. SMITH:
18 Q.     Ms. Kutzler's contract is set to
19 expire -- current contract is set to expire at
20 some point, correct?
21 A.     Correct.
22 Q.     The county intends to hire a full-time
23 employee for the position of HR director, correct?
24 A.     Correct.

Page 73

1 Q.      And from where would that individual
2 learn as to where receipt of policy forms are
3 stored when they when they take over the
4 position?
5 A.      Between in this particular instance,
6 between Doreen and the remaining staff in the HR
7 office.  But I think, Ms. Smith, when when you
8 had shown me my policy that times, I think my
9 signature page was in my file if that's where you
10 got it.
11 Q.      We're going to get to that because I
12 don't know --
13 A.      I know, I don't ask you questions.
14 Sorry about that.
15 Q.      We'll get to that.
16 A.      Okay.
17 Q.      We'll get to that.
18      Does the county have any written policy
19 or written procedure regarding the training of
20 employees related to its sexual harassment policy?
21 A.      I am not aware of a written policy
22 that's in a -- in a sheet like this.
23 Q.      Okay.
24      But I think you did testify earlier that

Page 74

1 sexual harassment training is conducted by the
2 county, by non-written policy or procedure every
3 two years?
4 A.      Correct.
5 Q.      Okay.
6      Any other non-written procedures or
7 policies that you can think of that the county has
8 regarding training of employees for sexual
9 harassment?
10 A.      Other than what I mentioned?  No.
11 Q.      Other than that it happens every two
12 years?
13 A.      No.
14 Q.      Okay.
15      Does the county have any written policy
16 or written procedure --
17 A.      Well, let -- let me back up there.
18 Q.      Sure.
19 A.      When a new employee comes in, they take
20 the training at that time.
21 Q.      Okay.  That's fair.  Thank you.
22      So the -- the non-written, but policy
23 and procedure of the county, is that each current
24 employee undergo training every two years and each

Page 75

1 new employee undergo sexual harassment training at
2 the time they are hired and then how -- is it that
3 they then go under -- undergo the training every
4 two years or they undergo it whenever that next
5 training is implemented?
6 A.      Whenever the next training is.  So if
7 that next training is six months, then they take
8 it six months --
9 Q.      Again in six months to get on that same
10 track?
11 A.      Otherwise it would be a nightmare to
12 administer.
13 Q.      You would be doing trainings all the
14 time?
15 A.      Yes.
16 Q.      Okay.  That's what I figured, I just
17 wanted to make the record clear.  Thank you.
18      Does the county have any written policy
19 or written procedure regarding the training of
20 employees related to its non-discrimination
21 policy?
22 A.      That would be at the same time the
23 sexual harassment training is done.  There's parts
24 in there that deal with discrimination.

Page 76

1 Q.      Okay.
2      So other than that two years and when
3 you're hired, no other -- well, that's not in
4 writing though, correct?
5 A.      Correct.
6 Q.      So there's no written policy, other than
7 what we've looked at, regarding training of
8 employees in non-discrimination, correct?
9 A.      Correct.
10 Q.      And the non-written for
11 non-discrimination is the same as the non-written
12 for sexual harassment?
13 A.      Correct.
14 Q.      Okay.
15      Ask the same questions for
16 anti-retaliation policies, does the county have
17 any written policy or written procedure regarding
18 the training of its employees related to
19 anti-retaliation?
20 A.      That is covered in the sexual harassment
21 training module, they talk about retaliation in
22 there.
23 Q.      Okay.
24      So no written policy about how employees

Case 3:21-cv-00477-MCC    Document 280-1    Filed 09/20/23    Page 112 of 342
CONFIDENTIAL
Deposition of Gary Bender 30(b)(6) - Revised                    Jane Doe, et al. v. Schuylkill County Courthouse, et al.

Page 77

1  are to be trained or when they're to be trained?
2  A.      No.
3  Q.      Okay.
4      Sounds like from your testimony, correct
5  me if I'm wrong, there is a non-written policy or
6  procedure of the county that they undergo the two
7  years or when they're hired training, and that
8  would be encompassed sexual harassment,
9  non-retaliate -- non-discrimination, and
10  anti-retaliation, correct?
11  A.      Yes.
12  Q.      Okay.
13      I'm going to try and speed this up and
14  lump this together.  If you need me to break it
15  down, I will.
16      Does the county have any -- so same
17  questions for elected officials, is there anything
18  different for employees versus elected officials
19  in the -- there being written policies about how
20  they're trained on sexual harassment,
21  discrimination, or retaliation?
22  A.      It would be the same as I described for
23  employees.
24  Q.      So no written policy on how they are

Page 78

1  trained, just procedural policies in that every
2  two years they undergo sexual harassment,
3  discrimination, retaliation training and/or when
4  they're elected and then thereafter?
5  A.      Correct.
6  Q.      Okay.
7      So employees and elected officials, in
8  the sense of sexual harassment, discrimination,
9  and retaliation training, are the same?
10  A.      Yes.
11  Q.      Do the policies we looked at, at each of
12  their times that they were in effect until the
13  next revision came, did they apply to elected
14  officials?
15  A.      Technically, yes, they apply to elected
16  officials.
17  Q.      All right.
18      Other than the policies we've looked at
19  today, has the county at any time since 2012
20  maintained any written policy or procedure
21  regarding the conducting of investigations of
22  complaints of sexual harassment?
23      MS. JONES:  I'm sorry.  Did you
24  preface that by other than what --

Page 79

1  BY MS. SMITH:
2  Q.      Other than what we've looked at, because
3  some of those, candidly, include steps to be
4  taken.
5  A.      They do.
6  Q.      So I am just trying to figure out if
7  there's anything independent of those that
8  dictates how a county employee, HR, or other
9  employee is to conduct an investigation of a
10  complaint of sexual harassment?
11  A.      Other than what's in here?
12  Q.      Other than what we've looked at.
13  A.      No.
14  Q.      Okay.
15      Same questions, other than what we've
16  looked at, is there any independent policies of
17  the county written about how a county employee,
18  HR, or otherwise is to conduct an invest -- an
19  investigation of complaints of discrimination?
20  A.      No, other than what's here.
21  Q.      Okay.
22      And same question for retaliation, other
23  than what we've looked at, does the county
24  maintain any written policy since 2012 as to

Page 80

1  conducting -- conducting an investigation into the
2  complaint of retaliation?
3  A.      None, other than what we've described.
4  Q.      Okay.
5      Any non-written policy that the county
6  has about how an investigation -- we'll start with
7  sexual harassment -- is to be conducted?
8  A.      No.
9  Q.      So whatever is written in the policies
10  that we've looked at today, is the complete policy
11  or procedure of the county regarding
12  investigations into complaints of sexual
13  harassment?
14      MS. JONES:  Object to the form.
15      You may answer.
16      THE WITNESS:  No.  But there is a
17  work in progress.
18  BY MS. SMITH:
19  Q.      What do you mean by that?
20  A.      In other words, we are beginning to look
21  at implementations of particular policies.
22  Q.      Okay.  And -- understood.  I am not -- I
23  won't put on the record why I think that is, but
24  anyway.

Case 3:21-cv-00477-MCC   Document 280-1   CONFIDENTIAL   Filed 09/20/23   Page 113 of 342
Deposition of Gary Bender 30(b)(6) - Revised
Jane Doe, et al. v. Schuylkill County Courthouse, et al.

Page 81

1    Okay.
2    But -- so let's take this back.  Prior
3 to, let's say, the beginning of 2023, so prior to
4 2023, was there any non-written policy or
5 procedure of the county, other than what we've
6 looked at, because those are in writing, any
7 non-written policy or procedure regarding how an
8 investigation into a complaint of sexual
9 harassment is to be conducted?
10 A.    No.
11 Q.    Okay.
12    Same question for discrimination, prior
13 to 2023, so December 2022 back, did the county
14 have any non-written policy or procedure regarding
15 how investigations into complaints of
16 discrimination were to be conducted?
17 A.    No.
18 Q.    Finally, prior to January 2023, did the
19 county have any non-written policy or procedure
20 regarding how investigations of complaints of
21 retaliation were to be conducted?
22 A.    No.
23 Q.    What, if any, investigations has the
24 county conducted regarding Jane Doe 1's reports

Page 82

1 and/or complaints of discrimination?
2 A.    Okay.  Repeat that for me, please.
3 Q.    What, if any, investigations has the
4 county conducted regarding Ms. Jane Doe 1's
5 reports and complaints of discrimination, which in
6 my definition, would include sexual harassment?
7 A.    They have been investigated by the human
8 resources department.
9 Q.    How many investigations have been
10 conducted by the county?
11 A.    I don't have an answer to that.
12 Q.    Is there a report for any of these
13 investigations?
14 A.    They would be in her personnel file if
15 there are, yes.
16 Q.    Are there reports that you know exist?
17 A.    I haven't looked at her personnel file.
18 Q.    Was anyone interviewed -- was anyone
19 interviewed during the investigation -- any
20 investigation the county conducted?
21 A.    That would be the procedure.
22 Q.    Do you know who was interviewed for any
23 of these investigations?
24 A.    I do not.

Page 83

1 Q.    What was determined in any of these
2 investigations?
3 A.    That I'm not aware of a determination.
4 Q.    Was any video footage reviewed in any of
5 the investigations?
6 A.    Of Jane Doe 1, no.
7 Q.    There was no video footage reviewed in
8 any investigation -- during any investigation into
9 Jane Doe 1's reports of discrimination?
10 A.    I'm not aware of any video.
11 Q.    I just want to make sure the record is
12 clear.
13    Video -- like video on like a tape that
14 someone can watch now or video being reviewed,
15 like footage being reviewed and played back on,
16 like, the sheriff's cameras, for instance?
17 A.    Not that I'm aware of.
18 Q.    What, if any, investigations has the
19 county conducted regarding Jane Doe 2's reports --
20 any reports by Jane Doe 2 of -- reports and
21 complaints by Jane Doe 2 of discrimination,
22 including sexual harassment?
23 A.    Jane Doe 2 was interviewed and there --
24 there was a -- there was an investigation.

Page 84

1 Q.    One investigation or more than one?
2 A.    That I don't know.
3 Q.    Was there a report?
4 A.    I would think so, yes.
5 Q.    Do you know if there's a report?
6 A.    I -- I can't answer that.
7 Q.    So you can't answer, meaning you cannot
8 affirmatively say there is a report?
9 A.    Correct.  I haven't looked at any.
10 Q.    Do you know if anyone was inter --
11 anyone was interviewed in connection with any
12 investigation into any report or complaint of
13 discrimination by Jane Doe 2?
14 A.    I don't know specifically.
15 Q.    Do you know --
16 A.    Now, Ms. Smith, are we going back to
17 May 2020?
18 Q.    We are going back to any time during
19 Jane Doe 2's employment with the county.
20 A.    Okay.  So -- okay.  So -- so it would be
21 that initial investigation after May 20th?
22 Q.    Any other investigations during Jane Doe
23 2's employment into any report or complaint by her
24 of discrimination, including sexual harassment?

Page 85

A.    Outside of the initial report?
Q.    Yes.
A.    Okay.
Q.    Well, because now you've testified
there's an initial report.  So outside of that,
what you called an initial investigation in May of
2020, any others?
A.    I'm not aware of any.
Q.    Are you aware of any --
A.    Hold up -- hold up on that.  There would
have been the -- there was an investigative
complaint when she was allegedly being followed.
Q.    Do you recall when that was?
A.    I don't have the date.
Q.    Was anyone interviewed?
A.    Yes.  It would have been Jane Doe 3,
Jane Doe 4, Sheriff Groody, and Jane Doe 2
provided a -- a written statement.
Q.    Who interviewed Jane Doe 3?
A.    Ms. Zula.
Q.    Who interview Jane Doe 4?
A.    Ms. Zula.
Q.    Who interviewed Sheriff Groody?
A.    Ms. Zula.

Page 86

Q.    Who inter -- and you said Jane Doe 2
provided a written statement.  Was that a written
statement that the county -- someone at the county
helped her prepare or one that she provided on her
own?
A.    I think you had prepared that.
Q.    And when you said when she was allegedly
being followed, do you know who she alleged she
was being followed by?
A.    Commissioner Halcovage.
Q.    And do you know if this is the
incident -- we'll call it an alleged incident, the
event that Commissioner -- when Commissioner
Halcovage alleged that he was at a funeral?
A.    Correct.
Q.    It was on a day of a commissioner's
meeting, he wasn't at the commissioner's meeting
and he alleges he was at a funeral?
A.    That is correct.
      MS. JONES:  Catherine, in light of
the witness's answer about Jane Doe 2 and not
realizing and excluding the May 2020
investigation, I think he did not anticipate that
as part of your initials questions.

Page 87

      MS. SMITH:  Okay.  Well, Counsel,
this is not proper under the federal rules.  Your
client has been instructed as to what he can and
cannot do.
      MS. JONES:  I'll ask him questions
then.
      MS. SMITH:  Okay.
      MS. JONES:  Just I thought his
reaction was obvious, so you might want to follow
up.  But if you don't want to, I will.
BY MS. SMITH:
Q.    Was any video footage reviewed regarding
this incident?
A.    Not that I'm aware of.
Q.    Are you aware that Jane Doe 2 alleged
that she took pictures on her county-issued iPad
of being followed by Commissioner Halcovage?
A.    I think that was in her report.
Q.    Did anyone on behalf of the county
attempt to recover any images from Jane Doe 2's
county-issued iPad?
A.    I'm in aware of that.
Q.    Was Jane Doe 2 -- did anyone at the
county ask Jane Doe 2 for her iPad to attempt to

Page 88

obtain, recover, preserve, clone any images?
A.    I'm not aware of that.
Q.    Were any documents, any sort of
document, picture, text message, e-mail, anything,
any evidence, I should could call it, not just
document, any evidence provided by Defendant
Halcovage to the county in support of his position
regarding the incident?
A.    Outside of written -- written comments,
I don't think so.
Q.    But he did provide a written statement
--
A.    Yes.
Q.    -- of his version of the events?
A.    Yes.
Q.    Okay.
      And who did he provide that to?
A.    Ms. Zula.
Q.    Did he prepare it on his own or with Ms.
Zula's assistance?
A.    On his own.
      MS. SMITH:  Let's just take a quick
break.
      Matt, we can go off the record.

Page 89

1 Aleisha, we can go off the record.
2         VIDEOGRAPHER:  The time is now
3 10:28 a.m. and we're going off the record.
4                - - -
5     (Whereupon, brief recess was held off
6 the record.)
7                - - -
8         VIDEOGRAPHER:  The time is now
9 10:38 a.m. and we are back on the record.
10 BY MS. SMITH:
11 Q.      Mr. Bender, before the break, you were
12 testifying on behalf of the county about Jane Doe
13 2's -- any reports or complaints of discrimination
14 by Jane Doe 2.  And you testified about an initial
15 investigation, May of 2020, and then this other
16 complaint of her being followed.
17         Are there any other investigations the
18 county has conducted during Jane Doe 2's
19 employment into reports or complaints by her of
20 discrimination?
21         MS. JONES:  Object to the form.
22         You can answer.
23         THE WITNESS:  Okay.  Can -- can I
24 just back up a little bit to clarify things?  You

Page 90

1 know, it -- the only reason we're here today is
2 because that May 20th complaint.
3         So when you ask me, did you ever hear of
4 a complaint, you're also referring to this
5 May 20th complaint?
6 BY MS. SMITH:
7 Q.      I'm asking what the county has done
8 during each of these individuals employments.  So
9 right now we're talking about Jane Doe 2.
10 A.      Okay.
11 Q.      So I want to know what the county has
12 done regarding -- if the county has conducted any
13 investigations, and if so, which ones, when, and
14 then follow-up questions, into complaints or
15 reports of discrimination by Jane Doe 2?
16 A.      Okay.  Then we can back up to the
17 May 20th, the initial complaint.
18 Q.      Okay.
19         So that's the initial investigation in
20 May of 2020, that you referred to?
21 A.      Correct.
22 Q.      Okay.
23         And then we have this other one of an
24 allegation that she was being followed by

Page 91

1 Defendant Halcovage, correct?
2 A.      Correct.
3 Q.      Any there any others?
4 A.      There would be a complaint that they
5 said Mr. Halcovage was driving past their window
6 and taking pictures.
7 Q.      Who is they?
8 A.      Jane Doe 1 and Jane Doe 2.
9 Q.      Okay.
10         Was this investigated by the county?
11 A.      It was.
12 Q.      By whom?
13 A.      Ms. Zula.
14 Q.      What, if any -- who, if anyone, did she
15 interview in connection with this?
16 A.      She would have talked to Commissioner
17 Halcovage and she would have talked to Jane Doe 2
18 and Jane Doe 1.
19 Q.      Did she obtain statements from any of
20 those individuals?
21 A.      Beg your pardon.
22 Q.      Did she obtain statements from any of
23 those individuals?
24 A.      I would think so, yes.

Page 92

1 Q.      Were they written?
2 A.      Yes.
3 Q.      Did she take notes?
4 A.      I would think so, yes.
5 Q.      Did she review any surveillance footage?
6 A.      The sheriff did.
7 Q.      Which sheriff?
8 A.      Chief Deputy Tobin.
9 Q.      Was that video preserved?
10 A.      There was nothing on the video.  They
11 couldn't see from the -- the cameras on that --
12 that window.
13 Q.      Well, there was camera footage, correct?
14 A.      They looked at camera footage, yes.
15 Q.      And was that footage, which you're
16 testifying indicates nothing relevant or useful
17 exists, was that preserved?
18 A.      That I don't know.
19 Q.      Other than speaking to Defendant
20 Halcovage, Jane Doe 2, Jane Doe 1, and then this
21 review of surveillance by Deputy Chief Tobin, was
22 there any -- was anything else conducted, any
23 other investigation conducted or any other action
24 taken during the investigation?

Page 93

1  A.      On that investigation?
2  Q.      For that incident.
3  A.      No.
4  Q.      Any others -- any other investigations
5  by the county into reports or complaints of
6  discrimination by Jane Doe 2 during her
7  employment?
8  A.      There was a complaint by Jane Doe 2 and
9  Jane Doe 1, well, that other one was as well, that
10 when Mr. Hatter was down, they felt he acted in --
11 in an inappropriate manner.
12 Q.      Who investigated that on behalf of the
13 county?
14 A.      Ms. Zula.
15 Q.      Who was interviewed, if anyone?
16 A.      Mr. Hatter, Jane Doe 2, and Jane Doe 1.
17 Q.      Did Ms. Zula or anyone on behalf of the
18 county obtain written statements from any of those
19 individuals?
20 A.      I would think so, yes.
21 Q.      Did she take -- did Ms. Zula or anyone
22 on behalf of the county take written notes during
23 those interviews?
24 A.      I would think so, yes.

Page 94

1  Q.      Was there any video footage reviewed for
2  that investigation?
3  A.      No.
4  Q.      Any others?
5  A.      On Jane Doe 2?
6  Q.      Yes.  Any other investigations conducted
7  by the county into complaints or reports of
8  discrimination --
9  A.      I'm not aware of any others.
10 Q.      Okay.
11     Now, you just testified to two other --
12 two incidents involving Jane Doe 1.  I had asked
13 you earlier about Jane Doe 1 and her reports and
14 complaints of discrimination.
15     Are you now supplementing your answer
16 with there's two incidents?
17 A.      Yes.
18 Q.      Okay.
19     Did you have a conversation with your
20 attorney about your testimony during the break?
21 A.      Yes.  She reminded me I'm speaking too
22 fast and that I am here not as Gary Bender, I am
23 here representing the county.  And just I was
24 confused, because the only reason we're here is

Page 95

1  because the May 20th investigation.
2  Q.      Did she instruct you to supplement your
3  answer as it relates to Jane Doe 1?
4  A.      She said think hard to make sure that
5  I'm being correct.
6  Q.      Did she tell to supplement your answer
7  with additional investigation --
8  A.      If I knew something, yes.
9  Q.      Did she remind you of the Kent Hatter
10 investigation?
11 A.      No.
12 Q.      Did she remind you of the driving past
13 the windows investigation?
14 A.      No.
15 Q.      Other than those two now that you've
16 testified to regarding Jane Doe 1 in the initial
17 May of 2020 investigation, are there any other
18 reports or complaint of discrimination by Jane Doe
19 1 that the county has investigated?
20     MS. JONES:  I'm sorry.  Did she say
21 including the May 2020.
22     MS. SMITH:  Other than.
23     MS. JONES:  Okay.
24     MS. SMITH:  So I will be clear.

Page 96

1  BY MS. SMITH:
2  Q.      So other than the May of 2020 initial
3  investigation and the two that you just mentioned
4  when we were speaking about Jane Doe 2, are there
5  any other investigations that the county has
6  conducted regarding Jane Doe 1's reports or
7  complaints of discrimination?
8  A.      I can't think of any.  There's an active
9  investigation right now.
10 Q.      Into a complaint of what?
11 A.      It's something an attorney is
12 investigating.  It's an internal office thing that
13 it was -- she's stating Mr. Hatter had opened a
14 piece of her mail that was on her desk.
15 Q.      That's an active investigation?
16 A.      It is.
17 Q.      Okay.
18     Moving on to -- so let me just make sure
19 we can close the door on that.
20     Are there any others that you can think
21 of -- any other investigations by the county that
22 have been conducted into complaints or reports of
23 discrimination by Jane Doe 1 or Jane Doe 2 or have
24 we covered them all?

Deposition of Gary Bender 30(b)(6) - Revised                    Jane Doe, et al. v. Schuylkill County Courthouse, et al.

Page 97

A.    I can't think of any others.

Q.    Okay.

So moving on to Jane Doe 4.  Are -- what, if any, investigations has the county conducted regarding any report or complaint of discrimination by Jane Doe 4?

A.    Well, she was interviewed by Ms. Twigg back in -- in May of '20, and I think Mr. Roth was in on that interview as well.

Q.    Okay.

Any other investigations conducted by the county at any time during Jane Doe 4's employment into complaints or reports of discrimination?

MS. JONES:  Object to the form.

You can answer.

THE WITNESS:  I can't think of any.

BY MS. SMITH:

Q.    Moving on to Jane Doe 3.  At any point during her employment, has the county conducted any investigation into a complaint or a report of discrimination by her?

A.    Again, she would have been interviewed by Mr. Roth and Ms. Twigg on May 20th.

Page 98

Q.    Okay.

Other than that, is there any other investigation by the county that you are aware of during Ms. -- you the county aware of, because you're speaking as the county, that was conducted into reports or complaints of discrimination by Jane Doe 3?

MS. JONES:  Object to the form.

You can answer.

THE WITNESS:  Think she made a complaint about the hiring in the clerk of courts office, but I don't particularly know that it was a harassment complaint or a discrimination.

BY MS. SMITH:

Q.    Okay.  Well, let's talk about it since you mentioned it.

Was it investigated by the county?

A.    I think we just received her e-mail on that.

Q.    Okay.

Was there any investigation --

A.    I don't think there was an investigation, per se.

Q.    What do you mean by per se?

Page 99

A.    I think the e-mail was -- was -- was what was recorded.

Q.    Okay.

So the e-mail was saved or preserved in some way?

A.    Yes.

Q.    Is that what I'm understanding?

A.    Uh-hum.

Q.    Other than preserving the e-mail, was any action taken to look into, to interview anyone, to review any video, to do any type of investigation regarding what she said, Jane Doe 3 said in that e-mail?

A.    Mr. Marshall sent her a letter outlining the policy.

Q.    Do you know who drafted the letter that Mr. Marshall sent?

A.    Mr. Marshall.

Q.    Do you know who sent the letter that --

A.    Mr. Marshall.

Q.    Not Mr. Marshall's law firm's personal secretary?

A.    Well, that I don't know.

Q.    Okay.

Page 100

So do you -- do you know who sent the letter to Jane Doe 3?

MS. JONES:  Object to the form.

You can answer if you know.

THE WITNESS:  Who actually placed it in the mail?

BY MS. SMITH:

Q.    Well, was it mailed, was it e-mailed, was it carrier pigeon?

MS. JONES:  I object to the form.

You can answer if you can.

THE WITNESS:  Ms. -- I'm going to have to guess and I don't want to do that.

BY MS. SMITH:

Q.    Well, and I don't want you to guess either.  So I would like an answer.  If that answer is I don't know, that that's your answer.

A.    That would be it.

Q.    Okay.

So you don't know in what form the letter was sent to Jane Doe 3?

A.    I do not.

Q.    Okay.

And do you know who sent Jane Doe 3 the

Deposition of Gary Bender 30(b)(6) - Revised                    Jane Doe, et al. v. Schuylkill County Courthouse, et al.

Page 101

1  letter?
2  A.      Either Mr. Marshall or Mr. Marshall's
3  office.
4  Q.      Mr. Marshall's office being his law
5  firm, personal private law firm, or the
6  solicitor's office?
7  A.      That I don't know.
8  Q.      So you do no know who sent Jane Doe 3
9  the letter?
10        MS. JONES:  Object to the form.  I
11 think he's answered that as best he could.
12        THE WITNESS:  That would be
13 correct.
14 BY MS. SMITH:
15 Q.      Other than the May of 2020 investigation
16 and this e-mail that Jane Doe 3 sent and
17 Mr. Marshall responded to that we were just
18 discussing, are there any other investigations the
19 county had conducted regarding Ms. -- any report
20 by Jane Doe 3 of complaints of discrimination?
21 A.      Not that I'm aware of.
22 Q.      I'm going to move on to retaliation
23 complaints.  So we are going to go through some of
24 similar questions.

Page 102

1         What, if any, investigations has the
2  county conducted regarding any report or complaint
3  of retaliation by Jane Doe 1?  And this is at any
4  time during her employment.
5  A.      Well, the May 20th complaint was -- was
6  on sexual harassment.
7  Q.      Okay.
8  A.      I don't know that that involved
9  retaliation.
10 Q.      Okay.  That's fair.
11        Other than that May of 2020, which I
12 think we've previous at depositions, the documents
13 are fully fleshed out, so I won't ask you any
14 questions about that.  But other than that one,
15 whether we classify that as sexual harassment or
16 retaliation or discrimination or all of the above,
17 other than that, is there any other investigations
18 that the county has conducted into complaints or
19 reports of retaliation by Jane Doe 1?
20 A.      I don't know of any other
21 investigations.
22 Q.      Same question for Jane Doe 2.  So,
23 again, I will preface this question with, other
24 than the May 2020 investigation, has the county

Page 103

1  conducted any investigations into complaints or
2  reports by Jane Doe 2 of retaliation?
3  A.      I'm not aware of an investigation.
4  Q.      Again, again, other than the May 2020
5  investigation, has the county conducted -- and
6  when -- just so the record is clear, I want to
7  make sure that we define May 2020 investigation.
8  This is the report -- the investigation that was
9  conducted by Ms. Twigg and Mr. Roth, you sat in --
10 Mr. Bender sat in on an interview in which
11 numerous individuals were interviewed, reports
12 were drafted, press releases were issued in --
13 regarding the complaints of Jane Doe 1, Jane Doe
14 2, Jane Doe 3, and Jane Doe 4 related to
15 discrimination, retaliation, harassment by the
16 county and other county officials, correct?
17 A.      Correct.
18 Q.      Okay.
19        So other than that, has the county
20 conducted any investigation into reports or
21 complaints of retaliation by Jane Doe 4?
22 A.      I don't know of any investigations.
23 Q.      What, if any, investigations has the
24 county conducted into reports or complaints of

Page 104

1  retaliation by Jane Doe 3, other than the May of
2  2020 investigation?
3  A.      I'm not aware of any investigations.
4  Q.      Has the county -- when I -- strike that.
5         Has the county employed or utilized a
6  third party to conduct any investigation into any
7  complaints or reports of retaliation by the
8  plaintiffs?
9  A.      Yes.
10 Q.      Okay.
11        When?
12 A.      Say in -- some time in -- in '21.
13 Q.      Who was to third party?
14 A.      That was an attorney from Hubric
15 Resources or Hubric Resources referred us to an
16 attorney, Mr. Bergonzi.
17        Is that name familiar to you?  Well, no.
18 Strike that.
19 Q.      Are you referring to Peter Bergonzi?
20 A.      Yes.
21 Q.      You believe he's an attorney?
22 A.      I don't know that specifically.
23 Q.      Okay.
24        And what -- who referred or obtained the

Page 105

1  services of Hubric Resources for investigation,
2  that investigation?
3  A.     The county.
4  Q.     Who at the county?
5  A.     Me, Gary Bender.
6  Q.     And whose complaints -- or Mr. -- was
7  Mr. Bergonzi investigating?
8  A.     Let's back up.  When I say me, keep in
9  mind if it was a contract, that contract would
10 have had to been approved by the board of
11 commissioners.
12 Q.     So when Mr. Bergonzi investigated
13 whatever he was investigated, because we haven't
14 gotten to that point yet in the testimony, that
15 investigation was pursuant to a contract?
16 A.     We would have had some way to pay him,
17 whether it be -- so he would have had to have a
18 contract.
19 Q.     So Mr. Bergonzi had a contract with the
20 county?
21 A.     I can't answer that.
22 Q.     Okay.
23        So --
24 A.     He was paid.

Page 106

1  Q.     Okay.
2         Did the commissioners approve -- have to
3  approve the investigation being conducted by
4  Mr. Bergonzi?
5  A.     They approve a contract.
6  Q.     Okay.
7  A.     And it could have been billed through --
8  you know, it could have been billed through
9  Hubric.  I don't -- I don't know.  It could have
10 been billed through Hubric.
11 Q.     Okay.
12        What was Mr. Bergonzi investigating?
13 A.     There was a complaint by Jane Doe 3, she
14 received a written warning and she wanted another
15 investigator to -- to look at that and review it.
16 Q.     Okay.
17 A.     And so we complied with that request.
18 Q.     Okay.
19        Other than this complaint by Jane Doe 3
20 about -- other than this complaint by Jane Doe 3,
21 was Mr. Bergonzi tasked with conducting any other
22 investigations on behalf of the county?
23 A.     No.
24 Q.     So I just want to go back, because we

Page 107

1  talked about Jane Doe 3, Jane Doe 4, Jane Doe 2,
2  and Jane Doe 1's reports of retaliation.  And you
3  answered -- and the county's investigation thereof
4  and you answered no to each of them, other than
5  the May 2020 investigation.  But now you're
6  telling me about this Hubric Resources.
7         So when I ask you about the county, and
8  you can supplement your answer if you need to, we
9  have now talked about the Bergonzi investigation.
10 When I'm talking about the county, I want to know,
11 has the county, meaning any employee, agent,
12 representative, third party utilized to conduct
13 investigations, including Hubric Resources
14 employee, Doreen Kutzler, who was assigned there,
15 is there anyone else on behalf of the county who
16 conducted investigations into any complaints of
17 retaliation by any of the four plaintiffs, other
18 than the May 2020 and other than the Bergonzi that
19 we just talked about?
20        MS. JONES:  Object to the form.
21        You may answer.
22        THE WITNESS:  We do have someone
23 contracted now.
24 BY MS. SMITH:

Page 108

1  Q.     Okay.
2         Is that McNees?  And McNees, I forget
3  the rest of law firm's name.
4  A.     McNees & Wallace.
5  Q.     McNees & Wallace, yes.
6         Is that who you are referring to?
7  A.     Yes.
8  Q.     Okay.
9         And that's an ongoing investigation,
10 correct?
11 A.     It is.
12 Q.     Okay.
13        Other than that ongoing investigation,
14 the May of 2020 investigation, and what you
15 believe was 2021 or whenever that was, the Peter
16 Bergonzi investigation, are there any other
17 investigations by the county, its agents, its
18 employee, its representatives, third parties that
19 were retained by the county, into complaints of
20 retaliation or reports of retaliation by -- made
21 by any of the plaintiffs?
22        MS. JONES:  Object to the form.
23        You may answer.
24        THE WITNESS:  Not that I'm aware

Page 109

1  of.  And, however, the one by Mr. Bergonzi wasn't
2  necessarily retaliation or harassment.
3  BY MS. SMITH:
4  Q.      Okay.
5          But you brought it up, so I just want
6  to --
7  A.      Okay.
8  Q.      Even if we classify it as such, there's
9  no others that you can think of that we haven't
10 covered that could potentially be classified as
11 retaliation investigations?
12         MS. JONES:  Same objection.
13         You may answer.
14         THE WITNESS:  She said yes?
15 BY MS. SMITH:
16 Q.      Yes.  She said yes, you can answer.
17 A.      Not that I'm aware of.
18 Q.      Okay.
19         MS. SMITH:  And I think we -- Matt,
20 if you can pull up 213 for me.
21              - - -
22         (Previously marked Exhibit-213.)
23              - - -
24 BY MS. SMITH:

Page 110

1  Q.      This document is a job classification
2  description, which if we look at the last of these
3  three pages, appears to have been implemented on
4  January 14, 2009, and then revised on
5  December 1996.
6          Am I reading this document accurately?
7  A.      It appears it, yes.
8  Q.      Has the county made any revisions to
9  this -- and it's -- it's -- so the record is
10 clear, this is a job classification description
11 for the position of real estate and market
12 analyst, correct?
13 A.      That's what it states, yes.
14 Q.      Has the county made any revisions to
15 this job classification description since December
16 of 1996?
17         MS. JONES:  I will object to the
18 form.
19         But you can answer.
20         THE WITNESS:  I'm not aware of any.
21 BY MS. SMITH:
22 Q.      This was the job classification
23 description for the position that Jane Doe 1 --
24 for the position of real estate market analyst at

Page 111

1  all times that Jane Doe 1 held that position,
2  correct?
3  A.      I would think so, yes.
4          MS. SMITH:  All right.  Matt, if
5  you can pull up 182.
6              - - -
7          (Previously marked Exhibit-182.)
8              - - -
9  BY MS. SMITH:
10 Q.      This is the job -- the county's job
11 classification description for the position of
12 field appraiser.  If we look to the second page,
13 which was implemented in February of 2019,
14 correct?
15 A.      That's what it states, yes.
16 Q.      Prior to February of 2019, did the
17 county have a job classification description for
18 the position of field appraiser?
19 A.      Yes.
20 Q.      Okay.
21         This doesn't indicate this is a revision
22 of any?
23 A.      It does not.
24 Q.      Okay.

Page 112

1          So was it -- this was not a revision and
2  it was -- why -- if there was one that existed
3  before February of 2019, why is there no
4  indication this is a revision to that?
5          MS. JONES:  Object to the form.
6          But you can answer.
7          THE WITNESS:  I don't have -- I
8  don't know.
9  BY MS. SMITH:
10 Q.      Okay.
11         Has the county made any revisions to
12 this job classification description since
13 February of 2019?
14 A.      Not that I'm aware of.
15 Q.      This was the job classification
16 description for the position of field appraiser at
17 all times Jane Doe 2 has held that position,
18 correct?
19 A.      I would think so, yes.
20         MS. SMITH:  Matt, if you can pull
21 up 218.
22              - - -
23         (Previously marked Exhibit-218.)
24              - - -

Deposition of Gary Bender 30(b)(6) - Revised                    Jane Doe, et al. v. Schuylkill County Courthouse, et al.

Page 113

BY MS. SMITH:

Q.      This is the county's job classification description that was implemented in June 1994, if you look to the second page and then revised on March 4, 2008, correct?

A.      That's what it states, yes.

Q.      Has the county made any revisions to this job classification since March 4, 2008?

A.      Not that I'm aware of.

Q.      This was the job classification description for the position of tax claim bureau assistant director at all times that Jane Doe 4 held that position, correct?

A.      I would think so, yes.

Q.      Is the assistant director of tax claim bureau sometimes also referred to as deputy director?

A.      Yeah, I think they would be one in the same, yes.

Q.      Okay.
        There's no -- the county has no separate or distinct job classification description for deputy director of tax claim, correct?

A.      Not that I'm aware of, no.

Page 114

Q.      Okay?
        MS. SMITH:  Matt, if you can pull up 219.
                        - - -
        (Previously marked Exhibit-219)
                        - - -

BY MS. SMITH:

Q.      This is the county's job classification description for the position -- somewhat dual position of assistant director of both tax claim and tax assessment that was implemented in May, if we look to the second page of 2019, correct?

A.      Correct.

Q.      Has the county made any revisions to this job classification description since May of 2019?

A.      This position doesn't exist.

Q.      Okay.
        So this position was recently -- in March of 2021, eliminated, correct?

A.      Correct.

Q.      Okay.
        When it was eliminated, the positions -- what are two positions here, assistant director of

Page 115

tax claim and assistant director of tax assessment, became two distinct positions again, correct?

A.      That would be correct.

Q.      Okay.
        And we just looked at the assistant director of tax bureau -- claim bureau.  Would that now be the controlling job description for that independent position again?

A.      I would think so, yes.

Q.      Okay.
        Is there an assistant director in tax assessment or what I think is also commonly referred to as the assistant chief assessor?

A.      Correct.

Q.      Is there a job description for that position?

A.      I would think so, yes.

Q.      And for a period of time between, I think, March of 2021 and June or July of 2021, Jane Doe 4 held the position of assistant chief assessor, correct?

A.      Between what time frame?

Q.      March of 2021, until June or July, I

Page 116

think, of 2021, for a period after her demotion or from the position -- the dual position, she remained in tax assessment as the assistant chief assessor, correct?

        MS. JONES:  Object to the form.
        You can answer.
        THE WITNESS:  Yes.

BY MS. SMITH:

Q.      I don't know if I asked this question, I apologize.
        The -- the dual role position, Exhibit-219, that was the job classification for the position of assistant director tax claim bureau/tax assessment at all times that Jane Doe 4 held that position, correct?

A.      I would think so, yes.

        MS. SMITH:  Okay.  Matt, if we can pull up 216.
                        - - -
        (Previously marked Exhibit-216.)
                        - - -

BY MS. SMITH:

Q.      This is a -- the county's -- one of the

Page 117

1 counties -- strike that.
2        This is a job classification description
3 of the county's -- of the county for the position
4 of tax claim bureau director, correct?
5 A.     That is correct.
6 Q.     This is implemented on June 1994 and --
7 it was implemented on June -- in June 1994, and
8 revised on March 4, 2008, correct?
9 A.     That's what it states, yes.
10 Q.    Okay.
11       Now, I'm going to also -- I want you to
12 keep that one in front of you.
13       MS. SMITH:  Matt, if you could
14 maybe split screen 219 -- I'm sorry -- 216 and 45.
15 BY MS. SMITH:
16 Q.    The reason for my stuttered verbiage
17 and, maybe you can help me out with this, is this
18 is also a job classification description of the
19 county for the position of tax claim bureau
20 director, correct?
21 A.    That's what it states, yes.
22 Q.    Okay.
23       MS. SMITH:  Oh, let me wait until
24 Matt gets these up on the screen so our Zoom

Page 118

1 participants have it.  I am just waiting on the
2 Zoom.  I want to make sure they have it.  They --
3 they need to see it on the screen as well, so they
4 know what I'm referring to, especially for this
5 one.
6        Thank you, Matt.
7 BY MS. SMITH
8 Q.    Okay.
9        So if -- on 45, if we look to the second
10 page, this also says implemented June 1994, but
11 revised April 2018.
12       MS. JONES:  '15.
13       THE WITNESS:  '15.
14       MS. SMITH:  Sorry.  '15.  Thank
15 you.
16 BY MS. SMITH:
17 Q.    It doesn't have -- on 45 it doesn't have
18 the revision date of 3/4/2008.  Am I correct in
19 believing that 2/16 was a revision in March of
20 2008, and then this 45 is a more revised version
21 of the 2/16, March 2008 revision?
22 A.    I would agree with that.
23 Q.    Okay.
24       It just -- it doesn't list all the

Page 119

1 revisions, so I just wanted to make sure that I
2 was understanding that it was just they didn't
3 list all the revision dates, but this is a
4 subsequent revision?
5 A.     That would be my understanding as well.
6 Q.     Okay.  All right.  Perfect.
7        So then 216, this would have applied --
8 would have been the job classification description
9 for anyone who held the position between March 4,
10 2008, and April 2015, correct?
11 A.     Correct.
12 Q.     Okay.
13        And then anyone who held the position
14 April 2015, until current, 45 would be the job --
15 who held the tax claim bureau director, 45 would
16 be the applicable job classification description?
17 A.     I would agree with you.
18 Q.     Okay.
19        And since April of 2015, has the county
20 made any revisions to the -- that tax claim bureau
21 director job classification description?
22 A.     I'm unaware of any.
23        MS. SMITH:  All right.  Matt, if
24 you can pull up 217.

Page 120

1        - - -
2        (Previously marked Exhibit-217.)
3        - - -
4 BY MS. SMITH:
5 Q.     All right.
6        Mr. -- I'm sorry.  This is the county's
7 job classification description for the position of
8 chief assessor/director of tax claim, correct?
9 A.     That's what it states, yes.
10 Q.    If we look to the second page, this was
11 implemented May of 2019, correct?
12 A.     Uh-hum, that's what it states.
13 Q.     Okay.
14        Does this position still exist?
15 A.     This is what?
16 Q.     Does this position still exist?
17 A.     It does not.
18 Q.     Okay.
19        So between May of 2019 and when the
20 county, for lack of a better word abolished or got
21 rid of this position, this was the job
22 classification description that applied to anyone
23 who held that position during that time, correct?
24 A.     That would be correct.

Page 121

1  Q.      And the removal or -- of this position
2  was when Jane Doe 3 was -- when the offices were
3  restructure in March of 2021; is that correct?
4  A.      Correct.
5  Q.      Okay.
6          MS. SMITH:  Matt, if you can pull
7  up SC1225 to 1226.  It will be 326 for today's
8  purposes.
9              - - -
10         (SC1225 marked as Exhibit-326 for
11 identification.)
12             - - -
13 BY MS. SMITH:
14 Q.      This is the county's job classification
15 description for the position of assistant county
16 solicitor, correct?
17 A.      Correct.
18 Q.      If we look to the second page, it was
19 implemented in June 1994, correct?
20 A.      Correct.
21 Q.      Has the county made any revisions to
22 this job classification description since
23 June 1994?
24 A.      To this particular one, not that I'm

Page 122

1  aware of.
2  Q.      Okay.
3          And Defendant Glenn Roth has held the
4  position of assistant county solicitor at some
5  point during his employment with the county,
6  correct?
7  A.      He has.
8  Q.      And so at any times he held that
9  position, this -- this job classification
10 description would have applied to him, correct?
11 A.      That would be correct.
12 Q.      Okay.
13         Going to look at Exhibit-30.
14         This is the county's job classification
15 description for the position of first assistant
16 county solicitor/risk manager, correct?
17 A.      That is correct.
18 Q.      If we look to the second page, it --
19 this description was implemented on
20 October 2017 -- in October of 2017, correct?
21 A.      That -- it states that, yes.
22 Q.      Okay.
23         Has the county made any revisions to
24 this job classification description since

Page 123

1  October of 2017?
2  A.      Not that I'm aware of.
3  Q.      And Defendant Roth, at some point during
4  his employment, held this position, correct?
5  A.      Correct.
6  Q.      And this job classification description
7  would have applied to Defendant Roth at all times
8  that he held this position with the county,
9  correct?
10 A.      Correct.
11         MS. SMITH:  I am going to mark
12 county defendant's sup 0000078 as 327 for today's
13 purposes.
14             - --
15         (SUP0000078 marked as Exhibit 327 for
16 identification.)
17             - - -
18 BY MS. SMITH:
19 Q.      Do you recognize this document?
20 A.      Yes, I've seen it.
21 Q.      This is the solicitor's assignments for
22 the county solicitors, correct?
23 A.      Correct.
24 Q.      On the top left-hand side, do you see

Page 124

1  the date of October 14, 2014?
2  A.      Uh-huh, I do.
3  Q.      Okay.
4          Is this -- were these the assignments of
5  the solicitors named on this document in October
6  of 2014?
7          MS. JONES:  Object to the form.
8          But you may answer.
9          THE WITNESS:  Your statement again.
10 BY MS. SMITH:
11 Q.      So there's -- there's three solicitors
12 named --
13 A.      Correct.
14 Q.      -- can we agree?
15         In October of 2014, were these the
16 departments which each solicitor named there,
17 those three names, were assigned?
18 A.      Yes.  I'm sorry.  Yes.
19 Q.      Okay.
20         Were -- so I'm going to represent to you
21 that Defendant Roth was hired as a solicitor on
22 July 2nd of 2012, that's when his PAR was voted on
23 being effective.  Well, his PAR was voted on
24 before that, but it was effective on that date.

Deposition of Gary Bender 30(b)(6) - Revised                                     Jane Doe, et al. v. Schuylkill County Courthouse, et al.

Page 125

1    Were there -- were the assignment
2  between his hire date in 2012 and October 2014,
3  were the assignments any different?
4  A.    Not that I'm aware of.
5  Q.    Okay.
6  A.    But, again, understand, Ms. Smith, that
7  these -- these assignments, in other words, Glenn
8  is there as a full time.  So he may -- somebody
9  may come over with a grant writer question and
10 Chris wouldn't be there, so they would go to
11 Glenn.  The full-time guy always gets dumped on.
12 So these are the assignments, but you may go to
13 different people depending who is there.
14 Q.    Okay.
15    But Glenn, since he has been employed by
16 the county, has been a full-time employee,
17 correct?
18 A.    That is correct.
19 Q.    Okay.
20    And has the solicitor's assignments list
21 changed at all since October 14, 2014?
22    MS. JONES:  I will object to the
23 form.
24    You can answer.

Page 126

1    THE WITNESS:  Yes.  The election
2  bureau, as you see under Mr. Hobbs.
3  BY MS. SMITH:
4  Q.    Yes.
5  A.    That was transferred over to  Mr. Roth.
6  Q.    Okay.
7  A.    Because Mr. Hobb was running for judge
8  last year.
9  Q.    And Mr. Hobbs was elected, correct?
10 A.    Yes, he was.
11 Q.    Okay.
12    So he's not a solicitor anymore,
13 correct?
14 A.    That is correct.
15 Q.    So he doesn't have any assignments
16 anymore, correct?
17 A.    That would be correct.
18 Q.    Okay.
19 A.    Yes, that would be correct.
20 Q.    Did the county hire someone to replace
21 Mr. Hobbs?
22 A.    Yes.
23 Q.    And who is that?
24 A.    Paul Datte, D-A-T-T-E.

Page 127

1  Q.    And did Dr. Datte take over the
2  remaining -- other than the election bureau, which
3  you just testified to was under Mr. Roth, did he
4  take over all other departments or divisions
5  assigned to Mr. Hobbs?
6  A.    Yes.  With exception of the election
7  bureau, that's still -- Glenn Roth still holds
8  that.
9  Q.    Okay.
10    So then -- go ahead.
11 A.    And also the planning and zoning was
12 transferred from Mr. Roth over to Chris Hobbs and
13 now Paul Datte.
14 Q.    Okay.
15    Any other changes since October of 2014?
16 A.    Not that I'm aware of, no.
17    MS. SMITH:  Okay.  Matt, if we can
18 pull up 212.
19    - - -
20    (Previously marked Exhibit-212.)
21    - - -
22 BY MS. SMITH:
23 Q.    Okay.
24    This is 212.  Is the -- the county's job

Page 128

1  classification description for county
2  administrator, correct?
3  A.    That is correct.
4  Q.    If we turn to the third page of --
5  sorry -- fourth page of this one, this was
6  implemented by the county in June of 2016,
7  correct?
8  A.    That's what it states, yes.
9  Q.    Okay.
10    And so this job classification has
11 applied to Defendant Bender for all -- at all
12 times that he held that position, correct?
13 A.    That is correct.
14 Q.    All right.
15    Last job classification description we
16 are going to look at is 81.
17    MS. SMITH:  Exhibit-81, Matt.
18 Sorry if that wasn't clear.
19    - - -
20    (Previously marked Exhibit-81.)
21    - - -
22 BY MS. SMITH:
23 Q.    This is the county's job classification
24 description for the position of human resources

Deposition of Gary Bender 30(b)(6) - Revised                    Jane Doe, et al. v. Schuylkill County Courthouse, et al.

Page 129

1  director, correct?
2  A.      Yes, that's what it states.
3  Q.      If we look to the third page, it was
4  implemented by the county on November 20 -- in
5  November of 2017, correct?
6  A.      That's what it states, yes.
7  Q.      Did the county have a job classification
8  description for the position of human resources
9  director before November of 2017?
10 A.      I would think so, yes.
11 Q.      Do you know?
12 A.      Yes, Ms. Chwastiak would have had a job
13 description.
14 Q.      This date on Page 3 does not have a
15 revision date?
16 A.      It does not, no.
17 Q.      Okay.
18 A.      I see that.
19 Q.      Okay.
20        So can you tell me for sure that the
21 county maintained a job classification description
22 for the position of human resources director prior
23 to November of 2017?
24 A.      There would have been one, yes.

Page 130

1  Q.      There would have been one, but can you
2  tell me, in fact, that there was one?
3          MS. JONES:  Object to the form.
4          You can answer it.
5          THE WITNESS:  Yes.
6  BY MS. SMITH:
7  Q.      You've seen it?
8  A.      No.
9  Q.      Does -- is a copy of an earlier job
10 classification description maintained anywhere in
11 the courthouse or in any county building?
12 A.      I would think so.
13 Q.      Where is it maintained?
14 A.      That would be in the human resources
15 office.
16 Q.      Has the county made any revisions to
17 this job classification description since November
18 of 2017?
19 A.      I'm not aware of any.
20 Q.      This job classification applied to Ms.
21 Twigg at all times she was employed by the county,
22 correct?
23 A.      Yes.
24 Q.      This job classification applied to

Page 131

1  Ms. -- to Defendant Zula at all times she was
2  employed by the county, correct?
3  A.      Yes.  And if we can just back up, the
4  reason I know that there was -- it was the human
5  resource director/risk manager when Martina
6  Chwastiak held that position.
7  Q.      Okay.
8          So there wasn't -- so like we looked at
9  the earlier one of the chief assessor and tax
10 claim director, it was like a dual role, would
11 there have been something titled human resources
12 director/risk manager that existed?
13 A.      That would be correct.
14 Q.      Okay.
15        So an independent one of this, which is
16 why there's not a revision date?
17 A.      That would be correct.
18 Q.      Okay.  All right.
19        So after Ms. Chwastiak left, the next
20 person employed by the counsel in the position of
21 human resources director would have been Ms.
22 Twigg; am I correct?
23 A.      Okay.  Repeat.
24 Q.      After Ms. Chwastiak left, she was

Page 132

1  replaced by Ms. Twigg, correct?
2  A.      Yes.
3  Q.      Okay.
4          And when Ms. Chwastiak left, she left
5  from the dual position of human resources
6  director/risk manager and Ms. Twigg came in as
7  just human resources?
8  A.      That is correct.
9  Q.      Okay.
10 A.      So which means there would have been an
11 earlier human resources director only because
12 Ms. Chwastiak became the human resource director,
13 risk manager, sometime before that.
14 Q.      Okay.
15        That's fair.
16 A.      I know that's confusing, but I know the
17 positions and...
18 Q.      Okay.
19        That's fair.
20        This job classification description has
21 applied -- applied to Andrea Whelan at all times
22 she was employed by the county, correct?
23 A.      That would be correct.
24 Q.      Did this job classification description

Page 133

1  apply to Defendant Kutzler at all times she worked
2  as interim county human resources director and/or
3  with a contractor with the county as it relates to
4  the position of human resources director?
5  A.      Yes.  We can say, she wasn't an
6  employee, but she would have assumed these
7  responsibilities.
8  Q.      Okay.
9         Does the county have a job
10  classification description for any elected
11  position?
12  A.      No.  That's set up by county code.
13  Q.      Okay.
14         So there's no written job classification
15  description for the position of county
16  commissioner?
17  A.      No, as specified in the county code.
18  Q.      Okay.
19         Do you know what portion of the county
20  code applies to or is the equivalent of a job
21  classification description for a county
22  commissioner?
23  A.      Do I know the section?  I do not.
24  Q.      All right.

Page 134

1         I am going to have you put those aside
2  because I'm going to hand you a stack of some
3  documents and I don't want to get anything too
4  mixed up.
5         MS. JONES:  Put it right under
6  here.
7         THE WITNESS:  Oh, okay.
8         MS. SMITH:  Yeah.  Matt, can you
9  pull up Documents 92 through 146.  And for all
10  those on Zoom, it may be easier for you to pull up
11  those Bates stamps on your own just so you can
12  scroll through them at your leisure.
13  BY MS. SMITH:
14  Q.      So we are going to -- these are all what
15  I understand and that's what I'm trying to figure
16  out, if my understanding is correct, this is what
17  I understand to be the contents of everyone's
18  personnel file.  You touched on this a little bit
19  before, that certain things might be or should be
20  included in the personnel file, when I think I was
21  asking you about the verifications that policies
22  were received.  And you thought maybe those might
23  be in personnel files.
24         So the county has produced documents in

Page 135

1  this case in connection with the litigation.  Do
2  you understand that?
3  A.      Yes.
4  Q.      Okay.
5         They were not organized and I will put
6  on the record, this was before Marie was involved
7  in the case.  They were not organized or produced
8  in any manner in which I can tell that they are
9  delineated into what it was.  It's just a stack of
10  documents.
11         So I'm trying to figure out what is
12  actually maintained in the plaintiffs' and
13  defendants' personnel file so I know if I have its
14  contents.
15         So my question for you is, this is what
16  I believe based off my review of the documents,
17  and I could be wrong, that the county produced is
18  what is maintained in Jane Doe 2's personnel file.
19  My question for you is:  Are you aware of any
20  other documents, other than these, and you can
21  take your time to review them, that are in Jane
22  Doe 2's county personnel file?
23         MS. JONES:  Okay.  Hold on.  Before
24  you -- you can look if you want while I'm

Page 136

1  objecting.  So I am going to --
2         THE WITNESS:  For the record, I
3  have never looked at her file, so I don't know
4  what was in or not in.
5         MS. JONES:  So I'm going to object
6  first just for clarification.
7         Catherine, the Bates stamped
8  numbers, those were produced by prior counsel to
9  me in response to discovery, the Bates stamp
10  numbers.
11         MS. SMITH:  What about them?
12         MS. JONES:  Those are from
13  county-produced document from my prior counsel to
14  me.
15         MS. SMITH:  Prior counsel to you?
16         MS. JONES:  Chris Gott.
17         MS. SMITH:  Oh, I thought you meant
18  he gave them to you, not him being -- yes.  Yes.
19  Yes.
20         MS. JONES:  And theses are the
21  Bates stamps numbers, but they are not exhibit
22  numbers in the case, correct?
23         MS. SMITH:  No.  This has not been
24  marked an exhibit and I'm not going to.  I am

Case 3:21-cv-00477-MCC   Document 280-1   CONFIDENTIAL   Filed 09/20/23   Page 127 of 342
Deposition of Gary Bender 30(b)(6) - Revised
Jane Doe, et al. v. Schuylkill County Courthouse, et al.

Page 137

referencing it on the -- because it's going to be voluminous for the transcript.

MS. JONES: Right. Okay. So that's one clarification I just wanted to say.

MS. SMITH: Yes. I am not marking it as an exhibit --

MS. JONES: Okay.

MS. SMITH: -- but it is, for the record, Schuylkill County's first production of Documents 92 through 146.

MS. JONES: Okay. My objection to your question is twofold or multiple basis, has multiple basis. One is to the form. Secondly, though, more substantively, it reverts back to my prior objection at the beginning and my prior objections to you, where in we discussed the personnel file issue and the production of a witness and the conversation with the court because I very much recall specifically addressing that an individual witness for individual contents of a file would not be possible, in essence, because we don't -- it would be multiple people.

So I'm just preserving that position --

Page 138

MS. SMITH: Okay.

MS. JONES: -- that Mr. Bender here today can speak to what you told me was the purpose of that category, which was what types of documents and he can answer what he knows about that. But I just am preserving my position that I think that injury into the specific pages of a file are not appropriate for this purpose today.

MS. SMITH: Well, let me just put on the record that at no point in time was my --

MS. JONES: I know.

MS. SMITH: Hold on one second.

At no point in time was inquiry as detailed in the notice of deposition, limited thereafter regarding the types of document. My exact statements to you, and I believe to the court, were that the prior counsel to you, which while not you, is still some onus on you because there was deficiency letters thereafter, the document production was not organized or delineated in a manner in which I could understand what is or what is not included in the plaintiffs' personnel file.

And the request for documents

Page 139

clearly, unequivocally requests the entire contents and requests an ongoing continual production of a the plaintiffs' personnel file. So we all know these plaintiffs or some of these plaintiffs remain employed by the county, so should documents be added, those should be produced to us and delineated as personnel files that have been put or added to their personnel file.

I have a right to know, as I have requested and as is relevant, extremely relevant to this case, what is in the contents of my clients' personnel files at the county. Mr. Bender just testified that he has never even looked at a personnel file, at the personnel files.

My question to him is going to be, has he looked at -- I think he testified to it earlier, but my question will be: Has he looked at Jane Doe 2's, has he looked at Jane Doe 1's, has he looked at Jane Doe 4's, and has he looked at Jane Doe 3's. And then we going to go through the defendants and then there is another one as to individuals -- I think there's -- no. I'm sorry.

Page 140

It's just the defendants for personnel files.

My assumption is that he's going to testify that he hasn't looked at any of them. This becomes an issue because we can end the deposition. We can come back another day after this is briefed with the court. But I think what the logical solution is and the fair solution is and the most expeditious solution is, is that we put that on the record and instead of me seeking sanctions and having to come back another day, is that I simply get a straight forward response from the county as to these -- this is Jane Doe 2's personnel file. This is everything that is in it and this is what exists as of today March 31st or April 1st or April 2nd. This is Jane Doe 3's this is what's in it. This is Jane Doe 1's.

I don't -- if the county wants to put it in writing as opposed to bringing nine witnesses in, what you will give me and say, the county will say, this is what's in their personnel file, nothing else is in it, this is it, that's -- I mean, that gives me the answer that I'm looking for.

The problem is, is I haven't gotten

Page 141

than.  And, again, Christopher Scott was before you and he handled it and he simply wrote produced, but didn't -- pursuant to the rules, which they require, did not tell me what Bates numbers or that answer.  That's all I'm -- that's all I'm looking for.

I mean, it can be done here today.  I'm not going to -- I am not going to seek -- I will put on the record, if the county will agree to that, I will not seek to bind Mr. Bender here in telling me if this is everything and using an I don't know.

MS. JONES:  Well, I guess I'll say this, Catherine, I agree that Mr. Scott's method of production was less detailed.  Having said that, it has created difficulties at times for us in identifying what he produced.  I'm not the saying that I don't think, however, that you got the file.  I appreciate you're saying you're having difficulty because there's a lot of documents in the case and the way they were produced initially differ very much from how we produce documents.

I think we have been trying to deal

Page 142

with those deficiencies letters and our objections to your objections.

I also think that there's a -- there's at least a, in my view, no basis for sanctions that you think you can immediately move for, based on your comments today.  But I'm certainly willing to investigate whether or not a particular group that you think comprises the file is, in fact, the file.

MS. SMITH:  Okay.

MS. JONES:  And whether or not there's more to it now --

MS. SMITH:  Okay.

MS. JONES:  -- then from the time you saw it.  I'm not -- I'm not sure I might not have an issue or objection, I am going to preserve whatever I might need to preserve that I don't know what he did and identified as a personnel record, so that you can't say, oh, Scott should have done this and this was the personnel file and it wasn't complete and now there's more paper.

MS. SMITH:  I don't --

MS. JONES:  Because I can't speak for him and I get it, the county could be, but I'm

Page 143

not going to speak for him.

MS. SMITH:  I am not --

MS. JONES:  But I'm at least willing, for purposes of avoiding an unnecessary examination today and just to say if you have done what you've described and I think these are already in order from his production, so it would -- one might argue it is probably the file.  I mean, you know, he just didn't say the numbers or the details, it starts on this page, it ends on this, it has this, this, and this included.

MS. SMITH:  But I am sure you can appreciate that leaves me to assuming and not having a definitive answer from the county that this is, in fact, the personnel file.  This could be kept in -- this could be responsive to another document request with any documents related to the plaintiffs.  This could be something that's kept in something other than a personnel file.

MS. JONES:  It's not likely based on the content if what you're showing us, but --

MS. SMITH:  It's not based -- but, again, I'm left to guess and assume.  And in purposes -- for purposes of litigation and

Page 144

completeness, that is not, under the rules, proper.  Again, it was done by prior counsel.  I think you're experiencing some of the issues I am.  I have taken the steps in and undertaken the efforts of figuring out what documents belong to which clients, defendants, plaintiffs, and comprising what I believe is their personnel file.  And I have them here today, so I'm happy to provide you a copy and we can put on the record and I would just ask for an agreement that if there's anything other these documents in the plaintiffs' personnel files or the defendants' personnel files, other than the ones I have for each of them, which we can put on the record, that the county produce them, whether they are ones that are from before you took over and should have been turned over or after that have now been newly existing because time has passed.  I won't take issue or raise issue with the failure to turn them over prior, I just want them and I would like in writing, what is in my plaintiffs -- my plaintffs' county personnel file.

MS. JONES:  And I am going to presume, because I don't have it in front of me,

Page 145

that you made that specific request --
          MS. SMITH:  Yes.
          MS. JONES:  -- for each of the
plaintiffs.
          MS. SMITH:  Yes, I did.
          MS. JONES:  So with respect to the
plaintiffs --
          MS. SMITH:  And defendants.
          MS. JONES:  That if you made the
request the defendants --
          MS. SMITH:  Yes.
          MS. JONES:  I don't have them in
front of me.  I can't remember those kinds of --
every detail.  And the lawyers for those parties
can weigh in on their position of they differ from
mine.  But I'm willing to look at what you've
identified and discern if they are, in fact,
included in the personnel file and whether there
were other documents that are included in the
personnel file that are not here and have not
otherwise been produced.
          We may have produced them in other
context that I'm not aware of.
          MS. SMITH:  So in --

Page 146

          MS. JONES:  And we will tell you
that if we did.
          MS. SMITH:  So if there was -- so
let's say Jane Doe 2's, which is 92 through 146,
let's say there is one document that's in her
personnel file that's been missing, but it was
produced as -- by you because you realized it and
it's SC 900, hypothetically, I just want to know
that it was produced and that it is in -- like I
want to know what's in her personnel file.  I
don't want to know we've -- I don't want a
response of we've produced her entire personnel
file.  It's not just these, but it's hidden in
this haystack of thousands of documents.  If
you're comparing page to page while you go through
it, it should be easy enough for you guys to
say -- even if you produce it as a new Bates stamp
number, this may have been previously produced, we
are Bates stamping it as a new number so we don't
have to go through the needle in the haystack, but
here it is just so you know what's in her
personnel file.
          MS. JONES:  I will certainly try to
do that.  I can't say though because we've

Page 147

produced tens of thousands of documents that I'm
going to be able to be certain that some document
out there was produced and I have to go back and
tell you where it was.
          MS. SMITH:  No.  No.  No.  That's
what I'm saying you don't have to do.
          MS. JONES:  I'm going to agree to
try and verify that what you believe are the
files, either are, in fact, the files or are not
the files and what is our current status of the
files, subject to counsel for the other parties
telling me they have any issues with that.
          MS. SMITH:  Well, since we're on
the record and so we don't waste -- if I need to
make the record about this issue, certainly Mr.
Bender being here as the 30B6 witness and his
inability to testify, does any counsel have any
objection to their clients' county personnel
record being turned over?  Redacted, of course,
for Social Security numbers, bank account numbers,
because I am sure there is tax information.
          MS. JONES:  And, again, my position
is, if in fact, they were asked for already.
          MS. SMITH:  So I can -- I can --

Page 148

          MS. JONES:  And if the answer is
yes, then the answer is yes, I mean, you know...
          MS. SMITH:  And so I should --
well, let's start with objections for -- for any
counsel.
          Mr. Less, do you have any
objection?
          MS. JONES:  Well, we probably won't
have one for her.  She's not --
          MR. LEES:  I was just going to say,
I don't believe there would be a personnel file
for my client.
          MS. SMITH:  And to the extent that
there isn't, I would just want to know that.  To
the extent that there is, is there any objection
to the contents being turned over, obviously
subject to redactions for personnel -- personal
information?
          MR. LEES:  No, I don't have any
objections.
          MS. SMITH:  Mr. Geiger?
          MR. GEIGER:  No, I have no -- I
think that's discoverable.
          MS. SMITH:  Okay.  And Miss

Case 3:21-cv-00477-MCC   Document 280-1   Filed 09/20/23   Page 130 of 342
CONFIDENTIAL
Deposition of Gary Bender 30(b)(6) - Revised                    Jane Doe, et al. v. Schuylkill County Courthouse, et al.

Page 149

Wynkoop?

MS. WYNKOOP: I mean, to the extent that the county holds any sort of privilege here, I'm not making an objection right now. But, I mean, I don't think what one exists for Glenn either.

MS. JONES: Well, I don't know that.

MS. SMITH: Yeah, I think one does exist for Glenn.

MS. JONES: It may be because he was a full-time employee for purposes of benefits and things like that. I don't know.

MS. SMITH: Right. So -- okay. So -- and I just want to be clear, so when I -- there has been testimony in this case, the request for the plaintiffs was identified and produced, it's Document Request 14, which went to the county and Bender, identify and produce any and all documents that refer or relate to each of the plaintiffs, including, but not limited to their entire personnel file, applications for employment, attendance records, disciplinary records, performance records, and documents

Page 150

concerning leave of absence, reasonable accommodation, FMLA request, X, Y, Z, so it's Document Request 14.

So I just want to be clear on the record, this is what I understand -- we'll go through each of the individuals, but the document packets that I have are what I understand to be the contents of each individual's personnel file.

MS. JONES: So why don't we mark them.

MS. SMITH: So --

MR. GEIGER: Catherine, can I just add, I mean, Heidi Zula testified yesterday that each employee has two files.

MS. SMITH: Right. That's what I was getting to. So that -- so being --

MR. GEIGER: The medical file I object to, but the -- the personnel file I do not.

MS. SMITH: Okay. So let me -- let's start with the plaintiffs because the plaintiffs -- so there was testimony as to two files, a personal -- personnel file and a medical file. Given my request states any and all documents that refer or relate to each of the

Page 151

plaintiffs, including but not limited to their entire personnel file. There is no question that I requested the entire personnel file and it's discoverable.

It also states documents concerning leaves of absence, reasonable accommodation, FMLA requests. That, my understanding based on Heidi Zula's testimony, would be in the medical file, which I believe then the entire medical file would be discoverable.

MS. JONES: As to the plaintiffs.

MS. SMITH: Plaintiffs, right. And I am just talking about the plaintiffs right now.

So I don't know or have any -- and I have been through discovery, it's in binders, it's tabbed, it is OCD organized. I have no way -- it's both of us. I have no way -- unlike this -- these personnel files, which how it was produced, I was kind of able to -- to pull together what exists in a personnel file, the medical stuff is all over. And I partially -- it's not -- I don't think how it was produced necessarily. I think because it might have been responsive to multiple requests, it was produced

Page 152

multiple times. I would just like to know what's in the personnel file, not here's all their personal records. I would like to know in the HR office, there is a file that says personnel file, Jane Doe 1. There's one that says medical file, Jane Doe 1, as I understand it and I would like to know what's in those.

MS. JONES: For the plaintiffs.

MS. SMITH: For the plaintiffs. And that's what we're discussing right now.

MS. JONES: I'm okay with making --

MS. SMITH: Okay.

MS. JONES: -- that inquiry based on what you've just described as your prior request. If I think of an objection of any issue I don't think of now, I will certainly raise it with you. But I -- I think for the plaintiffs, I don't see that because you're asking for things about them that might otherwise be protected of defendants.

MS. SMITH: Right. I am going to get to defendants in a second.

So for the plaintiffs, what I believe is Jane Doe 2's personnel file is

Deposition of Gary Bender 30(b)(6) - Revised                    Jane Doe, et al. v. Schuylkill County Courthouse, et al.

Page 153

1  Schuylkill County's First Production 92 through
2  146.  Ms. Jane Doe 1's personnel file is 227.
3          MS. JONES:  Wait.  I'm sorry.  Who
4  was the first one?
5          MS. SMITH:  Jane Doe 2 -- Jane Doe
6  2.
7          MS. JONES:  It was 92 to 46.
8          MS. SMITH:  146.
9          MS. JONES:  Okay.
10         MS. SMITH:  Jane Doe 1 is what I
11 believe is her personnel file, is SC's first
12 production, 227 to 301.
13         MS. JONES:  And they're all
14 consecutive?
15         MS. SMITH:  Yes.
16         MS. JONES:  So it tells me he
17 likely did produce it, but I -- if there's
18 something more recent and we find there's
19 something in the middle that should have been
20 there, I'm willing to get that for the plaintiffs.
21         MR. GEIGER:  Maybe I'm confused,
22 but -- so with respect to the plaintiffs, so Marie
23 is going to produce not just the regular personnel
24 file, but the medical file for each plaintiff as

Page 154

1  well, right?
2          MS. JONES:  Yes.  I'm going to seek
3  to get that and assume that's where they are.
4          MR. GEIGER:  Because I think it's
5  relevant with respect to the plaintiffs.
6          MS. JONES:  Yeah.
7          MR. GEIGER:  But not with respect
8  to the defendants.
9          MS. SMITH:  And we're getting to
10 the defendants now.
11         MS. JONES:  I think I agree with
12 you, Gerry, so I was preserving that as well.  Go
13 ahead.
14         MS. SMITH:  Ms. Jane Doe 4 is 302
15 through 359.  Jane Doe 3 is 400 through 466.  And
16 all are in SC's first production.
17         MS. JONES:  Okay.  This is a clear
18 example of the issue I was concerned about in the
19 notice, but I think this is a way to address it.
20         MS. SMITH:  Okay.
21         MS. JONES:  So Mr. Bender here
22 won't be having to --
23         MS. SMITH:  So I did not request
24 and I am not -- so -- yeah.  Yeah.  Yeah.  So for

Page 155

1  Defendant Halcovage, Defendant Bender, and
2  Defendant Roth, I did not request anything -- it's
3  Document Request 15.  I don't have the FMLA,
4  reasonable accommodation request.  I don't have
5  leave of absence request.  I have a list of
6  things.  Assuming that there is nothing -- it's
7  attendance records, applications for employment,
8  disciplinary records, performance records,
9  criminal records, compensation, X, Y, Z, it's in
10 Document Request 14.
11         To the extent that none of those
12 things are in the medical file, which based off
13 this list and what I am thinking is in the medical
14 file, it doesn't look like I am requesting within
15 the medical file.  However, if an attendance
16 record, for instance, was in the medical file, I
17 would just want to be provided with that as it was
18 requested.  I think attendance is relevant and
19 discoverable.  I'm not asking for things other
20 than that in the medical files of those three
21 defendants.
22         But -- so while my paralegal pulls
23 up Zula's request, just to make sure hers isn't
24 any different, I can't imagine it will be based

Page 156

1  off how I do discovery, Bender's, what I believe
2  is Bender's personnel file, is SC 1 through 36.
3          Defendant Roth is SC 360 to 399.
4  And Defendant Halcovage is SC 189 to 226.
5          So Defendant Heidi Zula and
6  Defendant Kutzler's personnel file requests were
7  the same, so, again, unless there is, like, a
8  slight overlap of something in her medical file,
9  I'm not requesting the entire contents.
10 A.      I do not have -- and it may be and if
11 this is the answer, I would just ask for it in
12 writing from the county, that there might not be
13 one that exists for Defendant Kutzler.  And if
14 that's the case, then -- then that's the case.  I
15 just ask for that clarification because it wasn't
16 clear on the production.
17         And then Zula -- oh, Zula's are 1 --
18 Zula's are 1 to 65, but in Zula's production
19 because the county produced its own documents and
20 then Zula's document request and production came
21 later.  So I believe Zula's personnel file
22 contents are Zula's Production Documents 1 to 65.
23 I don't know why I don't have a copy for you,
24 but...

Page 157

1   MS. JONES:  I'm sorry.  Could you
2   say the Zula numbers again.
3       MS. SMITH:  It's Zula production of
4   documents 1 to 65.
5       MS. JONES:  I'm guessing -- I'm
6   guessing that was me, we -- that we produced that.
7   No?
8       MS. SMITH:  Yes, but it wasn't --
9   there was no --
10      MS. JONES:  It was later?
11      MS. SMITH:  I don't know if you
12  were in at that point or not.  I can't -- I can't
13  recall.
14      MS. JONES:  Well, she was a named
15  party initially, so maybe not.
16      MS. SMITH:  So maybe not.  But in
17  any event, there was no indication in the response
18  to doc production that delineated which documents
19  were the contents of her personnel file, so I'm
20  just asking for clarification that my assumption
21  that one is Zula's production, 1 to 65, are, in
22  fact, the contents of her personnel file.
23      And I'm pretty sure since the
24  production of documents, Ms. Zula was employed for

Page 158

1   sometime thereafter, so there may be additional
2   documents and we would just ask that, given on the
3   request for continual discovery, that any
4   newly-added documents be produced as well.
5       MS. JONES:  Yeah.  So, look, I'm
6   trying to be cooperative in the spirit of
7   what this -- today's deposition was for.  And
8   you've gathered the documents that we've already
9   produced.  I just don't want to be producing
10  something that either wasn't requested or that
11  their lawyers, independent lawyers believe is
12  improper.
13      You know, I do think -- I know you
14  issued the 30B6 notice, Catherine.  I think maybe
15  a more specific conversation about this could have
16  been useful.  And I don't think I understood this
17  was your issue.  But, you know, that we could
18  address, but -- before today.  But that's okay.
19  I'm willing to try to do that so we can avoid --
20  you know, this is a lot to get through with
21  somebody who is not going to be able to do the
22  details based on my objections from the beginning
23  of this, so...
24      MS. SMITH:  The only other thing, I

Page 159

1   think, on this topic, other than a few questions
2   for Mr. Bender as a 30B6 witness, is a date.
3       MS. JONES:  Date of what?
4       MS. SMITH:  Of when we can expect a
5   response.  I just want to -- you can say whatever
6   date you want, I just want to try and get to an
7   agreement on the record so we can have a
8   definitive date and not just have to continually
9   ask if you're providing it to us.
10      MS. JONES:  Yeah.  I'd probably
11  tell you 30 days, but, you know.
12      MS. SMITH:  I -- I -- 30 days is
13  fine.
14      MS. JONES:  Okay.
15      MS. SMITH:  As long as I have it by
16  the 30 days, that gives us -- that puts us at the
17  end of April.
18      MS. JONES:  Yeah.  And if we aren't
19  going to produce something for a reason, that I
20  can identify you ahead of that.
21      MS. SMITH:  Okay.
22      MS. JONES:  But, again, the other
23  defendants, I think, appropriately, and I would
24  for Mr. Bender individually and Ms. Zula

Page 160

1   individually, raise issues about the medical
2   stuff, the personal stuff.  I don't know about
3   attendance, but I don't know if there is even such
4   a thing for persons in those positions, but...
5       MS. SMITH:  So Document Request 15
6   for Bender, Halcovage, and Roth.
7       MS. JONES:  Oh, 15, not 14.
8       MS. SMITH:  Fourteen is the
9   plaintiffs, right.
10      MS. JONES:  Okay.
11      MS. SMITH:  Fourteen plaintiffs, 15
12  is defendants.  And then for Zula in her doc
13  request it's nine.  And for Kutzler it's nine as
14  well.
15      MS. JONES:  So, Defense Counsel, I
16  can let you know what we're gathering.  But is
17  there any other positions that you want to
18  identify that I haven't identified?
19      MS. SMITH:  Any -- what do you mean
20  positions?
21      MS. JONES:  Objections or issues.
22      MS. SMITH:  I mean, the only other
23  issue is if there are objections raised by you, I
24  would say that they were waived as being responses

Deposition of Gary Bender 30(b)(6) - Revised                    Jane Doe, et al. v. Schuylkill County Courthouse, et al.

Page 161

1  of defendants, have no objections, just see
2  attached produced records. I understand it wasn't
3  you, but I believe that your prior counsel was
4  binding and there was no objections.
5        MS. JONES: I'm asking counsel
6  today about what I have agreed to do, if they have
7  any objection that I should know about that.
8        MS. SMITH: I am just saying, in
9  the event that the county tries to raise
10 objections, my position will be that those
11 objections were waived. Again, not you,
12 Ms. Jones, but your -- your clients,
13 unfortunately, are bound by the actions of their
14 prior counsel and no objections were raised in the
15 document production.
16       MS. JONES: I think we'd probably
17 dealt the deficiency letters in some respects
18 already. I understand your position.
19       MS. SMITH: Other than that, I do
20 just have few questions for Mr. Bender as the 30B6
21 witness.
22       MS. JONES: I'm sorry. Did you say
23 that was No. 9 for Zula and Kutzler?
24       MS. SMITH: Yes.

Page 162

1  BY MS. SMITH:
2  Q.     All right.
3        I just -- I'm going to run through some
4  quick questions with you, just so I have a clear
5  record.
6        Mr. -- Mr. 30B6 Witness, at any point in
7  preparation for today's deposition did you review
8  the contents of Jane Doe 2's personnel file?
9  A.     I did --
10       MS. JONES: Okay. I am going to
11 object to the form of the question on every one of
12 these, so if you just want to put it all in one,
13 it might be easier.
14       MS. SMITH: We can just have a
15 standing objection.
16       MS. JONES: Well, I think I should
17 lodge it to the right questions. But if -- my
18 question -- my point is simply, if you're going to
19 say that as to each individual --
20       MS. SMITH: Okay. If you're not
21 going to object to form as to me grouping them
22 together.
23       MS. JONES: I won't.
24       MS. SMITH: Okay.

Page 163

1        MS. JONES: It's not -- the
2  objection I raise is not to you grouping them
3  together, it's the other --
4        MS. SMITH: Okay.
5  BY MS. SMITH:
6  Q.     Mr. -- as the 30(b)(6) witness here
7  today, in preparation for today's deposition, did
8  you review the contents of any of the plaintiffs,
9  Jane Doe 2, Jane Doe 1, Jane Doe 4, or Jane Doe
10 3's personnel file?
11       MS. JONES: Object to the form.
12       He may answer.
13       THE WITNESS: I did not.
14 BY MS. SMITH:
15 Q.     In preparation for today's deposition,
16 did you review the contents of any of the
17 plaintiff's, Jane Doe 2, Jane Doe 1, Jane Doe 4,
18 or Jane Doe 3's medical files?
19       MS. JONES: Same objection.
20       You may answer.
21       THE WITNESS: I did not.
22 BY MS. SMITH:
23 Q.     In preparation for today's deposition,
24 did you review any of the individually named

Page 164

1  defendants, Halcovage, Bender, Rother, Zula, or
2  Kutzler's personnel file?
3        MS. JONES: Object to the form.
4        You may answer.
5        THE WITNESS: I did not.
6  BY MS. SMITH:
7  Q.     Does the county conduct annual
8  evaluations of employees?
9  A.     The county, per se, no. There are
10 annual evaluations made for civil service
11 employees and those employee would be employees in
12 senior services, in children and youth, and in the
13 drug, alcohol, and mental health disability
14 services, developmental service.
15 Q.     Does the county conduct any interim
16 evaluations of any employees?
17 A.     Do not.
18 Q.     Does the county conduct any evaluations
19 of employees, like formal evaluations?
20 A.     As a matter of form or routine, I don't
21 think so, no.
22 Q.     Okay.
23       Other than those -- just so the record
24 is clear, other than those civil --

Page 165

1  A.      Correct.
2  Q.      -- service positions?
3  A.      Correct.
4  Q.      Okay.
5          What verbal warnings has Jane Doe 1 been
6  subjected to during her employment with the
7  county?
8          MS. JONES:  Okay.  I'm going to
9  object to the form of the question.  And I believe
10 that our lengthy discussion about records would
11 likely assist in addressing those issues.
12         But if you want to ask him those
13 things, you can.
14         And you can answer subject to my
15 objection.
16 BY MS. SMITH:
17 Q.      What verbal warnings has Jane Doe 1 been
18 subjected to during her employment with the
19 county?
20 A.      I think Heidi advised her about her
21 timeliness of her reports.
22 Q.      On how many occasions?
23 A.      That I don't know.
24 Q.      So you are aware of at least one

Page 166

1  occasion that Heidi advised Jane Doe 1 of the
2  timeliness of her reports?
3  A.      Yes.
4  Q.      Okay.
5          Then just so the clear is clear, those
6  are the STEB or the State Tax Equalization Board
7  reports?
8  A.      Yes.
9  Q.      Okay.
10         Any other verbal warnings that you're
11 aware of that Jane Doe 1 has been subjected to
12 during her employment with the county?
13 A.      I think Ms. Zimmerman has -- you know --
14 you know, we can get into that definition of a
15 verbal.  There are -- there are two types of
16 verbal warnings.  You can say, well, one can be
17 just more of an educational.  In other words, you
18 know, Mrs. Smith, you're not completing your
19 assignments on time, you got to do a better job
20 getting these in here.
21         But there there's an official one that
22 we would say, okay, here's a verbal warning and
23 you have to document that you received it.  So
24 some are just educational, some are -- are more

Page 167

1  disciplinary.
2  Q.      Okay.
3          That --
4  A.      So I would think if you want all of
5  them -- I would think that Ms. Zimmerman probably
6  has talked to her on occasion about the timeliness
7  of the submission of her time sheets and the
8  completeness of them.
9  Q.      Okay.
10         So let's go -- I don't want to say back,
11 because that's not the right word, but let's kind
12 of unpack that a little bit.
13 A.      Okay.
14 Q.      So fair distinction, and I appreciate
15 that, of kind of an educational instruction versus
16 a documented verbal warning.  And it's always a
17 little bit weird to say a verbal that has a
18 document because essentially --
19 A.      I know.
20 Q.      -- it's written.
21 A.      I know.
22 Q.      But -- but there are warnings that are
23 verbal, but are memorialized that the county
24 employees or department heads can issue to their

Page 168

1  employees.  And then there's what would be called
2  a written warning, where there's actually writing
3  that says written warning on it, correct?
4  A.      That is correct.
5  Q.      Okay.
6          So what I want to know is how the county
7  treats educational discussions.  I don't want to
8  call them warnings, but educational discussions or
9  I think as you called them, educational warnings
10 and these memorialized verbal warnings, how the
11 county treats them differently, if at all?
12 A.      A verbal warning that's more of
13 educational, in my opinion, like I would -- if
14 you're not producing a work product the way -- I
15 think I said you're making a lot of mistakes, I
16 would address that as you're making a lot of
17 mistakes, here's what I suggest that you do and
18 you really want to come up because we can't have
19 these mistakes.  That would be the end of it.
20         If it's something, I'd say, you know, I
21 can -- don't take offense, I am using you.
22 Q.      You're fine.
23 A.      You know, Ms. Smith, we talked about
24 this a number of times and it happened -- so --

Page 169

1  and we'd go to HR, then it would be more a verbal
2  warning that HR would be involved in with and that
3  would be a -- a document made.
4  Q.      So then as I understand it, and correct
5  me if I'm wrong, this educational discussion is
6  more of that, an education discussion, where a
7  verbal warning is more of a disciplinary action?
8  A.      It puts the employer on notice that
9  the -- you know, that they have to step up to the
10 plate and get their -- their -- their work done.
11 It's not really -- you don't want to get them
12 afraid that they're going to be disciplined, but
13 then when you go to take them over to HR, that is
14 now a step in the discipline process.
15        Especially with union employees, because
16 union employees, they do want to see that step.
17 Q.      Okay.
18        Educational discussions, warnings,
19 whatever, the non-verbal memorialized ones, are
20 those memorialized in any way or -- or is there
21 any county policy or procedure about memorializing
22 educational discussions or warnings?
23 A.      No.
24 Q.      Okay.

Page 170

1        Is there any county policy or procedure
2  about memorializing verbal warnings?
3  A.      If you look at some of the -- the
4  documents here, there is a section on verbal
5  warning where the employee signs it that he or she
6  has received a verbal warning.
7  Q.      Okay.
8        You pointed to a stack of documents
9  before you.  Do you believe that there is
10 something in -- because we've only looked at
11 sexual harassment, antidiscrimination policies so
12 far, that's the stack you pointed to.  Do you
13 believe that one of those policies there's
14 something about warnings?
15 A.      In the sexual harassment one?  Yes, we
16 know there is.  We looked at that one.
17 Q.      There's something about warnings?
18 A.      Yes.
19 Q.      Okay.
20        Any other county policy that is written
21 about warn -- verbal warnings being administered
22 to employees?
23 A.      Not that I'm aware of.  And since that
24 was a recent revision of that, I would suspect

Page 171

1  that other revisions that come along would start
2  to have that -- that documentation in there.
3  Q.      Okay.
4        So right now it's just a
5  non-memorialized, other than what's in the
6  policies we've looked at, a non-memorialized
7  procedure or policy of the county that someone who
8  is subjected to a verbal warning of a disciplinary
9  type, it should be documented in some manner?
10 A.      Yes.  You want the employee to
11 acknowledge that they have received a verbal
12 warning.
13 Q.      And the documentation that accompanies a
14 verbal disciplinary warning and the employees
15 acknowledgment of that warning, where are those
16 documents maintained?
17 A.      Those, I suspect, would be in their
18 personnel file.
19 Q.      Okay.
20        So this is -- I'm not trying to -- to
21 trick you or close anything -- any avenues here.
22 Educational may not be documented in any form,
23 correct?
24 A.      That is correct.

Page 172

1  Q.      And so there may not be a knowledge of
2  the county as to every educational conversation a
3  supervisor has with an employee, correct?
4  A.      That would be correct.
5  Q.      Okay.
6        But the verbal warnings of the
7  disciplinary sense, the county through the
8  personnel files of each employee, should have an
9  understanding of, correct?
10 A.      That is correct.
11 Q.      Okay.
12        So I -- for these next questions related
13 to the plaintiffs and their verb -- and verbal
14 warnings, I'm simply asking not about those
15 educational conversations, as you have
16 differentiated, but about the verbal disciplinary
17 type that should be documented and in their
18 personnel file.
19        Verbal warnings that Jane Doe 1 has been
20 subjected to, verbal disciplinary that are
21 documented, are you aware of any, you the county?
22 A.      Yes.
23 Q.      Okay.
24        I know --

Case 3:21-cv-00477-MCC    Document 280-1    Filed 09/20/23    Page 136 of 342

Deposition of Gary Bender 30(b)(6) - Revised                                    Jane Doe, et al. v. Schuylkill County Courthouse, et al.

CONFIDENTIAL

Page 173

1  A.      I'm aware there must be because I think
2  the -- she actually received a suspension at one
3  point.  So that would have come -- so you to
4  verbal to written and then to a potential
5  suspension.
6  Q.      Okay.
7         So do you know what a progressive
8  discipline policy is?
9  A.      Yes.
10  Q.      Is -- does the county, whether in
11  writing or elsewhere, does the county follow
12  progressive discipline?
13  A.      For all union employees, yes, that is in
14  the union contracts.
15  Q.      Okay.
16         What about for non-union employees?
17  A.      I don't think there is.
18  Q.      Does the -- there's no written, is that
19  what --
20  A.      Correct.
21  Q.      -- I am understanding?
22         Does the county follow a progressive
23  discipline for non-union employees, even if it's
24  not in writing?

Page 174

1  A.      We certainly would encourage that, but
2  all non-union employees are at-will employees.
3  Q.      Okay.
4         So Jane Doe 1, the verbal -- verbal, I'm
5  not talking about written --
6  A.      Okay.
7  Q.      -- I am not talking about suspensions at
8  this point, verbal warnings that Jane Doe 1 has
9  been subjected to during her employment, how
10  many -- are there any, how many?
11  A.      Well, I know there would be at least
12  one.  I don't know how many would be in there.
13  Q.      Okay.
14         Is the one -- as I think as I understood
15  your testimony, correct me if I'm wrong, the
16  Zim -- Jane Doe 1 and Ms. Zimmerman's
17  conversations were more the educational type,
18  correct?
19  A.      Uh-huh.
20  Q.      Is that a yes?
21  A.      Yes.
22  Q.      Okay.
23  A.      Sorry.
24  Q.      So was the one that you're speaking of

Page 175

1  was -- is the one where Heidi advise Jane Doe 1 of
2  the timeliness -- the timeliness of her STEB
3  reports?
4  A.      That would be correct.
5  Q.      Okay.
6         So other than that one, are you aware of
7  any of the verbal warnings that have been issued
8  to Jane Doe 1?
9  A.      I am not.
10         MS. JONES:  I just want to object
11  to the form.  I wanted to object to the form.  I
12  couldn't get it out.
13  BY MS. SMITH:
14  Q.      What about written warnings that Jane
15  Doe 1 has been subjected to, are you aware of any?
16  And I am differentiating them from suspensions,
17  because, right, there's verbal, written, and then
18  suspension, and then termination, right?
19  A.      Yes.  So I would suspect that there
20  would be a written warning in there as well.
21  Q.      Okay.
22         What was that for?
23  A.      I think for the same topic.
24  Q.      Okay.

Page 176

1         And what about suspensions, has Jane Doe
2  1 ever been suspended?
3  A.      Yes.
4  Q.      For how long?
5  A.      Three days.
6  Q.      Prior to being suspended, was Jane Doe 1
7  afforded a Loudermill Hearing?
8  A.      Yes.
9  Q.      Do you know when that was?
10  A.      I do not.
11  Q.      Jane Doe 1 is still a county employee,
12  so fair to say she hasn't been terminated, right?
13  A.      That is correct.
14  Q.      Moving on to Jane Doe 2.  What verbal
15  warnings was Jane Doe 2 subject -- subjected to
16  during her employment at the county?  And, again,
17  differentiating from the educational topic, but
18  more the -- what verbal disciplinary warnings was
19  she subjected to?
20         MS. JONES:  So I am going to just
21  object to the form on the same basis as my
22  objections about the review of the personnel
23  records.
24         But you may answer.

Page 177

1  THE WITNESS:  Yes, she would have
2  for failure to be at work.
3  BY MS. SMITH:
4  Q.    How many verbal warnings?
5  A.    That I don't know.
6  Q.    Was Jane Doe 2 -- did Jane Doe 2 ever
7  receive a written warning during her employment
8  with the county?
9  A.    I would assume she has, yes.
10 Q.    How many?
11 A.    At least one.
12 Q.    Are you aware of any more than one?
13 A.    I'm not aware of any.
14 Q.    Was Jane Doe 2 ever provided -- I'm
15 sorry -- Jane Doe 2 ever suspended during her
16 employment with the county?
17 A.    Yes.
18 Q.    When?
19 A.    I don't know the date.  It would have
20 been calendar year '22.
21 Q.    Was she afforded a Loudermill Hearing
22 before being suspended?
23 A.    Yes.
24 Q.    So, I'm sorry, for Jane Doe 1 we talked

Page 178

1  about Loudermill Hearing.  Was Ms. -- Jane Doe 1
2  only subjected or, I don't want to say
3  subjected, did she only have one Loudermill
4  Hearing during your employment?
5  A.    That I don't know.
6  Q.    Are you aware of any more than one?
7  A.    I'm not.
8  Q.    Same question for Jane Doe 2, you she
9  had at least one Loudermill Hearing.  Are you
10 aware of any more than one Loudermill Hearing for
11 Jane Doe 2?
12 A.    Yes.
13 Q.    How many?
14 A.    Two.
15 Q.    Okay.
16 A.    That I'm aware of.
17 Q.    So one was before she was suspended in
18 the calendar year 2022; is that what you testified
19 to?
20 A.    Yes.
21 Q.    And when was the other one?
22 A.    The other one was a Loudermill Hearing
23 prior to termination or resignation.
24 Q.    When was Jane Doe 2 afforded a

Page 179

1  Loudermill Hearing?
2  A.    Would have been sometime in calendar
3  year '22.
4  Q.    2022?
5  A.    Correct.
6  Q.    Before her resignation was voted on?
7  A.    Yes.
8  Q.    You're sure of that?
9  A.    I'm sure of -- if you -- there was --
10 there were two scheduled, let's put it that way.
11 I can't -- I can't confirm that a second one was
12 done.  If she didn't show up for that, that would
13 be the same thing as a Loudermill Hearing if you
14 don't show up.
15 Q.    Was Jane Doe 2 ever notified of a
16 Loudermill Hearing prior to her resignation being
17 voted on?
18 A.    Oh, yes.  Yes.
19 Q.    By who?
20 A.    That would have been Ms. Whalen.
21 Q.    In what form?
22 A.    I think a letter.
23 Q.    By e-mail, by mail, by carrier pigeon --
24 A.    I think by mail.

Page 180

1  Q.    -- by fax?
2  A.    I think by mail.
3  Q.    To what address?
4  A.    That I don't know.
5  Q.    Does the county have a copy of that
6  letter?
7  A.    I'm sure we do.
8  Q.    Was it sent certified mail or regular
9  mail?
10 A.    That I don't know.
11 Q.    Other than those two Loudermill Hearings
12 that you just discussed, is there any others that
13 you were aware of that Jane Doe 2 was --
14 participated in?
15 A.    Not that I'm aware of.
16 Q.    Was Jane Doe 2 terminated?
17 A.    She was not.
18 Q.    Has Jane Doe 2's resignation been voted
19 on by the commissioners?
20 A.    It doesn't get voted on at the board.
21 It goes through as informational only.
22 Q.    Well, Jane Doe 2's resignation was
23 listed on the commissioners agenda for a vote at a
24 public meeting, was it not?

Deposition of Gary Bender 30(b)(6) - Revised                    Jane Doe, et al. v. Schuylkill County Courthouse, et al.

Page 181

1  A.      I think it was information only.
2  Q.      So Jane Doe 2 is not a county employee
3  currently, correct?
4  A.      That is correct.
5  Q.      Jane Doe 2 was a member of the union,
6  correct?
7  A.      That is correct.
8  Q.      Moving on to Jane Doe 4.
9          What verbal warnings has Jane Doe 4 been
10 subjected to during her employment with the
11 county?  And, again, just the verbal disciplinary
12 type, not the educational.
13 A.      I'm not aware of any for Jane Doe 4.
14 Q.      Well, written --
15 A.      Well, nevermind.  She -- she had to get
16 a verbal.  Yes, I think there was at least one.
17 Q.      Okay.
18         When was that?
19 A.      That would have been in -- probably
20 sometime in March of 2021.
21 Q.      Who administered that?
22 A.      Ms. Zula.
23 Q.      Was it documented in anyway?
24 A.      Yes.

Page 182

1  Q.      In writing?
2  A.      Yes.
3  Q.      Where would that document be maintained?
4  A.      That would be in her personnel file.
5  Q.      Did Ms. -- Jane Doe 4 acknowledge
6  receipt of that documentation?
7  A.      I'm sure she did.
8  Q.      What was the incident which resulted in
9  her receiving a verbal warning?
10 A.      I would have to look at the verbal
11 warning.  I know it was insubordination and
12 disrespect.
13 Q.      Are you referring to the Tony Alu
14 situation?
15 A.      Yes, I am.
16 Q.      Okay.
17         If I told you that that was a written
18 warning, that -- that that write up or that
19 disciplinary action indicates written warning.
20 Are you aware of anything other than that, that
21 you believe is a verbal warning that Jane Doe 4
22 was subjected to?
23 A.      If there wasn't one before, no, I'm not
24 then if she...

Page 183

1  Q.      Okay.
2          So you are aware of some sort of
3  disciplinary action?
4  A.      Yes.
5  Q.      By the county that Jane Doe 4 was
6  subjected to, roughly in the time range of
7  March of 2021, that Ms. Zula documented regarding
8  Jane Doe 4's interaction with an Anthony Alu; am I
9  understanding you correctly?
10 A.      Yes.
11 Q.      And other than that, you are not aware
12 of any other verbal disciplinary warnings issued
13 to Jane Doe 4 by the county?
14 A.      I am not.
15 Q.      Okay.
16         What about any other written warnings
17 issued by Jane Doe 4 -- to Jane Doe 4 by the
18 county?
19 A.      I'm not aware of any.
20 Q.      Okay.
21         So whether that Alu one is a verbal or a
22 written, that's the only type of warning --
23 A.      As -- as far as I know, yes, ma'am.
24 Q.      Okay.

Page 184

1          Was Jane Doe 4 ever provided a
2  Loudermill Hearing during her employment with the
3  county?
4  A.      No.
5  Q.      Jane Doe 4 -- was Jane Doe 4, other than
6  her current ongoing, unpaid suspension, ever
7  suspended by the county?
8  A.      No.
9  Q.      Jane Doe 4 has been and is currently --
10 has been suspended and is currently still
11 indefinitely suspended by the counsel, correct?
12 A.      That is correct.
13 Q.      Was she afforded a Loudermill Hearing
14 before that suspension?
15 A.      She probably would have been.  I don't
16 know.
17 Q.      The county commissioners voted on Jane
18 Doe 4's termination at some point, correct?
19 A.      She was not -- yes.
20 Q.      They voted on it?
21 A.      Yes.  Yes.  I'm sorry.  Yes.
22 Q.      Okay.
23         How many times?
24 A.      Two.

Deposition of Gary Bender 30(b)(6) - Revised                    Jane Doe, et al. v. Schuylkill County Courthouse, et al.

Page 185

1  Q.       Neither for passed by majority vote,
2  correct?
3  A.       That is correct.
4  Q.       Do you recall when those two times were?
5  A.       No, I don't.
6  Q.       Okay.
7           Has Jane Doe 4 been terminated?
8  A.       She has not.
9  Q.       What's the status of Jane Doe 4's
10 employment?
11 A.       She's suspended -- she's suspended --
12 suspended employee at this point.
13 Q.       If the votes did not pass by majority,
14 why has she not been reinstated?
15 A.       Because the vote really wasn't --
16 Commissioner Hess's vote was not -- that was
17 double negative, it wasn't a no vote, he wanted to
18 see more investigation.
19 Q.       When was that vote taken?
20 A.       I don't know.
21 Q.       Has that additional investigation been
22 conducted?
23 A.       There were two, yes.
24 Q.       They have both been concluded?

Page 186

1  A.       No.
2  Q.       When will they be concluded?
3  A.       I don't know.
4  Q.       Has the county asked Eckert Seamans --
5  I'm sorry.  Strike that.
6           Has the county asked for that additional
7  investigation to be conducted by any definitive
8  date?
9  A.       I'm unaware of anything.
10 Q.       And just so the record is clear, those
11 investigations that were conducted at the request
12 of Commissioner Hess were done by Eckert Seamans,
13 correct?
14 A.       And Ms. Zula, there were --
15 Q.       There was three, so there's one by Ms.
16 Zula and then two by Eckert Seamans, correct?
17 A.       That is correct.
18          MS. JONES:  Object to the form.
19 BY MS. SMITH:
20 Q.       Ms. Zula's came before Commissioner Hess
21 requested additional, correct?
22 A.       Yes.
23 Q.       Okay.
24          So the ones that were additional, so the

Page 187

1  county's own independent report, Ms. Zula's, were
2  done after Commissioner Hess requested them and
3  done by Eckert Seamans?
4          MS. JONES:  Object to the form.
5          You may answer.
6          THE WITNESS:  Yes.
7  BY MS. SMITH:
8  Q.       What verbal warnings has Jane Doe 3,
9  again, for verbal warnings, I mean the
10 disciplinary type, not the educational, has Jane
11 Doe 3 been subjected to during her employment with
12 the county?
13 A.       I know of at least one.
14 Q.       Okay.
15          And when was that one?
16 A.       Probably around the same time as Jane
17 Doe 4's.
18 Q.       Okay.
19          And for what reason did she receive a
20 verbal warning?
21 A.       I think that was also disrespect and
22 insubordination.
23 Q.       Is that, again, an interaction with
24 Mr. Alu?

Page 188

1  A.       It is.
2  Q.       Okay.
3          So, again, similar to Jane Doe 4, I'm
4  going to represent to you that that was a written
5  warning.
6  A.       Okay.
7  Q.       So whether we classify it as a verbal or
8  a written, are there any other warnings, verbal
9  disciplinary or written disciplinary that Jane Doe
10 3 received, other than the one regarding her
11 interaction with Mr. Alu?
12 A.       Not that I'm aware of.
13 Q.       Okay.
14          Was Jane Doe 3 ever suspended, again,
15 other than her current, unpaid, indefinite
16 suspension, other than that one, was she ever
17 suspended while employed by the county?
18 A.       No.
19 Q.       Was she ever provided a Loudermill
20 Hearing during her employment with the county?
21 A.       I would think so, but I don't know that
22 specifically.
23 Q.       How many times did the county vote on
24 Jane Doe 3's termination?  The county

Deposition of Gary Bender 30(b)(6) - Revised                    Jane Doe, et al. v. Schuylkill County Courthouse, et al.

Page 189

1  commissioners, I should say.
2  A.    Two.
3  Q.    Okay.
4        Do you know when those were?
5  A.    I do not.
6  Q.    Has Jane Doe 3 been terminated?
7  A.    She has not.
8  Q.    What is the status of her employment?
9  A.    She's on suspension.
10 Q.    And why has she not been reinstated?
11 A.    Because the results of the investigation
12 have not been concluded.
13 Q.    Are you aware of any other criticisms of
14 the work performance of, let's start with Jane Doe
15 3, other than what we've just discussed?
16       So let me be clear.  So the -- for Jane
17 Doe 3, we talked about the Alu issue, which there
18 was some sort of discipline and her current
19 suspension.  Other than those, are you aware of
20 any criticisms of Jane Doe 3's work performance
21 during her employment with the county?
22 A.    On her work performance, I would say no.
23 Q.    Same question for Jane Doe 4, so other
24 than the Alu disciplinary action of some sort,

Page 190

1  verbal or written, and the current unpaid
2  suspension, are you aware of any other criticisms
3  of Jane Doe 4's work performance during her
4  employment with the county?
5  A.    I'm unaware of any.
6  Q.    Okay.
7        Same question for Jane Doe 2, so Jane
8  Doe 2 we talked about two Loudermills, one for
9  suspension, one for her resignation.  You believe
10 at least one written warning.  And you believe --
11 and I think a verbal for failure to be at work.
12 Other than those, and correct me if I didn't
13 recall them all correctly, are you aware of any
14 other criticisms?
15       So -- so let me put it this way, other
16 than documented disciplinary issues with Jane Doe
17 2, are you aware of any other criticisms regarding
18 her work?
19 A.    Yes.  When she was in the treasurer's
20 office, she had an inability to -- to get to work
21 on time.
22 Q.    Okay.
23       Anything else?
24 A.    Same thin when she moved down to the tax

Page 191

1  assessment office, there was some criticisms of
2  her inability to get to work on time.
3  Q.    Okay.
4  A.    And reporting where she was.
5  Q.    Okay.
6        Were those documented in any way?
7  A.    If they were, they would be in the file.
8  Q.    In her personnel file?
9  A.    That's correct.
10 Q.    Okay.
11       And same question for Jane Doe 1, other
12 than documented disciplinary --
13 A.    Let's go back to -- to Jane Doe 2 still.
14 Q.    Sure.  Yeah.
15 A.    Because there's been other criticisms on
16 her work performance in terms of turning in her
17 reports from the field, not completing assignments
18 in the field.
19 Q.    Okay.
20       Anything else?
21 A.    No.
22 Q.    Okay.
23       So moving on to -- to Jane Doe 1, other
24 than documented disciplinary actions, are you

Page 192

1  aware of any other criticisms about her work
2  performance that exist?
3  A.    No.  I think Ms. Murray had mentioned
4  that when it came time for the STEB reports, it
5  was always -- you had keep giving her consistent
6  reminders to -- to complete them.
7  Q.    Anything else?
8  A.    Just recently not turning in -- the
9  things that were documented, I guess, but we
10 also -- she also received some, I guess,
11 educational warnings in terms of -- we went
12 through this a few minutes ago, on completing the
13 time sheets and...
14 Q.    But those were educational --
15 educational --
16 A.    You said undocumented.  Those were --
17 those would be undocumented.
18 Q.    Okay.
19       Those were not disciplinary in nature or
20 were they?
21 A.    Not all of them, no.
22       MS. SMITH:  Okay.  Can we go off
23 the record for just a second.
24       VIDEOGRAPHER:  The time is now

Deposition of Gary Bender 30(b)(6) - Revised                    Jane Doe, et al. v. Schuylkill County Courthouse, et al.

Page 193

1  12:18 p.m. and we're going off the record.
2           - - -
3         (Whereupon, brief recess was held off
4  the record.)
5           - - -
6         VIDEOGRAPHER:  The time is now
7  1:25 p.m. and we're back on the record.
8  BY MS. SMITH:
9  Q.      All right.
10        Before the break we were discussing the
11  plaintiffs evaluations, criticisms, job
12  performance, things like that.  I am going to go
13  through some of the -- or I am going to go through
14  the defendants now.
15        But before I do so, did you discuss your
16  deposition testimony at all during the lunch
17  break?
18  A.      We did not.
19  Q.      So let's start with -- Defendant Bender.
20  I'm going to ask about him now, but I'm going to
21  be asking you, Mr. Bender, as the county about --
22  A.      Real standup guy.
23  Q.      -- Defendant Bender.
24        And I am going to -- if we need to break

Page 194

1  it down, we can, but I'm just going to do a
2  general to save some time.
3         During his employment with the county,
4  has Mr. Bender ever been subjected to any type of
5  disciplinary warning, whether verbal, written,
6  suspension, Loudermill, attempted termination?
7  A.      I have not.
8  Q.      Okay.
9         Has Mr. Bender ever received any type of
10  written evaluation, whether annual or interim?
11  A.      Have not.
12  Q.      Has Mr. Bender received any criticisms
13  of his work performance?
14  A.      I have not.
15  Q.      For Defendant Roth, same questions.
16  Again, if we need to break it down, we can, but
17  first generally, has Defendant Roth during his
18  employment with the county been subjected to any
19  type of disciplinary action, verbal warning,
20  written warning, suspension, Loudermill Hearing,
21  attempted termination?
22  A.      Not to my knowledge.
23  Q.      Okay.
24        Has Mr. Roth received any evaluation,

Page 195

1  whether annual or interim during his employment?
2  A.      Not to my knowledge.
3  Q.      Any specific instances that could rise
4  to an evaluation or criticism or any criticism of
5  Mr. Roth's work performance during his employment
6  with the county?
7  A.      No.
8  Q.      Defendant Zula, Heidi Zula, was she,
9  during her employment with the county, ever
10  subjected to any type of disciplinary action,
11  verbal warning, written warning, suspension,
12  Loudermill Hearing, or attempted termination?
13  A.      No.
14  Q.      Any evaluation conducted of Ms. Zula
15  while she was employed by the county, whether
16  annual or interim?
17  A.      No.
18  Q.      Any specific incident that you can think
19  of or any criticism -- specific incident that
20  gives rise to an evaluation or criticism or any
21  criticism of Ms. Zula's work performance during
22  her employment with county?
23  A.      No, not by management at all.
24  Q.      Okay.

Page 196

1         Defendant Kutzler, during her periods of
2  contracting with the county as acting or interim
3  HR director, was she subjected to any type of
4  disciplinary action, verbal warning, written
5  warning, suspension, Loudermill Hearing, or
6  attempted termination?
7  A.      No.
8  Q.      Was Ms. Kutzler ever -- did she ever
9  receive an evaluation, whether annual or interim?
10  A.      Not by the county, no.
11  Q.      And any instances that give rise to a
12  criticism or any criticisms that she received for
13  her work performance?
14  A.      Not through management.
15  Q.      So you just said, I think, for Ms. Zula
16  and Ms. Kutzler, not through management.
17  A.      Yes.
18  Q.      Were there, like, non-management
19  employees who complained?
20  A.      She would get criticized at public
21  meetings.
22  Q.      Okay.
23  A.      Which is not really -- that was a
24  criticism, but it was through management, it was

Deposition of Gary Bender 30(b)(6) - Revised                    Jane Doe, et al. v. Schuylkill County Courthouse, et al.

Page 197

1 through somebody from the public or...
2 Q.    Okay.
3       Any -- other than at public meetings,
4 did was there any criticisms of Ms. Zula or Ms.
5 Kutzler's work performance?
6 A.    No.
7 Q.    Okay.
8       So anyone -- would -- when you say
9 public meetings, were those all commissioners
10 meetings?
11 A.   Yes.
12 Q.   Okay.
13      Are commissioner meetings recorded?
14 A.   They are.
15 Q.   By the county?
16 A.   They are.
17 Q.   Okay.
18      And does the county maintain copies of
19 those recordings?
20 A.   I think until the official minutes, they
21 become the unofficial -- I would have -- we do,
22 but I think once the recording is there and you
23 make the minutes, then the minutes become the
24 official document.

Page 198

1 Q.    But is the recording still maintained or
2 preserved?
3 A.    I would believe so.
4 Q.    Is it audio, visual, or both, the
5 recording?
6 A.    Audio.
7 Q.    Okay.
8       So there's no visual recording?
9 A.    No.
10 Q.   Okay.
11      Defendant Halcovage, during his term,
12 election with the county, has he ever been
13 subjected to verbal -- any type of disciplinary
14 action, verbal, written, suspension, Loudermill,
15 or attempted termination?
16 A.   No.
17 Q.   Any evaluations ever conducted of
18 Defendant Halcovage's work performance while he
19 has been a commissioner?
20 A.   No.  Unless you consider that report
21 that was done as a -- an evaluation.
22 Q.   Okay.
23      That's -- and the report, just so the
24 record is clear, is that May 2020 report of Ms.

Page 199

1 Twigg?
2 A.    Yes.
3 Q.    Okay.
4       So other than that, no evaluation of his
5 work performance in his position as commissioner?
6 A.    No.
7 Q.    Any criticisms of his work performance
8 or his -- his performance as a commissioner that
9 you can think of?
10 A.   Outside of that report, no.
11 Q.   Okay.
12      So now we are going to go through some
13 other individuals who have done work for the
14 county.  Going to start with Ms. Deborah Twigg.
15      During her employment with the county,
16 did she ever receive any -- was she ever subjected
17 to any type of disciplinary action, whether
18 verbal, written, suspension, Loudermill, or
19 attempted termination?
20 A.   No.
21 Q.   Was her work ever criticized in anyway,
22 Ms. Twigg's, during her employment with the
23 county?
24 A.   No.  I wouldn't say criticized.  We had

Page 200

1 disagreements from time to time.  But I guess I
2 wouldn't define that as a criticism for work, it's
3 just...
4 Q.    And so the record is clear, and I know
5 it's awkward and I don't judge you for this, but
6 you were saying we had disagreements.  When you
7 say we, are you saying we --
8 A.    Oh, I'm sorry.  Ms. Twigg and I
9 sometimes had --
10 Q.   You as in Mr. Bender?
11 A.   Yes.
12 Q.   Okay.
13      So other than Mr. Bender, did the county
14 or any of its employees, other than Mr. Bender,
15 that you know, have any disagreements with Ms.
16 Twigg?
17 A.   Not that I'm aware of.
18 Q.   Okay.  I just -- because the you and the
19 I --
20 A.   I got you.
21 Q.   I do want to clarify.  Thank you.
22      But, again, you said the disagreements
23 Mr. Bender had with Ms. Twigg, you would not
24 characterize as criticisms?

Page 201

1  A.      No.
2  Q.      Okay.
3          And was Ms. Twigg ever evaluated during
4  her employment, whether annual or interim?
5  A.      No.
6  Q.      Next we are going to discuss
7  Ms. Virginia Murray.
8          Are you aware of any disciplinary action
9  that Ms. Murray was subjected to during her
10 employment with the county, whether verbal,
11 written, suspension, a Loudermill Hearing, or an
12 attempted termination?
13 A.      I am not.
14 Q.      During her employment with the county,
15 Ms. Murray's work ever criticized in any way?
16 A.      No, not that I'm aware of.
17 Q.      Was Ms. Murray ever evaluated, whether
18 annual or interim?
19 A.      No.
20 Q.      Ms. Deborah Dash, was she ever subjected
21 to any type of discipline, verbal, written,
22 suspension, Loudermill, or attempted termination
23 during her employment with the county?
24 A.      Not that I'm aware of.

Page 202

1  Q.      Was she ever -- did she ever receive an
2  evaluation of her work, whether annual or interim,
3  during her employment with the county?
4  A.      Not that I'm aware of.
5  Q.      And was she -- was her work ever
6  criticized in any way?
7  A.      Not that I'm aware of.
8  Q.      Did the county ever -- I'm sorry.
9  Colleen Warmkessel, was she ever subjected to any
10 type of disciplinary action while she was employed
11 by the county, whether verbal, written,
12 suspension, Loudermill, or attempted termination?
13 A.      Yes.
14 Q.      Okay.
15         So for Ms. Warmkessel, which of those
16 types of disciplinary action Ms. Warmkessel
17 subjected to?
18 A.      She received a verbal warning, a written
19 warning, and she did have a Loudermill Hearing.
20 Q.      And then she was terminated?
21 A.      No.  No, there was --
22 Q.      Oh, does she --
23 A.      She changed jobs in the meantime.  She
24 had -- it was a Loudermill Hearing.  There was

Page 203

1  going to be a -- I forget what they call it -- a
2  suspension was going to be recommended, but then
3  she has filed a complaint.
4  Q.      With who?  Like, an internal complaint?
5  A.      With HR.  Yeah.
6  Q.      Okay.
7          And as a result of her filing that
8  complaint, her suspension was not enforced?
9  A.      It was not.  We held off on that as
10 pending the outcome of that report.  And then in
11 the interim, she has changed departments.
12 Q.      Okay.
13         So that was the Loudermill.  Let's go
14 back to the written warning.
15 A.      Okay.
16 Q.      Was that separate and distinct from the
17 issues this led up to the Loudermill?
18 A.      No.  They're all related.
19 Q.      The verbal, the written, and the
20 Loudermill?
21 A.      That is correct.
22 Q.      Okay.
23         So what was the underlying issue with
24 Ms. Warmkessel's work performance that led to

Page 204

1  disciplinary action, this disciplinary action?
2  A.      Too many errors in -- in her documents,
3  which lead to lot of confusion, a lot of mistakes
4  being put on deeds.  And her failure then to take
5  corrective action to fix those.  She was offered
6  some training for a period of time.  She didn't
7  complete that training and continued to make
8  mistakes.
9  Q.      And this resulted in one disciplinary
10 action or it resulted in a verbal and then a
11 written at a separate time and then a Loudermill?
12 A.      I think that is correct.  That's the
13 pathway.  There was a verbal warning, a written
14 warning, and then the Loudermill hearing
15 proceeded, a possible suspension.
16 Q.      So she was -- was there time in between
17 each of those?
18 A.      Yes.
19 Q.      Okay.  Okay.
20         So it was for the same issue with her
21 work performance, but at different periods in
22 time?
23 A.      Correct.  And there were a number of
24 what we called this morning, those educational

Deposition of Gary Bender 30(b)(6) - Revised                                    Jane Doe, et al. v. Schuylkill County Courthouse, et al.

Page 205

1  warnings.
2  Q.    Okay.
3       Do you who administered Ms. Warmkessel's
4  verbal warning?
5  A.    It would have been Ms. Whalen.
6  Q.    Was it documented?
7  A.    Oh, yes.
8  Q.    Did Ms. Warmkessel sign the receipt --
9  or sign acknowledging receipt of the
10 documentation?
11 A.    Yes.  I think she did, yes.
12 Q.    Same with her written warning, who
13 administered that?
14 A.    Ms. Whalen.
15 Q.    Was that also documented?
16 A.    Yes.
17 Q.    Did Ms. Warmkessel also sign for that?
18 A.    Yes.
19 Q.    And there would be some sort of written
20 documentation for the Loudermill?
21 A.    That is correct.
22 Q.    Okay.
23       Other than the issues and the
24 disciplinary actions that resulted thereafter, was

Page 206

1  Ms. Warmkessel's work ever criticized in any other
2  way?
3  A.    Only in the number of errors, but that
4  was a longstanding problem going on for quite a
5  while.
6  Q.    When would you say those errors began?
7  A.    I think when she transferred into the
8  assessment office, there was some -- it was a
9  complicated job and I did have concerns when she
10 took it because it's a -- I am very friendly with
11 her, but sometimes you take positions for money
12 that you wind up that you can't handle and I think
13 she had difficulty doing that.
14 Q.    Do you remember when she transferred
15 into the assessment office?
16 A.    I do not.
17 Q.    Do you remember the year?
18 A.    '21.
19 Q.    Okay.
20      2021.
21 Q.    So you think around '21, at least around
22 the time she transferred into the assessment
23 office, her errors and mistakes began?
24 A.    No.  I think they were over in the

Page 207

1  tax -- she had struggle in the tax claim office as
2  well, but there were no written warnings that I
3  could recall when she was in the tax -- she went
4  from tax claim office over to tax assessment.
5  Q.    Okay.
6       So you think, and correct me if I'm
7  wrong if I'm not understanding your testimony,
8  Ms. Warmkessel had issues in the tax claim office
9  when she was employed in that office?
10 A.    Yes.
11 Q.    But they were not documented?
12 A.    I don't think so.
13 Q.    Disciplinary actions?
14 A.    I don't think so.
15 Q.    Okay.
16      And then she transferred at some point,
17 you believe, in 2021, to the tax assessment
18 office.  And you believe she had issues making too
19 many errors, mistakes there as well?
20 A.    Correct.
21 Q.    Okay.
22 A.    And it could have been 2020.  We...
23 Q.    Okay.
24      So -- but --

Page 208

1  A.    She wasn't in for a long period.
2  Q.    Whenever she transferred --
3  A.    Correct.
4  Q.    -- into the tax assessment --
5  A.    Yes.  Okay.
6  Q.    -- office, you believe she had issues in
7  the tax assessment office regarding her work
8  performance?
9  A.    Yes.
10 Q.    Okay.
11      Were those documented?
12 A.    That I don't know.  I think a lot of
13 them were just educational, those educational
14 warnings that we had and then we offered -- they
15 offered training for her and so they tried to work
16 with her on that.
17 Q.    When -- what office was Ms. Warmkessel
18 in when Whelan documented the verbal warning?
19 A.    Tax assessment.
20 Q.    Okay.
21      So she was still in assessment?
22 A.    Yes.
23 Q.    Okay.
24      And she's -- you said she transferred

Page 209

1  offices.  Where is she now?
2  A.     She's in the clerk of courts.
3  Q.     Okay.
4       Has she had criticisms of her work
5  performance in the clerk of courts?
6  A.     Not that I'm aware of.
7  Q.     And no disciplinary action since being
8  in the clerk of courts?
9  A.     Not that I'm aware of.
10 Q.     Moving on to Mr. Hatter, Kent Hatter.
11 Mr. Hatter, during his employment with the county,
12 has he ever been subjected to any disciplinary
13 action, verbal warning, a written warning,
14 suspension, Loudermill Hearing, or attempted
15 termination?
16 A.     No.  He -- he did have an educational
17 warning, I would say.
18 Q.     About what?
19 A.     That was the time when he went down to
20 meet with Jane Doe 2 and Jane Doe 1 and -- and
21 then they accused him of -- of some harassment.
22 And when he was in my office, I chastised him that
23 he should not have gone down by himself.  That was
24 silly to do, he should know better than that.

Page 210

1  Q.     But he didn't -- this wasn't documented
2  in any way, correct?
3  A.     No.
4  Q.     Other than that, has Mr. Hatter's work
5  ever been criticized in any time during his
6  employment with the county?
7  A.     Not by management.  Of course, in that
8  complaint he was.
9  Q.     Okay.
10      Other than that?
11 A.     No.
12 Q.     And just so the record is clear, by
13 complaint, you mean Jane Doe 2 and Jane Doe 1's
14 complaint you just referenced?
15 A.     Correct.
16 Q.     Okay.
17      So other than that complaint by Jane Doe
18 2 and Jane Doe 1, he has received no criticism of
19 his work performance?
20 A.     Well, again, that the complaint was
21 against Mr. Matter, but by Ms. Warmkessel in terms
22 of -- she felt his actions were retaliatory
23 because of her work being overly criticized.  And
24 also I think I mentioned earlier this morning,

Page 211

1  that when he opened up a letter that was on a desk
2  that was addressed to Jane Doe 1.  It was in
3  county, but Kent had opened that and she felt
4  that -- she had told Jane Doe 1 about -- Jane Doe
5  1 about that and they worked it out, but she felt
6  that he was retaliating against her.  So that's
7  what that current investigation is about.
8  Q.     Okay.
9  A.     It was a long answer, I get that.
10 Q.     No, it's okay.
11      So other than that kind of complaint by
12 Jane Doe 1 and Ms. Warmkessel and the kind of dual
13 complaint by Jane Doe 2 and Jane Doe 1, are there
14 any other instances you can think of where Mr.
15 Hatter's work has been criticized?
16 A.     No.
17 Q.     Okay.
18      And has he ever, Mr. Hatter, received an
19 evaluation of any type, interim or annual?
20 A.     He has not.
21 Q.     And Mr. Anthony Alu, during his
22 employment with the county, was he subject to
23 any -- or his contract with the county, was he
24 subject to any discipline, verbal, written,

Page 212

1  suspension, Loudermill, attempted termination?
2  A.     No.
3  Q.     Was his work ever criticized in any way?
4  A.     His work, no.
5  Q.     And was he ever -- did he ever receive
6  an evaluation of any type, annual or interim?
7  A.     No.
8  Q.     Okay.
9       I'm going to move to another topic about
10 Mr. Alu, just since we're talking about him.
11      He was a contractor with the county,
12 correct?
13 A.     That is correct.
14 Q.     What was the reason or purpose of the
15 county contracting with Mr. Alu?
16 A.     Mr. Alu was brought in to help us,
17 assist us in the reorganization of the tax
18 assessment office, and as well as he initially
19 was -- had the discussion on helping us maybe
20 complete the STEB reports.
21 Q.     When did his contract begin?
22 A.     In, I think, March of 2021.
23 Q.     When did it end?
24 A.     Trying to think.  We extended that, I

Deposition of Gary Bender 30(b)(6) - Revised                                  Jane Doe, et al. v. Schuylkill County Courthouse, et al.

Page 213

1  think it was, until the end of the year,
2  December 31st.  And we maybe extended that a
3  little bit when we got into reassessment, so --
4        It's terminated now.
5  Q.     Okay.
6        So let's start with that.  So it's
7  terminated now.  There was -- it sounded like
8  based on your testimony, there was an initial
9  contract, which was extended at least once?
10 A.     Yes.
11 Q.     Was it extended more than once?
12 A.     I think so, yes.
13 Q.     How many times?
14 A.     Just one -- two times.
15 Q.     Two times.  Okay.
16       And the first one -- am I understanding
17 you correctly that the first contract was from
18 March of 2021 until December 31st of 2021, and
19 then extended or was there an extension between
20 those two dates?
21 A.     I'm not sure.
22 Q.     Okay.
23       Okay.
24       Was there a written contract?

Page 214

1  A.     Yes.
2  Q.     What was Mr. Alu's hourly rate?
3  A.     I think it was $40 per hour.
4  Q.     The extensions, whether one, two, or
5  more, were those written extensions?
6  A.     Yes.
7  Q.     Does the county maintain records of
8  payroll compensation for employees?
9  A.     Yes.
10 Q.     How long are those records retained?
11 A.     Again, I think they would adhere to the
12 retention policy of the Pennsylvania Historical
13 Museum Commission at a minimum.
14 Q.     What do those records include?  Like, is
15 it W-2s, is it also, like, time sheets?  Is it --
16 what's in the payroll records that the county
17 maintains for employees?
18 A.     Yes, certainly there would be the -- the
19 W-2, W-4s that get produced.  And our employees
20 all submit time sheets, and they also would be
21 part of that record.
22 Q.     So then based off your testimony, the
23 county should have payroll compensation records,
24 W-2s, W-4s, and time sheets for the plaintiffs for

Page 215

1  each year that they worked for the county, as far
2  back as the -- it was the Pennsylvania?
3  A.     Historical Museum Commission.
4  Q.     Historical Museum Commission requires?
5  A.     Yes.
6  Q.     Okay.
7        Has Jane Doe 1 -- had Jane Doe 1 and
8  Jane Doe 2's compensations to what they've earned,
9  decreased since May of 2020?
10       MS. JONES:  Object to the form of
11 that question.
12       You can answer if you can.
13 BY MS. SMITH:
14 Q.     So let's start for what they earned in
15 2019, versus 2020.  We can start with Jane Doe 1.
16 Did Jane Doe 1 earn less in 2020, less
17 in earnings from the county?  Obviously I'm not
18 going to ask you about any other job she had.
19       But for the county, did she earn less in
20 2020 than she did in 2019?
21 A.     Yes.
22 Q.     Did Jane Doe 2 earn less in 2020 than
23 she did in 2019?
24 A.     Yes.

Page 216

1  Q.     2021 versus 2020, did Jane Doe 1 earn
2  less?
3  A.     I wouldn't think so only because in 2020
4  she was furloughed for a period of time?
5  Q.     Okay.
6        But do you know?
7  A.     Do I know if she was furloughed?
8  Q.     No.  Do you know if she earned less in
9  2020 or --
10 A.     I don't specifically, no.
11 Q.     Do you know if Jane Doe 2 earned less in
12 2020 or 2021?
13 A.     In '20 she would have earned less as
14 well, she was furloughed as well.
15 Q.     But do you know that for sure?
16 A.     That she was furloughed?
17 Q.     No.  That she earned less?
18 A.     Oh, yes.  Yes.  Yes, I know the
19 compensation in '20 would have been less than '19.
20 Q.     So you know --
21 A.     I do not know in '21, but I would bet.
22 Q.     Okay.
23       Well --
24 A.     I know.

Deposition of Gary Bender 30(b)(6) - Revised                    Jane Doe, et al. v. Schuylkill County Courthouse, et al.

Page 217

1  Q.    I -- I, no offense, but I don't want
2  bets here.  I'd like factual information.
3  A.    Right.
4  Q.    But the county would maintain W-2s for
5  those years, correct?
6  A.    That is correct.
7  Q.    And they would be the best evidence of
8  what the individuals earned for those years,
9  correct?
10 A.    Absolutely.
11 Q.    Same question for Jane Doe 2 -- I mean
12 Jane Doe 1 -- I mean Jane Doe 3 and Jane Doe 4.
13 They were suspended in -- no.  They were suspended
14 September 2021, correct?  So fair to say that in
15 2022, they earned less, significantly, by the
16 entire salary less, in 2022 than they did in 2021?
17 A.    Correct.
18 Q.    And in 2023, they have earned nothing,
19 correct, Jane Doe 3 --
20 A.    That's correct.
21 Q.    -- and Jane Doe 4?
22       So 20 -- so 2023, they earned nothing.
23 2022 they earned nothing, correct?
24 A.    Correct.

Page 218

1  Q.    2021 they had -- were paid -- on -- on
2  unpaid suspension beginning in September of 2021,
3  correct?
4  A.    Correct.
5  Q.    So they would definitely have earned
6  less in 2021 than 2020, correct?
7  A.    Yes.
8  Q.    Okay.
9        And they were also -- their salaries
10 were reduced in March of 2021, correct?
11 A.    That is correct.
12 Q.    So they also would have earned less in
13 that sense, correct?
14 A.    Yes.
15 Q.    Okay.
16       Do you know from Jane Doe 3 and Jane Doe
17 4, did they earn any less in 2021 than 2020 --
18 2020 than 2019?
19 A.    No, they would not.
20 Q.    Okay.
21       Because they were salaried --
22 A.    Correct.
23 Q.    -- no matter how many hours they worked
24 and nothing -- no demotions in pay -- reductions

Page 219

1  in pay or suspensions occurred in 2020, correct?
2  A.    Correct.
3  Q.    Okay.  All right.
4        Since 2012, has the county resolved any
5  claims made against any -- either -- either
6  against the county or any county employee or
7  elected official arising out of employment-related
8  issues?
9  A.    Okay.  Go through that again for me.
10 Q.    Sure.
11       Since 2012, has the county resolved any
12 claims made against it or its employees or elected
13 officials, arising out of employment-related
14 issues?
15       And let me clarify claims.  I am not
16 asking for grievances, like union grievance.  I am
17 asking about EEOC claims, federal complaints,
18 state complaints, like state civil complaints,
19 federal complaints, civil complaints?
20 A.    No.
21 Q.    Okay.
22 A.    Not that I'm aware of.
23 Q.    There are claims against the county
24 currently regarding overtime issues, correct?

Page 220

1  A.    That is correct.
2  Q.    It's still pending though, correct?
3  A.    Yes.
4        MS. SMITH:  Okay.  I am going to
5  mark for today's purposes --
6        THE WITNESS:  Could I just add
7  something?
8  BY MS. SMITH:
9  Q.    Sure.
10 A.    When you talk about compensation for
11 Jane Doe 1 and Jane Doe 2, their hourly rate
12 didn't change.  In other words, if they had less
13 pay it would be because they worked less hours.
14 They were hourly employees, not --
15 Q.    Okay.  Yeah.  No.  No.  No.  I
16 appreciate that.
17 A.    Okay.
18 Q.    That's a fair distinction.  Thank you.
19       MS. SMITH:  I am going to mark for
20 today's purposes Exhibit-328.  It is Doe
21 Supplement 46 through 49.
22       - - -
23       (Doe 46-49 marked as Exhibit-328 for
24 identification.)

Page 221

- - -

BY MS. SMITH:

Q.     The county has contracted with Eckert Seamans, correct?

A.     Yes.

Q.     And how many time has the county contracted -- contracted with Eckert Seamans since 2012?

MS. JONES:  I am just going to object to the form of question.

But you can answer it.

THE WITNESS:  I think we have a standing contract with them for an hourly rate. And that hourly rate can change from year to year.

BY MS. SMITH:

Q.     Okay.

So other than more recently, like let's since 20 -- let's say since 2020, did the county ever contract with Eckert Seamans previous to that?

A.     Yes.

Q.     Okay.

Are there any issues related to the plaintiffs claims prior to May of 2020?

Page 222

A.     No.

Q.     Okay.

Since May of 2020, the county -- as I understand your testimony, correct me if I am wrong, the county has entered into one standing contract with Eckert Seamans for an hourly rate for work conducted?

MS. JONES:  Object to the form.

You can answer.

BY MS. SMITH:

Q.     Meaning, I'm just trying to figure out, is there -- was there one contract and it ended and then they entered into another one or has it been one --

A.     I think we have an open-ended contract with Eckert Seamans.  Some of the law firms we do and we just -- we do a contract with them for either labor things and we just extend that contract out, the rate changes maybe from year to year based on -- they will send us something in January that their rates have changed.

Q.     Okay.

As it relates to the plaintiffs' claims and your -- and the county's contract with Eckert

Page 223

Seamans, what was the reason or purpose of the county contract with Eckert Seamans, whenever they originally entered into a contract, again, regarding the plaintiffs' claims?

MS. JONES:  I'm sorry.  Can you just repeat that?

BY MS. SMITH:

Q.     So when -- I'm asking questions about the contract with Eckert Seamans only as it relates to the plaintiffs' claims, not any other contracts with the county with Eckert Seamans for other things.  What was the reason or purpose behind the county entering into that contract?

MS. JONES:  Object to the form and object to the extent it includes communications with them.

But I think you can answer that question.

THE WITNESS:  Well, we contract with them to review Ms. Zula's investigation in the LexisNexis case.

BY MS. SMITH

Q.     Do you know when that contract began?

MS. JONES:  Can I just -- I am

Page 224

going to object to the form.  I think the word contract is misleading and I think he's -- I just don't want -- I don't want there to be misunderstanding.  You know what I mean?  Just from a standpoint of a lawyer, it's not like every -- like I will make a contract to do this particular investigation, it's not a contract, it's like you retain a firm and then you hire them every once in a while.

BY MS. SMITH:

Q.     Was there a written contract with Eckert Seamans?

A.     A separate one, no.

Q.     What do you mean a separate one?

A.     In other words, there's a contract out there, we have an agreement with Eckert Seamans and probably at the -- not probably, at the time we said we have this issue coming up, could you handle this.  So there was no separate contracts there.  We have a contract with Eckert Seamans to do this investigation.  It's not that where we give them some work, they assign us, and we get a rate.

Q.     Okay.

Page 225

So is there -- is the county's, I don't
know the right word to say, contract with Eckert
Seamans, is it for a period of time and then
throughout that -- for that period of time, the
rate remains the same and you assign or provide
them work to -- to receive advice, legal advice
on?
A.      No.  I think mostly it's an open-ended
contract.  Put of them we put in for, let's say, a
start date, but not a stop date.  And --
Q.      Okay.
A.      -- the compensation then would change
perhaps yearly.  If their -- if the cost lowers,
costs go up.  We do that with engineering
contracts sometimes as well.
Q.      Okay.
        When the services of Eckert Seamans were
engaged as it relates -- when you engaged the
services of Eckert Seamans as it relates to the
plaintiffs' claims, what was the reason or purpose
for that?
A.      To review Heidi's investigation.
Q.      Okay.
        And the services of Eckert Seamans,

Page 226

again, were requested or retained for -- as it
relates to the plaintiffs' claim -- plaintiffs'
claims on a later date, correct?
A.      That is correct.
Q.      Okay.
        What was the purpose or reason for that?
A.      To conduct an independent investigation.
Q.      Okay.
        And there is no written documentation
about what services they are to provide as it
relates to that second engagement of their
services?
A.      No.  They did -- on the first one they
did a review of Heidi's investigation and then
they just send us a bill with -- you know, as
lawyers do, the time we were here, the time we
spent on it, and here's the hourly rate.
Q.      Okay.
A.      And we pay that bill.
Q.      The first work they did for that bill
that you received, did the county rely on that
report in making any employment-related decisions
regarding any of the plaintiffs?
        MS. JONES:  I am going to object to

Page 227

the form of question.  I think it calls for
information that's privileged.  I don't know how
there individual -- I think as an individual he
can answer what he knows.  I am not sure that
question can be answered for the county as a 30B6
because the entity doesn't rely, a person relies.
So I think it's an improper question for the 30B6.
        MS. SMITH:  I disagree.  But he can
answer it -- are you allowing him to answer?
        MS. JONES:  I don't think he can
answer that question.  I don't think a
representative for an entity can answer about an
entity's decision when the decision has to be by
individuals.
        MS. SMITH:  Right.  But the
individuals are employees or elected officials of
the entity.  And the entity under 30B6, to what
acknowledge they have or should have regarding
what actions their employees took.  So if their
employees or elected officials, the county's,
relied on information provided, the county should
have knowledge of that.
        30(b)(6) witnesses to have prepared
for a deposition of the 30(b)(6) deposition, in

Page 228

speaking with fact witness individuals so that it
can either bind or not bind the county with a --
or bind the county to a particular answer.  So I
think -- let me ask a question up to -- leading up
to that question.  I will strike that question and
ask another one.
BY MS. SMITH:
Q.      Sir, did you speak -- in preparation of
today's deposition, did you speak with anyone who
reviewed, first, Eckert Seamans' report to the
county and who made decisions related to the
plaintiffs regarding that report?
A.      For today, no.
Q.      Same question for the second report.
There was a second record by Eckert Seamans,
correct?  Or, I'm sorry.  I this you said earlier
there was not?
A.      Correct.
Q.      Okay.
        So then it's just the first report.
        MS. SMITH:  So I am going to say
that he's not the proper witness or he's an
ill-prepared witness --
        MS. JONES:  We'll have to -- go

Deposition of Gary Bender 30(b)(6) - Revised                    Jane Doe, et al. v. Schuylkill County Courthouse, et al.

Page 229

ahead.  You can finish.

MS. SMITH:  This will have to be addressed with a judge, because I do believe that he -- in that there is limited individuals who were involved in the decisions, he could have spoken with to them to be able to bind the company as to what was relied upon and what was not relied upon.

So I'm going to ask the question to make my record.  If the answer is I don't know, it's I don't know.

BY MS. SMITH:

Q.     But did the county rely on the reports -- on the report of Eckert Seamans in making any employment-related decisions regarding any of the plaintiffs?

MS. JONES:  I am going to object to the form of the question.  I am also going to object to the extent his answer would call for communications with counsel.

MS. SMITH:  Are you --

MS. JONES:  However, this witness may be one of the people, so -- who was involved in the process and he's already testified as an

Page 230

individual about that process.  So this was one of the issues that I raised in preserving my objections on how certain topics weren't proffered with a 30(b)(6) deposition.  And I don't think that question can be answered by him on behalf of the county.  I think it has to be answered as you have asked, frankly, the persons who had to make that decision.

MS. SMITH:  We disagree on that.  But as it relates to your objection regarding advice of -- communications, I think, with counsel is how you phrased it, are you waiving the advice of counsel defense?

MS. JONES:  We have never relied upon an advice of counsel defense.

MS. SMITH:  Okay.  I just want to -- I want -- would like to my record.

Are you waiving the advice of counsel defense?

MS. JONES:  I am not waiving anything.  I am not asserting the counsel -- the advice of counsel device.

BY MS. SMITH:

Q.     Sir, what was the -- I think we went

Page 231

through that.

Other than the bill for the first Eckert Seamans' report, has the county received a second and subsequent bill from Lexis -- from Eckert Seamans?

A.     I'm not aware of any.

Q.     How much was the first bill for?

A.     I don't have that information.

Q.     When was that received?

A.     I would say sometime in '21.

Q.     Let me come back to one question on that topic, but I'm going to move on.

The county contracted with a Joan R. Price, esquire, correct?

A.     We do have a contract with her, yes.

Q.     Okay.

Is hers a written contract in the traditional sense or is hers similar to Eckert Seamans?

A.     You know, I'm not aware of that.  I would think it would be a separate contract, but I don't know that.

Q.     Is that -- do you know if the contract, whether it's a traditional contract or the type

Page 232

like Eckert Seamans, is it open ended or was it finite time?

A.     That was open ended.

Q.     Okay.

Is it still open ended?

A.     Yes.

Q.     Okay.

And what was the reason or purpose of the county contracting -- contracting with Attorney Price?

A.     To provide consultation on the litigation concerning reassessment.

Q.     And when was -- when did her contract begin as it relates to the reassessment of negotiation?

A.     I don't have that information.

Q.     Okay.

What services did she provide to the county?

A.     Advice and counsel and handling the lawsuit.

Q.     So other than the litigation on reassessment, she provided no other services related to the tax assessment office?

Deposition of Gary Bender 30(b)(6) - Revised                    Jane Doe, et al. v. Schuylkill County Courthouse, et al.

Page 233

1  A.      Not that I'm aware of.
2  Q.      The county has a contract, a traditional
3  contract with LexisNexis, correct?
4  A.      We have several agreements, yes.
5  Q.      Okay.
6          Is there an individual contract for each
7  office who has access to LexisNexis?
8  A.      Correct.
9  Q.      Okay.
10         And that's what you mean you have
11 several --
12 A.      Yes.
13 Q.      -- contracts?
14 A.      Yes.  Yes.  I'm sorry.  Yes.
15 Q.      The several contracts is a contract for
16 each office that has use of it?
17 A.      Yes.
18 Q.      Okay.
19         What are those offices?
20 A.      Law library, adult probation, the
21 district attorney, domestic relations, and tax
22 claim.
23 Q.      Those contracts, who -- let -- let me
24 strike that.  Do the heads of any of those

Page 234

1  departments that you just named, do the heads of
2  those departments receive a copy of the county's
3  contract with LexisNexis for their office?
4  A.      I would think so, yes.
5  Q.      So today, unfortunately, is not about
6  thinking so.  I am trying to determine facts and
7  what you do or do not know.
8          Do you know, do you have knowledge that
9  the off -- any of those offices received a copy of
10 the contract?
11 A.      Yes.
12 Q.      Okay.
13 A.      There are contracts in the system.
14 Q.      What do you mean the system?
15 A.      In our -- in our contract system on
16 Smart Term.
17 Q.      And so, for instance, the law library,
18 can they access the Smart Term --
19 A.      Yes.
20 Q.      -- contract?
21 A.      Yes.
22 Q.      And they can access -- can they access,
23 for instance, any contract, so like the LexisNexis
24 contract for a adult probation?

Page 235

1  MS. JONES:  Who -- who -- who is
2  they, when you say --
3          MS. SMITH:  The law -- I'm sorry.
4  I was speaking of the law library.
5  BY MS. SMITH:
6  Q.      So for -- can one department who has a
7  LexisNexis contract access another department's
8  LexisNexis contract on that Smart Term system?
9  A.      Yes.  Departments heads generally have
10 access to what we call accounting, where the
11 contracts are kept and they can enter the name of
12 the contract or the number of the contract and
13 look at that.
14 Q.      Okay.
15         So other than on the Smart Term system
16 and it being available, is one provided by the
17 county directly to a department head?
18         MS. JONES:  Object to the form.
19         But you can answer.
20         THE WITNESS:  Well, they contract
21 with them.  They get it approved by the board, but
22 the contract goes to them.  There's a contract --
23 a copy of that contract with the commissioners,
24 with the controller, with the office, and with the

Page 236

1  vendor.
2  Q.      So who signs the LexisNexis contract on
3  behalf of the county?
4  A.      The county commissioners.
5  Q.      Okay.
6          The department heads don't sign them?
7  A.      No.
8  Q.      Okay.
9          So when, if at all, does the department
10 head receive a copy of that, if they actually
11 receive one, not if they just have one available
12 to view?
13         So, for instance, county policies are
14 also on the county's website, correct?
15 A.      Uh-huh.
16 Q.      Is that a yes?
17 A.      Yes.
18 Q.      And employees can access them at their
19 leisure if they want to look one up, that they
20 don't -- that they no longer have in their
21 possession, correct?
22 A.      Correct.
23 Q.      But they also receive a physical copy,
24 whether it be at their hiring, at the trainings,

Page 237

1  if one is newly issued, they receive by e-mail or
2  in a paper, a copy of that, correct?
3  A.       Yes.
4  Q.       Okay.
5        So that's what I am trying to figure
6  out. Is it just that smart term has these
7  contracts available for the department heads to
8  view at their leisure or do they actually -- does
9  the county or someone -- does someone on behalf of
10 the county actually go to the department head and
11 say, we've entered into this contract, here's the
12 contract?
13 A.       No. That's not quite how it works.
14 Q.       Okay.
15 A.       So if I am the department head and I
16 wanted to have a contract with LexisNexis, I reach
17 out to them and I say, here is what I want to do.
18 They send terms -- we send our terms and
19 conditions. They sign the contract, we send it
20 back. We make four copies of that contract. I,
21 as the department head, make a copy of that
22 contract.
23       So I take -- I take one down to the
24 commissioners office to go on the agenda. I take

Page 238

1  one to the controllers office for them to store.
2  I send one -- well, after it's signed, I will take
3  it back to the vendor, and I keep one in my
4  department.
5  Q.       Okay.
6        So for the tax claim office
7  specifically, was Jane Doe 3 -- was the LexisNexis
8  contract entered into while Jane Doe 3 was the
9  department head, before or after?
10 A.       While she was the department head, yes.
11 Q.       Okay.
12       Was she provided a copy of the county's
13 contract with LexisNexis?
14 A.       Yes, because she would have put it
15 together.
16 Q.       Who provided it to her, once it was
17 signed and entered into?
18 A.       Well, the commissioners' office.
19 Q.       Who at the commissioners' office gave
20 Ms. Copy a -- gave Jane Doe 3 a copy of the
21 contract, the county's contract with LexisNexis?
22 A.       As I said, she would prepare four
23 contracts. She would take it down -- LexisNexis
24 would have them sign, the commissioners that have

Page 239

1  not yet. They go down to the chief clerks office,
2  they get put on the -- if they get approved, the
3  chief clerk stamps them, she sends one -- two
4  copies up to the -- to the tax claim, in this
5  case, and tax claim would send one to LexisNexis.
6  We would send one to the controllers office and we
7  keep one in our file.
8  Q.       So you're saying there's a LexisNexis
9  contract that is stamped by the chief clerk?
10 A.       The names of the commissioners are
11 stamped on by the chief clerk after the
12 commissioners approval at a -- a board meeting.
13 Q.       Okay.
14       And the chief clerk would have sent the
15 contract to Jane Doe 3?
16       MS. JONES: That's not what he
17 said.
18 BY MS. SMITH:
19 Q.       I thought you said the stamped copy
20 was -- it was stamped by the chief clerk and then
21 the chief clerk provided a copy to Jane Doe 3,
22 who -- or two copies maybe, and one -- tax claim
23 would send it to LexisNexis, correct?
24 A.       Correct.

Page 240

1  Q.       Okay.
2        So the chief clerk provided the stamped
3  copy to Jane Doe 3?
4  A.       I get you. Okay. I understand. I
5  think we're talking about the same thing, Ms.
6  Smith. It's just we're going about it different
7  ways.
8        All contracts are initiated by the
9  department. They bring them down. When they are
10 approved by the agenda, they get stamped with the
11 commissioner's seal. Once they're approved by the
12 commissioners and then we send copies back to the
13 department, the controllers office, and we keep
14 for our -- the commissioners file.
15 Q.       So it's your testimony that Jane Doe 3,
16 on behalf of the county's tax claim bureau,
17 initiated the LexisNexis contract?
18 A.       Yes.
19 Q.       And that then it was submitted for
20 approval by the commissioners?
21 A.       Yes.
22 Q.       And that then a stamped copy, which was
23 approved by the commissioners, was returned to
24 Jane Doe 3 by the chief clerk?

Page 241

1  A.      Yes.
2  Q.      Does the county have any written policy
3  or written procedure regarding the training of
4  employees in the use of LexisNexis?
5  A.      The county has no policy, no.
6  Q.      So written or otherwise?
7  A.      No.
8  Q.      Does the county provided any training
9  related to the use of LexisNexis for those
10 employees who have access to LexisNexis accounts
11 through a county contract with LexisNexis?
12 A.      The county does not.
13 Q.      Does the county secure any outside
14 entity, including but not limited to LexisNexis,
15 to provide training to employees, county
16 employees, who have access to LexisNexis accounts
17 through a county contract with LexisNexis?
18 A.      Yes.  LexisNexis does provide that
19 training.
20 Q.      Did Jane Doe 3 receive that training?
21 A.      You sort of have to take that training
22 when you first sign up.
23 Q.      Did Jane Doe 3 receive that training?
24 A.      That I don't know.

Page 242

1  Q.      Did Jane Doe 4 receive that training?
2  A.      I don't know that.
3  Q.      Do you know what that training entails?
4  A.      Yes.  How to log on and how to utilize
5  the system.
6  Q.      Does the county provide any training to
7  its employees related to the legally permissible
8  uses of LexisNexis, to its employees who have
9  access to LexisNexis accounts through the county's
10 contract with LexisNexis?
11 A.      The county did not provide that
12 training, no.
13 Q.      Does the county secure any outside
14 entity, including but not limited to LexisNexis,
15 to provide training to its employees who have
16 access to LexisNexis accounts through the county's
17 contracts with LexisNexis regarding the legally
18 permissible uses of LexisNexis?
19 A.      That is provided by LexisNexis.
20 Q.      Is that during that same training?
21 A.      Yes.
22 Q.      And you don't know if Jane Doe 3 or Jane
23 Doe 4 received that, correct?
24 A.      I don't know exactly, no.

Page 243

1          MS. SMITH:  We're just going to
2  take a five-minute break.
3          VIDEOGRAPHER:  The time is now
4  2:12 p.m. and we are going off the record.
5                    - - -
6          (Whereupon, brief recess was held off
7  the record.)
8                    - - -
9          VIDEOGRAPHER:  The time is
10 2:19 p.m. and we are back on the record.
11 BY MS. SMITH:
12 Q.      All right.
13         Mr. Bender, I think you have 328 in
14 front of you; is that correct?
15 A.      Yes.
16         MS. SMITH:  Okay.  Matt, can you
17 put 328 up on the screen.  Thank you.
18 BY MS. SMITH:
19 Q.      This is the county's social media policy
20 as implemented in January of 2016, correct?
21 A.      That is correct.
22 Q.      Has this -- has the county made any
23 revisions to this policy since it was implemented?
24 A.      Not that I am aware of, no.

Page 244

1  Q.      Does this policy apply to elected
2  officials?
3  A.      To some.  And I'll qualify that
4  statement, when this policy was introduced, the
5  president judge refused to accept it.  And so
6  anybody falling under the -- the court system
7  would not be obligated into this policy.
8  Q.      Okay.
9  A.      I know -- if you're looking at the
10 signatures, but the judge really can weigh in on
11 what we do.  Any time a policy is implemented, we
12 send it up to president judge for his review.  It
13 was odd in this case that he had issues with this
14 policy based on first amendments, the individual
15 court members -- court employees under him would
16 not be effected by this policy.
17 Q.      Okay.
18         But courthouse, not court, but
19 courthouse elected officials, for instance, the
20 treasurer is an elected official, correct?
21 A.      Correct.
22 Q.      Would this apply to them?
23 A.      We would expect it to, yes.
24 Q.      We, the county, correct?

Deposition of Gary Bender 30(b)(6) - Revised          Jane Doe, et al. v. Schuylkill County Courthouse, et al.

Page 245

1  A.      The county would.
2  Q.      Okay.
3          Does it apply to commissioners?
4  A.      I would think so, yes.
5  Q.      Okay.
6          And does it apply to -- so any elected
7  official of the courthouse, that's not the court
8  --
9  A.      Correct.
10 Q.      -- it would apply to?
11 A.      Yes.
12 Q.      Okay.
13         How does the county enforce this policy
14 if it's violated by an elected official?
15 A.      That's a good question.  And I don't
16 know that we have disciplined anybody under this
17 policy because of these first amendments rights.
18 But, clearly, I think my guidance to employees
19 that I deal with saying you needed to be careful
20 what you do on social media.  Can it -- it can and
21 may be used against you at some point.  I don't
22 know that we ever have.
23 Q.      Okay.
24         If we look to the second page, it -- it

Page 246

1  tells us the definition of social -- of social
2  networking.
3          Do you see that?
4  A.      Yes.
5  Q.      So about midway through that paragraph,
6  it says examples of these -- of the types of
7  Internet-based social networking sites include
8  blogs, networking sites, photo sharing, video
9  sharing, micro-blogging, podcasts, as well as
10 comments posted on these sites.
11         Do you see that?
12 A.      Uh-huh.  Yes.
13 Q.      And then the final sentence of this
14 paragraph states:  The definition of social
15 networking will be construed by the county and the
16 department as broadly as reasonably possible
17 within its sole discretion.
18         What is the department in that last
19 sentence mean?
20 A.      I would think the department head.
21 Q.      Okay.
22 A.      How he or she would interpret it.
23 Q.      Okay.
24         So the department heads are supposed

Page 247

1  to -- per this sentence, are supposed to construe
2  this policy or -- I'm sorry -- social network as
3  broadly and reasonably as possible within its
4  discretion?
5  A.      Correct.  And I would think the
6  departments they are referring to here would be
7  the departments under the -- an elected official,
8  like the treasurer's department things like --
9  because they have the right to hire, fire, and
10 discipline.
11 Q.      Okay.
12         So they have sole discretion because
13 they have those 1620 rights?
14 A.      Correct.
15 Q.      Whereas a department head of a non-elect
16 official, it would be the county's sole
17 discretion?
18 A.      That would be correct.
19 Q.      Okay.  Understood.
20         Going back to that other sentence about
21 the blogs, the networking sites, all those things,
22 does that include radio shows?
23         MS. JONES:  Does what include radio
24 shows?

Page 248

1  BY MS. SMITH:
2  Q.      That prior sentence, the blogs, the
3  networking sites, the examples of Internet-based
4  social networking sites?
5  A.      That's a good question.  It's a media
6  outlet.  I'm not sure that's what this was meant
7  to address, but...
8  Q.      Well, in that, those are examples and
9  that sentence -- that last sentence we looked at
10 says, it should be construed as broadly and
11 reasonably as possible.
12         Does the county believe that this policy
13 relates to statements of employees made on radio
14 shows or radio broadcasts I guess I should call
15 them?
16 A.      I do --
17         MS. JONES:  Object to the form.
18         But you can -- you can answer.
19 BY MS. SMITH:
20 Q.      Well, you today, you're county
21 administrator, Mr. Bender, for the county.  But
22 you here today, as well, you also the county, you
23 are not Mr. Bender.
24 A.      Yes.

Deposition of Gary Bender 30(b)(6) - Revised                    Jane Doe, et al. v. Schuylkill County Courthouse, et al.

Page 249

Q.     So does the county, and I think your
answer was I do?
A.     I do.  And I think the commissioners
would agree with me, it's that the radio does
count.  You shouldn't get on the radio.  It's
another social outlet and you have to be careful
what you say.
Q.     Okay.  All right.  You can put that
aside.
        MS. SMITH:  Matt, I think Alyssa
named it outside employment policy and I will mark
it for today's purposes as 329.
                    - - -
        (Policy marked as Exhibit-329 for
identification.)
                    - - -
BY MS. SMITH:
Q.     This is the county's outside employment
policy implemented in November -- well, I'm sorry.
This is not a signed policy.
        Do you know whether this policy, outside
employment policy actually implemented by the
county?
A.     I don't have that information.

Page 250

Q.     Did you -- you reviewed the notice of
deposition today -- for today, correct?
A.     Uh-hum.
Q.     Is that a yes?
A.     Yes.  Sorry.
Q.     And the list includes the implementation
of policies and/or procedures regarding Schuylkill
County's outside employment policy, correct?
A.     Correct.
        MS. JONES:  What was your question?
BY MS. SMITH:
Q.     Did you review this policy in advance of
today for preparation for today's deposition?
A.     Yes.
Q.     Okay.
        So was it signed and implemented?
A.     I don't know.
Q.     But you reviewed it for today before --
you reviewed a copy of this before today in
preparation for today?
A.     I did.  Could have been the same copy we
have.
Q.     But you don't recall if the one you
reviewed was implemented?

Page 251

A.     I don't.
Q.     Does the counsel have an implemented
outside employment policy then?
A.     Yes.
Q.     Okay.
        Is it different than this one?
A.     No.
Q.     Okay.
        So this is the county --
A.     Oh, I'm sorry.
Q.     That's what I am trying to figure out.
A.     I'm sorry.  I'm sorry.  We go back -- I
think we're on the same path, Ms. Smith, we
just...
Q.     So what -- this policy has been
implemented by the county?
A.     Correct.
Q.     Okay.
        This one is -- is an unsigned copy, and
that's why I was trying to just make sure that
this has, in fact --
A.     That there is a signed -- yes.
Q.     That this has, in fact, been implemented
and put in place by the county?

Page 252

A.     Yes.
Q.     And was that in November of 2005?
A.     Yes.
Q.     Okay.
        Has there been any revisions to this
policy since it was implemented, so since November
2009?
A.     No.
Q.     All right.
        In the first paragraph there under the
bolded policy statement, it states:  The county of
Schuylkill prohibits employees from holding two
county jobs if the combined work hours exceed 40
hours weekly.
        Does that mean that the actual hours
work cannot exceed 40 or the possible hours
worked?
        So, like, someone, if they're full time,
could work up to 40 in one job and they, if
employed in a second position, could work up to 40
in another job, but let's say they work five at
Office A and 35 at Office B, they could work up to
80, but they are actually only working 40?  Does
that make -- so I am trying to figure out which it

Page 253

1  is.
2         MS. JONES:  Object to the form.
3         But you may answer.
4         THE WITNESS:  My interpretation of
5  the county is that if you have a full-time job
6  that's 35 hours a week, so if you took a second
7  job in the courthouse, I don't know of a job out
8  there that's only five hours per week.
9  Q.     But what if the person isn't working any
10 hours in their current full-time job?
11 A.     Why aren't they?  That would be my
12 question.  If your job -- so if you're a clerk in
13 an office and you're expected to be there 35 hours
14 a week, so you take another job for 15 hours a
15 week, no, then you couldn't take that job.
16 Q.     What if they're on unpaid suspension,
17 does this policy prohibit that individual who is
18 not working any hours from taking a job in an
19 elected official's office who has 1620 rights?
20 A.     I would say, no, that they can't have
21 two jobs.  And that was Mr. Marshall's
22 interpretation as well.
23 Q.     Okay.
24        But as the County of Schuylkill, as you

Page 254

1  sit here today, is it your testimony that an
2  individual cannot hold two county jobs if -- even
3  if they're not working any hours in one of those
4  two jobs?
5  A.     Yes, because they signed -- committed to
6  a certain number of hours in excess of 40.
7  Q.     So it's -- the policy prohibits an
8  individual from holding two positions which could
9  potentially be worked more than 40 hours?
10 A.     Correct.
11 Q.     Okay.
12        So it's not the actual hours worked,
13 it's the potential hours they could work?
14 A.     Correct.
15 Q.     All right.
16        You know who Deborah Detweiler is,
17 correct?
18 A.     I do.
19 Q.     Ms. Deb Detweiler worked full time in
20 the assessment office as a field appraiser,
21 correct?
22 A.     She was.
23 Q.     And she also, at the same time, worked
24 in the coroner's office, correct?

Page 255

1  A.     That is correct.
2  Q.     She committed to the field appraiser
3  position for 35 hours a week, correct?
4  A.     Yes.
5  Q.     And she worked at the same time in the
6  coroner's office for more than five hours per
7  week, correct?
8  A.     That is -- that is correct.  I think she
9  had, yes.
10 Q.     Okay.
11        So did the county not enforce this
12 policy against Ms. Detweiler?
13 A.     We did.
14 Q.     And how did you do so?
15 A.     They had to give up those positions.
16 Q.     When was she forced to give up that
17 position?
18 A.     In 20, I want to say, '16.
19 Q.     How long did she hold both positions
20 for?
21 A.     Longer than that.  I don't know when she
22 started at the coroner's office.
23 Q.     How -- would it be more than a year that
24 she held both positions?

Page 256

1  A.     I would think so, yes.
2  Q.     Would you say more than two years?
3  A.     That I don't know.
4  Q.     Why did the county decide to enforce
5  this policy and have her pick between the two
6  jobs?
7  A.     The county at one point probably just
8  ignored that.  Well, not probably, just ignored
9  it.  When I came on board in 2016, this was
10 addressed to me with the HR officer, Martina
11 Quasak.  And I think inform Dr. Moreland that
12 people cannot work more than five hours in his
13 office and he assured me that's what he would do.
14 We discovered then he wasn't doing that, which is
15 now some litigation.
16 Q.     When did that litigation begin?
17 A.     I don't know specifically.
18 Q.     Was it in 2016?
19 A.     No.
20 Q.     Okay.
21        It was -- it was after that, right?
22 A.     It was after that, yes.
23 Q.     What's the county's definition of a
24 full-time employee hours wise?  Like, how many

Page 257

1 hours, when someone's full time, do they have to
2 commit to?
3 A.     It depends on the office.  Most offices
4 in the courthouse are 35 hours a week.  We have
5 some offices in the -- in the county that are 37
6 and a half hours a week.  We have some that are 40
7 hours a week.
8 Q.     Okay.
9        So none less than 35?
10 A.     Full time, no.
11 Q.     Okay.
12        And what about part time, is there any
13 set number of hours a part-time employee has to
14 work?
15 A.     Between 15 and 20 hours per week.
16 Q.     So no less than 15?
17 A.     We try to keep the -- the part timers
18 below a certain number of hours to avoid health
19 benefits.
20 Q.     Okay.
21        So under a certain number, but no less
22 than 15?
23 A.     I would think so.
24 Q.     Okay.

Page 258

1        So you know who Heather Matascavage is?
2 I am going to say --
3 A.     Matascavage.
4 Q.     Matascavage.  I always say it wrong.
5 Thank you.
6        You know who she is, correct?
7 A.     I do.
8 Q.     So is a Clerk Typist 2 at the
9 courthouse?
10 A.     She is.
11 Q.     In what department or division?
12 A.     Tax claim.
13 Q.     She's full time there, correct?
14 A.     Correct.
15 Q.     Is she a 35, 37, 40-hour a week?
16 A.     Thirty-five.
17 Q.     She also is a tax collector for the
18 county, correct?
19 A.     A tax?
20 Q.     Collector.
21 A.     Collector.  That is correct.
22 Q.     As a part-time employee, correct?
23 A.     We don't classify it as that.  She's an
24 elected official.

Page 259

1 Q.     A tax collector is an elect official?
2 A.     It is.
3 Q.     Does she receive payroll from the county
4 as a tax collector?
5 A.     I do believe so.
6 Q.     And the Schuylkill County payroll
7 system, Payroll Statistics, would have her listed
8 as a part-time employee as a tax collector,
9 correct?
10 A.     Don't know that for sure.  Probably.
11 Q.     Is there a ceiling on the number of
12 hours that a tax collector can work?
13 A.     A tax collector's hours are set by the
14 tax collector.
15 Q.     How many hours a week does Ms. -- how
16 many hours a week does Heather M. work as a tax
17 collector?
18 A.     I don't know.
19 Q.     Okay.
20        But there's a set number of hours?
21 A.     Not really.  That's up to the collector.
22 So if the tax collector says, I'm going to have my
23 office open from 9:00 to 2:00 on a Saturday,
24 that's when I'm collecting taxes.

Page 260

1 Q.     Okay.
2 A.     Those are her hours.
3 Q.     So she herself, as the tax collector,
4 determines her own hours?
5 A.     That is correct.
6 Q.     So her potential hours as a tax
7 collector are as many as she desires?
8 A.     But she's not paid by the hour.  She's
9 paid be the amount of taxes she collects.
10 Q.     Okay.
11        But she is listed as county part-time
12 employee on the payroll statistics form, correct?
13 A.     That I don't know.
14 Q.     Is the tax collection office different
15 than a tax collector?
16        MS. JONES:  I am going to object to
17 the form of the question, I think it answers
18 itself.
19        But you can answer if you can.
20        THE WITNESS:  Well, yeah, because
21 the office is an office and the tax collector is
22 the tax collector.
23 BY MS. SMITH:
24 Q.     Okay.

Page 261

1 So the tax collection -- a tax
2 collection office employee is not -- is an actual
3 employee, not what you said, was an elected
4 official as a tax collector, correct?
5 MS. JONES: I am going to object to
6 the form of that question.
7 If you can answer it --
8 THE WITNESS: Could you repeat it?
9 BY MS. SMITH:
10 Q. So let's go -- strike that.
11 Ms. Alicia Beach, you know who that is,
12 correct?
13 A. I do.
14 Q. So she is an employee of what office at
15 the county courthouse?
16 A. County treasurer's office.
17 Q. Okay.
18 So could that potentially be listed as
19 the tax collection office?
20 MS. JONES: I object to the form.
21 MS. SMITH: On the --
22 MS. JONES: I object it's beyond
23 the scope of this -- this -- this list of topics,
24 too.

Page 262

1 MS. SMITH: Well, it's
2 implementation of this outside employment policy.
3 Trying to figure out who they actually implemented
4 against and who they enforced it against and who
5 they choose not to enforce it against.
6 MS. JONES: Okay.
7 BY MS. SMITH:
8 Q. So Ms. Alicia Beach, if the county's
9 payroll statistic form has her listed as full time
10 in the tax collection office, county courthouse,
11 that would be the treasurer's office?
12 A. That would be the treasurer's office.
13 Q. Okay.
14 And then it has her listed as an acting
15 tax collector. Is that -- but then it has Heather
16 M. as a tax collector. Are those two different
17 things?
18 A. I don't know. I would have to know
19 whether Alicia Beach is an assistant tax collector
20 in a municipality.
21 Q. Well, is Alicia Beach a tax collector in
22 any municipality?
23 A. I am not aware of any.
24 Q. Okay. All right.

Page 263

1 And do you know how many hours a week
2 Alicia Beach worked as an acting tax collector, as
3 per the county's payroll statistic form?
4 A. I do not.
5 Q. Okay.
6 A. I would have to -- we are getting into
7 an area I'm very uncomfortable with because the --
8 each tax collector has to have someone that's
9 available to collect taxes when they are not --
10 like if they're on vacation, so that they have --
11 I didn't know if that was an acting or an
12 alternate, that's by law. So I don't know if
13 Melissa -- if Alicia Beach is one of those or not.
14 Q. Okay.
15 A. We do know that Heather Matascavage is a
16 tax collector and she's not paid by the hour by
17 the county, she's paid based on the taxes she
18 collects.
19 Q. Okay.
20 A. She has an independent office, not paid
21 for by the county, that she sits in. And it can
22 be in her home or it can be in the office of the
23 municipality where she collects municipal taxes.
24 Q. All right. Let's move on to someone who

Page 264

1 is not a tax collector.
2 Do you know who William Burke is?
3 A. I do.
4 Q. Is he a county solicitor?
5 A. He's a solicitor. He's a solicitor for
6 the recorder of deeds office.
7 Q. Okay.
8 So he's not in the same office as
9 Defendant Roth, like the solicitor's office?
10 A. Oh, no. No. No. I'm sorry.
11 Q. Okay.
12 A. Each row office gets to have their own
13 solicitor.
14 Q. Okay. All right. Thank you for that
15 clarification.
16 And, I'm sorry, you said he's a
17 solicitor for which office?
18 A. Recorder of deeds.
19 Q. Okay.
20 And do you know how many hours a week
21 part time he works for that office?
22 A. They're not required to work any.
23 Q. Do you know how many hours he does work
24 though?

Page 265

1  A.       I do not.
2  Q.       And he's also an assistant public
3  defender part time?
4  A.       He is.
5  Q.       Do you know how many hours he -- a week
6  he works there?
7  A.       I do not.
8  Q.       Okay.
9         In any event, as a solicitor for the
10 recorder of deeds office, part time, he could work
11 up to how many hours?
12 A.       I guess it would depend on his caseload.
13 Q.       But what's he allowed to county up to?
14 What's the county permit him?  How many hours a
15 week?  Because you say part -- you said the county
16 tries to keep part-time employees under a certain
17 amount of health coverage.
18 A.       Correct.  But he's not paid by the hour.
19 He's paid a -- fee.
20 Q.       For which office?
21 A.       For the recorder of deeds.  He's paid
22 hourly in the public defender's office.
23 Q.       And how many hours a week does he -- can
24 he work this?

Page 266

1  A.       I don't know in the public defender's
2  office.
3  Q.       All right.
4         We were talking a little about STEB
5  reports earlier, the State Tax Equalization Board
6  reports.  The county is responsible for submitting
7  those reports to the State Tax Equalization Board,
8  correct?
9  A.       That's correct.
10 Q.       What position at the county is
11 responsible for the STEB reports?
12 A.       The assessment office.
13 Q.       What position?
14 A.       In general.  And specifically it would
15 be the -- Jane Doe 1's position.
16 Q.       What position is that?
17 A.       Market analyst.
18 Q.       What information is used to complete
19 those reports?
20 A.       Current sales.
21 Q.       Where is that information obtained from?
22 A.       In our Govern System at the county
23 courthouse.
24 Q.       And who inputs the sales information

Page 267

1  into Govern?  Like how is that --
2  A.       Someone in the assessment office.
3  Q.       Do you know what position?
4  A.       I don't.
5  Q.       Okay.
6         Is the Govern System the only system
7  that is used to complete -- required to complete
8  the STEB reports or are there others?
9  A.       No.  You need to use that system, yes.
10 Q.       Right.
11       But other than Govern, is there any
12 others?
13 A.       Not that I'm aware of, no.
14 Q.       Okay.
15       So like Smart Term is a system the
16 county --
17 A.       No.  I'm sorry.  No.  Just the Govern
18 System.
19 Q.       Hold on.
20       Smart Term is a system the county has,
21 right?
22 A.       Yes.
23 Q.       Okay.
24       But there's no other systems, other than

Page 268

1  Govern, that Jane Doe 1's position, real estate
2  market analyst would need to use in order to
3  complete the STEB reports?
4  A.       Correct.
5  Q.       Okay.
6         Can the Govern System be accessed from
7  locations other than county buildings?
8  A.       Yes.
9  Q.       And there's deadlines for the STEB
10 reports, correct?
11 A.       There are.
12 Q.       What are those deadlines?
13 A.       I'm not aware.
14 Q.       Were any deadlines for the STEB reports
15 stayed during COVID -- the COVID-19 pandemic?
16 A.       What do you mean?
17 Q.       Stayed.  Like, were they paused?  Did
18 the -- the state say, there's normally a deadline,
19 but since COVID, we're going to extend them or
20 pause them until we figure what's going on with
21 COVID?
22 A.       Yeah.  I'm not aware of that.
23 Q.       You're not aware that the state
24 implemented a hiatus on the reports?

Case 3:21-cv-00477-MCC    Document 280-1  CONFIDENTIAL    Filed 09/20/23   Page 160 of 342
Deposition of Gary Bender 30(b)(6) - Revised
Jane Doe, et al. v. Schuylkill County Courthouse, et al.

Page 269

1  A.    I am not.
2  Q.    What happens if a deadline is not met?
3  A.    That I don't know.
4  Q.    I know we touched on electronic devices
5  earlier and I apologize if I am repeating myself.
6  If I am, I am sure your attorney will object.
7      Does the county have any policies or
8  procedures, whether memorialized in writing or
9  not, regarding the issuance of electronic devices
10 to its employees or -- employees or elected
11 officials?
12     MS. JONES:  Object to the form.
13     But if you can answer, you may.
14     THE WITNESS:  For a device, it
15 would be up to the department head whether they
16 need that device.  For instance, I think we
17 mentioned earlier, the children and youth clerk,
18 the caseworkers have them so they can enter data
19 in the field.  Senior services has them.  Adult
20 probation has them.  So it's up to the department
21 what their needs are.
22 Q.    Okay.
23     So let me unpack that a little bit.
24     Is there any written policy regarding

Page 270

1  how electronic devices are issued to its employees
2  or elected officials?
3  A.    No.
4  Q.    Okay.
5      So there is procedures in place, common
6  procedures, but nothing in writing?
7  A.    Correct.
8  Q.    Okay.
9      And it's your testimony that each
10 department head is -- is tasked with or
11 responsible for issuing county electronic device
12 to its employees?
13 A.    Yes.  They decide who should be using
14 them.
15 Q.    So when you say -- I just want to make
16 sure that I'm clear.  When you say a department
17 head, for instance, in the assessment office, it
18 would be the chief assessor still right now, I
19 believe it's Mr. --
20 A.    Hatter.
21 Q.    -- Hatter, correct?  Correct?
22 A.    Correct.
23 Q.    Sorry.  We just need a verbal on the
24 record.

Page 271

1      So it's a -- field appraiser is in the
2  assessment office, correct?
3  A.    Correct.
4  Q.    If a field appraiser needed -- wanted a
5  county cell phone, it would be up to Mr. Hatter to
6  determine if that person should get a county cell
7  phone?
8  A.    Yes.
9  Q.    Where would Mr. Hatter go then?  Like,
10 would he just go to MIS or who -- who has the
11 county devices, electronic devices, was it MIS?
12 A.    The -- those that are on -- on a -- on a
13 data plan, that would come through me.
14 Q.    Okay.
15     So let's -- I want to kind of back up a
16 little bit and unpack that.
17     So if it's something that's not on a
18 data plan and Mr. Hatter says my employee, a field
19 assessor, needs this device not on a data plan, he
20 can go where to get that device?
21 A.    He would go to MIS and then MIS would
22 order them if they're just regular -- regular
23 iPads without a data plan.
24 Q.    Okay.

Page 272

1      And he doesn't have to have approval
2  from anyone at the county, other than himself, to
3  get that non-data plan device?
4  A.    We would look to make sure that's in his
5  budget.  So if it's not in his budget, he would
6  have to go to the finance department and request
7  that he can get something off -- on that
8  particular line item.  He may have to do a budget
9  adjustment.  Mr. Buber, who is our -- my finance
10 director, would then contact me and see if I
11 approve that.
12 Q.    When you say we will look at his budget,
13 who is we?
14 A.    I'm sorry.  The finance director, Mr.
15 Buber, and myself.
16 Q.    Okay.
17     So what if he had the money in his
18 budget, does that still have to be reviewed by you
19 and Mr. -- you, Mr. Bender, and Mr. Buber?
20 A.    No, because that's passively approved
21 when -- when the commissioners approve the budget.
22 So...
23 Q.    Go ahead.  Sorry.
24 A.    So if he has in his budget for 2023, I'm

Page 273

1 going to need five new iPads in my office, I put
2 them in my budget.  When Paul and I review the
3 budget request at the end of the year, we say,
4 well, you know, he just got five iPads last year,
5 we would strike that or we would call him and say,
6 why do you need five more.  And then if they get
7 included in the budget, he has the budgetary
8 authority then to purchase those.
9 Q.     So if he's planned for in his budget for
10 the year, if it's something planned, he can just
11 go to MIS and get the device?
12 A.     That is correct.
13 Q.     It's not a data plan.  If he hasn't
14 planned for it in his budget and something changes
15 over the course of a year, which can happen, he
16 then comes to you, Mr. Bender, and Mr. Buber and
17 says, I need some wiggle room in my budget to
18 order this device and you review it and either
19 approve or decline it?
20 A.     Correct.
21 Q.     Okay.
22        So that's -- go ahead.
23 A.     Just to be clear, MIS doesn't have them
24 sitting in their office down there.

Page 274

1 Q.     Fair.
2        They have to order it?
3 A.     Yeah.  So he would put a purchase order
4 through, but that purchase order has to be
5 approved by -- and MIS may go out and get a quote
6 for him.
7 Q.     Okay.
8 A.     So he knows what to put in that purchase
9 order.
10 Q.     Okay.
11 A.     I don't --
12 Q.     Yeah.  No.  No.  It's -- and I
13 appreciate the clarification because that's what
14 we're trying to find out here today, how the
15 county operates.
16        So that was for non-data devices, data
17 plan devices.  For data plan devices that request
18 for those devices come to you, Mr. Bender?
19 A.     That is correct.
20 Q.     Okay.
21        And -- and you and only you have to
22 review and approve it or do you have to get input
23 or do you have to involve Mr. Buber in that?
24 A.     It would have to be in their budget to

Page 275

1 do that.
2 Q.     Okay.
3        So if it's in their budget, you, and
4 only you, Mr. Bender, can approve it.  If it's not
5 in their budget, it, again, requires the
6 involvement of Mr. Buber?
7 A.     Correct.
8 Q.     Okay.
9        And is there something at the county
10 called surplus?
11 A.     From?
12 Q.     For electronic devices, like if they're
13 returned to surplus?  Is that...
14 A.     From time to time when -- when we were
15 there, they get surplused.  Say, a computer, the
16 hard drive will be taken out by MIS, the computer
17 box itself and the monitor will be placed
18 downstairs.  There's a company that come in and
19 recycle them.
20 Q.     Okay.
21        So, for instance, what happens if
22 elected official changes who is elected to
23 position, right?  Because they only serve a term,
24 so sometimes they change, correct?

Page 276

1 A.     Correct.
2 Q.     What if someone, an elected official,
3 has been an issued an electronic device from the
4 county and it's still in good and working order
5 and they either don't run the next term or someone
6 unseats them and someone new comes into their
7 elected position, what happens to the no longer
8 elected officials good working order condition
9 electronic devices?
10 A.     We would offer that to the elected
11 official that comes in, if he wants that.  We
12 would -- you know, you have to try to get the --
13 with an iPad, as you well know, if they don't
14 provide you with that Apple ID, you're dead in the
15 water.  Than does happen.  That does happen and
16 then they're useless.
17 Q.     Okay.
18 A.     But let's say he puts his Apple ID in
19 and we erase -- erase everything.  Then it's like
20 a brand new iPad and this elected official could
21 use it.  If he doesn't want it, then it goes to
22 MIS and it can be re-purposed.
23 Q.     So barring the not having the Apple ID,
24 which I understand not having that and it being

Case 3:21-cv-00477-MCC   Document 280-1   Filed 09/20/23   Page 162 of 342
CONFIDENTIAL
Deposition of Gary Bender 30(b)(6) - Revised                    Jane Doe, et al. v. Schuylkill County Courthouse, et al.

Page 277

1  use -- a useless paper, barring that or aside from
2  that, if -- when the elected official is no longer
3  a seated elected official, who do they return
4  their device to?
5  A.      I would say to MIS.  Anybody in the
6  commissioner's office will return them to me,
7  since I am in the commissioner's office.  But an
8  elected official could just turn them into MIS.
9  Q.      Okay.
10          And is that sometimes referred to
11 returning a device to surplus?
12 A.      Yes and no.  It's -- it's -- when you
13 say surplus, I'm interpreting surplus to mean it's
14 no good anymore, we're going to surplus it.
15 Q.      Okay.
16 A.      And it's going to be disposed of.
17 Q.      Okay.
18 A.      So the better word, it would be
19 re-purposed.
20 Q.      Okay.
21          But when a device is re-purposed,
22 meaning changing hands between employees or
23 elected officials, the county, I think as I
24 understand your testimony, clears the data or the

Page 278

1  hard drive or the information on it so it's a
2  blank, new device, new in the sense it has no
3  data?
4  A.      A new old device, yes.
5  Q.      Yeah.  Okay.  Yes.
6          So this -- again, this is not a policy
7  in writing, this is just the procedures of the
8  county, correct?
9  A.      Correct.
10 Q.      So are employees -- does the county have
11 any procedure about the transfer of devices
12 between employees -- employee to employee,
13 employee to elected official?
14          MS. JONES:  I will object to the
15 form.  I am not sure I understand the question, so
16 I am a little hesitant to let him answer.
17          MS. SMITH:  I can clarify it.
18 BY MS. SMITH:
19 Q.      Do you need me to clarify it or do you
20 understand?
21 A.      No, I think I know what you mean.
22 Q.      Okay.
23 A.      We -- we have asset reports.  Each
24 department has what devices they have.  So if I'm

Page 279

1  in my office and I am not using mine and you're in
2  a different office, I say, okay, Ms. Smith, I am
3  going to give you this device.  I will then, on
4  the next report, delete that and it was a transfer
5  to whatever your department is.  And you on your
6  report, would have added to or transferred into.
7  Q.      Okay.
8  A.      So we track where that -- where that
9  device goes.
10 Q.      Who is in -- like who is possession and
11 using it, correct?
12 A.      Yes.
13 Q.      Right.
14          So that -- that report is -- those
15 notations are made so the county knows who is
16 supposed to be in possession and responsible for
17 that county-issued electronic device?
18 A.      That is correct.
19 Q.      Okay.
20          And those notations on those reports
21 include a serial number or something regarding the
22 device?
23 A.      They do.  And the original value of the
24 model.

Page 280

1  Q.      Okay.
2          When that situation happens, when a
3  department to department -- when a transfer of a
4  device occurs in that matter, does it go to MIS
5  for the data to be wiped, similar to the elected
6  official scenario we were speaking of?
7  A.      It should, yes.
8  Q.      Okay.
9          So MIS should also have some
10 documentation as to that transfer?
11 A.      Yes.
12 Q.      Okay.
13 A.      Well, they have -- because they get
14 copies of those reports.
15 Q.      Okay.
16          So they have the -- the report that each
17 of those departments who transfer the devices do?
18 A.      Yeah.  And most times what will happen,
19 say if it's my device and you're going to get it,
20 I would enter my Apple ID, I would erase it, and
21 give you my iPad, and then you've got a clean
22 iPad.
23 Q.      Well -- so in that scenario, MIS wasn't
24 involved.  So does it go to MIS or does --

Deposition of Gary Bender 30(b)(6) - Revised                    Jane Doe, et al. v. Schuylkill County Courthouse, et al.

Page 281

1  A.    It doesn't have to.
2  Q.    Okay.
3         So the county procedure, it doesn't have
4  to go to MIS?
5  A.    Right.  So if you have a department, if
6  I am going to transfer to you, then we already
7  know -- if I don't have a use for it, then I take
8  it to MIS and say another departments wants it,
9  you have one available, we can re-purpose that
10 machine.
11 Q.    Does the county have any policy or
12 procedure, written or not written, about returning
13 devices to surplus, by your definition of surplus,
14 so no longer going to be used, that are subject to
15 a litigation hold?
16 A.    Well, in that case, they -- they need to
17 go to MIS.
18 Q.    And then is MIS to wipe them clean and
19 return them to surplus or is MIS -- what -- what
20 are they supposed to do with the county --
21 A.    If they are in a litigation hold, they
22 are probably in a -- an area down there that's --
23 that's secure.
24 Q.    Okay.

Page 282

1         Are all iPads that the county has issued
2  to Defendant Halcovage in MIS's possession?  I'm
3  sorry.  Strike that.
4         Are all electronic -- county-issued
5  electronic devices that have been issued to
6  Defendant Halcovage since May of 2020, in the
7  county's possession?
8         MS. JONES:  I object to the form.
9  Like, today?
10        MS. SMITH:  Uh-hum.
11        MS. JONES:  Does MIS have them
12 today, is that your question?
13        MS. SMITH:  Uh-hum.  Yes.
14        THE WITNESS:  I think they're
15 accounted for, yes.
16 BY MS. SMITH:
17 Q.    Okay.
18        When you say accounted for, whose
19 possession are they in?
20 A.    The one iPads Commissioner Halcovage
21 still has.  There's an iPad that's in MIS.  And
22 the Surface is taken back to MIS.
23 Q.    Okay.
24        So MIS has possession of two and

Page 283

1  Defendant Halcovage has possession of one,
2  correct?
3  A.    Yes.
4  Q.    Okay.
5         The one that he's in possession of, has
6  MIS -- I am sorry if you answered this.
7         Has MIS ever preserved, cloned, copied
8  the contents of that?
9  A.    I'm almost certain.  Yeah, Stanley comes
10 out to look and to download photos and things like
11 that.  Those were all taken off his...
12 Q.    Off the one he's -- the iPad he's --
13 A.    Yes.
14 Q.    -- currently in possession of?  Photos?
15 I'm sorry.  What else?
16 A.    Photos are about the only thing.
17 Basically an iPad is used for, as you know, it's a
18 great e-mail device.  It's not a device that you
19 use to store documents.  So it's not a big
20 document depository.  But it's used for photos,
21 media, and -- and e-mails.  And the e-mails don't
22 really have to come off of after because they're
23 in a central place.
24 Q.    We discussed that earlier.

Page 284

1         What about audio recordings?
2         MS. JONES:  What about them?
3  BY MS. SMITH:
4  Q.    Well, you were saying things can be
5  taken off the iPad and it's mostly used for photos
6  and e-mails can be obtained from another location.
7  Were -- did MIS take any audio recordings or --
8  shouldn't say take.  Did they clone, copy,
9  preserve any audio recordings that are on
10 Defendant Halcovage's iPad that he's in possession
11 of?
12 A.    I think they downloaded every -- I am
13 pretty sure they -- I know you don't like think or
14 pretty sure, but that was in the decree.  So
15 whatever is in decree, Mr. Nester really did a
16 good job in making sure all that stuff was
17 secured.
18 Q.    When you say decree, are you referring
19 to the recent consent to the county --
20 A.    No.  No.  The one that you submitted,
21 like preserving all documents.
22 Q.    Okay.
23        You're calling that a decree.  Okay.
24 A.    I'm sorry.  Yeah.  It's -- it's --

Case 3:21-cv-00477-MCC   Document 280-1   CONFIDENTIAL   Filed 09/20/23   Page 164 of 342
Deposition of Gary Bender 30(b)(6) - Revised
Jane Doe, et al. v. Schuylkill County Courthouse, et al.

Page 285

1  Q.     And when was that done?
2         MS. JONES:  Object to the form.
3         THE WITNESS:  That continues to be
4  done.
5  BY MS. SMITH:
6  Q.     What continues to be done?
7  A.     In other words, they will come up
8  sometimes, like if George were to get a new
9  computer, they would download everything on that
10 computer, the hard drive, and that gets secured
11 so -- or if he gets a new iPad, they would
12 download stuff from the old iPad.
13 Q.     But I am talking about the iPad that
14 Defendant Halcovage is currently in possession of.
15 A.     Okay.
16 Q.     When was the data from that preserved or
17 cloned?
18 A.     That I don't know.
19 Q.     So you don't know -- do you know that
20 that happened?
21 A.     I do not.
22 Q.     Okay.
23 A.     I mean, I have seen MIS in his office
24 with the iPad.

Page 286

1  Q.     Have you spoken with anyone who has
2  confirmed that they preserved, cloned, copied the
3  contents of that?
4  A.     I have not.
5  Q.     So we were -- you were talking about the
6  decree, the letter about the preservation that you
7  received from my office.
8         After receiving that, what actions did
9  the county -- other than I think you testified to
10 you instructing MIS about these electronic --
11 electronic devices we went over earlier on in the
12 deposition.
13        Is there any other actions that the
14 county took thereafter to preserve data and
15 electronically-stored information related to the
16 plaintiffs claims and/or the defendants defenses?
17        MS. JONES:  I object to the form.
18 It's been asked and answered already.
19        But you can answer.
20        MS. SMITH:  I am asking any other
21 actions.
22        MS. JONES:  You can answer it.
23        THE WITNESS:  Yes.  I certainly
24 went to every defendant and told them that -- and

Page 287

1  showed them a copy of the letter and they have
2  to -- and here's what they have to do.
3  BY MS. SMITH:
4  Q.     Okay.
5         Other than the defendants?
6  A.     And Commissioners -- Commissioner
7  Hetherington, well, he didn't have an iPad.  But
8  Commissioner Hess, I told him, and everybody else
9  that was connected with the defendants, this is
10 something we have to do.
11 Q.     Okay.
12        Did that include the sheriff's
13 department in it, anyone from the sheriff's
14 department?
15 A.     I don't believe so, no.
16 Q.     When Ms. Kutzler came on board through
17 the Hubric Resources agreement, was she informed
18 of the county's requirement to preserve data and
19 electronically-stored information?
20 A.     Yes.
21 Q.     When Ms. Zula came on board, was she
22 informed of the same?
23 A.     Yes.
24 Q.     And who informed them of that?

Page 288

1  A.     I did.
2  Q.     When Mr. Alu was working or contracting
3  with the county, was he informed of that?
4  A.     Yes.
5  Q.     Was Mr. Hatter informed of the county's
6  requirement?
7  A.     Yes.
8  Q.     Was Ms. Zimmerman?
9  A.     Yes.  She's aware of the policy or of
10 the -- of the order.
11 Q.     Okay.
12        Was Ms. Dash?
13 A.     She's aware of it as well, yes.
14 Q.     Okay.
15        And who informed these people of that?
16 A.     I did.
17 Q.     All of them?
18 A.     Yes.
19 Q.     Okay.
20        And when you say I in this sense, you
21 mean Mr. Bender?
22 A.     Mr. Bender did, yes.
23 Q.     I just wanted to make sure the record is
24 clear.  It gets confusing.

Page 289

1  When you informed them of this, this
2  requirement of the county's, what did you inform
3  them specifically that they were required --
4  A.      That there's a litigation hold on all
5  documents and all e-mails.  They shouldn't be
6  deleting any documents or deleting any e-mails.
7  And that MIS would be coming up to make copies
8  with a machine.  The -- the computers of Jane Doe
9  3 and Jane Doe 4 are down in -- in MIS, so they
10 are not being used.
11 Q.      Was the -- were these instructions, any
12 of these instructions to the people we just went
13 over, in writing at all or were they all verbal?
14 A.      They were all verbal.  The writing part
15 came from your letter.
16 Q.      Okay.
17         So other than providing my letter, my
18 firm's letter?
19 A.      I didn't write a letter, no.
20 Q.      What's that?
21 A.      I didn't write a letter, no.
22 Q.      Okay.
23         So other than you providing what was on
24 my firm's letterhead, there was no other

Page 290

1  independent documentation, whether e-mail, written
2  document from you?
3  A.      No.
4  Q.      Okay.
5          Does the county have any documents
6  related to communications regarding the
7  preservation or attempted preservation of any
8  surveillance footage from the courthouse since May
9  of 2020?
10         MS. JONES:  Object to the form.
11         You can answer it if you can.
12         THE WITNESS:  Is that a yes?
13         MS. JONES:  Yes.
14         THE WITNESS:  The one that was --
15 was preserved was the -- the hill incident.
16 BY MS. SMITH:
17 Q.      Right.
18         My question is more so or is, is there
19 any documents, so like e-mails, letters, text
20 messages, anything like that that the county has
21 that show its efforts to preserve, whether
22 successful efforts or unsuccessful efforts, but
23 their attempts to preserve surveillance footage?
24         MS. JONES:  I am just going to

Page 291

1  object to the form and renew my objections to the
2  extent that it's a duplicative request from
3  existing discovery.
4          You may answer if you can.
5          THE WITNESS:  I'm not aware of any
6  written documents.
7  BY MS. SMITH:
8  Q.      There was testimony about, and I don't
9  recall who, but there was testimony about
10 communications with the Johnson Controls.
11         Do you know what Johnson Controls is?
12 A.      Johnson Controls installed the security
13 system at the courthouse.
14 Q.      Okay.
15         Was there ever any communication with
16 Johnson Controls about preservation of
17 surveillance footage from the courthouse related
18 to the plaintiffs' claims?
19 A.      Yes.  There was a -- a phone call by me
20 and by Sheriff Groody as to how long things can be
21 stored.
22 Q.      Any communications with Johnson Controls
23 in writing, by e-mail, by letter?
24 A.      There would be e-mails to that effect,

Page 292

1  yes.
2  Q.      From whom to whom?
3  A.      Probably to Sheriff Groody or Brian
4  Tobin, probably, and probably from me.
5  Q.      To Johnson Controls?
6  A.      Yes.
7  Q.      Okay.
8          So you think there's e-mails from you,
9  Mr. Bender, to Johnson Controls and possibly from
10 Sheriff Groody and/or --
11 A.      I do.
12 Q.      And/or Deputy Tobin to Johnson Controls?
13 A.      I do.
14 Q.      About surveillance footage from the
15 courthouse?
16 A.      The extent of what we can, how long they
17 record.
18 Q.      Okay.
19         Not actually requesting specific
20 preservations of dates or times, just inquiring --
21 A.      Yes.
22 Q.      -- how long footage is retained?
23 A.      Yes.
24 Q.      Okay.

Page 293

1  Q.    And how long is footage retained?
2  A.    The length of time they can be stored?
3  Q.    Uh-huh.
4  A.    Two months.
5  Q.    There's been testimony in this case
6  about video surveillance from the courthouse being
7  viewed.  I know we talked today about one where
8  there was nothing allegedly useful on it and it
9  was not preserved.  But there was testimony about
10 Jane Doe 1's office being entered into by an
11 unknown woman.  Was any video surveillance
12 preserved from that incident?
13       MS. JONES:  Object to the form of
14 the question.  I'm not sure how that specific
15 incident fits within the list and it's consistent
16 with my other objections.
17       If you're able, you may answer.
18       MS. SMITH:  Just for the record, 29
19 is actions taken by SC to ensure preserve of data
20 and electronically-stored information related to
21 the plaintiffs' claims.
22 BY MS. SMITH:
23 Q.    But I believe your attorney told you
24 that you can answer.

Page 294

1        So was there any effort or was that
2  video footage preserved?
3  A.    That I don't know.  I would have -- I
4  did know there was video that people looked at.
5  So if somebody downloaded it, it is probably on a
6  flip drive somewhere.
7  Q.    Who looked at the video footage?
8  A.    Brian Tobin.
9  Q.    Anyone else?
10 A.    I think I did up in his office as well.
11 Q.    Okay.
12       And you, Mr. Bender, and Mr. -- and
13 Deputy Tobin were both aware of the county's
14 requirement to preserve data including video
15 surveillance, correct?
16 A.    Correct.
17 Q.    When -- and I should be clear, you were
18 aware of it when that video surveillance was
19 viewed, correct?
20 A.    Yes.
21 Q.    Was -- and you believe it was preserved?
22 A.    No, because we found out what was -- it
23 wasn't anybody trying to enter her office.
24 Q.    Okay.

Page 295

1        So you made a determination that it
2  wasn't useful, you, Mr. Bender, made a
3  determination that it wasn't useful, so you didn't
4  preserve it?
5  A.    I think it was Sheriff Groody.
6  Q.    Did you ask the plaintiffs if they
7  agreed if they wanted -- that they -- let me
8  strike that.
9        Did the plaintiffs view it?
10 A.    That I don't know.
11 Q.    There was testimony in this case that
12 Defendant Halcovage was walking through the
13 courthouse unescorted and encountered the
14 plaintiffs, Jane Doe 3, I believe, and Jane Doe 4.
15 Do you -- do you -- are you aware of that?
16 A.    That's factually not correct.  He was
17 being escorted.
18 Q.    Go ahead.
19 A.    No, that's what I know.
20 Q.    How do you know that?
21 A.    Because the woman that escorted him told
22 me.
23 Q.    Did you take a statement from her?
24 A.    No.

Page 296

1  Q.    Was there video surveillance reviewed?
2  A.    No.
3  Q.    If there was testimony that a county
4  employer reviewed that video -- or either Ms. Zula
5  or Ms. Kutzler reviewed that or Deputy Tobin
6  reviewed that, would that be incorrect?
7  A.    I don't have knowledge of that.
8  Q.    Other than the hill incident, have
9  any -- has any video surveillance been preserved
10 by the county since May of 2020, related to the
11 plaintiffs' claims?
12       MS. JONES:  Object to the form of
13 the question.
14       You can answer if you can.
15       THE WITNESS:  I don't know.
16 BY MS. SMITH:
17 Q.    Mr. -- I'm sorry.  Mr. Bender.  Okay.
18       So now I want to talk about grading
19 scales for employees.  So as I understand it, the
20 county has a -- a range and a step designation for
21 purposes of salary determination; am I accurate?
22 A.    For exempt employees, yes.
23 Q.    Okay.
24       For exempt employees, right.

Deposition of Gary Bender 30(b)(6) - Revised                    Jane Doe, et al. v. Schuylkill County Courthouse, et al.

Page 297

1  And so how is an exempt employees's pay
2  range decided?  Meaning, because there's a range
3  and a step, not their range of how they're paid,
4  like the range on that -- that scale, how is that
5  decided?
6      MS. JONES:  I am objecting to the
7  form.  I don't understand your question.
8      Can you repeat it so I can understand
9  it.
10     MS. SMITH:  Sure.
11 BY MS. SMITH:
12 Q.    So I -- as I understand it, Mr. Bender,
13 there's -- each employee who is exempt is assigned
14 a range, which is one column on a scale, and a
15 step, which is another access.  And then they are
16 followed up to the box where they overlap and that
17 determines their salary; am I correct?
18 A.    Correct.
19 Q.    Okay.
20     MS. SMITH:  Does that?
21     MS. JONES:  It helps.
22     MS. SMITH:  Okay.
23 BY MS. SMITH:
24 Q.    So there's two accesses, one is range,

Page 298

1  one is step.  I'm trying to figure out how the
2  employee who is subjected to that, accesses are
3  determined.  So how their range number is
4  determined and how their step number is
5  determined.
6      So I want to start with range.  Is there
7  a formula?  Is there a written policy?  Are there
8  criteria?  Is it discretionary?
9  A.    It is to a degree discretionary.  When
10 someone comes in like that, the HR director would
11 look at the particular job, would examine other
12 jobs in the courthouse that are somewhat similar,
13 and then look at the skill level of the person
14 coming in, does she have a little more experience
15 with -- in another company or somewhere else in
16 the department.  So that might put her at a higher
17 level.
18     And sometimes you will look and you say,
19 well, we think she should be making X number of
20 dollars a year.  That puts her at Range 8, Step 2.
21 Q.    Okay.
22 A.    So sometimes it can be arbitrary, but
23 it's based on the HR determination of what their
24 skill level is and what level they're coming in.

Page 299

1  Q.    Okay.  So let me make sure I understand
2  you correctly.
3      There's no written policy delineating
4  certain criteria that the county has for ranges of
5  exempt employees?
6      MS. JONES:  Object to the form.  I
7  don't believe that's what he said, so I'm
8  objecting to the form.
9      You can answer that question.
10     MS. SMITH:  So let me rephrase it.
11 BY MS. SMITH:
12 Q.    Is there a written policy --
13 A.    No.
14 Q.    -- regarding assignment of a range to an
15 employee --
16     MS. JONES:  Wait for the question,
17 please.
18 BY MS. SMITH:
19 Q.    Is there a written policy of the county
20 for assignment of a range to an exempt employee?
21     MS. JONES:  I object to the form.
22     You can answer.
23     THE WITNESS:  No.
24 BY MS. SMITH:

Page 300

1  Q.    Is there any written document that the
2  county has regarding how ranges are assigned for
3  an exempt employee?
4  A.    Not that I'm aware of.
5  Q.    Okay.
6      So while there may be a procedure in
7  place for certain considerations, such as
8  experience in the field, some other things that
9  you mentioned, those things are procedurally how
10 the county acts, along with some discretion --
11 discretion by the HR office to assign a range to
12 an exempt employee?
13 A.    Correct.
14 Q.    Okay.
15     How about the step, where does the
16 step -- how does that getting assigned?
17 A.    It would -- that would be decided on
18 what the final salary -- what the final hourly
19 rate would be.  If you're on Range 8, Step 2 and
20 you say, well, this person we think should be on a
21 Step 4, that's a little bit higher of a salary.
22 Q.    So for instance, if an employee -- and a
23 new applicant is applying for a position, just
24 because they are a new applicant, they are not

Page 301

1  automatically assigned Step 1; am I understanding
2  you correctly?
3  A.      Sometimes they should be, yeah.  They --
4  they are when -- they should start at Step 1.  But
5  if they come in with some different skill levels,
6  we may move them up.
7  Q.      So -- so not all new employees must be
8  assigned to Step 1; am I understanding you
9  correctly?
10  A.      They are not necessarily all assigned
11  Step 1.
12  Q.      Okay.
13      And their step -- the step level that
14  they are assigned is somewhat discretionary; as
15  I'm understanding you?
16  A.      Yes.
17  Q.      And is also impacted, somewhat as I'm
18  understanding you, by their experience in the
19  field?
20  A.      Yes.
21  Q.      Okay.
22      And is there any written policy that the
23  county has regarding the assignment of step
24  numbers or levels to a --

Page 302

1  A.      A written policy, no.
2  Q.      Okay.
3      So pretty much step and range, sound
4  like their conducted and the assignment is
5  conducted in the same manner, discretionary with
6  some factors such as experience?
7  A.      Yes.  Looking at other people -- other
8  skill levels in the county, what they're getting
9  paid, what their step and range are.  And so if
10  someone is coming in with a lower skill level you
11  don't -- and they're a Step 6, you don't want to
12  bring this person in at a Step 8 if they don't
13  have the same skill level.
14  Q.      Okay.
15  A.      It's a bit arbitrary, I understand what
16  you're saying.
17  Q.      But this access, the two lines with the
18  numbers that you match up and find a range or a
19  salary, is it a range -- when you match up the
20  access, the box which they overlap at, is it a
21  range like 20,000 to 30,000 or is it a -- a finite
22  number like 30,000?
23  A.      No.  It can be anywhere in between.  It
24  could be $30,267.  And you can get -- if it's

Page 303

1  hourly, it can be $26.7365.
2  Q.      But is there one number in that box of
3  the two meeting access?
4  A.      Yes.
5  Q.      Not like this -- somewhere in between
6  this and then county then has discretion to --
7  A.      I don't think so, no.
8  Q.      Okay.
9  A.      That's why you go up to the next step.
10  Q.      Right.
11      Because that's why there's a finite
12  number and if you think they should make more, you
13  move them up a step or up a range, right?
14  A.      Right.
15  Q.      Or down if that would be appropriate,
16  correct?
17  A.      Yes.
18  Q.      Okay.
19      But this step and range access document,
20  it's a physical document that the county
21  maintains, correct?
22  A.      Yes.
23  Q.      Is it updated, like, yearly or --
24  because, like for instance, if it was created in

Page 304

1  1980 and the range and step still have a set
2  number of a salary, that's going to be a lot
3  different of what the cost of living is versus
4  now.  Is it updated?
5  A.      One would hope, but I don't -- well,
6  know it has to be because I know what some of the
7  numbers are on there, but I don't know when it
8  gets updated.
9  Q.      Who updates it?
10  A.      In HR.
11  Q.      Okay.
12      But there is a physical document?
13  A.      Yes.
14      MS. SMITH:  Okay.  Just take a
15  couple-minute break.  I think I'm pretty much
16  done, so...
17      VIDEOGRAPHER:  The time is now
18  3:14 p.m. and we're going off the record.
19          - - -
20      (Whereupon brief recess was held off the
21  record.)
22          - - -
23      VIDEOGRAPHER:  The time is now
24  3:24 p.m. and we are back on the record.

Deposition of Gary Bender 30(b)(6) - Revised

Jane Doe, et al. v. Schuylkill County Courthouse, et al.

Page 305

BY MS. SMITH:
Q.     All right.
       Mr. Bender, so during the break you did
inform me that you did want to supplement one of
your answers, so you can go ahead and do that.
A.     Yeah.  I just wanted -- on that -- on
that range, there's a step zero that everybody is
supposed to start at.  But, again, it all depends
on the skill level they're coming in at and if our
row officer comes down, she's always beating us
about coming up maybe to a Step 1.
Q.     Okay.
       So Step 0 and then do you know what the
highest step range is?
A.     I do not.
Q.     Okay.
       What about range, where does range
start, is it a 0 or a 1?
A.     No.  Range 1.
Q.     Okay.
A.     And that would go up to, maybe, Range
15.
Q.     Okay.
       So there's no Range 0?

Page 306

A.     No.
Q.     Okay.  All right.
       MS. SMITH:  With that, I don't have
any further questions for you, Mr. Bender.  I
think, just for the record, off -- during the
break, Mr. Lees and Mr. Geiger and Ms. Wynkoop
said that guys don't have any questions for your
client, correct?
       MR. LEES:  That is correct, no
questions.
       MR. GEIGER:  Yes, no questions.
       MS. WYNKOOP:  No questions.
       MS. SMITH:  So then that leaves
Marie.
       MS. JONES:  I just have a couple of
follow and I am sure my voice will get me very far
today.
       But, Paul, it wasn't a rave, it was
a really fabulous wedding.
                   - - -
              Examination
                   - - -
BY MS. JONES:
Q.     Can -- can you identify, Mr. Bender, the

Page 307

timing when Boots Hetherington became a county
commissioner?
A.     Probably around March the 2nd.  I would
say it was about two weeks, around the 14th -- it
was two weeks before the 20th, because he was only
in office two weeks.
Q.     Of May?
A.     Of may of 2020.
Q.     So to the extent Mr. Hetherington had a
cell phone that was county-issued at the time of
notice of any claim, would it be your best belief
that it was about a two-week period that he had
that phone, if -- if at all?
A.     I'm not sure when he acquired it.  He
didn't have a county cell phone at first.  He got
one later -- a little bit later on.
Q.     Okay.
       Ms. Smith asked you about a -- what I
will call an organizational chart for the county.
And you indicated that there may be on that is
slightly different, either today or then what that
looked like.  Can you identify what those
difference are?
A.     Well, just the one on the tax claim.

Page 308

But if you looked at her -- the job descriptions
that get printed out for the tax claim they report
to the county administrator.
Q.     And what was the issue on how it looked
on the organizational chart?
A.     Well, when Bob Fritzman was here, Bob
Fritzman was a -- one of the assistant county
solicitors.  And at one point, he was head of tax
claim and so he, I guess, moved tax claim under
solicitor.  But in his role as the tax claim
director, he would have reported it to the county
administrator, but not in as role as the
solicitor.
Q.     Okay.  Thank you.
A.     Me, being Gary Bender, the
administrator, but not the county.
Q.     While there may not, from your earlier
testimony, have been a written policy on the
process for conducting investigations on
complaints of discrimination or harassment, was
there a practice at the county about what an
employee should do to make a complaint, and then
if so, what would happen with that complaint?
A.     Yes.  And if there are complaints of any

Page 309

1  nature, that should go to the immediate
2  supervisor.  If not resolved, then it goes to the
3  department head and it goes to HR.  There's --
4  there's certainly a chain of command as complaints
5  move up the system.  Say, if you say -- if you
6  have an employee complaining about a supervisor,
7  then he would go to the director, I could see, and
8  then it goes to the HR director.
9  Q.      And by extension, if there was a
10 complaint about the director or a higher-level
11 person, who would expect employees to go to with a
12 complaint?
13 A.      They would either go to the HR director
14 or they would come to me.
15 Q.      As county administrator?
16 A.      Yes, as county administrator.
17 Q.      I think you clarified this, but with
18 respect to the May 2020 report of Jane Doe 1, was
19 there, in fact, an investigation conducted?
20 A.      Yes.
21 Q.      Okay.
22         And is that the matter that was
23 described involving Ms. Twigg and you and a number
24 of interviews?

Page 310

1  A.      Yes.
2  Q.      Okay.  Thank you.
3         You were asked questions about whether
4  Jane Doe 3 or Jane Doe 4 made any complaints about
5  discrimination, harassment, or retaliation.  Are
6  you aware that Jane Doe 4 and Jane Doe 3
7  repeatedly issued e-mails to people about
8  operational issues that they may have referred to
9  as there -- as being based in their belief, on a
10 retaliatory basis?
11 A.      Just about every e-mail had that on it.
12 Q.      And are you aware of whether responses
13 to those e-mails were issued?
14         MS. SMITH:  I am going to object to
15 the form.
16 BY MS. JONES:
17 Q.      You can answer.
18 A.      Initially no.  And then I likely to
19 start that the county is not and will not
20 retaliate.
21 Q.      But for every e-mail that came and
22 included a claim at the bottom or in the content
23 that they didn't like how something was going at
24 the county and, therefore, they made a connection

Page 311

1  to retaliation to them, there were not specific
2  investigations with interviews on every instance,
3  were there?
4  A.      No.
5  Q.      I think you did identify some responses
6  that you were aware of.  I think one I recall was
7  you said Mr. Marshall even responded?
8  A.      Yes.
9  Q.      But were you aware, for example, that
10 Ms. Zula also responded to some e-mails to them?
11 A.      Yes.
12 Q.      You described what you called kind of
13 educational counseling or educational warnings.
14 What would you characterize in terms of an
15 educational warning or a verbal warning for the
16 matter in which Jane Doe 3 and Jane Doe 4 sought
17 to meet with the commissioners about their
18 concerns in dealing with the county administrator?
19 A.      What was my response to the
20 commissioners?
21 Q.      What -- what was your understanding of
22 the county's response to that?
23 A.      That they should not have a meeting
24 without the county administrator present.

Page 312

1  Q.      And did you understand a meeting
2  occurred?
3  A.      Yes.
4  Q.      Would you characterize that in the
5  category of an educational session like you've
6  described earlier, as opposed to a formal verbal
7  warning of any kind?
8  A.      To me.
9  Q.      No.  To Jane Doe 3 and Jane Doe 4?
10 A.      Yes.
11 Q.      And -- and were these educational
12 discussions or sessions in part because the
13 supervisor might communicate with an employee on a
14 more regular basis than, say, HR or someone at a
15 higher level, and so that the employee could be
16 made aware when something happens as to whether
17 the supervisor thought it was good or bad?
18 A.      Sure.  Everybody makes mistake and
19 everybody needs to have maybe some guidance
20 sometimes.  So if a department head doesn't
21 necessarily want to let it -- let it rise to the
22 level of an official warning, they just -- some
23 people are sheepish and they don't want to give
24 warnings.  And that can sometimes lead to a

Page 313

1  confusion down the road if the behavior continues.
2  Q.      You were asked questions by Ms. Smith
3  about criticisms that may have been issued about
4  various people.  And I think in one instance or
5  two you identified criticisms that members of the
6  public may have made at public meetings.
7  A.      Yes.
8  Q.      Are members of the public at virtually
9  all the commissioners' meetings?
10 A.      They have been for quite sometime.
11 Q.      And in that capacity, do members of the
12 public make criticisms about a lot of the public
13 officials?
14 A.      Yes.
15 Q.      Are those kinds of criticisms identified
16 as a complaint that the county believes the HR
17 department has to investigate?
18 A.      No.  Most of them are derogatory and the
19 commissioners don't have the backbone to -- I
20 chastise my commissioners all the time.  They
21 allow people that work under me to be denigrated
22 at these meetings.  That's not fair.  It's not
23 right.
24 Q.      So -- so the criticisms that you

Page 314

1  describe or the lack of criticisms that you
2  described to Ms. Smith were based on the county
3  management or the county leadership criticizing or
4  not criticizing when you answered those questions,
5  versus the public, for example?
6  A.      Could you repeat that again?  I didn't
7  hear you.
8  Q.      Yeah.  It was kind of a confusing
9  question.
10         So you -- you answered that in many
11 instances, there were no criticizing -- criticisms
12 of some of these people, either the plaintiffs or
13 the defendants.  And -- and those answers were
14 based on the county criticizing, as opposed to
15 some member of the public.
16 A.      Okay.  Yeah.
17 Q.      Okay.
18         You were -- you were asked some
19 questions about LexisNexis.  What is your
20 understanding of who was trained on LexisNexis?
21 A.      My understanding that certainly Jane Doe
22 3 and Jane Doe 4 took the training.  When you get
23 on the LexisNexis -- and I did have access to it
24 after all this happened, because I want to see

Page 315

1  what takes place when you log on to that.  The
2  first thing you're required to do is take the
3  training.  So on the training it tells you to set
4  up users.  You set up administrator and then you
5  set up users.  And the administrator then dictates
6  what the user may or may not access.
7  Q.      So is it your understanding that any of
8  the departments that you described that had
9  availability to use LexisNexis in the county,
10 would have had to have that training by
11 LexisNexis?
12 A.      Yes.  And if you go onto the site, there
13 are opportunities for further training are there
14 on that site.
15 Q.      So when Ms. Smith was asking questions
16 about LexisNexis training to Jane Doe 3 or Jane
17 Doe 4, based at least in part on your own personal
18 use of that process, the training that you said
19 you went through, is it your understanding that
20 each of those two would have had to have received
21 the training because they were able to log on and
22 access the system?
23 A.      I would think so, yes.
24 Q.      Okay.

Page 316

1         And did the training describe the
2  appropriate uses or the -- the nature of the uses
3  of the system?
4  A.      Not -- no, not to that degree.  What --
5  what they -- I took that to mean, you -- you set
6  up an administrator and a user and what the
7  administrator sets up the parameter of what the
8  user can see, that means that everybody shouldn't
9  see everything.
10 Q.      Okay.
11         So by having restrictions on who can see
12 what in its system, it's -- is it your
13 understanding that that was how any particular
14 department would limb who can access --
15 A.      Yes.
16 Q.      -- this system?
17 A.      Yes.
18 Q.      Okay.
19         So I can understand the tax collector
20 area of inquiry that we heard earlier.  Is a tax
21 collector a municipal, not a county position?
22 A.      That is correct.
23 Q.      And so in the case of Heather
24 Matascavage, she worked at the county as an

Case 3:21-cv-00477-MCC   Document 280-1   CONFIDENTIAL   Filed 09/20/23   Page 172 of 342

Deposition of Gary Bender 30(b)(6) - Revised
Jane Doe, et al. v. Schuylkill County Courthouse, et al.

Page 317

1  employee, but she held a separate position as an
2  elected official in some municipality in which she
3  lived?
4  A.      And the school district.
5  Q.      I'm sorry.  The school district in which
6  she lived?
7  A.      Yes.
8  Q.      Okay.
9         And the county -- do you -- do you
10 believe the county can prevent somebody from
11 running for office as a tax collector in their
12 municipality?
13 A.      I do not think so, no.
14 Q.      So they're not being paid as a county
15 employee when they receive funds as a tax
16 collector, are they?
17 A.      It is my opinion that they are not,
18 because they also receive money from the
19 municipality and from the school district, many
20 schools, not all the districts.
21 Q.      I think you said that the office they
22 have is either their own paid office or their
23 home, but it's not a county office?
24 A.      Correct.  In Porter Township, we allow

Page 318

1  our tax collector to use the township building on
2  a Saturday if she wants to collect taxes.  She's
3  used that from time -- not all time.  And then she
4  has an office at her own home.
5  Q.      Okay.
6         With respect to the video evidence, to
7  the extent the county was made aware by any of the
8  plaintiffs of an incident, is it your
9  understanding that the extent to which there might
10 be video of that area was reviewed with the
11 assistance of the sheriff's department?
12 A.      Yes.
13 Q.      And if that was reviewed and there was
14 nothing on the video to reflect information
15 connected to the complaint, is it your
16 understanding that that's why video evidence may
17 or may not have been retained?
18 A.      Correct.
19 Q.      And, finally, so I understand the access
20 issue a little better, it's like a chart, if I'm
21 not misunderstanding this, where it kind of has an
22 L and the initial hire is where the first decision
23 has to be made on where someone is placed.  But
24 once they're placed, do they then follow a range

Page 319

1  and step to change their income or salary?
2  A.      That -- that's an interesting point,
3  because it is not used that way.  When you start
4  at the county, let's say you start as a clerk and
5  you remain a clerk, you basically get a 3 percent
6  raise each year.  But there's -- the only other
7  avenue for you, a lot of times, is to become a
8  clerk -- you have to start as a Clerk 2, to try
9  and get to a Clerk 3 position.
10        It's very difficult in the county to
11 make more money outside of assuming a
12 responsibility.  So if you're a Clerk 1, you will
13 tend to get those raises.
14        You, you know, I've always viewed that,
15 that range and step has -- so if you had
16 progressive incentive raises from time to time,
17 that you could go up a step or two, that's not
18 what happens.
19 Q.      Okay.
20 A.      Most of the time.  And sometimes they
21 do, they will come in, oh, this person has taken
22 on more responsibilities, I like to see them get a
23 raise.  That has to be reviewed and then what HR
24 does, we look at -- HR would look at what they're

Page 320

1  doing versus watching the job.  Is it -- is it --
2  is it more work or is it higher-level work?
3  There's a difference.  And just for more work,
4  that maybe doesn't cut it sometimes.  But
5  higher-level work certainly does.
6  Q.      And how does that play in with a
7  collective bargaining agreement that might exist?
8  A.      Yes.
9  Q.      How does it play in?  Like, how -- does
10 the -- does the union agreement dictate how that
11 chart is utilized in any way?
12 A.      Their are start rates in the union that
13 are separate from that grid, that range of step.
14 Q.      Okay.
15 A.      These are also for non -- for non -- or
16 for exempt employees.
17 Q.      Okay.
18 A.      For non-union non-exempt employees.
19 Q.      Okay.
20 A.      And so union has the start rate.  You
21 come in that office and on the ASFCME union,
22 here's the starting rate.  And so you go up from
23 there.  And sometimes they say after six months,
24 you get an increase.  After a year you get an

Page 321

increase.  Maybe up to three years, I think in the
clerk of courts office after three years you get
an increase.
       But outside of that, it's very difficult
to -- to get raise races.  It's -- it's a problem
we face at that county all the time.
Q.      I think you testified there was no
formal evaluation process at the county whereby
every employee got an evaluation on a certain
increment of time?
A.      That is true, we do not.
Q.      Is there a less formal method whereby
department heads may evaluate their employees for
things like you've just described, trying to
determine if because they're a good employee, they
can get paid more?
A.      Yes.  So what you do is -- like I have
one going on with -- with my chief clerk.  My
chief clerk when she came on board had a certain
level she had to do.  She's taken a lot more
responsibilities, and so I'd like to get her a
higher salary.  That's a very difficult thing to
do, even for me, at the county because
commissioners are hard on that.  But she has put

Page 322

in a lot of extra time, not only just time, but
different skill levels of work.
Q.      So do department heads have some ability
to advocate for their employees --
A.      Yes.
Q.      -- within the system?  Okay.
A.      And we just went through a top down at
senior services or children and youth, I'm sorry,
that they were -- we were losing a lot of people
down at children and youth, and not just us,
statewide.  So we instituted an intensive pay or a
retention bonus for them to try to keep employees.
It's a struggle, not just for counties, for
everybody right now.  And so my goal and in our
last contract, is to start raising the base rates.
I think sometimes -- if I am getting wordy, just
stop me.
       You're -- you're -- the people that do
union contracts are generally long-term people and
they have less concern about the base rate then
they do about something that's going to effect
them.  So we're trying.
       MS. JONES:  That's all the
questions I have.

Page 323

       THE WITNESS:  That's a long answer
to it, it only required a short answer.  Sorry.
       MS. JONES:  That's all right.
Thank you very much.
       MS. SMITH:  I don't have any
further questions based on that.
       VIDEOGRAPHER:  The time is now
3:44 p.m. and we're going off the record.
                    - - -
       (Whereupon, deposition concluded at 3:44
p.m.)
                    - - -

```
 1

 2              C E R T I F I C A T I O N

 3

 4          I, COLEEN TRIFUN, RPR and Notary Public,

 5   do hereby certify that the foregoing is a true and

 6   accurate transcript of the stenographic notes

 7   taken by me in the aforementioned matter.

 8

 9                      -  -  -

10

11

12

13

14

15

16

17

18

19

20

21   DATE:              _____

22                      COLEEN TRIFUN, RPR

23

24
```

# EXHIBIT

# P5

Case 3:21-cv-00477-MCC   Document 280-1   Filed 09/20/23   Page 176 of 342
CONFIDENTIAL

Deposition of Heidi Zula Vol. I - Revised                    Jane Doe, et al. v. Schuylkill County Courthouse, et al.

1    ----------------------------

2    JANE DOE, et al.,         : UNITED STATES DISTRICT COURT
            Plaintiff         : MIDDLE DISTRICT OF PENNSYLVANIA
3        v.                   :
     SCHUYLKILL COUNTY        : CIVIL DOCKET NO:
4    COURTHOUSE, et al.,      : 3:21-CV-00477
            Defendants        :
5    ----------------------------

6

7                          ***

8                       VOLUME I

9                          ***

10           TRANSCRIPT MARKED CONFIDENTIAL

11                         ***

12

13

14

15

16

17

18           VIDEOTAPE DEPOSITION OF HEIDI ZULA taken

19    at the U.S. Attorney's Office, Middle District of

20    Pennsylvania, 228 Walnut Street, Harrisburg,

21    Pennsylvania 17108 on Wednesday, October 19, 2022 at

22    9:16 a.m. before Coleen Trifun, RPR and Notary

23    Public.

24

```
 1    A P P E A R A N C E S :

 2              DEREK SMITH LAW GROUP, PLLC
                BY:  CATHERINE SMITH, ESQUIRE
 3              1835 Market Street
                Suite 2950
 4              Philadelphia, Pennsylvania 19103
                catherine@dereksmith.com
 5              Counsel for the Plaintiff

 6

 7              DEPARTMENT OF JUSTICE
                CIVIL RIGHTS DIVISION
 8              BY:  AMBER FOX, ESQUIRE
                     ALLAN TOWNSEND, ESQUIRE
 9              150 M St. NE Room 9.932
                Washington, District of Columbia 20002
10              amber.fox@usdoj.gov
                allan.townsend@usdoj.gov
11              Counsel for the Plaintiffs

12              NEWMAN WILLIAM, P.C.
                BY:  GERARD J. GEIGER, ESQUIRE
13              P.O. BOX   511
                712 Monroe Street
14              Stroudsburg, Pennsylvania 18360
                ggeiger@newmanwilliams.com
15              Counsel for George Halcovage

16              MCNERNEY PAGE VANDERLIN & HALL
                BY:  NICOLE IPPOLITO, ESQUIRE
17              433 Market Street
                Williamsport, Pennsylvania 17701
18              nippolito@mpvhlaw.com
                Counsel for Glenn Roth
19

20              JONES PASSODELIS
                MARIA N. PIPAK, ESQUIRE
21              Gulf Tower, Suite 3410
                707 Grant Street
22              Pittsburgh, Pennsylvania 15219
                mpipak@jonespassodelis.com
23              Counsel for Gary Bender and Heidi Zula

24
```

```
 1              DICKIE MCCAMEY
                BY:  PAUL G. LEES, ESQUIRE
 2              190 Brodhead Road, Suite 310
                Bethlehem, Pennsylvania 18017
 3              plees@dmclaw.com
                Counsel for additional parties
 4

 5              ALSO PRESENT:
                ALYSSA DEBISE, PARALEGAL
 6              JANE DOE 1
                JANE DOE 3
 7              JANE DOE 4(via Zoom)
                GEORGE HALCOVAGE
 8

 9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24
```

Jane Doe, et al. v. Schuylkill County Courthouse, et al.

```
 1                         - - -

 2                        INDEX

 3                         - - -

 4  WITNESS              INTERROGATION BY      PAGE

 5  HEIDI ZULA

 6              By Ms. Smith          10

 7                    - - -

 8                    EXHIBITS

                      - - -

10  EXHIBIT NUMBER       DESCRIPTION           PAGE

11  Exhibit-86           Zula 24               15

12  Exhibit-87           Zula 13               23

13  Exhibit-88           Zula 35-36            25

14  Exhibit-89           Zula 23               27

15  Exhibit-90           Zula 37-38            29

16  Exhibit-91           Zula 25               32

17  Exhibit-92           Zula 40-42            38

18  Exhibit-93           Zula 48               42

19  Exhibit-94           Zula 49-52            42

20  Exhibit-95           Zula 817-820          95

21  Exhibit-96           Zula 46               63

22  Exhibit-97           SC1254-1259           65

23  Exhibit-98           Zula 237-243          66

24  Exhibit-99           Zula 473-474          72
```

| 1 | Exhibit-100 | Zula 448, 441-442 | 75 |
| 2 | Exhibit-101 | Zula 55-138 | 78 |
| 3 | Exhibit-102 | Zula 139-236 | 79 |
| 4 | Exhibit-103 | Zula 244-250 | 86 |
| 5 | Exhibit-104 | Zula 47 | 86 |
| 6 | Exhibit-105 | Zula 251-257 | 100 |
| 7 | Exhibit-106 | Zula 258-260 | 111 |
| 8 | Exhibit-107 | Zula 855-857 | 116 |
| 9 | Exhibit-108 | Zula 2759-2760 | 135 |
| 10 | Exhibit-109 | Zula 707-708 | 139 |
| 11 | Exhibit-110 | Zula 709-710 | 141 |
| 12 | Exhibit-111 | Zula 318-319 | 150 |
| 13 | Exhibit-112 | Zula 575 | 151 |
| 14 | Exhibit-113 | Zula 630-632 | 156 |
| 15 | Exhibit-114 | Doe 575 | 167 |
| 16 | Exhibit-115 | Doe 583 | 183 |
| 17 | Exhibit-116 | Doe 596-600 | 199 |
| 18 | Exhibit-117 | Zula 399-402 | 208 |
| 19 | Exhibit-118 | Zula 413-415 | 217 |
| 20 | Exhibit-119 | Zula 451-453 | 261 |
| 21 | Exhibit-120 | Zula 390 | 272 |
| 22 | Exhibit-121 | SC633 | 293 |
| 23 | Exhibit-122 | Zula 268-270 | 295 |
| 24 | Exhibit-123 | Zula 420 | 314 |

Deposition of Heidi Zula Vol. I - Revised                    Jane Doe, et al. v. Schuylkill County Courthouse, et al.

```
 1   Exhibit-124           Zula  426                 316

 2   Exhibit-125           Zula  2481                318

 3   Exhibit-126           Zula  550-551             322

 4   Exhibit-127           Zula  274                 330

 5   Exhibit-128           Zula  271-273             339

 6   Exhibit-129           Zula  800-801             341

 7   Exhibit-130           Zula  470-472 & 454-455   347

 8   Exhibit-131           Zula  475-477             352

 9   Exhibit-132           Zula  460-463             354

10   Exhibit-133           Zula  288-291             356

11   Exhibit-134           Zula  555-556             362

12   Exhibit-135           Zula  571-573             363

13   Exhibit-136           Zula  886, 292-293        366

14   Exhibit-137           Zula  673-674             382

15   Exhibit-138           Zula  685-687             390

16   Exhibit-139           Zula  701                 395

17                             - - -

18        PREVIOUSLY MARKED EXHIBITS MENTIONED

19   Exhibit-43   Page 45 Line 13

20                             - - -

21

22

23

24
```

```
 1              DIRECTION TO WITNESS NOT TO ANSWER

 2    PAGE  LINE           PAGE  LINE           PAGE  LINE

 3                          (None)

 4

 5

 6

 7

 8

 9

10

11          REQUEST FOR PRODUCTION OF DOCUMENTS

12    PAGE  LINE           PAGE  LINE           PAGE  LINE

13                          (None)

14

15

16

17

18

19

20

21

22

23

24
```

Page 8

THE COURT REPORTER: Would you like a copy of the transcript?
MS. IPPOLITO: Yes.
MS. PIPAK: Yes, for the county defendants.
MR. LEES: I'm not going to order.
MR. GEIGER: I'll have one in ASCII format.
MS. FOX: Yes.
VIDEOGRAPHER: We are now on the record. My name is Alecia Katz of Everest Court Reporting. The date today is October 19, 2022, and the time is approximately 9:16 a.m. This deposition is located at 228 Walnut Street in Harrisburg, Pennsylvania. The caption in the case is Jane Doe et al versus Schuylkill County Courthouse et al.
The name of the witness is Heidi Zula. At this time, will the attorneys identify themselves, the parties they represent, and after which our court reporter, Coleen Trifun, will swear in the witness and we can proceed.
MS. SMITH: On behalf of the plaintiffs, Jane Doe through Jane Doe Four,

Page 9

Catherine Smith from the Derek Smith Law Group. And present in the room are plaintiffs Jane Doe 3 and Plaintiff Jane Doe 4. Appearing by Zoom is plaintiff Jane Doe 1. Also present on behalf of the Derrick Smith Law Group is my paralegal Alyssa DeBise.
MS. FOX: Amber Fox, plaintiff intervener, United States Department of Justice.
MS. TOWNSEND: Allen Townsend, also with the Department of Justice.
MS. PIPAK: Maria Pipak for the witness Heidi Zula, Gary Bender, and the county.
MR. LEES: Paul Lees for defendant Kutzler.
MR. GEIGER: Gerry Geiger here for Defendant Halcovage and also Mr. Halcovage is present with me.
MS. IPPOLITO: Nicole Ippolito for Defendant Glen Roth.
MS. SMITH: And, Counsel, there's a stipulation that this transcript in its entirety will be marked confidential.
(All parties agreed.)
MS. SMITH: Objections as to form

Page 10

and privilege only, correct?
(All parties agreed.)
- - -
HEIDI ZULA, having been first duly sworn, was examined and testified as follows:
- - -
Examination
- - -
BY MS. SMITH:
Q. Good morning, Ms. Zula. As you know, my name is Catherine Smith and I represent the plaintiffs in this matter. I am going to go through some instructions here at the beginning and ask you some questions.
Have you spoken with your attorney regarding the procedures for the taking of your deposition?
MS. PIPAK: Objection.
BY MS. SMITH:
Q. I am just asking if -- not the contents of the conversation, just have you spoken with your attorney?
A. Yes.
Q. Okay.

Page 11

And you understand that you've now been placed under oath and that you have an obligation to testify truthfully?
A. Yes.
Q. You understand that even though we are in an informal conference room, that your testimony has the same force and effect as if you're testifying in a court of law before a judge or a jury?
A. Yes.
Q. You understand that the court reporter to your left is going to be taking everything that is said down during the deposition and your testimony will later be transcribed?
A. Yes.
Q. Do you understand that the court reporter cannot transcribe inaudible responses such as the nod of a head, and therefore, you must make audible responses?
A. Yes.
Q. Do you understand that you should wait for the complete question to be asked before responding and I similarly will wait for you to completely answer the question before I ask my

Page 12

1 next?
2 A.    Yes.
3 Q.    If you do not understand a question or
4 if you think it was ambiguous, please let me know
5 and I will rephrase the question.
6       Do you understand?
7 A.    Yes.
8 Q.    Do you agree that if you do not
9 otherwise indicate, I will assume that you've
10 understood my question?
11 A.    Yes.
12 Q.    If at any time you realize that an
13 answer given earlier in your deposition was
14 inaccurate or incomplete, please let me know that
15 you wish to correct or supplement your answer.
16      Do you understand?
17 A.    Yes.
18 Q.    If you do not know or remember the
19 information necessary to answer a question, please
20 let me know.  I may ask you to generalize if you
21 can give me a year or a month, but if you don't
22 know a specific date, please don't guess.
23      Do you understand that?
24 A.    Yes.

Page 13

1 Q.    Have you recently consumed any
2 medication, alcohol, or any other substance which
3 impairs your ability to understand and testify
4 truthfully here today?
5 A.    No.
6 Q.    Is there any reason that you can think
7 of that renders you inable -- unable to testify
8 truthfully here today?
9 A.    No.
10 Q.   If at any time you need a break, please
11 let me know.  The only requirement I have or
12 request I have is that you answer any question
13 posed to you and then we'll take a break.
14      Do you understand?
15 A.   Yes.
16 Q.   Have you understood the instructions?
17 A.   Yes.
18 Q.   Do you have any questions?
19 A.   No.
20 Q.   All right.
21      Ms. Zula, periodically throughout the
22 deposition I may be referring to individuals by
23 names, Jane Doe 1 or Jane Doe 1.
24      Do you understand that I'm referring to

Page 14

1 Plaintiff Jane Doe One if I refer to Jane Doe 1?
2 A.    Yes.
3 Q.    Okay.
4       And Jane Doe 2 or Jane Doe 2, that I am
5 referring to Jane Doe 2 or Jane Doe Three -- or
6 I'm sorry -- Jane Doe Four -- sorry -- Jane Doe
7 Two.  I can't get this right.  Jane Doe Two?
8 A.    Yes.
9 Q.    Okay.
10      And Jane Doe 4 or Jane Doe 4, that I am
11 referring to Ms. Jane Doe 4, Jane Doe Four?
12 A.    Yes.
13 Q.    And Ms. Jane Doe 3 or Jane Doe 3, that I
14 am referring to Jane Doe Three?
15 A.    Yes.
16 Q.    Okay.
17      And when I refer to the county, I am
18 referring to defendant Schuylkill County.
19      Do you understand that?
20 A.    Yes.
21 Q.    Ms. Zula, your employment with
22 Schuylkill County began on January 11, 2021,
23 correct?
24 A.    Yes.

Page 15

1 Q.    And periodically throughout the
2 deposition I will be marking exhibits.  I will
3 provide you with a copy, as well as others with
4 copies.
5                  - - -
6       (       marked as Exhibit   for
7 identification.)
8                  - - -
9       MS. SMITH:  This is going to be
10 Zula-24, Exhibit 30 -- I mean 86, but Zula-24.
11 BY MS. SMITH:
12 Q.    When I reference the Zula or others,
13 it's this number down the bottom.  It's just what
14 we've marked it for identification purposes.
15      So I'm going to ask if you recognize
16 this document?
17 A.    Yes.
18 Q.    This is what's called a personal action
19 request form for the county?
20 A.    Yes, that's correct.
21 Q.    And it's commonly referred to as a PAR?
22 A.    Yes.
23 Q.    Who can complete a PAR?
24 A.    The PARs can be completed typically by

Page 16

1 the supervisor.
2 Q.        Anyone else?
3 A.        They can be completed by HR or anyone in
4 the chain of command typically.
5 Q.        And this is a PAR completed by Defendant
6 Gary Bender, who at the time it was completed, was
7 county administrator, correct?
8 A.        Yes.
9 Q.        And it was created November on 13, 2020,
10 correct?
11 A.        Yes.
12 Q.        Had you applied to the county for
13 employment before November 13, 2020?
14 A.        Yes.
15 Q.        And there's a section for -- it's called
16 recommend -- recommended status.
17          Do you see that about the middle?
18 A.        Yes.
19 Q.        And there's full time, part time,
20 temporary, or per diem?
21 A.        Yes.
22 Q.        Who makes that selection?
23 A.        Whoever is completing the form.
24 Q.        And then there's exempt or non-exempt.

Page 17

1 Do you see that?
2 A.        Yes.
3 Q.        Who completes that portion?
4 A.        Whoever is completing the form.
5 Q.        Down the bottom there's a section for
6 human resources recommendation.
7          Do you see that?
8 A.        Yes.
9 Q.        And on this part, it circled approved
10 and it looks like there's initials DWK or
11 something along those lines.
12          Do you see that?
13 A.        Yes.
14 Q.        Do you know whose initials those are?
15 A.        They're Doreen Kutzler's.
16 Q.        She was the interim human resources
17 director at the time, correct?
18 A.        Yes.
19 Q.        Do you know what county policy or
20 procedure is if the disapproved selection is
21 circled in that portion of the PAR?
22 A.        No.
23          MS. PIPAK:  Objection.
24          You're good.

Page 18

1 BY MS. SMITH:
2 Q.        On the top right of this form there's
3 two stamps, one is approved by the commissioners
4 and one is approved by the salary board.
5          Do you see those?
6 A.        Yes.
7 Q.        This is when your actual appointment to
8 the position was voted on by the commissioners,
9 correct?
10 A.        Yes.
11 Q.        Prior to -- and that would be
12 December 9, 2020, which is when their stamp is,
13 correct?
14 A.        Yes.
15 Q.        Were you placed on an agenda for a vote
16 prior to December 9, 2020?
17 A.        Yes.
18 Q.        Do you remember when that was?
19 A.        It was the end of November of 2020.  I
20 don't remember the exact date.
21 Q.        Okay.
22          But do you remember -- so there's -- as
23 they are listed on the county's website, there's
24 commissioners meetings and executive sessions,

Page 19

1 correct?
2 A.        No.
3 Q.        There's commissioner's meetings and work
4 sessions; is that what it is?
5 A.        Yes.
6 Q.        Okay.
7          Do you remember if the one that you were
8 initially placed on the agenda for was a work
9 session or a commissioner's meeting?
10 A.        I don't recall.
11 Q.        Do you remember if it was October 24,
12 2020?
13 A.        I don't recall the exact date.
14 Q.        Defendant Halcovage was a commission on
15 December 9, 2020, correct?
16 A.        Yes.
17 Q.        Do you know if he voted on your
18 appointment to the position of human resources
19 director?
20 A.        I'm not exactly certain of the vote.
21 Q.        There's -- we talked about the stamp of
22 the salary board.  It's the same date and the vote
23 on your salary was done on December 9, 2020,
24 correct?

Case 3:21-cv-00477-MCC    Document 280-1    Filed 09/20/23    Page 186 of 342
CONFIDENTIAL
Deposition of Heidi Zula Vol. I - Revised                    Jane Doe, et al. v. Schuylkill County Courthouse, et al.

Page 20

1    A.      Yes.
2    Q.      Do you know who determined your salary
3    of 79,000?
4    A.      No.
5    Q.      Did you have any discussions with anyone
6    prior to your offer of employment regarding your
7    salary?
8    A.      Yes.
9    Q.      With whom?
10   A.      Doreen Kutzler is the person that I
11   dealt with.
12   Q.      Any other discussions with anyone else
13   regarding your salary amount?
14   A.      No.
15   Q.      Was that the initial salary that was
16   offered to you or did you negotiate?
17   A.      I negotiated.
18   Q.      Okay.
19           What was the initial salary that was
20   offered to you?
21   A.      I don't exactly recall.  I don't -- I
22   don't exactly recall what it was.
23   Q.      And those negotiations were with Doreen
24   Kutzler?

Page 21

1    A.      Yes.
2    Q.      Okay.
3            How did you learn of the position of the
4    human resources director with the county?
5    A.      It was an Indeed posting.
6    Q.      Did anyone alert you to it or did you
7    just come across it on your own?
8    A.      No, I came across it on my own.
9    Q.      Did you interview with anyone prior to
10   being offered the position?
11   A.      Yes.
12   Q.      Who?
13   A.      It was Doreen Kutzler was in my
14   interview, Gary Bender, I believe Lisa Mahall, and
15   Elaine Gilbert were a part of the interview panel.
16   Q.      And it was one interview with all of
17   them?
18   A.      I did one initial interview and then I
19   had to come back with a second-round interview,
20   and that included the commissioners.
21   Q.      So the first interview round was the
22   individuals you just named?
23   A.      Yes.
24   Q.      The second one was just with the

Page 22

1    commissioners?
2    A.      No.  Doreen Kutzler was there, Gary
3    Bender, and the commissioners.
4    Q.      All three commissioners?
5    A.      Mr. Hess, I believe, was on the phone.
6    Q.      Okay.
7    A.      He was present for the interview, but he
8    was not present physically.
9    Q.      Okay.
10   A.      He was on the phone.
11   Q.      Understood.
12           When, if you recall, did this -- let's
13   start with the first one.  When did that take
14   place?
15   A.      That one happened at the end of
16   September in 2020.
17   Q.      And then when did the second interview
18   with the commissioners present take place?
19   A.      I don't exactly recall.  I believe it
20   was in the end of October of 2020.
21   Q.      Did they both occur at the same
22   location?
23   A.      Yes.
24   Q.      At the courthouse?

Page 23

1    A.      Yes.
2    Q.      Prior to interviewing, did you know
3    Defendant Halcovage?
4    A.      No.
5    Q.      Prior to interviewing, did you know Gary
6    Bender?
7    A.      No.  Well, let me just say, I knew of
8    George Halcovage.  And did not know of Gary
9    Bender.
10   Q.      Okay.
11   A.      And I did not know them personally.
12   Q.      Did you fill out an employment
13   application?
14   A.      Yes.
15   Q.      Do you recall when?
16   A.      I don't recall the exact date, no.  I
17   believe it was in September, sometime, of 2020.
18   Q.      Do you believe a copy of your
19   application is maintained in your personnel file?
20   A.      Yes.
21           MS. SMITH:  Going to mark this
22   Exhibit 87.
23                    - - -
24           (Zula-13 marked as Exhibit-87 for

Page 24

1  identification.)
2              - - -
3        MS. SMITH:  Zula 13.
4  BY MS. SMITH:
5  Q.     Ms. Zula, do you recognize this
6  document?
7  A.     No.
8  Q.     You didn't complete this?
9  A.     No.
10 Q.     Have you ever seen this type of new hire
11 checklist?
12 A.     No.
13 Q.     This indicates your employment
14 application was received 9/17/2020.
15       Does that sound about right?
16 A.     Yes.
17 Q.     So you've never utilized this type of
18 form with new hires with the county?
19 A.     I did not hire handle the new hire
20 paperwork when I worked at the county, so, no, I
21 did not utilize this form.
22 Q.     So in your entire employment with the
23 county, you never handled any new hire paperwork?
24 A.     No.  I'm not saying that, but I'm saying

Page 25

1  that I did not use this checklist.
2  Q.     Okay.
3        So you have done new hire paperwork with
4  new hires, but in doing so, you have not utilized
5  this form?
6        MS. PIPAK:  Objection.
7        You can answer.
8        THE WITNESS:  I was not -- I did
9  not do it.  I have assisted doing new hire
10 paperwork when one of the staff members in HR was
11 not available, but that was not part of my regular
12 course of business and I did not compile personnel
13 files or do the checklists at all.  I didn't even
14 know this existed.
15 BY MS. SMITH:
16 Q.     Okay.
17       Who, during your employment, was tasked
18 with compiling new hire documents?
19 A.     Ann Craft, the administrative assistant
20 in the HR office.
21       MS. SMITH:  Look at Zula 35 and 36.
22              - - -
23       (Zula 35-36 marked as Exhibit-88 for
24 identification.)

Page 26

1              - - -
2  BY MS. SMITH:
3  Q.     Do you recognize this document?
4  A.     Yes.
5  Q.     Did you receive this letter from then
6  interim director Heidi Zula -- I'm sorry -- Doreen
7  Kutzler on or about November 12, 2020?
8  A.     Yes.
9  Q.     And this letter indicates that you would
10 report to Defendant Gary Bender, county
11 administrator?
12 A.     Yes.
13 Q.     And that was your -- it was your
14 understanding that Mr. Bender was your direct
15 supervisor, correct?
16 A.     Yes.
17 Q.     This letter indicates that the position
18 offered to you was a full-time exempt position,
19 correct?
20 A.     Yes.
21 Q.     If we look back and -- I'm sorry I
22 forgot.  Okay, I'll ask you to refer back to
23 exhibits.  Your PAR indicates a full-time
24 non-exempt position.

Page 27

1        Do you know why that is?
2  A.     I do not know.
3  Q.     Were you exempt or non-exempt?
4  A.     I was -- I was exempt.
5  Q.     Okay.
6        If we look -- sorry -- back to the one
7  in front of you, there are -- if you look to the
8  top of Page 2, which is Zula 36, the first portion
9  of that states:  This job offer is contingent upon
10 the following and it has passing a drug test and
11 physical exam, satisfactory reference checks, and
12 execution of an employment non-complete
13 confidentiality agreement.
14       Do you see that?
15 A.     Yes.
16 Q.     Did you understand that these were the
17 only three things upon which your job offer was
18 contingent?
19 A.     Yes.
20 Q.     You can put that one aside.
21       MS. SMITH:  Zula 23.  Exhibit 89.
22              - - -
23       (Zula 23 marked as Exhibit-89 for
24 identification.)

Page 28

- - -
BY MS. SMITH:
Q.      Do you recognize this document?
A.      Yes.
Q.      Did you receive this letter from interim
director Doreen Kutzler on or about December 11th?
A.      Yes.
Q.      Do you know why you received this letter
if you had received another offer letter on
November 12, 2020?
        MS. PIPAK:  Objection.
        Go ahead, you can answer.
        THE WITNESS:  This is the standard
letter that's given to every, I think, county
employee when they start when you go through your
new -- you're pre-orientation paperwork.  This
was -- Exhibit-88 was the letter that I requested
to confirm my conditions of employment upon my
acceptance of the offer.
BY MS. SMITH:
Q.      Okay.
        So 88 was something sent to you at your
request?
A.      Yes.

Page 29

Q.      Okay.
        And then 89, as I understand your
testimony and correct me if I'm wrong, was given
to you during, like, your initial orientation new
hire documents?
A.      Yes.  When you come in to go -- prior to
going to do your drug test and physical screening,
you would come into the HR office, sign off on
paperwork to include the releases and things, to
go get your drug test and physical.  And then this
document 80 -- that's marked as 89, was also
provided as well as a confirmation of salary.
Q.      Okay.
        MS. SMITH:  Zula 37 and 38, it's
going to be marked as Exhibit-90.
        - - -
        (Zula 37-38 marked as Exhibit-90 for
identification.)
        - - -
BY MS. SMITH:
Q.      Ms. Zula, do you recognize this
document?
A.      Yes.
Q.      And this is your resume that was

Page 30

submitted to the county?
A.      Yes, that's correct.
Q.      Is this different than the application
for employment that you submitted?
A.      I don't recall what my application of
employment said, but it would have been based upon
my resume.
Q.      So I guess my question is:  It was a
different form, right, it wasn't just your resume
that was given in?
A.      When I applied, I applied through --
directly through Indeed, and so I submitted my
resume through Indeed.  I don't recall if I
actually filled out the county paper application
or not.  That I don't recall.  But when I applied
for the position, it was directly through Indeed,
through the submission of my resume.
Q.      Is everything in this document true and
correct?
A.      Yes.
Q.      If we look to the position you held
right before the county, it was Middletown Area
School District; is that correct?
A.      Yes.

Page 31

Q.      And why did you leave Middletown Area
School District?
A.      To take the position at the county.
Q.      Why did you want a different position?
A.      I -- Based upon my family circumstances,
I was looking for a position closer to home.
Q.      At your time at Middletown Area School
District, were you subject in any disciplinary
action?
A.      No.
Q.      Before that you held a job at the
Pennsylvania Department of Corrections; is that
correct?
A.      Yes.
Q.      Were you subject to any disciplinary
action there?
A.      No.
Q.      Why did you leave the Department of
Corrections to go to Middletown?
A.      It was a better opportunity.
Q.      And prior to that you worked at the
Pennsylvania Board of Probation and Parole?
A.      Yes.
Q.      Any disciplinary action there?

Page 32

1  A.      No.
2  Q.      And we have before that, the
3  Pennsylvania Board of Probation and Parole in a
4  different position, correct?
5  A.      Yes.
6  Q.      Any disciplinary action in that
7  position?
8  A.      No.
9  Q.      And then finally right before that was
10 the Pennsylvania Department of Banking.
11      Any disciplinary action there?
12 A.      No.
13      MS. SMITH:  This is Zula 25, marked
14 as Exhibit-91.
15          - - -
16      (Zula-25 marked as Exhibit-91 for
17 identification.)
18          - - -
19 BY MS. SMITH:
20 Q.      Do you recognize this document?
21 A.      Yes.
22 Q.      You signed this consent to background
23 check and reference on December 11, 2020, correct?
24 A.      Yes.

Page 33

1  Q.      Is the consent to background and
2  reference check something that every new hire with
3  the county signs?
4  A.      Yes.
5  Q.      Do you know, does that include elected
6  officials?
7  A.      That I don't know.
8  Q.      Do you know what happens or what the
9  process or policy is if a background check comes
10 back with an issue, a conviction or something that
11 would cause concern?
12      MS. PIPAK:  Objection.
13      You can answer.
14      THE WITNESS:  It happened, I
15 believe, one time during my employment and I
16 discussed it with my supervisor, Gary Bender, to
17 determine if we would continue with the offer or
18 not.
19 BY MS. SMITH:
20 Q.      So let me make sure I have the timing
21 correct.
22      Well, based off this, this was signed
23 12/11/22.  So your background check was not
24 conducted until after that date, correct?

Page 34

1  A.      The background check that's completed is
2  a check of the -- it's an online check and I don't
3  know -- it's the municipal system where you go in
4  and put the name and do searches for criminal,
5  like, docket reports, things like that.  That's
6  the background investigation that's completed.
7  And to my knowledge, that was not done until after
8  I signed this form.
9  Q.      Right.
10      So you hadn't yet given them consent?
11 A.      Correct.
12 Q.      Okay.
13      But if we look back to the PAR, that was
14 voted on December 9, 2020, correct?  And you
15 can look back if you need to.  It's Exhibit --
16 A.      Yes.
17 Q.      Okay.
18      So the commissioners voted on your, I
19 guess, qualifications or they're confident in you
20 in the position without having had your background
21 check; would you agree?
22      MS. PIPAK:  Objection to form.
23      But you can answer.
24      THE WITNESS:  Yes.  My background

Page 35

1  check, I can tell you, they did check --
2  references were checked prior to my hire, prior to
3  the offer being made.
4  BY MS. SMITH:
5  Q.      So when you say hire, because there's a
6  date of PAR is completed, a date it's voted on,
7  and a date you actually start.  So when you say
8  date of hire, which of those three dates are you
9  referring to?
10 A.      The date of the offer.
11 Q.      I'm sorry.  Just remember --
12 A.      The date --
13 Q.      No.  No.  No.
14 A.      Sorry.  The date of the offer would have
15 been the November 12th.  I do know that Ms.
16 Kutzler did do a reference check with my existing
17 supervisor at the school district prior to that
18 offer letter coming to me.
19 Q.      The reason I pointed and had you
20 pause --
21 A.      Yup.  Sorry.
22 Q.      Just remember she has to take both of us
23 down.
24 A.      I apologize.

Page 36

1 Q.      You'll get it by the end of it.  Just
2 let me finish my question before you start
3 answering.
4 A.      I apologize.
5 Q.      You're okay.
6        You're going to anticipate my questions,
7 so try and remember that.
8        But -- so -- so your references may have
9 been checked prior to the offer letter, but you
10 would agree prior to the commissioners vote, your
11 background check was not done?
12 A.      That's correct.
13 Q.      Okay.
14        You were describing the location of,
15 like, the backgrounds checks of, like, the website
16 of the municipal search.
17        Do you know, is that the docket sheets for
18 the State of Pennsylvania?
19 A.      Yes.
20 Q.      Do you know if background checks outside
21 of the State of Pennsylvania are conducted?
22 A.      Not to my knowledge.
23 Q.      Then after you -- the commissioners
24 voted and your start date being January 11, 2021,

Page 37

1 you did complete new hire paperwork, correct?
2 A.      Yes.
3 Q.      Do you recall what paperwork?
4 A.      It would have been a -- like an
5 information sheet, like personal demographic
6 information, the W-4 form, the I-9 form, the sign
7 off on policies and procedures, the local services
8 tax form for the -- to determine where you live,
9 where your taxes should come out of.  I believe
10 there was retirement paperwork that was completed,
11 and new hire benefits paperwork.
12 Q.      When did you complete this paperwork?
13 A.      That I -- I don't exactly recall the
14 exact date.  It would have been -- I believe it
15 was sometime in December of 2020.
16 Q.      And do you recall where you were?
17 A.      I completed it in the HR office.
18 Q.      Do you recall with whom or who gave it
19 to you?
20 A.      And Craft met with me initially to go
21 over the initial paperwork and then I -- I met
22 with Elaine Fucci.  And actually, that would have
23 been -- now that I think about it -- that would
24 have been completed my first day of employment,

Page 38

1 January 11th, is when the actual new hire
2 paperwork was completed.
3        MS. SMITH:  Can mark as Exhibit 92,
4 it's Zula 40 through 42.
5              - - -
6        (Zula 40-42 marked as Exhibit-92 for
7 identification.)
8              - - -
9 BY MS. SMITH:
10 Q.      Do you recognize this document?
11 A.      Yes.
12 Q.      And in fact, there is some of the dates
13 to the right of your signature are 1/11/2020,
14 which was your start date, correct?
15 A.      Yes.
16 Q.      There's a couple others that are
17 1/13/20 -- I'm sorry.  I think I said 1/11/2020.
18 It's 1/11/2021, correct?
19 A.      Yes.
20 Q.      And then there are some that are
21 1/13/2021?
22 A.      Yes.
23 Q.      And you signed and dated each of -- next
24 to each of these policies and procedures at the

Page 39

1 county, correct?
2 A.      Yes.
3 Q.      And that's because you had received
4 them, read them, and understood them?
5 A.      Yes.
6 Q.      Do you know who created this form?
7 A.      No.
8 Q.      Did you ever utilize this form in your
9 position as director of human resources with the
10 county?
11 A.      Yes.
12 Q.      Is this a form that is to be used for
13 all new hires with the county?
14 A.      Yes.
15 Q.      Obviously you were coming on as director
16 of human resources, correct?
17 A.      Yes.
18 Q.      When you received and read the policies,
19 did you believe they were up to date and
20 sufficient?
21        MS. PIPAK:  Objection.
22        You can answer.
23        THE WITNESS:  No.  There were
24 certainly some policies that were outdated and

Case 3:21-cv-00477-MCC    Document 280-1    Filed 09/20/23    Page 191 of 342
CONFIDENTIAL
Deposition of Heidi Zula Vol. I - Revised
Jane Doe, et al. v. Schuylkill County Courthouse, et al.

Page 40

1 could use to be updated that was one of the tasks
2 that I was asked to look at.
3 BY MS. SMITH:
4 Q.      Okay.
5         Did -- do you remember any specifically
6 that you believed were outdated?
7 A.      I don't recall off the top of my head
8 which ones.
9 Q.      And then at some point during your
10 employment, you did revise or suggest revisions to
11 any -- to some of these policies?
12 A.      Yes.
13 Q.      Are you aware, did each of these listed
14 items apply to all county employees?
15 A.      Yes.
16 Q.      Do you know, did that apply to elected
17 officials?
18 A.      I would say no, as we're not responsible
19 for their -- we have no control over their
20 employment because they're not truly employed by
21 the county.
22 Q.      So when a new individual is elected to a
23 position, they do not receive these policies?
24 A.      I don't -- I know because we did not

Page 41

1 hire -- or put it this way, we did not have a new
2 elected official come on board when I was at the
3 county, so I am not certain what exactly they are
4 provided.
5 Q.      Okay.
6         Well, as you were director of human
7 resources, had a new individual been elected to a
8 position, would you have provided them with these
9 policies?
10         MS. PIPAK:  Objection.
11         You can answer if you --
12         THE WITNESS:  Yes, I would have.
13 BY MS. SMITH:
14 Q.      And you would have asked them to sign
15 and date this acknowledgment form?
16 A.      Yeah.  Potentially some of the policy
17 would not have applied to them.  But, yes, we
18 would have provided them with -- I would have
19 provided them with the policies if that had
20 occurred.
21 Q.      Did you receive a job description when
22 you started with the county?
23 A.      Yes.
24         MS. SMITH:  Zula 48, Exhibit-93.

Page 42

1         - - -
2         (Zula 48 marked as Exhibit-93 for
3 identification.)
4         - - -
5 BY MS. SMITH:
6 Q.      Do you recognize this document?
7 A.      Yes.
8 Q.      You signed and dated the receipt of the
9 job description for human resources director on
10 1/11/2021, correct?
11 A.      Yes.
12 Q.      And by signing, you understand that you
13 acknowledging that you understood the essential
14 job duties and responsibilities required and
15 confirmed that you were qualified to perform them?
16 A.      Yes.
17 Q.      Does every new employee receive a job
18 description when they start with the county?
19 A.      Yes, they should.
20 Q.      And are they all required to sign an
21 acknowledgment form like this one?
22 A.      Yes.
23         MS. SMITH:  Going to look at Zula
24 49 to 52, Exhibit-94.

Page 43

1         - - -
2         (Zula 49-52 marked as Exhibit-94 for
3 identification.)
4         - - -
5 BY MS. SMITH:
6 Q.      And I'm going to go through some
7 specific questions on this document.
8         My first one is just going to be
9 generally, do you recognize this document?
10 A.      Yes.
11 Q.      If we look to the last page of this
12 document it indicates a date of November 7 --
13 2017, on Zula 52.
14         Do you see that?
15 A.      Yes.
16 Q.      Is this the job classification
17 description for your position of human resources
18 director that you received and acknowledged
19 receipt of in the last document we looked at?
20 A.      Yes.  I believe so, yes.
21 Q.      Do you believe that this is a fair and
22 accurate representation of your job duties and
23 responsibility as the human resources director for
24 the county?

Page 44

1 A.    Yes.
2 Q.    Is there anything that you were required
3 to do or responsible for which is not included in
4 here?
5 A.    No.  I believe this accurately reflects
6 the responsibilities of the position.
7 Q.    And everything that's included in this
8 description is something for which you were
9 responsible for?
10 A.    Yes.
11 Q.    There's a section on the first page all
12 the way down, essential duties and
13 responsibilities.
14    Do you see that?
15 A.    Yes.
16 Q.    If you look to No. 2, it indicates that
17 one of your job duties was analyze organizational
18 structure.
19    Do you see that?
20 A.    Yes.
21 Q.    Did you ever receive an organizational
22 structure document while you worked for the
23 county?
24 A.    We did have an organizational chart,

Page 45

1 yes. that was available on the county website.
2 Q.    Okay.
3    Did you ever suggest any revisions to
4 it?
5 A.    Not specific revisions to the
6 organizational chart, no.
7 Q.    Do you believe that the organizational
8 structure of the county that existed that you saw,
9 was an accurate representation of organizational
10 structure?
11 A.    Yes.
12    MS. SMITH:  For our tech it's Zula
13 2473.  For all others, it's previously marked 43.
14    (Previously marked exhibit.)
15 BY MS. SMITH:
16 Q.    Ms. Zula, you now have in front of you
17 what was previously at a different deposition,
18 marked Exhibit-43 or Zula 2473.
19    Is this the organizational structure
20 that you were just referring to?
21 A.    Yes.  This is the organizational chart
22 that's found on the county website, yes.
23 Q.    And that's as recently as January 2021?
24 A.    Yes.

Page 46

1 Q.    Okay.
2    If we look back to -- I'm sorry -- the
3 Exhibit-94, back under essential duties and
4 responsibilities, Paragraph 4, it indicates that
5 one of your job duties was to process required
6 documents through payroll and insurance providers
7 to ensure accurate recordkeeping and proper
8 deductions.
9    Do you see that?
10 A.    Yes.
11 Q.    In layman's terms, does that mean that
12 human resources was responsible for payroll?
13    MS. PIPAK:  Objection.
14    THE WITNESS:  No.
15 BY MS. SMITH:
16 Q.    Okay.
17    What does that --
18    MS. PIPAK:  You can answer.
19    MS. SMITH:  Sorry.
20    THE WITNESS:  No.  Payroll was
21 processed from the controller's office.
22 BY MS. SMITH:
23 Q.    What does that mean to you?
24 A.    That we would not -- notify that the

Page 47

1 payroll office, the payroll processor of any
2 changes as it related to insurance coverages or
3 deductions that needed to be done for employees.
4 That was our interaction with the payroll process
5 from a benefits perspective.
6 Q.    Okay.
7    So each department within the county
8 submits time sheets for their employees, correct?
9 A.    Yes.
10 Q.    Do you get submitted to the controllers
11 office or to HR?
12 A.    No, they go directly to the controllers
13 office after they are signed off on by the
14 supervisor.
15 Q.    So HR has no oversight in the time
16 sheets of employees?
17 A.    We do -- we do not review them on a
18 regular basis, no.  There are -- if there's
19 questions by the supervisor, we get involved.  But
20 we do not review every single time sheet on every
21 single pay period.
22 Q.    So are you familiar with the Fair Labor
23 Standards Act?
24 A.    Yes.

Page 48

Q.      And you understand that it requires
employers to keep accurate records of an
employee's hours?
        MS. PIPAK:  Objection.
        You can answer if you know.
        THE WITNESS:  Yes.
BY MS. SMITH:
Q.      Okay.
        Do you -- is that for the county --
those records, are they maintained by the controls
office, the HR office, or something different?
A.      They are maintained by the controllers
office.
Q.      Does HR have access to those records if
they need them?
A.      Yes.
Q.      Are they -- the record of hours
employees worked maintained by any one other than
the controllers office?
A.      The official record, no.  The official
record is maintained by the controllers office
because that's what pay is based upon.  I don't
know if supervisors keep records of time sheets or
not.

Page 49

Q.      But there's no third-party payroll
company for --
A.      No.  We do not -- the county did not use
a third party.
Q.      We may come back to this, but you can
put 94 aside for now.
        In November of 20 -- well, go back a
little before that.
        In September of 2020, when you applied
and you believe you were first interviewed for the
position, what, if anything, did you know about
the plaintiff's claims against the county?
A.      The only thing I knew was what was
written in the newspaper.  Based upon those
articles, that's the only thing I was aware of.
And truly not much, as I don't really read the
newspaper often.  I just knew that there was
allegations made and that's it.
Q.      And that was prior to you being hired by
the county?
A.      Yes.
Q.      When you were interviewed at either the
first or second, did you ask anyone or was
anything shared with you about the plaintiff's

Page 50

claims against the county?
A.      No.
Q.      After being offered the job position,
but before your start date, did you ask or did
anyone tell you anything about the plaintiff's
claims?
A.      No.
Q.      When is the first time you learned
about -- from the county, about the plaintiff's
ongoing issues with the county?
        MS. PIPAK:  Objection.
        To the extent it doesn't involve
conversations with counsel, you can answer.
        MS. SMITH:  Well, when is not a
context of a conversation.  So I'm just asking
when.
        THE WITNESS:  When I came on board,
probably in January.  I was apprized of some of
the ongoing concerns.  I think the first day that
I was an employee of the county was the first day
that Jane Doe 1 and Jane Doe 2 came back to work
at the 410 Building.  So Ms. Kutzler informed me,
kind of, what was going on regarding that issue.

Page 51

BY MS. SMITH:
Q.      Okay.
        So you had conversations with Ms.
Kutzler about, at least, Jane Doe 1 and Jane Doe
2?
A.      Yes, as return are their return back to
work on January 11th, my first day that was...
Q.      Did she, at that point, Ms. Kutzler,
inform you of any background as to why they were
being moved to the 410 Building?
A.      Yes, she did.
Q.      Okay.
        Do you remember what she informed you
of?
A.      I don't recall the exact discussion.  I
know it involved that -- their claims against Mr.
Halcovage and that they were working from home for
an extended period of time and that they were now
being brought back to work and their office was
being moved so that there would be no interaction
between Jane Doe 2 and Ms. Kutzler and Mr.
Halcovage.
Q.      Did Ms. Kutzler at that time explain to
you how the 410 Building had been selected?

Page 52

1  A.      No.
2  Q.      Did she explain to you or discuss with
3  you whether the -- any of the plaintiffs were --
4  strike that.
5          At that point, did you know that Jane
6  Doe 3 and Jane Doe 4 had been Jane Doe 1 -- or
7  were Jane Doe 1 and Jane Doe 2's supervisors?
8  A.      Yes, I was made aware of that.
9  Q.      Did Ms. Kutzler inform you if there had
10 been any conversations held about the
11 accessibility of the 410 Building?
12 A.      No.
13 Q.      Did you ask if this was something that
14 was a collective decision?
15 A.      No, I did not.
16 Q.      Other than that conversation, can you
17 think of any others regarding the plaintiff's
18 claims early on in your employment?
19 A.      As we -- as I progressed through my
20 employment and worked with Doreen, there were a
21 number of issues that came up, that there was a
22 number of, like, allegations made against Mr.
23 Halcovage.  That as I got more involved in the
24 position, I was then made aware of some of the

Page 53

1  things that they had indicated during their
2  complaint.
3  Q.      So let's talk about that early time
4  period in your employment.
5          When you started on January 11, 2021,
6  was Ms. Kutzler still a contractor?
7  A.      Yes.
8  Q.      Was she -- because she was interim human
9  resources director.
10         Did her title change when you started?
11 A.      I don't think it changed immediately.  I
12 don't think it kind of -- I don't think there was
13 anything official to change it immediately.  I
14 mean, I was the HR director, but she was there for
15 pretty much the first fourish months of my
16 employment to do transition.  There's contract
17 negotiations going on, so we did like a transition
18 period.  And then I kind of, for lack of a better
19 term, took over the HR responsibilities and then
20 her focus shifted to training her staff.
21 Q.      And just so I'm clear, you were talking
22 about the first four months.
23         Was that -- when she transitioned --
24 when Ms. Kutzler transitioned from kind of

Page 54

1  transitioning the role to your duties to training
2  duties, was that during the four months or was the
3  four months when she transitioned to training?
4  A.      That was all inclusive.  So the
5  transition was probably six weeks maybe.
6  Q.      Okay.
7  A.      Somewhere around there and then she
8  started working on updating policy and doing
9  training for staff.
10 Q.      And then after about four months or so
11 is when she -- her contract or human resources
12 contract with the county ended?
13 A.      I don't know if the contract ended, but
14 she no longer was doing work for the county at
15 that point.
16 Q.      Let's talk about the first portion of
17 the transition period.
18         Was it your primary responsibility or
19 Ms. Kutzler's for personnel issues?
20 A.      I think we dealt with them together.  I
21 don't think we had one primary over the other.  We
22 kind of worked together during that time period.
23 She obviously had the background knowledge of
24 things that have gone on, things that were kind of

Page 55

1  still in the works.  And then I kind of stepped
2  in, we worked together on issues, and then I
3  transitioned to kind of doing those things on my
4  own.
5  Q.      So for that first four month or so
6  period until Ms. Kutzler stopped doing work with
7  the county, did you have any access to her
8  e-mails?
9  A.      Not during that time frame, no.
10 Q.      After she ended her -- or stopped doing
11 work with the county, did you then have access to
12 her e-mails?
13 A.      Yes.  I think her e-mails were forwarded
14 to me when she left her employment.
15 Q.      So e-mails then moving forward that were
16 sent to her or ones that had been sent to her in
17 the past?
18 A.      No, just moving forward.
19 Q.      So you never, during your employment
20 with the county, had any access to her past
21 received or sent e-mails?
22 A.      Not that I can recall, no.
23 Q.      Okay.
24 A.      They were forwarded to -- directly to my

Page 56

1  in box. So if she got an e-mail sent to her
2  e-mail address, instead of -- like I didn't go
3  into her in box, it just forwarded it and it hit
4  my in-box.
5  Q.      The tech division in the county --
6  A.      Yes. They -- they did that.
7  Q.      Okay.
8          Did you ever have any conversations with
9  Defendant Gary Bender about the plaintiff's claims
10 against the county?
11 A.      Yes, we did.
12 Q.      Do you recall when that was?
13 A.      I don't exactly recall when the first
14 time was, no. I know as we were dealing with
15 issues, we would discuss things that had occurred.
16 At times he would fill me in some of the kind of
17 background. But that was pretty much it. I don't
18 specifically recall when any of that occurred or
19 what -- what he said.
20 Q.      What about Defendant Glen Roth, did you
21 ever talk with him about the plaintiff's claims?
22          MS. PIPAK: Objection.
23          To the extent it calls for
24 conversations you had with counsel, I'm going to

Page 57

1  answer -- I am going to advise her not to answer.
2  BY MS. SMITH:
3  Q.      Again, not asking about the contents,
4  just did you have any conversations with him?
5  A.      There were at times, yes, when I did
6  have conversations with Glen.
7  Q.      Do you remember the first time you had a
8  conversation with him?
9  A.      It was probably pretty late in my tenure
10 at the county. Well, I shouldn't say late.
11 Probably within like mid year 2021, somewhere
12 around there.
13 Q.      So you would say probably after Ms.
14 Kutzler's employment, stopped doing work for the
15 county?
16 A.      Potentially, yes.
17 Q.      About.
18          What about Defendant Halcovage, did you
19 ever speak with him about the claims against him?
20 A.      No.
21 Q.      After you started with the county, did
22 you ever speak with the plaintiffs to get an
23 understanding of what issues they were dealing
24 with or their claims against the county?

Page 58

1  A.      I spoke with them regarding the issues
2  that occurred during my tenure of employment. I
3  did not go back and speak to them about any of the
4  prior issues that occurred, no.
5  Q.      So from what we just went through with
6  each of the defendants, it sounds like as issues
7  arose, you gathered information and dealt with it,
8  but didn't have any independent conversations
9  about the facts of the plaintiff's claims?
10 A.      Yes, I -- I didn't.
11 Q.      When you spoke with Defendant Kutzler
12 about the claims of -- the plaintiff's claims, was
13 she in support of the plaintiffs? Was she -- did
14 she feel that they were -- let me strike that.
15          Did Ms. Kutzler ever tell you how she
16 felt about the plaintiffs or their claims against
17 the county?
18 A.      No, we didn't discuss that.
19 Q.      Never made any remarks about them?
20 A.      I guess for clarification, what claims
21 are we referring to? I guess that would be my
22 question to understand if I'm answering it
23 correctly.
24 Q.      Well, so you understand that the

Page 59

1  plaintiffs are suing the county because George
2  Halcovage sexually assaulted Jane Doe 1, correct?
3  A.      Yes, I'm aware of that.
4  Q.      And that they are -- the other three are
5  suing the county because George Halcovage sexually
6  harassed them?
7  A.      Okay. So those are the claims we're
8  referring to?
9  Q.      And then that the county failed to act
10 appropriately regarding that sexual assault and
11 sexual harassment.
12          MS. PIPAK: I am just going to
13 object to the form.
14          But go ahead.
15          THE WITNESS: No. Ms. Kutzler and
16 I didn't discuss her feelings regarding the claims
17 of sexual harassment, no.
18 BY MS. SMITH:
19 Q.      Okay.
20          What about retaliation?
21          MS. PIPAK: Objection.
22          Can you rephrase?
23 BY MS. SMITH:
24 Q.      Did you and Ms. Kutzler ever discuss the

Page 60

1 plaintiff's claims of retaliation?
2 A.     Yes, we did, based upon, you know, the
3 actions that were occurring, we discussed those
4 actions, yes.
5 Q.     And did Ms. Kutzler ever make any
6 remarks to you about her feelings regarding those
7 claims?
8 A.     I can't recall.
9 Q.     What about Mr. Bender, did he ever make
10 any comments about how he felt about the
11 plaintiffs?
12 A.     About the plaintiffs?
13 Q.     Yes.
14 A.     Can you clarify what you mean about the
15 plaintiffs?  Like --
16 Q.     Did he ever say how he felt about any of
17 them, whether he hated them, liked them, loved
18 them, anything like that?
19 A.     Mr. Bender did make a -- has made -- has
20 made comments that, you know, based upon
21 specifically Jane Doe 3's actions towards him,
22 that he was, you know, not going to -- based upon
23 her failure to communicate with him, he wasn't
24 going to communicate with her based upon that.

Page 61

1 Q.     Do you recall when that was?
2 A.     I don't exactly recall, no.
3 Q.     Was it in 2021?
4 A.     Yes, it would have been 2021.
5 Q.     Was it when Ms. Kutzler was still doing
6 work for the county?
7 A.     That I don't remember.
8 Q.     In January of 2021, the county revised
9 its sexual harassment policy?
10 A.     I don't recall.  I don't believe it was
11 in the January, but I don't recall the exact date.
12 But, yes, the policy was revised.
13 Q.     Actually, sorry.  Going to go back real
14 quick just because I want to check on something
15 that we chatted about.
16        MS. SMITH:  I am going to mark Zula
17 817 to 820 as 95.
18        - - -
19        (Zula 817-820 marked as Exhibit-95 for
20 identification.)
21        - - -
22 BY MS. SMITH:
23 Q.     Just because we were just talking about
24 it, so I want to keep it fresh in your mind.

Page 62

1        We were talking about payroll and time
2 sheets.  These are the time sheets that employees
3 of different departments submit to their
4 supervisor, who then signs off on it and submits
5 it to the controllers office, correct?
6 A.     Yes.
7 Q.     Are these the same time sheets that are
8 utilized by every department or does each
9 department have its own?
10 A.     This time sheet is utilized by most
11 departments --
12 Q.     Okay.
13 A.     -- within the county.  I believe the
14 prison does something different to report their
15 time.  I don't -- each employee doesn't submit
16 their own time sheet.  I'm not sure how it works
17 at the prison.  But for the vast majority of
18 departments, yes, they utilize this time sheet.
19 Q.     Okay.  Perfect.  Sorry.  I just had that
20 question.
21        So we were talking about January 2021,
22 and the revision to the sexual harassment policy.
23        MS. SMITH:  Going to mark Zula 46
24 as 96.

Page 63

1        - - -
2        (Zula 46 marked as Exhibit-96 for
3 identification.)
4        - - -
5 BY MS. SMITH:
6 Q.     Do you recognize this form?
7 A.     Yes.
8 Q.     You signed acknowledgment of having
9 received, read, and reviewed a copy of the county
10 of Schuylkill's anti-harassment and
11 non-discrimination policy as revised January of
12 2021, correct?
13 A.     Yes.
14 Q.     And you signed it on February 23, 2021,
15 correct?
16 A.     Yes.
17 Q.     Did you, in fact, read, review --
18 receive, read, and review a copy of a revised
19 policy from 2020 -- January 2021?
20 A.     I guess it was from January 2021.  Yes,
21 this was signed after the training that we
22 completed.
23 Q.     Okay.  All right.
24        If we can look back to Exhibit-92.  Yes,

Page 64

1 that one, perfect.
2      There is no anti-harassment and
3 non-discrimination policy on this list, correct?
4 A.     Correct.
5 Q.     There is a sexual harassment policy --
6 A.     Yes.
7 Q.     -- on No. 50, correct?
8 A.     Yes.  Sorry.  Yes.
9 Q.     I'm sorry, going back to 92.
10      The policy that you signed for on 92,
11 indicates you received a sexual harassment policy
12 and then it has 2015-18, that's the policy number,
13 correct?
14 A.     Yes.
15 Q.     And then in parenthesis, REV9-13.
16 That's when it was last revised, correct?
17 A.     Yes.
18 Q.     Okay.
19      So when you started, the last revision
20 to that policy had been September of 2013,
21 correct?
22 A.     Yes.
23 Q.     And then after you were hired, there was
24 a revision to the policy?

Page 65

1 A.     Yes.
2      MS. SMITH:  Okay.  I apologize if I
3 am double marking this.  It might have been used
4 before, but I'm going to mark it as Exhibit-97.
5 It's Schuylkill County, it's SC1254 to 1259.
6      - - -
7      (SC1254-1259 marked as Exhibit-97 for
8 identification.)
9      - - -
10 BY MS. SMITH:
11 Q.     Do you recognize this document?
12 A.     Yes.
13 Q.     Okay.
14      Just looking quickly back at 92.  We
15 were talking about the policy number.
16      The policy number on 92 has 2015-18.
17 The policy number on 97 has 2005-18.
18      Do you see that?
19 A.     Yes.
20 Q.     Is that just a typo?
21 A.     I would believe so, yes.
22 Q.     Okay.
23      Because this indicates as -- this being
24 97 indicates the sexual harassment policy, as does

Page 66

1 No. 50 of 92, correct?
2 A.     Yes.
3 Q.     And it's got that revision date of
4 September of 2013, correct?
5 A.     Yes.
6 Q.     Okay.
7      Is it your understanding then that the
8 January 2021 anti-harassment and
9 non-discrimination policy was a revision to
10 Document 97?
11      So my question is, so 97 is called
12 sexual harassment.  You're signing on 96, I
13 believe, for an anti-harassment and
14 non-discrimination.
15      Was part of the revision a name change?
16 A.     Yes.
17 Q.     Okay.
18      MS. SMITH:  We're going to look at
19 Zula 237 through 243.  241 is going to be Exhibit
20 98.
21      - - -
22      (Zula 237-243 marked as Exhibit-98 for
23 identification.)
24      - - -

Page 67

1 BY MS. SMITH:
2 Q.     Do you recognize -- recognize this
3 document?
4 A.     Yes.
5 Q.     Okay.
6      So this has that same policy number,
7 2005-18.  And this has anti-harassment,
8 non-discrimination policy as the name, correct?
9 A.     Yes.
10 Q.     This one indicates revised
11 February 2021, and then supercedes September 2013.
12 Do you see that?
13 A.     Yes.
14 Q.     Do you know why this policy does not
15 supersede the January 2021 revision?
16 A.     I don't -- I don't believe there was one
17 that was approved in January 2021.  I believe that
18 this was the first revision to the 2005-18 policy
19 that superceded 9/13.  I think potentially it was
20 going to be on the agenda in January, but it
21 wasn't actually approved until February.
22 Q.     Okay.
23      I'm going to represent to you that in
24 this document production in this case, that

Page 68

1 January 2021 has not been produced.
2        So does that sound right to you?
3 A.      Yeah.  I didn't think it was revised in
4 January 2021.  It may have originally been
5 intended to be revised in January 2021, but it
6 actually wasn't approved until February.
7 Q.      Okay.
8        Then if we look back at 96, who drafted
9 this document?
10 A.      This document?
11 Q.      Yup.
12 A.      This is part of the policy that's in the
13 Exhibit-98, that was drafted by Ms. Kutzler.
14 Q.      Okay.
15        And if we look to Page 6 or Zula 242 and
16 98, it is that page and it has a January 2021,
17 correct?
18 A.      Yes.
19 Q.      But this is a February 2021 revision
20 that was signed off and approved by the
21 commissioners, correct?
22 A.      Yes.
23 Q.      Any reason why you didn't tell Ms.
24 Kutzler that that January 2021 should be updated?

Page 69

1 A.      I didn't even see it, honestly.
2 Q.      These -- the revisions made to the
3 September 2013 policy, specifically the -- what
4 was the sexual harassment policy, were you
5 involved in that?
6 A.      No.  Well, I reviewed -- I read through
7 the policy once it was revised, that was it.  But
8 I did not -- was not involved in the actual
9 writing of the revised policy.
10 Q.      After -- well, strike that.
11        When you reviewed the policy, do you
12 recall if it was before the commissioners had
13 voted on it?
14 A.      Yes.
15 Q.      Did you offer any suggestions, changes,
16 or critiques?
17 A.      No, I don't believe I made any changes.
18 Q.      Do you believe -- strike that.
19        Earlier you testified that when you
20 received some of the policies on your initial day
21 or week of hire, that you thought that there were
22 some that could use some revisions.
23        Do you recall testifying to that?
24 A.      Yes.

Page 70

1 Q.      After reviewing the revised copy of this
2 policy before you, so 98, did you believe it was
3 sufficient?
4 A.      Yes.
5 Q.      At the time this policy was revised,
6 in-person training was held, correct?
7 A.      After it was revised, yes.
8 Q.      Okay.
9        Did you attend?
10 A.      Yes.
11 Q.      Do you recall when?
12 A.      Based upon my signature on Exhibit-96, I
13 would say it was February 23, 2021.
14 Q.      Okay.
15        So based off your testimony, is it your
16 recollection that you were provided with a copy
17 and asked to sign the acknowledgment form, which
18 is Exhibit-96, on the day of your in-person
19 training?
20 A.      Yes.
21 Q.      Okay.
22        Were you provided with any materials --
23 A.      Yes.
24 Q.      -- at the training?

Page 71

1 A.      Yes.
2 Q.      Who conducted the trainings?
3 A.      They were conducted by Doreen Kutzler
4 and I believe for the supervisor trainings, Tom
5 Hubert, I guess, is his last name.  He also came
6 and conducted some of the trainings as well.
7 Q.      So there were two training sessions, one
8 for managers or department heads and one for
9 just -- I don't want to call them regular
10 employees, but non-managerial staff?
11 A.      Yes.
12 Q.      And at the non-managerial staff
13 trainings, it was just Doreen Kutzler.  And at the
14 managerial it was Tom Hubert and Doreen Kutzler?
15 A.      Yes.
16 Q.      Which one did you attend?
17 A.      The managerial one.
18 Q.      Did you have any involvement with the
19 scheduling of employees attendance at the
20 training?
21 A.      No.
22 Q.      Was it your understanding that training
23 was mandatory for all employees?
24 A.      Yes.

Page 72

1  Q.      Was it your understanding that it was --
2  that it was mandatory for elected officials?
3  A.      Yes.
4          MS. SMITH:  Going to mark --
5  sorry -- Zula 473 to 474 as 99.
6          - - -
7          (Zula 473-474 marked as Exhibit-99 for
8  identification.)
9          - - -
10 BY MS. SMITH:
11 Q.      Do you recognize this e-mail?
12 A.      Yes.
13 Q.      And the first page is an e-mail from you
14 to Defendant Halcovage, correct?
15 A.      Yes.
16 Q.      And indicates there's an attachment?
17 A.      Yes.
18 Q.      Is the second page, Zula 474 of this
19 document, the attachment?
20 A.      Yes, I believe so.
21 Q.      Okay.
22         Why were you sending a list of attendees
23 for the manager training sessions to Defendant
24 Halcovage?

Page 73

1  A.      He had questioned who was -- he needed
2  to schedule himself for training and he questioned
3  who was going to be in what training sessions, as
4  he did not want to attend the training sessions
5  with Jane Doe 3 and Jane Doe 4.
6  Q.      There are numerous individuals listed on
7  this training session, correct?
8  A.      Yes.
9  Q.      Training schedule, I guess I should call
10 it.
11         It includes Commissioner Hess and
12 Commissioner Hetherington, correct?  They are --
13 Hetherington is on the top right box, it's listed
14 as Hetherington.
15         Do you see that?
16 A.      Yes.
17 Q.      And then Hess is in the middle left box,
18 No. 3?
19 A.      Yes.
20 Q.      So elected officials were required to
21 attend this training?
22 A.      Yes.
23 Q.      Are you aware of how the county was able
24 to require elected officials attend this training?

Page 74

1  A.      It was a request made of the elected
2  officials to attend the training.
3  Q.      And what, if anything, would have
4  occurred had they refused?
5  A.      That I don't know.
6  Q.      Commissioner Halcovage is not listed on
7  this document, is he?  Or I should say, the second
8  Page 474 of this document, because his name is on
9  the e-mail, but...
10 A.      No, I do not see his name.
11 Q.      Do you know if Mr. -- Defendant
12 Halcovage ever attended the manager training
13 session in February of 2021?
14 A.      Yes, I believe he did.
15 Q.      And were you in the training with him?
16 A.      I don't recall being in the training
17 with him.
18 Q.      Where does your knowledge come from that
19 he was -- he did attend the training?
20 A.      I think I had a conversation with Doreen
21 about it because I had to get the listing from her
22 of the manager attendee training and I think she
23 then worked with George to schedule him for the
24 training, so...

Page 75

1  Q.      Okay.
2          So you're aware that he was scheduled?
3  A.      Yes.
4  Q.      Are you aware that he ever attended?
5  A.      I believe we got a sign off of his sheet
6  that everybody had to turn in.  Yes, I do believe
7  we did get that.
8          MS. SMITH:  I am going to mark Zula
9  448, 441, and 442.  They are out of order, but I
10 am going to mark that as 100.
11         - - -
12         (Zula 448, 441-442 marked as Exhibit-100
13 for identification.)
14         - - -
15 BY MS. SMITH:
16 Q.      Ms. Zula, do you recognize this chain of
17 e-mails?
18 A.      Yes.
19 Q.      And they are kind of out of order and
20 there is two Page 1s because there is some
21 overlapping in order to save pages, I condensed it
22 into one.
23         If we look at Page 441, the second page,
24 Jane Doe 3's e-mail to Defendant Ms. Kutzler,

Page 76

1  which you're CC'ed on, indicates that the county
2  canceled the Friday, February 19, 2021, training.
3  Do you see that?
4  A.      Where does it say that?
5  Q.      The very last sentence on Page 2, it
6  says:  The session scheduled for today, which
7  she's sending the e-mail -- I'm sorry, I might
8  have said February 19th.
9  A.      Yeah, I was going -- okay.  Yes.
10 Q.      Were canceled by the county and you
11 informed me yesterday, Gary Bender is now
12 attending the session we are scheduled to attend.
13 Do you see that?
14 A.      Yes.
15 Q.      The training was canceled due to
16 inclement weather, correct?
17 A.      To my knowledge, yes.
18 Q.      Did you have any involvement in the
19 rescheduling of Defendant Bender's training day?
20 A.      No, I did not.
21 Q.      So you never discussed with anyone the
22 fact that Jane Doe 3 and Jane Doe 4 were already
23 scheduled for that session?
24 A.      No.  I receive a copy of the

Page 77

1  communications, that was all.
2  Q.      And you are CC'ed on this chain of
3  e-mails, correct?
4  A.      Yes.
5  Q.      Did you ever provide your opinion as to
6  the fact that Defendant Bender was attending or
7  potential being rescheduled to attend a session in
8  which Jane Doe 3 and Jane Doe 4 were attending?
9  A.      No.
10 Q.      Do you see that as an -- an issue?
11 A.      I wasn't responsible for the scheduling.
12 I didn't handle the scheduling.
13 Q.      Well, you were the HR director, right?
14 A.      Yes.
15 Q.      And you were responsible for personnel
16 matters, correct?
17 A.      Yes.
18 Q.      Jane Doe 3 and Jane Doe 4's work
19 environment would be a personnel matter, correct?
20 A.      Yes.
21 Q.      You didn't think it important to give
22 input as to, hey, these two ladies have an EEOC
23 charge against this individual for sexual
24 harassment or retaliation, maybe we shouldn't

Page 78

1  schedule them on the same day?
2          MS. PIPAK:  Objection.
3          You can answer.
4          THE WITNESS:  Ms. Kutzler did work
5  with Gary and it was -- he was rescheduled.  I
6  didn't think there was anything further that I
7  would need to do since he was rescheduled for a
8  different day.
9  BY MS. SMITH:
10 Q.      But do you -- so I guess the question
11 then is:  Do you agree with Ms. Kutzler's decision
12 that he shouldn't have attended the same day?
13 A.      Correct, yes.
14         MS. SMITH:  Okay.  Sorry.  These
15 are large documents, we are not going to go
16 through the contents of them, but I just want to
17 make sure I understand what they are.  I am going
18 to mark Zula 55 to 138.
19              - - -
20         (Zula 55-138 marked as Exhibit-101 for
21 identification.)
22              - - -
23 BY MS. SMITH:
24 Q.      Do you recognize this document?

Page 79

1  A.      Yes.
2  Q.      Do you know if this -- the PowerPoint
3  that was presented at the sexual harassment
4  training in February/March of 2021?
5  A.      Yes.  This is the PowerPoint.  I just
6  don't know if this is the supervisor one or the
7  employee one.
8  Q.      Okay.
9          So we'll take a look at another one,
10 because there is two.  That's why I'm trying to
11 figure it out.
12 A.      I believe based upon the -- well, I
13 shouldn't say that.  I don't...
14 Q.      Let me give you the other one.
15         MS. SMITH:  I will mark Zula 139 to
16 236 as 102.
17              - - -
18         (Zula 139-236 marked as Exhibit-102 for
19 identification.)
20              - - -
21         MS. SMITH:  And just for the
22 record, Jane Doe 2 has joined the Zoom call.
23 BY MS. SMITH:
24 Q.      All right.

Page 80

1  Now, having looked at 101 and 102, do
2  you recall which, if any, PowerPoint was for the
3  managers?
4  A.     102 was for the managers.
5  Q.     Okay.
6       And 102 -- 102 is for the non-managerial
7  staff?
8  A.     For the -- yes, the employees.
9  Q.     Did you attend both trainings given that
10 you were human resources director or only the
11 managerial training?
12 A.     I attended the full managerial training
13 and then I did go into a few of the sessions for
14 the employees, but didn't stay the whole time.
15 Q.     Okay.
16      So just periodic pop ins when you had
17 time?
18 A.     Yes.
19 Q.     Were copies of these PowerPoints given
20 to staff, either managerial or non-managerial?
21 A.     Yes.  It was my understanding that they
22 were provided in hard copy to those who attended
23 in person.  I think for a lot of the employee
24 sessions, there was virtual sessions being held

Page 81

1  due to social distancing and space and then they
2  were e-mailed, I believe, copies of the
3  presentation.
4  Q.     So for staff that attended in person,
5  they received hard copies.  For staff that
6  appeared virtually, they received e-mail copies?
7  A.     Yes.
8  Q.     Okay.
9       And I think you testified to this
10 earlier, but you, at the training, also received a
11 copy of the revised sexual harassment -- well, I
12 think it was then called antidiscrimination,
13 anti-harassment policy, correct?
14 A.     Yes.  You received a copy of that policy
15 at the training.
16 Q.     Were any other documents provided at the
17 training?
18 A.     There was a quiz form that was to be
19 turned in, as well as -- I don't know if it was a
20 separate form for the sign-off sheet or if you
21 just ripped it out of the policy that you got.  I
22 don't recall that, but --
23 Q.     Okay.
24 A.     -- that was the form that needed to be

Page 82

1  turned back in to indicate your attendance.
2  Q.     Was the form turn -- the acknowledgment
3  form, was that turned in at the training or was it
4  turned in thereafter?
5  A.     It was -- if you were in person, it was
6  turned in at the training.  If you were virtual,
7  you needed to forward it to the HR office and then
8  they were tracked.
9  Q.     Okay.
10      The quiz form, was that a quiz that was
11 taken at the training or after the training?
12 A.     At the training.
13 Q.     And it was turned in at the training?
14 A.     Yes.
15 Q.     Was there then discussions held about
16 the accurate answers?
17 A.     Yes.
18 Q.     Was that before you handed in your
19 answers or after you handed in your answers?
20 A.     That was before you handed in your
21 answers.
22 Q.     Okay.
23      And so you reviewed your answers in
24 comparison for what they were saying was accurate?

Page 83

1  A.     Correct.
2  Q.     Do you know, were the quiz and answers
3  discussions in the training covered in the
4  PowerPoint?
5  A.     Yes.
6  Q.     So the accurate answers were in the
7  PowerPoint?
8  A.     Yes.
9  Q.     Was it a video?  Was it --
10 A.     Was what a video?
11 Q.     The accurate answers?
12      So if look to like 102, there's some --
13 obviously this is not a video, but there is
14 some --
15 A.     Yeah.  There was a video that was played
16 as part of the training, as well -- as well as
17 discussion regarding scenarios.  Yes, there was a
18 video as part of the training.
19 Q.     Okay.
20      So if we look to 102, if you go to Zula
21 232, should just say quiz, right?
22 A.     Yes.
23 Q.     Is that when they paused for a person to
24 answer the question?

Page 84

1  A.      Yes.  From what I recall, people were
2  given an opportunity to answer and then there was
3  discussion following that.
4  Q.      Okay.
5         If we look to the few pages after that
6  page, I don't see anything about -- in this
7  PowerPoint, about the accurate responses.  It
8  would have come after the opportunity to take the
9  quiz, correct?
10 A.      Yes.
11 Q.      Do you see anything in those pages that
12 is what you recall as being the accurate answer
13 discussion?
14 A.      No.  It was a discussion, it wasn't part
15 of the policy -- or wasn't part of the
16 presentation.
17 Q.      Okay.
18        So the accurate answers were not
19 displayed on the screen?
20 A.      No.
21 Q.      Okay.
22        If you had gotten any answers wrong on
23 the quiz, was there discussions held either

Page 85

1  collectively or individually as to why your
2  answers were wrong or any information regarding
3  the wrong answers or incorrect?
4  A.      I didn't lead the training.  However,
5  when I attended, I know that we went through each
6  question of the quiz.  You know, we kind of -- how
7  many had this answer, raise your hand.  How many
8  had that answer, raise your hand.  And then there
9  was a discussion, okay, this is the right answer
10 and then discussion why the other one wasn't
11 appropriate.
12 Q.      And Doreen Kutzler and Tom Hubert were
13 both in your training session?
14 A.      I believe, yes.  The one I attended both
15 of them were there.
16 Q.      Was that at the courthouse?
17 A.      Yes.
18 Q.      Do you remember what room that was in?
19 A.      It was in the commissioner's board room.
20 Q.      Do you know if all training sessions
21 were held in the commissioner's board room?
22 A.      I don't believe all training --
23 potentially the manager training sessions were
24 held in the commissioner's board room.  But the

Page 86

1  employees sessions were held, potentially some
2  there, some in the children and youth building.
3  There were sessions held at the prison.
4  Q.      After this training, the county's --
5  what was now called the anti-harassment and
6  non-discrimination policy was again revised in
7  May of 2021, correct?
8  A.      Yes.
9         MS. SMITH:  I am going to mark as
10 107, Zula 244.  103, sorry.  103, 244 to 250.
11        - - -
12        (Zula 244-250 marked as Exhibit-103 for
13 identification.)
14        - - -
15        MS. SMITH:  Sorry.  We're going to
16 come back to that one in a second.  I don't want
17 my documents out of order.  You can still leave it
18 marked as 103. I'm going to mark as 104 and we
19 will talk about that first, it's Zula 47.
20        - - -
21        (Zula 47 marked as Exhibit-104 for
22 identification.)
23        - - -
24 BY MS. SMITH:

Page 87

1  Q.      So looking at 104, is this the quiz that
2  we were just talking about?
3  A.      Yes.
4  Q.      All right.
5         And you signed that these were the
6  answers that you had circled prior to being
7  informed of the correct answers; is that how I
8  understand it?
9  A.      Yes.
10 Q.      Do you recall if you got any of them
11 incorrect?
12 A.      I don't recall.
13 Q.      Did you find any of the questions
14 confusing or ambiguous?
15 A.      Yes.  There are some -- the situations,
16 depending on all of the facts could be confusing
17 if you don't have all the facts regarding the
18 specific question.
19 Q.      Did you ever suggest to anyone at the
20 county including Doreen Kutzler or Mr. Hubert,
21 that maybe these questions should be flushed out a
22 little more or any revisions to them should be
23 made?
24 A.      No, I did not make any suggestions.

Page 88

Q.    Put that one aside.

      So now going back to 103. We were discussing that after this training in February and March there was another revision made.

      This document in front of you, 103, has what -- it's black and white, but appears to be redlined throughout it.

      Do you see that?

A.    Yes.

Q.    Were you involved in the red lines and revisions to the policy in May of 2021?

A.    Yes. I prepared the red-line revision.

Q.    Okay.

      Was Doreen Kutzler still employed with the county at that point?

A.    I -- I don't recall exactly. I don't -- I'm not sure.

Q.    Okay.

      Do you remember if she had any involvement in these revisions?

A.    I believe I discussed with her the issue regarding the change was a result of Chris Hobbs has not wanting to be named as an EEO officer for the county, so I did have a discussion with her as

Page 89

to how he became named as that in the policy because I wasn't part of that discussion, initial discussion.

Q.    Okay.

      So we can either look back at the other policy or we can look at the red lines in this. Chris Hobbs was in the February 2021 -- 2021 policy, a named EEO -- EEO officer for the county, correct?

A.    Yes.

Q.    And at some point did you come to learn that he had said that he had not consented to that?

A.    Yes.

Q.    And that he wanted to be removed?

A.    Correct.

Q.    And as result of that, it sounds like you then spoke with Ms. Kutzler and decided to make some revisions?

A.    Yes.

Q.    What was the conversation with Ms. Kutzler about why Chris Hobbs, someone who did not want to be named or consented to it, why he was included?

Page 90

A.    He was included based -- she indicated that she had gone to the solicitor's office because it made sense to have someone in the solicitor's office serve in that capacity. And it was decided by the solicitor's office that he would be to person to serve in that capacity as the assistant solicitor.

Q.    Did she indicate whom in the solicitor's office decided that?

A.    No, I don't recall her...

Q.    Okay.

      Did she indicate why she thought it would be prudent to put a solicitor in as an EEO officer?

A.    No.

Q.    Did she indicate if she had ever spoken with Mr. Hobbs?

A.    No.

Q.    When did the revisions begin to be made on this policy? Was it in the same month of May or did it start earlier than that?

A.    I don't recall the exact date, but it was a result of Jane Doe 3 contacting Mr. Hobbs. I think it was Jane Doe 3 contacting Mr. Hobbs to

Page 91

indicate that she was contacting him as an EEO officer. And then that's what transpired from there, resulting in the change to the policy.

Q.    Other than discussing this with Ms. Kutzler, did you discuss these suggested revisions with anyone else?

A.    Yes.

Q.    Who?

A.    Mr. Bender.

Q.    And what was Mr. Bender's position on it?

A.    We discussed that I didn't think it would be appropriate to add -- keep the names in because, you know, people change positions, so it would make more sense to just have the position listed, so then the person who is in the position would serve in that role. He agreed. And then we also discussed what the other option would be as far as who the other EEO officer could be. And then we, you know, after our discussion, came up with the additional language that was added.

Q.    So in the -- I shouldn't say original. In the February 2021 policy, there were two individuals named. It was you specifically and

Page 92

1  Christopher Hobbs specifically, correct?
2  A.      Yes.
3  Q.      In this policy, there is only -- well,
4  in the red lines of this policy there is only one
5  individual not by name, but by position, that
6  would be the human resources director, correct?
7  A.      Yes.
8  Q.      And then there is no second individual
9  except with the county's sole discretion; would
10  you agree.
11  A.      Yes.
12  Q.      Okay.
13      Why was a second named individual not
14  included without the county having discretion?
15  A.      I -- we -- that's just what we decided
16  to put in the policy as a recommendation.
17  Q.      And that's you and Mr. Bender?
18  A.      Yes.
19  Q.      Okay.
20      The sentence regarding the sole
21  discretion reads:  In the event that the human
22  resources director is unable or precluded from
23  serving as an EEO officer, let's start with that
24  portion of the sentence.

Page 93

1      What in your mind would render the human
2  resources director unable or precluded from
3  serving as an EEO officer?
4  A.      If the complaint was against that
5  person.
6  Q.      Okay.
7      Anything else?
8  A.      No, I believe that's pretty much it.
9  Q.      So if the E -- if the human resources
10  director had been -- if allegations had been
11  brought against the human resources director that
12  they were engaging in aiding and abetting the
13  county in unlawful acts or retaliating, do you
14  believe that then they would be permitted to
15  continue to review complaints by the accuser in
16  the future?
17      MS. PIPAK:  Objection.
18      You can answer.
19      THE WITNESS:  So if the specific
20  complaint is against the HR director, then, no,
21  they shouldn't be involved in that specific
22  investigation.
23  BY MS. SMITH:
24  Q.      But you believe that they would still be

Page 94

1  able to investigate other complaints by someone
2  who had made a previous complaint against them?
3  If the --
4  A.      I'm not following.
5  Q.      Let's say Jane Doe says Heidi Zula, I
6  don't know, let's say something very blatantly
7  unlawful, raped me.  And then subsequent to that,
8  she has a complaint against John Doe completely
9  unrelated, do you believe that you as the human
10  resources director, could still investigate or
11  should investigate her future complaints
12  against unrelated -- in unrelated matters?
13      MS. PIPAK:  Objection.
14      You can answer.
15      THE WITNESS:  Yes.  I believe in
16  certain instances that would be appropriate.
17  BY MS. SMITH:
18  Q.      Okay.
19      It then say, comma, the county, comma,
20  within its sole discretion.  Whose discretion
21  within the county would that be?
22  A.      I don't know.  I would assume either --
23  I would believe most likely the county
24  administrators, as he supervisors -- that position

Page 95

1  supervisors the court or -- I mean, excuse me, the
2  county human resources officer.  This was language
3  that was reviewed and provided by our attorneys,
4  so...
5  Q.      So your attorneys had input into this?
6  A.      Yes.
7      MS. PIPAK:  Objection.
8      I'm going to advise you not to talk
9  about what you talked about with counsel.
10      THE WITNESS:  Okay.
11  BY MS. SMITH:
12  Q.      Okay.
13      So earlier you said it was you and Mr.
14  Bender?
15  A.      Yes.
16  Q.      There were also discussions held with
17  counsel regarding it?
18  A.      Yes.
19  Q.      And which counsel was that?
20  A.      Typically it would either be solicitors
21  from the county and/or our outside counsel that we
22  worked with regarding a lot of these EEO-related
23  issue.
24  Q.      And again, I am not asking for any of

Page 96

1 the contents, but I am just trying to figure out
2 for this -- these revisions, do you recall which
3 counsel it was?
4 A.      I don't recall specifically which
5 counsel, no.
6 Q.      Okay.
7         Do you recall if it -- it was Defendant
8 Roth?
9 A.      No.  Those -- I would not have discussed
10 it with him.  I would have discussed it with Al
11 Marshall or -- okay.  Tom.
12         MS. PIPAK:  Can we move away from
13 this line of questioning.  I think this is
14 inappropriate.
15         MS. SMITH:  Who is involved in a
16 conversation is not the contents of a
17 conversation.  Only the contents of conversations
18 are involved.  Who advises her is completely
19 irrelevant and permissible questioning.
20         Again, I have instructed her, as
21 have you, that the contents of the conversations,
22 it's simply whom, because to determine what is
23 privileged or what is not privileged, there is a
24 plethora of case laws to certain investigations

Page 97

1 and decisions, so I need that line of questioning
2 and I am permitted to ask that line of
3 questioning.
4         MS. PIPAK:  Okay.  It's getting
5 very close to what was discussed.  So I am -- I am
6 just being careful.
7         MS. SMITH:  Again, she has been
8 instructed by.  I -- I've instructed her, I am not
9 even her counsel.  I'm not asking for the contents
10 of the conversation.  I am simply asking for the
11 names of the counsel that were involved.
12 BY MS. SMITH:
13 Q.      Was it a solicitor?  If so, who or was
14 it outside counsel?  If so, who?  Again just
15 names.
16 A.      I believe it would have been -- well, Al
17 Marshall and/or Tom Highbock.
18 Q.      But you don't recall which?
19 A.      I don't.
20 Q.      Okay.
21         When -- so the language to me is
22 somewhat unclear.  Is it the county who decides
23 that they shall appoint an alternative EEO officer
24 or -- and/or, I guess, is it when a employee

Page 98

1 requests an alternative EEO officer serve?
2         MS. PIPAK:  Objection to the form.
3         You can answer.
4         THE WITNESS:  I don't believe -- I
5 believe potentially either could apply.
6 BY MS. SMITH:
7 Q.      So is your understanding of this
8 revision that if an employee asks the human
9 resources director to be precluded from serving as
10 the EEO officer, that then an alternative officer
11 would be appointed or is it that then the county
12 would review that and determine if an alternative
13 EEO officer should serve?
14 A.      I think the second situation would be
15 more accurate, that if the employee raised on
16 objection to the HR office director serving in
17 that capacity, that the request would go to the
18 county and then they would make the determination.
19 Q.      Okay.
20         And, again, you believe that that is a
21 request that would go to the administrator for
22 determination?
23 A.      Yes.
24 Q.      Based off -- well, let's -- there's one

Page 99

1 more, I believe, red-line revision to this and
2 it's on Page 3 in BV.  It changes either to any,
3 correct?
4 A.      Yes.
5 Q.      Do you know who suggested that revision?
6 A.      I don't recall.
7 Q.      Do you remember having any discussions
8 about it?
9         MS. PIPAK:  I am going to object to
10 the extent it relates to any conversations you had
11 with attorneys.
12         MS. SMITH:  And, again, I am just
13 asking who, so I am trying to figure that out.
14 BY MS. SMITH:
15 Q.      Do you recall who?
16 A.      I don't recall that specific change.
17 Q.      Okay.
18         I'm sorry.  And I -- just so I don't
19 misrepresent for the record, on Page 7, the last
20 page, the as revised January 2021 was also taken
21 out, correct?
22 A.      Yes.
23         MS. SMITH:  So now we are going to
24 look at the actual policies implemented, 105, it's

Page 100

1  going to be Zula 251 through 257.
2              - - -
3          (Zula 251-257 marked as Exhibit-105 for
4  identification.)
5              - - -
6  BY MS. SMITH:
7  Q.      And if you need to look back at the
8  other one, obviously it's in front of you.  But
9  the red-line revision -- the red-line revisions on
10 the first page under EEO -- EEO statement
11 regarding the sole discretion of the county that
12 we looked at, those were, in fact, adopted,
13 correct?
14 A.      Yes.
15 Q.      Okay.
16     I saw you turn a couple pages later.
17 Were you looking to see if it had been signed by
18 the commissioners?
19 A.      Yes.
20 Q.      Okay.
21     And it was, in fact, signed by them,
22 correct?
23 A.      Yes.
24 Q.      So this became the county's

Page 101

1  anti-harassment and non-discrimination policy in
2  May of 2021?
3  A.      Yes.
4  Q.      Based off of this policy, if an employee
5  wanted to report that they believed or suspected
6  that the rights under this policy had been
7  violated, but were not comfortable reporting it to
8  the human resources director, who do you believe
9  that they could report it to?
10 A.      They could report it to their
11 supervisor.  They could report it to the county
12 administrator.  They could report it to the
13 commissioners, I suppose.
14 Q.      Well, where does it allow for that?
15 A.      It doesn't say that in the policy.
16 Q.      Advising employees of to whom they could
17 report violations of this policy would be
18 important, correct?
19 A.      Yes.  They were included in the training
20 that was provided to staff.
21 Q.      The alternatives?
22 A.      My recollection, the training did
23 provide, yes, that you can report to your
24 supervisor, you could report to HR.

Page 102

1  Q.      And in the event that an individual
2  reported something to their supervisor or county
3  administration, to where would those individuals
4  then report the issues?
5  A.      Typically they would come to the HR
6  office.
7  Q.      Okay.
8          So everything, again, would still
9  trickle to the HR office?
10 A.      Yes, potentially.
11 Q.      So if an employee was uncomfortable with
12 the human resources director investigating their
13 claims, what alternatives did the county provide
14 for them?
15 A.      They would go to the next chain in
16 command and the -- the decision would be made as
17 to who would investigate the claim.
18 Q.      Well, the next chain of command from the
19 human resources director would be the county
20 administrator, correct?
21 A.      Yes.
22 Q.      And the county administrator's next
23 chain of command would be the commissioners,
24 correct?

Page 103

1  A.      Yes.
2  Q.      And if -- you said if an individual
3  reported it to a county administrator, it would
4  trickle down to the HR director, correct?
5  A.      I'm sure we would have a conversation,
6  but ultimately the county administrator had the
7  decision-making process to make a decision as to
8  who would investigate the claim if it wouldn't be
9  the HR director.
10 Q.      Okay.
11          But, again, it's within that
12 individual's sole discretion as the policy reads?
13 A.      Yes.
14 Q.      All right.
15          So I want to look at that other change
16 that we looked at in the red line on Page 3 in B.
17 It went from either to any.
18          Do you see that?
19 A.      Uh-huh.
20 Q.      That change was adopted, correct?
21 A.      Yes.
22 Q.      Any would imply more than one EEO
23 officer, correct?
24 A.      Yes.

Page 104

1  Q.      And it indicates officers whose offices
2  are located at a specific address, correct?
3  A.      Yes.
4  Q.      Again, indicating more than one EEO
5  officer?
6  A.      Yes.
7  Q.      But you would agree that there was, in
8  fact, only one EEO officer for the county in May
9  of 2021?
10 A.      Yes.
11 Q.      And then looking at the last change that
12 was proposed on Page 7, this policy, the revision
13 date was removed as the red line in this previous
14 exhibit that we looked at, correct?
15 A.      Uh-huh.
16 Q.      Is that a yes?
17 A.      Yes.  Sorry.  Yes.
18 Q.      You're okay.
19        Do you know who suggested that revision?
20 A.      I don't recall.
21 Q.      Okay.
22        If there's no date on the policy
23 acknowledgment form, how was it that the county
24 was to keep records or know if certain employees

Page 105

1  had completed or received -- I'm sorry -- certain
2  revised policies?
3        MS. PIPAK:  Object to the form.
4        You can answer.
5        THE WITNESS:  I would base it off
6  of the date that the employee signed the
7  acknowledgment form.
8  BY MS. SMITH:
9  Q.      But you wouldn't know which policy they
10 were handed, would you?
11 A.      It indicates that they've reviewed --
12 received, read, and reviewed a copy of the County
13 of Schuylkill's anti-harassment and
14 non-discrimination policy.  And then based upon
15 their date, would be the date of this revision.
16 Q.      Well, we looked at your acknowledgment
17 form that had said that you acknowledged receipt
18 of a January '21, policy, which you had, in fact,
19 not received because there was no January 2021
20 policy, correct?
21 A.      Uh-huh, yes.
22 Q.      So -- so mistakes happen, correct?
23 A.      Yes, they do.
24 Q.      So wouldn't it be prudent to put the

Page 106

1  revision date in this document so that the
2  employee knew which revision policy they were
3  acknowledging receipt of?
4  A.      Apparently I didn't find it important
5  enough to do that since it was taken out of the
6  red line -- out of the document.
7  Q.      Looking back on it now, do you believe
8  that it would be prudent to include that, to
9  ensure that the employee was signing an
10 acknowledgment of the most up-to-date revised copy
11 of a policy?
12 A.      I -- again, I don't believe it's
13 necessary.  If we have the date that the employee
14 signed it, the county policies are updated based
15 upon -- and their revision date is included.  So
16 if you signed it after that date, I would make
17 that determination that you signed the most recent
18 policy.
19 Q.      Okay.
20 A.      And to go back, as I'm reading through
21 this, it does indicate if an agreed person does
22 not wish to communicate directly with the offended
23 person or if communication is not successful or
24 appropriate to the employee, an oral written

Page 107

1  complaint can be delivered to a whole host of a
2  number of people, the individual's complaint to
3  direct supervisor, any supervisor, the county
4  administrator, the county commissioners, or the
5  county EEO officers, so it is included in the
6  policy.
7  Q.      But, again, the investigation would be
8  done by the EEO officer, correct?
9  A.      Yes.  Unless it was determined that that
10 EEO officer cannot serve in that capacity.
11 Q.      And that would be at the county
12 administrator's sole discretion?
13 A.      Well, at the county's sole discretion,
14 yes.  So I don't know who or if there's any
15 further discussion that the county administrator
16 would have with anyone regarding that decision,
17 but I would take that to the county
18 administrators, the HR director as that position
19 was the direct supervisor of the HR director.
20        MS. SMITH:  Okay.  All right.  I
21 think we're going to take a couple-minute break.
22 I think everybody --
23        VIDEOGRAPHER:  It is now
24 11:02 a.m., and we're going off the record.

Page 108

1      - - -
2      (Whereupon, brief recess was held off the
3  record.)
4      - - -
5      VIDEOGRAPHER:  The time now is
6  11:13 a.m. back on the record.
7      ***part 1***
8  BY MS. SMITH:
9  Q.     All right.
10     Ms. Zula, you have in front of you
11 Exhibit 105, it's the May 2021 revised policy,
12 anti-harassment and non-discrimination policy.
13     If we look to that signature page that
14 you briefly looked at earlier, Zula 225, there is
15 a signature line for the chief clerk.
16     Do you see that?
17 A.     Yes.
18 Q.     Does the chief clerk have to approve any
19 policies or revisions to policies before they are
20 implemented?
21 A.     No, not to my knowledge.
22 Q.     Okay.
23     Do you know why there's a line for the
24 chief clerk's signature?

Page 109

1  A.     I believe she's attesting to the fact
2  that the others signed it.
3  Q.     Okay.
4      And then there's a signature line for
5  each of the then sitting commissioners, correct?
6  A.     Yes.
7  Q.     Do all of the commissioners have to
8  approve a policy or revision to a policy before
9  it's implemented?
10 A.     No.  Not -- I believe it's just by
11 majority vote.
12 Q.     Okay.
13     Do you know what happens if they don't
14 vote in the majority on a policy?
15 A.     I believe then they don't sign it.
16 Q.     Okay.
17     And then it's not implemented, correct?
18 A.     If -- if a majority votes to approve the
19 policy, yes, it would be implemented.  But if a
20 commissioner dissents, they would not sign the
21 policy.  The other two commissioners would sign
22 the policy.
23 Q.     Okay.
24     And if two or three dissented --

Page 110

1  A.     Then it would not be -- yes.  Then it
2  would -- sorry -- it would not be implement then.
3  Sorry.
4  Q.     Okay.
5      Let me just get my question out so the
6  record is clear.
7      If two or three dissented, two or three
8  commissioners dissented, the policy would not be
9  implemented, correct?
10 A.     Yes, that's correct.
11 Q.     And then would HR in connection with
12 others, make revisions to have the policy then
13 implemented in a different type?  So like if the
14 commissioner said we won't -- we're dissenting,
15 they would tell you why they are dissenting,
16 right?  This is an issue or that's an issue?
17 A.     Yes.  I would believe they would, yes.
18 Q.     And then there would be revisions made
19 to conform with their requests?
20 A.     Yes or the existing policy that was in
21 place prior would remain.
22 Q.     Okay.
23     Are -- I'm sorry.  One more question.
24     Are the revisions or implementations of

Page 111

1  policies something that's voted on during
2  commissioner's meetings or is this an executive
3  session topic?
4  A.     No, they are voted on publicly at the
5  meeting.
6      MS. SMITH:  I want to look at
7  another policy, Zula 258 through 260, going to be
8  Exhibit 106.
9      - - -
10     (Zula 258-260 marked as Exhibit-106 for
11 identification.)
12     - - -
13 BY MS. SMITH:
14 Q.     Ms. Zula, this exhibit includes two
15 pages of a red-line version and then an unsigned
16 non-red-line version.
17     This is the county's jury duty/subpoenas
18 policy, correct?
19 A.     Yes.
20 Q.     All right.
21     Well, first let's look at the last page,
22 which is the unsigned non-red-line version.
23     Do you know, was this ever signed and --
24 by the commissioners and implemented?

Page 112

1  A.      Yes.
2  Q.      Okay.
3         So there should be a signed copy
4  somewhere?
5  A.      Yes.
6  Q.      Okay.
7         Were you involved in the revisions to
8  this policy?
9  A.      Yes.
10  Q.      Who else was involved?
11  A.      The controllers office.
12  Q.      Okay.
13         Anyone else?
14  A.      No.  The -- well, after I prepared the
15  revision based upon my discussions with the
16  controller, it was reviewed by my supervisor, Gary
17  Bender.
18  Q.      Okay.
19         What initiated the decision to revise
20  this policy?
21  A.      The issue -- the issue was that county
22  employees were being called to county jury duty
23  and so we provided jury duty leave to county
24  employees, which is paid time off.  And then they

Page 113

1  were then getting cut a check by the controllers
2  office for their attendance at county jury duty.
3  So essentially then, the county was paying them
4  for their time away.  And, you know, them cutting
5  them, I don't know what it was, $9 or something in
6  a check for jury duty and then they're having to
7  come turn around and reissue the check back to the
8  county, so it's all kind of the county's money and
9  it was just wasting time from the perspective of
10  the controllers office.  And so they asked to
11  revise the policy to reflect that they need to
12  inform the court that, you know, if they're a
13  county employee, so that payment wasn't issued.
14  Q.      So you made revisions, based off someone
15  coming to you and asking you to make revisions?
16  A.      Yes.
17  Q.      Whom specifically came to you?
18  A.      Sharyn Yackenchick.
19  Q.      Do you remember when -- I'm going to
20  call her Sharyn -- Sharyn came to you and asked
21  you to revise the policy?
22  A.      It would have been sometime prior to the
23  revision date, so prior to March of 2021.  I don't
24  exactly remember the date.

Page 114

1  Q.      Did you speak with her in person or did
2  she e-mail you?
3  A.      In person.
4  Q.      In March of 2021, do you recall that
5  Jane Doe 3, Jane Doe 4, Jane Doe 1, and Jane Doe 2
6  all requested time off to attend interviews with
7  the EEOC investigator?
8  A.      I don't recall that being in March of
9  2021.  I think that was later in the year.  I
10  don't recall it being in March.
11  Q.      Okay.
12         Later in the year was the attorney
13  general's investigation.
14         Do you recall that?
15  A.      I know -- I don't know whose
16  investigation it was, but there was time that they
17  had requested off, but I don't recall them
18  request -- I don't recall them requesting time off
19  in March.  I think it was later in the year.
20  Q.      So it's your testimony that their
21  request off for -- they're meaning the plaintiffs
22  request off to attend matters related to their
23  claims, had nothing to do with the revision of
24  this policy?

Page 115

1  A.      Yeah.  The revision of the policy had
2  nothing to do with the claims that were
3  requested -- filed or requested or whatever by any
4  of the plaintiffs.
5  Q.      And all of the red-line revisions are
6  ones that you made and suggested?
7  A.      Yes.  I prepared the red-line document.
8  It was reviewed by my supervisor.  And then
9  typically after discussion with my supervisor, we
10  would then forward it to the commissioners for
11  review to -- and presentation at the agenda and I
12  would provide a copy of the red-line document, so
13  they could see the changes, as well as a copy of,
14  like, the clean document that would be placed on
15  the board agenda.
16  Q.      Okay.
17         Do you recall when you presented your
18  red-line document to Mr. Bender, if he had any
19  changes that he thought should be made?
20  A.      I don't recall.
21  Q.      During your employment with the county,
22  are you aware of any other policies that were
23  revised?
24  A.      Yes.

Deposition of Heidi Zula Vol. I - Revised                                    Jane Doe, et al. v. Schuylkill County Courthouse, et al.

Page 116

1  Q.      Do you recall which ones?
2  A.      We revised the retiree health care
3  policy.
4  Q.      And if you need to look at that list, it
5  --
6  A.      I don't -- I can't -- I mean, I know the
7  retiree health care policy because it took a very
8  long time to work through that.  I mean, during my
9  tenure at the county, I mean, obviously the
10 anti-harassment and non-discrimination, the jury
11 duty policy, the retiree health care.  We enacted
12 a policy, and it's not on here because it was
13 after -- for medical marijuana, that was a brand
14 new policy.  I can't think of anymore off the top
15 of my head.  I think those...
16 Q.      Okay.
17         MS. SMITH:  Going to mark as Zula
18 855 to 857 as 107.
19              - - -
20         (Zula 855-857 marked as Exhibit-107 for
21 identification.)
22              - - -
23 BY MS. SMITH:
24 Q.      Do you recognize this chain of e-mails?

Page 117

1  A.      Yes.
2  Q.      Who decided to implement the Stop It
3  Solutions, as it calls it, a technology platform?
4  A.      That was -- we had conversations with C
5  Cap I think is who presented the program to us.
6  It was reviewed by Ms. Kutzler and myself, as well
7  as Gary Bender.  And then it was recommended to
8  the commissioners for approval.
9  Q.      Was it approved by the commissioners?
10 A.      Yes.  To my knowledge, yes.
11 Q.      Okay.  Stop It Solutions is not included
12 in the anti-harassment, non-discrimination policy,
13 correct.
14 A.      Not in the policy, no.
15 Q.      Do you know why?
16 A.      It's -- and it's -- I don't know why
17 it's not.  I mean, I don't think it's appropriate
18 to be in the policy because it is -- it applies to
19 a number of different types of -- like anyone can
20 use the solution to report any kind of issue that
21 they're having.  Like for example, I had an
22 employee who -- or a claim that came in or an --
23 an injury that came in about an employee who was
24 abusing leave, for example, that didn't have

Page 118

1  anything to do with like an EEO issue.  So it's a
2  solution that applied to multiple different kinds
3  of facets in the county and people can report
4  fraud, all sorts of different types of things.  So
5  it's not specific just to anti-harassment.
6  Q.      Okay.
7          But anti-harassment can be reported
8  through it, correct?
9  A.      Yes.
10 Q.      And it can be reported anonymously
11 through it?
12 A.      Yes.
13 Q.      And does it -- does Stop It have its own
14 investigators or is it just a platform in which
15 information can be transmitted from the -- from
16 the reporter to the county?
17 A.      It's a platform that information is
18 transmitted?
19 Q.      Okay.
20         So it's really just a new wave type of
21 application on the phone that then an individual
22 can make an HR report, correct?
23 A.      Yes.
24 Q.      Okay.

Page 119

1          And, again, sexual harassment,
2  retaliation claims can be reported through it?
3  A.      Yeah.  Potentially, yes.
4  Q.      So your only reason for saying it
5  shouldn't be -- you don't believe it would be
6  appropriate for it to be in the sexual harassment
7  policies because it's over inclusive?
8  A.      Yeah.  It's -- it includes a lot more
9  issues than just the sexual harassment or
10 harassment.  It -- it can be utilized for just
11 about anything.
12 Q.      So wouldn't including it in any policy
13 be an appropriate way to address that concern?
14 A.      I mean, the information was put out to
15 all county employees through the training, through
16 communications, through posters that were put up.
17 So the information was communicated to employees,
18 it's just not part of the policy.
19 Q.      Was a mass e-mail sent out?
20 A.      Yes.
21 Q.      Okay.
22         And you said posters were put up?
23 A.      Yes.
24 Q.      Where were they put up?

Case 3:21-cv-00477-MCC   Document 280-1   CONFIDENTIAL   Filed 09/20/23   Page 211 of 342

Deposition of Heidi Zula Vol. I - Revised                    Jane Doe, et al. v. Schuylkill County Courthouse, et al.

Page 120

1  A.      I believe they were put up in -- on
2  different bulletin boards throughout the county.
3  So in the courthouse, in the different office
4  buildings.  There's flyers that are -- that were
5  provided, from what I can recall.  And then an
6  e-mail blast was sent out to everybody.
7  Q.      Do you know where in the courthouse the
8  poster was?
9  A.      I don't exactly know the locations, no.
10 Q.      Do you know if one was put in the 410
11 Building?
12 A.      I would assume so because they were --
13 they were sent to all buildings, but I don't known
14 exactly where it would be.
15 Q.      And you didn't hang the posters,
16 correct?
17 A.      No, I did not.
18 Q.      So you have no personal knowledge of the
19 poster being in the 410 Building?
20 A.      No, I don't.
21 Q.      During your employment, had you ever
22 visited the 410 Building?
23 A.      Yes.
24 Q.      How many times would you say?

Page 121

1  A.      Maybe ten.
2  Q.      Do you know, does the county maintain
3  copies of all Stop It Solution submissions?
4  A.      That I don't know.  I'm not sure if the
5  county maintains those or not.  We would get a
6  notification that there was one there and you
7  would log into the solution to look at it, but I
8  don't know if copies are actually maintained in
9  the system once they're closed out.  I don't know.
10 Q.      Okay.
11         And the Stop It Solutions would be a --
12 well, let's turn to Page 2 actually of this
13 document, it's Zula 856.
14         Just below the -- the little lady there,
15 the second -- third -- I'm sorry -- bullet point
16 is access two-way anonymous communication to
17 follow up on your reports.
18         This mean an employee can submit an
19 anonymous communication and be responded to
20 through the Stop It program, so that, for
21 instance, they then don't have to provide their
22 e-mail to get correspondence regarding their
23 complaint, correct?
24 A.      Yes.  That can occur.

Page 122

1  Q.      So if an employee had a concern about
2  the human resources director and they wanted to
3  remain anonymous, this would be an alternative to
4  the human resources director, as the EEO officer,
5  in that they could remain anonymous and that
6  concern could be alleviated?
7  A.      Yes.  They can file a complaint, an
8  anonymous complaint directly through this Stop It,
9  yes.
10 Q.      Okay.
11         So if a supervisor came to you and said
12 I have an employee who has a concern, but
13 they're -- they want to remain anonymous, the Stop
14 It Solution would be a viable suggestion to that
15 supervisor to tell the employee about, correct?
16 A.      Yes.
17 Q.      So at the time that you began your
18 employment with the county, Jane Doe 3, Jane Doe
19 4, Jane Doe 1, Jane Doe 2 were all already
20 employed, correct?
21 A.      Yes.
22 Q.      At the time you were employed, Jane Doe
23 3 was the chief assessor and tax claim director,
24 correct?

Page 123

1  A.      When I started, yes.
2  Q.      Yes.  Okay.
3         And at the time you started, Jane Doe 4
4  was the assistant tax claim director and
5  assistant -- or what I think is also called the
6  deputy chief assessor, correct?
7  A.      Yes.
8  Q.      Jane Doe 1 was a market -- a field
9  market analyst or a -- I'm sorry -- real estate
10 market analyst?  I am combining the two.
11 A.      Yes.
12 Q.      And Jane Doe 2 at the time you were
13 hired was a field appraiser?
14 A.      Yes.
15 Q.      And Jane Doe 1 and Jane Doe 2 were --
16 their positions were both in the tax assessment
17 office, correct?
18 A.      Yes.
19 Q.      When you were hired, do you know how
20 many employees there were in the tax claim bureau?
21 A.      I don't exactly know.  I can probably
22 count.  One, two, three, four, five, six.  Seven
23 maybe.  Seven.  Six, seven, somewhere around
24 there.

Page 124

Q.    And does that include Jane Doe 3 and Jane Doe 4?
A.    Yes.
Q.    Okay.
      How about in the assessment office?
A.    There was turnover in the assessment office, so I don't know exactly how many field appraisers there were when I first started. One, two, three, four, five, six, seven, eight. Seven or eight, I think, were employed when I started.
Q.    And, again, is that including Jane Doe 3 and Jane Doe 4?
A.    Yes.
Q.    Okay.
      Does -- do the numbers that you just provided, the six and seven, seven and eight, do those includes, I think they are termed, contractors or per diems?
A.    No.
Q.    Okay.
      So you think that in addition to those numbers, there may have been others who were contractors or per diems?
A.    Yes. We did bring -- I think there were

Page 125

some, like, former employees who left and were rehired on the per-diem basis to provide assistance and training, yes. But my numbers did not include them.
Q.    Okay.
      Prior to your employment, did you -- well, during your employment, did you ever come to learn how many employees those offices operated with prior to your employment?
A.    I was -- I was aware there were vacancies in this tax assessment office due to -- I don't know if they were retirements or resignations in specifically the field appraiser position.
Q.    Do you know how many vacancies?
A.    No, I don't -- I don't recall. I would say two or three, but I don't know if that's completely accurate.
Q.    Do you know if other than vacancies in the field appraiser position, there were vacancies in any other position such as clerk or typist?
A.    I believe their clerk typist were filled, from what I can recall. And I think the tax claim office was full as well.

Page 126

Q.    Do you know how many of those employees -- again, this is at the time you were hired, so we are talking the January 2021 time frame, held valid CPE licenses?
A.    At the time I was hired, I don't exactly know who all had the license, no.
Q.    And let me ask you this: When you say you don't know, is it that you don't know now or is it that you don't recall? Do you understand the difference? Let me -- let me strike that. Let me rephrase it.
      Is it that you never knew or that you don't recall?
A.    Well, I -- at the time I was hired, I don't answer know who had it or who didn't. I mean, after the fact I did learn that -- who had their license and who didn't. I believe that Jane Doe 3 had her license. Jane Doe 4 was going through the process. Tiffany Keel, who was one of the field appraisers, I think she was going through the process. I don't think we had any field appraisers when I was hired who had the CPE license.
Q.    Okay.

Page 127

      So the record is clean, Ms. Keel's last name is also Mayer, right?
A.    Yeah. I -- I know she got married. I wasn't sure what's her appropriate name, but I know we still --
Q.    Okay.
A.    -- refer to her as Keel, I think, when I was there.
Q.    Just wanted to make sure we understood she was the same person.
      Do you know, historically, how many CPE licenses have been -- strike that.
      Do you know historically how many employees who have held CPE licenses have staffed the assessment office?
A.    I'm not sure I understand the question.
Q.    Like, how many is an optimal number of CPE-licensed employees?
A.    So my understanding is that the CPE license is required of all field appraisers. They have a certain number of time to obtain that license. And that was the requirement for that position and then as well as the chief assessor and the deputy.

Case 3:21-cv-00477-MCC   Document 280-1   Filed 09/20/23   Page 213 of 342
CONFIDENTIAL
Deposition of Heidi Zula Vol. I - Revised                    Jane Doe, et al. v. Schuylkill County Courthouse, et al.

Page 128

Q.    Do you know what a field appraiser does?
A.    Yes.
Q.    Okay.
      And what do they do?
A.    So my understanding is they, in general terms, go out, they review properties to determine assessed values to put them on the tax roles. They review -- I know they go out and they review different, like, permits and things that were issued to go and see if there's additional properties that need to be picked up to added on to the tax roles.
Q.    And generally, what's your understanding of what the assessment office does?
A.    So they're the office that would set the assessed values for the county properties and then they would issues the tax bills.
Q.    So to dumb it down a little bit even more, tax assessment says you Mr. Homeowner are going to own this based off our field appraiser's work and then the tax collectors and the treasurer's office collect those taxes annually for the property owner, correct?
A.    Yes.

Page 129

Q.    Okay.
      So based off that really dumbed-down version that I just gave, assessment -- the assessment office cannot complete its duties without field appraisers, correct?
A.    Yes, they need field appraisers to do that work.
Q.    Okay.
      And, again, I don't know if you answered this question, optimally how many field appraisers should there be in the tax assessment office?
A.    That I don't have -- that's -- I'm not certain. I know -- I mean, if I had the compliment, I would look at how many complimented positions we have. I don't know if that's the optimal number or not.
Q.    What's a compliment?
A.    So the staff compliment, so the number of positions that each office has assigned to them.
Q.    So there's a document that the county maintains that says, this is what positions are open and should be filled to know which vacancies exist?

Page 130

A.    Yes.
Q.    Okay.
      So there's essentially a document that says what the optimal numbers for the office are, correct?
      MS. PIPAK:  Objection.
      You can -- you can answer.
      THE WITNESS:  It's -- the document indicates this is how many authorized positions are given to each particular office.
BY MS. SMITH:
Q.    Okay.  That's fair, the distinction. Thank you.
      So for instance, if an office has approved positions, but the director or the -- the head of the department thinks more might be needed or changes, they can be modified, correct?
A.    Yes.
Q.    With the approval of whom?
A.    The commissioners.
Q.    And only the commissioners?
A.    The commiss -- well, it would be -- positions are created at the salary board. I guess it would be the salary board who actually

Page 131

approves the creation of new positions.
Q.    So let's walk through, hypothetically a department head says, I need a new position. I need another field appraiser. I've got four, but I need a fifth. They would go to the salary board and say --
A.    Well, they would submit a request through -- typically through a PAR. They would submit a PAR form requesting a new position, typically prior to that PAR form being submitted. However, there would be conversations with -- typically HR would get involved to determine, okay, you know, here is the additional work, is this the appropriate, like, classification of the position. And then it would also typically be reviewed by the county administrator, as well as finance would get involved to make sure that we had a budget available to pay for the position.
      And then a PAR request would be put in. It would be added on to the salary board agenda. And then the salary board would review that. Potentially a supervisor department -- department head an elected official, because if they would ask for a new position, they could come to the salary

Page 132

1  board and provide, you know, their justification as
2  to why if there's any questions as to why the
3  position should be added.
4  Q.     In addition to the salary board, do the
5  commissioners then also have to vote on it?
6  A.     The commissioners are part of the salary
7  board.
8  Q.     Okay.
9  A.     So the salary board, I believe, approves
10 the new positions.  Any changes to the positions,
11 that's the salary board function.  The
12 commissioners do the hiring of people into those
13 positions.
14 Q.     Okay.
15        So then -- let me make sure, I think I
16 understand.
17        The salary board, which includes the
18 commissioner, approves the creation or changing of
19 positions, the commissioners vote on who fills
20 that then position?
21 A.     Yes.
22 Q.     Okay.  Got it.
23        So we -- you just talked a lot about the
24 process.  It kind of involves -- there was a lot

Page 133

1  of people involved.
2         What would happen if, let's say, the
3  county administrator didn't agree with a creation
4  of a new position?
5         MS. PIPAK:  Object to the form.
6         You can answer.
7         THE WITNESS:  Either, one, it
8  wouldn't be brought -- put on the agenda for
9  review or it -- I don't know what his process
10 would be to inform the commissioners or the salary
11 board regarding such a request and why he did not
12 believe it was something that would be appropriate
13 to add.
14 BY MS. SMITH:
15 Q.     So then, I guess, based on your
16 testimony, is it fair to say that there's no
17 written policy or procedure regarding this
18 process?
19 A.     Not to my knowledge.
20 Q.     Okay.
21        Who sits on the salary board, it's the
22 commissioners?
23 A.     So, let me think.  It's the
24 commissioners, the controller, and I don't -- I'm

Page 134

1  not sure if the treasurer -- I don't believe the
2  treasurer.  I think it's the commissioners, the
3  controller.  I'm just thinking who would get a
4  vote.  And then if it's an elected official's
5  office, they would also get a vote as well on the
6  salary board.  But if it was a county position, it
7  would just be the commissioners and the
8  controller, I believe.
9  Q.     Okay.
10 A.     I don't think the treasurer is part of
11 the salary board.
12 Q.     Okay.
13 A.     That I can recall.
14 Q.     Okay.
15        So at -- at some point, Jane Doe 3 and
16 Jane Doe 4 were demoted, correct?
17 A.     Yes.
18 Q.     And that was, if you recall, March 2021?
19 A.     Yes.
20 Q.     After they were demoted, obviously their
21 jobs were -- were filled.  And at some point Deb
22 Dash became the interim director of tax claim,
23 correct?
24 A.     Yes.

Page 135

1  Q.     Do you recall if she was the interim
2  director of tax claim in August of 2021?
3  A.     Yes.
4  Q.     Okay.
5         So Ms. Dash as the interim -- I'm sorry.
6  She was -- was she the interim director of tax
7  claim or the interim assistant director?
8  A.     The interim assistant.
9  Q.     Okay.
10        And in that, she had the authority to
11 allow employees of the office she supervised, to
12 work from home as needed?
13 A.     She could, yes.  She -- she could have
14 that recommendation come through and then it would
15 be reviewed by myself and then I would review
16 those with my supervisor as well.
17        MS. SMITH:  Going to mark 2759 and
18 2760 as 108.
19             - - -
20        (Zula 2759-2760 marked as Exhibit-108
21 for identification.)
22             - - -
23 BY MS. SMITH:
24 Q.     Ms. Zula, do you recognize this

Case 3:21-cv-00477-MCC   Document 280-1   CONFIDENTIAL   Filed 09/20/23   Page 215 of 342
Deposition of Heidi Zula Vol. I - Revised
Jane Doe, et al. v. Schuylkill County Courthouse, et al.

Page 136

1  document?
2  A.      Yes.
3  Q.      This is an e-mail chain from --
4  including you, Ms. Dash, and Mr. Bender, correct?
5  A.      Yes.
6  Q.      Do you see Ms. Dash's e-mail at the
7  bottom of Page 1, on Friday, August 27th, stating
8  that this will confirm that Denise Burke worked
9  form home on Wednesday, Thursday, Friday of this
10  week.  She plans to continue working from home
11  next week as well?
12  A.      Yes.
13  Q.      Do you recall, was there any prior
14  approval of Denise Burke working from home
15  Wednesday, Thursday, and Friday that week?
16  A.      Yes.
17  Q.      How did that come to you?
18  A.      Ms. Dash had come to us to explain the
19  situation regarding Ms. Burke's personal
20  circumstances and indicated that there was work
21  that she was able to do from home and requested
22  that we permit her to do so.  And after that
23  discussion, we did permit Ms. Burke to work from
24  home for that limited period of time.

Page 137

1  Q.      Who was the we?
2  A.      Mr. Bender and I.
3  Q.      And this is a verbal conversation you
4  had with Ms. Dash?
5  A.      Yes.
6  Q.      What day did that occur?
7  A.      I don't recall.
8  Q.      How -- was it the same week that she
9  worked from home or was it before that?
10  A.      Yes, it would have been -- it would have
11  been before she actually worked from home.
12  Q.      Was it the same week or a week prior?
13  A.      I think it was the same week, if I'm
14  thinking of the correct situation.  I think it was
15  COVID related, I believe.
16  Q.      You believe that this August 2021
17  approval to work from home was related to COVID?
18  A.      I believe so.
19  Q.      Was the county not utilizing COVID
20  quarantine at that point?
21  A.      Yes.
22  Q.      And if an individual was vaccinated
23  versus non-vaccinated, symptomatic or
24  non-symptomatic played into whether an individual

Page 138

1  worked from home, correct?
2  A.      No.  That didn't -- that decision
3  didn't -- I mean, that -- those qualifications
4  played into whether or not they could be at work,
5  physically at work.  And then based upon, you
6  know, the situation with each particular employee,
7  we would review based upon the request of the
8  supervisor, as to whether or not there was work
9  and if the employee was able to work from home
10  given their condition.
11          I believe hers was COVID related.  I could
12  be wrong, but I believe it was COVID related.  And
13  so the request was made that there was work to do.
14  She was feeling up to doing work, she just couldn't
15  be in -- physically in the office to do it and
16  therefore we approved it.
17  Q.      Okay.
18          Other than a verbal conversation, there
19  was no paperwork submitted?
20  A.      If it was COVID related, we typically
21  got to test results, so -- but...
22  Q.      Other than that?
23  A.      But other than that, no, there would
24  have been no paperwork submitted, to my knowledge.

Page 139

1  Q.      Okay.
2          Are you aware that in March 2021,
3  Christine Zimmerman was permitted to work from the
4  field/home Monday through Friday?
5  A.      I don't recall that particular
6  situation.
7          MS. SMITH:  Zula 707 and 708, it's
8  going to be Exhibit-109.
9                     - - -
10          (Zula 707-708 marked as Exhibit-109 for
11  identification.)
12                     - - -
13  BY MS. SMITH:
14  Q.      Do you recognize this document, Ms.
15  Zula?
16  A.      Yes.  I've seen -- well, I have seen the
17  form before.  I don't recall seeing
18  Ms. Zimmerman's form, but I do -- I am familiar
19  with the telecommuting agreement, yes.
20  Q.      Okay.
21          And what's your understanding of when
22  one of these forms, one of these short-term
23  telecommunicating agreements needs to be
24  completed?

Page 140

1  A.    This was a process, my understanding,
2  when COVID first hit that the county put into
3  place that if an employee would need to work from
4  home on a limited basis, that they could make that
5  request.
6  Q.    Okay.
7      And so why was this form not utilized
8  for Ms. Dash?
9  A.    For Ms. Burke, you mean?
10  Q.    I'm sorry.  Yes.  Ms. Burke.
11  A.    I don't recall.  I mean, it was just not
12  something we did on a regular basis, and so we
13  didn't -- I didn't have her fill the form out.
14  Q.    Okay.
15      Page 2 of this document, Zula 708,
16  indicates human resource's signature.
17      Do you recall if this was ever approved?
18  A.    I don't recall.  I don't recall this
19  particular situation.
20  Q.    Okay.
21      Do you know if Tiffany Mayer, Tiffany
22  Keel was permitted to work from her vehicle/home
23  Monday through Friday in March of 2021?
24  A.    That I don't recall either.

Page 141

1      MS. SMITH:  70 -- Zula 709 to 710,
2  it's going to be 10 -- 110.
3              - - -
4      (Zula 709-710 marked as Exhibit-110 for
5  identification.)
6              - - -
7  BY MS. SMITH:
8  Q.    This is a similar form, but this one is
9  for Tiffany Mayer, correct?
10  A.    Yes.
11  Q.    Do you know if this one was ever
12  approved?
13  A.    I don't recall.
14  Q.    Do you have any reason to believe that
15  Ms. Zimmerman and Ms. Mayer were not permitted to
16  work from locations, other than the courthouse,
17  the field, a vehicle, and their home Monday
18  through Friday March of 2021?
19  A.    I know in their positions as field
20  appraisers, they did a vast majority of their work
21  out in the field.  And there were times where they
22  did then finish up their paperwork from a
23  different location, yes, I was familiar with that.
24  Q.    Meaning from -- I mean, I think

Page 142

1  Ms. Mayers says her vehicle?
2  A.    From home, from the vehicle.  They had
3  iPads that they could upload their work or submit
4  their work.  I'm not exactly sure of the process.
5  Q.    Okay.
6      And so we talked about this a little bit
7  earlier, prior to your employment, the county had
8  made a decision to have Jane Doe 1 and Jane Doe 2
9  relocated from the courthouse to the County's 410
10  Building, correct?
11  A.    Yes.
12  Q.    And it was, I think you said, on your
13  first day of employment that they started in
14  that -- physically started in that building,
15  correct?
16  A.    Yes.
17  Q.    I know you said you had a conversation
18  with Ms. Kutzler about it.  Can you tell us a
19  little bit more of what exactly Ms. Kutzler told
20  you as to why they were relocated?
21  A.    She told me based upon the claims that
22  were filed, that they were to not have or limit --
23  limited contact or in an effort to limit their
24  contact with Mr. Halcovage, that they were going

Page 143

1  to be placed -- their offices placed -- moved to a
2  different location.
3  Q.    Okay.
4      Did you have any conversations with her
5  about why that particular building was selected?
6  A.    Not that I recall, no.
7  Q.    Did you have any conversations with her
8  about the fact that prior to that, Jane Doe 2 and
9  Jane Doe 1 had requested to work from home?
10  A.    It was my understanding that she did --
11  she informed me that, yes, they were indeed
12  working from home prior to coming back to the work
13  at the 410 Building.
14  Q.    Did she indicate to you that they wanted
15  to continue to work from home and not go to the
16  410 Building?
17  A.    Yes.  That become abundantly clear
18  through my employment, that they did not want to
19  be at the 410 Building.
20  Q.    But in that -- those kind of initial
21  conversations with Ms. Kutzler, did she inform you
22  of that?
23  A.    I don't recall if she actually said
24  that.  I don't recall, but...

Case 3:21-cv-00477-MCC   Document 280-1   Filed 09/20/23   Page 217 of 342

Deposition of Heidi Zula Vol. I - Revised                    Jane Doe, et al. v. Schuylkill County Courthouse, et al.

Page 144

1  Q.      Did she tell you why they had been moved
2  from the work from home status to a county
3  building?
4  A.      Ms. Kutzler specifically, I don't recall
5  if she informed me why.
6  Q.      Do you recall having any conversation
7  withs Ms. Kutzler about the accessibility of the
8  410 Building to the public?
9  A.      Not that I recall, no.
10 Q.      Are you aware that the 410 Building is
11 accessible to the public without a county-issued
12 keycard?
13 A.      Yes.  I believe you can walk in the
14 door, the main door, yes.
15 Q.      Because the 410 Building houses the
16 election bureau, correct?
17 A.      Yes.
18 Q.      And the public needs to access the
19 election bureau?
20 A.      Yes.
21 Q.      Okay.
22         You're obviously familiar with 410
23 Building; fair to say?
24 A.      Yes.

Page 145

1  Q.      Jane Doe 2 and Jane Doe 1 each were
2  assigned unique offices within that building?
3  A.      Yes.
4  Q.      And Jane Doe 1's is not -- is accessible
5  by the public if the door is open, correct?
6  A.      Yes.  From -- Jane Doe 1's office was
7  located, you walked in the main door by the
8  election bureau and there was a long hallway.  The
9  drug and alcohol, I think it was, mental health
10 was on the right.  There's a stairwell and then
11 Jane Doe 1's office was located outside of the --
12 on the opposite side of the mental health and drug
13 and alcohol office.
14 Q.      And it's a singular office, correct?
15 A.      Yes.  Her office was a singular office.
16 Q.      So she either had to have her door shut
17 and locked in order for privacy or open and she
18 would be accessible to the public, correct?
19 A.      Yes.
20 Q.      Jane Doe 2's was located inside of a
21 larger office space behind a key door, correct?
22 A.      I don't know if it's a keyed door.  The
23 human services office, there's like a receptionist
24 desk area there and so -- but I don't -- I'm not

Page 146

1  certain if the door leading into the human
2  services office is locked all the time.  That I
3  don't know.
4  Q.      Okay.
5  A.      I don't recall that.
6  Q.      When is the first time after January 11,
7  2021, that you viewed either Jane Doe 2 or Jane
8  Doe 1's office spaces in the 410 Building?
9  A.      The first time would have been -- I
10 believe I had a meeting with both Jane Doe 1 and
11 Jane Doe 2 in Jane Doe 1's office in the 410
12 Building.  I don't exactly recall when that was,
13 but that would have been the first time.
14 Q.      Do you know, was it in January 2021?
15 A.      No.  I think it was later than that.
16 Q.      Later than February?
17 A.      Probably even later.  Yeah, March, April
18 time frame maybe.
19 Q.      Were you ever made aware that a
20 Qualified Cleaning Company was allegedly hired to
21 clean Jane Doe 1 and Jane Doe 2's 410 office
22 space?
23 A.      Yes.
24 Q.      When were you made aware of that?

Page 147

1  A.      I believe when they returned to the
2  offices, that both Jane Doe 1 and Jane Doe 2
3  reported that their offices -- they weren't happy
4  with the conditions of the offices.  And then
5  after that report was made, Ms. Kutzler and Mr.
6  Bender and I had discussions that they did have
7  the office professionally cleaned by SERVPRO.  And
8  I believe then Ms. Kutzler also when down to
9  view -- well, she was actually there to view the
10 offices when they arrived on January 11th.
11 Q.      So on January 11th, it's your
12 understanding Ms. Kutzler went to the 410 Building
13 with Jane Doe 1 and Jane Doe 2 and gave them their
14 keys, correct?
15 A.      Yes.  She met with them on their first
16 and day back.
17 Q.      And it's your understanding she viewed
18 their offices that day?
19 A.      Yes, I believe so.
20 Q.      Okay.
21         So there's a conversation between you,
22 Mr. Bender, Ms. Kutzler after Jane Doe 2 and Jane
23 Doe 1 made complaints about the condition of their
24 offices?

Page 148

1  A.      Yes.
2  Q.      And what was the content of that
3  conversation?
4  A.      That you -- they weren't -- well, that
5  they didn't understand why the conditions of the
6  office were not acceptable because they were
7  professionally cleaned.  That those offices were
8  occupied by other county employees with no issues
9  in the past.  And that we discussed what, you
10 know, remedies we could do to alleviate their
11 concerns or complaint.
12 Q.      What were those options to alleviate
13 their concerns and complaints?
14 A.      So I think one of the complaints was
15 that there were ceiling tiles that had black,
16 like, spots on them.  So we had contacted the --
17 well, the maintenance department was contacted to
18 replace the ceiling tiles.  There were additional
19 boxes, I think, that were left in one of the -- I
20 think it was Jane Doe 2's office that were from --
21 I don't know, whoever the person was in there
22 prior.  I think there was some IT equipment
23 potentially.  So we made arrangements with the IT
24 department to go down there and clean that -- that

Page 149

1  stuff out.
2  Q.      Okay.
3          Was any other cleaning company brought
4  in to clean the offices after the SERVPRO company
5  came in?
6  A.      I'm not certain.
7  Q.      Okay.
8          Did you -- you --
9  A.      I --
10 Q.      You are not certain as you sit here
11 today or are you just -- you had no involvement in
12 it?
13 A.      I had no involvement in it.  I know that
14 there is a cleaning company for that building, but
15 what areas of the building it cleans, I have no
16 idea.
17 Q.      Okay.
18          The conversation that -- that you were
19 just describing between yourself, Defendant
20 Bender, and Defendant Kutzler, did that happen
21 before or after you viewed the office spaces in
22 March and April -- March or April?
23 A.      That happened before.
24 Q.      Okay.

Page 150

1          Do you recall when that conversation --
2  A.      It would have been right -- right around
3  the time that they may made the complaints.
4          MS. SMITH:  Okay.  Mark this as
5  Exhibit 111, it's Zula 318 and 319.
6                      - - -
7          (Zula 318-319 marked as Exhibit-111 for
8  identification.)
9                      - - -
10 BY MS. SMITH:
11 Q.      Ms. Zula, do you recognize this
12 document -- this e-mail chain?
13 A.      Yes.
14 Q.      I -- I see that you're your not CC'ed on
15 the first e-mail, but given how it's formatted, it
16 appears that when Ms. Kutzler sent an e-mail, her
17 e-mail on January 13th at 8:36, it was including
18 the -- Jane Doe 3's January 13, 7:23 a.m. e-mail.
19 Is that a fair representation of this document?
20 A.      Yes.
21 Q.      Okay.
22          So is it fair to say then as of
23 January 13th, you were notified, as well as others
24 at the county, were notified as to the conditions

Page 151

1  and the -- the dissatisfaction with the conditions
2  of Jane Doe 1 and Jane Doe 2's offices?
3  A.      Yes.  We were made aware of their
4  dissatisfaction.
5  Q.      Okay.
6          Did -- to your knowledge, did anyone
7  ever contact SERVPRO to contest how the offices
8  were cleaned and the payment made to them?
9  A.      I'm not aware.
10         MS. SMITH:  Going to look at Zula
11 515, Exhibit 112.
12                      - - -
13         (Zula 515 marked as Exhibit-112 for
14 identification.)
15                      - - -
16 BY MS. SMITH:
17 Q.      Do you recognize this e-mail?
18 A.      Yes.
19 Q.      This is an e-mail from Jane Doe 2 to
20 numerous individuals at the county, including
21 yourself, correct?
22 A.      Yes.
23 Q.      And it's dated February 26, 2021,
24 correct?

Page 152

1  A.      Uh-huh.
2  Q.      Is that a yes?
3  A.      Yes.
4  Q.      Her first sentence she states that
5  sometime between October and December of 2020, I
6  was informed by the county that my office/work
7  space was being relocated to a vacant room within
8  another department in the 410 Building.
9         Do you see that?
10 A.      Yes.
11 Q.      Did you come to learn that prior to
12 January 11, 2021, the county had attempt to have
13 Jane Doe 2 and Jane Doe 1 work from the 410
14 Building?
15 A.      I was not privy to any of those
16 conversations and I did not get any of that
17 information.  I was just told that they were being
18 returned back to work from working from home in
19 January of 2021.
20 Q.      So I understand that at time in
21 January of 2021, you may not have known this, but
22 at any point, or is today the first day, did you
23 learn that there was efforts prior to January
24 2021, that efforts were made to locate them there?

Page 153

1  A.      No, I was not aware -- made aware of
2  that.
3  Q.      So this is the first time?
4  A.      Yeah.  I was not aware that they --
5  there were -- what efforts were made prior to
6  January of 2021.
7  Q.      Okay.
8         Jane Doe 2 goes on in Paragraph 1 to
9  indicate that there are still concerns regarding
10 her office that need to be addressed.
11        Would you agree?
12 A.      Yes.
13 Q.      And one of those is the water-stained
14 ceiling tiles, which she indicates that pieces of
15 tile are falling on her or falling, containing
16 mold spores and other issues including supplies
17 and documents still being in her office, correct?
18 A.      Yes.
19 Q.      If we look back to Exhibit -- if we look
20 back to 111, which is Zula 318 and 319, these
21 issues were listed in Jane Doe 3's e-mail,
22 correct?  If we look to the first --
23 A.      Yeah, I'm reading.
24 Q.      Okay.

Page 154

1         I just was going to point you to the
2  section.
3  A.      Yes.
4  Q.      And in fact, in Doreen Kutzler's e-mail,
5  she suggests that -- or asks, is it possible to
6  switch them out, the ceiling tiles out, as well
7  as -- I'm sorry.
8         She says why don't -- she asks, is it
9  possible to switch them out, correct?
10 A.      Yes.
11 Q.      Do you know why between January 13th of
12 2021, and February 26, 2021, these issues were not
13 addressed?
14 A.      No, I don't.
15 Q.      Did you, between those dates, January
16 13, 2021, February 26, 2021, take any action to
17 have those issues corrected?
18 A.      As I indicated earlier, Ms. Kutzler and
19 I did have conversations with Mr. Bender that we
20 were going -- that we wanted to have that action
21 and my understanding was the maintenance
22 department was made aware of those requests.
23 Q.      What was your understanding of whom
24 made -- of who made maintenance aware of those

Page 155

1  requests?
2  A.      I don't know.  I believe it was Gary.
3  I'm not exactly certain though.  I know I did not.
4  Q.      Okay.
5         So where did your knowledge or belief
6  that someone had made maintenance aware come from?
7  A.      Based on our conversations.
8  Q.      So did someone say, I made maintenance
9  aware or did -- what happened?  How did you come
10 to --
11 A.      Well, yeah.  We talk about Paul
12 Federeoff, he was the maintenance manager, that he
13 was made aware that we need to make these changes
14 and to resolve the issue.
15 Q.      Okay.
16        But you don't know who told Paul
17 Federeoff?
18 A.      I don't.
19 Q.      Do you know if a work order was put in?
20 A.      I do not.
21        MS. SMITH:  All right.  We're going
22 to look to Zula 630 to 632.  It's going to be
23 marked as Exhibit-113.
24            - - -

Page 156

1   (Zula 630-632 marked as Exhibit-113 for
2   identification.)
3            - - -
4   BY MS. SMITH:
5   Q.      Do you recognize this e-mail chain, Ms.
6   Zula?
7   A.      Yes.
8   Q.      Again, I -- I see that you're not CC'ed
9   on the first e-mail in the chain, which is the
10  second and third page, but you are -- it appears
11  Jane Doe 3 forwarded that first e-mail to you in
12  the second e-mail, which begins on the first page;
13  is that correct?
14  A.      Yes.
15  Q.      Okay.
16      And again, Jane Doe 2 in her e-mail, the
17  first in the chain on Page 2 onto 3 on Friday,
18  March 5, 2021, again, addresses issues that are --
19  that she is still having in her office as of that
20  date, correct?
21  A.      Can you repeat that?  I'm sorry.
22  Q.      So Jane Doe 2 e-mailed Jane Doe 3 on
23  March 5, 2021.
24      Would you agree?

Page 157

1   A.      Yes.
2   Q.      And in it, she indicates that as of
3   March 4th, the tiles were just getting replaced,
4   correct?
5   A.      Yes.
6   Q.      And Jane Doe 2, in her e-mail, also
7   addresses other concerns regarding who accessed
8   her office, correct?
9   A.      Yes, correct.
10  Q.      And when Jane Doe 3 forwards her e-mail,
11  she raises concerns as well from Jane Doe 2 that
12  Jane Doe 2 is not being treated in a friendly
13  manner by those in the office to which she was
14  reassigned, correct?
15  A.      Yes.  She made those indications.
16  Q.      And she indicates that this is only
17  adding to the daily stress that Jane Doe 2 was
18  already experiencing, correct?
19  A.      Yes.  That's what she indicated.
20  Q.      Did you ever speak to Jane Doe 2 about
21  these concerns, either the ones raised by her or
22  the ones raised by Jane Doe 3?
23  A.      I don't recall specifically speaking to
24  her about these, no.

Page 158

1   Q.      Did you ever ask her if she wanted to
2   move offices?
3   A.      No.  That was a discussion that I had
4   with Mr. Bender about potentially moving her
5   office into Elaine Gilbert's area, which is the
6   drug and alcohol, mental health.
7   Q.      Her office was never moved, correct?
8   A.      No, it was not.
9   Q.      Why wasn't it moved?
10  A.      Mr. Bender made the decision not to move
11  her office.
12  Q.      Do you know why?
13  A.      No.
14  Q.      Did he instruct you to speak with or to
15  not to speak with Jane Doe 2 about that option?
16  A.      No, he did not.
17  Q.      Did you ever ask him if you could speak
18  with her to figure out what she would want?
19  A.      No, I didn't ask him that question.
20  Q.      In January of 2021, so let's start
21  specifically January 11, 2021, when you learned
22  about Jane Doe 2 and Jane Doe 1's relocation to
23  the 410 Building, what was your understanding or
24  knowledge of parking assignments at that building?

Page 159

1   A.      At that point in time, I had no
2   knowledge of parking assignments at that building.
3   Q.      Okay.
4       At some point, did you come to learn
5   about parking at that building?
6   A.      Yes.
7   Q.      Do you recall when that was?
8   A.      Oh, that was -- I don't recall the exact
9   date, but it was much later in my employment
10  tenure.
11  Q.      Okay.
12      If you recall we met at a -- as sexual
13  violence protection order --
14  A.      Yes.
15  Q.      -- hearing at the courthouse, correct?
16  A.      Yes.
17  Q.      I'm going to represent to you I believe
18  that was in May of 2021.  Do you recall if
19  prior -- because you and I had discussions, along
20  with others, about parking at the 410 Building,
21  correct?
22  A.      Yes.  That would have been probably the
23  first time I knew about parking situation at the
24  410 Building.

Deposition of Heidi Zula Vol. I - Revised                      Jane Doe, et al. v. Schuylkill County Courthouse, et al.

Page 160

1  Q.    You believe that was the first time?
2  A.    Yes.
3  Q.    Okay.
4        As a result of that conversation in
5  which Mr. Roth was present, correct?
6  A.    Yes.
7  Q.    Did you take any action or conduct any
8  investigation to figure out if Jane Doe 2 or Jane
9  Doe 1 could be assigned a space at the 410
10 Building?
11 A.    Yes.
12 Q.    What action or investigation did you
13 take?
14 A.    Well, based upon your request at the
15 hearing, I did discuss it with Mr. Bender, that
16 the request was made for a parking space directly
17 outside of the 410 Building.  And he made the
18 determination that a space would not be provided.
19 Q.    Mr. Bender made the determination?
20 A.    Yes.
21 Q.    Do you know if he consulted with anyone?
22 A.    I don't know.
23 Q.    Is it your understanding that Mr. Bender
24 has the authority to assign county -- strike that.

Page 161

1        Let's start with this:  The 410 Building
2  is a county-owned building, correct?
3  A.    Yes.
4  Q.    And the parking lot is a county-owned
5  parking lot, correct?
6  A.    I believe so, yes.
7  Q.    Okay.
8        So do you know who has the authority,
9  whether it be one or multiple individuals, the
10 authority to assign parking spaces at the 410
11 Building?
12 A.    I believe the parking assignments are
13 managed by -- and I don't know her title, within
14 the human services office.  I think her name was
15 Sharon Love.  She kind of managed the parking
16 situation at that building.  But she reported to
17 Mr. Bender, so I'm assuming if he would have made
18 a determination to issue parking to someone, that
19 it would have been done.
20 Q.    Okay.
21        Did you provide your input as to whether
22 parking spaces should be assigned to Jane Doe 2
23 and Jane Doe 1 at that building?
24 A.    I don't believe I provided my input.  I

Page 162

1  provided the information that was requested.
2  Q.    Okay.
3        Was Glen Roth involved in your
4  discussions with Mr. Bender at all?
5  A.    I believe he was there, yes, because --
6        MS. IPPOLITO:  I am going to object
7  --
8        MS. PIPAK:  To any conversations
9  you may have had with Mr. Roth.
10       THE WITNESS:  Okay.
11 BY MS. SMITH:
12 Q.    Again, I am not asking for the contents,
13 but he was there?
14 A.    I believe he was there, yes.
15 Q.    Did he provide any input?
16       MS. PIPAK:  Objection.
17       THE WITNESS:  I don't -- I don't
18 recall.
19 BY MS. SMITH:
20 Q.    Okay.
21 A.    I don't recall.
22 Q.    What was your understanding -- strike
23 that.
24       In January 11th of 2021, when you

Page 163

1  started with the county, did you learn if -- what
2  or if any restrictions were placed on Defendant
3  Halcovage's access to the courthouse?
4  A.    I don't -- I don't recall if -- what the
5  specific restrictions were back in January.  I do
6  know that I recall being told, and I don't know if
7  this happened -- I think this happened prior to me
8  starting, that Mr. Halcovage had to be wanded in
9  by the sheriff's office.  I think he was met down
10 by the back entrance of the courthouse.  There's
11 an entrance where employees park, he was wanded
12 and then he was permitted to come up into the
13 courthouse.  I don't know if that was the
14 restriction that was in place right when I
15 started, but I know that kind of morphed over the
16 next several months.
17 Q.    Were you aware that Defendant Halcovage
18 was outright restricted from entering the 410
19 Building?
20 A.    Yes.  There was discussion with -- I
21 know Mr. Bender had advised that there was
22 discussion that Mr. Halcovage was not to be going
23 down to the 410 Building unless he was accompanied
24 by another individual.

Page 164

1  Q.      When you started, do you know, was
2  Defendant Halcovage to be escorted by another
3  individual when in the courthouse as well or just
4  --
5  A.      I don't know if that was in place when I
6  first started, but that eventually became the --
7  the protocol.  And I think that actually was in
8  place when I started, that if he was going to
9  travel throughout the courthouse, he would be
10 escorted.
11 Q.      And do you know whose decision or
12 agreement that was, where that came from?
13 A.      I knew the sheriff was involved.  I
14 don't snow exactly know -- I'm not exactly sure if
15 that was just an agreement -- I don't -- I don't
16 know who was involved in that.
17 Q.      So your understanding is that -- or
18 strike that.
19      At the time that you were hired
20 January 11, 2021, was Commissioner Halcovage still
21 parking in the lower lot?
22 A.      I believe so, yes.  I believe he was.
23 Q.      And do you recall was -- were Jane Doe 3
24 and Jane Doe 4 parking in the upper lot?

Page 165

1  A.      I believe they parked in the -- I
2  believe their spots were moved prior to me getting
3  there.  And that Mr. Halcovage was parking in the
4  lower lot and they were parking in the upper lot.
5  Q.      And I think you testified to this, and
6  just so I am clear, you -- it was your
7  understanding in January of 2021 then that
8  Commissioner Halcovage could park in the lower lot
9  and then enter the commissioner's entrance in --
10 in that lower lot after being wanded by a sheriff;
11 is that correct?
12 A.      Yeah.  He had to be met by a sheriff,
13 yes.
14 Q.      Do you also recall if Commissioner
15 Halcovage was restricted Monday through Friday
16 8:00 a.m. to 4:00 or 5:00 p.m.?
17 A.      I don't know if that was something
18 that -- that was in place immediately right when I
19 hired, but I -- when I was hired, but I know that
20 was the restriction that was then placed on him on
21 his access card to the courthouse.
22      MS. SMITH:  All right.  Now is
23 probably a good time to take a break.  We can go
24 off the record.

Page 166

1      VIDEOGRAPHER:  The time is now
2  12:20 p.m. and we're going off the record.
3                    - - -
4      (Whereupon, brief recess was held off the
5  record.)
6                    - - -
7      VIDEOGRAPHER:  The time is now
8  1:09 p.m. and we're back on the record.
9      MS. SMITH:  Matt, I uploaded
10 another document to the exhibits.  It should be
11 Doe supplemental 575.
12      Sorry, for those who wanted paper
13 copies, I don't have copies of this just because
14 it was added on the fly.
15      MS. PIPAK:  Sorry.  575?
16      MS. SMITH:  Uh-huh.
17      THE TECHNICIAN:  Will you be
18 marking this, Counsel?
19      MS. SMITH:  Yes.  This is going to
20 be Exhibit 114.
21                    - - -
22      (Doe 575 marked as Exhibit-114 for
23 identification.)
24                    - - -

Page 167

1  BY MS. SMITH
2  Q.      Ms. Zula, I am --
3      MS. SMITH:  So I have the same one
4  on my screen, just so she can look at --
5  BY MS. SMITH:
6  Q.      I'm going to ask you to just take a look
7  at -- at this document.
8      MS. FOX:  Can you read out the
9  Bates numbers out again?
10      MS. SMITH:  It's Doe supplemental
11 575.
12      MS. FOX:  Thanks.
13      MS. SMITH:  Yup.  And Exhibit-114.
14 BY MS. SMITH:
15 Q.      Have you reviewed it?
16 A.      Yes.
17 Q.      Okay.  Perfect.  Sorry, we're going to
18 have to share this.
19      You are not CC'ed on this, I -- I do see
20 that.  But were you ever made aware of the
21 contents in this e-mail?
22 A.      Yes.
23 Q.      Okay.
24      Do you recall when?

Deposition of Heidi Zula Vol. I - Revised                    Jane Doe, et al. v. Schuylkill County Courthouse, et al.

Page 168

1  A.      It would have been that day, Ms. Zula
2  discussed the situation with me and then I did
3  participate in some of the discussions.
4  Q.      Okay.
5         And when you say in some of the
6  discussions, let's start with who was involved in
7  those --
8  A.      So it was Ms. Kutzler.
9  Q.      Sorry.  Just let me -- it's okay.
10        Who was involved in those discussions?
11  A.      It was Ms. Kutzler and I, and I believe
12  we spoke with Jane Doe 3, based upon the e-mail
13  that she had sent to Ms. Kutzler.  We then
14  attempted to reach out to Jane Doe 2 to discuss
15  the situation with her and she would not speak to
16  us.  And we were informed that she would be
17  providing us with a statement regarding her
18  concerns and the statement was never received.
19  Q.      So you're saying you never received a
20  statement regarding this incident?
21  A.      No.  The only time I seen a statement
22  regarding incident from Jane Doe 2 was when -- and
23  forgive me because I'm not the lawyer, so whatever
24  was filed in March of -- I think it was March,

Page 169

1  was -- that's when I was told the statement was
2  submitted, whatever paperwork and exhibits or --
3  or supplements or whatever they're called was
4  submitted.  And I think her statement was part of
5  that documentation.  But I'm not exactly certain.
6  But what was the first time.  She never submitted
7  a statement to us directly.
8  Q.      When you're referring to March, are you
9  referring to March of 2020?
10  A.      March of 2021.  I think there was some
11  sort of documents filed in March of 2021 or maybe
12  later or maybe it was even later, I don't exactly
13  recall what -- because I wasn't involved in that
14  first step of the process.  So -- but I believe
15  one of those filings is where the statement
16  appeared and that was the first time that I've
17  ever seen this statement from Jane Doe 2 about
18  this particular incident.
19  Q.      Okay.
20        Are you aware that Thomas Heinbach,
21  Esquire, through me, requested a statement from
22  Jane Doe 2?
23  A.      Yes.

Page 170

1  Q.      And are you aware that I provided Thomas
2  Heinbach, Esquire a statement --
3  A.      No, I was not because I did not -- I did
4  not get it.  So if it was provided, I didn't
5  receive it.
6  Q.      Did Ms. -- do you know if Ms. Kutzler
7  ever received a statement?
8  A.      I -- to my knowledge she didn't because
9  I think we've had those -- we had those
10  discussions.
11  Q.      That question why she never --
12  A.      Yeah.  We never received a statement.
13  We did speak with Mr. Halcovage regarding the
14  incident as well and received his side of the
15  story.
16  Q.      Do you recall what his side of the story
17  was?
18  A.      He indicated that he was going to a
19  funeral, I believe it was, in St. Claire.  I
20  believe he -- from what I can recall, he denied
21  going to Walmart.  I don't think he was at the
22  Walmart in that parking lot.  He did see Jane Doe
23  2 on the highway and then he made the turn to go
24  off of the highway into the town to the -- to the

Page 171

1  funeral home he was going to for the funeral.
2  Q.      So do you recall who you -- you said you
3  spoke with Jane Doe 3, you attempted to reach Jane
4  Doe 2 and you spoke with Defendant Halcovage.  Do
5  you know what order those occurred in?
6  A.      I think it was Jane Doe 3 first because
7  I think -- well, Doreen did the -- the discussion,
8  I just sat in.
9  Q.      Okay.
10  A.      And then we attempted to reach out with
11  Doreen -- Doreen and I attempted to reach out to
12  Jane Doe 2.  I believe she was directed through
13  Jane Doe 3 to go file a police report with -- I
14  think it's, I guess, the St. Claire police
15  department.  I am not aware if that was ever
16  completed.  And then when we reached out to her,
17  we were told she would provide a statement and I
18  don't know if that came from your office or whom,
19  that a statement would be provided.  We never got
20  the statement.  And then we did question Mr.
21  Halcovage regarding his interactions with Jane Doe
22  2 that day.
23  Q.      So let's start with Jane Doe 3's -- the
24  conversation you had with Jane Doe 3.  Was it just

Page 172

1  you, Ms. Kutzler, and Jane Doe 3 present?
2  A.      Yes.
3  Q.      And was that in person?
4  A.      No.  I believe it was on the phone.
5  Q.      And then you attempted to reach Jane Doe
6  2 by phone, correct?
7  A.      By phone.
8  Q.      That was just you and Ms. Kutzler?
9  A.      Yes.
10 Q.      And then -- then you spoke with Mr.
11 Halcovage.  Was that you and Ms. Kutzler again?
12 A.      Yes.  That was a day later maybe.  It
13 wasn't that same day.  I don't -- I don't believe
14 it was that same day.
15 Q.      So the conversation with Jane Doe 3 and
16 the reach out to Jane Doe 2 were the same day as
17 the incident, so January 13th?
18 A.      Yes, I believe so.
19 Q.      Okay.
20 A.      Yes.
21 Q.      When you spoke with Jane Doe 3, did you
22 take any notes, either you or Ms. Kutzler?
23 A.      I can't recall.  I don't know.
24 Q.      When you spoke with Defendant Halcovage,

Page 173

1  did you take any notes?
2  A.      I -- I don't remember.  I don't know.
3  Q.      Is it typical county policy that in an
4  HR investigation, that notes should be taken?
5  A.      Yes.  I would typically take notes when
6  I do meet with employees.  So, yes, that would be
7  my typical process.  I can't recall if I did or I
8  didn't though.
9  Q.      Did you ever ask Jane Doe 3 to write a
10 statement?
11 A.      I don't believe we asked her to write a
12 statement, no.
13 Q.      Did you ever prepare or do you know
14 anyone who prepared a statement for Jane Doe 3 to
15 sign based off what she report to you?
16 A.      No.  We utilized the e-mail that she
17 provided.
18 Q.      Okay.
19         Is it something -- is it -- is it
20 typical that HR would write a statement for an
21 employee with a grievance or that they'd ask the
22 employee to write the grievance?
23 A.      As far as grievance, meaning?
24 Q.      Sorry.  Yeah, because you guys have a

Page 174

1  union.
2  A.      Yeah.  So like that's what -- yeah.
3  Q.      Understood.  Let's clarify that.
4          So if an employee has a complaint or
5  reports something such as this incident, a safety
6  concern, let's say, would it be typical for the
7  county to draft a statement for them to sign based
8  on their reports or would they say, hey, can you
9  draft a statement and provide it to us?
10 A.      During my tenure there, we would utilize
11 the documentation that we received from the
12 employee.  The employee would provide us with that
13 information.  So is this case, we would utilize
14 her e-mail, which outlines what occurred.
15 Q.      So let's say her e-mail was just vague
16 and you needed more information, would you just
17 then ask her in an e-mail to provide more?
18 A.      Potentially, yes.  Yes, I would.
19 Q.      So in your time as an employee with the
20 county, was there ever a time that statements were
21 asked or requested of individuals with issues such
22 as a safety concern?
23 A.      Formalized statements?  I'm just trying
24 to think.  I mean, yeah, they -- I believe there

Page 175

1  were -- on occasion, we did have employees prepare
2  their own statement and sign it.  But typically if
3  the employee provided something in writing such as
4  an e-mail, I would utilize that, unless there was
5  more information that was needed.
6  Q.      Okay.
7          But it would be the employee writing a
8  statement and providing it to you?
9  A.      Yes.
10 Q.      Okay.
11         Do you recall any of those instances?
12 A.      We had a situation in our MIS department
13 where there were some employees making complaints
14 about another employee.  So, yes, I did ask each
15 of them to write a statement and provide it to me
16 in writing.
17 Q.      After you spoke with Defendant Halcovage
18 did you ever confirm if there was, in fact, a
19 funeral?
20 A.      Yes.
21 Q.      And was there?
22 A.      Yes.
23 Q.      Did you confirm he was present at it?
24 A.      Yes.

Case 3:21-cv-00477-MCC   Document 280-1   CONFIDENTIAL   Filed 09/20/23   Page 225 of 342

Deposition of Heidi Zula Vol. I - Revised                    Jane Doe, et al. v. Schuylkill County Courthouse, et al.

Page 176

Q.      And it was in St. Claire?
A.      Yes.
Q.      Did you ever -- or to your knowledge,
did anyone on behalf of the county ever reach out
to the St. Claire police department to obtain a
police report or a copy of the police report?
A.      I did not, no.
Q.      Are you aware of anyone who did?
A.      I'm not aware.
Q.      Do you know how it came that Tom
Heinbach contact -- contacted me for Jane Doe 2 to
write a statement?
        MS. PIPAK:  Objection to the extent
your answer reflects any communications you had
with counsel.
        MS. SMITH:  Given that Mr. Heinbach
reached out to me to ask to write a statement,
that privilege has been waived.
        MS. PIPAK:  It's the privilege for
her reaching out.  If -- I asked -- I said any
communication she had with counsel.  So I'm saying
any communication she had with counsel --
        MS. SMITH:  Given that Mr. Heinbach
contacted me as result of reports made and asked

Page 177

my statement -- my client to write a statement,
would be a waiver of the privilege of the contents
of the communication.
        MS. PIPAK:  That wouldn't be a
waiver.
        MS. SMITH:  Yes, it would.
        MS. PIPAK:  No, it wouldn't.  I --
I -- I really -- I don't know any authority that
that would be a waiver.
        So I'm going to direct you not to
answer.
        MS. SMITH:  Okay.  I'm going to
reserve my write to -- to ask those questions and
we can brief it with the judge.
        MS. PIPAK:  Okay.
BY MS. SMITH:
Q.      Without disclosing the contents of the
conversation, did you have any conversation
regarding this incident with Thomas Heinbach?
A.      Yes.
Q.      Okay.
        Was that before or after you spoke with
Jane Doe 2?
A.      We didn't speak with Jane Doe 2.

Page 178

        I'm sorry.
        Was that before or after you reached out
to Jane Doe 2?
A.      After.
Q.      Was it before or after you spoke with
Defendant Halcovage?
A.      Before.
Q.      Did you ever follow up with Mr. Heinbach
to determine if he had received any information?
        MS. PIPAK:  I'm going to object to
that on attorney-client privilege.
        MS. SMITH:  It's not asking for the
contents, it's asking if she had a conversation.
        MS. PIPAK:  You are asked about --
you are asking about a specific thing, so you're
asking about the contents of it.
        MS. SMITH:  It's not.  It's whether
a conversation occurred is not contents.  A
conversation can occur and it can say a million
things in --
        MS. PIPAK:  The way your question
was -- was asked, did you ask a question about --
or did you reach out to him about this --
        MS. SMITH:  Did you have -- you can

Page 179

read back my question.  It's did you have a
conversation.  I am not asking for the contents of
the conversation, it's just simply whether she had
action to speak with him is not a privileged --
it's her act of doing something.  It's not a
conversation that's occurring, therefore there is
no contents to it.
        MS. PIPAK:  Okay.  Ask the question
again.
BY MS. SMITH:
Q.      Did you -- after speaking with
Mr. Heinbach initially, did you ever reach out to
him -- did you ever have a conversation again with
him about this issue?
        MS. PIPAK:  Objection.
BY MS. SMITH:
Q.      Did you ever take that action?
        MS. PIPAK:  Objection.
        Do not answer this.
        MS. SMITH:  Then we can get the
judge on the phone because this one is 100
percent -- it's her act, it is not the contents.
The contents -- the reason a privilege exists --
        MS. PIPAK:  But you're asking about

Deposition of Heidi Zula Vol. I - Revised                Jane Doe, et al. v. Schuylkill County Courthouse, et al.

Page 180

1  --
2       MS. SMITH:  I'm not asking about
3  the conversation.  I'm asking what she did, what
4  was her act.  Did she reach out to him.
5       MS. PIPAK:  Ask that question then.
6  Ask that question.
7  BY MS. SMITH:
8  Q.     Did you reach out to Thomas Heinbach
9  about this incident?
10      MS. PIPAK:  No.  Ask her what she
11 did.
12      MS. SMITH:  What she did is -- is a
13 question that is so open ended.  What did she do?
14 She could have had a party at her house that
15 night.
16      MS. PIPAK:  Right.  Ask her that
17 question, do not ask her about the conversation
18 she had with the attorney.
19      MS. SMITH:  I don't care what she
20 did on her own.  I am asking her about this.
21 BY MS. SMITH:
22 Q.     What did you do about this?  This --
23 after you spoke with Mr. Heinbach the first time
24 and then Defendant Halcovage, what else did you do

Page 181

1  regarding this incident?
2  A.     I did follow up with Mr. Heinbach and he
3  was aware we never received the statement.
4  Q.     And so after speaking with Mr. Heinbach,
5  you still believed that -- you still had never
6  seen a statement?
7  A.     I never saw the statement.
8  Q.     Okay.
9       Do you recall when that was?
10 A.     It would have been shortly thereafter
11 because we spoke with Mr. Halcovage that same --
12 that very next day, I believe it was.  And so I
13 believe it was probably even a few weeks later
14 when we were dealing with some other issues that
15 we had that conversation with Mr. Heinbach.
16 Q.     Okay.
17      So this e-mail indicates that
18 January 13th was a Wednesday.  You said you
19 thought you spoke with Mr. Halcovage the next day,
20 so likely Thursday, January 14th?
21 A.     Yeah.  Most likely Thursday, yes.
22 Q.     And then do you know if the conversation
23 with Mr. Heinbach occurred on the Thursday, the
24 Friday, or the following week?

Page 182

1  A.     Probably the following week because we
2  still hadn't received anything.
3  Q.     Okay.
4       And in this -- I'm going to have you
5  look at the last paragraph of this e-mail.
6       You said you thought you had received
7  this e-mail, correct?
8  A.     I don't recall receiving this e-mail.
9  I'm familiar with its contents based upon my
10 discussions.
11 Q.     So --
12 A.     I don't know if I have got this
13 communication or not.
14 Q.     Okay.
15      Are you aware of the contents of the
16 second paragraph of this e-mail?
17 A.     Yes, I was made aware of that.
18 Q.     Did you, or to your knowledge, did
19 anyone on behalf of the county speak with Jane Doe
20 3 or Jane Doe 4 regarding their assigned -- I'm
21 sorry -- this newly designate commissioner parking
22 vehicle spot?
23 A.     I did not speak with to Jane Doe 3 or
24 Jane Doe 4.  I'm not sure if anyone else did.

Page 183

1  Q.     Okay.
2       Do you know who designated the spot of
3  commissioners vehicle in January of 2021?
4  A.     Yes.  We did -- Doreen and I did look
5  into this issue with Mr. Bender.  That was -- the
6  parking spot was supposed to just say reserved
7  because there -- it was to be utilized for
8  vendor -- a specific vendor and I don't recall
9  which vendor, so that they can come into the
10 courthouse and go quickly.
11      However, when the maintenance department
12 issued -- put the sign up, they thought it would be
13 more appropriate that nobody would park there if it
14 said commissioner's vehicle, and therefore, that's
15 what they put on the sign when the sign was put up.
16      MS. SMITH:  If we can put Doe
17 supplement 583 and 584 on the screen.
18           - - -
19      (Doe 583-584 marked as Exhibit-115 for
20 identification.)
21           - - -
22 BY MS. SMITH:
23 Q.     Just before we look at this one, did you
24 or did Ms. Kutzler ever write an investigation

Page 184

1  report regarding Jane Doe 2's allegations that --
2  Jane Doe 3's relayance of those allegations that
3  Defendant Halcovage had followed her?
4  A.      I did not.
5  Q.      Do you know anyone who did?
6  A.      No.
7          MS. SMITH:  115.
8  BY MS. SMITH:
9  Q.      If we look at the second page to
10 supplement 584 of this, you send Jane Doe 3 an
11 e-mail on January 15th of 2021.  It says:  Please
12 see the attached correspondence on behalf of
13 county administrate Gary R. Bender.
14         Do you see that?
15 A.      Yes.
16 Q.      Okay.
17         This doesn't appear to have an
18 attachment to it.  But was there an attachment to
19 the e-mail?
20 A.      I believe, yes, it would be this
21 document.
22 Q.      Okay.
23         And so you did send Doe Supplemental
24 583, the first page of this exhibit to Jane Doe 3,

Page 185

1  correct?
2  A.      Yes.
3  Q.      Did you have any input in the drafting
4  of this letter?
5  A.      Ms. Kutzler drafted it.  I think I did
6  review it upon her drafting it.  And then it was
7  provided to Mr. Bender for his review and
8  signature.
9  Q.      And then he did review, sign it, and
10 then had you send it to Jane Doe 3?
11 A.      Yes.
12 Q.      Okay.
13         When you reviewed Ms. Kutzler's draft of
14 this, what was the reason you reviewed it?
15 A.      I was part of the conversation that
16 occurred regarding why the tax assessment
17 employees were not utilizing that entrance to
18 limit the potential of running into Mr. Halcovage.
19 Q.      Okay.
20         So that's the second paragraph contained
21 in this letter?
22 A.      Uh-huh.
23 Q.      Is that a yes?
24 A.      Yes.

Page 186

1  Q.      Okay.
2          And it talks about January 13th,
3  correct?
4  A.      Yes.
5  Q.      So the conversation you were just
6  testifying that you were part of occurred on
7  January 13th; is that what I'm to understand?
8  A.      Yes, I believe so.
9  Q.      Do you remember at time?
10 A.      No, I do not.
11 Q.      Okay.
12         So it says:  While in conversation with
13 interim human resources director and new human
14 resources director, that would be Doreen Kutzler
15 and you, correct?
16 A.      Uh-huh, yes.
17 Q.      The question was posed as to why the tax
18 assessment employees have not utilized the north
19 entrance when exiting -- entering and exiting the
20 courthouse.
21         Who was the question posed by and to
22 whom?
23 A.      I believe this situation occurred in
24 that Mr. Halcovage was going to a press conference

Page 187

1  upstairs in Courtroom 1.  And this question was
2  posed by Jane Doe 3 because they were made aware
3  that he entered the building through a different
4  door.
5  Q.      Well, January 13th was the day that
6  Commissioner Halcovage was allegedly at the
7  funeral, correct?
8  A.      That's the day I believe we spoke to
9  Jane Doe 3.  I don't recall if that's the exact
10 same day that the press conference was.  That I
11 don't recall.  But he was at the funeral on the
12 13th, based upon the original e-mail.
13 Q.      Okay.
14         So my -- my reading of this, and correct
15 me if I'm wrong, is that Commissioner Halcovage
16 attended a press conference in Courtroom 1 on
17 January 15th, as it says in the last sentence, in
18 the very last part, which is exactly what occurred
19 today?
20 A.      Yes, that would make sense.
21 Q.      So the January 13th question --
22 conversation in Paragraph 2 occurred two days
23 prior to this issue with Commissioner Halcovage
24 and the press conference, correct?

Case 3:21-cv-00477-MCC   Document 280-1   Filed 09/20/23   Page 228 of 342

Deposition of Heidi Zula Vol. I - Revised                                    Jane Doe, et al. v. Schuylkill County Courthouse, et al.

Page 188

A.      Yes.

Q.      Okay.

So then what was -- this conversation in Paragraph 2, what was -- why was that conversation occurring and whom was involved?

A.      I believe the conversation was based upon -- it included Doreen Kutzler, myself, and Jane Doe 3.  I don't know why the question was posed.  I don't recall that, but this outlines what was discussed.

Q.      Okay.

So let's talk about, at least then, January 13th, 14th, and 15th.  What was the understanding of where Defendant Halcovage was to enter the courthouse?

A.      At that point in time, I don't believe it was restricted as far as that he could only be coming in through the bottom door.  He would then -- he would -- had to be escorted, as was indicated here.  So my recollection of this is that he met Gary Bender at one of the other entrances of the courthouse and he and Gary Bender walked upstairs to Courtroom 1 to attend the press conference.

Page 189

Q.      Okay.

And then on January 13th, 14th, and 15th, what was the understanding of where the tax assessment employees were to enter the courthouse?

A.      Well, the tax assessment employees could have entered the courthouse from any location, as their badge would have let them in.  But based upon the prior discussions, it was suggested that they enter through the north entrance because typically Commissioner Halcovage would come in through the bottom entrance of the courthouse.  And if you enter the bottom entrance of the courthouse, come up the elevator or the steps, you don't actually enter the courthouse building.  You're kind of on the outside of that.  So the north entrance would allow employees to come down the steps and go right into the tax offices.

Q.      Okay.

So -- but the tax assessment employees had no requirement regarding --

A.      No.

Q.      -- what door they had to enter?

A.      You are correct.

Q.      Okay.

Page 190

And this e-mail, if we look to the second page again, it's sent at 4:07 p.m. on the day of this late, January 15th, which based on the first paragraph where we just established is, if my math is correct, about six hours after -- five hours and about ten minutes or so, after Jane Doe 3 raises her concerns regarding what occurred; would you agree?  So Jane Doe 3 --

A.      Yes.

Q.      Okay.

In that five hours, did you conduct any investigation as to whether, as Paragraph 2 at the end states, encountered any of her employees upon entering, traveling through, or leaving the courthouse entrance today?

A.      Yes.

Q.      What investigation did you conduct?

A.      We reviewed the cameras to determine where Mr. Halcovage was in the courthouse through the sheriff's office.  And his whereabouts were tracked down each of the hallways and he was accompanied by Mr. Bender the entire time upon his return back to the commissioners office and at no point in time were there any other tax assessment

Page 191

employees viewed on the cameras.

Q.      How many cameras did you view?

A.      I don't recall.

Q.      Were you aware that a preservation of evidence letter had been sent at that point?

A.      At that point, I don't think I was aware of any of that, no.

Q.      Who did you view the video with?

A.      It would have been done with the sheriff's office, I don't know exactly who it was that viewed the video, but it was done in the sheriff's office because they are the only people who have access to -- had access to the videos.

Q.      Other than someone from the sheriff's office, one or more people, was there anyone else present?

A.      Doreen Kutzler and I.

Q.      Anyone else?

A.      No.

Q.      Was that video preserved, do you know?

A.      I do not know.

Q.      Do you think -- so Halcovage, during this video, was escorted by Defendant Bender, correct?

Page 192

1  A.      Yes.
2  Q.      Did you know at that time in January of
3  2021, that both Halcovage and Mr. Bender were
4  named as respondents in an EEOC charge by the
5  plaintiffs?
6  A.      That was my first week of employment, I
7  don't know exactly -- I knew that there was a
8  charge, I didn't know who it was against or what.
9  So I don't know if I knew at that particular point
10 in time.
11 Q.      Did you speak with Jane Doe 3 regarding
12 her e-mail of February -- I'm sorry --
13 January 15th, 10:51 a.m.?
14 A.      I don't recall speaking to her regarding
15 the e-mail.
16 Q.      Did you speak with her regarding her
17 instruction for her employees to leave their work
18 locations?
19 A.      I believe we had that conversation
20 during the January 13th meeting, based upon this
21 letter.
22 Q.      Well, on January 13th, Jane Doe 3 hadn't
23 instructed her employees to leave their work
24 locations, correct?

Page 193

1  A.      Oh, you're -- I'm sorry.  I thought you
2  said through the north entrance.
3  Q.      No.  Sorry.
4      To leave the -- so in Paragraph 3, it
5  says:  As you stated in your e-mail, which I take
6  it referring to that January 15, 10:51 a.m. e-mail
7  because that's what the e-mail referenced in this
8  you.  You directed your employees to leave their
9  work locations early based on the situation and
10 you left work -- work early as well.
11     Do you see that?
12 A.      Yes.
13 Q.      Did you ever speak with Jane Doe 3 about
14 what she said to them, what she actually
15 instructed, or what happened?
16 A.      No.  I believe that was all based upon
17 the e-mail that she sent.
18 Q.      Anyone ask her if she told her employees
19 they have to use available accrued time to cover
20 their absences?
21 A.      No.
22 Q.      In the next sentence it states:  In
23 addition you do not have the authority to direct
24 your employees to leave their work site without

Page 194

1  appropriate usage of leave.
2      Did you consider that Jane Doe 3 was an
3  exempt employee at this time?
4  A.      I'm not sure I understand the question.
5  Q.      So in January of 2021, January 15th,
6  specifically, was Jane Doe 3 an exempt employee?
7  A.      Yes.
8  Q.      And did you take that into consideration
9  regarding what authority she has regarding the
10 direction of her employees?
11 A.      So she may direct the work of her
12 employees, but her employees are still bound to
13 follow the protocols of the county.  And when
14 you're not present at work, you need to be taking
15 some sort of accrued leave or leave without pay in
16 order to be off.
17 Q.      Well, what if Jane Doe 3 instructed them
18 to work from home?
19         MS. PIPAK:  Objection to the form.
20         You can answer.
21         THE WITNESS:  Again, that was not
22 permissible based upon this information.
23 BY MS. SMITH:
24 Q.      This letter?

Page 195

1  A.      Yes.
2  Q.      Well, is there a county policy or
3  procedure that says it's not permissible for a
4  department head to allow their employees to work
5  from home?
6  A.      That, again, would be something that
7  would need to be discussed through the chain of
8  command.
9  Q.      Is there a policy that states that?
10 A.      No.
11 Q.      Are you aware if Jane Doe 3, prior to
12 January 15th of 2021, was ever -- had ever been
13 permitted to allow employees to work from home on
14 a discretionary basis?
15 A.      I'm not aware.
16 Q.      Do you think that historical precedent
17 of what Jane Doe 3 was or was not permitted to do
18 would be relevant in the writing of this letter?
19 A.      In this particular situation, no.  It
20 was based upon the information that we had in the
21 e-mail, that she allowed her employees to leave
22 work early.  And, therefore, we -- it was directed
23 in the letter that she was to have her employees
24 utilize appropriate leave in order for their

Page 196

1  absence from work.
2  Q.      Was the January 13th incident, as
3  reported by Jane Doe 2 and forwarded by Jane Doe
4  3 -- I'm sorry.  I don't think it was forwarded.
5  The one we looked at that you said you spoke with
6  Doreen and then Jane Doe 3, Mr. Halcovage had
7  tried to reach Jane Doe 2 about, was that
8  considered when writing this letter?
9  A.      I believe this -- this letter addressed
10 the e-mail that was sent by Jane Doe 3 regarding
11 Mr. Halcovage's attendance at the press
12 conference.  It was not related to the situation
13 with Jane Doe 2 that was reported on the 13th.
14 Q.      Right.
15         But on the 13th, Jane Doe 2 reported to
16 you -- or reported to Jane Doe 3, Jane Doe 3
17 reported to you that she believed Defendant
18 Halcovage had followed her, correct?
19 A.      Yes.  That's the information that was
20 reported.
21 Q.      And you testified that you didn't think
22 it was until the following week that you followed
23 up with Mr. Heinbach about Jane Doe 2's statement,
24 correct?

Page 197

1  A.      Yes.
2  Q.      So within five hours of Jane Doe 3
3  allowing individuals to go home, whether accrued
4  time or work from home or whatever, to go home,
5  this letter was issued, but you had yet to receive
6  a statement from Jane Doe 2 as to those safety
7  concerns, correct?
8  A.      Jane Doe 2 and Ms. -- the information
9  that was provided in the e-mail, Jane Doe 2, nor
10 Jane Doe 1, nor Jane Doe 3, nor Jane Doe 4 even
11 came in to -- encountered Mr. Halcovage while he
12 was in the courthouse.  They were informed by
13 someone else that he was in the courthouse.
14 Q.      Well, did you speak with any of them to
15 find that out?
16 A.      That was based upon our review of the
17 information, based upon the e-mail that we
18 received.
19 Q.      Again, did you speak with them to find
20 that out?
21 A.      No, I did not.
22 Q.      Okay.
23         If individuals had -- who had reported
24 sexual harassment and retaliation by an individual

Page 198

1  learned that -- believed that that individual had
2  followed one of them and then believed that he was
3  walking unaccompanied throughout the courthouse,
4  wouldn't those two things go hand in hand to you?
5         MS. PIPAK:  I'm going to object to
6  the form.
7         And if you understand it, you can
8  answer it.
9         THE WITNESS:  Can you restate that?
10 BY MS. SMITH:
11 Q.      Let me strike that.
12         Let's just go with this:  So is it your
13 testimony that the January 13th incident that Jane
14 Doe 2 reported was not taken into consideration
15 regard -- when drafting this e-mail?
16 A.      That's correct.
17         MS. SMITH:  Okay.  I'm going to
18 mark Doe Supplement 596 through 600 -- I'm
19 sorry -- 601.  It's going to be Exhibit-116.
20             - - -
21         (Doe 596-600 marked as Exhibit 116 for
22 identification.)
23             - - -
24 BY MS. SMITH:

Page 199

1  Q.      I'm going to actually have you focus and
2  flip to the page that's Bates stamped 600.  Do you
3  recognize this document?  Again, sorry.  I should
4  say:  Do you recognize what is Doe Supplement 600
5  and 601?
6  A.      No, I don't.
7  Q.      So is it that you don't recognize the
8  document as it's dated before your employment or
9  do you not recognize the form in and of itself?
10 A.      I don't -- I never -- I don't -- I've
11 never used this form.  So I'm not aware of what it
12 was utilized or what was the purpose behind it.  I
13 don't know.
14 Q.      Okay.
15 A.      But if it --
16 Q.      Go ahead.  I'm sorry.
17 A.      No, I don't know.
18 Q.      This form is titled executive
19 exemption -- executive exemption, Jane Doe 3,
20 correct?
21 A.      Yes.
22 Q.      And you stated that you do believe
23 that -- you understood Jane Doe 3 was exempt in
24 January of 2021, correct?

Page 200

1  A.      Yes.
2  Q.      If we look to the management section of
3  this, it indicates in the third, I'll call them
4  bullet points for lack of a better word, directing
5  the work of employees.
6        Did you take the fact -- did you take
7  into consideration the fact that Jane Doe 3's
8  executive exemption test allowed her to direct the
9  work of employees when writing that January -- or
10 reviewing that January 15th letter?
11 A.      Yes.
12 Q.      If we look to the last one, providing
13 safety and security of employees or the property.
14       Did you take that into consideration
15 when reviewing the January 15th letter?
16 A.      I'm not sure I understand the question.
17 Q.      The last point on the first page --
18 well, this is Doe Supplement 600.  It says her
19 management duties include providing safety and
20 security of employees or the property, correct,
21 that's what it states?
22 A.      That's what it states, yes.
23 Q.      Do you believe that she had the
24 authority and that was one of her management

Page 201

1  duties?
2  A.      Yes, from the perspective that she can
3  do that.  However, it needs to be done within
4  accordance with county policy.
5  Q.      Well, what policy are we talking about?
6  Because you stated there was no written policy
7  that she had to get approval to have her employees
8  work from home.
9  A.      So --
10       MS. PIPAK:  Object to the form.
11       But you can answer.
12       THE WITNESS:  So to my
13 recollection, she didn't indicate she was having
14 her employees work from home.  She indicated she
15 sent her employees home.  And, therefore, we
16 informed her that should her employees have been
17 sent home, she was to have the appropriate leave
18 charge, which is in accordance with the county's
19 policy.
20 BY MS. SMITH:
21 Q.      Did anyone ask her if they were working
22 from home?
23 A.      I don't recall.
24 Q.      Did anyone ask her if there was a -- she

Page 202

1  had a concern for safety -- her employee's safety?
2  A.      No.
3  Q.      Were you aware that Defendant Bender,
4  prior to January of 2021, had informed Jane Doe 3
5  and Jane Doe 4 that they were to -- they were
6  authorized to use their discretion and independent
7  judgment in the management of employees in their
8  offices?
9  A.      No, I'm not aware of any of those
10 conversations.
11 Q.      If Mr. Bender had told Jane Doe 3 that,
12 would that change your opinion as to whether she
13 should have been issued that letter, the
14 January 15th letter, Exhibit-115?
15 A.      That letter was issued at the direction
16 of Mr. Bender, as a response to the e-mail that
17 was provided and that's why we issued the letter.
18 Q.      I understand that.
19       But what I'm saying is, is Ms. Bender --
20 Mr. Bender had been disingenuous and had, in fact,
21 previously informed Jane Doe 3 and Jane Doe 4 that
22 they could use their discretion and independent
23 judgment in the management of their employees,
24 would that change your opinion as to whether this

Page 203

1  letter should have been issued?  In Exhibit-15,
2  when I say this letter, 115.
3  A.      No.  I think the letter was issued based
4  upon the in -- in response to the e-mail, so it
5  was a response to the e-mail.  So I believe we
6  would have still responded to her e-mail based
7  upon the information she provided.
8  Q.      Well, if we look to probably the --
9  well, it's the third line down in the third
10 paragraph, it says:  In addition, you do not have
11 the authority to direct your employees to leave
12 their work site without appropriate usage of
13 leave.
14       If they have the independent judge -- if
15 he had told them they have the independent
16 judgment and discretion, wouldn't that be
17 contradictory to what he had previously told them?
18 A.      I'm not aware if he told them that or
19 not.  I don't know.
20 Q.      It's a hypothetical.
21       If he had told them that, this sentence
22 would be in contradiction to that, correct?
23       MS. PIPAK:  I'm going to object to
24 the form.

Case 3:21-cv-00477-MCC    Document 280-1    Filed 09/20/23    Page 232 of 342
CONFIDENTIAL
Deposition of Heidi Zula Vol. I - Revised                    Jane Doe, et al. v. Schuylkill County Courthouse, et al.

Page 204

1  But go ahead.
2  THE WITNESS:  I -- if --
3  potentially, then yes, I guess.  I'm not sure I am
4  understanding, but okay.
5  BY MS. SMITH:
6  Q.     So if Mr. Bender had said to -- prior to
7  this letter to Jane Doe 4 and Jane Doe 3, you have
8  discretion and independent judgment in the
9  management of the employees in your office.  And
10 this letter is saying you don't have the authority
11 to direct your employees to leave their work site,
12 aren't those things in contradiction?
13 A.     No.  The letter says you don't have the
14 authority to direct your employees to leave their
15 work site without the appropriate usage of leave.
16 So she decided to tell her employees to go home.
17 I'm assuming she could do that based upon,
18 apparently, the hypothetical authority that was
19 given to them by Mr. Bender, but they would still
20 have to utilize appropriate leave.
21 Q.     And again -- but there is no county
22 policy that says that, correct?
23 A.     There is a county policy regarding leave
24 usage, yes.

Page 205

1  Q.     What policy would that be?
2  A.     So there's absentee and tardy in this
3  policy.  205-14, I believe, has language in there
4  regarding leave.  I believe there's also the
5  conduct policy talks about, you know, reporting to
6  work, utilizing leave.  I'm not certain of any
7  others.  But we also have a vacation policy, a
8  sick leave policy, a personal day policy.
9  Q.     Did department heads have discretion to
10 set their employees' schedules?
11 A.     As far as..?
12 Q.     Like days, hours worked?
13 A.     No.  They were pretty much set by the
14 hours of the courthouse.  Everyone pretty much
15 worked the hours that the courthouse were open.
16 Q.     Going back to that January 13th
17 conversation that you were recalling with Ms.
18 Kutzler and Jane Doe 3, do you recall Ms. Kutzler
19 confirming that the north door was the door that
20 should be used to enter the building to avoid
21 contact with Mr. Halcovage?
22 A.     Can you repeated the question?
23 Q.     You were -- when we looked at one of the
24 other documents, you had recalled a conversation

Page 206

1  on January 13th that occurred between yourself,
2  Ms. Kutzler, and Jane Doe 3 about tax assessment
3  employees using the north door to avoid contact;
4  is that correct?
5  A.     Yes.  I believe that was a suggestion
6  that was made to utilize that door.
7  Q.     As a result of that suggestion, was
8  there ever -- did you have any conversation or are
9  you aware of anyone who had any conversation with
10 Defendant Halcovage and asked him to not use the
11 north door?
12 A.     No.  I -- I don't believe at that point
13 in time -- so, again, I believe it was that he
14 needed to be escorted when he was out in the
15 building, which is what he did.  And then I
16 believe after the situation occurred, there was
17 some conversation.  I don't recall if it was with
18 Mr. Halcovage or not, that it would probably be
19 best if he just entered the same door all the
20 time.  And then if he was going to go into the
21 courthouse, that he would be escorted by somebody
22 else.
23 Q.     At any point -- strike that.
24 At any point during your employment, did

Page 207

1  you come to learn of an incident where George
2  Halcovage climbed a pretty steep, dangerous
3  embankment from the lower lot to the upper lot?
4  A.     Yes.  I became -- I was made aware of
5  that situation.
6  Q.     Was that before your employment or after
7  you began?
8  A.     The situation occurred before my
9  employment and I think it was publicized in the
10 newspaper.
11 Q.     How did you come to learn about it?
12 A.     I believe I learned about it through the
13 newspaper prior to my employment, but it was
14 referenced when I was employed.
15 Q.     Okay.
16 Did you take that into consideration
17 when reviewing the -- the January 15, 2021, letter
18 to Jane Doe 3?
19 A.     No.
20 Q.     Pretty early on into your employment you
21 requested to meet with Jane Doe 3, correct?
22 A.     Yeah.  I'm sure I did meet with Jane Doe
23 3 pretty early on in my employment, yes.
24 MS. SMITH:  Okay. I'm going to mark

Page 208

1  Zula 399 to 402 as 117.
2              - - -
3      (Zula 399-402 marked as Exhibit-117 for
4  identification.)
5              - - -
6  BY MS. SMITH:
7  Q.      Do you recognize this chain of e-mails,
8  Ms. Zula?
9  A.      Yes.
10  Q.      Again, if we look to Page 2, Zula 400 to
11  401, this is an e-mail from you to Jane Doe 3 on
12  January 27, 2021, correct?
13  A.      Yes.
14  Q.      If we look to the second paragraph of
15  your e-mail, it says:  As a side note, I would
16  like to discuss this practice with you as we near
17  upcoming contract negotiations.
18          The practice you wanted to discuss was
19  the hourly rates for interim field appraisers and
20  CPE completion, correct?
21  A.      Yes.
22  Q.      Okay.
23          Was there any other reason that you
24  requested this meeting?

Page 209

1  A.      No.  The meeting with requested to
2  discuss the issues that were outlined.
3  Q.      It wasn't to discuss the operations
4  generally of the tax assessment issue?
5  A.      We did get into that --
6  Q.      Sorry.  Tax assessment office.  I
7  apologize.
8  A.      Yes.  We did get into those issues as
9  well.
10  Q.      But was it scheduled for that purpose?
11  A.      No.  It was scheduled for the purpose of
12  reviewing the program coordinator/field appraiser
13  position.
14  Q.      Doreen Kutzler was present at that
15  meeting, correct?
16  A.      Yes.
17  Q.      And Jane Doe 4 was present at that
18  meeting, correct?
19  A.      Yes.
20  Q.      If I told you that Doreen Kutzler sent
21  an e-mail to Jane Doe 3 also requesting to meet
22  with her at this -- during this time period to
23  discuss tax assessment office operations, would
24  that change your opinion as to whether or not the

Page 210

1  meeting was for other reasons?
2  A.      The meeting was to discuss the field
3  appraiser and the program coordinator position
4  because there was a lot of issues from a
5  contractual perspective, as to how we were paying
6  these interim field appraiser positions that
7  didn't exist as part of the contract.  There was
8  also discussions that were held at that meeting to
9  discuss the operations of the tax assessment
10  office because there were some additional things
11  going on there as well.
12          I think the primary purpose of the meeting
13  was the field appraiser position, though.
14  Q.      Okay.
15          Whose decision was it to hold this
16  meeting?
17  A.      I think Doreen and I both were part of
18  process.
19  Q.      Did anyone instruct you to have
20  conversations with Jane Doe 3 and/or Jane Doe 4
21  about tax assessment office operations at -- in
22  January of 2021?
23  A.      Yes.
24  Q.      Who?

Page 211

1  A.      So Mr. Bender and Mr. Roth were part of
2  conversations about the operations of the tax
3  assessment office prior to me even getting to the
4  county.  There were discussions about how it was
5  running that I was brought into when I started
6  with the county.  So, yes, there was some
7  direction to determine what exactly was going on
8  as well.
9  Q.      When you say that you were brought into
10  when you started with the county, when exactly
11  were you brought into the conversations?  First
12  week, second week?
13  A.      It was probably the first week.
14  Q.      Okay.
15          Are you aware of STEB reports?
16  A.      Yes.
17  Q.      And do you know what STEB stands for?
18  A.      State Tax Equalization Board.
19  Q.      What -- tell me everything you know
20  about a STEB report.
21  A.      So the STEB --
22          MS. PIPAK:  I am going to object to
23  the form.
24          But go ahead.

Page 212

THE WITNESS: Oh, sorry. So the STEB reports are submitted on a monthly basis to determine, and I don't know the proper lingo, if it's a valid sale and it's not like sales between like family members or some other exempt type of sale of property. They're submitted then and they're utilized to determine the common level ratio for the county. I think that's the appropriate term.

BY MS. SMITH:

Q. Okay. When did you come to learn that information?

A. It was when I -- we started looking at the operations of the tax asses office, as well as we received communications that the county received communication that our STEB reports have not been filed for a number of months, I want to say it was probably sometime in January time frame, February time frame, somewhere around there.

Q. Of 2021?

A. Yes.

Q. Okay. Who is responsible within the county for

Page 213

STEB reports?

A. The real estate market analyst is the position that completes the STEB reports.

Q. Is the real estate market analyst -- do they obtain information from any other job positions within the county to complete the STEB report?

A. So there's a report that's run that they review, that person reviews on a monthly basis. So that information is fed into, I want to say, the Govern System, I think is what it was called. And then it's -- whatever the deeds and all of that information that's entered into the system, it pulls out a monthly report. That is then checked by the real estate market analyst. So, yes, it's based upon the information that's put into the system from other positions within the office.

Q. Including field appraisers?

A. I don't exactly know who puts the information in. So if it's field appraises, the typist, I don't know that exactly.

Q. Okay. So in January, February 2021, would you

Page 214

say that you had a good understanding of the STEB reports and the real estate market analyst job duties?

MS. PIPAK: I'll object to the form. But go ahead, you can answer.

THE WITNESS: I don't know what good is classified as. I mean, I understood what the responsibilities were as far as to the submission of the STEB reports were to be done on a monthly basis and at that point, they were significantly delinquent with the state.

BY MS. SMITH:

Q. Okay. Are you aware that the state allowed for a few months grace period as a result of COVID in 2020?

A. Yes.

Q. Okay. What -- how long, do you know, did the state --

A. I don't know what the grace period was. All I know is that we -- the county received a letter stating that -- that the -- if the reports

Page 215

were not filed timely, that our common level ratio would be impacted.

Q. Okay. And prior to this request of a meeting on January 27th by you, you had already been informed that there was concerns regarding the tax assessment operations, correct?

A. Yes.

Q. And there was already talks of removing Jane Doe 3 from her position, correct?

A. There were talks about bringing in a consultant to work in that role.

Q. So the talks were just to bring a consultant in that Jane Doe 3 would retain her position, but not -- but not as a consultant?

A. I know that there were -- prior to me starting with the county, there were -- there were talks about bringing in a consultant. And when I first started, I believe it was like the first week or so, that there was a meeting set up with Mr. Alu, who was the consultant to come in and, you know, discuss what he could bring to the table. And, yes, as part of those discussions, there were there some discussions about

Page 216

1  restructuring the offices back to tax assessment
2  and tax claim as two separate offices.
3  Q.     Whose suggestion was it that they be
4  returned to two offices?
5  A.     That decision was made by the
6  commissioners.
7  Q.     All three?
8  A.     The commissioners had to vote on the...
9  Q.     So the official vote was by all the
10 commissioners, but the decision -- the discussions
11 to investigate as to whether they should be
12 returned to two offices, who instructed or decided
13 that?
14 A.     So the -- I mean, I was directed to look
15 into the issue by Mr. Bender.  And, you know, I
16 reviewed the information and provided it and then
17 it was -- the determination was made to put the
18 information on the agenda and voted on by the
19 commissioners.
20 Q.     So you're -- strike that.  One second.
21        MS. SMITH:  We're going to look at
22 4 -- Zula 413 to 415, mark it Exhibit-118.
23            - - -
24        (Zula 413-415 marked as Exhibit-118 for

Page 217

1  identification.)
2            - - -
3  BY MS. SMITH:
4  Q.     Ms. Zula, do you recognize the e-mail
5  that is the first page, Zula 214?
6  A.     Yes.
7  Q.     Okay.
8         It's an e-mail from you to Ms. Kutzler,
9  correct?
10 A.     Yes.
11 Q.     And there is a attachment report Jane
12 Doe 3 work performance.
13        Do you see that?
14 A.     Yes.
15 Q.     Is 414 and 415, the next two pages, that
16 attachment?
17 A.     Yes.
18 Q.     Okay.
19        Let's look at your e-mail for a second.
20        The second sentence there, it says:  I
21 really struggled with putting this memo together.
22        Can you explain to us what you meant by
23 that?
24 A.     I struggled with understanding fully the

Page 218

1  scope of the offices and, you know, understanding
2  each of the roles and who did what.  So I did
3  struggle with kind of putting all those pieces
4  together because there were a lot of moving parts.
5  Q.     I understand.  I'm coming to learn very
6  slowly what those offices do, so I can understand
7  and appreciate that.
8         And this is just shy of a month into
9  your employment with the county, correct?
10 A.     Yes.
11 Q.     In any of your prior employment history
12 that we went over in your resume, did you ever
13 work with STEB reports?
14 A.     No.
15 Q.     Did you ever work with an assessment
16 office?
17 A.     No.  I never worked for a county.
18 Q.     Okay.
19        So your only knowledge of STEB reports
20 and assessment offices came from your, just shy
21 of, a month employment?
22 A.     Correct.
23 Q.     And is that kind of what caused some
24 struggle in putting this memo together?

Page 219

1  A.     Yes.
2  Q.     It then goes on to say:  I really
3  focused on the failure to submit the STEB reports
4  as the basis for the removal from her position.
5         This e-mail and that sentence to me, and
6  correct me if I'm wrong, indicates that you were
7  instructed to come to a conclusion and to find a
8  reason to come to that conclusion.
9         Is that a fair assessment?
10 A.     During our discussions, yes, there was
11 conversation about removing Jane Doe 3 from her
12 position, yes.
13 Q.     And that -- that's what the conclusion
14 of your memo should be, correct?
15 A.     My conclusion in my memo indicated that
16 it is recommended that she be removed from the
17 chief assessor position.
18 Q.     I understand that.
19        But I'm asking before you -- were you
20 supposed to come up with a means to justify an
21 ends or were you supposed to come up with an
22 independent conclusion?
23 A.     I came up with a conclusion based upon
24 the information that I have received.

Page 220

1  Q.     Did you feel that it was a fully
2  informed conclusion?
3  A.     Yes.  Based upon the fact that the STEB
4  reports were not submitted and the impact that
5  could have on the county and the tax role, that,
6  yes, it was an appropriate decision.
7  Q.     So you're telling me that you were not
8  told to come to a specific conclusion?
9  A.     I wasn't instructed to come to a
10 specific conclusion, no.
11 Q.     Was it suggested that you should?
12 A.     No.  But there were talks prior to us
13 delving into this issue about the removal of Jane
14 Doe 3 -- well, I should say the separation of the
15 offices, which would have resulted in her removal
16 in being over both offices.
17 Q.     If you struggled with putting the memo
18 together, how can you believe that your conclusion
19 was fully informed?
20 A.     Based upon the information I had, that's
21 the conclusion I made.
22 Q.     Right.
23        But based upon the information you had,
24 you came to a conclusion.  But I am saying, when

Page 221

1  you came to that conclusion, did you feel that you
2  had all of the information and knowledge to be
3  able to be the person to reach that conclusion?
4  A.     Yes.
5  Q.     Okay.
6        Let's look at the memo.  First sentence
7  says, on February 5, 2021, a meeting was held by
8  the human resource office with Ms. Jane Doe 3 and
9  Ms. Jane Doe 4 to discuss the operation of the tax
10 assessment office.
11        Do you see that?
12 A.     Yes.
13 Q.     That's that meeting you requested on
14 January 27th in the e-mail we just looked at,
15 correct?
16 A.     Yes.
17 Q.     It was you, Ms. Kutzler, Jane Doe 3, and
18 Jane Doe 4 that were present?
19 A.     Yes.
20 Q.     No one else?
21 A.     Yes.
22 Q.     I thought that meeting was held to
23 discuss the interim position, not the operation of
24 the tax assessment --

Page 222

1  A.     It was.  However, as part of the
2  operation, we talked about the field appraisers,
3  those positions, and then it morphed into the
4  discussions regarding the overall operation of the
5  tax assessment office.  And then we specifically
6  then got into the concern about the STEB reports.
7  Q.     Okay.
8        Next sentence says:  During the
9  discussion, a significant issue was revealed that
10 caused a great concern regarding the efficient
11 operation of the tax assessment office.
12        The great concern was the STEB report,
13 correct?
14 A.     Yes.
15 Q.     That was an issue that you believed had
16 already been revealed prior to this discussion,
17 had it not?
18 A.     Yes, I was aware of it prior to this
19 discussion.
20 Q.     So why do you write during this
21 discussion, a significant issue -- issue was
22 revealed?
23 A.     We discussed it during -- as part of the
24 meeting.

Page 223

1  Q.     But revealed means for the first time.
2  A.     Well, it wasn't for the first time,
3  so...
4  Q.     So that's an -- an error, correct?
5  A.     Well, maybe a misuse of a word.
6  Q.     Jane Doe 3 indicated that the reports
7  that are filed with the State Tax Equalization
8  Board by the tax assessment office are severally
9  delinquent.  Were those words specifically used my
10 Jane Doe 3?
11 A.     I don't believe, no.
12 Q.     Okay.
13        So she didn't indicate that they were
14 severely delinquent?
15 A.     She probably did not use those words.  I
16 don't recall.
17 Q.     When you were meeting with Jane Doe 3
18 and Jane Doe 4 on February 5th, did either you or
19 Ms. Kutzler take notes?
20 A.     I believe we did, yes.
21 Q.     Okay.
22        Were those handwritten or typed?
23 A.     They would have most likely been
24 handwritten.

Case 3:21-cv-00477-MCC   Document 280-1   CONFIDENTIAL   Filed 09/20/23   Page 237 of 342
Deposition of Heidi Zula Vol. I - Revised
Jane Doe, et al. v. Schuylkill County Courthouse, et al.

Page 224

1  Q.      Were they maintained anywhere?
2  A.      I don't recall.
3  Q.      Placed in Jane Doe 3's personnel file?
4  A.      No.
5  Q.      The conclusion of this memo is that she
6  be removed from her position, correct?
7  A.      Yes.
8  Q.      And that would be a personnel issue?
9  A.      That was the recommendation to my
10 supervisor, Mr. Bender.
11 Q.      So being that you were recommending a
12 demotion of an employee, don't you think that
13 notes regarding your conversation with her should
14 have been included -- maintained in her personnel
15 file?
16 A.      No.  The resulting action would be
17 placed in her personnel file.
18 Q.      It goes on to state a couple sentences
19 down:  Jane Doe 3 indicated that all reports for
20 the 2020 calendar year must be uploaded by
21 February 28, 2021, otherwise the Commonwealth will
22 shut down the county's access to the system.
23         Well, you were meeting with her on
24 February 5th of 2021, correct?

Page 225

1  A.      Yes.
2  Q.      So she still had 28 -- I'm sorry -- 23
3  days -- terrible math -- to submit the 2020
4  calendar year STEB reports, correct?
5  A.      Yes.
6  Q.      So if she still had 23 days, how were
7  they severely delinquent?
8  A.      Because they were due each month
9  following the month.  Like, they were to be
10 submitted on a monthly basis and they weren't
11 submitted on a monthly basis, and so there were a
12 number that were severely delinquent because they
13 were submitted on a monthly basis as they were to
14 be done.
15 Q.      Next sentence states:  She explained
16 that despite COVID, the real estate market has
17 been very busy, causing the preparation of the
18 STEB reports to be delayed by one or two months.
19         Do you recall having conversations during
20 this meeting with Jane Doe 3 and Jane Doe 4 that --
21 about the grace period that the state had allowed
22 for COVID?
23 A.      Yeah, by one to two months, based upon
24 that.

Page 226

1  Q.      Well, that says they were delayed by one
2  to two months.  That doesn't talk about a grace
3  period there.
4  A.      Then I don't recall if that was
5  discussed during the meeting or not.
6  Q.      Okay.
7          The next paragraph talks -- and the
8  sentence specifically reads:  Jane Doe 3 stated
9  that Jane Doe 4 has been mentally destroyed by the
10 harassment allegations made against the county.
11 And it inhibits her ability to perform her work.
12 Further, Jane Doe 3 also indicated that it is
13 difficult for the reports to be completed outside
14 of the tax assessment office and Jane Doe 1's
15 placement in the 410 Building has hampered her
16 ability to complete the reports.
17         Did the county at any point at this
18 time, February of 2021, consider disciplining Jane
19 Doe 1?
20 A.      Not at this point, no.
21 Q.      Why was the -- why was Jane Doe 3
22 disciplined then?
23 A.      She was ultimately responsible for the
24 operations of her office.

Page 227

1  Q.      And is this memo the catalyst to what
2  lead to Jane Doe 3 and Jane Doe 4's demotion?
3  A.      I don't know if it was the catalyst.  It
4  was a review of some information that I was asked
5  to do, but I don't know if it was the actual
6  catalyst which resulted in that.
7  Q.      Well, it was the start of it, correct?
8  A.      No.  That -- those conversations were
9  started prior to me getting to the county.
10 Q.      Okay.
11         Why was Jane Doe 4 demoted?
12 A.      The -- the office -- the ultimate
13 decision was to separate the offices.  So in order
14 to separate the offices, the positions of being
15 the chief tax assessor and the director of tax
16 claim needed to be separated because the offices
17 were now separated.  So that is -- was the
18 decision that was made, to separate the positions
19 and take them back to what they were before.
20 Q.      And the reason for the separation of the
21 offices was because of the delinquency of the STEB
22 reports?
23 A.      That amongst other reasons I'm sure that
24 I wasn't privy to.

Page 228

Q.    So you're not aware of any other
reasons?
A.    I believe that there were also other
reasons, I just didn't make -- I wasn't involved.
I was involved with the STEB report issue.
Q.    Okay.
So my question is:  As you sit here
today, are you aware of any other reasons that
contributed -- and, again, it doesn't mean that
none exist, but are you aware of any other reasons
that Jane Doe 3 and Jane Doe 4 were demoted?
MS. IPPOLITO:  If you only know
them based upon conversations with your attorney,
I recommend that they do not be answered, the
questions not be answered and I would object to
these questions.
THE WITNESS:  I guess so.  I'm not
sure.  The information I had related to the STEB
reports.
BY MS. SMITH:
Q.    That's the only information that you
have?  That's what I'm trying to clarify.  Are you
aware of any other reasons that Jane Doe 3 and
Jane Doe 4 were demoted?

Page 229

A.    It was my -- my interaction was with the
STEB reports.
Q.    Again, still I'm -- I'm just trying to
get a concise answer here.  I understand your
involvement was with the STEB reports, that's
what -- but do you have any knowledge?  Again,
let's start with just not what the knowledge was
or who it came from, just do you have any
knowledge for any other reason for their demotion,
Jane Doe 3 and Jane Doe 4?
A.    No.
Q.    Okay.
And again, in February, March 2021, Jane
Doe 1 was not disciplined by the county?
A.    No, she was not.
Q.    Was there ever a consideration of
relocating Defendant Halcovage to the 410 Building
if, as Jane Doe 3 indicated to you, reports being
completed outside the tax assessment office
hampered Jane Doe 1's ability to complete the
reports?
A.    I have no control over what an elected
official can do, so I was not involved in any
of -- further discussions regarding Mr.

Page 230

Halcovage's work location or otherwise.
Q.    Why do you believe you had no ability to
control an elected official?
A.    Because I can't.  As a county employee,
I did not have any authority over his work within
the county.
Q.    So --
A.    He's not an employee.
Q.    Who do you believe did?
A.    Well, apparently Mr. Groody did as the
sheriff.
Q.    Did you ever go to Sheriff Groody and
say, can you move to Defendant Halcovage to the
410 so Jane Doe 1 can work from the courthouse?
A.    No, I did not.
Q.    Did you ever ask Defendant Halcovage,
hey, do you mind working from a different building
or working from home?
A.    I did not have those specific
conversations with Mr. Halcovage.
Q.    This -- a memo on Paragraph 2 goes on to
state:  When asked what additional resources could
be provided to Jane Doe 1 to complete the reports,
Jane Doe 3 offered no further suggestions or

Page 231

information.
Did you, before writing this report,
speak with Defendant Kutzler?
A.    So I drafted the initial memo and then
it was reviewed by Ms. Kutzler.
Q.    Okay.
So --
A.    Based upon our meeting that we had.
Q.    But prior to drafting it, maybe not
about the writing of the report, but the
information used to come up with the contents of
the report, did you speak with Ms. Kutzler about
that?
A.    Yes, we had conversations, yes.
Q.    Were you -- again, because this is less
than a month into your employment, were you aware
of any issues or concerns that the plaintiff --
plaintiffs had raised regarding their work
environment prior to your employment?
A.    So I am -- I was aware of the issues
that they raised about working out of the 410
Building, yes.
Q.    Well, the ones we went over, like since
your employment?

Deposition of Heidi Zula Vol. I - Revised                    Jane Doe, et al. v. Schuylkill County Courthouse, et al.

Page 232

1  A.    Yes.
2  Q.    Okay.
3      But any issues --
4  A.    I didn't have -- not that I can recall
5  having any specific discussions about their work
6  environment, no.
7  Q.    Okay.
8      So let's -- I'm going to be go through a
9  few of them.  Are you aware that on July 15, 2020,
10 Defendant Roth was notified that tax claim and
11 assessment offices were understaffed, thus
12 impacting Jane Doe 3 and Jane Doe 4's ability to
13 perform their job duties?
14 A.    No.
15 Q.    Were you aware that on that same day,
16 plaintiffs requested to be made aware of any
17 changes in Defendant Halcovage's access to the
18 courthouse so they would feel more comfortable
19 reporting to their work environment?
20 A.    No.
21 Q.    Are you aware that on July 21st,
22 plaintiffs notified Defendant Roth that Defendant
23 Halcovage had climbed up a steep and dangerous
24 embankment to where Jane Doe 3 and Jane Doe 4 were

Page 233

1  at the time?
2  A.    I was made aware of that based upon,
3  like, external press coverage, not through my
4  county employment.
5  Q.    Okay.
6      But did you specifically know that
7  Defendant Roth had been made aware of it?
8  A.    No.
9  Q.    Were you made aware that plaintiffs had
10 raised concerns with safety, their safety at the
11 courthouse, given that action by Defendant
12 Halcovage?
13 A.    That action, no.
14 Q.    Are you aware that on July -- I'm
15 sorry -- the same day, July 21, 2020, plaintiffs
16 notified that Defendant Roth and Defendant
17 Halcovage had entered the courthouse, gone through
18 to metal detector, as at the time he was required,
19 exited the courthouse, and then retrieved a bag
20 from his car and entered the courthouse again
21 without going back through the metal detector?
22 A.    No.
23 Q.    Are you aware that they raised concerns
24 with their safety as a result of this?

Page 234

1  A.    No.
2  Q.    Are you aware that a PAR -- prior to
3  your employment in 2020, a PAR was completed by
4  the treasurer's office for Dana Murray's transfer
5  out of the tax claim bureau and into the
6  treasurer's office with less than two weeks
7  notice?
8  A.    No.
9  Q.    Are you aware that on August 12, 2020,
10 Jane Doe 3 informed Defendant Roth that her
11 offices were having photo issues with govern.
12 They only had person doing full-time field work,
13 one who was training, new clerk typist two, no
14 clerk typist one, and a program -- program
15 coordinator who was new and thus still learning
16 her position and permits coming in volumes,
17 causing field work to be very backed up?
18 A.    No.
19 Q.    Are you in -- aware that in that same
20 e-mail Defendant -- Jane Doe 3 informed Defendant
21 Roth that her office -- office, tax claims, was
22 understaffed -- I'm sorry -- tax assessment was
23 understaffed?
24     MS. IPPOLITO:  Catherine, what are

Page 235

1  you reading from?
2      MS. SMITH:  I am reading from --
3  these are all e-mails that are in the production.
4  I'm asking if she's aware of them.
5      MS. IPPOLITO:  Do you have --
6      MS. SMITH:  I'll give you the Bates
7  stamps, but I won't produce them, but -- I won't
8  mark them.
9      MS. IPPOLITO:  Yeah, give me the
10 Bates stamps.
11     MS. SMITH:  So it's Doe
12 Supplemental 215, 223, 224 through 226, 240, 289,
13 255 to 256, and 284.
14 BY MS. SMITH:
15 Q.    Are you aware that on August 14, 2020,
16 Jane Doe 3 and Jane Doe 4 requested that they not
17 have to communicate with Defendant Roth, Bender,
18 Halcovage, and to be provided alternative points
19 of contact for work-related matters?
20 A.    I'm aware of that after my employment
21 started, as Mr. Bender -- there was some
22 disagreement between Mr. Bender and what the
23 agreement was supposed to be, I'm aware of that --
24 Q.    Okay.

Deposition of Heidi Zula Vol. I - Revised                                    Jane Doe, et al. v. Schuylkill County Courthouse, et al.

Page 236

1 A.      -- issue.
2 Q.      Are you aware on that same day, Jane Doe
3 1 and Jane Doe 2 requested to be permitted to
4 continue work from home, but with weekly access to
5 the courthouse without having to come into contact
6 with Defendant Halcovage, Bender, and Roth, and
7 that they be provided the equipment and tools
8 necessary for them to fulfill their job
9 requirements from home?
10 A.      No.
11 Q.      Are you aware that in August of 20 --
12 I'm sorry -- 2020, Jane Doe 3 informed
13 Commissioner Hess and Hetherington that she has
14 been requesting that Defendant Bender post vacant
15 positions in her offices and that Bend --
16 Defendant Bender did not communicate timely and
17 that this prolonged staffing issues with her
18 office?
19 A.      No.
20 Q.      Are you aware the same e-mail Jane Doe 3
21 voiced her concern that Defendant Bender never
22 reached out to make the plaintiffs feel safe in
23 the courthouse and that she and Jane Doe 4 reached
24 out to Defendant Bender to make changes so that

Page 237

1 they could continue to run their offices, which
2 were struggling due to the disruption caused by
3 Defendant Halcovage's conduct -- conduct and that
4 the assessment work was piling up because they
5 were not fully staffed?
6 A.      No.
7 Q.      Are you aware that on September 4, 2020,
8 Jane Doe 2 and Jane Doe 1 had not been provided
9 safe weekly access to the courthouse, nor the
10 necessary equipment and supplies needed to perform
11 their job duties from home?
12 A.      No.
13 Q.      Are you aware that on September 4th,
14 Jane Doe 3 and Jane Doe 4 requested to work from
15 home or alternatively work from home for a few
16 days as they believed it would be more productive
17 working from home?
18 A.      No.
19 Q.      Are you aware that in September of 2020,
20 assessment appeal hearings removed last minute and
21 as a result, Jane Doe 3 and Jane Doe 4 had to
22 complete additional work?
23 A.      No.
24 Q.      Are you aware that Jane Doe 3 in

Page 238

1 September of 2020 had completed the necessary
2 paperwork for leasing the vehicles for the
3 assessment office, specifically field appraisers,
4 which was submitted -- which was submitted to
5 Defendant Bender?
6 A.      No.
7 Q.      Are you aware that Jane Doe 3 in
8 September of 2020 informed Commissioner
9 Hetherington and Commissioner Hess that Defendant
10 Bender had not approved these -- the paperwork for
11 the leasing of these vehicles?
12 A.      No.
13 Q.      Are you aware that Defendant Bender
14 never approved the lease of these vehicles during
15 Jane Doe 3's time as chief assessor?
16 A.      I'm not aware of the request, so I'm not
17 aware of approval, no.
18 Q.      Are you aware that he approved it?  I
19 don't know if it was under Alu or Hatter, I
20 apologize, but he did eventually approve a
21 request?
22 A.      I do recall there were leases done for
23 the tax assessment office.  I don't recall when.
24 I think they were put on the board agenda for

Page 239

1 review and approval.
2 Q.      Do you know if it was after March of
3 2021?
4 A.      I believe it was, yes.
5 Q.      So it was after Jane Doe 3's demotion,
6 correct?
7 A.      Yes.
8 Q.      Are you aware that on October 15, 2020,
9 Jane Doe 3 informed Defendant Kutzler that the
10 county's denial to increase Helene O'Connor's
11 hourly wage by -- as a result of the county's
12 denial to increase Helene O'Connor's hourly wage
13 by $5, Ms. O'Connor was not willing to continue to
14 work for the county?
15          MS. PIPAK:  I am going to object to
16 the form.
17          Go ahead, you can answer.
18          THE WITNESS:  I'm not aware of the
19 specific situation, but I did hear that there was
20 some discussion about Ms. O'Connor's hourly rate,
21 but the specifics I'm not aware of.
22 BY MS. SMITH:
23 Q.      Are you aware that Jane Doe 3 informed
24 Ms. Kutzler that as a result of Ms. O'Connor not

Page 240

1 extending her work with the county, that the
2 assessment office or one of Jane Doe 3's offices
3 wouldn't be able to complete the annual
4 certification on time?
5 A.    No.
6 Q.    Are you aware that prior to October 15,
7 2020, Jane Doe 3 had discussed the work
8 environment caused by the sexual harassment,
9 COVID, new staff, and three people being out to
10 CPE classes with numerous county employees?
11 A.    No.
12 Q.    Okay.
13       I, candidly, stopped there because I
14 thought that that was enough of 2020 e-mails.  But
15 those, having heard those things, and assuming
16 they are all true, which I'll represent to you
17 they are supported by e-mails, does it change your
18 opinion as to Jane Doe 3's request for additional
19 resources to have STEB reports completed?
20       MS. PIPAK:  I'm going to object to
21 the form.
22       You can answer.
23       THE WITNESS:  No.  I believe the
24 STEB reports were to be done by Jane Doe 1.  They

Page 241

1 were her responsibility.  And, I mean, they are
2 based upon whatever information was done by the
3 field assessors or the field appraisers position.
4 So, I mean, regardless if they were out doing
5 properties or if things were being done, that
6 information was still -- whatever was put in the
7 system can be pulled out of the system and that's
8 what she completed her STEB report based upon.
9       And given that the STEB reports
10 were severally delinquent and the potential for
11 the impact of not having those STEB reports
12 completed on a timely basis to the county, that is
13 what my recommendation was based on.
14 BY MS. SMITH:
15 Q.    If you had had all the information that
16 I just went over, would you have come to a
17 different conclusion as to whether Jane Doe 3
18 should be removed from her position?
19       MS. PIPAK:  I am going to object to
20 the form.
21       THE WITNESS:  I don't -- I don't
22 know.  I -- I don't.
23 BY MS. SMITH:
24 Q.    Okay.

Page 242

1       Do you think information regarding
2 requests, staffing issues, comments, concerns that
3 occurred prior to your employment, would have been
4 relevant or useful to writing a report such as
5 this, this being Exhibit-118?
6 A.    Again, my report was focused on the STEB
7 reports.  So potential if those impacted the STEB
8 reports, yes, it would have been relevant.  But I
9 focused on the completion of the STEB reports.
10 Q.    Okay.
11       So let's unpack that in connection with
12 what you testified to earlier.
13       The STEB reports you were indicating
14 were completed based off information pulled out of
15 govern, correct?
16 A.    Yes, that's my understanding.
17 Q.    If govern -- if the information in
18 govern was inputted -- input by field appraisers
19 and Jane Doe 3 had -- I think the one e-mail she
20 indicated she had one field appraiser and one in
21 training?
22 A.    I don't believe that the STEB report is
23 based upon information put in by field appraisers.
24 It's based upon the deeds that are put into the

Page 243

1 system and that is, my understanding, done by the
2 clerk typist in the office.  And then the
3 information is pulled out of the system to
4 validate whether or not the sales are accurate or
5 if they're valid sales.  So if they were like
6 family to family or other valid -- or other
7 exemptions that would be put in.  I don't believe
8 that they have any impact on the field appraiser
9 work.
10 Q.    As you sit here today, can you tell me
11 with certainty that the STEB reports do not
12 require any data to -- that the STEB reports do
13 not require the field appraisers to have input
14 certain data before they can be completed?
15       MS. PIPAK:  Object to the form.
16       Go ahead.
17       THE WITNESS:  I don't -- I can't
18 say that with absolute certainty, no.
19 BY MS. SMITH:
20 Q.    Okay.
21       At the time you wrote this memo, could
22 you have said that with absolute certainty?
23 A.    No.
24 Q.    Okay.

Case 3:21-cv-00477-MCC   Document 280-1   CONFIDENTIAL   Filed 09/20/23   Page 242 of 342
Deposition of Heidi Zula Vol. I - Revised
Jane Doe, et al. v. Schuylkill County Courthouse, et al.

Page 244

1  In order to decide who or what position
2 was causing the delinquency of the STEB report,
3 wouldn't it be important to know the complete
4 process from start to finish?
5 A.     Based upon the information I had, it was
6 based upon the work that was required of the real
7 estate market analyst position.
8 Q.     But you didn't understand the process
9 from start to finish, correct?
10      MS. PIPAK:  Objection to the form.
11      Go ahead.
12      THE WITNESS:  I knew that she was
13 required to pull the report, review the report,
14 and then make any notations and then upload it to
15 the state and then that was not -- but that was
16 not being completed.
17 BY MS. SMITH:
18 Q.     But you don't know the report, from
19 where that information came, correct?
20 A.     Not all of it, no.
21 Q.     Okay.
22      So if -- let's say it was a field
23 appraiser, even a clerk typist one, whoever was
24 inputting that data from which she then -- Jane

Page 245

1 Doe 1 then pull the report, if they weren't doing
2 their job, so she couldn't do her job, wouldn't
3 that be something that would be important to know?
4 A.     Yes.
5 Q.     Did you -- again, did you ever find out
6 who was inputting the data?
7 A.     No, I did not.
8 Q.     Did you ever determine if it was them,
9 the inputter, versus Jane Doe 1, the report
10 puller, that was responsible for the delay?
11 A.     No.
12 Q.     Okay.
13      But you -- you determined, based off my
14 reading of your report, that it was Jane Doe 1's
15 issue, correct?
16 A.     Jane Doe 1 was -- her position was
17 responsible for submitting the STEB reports.
18 Q.     Okay.
19      So, again, why was it then that you
20 believe Jane Doe 3 should be removed from her
21 position?
22 A.     She was ultimately responsible for the
23 office and the operation of that office.  And it
24 was recommended that those positions -- the

Page 246

1 offices be separated as and such, that Jane Doe 3
2 would be removed from either one of those
3 positions.
4 Q.     If we look to the middle of the third
5 paragraph on the first page, it starts with
6 further.  It's 414.  Second page.  Sorry.  I might
7 have said third.
8      Do you see that sentence?
9 A.     Uh-huh.
10 Q.     Further, the 410 building office
11 provided to Jane Doe 1 was not sufficient for her
12 to perform her duties.  Jane Doe 3 did nothing to
13 request any additional resources for Jane Doe 1 to
14 perform her duties, nor offered any suggestions
15 how these reports can be completed and brought up
16 to date.
17      Is that your synopsis or conclusion
18 based off of just the February 5, 2021, meeting?
19 A.     No.  There was also an e-mail that was
20 provided by Jane Doe 3 early in January, which
21 indicated that, yes, it would be beneficial for
22 Jane Doe 1 to work out of the tax assessment
23 office to complete the STEB reports.  However,
24 that she did still have the ability to do them

Page 247

1 from the office in the 410 Building.
2 Q.     Did you consider the fact that in the
3 paragraph prior to that, Jane Doe 3 indicated to
4 you that Jane Doe 1 had been mentally destroyed by
5 harassment, which inhibited her ability to perform
6 her work?
7 A.     No, wait.  Can you state the question
8 again?  I'm sorry.
9 BY MS. SMITH:
10 Q.     You said Jane Doe 3 did nothing to
11 request addition resources, nor offer any -- nor
12 offered any suggestions as how these reports can
13 be completed and brought up to date.
14      In the paragraph prior to that it says,
15 Jane Doe 1 was mentally destroyed and that the
16 placement in the 410 Building has hampered her
17 ability to complete her reports.
18      Did you not consider that a suggestion
19 that Jane Doe 1 be permitted to either work from
20 home or work at the courthouse?
21 A.     No.  Based upon her e-mail that she
22 previously provided, Jane Doe 1 should have the
23 ability to complete the STEB reports from her
24 office at the 410 Building.  So, yes, there was

Page 248

1  discussion about having Jane Doe 1 work out of the
2  courthouse and we certainly would have
3  accommodated that, but she did not want to do
4  that.
5  Q.      Right.
6       Because she didn't want to work there
7  because Defendant Halcovage was still there,
8  correct?
9          MS. PIPAK:  Objection to form.
10         THE WITNESS:  I don't know why she
11 didn't want to work there.  I'm assuming, yes,
12 that's why she didn't want to work there.
13 BY MS. SMITH:
14 Q.      Did you ever ask her?
15 A.      No.
16 Q.      Did you --
17 A.      Actually, yes, I think we did have a
18 conversation, now that I think about it.  Yes, I
19 did have a conversation with Jane Doe 1 about --
20 and Jane Doe 2 about returning to the courthouse.
21 And, yes, they did indicate that they did not want
22 to be there because of Mr. Halcovage.
23 Q.      Do you remember when that was?
24 A.      No, I don't.

Page 249

1  Q.      Do you know if it was after or before
2  February 5th?
3  A.      It was after.
4  Q.      I'm sorry.
5       2021.
6       This sentence goes -- paragraph goes on
7  to state that Jane Doe 3 has also not availed
8  herself to additional assistance provided to the
9  tax assessment office by the county.
10      What additional assistance did the
11 county provide to Jane Doe 3?
12 A.      There were recent retirees and former
13 employees who were hired to come back in and
14 provide assistance to the tax assessment office
15 and they were not utilized in that capacity.
16 Q.      Who were those retirees that --
17 A.      I believe -- I believe one was Deb
18 Detweiler and the other one I can't recall her
19 name.
20 Q.      Do you know when Deb Detweiler was
21 brought back to the county?
22 A.      I do not.
23 Q.      The other was a female though?
24 A.      I believe it was a female, yes.

Page 250

1  Q.      You then, kind of just as you testified,
2  the last sentence in this paragraph states:
3  However, Jane Doe 3 had failed to utilize them to
4  assist in the operation of the office.
5       Where did the information for that
6  conclusion come from?
7  A.      I was made aware that -- that these
8  additional retirees or former employees were hired
9  as kind of a per-diem basis and that they weren't
10 utilized and I did confirm that with payroll
11 records because they weren't paid.
12 Q.      Was one of the individuals Helene
13 O'Connor?
14 A.      No.
15 Q.      Okay.
16      Did you speak with the two individuals?
17 A.      The two..?
18 Q.      Per diems?
19 A.      No, I did not.
20 Q.      Did you ask them -- strike that.
21      Let's kind of walk through how per diem
22 works.
23      Are per diem employees voted on by the
24 commissioners?

Page 251

1  A.      Yes.
2  Q.      And the salary board?
3  A.      Yes.
4  Q.      And it's a set number of hours that
5  they -- or I should say, a max number of hours
6  that they can work?
7  A.      Yes.  I believe they're put on the
8  agenda based upon up to a certain number of hours.
9  Q.      At a specific hourly rate?
10 A.      Yes.
11 Q.      Okay.
12      Who sets the schedule for those
13 individuals?
14 A.      I believe they're typically done by the
15 supervisor.
16 Q.      If a per diem employee can work up to,
17 let's say, 20 hours a week, if that's what the PAR
18 was approved for, but they only want to work ten,
19 what happens then?
20 A.      They would work ten hours.
21 Q.      So other than seeing that they -- these
22 per diem employees did not work, is there any
23 other confirmation that it was Jane Doe 3's
24 failure to utilize them?

Page 252

1  A.      No.  Just my review of the records of
2  payroll.
3  Q.      So is it possible then that these
4  employees did not want to work those hours for
5  other reasons?
6  A.      Yes.
7  Q.      Do you know, what was Deb Detweiler's
8  position for which she was hired when she was per
9  diem?
10 A.      I don't know.
11 Q.      Was she a real estate market analyst?
12 A.      No.  I believe -- I believe she was a
13 field appraiser, assessor, something to that
14 effect.  I don't -- I don't exactly know.
15 Q.      Do you know, did Deb Detweiler have the
16 ability or knowledge to complete the STEB reports?
17 A.      I do not know.
18 Q.      Is the other individual Diane Ruscavage?
19 A.      Yes.
20 Q.      And does Ms. Ruscavage have the ability
21 or knowledge to complete STEB reports?
22 A.      I don't know.
23 Q.      Okay.
24         So how do you know that -- even if Jane

Page 253

1  Doe 3 had failed to utilize them, that it would
2  have impacted the STEB report completion?
3  A.      I don't know that.
4  Q.      Are you aware that Ms. Ruscavage did not
5  work during this period prior to 2021, because of
6  COVID and she had moved?
7  A.      No, I'm not aware of that.
8  Q.      At any point in your -- well, at any
9  point ever, did you come to learn the -- did you
10 come to learn about Jane Doe 3's -- how do I
11 phrase this?  Jane Doe 3's improvements to the tax
12 assessment office after she took over?
13 A.      No.
14 Q.      Okay.
15         Prior to recommending that she be
16 removed from her position, did you speak with any
17 tax assessment employees, current or former, and
18 ask them what they thought of her as a supervisor?
19 A.      No, I did not.
20 Q.      Why?
21 A.      I focused, again, on the STEB reports
22 and I did not go and speak with the tax assessment
23 employees.
24 Q.      Did you speak with any assessment

Page 254

1  employee and ask them who could -- who had the
2  ability to complete the STEB reports?
3  A.      No.
4  Q.      And again, in fact, on February 5th,
5  they were not yet late, correct?
6  A.      They were late.  There was a drop-dead
7  deadline of February 28th for all of the reports
8  for the 2021 calendar year to be submitted and
9  uploaded.
10 Q.      And thus, there was -- as that date, the
11 drop-dead date had not been missed, there was no
12 negative consequences to the county, correct?
13 A.      Correct.
14 Q.      When you wrote this memo, did you
15 consider that Jane Doe 1, for a number of months
16 after the COVID grace period, had requested
17 supplies to work from home?
18 A.      No, I was not aware.
19 Q.      So Jane Doe 1, as you're understanding
20 it, is that from -- well, strike that.
21         Are you aware that the county furloughed
22 employees due to COVID?
23 A.      Yes, I am aware of that.
24 Q.      Are you aware that Jane Doe 1 and Jane

Page 255

1  Doe 2 were two of those employees?
2  A.      Yes.
3  Q.      And there was a period of time, I think
4  it was April -- April 2020 to July 2020, that
5  county employees who were furloughed did not work
6  at all?
7  A.      Yes.  I believe -- yes, I'm aware that
8  there was a period of time where the furloughed
9  county employees did not work.
10 Q.      And then there was a period of time that
11 some of the furloughed employees were changed from
12 furloughed status to work-from-home status?
13 A.      Yes.  I'm aware that certain departments
14 did permit staff to work from home and then they
15 also potentially worked a few days in the office
16 or like a hybrid kind of schedule, yes.
17 Q.      Because that April to, like, July period
18 was kind of the learning curve of transferring
19 things to someone's home due to COVID, correct?
20 A.      Yes.
21 Q.      And then once they got up and running
22 with that the new normal, as we've called it, some
23 of those employees could perform their duties from
24 home, correct?

Page 256

1  A.      Yes.
2  Q.      And are you aware that Jane Doe 1 was
3  one of those individuals who was brought back from
4  furlough in a work-from-home status?
5  A.      I don't -- I'm not aware.  I know she
6  was furloughed.  I don't know exactly whether she
7  worked from home full time, if she had a hybrid,
8  that I don't know when she returned or if she had
9  to just come back in the office.
10  Q.     Are you --
11  A.      That I'm not aware.
12  Q.      So you don't know if she ever came --
13  between May of 2020 and January of 2021, you don't
14  know if she ever came back?
15  A.      I don't know.
16  Q.      Okay.
17          But prior to January of 2020, are you
18  aware of what equipment Jane Doe 1 was provided at
19  her home to complete her job duties?
20  A.      January of 2021?
21  Q.      Sorry.  Yeah.
22          From May of -- prior to January of 2021,
23  are you aware of what supplies, if any, Jane Doe 1
24  was provided to --

Page 257

1  A.      I don't know.
2  Q.      Okay.
3          If Jane Doe 1 had not been provided the
4  necessary supplies to complete the STEB reports
5  from home, would that change your opinion as to
6  whether it was her failure or someone else's?
7  A.      Potentially.  I don't know the
8  situation.  I need to kind of review that.  But at
9  the end of the day, the STEB reports needed to be
10  completed by someone.
11  Q.      Okay.
12          Looking at the next page, 415, the
13  second to last paragraph starts with further.
14  Further, it is noted that Jane Doe 3 has failed to
15  communicate with, I think it should say, her
16  direct supervisor, county administrator Gary
17  Bender regarding the issue.
18          Do you see that?
19  A.      Yes.
20  Q.      Are you aware of, if prior to January
21  and February of 2021, Jane Doe 3 was ever required
22  to speak with Mr. Bender regarding STEB reports?
23  A.      I'm not aware.
24  Q.      If Mr. Bender should have been spoken

Page 258

1  with about this issue, why was he not included in
2  this meeting?
3  A.      In the meeting?
4  Q.      The February 5th meeting.
5  A.      Ms. Kutzler and I were asked to address
6  the field appraiser position and then also talk
7  about -- well, it morphed into talking about the
8  full operations of the office.  And that meeting
9  was just with me and her.  We didn't believe Mr.
10  Bender needed to be part of that meeting.
11  Q.      Ms. Kutzler, what would you say her
12  knowledge -- level of knowledge about the STEB
13  reports was in February of 2021?
14  A.      I don't know.
15  Q.      Mr. Bender, as county administrator, was
16  the supervisor for the tax assessment office,
17  correct?
18  A.      Yes.
19  Q.      Did he -- did he give you any
20  information regarding the STEB reports or their
21  completion?
22  A.      He, I believe, was the one who provided
23  me with the memo that was issued from the tax --
24  state tax mutualization board regarding the

Page 259

1  delinquency.
2  Q.      But no information on, like, the start
3  to finish process?
4  A.      No.
5  Q.      The next sentence says:  She did not
6  seek any assistance or guidance from her
7  supervisor on how to remedy the severe delinquency
8  in the STEB reports -- STEB report filings.
9          Do you see that?
10  A.      Yes.
11  Q.      Where did that information come from?
12  A.      Mr. Bender.
13  Q.      So if there's an e-mail that is Jane Doe
14  3 seeking his guidance and supervision, then that
15  would be an inaccurate statement on his part,
16  correct?
17  A.      Potentially.
18  Q.      In addition, Mr. Bender has also
19  reported Jane Doe 3's unwillingness to proceed
20  with other projects and recommendations that he
21  has presented to her for consideration and
22  implementation.
23          What other projects and recommendations
24  did he present to her?

Case 3:21-cv-00477-MCC   Document 280-1   Filed 09/20/23   Page 246 of 342
CONFIDENTIAL
Deposition of Heidi Zula Vol. I - Revised
Jane Doe, et al. v. Schuylkill County Courthouse, et al.

Page 260

1  A.     He requested interim billing to be
2  considered.  And based upon the information I
3  received from him, that Jane Doe 3 told him that
4  she was not going to proceed with that process.
5  And I believe that was a conversation with Mr.
6  Bender, Ms. Marchalk as the treasurer, and Jane
7  Doe 3.
8  Q.     Any others?
9  A.     I don't recall.
10 Q.     Okay.
11        Did Mr. Bender provide you with any
12 communication documenting that interim billing
13 conversation?
14 A.     No.
15 Q.     Are you aware of the fact that the
16 county did not being to do interim billing, I
17 believe, until after Jane Doe 3 was demoted?
18 A.     Yes.
19 Q.     Okay.
20        Do you know when that was actually
21 implementing?
22 A.     I don't exactly know.  And I don't know
23 if it has been.  I don't know.
24 Q.     Okay.

Page 261

1        So you don't even know if it's been?
2  A.     I don't know.
3  Q.     Okay.
4  A.     I don't know.
5        MS. SMITH:  We're going to look at
6  Zula 451 to 453, Exhibit 119.
7              - - -
8        (Zula 451-453 marked as Exhibit-119 for
9  identification.)
10             - - -
11 BY MS. SMITH:
12 Q.     Do you recognize this e-mail chain?
13 A.     Yes.
14 Q.     The first e-mail, which is on Page 2,
15 Zula 452, a little bit onto 453, is an e-mail from
16 you to Jane Doe 3 regarding that February 25,
17 2021, conversation, right?
18 A.     Yes.
19 Q.     Who requested or did you do it on your
20 own accord, this e-mail?
21 A.     The original e-mail, the February 18th
22 e-mail?
23 Q.     Correct.
24 A.     I was asked to follow up on the

Page 262

1  submission by Mr. Bender, of the reports by Mr.
2  Bender.
3  Q.     Okay.
4        Jane Doe 3 then responds to you that
5  same day.  We would agree that this is 13 days
6  later, correct?
7  A.     Yes.
8  Q.     Obviously probably at least one weekend
9  in there; would you agree?
10 A.     Yes.
11 Q.     If we look at Paragraph 3 of Jane Doe
12 3's e-mail on Page 1, it starts with when we met.
13        She says:  When we met, I failed to
14 remind you that Jane Doe 1 was furloughed for
15 three months and there were two months which
16 followed the furlough in which Jane Doe 1 waited
17 for the county to provide a workspace that was
18 suitable.
19        So that would be at least five months,
20 would you agree, that Jane Doe 1 couldn't complete
21 the STEB reports?
22 A.     Based upon her information, yes.
23 Q.     This paragraph Jane Doe 3 goes on to
24 state, the second to last sentence:  Between Jane

Page 263

1  Doe 4 and I, we worked a total of 81 hours overtime
2  last pay period to meet the deadline.  At this
3  point, there are ten months fully approved and the
4  remain two months are to be completed, but need to
5  be uploaded and then approved.
6        Jane Doe 4 and Jane Doe 3 were exempt
7  employees, correct?
8  A.     Yes.
9  Q.     So 81 hours of overtime they were not
10 paid for, correct?
11 A.     That's correct.
12 Q.     If we look to the first paragraph, it
13 says, she had informed you, and I think in your
14 e-mail it says the same, January was completed and
15 uploaded.  And February, March, and April STEBs
16 were almost complete.
17        So there was only one month that had
18 been completed in January, correct?  I mean in
19 February when you met?
20 A.     Yes.
21 Q.     It was -- the only month was January
22 that was complete, correct?
23 A.     Yes.
24 Q.     And then looking back at that third

Page 264

1 paragraph, ten months were fully approved.  So
2 nine additional months had been completed and
3 fully improved, with two completed and needing
4 upload, correct?
5 A.      So she indicated January was completed,
6 yes.  February, March sales were almost complete.
7 So basically 11 months were still outstanding.
8 Q.      In Jan -- in February when you met?
9 A.      Yes.
10 Q.      Right.
11         And then by 13 days later, all that was
12 needed to be done was completing and uploading --
13 completing -- I'm sorry.  Uploading and approving
14 two months?
15 A.      Correct.
16 Q.      So everything was pretty much done 13
17 days later; would you agree?
18 A.      The vast majority of what needed to be
19 done, yes.
20 Q.      Okay.
21         Is this Jane Doe 3 not -- and Jane Doe 4
22 not completing their job duties?
23 A.      Well, they were completing the job
24 duties that were assigned to Jane Doe 1.  And so

Page 265

1 from that perspective, they didn't oversee or
2 provide appropriate supervision to Jane Doe 1 to
3 get her job duty completed.
4 Q.      So you're saying because they didn't
5 delegate it to Jane Doe 1, that was the issue?
6 A.      Well --
7         MS. PIPAK:  Objection to the form.
8         Go ahead.
9         THE WITNESS:  That was part of the
10 issue, yes.
11 BY MS. SMITH:
12 Q.      What's the other part of the issue?
13 A.      That the STEB reports were severely
14 delinquent, as they're supposed to be submitted on
15 a monthly basis.
16 Q.      Are you aware of all the other job
17 duties that are required for the operation of the
18 tax assessment office?
19 A.      Yes.  I'm aware that there is other job
20 duties, other than the STEB report.
21 Q.      Okay.
22         Are you aware of all the job duties of
23 the tax claim bureau?
24 A.      Yes.

Page 266

1 Q.      Okay.
2         They're quite -- there's quite a few of
3 them, correct, between the two offices?
4         MS. PIPAK:  I'll object to the
5 form.
6         Go ahead.
7         THE WITNESS:  Yes.
8 BY MS. SMITH:
9 Q.      So you're saying that because -- I'm
10 sorry.  If we look to your memo, your issue was
11 that Jane Doe 1 -- I'm sorry -- that Jane Doe 3
12 wasn't ensuring that the STEB reports were done,
13 correct?
14 A.      Yes.  That they weren't being done on a
15 timely basis, yes.
16 Q.      Jane Doe 3 now spends, along with Jane
17 Doe 4, a combined 81 hours of overtime to get them
18 complete and you have issue with that?
19         MS. PIPAK:  Object to the form.
20         Go ahead.
21         THE WITNESS:  My issue was the fact
22 that they were not being submitted on a timely
23 basis, as they were supposed to be on a monthly
24 basis.

Page 267

1 BY MS. SMITH:
2 Q.      Okay.
3         But you said that there was an issue
4 with the fact that Jane Doe 1 was the -- wasn't
5 the one who completed them, correct?
6 A.      Well, the -- yes.  Combined with the
7 fact that Jane Doe 1 should have been doing it,
8 because I think in my e-mail I said, you know, it
9 generates the question, what is Jane Doe 1
10 actually doing during her workday when her primary
11 focus is the completion of the STEB reports.
12 Q.      Well, wouldn't that be an address to
13 with Jane Doe 1 if --
14 A.      Jane Doe 3 and Jane Doe 4 were the
15 supervisors of Jane Doe 1, so if they were
16 permitting her -- the question begs itself, what
17 were they allowing -- was she being paid to do.
18 If she wasn't doing the STEB reports, quite
19 honestly, why would we even need the position
20 then.
21 Q.      Did you look at her pay stubs or her
22 time sheets?
23 A.      Yes.
24 Q.      Was she -- how many hours was she

Page 268

1 actually working?
2 A.    I -- I don't recall, but she was being
3 paid during that time period.
4 Q.    But you don't know how many hours she
5 was paid for during that time period?
6 A.    I don't know without looking.
7 Q.    When you are saying time period, what
8 time period are you referring to?
9 A.    So during the time period in which she
10 was going -- supposed to be submitting the 2020
11 reports.  She was claiming time worked during
12 2020, as well as January of 2020 and February
13 of -- excuse me -- January 2021 and February 2021.
14 Q.    So other than the time reports for
15 January of 2021 and February of 2021, you didn't
16 look at her time sheets?
17 A.    Not prior to that, no.  No, not prior to
18 my start at the -- at the county.
19 Q.    Let me just make sure my question and
20 your answer is clear so the record is clear.
21       When you decided that there was concerns
22 regarding what Jane Doe 1 was doing because she
23 was submitting time reports, the only time reports
24 you looked at were January 2021 and February of

Page 269

1 2021, correct?
2 A.    Yes.  And it was discussed also with Mr.
3 Bender that they were continually to be paid
4 during that time frame and they weren't submitting
5 any work, Jane Doe 1.
6 Q.    Okay.  All right.
7       So let's go back to your job
8 description.  I apologize I don't remember what
9 the number is.
10       MS. SMITH:  94, going to be Zula 49
11 to 52.
12 BY MS. SMITH:
13 Q.    Ms. Zula, please tell me where in that
14 job description it states that the STEB reports or
15 the daily operations of the tax assessment office
16 are in your job purview?
17 A.    They aren't.
18 Q.    Why then were you looking into this
19 issue?
20 A.    Because I was asked to do so by my
21 supervisor.
22 Q.    That is Defendant Gary Bender, correct?
23       MS. PIPAK:  Objection to the form.
24       You don't have to answer that.

Page 270

1 That's argumentative.
2 BY MS. SMITH:
3 Q.    That's Defendant Gary Bender, correct?
4       MS. PIPAK:  You don't have to
5 answer that.
6       That's argumentative.
7       MS. SMITH:  Are you serious?  If
8 I'm argumentative, then you're argumentative right
9 now.  Answer a simple question.
10       MS. PIPAK:  I'm not asking her the
11 questions and that question is argumentative.
12       MS. SMITH:  It's not, Counsel.
13 BY MS. SMITH:
14 Q.    Was Gary Bender your supervisor?
15 A.    Yes.
16 Q.    Was he the one who instructed you to --
17 to look into the STEB issue?
18 A.    Yes.
19 Q.    Okay.
20       Did you tell Mr. Bender it wasn't part
21 of your job description?
22 A.    No, I did not.
23 Q.    Why not?
24 A.    He asked me to look at an organization

Page 271

1 and that's what I did.
2 Q.    But you -- it wasn't part of your job
3 description?
4 A.    So it was a directive given to me by my
5 supervisor, and so I followed the directive.
6 Q.    Because it would be uncomfortable to
7 tell your supervisor that you didn't want to do
8 something they wanted you to do, correct?
9 A.    No, not necessary.
10 Q.    Okay.
11       Did you feel that you were qualified to
12 look into this issue?
13 A.    I did, yes.
14       MS. SMITH:  Looking at Zula 390,
15 120 is the Exhibit.
16                    - - -
17       (Zula 390 marked as Exhibit-120 for
18 identification.)
19                    - - -
20 BY MS. SMITH:
21 Q.    Ms. Zula, do you recognize this e-mail?
22 A.    Yes.
23 Q.    What draft plan were you working on in
24 Jan -- on January 29, 2021?

Page 272

1  MS. PIPAK:  Go ahead.
2  THE WITNESS:  So the draft plan was
3 we were discussing what was going to happen with
4 the tax assessment office.  As I indicated, there
5 was discussion about bringing in a consultant to
6 get the operations of the office kind of back on
7 track.
8 BY MS. SMITH:
9 Q.  Was a consultant ever brought in?
10 A.  Yes.
11 Q.  Is that Joan R. Price?
12 A.  No.  The consultant for the tax
13 assessment office was Tony Alu.
14 Q.  Okay.
15  So you're talking about a consultant
16 after Jane Doe 3's demotion?
17 A.  Yes.  But the discussions with Mr. Alu
18 happened much prior to that.
19 Q.  The discussions with Mr. Alu or about
20 Mr. Alu?
21 A.  Both.  We met with Mr. Alu, kind of jut
22 like an interview in, I believe it was, my first
23 or second week of employment with the county.  And
24 then there were some discussions as to, you know,

Page 273

1 what plan we wanted to put in place moving
2 forward.
3 Q.  And you met with Mr. Alu to discuss the
4 operations of the tax assessment office, correct?
5 A.  I was part of the meeting, I attended
6 the meeting, I did not run the meeting.
7 Q.  Okay.
8  But the meeting with Mr. Alu was
9 involving discussions about the operations of the
10 tax assessment office, correct?
11 A.  Yes.
12 Q.  Do you know what, if any information,
13 Mr. Alu reviewed in that meeting or prior to that
14 meeting to give opinions or come to conclusions?
15 A.  No, I do not.
16 Q.  The department head of the tax
17 assessment office is called a chief assessor,
18 correct?
19 A.  Yes.
20 Q.  And by statute, a chief assessor is to
21 hold a certified Pennsylvania Evaluators License,
22 correct?
23 A.  Yes.
24 Q.  Are you aware that prior to his

Page 274

1 employment with the county, Mr. Alu did not hold a
2 valid CPE license?
3 A.  No, I'm not the aware of that.  I
4 believe he did.
5 Q.  Would it change your opinion as to -- as
6 to his ability to consult on assessment issues if
7 he did not hold a CPE license?
8 A.  No.
9 Q.  How can someone who doesn't hold a
10 license for the chief position of the department
11 advise?
12 A.  He had numerous years of experience
13 through Luzerne County, I believe it was.  He was
14 their chief assessor for a number of years and so
15 he had a lot of expertise in county tax
16 assessment.
17 Q.  Do you know when he retired from or left
18 Luzerne?
19 A.  No, I do not.
20 Q.  Do you -- are you aware of any issues
21 that the Luzern County assessor's office had while
22 he was employed there?
23 A.  No, I do not.
24 Q.  And are you aware as to if his -- maybe

Page 275

1 previously-held CPE license was no longer valid?
2 A.  No.
3 Q.  Do you know any changes to the CPE
4 licensing requirements or compliance that had
5 changed during any lapse of his license?
6 A.  No.
7 Q.  So who -- so was there a draft plan ever
8 put into writing?
9 A.  Not to my knowledge, no.
10 Q.  Okay.
11  It was just something discussed?
12 A.  Yes.  There were discussions that were
13 held regarding the operations of the tax
14 assessment office.
15 Q.  So why in this e-mail is the request to
16 you, what do you need from me to draft the plan,
17 correct?  I don't -- I mean, it's not really
18 grammatically correct.  But what did you take that
19 sentence to mean?
20 A.  That our discussions regarding the
21 office, like, if he -- we needed any additional
22 information from Mr. Heinbach.
23 Q.  Okay.
24  Did you need any additional information

Page 276

1  from him?
2  A.    Not that I recall.
3  Q.    So Mr. Alu, yourself were in this
4  meeting about this draft plan.  Who else is there?
5  A.    Mr. Bender, Ms. Kutzler, and Mr. Roth.
6  Q.    Other than Mr. Alu, who talked?
7  A.    I believe Mr. Bender talked and Mr. Roth
8  potentially.  Mr. Roth, I think they kind of led
9  the meeting regarding kind of the operations of
10 the office --
11        MS. IPPOLITO:  I'm going to object
12 --
13        MS. PIPAK:  Can we take a break.  I
14 don't know -- I just want to check if I need to
15 call that back.  I don't know why it was -- I
16 understand -- I just need to understand what that
17 document is.
18        MS. SMITH:  I mean, it's been
19 produced at this point.
20        MS. PIPAK:  I understand.  There's
21 also -- I just -- I just need to check.  I just
22 need to check into it.
23        MS. SMITH:  We can take a minute.
24        VIDEOGRAPHER:  The time is now

Page 277

1  3:07 p.m. and we're going off the record.
2              - - -
3        (Whereupon, brief recess was held after
4  the record.)
5              - - -
6        MS. PIPAK:  This is the first time
7  I have seen this document.  This is the first time
8  I've known that this document has been produced.
9  I am not sure if it's attorney-client privilege.
10 I don't know that it is to the effect that I don't
11 know if there's legal advice given or received.
12        For the limited purposes of today,
13 I just want to put on the record, she's allowed
14 to -- we are allowing her to answer some questions
15 about it.  To the extent there's conversations
16 with counsel, including Heinbach and Glenn Roth
17 about legal advice back and forth, I would ask
18 that she does not answer those questions.
19        MS. SMITH:  Okay.  I think I
20 understand, but I guess we'll take it question by
21 question.
22        MS. PIPAK:  And I'll try to work
23 with everybody.
24        VIDEOGRAPHER:  The time is now 3:34

Page 278

1  p.m. and we're back on the record.
2  BY MS. SMITH:
3  Q.    All right.
4        Ms. Zula, you were talking about a
5  meeting in which Tony Alu was brought in to
6  discuss -- I guess, why don't you tell me, what
7  exactly was he discussing or rising on?
8  A.    So the initial meeting I was part of was
9  we were speaking to him about his credentials,
10 kind of outlining what ideally we were looking for
11 as far as recommendations regarding the operations
12 of the tax assessment office.
13        And then following that meeting was
14 further discussion that I was not part of as far as,
15 you know, what those recommendations would be.
16 Q.    Okay.
17 A.    So the initial meeting was basically
18 introduction with him.  Getting his credentials,
19 and determining a plan to move forward.
20 Q.    Were any documents used, reviewed.
21 presented?
22 A.    I believe the only document would have
23 been his resume.
24 Q.    Okay.

Page 279

1        And during this meeting, did Mr. Alu
2  give you advice, not you specifically, but the
3  individuals in the meeting, advice on a plan or
4  how to move forward or the operations of the tax
5  assessment office?
6  A.    Not at that point.  I think it was more
7  the scope of the work that was discussed as to
8  what we would be looking for, the county would be
9  looking for him to do.
10 Q.    Okay.
11        And then there was another meeting
12 you -- that was held that you were not a part of?
13 A.    I believe there were further discussions
14 with Mr. Alu.  I don't know if they were formal
15 meetings or just discussions.  But I do not recall
16 being part of those.
17 Q.    Do you know if Mr. Alu -- strike that.
18        At some point, Mr. Alu get hired as a
19 contract per diem, I don't know what the exact
20 term is.  What was he hired as?
21 A.    He was hired as a consultant contractor.
22 So he wasn't an employee.  He was like a
23 contractor that we had a separate agreement with,
24 like, for his terms and conditions.

Case 3:21-cv-00477-MCC   Document 280-1   CONFIDENTIAL   Filed 09/20/23   Page 251 of 342

Deposition of Heidi Zula Vol. I - Revised                                    Jane Doe, et al. v. Schuylkill County Courthouse, et al.

Page 280

1  Q.      So contractor consultant is what Ms.
2  Kutzler was, correct?
3  A.      Yes.
4  Q.      And well, I guess what, Hubert Resources
5  was who sent Ms. Kutzler, correct?
6  A.      Yes.
7  Q.      Probably be the correct terminology.
8        They contract consultants do not have
9  PARs, correct?
10  A.      That's correct.
11  Q.      They have contracts, right?
12  A.      Yes.
13  Q.      Okay.
14        So are you aware of a contract that
15  exists for Mr. Alu's consultation for the county?
16  A.      Yes.  There was a contract prepared.
17  Q.      And that wasn't until, as I understand
18  it, April of 2021, correct?
19  A.      I don't know the exact date.
20  Q.      Okay.
21        It was after Jane Doe 3 and Jane Doe 4's
22  demotion was voted on, correct?
23  A.      Yes, it was after that time frame.
24  Q.      And then there was time period after

Page 281

1  their demotion that the office was without a chief
2  assessor, correct?
3  A.      I believe so, yes.
4  Q.      Okay you know if between the meeting
5  that you were involved in, which I think correct
6  me if I'm wrong, you testified was one of your
7  first few weeks in your employment?
8  A.      Yes, that is correct.
9  Q.      So January 2021, would that be fair to
10  say?
11  A.      Yes.
12  Q.      And then Mr. Alu's contract -- are you
13  aware of any advice by Mr. Alu or suggestions or
14  recommendations by Mr. Alu to the county,
15  regarding the operations of the tax assessment
16  office?
17  A.      No.  Not that I can recall, no.  I don't
18  believe we had anything come in directly from him
19  prior to his hire as a consultant.
20  Q.      Okay.
21        So was a plan ever -- you said that a
22  plan was never formally written down regarding the
23  tax assessment and tax claim bureau; is that
24  correct?

Page 282

1  A.      That's correct.
2  Q.      Was one ever discussed?
3  A.      Yes.  A plan was discussed on how to
4  move the offices forward.
5  Q.      Was Mr. Alu involved in that?
6  A.      No, I don't believe he was involved in
7  the actual discussions, he was part of the plan
8  though.
9  Q.      Okay.
10        Meaning that he would become a
11  contractor once Jane Doe 3 was no longer the chief
12  assessor or what was his part?
13  A.      Yes.  That his -- his part of the plan
14  was to come in and review the operation of the
15  office and then make recommendations on how to
16  move it forward.
17  Q.      Okay.
18        Who was involved in the drafting of that
19  plan?
20        MS. PIPAK:  Objection.
21        You can answer.
22        THE WITNESS:  The plan -- like, if
23  we're going to call it a plan, it was more or less
24  discussions that were held between myself, Glenn

Page 283

1  Roth, Gary Bender, and Doreen Kutzler as to kind
2  of how we were going to move forward.
3  BY MS. SMITH:
4  Q.      Are you aware that the county had a
5  consultation agreement contract with a Joan R.
6  Price, Esquire?
7  A.      I'm familiar with the name, yes.
8  Q.      Did you ever receive any information,
9  review any information regarding what assistance
10  she gave to the tax assessment office?
11  A.      No.  The only communication I had with
12  her related to the STEB reports and the submission
13  of the STEB reports and understanding that
14  process.  And how to determine, you know, what
15  reports have been submitted, that was kind of the
16  only interaction that I had with her.
17  Q.      So she was still a consultant contractor
18  when you started?
19  A.      Yes.  To my knowledge, yes.
20  Q.      Okay.
21        And just so I understand, you were just
22  talking about a conversation you had with her.  It
23  seems like it was more informational, just
24  about -- learning about STEB reports, not --

Page 284

1  A.      Yeah.
2  Q.      -- legal advice?
3  A.      No.
4  Q.      It was just to get you up to speed on
5  what the assessment office did regarding STEB
6  reports?
7  A.      That, and as well as trying to determine
8  what STEB reports had been submitted.
9  Q.      How to use the systems?
10  A.      No, not necessarily how use the systems.
11  Who to contact at the state --
12  Q.      Okay.
13  A.      -- to determine what has been done and
14  what hasn't been done.
15  Q.      Okay.
16      Prior to February 5, 2021, did you
17  contact the state?
18  A.      I don't recall -- I did contact the
19  state.  I think it was after February 5th, though.
20  Q.      Okay.
21      Being that there was already a
22  contractor consultant for the assessment office,
23  do you know why it was determined or thought that
24  another contractor consultant would be any

Page 285

1  different?
2  A.      No, because I wasn't -- I'm not sure
3  what Ms. Price's role was.  I don't know.
4  Q.      In the month or so period between
5  January 11th and February 5th, did you ever
6  observe Ms. Price enter the assessment office?
7  A.      I don't know who she is, so no.  I don't
8  know who she is.
9  Q.      I thought you said you spoke with her?
10  A.      I did speak with her on the phone.
11  Q.      Oh, okay.
12      You mean you don't know what she looks
13  like?
14  A.      I don't -- yeah, I don't know -- yeah, I
15  don't know, like --
16  Q.      Okay.
17  A.      -- who she is to see.  Like, I have no
18  idea if she entered the office or she didn't
19  because I've never seen her before.
20  Q.      Okay.
21      During your employment from January 11th
22  to February 5th, did you ever observe Defendant
23  Bender enter the assessment office?
24  A.      Yes.

Page 286

1  Q.      How often or how many times?  Let's
2  start with that.
3  A.      I -- I don't recall how many times.
4  I -- don't -- I don't --
5  Q.      Was it more than ten in that less than a
6  month period?
7  A.      Oh, in that month period of time?
8  Q.      Yeah.
9  A.      I don't know if I seen him enter the
10  assessment office during that month period of
11  time, no.
12  Q.      Was -- in this -- I'm just using
13  Mr. Heinbach's words, this draft plan to -- for
14  the tax offices, was there any discussion about
15  hiring a second real estate market analyst?
16  A.      No.
17  Q.      Was there any discussion about moving
18  Jane Doe 1 back to -- Jane Doe 1 back to the
19  courthouse or asking her simply if she would move
20  back to the courthouse?
21  A.      Not part of the -- the plan, no.
22  Q.      Was there any discussion about maybe
23  reassigning STEB duties to Jane Doe 4?
24  A.      No.

Page 287

1  Q.      Was there any talk about asking Jane Doe
2  3 or Jane Doe 4 if there was somebody else who
3  could complete the STEB duties?
4  A.      No.
5  Q.      Was there any talk about -- well,
6  actually let's look at real quick, I think it was,
7  90 something, your job description.
8      Looking at the first Page 49, No. 2
9  says:  Perform job analysis and prepare changes to
10  classification of descriptions.  That would be --
11  mean that you would prepare changes to that job
12  description form that -- this form that we're
13  looking at, correct, for other positions within
14  the county?
15  A.      So typically the supervisor drafts the
16  job descriptions and then they would present them
17  to the HR office for review and then we would
18  ensure that those job duties would be
19  appropriately assigned to that classification of
20  position, position classification based upon kind
21  of the salary plan that's been outlined, so in the
22  contract, like the different collective bargaining
23  agreements.
24  Q.      So was there any conversation with Jane

Case 3:21-cv-00477-MCC    Document 280-1    CONFIDENTIAL    Filed 09/20/23    Page 253 of 342
Deposition of Heidi Zula Vol. I - Revised
Jane Doe, et al. v. Schuylkill County Courthouse, et al.

Page 288

1  Doe 3 and/or Jane Doe 4 to ask them, hey, let's
2  look over the assessment office and let's discuss
3  if maybe some of these job classifications within
4  your office might need to be changed around?
5  A.      The only conversation was in reference
6  to the field appraiser position and the use of the
7  interim field appraiser positions, that was the
8  only conversation.
9  Q.      Okay.
10  A.      About positions within that office.
11  Q.      Was there any thought, hey, if Jane Doe
12  3 -- Jane Doe 3 and Jane Doe 4 can get STEB done
13  in 13 days, maybe we just put the job duty on them
14  and get rid of the real estate market analyst?
15  A.      There was some thought about that, yes.
16  Q.      Okay.
17        Why was it chosen instead to demote Jane
18  Doe 3?
19  A.      It wasn't necessarily chosen to demote
20  Jane Doe 3.  It was the overall operation of the
21  office and the separation of the office between
22  the tax assessment and the tax claim offices that
23  ultimately resulted in Jane Doe 3 demotion.  We
24  did not go down the line of eliminating Jane Doe

Page 289

1  1's position as the real estate market analyst.
2  Q.      Why?
3  A.      Based upon some of discussion, was based
4  upon, you know, that our -- we didn't believe that
5  it would be appropriate given some of the claims
6  that she made to eliminate her position.
7  Q.      You just testified that based on the
8  overall operation of the offices --
9        MS. SMITH:  Actually, can have it
10  read, her -- before my last question, her answer.
11              - - -
12        (Whereupon, court reporter read back last
13  answer.)
14              - - -
15  BY MS. SMITH:
16  Q.      Sp your testimony there was that it was
17  the overall operations of the tax claim and tax
18  assessment offices?
19  A.      The ultimate -- the results of changing
20  the positions of Jane Doe 3 and Jane Doe 4 were a
21  result of the separation of the offices.  My
22  recommendation was based upon the completion of
23  the STEB reports.  However, that was just my
24  recommendation.  I didn't make the ultimate

Page 290

1  decision.
2        So based upon my information, plus
3  whatever other information was available to others
4  in the county who had the authority to make those
5  decisions, it was decided that the offices would be
6  separated.  And they were separated and as a result
7  of that, that resulted in the elimination of the
8  deputy chief assessor/director of tax claim position
9  and the -- or I'm sorry -- the chief assessor and
10  the -- the tax claim director position and the
11  combined position of the deputy chief assessor
12  assistant tax claim director.
13  Q.      So you're saying you are essentially a
14  piece of the puzzle, the STEB reports was part of
15  a larger decision, correct?
16  A.      Yes.
17  Q.      Were you involved in that larger
18  decision?
19  A.      I made the recommendation based upon the
20  report I provided to my supervisor, Mr. Bender.
21  And then from there, he ultimately directed me to
22  put the PARs through to separate the offices.
23  Q.      So in between those two things, the
24  submission of your memo and the PAR, were you

Page 291

1  involved at all, discussions or anything like
2  that?
3  A.      I mean, we had discussions about my
4  memo, about the completion of the STEB reports.
5  There was discussion, as I said, about the plan of
6  bringing Mr. Alu on board to evaluate the office.
7  We did have discussions about Jane Doe 3's
8  communication, I believe that was part of my memo,
9  with her supervisor.  And that's pretty much what
10  I can recall as far as the discussions.
11  Q.      Okay.
12        You were saying that you didn't go down
13  the road of terminating Jane Doe 1's position
14  because of the claim she had made.
15        What claims are you referring to?
16  A.      The claims of the sexual harassment
17  claim.  And I think that is discussion that I had
18  directly with our attorneys, so I don't believe
19  it's appropriate for me to divulge that
20  information.
21  Q.      Are you aware of any issues with the
22  STEB reports being submitted timely, post Jane Doe
23  3 and Jane Doe 4's demotion?
24  A.      Yes.

Page 292

Q.     They were -- Jane Doe 1 failed submit
timely under Mr. Alu, correct?
A.     I don't know if it was under Mr. Alu,
but definitely under Mr. Hatter, she did not
submit them timely.
Q.     Mr. Hatter is still the chief assessor,
correct?
A.     To my knowledge, yes, I believe he still
is.  He was when I was there.
Q.     Okay.
A.     So I don't know if something changed
since then.
Q.     When you -- so for the record, you have
ultimately since your employment, left the county,
correct?
A.     That's correct.
Q.     That was in May of this year?
A.     My last day was June 3rd, I think it
was --
Q.     Okay.
A.     -- of 2022.
Q.     And when you left, Mr. Hatter was still
the chief assessor?
A.     Yes, correct.

Page 293

Q.     Mr. Hatter was appointed the chief
assessor in June-ish -- May of 2021?
A.     I don't know the exact date.
Q.     I have it.
       Does May 12, 2021, sound familiar?
       MS. SMITH:  This one might have
been marked at Roth's.  I can't remember.  I
apologize if it was, but I'm going to mark SC633
as 121.
                      - - -
       (SC633 marked as Exhibit-121 for
identification.)
                      - - -
BY MS. SMITH:
Q.     Okay.
       So this actually refreshes both of our
recollection.  It says this PAR is for Mr. Hatter,
correct?
A.     That's correct.
Q.     And his effective date was May 24, 2021,
correct?
A.     Yes.
Q.     So mr. Hatter was the chief assessor for
at least a year, if not more, if he still is the

Page 294

chief assessor, correct?
A.     Yes.
Q.     And during that time, Jane Doe 1 failed
to submit timely STEB reports, correct?
A.     Yes.
Q.     In fact, Mr. Hatter has written her up,
I think she was even suspended, correct?
A.     Yes.
Q.     Has Mr. Hatter been demoted?
A.     No, he has not.
Q.     Do you know why?
A.     No, I don't.
Q.     Did Mr. Bender ask you to look into the
operations of the tax assessment issue under
Mr. Hatter?
A.     No.
Q.     Has anyone, to your knowledge,
questioned the operation of the tax assessment
issues under Mr. Hatter --
A.     I'm sorry.  Can you repeat that?
Q.     I think I said issues.
A.     Yes.
Q.     Has anyone -- has anyone, to your
knowledge, questioned the operation of the tax

Page 295

assessment office under Mr. Hatter?
A.     As far as his direction?
Q.     Correct.
A.     No.
Q.     So taking you back to early on in your
employment, February of 2021.  Shortly after you
started, you received a physician's medical review
form for Jane Doe 1 -- from Jane Doe 1's medical
provider, correct?
A.     Yes.
       MS. SMITH:  Okay.  Mark it as 122.
It's 26 -- Zula 268 through 270.
                      - - -
       (Zula 268-270 marked as Exhibit-122 for
identification.)
                      - - -
BY MS. SMITH:
Q.     Do you recognize this document?
A.     Yes.
Q.     The top of the document is some -- it
looks like fax information.  Is that fax
information that was received by the county?
A.     I don't know exactly --
Q.     Okay.

Page 296

A.      -- if that's from when it was received
by the county or not.  I don't know that.
Q.      Okay.
        Do you know if this -- so this document
is dated, if we look to the back, it's 2/5 of
2021.  I -- I was assuming that that fax was from
the county's fax information.  But does around
2/16/2021, sound about when you received this?
A.      Yes.  Yes.
Q.      Okay.
        Is this, do you know, the first
paperwork regarding Jane Doe 1's, what we'll call,
reasonable accommodation request?
A.      Yes.
Q.      To work from home?
A.      To my knowledge.
Q.      That you received?
A.      Sorry.
Q.      It's okay.
A.      Yes, to my knowledge.
Q.      Okay.
        After you received this paperwork, what,
if anything, did you do?
A.      I attempted to reach out to Jane Doe 1

Page 297

to discuss the documentation, to go through, you
know, the interactive process under the ADA.  And
I contacted her via phone.  I believe it was via
phone to set up a meeting with her.  She
indicated, yes, that would work great.  And then
we set up a time.  And then subsequent to that, I
received communication that I was not to
communicate with her, I believe, from your office.
Q.      I didn't send you any e-mails, did I?
A.      I believe so, yes.
Q.      Okay.
        Did you then speak or do -- speak with
anyone else or do anything else?
A.      Yes.  I believe we did review -- I
reviewed this documentation and then I did consult
with our attorney regarding the documentation,
specifically Mr. Heinbach.  And then based upon
the documentation received, we believe we have
already provided a reasonable accommodation to
Jane Doe 1 based upon her office being placed at
the 410 Building.
Q.      Okay.
        So you never spoke with Jane Doe 1,
correct?

Page 298

A.      Not specifically about this.
Q.      Did you ever speak with Jane Doe 3 -- so
strike that.
        In February of 2021, Jane Doe 3 was
still Jane Doe 1's supervisor, correct?
A.      Yes.
Q.      Did you ever speak with Jane Doe 3 to
ask for her input regarding this reasonable
accommodation request?
A.      I don't believe I spoke with her.  I
believe and I don't -- well, I should probably say
I don't recall because I know I had some
communication with Jane Doe 3 via e-mail, but I'm
not certain whether it was regarding Jane Doe 1 or
Jane Doe 2.
Q.      Okay.
        Was that e-mail communication, if you
recall, communicated initiated by yourself or Jane
Doe 3?
A.      It was initiated by her.
Q.      Jane Doe 3?
A.      Yes.
Q.      Okay.
        In February of 2021, what level of

Page 299

understanding would say you had as to Jane Doe 1's
job duties and responsibilities?
A.      My understanding was she did the
completion of the STEB reports, which -- and then
she also did, like, market analysis reviews, which
did at times require her to go out into the field,
was my understanding.
Q.      Well, sorry, maybe that was a bad
question.
        I guess my -- my question is:  Do you
feel that in February of 2021, you had enough
knowledge of Jane Doe 1's job duties to make a
determination as to a -- her reasonable
accommodation request to work from home?
A.      Well, the reasonable accommodation
request indicated that she was to be working in a
safe or separated area or working from home.  So
based upon her doctor's documentation, we met the
reasonable accommodation to have her work in a
safe or separated area.
Q.      Okay.
        So my question though is:  Do you feel
that in February of 2021, you had enough
information and knowledge of Jane Doe 1's job

Deposition of Heidi Zula Vol. I - Revised                    Jane Doe, et al. v. Schuylkill County Courthouse, et al.

Page 300

1  duties to make a determination regarding a
2  reasonable accommodation request by her, whatever
3  the accommodation request was?
4  A.    Yes, based upon my consultation with our
5  attorney.
6  Q.    And that would be Mr. Heinbach?
7  A.    Yes, Mr. Heinbach.
8  Q.    Do you know if Mr. Heinbach has any STEB
9  knowledge, information?
10       MS. PIPAK:  I'll object to the
11  extent you had any conversations with him about
12  STEB knowledge.
13       So if you can answer, other than
14  conversations you had.
15       THE WITNESS:  I know that
16  Mr. Heinbach works directly with counties pretty
17  extensively.  So I believe that, yes, he did have
18  this necessary knowledge to advise me.
19  BY MS. SMITH:
20  Q.    Did you ever provide Mr. Heinbach with
21  Jane Doe 1's job description?
22       MS. PIPAK:  I'm going to object on
23  the basis of attorney-client privilege to the
24  extent you were seeking legal advice.

Page 301

1       MS. SMITH:  It's an action.  What
2  she did with a job description has nothing to do
3  with the contents of a conversation.
4       MS. PIPAK:  If she was doing
5  that -- and I'm -- and I'm advising her that if
6  she was doing that for the purpose of seeking
7  legal advice.
8       MS. SMITH:  Counsel, even if she's
9  doing something for the purposes of seeking legal
10  advice, it's the legal advice that is the
11  privileged communication.  Her --
12       MS. PIPAK:  Her asking for legal
13  advice is.
14       MS. SMITH:  No, it's not.  Asking
15  for legal advice is not privileged.  Getting the
16  legal advice is priveledged.
17       MS. PIPAK:  I don't think that's
18  correct.
19       MS. SMITH:  Look up -- then let's
20  take a break and please look up what privilege is,
21  because it's privileged communication.  Her act of
22  giving someone a document is not legal advice.
23  It's the legal advice that is rendered therefrom
24  that would be privileged.  So I will take a break

Page 302

1  and you can look it up.
2       MS. PIPAK:  All right.  I'm not
3  going to look this up.
4       MS. SMITH:  Okay.  Then we'll call
5  the judge.
6       MS. PIPAK:  She's not -- okay.  You
7  can call the judge on that question.  You are
8  asking what legal advice she sought from her
9  counsel.  That's covered by privilege.
10       MS. SMITH:  I'm not asking her what
11  legal advice she sought from her counsel.  This is
12  exactly what I'm not asking her.  I am asking her
13  if she gave him a document.  It's a physical act.
14  There's no words -- I am not asking what words
15  were spoken.  I am asking if she e-mailed, handed,
16  sent in the mail, sent by carrier pigeon, a
17  document, if she ever reviewed that document.  I am
18  not asking for the contents of conversation, what
19  his advice was, what was rendered there from it,
20  what decisions were made.  All I'm asking is if
21  she gave him a job description.  Did she hand it
22  to him, mail it to him?
23       MS. PIPAK:  And I'm telling you,
24  she can't answer if she did -- took any action for

Page 303

1  the purpose of seeking legal advice.
2       MS. SMITH:  That's not accurate,
3  Counsel.  It's -- she -- what her actions were --
4  just as if, if I ask the question as a result of
5  Mr. Heinbach -- your conversations with
6  Mr. Heinbach, what did you do, the act is separate
7  and distinction from the conversations and the
8  legal advice that is therein rendered are not
9  privileged.  It's the acts before and the acts
10  after that do not constitute privilege.
11       MS. PIPAK:  You can ask that
12  question.  You can't ask --
13       MS. SMITH:  That's what I'm asking
14  her.
15       MS. PIPAK:  That's not the question
16  you asked.  You can specifically ask her a
17  question, what did she do.
18       MS. SMITH:  Counsel, think about
19  what you're saying.  Please think about what
20  you're saying.  If I asked you --
21       MS. PIPAK:  She's not answering
22  that question.  You can call the judge on it.
23  BY MS. SMITH:
24  Q.    Ms. Zula, did you send -- did you put in

Page 304

1 the mail, e-mail, regular mail, a job description
2 to Mr. Heinbach?
3       MS. PIPAK:  You can not answer that
4 question.
5       MS. SMITH:  All right. let's call
6 the judge.
7       MS. PIPAK:  Okay.
8       MS. SMITH:  We can go off the
9 record.
10      VIDEOGRAPHER:  The time is now
11 4:03 p.m. and we're going off the record.
12      MR. GEIGER:  Just put another spin
13 on this, if Tom Heinbach asked for a job
14 description with the idea that he needed that as
15 part of the legal advice he was giving, then I
16 think it does quality as privilege.
17      MS. SMITH:  That's not what the
18 testimony is here.  And I am not asking if Tom
19 Heinbach asked for a job description.  I'm asking
20 if she sent one.  It is purely her action.  It's
21 just as if -- it's the actions before and the
22 actions after by individuals do not constitute the
23 legal advice.  It is the legal advice that is
24 being rendered to an individual and --

Page 305

1       MR. GEIGER:  I mean, why is it
2 relevant what Tom Heinbach reviewed in giving his
3 advice?
4       MS. SMITH:  Because I am not --
5 that's my work product as to how I think it's
6 relevant.  Whether you think it's relevant or not
7 has nothing to do with this.  This is my
8 deposition and I get to ask my questions.  It's
9 not privileged.
10      MS. PIPAK:  You're asking -- your
11 question was in the context of she reached out --
12 she spoke to counsel on this issue and you asked
13 --
14      MS. SMITH:  If she -- if she took
15 an action.
16      MS. PIPAK:  -- what she -- what she
17 provided to counsel for the purpose of that legal
18 advice.  That's subject to attorney-client
19 privilege.
20                --- ---
21       (Whereupon, brief recess was held off the
22 record.)
23                --- ---
24       MS. SMITH:  Your Honor, we are in a

Page 306

1 deposition of one of the named defendants and it's
2 come up a few times as to whether acts by an
3 individual, such as sending a document or
4 something of that nature before and/or after
5 attorney client communications are privileged as
6 well.  So for instance, if we have a conversation,
7 you asked me to send something, you're my
8 attorney, and then I do the act of sending it to
9 you, is a question regarding the act
10 attorney-client privileged?
11      MS. PIPAK:  Your Honor, this is
12 Maria Pipak.  I represent Heidi Zula.  She is the
13 deponent today.  I have to say I disagree with
14 Ms. Smith's assessment or summary of the issue.
15 The question posed dealt with my client asking --
16 seeking legal advice from her attorney on an issue
17 and she refused to provide any further
18 information.  And the follow-up question related
19 to whether a specific document was sent to him for
20 the attorney to provide --
21      MS. SMITH:  No.  No.  No.  No, it
22 was not.
23      MS. PIPAK:  -- the consultation.
24      MS. SMITH:  The question was

Page 307

1 simply, was this document provided to the
2 attorney?  I never asked as to the question of
3 whether there was con -- attorney consultation
4 given, whether legal advice was rendered.  I, in
5 fact, put on the record, I'm not asking what
6 happened thereafter.  I'm simply asking, did you
7 e-mail this document or send this document or give
8 this document to this attorney.
9       MS. PIPAK:  We do have a court
10 reporter here, so we can read it back if either of
11 us are wrong.
12      THE COURT:  Well, since there seems
13 to be dispute as what the question was and you're
14 asking me to try to mediate the outcome, I
15 probably should have a clearer sense of what --
16 what the exchange is and what the context of it
17 was.  So I'm gathering that there was some sort of
18 a question about a conversation with counsel and a
19 question regarding whether something was sent to
20 counsel.
21      MS. SMITH:  Yes.  And I can -- even
22 if this question was one different than I'm
23 saying, I will agree to limit it to, did you send
24 this document in anyway -- or give this document

Page 308

to your attorney in any way, shape, or form.

MS. PIPAK:  And this is Maria Pipak.  I advised that if -- that she should not answer the question to the extent she provided any document to counsel for the purpose of seeking legal advice.

THE COURT:  And you'll forgive me. The document itself, since you all seem to know what it is, what was it?

MS. SMITH:  It's a job description.

THE COURT:  Okay.  Recognizing that I don't have the benefit of a full context of your conversation and deposition, but given what you've described to me, it would seem to me that the -- the nature of the exchange back and forth between the deponent and her counsel could make a discussion regarding what she said to counsel, also breaked by the privilege.  So I would sustain an objection to that specific in particular.

MS. SMITH:  Well, Your Honor, I'm not asking about the conversation.  I'm simply asking --

THE COURT:  Well, no.  I -- I think I actually understood what you said.  But -- and

Page 309

let me repeat it back so that we're clear that I did, in fact, understand what you said.

I understand that you were asking whether she sent the document?

MS. SMITH:  Yes.  Took an action, no conversation held.

THE COURT:  Yes.  Yes, but -- but I also was led to understand that that action that you were asking about, would have taken place in the context of communications that she was having with her counsel.  And in that context, it seems to me that asking what one sent to counsel begins to tread into areas that may be covered by privilege and that's why I was sustaining the objection.

MS. SMITH:  Your Honor, would you allow us to brief this issue because there is substantial case law regarding this issue.

THE COURT:  All right.  Sure.  You can feel free to brief the issue.

MS. SMITH:  Okay.

THE COURT:  What happened is, as you may a recall from a few minutes ago, you called me up.

Page 310

MS. SMITH:  Understood.  No, I understand.  I am just asking --

THE COURT:  If you let me finish, I'd appreciate it.  Is that okay with you, Ms. Smith?

MS. SMITH:  Sure.  I apologize, Your Honor.

THE COURT:  Okay.  No, that's okay. That's okay.

You called me up and you are giving my horseback sense of the law.  I welcome briefing on this, so you should feel free to brief this issue.  How much time would you need for a brief?

MS. SMITH:  Well, Your Honor, we have plenty time in discovery and I have motions for summary judgment due.  I would just request 30 days.  We can always revisit this during --

THE COURT:  Okay.  Do it.  No, that would be fine.  Do you want me to put an order on the docket or do you just want to just get something to me in 30 days?

MS. SMITH:  I think we can just get something to you in 30 days.

THE COURT:  All right.  And that's

Page 311

fine.  And then I certainly look forward to being further informed on this issue and perhaps having some deeper factual context with which to consider it in a more thorough and proper way.  But -- so please feel free to submit such a brief.  If I receive such a brief from you, Ms. Smith, how much time would you want to respond to the brief on this issue?

MS. PIPAK:  Ten days is fine, Your Honor.

THE COURT:  Okay.  Okay.  So that is what we will do.  And I'm pleased to just make some sort of brief docket notation that we can just put there on the docket so the folks have a timetable should it be end of the deposition and upon reflection, you feel that it would be an issue worth briefing.

I certainly would look forward to receiving those and having a chance to consider this issue in the month or so away.

Is there anything else I can do for you all?

MS. SMITH:  No, Your Honor.  Thank you.

Page 312

1  MS. PIPAK:  Thank you, Your Honor.
2  THE COURT:  Excellent.  Thank you.
3  Talk to you soon.
4  VIDEOGRAPHER:  The time is now 4:13
5  p.m. and we're back on the record.
6  - - -
7  BY MS. SMITH:
8  Q.     Ms. Zula, is speaking with an employee's
9  supervisor to determine if a reasonable
10  accommodation request was feasible, something that
11  human resources typically does?
12  A.     It depends on the situation.
13  Q.     What would it depend on?
14  A.     If information was needed to understand
15  what job duties could be or what -- what needs to
16  be done for a specific job duty.
17  Q.     Did you feel that you needed to know
18  anything about Jane Doe 1's job duty in order to
19  evaluate this reasonable accommodation request?
20  A.     No.
21  Q.     You believed you had enough -- enough of
22  an understanding of her job duty at that time to
23  make a determination?
24  A.     Yes, based upon the information we

Page 313

1  received from her physician, that is what we
2  utilized to make the determination.
3  Q.     Well, it's what you received from her
4  physician, in conjunction with her job duty,
5  correct?
6  A.     Yes.
7  Q.     Her job duties, I should say?
8  A.     Her job duties, yes.
9  Q.     Okay.
10  So you would have to have information
11  from her physician and enough of an understanding
12  of her job duties in order to make a determination
13  regarding a reasonable accommodation request; is
14  that fair?
15  A.     Yes.
16  MS. SMITH:  Okay.  Going to mark
17  Zula 420 as 123.
18  - - -
19  (Zula 420 marked as Exhibit-123 for
20  identification.)
21  - - -
22  BY MS. SMITH:
23  Q.     Do you recognize this e-mail?
24  A.     Yes.

Page 314

1  Q.     Did you ever receive a response from Mr.
2  Bender?
3  A.     I'm not sure.
4  Q.     In the third line down it says:  I am
5  assuming that we will need to engage in the
6  interactive process with Jane Doe 1 regarding her
7  request.  I wanted to ensure there was nothing
8  further that Tom would like for us to do.
9  Did you, in fact, engage with Jane Doe 1
10  regarding her request?
11  A.     Yes.  I attempted to.
12  Q.     Okay.
13  You attempted to, but you did not,
14  correct?
15  A.     No, because I was told not to contact
16  her.
17  Q.     Subsequent to this accommodation
18  request, do you recall calling Jane Doe 1 on
19  speaker and having a conversation with her
20  regarding medical issues?
21  A.     This was when I contacted her, I was on
22  speakerphone in my office and that was to indicate
23  that we received her documentation and set up a
24  time to meet with her.  And at that point we were

Page 315

1  going to discuss and she told -- I was then told
2  that I can't discuss it with her.
3  Q.     I disagree with you or don't recall that
4  there was communication directly from me.
5  But had you received it from me or
6  whomever, communication that you should not speak
7  with her, did you then -- what actions did you
8  take to then try and get the information regarding
9  Jane Doe 1's reasonable accommodation request?
10  A.     As I indicated, I review the information
11  provided by her doctor and I did consult with my
12  attorney regarding the matter.  And it was
13  determined that we did meet her requests for a
14  reasonable accommodation.
15  Q.     Okay.
16  But what I'm asking is, is you wanted to
17  speak with Jane Doe 1 for some reason, correct?
18  A.     Yes.
19  Q.     What was that reason?
20  A.     To just understand a little bit more
21  about what she was seeking.
22  Q.     Did you ever make any attempts to better
23  understand what she was seeking through any other
24  channels, but for speaking with Jane Doe 1?

Page 316

A.      No.
        MS. SMITH:  Marked Zula 426 as
Exhibit-124.
                - - -
        (Zula 426 marked as Exhibit-124 for
identification.)
                - - -
BY MS. SMITH:
Q.      Do you recognize this e-mail?
A.      Yes.
Q.      Do you know why you reached out to
Heather Garrity to find out if Jane Doe 1 had
requested and/or filed for leave under the FMLA?
A.      I do not recall why I did that.
Q.      Do you know if it was at your own doing
or did someone request that you find out?
A.      I -- I really don't recall.
Q.      After Jane Doe 1 in -- on February 16th
after her medical provider submitted the medical
form for a reasonable accommodation request, did
you ever speak with Jane Doe 1 regarding her
rights under FMLA?
A.      I know there was -- I don't know if we
spoke, but I believe there was communication

Page 317

because she did subsequently request to take FMLA.
And that was handled by Ms. Garrity in my office.
She tracked her -- well, she reviewed her time and
it was found that she was not eligible to take
FMLA because she didn't work the requisite hours
during the preceding 12 months.
Q.      But in February of 2021, do -- well,
let's strike that.
        That topic or conversation,
communication you were just speaking of with
Ms. Garrity, do you know when that was?
A.      I don't recall the date.
Q.      Do you know if it was in February 2021?
A.      I don't recall.
        MS. SMITH:  We have Zula 2481, it's
125.
                - - -
        (Zula 2481 marked as Exhibit-125 for
identification.)
                - - -
BY MS. SMITH:
Q.      Do you recognize this letter?
A.      Yes.
Q.      It's a letter issued by you to Jane Doe

Page 318

1, correct?
A.      Yes.
Q.      Issue date is February 26, 2021?
A.      Yes.
Q.      Do you -- who drafted this letter?
A.      I did.
Q.      Did any -- go ahead.  I'm sorry.
A.      I'm sorry.  Go ahead.  Yes, I drafted
it.
Q.      Did anyone have any input in it?
A.      Yes.
Q.      Who?
A.      My attorney.
Q.      Other than your attorney, anyone else?
A.      No.
Q.      Okay.
        But you drafted the initial?
A.      I drafted the initial letter for review.
Q.      Okay.
        After whatever consultation with your
attorney, a copy of this was sent to -- this
version was sent to Jane Doe 1, correct?
A.      I believe, yes.
Q.      Do you know -- it says CC to Jane Doe 3

Page 319

and file.  Does that indicate that Jane Doe 3 also
received a copy and a copy was placed in Jane Doe
1's personnel file?
A.      A copy would have most likely been
placed in her medical file.
Q.      What do you mean her medical file?
A.      So there's -- we keep a medical file
which is separate from the personnel file, which
indicate -- like where we would keep things such
as FMLA paperwork, preemployment physical
information, drug test information, that where
those are kept.
Q.      Would reasonable accommodation request
paperwork be kept in there?  Something like this?
A.      So the Document 122, yes, that's where
that should be kept.
Q.      And you would agree that this is -- this
letter denies Jane Doe 1 the right to work from
home, correct?
        MS. PIPAK:  I'll object to the
form.
        Go ahead.
        THE WITNESS:  Well, the
accommodation requested was for her to either work

Page 320

1  from home or work in a safe and separated area.
2  So we granted the accommodation to work in a safe
3  or separated area.
4  BY MS. SMITH:
5  Q.      And did not grant her the work from home
6  option, correct?
7  A.      We did not grant her the option to work
8  from home.
9  Q.      The last sentence of the second
10 paragraph states:  These accommodations, meaning
11 the 410 Building work location, are considered the
12 most effective given your essential job functions
13 and the operational needs of the county.
14         What essential job functions do you
15 believe she couldn't complete from home that she
16 could complete from the 410 Building?
17 A.      Visiting real estate parcels,
18 monitoring -- well, that I one I'm not sure of.
19 Visiting the parcels, but, I mean, I believe more
20 the concern was Jane Doe 1's history of her work
21 product completion when she worked from home, is
22 what the issue was.
23 Q.      Was that an issue or concern you had?
24 A.      That was a concern that was brought to

Page 321

1  my attention by county administration.
2  Q.      When you say county administration, who
3  are you referring to?
4  A.      Mr. Bender.
5  Q.      Anyone else in county administration?
6  A.      I know Ms. Kutzler had made reference
7  to -- that there was some questions as to what
8  work product they were completing.
9  Q.      When you say they, who is they?
10 A.      Jane Doe 1 and Jane Doe 2.
11 Q.      Did you ever look into what may have
12 contributed to their work product during working
13 from home?
14 A.      No, I did not.
15 Q.      You don't know if they had the supplies
16 needed to complete the essential job functions of
17 their positions, did you?
18 A.      I did not look into that issue.
19         MS. SMITH:  Okay.  Marked 550 --
20 Zula 550 to 551, it's 126.
21               - - -
22         (Zula 550-551 marked as Exhibit-126 for
23 identification.)
24               - - -

Page 322

1  BY MS. SMITH:
2  Q.      Do you recognize this e-mail chain?
3  A.      Yes.
4  Q.      Ms. -- Jane Doe 3 on Page 2, going on --
5  1 going on Page 2, February 26, 2021, 233, asks --
6  says, I have a question and then asks, is this a
7  denial of the request to perform some duties from
8  home.  It's in reference -- or response, I guess,
9  to your e-mail of February 26th.  The letter that
10 it references in your e-mail would have been the
11 one we just looked at, correct?
12 A.      Yes.
13 Q.      Okay.
14         And you respond, yes.  The accommodation
15 provided will be for Jane Doe 1 to perform her
16 duties in the office or in the field as needed.
17 The yes is in response to, this is a denial of the
18 request to perform some duties from home, correct?
19 A.      Yes.
20 Q.      Jane Doe 3 then questions, does this
21 mean that I do not have the authority to direct
22 employees to work from home and work can only be
23 completed in the office setting, regardless of
24 circumstances or does this just apply to Jane Doe

Page 323

1  1?  You respond that she does have the authority
2  to direct the work of her staff, but work from
3  home requests for all staff must be reviewed with
4  administration to maintain consistent compliance
5  with legal requirements and are approved on a
6  case-by-case basis, based upon the work assigned
7  and performed by the position.
8          When you say all work from home requests
9  for staff must be reviewed with administration, whom
10 are you including in administration?
11 A.      So they were reviewed with Gary Bender.
12 Q.      And then it says consistent -- to
13 maintain consistent compliance with legal
14 requirements.  What legal requirements?
15 A.      I'm not certain.
16 Q.      Did anybody help you draft this e-mail?
17 A.      Yes.
18 Q.      Who?
19 A.      My attorney, Mr. Heinbach.
20 Q.      Okay.
21         Then you state that these work from home
22 requests will be approved on a case-by-case basis,
23 based upon the work assigned and performed by this
24 position.  Who would approve on a case-by-case

Deposition of Heidi Zula Vol. I - Revised                          Jane Doe, et al. v. Schuylkill County Courthouse, et al.

Page 324

basis?

A.      So when I received requests, I met daily with my supervisor, Mr. Bender, and we reviewed those requests and he would ultimately provide the guidance as to whether or not we could approve those requests.

Q.      So did Mr. Bender provide guidance on whether to deny, as you said yes, the work from home is denied, the work from home request of Jane Doe 1?

A.      Yes, he did indicate that Jane Doe 1 could not work from home.

Q.      Did you believe it was appropriate for Mr. Bender to weigh in on a matter of an individual who had accused him of sexual harassment, aiding, abetting, and retaliation?

A.      In his role as the county administrator, yes.  They were still employees of the county and so, yes, it would be appropriate for him to review a request for a work from home requirement.

Q.      But by an individual who had accused him of something so significant?

A.      Yes.  I reviewed it with him.

Q.      I'm not asking if you reviewed it with

Page 325

him.

I'm asking if you believe that it's -- is it appropriate, not is it his job duty, not do you do it with him, is it, do you believe, appropriate for him to have reviewed this work from home request, being -- being have been accused of what he was accused of by Jane Doe 1 or do you think he should have asked somebody else to do it?

MS. PIPAK:  I'll object to the form.

But you can answer.

THE WITNESS:  Well, I don't believe he was accused of doing anything to Jane Doe 1, based upon what I understand.  And so, yes, I believed it was appropriate to review these -- this information with him.

BY MS. SMITH:

Q.      Do you believe that Mr. Bender's decision regarding Jane Doe 1 was an impartial one?

A.      Yes.

Q.      Would you agree that at time that this reasonable accommodation request was made by Jane

Page 326

Doe 1, that Jane Doe 3 had more knowledge about Jane Doe 1's job description and job duties --

A.      Yes.

Q.      -- than you?

A.      Yes, she did.

Q.      Okay.

Why didn't you defer judgment to her regarding this request?

A.      I deferred judgment to the documentation we received from the provider.

Q.      Right.

But her job duties and responsibilities also played a part, right?

A.      Yes, they did.

Q.      And the person with the county who had the most knowledge regarding those job duties and responsibilities of Jane Doe 1 would have been Jane Doe 3, correct?

A.      I'm not certain if she was the only -- I'm not certain if she's the one who had the most knowledge.  I don't know that.  She had more knowledge than I did, yes.

Q.      So why didn't you ask for her input?

A.      Because I based it off of the

Page 327

documentation that was provided by the doctor indicating that either a work from home or a separated work area be provided.

Q.      That's what you relied your opinion on.

I'm asking, why didn't you, in addition to that -- what was your reasoning for not just asking Jane Doe 3?

A.      I didn't believe I needed to.

Q.      Why didn't you believe you needed to?

A.      Because I didn't.  I based it off of the documentation we received from the doctor.

Q.      Right.

But Jane Doe 3, you just said, had more knowledge than you about Jane Doe 1's work duties, correct?

A.      Yes.

Q.      So why didn't you think that her input would be relevant?

A.      I didn't believe I needed her input.

Q.      Is that -- you thought you could make a decision or you thought legally you didn't need her opinion?

A.      Well, as I said --

MS. PIPAK:  I am going to object to

Deposition of Heidi Zula Vol. I - Revised                    Jane Doe, et al. v. Schuylkill County Courthouse, et al.

Page 328

1  the form.
2          But you can answer.
3          THE WITNESS:  I consulted with my
4  attorney regarding the paperwork received.  I
5  received guidance from the attorney and I followed
6  that guidance.
7  BY MS. SMITH:
8  Q.      The 410 Building, we established through
9  your testimony earlier, was open to the public,
10 correct?
11 A.      Yes.
12 Q.      Mr. Halcovage could enter that building,
13 correct?
14 A.      Yes, potentially.
15 Q.      Jane Doe 1 did not have a parking space,
16 correct?
17 A.      Not to my knowledge.
18 Q.      She would have to walk from the street
19 or another location to enter the building,
20 correct?
21 A.      Yes.
22 Q.      How is it is that you came to the
23 conclusion that that was a safe work environment?
24 A.      It was a separated work environment from

Page 329

1  Mr. Halcovage.  I can not control what happens out
2  on the street between Jane Doe 1 or -- and any of
3  the people she's made allegations against.  I --
4  in the office, Mr. Halcovage was told he is not to
5  be in the 410 Building and he did not go to the
6  410 Building.
7  Q.      Jane Doe 1's job duties included often
8  going out into the field, correct?
9  A.      Yes, that's my understanding.
10 Q.      Which would mean she would have to come
11 and go from the building more often than, say,
12 someone who only has an office job, correct?
13 A.      Yes.
14 Q.      Did you take that into consideration
15 when determining whether an alternative location
16 from the courthouse or working from home would be
17 a better -- a safer or separate -- more separated
18 area from Mr. Halcovage?
19          MS. PIPAK:  Object to the form.
20          You can answer.
21          THE WITNESS:  I don't think I
22 specifically took that into consideration, no.
23          MS. SMITH:  I'm going to mark Zula
24 274 as Exhibit-127.

Page 330

1          - - -
2          (Zula 274 marked as Exhibit-127 for
3  identification.)
4          - - -
5  BY MS. SMITH:
6  Q.      Ms. Zula, do you recognize this
7  document?
8  A.      Yes.
9  Q.      There's a stamp on the right, it says
10 received March 12, 2021, human resources.  Is that
11 a stamp that is placed on documents received from
12 outside entities, entities outside the county when
13 they're received by human resources?
14 A.      Yes.  Sometimes, yes.
15 Q.      When does something get a stamp versus
16 when does something --
17 A.      I don't know.  I don't stamp the -- I
18 don't stamp the documentation in.  I don't know.
19 Q.      Who stamps it?
20 A.      It's done by the administrative
21 assistant.
22 Q.      And that's an administrative assistant
23 to the director of human resources?
24 A.      Yes.

Page 331

1  Q.      Was there ever instruction that any
2  incoming paperwork from an outside source should
3  be stamped?
4  A.      That was the general direction, yes.
5  Q.      Did you receive this letter from, looks
6  like, Dr. Lubinsky, L-U-B-I-N-S-K-Y, on or about
7  March 12, 2021?
8  A.      Yes.
9  Q.      And did you review it?
10 A.      Yes.
11 Q.      As a result of this letter, what, if
12 anything, did you do?
13 A.      We did review the information again.
14 However, the decision to not allow Jane Doe 1 to
15 work from home still stood.
16 Q.      Did you, after receiving this letter,
17 speak with Jane Doe 1?
18 A.      No, I did not.
19 Q.      Did you make any attempts to speak with
20 her?
21 A.      No, I did not.
22 Q.      Did you speak with Jane Doe 3?
23 A.      No, I did not.
24 Q.      Did you attempt to speak with Jane Doe

Page 332

3?

A.     I do not -- I do not believe I did.

Q.     This is a request that the 410 Building be -- Jane Doe 1's location, work location, the 410 Building be reconsidered, as her medical provider did not believe that that was, in fact, a safe and separated location, correct?

        MS. PIPAK:  I'll object to the form.

        But you can answer.

        THE WITNESS:  Can you repeat the question?  I just was reading.

BY MS. SMITH:

Q.     So the last -- the February 16 fax that we looked at, the medical provider form, that was kind of a hybrid request of either work from a safe and separated location or from home.  This is more of a, your alleged safe and separated location is not, in fact, a safe and separated location communication, correct?

A.     I don't know what you're asking me.

Q.     In this letter, they are basically saying what you consider a safe and separated location for Jane Doe 1, meaning the 410 Building,

Page 333

is not, in fact, a safe and separated location, correct?

A.     That's what the doctor is stating, yes.

Q.     Okay.

        And in fact, they raised the issue of what I just raised, in Paragraph 3, namely walking to and from her vehicle multiple times a day to complete essential job functions as a field appraiser alone places her at risk.

        Did you then consider that as -- as having an impact on safety and separation of her work environment?

A.     No, I did not.

Q.     I'm sorry.

        Why couldn't Jane Doe 1 work from home and in the field, a hybrid; what was the reasoning?

A.     We had great concerns about her submission of her work product.  She did not complete her work when she worked from home, so we believed it would be more appropriate for her to work in an office location at the county where her work can be more closely monitored.

Q.     Do you recall in the February 5th

Page 334

meeting you had -- 2021 meeting you had with Jane Doe 3 and Jane Doe 3 and Jane Doe 4, that they informed you that coming in -- that Jane Doe 1's act of coming into a county building is what caused her extreme anxiety and that is what disrupted her work?

A.     I believe that was discussed, yes.

Q.     So did you think maybe if we let her work from home, she won't have this anxiety and she will be more productive, let's try that out?

        MS. PIPAK:  Object to the form.

        Go ahead.

        THE WITNESS:  Prior to me getting to the county, she did work from home and I was advised that she did not submit her work product, hence the delinquency of the STEB reports.  And therefore, the determination was made when I reviewed information with my supervisor, that she was not going to be permitted to work from home.

Q.     Ms. Zula, during your employment with the county in January of 2022, the county again entered into a work from home agreement with Jane Doe 1, did they not?

A.     Yes, they did.

Page 335

Q.     And between February or March 2021 and January of 2022, Jane Doe 1 still failed to timely complete her STEB reports, correct?

A.     Yes, at times.  Yeah, she was more timely than she was prior.  But, yes, she -- she was late on occasion, yes.

Q.     Why -- what changed if the county had concerns about her work product, STEB reports being late or -- strike that.

        Prior to the denial of her work from home request in March of 2021, she had never been written up or disciplined for her late STEB reports, correct?

A.     To my knowledge, no, she had not.

Q.     After that, after she began working back at the county building, the 410 Building, she was written up and suspended for her late STEB reports, correct?

A.     Yes.

Q.     And despite two disciplinary actions, in January of 2022, the county still allowed her then to work from home, correct?

A.     Well, what led up to them working from home was the fact that they took what they termed

Page 336

or what Jane Doe 1 termed, a sabbatical, which was a completely non-approved leave, but, again, we did not take any action based upon that.  So in order to get her to return back to work and after consultation with our attorney at the time, we did enter into an agreement to allow her to come back to work from her sabbatical on a work from home basis.

Q.      So again my question is:  Despite two disciplinary actions in the month after this denial, so after March of 2021, after those two disciplinary actions, in January of 2022, Jane Doe 1 was permitted to work from home, correct?

A.      Yes.  After -- because they weren't reporting to work period, so yes.

Q.      In those months, Jan -- March of 2021 and January of 2022, do you recall receiving any correspondence from anyone regarding work supplies for Jane Doe 1?

A.      I'm not certain.  I know when she came back in January, there was some request for supplies for her to work from home.  I don't recall if there were any prior to that.  I don't remember.  But I know there was some discussion

Page 337

about supplies in January when she did -- January 2022, when she did return working from home.

Q.      Do you know if in January 2021, when she returned from the 2020 stint of working from home, did she return any county equipment that she had been utilizing at home?

A.      I don't know.

Q.      Okay.

        Do you know if then in January of 2022, when she started that work from home stint, did she receive different equipment than she had received in 2020?

A.      I don't know.  I know she had a laptop assigned to her that she could utilize to work from home, but I don't know if it was the same laptop.  I don't know.

Q.      You're talking -- you said she had a laptop assigned to her.  You mean in 2022?

A.      Yes.  And prior to that she worked with a laptop.  She had a laptop assigned to her that she could utilize to do her work duties.

Q.      Was she given an additional monitor?

A.      That I'm not certain.

Page 338

Q.      Was she given a full-sized keyboard?

A.      I don't know.

Q.      So do you recall if you were involved in those supplies?

A.      No.  No, I don't -- I don't -- I don't recall being involved.  I know that there was  a request for supplies in 2022.  What those specific supplies were from Jane Doe 1's standpoint, I don't recall.

        MS. SMITH:  Okay.  We will mark for today's purposes as 128, it's Zula 271 and 272.  271 through 273, I apologize.

                    - - -

        (Zula 271-273 marked as Exhibit-128 for identification.)

                    - - -

BY MS. SMITH:

Q.      I want look at this in conjunction with what was marked as 127.

        They are consecutive Bates numbers at the bottom right and they have that same fax information at the top.  Do you recall the time -- at the time you received this letter, are these other pages, if we look at -- if we look

Page 339

at 127, it says Page 5 of 5 and these pages say 2, 3, and 4 of 5 --

A.      Yes.

Q.      -- do you see that?

        Okay.

        So were these received by you at the same time as --

A.      Yes, I believe they were.

Q.      -- 127?

        Do you have any medical training?

A.      No.  And I did not review this document because I'm not a medical provider.  And so why it was provided, I have no idea.

Q.      Okay.

A.      No, I did not -- I did not do anything with this document, other than put it in the file.

Q.      Well, you received it, right?

A.      I received.

Q.      You looked through it probably, right?

A.      I -- yeah.  And I have no idea what that is.

Q.      And you said I don't really understand this because it's --

A.      Correct.

Deposition of Heidi Zula Vol. I - Revised                                          Jane Doe, et al. v. Schuylkill County Courthouse, et al.

Page 340

1  Q.      -- basically Chinese?
2  A.      Yes.  I'm not a doctor.  Never had any
3  medical training.  I have no idea.
4  Q.      Did you ever reach out to Jane Doe 1's
5  doctor?
6  A.      No.
7  Q.      Did you ever say, hey, can you translate
8  this for me?
9  A.      No, I did not.
10  Q.      Did you ever ask any doctor, hey, can
11  you translate this for me?
12  A.      No, I did not.
13  Q.      Okay.
14       Do you know if -- well, you said you
15  didn't understand it.  So you have no idea what it
16  says, right?
17  A.      No.  Only that it's a summary of
18  whatever her visit that occurred, apparently, on
19  3/1.
20       MS. SMITH:  Okay.  Mark for today's
21  purposes 129, it's Zula 800 to 801.
22       - - -
23       (Zula 800-801 marked as Exhibit-129 for
24  identification.)

Page 341

1       - - -
2  BY MS. SMITH:
3  Q.      This is an e-mail -- well, an e-mail
4  chain, the first of which is an e-mail from you to
5  Jane Doe 1 on March 24, 2021 correct?
6  A.      Yes.
7  Q.      So you did communicate with Jane Doe 1
8  after you believe I instructed you not to,
9  correct?
10  A.      Yeah.  I didn't speak with her.
11  Q.      Okay.
12       But you communicated with her, correct?
13  A.      Yes.
14  Q.      All right.
15       In the March 24th e-mail from you about
16  midway through it says:  The most recent
17  documentation received from your physician
18  requested that the county reevaluate the decision
19  regarding your request for a reasonable
20  accommodation based upon an additional physician's
21  medical review statement dated March 1, 2021, that
22  was provided.  However, we have no received the
23  revised statement from March 1, 2021.
24       So I'm confused.  Are you -- because it

Page 342

1  says that was provided and then it says was not --
2  A.      Well, I think there was -- I think there
3  was belief that we were going to get something
4  similar to this document, revised, dated
5  March 1st --
6  Q.      Okay.
7  A.      -- I believe that's what I was looking
8  for.
9  Q.      So when you said this, just for the
10  record, you were --
11  A.      I'm sorry.
12  Q.      -- holding up --
13  A.      Exhibit-122.  Sorry.
14  Q.      Okay.
15       So I guess looking then at Exhibit-127
16  for a second.  Looking at the bottom para -- well,
17  the second to last paragraph.  The last sentence
18  it says:  I'm asking that you consider the
19  physician review statement dated March 1, 2021.
20       Is your sentence, the additional --
21  based upon the additional physician review
22  statement dated March 1, 2021, that was provided,
23  quoting this letter and you saying in the next
24  sentence, however, we have not received this

Page 343

1  statement because you hadn't received --
2  A.      So my -- and maybe my e-mail was
3  incorrect.  We got this information.
4  Q.      When you're saying this --
5  A.      I'm sorry.  Exhibit-127 and 128 and in
6  the last sentence as you indicated, I am
7  requesting that you consider the physician's
8  review statement dated March 1st.  That is the
9  statement that I am -- I am believing that we
10  were -- should have received a March 1st dated
11  medical -- physician medical review statement,
12  such as Exhibit-122 from March 1st.  And I did not
13  get a document such as that as was referenced in
14  Exhibit-127.
15  Q.      Okay.
16       So if I understand correctly, what you
17  are saying in those two sentences is her doctor
18  said he sent this March 1st thing, we didn't
19  receive it and I need it --
20  A.      Yes.
21  Q.      -- to reconsider?
22  A.      Yeah.  Based upon -- I wasn't sure what
23  was in the physician's review statement dated
24  March 1, 2021, because I didn't see that physician

Page 344

1  review statement such as was in Exhibit-122.
2  Q.    Okay.
3        Did you consider that this 128, which is
4  a summary by a physician dated March 1, 2021, was
5  the physician's review -- medical review
6  statement?
7  A.    No, I did not.
8  Q.    Okay.
9        And it was, in fact, included with the
10 fax which says that there's a physician's review
11 statement that included, correct?
12 A.    Yes, it was.  But I did not, as
13 indicated in Exhibit-122, that's the physician's
14 medical review statement that I was expecting to
15 receive.
16 Q.    Jane Doe 1 responds -- Jane Doe 1
17 responds that you can call her physician's office
18 and provides you their phone number, correct?
19 A.    Yes.
20 Q.    And you indicate that you would attempt
21 to reach out to her physician's office to request
22 the additional documentation, correct?
23 A.    Yes.
24 Q.    Did you ever reach out to her doctor's

Page 345

1  office?
2  A.    Yes, I believe I did.
3  Q.    And did they ever provide you or tell
4  you that, hey, this -- that document we faxed you
5  was, in fact, the statement?
6  A.    I believe -- I don't know if I actually
7  did speak to anyone on Jane Doe 1's behalf from the
8  office, the doctor's office.  I'm not certain if I
9  did or I didn't.  I don't remember.
10 Q.    Well, do you know if you, in fact,
11 reached out then?
12 A.    I believe -- yes, I did reach out.  But
13 I don't -- I am not certain if I talked to them
14 about Jane Doe 1 or not.
15 Q.    Do you know if you reached out more than
16 once?
17 A.    I don't recall.
18 Q.    Do you know if you ever received this
19 March 1st physician review -- review statement or
20 information that this 128 was, in fact, that
21 statement -- statement?
22 A.    No, I don't -- I don't believe I
23 received anything for the March 1st indication.
24 Q.    Do you know if Jane Doe 1's doctor's

Page 346

1  March 8th letter in request for reconsideration
2  then was ever, in fact, reconsidered?
3  A.    As I indicated, we did not grant her the
4  ability to work from home at that time.
5  Q.    So after the March 8th letter, there was
6  another denial of her work from home?
7  A.    Yes.  We did not approve her ability to
8  work from home or request to work from home.
9  Q.    And was that -- did you have the
10 March 1, 2021, physician's review statement to
11 consider as her doctor requested when making that
12 decision?
13 A.    No, I did not receive the March 1st
14 document as was referenced.
15 Q.    Okay.
16       On March 8th of 2021, Jane Doe 1's
17 supervisor was still Jane Doe 3, correct?
18 A.    Yes.
19 Q.    Did you speak with Jane Doe 3 after
20 receiving this March 8, 2021, letter of
21 reconsideration from Jane Doe 1's medical
22 provider?
23 A.    No, I do not believe I did.
24 Q.    Do you recall around the same time that

Page 347

1  you received Jane Doe 1's medical provider's
2  documentation, that Jane Doe 3 submitted a
3  short-term telecommuting agreement from Jane Doe
4  1?
5  A.    Yes, I believe it was right around that
6  time.
7        MS. SMITH:  Okay.  I'm going to
8  mark 470 to 72 -- 470 to 472 and 454 and 455
9  collectively as 130.
10             - - -
11       (Zula 470-472 and 454-455 marked as
12 Exhibit-130 for identification.)
13             - - -
14 BY MS. SMITH:
15 Q.    If we look -- Ms. Zula, I am going to
16 draw your attention to --
17       MS. SMITH:  Matt, if you can put
18 470 up on the screen for right now.
19 BY MS. SMITH:
20 Q.    Okay.
21       Ms. Zula, please look to page -- the
22 bottom of Page 1 on 470 to Page 471.  This is an
23 E-mail from Jane Doe 3 on February 18th to you,
24 correct?

Deposition of Heidi Zula Vol. I - Revised                    Jane Doe, et al. v. Schuylkill County Courthouse, et al.

Page 348

1  A.      Yes.
2  Q.      Okay.
3        Now, if we turn to Page 2, the very last
4  paragraph of Jane Doe 3's e-mail, she states:  If
5  the county wishes to continually meet the
6  deadlines set by STEB and remain in compliance, I
7  would advise that Jane Doe 1 be permitted to work
8  a schedule that permits a portion of her time be
9  spent in the 4 -- at the 410 Building, a portion
10 of time working from home, and a portion of the
11 time in the field as needed, and then she gives
12 you the current STEB upload dates or information.
13       I don't see a short-term telecommuting
14 agreement attachment to this e-mail, but it's my
15 understanding that 454 and 455 was attached, as
16 the date indicated on it, it was 2/18, was
17 attached to this e-mail.  Was that your
18 recollection?
19 A.      I don't know -- I don't know if it was
20 attached to this e-mail.  That I don't know.
21 Q.      Okay.
22       But in any event, this 50 -- 454 and 455
23 document was received by you around February 18th
24 or 19th of 2021?

Page 349

1  A.      Yes.
2  Q.      Okay.
3        MS. IPPOLITO:  Catherine, are you
4  making -- is that definitely going to be all part
5  of Exhibit-130?
6        MS. SMITH:  Yes.
7  BY MS. SMITH:
8  Q.      When you received this, from whom did
9  you receive it?
10 A.      I believe it came from Jane Doe 3.
11 Q.      Okay.
12       And did you review it?
13 A.      Yes.
14 Q.      And as a result of reviewing it, what,
15 if anything, did you do?
16 A.      I consulted with Mr. Bender, as well as
17 my attorney, Tom Heinbach.
18 Q.      Were those consultations in the same
19 communication or were they separate?
20 A.      They were most likely separate.
21 Typically I talk to Tom separately from Mr.
22 Bender.
23 Q.      Okay.
24       When you talked to Mr. Bender, what, if

Page 350

1  anything, was discussed?
2  A.      My understanding was -- well, based upon
3  our discussions, again, he had some great concerns
4  about allowing Jane Doe 1 to work from home.
5  Q.      And he -- did he instruct you to deny
6  this?
7  A.      Well, we asked for further clarification
8  initially.  But at the end of the day, yes, we did
9  end up denying her request to work from home.
10 Q.      Okay.
11       So you said you asked for further
12 clarification, you pointed to something.  Were you
13 pointing to 470?
14 A.      Yes.  Exhibit-130, we did ask for
15 clarification in the e-mail.
16 Q.      So you send Jane Doe 3, in response to
17 receiving what's 454 and 455, the telecommuting
18 agreement, a couple days later you send Jane Doe 3
19 an e-mail requesting further clarification,
20 correct?
21 A.      Yes.
22 Q.      Did -- in your conversation with Mr.
23 Bender, did the -- did the discussion about
24 requesting further information or clarification

Page 351

1  come up?
2  A.      I don't believe it did, no.
3  Q.      Okay.
4        Did Mr. Bender tell you to deny the
5  short-term telecommuting agreement?
6  A.      Initially -- well, eventually yes.  I
7  don't know the timing of that though, as far as
8  when that occurred.
9  Q.      Before you sent this February 22nd
10 e-mail, did he tell you to deny it?
11 A.      No.
12 Q.      What did he tell you to do?
13 A.      So he typically -- well, he -- I'm sure
14 he told me to follow up with Tom Heinbach and
15 that's what I did.
16 Q.      Okay.
17       And then on February 22, 2021, you sent
18 this e-mail to Jane Doe 1?
19 A.      Correct.
20 Q.      Sorry.
21       To Jane Doe 3.
22       MS. SMITH:  I'm going to mark as
23 131, it's 475 to 477, Zula 475 to 477.
24            - - -

Page 352

1    (Zula 475-477 marked as Exhibit-131 for
2 identification.)
3                    - - -
4 BY MS. SMITH:
5 Q.    Ms. Zula, do you recognize this chain of
6 e-mails?
7 A.    Yes.
8 Q.    This is essentially a continuation of
9 last the e-mail, correct?
10 A.    Yes.
11 Q.    And this is Jane Doe 3's response to
12 your request for further information and
13 clarification?
14 A.    Yes.
15 Q.    Okay.
16    Why is it that you needed this
17 information if in February -- well -- so this
18 information, was this just for the short-term
19 telecommuting agreement?
20 A.    Yes.
21 Q.    And was this -- this -- was this
22 information used for Jane Doe 1's medical
23 provider's response?
24 A.    No, I don't -- no.  I believe for the

Page 353

1 medical provider responses the documentation we
2 used from the medical provider.
3 Q.    Okay.  All right.
4    I'm sorry.
5    So just going back real quick to the 47
6 one.  Is that what you have in front of you?
7        MS. PIPAK:  What exhibit is that?
8        THE WITNESS:  130.
9 BY MS. SMITH:
10 Q.    Between receiving the -- and I'm sorry
11 if you testified to this.
12    Between receiving the work from the --
13 telecommuting agreement or the short-term
14 telecommuting agreement from Jane Doe 3 and asking
15 for the additional information, as you did on
16 February 22nd, did Mr. Bender tell you to deny the
17 request?
18 A.    No.  I don't believe it was in between
19 that time frame.  It was after we received the
20 information.
21 Q.    Right, because additional information
22 was necessary to make a fully informed decision,
23 correct?
24 A.    Yes.

Page 354

1        MS. SMITH:  Okay.  I'm going to
2 mark as 132, 460 to 463.
3                    - - -
4    (Zula 460-463 marked as Exhibit-132 for
5 identification.)
6                    - - -
7 BY MS. SMITH:
8 Q.    Why don't you take a look at this.
9    This is also a continuation, kind of, of
10 that chain of e-mails, correct?
11 A.    Yes.
12 Q.    On February 19, 2021, Mr. Bender told
13 you, do not sign, did he not?
14 A.    Correct.
15 Q.    Is that a denial of Jane Doe 1's home
16 from work agreement?
17 A.    No.  That was just to not sign it at
18 that time.
19 Q.    He's telling you not to sign it?
20 A.    Correct.
21 Q.    Does he tell you to request additional
22 information?
23 A.    No.  But that was a discussion that we
24 had.

Page 355

1 Q.    So it was Mr. Bender who told you to
2 request additional information?
3 A.    We had a discussion regarding her
4 request for the work from home agreement and he
5 had requested that I reach out to Tom Heinbach to
6 get further guidance.
7 Q.    Why is it that you communicated with Mr.
8 Bender through e-mail on February -- I'm sorry.
9 Strike that.
10    That conversation regarding additional
11 information, was that in person or in e-mail?
12 A.    That would have, I believe, been in
13 person.  I met with Mr. Bender on a daily basis as
14 my supervisor.
15 Q.    But you put everything else about this
16 in writing, didn't you?
17 A.    Well, we didn't meet until the end of
18 the day, so, I mean, there -- yes, I did
19 communicate with him via e-mail as well.
20 Q.    Did you write down what additional
21 information he thought you should --
22 A.    No.
23 Q.    -- ask her?
24 A.    No, I most likely did not.

Page 356

Q.    On March 1, 2021, human resources
received a completed physician's medical review
from Jane Doe 2, correct?
A.    I don't know the date.
       MS. SMITH:  It's going to be Zula
291 and then 288 through 9 -- 290.
       It's going to be Exhibit-133.
          - - -
       (Zula 288-291 marked as Exhibit-133 for
identification.)
          - - -
BY MS. SMITH:
Q.    This one also has a stamp on the first
page, correct?
A.    Yes.
Q.    Received March 1, 2021, human resources,
correct?
A.    Yes.
Q.    Okay.
       I know these are out of consecutive
Bates stamp order, but based off of the fax
information at the top, this is how it appears to
be -- had been received.  Am I correct in how I
constructed this?

Page 357

A.    Are you -- are you asking that -- this
is Page 2, this is Page 3, this is Page 4?
Q.    Well, this one -- see how this Bates
stamp is 291 and then it goes to 288, which
obviously are not in consecutive numbering order.
But if you look to the top, there's a fax
information and it all appears the same.  And it's
a one of four and it's a two of four.
       Is this how it was received?
A.    Yes.  I would believe so, yes.
Q.    Okay.
       Did you review this physician's medical
review form?
A.    Yes.
Q.    After are you received and reviewed it,
did you speak with anyone?
A.    I attempted to speak with Jane Doe 2 and
I believe that I was informed by Jane Doe 3 that I
would have to speak with her regarding the
request, not Jane Doe 2.
Q.    Her meaning Jane Doe 3?
A.    Yes.
Q.    Okay.
       How did you attempt to speak to Jane Doe

Page 358

2?  Was it a phone, did you send her an e-mail,
text --
A.    I believe I did make a phone call, as
well as I think I sent an e-mail as well, I think.
But I know I reached out to her and then I believe
I got an e-mail response back from Jane Doe 3
indicating that I was to review the information
with her, I believe that was the way it
transpired.
Q.    Did you ever speak with Jane Doe 3?
A.    I believe we communicated via e-mail.
Q.    And what did you communicate about?
A.    I don't exactly recall the discussion.
Q.    So then is it fair that you never spoke
with Jane Doe 2?
A.    I attempted to, but I don't believe I
actually physically spoke to Jane Doe 2.  I
believe I did have a written communication with
her because I believe we did seek additional
clarification on her statement that was provided
from her physician.
Q.    You understand that the interactive
process is between the employer and the employee,
correct?

Page 359

A.    Yes.
Q.    But the information needed for the
interactive process comes from the physician or at
least part of it does, correct?
A.    Yes.
Q.    What's your understanding generally
or -- let's start with generally, as it relates to
employers reaching out to physicians or going
through employees for medical information?
A.    So typically we would go to the employee
and ask them to obtain the additional information,
that's typically the process.  We would provide
that information to them saying, you know, we have
a question about this, can you get further
clarification or something to that effect.
Q.    And so an employee can just bring you
any document, altered, not altered, directly --
       MS. PIPAK:  Objection to the form.
       You can --
BY MS. SMITH:
Q.    -- to human resources?
A.    Well, I wouldn't believe they bring
altered documents.  I mean, typically we get
faxes.  We get official forms from doctors

Page 360

1 directly that are signed by the doctor, so I am
2 not...
3 Q.      I'm just confused why the county doesn't
4 reach directly out to medical providers to make
5 sure that it is, in fact, the medical provider who
6 provides the information?
7 A.      Well, I had no belief to -- I have no
8 reason to believe that the doctor that signed off
9 on it isn't legitimate.
10 Q.      Okay.
11      Did you in your conversations or
12 communications with Jane Doe 3 ever ask her if she
13 thought Jane Doe 2's request or Jane Doe 2's
14 medical provider's request was -- should be
15 approved?
16 A.      I don't recall my specific conversations
17 with Jane Doe 3.
18 Q.      Other than Jane Doe 3 and attempting to
19 speak with Jane Doe 2, did you speak with anyone
20 else regarding this physician medical review form?
21 A.      Yes.  I believe I advised Mr. Bender
22 that we received the request, as well as spoke
23 with my attorney, Tom Heinbach, regarding the
24 request.

Page 361

1 Q.      Again, similar to Jane Doe 1, were those
2 conversations separate, the ones with Bender and
3 Tom Heinbach?
4 A.      Yes, typically they would be.
5 Q.      Okay.
6      What did Ms. Bend -- Mr. Bender tell
7 you, if anything, to do in regards to it?
8 A.      That we needed to review it with
9 Mr. Heinbach to get his guidance on how to
10 proceed.
11      MS. SMITH:  I'm going to mark as
12 134, Zula 555 and 556.
13      - - -
14      (Zula 555-556 marked as Exhibit-134 for
15 identification.)
16      - - -
17 BY MS. SMITH:
18 Q.      Do you recognize this e-mail
19 correspondence?
20 A.      Yes.
21 Q.      Do you recall reaching out to Ms.
22 Kutzler regarding --
23 A.      Apparently I did, based upon this, yes.
24 Q.      Okay.

Page 362

1      Was Ms. Kutzler still providing
2 consultation to the county regarding human
3 resources issues?
4 A.      Yes.
5 Q.      You were, in fact, or had been the human
6 resources director just shy of two months at this
7 point, correct?
8 A.      Yes.
9 Q.      And I don't know, refresh my
10 recollection, your resume, you have like 28 years
11 of human resources experience, is that --
12 A.      Twenty.
13 Q.      Twenty.  Okay.  Sorry.  I didn't mean to
14 make you older.  I was just trying to remember the
15 number.
16      Why did you feel the need to have Doreen
17 Kutzler review correspondence you were going to
18 send to Jane Doe 2?
19 A.      Just to get an extra set of eyes on the
20 correspondence.  I just thought it was appropriate
21 to ask for her thoughts on it.
22 Q.      Okay.
23      She makes an adjustment to No. 4 and
24 otherwise says it's good to go, correct?

Page 363

1 A.      Yes.
2 Q.      And did that correspondence go out to
3 Jane Doe 2?
4 A.      I believe so.
5      MS. SMITH:  All right.  We'll mark
6 as 135, it's Zula 571 to 573.
7      - - -
8      (Zula 571-573 marked as Exhibit-135 for
9 identification.)
10      - - -
11 BY MS. SMITH:
12 Q.      Do you recognize this e-mail chain?
13 A.      Yes.
14 Q.      Okay.
15      So on March 3rd, you, in fact, send that
16 draft correspondence from the previous e-mail with
17 Ms. Kutzler that we looked at, to Jane Doe 2,
18 correct?
19 A.      Yes.
20 Q.      And then Jane Doe 3 -- Jane Doe 3 is not
21 CC'ed on that, correct?
22 A.      No.
23 Q.      Jane Doe 3 reaches out to you on
24 March 3rd, a little bit later in the day, correct?

Page 364

A.    Yes.
Q.    Is that that communication you had with Jane Doe 3 that you were referring to earlier?
A.    I believe so, yes.
Q.    Okay.
      Jane Doe 3, in fact, asked why she isn't being included on communications being she's Jane Doe 1 and Jane Doe 2's direct supervisor; would you agree?
A.    Yes, she did ask that question.
Q.    And if we look to Page 1 of this document, you write:  The interactive process of ADA is between the employer and the individual employee.  I will be engaging in the interactive process on behalf of the employer.  If I should require additional information or clarification from you as the department head, I will contact you directly to discuss.
      Did you ever contact Jane Doe 3 to discuss?
A.    Not to my knowledge.
Q.    Did you ever require any additional information or clarification from her?
A.    Not to my knowledge.

Page 365

Q.    Did anyone instruct you to exclude Jane Doe 3 from the interactive process?
A.    No.
Q.    It was a decision you made on your own?
A.    Yes.  Well -- and I don't believe I excluded her.  I engaged in the process with the employee.  And as I indicated, would touch base with Jane Doe 3 if I needed any additional information.
Q.    But she wasn't included?
A.    No, she wasn't.
Q.    And that was a decision that was yours and yours alone?
A.    Yeah.  I sent the e-mail and only sent it to Jane Doe 2.
      MS. SMITH:  Going to mark 29 -- I'm sorry.  886 and then 292 and 293 Zula, as 136.
                    - - -
      (Zula 886, 292-293 marked as Exhibit-136 for identification.)
                    - - -
BY MS. SMITH:
Q.    The first question I have about these is -- so, like, the other ones we looked at, the

Page 366

Bates stamps are not consecutive.  Obviously 886 comes after 292.
      But it talks about -- this e-mail talks about Dr. Michael Bradley's response and there is an attachment.  Is that response and the attachment 292 and 293; am I correct?
A.    Yes, I believe so.
Q.    Okay.
      Sorry, it's just how they were produced to me, so I am trying to piece them together and make sure that my assumptions are right.
      So someone named Desiree reached out or sent you what is 292 and 293 on April 1st of 2021, correct?
A.    Yes.
Q.    And the 292 and 293, is a Dr. Michael Bradley's response to those -- that request or those requests for additional information, clarification that you sent to Jane Doe 2 on March 3rd, correct?
A.    Yes.
Q.    All right.
      This -- you were the only individual who is on the e-mail, so you did receive it, correct?

Page 367

A.    Yes, I believe I did receive it.
Q.    Did you review this document?
A.    Yes.
Q.    After reviewing this document, what, if anything, did you do?
A.    I consulted with my attorney regarding the next steps of the process.
Q.    Did you consult with Defendant Bender?
A.    I believe after the fact, yes.
Q.    So you consulted with your attorney and then after that, you consulted with Defendant Bender?
A.    Yes.
Q.    Was your attorney present in the consultation with Defendant Bender?
A.    That I don't recall.
Q.    Okay.
      What, if anything, did Bender tell you?
A.    Again, we discussed the request to work from home.  And, again, the request was not permitted.
Q.    What, if anything, other than this letter, did you consider in that denial, post receipt of this letter?  So you get this letter,

Case 3:21-cv-00477-MCC    Document 280-1    Filed 09/20/23    Page 273 of 342
Deposition of Heidi Zula Vol. I - Revised
Jane Doe, et al. v. Schuylkill County Courthouse, et al.

Page 368

1 the request is then denied.  Is there anything
2 else that is considered during that time period?
3          MS. PIPAK:  I'll object to the
4 form.
5          But go ahead.
6          THE WITNESS:  I'm not following
7 what you're asking.  So I received this letter.
8 BY MS. SMITH:
9 Q.      Yup.
10         This letter you got on April 1st --
11 A.      Okay.
12 Q.      -- in the e-mail.  And then again it's
13 decided that the work from home request is still
14 not approved, correct?
15 A.      Yes.
16 Q.      Did you consider anything other than
17 this letter in that then denial or non-approval
18 from the work from home request?
19 A.      And again, we also considered the
20 previous history regarding the working from home
21 product, yes.
22 Q.      Okay.  All right.
23         So going now to March of 2021, we
24 started to talk about it briefly.  At that time,

Page 369

1 Jane Doe 3 and Jane Doe 4 were, in fact, demoted,
2 correct?
3 A.      Yes.
4 Q.      Jane Doe 3 lost her title of chief
5 assessor and became tax claim director only,
6 correct?
7 A.      Yes.
8 Q.      Jane Doe 4 lost her title of assistant
9 tax claim director and became the assistant or
10 deputy chief assessor, correct?
11 A.      Yes.
12 Q.      Not asking who voted on them, because I
13 know ultimately it had to be voted on by the
14 commissioners, correct?
15 A.      Yes.
16 Q.      Who made the decision that those -- not
17 about the demotion, because I know you said it was
18 kind of a collective decision, but who decided
19 that Jane Doe 1 was going -- I'm sorry.  Jane Doe
20 3 was going to say in tax claim and Jane Doe 4 was
21 going to go to tax assessment or stay in tax
22 assessment?
23 A.      That was -- that recommendation was made
24 by Mr. Bender.

Page 370

1 Q.      Did he give a reason?
2 A.      I believe there were discussions again
3 with our attorney, as well as Mr. Bender, based
4 upon -- we needed -- the belief was that we needed
5 to have someone who was familiar with the
6 operations in the chief assessor position -- or
7 the tax assessment office, so it was decided to
8 leave Jane Doe 4 there as we were planning to
9 bring on Mr. Alu and --
10 Q.      So correct -- wait.  So I just want to
11 make sure I understood your testimony correctly.
12         The decision was that because Jane Doe 4
13 had assessment knowledge, she should remain in the
14 assessment office?
15 A.      Well, she was the second in the chain of
16 command there.  So it was believed that Jane Doe
17 3, when she served as the director of tax claim,
18 that, you know, the office ran well.  And we
19 already had the discussions about Mr. Alu coming
20 in to evaluate the office and review information.
21 So it was determined to put Jane Doe 3 back in the
22 tax assessment of -- or tax claim office, excuse
23 me, and leave Jane Doe 4 in the tax assessment
24 office, so that there would be somebody there who

Page 371

1 had some knowledge of what was going on in the
2 office during the time frame that they served as
3 the supervisors.
4 Q.      Were you aware that prior to Jane Doe 4
5 taking on the job of assistant or deputy chief
6 assessor in tax claim -- I'm sorry -- in
7 assessment, that she had served for a number of
8 years in the tax claim bureau only?
9 A.      Yes.
10 Q.      Did you know that Jane Doe 4, in March
11 of 2021, did not hold a CPE license?
12 A.      Yes, I was aware of that.
13 Q.      Did you know that Ms. Jane Doe 3 did, in
14 fact, hold a CPE license?
15 A.      Yes.
16 Q.      Are you aware of the difficulty of
17 getting a CPE license?
18 A.      I'm familiar with the process, yes.
19 Q.      It's --
20 A.      I don't know of the difficulty because
21 I've never sat through the exam, so I don't know.
22 And my difficult versus somebody else's difficult
23 is potentially two different things.
24 Q.      With that said, let me ask a better

Case 3:21-cv-00477-MCC   Document 280-1   Filed 09/20/23   Page 274 of 342
CONFIDENTIAL
Deposition of Heidi Zula Vol. I - Revised                    Jane Doe, et al. v. Schuylkill County Courthouse, et al.

Page 372

question.

What I meant was, are you -- applicants for employment with the county with CPE licenses are far and few between; would you agree?

A.    Yes, because it is such a specialized certification that only applies to tax assessment offices and counties.  And so unless you're hiring someone from another county who already has the CPE, yes, there needs to be a time frame in which the person can get their license.

Q.    And, again, I think we established this earlier, by statute, a chief assessor must hold a CPE license, correct?

A.    That's my understanding, yes.

Q.    While a deputy chief assessor has a grace period to obtain their CPE license, correct?

A.    I don't know if -- I'm not sure of what the grace period is and I'm not sure if it even applies to the chief assessor.  But in order for somebody to value or -- and I don't know, this may be the wrong term, but to approve the valuations of the properties, they have to have a CPE licensed.  And so, yes, that typically the chief assessor would have to have that license.

Page 373

Q.    Right.

So at the time they're hired, they have to hold it, right?

A.    I don't know if it's at the time that they hold it, but there has to be somebody in the county that can, like, sign off and approve those valuations who has that license.

Q.    Okay.

So --

A.    And I am not certain if they have to hold it when they get there or they don't, I don't know that.  I don't believe, no, because Mr. Hatter did not have his either when we hired him.

Q.    Okay.

So they have the sign off -- the reason they have to have the CPE license is because they have to sign off on valuations?

A.    Yeah, of properties, is my understanding.

Q.    Is that in connection with the STEB reports, is that where the valuations are?

A.    No.  I am talking about with the assessed values of the properties.  Like -- and I

Page 374

don't know if I am using the right terminology, but my understanding is the person has to be certified in order to sign off on those values that are given to the properties based upon the assessments that are done.

Q.    So what --

A.    Or the reviews of the property or whatever they're called.

Q.    If values of properties are not -- if the assessed values of properties are not signed off on, what happens?  Like, so if STEB reports aren't submitted, it has ramifications for taxing bodies.  If assessed properties are not signed off on, what -- what are, if any, the ramifications?

A.    I don't know.

Q.    Okay.

Is it possibly that then taxes on that newly assessed value can't be recovered?

A.    I don't know.

Q.    Okay.

In any event, would it be fair to say that if a assessor -- well, strike that.

Let's start with this:  Are you aware that there are only certain times of year -- of

Page 375

year that the CPE class and licensing tests are offered?

A.    I know that there's classes that are offered.  I don't know how often they are or when the test is offered, that I don't know.

Q.    Okay.

If a chief assessor came on by statue, which I don't believe it is, but if a chief assessor came on and did not have a valid CPE license, waiting -- having to wait in order to get that CPE license could cause some disruptions to the operations of the tax assessment office, correct?

A.    Yes.  A plan would have to be put in place for somebody who has the appropriate CPE license to kind of serve in that role.

Q.    At the time Jane Doe 3 was demoted and removed from her position of chief assessor, was there a plan in place as to who would replace her?

A.    Not the specific employee, no.  The plan was that we were going to look to bring Mr. Alu on board to serve in that capacity.

Q.    Why then wasn't Mr. Alu brought on immediately after Jane Doe 3 was demoted?

Page 376

1  A.      There was some discussion about how we
2  were going to employee him, about whether he would
3  be an actual employee of the county versus a
4  contractor.  And so we worked -- had to work out
5  those issues and it was ultimately then put on as
6  a contracted employee.
7  Q.      Why weren't those issues ironed out
8  before Jane Doe 3 was demoted?
9  A.      I don't know.
10 Q.      Do you think that Jane Doe 3 being
11 demoted was so pressing that those issues couldn't
12 be ironed out before she was demoted?
13         MS. PIPAK:  Object to the form.
14         Go ahead.
15         THE WITNESS:  No, I don't -- I
16 don't believe that they were pressing at that
17 point.  I don't -- I don't believe so.
18 BY MS. SMITH:
19 Q.      Do you think that Jane Doe 3's actions
20 were so detrimental to the assessment office that
21 leaving the assessment office without a chief
22 assessor for a period of time or without an
23 individual overseeing it with a CPE license was a
24 better move?

Page 377

1          MS. PIPAK:  Object to the form.
2          Go ahead.
3          THE WITNESS:  So based upon the
4  decisions that were made by the people that I
5  report to, we made the transition that specified
6  date and time.
7  BY MS. SMITH:
8  Q.      Okay.
9          I'm asking you if you thought it was a
10 smart decision?
11         MS. PIPAK:  Object to the form.
12         Go ahead.
13         THE WITNESS:  I mean, I think it
14 would probably have been a little better to have a
15 plan, a fully worked out plan in place, but we
16 didn't at that point in time.  I know we had
17 discussions with Mr. Alu to bring him on board.
18 Unfortunately that process didn't go as quickly as
19 planned.
20 BY MS. SMITH:
21 Q.      Who pushed this decision through so
22 quickly?
23 A.      I don't think --
24         MS. PIPAK:  Object to the form.

Page 378

1          Go ahead.
2          THE WITNESS:  I'm sorry.  I don't
3  think it was pushed through quickly.  As I said,
4  there was a lot of discussion.  We met back in
5  February with Jane Doe 3 and Jane Doe 4 to talk
6  about the office.  And, I mean, I prepared the
7  memo, so it was quite some time since, so those
8  discussions were ongoing for quite some time.
9  BY MS. SMITH:
10 Q.      Okay.
11         Well, who pushed for Jane Doe 3's
12 demotion without having a replacement chief
13 assessor or supervisor with a CPE license in
14 place?
15         MS. PIPAK:  Objection.
16         Go ahead.
17         THE WITNESS:  So we -- after much
18 discussions, it was decided and I was directed to
19 put the PARs into separate the two positions, as
20 that was -- so we were going to separate the two
21 positions.  And as a result of that, we placed
22 Jane Doe 3 in one and Jane Doe 4 in another
23 office.
24 BY MS. SMITH:

Page 379

1  Q.      Who decided that and directed those
2  PARs?
3  A.      Mr. Bender.
4  Q.      Did you ever say to Mr. Bender, hey,
5  maybe we should have a replacement in line?
6  A.      No.
7          MS. PIPAK:  Object to the form.
8          Go ahead.
9  BY MS. SMITH:
10 Q.      Did you ever say to Mr. Bender, hey,
11 maybe we should bring a consultant on so Jane Doe
12 3 can get them up to speed on what she's been
13 doing and then he can transition from there?
14         MS. PIPAK:  Object to the form.
15         Go ahead.
16         THE WITNESS:  No.  I believe that's
17 why the decision was made to leave Jane Doe 4 in
18 the office.
19 BY MS. SMITH:
20 Q.      Well, Jane Doe 4 didn't hold a valid CPE
21 license, did she?
22 A.      That's correct.
23 Q.      And Jane Doe 4 had a wealth of knowledge
24 for the tax claim bureau, correct?

Case 3:21-cv-00477-MCC    Document 280-1    CONFIDENTIAL    Filed 09/20/23    Page 276 of 342
Deposition of Heidi Zula Vol. I - Revised
Jane Doe, et al. v. Schuylkill County Courthouse, et al.

Page 380

A.     Yes.

Q.     And so she could assist the new tax claim director in the tax claim bureau if she had been placed there, correct?

A.     Yes, she could.

Q.     And Jane Doe 3 could have -- maybe if she was -- well, strike that.

       Jane Doe 3, to your knowledge, was running the assessment office efficiently except for the STEB reports, correct?

A.     I -- as I said, I'm not thoroughly familiar with all of the operations, but my focus was the STEB reports, but there were other issues that were beyond what I was involved in.

Q.     So couldn't Jane Doe 3 have been left as the chief assessor, move Jane Doe 4 to the assistant director or director of tax claim, and then provided Jane Doe 3 with, instead of an assistant chief assessor, deputy chief assessor with a consultant to rectify the issues as you saw them in the assessment office?

       MS. PIPAK:  I'll object to the form.

       Go ahead.

Page 381

       THE WITNESS:  Yes, that could have been an option.

BY MS. SMITH:

Q.     Did anybody during your employment say, hey, what did we spend all that money on Joan Price for if she was supposed to consult with the tax assessment office?

       MS. PIPAK:  Object to the form.

       THE WITNESS:  That was never a discussion with me.

BY MS. SMITH:

Q.     Did you ever find out or hear that Mr. -- Ms. Price got paid $250 an hour to consult with the assessment office?

A.     No, I'm not aware of that.

       MS. SMITH:  Mark as 67 -- I'm sorry.  I am going to mark 673 and 674 as 137.

                       - - -

       (Zula 673-674 marked as Exhibit-137 for identification.)

       MR. LEES:  Off the record for a minute.

       VIDEOGRAPHER:  The time is now 5:30 p.m., we are going off the video record.

Page 382

                       - - -

       (Whereupon, brief recess was held off the record.)

                       - - -

       VIDEOGRAPHER:  Time now 5:38 p.m. and we're back on the record.

BY MS. SMITH:

Q.     Ms. Zula, we were earlier discussing the discussions about the restructuring of the tax claim and tax assessment offices.

       Was Mr. Heinbach involved in those discussions?

A.     Yes.

Q.     And did Mr. Heinbach give legal advice during those?

A.     I would say yes.

Q.     Okay.

       What was that legal advice?

       MS. PIPAK:  I am going to object on attorney-client privilege.

       MS. SMITH:  Are you reserving the right to assert the defense -- the advice of counsel defense at trial or are you waiving it?

       MS. PIPAK:  I'm sorry.  On the --

Page 383

       MS. SMITH:  The advice -- are you reserving the right to assert the advice of counsel defense at trial or are you waiving it?

       MS. PIPAK:  Well, we are not waiving anything.  But for the purpose of depositions, she's not going to answer this question.  We can brief this.

       MS. SMITH:  Okay.  So you're -- you're waiving -- you're not waiving the defense, correct?

       MS. PIPAK:  No, I'm not waiving the defense.  I don't believe we -- I don't think that was -- I don't think that was our answer.  I don't think we raised that defense in the answer.

       MS. SMITH:  It's not an affirmative defense.  I am asking if you're waiving the right to bring in the advice of counsel defense at trial.

       MS. PIPAK:  Catherine, I think this is inappropriate.  I just think this is an inappropriate line of questioning.

       MS. SMITH:  I'm asking you simply as her attorney, are you waiving or asserting that right?

Page 384

1  MS. PIPAK: I'm not waiving
2  anything. I will say right now, we do not have
3  a -- a defense of advice of counsel.
4        MS. TOWNSEND: I missed the
5  question. The question was about --
6        MS. SMITH: Did he provide legal
7  advice.
8        MS. TOWNSEND: About what?
9        MS. SMITH: About the tax
10 assessment office division.
11       MS. TOWNSEND: So are you going to
12 reserve the right to introduce evidence that they
13 made this decision based on the advice of counsel?
14       MS. PIPAK: For the purpose of?
15       MS. TOWNSEND: Anything. Like
16 bring up -- are you reserving the right to bring
17 into trial evidence that counsel was consulted
18 before making this decision?
19       MR. GEIGER: Doesn't it matter who
20 made the decision, because she's not the decision
21 maker.
22       MS. PIPAK: So as for this witness,
23 I --
24       MR. GEIGER: She would not rely on

Page 385

1  the advice of legal counsel because she made no
2  decision.
3        MS. TOWNSEND: I don't think that
4  you can bring into evidence that -- you know,
5  implying that you complied with the law because
6  you spoke with an attorney before making a
7  decision and then prevent us from questioning
8  about what that communication was with the
9  attorney.
10       MS. PIPAK: As on this -- as to
11 this retaliation claim. I mean --
12       MS. TOWNSEND: So you're asking --
13 the question here is about the restructuring?
14       MS. SMITH: Correct.
15       MS. TOWNSEND: Okay. So if you
16 brought into evidence at trial --
17       MS. PIPAK: I understand that. And
18 as of right now, we do not have an advice of
19 counsel defense as to this retaliation claim. But
20 I'm not waiving anything at this point.
21       MS. SMITH: Well, at the moment of
22 this deposition then, if you're -- if don't have
23 the advice from counsel, then I'm permitted to ask
24 her those questions. Unless you assert that --

Page 386

1  MS. PIPAK: I would say it's --
2  that's actually the opposite of the position.
3        MS. TOWNSEND: So I just don't want
4  to be in a position where we get to trial and
5  testimony comes in that a lawyer was consulted
6  before making this decision and we were precluded
7  because of your objection and instruction not
8  to -- to the witness not to answer from finding
9  out what those communications were with counsel.
10 If you're prepared to say all references to
11 consultations with attorneys will not be
12 introduced as evidence at trial, then -- then I
13 guess that answers the question.
14       MS. PIPAK: Okay. Then we're going
15 to have to stop for tonight and we can bring this
16 up tomorrow and we can go back on the record for
17 23 minutes. I mean, I'm not making that decision
18 here.
19       MS. TOWNSEND: Well, I mean, you
20 can -- we can --
21       MS. SMITH: Yeah, we still have
22 tomorrow. Yeah, I'll -- we'll reserve the right,
23 all parties will reserve the right to revisit that
24 issue tomorrow. I -- there's plenty of other

Page 387

1  questions I can ask to get us through tonight.
2        I am going to mark as 137, Zula 673
3  to 674.
4  BY MS. SMITH:
5  Q.    Do you remember this e-mail chain?
6  A.    Yes.
7  Q.    And is this March 11th e-mail from you
8  to Jane Doe 3, a request to meet with her to
9  discuss what would eventually be the division of
10 the offices?
11 A.    Yes.
12 Q.    Okay.
13       Jane Doe 3 replies to you that she's off
14 tomorrow and Jane Doe 4 had a death in the family,
15 so she's not available either, correct?
16 A.    Yes.
17 Q.    Do you recall when -- strike that.
18       On March 11th when you sent the e-mail
19 to Jane Doe 3, did you know Jane Doe 4 was off on
20 bereavement leave for the death of her brother?
21 A.    No, I did not know that.
22 Q.    Okay.
23       But did learn it on March 11th at 4:38,
24 correct?

Page 388

1  A.      I knew she had a death in the family, I
2  am not exactly sure who it was.
3  Q.      Okay.
4         Jane Doe 3 -- okay.  In your response to
5  Jane Doe 3 you indicate that even though Jane Doe
6  4was off, it didn't matter because Jane Doe
7  4'sattendance at the meeting would not be
8  appropriate.
9         Do you see that?
10 A.      Yes.
11 Q.      Why did you think that Jane Doe
12 4'sattendance at the meeting wouldn't be
13 appropriate?
14 A.      Because we were going to discuss Jane
15 Doe 3's action that was going to be recommended to
16 the board.
17 Q.      Well, Jane Doe 4's demotion was also
18 going to be recommended to the board, correct?
19 A.      Yes.
20 Q.      And moving one to one office and one to
21 the other office was going to impact each of --
22 A.      We were going to meet with them
23 separately, not together.
24 Q.      Well, if Jane Doe 3 wanted someone

Page 389

1  present there, why was she denied that right?
2  A.      We just did not feel it was appropriate.
3  Q.      Who is we?
4  A.      Well, I didn't feel it was appropriate.
5  She's not a union-represented employee, and so
6  we -- I made the decision that Jane Doe 4did not
7  have to attend her meeting.
8  Q.      Well, having to attend a meeting is
9  different than being able to, correct?
10 A.      Yes.
11 Q.      And is there any county policy that says
12 that when an individual employee meets with HR
13 that they can't have a witness present?
14 A.      No.  But there's no county policy says
15 that they have to either.
16 Q.      Okay.
17        And is there any -- was there anyone
18 with whom you consulted before you denied that
19 request of Jane Doe 3?
20 A.      Not on this specific request, I don't
21 believe so, no.
22 Q.      On others did you consult with someone
23 prior to denying a similar request?
24 A.      Yes.  There were some discussions with

Page 390

1  Mr. Heinbach, as our counsel, regarding other
2  issues that occurred.
3  Q.      Do you know if those were before or
4  after this?
5  A.      They were after this.
6  Q.      Okay.
7         So given his previous advice, you on
8  this case, made your own decision to deny her
9  request?
10 A.      Yes.
11        MS. SMITH:  Okay.  Going to mark as
12 138, it's Zula 685 to 687.
13              - - -
14        (Zula 685-687 marked as Exhibit-138 for
15 identification.)
16              - - -
17 BY MS. SMITH:
18 Q.      This is a further chain of these
19 e-mails, correct?
20 A.      Yes.
21 Q.      Jane Doe 3, on Page 2 of this document,
22 indicates to you that she and Jane Doe 4 learned
23 of recent retaliatory behavior that the county
24 administration has been planning to use against

Page 391

1  both Jane Doe 4and herself.  And they -- in light
2  of that, they would consider any discussions
3  regarding either office to be suspect and
4  requested that their attorney be present at the
5  meeting regarding either office.
6         Do you see that?
7  A.      Yes.
8  Q.      Why was there an issue with Jane Doe 3's
9  attorney being present?
10 A.      As I indicated in my response, the
11 meeting was to discuss the operations of the tax
12 assessment and the tax claim offices and that
13 management has the right to request such meetings
14 with our employees to discuss work-related issues.
15 And given this scenario, that it would not be
16 appropriate for the attorney to attend the
17 meeting.
18 Q.      Well, I can see what you wrote there,
19 but I'm asking you as you sit here today, what is
20 your understanding of the reason that that -- at
21 that specific meeting, an attorney would not be
22 appropriate?
23 A.      Because it was to discuss work-related
24 operational issues.  So I made the determination

Page 392

1  that an attorney would not be appropriate to be
2  present.
3  Q.      So conversations with Jane Doe 4 and/or
4  Jane Doe 3 that involved work-related operational
5  issues, it was that that was the reason that they
6  weren't permitted to have their attorney present?
7  A.      Yes.
8          MS. PIPAK:  Objection.
9          Go ahead.
10         THE WITNESS:  Sorry.  But yes.  As
11  I indicated, it was discussed, the operations of
12  the office, specifically the organizational
13  structure and it was unrelated to the EEOC charges
14  that have been filed by her and others.
15  BY MS. SMITH:
16  Q.      So if it had been work related, but
17  related to the EEOC charges, would that be
18  something that you would think they could have
19  their attorney present for?
20         MS. PIPAK:  Objection to the form.
21         You can answer.
22         THE WITNESS:  I wasn't going to be
23  involved -- I wasn't getting involved in the EEOC
24  charges.  I'm just saying that from a work

Page 393

1  perspective, that the attorney would not be
2  permitted.  We wouldn't permit that of any county
3  employee to bring their attorney for an
4  operational work issue.
5  BY MS. SMITH:
6  Q.      Ever?
7  A.      When I was there, no.
8  Q.      Ms. Zula --
9  A.      During -- well, during -- at this point
10  in time, yeah.  At this point in time.
11  Q.      Did it ever change?
12  A.      When an investigation was conducted,
13  yes, at the advice being that I was having an
14  attorney present, it was indicated that I should
15  allow them to have an attorney present.
16  Q.      Right.
17          Because I sat in on the LexisNexis --
18  A.      Yes.
19  Q.      -- interview with them, didn't I?
20  A.      Yes, you did.
21  Q.      So when the county found it appropriate
22  and convenient to have their attorney present,
23  then Jane Doe 3 and Jane Doe 4 were permitted to
24  have theirs present?

Page 394

1          MS. PIPAK:  I'll object to the
2  form.
3          You can answer.
4          THE WITNESS:  I was advised to
5  allow them at that point in time to allow them to
6  bring you as their attorney, yes.
7  BY MS. SMITH:
8  Q.      In the March 12th e-mail by Jane Doe 3,
9  at the top there she references -- she states,
10  there has never been one operational meeting
11  requested by the county for tax claim or tax
12  assessment, except for the one in which you called
13  us down to discuss interim positions and then
14  proceeded to inquire about all aspects of tax
15  assessment.
16          Did you understand that or take that to
17  be the February 5, 2021, meeting?
18  A.      Yes.
19          MS. SMITH:  Okay.  Look at 701,
20  which I will mark as 139 for today's purposes.
21                  - - -
22          (Zula 701 marked as Exhibit-139 for
23  identification.)
24                  - - -

Page 395

1          MS. SMITH:  You can go back to the
2  other one.  I apologize.  Matt, if you can go back
3  to 685, 687, which is 138.
4  BY MS. SMITH:
5  Q.      It's in the bottom e-mail, that Friday
6  March 12th at 12:52 a.m. e-mail.  In the second
7  sentence Jane Doe 3 says:  I have already attended
8  one meeting in which you stated we would be
9  discussing interim positions, when instead you
10  asked many other detailed questions about the
11  office operations.  That was also the February 5,
12  2021, meeting, correct?
13  A.      February 5th?
14  Q.      2021.
15  A.      Yes.
16  Q.      The next sentence says, during that
17  meeting there were several issues and concerns
18  that Jane Doe 4 and I had, which were brought to
19  your attention.  Do you contest that during that
20  meeting there were several issues and concerns
21  that Jane Doe 4 and Jane Doe 3 brought to your
22  attention?
23  A.      I don't exactly recall.  I don't know.
24  Q.      So it could have been?

Page 396

A.     Yeah.  Potentially, yes.
Q.     Okay.
       And then she says:  None of which have
been addressed.  Do you know if any of the issues
and concerns that Jane Doe 3 and Jane Doe 4 raised
during that meeting had been addressed?
A.     I don't recall exactly what they were,
no, to respond to that.
Q.     She goes on to state about an incident
where an HR lured an assessment employee to a
meeting, indicating that they were going to offer
her good news about returning to a position which
she previously held -- which she previously held,
when, in fact, they blindsided her by telling her
to side an affidavit that was presented by
respondents in the EEOC charge of Jane Doe 2.
That would be Heather Matukewicz,
M-A-T-U-K-E-W-I-C-Z.
       You were involved in the prep --
interviews, discussion, investigation, whatever you
want to call it, of Heather Matukewicz regarding
Jane Doe 2, correct?
A.     No, I was not.
Q.     Okay.

Page 397

       Were you ever informed about it?
A.     I was told about it after I started with
the county, but this happened prior to me  being
employed.
Q.     Okay.
       Did Jane Doe 3 discuss that matter with
you at that February 5, 2021, meeting?
A.     I don't recall that being a discussion.
I don't know.
Q.     Do you know how many vacancies were in
the office, the tax assessment office March of
2021?
A.     No, I do not.
Q.     Going to back to Zula 71, which is 139.
This is an e-mail from Jane Doe 4 to you on
March 15th, correct?
A.     Yes.
Q.     I'm sorry.  You to Jane Doe 4, I had it
backwards.
       You sent this to Jane Doe 4, correct?
A.     Correct.
Q.     Was Jane Doe 4 still on bereavement
leave at this time?
A.     I'm not certain.  I believe she was,

Page 398

yes.
Q.     Did you think to check if she was still
on bereavement leave before telling her she'd be
demoted?
A.     We wanted -- I -- we wanted to get her
the information prior to hitting it -- hitting the
board agenda the following day.  So based upon her
not being in the office, we -- I sent the e-mail.
Q.     Did you ever say -- after Jane Doe 3
notifying that Jane Doe 4 was out for the death of
a family member, did you ever say to anyone, hey,
let's push this back a week, she had a family
member die?
       MS. PIPAK:  Object to the form.
       THE WITNESS:  No.
BY MS. SMITH:
Q.     Did anyone ever say, hey -- did you ever
hear any discussions, hey, let's take into
consideration Jane Doe 4's feeling about the death
of her family and push her demotion back?
A.     No.
       MS. PIPAK:  Object to the form.
       THE WITNESS:  No.
BY MS. SMITH:

Page 399

Q.     Does Mr. Bender hold a CPE license?
A.     Not to my knowledge.
Q.     The vote at the commissioner's meeting
on Jane Doe 4's and Jane Doe 3's demotion was on
March 17, 2021, correct?
A.     Yes.
Q.     And do you know who -- because the way a
commissioner's meeting, as I understand it works,
is someone has to recommend something to the
commissioners, kind of like make a motion and then
they vote, correct?
A.     Yes.  I read -- I would have read the
PAR report with those actions on it.
Q.     But it's your testimony that the only
reason that you read the PAR report is at the
instruction of Defendant Bender?
A.     I was instructed to issue the PARs based
upon the recommendation to restructure the
offices.  And, yes, they were put on the PAR
report that my office prepares and submits to the
commissioner's office.
Q.     And whose direction was that?
A.     Mr. Bender.
Q.     Okay.

Page 400

1  Did you have an opinion as to whether
2  the offices should be restructured?
3  A.  I mean, no, I didn't really have an
4  opinion.  I reported the information based upon
5  that I -- well, I guess, yes, I guess I did have
6  an opinion on it based upon that memo that I
7  prepared, yes, that they should be separated.
8  Q.  Did you have an opinion as to whether
9  Jane Doe 3 should hold the chief assessor or tax
10 claim director position?
11 A.  No, that I did not.
12 Q.  Did you have an opinion as to whether --
13 which assistant position Jane Doe 4 should hold?
14 A.  I did discuss -- I remember I did
15 discuss potentially putting both of them back in
16 tax assessment -- I mean, sorry tax claim because
17 that's basically where they came from prior to the
18 combining of the offices.  And it was decided by
19 Mr. Bender that we needed to have somebody else --
20 somebody still in tax assessment who had some day
21 to day working knowledge, and so that was why Jane
22 Doe 4 was kept in the tax assessment office.
23 Q.  Who -- when you left the county, who was
24 the assistant chief assessor?

Page 401

1  A.  Christine Zimmerman.
2  Q.  Ms. Zimmerman was in the assessment
3  office at the time of the demotions in March 2021,
4  correct?
5  A.  Yes.
6  Q.  Why couldn't Mrs. Zimmerman have become
7  the deputy chief assessor at that time?
8  A.  She was a field appraiser at that time,
9  so she wasn't in a supervisory role.
10 Q.  But she was a field appraiser when she
11 was promoted to the deputy assessor in -- whenever
12 it was, correct?
13 A.  Yes, that's correct.
14 Q.  So what's the difference of March 2021
15 and when she was promoted?
16 A.  Because the position wasn't posted at
17 that point in time, so we believed -- so Mr.
18 Bender made the decision to put one in one office,
19 one in the other office.
20 Q.  Right.
21     But your testimony was that Mr. Bender
22 made the decision because someone with some
23 assessment knowledge needed to remain in the
24 assessment office, correct?

Page 402

1  A.  Yes.
2  Q.  Why couldn't that person have been
3  Ms. Zimmerman?
4  A.  I guess it could have, but it was not
5  made -- that recommendation was not made.
6  Q.  Okay.
7      Was that discussed?
8  A.  No, not to my knowledge.
9  Q.  Were any of the commissioners ever
10 involved in any of the restructuring
11 conversations?
12 A.  So I believe we did meet in executive
13 session with the commissioners to advise them of
14 the information that was found, because ultimately
15 they were the ones that received the STEB doc --
16 the document from the state indicating the
17 delinquency of the STEB reports.
18 Q.  Were all three commissioners present?
19 A.  I don't recall.  Typically, yes, they
20 would all be present during executive session.
21 But, I don't exactly if -- exactly who was there
22 at the meeting.
23 Q.  Okay.
24     Do you recall Commissioner Hess asking

Page 403

1  any questions or challenging anything?
2  A.  I don't recall.
3  Q.  Do you recall anybody bringing up the
4  fact that now Commissioner Stottlemyer had told
5  Jane Doe 3 that should the offices ever be
6  disbanded, you will or should remain in tax
7  assessment?
8  A.  No, I was not made aware of any of those
9  conversations.
10 Q.  Never heard that comment?
11 A.  No.
12     MS. SMITH:  Okay.  Going to mark
13 715 --
14     MS. PIPAK:  I think -- are we at
15 seven hours?
16     MS. SMITH:  Okay.
17     MS. PIPAK:  We can just pick up
18 tomorrow.
19     VIDEOGRAPHER:  The time is now 6:01
20 p.m. and we are going off the record.
21         - - -
22     (Whereupon, deposition concluded at
23 6:02 p.m.)
24         - - -

```
 1              C E R T I F I C A T I O N

 2

 3

 4         I, COLEEN TRIFUN, RPR and Notary Public,

 5   do hereby certify that the foregoing is a true and

 6   accurate transcript of the stenographic notes taken

 7   by me in the aforementioned matter.

 8

 9                        -  -  -

10

11

12

13

14

15

16

17

18

19

20

21   DATE:                 _____

22                         COLEEN TRIFUN, RPR

23

24
```

Case 3:21-cv-00477-MCC   Document 230-1   CONFIDENTIAL   Filed 09/20/23   Page 283 of 342

Deposition of Heidi Zula Vol. I - Revised
Jane Doe, et al. v. Schuylkill County Courthouse, et al.

### WORD INDEX

**< $ >**
**$250** 381:*13*
**$5** 239:*13*
**$9** 113:*5*

**< 1 >**
**1** 3:*6*  9:*4*  13:*23*
14:*1*  50:*21*  51:*4*
52:*6, 7*  59:*2*  108:*7*
114:*5*  122:*19*  123:*8,*
*15*  136:*7*  142:*8*
143:*9*  145:*1*  146:*10,*
*21*  147:*2, 13, 23*
151:*2*  152:*13*  153:*8*
160:*9*  161:*23*  187:*1,*
*16*  188:*23*  197:*10*
226:*19*  229:*14*
230:*14, 23*  236:*3*
237:*8*  240:*24*  245:*1,*
*9, 16*  246:*11, 13, 22*
247:*4, 15, 19, 22*
248:*1, 19*  254:*15, 19,*
*24*  256:*2, 18, 23*
257:*3*  262:*12, 14, 16,*
*20*  264:*24*  265:*2, 5*
266:*11*  267:*4, 7, 9, 13,*
*15*  268:*22*  269:*5*
286:*18*  292:*1*  294:*3*
295:*8*  296:*24*  297:*20,*
*23*  298:*14*  314:*6, 9,*
*18*  315:*17, 24*  316:*12,*
*18, 21*  318:*1, 22*
319:*18*  321:*10*  322:*5,*
*15*  323:*1*  324:*10, 11*
325:*7, 14, 20*  326:*1,*
*17*  328:*15*  329:*2*
331:*14, 17*  332:*24*
333:*15*  334:*23*  335:*2*
336:*1, 13, 19*  341:*5, 7,*
*21, 23*  342:*19, 22*
343:*24*  344:*4, 16*
345:*14*  346:*10*  347:*4,*
*22*  348:*7*  350:*4*
351:*18*  356:*1, 16*
361:*1*  364:*8, 11*
369:*19*
**1/11/2020** 38:*13, 17*

**1/11/2021** 38:*18*
42:*10*
**1/13/20** 38:*17*
**1/13/2021** 38:*21*
**1:09** 166:*8*
**10** 4:*6*  141:*2*
**10:51** 192:*13*  193:*6*
**100** 5:*6*  75:*10*
179:*21*
**101** 80:*1*
**102** 79:*16*  80:*1, 4, 6*
83:*12, 20*
**103** 86:*10, 18*  88:*2, 5*
**104** 86:*18*  87:*1*
**105** 99:*24*  108:*11*
**106** 111:*8*
**107** 86:*10*  116:*18*
**108** 135:*18*
**11** 14:*22*  32:*23*
36:*24*  53:*5*  146:*6*
152:*12*  158:*21*
164:*20*  264:*7*
**11:02** 107:*24*
**11:13** 108:*6*
**110** 141:*2*
**111** 5:*7*  150:*5*
153:*20*
**112** 151:*11*
**114** 166:*20*
**115** 184:*7*  203:*2*
**116** 5:*8*  198:*21*
**117** 208:*1*
**119** 261:*6*
**11th** 28:*6*  38:*1*  51:*7*
147:*10, 11*  162:*24*
285:*5, 21*  387:*7, 18,*
*23*
**12** 26:*7*  28:*10*  234:*9*
293:*5*  317:*6*  330:*10*
331:*7*
**12/11/22** 33:*23*
**12:20** 166:*2*
**12:52** 395:*6*
**120** 271:*15*
**121** 293:*9*
**122** 295:*11*  319:*15*
**123** 313:*17*
**125** 317:*16*
**1259** 65:*5*

**126** 321:*20*
**127** 338:*19*  339:*1, 9*
**128** 338:*11*  343:*5*
344:*3*  345:*20*
**129** 340:*21*
**12th** 35:*15*  394:*8*
395:*6*
**13** 4:*12*  6:*19*  16:*9,*
*13*  24:*3*  150:*18*
154:*16*  262:*5*  264:*11,*
*16*  288:*13*
**130** 347:*9*  353:*8*
**131** 351:*23*
**132** 354:*2*
**134** 361:*12*
**135** 5:*9*  363:*6*
**136** 365:*17*
**137** 381:*17*  387:*2*
**138** 78:*18*  390:*12*
395:*3*
**139** 5:*10*  79:*15*
394:*20*  397:*14*
**139-236** 5:*3*  79:*18*
**13th** 150:*17, 23*
154:*11*  172:*17*
181:*18*  186:*2, 7*
187:*5, 12, 21*  188:*13*
189:*2*  192:*20, 22*
196:*2, 13, 15*  198:*13*
205:*16*  206:*1*
**14** 235:*15*
**141** 5:*11*
**14th** 181:*20*  188:*13*
189:*2*
**15** 4:*11*  193:*6*
207:*17*  232:*9*  239:*8*
240:*6*
**150** 2:*9*  5:*12*
**151** 5:*13*
**15219** 2:*22*
**156** 5:*14*
**15th** 184:*11*  187:*17*
188:*13*  189:*3*  190:*3*
192:*13*  194:*5*  195:*12*
200:*10, 15*  202:*14*
397:*16*
**16** 332:*14*
**167** 5:*15*
**16th** 316:*18*

**17** 399:*5*
**17108** 1:*21*
**17701** 2:*17*
**18017** 3:*2*
**183** 5:*16*
**1835** 2:*3*
**18360** 2:*14*
**18th** 261:*21*  347:*23*
348:*23*
**19** 1:*21*  8:*12*  76:*2*
354:*12*
**190** 3:*2*
**19103** 2:*4*
**199** 5:*17*
**19th** 76:*8*  348:*24*
**1s** 75:*20*
**1's** 145:*4, 6, 11*
146:*8, 11*  158:*22*
226:*14*  229:*20*
245:*14*  289:*1*  291:*13*
295:*8*  296:*12*  298:*5*
299:*1, 12, 24*  300:*21*
312:*18*  315:*9*  319:*3*
320:*20*  326:*2*  327:*14*
329:*7*  332:*4*  334:*3*
338:*8*  340:*4*  345:*7,*
*24*  346:*16, 21*  347:*1*
352:*22*  354:*15*
**1st** 342:*5*  343:*8, 10,*
*12, 18*  345:*19, 23*
346:*13*  366:*13*
368:*10*

**< 2 >**
**2** 14:*4, 5*  27:*8*  44:*16*
50:*21*  51:*5, 21*  76:*5*
79:*22*  114:*5*  121:*12*
122:*19*  123:*12, 15*
140:*15*  142:*8*  143:*8*
145:*1*  146:*7, 11*
147:*2, 13, 22*  151:*19*
152:*13*  153:*8*  156:*16,*
*17, 22*  157:*6, 11, 12,*
*17, 20*  158:*15, 22*
160:*8*  161:*22*  168:*14,*
*22*  169:*17, 23*  170:*23*
171:*4, 12, 22*  172:*6,*
*16*  176:*11*  177:*23, 24*
178:*3*  187:*22*  188:*4,*
190:*12*  196:*3, 7, 13,*

Case 3:21-cv-00477-MCC   Document 280-1   Filed 09/20/23   Page 284 of 342
CONFIDENTIAL
Deposition of Heidi Zula Vol. I - Revised
Jane Doe, et al. v. Schuylkill County Courthouse, et al.

*15* 197:*6, 8, 9* 198:*14*
208:*10* 230:*21* 236:*3*
237:*8* 248:*20* 255:*1*
261:*14* 287:*8* 298:*15*
321:*10* 322:*4, 5*
339:*1* 348:*3* 356:*3*
357:*2, 17, 20* 358:*1,*
*15, 17* 360:*19* 362:*18*
363:*3, 17* 365:*15*
366:*19* 390:*21*
396:*16, 22*
**2/16/2021** 296:*8*
**2/18** 348:*16*
**2/5** 296:*5*
**20** 49:*7* 236:*11*
251:*17*
**20002** 2:*9*
**2005-18** 65:*17* 67:*7,*
*18*
**2013** 64:*20* 66:*4*
67:*11* 69:*3*
**2015-18** 64:*12* 65:*16*
**2017** 43:*13*
**2020** 16:*9, 13* 18:*12,*
*16, 19* 19:*12, 15, 23*
22:*16, 20* 23:*17* 26:*7*
28:*10* 32:*23* 34:*14*
37:*15* 49:*9* 63:*19*
152:*5* 169:*9* 214:*17*
224:*20* 225:*3* 232:*9*
233:*15* 234:*3, 9*
235:*15* 236:*12* 237:*7,*
*19* 238:*1, 8* 239:*8*
240:*7, 14* 255:*4*
256:*13, 17* 268:*10, 12*
337:*5, 13*
**2021** 14:*22* 36:*24*
45:*23* 53:*5* 57:*11*
61:*3, 4, 8* 62:*21*
63:*12, 14, 19, 20* 66:*8*
67:*11, 15, 17* 68:*1, 4,*
*5, 16, 19, 24* 70:*13*
74:*13* 76:*2* 79:*4*
86:*7* 88:*11* 89:*7*
91:*23* 99:*20* 101:*2*
104:*9* 105:*19* 108:*11*
113:*23* 114:*4, 9*
126:*3* 134:*18* 135:*2*
137:*16* 139:*2* 140:*23*
141:*18* 146:*7, 14*

151:*23* 152:*12, 19, 21,*
*24* 153:*6* 154:*12, 16*
156:*18, 23* 158:*20, 21*
159:*18* 162:*24*
164:*20* 165:*7* 169:*10,*
*11* 183:*3* 184:*11*
192:*3* 194:*5* 195:*12*
199:*24* 202:*4* 207:*17*
208:*12* 210:*22*
212:*21* 213:*24* 221:*7*
224:*21, 24* 226:*18*
229:*13* 239:*3* 246:*18*
249:*5* 253:*5* 254:*8*
256:*13, 20, 22* 257:*21*
258:*13* 261:*17*
268:*13, 15, 24* 269:*1*
271:*24* 280:*18* 281:*9*
284:*16* 293:*2, 5, 20*
295:*6* 296:*6* 298:*4,*
*24* 299:*11, 23* 317:*7,*
*13* 318:*3* 322:*5*
330:*10* 331:*7* 334:*1*
335:*1, 11* 336:*11, 16*
337:*4* 341:*5, 21, 23*
342:*19, 22* 343:*24*
344:*4* 346:*10, 16, 20*
348:*24* 351:*17*
354:*12* 356:*1, 16*
366:*13* 368:*23*
371:*11* 394:*17*
395:*12, 14* 397:*7, 12*
399:*5* 401:*3, 14*
**2022** 1:*21* 8:*12*
292:*21* 334:*21* 335:*2,*
*21* 336:*12, 17* 337:*2,*
*10, 19* 338:*7*
**205-14** 205:*3*
**208** 5:*18*
**21** 105:*18* 233:*15*
**214** 217:*5*
**215** 235:*12*
**217** 5:*19*
**21st** 232:*21*
**22** 351:*17*
**223** 235:*12*
**224** 235:*12*
**225** 108:*14*
**226** 235:*12*
**228** 1:*20* 8:*14*
**22nd** 351:*9* 353:*16*

**23** 4:*12, 14* 27:*21, 23*
63:*14* 70:*13* 225:*2, 6*
386:*17*
**232** 83:*21*
**233** 322:*5*
**236** 79:*16*
**237** 66:*19*
**237-243** 4:*23* 66:*22*
**24** 4:*11* 19:*11*
293:*20* 341:*5*
**240** 235:*12*
**241** 66:*19*
**242** 68:*15*
**243** 66:*19*
**244** 86:*10*
**244-250** 5:*4* 86:*12*
**2473** 45:*13, 18*
**2481** 6:*2* 317:*15, 18*
**24th** 341:*15*
**25** 4:*13, 16* 32:*13*
261:*16*
**250** 86:*10*
**251** 100:*1*
**251-257** 5:*6* 100:*3*
**255** 235:*13*
**256** 235:*13*
**257** 100:*1*
**258** 111:*7*
**258-260** 5:*7* 111:*10*
**26** 151:*23* 154:*12, 16*
295:*12* 318:*3* 322:*5*
**260** 111:*7*
**261** 5:*20*
**268** 295:*12*
**268-270** 5:*23* 295:*14*
**26th** 322:*9*
**27** 4:*14* 208:*12*
**270** 295:*12*
**271** 338:*11, 12*
**271-273** 6:*5* 338:*14*
**272** 5:*21* 338:*11*
**273** 338:*12*
**274** 6:*4* 329:*24*
330:*2*
**2759** 135:*17*
**2759-2760** 5:*9* 135:*20*
**2760** 135:*18*
**27th** 136:*7* 215:*5*
221:*14*

**28** 224:*21* 225:*2*
362:*10*
**284** 235:*13*
**288** 356:*6* 357:*4*
**288-291** 6:*10* 356:*9*
**289** 235:*12*
**28th** 254:*7*
**29** 4:*15* 271:*24*
365:*16*
**290** 356:*6*
**291** 356:*6* 357:*4*
**292** 365:*17* 366:*2, 6,*
*13, 16*
**292-293** 6:*13* 365:*19*
**293** 5:*22* 365:*17*
366:*6, 13, 16*
**295** 5:*23*
**2950** 2:*3*
**2's** 52:*7* 145:*20*
146:*21* 148:*20* 151:*2*
184:*1* 196:*23* 360:*13*
364:*8*

**< 3 >**
**3** 3:*6* 9:*2* 14:*13*
52:*6* 73:*5, 18* 76:*22*
77:*8, 18* 90:*23, 24*
99:*2* 103:*16* 114:*5*
122:*18, 23* 124:*1, 11*
126:*18* 134:*15*
156:*11, 17, 22* 157:*10,*
*22* 164:*23* 168:*12*
171:*3, 6, 13, 24* 172:*1,*
*15, 21* 173:*9, 14*
182:*20, 23* 184:*10, 24*
185:*10* 187:*2, 9*
188:*8* 190:*7, 8*
192:*11, 22* 193:*4, 13*
194:*2, 6, 17* 195:*11,*
*17* 196:*4, 6, 10, 16*
197:*2, 10* 199:*19, 23*
202:*4, 11, 21* 204:*7*
205:*18* 206:*2* 207:*18,*
*21, 23* 208:*11* 209:*21*
210:*20* 215:*10, 14*
217:*12* 219:*11*
220:*14* 221:*8, 17*
223:*6, 10, 17* 224:*19*
225:*20* 226:*8, 12, 21*
227:*2* 228:*11, 23*

Case 3:21-cv-00477-MCC   Document 280-1   Filed 09/20/23   Page 285 of 342
CONFIDENTIAL
Deposition of Heidi Zula Vol. I - Revised
Jane Doe, et al. v. Schuylkill County Courthouse, et al.

229:*10, 18*  230:*24*
232:*12, 24*  234:*10, 20*
235:*16*  236:*12, 20*
237:*14, 21, 24*  238:7
239:*9, 23*  240:7
241:*17*  242:*19*
245:*20*  246:*1, 12, 20*
247:*3, 10*  249:*7, 11*
250:*3*  253:*1*  257:*14,
21*  259:*14*  260:*3, 7,
17*  261:*16*  262:*4, 11,
23*  263:6  264:*21*
266:*11, 16*  267:*14*
280:*21*  282:*11*  287:2
288:*1, 12, 18, 20, 23*
289:*20*  291:*23*  298:*2,
4, 7, 13, 19, 21*  318:*24*
319:*1*  322:*4, 20*
326:*1, 18*  327:*7, 13*
331:*22*  332:*1*  333:6
334:2  339:2  346:*17,
19*  347:*2, 23*  349:*10*
350:*16, 18*  351:*21*
353:*14*  357:*2, 18, 21*
358:6, *10*  360:*12, 17,
18*  363:*20, 23*  364:*3,
6, 19*  365:*2, 8*  369:*1,
4, 20*  370:*17, 21*
371:*13*  375:*17, 24*
376:8, *10*  378:*5, 22*
379:*12*  380:6, *8, 15,
18*  387:8, *13, 19*
388:*4, 5, 24*  389:*19*
390:*21*  392:4  393:*23*
394:8  395:*7, 21*
396:5  397:6  398:9
400:9  403:5
**3/1**  340:*19*
**3:07**  277:*1*
**3:21-CV-00477**  1:*4*
**3:34**  277:*24*
**30**  15:*10*  310:*16, 21,
23*
**310**  3:2
**314**  5:*24*
**316**  6:*1*
**318**  6:2  150:5
153:*20*
**318-319**  5:*12*  150:7

**319**  150:5  153:*20*
**32**  4:*16*
**322**  6:*3*
**330**  6:4
**339**  6:5
**341**  6:6
**3410**  2:*21*
**347**  6:7
**35**  25:*21*
**352**  6:8
**35-36**  4:*13*  25:*23*
**354**  6:9
**356**  6:*10*
**36**  25:*21*  27:8
**362**  6:*11*
**363**  6:*12*
**366**  6:*13*
**37**  29:*14*
**37-38**  4:*15*  29:*17*
**38**  4:*17*  29:*14*
**382**  6:*14*
**390**  5:*21*  6:*15*
271:*14, 17*
**395**  6:*16*
**399**  208:*1*
**399-402**  5:*18*  208:*3*
**3rd**  292:*18*  363:*15,
24*  366:*20*
**3's**  60:*21*  75:*24*
150:*18*  153:*21*
171:*23*  184:2  200:7
224:*3*  238:*15*  239:5
240:2, *18*  251:*23*
253:*10, 11*  259:*19*
262:*12*  272:*16*  291:7
348:4  352:*11*  376:*19*
378:*11*  388:*15*  391:8
399:4

**< 4 >**
**4**  9:*3*  14:*10, 11*  46:4
52:6  73:5  76:22
77:8  114:5  122:*19*
123:*3*  124:2, *12*
126:*18*  134:*16*
164:*24*  182:*20, 24*
197:*10*  202:5, *21*
204:7  209:*17*  210:*20*
216:22  221:9, *18*
223:*18*  225:*20*  226:9

227:*11*  228:*11, 24*
229:*10*  232:*24*
235:*16*  236:*23*  237:*7,
14, 21*  264:*21*  266:*17*
267:*14*  286:*23*  287:2
288:*1, 12*  289:*20*
334:2  339:2  348:9
357:2  362:*23*  369:*1,
8, 20*  370:*8, 12, 23*
371:*4, 10*  378:*5, 22*
379:*17, 20, 23*  380:*16*
390:*22*  392:3  393:*23*
396:5  397:*15, 18, 20,
22*  398:*10*  400:*13, 22*
**4(via**  3:7
**4:00**  165:*16*
**4:03**  304:*11*
**4:07**  190:2
**4:13**  312:4
**4:38**  387:*23*
**40**  38:4
**400**  208:*10*
**401**  208:*11*
**402**  208:*1*
**40-42**  4:*17*  38:6
**410**  50:22  51:*10, 24*
52:*11*  120:*10, 19, 22*
142:9  143:*13, 16, 19*
144:8, *10, 15, 22*
146:8, *11, 21*  147:*12*
152:8, *13*  158:*23*
159:*20, 24*  160:9, *17*
161:*1, 10*  163:*18, 23*
226:*15*  229:*17*
230:*14*  231:*21*
246:*10*  247:*1, 16, 24*
297:*21*  320:*11, 16*
328:8  329:5, *6*  332:*3,
5, 24*  335:*16*  348:9
**413**  216:22
**413-415**  5:*19*  216:*24*
**414**  217:*15*  246:6
**415**  216:22  217:*15*
257:*12*
**42**  4:*18, 19*  38:4
**420**  5:*24*  313:*17, 19*
**426**  6:*1*  316:2, *5*
**43**  45:*13*
**433**  2:*17*

**441**  75:*9, 23*
**441-442**  5:*1*  75:*12*
**442**  75:*9*
**448**  5:*1*  75:*9, 12*
**45**  6:*19*
**451**  261:*6*
**451-453**  5:*20*  261:*8*
**452**  261:*15*
**453**  261:*6, 15*
**454**  347:8  348:*15, 22*
350:*17*
**454-455**  6:*7*  347:*11*
**455**  347:8  348:*15, 22*
350:*17*
**46**  4:*21*  62:*23*  63:2
**460**  354:2
**460-463**  6:*9*  354:*4*
**463**  354:2
**47**  5:5  86:*19, 21*
353:5
**470**  347:8, *18, 22*
350:*13*
**470-472**  6:*7*  347:*11*
**471**  347:22
**472**  347:8
**473**  72:5
**473-474**  4:*24*  72:7
**474**  72:5, *18*  74:8
**475**  351:*23*
**475-477**  6:*8*  352:*1*
**477**  351:*23*
**48**  4:*18*  41:*24*  42:2
**49**  42:*24*  269:*10*
287:8
**49-52**  4:*19*  43:2
**4and**  263:*1, 6*  391:*1*
395:*18, 21*
**4did**  389:6
**4had**  387:*14*
**4's**  77:*18*  227:2
232:*12*  280:*21*
291:*23*  388:*17*
398:*19*  399:4
**4'sattendance**  388:*7,
12*
**4th**  157:*3*  237:*13*
**4was**  387:*19*  388:6

**< 5 >**

Case 3:21-cv-00477-MCC   Document 280-1   Filed 09/20/23   Page 286 of 342
CONFIDENTIAL
Deposition of Heidi Zula Vol. I - Revised
Jane Doe, et al. v. Schuylkill County Courthouse, et al.

**5** 156:*18, 23* 221:7
246:*18* 284:*16* 339:*1,
2* 394:*17* 395:*11*
397:7
**5:00** 165:*16*
**5:30** 381:*24*
**5:38** 382:5
**50** 64:7 66:*1* 348:22
**511** 2:*13*
**515** 151:*11, 13*
**52** 42:*24* 43:*13*
269:*11*
**55** 78:*18*
**550** 321:*19, 20*
**550-551** 6:*3* 321:22
**551** 321:*20*
**55-138** 5:*2* 78:*20*
**555** 361:*12*
**555-556** 6:*11* 361:*14*
**556** 361:*12*
**571** 363:6
**571-573** 6:*12* 363:*8*
**573** 363:6
**575** 5:*13, 15* 166:*11,
15, 22* 167:*11*
**583** 5:*16* 183:*17*
184:*24*
**583-584** 183:*19*
**584** 183:*17* 184:*10*
**596** 198:*18*
**596-600** 5:*17* 198:*21*
**5th** 223:*18* 224:*24*
249:2 254:*4* 258:*4*
284:*19* 285:5, *22*
333:*24* 395:*13*

**< 6 >**
**6** 68:*15*
**6:01** 403:*19*
**6:02** 403:*23*
**600** 198:*18* 199:2, *4*
200:*18*
**601** 198:*19* 199:5
**63** 4:*21*
**630** 155:22
**630-632** 5:*14* 156:*1*
**632** 155:22
**65** 4:22
**66** 4:*23*

**67** 381:*16*
**673** 381:*17* 387:2
**673-674** 6:*14* 381:*19*
**674** 381:*17* 387:*3*
**685** 390:*12* 395:*3*
**685-687** 6:*15* 390:*14*
**687** 390:*12* 395:*3*

**< 7 >**
**7** 43:*12* 99:*19*
104:*12*
**7:23** 150:*18*
**70** 141:*1*
**701** 6:*16* 394:*19, 22*
**707** 2:*21* 139:7
**707-708** 5:*10* 139:*10*
**708** 139:7 140:*15*
**709** 141:*1*
**709-710** 5:*11* 141:*4*
**71** 397:*14*
**710** 141:*1*
**712** 2:*13*
**715** 403:*13*
**72** 4:*24* 347:8
**75** 5:*1*
**78** 5:*2*
**79** 5:*3*
**79,000** 20:*3*

**< 8 >**
**8** 346:*20*
**8:00** 165:*16*
**8:36** 150:*17*
**80** 29:*11*
**800** 340:*21*
**800-801** 6:*6* 340:*23*
**801** 340:*21*
**81** 263:*1, 9* 266:*17*
**817** 61:*17*
**817-820** 4:*20* 61:*19*
**820** 61:*17*
**855** 116:*18*
**855-857** 5:*8* 116:*20*
**856** 121:*13*
**857** 116:*18*
**86** 5:*4, 5* 15:*10*
**87** 23:22
**88** 28:22
**886** 6:*13* 365:*17, 19*

**366:**1
**89** 27:*21* 29:2, *11*
**8th** 346:*1, 5, 16*

**< 9 >**
**9** 18:*12, 16* 19:*15, 23*
34:*14* 356:6
**9.932** 2:9
**9/13** 67:*19*
**9/17/2020** 24:*14*
**9:16** 1:22 8:*13*
**90** 287:7
**92** 38:*3* 64:9, *10*
65:*14, 16* 66:*1*
**94** 49:6 269:*10*
**95** 4:*20* 61:*17*
**96** 62:*24* 66:*12* 68:*8*
**97** 65:*17, 24* 66:*10,
11*
**98** 66:*20* 68:*16* 70:2
**99** 72:5

**< A >**
**a.m** 1:22 8:*13*
107:*24* 108:6 150:*18*
165:*16* 192:*13* 193:6
395:6
**abetting** 93:*12*
324:*16*
**ability** 13:*3* 226:*11,
16* 229:*20* 230:2
232:*12* 246:*24* 247:*5,
17, 23* 252:*16, 20*
254:2 274:6 346:*4, 7*
**able** 73:*23* 94:*1*
136:*21* 138:*9* 221:*3*
240:*3* 389:9
**absence** 196:*1*
**absences** 193:*20*
**absentee** 205:2
**absolute** 243:*18, 22*
**abundantly** 143:*17*
**abusing** 117:*24*
**acceptable** 148:6
**acceptance** 28:*19*
**access** 48:*14* 55:7, *11,
20* 121:*16* 144:*18*
163:*3* 165:*21* 191:*13*
224:22 232:*17* 236:4

**237:**9
**accessed** 157:7
**accessibility** 52:*11*
144:7
**accessible** 144:*11*
145:*4, 18*
**accommodated** 248:*3*
**accommodation**
296:*13* 297:*19* 298:9
299:*14, 15, 19* 300:2,
3* 312:*10, 19* 313:*13*
314:*17* 315:9, *14*
316:*20* 319:*13, 24*
320:2 322:*14* 325:*24*
341:*20*
**accommodations**
320:*10*
**accompanied** 163:*23*
190:22
**accord** 261:*20*
**accrued** 193:*19*
194:*15* 197:*3*
**accurate** 43:22 45:*9*
46:7 48:2 82:*16, 24*
83:6, *11* 84:7, *13, 19*
98:*15* 125:*18* 243:*4*
303:2 404:6
**accurately** 44:*5*
**accused** 324:*15, 21*
325:7, *14*
**accuser** 93:*15*
**acknowledged** 43:*18*
105:*17*
**acknowledging** 42:*13*
106:*3*
**acknowledgment**
41:*15* 42:*21* 63:*8*
70:*17* 82:2 104:*23*
105:7, *16* 106:*10*
**Act** 47:*23* 59:9
179:5, *22* 180:*4*
301:*21* 302:*13* 303:6
306:8, *9* 334:*4*
**action** 15:*18* 31:9,
16, 24* 32:6, *11*
154:*16, 20* 160:7, *12*
179:4, *17* 224:*16*
233:*11, 13* 301:*1*
302:*24* 304:*20*

305:*15*  309:*5*, *8*
336:*3*  388:*15*
**actions**  60:*3*, *4*, *21*
303:*3*  304:*21*, *22*
315:*7*  335:*20*  336:*10*,
*12*  376:*19*  399:*13*
**acts**  93:*13*  303:*9*
306:*2*
**actual**  18:*7*  38:*1*
69:*8*  99:*24*  227:*5*
282:*7*  376:*3*
**ADA**  297:*2*  364:*13*
**add**  91:*13*  133:*13*
**added**  91:*21*  128:*11*
131:*20*  132:*3*  166:*14*
**adding**  157:*17*
**addition**  124:*21*
132:*4*  193:*23*  203:*10*
247:*11*  259:*18*  327:*5*
**additional**  3:*3*  91:*21*
128:*10*  131:*13*
148:*18*  210:*10*
230:*22*  237:*22*
240:*18*  246:*13*  249:*8*,
*10*  250:*8*  264:*2*
275:*21*, *24*  337:*23*
341:*20*  342:*20*, *21*
344:*22*  353:*15*, *21*
354:*21*  355:*2*, *10*, *20*
358:*19*  359:*11*
364:*16*, *22*  365:*8*
366:*18*
**address**  56:*2*  104:*2*
119:*13*  258:*5*  267:*12*
**addressed**  153:*10*
154:*13*  196:*9*  396:*4*,
*6*
**addresses**  156:*18*
157:*7*
**adjustment**  362:*23*
**administrate**  184:*13*
**administration**  102:*3*
321:*1*, *2*, *5*  323:*4*, *9*,
*10*  390:*24*
**administrative**  25:*19*
330:*20*, *22*
**administrator**  16:*7*
26:*11*  98:*21*  101:*12*
102:*20*  103:*3*, *6*
107:*4*, *15*  131:*16*

133:*3*  257:*16*  258:*15*
324:*17*
**administrators**  94:*24*
107:*18*
**administrator's**
102:*22*  107:*12*
**adopted**  100:*12*
103:*20*
**advice**  277:*11*, *17*
279:*2*, *3*  281:*13*
284:*2*  300:*24*  301:*7*,
*10*, *13*, *15*, *16*, *22*, *23*
302:*8*, *11*, *19*  303:*1*, *8*
304:*15*, *23*  305:*3*, *18*
306:*16*  307:*4*  308:*6*
382:*14*, *18*, *22*  383:*1*,
*2*, *17*  384:*3*, *7*, *13*
385:*1*, *18*, *23*  390:*7*
393:*13*
**advise**  57:*1*  95:*8*
274:*11*  300:*18*  348:*7*
402:*13*
**advised**  163:*21*
308:*3*  334:*15*  360:*21*
394:*4*
**advises**  96:*18*
**Advising**  101:*16*
301:*5*
**affidavit**  396:*15*
**affirmative**  383:*15*
**aforementioned**  404:*7*
**agenda**  18:*15*  19:*8*
67:*20*  115:*11*, *15*
131:*20*  133:*8*  216:*18*
238:*24*  251:*8*  398:*7*
**ago**  309:*23*
**agree**  12:*8*  34:*21*
36:*10*  78:*11*  92:*10*
104:*7*  133:*3*  153:*11*
156:*24*  190:*8*  262:*5*,
*9*, *20*  264:*17*  307:*23*
319:*17*  325:*23*  364:*9*
372:*4*
**agreed**  9:*23*  10:*2*
91:*17*  106:*21*
**agreement**  27:*13*
139:*19*  164:*12*, *15*
235:*23*  279:*23*  283:*5*
334:*22*  336:*6*  347:*3*
348:*14*  350:*18*  351:*5*

352:*19*  353:*13*, *14*
354:*16*  355:*4*
**agreements**  139:*23*
287:*23*
**ahead**  28:*12*  59:*14*
199:*16*  204:*1*  211:*24*
214:*6*  239:*17*  243:*16*
244:*11*  265:*8*  266:*6*,
*20*  272:*1*  318:*7*, *8*
319:*22*  334:*12*  368:*5*
376:*14*  377:*2*, *12*
378:*1*, *16*  379:*8*, *15*
380:*24*  392:*9*
**aiding**  93:*12*  324:*16*
**al**  1:*2*, *4*  8:*16*, *17*
96:*10*  97:*16*
**alcohol**  13:*2*  145:*9*,
*13*  158:*6*
**Alecia**  8:*11*
**alert**  21:*6*
**ALLAN**  2:*8*
allan.townsend@usdoj
.gov  2:*10*
**allegations**  49:*18*
52:*22*  93:*10*  184:*1*, *2*
226:*10*  329:*3*
**alleged**  332:*18*
**allegedly**  146:*20*
187:*6*
**Allen**  9:*9*
**alleviate**  148:*10*, *12*
**alleviated**  122:*6*
**allow**  101:*14*  135:*11*
189:*16*  195:*4*, *13*
309:*17*  331:*14*  336:*6*
393:*15*  394:*5*
**allowed**  195:*21*
200:*8*  214:*15*  225:*21*
277:*13*  335:*21*
**allowing**  197:*3*
267:*17*  277:*14*  350:*4*
**altered**  359:*17*, *23*
**alternative**  97:*23*
98:*1*, *10*, *12*  122:*3*
235:*18*  329:*15*
**alternatively**  237:*15*
**alternatives**  101:*21*
102:*13*
**Alu**  215:*21*  238:*19*
272:*13*, *17*, *19*, *20*, *21*

273:*3*, *8*, *13*  274:*1*
276:*3*, *6*  278:*5*  279:*1*,
*14*, *17*, *18*  281:*13*, *14*
282:*5*  291:*6*  292:*2*, *3*
370:*9*, *19*  375:*21*, *23*
377:*17*
**Alu's**  280:*15*  281:*12*
**ALYSSA**  3:*5*  9:*5*
**AMBER**  2:*8*  9:*7*
amber.fox@usdoj.gov
2:*10*
**ambiguous**  12:*4*
87:*14*
**amount**  20:*13*
**analysis**  287:*9*  299:*5*
**analyst**  123:*9*, *10*
213:*2*, *4*, *15*  214:*2*
244:*7*  252:*11*  286:*15*
288:*14*  289:*1*
**analyze**  44:*17*
**and/or**  95:*21*  97:*17*,
*24*  210:*20*  288:*1*
306:*4*  316:*13*  392:*3*
**Ann**  25:*19*
**annual**  240:*3*
**annually**  128:*22*
**anonymous**  121:*16*,
*19*  122:*3*, *5*, *8*, *13*
**anonymously**  118:*10*
**ANSWER**  7:*1*  11:*24*
12:*13*, *15*, *19*  13:*12*
25:*7*  28:*12*  33:*13*
34:*23*  39:*22*  41:*11*
46:*18*  48:*5*  50:*13*
57:*1*  78:*3*  83:*24*
84:*2*, *13*  85:*7*, *8*, *9*
93:*18*  94:*14*  98:*3*
105:*4*  126:*15*  130:*7*
133:*6*  176:*14*  177:*11*
179:*19*  194:*20*  198:*8*
201:*11*  214:*6*  229:*4*
239:*17*  240:*22*
268:*20*  269:*24*  270:*5*,
*9*  277:*14*, *18*  282:*21*
289:*10*, *13*  300:*13*
302:*24*  304:*3*  308:*4*
325:*12*  328:*2*  329:*20*
332:*10*  383:*6*, *13*, *14*
386:*8*  392:*21*  394:*3*

**answered** 129:9
228:14, 15
**answering** 36:3
58:22 303:21
**answers** 82:16, 19, 21,
23 83:2, 6, 11 84:19,
23 85:2, 3 87:6, 7
386:13
**anticipate** 36:6
**antidiscrimination**
81:12
**anti-harassment**
63:10 64:2 66:8, 13
67:7 81:13 86:5
101:1 105:13 108:12
116:10 117:12 118:5,
7
**anxiety** 334:5, 9
**anybody** 323:16
381:4 403:3
**anymore** 116:14
**anyway** 307:24
**apologize** 35:24 36:4
65:2 209:7 238:20
269:8 293:8 310:6
338:12 395:2
**Apparently** 106:4
204:18 230:10
340:18 361:23
**appeal** 237:20
**appear** 184:17
**appeared** 81:6
169:16
**Appearing** 9:3
**appears** 88:6 150:16
156:10 356:22 357:7
**applicants** 372:2
**application** 23:13, 19
24:14 30:3, 5, 14
118:21
**applied** 16:12 30:11,
15 41:17 49:9 118:2
**applies** 117:18 372:6,
19
**apply** 40:14, 16 98:5
322:24
**appoint** 97:23
**appointed** 98:11
293:1

**appointment** 18:7
19:18
**appraiser** 123:13
125:13, 20 128:1
131:4 209:12 210:3,
6, 13 242:20 243:8
244:23 252:13 258:6
288:6, 7 333:9 401:8,
10
**appraisers** 124:8
126:20, 22 127:20
129:5, 6, 10 141:20
208:19 213:19 222:2
238:3 241:3 242:18,
23 243:13
**appraiser's** 128:20
**appraises** 213:21
**appreciate** 218:7
310:4
**apprized** 50:18
**appropriate** 85:11
91:13 94:16 106:24
117:17 119:6, 13
127:4 131:14 133:12
183:13 194:1 195:24
201:17 203:12
204:15, 20 212:9
220:6 265:2 289:5
291:19 324:13, 19
325:3, 5, 16 333:21
362:20 375:15 388:8,
13 389:2, 4 391:16,
22 392:1 393:21
**appropriately** 59:10
287:19
**approval** 117:8
130:19 136:14
137:17 201:7 238:17
239:1
**approve** 108:18
109:8, 18 238:20
323:24 324:5 346:7
372:21 373:6
**approved** 17:9 18:3,
4 67:17, 21 68:6, 20
117:9 130:15 138:16
140:17 141:12
238:10, 14, 18 251:18
263:3, 5 264:1 323:5,
22 360:15 368:14

**approves** 131:1
132:9, 18
**approving** 264:13
**approximately** 8:13
**April** 146:17 149:22
255:4, 17 263:15
280:18 366:13
368:10
**Area** 30:22 31:1, 7
145:24 158:5 299:17,
20 320:1, 3 327:3
329:18
**areas** 149:15 309:13
**argumentative** 270:1,
6, 8, 11
**arose** 58:7
**arrangements** 148:23
**arrived** 147:10
**articles** 49:15
**ASCII** 8:7
**aside** 27:20 49:6
88:1
**asked** 11:22 40:2
41:14 70:17 113:10,
20 173:11 174:21
176:20, 24 178:14, 22
206:10 227:4 230:22
258:5 261:24 269:20
270:24 303:16, 20
304:13, 19 305:12
306:7 307:2 325:8
350:7, 11 364:6
395:10
**asking** 10:20 50:15
57:3 95:24 97:9, 10
99:13 113:15 162:12
178:12, 13, 15, 16
179:2, 24 180:2, 3, 20
219:19 235:4 270:10
286:19 287:1 301:12,
14 302:8, 10, 12, 14,
15, 18, 20 303:13
304:18, 19 305:10
306:15 307:5, 6, 14
308:21, 22 309:3, 9,
12 310:2 315:16
324:24 325:2 327:5,
7 332:21 342:18
353:14 357:1 368:7
369:12 377:9 383:16,

22 385:12 391:19
402:24
**asks** 98:8 154:5, 8
322:5, 6
**aspects** 394:14
**assault** 59:10
**assaulted** 59:2
**assert** 382:22 383:2
385:24
**asserting** 383:23
**asses** 212:15
**assessed** 128:7, 16
373:24 374:10, 13, 18
**assessment** 123:16
124:5, 6 125:11
127:15 128:14, 19
129:3, 4, 11 185:16
186:18 189:4, 5, 19
190:24 206:2 209:4,
6, 23 210:9, 21 211:3
215:7 216:1 218:15,
20 219:9 221:10, 24
222:5, 11 223:8
226:14 229:19
232:11 234:22 237:4,
20 238:3, 23 240:2
246:22 249:9, 14
253:12, 17, 22, 24
258:16 265:18
269:15 272:4, 13
273:4, 10, 17 274:6,
16 275:14 278:12
279:5 281:15, 23
283:10 284:5, 22
285:6, 23 286:10
288:2, 22 289:18
294:14, 18 295:1
306:14 369:21, 22
370:7, 13, 14, 22, 23
371:7 372:6 375:12
376:20, 21 380:9, 21
381:7, 14 382:10
384:10 391:12
394:12, 15 396:10
397:11 400:16, 20, 22
401:2, 23, 24 403:7
**assessments** 374:5
**assessor** 122:23
123:6 127:23 219:17
227:15 238:15

252:13  273:17, 20
274:14  281:2  282:12
290:9, 11  292:6, 23
293:2, 23  294:1
369:5, 10  370:6
371:6  372:12, 15, 19,
24  374:22  375:7, 9,
18  376:22  378:13
380:16, 19  400:9, 24
401:7, 11
**assessor/director**
290:8
**assessors** 241:3
**assessor's** 274:21
**assign** 160:24  161:10
**assigned** 129:19
145:2  160:9  161:22
182:20  264:24
287:19  323:6, 23
337:15, 19, 21
**assignments** 158:24
159:2  161:12
**assist** 250:4  380:2
**assistance** 125:3
249:8, 10, 14  259:6
283:9
**assistant** 25:19  90:7
123:4, 5  135:7, 8
290:12  330:21, 22
369:8, 9  371:5
380:17, 19  400:13, 24
**assisted** 25:9
**assume** 12:9  94:22
120:12
**assuming** 161:17
204:17  240:15
248:11  296:6  314:5
**assumptions** 366:11
**attached** 184:12
348:15, 17, 20
**attachment** 72:16, 19
184:18  217:11, 16
348:14  366:5, 6
**attempt** 152:12
331:24  344:20
357:24
**attempted** 168:14
171:3, 10, 11  172:5
296:24  314:11, 13

357:17  358:16
**attempting** 360:18
**attempts** 315:22
331:19
**attend** 70:9  71:16
73:4, 21, 24  74:2, 19
76:12  77:7  80:9
114:6, 22  188:23
389:7, 8  391:16
**attendance** 71:19
82:1  113:2  196:11
**attended** 74:12  75:4
78:12  80:12, 22  81:4
85:5, 14  187:16
273:5  395:7
**attendee** 74:22
**attendees** 72:22
**attending** 76:12  77:6,
8
**attention** 321:1
347:16  395:19, 22
**attesting** 109:1
**attorney** 10:15, 22
114:12  180:18
228:13  297:16  300:5
306:5, 8, 16, 20  307:2,
3, 8  308:1  315:12
318:13, 14, 21  323:19
328:4, 5  336:5
349:17  360:23  367:6,
10, 14  370:3  383:21
385:6, 9  391:4, 9, 16,
21  392:1, 6, 19  393:1,
3, 14, 15, 22  394:6
**attorney-client**
178:11  277:9  300:23
305:18  306:10
382:20
**attorneys** 8:19  95:3,
5  99:11  291:18
386:11
**Attorney's** 1:19
**audible** 11:19
**August** 135:2  136:7
137:16  234:9  235:15
236:11
**authority** 135:10
160:24  161:8, 10
177:8  193:23  194:9
200:24  203:11

204:10, 14, 18  230:5
290:4  322:21  323:1
**authorized** 130:9
202:6
**available** 25:11  45:1
131:18  193:19  290:3
387:15
**availed** 249:7
**avoid** 205:20  206:3
**aware** 40:13  49:15
52:8, 24  59:3  73:23
75:2, 4  115:22
125:10  139:2  144:10
146:19, 24  151:3, 9
153:1, 4  154:22, 24
155:6, 9, 13  163:17
167:20  169:21  170:1
171:15  176:8, 9
181:3  182:15, 17
187:2  191:4, 6
195:11, 15  199:11
202:3, 9  203:18
206:9  207:4  211:15
214:15  222:18  228:1,
8, 10, 23  231:16, 20
232:9, 15, 16, 21
233:2, 7, 9, 14, 23
234:2, 9, 19  235:4, 15,
20, 23  236:2, 11, 20
237:7, 13, 19, 24
238:7, 13, 16, 17, 18
239:8, 18, 21, 23
240:6  250:7  253:4, 7
254:18, 21, 23, 24
255:7, 13  256:2, 5, 11,
18, 23  257:20, 23
260:15  265:16, 19, 22
273:24  274:3, 20, 24
280:14  281:13  283:4
291:21  371:4, 12, 16
374:23  381:15  403:8

**< B >**
**back** 21:19  26:21, 22
27:6  33:10  34:13, 15
46:2, 3  49:5, 7  50:21
51:6, 19  58:3  61:13
63:24  64:9  65:14
68:8  82:1  86:16
88:2  89:5  100:7

106:7, 20  108:6
113:7  143:12  147:16
152:18  153:19, 20
163:5, 10  166:8
179:1  190:23  205:16
216:1  227:19  233:21
249:13, 21  256:3, 9,
14  263:24  269:7
272:6  276:15  277:17
278:1  286:18, 20
289:12  295:5  296:5
307:10  308:15  309:1
312:5  335:15  336:4,
6, 21  353:5  358:6
370:21  378:4  382:6
386:16  395:1, 2
397:14  398:12, 20
400:15
**backed** 234:17
**background** 32:22
33:1, 9, 23  34:1, 6, 20,
24  36:11, 20  51:9
54:23  56:17
**backgrounds** 36:15
**backwards** 397:19
**bad** 299:8
**badge** 189:7
**bag** 233:19
**Banking** 32:10
**bargaining** 287:22
**base** 105:5  365:7
**based** 30:6  31:5
33:22  48:22  49:14
60:2, 20, 22, 24  70:12,
15  79:12  90:1  98:24
101:4  105:14  106:14
112:15  113:14
128:20  129:2  133:15
138:5, 7  142:21
155:7  160:14  168:12
173:15  174:7  182:9
187:12  188:6  189:7
190:3  192:20  193:9,
16  194:22  195:20
197:16, 17  203:3, 6
204:17  213:16
219:23  220:3, 20, 23
225:23  228:13  231:8
233:2  241:2, 8, 13
242:14, 23, 24  244:5,

Case 3:21-cv-00477-MCC    Document 280-1    Filed 09/20/23    Page 290 of 342
CONFIDENTIAL
Deposition of Heidi Zula Vol. I - Revised                                    Jane Doe, et al. v. Schuylkill County Courthouse, et al.

*6* 245:*13* 246:*18*
247:*21* 251:8 260:2
262:22 287:20 289:*3,
7, 22* 290:2, *19*
297:*17, 20* 299:*18*
300:*4* 312:24 323:*6,
23* 325:15 326:24
327:*10* 336:3 341:*20*
342:*21* 343:22 350:2
356:*21* 361:*23* 370:*3*
374:*4* 377:*3* 384:*13*
398:7 399:*17* 400:*4,
6*

**basically** 264:7
278:*17* 332:22 340:*1*
400:*17*

**basis** 47:*18* 125:2
140:*4, 12* 195:*14*
212:2 213:9 214:*11*
219:*4* 225:*10, 11, 13*
241:*12* 250:9 265:15
266:*15, 23, 24* 300:*23*
323:*6, 22* 324:*1*
336:8 355:*13*

**Bates** 167:9 199:2
235:6, *10* 338:20
356:*21* 357:*3* 366:*1*

**began** 14:22 122:*17*
207:7 335:15

**beginning** 10:*13*

**begins** 156:*12* 309:*12*

**begs** 267:*16*

**behalf** 8:*23* 9:*4*
176:*4* 182:*19* 184:*12*
345:7 364:*15*

**behavior** 390:*23*

**belief** 155:5 342:*3*
360:7 370:*4*

**believe** 21:*14* 22:5,
*19* 23:*17, 18* 33:*15*
37:9, *14* 39:*19* 43:*20,
21* 44:5 45:7 49:*10*
61:*10* 62:13 65:21
66:*13* 67:*16, 17*
69:*17, 18* 70:2 71:*4*
72:20 74:*14* 75:5, *6*
79:*12* 81:2 85:*14, 22*
88:*21* 93:8, *14, 24*
94:9, *15, 23* 97:*16*
98:*4, 5, 20* 99:*1*

101:8 106:7, *12*
109:*1, 10, 15* 110:*17*
119:5 120:*1* 125:22
126:*17* 132:9 133:*12*
134:*1, 8* 137:*15, 16,
18* 138:*11, 12* 141:*14*
144:*13* 146:*10* 147:*1,
8, 19* 155:2 159:*17*
160:*1* 161:*6, 12, 24*
162:5, *14* 164:22
165:*1, 2* 168:*11*
169:*14* 170:*19, 20*
171:*12* 172:*4, 13, 18*
173:*11* 174:*24*
181:*12, 13* 184:*20*
186:8, *23* 187:8
188:6, *16* 192:*19*
193:*16* 196:9 199:22
200:*23* 203:5 205:*3,
4* 206:5, *12, 13, 16*
207:*12* 215:*19*
220:*18* 223:*11, 20*
228:*3* 230:2, 9 239:*4*
240:*23* 242:22 243:7
245:*20* 249:*17, 24*
251:7, *14* 252:*12*
255:7 258:9, *22*
260:5, *17* 272:22
274:*4, 13* 276:7
278:22 279:*13* 281:*3,
18* 282:6 289:*4*
291:8, *18* 292:8
297:*3, 8, 10, 14, 18*
298:*10, 11* 300:*17*
316:24 318:*23*
320:*15, 19* 324:*13*
325:2, *4, 13, 19* 327:8,
*9, 19* 332:2, 6 334:7
339:8 341:8 342:7
345:2, 6, 12, 22
346:*23* 347:5 349:*10*
351:2 352:24 353:*18*
355:*12* 357:*10, 18*
358:*3, 5, 8, 11, 16, 18,
19* 359:22 360:8, *21*
363:*4* 364:*4* 365:5
366:7 367:*1, 9* 370:2
373:*12* 375:8 376:*16,
17* 379:*16* 383:*12*

389:*21* 397:*24*
402:*12*

**believed** 40:6 101:*5*
181:5 196:*17* 198:*1,
2* 222:*15* 237:*16*
312:*21* 325:*16*
333:*21* 370:*16*
401:*17*

**believing** 343:*9*

**Bend** 236:*15* 361:6

**Bender** 2:*23* 9:*12*
16:6 21:*14* 22:*3*
23:6, *9* 26:*10, 14*
33:*16* 56:*9* 60:9, *19*
76:*11* 77:6 91:*9*
92:*17* 95:*14* 112:*17*
115:*18* 117:7 136:*4*
137:2 147:6, *22*
149:*20* 154:*19* 158:*4,
10* 160:*15, 19, 23*
161:*17* 162:*4* 163:*21*
183:5 184:*13* 185:7
188:*21, 22* 190:22
191:*23* 192:*3* 202:*3,
11, 16, 19, 20* 204:*6,
19* 211:*1* 216:*15*
224:*10* 235:*17, 21, 22*
236:6, *14, 16, 21, 24*
238:5, *10, 13* 257:*17,
22, 24* 258:*10, 15*
259:*12, 18* 260:6, *11*
262:*1, 2* 269:3, *22*
270:*3, 14, 20* 276:5, *7*
283:*1* 285:*23* 290:*20*
294:*13* 314:2 321:*4*
323:*11* 324:*3, 7, 14*
349:*16, 22, 24* 350:*23*
351:*4* 353:*16* 354:*12*
355:*1, 8, 13* 360:*21*
361:*2, 6* 367:8, *12, 15,
18* 369:*24* 370:*3*
379:*3, 4, 10* 399:*1, 16,
23* 400:*19* 401:*18, 21*

**Bender's** 76:*19*
91:*10* 325:*19*

**beneficial** 246:*21*

**benefit** 308:*12*

**benefits** 37:*11* 47:5

**bereavement** 387:*20*

397:22 398:*3*

**best** 206:*19*

**Bethlehem** 3:2

**better** 31:*20* 53:*18*
200:*4* 315:22 329:*17*
371:24 376:24
377:*14*

**beyond** 380:*14*

**billing** 260:*1, 12, 16*

**bills** 128:*17*

**bit** 128:*18* 142:6, *19*
261:*15* 315:*20*
363:24

**black** 88:6 148:*15*

**blast** 120:6

**blatantly** 94:6

**blindsided** 396:*14*

**board** 18:*4* 19:22
31:22 32:*3* 41:2
50:*17* 85:*19, 21, 24*
115:*15* 130:23, *24*
131:5, *20, 21* 132:*1, 4,
7, 9, 11, 17* 133:*11, 21*
134:6, *11* 211:*18*
223:8 238:24 251:2
258:24 291:6 375:22
377:*17* 388:*16, 18*
398:7

**boards** 120:2

**bodies** 374:*13*

**bottom** 15:*13* 17:5
136:7 188:*18* 189:*11,
12* 338:*21* 342:*16*
347:22 395:5

**bound** 194:*12*

**BOX** 2:*13* 56:*1, 3*
73:*13, 17*

**boxes** 148:*19*

**Bradley's** 366:*4, 17*

**brand** 116:*13*

**break** 13:*10, 12*
107:*21* 165:*23*
276:*13* 301:*20, 24*

**breaked** 308:*18*

**brief** 108:2 166:*4*
177:*14* 277:*3* 305:*21*
309:*17, 20* 310:*12, 13*
311:5, *6, 7, 13* 382:2
383:7

**briefing** 310:*11*
311:*17*
**briefly** 108:*14* 368:*24*
**bring** 124:*24* 215:*13*,
*22* 359:*16*, *22* 370:*9*
375:*21* 377:*17*
379:*11* 383:*17*
384:*16* 385:*4* 386:*15*
393:*3* 394:*6*
**bringing** 215:*11*, *18*
272:*5* 291:*6* 403:*3*
**Brodhead** 3:*2*
**brother** 387:*20*
**brought** 51:*19* 93:*11*
133:*8* 149:*3* 211:*5*, *9*,
*11* 246:*15* 247:*13*
249:*21* 256:*3* 272:*9*
278:*5* 320:*24* 375:*23*
385:*16* 395:*18*, *21*
**budget** 131:*18*
**Building** 50:*22*
51:*10*, *24* 52:*11* 86:*2*
120:*11*, *19*, *22* 142:*10*,
*14* 143:*5*, *13*, *16*, *19*
144:*3*, *8*, *10*, *15*, *23*
145:*2* 146:*8*, *12*
147:*12* 149:*14*, *15*
152:*8*, *14* 158:*23*, *24*
159:*2*, *5*, *20*, *24*
160:*10*, *17* 161:*1*, *2*,
*11*, *16*, *23* 163:*19*, *23*
187:*3* 189:*14* 205:*20*
206:*15* 226:*15*
229:*17* 230:*17*
231:*22* 246:*10* 247:*1*,
*16*, *24* 297:*21* 320:*11*,
*16* 328:*8*, *12*, *19*
329:*5*, *6*, *11* 332:*3*, *5*,
*24* 334:*4* 335:*16*
348:*9*
**buildings** 120:*4*, *13*
**bullet** 121:*15* 200:*4*
**bulletin** 120:*2*
**bureau** 123:*20*
144:*16*, *19* 145:*8*
234:*5* 265:*23* 281:*23*
371:*8* 379:*24* 380:*3*
**Burke** 136:*8*, *14*, *23*
140:*9*, *10*

**Burke's** 136:*19*
**business** 25:*12*
**busy** 225:*17*
**BV** 99:*2*

**< C >**
**calendar** 224:*20*
225:*4* 254:*8*
**call** 71:*9* 73:*9* 79:*22*
113:*20* 200:*3* 276:*15*
282:*23* 296:*12* 302:*4*,
*7* 303:*22* 304:*5*
344:*17* 358:*3* 396:*21*
**called** 15:*18* 16:*15*
66:*11* 81:*12* 86:*5*
112:*22* 123:*5* 169:*3*
213:*11* 255:*22*
273:*17* 309:*24*
310:*10* 374:*8* 394:*12*
**calling** 314:*18*
**calls** 56:*23* 117:*3*
**cameras** 190:*18*
191:*1*, *2*
**canceled** 76:*2*, *10*, *15*
**candidly** 240:*13*
**Cap** 117:*5*
**capacity** 90:*4*, *6*
98:*17* 107:*10* 249:*15*
375:*22*
**caption** 8:*15*
**car** 233:*20*
**card** 165:*21*
**care** 116:*2*, *7*, *11*
180:*19*
**careful** 97:*6*
**carrier** 302:*16*
**case** 8:*15* 67:*24*
96:*24* 174:*13* 309:*18*
390:*8*
**case-by-case** 323:*6*,
*22*, *24*
**catalyst** 227:*1*, *3*, *6*
**CATHERINE** 2:*2*
9:*1* 10:*11* 234:*24*
349:*3* 383:*19*
**catherine@dereksmith
.com** 2:*4*
**cause** 33:*11* 375:*11*

**caused** 218:*23*
222:*10* 237:*2* 240:*8*
334:*5*
**causing** 225:*17*
234:*17* 244:*2*
**CC** 318:*24*
**CC'ed** 76:*1* 77:*2*
150:*14* 156:*8* 167:*19*
363:*21*
**ceiling** 148:*15*, *18*
153:*14* 154:*6*
**certain** 19:*20* 41:*3*
94:*16* 96:*24* 104:*24*
105:*1* 127:*21* 129:*13*
146:*1* 149:*6*, *10*
155:*3* 169:*5* 205:*6*
243:*14* 251:*8* 255:*13*
298:*14* 323:*15*
326:*19*, *20* 336:*20*
337:*24* 345:*8*, *13*
373:*10* 374:*24*
397:*24*
**certainly** 39:*24*
248:*2* 311:*1*, *18*
**certainty** 243:*11*, *18*,
*22*
**certification** 240:*4*
372:*6*
**certified** 273:*21*
374:*3*
**certify** 404:*5*
**chain** 16:*4* 75:*16*
77:*2* 102:*15*, *18*, *23*
116:*24* 136:*3* 150:*12*
156:*5*, *9*, *17* 195:*7*
208:*7* 261:*12* 322:*2*
341:*4* 352:*5* 354:*10*
363:*12* 370:*15* 387:*5*
390:*18*
**challenging** 403:*1*
**chance** 311:*19*
**change** 53:*10*, *13*
66:*15* 88:*22* 91:*3*, *14*
99:*16* 103:*15*, *20*
104:*11* 202:*12*, *24*
209:*24* 240:*17* 257:*5*
274:*5* 393:*11*
**changed** 53:*11*
255:*11* 275:*5* 288:*4*
292:*11* 335:*7*

**changes** 47:*2* 69:*15*,
*17* 99:*2* 115:*13*, *19*
130:*17* 132:*10*
155:*13* 232:*17*
236:*24* 275:*3* 287:*9*,
*11*
**changing** 132:*18*
289:*19*
**channels** 315:*20*
**charge** 77:*23* 192:*4*,
*8* 201:*18* 396:*16*
**charges** 392:*13*, *17*, *24*
**chart** 44:*24* 45:*6*, *21*
**chatted** 61:*15*
**check** 32:*23* 33:*2*, *9*,
*23* 34:*1*, *2*, *21* 35:*1*,
*16* 36:*11* 61:*14*
113:*1*, *6*, *7* 276:*14*, *21*,
*22* 398:*2*
**checked** 35:*2* 36:*9*
213:*15*
**checklist** 24:*11* 25:*1*
**checklists** 25:*13*
**checks** 27:*11* 36:*15*,
*20*
**chief** 108:*15*, *18*, *24*
122:*23* 123:*6* 127:*23*
219:*17* 227:*15*
238:*15* 273:*17*, *20*
274:*10*, *14* 281:*1*
282:*11* 290:*8*, *9*, *11*
292:*6*, *23* 293:*1*, *23*
294:*1* 369:*4*, *10*
370:*6* 371:*5* 372:*12*,
*15*, *19*, *23* 375:*7*, *8*, *18*
376:*21* 378:*12*
380:*16*, *19* 400:*9*, *24*
401:*7*
**children** 86:*2*
**Chinese** 340:*1*
**chosen** 288:*17*, *19*
**Chris** 88:*22* 89:*7*, *22*
**Christine** 139:*3*
401:*1*
**Christopher** 92:*1*
**circled** 17:*9*, *21* 87:*6*
**circumstances** 31:*5*
136:*20* 322:*24*
**CIVIL** 1:*3* 2:*7*

Case 3:21-cv-00477-MCC   Document 280-1   Filed 09/20/23   Page 292 of 342   CONFIDENTIAL
Deposition of Heidi Zula Vol. I - Revised
Jane Doe, et al. v. Schuylkill County Courthouse, et al.

**claim** 102:*17* 103:*8*
117:*22* 122:*23* 123:*4*,
*20* 125:*24* 134:*22*
135:2, *7* 216:2
227:*16* 232:*10* 234:5
265:*23* 281:*23*
288:*22* 289:*17* 290:*8*,
*10*, *12* 291:*14*, *17*
369:*5*, *9*, *20* 370:*17*,
*22* 371:*6*, *8* 379:*24*
380:*3*, *17* 382:*10*
385:*11*, *19* 391:*12*
394:*11* 400:*10*, *16*
**claiming** 268:*11*
**claims** 49:*12* 50:*1*, *6*
51:*16* 52:*18* 56:*9*, *21*
57:*19*, *24* 58:*9*, *12*, *16*,
*20* 59:*7*, *16* 60:*1*, *7*
102:*13* 114:*23* 115:2
119:2 142:*21* 234:*21*
289:5 291:*15*, *16*
**Claire** 170:*19*
171:*14* 176:*1*, *5*
**clarification** 58:*20*
350:7, *12*, *15*, *19*, *24*
352:*13* 358:*20*
359:*15* 364:*16*, *23*
366:*19*
**clarify** 60:*14* 174:*3*
228:*22*
**class** 375:*1*
**classes** 240:*10* 375:*3*
**classification** 43:*16*
131:*14* 287:*10*, *19*, *20*
**classifications** 288:*3*
**classified** 214:*8*
**clean** 115:*14* 127:*1*
146:*21* 148:*24* 149:*4*
**cleaned** 147:7 148:7
151:*8*
**Cleaning** 146:*20*
149:*3*, *14*
**cleans** 149:*15*
**clear** 53:*21* 110:*6*
143:*17* 165:6 268:*20*
309:*1*
**clearer** 307:*15*
**clerk** 108:*15*, *18*
125:*21*, *22* 234:*13*, *14*

243:2 244:*23*
**clerk's** 108:*24*
**client** 177:*1* 306:5, *15*
**climbed** 207:*2*
232:*23*
**close** 97:*5*
**closed** 121:*9*
**closely** 333:*23*
**closer** 31:*6*
**Coleen** 1:*22* 8:*21*
404:*4*, *22*
**collect** 128:*22*
**collective** 52:*14*
287:*22* 369:*18*
**collectively** 85:*1*
347:*9*
**collectors** 128:*21*
**Columbia** 2:*9*
**combined** 266:*17*
267:*6* 290:*11*
**combining** 123:*10*
400:*18*
**come** 21:*7*, *19* 29:*6*,
*8* 37:*9* 41:*2* 49:*5*
74:*18* 84:*8* 86:*16*
89:*11* 102:*5* 113:*7*
125:*7* 131:*24* 135:*14*
136:*17*, *18* 152:*11*
155:6, *9* 159:*4*
163:*12* 183:*9* 189:*10*,
*13*, *16* 207:*1*, *11*
212:*12* 215:*21* 219:*7*,
*8*, *20*, *21* 220:*8*, *9*
231:*11* 236:*5* 241:*16*
249:*13* 250:*6* 253:*9*,
*10* 256:*9* 259:*11*
273:*14* 281:*18*
282:*14* 306:*2* 329:*10*
336:*6* 351:*1*
**comes** 33:*9* 359:*3*
366:*2* 386:*5*
**comfortable** 101:*7*
232:*18*
**coming** 35:*18* 39:*15*
113:*15* 143:*12*
188:*18* 218:*5* 234:*16*
334:*3*, *4* 370:*19*
**comma** 94:*19*

**command** 16:*4*
102:*16*, *18*, *23* 195:*8*
370:*16*
**comment** 403:*10*
**comments** 60:*10*, *20*
242:*2*
**commiss** 130:*22*
**commission** 19:*14*
**Commissioner** 73:*11*,
*12* 74:6 109:*20*
110:*14* 132:*18*
164:*20* 165:*8*, *14*
182:*21* 187:*6*, *15*, *23*
189:*10* 236:*13* 238:*8*,
*9* 402:*24* 403:*4*
**commissioners** 18:*3*,
*8*, *24* 21:*20* 22:*1*, *3*, *4*,
*18* 34:*18* 36:*10*, *23*
68:*21* 69:*12* 100:*18*
101:*13* 102:*23* 107:*4*
109:*5*, *7*, *21* 110:*8*
111:*24* 115:*10* 117:*8*,
*9* 130:*20*, *21* 132:*5*, *6*,
*12*, *19* 133:*10*, *22*, *24*
134:*2*, *7* 183:*3*
190:*23* 216:*6*, *8*, *10*,
*19* 250:*24* 369:*14*
399:*10* 402:*9*, *13*, *18*
**commissioner's** 19:*3*,
*9* 85:*19*, *21*, *24* 111:*2*
165:*9* 183:*14* 399:*3*,
*8*, *21*
**common** 212:7 215:*1*
**commonly** 15:*21*
**Commonwealth**
224:*21*
**communicate** 60:*23*,
*24* 106:*22* 235:*17*
236:*16* 257:*15* 297:*8*
341:*7* 355:*19* 358:*12*
**communicated**
119:*17* 298:*18*
341:*12* 355:*7* 358:*11*
**communication**
106:*23* 121:*16*, *19*
176:*21*, *22* 177:*3*
182:*13* 212:*17*
260:*12* 283:*11* 291:*8*
297:*7* 298:*13*, *17*
301:*11*, *21* 315:*4*, *6*

316:*24* 317:*10*
332:*20* 349:*19*
358:*18* 364:*2* 385:*8*
**communications** 77:*1*
119:*16* 176:*14*
212:*16* 306:*5* 309:*10*
360:*12* 364:*7* 386:*9*
**company** 49:*2*
146:*20* 149:*3*, *4*, *14*
**comparison** 82:*24*
**compile** 25:*12*
**compiling** 25:*18*
**complaint** 53:2 93:*4*,
*20* 94:*2*, *8* 107:*1*, *2*
121:*23* 122:*7*, *8*
148:*11* 174:*4*
**complaints** 93:*15*
94:*1*, *11* 147:*23*
148:*13*, *14* 150:*3*
175:*13*
**complete** 11:*22*
15:*23* 24:*8* 37:*1*, *12*
129:*4* 213:*6* 226:*16*
229:*20* 230:*23*
237:*22* 240:*3* 244:*3*
246:*23* 247:*17*, *23*
252:*16*, *21* 254:*2*
256:*19* 257:*4* 262:*20*
263:*16*, *22* 264:*6*
266:*18* 287:*3* 320:*15*,
*16* 321:*16* 333:*8*, *20*
335:*3*
**completed** 15:*24*
16:*3*, *5*, *6* 34:*1*, *6*
35:*6* 37:*10*, *17*, *24*
38:*2* 63:*22* 105:*1*
139:*24* 171:*16*
226:*13* 229:*19* 234:*3*
238:*1* 240:*19* 241:*8*,
*12* 242:*14* 243:*14*
244:*16* 246:*15*
247:*13* 257:*10* 263:*4*,
*14*, *18* 264:*2*, *3*, *5*
265:*3* 267:*5* 322:*23*
356:*2*
**completely** 11:*24*
94:*8* 96:*18* 125:*18*
336:*2*
**completes** 17:*3* 213:*3*

Case 3:21-cv-00477-MCC   Document 280-1   Filed 09/20/23   Page 293 of 342
CONFIDENTIAL
Deposition of Heidi Zula Vol. I - Revised                    Jane Doe, et al. v. Schuylkill County Courthouse, et al.

completing 16:*23*
17:*4* 264:*12, 13, 22,*
*23* 321:*8*
completion 208:*20*
242:*9* 253:*2* 258:*21*
267:*11* 289:*22* 291:*4*
299:*4* 320:*21*
compliance 275:*4*
323:*4, 13* 348:*6*
complied 385:*5*
compliment 129:*14,*
*17, 18*
complimented 129:*14*
con 307:*3*
concern 33:*11*
119:*13* 122:*1, 6, 12*
174:*6, 22* 202:*1*
222:*6, 10, 12* 236:*21*
320:*20, 23, 24*
concerns 50:*19*
148:*11, 13* 153:*9*
157:*7, 11, 21* 168:*18*
190:*7* 197:*7* 215:*6*
231:*17* 233:*10, 23*
242:*2* 268:*21* 333:*18*
335:*8* 350:*3* 395:*17,*
*20* 396:*5*
concise 229:*4*
concluded 403:*22*
conclusion 219:*7, 8,*
*13, 15, 22, 23* 220:*2, 8,*
*10, 18, 21, 24* 221:*1, 3*
224:*5* 241:*17* 246:*17*
250:*6* 328:*23*
conclusions 273:*14*
condensed 75:*21*
condition 138:*10*
147:*23*
conditions 28:*18*
147:*4* 148:*5* 150:*24*
151:*1* 279:*24*
conduct 160:*7*
190:*11, 17* 205:*5*
237:*3*
conducted 33:*24*
36:*21* 71:*2, 3, 6*
393:*12*
conference 11:*6*
186:*24* 187:*10, 16, 24*

188:*24* 196:*12*
confident 34:*19*
CONFIDENTIAL
1:*10* 9:*22*
confidentiality 27:*13*
confirm 28:*18* 136:*8*
175:*18, 23* 250:*10*
confirmation 29:*12*
251:*23*
confirmed 42:*15*
confirming 205:*19*
conform 110:*19*
confused 341:*24*
360:*3*
confusing 87:*14, 16*
conjunction 313:*4*
338:*18*
connection 110:*11*
242:*11* 373:*21*
consecutive 338:*20*
356:*20* 357:*5* 366:*1*
consent 32:22 33:*1*
34:*10*
consented 89:*12, 23*
consequences 254:*12*
consider 194:2
226:*18* 247:*2, 18*
254:*15* 311:*3, 19*
332:*23* 333:*10*
342:*18* 343:*7* 344:*3*
346:*11* 367:*23*
368:*16* 391:*2*
consideration 194:*8*
198:*14* 200:*7, 14*
207:*16* 229:*16*
259:*21* 329:*14, 22*
398:*19*
considered 196:*8*
260:2 320:*11* 368:*2,*
*19*
consistent 323:*4, 12,*
*13*
constitute 303:*10*
304:*22*
constructed 356:*24*
consult 274:6 297:*15*
315:*11* 367:*8* 381:*6,*
*13* 389:*22*
consultant 215:*12, 14,*
*15, 18, 21* 272:*5, 9, 12,*

*15* 279:*21* 280:*1*
281:*19* 283:*17*
284:*22, 24* 379:*11*
380:*20*
consultants 280:*8*
consultation 280:*15*
283:*5* 300:*4* 306:*23*
307:*3* 318:*20* 336:*5*
362:*2* 367:*15*
consultations 349:*18*
386:*11*
consulted 160:*21*
328:*3* 349:*16* 367:*6,*
*10, 11* 384:*17* 386:*5*
389:*18*
consumed 13:*1*
contact 142:*23, 24*
151:*7* 176:*11* 205:*21*
206:*3* 235:*19* 236:*5*
284:*11, 17, 18* 314:*15*
364:*17, 19*
contacted 148:*16, 17*
176:*11, 24* 297:*3*
314:*21*
contacting 90:*23, 24*
91:*1*
contained 185:*20*
containing 153:*15*
content 148:2
contents 10:*20* 57:*3*
78:*16* 96:*1, 16, 17, 21*
97:*9* 162:*12* 167:*21*
177:*2, 17* 178:*13, 16,*
*18* 179:*2, 7, 22, 23*
182:*9, 15* 231:*11*
301:*3* 302:*18*
contest 151:*7* 395:*19*
context 50:*15* 305:*11*
307:*16* 308:*12*
309:*10, 11* 311:*3*
contingent 27:*9, 18*
continually 269:*3*
348:*5*
continuation 352:*8*
354:*9*
continue 33:*17*
93:*15* 136:*10* 143:*15*
236:*4* 237:*1* 239:*13*
contract 53:*16* 54:*11,*
*12, 13* 208:*17* 210:*7*

279:*19* 280:*8, 14, 16*
281:*12* 283:*5* 287:*22*
contracted 376:*6*
contractor 53:*6*
279:*21, 23* 280:*1*
282:*11* 283:*17*
284:*22, 24* 376:*4*
contractors 124:*18, 23*
contracts 280:*11*
contractual 210:*5*
contradiction 203:*22*
204:*12*
contradictory 203:*17*
contributed 228:*9*
321:*12*
control 40:*19* 229:*22*
230:*3* 329:*1*
controller 112:*16*
133:*24* 134:*3, 8*
controllers 47:*10, 12*
48:*12, 19, 21* 62:*5*
112:*11* 113:*1, 10*
controller's 46:*21*
controls 48:*10*
convenient 393:*22*
conversation 10:*21*
50:*15* 52:*16* 57:*8*
74:*20* 89:*21* 96:*16,*
*17* 97:*10* 103:*5*
137:*3* 138:*18* 142:*17*
144:*6* 147:*21* 148:*3*
149:*18* 150:*1* 160:*4*
171:*24* 172:*15*
177:*18* 178:*13, 18, 19*
179:*2, 3, 6, 13* 180:*3,*
*17* 181:*15, 22* 185:*15*
186:*5, 12* 187:*22*
188:*3, 4, 6* 192:*19*
205:*17, 24* 206:*8, 9,*
*17* 219:*11* 224:*13*
248:*18, 19* 260:*5, 13*
261:*17* 283:*22*
287:*24* 288:*5, 8*
301:*3* 302:*18* 306:*6*
307:*18* 308:*13, 21*
309:*6* 314:*19* 317:*9*
350:*22* 355:*10*
conversations 50:*13*
51:*3* 52:*10* 56:*8, 24*
57:*4, 6* 58:*8* 96:*17,*

Case 3:21-cv-00477-MCC    Document 280-1    Filed 09/20/23    Page 294 of 342
CONFIDENTIAL
Deposition of Heidi Zula Vol. I - Revised
Jane Doe, et al. v. Schuylkill County Courthouse, et al.

*21* 99:*10* 117:*4*
131:*11* 143:*4, 7, 21*
152:*16* 154:*19* 155:*7*
162:*8* 202:*10* 210:*20*
211:*2, 11* 225:*19*
227:*8* 228:*13* 230:*20*
231:*14* 277:*15*
300:*11, 14* 303:*5, 7*
360:*11, 16* 361:*2*
392:*3* 402:*11* 403:*9*
**conviction** 33:*10*
**coordinator** 210:*3*
234:*15*
**coordinator/field**
209:*12*
**copies** 15:*4* 80:*19*
81:*2, 5, 6* 121:*3, 8*
166:*13*
**copy** 8:*2* 15:*3* 23:*18*
63:*9, 18* 70:*1, 16*
76:*24* 80:*22* 81:*11,*
*14* 105:*12* 106:*10*
112:*3* 115:*12, 13*
176:*6* 318:*21* 319:*2,*
*4*
**correct** 10:*1* 12:*15*
14:*23* 15:*20* 16:*7, 10*
17:*17* 18:*9, 13* 19:*1,*
*15, 24* 26:*15, 19* 29:*3*
30:*2, 19, 23* 31:*13*
32:*4, 23* 33:*21, 24*
34:*11, 14* 36:*12* 37:*1*
38:*14, 18* 39:*1, 16*
42:*10* 47:*8* 59:*2*
62:*5* 63:*12, 15* 64:*3,*
*4, 7, 13, 16, 21* 66:*1, 4*
67:*8* 68:*17, 21* 70:*6*
72:*14* 73:*7, 12* 76:*16*
77:*3, 16, 19* 78:*13*
81:*13* 83:*1* 84:*9*
86:*7* 87:*7* 89:*9, 16*
92:*1, 6* 99:*3, 21*
100:*13, 22* 101:*18*
102:*20, 24* 103:*4, 20,*
*23* 104:*2, 14* 105:*20,*
*22* 107:*8* 109:*5, 17*
110:*9, 10* 111:*18*
117:*13* 118:*8, 22*
120:*16* 121:*23*
122:*15, 20, 24* 123:*6,*

*17* 128:*23* 129:*5*
130:*5, 17* 134:*16, 23*
136:*4* 137:*14* 138:*1*
141:*9* 142:*10, 15*
144:*16* 145:*5, 14, 18,*
*21* 147:*14* 151:*21, 24*
153:*17, 22* 154:*9*
156:*13, 20* 157:*4, 8, 9,*
*14, 18* 158:*7* 159:*15,*
*21* 160:*5* 161:*2, 5*
165:*11* 172:*6* 182:*7*
185:*1* 186:*3, 15*
187:*7, 14, 24* 189:*23*
190:*5* 191:*24* 192:*24*
196:*18, 24* 197:*7*
198:*16* 199:*20, 24*
200:*20* 203:*22*
204:*22* 206:*4* 207:*21*
208:*12, 20* 209:*15, 18*
215:*7, 10* 217:*9*
218:*9, 22* 219:*6, 14*
221:*15* 222:*13* 223:*4*
224:*6, 24* 225:*4*
227:*7* 239:*6* 242:*15*
244:*9, 19* 245:*15*
248:*8* 254:*5, 12, 13*
255:*19, 24* 258:*17*
259:*16* 261:*23* 262:*6*
263:*7, 10, 11, 18, 22*
264:*4, 15* 266:*3, 13*
267:*5* 269:*1, 22*
270:*3* 271:*8* 273:*4,*
*10, 18, 22* 275:*17, 18*
280:*2, 5, 7, 9, 10, 18,*
*22* 281:*2, 5, 8, 24*
282:*1* 287:*13* 290:*15*
292:*2, 7, 15, 16, 24*
293:*18, 19, 21* 294:*1,*
*4, 7* 295:*3, 9* 297:*24*
298:*5* 301:*18* 313:*5*
314:*14* 315:*17* 318:*1,*
*22* 319:*19* 320:*6*
322:*11, 18* 326:*18*
327:*15* 328:*10, 13, 16,*
*20* 329:*8, 12* 332:*7,*
*20* 333:*2* 335:*3, 13,*
*18, 22* 336:*13* 339:*24*
341:*5, 9, 12* 344:*11,*
*18, 22* 346:*17* 347:*24*
350:*20* 351:*19* 352:*9*

353:*23* 354:*10, 14, 20*
356:*3, 14, 17, 23*
358:*24* 359:*4* 362:*7,*
*24* 363:*18, 21, 24*
366:*6, 14, 20, 24*
368:*14* 369:*2, 6, 10,*
*14* 370:*10* 372:*13, 16*
375:*13* 379:*22, 24*
380:*4, 10* 383:*10*
385:*14* 387:*15, 24*
388:*18* 389:*9* 390:*19*
395:*12* 396:*22*
397:*16, 20, 21* 399:*5,*
*11* 401:*4, 12, 13, 24*
**corrected** 154:*17*
**Corrections** 31:*12, 19*
**correctly** 58:*23*
343:*16* 370:*11*
**correspondence**
121:*22* 184:*12*
336:*18* 361:*19*
362:*17, 20* 363:*2, 16*
**Counsel** 2:*5, 11, 15,*
*18, 23* 3:*3* 9:*20*
50:*13* 56:*24* 95:*9, 17,*
*19, 21* 96:*3, 5* 97:*9,*
*11, 14* 166:*18* 176:*15,*
*21, 22* 270:*12* 277:*16*
301:*8* 302:*9, 11*
303:*3, 18* 305:*12, 17*
307:*18, 20* 308:*5, 16,*
*17* 309:*11, 12* 382:*23*
383:*3, 17* 384:*3, 13,*
*17* 385:*1, 19, 23*
386:*9* 390:*1*
**count** 123:*22*
**counties** 300:*16*
372:*7*
**COUNTY** 1:*3* 8:*4,*
*16* 9:*12* 14:*17, 18, 22*
15:*19* 16:*7, 12* 17:*19*
21:*4* 24:*18, 20, 23*
26:*10* 28:*14* 30:*1, 14,*
*22* 31:*3* 33:*3* 39:*1,*
*10, 13* 40:*14, 21* 41:*3,*
*22* 42:*18* 43:*24*
44:*23* 45:*1, 8, 22*
47:*7* 48:*9* 49:*3, 12,*
*20* 50:*1, 9, 10, 20*
54:*12, 14* 55:*7, 11, 20*

56:*5, 10* 57:*10, 15, 21,*
*24* 58:*17* 59:*1, 5, 9*
61:*6, 8* 62:*13* 63:*9*
65:*5* 73:*23* 76:*1, 10*
87:*20* 88:*15, 24* 89:*8*
92:*14* 93:*13* 94:*19,*
*21, 23* 95:*2, 21* 97:*22*
98:*11, 18* 100:*11*
101:*11* 102:*2, 13, 19,*
*22* 103:*3, 6* 104:*8, 23*
105:*12* 106:*14* 107:*3,*
*4, 5, 11, 15, 17* 112:*21,*
*22, 23* 113:*2, 3, 4, 8,*
*13* 115:*21* 116:*9*
118:*3, 16* 119:*15*
120:*2* 121:*2, 5*
122:*18* 128:*16*
129:*21* 131:*16* 133:*3*
134:*6* 137:*19* 140:*2*
142:*7* 144:*2* 148:*8*
150:*24* 151:*20* 152:*6,*
*12* 160:*24* 163:*1*
173:*3* 174:*7, 20*
176:*4* 182:*19* 184:*13*
194:*13* 195:*2* 201:*4*
204:*21, 23* 211:*4, 6,*
*10* 212:*8, 16, 24*
213:*6* 214:*23* 215:*17*
218:*9, 17* 220:*5*
226:*10, 17* 227:*9*
229:*14* 230:*4, 6*
233:*4* 239:*14* 240:*1,*
*10* 241:*12* 249:*9, 11,*
*21* 254:*12, 21* 255:*5,*
*9* 257:*16* 258:*15*
260:*16* 262:*17*
268:*18* 272:*23* 274:*1,*
*13, 15, 21* 279:*8*
280:*15* 281:*14* 283:*4*
287:*14* 290:*4* 292:*14*
295:*22* 296:*2* 320:*13*
321:*1, 2, 5* 324:*17, 18*
326:*15* 330:*12*
333:*22* 334:*4, 14, 21*
335:*7, 16, 21* 337:*6*
341:*18* 348:*5* 360:*3*
362:*2* 372:*3, 8* 373:*6*
376:*3* 389:*11, 14*
390:*23* 393:*2, 21*

394:*11*  397:*3*  400:*23*
**county-issued**  144:*11*
**county-owned**  161:2,
*4*
**county's**  18:*23*  86:*4*
92:9  100:*24*  107:*13*
111:*17*  113:8  142:9
201:*18*  224:22
239:*10, 11*  296:7
**couple**  38:*16*  100:*16*
224:*18*  350:*18*
**couple-minute**  107:*21*
**course**  25:*12*
**COURT**  1:2  8:*1, 11,
21*  11:8, *11, 16*  95:*1*
113:*12*  289:*12*  307:*9,
12*  308:7, *11, 23*
309:7, *19, 22*  310:*3, 8,
18, 24*  311:*11*  312:2
**COURTHOUSE**  1:*4*
8:*17*  22:24  85:*16*
120:*3, 7*  141:*16*
142:9  159:*15*  163:*3,
10, 13*  164:*3, 9*
165:*21*  183:*10*
186:*20*  188:*15, 22*
189:*4, 6, 11, 13, 14*
190:*15, 19*  197:*12, 13*
198:*3*  205:*14, 15*
206:*21*  230:*14*
232:*18*  233:*11, 17, 19,
20*  236:*5, 23*  237:9
247:*20*  248:2, *20*
286:*19, 20*  329:*16*
**Courtroom**  187:*1, 16*
188:*23*
**cover**  193:*19*
**coverage**  233:*3*
**coverages**  47:2
**covered**  83:*3*  302:9
309:*13*
**COVID**  137:*15, 17,
19*  138:*11, 12, 20*
140:2  214:*16*  225:*16,
22*  240:9  253:6
254:*16, 22*  255:*19*
**CPE**  126:*4, 22*
127:*11, 14, 19*  208:*20*
240:*10*  274:2, *7*
275:*1, 3*  371:*11, 14,*

17  372:*3, 9, 13, 16, 22*
373:*17*  375:*1, 9, 11,
15*  376:*23*  378:*13*
379:*20*  399:*1*
**CPE-licensed**  127:*18*
**Craft**  25:*19*  37:*20*
**created**  16:9  39:6
130:*23*
**creation**  131:*1*
132:*18*  133:*3*
**credentials**  278:*9, 18*
**criminal**  34:*4*
**critiques**  69:*16*
**current**  253:*17*
348:*12*
**curve**  255:*18*
**cut**  113:*1*
**cutting**  113:*4*

**< D >**
**daily**  157:*17*  269:*15*
324:2  355:*13*
**Dana**  234:*4*
**dangerous**  207:2
232:*23*
**Dash**  134:22  135:*5*
136:*4, 18*  137:*4*
140:*8*
**Dash's**  136:*6*
**data**  243:*12, 14*
244:*24*  245:6
**date**  8:*12*  12:22
18:*20*  19:*13, 22*
23:*16*  33:*24*  35:6, *7,
8, 10, 12, 14*  36:24
37:*14*  38:*14*  39:*19*
41:*15*  43:*12*  50:*4*
61:*11*  66:*3*  90:22
104:*13, 22*  105:*6, 15*
106:*1, 13, 15, 16*
113:*23, 24*  156:*20*
159:9  246:*16*  247:*13*
254:*10, 11*  280:*19*
293:*3, 20*  317:*12*
318:*3*  348:*16*  356:*4*
377:*6*  404:*21*
**dated**  38:*23*  42:8
151:*23*  199:*8*  296:*5*
341:*21*  342:*4, 19, 22*
343:*8, 10, 23*  344:*4*

**dates**  35:*8*  38:*12*
154:*15*  348:*12*
**day**  37:*24*  50:*19, 20*
51:7  69:*20*  70:*18*
76:*19*  78:*1, 8, 12*
137:*6*  142:*13*  147:*16,
18*  152:22  168:*1*
171:22  172:*12, 13, 14,
16*  181:*12, 19*  187:*5,
8, 10*  190:*3*  205:*8*
232:*15*  233:*15*  236:2
257:9  262:*5*  292:*18*
333:7  350:*8*  355:*18*
363:*24*  398:7  400:*20,
21*
**days**  187:22  205:*12*
225:*3, 6*  237:*16*
255:*15*  262:*5*  264:*11,
17*  288:*13*  310:*17, 21,
23*  311:9  350:*18*
**deadline**  254:7  263:2
**deadlines**  348:6
**dealing**  56:*14*  57:*23*
181:*14*
**dealt**  20:*11*  54:*20*
58:7  306:*15*
**death**  387:*14, 20*
388:*1*  398:*10, 19*
**Deb**  134:*21*  249:*17,
20*  252:*7, 15*
**DEBISE**  3:*5*  9:*6*
**December**  18:*12, 16*
19:*15, 23*  28:6  32:*23*
34:*14*  37:*15*  152:*5*
**decide**  244:*1*
**decided**  89:*18*  90:*5,
9*  92:*15*  117:2
204:*16*  216:*12*
268:*21*  290:*5*  368:*13*
369:*18*  370:7  378:*18*
379:*1*  400:*18*
**decides**  97:22
**decision**  52:*14*  78:*11*
102:*16*  103:7  107:*16*
112:*19*  138:2  142:*8*
158:*10*  164:*11*
210:*15*  216:*5, 10*
220:*6*  227:*13, 18*
290:*1, 15, 18*  325:*20*
327:*21*  331:*14*

341:*18*  346:*12*
353:22  365:*4, 12*
369:*16, 18*  370:*12*
377:*10, 21*  379:*17*
384:*13, 18, 20*  385:2,
*7*  386:6, *17*  389:6
390:*8*  401:*18, 22*
**decision-making**
103:7
**decisions**  97:*1*  290:*5*
302:*20*  377:*4*
**deductions**  46:*8*  47:*3*
**deeds**  213:*12*  242:*24*
**deeper**  311:*3*
**defendant**  9:*13, 16,
19*  14:*18*  16:*5*  19:*14*
23:*3*  26:*10*  56:*9, 20*
57:*18*  58:*11*  72:*14,
23*  74:*11*  75:24
76:*19*  77:6  96:7
149:*19, 20*  163:2, *17*
164:2  171:*4*  172:24
175:*17*  178:6  180:24
184:*3*  188:*14*  191:*23*
196:*17*  202:*3*  206:*10*
229:*17*  230:*13, 16*
231:*3*  232:*10, 17, 22*
233:7, *11, 16*  234:*10,
20*  235:*17*  236:6, *14,
16, 21, 24*  237:*3*
238:*5, 9, 13*  239:*9*
248:7  269:22  270:*3*
285:22  367:8, *11, 15*
399:*16*
**Defendants**  1:*4*  8:*5*
58:6  306:*1*
**defense**  382:22, *23*
383:*3, 9, 12, 14, 16, 17*
384:*3*  385:*19*
**defer**  326:7
**deferred**  326:9
**definitely**  292:*4*
349:*4*
**delay**  245:*10*
**delayed**  225:*18*  226:*1*
**delegate**  265:*5*
**delinquency**  227:*21*
244:2  259:*1, 7*
334:*16*  402:*17*

Case 3:21-cv-00477-MCC   Document 280   CONFIDENTIAL   Filed 09/20/23   Page 296 of 342
Deposition of Heidi Zula Vol. I - Revised
Jane Doe, et al. v. Schuylkill County Courthouse, et al.

**delinquent** 214:*12*
223:*9, 14* 225:*7, 12*
241:*10* 265:*14*
**delivered** 107:*1*
**delving** 220:*13*
**demographic** 37:*5*
**demote** 288:*17, 19*
**demoted** 134:*16, 20*
227:*11* 228:*11, 24*
260:*17* 294:*9* 369:*1*
375:*17, 24* 376:*8, 11,
12* 398:*4*
**demotion** 224:*12*
227:*2* 229:*9* 239:*5*
272:*16* 280:*22* 281:*1*
288:*23* 291:*23*
369:*17* 378:*12*
388:*17* 398:*20* 399:*4*
**demotions** 401:*3*
**denial** 239:*10, 12*
322:*7, 17* 335:*10*
336:*11* 346:*6* 354:*15*
367:*23* 368:*17*
**denied** 170:*20* 324:*9*
368:*1* 389:*1, 18*
**denies** 319:*18*
**Denise** 136:*8, 14*
**deny** 324:*8* 350:*5*
351:*4, 10* 353:*16*
390:*8*
**denying** 350:*9*
389:*23*
**DEPARTMENT** 2:*7*
9:*8, 10* 31:*12, 18*
32:*10* 47:*7* 62:*8, 9*
71:*8* 130:*16* 131:*3,
22* 148:*17, 24* 152:*8*
154:*22* 171:*15*
175:*12* 176:*5* 183:*11*
195:*4* 205:*9* 273:*16*
274:*10* 364:*17*
**departments** 62:*3, 11,
18* 255:*13*
**depend** 312:*13*
**depending** 87:*16*
**depends** 312:*12*
**deponent** 306:*13*
308:*16*
**DEPOSITION** 1:*18*
8:*14* 10:*17* 11:*13*

12:*13* 13:*22* 15:*2*
45:*17* 305:*8* 306:*1*
308:*13* 311:*15*
385:*22* 403:*22*
**depositions** 383:*6*
**deputy** 123:*6* 127:*24*
290:*8, 11* 369:*10*
371:*5* 372:*15* 380:*19*
401:*7, 11*
**DEREK** 2:*2* 9:*1*
**Derrick** 9:*5*
**described** 308:*14*
**describing** 36:*14*
149:*19*
**DESCRIPTION** 4:*10*
41:*21* 42:*9, 18* 43:*17*
44:*8* 269:*8, 14*
270:*21* 271:*3* 287:*7,
12* 300:*21* 301:*2*
302:*21* 304:*1, 14, 19*
308:*10* 326:*2*
**descriptions** 287:*10,
16*
**designate** 182:*21*
**designated** 183:*2*
**Desiree** 366:*12*
**desk** 145:*24*
**despite** 225:*16*
335:*20* 336:*9*
**destroyed** 226:*9*
247:*4, 15*
**detailed** 395:*10*
**detector** 233:*18, 21*
**determination** 98:*18,
22* 106:*17* 160:*18, 19*
161:*18* 216:*17*
299:*13* 300:*1* 312:*23*
313:*2, 12* 334:*17*
391:*24*
**determine** 33:*17*
37:*8* 96:*22* 98:*12*
128:*6* 131:*12* 178:*9*
190:*18* 211:*7* 212:*3,
7* 245:*8* 283:*14*
284:*7, 13* 312:*9*
**determined** 20:*2*
107:*9* 245:*13* 284:*23*
315:*13* 370:*21*
**determining** 278:*19*

329:*15*
**detrimental** 376:*20*
**Detweiler** 249:*18, 20*
252:*15*
**Detweiler's** 252:*7*
**Diane** 252:*18*
**DICKIE** 3:*1*
**die** 398:*13*
**diem** 16:*20* 250:*21,
23* 251:*16, 22* 252:*9*
279:*19*
**diems** 124:*18, 23*
250:*18*
**difference** 126:*10*
401:*14*
**different** 30:*3, 9*
31:*4* 32:*4* 45:*17*
48:*11* 62:*3, 14* 78:*8*
110:*13* 117:*19* 118:*2,
4* 120:*2, 3* 128:*9*
141:*23* 143:*2* 187:*3*
230:*17* 241:*17* 285:*1*
287:*22* 307:*22*
337:*12* 371:*23* 389:*9*
**difficult** 226:*13*
371:*22*
**difficulty** 371:*16, 20*
**direct** 26:*14* 107:*3,
19* 177:*10* 193:*23*
194:*11* 200:*8* 203:*11*
204:*11, 14* 257:*16*
322:*21* 323:*2* 364:*8*
**directed** 171:*12*
193:*8* 195:*22* 216:*14*
290:*21* 378:*18* 379:*1*
**directing** 200:*4*
**DIRECTION** 7:*1*
194:*10* 202:*15* 211:*7*
295:*2* 331:*4* 399:*22*
**directive** 271:*4, 5*
**directly** 30:*12, 16*
47:*12* 55:*24* 106:*22*
122:*8* 160:*16* 169:*7*
281:*18* 291:*18*
300:*16* 315:*4* 359:*17*
360:*1, 4* 364:*18*
**director** 17:*17* 19:*19*
21:*4* 26:*6* 28:*6* 39:*9,
15* 41:*6* 42:*9* 43:*18,
23* 53:*9, 14* 77:*13*

80:*10* 92:*6, 22* 93:*2,
10, 11, 20* 94:*10* 98:*9,
16* 101:*8* 102:*12, 19*
103:*4, 9* 107:*18, 19*
122:*2, 4, 23* 123:*4*
130:*15* 134:*22* 135:*2,
6, 7* 186:*13, 14*
227:*15* 290:*10, 12*
330:*23* 362:*6* 369:*5,
9* 370:*17* 380:*3, 17*
400:*10*
**disagree** 306:*13*
315:*3*
**disagreement** 235:*22*
**disapproved** 17:*20*
**disbanded** 403:*6*
**disciplinary** 31:*8, 15,
24* 32:*6, 11* 335:*20*
336:*10, 12*
**disciplined** 226:*22*
229:*14* 335:*12*
**disciplining** 226:*18*
**disclosing** 177:*17*
**discovery** 310:*15*
**discretion** 92:*9, 14,
21* 94:*20* 100:*11*
103:*12* 107:*12, 13*
202:*6, 22* 203:*16*
204:*8* 205:*9*
**discretionary** 195:*14*
**discuss** 52:*2* 56:*15*
58:*18* 59:*16, 24* 91:*5*
160:*15* 168:*14*
208:*16, 18* 209:*2, 3,
23* 210:*2, 9* 215:*22*
221:*9, 23* 273:*3*
278:*6* 288:*2* 297:*1*
315:*1, 2* 364:*18, 20*
387:*9* 388:*14* 391:*11,
14, 23* 394:*13* 397:*6*
400:*14, 15*
**discussed** 33:*16* 60:*3*
76:*21* 88:*21* 91:*12,
18* 96:*9, 10* 97:*5*
148:*9* 168:*2* 188:*10*
195:*7* 222:*23* 226:*5*
240:*7* 269:*2* 275:*11*
279:*7* 282:*2, 3* 334:*7*
350:*1* 367:*19* 392:*11*
402:*7*

discussing 88:3 91:4
272:3 278:7 382:8
395:9
discussion 51:15
83:17 84:3, 14, 15
85:9, 10 88:24 89:2,
3 91:20 107:15
115:9 136:23 158:3
163:20, 22 171:7
222:9, 16, 19, 21
239:20 248:1 272:5
278:14 286:14, 17, 22
289:3 291:5, 17
308:17 336:24
350:23 354:23 355:3
358:13 376:1 378:4
381:10 396:20 397:8
discussions 20:5, 12
82:15 83:3 84:24
95:16 99:7 112:15
147:6 159:19 162:4
168:3, 6, 10 170:10
182:10 189:8 210:8
211:4 215:23, 24
216:10 219:10 222:4
229:24 232:5 272:17,
19, 24 273:9 275:12,
20 279:13, 15 282:7,
24 291:1, 3, 7, 10
350:3 370:2, 19
377:17 378:8, 18
382:9, 12 389:24
391:2 398:18
disingenuous 202:20
displayed 84:20
dispute 307:13
disrupted 334:6
disruption 237:2
disruptions 375:11
dissatisfaction 151:1,
4
dissented 109:24
110:7, 8
dissenting 110:14, 15
dissents 109:20
distancing 81:1
distinction 130:12
303:7

DISTRICT 1:2, 19
2:9 30:23 31:2, 8
35:17
DIVISION 2:7 56:5
384:10 387:9
divulge 291:19
doc 402:15
DOCKET 1:3 34:5
36:17 310:20 311:13,
14
doctor 315:11 327:1,
11 333:3 340:2, 5, 10
343:17 346:11 360:1,
8
doctors 359:24
doctor's 299:18
344:24 345:8, 24
document 15:16
24:6 26:3 28:3
29:11, 22 30:18
32:20 38:10 42:6
43:7, 9, 12, 19 44:22
65:11 66:10 67:3, 24
68:9, 10 72:19 74:7,
8 78:24 88:5 106:1,
6 115:7, 12, 14, 18
121:13 129:21 130:3,
8 136:1 139:14
140:15 150:12, 19
166:10 167:7 184:21
199:3, 8 276:17
277:7, 8 278:22
295:18, 20 296:4
301:22 302:13, 17
306:3, 19 307:1, 7, 8,
24 308:5, 8 309:4
319:15 330:7 339:11,
16 342:4 343:13
345:4 346:14 348:23
359:17 364:12 367:2,
4 390:21 402:16
documentation 169:5
174:11 297:1, 15, 16,
18 299:18 314:23
326:9 327:1, 11
330:18 341:17
344:22 347:2 353:1
documenting 260:12
DOCUMENTS 7:11
25:18 29:5 46:6

78:15 81:16 86:17
153:17 169:11
205:24 278:20
330:11 359:23
DOE 1:2 3:6, 7
5:15, 16, 17 8:16, 24
9:2, 3, 4 13:23 14:1,
4, 5, 6, 7, 10, 11, 13, 14
50:21 51:4, 21 52:6,
7 59:2 60:21 73:5
75:24 76:22 77:8, 18
79:22 90:23, 24 94:5,
8 114:5 122:18, 19,
22 123:3, 8, 12, 15
124:1, 2, 11, 12
126:18 134:15, 16
142:8 143:8, 9 145:1,
4, 6, 11, 20 146:7, 8,
10, 11, 21 147:2, 13,
22, 23 148:20 150:18
151:2, 19 152:13
153:8, 21 156:11, 16,
22 157:6, 10, 11, 12,
17, 20, 22 158:15, 22
160:8, 9 161:22, 23
164:23, 24 166:11, 22
167:10 168:12, 14, 22
169:17, 23 170:22
171:3, 4, 6, 12, 13, 21,
23, 24 172:1, 5, 15, 16,
21 173:9, 14 176:11
177:23, 24 178:3
182:19, 20, 23, 24
183:16, 19 184:1, 2,
10, 23, 24 185:10
187:2, 9 188:8 190:6,
8 192:11, 22 193:13
194:2, 6, 17 195:11,
17 196:3, 6, 7, 10, 13,
15, 16, 23 197:2, 6, 8,
9, 10 198:14, 18, 21
199:4, 19, 23 200:7,
18 202:4, 5, 11, 21
204:7 205:18 206:2
207:18, 21, 22 208:11
209:17, 21 210:20
215:10, 14 217:12
219:11 220:14 221:8,
9, 17, 18 223:6, 10, 17,
18 224:3, 19 225:20

226:8, 9, 12, 14, 19, 21
227:2, 11 228:11, 23,
24 229:10, 14, 18, 20
230:14, 23, 24 232:12,
24 234:10, 20 235:11,
16 236:2, 3, 12, 20, 23
237:8, 14, 21, 24
238:7, 15 239:5, 9, 23
240:2, 7, 18, 24
241:17 242:19 245:1,
9, 14, 16, 20 246:1, 11,
12, 13, 20, 22 247:3, 4,
10, 15, 19, 22 248:1,
19, 20 249:7, 11
250:3 251:23 253:1,
10, 11 254:15, 19, 24
255:1 256:2, 18, 23
257:3, 14, 21 259:13,
19 260:3, 7, 17
261:16 262:4, 11, 14,
16, 20, 23 263:1, 6
264:21, 24 265:2, 5
266:11, 16, 17 267:4,
7, 9, 13, 14, 15 268:22
269:5 272:16 280:21
282:11 286:18, 23
287:1, 2 288:1, 11, 12,
18, 20, 23, 24 289:20
291:7, 13, 22, 23
292:1 294:3 295:8
296:12, 24 297:20, 23
298:2, 4, 5, 7, 13, 14,
15, 19, 21 299:1, 12,
24 300:21 312:18
314:6, 9, 18 315:9, 17,
24 316:12, 18, 21
317:24 318:22, 24
319:1, 2, 18 320:20
321:10 322:4, 15, 20,
24 324:10, 11 325:7,
14, 20 326:1, 2, 17, 18
327:7, 13, 14 328:15
329:2, 7 331:14, 17,
22, 24 332:4, 24
333:15 334:2, 3, 23
335:2 336:1, 12, 19
338:8 340:4 341:5, 7
344:16 345:7, 14, 24
346:16, 17, 19, 21
347:1, 2, 3, 23 348:4,

7 349:10 350:4, 16,
18 351:18, 21 352:11,
22 353:14 354:15
356:3 357:17, 18, 20,
21, 24 358:6, 10, 15,
17 360:12, 13, 17, 18,
19 361:1 362:18
363:3, 17, 20, 23
364:3, 6, 8, 19 365:2,
8, 15 366:19 369:1, 4,
8, 19, 20 370:8, 12, 16,
21, 23 371:4, 10, 13
375:17, 24 376:8, 10,
19 378:5, 11, 22
379:11, 17, 20, 23
380:6, 8, 15, 16, 18
387:8, 13, 14, 19
388:4, 5, 6, 11, 15, 17,
24 389:6, 19 390:21,
22 391:1, 8 392:3, 4
393:23 394:8 395:7,
18, 21 396:5, 16, 22
397:6, 15, 18, 20, 22
398:9, 10, 19 399:4
400:9, 13, 22 403:5
**doing** 25:4, 9 54:8,
14 55:3, 6, 10 57:14
61:5 138:14 179:5
234:12 241:4 245:1
267:7, 10, 18 268:22
301:4, 6, 9 316:15
325:14 379:13
**door** 144:14 145:5, 7,
16, 21, 22 146:1
187:4 188:18 189:22
205:19 206:3, 6, 11,
19
**Doreen** 17:15 20:10,
23 21:13 22:2 26:6
28:6 52:20 71:3, 13,
14 74:20 85:12
87:20 88:14 154:4
171:7, 11 183:4
186:14 188:7 191:17
196:6 209:14, 20
210:17 283:1 362:16
**double** 65:3
**Dr** 331:6 366:4, 16
**draft** 174:7, 9
185:13 271:23 272:2

275:7, 16 276:4
286:13 323:16
363:16
**drafted** 68:8, 13
185:5 231:4 318:5, 8,
17, 18
**drafting** 185:3, 6
198:15 231:9 282:18
**drafts** 287:15
**draw** 347:16
**drop-dead** 254:6, 11
**drug** 27:10 29:7, 10
145:9, 12 158:6
319:11
**due** 76:15 81:1
125:11 225:8 237:2
254:22 255:19
310:16
**duly** 10:4
**dumb** 128:18
**dumbed-down** 129:2
**duties** 42:14 43:22
44:12, 17 46:3, 5
54:1, 2 129:4 200:19
201:1 214:3 232:13
237:11 246:12, 14
255:23 256:19
264:22, 24 265:17, 20,
22 286:23 287:3, 18
299:2, 12 300:1
312:15 313:7, 8, 12
322:7, 16, 18 326:2,
12, 16 327:14 329:7
337:22
**duty** 112:22, 23
113:2, 6 116:11
265:3 288:13 312:16,
18, 22 313:4 325:3
**duty/subpoenas**
111:17
**DWK** 17:10

< E >
**earlier** 12:13 69:19
81:10 90:21 95:13
108:14 142:7 154:18
242:12 328:9 364:3
372:12 382:8
**early** 52:18 53:3
193:9, 10 195:22

207:20, 23 246:20
295:5
**EEO** 88:23 89:8
90:13 91:1, 19 92:23
93:3 97:23 98:1, 10,
13 100:10 103:22
104:4, 8 107:5, 8, 10
118:1 122:4
**EEOC** 77:22 114:7
192:4 392:13, 17, 23
396:16
**EEO-related** 95:22
**effect** 11:7 252:14
277:10 359:15
**effective** 293:20
320:12
**efficient** 222:10
**efficiently** 380:9
**effort** 142:23
**efforts** 152:23, 24
153:5
**eight** 124:9, 10, 16
**either** 49:22 80:20
84:24 89:5 94:22
95:20 98:5 99:2
103:17 133:7 140:24
145:16 146:7 157:21
172:22 223:18 246:2
247:19 307:10
319:24 327:2 332:16
373:13 387:15
389:15 391:3, 5
**Elaine** 21:15 37:22
158:5
**elected** 33:5 40:16,
22 41:2, 7 72:2
73:20, 24 74:1
131:23 134:4 229:22
230:3
**election** 144:16, 19
145:8
**elevator** 189:13
**eligible** 317:4
**eliminate** 289:6
**eliminating** 288:24
**elimination** 290:7
**else's** 257:6 371:22
**e-mail** 56:1, 2 72:11,
13 74:9 75:24 76:7
81:6 114:2 119:19

120:6 121:22 136:3,
6 150:12, 15, 16, 17,
18 151:17, 19 153:21
154:4 156:5, 9, 11, 12,
16 157:6, 10 167:21
168:12 173:16
174:14, 15, 17 175:4
181:17 182:5, 7, 8, 16
184:11, 19 187:12
190:1 192:12, 15
193:5, 6, 7, 17 195:21
196:10 197:9, 17
198:15 202:16 203:4,
5, 6 208:11, 15
209:21 217:4, 8, 19
219:5 221:14 234:20
236:20 242:19
246:19 247:21
259:13 261:12, 14, 15,
20, 21, 22 262:12
263:14 267:8 271:21
275:15 298:13, 17
304:1 307:7 313:23
316:9 322:2, 9, 10
323:16 341:3, 4, 15
343:2 347:23 348:4,
14, 17, 20 350:15, 19
351:10, 18 352:9
355:8, 11, 19 358:1, 4,
6, 11 361:18 363:12,
16 365:14 366:3, 24
368:12 387:5, 7, 18
394:8 395:5, 6
397:15 398:8
**e-mailed** 81:2
156:22 302:15
**e-mails** 55:8, 12, 13,
15, 21 75:17 77:3
116:24 208:7 235:3
240:14, 17 297:9
352:6 354:10 390:19
**embankment** 207:3
232:24
**employed** 40:20
88:14 122:20, 22
124:10 207:14
274:22 397:4
**employee** 28:15
42:17 50:20 62:15
79:7 80:23 97:24

98:*8, 15*  101:*4*
102:*11*  105:*6*  106:*2,
9, 13, 24*  113:*13*
117:*22, 23*  121:*18*
122:*1, 12, 15*  138:*6, 9*
140:*3*  173:*21, 22*
174:*4, 12, 19*  175:*3, 7,
14*  194:*3, 6*  224:*12*
230:*4, 8*  251:*16*
254:*1*  279:*22*  358:*23*
359:*10, 16*  364:*14*
365:*7*  375:*20*  376:*2,
3, 6*  389:*5, 12*  393:*3*
396:*10*
**employees**  40:*14*
47:*3, 8, 16*  48:*18*
62:2  71:*10, 19, 23*
80:*8, 14*  86:*1*  101:*16*
104:*24*  112:*22, 24*
119:*15, 17*  123:*20*
125:*1, 8*  126:2
127:*14, 18*  135:*11*
148:*8*  163:*11*  173:*6*
175:*1, 13*  185:*17*
186:*18*  189:*4, 5, 16,
19*  190:*13*  191:*1*
192:*17, 23*  193:*8, 18,
24*  194:*10, 12*  195:*4,
13, 21, 23*  200:*5, 9, 13,
20*  201:*7, 14, 15, 16*
202:*7, 23*  203:*11*
204:*9, 11, 14, 16*
205:*10*  206:*3*  240:*10*
249:*13*  250:*8, 23*
251:*22*  252:*4*  253:*17,
23*  254:*22*  255:*1, 5, 9,
11, 23*  263:*7*  322:*22*
324:*18*  359:*9*  391:*14*
**employee's**  48:*3*
202:*1*  312:*8*
**employer**  358:*23*
364:*13, 15*
**employers**  48:2
359:*8*
**employment**  14:*21*
16:*13*  20:6  23:*12*
24:*13, 22*  25:*17*
27:*12*  28:*18*  30:*4, 6*
33:*15*  37:*24*  40:*10,
20*  52:*18, 20*  53:*4, 16*

55:*14, 19*  57:*14*  58:2
115:*21*  120:*21*
122:*18*  125:*6, 7, 9*
142:*7, 13*  143:*18*
159:*9*  192:*6*  199:*8*
206:*24*  207:*6, 9, 13,
20, 23*  218:*9, 11, 21*
231:*16, 19, 24*  233:*4*
234:*3*  235:*20*  242:*3*
272:*23*  274:*1*  281:*7*
285:*21*  292:*14*  295:*6*
334:*20*  372:*3*  381:*4*
**enacted**  116:*11*
**encountered**  190:*13*
197:*11*
**ended**  54:*12, 13*
55:*10*  180:*13*
**ends**  219:*21*
**engage**  314:*5, 9*
**engaged**  365:*6*
**engaging**  93:*12*
364:*14*
**ensure**  46:7  106:*9*
287:*18*  314:*7*
**ensuring**  266:*12*
**enter**  165:*9*  188:*15*
189:*4, 9, 12, 14, 22*
205:*20*  285:*6, 23*
286:*9*  328:*12, 19*
336:*6*
**entered**  187:*3*  189:*6*
206:*19*  213:*13*
233:*17, 20*  285:*18*
334:*22*
**entering**  163:*18*
186:*19*  190:*14*
**entire**  24:*22*  190:*22*
**entirety**  9:*21*
**entities**  330:*12*
**entrance**  163:*10, 11*
165:*9*  185:*17*  186:*19*
189:*9, 11, 12, 16*
190:*15*  193:2
**entrances**  188:*22*
**environment**  77:*19*
231:*19*  232:*6, 19*
240:*8*  328:*23, 24*
333:*12*
**Equalization**  211:*18*
223:*7*

**equipment**  148:*22*
236:*7*  237:*10*  256:*18*
337:*6, 12*
**error**  223:*4*
**escorted**  164:*2, 10*
188:*19*  191:*23*
206:*14, 21*
**ESQUIRE**  2:*2, 8, 12,
16, 20*  3:*1*  169:*22*
170:2  283:*6*
**essential**  42:*13*
44:*12*  46:*3*  320:*12,
14*  321:*16*  333:*8*
**essentially**  113:*3*
130:*3*  290:*13*  352:*8*
**established**  190:*4*
328:*8*  372:*11*
**estate**  123:*9*  213:*2, 4,
15*  214:2  225:*16*
244:*7*  252:*11*  286:*15*
288:*14*  289:*1*  320:*17*
**et**  1:*2, 4*  8:*16, 17*
**evaluate**  291:*6*
312:*19*  370:*20*
**Evaluators**  273:*21*
**event**  92:*21*  102:*1*
348:*22*  374:*21*
**eventually**  164:*6*
238:*20*  351:*6*  387:*9*
**Everest**  8:*11*
**everybody**  75:*6*
107:*22*  120:*6*  277:*23*
**evidence**  191:*5*
384:*12, 17*  385:*4, 16*
386:*12*
**exact**  18:*20*  19:*13*
23:*16*  37:*14*  51:*15*
61:*11*  90:*22*  159:*8*
187:*9*  279:*19*  280:*19*
293:*3*
**exactly**  19:*20*  20:*21,
22*  22:*19*  37:*13*  41:*3*
56:*13*  61:2  88:*16*
113:*24*  120:*9, 14*
123:*21*  124:*7*  126:*5*
142:*4, 19*  146:*12*
155:*3*  164:*14*  169:*5,
12*  187:*18*  191:*10*
192:*7*  211:*7, 10*
213:*20, 22*  252:*14*

256:*6*  260:*22*  278:*7*
295:*23*  302:*12*
358:*13*  388:2  395:*23*
396:*7*  402:*21*
**exam**  27:*11*  371:*21*
**Examination**  10:*7*
**examined**  10:*5*
**example**  117:*21, 24*
**Excellent**  312:2
**exchange**  307:*16*
308:*15*
**exclude**  365:*1*
**excluded**  365:*6*
**excuse**  95:*1*  268:*13*
370:*22*
**execution**  27:*12*
**executive**  18:*24*
111:2  199:*18, 19*
200:*8*  402:*12, 20*
**exempt**  16:*24*  26:*18*
27:*3, 4*  194:*3, 6*
199:*23*  212:*5*  263:*6*
**exemption**  199:*19*
200:*8*
**exemptions**  243:*7*
**EXHIBIT**  4:*10*  15:*6,
10*  23:*22*  27:*21*
34:*15*  38:*3*  45:*14*
66:*19*  104:*14*  108:*11*
111:*8, 14*  150:*5*
151:*11*  153:*19*
166:*20*  184:*24*
198:*21*  261:*6*  271:*15*
353:*7*
**Exhibit-100**  5:*1*
75:*12*
**Exhibit-101**  5:2
78:*20*
**Exhibit-102**  5:*3*
79:*18*
**Exhibit-103**  5:*4*
86:*12*
**Exhibit-104**  5:*5*
86:*21*
**Exhibit-105**  5:*6*
100:*3*
**Exhibit-106**  5:*7*
111:*10*
**Exhibit-107**  5:*8*
116:*20*

**Exhibit-108** 5:9 135:20

**Exhibit-109** 5:10 139:8, 10

**Exhibit-110** 5:11 141:4

**Exhibit-111** 5:12 150:7

**Exhibit-112** 5:13 151:13

**Exhibit-113** 5:14 155:23  156:1

**Exhibit-114** 5:15 166:22  167:13

**Exhibit-115** 5:16 183:19  202:14

**Exhibit-116** 5:17 198:19

**Exhibit-117** 5:18 208:3

**Exhibit-118** 5:19 216:22, 24  242:5

**Exhibit-119** 5:20 261:8

**Exhibit-120** 5:21 271:17

**Exhibit-121** 5:22 293:11

**Exhibit-122** 5:23 295:14  342:13 343:12  344:1, 13

**Exhibit-123** 5:24 313:19

**Exhibit-124** 6:1 316:3, 5

**Exhibit-125** 6:2 317:18

**Exhibit-126** 6:3 321:22

**Exhibit-127** 6:4 329:24  330:2  342:15 343:5, 14

**Exhibit-128** 6:5 338:14

**Exhibit-129** 6:6 340:23

**Exhibit-130** 6:7 347:12  349:5  350:14

**Exhibit-131** 6:8 352:1

**Exhibit-132** 6:9 354:4

**Exhibit-133** 6:10 356:7, 9

**Exhibit-134** 6:11 361:14

**Exhibit-135** 6:12 363:8

**Exhibit-136** 6:13 365:19

**Exhibit-137** 6:14 381:19

**Exhibit-138** 6:15 390:14

**Exhibit-139** 6:16 394:22

**Exhibit-15** 203:1

**Exhibit-43** 6:19 45:18

**Exhibit-86** 4:11

**Exhibit-87** 4:12 23:24

**Exhibit-88** 4:13 25:23  28:17

**Exhibit-89** 4:14 27:23

**Exhibit-90** 4:15 29:15, 17

**Exhibit-91** 4:16 32:14, 16

**Exhibit-92** 4:17  38:6 63:24

**Exhibit-93** 4:18 41:24  42:2

**Exhibit-94** 4:19 42:24  43:2  46:3

**Exhibit-95** 4:20 61:19

**Exhibit-96** 4:21  63:2 70:12, 18

**Exhibit-97** 4:22  65:4, 7

**Exhibit-98** 4:23 66:22  68:13

**Exhibit-99** 4:24  72:7

**EXHIBITS** 4:8  6:18 15:2  26:23  166:10 169:2

**exist** 129:24  210:7

228:10

**existed** 25:14  45:8

**existing** 35:16  110:20

**exists** 179:23  280:15

**exited** 233:19

**exiting** 186:19

**expecting** 344:14

**experience** 274:12 362:11

**experiencing** 157:18

**expertise** 274:15

**explain** 51:23  52:2 136:18  217:22

**explained** 225:15

**extended** 51:18

**extending** 240:1

**extensively** 300:17

**extent** 50:12  56:23 99:10  176:13  277:15 300:11, 24  308:4

**external** 233:3

**extra** 362:19

**extreme** 334:5

**eyes** 362:19

**< F >**

**facets** 118:3

**fact** 38:12  63:17 76:22  77:6  100:12, 21  104:8  105:18 109:1  126:16  143:8 154:4  175:18  200:6, 7  202:20  220:3 247:2  254:4  260:15 266:21  267:4, 7 294:6  307:5  309:2 314:9  332:6, 19 333:1, 5  335:24 344:9  345:5, 10, 20 346:2  360:5  362:5 363:15  364:6  367:9 369:1  371:14  396:14 403:4

**facts** 58:9  87:16, 17

**factual** 311:3

**failed** 59:9  250:3 253:1  257:14  262:13 292:1  294:3  335:2

**failure** 60:23  219:3 251:24  257:6

**fair** 43:21  47:22 130:12  133:16 144:23  150:19, 22 219:9  281:9  313:14 358:14  374:21

**falling** 153:15

**familiar** 47:22 139:18  141:23 144:22  182:9  283:7 293:5  370:5  371:18 380:12

**family** 31:5  212:5 243:6  387:14  388:1 398:11, 12, 20

**far** 91:19  173:23 188:17  205:11  214:9 278:11, 14  291:10 295:2  351:7  372:4

**fax** 295:21  296:6, 7 332:14  338:21 344:10  356:21  357:6

**faxed** 345:4

**faxes** 359:24

**feasible** 312:10

**February** 63:14 67:11, 21  68:6, 19 70:13  74:13  76:2, 8 88:3  89:7  91:23 146:16  151:23 154:12, 16  192:12 212:19  213:24  221:7 223:18  224:21, 24 226:18  229:13 246:18  249:2  254:4, 7  257:21  258:4, 13 261:16, 21  263:15, 19 264:6, 8  268:12, 13, 15, 24  284:16, 19 285:5, 22  295:6 298:4, 24  299:11, 23 316:18  317:7, 13 318:3  322:5, 9 332:14  333:24  335:1 347:23  348:23  351:9, 17  352:17  353:16 354:12  355:8  378:5 394:17  395:11, 13 397:7

**February/March** 79:4

fed 213:*10*

**Federooff** 155:*12*, *17*

**feel** 58:*14* 220:*1*
221:*1* 232:*18* 236:22
271:*11* 299:*11*, 22
309:*20* 310:*12* 311:*5*,
*16* 312:*17* 362:*16*
389:2, *4*

**feeling** 138:*14* 398:*19*

**feelings** 59:*16* 60:6

**felt** 58:*16* 60:*10*, *16*

**female** 249:*23*, *24*

**field** 123:8, *13* 124:7
125:*13*, *20* 126:20, *22*
127:*20* 128:*1*, *20*
129:5, 6, *10* 131:4
141:*17*, *19*, *21* 208:*19*
210:2, 6, *13* 213:*19*,
*21* 222:2 234:*12*, *17*
238:*3* 241:*3* 242:*18*,
*20*, *23* 243:8, *13*
244:22 252:*13* 258:6
288:6, 7 299:6
322:*16* 329:8 333:8,
*16* 348:*11* 401:8, *10*

**field/home** 139:*4*

**fifth** 131:5

**figure** 79:*11* 96:*1*
99:*13* 158:*18* 160:8

**file** 23:*19* 122:7
171:*13* 224:*3*, *15*, *17*
319:*1*, *3*, 5, 6, 7, 8
339:*16*

**filed** 115:*3* 142:22
168:*24* 169:*11*
212:*18* 215:*1* 223:7
316:*13* 392:*14*

**files** 25:*13*

**filings** 169:*15* 259:8

**fill** 23:*12* 56:*16*
140:*13*

**filled** 30:*14* 125:*23*
129:*23* 134:*21*

**fills** 132:*19*

**finally** 32:9

**finance** 131:*17*

**find** 87:*13* 106:*4*
197:*15*, *19* 219:7
245:5 316:*12*, *16*

381:*12*

**finding** 386:8

**fine** 310:*19* 311:*1*, 9

**finish** 36:2 141:22
244:*4*, 9 259:*3* 310:*3*

**first** 10:*4* 21:*21*
22:*13* 27:8 37:*24*
43:8 44:*11* 49:*10*, *23*
50:8, *19*, *20* 51:7
53:*15*, 22 54:*16* 55:5
56:*13* 57:7 67:*18*
72:*13* 86:*19* 100:*10*
111:*21* 124:8 140:2
142:*13* 146:6, 9, *13*
147:*15* 150:*15* 152:*4*,
22 153:*3*, 22 156:9,
*11*, *12*, *17* 159:*23*
160:*1* 164:6 169:6,
*14*, *16* 171:6 180:*23*
184:*24* 190:*4* 192:6
200:*17* 211:*11*, *13*
215:*19* 217:5 221:6
223:*1*, 2 246:5
261:*14* 263:*12*
272:22 277:6, 7
281:7 287:8 296:*11*
341:*4* 356:*13* 365:*23*

**five** 123:22 124:9
190:5, *11* 197:2
262:*19*

**flip** 199:2

**flushed** 87:*21*

**fly** 166:*14*

**flyers** 120:*4*

**FMLA** 316:*13*, 22
317:*1*, 5 319:*10*

**focus** 53:*20* 199:*1*
267:*11* 380:*12*

**focused** 219:*3* 242:6,
9 253:*21*

**folks** 311:*14*

**follow** 121:*17* 178:8
181:2 194:*13* 261:*24*
351:*14*

**followed** 184:*3*
196:*18*, 22 198:2
262:*16* 271:5 328:5

**following** 27:*10* 84:*3*
94:4 181:*24* 182:*1*

196:22 225:9 278:*13*
368:6 398:7

**follows** 10:5

**follow-up** 306:*18*

**force** 11:7

**foregoing** 404:5

**forgive** 168:*23* 308:7

**forgot** 26:22

**form** 9:24 15:*19*
16:23 17:*4* 18:2
24:*18*, *21* 25:5 30:9
34:8, *22* 37:6, 8 39:6,
8, *12* 41:*15* 42:*21*
59:*13* 63:6 70:*17*
81:*18*, 20, *24* 82:2, *3*,
*10* 98:2 104:*23*
105:*3*, 7, *17* 131:9, *10*
133:5 136:9 139:*17*,
*18* 140:7, *13* 141:8
194:*19* 198:6 199:9,
*11*, *18* 201:*10* 203:24
211:*23* 214:5 239:*16*
240:*21* 241:*20*
243:*15* 244:*10* 248:9
265:7 266:5, *19*
269:*23* 287:*12* 295:8
308:*1* 316:20 319:*21*
325:*11* 328:*1* 329:*19*
332:9, *15* 334:*11*
357:*13* 359:*18*
360:*20* 368:*4* 376:*13*
377:*1*, *11*, *24* 379:7,
*14* 380:*23* 381:8
392:*20* 394:2 398:*14*,
22

**formal** 279:*14*

**Formalized** 174:*23*

**formally** 281:22

**format** 8:8

**formatted** 150:*15*

**former** 125:*1* 249:*12*
250:8 253:*17*

**forms** 139:22 359:*24*

**forth** 277:*17* 308:*15*

**forward** 55:*15*, *18*
82:7 115:*10* 273:2
278:*19* 279:*4* 282:*4*,
*16* 283:2 311:*1*, *18*

**forwarded** 55:*13*, 24

56:*3* 156:*11* 196:*3*, *4*

**forwards** 157:*10*

**found** 45:22 317:*4*
393:*21* 402:*14*

**Four** 8:*24* 14:6, *11*
53:22 54:2, *3*, *10*
55:5 123:22 124:9
131:*4* 357:8

**fourish** 53:*15*

**FOX** 2:8 8:9 9:7
167:8, *12*

**frame** 55:9 126:*4*
146:*18* 212:*19*, 20
269:*4* 280:*23* 353:*19*
371:2 372:9

**fraud** 118:*4*

**free** 309:*20* 310:*12*
311:5

**fresh** 61:*24*

**Friday** 76:2 136:7, 9,
*15* 139:*4* 140:*23*
141:*18* 156:*17*
165:*15* 181:*24* 395:*15*

**friendly** 157:*12*

**front** 27:7 45:*16*
88:*5* 100:8 108:*10*
353:6

**Fucci** 37:22

**fulfill** 236:8

**full** 16:*19* 80:*12*
125:24 256:7 258:8
308:*12*

**full-sized** 338:*1*

**full-time** 26:*18*, *23*
234:*12*

**fully** 217:*24* 220:*1*,
*19* 237:5 263:*3*
264:*1*, *3* 353:22
377:*15*

**function** 132:*11*

**functions** 320:*12*, *14*
321:*16* 333:8

**funeral** 170:*19*
171:*1* 175:*19* 187:7,
*11*

**furlough** 256:*4*
262:*16*

**furloughed** 254:*21*
255:5, *8*, *11*, *12* 256:6
262:*14*

**further** 78:*6* 107:*15*
226:*12* 229:*24*
230:*24* 246:6, *10*
257:*13, 14* 278:*14*
279:*13* 306:*17* 311:*2*
314:*8* 350:*7, 11, 19,*
*24* 352:*12* 355:*6*
359:*14* 390:*18*
**future** 93:*16* 94:*11*

**< G >**
**Garrity** 316:*12*
317:*2, 11*
**Gary** 2:*23* 9:*12*
16:*6* 21:*14* 22:2
23:*5, 8* 26:*10* 33:*16*
56:9 76:*11* 78:5
112:*16* 117:7 155:2
184:*13* 188:*21, 22*
257:*16* 269:*22* 270:*3,*
*14* 283:*1* 323:*11*
**gathered** 58:*7*
**gathering** 307:*17*
**GEIGER** 2:*12* 8:*7*
9:*15* 304:*12* 305:*1*
384:*19, 24*
**general** 128:*5* 331:*4*
**generalize** 12:*20*
**generally** 43:*9*
128:*13* 209:*4* 359:*6,*
*7*
**general's** 114:*13*
**generates** 267:*9*
**George** 2:*15* 3:*7*
23:*8* 59:*1, 5* 74:*23*
207:*1*
**GERARD** 2:*12*
**Gerry** 9:*15*
**getting** 97:*4* 113:*1*
157:*3* 165:*2* 211:*3*
227:9 278:*18* 301:*15*
334:*13* 371:*17*
392:*23*
**ggeiger@newmanwilli**
**ams.com** 2:*14*
**Gilbert** 21:*15*
**Gilbert's** 158:*5*
**give** 12:*21* 77:*21*
79:*14* 235:6, *9*
258:*19* 273:*14* 279:2

307:*7, 24* 370:*1*
382:*14*
**given** 12:*13* 28:*14*
29:*3* 30:*10* 34:*10*
80:*9, 19* 84:*2* 130:*10*
138:*10* 150:*15*
176:*16, 23* 204:*19*
233:*11* 241:*9* 271:*4*
277:*11* 289:*5* 307:*4*
308:*13* 320:*12*
337:*23* 338:*1* 374:*4*
390:*7* 391:*15*
**gives** 348:*11*
**giving** 301:*22*
304:*15* 305:*2* 310:*10*
**Glen** 9:*19* 56:*20*
57:*6* 162:*3*
**Glenn** 2:*18* 277:*16*
282:*24*
**go** 10:*12* 28:*12, 15*
29:*6, 10* 31:*19* 34:*3*
37:*20* 43:*6* 47:*12*
49:*7* 56:*2* 58:*3*
59:*14* 61:*13* 78:*15*
80:*13* 83:*20* 98:*17,*
*21* 102:*15* 106:*20*
128:*6, 8, 10* 131:*5*
143:*15* 148:*24*
165:*23* 170:*23*
171:*13* 183:*10*
189:*17* 197:*3, 4*
198:*4, 12* 199:*16*
204:*1, 16* 206:*20*
211:*24* 214:*6* 230:*12*
232:*8* 239:*17* 243:*16*
244:*11* 253:*22* 265:*8*
266:*6, 20* 269:*7*
272:*1* 288:*24* 291:*12*
297:*1* 299:*6* 304:*8*
318:*7, 8* 319:*22*
329:*5, 11* 334:*12*
359:*10* 362:*24* 363:*2*
368:*5* 369:*21* 376:*14*
377:*2, 12, 18* 378:*1,*
*16* 379:*8, 15* 380:*24*
386:*16* 392:*9* 395:*1,*
*2*
**goes** 153:*8* 219:2
224:*18* 230:*21* 249:*6*
262:*23* 357:*4* 396:*9*

**going** 8:*6* 10:*12*
11:*12* 15:*9, 15* 23:*21*
29:*7, 15* 36:*6* 42:*23*
43:*6, 8* 50:*23* 53:*17*
56:*24* 57:*1* 59:*12*
60:*22, 24* 61:*13, 16*
62:*23* 64:*9* 65:*4*
66:*18, 19* 67:*20, 23*
72:*4* 73:*3* 75:*8, 10*
76:*9* 78:*15, 17* 86:*9,*
*15, 18* 88:*2* 95:*8*
99:*9, 23* 100:*1*
107:*21, 24* 111:*7*
113:*19* 116:*17*
126:*18, 20* 128:*20*
135:*17* 139:*8* 141:*2*
142:*24* 151:*10* 154:*1,*
*20* 155:*21, 22* 159:*17*
162:*6* 163:*22* 164:*8*
166:*2, 19* 167:*6, 17*
170:*18, 21* 171:*1*
177:*10, 12* 178:*10*
182:*4* 186:*24* 198:*5,*
*17, 19* 199:*1* 203:*23*
205:*16* 206:*20*
207:*24* 210:*11* 211:*7,*
*22* 216:*21* 232:*8*
233:*21* 239:*15*
240:*20* 241:*19* 260:*4*
261:*5* 268:*10* 269:*10*
272:*3* 276:*11* 277:*1*
282:*23* 283:*2* 293:*8*
300:*22* 302:*3* 304:*11*
313:*16* 315:*1* 322:*4,*
*5* 327:*24* 329:*8, 23*
334:*19* 342:*3* 347:*7,*
*15* 349:*4* 351:*22*
353:*5* 354:*1* 356:*5, 7*
359:*8* 361:*11* 362:*17*
365:*16* 368:*23*
369:*19, 20, 21* 371:*1*
375:*21* 376:*2* 378:*20*
381:*17, 24* 382:*19*
383:*6* 384:*11* 386:*14*
387:*2* 388:*14, 15, 18,*
*21, 22* 390:*11* 392:*22*
396:*11* 397:*14*
403:*12, 20*

**Good** 10:*10* 17:*24*
165:*23* 214:*1, 8*
362:*24* 396:*12*
**gotten** 84:*23*
**Govern** 213:*11*
234:*11* 242:*15, 17, 18*
**grace** 214:*16, 22*
225:*21* 226:*2* 254:*16*
372:*16, 18*
**grammatically** 275:*18*
**Grant** 2:*21* 320:*5, 7*
346:*3*
**granted** 320:*2*
**great** 222:*10, 12*
297:*5* 333:*18* 350:*3*
**grievance** 173:*21, 22,*
*23*
**Groody** 230:*10, 12*
**GROUP** 2:*2* 9:*1, 5*
**guess** 12:*22* 30:*8*
34:*19* 58:*20, 21*
63:*20* 71:*5* 73:*9*
78:*10* 97:*24* 130:*24*
133:*15* 171:*14* 204:*3*
228:*17* 277:*20* 278:*6*
280:*4* 299:*10* 322:*8*
342:*15* 386:*13* 400:*5*
402:*4*
**guidance** 259:*6, 14*
324:*5, 7* 328:*5, 6*
355:*6* 361:*9*
**Gulf** 2:*21*
**guys** 173:*24*

**< H >**
**Halcovage** 2:*15* 3:*7*
9:*16* 19:*14* 23:*3, 8*
51:*17, 22* 52:*23*
57:*18* 59:*2, 5* 72:*14,*
*24* 74:6, *12* 142:*24*
163:*8, 17, 22* 164:*2,*
*20* 165:*3, 8, 15*
170:*13* 171:*4, 21*
172:*11, 24* 175:*17*
178:*6* 180:*24* 181:*11,*
*19* 184:*3* 185:*18*
186:*24* 187:6, *15, 23*
188:*14* 189:*10*
190:*19* 191:*22* 192:*3*
196:6, *18* 197:*11*

Case 3:21-cv-00477-MCC   Document 280-1  CONFIDENTIAL  Filed 09/20/23   Page 303 of 342

Deposition of Heidi Zula Vol. I - Revised                    Jane Doe, et al. v. Schuylkill County Courthouse, et al.

205:*21*  206:*10*, *18*
207:*2*  229:*17*  230:*13*,
*16*, *20*  232:*23*  233:*12*,
*17*  235:*18*  236:*6*
248:*7*, *22*  328:*12*
329:*1*, *4*, *18*
**Halcovage's**  163:*3*
196:*11*  230:*1*  232:*17*
237:*3*
**HALL**  2:*16*
**hallway**  145:*8*
**hallways**  190:*21*
**hampered**  226:*15*
229:*20*  247:*16*
**hand**  85:*7*, *8*  198:*4*
302:*21*
**handed**  82:*18*, *19*, *20*
105:*10*  302:*15*
**handle**  24:*19*  77:*12*
**handled**  24:*23*  317:*2*
**handwritten**  223:*22*,
*24*
**hang**  120:*15*
**happen**  105:*22*
133:*2*  149:*20*  272:*3*
**happened**  22:*15*
33:*14*  149:*23*  155:*9*
163:*7*  193:*15*  272:*18*
307:*6*  309:*22*  397:*3*
**happens**  33:*8*  109:*13*
251:*19*  329:*1*  374:*11*
**happy**  147:*3*
**harassed**  59:*6*
**harassment**  59:*11*, *17*
61:*9*  62:*22*  64:*5*, *11*
65:*24*  66:*12*  69:*4*
77:*24*  79:*3*  81:*11*
119:*1*, *6*, *9*, *10*  197:*24*
226:*10*  240:*8*  247:*5*
291:*16*  324:*16*
**hard**  80:*22*  81:*5*
**Harrisburg**  1:*20*
8:*15*
**hated**  60:*17*
**Hatter**  238:*19*  292:*4*,
*6*, *22*  293:*1*, *17*, *23*
294:*6*, *9*, *15*, *19*  295:*1*
373:*13*
**head**  11:*18*  40:*7*
116:*15*  130:*16*  131:*3*,

*23*  195:*4*  273:*16*
364:*17*
**heads**  71:*8*  205:*9*
**health**  116:*2*, *7*, *11*
145:*9*, *12*  158:*6*
**hear**  239:*19*  381:*12*
398:*18*
**heard**  240:*15*  403:*10*
**hearing**  159:*15*
160:*15*
**hearings**  237:*20*
**Heather**  316:*12*
396:*17*, *21*
**HEIDI**  1:*18*  2:*23*
4:*5*  8:*18*  9:*12*  10:*4*
26:*6*  94:*5*  306:*12*
**Heinbach**  169:*21*
170:*2*  176:*11*, *16*, *23*
177:*19*  178:*8*  179:*12*
180:*8*, *23*  181:*2*, *4*, *15*,
*23*  196:*23*  275:*22*
277:*16*  297:*17*  300:*6*,
*7*, *8*, *16*, *20*  303:*5*, *6*
304:*2*, *13*, *19*  305:*2*
323:*19*  349:*17*
351:*14*  355:*5*  360:*23*
361:*3*, *9*  382:*11*, *14*
390:*1*
**Heinbach's**  286:*13*
**held**  30:*21*  31:*11*
52:*10*  70:*6*  80:*24*
82:*15*  84:*24*  85:*21*,
*24*  86:*1*, *3*  95:*16*
108:*2*  126:*4*  127:*14*
166:*4*  210:*8*  221:*7*,
*22*  275:*13*  277:*3*
279:*12*  282:*24*
305:*21*  309:*6*  382:*2*
396:*13*
**Helene**  239:*10*, *12*
250:*12*
**help**  323:*16*
**Hess**  22:*5*  73:*11*, *17*
236:*13*  238:*9*  402:*24*
**Hetherington**  73:*12*,
*13*, *14*  236:*13*  238:*9*
**hey**  77:*22*  174:*8*
230:*17*  288:*1*, *11*
340:*7*, *10*  345:*4*

379:*4*, *10*  381:*5*
398:*11*, *17*, *18*
**Highbock**  97:*17*
**highway**  170:*23*, *24*
**hire**  24:*10*, *19*, *23*
25:*3*, *9*, *18*  29:*5*  33:*2*
35:*2*, *5*, *8*  37:*1*, *11*
38:*1*  41:*1*  69:*21*
281:*19*
**hired**  49:*19*  64:*23*
123:*13*, *19*  126:*3*, *5*,
*14*, *22*  146:*20*  164:*19*
165:*19*  249:*13*  250:*8*
252:*8*  279:*18*, *20*, *21*
373:*2*, *13*
**hires**  24:*18*  25:*4*
39:*13*
**hiring**  132:*12*
286:*15*  372:*7*
**historical**  195:*16*
**historically**  127:*11*, *13*
**history**  218:*11*
320:*20*  368:*20*
**hit**  56:*3*  140:*2*
**hitting**  398:*6*
**Hobbs**  88:*22*  89:*7*,
*22*  90:*17*, *23*, *24*  92:*1*
**hold**  210:*15*  273:*21*
274:*1*, *7*, *9*  371:*11*, *14*
372:*12*  373:*3*, *5*, *11*
379:*20*  399:*1*  400:*9*,
*13*
**holding**  342:*12*
**home**  31:*6*  51:*17*
135:*12*  136:*9*, *10*, *14*,
*21*, *24*  137:*9*, *11*, *17*
138:*1*, *9*  140:*4*
141:*17*  142:*2*  143:*9*,
*12*, *15*  144:*2*  152:*18*
171:*1*  194:*18*  195:*5*,
*13*  197:*3*, *4*  201:*8*, *14*,
*15*, *17*, *22*  204:*16*
230:*18*  236:*4*, *9*
237:*11*, *15*, *17*  247:*20*
254:*17*  255:*14*, *19*, *24*
256:*7*, *19*  257:*5*
296:*15*  299:*14*, *17*
319:*19*  320:*1*, *5*, *8*, *15*,
*21*  321:*13*  322:*8*, *18*,
*22*  323:*3*, *8*, *21*  324:*9*,

*12*, *20*  325:*6*  327:*2*
329:*16*  331:*15*
332:*17*  333:*15*, *20*
334:*9*, *14*, *19*, *22*
335:*11*, *22*, *24*  336:*7*,
*13*, *22*  337:*3*, *5*, *7*, *11*,
*16*  346:*4*, *6*, *8*  348:*10*
350:*4*, *9*  354:*15*
355:*4*  367:*20*  368:*13*,
*18*, *20*
**Homeowner**  128:*19*
**honestly**  69:*1*  267:*19*
**Honor**  305:*24*
306:*11*  308:*20*
309:*16*  310:*7*, *14*
311:*10*, *23*  312:*1*
**horseback**  310:*11*
**host**  107:*1*
**hour**  381:*13*
**hourly**  208:*19*
239:*11*, *12*, *20*  251:*9*
**hours**  48:*3*, *17*  190:*5*,
*6*, *11*  197:*2*  205:*12*,
*14*, *15*  251:*4*, *5*, *8*, *17*,
*20*  252:*4*  263:*1*, *9*
266:*17*  267:*24*  268:*4*
317:*5*  403:*15*
**house**  180:*14*
**houses**  144:*15*
**HR**  16:*3*  25:*10*, *20*
29:*8*  37:*17*  47:*11*, *15*
48:*11*, *14*  53:*14*, *19*
77:*13*  82:*7*  93:*20*
98:*16*  101:*24*  102:*5*,
*9*  103:*4*, *9*  107:*18*, *19*
110:*11*  118:*22*
131:*12*  173:*4*, *20*
287:*17*  389:*12*
396:*10*
**Hubert**  71:*5*, *14*
85:*12*  87:*20*  280:*4*
**human**  17:*6*, *16*
19:*18*  21:*4*  39:*9*, *16*
41:*6*  42:*9*  43:*17*, *23*
46:*12*  53:*8*  54:*11*
80:*10*  92:*6*, *21*  93:*1*,
*9*, *11*  94:*9*  95:*2*  98:*8*
101:*8*  102:*12*, *19*
122:*2*, *4*  140:*16*
145:*23*  146:*1*  161:*14*

186:13  221:8  312:11
330:10, 13, 23  356:1,
16  359:21  362:2, 5,
11
**hybrid**  255:16  256:7
332:16  333:16
**hypothetical**  203:20
204:18
**hypothetically**  131:2

**< I >**
**I-9**  37:6
**idea**  149:16  285:18
304:14  339:13, 20
340:3, 15
**ideally**  278:10
**identification**  15:7,
14  24:1  25:24  27:24
29:18  32:17  38:7
42:3  43:3  61:20
63:3  65:8  66:23
72:8  75:13  78:21
79:19  86:13, 22
100:4  111:11  116:21
135:21  139:11  141:5
150:8  151:14  156:2
166:23  183:20
198:22  208:4  217:1
261:9  271:18  293:12
295:15  313:20  316:6
317:19  321:23  330:3
338:15  340:24
347:12  352:2  354:5
356:10  361:15  363:9
365:20  381:20
390:15  394:23
**identify**  8:19
**immediately**  53:11,
13  165:18  375:24
**impact**  220:4  241:11
243:8  333:11  388:21
**impacted**  215:2
242:7  253:2
**impacting**  232:12
**impairs**  13:3
**impartial**  325:20
**implement**  110:2
117:2
**implementation**
259:22

**implementations**
110:24
**implemented**  99:24
108:20  109:9, 17, 19
110:9, 13  111:24
**implementing**  260:21
**imply**  103:22
**implying**  385:5
**important**  77:21
101:18  106:4  244:3
245:3
**improved**  264:3
**improvements**  253:11
**inable**  13:7
**inaccurate**  12:14
259:15
**inappropriate**  96:14
383:20, 21
**inaudible**  11:17
**in-box**  56:4
**incident**  168:20, 22
169:18  170:14
172:17  174:5  177:19
180:9  181:1  196:2
198:13  207:1  396:9
**inclement**  76:16
**include**  29:9  33:5
106:8  124:1  125:4
200:19
**included**  21:20  44:3,
7  89:24  90:1  92:14
101:19  106:15  107:5
117:11  188:7  224:14
258:1  329:7  344:9,
11  364:7  365:10
**includes**  73:11
111:14  119:8  124:17
132:17
**including**  87:20
119:12  124:11  136:4
150:17  151:20
153:16  213:19
277:16  323:10
**inclusive**  54:4  119:7
**incoming**  331:2
**incomplete**  12:14
**incorrect**  85:3  87:11
343:3
**increase**  239:10, 12

**independent**  58:8
202:6, 22  203:14, 15
204:8  219:22
**INDEX**  4:2
**indicate**  12:9  82:1
90:8, 12, 16  91:1
106:21  143:14  153:9
201:13  223:13
248:21  314:22  319:1,
9  324:11  344:20
388:5
**indicated**  53:1  90:1
136:20  154:18
157:19  170:18
188:20  201:14
219:15  223:6  224:19
226:12  229:18
242:20  246:21  247:3
264:5  272:4  297:5
299:16  315:10  343:6
344:13  346:3  348:16
365:7  391:10  392:11
393:14
**indicates**  24:13  26:9,
17, 23  43:12  44:16
46:4  64:11  65:23, 24
67:10  72:16  76:1
104:1  105:11  130:9
140:16  153:14  157:2,
16  181:17  200:3
219:6  390:22
**indicating**  104:4
242:13  327:2  358:7
396:11  402:16
**indication**  345:23
**indications**  157:15
**individual**  40:22
41:7  77:23  92:5, 8,
13  102:1  103:2
118:21  137:22, 24
163:24  164:3  197:24
198:1  252:18  304:24
306:3  324:15, 21
364:13  366:23
376:23  389:12
**individually**  85:1
**individuals**  13:22
21:22  73:6  91:24
102:3  151:20  161:9
174:21  197:3, 23

250:12, 16  251:13
256:3  279:3  304:22
**individual's**  103:12
107:2
**inform**  51:9  52:9
113:12  133:10
143:21
**informal**  11:6
**information**  12:19
37:5, 6  58:7  85:2
118:15, 17  119:14, 17
152:17  162:1  174:13,
16  175:5  178:9
194:22  195:20
196:19  197:8, 17
203:7  212:13  213:5,
10, 13, 16, 21  216:16,
18  219:24  220:20, 23
221:2  227:4  228:18,
21  231:1, 11  241:2, 6,
15  242:1, 14, 17, 23
243:3  244:5, 19
250:5  258:20  259:2,
11  260:2  262:22
273:12  275:22, 24
283:8, 9  290:2, 3
291:20  295:21, 22
296:7  299:24  300:9
306:18  312:14, 24
313:10  315:8, 10
319:11  325:17
331:13  334:18
338:22  343:3  345:20
348:12  350:24
352:12, 17, 18, 22
353:15, 20, 21  354:22
355:2, 11, 21  356:22
357:7  358:7  359:2, 9,
11, 13  360:6  364:16,
23  365:9  366:18
370:20  398:6  400:4
402:14
**informational**  283:23
**informed**  50:22
51:13  76:11  87:7
143:11  144:5  152:6
168:16  197:12
201:16  202:4, 21
215:6  220:2, 19
234:10, 20  236:12

Case 3:21-cv-00477-MCC   Document 280-1   CONFIDENTIAL   Filed 09/20/23   Page 305 of 342

Deposition of Heidi Zula Vol. I - Revised                    Jane Doe, et al. v. Schuylkill County Courthouse, et al.

238:8  239:9, 23
263:13  311:2  334:3
353:22  357:18  397:1
**inhibited**  247:5
**inhibits**  226:11
**initial**  20:15, 19
21:18  29:4  37:21
69:20  89:2  143:20
231:4  278:8, 17
318:17, 18
**initially**  19:8  37:20
179:12  350:8  351:6
**initials**  17:10, 14
**initiated**  112:19
298:18, 20
**injury**  117:23
**in-person**  70:6, 18
**input**  77:22  95:5
161:21, 24  162:15
185:3  242:18  243:13
298:8  318:10  326:23
327:17, 19
**inputted**  242:18
**inputter**  245:9
**inputting**  244:24
245:6
**inquire**  394:14
**ins**  80:16
**inside**  145:20
**instance**  121:21
130:14  306:6
**instances**  94:16
175:11
**instruct**  158:14
210:19  350:5  365:1
**instructed**  96:20
97:8  192:23  193:15
194:17  216:12  219:7
220:9  270:16  341:8
399:17
**instruction**  192:17
331:1  386:7  399:16
**instructions**  10:13
13:16
**insurance**  46:6  47:2
**intended**  68:5
**interaction**  47:4
51:20  229:1  283:16
**interactions**  171:21

**interactive**  297:2
314:6  358:22  359:3
364:12, 14  365:2
**interim**  17:16  26:6
28:5  53:8  134:22
135:1, 5, 6, 7, 8
186:13  208:19  210:6
221:23  260:1, 12, 16
288:7  394:13  395:9
**INTERROGATION**
4:4
**intervener**  9:8
**interview**  21:9, 14, 15,
16, 18, 19, 21  22:7, 17
272:22  393:19
**interviewed**  49:10, 22
**interviewing**  23:2, 5
**interviews**  114:6
396:20
**introduce**  384:12
**introduced**  386:12
**introduction**  278:18
**investigate**  94:1, 10,
11  102:17  103:8
216:11
**investigating**  102:12
**investigation**  34:6
93:22  107:7  114:13,
16  160:8, 12  173:4
183:24  190:12, 17
393:12  396:20
**investigations**  96:24
**investigator**  114:7
**investigators**  118:14
**involve**  50:12
**involved**  47:19
51:16  52:23  69:5, 8
88:10  93:21  96:15,
18  97:11  112:7, 10
131:12, 17  133:1
162:3  164:13, 16
168:6, 10  169:13
188:5  228:4, 5
229:23  281:5  282:5,
6, 18  290:17  291:1
338:3, 6  380:14
382:11  392:4, 23
396:19  402:10

**involvement**  71:18
76:18  88:20  149:11,
13  229:5
**involves**  132:24
**involving**  273:9
**iPads**  142:3
**IPPOLITO**  2:16  8:3
9:18  162:6  228:12
234:24  235:5, 9
276:11  349:3
**ironed**  376:7, 12
**irrelevant**  96:19
**issue**  33:10  50:23
77:10  88:21  95:23
110:16  112:21
117:20  118:1  155:14
161:18  179:14  183:5
187:23  209:4  216:15
220:13  222:9, 15, 21
224:8  228:5  236:1
245:15  257:17  258:1
265:5, 10, 12  266:10,
18, 21  267:3  269:19
270:17  271:12
294:14  305:12
306:14, 16  309:17, 18,
20  310:13  311:2, 8,
17, 20  318:3  320:22,
23  321:18  333:5
386:24  391:8  393:4
399:17
**issued**  113:13
128:10  183:12  197:5
202:13, 15, 17  203:1,
3  258:23  317:24
**issues**  50:10  52:21
54:19  55:2  56:15
57:23  58:1, 4, 6
102:4  119:9  128:17
148:8  153:16, 21
154:12, 17  156:18
174:21  181:14  209:2,
8  210:4  231:17, 20
232:3  234:11  236:17
242:2  274:6, 20
291:21  294:19, 21
314:20  362:3  376:5,
7, 11  380:13, 20
390:2  391:14, 24

392:5  395:17, 20
396:4
**items**  40:14
**its**  9:21  61:9  62:9
94:20  118:13  129:4
182:9

**< J >**
**Jan**  264:8  271:24
336:16
**JANE**  1:2  3:6, 7
8:16, 24  9:2, 3, 4
13:23  14:1, 4, 5, 6, 7,
10, 11, 13, 14  50:21
51:4, 21  52:5, 6, 7
59:2  60:21  73:5
75:24  76:22  77:8, 18
79:22  90:23, 24  94:5
114:5  122:18, 19, 22
123:3, 8, 12, 15  124:1,
2, 11, 12  126:17, 18
134:15, 16  142:8
143:8, 9  145:1, 4, 6,
11, 20  146:7, 10, 11,
21  147:2, 13, 22
148:20  150:18  151:2,
19  152:13  153:8, 21
156:11, 16, 22  157:6,
10, 11, 12, 17, 20, 22
158:15, 22  160:8
161:22, 23  164:23, 24
168:12, 14, 22  169:17,
23  170:22  171:3, 6,
12, 13, 21, 23, 24
172:1, 5, 15, 16, 21
173:9, 14  176:11
177:23, 24  178:3
182:19, 20, 23, 24
184:1, 2, 10, 24
185:10  187:2, 9
188:8  190:6, 8
192:11, 22  193:13
194:2, 6, 17  195:11,
17  196:3, 6, 7, 10, 13,
15, 16, 23  197:2, 6, 8,
9, 10  198:13  199:19,
23  200:7  202:4, 5, 11,
21  204:7  205:18
206:2  207:18, 21, 22
208:11  209:17, 21

Case 3:21-cv-00477-MCC    Document 280-1    Filed 09/20/23    Page 306 of 342
CONFIDENTIAL
Deposition of Heidi Zula Vol. I - Revised                    Jane Doe, et al. v. Schuylkill County Courthouse, et al.

210:20  215:10, 14
217:11  219:11
220:13  221:8, 9, 17,
18  223:6, 10, 17, 18
224:3, 19  225:20
226:8, 9, 12, 14, 18, 21
227:2, 11  228:11, 23,
24  229:10, 13, 18, 20
230:14, 23, 24  232:12,
24  234:10, 20  235:16
236:2, 3, 12, 20, 23
237:8, 14, 21, 24
238:7, 15  239:5, 9, 23
240:2, 7, 18, 24
241:17  242:19
244:24  245:9, 14, 16,
20  246:1, 11, 12, 13,
20, 22  247:3, 4, 10, 15,
19, 22  248:1, 19, 20
249:7, 11  250:3
251:23  252:24
253:10, 11  254:15, 19,
24  256:2, 18, 23
257:3, 14, 21  259:13,
19  260:3, 6, 17
261:16  262:4, 11, 14,
16, 20, 23, 24  263:6
264:21, 24  265:2, 5
266:11, 16  267:4, 7, 9,
13, 14, 15  268:22
269:5  272:16  280:21
282:11  286:18, 23
287:1, 2, 24  288:1, 11,
12, 17, 20, 23, 24
289:20  291:7, 13, 22,
23  292:1  294:3
295:8  296:12, 24
297:20, 23  298:2, 4, 5,
7, 13, 14, 15, 18, 21
299:1, 12, 24  300:21
312:18  314:6, 9, 18
315:9, 17, 24  316:12,
18, 21  317:24  318:22,
24  319:1, 2, 18
320:20  321:10  322:4,
15, 20, 24  324:9, 11
325:7, 14, 20, 24
326:1, 2, 17, 18  327:7,
13, 14  328:15  329:2,
7  331:14, 17, 22, 24

332:4, 24  333:15
334:1, 2, 3, 22  335:2
336:1, 12, 19  338:8
340:4  341:5, 7
344:16  345:7, 14, 24
346:16, 17, 19, 21
347:1, 2, 3, 23  348:4,
7  349:10  350:4, 16,
18  351:18, 21  352:11,
22  353:14  354:15
356:3  357:17, 18, 20,
21, 24  358:6, 10, 15,
17  360:12, 13, 17, 18,
19  361:1  362:18
363:3, 17, 20, 23
364:3, 6, 7, 8, 19
365:1, 8, 15  366:19
369:1, 4, 8, 19, 20
370:8, 12, 16, 21, 23
371:4, 10, 13  375:17,
24  376:8, 10, 19
378:5, 11, 22  379:11,
17, 20, 23  380:6, 8, 15,
16, 18  387:8, 13, 14,
19  388:4, 5, 6, 11, 14,
17, 24  389:6, 19
390:21, 22  391:1, 8
392:3, 4  393:23
394:8  395:7, 18, 21
396:5, 16, 22  397:6,
15, 18, 20, 22  398:9,
10, 19  399:4  400:9,
13, 21  403:5
**January** 14:22  36:24
38:1  45:23  50:18
51:7  53:5  61:8, 11
62:21  63:11, 19, 20
66:8  67:15, 17, 20
68:1, 4, 5, 16, 24
99:20  105:18, 19
126:3  146:6, 14
147:10, 11  150:17, 18,
23  152:12, 19, 21, 23
153:6  154:11, 15
158:20, 21  162:24
163:5  164:20  165:7
172:17  181:18, 20
183:3  184:11  186:2,
7  187:5, 17, 21
188:13  189:2  190:3

192:2, 13, 20, 22
193:6  194:5  195:12
196:2  198:13  199:24
200:9, 10, 15  202:4,
14  205:16  206:1
207:17  208:12
210:22  212:19
213:24  215:5  221:14
246:20  256:13, 17, 20,
22  257:20  263:14, 18,
21  264:5  268:12, 13,
15, 24  271:24  281:9
285:5, 21  334:21
335:2, 21  336:12, 17,
21  337:1, 2, 4, 10
**Joan** 272:11  283:5
381:5
**job** 27:9, 17  31:11
41:21  42:9, 14, 17
43:16, 22  44:17  46:5
50:3  213:5  214:2
232:13  236:8  237:11
245:2  256:19  264:22,
23  265:3, 16, 19, 22
269:7, 14, 16  270:21
271:2  287:7, 9, 11, 16,
18  288:3, 13  299:2,
12, 24  300:21  301:2
302:21  304:1, 13, 19
308:10  312:15, 16, 18,
22  313:4, 7, 8, 12
320:12, 14  321:16
325:3  326:2, 12, 16
329:7, 12  333:8
371:5
**jobs** 134:21
**John** 94:8
**joined** 79:22
**JONES** 2:20
**judge** 11:8  177:14
179:21  203:14  302:5,
7  303:22  304:6
**judgment** 202:7, 23
203:16  204:8  310:16
326:7, 9
**July** 232:9, 21
233:14, 15  255:4, 17
**June** 292:18
**June-ish** 293:2

**jury** 11:9  111:17
112:22, 23  113:2, 6
116:10
**JUSTICE** 2:7  9:8, 10
**justification** 132:1
**justify** 219:20
**jut** 272:21

**< K >**
**Katz** 8:11
**Keel** 126:19  127:7
140:22
**Keel's** 127:1
**keep** 48:2, 23  61:24
91:13  104:24  319:7,
9
**kept** 319:12, 14, 16
400:22
**key** 145:21
**keyboard** 338:1
**keycard** 144:12
**keyed** 145:22
**keys** 147:14
**kind** 50:23  53:12, 18,
24  54:22, 24  55:1, 3
56:16  75:19  85:6
113:8  117:20  132:24
143:20  161:15
163:15  189:15  218:3,
23  250:1, 9, 21
255:16, 18  257:8
272:6, 21  276:8, 9
278:10  283:1, 15
287:20  332:16  354:9
369:18  375:16
399:10
**kinds** 118:2
**knew** 23:7  49:13, 17
106:2  126:12  159:23
164:13  192:7, 9
244:12  388:1
**know** 10:10  12:4, 14,
18, 20, 22  13:11
17:14, 19  19:17  20:2
23:2, 5, 8, 11  25:14
27:1, 2  28:8  33:5, 7,
8  34:3  35:15  36:17,
20  39:6  40:16, 24
48:5, 23  49:11  51:16
52:5  54:13  56:14

60:2, *20, 22*  67:*14*
74:5, *11*  79:2, *6*
81:*19*  83:2  85:5, *6,*
*20*  91:*14, 20*  94:6, *22*
99:5  104:*19, 24*
105:9  107:*14*  108:*23*
109:*13*  111:*23*  113:5,
*12*  114:*15*  116:6
117:*15, 16*  120:7, *9,*
*10*  121:2, *4, 8, 9*
123:*19, 21*  124:7
125:*12, 15, 17, 19*
126:*1, 6, 8, 15*  127:*3,*
*5, 11, 13*  128:*1, 8*
129:*9, 13, 15, 23*
131:*13*  132:*1*  133:9
138:6  140:*21*  141:*11,*
*19*  142:*17*  145:22
146:*3, 14*  148:*10, 21*
149:*13*  154:*11*  155:2,
*3, 16, 19*  158:*12*
160:*21, 22*  161:8, *13*
163:6, *13, 15, 21*
164:*1, 5, 11, 14, 16*
165:*17, 19*  170:6
171:5, *18*  172:*23*
173:*2, 13*  176:*10*
177:8  181:22  182:*12*
183:2  184:5  188:*8*
191:*10, 20, 21*  192:2,
*7, 8, 9*  199:*13, 17*
203:*19*  205:5  211:*17,*
*19*  212:3  213:*20, 22*
214:7, *20, 22, 23*
215:*16, 22*  216:*15*
218:*1*  227:*3, 5*
228:*12*  233:6  238:*19*
239:2  241:22  244:*3,*
*18*  245:*3*  248:*10*
249:*1, 20*  252:7, *10,*
*14, 15, 17, 22, 24*
253:*3*  256:5, *6, 8, 12,*
*14, 15*  257:*1, 7*
258:*14*  260:*20, 22, 23*
261:*1, 2, 4*  267:*8*
268:*4, 6*  272:*24*
273:*12*  274:*17*  275:*3*
276:*14, 15*  277:*10, 11*
278:*15*  279:*14, 17, 19*
280:*19*  281:*4*  283:*14*

284:*23*  285:*3, 7, 8, 12,*
*14, 15*  286:9  289:*4*
292:*3, 11*  293:*3*
294:*11*  295:*23*  296:*2,*
*4, 11*  297:2  298:*12*
300:*8, 15*  308:*8*
312:*17*  316:*11, 15, 23*
317:*11, 13*  318:*24*
321:*6, 15*  326:*21*
330:*17, 18*  332:*21*
336:*20, 24*  337:*4, 8,*
*10, 14, 16, 17*  338:*2, 6*
340:*14*  345:*6, 10, 15,*
*18, 24*  348:*19, 20*
351:7  356:*4, 20*
358:5  359:*13*  362:9
369:*13, 17*  370:*18*
371:*10, 13, 20, 21*
372:*17, 20*  373:*4, 12*
374:*1, 15, 19*  375:*3, 4,*
*5*  376:9  377:*16*
385:*4*  387:*19, 21*
390:*3*  395:*23*  396:*4*
397:*9, 10*  399:7
**knowledge**  34:7
36:22  54:*23*  74:*18*
76:*17*  108:*21*  117:*10*
120:*18*  133:*19*
138:*24*  151:6  155:5
158:*24*  159:2  170:*8*
176:*3*  182:*18*  218:*19*
221:2  229:6, *7, 9*
252:*16, 21*  258:*12*
275:9  283:*19*  292:*8*
294:*17, 24*  296:*16, 20*
299:*12, 24*  300:9, *12,*
*18*  326:*1, 16, 21, 22*
327:*14*  328:*17*
335:*14*  364:*21, 24*
370:*13*  371:*1*  379:*23*
380:8  399:2  400:*21*
401:*23*  402:8
**known**  120:*13*
152:*21*  277:8
**Kutzler**  9:*14*  20:*10,*
*24*  21:*13*  22:2  26:7
28:6  35:*16*  50:22
51:*4, 8, 21, 23*  52:9
53:6, *24*  55:6  58:*11,*
*15*  59:*15, 24*  60:5

61:5  68:*13, 24*  71:*3,*
*13, 14*  75:24  78:4
85:*12*  87:*20*  88:*14*
89:*18, 22*  91:5  117:6
142:*18, 19*  143:*21*
144:*4, 7*  147:5, *8, 12,*
*22*  149:*20*  150:*16*
154:*18*  168:*1, 8, 11,*
*13*  170:6  172:*1, 8, 11,*
*22*  183:*24*  185:5
186:*14*  188:7  191:*17*
205:*18*  206:2  209:*14,*
*20*  217:8  221:*17*
223:*19*  231:*3, 5, 12*
239:*9, 24*  258:5, *11*
276:5  280:*2, 5*  283:*1*
321:6  361:*22*  362:*1,*
*17*  363:*17*
**Kutzler's**  17:*15*
54:*19*  57:*14*  78:*11*
154:*4*  185:*13*

**< L >**
**Labor**  47:22
**lack**  53:*18*  200:*4*
**ladies**  77:22
**lady**  121:*14*
**language**  91:*21*  95:2
97:*21*  205:*3*
**lapse**  275:*5*
**laptop**  337:*14, 17, 19,*
*21*
**large**  78:*15*
**larger**  145:*21*  290:*15,*
*17*
**late**  57:9, *10*  190:*3*
254:5, *6*  335:6, *9, 12,*
*17*
**LAW**  2:2  9:*1, 5*
11:8  309:*18*  310:*11*
385:*5*
**laws**  96:*24*
**lawyer**  168:*23*  386:5
**layman's**  46:*11*
**lead**  85:*4*  227:2
**leading**  146:*1*
**learn**  21:*3*  89:*11*
125:8  126:*16*  152:*11,*
*23*  159:*4*  163:*1*
207:*1, 11*  212:*12*

218:5  253:*9, 10*
387:*23*
**learned**  50:*8*  158:*21*
198:*1*  207:*12*  390:22
**learning**  234:*15*
255:*18*  283:*24*
**lease**  238:*14*
**leases**  238:22
**leasing**  238:2, *11*
**leave**  31:*1, 18*  86:*17*
112:*23*  117:*24*
192:*17, 23*  193:*4, 8,*
*24*  194:*1, 15*  195:*21,*
*24*  201:*17*  203:*11, 13*
204:*11, 14, 15, 20, 23*
205:*4, 6, 8*  316:*13*
336:2  370:*8, 23*
379:*17*  387:*20*
397:*23*  398:*3*
**leaving**  190:*14*
376:*21*
**led**  276:*8*  309:*8*
335:*23*
**LEES**  3:*1*  8:6  9:*13*
381:*21*
**left**  11:*12*  55:*14*
73:*17*  125:*1*  148:*19*
193:*10*  274:*17*
292:*14, 22*  380:*15*
400:*23*
**legal**  277:*11, 17*
284:2  300:*24*  301:*7,*
*9, 10, 12, 15, 16, 22, 23*
302:*8, 11*  303:*1, 8*
304:*15, 23*  305:*17*
306:*16*  307:*4*  308:*6*
323:5, *13, 14*  382:*14,*
*18*  384:6  385:*1*
**legally**  327:*21*
**legitimate**  360:9
**letter**  26:5, *9, 17*
28:5, *8, 9, 14, 17*
35:*18*  36:9  185:*4, 21*
191:5  192:*21*  194:*24*
195:*18, 23*  196:*8, 9*
197:5  200:*10, 15*
202:*13, 14, 15, 17*
203:*1, 2, 3*  204:7, *10,*
*13*  207:*17*  214:24
317:*22, 24*  318:5, *18*

319:*18*  322:*9*  331:*5*,
*11*, *16*  332:22  338:*23*
342:*23*  346:*1, 5, 20*
367:*23, 24*  368:*7, 10,*
*17*
**level**  212:*7*  215:*1*
258:*12*  298:*24*
**LexisNexis**  393:*17*
**license**  126:*6, 17, 18,*
*23*  127:*20, 22*  273:*21*
274:*2, 7, 10*  275:*1, 5*
371:*11, 14, 17*  372:*10,*
*13, 16, 24*  373:*7, 17*
375:*10, 11, 16*  376:*23*
378:*13*  379:*21*  399:*1*
**licensed**  372:*23*
**licenses**  126:*4*
127:*12, 14*  372:*3*
**licensing**  275:*4*  375:*1*
**light**  391:*1*
**liked**  60:*17*
**limit**  142:*22, 23*
185:*18*  307:*23*
**limited**  136:*24*  140:*4*
142:*23*  277:*12*
**Line**  6:*19*  7:*2, 12*
96:*13*  97:*1, 2*  103:*16*
104:*13*  106:*6*  108:*15,*
*23*  109:*4*  203:*9*
288:*24*  314:*4*  379:*5*
383:*21*
**lines**  17:*11*  88:*10*
89:*6*  92:*4*
**lingo**  212:*3*
**Lisa**  21:*14*
**list**  64:*3*  72:22  116:*4*
**listed**  18:*23*  40:*13*
73:*6, 13*  74:*6*  91:*16*
153:*21*
**listing**  74:*21*
**little**  49:*8*  87:22
121:*14*  128:*18*  142:*6,*
*19*  261:*15*  315:*20*
363:*24*  377:*14*
**live**  37:*8*
**local**  37:*7*
**locate**  152:*24*
**located**  8:*14*  104:*2*
145:*7, 11, 20*

**location**  22:22  36:*14*
141:*23*  143:*2*  189:*6*
230:*1*  320:*11*  328:*19*
329:*15*  332:*4, 7, 17,*
*19, 20, 24*  333:*1, 22*
**locations**  120:*9*
141:*16*  192:*18, 24*
193:*9*
**locked**  145:*17*  146:*2*
**log**  121:*7*
**long**  116:*8*  145:*8*
214:*20*
**longer**  54:*14*  275:*1*
282:*11*
**Look**  25:*21*  26:*21*
27:*6, 7*  30:*21*  34:*13,*
*15*  40:*2*  42:*23*  43:*11*
44:*16*  46:*2*  63:*24*
66:*18*  68:*8, 15*  75:*23*
79:*9*  83:*12, 20*  84:*5*
89:*5, 6*  99:*24*  100:*7*
103:*15*  108:*13*  111:*6,*
*21*  116:*4*  121:*7*
129:*14*  151:*10*
153:*19, 22*  155:22
167:*4, 6*  182:*5*  183:*4,*
*23*  184:*9*  190:*1*
200:*2, 12*  203:*8*
208:*10, 14*  216:*14, 21*
217:*19*  221:*6*  246:*4*
261:*5*  262:*11*  263:*12*
266:*10*  267:*21*
268:*16*  270:*17, 24*
271:*12*  287:*6*  288:*2*
294:*13*  296:*5*  301:*19,*
*20*  302:*1, 3*  311:*1, 18*
321:*11, 18*  338:*18, 24*
347:*15, 21*  354:*8*
357:*6*  364:*11*  375:*21*
394:*19*
**looked**  43:*19*  80:*1*
100:*12*  103:*16*
104:*14*  105:*16*
108:*14*  196:*5*  205:*23*
221:*14*  268:*24*
322:*11*  332:*15*
339:*19*  363:*17*
365:*24*
**looking**  31:*6*  65:*14*
87:*1*  100:*17*  104:*11*

106:*7*  212:*14*  257:*12*
263:*24*  268:*6*  269:*18*
271:*14*  278:*10*  279:*8,*
*9*  287:*8, 13*  342:*7, 15,*
*16*
**looks**  17:*10*  285:*12*
295:*21*  331:*5*
**lost**  369:*4, 8*
**lot**  80:*23*  95:22
119:*8*  132:*23, 24*
161:*4, 5*  164:*21, 24*
165:*4, 8, 10*  170:22
207:*3*  210:*4*  218:*4*
274:*15*  378:*4*
**Love**  161:*15*
**loved**  60:*17*
**lower**  164:*21*  165:*4,*
*8, 10*  207:*3*
**Lubinsky**  331:*6*
**L-U-B-I-N-S-K-Y**
331:*6*
**lured**  396:*10*
**Luzern**  274:*21*
**Luzerne**  274:*13, 18*

**< M >**
**Mahall**  21:*14*
**mail**  302:*16, 22*
304:*1*
**main**  144:*14*  145:*7*
**maintain**  121:*2*
323:*4, 13*
**maintained**  23:*19*
48:*10, 12, 18, 21*
121:*8*  224:*1, 14*
**maintains**  121:*5*
129:22
**maintenance**  148:*17*
154:*21, 24*  155:*6, 8,*
*12*  183:*11*
**majority**  62:*17*
109:*11, 14, 18*  141:*20*
264:*18*
**maker**  384:*21*
**making**  175:*13*
346:*11*  349:*4*  384:*18*
385:*6*  386:*6, 17*
**managed**  161:*13, 15*

**management**  200:*2,*
*19, 24*  202:*7, 23*
204:*9*  391:*13*
**manager**  72:*23*
74:*12, 22*  85:*23*
155:*12*
**managerial**  71:*14, 17*
80:*11, 12, 20*
**managers**  71:*8*  80:*3,*
*4*
**mandatory**  71:*23*
72:*2*
**manner**  157:*13*
**March**  88:*4*  113:*23*
114:*4, 8, 10, 19*
134:*18*  139:*2*  140:*23*
141:*18*  146:*17*
149:22  156:*18, 23*
157:*3*  168:*24*  169:*8,*
*9, 10, 11*  229:*13*
239:*2*  263:*15*  264:*6*
330:*10*  331:*7*  335:*1,*
*11*  336:*11, 16*  341:*5,*
*15, 21, 23*  342:*5, 19,*
*22*  343:*8, 10, 12, 18,*
*24*  344:*4*  345:*19, 23*
346:*1, 5, 10, 13, 16, 20*
356:*1, 16*  363:*15, 24*
366:*20*  368:*23*
371:*10*  387:*7, 18, 23*
394:*8*  395:*6*  397:*11,*
*16*  399:*5*  401:*3, 14*
**Marchalk**  260:*6*
**MARIA**  2:*20*  9:*11*
306:*12*  308:*2*
**marijuana**  116:*13*
**mark**  23:*21*  38:*3*
61:*16*  62:*23*  65:*4*
72:*4*  75:*8, 10*  78:*18*
79:*15*  86:*9, 18*
116:*17*  135:*17*  150:*4*
198:*18*  207:*24*
216:22  235:*8*  293:*8*
295:*11*  313:*16*
329:*23*  338:*10*
340:*20*  347:*8*  351:22
354:*2*  361:*11*  363:*5*
365:*16*  381:*16, 17*
387:*2*  390:*11*  394:*20*
403:*12*

**MARKED** 1:*10* 6:*18* 9:22 15:6, *14* 23:24 25:23 27:23 29:*11*, *15*, *17* 32:13, *16* 38:6 42:2 43:2 45:*13*, *14*, *18* 61:*19* 63:2 65:7 66:22 72:7 75:*12* 78:20 79:*18* 86:*12*, *18*, *21* 100:*3* 111:*10* 116:*20* 135:20 139:*10* 141:4 150:7 151:*13* 155:23 156:*1* 166:22 183:*19* 198:*21* 208:*3* 216:*24* 261:8 271:*17* 293:7, *11* 295:14 313:*19* 316:2, *5* 317:*18* 321:*19*, *22* 330:2 338:*14*, *19* 340:*23* 347:*11* 352:1 354:4 356:9 361:*14* 363:8 365:*19* 381:*19* 390:*14* 394:22

**Market** 2:*3*, *17* 123:8, *9*, *10* 213:2, *4*, *15* 214:2 225:*16* 244:7 252:*11* 286:*15* 288:*14* 289:*1* 299:5

**marking** 15:2 65:*3* 166:*18*

**married** 127:*3*

**Marshall** 96:*11* 97:*17*

**mass** 119:*19*

**materials** 70:22

**math** 190:*5* 225:*3*

**Matt** 166:9 347:*17* 395:2

**matter** 10:*12* 77:*19* 315:*12* 324:*14* 384:*19* 388:6 397:6 404:7

**matters** 77:*16* 94:*12* 114:22 235:*19*

**Matukewicz** 396:*17*, *21*

**M-A-T-U-K-E-W-I-C-Z** 396:*18*

**max** 251:*5*

**Mayer** 127:2 140:*21* 141:*9*, *15*

**Mayers** 142:*1*

**MCCAMEY** 3:*1*

**MCNERNEY** 2:*16*

**mean** 15:*10* 46:*11*, *23* 53:*14* 60:*14* 95:*1* 116:6, *8*, *9* 117:*17* 119:*14* 121:*18* 126:*16* 129:*13* 138:*3* 140:9, *11* 141:24 174:24 214:8 216:*14* 228:9 241:*1*, *4* 263:*18* 275:*17*, *19* 276:18 285:*12* 287:*11* 291:*3* 305:*1* 319:6 320:*19* 322:*21* 329:*10* 337:*19* 355:18 359:23 362:*13* 377:*13* 378:6 385:*11* 386:*17*, *19* 400:*3*, *16*

**meaning** 114:*21* 141:24 173:*23* 282:*10* 320:*10* 332:24 357:*21*

**means** 219:*20* 223:*1*

**meant** 217:22 372:2

**mediate** 307:*14*

**medical** 116:*13* 295:7, *8* 314:*20* 316:*19* 319:5, *6*, *7* 332:5, *15* 339:*10*, *12* 340:*3* 341:*21* 343:*11* 344:5, *14* 346:*21* 347:*1* 352:22 353:*1*, *2* 356:2 357:*12* 359:9 360:*4*, *5*, *14*, *20*

**medication** 13:2

**meet** 173:6 207:*21*, *22* 209:*21* 263:2 314:*24* 315:*13* 348:*5* 355:*17* 387:*8* 388:22 402:*12*

**meeting** 19:9 111:*5* 146:*10* 192:20 208:*24* 209:*1*, *15*, *18* 210:*1*, *2*, *8*, *12*, *16* 215:*4*, *20* 221:7, *13*, *22* 222:24 223:*17*

224:23 225:*20* 226:*5* 231:8 246:*18* 258:2, *3*, *4*, *8*, *10* 273:5, *6*, *8*, *13*, *14* 276:4, *9* 278:*5*, *8*, *13*, *17* 279:*1*, *3*, *11* 281:*4* 297:*4* 334:*1* 388:7, *12* 389:7, *8* 391:5, *11*, *17*, *21* 394:*10*, *17* 395:8, *12*, *17*, *20* 396:6, *11* 397:7 399:*3*, *8* 402:22

**meetings** 18:*24* 19:*3* 111:2 279:*15* 391:*13*

**meets** 389:*12*

**member** 398:*11*, *13*

**members** 25:*10* 212:5

**memo** 217:*21* 218:24 219:*14*, *15* 220:17 221:6 224:5 227:*1* 230:*21* 231:4 243:*21* 254:*14* 258:23 266:*10* 290:24 291:*4*, *8* 378:7 400:6

**mental** 145:9, *12* 158:6

**mentally** 226:9 247:*4*, *15*

**MENTIONED** 6:*18*

**met** 37:20, *21* 147:*15* 159:*12* 163:9 165:*12* 188:*21* 262:*12*, *13* 263:*19* 264:8 272:*21* 273:*3* 299:*18* 324:2 355:*13* 378:*4*

**metal** 233:*18*, *21*

**Michael** 366:4, *16*

**mid** 57:*11*

**MIDDLE** 1:2, *19* 16:*17* 73:*17* 246:*4*

**Middletown** 30:22 31:*1*, *7*, *19*

**midway** 341:*16*

**million** 178:*19*

**mind** 61:*24* 93:*1* 230:*17*

**minute** 237:20 276:23 381:22

**minutes** 190:6 309:23 386:*17*

**MIS** 175:*12*

**misrepresent** 99:*19*

**missed** 254:*11* 384:*4*

**mistakes** 105:22

**misuse** 223:*5*

**modified** 130:*17*

**mold** 153:*16*

**moment** 385:*21*

**Monday** 139:*4* 140:*23* 141:*17* 165:*15*

**money** 113:8 381:*5*

**monitor** 337:*23*

**monitored** 333:*23*

**monitoring** 320:*18*

**Monroe** 2:*13*

**month** 12:*21* 55:*5* 90:20 218:8, *21* 225:8, *9* 231:*16* 263:*17*, *21* 285:*4* 286:6, *7*, *10* 311:*20* 336:*10*

**monthly** 212:2 213:*9*, *14* 214:*11* 225:*10*, *11*, *13* 265:*15* 266:23

**months** 53:*15*, *22* 54:2, *3*, *10* 163:*16* 212:*18* 214:*16* 225:*18*, *23* 226:2 254:*15* 262:*15*, *19* 263:*3*, *4* 264:*1*, *2*, *7*, *14* 317:6 336:*16* 362:6

**morning** 10:*10*

**morphed** 163:*15* 222:*3* 258:7

**motion** 399:*10*

**motions** 310:*15*

**move** 96:*12* 158:2, *10* 230:*13* 278:*19* 279:4 282:*4*, *16* 283:2 286:*19* 376:24 380:*16*

**moved** 51:*10*, *20* 143:*1* 144:*1* 158:7, *9* 165:2 253:6

moving 55:*15, 18*
158:*4* 218:*4* 273:*1*
286:*17* 388:*20*
mpipak@jonespassode
lis.com 2:*22*
multiple 118:*2* 161:*9*
333:*7*
municipal 34:*3* 36:*16*
Murray's 234:*4*
mutualization 258:*24*

< N >
name 8:*11, 18* 10:*11*
34:*4* 66:*15* 67:*8*
71:*5* 74:*8, 10* 92:*5*
127:2, *4* 161:*14*
249:*19* 283:*7*
named 21:*22* 88:*23*
89:*1, 8, 23* 91:*24*
92:*13* 192:*4* 306:*1*
366:*12*
names 13:*23* 91:*13*
97:*11, 15*
nature 306:*4* 308:*15*
NE 2:*9*
near 208:*16*
necessarily 284:*10*
288:*19*
necessary 12:*19*
106:*13* 236:*8* 237:*10*
238:*1* 257:*4* 271:*9*
300:*18* 353:*22*
need 13:*10* 34:*15*
48:*15* 78:*7* 97:*1*
100:*7* 113:*11* 116:*4*
128:*11* 129:*6* 131:*3,
4, 5* 140:*3* 153:*10*
155:*13* 194:*14* 195:*7*
257:*8* 263:*4* 267:*19*
275:*16, 24* 276:*14, 16,
21, 22* 288:*4* 310:*13*
314:*5* 327:*21* 343:*19*
362:*16*
needed 47:*3* 73:*1*
81:*24* 82:*7* 130:*16*
135:*12* 174:*16* 175:*5*
206:*14* 227:*16*
237:*10* 257:*9* 258:*10*
264:*12, 18* 275:*21*
304:*14* 312:*14, 17*

321:*16* 322:*16* 327:*8,
9, 19* 348:*11* 352:*16*
359:*2* 361:*8* 365:*8*
370:*4* 400:*19* 401:*23*
needing 264:*3*
needs 139:*23* 144:*18*
201:*3* 312:*15* 320:*13*
372:*9*
negative 254:*12*
negotiate 20:*16*
negotiated 20:*17*
negotiations 20:*23*
53:*17* 208:*17*
never 24:*17, 23*
55:*19* 58:*19* 76:*21*
126:*12* 158:*7* 168:*18,
19* 169:*6* 170:*11, 12*
171:*19* 181:*3, 5, 7*
199:*10, 11* 218:*17*
236:*21* 238:*14*
281:*22* 285:*19*
297:*23* 307:*2* 335:*11*
340:*2* 358:*14* 371:*21*
381:*9* 394:*10* 403:*10*
new 24:*10, 18, 19, 23*
25:*3, 4, 9, 18* 28:*16*
29:*4* 33:*2* 37:*1, 11*
38:*1* 39:*13* 40:*22*
41:*1, 7* 42:*17* 116:*14*
118:*20* 131:*1, 3, 9, 24*
132:*10* 133:*4* 186:*13*
234:*13, 15* 240:*9*
255:*22* 380:*2*
newly 182:*21* 374:*18*
NEWMAN 2:*12*
news 396:*12*
newspaper 49:*14, 17*
207:*10, 13*
NICOLE 2:*16* 9:*18*
night 180:*15*
nine 264:*2*
nippolito@mpvhlaw.co
m 2:*18*
nod 11:*18*
non-approval 368:*17*
non-approved 336:*2*
non-complete 27:*12*
non-discrimination
63:*11* 64:*3* 66:*9, 14*
67:*8* 86:*6* 101:*1*

105:*14* 108:*12*
116:*10* 117:*12*
non-exempt 16:*24*
26:*24* 27:*3*
non-managerial
71:*10, 12* 80:*6, 20*
non-red-line 111:*16,
22*
non-symptomatic
137:*24*
non-vaccinated
137:*23*
normal 255:*22*
north 186:*18* 189:*9,
16* 193:*2* 205:*19*
206:*3, 11*
Notary 1:*22* 404:*4*
notation 311:*13*
notations 244:*14*
note 208:*15*
noted 257:*14*
notes 172:*22* 173:*1,
4, 5* 223:*19* 224:*13*
404:*6*
notice 234:*7*
notification 121:*6*
notified 150:*23, 24*
232:*10, 22* 233:*16*
notify 46:*24*
notifying 398:*10*
November 16:*9, 13*
18:*19* 26:*7* 28:*10*
35:*15* 43:*12* 49:*7*
NUMBER 4:*10*
15:*13* 52:*21, 22*
64:*12* 65:*15, 16, 17*
67:*6* 107:*2* 117:*19*
127:*17, 21* 129:*16, 18*
212:*18* 225:*12* 251:*4,
5, 8* 254:*15* 269:*9*
274:*14* 344:*18*
362:*15* 371:*7*
numbering 357:*5*
numbers 124:*15, 22*
125:*3* 130:*4* 167:*9*
338:*20*
numerous 73:*6*
151:*20* 240:*10*
274:*12*

< O >
oath 11:*2*
object 59:*13* 99:*9*
105:*3* 133:*5* 162:*6*
178:*10* 198:*5* 201:*10*
203:*23* 211:*22* 214:*4*
228:*15* 239:*15*
240:*20* 241:*19*
243:*15* 266:*4, 19*
276:*11* 300:*10, 22*
319:*20* 325:*10*
327:*24* 329:*19* 332:*8*
334:*11* 368:*3* 376:*13*
377:*1, 11, 24* 379:*7,
14* 380:*22* 381:*8*
382:*19* 394:*1* 398:*14,
22*
Objection 10:*18*
17:*23* 25:*6* 28:*11*
33:*12* 34:*22* 39:*21*
41:*10* 46:*13* 48:*4*
50:*11* 56:*22* 59:*21*
78:*2* 93:*17* 94:*13*
95:*7* 98:*2, 16* 130:*6*
162:*16* 176:*13*
179:*15, 18* 194:*19*
244:*10* 248:*9* 265:*7*
269:*23* 282:*20*
308:*19* 309:*15*
359:*18* 378:*15* 386:*7*
392:*8, 20*
Objections 9:*24*
obligation 11:*2*
observe 285:*6, 22*
obtain 127:*21* 176:*5*
213:*5* 359:*11* 372:*16*
Obviously 39:*15*
54:*23* 83:*13* 100:*8*
116:*9* 134:*20* 144:*22*
262:*8* 357:*5* 366:*1*
occasion 175:*1* 335:*6*
occupied 148:*8*
occur 22:*21* 121:*24*
137:*6* 178:*19*
occurred 41:*20*
56:*15, 18* 58:*2, 4*
74:*4* 171:*5* 174:*14*
178:*18* 181:*23*
185:*16* 186:*6, 23*

CONFIDENTIAL

Deposition of Heidi Zula Vol. I - Revised          Jane Doe, et al. v. Schuylkill County Courthouse, et al.

187:*18*, *22*  190:7
206:*1*, *16*  207:8
242:*3*  340:*18*  351:8
390:2

**occurring**  60:*3*
179:6  188:5

**O'Connor**  239:*13*, *24*
250:*13*

**O'Connor's**  239:*10*,
*12*, *20*

**October**  1:*21*  8:*12*
19:*11*  22:20  152:5
239:8  240:6

**offended**  106:22

**offer**  20:6  27:9, *17*
28:9, *19*  33:*17*  35:*3*,
*10*, *14*, *18*  36:9  69:*15*
247:*11*  396:*11*

**offered**  20:*16*, *20*
21:*10*  26:*18*  50:*3*
230:*24*  246:*14*
247:*12*  375:2, *4*, *5*

**Office**  1:*19*  25:*20*
29:8  37:*17*  46:*21*
47:*1*, *11*, *13*  48:*11*, *13*,
*19*, *21*  51:*19*  62:5
82:7  90:2, *4*, *5*, *9*
98:*16*  102:6, *9*
112:*11*  113:2, *10*
120:*3*  123:*17*  124:*5*,
*7*  125:*11*, *24*  127:*15*
128:*14*, *15*, *22*  129:*4*,
*11*, *19*  130:*4*, *10*, *14*
134:5  135:*11*  138:*15*
145:6, *11*, *13*, *14*, *15*,
*21*, *23*  146:2, 8, *11*, *21*
147:7  148:6, *20*
149:*21*  153:*10*, *17*
156:*19*  157:8, *13*
158:5, 7, *11*  161:*14*
163:9  171:*18*  190:*20*,
*23*  191:*10*, *12*, *15*
204:9  209:6, *23*
210:*10*, *21*  211:*3*
212:*15*  213:*18*
218:*16*  221:8, *10*
222:5, *11*  223:8
226:*14*, *24*  227:*12*
229:*19*  234:4, 6, *21*
236:*18*  238:*3*, *23*

240:2  243:2  245:*23*
246:*10*, *23*  247:*1*, *24*
249:9, *14*  250:*4*
253:*12*  255:*15*  256:9
258:8, *16*  265:*18*
269:*15*  272:4, 6, *13*
273:4, *10*, *17*  274:*21*
275:*14*, *21*  276:*10*
278:*12*  279:5  281:*1*,
*16*  282:*15*  283:*10*
284:5, *22*  285:6, *18*,
*23*  286:*10*  287:*17*
288:2, *4*, *10*, *21*  291:6
295:*1*  297:8, *20*
314:22  317:2  322:*16*,
*23*  329:4, *12*  333:22
344:*17*, *21*  345:*1*, *8*
370:7, *14*, *18*, *20*, *22*,
*24*  371:2  375:*12*
376:*20*, *21*  378:6, *23*
379:*18*  380:9, *21*
381:7, *14*  384:*10*
388:*20*, *21*  391:*3*, *5*
392:*12*  395:*11*
397:*11*  398:8  399:*20*,
*21*  400:22  401:*3*, *18*,
*19*, *24*

**office/work**  152:6

**officer**  88:*23*  89:8
90:*14*  91:2, *19*  92:*23*
93:*3*  95:2  97:*23*
98:*1*, *10*, *13*  103:*23*
104:5, *8*  107:8, *10*
122:4

**officers**  104:*1*  107:5

**offices**  104:*1*  125:8
143:*1*  145:2  147:2, *3*,
*4*, *10*, *18*, *24*  148:7
149:*4*  151:2, *7*  158:*2*
189:*17*  202:8  216:*1*,
*2*, *4*, *12*  218:*1*, 6, *20*
220:*15*, *16*  227:*13*, *14*,
*16*, *21*  232:*11*  234:*11*
236:*15*  237:*1*  240:2
246:*1*  266:*3*  282:*4*
286:*14*  288:22  289:8,
*18*, *21*  290:5, *22*
372:7  382:*10*  387:*10*
391:*12*  399:*19*  400:2,
*18*  403:5

**official**  41:2  48:*20*
53:*13*  131:23  216:9
229:*23*  230:*3*  359:*24*

**officials**  33:6  40:*17*
72:2  73:*20*, *24*  74:2

**official's**  134:4

**Oh**  159:8  193:*1*
212:*1*  285:*11*  286:7

**Okay**  10:*24*  14:*3*, *9*,
*16*  18:*21*  19:6  20:*18*
21:2  22:6, *9*  23:*10*
25:2, *16*  26:22  27:5
28:*21*  29:*1*, *13*  34:*12*,
*17*  36:5, *13*  40:*4*
41:5  45:2  46:*1*, *16*
47:6  48:8  51:2, *12*
54:6  55:23  56:7
59:7, *19*  62:*12*, *19*
63:23  64:*18*  65:2, *13*,
*22*  66:6, *17*  67:5, *22*
68:7, *14*  70:8, *14*, *21*
72:*21*  75:*1*  76:9
78:*14*  79:8  80:5, *15*
81:8, *23*  82:9, *22*
83:*19*  84:4, *11*, *18*, *22*
85:9  88:*13*, *18*  89:*4*
90:*11*  92:*12*, *19*  93:6
94:*18*  95:*10*, *12*  96:6,
*11*  97:4, *20*  98:*19*
99:*17*  100:*15*, *20*
102:7  103:*10*  104:*18*,
*21*  106:*19*  107:*20*
108:22  109:*3*, *12*, *16*,
*23*  110:4, *22*  112:2, 6,
*12*, *18*  114:*11*  115:*16*
116:*16*  117:*11*  118:6,
*19*, *24*  119:*21*  121:*10*
122:*10*  123:2  124:*4*,
*14*, *20*  125:5  126:*24*
127:6  128:*3*  129:*1*, *8*
130:2, *12*  131:*13*
132:8, *14*, *22*  133:*20*
134:9, *12*, *14*  135:4, *9*
138:*17*  139:*1*, *20*
140:6, *14*, *20*  142:5
143:*3*  144:*21*  146:*4*
147:*20*  149:2, *7*, *17*,
*24*  150:*4*, *21*  151:5
153:7, *24*  155:*4*, *15*
156:*15*  159:*3*, *11*

160:*3*  161:7, *20*
162:2, *10*, *20*  167:*17*,
*23*  168:4, *9*  169:*19*,
*20*  171:9  172:*19*
173:*18*  175:6, *10*
177:*12*, *15*, *21*  179:8
181:8, *16*  182:3, *14*
183:*1*  184:*16*, *22*
185:*12*, *19*  186:*1*, *11*
187:*13*  188:2, *11*
189:*1*, *18*, *24*  190:*10*
197:22  198:*17*
199:*14*  204:*4*  207:*15*,
*24*  208:22  210:*14*
211:*14*  212:*11*, *23*
213:23  214:*14*, *19*
215:*3*  217:7, *18*
218:*18*  221:5  222:7
223:*12*, *21*  226:6
227:*10*  228:6  229:*12*
231:6  232:2, *7*  233:5
235:*24*  240:*12*
241:*24*  242:*10*
243:*20*, *24*  244:*21*
245:*12*, *18*  250:*15*
251:*11*  252:*23*
253:*14*  256:*16*  257:2,
*11*  260:*10*, *19*, *24*
261:*3*  262:*3*  264:*20*
265:*21*  266:*1*  267:2
269:6  270:*19*  271:*10*
272:*14*  273:7  275:*10*,
*23*  277:*19*  278:*16*, *24*
279:*10*  280:*13*, *20*
281:*4*, *20*  282:9, *17*
283:*20*  284:*12*, *15*, *20*
285:*11*, *16*, *20*  288:9,
*16*  291:*11*  292:*10*, *20*
293:*15*  295:*11*, *24*
296:*3*, *10*, *19*, *21*
297:*11*, *22*  298:*16*, *23*
299:*21*  302:4, *6*
304:7  308:*11*  309:*21*
310:*4*, 8, 9, *18*  311:*11*
313:9, *16*  314:*12*
315:*15*  318:*16*, *19*
321:*19*  322:*13*
323:*20*  326:6  333:*4*
337:9  338:*10*  339:5,
*14*  340:*13*, *20*  341:*11*

Case 3:21-cv-00477-MCC    Document 280-1    Filed 09/20/23    Page 312 of 342
Deposition of Heidi Zula Vol. I - Revised                    Jane Doe, et al. v. Schuylkill County Courthouse, et al.
CONFIDENTIAL

342:6, *14*  343:*15*
344:*2*, *8*  346:*15*
347:*7*, *20*  348:*2*, *21*
349:*2*, *11*, *23*  350:*10*
351:*3*, *16*  352:*15*
353:*3*  354:*1*  356:*19*
357:*11*, *23*  360:*10*
361:*5*, *24*  362:*13*, *22*
363:*14*  364:*5*  366:*8*
367:*17*  368:*11*, *22*
373:*8*, *15*  374:*16*, *20*
375:*6*  377:*8*  378:*10*
382:*17*  383:*8*  385:*15*
386:*14*  387:*12*, *22*
388:*3*, *4*  389:*16*
390:*6*, *11*  394:*19*
396:*2*, *24*  397:*5*
399:*24*  402:*6*, *23*
403:*12*, *16*
**older**  362:*14*
**once**  69:*7*  121:*9*
255:*21*  282:*11*
345:*16*
**ones**  40:*8*  55:*16*
115:*6*  116:*1*  157:*21*,
*22*  231:*23*  361:*2*
365:*24*  402:*15*
**ongoing**  50:*10*, *19*
378:*8*
**online**  34:*2*
**open**  129:*23*  145:*5*,
*17*  180:*12*  205:*15*
328:*9*
**operated**  125:*8*
**operation**  221:*9*, *23*
222:*2*, *4*, *11*  245:*23*
250:*4*  265:*17*  282:*14*
288:*20*  289:*8*  294:*18*,
*24*
**operational**  320:*13*
391:*24*  392:*4*  393:*4*
394:*10*
**operations**  209:*3*, *23*
210:*9*, *21*  211:*2*
212:*15*  215:*7*  226:*24*
258:*8*  269:*15*  272:*6*
273:*4*, *9*  275:*13*
276:*9*  278:*11*  279:*4*
281:*15*  289:*17*
294:*14*  370:*6*  375:*12*

380:*12*  391:*11*
392:*11*  395:*11*
**opinion**  77:*5*  202:*12*,
*24*  209:*24*  240:*18*
257:*5*  274:*5*  327:*4*,
*22*  400:*1*, *4*, *6*, *8*, *12*
**opinions**  273:*14*
**opportunity**  31:*20*
84:*2*, *8*
**opposite**  145:*12*
386:*2*
**optimal**  127:*17*
129:*16*  130:*4*
**optimally**  129:*10*
**option**  91:*18*  158:*15*
320:*6*, *7*  381:*2*
**options**  148:*12*
**oral**  106:*24*
**order**  8:*6*  75:*9*, *19*,
*21*  86:*17*  145:*17*
155:*19*  159:*13*  171:*5*
194:*16*  195:*24*
227:*13*  244:*1*  310:*19*
312:*18*  313:*12*  336:*4*
356:*21*  357:*5*  372:*19*
374:*3*  375:*10*
**organization**  270:*24*
**organizational**  44:*17*,
*21*, *24*  45:*6*, *7*, *9*, *19*,
*21*  392:*12*
**orientation**  29:*4*
**original**  91:*22*
187:*12*  261:*21*
**originally**  68:*4*
**outcome**  307:*14*
**outdated**  39:*24*  40:*6*
**outlined**  209:*2*
287:*21*
**outlines**  174:*14*  188:*9*
**outlining**  278:*10*
**outright**  163:*18*
**outside**  36:*20*  95:*21*
97:*14*  145:*11*  160:*17*
189:*15*  226:*13*
229:*19*  330:*12*  331:*2*
**outstanding**  264:*7*
**overall**  222:*4*  288:*20*
289:*8*, *17*
**overlapping**  75:*21*

**oversee**  265:*1*
**overseeing**  376:*23*
**oversight**  47:*15*
**overtime**  263:*1*, *9*
266:*17*
**owner**  128:*23*

**< P >**
**P.C**  2:*12*
**p.m**  165:*16*  166:*2*, *8*
190:*2*  277:*1*  278:*1*
304:*11*  312:*5*  381:*24*
382:*5*  403:*20*, *23*
**P.O**  2:*13*
**PAGE**  2:*16*  4:*4*, *10*
6:*19*  7:*2*, *12*  27:*8*
43:*11*  44:*11*  68:*15*,
*16*  72:*13*, *18*  74:*8*
75:*20*, *23*  76:*5*  84:*6*
99:*2*, *19*, *20*  100:*10*
103:*16*  104:*12*
108:*13*  111:*21*
121:*12*  136:*7*  140:*15*
156:*10*, *12*, *17*  184:*9*,
*24*  190:*2*  199:*2*
200:*17*  208:*10*  217:*5*
246:*5*, *6*  257:*12*
261:*14*  262:*12*  287:*8*
322:*4*, *5*  339:*1*
347:*21*, *22*  348:*3*
356:*14*  357:*2*  364:*11*
390:*21*
**pages**  75:*21*  84:*5*, *12*
100:*16*  111:*15*
217:*15*  338:*24*  339:*1*
**paid**  112:*24*  250:*11*
263:*10*  267:*17*  268:*3*,
*5*  269:*3*  381:*13*
**panel**  21:*15*
**paper**  30:*14*  166:*12*
**paperwork**  24:*20*, *23*
25:*3*, *10*  28:*16*  29:*9*
37:*1*, *3*, *10*, *11*, *12*, *21*
38:*2*  138:*19*, *24*
141:*22*  169:*2*  238:*2*,
*10*  296:*12*, *22*  319:*10*,
*14*  328:*4*  331:*2*
**PAR**  15:*21*, *23*  16:*5*
17:*21*  26:*23*  34:*13*
35:*6*  131:*8*, *9*, *10*, *19*

234:*2*, *3*  251:*17*
290:*24*  293:*17*
399:*13*, *15*, *19*
**para**  342:*16*
**Paragraph**  46:*4*
153:*8*  182:*5*, *16*
185:*20*  187:*22*  188:*4*
190:*4*, *12*  193:*4*
203:*10*  208:*14*  226:*7*
230:*21*  246:*5*  247:*3*,
*14*  249:*6*  250:*2*
257:*13*  262:*11*, *23*
263:*12*  264:*1*  320:*10*
333:*6*  342:*17*  348:*4*
**PARALEGAL**  3:*5*
9:*5*
**parcels**  320:*17*, *19*
**parenthesis**  64:*15*
**park**  163:*11*  165:*8*
183:*13*
**parked**  165:*1*
**parking**  158:*24*
159:*2*, *5*, *20*, *23*
160:*16*  161:*4*, *5*, *10*,
*12*, *15*, *18*, *22*  164:*21*,
*24*  165:*3*, *4*  170:*22*
182:*21*  183:*6*  328:*15*
**Parole**  31:*22*  32:*3*
**PARs**  15:*24*  280:*9*
290:*22*  378:*19*  379:*2*
399:*17*
**part**  16:*19*  17:*9*
21:*15*  25:*11*  66:*15*
68:*12*  83:*16*, *18*
84:*15*, *16*  89:*2*  108:*7*
119:*18*  132:*6*  134:*10*
169:*4*  185:*15*  186:*6*
187:*18*  210:*7*, *17*
211:*1*  215:*23*  222:*1*,
*23*  258:*10*  259:*15*
265:*9*, *12*  270:*20*
271:*2*  273:*5*  278:*8*,
*14*  279:*12*, *16*  282:*7*,
*12*, *13*  286:*21*  290:*14*
291:*8*  304:*15*  326:*13*
349:*4*  359:*4*
**participate**  168:*3*
**particular**  130:*10*
138:*6*  139:*5*  140:*19*

143:5  169:18  192:9
195:19  308:19
**parties**  3:3  8:20
9:23  10:2  386:23
**parts**  218:4
**party**  49:4  180:14
**passing**  27:10
**PASSODELIS**  2:20
**PAUL**  3:1  9:13
155:11, 16
**pause**  35:20
**paused**  83:23
**pay**  47:21  48:22
131:18  194:15  263:2
267:21
**paying**  113:3  210:5
**payment**  113:13
151:8
**payroll**  46:6, 12, 20
47:1, 4  49:1  62:1
250:10  252:2
**PENNSYLVANIA**
1:2, 20, 21  2:4, 14, 17,
22  3:2  8:15  31:12,
22  32:3, 10  36:18, 21
273:21
**people**  84:1  91:14
107:2  118:3  132:12
133:1  191:12, 15
240:9  329:3  377:4
**percent**  179:22
**per-diem**  125:2
250:9
**Perfect**  62:19  64:1
167:17
**perform**  42:15
226:11  232:13
237:10  246:12, 14
247:5  255:23  287:9
322:7, 15, 18
**performance**  217:12
**performed**  323:7, 23
**period**  47:21  51:18
53:4, 18  54:17, 22
55:6  136:24  209:22
214:16, 22  225:21
226:3  253:5  254:16
255:3, 8, 10, 17  263:2
268:3, 5, 7, 8, 9
280:24  285:4  286:6,

7, 10  336:15  368:2
372:16, 18  376:22
**periodic**  80:16
**periodically**  13:21
15:1
**permissible**  96:19
194:22  195:3
**permit**  136:22, 23
255:14  393:2
**permits**  128:9
234:16  348:8
**permitted**  93:14
97:2  139:3  140:22
141:15  163:12
195:13, 17  236:3
247:19  334:19
336:13  348:7  367:21
385:23  392:6  393:2,
23
**permitting**  267:16
**person**  20:10  80:23
81:4  82:5  83:23
90:6  91:16  93:5
106:21, 23  114:1, 3
127:10  148:21  172:3
213:9  221:3  234:12
326:15  355:11, 13
372:10  374:2  402:2
**personal**  15:18  37:5
120:18  136:19  205:8
**personally**  23:11
**personnel**  23:19
25:12  54:19  77:15,
19  224:3, 8, 14, 17
319:3, 8
**perspective**  47:5
113:9  201:2  210:5
265:1  393:1
**Philadelphia**  2:4
**phone**  22:5, 10
118:21  172:4, 6, 7
179:21  285:10  297:3,
4  344:18  358:1, 3
**photo**  234:11
**phrase**  253:11
**physical**  27:11  29:7,
10  302:13  319:10
**physically**  22:8
138:5, 15  142:14
358:17

**physician**  313:1, 4, 11
341:17  342:19, 21
343:11, 24  344:4
345:19  358:21  359:3
360:20
**physicians**  359:8
**physician's**  295:7
341:20  343:7, 23
344:5, 10, 13, 17, 21
346:10  356:2  357:12
**pick**  403:17
**picked**  128:11
**piece**  290:14  366:10
**pieces**  153:14  218:3
**pigeon**  302:16
**piling**  237:4
**PIPAK**  2:20  8:4
9:11  10:18  17:23
25:6  28:11  33:12
34:22  39:21  41:10
46:13, 18  48:4  50:11
56:22  59:12, 21  78:2
93:17  94:13  95:7
96:12  97:4  98:2
99:9  105:3  130:6
133:5  162:8, 16
166:15  176:13, 19
177:4, 7, 15  178:10,
14, 21  179:8, 15, 18,
24  180:5, 10, 16
194:19  198:5  201:10
203:23  211:22  214:4
239:15  240:20
241:19  243:15
244:10  248:9  265:7
266:4, 19  269:23
270:4, 10  272:1
276:13, 20  277:6, 22
282:20  300:10, 22
301:4, 12, 17  302:2, 6,
23  303:11, 15, 21
304:3, 7  305:10, 16
306:11, 12, 23  307:9
308:2, 3  311:9  312:1
319:20  325:10
327:24  329:19  332:8
334:11  353:7  359:18
368:3  376:13  377:1,
11, 24  378:15  379:7,
14  380:22  381:8

382:19, 24  383:4, 11,
19  384:1, 14, 22
385:10, 17  386:1, 14
392:8, 20  394:1
398:14, 22  403:14, 17
**Pittsburgh**  2:22
**place**  22:14, 18
110:21  140:3  163:14
164:5, 8  165:18
273:1  309:9  375:15,
19  377:15  378:14
**placed**  11:2  18:15
19:8  115:14  143:1
163:2  165:20  224:3,
17  297:20  319:2, 5
330:11  378:21  380:4
**placement**  226:15
247:16
**places**  333:9
**Plaintiff**  1:2  2:5  9:3,
4, 7  14:1  231:17
**Plaintiffs**  2:11  8:24
9:2  10:12  52:3
57:22  58:13, 16  59:1
60:11, 12, 15  114:21
115:4  192:5  231:18
232:16, 22  233:9, 15
236:22
**plaintiff's**  49:12, 24
50:5, 9  52:17  56:9,
21  58:9, 12  60:1
**plan**  271:23  272:2
273:1  275:7, 16
276:4  278:19  279:3
281:21, 22  282:3, 7,
13, 19, 22, 23  286:13,
21  287:21  291:5
375:14, 19, 20  377:15
**planned**  377:19
**planning**  370:8
390:24
**plans**  136:10
**platform**  117:3
118:14, 17
**played**  83:15  137:24
138:4  326:13
**please**  12:4, 14, 19, 22
13:10  184:11  269:13
301:20  303:19  311:5

Case 3:21-cv-00477-MCC    Document 280-1    Filed 09/20/23    Page 314 of 342
CONFIDENTIAL
Deposition of Heidi Zula Vol. I - Revised                                    Jane Doe, et al. v. Schuylkill County Courthouse, et al.

347:*21*

**pleased** 311:*12*

**plees@dmclaw.com**
3:*3*

**plenty** 310:*15*  386:*24*

**plethora** 96:*24*

**PLLC** 2:2

**plus** 290:2

**point** 40:*9*  51:*8*
52:*5*  54:*15*  88:*15*
89:*11*  121:*15*  134:*15*,
*21*  137:*20*  152:*22*
154:*1*  159:*1, 4*
188:*16*  190:*24*  191:*5,
6*  192:*9*  200:*17*
206:*12, 23, 24*  214:*11*
226:*17, 20*  253:*8, 9*
263:*3*  276:*19*  279:*6,
18*  314:*24*  362:*7*
376:*17*  377:*16*
385:*20*  393:*9, 10*
394:*5*  401:*17*

**pointed** 35:*19*  350:*12*

**pointing** 350:*13*

**points** 200:*4*  235:*18*

**police** 171:*13, 14*
176:*5, 6*

**policies** 37:*7*  38:*24*
39:*18, 24*  40:*11, 23*
41:*9, 19*  69:*20*  99:*24*
105:*2*  106:*14*  108:*19*
111:*1*  115:*22*  119:*7*

**policy** 17:*19*  33:*9*
41:*16*  54:*8*  61:*9, 12*
62:*22*  63:*11, 19*  64:*3,
5, 10, 11, 12, 20, 24*
65:*15, 16, 17, 24*  66:*9*
67:*6, 8, 14, 18*  68:*12*
69:*3, 4, 7, 9, 11*  70:*2,
5*  81:*13, 14, 21*  84:*16*
86:*6*  88:*11*  89:*1, 6, 8*
90:*20*  91:*3, 23*  92:*3,
4, 16*  101:*1, 4, 6, 15,
17*  103:*12*  104:*12, 22*
105:*9, 14, 18, 20*
106:*2, 11, 18*  107:*6*
108:*11, 12*  109:*8, 14,
19, 21, 22*  110:*8, 12,
20*  111:*7, 18*  112:*8,
20*  113:*11, 21*  114:*24*

115:*1*  116:*3, 7, 11, 12,
14*  117:*12, 14, 18*
119:*12, 18*  133:*17*
173:*3*  195:2, *9*  201:*4,
5, 6, 19*  204:22, *23*
205:*1, 3, 5, 7, 8*
389:*11, 14*

**pop** 80:*16*

**portion** 17:*3, 21*
27:*8*  54:*16*  92:*24*
348:*8, 9, 10*

**posed** 13:*13*  186:*17,
21*  187:*2*  188:*9*
306:*15*

**position** 18:*8*  19:*18*
21:*3, 10*  26:*17, 18, 24*
30:*16, 21*  31:*3, 4, 6*
32:*4, 7*  34:*20*  39:*9*
40:*23*  41:*8*  43:*17*
44:*6*  49:*11*  50:*3*
52:*24*  91:*10, 15, 16*
92:*5*  94:*24*  107:*18*
125:*14, 20, 21*  127:*23*
131:*3, 9, 15, 18, 24*
132:*3, 20*  133:*4*
134:*6*  209:*13*  210:*3,
13*  213:*3*  215:*10, 15*
219:*4, 12, 17*  221:*23*
224:*6*  234:*16*  241:*3,
18*  244:*1, 7*  245:*16,
21*  252:*8*  253:*16*
258:*6*  267:*19*  274:*10*
287:*20*  288:*6*  289:*1,
6*  290:*8, 10, 11*
291:*13*  323:*7, 24*
370:*6*  375:*18*  386:*2,
4*  396:*12*  400:*10, 13*
401:*16*

**positions** 91:*14*
123:*16*  129:*15, 19, 22*
130:*9, 15, 23*  131:*1*
132:*10, 13, 19*  141:*19*
210:6  213:6, *17*
222:*3*  227:*14, 18*
236:*15*  245:24  246:*3*
287:*13*  288:*7, 10*
289:20  321:*17*
378:*19, 21*  394:*13*
395:*9*

**possible** 154:*5, 9*
252:*3*

**possibly** 374:*17*

**post** 236:*14*  291:22
367:*23*

**posted** 401:*16*

**poster** 120:*8, 19*

**posters** 119:*16, 22*
120:*15*

**posting** 21:*5*

**potential** 77:*7*
185:*18*  241:*10*  242:*7*

**Potentially** 41:*16*
57:*16*  67:*19*  85:*23*
86:*1*  98:*5*  102:*10*
119:*3*  131:*22*  148:*23*
158:*4*  174:*18*  204:*3*
255:*15*  257:*7*  259:*17*
276:*8*  328:*14*  371:*23*
396:*1*  400:*15*

**PowerPoint** 79:*2, 5*
80:*2*  83:*4, 7*  84:*7*

**PowerPoints** 80:*19*

**practice** 208:*16, 18*

**precedent** 195:*16*

**preceding** 317:*6*

**precluded** 92:*22*
93:2  98:*9*  386:*6*

**preemployment**
319:*10*

**pre-orientation** 28:*16*

**prep** 396:*19*

**preparation** 225:*17*

**prepare** 173:*13*
175:*1*  287:*9, 11*

**prepared** 88:*12*
112:*14*  115:*7*  173:*14*
280:*16*  378:*6*  386:*10*
400:*7*

**prepares** 399:*20*

**PRESENT** 3:*5*  9:*2,
4, 17*  22:*7, 8, 18*
160:*5*  172:*1*  175:*23*
191:*16*  194:*14*
209:*14, 17*  221:*18*
259:*24*  287:*16*
367:*14*  389:*1, 13*
391:*4, 9*  392:*2, 6, 19*
393:*14, 15, 22, 24*
402:*18, 20*

**presentation** 81:*3*
84:*17*  115:*11*

**presented** 79:*3*
115:*17*  117:*5*  259:*21*
278:*21*  396:*15*

**preservation** 191:*4*

**preserved** 191:*20*

**press** 186:*24*  187:*10,
16, 24*  188:*23*  196:*11*
233:*3*

**pressing** 376:*11, 16*

**pretty** 53:*15*  56:*17*
57:*9*  93:*8*  205:*13, 14*
207:*2, 20, 23*  264:*16*
291:*9*  300:*16*

**prevent** 385:*7*

**previous** 94:*2*
104:*13*  363:*16*
368:*20*  390:*7*

**PREVIOUSLY** 6:*18*
45:*13, 14, 17*  202:*21*
203:*17*  247:22
396:*13*

**previously-held** 275:*1*

**Price** 272:*11*  283:*6*
285:*6*  381:*6, 13*

**Price's** 285:*3*

**primary** 54:*18, 21*
210:*12*  267:*10*

**Prior** 18:*11, 16*  20:*6*
21:*9*  23:*2, 5*  29:*6*
31:*21*  35:*2, 17*  36:*9,
10*  49:*19*  58:*4*  87:*6*
110:*21*  113:22, *23*
125:*6, 9*  131:*10*
136:*13*  137:*12*  142:*7*
143:*8, 12*  148:*22*
152:*11, 23*  153:*5*
159:*19*  163:*7*  165:*2*
187:*23*  189:*8*  195:*11*
202:*4*  204:*6*  207:*13*
211:*3*  215:*4, 16*
218:*11*  220:*12*
222:*16, 18*  227:*9*
231:*9, 19*  234:*2*
240:*6*  242:*3*  247:*3,
14*  253:*5, 15*  256:*17,
22*  257:*20*  268:*17*
272:*18*  273:*13, 24*
281:*19*  284:*16*

Case 3:21-cv-00477-MCC    Document 280-1    Filed 09/20/23    Page 315 of 342
CONFIDENTIAL
Deposition of Heidi Zula Vol. I - Revised                    Jane Doe, et al. v. Schuylkill County Courthouse, et al.

334:*13*  335:5, *10*
336:*23*  337:*20*  371:*4*
389:*23*  397:*3*  398:6
400:*17*
**prison**  62:*14, 17*  86:*3*
**privacy**  145:*17*
**priveledged**  301:*16*
**privilege**  10:*1*
176:*18, 19*  177:2
178:*11*  179:*23*  277:9
300:*23*  301:*20*  302:9
303:*10*  304:*16*
305:*19*  308:*18*
309:*14*  382:*20*
**privileged**  96:*23*
179:*4*  301:*11, 15, 21,
24*  303:9  305:9
306:*5, 10*
**privy**  152:*15*  227:*24*
**probably**  50:*18*  54:*5*
57:9, *11, 13*  123:*21*
146:*17*  159:*22*
165:*23*  181:*13*  182:*1*
203:8  206:*18*  211:*13*
212:*19*  223:*15*  262:8
280:7  298:*11*  307:*15*
339:*19*  377:*14*
**Probation**  31:*22*  32:*3*
**procedure**  17:*20*
133:*17*  195:*3*
**procedures**  10:*16*
37:7  38:*24*
**proceed**  8:*22*  259:*19*
260:*4*  361:*10*
**proceeded**  394:*14*
**process**  33:9  46:5
47:*4*  103:7  126:*19,
21*  132:*24*  133:9, *18*
140:*1*  142:*4*  169:*14*
173:7  210:*18*  244:*4,
8*  259:*3*  260:*4*
283:*14*  297:2  314:6
358:*23*  359:*3, 12*
364:*12, 15*  365:*2, 6*
367:7  371:*18*  377:*18*
**processed**  46:*21*
**processor**  47:*1*
**produce**  235:7
**produced**  68:*1*
276:*19*  277:8  366:9

**product**  305:*5*
320:*21*  321:8, *12*
333:*19*  334:*15*  335:8
368:*21*
**PRODUCTION**  7:*11*
67:*24*  235:*3*
**productive**  237:*16*
334:*10*
**professionally**  147:7
148:7
**program**  117:*5*
121:*20*  209:*12*  210:*3*
234:*14*
**progressed**  52:*19*
**projects**  259:*20, 23*
**prolonged**  236:*17*
**promoted**  401:*11, 15*
**proper**  46:7  212:*3*
311:*4*
**properties**  128:*6, 11,
16*  241:*5*  372:*22*
373:*19, 24*  374:*4, 9,
10, 13*
**property**  128:*23*
200:*13, 20*  212:6
374:7
**proposed**  104:*12*
**protection**  159:*13*
**protocol**  164:7
**protocols**  194:*13*
**provide**  15:*3*  77:5
101:*23*  102:*13*
115:*12*  121:*21*  125:2
132:*1*  161:*21*  162:*15*
171:*17*  174:9, *12, 17*
175:*15*  249:*11, 14*
260:*11*  262:*17*  265:2
300:*20*  306:*17, 20*
324:*4, 7*  345:*3*
359:*12*  384:6
**provided**  29:*12*  41:*4,
8, 18, 19*  70:*16, 22*
80:*22*  81:*16*  95:*3*
101:*20*  112:*23*  120:*5*
124:*16*  160:*18*
161:*24*  162:*1*  170:*1,
4*  171:*19*  173:*17*
175:*3*  185:7  197:9
202:*17*  203:7  216:*16*
230:*23*  235:*18*  236:7

237:8  246:*11, 20*
247:*22*  249:8  256:*18,
24*  257:*3*  258:*22*
290:*20*  297:*19*
305:*17*  307:*1*  308:*4*
315:*11*  322:*15*  327:*1,
3*  339:*13*  341:*22*
342:*1, 22*  358:*20*
380:*18*
**provider**  295:9
316:*19*  326:*10*  332:6,
15*  339:*12*  346:*22*
353:*1, 2*  360:*5*
**providers**  46:6  360:*4*
**provider's**  347:*1*
352:*23*  360:*14*
**provides**  344:*18*
360:6
**providing**  168:*17*
175:8  200:*12, 19*
362:*2*
**prudent**  90:*13*
105:*24*  106:8
**Public**  1:*23*  144:*8,
11, 18*  145:*5, 18*
328:9  404:*4*
**publicized**  207:9
**publicly**  111:*4*
**pull**  244:*13*  245:*1*
**pulled**  241:7  242:*14*
243:*3*
**puller**  245:*10*
**pulls**  213:*14*
**purely**  304:*20*
**purpose**  199:*12*
209:*10, 11*  210:*12*
301:6  303:*1*  305:*17*
308:*5*  383:*5*  384:*14*
**purposes**  15:*14*
277:*12*  301:9  338:*11*
340:*21*  394:*20*
**purview**  269:*16*
**push**  398:*12, 20*
**pushed**  377:*21*  378:*3,
11*
**put**  27:*20*  34:*4*  41:*1*
49:6  88:*1*  90:*13*
92:*16*  105:*24*  119:*14,
16, 22, 24*  120:*1, 10*
128:7  131:*19*  133:8

140:2  155:*19*  183:*12,
15, 16*  213:*16*  216:*17*
238:*24*  241:6  242:*23,
24*  243:7  251:7
273:*1*  275:8  277:*13*
288:*13*  290:*22*
303:*24*  304:*12*  307:*5*
310:*19*  311:*14*
339:*16*  347:*17*
355:*15*  370:*21*
375:*14*  376:*5*  378:*19*
399:*19*  401:*18*
**puts**  213:*20*
**putting**  217:*21*
218:*3, 24*  220:*17*
400:*15*
**puzzle**  290:*14*

**< Q >**
**qualifications**  34:*19*
138:*3*
**qualified**  42:*15*
146:*20*  271:*11*
**quality**  304:*16*
**quarantine**  137:*20*
**question**  11:*22, 24*
12:*3, 5, 10, 19*  13:*12*
30:8  36:2  58:*22*
62:*20*  66:*11*  78:*10*
83:*24*  85:6  87:*18*
110:*5, 23*  127:*16*
129:*10*  158:*19*
170:*11*  171:*20*
178:*21, 22*  179:*1, 8*
180:*5, 6, 13, 17*
186:*17, 21*  187:*1, 21*
188:8  194:*4*  200:*16*
205:*22*  228:7  247:7
267:9, *16*  268:*19*
270:9, *11*  277:*20, 21*
289:*10*  299:9, *10, 22*
302:7  303:*4, 12, 15,
17, 22*  304:*4*  305:*11*
306:9, *15, 18, 24*
307:*2, 13, 18, 19, 22*
308:*4*  322:6  332:*12*
336:9  359:*14*  364:*10*
365:*23*  372:*1*  383:7
384:*5*  385:*13*  386:*13*

questioned   73:1, 2
294:18, 24
questioning   96:13, 19
97:1, 3   383:21   385:7
questions   10:14
13:18   36:6   43:7
47:19   87:13, 21
132:2   177:13   228:15,
16   270:11   277:14, 18
305:8   321:7   322:20
385:24   387:1   395:10
403:1
quick   61:14   287:6
353:5
quickly   65:14
183:10   377:18, 22
378:3
quite   266:2   267:18
378:7, 8
quiz   81:18   82:10
83:2, 21   84:9, 24
85:6   87:1
quoting   342:23

< R >
raise   85:7, 8
raised   98:15   157:21,
22   231:18, 21   233:10,
23   333:5, 6   383:14
396:5
raises   157:11   190:7
ramifications   374:12,
14
ran   370:18
raped   94:7
rate   239:20   251:9
rates   208:19
ratio   212:8   215:1
reach   168:14   171:3,
10, 11   172:5, 16
176:4   178:23   179:12
180:4, 8   196:7   221:3
296:24   340:4   344:21,
24   345:12   355:5
360:4
reached   171:16
176:17   178:2   236:22,
23   305:11   316:11
345:11, 15   358:5

366:12
reaches   363:23
reaching   176:20
359:8   361:21
read   39:4, 18   49:16
63:9, 17, 18   69:6
105:12   167:8   179:1
289:10, 12   307:10
399:12, 15
reading   106:20
153:23   187:14   235:1,
2   245:14   332:12
reads   92:21   103:12
226:8
real   61:13   123:9
213:2, 4, 15   214:2
225:16   244:6   252:11
286:15   287:6   288:14
289:1   320:17   353:5
realize   12:12
really   49:16   118:20
129:2   177:8   217:21
219:2   275:17   316:17
339:22   400:3
reason   13:6   35:19
68:23   119:4   141:14
179:23   185:14
208:23   219:8   227:20
229:9   315:17, 19
360:8   370:1   373:16
391:20   392:5   399:15
reasonable   296:13
297:19   298:8   299:13,
15, 19   300:2   312:9,
19   313:13   315:9, 14
316:20   319:13
325:24   341:19
reasoning   327:6
333:17
reasons   210:1
227:23   228:2, 4, 8, 10,
23   252:5
reassigned   157:14
reassigning   286:23
recall   19:10, 13
20:21, 22   22:12, 19
23:15, 16   30:5, 13, 15
37:3, 13, 16, 18   40:7
51:15   55:22   56:12,
13, 18   60:8   61:1, 2,

10, 11   69:12, 23
70:11   74:16   80:2
81:22   84:1, 13   87:10,
12   88:16   90:10, 22
96:2, 4, 7   97:18   99:6,
15, 16   104:20   114:4,
8, 10, 14, 17, 18
115:17, 20   116:1
120:5   125:16, 23
126:9, 13   134:13, 18
135:1   136:13   137:7
139:5, 17   140:11, 17,
18, 24   141:13   143:6,
23, 24   144:4, 6, 9
146:5, 12   150:1
157:23   159:7, 8, 12,
18   162:18, 21   163:4,
6   164:23   165:14
167:24   169:13
170:16, 20   171:2
172:23   173:7   175:11
181:9   182:8   183:8
187:9, 11   188:9
191:3   192:14   201:23
205:18   206:17
223:16   224:2   225:19
226:4   232:4   238:22,
23   249:18   260:9
268:2   276:2   279:15
281:17   284:18   286:3
291:10   298:12, 18
309:23   314:18   315:3
316:14, 17   317:12, 14
333:24   336:17, 23
338:3, 6, 9, 22   345:17
346:24   358:13
360:16   361:21
367:16   387:17
395:23   396:7   397:8
402:19, 24   403:2, 3
recalled   205:24
recalling   205:17
receipt   42:8   43:19
105:17   106:3   367:24
receive   26:5   28:5
40:23   41:21   42:17
44:21   63:18   76:24
170:5   197:5   283:8
311:6   314:1   331:5
337:12   343:19

344:15   346:13   349:9
366:24   367:1
received   24:14   28:8,
9   39:3, 18   43:18
55:21   63:9   64:11
69:20   81:5, 6, 10, 14
105:1, 12, 19   168:18,
19   170:7, 12, 14
174:11   178:9   181:3
182:2, 6   197:18
212:16   214:23
219:24   260:3   277:11
295:7, 22   296:1, 8, 17,
22   297:7, 18   313:1, 3
314:23   315:5   319:2
324:2   326:10   327:11
328:4, 5   330:10, 11,
13   337:13   338:23
339:6, 17, 18   341:17,
22   342:24   343:1, 10
345:18, 23   347:1
348:23   349:8   353:19
356:2, 16, 23   357:9,
15   360:22   368:7
402:15
receiving   182:8
311:19   331:16
336:17   346:20
350:17   353:10, 12
receptionist   145:23
recess   108:2   166:4
277:3   305:21   382:2
recognize   15:15   24:5
26:3   28:3   29:21
32:20   38:10   42:6
43:9   63:6   65:11
67:2   72:11   75:16
78:24   116:24   135:24
139:14   150:11
151:17   156:5   199:3,
4, 7, 9   208:7   217:4
261:12   271:21
295:18   313:23   316:9
317:22   322:2   330:6
352:5   361:18   363:12
Recognizing   308:11
recollection   70:16
101:22   188:20
201:13   293:17
348:18   362:10

recommend 16:*16*
228:*14* 399:*9*
recommendation
17:*6* 92:*16* 135:*14*
224:*9* 241:*13* 289:*22,*
*24* 290:*19* 369:*23*
399:*18* 402:*5*
recommendations
259:*20, 23* 278:*11, 15*
281:*14* 282:*15*
recommended 16:*16*
117:*7* 219:*16* 245:*24*
388:*15, 18*
recommending
224:*11* 253:*15*
reconsider 343:*21*
reconsideration
346:*1, 21*
reconsidered 332:*5*
346:*2*
record 8:*11* 48:*17,*
*20, 21* 79:*22* 99:*19*
107:*24* 108:*3, 6*
110:*6* 127:*1* 165:*24*
166:*2, 5, 8* 268:*20*
277:*1, 4, 13* 278:*1*
292:*13* 304:*9, 11*
305:*22* 307:*5* 312:*5*
342:*10* 381:*21, 24*
382:*3, 6* 386:*16*
403:*20*
recordkeeping 46:*7*
records 48:*2, 10, 14,*
*23* 104:*24* 250:*11*
252:*1*
recovered 374:*18*
rectify 380:*20*
red 88:*10* 89:*6* 92:*4*
103:*16* 104:*13* 106:*6*
red-line 88:*12* 99:*1*
100:*9* 111:*15* 115:*5,*
*7, 12, 18*
redlined 88:*7*
reevaluate 341:*18*
refer 14:*1, 17* 26:*22*
127:*7*
reference 15:*12*
27:*11* 32:*23* 33:*2*
35:*16* 288:*5* 321:*6*
322:*8*

referenced 193:*7*
207:*14* 343:*13*
346:*14*
references 35:2 36:*8*
322:*10* 386:*10* 394:*9*
referred 15:*21*
referring 13:*22, 24*
14:*5, 11, 14, 18* 35:*9*
45:*20* 58:*21* 59:*8*
169:*8, 9* 193:*6* 268:*8*
291:*15* 321:*3* 364:*3*
reflect 113:*11*
reflection 311:*16*
reflects 44:*5* 176:*14*
refresh 362:*9*
refreshes 293:*16*
refused 74:*4* 306:*17*
regard 198:*15*
regarding 10:*16*
20:*6, 13* 50:*23* 52:*17*
58:*1* 59:*10, 16* 60:*6*
83:*17* 85:*2* 87:*17*
88:*22* 92:*20* 95:*17,*
*22* 100:*11* 107:*16*
121:*22* 133:*11, 17*
136:*19* 153:*9* 157:*7*
168:*17, 20, 22* 170:*13*
171:*21* 177:*19* 181:*1*
182:*20* 184:*1* 185:*16*
189:*20* 190:*7* 192:*11,*
*14, 16* 194:*9* 196:*10*
204:*23* 205:*4* 215:*6*
222:*4, 10* 224:*13*
229:*24* 231:*18* 242:*1*
257:*17, 22* 258:*20, 24*
261:*16* 268:*22*
275:*13, 20* 276:*9*
278:*11* 281:*15, 22*
283:*9* 284:*5* 296:*12*
297:*16* 298:*8, 14*
300:*1* 306:*9* 307:*19*
308:*17* 309:*18*
313:*13* 314:*6, 10, 20*
315:*8, 12* 316:*21*
325:*20* 326:*8, 16*
328:*4* 336:*18* 341:*19*
355:*3, 10* 357:*19*
360:*20, 23* 361:*22*
362:*2* 367:*6* 368:*20*

390:*1* 391:*3, 5*
396:*21*
regardless 241:*4*
322:*23*
regards 361:*7*
regular 25:*11* 47:*18*
71:*9* 140:*12* 304:*1*
rehired 125:*2*
reissue 113:*7*
related 47:*2* 114:*22*
137:*15, 17* 138:*11, 12,*
*20* 196:*12* 228:*18*
283:*12* 306:*18*
392:*16, 17*
relates 99:*10* 359:*7*
relayance 184:*2*
releases 29:*9*
relevant 195:*18*
242:*4, 8* 305:*2, 6*
327:*18*
relied 327:*4*
relocated 142:*9, 20*
152:*7*
relocating 229:*17*
relocation 158:22
rely 384:*24*
remain 110:*21* 122:*3,*
*5, 13* 263:*4* 348:*6*
370:*13* 401:*23* 403:*6*
remarks 58:*19* 60:*6*
remedies 148:*10*
remedy 259:*7*
remember 12:*18*
18:*18, 20, 22* 19:*7, 11*
35:*11, 22* 36:*7* 40:*5*
51:*13* 57:*7* 61:*7*
85:*18* 88:*19* 99:*7*
113:*19, 24* 173:*2*
186:*9* 248:*23* 269:*8*
293:*7* 336:*24* 345:*9*
362:*14* 387:*5* 400:*14*
remind 262:*14*
removal 219:*4*
220:*13, 15*
removed 89:*15*
104:*13* 219:*16* 224:*6*
237:*20* 241:*18*
245:*20* 246:*2* 253:*16*
375:*18*

removing 215:*9*
219:*11*
render 93:*1*
rendered 301:*23*
302:*19* 303:*8* 304:*24*
307:*4*
renders 13:*7*
repeat 156:*21*
294:*20* 309:*1* 332:*11*
repeated 205:*22*
rephrase 12:*5* 59:22
126:*11*
replace 148:*18*
375:*19*
replaced 157:*3*
replacement 378:*12*
379:*5*
replies 387:*13*
report 26:*10* 62:*14*
101:*5, 9, 10, 11, 12, 17,*
*23, 24* 102:*4* 117:*20*
118:*3, 22* 147:*5*
171:*13* 173:*15* 176:*6*
184:*1* 211:*20* 213:*7,*
*8, 14* 217:*11* 222:*12*
228:*5* 231:*2, 10, 12*
241:*8* 242:*4, 6, 22*
244:*2, 13, 18* 245:*1, 9,*
*14* 253:*2* 259:*8*
265:*20* 290:*20* 377:*5*
399:*13, 15, 20*
reported 102:*2*
103:*3* 118:*7, 10*
119:*2* 147:*3* 161:*16*
196:*3, 13, 15, 16, 17,*
*20* 197:*23* 198:*14*
259:*19* 400:*4*
REPORTER 8:*1, 21*
11:*11, 17* 118:*16*
289:*12* 307:*10*
Reporting 8:*12*
101:*7* 205:*5* 232:*19*
336:*15*
reports 34:*5* 121:*17*
174:*5, 8* 176:*24*
211:*15* 212:*2, 17*
213:*1, 3* 214:*2, 10, 24*
218:*13, 19* 219:*3*
220:*4* 222:*6* 223:*6*
224:*19* 225:*4, 18*

Case 3:21-cv-00477-MCC    Document 280-1    Filed 09/20/23    Page 318 of 342
Deposition of Heidi Zula Vol. I - Revised
CONFIDENTIAL
Jane Doe, et al. v. Schuylkill County Courthouse, et al.

226:*13*, *16*  227:22
228:*19*  229:*2*, *5*, *18*,
*21*  230:*23*  240:*19*, *24*
241:*9*, *11*  242:*7*, *8*, *9*,
*13*  243:*11*, *12*  245:*17*
246:*15*, *23*  247:*12*, *17*,
*23*  252:*16*, *21*  253:*21*
254:*2*, *7*  257:*4*, *9*, *22*
258:*13*, *20*  259:*8*
262:*1*, *21*  265:*13*
266:*12*  267:*11*, *18*
268:*11*, *14*, *23*  269:*14*
283:*12*, *13*, *15*, *24*
284:*6*, *8*  289:*23*
290:*14*  291:*4*, *22*
294:*4*  299:*4*  334:*16*
335:*3*, *8*, *13*, *18*
373:*22*  374:*11*
380:*10*, *13*  402:*17*
**represent**  8:*20*  10:*11*
67:*23*  159:*17*  240:*16*
306:*12*
**representation**  43:*22*
45:*9*  150:*19*
**REQUEST**  7:*11*
13:*12*  15:*19*  28:*23*
74:*1*  98:*17*, *21*
114:*18*, *21*, *22*  131:*7*,
*19*  133:*11*  138:*7*, *13*
140:*5*  160:*14*, *16*
215:*4*  238:*16*, *21*
240:*18*  246:*13*
247:*11*  275:*15*
296:*13*  298:*9*  299:*14*,
*16*  300:*2*, *3*  310:*16*
312:*10*, *19*  313:*13*
314:*7*, *10*, *18*  315:*9*
316:*16*, *20*  317:*1*
319:*13*  322:*7*, *18*
324:*9*, *20*  325:*6*, *24*
326:*8*  332:*3*, *16*
335:*11*  336:*21*  338:*7*
341:*19*  344:*21*  346:*1*,
*8*  350:*9*  352:*12*
353:*17*  354:*21*  355:*2*,
*4*  357:*20*  360:*13*, *14*,
*22*, *24*  366:*17*  367:*19*,
*20*  368:*1*, *13*, *18*
387:*8*  389:*19*, *20*, *23*
390:*9*  391:*13*

**requested**  28:*17*
114:*6*, *17*  115:*3*
136:*21*  143:*9*  162:*1*
169:22  174:*21*
207:*21*  208:*24*  209:*1*
221:*13*  232:*16*
235:*16*  236:*3*  237:*14*
254:*16*  260:*1*  261:*19*
316:*13*  319:*24*
341:*18*  346:*11*  355:*5*
391:*4*  394:*11*
**requesting**  114:*18*
131:*9*  209:*21*  236:*14*
343:*7*  350:*19*, *24*
**requests**  98:*1*  110:*19*
154:22  155:*1*  242:*2*
315:*13*  323:*3*, *8*, *22*
324:*2*, *4*, *6*  366:*18*
**require**  73:*24*
243:*12*, *13*  299:*6*
364:*16*, *22*
**required**  42:*14*, *20*
44:*2*  46:*5*  73:*20*
127:*20*  233:*18*  244:*6*,
*13*  257:*21*  265:*17*
**requirement**  13:*11*
127:22  189:*20*
324:*20*
**requirements**  236:*9*
275:*4*  323:*5*, *14*
**requires**  48:*1*
**requisite**  317:*5*
**rescheduled**  77:*7*
78:*5*, *7*
**rescheduling**  76:*19*
**reserve**  177:*13*
384:*12*  386:*22*, *23*
**reserved**  183:*6*
**reserving**  382:*21*
383:*2*  384:*16*
**resignations**  125:*13*
**resolve**  155:*14*
**resource**  221:*8*
**resources**  17:*6*, *16*
19:*18*  21:*4*  39:*9*, *16*
41:*7*  42:*9*  43:*17*, *23*
46:*12*  53:*9*  54:*11*
80:*10*  92:*6*, *22*  93:*2*,
*9*, *11*  94:*10*  95:*2*
98:*9*  101:*8*  102:*12*,

*19*  122:*2*, *4*  186:*13*,
*14*  230:22  240:*19*
246:*13*  247:*11*  280:*4*
312:*11*  330:*10*, *13*, *23*
356:*1*, *16*  359:*21*
362:*3*, *6*, *11*
**resource's**  140:*16*
**respond**  311:7
322:*14*  323:*1*  396:*8*
**responded**  121:*19*
203:*6*
**respondents**  192:*4*
396:*16*
**responding**  11:*23*
**responds**  262:*4*
344:*16*, *17*
**response**  202:*16*
203:*4*, *5*  314:*1*  322:*8*,
*17*  350:*16*  352:*11*, *23*
358:*6*  366:*4*, *5*, *17*
388:*4*  391:*10*
**responses**  11:*17*, *19*
84:*7*  353:*1*
**responsibilities**  42:*14*
44:*6*, *13*  46:*4*  53:*19*
214:*9*  299:*2*  326:*12*,
*17*
**responsibility**  43:*23*
54:*18*  241:*1*
**responsible**  40:*18*
44:*3*, *9*  46:*12*  77:*11*,
*15*  212:24  226:*23*
245:*10*, *17*, *22*
**restate**  198:*9*
**restricted**  163:*18*
165:*15*  188:*17*
**restriction**  163:*14*
165:*20*
**restrictions**  163:*2*, *5*
**restructure**  399:*18*
**restructured**  400:*2*
**restructuring**  216:*1*
382:*9*  385:*13*  402:*10*
**result**  88:22  89:*17*
90:*23*  160:*4*  176:*24*
206:*7*  214:*16*  233:*24*
237:*21*  239:*11*, *24*
289:*21*  290:*6*  303:*4*
331:*11*  349:*14*
378:*21*

**resulted**  220:*15*
227:*6*  288:*23*  290:*7*
**resulting**  91:*3*  224:*16*
**results**  138:*21*  289:*19*
**resume**  29:*24*  30:*7*, *9*,
*13*, *17*  218:*12*  278:*23*
362:*10*
**retain**  215:*14*
**retaliating**  93:*13*
**retaliation**  59:*20*
60:*1*  77:*24*  119:*2*
197:*24*  324:*16*
385:*11*, *19*
**retaliatory**  390:*23*
**retired**  274:*17*
**retiree**  116:*2*, *7*, *11*
**retirees**  249:*12*, *16*
250:*8*
**retirement**  37:*10*
**retirements**  125:*12*
**retrieved**  233:*19*
**return**  51:*6*  190:*23*
336:*4*  337:*2*, *6*
**returned**  147:*1*
152:*18*  216:*4*, *12*
256:*8*  337:*5*
**returning**  248:*20*
396:*12*
**REV9-13**  64:*15*
**revealed**  222:*9*, *16*, *22*
223:*1*
**review**  47:*17*, *20*
63:*17*, *18*  93:*15*
98:*12*  115:*11*  128:*6*,
*8*  131:*21*  133:*9*
135:*15*  138:*7*  185:*6*,
*7*, *9*  197:*16*  213:*9*
227:*4*  239:*1*  244:*13*
252:*1*  257:*8*  282:*14*
283:*9*  287:*17*  295:*7*
297:*14*  315:*10*
318:*18*  324:*19*
325:*16*  331:*9*, *13*
339:*11*  341:*21*
342:*19*, *21*  343:*8*, *11*,
*23*  344:*1*, *5*, *10*, *14*
345:*19*  346:*10*
349:*12*  356:*2*  357:*12*,
*13*  358:*7*  360:*20*

Case 3:21-cv-00477-MCC   Document 280-1   Filed 09/20/23   Page 319 of 342
CONFIDENTIAL
Deposition of Heidi Zula Vol. I - Revised
Jane Doe, et al. v. Schuylkill County Courthouse, et al.

361:8   362:17   367:2
370:20
reviewed   63:9   69:6,
11   82:23   95:3
105:11, 12   112:16
115:8   117:6   131:16
135:15   167:15
185:13, 14   190:18
216:16   231:5   273:13
278:20   297:15
302:17   305:2   317:3
323:3, 9, 11   324:3, 23,
24   325:5   334:18
357:15
reviewing   70:1
200:10, 15   207:17
209:12   349:14   367:4
reviews   213:9   299:5
374:7
revise   40:10   112:19
113:11, 21
revised   61:8, 12
63:11, 18   64:16
67:10   68:3, 5   69:7, 9
70:1, 5, 7   81:11   86:6
99:20   105:2   106:10
108:11   115:23   116:2
341:23   342:4
revision   62:22   64:19,
24   66:3, 9, 15   67:15,
18   68:19   88:4, 12
98:8   99:1, 5   100:9
104:12, 19   105:15
106:1, 2, 15   109:8
112:15   113:23
114:23   115:1
revisions   40:10   45:3,
5   69:2, 22   87:22
88:11, 20   89:19
90:19   91:5   96:2
100:9   108:19   110:12,
18, 24   112:7   113:14,
15   115:5
revisit   310:17   386:23
rid   288:14
right   13:20   14:7
18:2   24:15   30:9, 22
32:9   34:9   38:13
63:23   68:2   73:13
77:13   79:24   83:21

85:9   87:4   103:14
107:20   108:9   110:16
111:20   127:2   145:10
150:2   155:21   163:14
165:18, 22   180:16
189:17   196:14
220:22   248:5   261:17
264:10   269:6   270:8
278:3   280:11   302:2
304:5   309:19   310:24
319:18   326:11, 13
327:12   330:9   338:21
339:17, 19   340:16
341:14   347:5, 18
353:3, 21   363:5
366:11, 22   368:22
373:1, 3   374:1
382:22   383:2, 16, 24
384:2, 12, 16   385:18
386:22, 23   389:1
391:13   393:16
401:20
RIGHTS   2:7   101:6
316:22
ripped   81:21
rising   278:7
risk   333:9
Road   3:2   291:13
role   54:1   91:17
215:12   220:5   285:3
324:17   375:16   401:9
roles   128:7, 12   218:2
Room   2:9   9:2   11:6
85:18, 19, 21, 24
152:7
Roth   2:18   9:19
56:20   96:8   160:5
162:3, 9   211:1
232:10, 22   233:7, 16
234:10, 21   235:17
236:6   276:5, 7, 8
277:16   283:1
Roth's   293:7
round   21:21
RPR   1:22   404:4, 22
run   213:8   237:1
273:6
running   185:18
211:5   255:21   380:9

Ruscavage   252:18, 20
253:4


< S >
sabbatical   336:1, 7
safe   236:22   237:9
299:17, 20   320:1, 2
328:23   332:7, 17, 18,
19, 23   333:1
safer   329:17
safety   174:5, 22
197:6   200:13, 19
202:1   233:10, 24
333:11
salary   18:4   19:22,
23   20:2, 7, 13, 15, 19
29:12   130:23, 24
131:5, 20, 21, 24
132:4, 6, 9, 11, 17
133:10, 21   134:6, 11
251:2   287:21
sale   212:4, 6
sales   212:4   243:4, 5
264:6
sat   171:8   371:21
393:17
satisfactory   27:11
save   75:21
saw   45:8   100:16
181:7   380:20
saying   24:24   82:24
119:4   168:19   176:21
202:19   204:10
220:24   265:4   266:9
268:7   290:13   291:12
303:19, 20   307:23
332:23   342:23   343:4,
17   359:13   392:24
says   76:6   94:5
128:19   129:22   130:4
131:3   142:1   154:8
184:11   186:12
187:17   193:5   195:3
200:18   203:10
204:13, 22   208:15
217:20   221:7   222:8
226:1   247:14   259:5
262:13   263:13, 14
287:9   293:17   314:4
318:24   322:6   323:12

330:9   339:1   340:16
341:16   342:1, 18
344:10   362:24
389:11, 14   395:7, 16
396:3
SC1254   65:5
SC1254-1259   4:22
65:7
SC633   5:22   293:8, 11
scenario   391:15
scenarios   83:17
schedule   73:2, 9
74:23   78:1   251:12
255:16   348:8
scheduled   75:2   76:6,
12, 23   209:10, 11
schedules   205:10
scheduling   71:19
77:11, 12
School   30:23   31:2, 7
35:17
SCHUYLKILL   1:3
8:16   14:18, 22   65:5
Schuylkill's   63:10
105:13
scope   218:1   279:7
screen   84:20   167:4
183:17   347:18
screening   29:7
search   36:16
searches   34:4
second   21:24   22:17
49:23   72:18   74:7
75:23   86:16   92:8, 13
98:14   121:15   156:10,
12   182:16   184:9
185:20   190:2   208:14
211:12   216:20
217:19, 20   246:6
257:13   262:24
272:23   286:15   320:9
342:16, 17   370:15
395:6
second-round   21:19
section   16:15   17:5
44:11   154:2   200:2
security   200:13, 20
see   16:17   17:1, 7, 12
18:5   27:14   43:14
44:14, 19   46:9   65:18

Case 3:21-cv-00477-MCC Document 230-1 CONFIDENTIAL Filed 09/20/23 Page 320 of 342

Deposition of Heidi Zula Vol. I - Revised                    Jane Doe, et al. v. Schuylkill County Courthouse, et al.

67:*12* 69:*1* 73:*15*
74:*10* 76:*3*, *13* 77:*10*
84:*6*, *12* 88:*8* 100:*17*
103:*18* 108:*16*
115:*13* 128:*10* 136:*6*
150:*14* 152:*9* 156:*8*
167:*19* 170:22
184:*12*, *14* 193:*11*
217:*13* 221:*11* 246:*8*
257:*18* 259:*9* 285:*17*
339:*4* 343:24 348:*13*
357:*3* 388:*9* 391:*6*,
*18*
**seeing** 139:*17* 251:*21*
**seek** 259:*6* 358:*19*
**seeking** 259:*14*
300:*24* 301:*6*, *9*
303:*1* 306:*16* 308:*5*
315:*21*, *23*
**seen** 24:*10* 139:*16*
168:*21* 169:*17* 181:*6*
277:*7* 285:*19* 286:*9*
**selected** 51:*24* 143:*5*
**selection** 16:22 17:*20*
**send** 184:*10*, *23*
185:*10* 297:*9* 303:24
306:*7* 307:*7*, *23*
350:*16*, *18* 358:*1*
362:*18* 363:*15*
**sending** 72:22 76:*7*
306:*3*, *8*
**sense** 90:*3* 91:*15*
187:*20* 307:*15*
310:*11*
**sent** 28:22 55:*16*, *21*
56:*1* 119:*19* 120:*6*,
*13* 150:*16* 168:*13*
190:2 191:*5* 193:*17*
196:*10* 201:*15*, *17*
209:*20* 280:*5* 302:*16*
304:*20* 306:*19*
307:*19* 309:*4*, *12*
318:*21*, 22 343:*18*
351:*9*, *17* 358:*4*
365:*14* 366:*13*, *19*
387:*18* 397:*20* 398:*8*
**sentence** 76:*5* 92:*20*,
*24* 152:*4* 187:*17*
193:22 203:*21*
217:*20* 219:*5* 221:*6*

222:*8* 225:*15* 226:*8*
246:*8* 249:*6* 250:2
259:*5* 262:*24* 275:*19*
320:*9* 342:*17*, *20*, *24*
343:*6* 395:*7*, *16*
**sentences** 224:*18*
343:*17*
**separate** 81:*20* 216:2
227:*13*, *14*, *18* 279:*23*
290:22 303:*6* 319:*8*
329:*17* 349:*19*, *20*
361:2 378:*19*, *20*
**separated** 227:*16*, *17*
246:*1* 290:*6* 299:*17*,
*20* 320:*1*, *3* 327:*3*
328:*24* 329:*17* 332:*7*,
*17*, *18*, *19*, *23* 333:*1*
400:*7*
**separately** 349:*21*
388:*23*
**separation** 220:*14*
227:*20* 288:*21*
289:*21* 333:*11*
**September** 22:*16*
23:*17* 49:*9* 64:*20*
66:*4* 67:*11* 69:*3*
237:*7*, *13*, *19* 238:*1*, *8*
**serious** 270:*7*
**serve** 90:*4*, *6* 91:*17*
98:*1*, *13* 107:*10*
375:*16*, 22
**served** 370:*17* 371:2,
*7*
**services** 37:*7* 145:*23*
146:2 161:*14*
**serving** 92:*23* 93:*3*
98:*9*, *16*
**SERVPRO** 147:*7*
149:*4* 151:*7*
**session** 19:*9* 73:*7*
74:*13* 76:*6*, *12*, *23*
77:*7* 85:*13* 111:*3*
402:*13*, *20*
**sessions** 18:*24* 19:*4*
71:*7* 72:*23* 73:*3*, *4*
80:*13*, *24* 85:*20*, *23*
86:*1*, *3*
**set** 128:*15* 205:*10*,
*13* 215:*20* 251:*4*

297:*4*, *6* 314:*23*
348:*6* 362:*19*
**sets** 251:*12*
**setting** 322:*23*
**Seven** 123:22, *23*
124:*9*, *16* 403:*15*
**severally** 223:*8*
241:*10*
**severe** 259:*7*
**severely** 223:*14*
225:*7*, *12* 265:*13*
**sexual** 59:*10*, *11*, *17*
61:*9* 62:22 64:*5*, *11*
65:24 66:*12* 69:*4*
77:*23* 79:*3* 81:*11*
119:*1*, *6*, *9* 159:*12*
197:*24* 240:*8* 291:*16*
324:*15*
**sexually** 59:2, *5*
**shape** 308:*1*
**share** 167:*18*
**shared** 49:*24*
**Sharon** 161:*15*
**Sharyn** 113:*18*, *20*
**she'd** 398:*3*
**sheet** 37:*5* 47:*20*
62:*10*, *16*, *18* 75:*5*
81:*20*
**sheets** 36:*17* 47:*8*, *16*
48:*23* 62:2, *7* 267:22
268:*16*
**sheriff** 164:*13*
165:*10*, *12* 230:*11*, *12*
**sheriff's** 163:*9*
190:*20* 191:*10*, *12*, *14*
**shifted** 53:*20*
**shortly** 181:*10* 295:*6*
**short-term** 139:22
347:*3* 348:*13* 351:*5*
352:*18* 353:*13*
**shut** 145:*16* 224:22
**shy** 218:*8*, *20* 362:*6*
**sick** 205:*8*
**side** 145:*12* 170:*14*,
*16* 208:*15* 396:*15*
**sign** 29:*8* 37:*6*
41:*14* 42:*20* 70:*17*
75:*5* 109:*15*, *20*, *21*
173:*15* 174:*7* 175:2
183:*12*, *15* 185:*9*

354:*13*, *17*, *19* 373:*6*,
*16*, *18* 374:*3*
**signature** 38:*13*
70:*12* 108:*13*, *15*, *24*
109:*4* 140:*16* 185:*8*
**signed** 32:22 33:22
34:*8* 38:*23* 42:*8*
47:*13* 63:*8*, *14*, *21*
64:*10* 68:*20* 87:*5*
100:*17*, *21* 105:*6*
106:*14*, *16*, *17* 109:2
111:*23* 112:*3* 360:*1*,
*8* 374:*10*, *13*
**significant** 222:*9*, *21*
324:22
**significantly** 214:*12*
**signing** 42:*12* 66:*12*
106:*9*
**sign-off** 81:*20*
**signs** 33:*3* 62:*4*
**similar** 141:*8* 342:*4*
361:*1* 389:*23*
**similarly** 11:*23*
**simple** 270:*9*
**simply** 96:22 97:*10*
179:*3* 286:*19* 307:*1*,
*6* 308:*21* 383:22
**single** 47:*20*, *21*
**singular** 145:*14*, *15*
**sit** 149:*10* 228:*7*
243:*10* 391:*19*
**site** 193:24 203:*12*
204:*11*, *15*
**sits** 133:*21*
**sitting** 109:*5*
**situation** 98:*14*
136:*19* 137:*14* 138:*6*
139:*6* 140:*19* 159:*23*
161:*16* 168:2, *15*
175:*12* 186:*23* 193:*9*
195:*19* 196:*12*
206:*16* 207:*5*, *8*
239:*19* 257:*8* 312:*12*
**situations** 87:*15*
**six** 54:*5* 123:22, *23*
124:*9*, *16* 190:*5*
**slowly** 218:*6*
**smart** 377:*10*
**SMITH** 2:2 4:*6*
8:*23* 9:*1*, *5*, *20*, *24*

Case 3:21-cv-00477-MCC    Document 280-1    Filed 09/20/23    Page 321 of 342
CONFIDENTIAL
Deposition of Heidi Zula Vol. I - Revised
Jane Doe, et al. v. Schuylkill County Courthouse, et al.

10:*9, 11, 19*  15:*9, 11*
18:*1*  23:*21*  24:*3, 4*
25:*15, 21*  26:2  27:*21*
28:2, *20*  29:*14, 20*
32:*13, 19*  33:*19*  35:4
38:*3, 9*  40:*3*  41:*13,
24*  42:*5, 23*  43:5
45:*12, 15*  46:*15, 19,
22*  48:7  50:*14*  51:*1*
57:2  59:*18, 23*  61:*16,
22*  62:*23*  63:5  65:*2,
10*  66:*18*  67:*1*  72:*4,
10*  75:*8, 15*  78:*9, 14,
23*  79:*15, 21, 23*  86:*9,
15, 24*  93:*23*  94:*17*
95:*11*  96:*15*  97:*7, 12*
98:*6*  99:*12, 14, 23*
100:*6*  105:*8*  107:*20*
108:*1*  111:*6, 13*
116:*17, 23*  130:*11*
133:*14*  135:*17, 23*
139:*7, 13*  141:*1, 7*
150:*4, 10*  151:*10, 16*
155:*21*  156:*4*  162:*11,
19*  165:*22*  166:*9, 16,
19*  167:*1, 3, 5, 10, 13,
14*  176:*16, 23*  177:*6,
12, 16*  178:*12, 17, 24*
179:*10, 16, 20*  180:*2,
7, 12, 19, 21*  183:*16,
22*  184:*7, 8*  194:*23*
198:*10, 17, 24*  201:*20*
204:5  207:*24*  208:*6*
212:*10*  214:*13*
216:*21*  217:*3*  228:*20*
235:*2, 6, 11, 14*
239:*22*  241:*14, 23*
243:*19*  244:*17*  247:*9*
248:*13*  261:*5, 11*
265:*11*  266:*8*  267:*1*
269:*10, 12*  270:*2, 7,
12, 13*  271:*14, 20*
272:*8*  276:*18, 23*
277:*19*  278:*2*  283:*3*
289:*9, 15*  293:*6, 14*
295:*11, 17*  300:*19*
301:*1, 8, 14, 19*  302:*4,
10*  303:*2, 13, 18, 23*
304:*5, 8, 17*  305:*4, 14,
24*  306:*21, 24*  307:*21*

308:*10, 20*  309:*5, 16,
21*  310:*1, 5, 6, 14, 22*
311:*6, 23*  312:*7*
313:*16, 22*  316:*2, 8*
317:*15, 21*  320:*4*
321:*19*  322:*1*  325:*18*
328:*7*  329:*23*  330:*5*
332:*13*  338:*10, 17*
340:*20*  341:*2*  347:*7,
14, 17, 19*  349:*6, 7*
351:*22*  352:*4*  353:*9*
354:*1, 7*  356:*5, 12*
359:*20*  361:*11, 17*
363:*5, 11*  365:*16, 22*
368:*8*  376:*18*  377:*7,
20*  378:*9, 24*  379:*9,
19*  381:*3, 11, 16*
382:*7, 21*  383:*1, 8, 15,
22*  384:*6, 9*  385:*14,
21*  386:*21*  387:*4*
390:*11, 17*  392:*15*
393:*5*  394:*7, 19*
395:*1, 4*  398:*16, 24*
403:*12, 16*
**Smith's**  306:*14*
**snow**  164:*14*
**social**  81:*1*
**sole**  92:*9, 20*  94:*20*
100:*11*  103:*12*
107:*12, 13*
**solicitor**  90:*7, 13*
97:*13*
**solicitors**  95:*20*
**solicitor's**  90:*2, 4, 5, 8*
**solution**  117:*20*
118:*2*  121:*3, 7*
122:*14*
**Solutions**  117:*3, 11*
121:*11*
**somebody**  206:*21*
287:*2*  325:*8*  370:*24*
371:*22*  372:*20*  373:*5*
375:*15*  400:*19, 20*
**someone's**  255:*19*
**somewhat**  97:*22*
**soon**  312:*3*
**sorry**  14:*6*  26:*6, 21*
27:*6*  35:*11, 14, 21*
38:*17*  46:*2, 19*  61:*13*
62:*19*  64:*8, 9*  72:*5*

76:7  78:*14*  86:*10, 15*
99:*18*  104:*17*  105:*1*
110:*2, 3, 23*  121:*15*
123:*9*  135:*5*  140:*10*
154:*7*  156:*21*  166:*12,
15*  167:*17*  168:*9*
173:*24*  178:*1*  182:*21*
192:*12*  193:*1, 3*
196:*4*  198:*19*  199:*3,
16*  209:*6*  212:*1*
225:*2*  233:*15*  234:*22*
236:*12*  246:*6*  247:*8*
249:*4*  256:*21*  264:*13*
266:*10, 11*  290:*9*
294:*20*  296:*18*  299:*8*
318:*7, 8*  333:*14*
342:*11, 13*  343:*5*
351:*20*  353:*4, 10*
355:*8*  362:*13*  365:*17*
366:*9*  369:*19*  371:*6*
378:*2*  381:*17*  382:*24*
392:*10*  397:*18*
400:*16*
**sort**  169:*11*  194:*15*
307:*17*  311:*13*
**sorts**  118:*4*
**sought**  302:*8, 11*
**sound**  24:*15*  68:2
293:*5*  296:*8*
**sounds**  58:*6*  89:*17*
**source**  331:*2*
**Sp**  289:*16*
**space**  81:*1*  145:*21*
146:*22*  152:*7*  160:*9,
16, 18*  328:*15*
**spaces**  146:*8*  149:*21*
161:*10, 22*
**speak**  57:*19, 22*  58:*3*
114:*1*  157:*20*  158:*14,
15, 17*  168:*15*  170:*13*
177:*24*  179:*4*  182:*19,
23*  192:*11, 16*  193:*13*
197:*14, 19*  231:*3, 12*
250:*16*  253:*16, 22, 24*
257:*22*  285:*10*
297:*12*  298:*2, 7*
315:*6, 17*  316:*21*
331:*17, 19, 22, 24*
341:*10*  345:*7*  346:*19*

357:*16, 17, 19, 24*
358:*10*  360:*19*
**speaker**  314:*19*
**speakerphone**  314:*22*
**speaking**  157:*23*
179:*11*  181:*4*  192:*14*
278:*9*  312:*8*  315:*24*
317:*10*
**specialized**  372:*5*
**specific**  12:*22*  43:*7*
45:*5*  87:*18*  93:*19, 21*
99:*16*  104:2  118:*5*
163:*5*  178:*15*  183:*8*
220:*8, 10*  230:*19*
232:*5*  239:*19*  251:*9*
306:*19*  308:*19*
312:*16*  338:*7*  360:*16*
375:*20*  389:*20*
391:*21*
**specifically**  40:*5*
56:*18*  60:*21*  69:*3*
91:*24*  92:*1*  96:4
113:*17*  125:*13*  144:*4*
157:*23*  158:*21*  194:*6*
222:*5*  223:*9*  226:*8*
233:*6*  238:*3*  279:*2*
297:*17*  298:*1*  303:*16*
329:*22*  392:*12*
**specifics**  239:*21*
**specified**  377:*5*
**speed**  284:*4*  379:*12*
**spend**  381:*5*
**spends**  266:*16*
**spent**  348:*9*
**spin**  304:*12*
**spoke**  58:*1, 11*  89:*18*
168:*12*  171:*3, 4*
172:*10, 21, 24*  175:*17*
177:*22*  178:*5*  180:*23*
181:*11, 19*  187:*8*
196:*5*  285:*9*  297:*23*
298:*10*  305:*12*
316:*24*  358:*14, 17*
360:*22*  385:6
**spoken**  10:*15, 21*
90:*16*  257:*24*  302:*15*
**spores**  153:*16*
**spot**  182:*22*  183:*2, 6*
**spots**  148:*16*  165:2

St  2:9  170:19
171:14  176:1, 5
staff  25:10  53:20
54:9  71:10, 12  80:7,
20  81:4, 5  101:20
129:18  240:9  255:14
323:2, 3, 9
staffed  127:14  237:5
staffing  236:17  242:2
stairwell  145:10
stamp  18:12  19:21
330:9, 11, 15, 17, 18
356:13, 21  357:4
stamped  199:2  331:3
stamps  18:3  235:7,
10  330:19  366:1
standard  28:13
Standards  47:23
standpoint  338:8
stands  211:17
start  22:13  28:15
35:7  36:2, 24  38:14
42:18  50:4  90:21
92:23  158:20  161:1
168:6  171:23  227:7
229:7  244:4, 9  259:2
268:18  286:2  359:7
374:23
started  41:22  53:5,
10  54:8  57:21  64:19
123:1, 3  124:8, 10
142:13, 14  163:1, 15
164:1, 6, 8  211:5, 10
212:14  215:19  227:9
235:21  283:18  295:7
337:11  368:24  397:2
starting  163:8  215:17
starts  246:5  257:13
262:12
State  36:18, 21
211:18  214:12, 15, 21
223:7  224:18  225:21
230:22  244:15  247:7
249:7  258:24  262:24
284:11, 17, 19  323:21
396:9  402:16
stated  193:5  199:22
201:6  226:8  395:8
statement  100:10
168:17, 18, 20, 21

169:1, 4, 7, 15, 17, 22
170:2, 7, 12  171:17,
19, 20  173:10, 12, 14,
20  174:7, 9  175:2, 8,
15  176:12, 17  177:1
181:3, 6, 7  196:23
197:6  259:15  341:21,
23  342:19, 22  343:1,
8, 9, 11, 23  344:1, 6,
11, 14  345:5, 19, 21
346:10  358:20
statements  174:20, 23
STATES  1:2  9:8
27:9  152:4  190:13
193:22  195:9  200:21,
22  225:15  250:2
269:14  320:10  348:4
394:9
stating  136:7  214:24
333:3
statue  375:7
status  16:16  144:2
255:12  256:4
statute  273:20
372:12
stay  80:14  369:21
STEB  211:15, 17, 20,
21  212:2, 17  213:1, 3,
6  214:1, 10  218:13,
19  219:3  220:3
222:6, 12  225:4, 18
227:21  228:5, 18
229:2, 5  240:19, 24
241:8, 9, 11  242:6, 7,
9, 13, 22  243:11, 12
244:2  245:17  246:23
247:23  252:16, 21
253:2, 21  254:2
257:4, 9, 22  258:12,
20  259:8  262:21
265:13, 20  266:12
267:11, 18  269:14
270:17  283:12, 13, 24
284:5, 8  286:23
287:3  288:12  289:23
290:14  291:4, 22
294:4  299:4  300:8,
12  334:16  335:3, 8,
12, 17  348:6, 12

373:21  374:11
380:10, 13  402:15, 17
STEBs  263:15
steep  207:2  232:23
stenographic  404:6
step  169:14
stepped  55:1
steps  189:13, 17
367:7
stint  337:5, 11
stipulation  9:21
stood  331:15
Stop  117:2, 11
118:13  121:3, 11, 20
122:8, 13  386:15
stopped  55:6, 10
57:14  240:13
story  170:15, 16
Stottlemyer  403:4
Street  1:20  2:3, 13,
17, 21  8:14  328:18
329:2
stress  157:17
strike  52:4  58:14
69:10, 18  126:10
127:12  160:24
162:22  164:18
198:11  206:23
216:20  250:20
254:20  279:17  298:3
317:8  335:9  355:9
374:22  380:7  387:17
Stroudsburg  2:14
structure  44:18, 22
45:8, 10, 19  392:13
struggle  218:3, 24
struggled  217:21, 24
220:17
struggling  237:2
stubs  267:21
stuff  149:1
subject  31:8, 15
305:18
submission  30:17
214:10  262:1  283:12
290:24  333:19
submissions  121:3
submit  62:3, 15
121:18  131:7, 9
142:3  219:3  225:3

292:1, 5  294:4  311:5
334:15
submits  47:8  62:4
399:20
submitted  30:1, 4, 12
47:10  131:10  138:19,
24  169:2, 4, 6  212:2,
6  220:4  225:10, 11,
13  238:4  254:8
265:14  266:22
283:15  284:8  291:22
316:19  347:2  374:12
submitting  245:17
268:10, 23  269:4
subsequent  94:7
297:6  314:17
subsequently  317:1
substance  13:2
substantial  309:18
successful  106:23
sufficient  39:20  70:3
246:11
suggest  40:10  45:3
87:19
suggested  91:5  99:5
104:19  115:6  189:8
220:11
suggestion  122:14
206:5, 7  216:3
247:18
suggestions  69:15
87:24  230:24  246:14
247:12  281:13
suggests  154:5
suing  59:1, 5
suitable  262:18
Suite  2:3, 21  3:2
summary  306:14
310:16  340:17  344:4
superceded  67:19
supercedes  67:11
supersede  67:15
supervised  135:11
supervision  259:14
265:2
supervisor  16:1
26:15  33:16  35:17
47:14, 19  62:4  71:4
79:6  101:11, 24
102:2  107:3, 19

112:*16*  115:8, *9*
122:*11, 15*  131:22
135:*16*  138:8  224:*10*
251:*15*  253:*18*
257:*16*  258:*16*  259:7
269:*21*  270:*14*  271:*5,
7*  287:*15*  290:*20*
291:9  298:5  312:9
324:*3*  334:*18*  346:*17*
355:*14*  364:8  378:*13*
**supervisors**  48:*23*
52:7  94:*24*  95:*1*
267:*15*  371:*3*
**supervisory**  401:*9*
**supplement**  12:*15*
183:*17*  184:*10*
198:*18*  199:*4*  200:*18*
**supplemental**  166:*11*
167:*10*  184:*23*
235:*12*
**supplies**  153:*16*
237:*10*  254:*17*
256:*23*  257:*4*  321:*15*
336:*18, 22*  337:*1*
338:*4, 7, 8*
**support**  58:*13*
**supported**  240:*17*
**suppose**  101:*13*
**supposed**  183:*6*
219:*20, 21*  235:*23*
265:*14*  266:*23*
268:*10*  381:6
**sure**  33:*20*  62:*16*
78:*17*  88:*17*  103:*5*
121:*4*  127:*4, 9, 16*
131:*17*  132:*15*  134:*1*
142:*4*  164:*14*  182:*24*
194:*4*  200:*16*  204:*3*
207:*22*  227:*23*
228:*18*  268:*19*  277:*9*
285:2  309:*19*  310:6
314:*3*  320:*18*  343:22
351:*13*  360:*5*  366:*11*
370:*11*  372:*17, 18*
388:2
**suspect**  391:*3*
**suspected**  101:*5*
**suspended**  294:7

335:*17*
**sustain**  308:*18*
**sustaining**  309:*14*
**swear**  8:22
**switch**  154:*6, 9*
**sworn**  10:*4*
**symptomatic**  137:*23*
**synopsis**  246:*17*
**system**  34:*3*  121:9
213:*11, 13, 17*  224:22
241:*7*  243:*1, 3*
**systems**  284:*9, 10*

< T >
**table**  215:*23*
**take**  13:*13*  22:*13, 18*
31:*3*  35:22  79:9
84:*8*  107:*17, 21*
154:*16*  160:*7, 13*
165:*23*  167:6  172:22
173:*1, 5*  179:*17*
193:5  194:*8*  200:*6,
14*  207:*16*  223:*19*
227:*19*  275:*18*
276:*13, 23*  277:*20*
301:*20, 24*  315:*8*
317:*1, 4*  329:*14*
336:*3*  354:*8*  394:*16*
398:*18*
**taken**  1:*18*  82:*11*
99:*20*  106:5  173:*4*
198:*14*  309:9  404:*6*
**talk**  53:*3*  54:*16*
56:*21*  86:*19*  95:*8*
155:*11*  188:*12*  226:*2*
258:*6*  287:*1, 5*  312:*3*
349:*21*  368:*24*  378:*5*
**talked**  19:*21*  95:*9*
132:*23*  142:*6*  222:*2*
276:*6, 7*  345:*13*
349:*24*
**talking**  53:*21*  61:*23*
62:*1, 21*  65:*15*  87:*2*
126:*3*  201:5  258:*7*
272:*15*  278:*4*  283:*22*
337:*18*  373:*23*
**talks**  186:*2*  205:*5*
215:*9, 11, 13, 18*
220:*12*  226:*7*  366:*3*

**tardy**  205:*2*
**tasked**  25:*17*
**tasks**  40:*1*
**tax**  37:*8*  122:*23*
123:*4, 16, 20*  125:*11,
24*  128:*7, 12, 17, 19,
21*  129:*11*  134:22
135:*2, 6*  185:*16*
186:*17*  189:*3, 5, 17,
19*  190:*24*  206:*2*
209:*4, 6, 23*  210:*9, 21*
211:*2, 18*  212:*15*
215:*6*  216:*1, 2*  220:*5*
221:*9, 24*  222:*5, 11*
223:*7, 8*  226:*14*
227:*15*  229:*19*
232:*10*  234:*5, 21, 22*
238:*23*  246:22  249:*9,
14*  253:*11, 17, 22*
258:*16, 23, 24*  265:*18,
23*  269:*15*  272:*4, 12*
273:*4, 10, 16*  274:*15*
275:*13*  278:*12*  279:*4*
281:*15, 23*  283:*10*
286:*14*  288:22
289:*17*  290:*8, 10, 12*
294:*14, 18, 24*  369:*5,
9, 20, 21*  370:*7, 17, 22,
23*  371:*6, 8*  372:*6*
375:*12*  379:*24*  380:*2,
3, 17*  381:*7*  382:*9, 10*
384:*9*  391:*11, 12*
394:*11, 14*  397:*11*
400:*9, 16, 20, 22*
403:*6*
**taxes**  37:*9*  128:*22*
374:*17*
**taxing**  374:*12*
**tech**  45:*12*  56:*5*
**TECHNICIAN**
166:*17*
**technology**  117:*3*
**telecommunicating**
139:*23*
**telecommuting**
139:*19*  347:*3*  348:*13*
350:*17*  351:*5*  352:*19*
353:*13, 14*
**tell**  35:*1*  50:*5*  58:*15*
68:*23*  110:*15*  122:*15*

142:*18*  144:*1*  204:*16*
211:*19*  243:*10*
269:*13*  270:*20*  271:7
278:*6*  345:*3*  351:*4,
10, 12*  353:*16*  354:*21*
361:*6*  367:*18*
**telling**  220:7  302:*23*
354:*19*  396:*14*  398:*3*
**temporary**  16:*20*
**ten**  121:*1*  190:*6*
251:*18, 20*  263:*3*
264:*1*  286:*5*  311:*9*
**tenure**  57:*9*  58:*2*
116:*9*  159:*10*  174:*10*
**term**  53:*19*  212:*9*
279:*20*  372:*21*
**termed**  124:*17*
335:*24*  336:*1*
**terminating**  291:*13*
**terminology**  280:*7*
374:*1*
**terms**  46:*11*  128:*6*
279:*24*
**terrible**  225:*3*
**test**  27:*10*  29:*7, 10*
138:*21*  200:*8*  319:*11*
375:*5*
**testified**  10:*5*  69:*19*
81:*9*  165:*5*  196:*21*
242:*12*  250:*1*  281:*6*
289:*7*  353:*11*
**testify**  11:*3*  13:*3, 7*
**testifying**  11:*8*  69:*23*
186:*6*
**testimony**  11:*7, 14*
29:*3*  70:*15*  114:*20*
133:*16*  198:*13*
289:*16*  304:*18*  328:*9*
370:*11*  386:*5*  399:*14*
401:*21*
**tests**  375:*1*
**text**  358:*2*
**Thank**  130:*13*
311:*23*  312:*1, 2*
**Thanks**  167:*12*
**theirs**  393:*24*
**therefrom**  301:*23*
**thing**  49:*13, 15*
178:*15*  343:*18*

Case 3:21-cv-00477-MCC   Document 280-1   Filed 09/20/23   Page 324 of 342
CONFIDENTIAL
Deposition of Heidi Zula Vol. I - Revised                          Jane Doe, et al. v. Schuylkill County Courthouse, et al.

**things**  27:17  29:9
34:5  53:1  54:24
55:3  56:15  118:4
128:9  178:20  198:4
204:12  210:10
240:15  241:5  255:19
290:23  319:9  371:23
**think**  12:4  13:6
28:14  37:23  38:17
50:19  52:17  53:11,
12  54:20, 21  55:13
67:19  68:3  74:20, 22
77:21  78:6  80:23
81:9, 12  90:24  91:12
96:13  98:14  107:21,
22  114:9, 19  116:14,
15  117:5, 17  123:5
124:10, 17, 21, 24
125:23  126:20, 21
127:7  132:15  133:23
134:2, 10  137:13, 14
141:24  142:12  145:9
146:15  148:14, 19, 20,
22  161:14  163:7, 9
164:7  165:5  168:24
169:4, 10  170:9, 21
171:6, 7, 14  174:24
185:5  191:6, 22
195:16  196:4, 21
203:3  207:9  210:12,
17  212:8  213:11
224:12  238:24  242:1,
19  248:17, 18  255:3
257:15  263:13  267:8
276:8  277:19  279:6
281:5  284:19  287:6
291:17  292:18  294:7,
21  301:17  303:18, 19
304:16  305:5, 6
308:23  310:22  325:8
327:17  329:21  334:8
342:2  358:4  372:11
376:10, 19  377:13, 23
378:3  383:12, 13, 14,
19, 20  385:3  388:11
392:18  398:2  403:14
**thinking**  134:3
137:14
**thinks**  130:16

**third**  49:4  121:15
156:10  200:3  203:9
246:4, 7  263:24
314:4
**third-party**  49:1
**Thomas**  169:21
170:1  177:19  180:8
**thorough**  311:4
**thoroughly**  380:11
**thought**  69:21  90:12
115:19  181:19  182:6
183:12  193:1  221:22
240:14  253:18
284:23  285:9  288:11,
15  327:20, 21  355:21
360:13  362:20  377:9
**thoughts**  362:21
**Three**  14:5, 14  22:4
27:17  35:8  59:4
109:24  110:7  123:22
124:9  125:17  216:7
240:9  262:15  402:18
**Thursday**  136:9, 15
181:20, 21, 23
**Tiffany**  126:19
140:21  141:9
**tile**  153:15
**tiles**  148:15, 18
153:14  154:6  157:3
**time**  8:13, 19  12:12
13:10  16:6, 19  17:17
31:7  33:15  47:8, 15,
20  48:23  50:8  51:18,
23  53:3  54:22  55:9
56:14  57:7  62:1, 2, 7,
10, 15, 16, 18  70:5
80:14, 17  108:5
112:24  113:4, 9
114:6, 16, 18  116:8
122:17, 22  123:3, 12
126:2, 3, 5, 14  127:21
136:24  146:2, 6, 9, 13,
18  150:3  152:20
153:3  159:1, 23
160:1  164:19  165:23
166:1, 7  168:21
169:6, 16  174:19, 20
180:23  186:9  188:16
190:22, 24  192:2, 10
193:19  194:3  197:4

206:13, 20  209:22
212:19, 20  223:1, 2
226:18  233:1, 18
238:15  240:4  243:21
255:3, 8, 10  256:7
267:22  268:3, 5, 7, 8,
9, 11, 14, 16, 23  269:4
276:24  277:6, 7, 24
280:23, 24  286:7, 11
294:3  297:6  304:10
310:13, 15  311:7
312:4, 22  314:24
317:3  325:23  336:5
338:23  339:7  346:4,
24  347:6  348:8, 10,
11  353:19  354:18
368:2, 24  371:2
372:9  373:2, 4
375:17  376:22  377:6,
16  378:7, 8  381:23
382:5  393:10  394:5
397:23  401:3, 7, 8, 17
403:19
**timely**  215:1  236:16
241:12  266:15, 22
291:22  292:2, 5
294:4  335:2, 5
**times**  56:16  57:5
120:24  141:21  286:1,
3  299:6  306:2  333:7
335:4  374:24
**timetable**  311:15
**timing**  33:20  351:7
**title**  53:10  161:13
369:4, 8
**titled**  199:18
**today**  8:12  13:4, 8
76:6  149:11  152:22
187:19  190:15  228:8
243:10  277:12
306:13  391:19
**today's**  338:11
340:20  394:20
**told**  142:19, 21
152:17  155:16  163:6
169:1  171:17  193:18
202:11  203:15, 17, 18,
21  209:20  220:8
260:3  314:15  315:1

329:4  351:14  354:12
355:1  397:2  403:4
**Tom**  71:4, 14  85:12
96:11  97:17  176:10
304:13, 18  305:2
314:8  349:17, 21
351:14  355:5  360:23
361:3
**tomorrow**  386:16, 22,
24  387:14  403:18
**tonight**  386:15  387:1
**Tony**  272:13  278:5
**tools**  236:7
**top**  18:2  27:8  40:7
73:13  116:14  295:20
338:22  356:22  357:6
394:9
**topic**  111:3  317:9
**total**  263:1
**touch**  365:7
**Tower**  2:21
**town**  170:24
**TOWNSEND**  2:8
9:9  384:4, 8, 11, 15
385:3, 12, 15  386:3,
19
**track**  272:7
**tracked**  82:8  190:21
317:3
**training**  53:20  54:1,
3, 9  63:21  70:6, 19,
24  71:7, 20, 22  72:23
73:2, 3, 4, 7, 9, 21, 24
74:2, 12, 15, 16, 19, 22,
24  76:2, 15, 19  79:4
80:11, 12  81:10, 15,
17  82:3, 6, 11, 12, 13
83:3, 16, 18  85:4, 13,
20, 22, 23  86:4  88:3
101:19, 22  119:15
125:3  234:13  242:21
339:10  340:3
**trainings**  71:2, 4, 6,
13  80:9
**transcribe**  11:17
**transcribed**  11:14
**TRANSCRIPT**  1:10
8:2  9:21  404:6
**transfer**  234:4
**transferring**  255:18

Deposition of Heidi Zula Vol. I - Revised                    Jane Doe, et al. v. Schuylkill County Courthouse, et al.

transition 53:16, 17
54:5, 17 377:5
379:13
transitioned 53:23,
24 54:3 55:3
transitioning 54:1
translate 340:7, 11
transmitted 118:15,
18
transpired 91:2
358:9
travel 164:9
traveling 190:14
tread 309:13
treasurer 134:1, 2, 10
260:6
treasurer's 128:22
234:4, 6
treated 157:12
trial 382:23 383:3,
18 384:17 385:16
386:4, 12
trickle 102:9 103:4
tried 196:7
Trifun 1:22 8:21
404:4, 22
true 30:18 240:16
404:5
truly 40:20 49:16
truthfully 11:3 13:4,
8
try 36:7 277:22
307:14 315:8 334:10
trying 79:10 96:1
99:13 174:23 228:22
229:3 284:7 362:14
366:10
turn 75:6 82:2
100:16 113:7 121:12
170:23 348:3
turned 81:19 82:1, 3,
4, 6, 13
turnover 124:6
Twenty 362:12, 13
Two 14:7 18:3 71:7
75:20 77:22 79:10
91:23 109:21, 24
110:7 111:14 123:10,
22 124:9 125:17
187:22 198:4 216:2,

4, 12 217:15 225:18,
23 226:2 234:6, 13
250:16, 17 255:1
262:15 263:4 264:3,
14 266:3 290:23
335:20 336:9, 11
343:17 357:8 362:6
371:23 378:19, 20
two-way 121:16
type 24:10, 17
110:13 118:20 212:5
typed 223:22
types 117:19 118:4
typical 173:3, 7, 20
174:6
typically 15:24 16:4
95:20 102:5 115:9
131:8, 10, 12, 15
138:20 173:5 175:2
189:10 251:14
287:15 312:11
349:21 351:13
359:10, 12, 23 361:4
372:23 402:19
typist 125:21, 22
213:22 234:13, 14
243:2 244:23
typo 65:20

< U >
U.S 1:19
Uh-huh 103:19
104:15 105:21 152:1
166:16 185:22
186:16 246:9
ultimate 227:12
289:19, 24
ultimately 103:6
226:23 245:22
288:23 290:21
292:14 324:4 369:13
376:5 402:14
unable 13:7 92:22
93:2
unaccompanied 198:3
unclear 97:22
uncomfortable
102:11 271:6
understaffed 232:11
234:22, 23

understand 11:1, 5,
11, 16, 21 12:3, 6, 16,
23 13:3, 14, 24 14:19
27:16 29:2 42:12
48:1 58:22, 24 78:17
87:8 126:9 127:16
132:16 148:5 152:20
186:7 194:4 198:7
200:16 202:18 218:5,
6 219:18 229:4
244:8 276:16, 20
277:20 280:17
283:21 309:2, 3, 8
310:2 312:14 315:20,
23 325:15 339:22
340:15 343:16
358:22 385:17
394:16 399:8
understanding 26:14
57:23 66:7 71:22
72:1 80:21 98:7
127:19 128:5, 13
139:21 140:1 143:10
147:12, 17 154:21, 23
158:23 160:23
162:22 164:17 165:7
188:14 189:3 204:4
214:1 217:24 218:1
242:16 243:1 254:19
283:13 299:1, 3, 7
312:22 313:11 329:9
348:15 350:2 359:6
372:14 373:20 374:2
391:20
understood 12:10
13:16 22:11 39:4
42:13 127:9 174:3
199:23 214:8 308:24
310:1 370:11
Unfortunately 377:18
union 174:1
union-represented
389:5
unique 145:2
UNITED 1:2 9:8
unlawful 93:13 94:7
unpack 242:11
unrelated 94:9, 12
392:13

unsigned 111:15, 22
unwillingness 259:19
upcoming 208:17
updated 40:1 68:24
106:14
updating 54:8
upload 142:3 244:14
264:4 348:12
uploaded 166:9
224:20 254:9 263:5,
15
uploading 264:12, 13
upper 164:24 165:4
207:3
upstairs 187:1
188:23
up-to-date 106:10
usage 194:1 203:12
204:15, 24
use 25:1 40:1 49:3
69:22 117:20 193:19
202:6, 22 206:10
223:15 284:9, 10
288:6 390:24
useful 242:4
utilize 24:21 39:8
62:18 174:10, 13
175:4 195:24 204:20
206:6 250:3 251:24
253:1 337:15, 22
utilized 24:17 25:4
62:8, 10 119:10
140:7 173:16 183:7
186:18 199:12 212:7
249:15 250:10 313:2
utilizing 137:19
185:17 205:6 337:7

< V >
vacancies 125:11, 15,
19, 20 129:23 397:10
vacant 152:7 236:14
vacation 205:7
vaccinated 137:22
vague 174:15
valid 126:4 212:4
243:5, 6 274:2 275:1
375:9 379:20
validate 243:4

valuations 372:*21*
373:*7*, *18*, *22*
value 372:*20* 374:*18*
values 128:*7*, *16*
373:*24* 374:*3*, *9*, *10*
VANDERLIN 2:*16*
vast 62:*17* 141:*20*
264:*18*
vehicle 141:*17* 142:*1*,
*2* 182:*22* 183:*3*, *14*
333:*7*
vehicle/home 140:*22*
vehicles 238:*2*, *11*, *14*
vendor 183:*8*, *9*
verbal 137:*3* 138:*18*
version 111:*15*, *16*, *22*
129:*3* 318:*22*
versus 8:*16* 137:*23*
245:*9* 330:*15* 371:*22*
376:*3*
viable 122:*14*
video 83:*9*, *10*, *13*, *15*,
*18* 191:*8*, *11*, *20*, *23*
381:*24*
VIDEOGRAPHER
8:*10* 107:*23* 108:*5*
166:*1*, *7* 276:*24*
277:*24* 304:*10* 312:*4*
381:*23* 382:*5* 403:*19*
videos 191:*13*
VIDEOTAPE 1:*18*
view 147:*9* 191:*2*, *8*
viewed 146:*7* 147:*17*
149:*21* 191:*1*, *11*
violated 101:*7*
violations 101:*17*
violence 159:*13*
virtual 80:*24* 82:*6*
virtually 81:*6*
visit 340:*18*
visited 120:*22*
Visiting 320:*17*, *19*
voiced 236:*21*
VOLUME 1:*8*
volumes 234:*16*
vote 18:*15* 19:*20*, *22*
36:*10* 109:*11*, *14*
132:*5*, *19* 134:*4*, *5*
216:*8*, *9* 399:*3*, *11*

voted 18:*8* 19:*17*
34:*14*, *18* 35:*6* 36:*24*
69:*13* 111:*1*, *4*
216:*18* 250:*23*
280:*22* 369:*12*, *13*
votes 109:*18*

< W >
W-4 37:*6*
wage 239:*11*, *12*
wait 11:*21*, *23* 247:*7*
370:*10* 375:*10*
waited 262:*16*
waiting 375:*10*
waived 176:*18*
waiver 177:*2*, *5*, *9*
waiving 382:*23*
383:*3*, *5*, *9*, *11*, *16*, *23*
384:*1* 385:*20*
walk 131:*2* 144:*13*
250:*21* 328:*18*
walked 145:*7* 188:*23*
walking 198:*3* 333:*6*
Walmart 170:*21*, *22*
Walnut 1:*20* 8:*14*
wanded 163:*8*, *11*
165:*10*
want 31:*4* 61:*14*, *24*
71:*9* 73:*4* 78:*16*
86:*16* 89:*23* 103:*15*
111:*6* 122:*13* 143:*18*
158:*18* 212:*18*
213:*10* 248:*3*, *6*, *11*,
*12*, *21* 251:*18* 252:*4*
271:*7* 276:*14* 277:*13*
310:*19*, *20* 311:*7*
338:*18* 370:*10* 386:*3*
396:*21*
wanted 89:*15* 101:*5*
122:*2* 127:*9* 143:*14*
154:*20* 158:*1* 166:*12*
208:*18* 271:*8* 273:*1*
314:*7* 315:*16* 388:*24*
398:*5*
wanting 88:*23*
Washington 2:*9*
wasting 113:*9*
water-stained 153:*13*
wave 118:*20*

way 41:*1* 44:*12*
119:*13* 178:*21* 308:*1*
311:*4* 358:*8* 399:*7*
wealth 379:*23*
weather 76:*16*
website 18:*23* 36:*15*
45:*1*, *22*
Wednesday 1:*21*
136:*9*, *15* 181:*18*
week 69:*21* 136:*10*,
*11*, *15* 137:*8*, *12*, *13*
181:*24* 182:*1* 192:*6*
196:*22* 211:*12*, *13*
215:*20* 251:*17*
272:*23* 398:*12*
weekend 262:*8*
weekly 236:*4* 237:*9*
weeks 54:*5* 181:*13*
234:*6* 281:*7*
weigh 324:*14*
welcome 310:*11*
well 15:*3* 23:*7*
29:*12* 33:*22* 41:*6*
49:*7* 50:*14* 57:*10*
58:*24* 69:*6*, *10* 71:*6*
77:*13* 79:*12* 81:*11*,
*19* 83:*16* 92:*3* 97:*16*
98:*24* 101:*14* 102:*18*
105:*16* 107:*13*
111:*21* 112:*14*
115:*13* 117:*6* 121:*12*
125:*7*, *24* 126:*14*
127:*23* 130:*22* 131:*7*,
*16* 134:*5* 135:*16*
136:*11* 139:*16* 147:*9*
148:*4*, *17* 150:*23*
154:*6* 155:*11* 157:*11*
160:*14* 164:*3* 170:*14*
171:*7* 187:*5* 189:*5*
192:*22* 193:*10*
194:*17* 195:*2* 197:*14*
200:*18* 201:*5* 203:*8*,
*9* 209:*9* 210:*11*
211:*8* 212:*15* 220:*14*
223:*2*, *5* 224:*23*
226:*1* 227:*7* 230:*10*
231:*23* 253:*8* 254:*20*
258:*7* 264:*23* 265:*6*
267:*6*, *12* 268:*12*
280:*4* 284:*7* 287:*5*

298:*11* 299:*8*, *15*
306:*6* 307:*12* 308:*20*,
*23* 310:*14* 313:*3*
317:*3*, *7* 319:*23*
320:*18* 325:*13*
327:*23* 335:*23*
339:*17* 340:*14* 341:*3*
342:*2*, *16* 345:*10*
349:*16* 350:*2*, *7*
351:*6*, *13* 352:*17*
355:*17*, *19* 357:*3*
358:*4* 359:*22* 360:*7*,
*22* 365:*5* 370:*3*, *15*,
*18* 374:*22* 378:*11*
379:*20* 380:*7* 383:*4*
385:*21* 386:*19*
388:*17*, *24* 389:*4*, *8*
391:*18* 393:*9* 400:*5*
went 58:*5* 85:*5*
103:*17* 147:*12*
218:*12* 231:*23*
241:*16*
we're 40:*18* 59:*7*
66:*18* 86:*15* 107:*21*,
*24* 110:*14* 155:*21*
166:*2*, *8* 167:*17*
216:*21* 261:*5* 277:*1*
278:*1* 282:*23* 287:*12*
304:*11* 309:*1* 312:*5*
382:*6* 386:*14*
we've 15:*14* 170:*9*
255:*22*
whereabouts 190:*20*
white 88:*6*
WILLIAM 2:*12*
Williamsport 2:*17*
willing 239:*13*
wish 12:*15* 106:*22*
wishes 348:*5*
withs 144:*7*
WITNESS 4:*4* 7:*1*
8:*18*, *22* 9:*12* 25:*8*
28:*13* 33:*14* 34:*24*
39:*23* 41:*12* 46:*14*,
*20* 48:*6* 50:*17* 59:*15*
78:*4* 93:*19* 94:*15*
95:*10* 98:*4* 105:*5*
130:*8* 133:*7* 162:*10*,
*17* 194:*21* 198:*9*
201:*12* 204:*2* 212:*1*

214:7  228:17  239:18
240:23  241:21
243:17  244:12
248:10  265:9  266:7,
21  272:2  282:22
300:15  319:23
325:13  328:3  329:21
332:11  334:13  353:8
368:6  376:15  377:3,
13  378:2, 17  379:16
381:1, 9  384:22
386:8  389:13  392:10,
22  394:4  398:15, 23
**word** 200:4  223:5
**words** 223:9, 15
286:13  302:14
**work** 19:3, 8  50:21
51:7, 19  54:14  55:6,
11  57:14  61:6  77:18
78:4  116:8  128:21
129:7  131:13  135:12
136:20, 23  137:17
138:4, 5, 8, 9, 13, 14
139:3  140:3, 22
141:16, 20  142:3, 4
143:9, 12, 15  144:2
152:13, 18  155:19
192:17, 23  193:9, 10,
24  194:11, 14, 18
195:4, 13, 22  196:1
197:4  200:5, 9  201:8,
14  203:12  204:11, 15
205:6  215:12  217:12
218:13, 15  226:11
230:1, 5, 14  231:18
232:5, 19  234:12, 17
236:4  237:4, 14, 15,
22  239:14  240:1, 7
243:9  244:6  246:22
247:6, 19, 20  248:1, 6,
11, 12  251:6, 16, 18,
20, 22  252:4  253:5
254:17  255:5, 9, 14
269:5  277:22  279:7
296:15  297:5  299:14,
19  305:5  317:5
319:18, 24  320:1, 2, 5,
7, 11, 20  321:8, 12
322:22  323:2, 6, 8, 21,
23  324:8, 9, 12, 20

325:5  327:2, 3, 14
328:23, 24  331:15
332:4, 16  333:12, 15,
19, 20, 22, 23  334:6, 9,
14, 15, 19, 22  335:8,
10, 22  336:4, 7, 13, 15,
18, 22  337:11, 15, 22
346:4, 6, 8  348:7
350:4, 9  353:12
354:16  355:4  367:19
368:13, 18  376:4
392:16, 24  393:4
**workday** 267:10
**worked** 24:20  31:21
44:22  48:18  52:20
54:22  55:2  74:23
95:22  136:8  137:9,
11  138:1  205:12, 15
218:17  255:15  256:7
263:1  268:11  320:21
333:20  337:20  376:4
377:15
**work-from-home**
255:12  256:4
**working** 51:17  54:8
136:10, 14  143:12
152:18  201:21
230:17, 18  231:21
237:17  268:1  271:23
299:16, 17  321:12
329:16  335:15, 23
337:2, 5  348:10
368:20  400:21
**work-related** 235:19
391:14, 23  392:4
**works** 55:1  62:16
250:22  300:16  399:8
**workspace** 262:17
**worth** 311:17
**write** 173:9, 11, 20,
22  175:15  176:12, 17
177:1, 13  183:24
222:20  355:20
364:12
**writing** 69:9  175:3,
7, 16  195:18  196:8
200:9  231:2, 10
242:4  275:8  355:16
**written** 49:14  106:24
133:17  201:6  281:22

294:6  335:12, 17
358:18
**wrong** 29:3  84:23
85:2, 3  138:12
187:15  219:6  281:6
307:11  372:21
**wrote** 243:21  254:14
391:18

**< Y >**
**Yackenchick** 113:18
**Yeah** 41:16  68:3
76:9  83:15  115:1
119:3, 8  127:3
146:17  153:4, 23
155:11  165:12
170:12  173:24  174:2,
24  181:21  207:22
225:23  235:9  256:21
284:1  285:14  286:8
335:4  339:20  341:10
343:22  365:14
373:19  386:21, 22
393:10  396:1
**year** 12:21  57:11
114:9, 12, 19  224:20
225:4  254:8  292:17
293:24  374:24  375:1
**years** 274:12, 14
362:10  371:8
**yesterday** 76:11
**youth** 86:2
**Yup** 35:21  68:11
167:13  368:9

**< Z >**
**Zimmerman** 139:3
141:15  401:1, 2, 6
402:3
**Zimmerman's** 139:18
**Zoom** 3:7  9:3  79:22
**ZULA** 1:18  2:23
4:5, 11, 12, 13, 14, 15,
16, 17, 18, 19, 20, 21,
23, 24  5:1, 2, 3, 4, 5, 6,
7, 8, 9, 10, 11, 12, 13,
14, 18, 19, 20, 21, 23,
24  6:1, 2, 3, 4, 5, 6, 7,
8, 9, 10, 11, 12, 13, 14,
15, 16  8:19  9:12

10:4, 10  13:21  14:21
15:12  24:3, 5  25:21,
23  26:6  27:8, 21, 23
29:14, 17, 21  32:13
38:4, 6  41:24  42:2,
23  43:2, 13  45:12, 16,
18  61:16, 19  62:23
63:2  66:19, 22  68:15
72:5, 7, 18  75:8, 12,
16  78:18, 20  79:15,
18  83:20  86:10, 12,
19, 21  94:5  100:1, 3
108:10, 14  111:7, 10,
14  116:17, 20  121:13
135:20, 24  139:7, 10,
15  140:15  141:1, 4
150:5, 7, 11  151:10,
13  153:20  155:22
156:1, 6  167:2  208:1,
3, 8, 10  216:22, 24
217:4, 5  261:6, 8, 15
269:10, 13  271:14, 17,
21  278:4  295:12, 14
303:24  306:12  312:8
313:17, 19  316:2, 5
317:15, 18  321:20, 22
329:23  330:2, 6
334:20  338:11, 14
340:21, 23  347:11, 15,
21  351:23  352:1, 5
354:4  356:5, 9
361:12, 14  363:6, 8
365:17, 19  381:19
382:8  387:2  390:12,
14  393:8  394:22
397:14
**Zula-13** 23:24
**Zula-24** 15:10
**Zula-25** 32:16

Deposition of Heidi Zula Vol. I - Revised
Jane Doe, et al. v. Schuylkill County Courthouse, et al.

## WORD LIST

**< $ >**
**$250**  *(1)*
**$5**  *(1)*
**$9**  *(1)*

**< 1 >**
**1**  *(139)*
**1/11/2020**  *(2)*
**1/11/2021**  *(2)*
**1/13/20**  *(1)*
**1/13/2021**  *(1)*
**1:09**  *(1)*
**10**  *(2)*
**10:51**  *(2)*
**100**  *(3)*
**101**  *(1)*
**102**  *(7)*
**103**  *(5)*
**104**  *(2)*
**105**  *(2)*
**106**  *(1)*
**107**  *(2)*
**108**  *(1)*
**11**  *(9)*
**11:02**  *(1)*
**11:13**  *(1)*
**110**  *(1)*
**111**  *(3)*
**112**  *(1)*
**114**  *(1)*
**115**  *(2)*
**116**  *(2)*
**117**  *(1)*
**119**  *(1)*
**11th**  *(11)*
**12**  *(7)*
**12/11/22**  *(1)*
**12:20**  *(1)*
**12:52**  *(1)*
**120**  *(1)*
**121**  *(1)*
**122**  *(2)*
**123**  *(1)*
**125**  *(1)*
**1259**  *(1)*
**126**  *(1)*
**127**  *(3)*

**128**  *(4)*
**129**  *(1)*
**12th**  *(3)*
**13**  *(11)*
**130**  *(2)*
**131**  *(1)*
**132**  *(1)*
**134**  *(1)*
**135**  *(2)*
**136**  *(1)*
**137**  *(2)*
**138**  *(3)*
**139**  *(4)*
**139-236**  *(2)*
**13th**  *(20)*
**14**  *(1)*
**141**  *(1)*
**14th**  *(3)*
**15**  *(6)*
**150**  *(2)*
**151**  *(1)*
**15219**  *(1)*
**156**  *(1)*
**15th**  *(12)*
**16**  *(1)*
**167**  *(1)*
**16th**  *(1)*
**17**  *(1)*
**17108**  *(1)*
**17701**  *(1)*
**18017**  *(1)*
**183**  *(1)*
**1835**  *(1)*
**18360**  *(1)*
**18th**  *(3)*
**19**  *(4)*
**190**  *(1)*
**19103**  *(1)*
**199**  *(1)*
**19th**  *(2)*
**1s**  *(1)*
**1's**  *(36)*
**1st**  *(10)*

**< 2 >**
**2**  *(94)*
**2/16/2021**  *(1)*
**2/18**  *(1)*
**2/5**  *(1)*

**20**  *(3)*
**20002**  *(1)*
**2005-18**  *(3)*
**2013**  *(4)*
**2015-18**  *(2)*
**2017**  *(1)*
**2020**  *(45)*
**2021**  *(154)*
**2022**  *(12)*
**205-14**  *(1)*
**208**  *(1)*
**21**  *(2)*
**214**  *(1)*
**215**  *(1)*
**217**  *(1)*
**21st**  *(1)*
**22**  *(1)*
**223**  *(1)*
**224**  *(1)*
**225**  *(1)*
**226**  *(1)*
**228**  *(2)*
**22nd**  *(2)*
**23**  *(9)*
**232**  *(1)*
**233**  *(1)*
**236**  *(1)*
**237**  *(1)*
**237-243**  *(2)*
**24**  *(4)*
**240**  *(1)*
**241**  *(1)*
**242**  *(1)*
**243**  *(1)*
**244**  *(2)*
**244-250**  *(2)*
**2473**  *(2)*
**2481**  *(3)*
**24th**  *(1)*
**25**  *(4)*
**250**  *(1)*
**251**  *(1)*
**251-257**  *(2)*
**255**  *(1)*
**256**  *(1)*
**257**  *(1)*
**258**  *(1)*
**258-260**  *(2)*
**26**  *(6)*

**260**  *(1)*
**261**  *(1)*
**268**  *(1)*
**268-270**  *(2)*
**26th**  *(1)*
**27**  *(2)*
**270**  *(1)*
**271**  *(2)*
**271-273**  *(2)*
**272**  *(2)*
**273**  *(1)*
**274**  *(3)*
**2759**  *(1)*
**2759-2760**  *(2)*
**2760**  *(1)*
**27th**  *(3)*
**28**  *(3)*
**284**  *(1)*
**288**  *(2)*
**288-291**  *(2)*
**289**  *(1)*
**28th**  *(1)*
**29**  *(3)*
**290**  *(1)*
**291**  *(2)*
**292**  *(5)*
**292-293**  *(2)*
**293**  *(5)*
**295**  *(1)*
**2950**  *(1)*
**2's**  *(10)*

**< 3 >**
**3**  *(230)*
**3/1**  *(1)*
**3:07**  *(1)*
**3:21-CV-00477**  *(1)*
**3:34**  *(1)*
**30**  *(4)*
**310**  *(1)*
**314**  *(1)*
**316**  *(1)*
**318**  *(3)*
**318-319**  *(2)*
**319**  *(2)*
**32**  *(1)*
**322**  *(1)*
**330**  *(1)*
**339**  *(1)*

Deposition of Heidi Zula Vol. I - Revised                    Jane Doe, et al. v. Schuylkill County Courthouse, et al.

341  *(1)*
3410  *(1)*
347  *(1)*
35  *(1)*
352  *(1)*
35-36  *(2)*
354  *(1)*
356  *(1)*
36  *(2)*
362  *(1)*
363  *(1)*
366  *(1)*
37  *(1)*
37-38  *(2)*
38  *(2)*
382  *(1)*
390  *(4)*
395  *(1)*
399  *(1)*
399-402  *(2)*
3rd  *(4)*
3's  *(26)*

< 4 >
4  *(79)*
4(via  *(1)*
4:00  *(1)*
4:03  *(1)*
4:07  *(1)*
4:13  *(1)*
4:38  *(1)*
40  *(1)*
400  *(1)*
401  *(1)*
402  *(1)*
40-42  *(2)*
410  *(49)*
413  *(1)*
413-415  *(2)*
414  *(2)*
415  *(3)*
42  *(3)*
420  *(3)*
426  *(3)*
43  *(1)*
433  *(1)*
441  *(2)*
441-442  *(2)*
442  *(1)*

448  *(3)*
45  *(1)*
451  *(1)*
451-453  *(2)*
452  *(1)*
453  *(2)*
454  *(4)*
454-455  *(2)*
455  *(4)*
46  *(3)*
460  *(1)*
460-463  *(2)*
463  *(1)*
47  *(4)*
470  *(5)*
470-472  *(2)*
471  *(1)*
472  *(1)*
473  *(1)*
473-474  *(2)*
474  *(3)*
475  *(2)*
475-477  *(2)*
477  *(2)*
48  *(3)*
49  *(3)*
49-52  *(2)*
4and  *(5)*
4did  *(1)*
4had  *(1)*
4's  *(8)*
4'sattendance  *(2)*
4th  *(2)*
4was  *(2)*

< 5 >
5  *(11)*
5:00  *(1)*
5:30  *(1)*
5:38  *(1)*
50  *(3)*
511  *(1)*
515  *(2)*
52  *(3)*
55  *(1)*
550  *(2)*
550-551  *(2)*
551  *(1)*
55-138  *(2)*

555  *(1)*
555-556  *(2)*
556  *(1)*
571  *(1)*
571-573  *(2)*
573  *(1)*
575  *(6)*
583  *(3)*
583-584  *(1)*
584  *(2)*
596  *(1)*
596-600  *(2)*
5th  *(10)*

< 6 >
6  *(1)*
6:01  *(1)*
6:02  *(1)*
600  *(4)*
601  *(2)*
63  *(1)*
630  *(1)*
630-632  *(2)*
632  *(1)*
65  *(1)*
66  *(1)*
67  *(1)*
673  *(2)*
673-674  *(2)*
674  *(2)*
685  *(2)*
685-687  *(2)*
687  *(2)*

< 7 >
7  *(3)*
7:23  *(1)*
70  *(1)*
701  *(3)*
707  *(2)*
707-708  *(2)*
708  *(2)*
709  *(1)*
709-710  *(2)*
71  *(1)*
710  *(1)*
712  *(1)*
715  *(1)*
72  *(2)*

75  *(1)*
78  *(1)*
79  *(1)*
79,000  *(1)*

< 8 >
8  *(1)*
8:00  *(1)*
8:36  *(1)*
80  *(1)*
800  *(1)*
800-801  *(2)*
801  *(1)*
81  *(3)*
817  *(1)*
817-820  *(2)*
820  *(1)*
855  *(1)*
855-857  *(2)*
856  *(1)*
857  *(1)*
86  *(3)*
87  *(1)*
88  *(1)*
886  *(4)*
89  *(3)*
8th  *(3)*

< 9 >
9  *(6)*
9.932  *(1)*
9/13  *(1)*
9/17/2020  *(1)*
9:16  *(2)*
90  *(1)*
92  *(6)*
94  *(2)*
95  *(2)*
96  *(3)*
97  *(4)*
98  *(3)*
99  *(1)*

< A >
a.m  *(9)*
abetting  *(2)*
ability  *(16)*
able  *(7)*
absence  *(1)*

Deposition of Heidi Zula Vol. I - Revised                    Jane Doe, et al. v. Schuylkill County Courthouse, et al.

absences *(1)*
absentee *(1)*
absolute *(2)*
abundantly *(1)*
abusing *(1)*
acceptable *(1)*
acceptance *(1)*
access *(14)*
accessed *(1)*
accessibility *(2)*
accessible *(3)*
accommodated *(1)*
accommodation *(21)*
accommodations *(1)*
accompanied *(2)*
accord *(1)*
accrued *(3)*
accurate *(16)*
accurately *(1)*
accused *(5)*
accuser *(1)*
acknowledged *(2)*
acknowledging *(2)*
acknowledgment *(9)*
Act *(11)*
action *(23)*
actions *(12)*
acts *(4)*
actual *(7)*
ADA *(2)*
add *(2)*
added *(5)*
adding *(1)*
addition *(7)*
additional *(33)*
address *(5)*
addressed *(5)*
addresses *(2)*
adjustment *(1)*
administrate *(1)*
administration *(8)*
administrative *(3)*
administrator *(14)*
administrators *(2)*
administrator's *(2)*
adopted *(2)*
advice *(42)*
advise *(6)*
advised *(5)*

advises *(1)*
Advising *(2)*
affidavit *(1)*
affirmative *(1)*
aforementioned *(1)*
agenda *(11)*
ago *(1)*
agree *(19)*
agreed *(4)*
agreement *(18)*
agreements *(2)*
ahead *(27)*
aiding *(2)*
al *(6)*
alcohol *(4)*
Alecia *(1)*
alert *(1)*
ALLAN *(1)*
allan.townsend@usdoj
.gov *(1)*
allegations *(7)*
alleged *(1)*
allegedly *(2)*
Allen *(1)*
alleviate *(2)*
alleviated *(1)*
allow *(11)*
allowed *(6)*
allowing *(4)*
altered *(3)*
alternative *(7)*
alternatively *(1)*
alternatives *(2)*
Alu *(29)*
Alu's *(2)*
ALYSSA *(2)*
AMBER *(2)*
amber.fox@usdoj.gov
*(1)*
ambiguous *(2)*
amount *(1)*
analysis *(2)*
analyst *(11)*
analyze *(1)*
and/or *(8)*
Ann *(1)*
annual *(1)*
annually *(1)*
anonymous *(6)*

anonymously *(1)*
ANSWER *(64)*
answered *(3)*
answering *(3)*
answers *(15)*
anticipate *(1)*
antidiscrimination *(1)*
anti-harassment *(14)*
anxiety *(2)*
anybody *(3)*
anymore *(1)*
anyway *(1)*
apologize *(10)*
Apparently *(5)*
appeal *(1)*
appear *(1)*
appeared *(2)*
Appearing *(1)*
appears *(5)*
applicants *(1)*
application *(7)*
applied *(7)*
applies *(3)*
apply *(4)*
appoint *(1)*
appointed *(2)*
appointment *(2)*
appraiser *(19)*
appraisers *(16)*
appraiser's *(1)*
appraises *(1)*
appreciate *(2)*
apprized *(1)*
appropriate *(38)*
appropriately *(2)*
approval *(7)*
approve *(9)*
approved *(23)*
approves *(3)*
approving *(1)*
approximately *(1)*
April *(10)*
Area *(11)*
areas *(2)*
argumentative *(5)*
arose *(1)*
arrangements *(1)*
arrived *(1)*
articles *(1)*

ASCII *(1)*
aside *(3)*
asked *(31)*
asking *(64)*
asks *(5)*
aspects *(1)*
assault *(3)*
assaulted *(1)*
assert *(3)*
asserting *(1)*
asses *(1)*
assessed *(6)*
assessment *(107)*
assessments *(1)*
assessor *(40)*
assessor/director *(1)*
assessors *(1)*
assessor's *(1)*
assign *(1)*
assigned *(12)*
assignments *(3)*
assist *(2)*
assistance *(6)*
assistant *(16)*
assisted *(1)*
assume *(3)*
assuming *(6)*
assumptions *(1)*
attached *(4)*
attachment *(9)*
attempt *(4)*
attempted *(10)*
attempting *(1)*
attempts *(2)*
attend *(16)*
attendance *(4)*
attended *(11)*
attendee *(1)*
attendees *(1)*
attending *(3)*
attention *(4)*
attesting *(1)*
attorney *(45)*
attorney-client *(6)*
attorneys *(6)*
Attorney's *(1)*
audible *(1)*
August *(6)*
authority *(16)*

Deposition of Heidi Zula Vol. I - Revised                    Jane Doe, et al. v. Schuylkill County Courthouse, et al.

authorized  (2)
available  (6)
availed  (1)
avoid  (2)
aware  (121)

< B >
back  (80)
backed  (1)
background  (13)
backgrounds  (1)
backwards  (1)
bad  (1)
badge  (1)
bag  (1)
Banking  (1)
bargaining  (1)
base  (2)
based  (100)
basically  (5)
basis  (24)
Bates  (8)
began  (4)
beginning  (1)
begins  (2)
begs  (1)
behalf  (7)
behavior  (1)
belief  (4)
believe  (215)
believed  (13)
believing  (1)
Bend  (2)
Bender  (120)
Bender's  (3)
beneficial  (1)
benefit  (1)
benefits  (2)
bereavement  (3)
best  (1)
Bethlehem  (1)
better  (8)
beyond  (1)
billing  (3)
bills  (1)
bit  (6)
black  (2)
blast  (1)
blatantly  (1)

blindsided  (1)
board  (36)
boards  (1)
bodies  (1)
bottom  (10)
bound  (1)
BOX  (5)
boxes  (1)
Bradley's  (2)
brand  (1)
break  (7)
breaked  (1)
brief  (15)
briefing  (2)
briefly  (2)
bring  (16)
bringing  (5)
Brodhead  (1)
brother  (1)
brought  (18)
budget  (1)
Building  (70)
buildings  (2)
bullet  (2)
bulletin  (1)
bureau  (10)
Burke  (5)
Burke's  (1)
business  (1)
busy  (1)
BV  (1)

< C >
calendar  (3)
call  (15)
called  (15)
calling  (1)
calls  (2)
cameras  (3)
canceled  (3)
candidly  (1)
Cap  (1)
capacity  (6)
caption  (1)
car  (1)
card  (1)
care  (4)
careful  (1)
carrier  (1)

case  (6)
case-by-case  (3)
catalyst  (3)
CATHERINE  (6)
catherine@dereksmith
.com  (1)
cause  (2)
caused  (5)
causing  (3)
CC  (1)
CC'ed  (6)
ceiling  (4)
certain  (28)
certainly  (4)
certainty  (3)
certification  (2)
certified  (2)
certify  (1)
chain  (23)
challenging  (1)
chance  (1)
change  (17)
changed  (6)
changes  (14)
changing  (2)
channels  (1)
charge  (5)
charges  (4)
chart  (3)
chatted  (1)
check  (20)
checked  (3)
checklist  (2)
checklists  (1)
checks  (3)
chief  (42)
children  (1)
Chinese  (1)
chosen  (2)
Chris  (3)
Christine  (2)
Christopher  (1)
circled  (3)
circumstances  (3)
CIVIL  (2)
claim  (41)
claiming  (1)
claims  (27)
Claire  (4)

clarification  (12)
clarify  (3)
class  (1)
classes  (2)
classification  (5)
classifications  (1)
classified  (1)
clean  (5)
cleaned  (3)
Cleaning  (3)
cleans  (1)
clear  (7)
clearer  (1)
clerk  (8)
clerk's  (1)
client  (3)
climbed  (2)
close  (1)
closed  (1)
closely  (1)
closer  (1)
Coleen  (4)
collect  (1)
collective  (3)
collectively  (2)
collectors  (1)
Columbia  (1)
combined  (3)
combining  (2)
come  (53)
comes  (4)
comfortable  (2)
coming  (10)
comma  (2)
command  (6)
comment  (2)
comments  (3)
commiss  (1)
commission  (2)
Commissioner  (19)
commissioners  (48)
commissioner's  (11)
common  (2)
commonly  (1)
Commonwealth  (1)
communicate  (10)
communicated  (5)
communication  (25)
communications  (9)

Case 3:21-cv-00477-MCC    Document 280-1    Filed 09/20/23    Page 332 of 342
CONFIDENTIAL
Deposition of Heidi Zula Vol. I - Revised                    Jane Doe, et al. v. Schuylkill County Courthouse, et al.

company  (5)
comparison  (1)
compile  (1)
compiling  (1)
complaint  (12)
complaints  (8)
complete  (33)
completed  (38)
completely  (5)
completes  (2)
completing  (7)
completion  (9)
compliance  (4)
complied  (1)
compliment  (3)
complimented  (1)
con  (1)
concern  (15)
concerns  (22)
concise  (1)
concluded  (1)
conclusion  (19)
conclusions  (1)
condensed  (1)
condition  (2)
conditions  (6)
conduct  (6)
conducted  (6)
conference  (7)
confident  (1)
CONFIDENTIAL  (2)
confidentiality  (1)
confirm  (5)
confirmation  (2)
confirmed  (1)
confirming  (1)
conform  (1)
confused  (2)
confusing  (2)
conjunction  (2)
connection  (3)
consecutive  (4)
consent  (3)
consented  (2)
consequences  (1)
consider  (16)
consideration  (10)
considered  (5)
consistent  (3)

constitute  (2)
constructed  (1)
consult  (7)
consultant  (17)
consultants  (1)
consultation  (9)
consultations  (2)
consulted  (9)
consumed  (1)
contact  (14)
contacted  (6)
contacting  (3)
contained  (1)
containing  (1)
content  (1)
contents  (24)
contest  (2)
context  (7)
contingent  (2)
continually  (2)
continuation  (2)
continue  (7)
contract  (13)
contracted  (1)
contractor  (9)
contractors  (2)
contracts  (1)
contractual  (1)
contradiction  (2)
contradictory  (1)
contributed  (2)
control  (4)
controller  (4)
controllers  (9)
controller's  (1)
controls  (1)
convenient  (1)
conversation  (69)
conversations  (40)
conviction  (1)
coordinator  (2)
coordinator/field  (1)
copies  (9)
copy  (21)
correct  (326)
corrected  (1)
Corrections  (2)
correctly  (3)
correspondence  (8)

Counsel  (49)
count  (1)
counties  (2)
COUNTY  (225)
county-issued  (1)
county-owned  (1)
county's  (13)
couple  (4)
couple-minute  (1)
course  (1)
COURT  (24)
COURTHOUSE  (47)
Courtroom  (3)
cover  (1)
coverage  (1)
coverages  (1)
covered  (3)
COVID  (15)
CPE  (28)
CPE-licensed  (1)
Craft  (2)
created  (3)
creation  (3)
credentials  (2)
criminal  (1)
critiques  (1)
current  (2)
curve  (1)
cut  (1)
cutting  (1)

< D >
daily  (4)
Dana  (1)
dangerous  (2)
Dash  (6)
Dash's  (1)
data  (4)
date  (50)
dated  (13)
dates  (4)
day  (41)
days  (15)
deadline  (2)
deadlines  (1)
dealing  (3)
dealt  (4)
death  (5)
Deb  (5)

DEBISE  (2)
December  (9)
decide  (1)
decided  (15)
decides  (1)
decision  (45)
decision-making  (1)
decisions  (4)
deductions  (2)
deeds  (2)
deeper  (1)
defendant  (69)
Defendants  (4)
defense  (10)
defer  (1)
deferred  (1)
definitely  (2)
delay  (1)
delayed  (2)
delegate  (1)
delinquency  (6)
delinquent  (7)
delivered  (1)
delving  (1)
demographic  (1)
demote  (2)
demoted  (14)
demotion  (14)
demotions  (1)
denial  (10)
denied  (5)
denies  (1)
Denise  (2)
deny  (6)
denying  (2)
DEPARTMENT  (27)
departments  (4)
depend  (1)
depending  (1)
depends  (1)
deponent  (2)
DEPOSITION  (14)
depositions  (1)
deputy  (10)
DEREK  (2)
Derrick  (1)
described  (1)
describing  (2)
DESCRIPTION  (20)

Deposition of Heidi Zula Vol. I - Revised                    Jane Doe, et al. v. Schuylkill County Courthouse, et al.

descriptions  (2)
designate  (1)
designated  (1)
Desiree  (1)
desk  (1)
despite  (3)
destroyed  (3)
detailed  (1)
detector  (2)
determination  (14)
determine  (16)
determined  (6)
determining  (2)
detrimental  (1)
Detweiler  (3)
Detweiler's  (1)
Diane  (1)
DICKIE  (1)
die  (1)
diem  (7)
diems  (3)
difference  (2)
different  (27)
difficult  (3)
difficulty  (2)
direct  (14)
directed  (7)
directing  (1)
DIRECTION  (7)
directive  (2)
directly  (16)
director  (54)
disagree  (2)
disagreement  (1)
disapproved  (1)
disbanded  (1)
disciplinary  (8)
disciplined  (3)
disciplining  (1)
disclosing  (1)
discovery  (1)
discretion  (14)
discretionary  (1)
discuss  (35)
discussed  (26)
discussing  (6)
discussion  (43)
discussions  (51)
disingenuous  (1)

displayed  (1)
dispute  (1)
disrupted  (1)
disruption  (1)
disruptions  (1)
dissatisfaction  (2)
dissented  (3)
dissenting  (2)
dissents  (1)
distancing  (1)
distinction  (2)
DISTRICT  (8)
DIVISION  (4)
divulge  (1)
doc  (1)
DOCKET  (6)
doctor  (11)
doctors  (1)
doctor's  (4)
document  (83)
documentation  (16)
documenting  (1)
DOCUMENTS  (13)
DOE  (607)
doing  (24)
door  (17)
Doreen  (29)
double  (1)
Dr  (3)
draft  (11)
drafted  (8)
drafting  (5)
drafts  (1)
draw  (1)
drop-dead  (2)
drug  (7)
due  (8)
duly  (1)
dumb  (1)
dumbed-down  (1)
duties  (42)
duty  (12)
duty/subpoenas  (1)
DWK  (1)

< E >
earlier  (13)
early  (9)
EEO  (22)

EEOC  (7)
EEO-related  (1)
effect  (4)
effective  (2)
efficient  (1)
efficiently  (1)
effort  (1)
efforts  (3)
eight  (3)
either  (27)
Elaine  (3)
elected  (13)
election  (3)
elevator  (1)
eligible  (1)
eliminate  (1)
eliminating  (1)
elimination  (1)
else's  (2)
e-mail  (133)
e-mailed  (3)
e-mails  (16)
embankment  (2)
employed  (8)
employee  (56)
employees  (86)
employee's  (3)
employer  (3)
employers  (2)
employment  (60)
enacted  (1)
encountered  (2)
ended  (4)
ends  (1)
engage  (2)
engaged  (1)
engaging  (2)
ensure  (4)
ensuring  (1)
enter  (14)
entered  (8)
entering  (3)
entire  (2)
entirety  (1)
entities  (2)
entrance  (11)
entrances  (1)
environment  (8)
Equalization  (2)

equipment  (6)
error  (1)
escorted  (6)
ESQUIRE  (10)
essential  (7)
essentially  (4)
established  (3)
estate  (12)
et  (4)
evaluate  (3)
Evaluators  (1)
event  (4)
eventually  (4)
Everest  (1)
everybody  (4)
evidence  (6)
exact  (12)
exactly  (42)
exam  (2)
Examination  (1)
examined  (1)
example  (2)
Excellent  (1)
exchange  (2)
exclude  (1)
excluded  (1)
excuse  (3)
execution  (1)
executive  (7)
exempt  (9)
exemption  (3)
exemptions  (1)
EXHIBIT  (22)
Exhibit-100  (2)
Exhibit-101  (2)
Exhibit-102  (2)
Exhibit-103  (2)
Exhibit-104  (2)
Exhibit-105  (2)
Exhibit-106  (2)
Exhibit-107  (2)
Exhibit-108  (2)
Exhibit-109  (3)
Exhibit-110  (2)
Exhibit-111  (2)
Exhibit-112  (2)
Exhibit-113  (3)
Exhibit-114  (3)
Exhibit-115  (3)

**Exhibit-116** *(2)*
**Exhibit-117** *(2)*
**Exhibit-118** *(4)*
**Exhibit-119** *(2)*
**Exhibit-120** *(2)*
**Exhibit-121** *(2)*
**Exhibit-122** *(6)*
**Exhibit-123** *(2)*
**Exhibit-124** *(3)*
**Exhibit-125** *(2)*
**Exhibit-126** *(2)*
**Exhibit-127** *(6)*
**Exhibit-128** *(2)*
**Exhibit-129** *(2)*
**Exhibit-130** *(4)*
**Exhibit-131** *(2)*
**Exhibit-132** *(2)*
**Exhibit-133** *(3)*
**Exhibit-134** *(2)*
**Exhibit-135** *(2)*
**Exhibit-136** *(2)*
**Exhibit-137** *(2)*
**Exhibit-138** *(2)*
**Exhibit-139** *(2)*
**Exhibit-15** *(1)*
**Exhibit-43** *(2)*
**Exhibit-86** *(1)*
**Exhibit-87** *(2)*
**Exhibit-88** *(3)*
**Exhibit-89** *(2)*
**Exhibit-90** *(3)*
**Exhibit-91** *(3)*
**Exhibit-92** *(3)*
**Exhibit-93** *(3)*
**Exhibit-94** *(4)*
**Exhibit-95** *(2)*
**Exhibit-96** *(4)*
**Exhibit-97** *(3)*
**Exhibit-98** *(3)*
**Exhibit-99** *(2)*
**EXHIBITS** *(6)*
exist *(3)*
existed *(2)*
existing *(2)*
exists *(2)*
exited *(1)*
exiting *(2)*
expecting *(1)*
experience *(2)*

experiencing *(1)*
expertise *(1)*
explain *(4)*
explained *(1)*
extended *(1)*
extending *(1)*
extensively *(1)*
extent *(8)*
external *(1)*
extra *(1)*
extreme *(1)*
eyes *(1)*

**< F >**
facets *(1)*
fact *(46)*
facts *(3)*
factual *(1)*
failed *(8)*
failure *(4)*
fair *(12)*
falling *(2)*
familiar *(10)*
family *(9)*
far *(11)*
fax *(9)*
faxed *(1)*
faxes *(1)*
feasible *(1)*
February *(73)*
February/March *(1)*
fed *(1)*
Federoff *(2)*
feel *(16)*
feeling *(2)*
feelings *(2)*
felt *(3)*
female *(2)*
field *(47)*
field/home *(1)*
fifth *(1)*
figure *(5)*
file *(13)*
filed *(9)*
files *(1)*
filings *(2)*
fill *(3)*
filled *(4)*
fills *(1)*

finally *(1)*
finance *(1)*
find *(9)*
finding *(1)*
fine *(3)*
finish *(6)*
first *(72)*
five *(6)*
flip *(1)*
flushed *(1)*
fly *(1)*
flyers *(1)*
FMLA *(5)*
focus *(4)*
focused *(4)*
folks *(1)*
follow *(6)*
followed *(7)*
following *(10)*
follows *(1)*
follow-up *(1)*
force *(1)*
foregoing *(1)*
forgive *(2)*
forgot *(1)*
form *(89)*
formal *(1)*
Formalized *(1)*
formally *(1)*
format *(1)*
formatted *(1)*
former *(4)*
forms *(2)*
forth *(2)*
forward *(12)*
forwarded *(6)*
forwards *(1)*
found *(4)*
Four *(13)*
fourish *(1)*
FOX *(6)*
frame *(10)*
fraud *(1)*
free *(3)*
fresh *(1)*
Friday *(11)*
friendly *(1)*
front *(6)*
Fucci *(1)*

fulfill *(1)*
full *(6)*
full-sized *(1)*
full-time *(3)*
fully *(9)*
function *(1)*
functions *(4)*
funeral *(6)*
furlough *(2)*
furloughed *(7)*
further *(22)*
future *(2)*

**< G >**
Garrity *(3)*
Gary *(24)*
gathered *(1)*
gathering *(1)*
GEIGER *(8)*
general *(2)*
generalize *(1)*
generally *(5)*
general's *(1)*
generates *(1)*
George *(7)*
GERARD *(1)*
Gerry *(1)*
getting *(11)*
ggeiger@newmanwilli
ams.com *(1)*
Gilbert *(1)*
Gilbert's *(1)*
give *(12)*
given *(27)*
gives *(1)*
giving *(4)*
Glen *(4)*
Glenn *(3)*
go *(83)*
goes *(9)*
going *(153)*
Good *(7)*
gotten *(1)*
Govern *(5)*
grace *(7)*
grammatically *(1)*
Grant *(4)*
granted *(1)*
great *(5)*

Case 3:21-cv-00477-MCC   Document 280-1   Filed 09/20/23   Page 335 of 342
CONFIDENTIAL
Deposition of Heidi Zula Vol. I - Revised                    Jane Doe, et al. v. Schuylkill County Courthouse, et al.

grievance  (3)
Groody  (2)
GROUP  (3)
guess  (25)
guidance  (8)
Gulf  (1)
guys  (1)

< H >
Halcovage  (69)
Halcovage's  (5)
HALL  (1)
hallway  (1)
hallways  (1)
hampered  (3)
hand  (5)
handed  (5)
handle  (2)
handled  (2)
handwritten  (2)
hang  (1)
happen  (4)
happened  (11)
happens  (5)
happy  (1)
harassed  (1)
harassment  (22)
hard  (2)
Harrisburg  (2)
hated  (1)
Hatter  (13)
head  (9)
heads  (2)
health  (6)
hear  (3)
heard  (2)
hearing  (2)
hearings  (1)
Heather  (3)
HEIDI  (9)
Heinbach  (39)
Heinbach's  (1)
held  (28)
Helene  (3)
help  (1)
Hess  (6)
Hetherington  (5)
hey  (14)
Highbock  (1)

highway  (2)
hire  (18)
hired  (20)
hires  (3)
hiring  (3)
historical  (1)
historically  (2)
history  (3)
hit  (2)
hitting  (2)
Hobbs  (7)
hold  (15)
holding  (1)
home  (104)
Homeowner  (1)
honestly  (2)
Honor  (9)
horseback  (1)
host  (1)
hour  (1)
hourly  (5)
hours  (22)
house  (1)
houses  (1)
HR  (30)
Hubert  (5)
human  (44)
hybrid  (4)
hypothetical  (2)
hypothetically  (1)

< I >
I-9  (1)
idea  (7)
ideally  (1)
identification  (55)
identify  (1)
immediately  (4)
impact  (5)
impacted  (3)
impacting  (1)
impairs  (1)
impartial  (1)
implement  (2)
implementation  (1)
implementations  (1)
implemented  (8)
implementing  (1)
imply  (1)

implying  (1)
important  (5)
improved  (1)
improvements  (1)
inable  (1)
inaccurate  (2)
inappropriate  (3)
inaudible  (1)
in-box  (1)
incident  (13)
inclement  (1)
include  (6)
included  (18)
includes  (5)
including  (10)
inclusive  (2)
incoming  (1)
incomplete  (1)
incorrect  (3)
increase  (2)
independent  (7)
INDEX  (1)
indicate  (18)
indicated  (29)
indicates  (24)
indicating  (6)
indication  (1)
indications  (1)
individual  (24)
individually  (1)
individuals  (16)
individual's  (2)
inform  (5)
informal  (1)
information  (110)
informational  (1)
informed  (27)
inhibited  (1)
inhibits  (1)
initial  (13)
initially  (5)
initials  (2)
initiated  (3)
injury  (1)
in-person  (2)
input  (13)
inputted  (1)
inputter  (1)
inputting  (2)

inquire  (1)
ins  (1)
inside  (1)
instance  (3)
instances  (2)
instruct  (4)
instructed  (12)
instruction  (4)
instructions  (2)
insurance  (1)
intended  (1)
interaction  (4)
interactions  (1)
interactive  (7)
interim  (20)
INTERROGATION  (1)
intervener  (1)
interview  (11)
interviewed  (2)
interviewing  (2)
interviews  (2)
introduce  (1)
introduced  (1)
introduction  (1)
investigate  (6)
investigating  (1)
investigation  (13)
investigations  (1)
investigator  (1)
investigators  (1)
involve  (1)
involved  (40)
involvement  (6)
involves  (1)
involving  (1)
iPads  (1)
IPPOLITO  (11)
ironed  (2)
irrelevant  (1)
issue  (60)
issued  (11)
issues  (48)
items  (1)
its  (7)

< J >
Jan  (3)
JANE  (592)

January  *(112)*
Joan  *(3)*
job  *(68)*
jobs  *(1)*
John  *(1)*
joined  *(1)*
JONES  *(1)*
judge  *(8)*
judgment  *(7)*
July  *(6)*
June  *(1)*
June-ish  *(1)*
jury  *(7)*
JUSTICE  *(3)*
justification  *(1)*
justify  *(1)*
jut  *(1)*

< K >
Katz  *(1)*
Keel  *(3)*
Keel's  *(1)*
keep  *(7)*
kept  *(4)*
key  *(1)*
keyboard  *(1)*
keycard  *(1)*
keyed  *(1)*
keys  *(1)*
kind  *(39)*
kinds  *(1)*
knew  *(11)*
know  *(315)*
knowledge  *(55)*
known  *(3)*
Kutzler  *(87)*
Kutzler's  *(6)*

< L >
Labor  *(1)*
lack  *(2)*
ladies  *(1)*
lady  *(1)*
language  *(4)*
lapse  *(1)*
laptop  *(5)*
large  *(1)*
larger  *(3)*
late  *(9)*

LAW  *(7)*
laws  *(1)*
lawyer  *(2)*
layman's  *(1)*
lead  *(2)*
leading  *(1)*
learn  *(15)*
learned  *(5)*
learning  *(3)*
lease  *(1)*
leases  *(1)*
leasing  *(2)*
leave  *(34)*
leaving  *(2)*
led  *(3)*
LEES  *(5)*
left  *(11)*
legal  *(30)*
legally  *(1)*
legitimate  *(1)*
letter  *(55)*
level  *(4)*
LexisNexis  *(1)*
license  *(28)*
licensed  *(1)*
licenses  *(4)*
licensing  *(2)*
light  *(1)*
liked  *(1)*
limit  *(4)*
limited  *(4)*
Line  *(21)*
lines  *(4)*
lingo  *(1)*
Lisa  *(1)*
list  *(3)*
listed  *(7)*
listing  *(1)*
little  *(10)*
live  *(1)*
local  *(1)*
locate  *(1)*
located  *(5)*
location  *(18)*
locations  *(5)*
locked  *(2)*
log  *(1)*
long  *(3)*
longer  *(3)*

Look  *(85)*
looked  *(16)*
looking  *(20)*
looks  *(4)*
lost  *(2)*
lot  *(20)*
Love  *(1)*
loved  *(1)*
lower  *(5)*
Lubinsky  *(1)*
L-U-B-I-N-S-K-Y  *(1)*
lured  *(1)*
Luzern  *(1)*
Luzerne  *(2)*

< M >
Mahall  *(1)*
mail  *(4)*
main  *(2)*
maintain  *(3)*
maintained  *(8)*
maintains  *(2)*
maintenance  *(7)*
majority  *(2)*
maker  *(1)*
making  *(7)*
managed  *(2)*
management  *(7)*
manager  *(5)*
managerial  *(5)*
managers  *(3)*
mandatory  *(2)*
manner  *(1)*
March  *(70)*
Marchalk  *(1)*
MARIA  *(4)*
marijuana  *(1)*
mark  *(37)*
MARKED  *(70)*
Market  *(16)*
marking  *(3)*
married  *(1)*
Marshall  *(2)*
mass  *(1)*
materials  *(1)*
math  *(2)*
Matt  *(3)*
matter  *(8)*
matters  *(4)*
Matukewicz  *(2)*

Look  *(85)*

M-A-T-U-K-E-W-I-C-Z  *(1)*
max  *(1)*
Mayer  *(4)*
Mayers  *(1)*
MCCAMEY  *(1)*
MCNERNEY  *(1)*
mean  *(47)*
meaning  *(7)*
means  *(2)*
meant  *(2)*
mediate  *(1)*
medical  *(31)*
medication  *(1)*
meet  *(12)*
meeting  *(69)*
meetings  *(5)*
meets  *(1)*
member  *(2)*
members  *(2)*
memo  *(19)*
mental  *(3)*
mentally  *(3)*
MENTIONED  *(1)*
met  *(17)*
metal  *(2)*
Michael  *(2)*
mid  *(1)*
MIDDLE  *(5)*
Middletown  *(4)*
midway  *(1)*
million  *(1)*
mind  *(3)*
minute  *(3)*
minutes  *(3)*
MIS  *(1)*
misrepresent  *(1)*
missed  *(2)*
mistakes  *(1)*
misuse  *(1)*
modified  *(1)*
mold  *(1)*
moment  *(1)*
Monday  *(4)*
money  *(1)*
monitor  *(1)*
monitored  *(1)*
monitoring  *(1)*
Monroe  *(1)*

CONFIDENTIAL

Deposition of Heidi Zula Vol. I - Revised

Jane Doe, et al. v. Schuylkill County Courthouse, et al.

month  *(16)*
monthly  *(9)*
months  *(24)*
morning  *(1)*
morphed  *(3)*
motion  *(1)*
motions  *(1)*
move  *(12)*
moved  *(8)*
moving  *(7)*
mpipak@jonespassode
lis.com  *(1)*
multiple  *(3)*
municipal  *(2)*
Murray's  *(1)*
mutualization  *(1)*

< N >
name  *(15)*
named  *(10)*
names  *(4)*
nature  *(2)*
NE  *(1)*
near  *(1)*
necessarily  *(2)*
necessary  *(9)*
need  *(33)*
needed  *(33)*
needing  *(1)*
needs  *(6)*
negative  *(1)*
negotiate  *(1)*
negotiated  *(1)*
negotiations  *(3)*
never  *(32)*
new  *(33)*
newly  *(2)*
NEWMAN  *(1)*
news  *(1)*
newspaper  *(4)*
NICOLE  *(2)*
night  *(1)*
nine  *(1)*
nippolito@mpvhlaw.co
m  *(1)*
nod  *(1)*
non-approval  *(1)*
non-approved  *(1)*
non-complete  *(1)*

non-discrimination
  *(11)*
non-exempt  *(3)*
non-managerial  *(4)*
non-red-line  *(2)*
non-symptomatic  *(1)*
non-vaccinated  *(1)*
normal  *(1)*
north  *(7)*
Notary  *(2)*
notation  *(1)*
notations  *(1)*
note  *(1)*
noted  *(1)*
notes  *(7)*
notice  *(1)*
notification  *(1)*
notified  *(5)*
notify  *(1)*
notifying  *(1)*
November  *(8)*
NUMBER  *(26)*
numbering  *(1)*
numbers  *(6)*
numerous  *(4)*

< O >
oath  *(1)*
object  *(40)*
Objection  *(37)*
Objections  *(1)*
obligation  *(1)*
observe  *(2)*
obtain  *(5)*
Obviously  *(10)*
occasion  *(2)*
occupied  *(1)*
occur  *(4)*
occurred  *(23)*
occurring  *(3)*
O'Connor  *(3)*
O'Connor's  *(3)*
October  *(7)*
offended  *(1)*
offer  *(14)*
offered  *(11)*
Office  *(198)*
office/work  *(1)*
officer  *(19)*

officers  *(2)*
offices  *(53)*
official  *(9)*
officials  *(6)*
official's  *(1)*
Oh  *(5)*
Okay  *(386)*
older  *(1)*
once  *(5)*
ones  *(10)*
ongoing  *(3)*
online  *(1)*
open  *(6)*
operated  *(1)*
operation  *(13)*
operational  *(5)*
operations  *(26)*
opinion  *(14)*
opinions  *(1)*
opportunity  *(3)*
opposite  *(2)*
optimal  *(3)*
optimally  *(1)*
option  *(5)*
options  *(1)*
oral  *(1)*
order  *(22)*
organization  *(1)*
organizational  *(9)*
orientation  *(1)*
original  *(3)*
originally  *(1)*
outcome  *(1)*
outdated  *(2)*
outlined  *(2)*
outlines  *(2)*
outlining  *(1)*
outright  *(1)*
outside  *(11)*
outstanding  *(1)*
overall  *(4)*
overlapping  *(1)*
oversee  *(1)*
overseeing  *(1)*
oversight  *(1)*
overtime  *(3)*
owner  *(1)*

< P >

P.C  *(1)*
p.m  *(12)*
P.O  *(1)*
PAGE  *(63)*
pages  *(8)*
paid  *(8)*
panel  *(1)*
paper  *(2)*
paperwork  *(25)*
PAR  *(19)*
para  *(1)*
Paragraph  *(28)*
PARALEGAL  *(2)*
parcels  *(2)*
parenthesis  *(1)*
park  *(3)*
parked  *(1)*
parking  *(21)*
Parole  *(2)*
PARs  *(6)*
part  *(46)*
participate  *(1)*
particular  *(9)*
parties  *(5)*
parts  *(1)*
party  *(2)*
passing  *(1)*
PASSODELIS  *(1)*
PAUL  *(4)*
pause  *(1)*
paused  *(1)*
pay  *(6)*
paying  *(2)*
payment  *(2)*
payroll  *(10)*
PENNSYLVANIA
  *(16)*
people  *(11)*
percent  *(1)*
per-diem  *(2)*
Perfect  *(3)*
perform  *(12)*
performance  *(1)*
performed  *(2)*
period  *(35)*
periodic  *(1)*
periodically  *(2)*
permissible  *(3)*
permit  *(4)*

Case 3:21-cv-00477-MCC   Document 280-1   Filed 09/20/23   Page 338 of 342
CONFIDENTIAL
Deposition of Heidi Zula Vol. I - Revised
Jane Doe, et al. v. Schuylkill County Courthouse, et al.

permits *(3)*
permitted *(18)*
permitting *(1)*
person *(24)*
personal *(5)*
personally *(1)*
personnel *(11)*
perspective *(6)*
Philadelphia *(1)*
phone *(13)*
photo *(1)*
phrase *(1)*
physical *(5)*
physically *(5)*
physician *(13)*
physicians *(1)*
physician's *(12)*
pick *(1)*
picked *(1)*
piece *(2)*
pieces *(2)*
pigeon *(1)*
piling *(1)*
PIPAK *(132)*
Pittsburgh *(1)*
place *(14)*
placed *(16)*
placement *(2)*
places *(1)*
Plaintiff *(7)*
Plaintiffs *(21)*
plaintiff's *(10)*
plan *(25)*
planned *(1)*
planning *(2)*
plans *(1)*
platform *(3)*
played *(4)*
please *(11)*
pleased *(1)*
plees@dmclaw.com *(1)*
plenty *(2)*
plethora *(1)*
PLLC *(1)*
plus *(1)*
point *(41)*
pointed *(2)*
pointing *(1)*

points *(2)*
police *(5)*
policies *(17)*
policy *(111)*
pop *(1)*
portion *(8)*
posed *(6)*
position *(84)*
positions *(32)*
possible *(13)*
possibly *(1)*
post *(3)*
posted *(1)*
poster *(2)*
posters *(3)*
posting *(1)*
potential *(4)*
Potentially *(21)*
PowerPoint *(6)*
PowerPoints *(1)*
practice *(2)*
precedent *(1)*
preceding *(1)*
precluded *(4)*
preemployment *(1)*
pre-orientation *(1)*
prep *(1)*
preparation *(1)*
prepare *(4)*
prepared *(8)*
prepares *(1)*
PRESENT *(31)*
presentation *(3)*
presented *(6)*
preservation *(1)*
preserved *(1)*
press *(7)*
pressing *(2)*
pretty *(12)*
prevent *(1)*
previous *(5)*
PREVIOUSLY *(9)*
previously-held *(1)*
Price *(5)*
Price's *(1)*
primary *(4)*
Prior *(77)*
prison *(3)*
privacy *(1)*

priveledged *(1)*
privilege *(16)*
privileged *(11)*
privy *(2)*
probably *(22)*
Probation *(2)*
procedure *(3)*
procedures *(3)*
proceed *(4)*
proceeded *(1)*
process *(31)*
processed *(1)*
processor *(1)*
produce *(3)*
produced *(4)*
product *(8)*
PRODUCTION *(3)*
productive *(1)*
professionally *(2)*
program *(6)*
progressed *(1)*
projects *(2)*
prolonged *(1)*
promoted *(2)*
proper *(3)*
properties *(11)*
property *(5)*
proposed *(1)*
protection *(1)*
protocol *(1)*
protocols *(1)*
provide *(28)*
provided *(54)*
provider *(10)*
providers *(2)*
provider's *(3)*
provides *(2)*
providing *(5)*
prudent *(3)*
Public *(8)*
publicized *(1)*
publicly *(1)*
pull *(2)*
pulled *(3)*
puller *(1)*
pulls *(1)*
purely *(1)*
purpose *(10)*
purposes *(6)*

purview *(1)*
push *(2)*
pushed *(3)*
put *(50)*
puts *(1)*
putting *(5)*
puzzle *(1)*

**< Q >**
qualifications *(2)*
qualified *(3)*
quality *(1)*
quarantine *(1)*
question *(82)*
questioned *(4)*
questioning *(6)*
questions *(21)*
quick *(3)*
quickly *(5)*
quite *(5)*
quiz *(9)*
quoting *(1)*

**< R >**
raise *(2)*
raised *(11)*
raises *(2)*
ramifications *(2)*
ran *(1)*
raped *(1)*
rate *(2)*
rates *(1)*
ratio *(2)*
reach *(20)*
reached *(11)*
reaches *(1)*
reaching *(3)*
read *(16)*
reading *(7)*
reads *(3)*
real *(15)*
realize *(1)*
really *(10)*
reason *(19)*
reasonable *(16)*
reasoning *(2)*
reasons *(8)*
reassigned *(1)*
reassigning *(1)*

Deposition of Heidi Zula Vol. I - Revised                    Jane Doe, et al. v. Schuylkill County Courthouse, et al.

| | | | |
|---|---|---|---|
| recall *(159)* | relates *(2)* | reserving *(3)* | revision *(26)* |
| recalled *(1)* | relayance *(1)* | resignations *(1)* | revisions *(21)* |
| recalling *(1)* | releases *(1)* | resolve *(1)* | revisit *(2)* |
| receipt *(5)* | relevant *(7)* | resource *(1)* | rid *(1)* |
| receive *(21)* | relied *(2)* | resources *(44)* | right *(80)* |
| received *(79)* | relocated *(3)* | resource's *(1)* | RIGHTS *(3)* |
| receiving *(8)* | relocating *(1)* | respond *(4)* | ripped *(1)* |
| receptionist *(1)* | relocation *(1)* | responded *(2)* | rising *(1)* |
| recess *(5)* | rely *(1)* | respondents *(2)* | risk *(1)* |
| recognize *(39)* | remain *(9)* | responding *(1)* | Road *(2)* |
| Recognizing *(1)* | remarks *(2)* | responds *(3)* | role *(8)* |
| recollection *(7)* | remedies *(1)* | response *(15)* | roles *(3)* |
| recommend *(3)* | remedy *(1)* | responses *(4)* | Room *(8)* |
| recommendation *(11)* | remember *(28)* | responsibilities *(9)* | Roth *(21)* |
| recommendations *(6)* | remind *(1)* | responsibility *(3)* | Roth's *(1)* |
| recommended *(6)* | removal *(3)* | responsible *(11)* | round *(1)* |
| recommending *(2)* | removed *(10)* | restate *(1)* | RPR *(3)* |
| reconsider *(1)* | removing *(2)* | restricted *(3)* | run *(1)* |
| reconsideration *(2)* | render *(1)* | restriction *(2)* | running *(4)* |
| reconsidered *(2)* | rendered *(5)* | restrictions *(2)* | Ruscavage *(3)* |
| record *(33)* | renders *(1)* | restructure *(1)* | |
| recordkeeping *(1)* | repeat *(4)* | restructured *(1)* | < S > |
| records *(7)* | repeated *(1)* | restructuring *(4)* | sabbatical *(1)* |
| recovered *(1)* | rephrase *(3)* | result *(17)* | safe *(13)* |
| rectify *(1)* | replace *(2)* | resulted *(4)* | safer *(1)* |
| red *(6)* | replaced *(1)* | resulting *(2)* | safety *(11)* |
| red-line *(9)* | replacement *(2)* | results *(2)* | salary *(26)* |
| redlined *(1)* | replies *(1)* | resume *(8)* | sale *(2)* |
| reevaluate *(1)* | report *(49)* | retain *(1)* | sales *(4)* |
| refer *(4)* | reported *(17)* | retaliating *(1)* | sat *(3)* |
| reference *(8)* | REPORTER *(7)* | retaliation *(8)* | satisfactory *(1)* |
| referenced *(4)* | Reporting *(5)* | retaliatory *(1)* | save *(1)* |
| references *(5)* | reports *(91)* | retired *(1)* | saw *(4)* |
| referred *(1)* | represent *(6)* | retiree *(3)* | saying *(23)* |
| referring *(17)* | representation *(3)* | retirees *(3)* | says *(47)* |
| reflect *(1)* | REQUEST *(82)* | retirement *(1)* | SC1254 *(1)* |
| reflection *(1)* | requested *(28)* | retirements *(1)* | SC1254-1259 *(2)* |
| reflects *(2)* | requesting *(7)* | retrieved *(1)* | SC633 *(3)* |
| refresh *(1)* | requests *(13)* | return *(6)* | scenario *(1)* |
| refreshes *(1)* | require *(6)* | returned *(6)* | scenarios *(1)* |
| refused *(2)* | required *(11)* | returning *(2)* | schedule *(7)* |
| regard *(1)* | requirement *(4)* | REV9-13 *(1)* | scheduled *(6)* |
| regarding *(100)* | requirements *(5)* | revealed *(4)* | schedules *(1)* |
| regardless *(2)* | requires *(1)* | review *(60)* | scheduling *(3)* |
| regards *(1)* | requisite *(1)* | reviewed *(33)* | School *(4)* |
| regular *(5)* | rescheduled *(3)* | reviewing *(7)* | SCHUYLKILL *(5)* |
| rehired *(1)* | rescheduling *(1)* | reviews *(3)* | Schuylkill's *(2)* |
| reissue *(1)* | reserve *(4)* | revise *(4)* | scope *(2)* |
| related *(13)* | reserved *(1)* | revised *(23)* | screen *(4)* |

Case 3:21-cv-00477-MCC   Document 280-1  Filed 09/20/23   Page 340 of 342
CONFIDENTIAL
Deposition of Heidi Zula Vol. I - Revised                Jane Doe, et al. v. Schuylkill County Courthouse, et al.

screening  *(1)*
search  *(1)*
searches  *(1)*
second  *(32)*
second-round  *(1)*
section  *(5)*
security  *(2)*
see  *(48)*
seeing  *(2)*
seek  *(2)*
seeking  *(9)*
seen  *(9)*
selected  *(2)*
selection  *(2)*
send  *(13)*
sending  *(4)*
sense  *(5)*
sent  *(38)*
sentence  *(26)*
sentences  *(2)*
separate  *(15)*
separated  *(19)*
separately  *(2)*
separation  *(5)*
September  *(12)*
serious  *(1)*
serve  *(8)*
served  *(3)*
services  *(4)*
serving  *(4)*
SERVPRO  *(3)*
session  *(11)*
sessions  *(13)*
set  *(10)*
sets  *(1)*
setting  *(1)*
Seven  *(8)*
severally  *(2)*
severe  *(1)*
severely  *(4)*
sexual  *(21)*
sexually  *(2)*
shape  *(1)*
share  *(1)*
shared  *(1)*
Sharon  *(1)*
Sharyn  *(3)*
she'd  *(1)*
sheet  *(7)*

sheets  *(9)*
sheriff  *(5)*
sheriff's  *(5)*
shifted  *(1)*
shortly  *(2)*
short-term  *(6)*
shut  *(2)*
shy  *(3)*
sick  *(1)*
side  *(5)*
sign  *(23)*
signature  *(8)*
signed  *(25)*
significant  *(3)*
significantly  *(1)*
signing  *(3)*
sign-off  *(1)*
signs  *(2)*
similar  *(4)*
similarly  *(1)*
simple  *(1)*
simply  *(8)*
single  *(2)*
singular  *(2)*
sit  *(4)*
site  *(4)*
sits  *(1)*
sitting  *(1)*
situation  *(21)*
situations  *(1)*
six  *(6)*
slowly  *(1)*
smart  *(1)*
SMITH  *(289)*
Smith's  *(1)*
snow  *(1)*
social  *(1)*
sole  *(7)*
solicitor  *(3)*
solicitors  *(1)*
solicitor's  *(4)*
solution  *(5)*
Solutions  *(3)*
somebody  *(10)*
someone's  *(1)*
somewhat  *(1)*
soon  *(1)*
sorry  *(84)*
sort  *(4)*

sorts  *(1)*
sought  *(2)*
sound  *(4)*
sounds  *(2)*
source  *(1)*
Sp  *(1)*
space  *(8)*
spaces  *(4)*
speak  *(48)*
speaker  *(1)*
speakerphone  *(1)*
speaking  *(8)*
specialized  *(1)*
specific  *(26)*
specifically  *(24)*
specifics  *(1)*
specified  *(1)*
speed  *(2)*
spend  *(1)*
spends  *(1)*
spent  *(1)*
spin  *(1)*
spoke  *(26)*
spoken  *(5)*
spores  *(1)*
spot  *(3)*
spots  *(2)*
St  *(5)*
staff  *(16)*
staffed  *(2)*
staffing  *(2)*
stairwell  *(1)*
stamp  *(10)*
stamped  *(2)*
stamps  *(5)*
standard  *(1)*
Standards  *(1)*
standpoint  *(1)*
stands  *(1)*
start  *(23)*
started  *(28)*
starting  *(2)*
starts  *(3)*
State  *(21)*
stated  *(5)*
statement  *(55)*
statements  *(2)*
STATES  *(15)*
stating  *(3)*

statue  *(1)*
status  *(5)*
statute  *(2)*
stay  *(2)*
STEB  *(89)*
STEBs  *(1)*
steep  *(2)*
stenographic  *(1)*
step  *(1)*
stepped  *(1)*
steps  *(3)*
stint  *(2)*
stipulation  *(1)*
stood  *(1)*
Stop  *(9)*
stopped  *(4)*
story  *(2)*
Stottlemyer  *(1)*
Street  *(8)*
stress  *(1)*
strike  *(22)*
Stroudsburg  *(1)*
structure  *(6)*
struggle  *(2)*
struggled  *(3)*
struggling  *(1)*
stubs  *(1)*
stuff  *(1)*
subject  *(3)*
submission  *(6)*
submissions  *(1)*
submit  *(13)*
submits  *(3)*
submitted  *(27)*
submitting  *(4)*
subsequent  *(3)*
subsequently  *(1)*
substance  *(1)*
substantial  *(1)*
successful  *(1)*
sufficient  *(3)*
suggest  *(3)*
suggested  *(6)*
suggestion  *(5)*
suggestions  *(6)*
suggests  *(1)*
suing  *(2)*
suitable  *(1)*
Suite  *(3)*

Deposition of Heidi Zula Vol. I - Revised                    Jane Doe, et al. v. Schuylkill County Courthouse, et al.

summary *(4)*
superceded *(1)*
supercedes *(1)*
supersede *(1)*
supervised *(1)*
supervision *(2)*
supervisor *(44)*
supervisors *(6)*
supervisory *(1)*
supplement *(6)*
supplemental *(4)*
supplements *(1)*
supplies *(12)*
support *(1)*
supported *(1)*
suppose *(1)*
supposed *(8)*
sure *(36)*
suspect *(1)*
suspected *(1)*
suspended *(2)*
sustain *(1)*
sustaining *(1)*
swear *(1)*
switch *(2)*
sworn *(1)*
symptomatic *(1)*
synopsis *(1)*
system *(10)*
systems *(2)*

< T >
table *(1)*
take *(40)*
taken *(8)*
talk *(15)*
talked *(9)*
talking *(14)*
talks *(10)*
tardy *(1)*
tasked *(1)*
tasks *(1)*
tax *(121)*
taxes *(3)*
taxing *(1)*
tech *(2)*
TECHNICIAN *(1)*
technology *(1)*
telecommunicating

*(1)*
telecommuting *(8)*
tell *(23)*
telling *(5)*
temporary *(1)*
ten *(8)*
tenure *(5)*
term *(4)*
termed *(3)*
terminating *(1)*
terminology *(2)*
terms *(3)*
terrible *(1)*
test *(7)*
testified *(10)*
testify *(3)*
testifying *(3)*
testimony *(14)*
tests *(1)*
text *(1)*
Thank *(4)*
Thanks *(1)*
theirs *(1)*
therefrom *(1)*
thing *(4)*
things *(20)*
think *(135)*
thinking *(2)*
thinks *(1)*
third *(10)*
third-party *(1)*
Thomas *(4)*
thorough *(1)*
thoroughly *(1)*
thought *(20)*
thoughts *(1)*
Three *(16)*
Thursday *(5)*
Tiffany *(4)*
tile *(1)*
tiles *(5)*
time *(163)*
timely *(11)*
times *(11)*
timetable *(1)*
timing *(2)*
title *(4)*
titled *(1)*
today *(13)*

today's *(3)*
told *(25)*
Tom *(16)*
tomorrow *(5)*
tonight *(2)*
Tony *(2)*
tools *(1)*
top *(10)*
topic *(2)*
total *(1)*
touch *(1)*
Tower *(1)*
town *(1)*
TOWNSEND *(12)*
track *(1)*
tracked *(3)*
training *(59)*
trainings *(5)*
transcribe *(1)*
transcribed *(1)*
TRANSCRIPT *(4)*
transfer *(1)*
transferring *(1)*
transition *(6)*
transitioned *(4)*
transitioning *(1)*
translate *(2)*
transmitted *(1)*
transpired *(2)*
travel *(1)*
traveling *(1)*
tread *(1)*
treasurer *(4)*
treasurer's *(3)*
treated *(1)*
trial *(7)*
trickle *(2)*
tried *(1)*
Trifun *(4)*
true *(3)*
truly *(2)*
truthfully *(3)*
try *(5)*
trying *(9)*
turn *(7)*
turned *(6)*
turnover *(1)*
Twenty *(2)*
Two *(46)*

two-way *(1)*
type *(5)*
typed *(1)*
types *(2)*
typical *(4)*
typically *(24)*
typist *(7)*
typo *(1)*

< U >
U.S *(1)*
Uh-huh *(8)*
ultimate *(3)*
ultimately *(10)*
unable *(3)*
unaccompanied *(1)*
unclear *(1)*
uncomfortable *(2)*
understaffed *(3)*
understand *(57)*
understanding *(45)*
understood *(12)*
Unfortunately *(1)*
union *(1)*
union-represented *(1)*
unique *(1)*
UNITED *(2)*
unlawful *(2)*
unpack *(1)*
unrelated *(4)*
unsigned *(2)*
unwillingness *(1)*
upcoming *(3)*
updated *(3)*
updating *(1)*
upload *(1)*
uploaded *(5)*
uploading *(2)*
upper *(3)*
upstairs *(2)*
up-to-date *(1)*
usage *(4)*
use *(14)*
useful *(1)*
utilize *(14)*
utilized *(14)*
utilizing *(4)*

< V >

Case 3:21-cv-00477-MCC   Document 280-1   CONFIDENTIAL   Filed 09/20/23   Page 342 of 342
Deposition of Heidi Zula Vol. I - Revised
Jane Doe, et al. v. Schuylkill County Courthouse, et al.

vacancies  *(6)*
vacant  *(2)*
vacation  *(1)*
vaccinated  *(1)*
vague  *(1)*
valid  *(8)*
validate  *(1)*
valuations  *(4)*
value  *(2)*
values  *(6)*
VANDERLIN  *(1)*
vast  *(3)*
vehicle  *(7)*
vehicle/home  *(1)*
vehicles  *(3)*
vendor  *(3)*
verbal  *(2)*
version  *(5)*
versus  *(6)*
viable  *(1)*
video  *(10)*
VIDEOGRAPHER
 *(12)*
videos  *(1)*
VIDEOTAPE  *(1)*
view  *(4)*
viewed  *(5)*
violated  *(1)*
violations  *(1)*
violence  *(1)*
virtual  *(2)*
virtually  *(1)*
visit  *(1)*
visited  *(1)*
Visiting  *(2)*
voiced  *(1)*
VOLUME  *(1)*
volumes  *(1)*
vote  *(14)*
voted  *(14)*
votes  *(1)*

< W >
W-4  *(1)*
wage  *(2)*
wait  *(5)*
waited  *(1)*
waiting  *(1)*
waived  *(1)*

waiver  *(3)*
waiving  *(10)*
walk  *(4)*
walked  *(2)*
walking  *(2)*
Walmart  *(2)*
Walnut  *(2)*
wanded  *(3)*
want  *(32)*
wanted  *(16)*
wanting  *(1)*
Washington  *(1)*
wasting  *(1)*
water-stained  *(1)*
wave  *(1)*
way  *(8)*
wealth  *(1)*
weather  *(1)*
website  *(4)*
Wednesday  *(4)*
week  *(19)*
weekend  *(1)*
weekly  *(2)*
weeks  *(4)*
weigh  *(1)*
welcome  *(1)*
well  *(140)*
went  *(7)*
we're  *(22)*
we've  *(3)*
whereabouts  *(1)*
white  *(1)*
WILLIAM  *(1)*
Williamsport  *(1)*
willing  *(1)*
wish  *(2)*
wishes  *(1)*
withs  *(1)*
WITNESS  *(69)*
word  *(2)*
words  *(5)*
work  *(186)*
workday  *(1)*
worked  *(25)*
work-from-home  *(2)*
working  *(24)*
work-related  *(4)*
works  *(5)*
workspace  *(1)*

worth  *(1)*
write  *(13)*
writing  *(12)*
written  *(9)*
wrong  *(10)*
wrote  *(3)*

< Y >
Yackenchick  *(1)*
Yeah  *(37)*
year  *(12)*
years  *(4)*
yesterday  *(1)*
youth  *(1)*
Yup  *(4)*

< Z >
Zimmerman  *(6)*
Zimmerman's  *(1)*
Zoom  *(3)*
ZULA  *(193)*
Zula-13  *(1)*
Zula-24  *(2)*
Zula-25  *(1)*