# EXHIBIT

# P10

```
 1    ----------------------------

 2    JANE DOE, et al.,          : UNITED STATES DISTRICT COURT
              Plaintiff         : MIDDLE DISTRICT OF PENNSYLVANIA
 3         v.                    :
      SCHUYLKILL COUNTY          : CIVIL DOCKET NO:
 4    COURTHOUSE, et al.,        : 3:21-CV-00477
              Defendants        :
 5    ----------------------------

 6

 7                         ***

 8                      VOLUME I

 9                         ***

10          TRANSCRIPT MARKED CONFIDENTIAL

11                         ***

12

13

14

15

16

17

18          VIDEOTAPE DEPOSITION OF DOREEN KUTZLER

19    taken at the the Law Offices of Margolis

20    Edelstein, 214 Senate Avenue, Suite 402, Camp

21    Hill, Pennsylvania 17011 on Wednesday, January 25,

22    2023 at 9:01 a.m. before Coleen Trifun, RPR and

23    Notary Public.

24
```

```
 1    A P P E A R A N C E S :

 2            DEREK SMITH LAW GROUP, PLLC
              BY:  CATHERINE SMITH, ESQUIRE
 3            1835 Market Street
              Suite 2950
 4            Philadelphia, Pennsylvania 19103
              catherine@dereksmith.com
 5            Counsel for the Plaintiff

 6            NEWMAN WILLIAM, P.C.
              BY:  GERARD J. GEIGER, ESQUIRE
 7            P.O. BOX   511
              712 Monroe Street
 8            Stroudsburg, Pennsylvania 18360
              ggeiger@newmanwilliams.com
 9            Counsel for George Halcovage

10            JONES PASSODELIS
              BY:  MARIA PIPAK, ESQUIRE
11            Gulf Tower, Suite 3410
              707 Grant Street
12            Pittsburgh, Pennsylvania 15219
              mpipak@jonespassodelis.com
13            Counsel for Gary Bender and Heidi Zula
              (Via Zoom.)
14

15            DICKIE MCCAMEY
              BY:  PAUL G. LEES, ESQUIRE
16            190 Brodhead Road, Suite 310
              Bethlehem, Pennsylvania 18017
17            plees@dmclaw.com
              Counsel for additional parties
18

19            MARGOLIS EDELSTEIN
              BY:  MEGHAN WYNKOOP, ESQUIRE
20               JOCELYN MENDEZ, ESQUIRE
              The Curtis Center
21            170 S. Independence Mall W.
              Suite 400E
22            Philadelphia, Pennsylvania 19106
              mwynkoop@margolisedelstein.com
23            Counsel for Glenn Roth

24
```

```
 1            ALSO PRESENT:

 2            ALEISHA CATTS, VIDEO SPECIALIST
              MATT MESSNER, TECHNICIAN (Via Zoom)
 3            ALYSSA DEBISE, PARALEGAL
              ANGELA TOOMEY (Via Zoom)
 4            DENISE GERCHAK (Via Zoom)
              GEORGE HALCOVAGE (Via Zoom)
 5

 6

 7

 8

 9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24
```

```
 1                        - - -

 2                       INDEX

 3                        - - -

 4  WITNESS              INTERROGATION BY      PAGE

 5  DOREEN KUTZLER

 6                    By Ms. Smith          8

 7                        - - -

 8                      EXHIBITS

                         - - -

10  EXHIBIT NUMBER       DESCRIPTION        PAGE
```

| EXHIBIT NUMBER | DESCRIPTION | PAGE |
|---|---|---|
| Exhibit 275 | Kutzler 7-9 | 15 |
| Exhibit 276 | Kutzler 17-18 | 20 |
| Exhibit 277 | Doe 1118-1120 | 48 |
| Exhibit 278 | Doe 366-369 | 56 |
| Exhibit 279 | Doe 3136-3137 | 74 |
| Exhibit 280 | Doe 344 | 100 |
| Exhibit 281 | Doe 3138 | 120 |
| Exhibit 282 | Doe 1115-1117 | 130 |
| Exhibit 283 | Doe 1121-1124 | 151 |
| Exhibit 284 | Doe 1127 | 203 |
| Exhibit 285 | Doe 1137 | 260 |
| Exhibit 286 | Doe 510-514 | 277 |
| Exhibit 287 | Doe 493-494 | 277 |
| Exhibit 288 | Doe 507 | 291 |

```
 1    Exhibit 289          Doe 504-505        291

 2    Exhibit 290          Doe 520-521        297

 3    Exhibit 291          Doe 549            310

 4    Exhibit 292          Doe 7-10           324

 5    Exhibit 293          Doe 571-572        334

 6    Exhibit 294          Zula 325-326       365

 7    Exhibit 295          RP 432-434         398

 8

 9                   PREVIOUSLY MARKED EXHIBITS

10    Exhibit 229    Page 96       Exhibit-230   Page 159

11    Exhibit 232    Page 171      Exhibit-233   Page 211

12    Exhibit 19     Page 218      Exhibit-72    Page 218

13    Exhibit 17     Page 340      Exhibit-111   Page 343

14    Exhibit 61     Page 349      Exhibit-21    Page 347

15    Exhibit 100    Page 404      Exhibit-107   Page 408

16

17

18

19

20

21

22

23

24
```

Deposition of Doreen Kutzler                                    Jane Doe, et al. v. Schuylkill County Courthouse, et al.

```
 1              DIRECTION TO WITNESS NOT TO ANSWER

 2     PAGE  LINE          PAGE  LINE          PAGE  LINE

 3                          (None)

 4

 5

 6

 7

 8

 9

10

11

12

13           REQUEST FOR PRODUCTION OF DOCUMENTS

14     PAGE  LINE          PAGE  LINE          PAGE  LINE

15                          (None)

16

17

18

19

20

21

22

23

24
```

Page 7

1  THE COURT REPORTER:  Would you like
2 a copy of the transcript?
3  MR. LEES:  Yes.
4  - - -
5  VIDEOGRAPHER:  We are now on the
6 record.  Today's date is January 25, 2023, and the
7 time is approximately 9:01 a.m.  This is the
8 recorded video deposition of Doreen Kutzler,
9 Volume 1, in the matter of Jane Doe et al versus
10 Schuylkill County Courthouse et al.  This
11 deposition is being held at 214 Senate Avenue in
12 Camp Hill, Pennsylvania.  My name is Alicia Katz
13 from Everest Court Reporting and I'm the video
14 specialist.  The court reporter today is Coleen
15 Trifun, also from Everest Court Reporting.
16  Counsel will now state their
17 appearance for the record.
18  MS. SMITH:  Good morning.
19 Catherine Smith on behalf of the plaintiff.
20 Appearing by Zoom or observing by Zoom are
21 Plaintiff Doe 3 and 4, Ms. Toomey and Ms. Gerchak,
22 as well my paralegal Alyssa Debise is present in
23 the room with me.
24  MR. LEES:  Paul Lees for Defendant

Page 8

1 Kutzler.
2  MS. WYNKOOP:  Meghan Wynkoop --
3  MR. GEIGER:  Gerry Geiger for
4 Commissioner Halcovage, who is also on Zoom with
5 us just now.
6  MS. WYNKOOP:  Meghan Wynkoop on
7 behalf of Glenn Roth.
8  MS. PIPAK:  Maria Pipak for
9 Schuylkill County, Gary Bender and Heidi Zula.
10  MS. MENDEZ:  Jocelyn Mendez on
11 behalf of Glenn Roth.
12  - - -
13  DOREEN KUTZLER, having been first duly
14 sworn, was examined and testified as follows:
15  - - -
16  Examination
17  - - -
18 BY MS. SMITH:
19 Q.  Let me ask you this first question:  How
20 do I say your last name correctly?
21 A.  Kutzler.
22 Q.  Kutzler.  Okay.
23  Good morning, Ms. Kutzler.  My name is
24 Catherine Smith.  We met off the record.  I

Page 9

1 represent the plaintiffs Jane Doe 1, 2, 3, and 4
2 in the matter against Schuylkill County.
3  My first question for you is:  Have you
4 been advised of the confidentiality agreement in
5 this matter?
6 A.  As far as..?
7 Q.  That the contents of the deposition and
8 the matter are --
9 A.  Yes.
10 Q.  -- not to be disclosed to anyone?
11 A.  Yes.
12 Q.  Outside of your counsel and --
13 A.  Sure.
14 Q.  -- people that counsel tell you that you
15 may disclose it to.
16 A.  Sure.
17 Q.  Okay.
18  Have you spoken -- and I don't want to
19 know the contents -- but have you spoken with your
20 attorney regarding the procedures for the taking
21 of your deposition today?
22 A.  Yes.
23 Q.  And you understand that you've been
24 placed under oath and that you have an obligation

Page 10

1 to testify truthfully?
2 A.  Yes.
3 Q.  You understand that even though we are
4 in an informal conference room, your testimony has
5 the same force and effect as if you were
6 testifying in a court of law before a judge or a
7 jury?
8 A.  Yes.
9 Q.  Do you understand that the court
10 reporter will take down everything that is said
11 during the deposition and it will later be
12 transcribed in order to read like a script?
13 A.  Yes.
14 Q.  Do you understand that the court
15 reporter can not transcribe inaudible responses
16 such as the nod of the head?
17 A.  Yes.
18 Q.  Do you understand that you should wait
19 for the complete question to be asked before
20 responding, and likewise, I will wait for your
21 complete answer before I ask my next question?
22 A.  Yes.
23 Q.  If you do not understand a question or
24 if you think that it was ambiguous, please let me

Page 11

1  know and I will rephrase the question.
2      Do you understand?
3  A.    Yes.
4  Q.    Do you agree that if you do not
5  otherwise indicate, I will assume that you've
6  understood my question?
7  A.    Yes.
8  Q.    If at any point you realize that an
9  answer you gave earlier was inaccurate or
10 incomplete or you remember the information
11 necessary to answer it, please let me know and you
12 will be allowed to supplement your answer.
13     Do you understand that?
14 A.    Yes.
15 Q.    I'm not going to ever ask you to
16 completely speculate and you shouldn't do so.  I
17 may ask you a general time frame, a year, a month,
18 as close as you can get, but I won't ask you to --
19 I don't want you to guess for any answers.
20     Do you understand that?
21 A.    Yes.
22 Q.    Have you recently consumed any
23 medication or alcohol or any other substance which
24 impairs your ability to testify truthfully here

Page 12

1  today?
2  A.    No.
3  Q.    Is there any other reason you can think
4  of as to why you're not able to testify truthfully
5  here today?
6  A.    No.
7  Q.    Do you understand the instructions I've
8  given you?
9  A.    Yes.
10 Q.    Okay.
11     Only other instruction is if at any
12 point you need to take a break, please just let me
13 know.
14 A.    Okay.
15 Q.    Only request I have is if there's a
16 question posed to you, that you answer it and then
17 we'll take a break.
18 A.    Okay.
19 Q.    Do you have any questions for me
20 regarding your deposition?
21 A.    No.
22 Q.    Okay.
23     Ms. --
24     MR. LEES:  Catherine, we're going

Page 13

1  to do these under the usual stipulations that
2  we've been doing all the other depositions?
3      MS. SMITH:  Yes.  Confidentiality,
4  objection to form, and privilege only, correct?
5      MR. LEES:  Correct.  And -- and
6  we'll reserve reading and signing.
7      MS. SMITH:  Okay.
8  BY MS. SMITH:
9  Q.    Ms. Kutzler, periodically throughout the
10 deposition I'm going to refer to a couple of
11 individuals.  If I refer to Ms. Kleckner, do you
12 understand that to I'm referring to Marcy Kleckner
13 or Plaintiff Jane Doe 1?
14 A.    Yes.
15 Q.    Ms. Good -- Melissa Goodman or Ms.
16 Goodman that I am referring to Melissa Goodman,
17 Jane Doe 2?
18 A.    Yes.
19 Q.    Ms. Toomey or Ms. Angela Toomey that I
20 am referring to Jane Doe 3?
21 A.    Yes.
22 Q.    And Ms. Denise Gerchak or Denise or Ms.
23 Gerchak that I am referring to Jane Doe 4?
24 A.    Yes.

Page 14

1  Q.    Likewise, if I refer to the county, do
2  you understand that I am referring to the County
3  of Schuylkill?
4  A.    Yes.
5  Q.    Okay.  Thank you.
6      Ms. Kutzler, who is your current
7  employer?
8  A.    Hubric Resources.
9  Q.    And how long have you been employed
10 there?
11 A.    October of 2019, so three years.  A
12 little more than three years.
13 Q.    And what is your job title or role
14 there?
15 A.    Senior human resources consultant.
16 Q.    Is that the job you've held since 2019
17 or have you been promoted?
18 A.    It's been the same.
19 Q.    As I told you off the record, I'm
20 periodically going to provide you with documents.
21 A.    Uh-huh.
22 Q.    They will be marked and I will reference
23 them.
24     MS. SMITH:  So the first one I'm

Page 15

1  going to mark is what's been Bates stamped Kutzler
2  7 through 9.
3        It might have zeros in from of it,
4  Matt, but I am just going to refer to those.
5              - - -
6        (Kutzler 7-9 marked as Exhibit-275 for
7  identification.)
8              - - -
9        MS. SMITH:  And this is going to be
10  275.
11  BY MS. SMITH:
12  Q.      Ms. Kutzler, do you recognize this
13  document?
14  A.      Yes.
15  Q.      Actually, sorry.
16        Some of this might be just a slight
17  delay when I give you the document because we have
18  to make sure that it's projected on Zoom for some
19  of the --
20  A.      Okay.
21  Q.      -- individuals who are observing.
22        All right.  Now we have it up.
23        And you said you did recognize this
24  document?

Page 16

1  A.      Yes.
2  Q.      Okay.
3        And what is this document?
4  A.      This is a resume.
5  Q.      Is this your resume?
6  A.      It is.
7  Q.      Okay.
8        And did you create this document?
9  A.      Yes.
10  Q.      Do you recall when?
11  A.      Would have been in October of 2019 when
12  I started with Hubric Resources.
13  Q.      Okay.
14        Is everything in this resume accurate?
15  A.      Yes.
16  Q.      Have there been any changes or are there
17  any updates to any of the information in this
18  resume since it was created?
19  A.      No.
20  Q.      On Page 3 of this document under
21  education.
22  A.      Yes.
23  Q.      It indicates that you're pursuing a
24  bachelor of arts in management and leadership at

Page 17

1  JFK University.
2        Is that accurate?
3  A.      No longer.
4  Q.      Did you complete that or did you just
5  forego the degree?
6  A.      I did not complete it.
7  Q.      And you're not still attending?
8  A.      Correct.
9  Q.      Did you receive your high school
10  diploma, GED, or an equivalent?
11  A.      High school diploma.
12  Q.      Did you study at any other college or
13  post-secondary school?
14  A.      Yes.
15  Q.      Where was that?
16  A.      University of Phoenix and Strayer
17  University.
18  Q.      Did you receive a degree from either?
19  A.      No.
20  Q.      Your resume, by my count, lists seven
21  employers dating back to 1991.
22        Were you terminated or involuntarily
23  discharged from any of the employers listed on
24  your resume?

Page 18

1  A.      No.
2  Q.      Were any of these employers county
3  governments?
4  A.      The Berks County Intermediate Unit is
5  part of the school system.
6  Q.      Okay.
7  A.      I guess it's not -- it falls under the
8  Pennsylvania Higher Education Agency.
9  Q.      Any others?
10  A.      No.
11  Q.      In any of those positions, did you
12  have -- the -- the seven employers listed on your
13  resume, did you have any -- receive any training
14  or experience related to county tax claims or tax
15  assessments?
16  A.      No.
17  Q.      Your resume indicates that you have --
18  it's in that first paragraph there on Page 1 --
19  30-plus years of comprehensive human resource --
20  resources experience; is that correct?
21  A.      Yes.
22  Q.      Do you have any specialize training
23  related to human resources?
24  A.      As far as certifications?

Page 19

Q.      Well, it could include certifications, yes.  But even just on-job training?

A.      Yeah.  I have -- over the course of my career, I have specialized in benefit administration and management.

Q.      Did you receive a certification for that?

A.      No.

Q.      Okay.
        Is there -- so let's maybe start with the certifications or licenses.
        Do you hold any certification, license, degree of -- any sort of certificate that relates to human resources?

A.      No.

Q.      Okay.
        But you did specialize in benefit administration --

A.      Yes.

Q.      -- throughout your career?
        Do you hold any licenses or certificates related to county tax claim or tax assessment?

A.      No.

Q.      Was -- would it be fair to say that the

Page 20

first time you ever dealt with any sort of tax claim or tax assessment for a county was at Schuylkill County?

A.      Yes.

Q.      You can put that document aside.
        Going to look at what's been marked as Kutzler 17 and 18.

        MS. SMITH:  And that will be 276 for today's purposes.

                      - - -

        (Kutzler 17-18 marked as Exhibit-276 for identification.)

                      - - -

BY MS. SMITH:

Q.      Do you recognize this document?

A.      Yes.

Q.      And this is a -- this is titled consultant confidentiality and nondisclosure agreement.
        Do you see that?

A.      Yes.

Q.      And it's an agreement entered into on September 11, 2020, between Hubric Resources and the board of commissioners with Schuylkill County.

Page 21

        Would you agree?

A.      Yes.

Q.      Okay.
        You were employed by Hubric Resources in September of 2020, correct?

A.      October of 2019.

Q.      Right.
        So you were employed there in September?

A.      Yes.

Q.      Right?

A.      Yes.

Q.      2020.
        Were you involved in this -- so let me ask you this:  Around September 11t of 2020, Hubric Resources entered into a consultation agreement with the County of Schuylkill, correct?

A.      Yes.

Q.      Were you involved in those negotiations at all?

A.      No.

Q.      Okay.
        So can you walk me through or tell me what, if anything, you were told or instructed after the agreement was entered into?

Page 22

A.      Yes.  So Tom Hubric, who is the president Hubric Resources, manages and facilitates all contracts with our clients.  So he develops these contracts based upon the discussions that he has with each client and then he summarizes what my responsibilities will be for the client, such as interim HR support services.

Q.      Okay.
        And are you informed of what the contents of the contract say?

A.      Not specifically.

Q.      Okay.
        You're not provided a copy of the contract?

A.      No.

Q.      You're just provided an instruction or description of what your duties will be?

A.      Yes.

Q.      Okay.
        Do you know who for the county was involved in the contract negotiations?

A.      My understanding was it was a conversation between Tom and Mr. Bender.

Q.      Are there other individuals who hold

Page 23

1  your role at Hubric Resources?
2  A.      Yes.
3  Q.      Okay.
4         And do you know how it came to be that
5  you were selected for the role?
6  A.      It all depends on our workload.  So if
7  some of us have more time available and if any of
8  us have experience with like agencies or clients,
9  so if I had prior county experience, I would be
10 more likely to be assigned to that client.
11 Q.      Okay.
12        But you didn't have prior county
13 experience?
14 A.      Correct.
15 Q.      So do you know why you were selected for
16 this contract?
17 A.      I did some work with a local township
18 and we do -- probably two-thirds of our clients
19 are nonprofit agencies, so knowing that the county
20 is nonprofit and based upon my availability, would
21 have been the primary reasoning behind me being
22 selected.
23 Q.      Was your selection more of a discussion
24 between you and someone with Hubric Resources or

Page 24

1  was it an assignment?
2  A.      Tom asks what our bandwidth is, if you
3  will, and what availability we would have, because
4  knowing that this was going to be a full-time
5  assignment, so 40 hours a week on average, it --
6  he would have asked me whether or not I could
7  support the client.
8  Q.      And other than kind of what you
9  described as your bandwidth, were -- was there any
10 other information provided to you in order for
11 those discussions to occur to decide if you were a
12 good fit for the county?
13 A.      No.
14 Q.      Did you interview or speak with anyone
15 at the county?
16 A.      No.
17 Q.      Do you live in Schuylkill County?
18 A.      No.  In Berks County.
19 Q.      Okay.
20        So when you agreed to take the
21 assignment or it was assigned to you, did you --
22 were you told or were you aware of how often you
23 would need to be present at Schuylkill County
24 Courthouse?

Page 25

1  A.      Yes.
2  Q.      And how often was that?
3  A.      Monday through Friday.
4  Q.      Okay.
5         The direction or instructions that you
6  were given as to what you would need to provide to
7  the county in this contract, was that in writing
8  or was it an in-person discussion?
9  A.      In-person discussion.
10 Q.      Did you take any notes?
11 A.      No.
12 Q.      Do you recall what you were told?
13 A.      That I would provide interim HR services
14 and facilitate the day-to-day operations of the HR
15 department.
16 Q.      Were you informed about who, if anyone,
17 you would supervisor?
18 A.      Yes.
19 Q.      And who was that?
20 A.      That was Heather Garrity, the HR
21 specialist, and risk -- assistant risk manager,
22 Elaine Fucci, who was the benefits specialist, who
23 is -- and Ann Kraft who is an HR assistant.
24 Q.      What, if any information, were you given

Page 26

1  about the plaintiffs' allegations before beginning
2  your consultation work for the county?
3  A.      We had a discussion on September 3rd
4  regarding the responsibilities that I would have
5  and there was mention of the harassment case.
6  Q.      Okay.
7         So who is the, we, that you say had a
8  discussion?
9  A.      Myself, Tom Hubric, Mr. Bender, Ms.
10 Twigg.
11 Q.      Where did this conversation take place?
12 A.      The HR conference room.
13 Q.      Do you know, had the contract been
14 signed at that point?
15 A.      No.
16 Q.      And when you say HR conference room,
17 that's the one at the county, correct?
18 A.      Yes.
19 Q.      Okay.
20        You said there was mention, I think, of
21 the harassment claims, was the words you used.
22 Can you be more specific as to what was mentioned
23 or discussed, how in depth or not in depth it was?
24 A.      Just that there were charges filed

Page 27

1 through the EEOC against Commissioner Halcovage
2 with individuals out of the tax assessment office.
3 Q.      Were you informed that Defendant Bender,
4 Mr. Gary Bender, had been named a respondent in
5 the EEOC charge at that time?
6 A.      I did not know that at the time.
7 Q.      Were you informed that County Solicitor
8 Glenn Roth and -- and risk manager Glenn Roth was
9 also named a respondent at that time?
10 A.     No.  We did not discuss specifics.
11 Q.     Were you provided a copy of any of the
12 allegations of the plaintiffs?
13 A.     Not at that initial meeting.
14 Q.     Were you paid by the county or by Hubric
15 Resources during your time there?
16 A.     Hubric Resources.
17 Q.     After this initial September 3rd, and
18 that's September 3, 2020, correct?
19 A.     Yes.
20 Q.     Okay.
21        After that initial September 3, 2020,
22 meeting, when is the next time that you met with
23 anyone from the county regarding your work there?
24 A.     I started my assignment on Friday,

Page 28

1 September 4th.  So Deb Twigg and I met for the
2 entire day with a -- based upon a knowledge
3 transfer.  So she was getting me up to speed on
4 everything that was happening within the HR
5 department.
6 Q.      Okay.
7        And at that time, what, if any,
8 discussions were held concerning the plaintiffs
9 claims against the county?
10 A.     She did go into specifics regard the
11 four plaintiffs and Commissioner Halcovage and
12 the -- some of the allegations.  And then she
13 shared with me her investigation.
14 Q.     When you say she shared with -- with you
15 her investigation, did she share just the contents
16 or were you shown some sort of report or document?
17 A.     The summary memo.
18 Q.     Were you provided a copy of any of her
19 investigation final notes?
20 A.     I was made aware of where they were
21 located within the HR office in case I needed to
22 reference them.
23 Q.     Did you ever reference them?
24 A.     Yes.

Page 29

1 Q.      Do you remember when's the first time
2 that you referenced them?
3 A.      I don't remember that specifically.
4 Q.      Did you -- did you, if you know, provide
5 your resume to anyone at the county before you
6 began doing consultation work there?
7 A.      Tom would have provided it to Mr.
8 Bender.
9 Q.      At the time that you started at the
10 county, Defendant Halcovage was a county
11 commissioner, correct?
12 A.      Yes.
13 Q.      Did you know Defendant Halcovage before
14 you began doing consultation work for the county?
15 A.      No.
16 Q.      At some point you did meet him, correct?
17 A.      Yes.
18 Q.      Do you recall where you first met him?
19 A.      I think it was in the Hoffman room.
20 Q.      Do you know how soon after you started?
21 A.      Within a week.
22 Q.      Do you know, was it a commissioner's
23 meeting, meeting just with you and him or what was
24 the -- what was going on in the Hoffman room?

Page 30

1 A.      Sure.  So Tom and I were present with
2 Mr. Bender, Mr. Halcovage, I don't remember if
3 Commissioner Hetherington was there, but I think
4 Commissioner Hess was there.
5 Q.      Okay.
6        And --
7 A.      Oh, Mr. Roth.
8 Q.      And what was the purpose of this
9 meeting?
10 A.     Introductions.
11 Q.     So your introduction to those other
12 employees or county officials?
13 A.     Yes.
14 Q.     Okay.
15        Did someone run the meeting?
16 A.     No, not specifically.
17 Q.     Tell me what happened, what you
18 observed, what was said at this meeting.
19 A.     It was introductions regarding -- to --
20 to the commissioners and the individuals in the
21 room.  And Mr. Bender provided a summary of what
22 my responsibilities would be and Tom reiterated
23 that my support would be to help facilitate the
24 day-to-day operations of the HR department.

Deposition of Doreen Kutzler                                    Jane Doe, et al. v. Schuylkill County Courthouse, et al.

Page 31

1  Q.      Was the summary responsibilities
2  provided by Mr. Bender in writing or just verbal?
3  A.      Verbal.
4  Q.      Do you recall what he conveyed to you?
5  He --
6  A.      No.
7  Q.      -- being Mr. Bender.
8  A.      No, not specifically.
9  Q.      During this meeting, was anything
10 discussed regarding the plaintiffs' claims?
11 A.      Yes.
12 Q.      What was discussed?
13 A.      That the claim was first brought to the
14 county's attention in May and that the EEO charges
15 were brought in July of 2020.
16 Q.      Anything else, other than that?
17 A.      No.
18 Q.      What did you understand your
19 responsibilities to be regarding the plaintiffs'
20 claims at that time?
21 A.      Well, the investigation was completed
22 and Mr. Bender had explained that, as the county
23 administrator, he had over site for the
24 administrative offices such as tax claim, tax

Page 32

1  assessment, HR physical, fiscal, engineer, and
2  real estate.  So he did explain to me the
3  differences between the administrative offices and
4  the row offices.
5          And that the row officers, you know, had
6  responsibility for managing their own departments
7  or offices within the courthouse, where as Mr.
8  Bender managed all of the administrative offices.
9  So all of those directors, assistant directors
10 reported up through him directly.
11 Q.      Okay.
12         So did you understand that tax claim --
13 the tax claim bureau and tax assessment office,
14 they were both administrative offices?
15 A.      Yes.
16 Q.      And they both reported to Defendant
17 Bender?
18 A.      Yes.
19 Q.      And HR human resources, as well was an
20 administrative office?
21 A.      Yes.
22 Q.      And so did you understand that you
23 reported to Defendant Bender?
24 A.      Yes.

Page 33

1  Q.      Okay.
2          And so I don't think you answered my
3  question, it's fine, because I got some of the
4  information --
5  A.      Okay.
6  Q.      -- I needed.
7          But so my question was:  What was your
8  understanding of what you needed to do in regards
9  to the plaintiffs' claims?
10         MR. LEES:  Just note my objection
11 to the form.
12         You can answer.
13         THE WITNESS:  Okay.
14         As far as day-to-day operations?
15 BY MS. SMITH:
16 Q.      Just the -- were you supposed to conduct
17 any new investigation?  Were you supposed -- was
18 there anything specific that you were instructed
19 to do related to the plaintiffs' claims?
20 A.      No.
21 Q.      Okay.
22         Had you had any experience with, I'll
23 call them employers or companies, that had elected
24 officials involved?

Page 34

1  A.      No.
2  Q.      Okay.
3          Did you do any research or conduct any
4  investigation of your own to figure out what a
5  power or authority in HR department had over
6  elected officials?
7  A.      No.
8  Q.      Did you ever speak with any of Hubric's
9  attorneys or the county's attorneys to figure out
10 what power or authority human resources had over
11 an elected official?
12 A.      No.
13         MS. PIPAK:  Note my objection based
14 on attorney-client privilege.  But it's fine, I
15 think she already answered.
16         MS. SMITH:  What's that?
17         MS. PIPAK:  I was objecting on the
18 basis of attorney-client privilege, but I think
19 she already answered, so...
20         MS. SMITH:  Okay.  Well, then --
21 then on that note, we do need to discuss the
22 advice of counsel.  Are you guys doing to be
23 asserting it or will you be waiving it?
24         MS. PIPAK:  Well, this is a

Page 35

different issue, but this -- that's not a blanket,
you get to ask anything about any attorney-client
privilege in the case.  But we are not asserting
the defense -- an advice of counsel defense, but
that question doesn't have anything to do with
that.

MS. SMITH:  Okay.

BY MS. SMITH:

Q.      What, if anything, did you know about
Defendant Halcovage before you begin doing
consulting work for Schuylkill County?

A.      Nothing.

Q.      When you met Defendant Halcovage, can
you tell what your thoughts, opinions, feelings
were about him?  What your impression was?

A.      He's a snake.

Q.      Why do you say that?

A.      So within the first week that I started
working at the county, I think it was the
following Friday, I was leaving, exiting the
building, and he had been at the top of the steps.
And as I exited the HR department, he saw me
coming out and he waited part way down the steps.
And when I got to the top of the steps, he waited

Page 36

for me and he said, oh, I'll walk out with you.

And as we got closer to one another, I
had a bag filled with my computer and files and
personal items.  And he reached for it and said my
mom always told me to respect women, let me get
your bag for you.  And I said no, George, I got
it.  And he tried to carry it for me.  And I said
no, George, I have it and I had to yank it out of
his hand in order to proceed down the steps.

Q.      Ms. Kutzler, as you sit here today, has
your opinion of George Halcovage changed?

A.      From when I first met him?

Q.      From when you formed the opinion that
you believed he was a snake?

A.      No.

Q.      Do you believe that Defendant Halcovage,
as I think you just said he said, respects women?

A.      No.

Q.      Do you believe that Defendant Halcovage
took no for an answer from you?

A.      No.

Q.      Ms. Kutzler, as you sit here today, do
you believe that the County of Schuylkill and its
officials allowed you to perform your duties and

Page 37

responsibilities under the contract to your
fullest ability?

MR. LEES:  Just note my objection
to the form.

You can answer.

THE WITNESS:  As an HR
professional?

BY MS. SMITH:

Q.      Yes.

So I guess I can rephrase it.

Do you believe that -- that any of the
officials or employees of Schuylkill County
hindered your ability to fully do what you were
there to do?

A.      I wouldn't say hinder.

Q.      Okay.

A.      Because I voiced my professional opinion
to them on several occasions.

Q.      Okay.

So you voiced.

A.      Uh-huh.

Q.      Do you think that they listened it to?

A.      No.

Q.      Okay.

Page 38

Do you think -- did they do things that
were actively in contradiction to your
recommendations?

A.      Sometimes.

Q.      All right.

So Defendant Bender, Gary Bender was the
county administrator when you began working at the
county, correct?

A.      Yes.

Q.      Did you know him before you began the
consultation work?

A.      No.

Q.      Was -- the first time you met him I
think you mentioned was the precontract meeting;
is that correct?

A.      Yes.

Q.      All right.

Did you know anything about him before
you began --

A.      No.

Q.      -- the consultation work or, I guess,
before that meeting?

A.      No.

Q.      What was your opinion of Mr. Bender?

Page 39

1 A.      Mr. Bender was a great guy.  He has his
2 hands full.
3 Q.      All right.
4       So let's go back then to what we were
5 just talking about, about the county not listening
6 to, necessarily, your advice.
7       Who was it, you think, at the county
8 that did not listen to your advice?
9 A.      It's a number of people.
10 Q.     Okay.
11      Let's start with the first one you can
12 think of.
13 A.      Yeah.  Gary listened to me, but based
14 upon his responsibilities, he knew that there were
15 things that would not be agreed to.  And certainly
16 from the commissioner's perspective, if they
17 decided that that isn't the path they wanted to
18 take, they didn't take it.
19 Q.      So let's flush out the his
20 responsibilities statement.
21      You said based on his responsibilities,
22 there were just some things he wasn't going to
23 agree to; did I summarize your testimony
24 correctly?

Page 40

1 A.      For Mr. Bender?
2 Q.      Yes.
3 A.      Yeah.
4 Q.      Okay.
5       So give -- can you give me an example?
6 A.      Yeah.  Let me think about this for a
7 second.  So with -- in relation to the man -- the
8 day-to-day management of the tax claim office and
9 tax assessment, that was his responsibility and I
10 didn't get involved in the day-to-day operations
11 of that.
12 Q.      Okay.
13 A.      When the request was made for Jane Doe 1
14 and Jane Doe 2 to work from home, that came to me
15 in -- I was made aware of it in mid October.  And
16 that was through Christopher Scott, that request
17 came through, and I was asked to see if --
18      MS. PIPAK:  I'm going to object to
19 the -- I'm going to object on the basis of
20 attorney-client privilege.
21 BY MS. SMITH:
22 Q.      Ms. Kutzler, just based on what you were
23 told, what did you do?
24      So you just -- she's obj -- Maria is

Page 41

1 objecting because attorney-client privilege.  She
2 represents the county.
3 A.      Right.
4 Q.      So there is conversations between an
5 attorney and a representative of the county or
6 someone who works for the county.  The county
7 holds the privilege, so you can't waive the right
8 to disclose the contents of the conversation.
9 A.      Okay.
10 Q.      Only they can.  They're not waiving it.
11 A.      Okay.
12      MS. SMITH:  I imagine, correct,
13 Maria?
14      MS. PIPAK:  Correct.
15      MS. SMITH:  Okay.
16      MS. PIPAK:  We're not waiving it.
17 BY MS. SMITH:
18 Q.      So I'm not asking you to disclose the
19 conversations between you and Mr. Scott, I don't
20 want to know the contents.  Just as a result of
21 what he told you, what were the next things that
22 you did, the steps you took?
23      MS. PIPAK:  Well -- well,
24 Catherine, I think I'm still asking for

Page 42

1 attorney-client privilege.  I think if you just
2 ask her what she did, not if she did it based on
3 an attorney, that would be okay.  But to ask it in
4 that way is getting into attorney-client
5 communications.
6      MS. SMITH:  Well, she just
7 testified she received a request and I'm asking
8 her what she did next.  Her actions are not
9 attorney-client privileged.
10      MS. PIPAK:  Well, the way you asked
11 that question, I think there's a way that it can
12 be rephrased and we can get that information, but
13 you -- the specific question you asked was based
14 on what the attorney told you to do, what did you
15 do.
16      MS. SMITH:  Right.  And that is not
17 priveledged.
18      MS. PIPAK:  No.  You're asking for
19 attorney-client privileged communications.
20      MS. SMITH:  It is not.  It's her
21 action thereafter.  It is not the contents of a
22 conversation, it's what she, Ms. Kutzler, did
23 after there was a conversation had, what she did
24 next.

Page 43

1    I'll rephrase it.
2  BY MS. SMITH:
3  Q.    Not disclosing any contents of any
4  conversation with any attorney, and I'm not asking
5  you to -- if the next step you took was to talk to
6  an attorney, I don't want to know that, all I want
7  to know is:  What did you do next?  What's the
8  next thing you did with regards to these -- to
9  work-from-home requests you received?
10  A.    I had a conversation with Mr. Bender.
11  Q.    Okay.
12  A.    About their ability to work from home.
13  Q.    And did you provide Mr. Bender with any
14  documents or did you just go in and ask him, hey,
15  I got this request, can they work from home?
16  A.    Correct.
17  Q.    Okay.
18    The latter?
19  A.    Yes.
20  Q.    Okay.
21    And what was Mr. Bender's response?
22  A.    At first he was not in favor of it.
23  Anybody that knows Mr. Bender knows that he is a
24  little more traditional and old school.  So I had

Page 44

1  conversations and we had discussions about why it
2  was the right thing to do for the ladies.
3  Q.    And these conversations, do you
4  recall -- you said you got the requests in the
5  middle of October.  So was that, as well, when
6  this conversation happened?
7  A.    Yes.
8  Q.    Do you know where this took place?
9  A.    In Gary Bender's office in --
10  Q.    Okay.
11  A.    -- Mr. Bender's office.
12  Q.    And this was just you and him present?
13  A.    Yes.
14  Q.    And what was your recommendation to Mr.
15  Bender?
16  A.    That we gather the materials needed in
17  order for them to be successful in a
18  work-from-home situation.
19  Q.    And just so we're clear and the record
20  is clear, this is for Jane Doe 1 and Jane Doe 2,
21  Marcy Kleckner and Melissa Goodman?
22  A.    Yes.
23  Q.    All right.
24    Did you feel -- strike that.

Page 45

1    Why did you believe that setting them up
2  for success to work from home was the appropriate
3  route the county should take?
4  A.    Because Mr. Halcovage was still in the
5  county building.
6  Q.    Okay.
7    And why did you think that meant that
8  Ms. Goodman and Ms. Kleckner should would work
9  from home?
10  A.    So they wouldn't have to be subjected to
11  seeing him.
12  Q.    So you had read Ms. Twigg's summary
13  report, correct?
14  A.    Yes.
15  Q.    And you had understood that the county,
16  based on its investigation, had found that
17  Defendant Halcovage committed violations of county
18  policies?
19  A.    Yes.
20  Q.    Did you -- based off your review of the
21  document, did you feel that Defendant Halcovage
22  had engaged in sexual harassment?
23  A.    That is my understanding.
24  Q.    And do you understand why it would be

Page 46

1  uncomfortable for a victim of sexual harassment to
2  report to a building where the sex harasser is
3  present in?
4  A.    Absolutely.
5  Q.    Okay.
6    Did you ever discuss with Mr. Bender,
7  maybe trying to have Defendant Halcovage relocate
8  his work location?
9  A.    Yes.  And I also had conversations with
10  Commissioners Hetherington and Hess.
11  Q.    Okay.
12    So let's start with Mr. Bender.
13    Did the conversation about relocating
14  Defendant Halcovage occur before or after this
15  work-from-home conversation we were just
16  discussing?
17  A.    Probably before.
18  Q.    Okay.
19    And so you have a conversation with Mr.
20  Bender about George -- Mr. Halcovage working from
21  some other location.
22    What's that conversation go like?
23  A.    That it was never going to happen.
24  Q.    And why -- what was your understanding

Page 47

1  of why that was?
2  A.      Because George wouldn't agree to it.
3  Q.      What was Gary's comments, thoughts on
4  that, if anything?
5  A.      That he has suggested it.  He's
6  requested it.  He felt that it would be in the
7  best interest of the county for Mr. Halcovage to
8  either work from home or work from somewhere else.
9  Q.      And the he had requested, he had
10 suggested it was Mr. Bender to Defendant
11 Halcovage?
12 A.      Yes.
13 Q.      All right.
14       And was it your understanding your
15 conversations with Mr. Bender that, despite those
16 requests, suggestions, and discussion about it
17 being in the best interest -- interest of the
18 county, Defendant Halcovage still would not do so?
19 A.      Correct.
20 Q.      Did you yourself ever talk with
21 Defendant Halcovage about a suggestion or working
22 from a different location?
23 A.      No.
24 Q.      So as a result, I guess of that

Page 48

1  conversation, and the fact that Mr. -- Defendant
2  Halcovage was still in the building, you then had
3  a subsequent conversation with Mr. Bender based
4  off the plaintiff's request as well, to allow them
5  to work from home so they wouldn't have to see Mr.
6  Halcovage?
7  A.      Yes.
8  Q.      Okay.
9        Did you at any point learn that the
10 request of the plaintiffs to work from home and
11 obtain supplies had been made for some time prior
12 to mid October?
13 A.      No.
14 Q.      All right.
15       You were first made aware of their
16 request in mid October?
17 A.      Yes.
18       MS. SMITH:  We're going to look at
19 Doe 1118 to 1120.  This is going to be 277.
20             - - -
21       (Doe 1118-1120 marked as Exhibit-277 for
22 identification.)
23             - - -
24 BY MS. SMITH:

Page 49

1  Q.      This is an e-mail chain between you and
2  Ms. Kleckner and there's some other individuals
3  cc'd on it, correct?
4  A.      Yes.
5  Q.      And this is from October 27, 2020?
6  A.      Yes.
7  Q.      So this is shortly after you learned of
8  Ms. Kleckner and Ms. Goodman's request to work
9  from home.
10       Is that correct?
11 A.      Yes.
12 Q.      All right.
13       So let me ask you this:  What was your
14 understanding of what Ms. Goodman and Ms.
15 Kleckner's work location assignment was when you
16 started at the county?  So September 4th until you
17 received that work-from-home request.
18 A.      That they were working from home.
19 Q.      Okay.
20       So was it your understanding that they
21 had been approved to do so?
22 A.      That was the understanding I had, yes.
23 Q.      Okay.
24       And then if we look at -- at this

Page 50

1  e-mail, if we look at the first page, it says:  I
2  am in receipt -- well, let's start with:  Nice to
3  virtually meet you.  In October, specifically
4  October 27th of 2020, you had not yet met Ms.
5  Kleckner or Ms. Goodman in person, correct?
6  A.      Correct.
7  Q.      And you hadn't even virtually met either
8  of them.
9        Is that correct?
10 A.      Correct.
11 Q.      Okay.
12       Next sentence states, or paragraph, I'm
13 in receipt of your request for accommodation.
14 That's the work-from-home request; am I --
15 A.      Yes.
16 Q.      Okay.
17       Then -- and I have pulled together most
18 of the office supplies.  My apologies for the
19 delay in getting you fully set -- set up and
20 supported to work from home.
21       The office supplies were a list that was
22 provided to you with your understanding that this
23 is what they needed to work from home, Ms. Goodman
24 and Ms. Kleckner, correct?

Page 51

A.    Yes.
Q.    All right.
      What was the delay that you're referring to in getting them fully set up and supported to work from home?
A.    With the computer order, the laptop.
Q.    Okay.
      So the next sentence does talk about that laptop. And it says: At this time, new laptops are in order, along with other technical equipment to support you in a telework assignment. And then it lists some items.
      Is that correct?
A.    Yes.
Q.    So was it -- the delay in -- in -- the delay that occurred before this e-mail was sent or the delay that was going to occur because these laptops needed to be ordered and weren't readily accessible?
A.    Yes. So when I originally placed the order for the laptops, there was no money in the tax assessment's budget in order to pay for those expenses. So I had learned about a committee that exists within the county. Theresa Gaffney leads

Page 52

that committee. I don't recall the name of it. But it's a philanthropic type committee where funds are raised and provided to departments to defer expenses associated with running the departments on a day-to-day basis, that's my understanding.
Q.    Okay.
A.    So the request went to Ms. Gaffney and the committee reviewed it. And that was probably two weeks before I even got a response that they would support the expense, because originally with their being no money in the budget, the purchase order was put on hold.
Q.    Okay.
A.    Until we established where the funds were coming from.
Q.    Okay.
      So when was that initial determination regarding there being no funds, like before the committee was discovered?
A.    It had to be around the October 27th date.
Q.    Okay.
      But sometime before October 27th?

Page 53

A.    Yeah.
Q.    Correct?
A.    Yeah.
Q.    Okay.
      How did you find out about this committee that Ms. Gaffney spearheaded or ran?
A.    I think Heather Garrity told me about it, Ms. Garrity.
Q.    When you first discovered there was no funds in the budget, did you go to anyone and speak with them about, hey, how do I get these laptops for these women?
A.    Yes.
Q.    Who did you speak with?
A.    Yes. I spoke with Paul Buber.
Q.    Okay.
      He's -- is he in the MIS department?
A.    He's fiscal.
Q.    Fiscal. Okay. Thank you.
      And what was his suggestion?
A.    That this committee existed and that perhaps -- he married up what Heather had told me about the committee and the fact that they would -- they supply fund -- funding to the

Page 54

departments.
Q.    Okay.
      So this e-mail, this October 27, 2020, e-mail is sent after your conversation with Mr. Bender.
      Is that correct?
A.    Yes.
Q.    So you said Mr. Bender, I think you referred to him as old school or traditional maybe. I apologize, I don't remember which words were used.
      But he -- he had a little reservation, as I understand from your testimony, about having Ms. Kleckner and Ms. Goodman work from home; is that correct?
A.    Yes.
Q.    But eventually, it sounds like based on this e-mail, that he did consent to or approve them working from home?
A.    Yes.
Q.    All right.
A.    And that was the point of the temporary telecommuting policy and agreement.
Q.    Okay.

Page 55

And we'll -- we'll get to that in one
second.

A.    Okay.

Q.    I appreciate that.

Did you -- did you and he, Mr. Bender,
have any conversations regarding the specific
items that Ms. Kleckner and Ms. Goodman were
requesting?

A.    No.

Q.    You didn't discuss the laptops?

A.    Other than the fact that when I had
originally put the PO through, that there wasn't
money in their budget in order to pay for it.

Q.    Okay.

But he didn't give you any pushback on
ordering laptops for them?

A.    No.

Q.    Okay.

Did you understand -- strike that.

At this time, would it be fair to say
that you had a limited understanding of exactly
what Ms. Kleckner and Ms. Goodman did?

A.    Yes.

Q.    Okay.

Page 56

But based on that understanding, did you
believe that they needed these items to be
productive in working from home?

A.    Yes.

Q.    And that until they received, especially
a new laptop, they wouldn't be fully able to
performing their job duties?

A.    Possibly.

MS. SMITH:  We're going to look at
Doe Supplement 366 to 369.  That will be 278.

- - -

(Doe 366-369 marked as Exhibit-278 for
identification.)

- - -

BY MS. SMITH:

Q.    I am also going to put in front of
you -- three -- actually we can hold off on that,
just because I don't want to do a split screen on
here.

Okay.

So you have in front of you what's now
been marked 278 for today's purposes.  This
actually contains two different documents or what
I believe is two different documents.  The first

Page 57

two pages look like to be a short-term
telecommuting agreement for Marcy Kleckner, the
second two the county's temporary telecommuting
policy.

Am I correct?

A.    Yes.

Q.    Okay.

And these two documents -- actually, I'm
sorry.  If you just quickly look back to the
e-mail we were just looking at.  These two
documents, you mentioned I think in your e-mail in
the second page, that they were attached, correct?

A.    Yes.

Q.    And these are those two attachments?

A.    Yes.

Q.    Okay.  Thank you.

Were -- let's start with the temporary
telecommuting policy, the second two -- or the
third and fourth page of this document.  Was this
a policy that was already in effect in Schuylkill
County at the time you started there?

A.    No.

Q.    Did you draft this?

A.    Yes.

Page 58

Q.    Okay.

And from -- did you use something that
you had already had or did you create it
completely new?

A.    This is a document that we used at the
firm.

Q.    And the firm being Hubric?

A.    Yes.

Q.    Okay.

Did you -- other than maybe changing the
name of the county and -- and the word county in
there as opposed to, like, employer, did you make
any other substantial changes to this policy?

A.    No, I did not.

Q.    All right.

Was this policy drafted by you in
regards to the request of Ms. Kleckner and Ms.
Goodman?

A.    Yes.

Q.    Who approved it, reviewed it, voted on
it?

A.    Mr. Bender.

Q.    Was it ever shown to the county
commissioners?

Page 59

A.      Not to my knowledge.

Q.      Was there -- there's commissioners' meetings where there's votes taken on certain things, correct?

A.      Yes.

Q.      Do you know if this was ever voted on at a commissioners' meeting?

A.      Not to my knowledge.

Q.      And you simply just showed this to Mr. Bender and approved it or did he make any changes?

A.      He did not make any changes.  He asked a couple of questions.

Q.      Do you recall what those were?

A.      Not specifically.

Q.      Okay.

        Under procedures, the first sentence states:  In the event of such circumstances, certain employee may be permitted to work remotely.

        The such circumstances is referring to extenuating circumstances that's referenced in the first paragraph, correct?

A.      Yes.

Q.      What was your understanding regarding

Page 60

this -- so when I'm asking questions about your understanding regards this policy, I am going to be referring to its implementation at Schuylkill County, not in regards to any other employers --

A.      Okay.

Q.       -- or entities.

        So what was your understanding of who at the county would make the decision if extenuating circumstances existed?

A.      It would be on a case-by-case basis. And specific to administrative offices, it would be Mr. Bender.

Q.      Okay.

        So for row offices it might be something different?

A.      Correct.

Q.      All right.

        But this temporary telecommuting policy applied to all employees of the county?

A.      Yes.

Q.      The next sentence states:  These employees will be advised of such requirements by human resources.

        What requirements is that speaking of?

Page 61

A.      So that would speak to the agreement itself, that the individual has to have a designated work area.  It has to be free from clutter or tripping hazards because we want to make sure that it was also ergonomically correct. And that there were -- any kind of interruption would be min -- minimalized throughout the course of the business day.

Q.      But the sentence is suggesting that those requirements are simply going to be given to the county employee by human resources, but not that the decision will be made by human resources?

A.      Correct.

Q.      The next sentence states:  Preparation should be made by employees and managers as far in advance as possible to allow remote work in extenuating circumstances.

        Were -- you understood at the time, October 27, 2020, that Ms. Toomey and Ms. Gerchak were Ms. Kleckner and Ms. Goodman's direct supervisors, right?

A.      Yes.

Q.      Okay.

        Were they notified or involved in any

Page 62

discussions regarding the work-from-home status of Ms. Kleckner and Ms. Goodman?

A.      To the extent of understanding what supplies they would need and -- I can't think of anything else because they were already working from home.

Q.      Okay.

A.      So that relationship was already established.

Q.      Did you, or to your knowledge, did anyone on behalf of the county have any conversations with Ms. Toomey and/or Ms. Gerchak what about what, if any, changes needed to occur regarding Ms. Kleckner and Ms. Goodman's work-from-home status so that the offices could run efficiently?

A.      We spoke specifically about the new laptops because of the Govern system that exists and the difficulties that they were having in accessing that system from the current equipment that they were working from.

Q.      Do you recall having any conversations with Ms. Toomey or Ms. Gerchak about Ms. Kleckner, specifically, doing increased field work to keep

Page 63

1  her away from the county building?
2  A.     No.
3  Q.     If we looked -- it's -- I guess it looks
4  like a paragraph to me, there's a second paragraph
5  for telework arrangements.
6  A.     Uh-huh.
7  Q.     Do you see that?
8        It says, either the county administrator
9  or human resources could -- human resources can
10  initiate a temporary telecommuting agreement
11  during extenuating circumstances.
12       So tell me what you think is different
13  about initiation of an agreement versus the
14  approval of an agreement?
15  A.     It would depend on the circumstances.
16  So if somebody has, perhaps, and ailing parents in
17  which they need to provide direct care to, we
18  would use something like this in that situation to
19  allow them the flexibility to work from home to
20  attend to their care.  So you get involved in
21  discussions with the employee that contain
22  protected health information and some confidential
23  information.  So in that regard, the
24  recommendation would be made from HR to Mr. Bender

Page 64

1  to say, this is a short-term telecommuting
2  agreement, these are the reasons, and this is why
3  we're approving it or recommending it.
4  Q.     Okay.
5  A.     Recommending that it be approved.
6  Q.     Okay.
7        But -- so ultimately -- so maybe HR does
8  the early leg work?
9  A.     Yes.
10  Q.     Makes a recommendation, but ultimately
11  the approval lies with the county administrator?
12  A.     Yes.
13  Q.     The next sentence states:  The human
14  resources director, manager, employee will discuss
15  the job responsibilities and determine if the job
16  is appropriate for a telecommuting arrangement,
17  including equipment needs, work space design
18  considerations, and scheduling issues.
19       From your testimony, and correct me if
20  I'm wrong, it sounds like they're -- with at least
21  an understanding about the appropriateness of the
22  telecommuting agreement with Ms. Kleckner and Ms.
23  Goodman and at least Ms. Toomey, if not Ms.
24  Gerchak, correct?

Page 65

1  A.     Correct.
2  Q.     And there was obviously e-mails and
3  correspondence regarding equipment needs with
4  those same individuals?
5  A.     Yes.
6  Q.     Were there any discussions around --
7  regarding scheduling issues with Ms. Kleckner and
8  Ms. Goodman?
9  A.     No.
10  Q.     Okay.
11       The next paragraph talks about the
12  telecommuting agreement and that it will be signed
13  by employee and his or her manager.  That would be
14  that -- those first two pages of this, correct?
15  A.     Correct.
16  Q.     And this was -- this first two pages,
17  Doe Supplement 366 and 367 were, in fact, provided
18  to Marcy in that e-mail.
19       Did she ever sign it?
20  A.     I'm recalling that she did.
21  Q.     Okay.
22  A.     But it would be part of her personnel
23  file.
24  Q.     Okay.

Page 66

1       So you believe any sort of short-term
2  telecommuting agreement would have -- that was
3  signed by her, it would've been maintained in her
4  personnel file?
5  A.     Correct.
6  Q.     And same for Ms. Goodman?
7  A.     Yes.
8  Q.     Okay.
9       The next sentence states:  Employees
10  shall not work for another employer or perform any
11  other work including work related to self
12  employment during the temporary telecommuting
13  period.
14       Was that just for the hours they were
15  working for the county?  So if they were an
16  8:00 -- 8:30 to 4:30, they couldn't do any other
17  work during those hours?
18  A.     Correct.
19  Q.     But if they wanted to have a part-time
20  job after 4:30 or to -- self employment, they were
21  permitted to do so?
22  A.     Sure.
23  Q.     Okay.
24       The last sentence of the last paragraph

Page 67

1  on this page, it says:  The county will also
2  reimburse the employee for business-related
3  expenses such as phone calls and shipping costs
4  that are reasonably incurred in carrying out the
5  employee's job.
6         Did you ever, or to your knowledge, did
7  anyone on behalf of the county ever advise Ms.
8  Kleckner and Ms. Goodman on how to submit for
9  reimbursements regarding phone calls?
10  A.      Not to my knowledge.
11  Q.      All right.
12         Now looking at the first two pages,
13  specifically Ms. Kleckner's telecommuting
14  agreement.  I want to look at -- so the temporary
15  work location is Ms. Kleckner's address at the
16  time, correct?
17  A.      Yes.
18  Q.      And the employee schedule was the same
19  as if she reported to the courthouse, correct?
20  A.      Correct.
21  Q.      Under the bold header of the employee
22  agrees, there's a sentence that states:
23  Non-exempt hourly employees will record all hours
24  worked and meal periods taken in accordance with

Page 68

1  regular time keeping practices.
2         Do you see that?
3  A.      Yes.
4  Q.      Ms. Kleckner and Ms. Goodman were both
5  non-exempt hourly employees, correct?
6  A.      Yes.
7  Q.      What was your understanding of what the
8  regular timekeeping practices were for the -- Ms.
9  Kleckner and Ms. Goodman?
10  A.      There are time sheets that the county
11  uses for payroll processing purposes.
12  Q.      And those time sheets are daily,
13  correct?  Just the number of hours worked per day,
14  it's not like an hourly or by minute increments?
15  A.      Daily.
16  Q.      Okay.
17  A.      Each day -- each day is recorded
18  independently.
19  Q.      Right.
20         And -- but it's not like Monday
21  9:00 a.m. to 10:00 a.m., it's just how many hours?
22  A.      Total hours.
23  Q.      For Monday?
24  A.      Yes.

Page 69

1  Q.      Okay.
2         And do you know, were those submitted
3  every day or were they submitted on a weekly,
4  biweekly, something else basis?
5  A.      In the HR department it was on a weekly
6  basis.
7  Q.      Okay.
8         Any reason to believe it was different
9  in any other --
10  A.      No.
11  Q.      -- administrative office?
12  A.      No.
13  Q.      Okay.
14         So was it your understanding that what
15  Ms. Kleckner and Ms. Goodman would have been
16  required to do, related to this short-term
17  telecommuting agreement was to submit weekly
18  reports of their hours worked each day?
19  A.      Yes.
20  Q.      And that could be hours worked, PTO
21  taken, vacation taken, it was just how many hours,
22  what they did during those --
23  A.      Correct.
24  Q.      The 8:00 to 4:30 Monday through Friday?

Page 70

1  A.      Yes.
2  Q.      Okay.
3         A couple down from that it says:  The
4  employee will communicate regularly with his or
5  her supervisor and coworkers, which includes a
6  weekly written report of activities.
7         It was your understanding that it was
8  only a requirement that they -- Ms. Goodman and
9  Ms. Kleckner weekly update in writing, their
10  supervisors?
11  A.      Correct.
12  Q.      Turning to the next page, Doe
13  Supplemental 367.
14         The first -- second sentence, I'm sorry.
15  The County of Schuylkill will provide the
16  following equipment, laptop, printer, office
17  supplies, and it has a list of various items
18  there.  And you can refer back to your e-mail if
19  it will refresh your recollection, but fair to say
20  that October 27th of 2020, Ms. Goodman did not
21  have a laptop, correct?
22  A.      To my knowledge, yes.
23  Q.      Or at least -- let me rephrase it.
24         A county-issued laptop, correct?

Page 71

1  A.      Correct.
2  Q.      Okay.
3        Ms. Good -- Kleckner had one, but it
4  was -- I think you can look and read the e-mail in
5  there if it refreshes your recollection, I think
6  she was having some technical --
7  A.      Oh, yeah.
8  Q.      -- issues with it?
9  A.      May 1st she was provided.
10 Q.      But she was having some issues with it,
11 correct?
12 A.      Based upon her e-mail, yes.
13 Q.      Okay.
14        And her e-mail was one that reported it
15 to you?
16 A.      Yes.
17 Q.      Okay.
18        Looking at your e-mail, does it refresh
19 your recollection if Ms. Goodman or Ms. Kleckner
20 had a printer at the time?
21 A.      I don't recall them having one.
22 Q.      Okay.
23 A.      Which is why we were ordering --
24 Q.      Makes sense.

Page 72

1  A.      -- one for home.
2  Q.      And they were provided some -- some
3  pens, some paperclips, some of those other items
4  there, probably, I think, shortly after
5  October 27, 2020, based on your e-mail here.
6        Is that correct?
7  A.      Yes.
8  Q.      All right.  Next sentence states:  The
9  employee will provide the following equipment, and
10 it references Internet connection.  But if we look
11 a couple paragraphs down, one, two, three, four
12 down, it says:  Employee will submit expense
13 reports with attached receipts in accordance with
14 the County of Schuylkill's expense reimbursement
15 policy.  The county agrees to reimburse the
16 employee $30 monthly, paid quarterly, for phone
17 and Internet.
18        Did you ever provide, or to your
19 knowledge, did anyone from the county provide Ms.
20 Goodman or Ms. Kleckner with this expense
21 reimbursement policy of the county?
22 A.      No.
23 Q.      Have you ever seen it?
24 A.      A submission for reimbursement?

Page 73

1  Q.      The policy.
2  A.      No.
3  Q.      So do you know even what the policy says
4  Ms. Kleckner and Ms. Goodman would have had to do
5  to get paid?
6  A.      Not specifically.
7  Q.      Okay.
8        Did you provide them with an expense
9  report, which they would have needed to submit?
10 A.      The expense reports, I think, are
11 available on the intranet.
12 Q.      Okay.
13        But you didn't e-mail them a copy?
14 A.      No, I did not.
15 Q.      Do you know anyone for the county who
16 did?
17 A.      Not -- no.
18 Q.      Did anyone, to your knowledge, tell them
19 that they were on -- that expense report was on
20 the intranet.
21 A.      Not to my knowledge.
22 Q.      Okay.
23        Do you know if Ms. Kleckner or Ms.
24 Goodman were ever reimbursed for phone or Internet

Page 74

1  expenses for working from home?
2  A.      Through me, no.
3  Q.      Okay.
4        I mean, maybe not just through you, but
5  to your knowledge, did they ever --
6  A.      Not -- not to my knowledge.
7  Q.      Okay?
8        MS. SMITH:  We're going to look at
9  Doe Supplement 3136 and 3137.
10       - - -
11       (Doe 3136-3137 marked as Exhibit-279 for
12 identification.)
13       - - -
14 BY MS. SMITH:
15 Q.      This is almost an identical short-term
16 telecommuting agreement as the one we just looked
17 at, but this is for Ms. Goodman, correct?
18 A.      Yes.
19 Q.      And the temporary work location is her
20 home address, correct?
21 A.      Yes.
22 Q.      And this was also provided -- this was
23 provided to Ms. Goodman around the same time that
24 the one we just looked at was provided to Ms.

Page 75

1  Kleckner, correct?
2  A.      Yes.
3  Q.      Okay.
4         Do you know if Ms. Goodman ever signed
5  hers?
6  A.      Not to my knowledge.
7  Q.      Was -- so shortly after October 27th of
8  2020, there was a change in work locations for Ms.
9  Goodman and Ms. Kleckner, correct?
10  A.      You mean from working from home?
11  Q.      Yes.
12  A.      Yes.
13  Q.      They -- there was a decision made to
14  assign them to the 410 Building within the county,
15  correct?
16  A.      Yes.
17  Q.      Do you recall when that decision was
18  made?
19  A.      No.
20  Q.      Okay.
21         Do you recall when that decision was
22  conveyed to Ms. Goodman or Ms. Kleckner?
23  A.      Middle of November.
24  Q.      Of 2020?

Page 76

1  A.      Yes.
2  Q.      So do you know, did Ms. Goodman or Ms.
3  Kleckner ever receive, between October 27, 2020,
4  when e-mail was sent and when they were told they
5  were being assigned to the 410 Building, did they
6  ever receive the laptop that -- the laptops you
7  had ordered for them?
8  A.      No.
9  Q.      Did they ever receive the printers?
10  A.      No.
11  Q.      Did -- I think we discussed, they had
12  received a couple supplies and pens, some paper
13  and some folders, I think, right?
14  A.      Yes.
15  Q.      Okay.
16         Do you believe that the supplies that
17  they did receive were sufficient for them to
18  conduct or perform their job duties?
19  A.      No.
20  Q.      Okay.
21         So what was then if -- your
22  understanding of what the county's policy
23  regarding their pay during that time?  They
24  couldn't complete their hours, what were they

Page 77

1  supposed to -- because they didn't have the
2  supplies, what were they supposed to do according
3  to the county?
4  A.      Work with the equipment that they had in
5  place.
6  Q.      So if a task took them longer than it
7  would have if they had the right equipment, was it
8  your understanding that they would then be
9  permitted to submit hours for the extended time to
10  complete the task?
11  A.      That wasn't my call to make.  That would
12  have been something that needed to be discussed
13  with their direct supervisors.
14  Q.      Okay.
15  A.      To obtain that approval for the
16  overtime.
17  Q.      So you believe that -- well, no, I'm not
18  saying overtime.  So let's say Task A would
19  normally -- if they were in the county building
20  with the systems and equipment they needed.
21  A.      Okay.
22  Q.      Would take them 15 minutes, but because
23  they didn't have laptops and they were doing it on
24  phones or iPads or whatever else they had, it

Page 78

1  would take them a half an hour, they were still
2  permitted to submit a half an hour worth of work?
3  A.      Yes.
4  Q.      Okay.
5         What was your understanding of what they
6  were to do, Ms. Kleckner and Ms. Goodman, if
7  because of the lack of equipment and supplies,
8  they couldn't fill they're entire workday?  Were
9  they permitted to still submit the hours because
10  they were available to work or were they supposed
11  to use bank time or non-paid time?
12         MS. PIPAK:  I am going to object to
13  the form.
14         But go ahead.
15  BY MS. SMITH:
16  Q.      You can answer.
17  A.      Well, I think the expectation was that
18  they were completing their job within the
19  regularly scheduled business hours.
20  Q.      Right.
21         But -- so they might be able to complete
22  whatever they can complete and during those
23  regular business hours.  But what if, because they
24  didn't have the necessary equipment and supplies,

Page 79

there were tasks that they couldn't complete?

Or let me -- let me strike that.

Did you understand or know if there were tasks in their job duties and descriptions that they could not complete because of the lack of supplies?

A.    No, I was not aware of that.

Q.    Okay.

And if you -- hypothetically if that had occurred, were they -- would they be required to use paid time off, unpaid time, or were they -- as long as they were available to work, that could submit time?

MS. PIPAK:  I am going to object to the form.

You can answer.

THE WITNESS:  Yeah.  I -- I think -- sorry.  I'm just confused by the question.

BY MS. SMITH:

Q.    So I can rephrase it.

If -- for instance, if there were job duties and responsibilities that Ms. Goodman could not complete because she didn't have a laptop and

Page 80

so, therefore, she didn't have 40 hours a week worth of work, let's say she had 35 just to make this hypothetical a little easier.

A.    Okay.

Q.    What would she do for the last five?

A.    Whatever she could to fill those hours.

Q.    But if she had no job duties that she could fulfill because of the lack of equipment and not being in the courthouse, was she supposed to use PTO or non-paid time or was she -- just because she was available, she could submit the hours?

A.    From my perspective, she would be paid for the actual hours worked.

Q.    Right.

So if there's nothing to do, she -- she wouldn't be paid?

A.    Right.

Q.    She would have to use PTO or --

A.    In order to --

Q.    -- not be paid?

A.    -- to make herself whole.

Q.    Right.  Right.

A.    Yeah.

Page 81

Q.    Okay.

Did you understand that a lot of Ms. Goodman and Ms. Kleckner's job duties, when they were in the courthouse, involved answering customer phone calls, speaking with customers at the tax assessment desk, things like that?

A.    I didn't have those specifics.

Q.    Okay.

Do you understand that if they were -- those job duties were part of their job assignments, that they would be impossible to fill from working from home?

A.    I don't think it's impossible.  I think it may be more difficult.

Q.    To wait on customers?

A.    To service customers over the phone.

Q.    Well, not over the phone, but at the desk?

A.    Oh, from a -- from a -- walking into the department perspective, yeah, that's -- yeah, you wouldn't be able to do that.

Q.    Okay.

Were Ms. Kleckner and Ms. Goodman set up with a -- a county phone number or were they

Page 82

expected to use their personal cell phone numbers?

A.    I don't know that.

Q.    Would you expect a county employee who is working from home to use their personal cell phone number to communicate with customers of the county?

A.    No.

Q.    Okay.

Do you know if they were ever setup with a program to reroute county incoming calls to their phones?

A.    I know the phones can be forwarded, but I don't know if they can be forwarded to a mobile.

Q.    Do you know if they were ever setup to be forwarded to Ms. Goodman or Ms. Kleckner on any phone at their work-from-home location?

A.    I'm -- I don't know the --

Q.    Okay.

A.    -- answer to that.

Q.    So if the call weren't forwarded, it would be impossible for them to service incoming calls for the county, correct?

A.    Correct.

Q.    Okay.

Deposition of Doreen Kutzler                                    Jane Doe, et al. v. Schuylkill County Courthouse, et al.

Page 83

1    Change gears just a little bit.  We're
2 going to go back to some of the -- the defendants
3 in this case.
4    Defendant Roth, Glenn Roth was an
5 assistant solicitor and risk manager for the
6 county at the time that you began there, correct?
7 A.    Yes.
8 Q.    Did you know him before that?
9 A.    No.
10 Q.    And where did -- was the -- that
11 introduction meeting, the Commissioners Bender,
12 Halcovage, you said Roth was there?
13 A.    Yes.
14 Q.    Was that the first time you met him?
15 A.    Yes.
16 Q.    Did you know anything about him before
17 you began with the county?
18 A.    No.
19 Q.    Did you know any of the plaintiffs
20 before you began working for the county?
21 A.    No.
22 Q.    Had you read anything about their claims
23 in the newspaper?
24 A.    No.

Page 84

1 Q.    And they were all -- all the plaintiffs
2 were already employed with the county when you
3 started, correct?
4 A.    Yes.
5 Q.    Okay.
6    I know you virtually met Marcy and Missy
7 in October of 2020.  When did you first meet Ms.
8 Toomey?
9 A.    It was the end of September of 2020.
10 Q.    And in what capacity did you meet her?
11 A.    They had an individual within the
12 department who tested positive for COVID.
13 Q.    Okay.
14 A.    So there was contact tracing.
15 Q.    Okay.
16    And was it a virtual meeting then with
17 Ms. Toomey?
18 A.    No.
19 Q.    Oh, you met her in person?
20 A.    Yes.  It was on a Saturday.
21 Q.    At the courthouse?
22 A.    Yes.
23 Q.    Did -- was she there -- why were you
24 guys there on a Saturday?

Page 85

1 A.    They were doing some work and when I
2 received the call indicating that one of the
3 individuals in the department had tested positive,
4 there was a request to do the contact tracing.
5 And certainly at that time, timing was of the
6 essence.  So we wanted to do it as quickly as
7 possible.  So I had offered to come into the
8 courthouse and met them in the tax claim office.
9 Q.    Okay.
10    And when you say they, that's Ms. Toomey
11 and Ms. Gerchak?
12 A.    Yes.
13 Q.    So then is it fair to say that that was
14 when you first met Ms. Gerchak as well?
15 A.    Yes.
16 Q.    Okay.
17    So we talked about when you started at
18 the county.  And you may have mentioned this, but
19 I'd just like to make it clear on the record, you
20 were named the interim -- interim director of
21 human resources for the county, correct?
22 A.    Yes.
23 Q.    Were you assigned an office?
24 A.    Yes.

Page 86

1 Q.    Where was it?
2 A.    In the HR department.
3 Q.    Was it Ms. Twigg's old office?
4 A.    Yes.
5 Q.    Okay.
6    And your days of work were Monday
7 through Friday?
8 A.    Yes.
9 Q.    Generally.  Obviously we've just learned
10 also Saturdays.
11    What were your hours worked?
12 A.    8:00 to 4:30.
13 Q.    And all of those days and hours worked
14 were to be conducted at the county courthouse?
15 A.    Yes.
16 Q.    Were you permitted to work from home or
17 any other location other than the courthouse?
18 A.    Other county buildings.
19 Q.    Were you assigned any county-issued
20 electronic devices?
21 A.    Laptop.
22 Q.    Who assigned that to you?
23 A.    Mr. Bender.
24 Q.    Did he also physically provide it to

Page 87

1 you?
2 A.      No.  Mr. Nester from IT.
3 Q.      Did you have to sign any paperwork, do
4 like a serial number, so they knew which device
5 you had?
6 A.      They had the serial number, but I didn't
7 sign anything.
8 Q.      Okay.
9       When you started with the county, was
10 Deborah Twigg still employed by the county?
11 A.      Yes.
12 Q.      How long, if you recall, did you overlap
13 employment with Ms. Twigg?
14 A.      One day.
15 Q.      That one --
16 A.      That one Friday.
17 Q.      You called an exchange of knowledge
18 session?
19 A.      Yeah, the transfer of knowledge.
20 Q.      Okay.
21       Did you speak with Ms. Twigg about the
22 reason for her resignation?
23 A.      No.
24 Q.      Did anyone tell you why she resigned?

Page 88

1 A.      Frustration.
2 Q.      Frustration with what or whom?
3 A.      With the county in general.
4 Q.      Anything specific about what she was
5 frustrated about?
6 A.      The inability to make decisions.
7 Q.      Who told you this?
8 A.      Ms. Garrity.
9 Q.      Did Ms. Garrity understand -- seem to
10 understand why Ms. Twigg was frustrated?
11 A.      I think so.
12 Q.      Having now worked at the county in the
13 HR department, can you appreciate Ms. Twigg's
14 frustrations?
15 A.      Yes.
16 Q.      Were you given access to Ms. Twigg's
17 e-mails?
18 A.      Yes.
19 Q.      Okay.
20       Did you have access to archived e-mails
21 or was it just, like, ones that she had already
22 received or was it that you were just receiving
23 her e-mails as they came in?
24 A.      I was receiving them as they came in.

Page 89

1 Q.      So you couldn't go back and see ones
2 that she had already received?
3 A.      Correct.
4 Q.      Okay.
5       When you met each of the plaintiffs,
6 whether virtually or in person or at any time
7 thereafter, did you speak with them about the
8 reports and complaints against the county or
9 Defendant Halcovage?
10 A.      We did have a conversation.
11 Q.      Okay.
12       Let's -- tell me about that
13 conversation.
14 A.      It was that Saturday when I was in doing
15 the contact tracing and Ms. Toomey and Ms. Gerchak
16 shared some of the details of Ms. Kleckner's
17 experience and Ms. Goodman's experience and their
18 experience themselves and how Mr. Halcovage would
19 monopolize the entire department, sometimes for
20 hours upon hours, on a daily basis.
21 Q.      Okay.
22       Did -- were there any discussions held
23 about their work environment at that time, their
24 current work environment?

Page 90

1 A.      No, not that I recall.
2 Q.      Did you speak with Ms. Kleckner or Ms.
3 Goodman personally about their claims against the
4 county or their work environment?
5 A.      No.
6 Q.      Can you tell me from your training and
7 experience, what is your understanding of the
8 ability of a subordinate employee to consent to
9 being in a sexual relationship with a supervisor?
10 A.      Strictly forbidden.
11 Q.      Do you understand what the term power
12 dynamic means?
13 A.      Yes.
14 Q.      What does that mean to you?
15 A.      Well, in a situation where there is an
16 individual who is in a position of power, it would
17 never be considered a consensual relationship
18 because of the authority that they hold over that
19 individual.
20 Q.      Do you believe that Mr. -- Defendant
21 Halcovage held authority over Marcy Kleckner?
22 A.      Yes.
23 Q.      Is it your understanding that that power
24 dynamic, as you defined it, is why it's forbidden

Page 91

1 for a subordinate employee to be in a sexual
2 relationship with a supervisor?
3 A.     Yes.
4 Q.     Do you believe that Defendant Halcovage
5 is Ms. Kleckner, Ms. Goodman, Ms. Gerchak, and Ms.
6 Toomey's supervisor?
7 A.     Was Mr. Halcovage?
8 Q.     Yes.
9 A.     As that individual in a position of
10 authority or direct supervisor?
11 Q.     Not necessary direct, but up the chain
12 of command, supervisor?
13 A.     Oh, yeah.  Yes.
14 Q.     Okay.
15     And I think you answered this, but Mr.
16 Bender was their supervisor?
17 A.     Correct.
18 Q.     Of all four individuals?
19 A.     Yes.
20 Q.     Can you tell me from your training and
21 experience, what is your understanding of how
22 often sexual harassment policies need to be
23 disseminated to employers and employees?
24 A.     Upon hire and then depending upon the

Page 92

1 organization, some companies do it on an annual
2 basis, some do it on a biannual basis.
3 Q.     But no less than biannual?
4 A.     Correct.
5 Q.     Is that the same for how often sexual
6 harassment trainings need to be conducted?
7 A.     On average, yes.
8     MS. SMITH:  Let's take a quick
9 break.  We can go off the record.
10     VIDEOGRAPHER:  The time is now
11 10:20 a.m. and we're going off the record.
12     - - -
13     (Whereupon, brief recess was held off
14 the record.)
15     - - -
16     VIDEOGRAPHER:  The time is now
17 10:34 a.m. and we're back on the record.
18 BY MS. SMITH:
19 Q.     All right.
20     Ms. Kutzler, so I want to -- still
21 focusing on kind of that early time frame in your
22 employment with the county.
23     What, if anything, were you informed
24 about regarding Defendant Halcovage's freedom of

Page 93

1 movement into and within the courthouse?
2 A.     That he, for the most part, was to
3 remain in the commissioners office area and should
4 he have a need to be in any other area of the
5 courthouse, that he would need to be escorted by
6 someone within the courthouse.
7 Q.     Was it anyone in particular or he just
8 needed an escort?
9 A.     Just needed an escort.
10 Q.     Okay.
11     Did you have an understanding of what --
12 strike that.
13     Did you have an understanding of where
14 Defendant Halcovage was parking when you first
15 started at the county?
16 A.     In the commissioners' lot, the lower lot
17 off of Laurel Street I think it is.
18 Q.     Okay.
19     The lot that's different than the public
20 lot by the public entrance?
21 A.     Yes.
22 Q.     Okay.
23     And was he entering through the
24 commissioners' door from that lot into the

Page 94

1 courthouse at that time or was something else
2 happening?
3 A.     At that time he was coming in through
4 that door, waiting for a sheriff's deputy to meet
5 him to take him up to the security area to be
6 wanded.
7 Q.     Was it your understanding that this was
8 by agreement or imposed upon him?
9 A.     I think it imposed.
10 Q.     Do you know by who?
11 A.     Sheriff Groody.
12 Q.     Did Gary Bender ever share his thoughts
13 on that?
14 A.     Yes.
15 Q.     What were his thoughts on that?
16 A.     That it was being imposed by Sheriff
17 Groody because he's a Democrat and George is a
18 Republican.
19 Q.     Okay.
20     Did he think that -- other than that he
21 thought it was political, did he think that it was
22 justified?
23 A.     No.
24 Q.     Did he think it was unjustified?

Jane Doe, et al. v. Schuylkill County Courthouse, et al.

Page 95

1  A.     I thought he -- yeah.  I got the
2  impression that he thought it was up unjustified.
3  Q.     Did you have a feeling on it?
4  A.     No.
5  Q.     Did you -- would you agree with me that
6  it was something simple that might make the
7  plaintiffs more comfortable?
8  A.     Yes.
9  Q.     Because Ms. Toomey and Ms. Gerchak were
10 still working physically in the courthouse at that
11 time, correct?
12 A.     Yes.
13 Q.     Were there any conversations regarding
14 Ms. Toomey or Ms. Gerchak being permitted to work
15 from alternative locations?
16 A.     No, not to my knowledge.
17 Q.     Okay.
18        Do you know why?
19 A.     Being that they are the director and
20 assistant director of the department, in order for
21 them -- or in order really anyone to be
22 effectively managing a team of individuals, it --
23 it's best -- they're best served by being on site.
24 Q.     Okay.

Page 96

1  A.     The department is.
2  Q.     Were you aware that Halcovage's access
3  to the courthouse was limited to certain hours at
4  the time you started?
5  A.     Yes.
6  Q.     It was 8:00 a.m. to 5:00 p.m.?
7  A.     Yes.
8  Q.     So previously he had had access --
9  Defendant Halcovage had access at any time that he
10 wanted, correct?
11 A.     Yes.
12 Q.     I am going to show you -- I can move --
13 it will be easier if I give you the binder because
14 I have extra copies.
15        I am going to put in front of you what's
16 previously been marked as Exhibit-229.
17              ---
18        (Previously marked Exhibit-229.)
19              ---
20 BY MS. SMITH:
21 Q.     Do you recognize this document?
22 A.     Yes.
23 Q.     This is an e-mail from you -- from Ms.
24 Toomey -- I'm sorry -- to you on October 12, 2020.

Page 97

1  Would you agree with me that she reported to you
2  that, at least she believed, that Defendant
3  Halcovage has been -- had been walking in the
4  county courthouse hallway unescorted, that that's
5  what she report to you and --
6  A.     Yes.
7  Q.     -- you agree?
8  A.     Yes.
9  Q.     Okay.
10        That would have been in violation of
11 Sheriff Groody's order upon him at this time,
12 correct?
13 A.     If he were alone, yes.
14        MS. PIPAK:  Objection to form.
15        You can answer.
16        THE WITNESS:  If he were alone,
17 yes.
18 BY MS. SMITH:
19 Q.     Okay.
20        And she reported to you that he was
21 unescorted, correct?
22 A.     Yes.
23 Q.     All right.
24        And that would suggest that he was

Page 98

1  alone, correct?
2  A.     Yes.
3  Q.     All right.
4        Did you discuss this e-mail with anyone
5  from the county?
6  A.     Mr. Bender.
7  Q.     Do you recall when?
8  A.     That same day, the 12th.
9  Q.     What was discussed?
10 A.     Whether or not George was or was not
11 escorted.
12 Q.     And what was Mr. Bender's response?
13 A.     To check the video cameras.
14 Q.     Did you check the video cameras?
15 A.     Yes.  If this is the same day in
16 question that I'm thinking of.
17 Q.     Okay.
18        So at least at one point you did check
19 video cameras for --
20 A.     Yes.
21 Q.     -- something regarding Defendant
22 Halcovage's movement?
23 A.     Yes.
24 Q.     All right.

Page 99

1  Who -- did you check them yourself?  Did
2  you check them with the assistance of someone?
3  A.    With the assistance of Chief Tobin.
4  Q.    Okay.
5        And what, if anything, did you see on
6  these cameras?
7  A.    That Mr. Halcovage was walking down the
8  hallway with a woman.
9  Q.    Did you speak with Ms. Toomey to
10 determine the exact time frame she was referring
11 to?
12 A.    Yes.
13 Q.    When did you speak with her?
14 A.    It would have been that afternoon.
15 Q.    Prior to checking the video?
16 A.    Yes, to determine the time frame in
17 which to view the videos.
18 Q.    Did you ever respond to Ms. Toomey in
19 any fashion and inform her that you had viewed the
20 video?
21 A.    Not to my knowledge.
22 Q.    Did you let her know that Defendant
23 Halcovage, by your view of the videos, was
24 escorted?

Page 100

1  A.    I do believe so.
2  Q.    When did you inform her of that?
3  A.    It may have been that afternoon.
4  Q.    What was her response?
5  A.    I don't recall.
6  Q.    Was the video preserved?
7  A.    To my knowledge, yes.
8  Q.    By whom?
9  A.    The sheriff's department.
10 Q.    Did you instruct them to do so?
11 A.    No.
12    MS. SMITH:  I am going to mark Doe
13 Supplement 344 as 280.
14          - - -
15    (Doe 344 marked as Exhibit-280 for
16 identification.)
17          - - -
18 BY MS. SMITH:
19 Q.    Ms. Kutzler, do you recognize this
20 document?
21 A.    Yes.
22 Q.    Okay.
23        This is an October 15, 2020, e-mail to
24 you and other county employees from Ms. Toomey

Page 101

1  regarding an employee in the county's tax
2  assessment office, Helene O'Connor, correct?
3  A.    Yes.
4  Q.    Okay.
5        Ms. O'Connor was a contract employee of
6  the county at this time, correct?
7  A.    Yes.
8  Q.    And her contract had expired, correct?
9  A.    That's my understanding, yes.
10 Q.    Okay.
11       In this e-mail, Ms. Toomey in the second
12 sentence, indicates that Ms. O'Connor was not
13 willing to continue to work for less than $40 an
14 hour.
15       Do you see that?
16 A.    I do.
17 Q.    Do you recall, was this e-mail the first
18 time you learned that Ms. O'Connor was requesting
19 a pay increase?
20 A.    Yes.
21 Q.    That specific increase, so the 40 an
22 hour, was -- was denied, correct?
23 A.    Yes.
24 Q.    Do you know by whom?

Page 102

1  A.    Mr. Bender.
2  Q.    Was it ever put to the salary board for
3  a vote?
4  A.    Eventually, yes.
5  Q.    The 40?
6  A.    The 40, no.
7  Q.    Okay.
8        Was the $40 an hour ever put to the
9  commissioners for a vote?
10 A.    No, not to my knowledge.
11 Q.    Were you involved in the decision to
12 deny her $40 an hour?
13 A.    No.
14 Q.    Were you involved in any discussions
15 regarding whether Ms. O'Connor should receive $40
16 an hour?
17 A.    No.
18 Q.    Do you know, other than Mr. Bender, was
19 anyone else involved?
20 A.    Not to my knowledge.
21 Q.    You were eventually the one who informed
22 Ms. O'Connor her pay increase request to 40 an
23 hour was denied?
24 A.    Yes.

Page 103

1  Q.      And that was at the instruction of Mr.
2  Bender?
3  A.      Yes.
4  Q.      Do you know, did you or do you know, did
5  anyone for the county discuss or consult with Ms.
6  Toomey and Ms. Gerchak prior to the denial of the
7  $40 an hour pay request?
8  A.      Not to my knowledge.
9  Q.      Were you instructed not to consult with
10 them?
11 A.      No.
12 Q.      Is there a reason why you didn't?
13 A.      With -- my understanding is that with
14 the contractors agreements, those were handled
15 through this solicitors' office.  So Glenn Roth,
16 Mr. Roth would be the individual who would draft
17 any agreements with independent contractors.
18 Q.      So Mr. Bender would make the decision,
19 but Glenn Roth would draft the agreement?
20 A.      Yes.
21 Q.      So -- but was -- to your knowledge, was
22 Glenn Roth -- Roth involved in the decision
23 regarding the contractor and the negotiations?
24 A.      I don't know that.

Page 104

1  Q.      Okay.
2          So it sounds like you were just the --
3  the -- kind of middleman?
4  A.      I was the communicator.
5  Q.      Okay.  That's a better term.  I like
6  that.
7          In the next sentence after the $40 an
8  hour reference, it says:  Therefore, annual
9  certification will not be done by November 15th.
10 Denise and I do not have the staff or training to
11 complete it.
12         In early October of 2020 or mid October
13 of 2020, what was your understanding of the
14 staffing -- whether there was staffing issues in
15 the tax assessment office?
16 A.      Other than Ms. Kleckner and Ms. Goodman
17 working from home, they had an individual who was
18 on maternity leave.
19 Q.      Is that Ms. Mayer?
20 A.      Yes.
21 Q.      Okay.
22         And then there was this issue with
23 Ms. O'Connor being able to continue to work; is
24 that correct?

Page 105

1  A.      Yes.
2  Q.      And did -- had Ms. Detweiler resigned at
3  that point, do you know?
4  A.      I never worked with -- there when Deb
5  Detweiler was there.
6  Q.      Okay.
7          So do you know if -- strike that.
8          Do you know, is there a document of some
9  sort that indicates what levels, the number of
10 people and what positions each office,
11 specifically the tax assessment office, should be
12 operating with?
13 A.      Not to my knowledge.
14 Q.      Okay.
15         Do you know if the tax assessment office
16 in mid October of 2020 was fully staffed?
17 A.      I don't know the answer to that.
18 Q.      Okay.
19         So it's possible that it could have been
20 understaffed?
21 A.      Possibly, yes.
22 Q.      Okay.
23         And definitely having at least one
24 employee out on maternity leave would leave you

Page 106

1  understaffed?
2  A.      Yes.
3  Q.      And would you agree that Ms. Kleckner
4  and Ms. Goodman working from home and being that
5  this is before October 27, 2020, that they were
6  not fully set up to work from home, that would
7  impact the operations of the office too, correct?
8  A.      It could, yes.
9  Q.      After you received this e-mail, did you
10 speak with Ms. Toomey or Ms. Gerchak about the
11 statement, Denise and I do not have the staff or
12 training to complete it?
13 A.      No.
14 Q.      Did you ask them what, if anything, the
15 county could do to ensure that they had the staff
16 and training to complete the -- to optimally
17 operate?
18 A.      No.
19 Q.      Do you know, did anyone on behalf of the
20 county speak with Ms. Toomey regarding the
21 staffing issues she relays in this e-mail?
22 A.      Not to my knowledge.
23 Q.      In the next paragraph she states:  As we
24 spoke about the work environment caused by the

Page 107

1 sexual harassment issue, along with COVID -- COVID
2 furlough and the new staff caused by the
3 resignation of Deb Detweiler, interfered with the
4 time and focus required for Denise and I to
5 adequately train.
6         So it looks like, I was correct, Deb
7 Detweiler must have resigned some time prior to
8 this?
9 A.     Yeah.  I think she resigned prior to me
10 coming on board with the county.
11 Q.     Okay.
12        And Ms. Toomey, as -- at least in -- by
13 her belief, stating that the resignation by Deb
14 Detweiler also caused some staffing and
15 operational issues.
16        Would you agree?
17 A.     Yes.
18 Q.     Okay.
19        And when she says as we spoke about the
20 work environment caused by, is that that meeting
21 on that Saturday or Sunday that she's referring
22 to?
23 A.     She may be.
24 Q.     Did you have any other conversation with

Page 108

1 her about the work environment caused by the
2 sexual harassment around this time?
3 A.       There were comments that were made when
4 we would communicate with one another, that they
5 felt that the sexual harassment situation was
6 creating a more difficult situation for them to
7 effectively manage the department.
8 Q.       Did you have any reason to disagree with
9 her?  Is there anything that you saw or observed
10 that made you believe that that was not true?
11 A.      No.
12 Q.       Was there anything you saw or observed
13 that made you believe that that was, in fact,
14 the -- the truth?
15 A.      Not anything that I directly observed.
16 Q.       The next paragraph states:  Also in
17 light of the fact that county administration
18 doesn't have the ability or desire to supervisor
19 George Halcovage, Denise and I will be asking
20 our -- our attorney to obtain his work schedule so
21 that we can work outside of the building on days
22 that he is here.  As I mentioned earlier, our work
23 environment is becoming more difficult.
24        We talked a little bit about County

Page 109

1 Administrator Bender not feeling that George
2 Halcovage needed to be -- have the restrictions
3 imposed on him by Sheriff Groody and that George
4 Halcovage himself did not want to agree to not
5 come into the courthouse.
6        So would you agree with the fact that
7 there was an inability or desire to supervisor
8 George Halcovage?
9 A.     An inability.
10 Q.     Well, you don't think that Defendant
11 Bender not wanting to have him wanded was a -- was
12 his desire not to supervisor George Halcovage?
13        MS. PIPAK:  Objection to form.
14        You can answer.
15        THE WITNESS:  That wasn't Mr.
16 Bender's job.
17 BY MS. SMITH:
18 Q.     Okay.
19        Well, Mr. Bender was Ms. Toomey and Ms.
20 Gerchak's supervisor, correct?
21 A.     Uh-huh.
22 Q.     So making sure they had a safe,
23 comfortable working environment, free from
24 discrimination and retaliation would be his job,

Page 110

1 correct?
2 A.     Yes.
3 Q.     And if they had made it known that they
4 didn't -- as Ms. Toomey says here, that they
5 didn't want to work in the building when he was
6 there, implementing or at least engaging in an
7 interactive discussion with them to figure out
8 what would make them more comfortable would be his
9 job?
10 A.     Yes.
11 Q.     Okay.
12        Do you feel that Mr. Bender engaged in
13 an interactive discussion with Ms. Toomey and/or
14 Ms. Gerchak to find out how --
15        MS. PIPAK:  Object to --
16 BY MS. SMITH:
17 Q.     How they -- what the county could do to
18 make them feel more confident?
19        MS. PIPAK:  I'll just object to the
20 form.
21        But you can answer.
22        Sorry about that.
23        THE WITNESS:  I think Gary was open
24 to discussions with them, but they wouldn't engage

Deposition of Doreen Kutzler                                          Jane Doe, et al. v. Schuylkill County Courthouse, et al.

Page 111

1  him because of him being a defendant.
2  BY MS. SMITH:
3  Q.      Okay.
4        So you did learn at some point that he
5  was a defendant?
6  A.      Yes.
7  Q.      Did you feel that they were justified in
8  not wanting to speak with him being he was a
9  defendant?
10  A.      Well, I think that, you know, from my
11  perspective, he's their supervisor.  They did need
12  to keep the lines of communication open and if
13  they were willing to do that via e-mail, then that
14  would have been the tool of choice, but it didn't
15  even happen then.  I can understand why they
16  wouldn't want to talk directly to him, but
17  ultimately he was their supervisor.
18  Q.      Okay.
19        Ms. Kutzler, if you look at the ccs,
20  the --
21  A.      Uh-huh.
22  Q.      -- carbon copies of the recipients, Mr.
23  Bender is included on this e-mail chain, is he
24  not?

Page 112

1  A.      Yes.
2  Q.      And Ms. Toomey in this states that she
3  feels that there is an inability or a lack of
4  ability or desire to supervise and she wants to
5  work outside the building on days that Defendant
6  Halcovage is in the courthouse, correct?
7  A.      Yes.
8  Q.      And she indicates that she believes her
9  work environment is becoming more difficult,
10  correct?
11  A.      Yes.
12  Q.      Okay.
13        So was this not her communicating with
14  her supervisor, Mr. Bender, as well as HR about
15  what she needed from the county?
16  A.      Yeah.  Yes.
17  Q.      Did Mr. Bender ever respond to her?
18  A.      Not to my knowledge.
19  Q.      Did Mr. Bender ever instruct you to
20  engage in conversations with Ms. Toomey or Ms.
21  Gerchak about how they could have a safe and a
22  comfortable working environment?
23  A.      No.
24  Q.      Would you understand why Ms. Toomey felt

Page 113

1  that it was futile to engage Mr. Bender after he
2  failed to respond to this e-mail?
3        MR. LEES:  Objection to the form.
4        You can answer.
5        MS. PIPAK:  Object to the form.
6        THE WITNESS:  Yes.
7  BY MS. SMITH:
8  Q.      Were any discussions by you or anyone
9  else on behalf of the county had with Ms. Toomey
10  or Ms. Gerchak about posting open positions to
11  fill, so that the staffing issue Ms. Toomey is
12  referencing in her e-mail could be addressed?
13  A.      There would have been conversations with
14  Heather Garrity, who administers all of the job
15  postings, because the positions would have been
16  under AFSCME, so under the union contract, so we
17  would follow that posting protocol.
18  Q.      Do you recall those conversations
19  actually occurring?
20  A.      Between Ms. Garrity and..?
21  Q.      Were you -- I guess if you were there,
22  did they occur in your presence; were you privy to
23  those?
24  A.      Not in my presence.

Page 114

1  Q.      Okay.
2        So you don't know that they actually
3  occurred?
4  A.      Correct.
5  Q.      If they occurred, they'd have to follow
6  AFSCME protocols?
7  A.      Yes.
8  Q.      But you're not -- have no knowledge,
9  personal knowledge of them actually occurring?
10  A.      Correct.
11  Q.      Do you have any personal knowledge of
12  any positions in the tax claim bureau -- I'm
13  sorry -- yeah, tax claim bureau or tax assessment
14  office being posted in the October to, let's say,
15  end of December 2020 range?
16  A.      There may have been a clerk's position,
17  yeah.
18  Q.      But that -- if that, that would be it?
19  A.      Yeah.
20  Q.      Okay.
21  A.      Yeah.  No other -- no field appraisers,
22  market analysts, or anything like that.
23  Q.      Do you know how many field appraisers
24  the office -- the tax assessment office should

Page 115

1  have at any given time?
2  A.      Not how many they should have.  I know
3  how many they had.
4  Q.      Okay.
5          How many did they have?
6  A.      Three.
7  Q.      Did any of those individuals -- one of
8  them was Melissa Goodman, correct?
9  A.      Yes.
10 Q.      And so she was having issues with job
11 duties given technological and supply issues,
12 correct?
13 A.      Yes.
14 Q.      So probably not performing up to typical
15 standards for her, correct?
16 A.      Agreed.
17 Q.      And do you remember who the other two
18 were?
19 A.      Chrissy Zimmerman and -- I don't
20 remember her name.  I can see her face, but I
21 can't remember her name.
22 Q.      It wasn't Tiffany, correct?
23 A.      It wasn't Tiffany.
24 Q.      Okay.  I can't remember the other

Page 116

1  person.
2          Did --
3  A.      Tiffany had gone through her CPE courses
4  and maybe Chrissy went through the CPE courses at
5  the same time.  I don't remember specifically.
6  Q.      Did either of those -- whom ever they
7  were, did either of those field appraisers leave
8  during your employment with the county?
9  A.      Not to my knowledge.
10 Q.      Okay.
11         I'm sorry if you answered this.
12         Did Mr. Bender tell you why he wouldn't
13 approve Ms. O'Connor's pay increase request for 40
14 an hour?
15 A.      No.  He did tell me that he would meet
16 them -- meet her halfway.  She was making $30 an
17 hour.  She requested 40, he was agreeable to 35.
18 Q.      Do you know anything about
19 Ms. O'Connor's training and experience?
20 A.      No.
21 Q.      For the position she held?
22 A.      No.
23 Q.      Did you know she was a long-time
24 employee with the county?

Page 117

1  A.      Yes.
2  Q.      Okay.
3          Did you know that she was maybe one of
4  the most knowledgable tax assessment employees in
5  the county?
6  A.      I assumed --
7              MS. PIPAK:  Objection to form.
8              You can answer.
9  BY MS. SMITH:
10 Q.      You can answer.
11 A.      Yeah, knowing her years of service.
12 Q.      Okay.
13         So I just want to ask you a question
14 before I forget.  You had mentioned this
15 interaction you had with Mr. Halcovage where he
16 refused to not take your bag.
17         Did you document that, write it in any
18 sort of HR document that was put into his
19 personnel file in any way?
20 A.      No.
21 Q.      Did you report it to anyone?
22 A.      No.
23 Q.      Why not?
24 A.      It was an interaction that I felt I

Page 118

1  handled appropriately.
2  Q.      Did it make you uncomfortable?
3  A.      Yes.
4  Q.      Do you feel that he would have acted the
5  same way if you had been a man?
6  A.      No.
7  Q.      Again, I'm sorry if I -- I asked this.
8          Did you actively engage in contract
9  negotiations with Ms. O'Connor?
10 A.      No.
11 Q.      Okay.
12         You just were the communicator of the
13 decisions?
14 A.      Yes.
15 Q.      Okay.
16         But Mr. Bender did actively engage in
17 contract negotiations with Ms. --
18 A.      I don't think he even had any
19 conversations with Helene.
20 Q.      Okay.
21         So he just told -- you told him she
22 wants 40.  He told you I'll meet her halfway.  You
23 told Helene he would meet her halfway?
24 A.      Yeah.

Page 119

1  Q.      Okay.
2  A.      And I worked -- I worked with Mr. Roth.
3  Q.      Okay.
4         And that's for the addendum to her
5  contract?
6  A.      Yes.
7  Q.      All right.
8         When you say you worked with Mr. Roth,
9  did you just tell him what the information kind of
10 to be inputted -- input into the addendum was?
11 A.      Yes.
12 Q.      Like amount?  You didn't actually do any
13 of the drafting of any of documents?
14 A.      No, I did not.
15 Q.      Okay.
16        So you basically were -- just
17 communicated information to him?
18 A.      Yes.
19 Q.      So he could prepare it, you then
20 communicated it to Ms. O'Connor?
21 A.      Yes.
22 Q.      Okay.
23 A.      It was Glenn, Gary said.
24 Q.      Okay.

Page 120

1  A.      This is what you need to do.
2  Q.      So, again, just the communicator?
3  A.      Yes.
4         MS. SMITH:  Going to look at Doe
5  Supplemental 3138.  It will be 281.
6              - - -
7         (Doe 3138 marked as Exhibit-281 for
8  identification.)
9              - - -
10 BY MS. SMITH:
11 Q.      Do you recognize this document?
12 A.      Yes.
13 Q.      And is this the addendum that you
14 communicated on behalf of Mr. Roth and Mr. Bender
15 to Helene O'Connor?
16 A.      Yes.
17 Q.      Okay.
18        So obviously if we look in the middle --
19 about the middle of the page in the second
20 paragraph, it talks about the 35.  That's that
21 middle point that Gary Bender agreed to meet
22 Ms. O'Connor at, correct?
23 A.      Yes.
24 Q.      So that information came from Mr.

Page 121

1  Bender, right?
2  A.      Yes.
3  Q.      The -- now there's a paragraph that
4  says:  Now therefore, it's the -- the second of
5  the two and there's a list of numbered points,
6  one, two, three, four.
7         Do you see that?
8  A.      Yes.
9  Q.      Where did this information come from?
10 A.      That was -- that -- those instructions
11 were directed by Mr. Bender to Mr. Roth to include
12 in the addendum.
13 Q.      Again, through you as the communicator
14 or --
15 A.      Yes.
16 Q.      Okay.
17        So Mr. Bender said, in addition to
18 giving her 35, we're going to require these four
19 other additional items?
20 A.      Yes.
21 Q.      All right.
22        Did you have any input or involvement in
23 these additional items?
24 A.      No.

Page 122

1  Q.      Did Mr. Bender ever speak with the --
2  Ms. Toomey or Ms. Gerchak regarding this on-site
3  training and transfer of knowledge, as it's
4  termed, these four bullet points?
5  A.      No.
6  Q.      Take a look at them if you need to.  My
7  question to you is:  Do you believe that these
8  additional items, these four bullet points,
9  require additional work by Ms. Toomey or Ms.
10 Gerchak?
11 A.      No.
12 Q.      Prior to this ad -- so this addendum was
13 signed at some point, correct?
14 A.      Yes.
15 Q.      All right.
16        So prior to this addendum being signed,
17 if we look at Bullet Point 2, was there weekly
18 project status meetings that were being held to
19 assess training status and retention levels?
20 A.      Not to my knowledge.
21 Q.      So would that not impose an additional
22 duty and time constraint, I guess, on Ms. Toomey
23 and Ms. Gerchak?
24 A.      Yes.

Page 123

Q.     Okay.
       Bullet Point No. 3 says:  Contractor
would -- will provide a status document to HR
director and county administrator, outlining the
completed training and process regarding accuracy.
       For the time that you were employed
there, the HR director would have been you to whom
it was provided, correct?
A.     Yes.
Q.     Would you have any ability to evaluate
the contents of that, given, I guess, not to be
rude, your lack of knowledge in tax assessment and
tax claims?
A.     No.
Q.     Okay.
A.     I would do the conduit in which it would
be provided to the county administrator.
Q.     So that you would just communicate -- it
would be given to you to give to Mr. Bender.
       Is that something in your training and
experience that you've seen happen, where the HR
is just this communicator?
A.     Oh, yeah.
Q.     Okay.

Page 124

       Is there any reason why it just couldn't
be communicated directly to the county
administrator?
A.     No.  No reason not to.
Q.     Do you think that Mr. Bender was an
approachable individual for his employees?
A.     Yes.
Q.     Do you think that the fact that you as
the HR director was this communicator middleman
made it seem like he was might not be
approachable?
A.     A perception, yeah.
Q.     You would agree that this addendum
imposes additional duties and responsibilities on
Ms. O'Connor, correct?
A.     I would think it would happen in the
natural course of what she was doing and the
services that she was providing to the county and
the tax assessment office.  So to put it on
record, if you will, to have the transfer of
knowledge take place, yeah, if there was more
focus put on it, then, yeah, it could potentially.
Q.     And so maybe -- I think as I understand
your testimony, generally if someone works with

Page 125

someone else with more experience, hopefully
there's a transfer of knowledge just in the
natural progression?
A.     Yes.
Q.     But this addendum requires kind of a
memorialization of that transfer, which might
impose -- which imposes by the sheer fact of
having to memorialize it imposes additional
duties?
A.     Yes.
Q.     So while Mr. Bender was, by you, quote,
unquote, saying I'll meet her in the middle by
giving her $5, as opposed to a $10 increase, he's
also giving her additional duties, correct?
A.     Yes.
Q.     Okay.
       Were you still employed by the county
when Mr. Hatter or Alu were hired?
A.     No.
Q.     So Ms. Toomey and Ms. Gerchak were still
departments of both -- department heads of both
departments when you were -- when you first left
the county?
A.     Yes.

Page 126

Q.     Okay.
       And that -- just so the report is clear,
I am saying first about the county because you
left at some point and then went back for a second
contract, correct?
A.     Yes.
Q.     Okay.
       And we'll -- we'll get to that later.
       Given what we reviewed in Ms. Toomey's
e-mail about her belief about the short staffing
and the resignation of Deb Detweiler, we talked
about Marcy -- Ms. Kleckner and Ms. Goodman
working from home.  She in -- Ms. Toomey in her
e-mail mentioned the CPE training.
       Do you think this contract addendum with
additional responsibilities, do you think it was
the appropriate time for that?
A.     Maybe not.
Q.     Would you agree that even without
staffing issues related to anyone else, the
staffing issues and the work environment issues
related to the sexual harassment claims, was a lot
for any county office to handle?
       MR. LEES:  Note my objection to

Page 127

1  form.
2      You can answer.
3      THE WITNESS:  Yes.
4  BY MS. SMITH:
5  Q.    Okay.
6      Understandable that any -- would you say
7  it's understandable that any department or
8  employer who has to deal with such allegations
9  would be under a lot of stress and -- and
10 pressure?
11 A.    Yes.
12 Q.    Do you recall informing Ms. Toomey that
13 she would only see the addendum once it was
14 executed?
15 A.    Ms. Toomey?
16 Q.    Yes.  That she would only see it once
17 Ms. O'Connor executed it?
18 A.    Yes.
19 Q.    Okay.
20     Why couldn't Ms. Toomey see it before
21 Ms. O'Connor executed it?
22 A.    Again, it was my understanding from
23 comm -- conversation with Mr. Bender, that
24 independent contractor agreements were between the

Page 128

1  county and the individual.
2  Q.    Well, you just agreed with me that it
3  imposed additional duties on Ms. Toomey and Ms.
4  Gerchak, correct?
5  A.    Uh-huh.
6  Q.    Is that -- just --
7  A.    Yes.
8  Q.    And so wouldn't it be fair to show them
9  that so they knew what additional duties were
10 being imposed upon them?
11     MR. LEES:  Objection to form.
12     You can answer.
13     THE WITNESS:  That would have been
14 an appropriate course of action.
15 BY MS. SMITH:
16 Q.    And, in fact, the addendum was created,
17 drafted, and executed with additional duties for
18 Ms. Toomey and Ms. Gerchak, but their job duties,
19 their written job duties that the county has for
20 each job were not edited or changed, amended in
21 any way, correct?
22 A.    Correct.
23 Q.    Was Ms. O'Connor's addendum voted on?
24 A.    Yes.

Page 129

1  Q.    By the commissioners, correct?
2  A.    Yes.
3  Q.    At a commissioners' meeting?
4  A.    Yes.
5  Q.    Do you know where the additional terms
6  listed on the addendum as Nos. 1 through 4 that we
7  just looked at, were those read at the
8  commissioners' meeting when posed -- it was posed
9  to the commissioners for a vote?
10 A.    No.
11 Q.    Was the addendum with the additional
12 terms, that 1 through 4, shown to Commissioner
13 Hess prior to being asked to vote on it?
14 A.    I don't know that.
15 Q.    You didn't show it to him?
16 A.    I did not.  I would imagine Ms. Dietrich
17 would have provided copies.
18 Q.    That's my next question.
19     Who is Linda Dietrich?
20 A.    She's the chief clerk.
21 Q.    Why would she be the one to show the
22 commissioners an item for vote?
23 A.    She facilitates all of the meetings, the
24 agendas, and any supporting documents that come

Page 130

1  from HR, fiscal, a variety of departments.
2  Q.    Okay.
3      So you don't have any knowledge that she
4  did, in fact, show it to Commissioner Hess?
5  A.    I do not.
6  Q.    But if someone had, it would most likely
7  be her?
8  A.    Yes.
9      MS. SMITH:  Okay.  We are going to
10 look at Doe 1115 through 1117.
11     - - -
12     (Doe 1115-1117 marked as Exhibit-282
13 for identification.)
14     - - -
15 BY MS. SMITH:
16 Q.    This is an e-mail chain between you and
17 Ms. Toomey and some other county officials being
18 copied, correct?
19 A.    Yes.
20 Q.    All right.
21     I want to look to the first e-mail in
22 the chain, which is actually going to be the last
23 page.
24     This is an October 22, 2020, e-mail from

Page 131

1 Ms. Toomey to you and other county officials,
2 including Mr. Bender, correct?
3 A.      Yes.
4 Q.      In it she inquires about Helene
5 O'Connor's consulting agreement.  She requests a
6 copy.  And she inquires about why she was bypassed
7 as the department head; would you agree?
8 A.      Yes.
9 Q.      And you would agree that you did not
10 discuss the contents of the addendum with Ms.
11 Toomey prior to it being approved for submission
12 to the commissioners for a vote, correct?
13 A.      Correct.
14 Q.      If we turn to the page prior to Doe
15 1116, you respond the same day to Ms. Toomey.
16      Looking at the third paragraph, it say:
17 I am the one who recommended the steps to ensure
18 the transfer of knowledge takes place within a
19 definitive time frame.
20      Can you tell me what you meant by that?
21 A.      That there would be the recording or
22 documentation of the transfer of knowledge.
23 Q.      Okay.
24 A.      During the time period in which the

Page 132

1 addendum speaks, through March 31st, I think it
2 was.
3 Q.      So was it you who suggested all of the 1
4 through 4 points --
5 A.      No.
6 Q.      -- or just -- explain that to me a
7 little bit more.  Like, what do you mean by time
8 frame?
9 A.      That the transfer of knowledge would
10 occur by the time she left.
11 Q.      Okay.
12      So your -- the expiration date is -- of
13 the contract addendum is March 31, 2021.  So it
14 was just you who suggested that these things and
15 the transfer of knowledge occur by that end date?
16 A.      Yes.
17 Q.      Okay.
18      You just agreed or testified that you
19 thought it would have been fair to maybe not
20 address this transfer of knowledge at this point,
21 given what the offices were going through.
22      Did you speak with Ms. Toomey to figure
23 out what length of time might be appropriate,
24 given what she -- her offices were experiencing?

Page 133

1 A.      No.
2 Q.      So how did you come up with that, that
3 March 31st date?
4 A.      It was a date that was directed to me.
5 Q.      Did you say, hey, let's talk with the
6 department head?
7 A.      No.
8 Q.      Did you say maybe we should extend this,
9 given what they're going through?
10 A.      No.
11 Q.      Why did you feel that it needed -- that
12 the transfer of knowledge needed to be completed
13 in a definitive time frame?
14 A.      So Helene could enjoy her retirement.
15 Q.      Did you discuss with Ms. O'Connor if she
16 would be willing to stay a little bit longer given
17 what the offices were going through?
18 A.      I did have a conversation with her.  I
19 do remember her commenting that she didn't want to
20 do this forever.
21 Q.      Did you discuss with anybody at the
22 county, defendants, plaintiffs, anyone at all
23 about actively searching for additional employees
24 to ensure that the tax assessment office had what

Page 134

1 they needed to operate effectively at this time?
2 A.      No.
3 Q.      When you decided this definitive time
4 frame, did you consider that there were a number
5 of employees we were attending CPE training at the
6 time?
7 A.      I wasn't aware of anyone in CPE courses,
8 other than the month of September.
9 Q.      Did you consider that at this exact
10 time, Ms. Goodman and Ms. Kleckner were still
11 waiting to be set up for optimal work from home?
12 A.      Yes.
13 Q.      Did you think that that might mean the
14 time should be -- did you think that that might
15 mean the time should be extended on which the
16 transfer of knowledge should take place?
17 A.      I didn't take that into consideration.
18 Q.      Do you think it's something you should
19 have taken into consideration?
20 A.      Maybe.
21 Q.      Your e-mail goes on to state:  I will be
22 the one meeting with Helene to ensure the work
23 performed is meeting the guidelines of the
24 agreement.

Page 135

1   I think you just indicated or agreed
2   with me that it would have been hard for you to
3   actually determine if her work was sufficient
4   because you didn't have much knowledge about tax
5   assessment, correct?
6   A.      Yes.
7   Q.      So why was it you that was picked to
8   review this work?
9   A.      It was really, again, to be the conduit
10  to receive the information, provide it to Mr.
11  Bender.
12  Q.      So you wouldn't necessarily evaluate the
13  work, you would just gather the information?
14  A.      Correct.
15  Q.      Was it -- this to me does not indicate,
16  and correct me if I'm wrong, that you were to meet
17  with Ms. Toomey and Ms. Gerchak to determine if
18  the work was sufficient; would you agree?
19  A.      Correct.
20  Q.      Why was it that you weren't going to
21  meet with them in addition to Ms. O'Connor to
22  discuss the transfer of knowledge?
23  A.      I wasn't instructed to.
24  Q.      Who instructed you to meet with Helene?

Page 136

1   A.      Mr. Bender.
2   Q.      Did you say, hey, maybe I should meet
3   with their supervisors too?
4   A.      I did.
5   Q.      And what was his response?
6   A.      No, don't do it.
7   Q.      Do you think that that was advisable?
8   A.      No.
9   Q.      Do you think that meeting with the
10  people who the knowledge was to be transferred to
11  would have been in the best interest of the
12  county?
13  A.      Yeah.  Yes.
14  Q.      In the last sentence of that paragraph
15  it says:  In addition, it is my understanding that
16  the agreement with Helene is between her, HR, and
17  the county.  I think that's what you're kind of
18  testifying here today to already.
19      In this next sentence it says:  I'm not
20  aware of the process regarding agreements here at
21  the courthouse prior to my assignment, which began
22  on Friday, September 4, 2020.
23      So is it -- it fair to say that you
24  don't know if department heads had been involved

Page 137

1   in contract negotiations prior to you getting
2   there?
3   A.      Correct.
4   Q.      So if Ms. Toomey and Ms -- if Ms. Toomey
5   and/or Ms. Gerchak had, in fact, been involved in
6   contract negotiations with their departmental
7   contractors, is there any reason you can think of
8   why they shouldn't have been involved in this one?
9   A.      No.
10  Q.      Is there any reason you can think of why
11  they shouldn't have been involved, even if it
12  wasn't prior practice?
13  A.      Other than not -- other than Mr. Bender
14  not wanting to include them, no.
15  Q.      But do you think including the
16  department heads in discussions about their
17  departments was advisable?
18  A.      Yes.
19  Q.      Do you think that Mr. Bender's refusal
20  was in order to create a hostile work or difficult
21  work environment for the ladies?
22          MR. LEES:  Object -- just note my
23  objection to the form.
24          MS. PIPAK:  Objection to the form.

Page 138

1          THE WITNESS:  I'm sorry.  Could you
2   --
3   BY MS. SMITH:
4   Q.      Do you think Mr. Bender's decision to
5   not include Ms. Toomey and/or Ms. Gerchak was in
6   an effort to create a hostile or difficult work
7   environment?
8   A.      No.
9   Q.      Why do you think it was?
10  A.      A hostile work environment?
11  Q.      No.  Why do you think it was not -- why
12  do you think his reason for not including them
13  was?  If it wasn't to create a hostile or
14  difficult work environment, what was his purpose
15  or reason?
16  A.      To really get the department functioning
17  as it should.
18  Q.      How could the department get to
19  functioning as it should if he wasn't actively
20  engaging the department heads?
21  A.      That's the $64,000 question.
22  Q.      Okay.
23      So you believe that his reason was to
24  get it working optimally, you just don't think he

Page 139

1 executed it correctly?
2 A.      Yeah.
3 Q.      Okay.
4       Why are you so sure that it was to get
5 them running effectively, the offices effectively,
6 and not out of spite?
7 A.      Well, the tax assessment office is a
8 money generator for the county and they bring in
9 probably the largest revenue for the county.  And
10 without that department functioning and getting
11 whatever reports, whatever tax bills out into the
12 community, then there's -- there's no revenue
13 generated.
14 Q.      Right.
15       So obviously running that office
16 optimally is important?
17 A.      Yeah.
18 Q.      My question is -- well, let's start with
19 this:  When you started with the county, were you
20 made aware of how the office of tax assessment had
21 been operating prior to the reports of sexual
22 harassment?
23 A.      No.
24 Q.      Were you made aware that Ms. Toomey had

Page 140

1 turned the office around significantly in regards
2 to different sales of properties to generate
3 income for the -- for the county?
4 A.      No.
5       MS. PIPAK:  Object to the form.
6       You can answer.
7       MS. SMITH:  She already did, but --
8 can -- are you able to hear her?
9       MS. PIPAK:  Yeah.
10       MS. SMITH:  Gerry, are you having
11 any trouble hearing us?  Because, Maria, you are
12 going in and out.  I don't know if it's our end or
13 yours.
14       MR. GEIGER:  No.  I can hear you
15 perfectly.
16       MS. SMITH:  Okay.  Yeah, I don't
17 know, Maria, if it's your connection.  You are
18 just going in and out, so our steno is having a
19 hard time.
20       MS. PIPAK:  Okay.  I'll try to be
21 clearer.
22       MS. SMITH:  Yeah.  There you go,
23 that's better.
24 BY MS. SMITH:

Page 141

1 Q.      Ms. Kutzler, I -- I think we talked --
2 you were just saying how the tax assessment office
3 operations is important because it's a money
4 generator for the county.  But why is it you're so
5 sure that Gary Bender's conduct towards the
6 assessment office was from a place of operational
7 desires, as opposed to out of spite for being
8 named a defendant?
9       MR. LEES:  Same -- same objection
10 as to form.
11       You can answer.
12       THE WITNESS:  Gary was trying to
13 keep the county running.  Again, with him having
14 oversight for the administrative departments,
15 he -- he was doing the best he could.  And if
16 he -- if he could have removed George from the
17 courthouse, he would have done it, but he
18 didn't -- he didn't have the authority as well.
19 BY MS. SMITH:
20 Q.      Do you think that Ms. Toomey and Ms.
21 Gerchak were doing the best that they could under
22 the circumstances?
23 A.      Yes.
24 Q.      Do you think that -- strike that.

Page 142

1       If I told you that Mr. Bender was not
2 involved in day-to-day operations of the tax
3 assessment office prior to the sexual harassment
4 reports, would it change your opinion as to what
5 the purpose of his involvement was post reports?
6 A.      Would it change --
7       MS. PIPAK:  Object to the form.
8 Object to the form.
9       You can answer.
10       THE WITNESS:  So would it change my
11 opinion of how Gary interacted with the
12 department?
13 BY MS. SMITH:
14 Q.      Yes.
15       So to be more clear, so you were saying
16 that you think Gary was interacting with the
17 department because he needed these offices to
18 operate --
19 A.      Right.
20 Q.      -- optimally?
21 A.      Yes.
22 Q.      If he hadn't been so interactive with
23 the departments prior to the sexual harassment
24 claims --

Page 143

1  A.      But now he was.
2  Q.      -- but now he was all of a sudden, the
3  only change being the sexual harassment claims and
4  him being a named defendant, would that change
5  your opinion?
6  A.      No.
7  Q.      Okay.
8          Why not?
9  A.      Again, I don't think Mr. Bender was
10 making decisions on how the department should be
11 run because of the harassment case.  He was making
12 those decisions on behalf of the county as a
13 whole.
14 Q.      Did you or anyone on behalf of Hubric
15 Resources engage in contract discussions with any
16 other county contractor?
17 A.      No.
18 Q.      Do you know if any other county
19 contractor's contract was extended during the time
20 Hubric Resources was in place at the county?
21 A.      Not to my knowledge.
22 Q.      If we look, still on Page 2, Doe 1116.
23         The last sentence, the last paragraph,
24 it says:  You cannot speak to how this type of

Page 144

1  agreement was handled in the past.  But I am
2  working perspectively to provide all employees and
3  departments with support to the greatest extent
4  possible.
5          Do you see that?
6  A.      Yes.
7  Q.      What things were you doing to work
8  perspectively to provide the tax assessment office
9  with support?
10 A.      Well, it would be the responsibilities
11 on a day-to-day basis of any employee-relations
12 issue, any recruiting needs, training --
13 Q.      Did you --
14 A.      -- development of the employees.
15 Q.      Did you speak with Ms. Toomey or Ms.
16 Gerchak regarding those specific -- specific
17 items?
18 A.      No.
19 Q.      So those are things you could have done
20 to work perspectively to provide them with
21 support, but that you did not do?
22 A.      Correct.
23 Q.      Why didn't you?
24 A.      The county is a large employer and the

Page 145

1  tax assessment and tax claim offices aren't the
2  only two offices within the county.
3  Q.      So were --
4  A.      That I was supporting.
5  Q.      So were you doing those specific items
6  you listed for other county offices?
7  A.      Some.
8  Q.      Okay.
9          Do you remember which ones?
10 A.      No.
11 Q.      Okay.
12          Sorry, I just -- keep that e-mail chain
13 in front of you.  Just one last question.
14 A.      Yep.
15 Q.      Maybe a couple more.
16          You would agree that nowhere in this
17 e-mail chain or that response do you ask or -- or
18 invite Ms. Toomey's feedback or input regarding
19 the addendum and/or information regarding the
20 needs of the tax assessment office?
21 A.      Correct.
22 Q.      All right.  We're going to go to the
23 first page of the document, 1115.
24          There's two responses here from Ms.

Page 146

1  Toomey to that last e-mail we looked at from you.
2  The first, she indicates that she believes that
3  county administration still allowing Defendant
4  Halcovage to contribute to the hostile work
5  environment that continues.
6          Do you see that?
7  A.      I do.
8  Q.      Thirty-plus years of human resources,
9  I'm sure you're aware of the words hostile work
10 environment being a somewhat legal term in -- in
11 the field of employment law, correct?
12 A.      Yes.
13 Q.      And it's illegal for employers to engage
14 in a hostile work environment of their employees,
15 correct?
16 A.      Yes.
17 Q.      Okay.
18          Knowing that, did you ever investigate
19 Ms. Toomey's report of a hostile work environment?
20 A.      No.
21 Q.      Did you ever ask her what she meant?
22 A.      No.
23 Q.      Did you ever ask her why she felt that
24 way?

Page 147

1  A.    No.
2  Q.    Other than your response at the top of
3  the chain on that page.
4  A.    Yes.
5  Q.    Did you ever send her any other
6  response, either written or communicated to her,
7  regarding this e-mail chain con -- contact?
8  A.    Not that I recall.
9  Q.    That e-mail response simply -- that we
10 were just referring to before simply states,
11 nothing has changed regarding the department head
12 communicating with contractors, correct?
13 A.    Yes.
14 Q.    What changed between your October 22,
15 10:07 e-mail, which is the one on the page prior
16 and this e-mail regarding your knowledge as to
17 what contract negotiations previously included?
18 A.    I'm sorry.  Can you clarify?
19 Q.    Sure.
20        So in the -- we've talked about in this
21 other e-mail on Page 1116, that you didn't know
22 about how contract negotiations used to be, right.
23 So if you don't know how they used to be, how can
24 you say that nothing's changed?

Page 148

1        MR. LEES:  Objection to the form.
2        You can answer.
3        THE WITNESS:  Well, I didn't know.
4  BY MS. SMITH:
5  Q.    Okay.
6        Is that because Mr. Bender was telling
7  you how to respond to Ms. Toomey?
8  A.    Yes.
9  Q.    When you would respond to Ms. Toomey
10 or -- let's strike that.
11        When you got an e-mail from Ms. Toomey,
12 did you go to Mr. Bender and say, how do we
13 respond to this or what should I do?
14 A.    Not on every occasion.
15 Q.    On some occasions?
16 A.    On some.
17 Q.    And would Mr. Bender, at least on some
18 occasions, tell you how you were to respond?
19 A.    He would refer me to counsel.
20 Q.    Can you tell me which counsel he would
21 refer you to?  Are you talking about a solicitor
22 or like an outside counsel?
23 A.    Outside counsel.
24 Q.    Okay.

Page 149

1        He would never provide you with his own
2  directed response on how to respond?
3  A.    No.
4  Q.    All right.
5        So is this response on the top of that
6  page at the direction of counsel?
7  A.    No.  This would have been --
8        MS. PIPAK:  Object to form.
9        MS. SMITH:  This is advice of
10 counsel and it's been produced.
11        MS. PIPAK:  Your question was
12 asking, though, where that came from, so -- but I
13 think she answered no, so I think...
14        MR. LEES:  I think it's moot, she
15 did say no.
16        MS. PIPAK:  Right.
17        THE WITNESS:  It was not based
18 upon -- that -- that response is not based upon
19 counsel.
20 BY MS. SMITH:
21 Q.    Okay.
22        Is this response based on anything from
23 Gary Bender?
24 A.    Yes.

Page 150

1  Q.    Okay.
2        He told you how to respond?
3  A.    Yes.
4  Q.    Okay.
5        So I think -- I just want to clarify
6  that in an earlier question.  There were times
7  that you went to Mr. Bender about Ms. Toomey's
8  e-mails and he directly told you himself how to
9  respond?
10 A.    Yes.
11 Q.    There were times he directed you to
12 counsel?
13 A.    Yes.
14 Q.    But other times that he instructed you
15 how to respond?
16 A.    Yes.
17 Q.    Other than telling you how to respond,
18 did Mr. Bender ever draft an e-mail response for
19 you?
20 A.    No.
21 Q.    Did he ever send you in e-mail, like
22 a -- what you should copy and paste in response?
23 A.    No.
24 Q.    Did most of your communications

Page 151

1  regarding -- most or all of your communications or
2  something different, regarding Ms. Toomey's to you
3  with Mr. Bender, occur in person?
4  A.     Yes.
5  Q.     Was that by your own decision or were
6  you instructed to do that?
7  A.     We had a standing meeting every day --
8  Q.     Okay.
9  A.     -- at 4:00 p.m. and we would discuss the
10 events of the day, what I was working on.
11 Q.     Was there ever a time that Mr. Bender
12 told you to hold off or wait to respond to Ms.
13 Toomey?
14 A.     No.
15         MS. SMITH:  I am going to mark 283.
16 I am going to mark Doe 1121 through 1124 as Doe --
17 as 283.
18              - - -
19     (Doe 1121-1124 marked as Exhibit-283 for
20 identification.)
21              - - -
22 BY MS. SMITH:
23 Q.     Do you recognize this e-mail chain?
24 A.     Yes.

Page 152

1  Q.     Okay.
2         And if we look to the bottom of the
3  second page onto the third page, there is a
4  October 27, 2020, 4:51 p.m. e-mail.  The
5  contents -- the time stamps and stuff is at the
6  bottom of --
7  A.     Yep.
8  Q.     -- the second, but content is on the top
9  of the third.
10        Ms. Toomey's e-mail indicate that Ms.
11 Gerchak had informed her that you had stopped into
12 one of the offices that day to discuss the
13 purchase of items for Ms. Kleckner and Ms.
14 Goodman.  Do you recall stopping down to discuss
15 that?
16 A.     Yes.
17 Q.     Okay.
18        Is that when you learned -- I think you
19 testified earlier to this, when you learned that
20 there wasn't items in the budget and you had to go
21 find that other source, which was the committee?
22 A.     Yes.
23 Q.     Okay.
24        Do you recall what office you stopped in

Page 153

1  to?
2  A.     Ms. Gerchak's.
3  Q.     In -- and she was in?
4  A.     Tax claim.
5  Q.     Her physical office was in tax claim,
6  correct?
7  A.     Yes.
8  Q.     Okay.
9         The material and supplies line items
10 that's referenced in this e-mail, that's what you
11 were referencing as the tax assessment budget,
12 correct?
13 A.     Yes.
14 Q.     All right.
15        Was it your initial idea to check the
16 tax assessment budget for the supplies to purchase
17 for Ms. Kleckner and Ms. Goodman or someone
18 else's?
19 A.     That would have been directed through
20 Paul Buber.
21 Q.     So I guess just walk me through what
22 happened.  So you talk with Gary Bender about Ms.
23 Goodman and Ms. Kleckner needing supplies and that
24 they needed to be purchased by the county.  And

Page 154

1  then he -- does he direct you to go to Paul Buber?
2  A.     I worked with Linda Dietrich because she
3  coordinates all of -- the distribution of all of
4  the office supplies, so the commissioner's office.
5  Q.     Okay.
6  A.     So Linda, Marybeth, and Wendy at the
7  time, so you placed your orders through them.  So
8  the papers, the pens, the staples, that kind of
9  thing.
10 Q.     Okay.
11 A.     And then a PO needed to be submitted and
12 I worked with Paul Buber in fiscal to make the
13 request for the laptop, monitor, printer,
14 keyboards, mice, all of the electronic --
15 Q.     Okay.
16 A.     -- equipment.
17 Q.     Okay.
18        And so it was, correct me if I'm wrong,
19 Paul Buber who instructed you that the items could
20 be purchased, but the payment needed to come
21 through --
22 A.     Through the -- run through the
23 department budget.
24 Q.     Budget.  Okay.

Page 155

1  A.      Yeah.
2  Q.      Are you aware then or now as to how
3  department budgets impact the -- how the
4  department's unit is operating.  So whether
5  they -- did the budget affect what they -- whether
6  the department appears to be operating effectively
7  or not effectively?
8         So for instance, in like a private
9  business, if you have a ton of money spent --
10 A.      Sure --
11 Q.      Going out, but not a lot of -- a ton of
12 money coming in, the business isn't doing well.
13 Is that the same for the budget with county -- the
14 county offices?
15 A.      I don't think it runs like that.
16 Q.      Okay.
17 A.      Yeah.  There's -- there's not a --
18 there's not a clear line of sight between we're in
19 the red, we're in the black.
20 Q.      Okay.
21        And is this e-mail from Ms. Toomey to
22 you, and what I think you testified to earlier, where
23 you learned that there wasn't money in the budget?
24 A.      Yes.  She speaks to only have the $8.40

Page 156

1  available in that line item.
2  Q.      Going to the page before that, the
3  second page, Doe 1112.  You tell her to process
4  the budget adjusting to use the money previously
5  planned for prior judicial sales so we can get the
6  equipment ordered ASAP.
7         So at that point, the equipment had not
8  yet been ordered, correct?
9  A.      Correct.
10 Q.      And do you know what impact the use of
11 money you for judicial sale would have on
12 county -- the county operations?
13 A.      As far as the budget transfer?
14 Q.      So would it negatively impact the
15 ability of the county to have a judicial sale if
16 they didn't have money to do so?
17 A.      No.
18 Q.      Well, what is money that's earmarked for
19 a judicial sale used for?
20 A.      So they establish a budget and the --
21 that amount -- my understanding is that amount is
22 to cover those administrative expenses and if
23 there's -- you know, you kind of rob Peter to pay
24 Paul in the scheme of your budget.  And if you

Page 157

1  have more money in, you know, conferences and
2  seminars, but you don't have enough in materials
3  and supplies, they transfer it internally.
4  Q.      Okay.
5         So you think that if there was -- if
6  money from the previously planned judicial sale
7  was used for this equipment order, what -- that
8  there would still be enough money in that other
9  budget?
10 A.      Sometimes there is still enough money.
11 Q.      Okay.
12        And what if there wasn't enough money,
13 then what would happen to the judicial -- judicial
14 sale?
15 A.      Well, my understanding was, there
16 weren't any more judicial sales planned for that
17 budget year.
18 Q.      Okay.
19 A.      So that money wouldn't have been spent.
20 Q.      Okay.
21        So essentially it was excess money for
22 the year?
23 A.      Correct.
24 Q.      Okay.  All right.

Page 158

1         Do you know what goes into a budget
2  adjustment?
3  A.      There is communications with Paul Buber
4  in the physical department.  And as those
5  transactions take place, there is a form that is
6  presented at a commissioner's meeting and that
7  goes through an approval process.
8  Q.      So it's not -- would you say it's a
9  simple process or a somewhat tedious process?
10 A.      It's standard accounting procedures, so
11 that they can track the movement of that money.
12 Q.      I get it's standard.  But I'm just
13 trying to get at is, how long would it take
14 someone to do that?
15 A.      Within a week or two.
16 Q.      But it takes additional work, correct?
17 A.      Yes.
18 Q.      And so why was it that Angela Toomey,
19 who was already overworked, was asked to do that?
20        MR. LEES:  Objection to form.
21        THE WITNESS:  It's driven by the
22 fiscal office.
23 BY MS. SMITH:
24 Q.      Why --

Page 159

A.      So it would just be a phone conversation
that Ms. Toomey would have with Mr. Buber to say,
I want to take money from this account and move it
to this account.  And Paul does all of the prep
work for the commissioner's meeting.  That's
his -- that's part of his responsibility, managing
the fiscal department.
Q.      Okay.  Thank you.
        MS. SMITH:  We're going to look at
Exhibit -- previously marked Exhibit-230.
             - - -
        (Previously mark Exhibit-230.)
             - - -
BY MS. SMITH:
Q.      Do you recognize this e-mail?
A.      I do.
Q.      And this, you would agree, is an
October 28, 2020, e-mail from Ms. Toomey to you,
as well as other county officials including Mr.
Bender?
A.      Yes.
Q.      Do you know if you ever responded to Ms.
Toomey's e-mail?
A.      I do not recall.

Page 160

Q.      You would agree that Ms. Toomey
indicates that Ms. Goodman needs to come into the
office that day to enter information into the
county systems, correct?
A.      Yes.
Q.      And the office at this point would be
meaning the county courthouse?
A.      Correct.
Q.      Okay.
        She then, in her next sentence indicates
that this needs to be done for some other county
tax assessment work.
        Would you agree?
A.      Yes.
Q.      And that then Ms. Goodman will not enter
the building if George Halcovage is here and asked
when -- to be let it known when it would be safe
for Ms. Goodman to enter the courthouse.
        Given that Ms. Goodman didn't have --
well, let's start with this:  She didn't have a
laptop by the next day after your October 27th
e-mail.
        We can agree, right?
A.      Yes.

Page 161

Q.      Okay.
        So given that she didn't have the
necessary equipment to work from home, why was it
that it couldn't be told when it was safe for her
to enter the courthouse?
A.      I'm sorry?
Q.      So would there be any reason she
couldn't be told when it was safe to -- for her to
enter the courthouse?
A.      No.
Q.      Is there any reason she couldn't be told
if there was a day that the county knew that
Defendant Halcovage wasn't going to come in?
A.      You never knew that.
Q.      But if -- I mean, if he had something,
an event somewhere else that he was attending?
A.      I didn't have access to Mr. Halcovage's
schedule, so I didn't know when he was in or out.
Q.      Okay.
        Is there any reason that an interactive
conversation with Ms. Goodman and Ms. Toomey
didn't occur -- well, let's start with that.
Strike that.
        Did any kind of conversation by you or,

Page 162

to your knowledge, by anyone from the county occur
with Ms. Goodman or her supervisors regarding what
she needed to feel safe to enter the courthouse?
A.      I don't know if it was as a result of
this particular e-mail, but we did have a
conversation about having them use the north
entrance, which is an employee entrance, into the
courthouse, rather than have the ladies come in
through the main entrance where there's a direct
line of sight to the commissioner's office.
        The employees entrance, the north door,
they would enter, come down the steps, make a
right, take 10 or 15 steps, and then enter the tax
assessment office.  So that was the shortest
course of entry with the potentially least
likelihood of a sighting.
Q.      And so there's multiple entrances that
an employee with a swipe card can enter the
courthouse, correct?
A.      Yes.
Q.      Including commissioners, correct?
A.      Yes.
Q.      What would -- so the north door, as you
indicated, would be the quickest, most direct

Page 163

1 route for an employee to enter the building and
2 get to the tax assessment office.  What would be
3 quickest door for a commissioner to enter the
4 building and get to the commissioners' suite?
5 A.      The com -- the employee entrance at the
6 lower parking lot.
7 Q.      So based off of where Defendant
8 Halcovage had been parking, would there be any
9 logical reason for him to enter the north door?
10 A.      I am aware that he did enter the north
11 door one morning as he waited for Mr. Bender to
12 join him, to walk with him to go to Courtroom 1, I
13 think it was, for the swearing in of Judge Hale.
14 Q.      Okay.
15       But for non-events or just regular
16 county business, would there be any reason for a
17 commissioner to enter the north door as opposed to
18 a different door?
19 A.      Not to my knowledge.
20 Q.      So were there conversations then with --
21 to your knowledge, either that you participated in
22 or you observed or know about, with Defendant
23 Halcovage, asking him or instructing him to not
24 use the north door?

Page 164

1 A.      I had conversations with Mr. Bender
2 requesting that that information be conveyed to
3 him.
4 Q.      What was Mr. Bender's response?
5 A.      He would have the conversation with Mr.
6 Halcovage.
7 Q.      Did he ever tell you what -- anything
8 about those conversations?
9 A.      No.
10 Q.      Did he ever tell you if they happened?
11 A.      Yes.
12 Q.      Okay.
13       And did he tell you if Mr. -- Defendant
14 Halcovage had agreed?
15 A.      Sometimes he did, sometimes he didn't.
16 Q.      Okay.
17 A.      That Mr. Halcovage did not agree.
18 Q.      So as it relates -- so let me just make
19 sure I understand you.
20       Did Mr. -- did Defendant Halcovage
21 outright disagree with entering -- not using the
22 north door?
23 A.      Not to my knowledge.
24 Q.      Okay.

Page 165

1       Did he outright agree to not use the
2 north entrance?
3 A.      I recollect with my conversations with
4 Mr. Bender that he was instructed to use
5 specifically the main entrance.
6 Q.      Okay.
7       And this is before any -- or at a time
8 when there was no instruction by Sheriff Groody
9 for that entrance, correct?
10 A.      Well, he was -- he was instructed to
11 come through the employee entrance from the lower
12 parking lot.  And then they stopped wanding Mr.
13 Halcovage and they then moved him up to the upper
14 parking lot.  And then I think he moved back down
15 and then he moved back up.  So it's -- he's been
16 moved a couple times.
17 Q.      Okay.
18       But when he was -- so whenever his
19 parking spot was -- Commissioner Halcovage's
20 parking spot was in the upper lot by the main
21 entrance, he was instructed, if I'm understanding
22 you correctly and correct me if I'm wrong, to
23 enter the main entrance because that's where he
24 was parking?

Page 166

1 A.      Yes.
2 Q.      Okay.
3       And, again, correct me if I'm wrong,
4 what I'm understanding from your testimony is
5 that, while this conversation was had with
6 Defendant Bender instructing Defendant Halcovage
7 to do this, there were days that Defendant
8 Halcovage complied and there were days that he
9 didn't comply?
10 A.      I think he complied, but he complained
11 about it.  He didn't want it to be that way.
12 Q.      Okay.
13 A.      Yeah.
14 Q.      So -- but there was at least one
15 occasion where he entered the north entrance?
16 A.      Yes.
17 Q.      Okay.
18       Were there any conversations that you
19 had or that you're aware of by anyone at the
20 county with Ms. Goodman about what would make her
21 feel safe to enter the courthouse?
22 A.      Just the suggestion that I made that
23 they use the north entrance.
24 Q.      Did you specifically yourself talk with

Deposition of Doreen Kutzler                                    Jane Doe, et al. v. Schuylkill County Courthouse, et al.

Page 167

1  Ms. Goodman about that?
2  A.      Ms. Toomey.
3  Q.      Okay.
4        Was there ever a conversation that you
5  had or anyone at the county had, to your
6  knowledge, with the sheriff's department to maybe
7  coordinate them escorting Ms. Goodman or Ms.
8  Kleckner into their offices?
9  A.      There were conversations, yes.
10  Q.      Okay.
11  A.      But based upon their staffing
12  requirements, Chief Tobin and Sheriff Groody said
13  that it was not possible from a manpower
14  perspective.
15  Q.      Was that -- I'm sorry.
16  A.      Sorry.
17  Q.      Go ahead.
18  A.      To have a deputy escort.
19  Q.      Was that a manpower that was a day to
20  day -- like an everyday request or if it was like
21  a periodic?  Like, if it was a once-a-week
22  request, could they have accommodated it?
23  A.      I don't know that -- Chief Tobin would
24  have to answer that.

Page 168

1  Q.      But were those conversations held about,
2  hey, can you do it once a week?
3  A.      I don't know that they got that
4  specific.
5  Q.      Did anyone ask Ms. Toomey or Ms. Goodman
6  or Ms. Kleckner or Ms. Gerchak, how often they
7  thought would be helpful for Ms. Goodman and Ms.
8  Kleckner to come to the courthouse?
9  A.      I did not have any conversations in that
10  regard.
11  Q.      Are you aware of any?
12  A.      No.
13  Q.      At the time that you worked at the
14  county, were -- and I don't -- I don't remember,
15  so I'm going to ask you to help me out.
16        Did -- was Zoom free at that point, do
17  you know, like were -- or was there a county
18  contract for Zoom?
19  A.      There was not one until I started
20  working --
21  Q.      Okay.
22  A.      -- for the courthouse.
23  Q.      Yeah, because I know --
24  A.      Or for the county, because we used -- I

Page 169

1  used it specifically during my training.
2  Q.      Okay.
3  A.      Because we offered it both in person and
4  via virtual.
5  Q.      Okay.
6        Was that -- were any discussions -- when
7  you are saying your training, are you talking
8  about the sexual harassment training --
9  A.      Yes.
10  Q.      -- in 2021?
11  A.      Sorry.  Yes.
12  Q.      It's okay.  No, I just want to make the
13  record clear.
14        So prior to that, the county did not
15  have a Zoom contract?
16  A.      The commissioners' office had one.
17  Q.      Okay.
18        But not any of the underlying
19  departments?
20  A.      Not to my knowledge.
21  Q.      Were there any discussions that you had
22  or that you're aware of, regarding getting a Zoom
23  contract so that Ms. Kleckner and Ms. Goodman
24  could Zoom in for office needs?

Page 170

1  A.      No, I did not have any conversations in
2  that regard.
3  Q.      But the commissioners' office and,
4  therefore, Defendant Halcovage had the capability
5  to Zoom in?
6  A.      Yes.
7  Q.      Was there ever discussions about
8  Commissioner Halcovage Zooming in for county
9  business?
10  A.      I had a meeting with Commissioners
11  Hetherington and Hess specifically requesting that
12  they have discussions with Mr. Halcovage to
13  implore him to work from home.
14  Q.      Do you know if they ever had those
15  conversations?
16  A.      Yes.
17  Q.      Did they ever tell you what happened
18  during those conversations?
19  A.      He refused.
20  Q.      Did they -- either of them tell you how
21  they felt after Defendant Halcovage's refusal?
22  A.      That he should do it, work from home
23  that is.
24  Q.      Right.

Page 171

MS. SMITH:  We're going to look at previously marked Exhibit-232.

                     - - -

(Previously marked Exhibit-232.)

                     - - -

BY MS. SMITH:

Q.     Do you recognize this e-mail?

A.     Yes.

Q.     This, you would agree, is a November 12, 2020, 11:32 a.m. e-mail from you to other county officials. I'm sorry. It's from Ms. Toomey to you and other county officials, including Mr. Bender, correct?

A.     Yes.

Q.     All right.
       She's following up on kind of the content we talked about earlier, she's following up on Ms. Helene O'Connor's addendum to her contract, correct?

A.     Yes.

Q.     Do you see the second sentence in the first paragraph, she says:  I know that Gary Hess has not been in the building to sign it and George Halcovage abstained so he could interfere with

Page 172

office operations.
       Do you know what she's referring to regarding Defendant Halcovage's abstaining?

A.     Other than he wouldn't sign the addendum because of his involvement in the harassment case.

Q.     Okay.
       So give me a little more on, like, what you know Defendant Halcovage did or did not do related to the addendum.

A.     I don't think he voted on it.

Q.     Okay.

A.     Because it involved an employee who works in the tax assessment and Mr. Halcovage has taken the stance that he's abstained from, to my understanding and to my knowledge, everything that's associated with the tax assessment office.

Q.     I'm sorry.
       Say that last -- he abstained from everything regarding the tax assessment office?

A.     Yeah. Any time anything has been brought to the commissioner's meeting for vote, he abstains.

Q.     Since -- since November of 2020?

A.     Before that.

Page 173

Q.     Do you know why?

A.     Because he's a defendant named in the case.

Q.     And do you agree that a defendant named in a case probably shouldn't vote on operational issues regarding a --

A.     No.

Q.     -- plaintiff in a case?

A.     No.

Q.     Are you aware that Defendant Halcovage voted on the demotion of Ms. Gerchak and Ms. Toomey?

A.     He did?

Q.     In March of --
       MS. PIPAK:  Object to the form.
       Go ahead.
       THE WITNESS:  Sorry. No, I was not aware.

BY MS. SMITH:

Q.     Okay.
       So if Mr. Halcovage had voted to remove -- strike that.
       Are you aware that Ms. Toomey and Ms. Gerchak were removed from their dual-role position

Page 174

where they no longer oversaw both offices?

A.     I did learn that.

Q.     Okay.
       Were you involved in the delivering of that news?

A.     No.

Q.     Okay. I didn't -- so if I told you that Defendant Halcovage voted in affirmative for their demotion or their -- as the county calls it, the restructuring of the office, do you believe that would be in -- would be in line with Defendant Halcovage -- with what Defendant Halcovage has espoused to you regarding abstaining related to the tax assessment office?
       MS. PIPAK:  Object to the form.
       You can answer.
       MR. GEIGER:  Object.
       THE WITNESS:  So -- just so I understand correctly.

BY MS. SMITH:

Q.     Yeah.

A.     Do I agree with the fact that he --

Q.     No. Sorry.

A.     Okay.

Case 3:21-cv-00477-MCC   Document 280-1   Filed 09/20/23   Page 50 of 373
Deposition of Doreen Kutzler
Jane Doe, et al. v. Schuylkill County Courthouse, et al.

Page 175

1  Q.      Just because I -- I started that line of
2  questioning.
3  A.      Okay.  Okay.
4  Q.      -- and I didn't finish it.
5        So let me understand this correct, make
6  sure I understand you correctly.
7        You understood from Defendant Halcovage
8  himself that he was abstaining from voting or
9  conducting -- doing any business that related to
10 the tax assessment office because he was a
11 defendant and the plaintiffs worked in that
12 office?
13 A.      Yes.
14 Q.      So based on that, do you believe that if
15 he voted on the restructuring of those offices,
16 which removed Ms. Toomey and Ms. Gerchak from two
17 of their positions, one -- one position each, that
18 that was in line with what he had espoused while
19 you worked at the county?
20 A.      Oh, no.
21 Q.      Do you believe it would be proper for
22 him to vote on the restructuring of the tax
23 assessment office, which included the reduction in
24 Ms. Toomey and Ms. Gerchak's pay?

Page 176

1  A.      No.
2        MS. PIPAK:  Objection to the form.
3        You can answer.
4  BY MS. SMITH:
5  Q.      In -- in this e-mail specifically that
6  we have in front of you, 232, she, in Paragraph 3
7  indicates to Ms. -- Ms. Toomey indicates that she
8  has not heard anything in response to an e -- her
9  e-mail regarding Marcy's visit to the office
10 tomorrow so that she can complete sales
11 submissions.  The state tax equalization board
12 would like an explanation.
13        Let's just go a little bit about your
14 understanding.
15        So did you understand that Ms.
16 Kleckner's job duties included the completion of
17 what are called STEB reports?
18 A.      I did learn that.
19 Q.      Okay.
20        And you understood those STEB reports
21 went to the State Tax Equalization Board?
22 A.      I learned that as well.
23 Q.      And then there is something that the
24 state tax board does which impacts county money?

Page 177

1  A.      Yes.
2  Q.      Okay.
3        Any reason to disagree or not believe
4  that Ms. Toomey had not received a response to her
5  e-mail regarding Marcy coming into the office?
6  A.      So in one of my daily meetings with Mr.
7  Bender, we had talked about this, specifically the
8  STEB reports, and he very emphatically instructed
9  me that the STEB reports were not under the guise
10 of the HR department.
11 Q.      Okay.
12        And so was that his way, without saying
13 that you shouldn't be involved in it?
14 A.      Correct.
15 Q.      So you were instructed by Mr. Bender to
16 not respond to Ms. Toomey regarding issues with
17 the STEB report?
18 A.      Correct.
19 Q.      Why do you think he told you that?
20        MS. PIPAK:  Objection to the form.
21        You can answer.
22        THE WITNESS:  I think he wanted
23 them to figure it out for themselves.
24 BY MS. SMITH:

Page 178

1  Q.      Well, you would agree with me that the
2  STEB reports would be -- the timely and proper
3  completion of the STEB reports would be for the
4  good of the county, correct?
5  A.      Yes.
6  Q.      And the reason that he was -- Mr.
7  Bender, and according to your testimony, was so
8  involved in Helene O'Connor's contracts and
9  negotiations because he wanted the offices to
10 operate optimally, right?
11 A.      Yes.
12 Q.      So why then didn't he want the offices
13 to operate optimally in regards to this issue?
14 A.      I think he did.  I think he -- I was
15 under the impression he wanted Ms. Toomey and Ms.
16 Gerchak to handle it.
17 Q.      Why wouldn't he let Ms. Toomey and Ms.
18 Gerchak handle Ms. O'Connor's issue then?
19 A.      I can't answer that.
20 Q.      Do you think it's because this issue
21 involved only plaintiffs and that one involved an
22 outside person?
23 A.      Perhaps.
24 Q.      Do you think that Mr. Bender was setting

Page 179

1  Ms. Toomey, Ms. Gerchak, or any of the plaintiffs
2  up for failure?
3            MS. PIPAK:  Objection to form.
4            MR. LEES:  Objection to the form.
5            You can answer.
6            THE WITNESS:  I think there was a
7  dance.
8  BY MS. SMITH:
9  Q.      What do you mean by that?
10 A.      That he was testing what they would and
11 wouldn't do.
12 Q.      When you say they, you mean the
13 plaintiffs, right?
14 A.      Yes.
15 Q.      Did he test anybody else in that nature?
16 A.      Yes.
17 Q.      Who would you say he tested in that
18 nature?
19 A.      Lisa Mayhall, Paul Buber.  He had very
20 specific expectations.  What was his name?  The
21 gentleman that ran the maintenance department,
22 Paul -- I don't remember his last name.  He -- he
23 pushed him pretty hard.  He pushed him really
24 hard.

Page 180

1  Q.      Do you think given what the offices, Ms.
2  Toomey's offices were going through at that
3  point -- I'm going to refer to them as Toomey's
4  offices, I am referring to the tax claim bureau
5  and the tax assessment office, at least for this
6  time period.
7            What her offices were going -- going
8  through at that point and pushing her hard was the
9  appropriate response?
10 A.      No.
11 Q.      Do you think that Ms. Toomey, throughout
12 your time there at the county, had reached out for
13 help regarding those difficulties her offices were
14 going through?
15 A.      To a certain extent.
16 Q.      So in your words, Mr. Bender wanted, in
17 your mind, Ms. Toomey and Ms. Gerchak to figure it
18 out related to the STEB reports.  But if -- strike
19 that.
20           November 12, 2020, Ms. Ger -- Ms.
21 Kleckner still did not have the new laptop,
22 correct?
23 A.      Correct.
24 Q.      She didn't have the new printer,

Page 181

1  correct?
2  A.      Correct.
3  Q.      She wasn't in the 410 Building, correct?
4  A.      Correct.
5  Q.      And she was still, I'm going to call it
6  working from home, put I am going to put air
7  quotes on it, because she wasn't set up to work
8  from home, but that's the only place she could
9  work from, correct?
10 A.      Correct.
11 Q.      Okay.
12           And those things had been done, the
13 request of supplies I should say, were done at the
14 request of the plaintiffs, correct?
15 A.      Yes.
16 Q.      So they had taken steps to figure it
17 out; would you agree?
18 A.      Yes.
19 Q.      Ms. Toomey sends an e-mail to you and
20 includes Mr. Bender and tries to figure out a day
21 where Ms. Kleckner can come to the office, does
22 she not?
23 A.      Yes.
24 Q.      So what, in your mind, more could Ms.

Page 182

1  Toomey have done to figure out the STEB report
2  issue?
3            MR. LEES:  Objection to the form.
4            You can answer.
5            THE WITNESS:  Complete the forms
6  herself.
7  BY MS. SMITH:
8  Q.      And if as a manager, a department head,
9  she had done what her employee was incapable of
10 doing because of obstacles, that would be proper
11 managerial style, correct?
12 A.      Yes.
13 Q.      Would you -- if Ms. Toomey could not
14 have -- I'm sorry.  If Ms. Kleckner could not have
15 completed the STEB reports because of obstacles
16 not created by her, and Ms. Toomey completed them,
17 would you say that was a lack of delegation or
18 that was proper management style?
19 A.      I think it's a combination.  I don't --
20 I don't think it's lack of delegation because they
21 were in a situation where they were shorthanded
22 and, you know, the staff was treading water to
23 just -- to, you know, keep the ship moving
24 forward, if you will.

Page 183

Q.      Do you know, was there anyone else at
county at this time, October 2020, other than Ms.
Kleckner and I think Ms. Toomey, that could --
could -- and Ms. Gerchak, that could complete the
STEB reports?
A.      I -- not to any knowledge.
Q.      Okay.
        Next paragraph of this e-mail references
Heather Matascavage -- I am sure I am saying that
wrong, I always do -- situation. Do you know what
Ms. Toomey is referencing there?
A.      She bid out of the tax claim office from
a clerk's position to a field appraiser's position
and she wanted to go back to her clerk's position
in tax claim, but based upon the collective
bargaining agree, she was outside the window of
days in which she could return to her prior
position, no harm, no foul. So her only options
were to remain in the department, she could
transfer or bid through to an open position, or
leave the organization in its entirety.
Q.      Okay.
        Is -- we were speaking about fields
appraisers earlier and you couldn't remember

Page 184

someone's name.
        Is that Heather then?
A.      She was going through training. She was
new to the department.
Q.      Okay.
A.      Because her transfer was the end of
September. And I don't recall if it was 30 or 45
days that they have in which to return to their
prior position and she was beyond that time
period.
Q.      Okay.
        But I think my question was -- so
earlier when we were talking about what field
appraisers there were, did you consider her field
appraiser when you were saying there was -- there
was Melissa Goodman, there was Chrissy Zimmerman,
and there was another one where you said you
couldn't remember her name?
A.      It's not Heather.
Q.      Okay. All right.
        Do you know you or anyone from the
county responded to this e-mail from Ms. Toomey?
A.      Not to my knowledge.
Q.      Did you discuss this e-mail with anybody

Page 185

from the county?
A.      Mr. Bender.
Q.      Okay.
        Because you did say -- you talked about
Mr. Bender -- with Mr. Bender about the STEB
reports and his response was essentially let them
figure it out?
A.      Yes.
Q.      Do you remember what his exact response
was?
A.      I don't.
Q.      Any update provided to Ms. Toomey in
response to this e-mail about Helene's contract?
A.      I do remember reaching out to Mr. Buber
in fiscal to final out where her payment was,
considering that it was $9,200.
Q.      That she was owed because she had worked
outside of her contract, correct?
A.      Yes. Yes, the contract expired I think
in June.
Q.      And any -- to your knowledge, by you or
anyone for the county, any investigation into Ms.
Toomey's statement that Ms. Matascavage had
stressed to her -- Ms. Toomey -- that the working

Page 186

environment is not one that she was wishes to be a
part of?
A.      Heather did come to the HR department.
Q.      Okay.
        Do you know, was that before or after
November 12th?
A.      Before.
Q.      Okay.
        So you had already spoken with her?
A.      Yes.
Q.      Okay.
        And did you -- what did you and Heather
speak about?
A.      She had reached out to me and indicated
that she wanted to discuss her concerns with the
training and the days that she had spent with Ms.
Goodman out on the road.
Q.      Okay.
        She came on her own accord to the HR
office?
A.      Yes.
Q.      All right.
        And what did -- what did she share with
you about those things?

Deposition of Doreen Kutzler                                                    Jane Doe, et al. v. Schuylkill County Courthouse, et al.

Page 187

1  A.      Well, I had asked Mr. Roth to join me in
2  the meeting with Ms. Matascavage.
3  Q.      Okay.
4          Why did you ask Mr. Roth to join you?
5  A.      Because of what she had mentioned to me
6  as to the nature of what she wanted to discuss.
7  Q.      What specifically?
8  A.      The erratic behavior of Ms. Goodman
9  while out on the road for those two days.
10         MS. PIPAK:  Okay.  Just so the
11 record is clear from the county's position, we're
12 allowing her to answer this line of questioning
13 regards the involvement of Glenn Roth in the
14 investigation, to the extent not protected of
15 attorney-client communications.
16         MS. SMITH:  Okay.
17 BY MS. SMITH:
18 Q.      So -- so Ms. Matascavage comes into your
19 office and says something about the erratic
20 driving of Ms. Goodman.  You -- my understanding
21 that you stop the conversation there and then ask
22 Glenn to join you?
23 A.      No.  He -- she had asked to meet with
24 me, we had set a time.  I had asked Glenn if he

Page 188

1  could be there.
2  Q.      So how did you know what the contents of
3  the conversation would be?
4  A.      She had said that she wanted to talk
5  about the days of training that she spent with Ms.
6  Goodman.
7  Q.      This is in an e-mail communication?
8  A.      No.  Verbal.
9  Q.      Okay.
10         So she tells you -- and then -- she
11 tells you she wanted to meet with you regarding
12 erratic driving of Ms. Goodman?
13 A.      Yes.
14 Q.      And you had set a time to meet?
15 A.      Yes.
16 Q.      And you asked Glenn to meet you at that
17 time?
18 A.      Yes.
19 Q.      Okay.  Got it.
20         And so why did you want -- did you want
21 Mr. Roth there specifically or just someone else?
22 A.      Just someone else.
23 Q.      Okay.
24         Because you wanted a witness?

Page 189

1  A.      Yes.
2  Q.      Okay.
3          Because having a witness present to
4  ensure that the -- what actually happened is what
5  is conveyed down the road would be important?
6  A.      Yes.
7  Q.      And was it because it was Ms. Goodman
8  and she had brought litigation against the county?
9  A.      No.
10 Q.      What was -- why then did you feel the
11 need to have a witness?
12 A.      Well, with the -- with -- with Heather
13 raising the concerns and everything that was going
14 on, not necessarily based upon the harassment
15 case, but all of the performance within the tax
16 assessment office, I thought it was important to
17 have Mr. Roth there.
18 Q.      What do you mean the performance in the
19 tax assessment office?
20 A.      Just the fact that there were field
21 appraisers who were being trained and there was
22 not -- the supporting -- not enough staff from the
23 perspective of Ms. Toomey and Ms. Gerchak.
24 Q.      Well, did you think that they were wrong

Page 190

1  that there wasn't enough staff?
2  A.      No.
3  Q.      Okay.
4          So -- but as I understand it, you wanted
5  someone there, it ended up being Defendant Roth,
6  but you wanted someone there to make sure that
7  what was discussed -- what you did and discussed
8  was not misconstrued or manipulated, right?
9  A.      Yes.
10 Q.      Why did you think that Heather
11 Matascavage would misconstrue or manipulate what
12 you said?
13 A.      She had alluded to me that there was
14 some elicit drug use.
15 Q.      When you say alluded, what exactly do
16 you mean?
17 A.      She made the statement that everyone in
18 the courthouse knows that Missy is a meth head.
19 Q.      Why did you think that that meant
20 Ms. Matascavage would manipulate what you
21 discussed with her?
22 A.      Manipulate?
23 Q.      You said the reason you wanted a witness
24 there is because you didn't want anything to be

Page 191

1  manipulated or misconstrued about what --
2  A.     Yes.
3  Q.     -- you discussed?
4  A.     Yes.
5  Q.     So why, just by her saying that there
6  was -- Missy Goodman -- the elicit drug used by
7  Missy Goodman, just by her saying that, why did
8  you think then you needed to have a witness with
9  Ms. Matascavage?
10 A.     So Ms. Goodman is representing the
11 County of Schuylkill when she's out on the road as
12 a field appraiser and Glenn is in charge of the
13 risk management for the county, so I thought it
14 was important for him to hear it from her specific
15 to the risk management liabilities.
16 Q.     So then was it that you wanted a witness
17 there or that you wanted Glenn Roth there
18 specifically?
19 A.     Both.
20 Q.     Did anyone --
21 A.     It -- I -- sorry.
22 Q.     Go ahead.
23 A.     I wanted a witness there and when I
24

Page 192

1  thought about it and realized that there's a
2  liability to the county based upon the fact that
3  she's out on the road representing, they both were
4  out on the road representing the county, I wanted
5  Glenn to hear it directory from her for his record
6  keeping purposes.
7  Q.     So you said when I thought about it.
8  Did you also have discussions with Mr. Bender
9  about it?
10 A.     No.
11 Q.     Okay.
12 So you -- this chain of events, Ms.
13 Matascavage coming in, Ms. Matascavage making
14 these statements about Ms. Goodman, and then
15 setting up this appointment with her with Roth,
16 that all occurred without you having talked to Mr.
17 Bender?
18 A.     Correct.
19 Q.     Okay.
20 And the reason you thought that it
21 should be Roth when you thought about it was
22 because anything that could potentially expose the
23 county to litigation, is something that the risk
24 manager should be involved in?

Page 193

1  A.     Yes.
2  Q.     Because his job is to manage risks to
3  the county, correct?
4  A.     Yes.
5  Q.     Okay.
6  Which would include litigation, correct?
7  A.     Yes.
8  Q.     Okay.
9  So you and Glenn do meet with
10 Ms. Matascavage, correct?
11 A.     Yes.
12 Q.     You guys -- is it an informal
13 conversation, do you take notes, what happens?
14 A.     It's -- yeah.  It is a discussion in the
15 HR office behind closed doors.  I would have
16 scribed some notes.  I think Glenn scribed more
17 notes than I did.
18 Q.     These are handwritten notes?
19 A.     Yes.
20 Q.     Did you put copy of your notes anywhere,
21 like in Ms. Matascavage's personnel file, a
22 specific filing cabinet in the office?
23 A.     No.
24 Q.     What was done with your notes?

Page 194

1  A.     I would have held them in a file folder
2  that I use personally.
3  Q.     That you take from the county?
4  A.     Uh-huh.
5  Q.     Or that you left at the county?
6  A.     That I would take with me.
7  Q.     Do you have a copy of those notes still?
8  A.     I may.
9  Q.     What -- why wouldn't you have retained a
10 copy?
11 A.     I don't make it a practice to do that.
12 Q.     Did anyone at the county instruct you
13 that there was what's called a litigation hold,
14 meaning that anything related to the plaintiff --
15 plaintiffs or their employment with the county was
16 supposed to be retained and preserved?
17 A.     As it related to the case, yes.
18 Q.     Okay.
19 Well, didn't you think --
20         MS. PIPAK:  Objection to the form
21 to the extent that it calls for conversations with
22 attorneys.
23 BY MS. SMITH:
24 Q.     Were you -- you didn't think that

Deposition of Doreen Kutzler                                    Jane Doe, et al. v. Schuylkill County Courthouse, et al.

Page 195

1  accusations that one of the plaintiffs was a drug
2  user and had employment performance issues was
3  related to their employment claims?
4  A.     No.
5  Q.     Okay.
6        When there was an affidavit for
7  Ms. Matascavage that was drafted.  Did that occur
8  contemporaneous with the meeting or at some other
9  time?
10 A.     It was a follow-up to the meeting.
11 Q.     But Glenn didn't sit there and type it
12 or --
13 A.     No.  No.
14 Q.     -- you didn't sit there and type it --
15 A.     No.
16 Q.     -- in the meeting?
17 A.     It was after.
18 Q.     Okay.
19       And Mr. Roth did that, correct?
20 A.     I'm sorry?
21 Q.     Defendant Roth drafted the affidavit?
22 A.     Yes.
23 Q.     Correct?
24       Okay.

Page 196

1        Did look it over at all before it was
2  provided to Ms. Matascavage?
3  A.     No.
4  Q.     So he drafted it.  He gave it to Ms.
5  Matascavage?
6  A.     I gave it to her.
7  Q.     Okay.
8        He gives it to you, you give it to her?
9  A.     In a sealed envelope.
10 Q.     Where were you when you gave it to her?
11 A.     In the HR department.
12 Q.     In your office or just in the..?
13 A.     Yes.
14 Q.     Okay.
15 A.     HR.
16 Q.     You -- same day, different day than the
17 initial meeting?
18 A.     Different day.
19 Q.     Do you know how many days later?
20 A.     I don't remember that.
21 Q.     You asked her to come down to the
22 office?
23 A.     Yes.
24 Q.     She comes down, you give her the

Page 197

1  envelope?
2  A.     Yes.
3  Q.     Do you have her open it there or do you
4  tell her to review this and get back to you?
5  A.     I asked her to review it.
6  Q.     And does she give you back a copy?
7  A.     A signed copy, yes.
8  Q.     Okay.
9        Do you know, was it the same day,
10 different day?
11 A.     I don't remember that.  Might have been
12 the same day.
13 Q.     During any of these meetings with Ms.
14 Matascavage or communications, the first one where
15 she alludes to the drug use, the one where Mr.
16 Roth was present, and the -- the final one that
17 you were just talking about where she gives you
18 back the signed -- or, I guess, the one where you
19 give her the affidavit or the one where she gives
20 it back, do you recall, did you have any
21 discussions with her about the potential for her
22 to transfer back to the tax claim bureau?
23 A.     They had filed a grievance.  She had
24 filed a grievance through AFSCME and I worked with

Page 198

1  the business agent Brenda, I can't remember
2  Brenda's last name, regarding it and we talked
3  through what her options were.  Brenda understood
4  that she was outside of the window to go back into
5  her former position and there was a position in
6  the secretarial pool that was available, which is
7  under the AFSCME contract.  And we encouraged her
8  to apply for that position if she needed to leave
9  the tax assessment office.  She never did apply
10 for the secretarial pool position.
11 Q.     Whose decision -- with whom does the
12 decision lie regarding a transfer back to a
13 department that's outside a window?
14 A.     That's all dictated by the CBA.
15 Q.     So it's just a flat -- if you're outside
16 that window, you can't transfer back?
17 A.     Correct.
18 Q.     Cause if I recall correctly, Ms.
19 Matascavage, there was discussions or
20 communications about the fact that she didn't
21 really actually work, work in the department, she
22 was transferred there, but she did her CPE
23 training.
24 A.     Right.

Page 199

Q.      So she was outside of the building, and so really she couldn't get the full, immersive experience to make a decision --

A.      Okay.

Q.      -- which is what the bargaining agreement spirit was.

Do you recall those conversations?

A.      I was aware that she was in training and they use the title as interim field appraiser. But for all intents and purposes, they're in that new role.

Q.      But they don't receive the pay of the role, correct?

A.      Not to my knowledge.

Q.      Right.

They receive a -- a --

A.      They receive --

Q.      Whatever the --

A.      -- training rate. Yeah, whatever that rate is until they complete the training.

Q.      So they get the benefit or the detriment of less pay and they get the detriment of not being -- being in the position for transfer purposes under the AFSCME?

Page 200

A.      Yes.

Q.      Okay.

And so, again, with whom does -- if an employee filed a grievance and said -- such as Heather and said, look, I was interim and I was in training, so I didn't really know what the job entailed because I wasn't doing the job, I was training.

A.      Sure.

Q.      And let me strike that.

She wasn't even training, she was at CPE classes, right?

A.      I don't know which order they come in.

Q.      Okay.

So if Ms. Matascavage had filed a grievance and said, look, I wasn't even training, I was at CPE classes off-site, at a different building just learning, not doing field work. And now that I've been in the field work position and it's under the 45 days, I think I should be considered within the window because my time in the actual role is 45 days. She had filed that grievance.

With whom does the decision lie whether

Page 201

to allow her to transfer back?

A.      That's the union.

Q.      Okay.

So it's -- her union makes the decision, not the county?

A.      Well, it's -- yeah. We have to administer the contract as written. So the -- the business agent isn't going to take into consideration what amount of time is spent in training as compared to being in the actual role because they're considered being in the role of the field appraiser. However, it's managed internally within the department is how it's managed. But the CBA governs -- the transfer date is October 1st. They have until November 15th in which to move back to their prior position with no repercussions.

Q.      So could someone at the county have said we'll still let her transfer back?

A.      No.

Q.      Okay.

A.      We don't have that authority.

Q.      Okay.

So not even the commissioners or

Page 202

Defendant Bender?

A.      No.

Q.      Did you ever -- do you recall if you ever told Ms. Matascavage you thought you had good news for her regarding her transfer -- regarding any of these meetings?

A.      Yes. As a -- as a resolution, I did. I was hopeful that she would bid through for the secretarial pool because I knew how unhappy she was.

Q.      Do you know, did the secretarial pool come with a pay cut for her?

A.      No. It was a pay increase.

MS. SMITH: We're just going to go off record for a quick five minutes.

VIDEOGRAPHER: The time is now 12:18 p.m. and we're going off the record.

- - -

(Whereupon, a brief recess was held off the record.)

- - -

VIDEOGRAPHER: The time is now 12:26 p.m. and we're back on the record.

MS. SMITH: All right. And I am

Page 203

1  just going to put on the record, my associate Tova
2  joined.  She's just observing.  She's my junior
3  associate, though.
4  BY MS. SMITH:
5  Q.      All right, Ms. Kutzler, going to look at
6  Doe 1127.
7          MS. SMITH:  284 for today's
8  purposes.
9              - - -
10     (Doe 1127 marked as Exhibit-284 for
11 identification.)
12             - - -
13 BY MS. SMITH:
14 Q.      Do you recognize this e-mail?
15 A.      Yes.
16 Q.      Okay.
17         And this is an e-mail from Angela
18 Toomey, also on November 12, 2020, to you and
19 other individuals with the county, including Mr.
20 Bender.  And it includes her report about an
21 interaction or encounter that Ms. Goodman had with
22 Defendant Halcovage.
23         Would you agree?
24 A.      Yes.

Page 204

1  Q.      Okay.
2          Did you ever respond to this e-mail?
3  A.      No.
4  Q.      Okay.
5          Did you ever speak with Ms. Toomey, Ms.
6  Gerchak, or Ms. Goodman about what happened?
7  A.      No.
8  Q.      Did you ever speak with anyone at the
9  county about this e-mail?
10 A.      Mr. Bender.
11 Q.      What was the contents of that
12 conversation?
13 A.      That I had received information from Ms.
14 Toomey regarding this situation that had presented
15 and what could we do, if anything, to have George
16 removed from the building.
17 Q.      What was Mr. Bender's response?
18 A.      That we had discussed that on numerous
19 occasions and while I knew the answer to that, he
20 would yet again go to George and ask him to work
21 from home.
22 Q.      Do you know, did Mr. Bender go to
23 Defendant Halcovage and ask him to work from home,
24 given this?

Page 205

1  A.      Yes.
2  Q.      And what was, if you know, Defendant
3  Halcovage's response?
4  A.      Mr. Bender informed me that he was not
5  agreeable to that.
6  Q.      Did this report to you by Ms. Toomey
7  reinstill your thought that it was appropriate for
8  Ms. Goodman and Ms. Kleckner to work from home?
9  A.      Yes.
10 Q.      Did you contact Ms. Goodman to -- strike
11 that.
12         Does the counsel, to your knowledge,
13 have an employee assistance program or an EAP
14 program?
15 A.      Yes.
16 Q.      Did you contact Ms. Goodman to offer her
17 information about the EAP program?
18 A.      Yes.  That information was provided -- I
19 think it was provided to them back in September
20 when we were going through the contact tracing.
21 And part of my responsibilities initially
22 with the county was to manage the COVID program.
23 So there were press releases and communications
24 that I had sent out to all employees regarding the

Page 206

1  employee assistance program and the assistance
2  that they could provide.
3  Q.      And that -- those communications were
4  specific to COVID, correct?
5  A.      Yes.
6  Q.      Okay.
7          But did you ever reach out to Ms.
8  Goodman in response to this e-mail report and say
9  the EAP can offer you mental health services?
10 A.      Not this communication, that I recall.
11 Q.      Did you ever reach out to Ms. Goodman in
12 regards to any communication about EAP being
13 offered -- being able to offer mental health
14 services?
15 A.      Yes, I do remember.
16 Q.      Okay.
17         When was that?
18 A.      I'm not sure.
19 Q.      Do you remember what it was in response
20 to?
21 A.      Just in general.
22 Q.      Do you know if it was -- well, let's
23 start with this:  Was it during your first stint
24 or your second stint with the county?

Page 207

1  A.    First.
2  Q.    Okay.
3        Do you know, was it in the year 2020?
4  A.    It may have been.  Yeah, it -- it likely
5  would have been in 2020, simply because Ms. Zula
6  came on board January 11th.
7  Q.    Okay.
8        And so you think it would have been
9  before that?
10 A.    Yeah.
11 Q.    Okay.
12 A.    Yeah, it may have been around the time
13 we were trying to get them into the 410 Building.
14 Q.    Do you know, was this communication
15 about EAP's mental health services in writing or
16 in person?
17 A.    To Ms. Goodman directly?
18 Q.    Yeah.
19 A.    It may have been in an -- it may have
20 been in an e-mail.  But we have -- there are
21 pamphlets and business cards with the 1-800 number
22 on it.
23 Q.    Okay.
24 A.    I don't recall ever specifically handing

Page 208

1  her that information.
2  Q.    Okay.
3        Do you recall specifically ever giving
4  that to Ms. Kleckner?
5  A.    No.
6  Q.    Ms. Toomey?
7  A.    No.
8  Q.    Ms. Gerchak?
9  A.    No.
10 Q.    And you never conducted any
11 investigation questioning of Ms. Toomey or Ms.
12 Goodman or Ms. Gerchak about this e-mail report
13 here?
14 A.    No.
15 Q.    Was any type of formal HR report done
16 and placed in Defendant Halcovage's personnel
17 file?
18 A.    No.  It would have just been the
19 discussion that I had with Mr. Bender.
20 Q.    Does the county maintain a personnel
21 file for commissioners?
22 A.    Yes.
23 Q.    Okay.
24        And would you agree that -- well, let's

Page 209

1  start with this?  You would agree that over time,
2  different HR directors and employees come and
3  go --
4  A.    Yes.
5  Q.    -- with the county?
6        Would it be important to memorialize
7  things like this in an individual employee's file
8  so that the next successor in whatever position it
9  may be, would know?
10 A.    So something of this nature or the fact
11 that there was employee assistance program
12 information shared?
13 Q.    Well, let's start with the -- the
14 e-mail, the contents of the e-mail, something such
15 as that?
16 A.    Typically you have access to the e-mail
17 accounts, but they're typically -- it's also
18 prospectively.  So it's not -- you don't look back
19 on what has happened.  You kind of have a starting
20 point and move forward from there.
21 Q.    Right.
22        So if you didn't print this e-mail out
23 and put it somewhere or memorialized it in some
24 sort of writing or document, how would any of your

Page 210

1  successors in the HR department know what had
2  occurred leading up to their employment?
3  A.    It may have just been in a
4  communication, a conversation to say hey, this, is
5  what I've been working on, that kind of knowledge
6  of -- transfer of knowledge.
7  Q.    Right.
8  A.    To say, you know, this is -- we -- we've
9  had issues recently with Mr. Halcovage not
10 remaining in the commissioners' office, so there
11 have been concerns raised a number of times.  We
12 have addressed them with the county administrator
13 and it would have been in that regard.
14 Q.    Okay.
15 A.    More so.
16 Q.    And if -- if it didn't -- if that didn't
17 occur, then there would be no way that the
18 successor would know, right?
19 A.    No.  Correct.
20 Q.    And so even if you did your job and
21 transferred the knowledge appropriately. let's say
22 to your successor, so in your case Heidi Zula, but
23 she didn't transfer it to her successor, that
24 would be -- mean that the information wasn't held

Page 211

1 by your successor's successor, correct?
2 A.      Correct.
3 Q.      All right.
4        MS. PIPAK:  Object to the form.
5 BY MS. SMITH:
6 Q.      So it would be -- would you agree then
7 that that's why there is policies, procedures, and
8 practices within the HR realm of writing things
9 down and creating personnel files?
10 A.      Yes.
11        MS. SMITH:  We are going to look to
12 Doe Supplemental -- I'm sorry.  We're going to
13 look to Exhibit -- previously marked Exhibit-233.
14                --- 
15        (Previously marked Exhibit-233.)
16                --- 
17 BY MS. SMITH:
18 Q.      All right.
19        Do you recognize this e-mail chain, the
20 first two pages?
21 A.      Yes.
22 Q.      Okay.
23        So the first e-mail in the e-mail chain
24 is an e-mail from a Renee Reynolds at PA.gov to

Page 212

1 mainly the commissioners of the county and then
2 some other county employees.
3        Would you agree?
4 A.      Yes.
5 Q.      And the subject is Schuylkill County
6 delinquent STEB sales submission.
7        In it, there's -- Ms. Reynolds addresses
8 the commissioners and basically addresses the
9 issue of the STEB reports being delinquent,
10 correct?
11 A.      Yes.
12 Q.      Okay.
13        Ms. Toomey herself forwarded this that
14 same day to you, as well as other county officials
15 including Mr. Bender, correct?
16 A.      Yes.
17 Q.      She alerts you to the noncompliance
18 letter that the county received, correct?
19 A.      Yes.
20 Q.      And she says:  If there are no plans to
21 take this seriously and work on a resolution so
22 that the county can meet their obligations, I will
23 explain that as necessary.  We have made this
24 request several times and each time our requests

Page 213

1 are discussed.  Mr. Halcovage is being permitted
2 to disrupt county business and interfere with
3 operations of the assessment office.  I believe it
4 would be in everyone's best interest to come up
5 with -- with a solution within ten days, as
6 required by STEB, and before the county is
7 penalized.
8        Did you ever respond to Ms. Toomey's
9 e-mail?
10 A.      No.
11 Q.      Did you discuss Ms. Toomey's e-mail with
12 anyone?
13 A.      Mr. Bender.
14 Q.      And what was Mr. Bender's response?
15 A.      This is a STEB situation, not involving
16 HR, and he would take care of it.
17 Q.      Did you feel or discuss with Mr. Bender
18 that this also involved personnel issues because
19 it was involving an employee's ability to access a
20 building to do their work?
21 A.      I did not perceive it in that way.
22 Q.      Okay.
23        Did you perceive it in a way that it was
24 something that HR should -- should address?

Page 214

1 A.      In normal circumstances, yes.
2 Q.      Okay.
3        Did you tell Mr. Bender that you thought
4 HR should address it?
5 A.      Yes.
6 Q.      And he still said no?
7 A.      Correct.
8 Q.      Did you remind -- during this discussion
9 about this e-mail with Mr. Bender, did you remind
10 him that Ms. Kleckner was responsible for the STEB
11 and she still did not have the necessary equipment
12 to work from home?
13 A.      Yes.
14 Q.      And what was his response to that?
15 A.      I think that's when the decision was
16 made to move them into the 410 Building.  It was
17 around that time.
18 Q.      Okay.
19        And who made that decision?
20 A.      Mr. Bender.
21 Q.      Did -- do you know if he discussed it
22 with anyone else, other than, I guess, telling you
23 that it was occurring?
24 A.      As far as I know, he didn't discuss it

Deposition of Doreen Kutzler                                    Jane Doe, et al. v. Schuylkill County Courthouse, et al.

Page 215

1  with anyone else.
2  Q.      Okay.
3          And that would include Ms. Toomey and
4  Ms. Kleckner?
5  A.      Correct.
6  Q.      The supervisors of the two women who
7  were being put into the 410 Building?
8  A.      Correct.
9  Q.      Did you find that odd or question that
10 at all?
11 A.      No.
12 Q.      Did you think asking Ms. Toomey or Ms.
13 Gerchak if assigning Ms. Kleckner and Ms. Goodman
14 to the 410 Building would help their operations --
15 help the operations of their office.
16         Did you discuss that?
17 A.      I did not.
18 Q.      So you said that you didn't see it as an
19 HR issue being that, as I termed it, a personnel
20 issue with access to the building.
21         How did you see this issue?
22 A.      The noncompliance of the STEB report or
23 the fact that George was still in the building?
24 Q.      So I guess my -- the effect of Ms.

Page 216

1  Kleckner not being able to enter the building
2  having an impact STEB report compliance, how did
3  you view that?
4  A.      While I think that there were challenges
5  with the technology that was being used to
6  complete the STEB reports, after learning more
7  about them, more so in my second tour with the
8  county, it may have taken more time, but it wasn't
9  impossible to complete the work outside of the
10 courthouse.
11 Q.      Do you know what, if any, county
12 programs are utilized to complete the STEB report?
13 A.      I don't.
14 Q.      Do you know -- I am going to ask a
15 question and I am going to assume that you don't
16 because of given your last question, but do you
17 know if Ms. Good -- Ms. Kleckner had access to
18 those -- any county programs needed for STEB
19 report completion in her home in November of 2020?
20 A.      My understanding was yes, she did.
21 Q.      Okay.
22         Do you if those operated optimally on
23 the laptop she had from the county?
24 A.      I understand there were challenges with

Page 217

1  the Govern system that I had mentioned before.  My
2  understanding is that depending upon the size of
3  the screen, the Govern screen comes up much
4  smaller.  So if you're already working on a
5  reduced screen, it's reduced even further, which
6  makes it very difficult to read and navigate
7  through it.
8  Q.      Are you aware of any pause or stay on
9  STEB submissions during COVID time period?
10 A.      No.
11 Q.      So you wouldn't know then what backlog
12 the county had because of that stay or in that
13 time period?
14 A.      No.
15 Q.      Were you aware that Ms. Kleckner and Ms.
16 Goodman were furloughed, meaning they were not
17 permitted to work for a period of time?
18 A.      Yes.
19 Q.      Okay.
20         And did you know that was April -- April
21 2020 to July 2020?
22 A.      I'm not familiar with the time period.
23 Q.      Okay.
24 A.      I just knew they were on furlough.

Page 218

1  Q.      Okay.
2          So would you agree that being on
3  furlough and not being permitted to work may cause
4  someone to come back to a backlog of work?
5  A.      Sure.
6  Q.      If no one was doing their work while
7  they were furloughed?
8  A.      Yes.
9  Q.      Okay.
10         Do you who Joan R. Price is?
11 A.      No.
12 Q.      So you weren't involved in any
13 recommendation or consultation agreement with her?
14 A.      No.
15 Q.      And since you're not aware of her, is it
16 fair to say then that you have no idea what, if
17 any, role she played in evaluating the county's
18 real estate tax assessment procedure?
19 A.      I have no knowledge of that.
20         MS. SMITH:  We're going to look at
21 what's been previously marked as Exhibit-19.
22         - - -
23         (Previously marked Exhibit-19.)
24         - - -

Page 219

BY MS. SMITH:

Q.     Do you recognize this e-mail chain?

A.     Yes.

Q.     Okay.

Sorry, it's a little bit -- some of it is hard to read.  But it is an e-mail chain from -- starting with an e-mail from Ms. Kleckner to you and then you to Ms. Kleckner on November 23, 2020.

Would you agree?

A.     Yes.

Q.     If we look at Ms. Kleckner's e-mail, which it's -- the contents are on the second page, she states:  I'm reaching out to you to see where we are with getting supplies needed for me to work from home.  I received paper, paperclips, and folders a few weeks back.  I am still waiting on a computer and printer.

Any reason to -- to disbelieve that Ms. Kleckner had only received paper, paperclips, and folders?

A.     No.

Q.     Do you know what, if any, use that would be -- use that would be to Ms. Kleckner, those

Page 220

items would be to Ms. Kleckner and her job?

A.     Other than recording, taking it with her if she was going out for any kind of an appraisal or field work that she could record it.

Q.     Would you agree that paper, paperclips, and folders is pretty minimal?

A.     Oh, yeah.

Q.     Okay.

And that the computer and the printer were really the items that Ms. Kleckner needed to work from home?

A.     Yes.

MR. LEES:  Objection to form.

BY MS. SMITH:

Q.     Ms. Kleckner in her next sentence said: I did receive a copy of the letter sent out by the state regarding the sales being submitted and it is instrumental that I get all the supplies requested so I can complete the task.

So meaning -- did you take that to mean the computer and printer were needed for her to complete these STEB reports?

A.     Yes.

Q.     Okay.

Page 221

Ms. Kleckner herself then offers an alternative of allowing her to access her office.

Do you see that?

A.     Uh-huh.

Q.     Is that a yes?

A.     Yes.

Q.     Sorry.  Just --

A.     Sorry.  Yeah.

Q.     And states:  There are certain circumstances that must be met in order for that to happen, which can be discussed in further detail with my attorney.  Please let me know how much longer I'm going to wait so I can upload STEB.

Other than the e-mail response of yours on the next page, did you communicate with Ms. Kleckner at all in regards to this e-mail chain?

A.     No.

Q.     You would agree that Ms. Kleckner's e-mail is, at least for the most part, related to her STEB report completion, right?

A.     It appears, yes.

Q.     Okay.

And -- and you respond to this STEB

Page 222

report e-mail, correct?

MR. LEES:  Objection to the form.

THE WITNESS:  Yes.  Based upon -- based upon the fact that the situation was changing.

BY MS. SMITH:

Q.     Okay.

And was that because Gary Bender had instructed you that this was -- it was permissible for you to respond to?

A.     Well, it was in response to the discussion we had the week before regarding the prior e-mail, as it related to the completion of the STEB reports and the fact that he had made the decision he that would like them to work out of the 410 Building.

Q.     So why if Mr. Bender wanted Ms. Toomey and Ms. Gerchak to figure out the STEB reports and now allow you to respond to their questions or concerns about reasonable accommodations for the plaintiffs as they requested, did he take it upon himself solely -- if you know, solely to make the decision about the 410 Building?

MS. PIPAK:  Object to the form.

Page 223

1  You can answer.
2  THE WITNESS:  Well, in order for
3  the STEB report to be completed and to give
4  them -- his intention was to take their equipment
5  from the tax assessment office and have it moved
6  to the 410 Building, so they would have full
7  access to whatever equipment they had used
8  normally when in the courthouse.
9  Q.  Well, so let me -- let me ask one
10 question about that.  Why couldn't then that
11 equipment be transferred to their homes?
12 A.  No reason not to.
13 Q.  So they could have done everything they
14 did from the 410 Building from their homes?
15 A.  Yes.
16 Q.  And the equipment, instead of waiting
17 for these long delayed supply to be ordered or to
18 be delivered, that were ordered, he could have
19 approved their computers at the county courthouse
20 to be moved to their home offices?
21 A.  To my understanding.  Yeah, to my
22 knowledge.
23 Q.  And so my question though was, you had
24 stated that you felt that Mr. Bender wanted -- or

Page 224

1  told you he wanted Ms. Kleckner -- I'm sorry --
2  Ms. Gerchak and Ms. Toomey to figure out STEB on
3  their own.  That's why he didn't get involved in
4  the earlier e-mail conversations that we looked at
5  regarding their requests for assistance in the
6  STEB reports, correct?
7  A.  Right.
8  Q.  Why then do you -- to your knowledge or
9  understanding, did he then step in when it came to
10 Marcy -- Melissa -- Ms. Goodman and Ms. Kleckner
11 being assigned to the 410 Building?
12 A.  So when -- I don't -- I don't know the
13 exact timing or the dates, but both Ms. Gerchak
14 and Ms. Toomey had requested two weeks of vacation
15 in early November, leading up to the deadline for
16 the STEB reports being filed.  And that was grant
17 by Mr. Bender and then we received the notice --
18 he was aware that the STEB reports were delinquent
19 and the letter was received regarding the
20 delinquency.
21 They didn't -- they ended up not doing
22 the vacation, the two-weeks vacation, and came in.
23 And my understanding is that the two of them are
24 the ones who completed the STEB reports to bring

Page 225

1  them at least current, I think, or at least to a
2  point where we were no -- the county was no longer
3  in delinquency.
4  Q.  Okay.
5  So let me make sure I understand your
6  testimony.
7  So Mr. Bender was aware that the county
8  STEB reports were delinquent?
9  A.  Yes.
10 Q.  Maybe even to the point having received
11 the -- the e-mail correspondence from Renee
12 Reynolds that Ms. Toomey forwarded to you and Mr.
13 Bender, indicating the same, that the STEB reports
14 for the county were delinquent, when he approved
15 Ms. Toomey and Ms. Gerchak, the two department
16 heads, to go on approved, simultaneous vacations?
17 A.  Yes.
18 Q.  And instead of allowing the county to
19 have to figure it out, Ms. Toomey and Ms. Gerchak
20 forgoed going on vacation and came in and
21 completed delinquent -- the delinquent reports to
22 bring the county into compliance?
23 A.  Yes, that's my understand.
24 Q.  And as a result, the county did not

Page 226

1  receive any monetary detriment at -- because of
2  their actions?
3  A.  That would be the expected outcome.
4  Q.  Who did Gary Bender think was going to
5  do the STEB reports if Ms. Kleck -- Ms. Goodman
6  and Ms. Toomey were on vacation?
7  A.  I don't know.
8  Q.  Do you know, did --
9  MS. PIPAK:  Object to the form.
10 Go ahead.
11 BY MS. SMITH:
12 Q.  Do you know, does Mr. Bender hold a CPE
13 license?
14 A.  Not to my knowledge.
15 Q.  Are you aware that the STEB reports
16 require approval to be signed off or final
17 approval with someone with a CPE license?
18 A.  That is my understanding.
19 Q.  Do you know, was there anyone else
20 employed by the county in November of 2020 who had
21 a CPE license, other than Ms. Toomey, Ms. Gerchak,
22 and I believe Ms. Kleckner?
23 A.  Not that I'm aware of.
24 Q.  Is this e-mail response by you on the

Page 227

1 first page of Exhibit-19, the first time you
2 recall communicating with Ms. Kleckner about the
3 office space in the 410 Building?
4 A.     Yes.
5 Q.     Okay.
6       And in that sentence about the 410
7 Building, you reference Melissa Goodman.
8       Did you also communicate around the same
9 time with Melissa Goodman about the change in
10 plans?
11 A.     I don't think so.
12 Q.     Do you recall when you first
13 communicated with Ms. Goodman about her being
14 assigned to the 410 Building?
15 A.     I don't remember that.
16 Q.     But at some point you did communicate
17 that with her?
18 A.     Yes.
19 Q.     Okay.
20       But is it correct that you did not --
21 you simply communicated it with them, you did not
22 ask either Ms. Kleckner or Ms. Goodman if they
23 were comfortable with that?
24 A.     No.

Page 228

1 Q.     No, I'm not correct or no, you didn't?
2 A.     No, I didn't.
3 Q.     Okay.  Thank you.
4       Is there a reason why you didn't ask
5 them if they were comfortable with that?
6 A.     It was a directive I received.
7 Q.     So you basically, correct me if I'm
8 wrong, you were given no option, even if they had
9 said they weren't comfortable with it?
10 A.     Correct.
11 Q.     And that was from Mr. Bender?
12 A.     Yes.
13 Q.     Do you know, was anyone else involved in
14 that decision?
15 A.     No, I'm not aware of anyone else being
16 involved.
17 Q.     In the last sentence of the first
18 paragraph of your e-mail, it states:  In addition,
19 Gary Bender has informed George that if he makes
20 any attempt to gain access into the building, the
21 sheriff will be called and he will be arrested.
22       Is that something Gary Bender told you?
23 A.     Yes.
24 Q.     Okay.

Page 229

1       The 410 Building is a county building,
2 correct?
3 A.     It is.
4 Q.     Why is it, if you know, that Bender --
5 Mr. Bender thought he could have Mr. Halcovage
6 arrested if he was in the 410 Building, but not
7 the courthouse?
8 A.     Well, I did some research with Chief
9 Tobin and it's protection from influence, it's
10 from -- it's intimidating a plaintiff.  I don't
11 remember the specific terminology.
12 Q.     Okay.
13 A.     But Chief Tobin and Sheriff Groody did
14 inform me that with Ms. Kleckner and Ms. Goodman
15 going into the 410 Building, that they could
16 provide some level of protection so that Mr.
17 Halcovage didn't access the building because of
18 this intimidation clause.  I'm not even sure what
19 to --
20 Q.     Okay.
21 A.     -- call it.  So when I received the
22 information and I learned specifically what could
23 happen if George was seen or found in or near or
24 around the 410 Building, they could technically

Page 230

1 arrest him.  So he was provided with a letter to
2 that --
3 Q.     What was --
4 A.     In that regard.
5 Q.     Okay.
6       What was the distinction or difference
7 between Ms. Kleckner and Ms. Goodman entering the
8 410 versus entering the courthouse?
9 A.     Well, the 410 is certainly not as large
10 as the courthouse.  There aren't as many
11 departments in that building, the 410 Building.
12 And it's -- while there's still public access to
13 it, there's public access into, I think, the
14 election bureau and senior services, but senior
15 services is down on the lower level.
16       I don't know that the public access,
17 health and human services or the human services
18 department, which is where Ms. Goodman's office
19 was located, Ms. Kleckner's office was right
20 outside, and then there was mental health and
21 developmental services there and they don't have
22 anyone from the public coming in to that office,
23 to my knowledge.
24 Q.     But did the number of departments in the

Page 231

1  building or the size of the building, to your
2  recollection or knowledge, matter when it came to
3  this witness intimidation clause that you were
4  referencing?
5  A.      No.  But I think that in Mr. Bender's
6  thought process, to -- to have those ladies
7  working somewhere other than the courthouse,
8  because we knew that Mr. Halcovage was going to
9  continue reporting to the courthouse, that he was
10 going to continue reporting to the commissioner's
11 office, and he would be there at least on
12 Wednesdays for the commissioners meetings.  There
13 was -- Gary did mention to me, well, we're either
14 going to put them in the 410 Building or the
15 children and youth building, which is off campus,
16 away from the courthouse, away from where George
17 reports on a daily basis.
18 Q.      The children and youth building is a
19 separate building from the 410 Building?
20 A.      It is.
21 Q.      Where is that located?
22 A.      Across the street from the 410 Building.
23 Q.      Isn't the police department across the
24 street?

Page 232

1  A.      It's -- yeah.  It's the other corner.
2  Q.      Oh, okay.
3  A.      So if 410 is here, the police department
4  is here. children and youth is...
5  Q.      So if you're -- if the 410 is on your
6  left and the police is on your right, if you make
7  a left at the light, it's --
8  A.      It's that --
9  Q.      -- that -- the one on the --
10 A.      -- building, on the corner.
11 Q.      -- right-hand side?
12 A.      On the corner.
13 Q.      Okay.
14         Does that have a parking lot?
15 A.      Yes.
16 Q.      Do you know how many county employees
17 are in that building?
18 A.      In children and youth?
19 Q.      Yes.
20 A.      Over a hundred.
21 Q.      Okay.
22         And I'm sure there's not a hundred
23 parking spots --
24 A.      No.

Page 233

1  Q.      -- for that building?
2          Okay.
3          Did anyone ever ask Ms. Kleckner or Ms.
4  Goodman if they preferred Children and Youth or
5  the other building?
6  A.      No.
7  Q.      The 410 Building, I should say?
8  A.      No.  It was based upon availability of
9  space.
10 Q.      Okay.
11         Again -- but going back to my line of
12 questioning, why if -- if Mr. Bender thought and
13 you thought, based on your research with Groody
14 and Tobin, that you could inform or that Mr.
15 Bender could inform Defendant Halcovage that he
16 would be arrested if he entered a county building
17 because the plaintiffs were to be found there, why
18 if the plaintiffs were to be found in the county
19 courthouse in their offices where they worked,
20 couldn't the same be told to Defendant Halcovage?
21         MR. LEES:  Just note my objection
22 to the form.  I think -- I don't think you -- I
23 think you mischaracterized what the witness said.
24         But you can answer.

Page 234

1  BY MS. SMITH:
2  Q.      I might -- so, I guess, let's clarify
3  then.
4          Am I missing what you said?
5          Like, Mr. -- let's start -- let's take
6  it piece by piece.
7  A.      Okay.
8  Q.      Mr. Bender informed in writing,
9  Defendant Halcovage that if he entered the 410
10 Building he would be arrested, correct?
11 A.      I informed him in writing.
12 Q.      Oh, okay.  So then I got that wrong.
13         And you did so at the instruction of Mr.
14 Bender?
15 A.      Yes.
16 Q.      Okay.
17         And this instruction that -- of Mr.
18 Bender and your writing to Mr. -- Defendant
19 Halcovage, correct me if I'm wrong, was a kind of
20 compilation of your research and your discussions
21 with Mr. -- with Tobin and Groody and discussions
22 with Bender?
23 A.      Yes.
24 Q.      Okay.

Page 235

And you kind of collectively said, this is what I found and he said okay, this is what we'll do?

A.    It didn't even go that far.  I made the suggestion to Gary.  I said, is there anyway that we can prevent George from entering that building.  And he said, you would have to talk to the sheriff's department.  So I had a conversation with Chief Tobin, Sheriff Groody, and they informed me of this undue influence clause that would allow them to arrest George.

Q.    Okay.

Because the plaintiffs were in the building?

A.    Correct.

Q.    Like, working there?

A.    Correct.

Q.    So was then there any conversations that you had with anyone, Bender, Tobin, Groody, anyone at the county, where you said, if we can do that in the 410 Building, why can't we allow the plaintiffs to work from their offices in the county courthouse and tell him he can't come in for that reason, in the courthouse, him being

Page 236

Defendant Halcovage?

A.    I don't have an answer for that.

Q.    Did you have those conversations?

A.    No.

Q.    Okay.

Is there any distinction with a difference between the 410 Building and the courthouse, as it relates to what you researched and discussed with Tobin and Groody regarding that witness intimidation clause?

MS. PIPAK:  I am going to object to the form.

But you can answer.

THE WITNESS:  I -- for the most part, Mr. Halcovage doesn't have any reason to be in the 410 Building, unless he wants to go and chitchat with somebody, which he was known to do.

BY MS. SMITH:

Q.    So it was somewhat of a -- I don't want to -- I don't want to say cop out, but it was somewhat of a convenience thing for the county to be like, if -- we know we'll get pushback from George if we try and exclude him from the courthouse, but we probably can get him to agree

Page 237

not to go to the 410 Building?

A.    Maybe.

Q.    Okay.

A.    I don't know that he necessarily agreed.  He pushed back.

Q.    So even after Ms. Goodman and Ms. Kleckner were assigned to the 410 Building and he was informed he wasn't to go there, he pushed back?

A.    Oh, he argued with Mr. Bender that he could go anywhere that was a county building.

Q.    Had you ever seen Defendant Halcovage conduct any business in the 410 Building prior to that argument?

A.    No.

Q.    Did you find Mr. Halcovage's response to be -- actually, strike that.

How -- what -- how did you take Mr. Halcovage's response?

A.    That he could do whatever he wanted whenever he wanted to whoever he wanted.

Q.    Do you think that employees of the county thought that that's how he acted, Defendant Halcovage, that he could do whatever he wanted to

Page 238

whomever he wanted whenever he wanted?

A.    Yes.  Yes.

VIDEOGRAPHER:  Catherine, it's about 1:00.  Do you want to take lunch?

MS. SMITH:  Yeah.  Let me just finish up this exhibit and then we'll be probably here until maybe five more minutes.

BY MS. SMITH:

Q.    If you look at the sentence prior to the one we were just looking at, it says:  Please note that this is a secure building in which Mr. Halcovage does not having access into.

That was actually inaccurate, correct?

A.    It's inaccurate in the fact that it's a public building, but his badge didn't work at the 410 Building.  So any of the secure doors he wouldn't be able to enter through.

Q.    But as you stated earlier, the election bureau is in that, so the front door to that building on Second Street, I believe it is, is -- does not require keycard access, correct?

A.    Correct.

Q.    And Ms. Kleckner's office was directly accessible in that hallway, correct?

Page 239

1  A.      Yes.
2  Q.      So if her door was open, Mr. Halcovage
3  could have entered that building and walked right
4  into her office?
5  A.      Yes.
6  Q.      Ms. Goodman's was behind -- within
7  another department, behind another keycard door,
8  correct?
9  A.      Yes.
10 Q.      And that required keycard access?
11 A.      Yes.
12 Q.      Do you know, was Mr. -- Defendant
13 Halcovage's keycard specifically disabled for that
14 keycard --
15 A.      Yes.
16 Q.      -- pass?
17         Okay.
18 A.      And the reason I know that is because
19 Ann Kraft in the HR department manages the badge
20 access.
21 Q.      Okay.
22         Do you who made the decision to put
23 Marcy -- Ms. Kleckner in one of those and Ms.
24 Goodman in the another?

Page 240

1  A.      I -- no.
2  Q.      Okay.
3          But they were told which was whose,
4  right?
5  A.      Yes.
6  Q.      They didn't get to select?
7  A.      No.
8  Q.      Okay.
9  A.      Yeah, I'm not sure why that was.
10 Q.      Were there more than -- was there more
11 than one open office in -- in that department
12 where Ms. Goodman's office was located?
13 A.      I know there was a -- there was a door
14 across from Ms. Goodman's office.  I don't
15 remember what was in there.
16 Q.      And -- but do you know if it was empty?
17 Could Ms. Good -- or Kleckner been assigned to
18 that office?
19 A.      I don't think it was occupied.
20 Q.      So Ms. Kleckner could have been assigned
21 there?
22 A.      Yes.
23 Q.      Behind a keycard pad door?
24 A.      Yes.

Page 241

1  Q.      Any reason why that one wasn't selected?
2  A.      I don't know.
3  Q.      Okay.
4          I mean, to me what makes sense, and
5  correct me if I am wrong, is putting both of them
6  behind a keycard door would have been more secure
7  for them?
8  A.      Yes.
9  Q.      And even if you didn't --
10         MS. PIPAK:  Object -- I was going
11 to object to the form there.  I just want it noted
12 for the record.
13 BY MS. SMITH:
14 Q.      I mean, even if you didn't have room to
15 put them both back there, to me, and correct me if
16 I am wrong or you disagree, putting Ms. Goodman in
17 the hallway one would have made more sense because
18 she was predominantly out in the field and not in
19 a building, where Ms. Kleckner mostly worked from
20 the building?
21 A.      Yes.
22 Q.      And the 410 Building, unlike -- sorry --
23 the county courthouse, unlike the 410 Building,
24 has sheriff presence and metal detectors?

Page 242

1  A.      Yes.
2  Q.      There was no sheriff and no metal
3  detectors in the 410 Building?
4  A.      Correct.
5  Q.      Sorry.  Going back to the first sentence
6  in this e-mail --
7  A.      Uh-huh.
8  Q.      -- response of yours.  It says there's a
9  change in plans so we can provide you with the
10 necessary support and technology for you in
11 completing the tasks for the STEB filing.
12         That was your understanding of why the
13 decision was made to switch from this work from
14 home potential to the 410 Building, correct?
15 A.      Yes.
16 Q.      STEB report was not Ms. Goodman's job
17 responsibility, was it?
18 A.      No.
19 Q.      Why then was her work from home
20 agreement revoked at the same time?
21 A.      I don't know the answer to that.
22 Q.      In the second paragraph of your e-mail
23 it talks about the anticipated, or what was at
24 that point, anticipated date of -- for occupancy

Page 243

1  for Ms. Kleckner and Ms. Goodman of November 30,
2  2020, correct?
3  A.      Yes.
4  Q.      That didn't actually happen, did it?
5  A.      No.
6  Q.      Do you recall what delayed it?
7  A.      Yeah.  I had reached out to SERVPRO to
8  have the offices cleaned by one of their
9  technicians and they're -- the first day the
10 technician didn't show up and then I worked with
11 the regional manager to have a second technician
12 dispatched.  Again, that person did not show up.
13 They were having employment issues, recruiting
14 issues because of COVID.  And they eventually
15 never did fulfill the contract in coming to clean
16 those offices.
17 Q.      SERVPRO never cleaned the offices?
18 A.      No.
19 Q.      Okay.
20        So it's fair to say then that the
21 initial -- first initial delays of Ms. Kleckner
22 and Ms. Goodman going to their offices was not
23 anything caused by them?
24 A.      No.

Page 244

1  Q.      Okay.
2         Was it your decision to have someone
3  come out and clean the offices or were your
4  instructed to do so?
5  A.      It was my decision simply because of the
6  condition that the offices were in.
7  Q.      You personally observed the offices
8  prior to Ms. Goodman and Ms. Kleckner observing
9  them?
10 A.      I did.
11 Q.      And they were in pretty bad condition,
12 were they not?
13 A.      Yes.
14 Q.      Okay.
15        And so you decided to have -- to obtain
16 a cleaning company to come clean them?
17 A.      Yes.
18 Q.      The county has cleaning contracts with
19 different entities, right?
20 A.      Yes.
21 Q.      Why did you -- was SERVPRO one of the
22 contractors?
23 A.      No.
24 Q.      Okay.

Page 245

1         Why did you decide to utilize a company
2  outside of the contractors the county uses?
3  A.      Based upon their COVID protocols.
4  Q.      SERVEPRO's COVID protocols?
5  A.      Yes.
6  Q.      Okay.
7         So you felt that the cleaning companies
8  with whom the county contracted weren't sufficient
9  during COVID time?
10 A.      Not that they weren't sufficient, but
11 they -- there were more things that SERVPRO would
12 do in regards to responding to the cleaning of an
13 office.
14 Q.      Okay.
15        And when SERVPRO didn't show up, what
16 happened with the cleaning of the offices?
17 A.      I cleaned them and the maintenance
18 department cleaned them.
19 Q.      Do you recall when that was?
20 A.      Sometime in September.  And they worked
21 with Stan Nester to have equipment removed from
22 the office that Ms. Goodman occupied.  They were
23 using it as a storage room.
24 Q.      The -- the removal of the office

Page 246

1  equipment didn't happen though before Ms. Goodman
2  took --
3  A.      No.
4  Q.      -- possession, right?
5  A.      No.  It was kind of right at the same
6  time that Stan finally got -- I kicked him in
7  the...
8  Q.      But you would say that the cleaning that
9  you did of the offices occurred before Ms. Goodman
10 and Ms. Kleckner --
11 A.      Yes.
12 Q.      -- took possession of the keys?
13 A.      Yes.
14 Q.      Okay.
15        And that was with you, Stan Nester, did
16 the cleaning?
17 A.      No.
18 Q.      Who else did cleaning with you?
19 A.      The maintenance department.
20 Q.      Do you remember who?
21 A.      I don't.
22 Q.      Okay.
23        Was it more than one person?
24 A.      It was two, two -- two --

Deposition of Doreen Kutzler                              Jane Doe, et al. v. Schuylkill County Courthouse, et al.

Page 247

1  Q.     Males?
2  A.     -- maintenance guys?  Yeah.  You know
3  how well men clean.
4  Q.     I plead the fifth or my fiance won't be
5  happy.
6         MS. SMITH:  All right.  I think we
7  can get to the next stuff after lunch, so we'll
8  take a quick break, a longer break.
9         VIDEOGRAPHER:  The time is now
10 1:09 p.m. and we're going off the record.
11                    - - -
12        (Whereupon, luncheon recess held off the
13 record.)
14                    - - -
15        VIDEOGRAPHER:  The time is now
16 1:42 p.m. and we're back on the record.
17 BY MS. SMITH:
18 Q.     All right.  Ms. Kutzler, so before lunch
19 we were just talking about the kind of change in
20 plans from work from home to the 410 Building for
21 Ms. Goodman and Ms. Kleckner.
22        In your training and experience, and I
23 guess more specifically as it relates to the
24 county, as you aware of any policies, procedures,

Page 248

1  or practices regarding communication of employee
2  personnel issues and the confidentiality thereof?
3  A.     There is a personnel policy that speaks
4  to the need or the ability to report concerns to
5  HR.
6  Q.     Okay.
7         If you, as HR director, were
8  communicating employee-related personnel matters
9  regarding a specific employee, is it your
10 understanding that the county's policies of
11 that -- unless it's with like their direct
12 supervisors or someone up the chain of command in
13 their supervisory authority, that you shouldn't
14 discuss one employee's personnel issues with
15 another?
16 A.     Correct.
17 Q.     Okay.
18        So if we look back to 19, which is in
19 front of you, Exhibit-19, you're e-mailing Ms.
20 Kleckner and Ms. Toomey, her supervisor in this
21 e-mail, but you mention Melissa Goodman as well.
22 Do you see that?
23 A.     Yes.
24 Q.     Why did you feel it was appropriate to

Page 249

1  reference Ms. Goodman in an e-mail to Ms.
2  Kleckner?
3  A.     Just so that Ms. Kleckner would be aware
4  that Ms. Goodman will be in the 410 Building as
5  well.
6  Q.     Did you ask Ms. Goodman if she was okay
7  with Ms. Kleckner knowing that?
8  A.     No.  No.
9  Q.     Okay.
10        And, in fact, when it related to the 410
11 Building and their assignment there, was it your
12 understanding that it was supposed to be kept as
13 confidential as possible so that they felt safe
14 and secure there?
15 A.     There was never a question about
16 confidentiality.
17 Q.     As it relates to the 410 Building, there
18 is a parking lot for that building, correct?
19 A.     Yes.
20 Q.     Okay.
21        And as it relates to the courthouse,
22 there's multiple parking lots for that building,
23 correct?
24 A.     Yes.

Page 250

1  Q.     And my understanding is that in this
2  time frame, the end of 2020, there was plenty of
3  parking spaces at the courthouse that Ms. Kleckner
4  and Ms. Goodman were able to utilize a parking
5  space for that -- when they were still going to
6  the courthouse, correct?
7  A.     That's my understanding, yes.
8  Q.     Okay.
9         They weren't assigned parking spaces,
10 though?
11 A.     Not to my knowledge.
12 Q.     Okay.
13        But there was sufficient parking --
14 actually, I should strike that.
15        There was two parking lots for the
16 courthouse, plus the overflow lot?
17 A.     Yes.
18 Q.     And none of those were paid parking?
19 A.     Correct.
20 Q.     And so it was -- there would be
21 sufficient space for Ms. Kleckner or Ms. Goodman
22 to park at the courthouse without having to pay
23 for it?
24 A.     Yes.

Page 251

1  Q.      Okay.
2         The 410 Building was not the same
3  circumstances; is that correct?
4  A.      Much smaller parking lot?
5  Q.      And much smaller in comparison to the
6  number of employees assigned to the building; is
7  that correct?
8  A.      Yes.
9  Q.      There was no overflow lot for that
10 building, correct?
11 A.      The only overflow that I was aware of
12 was the parking garage, but I don't know if that
13 was free.
14 Q.      Okay.
15        Then the only other option for those
16 employees would be then -- 410 Building employees
17 would be to park on the street, correct?
18 A.      Yes.
19 Q.      And that was metered, paid parking,
20 correct?
21 A.      To -- to -- yeah.  To my knowledge all
22 of that is metered.
23 Q.      Okay.
24        And the meter -- metered lots would not

Page 252

1  be something that the county would reimburse an
2  employee for, correct?
3  A.      No.
4  Q.      Did you have any discussions regarding
5  parking for Ms. Goodman or Ms. Kleckner when the
6  410 Building came into play?
7  A.      No.
8  Q.      Did anybody -- so you just didn't have
9  any conversations regarding it?
10 A.      Correct.
11 Q.      Okay.
12        The -- and just so the record is kind of
13 clear, as much as we can, as to how the kind of
14 geographical layout is.  The courthouse sits
15 higher up, up a hill than the 410 Building,
16 correct?
17 A.      Yes.
18 Q.      Probably, in my estimate, I think like
19 half a mile walk from the courthouse parking lot?
20 A.      Two blocks.
21 Q.      Two blocks.
22        So maybe even more than half a mile, if
23 you were to park in -- strike that.
24        The overflow lot that we were talking

Page 253

1  about and the main lot, the non-commissioners lot
2  or the upper lot for the courthouse, those are
3  just across a street from reach other, right?
4  A.      The overflow -- yeah.  The overflow is
5  next to the prison and then the main employee
6  parking lot is adjacent to the main entrance.
7  Q.      Right.
8         And they are just across one street?
9  A.      Yes.
10 Q.      One on either side of the street?
11 A.      Yes.
12 Q.      And both of those then are about a half
13 a block -- or I'm sorry -- about two blocks from
14 the 410 Building entrance?
15 A.      From where they're situated, it's
16 probably closer to 3 blocks.
17 Q.      Okay.
18        So whatever a block distance is in
19 Schuylkill County, would be the physical distance
20 of those two?
21 A.      Yes.
22 Q.      So not exactly, would you agree, an
23 ideal location for someone to park who works in
24 the 410 Building?

Page 254

1  A.      To expect someone to park up at the
2  courthouse and walk down to the 410 Building?
3  Yeah, it's not reasonable.
4  Q.      Okay.
5         So it's not like Ms. Kleckner and Ms.
6  Goodman should have been -- in your opinion,
7  should have been expected to park there in the
8  courthouse parking lot and walk to the --
9  A.      Not on a daily basis.
10 Q.      Okay.
11        Did you or do you now believe that
12 relocating the individuals, Ms. Kleckner and Ms.
13 Goodman, who had reported and opposed Defendant --
14 Defendant Halcovage's unlawful conduct to the 410
15 Building, was retaliatory?
16 A.      No.
17        MS. PIPAK:  Objection to the form.
18        You can answer.
19 BY MS. SMITH:
20 Q.      Do you think it was fair that the
21 victims, even by the county's own opinion -- well,
22 strike that.
23        Do you think the county's opinion was
24 that they were victims, Ms. Kleckner and Ms.

Case 3:21-cv-00477-MCC   Document 280-2   Filed 09/20/23   Page 70 of 373

Deposition of Doreen Kutzler                                    Jane Doe, et al. v. Schuylkill County Courthouse, et al.

Page 255

1  Goodman?
2  A.      Yes.
3  Q.      And so even -- do you think it was fair
4  that the victims had to relocate their workspace,
5  as opposed to the perpetrator?
6          MR. LEES:  Just note my objection
7  to the form.
8          MS. PIPAK:  Objection to form.
9          MR. LEES:  You can answer.
10         THE WITNESS:  No.
11 BY MS. SMITH:
12 Q.      Did each person in the tax assessment
13 office have their own printer?
14 A.      I don't know the answer to that.
15 Q.      Okay.
16         So when you were talking about
17 relocating some of the equipment, computer and
18 whatnot, from the tax assessment office to the 410
19 Building, was there discussion about a printer
20 also being relocated?
21 A.      I think there was a printer that was
22 being moved from tax assessment to 410.  They both
23 ended up with their own printer because of their
24 offices being in -- in different proximity.

Page 256

1  Q.      Okay.
2          So there's -- fair to say then that
3  there was printers available for Ms. Goodman and
4  Ms. Kleckner's individual use?
5  A.      Yes, because I think Stan had ended up
6  ordering printers for them with the expectation
7  that they would be set up at their homes and then
8  sent up at the 410 Building.
9  Q.      Okay.
10         So originally we had discussed that the
11 date was supposed to be November 30th, but then
12 there was the SERVPRO issues.
13         And do you recall when the -- strike
14 that.
15         There was a day eventually that you met
16 with Ms. Kleckner and Ms. Goodman in person to
17 give them the keys to the offices, correct?
18 A.      Yes.
19 Q.      Do you recall when that was?
20 A.      I do not.
21 Q.      Okay.
22         Do you recall there being an issue
23 regarding Mr. Bender being the one that was
24 originally going to give them their keys?

Page 257

1  A.      Yeah.
2  Q.      Okay.
3  A.      I'm the one that had mentioned that.
4  Q.      Okay.
5  A.      So that was my mistake in indicating
6  that Mr. Bender would be providing them with their
7  keys --
8  Q.      Well, did --
9  A.      -- to me.
10 Q.      Did Mr. Bender tell you he was going to
11 give them their keys?
12 A.      No.
13 Q.      Okay.
14         You just thought that he was going to be
15 the one?
16 A.      Yes.
17 Q.      All right.
18 A.      Because of him having oversight to the
19 maintenance department and the maintenance
20 department is who had the keys cut.  So I was
21 under the impression that they would give the keys
22 to him, he would then, in turn, turn them over to
23 Ms. Kleckner and Goodman.
24 Q.      Okay.

Page 258

1          And do you recall then Ms. Toomey
2  telling you that they were uncomfortable with
3  that?
4  A.      Yes.
5  Q.      All right.
6          And that was then addressed and changed
7  and you met Ms. Goodman, Kleckner, Ms. Toomey, and
8  Ms. Gerchak at the 410 Building --
9  A.      Yes.
10 Q.      -- on a specific day?
11 A.      Yes.
12 Q.      Okay.
13         Does September 8th sound about right?
14 A.      Probably.
15 Q.      Okay.
16         Do you recall if around that time,
17 either just shortly there before or at that
18 meeting where you gave them their keys, did any of
19 the four plaintiffs raise issues or concerns
20 related to parking at the 410 Building with you?
21 A.      They asked if there would be assigned
22 parking spaces.  And Mr. Bender manages all of the
23 spaces for the buildings in the county, so I told
24 them that I would check with him.

Page 259

Q.     So it's your understanding that Mr.
Bender manages the spaces of the 410 Building, as
well as the courthouse?
A.     410 Building, courthouse, the 911
center.  I don't think he -- I don't think he gets
involved in the prison parking because that's --
they kind of do their own thing.
Q.     Okay.
       Did you have that conversation with Mr.
Bender about --
A.     About parking?
Q.     Seeing if there was parking?
A.     No.
Q.     Why not?  I thought you just said that
you told -- the plaintiffs raised concerns and you
said you would speak with Mr. Bender?
A.     Oh, yeah.  Well, with having spaces
assigned and he indicated that there weren't any
spaces to assign because the lot was full.
Q.     Okay.
       Was there -- were there any further
conversations then?
A.     No.
Q.     Were there any then conversations to say

Page 260

maybe the 410 Building isn't an ideal location for
these individuals?
A.     No.
Q.     Were there concerns about the plaintiffs
having to walk further for their work -- so
specifically Ms. Goodman and Ms. Kleckner having
to walk farther for their work locations and
exposing them to potentially running into
Defendant Halcovage?
A.     No.
       MS. SMITH:  All right.  We're going
to look at Doe 1137.  It will be 285.  It's 1137
through 1140.
                    - - -
       (Doe 1137 marked as Exhibit-285 for
identification.)
                    - - -
BY MS. SMITH:
Q.     So we're going to look on the last page,
start chronologically from the last page.
       It's dated September 7, 2020, and it's
an e-mail from Ms. Toomey to you, as well as other
individuals, including Mr. Bender, regarding the
410.  And it indicates that Marcy and Missy will

Page 261

begin working from the office in the 410 Building
tomorrow morning as the county directed.
       So does that refresh your rec -- refresh
your recollection as to kind of when that -- the
cleaning issues were resolved and it was ready for
occupancy?
A.     Yes.
Q.     Okay.
       Ms. Toomey requests on behalf of her and
Ms. Kleckner and Ms. Goodman that Joseph Groody or
Brian Tobin be present to address any concerns
that Marcy and Melissa may have regarding their
safety while working from that space.  Were
Sheriff Joseph -- were Sheriff Groody or Brian
Tobin present when you exchanged the keys?
A.     Sheriff Tobin or Chief Tobin.
Q.     Do you recall any of the individuals
present, so the plaintiffs, having raised any
questions or concerns to Chief Tobin?
A.     No, not that I recall.
Q.     But that is -- eventually when the
meeting did happen, that's when their question
about parking was raised, as is indicated in this
e-mail?

Page 262

A.     Yes.
Q.     If we turn two pages prior to that,
there's an e-mail on -- from me to Thomas Heinbach
on December 7th.
A.     Uh-huh.
Q.     Do you know who Mr. Heinbach is?
A.     He's counsel for the county.
Q.     Okay.
       And in response to my e-mail, Thomas
Heinbach responds, Ms. Kutzler has been in contact
with Angela Toomey and advises that -- to advise
that Ms. Kutzler will be there tomorrow morning
rather than Mr. Bender.
       I believe she copied you on the e-mail?
A.     Yes.
Q.     Did you understand from Mr. Heinbach
that I had reached out to him regarding the issue
concerning Ms. Toomey, Ms. Kleckner, Ms. Goodman
meeting with Mr. Bender?
A.     Yes.
       MS. PIPAK:  Objection.  Again,
that's attorney-client privilege.
       MS. SMITH:  Your -- counsel for the
county produced -- sent this e-mail to me, it's

Deposition of Doreen Kutzler                           Jane Doe, et al. v. Schuylkill County Courthouse, et al.

Page 263

1  not privileged.
2          MS. PIPAK:  Right.  No, but you're
3  asking about Doreen's conversations with Tom
4  Heinbach.  That's privileged.  You can't ask her
5  those conversations.
6  BY MS. SMITH:
7  Q.      Anyway, Ms. Kutzler, so --
8          MS. PIPAK:  You can ask her about
9  your e-mail --
10 BY MS. SMITH
11 Q.      Did you --
12         MS. PIPAK:  -- but not the
13 conversation she had with Tom Heinbach.
14         MS. SMITH:  Okay.
15 BY MS. SMITH:
16 Q.      Anyway, Ms. Kutzler, did you understand
17 that I had reached out -- were you informed that I
18 had reached out to Mr. Heinbach?
19 A.      Yes.
20         MS. PIPAK:  Objection to the extent
21 it calls for conversations with counsel.
22 BY MS. SMITH:
23 Q.      And did you understand that there had
24 been an agreement by myself and Mr. Scott related

Page 264

1  to the plaintiffs that they didn't have to
2  communicate with Mr. Bender directly?
3          MS. PIPAK:  Objection.  You can
4  answer to the extent -- Doreen, I'm going to ask
5  you to wait for me to form my objections before
6  you answer these questions.
7          MS. SMITH:  She didn't say
8  anything.
9          MS. PIPAK:  She -- I'm not yelling
10 at her, I am just asking her to --
11         MS. SMITH:  Okay.  Well, you can --
12 I am going to -- for her sake, I'm going to ask
13 you to take your tone down because she didn't say
14 anything.
15         MS. PIPAK:  Honestly, I am just
16 trying to be heard because you said you couldn't
17 hear me before, I am just trying to talk loud.
18 Really, that's all I'm trying to do here.
19         Could you ask that question again?
20 BY MS. SMITH:
21 Q.      Were you ever informed that there was an
22 agreement that was entered into that my clients
23 did not have to have direct access --
24 communication with Mr. Bender?

Page 265

1          MS. PIPAK:  And I'm going to object
2  to that and direct the witness not to answer to
3  the extent it involves -- the answer would involve
4  communications with counsel.
5  BY MS. SMITH:
6  Q.      Did you speak with Mr. Bender, Ms.
7  Kutzler, about whether the plaintiffs were
8  supposed to interact with him, other than through
9  e-mail?
10 A.      Yes.
11 Q.      Okay.
12         And did Mr. Bender tell you that there
13 was an agreement that the plaintiffs only were to
14 communicate with him through e-mail?
15 A.      Yes.
16 Q.      Okay.
17         And it was because of that you then
18 understood why the plaintiffs didn't meet -- want
19 to meet with Mr. Bender for the keys?
20 A.      Yes.
21 Q.      Okay.
22         And that's why you changed the -- or the
23 decision and you met with them?
24 A.      Yes.

Page 266

1  Q.      Okay.
2          And if you look at the first page,
3  it's -- it's my e-mail to counsel stating:  Given
4  this late hour, I already informed my clients that
5  they should wait to report to the 410 Building.
6          Does this refresh your recollection as
7  to whether then it was the next day, given the
8  kind of issues with who was going to met with
9  them, that they actually met you?
10 A.      Yes.
11 Q.      Okay.
12         So it was December 8, 2012, that you met
13 with them?
14 A.      Yes.
15 Q.      Okay.  Perfect.  Thank you.
16         So at the time you made the decision to
17 have Mr. Bender meet with the plaintiffs, did you
18 know he was a named respondent in the EEOC charge?
19 A.      Yes.
20 Q.      Okay.
21         But you didn't think that was a concern
22 to have a named respondent meet with the alleged
23 victims?
24 A.      It was just an oversight on my part.

Page 267

1 Q.    Okay.  That's fine.
2      Did Mr. Bender seem to take any issue
3 with the fact that it got pushed off a day that
4 they reported to -- that Ms. Kleckner and Ms.
5 Goodman reported to this building?
6 A.    No.
7 Q.    What would you say the state of Ms.
8 Kleckner and Ms. Goodman's offices were in at the
9 time that they took the keys, so December 8, 2020?
10 A.    Fair.
11 Q.    Did you go into the offices with Ms.
12 Kleckner and Ms. Goodman that day?
13 A.    Yes.
14 Q.    And did Ms. Goodman point out a number
15 of concerns she had with her office's esthetics
16 and condition?
17 A.    She did.
18 Q.    Were there -- did she point out mouse or
19 rat droppings?
20 A.    I don't remember her pointing that out.
21 I do remember the ceiling tile had water damage.
22 Q.    Was it just water damage or was there
23 still water dripping from it at that point?
24 A.    I don't recall water dripping.

Page 268

1 Q.    Okay.
2      But it definitely was --
3 A.    Oh, yeah.
4 Q.    -- water stained?
5 A.    It was definitely -- it was definitely
6 water stained.
7 Q.    Anyone ever, to your knowledge, up until
8 December 8th, remove those tiles to see if there
9 was mold in them?
10 A.    No.
11 Q.    Do you remember there being a cookie or
12 a cupcake in a heater vent?
13 A.    No.
14 Q.    Okay.
15      There was a number of computer CPU
16 towers that were taking up a lot of the office
17 space, correct?
18 A.    Yes.
19 Q.    And the only file cabinet in the office
20 was completely full, correct?
21 A.    To my knowledge, yes.
22 Q.    And the sole closet in the office, and I
23 am just referring to Ms. Goodman's office for now,
24 just for the record.

Page 269

1      The sole closet was completely full with
2 items, correct?
3 A.    It may have been.
4 Q.    Their -- Ms. Goodman and Ms. Kleckner's
5 computers had been transferred to those offices at
6 that point, correct?
7 A.    Yes.
8 Q.    Okay.
9      Do you know if the printers were there
10 at that point?
11 A.    No.
12 Q.    The print -- so they were not there?
13 A.    They were not.
14 Q.    Okay.
15      Did you know or were you informed that
16 in the assessment office, Ms. Kleckner and Ms. --
17 and/or Ms. Goodman, I can't remember if it was
18 both, one or if not both of them, had dual
19 monitors and they did not in the 410 Building?
20 A.    I don't know what they had in the tax
21 assessment building.
22 Q.    Okay.
23 A.    Or office of the courthouse.
24 Q.    Do you know how long after December 8th

Page 270

1 they were -- Ms. Goodman and Ms. Kleckner were
2 provided printers in that office in the 410
3 Building?
4 A.    It was likely not until after the 1st of
5 the year, just prior to their occupation of the
6 offices.
7 Q.    So they didn't actually beginning
8 working in the 410 Building then in December?
9 A.    No.
10 Q.    Okay.
11      Why not?
12 A.    There were still concerns around the
13 cleanliness of the office.  So we had maintenance
14 go back in.  That's when Mr. Nester finally
15 removed all of the IT equipment and files.
16 Q.    So then --
17 A.    And then -- sorry.
18 Q.    No, go ahead.
19 A.    And then he would have -- did he -- I
20 don't remember if he set up the printers at that
21 point in time because this was done -- I think it
22 was done between Christmas and New Years.
23 Q.    So then would you say that the county
24 approved Ms. Goodman and Ms. Kleckner to continue

Page 271

1  to work from home between December 8th and then
2  whenever they did take possession of the office?
3  A.      Yes.
4  Q.      All right.
5          But, again, they still -- Ms. Goodman
6  and Ms. Kleckner still did not have laptops,
7  computers, printers at home to work from, correct?
8  A.      Correct.
9  Q.      Did you believe that their concerns --
10 Ms. Kleckner and Ms. Goodman's concerns with their
11 office conditions were justified?
12 A.      Yes.
13 Q.      Was SERV -- did SERVPRO come out during
14 that time period?
15 A.      No.
16 Q.      Was there any additional cleaning done?
17 A.      Yes.
18 Q.      Is that during the time when you cleaned
19 it?
20 A.      After I cleaned it.
21 Q.      So before December 8th you did not clean
22 it?
23 A.      No.
24 Q.      It was after they first saw it that

Page 272

1  that's when --
2  A.      Yes.
3  Q.      Okay.
4          So SERVPRO doesn't come out -- nobody
5  comes out or cleans it, the county still wants
6  them to take possession.  They justifiably raise
7  concerns about the conditions and then, I guess,
8  because you can't get anybody to come clean it
9  from SERVPRO, you do it yourself?
10 A.      Yes.
11 Q.      Or with --
12         MS. PIPAK:  Object to the form.
13         You can answer.
14 BY MS. SMITH:
15 Q.      What was your understanding about time
16 off for employees who needed to speak with law
17 enforcement agencies?
18 A.      Based upon the fact that they were
19 subpoenaed or not?
20 Q.      If they were not subpoenaed?
21         MS. PIPAK:  Object to the form.
22         But you can answer.
23         THE WITNESS:  My understanding was
24 that the department head would manage the

Page 273

1  individuals' time accordingly.  I don't -- I think
2  there is a policy at the courthouse as it speaks
3  to individuals who are subpoenaed, but I'm not 100
4  percent certain about that.
5  BY MS. SMITH:
6  Q.      So do you recall if you were involved in
7  a revision to a subpoena or jury duty -- jury
8  duty's policy?
9  A.      No.
10 Q.      No you weren't?
11 A.      I was not.
12 Q.      Okay.
13         Do you recall the plaintiffs requesting
14 time off to speak with the attorney general's
15 office?
16 A.      Yes.
17 Q.      Do you recall informing them that they
18 would either have to use PTO or bank time or be
19 unpaid?
20 A.      Yes.
21 Q.      Did you speak with anybody about --
22 strike that.
23         You informed my clients, the plaintiffs
24 that that was what would have to occur, correct?

Page 274

1  A.      Yes.
2  Q.      Did you speak with anybody before
3  informing my clients of that?
4  A.      Mr. Bender.
5  Q.      And what, if anything, did those
6  conversations involve?
7  A.      Mr. Bender indicated that Ms. Toomey
8  being the director of the department, should
9  manage their time accordingly based upon whatever
10 PTO time they have available to them in order to
11 get paid.
12 Q.      Did he say if given that -- strike that.
13         So did you understand that the reason
14 that the plaintiffs wanted to speak with the
15 attorney generals office was in regards to
16 Defendant Halcovage's sexual harassment?
17 A.      I did not know that at the time.
18 Q.      Okay.
19         Did you ever learn that?
20 A.      I did.
21 Q.      When did you learn it?
22 A.      After -- after long after the fact.
23 Q.      Okay.
24         So not while you were employed -- well,

Deposition of Doreen Kutzler                           Jane Doe, et al. v. Schuylkill County Courthouse, et al.

Page 275

1  at least long after your employment, first stint?
2  A.     Yeah.  It was -- it was probably in
3  March.
4  Q.     Did you ask any of the plaintiffs why
5  they wanted to speak with the attorney generals
6  office?
7  A.     No.
8  Q.     Do you know if anybody from the county
9  did?
10  A.     Not to my knowledge.
11  Q.     In those conversations you had with
12  Defendant Bender or conversation you had with
13  Defendant Bender about their -- plaintiffs time
14  off request for attorney general interviews, did
15  he indicate to you that they would have to use PTO
16  or not be paid to attend those interviews?
17  A.     Yes.
18        MR. LEES:  Just note -- again, just
19  note my objection to the form because I think the
20  witness just said that she wasn't aware that it
21  was to speak with the AG.
22        MS. SMITH:  Well, okay.  So let's
23  go back.
24  BY MS. SMITH:

Page 276

1  Q.     I thought you said that you knew it was
2  to speak with the AG, but you didn't know it was
3  about the allegations against Defendant Halcovage;
4  am I right?
5  A.     I knew they were going to Harrisburg.  I
6  don't recall specifically if the -- if the AG was
7  mentioned.
8  Q.     Did --
9        MR. LEES:  And actually I misspoke
10  then, because that was -- I missed that part.
11  Okay.
12        MS. SMITH:  Okay.  Yeah, I mean, I
13  probably needed clarification, I know the record
14  did, so we made it clear.
15  BY MS. SMITH:
16  Q.     So you knew that -- you at least know
17  you know they were going to Harrisburg, right?
18  A.     Right.
19  Q.     Do you know that it -- if it was a
20  vacation, if it -- what did you know about
21  Harrisburg?
22  A.     That they were going to meet with
23  somebody regarding -- I don't even know.  They
24  didn't even say.

Page 277

1  Q.     So you weren't told that it was an
2  attorney general interview that they were going
3  to?
4  A.     I don't recall that.
5        MS. SMITH:  Okay.  I am going to
6  mark as 286, it will be Doe Supplemental 510
7  through 514.
8              - - -
9        (Doe 510-514 marked as Exhibit-286 for
10  identification.)
11              - - -
12  BY MS. SMITH:
13  Q.     If we look to the very -- well, the
14  second to last page with the signature line on
15  last page, context of the e-mail is on 513.
16        There's an e-mail from Angela Toomey to
17  you on December 11th.  She states:  Marcy and
18  Missy are making a PTO request for Tuesday,
19  December 15th.  See attached.
20        MS. SMITH:  Sorry, Matt, I'm going
21  to make you earn your money.  I'm going to also --
22  I'll mark collectively for the record purposes, as
23  287, it's 493 and 494.
24              - - -

Page 278

1        (Doe 493-494 marked as Exhibit-287 for
2  identification.)
3              - - -
4  BY MS. SMITH:
5  Q.     So you have now in front of you the
6  first page of 287.
7        Is this one of the two attachments that
8  Ms. Toomey sent you?
9  A.     I don't recall seeing these requests.
10  Q.     Okay.
11        So if we look back at 286, Ms. Toomey
12  said see attached.
13  A.     Okay.  Yeah, I don't remember those.
14  Q.     Okay.
15        Any reason to believe that Ms. Toomey
16  did not attach -- at least let's start with the
17  first page of 287, Ms. Goodman's PTO request?
18  A.     No reason that they wouldn't have been.
19  Q.     And then 494, it's an e-mail from the
20  same date and same time, but from -- or roughly
21  the same time, from Ms. Kleckner making an
22  identical request for PTO?
23  A.     Yes.
24  Q.     Any reason to believe that this wasn't

Page 279

1  also one of the attachment Ms. Toomey was
2  referencing?
3  A.      No.
4  Q.      Okay.
5          So they're pretty much identical, so you
6  can look at either one.
7          MS. SMITH:  And, Matt, you can
8  project either -- you can project either one, but
9  you've got Kleckner's up, so we'll look at --
10 BY MS. SMITH:
11 Q.      If you look at the second page of 287,
12 the one with -- for Marcy.
13         Do you see where it says, end of the
14 first line, beginning of the second line, I don't
15 feel comfortable mentioning in this e-mail due to
16 the concern for my safety.
17         Do you recall this being sent to you,
18 forwarded to you?
19 A.      No.
20 Q.      Okay.
21         So you didn't have any discussions with
22 Ms. Kleckner or Ms. Goodman about why they would
23 have a concern for their safety --
24 A.      No.

Page 280

1  Q.      -- mentioning their reason for going?
2  A.      No.
3  Q.      Okay.
4          MS. PIPAK:  The Bates number on
5  this exhibit, is it Doe Supplemental 493?
6          MS. SMITH:  Doe Supplemental 493
7  and 494.
8  BY MS. SMITH:
9  Q.      Okay.
10         If we look to the first page of 286, the
11 very first page, yeah, there you go.  The bottom
12 e-mail from you to Angela on December 14th states:
13 Apologies for not responding sooner as I had some
14 research to complete.  I have found no applicable
15 county handbook provision or other policy that
16 would provide paid time off outside of sick hours,
17 vacation, or personal time that Marcy and Melissa
18 had available to them today.
19         Do you recall doing research into the
20 subpoena or jury duty subpoena because it was in
21 regards to a law enforcement investigation
22 concerning Defendant Halcovage?
23 A.      I had a conversation with Heather
24 Garrity.

Page 281

1  Q.      Okay.
2  A.      From the HR department.
3  Q.      So does this then refresh your
4  recollection -- and, listen, I know it's been a
5  number of years and there was a lot going on.
6  Does this refresh your recollection if you knew
7  that, in fact, Ms. Goodman and Ms. Kleckner wanted
8  to attend an interview with the AG's office
9  related to Defendant Halcovage?
10 A.      Yes.
11 Q.      Okay.
12         And so they -- you knew that that's what
13 they wanted to do, and yet it was still decided by
14 the county that they needed to either use PTO or
15 not be paid?
16 A.      Correct.
17 Q.      Okay.
18         Who made that decision?
19 A.      Mr. Bender.
20 Q.      And did Mr. Bender understand that the
21 AG interviews that Ms. Goodman and Ms. Kleckner
22 wanted to attend, I believe it was also Ms.
23 Goodman and -- I mean Ms. Toomey and Ms. Gerchak,
24 but those AG interviews they wanted to attend

Page 282

1  related to Defendant Halcovage's conduct?
2  A.      I don't know the answer to that.
3  Q.      Did you have that conversation with him?
4  A.      No.
5  Q.      Okay.
6          But you knew that that's what it had to
7  do with?
8  A.      I was made aware, yes.
9  Q.      Okay.
10         And when he said no, they have to use
11 PTO, you didn't tell him, well, it's in regards to
12 --
13 A.      I think I did.
14 Q.      Okay.
15         So he did know that it was in regards to
16 an AG investigation?
17 A.      Yes.
18 Q.      Okay.
19         And he knew that investigation was
20 related to Defendant Halcovage?
21 A.      Yes.
22 Q.      Okay.
23         And he still said no?
24 A.      Yes.

Page 283

1  Q.      I should rephrase that.
2         He still said they have to have use PTO
3  or be unpaid?
4  A.      Correct.
5  Q.      Okay.
6         Do you have any understanding or
7  knowledge of how county benefits work, like health
8  insurance?
9  A.      Yes.
10 Q.      Okay.
11        A county employee has -- is required to
12 work a requisite number of hours before they're --
13 per week to be eligible for benefits, correct?
14 A.      Correct.
15 Q.      30 -- is it 35?
16 A.      As a full time.
17 Q.      Okay.
18        So you have to be 35 hours to be a
19 full-time employee and those are the individuals
20 who receive -- are eligible to receive county
21 health insurance?
22 A.      Correct.
23 Q.      What happens if an employee works under
24 35 hours in any given week?

Page 284

1  A.      Well, it's -- because of the ACA and the
2  reporting requirements, if they drop under 30
3  hours on a weekly pay period basis and that
4  averages less than 30 hours over a certain period
5  of time, under the ACA, they're not eligible to
6  participate in the plan.
7  Q.      What's the ACA?
8  A.      Affordable Care Act.
9  Q.      Okay.
10        And so if -- PTO, vacation, sick time
11 count towards those 35 hours, correct?
12 A.      Vacation counts as time worked.  Sick
13 doesn't.  I don't think P -- I don't think
14 personal does either.  Just vacation.
15 Q.      Okay.
16        But what about non-paid leave?
17 A.      So until an individual gets into a
18 30-day period where they're on some type of unpaid
19 leave, would their benefit enrollment be impacted.
20 Q.      Is -- that's what I'm asking you.  Yes.
21 A.      Yes.
22 Q.      It would be, right?
23 A.      Yes.
24 Q.      Okay.

Page 285

1         So for instance if going to these AG
2  interviews and Ms. Goodman and Ms. Kleckner taking
3  time off to attend them and being unpaid, they --
4  those -- the hours that they were at the AG
5  interviews would not count towards time worked for
6  the 35-hour benefit minimum requirement, correct?
7         MS. PIPAK:  Object to the form.
8         You can answer.
9         THE WITNESS:  It wouldn't impact
10 their ability to remain enrolled in benefits
11 because it was a one-day situation.
12 BY MS. SMITH:
13 Q.      Right.
14        But what I am -- so I guess -- you're
15 getting to the conclusion.
16 A.      Sorry.
17 Q.      I'm trying to get -- no, no, no, it's
18 okay.
19        I am trying to get at the facts because
20 there's other hype facts that play into this.
21        My first question is:  Just when an
22 individual such as Ms. Goodman and Ms. Kleckner
23 takes a day and doesn't work.
24 A.      Uh-huh.

Page 286

1  Q.      And they don't record any hours for that
2  because they don't have vacation and they're not
3  paid, that -- then those hours, however long they
4  are, do not count towards the 35 hours?
5  A.      Correct.
6  Q.      Because it has to be covered by
7  vacation?
8  A.      Correct.
9  Q.      Okay.
10        So then if the employee in question also
11 was using -- utilizing sick time to make -- to be
12 paid, but not -- to use sick time to be paid, but
13 not actually working, that would impact the number
14 of hours that an employee worked for the benefits
15 minimum requirement?
16 A.      It could.  Yeah, because there's very
17 specific -- well, there's guidelines -- I don't
18 want to get this confused.
19        The collective bargaining agreement
20 doesn't dictate the eligibility.  Sorry.  I'm
21 thinking through this out loud.  This -- the --
22 yeah, the collective bargaining agreement does not
23 dictate eligibility for benefits.  That's through
24 the plan document.  And only when there's a

Page 287

1 continuous leave of absence of 30 or more days is
2 the individual's eligibility impacted --
3 Q.      Okay.
4 A.      -- to be enrolled.
5 Q.      Okay.
6        So if someone is working sporadically,
7 but not making 35 hours, they're eligible --
8 eligibility is not impacted?
9 A.      No.  They -- it would be impacted.
10 Q.      Okay.
11 A.      They would -- they would not meet the
12 minimum requirements.
13 Q.      Okay.
14 A.      For eligibility under the plan document,
15 which would trigger a qualifying life event, in
16 which that individual would receive COBRA
17 coverage.
18 Q.      Okay.
19        So if they're on something such as FMLA
20 leave, which would then trigger that 30-day
21 period, they -- they wouldn't their eligibility
22 wouldn't be impacted because they're on that
23 leave, extended leave?
24 A.      Until -- correct.

Page 288

1 Q.      Okay.
2 A.      Yes.
3 Q.      So it's FMLA --
4 A.      Yes.
5 Q.      -- short-term disability?
6 A.      Yes.
7 Q.      Okay.  Got it.  Understood.
8        What control does the county have in the
9 benefit eligibility, other than reporting --
10 because obviously someone's got to report the
11 hours to the plan.  But other than that, if the
12 employee isn't making the hours, can the county
13 still decide to allow to employee to receive
14 benefits?
15 A.      Yes.
16 Q.      Who makes that decision?
17 A.      Mr. Bender.
18 Q.      So an employee could be minium --
19 minimum -- part time, so less than 35 hours, and
20 still be eligible for benefits so if Mr. Bender
21 elected to allow them to do so?
22 A.      Well, I don't think he would -- I don't
23 think he would -- the plan doesn't allow for part
24 time-individuals --

Page 289

1 Q.      Okay.
2 A.      -- to enroll in benefits.
3 Q.      Okay.
4 A.      And as far as the hours that are
5 reported on an annual basis, it's not something
6 that's done regularly.  There's like an annual
7 report that's review for ACA requirements.
8 Q.      Okay.
9 A.      And if an employee doesn't maintain at
10 least 30 hours or more, then that's -- that's what
11 creates the qualifying life event.  Does that make
12 sense?
13 Q.      Right.
14        But you were saying that Mr. Bender held
15 authority to allow someone who wasn't making the
16 hours to continue to be enrolled.  So maybe not
17 newly enroll because you said -- is that the
18 distinction?  Like, if they are new -- they can't
19 newly enroll in the plan if they don't -- aren't a
20 full-time employee, but a full-time employee who
21 is not making the hours requirement could be
22 permitted to remain enrolled in Mr. Bender
23 approved them.
24        Am I correct?

Page 290

1 A.      Yeah.  I would -- I would say that he
2 would -- he can influence the decision on whether
3 or not they would be sent to COBRA.  So he
4 would -- he would -- he wouldn't influence the
5 eligibility, but he could -- he can influence the
6 termination of coverage.
7 Q.      Okay.
8        So if -- maybe I am -- correct me if I'm
9 understanding you correctly or I am accurate, Mr.
10 Bender could take an affirmative step -- step at
11 any point to report the not -- the employee not
12 meeting the hours requirement and trigger COBRA?
13 A.      Yes.
14 Q.      He could also not take that affirmative
15 step and it would allow them to continue,
16 regardless of what their hours were?
17 A.      Correct.
18 Q.      Okay.
19        Anyone else who has that authority in
20 the county?
21 A.      Well, the commissioners.
22 Q.      Okay.
23        Anyone else?
24 A.      I don't think so.

Page 291

MS. SMITH:  Okay.  Going to look at Doe Supplement 507, 288.

- - -

(Doe 507 marked as Exhibit-288 for identification.)

- - -

BY MS. SMITH:

Q.     Do you recognize this e-mail?

A.     Yes.

Q.     This is an e-mail from Ms. Toomey to you, as well as some other individuals on December 12, 2020, correct?

A.     Yes.

Q.     All right.

MS. SMITH:  We're going to look at 504 and 505, I can collectively mark these at 289.

- - -

(Doe 504-505 marked as Exhibit-289 for identification.)

- - -

MS. SMITH:  Matt, you can start with projecting 504 on the screen.

BY MS. SMITH:

Q.     Do you recognize this e-mail?

Page 292

A.     Yes.

Q.     Okay.

Is one of those two attachments Ms. Toomey references in her e-mail to you?

A.     Yes, I think so.

Q.     Okay.

Okay.

So let's start with this one since we've got it up on the screen.  Ms. Kleckner states:  Please allow this e-mail to serve as my official request for a reasonable accommodation to work from home.

As you know, I attempted to work in a new office the county provided, however I experienced extreme anxiety and panic attacks.  Additionally, the office is not set up to work efficiently and does not have the equipment to adequately perform my job.

Did you speak with Ms. Kleckner about the e-mail and her statements in that paragraph?

A.     No.

Q.     Do you know if anyone on the county -- on behalf of the county did?

A.     Not to my knowledge.

Page 293

Q.     Do you have an understanding of disability reasonable accommodation conversations?

A.     Yes.

Q.     And are you aware that an interactive process has to occur?

A.     Yes.

Q.     Do you think the county engaged Ms. Kleckner in an interactive process?

A.     At this point, no.

Q.     Do you believe that anxiety and panic attacks could qualify as a disability for which a reasonable accommodate might be granted?

MR. LEES:  Just note my objection. You can answer.

THE WITNESS:  Yes.

BY MS. SMITH:

Q.     Did you try and have anyone at the county speak or engage Ms. Kleckner in an interactive process?

A.     Not at this point.

Q.     Why not?

A.     I didn't tie it to an ADA request, an ADA reasonable accommodation request.

Q.     Well, Ms. Kleckner uses the words

Page 294

reasonable accommodation and then says she's experiencing extreme anxiety and panic attacks.  Why didn't you think that her request was as result of that disability she was espousing?

A.     I didn't make that connection.

Q.     Did you -- I'm sorry if I asked you this.  Did you respond to Ms. Kleckner's e-mail, either directly to her or Ms. Toomey's forwarding of Ms. Kleckner's e-mail?

A.     It was -- it would have been through the forwarding of Ms. Toomey's e-mail.

Q.     You do recall responding?

A.     I responded to Ms. Toomey.

Q.     Okay.

And what did you tell Ms. Toomey?

A.     In that I would take another look at the space.

Q.     Okay.

But not anything about the request -- Ms. Kleckner's request to work from home?

A.     Well, that I would speak with Mr. Bender about it again to see if there was any chance of that being approved.

Q.     Okay.

Page 295

1  So did you then speak with Mr. Bender
2  about re -- reconsidering the work from home
3  request?
4  A.  Yes.
5  Q.  What was his response?
6  A.  No.
7  Q.  Why, if he told you?
8  A.  He didn't.
9  Q.  He just said no?
10  A.  He just said no.
11  Q.  Return to 505, 506.  It's an e-mail from
12  Ms. Goodman to Ms. Toomey.
13  Was this the other attachment to Ms.
14  Toomey's e-mail?
15  A.  Yes.
16  Q.  Okay.
17  Ms. Goodman indicates:  The thought of
18  coming -- it's in the second paragraph, the middle
19  of it.
20  The thought of coming back to be work
21  while Mr. Halcovage remains employed causes me to
22  fell shame, disgusted, embarrassed, defeated,
23  sick, scared, nervous, and depressed.  These
24  feelings are compounded by the fact that the

Page 296

1  office space is filthy, degrading, and for lack of
2  a better word, a slap in the face.
3  Did you reach out to Ms. Goodman to
4  discuss her statements in that paragraph?
5  A.  No.
6  Q.  Why not?
7  A.  I would have had conversations with Ms.
8  Toomey.
9  Q.  Why did you feel that addressing with
10  Ms. Toomey was appropriate as opposed to
11  addressing it with the specific employees
12  themselves?
13  A.  The majority of communications typically
14  came from Ms. Toomey.  And with her being their
15  direct supervisor, I did work for her.
16  Q.  The conversation you said you had with
17  Mr. Bender to reconsider the 410 Building, was
18  that in regards -- I'm sorry -- to reconsider the
19  work from home request, was that a general request
20  as it relates to Ms. Kleckner and Ms. Goodman?
21  A.  Yes.
22  Q.  Okay.
23  So you were asking him to reconsider
24  both work -- working from home?

Page 297

1  A.  Yes.
2  Q.  Okay.
3  Ms. Goodman, in the bullet points there,
4  she lists a number of issues with her office
5  space.
6  Do you have any reason to believe that
7  she misrepresented in official e-mail to the
8  county, what was wrong with her office?
9  A.  No.
10  Q.  Okay.
11  And similar to Ms. Kleckner, did you not
12  engage Ms. Goodman in an interactive discussion
13  about a reasonable accommodation to work from
14  home?
15  A.  Correct.
16  MS. SMITH:  Going to look at Doe
17  Supplement 520 and 521, 290.
18  - - -
19  (Doe 520-521 marked as Exhibit-290 for
20  identification.)
21  - - -
22  BY MS. SMITH:
23  Q.  Do you recognize this document?
24  A.  Yes.

Page 298

1  Q.  It includes an e-mail from you to me, as
2  well as the county's attorney, Mr. Heinbach, Mr.
3  Bender, and the county solicitor Mr. Roth, as well
4  as the document, which was attached to your
5  e-mail, correct?
6  A.  Yes.
7  Q.  Okay.
8  Who drafted this letter?
9  A.  Mr. Heinbach.
10  Q.  And did you make any edits or changes to
11  it?
12  A.  No, I did not.
13  Q.  Did Mr. Bender make any edits or changes
14  to it?
15  A.  Not to my knowledge.
16  Q.  You were just instructed by Mr. Heinbach
17  to give this to me?
18  A.  Yes.
19  Q.  Okay.
20  No input at all on it?
21  A.  No.
22  Q.  On the second page of the letter, so the
23  last page of the document.
24  A.  Uh-huh.

Page 299

1  Q.      It indicates who is copied.
2         What does it mean by file?
3  A.      Personnel file.
4  Q.      So that would be personnel file for Ms.
5  Kleckner and Ms. Goodman, in this case?
6  A.      Yes.
7  Q.      Okay.
8         At this point, so December 16, 2020, had
9  you received any correspondence or information
10 from either Ms. Kleckner or Ms. Goodman's medical
11 providers?
12 A.      Not to my knowledge.
13 Q.      Okay.
14        If you look to the -- on the first page
15 of the letter, so second page of the document.
16 A.      Uh-huh.
17 Q.      There's numbered -- a numbered list.  We
18 are going to look to No. 2.
19        The county has engaged an outside
20 cleaning company to have both offices
21 professionally cleaned and disinfected.
22        I think from today's testimony, correct
23 me if I'm wrong, there was never a professional --
24 an out -- no -- never an outside cleaning company

Page 300

1  that professionally cleaned or disinfected the
2  offices, correct?
3  A.      Correct.
4  Q.      In the county's attempt the access the
5  offices on December 15th, Ms. Kleckner and Ms.
6  Goodman held the only keys for entry.
7         Who attempted to access their offices?
8  A.      Maintenance.
9  Q.      Okay.
10        Not an outside cleaning company?
11 A.      No, not at that point.
12 Q.      Okay.
13        Would you agree with me that the word --
14 the way that that's worded it seems as though it's
15 the outside cleaning company?
16 A.      Yes.
17 Q.      Then it states:  Given that retaining an
18 outside cleaning company would cost he county
19 additional monies, we held off until we received
20 confirmation that the employees would relocate to
21 the 410 Building.
22        That's not accurate, is it?
23 A.      As far as?
24 Q.      Holding -- why the held -- why the

Page 301

1  county held off on retaining the outside cleaning
2  company?
3  A.      I don't -- I think that the county held
4  off on having the offices cleaned period.
5  Q.      Okay.
6  A.      Whether it was by an outside vendor or
7  the maintenance crew or anyone else.
8  Q.      But because they were waiting for
9  confirmation that the employers would relocate
10 there?
11 A.      Right.
12 Q.      Did the -- the employees in this case
13 were Ms. Goodman and Ms. Kleckner, right?
14 A.      Yes.
15 Q.      Did they have an option to confirm or
16 decline to work there?
17 A.      I would say no.
18 Q.      Right.
19        It was either be employed or not be
20 employed?
21 A.      Yeah.
22 Q.      Be employed and work from the 410 or not
23 be employed?
24 A.      Yes.

Page 302

1  Q.      Okay.
2         They didn't have an option to say, no,
3  we want to continue to work from home?
4  A.      Yes.
5  Q.      Because they tried that, right?
6  A.      Right.
7  Q.      And it was denied, correct?
8  A.      Yes.
9  Q.      Okay.
10        The next No. 3 says:  The concerns
11 raised by Ms. Goodman regarding the MIS equipment,
12 approximately ten towers and one filing cabinet,
13 are being addressed by the MIS director.  The
14 equipment will be removed from their offices as
15 soon as pract -- practical.
16        Ms. Goodman raised concerns with the
17 tower -- the towers and the filing cabinet at the
18 December 8th meeting, correct?
19 A.      Correct.
20 Q.      Okay.
21        Do you know how soon after the MIS
22 director was asked to remove them?
23 A.      That it happened?
24 Q.      Yeah.

Deposition of Doreen Kutzler                                    Jane Doe, et al. v. Schuylkill County Courthouse, et al.

Page 303

1  A.      Again, I don't think it was until
2  between Christmas and New Years.
3  Q.      Well -- so -- but I'm sorry.  Maybe my
4  question wasn't clear.
5          Not when the removal happened, but when
6  the request the removal was made?
7  A.      Oh, that was initial when it was --
8  Q.      Right on December 8th or something
9  different?
10  A.      Yeah.  Yes, it would have been
11  December 8th.
12  Q.      Okay.
13          Do you know why it took them so long?
14  A.      No.
15  Q.      Do you know if they were told by anyone
16  not to remove it?
17  A.      No.
18  Q.      Ms. Goodman and Ms. Kleckner, while
19  working from home without the necessary equipment,
20  without the laptops, computer, printer, were
21  having difficultly making their 35 hours a week;
22  would you agree?
23  A.      Yes.
24          MS. PIPAK:  Object to the form.

Page 304

1          Go ahead.
2  BY MS. SMITH:
3  Q.      They were out of time -- county time to
4  utilize to be paid for any non-hours.  So they
5  didn't work, they didn't get paid because they
6  were out of banked time, right?
7  A.      Correct.
8  Q.      Okay.
9          So if they didn't have the equipment and
10  they -- at home and they now couldn't get into the
11  410 Building, why was it made -- why wasn't it
12  made a priority to equip and get ready the 410
13  Building for them so they could start making their
14  hours and getting paid?
15          MR. LEES:  Just note my objection
16  to form.
17          You can answer.
18          THE WITNESS:  It was.  It was just
19  a matter of cutting through some red tape and
20  getting people to react --
21  BY MS. SMITH:
22  Q.      What red --
23  A.      -- and respond.
24  Q.      What red tape or individuals are you

Page 305

1  referring to?
2  A.      The maintenance crew.
3  Q.      Did you -- you tried to get them to
4  respond?
5  A.      Yes.
6  Q.      Did you seek the assistance of any
7  county officials to get them to respond?
8  A.      I spoke with Paul.  Again, I don't
9  remember Paul's last name.  He's retired.  He was
10  the director of maintenance.
11  Q.      That's not Buber, right?
12  A.      No.
13  Q.      That's finance.
14  A.      He's finance.  I can't remember his
15  name.  I'm sorry.
16  Q.      It's okay.
17          So you asked for his assistance.  But
18  anyone else?
19  A.      And Mr. Bender's.
20  Q.      Did Mr. Bender assist you?
21  A.      He told me to speak with Paul.
22  Q.      Did you tell him you spoke with Paul?
23  A.      I did.
24  Q.      And did you tell him it still wasn't

Page 306

1  getting done?
2  A.      Yes.
3  Q.      Did he offer you any other assistance?
4  A.      No.
5  Q.      Did he speak with Paul?
6  A.      Not to my knowledge.
7  Q.      Did he speak with anyone else to try and
8  move things along?
9  A.      He did have a conversation with
10  Mr. Nester.
11  Q.      Okay.
12  A.      About the IT equipment.
13  Q.      That was only as it relates to the IT
14  equipment, right?
15  A.      Yeah.
16  Q.      Nester couldn't do anything about the --
17  A.      No.
18  Q.      -- cleaning and all that stuff?
19  A.      Correct.
20  Q.      Okay.
21          No. 4, the concerns raised regarding a
22  smell/odor in the office were never raised prior
23  to any -- by any prior employees using those
24  offices.

Page 307

1  Do you know when an employee last
2  occupied those offices was?
3  A.  I do not.
4  Q.  Okay.
5  And then it states:  This is first time
6  a complaint of an odor has been raised and the
7  county will investigate the concern.
8  Do you know what, if anything, the
9  county did to investigate the concern?
10  A.  Again, maintenance would have been sent
11  to determine where it may have been coming from
12  and to -- maybe it was the ceiling tiles.  I don't
13  know.
14  Q.  All right.
15  N the next page of the letters, the last
16  page of the document:  Some employees,
17  particularly those in tax assessment and tax
18  claim, are responsible for correctly performing
19  time sensitive duties that are mandate -- mandated
20  by state statutes.
21  That would include the STEB report,
22  correct?
23  A.  I assume, yes.
24  Q.  Okay.

Page 308

1  Do you know, other than the STEB report,
2  what time sensitive duties mandated by state
3  statutes Ms. Goodman or Ms. Kleckner performed?
4  A.  I do not.
5  Q.  If we look to No. 2 under this
6  paragraph, it says meeting all state and local
7  mandates, sales, submissions, and other reports
8  are required to be submitted to the State Tax
9  Equalization Board.
10  Would you agree with me that Ms. Goodman
11  did not do sale submissions or reports that were
12  submitted to the State Tax Equalization Board?
13  A.  That's my understanding.
14  Q.  Do you know, did Ms. Goodman or Ms. --
15  Ms. Goodman, did she manage tax assessment roles?
16  A.  I don't know that.
17  Q.  Do you know, did Ms. Goodman schedule
18  assessment appeals?
19  A.  I don't know that.
20  Q.  Did you know if Ms. Kleckner managed tax
21  assessment roles?
22  A.  I don't know that.
23  Q.  Do you know if Ms. Kleckner scheduled
24  assessment appeals?

Page 309

1  A.  I don't know that as well.
2  Q.  In the second to last paragraph it
3  states:  Such important responsibilities, working
4  from home does not and has not provided the
5  designed environment necessary for these important
6  tasks to be completed.
7  Do you feel that Ms. Kleckner and Ms.
8  Goodman had a fair opportunity to show whether
9  working from home was designed to complete these
10  important tasks?
11  MR. LEES:  Just note my objection
12  to form.
13  MS. PIPAK:  Object to the form.
14  MR. LEES:  You can answer.
15  THE WITNESS:  Had they been
16  provided with the appropriate equipment, yes, they
17  could have been very successful.
18  BY MS. SMITH:
19  Q.  Okay.
20  So you believe if they had the
21  appropriate equipment, they could have worked from
22  home?
23  A.  Yes.
24  Q.  Do you think that if they would have

Page 310

1  been any less accessible working from home then in
2  the -- in the 410 Building if they had the
3  equipment they needed?
4  A.  No.
5  Q.  The last since sentence of this letter
6  states -- well, I guess it's the last part of the
7  last sentence, if they feel they are experiencing
8  medical conditions that prohibit them from doing
9  so, please have them complete the accompanying
10  form for reasonable accommodations.
11  Do you know if you sent me a reasonable
12  accommodation with this letter?
13  A.  My understanding is yes.
14  MS. SMITH:  We're going to look at
15  Doe Supplement 549.  It's going to be 291.
16  - - -
17  (Doe 549 marked as Exhibit-291 for
18  identification.)
19  - - -
20  BY MS. SMITH:
21  Q.  Ms. Kutzler, do you recognize this
22  e-mail?
23  A.  Yes.
24  Q.  This is a December 22, 2020, e-mail from

Page 311

1  Ms. Toomey to you about Heather Matascavage; would
2  you agree?
3  A.      Yes.
4  Q.      Did you respond to this e-mail?
5  A.      Not to my knowledge.
6  Q.      Why not?
7  A.      I would have had a conversation with Mr.
8  Roth and Mr. Bender about it before responding.
9  Q.      Okay.
10         And did one of them instruct you not to
11 answer?
12         MS. PIPAK:  I am going to object
13 right now to the extent your answer relates to
14 conversations you had with counsel, I'm going to
15 direct you not to answer.
16         MS. SMITH:  Are you directing
17 your -- are you asserting a defense of counsel
18 privilege?
19         MR. LEES:  Am I?
20         MS. SMITH:  On behalf of your
21 client?
22         MR. LEES:  Well, again, it's the
23 county's privilege that they're asserting.  So as
24 it relates to communication she had with Attorney

Page 312

1  Roth and the county is taking this position, I
2  don't think I can overrule their...
3         MS. SMITH:  It's their privilege,
4  but it's your --
5         MR. LEES:  I understand that.
6         MS. SMITH:  Right.
7         MR. LEES:  And -- and I still may
8  have to address that, but for today's purposes,
9  they've raised it, so it's going to put the ball
10 in my court now to have to address that with the
11 judge if I need to.  But I -- I'm not going to
12 overrule them today and allow her to testify over
13 their objections.
14         MS. SMITH:  Are you asserting the
15 defense of counsel privilege, though?
16         MR. LEES:  Well, again, as it
17 relates to -- read back the question.
18                  - - -
19         (Whereupon, last question was read back
20 by the court reporter.)
21                  - - -
22         MR. LEES:  Well, that question
23 doesn't call --
24         MS. SMITH:  No.  No.  No, but then

Page 313

1  I asked her, did she ask -- did Defendant Bender
2  or Defendant Roth instruct her not to answer.  So
3  if she's --
4         MR. LEES:  Okay.  And, again, I --
5         MS. PIPAK:  I will just -- let me
6  interject here.  I'm looking at this again and
7  this seems to relate to the investigation done
8  with Heather and the affidavit, which I believe
9  was not related to legal advice.  Is -- is that --
10        MS. SMITH:  I mean, you guys have
11 allowed all the other defendants to answer
12 regarding this, including Defendant Roth, so...
13        MS. PIPAK:  Right.  Okay.  So
14 that's -- right.  I think I am okay with her
15 answering this then.
16 BY MS. SMITH:
17 Q.      You can answer.
18 A.      Can you state the question again?
19 Q.      Sure.
20        Did -- you said in your -- your answer
21 that before responding, you would have spoken to
22 Mr. Bender and/or Mr. Roth?
23 A.      Yes.
24 Q.      Did you speak with both of them?

Page 314

1  A.      Mr. Bender.
2  Q.      Okay.
3         So you didn't even speak with Defendant
4  Roth about this?
5  A.      I don't think so.
6  Q.      Okay.
7  A.      I don't recall.
8  Q.      Okay.
9         Well, at least as it relates to
10 Defendant Bender, who you remember speaking with,
11 did he instruct you not to respond?
12 A.      Yes.
13 Q.      Did he tell you why?
14 A.      No.
15 Q.      Ms. Matascavage was still in the tax
16 assessment office in 20 -- December of 2020,
17 correct?
18 A.      Yes.
19 Q.      And Ms. Toomey was the chief assessor of
20 the department head at that time?
21 A.      Yes.
22 Q.      In the second paragraph it indicates,
23 Heather was extremely uncomfortable with the line
24 of questioning directed at her by the county and

Page 315

1  planned to provide a supplementary affidavit this
2  morning when you met with her.
3       Did -- do you know, based off the date
4  of this e-mail and the contents of it, was that
5  meeting -- because it's directed to you.  So that
6  meeting that you had that morning with Ms. Matascavage,
7  when that she provided -- you provided her with
8  the affidavit or when she was providing you with a
9  signed one back or what meeting that was?
10 A.     This was the affidavit she provided back
11 to the county to...
12 Q.     Well -- so she -- well -- so let's
13 clarify that.
14      Was it the affidavit that Mr. Roth had
15 prepared for her that she returned signed or a
16 different one?
17 A.     I think it was a different one.
18 Q.     So there -- there was a different one
19 provided.  We can agree on that, right?
20 A.     Yes.
21 Q.     I'm just trying to figure out the
22 timing, because Ms. Toomey's e-mail says she had
23 planned -- and planned to provide a supplement
24 affidavit, which to me, and I could be wrong,

Page 316

1  suggests that she didn't actually.  She had
2  planned to, but plan meaning she didn't do it.
3       So I just didn't know if this was --
4  what meeting you had with Heather on
5  December 22nd, that's what I'm trying to figure
6  out.
7  A.     Yeah.  I don't remember that meeting.
8  Q.     Okay.
9       Do you remember, other than the first
10 meeting -- because the next sentence says:  She,
11 however, felt very intimidated by and
12 uncomfortable with Glenn Roth being present.
13      So do you know, other than the very
14 first meeting you had with Heather with Glenn
15 present where he -- you guys took the information
16 down, a second one where Glenn was there?
17 A.     I am trying to remember if he was
18 present when we had asked her to execute the
19 affidavit that he had drafted based upon our
20 discussions.
21 Q.     So I could be wrong, and correct me if
22 I'm wrong, I am just trying to refresh your
23 recollection.
24      I believe that Mr. Roth testified that

Page 317

1  you guys met with Heather, he went back and
2  drafted the affidavit, and then he came back and
3  she executed it; is that wrong?
4  A.     That wasn't all in the same day.
5  Q.     Okay.  All right.  That's fair.  And I
6  could be wrong about his testimony.
7  A.     Yeah.
8  Q.     And you just don't recall another
9  meeting with Glenn -- with Heather and Glenn being
10 present?
11 A.     Again, after he had completed the draft,
12 so we met, he when and drafted it, and then we got
13 back together to present her with it to have her
14 execute it.
15 Q.     I thoughts you said you put it in an
16 envelope for her?
17 A.     Yeah, I'm not remembering.
18 Q.     Okay.
19 A.     Sorry.
20 Q.     That's -- that's fair.
21      The next sentence says:  She decided to
22 deliver it to you following the meeting.
23      It's my understanding that she had done
24 that.  So that's, I think referencing, correct me

Page 318

1  if I am wrong, the second affidavit that Ms.
2  Matascavage provided to you, correct?
3  A.     Yes.
4  Q.     Is that maybe what she gave you back in
5  an envelope?
6  A.     I think so.
7  Q.     Okay.
8  A.     Yeah.
9  Q.     So you think maybe Glenn was present in
10 a subsequent meeting where Heather signed the
11 affidavit that the county prepared and then she
12 gave you, at a later time, her own affidavit in an
13 envelope?
14 A.     Yes.
15 Q.     Okay.
16 A.     Yes.
17 Q.     Okay.
18      Ms. Toomey goes on to write that:  I
19 spoke to Heather a short time ago and she's
20 extremely stressed and upset by the position she
21 was put in.  She came to the meeting under the
22 impression that the county was presenting her with
23 a solution pertaining to her request to return to
24 tax claim.

Page 319

1  In fact, I believe you communicated to
2  her she would be relieved when she left this
3  meeting that you arranged.
4      Did you -- I think we talked about this
5  earlier.  Did you use the word relieved in
6  conversations with Ms. Matascavage regarding her
7  meeting she arranged with you?
8  A.    I remember communicating to her that I
9  had good news.
10  Q.    Okay.
11      And that was what you thought was her
12  movement to the secretarial pool?
13  A.    Yes.
14  Q.    And those comments by you, the good news
15  comment, was in a conversation scheduling a
16  meeting with Ms. Matascavage regarding the
17  affidavit contents, correct?
18  A.    No.  Those were separate.
19  Q.    You didn't meet with Ms. Matascavage to
20  discuss her concerns at the same time you relayed
21  the information regarding the secretarial pool?
22  A.    Sorry.  Yeah, just from a timing
23  perspective, when she came back and I -- yeah.
24  She would have been asked to sign the affidavit

Page 320

1  and then I recall discussing the options with her
2  and that she -- because of being a member of the
3  AFSCME, she could bid through to the secretarial
4  pool position.
5  Q.    So let me make sure I have the timing
6  correct.
7      So you, her, and Glenn meet.  You and
8  Glenn get the contents -- Mr. Roth get the
9  contents or the information to make the contents
10  of the affidavit.  You then call Heather
11  Matascavage when the affidavit draft is ready and
12  tell her, as I understand, I've got good news for
13  you.  And in the meeting where you have her sign
14  the affidavit, you also inform her that the
15  secretarial pool is an option?
16  A.    Yes.
17  Q.    Okay.  Perfect.  Thank you.
18      Now, it may not have been your
19  intention, but can you see how Ms. Matascavage
20  might have believed that you guys were making this
21  decision of the secretarial pool dependent on her
22  signing of this affidavit?
23  A.    Oh --
24      MS. PIPAK:  Object to the form.

Page 321

1      MR. LEES:  Same -- same objection.
2      THE WITNESS:  Sorry.
3      MR. LEES:  You can answer.
4      THE WITNESS:  Sorry.  Yeah, no,
5  that was not the intention.
6  BY MS. SMITH:
7  Q.    I understand it wasn't your intention,
8  but do you understand why someone in Ms.
9  Matascavage's position may have believed that?
10      MR. LEES:  Same objection to the
11  form.
12      THE WITNESS:  Yes.
13  BY MS. SMITH:
14  Q.    Okay.
15      In your time with the county, whether
16  the first stint or the second stint, as I've been
17  calling it, did you -- were you ever involved in
18  the drafting of an affidavit for any other county
19  employee?
20  A.    No.
21  Q.    Did Mr. Roth tell you why he was
22  drafting this affidavit?
23  A.    No.
24  Q.    Did you ask him to draft it or did he

Page 322

1  offer to draft it?
2  A.    He was instructed to draft it.
3  Q.    By who?
4  A.    Mr. Bender.
5  Q.    When did Mr. Bender get involved in
6  this?
7  A.    He was brought up to speed after Glenn
8  and I met with her.
9  Q.    That's Heather, right?
10  A.    Yes.
11  Q.    Who decided to bring Mr. Bender up to
12  speed?
13  A.    We both agreed.
14  Q.    So after you met with Heather, there
15  wasn't any decision about writing an affidavit at
16  that point?
17  A.    No.
18  Q.    Then you, Mr. Roth, and Mr. Bender met?
19  A.    Yes.
20  Q.    And Mr. Bender said Glenn -- Mr. Roth,
21  write this affidavit for her?
22  A.    Yes.
23  Q.    Did you find that odd or..?
24  A.    No.

Page 323

Q.    No.

      If I told you that Mr. Roth and his time as a solicitor for the county had never written and affidavit for another employee, would you find it odd that Mr. Bender instructed him to write this one?

A.    Yes.

Q.    Did Mr. Bender say why he wanted Mr. Roth to write this affidavit?

A.    No.

      MS. SMITH:  Can we take a quick five-minute break?  Go off the record.

      VIDEOGRAPHER:  The time is now 3:00 p.m. and we're going off the record.

                - - -

      (Whereupon, brief recess was held off the record.)

                - - -

      VIDEOGRAPHER:  The time is now 3:07 p.m. and we're back on the record.

      MS. SMITH:  I just want to put on the record that Jane Doe 2, Melissa Goodman, did join for observation, the Zoom for observational purposes.

Page 324

      All right.  Matt, if we can put 72 on the screen, Exhibit-72.

                - - -

      (Previously marked Exhibit-72)

                - - -

BY MS. SMITH:

Q.    And, Ms. Kutzler, you do have it there in front of you.

      Do you recognize this document?

A.    Yes.

Q.    Okay.

      And is that the affidavit that Ms. Matascavage signed during that meeting with you and Mr. Roth and her?

A.    Yes.

      MS. SMITH:  Okay.  Put that one aside.

      And then, Matt, if we can project Doe 7 through 10.  I don't have copies.  It's going to be Exhibit-292.

                - - -

      (Doe 7-10 marked as Exhibit-292 for identification.)

                - - -

Page 325

BY MS. SMITH:

Q.    Do you recognize that document?

A.    Yes.

Q.    Okay.

      And what is that document?

A.    Declaration of Heather Matascavage.

Q.    Is that what Ms. Matascavage provided to you, that second affidavit, I think, as you termed it earlier?

A.    Yes, it appears to be.

Q.    That we think was in the envelope?

A.    Yes.

Q.    Okay.

      So you did receive this at some point during your employment on or around December of 2021 with the county, right?

A.    Yes.

Q.    Okay.

      What, if anything, did you do after receiving this declaration from Ms. Matascavage?

A.    I took it to -- I don't know if I took it to Mr. Roth or Mr. Bender.

Q.    Okay.

      At some point, did you take it to Mr.

Page 326

Bender?

A.    Yes.

Q.    Okay.

      What was Mr. Bender's response?

A.    He wasn't happy.

Q.    How do you know that?

A.    Well, he expressed frustration and determined that the affidavit as it was previously executed by Ms. Matascavage, was a void document.

Q.    Did Mr. Bender get visibly angry?

A.    No.

Q.    Did he get loud?

A.    A little.

Q.    When you say he expressed frustration, what does that mean to you; like what did you observe?

A.    That he rolled his eyes.  He did that a lot.  And really just expressed the fact that, you know, he -- we couldn't -- you keep the document, the other affidavit, in relation to this rebuttal.

Q.    Okay.

      So correct me if I wrong, basically that you couldn't take any action, the county couldn't take any action, given that there was now two

Page 327

1  competing, kind of, affidavits?
2  A.      Correct.
3  Q.      Okay.
4        Do you know, did Mr. Bender ever speak
5  with Ms. Matascavage himself?
6  A.      Not to my knowledge.
7  Q.      Why, if you know, was he so sure -- Mr.
8  Bender so sure that the first one was the correct
9  version of events?
10 A.      I think based upon Ms. Matascavage's
11 demeanor when she met with Mr. Roth and myself.
12 Q.      For the first time or the second time?
13 A.      Both times.
14 Q.      Okay.
15       What was her demeanor like the first
16 time?
17 A.      She was crying.  She was upset.  She was
18 shaking visibly, physically.
19 Q.      What was her demeanor like the second
20 time?
21 A.      She was more scared.
22 Q.      Scared of what?
23 A.      I don't know.
24 Q.      Okay.

Page 328

1        Well, in Paragraph 2 of this
2  declaration, so Exhibit-292, Ms. Matascavage
3  indicates that Melissa Goodman appeared all over
4  the place, was driving erratically, indicated that
5  she believed she was being followed, that didn't
6  change from what she had told you -- Ms.
7  Matascavage had told you from the first
8  conversation with her, right?
9  A.      Correct.
10 Q.      Okay.
11       And -- but then she writes in Paragraph
12 13, she has since learned that Ms. Goodman
13 experienced significant sexual harassment and
14 retaliation and stalking, which understandably
15 could have been the cause of her behavior.
16       Any reason to disagree that if someone
17 had experienced those things, they would exhibit
18 the type of behavior that Ms. Matascavage
19 observed?
20 A.      No.
21       MS. SMITH:  Matt, can you scroll
22 down for me.  Hold on.  Go back up.  I need to
23 look at 14.  Yep.  Perfect.  Right there.
24 BY MS. SMITH:

Page 329

1  Q.      In 14, Ms. Matascavage states that after
2  accompanying Ms. Goodman on two field visits, I
3  informed my supervisor, Angela Toomey and Ms.
4  Gerchak, that the training with Ms. Goodman was
5  not a productive learning environment for me and
6  requested that I no longer do field visits with
7  Ms. Goodman.
8        And then in 15 she states:  Ms. Toomey
9  and Ms. Gerchak approved my request and I never
10 went back out.
11       That didn't change from your first
12 meeting with her, Ms. Matascavage -- your first
13 meeting with Ms. Matascavage, right?
14 A.      The statement in 14?
15 Q.      And 15.
16 A.      To my knowledge, no.
17 Q.      Right.
18       So, I guess my question more clearly is:
19 Ms. Matascavage in your first meeting with her
20 with Mr. Roth when you gained the information for
21 the affidavit, she had told you that she went to
22 her supervisor, Ms. Toomey and Ms. Gerchak --
23 A.      Yes.
24 Q.      -- about Ms. Goodman's driving?

Page 330

1  A.      Yes.
2  Q.      Okay.
3        And did she, in that meeting, also tell
4  you that they had told her, you don't have to go
5  back out with Ms. Goodman then?
6  A.      She did not convey that to me.
7  Q.      Did you ask her what their response was?
8  A.      Yes.
9  Q.      And what did she say?
10 A.      I don't remember her saying there that
11 was a response to her not going -- not having to
12 go back out on the road with her.
13 Q.      Sorry.  Let me make sure I understand
14 you.
15       Did she say that she told Ms. Toomey and
16 Ms. Gerchak about Ms. Goodman's driving?
17 A.      She did.
18 Q.      Did she say if they responded to her?
19 A.      She said that they had conversations,
20 but she also did not say that they told her she
21 didn't have to go back out with Ms. Goodman.
22 Q.      Did you ask her what the contents of the
23 conversations were?
24 A.      Yes.  To what extent they had the

Page 331

1 conversations and what support she was getting
2 from the two of them.
3 Q.     Okay.
4       Did you ask her if she had to go back
5 out with Ms. Goodman since then?
6 A.     I did not.
7 Q.     Okay.
8       So it could be that they told her -- she
9 didn't tell you anything in the first meeting that
10 would contradict 15, is what I'm trying to find
11 out?
12 A.     Not that I recall.
13 Q.     Okay.
14       So that could have happened, it just
15 didn't get delved into during the first meeting?
16 A.     Yes.
17 Q.     Okay.
18       The next for Paragraph 15 states:  Ms.
19 Toomey then instructed Chrissy -- Chrissy
20 Zimmerman to continue my field visit training.
21       Do you know if that was true or not
22 true?
23 A.     I don't know.
24 Q.     Okay.

Page 332

1       That wasn't something that was delved
2 into in that first meeting?
3 A.     No.
4 Q.     After you received this declaration, so
5 the one that's in front of you, did you speak with
6 Ms. Toomey and Ms. Gerchak or Ms. Zimmerman to
7 find out if that course of events was accurate?
8 A.     No.
9       MS. SMITH:  Matt, if you can scroll
10 for me so I can see 17.
11 BY MS. SMITH:
12 Q.     If we look to Paragraph 20, she states:
13 Around November 2020, I approached my direct
14 supervisor, Angela Toomey, and requested a
15 transfer out of the assessment office due to the
16 hostile work environment that was occurring
17 because of other employees reporting unlawful
18 comments and conduct.
19       Did you speak with Ms. Matascavage about
20 this allegation or assertion in Paragraph 20,
21 after you received this declaration?
22 A.     I remember having a conversation with
23 Ms. Toomey and outlining with her the steps that
24 need to be taken by Ms. Matascavage base upon for

Page 333

1 CBA, collective bargaining agreement.
2 Q.     But that was as it relates to the
3 transfer, right?
4 A.     Yes.
5 Q.     Okay.
6       But -- so I'm asking, did you speak with
7 Ms. Matascavage about her assertion in this
8 declaration that there was a hostile work
9 environment in the assessment office?
10 A.     No.
11 Q.     Why not?
12 A.     I don't know.
13 Q.     In '22, Ms. Matascavage asserts that she
14 felt uncomfortable discussing certain things with
15 you.
16       Did you ask her -- ever ask her why?
17 A.     Which item?
18 Q.     Twenty-two.
19 A.     No.
20       MS. SMITH:  Can you scroll for me,
21 Matt, so I can see 26.  If we can scroll a little
22 further too, Matt.  We are going to look at Doe
23 Supplement 571 and 572, which will be 293.  293
24 for today's purposes.

Page 334

1       - - -
2       (Doe 571-572 marked as Exhibit-293 for
3 identification.)
4       - - -
5 BY MS. SMITH:
6 Q.     This is an e-mail chain between you and
7 Ms. Toomey in early January 2021.  Would you
8 agree?
9 A.     Yes.
10 Q.     If we look to the -- chronologically the
11 earliest e-mail on the second page, it's from a --
12 January 7th at 2:42 p.m. e-mail from Angela to
13 you.
14       She states:  I'm not sure if MIS is
15 still working on set up for Marcy and Missy.  I
16 gave the key -- here, we got his name -- I gave
17 the keys to Paul Fetterolf last week so that the
18 offices could be cleaned.  He passed them on to
19 Stan at MIS so that the printers and additional
20 monitors could be set up.
21       Any reason to believe that Marcy and
22 Missy's offices in the 410 Building had already
23 been cleaned January 7th and that the printers and
24 monitors -- additional monitors were set up?  Any

Page 335

1  reason to question the contents of this e-mail, is
2  really what I'm asking?
3  A.      No.
4  Q.      Okay.
5         So fair to say then as of January 7th,
6  offices still had not been cleaned and printers
7  and additional monitors had not been installed?
8  A.      They were cleaned.  But, again, the -- I
9  don't think Stan had the monitors and everything
10  set up until the -- on the 11th when they came to
11  work on the -- at the 410 Building.
12  Q.      Say that last part again.  You don't
13  think he had the monitors and printers set up
14  until when?
15  A.      That Monday, January 11th.
16  Q.      Okay.
17         In the last sentence of that paragraph
18  it says:  I just want ed to let you know that
19  we've heard nothing from anyone regarding whether
20  or not the offices are ready.
21         Was there any communication between
22  December 8th and January 7th about what was going
23  on with those offices?
24  A.      I don't think directly with Ms. Toomey

Page 336

1  or Ms. Gerchak or Ms. Kleckner or Goodman.
2  Q.      Okay.
3         Why wasn't there any communication or
4  update for them?
5  A.      I was working through getting the
6  maintenance guys to show up.  And then also with
7  Mr. Nester regarding the IT equipment.
8  Q.      Again, at this point, January 7, 2021,
9  there was still no new laptop for Ms. Goodman --
10  Ms. Kleckner, no laptop for Ms. Goodman, or
11  computers of any sort and no printers at their
12  homes, correct?
13  A.      Correct.
14  Q.      And Mr. Halcovage was still continuing
15  to refuse to work from a different location than
16  the courthouse?
17  A.      Correct.
18  Q.      You respond on January 7th, it's on the
19  first page:  Thanks for the update regarding the
20  STEB backlog.  Have they not been working from
21  home since they raised their concerns back in
22  December.
23         So -- so you're responding to Ms. Toomey
24  about STEB; would you agree?

Page 337

1  A.      Yes.
2  Q.      Did Mr. Bender authorize you to respond
3  to this one?
4  A.      That was just a general question from my
5  perspective, to determine whether or not they were
6  working from home.
7  Q.      Okay.
8         So do you know if you discussed Ms.
9  Toomey's initial e-mail before you sent your
10  response e-mail --
11  A.      No --
12  Q.      -- with Mr. Bender?
13  A.      We did not.
14  Q.      Okay.
15         So you just felt it was -- as HR
16  director, this was an acceptable question to be
17  asked?
18  A.      Yeah.  In general to determine whether
19  or not they were still working from home.
20  Q.      But you -- even if they had been working
21  from home, you agree that they didn't have the
22  necessary equipment to adequately performing their
23  job duties?
24  A.      Correct.

Page 338

1  Q.      Okay.
2         And so did you understand that the
3  ability for Marcy Kleckner to adequately perform
4  her job duties, meaning STEB, she didn't have the
5  necessary equipment to do so?
6  A.      Well --
7         MR. LEES:  Just note my objection
8  to the form.
9         MS. PIPAK:  Objection to the form.
10  Go ahead.
11         MR. LEES:  Go ahead.
12         THE WITNESS:  Yeah.  I -- I think,
13  again, while it was difficult and it was
14  cumbersome and it was at times very complicated,
15  it -- she still had the ability to do the work.
16  BY MS. SMITH:
17  Q.      So I want to just kind of parse that out
18  a little bit.
19         The ability to do the work means that
20  the work can still be done.  But did you believe
21  that she had the ability to do the work and meet
22  the deadlines as required by the state?
23  A.      I think there were challenges that she
24  faced in that regard.

Page 339

1  Q.      Were there -- were the challenges so
2  much so that she might not have met some of those
3  deadlines?
4  A.      I can't speak to that.
5  Q.      Okay.
6          And, I mean, that's kind of fair, you
7  didn't -- you've never done a STEB report, right?
8  A.      Yeah.
9  Q.      You've never --
10 A.      I don't even know what it looks like, to
11 be honest with you.
12 Q.      Okay.  That's completely fair.
13         So is it possible then that Ms. Kleckner
14 could have had such obstacles or difficulties,
15 given her lack of equipment, that she wasn't able
16 to meet the state deadlines?
17 A.      Perhaps.
18 Q.      Ms. Toomey responds to you and says:
19 Marcy can't do the STEB reports from home, which
20 is why I ask that she be able to come into the
21 office.
22         But they -- she goes on to talk about
23 the 410 Building.
24         Did you ever respond to this e-mail?

Page 340

1  A.      No.
2          MS. SMITH:  Actually, just briefly,
3  Matt, if you can scroll down just a tiny bit.
4  Right -- perfect.  Right there.
5  BY MS. SMITH:
6  Q.      In your e-mail to Ms. Toomey, you
7  indicate a letter was just sent to both Marcy and
8  Missy regarding their pending return.
9          Do you see that?
10 A.      Yes.
11 Q.      You can put that one aside.
12         MS. SMITH:  We're going to look at
13 what was previously marked Exhibit-17.
14                    - - -
15         (Previously marked Exhibit-17)
16                    - - -
17 BY MS. SMITH:
18 Q.      Is this that letter that you were
19 referencing that had been sent to Ms. Kleckner?
20 A.      Yes.
21 Q.      Okay.
22         I am also going to put in front of you
23 Exhibit -- actually, hold on one second.  I
24 apologize.

Page 341

1          No, we are just going to look at that
2  one.
3          Was a similar e-mail -- sorry -- a
4  similar letter sent to Ms. Goodman as well?
5  A.      Yes.
6  Q.      Okay.
7          Probably identical, except for the
8  biographical?
9  A.      Yes.
10 Q.      Looking at -- who drafted this letter?
11 Actually, let's start with that.
12 A.      Who drafted it?
13 Q.      Yes.
14 A.      I did.
15 Q.      Did anyone review it, approve it -- or
16 approve it before you sent it to Ms. Kleckner and
17 Ms. Goodman?
18 A.      Not to my knowledge.
19 Q.      In Paragraph -- the one that -- there's
20 Paragraphs 1, 2, 3.
21 A.      Yes.
22 Q.      In that first one it says:  Providing
23 individuals secure office space at the county's
24 410 Building.

Page 342

1          We discussed this a little bit before.
2  Ms. Kleckner's office was not secure.  Was it?
3          MR. LEES:  Objection to form.
4          You can answer.
5          THE WITNESS:  She would have had to
6  keep her door closed and locked.
7  BY MS. SMITH:
8  Q.      Okay.
9          The second one says:  Hire a qualified
10 cleaning company, your office has been
11 professionally washed and disinfected.
12         That's not accurate either, is it?
13 A.      Correct.
14 Q.      And then finally, providing a dedicated
15 printer, which as been installed by the county's
16 MIS department.
17         As of the date of this letter, that was
18 not accurate, was it?
19 A.      Again, I thought that they had installed
20 and taken care of the IT equipment between
21 Christmas and New Years.
22 Q.      And then I thought you said you thought
23 when they got --
24 A.      It may have been on the 3rd when we got

Page 343

back from the New Year's holiday.

Q.       I thought you just testified that when you went there on the 11th, they were installing the printers?

A.       They were moving equipment on the 11th, I know that.

Q.       Okay.

A.       I don't remember if it was the printers themselves.

Q.       Okay.

          MS. SMITH:  We are going to look to previously marked Exhibit-111.

                  - - -

          (Previously marked Exhibit-111.)

                  - - -

BY MS. SMITH:

Q.       Do you recognize this chain of e-mails?

A.       Yes.

Q.       And let me turn to the second page.

          MS. PIPAK:  Wait.  Can we -- can we just take a second and let me review this.  Okay.  I know we've had this issue before, but I am going to call this back.  I was not aware of this and just the top part.  You can ask her about the

Page 344

bottom, but I think see this as attorney-client privilege.

          MS. SMITH:  Okay.  Well, I'm going to -- the same issue with the call back, this had been marked in -- that the DOJ raised.  This has been marked --

          MS. PIPAK:  Oh, this is the same -- oh, this is the same exhibit.  Right.  So -- and -- and we -- didn't we send a supplement exhibit on this as to the top part?

          MS. SMITH:  I don't know, but I don't believe that you're entitled to a call back as it was an exhibit, it was questioned on, and it was well beyond the time that you were permitted to -- I believe permitted to --

          MS. PIPAK:  Okay.  When was this -- when was this an exhibit?

          MS. SMITH:  111, so --

          MS. PIPAK:  Okay.  I'll let her --

          MS. SMITH:  Probably Bender's or Roth's would be guess.  I am going to guess Bender because 111 was probably much later than Roth.

          MS. PIPAK:  This was Zula's exhibit.

Page 345

          MS. SMITH:  Oh, it was Zula.  Oh, that makes sense.  It might have been Zula's.

          VIDEOGRAPHER:  I have it as Heidi Zula's Volume 1.

          MS. SMITH:  Thank you, Matt.

          MS. PIPAK:  I just want to look at something.

          MS. SMITH:  All right.  We can just go off the record then for a couple minutes.

          VIDEOGRAPHER:  The time is now 3:30 p.m. and we're going off the record.

                  - - -

          (Whereupon, brief recess was held off the record.)

                  - - -

          VIDEOGRAPHER:  The time is now 3:36 p.m. and we're back on the record.

BY MS. SMITH:

Q.       You should still have 111 in front of you, correct, Ms. Kutzler?

A.       Yes.

          MS. SMITH:  And, Matt, if you can put that back up on the screen.  Thank you.

BY MS. SMITH:

Page 346

Q.       Did anyone -- and if it was an attorney, I don't want to know the contents, did anyone tell you what to write in your e-mail which you forwarded to the individuals which you sent this to?

A.       No.

Q.       Okay.

          In the second paragraph you say:  I did mention to Gary that the cleaning by SERVPRO was not as good as we had hoped.

          I thought SERVPRO didn't do any cleaning?

A.       Yeah, I don't remember them doing a cleaning.

Q.       Okay.

A.       I may have meant the maintenance department.

Q.       Okay.

          And typos happens, that's just why I am asking you some of these questions.

          You state:  We could certainly go over the offices again and have -- go over the office again and have maintenance look at the desk drawer that is referenced in the e-mail.

Page 347

1    When you say go over the office again,
2  did that mean a cleaning?
3  A.    Another cleaning.
4  Q.    Okay.
5    So had you done one yet as of
6  January 13, 2021?
7  A.    Yes.
8  Q.    Okay.
9    You admit that at least one of the
10  office drawers in Ms. Goodman's office was broken?
11  A.    Yes.
12  Q.    Okay.
13    The next paragraph states in -- for the
14  ceiling tiles, it is possible to switch them
15  out -- is it possible to switch them out from
16  another office in human services.
17    Did you think that the tile -- ceiling
18  tiles were in a condition that they should be in
19  any office that an employee of the county worked
20  in?
21  A.    Well, what I mean by that was taking
22  tiles from the other office and replacing them,
23  not technically switching them.
24  Q.    Okay.

Page 348

1  A.    But at least replacing them with more
2  appropriate tiles or better-conditioned tiles.
3  Q.    Okay.
4    And then leaving the other office
5  without tiles?
6  A.    Yeah.
7  Q.    Like an unoccupied office or something?
8  A.    Yeah.
9  Q.    Okay.  All right.
10    The next sentence says:  At least they
11  won't be stained and we will give them one less
12  item to complain about.
13    Did you believe that the women -- the
14  plaintiffs were complaining?
15  A.    No.
16  Q.    Okay.
17    Why did you use that word?
18  A.    Just based upon the list of items and
19  for the -- it was frustrating for me because I was
20  trying to get the offices cleaned and I kept
21  running into -- they weren't dead ends they were
22  more roadblocks because I didn't have SERVPRO and
23  that failed me.  And then to have multiple
24  conversations with the maintenance guys in order

Page 349

1  to get it to a level where it was an office that
2  could be occupied was -- yeah.
3  Q.    So you were frustrated and just kind of
4  out frustration, that word was used?
5  A.    Yes.
6  Q.    So if you were frustrated, could you
7  understand how the four plaintiffs could be
8  frustrated?
9  A.    Sure.
10  Q.    So as of -- so January -- this e-mail is
11  from January 13th and you had met with them on --
12  the plaintiffs on January 11th for the 410
13  Building, correct?
14  A.    Yes.
15  Q.    So were they back in the 410 Build, Ms.
16  Goodman and Ms. Kleckner?
17  A.    Yes.
18  Q.    As of January 11th?
19  A.    Yes.
20  Q.    Okay.
21    MS. SMITH:  Going to show you
22  what's previously marked Exhibit-61.
23    - - -
24    (Previously marked Exhibit-61.)

Page 350

1    - - -
2  BY MS. SMITH:
3  Q.    Do you recognize this e-mail?
4  A.    Yes.
5  Q.    And this is a January 13 e-mail --
6  January 13, 2021, e-mail from Ms. Toomey to you
7  regarding an incident with Melissa Goodman,
8  correct?
9  A.    Yes.
10  Q.    Did you respond to this e-mail?
11  A.    Not that I recall.
12  Q.    Okay.
13    And I -- this is around the time that
14  Ms. Zula came on board with the county, correct?
15  A.    Yes.
16  Q.    Okay.
17    So let's discuss that one for a little
18  bit.
19    When was Ms. Zula's official start date
20  with the county, if you remember?
21  A.    Monday, January 11th.
22  Q.    Okay.
23    What was your understanding of what your
24  role or duties -- how your role or duties changed

Page 351

1  once she, Ms. Zula, began with the county?
2  A.      It was determined upon her start date
3  that there would be a transfer of knowledge, get
4  her up to speed, let her know what was taking
5  place with the harassment case, any day-to-day
6  operations, contract negotiations, and
7  commissioners' meeting because of the presentation
8  of the PAR report and the salary board reports.
9  Q.      Okay.
10        So when Ms. Zula -- when the county
11  decided to hire Ms. Zula, was it at that time or a
12  different time that an end date was kind of set
13  for your contract with -- or Hubric's contract
14  with the county?
15  A.      Yeah.  So at the -- simultaneously, it
16  was determined that I would administer and present
17  anti-harassment and non-discrimination training.
18  So I would move out of the role of the interim HR
19  director and then present the in-person and
20  virtual training to all employees of the county.
21  Q.      Okay.
22        So would you continue to provide what
23  I'll call day-to-day HR services or just this
24  harassment training presentation?

Page 352

1  A.      I -- I continued working with Heidi for
2  about four weeks, four to five weeks on a
3  day-to-day basis as we were also building the
4  training platform, which is a platform that we
5  used at another client that was approved by the
6  EEOC.
7  Q.      Okay.
8        So there was about, if I understand,
9  four to five weeks of a transfer of knowledge
10  where you kind -- you were transferring knowledge
11  to Ms. Zula from you, but you were also
12  transferring into doing more just sexual
13  harassment presentations for the county?
14  A.      I was conducting the training, yes.
15  Q.      Okay.
16        When Ms. Zula was hired by the county,
17  were you involved in that at all?
18  A.      Yes.
19  Q.      Tell me what happened, how that went
20  with finding a non-contract HR director.
21  A.      So there's job postings that were put
22  out on Indeed and LinkedIn.  And based upon the
23  resumes received, there were four or five
24  candidates that I had conducted prescreening

Page 353

1  interviews with.  And then we narrowed it down to,
2  I think it was, three individuals that came in and
3  met with Mr. Bender, Mr. Roth, Lisa Mayhall, and
4  Ms. Gilbert from mental health and development --
5  developmental services.  And then those
6  individuals were then asked to return as final
7  candidates for consideration of the role and they
8  met with the commissioners.
9  Q.      Okay.
10        So the Indeed posting who drafted that?
11  A.      I did.
12  Q.      Did anyone review it, approve it before
13  it was posted?
14  A.      No, not to my knowledge.
15  Q.      Okay.
16        And then as I understand, there were a
17  number of applications received by the county?
18  A.      Yes.
19  Q.      And I think you said -- so you did some
20  initial interviews where you, it sounded like,
21  weeded out a few candidates?
22  A.      Correct.
23  Q.      Then once they got past you, they went
24  to essentially a second interview --

Page 354

1  A.      Correct.
2  Q.      -- with you, Mr. Roth, Mr. Bender, Lisa
3  Mayhall, and Elaine Gilbert?
4  A.      Yes.
5  Q.      Those are the five?  Okay.
6        Elaine Gilbert is the benefits
7  administrator for the county; is that --
8  A.      No.  She's the director of mental health
9  and developmental services.
10  Q.      Why was she involved in the interview
11  process of an HR director?
12  A.      She's part of the interviewing
13  committee.
14  Q.      Okay.
15        There's a committee for interview?
16  A.      Yes.
17  Q.      Okay.
18        How does one, if you know, get on that?
19  A.      I don't know that.
20  Q.      Okay.
21        And so was Mayhall also part of that
22  committee?
23  A.      Yes.
24  Q.      Okay.

Page 355

1  Were there any candidates that didn't
2 make it through that level of interviewing, that
3 you didn't send on to the commissioners?
4 A.     One candidate that I remember.
5 Q.     Okay.
6  And what about the one -- the first
7 level where you conducted it, did anyone not make
8 it past that to the next --
9 A.     There were four or five.
10 Q.     Okay.
11  So those individuals, the four or five
12 for the solo level with you, they weren't ever
13 considered for employment --
14 A.     No.
15 Q.     -- past that?
16 A.     Correct.
17 Q.     Then there was the five-panel committee
18 and there was some -- at least one that didn't
19 get -- one applicant who didn't get through and
20 wasn't considered for employment?
21 A.     Correct.
22 Q.     And then there was how many that were
23 submitted to the commissioners?
24 A.     Two.

Page 356

1 Q.     Two.
2  Ms. Zula and one other --
3 A.     Yes.
4 Q.     Do you know who that was?
5 A.     First name is David.
6 Q.     Okay.
7  Do you know -- have any knowledge as to
8 why the commissioners selected Ms. Zula?
9 A.     No.
10 Q.     Okay.
11  The commissioners correctively, as you
12 understand, selected Ms. Zula and then I guess
13 instructed someone to do a PAR for her?
14 A.     Yes.  So through the hiring process,
15 once the individual has been approved, there is a
16 PAR that's completed and then it goes to the
17 commissioners' meeting for appointment.
18 Q.     Okay.
19  Do you know who completed the PAR for
20 Ms. Zula?
21 A.     I think I did.
22 Q.     Okay.
23  Do you know who decided how much Ms.
24 Zula -- what her salary would be?

Page 357

1 A.     In -- those were -- those were
2 discussions between myself and Mr. Bender.
3 Q.     Okay.
4  And were you in agreement with Mr.
5 Bender's -- did he pick a number?  Did you pick a
6 number?  Did you kind of -- what happened?
7 A.     I gave him a starting point and we
8 negotiated from there.
9 Q.     Was your number higher than -- did he
10 negotiate you down?
11 A.     Yes.
12 Q.     Okay.
13 A.     The commissioners ultimately were
14 involved in the decision of what her salary would
15 be as well.
16 Q.     But it went to them with a number in
17 mind and then they decided?
18 A.     Yes.
19 Q.     Or were they involved in that --
20 negotiations with Bender and you?
21 A.     So I -- I made a recommendation to Mr.
22 Bender and then he had discussions with the three
23 commissioners.  And then we got back together
24 collectively and talked through the justification

Page 358

1 of what it would be.
2 Q.     And did he, during that justification
3 discussion, explain to you that the commissioners
4 didn't want to pay her what you had suggested?
5 A.     Correct.
6 Q.     What, if anything, did you share with
7 Ms. Zula concerning the plaintiffs and their
8 allegations against the county and claims against
9 the county when she started?
10 A.     Ms. Zula and I had conversations
11 regarding the transition of them working from home
12 to the 410 Building and really trying to make that
13 as successful as possible.
14 Q.     Did you make it known to her that you
15 thought they could have worked from home just as
16 effectively as at the 410 building?
17 A.     Yes.
18 Q.     And what was her response to that?
19 A.     She didn't disagree.
20 Q.     Okay.
21  And was Ms. Zula provided by you or, if
22 you know, by anyone else, with a copy of Ms.
23 Twigg's -- the report by Ms. Twigg that you had
24 seen?

Deposition of Doreen Kutzler                                    Jane Doe, et al. v. Schuylkill County Courthouse, et al.

Page 359

1  A.      Again, she was made aware of the file
2  drawer in which those documents were stored.  And
3  I think she took it upon herself at some point --
4  not while at work, I don't think, to review the
5  files.
6  Q.      Okay.
7          So you think she took that file home
8  with her?
9  A.      I don't know if she took it home.
10 Q.      Okay.
11 A.      But between the hours of -- the
12 respective hours between 8:30 and 43:0.  She had a
13 tendency to work late into the evening.
14 Q.      All right.
15         So at least as very early as
16 January 13th, so just two days after Ms. Zula gets
17 hired, you're still dealing with and responding to
18 some day-to-day operational for personnel issues;
19 would that be fair to say?
20 A.      Yes.
21 Q.      Okay.
22         And I'm sorry if I asked you this
23 question:  Did can you respond to this e-mail?
24 A.      I don't remember.

Page 360

1  Q.      Okay.
2          Would you -- based off of the contents
3  of it, would you say that this espouses a safety
4  concern for Ms. -- by Ms. Goodman or for Ms.
5  Goodman?
6  A.      Potentially.
7  Q.      Okay.
8          Do you know, did -- Mr. Roth is cc'd on
9  this, correct?
10 A.      Yes.
11 Q.      Are you aware of Mr. Roth preparing an
12 affidavit for Ms. Goodman?
13 A.      In --
14 Q.      In regards to the contents of this
15 e-mail?
16 A.      No.
17 Q.      Is there a reason why an affidavit was
18 prepared for Ms. Matascavage about a safety
19 concern, but not Ms. Goodman?
20         MS. PIPAK:  Object to the form.
21         But you can answer.
22         THE WITNESS:  No.
23 BY MS. SMITH:
24 Q.      Do you see why I'm asking the question,

Page 361

1  if one was prepared for Ms. Matascavage, wouldn't
2  it only make sense that one would be prepared for
3  Ms. Goodman?
4  A.      Well, I think that the situation with
5  Ms. Matascavage was two employees in a vehicle
6  together.  This was two individuals out on the
7  highway.
8  Q.      Well, Ms. Goodman was out on the highway
9  in her capacity as a county employee, correct?
10 A.      Oh, okay.  Yeah.  Yeah.
11 Q.      I mean, she was, right?
12 A.      She was, yeah.
13 Q.      And -- and Mr. Halcovage was out in a --
14 as a county commissioner during work hours,
15 correct?
16 A.      My understanding is he --
17         MS. PIPAK:  Object to the form.
18         THE WITNESS:  Sorry.
19         MS. PIPAK:  You -- you can answer.
20         THE WITNESS:  He was on his way to
21 a funeral service.
22 BY MS. SMITH:
23 Q.      Did you ever speak with Ms. Goodman?
24 A.      No, we did not.

Page 362

1  Q.      Did you ever interview her?
2  A.      No.  She never responded.
3  Q.      Did you reach out to her?
4  A.      Ms. Zula did.
5  Q.      Were you cc'd on it?
6  A.      Yes.
7  Q.      Did you tell Ms. Zula to follow up with
8  Ms. Goodman?
9  A.      Well, Ms. Toomey and Ms. Gerchak had
10 come down to the HR department to make us aware of
11 the situation that had presented because we were
12 in the commissioners' meeting at 10:00 that
13 morning.  So we didn't know that this had all
14 transpired until after the commissioner's meeting
15 was over.
16 Q.      Okay.
17 A.      And when they had come down to the HR
18 department, Heidi had scribed notes and she had
19 asked for a copy of the police report that we were
20 informed was being filed by Ms. Goodman.
21 Q.      Did -- this was a -- the request for the
22 police report was made to Ms. Toomey and Ms.
23 Gerchak, correct?
24 A.      Yes.

Page 363

1  Q.      Okay.
2      And did -- had Ms. Goodman filed the
3  police report at that time?
4  A.      Our understanding was that she was with
5  the St. Claire police filing the report.
6  Q.      Did -- to your knowledge, did you or
7  anyone on behalf of the county reach out to the
8  St. Claire police department to obtain a report?
9  A.      I did not.
10  Q.      Okay.
11      And you're not aware of anyone else who
12  did?
13  A.      No.
14  Q.      Okay.
15      Did Ms. Zula ever obtain a copy of the
16  police report, to your knowledge?
17  A.      To my knowledge, no.
18  Q.      You testified earlier that Commissioner
19  Halcovage's parking spaces had changed a number of
20  times?
21  A.      Yes.
22  Q.      Do you know when they changed, were the
23  plaintiffs notified of the changes?
24  A.      Not to my knowledge.

Page 364

1  Q.      Do you think that it might have been
2  helpful for them to know so they could avoid where
3  he parked?
4  A.      Certainly.
5  Q.      Do you know why they weren't notified
6  then of when these park spaces were changed?
7  A.      Regarding this commissioner's vehicle
8  sign?
9  Q.      No, just in general.
10      You said they weren't notified when he
11  was -- his spots were changed.
12  A.      Right.
13  Q.      Do you know why?
14  A.      No.
15  Q.      Okay.
16      And that could have -- the changes to
17  his parking spot could have only been done by Mr.
18  Bender, correct?
19  A.      That was all Sheriff Groody.
20  Q.      Oh, the parking changes?
21  A.      Yeah.
22  Q.      Okay.
23      MS. SMITH:  All right.  We're going
24  to look at Zula RFP 325 and 326.  It will be 294.

Page 365

1      - - -
2      (Zula 325-326 marked as Exhibit-294 for
3  identification.)
4      - - -
5  BY MS. SMITH:
6  Q.      I am also going to put in front of you
7  120, you can leave it underneath, but it kind of
8  goes together.
9  A.      Okay.
10  Q.      We're going to start with the second
11  page, so Zula 326.  It's an e-mail from Heidi Zula
12  to Angela Toomey and you are cc'd on it.
13      Do you see that?
14  A.      Yes.
15  Q.      Okay.
16      It says -- says:  Please see the
17  attached correspondence on behalf of -- 120 is not
18  the right one.  I apologize.  I apologize.  You
19  can hand me 120 back, it's not actually the right
20  one I need you to look at.
21      Ms. Zula's e-mail to you indicates:
22  Please see the attached correspondence on behalf
23  of County Administrator Bender.
24      MS. SMITH:  I'm going to mark Doe

Page 366

1  Supplement 583 as 295.
2  BY MS. SMITH:
3  Q.      Do you recognize this January 15th
4  letter to Ms. Toomey from Mr. Bender?
5  A.      Somewhat.
6  Q.      Okay.
7      Do you know if that was the attachment
8  of the letter?
9  A.      I assume so.
10  Q.      Okay.
11      Did you have any involvement in the
12  drafting of this letter?
13  A.      What I can recall is that Ms. Zula and I
14  worked with Mr. Heinbach.
15      MR. LEES:  Wait.  I just want to
16  verify the county's position on this before you
17  continue.
18      MS. PIPAK:  Can you put up the
19  Exhibit-295?
20      MS. SMITH:  Oh, sorry.  Matt, can
21  you put -- so it's Doe Supplement 583.
22      MR. LEES:  This was previously
23  marked as a different exhibit.
24      MS. SMITH:  Let's revoke 295.

Deposition of Doreen Kutzler                                    Jane Doe, et al. v. Schuylkill County Courthouse, et al.

Page 367

Matt, can you pull up Exhibit-21.
That won't be 295 since it's already an exhibit, but
that is 21.

- - -

(Previously marked Exhibit-21.)

- - -

BY MS. SMITH:
Q.      All right.
So were you involved in the drafting of
the e-mail?
A.      Yes.
Q.      Okay.
I'm sorry.  I should call it -- it was a
letter.  The E-mail was what Ms. Zula sent, but
it's the letter that you were involved in the
drafting, which is Exhibit-291, correct?
A.      Yes.
Q.      Okay.
Did you do the first initial draft?
A.      We worked collectively on it.
Q.      Okay.
And who is we?
A.      Me and Ms. Zula.
Q.      All right.

Page 368

Who instructed you to draft such a -- a
letter?
MS. PIPAK:  I am going to object to
the extent that this calls for conversations you
had with counsel.  I am going to direct the
witness not to answer.
BY MS. SMITH:
Q.      Well, it has Gary Bender's name.  So did
Mr. Bender direct you to write this for him?
THE WITNESS:  I'm okay to answer?
MR. LEES:  You can answer that.
THE WITNESS:  Yes.
BY MS. SMITH:
Q.      Okay.
Tell me about how what went down.  What
happened?  Who was there?  What was the set up?
MS. PIPAK:  All right.  And I'm
just -- I am going to object and tell the witness
not to answer it to the extent it -- she relayed
communications she had with counsel.
THE WITNESS:  This letter is all
over the place.
So this letter is not in conjunction
with the safety concerns from the January 16th

Page 369

e-mail.  Oh, wait.  Yeah, it is.  Sorry.  I'm
thinking we're talking at the car.
BY MS. SMITH:
Q.      What car?
A.      The -- Ms. Goodman and Mr. Halcovage
from the 13th.
Q.      Right.  Right.  Right.
But -- so.  No.  You're right.
A.      This is --
Q.      We're talking about --
A.      Okay.
Q.      There's just an e-mail, if you look at
the second page of 294, there was that e-mail.
A.      Right.  Please see the attached
correspondence on behalf of county administration.
So this is this letter.
Q.      That was attached to the e-mail --
A.      Okay.
Q.      Correct?  Am I correct?
A.      Yes.
Q.      Okay.  All right.
A.      Sorry.
Q.      Now that you have your bearings.
A.      Yes.

Page 370

Q.      Did Mr. did -- you write this letter
with Ms. Zula?
A.      Yes.
Q.      On behalf of Mr. Bender at his
instruction?
A.      Yes.
Q.      Okay.
So that was all correct.  I just wanted
to make sure.
Why -- tell me about how that came to
fruition that he was telling you to write this
letter?
MS. PIPAK:  And I am just going to
raise the same objection to the extent of the
witness and instruct you not to answer any
communications you had with counsel.
MS. SMITH:  She can answer.
BY MS. SMITH:
Q.      If it's a conversation -- what she's
saying in her --
A.      It's a conversation I had with Ms. Zula.
Q.      Okay.
She's not an attorney, so you can
answer.

Page 371

A.     Right.
Q.     That's all she -- that's what she's
saying, you can answer as long as you're not
disclosing the contents of a conversation with one
of the county's attorneys.  If you had a
conversation with Ms. Zula or Mr. Bender, then you
can disclose those contents because they're not
attorneys.
A.     Okay.  Yeah, so with -- this was the
situation where George had come into the
courthouse through the north entrance to attend
the swearing in of Christina Hale.
Q.     Okay.
       So we had spoken about that briefly
earlier because there was another e-mail that you
thought might have been that where you reviewed
video.  Do you recall testifying to that?
A.     That -- the video would have been
associated with this letter, not what had happened
back in October.
Q.     Okay.
       So did you view video footage regarding
allegations by the plaintiffs about Commissioner
Halcovage more than once or was it only once and

Page 372

it was the Hale swearing in?
A.     It was -- it was one time and it was the
Hale swearing in.
Q.     So that would have been in January of
2021?
A.     Correct.
Q.     So then in October of 2021 when you
thought you might have reviewed video, you were
mistaken and you did not review video?
A.     Correct.
Q.     So now -- and I can pull that one back
up if we need to, there was an allegation that he
was unescorted, Defendant Halcovage, you never
were able to deny -- confirm that that was true,
correct?
A.     Correct.
Q.     Okay.  All right.
       So then this incident, which is the
Judge hale swearing in -- do you know, is that
H-A-L-E or --
A.     H-A-L-E.
Q.     Okay.
       This is when -- nevermind, there's so
many e-mails.  There might have been another

Page 373

e-mail which triggered the looking into this.
       But how did it come up that you needed
to go look at the video?
A.     We wanted to confirm -- Heidi and I
wanted to confirm, one, if George was in the
hallway at that time, at that particular time
frame, and whether or not he was walking with
anyone.
Q.     I guess -- so my question might have
been a bad one.
       Was there an e-mail from Ms. Toomey or
someone reporting him -- Defendant Halcovage's
actions that triggered you to go do that or..?
A.     It may have been an e-mail.  I think it
was an e-mail that would have come in because...
Q.     You can keep going.  Sorry.
A.     We would not have invested any --
investigated anything had we not been made aware
of the situation.
Q.     Ms. Toomey -- do you remember Ms. Toomey
sending an e-mail about excusing herself, Ms.
Gerchak, Ms. Goodman, and Ms. Kleckner for the day
to work from home because they had encountered
Defendant Halcovage?

Page 374

A.     I don't recall that e-mail.
Q.     Okay.
A.     So, I'm sorry, just for clarification --
Q.     Yeah.
A.     -- purposes, all four of them ran into
Commissioner Halcovage?
Q.     No.  And I am --
A.     Or --
Q.     I am not trying to represent to you
something that happened.  I am trying to find out
what you remember.  I was just trying to refresh
your recollection.
       But I am ask -- I am just going to
direct you to the third paragraph.
A.     Yes.
Q.     You may not have been cc'd on the e-mail
it references, but it says:  As you stated in your
e-mail and as this is directed to Ms. Toomey, as
she stated in her e-mail, you directed your
employees to leave their work locations early
based upon this situation and you left work early
as well.
       Does that refresh your recollection as
to what triggered the chain of events recording

Case 3:21-cv-00477-MCC Document 280-2 Filed 09/20/23 Page 100 of 373
CONFIDENTIAL
Deposition of Doreen Kutzler                    Jane Doe, et al. v. Schuylkill County Courthouse, et al.

Page 375

you looking into Halcovage's movements and this letter?

A.    I don't know that we were aware that they had left the building. So us looking at the videos, I think was based upon the fact that they raised concerns that George was walking through the building potentially unescorted.

Q.    Okay.
      In any event, something happened to trigger you to go look at the videos?

A.    Yes.

Q.    Was that -- and that was you and Ms. Zula who looked at the videos?

A.    Yes.

Q.    Did you have a conversation with Bender prior to looking at the videos about the issue?

A.    No.

Q.    You just got the e-mail and then went and looked at the videos?

A.    Yes.

Q.    And did you then speak with Ms. Toomey regarding the fact that he -- Defendant Halcovage was not unescorted?

Page 376

A.    I don't remember if I had the conversation or if Ms. Zula had the conversation.

Q.    And when you said had, do you mean you don't even know if you were present for it?

A.    I don't recall.

Q.    Okay. That's fair.
      Prior to having the conversation or if you did, do you recall if -- strike that.
      Do you recall if prior to a conversation being had with Ms. Toomey by anyone for the county, that Mr. Bender was informed of, I'll call it, the investigation findings, the video reveal?

A.    So did we have a conversation with him about it?

Q.    Yes. Yes, before anyone spoke with Ms. Toomey?

A.    Yes.

Q.    Okay.
      And what, if anything, do you recall informing Mr. Bender about?

A.    That we had observed Mr. Halcovage coming in through the north entrance, waiting. The stairs split, so many go down, so many go up. And he was waiting at the landing. And Mr. Bender

Page 377

appeared into the video, met George, and the two of them proceeded up the steps and then disappeared out of sight of that particular camera.
      And you can see the two of them walking together to Courtroom No. 1 or at least down the hall. And then they were picked up walking into Courtroom No. 1.

Q.    Is this the video surveillance you said that you questioned Ms. Toomey about the times that you needed to view?

A.    Yes.

Q.    Okay.
      Did you view his entire movement -- Defendant Halcovage's entire movement from the time of arrival through departure that day?

A.    From the moment he walked into the north entrance until he left the swearing in ceremony.

Q.    And then where did he go when he left the swearing in ceremony?

A.    He walked down the hall, past the treasurer's office and the register of wills and then at the controllers office is when he descended the steps.

Page 378

Q.    To go where?

A.    Back to the commissioners' office.

Q.    Did you see on the video surveillance, him entering the commissioners' office?

A.    Yes.

Q.    Was he escorted at that point?

A.    He walked with Gary Wilmur, the courier.

Q.    From Courtroom 1 to the commissioners' suite?

A.    No. He went from Courtroom 1, to the top of the stairs with a woman from the controllers office. I don't know who that was.

Q.    Okay.
      And then what happened after she left?

A.    They parted, he walked down the stairs, he met Gary, and then they continued on to the commissioners' office.

Q.    From your review of the video, did it appear as if the woman know -- knew that Gary Wilmur was at the bottom of the steps?

A.    No.

Q.    It didn't -- no, it didn't appear that way or no, you don't have an opinion as to how it appeared? I just want to make sure.

Page 379

1  A.      It did not appear that she --
2          MS. PIPAK:  Objection to the form.
3          You can answer.
4          THE WITNESS:  It did not appear
5  that she was aware that he was at the bottom of
6  the steps.
7  BY MS. SMITH:
8  Q.      Did -- did it appear that Defendant
9  Halcovage knew that Gary Wilmur was at the bottom
10 of the steps?
11 A.      No.
12 Q.      Did it appear as if -- when Defendant
13 Halcovage saw Mr. Wilmur that he was seeing him,
14 unknowing that he was going to be there?  Kind of
15 like someone shocked, oh, like, hey?
16 A.      Hey, how you doing.  Yeah, and then...
17 Q.      They just walked together?
18 A.      Correct.
19 Q.      So would you term Defendant Halcovage's
20 movements after leaving the woman as escorted?
21 A.      No.
22         MS. PIPAK:  Object to the form.
23         Go ahead.
24 BY MS. SMITH:

Page 380

1  Q.      In January of 2020, was Defendant
2  Halcovage per Sheriff Groody's orders, to be
3  escorted through the courthouse?
4  A.      Yes.
5  Q.      So would you term what you observed on
6  the video -- would you term Defendant Hal --
7  Halcovage's movements and conduct on the video to
8  be a violation of what Sheriff Groody imposed on
9  him?
10 A.      Potentially.
11         MS. PIPAK:  Objection.
12         Go ahead.
13 BY MS. SMITH:
14 Q.      So you view the video.  You -- someone
15 communicates -- you and Ms. Zula communicate with
16 Mr. Bender.  Someone communicates with Ms. Toomey.
17 And then is the letter written after that?
18 A.      Yes.
19 Q.      Okay.
20         What was Bender's instruction to you on
21 what the contents of this letter should have?
22 A.      Just that -- to make Ms. Toomey aware
23 that she wouldn't have the authority to send her
24 people home.

Page 381

1  Q.      Okay.
2          So you and Ms. Zula draft this letter
3  together.  And is it given to Mr. Bender?
4  A.      It's drafted alongside with counsel.
5  Q.      You said you drafted this with Ms. Zula,
6  correct?
7  A.      We did.
8  Q.      Did it get given to Mr. Bender?
9  A.      Eventually.
10 Q.      Okay.
11         Do you know if he made any changes to
12 it?
13 A.      Not to my knowledge.
14 Q.      Okay.
15         He just -- it looks like an e-signature,
16 so he didn't even hand sign it.
17         Did he just approve you to add his
18 e-signature?
19 A.      Yes.
20 Q.      And then you sent it out to Ms.
21 Toomey -- or Ms. Zula, I think, sent it out to Ms.
22 Toomey, correct?
23 A.      Yes.
24 Q.      Okay.

Page 382

1          The last sentence of the first
2  paragraph, it states:  As previously stated,
3  Commissioner Halcovage agreed to be escorted to
4  other areas of the courthouse, which is exactly
5  what occurred today.
6          That's not what occurred exactly, is it?
7  A.      Not in its entirety.
8          MS. PIPAK:  Object to the form.
9          Go ahead.
10 BY MS. SMITH:
11 Q.      The next paragraph states, the first
12 sentence, while in until conversation with the
13 interim human resources director and the new human
14 resources -- resources director on Wednesday,
15 January 13th, so that would be you and Ms. Zula,
16 correct?
17 A.      Yes.
18 Q.      The question was posed as to why the tax
19 assessment employees have not utilized the north
20 entrance when entering and exiting the courthouse.
21         Who posed that question?
22 A.      I did.
23 Q.      To Ms. Toomey?
24 A.      Yes.

Deposition of Doreen Kutzler                                  Jane Doe, et al. v. Schuylkill County Courthouse, et al.

Page 383

1  Q.      Okay.
2         And why did you pose that question to
3  Ms. Toomey?
4  A.      In knowing that Mr. Halcovage was
5  directed to use the main entrance in order to
6  provide all of the plaintiffs with the ability to
7  avoid any kind of run in, I recommended that they
8  use the north entrance.
9  Q.      So the way the sentence reads, it says,
10 the question was posed, not the suggestion was
11 made.  So were you -- and I'm just trying to
12 understand your conversation with her or what
13 happened during that exchange.
14        Was there -- prior to this letter, was
15 there an instruction by you or anyone on behalf of
16 the county to Ms. Toomey, that tax assessment
17 employees or more specifically the plaintiffs,
18 should utilize the north entrance?
19 A.      Yes.
20 Q.      And there wasn't, correct me if I'm
21 wrong, any question that they weren't doing so,
22 correct?
23 A.      Correct.
24 Q.      Okay.

Page 384

1         So the way it reads to me is that they
2  weren't -- you were asking them, why didn't you do
3  this, this all could have been avoided.  It wasn't
4  that, it was just a reminder, hey, utilize the
5  north entrance?
6  A.      No.  It was the aforementioned that you
7  said.  It was, why aren't you using -- to me, it
8  was more of a question for me, why aren't you
9  using the north entrance because nine times out of
10 ten, you can avoid, one, any run in because George
11 is using the main entrance.  And, two, again when
12 you come through the main entrance and you turn
13 and walk through the double doors that
14 automatically open, that's in direct line of sight
15 to the commissioners' office.  So if he was coming
16 up the step, if he was coming out of the elevator,
17 you would still see him no matter what.  So the
18 north entrance, no direct line of sight.  They can
19 avoid any interaction with him to the greatest
20 extent possible.
21 Q.      So, again, I just want to clarify, so it
22 was -- you said it was aforementioned, meaning why
23 aren't you using it.  But was there anything to
24 make you believe that they weren't utilizing it?

Page 385

1  A.      No.
2  Q.      Okay.
3         So you were just reaffirming that they
4  were using it?
5  A.      Yes.
6  Q.      Through questioning?
7  A.      Yes.
8  Q.      Okay.
9         But didn't -- on this particular day,
10 wasn't that the door that Mr. Halcovage used?
11 A.      It was.
12 Q.      Okay.
13        So even if they had, which by your
14 testimony, they were using the north entrance,
15 they still would have encountered him that day?
16 A.      Yes.  It's a Murphy's Law thing.
17 Q.      And -- well, Murphy's Law, except that
18 Defendant Halcovage had been asked not to use that
19 entrance and if he had abided by that simple
20 thing, it would have avoided this issue, correct?
21 A.      Correct.
22 Q.      So maybe we should call it Defendant
23 Halcovage's Law, that's what he wants.
24        Would you agree with that?

Page 386

1         MS. PIPAK:  Objection.
2         MR. LEES:  Objection to the form.
3         MS. SMITH:  I'll withdraw it.
4  BY MS. SMITH:
5  Q.      Do you have any understanding about what
6  exempt versus non-exempt employees are?
7  A.      Yes.
8  Q.      Do you -- and I'm not going to ask you
9  to recite it, so don't worry.
10        Do you know somewhat of the tests of
11 what a non-exempt employee -- the duties and
12 abilities they have?
13 A.      Yes.
14 Q.      Okay.
15        Ms. Toomey was an exempt -- exempt
16 employee, correct?
17 A.      Yes.
18 Q.      I always say them backwards.
19        She was a supervisor of a department?
20 A.      Yes.
21 Q.      As of January 15, 2021, based off of
22 your experience at the county and your
23 understanding of exempt verse non-exempt
24 employees, did you believe that Ms. Toomey held or

Case 3:21-cv-00477-MCC   Document 280-1  CONFIDENTIAL   Filed 09/20/23   Page 103 of 373

Deposition of Doreen Kutzler                                    Jane Doe, et al. v. Schuylkill County Courthouse, et al.

Page 387

1  at least should have held if she was going to be
2  classified as exempt, the ability to direct her
3  employees work locations?
4  A.      Yes.
5  Q.      Was there anything that you recall
6  surrounding this time, this incident, that led you
7  to believe that Ms. Toomey told her employees they
8  could go home and be paid, but not work?
9  A.      Not to my knowledge.
10 Q.      Okay.
11         Did you see this letter as a write-up or
12 a reprimand of Ms. Toomey?
13 A.      No.
14 Q.      During your employment with the county,
15 were you ever instructed to draft or compose a
16 letter similar to this, so not a reprimand, but a
17 letter to an employee on the -- an employee of the
18 county?
19 A.      No.
20 Q.      This is the only one?
21 A.      Yes.
22 Q.      Third paragraph, middle of it.
23 A.      Yes.
24 Q.      In addition, you do not have the

Page 388

1  authority to direct your employees to leave their
2  work site without appropriate usage of leave.
3         So you would disagree with the authority
4  to direct your employees to leave, it's just that
5  without appropriate usage of leave that makes --
6  is the issue?  Meaning, if she had excused them to
7  work from home and use PTO, vacation, sick, or
8  work from home and work from home, then it would
9  have been fine, correct?
10 A.      Correct.
11 Q.      Okay.
12         Did you speak with Ms. Toomey and ask
13 her what she -- exactly she'd instructed her
14 employees to do?
15 A.      I don't remember.
16 Q.      This letter was issued and sent out on
17 January 15th, which was the very same day that the
18 incident happened and the excusal of the employees
19 happened, correct?
20 A.      To my knowledge, yes.
21 Q.      The tax assessment office submitted
22 weekly hours, correct?
23 A.      Yes.
24 Q.      So if Ms. Toomey had submitted hours

Page 389

1  where they -- the employees that are excused had
2  submitted vacations, sick, or PTO, there would not
3  have been an issue, correct?
4  A.      Correct.
5  Q.      Why was it so important to issue this
6  letter the same day, if you know?
7  A.      I don't know that.
8  Q.      Do you know if Mr. Bender spoke with or
9  e-mailed Ms. Toomey and said, did you tell them to
10 use time or did you just send them home?
11 A.      Not to my knowledge.
12         MS. SMITH:  We are going to look at
13 Exhibit-20.
14         Matt, if you can pull that up.
15 BY MS. SMITH:
16 Q.      Do you recognize this e-mail?
17 A.      Yes.
18 Q.      Is this the chain of events -- is this
19 the start -- starting point of it?
20 A.      Yes.
21 Q.      Okay.
22         In it, Ms. Toomey clearly states:  We've
23 been advised by our attorney to exit the county
24 building and work from home until further notice.

Page 390

1         There's nothing in this e-mail that
2  suggests that she did not instruct them to just go
3  home and use county time, correct?
4  A.      Correct.
5         MS. SMITH:  Can we go off the
6  record for like five minutes.
7         VIDEOGRAPHER:  The time is
8  4:21 p.m. and we are off the record.
9                  - - -
10        (Whereupon, brief recess was held off
11 the record.)
12                 - - -
13        VIDEOGRAPHER:  The time is now 4:31
14 p.m. and we're back on the record.
15 BY MS. SMITH:
16 Q.      All right.
17        Ms. Kutzler, I want to -- I'm going to
18 jump in -- I know I've been going chronological,
19 trying to make it easier on you and myself.  I'm
20 going to jump a little bit just because I want to
21 get some understanding of what the second stint of
22 your time at the county involved.
23        When did that begin?
24 A.      May 19th of 2022.

Page 391

1  Q.      And was that, as I understand it and
2  correct me if I am wrong, was as a result of Ms.
3  Zula putting in her resignation?
4  A.      Yes.
5  Q.      Okay.
6          And so the county was going to be
7  without an HR director?
8  A.      Correct.
9  Q.      So they reached back out to Hubric
10 Resources and retained your services again?
11 A.      Yes.
12 Q.      And as you had worked there, I image it
13 obviously made sense for Hubric to assign you to
14 it?
15 A.      Yes.
16 Q.      Okay.
17         And you agreed?
18 A.      Yes.
19 Q.      All right.
20         And so from May 22nd until when did you
21 provide interim human resources services?
22 A.      Until October 27th.
23 Q.      And that was a result of Ms. Andrea
24 Whalen being retained -- hired by the county?

Page 392

1  A.      Correct.
2  Q.      Okay.
3          What, if anything, during your second
4  stint, so the 2022 stint, was different about the
5  services you provided, if anything, than your
6  first stint?
7  A.      No differences.
8  Q.      Okay.
9          Was there a transfer of knowledge, at
10 least as it relates to the time periods you
11 weren't there, between Ms. Zula and -- to you?
12 A.      Somewhat.  Not much.
13 Q.      Just kind of what had happened in that
14 period of time?
15 A.      Yes.
16 Q.      Okay.
17         Do you recall if any of that involved
18 anything related to the plaintiffs?
19 A.      Ms. Zula did inform me that -- that Ms.
20 Toomey and Ms. Gerchak's positions were split and
21 that they had been moved into tax claim.  And that
22 Ms. Kleckner and Ms. Goodman were supposed to be
23 working from the 410 office, but then were working
24 from home and requested to complete time sheets.

Page 393

1  Q.      Okay.
2          Anything else that you recall about the
3  plaintiffs that was transferred in the knowledge?
4  A.      No.
5  Q.      Did you have any interaction, whether in
6  person or by e-mail, a written exchange, with the
7  plaintiffs during that second stint of employment?
8  A.      I did send a communication to Ms.
9  Goodman regarding her termination of benefit
10 coverage.
11 Q.      Okay.
12         And at whose instruction, if anyones,
13 was that?
14 A.      I worked with Elaine Fucci in the HR
15 department, who is the benefit administrator, and
16 with the county policy, the ladies were paying
17 their contributions that's normally deducted out
18 of their pay.
19 Q.      Okay.
20 A.      And Ms. Goodman was in arrears.
21 Q.      Okay.
22 A.      So there were communications sent, two
23 letters, I think, if I recall, that stated that
24 she was in arrears and she had an opportunity to

Page 394

1  bring her account current.  And if that didn't
2  happen, then she would be -- the coverage would be
3  terminated and she would have a qualifying life
4  event.
5  Q.      Okay.
6          So was the correspondence you sent to
7  Ms. Goodman something you did on your own --
8  A.      Yes.
9  Q.      -- because of that arrears?
10 A.      Yes.
11 Q.      Okay.
12         So there was nothing -- we talked about
13 this earlier about Bender being able to send
14 correspondence if the person didn't have the
15 requisite hours.
16         That wasn't the case here?
17 A.      Correct.
18 Q.      All right.
19         Any other communications during your
20 second stint with -- of employment that you can
21 recall with the plaintiffs?
22 A.      There were e-mails received from Ms.
23 Toomey inquiring about the EEOC officer.
24 Q.      Okay.

Page 395

1    But the county's appointed individual?
2  A.    Yes.
3  Q.    Correct?
4    And what was your response, if any, to
5  her?
6  A.    Yeah.  So with the policy, it states
7  that the HR director and the solicitors office
8  would -- HR directors first, the back up, if you
9  will, would be someone from the solicitors office
10  and I had suggested Paul Dotty.  However, I was
11  not aware that he had defended or attended the UC
12  hearings on behalf of the county for Ms. Toomey
13  and Ms. Gerchak.
14  Q.    When you say UC, you mean the
15  unemployment hearing?
16  A.    Unemployment.
17  Q.    Okay.
18    So Paul when you learned that he was --
19  so Paul Dotty was a solicitor, correct?
20  A.    Yes.
21  Q.    And are you saying that because he
22  attended the unemployment compensation hearings on
23  behalf of the county, that he then -- it kind of
24  was a conflict if he would be the EEO officer for

Page 396

1  the county?
2  A.    Yes.  To Ms. Toomey's purview.
3  Q.    Okay.
4    So just as it relates to Ms. Toomey?
5  A.    Yes.
6  Q.    Because he had attended her unemployment
7  compensation?
8  A.    Correct.
9  Q.    Gotcha.  Okay.  I understand.
10    The second stint of your employment, do
11  you recall, had you been named as a respondent in
12  the EEOC charge by Ms. Toomey -- by the
13  plaintiffs?
14  A.    Yes.
15  Q.    Okay.
16    And so you were the interim HR director?
17  A.    Yes.
18  Q.    Risk -- I'm sorry.  You said who was the
19  back up, the risk manager, right?
20  A.    The...
21  Q.    Oh, the solicitor?
22  A.    Solicitor.  Solicitor's office.
23  Q.    Solicitor's office.
24    That would have included Glenn Roth, who

Page 397

1  was also a named respondent and I think a federal
2  defendant at that point, correct?
3  A.    Yes.
4  Q.    And then the back up, back up, you had
5  suggested, was Paul Dotty, and he had opposed
6  their un -- Ms. Toomey's unemployment?
7  A.    Correct.
8  Q.    So to whom was then Ms. Toomey to report
9  any issues, any EEO issues?
10  A.    Than would be the new HR director.
11  Q.    But while you remained there, to whom
12  was she to report it?
13  A.    I had conversations with Paul Dotty and
14  he was willing to speak with Ms. Toomey, but then
15  she didn't consider that and we never got to a
16  point where we identified anyone else.
17  Q.    So for a period of time, there was no
18  one -- no EEO or county representative named that
19  she could make reports of EEO compliance issues
20  to?
21    MR. LEES:  I will just object to
22  the form.
23    MS. PIPAK:  Object to the form.
24    MR. LEES:  But you can answer.

Page 398

1    THE WITNESS:  Correct.
2  BY MS. SMITH:
3  Q.    Okay.
4    Any knee other interactions or
5  communications with the plaintiff s from your
6  second stint that you recall?
7  A.    Other than the EEOC and then the COBRA
8  situation with Ms. Goodman, I can't think of
9  anything specifically.
10  Q.    Okay.
11    Switching gears a little bit again.  I
12  apologize.
13    I would like you to take a look at Zula
14  RP 432 and 4 --432 to 434.
15    MS. SMITH:  That will be 295.
16    - - -
17    (RP 432-434 marked as Exhibit-295 for
18  identification.)
19    - - -
20  BY MS. SMITH:
21  Q.    All right.
22    Going back to your -- your stint of
23  employment.  You were talking earlier about the
24  transfer of knowledge from you to Ms. Zula, as

Page 399

well as your transfer kind of into slightly
different contracting role with the county
involving sexual harassment training.
        Shortly after Ms. Zula started, so
roughly February of 2021, you started to conduct
sexual harassment training for county employees,
correct?
A.      Yes.
Q.      Okay.
        And what was your understanding
regarding elected officials attending at the
trainings?
A.      They would be required to attend them
just like any other employee.
Q.      And what was your understanding would
happen if they did not attend them?
A.      It wouldn't look favorable.
Q.      Could -- was it your understanding that
the county could take action against them?
A.      Not to my knowledge.
Q.      If we look to the second page of this
e-mail, there is an e-mail from you to Mr. Bender
about rescheduling the training due to weather
forecast. I think like today, there was some snow

Page 400

in Schuylkill County around that time, correct?
A.      Yes.
Q.      And some of -- one of, at least, the
trainings got moved, correct?
A.      Yes.
Q.      All right.
        And as a result of that, do you recall,
was Ms. Toomey and Ms. Gerchak originally
scheduled -- were they on that day that was moved?
A.      It was the 18th that was moved.
Q.      Right.
        So was that the day they had -- Ms.
Toomey and Ms. Gerchak had originally been
scheduled for?
A.      They were scheduled for the 19th.
Q.      Okay.
A.      Which I see is when Gary Bender's name
is on list as well.
Q.      Okay.
        And did that, to your recollection,
become a concern or issue raised by Ms. Toomey and
Ms. Gerchak that he --
A.      Yes.
Q.      Mr. Bender was scheduled to attend the

Page 401

same training?
A.      Yes.
Q.      Okay.
        Did you -- how did the list or the sign
up work?
A.      I had distributed -- so this was for
managerial, supervisory managerial staff and
above, because we did them first. And I -- based
upon the training dates that we had scheduled, I
had sent those dates out and they filled in on a
first come, first serve basis, depending upon who
responded and which date they wanted to attend.
Q.      Okay.
        Do you know when you received Mr.
Bender's response and selection for the 18th or --
the 18th? Because that's the one that got moved.
It ended up being the 19th, was the first day, but
the 18th was supposed to be the first day, right?
A.      Correct.
Q.      When you got his response and he wanted
to attend the 18th, had Ms. Toomey and Ms. Gerchak
already signed up for that day?
A.      I don't remember that specifically.
Q.      Okay.

Page 402

        Would you understand why Ms. Toomey and
Ms. Gerchak wouldn't want to attend the same
training as him?
A.      Sure.
Q.      Then on the first page of that document,
you provide the list. And like we stated, Gary
Bender, Ms. Toomey -- sorry -- it was the 19th,
they were -- right? Were they -- because this
says Friday, February 19th.
A.      Yeah.
Q.      That --
A.      So --
Q.      -- was not originally the first day of
the session, correct?
A.      The first session was scheduled for the
18th. That was rescheduled to the 25th.
Q.      Right.
        So when Ms. Toomey and Ms. Gerchak
signed up initially, they signed up for the 19th,
which would have been the second day, right?
A.      That's -- yeah. I think that's correct.
Q.      Okay. All right.
        As did Mr. Bender, correct?
A.      Yes.

Page 403

1  Q.      And in response to an e-mail from Ms.
2  Zula, you send an e-mail letting her know that
3  these people are scheduled for the 19th and you
4  state:  It is likely in George's best interest to
5  select another training session, as Angela and
6  Denise are RSVP'd to attend this one.
7        Why did you -- what was your reasoning
8  for that statement?
9  A.      So that they wouldn't be in the same
10 session together.
11 Q.      As someone they had accused of sexual
12 harassment?
13 A.      Correct.
14 Q.      But mr. Bender was still in that same
15 session as them, correct?
16 A.      Yeah.  He wasn't accused of sexual
17 harassment, was he?
18 Q.      Well, what was your understanding of
19 what he was accused of?
20 A.      More retaliation.
21 Q.      Did you understand that he was accused
22 of gender discrimination?
23 A.      No.
24 Q.      Okay.

Page 404

1  A.      I did not know that.
2        MS. SMITH:  We are going to look at
3  previously marked Exhibit-100.
4               - - -
5        (Previously marked Exhibit-100.)
6               - - -
7  BY MS. SMITH:
8  Q.      If we look to the second page, it's
9  going to be the first e-mail chronologically.
10       So Ms. Toomey's e-mail indicates in the
11 second paragraph, it's an e-mail from Ms. Toomey
12 to you:  After I scheduled the original session,
13 you informed me that Gary Bender would be
14 attending that session, so I chose the following
15 session.
16       So that would indicate to me basically
17 what we've just been talking about, that she
18 originally tried to schedule February 18th, you
19 told her that Bender was already scheduled for
20 that session, so she selected the 19th, correct?
21 A.      That's my understanding, yes.
22 Q.      Okay.
23       So then how is it, do you know, that Mr.
24 Bender then got scheduled on the 19th when Ms.

Page 405

1  Toomey and Ms. Gerchak were scheduled?
2  A.      It was based upon the 18th being
3  canceled.
4  Q.      But you knew that Ms. Toomey had
5  asked -- had chosen a different session after you
6  informed her about Bender being in that session,
7  correct?
8  A.      Yes.
9  Q.      So why was it that you allowed him to
10 move to the 19th?
11 A.      Just to get everybody in to one of the
12 training sessions.
13 Q.      You then, according to Ms. Toomey's
14 e-mail on Page 3, you informed her of Mr. Bender
15 attending the 19th.  And they -- I guess, it looks
16 like they agreed, despite being uncomfortable,
17 they agreed to attend those sessions; would you
18 agree?
19 A.      Yes.
20 Q.      Ms. Toomey then writes:  After some
21 thought and discussion, we were wondering why Gary
22 Bender, a respondent in an EEOC charge, is not
23 making an accommodation for us by attending one of
24 several other sessions being offered, but instead

Page 406

1  decides to attend the session which we choose --
2  which we chose in order to avoid him.
3        So you would agree that Ms. Toomey made
4  it clear that she, because of the EEOC charge, did
5  not want to attend the same session as Mr. Bender,
6  correct?
7  A.      Correct.
8  Q.      And your response that same day back on
9  Page 2 was:  Would you and Denise be interested in
10 attending virtually by a Zoom.
11       Why was it that Mr. Bender wasn't just
12 asked change what session he attended?
13 A.      He was.
14 Q.      Did he --
15 A.      Yes.
16 Q.      -- agree to do so?
17 A.      Yes.
18 Q.      Before you asked them if they would
19 attend by Zoom?
20 A.      That happened simultaneously.
21 Q.      Okay.
22 A.      Just as an option.
23 Q.      Okay.
24       And that's your -- the e-mail on the

Case 3:21-cv-00477-MCC   Document 280-2   Filed 09/20/23   Page 108 of 373
CONFIDENTIAL
Deposition of Doreen Kutzler                               Jane Doe, et al. v. Schuylkill County Courthouse, et al.

Page 407

1  first page at about 6:36 p.m.
2  A.      Yes.
3  Q.      You were working on having him attend
4  another session?
5  A.      Yes.
6  Q.      But your e-mail to Ms. Toomey on
7  February 18th at 3:42 is the one that asked her to
8  attend by Zoom, correct?
9  A.      Yeah.
10 Q.      So was it after you asked her to attend
11 by Zoom that you asked Bender to move because she
12 wouldn't attend by Zoom?
13 A.      Again, it was right around the same time
14 frame that they were both asked.
15 Q.      Okay.
16 A.      He was also provided the opportunity to
17 attend virtually.
18 Q.      And he wouldn't do that?
19 A.      He chose to do in person just on another
20 day.
21 Q.      A different day.  Okay.
22 A.      Yeah.
23         MS. SMITH:  All right.  We're going
24 to look at what's been previously marked as 107.

Page 408

1              - - -
2         (Previously marked Exhibit-107)
3              - - -
4  BY MS. SMITH:
5  Q.      Do you recognize this chain of e-mails?
6  A.      The Stop It Solutions, yes.
7  Q.      Okay.
8         What is Stop It Solutions?
9  A.      It's an ethics reporting line that's
10 actually offered through, I guess, CCAP.  It's a
11 free service that they provide to all the counties
12 across the State of PA.
13 Q.      When you started with the county -- so
14 this is a March 2021 e-mail --
15 A.      Yes.
16 Q.      -- communication.
17         Did -- when you started with the county
18 in 2020, was Stop It Solutions being implemented
19 or used?
20 A.      No.
21 Q.      How did you come to learn about it?
22 A.      There's solicitations, CCAP e-mails that
23 come in.  They're -- they inundate you.  And in
24 one of those e-mails that came in as a

Page 409

1  solicitation, was when I had -- I noticed that
2  they offered this service.
3  Q.      Okay.
4         And then did you look into the service?
5  A.      Yes.
6  Q.      And did you then make a determination
7  that it was something that the county should
8  utilize?
9  A.      Yes.  I thought it was one more support
10 mechanism for the employees because they didn't
11 have anything formally in place.  And this is --
12 yeah, this was kind of the tip of the iceberg
13 because of the capabilities or lack thereof, that
14 the system inherently had.
15 Q.      That Stop It's system inherently had?
16 A.      Yeah.  Like initially when we first
17 vetted it, we knew that it was a good idea and we
18 wanted to give the employees a tool in which they
19 could report something, but it's anonymous and the
20 individuals aren't encouraged in anyway or
21 required to provide any kind of identification.
22 So it makes it very difficult to do and
23 investigation.
24         And also, there was no way that you

Page 410

1  could respond directly to the individual that was
2  filing the complaint.
3  Q.      So a good idea, just poorly executed?
4  A.      Yes.
5  Q.      Okay.
6         So did this ever really -- Stop It
7  Solutions ever really get up and running at the
8  county?
9  A.      It -- it is up and running.
10 Q.      Okay.
11 A.      And they have upgraded the -- they have
12 push notifications where they have upgraded the
13 software so that now you can respond directly to
14 the individual and just at least obtain some type
15 of additional information so that you can dig a
16 little deeper and conduct the communication as
17 appropriate.
18 Q.      Do you know when the upgrade happened?
19 A.      It was recently.  It was within the last
20 four months.
21 Q.      Okay.
22 A.      Yeah, so late summer.
23 Q.      Okay.
24         So from March of 2021, it sounds like

Page 411

1  until at least March of '22, there was platform or
2  program issues that hindered the -- the full use
3  of this program?
4  A.      Yes.
5  Q.      Both on the employer and employee side?
6  A.      Yes, from a usage perspective.
7  Q.      To root out and actually investigate
8  claims?
9  A.      Yes.
10         MS. SMITH:  Okay.  All right.  This
11  is probably a good stopping point for today.
12         VIDEOGRAPHER:  The time is now
13  4:51 p.m. and we're going off the record.
14              - - -
15      (Whereupon, deposition concluded at
16  4:51 p.m.)
17              - - -
18
19
20
21
22
23
24

Deposition of Doreen Kutzler                                    Jane Doe, et al. v. Schuylkill County Courthouse, et al.

```
 1                    C E R T I F I C A T I O N

 2

 3

 4              I, COLEEN TRIFUN, RPR and Notary Public,

 5    do hereby certify that the foregoing is a true and

 6    accurate transcript of the stenographic notes

 7    taken by me in the aforementioned matter.

 8

 9                          -  -  -

10

11

12

13

14

15

16

17

18

19

20

21    DATE: February 13, 2023            Coleen Trifun
                                       _____
22

23                                      COLEEN TRIFUN, RPR

24
```

```
 1                    ERRATA SHEET

 2    Page Line    Correction      Reason for Correction

 3    _____ _____  _____  _____

 4    _____ _____  _____  _____

 5    _____ _____  _____  _____

 6    _____ _____  _____  _____

 7    _____ _____  _____  _____

 8    _____ _____  _____  _____

 9    _____ _____  _____  _____

10    _____ _____  _____  _____

11    _____ _____  _____  _____

12    _____ _____  _____  _____

13    _____ _____  _____  _____

14    _____ _____  _____  _____

15    _____ _____  _____  _____

16    _____ _____  _____  _____

17    _____ _____  _____  _____

18    _____ _____  _____  _____

19    _____ _____  _____  _____

20    _____ _____  _____  _____

21    _____ _____  _____  _____

22    _____ _____  _____  _____

23    SIGNATURE:

24    _____
```

Deposition of Doreen Kutzler                                      Jane Doe, et al. v. Schuylkill County Courthouse, et al.

## WORD INDEX

**< $ >**
**$10** 125:13
**$30** 72:16 116:16
**$40** 101:13 102:8, 12, 15 103:7 104:7
**$5** 125:13
**$64,000** 138:21
**$8.40** 155:24
**$9,200** 185:16

**< 1 >**
**1** 7:9 9:1 13:13 18:18 40:13 44:20 129:6, 12 132:3 163:12 341:20 345:4 377:6, 8 378:8, 10
**1:00** 238:4
**1:09** 247:10
**1:42** 247:16
**10** 162:13 324:19
**10:00** 68:21 362:12
**10:07** 147:15
**10:20** 92:11
**10:34** 92:17
**100** 4:16 5:15 273:3
**107** 407:24
**11** 20:23
**11:32** 171:10
**111** 344:18, 22 345:19
**1112** 156:3
**1115** 130:10 145:23
**1115-1117** 4:18 130:12
**1116** 131:15 143:22 147:21
**1117** 130:10
**1118** 48:19
**1118-1120** 4:13 48:21
**1120** 48:19
**1121** 151:16
**1121-1124** 4:19 151:19
**1124** 151:16
**1127** 4:20 203:6, 10
**1137** 4:21 260:12, 15
**1140** 260:13
**11t** 21:14

**11th** 207:6 277:17 335:10, 15 343:3, 5 349:12, 18 350:21
**12** 96:24 171:9 180:20 203:18 291:12
**12:18** 202:17
**12:26** 202:23
**120** 4:17 365:7, 17, 19
**12th** 98:8 186:6
**13** 328:12 347:6 350:5, 6
**130** 4:18
**13th** 349:11 359:16 369:6 382:15
**14** 328:23 329:1, 14
**14th** 280:12
**15** 4:11 77:22 100:23 162:13 329:8, 15 331:10, 18 386:21
**151** 4:19
**15219** 2:12
**159** 5:10
**15th** 104:9 201:15 277:19 300:5 366:3 388:17
**16** 299:8
**16th** 368:24
**17** 5:13 20:7 332:10
**170** 2:21
**17011** 1:21
**171** 5:11
**17-18** 4:12 20:11
**18** 20:7
**1-800** 207:21
**18017** 2:16
**1835** 2:3
**18360** 2:8
**18th** 400:10 401:15, 16, 18, 21 402:16 404:18 405:2 407:7
**19** 5:12 248:18
**190** 2:16
**19103** 2:4
**19106** 2:22
**1991** 17:21
**19th** 390:24 400:15 401:17 402:7, 9, 19

**403:**3 404:20, 24 405:10, 15
**1st** 71:9 201:15 270:4

**< 2 >**
**2** 9:1 13:17 40:14 44:20 122:17 143:22 299:18 308:5 323:22 328:1 341:20 406:9
**2:42** 334:12
**20** 4:12 314:16 332:12, 20
**2012** 266:12
**2019** 14:11, 16 16:11 21:6
**2020** 20:23 21:5, 12, 14 27:18, 21 31:15 49:5 50:4 54:3 61:19 70:20 72:5 75:8, 24 76:3 84:7, 9 96:24 100:23 104:12, 13 105:16 106:5 114:15 130:24 136:22 152:4 159:18 171:10 172:23 180:20 183:2 203:18 207:3, 5 216:19 217:21 219:9 226:20 243:2 250:2 260:21 267:9 291:12 299:8 310:24 314:16 332:13 380:1 408:18
**2021** 132:13 169:10 325:16 334:7 336:8 347:6 350:6 372:5, 7 386:21 399:5 408:14 410:24
**2022** 390:24 392:4
**2023** 1:22 7:6
**203** 4:20
**21** 367:3
**211** 5:11
**214** 1:20 7:11
**218** 5:12
**22** 130:24 147:14 310:24 333:13 411:1
**229** 5:10
**22nd** 316:5 391:20

**23** 219:9
**232** 5:11 176:6
**25** 1:21 7:6
**25th** 402:16
**26** 333:21
**260** 4:21
**27** 49:5 54:3 61:19 72:5 76:3 106:5 152:4
**275** 4:11 15:10
**276** 4:12 20:8
**277** 4:13, 22, 23 48:19
**278** 4:14 56:10, 22
**279** 4:15
**27th** 50:4 52:21, 24 70:20 75:7 160:21 391:22
**28** 159:18
**280** 4:16 100:13
**281** 4:17 120:5
**282** 4:18
**283** 4:19 151:15, 17
**284** 4:20 203:7
**285** 4:21 260:12
**286** 4:22 277:6 278:11 280:10
**287** 4:23 277:23 278:6, 17 279:11
**288** 4:24 291:2
**289** 5:1 291:16
**290** 5:2 297:17
**291** 4:24 5:1, 3 310:15
**292** 5:4
**293** 5:5 333:23
**294** 5:6 364:24 369:13
**295** 5:7 366:1, 24 367:2 398:15
**2950** 2:3
**297** 5:2

**< 3 >**
**3** 7:21 9:1 13:20 16:20 27:18, 21 123:2 176:6 253:16 302:10 341:20 405:14

Case 3:21-cv-00477-MCC   Document 280-1   Filed 09/20/23   Page 113 of 373
CONFIDENTIAL
Deposition of Doreen Kutzler                                    Jane Doe, et al. v. Schuylkill County Courthouse, et al.

**3:00**  323:*14*

**3:07**  323:*20*

**3:21-CV-00477**  1:*4*

**3:30**  345:*11*

**3:36**  345:*17*

**3:42**  407:*7*

**30**  184:*7*  243:*1*
283:*15*  284:2, *4*
287:*1*  289:*10*

**30-day**  284:*18*
287:*20*

**30-plus**  18:*19*

**30th**  256:*11*

**31**  132:*13*

**310**  2:*16*  5:*3*

**3136**  74:9

**3136-3137**  4:*15*  74:*11*

**3137**  74:9

**3138**  4:*17*  120:5, *7*

**31st**  132:*1*  133:*3*

**324**  5:*4*

**325**  364:*24*

**325-326**  5:*6*  365:*2*

**326**  364:*24*  365:*11*

**334**  5:*5*

**340**  5:*13*

**3410**  2:*11*

**343**  5:*13*

**344**  4:*16*  100:*13, 15*

**347**  5:*14*

**349**  5:*14*

**35**  80:2  116:*17*
120:*20*  121:*18*
283:*15, 18, 24*  284:*11*
286:*4*  287:*7*  288:*19*
303:*21*

**35-hour**  285:*6*

**365**  5:*6*

**366**  56:*10*  65:*17*

**366-369**  4:*14*  56:*12*

**367**  65:*17*  70:*13*

**369**  56:*10*

**398**  5:*7*

**3rd**  26:*3*  27:*17*
342:*24*

**< 4 >**

**4**  7:*21*  9:*1*  13:*23*
129:6, *12*  132:*4*

**136:22**  306:*21*
398:*14*

**4:00**  151:9

**4:21**  390:8

**4:30**  66:*16, 20*  69:*24*
86:*12*

**4:31**  390:*13*

**4:51**  152:*4*  411:*13, 16*

**40**  24:*5*  80:*1*  101:*21*
102:5, 6, 22  116:*13,
17*  118:22

**400E**  2:*21*

**402**  1:*20*

**404**  5:*15*

**408**  5:*15*

**410**  75:*14*  76:5
181:*3*  207:*13*  214:*16*
215:7, 14  222:*16, 23*
223:6, 14  224:*11*
227:3, 6, 14  229:*1, 6,
15, 24*  230:8, 9, 11
231:*14, 19, 22*  232:3,
5  233:7  234:9
235:*21*  236:7, 16
237:1, 7, 13  238:*16*
241:22, 23  242:3, 14
247:20  249:4, 10, 17
251:2, 16  252:6, 15
253:14, 24  254:2, 14
255:18, 22  256:8
258:8, 20  259:2, 4
260:1, 24  261:*1*
266:5  269:*19*  270:2,
8  296:*17*  300:*21*
301:22  304:*11, 12*
310:2  334:22  335:*11*
339:23  341:*24*
349:*12, 15*  358:*12, 16*
392:*23*

**43:0**  359:*12*

**432**  398:*14*

**432-434**  5:*7*  398:*17*

**434**  398:*14*

**45**  184:*7*  200:*20, 22*

**48**  4:*13*

**493**  277:*23*  280:5, 6

**493-494**  4:*23*  278:*1*

**494**  277:*23*  278:*19*
280:7

**4th**  28:*1*  49:*16*

**< 5 >**

**5:00**  96:6

**504**  291:*16, 22*

**504-505**  5:*1*  291:*18*

**505**  291:*16*  295:*11*

**506**  295:*11*

**507**  4:*24*  291:2, *4*

**510**  277:6

**510-514**  4:*22*  277:9

**511**  2:*7*

**513**  277:*15*

**514**  277:*7*

**520**  297:*17*

**520-521**  5:*2*  297:*19*

**521**  297:*17*

**549**  5:*3*  310:*15, 17*

**56**  4:*14*

**571**  333:*23*

**571-572**  5:*5*  334:*2*

**572**  333:*23*

**583**  366:*1, 21*

**< 6 >**

**6:36**  407:*1*

**61**  5:*14*

**< 7 >**

**7**  15:*2*  260:*21*
324:*19*  336:8

**707**  2:*11*

**7-10**  5:*4*  324:*22*

**712**  2:*7*

**72**  324:*1*

**74**  4:*15*

**7-9**  4:*11*  15:6

**7th**  262:*4*  334:*12, 23*
335:5, 22  336:*18*

**< 8 >**

**8**  4:*6*  266:*12*  267:9

**8:00**  66:*16*  69:*24*
86:*12*  96:6

**8:30**  66:*16*  359:*12*

**8th**  258:*13*  268:8
269:*24*  271:*1, 21*
302:*18*  303:8, *11*
335:22

**4th**  28:*1*  49:*16*

**< 9 >**

**9**  15:*2*

**9:00**  68:*21*

**9:01**  1:*22*  7:*7*

**911**  259:*4*

**96**  5:*10*

**< A >**

**a.m**  1:*22*  7:*7*  68:*21*
92:*11, 17*  96:6
171:*10*

**abided**  385:*19*

**abilities**  386:*12*

**ability**  11:*24*  37:2,
*13*  43:*12*  90:8
108:*18*  112:*4*  123:*10*
156:*15*  213:*19*  248:*4*
285:*10*  338:3, *15, 19,
21*  383:6  387:2

**able**  12:*4*  56:6
78:*21*  81:*21*  104:*23*
140:8  206:*13*  216:*1*
238:*17*  250:*4*  339:*15,
20*  372:*14*  394:*13*

**absence**  287:*1*

**Absolutely**  46:*4*

**abstained**  171:*24*
172:*14, 18*

**abstaining**  172:*3*
174:*13*  175:*8*

**abstains**  172:22

**ACA**  284:*1, 5, 7*
289:*7*

**acceptable**  337:*16*

**access**  88:*16, 20*  96:2,
8, 9  161:*17*  209:*16*
213:*19*  215:*20*
216:*17*  221:2  223:*7*
228:*20*  229:*17*
230:*12, 13, 16*  238:*12,
21*  239:*10, 20*  264:*23*
300:4, *7*

**accessible**  51:*19*
238:*24*  310:*1*

**accessing**  62:*20*

**accommodate**  293:*12*

**accommodated**
167:22

Case 3:21-cv-00477-MCC   Document 280-1   CONFIDENTIAL   Filed 09/20/23   Page 114 of 373

Deposition of Doreen Kutzler                                    Jane Doe, et al. v. Schuylkill County Courthouse, et al.

**accommodation**
50:13  292:11  293:2,
23  294:1  297:13
310:12  405:23
**accommodations**
222:20  310:10
**accompanying** 310:9
329:2
**accord** 186:19
**account** 159:3, 4
394:1
**accounting** 158:10
**accounts** 209:17
**accuracy** 123:5
**accurate** 16:14  17:2
290:9  300:22  332:7
342:12, 18  412:6
**accusations** 195:1
**accused** 403:11, 16,
19, 21
**Act** 284:8
**acted** 118:4  237:23
**action** 42:21  128:14
326:23, 24  399:19
**actions** 42:8  226:2
373:13
**actively** 38:2  118:8,
16  133:23  138:19
**activities** 70:6
**actual** 80:14  200:22
201:10
**ad** 122:12
**ADA** 293:22, 23
**add** 381:17
**addendum** 119:4, 10
120:13  121:12
122:12, 16  124:13
125:5  126:15  127:13
128:16, 23  129:6, 11
131:10  132:1, 13
145:19  171:18  172:4,
9
**addition** 121:17
135:21  136:15
228:18  387:24
**additional** 2:17
121:19, 23  122:8, 9,
21  124:14  125:8, 14
126:16  128:3, 9, 17
129:5, 11  133:23

158:16  271:16
300:19  334:19, 24
335:7  410:15
**Additionally** 292:16
**address** 67:15  74:20
132:20  213:24  214:4
261:11  312:8, 10
**addressed** 113:12
210:12  258:6  302:13
**addresses** 212:7, 8
**addressing** 296:9, 11
**adequately** 107:5
292:18  337:22  338:3
**adjacent** 253:6
**adjusting** 156:4
**adjustment** 158:2
**administer** 201:7
351:16
**administers** 113:14
**administration** 19:5,
18  108:17  146:3
369:15
**administrative** 31:24
32:3, 8, 14, 20  60:11
69:11  141:14  156:22
**administrator** 31:23
38:7  63:8  64:11
109:1  123:4, 17
124:3  210:12  354:7
365:23  393:15
**admit** 347:9
**advance** 61:16
**advice** 34:22  35:4
39:6, 8  149:9  313:9
**advisable** 136:7
137:17
**advise** 67:7  262:11
**advised** 9:4  60:22
389:23
**advises** 262:11
**affect** 155:5
**affidavit** 195:6, 21
197:19  313:8  315:1,
8, 10, 14, 24  316:19
317:2  318:1, 11, 12
319:17, 24  320:10, 11,
14, 22  321:18, 22
322:15, 21  323:4, 9
324:12  325:8  326:8,

20  329:21  360:12, 17
**affidavits** 327:1
**affirmative** 174:8
290:10, 14
**Affordable** 284:8
**aforementioned**
384:6, 22  412:7
**AFSCME** 113:16
114:6  197:24  198:7
199:24  320:3
**afternoon** 99:14
100:3
**AG** 275:21  276:2, 6
281:21, 24  282:16
285:1, 4
**agencies** 23:8, 19
272:17
**Agency** 18:8
**agendas** 129:24
**agent** 198:1  201:8
**ago** 318:19
**agree** 11:4  21:1
39:23  47:2  95:5
97:1, 7  106:3  107:16
109:4, 6  124:13
126:19  131:7, 9
135:18  145:16
159:17  160:1, 13, 23
164:17  165:1  171:9
173:4  174:22  178:1
181:17  183:16
203:23  208:24  209:1
211:6  212:3  218:2
219:10  220:5  221:19
236:24  253:22
300:13  303:22
308:10  311:2  315:19
334:8  336:24  337:21
385:24  405:18  406:3,
16
**agreeable** 116:17
205:5
**agreed** 24:20  39:15
115:16  120:21  128:2
132:18  135:1  164:14
237:4  322:13  382:3
391:17  405:16, 17
**agreement** 9:4  20:19,
22  21:16, 24  54:23
57:2  61:1  63:10, 13,

14  64:2, 22  65:12
66:2  67:14  69:17
74:16  94:8  103:19
131:5  134:24  136:16
144:1  199:6  218:13
242:20  263:24
264:22  265:13
286:19, 22  333:1
357:4
**agreements** 103:14,
17  127:24  136:20
**agrees** 67:22  72:15
**AG's** 281:8
**ahead** 78:14  167:17
173:16  191:23
226:10  270:18  304:1
338:10, 11  379:23
380:12  382:9
**ailing** 63:16
**air** 181:6
**al** 1:2, 4  7:9, 10
**alcohol** 11:23
**ALEISHA** 3:2
**alerts** 212:17
**Alicia** 7:12
**allegation** 332:20
372:12
**allegations** 26:1
27:12  28:12  127:8
276:3  358:8  371:23
**alleged** 266:22
**allow** 48:4  61:16
63:19  201:1  222:19
235:11, 21  288:13, 21,
23  289:15  290:15
292:10  312:12
**allowed** 11:12  36:24
313:11  405:9
**allowing** 146:3
187:12  221:2  225:18
**alluded** 190:13, 15
**alludes** 197:15
**alongside** 381:4
**alternative** 95:15
221:2
**Alu** 125:18
**ALYSSA** 3:3  7:22
**ambiguous** 10:24
**amended** 128:20

Case 3:21-cv-00477-MCC   Document 280-1   Filed 09/20/23   Page 115 of 373
CONFIDENTIAL
Deposition of Doreen Kutzler                    Jane Doe, et al. v. Schuylkill County Courthouse, et al.

**amount** 119:*12*
156:*21* 201:*9*
**analysts** 114:*22*
**and/or** 62:*12* 110:*13*
137:*5* 138:*5* 145:*19*
269:*17* 313:*22*
**Andrea** 391:*23*
**ANGELA** 3:*3* 13:*19*
158:*18* 203:*17*
262:*11* 277:*16*
280:*12* 329:*3* 332:*14*
334:*12* 365:*12* 403:*5*
**angry** 326:*10*
**Ann** 25:*23* 239:*19*
**annual** 92:*1* 104:*8*
289:*5, 6*
**anonymous** 409:*19*
**ANSWER** 6:*1* 10:*21*
11:*9, 11, 12* 12:*16*
33:*12* 36:*20* 37:*5*
78:*16* 79:*16* 82:*19*
97:*15* 105:*17* 109:*14*
110:*21* 113:*4* 117:*8,
10* 127:*2* 128:*12*
140:*6* 141:*11* 142:*9*
148:*2* 167:*24* 174:*16*
176:*3* 177:*21* 178:*19*
179:*5* 182:*4* 187:*12*
204:*19* 223:*1* 233:*24*
236:*2, 13* 242:*21*
254:*18* 255:*9, 14*
264:*4, 6* 265:*2, 3*
272:*13, 22* 282:*2*
285:*8* 293:*14* 304:*17*
309:*14* 311:*11, 13, 15*
313:*2, 11, 17, 20*
321:*3* 342:*4* 360:*21*
361:*19* 368:*6, 10, 11,
19* 370:*15, 17, 24*
371:*3* 379:*3* 397:*24*
**answered** 33:*2* 34:*15,
19* 91:*15* 116:*11*
149:*13*
**answering** 81:*4*
313:*15*
**answers** 11:*19*
**anticipated** 242:*23, 24*
**anti-harassment**
351:*17*

**anxiety** 292:*15*
293:*10* 294:*2*
**Anybody** 43:*23*
133:*21* 179:*15*
184:*24* 252:*8* 272:*8*
273:*21* 274:*2* 275:*8*
**anyones** 393:*12*
**anyway** 235:*5* 263:*7,
16* 409:*20*
**apologies** 50:*18*
280:*13*
**apologize** 54:*10*
340:*24* 365:*18*
398:*12*
**appeals** 308:*18, 24*
**appear** 378:*19, 22*
379:*1, 4, 8, 12*
**appearance** 7:*17*
**appeared** 328:*3*
377:*1* 378:*24*
**Appearing** 7:*20*
**appears** 155:*6*
221:*22* 325:*10*
**applicable** 280:*14*
**applicant** 355:*19*
**applications** 353:*17*
**applied** 60:*19*
**apply** 198:*8, 9*
**appointed** 395:*1*
**appointment** 192:*15*
356:*17*
**appraisal** 220:*3*
**appraiser** 184:*15*
191:*12* 199:*9* 201:*12*
**appraisers** 114:*21, 23*
116:*7* 183:*24* 184:*14*
189:*21*
**appraiser's** 183:*13*
**appreciate** 55:*4*
88:*13*
**approachable** 124:*6,
11*
**approached** 332:*13*
**appropriate** 45:*2*
64:*16* 126:*17* 128:*14*
132:*23* 180:*9* 205:*7*
248:*24* 296:*10*
309:*16, 21* 348:*2*
388:*2, 5* 410:*17*

**appropriately** 118:*1*
210:*21*
**appropriateness**
64:*21*
**approval** 63:*14*
64:*11* 77:*15* 158:*7*
226:*16, 17*
**approve** 54:*18*
116:*13* 341:*15, 16*
353:*12* 381:*17*
**approved** 49:*21*
58:*20* 59:*10* 64:*5*
131:*11* 223:*19*
225:*14, 16* 270:*24*
289:*23* 294:*23* 329:*9*
352:*5* 356:*15*
**approving** 64:*3*
**approximately** 7:*7*
302:*12*
**April** 217:*20*
**archived** 88:*20*
**area** 61:*3* 93:*3, 4*
94:*5*
**areas** 382:*4*
**argued** 237:*10*
**argument** 237:*14*
**arranged** 319:*3, 7*
**arrangement** 64:*16*
**arrangements** 63:*5*
**arrears** 393:*20, 24*
394:*9*
**arrest** 230:*1* 235:*11*
**arrested** 228:*21*
229:*6* 233:*16* 234:*10*
**arrival** 377:*16*
**arts** 16:*24*
**ASAP** 156:*6*
**aside** 20:*5* 324:*17*
340:*11*
**asked** 10:*19* 24:*6*
40:*17* 42:*10, 13*
59:*11* 118:*7* 129:*13*
158:*19* 160:*16* 187:*1,
23, 24* 188:*16* 196:*21*
197:*5* 258:*21* 294:*6*
302:*22* 305:*17* 313:*1*
316:*18* 319:*24*
337:*17* 353:*6* 359:*22*
362:*19* 385:*18* 405:*5*

406:*12, 18* 407:*7, 10,
11, 14*
**asking** 41:*18, 24*
42:*7, 18* 43:*4* 60:*1*
108:*19* 149:*12*
163:*23* 215:*12* 263:*3*
264:*10* 284:*20*
296:*23* 333:*6* 335:*2*
346:*20* 360:*24* 384:*2*
**asks** 24:*2*
**asserting** 34:*23* 35:*3*
311:*17, 23* 312:*14*
**assertion** 332:*20*
333:*7*
**asserts** 333:*13*
**assess** 122:*19*
**assessment** 19:*22*
20:*2* 27:*2* 32:*1, 13*
40:*9* 81:*6* 101:*2*
104:*15* 105:*11, 15*
114:*13, 24* 117:*4*
123:*12* 124:*19*
133:*24* 135:*5* 139:*7,
20* 141:*2, 6* 142:*3*
144:*8* 145:*1, 20*
153:*11, 16* 160:*12*
162:*14* 163:*2* 172:*13,
16, 19* 174:*14* 175:*10,
23* 180:*5* 189:*16, 19*
198:*9* 213:*3* 218:*18*
223:*5* 255:*12, 18, 22*
269:*16, 21* 307:*17*
308:*15, 18, 21, 24*
314:*16* 332:*15* 333:*9*
382:*19* 383:*16*
388:*21*
**assessments** 18:*15*
**assessment's** 51:*22*
**assessor** 314:*19*
**assign** 75:*14* 259:*19*
391:*13*
**assigned** 23:*10*
24:*21* 76:*5* 85:*23*
86:*19, 22* 224:*11*
227:*14* 237:*7* 240:*17,
20* 250:*9* 251:*6*
258:*21* 259:*18*
**assigning** 215:*13*

Deposition of Doreen Kutzler                                    Jane Doe, et al. v. Schuylkill County Courthouse, et al.

**assignment** 24:*1, 5, 21* 27:*24* 49:*15* 51:*11* 136:*21* 249:*11*
**assignments** 81:*11*
**assist** 305:*20*
**assistance** 99:*2, 3* 205:*13* 206:*1* 209:*11* 224:*5* 305:*6, 17* 306:*3*
**assistant** 25:*21, 23* 32:*9* 83:*5* 95:*20*
**associate** 203:*1, 3*
**associated** 52:*4* 172:*16* 371:*19*
**assume** 11:*5* 216:*15* 307:*23* 366:*9*
**assumed** 117:*6*
**attach** 278:*16*
**attached** 57:*12* 72:*13* 277:*19* 278:*12* 298:*4* 365:*17, 22* 369:*14, 17*
**attachment** 279:*1* 295:*13* 366:*7*
**attachments** 57:*14* 278:*7* 292:*3*
**attacks** 292:*15* 293:*11* 294:*2*
**attempt** 228:*20* 300:*4*
**attempted** 292:*13* 300:*7*
**attend** 63:*20* 275:*16* 281:*8, 22, 24* 285:*3* 371:*11* 399:*13, 16* 400:*24* 401:*12, 21* 402:*2* 403:*6* 405:*17* 406:*1, 5, 19* 407:*3, 8, 10, 12, 17*
**attended** 395:*11, 22* 396:*6* 406:*12*
**attending** 17:*7* 134:*5* 161:*16* 399:*11* 404:*14* 405:*15, 23* 406:*10*
**attention** 31:*14*
**attorney** 9:*20* 41:*5* 42:*3, 14* 43:*4, 6* 108:*20* 221:*12* 273:*14* 274:*15* 275:*5, 14* 277:*2* 298:*2*

311:*24* 346:*1* 370:*23* 389:*23*
**attorney-client** 34:*14, 18* 35:*2* 40:*20* 41:*1* 42:*1, 4, 9, 19* 187:*15* 262:*22* 344:*1*
**attorneys** 34:*9* 194:*22* 371:*5, 8*
**authority** 34:*5, 10* 90:*18, 21* 91:*10* 141:*18* 201:*22* 248:*13* 289:*15* 290:*19* 380:*23* 388:*1, 3*
**authorize** 337:*2*
**automatically** 384:*14*
**availability** 23:*20* 24:*3* 233:*8*
**available** 23:*7* 73:*11* 78:*10* 79:*12* 80:*11* 156:*1* 198:*6* 256:*3* 274:*10* 280:*18*
**Avenue** 1:*20* 7:*11*
**average** 24:*5* 92:*7*
**averages** 284:*4*
**avoid** 364:*2* 383:*7* 384:*10, 19* 406:*2*
**avoided** 384:*3* 385:*20*
**aware** 24:*22* 28:*20* 40:*15* 48:*15* 79:*7* 96:*2* 134:*7* 136:*20* 139:*20, 24* 146:*9* 155:*2* 163:*10* 166:*19* 168:*11* 169:*22* 173:*10, 18, 23* 199:*8* 217:*8, 15* 218:*15* 224:*18* 225:*7* 226:*15, 23* 228:*15* 247:*24* 249:*3* 251:*11* 275:*20* 282:*8* 293:*4* 343:*23* 359:*1* 360:*11* 362:*10* 363:*11* 373:*18* 375:*3* 379:*5* 380:*22* 395:*11*

**< B >**
**bachelor** 16:*24*
**back** 17:*21* 39:*4* 57:*9* 70:*18* 83:*2* 89:*1* 92:*17* 126:*4* 165:*14, 15* 183:*14*

197:*4, 6, 18, 20, 22* 198:*4, 12, 16* 201:*1, 16, 19* 202:*23* 205:*19* 209:*18* 218:*4* 219:*17* 233:*11* 237:*5, 9* 241:*15* 242:*5* 247:*16* 248:*18* 270:*14* 275:*23* 278:*11* 295:*20* 312:*17, 19* 315:*9, 10* 317:*1, 2, 13* 318:*4* 319:*23* 323:*20* 328:*22* 329:*10* 330:*5, 12, 21* 331:*4* 336:*21* 343:*1, 23* 344:*4, 12* 345:*17, 23* 349:*15* 357:*23* 365:*19* 371:*20* 372:*11* 378:*2* 390:*14* 391:*9* 395:*8* 396:*19* 397:*4* 398:*22* 406:*8*
**backlog** 217:*11* 218:*4* 336:*20*
**backwards** 386:*18*
**bad** 244:*11* 373:*10*
**badge** 238:*15* 239:*19*
**bag** 36:*3, 6* 117:*16*
**ball** 312:*9*
**bandwidth** 24:*2, 9*
**bank** 78:*11* 273:*18*
**banked** 304:*6*
**bargaining** 183:*16* 199:*5* 286:*19, 22* 333:*1*
**base** 332:*24*
**based** 22:*4* 23:*20* 28:*2* 34:*13* 39:*13, 21* 40:*22* 42:*2, 13* 45:*16, 20* 48:*3* 54:*17* 56:*1* 71:*12* 72:*5* 149:*17, 18, 22* 163:*7* 167:*11* 175:*14* 183:*15* 189:*14* 192:*2* 222:*3, 4* 233:*8, 13* 245:*3* 272:*18* 274:*9* 315:*3* 316:*19* 327:*10* 348:*18* 352:*22* 360:*2* 374:*21* 375:*5* 386:*21* 401:*8* 405:*2*

**basically** 119:*16* 212:*8* 228:*7* 326:*22* 404:*16*
**basis** 34:*18* 40:*19* 52:*5* 60:*10* 69:*4, 6* 89:*20* 92:*2* 144:*11* 231:*17* 254:*9* 284:*3* 289:*5* 352:*3* 401:*11*
**Bates** 15:*1* 280:*4*
**bearings** 369:*23*
**becoming** 108:*23* 112:*9*
**began** 29:*6, 14* 38:*7, 10, 19* 83:*6, 17, 20* 136:*21* 351:*1*
**beginning** 26:*1* 270:*7* 279:*14*
**behalf** 7:*19* 8:*7, 11* 62:*11* 67:*7* 106:*19* 113:*9* 120:*14* 143:*12, 14* 261:*9* 292:*23* 311:*20* 363:*7* 365:*17, 22* 369:*15* 370:*4* 383:*15* 395:*12, 23*
**behavior** 187:*8* 328:*15, 18*
**belief** 107:*13* 126:*10*
**believe** 36:*16, 19, 23* 37:*11* 45:*1* 56:*2, 24* 66:*1* 69:*8* 76:*16* 77:*17* 90:*20* 91:*4* 100:*1* 108:*10, 13* 122:*7* 138:*23* 174:*10* 175:*14, 21* 177:*3* 213:*3* 226:*22* 238:*20* 254:*11* 262:*14* 271:*9* 278:*15, 24* 281:*22* 293:*10* 297:*6* 309:*20* 313:*8* 316:*24* 319:*1* 334:*21* 338:*20* 344:*12, 15* 348:*13* 384:*24* 386:*24* 387:*7*
**believed** 36:*14* 97:*2* 320:*20* 321:*9* 328:*5*
**believes** 112:*8* 146:*2*
**Bender** 2:*13* 8:*9* 22:*23* 26:*9* 27:*3, 4* 29:*8* 30:*2, 21* 31:*2, 7, 22* 32:*8, 17, 23* 38:*6, 24* 39:*1* 40:*1* 43:*10,*

13, 23 44:15 46:6, 12, 20 47:10, 15 48:3 54:5, 8 55:5 58:22 59:10 60:12 63:24 83:11 86:23 91:16 94:12 98:6 102:1, 18 103:2, 18 109:1, 11, 19 110:12 111:23 112:14, 17, 19 113:1 116:12 118:16 120:14, 21 121:1, 11, 17 122:1 123:19 124:5 125:11 127:23 131:2 135:11 136:1 137:13 142:1 143:9 148:6, 12, 17 149:23 150:7, 18 151:3, 11 153:22 159:20 163:11 164:1 165:4 166:6 171:13 177:7, 15 178:7, 24 180:16 181:20 185:2, 5 192:8, 17 202:1 203:20 204:10, 22 205:4 208:19 212:15 213:13, 17 214:3, 9, 20 222:8, 17 223:24 224:17 225:7, 13 226:4, 12 228:11, 19, 22 229:4, 5 233:12, 15 234:8, 14, 18, 22 235:19 237:10 256:23 257:6, 10 258:22 259:2, 10, 16 260:23 262:13, 19 264:2, 24 265:6, 12, 19 266:17 267:2 274:4, 7 275:12, 13 281:19, 20 288:17, 20 289:14, 22 290:10 294:21 295:1 296:17 298:3, 13 305:20 311:8 313:1, 22 314:1, 10 322:4, 5, 11, 18, 20 323:5, 8 325:22 326:1, 10 327:4, 8 337:2, 12 344:21 353:3 354:2 357:2, 20, 22 364:18 365:23 366:4 368:9

370:4 371:6 375:15 376:11, 20, 24 380:16 381:3, 8 389:8 394:13 399:22 400:24 402:7, 23 403:14 404:13, 19, 24 405:6, 14, 22 406:5, 11 407:11
**Bender's** 43:21 44:9, 11 98:12 109:16 137:19 138:4 141:5 164:4 204:17 213:14 231:5 305:19 326:4 344:20 357:5 368:8 380:20 400:17 401:15
**benefit** 19:4, 17 199:21 284:19 285:6 288:9 393:9, 15
**benefits** 25:22 283:7, 13 285:10 286:14, 23 288:14, 20 289:2 354:6
**Berks** 18:4 24:18
**best** 47:7, 17 95:23 136:11 141:15, 21 213:4 403:4
**Bethlehem** 2:16
**better** 104:5 140:23 296:2
**better-conditioned** 348:2
**beyond** 184:9 344:14
**biannual** 92:2, 3
**bid** 183:12, 20 202:8 320:3
**bills** 139:11
**binder** 96:13
**biographical** 341:8
**bit** 83:1 108:24 132:7 133:16 176:13 219:5 338:18 340:3 342:1 350:18 390:20 398:11
**biweekly** 69:4
**black** 155:19
**blanket** 35:1
**block** 253:13, 18
**blocks** 252:20, 21 253:13, 16

**board** 20:24 102:2 107:10 176:11, 21, 24 207:6 308:9, 12 350:14 351:8
**bold** 67:21
**bottom** 152:2, 6 280:11 344:1 378:20 379:5, 9
**BOX** 2:7
**break** 12:12, 17 92:9 247:8 323:12
**Brenda** 198:1, 3
**Brenda's** 198:2
**Brian** 261:11, 14
**brief** 92:13 202:19 323:16 345:13 390:10
**briefly** 340:2 371:14
**bring** 139:8 224:24 225:22 322:11 394:1
**Brodhead** 2:16
**broken** 347:10
**brought** 31:13, 15 172:21 189:8 322:7
**Buber** 53:15 153:20 154:1, 12, 19 158:3 159:2 179:19 185:14 305:11
**budget** 51:22 52:12 53:10 55:13 152:20 153:11, 16 154:23, 24 155:5, 13, 23 156:4, 13, 20, 24 157:9, 17 158:1
**budgets** 155:3
**Build** 349:15
**building** 35:21 45:5 46:2 48:2 63:1 75:14 76:5 77:19 108:21 110:5 112:5 160:16 163:1, 4 171:23 181:3 199:1 200:18 204:16 207:13 213:20 214:16 215:7, 14, 20, 23 216:1 222:16, 23 223:6, 14 224:11 227:3, 7, 14 228:20 229:1, 6, 15, 17, 24 230:11 231:1, 14, 15,

18, 19, 22 232:10, 17 233:1, 5, 7, 16 234:10 235:6, 14, 21 236:7, 16 237:1, 7, 11, 13 238:11, 15, 16, 20 239:3 241:19, 20, 22, 23 242:3, 14 247:20 249:4, 11, 17, 18, 22 251:2, 6, 10, 16 252:6, 15 253:14, 24 254:2, 15 255:19 256:8 258:8, 20 259:2, 4 260:1 261:1 266:5 267:5 269:19, 21 270:3, 8 296:17 300:21 304:11, 13 310:2 334:22 335:11 339:23 341:24 349:13 352:3 358:12, 16 375:4, 7 389:24
**buildings** 86:18 258:23
**bullet** 122:4, 8, 17 123:2 297:3
**bureau** 32:13 114:12, 13 180:4 197:22 230:14 238:19
**business** 61:8 78:19, 23 155:9, 12 163:16 170:9 175:9 198:1 201:8 207:21 213:2 237:13
**business-related** 67:2
**bypassed** 131:6

**< C >**
**cabinet** 193:22 268:19 302:12, 17
**call** 33:23 77:11 82:20 85:2 181:5 229:21 312:23 320:10 343:23 344:4, 12 351:23 367:13 376:11 385:22
**called** 87:17 176:17 194:13 228:21
**calling** 321:17
**calls** 67:3, 9 81:5 82:10, 22 174:9

194:*21*  263:*21*  368:*4*
**camera**  377:*4*
**cameras**  98:*13, 14, 19*
99:*6*
**Camp**  1:*20*  7:*12*
**campus**  231:*15*
**canceled**  405:*3*
**candidate**  355:*4*
**candidates**  352:*24*
353:*7, 21*  355:*1*
**capabilities**  409:*13*
**capability**  170:*4*
**capacity**  84:*10*  361:*9*
**car**  369:*2, 4*
**carbon**  111:*22*
**card**  162:*18*
**cards**  207:*21*
**care**  63:*17, 20*
213:*16*  284:*8*  342:*20*
**career**  19:*4, 20*
**carry**  36:*7*
**carrying**  67:*4*
**case**  26:*5*  28:*21*
35:*3*  83:*3*  143:*11*
172:*5*  173:*3, 5, 8*
189:*15*  194:*17*
210:*22*  299:*5*  301:*12*
351:*5*  394:*16*
**case-by-case**  60:*10*
**CATHERINE**  2:*2*
7:*19*  8:*24*  12:*24*
41:*24*  238:*3*
**catherine@dereksmith**
**.com**  2:*4*
**CATTS**  3:*2*
**Cause**  198:*18*  218:*3*
328:*15*
**caused**  106:*24*  107:*2,*
*14, 20*  108:*1*  243:*23*
**causes**  295:*21*
**CBA**  198:*14*  201:*14*
333:*1*
**CCAP**  408:*10, 22*
**cc'd**  49:*3*  360:*8*
362:*5*  365:*12*  374:*16*
**ccs**  111:*19*
**ceiling**  267:*21*
307:*12*  347:*14, 17*
**cell**  82:*1, 4*

**Center**  2:*20*  259:*5*
**ceremony**  377:*18, 20*
**certain**  59:*3, 18*  96:*3*
180:*15*  221:*9*  273:*4*
284:*4*  333:*14*
**certainly**  39:*15*  85:*5*
230:*9*  346:*21*  364:*4*
**certificate**  19:*13*
**certificates**  19:*21*
**certification**  19:*6, 12*
104:*9*
**certifications**  18:*24*
19:*1, 11*
**certify**  412:*5*
**chain**  49:*1*  91:*11*
111:*23*  130:*16, 22*
145:*12, 17*  147:*3, 7*
151:*23*  192:*12*
211:*19, 23*  219:*2, 6*
221:*17*  248:*12*  334:*6*
343:*17*  374:*24*
389:*18*  408:*5*
**challenges**  216:*4, 24*
338:*23*  339:*1*
**chance**  294:*22*
**change**  75:*8*  83:*1*
142:*4, 6, 10*  143:*3, 4*
227:*9*  242:*9*  247:*19*
328:*6*  329:*11*  406:*12*
**changed**  36:*11*
128:*20*  147:*11, 14, 24*
258:*6*  265:*22*  350:*24*
363:*19, 22*  364:*6, 11*
**changes**  16:*16*  58:*13*
59:*10, 11*  62:*13*
298:*10, 13*  363:*23*
364:*16, 20*  381:*11*
**changing**  58:*10*
222:*5*
**charge**  27:*5*  191:*12*
266:*18*  396:*12*
405:*22*  406:*4*
**charges**  26:*24*  31:*14*
**check**  98:*13, 14, 18*
99:*1, 2*  153:*15*
258:*24*
**checking**  99:*15*
**Chief**  99:*3*  129:*20*
167:*12, 23*  229:*8, 13*

235:*9*  261:*16, 19*
314:*19*
**children**  231:*15, 18*
232:*4, 18*  233:*4*
**chitchat**  236:*17*
**choice**  111:*14*
**choose**  406:*1*
**chose**  404:*14*  406:*2*
407:*19*
**chosen**  405:*5*
**Chrissy**  115:*19*
116:*4*  184:*16*  331:*19*
**Christina**  371:*12*
**Christmas**  270:*22*
303:*2*  342:*21*
**Christopher**  40:*16*
**chronological**  390:*18*
**chronologically**
260:*20*  334:*10*  404:*9*
**circumstances**  59:*17,*
*20, 21*  60:*9*  61:*17*
63:*11, 15*  141:*22*
214:*1*  221:*10*  251:*3*
**CIVIL**  1:*3*
**claim**  19:*22*  20:*2*
31:*13, 24*  32:*12, 13*
40:*8*  85:*8*  114:*12, 13*
145:*1*  153:*4, 5*  180:*4*
183:*12, 15*  197:*22*
307:*18*  318:*24*
392:*21*
**claims**  18:*14*  26:*21*
28:*9*  31:*10, 20*  33:*9,*
*19*  83:*22*  90:*3*
123:*13*  126:*22*
142:*24*  143:*3*  195:*3*
358:*8*  411:*8*
**Claire**  363:*5, 8*
**clarification**  276:*13*
374:*3*
**clarify**  147:*18*  150:*5*
234:*2*  315:*13*  384:*21*
**classes**  200:*12, 17*
**classified**  387:*2*
**clause**  229:*18*  231:*3*
235:*10*  236:*10*
**clean**  243:*15*  244:*3,*
*16*  247:*3*  271:*21*
272:*8*

**cleaned**  243:*8, 17*
245:*17, 18*  271:*18, 20*
299:*21*  300:*1*  301:*4*
334:*18, 23*  335:*6, 8*
348:*20*
**cleaning**  244:*16, 18*
245:*7, 12, 16*  246:*8,*
*16, 18*  261:*5*  271:*16*
299:*20, 24*  300:*10, 15,*
*18*  301:*1*  306:*18*
342:*10*  346:*9, 12, 14*
347:*2, 3*
**cleanliness**  270:*13*
**cleans**  272:*5*
**clear**  44:*19, 20*  85:*19*
126:*2*  142:*15*  155:*18*
169:*13*  187:*11*
252:*13*  276:*14*  303:*4*
406:*4*
**clearer**  140:*21*
**clearly**  329:*18*
389:*22*
**clerk**  129:*20*
**clerk's**  114:*16*
183:*13, 14*
**client**  22:*5, 7*  23:*10*
24:*7*  311:*21*  352:*5*
**clients**  22:*3*  23:*8, 18*
264:*22*  266:*4*  273:*23*
274:*3*
**close**  11:*18*
**closed**  193:*15*  342:*6*
**closer**  36:*2*  253:*16*
**closet**  268:*22*  269:*1*
**clutter**  61:*4*
**COBRA**  287:*16*
290:*3, 12*  398:*7*
**Coleen**  1:*22*  7:*14*
412:*4, 22*
**collective**  183:*15*
286:*19, 22*  333:*1*
**collectively**  235:*1*
277:*22*  291:*16*
357:*24*  367:*20*
**college**  17:*12*
**com**  163:*5*
**combination**  182:*19*
**come**  85:*7*  109:*5*
121:*9*  129:*24*  133:*2*
154:*20*  160:*2*  161:*13*

162:8, 12  165:11
168:8  181:21  186:3
196:21  200:13
202:12  209:2  213:4
218:4  235:23  244:3,
16  271:13  272:4, 8
339:20  362:10, 17
371:10  373:2, 15
384:12  401:11
408:21, 23
**comes**  187:18  196:24
217:3  272:5
**comfortable**  95:7
109:23  110:8  112:22
227:23  228:5, 9
279:15
**coming**  35:23  52:16
94:3  107:10  155:12
177:5  192:13  230:22
243:15  295:18, 20
307:11  376:22
384:15, 16
**comm**  127:23
**command**  91:12
248:12
**comment**  319:15
**commenting**  133:19
**comments**  47:3
108:3  319:14  332:18
**Commissioner**  8:4
27:1  28:11  29:11
30:3, 4  129:12  130:4
163:3, 17  165:19
170:8  361:14  363:18
371:23  374:6  382:3
**commissioners**  20:24
30:20  46:10  58:24
59:2, 7  83:11  93:3,
16, 24  102:9  129:1, 3,
8, 9, 22  131:12
162:21  163:4  169:16
170:3, 10  201:24
208:21  210:10  212:1,
8  231:12  290:21
351:7  353:8  355:3,
23  356:8, 11, 17
357:13, 23  358:3
362:12  378:2, 4, 8, 17
384:15

**commissioner's**  29:22
39:16  154:4  158:6
159:5  162:10  172:21
231:10  362:14  364:7
**committed**  45:17
**committee**  51:23
52:1, 2, 9, 20  53:6, 21,
23  152:21  354:13, 15,
22  355:17
**communicate**  70:4
82:5  108:4  123:18
221:16  227:8, 16
264:2  265:14  380:15
**communicated**
119:17, 20  120:14
124:2  147:6  227:13,
21  319:1
**communicates**  380:15,
16
**communicating**
112:13  147:12  227:2
248:8  319:8
**communication**
111:12  188:7  206:10,
12  207:14  210:4
248:1  264:24  311:24
335:21  336:3  393:8
408:16  410:16
**communications**  42:5,
19  150:24  151:1
158:3  187:15  197:14
198:20  205:23  206:3
265:4  296:13  368:20
370:16  393:22
394:19  398:5
**communicator**  104:4
118:12  120:2  121:13
123:22  124:9
**community**  139:12
**companies**  33:23
92:1  245:7
**company**  244:16
245:1  299:20, 24
300:10, 15, 18  301:2
342:10
**compared**  201:10
**comparison**  251:5
**compensation**  395:22
396:7

**competing**  327:1
**compilation**  234:20
**complain**  348:12
**complained**  166:10
**complaining**  348:14
**complaint**  307:6
410:2
**complaints**  89:8
**complete**  10:19, 21
17:4, 6  76:24  77:10
78:21, 22  79:1, 5, 24
104:11  106:12, 16
176:10  182:5  183:4
199:20  216:6, 9, 12
220:19, 22  280:14
309:9  310:9  392:24
**completed**  31:21
123:5  133:12  182:15,
16  223:3  224:24
225:21  309:6  317:11
356:16, 19
**completely**  11:16
58:4  268:20  269:1
339:12
**completing**  78:18
242:11
**completion**  176:16
178:3  216:19  221:21
222:13
**compliance**  216:2
225:22  397:19
**complicated**  338:14
**complied**  166:8, 10
**comply**  166:9
**compose**  387:15
**compounded**  295:24
**comprehensive**  18:19
**computer**  36:3  51:6
219:18  220:9, 21
255:17  268:15
303:20
**computers**  223:19
269:5  271:7  336:11
**con**  147:7
**concern**  266:21
279:16, 23  307:7, 9
360:4, 19  400:21
**concerning**  28:8
262:18  280:22  358:7

**concerns**  186:15
189:13  210:11
222:20  248:4  258:19
259:15  260:4  261:11,
19  267:15  270:12
271:9, 10  272:7
302:10, 16  306:21
319:20  336:21
368:24  375:6
**concluded**  411:15
**conclusion**  285:15
**condition**  244:6, 11
267:16  347:18
**conditions**  271:11
272:7  310:8
**conduct**  33:16  34:3
76:18  141:5  237:13
254:14  282:1  332:18
380:7  399:5  410:16
**conducted**  86:14
92:6  208:10  352:24
355:7
**conducting**  175:9
352:14
**conduit**  123:16  135:9
**conference**  10:4
26:12, 16
**conferences**  157:1
**confident**  110:18
**CONFIDENTIAL**
1:10  63:22  249:13
**confidentiality**  9:4
13:3  20:18  248:2
249:16
**confirm**  301:15
372:14  373:4, 5
**confirmation**  300:20
301:9
**conflict**  395:24
**confused**  79:18
286:18
**conjunction**  368:23
**connection**  72:10
140:17  294:5
**consensual**  90:17
**consent**  54:18  90:8
**consider**  134:4, 9
184:14  397:15
**consideration**  134:17,

Case 3:21-cv-00477-MCC    Document 280-1    Filed 09/20/23    Page 120 of 373

CONFIDENTIAL

Deposition of Doreen Kutzler                    Jane Doe, et al. v. Schuylkill County Courthouse, et al.

*19* 201:*9* 353:*7*
**considerations** 64:*18*
**considered** 90:*17*
200:*21* 201:*11*
355:*13, 20*
**considering** 185:*16*
**constraint** 122:22
**consult** 103:5, *9*
**consultant** 14:*15*
20:*18*
**consultation** 21:*15*
26:2 29:6, *14* 38:*11,*
*21* 218:*13*
**consulting** 35:*11*
131:*5*
**consumed** 11:22
**contact** 84:*14* 85:*4*
89:*15* 147:*7* 205:*10,*
*16, 20* 262:*10*
**contain** 63:*21*
**contains** 56:*23*
**contemporaneous**
195:*8*
**content** 152:*8* 171:*17*
**contents** 9:*7, 19*
22:*10* 28:*15* 41:*8, 20*
42:*21* 43:*3* 123:*11*
131:*10* 152:*5* 188:*2*
204:*11* 209:*14*
219:*13* 315:*4* 319:*17*
320:*8, 9* 330:*22*
335:*1* 346:2 360:*2,*
*14* 371:*4, 7* 380:*21*
**context** 277:*15*
**continue** 101:*13*
104:*23* 231:*9, 10*
270:*24* 289:*16*
290:*15* 302:*3* 331:*20*
351:22 366:*17*
**continued** 352:*1*
378:*16*
**continues** 146:*5*
**continuing** 336:*14*
**continuous** 287:*1*
**contract** 22:*10, 14, 21*
23:*16* 25:*7* 26:*13*
37:*1* 101:5, *8* 113:*16*
118:*8, 17* 119:*5*
126:*5, 15* 132:*13*
137:*1, 6* 143:*15, 19*

147:*17, 22* 168:*18*
169:*15, 23* 171:*19*
185:*13, 18, 19* 198:*7*
201:*7* 243:*15* 351:*6,*
*13*
**contracted** 245:*8*
**contracting** 399:*2*
**contractor** 103:*23*
123:2 127:*24* 143:*16*
**contractors** 103:*14,*
*17* 137:*7* 147:*12*
244:22 245:*2*
**contractor's** 143:*19*
**contracts** 22:*3, 4*
178:*8* 244:*18*
**contradict** 331:*10*
**contradiction** 38:2
**contribute** 146:*4*
**contributions** 393:*17*
**control** 288:*8*
**controllers** 377:*23*
378:*12*
**convenience** 236:*21*
**conversation** 22:*23*
26:*11* 41:*8* 42:22, *23*
43:*4, 10* 44:*6* 46:*13,*
*15, 19, 22* 48:*1, 3*
54:*4* 89:*10, 13*
107:*24* 127:*23*
133:*18* 159:*1* 161:*21,*
*24* 162:*6* 164:*5*
166:*5* 167:*4* 187:*21*
188:*3* 193:*13* 204:*12*
235:*8* 259:*9* 263:*13*
275:*12* 280:*23* 282:*3*
296:*16* 306:*9* 311:*7*
319:*15* 328:*8* 332:22
370:*19, 21* 371:*4, 6*
375:*15* 376:2, *7, 9, 13*
382:*12* 383:*12*
**conversations** 41:*4,*
*19* 44:*1, 3* 46:*9*
47:*15* 55:*6* 62:*12, 22*
95:*13* 112:*20* 113:*13,*
*18* 118:*19* 163:*20*
164:*1, 8* 165:*3*
166:*18* 167:*9* 168:*1,*
*9* 170:*1, 15, 18*
194:*21* 199:*7* 224:*4*
235:*18* 236:*3* 252:*9*

259:22, *24* 263:*3, 5,*
*21* 274:*6* 275:*11*
293:2 296:*7* 311:*14*
319:*6* 330:*19, 23*
331:*1* 348:*24* 358:*10*
368:*4* 397:*13*
**convey** 330:*6*
**conveyed** 31:*4* 75:22
164:2 189:*5*
**cookie** 268:*11*
**coordinate** 167:*7*
**coordinates** 154:*3*
**cop** 236:*20*
**copied** 130:*18*
262:*14* 299:*1*
**copies** 96:*14* 111:22
129:*17* 324:*19*
**copy** 7:2 22:*13*
27:*11* 28:*18* 73:*13*
131:*6* 150:22 193:*20*
194:*7, 10* 197:*6, 7*
220:*16* 358:22
362:*19* 363:*15*
**corner** 232:*1, 10, 12*
**correct** 13:*4, 5* 17:*8*
18:*20* 21:*5, 16* 23:*14*
26:*17* 27:*18* 29:*11,*
*16* 38:*8, 15* 41:*12, 14*
43:*16* 45:*13* 47:*19*
49:*3, 10* 50:*5, 6, 9, 10,*
*24* 51:*13* 53:2 54:*6,*
*15* 57:*5, 12* 59:*4, 22*
60:*16* 61:*5, 13* 64:*19,*
*24* 65:*1, 14, 15* 66:*5,*
*18* 67:*16, 19, 20* 68:*5,*
*13* 69:*23* 70:*11, 21,*
*24* 71:*1, 11* 72:*6*
74:*17, 20* 75:*1, 9, 15*
82:22, *23* 83:*6* 84:*3*
85:*21* 89:*3* 91:*17*
92:*4* 95:*11* 96:*10*
97:*12, 21* 98:*1* 101:*2,*
*6, 8, 22* 104:*24* 106:*7*
107:*6* 109:*20* 110:*1*
112:*6, 10* 114:*4, 10*
115:*8, 12, 15, 22*
120:22 122:*13* 123:*8*
124:*15* 125:*14* 126:*5*
128:*4, 21, 22* 129:*1*
130:*18* 131:*2, 12, 13*

135:*5, 14, 16, 19*
137:*3* 144:22 145:*21*
146:*11, 15* 147:*12*
153:*6, 12* 154:*18*
156:*8, 9* 157:*23*
158:*16* 160:*4, 8*
162:*19, 21* 165:*9, 22*
166:*3* 171:*13, 19*
175:*5* 177:*14, 18*
178:*4* 180:22, *23*
181:*1, 2, 3, 4, 9, 10, 14*
182:*11* 185:*18*
192:*18* 193:*3, 6, 10*
195:*19, 23* 198:*17*
199:*13* 206:*4* 210:*19*
211:*1, 2* 212:*10, 15,*
*18* 214:*7* 215:*5, 8*
222:*1* 224:*6* 227:*20*
228:*1, 7, 10* 229:2
234:*10, 19* 235:*15, 17*
238:*13, 21, 22, 24*
239:*8* 241:*5, 15*
242:*4, 14* 243:2
248:*16* 249:*18, 23*
250:*6, 19* 251:*3, 7, 10,*
*17, 20* 252:2, *10, 16*
256:*17* 268:*17, 20*
269:2, *6* 271:*7, 8*
273:*24* 281:*16* 283:*4,*
*13, 14, 22* 284:*11*
285:*6* 286:*5, 8*
287:*24* 289:*24* 290:*8,*
*17* 291:*12* 297:*15*
298:*5* 299:22 300:*2,*
*3* 302:*7, 18, 19* 304:*7*
306:*19* 307:22
314:*17* 316:*21*
317:*24* 318:2 319:*17*
320:*6* 326:22 327:*2,*
*8* 328:*9* 336:*12, 13,*
*17* 337:*24* 342:*13*
345:*20* 349:*13* 350:*8,*
*14* 353:22 354:*1*
355:*16, 21* 358:*5*
360:*9* 361:*9, 15*
362:*23* 364:*18*
367:*16* 369:*19* 370:*8*
372:*6, 10, 15, 16*
379:*18* 381:*6, 22*
382:*16* 383:*20, 22, 23*

Case 3:21-cv-00477-MCC    Document 280-12    Filed 09/20/23    Page 121 of 373
CONFIDENTIAL
Deposition of Doreen Kutzler                    Jane Doe, et al. v. Schuylkill County Courthouse, et al.

385:20, 21  386:16
388:9, 10, 19, 22
389:3, 4  390:3, 4
391:2, 8  392:1
394:17  395:3, 19
396:8  397:2, 7  398:1
399:7  400:1, 4
401:19  402:14, 21, 23
403:13, 15  404:20
405:7  406:6, 7  407:8
**Correction**  413:2
**correctively**  356:11
**correctly**  8:20  39:24
139:1  165:22  174:19
175:6  198:18  290:9
307:18
**correspondence**  65:3
225:11  299:9  365:17,
22  369:15  394:6, 14
**cost**  300:18
**costs**  67:3
**Counsel**  2:5, 9, 13, 17,
23  7:16  9:12, 14
34:22  35:4  148:19,
20, 22, 23  149:6, 10,
19  150:12  205:12
262:7, 23  263:21
265:4  266:3  311:14,
17  312:15  368:5, 20
370:16  381:4
**count**  17:20  284:11
285:5  286:4
**counties**  408:11
**counts**  284:12
**COUNTY**  1:3  7:10
8:9  9:2  14:1, 2  18:2,
4, 14  19:22  20:2, 3,
24  21:16  22:20  23:9,
12, 19  24:12, 15, 17,
18, 23  25:7  26:2, 17
27:7, 14, 23  28:9
29:5, 10, 14  30:12
31:22  35:11, 19
36:23  37:12  38:7, 8
39:5, 7  41:2, 5, 6
45:3, 5, 15, 17  47:7,
18  49:16  51:24
57:21  58:11, 23  60:4,
8, 19  61:11  62:11
63:1, 8  64:11  66:15

67:1, 7  68:10  70:15
72:14, 15, 19, 21
73:15  75:14  77:3, 19
81:24  82:3, 6, 10, 22
83:6, 17, 20  84:2
85:18, 21  86:14, 18
87:9, 10  88:3, 12
89:8  90:4  92:22
93:15  97:4  98:5
100:24  101:6  103:5
106:15, 20  107:10
108:17, 24  110:17
112:15  113:9  116:8,
24  117:5  123:4, 17
124:2, 18  125:17, 23
126:3, 23  128:1, 19
130:17  131:1  133:22
136:12, 17  139:8, 9,
19  140:3  141:4, 13
143:12, 16, 18, 20
144:24  145:2, 6
146:3  153:24  155:13,
14  156:12, 15  159:19
160:4, 7, 11  161:12
162:1  163:16  166:20
167:5  168:14, 17, 24
169:14  170:8  171:10,
12  174:9  175:19
176:24  178:4  180:12
183:2  184:22  185:1,
22  189:8  191:11, 13
192:2, 4, 23  193:3
194:3, 5, 12, 15  201:5,
18  203:19  204:9
205:22  206:24
208:20  209:5  210:12
212:1, 2, 5, 14, 18, 22
213:2, 6  216:8, 11, 18,
23  217:12  223:19
225:2, 7, 14, 18, 22, 24
226:20  229:1  232:16
233:16, 18  235:20, 23
236:21  237:11, 23
241:23  244:18  245:2,
8  247:24  252:1
253:19  258:23  261:2
262:7, 24  270:23
272:5  275:8  280:15
281:14  283:7, 11, 20
288:8, 12  290:20

292:14, 22, 23  293:7,
18  297:8  298:3
299:19  300:18  301:1,
3  304:3  305:7  307:7,
9  312:1  314:24
315:11  318:11, 22
321:15, 18  323:3
325:16  326:23
347:19  350:14, 20
351:1, 10, 14, 20
352:13, 16  353:17
354:7  358:8, 9  361:9,
14  363:7  365:23
369:15  376:11
383:16  386:22
387:14, 18  389:23
390:3, 22  391:6, 24
393:16  395:12, 23
396:1  397:18  399:2,
6, 19  400:1  408:13,
17  409:7  410:8
**county-issued**  70:24
86:19
**county's**  31:14  34:9
57:3  76:22  101:1
187:11  218:17
248:10  254:21, 23
298:2  300:4  311:23
341:23  342:15
366:16  371:5  395:1
**couple**  13:10  59:12
70:3  72:11  76:12
145:15  165:16  345:9
**courier**  378:7
**course**  19:3  61:7
124:17  128:14
162:15  332:7
**courses**  116:3, 4
134:7
**COURT**  1:2  7:1, 13,
14, 15  10:6, 9, 14
312:10, 20
**COURTHOUSE**  1:4
7:10  24:24  32:7
42:19  80:9  81:4
84:21  85:8  86:14, 17
93:1, 5, 6  94:1  95:10
96:3  97:4  109:5
112:6  136:21  141:17
160:7, 18  161:5, 9

162:3, 8, 19  166:21
168:8, 22  190:18
216:10  223:8, 19
229:7  230:8, 10
231:7, 9, 16  233:19
235:23, 24  236:8, 24
241:23  249:21  250:3,
6, 16, 22  252:14, 19
253:2  254:2, 8  259:3,
4  269:23  273:2
336:16  371:11  380:3
382:4, 20
**Courtroom**  163:12
377:6, 8  378:8, 10
**cover**  156:22
**coverage**  287:17
290:6  393:10  394:2
**covered**  286:6
**COVID**  84:12  107:1
205:22  206:4  217:9
243:14  245:3, 4, 9
**coworkers**  70:5
**CPE**  116:3, 4  126:14
134:5, 7  198:22
200:11, 17  226:12, 17,
21
**CPU**  268:15
**create**  16:8  58:3
137:20  138:6, 13
**created**  16:18
128:16  182:16
**creates**  289:11
**creating**  108:6  211:9
**crew**  301:7  305:2
**crying**  327:17
**cumbersome**  338:14
**cupcake**  268:12
**current**  14:6  62:20
89:24  225:1  394:1
**Curtis**  2:20
**customer**  81:5
**customers**  81:5, 15,
16  82:5
**cut**  202:12  257:20
**cutting**  304:19

< D >
**daily**  68:12, 15
89:20  177:6  231:17

254:9

**damage** 267:21, 22

**dance** 179:7

**date** 7:6 52:22 132:12, 15 133:3, 4 201:14 242:24 256:11 278:20 315:3 342:17 350:19 351:2, 12 401:12 412:21

**dated** 260:21

**dates** 224:13 401:9, 10

**dating** 17:21

**David** 356:5

**day** 28:2 61:8 68:13, 17 69:3, 18 87:14 98:8, 15 131:15 151:7, 10 152:12 160:3, 21 161:12 167:19, 20 181:20 196:16, 18 197:9, 10, 12 212:14 243:9 256:15 258:10 266:7 267:3, 12 285:23 317:4 373:22 377:16 385:9, 15 388:17 389:6 400:9, 12 401:17, 18, 22 402:13, 20 406:8 407:20, 21

**days** 86:6, 13 108:21 112:5 166:7, 8 183:17 184:8 186:16 187:9 188:5 196:19 200:20, 22 213:5 287:1 359:16

**day-to-day** 25:14 30:24 33:14 40:8, 10 52:5 142:2 144:11 351:5, 23 352:3 359:18

**dead** 348:21

**deadline** 224:15

**deadlines** 338:22 339:3, 16

**deal** 127:8

**dealing** 359:17

**dealt** 20:1

**Deb** 28:1 105:4 107:3, 6, 13 126:11

**DEBISE** 3:3 7:22

**Deborah** 87:10

**December** 114:15 262:4 266:12 267:9 268:8 269:24 270:8 271:1, 21 277:17, 19 280:12 291:11 299:8 300:5 302:18 303:8, 11 310:24 314:16 316:5 325:15 335:22 336:22

**decide** 24:11 245:1 288:13

**decided** 39:17 134:3 244:15 281:13 317:21 322:11 351:11 356:23 357:17

**decides** 406:1

**decision** 60:8 61:12 75:13, 17, 21 102:11 103:18, 22 138:4 151:5 198:11, 12 199:3 200:24 201:4 214:15, 19 222:15, 23 228:14 239:22 242:13 244:2, 5 265:23 266:16 281:18 288:16 290:2 320:21 322:15 357:14

**decisions** 88:6 118:13 143:10, 12

**Declaration** 325:6, 20 328:2 332:4, 21 333:8

**decline** 301:16

**dedicated** 342:14

**deducted** 393:17

**deeper** 410:16

**defeated** 295:22

**Defendant** 7:24 27:3 29:10, 13 32:16, 23 35:10, 13 36:16, 19 38:6 45:17, 21 46:7, 14 47:10, 18, 21 48:1 83:4 89:9 90:20 91:4 92:24 93:14 96:9 97:2 98:21 99:22 109:10 111:1,

5, 9 112:5 141:8 143:4 146:3 161:13 163:7, 22 164:13, 20 166:6, 7 170:4, 21 172:3, 8 173:2, 4, 10 174:8, 11, 12 175:7, 11 190:5 195:21 202:1 203:22 204:23 205:2 208:16 233:15, 20 234:9, 18 236:1 237:12, 23 239:12 254:13, 14 260:9 274:16 275:12, 13 276:3 280:22 281:9 282:1, 20 313:1, 2, 12 314:3, 10 372:13 373:12, 24 375:23 377:15 379:8, 12, 19 380:1, 6 385:18, 22 397:2

**Defendants** 1:4 83:2 133:22 313:11

**defended** 395:11

**defense** 35:4 311:17 312:15

**defer** 52:4

**defined** 90:24

**definitely** 105:23 268:2, 5

**definitive** 131:19 133:13 134:3

**degrading** 296:1

**degree** 17:5, 18 19:13

**delay** 15:17 50:19 51:3, 15, 16, 17

**delayed** 223:17 243:6

**delays** 243:21

**delegation** 182:17, 20

**delinquency** 224:20 225:3

**delinquent** 212:6, 9 224:18 225:8, 14, 21

**deliver** 317:22

**delivered** 223:18

**delivering** 174:4

**delved** 331:15 332:1

**demeanor** 327:11, 15, 19

**Democrat** 94:17

**demotion** 173:11 174:9

**denial** 103:6

**denied** 101:22 102:23 302:7

**DENISE** 3:4 13:22 104:10 106:11 107:4 108:19 403:6 406:9

**deny** 102:12 372:14

**department** 25:15 28:5 30:24 34:5 35:22 53:17 69:5 81:20 84:12 85:3 86:2 88:13 89:19 95:20 96:1 100:9 108:7 125:21 127:7 131:7 133:6 136:24 137:16 138:16, 18, 20 139:10 142:12, 17 143:10 147:11 154:23 155:3, 6 158:4 159:7 167:6 177:10 179:21 182:8 183:19 184:4 186:3 196:11 198:13, 21 201:13 210:1 225:15 230:18 231:23 232:3 235:8 239:7, 19 240:11 245:18 246:19 257:19, 20 272:24 274:8 281:2 314:20 342:16 346:17 362:10, 18 363:8 386:19 393:15

**departmental** 137:6

**departments** 32:6 52:3, 5 54:1 125:21, 22 130:1 137:17 141:14 142:23 144:3 169:19 230:11, 24

**department's** 155:4

**departure** 377:16

**depend** 63:15

**dependent** 320:21

**depending** 91:24 217:2 401:11

**depends** 23:6

**DEPOSITION** 1:18 7:8, 11 9:7, 21 10:11

Case 3:21-cv-00477-MCC    Document 280-1    CONFIDENTIAL    Filed 09/20/23    Page 123 of 373

Deposition of Doreen Kutzler                                    Jane Doe, et al. v. Schuylkill County Courthouse, et al.

12:20  13:10  411:15
**depositions**  13:2
**depressed**  295:23
**depth**  26:23
**deputy**  94:4  167:18
**DEREK**  2:2
**descended**  377:24
**described**  24:9
**DESCRIPTION**  4:10
22:17
**descriptions**  79:4
**design**  64:17
**designated**  61:3
**designed**  309:5, 9
**desire**  108:18  109:7,
12  112:4
**desires**  141:7
**desk**  81:6, 18  346:23
**despite**  47:15  405:16
**detail**  221:12
**details**  89:16
**detectors**  241:24
242:3
**determination**  52:18
409:6
**determine**  64:15
99:10, 16  135:3, 17
307:11  337:5, 18
**determined**  326:8
351:2, 16
**detriment**  199:21, 22
226:1
**Detweiler**  105:2, 5
107:3, 7, 14  126:11
**development**  144:14
353:4
**developmental**
230:21  353:5  354:9
**develops**  22:4
**device**  87:4
**devices**  86:20
**DICKIE**  2:15
**dictate**  286:20, 23
**dictated**  198:14
**Dietrich**  129:16, 19
154:2
**difference**  230:6
236:7
**differences**  32:3
392:7

**different**  35:1  47:22
56:23, 24  60:15
63:12  69:8  93:19
140:2  151:2  163:18
196:16, 18  197:10
200:17  209:2  244:19
255:24  303:9  315:16,
17, 18  336:15  351:12
366:23  392:4  399:2
405:5  407:21
**difficult**  81:14  108:6,
23  112:9  137:20
138:6, 14  217:6
338:13  409:22
**difficulties**  62:19
180:13  339:14
**difficultly**  303:21
**dig**  410:15
**diploma**  17:10, 11
**direct**  61:20  63:17
77:13  91:10, 11
154:1  162:9, 24
248:11  264:23  265:2
296:15  311:15
332:13  368:5, 9
374:14  384:14, 18
387:2  388:1, 4
**directed**  121:11
133:4  149:2  150:11
153:19  261:2  314:24
315:5  374:18, 19
383:5
**directing**  311:16
**DIRECTION**  6:1
25:5  149:6
**directive**  228:6
**directly**  32:10
108:15  111:16  124:2
150:8  207:17  238:23
264:2  294:8  335:24
410:1, 13
**director**  64:14  85:20
95:19, 20  123:4, 7
124:9  248:7  274:8
302:13, 22  305:10
337:16  351:19
352:20  354:8, 11
382:13, 14  391:7
395:7  396:16  397:10

**directors**  32:9  209:2
395:8
**directory**  192:5
**disability**  288:5
293:2, 11  294:4
**disabled**  239:13
**disagree**  108:8
164:21  177:3  241:16
328:16  358:19  388:3
**disappeared**  377:3
**disbelieve**  219:19
**discharged**  17:23
**disclose**  9:15  41:8,
18  371:7
**disclosed**  9:10
**disclosing**  43:3  371:4
**discovered**  52:20
53:9
**discrimination**
109:24  403:22
**discuss**  27:10  34:21
46:6  55:10  64:14
98:4  103:5  131:10
133:15, 21  135:22
151:9  152:12, 14
184:24  186:15  187:6
213:11, 17  214:24
215:16  248:14  296:4
319:20  350:17
**discussed**  26:23
31:10, 12  76:11
77:12  98:9  190:7, 21
191:3  204:18  213:1
214:21  221:11  236:9
256:10  337:8  342:1
**discussing**  46:16
320:1  333:14
**discussion**  23:23
25:8, 9  26:3, 8  47:16
110:7, 13  193:14
208:19  210:4  214:8
222:12  255:19
297:12  358:3  405:21
**discussions**  22:5
24:11  28:8  44:1
62:1  63:21  65:6
89:22  102:14  110:24
113:8  137:16  143:15
169:6, 21  170:7, 12
192:8  197:21  198:19

234:20, 21  252:4
279:21  316:20  357:2,
22
**disgusted**  295:22
**disinfected**  299:21
300:1  342:11
**dispatched**  243:12
**disrupt**  213:2
**disseminated**  91:23
**distance**  253:18, 19
**distinction**  230:6
236:6  289:18
**distributed**  401:6
**distribution**  154:3
**DISTRICT**  1:2
**DOCKET**  1:3
**document**  15:13, 17,
24  16:3, 8, 20  20:5,
15  28:16  45:21
57:19  58:5  96:21
100:20  105:8  117:17,
18  120:11  123:3
145:23  209:24
286:24  287:14
297:23  298:4, 23
299:15  307:16  324:9
325:2, 5  326:9, 19
402:5
**documentation**
131:22
**DOCUMENTS**  6:13
14:20  43:14  56:23,
24  57:8, 11  119:13
129:24  359:2
**DOE**  1:2  4:13, 14,
15, 16, 17, 18, 19, 20,
21, 22, 23, 24  5:1, 2, 3,
4, 5  7:9, 21  9:1
13:13, 17, 20, 23
40:13, 14  44:20
48:19, 21  56:10, 12
65:17  70:12  74:9, 11
100:12, 15  120:4, 7
130:10, 12  131:14
143:22  151:16, 19
156:3  203:6, 10
211:12  260:12, 15
277:6, 9  278:1  280:5,
6  291:2, 4, 18  297:16,
19  310:15, 17  323:22

Case 3:21-cv-00477-MCC    Document 280-1    Filed 09/20/23    Page 124 of 373
CONFIDENTIAL

Deposition of Doreen Kutzler                                    Jane Doe, et al. v. Schuylkill County Courthouse, et al.

324:*18*, *22*  333:*22*
334:*2*  365:*24*  366:*21*
**doing**  13:*2*  29:*6*, *14*
34:*22*  35:*10*  62:*24*
77:*23*  85:*1*  89:*14*
124:*17*  141:*15*, *21*
144:*7*  145:*5*  155:*12*
175:*9*  182:*10*  200:*7*,
*18*  218:*6*  224:*21*
280:*19*  310:*8*  346:*13*
352:*12*  379:*16*
383:*21*
**DOJ**  344:*5*
**door**  93:*24*  94:*4*
162:*11*, *23*  163:*3*, *9*,
*11*, *17*, *18*, *24*  164:*22*
238:*19*  239:*2*, *7*
240:*13*, *23*  241:*6*
342:*6*  385:*10*
**doors**  193:*15*  238:*16*
384:*13*
**DOREEN**  1:*18*  4:*5*
7:*8*  8:*13*  264:*4*
**Doreen's**  263:*3*
**Dotty**  395:*10*, *19*
397:*5*, *13*
**double**  384:*13*
**draft**  57:*23*  103:*16*,
*19*  150:*18*  317:*11*
320:*11*  321:*24*  322:*1*,
*2*  367:*19*  368:*1*
381:*2*  387:*15*
**drafted**  58:*16*
128:*17*  195:*7*, *21*
196:*4*  298:*8*  316:*19*
317:*2*, *12*  341:*10*, *12*
353:*10*  381:*4*, *5*
**drafting**  119:*13*
321:*18*, *22*  366:*12*
367:*9*, *16*
**drawer**  346:*23*  359:*2*
**drawers**  347:*10*
**dripping**  267:*23*, *24*
**driven**  158:*21*
**driving**  187:*20*
188:*12*  328:*4*  329:*24*
330:*16*
**drop**  284:*2*
**droppings**  267:*19*

**drug**  190:*14*  191:*6*
195:*1*  197:*15*
**dual**  269:*18*
**dual-role**  173:*24*
**due**  279:*15*  332:*15*
399:*23*
**duly**  8:*13*
**duties**  22:*17*  36:*24*
56:*7*  76:*18*  79:*4*, *23*
80:*7*  81:*3*, *10*  115:*11*
124:*14*  125:*9*, *14*
128:*3*, *9*, *17*, *18*, *19*
176:*16*  307:*19*  308:*2*
337:*23*  338:*4*  350:*24*
386:*11*
**duty**  122:*22*  273:*7*
280:*20*
**duty's**  273:*8*
**dynamic**  90:*12*, *24*

< E >
**EAP**  205:*13*, *17*
206:*9*, *12*
**EAP's**  207:*15*
**earlier**  11:*9*  108:*22*
150:*6*  152:*19*  155:*22*
171:*17*  183:*24*
184:*13*  224:*4*  238:*18*
319:*5*  325:*9*  363:*18*
371:*15*  394:*13*
398:*23*
**earliest**  334:*11*
**early**  64:*8*  92:*21*
104:*12*  224:*15*  334:*7*
359:*15*  374:*20*, *21*
**earmarked**  156:*18*
**earn**  277:*21*
**easier**  80:*3*  96:*13*
390:*19*
**ed**  335:*18*
**Edelstein**  1:*20*  2:*19*
**edited**  128:*20*
**edits**  298:*10*, *13*
**education**  16:*21*  18:*8*
**EEO**  31:*14*  395:*24*
397:*9*, *18*, *19*
**EEOC**  27:*1*, *5*
266:*18*  352:*6*  394:*23*
396:*12*  398:*7*  405:*22*
406:*4*

**effect**  10:*5*  57:*20*
215:*24*
**effectively**  95:*22*
108:*7*  134:*1*  139:*5*
155:*6*, *7*  358:*16*
**efficiently**  62:*16*
292:*17*
**effort**  138:*6*
**either**  17:*18*  47:*8*
50:*7*  63:*8*  116:*6*, *7*
147:*6*  163:*21*  170:*20*
227:*22*  231:*13*
253:*10*  258:*17*
273:*18*  279:*6*, *8*
281:*14*  284:*14*  294:*8*
299:*10*  301:*19*
342:*12*
**Elaine**  25:*22*  354:*3*,
*6*  393:*14*
**elected**  33:*23*  34:*6*,
*11*  288:*21*  399:*11*
**election**  230:*14*
238:*18*
**electronic**  86:*20*
154:*14*
**elevator**  384:*16*
**elicit**  190:*14*  191:*6*
**eligibility**  286:*20*, *23*
287:*2*, *8*, *14*, *21*  288:*9*
290:*5*
**eligible**  283:*13*, *20*
284:*5*  287:*7*  288:*20*
**else's**  153:*18*
**e-mail**  49:*1*  50:*1*
51:*16*  54:*3*, *4*, *18*
57:*10*, *11*  65:*18*
70:*18*  71:*4*, *12*, *14*, *18*
72:*5*  73:*13*  76:*4*
96:*23*  98:*4*  100:*23*
101:*11*, *17*  106:*9*, *21*
111:*13*, *23*  113:*2*, *12*
126:*10*, *14*  130:*16*, *21*,
*24*  134:*21*  145:*12*, *17*
146:*1*  147:*7*, *9*, *15*, *16*,
*21*  148:*11*  150:*18*, *21*
151:*23*  152:*4*, *10*
153:*10*  155:*21*
159:*15*, *18*, *23*  160:*22*
162:*5*  171:*7*, *10*
176:*5*, *9*  177:*5*

181:*19*  183:*8*  184:*22*,
*24*  185:*13*  188:*7*
203:*14*, *17*  204:*2*, *9*
206:*8*  207:*20*  208:*12*
209:*14*, *16*, *22*  211:*19*,
*23*, *24*  213:*9*, *11*
214:*9*  219:*2*, *6*, *7*, *12*
221:*15*, *17*, *20*  222:*1*,
*13*  224:*4*  225:*11*
226:*24*  228:*18*  242:*6*,
*22*  248:*21*  249:*1*
260:*22*  261:*24*  262:*3*,
*9*, *14*, *24*  263:*9*  265:*9*,
*14*  266:*3*  277:*15*, *16*
278:*19*  279:*15*
280:*12*  291:*8*, *10*, *24*
292:*4*, *10*, *20*  294:*7*, *9*,
*11*  295:*11*, *14*  297:*7*
298:*1*, *5*  310:*22*, *24*
311:*4*  315:*4*, *22*
334:*6*, *11*, *12*  335:*1*
337:*9*, *10*  339:*24*
340:*6*  341:*3*  346:*3*,
*24*  349:*10*  350:*3*, *5*, *6*,
*10*  359:*23*  360:*15*
365:*11*, *21*  367:*10*, *14*
369:*1*, *12*, *13*, *17*
371:*15*  373:*1*, *11*, *14*,
*15*, *21*  374:*1*, *16*, *18*,
*19*  375:*18*  389:*16*
390:*1*  393:*6*  399:*22*
403:*1*, *2*  404:*9*, *10*, *11*
405:*14*  406:*24*  407:*6*
408:*14*
**e-mailed**  389:*9*
**e-mailing**  248:*19*
**e-mails**  65:*2*  88:*17*,
*20*, *23*  150:*8*  343:*17*
372:*24*  394:*22*  408:*5*,
*22*, *24*
**embarrassed**  295:*22*
**emphatically**  177:*8*
**employed**  14:*9*  21:*4*,
*8*  84:*2*  87:*10*  123:*6*
125:*17*  226:*20*
274:*24*  295:*21*
301:*19*, *20*, *22*, *23*
**employee**  59:*18*
61:*11*  63:*21*  64:*14*
65:*13*  67:*2*, *18*, *21*

70:*4*  72:9, *12, 16*
82:*3*  90:*8*  91:*1*
101:*1, 5*  105:*24*
116:*24*  162:7, *18*
163:*1, 5*  165:*11*
172:*12*  182:*9*  200:*4*
205:*13*  206:*1*  209:*11*
248:*1, 9*  252:2  253:5
283:*11, 19, 23*  286:*10,
14*  288:*12, 13, 18*
289:*9, 20*  290:*11*
307:*1*  321:*19*  323:*4*
347:*19*  361:9  386:*11,
16*  387:*17*  399:*14*
411:*5*
**employee-related**
248:*8*
**employee-relations**
144:*11*
**employees** 30:*12*
37:*12*  60:*19*, 22
61:*15*  66:9  67:*23*
68:5  91:*23*  100:*24*
117:*4*  124:6  133:*23*
134:5  144:2, *14*
146:*14*  162:*11*
205:*24*  209:2  212:2
232:*16*  237:22  251:6,
*16*  272:*16*  296:*11*
300:*20*  301:*12*
306:*23*  307:*16*
332:*17*  351:*20*  361:*5*
374:*20*  382:*19*
383:*17*  386:6, *24*
387:*3, 7*  388:*1, 4, 14,
18*  389:*1*  399:*6*
409:*10, 18*
**employee's** 67:*5*
209:7  213:*19*  248:*14*
**employer** 14:7  58:*12*
66:*10*  127:8  144:*24*
411:*5*
**employers** 17:*21, 23*
18:2, *12*  33:23  60:*4*
91:*23*  146:*13*  301:9
**employment** 66:*12,
20*  87:*13*  92:22
116:8  146:*11*  194:*15*
195:2, *3*  210:2
243:*13*  275:*1*  325:*15*

355:*13, 20*  387:*14*
393:7  394:*20*  396:*10*
398:*23*
**empty** 240:*16*
**encounter** 203:*21*
**encountered** 373:*23*
385:*15*
**encouraged** 198:7
409:*20*
**ended** 190:5  224:*21*
255:*23*  256:5  401:*17*
**ends** 348:*21*
**enforcement** 272:*17*
280:*21*
**engage** 110:*24*
112:*20*  113:*1*  118:8,
*16*  143:*15*  146:*13*
293:*18*  297:*12*
**engaged** 45:22
110:*12*  293:7  299:*19*
**engaging** 110:6
138:*20*
**engineer** 32:*1*
**enjoy** 133:*14*
**enroll** 289:2, *17, 19*
**enrolled** 285:*10*
287:*4*  289:*16, 22*
**enrollment** 284:*19*
**ensure** 106:*15*
131:*17*  133:24
134:22  189:*4*
**entailed** 200:7
**enter** 160:*3, 15, 18*
161:5, *9*  162:*3, 12, 13,
18*  163:*1, 3, 9, 10, 17*
165:*23*  166:*21*  216:*1*
238:*17*
**entered** 20:22  21:*15,
24*  166:*15*  233:*16*
234:9  239:*3*  264:22
**entering** 93:*23*
164:*21*  230:7, *8*
235:6  378:*4*  382:*20*
**entire** 28:2  78:*8*
89:*19*  377:*14, 15*
**entirety** 183:*21*  382:7
**entities** 60:6  244:*19*
**entitled** 344:*12*
**entrance** 93:*20*
162:7, *9, 11*  163:*5*

165:2, *5, 9, 11, 21, 23*
166:*15, 23*  253:6, *14*
371:*11*  376:22
377:*18*  382:*20*  383:*5,
8, 18*  384:*5, 9, 11, 12,
18*  385:*14, 19*
**entrances** 162:*17*
**entry** 162:*15*  300:6
**envelope** 196:9
197:*1*  317:*16*  318:*5,
13*  325:*11*
**environment** 89:*23,
24*  90:*4*  106:*24*
107:*20*  108:*1, 23*
109:*23*  112:9, *22*
126:*21*  137:*21*  138:7,
*10, 14*  146:*5, 10, 14,
19*  186:*1*  309:*5*
329:*5*  332:*16*  333:9
**equalization** 176:*11,
21*  308:9, *12*
**equip** 304:*12*
**equipment** 51:*11*
62:*20*  64:*17*  65:*3*
70:*16*  72:9  77:*4, 7,
20*  78:7, *24*  80:*8*
154:*16*  156:6, *7*
157:*7*  161:*3*  214:*11*
223:*4, 7, 11, 16*
245:*21*  246:*1*  255:*17*
270:*15*  292:*17*
302:*11, 14*  303:*19*
304:9  306:*12, 14*
309:*16, 21*  310:*3*
336:7  337:22  338:*5*
339:*15*  342:*20*  343:*5*
**equivalent** 17:*10*
**ergonomically** 61:*5*
**ERRATA** 413:*1*
**erratic** 187:8, *19*
188:*12*
**erratically** 328:*4*
**escort** 93:8, *9*  167:*18*
**escorted** 93:5  98:*11*
99:*24*  378:6  379:*20*
380:*3*  382:*3*
**escorting** 167:*7*
**e-signature** 381:*15, 18*
**especially** 56:*5*

**espoused** 174:*13*
175:*18*
**espouses** 360:*3*
**espousing** 294:*4*
**ESQUIRE** 2:2, 6, *10,
15, 19, 20*
**essence** 85:6
**essentially** 157:*21*
185:6  353:*24*
**establish** 156:*20*
**established** 52:*15*
62:9
**estate** 32:2  218:*18*
**esthetics** 267:*15*
**estimate** 252:*18*
**et** 1:2, *4*  7:9, *10*
**ethics** 408:9
**evaluate** 123:*10*
135:*12*
**evaluating** 218:*17*
**evening** 359:*13*
**event** 59:*17*  161:*16*
287:*15*  289:*11*  375:9
394:*4*
**events** 151:*10*
192:*12*  327:9  332:7
374:*24*  389:*18*
**eventually** 54:*17*
102:*4, 21*  243:*14*
256:*15*  261:*21*  381:9
**Everest** 7:*13, 15*
**everybody** 405:*11*
**everyday** 167:*20*
**everyone's** 213:*4*
**exact** 99:*10*  134:9
185:9  224:*13*
**exactly** 55:*21*  190:*15*
253:22  382:4, *6*
388:*13*
**Examination** 8:*16*
**examined** 8:*14*
**example** 40:*5*
**excess** 157:*21*
**exchange** 87:*17*
383:*13*  393:6
**exchanged** 261:*15*
**exclude** 236:*23*
**excusal** 388:*18*
**excused** 388:6  389:*1*
**excusing** 373:*21*

Case 3:21-cv-00477-MCC    Document 280-11    Filed 09/20/23    Page 126 of 373
CONFIDENTIAL
Deposition of Doreen Kutzler                                    Jane Doe, et al. v. Schuylkill County Courthouse, et al.

execute 316:*18*
317:*14*
executed 127:*14, 17,
21* 128:*17* 139:*1*
317:*3* 326:*9* 410:*3*
exempt 386:*6, 15, 23*
387:*2*
EXHIBIT 4:*10, 11,
12, 13, 14, 15, 16, 17,
18, 19, 20, 21, 22, 23,
24* 5:*1, 2, 3, 4, 5, 6, 7,
10, 11, 12, 13, 14, 15*
159:*10* 211:*13* 238:*6*
280:*5* 328:*17* 340:*23*
344:*8, 10, 13, 17, 24*
366:*23* 367:*2*
Exhibit-100 404:*3, 5*
Exhibit-107 5:*15*
408:*2*
Exhibit-111 5:*13*
343:*12, 14*
Exhibit-17 340:*13, 15*
Exhibit-19 218:*21, 23*
227:*1* 248:*19*
Exhibit-20 389:*13*
Exhibit-21 5:*14*
367:*1, 5*
Exhibit-229 96:*16, 18*
Exhibit-230 5:*10*
159:*10, 12*
Exhibit-232 171:*2, 4*
Exhibit-233 5:*11*
211:*13, 15*
Exhibit-275 15:*6*
Exhibit-276 20:*11*
Exhibit-277 48:*21*
Exhibit-278 56:*12*
Exhibit-279 74:*11*
Exhibit-280 100:*15*
Exhibit-281 120:*7*
Exhibit-282 130:*12*
Exhibit-283 151:*19*
Exhibit-284 203:*10*
Exhibit-285 260:*15*
Exhibit-286 277:*9*
Exhibit-287 278:*1*
Exhibit-288 291:*4*
Exhibit-289 291:*18*
Exhibit-290 297:*19*

Exhibit-291 310:*17*
367:*16*
Exhibit-292 324:*20,
22* 328:*2*
Exhibit-293 334:*2*
Exhibit-294 365:*2*
Exhibit-295 366:*19*
398:*17*
Exhibit-61 349:*22, 24*
Exhibit-72 5:*12*
324:*2, 4*
EXHIBITS 4:*8* 5:*9*
existed 53:*21* 60:*9*
exists 51:*24* 62:*18*
exit 389:*23*
exited 35:*22*
exiting 35:*20* 382:*20*
expect 82:*3* 254:*1*
expectation 78:*17*
256:*6*
expectations 179:*20*
expected 82:*1* 226:*3*
254:*7*
expense 52:*11* 72:*12,
14, 20* 73:*8, 10, 19*
expenses 51:*23* 52:*4*
67:*3* 74:*1* 156:*22*
experience 18:*14, 20*
23:*8, 9, 13* 33:*22*
89:*17, 18* 90:*7* 91:*21*
116:*19* 123:*21* 125:*1*
199:*3* 247:*22* 386:*22*
experienced 292:*15*
328:*13, 17*
experiencing 132:*24*
294:*2* 310:*7*
expiration 132:*12*
expired 101:*8* 185:*19*
explain 32:*2* 132:*6*
212:*23* 358:*3*
explained 31:*22*
explanation 176:*12*
expose 192:*22*
exposing 260:*8*
expressed 326:*7, 14,
18*
extend 133:*8*
extended 77:*9*
134:*15* 143:*19*
287:*23*

extent 62:*3* 144:*3*
180:*15* 187:*14*
194:*21* 263:*20* 264:*4*
265:*3* 311:*13* 330:*24*
368:*4, 19* 370:*14*
384:*20*
extenuating 59:*21*
60:*8* 61:*17* 63:*11*
extra 96:*14*
extreme 292:*15*
294:*2*
extremely 314:*23*
318:*20*
eyes 326:*17*

< F >
face 115:*20* 296:*2*
faced 338:*24*
facilitate 25:*14* 30:*23*
facilitates 22:*3*
129:*23*
fact 48:*1* 53:*23*
55:*11* 65:*17* 108:*13,
17* 109:*6* 124:*8*
125:*7* 128:*16* 130:*4*
137:*5* 174:*22* 189:*20*
192:*2* 198:*20* 209:*10*
215:*23* 222:*4, 14*
238:*14* 249:*10* 267:*3*
272:*18* 274:*22* 281:*7*
295:*24* 319:*1* 326:*18*
375:*5, 23*
facts 285:*19, 20*
failed 113:*2* 348:*23*
failure 179:*2*
fair 19:*24* 55:*20*
70:*19* 85:*13* 128:*8*
132:*19* 136:*23*
218:*16* 243:*20*
254:*20* 255:*3* 256:*2*
267:*10* 309:*8* 317:*5,
20* 335:*5* 339:*6, 12*
359:*19* 376:*6*
falls 18:*7*
familiar 217:*22*
far 9:*6* 18:*24* 33:*14*
61:*15* 156:*13* 214:*24*
235:*4* 289:*4* 300:*23*
farther 260:*7*

fashion 99:*19*
favor 43:*22*
favorable 399:*17*
February 399:*5*
402:*9* 404:*18* 407:*7*
federal 397:*1*
feedback 145:*18*
feel 44:*24* 45:*21*
110:*12, 18* 111:*7*
118:*4* 133:*11* 162:*3*
166:*21* 189:*10*
213:*17* 248:*24*
279:*15* 296:*9* 309:*7*
310:*7*
feeling 95:*3* 109:*1*
feelings 35:*14* 295:*24*
feels 112:*3*
fell 295:*22*
felt 47:*6* 108:*5*
112:*24* 117:*24*
146:*23* 170:*21*
223:*24* 245:*7* 249:*13*
316:*11* 333:*14*
337:*15*
Fetterolf 334:*17*
fiance 247:*4*
field 62:*24* 114:*21,
23* 116:*7* 146:*11*
183:*13* 184:*13, 14*
189:*20* 191:*12* 199:*9*
200:*18, 19* 201:*12*
220:*4* 241:*18* 329:*2,
6* 331:*20*
fields 183:*23*
fifth 247:*4*
figure 34:*4, 9* 110:*7*
132:*22* 177:*23*
180:*17* 181:*16, 20*
182:*1* 185:*7* 222:*18*
224:*2* 225:*19* 315:*21*
316:*5*
file 65:*23* 66:*4*
117:*19* 193:*21* 194:*1*
208:*17, 21* 209:*7*
268:*19* 299:*2, 3, 4*
359:*1, 7*
filed 26:*24* 197:*23,
24* 200:*4, 15, 22*
224:*16* 362:*20* 363:*2*

Case 3:21-cv-00477-MCC    Document 280-1    Filed 09/20/23    Page 127 of 373
CONFIDENTIAL
Deposition of Doreen Kutzler                                    Jane Doe, et al. v. Schuylkill County Courthouse, et al.

files 36:3 211:9 270:15 359:5

filing 193:22 242:11 302:12, 17 363:5 410:2

fill 78:8 80:6 81:11 113:11

filled 36:3 401:10

filthy 296:1

final 28:19 185:15 197:16 226:16 353:6

finally 246:6 270:14 342:14

finance 305:13, 14

find 53:5 110:14 152:21 215:9 237:16 322:23 323:4 331:10 332:7 374:10

finding 352:20

findings 376:12

fine 33:3 34:14 267:1 388:9

finish 175:4 238:6

firm 58:6, 7

first 8:13, 19 9:3 14:24 18:18 20:1 29:1, 18 31:13 35:18 36:12 38:13 39:11 43:22 48:15 50:1 53:9 56:24 59:16, 22 65:14, 16 67:12 70:14 83:14 84:7 85:14 93:14 101:17 125:22 126:3 130:21 145:23 146:2 171:22 197:14 206:23 207:1 211:20, 23 227:1, 12 228:17 242:5 243:9, 21 266:2 271:24 275:1 278:6, 17 279:14 280:10, 11 285:21 299:14 307:5 316:9, 14 321:16 327:8, 12, 15 328:7 329:11, 12, 19 331:9, 15 332:2 336:19 341:22 355:6 356:5 367:19 382:1, 11 392:6 395:8 401:8, 11, 17, 18 402:5, 13,

15 404:9 407:1 409:16

fiscal 32:1 53:18, 19 130:1 154:12 158:22 159:7 185:15

fit 24:12

five 80:5 202:15 238:7 352:2, 9, 23 354:5 355:9, 11 390:6

five-minute 323:12

five-panel 355:17

flat 198:15

flexibility 63:19

flush 39:19

FMLA 287:19 288:3

focus 107:4 124:22

focusing 92:21

folder 194:1

folders 76:13 219:17, 21 220:6

follow 113:17 114:5 362:7

followed 328:5

following 35:20 70:16 72:9 171:16, 17 317:22 404:14

follows 8:14

follow-up 195:10

footage 371:22

forbidden 90:10, 24

force 10:5

forecast 399:24

forego 17:5

foregoing 412:5

forever 133:20

forget 117:14

forgoed 225:20

form 13:4 33:11 37:4 78:13 79:15 97:14 109:13 110:20 113:3, 5 117:7 127:1 128:11 137:23, 24 140:5 141:10 142:7, 8 148:1 149:8 158:5, 20 173:15 174:15 176:2 177:20 179:3, 4 182:3 194:20 211:4 220:13 222:2, 24 226:9 233:22

236:12 241:11 254:17 255:7, 8 264:5 272:12, 21 275:19 285:7 303:24 304:16 309:12, 13 310:10 320:24 321:11 338:8, 9 342:3 360:20 361:17 379:2, 22 382:8 386:2 397:22, 23

formal 208:15

formally 409:11

formed 36:13

former 198:5

forms 182:5

forward 182:24 209:20

forwarded 82:12, 13, 15, 20 212:13 225:12 279:18 346:4

forwarding 294:8, 11

foul 183:18

found 45:16 229:23 233:17, 18 235:2 280:14

four 28:11 72:11 91:18 121:6, 18 122:4, 8 258:19 349:7 352:2, 9, 23 355:9, 11 374:5 410:20

fourth 57:19

frame 11:17 92:21 99:10, 16 131:19 132:8 133:13 134:4 250:2 373:7 407:14

free 61:3 109:23 168:16 251:13 408:11

freedom 92:24

Friday 25:3 27:24 35:20 69:24 86:7 87:16 136:22 402:9

front 56:16, 21 96:15 145:13 176:6 238:19 248:19 278:5 324:8 332:5 340:22 345:19 365:6

fruition 370:11

frustrated 88:5, 10 349:3, 6, 8

frustrating 348:19

Frustration 88:1, 2 326:7, 14 349:4

frustrations 88:14

Fucci 25:22 393:14

fulfill 80:8 243:15

full 39:2 199:2 223:6 259:19 268:20 269:1 283:16 411:2

fullest 37:2

full-time 24:4 283:19 289:20

fully 37:13 50:19 51:4 56:6 105:16 106:6

functioning 138:16, 19 139:16

fund 53:24

funding 53:24

funds 52:3, 15, 19 53:10

funeral 361:21

furlough 107:2 217:24 218:3

furloughed 217:16 218:7

further 217:5 221:11 259:21 260:5 333:22 389:24

futile 113:1

< G >

Gaffney 51:24 52:8 53:6

gain 228:20

gained 329:20

garage 251:12

Garrity 25:20 53:7, 8 88:8, 9 113:14, 20 280:24

Gary 2:13 8:9 27:4 38:6 39:13 44:9 94:12 110:23 119:23 120:21 141:5, 12 142:11, 16 149:23 153:22 171:22 222:8 226:4 228:19, 22 231:13 235:5 346:9

Case 3:21-cv-00477-MCC   Document 280-1   Filed 09/20/23   Page 128 of 373
CONFIDENTIAL
Deposition of Doreen Kutzler                    Jane Doe, et al. v. Schuylkill County Courthouse, et al.

368:8  378:7, *16*, *19*
379:9  400:*17*  402:6
404:*13*  405:2*1*
**Gary's**  47:*3*
**gather**  44:*16*  135:*13*
**gears**  83:*1*  398:*11*
**GED**  17:*10*
**GEIGER**  2:6  8:*3*
140:*14*  174:*17*
**gender**  403:22
**general**  11:*17*  88:*3*
206:*21*  275:14  277:2
296:19  337:4, *18*
364:9
**Generally**  86:9
124:*24*
**generals**  274:*15*
275:5
**general's**  273:*14*
**generate**  140:2
**generated**  139:*13*
**generator**  139:8
141:*4*
**gentleman**  179:2*1*
**geographical**  252:*14*
**George**  2:9  3:*4*
36:*6, 8, 11*  46:20
47:2  94:*17*  98:*10*
108:*19*  109:*1, 3, 8, 12*
141:*16*  160:*16*
171:*23*  204:*15, 20*
215:*23*  228:*19*
229:*23*  231:16  235:6,
*11*  236:*23*  371:*10*
373:5  375:6  377:*1*
384:*10*
**George's**  403:*4*
**Ger**  180:2*0*
**GERARD**  2:6
**GERCHAK**  3:*4*
7:2*1*  13:22, *23*  61:*19*
62:*12, 23*  64:*24*
85:*11, 14*  89:*15*  91:5
95:9, *14*  103:6
106:*10*  110:*14*
112:2*1*  113:*10*  122:2,
*10, 23*  125:20  128:*4,
18*  135:*17*  137:5
138:5  141:2*1*  144:*16*
152:*11*  168:6  173:*11*,

*24*  175:16  178:*16, 18*
179:*1*  180:*17*  183:*4*
189:*23*  204:6  208:*8,
12*  215:*13*  222:*18*
224:2, *13*  225:*15, 19*
226:2*1*  258:8  281:*23*
329:*4, 9, 22*  330:*16*
332:6  336:*1*  362:9,
*23*  373:22  395:*13*
400:*8, 13, 22*  401:2*1*
402:2, *18*  405:*1*
**Gerchak's**  109:2*0*
153:2  175:24  392:20
**Gerry**  8:*3*  140:*10*
**getting**  28:*3*  42:*4*
50:*19*  51:*4*  137:*1*
139:*10*  169:22
219:*15*  285:*15*
304:*14, 20*  306:*1*
331:*1*  336:5
**ggeiger@newmanwilli**
**ams.com**  2:*8*
**Gilbert**  353:*4*  354:*3,
6*
**give**  15:*17*  40:5
55:*15*  96:*13*  123:*19*
172:*7*  196:*8, 24*
197:6, *19*  223:*3*
256:*17, 24*  257:*11, 21*
298:*17*  348:*11*
409:*18*
**given**  12:8  25:6, *24*
61:*10*  88:*16*  115:*1,
11*  123:*11, 19*  126:9
132:2*1, 24*  133:9, *16*
160:*19*  161:2  180:*1*
204:*24*  216:*16*  228:8
266:*3, 7*  274:*12*
283:*24*  300:*17*
326:*24*  339:*15*  381:*3,
8*
**gives**  196:*8*  197:*17,
19*
**giving**  121:*18*
125:*13, 14*  208:*3*
**Glenn**  2:*23*  8:7, *11*
27:*8*  83:*4*  103:*15, 19,
22*  119:*23*  187:*13, 22,
24*  188:*16*  191:*12, 18*
192:5  193:9, *16*

195:*11*  316:*12, 14, 16*
317:9  318:9  320:*7, 8*
322:*7, 20*  396:2*4*
**go**  28:*10*  39:4  43:*14*
46:22  53:*10*  78:*14*
83:2  89:*1*  92:9
140:22  145:22
148:*12*  152:20  154:*1*
163:*12*  167:*17*
173:*16*  176:*13*
183:*14*  191:*23*  198:*4*
202:*14*  204:20, *22*
209:*3*  225:16  226:*10*
235:*4*  236:*16*  237:*1,
8, 11*  267:*11*  270:*14,
18*  275:*23*  280:*11*
304:*1*  323:*12*  328:22
330:*4, 12, 21*  331:*4*
338:*10, 11*  345:9
346:2*1, 22*  347:*1*
373:*3, 13*  375:*10*
376:*23*  377:*19*  378:*1*
379:*23*  380:*12*  382:9
387:*8*  390:*2, 5*
**goes**  134:2*1*  158:*1, 7*
318:*18*  339:22
356:*16*  365:*8*
**going**  11:*15*  12:24
13:*10*  14:20  15:*1, 4,
9*  20:6  24:4  29:24
39:22  40:*18, 19*
46:23  48:*18, 19*
51:*17*  56:9, *16*  60:2
61:*10*  74:8  78:*12*
79:*14*  83:2  92:*11*
96:*12, 15*  100:*12*
120:*4*  121:*18*  130:9,
22  132:2*1*  133:9, *17*
135:20  140:*12, 18*
145:22  151:*15, 16*
155:*11*  156:2  159:9
161:*13*  168:*15*  171:*1*
180:2, *3, 7, 14*  181:*5,
6*  184:*3*  189:*13*
201:*8*  202:*14, 17*
203:*1, 5*  205:20
211:*11, 12*  216:*14, 15*
218:20  220:*3*  221:*13*
225:20  226:*4*  229:*15*
231:*8, 10, 14*  233:*11*

236:*11*  241:*10*  242:5
243:22  247:*10*  250:5
256:24  257:*10, 14*
260:*11, 19*  264:*4, 12*
265:*1*  266:8  276:5,
*17, 22*  277:2, *5, 20, 21*
280:*1*  281:5  285:*1*
291:*1, 15*  297:*16*
299:*19*  310:*14, 15*
311:*12, 14*  312:9, *11*
323:*14*  324:*19*
330:*11*  333:22
335:22  340:*12, 22*
341:*1*  343:*11, 22*
344:*3, 21*  345:*11*
349:2*1*  364:*23*  365:6,
*10, 24*  368:*3, 5, 18*
370:*13*  373:*16*
374:*13*  379:*14*  386:8
387:*1*  389:*12*  390:*17,
18, 20*  391:6  398:22
404:2, *9*  407:*23*
411:*13*
**Good**  7:*18*  8:*23*
13:*15*  24:*12*  71:*3*
178:*4*  202:*4*  216:*17*
240:*17*  319:9, *14*
320:*12*  346:*10*
409:*17*  410:*3*  411:*11*
**Goodman**  13:*15, 16*
44:2*1*  45:*8*  49:*14*
50:5, *23*  54:*14*  55:*7,
22*  58:*18*  62:2  64:*23*
65:8  66:6  67:8  68:*4,
9*  69:*15*  70:8, *20*
71:*19*  72:20  73:*4, 24*
74:*17, 23*  75:*4, 9, 22*
76:2  78:6  79:*23*
81:*3, 23*  82:*15*  90:*3*
91:5  104:*16*  106:*4*
115:8  126:*12*  134:*10*
152:*14*  153:*17, 23*
160:2, *15, 18, 19*
161:2*1*  162:2  166:2*0*
167:*1, 7*  168:5, *7*
169:*23*  184:*16*
186:*17*  187:8, *20*
188:6, *12*  189:7
191:6, *7, 10*  192:*14*
203:2*1*  204:6  205:8,

10, 16  206:8, 11
207:17  208:12
215:13  217:16
224:10  226:5  227:7,
9, 13, 22  229:14
230:7  233:4  237:6
239:24  241:16  243:1,
22  244:8  245:22
246:1, 9  247:21
248:21  249:1, 4, 6
250:4, 21  252:5
254:6, 13  255:1
256:3, 16  257:23
258:7  260:6  261:10
262:18  267:5, 12, 14
269:4, 17  270:1, 24
271:5  279:22  281:7,
21, 23  285:2, 22
295:12, 17  296:3, 20
297:3, 12  299:5
300:6  301:13  302:11,
16  303:18  308:3, 10,
14, 15, 17  309:8
323:22  328:3, 12
329:2, 4, 7  330:5, 21
331:5  336:1, 9, 10
341:4, 17  349:16
350:7  360:4, 5, 12, 19
361:3, 8, 23  362:8, 20
363:2  369:5  373:22
392:22  393:9, 20
394:7  398:8
**Goodman's**  49:8
61:20  62:14  89:17
230:18  239:6  240:12,
14  242:16  267:8
268:23  271:10
278:17  299:10
329:24  330:16
347:10
**Gotcha**  396:9
**Govern**  62:18  217:1,
3
**governments**  18:3
**governs**  201:14
**Grant**  2:11  224:16
**granted**  293:12
**great**  39:1
**greatest**  144:3
384:19

**grievance**  197:23, 24
200:4, 16, 23
**Groody**  94:11, 17
109:3  165:8  167:12
229:13  233:13
234:21  235:9, 19
236:9  261:10, 14
364:19  380:8
**Groody's**  97:11
380:2
**GROUP**  2:2
**guess**  11:19  18:7
37:10  38:21  47:24
63:3  113:21  122:22
123:11  153:21
197:18  214:22
215:24  234:2  247:23
272:7  285:14  310:6
329:18  344:21
356:12  373:9  405:15
408:10
**guidelines**  134:23
286:17
**guise**  177:9
**Gulf**  2:11
**guy**  39:1
**guys**  34:22  84:24
193:12  247:2  313:10
316:15  317:1  320:20
336:6  348:24


< H >
**Hal**  380:6
**Halcovage**  2:9  3:4
8:4  27:1  28:11
29:10, 13  30:2  35:10,
13  36:11, 16, 19  45:4,
17, 21  46:7, 14, 20
47:7, 11, 18, 21  48:2,
6  83:12  89:9, 18
90:21  91:4, 7  93:14
96:9  97:3  99:7, 23
108:19  109:2, 4, 8, 12
112:6  117:15  146:4
160:16  161:13  163:8,
23  164:6, 14, 17, 20
165:13  166:6, 8
170:4, 8, 12  171:24
172:8, 13  173:10, 21
174:8, 12  175:7

203:22  204:23  210:9
213:1  229:5, 17
231:8  233:15, 20
234:9, 19  236:1, 15
237:12, 24  238:12
239:2  260:9  276:3
280:22  281:9  282:20
295:21  336:14
361:13  369:5  371:24
372:13  373:24  374:6
375:23  376:21  379:9,
13  380:2  382:3
383:4  385:10, 18
**Halcovage's**  92:24
96:2  98:22  161:17
165:19  170:21  172:3
205:3  208:16  237:16,
19  239:13  254:14
274:16  282:1  363:19
373:12  375:1  377:15
379:19  380:7  385:23
**Hale**  163:13  371:12
372:1, 3, 19
**H-A-L-E**  372:20, 21
**half**  78:1, 2  252:19,
22  253:12
**halfway**  116:16
118:22, 23
**hall**  377:7, 21
**hallway**  97:4  99:8
238:24  241:17  373:6
**hand**  36:9  365:19
381:16
**handbook**  280:15
**handing**  207:24
**handle**  126:23
178:16, 18
**handled**  103:14
118:1  144:1
**hands**  39:2
**handwritten**  193:18
**happen**  46:23
111:15  123:21
124:16  157:13
221:11  229:23  243:4
246:1  261:22  394:2
399:16
**happened**  30:17
44:6  153:22  164:10
170:17  189:4  204:6

209:19  245:16
302:23  303:5  331:14
352:19  357:6  368:16
371:19  374:10  375:9
378:14  383:13
388:18, 19  392:13
406:20  410:18
**happening**  28:4  94:2
**happens**  193:13
283:23  346:19
**happy**  247:5  326:5
**harasser**  46:2
**harassment**  26:5, 21
45:22  46:1  91:22
92:6  107:1  108:2, 5
126:22  139:22  142:3,
23  143:3, 11  169:8
172:5  189:14  274:16
328:13  351:5, 24
352:13  399:3, 6
403:12, 17
**hard**  135:2  140:19
179:23, 24  180:8
219:6
**harm**  183:18
**Harrisburg**  276:5, 17,
21
**Hatter**  125:18
**hazards**  61:4
**head**  10:16  131:7
133:6  147:11  182:8
190:18  272:24
314:20
**header**  67:21
**heads**  125:21  136:24
137:16  138:20
225:16
**health**  63:22  206:9,
13  207:15  230:17, 20
283:7, 21  353:4
354:8
**hear**  140:8, 14
191:14  192:5  264:17
**heard**  176:8  264:16
335:19
**hearing**  140:11
395:15
**hearings**  395:12, 22
**heater**  268:12

Case 3:21-cv-00477-MCC   Document 280-1   Filed 09/20/23   Page 130 of 373
CONFIDENTIAL
Deposition of Doreen Kutzler                                      Jane Doe, et al. v. Schuylkill County Courthouse, et al.

**Heather** 25:20 53:7, 22 113:14 183:9 184:2, 19 186:3, 12 189:12 190:10 200:5 280:23 311:1 313:8 314:23 316:4, 14 317:1, 9 318:10, 19 320:10 322:9, 14 325:6

**Heidi** 2:13 8:9 210:22 345:3 352:1 362:18 365:11 373:4

**Heinbach** 262:3, 6, 10, 16 263:4, 13, 18 298:2, 9, 16 366:14

**held** 7:11 14:16 28:8 89:22 90:21 92:13 116:21 122:18 168:1 194:1 202:19 210:24 247:12 289:14 300:6, 19, 24 301:1, 3 323:16 345:13 386:24 387:1 390:10

**Helene** 101:2 118:19, 23 120:15 131:4 133:14 134:22 135:24 136:16 171:18 178:8

**Helene's** 185:13

**help** 30:23 168:15 180:13 215:14, 15

**helpful** 168:7 364:2

**Hess** 30:4 46:10 129:13 130:4 170:11 171:22

**Hetherington** 30:3 46:10 170:11

**hey** 43:14 53:11 133:5 136:2 168:2 210:4 379:15, 16 384:4

**high** 17:9, 11

**Higher** 18:8 252:15 357:9

**highway** 361:7, 8

**Hill** 1:21 7:12 252:15

**hinder** 37:15

**hindered** 37:13 411:2

**hire** 91:24 342:9 351:11

**hired** 125:18 352:16 359:17 391:24

**hiring** 356:14

**Hoffman** 29:19, 24

**hold** 19:12, 21 22:24 52:13 56:17 90:18 151:12 194:13 226:12 328:22 340:23

**Holding** 300:24

**holds** 41:7

**holiday** 343:1

**home** 40:14 43:12, 15 45:2, 9 47:8 48:5, 10 49:9, 18 50:20, 23 51:5 54:14, 19 56:3 62:6 63:19 72:1 74:1, 20 75:10 81:12 82:4 86:16 104:17 106:4, 6 126:13 134:11 161:3 170:13, 22 181:6, 8 204:21, 23 205:8 214:12 216:19 219:16 220:11 223:20 242:14, 19 247:20 271:1, 7 292:12 294:20 295:2 296:19, 24 297:14 302:3 303:19 304:10 309:4, 9, 22 310:1 336:21 337:6, 19, 21 339:19 358:11, 15 359:7, 9 373:23 380:24 387:8 388:7, 8 389:10, 24 390:3 392:24

**homes** 223:11, 14 256:7 336:12

**honest** 339:11

**Honestly** 264:15

**hoped** 346:10

**hopeful** 202:8

**hopefully** 125:1

**hostile** 137:20 138:6, 10, 13 146:4, 9, 14, 19 332:16 333:8

**hour** 78:1, 2 101:14, 22 102:8, 12, 16, 23

103:7 104:8 116:14, 17 266:4

**hourly** 67:23 68:5, 14

**hours** 24:5 66:14, 17 67:23 68:13, 21, 22 69:18, 20, 21 76:24 77:9 78:9, 19, 23 80:1, 6, 12, 14 86:11, 13 89:20 96:3 280:16 283:12, 18, 24 284:3, 4, 11 285:4 286:1, 3, 4, 14 287:7 288:11, 12, 19 289:4, 10, 16, 21 290:12, 16 303:21 304:14 359:11, 12 361:14 388:22, 24 394:15

**HR** 22:7 25:13, 14, 20, 23 26:12, 16 28:4, 21 30:24 32:1, 19 34:5 35:22 37:6 63:24 64:7 69:5 86:2 88:13 112:14 117:18 123:3, 7, 21 124:9 130:1 136:16 177:10 186:3, 19 193:15 196:11, 15 208:15 209:2 210:1 211:8 213:16, 24 214:4 215:19 239:19 248:5, 7 281:2 337:15 351:18, 23 352:20 354:11 362:10, 17 391:7 393:14 395:7, 8 396:16 397:10

**Hubric** 14:8 16:12 20:23 21:4, 15 22:1, 2 23:1, 24 26:9 27:14, 16 58:7 143:14, 20 391:9, 13

**Hubric's** 34:8 351:13

**human** 14:15 18:19, 23 19:14 32:19 34:10 60:23 61:11, 12 63:9 64:13 85:21 146:8 230:17 347:16 382:13 391:21

**hundred** 232:20, 22

**hype** 285:20

**hypothetical** 80:3

**hypothetically** 79:9


**< I >**

**iceberg** 409:12

**idea** 153:15 218:16 409:17 410:3

**ideal** 253:23 260:1

**identical** 74:15 278:22 279:5 341:7

**identification** 15:7 20:12 48:22 56:13 74:12 100:16 120:8 130:13 151:20 203:11 260:16 277:10 278:2 291:5, 19 297:20 310:18 324:23 334:3 365:3 398:18 409:21

**identified** 397:16

**illegal** 146:13

**image** 391:12

**imagine** 41:12 129:16

**immersive** 199:2

**impact** 106:7 155:3 156:10, 14 216:2 285:9 286:13

**impacted** 284:19 287:2, 8, 9, 22

**impacts** 176:24

**impairs** 11:24

**implementation** 60:3

**implemented** 408:18

**implementing** 110:6

**implore** 170:13

**important** 139:16 141:3 189:5, 16 191:14 209:6 309:3, 5, 10 389:5

**impose** 122:21 125:7

**imposed** 94:8, 9, 16 109:3 128:3, 10 380:8

**imposes** 124:14 125:7, 8

**impossible** 81:11, 13 82:21 216:9

Case 3:21-cv-00477-MCC    Document 280-12    Filed 09/20/23    Page 131 of 373
CONFIDENTIAL

Deposition of Doreen Kutzler                                      Jane Doe, et al. v. Schuylkill County Courthouse, et al.

**impression** 35:*15*
95:2 178:*15* 257:*21*
318:22
**inability** 88:*6* 109:7,
*9* 112:*3*
**inaccurate** 11:*9*
238:*13, 14*
**inaudible** 10:*15*
**incapable** 182:*9*
**incident** 350:7
372:*18* 387:6 388:*18*
**include** 19:*1* 121:*11*
137:*14* 138:5 193:6
215:*3* 307:*21*
**included** 111:*23*
147:*17* 175:*23*
176:*16* 396:24
**includes** 70:5 181:*20*
203:20 298:*1*
**including** 64:*17*
66:*11* 131:2 137:*15*
138:*12* 159:*19*
162:*21* 171:*12*
203:*19* 212:*15*
260:*23* 313:*12*
**income** 140:*3*
**incoming** 82:*10, 21*
**incomplete** 11:*10*
**increase** 101:*19, 21*
102:22 116:*13*
125:*13* 202:*13*
**increased** 62:*24*
**increments** 68:*14*
**incurred** 67:*4*
**Independence** 2:*21*
**independent** 103:*17*
127:24
**independently** 68:*18*
**INDEX** 4:2
**indicate** 11:*5* 135:*15*
152:*10* 275:*15* 340:7
404:*16*
**indicated** 135:*1*
162:*24* 186:*14*
259:*18* 261:*23* 274:7
328:*4*
**indicates** 16:*23*
18:*17* 101:*12* 105:*9*
112:*8* 146:2 160:*2,
10* 176:7 260:24

**indicating** 85:2
225:*13* 257:5
**individual** 61:2
84:*11* 90:*16, 19* 91:9
103:*16* 104:*17* 124:6
128:*1* 209:7 256:*4*
284:*17* 285:22
287:*16* 356:*15* 395:*1*
410:*1, 14*
**individuals** 13:*11*
15:*21* 22:24 27:2
30:20 49:2 65:4
85:*3* 91:*18* 95:22
115:7 203:*19* 254:*12*
260:2, *23* 261:*17*
273:*1, 3* 283:*19*
291:*11* 304:24
341:*23* 346:*4* 353:2,
*6* 355:*11* 361:6
409:*20*
**individual's** 287:2
**influence** 229:*9*
235:*10* 290:2, *4, 5*
**inform** 99:*19* 100:2
229:*14* 233:*14, 15*
320:*14* 392:*19*
**informal** 10:*4* 193:*12*
**information** 11:*10*
16:*17* 24:*10* 25:24
33:*4* 42:*12* 63:22, *23*
119:9, *17* 120:*24*
121:9 135:*10, 13*
145:*19* 160:*3* 164:2
204:*13* 205:*17, 18*
208:*1* 209:*12* 210:*24*
229:22 299:9 316:*15*
319:*21* 320:9 329:*20*
410:*15*
**informed** 22:9 25:*16*
27:*3, 7* 92:23 102:*21*
152:*11* 205:*4* 228:*19*
234:8, *11* 235:*10*
237:8 263:*17* 264:*21*
266:*4* 269:*15* 273:*23*
329:*3* 362:20 376:*11*
404:*13* 405:6, *14*
**informing** 127:*12*

**inherently** 409:*14, 15*
**initial** 27:*13, 17, 21*
52:*18* 153:*15* 196:*17*
243:*21* 303:7 337:9
353:20 367:*19*
**initially** 205:*21*
402:*19* 409:*16*
**initiate** 63:*10*
**initiation** 63:*13*
**in-person** 25:8, *9*
351:*19*
**input** 119:*10* 121:22
145:*18* 298:20
**inputted** 119:*10*
**inquires** 131:*4, 6*
**inquiring** 394:*23*
**installed** 335:7
342:*15, 19*
**installing** 343:*3*
**instance** 79:22 155:8
285:*1*
**instruct** 100:*10*
112:*19* 194:*12*
311:*10* 313:2 314:*11*
370:*15* 390:2
**instructed** 21:*23*
33:*18* 103:9 135:*23,
24* 150:*14* 151:6
154:*19* 165:*4, 10, 21*
177:*8, 15* 222:9
244:*4* 298:*16* 322:2
323:5 331:*19* 356:*13*
368:*1* 387:*15* 388:*13*
**instructing** 163:*23*
166:6
**instruction** 12:*11*
22:*16* 103:*1* 165:8
234:*13, 17* 370:5
380:*20* 383:*15*
393:*12*
**instructions** 12:7
25:5 121:*10*
**instrumental** 220:*18*
**insurance** 283:*8, 21*
**intention** 223:*4*
320:*19* 321:5, *7*
**intents** 199:*10*
**interact** 265:8

**interacted** 142:*11*
**interacting** 142:*16*
**interaction** 117:*15,
24* 203:*21* 384:*19*
393:5
**interactions** 398:*4*
**interactive** 110:7, *13*
142:*22* 161:*20* 293:*4,
8, 19* 297:*12*
**interest** 47:7, *17*
136:*11* 213:4 403:*4*
**interested** 406:9
**interfere** 171:*24*
213:2
**interfered** 107:*3*
**interim** 22:7 25:*13*
85:*20* 199:9 200:5
351:*18* 382:*13*
391:*21* 396:*16*
**interject** 313:6
**Intermediate** 18:*4*
**internally** 157:*3*
201:*13*
**Internet** 72:*10, 17*
73:24
**INTERROGATION**
4:4
**interruption** 61:6
**interview** 24:*14*
277:2 281:8 353:24
354:*10, 15* 362:*1*
**interviewing** 354:*12*
355:2
**interviews** 275:*14, 16*
281:*21, 24* 285:2, 5
353:*1, 20*
**intimidated** 316:*11*
**intimidating** 229:*10*
**intimidation** 229:*18*
231:3 236:*10*
**intranet** 73:*11, 20*
**introduction** 30:*11*
83:*11*
**Introductions** 30:*10,
19*
**inundate** 408:*23*
**invested** 373:*17*
**investigate** 146:*18*
307:7, *9* 411:7
**investigated** 373:*18*

investigation 28:13,
15, 19 31:21 33:17
34:4 45:16 185:22
187:14 208:11
280:21 282:16, 19
313:7 376:12 409:23
invite 145:18
involuntarily 17:22
involve 265:3 274:6
involved 21:13, 18
22:21 33:24 40:10
61:24 63:20 81:4
102:11, 14, 19 103:22
136:24 137:5, 8, 11
142:2 172:12 174:4
177:13 178:8, 21
192:24 213:18
218:12 224:3 228:13,
16 259:6 273:6
321:17 322:5 352:17
354:10 357:14, 19
367:9, 15 390:22
392:17
involvement 121:22
142:5 172:5 187:13
366:11
involves 265:3
involving 213:15, 19
399:3
iPads 77:24
issue 35:1 104:22
107:1 113:11 144:12
178:13, 18, 20 182:2
212:9 215:19, 20, 21
256:22 262:17 267:2
343:22 344:4 375:16
385:20 388:6 389:3,
5 400:21
issued 388:16
issues 64:18 65:7
71:8, 10 104:14
106:21 107:15
115:10, 11 126:20, 21
173:6 177:16 195:2
210:9 213:18 243:13,
14 248:2, 14 256:12
258:19 261:5 266:8
297:4 359:18 397:9,
19 411:2

item 129:22 156:1
333:17 348:12
items 36:4 51:12
55:7 56:2 70:17
72:3 121:19, 23
122:8 144:17 145:5
152:13, 20 153:9
154:19 220:1, 10
269:2 348:18
its 36:23 45:16 60:3
183:21 382:7

< J >
JANE 1:2 7:9 9:1
13:13, 17, 20, 23
40:13, 14 44:20
323:22
January 1:21 7:6
207:6 334:7, 12, 23
335:5, 15, 22 336:8,
18 347:6 349:10, 11,
12, 18 350:5, 6, 21
359:16 366:3 368:24
372:4 380:1 382:15
386:21 388:17
JFK 17:1
Joan 218:10
job 14:13, 16 56:7
64:15 66:20 67:5
76:18 78:18 79:4, 22
80:7 81:3, 10 109:16,
24 110:9 113:14
115:10 128:18, 19, 20
176:16 193:2 200:6,
7 210:20 220:1
242:16 292:18
337:23 338:4 352:21
JOCELYN 2:20 8:10
join 163:12 187:1, 4,
22 323:23
joined 203:2
JONES 2:10
Joseph 261:10, 14
judge 10:6 163:13
312:11 372:19
judicial 156:5, 11, 15,
19 157:6, 13, 16
July 31:15 217:21
jump 390:18, 20

June 185:20
junior 203:2
jury 10:7 273:7
280:20
justifiably 272:6
justification 357:24
358:2
justified 94:22 111:7
271:11

< K >
Katz 7:12
keep 62:24 111:12
141:13 145:12
182:23 326:19 342:6
373:16
keeping 68:1 192:6
kept 249:12 348:20
key 334:16
keyboards 154:14
keycard 238:21
239:7, 10, 13, 14
240:23 241:6
keys 246:12 256:17,
24 257:7, 11, 20, 21
258:18 261:15
265:19 267:9 300:6
334:17
kicked 246:6
kind 24:8 61:6
92:21 104:3 119:9
125:5 136:17 154:8
156:23 161:24
171:16 209:19 210:5
220:3 234:19 235:1
246:5 247:19 252:12,
13 259:7 261:4
266:8 327:1 338:17
339:6 349:3 351:12
352:10 357:6 365:7
379:14 383:7 392:13
395:23 399:1 409:12,
21
Kleck 226:5
Kleckner 13:11, 12
44:21 45:8 49:2, 8
50:5, 24 54:14 55:7,
22 57:2 58:17 61:20
62:3, 14, 23 64:22
65:7 67:8 68:4, 9

69:15 70:9 71:3, 19
72:20 73:4, 23 75:1,
9, 22 76:3 78:6
81:23 82:15 90:2, 21
91:5 104:16 106:3
126:12 134:10
152:13 153:17, 23
167:8 168:6, 8
169:23 180:21
181:21 182:14 183:3
205:8 208:4 214:10
215:4, 13 216:1, 17
217:15 219:7, 8, 20,
24 220:1, 10, 15
221:1, 17 224:1, 10
226:22 227:2, 22
229:14 230:7 233:3
237:7 239:23 240:17,
20 241:19 243:1, 21
244:8 246:10 247:21
248:20 249:2, 3, 7
250:3, 21 252:5
254:5, 12, 24 256:16
257:23 258:7 260:6
261:10 262:18 267:4,
8, 12 269:16 270:1,
24 271:6, 10 278:21
279:22 281:7, 21
285:2, 22 292:9, 19
293:8, 18, 24 296:20
297:11 299:5, 10
300:5 301:13 303:18
308:3, 20, 23 309:7
336:1, 10 338:3
339:13 340:19
341:16 349:16
373:22 392:22
Kleckner's 49:15
67:13, 15 81:3 89:16
176:16 219:12
221:19 230:19
238:23 256:4 269:4
279:9 294:7, 9, 20
342:2
knee 398:4
knew 39:14 87:4
128:9 161:12, 14
202:9 204:19 217:24
231:8 276:1, 5, 16
281:6, 12 282:6, 19

378:*19*  379:*9*  405:*4*
409:*17*

**know**  9:*19*  11:*1, 11*
12:*13*  22:20  23:4, *15*
26:*13*  27:6  29:4, *13*,
20, 22  32:5  35:9
38:*10, 18*  41:20  43:6,
7  44:8  59:6  69:2
73:*3, 15, 23*  75:4
76:2  79:*3*  82:2, *9, 12,*
13, 14, 17  83:8, *16, 19*
84:6  94:*10*  95:*18*
99:22  101:24  102:*18*
103:*4, 24*  105:*3, 7, 8,*
15, 17  106:*19*  111:*10*
114:2, *23*  115:2
116:*18, 23*  117:*3*
129:5, 14  136:24
140:*12, 17*  143:*18*
147:*21, 23*  148:*3*
156:*10, 23*  157:*1*
158:*1*  159:22  161:*18*
162:4  163:22  167:*23*
168:*3, 17, 23*  170:*14*
171:22  172:2, *8*
173:*1*  182:22, *23*
183:*1, 10*  184:*21*
186:*5*  188:2  196:*19*
197:9  200:*6, 13*
202:*11*  204:22  205:2
206:22  207:*3, 14*
209:9  210:*1, 8, 18*
214:*21, 24*  216:*11, 14,*
17  217:*11, 20*  219:*23*
221:*12*  222:22
224:*12*  226:7, *8, 12,*
19  228:*13*  229:4
230:*16*  232:*16*
236:22  237:4  239:*12,*
18  240:*13, 16*  241:2
242:*21*  247:2  251:*12*
255:*14*  262:6  266:*18*
269:9, *15, 20, 24*
274:*17*  275:8  276:2,
13, 16, 17, 19, 20, 23
281:*4*  282:2, *15*
292:*13, 22*  302:*21*
303:*13, 15*  307:*1, 8,*
13  308:*1, 14, 16, 17,*
19, 20, 22, 23  309:*1*

310:*11*  315:*3*  316:*3,*
13  325:21  326:6, *19*
327:*4, 7, 23*  331:*21,*
23  333:*12*  335:*18*
337:8  339:*10*  343:6,
22  344:*11*  346:2
351:*4*  354:*18, 19*
356:*4, 7, 19, 23*
358:22  359:9  360:8
362:*13*  363:22  364:2,
5, 13  366:7  372:*19*
375:*3*  376:*4*  378:*12,*
19  381:*11*  386:*10*
389:6, *7, 8*  390:*18*
401:*14*  403:2  404:*1,*
23  410:*18*

**knowing**  23:*19*  24:4
117:*11*  146:*18*  249:7
383:*4*

**knowledgable**  117:*4*
**knowledge**  28:2  59:*1,*
8  62:*10*  67:6, *10*
70:22  72:*19*  73:*18,*
21  74:*5, 6*  75:6
87:*17, 19*  95:*16*
99:*21*  100:7  102:*10,*
20  103:*8, 21*  105:*13*
106:22  112:*18*  114:*8,*
9, 11  116:*9*  122:*3, 20*
123:*12*  124:*21*  125:2
130:*3*  131:*18, 22*
132:9, *15, 20*  133:*12*
134:*16*  135:4, *22*
136:*10*  143:*21*
147:*16*  162:*1*  163:*19,*
21  164:*23*  167:6
169:*20*  172:*15*  183:6
184:*23*  185:*21*
199:*14*  205:*12*  210:*5,*
6, 21  218:*19*  223:22
224:8  226:*14*  230:*23*
231:2  250:*11*  251:*21*
268:*7, 21*  275:*10*
283:*7*  292:24  298:*15*
299:*12*  306:6  311:*5*
327:6  329:*16*  341:*18*
351:*3*  352:9, *10*
353:*14*  356:7  363:6,
16, 17, 24  381:*13*
387:*9*  388:20  389:*11*

392:9  393:*3*  398:*24*
399:*20*
**known**  110:*3*  160:*17*
236:*17*  358:*14*
**knows**  43:*23*  190:*18*
**Kraft**  25:*23*  239:*19*
**KUTZLER**  1:*18*  4:*5,*
11, 12  7:8  8:*1, 13, 21,*
22, 23  13:9  14:6
15:*1, 6, 12*  20:7, *11*
36:*10, 22*  40:22
42:22  92:20  100:*19*
111:*19*  141:*1*  203:*5*
247:*18*  262:*10, 12*
263:*7, 16*  265:7
310:*21*  324:7  345:*20*
390:*17*

**< L >**
**lack**  78:7  79:5  80:8
112:*3*  123:*12*  182:*17,*
20  296:*1*  339:*15*
409:*13*
**ladies**  44:2  137:*21*
162:8  231:6  393:*16*
**landing**  376:*24*
**laptop**  51:6, *9*  56:6
70:*16, 21, 24*  76:6
79:24  86:*21*  154:*13*
160:*21*  180:*21*
216:*23*  336:9, *10*
**laptops**  51:*10, 18, 21*
53:*12*  55:*10, 16*
62:*18*  76:6  77:23
271:6  303:*20*
**large**  144:*24*  230:9
**largest**  139:9
**late**  266:*4*  359:*13*
410:22
**Laurel**  93:*17*
**Law**  1:*19*  2:2  10:6
146:*11*  272:*16*
280:*21*  385:*16, 17, 23*
**layout**  252:*14*
**leadership**  16:*24*
**leading**  210:2  224:*15*
**leads**  51:*24*
**learn**  48:9  111:*4*
174:2  176:*18*  274:*19,*
21  408:*21*

**learned**  49:7  51:*23*
86:9  101:*18*  152:*18,*
19  155:*23*  176:22
229:22  328:*12*
395:*18*
**learning**  200:*18*
216:6  329:5
**leave**  104:*18*  105:*24*
116:7  183:*21*  198:8
284:*16, 19*  287:*1, 20,*
23  365:7  374:*20*
388:*1, 2, 4, 5*
**leaving**  35:*20*  348:4
379:*20*
**led**  387:6
**LEES**  2:*15*  7:*3, 24*
12:*24*  13:*5*  33:*10*
37:*3*  113:*3*  126:*24*
128:*11*  137:22  141:9
148:*1*  149:*14*  158:*20*
179:*4*  182:*3*  220:*13*
222:2  233:*21*  255:6,
9  275:*18*  276:9
293:*13*  304:*15*
309:*11, 14*  311:*19, 22*
312:5, *7, 16, 22*  313:*4*
321:*1, 3, 10*  338:7, *11*
342:*3*  366:*15, 22*
368:*11*  386:2  397:*21,*
24
**left**  125:22  126:*4*
132:*10*  194:5  232:6,
7  319:2  374:*21*
375:*4*  377:*18, 19*
378:*14*
**leg**  64:*8*
**legal**  146:*10*  313:9
**length**  132:*23*
**letter**  212:*18*  220:*16*
224:*19*  230:*1*  298:8,
22  299:*15*  310:*5, 12*
340:7, *18*  341:*4, 10*
342:*17*  366:*4, 8, 12*
367:*14, 15*  368:2, *21,*
23  369:*16*  370:*1, 12*
371:*19*  375:2  380:*17,*
21  381:2  383:*14*
387:*11, 16, 17*  388:*16*
389:6

Case 3:21-cv-00477-MCC    Document 280-1    Filed 09/20/23    Page 134 of 373
CONFIDENTIAL
Deposition of Doreen Kutzler                                    Jane Doe, et al. v. Schuylkill County Courthouse, et al.

**letters** 307:*15*  393:*23*
**letting** 403:*2*
**level** 229:*16*  230:*15*
349:*1*  355:*2, 7, 12*
**levels** 105:*9*  122:*19*
**liabilities** 191:*15*
**liability** 192:*2*
**license** 19:*12*  226:*13,
17, 21*
**licenses** 19:*11, 21*
**lie** 198:*12*  200:*24*
**lies** 64:*11*
**life** 287:*15*  289:*11*
394:*3*
**light** 108:*17*  232:*7*
**likelihood** 162:*16*
**likewise** 10:*20*  14:*1*
**limited** 55:*21*  96:*3*
**Linda** 129:*19*  154:*2,
6*
**LINE** 6:*2, 14*  153:*9*
155:*18*  156:*1*  162:*10*
174:*11*  175:*1, 18*
187:*12*  233:*11*
277:*14*  279:*14*
314:*23*  384:*14, 18*
408:*9*  413:*2*
**lines** 111:*12*
**LinkedIn** 352:*22*
**Lisa** 179:*19*  353:*3*
354:*2*
**list** 50:*21*  70:*17*
121:*5*  299:*17*  348:*18*
400:*18*  401:*4*  402:*6*
**listed** 17:*23*  18:*12*
129:*6*  145:*6*
**listen** 39:*8*  281:*4*
**listened** 37:*22*  39:*13*
**listening** 39:*5*
**lists** 17:*20*  51:*12*
297:*4*
**litigation** 189:*8*
192:*23*  193:*6*  194:*13*
**little** 14:*12*  43:*24*
54:*12*  80:*3*  83:*1*
108:*24*  132:*7*  133:*16*
172:*7*  176:*13*  219:*5*
326:*13*  333:*21*
338:*18*  342:*1*  350:*17*

390:*20*  398:*11*
410:*16*
**live** 24:*17*
**local** 23:*17*  308:*6*
**located** 28:*21*  230:*19*
231:*21*  240:*12*
**location** 46:*8, 21*
47:*22*  49:*15*  67:*15*
74:*19*  82:*16*  86:*17*
253:*23*  260:*1*  336:*15*
**locations** 75:*8*  95:*15*
260:*7*  374:*20*  387:*3*
**locked** 342:*6*
**logical** 163:*9*
**long** 14:*9*  79:*12*
87:*12*  158:*13*  223:*17*
269:*24*  274:*22*  275:*1*
286:*3*  303:*13*  371:*3*
**longer** 17:*3*  77:*6*
133:*16*  174:*1*  221:*13*
225:*2*  247:*8*  329:*6*
**long-time** 116:*23*
**look** 20:*6*  48:*18*
49:*24*  50:*1*  56:*9*
57:*1, 9*  67:*14*  71:*4*
72:*10*  74:*8*  111:*19*
120:*4, 18*  122:*6, 17*
130:*10, 21*  143:*22*
152:*2*  159:*9*  171:*1*
196:*1*  200:*5, 16*
203:*5*  209:*18*  211:*11,
13*  218:*20*  219:*12*
238:*9*  248:*18*  260:*12,
19*  266:*2*  277:*13*
278:*11*  279:*6, 9, 11*
280:*10*  291:*1, 15*
294:*16*  297:*16*
299:*14, 18*  308:*5*
310:*14*  328:*23*
332:*12*  333:*22*
334:*10*  340:*12*  341:*1*
343:*11*  345:*6*  346:*23*
364:*24*  365:*20*
369:*12*  373:*3*  375:*10*
389:*12*  398:*13*
399:*17, 21*  404:*2, 8*
407:*24*  409:*4*
**looked** 63:*3*  74:*16,
24*  129:*7*  146:*1*
224:*4*  375:*13, 19*

**looking** 57:*10*  67:*12*
71:*18*  131:*16*  238:*10*
313:*6*  341:*10*  373:*1*
375:*1, 4, 16*
**looks** 63:*3*  107:*6*
339:*10*  381:*15*
405:*15*
**lot** 81:*2*  93:*16, 19,
20, 24*  126:*22*  127:*9*
155:*11*  163:*6*  165:*12,
14, 20*  232:*14*  249:*18*
250:*16*  251:*4, 9*
252:*19, 24*  253:*1, 2, 6*
254:*8*  259:*19*  268:*16*
281:*5*  326:*18*
**lots** 249:*22*  250:*15*
251:*24*
**loud** 264:*17*  286:*21*
326:*12*
**lower** 93:*16*  163:*6*
165:*11*  230:*15*
**lunch** 238:*4*  247:*7,
18*
**luncheon** 247:*12*

**< M >**
**main** 162:*9*  165:*5,
20, 23*  253:*1, 5, 6*
383:*5*  384:*11, 12*
**maintain** 208:*20*
289:*9*
**maintained** 66:*3*
**maintenance** 179:*21*
245:*17*  246:*19*  247:*2*
257:*19*  270:*13*  300:*8*
301:*7*  305:*2, 10*
307:*10*  336:*6*  346:*16,
23*  348:*24*
**majority** 296:*13*
**making** 109:*22*
116:*16*  143:*10, 11*
192:*13*  277:*18*
278:*21*  287:*7*  288:*12*
289:*15, 21*  303:*21*
304:*13*  320:*20*
405:*23*
**Males** 247:*1*
**Mall** 2:*21*
**man** 40:*7*  118:*5*

**manage** 108:*7*  193:*2*
205:*22*  272:*24*  274:*9*
308:*15*
**managed** 32:*8*
201:*12, 14*  308:*20*
**management** 16:*24*
19:*5*  40:*8*  182:*18*
191:*13, 15*
**manager** 25:*21*  27:*8*
64:*14*  65:*13*  83:*5*
182:*8*  192:*24*  243:*11*
396:*19*
**managerial** 182:*11*
401:*7*
**managers** 61:*15*
**manages** 22:*2*
239:*19*  258:*22*  259:*2*
**managing** 32:*6*
95:*22*  159:*6*
**mandate** 307:*19*
**mandated** 307:*19*
308:*2*
**mandates** 308:*7*
**manipulate** 190:*11,
20, 22*
**manipulated** 190:*8*
191:*1*
**manpower** 167:*13, 19*
**March** 132:*1, 13*
133:*3*  173:*14*  275:*3*
408:*14*  410:*24*  411:*1*
**Marcy** 13:*12*  44:*21*
57:*2*  65:*18*  84:*6*
90:*21*  126:*12*  177:*5*
224:*10*  239:*23*
260:*24*  261:*12*
277:*17*  279:*12*
280:*17*  334:*15, 21*
338:*3*  339:*19*  340:*7*
**Marcy's** 176:*9*
**Margolis** 1:*19*  2:*19*
**MARIA** 2:*10*  8:*8*
40:*24*  41:*13*  140:*11,
17*
**mark** 15:*1*  100:*12*
151:*15, 16*  159:*12*
277:*6, 22*  291:*16*
365:*24*
**MARKED** 1:*10*  5:*9*
14:*22*  15:*6*  20:*6, 11*

Case 3:21-cv-00477-MCC    Document 280-12    CONFIDENTIAL    Filed 09/20/23    Page 135 of 373

Deposition of Doreen Kutzler                                    Jane Doe, et al. v. Schuylkill County Courthouse, et al.

48:*21*  56:*12, 22*
74:*11*  96:*16, 18*
100:*15*  120:7  130:*12*
151:*19*  159:*10*  171:2,
*4*  203:*10*  211:*13, 15*
218:2*1, 23*  260:*15*
277:9  278:*1*  291:*4,
18*  297:19  310:*17*
324:*4, 22*  334:2
340:*13, 15*  343:*12, 14*
344:5, *6*  349:22, *24*
365:2  366:*23*  367:5
398:*17*  404:*3, 5*
407:*24*  408:2
**Market**  2:*3*  114:22
**married**  53:22
**Marybeth**  154:*6*
**Matascavage**  183:*9*
185:*23*  187:2, *18*
190:*11, 20*  191:9
192:*13*  193:*10*  195:7
196:2, 5  197:*14*
198:*19*  200:*15*  202:*4*
311:*1*  314:*15*  315:6
318:2  319:6, *16, 19*
320:*11, 19*  324:*13*
325:6, 7, *20*  326:9
327:5  328:2, 7, *18*
329:*1, 12, 13, 19*
332:*19, 24*  333:7, *13*
360:*18*  361:*1, 5*
**Matascavage's**
193:2*1*  321:9  327:*10*
**material**  153:9
**materials**  44:*16*
157:2
**maternity**  104:*18*
105:*24*
**MATT**  3:2  15:4
277:*20*  279:7  291:2*1*
324:*1, 18*  328:2*1*
332:9  333:2*1, 22*
340:*3*  345:5, *22*
366:*20*  367:*1*  389:*14*
**matter**  7:9  9:2, *5, 8*
231:2  304:*19*  384:*17*
412:7
**matters**  248:8
**Mayer**  104:*19*

**Mayhall**  179:*19*
353:*3*  354:*3, 21*
**MCCAMEY**  2:*15*
**meal**  67:*24*
**mean**  74:4  75:*10*
90:*14*  132:7  134:*13,
15*  161:*15*  179:9, *12*
189:*18*  190:*16*
210:*24*  220:*20*  241:*4,
14*  276:*12*  281:2*3*
299:2  313:*10*  326:*15*
339:6  347:2, *21*
361:*11*  376:*3*  395:*14*
**meaning**  160:7
194:*14*  217:*16*
220:2*0*  316:2  338:*4*
384:22  388:*6*
**means**  90:*12*  338:*19*
**meant**  45:7  131:2*0*
146:2*1*  190:*19*
346:*16*
**mechanism**  409:*10*
**medical**  299:*10*  310:8
**medication**  11:2*3*
**meet**  29:*16*  50:*3*
84:7, *10*  94:4  116:*15,
16*  118:22, 23  120:2*1*
125:*12*  135:*16, 21, 24*
136:2  187:2*3*  188:*11,
14, 16*  193:9  212:22
265:*18, 19*  266:*17, 22*
276:22  287:*11*
319:*19*  320:7  338:2*1*
339:*16*
**meeting**  27:*13, 22*
29:23  30:9, *15, 18*
31:9  38:*14, 22*  59:7
83:*11*  84:*16*  107:2*0*
129:*3, 8*  134:22, *23*
136:9  151:7  158:6
159:5  170:*10*  172:2*1*
187:2  195:8, *10, 16*
196:*17*  258:*18*
261:22  262:*19*
290:*12*  302:*18*  308:6
315:5, *6, 9*  316:*4, 7,
10, 14*  317:9, 22
318:*10, 21*  319:*3, 7,
16*  320:*13*  324:*13*
329:*12, 13, 19*  330:*3*

331:9, *15*  332:2
351:7  356:*17*  362:*12,
14*
**meetings**  59:*3*
122:*18*  129:23  177:6
197:*13*  202:6  231:*12*
**MEGHAN**  2:*19*  8:2,
6
**Melissa**  13:*15, 16*
44:2*1*  115:8  184:*16*
224:*10*  227:7, *9*
248:2*1*  261:*12*
280:*17*  323:22  328:*3*
350:7
**member**  320:2
**memo**  28:*17*
**memorialization**
125:6
**memorialize**  125:8
209:6
**memorialized**  209:2*3*
**men**  247:*3*
**MENDEZ**  2:2*0*  8:*10*
**mental**  206:9, *13*
207:*15*  230:2*0*  353:*4*
354:8
**mention**  26:5, *20*
231:*13*  248:2*1*  346:9
**mentioned**  26:22
38:*14*  57:*11*  85:*18*
108:22  117:*14*
126:*14*  187:5  217:*1*
257:*3*  276:7
**mentioning**  279:*15*
280:*1*
**MESSNER**  3:2
**met**  8:2*4*  27:22
28:*1*  29:*18*  35:*13*
36:*12*  38:*13*  50:*4, 7*
83:*14*  84:6, *19*  85:8,
14*  89:5  221:*10*
256:*15*  258:7  265:2*3*
266:8, *9, 12*  315:2
317:*1, 12*  322:8, *14,
18*  327:*11*  339:2
349:*11*  353:*3, 8*
377:*1*  378:*16*
**metal**  241:2*4*  242:2
**meter**  251:2*4*

**metered**  251:*19, 22,
24*
**meth**  190:*18*
**mice**  154:*14*
**mid**  40:*15*  48:*12, 16*
104:*12*  105:*16*
**MIDDLE**  1:2  44:*5*
75:2*3*  120:*18, 19, 21*
125:*12*  295:*18*
387:22
**middleman**  104:*3*
124:9
**mile**  252:*19, 22*
**min**  61:7
**mind**  180:*17*  181:2*4*
357:*17*
**minimal**  220:6
**minimalized**  61:7
**minimum**  285:6
286:*15*  287:*12*
288:*19*
**minium**  288:*18*
**minute**  68:*14*
**minutes**  77:22
202:*15*  238:7  345:9
390:6
**MIS**  53:*17*  302:*11,
13, 21*  334:*14, 19*
342:*16*
**mischaracterized**
233:2*3*
**misconstrue**  190:*11*
**misconstrued**  190:8
191:*1*
**misrepresented**  297:7
**missed**  276:*10*
**missing**  234:*4*
**misspoke**  276:9
**Missy**  84:6  190:*18*
191:6, 7  260:2*4*
277:*18*  334:*15*  340:8
**Missy's**  334:22
**mistake**  257:5
**mistaken**  372:9
**mobile**  82:*13*
**mold**  268:9
**mom**  36:5
**moment**  377:*17*

**Monday** 25:*3* 68:*20*, *23* 69:*24* 86:*6* 335:*15* 350:*21*
**monetary** 226:*1*
**money** 51:*21* 52:*12* 55:*13* 139:*8* 141:*3* 155:*9, 12, 23* 156:*4, 11, 16, 18* 157:*1, 6, 8, 10, 12, 19, 21* 158:*11* 159:*3* 176:*24* 277:*21*
**monies** 300:*19*
**monitor** 154:*13*
**monitors** 269:*19* 334:*20, 24* 335:*7, 9, 13*
**monopolize** 89:*19*
**Monroe** 2:*7*
**month** 11:*17* 134:*8*
**monthly** 72:*16*
**months** 410:*20*
**moot** 149:*14*
**morning** 7:*18* 8:*23* 163:*11* 261:*2* 262:*12* 315:*2, 6* 362:*13*
**mouse** 267:*18*
**move** 96:*12* 159:*3* 201:*16* 209:*20* 214:*16* 306:*8* 351:*18* 405:*10* 407:*11*
**moved** 165:*13, 14, 15, 16* 223:*5, 20* 255:*22* 392:*21* 400:*4, 9, 10* 401:*16*
**movement** 93:*1* 98:*22* 158:*11* 319:*12* 377:*14, 15*
**movements** 375:*1* 379:*20* 380:*7*
**moving** 182:*23* 343:*5*
**mpipak@jonespassode lis.com** 2:*12*
**multiple** 162:*17* 249:*22* 348:*23*
**Murphy's** 385:*16, 17*
**mwynkoop@margolise delstein.com** 2:*22*

**< N >**
**name** 7:*12* 8:*20, 23* 52:*1* 58:*11* 115:*20*,

*21* 179:*20, 22* 184:*1, 18* 198:*2* 305:*9, 15* 334:*16* 356:*5* 368:*8* 400:*17*
**named** 27:*4, 9* 85:*20* 141:*8* 143:*4* 173:*2, 4* 266:*18, 22* 396:*11* 397:*1, 18*
**narrowed** 353:*1*
**natural** 124:*17* 125:*3*
**nature** 179:*15, 18* 187:*6* 209:*10*
**navigate** 217:*6*
**near** 229:*23*
**necessarily** 39:*6* 135:*12* 189:*14* 237:*4*
**necessary** 11:*11* 78:*24* 91:*11* 161:*3* 212:*23* 214:*11* 242:*10* 303:*19* 309:*5* 337:*22* 338:*5*
**need** 12:*12* 24:*23* 25:*6* 34:*21* 62:*4* 63:*17* 91:*22* 92:*6* 93:*4, 5* 111:*11* 120:*1* 122:*6* 189:*11* 248:*4* 312:*11* 328:*22* 332:*24* 365:*20* 372:*12*
**needed** 28:*21* 33:*6, 8* 44:*16* 50:*23* 51:*18* 56:*2* 62:*13* 73:*9* 77:*12, 20* 93:*8, 9* 109:*2* 112:*15* 133:*11, 12* 134:*1* 142:*17* 153:*24* 154:*11, 20* 162:*3* 191:*8* 198:*8* 216:*18* 219:*15* 220:*10, 21* 272:*16* 276:*13* 281:*14* 310:*3* 373:*2* 377:*11*
**needing** 153:*23*
**needs** 64:*17* 65:*3* 144:*12* 145:*20* 160:*2, 11* 169:*24*
**negatively** 156:*14*
**negotiate** 357:*10*
**negotiated** 357:*8*
**negotiations** 21:*18* 22:*21* 103:*23* 118:*9*,

*17* 137:*1, 6* 147:*17, 22* 178:*9* 351:*6* 357:*20*
**nervous** 295:*23*
**Nester** 87:*2* 245:*21* 246:*15* 270:*14* 306:*10, 16* 336:*7*
**never** 46:*23* 90:*17* 105:*4* 149:*1* 161:*14* 198:*9* 208:*10* 243:*15, 17* 249:*15* 299:*23, 24* 306:*22* 323:*3* 329:*9* 339:*7, 9* 362:*2* 372:*13* 397:*15*
**nevermind** 372:*23*
**new** 33:*17* 51:*9* 56:*6* 58:*4* 62:*17* 107:*2* 180:*21, 24* 184:*4* 199:*11* 270:*22* 289:*18* 292:*14* 303:*2* 336:*9* 342:*21* 343:*1* 382:*13* 397:*10*
**newly** 289:*17, 19*
**NEWMAN** 2:*6*
**news** 174:*5* 202:*5* 319:*9, 14* 320:*12*
**newspaper** 83:*23*
**Nice** 50:*2*
**nine** 384:*9*
**nod** 10:*16*
**non-commissioners** 253:*1*
**noncompliance** 212:*17* 215:*22*
**non-contract** 352:*20*
**nondisclosure** 20:*18*
**non-discrimination** 351:*17*
**non-events** 163:*15*
**Non-exempt** 67:*23* 68:*5* 386:*6, 11, 23*
**non-hours** 304:*4*
**non-paid** 78:*11* 80:*10* 284:*16*
**nonprofit** 23:*19, 20*
**normal** 214:*1*
**normally** 77:*19* 223:*8* 393:*17*
**north** 162:*6, 11, 23* 163:*9, 10, 17, 24*

164:*22* 165:*2* 166:*15, 23* 371:*11* 376:*22* 377:*17* 382:*19* 383:*8, 18* 384:*5, 9, 18* 385:*14*
**Nos** 129:*6*
**Notary** 1:*23* 412:*4*
**note** 33:*10* 34:*13, 21* 37:*3* 126:*24* 137:*22* 233:*21* 238:*10* 255:*6* 275:*18, 19* 293:*13* 304:*15* 309:*11* 338:*7*
**noted** 241:*11*
**notes** 25:*10* 28:*19* 193:*13, 16, 17, 18, 20, 24* 194:*7* 362:*18* 412:*6*
**nothing's** 147:*24*
**notice** 224:*17* 389:*24*
**noticed** 409:*1*
**notifications** 410:*12*
**notified** 61:*24* 363:*23* 364:*5, 10*
**November** 75:*23* 104:*9* 171:*9* 172:*23* 180:*20* 186:*6* 201:*15* 203:*18* 216:*19* 219:*9* 224:*15* 226:*20* 243:*1* 256:*11* 332:*13*
**NUMBER** 4:*10* 39:*9* 68:*13* 81:*24* 82:*5* 87:*4, 6* 105:*9* 134:*4* 207:*21* 210:*11* 230:*24* 251:*6* 267:*14* 268:*15* 280:*4* 281:*5* 283:*12* 286:*13* 297:*4* 353:*17* 357:*5, 6, 9, 16* 363:*19*
**numbered** 121:*5* 299:*17*
**numbers** 82:*1*
**numerous** 204:*18*

**< O >**
**oath** 9:*24*
**obj** 40:*24*
**object** 40:*18, 19* 78:*12* 79:*14* 110:*15, 19* 113:*5* 137:*22* 140:*5* 142:*7, 8* 149:*8*

Deposition of Doreen Kutzler                                    Jane Doe, et al. v. Schuylkill County Courthouse, et al.

173:*15* 174:*15, 17*
211:*4* 222:*24* 226:*9*
236:*11* 241:*10, 11*
265:*1* 272:*12, 21*
285:*7* 303:*24* 309:*13*
311:*12* 320:*24*
360:*20* 361:*17* 368:*3,*
*18* 379:*22* 382:*8*
397:*21, 23*
**objecting** 34:*17* 41:*1*
**objection** 13:*4* 33:*10*
34:*13* 37:*3* 97:*14*
109:*13* 113:*3* 117:*7*
126:*24* 128:*11*
137:*23, 24* 141:*9*
148:*1* 158:*20* 176:*2*
177:*20* 179:*3, 4*
182:*3* 194:*20* 220:*13*
222:*2* 233:*21* 254:*17*
255:*6, 8* 262:*21*
263:*20* 264:*3* 275:*19*
293:*13* 304:*15*
309:*11* 321:*1, 10*
338:*7, 9* 342:*3*
370:*14* 379:*2* 380:*11*
386:*1, 2*
**objections** 264:*5*
312:*13*
**obligation** 9:*24*
**obligations** 212:*22*
**observation** 323:*23*
**observational** 323:*23*
**observe** 326:*16*
**observed** 30:*18*
108:*9, 12, 15* 163:*22*
244:*7* 328:*19* 376:*21*
380:*5*
**observing** 7:*20*
15:*21* 203:*2* 244:*8*
**obstacles** 182:*10, 15*
339:*14*
**obtain** 48:*11* 77:*15*
108:*20* 244:*15* 363:*8,*
*15* 410:*14*
**obviously** 65:*2* 86:*9*
120:*18* 139:*15*
288:*10* 391:*13*
**occasion** 148:*14*
166:*15*

**occasions** 37:*18*
148:*15, 18* 204:*19*
**occupancy** 242:*24*
261:*6*
**occupation** 270:*5*
**occupied** 240:*19*
245:*22* 307:*2* 349:*2*
**occur** 24:*11* 46:*14*
51:*17* 62:*13* 113:*22*
132:*10, 15* 151:*3*
161:*22* 162:*1* 195:*7*
210:*17* 273:*24* 293:*5*
**occurred** 51:*16*
79:*10* 114:*3, 5*
192:*16* 210:*2* 246:*9*
382:*5, 6*
**occurring** 113:*19*
114:*9* 214:*23* 332:*16*
**O'Connor** 101:*2, 5,*
*12, 18* 102:*15, 22*
104:*23* 118:*9* 119:*20*
120:*15, 22* 124:*15*
127:*17, 21* 133:*15*
135:*21*
**O'Connor's** 116:*13,*
*19* 128:*23* 131:*5*
171:*18* 178:*8, 18*
**October** 14:*11* 16:*11*
21:*6* 40:*15* 44:*5*
48:*12, 16* 49:*5* 50:*3,*
*4* 52:*21, 24* 54:*3*
61:*19* 70:*20* 72:*5*
75:*7* 76:*3* 84:*7*
96:*24* 100:*23* 104:*12*
105:*16* 106:*5* 114:*14*
130:*24* 147:*14* 152:*4*
159:*18* 160:*21* 183:*2*
201:*15* 371:*20* 372:*7*
391:*22*
**odd** 215:*9* 322:*23*
323:*5*
**odor** 307:*6*
**offer** 205:*16* 206:*9,*
*13* 306:*3* 322:*1*
**offered** 85:*7* 169:*3*
206:*13* 405:*24*
408:*10* 409:*2*
**offers** 221:*1*
**office** 27:*2* 28:*21*
32:*13, 20* 40:*8* 44:*9,*

*11* 50:*18, 21* 69:*11*
70:*16* 85:*8, 23* 86:*3*
93:*3* 101:*2* 103:*15*
104:*15* 105:*10, 11, 15*
106:*7* 114:*14, 24*
124:*19* 126:*23*
133:*24* 139:*7, 15, 20*
140:*1* 141:*2, 6* 142:*3*
144:*8* 145:*20* 152:*24*
153:*5* 154:*4* 158:*22*
160:*3, 6* 162:*10, 14*
163:*2* 169:*16, 24*
170:*3* 172:*1, 16, 19*
174:*10, 14* 175:*10, 12,*
*23* 176:*9* 177:*5*
180:*5* 181:*21* 183:*12*
186:*20* 187:*19*
189:*16, 19* 193:*15, 22*
196:*12, 22* 198:*9*
210:*10* 213:*3* 215:*15*
221:*2* 223:*5* 227:*3*
230:*18, 19, 22* 231:*11*
238:*23* 239:*4* 240:*11,*
*12, 14, 18* 245:*13, 22,*
*24* 255:*13, 18* 261:*1*
268:*16, 19, 22, 23*
269:*16, 23* 270:*2, 13*
271:*2, 11* 273:*15*
274:*15* 275:*6* 281:*8*
292:*14, 16* 296:*1*
297:*4, 8* 306:*22*
314:*16* 332:*15* 333:*9*
339:*21* 341:*23* 342:*2,*
*10* 346:*22* 347:*1, 10,*
*16, 19, 22* 348:*4, 7*
349:*1* 377:*22, 23*
378:*2, 4, 12, 17*
384:*15* 388:*21*
392:*23* 395:*7, 9*
396:*22, 23*
**officer** 394:*23* 395:*24*
**officers** 32:*5*
**Offices** 1:*19* 31:*24*
32:*3, 4, 7, 8, 14* 60:*11,*
*14* 62:*15* 132:*21, 24*
133:*17* 139:*5* 142:*17*
145:*1, 2, 6* 152:*12*
155:*14* 167:*8* 174:*1*
175:*15* 178:*9, 12*
180:*1, 2, 4, 7, 13*

223:*20* 233:*19*
235:*22* 243:*8, 16, 17,*
*22* 244:*3, 6, 7* 245:*16*
246:*9* 255:*24* 256:*17*
267:*8, 11* 269:*5*
270:*6* 299:*20* 300:*2,*
*5, 7* 301:*4* 302:*14*
306:*24* 307:*2* 334:*18,*
*22* 335:*6, 20, 23*
346:*22* 348:*20*
**office's** 267:*15*
**official** 34:*11* 292:*10*
297:*7* 350:*19*
**officials** 30:*12* 33:*24*
34:*6* 36:*24* 37:*12*
130:*17* 131:*1* 159:*19*
171:*11, 12* 212:*14*
305:*7* 399:*11*
**off-site** 200:*17*
**Oh** 30:*7* 36:*1* 71:*7*
81:*19* 84:*19* 91:*13*
123:*23* 175:*20* 220:*7*
232:*2* 234:*12* 237:*10*
259:*17* 268:*3* 303:*7*
320:*23* 344:*7, 8*
345:*1* 361:*10* 364:*20*
366:*20* 369:*1* 379:*15*
396:*21*
**Okay** 8:*22* 9:*17*
12:*10, 14, 18, 22* 13:*7*
14:*5* 15:*20* 16:*2, 7,*
*13* 18:*6* 19:*9, 16*
21:*3, 21* 22:*8, 12, 19*
23:*3, 11* 24:*19* 25:*4*
26:*6, 19* 27:*20* 28:*6*
30:*5, 14* 32:*11* 33:*1,*
*5, 13, 21* 34:*2, 20*
35:*7* 37:*16, 19, 24*
39:*10* 40:*4, 12* 41:*9,*
*11, 15* 42:*3* 43:*11, 17,*
*20* 44:*10* 45:*6* 46:*5,*
*11, 18* 48:*8* 49:*19, 23*
50:*11, 16* 51:*7* 52:*7,*
*14, 17, 23* 53:*4, 16, 19*
54:*2, 24* 55:*3, 14, 18,*
*24* 56:*20* 57:*7, 16*
58:*1, 9* 59:*15* 60:*5,*
*13* 61:*23* 62:*7* 64:*4,*
*6* 65:*10, 21, 24* 66:*8,*
*23* 68:*16* 69:*1, 7, 13*

Case 3:21-cv-00477-MCC   Document 280-1   CONFIDENTIAL   Filed 09/20/23   Page 138 of 373

Deposition of Doreen Kutzler                    Jane Doe, et al. v. Schuylkill County Courthouse, et al.

70:2  71:2, 13, 17, 22
73:7, 12, 22  74:3, 7
75:3, 20  76:15, 20
77:14, 21  78:4  79:8
80:4  81:1, 8, 22  82:8,
18, 24  84:5, 13, 15
85:9, 16  86:5  87:8,
20  88:19  89:4, 11, 21
91:14  93:10, 18, 22
94:19  95:17, 24  97:9,
19  98:17  99:4
100:22  101:4, 10
102:7  104:1, 5, 21
105:6, 14, 18, 22
107:11, 18  109:18
110:11  111:3, 18
112:12  114:1, 20
115:4, 24  116:10
117:2, 12  118:11, 15,
20  119:1, 3, 15, 22, 24
120:17  121:16  123:1,
15, 24  125:16  126:1,
7  127:5, 19  130:2, 9
131:23  132:11, 17
138:22  139:3  140:16,
20  143:7  145:8, 11
146:17  148:5, 24
149:21  150:1, 4
151:8  152:1, 17, 23
153:8  154:5, 10, 15,
17, 24  155:16, 20
157:4, 11, 18, 20, 24
159:8  160:9  161:1,
19  163:14  164:12, 16,
24  165:6, 17  166:2,
12, 17  167:3, 10
168:21  169:2, 5, 12,
17  172:6, 11  173:20
174:3, 7, 24  175:3
176:19  177:2, 11
181:11  183:7, 22
184:5, 11, 20  185:3
186:4, 8, 11, 18  187:3,
10, 16  188:9, 19, 23
189:2  190:3  191:16
192:11, 19  193:5, 8
194:18  195:5, 18, 24
196:7, 14  197:8
199:4  200:2, 14
201:3, 21, 23  203:16

204:1, 4  206:6, 16
207:2, 7, 11, 23  208:2,
23  210:14  211:22
212:12  213:22  214:2,
18  215:2  216:21
217:19, 23  218:1, 9
219:4  220:8, 24
221:23  222:7  225:4
227:5, 19  228:3, 24
229:12, 20  230:5
232:2, 13, 21  233:2,
10  234:7, 12, 16, 24
235:2, 12  236:5
237:3  239:17, 21
240:2, 8  241:3
243:19  244:1, 14, 24
245:6, 14  246:14, 22
248:6, 17  249:6, 9, 20
250:8, 12  251:1, 14,
23  252:11  253:17
254:4, 10  255:15
256:1, 9, 21  257:2, 4,
13, 24  258:12, 15
259:8, 20  261:8
262:8  263:14  264:11
265:11, 16, 21  266:1,
11, 15, 20  267:1
268:1, 14  269:8, 14,
22  270:10  272:3
273:12  274:18, 23
275:22  276:11, 12
277:5  278:10, 13, 14
279:4, 20  280:3, 9
281:1, 11, 17  282:5, 9,
14, 18, 22  283:5, 10,
17  284:9, 15, 24
285:18  286:9  287:3,
5, 10, 13, 18  288:1, 7
289:1, 3, 8  290:7, 18,
22  291:1  292:2, 6, 7
294:14, 18, 24  295:16
296:22  297:2, 10
298:7, 19  299:7, 13
300:9, 12  301:5
302:1, 9, 20  303:12
304:8  305:16  306:11,
20  307:4, 24  309:19
311:9  313:4, 13, 14
314:2, 6, 8  316:8
317:5, 18  318:7, 15,

17  319:10  320:17
321:14  324:11, 16
325:4, 13, 18, 23
326:3, 21  327:3, 14,
24  328:10  330:2
331:3, 7, 13, 17, 24
333:5  335:4, 16
336:2  337:7, 14
338:1  339:5, 12
340:21  341:6  342:8
343:7, 10, 21  344:3,
16, 19  346:7, 15, 18
347:4, 8, 12, 24  348:3,
9, 16  349:20  350:12,
16, 22  351:9, 21
352:7, 15  353:9, 15
354:5, 14, 17, 20, 24
355:5, 10  356:6, 10,
18, 22  357:3, 12
358:20  359:6, 10, 21
360:1, 7  361:10
362:16  363:1, 10, 14
364:15, 22  365:9, 15
366:6, 10  367:12, 18,
21  368:10, 14  369:11,
18, 21  370:7, 22
371:9, 13, 21  372:17,
22  374:2  375:8, 21
376:6, 18  377:13
378:13  380:19  381:1,
10, 14, 24  383:1, 24
385:2, 8, 12  386:14
387:10  388:11
389:21  391:5, 16
392:2, 8, 16  393:1, 11,
19, 21  394:5, 11, 24
395:17  396:3, 9, 15
398:3, 10  399:9
400:16, 19  401:3, 13,
24  402:22  403:24
404:22  406:21, 23
407:15, 21  408:7
409:3  410:5, 10, 21,
23  411:10
**old**  43:24  54:9  86:3
**once**  127:13, 16
168:2  351:1  353:23
356:15  371:24
**once-a-week**  167:21
**one-day**  285:11

**ones**  88:21  89:1
145:9  224:24
**on-job**  19:2
**on-site**  122:2
**open**  110:23  111:12
113:10  183:20  197:3
239:2  240:11  384:14
**operate**  106:17
134:1  142:18  178:10,
13
**operated**  216:22
**operating**  105:12
139:21  155:4, 6
**operational**  107:15
141:6  173:5  359:18
**operations**  25:14
30:24  33:14  40:10
106:7  141:3  142:2
156:12  172:1  213:3
215:14, 15  351:6
**opinion**  36:11, 13
37:17  38:24  142:4,
11  143:5  254:6, 21,
23  378:23
**opinions**  35:14
**opportunity**  309:8
393:24  407:16
**opposed**  58:12
125:13  141:7  163:17
254:13  255:5  296:10
397:5
**optimal**  134:11
**optimally**  106:16
138:24  139:16
142:20  178:10, 13
216:22
**option**  228:8  251:15
301:15  302:2  320:15
406:22
**options**  183:18
198:3  320:1
**order**  10:12  24:10
36:9  44:17  51:6, 10,
21, 22  52:13  55:13
80:20  95:20, 21
97:11  137:20  157:7
200:13  221:10  223:2
274:10  348:24  383:5
406:2

ordered 51:*18* 76:7 156:*6, 8* 223:*17, 18*
ordering 55:*16* 71:*23* 256:6
orders 154:7 380:2
organization 92:*1* 183:*21*
original 404:*12*
originally 51:*20* 52:*11* 55:*12* 256:*10, 24* 400:*8, 13* 402:*13* 404:*18*
outcome 226:3
outlining 123:4 332:*23*
outright 164:*21* 165:*1*
Outside 9:*12* 108:*21* 112:*5* 148:*22, 23* 178:*22* 183:*16* 185:*18* 198:*4, 13, 15* 199:*1* 216:*9* 230:*20* 245:*2* 280:*16* 299:*19, 24* 300:*10, 15, 18* 301:*1, 6*
overflow 250:*16* 251:*9, 11* 252:*24* 253:*4*
overlap 87:*12*
overrule 312:2, *12*
oversaw 174:*1*
oversight 141:*14* 257:*18* 266:*24*
overtime 77:*16, 18*
overworked 158:*19*
owed 185:*17*

< P >
P.C 2:6
p.m 96:6 151:9 152:*4* 202:*17, 23* 247:*10, 16* 323:*14, 20* 334:*12* 345:*11, 17* 390:*8, 14* 407:*1* 411:*13, 16*
P.O 2:7
PA 408:*12*
PA.gov 211:*24*
pad 240:*23*

PAGE 4:*4, 10* 5:*10, 11, 12, 13, 14, 15* 6:*2, 14* 16:*20* 18:*18* 50:*1* 57:*12, 19* 67:*1* 70:*12* 120:*19* 130:*23* 131:*14* 143:*22* 145:*23* 147:*3, 15, 21* 149:*6* 152:*3* 156:*2, 3* 219:*13* 221:*16* 227:*1* 260:*19, 20* 266:2 277:*14, 15* 278:*6, 17* 279:*11* 280:*10, 11* 298:*22, 23* 299:*14, 15* 307:*15, 16* 334:*11* 336:*19* 343:*19* 365:*11* 369:*13* 399:*21* 402:*5* 404:*8* 405:*14* 406:*9* 407:*1* 413:*2*
pages 57:*1* 65:*14, 16* 67:*12* 211:*20* 262:2
paid 27:*14* 72:*16* 73:*5* 79:*11* 80:*13, 17, 21* 250:*18* 251:*19* 274:*11* 275:*16* 280:*16* 281:*15* 286:*3, 12* 304:*4, 5, 14* 387:*8*
pamphlets 207:*21*
panic 292:*15* 293:*10* 294:2
paper 76:*12* 219:*16, 20* 220:*5*
paperclips 72:*3* 219:*16, 20* 220:*5*
papers 154:*8*
paperwork 87:*3*
PAR 351:*8* 356:*13, 16, 19*
paragraph 18:*18* 50:*12* 59:*22* 63:*4* 65:*11* 66:*24* 106:*23* 108:*16* 120:*20* 121:*3* 131:*16* 136:*14* 143:*23* 171:*22* 176:*6* 183:*8* 228:*18* 242:*22* 292:*20* 295:*18* 296:*4* 308:*6* 309:*2* 314:*22* 328:*1, 11* 331:*18* 332:*12, 20* 335:*17* 341:*19* 346:*8* 347:*13*

374:*14* 382:*2, 11* 387:*22* 404:*11*
paragraphs 72:*11* 341:*20*
PARALEGAL 3:*3* 7:*22*
parents 63:*16*
park 250:*22* 251:*17* 252:*23* 253:*23* 254:*1, 7* 364:*6*
parked 364:*3*
parking 93:*14* 163:*6, 8* 165:*12, 14, 19, 20, 24* 232:*14, 23* 249:*18, 22* 250:*3, 4, 9, 13, 15, 18* 251:*4, 12, 19* 252:*5, 19* 253:*6* 254:*8* 258:*20, 22* 259:*6, 11, 12* 261:*23* 363:*19* 364:*17, 20*
parse 338:*17*
part 18:5 35:*23* 65:*22* 81:*10* 93:2 159:*6* 186:2 205:*21* 221:*20* 236:*15* 266:*24* 276:*10* 288:*19, 23* 310:*6* 335:*12* 343:*24* 344:*10* 354:*12, 21*
parted 378:*15*
participate 284:*6*
participated 163:*21*
particular 93:*7* 162:*5* 373:*6* 377:*3* 385:*9*
particularly 307:*17*
parties 2:*17*
part-time 66:*19*
pass 239:*16*
passed 334:*18*
PASSODELIS 2:*10*
paste 150:*22*
path 39:*17*
PAUL 2:*15* 7:*24* 53:*15* 153:*20* 154:*1, 12, 19* 156:*24* 158:*3* 159:*4* 179:*19, 22* 305:*8, 21, 22* 306:*5* 334:*17* 395:*10, 18, 19*

397:*5, 13*
Paul's 305:*9*
pause 217:*8*
pay 51:*22* 55:*13* 76:*23* 101:*19* 102:*22* 103:*7* 116:*13* 156:*23* 175:*24* 199:*12, 22* 202:*12, 13* 250:*22* 284:*3* 358:*4* 393:*18*
paying 393:*16*
payment 154:*20* 185:*15*
payroll 68:*11*
penalized 213:*7*
pending 340:*8*
PENNSYLVANIA 1:*2, 21* 2:*4, 8, 12, 16, 22* 7:*12* 18:*8*
pens 72:*3* 76:*12* 154:*8*
people 9:*14* 39:*9* 105:*10* 136:*10* 304:*20* 380:*24* 403:*3*
perceive 213:*21, 23*
percent 273:*4*
perception 124:*12*
Perfect 266:*15* 320:*17* 328:*23* 340:*4*
perfectly 140:*15*
perform 36:*24* 66:*10* 76:*18* 292:*18* 338:*3*
performance 189:*15, 18* 195:*2*
performed 134:*23* 308:*3*
performing 56:*7* 115:*14* 307:*18* 337:*22*
period 66:*13* 131:*24* 180:*6* 184:*10* 217:*9, 13, 17, 22* 271:*14* 284:*3, 4, 18* 287:*21* 301:*4* 392:*14* 397:*17*
periodic 167:*21*
periodically 13:*9* 14:*20*
periods 67:*24* 392:*10*
permissible 222:*9*
permitted 59:*18* 66:*21* 77:*9* 78:*2, 9*

86:*16*  95:*14*  213:*1*
217:*17*  218:*3*  289:*22*
344:*14, 15*
**perpetrator**  255:*5*
**person**  50:*5*  84:*19*
89:*6*  116:*1*  151:*3*
169:*3*  178:*22*  207:*16*
243:*12*  246:*23*
255:*12*  256:*16*  393:*6*
394:*14*  407:*19*
**personal**  36:*4*  82:*1,*
*4*  114:*9, 11*  280:*17*
284:*14*
**personally**  90:*3*
194:*2*  244:*7*
**personnel**  65:*22*
66:*4*  117:*19*  193:*21*
208:*16, 20*  211:*9*
213:*18*  215:*19*  248:*2,*
*3, 8, 14*  299:*3, 4*
359:*18*
**perspective**  39:*16*
80:*13*  81:*20*  111:*11*
167:*14*  189:*23*
319:*23*  337:*5*  411:*6*
**perspectively**  144:*2, 8,*
*20*
**pertaining**  318:*23*
**Peter**  156:*23*
**Philadelphia**  2:*4, 22*
**philanthropic**  52:*2*
**Phoenix**  17:*16*
**phone**  67:*3, 9*  72:*16*
73:*24*  81:*5, 16, 17, 24*
82:*1, 5, 16*  159:*1*
**phones**  77:*24*  82:*11,*
*12*
**physical**  32:*1*  153:*5*
158:*4*  253:*19*
**physically**  86:*24*
95:*10*  327:*18*
**pick**  357:*5*
**picked**  135:*7*  377:*7*
**piece**  234:*6*
**PIPAK**  2:*10*  8:*8*
34:*13, 17, 24*  40:*18*
41:*14, 16, 23*  42:*10,*
*18*  78:*12*  79:*14*
97:*14*  109:*13*  110:*15,*
*19*  113:*5*  117:*7*

137:*24*  140:*5, 9, 20*
142:*7*  149:*8, 11, 16*
173:*15*  174:*15*  176:*2*
177:*20*  179:*3*  187:*10*
194:*20*  211:*4*  222:*24*
226:*9*  236:*11*  241:*10*
254:*17*  255:*8*  262:*21*
263:*2, 8, 12, 20*  264:*3,*
*9, 15*  265:*1*  272:*12,*
*21*  280:*4*  285:*7*
303:*24*  309:*13*
311:*12*  313:*5, 13*
320:*24*  338:*9*  343:*20*
344:*7, 16, 19, 23*
345:*6*  360:*20*  361:*17,*
*19*  366:*18*  368:*3, 17*
370:*13*  379:*2, 22*
380:*11*  382:*8*  386:*1*
397:*23*
**Pittsburgh**  2:*12*
**place**  26:*11*  44:*8*
77:*5*  124:*21*  131:*18*
134:*16*  141:*6*  143:*20*
158:*5*  181:*8*  328:*4*
351:*5*  368:*22*  409:*11*
**placed**  9:*24*  51:*20*
154:*7*  208:*16*
**Plaintiff**  1:*2*  2:*5*
7:*19, 21*  13:*13*  173:*8*
194:*14*  229:*10*  398:*5*
**plaintiffs**  9:*1*  26:*1*
27:*12*  28:*8, 11*  31:*10,*
*19*  33:*9, 19*  48:*10*
83:*19*  84:*1*  89:*5*
95:*7*  133:*22*  175:*11*
178:*21*  179:*1, 13*
181:*14*  194:*15*  195:*1*
222:*21*  233:*17, 18*
235:*13, 22*  258:*19*
259:*15*  260:*4*  261:*18*
264:*1*  265:*7, 13, 18*
266:*17*  273:*13, 23*
274:*14*  275:*4, 13*
348:*14*  349:*7, 12*
358:*7*  363:*23*  371:*23*
383:*6, 17*  392:*18*
393:*3, 7*  394:*21*
396:*13*
**plaintiff's**  48:*4*

**plan**  284:*6*  286:*24*
287:*14*  288:*11, 23*
289:*19*  316:*2*
**planned**  156:*5*  157:*6,*
*16*  315:*1, 23*  316:*2*
**plans**  212:*20*  227:*10*
242:*9*  247:*20*
**platform**  352:*4*  411:*1*
**play**  252:*6*  285:*20*
**played**  218:*17*
**plead**  247:*4*
**please**  10:*24*  11:*11*
12:*12*  221:*12*  238:*10*
292:*10*  310:*9*  365:*16,*
*22*  369:*14*
**plees@dmclaw.com**
2:*17*
**plenty**  250:*2*
**PLLC**  2:*2*
**plus**  250:*16*
**PO**  55:*12*  154:*11*
**point**  11:*8*  12:*12*
26:*14*  29:*16*  48:*9*
54:*22*  98:*18*  105:*3*
111:*4*  120:*21*  122:*13,*
*17*  123:*2*  126:*4*
132:*20*  156:*7*  160:*6*
168:*16*  180:*3, 8*
209:*20*  225:*2, 10*
227:*16*  242:*24*
267:*14, 18, 23*  269:*6,*
*10*  270:*21*  290:*11*
293:*9, 20*  299:*8*
300:*11*  322:*16*
325:*14, 24*  336:*8*
357:*7*  359:*3*  378:*6*
389:*19*  397:*2, 16*
411:*11*
**pointing**  267:*20*
**points**  121:*5*  122:*4,*
*8*  132:*4*  297:*3*
**police**  231:*23*  232:*3,*
*6*  362:*19, 22*  363:*3, 5,*
*8, 16*
**policies**  45:*18*  91:*22*
211:*7*  247:*24*  248:*10*
**policy**  54:*23*  57:*4, 18,*
*20*  58:*13, 16*  60:*2, 18*
72:*15, 21*  73:*1, 3*

76:*22*  248:*3*  273:*2, 8*
280:*15*  393:*16*  395:*6*
**political**  94:*21*
**pool**  198:*6, 10*  202:*9,*
*11*  319:*12, 21*  320:*4,*
*15, 21*
**poorly**  410:*3*
**pose**  383:*2*
**posed**  12:*16*  129:*8*
382:*18, 21*  383:*10*
**position**  90:*16*  91:*9*
114:*16*  116:*21*
173:*24*  175:*17*
183:*13, 14, 18, 20*
184:*9*  187:*11*  198:*5,*
*8, 10*  199:*23*  200:*19*
201:*16*  209:*8*  312:*1*
318:*20*  320:*4*  321:*9*
366:*16*
**positions**  18:*11*
105:*10*  113:*10, 15*
114:*12*  175:*17*
392:*20*
**positive**  84:*12*  85:*3*
**possession**  246:*4, 12*
271:*2*  272:*6*
**possible**  61:*16*  85:*7*
105:*19*  144:*4*  167:*13*
249:*13*  339:*13*
347:*14, 15*  358:*13*
384:*20*
**Possibly**  56:*8*  105:*21*
**post**  142:*5*
**posted**  114:*14*  353:*13*
**posting**  113:*10, 17*
353:*10*
**postings**  113:*15*
352:*21*
**post-secondary**  17:*13*
**potential**  197:*21*
242:*14*
**potentially**  124:*22*
162:*15*  192:*22*  260:*8*
360:*6*  375:*7*  380:*10*
**power**  34:*5, 10*
90:*11, 16, 23*
**pract**  302:*15*
**practical**  302:*15*
**practice**  137:*12*
194:*11*

**practices** 68:*1, 8*
211:8 248:*1*
**precontract** 38:*14*
**predominantly** 241:*18*
**preferred** 233:*4*
**prep** 159:*4*
**Preparation** 61:*14*
**prepare** 119:*19*
**prepared** 315:*15*
318:*11* 360:*18* 361:*1,*
*2*
**preparing** 360:*11*
**prescreening** 352:*24*
**presence** 113:22, *24*
241:*24*
**PRESENT** 3:*1* 7:22
24:*23* 30:*1* 44:*12*
46:*3* 189:*3* 197:*16*
261:*11, 15, 18* 316:*12,*
*15, 18* 317:*10, 13*
318:9 351:*16, 19*
376:*4*
**presentation** 351:*7, 24*
**presentations** 352:*13*
**presented** 158:*6*
204:*14* 362:*11*
**presenting** 318:22
**preserved** 100:*6*
194:*16*
**president** 22:2
**press** 205:*23*
**pressure** 127:*10*
**pretty** 179:*23* 220:6
244:*11* 279:5
**prevent** 235:6
**PREVIOUSLY** 5:*9*
96:8, *16, 18* 147:*17*
156:*4* 157:6 159:*10,*
*12* 171:2, *4* 211:*13,*
*15* 218:2*1, 23* 324:4
326:8 340:*13, 15*
343:*12, 14* 349:22, *24*
366:22 367:5 382:2
404:*3, 5* 407:*24*
408:*2*
**Price** 218:*10*
**primary** 23:2*1*
**print** 209:22 269:*12*
**printer** 70:*16* 71:*20*
154:*13* 180:*24*

219:*18* 220:9, *21*
255:*13, 19, 21, 23*
303:2*0* 342:*15*
**printers** 76:9 256:*3,*
*6* 269:9 270:2, *20*
271:7 334:*19, 23*
335:6, *13* 336:*11*
343:*4, 8*
**prior** 23:9, *12* 48:*11*
99:*15* 103:6 107:7, *9*
122:*12, 16* 129:*13*
131:*11, 14* 136:2*1*
137:*1, 12* 139:2*1*
142:*3, 23* 147:*15*
156:*5* 169:*14* 183:*17*
184:9 201:*16* 222:*13*
237:*13* 238:9 244:8
262:*2* 270:5 306:22,
*23* 375:*16* 376:7, *9*
383:*14*
**priority** 304:*12*
**prison** 253:*5* 259:6
**private** 155:*8*
**priveledged** 42:*17*
**privilege** 13:*4* 34:*14,*
*18* 35:*3* 40:20 41:*1,*
*7* 42:*1* 262:22
311:*18, 23* 312:*3, 15*
344:*2*
**privileged** 42:9, *19*
263:*1, 4*
**privy** 113:22
**probably** 23:*18*
46:*17* 52:9 72:*4*
115:*14* 139:9 173:*5*
236:24 238:6 252:*18*
253:16 258:*14* 275:2
276:*13* 341:7 344:2*0,*
*22* 411:*11*
**procedure** 218:*18*
**procedures** 9:*20*
59:*16* 158:*10* 211:7
247:24
**proceed** 36:9
**proceeded** 377:2
**process** 123:*5*
136:20 156:*3* 158:7,
*9* 231:6 293:*5, 8, 19*
354:*11* 356:*14*
**processing** 68:*11*

**produced** 149:*10*
262:24
**PRODUCTION** 6:*13*
**productive** 56:*3*
329:*5*
**professional** 37:7, *17*
299:*23*
**professionally** 299:2*1*
300:*1* 342:*11*
**program** 82:*10*
205:*13, 14, 17, 22*
206:*1* 209:*11* 411:2,
*3*
**programs** 216:*12, 18*
**progression** 125:*3*
**prohibit** 310:*8*
**project** 122:*18* 279:*8*
324:*18*
**projected** 15:*18*
**projecting** 291:22
**promoted** 14:*17*
**proper** 175:2*1* 178:2
182:*10, 18*
**properties** 140:*2*
**prospectively** 209:*18*
**protected** 63:22
187:*14*
**protection** 229:9, *16*
**protocol** 113:*17*
**protocols** 114:6
245:*3, 4*
**provide** 14:*20* 25:*6,*
*13* 29:*4* 43:*13* 63:*17*
70:*15* 72:9, *18, 19*
73:8 86:24 123:*3*
135:*10* 144:2, 8, *20*
149:*1* 206:2 229:*16*
242:9 280:*16* 315:*1,*
*23* 351:22 383:6
391:2*1* 402:6 408:*11*
409:2*1*
**provided** 22:*13, 16*
24:*10* 27:11 28:*18*
29:7 30:2*1* 31:2
50:22 52:*3* 65:*17*
71:9 72:2 74:22, *23,*
*24* 123:8, *17* 129:*17*
185:*12* 196:2 205:*18,*
*19* 230:*1* 270:2
292:*14* 309:*4, 16*

315:7, *10, 19* 318:2
325:7 358:2*1* 392:5
407:*16*
**providers** 299:*11*
**providing** 124:*18*
257:6 315:8 341:22
342:*14*
**provision** 280:*15*
**proximity** 255:*24*
**PTO** 69:2*0* 80:*10, 19*
273:*18* 274:*10*
275:*15* 277:*18*
278:*17, 22* 281:*14*
282:*11* 283:2 284:*10*
388:7 389:*2*
**Public** 1:2*3* 93:*19,*
*20* 230:*12, 13, 16, 22*
238:*15* 412:*4*
**pull** 367:*1* 372:*11*
389:*14*
**pulled** 50:*17*
**purchase** 52:*12*
152:*13* 153:*16*
**purchased** 153:*24*
154:2*0*
**purpose** 30:8 138:*14*
142:*5*
**purposes** 20:9 56:22
68:*11* 192:6 199:*10,*
*24* 203:8 277:22
312:8 323:*24* 333:*24*
374:*5*
**pursuing** 16:*23*
**purview** 396:*2*
**push** 410:*12*
**pushback** 55:*15*
236:22
**pushed** 179:*23* 237:5,
*8* 267:*3*
**pushing** 180:*8*
**put** 20:*5* 52:*13*
55:*12* 56:*16* 96:*15*
102:2, *8* 117:*18*
124:*19, 22* 181:6
193:2*0* 203:*1* 209:*23*
215:7 231:*14* 239:22
241:*15* 312:9 317:*15*
318:2*1* 323:2*1* 324:*1,*
*16* 340:*11, 22* 345:*23*

352:*21*  365:6  366:*18,
21*
**putting**  241:*5, 16*
391:*3*

**< Q >**
**qualified**  342:*9*
**qualify**  293:*11*
**qualifying**  287:*15*
289:*11*  394:*3*
**quarterly**  72:*16*
**question**  8:*19*  9:*3*
10:*19, 21, 23*  11:*1, 6*
12:*16*  33:*3, 7*  35:5
42:*11, 13*  79:*19*
98:*16*  117:*13*  122:7
129:*18*  138:*21*
139:*18*  145:*13*
149:*11*  150:6  184:*12*
215:9  216:*15, 16*
223:*10, 23*  249:*15*
261:*22*  264:*19*
285:*21*  286:*10*  303:*4*
312:*17, 19, 22*  313:*18*
329:*18*  335:*1*  337:*4,
16*  359:*23*  360:*24*
373:9  382:*18, 21*
383:*2, 10, 21*  384:8
**questioned**  344:*13*
377:*10*
**questioning**  175:*2*
187:*12*  208:*11*
233:*12*  314:*24*  385:6
**questions**  12:*19*
59:*12*  60:*1*  222:*19*
261:*19*  264:6  346:*20*
**quick**  92:8  202:*15*
247:8  323:*11*
**quickest**  162:*24*
163:*3*
**quickly**  57:9  85:6
**quote**  125:*11*
**quotes**  181:7

**< R >**
**raise**  258:*19*  272:6
370:*14*
**raised**  52:*3*  210:*11*
259:*15*  261:*18, 23*
302:*11, 16*  306:*21, 22*

307:6  312:9  336:*21*
344:*5*  375:6  400:*21*
**raising**  189:*13*
**ran**  53:6  179:*21*
374:*5*
**range**  114:*15*
**rat**  267:*19*
**rate**  199:*19, 20*
**reach**  206:*7, 11*
253:*3*  296:*3*  362:*3*
363:*7*
**reached**  36:*4*  180:*12*
186:*14*  243:7  262:*17*
263:*17, 18*  391:9
**reaching**  185:*14*
219:*14*
**react**  304:*20*
**read**  10:*12*  45:*12*
71:*4*  83:*22*  129:7
217:6  219:6  312:*17,
19*
**readily**  51:*18*
**reading**  13:6
**reads**  383:9  384:*1*
**ready**  261:5  304:*12*
320:*11*  335:*20*
**reaffirming**  385:*3*
**real**  32:*2*  218:*18*
**realize**  11:8
**realized**  192:*1*
**really**  95:*21*  135:9
138:*16*  179:*23*
198:*21*  199:*2*  200:6
220:*10*  264:*18*
326:*18*  335:*2*  358:*12*
410:6, 7
**realm**  211:8
**reason**  12:*3*  69:8
87:*22*  103:*12*  108:8
124:*1, 4*  137:*7, 10*
138:*12, 15, 23*  161:*7,
11, 20*  163:9, *16*
177:*3*  178:6  190:*23*
192:*20*  219:*19*
223:*12*  228:*4*  235:*24*
236:*15*  239:*18*  241:*1*
274:*13*  278:*15, 18, 24*
280:*1*  297:6  328:*16*
334:*21*  335:*1*  360:*17*
413:*2*

**reasonable**  222:*20*
254:*3*  292:*11*  293:*2,
12, 23*  294:*1*  297:*13*
310:*10, 11*
**reasonably**  67:*4*
**reasoning**  23:*21*
403:*7*
**reasons**  64:*2*
**rebuttal**  326:*20*
**rec**  261:*3*
**recall**  16:*10*  25:*12*
29:*18*  31:*4*  44:*4*
52:*1*  59:*13*  62:*22*
71:*21*  75:*17, 21*
87:*12*  90:*1*  98:*7*
100:*5*  101:*17*  113:*18*
127:*12*  147:8  152:*14,
24*  159:*24*  184:*7*
197:*20*  198:*18*  199:*7*
202:*3*  206:*10*  207:*24*
208:*3*  227:*2, 12*
243:6  245:*19*  256:*13,
19, 22*  258:*1, 16*
261:*17, 20*  267:*24*
273:6, *13, 17*  276:6
277:*4*  278:9  279:*17*
280:*19*  294:*12*  314:*7*
317:8  320:*1*  331:*12*
350:*11*  366:*13*
371:*17*  374:*1*  376:*5,
8, 9, 19*  387:*5*  392:*17*
393:*2, 23*  394:*21*
396:*11*  398:6  400:*7*
**recalling**  65:*20*
**receipt**  50:*2, 13*
**receipts**  72:*13*
**receive**  17:*9, 18*
18:*13*  19:6  76:*3, 6, 9,
17*  102:*15*  135:*10*
199:*12, 16, 17*  220:*16*
226:*1*  283:*20*  287:*16*
288:*13*  325:*14*
**received**  42:7  43:9
49:*17*  56:5  76:*12*
85:*2*  88:*22*  89:*2*
106:9  177:*4*  204:*13*
212:*18*  219:*16, 20*
224:*17, 19*  225:*10*
228:6  229:*21*  299:9
300:*19*  332:*4, 21*

352:*23*  353:*17*
394:*22*  401:*14*
**receiving**  88:*22, 24*
325:*20*
**recess**  92:*13*  202:*19*
247:*12*  323:*16*
345:*13*  390:*10*
**recipients**  111:*22*
**recite**  386:9
**recognize**  15:*12, 23*
20:*15*  96:*21*  100:*19*
120:*11*  151:*23*
159:*15*  171:7  203:*14*
211:*19*  219:*2*  291:*8,
24*  297:*23*  310:*21*
324:9  325:*2*  343:*17*
350:*3*  366:*3*  389:*16*
408:*5*
**recollect**  165:*3*
**recollection**  70:*19*
71:*5, 19*  231:*2*  261:*4*
266:6  281:*4, 6*
316:*23*  374:*12, 23*
400:*20*
**recommendation**
44:*14*  63:*24*  64:*10*
218:*13*  357:*21*
**recommendations**
38:*3*
**recommended**  131:*17*
383:*7*
**recommending**  64:*3, 5*
**reconsider**  296:*17, 18,
23*
**reconsidering**  295:*2*
**record**  7:6, *17*  8:*24*
14:*19*  44:*19*  67:*23*
85:*19*  92:9, *11, 14, 17*
124:*20*  169:*13*
187:*11*  192:*5*  202:*15,
17, 20, 23*  203:*1*
220:*4*  241:*12*  247:*10,
13, 16*  252:*12*  268:*24*
276:*13*  277:*22*  286:*1*
323:*12, 14, 17, 20, 22*
345:9, *11, 14, 18*
390:6, *8, 11, 14*
411:*13*
**recorded**  7:8  68:*17*

Case 3:21-cv-00477-MCC    Document 280-1    CONFIDENTIAL    Filed 09/20/23    Page 143 of 373

Deposition of Doreen Kutzler                                    Jane Doe, et al. v. Schuylkill County Courthouse, et al.

recording 131:*21*
220:2 374:*24*
recruiting 144:*12*
243:*13*
red 155:*19* 304:*19,*
*22, 24*
reduced 217:5
reduction 175:*23*
refer 13:*10, 11* 14:*1*
15:*4* 70:*18* 148:*19,*
*21* 180:*3*
reference 14:*22*
28:22, *23* 104:*8*
227:7 249:*1*
referenced 29:2
59:*21* 153:*10* 346:*24*
references 72:*10*
183:*8* 292:*4* 374:*17*
referencing 113:*12*
153:*11* 183:*11* 231:*4*
279:2 317:*24* 340:*19*
referred 54:*9*
referring 13:*12, 16,*
*20, 23* 14:2 51:*3*
59:20 60:*3* 99:*10*
107:*21* 147:*10* 172:2
180:*4* 268:*23* 305:*1*
refresh 70:*19* 71:*18*
261:*3* 266:*6* 281:*3, 6*
316:22 374:*11, 23*
refreshes 71:5
refusal 137:*19*
170:*21*
refuse 336:*15*
refused 117:*16*
170:*19*
regard 28:*10* 63:*23*
168:*10* 170:2 210:*13*
230:*4* 338:*24*
regarding 9:*20*
12:20 26:*4* 27:*23*
30:*19* 31:*10, 19*
52:19 55:6 59:*24*
62:*1, 14* 65:*3, 7* 67:*9*
76:23 92:*24* 95:*13*
98:*21* 101:*1* 102:*15*
103:*23* 106:*20* 122:2
123:5 136:20 144:*16*
145:*18, 19* 147:*7, 11,*
*16* 151:*1, 2* 162:2

169:22 172:*3, 19*
173:*6* 174:*13* 176:*9*
177:*5, 16* 180:*13*
188:*11* 198:2, *12*
202:5 204:*14* 205:*24*
220:*17* 222:*12* 224:*5,*
*19* 236:*9* 248:*1, 9*
252:*4, 9* 256:*23*
260:*23* 261:*12*
262:*17* 276:*23*
302:*11* 306:*21*
313:*12* 319:*6, 16, 21*
335:*19* 336:*7, 19*
340:*8* 350:*7* 358:*11*
364:*7* 371:22 375:*23*
393:*9* 399:*11*
regardless 290:*16*
regards 33:*8* 43:*8*
58:*17* 60:2, *4* 140:*1*
178:*13* 187:*13*
206:*12* 221:*17*
245:*12* 274:*15*
280:*21* 282:*11, 15*
296:*18* 360:*14*
regional 243:*11*
register 377:22
regular 68:*1, 8*
78:23 163:*15*
regularly 70:*4* 78:*19*
289:*6*
reimburse 67:2
72:*15* 252:*1*
reimbursed 73:*24*
reimbursement 72:*14,*
*21, 24*
reimbursements 67:*9*
reinstill 205:*7*
reiterated 30:*22*
relate 313:*7*
related 18:*14, 23*
19:22 33:*19* 66:*11*
69:*16* 126:*20, 22*
172:*9* 174:*13* 175:*9*
180:*18* 194:*14, 17*
195:*3* 221:*20* 222:*13*
249:*10* 258:*20*
263:*24* 281:*9* 282:*1,*
*20* 313:*9* 392:*18*
relates 19:*13* 164:*18*
236:*8* 247:*23* 249:*17,*

*21* 296:*20* 306:*13*
311:*13, 24* 312:*17*
314:*9* 333:2 392:*10*
396:*4*
relation 40:*7* 326:*20*
relationship 62:*8*
90:*9, 17* 91:2
relayed 319:*20*
368:*19*
relays 106:*21*
releases 205:*23*
relieved 319:2, *5*
relocate 46:*7* 255:*4*
300:*20* 301:*9*
relocated 255:*20*
relocating 46:*13*
254:*12* 255:*17*
remain 93:*3* 183:*19*
285:*10* 289:22
remained 397:*11*
remaining 210:*10*
remains 295:*21*
remember 11:*10*
29:*1, 3* 30:2 54:*10*
115:*17, 20, 21, 24*
116:5 133:*19* 145:*9*
168:*14* 179:22
183:*24* 184:*18* 185:*9,*
*14* 196:*20* 197:*11*
198:*1* 206:*15, 19*
227:*15* 229:*11*
240:*15* 246:*20*
267:*20, 21* 268:*11*
269:*17* 270:*20*
278:*13* 305:*9, 14*
314:*10* 316:*7, 9, 17*
319:*8* 330:*10* 332:22
343:*8* 346:*13* 350:*20*
355:*4* 359:*24* 373:*20*
374:*11* 376:*1* 388:*15*
401:*23*
remembering 317:*17*
remind 214:*8, 9*
reminder 384:*4*
remote 61:*16*
remotely 59:*19*
removal 245:*24*
303:*5, 6*
remove 173:22
268:*8* 302:22 303:*16*

removed 141:*16*
173:*24* 175:*16*
204:*16* 245:*21*
270:*15* 302:*14*
Renee 211:*24* 225:*11*
repercussions 201:*17*
rephrase 11:*1* 37:*10*
43:*1* 70:*23* 79:*21*
283:*1*
rephrased 42:*12*
replacing 347:22
348:*1*
report 28:*16* 45:*13*
46:2 70:6 73:*9, 19*
97:5 117:*21* 126:2
146:*19* 177:*17* 182:*1*
203:*20* 205:*6* 206:*8*
208:*12, 15* 215:22
216:2, *12, 19* 221:*21*
222:*1* 223:*3* 242:*16*
248:*4* 266:*5* 288:*10*
289:*7* 290:*11* 307:*21*
308:*1* 339:*7* 351:*8*
358:*23* 362:*19, 22*
363:*3, 5, 8, 16* 397:*8,*
*12* 409:*19*
reported 32:*10, 16,*
*23* 67:*19* 71:*14* 97:*1,*
*20* 254:*13* 267:*4, 5*
289:*5*
REPORTER 7:*1, 14*
10:*10, 15* 312:*20*
Reporting 7:*13, 15*
231:9, *10* 284:2
288:*9* 332:*17* 373:*12*
408:*9*
reports 69:*18* 72:*13*
73:*10* 89:*8* 139:*11,*
*21* 142:*4, 5* 176:*17,*
*20* 177:*8, 9* 178:2, *3*
180:*18* 182:*15* 183:*5*
185:*6* 212:*9* 216:*6*
220:22 222:*14, 18*
224:*6, 16, 18, 24*
225:*8, 13, 21* 226:*5,*
*15* 231:*17* 308:*7, 11*
339:*19* 351:*8* 397:*19*
represent 9:*1* 374:*9*
representative 41:*5*
397:*18*

Case 3:21-cv-00477-MCC    Document 280-1    CONFIDENTIAL    Filed 09/20/23    Page 144 of 373

Deposition of Doreen Kutzler                                    Jane Doe, et al. v. Schuylkill County Courthouse, et al.

**representing** 191:10
192:3, 4
**represents** 41:2
**reprimand** 387:12, 16
**Republican** 94:18
**REQUEST** 6:13
12:15  40:13, 16  42:7
43:15  48:4, 10, 16
49:8, 17  50:13, 14
52:8  58:17  85:4
102:22  103:7  116:13
154:13  167:20, 22
181:13, 14  212:24
275:14  277:18
278:17, 22  292:11
293:22, 23  294:3, 19,
20  295:3  296:19
303:6  318:23  329:9
362:21
**requested** 47:6, 9
116:17  220:19
222:21  224:14  329:6
332:14  392:24
**requesting** 55:8
101:18  164:2  170:11
273:13
**requests** 43:9  44:4
47:16  131:5  212:24
224:5  261:9  278:9
**require** 121:18
122:9  226:16  238:21
**required** 69:16
79:10  107:4  213:6
239:10  283:11  308:8
338:22  399:13
409:21
**requirement** 70:8
285:6  286:15  289:21
290:12
**requirements** 60:22,
24  61:10  167:12
284:2  287:12  289:7
**requires** 125:5
**requisite** 283:12
394:15
**reroute** 82:10
**rescheduled** 402:16
**rescheduling** 399:23

**research** 34:3  229:8
233:13  234:20
280:14, 19
**researched** 236:8
**reservation** 54:12
**reserve** 13:6
**resignation** 87:22
107:3, 13  126:11
391:3
**resigned** 87:24
105:2  107:7, 9
**resolution** 202:7
212:21
**resolved** 261:5
**resource** 18:19
**Resources** 14:8, 15
16:12  18:20, 23
19:14  20:23  21:4, 15
22:2  23:1, 24  27:15,
16  32:19  34:10
60:23  61:11, 12  63:9
64:14  85:21  143:15,
20  146:8  382:13, 14
391:10, 21
**respect** 36:5
**respective** 359:12
**respects** 36:17
**respond** 99:18
112:17  113:2  131:15
148:7, 9, 13, 18  149:2
150:2, 9, 15, 17
151:12  177:16  204:2
213:8  221:24  222:10,
19  294:7  304:23
305:4, 7  311:4
314:11  336:18  337:2
339:24  350:10
359:23  410:1, 13
**responded** 159:22
184:22  294:13
330:18  362:2  401:12
**respondent** 27:4, 9
266:18, 22  396:11
397:1  405:22
**responding** 10:20
245:12  280:13
294:12  311:8  313:21
336:23  359:17
**responds** 262:10
339:18

**response** 43:21
52:10  98:12  100:4
136:5  145:17  147:2,
6, 9  149:2, 5, 18, 22
150:18, 22  164:4
176:8  177:4  180:9
185:6, 9, 13  204:17
205:3  206:8, 19
213:14  214:14
221:15  222:11
226:24  237:16, 19
242:8  262:9  295:5
326:4  330:7, 11
337:10  358:18  395:4
401:15, 20  403:1
406:8
**responses** 10:15
145:24
**responsibilities** 22:6
26:4  30:22  31:1, 19
37:1  39:14, 20, 21
64:15  79:23  124:14
126:16  144:10
205:21  309:3
**responsibility** 32:6
40:9  159:6  242:17
**responsible** 214:10
307:18
**restrictions** 109:2
**restructuring** 174:10
175:15, 22
**result** 41:20  47:24
162:4  225:24  294:4
391:2, 23  400:7
**resume** 16:4, 5, 14, 18
17:20, 24  18:13, 17
29:5
**resumes** 352:23
**retained** 194:9, 16
391:10, 24
**retaining** 300:17
301:1
**retaliation** 109:24
328:14  403:20
**retaliatory** 254:15
**retention** 122:19
**retired** 305:9
**retirement** 133:14

**return** 183:17  184:8
295:11  318:23  340:8
353:6
**returned** 315:15
**reveal** 376:12
**revenue** 139:9, 12
**review** 45:20  135:8
197:4, 5  289:7
341:15  343:21
353:12  359:4  372:9
378:18
**reviewed** 52:9  58:20
126:9  371:16  372:8
**revision** 273:7
**revoke** 366:24
**revoked** 242:20
**Reynolds** 211:24
212:7  225:12
**RFP** 364:24
**right** 15:22  21:7, 10
38:5, 17  39:3  41:3, 7
42:16  44:2, 23  47:13
48:14  49:12  51:2
54:21  58:15  60:17
61:21  67:11  68:19
72:8  76:13  77:7
78:20  80:15, 18, 23
92:19  97:23  98:3, 24
119:7  121:1, 21
122:15  130:20
139:14  142:19
145:22  147:22  149:4,
16  153:14  157:24
160:23  162:13
170:24  171:15
178:10  179:13
184:20  186:22  190:8
198:24  199:15
200:12  202:24  203:5
209:21  210:7, 18
211:3, 18  221:21
224:7  230:19  232:6
239:3  240:4  244:19
246:4, 5  247:6, 18
253:3, 7  257:17
258:5, 13  260:11
263:2  271:4  276:4,
17, 18  284:22  285:13
289:13  291:14
301:11, 13, 18  302:5,

Case 3:21-cv-00477-MCC   Document 280-12   Filed 09/20/23   Page 145 of 373
CONFIDENTIAL
Deposition of Doreen Kutzler                                    Jane Doe, et al. v. Schuylkill County Courthouse, et al.

*6* 303:8  304:6
305:*11*  306:*14*
307:*14*  311:*13*  312:6
313:*13, 14*  315:*19*
317:5  322:9  324:*1*
325:*16*  328:8, *23*
329:*13, 17*  333:*3*
339:7  340:*4*  344:8
345:8  348:9  359:*14*
361:*11*  364:*12, 23*
365:*18, 19*  367:8, *24*
368:*17*  369:7, 8, *14,
21*  371:*1*  372:*17*
390:*16*  391:*19*
394:*18*  396:*19*
398:*21*  400:6, *11*
401:*18*  402:8, *17, 20,
22*  407:*13, 23*  411:*10*
**right-hand**  232:*11*
**risk**  25:*21*  27:8
83:5  191:*13, 15*
192:*23*  396:*18, 19*
**risks**  193:*2*
**Road**  2:*16*  186:*17*
187:9  189:5  191:*11*
192:*3, 4*  330:*12*
**roadblocks**  348:*22*
**rob**  156:*23*
**role**  14:*13*  23:*1, 5*
199:*11, 13*  200:22
201:*10, 11*  218:*17*
350:*24*  351:*18*  353:7
399:*2*
**roles**  308:*15, 21*
**rolled**  326:*17*
**room**  7:*23*  10:*4*
26:*12, 16*  29:*19, 24*
30:*21*  241:*14*  245:*23*
**root**  411:7
**Roth**  2:*23*  8:7, *11*
27:8  30:7  83:*4, 12*
103:*15, 16, 19, 22*
119:*2, 8*  120:*14*
121:*11*  187:*1, 4, 13*
188:*21*  189:*17*  190:5
191:*18*  192:*15, 21*
195:*19, 21*  197:*16*
298:*3*  311:8  312:*1*
313:*2, 12, 22*  314:*4*
315:*14*  316:*12, 24*

320:8  321:*21*  322:*18,
20*  323:2, 9  324:*14*
325:22  327:*11*
329:*20*  344:22  353:*3*
354:2  360:8, *11*
396:*24*
**Roth's**  344:*21*
**roughly**  278:*20*  399:5
**route**  45:*3*  163:*1*
**row**  32:*4, 5*  60:*14*
**RP**  5:7  398:*14, 17*
**RPR**  1:*22*  412:*4, 22*
**RSVP'd**  403:6
**rude**  123:*12*
**run**  30:*15*  62:*16*
143:*11*  154:22  383:7
384:*10*
**running**  52:*4*  139:*5,
15*  141:*13*  260:8
348:*21*  410:7, 9
**runs**  155:*15*

**< S >**
**safe**  109:*22*  112:*21*
160:*17*  161:*4, 8*
162:*3*  166:*21*  249:*13*
**safety**  261:*13*  279:*16,
23*  360:*3, 18*  368:*24*
**sake**  264:*12*
**salary**  102:2  351:8
356:*24*  357:*14*
**sale**  156:*11, 15, 19*
157:6, *14*  308:*11*
**sales**  140:2  156:5
157:*16*  176:*10*  212:6
220:*17*  308:7
**Saturday**  84:*20, 24*
89:*14*  107:*21*
**Saturdays**  86:*10*
**saw**  35:22  108:9, *12*
271:24  379:*13*
**saying**  77:*18*  125:*12*
126:*3*  141:2  142:*15*
169:7  177:*12*  183:9
184:*15*  191:5, 7
289:*14*  330:*10*
370:*20*  371:*3*  395:*21*
**says**  50:*1*  51:9  63:8
67:*1*  70:*3*  72:*12*
73:*3*  104:8  107:*19*

110:*4*  121:*4*  123:*2*
136:*15, 19*  143:*24*
171:22  187:*19*
212:*20*  238:*10*  242:8
279:*13*  294:*1*  302:*10*
308:6  315:22  316:*10*
317:*21*  335:*18*
339:*18*  341:22  342:9
348:*10*  365:*16*
374:*17*  383:9  402:9
**scared**  295:*23*
327:*21, 22*
**schedule**  67:*18*
108:*20*  161:*18*
308:*17*  404:*18*
**scheduled**  78:*19*
308:*23*  400:9, *14, 15,
24*  401:9  402:*15*
403:*3*  404:*12, 19, 24*
405:*1*
**scheduling**  64:*18*
65:7  319:*15*
**scheme**  156:*24*
**school**  17:9, *11, 13*
18:5  43:24  54:9
**SCHUYLKILL**  1:*3*
7:*10*  8:9  9:2  14:*3*
20:*3, 24*  21:*16*  24:*17,
23*  35:*11*  36:*23*
37:*12*  57:*20*  60:*3*
70:*15*  191:*11*  212:5
253:*19*  400:*1*
**Schuylkill's**  72:*14*
**Scott**  40:*16*  41:*19*
263:*24*
**screen**  56:*18*  217:*3,
5*  291:22  292:9
324:2  345:*23*
**scribed**  193:*16*
362:*18*
**script**  10:*12*
**scroll**  328:*21*  332:9
333:*20, 21*  340:*3*
**sealed**  196:9
**searching**  133:*23*
**second**  40:7  55:2
57:*3, 12, 18*  63:*4*
70:*14*  101:*11*  120:*19*
121:*4*  126:*4*  152:*3, 8*
156:*3*  171:*21*  206:*24*

216:7  219:*13*  238:*20*
242:22  243:*11*
277:*14*  279:*11, 14*
295:*18*  298:22
299:*15*  309:*2*  314:22
316:*16*  318:*1*  321:*16*
325:8  327:*12, 19*
334:*11*  340:*23*  342:9
343:*19, 21*  346:8
353:*24*  365:*10*
369:*13*  390:*21*  392:*3*
393:7  394:*20*  396:*10*
398:6  399:*21*  402:*20*
404:8, *11*
**secretarial**  198:6, *10*
202:9, *11*  319:*12, 21*
320:*3, 15, 21*
**secure**  238:*11, 16*
241:6  249:*14*  341:*23*
342:2
**security**  94:5
**see**  20:20  40:*17*
48:5  63:7  68:2  89:*1*
99:5  101:*15*  115:*20*
121:7  127:*13, 16, 20*
144:5  146:6  171:*21*
215:*18, 21*  219:*14*
221:*3*  248:22  268:8
277:*19*  278:*12*
279:*13*  294:22
320:*19*  332:*10*
333:*21*  340:9  344:*1*
360:*24*  365:*13, 16, 22*
369:*14*  377:5  378:*3*
384:*17*  387:*11*
400:*17*
**seeing**  45:*11*  259:*12*
278:9  379:*13*
**seek**  305:6
**seen**  72:*23*  123:*21*
229:*23*  237:*12*
358:*24*
**select**  240:6  403:5
**selected**  23:5, *15, 22*
241:*1*  356:8, *12*
404:*20*
**selection**  23:*23*
401:*15*
**self**  66:*11, 20*

seminars 157:2
Senate 1:20 7:11
send 147:5 150:21
344:9 355:3 380:23
389:10 393:8 394:13
403:2
sending 373:21
sends 181:19
Senior 14:15 230:14
sense 71:24 241:4,
17 289:12 345:2
361:2 391:13
sensitive 307:19
308:2
sent 51:16 54:4
76:4 205:24 220:16
256:8 262:24 278:8
279:17 290:3 307:10
310:11 337:9 340:7,
19 341:4, 16 346:4
367:14 381:20, 21
388:16 393:22 394:6
401:10
sentence 50:12 51:8
59:16 60:21 61:9, 14
64:13 66:9, 24 67:22
70:14 72:8 101:12
104:7 136:14, 19
143:23 160:10
171:21 220:15 227:6
228:17 238:9 242:5
310:5, 7 316:10
317:21 335:17
348:10 382:1, 12
383:9
separate 231:19
319:18
September 20:23
21:5, 8, 14 26:3
27:17, 18, 21 28:1
49:16 84:9 134:8
136:22 184:7 205:19
245:20 258:13
260:21
serial 87:4, 6
seriously 212:21
SERV 271:13
serve 292:10 401:11
served 95:23
SERVEPRO's 245:4

service 81:16 82:21
117:11 361:21
408:11 409:2, 4
services 22:7 25:13
124:18 206:9, 14
207:15 230:14, 15, 17,
21 347:16 351:23
353:5 354:9 391:10,
21 392:5
SERVPRO 243:7, 17
244:21 245:11, 15
256:12 271:13 272:4,
9 346:9, 11 348:22
session 87:18 402:14,
15 403:5, 10, 15
404:12, 14, 15, 20
405:5, 6 406:1, 5, 12
407:4
sessions 405:12, 17, 24
set 50:19 51:4
81:23 106:6 134:11
181:7 187:24 188:14
256:7 270:20 292:16
334:15, 20, 24 335:10,
13 351:12 368:16
setting 45:1 178:24
192:15
setup 82:9, 14
seven 17:20 18:12
sex 46:2
sexual 45:22 46:1
90:9 91:1, 22 92:5
107:1 108:2, 5
126:22 139:21 142:3,
23 143:3 169:8
274:16 328:13
352:12 399:3, 6
403:11, 16
shaking 327:18
shame 295:22
share 28:15 94:12
186:23 358:6
shared 28:13, 14
89:16 209:12
she'd 388:13
sheer 125:7
SHEET 413:1
sheets 68:10, 12
392:24

Sheriff 94:11, 16
97:11 109:3 165:8
167:12 228:21
229:13 235:9 241:24
242:2 261:14, 16
364:19 380:2, 8
sheriff's 94:4 100:9
167:6 235:8
ship 182:23
shipping 67:3
shocked 379:15
short 126:10 318:19
shortest 162:14
shorthanded 182:21
shortly 49:7 72:4
75:7 258:17 399:4
short-term 57:1 64:1
66:1 69:16 74:15
288:5
show 96:12 128:8
129:15, 21 130:4
243:10, 12 245:15
309:8 336:6 349:21
showed 59:9
shown 28:16 58:23
129:12
sick 280:16 284:10,
12 286:11, 12 295:23
388:7 389:2
side 232:11 253:10
411:5
sight 155:18 162:10
377:3 384:14, 18
sighting 162:16
sign 65:19 87:3, 7
171:23 172:4 319:24
320:13 364:8 381:16
401:4
signature 277:14
413:23
signed 26:14 65:12
66:3 75:4 122:13, 16
197:7, 18 226:16
315:9, 15 318:10
324:13 401:22
402:19
significant 328:13
significantly 140:1
signing 13:6 320:22

similar 297:11 341:3,
4 387:16
simple 95:6 158:9
385:19
simply 59:9 61:10
147:9, 10 207:5
227:21 244:5
simultaneous 225:16
simultaneously
351:15 406:20
sit 36:10, 22 195:11,
14
site 31:23 95:23
388:2
sits 252:14
situated 253:15
situation 44:18
63:18 90:15 108:5, 6
182:21 183:10
204:14 213:15 222:4
285:11 361:4 362:11
371:10 373:19
374:21 398:8
size 217:2 231:1
slap 296:2
slight 15:16
slightly 399:1
smaller 217:4 251:4,
5
smell/odor 306:22
SMITH 2:2 4:6
7:18, 19 8:18, 24
13:3, 7, 8 14:24 15:9,
11 20:8, 14 33:15
34:16, 20 35:7, 8
37:8 40:21 41:12, 15,
17 42:6, 16, 20 43:2
48:18, 24 56:9, 15
74:8, 14 78:15 79:20
92:8, 18 96:20 97:18
100:12, 18 109:17
110:16 111:2 113:7
117:9 120:4, 10
127:4 128:15 130:9,
15 138:3 140:7, 10,
16, 22, 24 141:19
142:13 148:4 149:9,
20 151:15, 22 158:23
159:9, 14 171:1, 6
173:19 174:20 176:4

Deposition of Doreen Kutzler                                    Jane Doe, et al. v. Schuylkill County Courthouse, et al.

177:24  179:8  182:7
187:16, 17  194:23
202:14, 24  203:4, 7,
13  211:5, 11, 17
218:20  219:1  220:14
222:6  226:11  234:1
236:18  238:5, 8
241:13  247:6, 17
254:19  255:11
260:11, 18  262:23
263:6, 10, 14, 15, 22
264:7, 11, 20  265:5
272:14  273:5  275:22,
24  276:12, 15  277:5,
12, 20  278:4  279:7,
10  280:6, 8  285:12
291:1, 7, 15, 21, 23
293:16  297:16, 22
304:2, 21  309:18
310:14, 20  311:16, 20
312:3, 6, 14, 24
313:10, 16  321:6, 13
323:11, 21  324:6, 16
325:1  328:21, 24
332:9, 11  333:20
334:5  338:16  340:2,
5, 12, 17  342:7
343:11, 16  344:3, 11,
18, 20  345:1, 5, 8, 18,
22, 24  349:21  350:2
360:23  361:22
364:23  365:5, 24
366:2, 20, 24  367:7
368:7, 13  369:3
370:17, 18  379:7, 24
380:13  382:10  386:3,
4  389:12, 15  390:5,
15  398:2, 15, 20
404:2, 7  407:23
408:4  411:10
**snake**  35:16  36:14
**snow**  399:24
**software**  410:13
**sole**  268:22  269:1
**solely**  222:22
**solicitation**  409:1
**solicitations**  408:22
**Solicitor**  27:7  83:5
148:21  298:3  323:3
395:19  396:21, 22

**solicitors**  103:15
395:7, 9
**Solicitor's**  396:22, 23
**solo**  355:12
**solution**  213:5
318:23
**Solutions**  408:6, 8, 18
410:7
**somebody**  63:16
236:17  276:23
**someone's**  184:1
288:10
**somewhat**  146:10
158:9  236:19, 21
366:5  386:10  392:12
**soon**  29:20  302:15,
21
**sooner**  280:13
**sorry**  15:15  57:9
70:14  79:18  96:24
110:22  114:13
116:11  118:7  138:1
145:12  147:18  161:6
167:15, 16  169:11
171:11  172:17
173:17  174:23
182:14  191:22
195:20  211:12  219:5
221:7, 8  224:1
241:22  242:5  253:13
270:17  277:20
285:16  286:20  294:6
296:18  303:3  305:15
317:19  319:22  321:2,
4  330:13  341:3
359:22  361:18
366:20  367:13  369:1,
22  373:16  374:3
396:18  402:7
**sort**  19:13  20:1
28:16  66:1  105:9
117:18  209:24
336:11
**sound**  258:13
**sounded**  353:20
**sounds**  54:17  64:20
104:2  410:24
**source**  152:21
**space**  64:17  227:3
233:9  250:5, 21

261:13  268:17
294:17  296:1  297:5
341:23
**spaces**  250:3, 9
258:22, 23  259:2, 17,
19  363:19  364:6
**speak**  24:14  34:8
53:11, 14  61:1  87:21
89:7  90:2  99:9, 13
106:10, 20  111:8
122:1  132:22  143:24
144:15  186:13  204:5,
8  259:16  265:6
272:16  273:14, 21
274:2, 14  275:5, 21
276:2  292:19  293:18
294:21  295:1  305:21
306:5, 7  313:24
314:3  327:4  332:5,
19  333:6  339:4
361:23  375:22
388:12  397:14
**speaking**  60:24  81:5
183:23  314:10
**speaks**  132:1  155:24
248:3  273:2
**spearheaded**  53:6
**SPECIALIST**  3:2
7:14  25:21, 22
**specialize**  18:22
19:17
**specialized**  19:4
**specific**  26:22  33:18
42:13  55:6  60:11
88:4  101:21  144:16
145:5  168:4  179:20
191:14  193:22  206:4
229:11  248:9  258:10
286:17  296:11
**specifically**  22:11
29:3  30:16  31:8
50:3  59:14  62:17, 24
67:13  73:6  105:11
116:5  165:5  166:24
169:1  170:11  176:5
177:7  187:7  188:21
191:19  207:24  208:3
229:22  239:13
247:23  260:6  276:6
383:17  398:9  401:23

**specifics**  27:10  28:10
81:7
**speculate**  11:16
**speed**  28:3  322:7, 12
351:4
**spent**  155:9  157:19
186:16  188:5  201:9
**spirit**  199:6
**spite**  139:6  141:7
**split**  56:18  376:23
392:20
**spoke**  53:15  62:17
106:24  107:19  305:8,
22  318:19  376:15
389:8
**spoken**  9:18, 19
186:9  313:21  371:14
**sporadically**  287:6
**spot**  165:19, 20
364:17
**spots**  232:23  364:11
**St**  363:5, 8
**staff**  104:10  106:11,
15  107:2  182:22
189:22  190:1  401:7
**staffed**  105:16
**staffing**  104:14
106:21  107:14
113:11  126:10, 20, 21
167:11
**stained**  268:4, 6
348:11
**stairs**  376:23  378:11,
15
**stalking**  328:14
**stamped**  15:1
**stamps**  152:5
**Stan**  245:21  246:6,
15  256:5  334:19
335:9
**stance**  172:14
**standard**  158:10, 12
**standards**  115:15
**standing**  151:7
**staples**  154:8
**start**  19:10  39:11
46:12  50:2  57:17
139:18  160:20
161:22  206:23  209:1,
13  234:5  260:20

Case 3:21-cv-00477-MCC   Document 280-1   Filed 09/20/23   Page 148 of 373
CONFIDENTIAL
Deposition of Doreen Kutzler                    Jane Doe, et al. v. Schuylkill County Courthouse, et al.

278:*16*  291:*21*  292:*8*
304:*13*  341:*11*
350:*19*  351:2  365:*10*
389:*19*
**started**  16:*12*  27:*24*
29:*9, 20*  35:*18*  49:*16*
57:*21*  84:*3*  85:*17*
87:*9*  93:*15*  96:4
139:*19*  168:*19*  175:*1*
358:*9*  399:*4, 5*
408:*13, 17*
**starting**  209:*19*
219:*7*  357:*7*  389:*19*
**state**  7:*16*  134:*21*
176:*11, 21, 24*  220:*17*
267:*7*  307:*20*  308:2,
*6, 8, 12*  313:*18*
338:*22*  339:*16*
346:*21*  403:*4*  408:*12*
**stated**  223:*24*  238:*18*
374:*17, 19*  382:2
393:*23*  402:6
**statement**  39:*20*
106:*11*  185:*23*
190:*17*  329:*14*  403:8
**statements**  192:*14*
292:*20*  296:4
**STATES**  1:2  50:*12*
59:*17*  60:*21*  61:*14*
64:*13*  66:9  67:22
72:8  106:*23*  108:*16*
112:2  147:*10*  219:*14*
221:9  228:*18*  277:*17*
280:*12*  292:9  300:*17*
307:5  309:*3*  310:6
329:*1, 8*  331:*18*
332:*12*  334:*14*
347:*13*  382:2, *11*
389:*22*  395:6
**stating**  107:*13*  266:*3*
**status**  62:*1, 15*
122:*18, 19*  123:*3*
**statutes**  307:*20*  308:*3*
**stay**  133:*16*  217:*8, 12*
**STEB**  176:*17, 20*
177:*8, 9, 17*  178:2, *3*
180:*18*  182:*1, 15*
183:*5*  185:5  212:*6, 9*
213:*6, 15*  214:*10*
215:*22*  216:2, *6, 12,*

*18*  217:*9*  220:*22*
221:*14, 21, 24*  222:*14,*
*18*  223:*3*  224:2, *6, 16,*
*18, 24*  225:8, *13*
226:5, *15*  242:*11, 16*
307:*21*  308:*1*  336:*20,*
*24*  338:*4*  339:*7, 19*
**steno**  140:*18*
**stenographic**  412:*6*
**step**  43:*5*  224:*9*
290:*10, 15*  384:*16*
**steps**  35:*21, 23, 24*
36:9  41:22  131:*17*
162:*12, 13*  181:*16*
332:*23*  377:2, *24*
378:*20*  379:6, *10*
**stint**  206:*23, 24*
275:*1*  321:*16*  390:*21*
392:*4, 6*  393:*7*
394:*20*  396:*10*  398:6,
*22*
**stipulations**  13:*1*
**stop**  187:*21*  408:*6, 8,*
*18*  409:*15*  410:6
**stopped**  152:*11, 24*
165:*12*
**stopping**  152:*14*
411:*11*
**storage**  245:*23*
**stored**  359:2
**Strayer**  17:*16*
**Street**  2:3, *7, 11*
93:*17*  231:22, *24*
238:*20*  251:*17*  253:*3,*
*8, 10*
**stress**  127:*9*
**stressed**  185:*24*
318:*20*
**Strictly**  90:*10*
**strike**  44:*24*  55:*19*
79:2  93:*12*  105:*7*
141:*24*  148:*10*
161:*23*  173:22
180:*18*  200:*10*
205:*10*  237:*17*
250:*14*  252:*23*
254:22  256:*13*
273:22  274:*12*  376:8
**Stroudsburg**  2:8
**study**  17:*12*

**stuff**  152:*5*  247:*7*
306:*18*
**style**  182:*11, 18*
**subject**  212:*5*
**subjected**  45:*10*
**submission**  72:*24*
131:*11*  212:*6*
**submissions**  176:*11*
217:*9*  308:*7, 11*
**submit**  67:*8*  69:*17*
72:*12*  73:*9*  77:*9*
78:*2, 9*  79:*13*  80:*11*
**submitted**  69:2, *3*
154:*11*  220:*17*  308:*8,*
*12*  355:*23*  388:*21, 24*
389:*2*
**subordinate**  90:*8*
91:*1*
**subpoena**  273:*7*
280:*20*
**subpoenaed**  272:*19,*
*20*  273:*3*
**subsequent**  48:*3*
318:*10*
**substance**  11:*23*
**substantial**  58:*13*
**success**  45:2
**successful**  44:*17*
309:*17*  358:*13*
**successor**  209:*8*
210:*18, 22, 23*  211:*1*
**successors**  210:*1*
**successor's**  211:*1*
**sudden**  143:2
**sufficient**  76:*17*
135:*3, 18*  245:8, *10*
250:*13, 21*
**suggest**  97:*24*
**suggested**  47:*5, 10*
132:*3, 14*  358:*4*
395:*10*  397:*5*
**suggesting**  61:*9*
**suggestion**  47:*21*
53:*20*  166:22  235:*5*
383:*10*
**suggestions**  47:*16*
**suggests**  316:*1*  390:2
**Suite**  1:*20*  2:3, *11,*
*16, 21*  163:*4*  378:*9*

**summarize**  39:*23*
**summarizes**  22:*6*
**summary**  28:*17*
30:*21*  31:*1*  45:*12*
**summer**  410:*22*
**Sunday**  107:*21*
**supervise**  112:*4*
**supervisor**  25:*17*
70:*5*  90:*9*  91:2, *6, 10,*
*12, 16*  108:*18*  109:*7,*
*12, 20*  111:*11, 17*
112:*14*  248:*20*
296:*15*  329:*3, 22*
332:*14*  386:*19*
**supervisors**  61:*21*
70:*10*  77:*13*  136:*3*
162:2  215:*6*  248:*12*
**supervisory**  248:*13*
401:*7*
**supplement**  11:*12*
56:*10*  65:*17*  74:*9*
100:*13*  291:2  297:*17*
310:*15*  315:*23*
333:*23*  344:*9*  366:*1,*
*21*
**Supplemental**  70:*13*
120:5  211:*12*  277:*6*
280:*5, 6*
**supplementary**  315:*1*
**supplies**  48:*11*  50:*18,*
*21*  62:*4*  70:*17*  76:*12,*
*16*  77:2  78:*7, 24*
79:6  153:*9, 16, 23*
154:*4*  157:*3*  181:*13*
219:*15*  220:*18*
**supply**  53:*24*  115:*11*
223:*17*
**support**  22:7  24:*7*
30:*23*  51:*11*  52:*11*
144:*3, 9, 21*  242:*10*
331:*1*  409:*9*
**supported**  50:*20*  51:*4*
**supporting**  129:*24*
145:*4*  189:*22*
**supposed**  33:*16, 17*
77:*1, 2*  78:*10*  80:*9*
194:*16*  249:*12*
256:*11*  265:*8*  392:22
401:*18*

**Sure** 9:*13*, *16* 15:*18*
30:*1* 61:*5* 66:22
109:22 139:*4* 141:*5*
146:9 147:*19* 155:*10*
164:*19* 175:6 183:9
190:6 200:9 206:*18*
218:5 225:5 229:*18*
232:22 240:9 313:*19*
320:5 327:*7*, *8*
330:*13* 334:*14* 349:9
370:9 378:24 402:*4*
**surrounding** 387:6
**surveillance** 377:9
378:*3*
**swearing** 163:*13*
371:*12* 372:*1*, *3*, *19*
377:*18*, 20
**swipe** 162:*18*
**switch** 242:*13*
347:*14*, 15
**switching** 347:*23*
398:*11*
**sworn** 8:*14*
**system** 18:5 62:*18*,
20 217:*1* 409:*14*, 15
**systems** 77:20 160:*4*

**< T >**
**take** 10:*10* 12:*12*, *17*
24:*20* 25:*10* 26:*11*
39:*18* 45:*3* 77:22
78:*1* 92:*8* 94:*5*
117:*16* 122:6 124:*21*
134:*16*, *17* 158:5, *13*
159:*3* 162:*13* 193:*13*
194:*3*, 6 201:*8*
212:*21* 213:*16*
220:20 222:*21* 223:*4*
234:5 237:*18* 238:*4*
247:*8* 264:*13* 267:*2*
271:*2* 272:6 290:*10*,
*14* 294:*16* 323:*11*
325:*24* 326:*23*, *24*
343:*21* 398:*13*
399:*19*
**taken** 1:*19* 59:*3*
67:*24* 69:*21* 134:*19*
172:*14* 181:*16* 216:*8*
332:*24* 342:*20* 412:*7*

**takes** 131:*18* 158:*16*
285:*23*
**talk** 43:5 47:*20*
51:*8* 111:*16* 133:*5*
153:*22* 166:*24* 188:*4*
235:*7* 264:*17* 339:*22*
**talked** 85:*17* 108:*24*
126:*11* 141:*1* 147:*20*
171:*17* 177:*7* 185:*4*
192:*16* 198:*2* 319:*4*
357:*24* 394:*12*
**talking** 39:*5* 148:*21*
169:*7* 184:*13* 197:*17*
247:*19* 252:*24*
255:*16* 369:*2*, *10*
398:*23* 404:*17*
**talks** 65:*11* 120:*20*
242:*23*
**tape** 304:*19*, *24*
**task** 77:6, *10*, *18*
220:*19*
**tasks** 79:*1*, *4* 242:*11*
309:6, *10*
**tax** 18:*14* 19:22
20:*1*, *2* 27:*2* 31:*24*
32:*12*, *13* 40:8, *9*
51:22 81:6 85:*8*
101:*1* 104:*15* 105:*11*,
*15* 114:*12*, *13*, *24*
117:*4* 123:*12*, *13*
124:*19* 133:*24* 135:*4*
139:*7*, *11*, *20* 141:*2*
142:*2* 144:*8* 145:*1*,
*20* 153:*4*, *5*, *11*, *16*
160:*12* 162:*13* 163:*2*
172:*13*, *16*, *19* 174:*14*
175:*10*, 22 176:*11*, *21*,
*24* 180:*4*, *5* 183:*12*,
*15* 189:*15*, *19* 197:22
198:*9* 218:*18* 223:*5*
255:*12*, *18*, 22 269:*20*
307:*17* 308:*8*, *12*, *15*,
*20* 314:*15* 318:*24*
382:*18* 383:*16*
388:*21* 392:*21*
**team** 95:22
**technical** 51:*10* 71:6
**technically** 229:*24*
347:*23*

**TECHNICIAN** 3:*2*
243:*10*, *11*
**technicians** 243:9
**technological** 115:*11*
**technology** 216:5
242:*10*
**tedious** 158:9
**telecommuting** 54:*23*
57:*2*, *3*, *18* 60:*18*
63:*10* 64:*1*, *16*, 22
65:*12* 66:*2*, *12* 67:*13*
69:*17* 74:*16*
**telework** 51:*11* 63:5
**tell** 9:*14* 21:22
30:*17* 35:*14* 63:*12*
73:*18* 87:*24* 89:*12*
90:6 91:*20* 116:*12*,
*15* 119:*13* 131:20
148:*18*, *20* 156:*3*
164:*7*, *10*, *13* 170:*17*,
*20* 197:*4* 214:*3*
235:*23* 257:*10*
265:*12* 282:*11*
294:*15* 305:22, *24*
314:*13* 320:*12*
321:*21* 330:*3* 331:9
346:*2* 352:*19* 362:*7*
368:*15*, *18* 370:*10*
389:9
**telling** 148:6 150:*17*
214:22 258:*2* 370:*11*
**tells** 188:*10*, *11*
**temporary** 54:22
57:*3*, *17* 60:*18* 63:*10*
66:*12* 67:*14* 74:*19*
**ten** 213:5 302:*12*
384:*10*
**tendency** 359:*13*
**term** 90:*11* 104:5
146:*10* 379:*19* 380:5,
*6*
**termed** 122:*4* 215:*19*
325:*8*
**terminated** 17:22
394:*3*
**termination** 290:6
393:9
**terminology** 229:*11*
**terms** 129:*5*, *12*
**test** 179:*15*

**tested** 84:*12* 85:*3*
179:*17*
**testified** 8:*14* 42:*7*
132:*18* 152:*19*
155:22 316:24 343:*2*
363:*18*
**testify** 10:*1* 11:*24*
12:*4* 312:*12*
**testifying** 10:6
136:*18* 371:*17*
**testimony** 10:*4*
39:*23* 54:*13* 64:*19*
124:*24* 166:*4* 178:*7*
225:6 299:22 317:6
385:*14*
**testing** 179:*10*
**tests** 386:*10*
**Thank** 14:5 53:*19*
57:*16* 159:*8* 228:*3*
266:*15* 320:*17* 345:5,
*23*
**Thanks** 336:*19*
**thereof** 248:2 409:*13*
**Theresa** 51:*24*
**thing** 43:8 44:2
154:9 236:*21* 259:7
385:*16*, *20*
**things** 38:*1* 39:*15*,
22 41:*21* 59:*4* 81:6
132:*14* 144:*7*, *19*
181:*12* 186:24 209:*7*
211:*8* 245:*11* 306:*8*
328:*17* 333:*14*
**think** 10:*24* 12:*3*
26:20 29:*19* 30:*3*
33:*2* 34:*15*, *18* 35:*19*
36:*17* 37:22 38:*1*, *14*
39:*7*, *12* 40:6 41:*24*
42:*1*, *11* 45:*7* 53:*7*
54:*8* 57:*11* 62:*4*
63:*12* 71:*4*, *5* 72:*4*
73:*10* 76:*11*, *13*
78:*17* 79:*18* 81:*13*
88:*11* 91:*15* 93:*17*
94:9, *20*, *21*, *24* 107:9
109:*10* 110:*23*
111:*10* 118:*18* 124:5,
*8*, *16*, *23* 126:*15*, *16*
132:*1* 134:*13*, *14*, *18*
135:*1* 136:*7*, *9*, *17*

Case 3:21-cv-00477-MCC   Document 280-1   Filed 09/20/23   Page 150 of 373
CONFIDENTIAL
Deposition of Doreen Kutzler                           Jane Doe, et al. v. Schuylkill County Courthouse, et al.

137:7, *10*, *15*, *19*
138:*4*, *9*, *11*, *12*, *24*
141:*1*, *20*, *24*  142:*16*
143:9  149:*13*, *14*
150:5  152:*18*  155:*15*, *22*  157:5  163:*13*
165:*14*  166:*10*
172:*10*  177:*19*, *22*
178:*14*, *20*, *24*  179:6
180:*1*, *11*  182:*19*, *20*
183:*3*  184:*12*  185:*19*
189:*24*  190:*10*, *19*
191:*8*  193:*16*  194:*19*, *24*  200:*20*  205:*19*
207:*8*  214:*15*  215:*12*
216:*4*  225:*1*  226:*4*
227:*11*  230:*13*  231:5
233:*22*, *23*  237:*22*
240:*19*  247:6  252:*18*
254:*20*, *23*  255:*3*, *21*
256:5  259:5  266:*21*
270:*21*  273:*1*  275:*19*
282:*13*  284:*13*
288:*22*, *23*  290:*24*
292:5  293:7  294:*3*
299:22  301:*3*  303:*1*
309:*24*  312:*2*  313:*14*
314:5  315:*17*  317:*24*
318:6, *9*  319:*4*  325:*8*, *11*  327:*10*  335:*9*, *13*, *24*  338:*12*, *23*  344:*1*
347:*17*  353:2, *19*
356:*21*  359:*3*, *4*, *7*
361:*4*  364:*1*  373:*14*
375:5  381:*21*  393:*23*
397:*1*  398:*8*  399:*24*
402:*21*

**thinking**  98:*16*
286:*21*  369:2

**third**  57:*19*  131:*16*
152:*3*, *9*  374:*14*
387:22

**Thirty-plus**  146:*8*

**Thomas**  262:*3*, *9*

**thought**  94:*21*  95:*1*, *2*  132:*19*  168:7
189:*16*  191:*13*  192:*1*, *7*, *20*, *21*  202:*4*  205:7
214:*3*  229:5  231:6
233:*12*, *13*  237:*23*

257:*14*  259:*14*  276:*1*
295:*17*, *20*  319:*11*
342:*19*, *22*  343:2
346:*11*  358:*15*
371:*16*  372:*8*  405:*21*
409:*9*

**thoughts**  35:*14*  47:*3*
94:*12*, *15*  317:*15*

**three**  14:*11*, *12*
56:*17*  72:*11*  115:6
121:6  353:2  357:22

**tie**  293:22

**Tiffany**  115:22, *23*
116:*3*

**tile**  267:*21*  347:*17*

**tiles**  268:8  307:*12*
347:*14*, *18*, *22*  348:2, *5*

**time**  7:7  11:*17*  20:*1*
23:7  27:5, 6, *9*, *15*, 22
28:7  29:*1*, *9*  31:*20*
38:*13*  48:*11*  51:*9*
55:*20*  57:*21*  61:*18*
67:*16*  68:*1*, *10*, *12*
71:*20*  74:*23*  76:*23*
77:*9*  78:*11*  79:*11*, *13*
80:*10*  83:6, *14*  85:5
89:6, *23*  92:*10*, *16*, *21*
94:*1*, *3*  95:*11*  96:*4*, *9*
97:*11*  99:*10*, *16*
101:6, *18*  107:*4*, *7*
108:2  115:*1*  116:5
122:22  123:6  126:*17*
131:*19*, *24*  132:7, *10*, *23*  133:*13*  134:*1*, *3*, 6, *10*, *14*, *15*  140:*19*
143:*19*  151:*11*  152:5
154:7  165:7  168:*13*
172:*20*  180:6, *12*
183:2  184:9  187:*24*
188:*14*, *17*  195:9
200:*21*  201:9  202:*16*, *22*  207:*12*  209:*1*
212:*24*  214:*17*  216:8
217:9, *13*, *17*, *22*
227:*1*, 9  242:*20*
245:9  246:6  247:9, *15*  250:2  258:*16*
266:*16*  267:9  270:*21*
271:*14*, *18*  272:*15*

273:*1*, *14*, *18*  274:9, *10*, *17*  275:*13*  278:*20*, *21*  280:*16*, *17*  283:*16*
284:5, *10*, *12*  285:*3*, 5
286:*11*, *12*  288:*19*
304:*3*, 6  307:5, *19*
308:2  314:*20*  318:*12*, *19*  319:*20*  321:*15*
323:2, *13*, *19*  327:*12*, *16*, *20*  344:*14*  345:*10*, *16*  350:*13*  351:*11*, *12*
363:*3*  372:2  373:6
377:*16*  387:6  389:*10*
390:*3*, 7, *13*, 22
392:*10*, *14*, *24*  397:*17*
400:*1*  407:*13*  411:*12*

**time-individuals**
288:*24*

**timekeeping**  68:8

**timely**  178:2

**times**  150:6, *11*, *14*
165:*16*  210:*11*
212:*24*  327:*13*
338:*14*  363:*20*
377:*10*  384:9

**timing**  85:5  224:*13*
315:22  319:22  320:5

**tiny**  340:*3*

**tip**  409:*12*

**title**  14:*13*  199:9

**titled**  20:*17*

**Tobin**  99:*3*  167:*12*, *23*  229:9, *13*  233:*14*
234:*21*  235:9, *19*
236:9  261:*11*, *15*, *16*, *19*

**today**  7:*14*  9:*21*
12:*1*, 5  36:*10*, 22
136:*18*  280:*18*
312:*12*  382:5  399:*24*
411:*11*

**Today's**  7:6  20:9
56:22  203:7  299:22
312:8  333:*24*

**told**  14:*19*  21:*23*
24:22  25:*12*  36:5
40:*23*  41:*21*  42:*14*
53:7, 22  76:4  88:7
118:*21*, *22*, *23*  142:*1*
150:2, 8  151:*12*

161:*4*, 8, *11*  174:7
177:*19*  202:*4*  224:*1*
228:22  233:*20*  240:*3*
258:*23*  259:*15*  277:*1*
295:7  303:*15*  305:*21*
323:2  328:6, 7
329:*21*  330:*4*, *15*, *20*
331:8  387:7  404:*19*

**Tom**  22:*1*, *23*  24:2
26:9  29:7  30:*1*, 22
263:*3*, *13*

**tomorrow**  176:*10*
261:2  262:*12*

**ton**  155:9, *11*

**tone**  264:*13*

**tool**  111:*14*  409:*18*

**TOOMEY**  3:*3*  7:*21*
13:*19*  61:*19*  62:*12*, *23*  64:*23*  84:8, *17*
85:*10*  89:*15*  95:9, *14*
96:*24*  99:9, *18*
100:*24*  101:*11*  103:6
106:*10*, *20*  107:*12*
109:*19*  110:*4*, *13*
112:2, *20*, *24*  113:9, *11*  122:2, 9, 22
125:*20*  126:*13*
127:*12*, *15*, *20*  128:*3*, *18*  130:*17*  131:*1*, *11*, *15*  132:22  135:*17*
137:*4*  138:5  139:*24*
141:*20*  144:*15*  146:*1*
148:7, 9, *11*  151:*13*
155:*21*  158:*18*  159:2, *18*  160:*1*  161:*21*
167:2  168:5  171:*11*
173:*12*, *23*  175:*16*, *24*
176:7  177:*4*, *16*
178:*15*, *17*  179:*1*
180:*11*, *17*  181:*19*
182:*1*, *13*, *16*  183:*3*, *11*  184:22  185:*12*, *24*
189:*23*  203:*18*  204:5, *14*  205:6  208:6, *11*
212:*13*  215:*3*, *12*
222:*17*  224:2, *14*
225:*12*, *15*, *19*  226:6, *21*  248:*20*  258:*1*, 7
260:*22*  261:9  262:*11*, *18*  274:7  277:*16*

Case 3:21-cv-00477-MCC    Document 280-1    Filed 09/20/23    Page 151 of 373
CONFIDENTIAL
Deposition of Doreen Kutzler                                    Jane Doe, et al. v. Schuylkill County Courthouse, et al.

278:8, 11, 15  279:1
281:23  291:10  292:4
294:13, 15  295:12
296:8, 10, 14  311:1
314:19  318:18  329:3,
8, 22  330:15  331:19
332:6, 14, 23  334:7
335:24  336:23
339:18  340:6  350:6
362:9, 22  365:12
366:4  373:11, 20
374:18  375:22
376:10, 16  377:10
380:16, 22  381:21, 22
382:23  383:3, 16
386:15, 24  387:7, 12
388:12, 24  389:9, 22
392:20  394:23
395:12  396:4, 12
397:8, 14  400:8, 13,
21  401:21  402:1, 7,
18  404:11  405:1, 4,
20  406:3  407:6
**Toomey's** 91:6
126:9  145:18  146:19
150:7  151:2  152:10
159:23  180:2, 3
185:23  213:8, 11
294:8, 11  295:14
315:22  337:9  396:2
397:6  404:10  405:13
**top** 35:21, 24  147:2
149:5  152:8  343:24
344:10  378:11
**Total** 68:22
**tour** 216:7
**Tova** 203:1
**Tower** 2:11  302:17
**towers** 268:16
302:12, 17
**township** 23:17
**tracing** 84:14  85:4
89:15  205:20
**track** 158:11
**traditional** 43:24
54:9
**train** 107:5
**trained** 189:21
**training** 18:13, 22
19:2  90:6  91:20

104:10  106:12, 16
116:19  122:3, 19
123:5, 20  126:14
134:5  144:12  169:1,
7, 8  184:3  186:16
188:5  198:23  199:8,
19, 20  200:6, 8, 11, 16
201:10  247:22  329:4
331:20  351:17, 20, 24
352:4, 14  399:3, 6, 23
401:1, 9  402:3  403:5
405:12
**trainings** 92:6
399:12  400:4
**transactions** 158:5
**transcribe** 10:15
**transcribed** 10:12
**TRANSCRIPT** 1:10
7:2  412:6
**transfer** 28:3  87:19
122:3  124:20  125:2,
6  131:18, 22  132:9,
15, 20  133:12  134:16
135:22  156:13  157:3
183:20  184:6  197:22
198:12, 16  199:23
201:1, 14, 19  202:5
210:6, 23  332:15
333:3  351:3  352:9
392:9  398:24  399:1
**transferred** 136:10
198:22  210:21
223:11  269:5  393:3
**transferring** 352:10,
12
**transition** 358:11
**transpired** 362:14
**treading** 182:22
**treasurer's** 377:22
**tried** 36:7  302:5
305:3  404:18
**tries** 181:20
**Trifun** 1:22  7:15
412:4, 22
**trigger** 287:15, 20
290:12  375:10
**triggered** 373:1, 13
374:24
**tripping** 61:4
**trouble** 140:11

**true** 108:10  331:21,
22  372:14  412:5
**truth** 108:14
**truthfully** 10:1
11:24  12:4
**try** 140:20  236:23
293:17  306:7
**trying** 46:7  141:12
158:13  207:13
264:16, 17, 18  285:17,
19  315:21  316:5, 17,
22  331:10  348:20
358:12  374:9, 10, 11
383:11  390:19
**Tuesday** 277:18
**turn** 131:14  257:22
262:2  343:19  384:12
**turned** 104:1
**Turning** 70:12
**Twenty-two** 333:18
**Twigg** 26:10  28:1
87:10, 13, 21  88:10
358:23
**Twigg's** 45:12  86:3
88:13, 16  358:23
**two** 52:10  56:23, 24
57:1, 3, 8, 10, 14, 18
65:14, 16  67:12
72:11  115:17  121:5,
6  145:2, 24  158:15
175:16  187:9  211:20
215:6  224:14, 23
225:15  246:24
250:15  252:20, 21
253:13, 20  262:2
278:7  292:3  326:24
329:2  331:2  355:24
356:1  359:16  361:5,
6  377:1, 5  384:11
393:22
**two-thirds** 23:18
**two-weeks** 224:22
**type** 52:2  143:24
195:11, 14  208:15
284:18  328:18
410:14
**typical** 115:14
**Typically** 209:16, 17
296:13

**typos** 346:19

**< U >**
**UC** 395:11, 14
**Uh-huh** 14:21  37:21
63:6  109:21  111:21
128:5  194:4  221:4
242:7  262:5  285:24
298:24  299:16
**ultimately** 64:7, 10
111:17  357:13
**un** 397:6
**uncomfortable** 46:1
118:2  258:2  314:23
316:12  333:14
405:16
**underlying** 169:18
**underneath** 365:7
**understaffed** 105:20
106:1
**understand** 9:23
10:3, 9, 14, 18, 23
11:2, 13, 20  12:7
13:12  14:2  31:18
32:12, 22  45:24
54:13  55:19  79:3
81:2, 9  88:9, 10
90:11  111:15  112:24
124:23  164:19
174:19  175:5, 6
176:15  190:4  216:24
225:5, 23  262:16
263:16, 23  274:13
281:20  312:5  320:12
321:7, 8  330:13
338:2  349:7  352:8
353:16  356:12
383:12  391:1  396:9
402:1  403:21
**Understandable**
127:6, 7
**understandably**
328:14
**understanding** 22:22
33:8  45:23  46:24
47:14  49:14, 20, 22
50:22  52:6  55:21
56:1  59:24  60:2, 7
62:3  64:21  68:7
69:14  70:7  76:22

Case 3:21-cv-00477-MCC    Document 280-1    Filed 09/20/23    Page 152 of 373
CONFIDENTIAL

Deposition of Doreen Kutzler                    Jane Doe, et al. v. Schuylkill County Courthouse, et al.

77:8  78:5  90:7, *23*
91:*21*  93:*11, 13*  94:7
101:9  103:*13*  104:*13*
127:22  136:*15*
156:*21*  157:*15*
165:*21*  166:4  172:*15*
176:*14*  187:*20*
216:*20*  217:2  223:*21*
224:*9, 23*  226:*18*
242:*12*  248:*10*
249:*12*  250:*1, 7*
259:*1*  272:15, *23*
283:6  290:9  293:*1*
308:*13*  310:*13*
317:*23*  350:*23*
361:*16*  363:4  386:*5,
23*  390:*21*  399:*10, 15,
18*  403:*18*  404:*21*
**understood**  11:6
45:*15*  61:*18*  175:7
176:*20*  198:*3*  265:*18*
288:7
**undue**  235:*10*
**unemployment**
395:*15, 16, 22*  396:6
397:6
**unescorted**  97:*4, 21*
372:*13*  375:7, *24*
**unhappy**  202:9
**union**  113:*16*  201:2,
*4*
**Unit**  18:*4*  155:4
**UNITED**  1:2
**University**  17:*1, 16,
17*
**unjustified**  94:*24*
95:2
**unknowing**  379:*14*
**unlawful**  254:*14*
332:*17*
**unoccupied**  348:7
**unpaid**  79:*11*  273:*19*
283:*3*  284:*18*  285:*3*
**unquote**  125:*12*
**update**  70:9  185:*12*
336:*4, 19*
**updates**  16:*17*
**upgrade**  410:*18*
**upgraded**  410:*11, 12*
**upload**  221:*13*

**upper**  165:*13, 20*
253:2
**upset**  318:*20*  327:*17*
**usage**  388:2, *5*  411:6
**use**  58:2  63:*18*
78:*11*  79:*11*  80:*10,
19*  82:*1, 4*  156:4, *10*
162:6  163:*24*  165:*1,
4*  166:*23*  190:*14*
194:2  197:*15*  199:9
219:*23, 24*  256:4
273:*18*  275:*15*
281:*14*  282:*10*  283:2
286:*12*  319:5  348:*17*
383:*5, 8*  385:*18*
388:7  389:*10*  390:*3*
411:2
**user**  195:2
**uses**  68:*11*  245:2
293:*24*
**usual**  13:*1*
**utilize**  245:*1*  250:4
304:*4*  383:*18*  384:*4*
409:8
**utilized**  216:*12*
382:*19*
**utilizing**  286:*11*
384:*24*

**< V >**
**vacation**  69:*21*
224:*14, 22*  225:*20*
226:6  276:*20*  280:*17*
284:*10, 12, 14*  286:2,
*7*  388:7
**vacations**  225:*16*
389:2
**variety**  130:*1*
**various**  70:*17*
**vehicle**  361:5  364:7
**vendor**  301:6
**vent**  268:*12*
**verbal**  31:2, *3*  188:8
**verify**  366:*16*
**verse**  386:*23*
**version**  327:9
**versus**  7:9  63:*13*
230:8  386:6
**vetted**  409:*17*
**victim**  46:*1*

**victims**  254:*21, 24*
255:4  266:*23*
**VIDEO**  3:2  7:8, *13*
98:*13, 14, 19*  99:*15,
20*  100:6  371:*17, 18,
22*  372:8, *9*  373:*3*
376:*12*  377:*1, 9*
378:*3, 18*  380:6, 7, *14*
**VIDEOGRAPHER**
7:5  92:*10, 16*  202:*16,
22*  238:*3*  247:9, *15*
323:*13, 19*  345:*3, 10,
16*  390:7, *13*  411:*12*
**videos**  99:*17, 23*
375:*5, 10, 13, 16, 19*
**VIDEOTAPE**  1:*18*
**view**  99:*17, 23*  216:*3*
371:22  377:*11, 14*
380:*14*
**viewed**  99:*19*
**violation**  97:*10*  380:8
**violations**  45:*17*
**virtual**  84:*16*  169:*4*
351:*20*
**virtually**  50:*3, 7*
84:6  89:6  406:*10*
407:*17*
**visibly**  326:*10*  327:*18*
**visit**  176:9  331:*20*
**visits**  329:2, *6*
**voiced**  37:*17, 20*
**void**  326:9
**VOLUME**  1:8  7:9
345:*4*
**vote**  102:*3, 9*  129:*9,
13, 22*  131:*12*  172:*21*
173:5  175:22
**voted**  58:*20*  59:6
128:*23*  172:*10*
173:*11, 21*  174:8
175:*15*
**votes**  59:*3*
**voting**  175:8

**< W >**
**wait**  10:*18, 20*  81:*15*
151:*12*  221:*13*  264:5
266:5  343:*20*  366:*15*
369:*1*

**waited**  35:*23, 24*
163:*11*
**waiting**  94:4  134:*11*
219:*17*  223:*16*  301:8
376:22, *24*
**waive**  41:7
**waiving**  34:*23*  41:*10,
16*
**walk**  21:22  36:*1*
153:*21*  163:*12*
252:*19*  254:2, *8*
260:5, *7*  384:*13*
**walked**  239:*3*  377:*17,
21*  378:7, *15*  379:*17*
**walking**  81:*19*  97:*3*
99:7  373:7  375:6
377:*5, 7*
**wanded**  94:6  109:*11*
**wanding**  165:*12*
**want**  9:*18*  11:*19*
41:*20*  43:6  56:*18*
61:*4*  67:*14*  92:*20*
109:*4*  110:5  111:*16*
117:*13*  130:*21*
133:*19*  150:5  159:*3*
166:*11*  169:*12*
178:*12*  188:*20*
190:*24*  236:*19, 20*
238:*4*  241:*11*  265:*18*
286:*18*  302:*3*  323:*21*
335:*18*  338:*17*  345:6
346:2  358:*4*  366:*15*
378:*24*  384:*21*
390:*17, 20*  402:2
406:5
**wanted**  39:*17*  66:*19*
85:6  96:*10*  177:22
178:9, *15*  180:*16*
183:*14*  186:*15*  187:6
188:*4, 11, 24*  190:*4, 6,
23*  191:*17, 18, 24*
192:*4*  222:*17*  223:*24*
224:*1*  237:*20, 21, 24*
238:*1*  274:*14*  275:5
281:*7, 13, 22, 24*
323:8  370:8  373:*4, 5*
401:*12, 20*  409:*18*
**wanting**  109:*11*
111:8  137:*14*

wants 112:*4* 118:22
236:16 272:5 385:*23*
washed 342:*11*
water 182:22 267:*21*,
*22, 23, 24* 268:*4, 6*
way 35:*23* 42:4, *10*,
*11* 117:*19* 118:5
128:*21* 146:24
166:*11* 177:*12*
210:*17* 213:*21, 23*
300:*14* 361:*20*
378:*23* 383:9 384:*1*
409:*24*
weather 399:*23*
Wednesday 1:*21*
382:*14*
Wednesdays 231:*12*
weeded 353:*21*
week 24:5 29:*21*
35:*18* 80:*1* 158:*15*
168:2 222:*12* 283:*13*,
*24* 303:*21* 334:*17*
weekly 69:*3, 5, 17*
70:*6, 9* 122:*17* 284:*3*
388:22
weeks 52:*10* 219:*17*
224:*14* 352:2, *9*
well 7:22 19:*1*
31:*21* 32:*19* 34:*20*,
*24* 41:*23* 42:6, *10*
44:5 48:*4* 50:2
77:*17* 78:*17* 81:*17*
85:*14* 90:*15* 109:*10*,
*19* 111:*10* 112:*14*
128:2 139:*7, 18*
141:*18* 144:*10* 148:*3*
155:*12* 156:*18*
157:*15* 159:*19*
160:*20* 161:22
165:*10* 176:22 178:*1*
187:*1* 189:*12, 24*
194:*19* 201:6 206:22
208:24 209:*13*
212:*14* 222:*11* 223:2,
*9* 229:8 230:*9*
231:*13* 247:*3* 248:*21*
249:5 254:*21* 257:8
259:*3, 17* 260:22
264:*11* 274:24
275:22 277:*13*

282:*11* 284:*1* 286:*17*
288:22 290:*21*
291:*11* 293:24
294:*21* 298:2, *3*
303:*3* 309:*1* 310:*6*
311:22 312:*16, 22*
314:9 315:*12* 326:7
328:*1* 338:6 341:*4*
344:*3, 14* 347:*21*
357:*15* 361:*4, 8*
362:9 368:8 374:22
385:*17* 399:*1* 400:*18*
403:*18*
Wendy 154:*6*
went 52:8 116:*4*
126:*4* 150:*7* 176:*21*
317:*1* 329:*10, 21*
343:*3* 352:*19* 353:*23*
357:*16* 368:*15*
375:*18* 378:*10*
we're 12:*24* 41:*16*
44:*19* 48:*18* 56:9
64:*3* 74:*8* 83:*1*
92:*11, 17* 121:*18*
145:22 155:*18, 19*
159:*9* 171:*1* 187:*11*
202:*14, 17, 23* 211:*12*
218:*20* 231:*13*
247:*10, 16* 260:*11, 19*
291:*15* 310:*14*
323:*14, 20* 340:*12*
345:*11, 17* 364:*23*
365:*10* 369:2, *10*
390:*14* 407:*23*
411:*13*
we've 13:2 86:*9*
147:*20* 210:8 292:*8*
335:*19* 343:22
389:22 404:*17*
Whalen 391:*24*
whatnot 255:*18*
when's 29:*1*
WILLIAM 2:*6*
willing 101:*13*
111:*13* 133:*16*
397:*14*
wills 377:22
Wilmur 378:*7, 20*
379:*9, 13*

window 183:*16*
198:*4, 13, 16* 200:*21*
wishes 186:*1*
withdraw 386:*3*
WITNESS 4:*4* 6:*1*
33:*13* 37:6 79:*17*
97:*16* 109:*15* 110:*23*
113:*6* 127:*3* 128:*13*
138:*1* 141:*12* 142:*10*
148:*3* 149:*17* 158:*21*
173:*17* 174:*18*
177:22 179:*6* 182:*5*
188:*24* 189:*3, 11*
190:*23* 191:*8, 17, 24*
222:*3* 223:*2* 231:*3*
233:*23* 236:*10, 14*
255:*10* 265:*2* 272:*23*
275:*20* 285:*9* 293:*15*
304:*18* 309:*15* 321:2,
*4, 12* 338:*12* 342:*5*
360:22 361:*18, 20*
368:*6, 10, 12, 18, 21*
370:*15* 379:*4* 398:*1*
woman 99:*8* 378:*11*,
*19* 379:*20*
women 36:5, *17*
53:*12* 215:6 348:*13*
wondering 405:*21*
word 58:*11* 296:*2*
300:*13* 319:*5* 348:*17*
349:*4*
worded 300:*14*
words 26:*21* 54:*10*
146:9 180:*16* 293:24
work 23:*17* 26:2
27:23 29:6, *14* 35:*11*
38:*11, 21* 40:*14*
43:*12, 15* 45:2, *8*
46:*8* 47:*8* 48:5, *10*
49:*8, 15* 50:*20, 23*
51:5 54:*14* 59:*18*
61:*3, 16* 62:24 63:*19*
64:*8, 17* 66:*10, 11, 17*
67:*15* 74:*19* 75:*8*
77:*4* 78:2, *10* 79:*12*
80:2 85:*1* 86:*6, 16*
89:*23, 24* 90:*4* 95:*14*
101:*13* 104:23 106:*6,*
*24* 107:*20* 108:*1, 20,*
*21, 22* 110:5 112:*5, 9*

122:9 126:*21* 134:*11*,
*22* 135:*3, 8, 13, 18*
137:*20, 21* 138:6, *10,*
*14* 144:7, *20* 146:*4, 9,*
*14, 19* 158:*16* 159:5
160:*12* 161:*3* 170:*13*,
*22* 181:*7, 9* 198:*21*
200:*18, 19* 204:*20, 23*
205:*8* 212:*21* 213:*20*
214:*12* 216:9 217:*17*
218:*3, 4, 6* 219:*15*
220:*4, 11* 222:*15*
235:22 238:*15*
242:*13, 19* 247:*20*
260:5, *7* 271:*1, 7*
283:*7, 12* 285:*23*
292:*11, 13, 16* 294:*20*
295:2, *20* 296:*15, 19,*
*24* 297:*13* 301:*16, 22*
302:*3* 304:*5* 332:*16*
333:8 335:*11* 336:*15*
338:*15, 19, 20, 21*
359:*4, 13* 361:*14*
373:23 374:*20, 21*
387:*3, 8* 388:2, *7, 8*
389:24 401:*5*
workday 78:*8*
worked 67:*24* 68:*13*
69:*18, 20* 80:*14*
86:*11, 13* 88:*12*
105:*4* 119:2, *8* 154:2,
*12* 168:*13* 175:*11, 19*
185:*17* 197:24
233:*19* 241:*19*
243:*10* 245:*20*
284:*12* 285:*5* 286:*14*
309:*21* 347:*19*
358:*15* 366:*14*
367:*20* 391:*12*
393:*14*
work-from-home
43:9 44:*18* 46:*15*
49:*17* 50:*14* 62:*1, 15*
82:*16*
working 35:*19* 38:7
46:*20* 47:*21* 49:*18*
54:*19* 56:*3* 62:5, *21*
66:*15* 74:*1* 75:*10*
81:*12* 82:*4* 83:*20*
95:*10* 104:*17* 106:*4*

Case 3:21-cv-00477-MCC   Document 280-12   Filed 09/20/23   Page 154 of 373
CONFIDENTIAL
Deposition of Doreen Kutzler
Jane Doe, et al. v. Schuylkill County Courthouse, et al.

109:*23*  112:22
126:*13*  138:*24*  144:2
151:*10*  168:*20*  181:6
185:*24*  210:5  217:4
231:7  235:*16*  261:*1,
13*  270:8  286:*13*
287:6  296:*24*  303:*19*
309:*3, 9*  310:*1*
334:*15*  336:*5, 20*
337:*6, 19, 20*  352:*1*
358:*11*  392:*23*  407:*3*
**workload**  23:6
**works**  41:6  124:*24*
172:*13*  253:*23*
283:*23*
**workspace**  255:*4*
**worry**  386:*9*
**worth**  78:2  80:2
**would've**  66:*3*
**write**  117:*17*  318:*18*
322:*21*  323:5, 9
346:*3*  368:*9*  370:*1,
11*
**writes**  328:*11*  405:*20*
**write-up**  387:*11*
**writing**  25:7  31:2
70:*9*  207:*15*  209:*24*
211:*8*  234:*8, 11, 18*
322:*15*
**written**  70:6  128:*19*
147:*6*  201:7  323:*3*
380:*17*  393:6
**wrong**  64:*20*  135:*16*
154:*18*  165:22  166:*3*
183:*10*  189:*24*  228:8
234:*12, 19*  241:5, *16*
297:8  299:*23*  315:*24*
316:*21, 22*  317:*3, 6*
318:*1*  326:22  383:*21*
391:2
**WYNKOOP**  2:*19*
8:2, *6*

**< Y >**
**yank**  36:8
**Yeah**  19:*3*  39:*13*
40:*3, 6*  53:*1, 3*  71:7
79:*17*  80:*24*  81:20
87:*19*  91:*13*  95:*1*
107:*9*  112:*16*  114:*13,*

17, 19, 21  117:*11*
118:*24*  123:*23*
124:*12, 21, 22*  136:*13*
139:2, *17*  140:*9, 16,
22*  155:*1, 17*  166:*13*
168:*23*  172:*20*
174:*21*  193:*14*
199:*19*  201:6  207:*4,
10, 12, 18*  220:7
221:*8*  223:*21*  232:*1*
238:5  240:9  243:7
247:2  251:*21*  253:4
254:*3*  257:*1*  259:*17*
268:*3*  275:2  276:*12*
278:*13*  280:*11*
286:*16, 22*  290:*1*
301:*21*  302:*24*
303:*10*  306:*15*  316:7
317:*7, 17*  318:*8*
319:22, *23*  321:*4*
337:*18*  338:*12*  339:8
346:*13*  348:6, *8*
349:2  351:*15*  361:*10,
12*  364:*21*  369:*1*
371:9  374:4  379:*16*
395:6  402:*10, 21*
403:*16*  407:9, *22*
409:*12, 16*  410:22
**year**  11:*17*  157:*17,
22*  207:*3*  270:5
**years**  14:*11, 12*
18:*19*  117:*11*  146:8
270:22  281:5  303:2
342:*21*
**Year's**  343:*1*
**yelling**  264:*9*
**Yep**  145:*14*  152:7
328:*23*
**youth**  231:*15, 18*
232:*4, 18*  233:4

**< Z >**
**zeros**  15:*3*
**Zimmerman**  115:*19*
184:*16*  331:*20*  332:6
**Zoom**  2:*13*  3:2, *3, 4*
7:*20*  8:4  15:*18*
168:*16, 18*  169:*15, 22,
24*  170:5  323:*23*

406:*10, 19*  407:8, *11,
12*
**Zooming**  170:8
**Zula**  2:*13*  5:6  8:9
207:5  210:22  345:*1*
350:*14*  351:*1, 10, 11*
352:*11, 16*  356:2, *8,
12, 20, 24*  358:7, *10,
21*  359:16  362:*4, 7*
363:*15*  364:*24*  365:*2,
11*  366:*13*  367:*14, 23*
370:2, *21*  371:6
375:*13*  376:2  380:*15*
381:2, *5, 21*  382:*15*
391:*3*  392:*11, 19*
398:*13, 24*  399:4
403:2
**Zula's**  344:*23*  345:*2,
4*  350:*19*  365:*21*

Deposition of Doreen Kutzler          Jane Doe, et al. v. Schuylkill County Courthouse, et al.

## WORD LIST

**< $ >**
**$10** *(1)*
**$30** *(2)*
**$40** *(6)*
**$5** *(1)*
**$64,000** *(1)*
**$8.40** *(1)*
**$9,200** *(1)*

**< 1 >**
**1** *(16)*
**1:00** *(1)*
**1:09** *(1)*
**1:42** *(1)*
**10** *(2)*
**10:00** *(2)*
**10:07** *(1)*
**10:20** *(1)*
**10:34** *(1)*
**100** *(3)*
**107** *(1)*
**11** *(1)*
**11:32** *(1)*
**111** *(3)*
**1112** *(1)*
**1115** *(2)*
**1115-1117** *(2)*
**1116** *(3)*
**1117** *(1)*
**1118** *(1)*
**1118-1120** *(2)*
**1120** *(1)*
**1121** *(1)*
**1121-1124** *(2)*
**1124** *(1)*
**1127** *(3)*
**1137** *(4)*
**1140** *(1)*
**11t** *(1)*
**11th** *(9)*
**12** *(5)*
**12:18** *(1)*
**12:26** *(1)*
**120** *(4)*
**12th** *(2)*
**13** *(4)*
**130** *(1)*

**13th** *(4)*
**14** *(3)*
**14th** *(1)*
**15** *(9)*
**151** *(1)*
**15219** *(1)*
**159** *(1)*
**15th** *(6)*
**16** *(1)*
**16th** *(1)*
**17** *(3)*
**170** *(1)*
**17011** *(1)*
**171** *(1)*
**17-18** *(2)*
**18** *(1)*
**1-800** *(1)*
**18017** *(1)*
**1835** *(1)*
**18360** *(1)*
**18th** *(9)*
**19** *(2)*
**190** *(1)*
**19103** *(1)*
**19106** *(1)*
**1991** *(1)*
**19th** *(11)*
**1st** *(3)*

**< 2 >**
**2** *(12)*
**2:42** *(1)*
**20** *(4)*
**2012** *(1)*
**2019** *(4)*
**2020** *(52)*
**2021** *(13)*
**2022** *(2)*
**2023** *(2)*
**203** *(1)*
**21** *(1)*
**211** *(1)*
**214** *(2)*
**218** *(2)*
**22** *(5)*
**229** *(1)*
**22nd** *(2)*
**23** *(1)*
**232** *(2)*

**25** *(2)*
**25th** *(1)*
**26** *(1)*
**260** *(1)*
**27** *(7)*
**275** *(2)*
**276** *(2)*
**277** *(4)*
**278** *(3)*
**279** *(1)*
**27th** *(7)*
**28** *(1)*
**280** *(2)*
**281** *(2)*
**282** *(1)*
**283** *(3)*
**284** *(2)*
**285** *(2)*
**286** *(4)*
**287** *(5)*
**288** *(2)*
**289** *(2)*
**290** *(2)*
**291** *(4)*
**292** *(1)*
**293** *(3)*
**294** *(3)*
**295** *(5)*
**2950** *(1)*
**297** *(1)*

**< 3 >**
**3** *(12)*
**3:00** *(1)*
**3:07** *(1)*
**3:21-CV-00477** *(1)*
**3:30** *(1)*
**3:36** *(1)*
**3:42** *(1)*
**30** *(7)*
**30-day** *(2)*
**30-plus** *(1)*
**30th** *(1)*
**31** *(1)*
**310** *(2)*
**3136** *(1)*
**3136-3137** *(2)*
**3137** *(1)*
**3138** *(3)*

**31st** *(2)*
**324** *(1)*
**325** *(1)*
**325-326** *(2)*
**326** *(2)*
**334** *(1)*
**340** *(1)*
**3410** *(1)*
**343** *(1)*
**344** *(3)*
**347** *(1)*
**349** *(1)*
**35** *(12)*
**35-hour** *(1)*
**365** *(1)*
**366** *(2)*
**366-369** *(2)*
**367** *(2)*
**369** *(1)*
**398** *(1)*
**3rd** *(3)*

**< 4 >**
**4** *(9)*
**4:00** *(1)*
**4:21** *(1)*
**4:30** *(4)*
**4:31** *(1)*
**4:51** *(3)*
**40** *(9)*
**400E** *(1)*
**402** *(1)*
**404** *(1)*
**408** *(1)*
**410** *(81)*
**43:0** *(1)*
**432** *(2)*
**432-434** *(2)*
**434** *(1)*
**45** *(3)*
**48** *(1)*
**493** *(3)*
**493-494** *(2)*
**494** *(3)*
**4th** *(2)*

**< 5 >**
**5:00** *(1)*
**504** *(2)*

Deposition of Doreen Kutzler

Jane Doe, et al. v. Schuylkill County Courthouse, et al.

**504-505** (2)
**505** (2)
**506** (1)
**507** (3)
**510** (1)
**510-514** (2)
**511** (1)
**513** (1)
**514** (1)
**520** (1)
**520-521** (2)
**521** (1)
**549** (3)
**56** (1)
**571** (1)
**571-572** (2)
**572** (1)
**583** (2)

**< 6 >**
**6:36** (1)
**61** (1)

**< 7 >**
**7** (4)
**707** (1)
**7-10** (2)
**712** (1)
**72** (1)
**74** (1)
**7-9** (2)
**7th** (6)

**< 8 >**
**8** (3)
**8:00** (4)
**8:30** (2)
**8th** (9)

**< 9 >**
**9** (1)
**9:00** (1)
**9:01** (2)
**911** (1)
**96** (1)

**< A >**
**a.m** (8)
**abided** (1)

**abilities** (1)
**ability** (18)
**able** (14)
**absence** (1)
**Absolutely** (1)
**abstained** (3)
**abstaining** (3)
**abstains** (1)
**ACA** (4)
**acceptable** (1)
**access** (24)
**accessible** (3)
**accessing** (1)
**accommodate** (1)
**accommodated** (1)
**accommodation** (8)
**accommodations** (2)
**accompanying** (2)
**accord** (1)
**account** (3)
**accounting** (1)
**accounts** (1)
**accuracy** (1)
**accurate** (8)
**accusations** (1)
**accused** (4)
**Act** (1)
**acted** (2)
**action** (5)
**actions** (3)
**actively** (5)
**activities** (1)
**actual** (3)
**ad** (1)
**ADA** (2)
**add** (1)
**addendum** (21)
**addition** (5)
**additional** (23)
**Additionally** (1)
**address** (8)
**addressed** (4)
**addresses** (2)
**addressing** (2)
**adequately** (4)
**adjacent** (1)
**adjusting** (1)
**adjustment** (1)
**administer** (2)

**administers** (1)
**administration** (5)
**administrative** (9)
**administrator** (12)
**admit** (1)
**advance** (1)
**advice** (6)
**advisable** (2)
**advise** (2)
**advised** (3)
**advises** (1)
**affect** (1)
**affidavit** (33)
**affidavits** (1)
**affirmative** (3)
**Affordable** (1)
**aforementioned** (3)
**AFSCME** (6)
**afternoon** (2)
**AG** (8)
**agencies** (3)
**Agency** (1)
**agendas** (1)
**agent** (2)
**ago** (1)
**agree** (52)
**agreeable** (2)
**agreed** (14)
**agreement** (34)
**agreements** (4)
**agrees** (2)
**AG's** (1)
**ahead** (12)
**ailing** (1)
**air** (1)
**al** (4)
**alcohol** (1)
**ALEISHA** (1)
**alerts** (1)
**Alicia** (1)
**allegation** (2)
**allegations** (7)
**alleged** (1)
**allow** (14)
**allowed** (4)
**allowing** (4)
**alluded** (2)
**alludes** (1)
**alongside** (1)

**alternative** (2)
**Alu** (1)
**ALYSSA** (2)
**ambiguous** (1)
**amended** (1)
**amount** (4)
**analysts** (1)
**and/or** (7)
**Andrea** (1)
**ANGELA** (12)
**angry** (1)
**Ann** (2)
**annual** (4)
**anonymous** (1)
**ANSWER** (74)
**answered** (6)
**answering** (2)
**answers** (1)
**anticipated** (2)
**anti-harassment** (1)
**anxiety** (3)
**Anybody** (9)
**anyones** (1)
**anyway** (4)
**apologies** (2)
**apologize** (5)
**appeals** (2)
**appear** (6)
**appearance** (1)
**appeared** (3)
**Appearing** (1)
**appears** (3)
**applicable** (1)
**applicant** (1)
**applications** (1)
**applied** (1)
**apply** (2)
**appointed** (1)
**appointment** (2)
**appraisal** (1)
**appraiser** (4)
**appraisers** (6)
**appraiser's** (1)
**appreciate** (2)
**approachable** (2)
**approached** (1)
**appropriate** (15)
**appropriately** (2)
**appropriateness** (1)

approval  (6)
approve  (6)
approved  (14)
approving  (1)
approximately  (2)
April  (2)
archived  (1)
area  (4)
areas  (1)
argued  (1)
argument  (1)
arranged  (2)
arrangement  (1)
arrangements  (1)
arrears  (3)
arrest  (2)
arrested  (4)
arrival  (1)
arts  (1)
ASAP  (1)
aside  (3)
asked  (35)
asking  (19)
asks  (1)
asserting  (5)
assertion  (2)
asserts  (1)
assess  (1)
assessment  (60)
assessments  (1)
assessment's  (1)
assessor  (1)
assign  (3)
assigned  (15)
assigning  (1)
assignment  (8)
assignments  (1)
assist  (1)
assistance  (10)
assistant  (5)
associate  (2)
associated  (3)
assume  (4)
assumed  (1)
attach  (1)
attached  (9)
attachment  (3)
attachments  (3)
attacks  (3)

attempt  (2)
attempted  (2)
attend  (23)
attended  (4)
attending  (8)
attention  (1)
attorney  (18)
attorney-client  (12)
attorneys  (5)
authority  (13)
authorize  (1)
automatically  (1)
availability  (3)
available  (10)
Avenue  (1)
average  (2)
averages  (1)
avoid  (5)
avoided  (2)
aware  (44)

< B >
bachelor  (1)
back  (75)
backlog  (3)
backwards  (1)
bad  (2)
badge  (2)
bag  (3)
ball  (1)
bandwidth  (2)
bank  (2)
banked  (1)
bargaining  (5)
base  (1)
based  (43)
basically  (5)
basis  (16)
Bates  (2)
bearings  (1)
becoming  (2)
began  (10)
beginning  (3)
behalf  (21)
behavior  (3)
belief  (2)
believe  (45)
believed  (5)
believes  (2)

Bender  (220)
Bender's  (20)
benefit  (8)
benefits  (10)
Berks  (2)
best  (9)
Bethlehem  (1)
better  (3)
better-conditioned  (1)
beyond  (2)
biannual  (2)
bid  (4)
bills  (1)
binder  (1)
biographical  (1)
bit  (12)
biweekly  (1)
black  (1)
blanket  (1)
block  (2)
blocks  (4)
board  (11)
bold  (1)
bottom  (7)
BOX  (1)
break  (6)
Brenda  (2)
Brenda's  (1)
Brian  (2)
brief  (5)
briefly  (2)
bring  (5)
Brodhead  (1)
broken  (1)
brought  (5)
Buber  (10)
budget  (19)
budgets  (1)
Build  (1)
building  (125)
buildings  (2)
bullet  (5)
bureau  (7)
business  (13)
business-related  (1)
bypassed  (1)

< C >
cabinet  (4)

call  (15)
called  (4)
calling  (1)
calls  (9)
camera  (1)
cameras  (4)
Camp  (2)
campus  (1)
canceled  (1)
candidate  (1)
candidates  (4)
capabilities  (1)
capability  (1)
capacity  (2)
car  (2)
carbon  (1)
card  (1)
cards  (1)
care  (5)
career  (2)
carry  (1)
carrying  (1)
case  (16)
case-by-case  (1)
CATHERINE  (6)
catherine@dereksmith
.com  (1)
CATTS  (1)
Cause  (3)
caused  (6)
causes  (1)
CBA  (3)
CCAP  (2)
cc'd  (5)
ccs  (1)
ceiling  (4)
cell  (2)
Center  (2)
ceremony  (2)
certain  (8)
certainly  (5)
certificate  (1)
certificates  (1)
certification  (3)
certifications  (3)
certify  (1)
chain  (22)
challenges  (4)
chance  (1)

Deposition of Doreen Kutzler                                          Jane Doe, et al. v. Schuylkill County Courthouse, et al.

change *(13)*
changed *(12)*
changes *(11)*
changing *(2)*
charge *(6)*
charges *(2)*
check *(7)*
checking *(1)*
Chief *(10)*
children *(5)*
chitchat *(1)*
choice *(1)*
choose *(1)*
chose *(3)*
chosen *(1)*
Chrissy *(5)*
Christina *(1)*
Christmas *(3)*
Christopher *(1)*
chronological *(1)*
chronologically *(3)*
circumstances *(11)*
CIVIL *(1)*
claim *(20)*
claims *(16)*
Claire *(2)*
clarification *(2)*
clarify *(5)*
classes *(2)*
classified *(1)*
clause *(4)*
clean *(6)*
cleaned *(14)*
cleaning *(23)*
cleanliness *(1)*
cleans *(1)*
clear *(12)*
clearer *(1)*
clearly *(2)*
clerk *(1)*
clerk's *(3)*
client *(6)*
clients *(7)*
close *(1)*
closed *(2)*
closer *(2)*
closet *(2)*
clutter *(1)*
COBRA *(4)*

Coleen *(4)*
collective *(4)*
collectively *(5)*
college *(1)*
com *(1)*
combination *(1)*
come *(36)*
comes *(4)*
comfortable *(8)*
coming *(15)*
comm *(1)*
command *(2)*
comment *(1)*
commenting *(1)*
comments *(4)*
Commissioner *(17)*
commissioners *(45)*
commissioner's *(10)*
committed *(1)*
committee *(13)*
communicate *(10)*
communicated *(8)*
communicates *(2)*
communicating *(5)*
communication *(14)*
communications *(17)*
communicator *(6)*
community *(1)*
companies *(3)*
company *(9)*
compared *(1)*
comparison *(1)*
compensation *(2)*
competing *(1)*
compilation *(1)*
complain *(1)*
complained *(1)*
complaining *(1)*
complaint *(2)*
complaints *(1)*
complete *(27)*
completed *(12)*
completely *(5)*
completing *(2)*
completion *(5)*
compliance *(3)*
complicated *(1)*
complied *(2)*
comply *(1)*

compose *(1)*
compounded *(1)*
comprehensive *(1)*
computer *(8)*
computers *(4)*
con *(1)*
concern *(8)*
concerning *(4)*
concerns *(22)*
concluded *(1)*
conclusion *(1)*
condition *(4)*
conditions *(3)*
conduct *(11)*
conducted *(5)*
conducting *(2)*
conduit *(2)*
conference *(3)*
conferences *(1)*
confident *(1)*
CONFIDENTIAL *(3)*
confidentiality *(5)*
confirm *(4)*
confirmation *(2)*
conflict *(1)*
confused *(2)*
conjunction *(1)*
connection *(3)*
consensual *(1)*
consent *(2)*
consider *(4)*
consideration *(4)*
considerations *(1)*
considered *(5)*
considering *(1)*
constraint *(1)*
consult *(2)*
consultant *(2)*
consultation *(7)*
consulting *(2)*
consumed *(1)*
contact *(8)*
contain *(1)*
contains *(1)*
contemporaneous *(1)*
content *(2)*
contents *(28)*
context *(1)*
continue *(11)*

continued *(2)*
continues *(1)*
continuing *(1)*
continuous *(1)*
contract *(35)*
contracted *(1)*
contracting *(1)*
contractor *(4)*
contractors *(6)*
contractor's *(1)*
contracts *(4)*
contradict *(1)*
contradiction *(1)*
contribute *(1)*
contributions *(1)*
control *(1)*
controllers *(2)*
convenience *(1)*
conversation *(55)*
conversations *(49)*
convey *(1)*
conveyed *(4)*
cookie *(1)*
coordinate *(1)*
coordinates *(1)*
cop *(1)*
copied *(3)*
copies *(4)*
copy *(16)*
corner *(3)*
correct *(309)*
Correction *(2)*
correctively *(1)*
correctly *(9)*
correspondence *(8)*
cost *(1)*
costs *(1)*
Counsel *(31)*
count *(4)*
counties *(1)*
counts *(1)*
COUNTY *(316)*
county-issued *(2)*
county's *(18)*
couple *(8)*
courier *(1)*
course *(6)*
courses *(3)*
COURT *(10)*

**COURTHOUSE** (67)
**Courtroom** (5)
**cover** (1)
**coverage** (4)
**covered** (1)
**COVID** (10)
**coworkers** (1)
**CPE** (11)
**CPU** (1)
**create** (5)
**created** (3)
**creates** (1)
**creating** (2)
**crew** (2)
**crying** (1)
**cumbersome** (1)
**cupcake** (1)
**current** (5)
**Curtis** (1)
**customer** (1)
**customers** (4)
**cut** (2)
**cutting** (1)

**< D >**
**daily** (6)
**damage** (2)
**dance** (1)
**date** (17)
**dated** (1)
**dates** (3)
**dating** (1)
**David** (1)
**day** (51)
**days** (17)
**day-to-day** (12)
**dead** (1)
**deadline** (1)
**deadlines** (3)
**deal** (1)
**dealing** (1)
**dealt** (1)
**Deb** (6)
**DEBISE** (2)
**Deborah** (1)
**December** (24)
**decide** (3)
**decided** (9)
**decides** (1)

**decision** (32)
**decisions** (4)
**Declaration** (6)
**decline** (1)
**dedicated** (1)
**deducted** (1)
**deeper** (1)
**defeated** (1)
**Defendant** (101)
**Defendants** (4)
**defended** (1)
**defense** (4)
**defer** (1)
**defined** (1)
**definitely** (4)
**definitive** (3)
**degrading** (1)
**degree** (3)
**delay** (6)
**delayed** (2)
**delays** (1)
**delegation** (2)
**delinquency** (2)
**delinquent** (7)
**deliver** (1)
**delivered** (1)
**delivering** (1)
**delved** (2)
**demeanor** (3)
**Democrat** (1)
**demotion** (2)
**denial** (1)
**denied** (3)
**DENISE** (9)
**deny** (2)
**department** (71)
**departmental** (1)
**departments** (14)
**department's** (1)
**departure** (1)
**depend** (1)
**dependent** (1)
**depending** (3)
**depends** (1)
**DEPOSITION** (9)
**depositions** (1)
**depressed** (1)
**depth** (2)
**deputy** (2)

**DEREK** (1)
**descended** (1)
**described** (1)
**DESCRIPTION** (2)
**descriptions** (1)
**design** (1)
**designated** (1)
**designed** (2)
**desire** (4)
**desires** (1)
**desk** (3)
**despite** (2)
**detail** (1)
**details** (1)
**detectors** (2)
**determination** (2)
**determine** (8)
**determined** (3)
**detriment** (3)
**Detweiler** (6)
**development** (2)
**developmental** (3)
**develops** (1)
**device** (1)
**devices** (1)
**DICKIE** (1)
**dictate** (2)
**dictated** (1)
**Dietrich** (3)
**difference** (2)
**differences** (2)
**different** (29)
**difficult** (10)
**difficulties** (3)
**difficultly** (1)
**dig** (1)
**diploma** (2)
**direct** (22)
**directed** (11)
**directing** (1)
**DIRECTION** (3)
**directive** (1)
**directly** (12)
**director** (23)
**directors** (4)
**directory** (1)
**disability** (4)
**disabled** (1)
**disagree** (7)

**disappeared** (1)
**disbelieve** (1)
**discharged** (1)
**disclose** (4)
**disclosed** (1)
**disclosing** (2)
**discovered** (2)
**discrimination** (2)
**discuss** (25)
**discussed** (18)
**discussing** (3)
**discussion** (17)
**discussions** (27)
**disgusted** (1)
**disinfected** (3)
**dispatched** (1)
**disrupt** (1)
**disseminated** (1)
**distance** (5)
**distinction** (3)
**distributed** (1)
**distribution** (1)
**DISTRICT** (2)
**DOCKET** (1)
**document** (34)
**documentation** (1)
**DOCUMENTS** (10)
**DOE** (73)
**doing** (27)
**DOJ** (1)
**door** (19)
**doors** (3)
**DOREEN** (5)
**Doreen's** (1)
**Dotty** (4)
**double** (1)
**draft** (13)
**drafted** (14)
**drafting** (6)
**drawer** (2)
**drawers** (1)
**dripping** (2)
**driven** (1)
**driving** (5)
**drop** (1)
**droppings** (1)
**drug** (4)
**dual** (1)
**dual-role** (1)

Deposition of Doreen Kutzler

Jane Doe, et al. v. Schuylkill County Courthouse, et al.

| | | | |
|---|---|---|---|
| **due** *(3)* | **employee's** *(4)* | **ESQUIRE** *(6)* | **Exhibit-277** *(1)* |
| **duly** *(1)* | **employer** *(6)* | **essence** *(1)* | **Exhibit-278** *(1)* |
| **duties** *(26)* | **employers** *(9)* | **essentially** *(3)* | **Exhibit-279** *(1)* |
| **duty** *(3)* | **employment** *(20)* | **establish** *(1)* | **Exhibit-280** *(1)* |
| **duty's** *(1)* | **empty** *(1)* | **established** *(2)* | **Exhibit-281** *(1)* |
| **dynamic** *(2)* | **encounter** *(1)* | **estate** *(1)* | **Exhibit-282** *(1)* |
| | **encountered** *(2)* | **esthetics** *(1)* | **Exhibit-283** *(1)* |
| **< E >** | **encouraged** *(2)* | **estimate** *(1)* | **Exhibit-284** *(1)* |
| **EAP** *(4)* | **ended** *(5)* | **et** *(4)* | **Exhibit-285** *(1)* |
| **EAP's** *(1)* | **ends** *(1)* | **ethics** *(1)* | **Exhibit-286** *(1)* |
| **earlier** *(16)* | **enforcement** *(2)* | **evaluate** *(2)* | **Exhibit-287** *(1)* |
| **earliest** *(1)* | **engage** *(9)* | **evaluating** *(1)* | **Exhibit-288** *(1)* |
| **early** *(8)* | **engaged** *(4)* | **evening** *(1)* | **Exhibit-289** *(1)* |
| **earmarked** *(1)* | **engaging** *(2)* | **event** *(6)* | **Exhibit-290** *(1)* |
| **earn** *(1)* | **engineer** *(1)* | **events** *(6)* | **Exhibit-291** *(2)* |
| **easier** *(3)* | **enjoy** *(1)* | **eventually** *(7)* | **Exhibit-292** *(3)* |
| **ed** *(1)* | **enroll** *(3)* | **Everest** *(2)* | **Exhibit-293** *(1)* |
| **Edelstein** *(2)* | **enrolled** *(4)* | **everybody** *(1)* | **Exhibit-294** *(1)* |
| **edited** *(1)* | **enrollment** *(1)* | **everyday** *(1)* | **Exhibit-295** *(2)* |
| **edits** *(2)* | **ensure** *(5)* | **everyone's** *(1)* | **Exhibit-61** *(2)* |
| **education** *(2)* | **entailed** *(1)* | **exact** *(4)* | **Exhibit-72** *(3)* |
| **EEO** *(5)* | **enter** *(18)* | **exactly** *(6)* | **EXHIBITS** *(2)* |
| **EEOC** *(9)* | **entered** *(8)* | **Examination** *(1)* | **existed** *(2)* |
| **effect** *(3)* | **entering** *(7)* | **examined** *(1)* | **exists** *(2)* |
| **effectively** *(8)* | **entire** *(5)* | **example** *(1)* | **exit** *(1)* |
| **efficiently** *(2)* | **entirety** *(2)* | **excess** *(1)* | **exited** *(1)* |
| **effort** *(1)* | **entities** *(2)* | **exchange** *(3)* | **exiting** *(2)* |
| **either** *(23)* | **entitled** *(1)* | **exchanged** *(1)* | **expect** *(2)* |
| **Elaine** *(4)* | **entrance** *(30)* | **exclude** *(1)* | **expectation** *(2)* |
| **elected** *(5)* | **entrances** *(1)* | **excusal** *(1)* | **expectations** *(1)* |
| **election** *(2)* | **entry** *(1)* | **excused** *(2)* | **expected** *(3)* |
| **electronic** *(2)* | **envelope** *(6)* | **excusing** *(1)* | **expense** *(7)* |
| **elevator** *(1)* | **environment** *(24)* | **execute** *(2)* | **expenses** *(5)* |
| **elicit** *(2)* | **equalization** *(4)* | **executed** *(8)* | **experience** *(17)* |
| **eligibility** *(8)* | **equip** *(1)* | **exempt** *(5)* | **experienced** *(3)* |
| **eligible** *(5)* | **equipment** *(42)* | **EXHIBIT** *(41)* | **experiencing** *(3)* |
| **else's** *(1)* | **equivalent** *(1)* | **Exhibit-100** *(2)* | **expiration** *(1)* |
| **e-mail** *(186)* | **ergonomically** *(1)* | **Exhibit-107** *(2)* | **expired** *(2)* |
| **e-mailed** *(1)* | **ERRATA** *(1)* | **Exhibit-111** *(3)* | **explain** *(4)* |
| **e-mailing** *(1)* | **erratic** *(3)* | **Exhibit-17** *(2)* | **explained** *(1)* |
| **e-mails** *(11)* | **erratically** *(1)* | **Exhibit-19** *(4)* | **explanation** *(1)* |
| **embarrassed** *(1)* | **escort** *(3)* | **Exhibit-20** *(1)* | **expose** *(1)* |
| **emphatically** *(1)* | **escorted** *(7)* | **Exhibit-21** *(3)* | **exposing** *(1)* |
| **employed** *(14)* | **escorting** *(2)* | **Exhibit-229** *(1)* | **expressed** *(3)* |
| **employee** *(57)* | **e-signature** *(2)* | **Exhibit-230** *(3)* | **extend** *(1)* |
| **employee-related** *(1)* | **especially** *(1)* | **Exhibit-232** *(2)* | **extended** *(4)* |
| **employee-relations** | **espoused** *(2)* | **Exhibit-233** *(3)* | **extent** *(14)* |
| *(1)* | **espouses** *(1)* | **Exhibit-275** *(1)* | **extenuating** *(4)* |
| **employees** *(50)* | **espousing** *(1)* | **Exhibit-276** *(1)* | **extra** *(1)* |

extreme  *(2)*
extremely  *(2)*
eyes  *(1)*

< F >
face  *(2)*
faced  *(1)*
facilitate  *(2)*
facilitates  *(2)*
fact  *(31)*
facts  *(2)*
failed  *(2)*
failure  *(1)*
fair  *(21)*
falls  *(1)*
familiar  *(1)*
far  *(9)*
farther  *(1)*
fashion  *(1)*
favor  *(1)*
favorable  *(1)*
February  *(4)*
federal  *(1)*
feedback  *(1)*
feel  *(16)*
feeling  *(2)*
feelings  *(2)*
feels  *(1)*
fell  *(1)*
felt  *(12)*
Fetterolf  *(1)*
fiance  *(1)*
field  *(19)*
fields  *(1)*
fifth  *(1)*
figure  *(15)*
file  *(14)*
filed  *(9)*
files  *(4)*
filing  *(6)*
fill  *(4)*
filled  *(2)*
filthy  *(1)*
final  *(5)*
finally  *(3)*
finance  *(2)*
find  *(10)*
finding  *(1)*
findings  *(1)*

fine  *(4)*
finish  *(2)*
firm  *(2)*
first  *(91)*
fiscal  *(8)*
fit  *(1)*
five  *(10)*
five-minute  *(1)*
five-panel  *(1)*
flat  *(1)*
flexibility  *(1)*
flush  *(1)*
FMLA  *(2)*
focus  *(2)*
focusing  *(1)*
folder  *(1)*
folders  *(4)*
follow  *(3)*
followed  *(1)*
following  *(7)*
follows  *(1)*
follow-up  *(1)*
footage  *(1)*
forbidden  *(2)*
force  *(1)*
forecast  *(1)*
forego  *(1)*
foregoing  *(1)*
forever  *(1)*
forget  *(1)*
forgoed  *(1)*
form  *(65)*
formal  *(1)*
formally  *(1)*
formed  *(1)*
former  *(1)*
forms  *(1)*
forward  *(2)*
forwarded  *(8)*
forwarding  *(2)*
foul  *(1)*
found  *(6)*
four  *(17)*
fourth  *(1)*
frame  *(11)*
free  *(5)*
freedom  *(1)*
Friday  *(8)*
front  *(13)*

fruition  *(1)*
frustrated  *(5)*
frustrating  *(1)*
Frustration  *(5)*
frustrations  *(1)*
Fucci  *(1)*
fulfill  *(2)*
full  *(8)*
fullest  *(1)*
full-time  *(4)*
fully  *(6)*
functioning  *(3)*
fund  *(1)*
funding  *(1)*
funds  *(4)*
funeral  *(1)*
furlough  *(3)*
furloughed  *(2)*
further  *(6)*
futile  *(1)*

< G >
Gaffney  *(3)*
gain  *(1)*
gained  *(1)*
garage  *(1)*
Garrity  *(8)*
Gary  *(33)*
Gary's  *(1)*
gather  *(2)*
gears  *(2)*
GED  *(1)*
GEIGER  *(5)*
gender  *(1)*
general  *(9)*
Generally  *(2)*
generals  *(2)*
general's  *(1)*
generate  *(1)*
generated  *(1)*
generator  *(2)*
gentleman  *(1)*
geographical  *(1)*
George  *(31)*
George's  *(1)*
Ger  *(1)*
GERARD  *(1)*
GERCHAK  *(70)*
Gerchak's  *(4)*

Gerry  *(2)*
getting  *(14)*
ggeiger@newmanwilli
ams.com  *(1)*
Gilbert  *(3)*
give  *(19)*
given  *(29)*
gives  *(3)*
giving  *(4)*
Glenn  *(31)*
go  *(63)*
goes  *(7)*
going  *(150)*
Good  *(16)*
Goodman  *(182)*
Goodman's  *(17)*
Gotcha  *(1)*
Govern  *(3)*
governments  *(1)*
governs  *(1)*
Grant  *(2)*
granted  *(1)*
great  *(1)*
greatest  *(2)*
grievance  *(5)*
Groody  *(15)*
Groody's  *(2)*
GROUP  *(1)*
guess  *(25)*
guidelines  *(2)*
guise  *(1)*
Gulf  *(1)*
guy  *(1)*
guys  *(10)*

< H >
Hal  *(1)*
Halcovage  *(106)*
Halcovage's  *(22)*
Hale  *(5)*
H-A-L-E  *(2)*
half  *(5)*
halfway  *(3)*
hall  *(2)*
hallway  *(5)*
hand  *(3)*
handbook  *(1)*
handing  *(1)*
handle  *(3)*

Case 3:21-cv-00477-MCC    Document 280-12    Filed 09/20/23    Page 162 of 373
CONFIDENTIAL
Deposition of Doreen Kutzler                              Jane Doe, et al. v. Schuylkill County Courthouse, et al.

handled (3)
hands (1)
handwritten (1)
happen (12)
happened (25)
happening (2)
happens (3)
happy (2)
harasser (1)
harassment (27)
hard (6)
harm (1)
Harrisburg (3)
Hatter (1)
hazards (1)
head (8)
header (1)
heads (5)
health (10)
hear (5)
heard (3)
hearing (2)
hearings (2)
heater (1)
Heather (26)
Heidi (8)
Heinbach (11)
held (24)
Helene (11)
Helene's (1)
help (5)
helpful (2)
Hess (6)
Hetherington (3)
hey (9)
high (2)
Higher (3)
highway (2)
Hill (3)
hinder (1)
hindered (2)
hire (3)
hired (4)
hiring (1)
Hoffman (2)
hold (11)
Holding (1)
holds (1)
holiday (1)

home (80)
homes (4)
honest (1)
Honestly (1)
hoped (1)
hopeful (1)
hopefully (1)
hostile (10)
hour (13)
hourly (3)
hours (54)
HR (59)
Hubric (17)
Hubric's (2)
human (20)
hundred (2)
hype (1)
hypothetical (1)
hypothetically (1)

< I >
iceberg (1)
idea (4)
ideal (2)
identical (4)
identification (22)
identified (1)
illegal (1)
image (1)
imagine (2)
immersive (1)
impact (7)
impacted (5)
impacts (1)
impairs (1)
implementation (1)
implemented (1)
implementing (1)
implore (1)
important (10)
impose (1)
imposed (7)
imposes (3)
impossible (4)
impression (5)
inability (4)
inaccurate (3)
inaudible (1)
incapable (1)

incident (4)
include (7)
included (5)
includes (4)
including (12)
income (1)
incoming (2)
incomplete (1)
increase (6)
increased (1)
increments (1)
incurred (1)
Independence (1)
independent (2)
independently (1)
INDEX (1)
indicate (6)
indicated (7)
indicates (17)
indicating (3)
individual (18)
individuals (28)
individual's (1)
influence (5)
inform (7)
informal (2)
information (30)
informed (24)
informing (4)
inherently (2)
initial (12)
initially (1)
initiate (1)
initiation (1)
in-person (3)
input (4)
inputted (1)
inquires (2)
inquiring (1)
installed (3)
installing (1)
instance (3)
instruct (8)
instructed (23)
instructing (2)
instruction (10)
instructions (3)
instrumental (1)
insurance (2)

intention (4)
intents (1)
interact (1)
interacted (1)
interacting (1)
interaction (5)
interactions (1)
interactive (8)
interest (6)
interested (1)
interfere (2)
interfered (1)
interim (10)
interject (1)
Intermediate (1)
internally (2)
Internet (3)
INTERROGATION (1)
interruption (1)
interview (7)
interviewing (2)
interviews (8)
intimidated (1)
intimidating (1)
intimidation (3)
intranet (1)
introduction (2)
Introductions (2)
inundate (1)
invested (1)
investigate (4)
investigated (1)
investigation (16)
invite (1)
involuntarily (1)
involve (2)
involved (41)
involvement (5)
involves (1)
involving (3)
iPads (1)
issue (24)
issued (1)
issues (31)
item (4)
items (19)
its (5)

**< J >**
**JANE**  (12)
**January**  (27)
**JFK**  (1)
**Joan**  (1)
**job**  (34)
**JOCELYN**  (2)
**join**  (5)
**joined**  (1)
**JONES**  (1)
**Joseph**  (2)
**judge**  (4)
**judicial**  (8)
**July**  (2)
**jump**  (2)
**June**  (1)
**junior**  (1)
**jury**  (4)
**justifiably**  (1)
**justification**  (2)
**justified**  (3)

**< K >**
**Katz**  (1)
**keep**  (8)
**keeping**  (2)
**kept**  (2)
**key**  (1)
**keyboards**  (1)
**keycard**  (7)
**keys**  (13)
**kicked**  (1)
**kind**  (38)
**Kleck**  (1)
**Kleckner**  (144)
**Kleckner's**  (17)
**knee**  (1)
**knew**  (20)
**know**  (224)
**knowing**  (6)
**knowledgable**  (1)
**knowledge**  (99)
**known**  (4)
**knows**  (3)
**Kraft**  (2)
**KUTZLER**  (36)

**< L >**
**lack**  (10)

**ladies**  (5)
**landing**  (1)
**laptop**  (15)
**laptops**  (11)
**large**  (2)
**largest**  (1)
**late**  (3)
**Laurel**  (1)
**Law**  (9)
**layout**  (1)
**leadership**  (1)
**leading**  (2)
**leads**  (1)
**learn**  (7)
**learned**  (11)
**learning**  (3)
**leave**  (18)
**leaving**  (3)
**led**  (1)
**LEES**  (48)
**left**  (12)
**leg**  (1)
**legal**  (2)
**length**  (1)
**letter**  (36)
**letters**  (2)
**letting**  (1)
**level**  (6)
**levels**  (2)
**liabilities**  (1)
**liability**  (1)
**license**  (4)
**licenses**  (2)
**lie**  (2)
**lies**  (1)
**life**  (3)
**light**  (2)
**likelihood**  (1)
**likewise**  (2)
**limited**  (2)
**Linda**  (3)
**LINE**  (23)
**lines**  (1)
**LinkedIn**  (1)
**Lisa**  (3)
**list**  (8)
**listed**  (4)
**listen**  (2)
**listened**  (2)

**listening**  (1)
**lists**  (3)
**litigation**  (4)
**little**  (19)
**live**  (1)
**local**  (2)
**located**  (4)
**location**  (11)
**locations**  (5)
**locked**  (1)
**logical**  (1)
**long**  (11)
**longer**  (8)
**long-time**  (1)
**look**  (72)
**looked**  (8)
**looking**  (11)
**looks**  (5)
**lot**  (29)
**lots**  (3)
**loud**  (3)
**lower**  (4)
**lunch**  (3)
**luncheon**  (1)

**< M >**
**main**  (10)
**maintain**  (2)
**maintained**  (1)
**maintenance**  (16)
**majority**  (1)
**making**  (15)
**Males**  (1)
**Mall**  (1)
**man**  (2)
**manage**  (6)
**managed**  (4)
**management**  (6)
**manager**  (9)
**managerial**  (3)
**managers**  (1)
**manages**  (4)
**managing**  (3)
**mandate**  (1)
**mandated**  (2)
**mandates**  (1)
**manipulate**  (3)
**manipulated**  (2)
**manpower**  (2)

**March**  (8)
**Marcy**  (20)
**Marcy's**  (1)
**Margolis**  (2)
**MARIA**  (6)
**mark**  (9)
**MARKED**  (50)
**Market**  (2)
**married**  (1)
**Marybeth**  (1)
**Matascavage**  (46)
**Matascavage's**  (3)
**material**  (1)
**materials**  (2)
**maternity**  (2)
**MATT**  (17)
**matter**  (8)
**matters**  (1)
**Mayer**  (1)
**Mayhall**  (4)
**MCCAMEY**  (1)
**meal**  (1)
**mean**  (26)
**meaning**  (8)
**means**  (2)
**meant**  (5)
**mechanism**  (1)
**medical**  (2)
**medication**  (1)
**meet**  (31)
**meeting**  (62)
**meetings**  (7)
**MEGHAN**  (3)
**Melissa**  (14)
**member**  (1)
**memo**  (1)
**memorialization**  (1)
**memorialize**  (2)
**memorialized**  (1)
**men**  (1)
**MENDEZ**  (3)
**mental**  (6)
**mention**  (5)
**mentioned**  (11)
**mentioning**  (2)
**MESSNER**  (1)
**met**  (35)
**metal**  (2)
**meter**  (1)

Deposition of Doreen Kutzler                 Jane Doe, et al. v. Schuylkill County Courthouse, et al.

metered *(3)*
meth *(1)*
mice *(1)*
mid *(5)*
MIDDLE *(9)*
middleman *(2)*
mile *(2)*
min *(1)*
mind *(3)*
minimal *(1)*
minimalized *(1)*
minimum *(4)*
minium *(1)*
minute *(1)*
minutes *(5)*
MIS *(7)*
mischaracterized *(1)*
misconstrue *(1)*
misconstrued *(2)*
misrepresented *(1)*
missed *(1)*
missing *(1)*
misspoke *(1)*
Missy *(8)*
Missy's *(1)*
mistake *(1)*
mistaken *(1)*
mobile *(1)*
mold *(1)*
mom *(1)*
moment *(1)*
Monday *(7)*
monetary *(1)*
money *(23)*
monies *(1)*
monitor *(1)*
monitors *(7)*
monopolize *(1)*
Monroe *(1)*
month *(2)*
monthly *(1)*
months *(1)*
moot *(1)*
morning *(8)*
mouse *(1)*
move *(9)*
moved *(12)*
movement *(6)*
movements *(3)*
moving *(2)*

mpipak@jonespassode
lis.com *(1)*
multiple *(3)*
Murphy's *(2)*
mwynkoop@margolise
delstein.com *(1)*

< N >
name *(18)*
named *(12)*
narrowed *(1)*
natural *(2)*
nature *(4)*
navigate *(1)*
near *(1)*
necessarily *(4)*
necessary *(11)*
need *(20)*
needed *(35)*
needing *(1)*
needs *(7)*
negatively *(1)*
negotiate *(1)*
negotiated *(1)*
negotiations *(12)*
nervous *(1)*
Nester *(7)*
never *(20)*
nevermind *(1)*
new *(19)*
newly *(2)*
NEWMAN *(1)*
news *(5)*
newspaper *(1)*
Nice *(1)*
nine *(1)*
nod *(1)*
non-commissioners
*(1)*
noncompliance *(2)*
non-contract *(1)*
nondisclosure *(1)*
non-discrimination
*(1)*
non-events *(1)*
Non-exempt *(5)*
non-hours *(1)*
non-paid *(3)*
nonprofit *(2)*

normal *(1)*
normally *(3)*
north *(21)*
Nos *(1)*
Notary *(2)*
note *(15)*
noted *(1)*
notes *(11)*
nothing's *(1)*
notice *(2)*
noticed *(1)*
notifications *(1)*
notified *(4)*
November *(15)*
NUMBER *(26)*
numbered *(3)*
numbers *(1)*
numerous *(1)*

< O >
oath *(1)*
obj *(1)*
object *(37)*
objecting *(2)*
objection *(44)*
objections *(2)*
obligation *(1)*
obligations *(1)*
observation *(1)*
observational *(1)*
observe *(1)*
observed *(9)*
observing *(4)*
obstacles *(3)*
obtain *(7)*
obviously *(6)*
occasion *(2)*
occasions *(4)*
occupancy *(2)*
occupation *(1)*
occupied *(4)*
occur *(14)*
occurred *(9)*
occurring *(4)*
O'Connor *(16)*
O'Connor's *(7)*
October *(36)*
odd *(3)*
odor *(1)*

offer *(5)*
offered *(6)*
offers *(1)*
office *(144)*
officer *(2)*
officers *(1)*
Offices *(63)*
office's *(1)*
official *(4)*
officials *(13)*
off-site *(1)*
Oh *(26)*
Okay *(645)*
old *(3)*
once *(8)*
once-a-week *(1)*
one-day *(1)*
ones *(4)*
on-job *(1)*
on-site *(1)*
open *(8)*
operate *(5)*
operated *(2)*
operating *(4)*
operational *(4)*
operations *(13)*
opinion *(11)*
opinions *(1)*
opportunity *(3)*
opposed *(8)*
optimal *(1)*
optimally *(1)*
option *(6)*
options *(3)*
order *(23)*
ordered *(6)*
ordering *(3)*
orders *(2)*
organization *(2)*
original *(1)*
originally *(9)*
outcome *(1)*
outlining *(2)*
outright *(2)*
Outside *(23)*
overflow *(6)*
overlap *(1)*
overrule *(2)*
oversaw *(1)*

Deposition of Doreen Kutzler                                    Jane Doe, et al. v. Schuylkill County Courthouse, et al.

oversight *(3)*
overtime *(2)*
overworked *(1)*
owed *(1)*

< P >
P.C *(1)*
p.m *(17)*
P.O *(1)*
PA *(1)*
PA.gov *(1)*
pad *(1)*
PAGE *(71)*
pages *(6)*
paid *(20)*
pamphlets *(1)*
panic *(3)*
paper *(4)*
paperclips *(4)*
papers *(1)*
paperwork *(1)*
PAR *(4)*
paragraph *(39)*
paragraphs *(2)*
PARALEGAL *(2)*
parents *(1)*
park *(7)*
parked *(1)*
parking *(34)*
parse *(1)*
part *(20)*
parted *(1)*
participate *(1)*
participated *(1)*
particular *(5)*
particularly *(1)*
parties *(1)*
part-time *(1)*
pass *(1)*
passed *(1)*
PASSODELIS *(1)*
paste *(1)*
path *(1)*
PAUL *(22)*
Paul's *(1)*
pause *(1)*
pay *(17)*
paying *(1)*
payment *(2)*

payroll *(1)*
penalized *(1)*
pending *(1)*
PENNSYLVANIA *(9)*
pens *(3)*
people *(7)*
perceive *(2)*
percent *(1)*
perception *(1)*
Perfect *(4)*
perfectly *(1)*
perform *(5)*
performance *(3)*
performed *(2)*
performing *(4)*
period *(16)*
periodic *(1)*
periodically *(2)*
periods *(2)*
permissible *(1)*
permitted *(13)*
perpetrator *(1)*
person *(15)*
personal *(7)*
personally *(3)*
personnel *(16)*
perspective *(9)*
perspectively *(3)*
pertaining *(1)*
Peter *(1)*
Philadelphia *(2)*
philanthropic *(1)*
Phoenix *(1)*
phone *(12)*
phones *(3)*
physical *(4)*
physically *(3)*
pick *(2)*
picked *(2)*
piece *(2)*
PIPAK *(81)*
Pittsburgh *(1)*
place *(14)*
placed *(4)*
Plaintiff *(9)*
plaintiffs *(54)*
plaintiff's *(1)*
plan *(7)*
planned *(7)*

plans *(4)*
platform *(3)*
play *(2)*
played *(1)*
plead *(1)*
please *(10)*
plees@dmclaw.com *(1)*
plenty *(1)*
PLLC *(1)*
plus *(1)*
PO *(2)*
point *(47)*
pointing *(1)*
points *(5)*
police *(9)*
policies *(5)*
policy *(19)*
political *(1)*
pool *(9)*
poorly *(1)*
pose *(1)*
posed *(6)*
position *(26)*
positions *(7)*
positive *(2)*
possession *(4)*
possible *(11)*
Possibly *(2)*
post *(1)*
posted *(2)*
posting *(3)*
postings *(2)*
post-secondary *(1)*
potential *(2)*
potentially *(7)*
power *(5)*
pract *(1)*
practical *(1)*
practice *(2)*
practices *(4)*
precontract *(1)*
predominantly *(1)*
preferred *(1)*
prep *(1)*
Preparation *(1)*
prepare *(1)*
prepared *(5)*
preparing *(1)*

prescreening *(1)*
presence *(3)*
PRESENT *(20)*
presentation *(2)*
presentations *(1)*
presented *(2)*
presenting *(1)*
preserved *(2)*
president *(1)*
press *(1)*
pressure *(1)*
pretty *(4)*
prevent *(1)*
PREVIOUSLY *(30)*
Price *(1)*
primary *(1)*
print *(2)*
printer *(13)*
printers *(14)*
prior *(36)*
priority *(1)*
prison *(2)*
private *(1)*
priveledged *(1)*
privilege *(14)*
privileged *(4)*
privy *(1)*
probably *(18)*
procedure *(1)*
procedures *(5)*
proceed *(1)*
proceeded *(1)*
process *(12)*
processing *(1)*
produced *(2)*
PRODUCTION *(1)*
productive *(2)*
professional *(3)*
professionally *(3)*
program *(9)*
programs *(9)*
progression *(1)*
prohibit *(1)*
project *(4)*
projected *(1)*
projecting *(1)*
promoted *(1)*
proper *(4)*
properties *(1)*

prospectively (1)
protected (2)
protection (2)
protocol (1)
protocols (3)
provide (30)
provided (37)
providers (1)
providing (5)
provision (1)
proximity (1)
PTO (15)
Public (9)
pull (3)
pulled (1)
purchase (3)
purchased (2)
purpose (3)
purposes (12)
pursuing (1)
purview (1)
push (1)
pushback (2)
pushed (5)
pushing (1)
put (32)
putting (3)

< Q >
qualified (1)
qualify (1)
qualifying (3)
quarterly (1)
question (52)
questioned (2)
questioning (6)
questions (7)
quick (4)
quickest (2)
quickly (2)
quote (1)
quotes (1)

< R >
raise (3)
raised (15)
raising (1)
ran (3)
range (1)

rat (1)
rate (2)
reach (6)
reached (8)
reaching (2)
react (1)
read (9)
readily (1)
reading (1)
reads (2)
ready (4)
reaffirming (1)
real (2)
realize (1)
realized (1)
really (14)
realm (1)
reason (39)
reasonable (10)
reasonably (1)
reasoning (2)
reasons (1)
rebuttal (1)
rec (1)
recall (71)
recalling (1)
receipt (2)
receipts (1)
receive (20)
received (27)
receiving (3)
recess (6)
recipients (1)
recite (1)
recognize (23)
recollect (1)
recollection (12)
recommendation (5)
recommendations (1)
recommended (2)
recommending (2)
reconsider (3)
reconsidering (1)
record (44)
recorded (2)
recording (3)
recruiting (2)
red (4)
reduced (2)

reduction (1)
refer (8)
reference (6)
referenced (4)
references (4)
referencing (7)
referred (1)
referring (15)
refresh (10)
refreshes (1)
refusal (2)
refuse (1)
refused (2)
regard (7)
regarding (82)
regardless (1)
regards (17)
regional (1)
register (1)
regular (4)
regularly (3)
reimburse (3)
reimbursed (1)
reimbursement (3)
reimbursements (1)
reinstill (1)
reiterated (1)
relate (1)
related (25)
relates (15)
relation (2)
relationship (4)
relayed (2)
relays (1)
releases (1)
relieved (2)
relocate (4)
relocated (1)
relocating (3)
remain (4)
remained (1)
remaining (1)
remains (1)
remember (52)
remembering (1)
remind (2)
reminder (1)
remote (1)
remotely (1)

removal (3)
remove (4)
removed (7)
Renee (2)
repercussions (1)
rephrase (6)
rephrased (1)
replacing (2)
report (44)
reported (11)
REPORTER (5)
Reporting (9)
reports (38)
represent (2)
representative (2)
representing (3)
represents (1)
reprimand (2)
Republican (1)
REQUEST (42)
requested (9)
requesting (5)
requests (8)
require (4)
required (10)
requirement (5)
requirements (7)
requires (1)
requisite (2)
reroute (1)
rescheduled (1)
rescheduling (1)
research (6)
researched (1)
reservation (1)
reserve (1)
resignation (5)
resigned (4)
resolution (2)
resolved (1)
resource (1)
Resources (31)
respect (1)
respective (1)
respects (1)
respond (33)
responded (6)
respondent (7)
responding (8)

responds  (2)
response  (46)
responses  (2)
responsibilities  (16)
responsibility  (4)
responsible  (2)
restrictions  (1)
restructuring  (3)
result  (8)
resume  (9)
resumes  (1)
retained  (4)
retaining  (2)
retaliation  (3)
retaliatory  (1)
retention  (1)
retired  (1)
retirement  (1)
return  (6)
returned  (1)
reveal  (1)
revenue  (2)
review  (11)
reviewed  (5)
revision  (1)
revoke  (1)
revoked  (1)
Reynolds  (3)
RFP  (1)
right  (153)
right-hand  (1)
risk  (9)
risks  (1)
Road  (8)
roadblocks  (1)
rob  (1)
role  (14)
roles  (2)
rolled  (1)
room  (9)
root  (1)
Roth  (56)
Roth's  (1)
roughly  (2)
route  (2)
row  (3)
RP  (3)
RPR  (3)
RSVP'd  (1)

rude  (1)
run  (6)
running  (8)
runs  (1)

< S >
safe  (8)
safety  (6)
sake  (1)
salary  (4)
sale  (6)
sales  (7)
Saturday  (4)
Saturdays  (1)
saw  (5)
saying  (16)
says  (37)
scared  (3)
schedule  (5)
scheduled  (13)
scheduling  (3)
scheme  (1)
school  (6)
SCHUYLKILL  (20)
Schuylkill's  (1)
Scott  (3)
screen  (8)
scribed  (3)
script  (1)
scroll  (5)
sealed  (1)
searching  (1)
second  (54)
secretarial  (9)
secure  (6)
security  (3)
see  (41)
seeing  (4)
seek  (5)
seen  (5)
select  (2)
selected  (7)
selection  (2)
self  (2)
seminars  (1)
Senate  (2)
send  (9)
sending  (1)
sends  (1)

Senior  (3)
sense  (7)
sensitive  (2)
sent  (25)
sentence  (33)
separate  (2)
September  (18)
serial  (2)
seriously  (1)
SERV  (1)
serve  (2)
served  (1)
SERVEPRO's  (1)
service  (7)
services  (18)
SERVPRO  (12)
session  (16)
sessions  (3)
set  (19)
setting  (3)
setup  (2)
seven  (2)
sex  (1)
sexual  (22)
shaking  (1)
shame  (1)
share  (4)
shared  (4)
she'd  (1)
sheer  (1)
SHEET  (1)
sheets  (3)
Sheriff  (17)
sheriff's  (4)
ship  (1)
shipping  (1)
shocked  (1)
short  (2)
shortest  (1)
shorthanded  (1)
shortly  (5)
short-term  (6)
show  (11)
showed  (1)
shown  (3)
sick  (8)
side  (3)
sight  (5)
sighting  (1)

sign  (10)
signature  (2)
signed  (16)
significant  (1)
significantly  (1)
signing  (2)
similar  (4)
simple  (3)
simply  (7)
simultaneous  (1)
simultaneously  (2)
sit  (4)
site  (3)
sits  (1)
situated  (1)
situation  (17)
size  (2)
slap  (1)
slight  (1)
slightly  (1)
smaller  (3)
smell/odor  (1)
SMITH  (216)
snake  (2)
snow  (1)
software  (1)
sole  (2)
solely  (2)
solicitation  (1)
solicitations  (1)
Solicitor  (8)
solicitors  (1)
Solicitor's  (2)
solo  (1)
solution  (2)
Solutions  (4)
somebody  (3)
someone's  (2)
somewhat  (7)
soon  (3)
sooner  (1)
sorry  (55)
sort  (8)
sound  (1)
sounded  (1)
sounds  (4)
source  (1)
space  (11)
spaces  (9)

Deposition of Doreen Kutzler                                    Jane Doe, et al. v. Schuylkill County Courthouse, et al.

speak  (48)
speaking  (4)
speaks  (4)
spearheaded  (1)
SPECIALIST  (4)
specialize  (2)
specialized  (1)
specific  (20)
specifically  (31)
specifics  (3)
speculate  (1)
speed  (4)
spent  (5)
spirit  (1)
spite  (2)
split  (3)
spoke  (9)
spoken  (5)
sporadically  (1)
spot  (3)
spots  (2)
St  (2)
staff  (8)
staffed  (1)
staffing  (9)
stained  (3)
stairs  (3)
stalking  (1)
stamped  (1)
stamps  (1)
Stan  (1)
stance  (1)
standard  (2)
standards  (1)
standing  (1)
staples  (1)
start  (22)
started  (20)
starting  (4)
state  (18)
stated  (7)
statement  (6)
statements  (3)
STATES  (33)
stating  (2)
status  (5)
statutes  (2)
stay  (3)
STEB  (48)

steno  (1)
stenographic  (1)
step  (6)
steps  (15)
stint  (14)
stipulations  (1)
stop  (6)
stopped  (3)
stopping  (2)
storage  (1)
stored  (1)
Strayer  (1)
Street  (11)
stress  (1)
stressed  (2)
Strictly  (1)
strike  (20)
Stroudsburg  (1)
study  (1)
stuff  (3)
style  (2)
subject  (1)
subjected  (1)
submission  (3)
submissions  (4)
submit  (9)
submitted  (10)
subordinate  (2)
subpoena  (3)
subpoenaed  (3)
subsequent  (2)
substance  (1)
substantial  (1)
success  (1)
successful  (1)
successor  (5)
successors  (1)
successor's  (1)
sudden  (1)
sufficient  (7)
suggest  (1)
suggested  (7)
suggesting  (1)
suggestion  (5)
suggestions  (1)
suggests  (2)
Suite  (7)
summarize  (1)
summarizes  (1)

summary  (4)
summer  (1)
Sunday  (1)
supervise  (1)
supervisor  (21)
supervisors  (7)
supervisory  (2)
supplement  (13)
Supplemental  (6)
supplementary  (1)
supplies  (19)
supply  (3)
support  (11)
supported  (2)
supporting  (3)
supposed  (12)
Sure  (33)
surrounding  (1)
surveillance  (2)
swearing  (7)
swipe  (1)
switch  (3)
switching  (2)
sworn  (1)
system  (6)
systems  (2)

< T >
take  (49)
taken  (12)
takes  (3)
talk  (11)
talked  (13)
talking  (12)
talks  (3)
tape  (2)
task  (4)
tasks  (5)
tax  (82)
team  (1)
technical  (2)
technically  (2)
TECHNICIAN  (3)
technicians  (1)
technological  (1)
technology  (2)
tedious  (1)
telecommuting  (15)
telework  (2)

tell  (43)
telling  (5)
tells  (2)
temporary  (8)
ten  (3)
tendency  (1)
term  (6)
termed  (3)
terminated  (2)
termination  (2)
terminology  (1)
terms  (2)
test  (1)
tested  (3)
testified  (8)
testify  (4)
testifying  (3)
testimony  (11)
testing  (1)
tests  (1)
Thank  (9)
Thanks  (1)
thereof  (2)
Theresa  (1)
thing  (7)
things  (17)
think  (184)
thinking  (3)
third  (6)
Thirty-plus  (1)
Thomas  (2)
thought  (35)
thoughts  (5)
three  (8)
tie  (1)
Tiffany  (3)
tile  (2)
tiles  (8)
time  (177)
time-individuals  (1)
timekeeping  (1)
timely  (1)
times  (11)
timing  (5)
tiny  (1)
tip  (1)
title  (2)
titled  (1)
Tobin  (15)

Deposition of Doreen Kutzler                                    Jane Doe, et al. v. Schuylkill County Courthouse, et al.

today  *(12)*
Today's  *(7)*
told  *(46)*
Tom  *(9)*
tomorrow  *(3)*
ton  *(2)*
tone  *(1)*
tool  *(2)*
TOOMEY  *(192)*
Toomey's  *(22)*
top  *(8)*
Total  *(1)*
tour  *(1)*
Tova  *(1)*
Tower  *(2)*
towers  *(3)*
township  *(1)*
tracing  *(4)*
track  *(1)*
traditional  *(2)*
train  *(1)*
trained  *(1)*
training  *(47)*
trainings  *(3)*
transactions  *(1)*
transcribe  *(1)*
transcribed  *(1)*
TRANSCRIPT  *(3)*
transfer  *(35)*
transferred  *(6)*
transferring  *(2)*
transition  *(1)*
transpired  *(1)*
treading  *(1)*
treasurer's  *(1)*
tried  *(4)*
tries  *(1)*
Trifun  *(4)*
trigger  *(4)*
triggered  *(3)*
tripping  *(1)*
trouble  *(1)*
true  *(5)*
truth  *(1)*
truthfully  *(3)*
try  *(4)*
trying  *(21)*
Tuesday  *(1)*
turn  *(6)*

turned  *(1)*
Turning  *(1)*
Twenty-two  *(1)*
Twigg  *(7)*
Twigg's  *(5)*
two  *(49)*
two-thirds  *(1)*
two-weeks  *(1)*
type  *(8)*
typical  *(1)*
Typically  *(3)*
typos  *(1)*

< U >
UC  *(2)*
Uh-huh  *(13)*
ultimately  *(4)*
un  *(1)*
uncomfortable  *(7)*
underlying  *(1)*
underneath  *(1)*
understaffed  *(2)*
understand  *(56)*
Understandable  *(2)*
understandably  *(1)*
understanding  *(72)*
understood  *(8)*
undue  *(1)*
unemployment  *(5)*
unescorted  *(5)*
unhappy  *(1)*
union  *(3)*
Unit  *(2)*
UNITED  *(1)*
University  *(3)*
unjustified  *(2)*
unknowing  *(1)*
unlawful  *(2)*
unoccupied  *(1)*
unpaid  *(5)*
unquote  *(1)*
update  *(4)*
updates  *(1)*
upgrade  *(1)*
upgraded  *(2)*
upload  *(1)*
upper  *(3)*
upset  *(2)*
usage  *(3)*

use  *(37)*
user  *(1)*
uses  *(3)*
usual  *(1)*
utilize  *(6)*
utilized  *(2)*
utilizing  *(2)*

< V >
vacation  *(14)*
vacations  *(2)*
variety  *(1)*
various  *(1)*
vehicle  *(2)*
vendor  *(1)*
vent  *(1)*
verbal  *(3)*
verify  *(1)*
verse  *(1)*
version  *(1)*
versus  *(4)*
vetted  *(1)*
victim  *(1)*
victims  *(4)*
VIDEO  *(23)*
VIDEOGRAPHER
   *(16)*
videos  *(7)*
VIDEOTAPE  *(1)*
view  *(7)*
viewed  *(1)*
violation  *(2)*
violations  *(1)*
virtual  *(3)*
virtually  *(6)*
visibly  *(2)*
visit  *(2)*
visits  *(2)*
voiced  *(2)*
void  *(1)*
VOLUME  *(3)*
vote  *(9)*
voted  *(8)*
votes  *(1)*
voting  *(1)*

< W >
wait  *(10)*
waited  *(3)*

waiting  *(7)*
waive  *(1)*
waiving  *(3)*
walk  *(10)*
walked  *(6)*
walking  *(7)*
wanded  *(2)*
wanding  *(1)*
want  *(43)*
wanted  *(43)*
wanting  *(3)*
wants  *(5)*
washed  *(1)*
water  *(7)*
way  *(19)*
weather  *(1)*
Wednesday  *(2)*
Wednesdays  *(1)*
weeded  *(1)*
week  *(11)*
weekly  *(8)*
weeks  *(6)*
well  *(100)*
Wendy  *(1)*
went  *(15)*
we're  *(41)*
we've  *(9)*
Whalen  *(1)*
whatnot  *(1)*
when's  *(1)*
WILLIAM  *(1)*
willing  *(4)*
wills  *(1)*
Wilmur  *(4)*
window  *(5)*
wishes  *(1)*
withdraw  *(1)*
WITNESS  *(59)*
woman  *(4)*
women  *(5)*
wondering  *(1)*
word  *(6)*
worded  *(1)*
words  *(5)*
work  *(156)*
workday  *(1)*
worked  *(33)*
work-from-home  *(8)*
working  *(52)*

**workload**  *(1)*
**works**  *(5)*
**workspace**  *(1)*
**worry**  *(1)*
**worth**  *(2)*
**would've**  *(1)*
**write**  *(9)*
**writes**  *(2)*
**write-up**  *(1)*
**writing**  *(10)*
**written**  *(7)*
**wrong**  *(23)*
**WYNKOOP**  *(5)*

**< Y >**
**yank**  *(1)*
**Yeah**  *(102)*
**year**  *(5)*
**years**  *(9)*
**Year's**  *(1)*
**yelling**  *(1)*
**Yep**  *(3)*
**youth**  *(5)*

**< Z >**
**zeros**  *(1)*
**Zimmerman**  *(4)*
**Zoom**  *(21)*
**Zooming**  *(1)*
**Zula**  *(48)*
**Zula's**  *(5)*

EXHIBIT

P23

```
 1   ---------------------------

 2   JANE DOE, et al.,           : UNITED STATES DISTRICT COURT
              Plaintiff          : MIDDLE DISTRICT OF PENNSYLVANIA
 3        v.                     :
     SCHUYLKILL COUNTY           : CIVIL DOCKET NO:
 4   COURTHOUSE, et al.,         : 3:21-CV-00477
              Defendants         :
 5   ---------------------------

 6

 7                          ***

 8                     VOLUME II

 9                          ***

10          TRANSCRIPT MARKED CONFIDENTIAL

11                          ***

12

13

14

15

16

17

18          VIDEOTAPE DEPOSITION OF DOREEN KUTZLER

19   taken at the Law Offices of Margolis Edelstein,

20   214 Senate Avenue, Suite 402, Camp Hill,

21   Pennsylvania 17011 on Thursday, January 26, 2023

22   at 9:01 a.m. before Coleen Trifun, RPR and Notary

23   Public.

24
```

```
 1   A P P E A R A N C E S :

 2           DEREK SMITH LAW GROUP, PLLC
             BY:  CATHERINE SMITH, ESQUIRE
 3           1835 Market Street
             Suite 2950
 4           Philadelphia, Pennsylvania 19103
             catherine@dereksmith.com
 5           Counsel for the Plaintiff

 6           NEWMAN WILLIAM, P.C.
             BY:  GERARD J. GEIGER, ESQUIRE
 7           P.O. BOX   511
             712 Monroe Street
 8           Stroudsburg, Pennsylvania 18360
             ggeiger@newmanwilliams.com
 9           Counsel for George Halcovage

10           JONES PASSODELIS
             BY:  MARIA PIPAK, ESQUIRE
11           Gulf Tower, Suite 3410
             707 Grant Street
12           Pittsburgh, Pennsylvania 15219
             mpipak@jonespassodelis.com
13           Counsel for Gary Bender and Heidi Zula
             (Via Zoom.)

14

15           DICKIE MCCAMEY
             BY:  PAUL G. LEES, ESQUIRE
16           190 Brodhead Road, Suite 310
             Bethlehem, Pennsylvania 18017
17           plees@dmclaw.com
             Counsel for additional parties

18

19           MARGOLIS EDELSTEIN
             BY:  MEGHAN WYNKOOP, ESQUIRE
20               JOCELYN MENDEZ, ESQUIRE
             The Curtis Center
21           170 S. Independence Mall W.
             Suite 400E
22           Philadelphia, Pennsylvania 19106
             mwynkoop@margolisedelstein.com
23           Counsel for Glenn Roth

24
```

```
 1              ALSO PRESENT:

 2          ALEISHA CATTS, VIDEO SPECIALIST
            MATT MESSNER, TECHNICIAN (Via Zoom)
 3          ALYSSA DEBISE, PARALEGAL
            JANE DOE 3 (Via Zoom)
 4          JANE DOE 4 (Via Zoom)
            GEORGE HALCOVAGE (Via Zoom)
 5

 6

 7

 8

 9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24
```

Deposition of Doreen Kutzler Vol. II - Revised                    Jane Doe, et al. v. Schuylkill County Courthouse, et al.

```
 1                        -  -  -

 2                       INDEX

 3                        -  -  -

 4  WITNESS              INTERROGATION BY      PAGE

 5  DOREEN KUTZLER

 6                 By Ms. Smith          7

 7                        -  -  -

 8                      EXHIBITS

                         -  -  -

10  EXHIBIT NUMBER        DESCRIPTION        PAGE

11  Exhibit-296          SC 206-207         15

12                        -  -  -

13            PREVIOUSLY MARKED EXHIBITS

14  Exhibit-43  Page 8        Exhibit-118  Page 21

15  Exhibit-226 Page 47       Exhibit-137  Page 49

16  Exhibit-120 Page 57       Exhibit-139  Page 60

17  Exhibit-30  Page 67       Exhibit-106  Page 79

18  Exhibit-97  Page 79       Exhibit-98   Page 79

19

20

21

22

23

24
```

Deposition of Doreen Kutzler Vol. II - Revised                    Jane Doe, et al. v. Schuylkill County Courthouse, et al.

```
 1              DIRECTION TO WITNESS NOT TO ANSWER

 2    PAGE   LINE          PAGE   LINE          PAGE   LINE

 3                          (None)

 4

 5

 6

 7

 8

 9

10

11

12

13         REQUEST FOR PRODUCTION OF DOCUMENTS

14    PAGE   LINE          PAGE   LINE          PAGE   LINE

15                          (None)

16

17

18

19

20

21

22

23

24
```

Page 6

1  VIDEOGRAPHER: We're now on the
2 record. Today's date is January 26, 2023, and the
3 time is approximately 9:01 a.m. This is the
4 recorded video deposition of Doreen Kutzler,
5 Volume II, in the matter of Jane Doe et al versus
6 Schuylkill County Courthouse et al. This
7 deposition is being held at 214 Senate Avenue in
8 Kent -- in Camp Hill, Pennsylvania.
9        My name is Aleisha Catts from
10 Everest Court Reporting, I'm the video specialist.
11 The court reporter today is Coleen Trifun, also
12 from Everest Court Reporting. Counsel will now
13 state their appearance for the record.
14        MS. SMITH: Good morning.
15 Catherine Smith on behalf of the plaintiffs.
16 Present in the room is my paralegal Alyssa
17 Debise and observing by video are Plaintiffs Jane
18 Doe 2 through 4, Jane Doe 2, Jane Doe 3, and Jane
19 Doe 4.
20        MR. LEES: Paul Lees for Defendant
21 Kutzler.
22        MS. WYNKOOP: Megan Wynkoop for
23 Defendant Glenn Roth.
24        MS. MENDEZ: Jocelyn Mendez for

Page 7

1 Defendant Glenn Roth.
2        MR. GEIGER: Gerry Geiger for
3 Defendant George Halcovage, who is listening in by
4 Zoom.
5        MS. PIPAK: Maria Pipak for Gary
6 Bender, Heidi Zula, and Schuylkill County.
7        MS. SMITH: Same stipulations
8 today, Counsel, objection to form and privilege
9 only.
10        MR. LEES: Yes. And reading and
11 signing reserved. Thank you.
12        MS. SMITH: Yeah.
13        - - -
14        DOREEN KUTZLER, having been first duly
15 sworn, was examined and testified as follows:
16        - - -
17        Examination
18        - - -
19 BY MS. SMITH:
20 Q.     Good morning, Ms. Kutzler.
21 A.     Good morning.
22 Q.     Did you speak with your attorney
23 before -- or between yesterday's deposition and
24 today's deposition?

Page 8

1 A.     No.
2 Q.     Okay.
3        And do you recall the instructions and
4 rules that I gave you about your deposition
5 yesterday?
6 A.     Yes.
7 Q.     Do you have any questions about those
8 rules for today's deposition?
9 A.     No.
10 Q.     Okay.
11        Any medication or alcohol or any other
12 substance that you -- you ingested that would
13 impair your ability to testify truthfully here
14 today?
15 A.     No.
16 Q.     Any other reason you can think of why
17 you couldn't testify truthfully today?
18 A.     No.
19 Q.     All right.
20        MS. SMITH: We are going to start
21 out with previously marked Exhibit 43.
22        - - -
23        (Previously marked Exhibit-43.)
24 BY MS. SMITH:

Page 9

1 Q.     Have you ever seen this document before?
2 A.     I have.
3 Q.     Okay.
4        And where did you see it?
5 A.     On the county's intranet.
6 Q.     Okay.
7        So this was on the county's intranet
8 when you were working at the Schuylkill County
9 Courthouse?
10 A.     Yes.
11 Q.     Okay.
12        Was this, your understanding, was the
13 organizational chart for the county?
14 A.     Yes.
15 Q.     All right.
16        If we look to -- it's a little bit
17 small, but if we look to the -- under the
18 electorate at the top about, I want to say, like
19 two quarters of the way from the left, we see
20 commissioners.
21        Do you see that?
22 A.     Yes.
23 Q.     And below the -- the commissioners in a
24 line of supervision is county administrator to the

Case 3:21-cv-00477-MCC Document 280-2 CONFIDENTIAL Filed 09/20/23 Page 178 of 373
Deposition of Doreen Kutzler Vol. II - Revised
Jane Doe, et al. v. Schuylkill County Courthouse, et al.

Page 10

1 far right of the line below that.
2      Do you see that?
3 A.     Yes.
4 Q.     It's your understanding then that the
5 county administrator reported to the
6 commissioner's as their supervisors?
7 A.     Yes.
8 Q.     And below county administrator we have a
9 number of offices, including on the -- the
10 right-hand side, second from top, human resources.
11      Is it your understanding that human
12 resources reported to the county administrator?
13 A.     Yes.
14 Q.     Okay.
15      And then we have below -- if we go down
16 a few, there's the assessment office.  It's still
17 kind in that direct line to county administrator.
18 Do you see that on the right-hand side?  It's
19 about three up from Rest Haven at the very bottom.
20 A.     Why can I not find this?
21 Q.     So if you --
22 A.     Oh, there it is.  Yes.  Yes.
23 Q.     Is it your understanding that the --
24 that that's the tax assessment office?

Page 11

1 A.     Yes.
2 Q.     And is it your understanding that the
3 tax assessment office directly reported to the
4 county administrator?
5 A.     Yes.
6 Q.     Okay.
7      And going back up, under commissioners,
8 just down to the right corner of commissioners,
9 there's solicitor.  That would be the -- the
10 county solicitor's office.
11      Am I correct?
12 A.     Yes.
13 Q.     And below them is tax claim.
14      Would that be the tax claim bureau?
15 A.     Yes.
16 Q.     And was it your understanding that the
17 organizational structure of the county, it was
18 that the tax claim bureau reported to the
19 solicitor's office?
20 A.     I was under the impression that they
21 reported up through the county administrator.
22 Q.     Okay.
23      And then who did the solicitors report
24 to?

Page 12

1 A.     The commissioners.
2 Q.     They didn't also report to the county
3 administrator?
4 A.     Not to my knowledge.
5 Q.     So on a supervisory level, would the
6 solicitor be an equivalent of a county
7 administrator?
8 A.     Yes.
9 Q.     Okay.
10      And those offices -- the solicitors
11 office and the administrators office both reported
12 to the commissioners?
13 A.     Correct.
14 Q.     Okay.  All right.  You can put that one
15 aside.
16      All right.
17      Yesterday, Ms. Kutzler, we were talking
18 about some implementation and sexual harassment
19 training that you started to conduct in transition
20 into -- after Ms. Zula was hired.
21      Can you tell me what, if anything, you
22 did to implement or to administer sexual
23 harassment training at the county?
24 A.     Yeah.  So when it was decided that the

Page 13

1 harassment training would be conducted, I worked
2 with my boss, Tom Hubric, to develop and customize
3 the training that was utilized at the county.
4      In addition to that, we developed a
5 quiz.  We revised the policy.  There was a video
6 that was purchased, which was an overview of
7 sexual harassment training.  We had Stop It put in
8 place.  And then we set the schedule for both in
9 person and virtual trainings for all the
10 employees.
11 Q.     Were the virtual trainings virtual, as
12 in they were viewing a live presentation or a live
13 person or was it like a recorded video that they
14 could watch?
15 A.     They were -- it was via Zoom and the
16 attendants, the participants were listening to me
17 provide the training to the in-person attendees.
18 Q.     And the county employees, as well as
19 elected officials were all notified that the
20 training was mandatory?
21 A.     Yes.
22 Q.     Okay.
23      And there was, as I understand it,
24 correct me if I am wrong, there was a training for

Page 14

1 supervisors or managerial level and a different
2 presentation for regular level employees?
3 A.     Yes.
4 Q.     Okay.
5        What was the difference between the two
6 or, if you recall, what were the primary
7 differences?
8 A.     So with the managerial, there was a --
9 there was a different deck for the managerial
10 training, a PowerPoint deck.  And then there was a
11 general employee deck.  And with the guidelines
12 under Title 7, there are specific requirements for
13 supervisors and managers, more specifically they
14 are held to a different standard being that they
15 are in a managerial position.
16 Q.     Okay.
17        And do you recall, did Mr. Bender attend
18 the managerial presentation?
19 A.     Yes.
20 Q.     And did Defendant Halcovage attend that?
21 A.     Yes.
22 Q.     Did Ms. Zula attend one of those
23 trainings?
24 A.     Yes.

Page 15

1 Q.     Did she attended the general employee or
2 the managerial?
3 A.     Managerial.
4 Q.     And did Glenn Roth attend one of those
5 trainings?
6 A.     He did.
7 Q.     The managerial or the general?
8 A.     Managerial.
9 Q.     Okay.
10        And would you believe that each of those
11 individuals, Mr. Bender, Mr. Halcovage, Ms. Zula,
12 and Mr. Roth all were of a supervisory managerial
13 level, that's why they attended that training?
14 A.     Yes.
15 Q.     Okay.
16        Going to show you what -- I don't
17 believe it's been marked an exhibit, it's 206 and
18 207.
19        MS. SMITH:  I think it should be
20 labeled probably SC 206 and 207, Matt.  So it will
21 be 296.
22        (SC 206-207 marked as Exhibit-296 for
23 identification.)
24              - - -

Page 16

1 BY MS. SMITH:
2 Q.     Do you recognize these documents, Ms.
3 Kutzler?
4 A.     Yes.
5 Q.     Okay.
6        And this first page, 206, is an
7 acknowledgment form for receipt of a -- of the
8 county's anti-harassment and non-discrimination
9 policies revised January 2021.
10        Is that accurate?
11 A.     Yes.
12 Q.     Okay.
13        Did you revise the policy in January of
14 2021?
15 A.     I did.
16 Q.     Okay.
17        Did you create this form or edit it to
18 change the date to say January 2021?
19 A.     Yes.
20 Q.     All right.
21        And this was something that each
22 individual who attended the training, signed
23 because they received the policy at that time.
24        Is that accurate?

Page 17

1 A.     Yes.
2 Q.     All right.
3        If we turn to the second page, you had
4 just testified about creating a quiz.
5        Is this the quiz you created?
6 A.     It is.
7 Q.     And other than -- I know you said Mr.
8 Hub -- Tom Hubric, right, helped you with some of
9 this work, but other than him, was there anyone
10 else who participated in changing the policy or
11 drafting this quiz?
12 A.     No.
13 Q.     If we look -- I'm going to just run
14 through the questions and I would like you to tell
15 me which -- what the correct response in your mind
16 is.
17        The first one says:  You see a cowork --
18 you see a coworker aggressively flirting with a
19 new employee.  She seems to like the attention and
20 has never complained.  Should you do anything
21 about it?  What in your mind is the correct
22 response?
23 A.     Yes.
24 Q.     Okay.  Your Facebook account is your own

Page 18

1  personal business and you can post whatever you
2  want, regardless of who you are, quote, friends
3  with?
4  A.    Incorrect.
5  Q.    You should be more tolerant of
6  inappropriate behaviors of customers or visitors?
7  A.    Incorrect.
8  Q.    Can I tell dirty jokes to coworkers so
9  long as nobody is offended?
10 A.    Incorrect.
11 Q.    I have a huge crush on a coworker and I
12 want to ask him or her out.  This is okay per
13 county policy?
14 A.    Yes.
15 Q.    I am Latino, therefore I am allowed to
16 speak freely about my thoughts about Latinos?
17 A.    Incorrect.
18 Q.    I'm addicted to Instagram and I have a
19 streak with my brother.  We just send funny,
20 harmless pics to each other throughout the day.
21 This is fine as it -- it is not a violation of the
22 county's harassment policy?
23 A.    Incorrect.
24 Q.    Although I'm a big hugger, I should

Page 19

1  never hug a coworker, supervisor, row office,
2  and/or commissioner?
3  A.    Correct.
4  Q.    I am very strong in my faith and I enjoy
5  talking about what I learned at church with my
6  coworkers who are strong in their faith.  This is
7  cool to do at work?
8  A.    Correct.
9  Q.    My supervisor/manager makes sexual
10 comments to me and it makes me uncomfortable.  As
11 he or she is my supervisor, I'm afraid that he or
12 she will be upset with me if I tell him or her to
13 stop.  In this situation, I should tell county
14 administrator or human resources and not worry
15 about potential retaliation?
16 A.    Correct.
17 Q.    Was this quiz administered during the
18 trainings for -- the in-person trainings for the
19 managerial staff?
20 A.    Yes.
21 Q.    And was it -- the person taking it
22 answered the questions on their own; is that
23 accurate?
24 A.    They did answer in advance and then we

Page 20

1  reviewed each question.
2  Q.    Okay.
3        And was -- the review was slides on the
4  PowerPoint to explain kind of the content of the
5  answers?
6  A.    Yes.
7  Q.    Do you recall if the PowerPoint for the
8  managerial supervisors, employees indicated
9  clearly that a supervisor could never have a
10 consensual relationship with a subordinate
11 employee?
12 A.    We touched on it.
13 Q.    Okay.
14 A.    But we didn't go into specifics or any
15 great detail.
16 Q.    Given that Commissioner Halcovage had
17 been accused of being in what he alleged was a
18 consensual relationship with a subordinate
19 employee, is there a reason that you didn't go
20 into more detail with that?
21 A.    No.
22 Q.    Was there -- as it relates to No. 4, can
23 I tell dirty -- dirty jokes to coworkers so long
24 as no one is offended.  Was there -- do you recall

Page 21

1  what the explanation or basis for saying that that
2  was incorrect was?
3  A.    In providing the training, it was about
4  knowing your audience and it was recommended and
5  suggested that if you wouldn't say it to your mom
6  or your grandmother or you don't want it splashed
7  on the front page of a newspaper, better left
8  unsaid.
9  Q.    Because you might think -- correct me if
10 I'm wrong, you might think someone is offended,
11 but -- or not offended, but they may internally or
12 not speak out about being they're offended,
13 correct?
14 A.    Certainly.
15 Q.    Okay.  You can put that one aside.
16       MS. SMITH:  Going to look at what's
17 been previously marked 118.
18       Matt, we are going to pull up
19 previously marked Exhibit-118.  Thank you.
20                - - -
21       (Previously marked Exhibit-118.)
22                - - -
23 BY MS. SMITH:
24 Q.    Do you recognize this document?

Page 22

1  A.      I do.
2  Q.      Okay.
3         So February of 2021, this -- this e-mail
4  specifically, February 8, 2021, can you tell me
5  what your role was in regards to personnel matters
6  such as this?
7  A.      As of this date?
8  Q.      Correct.
9  A.      Yeah.  I -- at this --
10        MS. PIPAK:  I am going to object to
11  the form.
12        But you can answer.
13        THE WITNESS:  At this point, I was
14  primarily focused on developing the training and
15  getting the schedule --
16  BY MS. SMITH:
17  Q.      Okay.
18  A.      -- developed.
19  Q.      So why then was it that Ms. Zula was
20  sending you a work performance memorandum to
21  review?
22  A.      I think just to have another set of eyes
23  review it.
24  Q.      Did you review this?

Page 23

1  A.      I did.
2  Q.      Did you respond to her?
3  A.      I don't recall specifically making any
4  recommended changes.
5  Q.      Okay.
6         Did you have any involvement in this
7  memorandum or what the contents of the memorandum
8  were prior to Ms. Zula reaching out to you?
9  A.      No.
10  Q.      Okay.
11        So did you have -- I mean, between
12  January 11, 2021, when Ms. Zula started and
13  February 8, 2021, when she sent you this e-mail,
14  were you still physically working at the
15  courthouse?
16  A.      Yes.
17  Q.      Okay.
18        When was your last physical day in the
19  courthouse, if you recall?
20  A.      April 14th.
21  Q.      So Monday through Friday, 9:00 to
22  5:00ish, you were physically in the courthouse
23  during that time?
24  A.      No.  Because of the training, I was

Page 24

1  typically there on Tuesdays, Wednesdays, and
2  Thursdays, just because Mondays and Fridays are
3  difficult with so many individuals taking time off
4  or being away.  And the schedules were -- you
5  know, as an example, when I was at the prison,
6  those were 24-hour shifts.  So I conducted
7  training at 3:00 a.m., 7:00 a.m., and it was
8  either 1:00 or 2:00 p.m.
9  Q.      Okay.
10  A.      So depending upon the departments needs
11  based upon their schedule and when they could
12  attend, there were -- I conducted 54 training
13  sessions.
14  Q.      So January -- I think we talked about
15  this yesterday.  January 11, 2021, Ms. Zula
16  starts.  And I think you said the transfer of
17  knowledge was about four to five weeks?
18  A.      Yes.
19  Q.      So for those four to five weeks, were
20  you -- or however long the transfer of knowledge
21  took, were you physically still in the courthouse
22  Monday through Friday?
23  A.      Yes.
24  Q.      And you weren't conducting in-person

Page 25

1  trainings for those four to five weeks; is that
2  correct?
3  A.      Correct.
4  Q.      Okay.
5         That's kind of when you were revising
6  the policy and getting the training materials
7  ready for the presentation?
8  A.      Yes.
9  Q.      Okay.
10        And then -- so that would take us about
11  to early February, early to mid February probably;
12  am I correct?
13  A.      Yes.
14  Q.      All right.
15        And then -- because training started
16  around February -- well, were supposed to start
17  February 18th.  Really started February 19th?
18  A.      Yes.
19  Q.      So is February 19th roughly then when
20  you went to this Tuesday, Wednesday, Thursday
21  schedule?
22  A.      Yes.
23  Q.      And were you only at the county
24  buildings, whether it be the prison or a different

Page 26

1  location, when you were conducting in-person
2  trainings or doing a Zoom training?
3  A.      Yes, that's correct.
4  Q.      So post the start of the training
5  presentations, were you doing any other county
6  work, if not like sending e-mail and then submit a
7  request?
8  A.      Other than managing the quizzes and the
9  acknowledgment pages so that they could be tracked
10 and then recorded and then placed in the employees
11 personnel file.
12 Q.      Okay.
13        So no like day-to-day HR complaints?
14 A.      No.
15 Q.      Or benefit administration, nothing like
16 that?
17 A.      No.
18 Q.      Okay.
19        So then your schedule became just as
20 needed for implementation or presentation of
21 training?
22 A.      Yes.
23 Q.      Okay.
24        So as February 8th is before

Page 27

1  February 19th, were you still -- do you believe
2  still working in the county courthouse at this
3  point on a regular basis?
4  A.      Yes.
5  Q.      Okay.
6        Were you involved in any interactions or
7  discussions about the plaintiffs between
8  January 11th and February 18th, that you recall?
9  A.      There were likely some conversations.
10 Q.      Do you recall what they were?
11 A.      No, I do not.  Sorry.
12 Q.      Okay.
13        So, again, I think you said you were
14 only -- you only were involved in this issue
15 that's the contents of this document after Ms.
16 Kutzler -- after Ms. Zula sent you this e-mail.
17        Is that correct?
18 A.      Yes.
19 Q.      All right.
20        Did -- do you recall if you reviewed
21 this document and signed off on it or approved it?
22 A.      I did not approve it.
23 Q.      Okay.
24 A.      I -- I would not have -- we would have

Page 28

1  discussed it.
2  Q.      Okay.
3  A.      But it wasn't in my purview because I
4  didn't want to step on Heidi's toes, because she,
5  at that point in time, was the HR director and the
6  decisions as to how she wanted to support the
7  county, I let her handle that.
8  Q.      Did -- so Ms. Zula in her e-mail says:
9  Please feel free to add, delete, or change
10 whatever you deem appropriate.
11        Did you add, delete, or change anything
12 in this document?
13 A.      Not that I recall.
14 Q.      Did you explain to her, like, why you
15 didn't feel the need to or that it was her -- her
16 job kind of now to do the HR work?
17 A.      Yeah.  We did have a conversation and I
18 shared with her that I would, you know, slowly
19 pull back any influence that I might have on her
20 because it was really her opportunity to get her
21 feet underneath her and to, you know, manage the
22 role as she saw fit.
23 Q.      Did you speak with Defendant Bender
24 about the contents of this document?

Page 29

1  A.      No, I did not.
2  Q.      This is a document that includes
3  information related to the STEB reports.
4        Would you agree?
5  A.      Yes.
6  Q.      Okay.
7        And I think you testified to this
8  yesterday, that STEB reports were something that
9  you were instructed were not in the purview of the
10 HR department.
11        Am I correct in your testimony?
12 A.      Yes.
13 Q.      Did you bring that to Ms. Zula's
14 attention and say, I was instructed by Mr. Bender
15 that this is not something that's supposed to be
16 HR or alert her to that at all?
17 A.      We did have a conversation.  I did make
18 her aware of my conversation with Mr. Bender and
19 that he said that that is a tax assessment
20 responsibility.
21 Q.      What was her response?
22 A.      I don't recall specifically.
23 Q.      Okay.
24        Do you believe that a memorandum such as

Page 30

1 this is in line with what the instructions that
2 Defendant Bender gave you related to STEB reports?
3        MS. PIPAK:  I am going to object to
4 the form.
5        But you can answer.
6        THE WITNESS:  Can you rephrase the
7 question?
8 BY MS. SMITH:
9 Q.     Sure.
10       So given that Mr. Bender instructed you
11 that STEB reports were in the purview of the tax
12 assessment office and not within the HR
13 department, is this something that you feel that
14 you would have done while you were HR director,
15 given it contains STEB information?
16       MS. PIPAK:  Same objection.
17       But go ahead.
18       THE WITNESS:  If Mr. Bender --
19 because of their -- the lack of communication
20 between Jane Doe 3 and Mr. Bender, I think he did
21 use HR as a conduit, again as a communicator.  So
22 if he would have instructed me to draft something,
23 I would have drafted.
24 BY MS. SMITH:

Page 31

1 Q.     Okay.
2        But does it seem contrary to what Mr.
3 Bender's instructions were regarding HR not
4 dealing with STEB?
5 A.     Yeah.  I'm sure it could be perceived
6 that way.
7 Q.     Okay.
8        In Ms. Zula's e-mail to you, she said
9 she really focused on the failure to submit STEB
10 reports for the basis for removal from her
11 position.
12       Were there discussions that were being
13 had in February to remove Jane Doe 3 from her
14 position as chief assessor?
15 A.     Not with me.
16 Q.     The sentence before that says:  I really
17 struggled with putting this memo together.  Ms.
18 Zula had only been employed by the county just shy
19 of a month at that point, correct?
20 A.     Yes.
21 Q.     Do you know, did Ms. Zula have any tax
22 assessment knowledge prior to coming to the
23 county?
24 A.     Not to my knowledge.

Page 32

1 Q.     You had been employed by the county or
2 worked at the courthouse for about four months
3 before you kind of transitioned into the training
4 role, correct?
5 A.     Yes.
6 Q.     Do you feel that in those four months,
7 you had gained enough knowledge to really eval --
8 about the STEB reports and the tax assessment
9 office to make a determination about their
10 operations?
11 A.     No.
12 Q.     Okay.
13       So would you think then Ms. Zula would
14 have -- if she had no prior experience, do you
15 think a month is enough time to really understand
16 what the tax assessment office does?
17       MS. PIPAK:  Object to the form.
18       But you can answer.
19       THE WITNESS:  Not likely.
20 BY MS. SMITH:
21 Q.     Okay.
22       And given -- I imagine you observed what
23 Ms. Zula did for that first month she was
24 employed?

Page 33

1 A.     Yes.
2 Q.     And there's a lot more than just the
3 assessment office at the county, correct?
4 A.     Yes.
5 Q.     And so it's not likely that she was
6 spending that entire month focused on the
7 assessment office, is it?
8        MR. LEES:  Objection to the form.
9        You can answer.
10       THE WITNESS:  Correct.
11 BY MS. SMITH:
12 Q.     Okay.
13       In the memorandum itself starting on
14 Page 2, so Zula 414, it starts with:  On
15 February 5, 2021, a meeting was held by the human
16 resources office with Ms. Jane Doe 3 and Ms. Jane
17 Doe 4 to discuss the operation of the tax
18 assessment office.
19       Do you recall being present at that
20 meeting?
21 A.     I do.
22 Q.     Okay.
23       Who requested that meeting?
24 A.     Ms. Zula.

Page 34

Q.    And she requested your presence or you decided to go?

A.    She requested my presence.

Q.    And do you know why?

A.    So that she could learn more about the tax assessment office and the day-to-day operations.

Q.    Okay.

      What, if any, participation or involvement did you have in the meeting, other than being there?

A.    I observed.

Q.    Okay.

      Didn't ask any questions?

A.    No.

Q.    What was your opinion of the meeting?

A.    That it was cordial and it was Ms. Zula asking questions about the day-to-day operations so that she could have a better understanding.

Q.    Did Jane Doe 3 provide information regarding operational staffing issues at the office -- assessment office was having at that time?

A.    I think so.

Page 35

Q.    Do you feel that Jane Doe 3 or Jane Doe 4 voiced specific needs that the office had that the county could assist them with during that meeting?

A.    Yes.

Q.    How was Ms. Zula's or what was Ms. Zula's response to those requests?

A.    She had -- was taking notes and she may have said something along the lines of, it would be something that she would have to review with Mr. Bender.

Q.    And that's something you experienced yourself where you couldn't really provide what was requested without Mr. Bender's approval, correct?

A.    Correct.

Q.    All right.

      In the first photograph at the bottom, I think it's the very last sentence, but it's three lines up, she explained -- and it's talking about Jane Doe 3 if you look at the sentence prior.  She explained that despite COVID, the real estate market has been very business, causing the preparation of STEB reports to be delayed by one

Page 36

or two months.  She's indicated that every real estate sale in the county needs to be validated and reported to the Commonwealth.

      Is that something you recall Jane Doe 3 explaining to Ms. Zula?

A.    Yes.

Q.    If we look to the second paragraph, the second sentence, so end of the second line, it's talking about the market analyst position.  It says:  This position is currently filled by Ms. Jane Doe 1.  Jane Doe 3 stated that Jane Doe 1 has been mentally disturbed by the harassment allegations made against the county and it -- and it inhibits her ability to perform her work.  Further, Jane Doe 3 also indicated that it is difficult for the reports to be completed outside of the tax assessment office and Jane Doe 1's place in the 410 Building has hampered her ability to complete the reports.

      Do you recall this being discussed during the meeting?

A.    Somewhat.

Q.    Do you recall Ms. Zula asking Jane Doe 3 any questions about what the county could do to

Page 37

aid Jane Doe 1's work performance?

A.    I don't know that that was discussed.

Q.    Do you know -- let me ask it this way:  Did you or to your knowledge, did anyone on behalf of the county reach out to Jane Doe 1 to see what could be done to help her, given that she was mentally destroyed by the harassment allegations?

      MS. PIPAK:  Object to the form.

      You can answer.

      THE WITNESS:  At some point there were additional discussions regarding ADA accommodations.  I don't know if that was when Ms. Zula started the process with the interactive dialogue or if it was after that.

BY MS. SMITH:

Q.    Were you involved in those interactive discussions?

A.    No.

Q.    Okay.

      Are you talking about when Ms. Zula started to receive paperwork from Jane Doe 1 and Jane Doe 2's medical providers?

A.    Yes.

Q.    Okay.

Page 38

1 But you -- did you review any of the
2 medical provider paperwork?
3 A.      No, I did not.
4 Q.      Okay.
5 And you -- I think you just said, you
6 were not present or involved in any of the
7 discussions with Ms. Zula, Jane Doe 1, and/or Jane
8 Doe 2 about accommodations or FMLA leave or
9 anything like that, correct?
10 A.      Correct.
11 Q.      Okay.
12 So you have no personal knowledge what
13 actually occurred?
14 A.      I do not.
15 Q.      Okay.
16 Do you know in -- on February 5th, was
17 Jane Doe 1 completely and fully set up,
18 technological wise, in the 410 Building?
19 A.      Yes.  My understanding is that both
20 offices were set up.
21 Q.      If we look to the bottom four lines of
22 the third paragraph, it starts with Jane Doe 3.
23 Do you see that?
24 A.      Yes.

Page 39

1 Q.      Okay.
2 It says:  Jane Doe 3 has also not
3 availed herself to the additional assistance
4 provided to the tax assessment office by the
5 county.
6 Do you know what additional assistance
7 was provided by the county to the tax assessment
8 office that this is referring to?
9 A.      I do not.
10 Q.      Do you think that the county provided
11 any additional assistance to the tax assessment
12 office?
13 MS. PIPAK:  Object to the form.
14 You can answer.
15 THE WITNESS:  I'm not aware of any.
16 BY MS. SMITH:
17 Q.      Okay.
18 Do you think that there was anything
19 that was offered to the tax assessment office by
20 the county that Jane Doe 3 did not avail herself
21 of?
22 A.      Not that I'm aware of.
23 Q.      Do you feel that during your -- the
24 September through January time that you were at

Page 40

1 the county courthouse, that Jane Doe 3 made
2 efforts to receive county assistance for the tax
3 assessment office?
4 A.      Yes.
5 Q.      Okay.
6 If you turn to the second page, I'm just
7 going to have you briefly -- or as long as you
8 need, I shouldn't say briefly, read that top
9 paragraph because it's kind of referenced in the
10 next paragraph, which I want to ask you some
11 questions about.
12 A.      Okay.
13 Q.      So if we look to the second paragraph on
14 this page, it states:  Further, it is noted that
15 Jane Doe 3 has failed to communicate with your
16 direct supervisor, County Administrator Gary
17 Bender, regarding this issue.
18 The way that this written -- is written,
19 it leads me to believe that the issue is the one
20 in the paragraph proceeding it.  Would you --
21 would you agree that that is how it reads?
22 MR. LEES:  Just note my objection
23 to the form.
24 You can answer.

Page 41

1 THE WITNESS:  Yes.
2 BY MS. SMITH:
3 Q.      So essentially regarding -- this issue
4 would be regarding the STEB compliance issue?
5 A.      Yes.
6 Q.      Okay.
7 We looked at a number of e-mails
8 yesterday where Mr. Bender -- you were e-mailed by
9 Jane Doe 3, Mr. Bender was cc'd in which I
10 believe, correct me if I'm wrong, you testified
11 Mr. Bender instructed you not to respond because
12 it related to the STEB report, correct?
13 A.      Correct.
14 Q.      So would this --
15 MS. PIPAK:  Objection to the form.
16 But go ahead.
17 BY MS. SMITH:
18 Q.      Would this sentence, in your opinion, be
19 accurate?
20 A.      Not directly.
21 Q.      Jane Doe 3 did communicate with her
22 direct supervisor, Mr. Bender, correct?
23 MS. PIPAK:  I am going to object to
24 the form.

Page 42

1    You can answer.
2        THE WITNESS:  She copied him --
3  BY MS. SMITH:
4  Q.      Okay.
5  A.      -- in her communications.
6  Q.      And to your knowledge, did Mr. Bender
7  reply to those communications?
8  A.      Not to my knowledge.
9  Q.      Did Mr. Bender go and speak to Jane Doe
10  3 in person regarding those communications?
11  A.      No.
12  Q.      Did Mr. Bender use you, the HR director,
13  as a conduit to communicate with Jane Doe 3
14  regarding those communication?
15  A.      Yes.
16  Q.      He -- you communicated with Jane Doe 3
17  regarding the STEB reports?
18  A.      No.
19  Q.      Okay.
20  A.      No, not yet.
21  Q.      So he did use you as -- sorry.  That was
22  a bad question.  I should be more specific.
23        Did Mr. Bender use you as a conduit to
24  communicate with Jane Doe 3 in relation and regard

Page 43

1  to her STEB report content e-mails?
2  A.      No.
3  Q.      Okay.
4        And it's your testimony that Mr. Bender
5  used you as a conduit to communicate with Jane Doe
6  3 correct?
7  A.      Uh-huh.
8  Q.      Is that a yes?
9  A.      Yes.
10  Q.      So would it be fair to say then that
11  Jane Doe 3 might have assumed that she should use
12  you as a conduit to communicate with Mr. Bender?
13        MR. LEES:  Note my objection to the
14  form.
15        You can answer.
16        THE WITNESS:  Yes.
17  BY MS. SMITH:
18  Q.      Okay.
19        At any point, do you recall Mr. Bender
20  instructing you to tell Jane Doe 3 or directly
21  instructing Jane Doe 3 that she was to e-mail him
22  and not just cc him?
23        MS. PIPAK:  Object to the form.
24        You can answer.

Page 44

1        THE WITNESS:  I don't think it
2  mattered what -- who was in which field in the
3  e-mail.
4  BY MS. SMITH:
5  Q.      Okay.
6        So then the e-mails that Jane Doe 3 was
7  sending related to STEB, you would consider
8  direct -- would be communication with her direct
9  supervisor if Mr. Bender was cc'd?
10  A.      Yes.
11  Q.      Okay.
12        So then, again, we looked at a number of
13  those e-mails with Mr. Bender cc'd.  Those would
14  be communication with her direct supervisor,
15  making this statement in this memorandum
16  incorrect?
17        MR. LEES:  Objection to the form.
18        You can answer.
19        THE WITNESS:  Yes.
20  BY MS. SMITH:
21  Q.      Okay.
22        The next sentence says:  She did not
23  seek any assistance or guidance from her
24  supervisor on how to remedy the severe

Page 45

1  delinquencies in the STEB reports.  Is that
2  sentence accurate?
3  A.      Depends.
4        MS. PIPAK:  Object to the form.
5        You can answer.
6  BY MS. SMITH:
7  Q.      What do you mean depends?
8  A.      It depends on who was interpreting it.
9  Q.      Why would it matter who was interpreting
10  it?
11  A.      Well, I think Ms. Zula may have thought
12  that by cc'ing Mr. Bender, that wasn't direct
13  contact.
14  Q.      Okay.
15        But did you see her cc -- Jane Doe 3
16  cc'ing Mr. Bender as seeking guidance and
17  assistance from him?
18  A.      I did.
19  Q.      And, in fact, Mr. Bender instructed you
20  not to answer Jane Doe 3's requests for
21  assistance?
22  A.      Correct.
23  Q.      And, therefore, obviously he
24  acknowledged that he saw the e-mails, correct?

Page 46

A.      Yes.
        MS. PIPAK:  Object to form.
        Go ahead.
BY MS. SMITH:
Q.      I'm going to ask a general question just
because I may be able to cut out some of these
documents.
A.      Okay.
Q.      If you -- if you have an answer, I might
need to -- to go into a few documents.
        Were you involved in any disciplinary
write ups of any of the plaintiffs in the year
2021?
A.      Not that I recall.
Q.      Okay.
        I can briefly show you, I'll just show
you what's been previously marked as 225.  It's
already marked, so it's easy enough to just show
you.  My apologies.
        MS. SMITH:  Sorry, Paul, they're
wet.
BY MS. SMITH:
Q.      Did you have an opportunity to review
that?

Page 47

A.      Uh-huh, yes.
Q.      Does -- does that look familiar to you?
A.      No.
Q.      So you weren't involved in any
discussions or administration of this written
disciplinary action for Jane Doe 4?
A.      No, I was not.
Q.      Okay.
        There's a similar one for Jane Doe 3.
Would you have been involved in that?
A.      No, I would not.
Q.      Were you consulted or asked to provide
any information for the disciplinary action?
A.      No.
Q.      Okay.
        Were you involved in the hiring or
contract of the county with Tony Alu or Anthony
Alu?
A.      No.
Q.      Were you involved with the hiring or
appointment of Kent Hatter?
A.      No.
        - - -
        (Previously marked Exhibit-226.)

Page 48

        - - -
BY MS. SMITH:
Q.      Show you what's previously marked
Exhibit-226.  Again, I just want you to take a
look at it.  It's from May of 2021.  My general
question is just going to be, do you recognize it
and kind of were you involved in it, similar to
the last one.
        So when you've had an opportunity to
review it, just let me know.
A.      No, I do not recognize it.
Q.      Okay.
A.      Nor was I involved.
Q.      And didn't provide any input or
information that would have been -- could have
been used to create that document?
A.      Correct.
Q.      Okay.  All right.
        Yesterday, Ms. Kutzler, we talked
about -- briefly about Jane Doe 3 and Jane Doe
4's, what I'm going to refer to as demotions or
what the county refers to as a restructuring.
        Do you -- what, if anything, was your
involvement in that?

Page 49

A.      I didn't have any involvement.
Q.      There were never discussions about
removing Jane Doe 3 from her position when you
worked at the county?
A.      No.
Q.      Do you recall being at a -- being asked
to attend a meeting with Ms. Zula, Ms. -- and Jane
Doe 3 around March 11, 2021?
A.      I don't recall that.
Q.      Do you recall -- do you recall ever
learning that Jane Doe 4's brother had suddenly
passed away?
A.      No.
Q.      Okay.
        I'm going to show you -- actually, the
one in front of you, yeah.
        MS. SMITH:  Paul, it's Exhibit-137.
        - - -
        (Previously marked Exhibit-137.)
        - - -
BY MS. SMITH:
Q.      If we look to the very bottom of the
first page, the e-mail dated March 11th from Ms.
Zula to Jane Doe 3.  Now, you aren't cc'd on this

Page 50

1 one, but it indicates that Doreen will also be
2 attending the meeting that she's requesting on
3 that Friday afternoon at 1:00.
4      Do you see that?
5 A.   I do.
6 Q.   Does this refresh your recollection that
7 you were to attend a meeting with Ms. Zula and
8 Jane Doe 3?
9 A.   That day?  No, Friday.
10 Q.   But you were to attend one on
11 March 12th?
12 A.   Yes.
13 Q.   Do you recall that meeting?
14 A.   I do not.
15 Q.   Okay.
16      Jane Doe 3 responds in the e-mail above
17 it and she cc's you and she indicates, I'm off
18 tomorrow.  Jane Doe 4 had a death -- death in the
19 family, so she is not available either.  Also,
20 Jane Doe 4 and I have several vacation days to use
21 before the end of March, so if you want to pick a
22 day next week and let us know what specific topics
23 we will be discussing first, we can arrange to
24 meet with you.

Page 51

1      Does this refresh your recollection
2 about learning that there was a meeting scheduled,
3 but Jane Doe 4 was on bereavement leave?
4 A.   Yes.
5 Q.   Okay.
6      Do you recall what the contents of that
7 meeting were?
8 A.   I don't.  Sorry.
9 Q.   Do you -- you don't recall what was
10 supposed to be discussed?
11 A.   No.
12 Q.   You don't recall that in that meeting,
13 Ms. Zula was going to be informing Jane Doe 3 that
14 the offices were being restructured and she was
15 being removed from her chief assessor position?
16 A.   No.
17 Q.   Ms. Zula responds in the top e-mail and
18 cc's you.  And she states in the second paragraph,
19 second line, end of it:  We will be meeting with
20 you as the department head, so Jane Doe 4's
21 attendance at a meeting is not appropriate.
22      If the offices were being restructured
23 and Jane Doe 3 was being removed from her chief
24 assessor position and Jane Doe 4 was being removed

Page 52

1 from her assistant director position in tax
2 claims, they were lose -- losing one of their two
3 department head positions.
4      Is there any reason you can think of that
5 Jane Doe 4's attendance wouldn't be appropriate?
6      MS. PIPAK:  Object to the form.
7      But you can answer.
8      THE WITNESS:  Yeah.  So in
9 situations like that where an individual's role or
10 their position is being directly impacted, you
11 typically don't have other employees attend
12 meetings such as that.
13 BY MS. SMITH:
14 Q.   What about -- is there any reason you
15 can think of that prior to such a change being
16 placed on the PAR for a vote by the commissioners,
17 that the individual effected wouldn't be notified
18 in private?
19 A.   I would think that would happen.
20 Q.   Okay.
21      If the roles were being affected, and I
22 understand what you're saying about the
23 confidentiality kind of in -- related to
24 conveyance of the information.

Page 53

1 A.   Uh-huh.
2 Q.   But if the individuals affected both
3 wanted to be present and one of the other weren't
4 present, is there any reason that -- any county
5 policies that dictate that that could not happen?
6 A.   There are no policies that I'm aware of.
7 But from an HR perspective and a standard
8 practice, again, it's typically not handled in
9 that manner.  In a collective bargaining
10 agreement, certainly the union employee has the
11 right to have representation when there's
12 discipline being handed down.  But in a non-union
13 position, it typically doesn't happen.
14 Q.   Okay.
15      Do you know if your attendance at this
16 meeting was requested as kind of similar to the
17 one with you and Roth and Ms. Matascavage, as a
18 witness, someone there to witness what happened so
19 that they could be a witness to the information at
20 a later point?
21 A.   That may be the reason.
22      MS. PIPAK:  Object to the form.
23 BY MS. SMITH:
24 Q.   Is there any county policy that dictates

Page 54

1  that if an employee is to have a meeting with HR,
2  not union and not necessarily disciplinary, just
3  let's say a non-union -- union employee, that they
4  can't bring a witness if they feel uncomfortable
5  to a meeting?
6  A.     Certainly if they're uncomfortable, they
7  may request it, but it's not typically granted.
8  Q.     Why is that?
9  A.     It's just not standard protocol.
10 Q.     But you had asked Mr. Roth to be a
11 witness for you against Ms. -- with Ms.
12 Matascavage, correct?
13 A.     Yes.
14 Q.     Is there any reason then why
15 Ms. Matascavage or someone in her situation
16 wouldn't be permitted to have a witness for -- of
17 her own choosing there?
18 A.     She could.
19 Q.     Okay.
20        And so hers would have been granted?
21 A.     Perhaps.
22 Q.     Okay.
23        And so someone -- let's say Jane Doe 3,
24 who had claims against the county, is there any

Page 55

1  reason why she wouldn't be permitted to have a
2  witness in a meeting that she felt uncomfortable
3  with?
4  A.     I -- yeah, I don't see why not.
5  Q.     Okay.
6        If she had meetings scheduled with you
7  and requested a witness, would you have granted
8  that?
9  A.     Perhaps.
10        MS. PIPAK:  Object to the form.
11 BY MS. SMITH:
12 Q.     So it's your testimony, Ms. Kutzler, if
13 I understand it correctly, again, correct me if
14 I'm wrong, that you were not involved in anyway or
15 privy to the restructuring, as the county calls
16 it, of the tax assessment and tax claim bureau?
17 A.     Correct.
18 Q.     And -- and you yesterday, I believe,
19 testified that you were unaware that Defendant
20 Halcovage had voted on the restructuring, which
21 reduced the pay of Jane Doe 3 and Jane Doe 4,
22 correct?
23 A.     Correct.
24 Q.     What was your opinion of Ms. Zula's

Page 56

1  approach or -- I'll call it approach to the
2  plaintiffs when she started with the county?
3        MR. LEES:  Just note my objection
4  to the form.
5        THE WITNESS:  So you want to know
6  her opinion of the plaintiffs?
7  BY MS. SMITH:
8  Q.     Your opinion of how she handled the
9  plaintiffs when she started with the county.  How
10 she reacted to them, how she responded and handled
11 their -- their e-mails and their claims?
12        MR. LEES:  Same objection.
13        You can answer.
14        THE WITNESS:  I think she was
15 approaching it from an HR perspective, a human
16 resource perspective.  So in -- as it related to
17 what their job responsibilities were or the
18 questions that arose, she applied her knowledge as
19 an HR professional, if this makes sense.
20 BY MS. SMITH:
21 Q.     Do you believe that she was
22 understanding of their issues, the plaintiffs'
23 issue?
24        MR. LEES:  Objection to the form.

Page 57

1        MS. PIPAK:  Object to the form.
2        THE WITNESS:  Yes.
3                  - - -
4        (Previously marked Exhibit-120.)
5                  - - -
6  BY MS. SMITH:
7  Q.     Ms. Zula -- or Ms. Kutzler, I'm sorry, I
8  would like you to take a look at what's been
9  previously marked as Exhibit-120.
10        Do you recognize this e-mail?
11 A.     No.
12 Q.     You are cc'd on it, correct?
13 A.     Yes.
14 Q.     Any idea what it means by plan, that's
15 in parenthesis?
16 A.     No.
17 Q.     Is there a plan or discussions about
18 removing Jane Doe 3 or Jane Doe 4 from their
19 positions, whether in part or in full in January
20 of 20 --
21        MS. PIPAK:  Catherine, correct me
22 if I'm wrong, but isn't this the one that we --
23        MS. SMITH:  You did.  And there's
24 still an outstanding issue on it, which the DOJ

Page 58

1  addressed as it was an untimely call back.
2          MS. PIPAK:  Right.  And -- and it's
3  not been addressed.  So I'm just going to preserve
4  my position for the record.  We'll move to strike
5  this.  But I don't think you raised an objection
6  with respect to the untimeliness of the call back.
7          MS. SMITH:  The DOJ raised it.
8  It's on behalf of the plaintiffs as a whole.
9          MS. PIPAK:  Right.  And they
10  weren't on behalf of the plaintiff.  That's been
11  very clear that they weren't the plaintiff's
12  attorney.
13          MS. SMITH:  They -- it was --
14          MS. PIPAK:  That was a separate
15  issue.
16          MS. SMITH:  Right.  The whole issue
17  was addressed though.  It didn't need to be
18  reiterated in another e-mail to you.
19          MS. PIPAK:  Well, I don't think
20  then that you're timely under the -- the callback
21  order and I'm just going to say -- I am going to
22  reserve my objection on this.  You've never raised
23  an issue about the timeliness of the callback.
24          MS. SMITH:  It was raised by the

Page 59

1  DOJ.  The issue didn't need to be raised twice.
2          MS. PIPAK:  Not sure that that's
3  correct.
4          MS. SMITH:  Okay.  Well, then it
5  needs to be addressed with the judge and if it's
6  your callback, then you should address it with the
7  judge.
8          MS. PIPAK:  Okay.  But I'm going to
9  preserve my position for the record.
10          MS. SMITH:  Okay.  And -- and you
11  have at this point, so...
12          MS. PIPAK:  Okay.
13  BY MS. SMITH:
14  Q.      Did you -- do you know, Ms. Kutzler,
15  what the plan was that was mentioned in this
16  e-mail?
17  A.      No.
18  Q.      Okay.
19          And you don't recall any discussions in
20  January of 2021, of removing Jane Doe 3 or Jane
21  Doe 4 from either or both of their positions?
22  A.      No.
23  Q.      I want you to turn to 139 in the book.
24  There may be two in there.  I apologize.

Page 60

1          MS. SMITH:  Matt, if you can put
2  139 up on the screen.  Thank you.
3                      - - -
4          (Previously marked Exhibit-139.)
5                      - - -
6  BY MS. SMITH:
7  Q.      Do you recognize this e-mail?
8  A.      No.
9  Q.      You are cc'd on it though, correct?
10  A.      I am.
11  Q.      And this is an e-mail that indicates
12  that on Wednesday, March 17th, the commissioners
13  are going -- it will be recommended to the board
14  of commissioners that the tax assessment and tax
15  claim offices be restructured into two separate
16  offices under the leadership in accordance with
17  the county's policy and procedure.  And that Jane
18  Doe 3's annual salary is going to change.
19          Do you see that -- I'm sorry --
20  A.      I do.
21  Q.      Jane Doe 4's salary is going to change?
22          If we -- and you can look back if you
23  need to.  If we look back at 137, that e-mail in
24  which is a couple days before which indicates

Page 61

1  that -- in the middle e-mail on the first page,
2  that Jane Doe 4 was out for the death of a family
3  member.
4          Do you see that?
5  A.      Yes.
6  Q.      Is there any -- what -- what's your
7  opinion or what -- as an HR professional, as to
8  deliverance of the news that positions will be
9  changed and salaries will be changed to someone --
10  to someone who is out on bereavement leave?
11  A.      So was Jane Doe 4 still out on the 15th?
12  Q.      I am going to represent to you that she
13  was and assuming from my question, that she was.
14  Is deliverance of news that your position is
15  changing and your salary is being reduced,
16  appropriate from an HR standpoint?
17          MR. LEES:  Note my objection to the
18  form.
19          You can answer.
20          THE WITNESS:  No.
21  BY MS. SMITH:
22  Q.      Okay.
23          You played or had some involvement in
24  the role in the commissioners meetings at points,

Page 62

1  correct?
2  A.      Yes.
3  Q.      Okay.
4        And sometimes there were things that
5  were placed on the agenda and/or the PARs were
6  completed that were going to be voted on at
7  different times, correct?
8  A.      Yes.
9  Q.      If there was something that was going to
10 be voted on, but something like a death in the
11 family of someone it affected was -- had occurred,
12 something could be pulled from the agenda or the
13 PAR, correct?
14 A.      Yes.
15 Q.      Okay.
16       Just because it was on the PAR, does --
17 did not mean that it must be voted on at that next
18 commissioners meeting, correct?
19 A.      There are specific guidelines for when
20 information or the -- the change, the transfer,
21 the hire, the effective date of it, so there's --
22 and I'm not going to get this right.
23       There's commissioners meetings and
24 there's work sessions.

Page 63

1  Q.      Right.
2  A.      And there's a difference.  I can't tell
3  you the difference, but there are certain things
4  that happen in one or the other, in which motions
5  are approved.  So based upon the timing in which
6  this was supposed to take effect, on Thursday,
7  March 18th, they typically didn't do things
8  retrospectively, but prospectively, which would
9  have driven why it was going to the board on the
10 17th.
11 Q.      Right.
12       But if they had pulled it from the
13 board's vote on the 17th, it could still happen,
14 it just couldn't happen probably by -- on the
15 18th?
16 A.      Correct.
17 Q.      So they would have had to move that
18 18th -- the day that it was in effect if they
19 voted on it later?
20 A.      Yes.
21 Q.      Did you ever see them vote
22 retroactively?
23 A.      There may have been occasions.  I can't
24 recall any specific examples.

Page 64

1  Q.      If you were HR director at the time and
2  there was a vote regarding Ms. -- Jane Doe 4's
3  salary and position changing and she was on
4  bereavement leave, would you have recommended that
5  it be removed and voted on at a later date?
6        MR. LEES:  Just note my objection
7  to the form.
8        MS. PIPAK:  Objection.
9        THE WITNESS:  I would have rec --
10 made the recommendation.
11 BY MS. SMITH:
12 Q.      Were you still working at the county
13 when Ms. Helene O'Connor resigned or I should say
14 her contract ended?
15 A.      I was conducting the training.
16 Q.      Did you speak with her or learn in
17 anyway why she was not extending her contract?
18 A.      No.
19 Q.      Did you speak with her about her
20 thoughts on the operation of the tax assessment
21 office at any point?
22 A.      Not that I recall.
23 Q.      At any point during your work with the
24 county, did you modify, change, update any of the

Page 65

1  job descriptions that the county has for each
2  position within it?
3  A.      We did work on the three positions in
4  the HR department, but I don't remember if that
5  was -- I think that was my second tour --
6  Q.      Okay.
7  A.      -- that we...
8  Q.      And that would be the HR director?
9  A.      Andrea Whalen.
10 Q.      You said you worked on the three
11 positions.  That --
12 A.      That -- sorry.  The HR specialist, the
13 benefit administrator, and the HR generalist.
14 Q.      Okay.
15 A.      Or HR assistant.
16 Q.      Were they updated?
17 A.      They were updated when Andrea came on
18 board, Ms. Whalen came on board.
19 Q.      Okay.
20       So they have since more recently been
21 updated?
22 A.      Yes.
23 Q.      And you were involved in those edits or
24 updates?

Page 66

A.      Yes.
Q.      Any other job titles or positions that
you were involved in updating?
A.      Not that I can recall.  There may have
been Elaine Gilbert in mental health and
developmental services, we were working on being
excused from civil service, so there were a number
of job descriptions that we worked on.  I worked
on several in her department.  I worked on several
with senior services and also children and youth.
Q.      Okay.
        Is -- at any point did you review any of
the plaintiff's job -- job descriptions, either on
your own or in connection with another individual
to see if the plaintiffs were performing they're
job duties as described?
A.      Yes, I did review them.
Q.      Do you know which plaintiffs job
description you reviewed?
A.      Jane Doe 2's.
Q.      And did you do that on your own or with
someone else?
A.      On my own.
Q.      At your own doing or at the instruction

Page 67

of someone else?
A.      When the -- when I was informed that the
individuals were going through CPE training, just
to get a better understanding of what a field
appraiser does in their role.
Q.      Okay.
        So not to look at -- you didn't look at
it to see if Jane Doe 2 was completing her duties,
to was more so just to get an understanding of the
duties?
A.      Yes.
Q.      Okay.
        So did you review any plaintiffs job
description to see if they were compliant with
their job descriptions?
A.      No.
Q.      Okay.
        I'm going to show you what's been
previously marked as Exhibit-30.
        - - -
        (Previously marked Exhibit-30.)
        - - -
BY MS. SMITH:
Q.      This is one of the job descriptions of

Page 68

the county for the position of first assistant
solicitor and risk manager, correct?
A.      Yes.
Q.      All right.
        And this would be the position that
Glenn Roth held while you were working at the
county, correct?
A.      Yes.
Q.      Did you do -- have a lot of interaction
with Mr. Roth?
A.      I did.
Q.      Did you have the opportunity to conduct
any work with him?
A.      Such as?
Q.      So more so then -- obviously people can
have interactions with their coworkers in passing,
if your offices are near each other.  But did you
have an opportunity to collaborate or work
together on any county issues?
A.      Because Heather Garrity, the HR
specialist, was also the assistant risk manager,
we worked together closely with Glenn when it came
to Workers' Comp claims and issues.
Q.      Okay.

Page 69

        As it relates to what duties and
responsibilities the risk manager has under this
job description, which, correct me if I'm wrong,
was in effect and controlled for Mr. Roth's
position at the time that you worked at the
county, correct?
A.      Yes.
Q.      Okay.
        So as it relates to this, do you believe
that these job duties and responsibilities require
Mr. Roth to do anything if he were to receive a
report of gender discrimination, sexual
harassment, retaliation?
A.      Sure.  It's the responsibility of an
individual when they become aware to report it.
Q.      What -- to report it to whom, in your
mind?
A.      If not their direct supervisor, then
human resources.
Q.      Would telling an individual who reported
such things, gender discrimination, sexual
harassment, retaliation, if that -- if someone
reported that to Mr. Roth, would it be sufficient
for Mr. Roth to tell them you should report it to

Page 70

1  HR?
2  A.      Yes.
3  Q.      Would Mr. Roth also have a duty to
4  report it himself?
5  A.      Yes.
6  Q.      Okay.
7          Just simply telling the person, you can
8  go to HR, isn't enough, he also had an affirmative
9  duty to tell someone?
10 A.      Yes.
11         MS. MENDEZ:  Objection to form.
12 BY MS. SMITH:
13 Q.      We looked at a number of e-mails over
14 the course of yesterday and maybe even a few that
15 included it today, about complaints by some of the
16 plaintiffs hostile work environment issues in
17 their departments.
18         Did you ever involve Mr. Roth in any
19 issues that the plaintiffs brought to your
20 attention?
21 A.      No.
22         MS. PIPAK:  Object to the form.
23 BY MS. SMITH:
24 Q.      If they were plaintiffs in a case

Page 71

1  against the county, which would mean litigation,
2  why isn't -- why is that Mr. Roth wasn't brought
3  in?
4          MS. PIPAK:  Object to the form.
5          THE WITNESS:  He was -- he was a
6  defendant.
7  BY MS. SMITH:
8  Q.      Did you bring any other county solicitor
9  into the discussions?
10         MR. LEES:  Just note my objection
11 to the form.
12         MS. PIPAK:  I'm going to object to
13 the -- I am going to object here to the extent
14 that this calls for litigation strategy and I
15 think it's attorney-client privilege if she -- if
16 you're asking about if she talked to other
17 solicitors.
18 BY MS. SMITH:
19 Q.      Okay.
20         Well, I'll as this question:  Did you
21 receive advice of counsel from any of the county
22 solicitors, as to how to act regarding the
23 plaintiffs?
24 A.      No.

Page 72

1          MS. PIPAK:  I am going to -- she --
2  I am -- okay.
3          THE WITNESS:  Sorry.
4          MS. PIPAK:  I am going to just note
5  for the record that you're seeking attorney-client
6  communications.  I am noting my objection.
7          You can move forward.
8  BY MS. SMITH:
9  Q.      Was the assistant -- I think you called
10 it assistant risk -- risk manager, is that what
11 it's called?  Were -- that was who?
12 A.      Heather Garrity.
13 Q.      Was Heather Garrity brought into any
14 issues or discussions with -- regarding the
15 plaintiffs and their claims?
16 A.      No.
17 Q.      Can you tell me what, if any -- you can
18 just tell me generally and I can go to more
19 questions if you have information, but do you have
20 any information or knowledge of the investigation
21 into unauthorized searches by Jane Doe 3 or Jane
22 Doe 4 on LexisNexis?
23 A.      I do not.
24 Q.      So you have not seen or reviewed any

Page 73

1  reports or documents from Eckert Seamans?
2          MS. PIPAK:  I am going to object on
3  that to the extent that this calls for
4  attorney-client communications, if she saw any
5  report or had communications about what a lawyer
6  said.
7          MS. SMITH:  I mean, so it comes
8  back to the issue that, Paul, you will have to
9  address this because if your client is asserting
10 advice of counsel in that if she acted in anyway
11 at the advice of counsel and they're objecting, we
12 have the issue because you can't have your cake
13 and eat it too and that you guys want to --
14         MR. LEES:  Well, I -- I understand
15 that.  But I don't think your question was seeking
16 advice of counsel.  I think you were asking the
17 witness whether she saw or observed any reports
18 by -- authored by Eckert Seamans regarding the
19 LexisNexis matter.  Correct me if I'm wrong.
20         MS. SMITH:  Correct, because I need
21 to lay --
22         MR. LEES:  So -- so --
23         MS. SMITH:  To lay the foundation.
24 And if I can't lay the foundation to get to

Page 74

1  whether there was advice of counsel -- I mean, I
2  can ask her that bluntly, but I was trying to lay
3  the foundation as to that she saw the reports and
4  then acted upon what the instructions were for
5  them.
6         MR. LEES:  Well, I think she's
7  already testified though that she didn't have any
8  involvement in the investigation of the LexisNexis
9  matter.  So how would she have acted on it if she
10  wasn't involved in it?
11         MS. SMITH:  Well, she -- because
12  there was -- there's the involvement of the
13  investigation, there's the conducting of it, and
14  there's the acting on it.  And I think we have
15  seen through the testimony that there's often
16  times that there was actions done, investigations,
17  quote, unquote, done.  Ms. Kutzler, she's
18  indicated was just the communicator or the conduit
19  of it.  So she may have acted and taken the
20  adverse employment action against the plaintiff,
21  not after her own investigation, but at the
22  instruction or advice of someone else.
23         MR. LEES:  Why don't we --
24         MS. PIPAK:  Well, she wasn't taking

Page 75

1  an adverse -- an alleged adverse action if she was
2  just the conduit.  She wasn't a decision maker,
3  she wasn't an actor, she was a conduit, so --
4         MS. SMITH:  But if she's the one
5  who, for instance, fired someone, if that was the
6  hypothetical, she fired someone, the firing is an
7  adverse employment action.  That's where the
8  advice of counsel issue comes in.  If she was
9  advised to fire Jane Doe 3 or Jane Doe 4 or demote
10  them or put them on unpaid suspension for a year
11  and a half and she was advised to do that by an
12  attorney or by Mr. Bender, that -- Mr. Bender is
13  not an attorney, so it comes in.  If she was
14  advised to put them on unpaid suspension at the
15  advice of counsel and she's going to use that as
16  her defense that she is not liable for the adverse
17  employment action that occurred, that would be
18  advice of counsel.
19         MS. PIPAK:  Well, I think you're
20  mixing apples and oranges here.  So that would
21  have been at the advice of Mr. Bender, not the
22  advice of counsel.
23         MS. SMITH:  I said if it was Mr.
24  Bender, it's not advice of counsel, I said.  But

Page 76

1  if she was told by an attorney, either from Eckert
2  Seamans or the county, and Ms. Kutzler wants to,
3  at trial, assert that the attorneys told her and
4  therefore she's not liable, that is advice of
5  counsel.
6         And if she's going to assert it,
7  but the county is going to serve privilege, then
8  this is an issue that you and Mr. Lees need to
9  address with the court because you guys can't have
10  your cake and eat it too, you can't use your short
11  sword and your shield.
12         MS. PIPAK:  No --
13         MR. LEES:  I -- I don't necessarily
14  --
15         MS. PIPAK:  She didn't have the
16  authority to fire anybody or suspend anybody.  She
17  these made that clear, that she's only acting on
18  behalf as a conduit.  So you can ask her if she
19  did those things -- if she did those things, if
20  she fired somebody, if she suspended somebody, if
21  she did those things, took those actions, that's
22  one thing.  I think the testimony is clear that
23  she didn't take those actions, so there would be
24  no advice of counsel defense here.

Page 77

1         MR. LEES:  And -- and -- and that
2  was -- that was actually what I was going to get
3  to.  Why don't you just ask the -- the concluding
4  question, which would be, did she take any actions
5  and it would kind of moot then the whole -- whole
6  issue as to whether such actions were taken on the
7  advice of counsel.
8  BY MS. SMITH:
9  Q.     Ms. Kutzler, did you take any action
10  related to Jane Doe 3 or Jane Doe 4 regarding
11  LexisNexis?
12  A.     No.
13  Q.     Okay.
14         Were you ever asked by Mr. Bender to
15  review a list of searches?
16  A.     No.
17  Q.     Were you ever -- were you involved in
18  anyway the referral of Jane Doe 3 or Jane Doe 4 to
19  the district attorney's office for criminal
20  investigation?
21  A.     No.
22  Q.     Have you ever reviewed or seen the
23  county's computer access policy?
24  A.     I've seen it.

Page 78

1  Q.     What's your understanding of the
2  county's computer access policy?
3  A.     That it's -- equipment and software are
4  county property and it's supposed to be used in a
5  professional, respectful, trusting manner.
6         There are specific guidelines around the
7  security and whether or not there's fishing or
8  spam or anything that could be questionable.
9  Q.     Is it your understanding that the
10 computer access policy of the county permits for
11 limited and occasional personal use of computers
12 and the Internet?
13 A.     It's discouraged, but it happens.
14 Q.     But for instance, an employee on like a
15 lunch break who might still be sitting at their
16 desk, could use it to check their personal e-mail
17 or Facebook or something like that?
18 A.     Sure.
19 Q.     Of course, you're not supposed to do it
20 during work hours while you're, you know, on
21 county time; is that correct?
22 A.     Yes.
23 Q.     Okay.
24        But if -- like I said, if someone's on a

Page 79

1  break, they would be permitted to -- to use their
2  county computer for personal use?
3  A.     Yes.
4  Q.     Okay.
5         MS. SMITH:  We're going to look at
6  Document 106.  This is the county's jury duty and
7  subpoena policy and some revisions that were made
8  to it in, it appears, March of 2021.
9              - - -
10        (Previously marked Exhibit-106.)
11             - - -
12 BY MS. SMITH:
13 Q.     Were you involved in the revision of
14 this policy?
15 A.     No.
16 Q.     Okay.  You can put that one aside then.
17        MS. SMITH:  We're going to look at
18 Exhibit-97.
19             - - -
20        (Previously marked Exhibit-97 and 98.)
21             - - -
22 BY MS. SMITH:
23 Q.     Do you recognize this policy?
24 A.     Yes.

Page 80

1  Q.     And this is the county's sexual
2  harassment policy.  It looks like it was last
3  revised in September of 2013.
4  A.     Yes.
5  Q.     This was the one that was in effect when
6  you were at the county for the first stint,
7  correct?
8  A.     Yes.
9  Q.     And this is the one you actively worked
10 to revise?
11 A.     Yes.
12 Q.     Okay.
13        I'm sorry if you answered this, the
14 revisions to this policy that you made, was it you
15 and only you who made those revisions or did you
16 work in conjunction with someone else?
17 A.     That was me.
18 Q.     Okay.
19        So it was you and only you?
20 A.     Yes.
21 Q.     Okay.
22        And what was your opinion or thoughts on
23 this policy, the September 2013 policy, when you
24 reviewed it?

Page 81

1         MR. LEES:  Just note my objection
2  to the form.
3         You can answer.
4         THE WITNESS:  I think it's a
5  comprehensive policy, but long outdated.
6  BY MS. SMITH:
7  Q.     I'm going to put in front of you --
8         MS. SMITH:  Also, Matt, if you can
9  split screen for Exhibit-97 and Exhibit-98.
10 BY MS. SMITH:
11 Q.     Okay.
12        So if we look at now 98 in conjunction
13 with 97, 98 is the February 2021 revised copy of
14 the county's sexual harassment policy, correct?
15 A.     Yes.
16 Q.     So I have one question for you:  The
17 policy number is the same, but the subject or the
18 name is changed?
19 A.     Yes.
20 Q.     Why -- why the change in -- it's the
21 same policy, right?
22 A.     Correct.
23 Q.     Why the change in names?
24 A.     So that its more inclusive than just

Page 82

1 sexual harassment.
2 Q.      Okay.
3       If we look to the third page of 97.
4 A.      Procedures for making an investigation?
5 Q.      Yes.
6 A.      Okay.
7 Q.      There is in deed, a whole host of
8 responsibilities of the HR director or -- yeah, HR
9 director and county administrator.  In fact,
10 there's 18 of them and they go all the way to two
11 pages later, Page 5.
12       Do you see that?
13 A.      I do.
14 Q.      Those are not included in the revised
15 copy, the Exhibit-98 or the February 2021.
16       Why were the duties of the county
17 administrator removed from the policy?
18 A.      It's standard practice for an HR
19 professional to cover all of these areas within
20 the policy and rather than be specific or have it
21 in black and white, if you will, it's to provide
22 flexibility for interpretation and administration
23 of the policy.
24 Q.      So it's -- I think you said it's common

Page 83

1 practice of an HR director to do these things.
2 But in your experience, is it common practice for
3 a county administrator to know to do these things?
4 A.      I would -- I would say yes.
5 Q.      Okay.
6       And is it common knowledge of county
7 employees to know what the responsibilities -- or
8 what responsibilities are owed to them by their
9 county administrator and human resources director?
10       MR. LEES:  Just note my objection
11 to the form.
12       THE WITNESS:  I think that
13 employees are to be made aware of a -- a work
14 environment that's free from harassment or
15 discriminatory treatment.
16 BY MS. SMITH:
17 Q.      Do you think it's important for an
18 employee to understand what steps their
19 supervisory -- their supervisors, such as the
20 county administrator and human resources
21 individual, is supposed to take in response to
22 their claims?
23 A.      Each case is different, so it's not
24 always going to follow these in any particular

Page 84

1 order.
2 Q.      If we look back to 226, which is going
3 to be probably in that stack of exhibits before
4 you.  I apologize.
5       It's the acknowledgment form by
6 Commissioner Halcovage that we looked at.
7       MS. SMITH:  I'm sorry.  2 -- 29 --
8 296, I apologize, not 226, Matt, sorry.
9       THE WITNESS:  Yep.
10 BY MS. SMITH:
11 Q.      Okay.
12       We had looked at that form and I asked
13 you if you had revised it for the date.  That
14 indicates a policy revision date of January 2021,
15 but I have -- we have the September and then
16 February, there's no January for these polices; is
17 that just a typo?
18 A.      I imagine it was based upon when Mr.
19 Bender and the commissioners received the policy
20 and then approved it, because this goes -- this
21 went in front of the commissioners for approval.
22 Q.      When you say this, just for the record,
23 you are talking about the February 2021 revision?
24 A.      Yes.

Page 85

1 Q.      Okay.
2       So you think that January might have
3 been when you revised it and February was when it
4 actually got approved and implemented?
5 A.      Correct.
6 Q.      So there is not another revision between
7 these two that I should be looking?
8 A.      Correct.
9 Q.      Okay.
10       And so did Defendant Halcovage have
11 input, at least by vote, on the revision of the
12 sexual harassment policy?
13 A.      Yes.  They -- each commissioner and Mr.
14 Bender and Mr. Roth all reviewed it.  I don't
15 recall if they had any revisions.
16 Q.      Did you feel from an HR standpoint, that
17 it was appropriate for someone accused of sexual
18 harassment to be voting on the anti-harassment,
19 non-discrimination policy?
20 A.      They vote on all policies.
21 Q.      Do you think that he should have --
22 Defendant Halcovage should have recused himself
23 from this one?
24       MS. PIPAK:  I am going to object to

Page 86

1  the form.
2          But you can answer.
3          THE WITNESS:  No.
4  BY MS. SMITH:
5  Q.      Even though he was accused of sexual
6  harassment?
7  A.      He should learn from it.
8  Q.      There was another revision to this
9  policy in May of 2021.  Were you involved in that?
10 A.      No.  Ms. Zula --
11 Q.      Okay.
12 A.      -- revised that and --
13 Q.      Do you -- go ahead.  Sorry.
14 A.      Sorry.  Specifically, she took out the
15 names of the individuals in the second paragraph
16 and just maintained the titles.
17 Q.      Okay.
18         And one of those names in --
19         MS. SMITH:  If we look at 98, Matt.
20 BY MS. SMITH
21 Q.      Is Christopher Hobbs.  Did you ask
22 Mr. Hobbs if he would consent to being an EEO
23 officer?
24 A.      We did have a conversation about it.

Page 87

1  Q.      And -- and what was the contents of that
2  conversation?
3  A.      He -- when I spoke with him, and
4  actually Mr. Bender, they weren't -- we weren't
5  together, but I had referenced that he was going
6  to be listed in the policy and I never received
7  any feedback.
8  Q.      So he didn't object or consent, he kind
9  of just --
10 A.      Correct.
11 Q.      -- silenced?
12 A.      Correct.
13         MS. SMITH:  Okay.  If we can go off
14 the record, take a couple-minute break.  I just
15 need to review my notes and I may be done.
16         VIDEOGRAPHER:  The time is now
17 10:22 a.m. and we're going off the record.
18                 - - -
19      (Whereupon, brief recess was held off
20 the record.)
21                 - - -
22         VIDEOGRAPHER:  The time is now
23 10:30 a.m. and we're back on the record.
24 BY MS. SMITH:

Page 88

1  Q.      All right, Ms. Kutzler.  Sorry.  I do
2  have just a couple more questions for you.
3          So more recently since Andrea Whalen has
4  been employed by the county as the HR director,
5  Jane Doe 3 and Jane Doe 4 have sent a number of
6  e-mails in which you were cc'd about questions
7  regarding their benefits, their ability to work in
8  Ms. Casey's office.
9          Do you recall receiving those?
10 A.      Yes.
11 Q.      Were you -- did you discuss them at all
12 with anyone from the county?
13 A.      Ms. Whalen.
14 Q.      Okay.
15         And what discussions did you have
16 regarding those?
17 A.      That there is a county policy that
18 speaks to individuals not having the ability to
19 hold two positions at the same time within the
20 county.
21 Q.      And is it your understanding that any
22 county employee cannot hold two positions or is it
23 depending on the number of hours in each position?
24 A.      Two full-time positions.

Page 89

1  Q.      Okay.
2          So, for instance, an employee can hold
3  two part-time positions with the county?
4  A.      I think, yes.
5  Q.      And as long as their hours -- I think it
6  doesn't exceed 35 or 40, they can hold more than
7  one position, correct?
8  A.      Correct.
9  Q.      Did you have any discussions about the
10 fact that Jane Doe 3 and Jane Doe 4 are not
11 working any hours in the tax claim bureau because
12 of their suspension?
13 A.      No.
14 Q.      Okay.
15         Do you consider or did you decision that
16 they have zero -- technically zero hours because
17 of their suspension in that position?
18 A.      Correct.
19         MR. LEES:  Object to the form.
20         You can answer.
21         THE WITNESS:  Yeah.  They're --
22 they're considered active employees.
23 BY MS. SMITH:
24 Q.      But they're not working any hours,

Page 90

1  correct?
2  A.    Correct.
3  Q.    So is it your understanding that that
4  policy you're referring to, because it could be
5  working hours, prohibits them from holding another
6  position?
7  A.    Yes.
8  Q.    Okay.
9        So it's just the ability to work hours?
10 A.    Correct.
11 Q.    All right.
12       Did you discuss this at all with Mr.
13 Bender?
14 A.    Yes.
15 Q.    And what was Mr. Bender's position?
16 A.    That an employee can't hold more than
17 two -- well, more than one full-time position
18 within the county.
19 Q.    Do you know if Ms. Whalen responded to
20 Jane Doe 3 and Jane Doe 4, informing them of that?
21 A.    I understand that she provided copies of
22 the policy to them.  To what extent she explained,
23 I don't know.
24 Q.    Okay.

Page 91

1        Do you know, did Mr. Bender communicate
2  with the plaintiffs, Jane Doe 3 and Jane Doe 4,
3  about this?
4  A.    Not to my knowledge.
5  Q.    Do you know -- are you aware that Mr. Al
6  Marshall responded to -- to some of Jane Doe 3's
7  inquires?
8  A.    No.
9  Q.    Okay.
10       Is it your understanding that Mr. Bender
11 made the decision, up for interpretation, of the
12 policy related to those -- to holding -- to Jane
13 Doe 3 and Jane Doe 4 holding two separate
14 positions?
15 A.    Sorry.  Can --
16       MS. PIPAK:  Object to the form.
17 BY MS. SMITH:
18 Q.    So you said you discussed with Mr.
19 Bender, the policy and how it would be applied to
20 Jane Doe 3 and Jane Doe 4, given their ability to
21 work, but not actually working the hours.
22       Is it your understanding that Mr. Bender
23 was the one who made the decision that that's how
24 the policy is interpreted?

Page 92

1  A.    No.
2  Q.    Who made the decision?
3  A.    My understanding was it was Mr.
4  Marshall.
5  Q.    Okay.
6        So it's your understanding -- so you
7  spoke with Mr. Bender, he spoke with Mr. Marshall,
8  and then you were informed -- or you and Ms.
9  Whalen were informed of how to respond?
10 A.    I don't know.  I'm not aware of any
11 discussions between Mr. Bender and Mr. Marshall.
12 Q.    Okay.
13       But you're aware that Mr. Bend -- you
14 believe that Mr. Bender didn't make the decision?
15 A.    Correct.
16 Q.    Okay.
17       Were you involved at all or privy to the
18 communications to Jane Doe 2 regarding her
19 abandonment of her job?
20 A.    I was aware that it was taking place.
21 Q.    Okay.
22       What, if any information, did you have
23 regarding that?
24 A.    The -- there was information from

Page 93

1  Ms. Zimmerman that her last communication with
2  Jane Doe 2 was April 26th, maybe the 27th, and
3  that was the last that she had any dialogue with
4  Jane Doe 2.
5  Q.    Okay.
6        Did you -- or are you aware of anyone on
7  behalf of the county who spoke with Jane Doe 2
8  regarding the allegations that she had abandoned
9  her job?
10 A.    Not to my knowledge.
11 Q.    Are you aware that Jane Doe 2
12 corresponded with county employees and told them
13 that she was not abandoning her position?
14       MS. PIPAK:  Object to the form.
15       You can answer.
16       THE WITNESS:  Not to my knowledge.
17 BY MS. SMITH:
18 Q.    Okay.
19       So you're not aware that Jane Doe 2
20 informed Ms. Whalen that she had tried to
21 communicate, but wasn't being given any work to
22 do?
23       MS. PIPAK:  Object to the form.
24       You can answer.

Page 94

1 THE WITNESS: Ms. Whalen and I did
2 have a -- she did share with me that she was
3 working with Ms. Zimmerman regarding the work
4 assignments that had taken place in April, prior
5 to Jane Doe 2 not connecting or contacting
6 Ms. Zimmerman.
7 BY MS. SMITH:
8 Q.    You -- were you involved at all in the
9 drafting of the letter to Jane Doe 2, indicating
10 that she had abandoned her position?
11 A.    No.
12 Q.    Yesterday you referred to Defendant
13 Halcovage as a snake and I know you gave us one
14 example of why you felt that way. Is there
15 anything else that you can think of that you used
16 to form the opinion that he was a snake or that he
17 did that made you uncomfortable during your
18 employment with the county?
19 A.    In any situation where sexual harassment
20 may occur or a complaint is filed, when an HR
21 professional such as myself, investigates a claim,
22 it is very typical -- it is very unusual for the
23 perpetrator to remain within the employment of the
24 organization.

Page 95

1 Q.    And so are you -- I understand your
2 testimony that you believe that his unwillingness
3 to step down is an issue?
4 A.    Yes.
5 Q.    Do you think his --
6      MS. PIPAK: Objection to form.
7 BY MS. SMITH:
8 Q.    Do you believe that his unwillingness to
9 step down, and I am referring to Defendant
10 Halcovage, is impacting the operations of the
11 county?
12 A.    Yes.
13 Q.    Do you believe that that impact is a
14 negative impact or a positive impact?
15 A.    Negative.
16 Q.    Do you believe, in your understanding of
17 what occurred both before your employment and
18 during your employment, that Defendant Halcovage
19 committed misconduct while in office?
20      MR. LEES: Just -- I'll just object
21 to the form of the question.
22      You can answer if you can.
23      THE WITNESS: Yes.
24      MS. SMITH: I don't have anything

Page 96

1 else for you. Thank you, Ms. Kutzler.
2      THE WITNESS: Thank you.
3      VIDEOGRAPHER: The time is now 10
4 --
5      MS. SMITH: I'm just going to put
6 on the record -- we can go off the video, video
7 record.
8      VIDEOGRAPHER: The time is now
9 10:37 a.m. and we're going off the record.
10      MS. SMITH: I just like to put on
11 the record that -- I don't know if made
12 yesterday's record, that I indicated that I
13 expected only to have about less than two hours
14 today, which is pretty spot on, one hour and 40
15 minutes. Never underestimate for an attorney,
16 that's crazy.
17      But that I offered and suggested
18 that we conclude Ms. Kutzler's deposition, meaning
19 that defendants have the opportunity to question
20 Ms. Kutzler, given our scheduling issues. And I'm
21 just going to make that offer again. And I think
22 Paul would be fine with that, Mr. Lees would be
23 fine with that as well.
24      So I am suggesting that we conclude

Page 97

1 Ms. Kutzler's deposition, but I think I understand
2 that Ms. Pipak and Mr. Geiger, you do not wish to
3 move forward with questioning today?
4      MR. GEIGER: That's correct. We're
5 going to reserve our right to question for a
6 different day.
7      MS. PIPAK: Right. And I'm not
8 sure that that's a fair accurate -- accurate
9 representation for the record, based on all the
10 discussions we had yesterday. But it is correct
11 that we're not moving forward today and we'll be
12 seeking to depose her on another day.
13      MS. SMITH: Okay. Well, what is it
14 that you think wasn't accurate about my recitation
15 of what occurred yesterday?
16      MS. PIPAK: And we can reread it.
17 But I don't think that it's fair to say that you
18 offered yesterday that you would only have two
19 hours based on the way that all of the depositions
20 in the case have been going and that I made the
21 point yesterday saying, you've always needed 14
22 hours, it was not expected that we were going to
23 be deposing the witness today.
24      MS. SMITH: I didn't say that it

Page 98

1  wasn't --
2         MS. PIPAK:  Based on the way past
3  depositions went.
4         MS. SMITH:  I didn't say that it
5  was -- I said yesterday, which was yesterday, not
6  any time before that, yesterday when I realized
7  that I only expected to have two hours today --
8         THE TECHNICIAN:  I think they froze
9  up.
10        MS. PIPAK:  I understand that -- I
11 understand that that was her position yesterday.
12 And I just want to raise -- I just want to make
13 clear that I raised yesterday that all the other
14 depositions have been going for a whole two days,
15 so it was not expected that we would be --
16        MS. SMITH:  Right.
17        MS. PIPAK:  -- it was not expected
18 that we'd be deposing the witness today.
19        MS. SMITH:  And -- and --
20        MR. GEIGER:  Every -- every
21 deposition was pushing the 14-hour envelope.  I
22 mean, it was -- it was -- they were -- questioning
23 had to stop because of the limit, so...
24        MS. PIPAK:  I raised that yesterday

Page 99

1  and I just want that --
2         MS. SMITH:  So, again, that's not a
3  misrepresentation by me of what occurred, it's an
4  additional representation by you that there was --
5  the other depositions.  But the fact that I
6  notified you yesterday at the conclusion of the
7  deposition, that I expected to only have two hours
8  today, is accurate, correct?
9         MS. PIPAK:  It's an unfair
10 representation.  But, anyway, I just want to make
11 the rep -- I just want to make the record clear
12 about what our position was for the record, and
13 that was --
14        MS. SMITH:  Well, I would like to
15 address your indication and statement that my
16 representation is unfair.  Did I not inform you
17 that I expected to only have --
18        MS. PIPAK:  Catherine, that's all
19 I'm saying on the record.
20        MS. SMITH:  -- two hours?
21        MS. PIPAK:  I don't know why you
22 are keep going.
23        MS. SMITH:  Because I don't want
24 you to -- you're indicating on a record that I was

Page 100

1  untruthful or inaccurate in my representation and
2  I would like to clarify this.
3         MS. PIPAK:  I said it was an unfair
4  representation --
5         MS. SMITH:  And so --
6         MS. PIPAK:  -- of the conversation,
7  that's not what you said, but...
8         MS. SMITH:  So a statement such as
9  that, I'd like to clarify for the record.  Did I
10 not indicate to you yesterday that I expected to
11 only have two hours today?
12        MS. PIPAK:  Yes.
13        MS. SMITH:  Okay.
14        MS. PIPAK:  And that was not the
15 full conversation.  So it was an unfair
16 representation of the conversation.  That's all.
17        MR. GEIGER:  And I think we can add
18 that Paul had some scheduling issues as well, that
19 may have prevented us from fully completing our
20 side of the questioning.
21        MS. SMITH:  I don't believe that --
22        MR. GEIGER:  I also think our
23 discussions yesterday were transcribed, at least
24 that's my belief, so I think we are arguing about

Page 101

1  nothing.
2         MR. LEES:  And -- and I don't know,
3  we don't necessarily need to do the scheduling
4  discussion on the record, we can take that off the
5  record.  But I will put on the record that I will
6  agree to produce Ms. Kutzler so the defendants can
7  conduct their cross-examination of her on another
8  day.
9              - - -
10        (Whereupon, deposition concluded at
11 10:42 a.m.)
12             - - -
13
14
15
16
17
18
19
20
21
22
23
24

```
 1                 C E R T I F I C A T I O N

 2            I, COLEEN TRIFUN, RPR and Notary Public,

 3   do hereby certify that the foregoing is a true and

 4   accurate transcript of the stenographic notes

 5   taken by me in the aforementioned matter.

 6                       -  -  -

 7

 8

 9

10

11

12

13

14

15

16

17

18   DATE:              _____

19                      COLEEN TRIFUN, RPR

20

21

22

23

24
```

Deposition of Doreen Kutzler Vol. II - Revised                    Jane Doe, et al. v. Schuylkill County Courthouse, et al.

```
 1                        ERRATA SHEET

 2     Page Line      Correction      Reason for Correction

 3     _____ _____   _____   _____

 4     _____ _____   _____   _____

 5     _____ _____   _____   _____

 6     _____ _____   _____   _____

 7     _____ _____   _____   _____

 8     _____ _____   _____   _____

 9     _____ _____   _____   _____

10     _____ _____   _____   _____

11     _____ _____   _____   _____

12     _____ _____   _____   _____

13     _____ _____   _____   _____

14     _____ _____   _____   _____

15     _____ _____   _____   _____

16     _____ _____   _____   _____

17     _____ _____   _____   _____

18     _____ _____   _____   _____

19     _____ _____   _____   _____

20     _____ _____   _____   _____

21     _____ _____   _____   _____

22     _____ _____   _____   _____

23     _____ _____   _____   _____

24     _____ _____   _____   _____
```

# EXHIBIT

# P58

```
 1    ---------------------------
 2    JANE DOE, et al.,         : UNITED STATES DISTRICT COURT
              Plaintiff        : MIDDLE DISTRICT OF PENNSYLVANIA
 3        v.                   :
      SCHUYLKILL COUNTY         : CIVIL DOCKET NO:
 4    COURTHOUSE, et al.,       : 3:21-CV-00477
              Defendants       :
 5    ---------------------------
 6
 7                            ***
 8                         VOLUME I
 9                            ***
10            TRANSCRIPT MARKED CONFIDENTIAL
11                            ***
12
13
14
15
16
17
18            VIDEOTAPE DEPOSITION OF GARY BENDER
19    taken at the U.S. Attorney's Office, Middle
20    District of Pennsylvania, 228 Walnut Street,
21    Harrisburg, Pennsylvania 17108 on Wednesday,
22    November 16, 2022 at 9:11 a.m. before Coleen
23    Trifun, RPR and Notary Public.
24
```

```
 1   A P P E A R A N C E S :

 2           DEREK SMITH LAW GROUP, PLLC
             BY:  CATHERINE SMITH, ESQUIRE
 3           1835 Market Street
             Suite 2950
 4           Philadelphia, Pennsylvania 19103
             catherine@dereksmith.com
 5           Counsel for the Plaintiff
             (Via Zoom)
 6

 7           DEPARTMENT OF JUSTICE
             CIVIL RIGHTS DIVISION
 8           BY:  AMBER FOX, ESQUIRE
                  ALLAN TOWNSEND, ESQUIRE
 9           150 M St. NE Room 9.932
             Washington, District of Columbia 20002
10           amber.fox@usdoj.gov
             allan.townsend@usdoj.gov
11           Counsel for the Plaintiffs

12           NEWMAN WILLIAM, P.C.
             BY:  GERARD J. GEIGER, ESQUIRE
13           P.O. BOX   511
             712 Monroe Street
14           Stroudsburg, Pennsylvania 18360
             ggeiger@newmanwilliams.com
15           Counsel for George Halcovage
             (Via Zoom)
16

17           MCNERNEY PAGE VANDERLIN & HALL
             BY:  NICOLE IPPOLITO, ESQUIRE
18           433 Market Street
             Williamsport, Pennsylvania 17701
19           nippolito@mpvhlaw.com
             Counsel for Glenn Roth
20           (Via Zoom)

21           JONES PASSODELIS
             BY:  MARIE MILLIE JONES, ESQUIRE
22           Gulf Tower, Suite 3410
             707 Grant Street
23           Pittsburgh, Pennsylvania 15219
             mjones@jonespassodelis.com
24           Counsel for Gary Bender and Heidi Zula
```

```
 1              DICKIE MCCAMEY
                BY:  PAUL G. LEES, ESQUIRE
 2              190 Brodhead Road, Suite 310
                Bethlehem, Pennsylvania 18017
 3              plees@dmclaw.com
                Counsel for additional parties
 4              (Via Zoom)

 5

 6              ALSO PRESENT:
                ALEISHA CATTS, VIDEO SPECIALIST
 7              ALYSSA DEBISE, PARALEGAL (Via Zoom)
                PATRICIA BASIL, PARALEGAL (Via Zoom)
 8              JANE DOE 3 (Via Zoom)
                JANE DOE 4 (Via Zoom)
 9              GLENN ROTH (Via Zoom)
                GEORGE HALCOVAGE (Via Zoom)
10

11

12

13

14

15

16

17

18

19

20

21

22

23

24
```

```
 1                         - - -

 2                         INDEX

 3                         - - -

 4   WITNESS              INTERROGATION BY     PAGE

 5   GARY BENDER

 6                   By Ms. Smith          9

 7                         - - -

 8                        EXHIBITS

                          - - -

10   EXHIBIT NUMBER       DESCRIPTION          PAGE

11   Exhibit-203          Bates Stamped 20       15

12   Exhibit-204          Bates Stamped 31-36    19

13   Exhibit-205          Bates Stamped 27       22

14   Exhibit-206          Bates Stamped 28       27

15   Exhibit-207          Bates Stamped 26       30

16   Exhibit-208          Bates Stamped 6        35

17   Exhibit-209          Bates Stamped 9        37

18   Exhibit-210          Bates Stamped 24       39

19   Exhibit-211          Bates Stamped 22 & 23  42

20   Exhibit-212          SC 1235-1238           46

21   Exhibit-213          Bates Stamped 1206-1208 68

22   Exhibit-214          Bates Stamped 114      107

23   Exhibit-215          Bates Stamped 102 & 242 148

24   Exhibit-216          SC 1221-1222           159
```

```
 1   Exhibit-217          Bates Stamped 1223-1224   170

 2   Exhibit-218          Bates Stamped 1215-1216   192

 3   Exhibit-219          Bates Stamped 1217-1218   198

 4   Exhibit-220          SC 1162-1163              233

 5   Exhibit-221          Bates Stamped 96 & 235    278

 6   Exhibit-222          Bates Stamped 14          338

 7   Exhibit-223          Bates Stamped 37          344

 8                           - - -

 9              PREVIOUSLY MARKED EXHIBITS

10   Exhibit-182    Page 116      Exhibit-42   Page 162

11   Exhibit-158    Page 172      Exhibit-48   Page 196

12   Exhibit-71     Page 219      Exhibit-81   Page 229

13   Exhibit-68     Page 251      Exhibit-85   Page 373

14   Exhibit-59     Page 377

15

16

17

18

19

20

21

22

23

24
```

Deposition of Gary Bender Vol. I - Revised                  Jane Doe, et al. v. Schuylkill County Courthouse, et al.

```
 1              DIRECTION TO WITNESS NOT TO ANSWER

 2    PAGE   LINE           PAGE   LINE           PAGE   LINE

 3    364    11             397    21             398    2

 4

 5

 6

 7

 8

 9

10

11              REQUEST FOR PRODUCTION OF DOCUMENTS

12    PAGE   LINE           PAGE   LINE           PAGE   LINE

13    14     15

14

15

16

17

18

19

20

21

22

23

24
```

THE COURT REPORTER: Would you like a standing order?

MS. JONES: Yes.

- - -

VIDEOGRAPHER: We are now on the record. My name is Aleisha Catts of Everest Court Reporting. The date today is November 16, 2022, and the time is approximately 9:11 a.m. This deposition is located at 228 Walnut Street in Harrisburg, Pennsylvania. The caption in the case is Jane Doe et al versus Schuylkill County Courthouse et al. The name of the witness is Gary Bender, Volume 1.

At this time the attorneys will identify themselves, the parties they represent, and after which our court reporter, Coleen Trifun, will swear in the witness and we can proceed.

MS. SMITH: This is Catherine Smith on behalf of the plaintiffs, Jane Doe through Jane Doe 4, appearing by Zoom. Along with me are plaintiff Jane Doe 3 and Jane Doe 4. Also appearing on behalf of my office are paralegals Patricia Basil and Alyssa DeBise.

MS. FOX: Amber Fox the United

States.

MR. TOWNSEND: Allen Townsend for the United States.

MS. JONES: Marie Millie Jones, counsel for Gary Bender, Schuylkill County, and Heidi Zula.

MR. GEIGER: Gerry Geiger here for Defendant Halcovage, who is also logged in remotely.

MR. LEES: Paul Lees for Defendant Doreen Kutzler.

MS. IPPOLITO: Nicole Ippolito for Glenn Roth and Glenn Roth is also on the Zoom.

MS. SMITH: I believe that -- is everyone -- same stipulations as in the previous deposition, that this transcript will be marked confidential in its entirety until the parties designate which portions shall remain confidential in accordance with the court's order.

(All parties agreed.)

MS. SMITH: And stipulations as to objections to form and privilege only.

(All parties agreed.)

- - -

GARY BENDER, having been first duly sworn, was examined and testified as follows:

- - -

Examination

- - -

BY MS. SMITH:

Q. Mr. Bender, my name is Catherine Smith. As you know, I represent the plaintiffs in the matter of -- in the case Jane Doe V Schuylkill County et al. Mr. Bender, I have a few preliminary questions and instructions and we'll get into your deposition.

Mr. Bender, have you spoken with your attorney regarding the procedures for the taking of your deposition?

A. Yes.

Q. You understand that you've now been placed under oath and that you have the obligation to testify truthfully?

A. Yes.

Q. You understand that even though you are in an informal conference room, I'm appearing remotely, that your testimony still has the same force and affect as if you were testifying in a

court of law before a judge or a jury?

A. Yes.

Q. Do you understand that the woman to your left, the court reporter, is going to take down everything that is said during the deposition and your entire testimony will be transcribed into a script-type format?

A. Yes.

Q. Do you understand that the court reporter cannot transcribe inaudible responses such as the nod of the head and, therefore, you must make an audible response?

A. Yes.

Q. You understand that you should wait for the complete question to be asked before responding and I, likewise, will wait for you to finish answering before I ask my next question?

A. Yes.

Q. If you do not understand a question or you think that it was ambiguous, please let me know and I will rephrase the question.

Do you understand?

A. Yes.

Q. Do you agree that if you do not

Deposition of Gary Bender Vol. I - Revised                    Jane Doe, et al. v. Schuylkill County Courthouse, et al.

Page 11

1 otherwise indicate, I will assume that you've
2 understood my question?
3 A.      Yes.
4 Q.      If you realize that any answer given
5 earlier in your deposition is inaccurate or
6 incomplete, please let me know that you wish to
7 correct or supplement your answer and you will be
8 allowed to do so.
9       Do you understand?
10 A.      Yes.
11 Q.      If you do not know or remember the
12 information necessary, please let me know.  I'm
13 not going to ask you to speculate.  I may ask you
14 to estimate, though.
15       Do you understand?
16 A.      Repeat that first part.
17 Q.      If you don't remember the information
18 necessary to answer a question, let me know.  I'm
19 not going to ask you to completely speculate.  I
20 may ask you to estimate, though.
21 A.      Okay.  Yes.  Yes, I understand that.
22 Q.      Have you recently consumed any
23 medication, alcohol, or any other substance which
24 impairs your ability to testify truthfully here

Page 12

1 today?
2 A.      No.
3 Q.      Is there any reason you can think of
4 that renders you incapable of testifying
5 truthfully here today?
6 A.      No.
7 Q.      If at any time you need a break, please
8 just let me know.  The only request I have is if
9 there's a question posed to you, that you answer
10 that before we take a break.
11       Do you understand?
12 A.      Understood, yes.
13 Q.      And do you understand the instructions
14 I've given you about your deposition?
15 A.      Yes.
16 Q.      Do you have any questions regarding your
17 deposition?
18 A.      No.
19 Q.      Mr. Bender, periodically throughout the
20 deposition, I will refer to specific individuals,
21 for instance, I may refer to Jane Doe 1, which
22 would be Jane Doe 1, Jane Doe 2 or Jane Doe 2,
23 which would be Ms. Jane Doe 2, Jane Doe 3 or Jane
24 Doe 3, which would be Ms. Jane Doe 3, Jane Doe 4

Page 13

1 or Jane Doe 4, which would be Ms. Jane Doe 4.
2       Do you understand that?
3 A.      Yes.
4 Q.      I also may refer to the county, which
5 would be Schuylkill County in this matter.
6       Do you understand that?
7 A.      Yes.
8 Q.      Mr. Bender, your employment with
9 Schuylkill County began in 2006, correct?
10 A.      That is correct.
11 Q.      And your employment was first as the
12 position of grant writer; is that correct?
13 A.      That is correct.
14 Q.      How did you learn of that position?
15 A.      I received a phone call early in January
16 that there was -- the person that was the grant
17 writer position had left, they were looking for
18 someone.  I had recently written some grants for
19 the -- some fire companies and -- and the -- the
20 township and asked if I was interested.  I said
21 that I perhaps would be, but I wanted to know why
22 the person left so I did call that person and they
23 had some -- some issues with their grant
24 reporting, not so much with grant writing, but

Page 14

1 reporting.  And they had some compliance issues on
2 grants.  And I thought I would be a challenge
3 after.  And so I agreed that I would be interested
4 in pursuing that.
5 Q.      Okay.
6       Do you remember who called you to tell
7 you that the position was open?
8 A.      It was Dan Daub, D-A-U-B.
9 Q.      Did you fill out an employment
10 application?
11 A.      If I did, it was during my interview.
12 Q.      Do you maintain a resume or CV?
13 A.      I do.
14       MS. SMITH:  I am going to make a
15 formal request for a copy of Mr. Bender's resume
16 or CV.
17 BY MS. SMITH:
18 Q.      You have indicated that you might have
19 filled out an employment application during an
20 interview.
21       Do you recall who you interviewed with?
22 A.      Yes, William Reppy, he was the county
23 administrator.
24 Q.      Did you interview with anyone other than

Case 3:21-cv-00477-MCC   Document 280-2   Filed 09/20/23   Page 212 of 373
CONFIDENTIAL
Deposition of Gary Bender Vol. I - Revised                    Jane Doe, et al. v. Schuylkill County Courthouse, et al.

Page 15

Mr. Reppy?

A.    I did not.

Q.    After you interviewed with Mr. Reppy, were you offered a position?

A.    Yes.  I think it was about a week later.

Q.    And you accepted that position?

A.    I did.

Q.    How long after you accepted the position did you begin working with the county?

A.    Probably three weeks.  I started March 1st.  I think my interview was in -- in January, so probably three or four weeks.

MS. SMITH:  I am going to mark as Exhibit 203 for today's purposes.  It is one of the exhibits in that stack.  It's Bates stamped No. 20.

MR. TOWNSEND:  So off the record here.

- - -

(Action request marked as Exhibit-203 for identification.)

- - -

THE WITNESS:  Okay.  I have it.

BY MS. SMITH:

Page 16

Q.    Okay.

Do you recognize this document, Mr. Bender?

A.    No.  It has changed since then, so I didn't -- I didn't see it at the time, but I know what it is.

Q.    Okay.

So this is a personal administrative action request and I think what you were just indicating was that the form now that the county uses looks a little different than this, but it's still what is referred to as a PAR, correct?

A.    That is correct.

Q.    Okay.

And this is the PAR for your appointment to the position of grant writer.  And it appears that the commissioners approved it February 22nd of 2006.  Is that an accurate representation of this document?

A.    Yes.  It's stamped that way.

Q.    Okay.

Do you know why it's dated August 26th of 2005, up there at the top left?

A.    I do not.

Page 17

Q.    Okay.

Did you interview as early as August of 2005?

A.    No.  I interviewed in January of 2006.

Q.    Okay.

So you had interviewed January of 2006, the commissioners approved it February of 2006, and then you started shortly thereafter?

A.    March 1, 2006.

Q.    Okay.

Mr. Bender, are you currently a registered Republican?

A.    I am.

Q.    Were you registered a Republican when you started with the county?

A.    Yes.

Q.    At any point did you switch your political affiliation?

A.    I did not.

Q.    Did Defendant Halcovage ever ask you what your party registration party was?

A.    He did not.

May I say something?

Q.    Sure.

Page 18

A.    He was not a commissioner at that time.

Q.    I'm asking you at any point --

A.    Oh, okay.

Q.    -- has Defendant Halcovage ever asked you what your political affiliation is?

A.    Yeah, he did not.

Q.    He's never asked you that?

A.    He did not.

Q.    Did you ever hear Defendant Halcovage ask any county employee what they were -- what their political registration was?

A.    I -- I have not.

Q.    Did you ever hear Defendant Halcovage tell Jane Doe 3 and/or Jane Doe 4 that they needed to change their political party to be promoted or words to that effect?

A.    No.

Q.    When you started with the county, were you provided with county policies?

A.    I'm sure I was, yes.

Q.    Do you remember by whom?

A.    I don't recall.

Q.    Do you know when?

A.    Probably March 1, 2006.

Case 3:21-cv-00477-MCC   Document 280-12   Filed 09/20/23   Page 213 of 373
CONFIDENTIAL
Deposition of Gary Bender Vol. I - Revised                    Jane Doe, et al. v. Schuylkill County Courthouse, et al.

Page 19

1  Q.     Do you remember where you were when you
2  received them?
3  A.     Yes.  In the county courthouse, I would
4  say over in the -- in the Hoffmann Room, one of
5  the conference rooms at the courthouse is where
6  they did the orientation.
7          MS. SMITH:  In that stack of
8  papers, there's a stapled packet of a few
9  documents.  It's going to be Exhibit 204.  It's
10 Bates 31 through 36.
11          - - -
12         (Bates stamped 31-36 marked as
13 Exhibit-204 for identification.)
14          - - -
15 BY MS. SMITH:
16 Q.     Do you recognize these documents?
17 A.     I do.
18         MS. JONES:  Go ahead and take a
19 look at all of them.
20         THE WITNESS:  Oh, well, wait a
21 minute.  I am looking at the front -- the top
22 page.  Sorry.
23 BY MS. SMITH:
24 Q.     That's okay.  Go ahead and flip through

Page 20

1  them.
2  A.     Okay.
3  Q.     All right.
4          On each of these documents, the
5  handwritten portion, is that your handwriting and
6  signature?
7  A.     It is.
8  Q.     These each indicate March 6th of 2006.
9  Does that refresh your recollection as to when you
10 received policies?
11 A.     I suppose.  I may be off on my start
12 date.  I thought I started March the 1st and I
13 still think I did.  But, anyway, it is dated March
14 the 6th, that is correct.
15 Q.     Okay.
16         When you received the policies, did you
17 have any questions or concerns about any of them
18 that you recall?
19 A.     I don't recall.
20 Q.     You agreed to abide by them during your
21 employment, correct?
22 A.     Correct.
23 Q.     You can put that one aside.
24         At some point after March of 2006, did

Page 21

1  you receive any other copies of county policies?
2          MS. JONES:  Ever?
3          MS. SMITH:  Yes.
4          MS. JONES:  Object to the form.
5  Okay.
6          So you can answer.
7  BY MS. SMITH:
8  Q.     At any point after 2006, did you receive
9  any other copies of county policies at any time?
10 A.     I -- I would suppose when they were
11 updated that we would have received an updated
12 policy because there were a number of them
13 updated, but -- but I don't recall specifically.
14 Q.     Okay.
15         But is that generally the policy of the
16 county, is that when a policy is updated, it is
17 distributed to employees?
18 A.     That is correct.
19         MS. SMITH:  Okay.  So I'm going to
20 mark also in that stack is No. 27, going to be 205
21 for today's purposes.
22          - - -
23         (Bates Stamped 27 marked as Exhibit-205
24 for identification.)

Page 22

1          - - -
2  BY MS. SMITH:
3  Q.     Do you recognize this document, Mr.
4  Bender?
5  A.     Yes.
6  Q.     That's your printed name and signature,
7  correct?
8  A.     It is.
9  Q.     Okay.
10         This one is dated October 27, 2006, and
11 it's an acknowledgment of your receipt of the
12 county sexual harassment policy as revised
13 July 2005.  Would you agree?
14 A.     Yes.
15 Q.     If you just go back to 204, it's the
16 packet of papers, and you look at 33, it's the
17 third page in that packet.  This is also an
18 acknowledgment by of your receipt of that same
19 policy.
20         Would you agree?
21 A.     Yes.
22 Q.     So there's no revision, according to
23 what I'm reading in these documents, March of 2006
24 and October of 2006.  So do you know why in

Page 23

1  October of 2006 you again signed the same policy?
2  A.     I do not.
3  Q.     Okay.
4        About two years after you were hired, in
5  June of 2008, you were promoted from grant writer
6  to grant writer and demolition coordinator; is
7  that correct?
8  A.     That is correct.
9  Q.     Was that a dual role, would you call it,
10 with the county?
11 A.     Yes.  I assumed all the former duties of
12 the grants office, as well as demolition.
13 Q.     Who made that decision?  Was it your
14 idea or how did that come about?
15 A.     Commissioner Chair Mentor Gallagher
16 asked if I would take that on.
17 Q.     And did the assumption of additional
18 duties come with a pay raise?
19 A.     I'm sure it did.
20 Q.     About two years, little less than two
21 years after that, you again changed jobs and you
22 went from grant writer and demolition coordinator
23 to CDBG coordinator and grant administrator; is
24 that correct?

Page 24

1  A.     Yes.  And also with demolition, I lost
2  none of the other responsibilities.
3  Q.     So you just assumed additional duties
4  again in 2010?
5  A.     That is correct.
6  Q.     All right.
7        So you kept all the ones that you had
8  already had, you just got more?
9  A.     Yes.
10 Q.     And how did that come about?
11 A.     There was a retirement by Mr. Tom
12 Gallagher and Commissioner Chair Mentor Gallagher
13 asked me if I would be willing to take on those
14 responsibilities.
15 Q.     And you again received a pay increase
16 for the assumption of those additional duties?
17 A.     I did.
18 Q.     A few years later in September of 2013,
19 you were promoted to the director of county's
20 community -- of the county's community development
21 office, correct?
22 A.     Economic development office.
23 Q.     Did that -- was that a complete change
24 in duties or was that again an assumption of

Page 25

1  additional duties?
2  A.     That was an assumption of additional
3  responsibilities.
4  Q.     Did you lose any of the duties that you
5  had prior to that?
6  A.     I did not.
7  Q.     That was because the county created a
8  new community develop office within the economic
9  development department; is that correct?
10 A.     Correct.
11 Q.     Who decided to create this new office?
12 A.     Well, that would have been the
13 commissioners at the time, which would have
14 been -- what year was that, 2013, did you say?
15 Q.     Yes, September 2013.
16 A.     Then Halcovage, Hess, and Commissioner
17 Stottlemyer, and Mark Scarbinsky, who was the
18 county administrator at the time.
19 Q.     And so Commissioners Halcovage,
20 Stottlemyer, Hess, and you said Mark Scarbinsky?
21 A.     Yes.
22 Q.     All right.
23        Do you know -- were you involved in
24 those discussions to create that new office?

Page 26

1  A.     Mark Scarbinsky had talked to me about
2  that on several occasions, whether I would do
3  that.
4  Q.     And did you agree to do that?
5  A.     I did.
6  Q.     And, again, that came -- the assumption
7  of additional duties came with a pay raise,
8  correct?
9  A.     That is correct.
10 Q.     Do you know for each of the pay
11 increases you received that we just discussed, who
12 made the decision on how much the increase would
13 be?
14 A.     Would have been the commissioners and
15 the controller who was also on the salary board.
16 It would have been a salary board decision.
17 Q.     So the salary board, which is made up of
18 the commissioners and the controller?
19 A.     Correct.
20        MS. SMITH:  I am going to mark as
21 206 for today's purpose, it's also in that stack,
22 it's No. 28.
23        - - -
24        (Bates Stamped 28 marked as Exhibit-206

Page 27

1  for identification.)
2              - - -
3  BY MS. SMITH:
4  Q.      Do you recognize this document, Mr.
5  Bender?
6  A.      I do.
7  Q.      Is that your printed name and signature
8  down the bottom?
9  A.      It is.
10 Q.      You signed acknowledging that you had
11 attended the county's sexual harassment training
12 on October 9, 2013, located at the boardroom
13 courthouse?
14 A.      That is -- that is correct.
15 Q.      Did you, in fact, attend sexual
16 harassment training in the boardroom of the
17 courthouse in October of 2013?
18 A.      I did.
19         Can we go back a little bit?
20 Q.      Sure.
21 A.      The -- I think the one in October 2006,
22 I know there was -- this one was in the boardroom
23 in October or sometime in -- between 2006, there
24 was a sexual harassment training at the campus of

Page 28

1  Penn State, that other form could have been an
2  acknowledgment of that.  I don't know that, but I
3  say -- I remember this one in the boardroom, but
4  there was one at Penn State prior to that.
5  Q.      Okay.
6          And I'm going to get there, so I
7  appreciate that.  Thank you.
8  A.      Oh, okay.
9  Q.      In this document, though, it also says
10 you signed acknowledging that you had received and
11 read the sexual harassment policy as revised in
12 September of 2013, correct?
13 A.      That is correct.
14 Q.      And you had received and read that
15 policy, correct?
16 A.      Yes.
17 Q.      Did you have any questions or concerns
18 about it?
19 A.      No.
20 Q.      So you were just getting to this in your
21 testimony, between your date of hire and this
22 training in October of 2013, did you attend any
23 other in person, virtual, or any other form of
24 sexual harassment training offered by the county?

Page 29

1  A.      Yes.
2  Q.      Okay.
3          And is that the Penn State one you were
4  just mentioning?
5  A.      Correct.  It was a -- it was at the Penn
6  State Schuylkill campus for county employees.
7  Q.      Okay.
8          Was that mandatory or was it voluntary?
9  A.      No.  No, we're required to do that.
10 Q.      Any other training that you received on
11 sexual harassment that was offered by the county
12 between your date of hire and October of 2013?
13 A.      I don't recall.  I'm sure there was no
14 more -- in-person training, I would have
15 remembered that.
16 Q.      Do you remember any virtual training
17 during that time period?
18 A.      I -- I can't.  No, I don't.  And I
19 think, Ms. Smith, had there been, there would have
20 been a form signed for that as well.  I know now
21 we require that form, even on the -- the virtual
22 training.
23         Sorry to interrupt, but I...
24 Q.      It's okay.  No, I appreciate that.

Page 30

1  Thank you.
2          MS. SMITH:  This is going to be
3  marked as 207, it's going to be 25 in that stack.
4              - - -
5          (Bates Stamped 26 marked as Exhibit-207
6  for identification.)
7              - - -
8          MS. JONES:  Catherine, can you give
9  me 30 seconds?  I just lost my connection.
10         MS. SMITH:  Yeah.  We can just go
11 off the record.
12         VIDEOGRAPHER:  The time is now 9:36
13 a.m. and we're going off the record.
14             - - -
15         (Whereupon, brief recess was held off
16 the record.)
17             - - -
18         VIDEOGRAPHER:  The time is now
19 9:43 a.m. and we're back on the record.
20         MS. SMITH:  Matt, if you can put
21 back on the screen 25.  Thank you.
22 BY MS. SMITH:
23 Q.      Mr. Bender, I believe you have what's
24 now been marked as Exhibit-207 for today's

Page 31

1  purposes, it's got a Bates stamp 25 at the bottom;
2  is that correct?
3  A.      That is correct.
4  Q.      Okay.
5         Do you recognize this document?
6  A.      I do.
7  Q.      And is that your printed name and
8  signature?
9  A.      It is.
10 Q.      And you signed acknowledging receipt of
11 the sexual harassment policy of the county as
12 revised July 2013, correct?
13 A.      That's what it states, yes.
14 Q.      And it states that you had reviewed and
15 received that policy, correct?
16 A.      Correct.
17 Q.      Did you have any questions or concerns
18 about the policy when you received it?
19 A.      I did not.
20 Q.      The last one you had received, I believe
21 you said, was October of 2013, so this is just
22 under two years later.  Is it your understanding
23 that the county is to distribute or engage
24 employees in sexual harassment training every two

Page 32

1  years?
2  A.      Yes.
3  Q.      Is it that they're to get the policy
4  every two years or are they supposed to engage in
5  training every two years?
6  A.      Well, I -- I don't want to guess, but I
7  would be willing to bet that this 2015 document is
8  what I signed after the -- the online course.
9  Q.      Okay.
10        So you believe that in --
11 A.      I do.  It doesn't state that I -- the
12 course, but I think when you take the course,
13 there's a form that you sign.  I just signed one
14 recently and I didn't really read the top.  But
15 with that, you're to -- to review that policy as
16 well.
17 Q.      Okay.
18        But so you believe that in May of 2015,
19 you took some type of sexual harassment training
20 course?
21 A.      That would be a guess, but I -- I would
22 think so, because when you receive the online
23 materials, you also receive a copy of the sexual
24 harassment policy.  And that's probably why we

Page 33

1  have to sign this and send it back, so there's two
2  things coming at the same time.
3  Q.      Okay.
4         So when you say you received the
5  materials, is that materials in connection with
6  the training course?
7  A.      The log-in information if we do it
8  online, yes.
9  Q.      Okay.
10        But you would agree that this form does
11 not indicate you attended training, correct?
12 A.      The document does not state that, that's
13 correct.
14 Q.      And you're not positive, but you think
15 you attended training?
16 A.      Yes.  And that information probably
17 would be in the human resources office.
18 Q.      In -- what information, in what form?
19 A.      That I completed the course.
20 Q.      Okay.
21        So you believe that the human resources
22 office maintains some sort of record of who
23 attends training courses and when?
24 A.      Yes.

Page 34

1  Q.      So just going back to my question
2  earlier, so is it your understanding that county
3  employees are to participate in sexual harassment
4  training every two years?
5  A.      Correct.
6  Q.      In June of 2016, you were promoted from
7  director of the county's community development
8  office to interim county administrator/director of
9  economic development; is that correct?
10 A.      In June of 2016, yes.
11 Q.      Yes.  Okay.
12        Defendant Halcovage was a county
13 commissioner in June of 2016, correct?
14 A.      Correct.
15 Q.      Was he involved in that promotion of
16 yours?
17 A.      Yes.
18 Q.      Do you know what involvement he had?
19 A.      He would have had to vote on that.
20 Q.      Were there -- were there any discussions
21 prior to the vote?
22 A.      With Commissioners Stottlemyer, Hess,
23 and Hal -- and Halcovage, yes.
24 Q.      What were those discussions?

Page 35

A.      The discussions would be, since Mark
Scarbinsky left the office, would I be willing to
take on those responsibilities as interim county
administrator.
Q.      Was the intent to have you then become
the actual county administrator thereafter?
A.      That was not the intent at the time
because I wasn't concerned about that at the time.
I didn't think I would do that.  I -- I was -- at
'16 I was 65.  I really didn't want to committee
for more years to do that, but I was willing to
take on the interim role.
Q.      And your promotion from director of
county's community development office to interim
county administrator came with a pay increase,
correct?
A.      It did.
Q.      Do you recall how much?
A.      I do not.
        MS. SMITH:  In that stack there's a
No. 6, going to mark as 208 for today's purposes.
        - - -
        (Bates Stamped 6 marked as Exhibit-208
for identification.)

Page 36

        - - -
BY MS. SMITH:
Q.      Do you recognize this document, Mr.
Bender?
A.      I do.
Q.      And this is the PAR for that promotion
you were just talking about, correct?
A.      That is correct.
Q.      And it looks like it came with a
promotion -- an increase in pay of just over
$15,000, correct?
A.      That is correct.
Q.      Do you know who made the decision that
you would receive a pay increase for your stint,
I'll call it, as interim county administrator?
A.      That would be the salary board.
Q.      And do you know, is it also the salary
board who decides the amount that will be
provided?
A.      The commissioners most likely would have
had a discussion on that and then it was presented
on the PAR, but the -- and the controller would
have been able to vote on that -- the salary board
would have been able to vote on that.

Page 37

Q.      Okay.
        If we now look at -- I want you to keep
this one in front of you.
        MS. SMITH:  But I am going to mark
as 209, it's No. 9 in that stack.
        - - -
        (Bates Stamped 9 marked as Exhibit-209
for identification.)
        - - -
BY MS. SMITH:
Q.      So No. 9 is the PAR for your promotion
prior to the promotion for PAR -- for the PAR of
Exhibit-208, correct?
A.      Correct.
Q.      Okay.
        In 209, the PAR for your 2013 promotion,
it indicates that your salary was increased to
$47,057.  And in the PAR for the subsequent
promotion in 2016, it indicates that your starting
salary before the promotion is $51,420.45.
        Do you know how your salary went from 47
and some dollars to 51 and some dollars in that
three-year period?
A.      You would have to do the math on that,

Page 38

Ms. Smith, because we get 3 percent raises every
year, so that -- that would figure up to
approximately that amount.
Q.      Okay.
        So you believe it's just the 3 percent
cost of living raises that are received?
A.      Yes.
Q.      You didn't receive any other promotions
or title changes --
A.      Did not.
Q.      -- or assumption of duties during that
time?
A.      I did not.
Q.      Okay.
        Some time after June of 2016, you did,
in fact, become the county administrator, correct?
A.      That is correct.
Q.      And you had indicated earlier that
you -- you didn't plan to.  What changed your
mind, why -- why did you then, in fact, to agree
to take on that role?
A.      I got a chance to look at the applicants
and I just thought I was a better fit.  I talked
with my wife that would be a commitment of more

Page 39

1  years at the county, she was okay with it.  I
2  think we have a great staff there.  I enjoyed my
3  time as interim and I think we could -- I just
4  thought it was a great fit and I put my name in.
5  Q.     So you put your name in at your own
6  decision, not at a request of any of the
7  commissioners?
8  A.     No.  At my own decision and my wife's.
9  I'm sorry.  And my wife's.
10 Q.     You became the county commissioner in
11 September -- September 14th of 2016; is that
12 right?
13 A.     That is correct.
14 Q.     And you've held that position since that
15 date, September 14, 2016?
16 A.     Correct.
17       MS. SMITH:  I am going to mark as
18 210, it's going to be 24 in that stack in front of
19 you.
20       THE WITNESS:  Okay.
21            - - -
22       (Bates Stamped 24 marked as Exhibit-210
23 for identification.)
24            - - -

Page 40

1  BY MS. SMITH:
2  Q.     Do you recognize this document?
3  A.     I didn't get what you said.
4  Q.     Do you -- do you recognize this
5  document?
6  A.     Oh, yes.  Yes.
7  Q.     Okay.
8        And is that your printed name and
9  signature?
10 A.     It is.
11 Q.     And you signed, acknowledging that you
12 reviewed and understood the sexual harassment
13 policy as revised July 2013, and that you agree to
14 abide by them -- by the policy, correct?
15 A.     Correct.
16 Q.     This one also indicates that you have
17 taken the sexual harassment training by the local
18 GovU/CCAP website.
19       Do you see that?
20 A.     I do.
21 Q.     Okay.
22       Does this refresh your recollection as
23 to whether, in fact, you took a training in May of
24 2015, or if it was possibly in August of 2019?

Page 41

1  A.     No.  I'm fairly certain that I took it
2  in 2015 as well.  I will check when I get back to
3  the courthouse, I will tell you that, but...
4  Q.     Okay.
5        But you definitely took one in August of
6  2019?
7  A.     Correct.
8  Q.     And this was a -- a virtual training?
9  A.     Yes.
10 Q.     Were any materials provided?
11 A.     The sexual harassment policy was
12 provided, as well as the log-in information for
13 the training.
14 Q.     No other materials?
15 A.     No.
16 Q.     Did you have any questions or concerns
17 about the training?
18 A.     I did not.
19 Q.     Did you understand your rights and
20 responsibilities as outlined in the policy?
21 A.     I do.
22       MS. SMITH:  I am going to mark as
23 211, it's going to be -- it's going to be 22 and
24 23 in that stack.

Page 42

1            - - -
2        (Bates Stamped 22-23 marked as
3  Exhibit-211 for identification.)
4            - - -
5  BY MS. SMITH:
6  Q.     Do you recognize these documents, Mr.
7  Bender?
8  A.     I do.
9  Q.     This is your printed name and signature
10 on the first page?
11       MS. IPPOLITO:  We can't see them
12 yet, at least I can't.
13       THE TECHNICIAN:  Sorry, Counsel.
14 Hang on a second.
15 BY MS. SMITH:
16 Q.     On the one that's on the screen on the
17 left, it's Bates stamped 22.  That's your printed
18 name and signature, correct, Mr. Bender?
19 A.     That is correct.
20 Q.     You acknowledge that you had received,
21 read, and reviewed the county's anti-harassment
22 and non-discrimination policies revised
23 January 2021, correct?
24 A.     Correct.

Page 43

1  Q.      Did you have any questions or concerns
2  about the policy when you received it?
3  A.      I did not.
4  Q.      At the time that you received it, there
5  was also an in-person training, correct?
6  A.      Yes.
7  Q.      Okay.
8          And that's the page on the right here on
9  the screen and No. 23, Bates stamp 23, is the quiz
10 that you took during the administration of that
11 in-person training, correct?
12 A.      That is correct.
13 Q.      Did you receive any other materials
14 aside from this quiz and the policy during that
15 training?
16 A.      I don't recall.  I think we had a
17 handout when -- I am pretty sure we did during
18 that course.
19 Q.      Do you remember where you attended this
20 training?
21 A.      Yes.  It was in the boardroom at the
22 county courthouse.
23 Q.      We -- let's go back through some of
24 these acknowledgment forms.  This one is 2021.

Page 44

1  The last one we looked at, which was Exhibit-210,
2  is in 2019, so that would be -- would be two
3  years.
4  A.      Okay.
5  Q.      And then the one before that that we
6  looked at, and I'll represent to has been produced
7  by the county, is from 2015 --
8  A.      '15.
9  Q.      -- it's Exhibit-207, which would be four
10 years, from '15 to '19.  So do you know, did you
11 take a sexual harassment training in 2017?
12 A.      I can't answer that.  I mean, I don't
13 recall.  I mean, I would have to look at the HR
14 files.  I can assure you if it was offered, I took
15 it.
16 Q.      Okay.
17         In your position other than county
18 administrator with the county, were you
19 responsible for or involved in personnel matters
20 for county employees?
21 A.      In what way?
22 Q.      Did you ever create a PAR for any
23 employee before you were county administrator?
24 A.      No.

Page 45

1  Q.      Were you involved in any discussions
2  about promotions or transfers of any county
3  employee prior to being county administrator?
4  A.      Yes.  I was involved in a discussion
5  when I was able to hire Michelle O'Connell as an
6  assistant in the CDBG program.
7  Q.      Any other times?
8  A.      Not before administrator, no.
9  Q.      Okay.
10         So it's fair to say then before you were
11 county administrator, you were not involved in any
12 hiring, firing, transfer, promotion of any of the
13 plaintiffs?
14         MS. JONES:  Of the plaintiffs, you
15 said?
16         MS. SMITH:  Yes.
17 BY MS. SMITH:
18 Q.      Of any of the plaintiffs?
19 A.      No.
20 Q.      And I am just talking about from the
21 time before you were county administrator?
22 A.      No.  Not in their hiring or transfers,
23 none of what you stated.
24 Q.      Okay.

Page 46

1          Were you involved in any decisions
2  regarding their -- the plaintiffs employment --
3  A.      No.
4  Q.      -- prior to you becoming county
5  administrator?
6  A.      No.
7  Q.      All right.
8          Now I would like to discuss your -- your
9  responsibilities as county administrator.
10         MS. SMITH:  So we are going to look
11 at SC-2 -- 1235 through 1238.  It should be the
12 last stapled packet in that stack in front of you.
13 And I will mark it as 212 for today's purposes.
14              - - -
15         (SC 1235-1238 marked as Exhibit-212 for
16 identification.)
17              - - -
18 BY MS. SMITH:
19 Q.      This is a four-page document, Mr.
20 Bender.  So go ahead and take a brief look at it.
21 I'll direct your attention to specific areas.
22         But my first question is just going to
23 be generally:  Do you recognize the document?
24 A.      Yes.

Case 3:21-cv-00477-MCC   Document 280-1   Filed 09/20/23   Page 220 of 373

Deposition of Gary Bender Vol. I - Revised                    Jane Doe, et al. v. Schuylkill County Courthouse, et al.

Page 47

Q.     Okay.
       This is the county's job classification
description for the position of county
administrator, correct?
A.     That is correct, that's what it states.
Q.     All right.
       If we turn to the last page of the
document, it's going to be 1238 at the bottom, it
states reports to county commissioners.
       Do you see that?
A.     Yes.
Q.     Okay.
       The county administrator, in fact,
reports to county commissioners, correct?
A.     Correct.
Q.     And it states date, June 2016.
       Do you see that?
A.     Yes.
Q.     This has been the county's job
classification description for county
administrators since June of 2016.
       Would you agree?
A.     I would agree.
Q.     Has there been any revisions to this

Page 48

since 2016, that you're aware of?
A.     Not that I'm aware of.
Q.     Okay.
       So would you agree then that this job
classification description has applied to you
during your entire time as county administrator?
A.     I would think so, yes.
Q.     All right.
       Turning back to Page 1, there's a
general summary at the top.
       Do you see that?
A.     I do.
Q.     It states in the third line down,
provide managerial direction to departments under
county commissioners.
       Do you see that?
A.     Yes.
Q.     The county's tax claim bureau is under
county commissioners, correct?
A.     That is correct.
Q.     And the head of county's tax claim
bureau is, and since you've become county
administrator, has been tax claim bureau director,
correct?

Page 49

A.     That is correct.
Q.     And since you've become county
administrator, Jane Doe 3 has been the county's
tax claim director, correct?
A.     That is correct.
Q.     So would it be fair to say that since
you became county administrator, you have been
Jane Doe 3's supervisor in her role as tax claim
director?
       MS. JONES:  Object to form.
       You may answer.
       THE WITNESS:  Yes.
BY MS. SMITH:
Q.     All right.
       From the time you became county
administrator until at least March of 2021, when
the tax claim bureau and the tax assessment
offices were restructured, the tax claim bureau
had an assistant tax claim director, correct?
A.     That is correct.
Q.     And since you became county
administrator, that role had been filled by Jane
Doe 4, correct?
A.     Correct.

Page 50

Q.     So would it be fair to say that since
you became county administrator until at least
March of 2021, you were Jane Doe 4's supervisor in
her role as assistant tax claim director?
       MS. JONES:  Object to form.
       You can answer.
       THE WITNESS:  Well, I would think
that she would report directly to the tax claim
director, but I would be overseeing both of them,
yes.
BY MS. SMITH:
Q.     Okay.
       The county's tax assessment office is
also under county commissioners, correct?
A.     Correct.
Q.     And the head of the county's tax
assessment office is, and since you became county
administrator, has been a chief assessor, correct?
A.     Correct.
Q.     Are you aware that statutorily, every
county must have a chief assessor?
A.     Yes.
Q.     And Jane Doe 3 became interim chief
assessor for the county in May of 2019; is that

Case 3:21-cv-00477-MCC   Document 280-12   Filed 09/20/23   Page 221 of 373
Deposition of Gary Bender Vol. I - Revised
Jane Doe, et al. v. Schuylkill County Courthouse, et al.

Page 51

correct?

A.      I don't have a document in front of me, but I assume you do and I will -- yes, I would say so.

Q.      Okay.

And then she became the chief assessor, she -- interim position, and then she became chief assessor around July of 2019, correct?

A.      That is correct.

Q.      So would it be fair to say that when Jane Doe 3 held the position of chief assessor, you would have been her supervisor in that role?

MS. JONES:  Object to form.

You can answer.

THE WITNESS:  Correct.

BY MS. SMITH:

Q.      The tax assessment also has, and since you've become a county administrator, has had an assistant or deputy chief assessor, correct?

A.      Well, I don't recall when Ginny Murray was there whether they had an assistant director or not.  I would think they did not up until Jane Doe 3 went over there and Jane Doe 4.

Q.      Okay.

Page 52

But at any point -- in any event, at some point during your employment as county administrator, the tax assessment office did have a assistant in the tax assessment office, correct?

A.      Correct.

Q.      And I've seen it referred to as assistant assessor or deputy assessor.

Are those titles interchangeable?

A.      Yes.

Q.      Okay.

And Jane Doe 4 held that position for a period of time, correct?

A.      Correct.

Q.      She started in that position roughly around the same time that Jane Doe 3 became chief assessor; is that correct?

A.      Yes.

Q.      And she held that title until about May of 2021; is that correct?

A.      Okay.  Yes.

Q.      All right.

And so would it be fair to say that while Jane Doe 4 held the position of assistant or deputy assessor, that you were her supervisor in

Page 53

that role?

MS. JONES:  Object to form.

You can answer.

THE WITNESS:  Yes.  Again, Jane Doe 3 would have been her immediate supervisor, but she still would have reported to me if -- if -- if something got -- if Jane Doe 3 wasn't there, she would report to me, yes.

BY MS. SMITH:

Q.      Okay.

And would you agree that as a supervisor of the tax claim bureau and tax assessment offices, you were also the supervisor of the employees, maybe not direct, but through chain of command, the supervisor of the employees within those offices?

MS. JONES:  Object to form.

You can answer.

THE WITNESS:  Yes.

BY MS. SMITH:

Q.      All right.

Looking back at 212, which is in front of you.  On Page 1, there's a No. 2 down the bottom.

Page 54

Do you see that?

A.      Uh-huh, yes.

Q.      It states:  Direct countywide personnel and labor relief relations activities, and then there's a list of six things, A through F beneath that.

Do you see that?

A.      Yes.

Q.      One of the items, it's B.  It says say direct development of new or modifications to existing policy.

During your employment with the county when you were county administrator, did you ever direct the development of a new policy for the county?

A.      Time as administrator?

Q.      Yes.

A.      I think we revised some policies.  I don't know of a new policy that was out there.  We did revise a couple of policies.  I can't recall off the top of my head what they are.  One was an inclement weather policy.  There may have been another one.

Q.      Okay.

Page 55

1  Do you know, were you ever involved in
2 the modification of the county's sexual harassment
3 or antidiscrimination policy?
4 A.    I don't think so, no.
5 Q.    Were you involved in the county's -- any
6 modification by the county to the jury duty or
7 subpoena policy?
8 A.    No.
9 Q.    Turning to the next page in the exhibit
10 before, should be a No. 3 at the top, it's Page
11 1236.
12 A.    Okay.
13 Q.    This paragraph discusses the county
14 administrator's duties and responsibilities
15 related to the management of departments under the
16 county commissioners.  And there is a list of
17 items, which include C, review and submit for
18 final approval recommendations for personnel
19 actions.
20  Do you see that?
21 A.    I do.
22 Q.    To whom did the -- did you as county
23 administrator submit for final approval,
24 recommendations for personnel actions?

Page 56

1 A.    They would come from the HR office over
2 to the -- for the next agenda item.
3 Q.    And then -- so they'd come from the HR
4 office to you for agenda items.  And who would
5 have the final approval of those personnel
6 actions?
7 A.    The board, board of commissioners.
8 Q.    Okay.  Thank you.
9  So would it be fair to say that it's
10 required that all personnel actions in departments
11 under county commissioners be reviewed and
12 submitted by the county administrator?
13 A.    They get reviewed by me.  They get
14 reviewed by the human services -- human resources
15 director.  They bring them over to me to look at
16 before they get approval by the chairman to be put
17 on the agenda.
18 Q.    Okay.
19  So they must be reviewed by you, HR
20 can't directly put it on the agenda for the
21 commissioners, correct?
22 A.    If I'm not there, they probably would,
23 but that's not the -- the normal way to do things.
24 I mean, they wouldn't put them directly on the

Page 57

1 agenda.  The agenda gets always passed through the
2 chairman of the board of commissioners.
3 Q.    Okay.
4  Could the HR director or employee send
5 it -- something directly to the chairman for
6 addition to the agenda or is it policy that it
7 should go through the county administrator?
8 A.    It would go through me if I'm in the
9 building, yes.
10 Q.    If you turn to the next page in this
11 Exhibit, there's going to be a No. 6 at the top.
12 It's -- the Bates stamp is 1237.
13 A.    Okay.
14 Q.    Under -- under No. 6 there is an A,
15 which states:  Ensure distribution of county
16 policies and procedures; do you see that?
17 A.    I do.
18 Q.    During your employment with the county
19 as county administrator, what, if anything, did
20 you do to ensure county policies and procedures
21 were distributed?
22 A.    Consult with the human resources
23 director, they're the ones that send them out.
24 Q.    Did you ever review any documents to

Page 58

1 ensure that all employees of the county had
2 received any revised policies?
3 A.    I would think just verbal communication
4 with the human resource director.
5 Q.    Did -- is it your understanding that
6 this job duty and responsibility required you to
7 ensure that all county employees had attended
8 sexual harassment training every two years?
9  MS. JONES:  I'm sorry.  Could you
10 repeat that, I was -- I missed it.
11 BY MS. SMITH:
12 Q.    Is it your understanding that this job
13 duty and responsibility also required you to
14 ensure that all county employees had taken sexual
15 harassment training every two years?
16 A.    Human resources keeps those files.
17 Clearly if someone did not, they would bring that
18 to my attention.
19 Q.    Did you ever obtain signatures from
20 employees on acknowledgment forms such as the ones
21 we looked at for you?
22 A.    No.  That is done by human resources.
23 Q.    Also in No. 6 of this document, there
24 was a C, which states:  Received non-routine

Page 59

1  complaints and coordinate response.
2        Do you see that?
3  A.    Yes.
4  Q.    Would this include complaints of sexual
5  harassment?
6  A.    Yes.  They would go to the human
7  resources office and she would bring them over to
8  discuss.
9  Q.    Okay.
10       But does it also mean that you could
11 receive non-routine complaints from employees
12 directly?
13 A.    If they came to my office, I would -- I
14 would hear them out, yes.
15 Q.    Do you believe that in your position as
16 county administrator that if you observed sexual
17 harassment, you had a duty to report it?
18 A.    I do.
19 Q.    Who do you believe your duty to report
20 it is to?
21 A.    Director of human resources.
22 Q.    What if you believed there was a
23 conflict of interest by you or the human resources
24 director?

Page 60

1        MS. JONES:  Object to the form.
2  I'm not sure I understand that question.
3        Could you rephrase.
4        MS. SMITH:  So Mr. Bender indicated
5  that he would report -- his duty is to report it
6  to the HR director.
7  BY MS. SMITH:
8  Q.    My question is to whom would you be
9  required to report sexual harassment to if you
10 and/or the HR director had a conflict of interest?
11       MS. JONES:  Okay.  You can answer
12 that.
13       THE WITNESS:  The county
14 commissioners with consultation from the county
15 solicitor.
16 BY MS. SMITH:
17 Q.    Do you believe that in your position as
18 county administrator, that if you received a
19 report of sexual harassment, that you have and had
20 a duty to report it?
21 A.    I would agree to that, yes.
22 Q.    And is that also to the HR director?
23 A.    Repeat that, please.
24 Q.    That also -- would you also report --

Page 61

1  you indicated earlier you would report
2  observations of sexual harassment to the director
3  of HR.  If you received a report, would you also
4  report that to director of HR?
5  A.    Yes.
6  Q.    Okay.
7        And same question regarding conflict of
8  interest, would you handle a report versus an
9  observation the same way?
10 A.    Yes.
11 Q.    Can you tell me what involvement you had
12 with the day-to-day operations of the tax claim
13 bureau prior to May of 2020?
14 A.    On the day-to-day operations, very
15 little.  I think Jane Doe 3 and I worked well
16 together.  I had a lot of confidence in her.  If
17 something would come up, I certainly would get
18 involved.  But anything normally on a day-to-day,
19 I don't go never in the beginning of the day and
20 ask how everyone is doing, but I count on my
21 directors to do their job and I have confidence in
22 all my directors.
23 Q.    Okay.
24       So then the same question for your

Page 62

1  day-to-day involvement with the tax assessment
2  office, what was that prior to May 2020?
3  A.    The same.  In other words, I don't go
4  over to the office on a day-to-day basis, but I do
5  have responsibilities on a day-to-day basis.
6  Q.    Okay.
7        Did you also similarly have confidence
8  in Jane Doe 3 when she was the department head or
9  chief assessor, similar to her -- your confidence
10 in her in the tax claim bureau?
11 A.    Prior to May, yes.
12 Q.    Okay.
13       So Jane Doe 1, Jane Doe 2, Jane Doe 3,
14 and Jane Doe 4 were all hired by the county after
15 you became a county employee, correct?
16 A.    Yes.
17 Q.    I am going to start with Jane Doe 1.
18 When did you meet Jane Doe 1?
19 A.    I think when she was hired in the
20 mailroom.
21 Q.    And where did you meet her?
22 A.    Probably in the mailroom.
23 Q.    Do you know who introduced you?
24 A.    I would think I introduced myself.  I

Page 63

1  was pretty much responsible for the mail machine,
2  if there was any service to be done, and so I
3  would have gone up and introduced myself.  I don't
4  recall specifically, however, but that's logical
5  when I would have done.
6  Q.     Okay.
7         So you said you were responsible for the
8  mail machine.
9         Do you remember when Jane Doe 1 worked
10 in the mailroom, what your title was?
11 A.     I do not.
12 Q.     But you remember that when she worked in
13 the mailroom, you were responsible for the mail
14 machine?
15 A.     Yes.
16 Q.     All right.
17        Would that have made you Jane Doe 1's
18 supervisor at that time?
19 A.     No.
20 Q.     Did you know anything about Jane Doe 1
21 before you met her?
22 A.     I did not.
23 Q.     At some point did you come to learn that
24 Jane Doe 1 struggled with alcohol and/or was an

Page 64

1  alcoholic?
2  A.     Only after the complaint was filed.
3  Q.     And when you say the complaint, are you
4  talking about the lawsuit in this case?
5  A.     Yes.  When things -- when I read some of
6  the things in the complaint, it was an issue
7  that -- that an alcoholic, but I was not aware of
8  that before that.
9  Q.     So you -- prior to at least 2020, May of
10 2020, you had no knowledge that Jane Doe 1 had any
11 issues with alcohol?
12 A.     I don't recall any of that.  I know
13 the -- the -- we were at a function one time and
14 she was -- looked like she was slightly inebriated
15 and I did mention that to Mr. Halcovage because it
16 was a political event, but I didn't know she had a
17 problem with it.
18 Q.     Okay.
19        When you mentioned it to Mr. Halcovage,
20 what was his response?
21 A.     That he would speak to her.
22 Q.     Do you remember what political function
23 that was?
24 A.     I think that was at an event called the

Page 65

1  October Fest.  It was a fundraiser for the
2  commissioners campaign.
3  Q.     Was -- do you remember what year that
4  was?
5  A.     I do not.  It would be a guess.  I
6  don't -- I don't want to guess.
7  Q.     Well, were you county administrator yet?
8  A.     No.
9  Q.     Okay.
10        So it was prior to September of 2016?
11 A.     Yes.
12 Q.     And if I told you Jane Doe 1 started in
13 the 2014 and you said it was October Fest, I am
14 going to, correct me if I am wrong, make an
15 assumption it either had to be 2014 or 2015,
16 correct?
17 A.     I would suspect 2015, that was the --
18 that was the election year.
19 Q.     Okay.
20        Were all county employees at this
21 political function?
22 A.     No.
23 Q.     Did you question why Jane Doe 1 was at
24 the political function?

Page 66

1  A.     They were selling -- or taking names at
2  the door and handing out nametags and things of
3  that sort.
4  Q.     Who is they?
5  A.     Jane Doe 2, Jane Doe 1, Mrs. Halcovage.
6  Q.     Why did you believe that you should say
7  something to Defendant Halcovage about Jane Doe
8  1's inebriation?
9  A.     Well, she was active in the campaign and
10 if she drove there herself, that might be a
11 problem.
12 Q.     What do you mean she was active in the
13 campaign?
14 A.     I think they helped at the door that
15 day.  I think they went door to door.  They did
16 some things for the -- the Halcovage campaign.
17 Q.     What's your opinion of Jane Doe 1?
18 A.     I think Jane Doe 1 is a very bright
19 woman.  She's very friendly.  I've never had any
20 issues with Jane Doe 1.  When she was in the
21 mailroom, she did a fantastic job.
22 Q.     Jane Doe 1 has been employed by the
23 county as a real estate market analyst in the tax
24 assessment office for the entire time that you've

Page 67

1  been county administrator, correct?
2  A.      Yes.
3  Q.      In that position, Jane Doe 1 reports to
4  and supervised by the assistant or deputy assessor
5  and then deputy -- or then the chef assessor
6  followed by you, and then the commissioners,
7  correct?
8  A.      Correct.
9  Q.      Prior to May of 2020, did you review
10 Jane Doe 1's work performance at all in her
11 position of real estate market analyst?
12 A.      I did not.
13 Q.      Prior to May of 2020, did you have any
14 questions or concerns regarding Jane Doe 1's work
15 performance as a real estate market analyst?
16 A.      I did not.
17 Q.      Prior to May of 2020, had anyone raised
18 any issues or concerns regarding Jane Doe 1's work
19 performance as a real estate market analyst?
20 A.      Not to me, no.
21      MS. SMITH:  Going to look at --
22 mark as Exhibit 213, it's going to be towards the
23 back of the stack, it's 1206 to 1208, it's a
24 stapled one.

Page 68

1           - - -
2      (Bates Stamped 1206-1208 marked as
3  Exhibit-213 for identification.)
4           - - -
5  BY MS. SMITH:
6  Q.      Mr. Bender, I am going to ask you again
7  just to generally look at this document and then I
8  am going to ask you some specific questions about
9  it.
10      Again, my first question being, do you
11 recognize the document?
12 A.      I do.
13 Q.      And this is the county job
14 classification description for that position Jane
15 Doe 1 holds, real estate market analyst, correct?
16 A.      It is.
17 Q.      If we turn to the last page, this
18 document indicates a date of December 1996, with a
19 revision date of January 14, 2009.
20      Would you agree?
21 A.      Yes.
22 Q.      Do you have any reason to believe it's
23 been revised since 2009?
24 A.      Not that I'm aware of.

Page 69

1  Q.      Okay.
2      So this is the job classification,
3  description that applies to Jane Doe 1 and has
4  applied to Jane Doe 1 for the entire time she's
5  been real estate market analyst, correct?
6  A.      Correct.
7  Q.      So, again, I want to talk about -- focus
8  on the time frame of when you became county
9  administrator, so September 2016 and May of 2020.
10 During that time, is there anything in this job
11 classification that you are aware that Jane Doe 1
12 did not do?
13 A.      I can't answer that.  I'm not aware of
14 any.
15 Q.      Okay.
16      Again, that's all I am asking you is
17 your personal knowledge.
18 A.      Okay.
19 Q.      So you're not aware of anything that she
20 did not do within this job description?
21 A.      I am not.
22 Q.      Okay.
23      Is there anything during that same time
24 in this job description that you believe Jane Doe

Page 70

1  1 was not qualified to do?
2      MS. JONES:  I'll object to the
3  form.
4      But he can answer.
5      THE WITNESS:  I am not aware of
6  any.
7  BY MS. SMITH:
8  Q.      Did anyone ever tell you that they
9  thought that Jane Doe 1 was having sex with
10 Defendant Halcovage?
11 A.      They did not.
12 Q.      Did you ever hear rumors that Jane Doe 1
13 was having sex with Defendant Halcovage?
14 A.      I did not.
15 Q.      Did Defendant Halcovage ever tell you
16 that she was having sex with Jane Doe 1?
17 A.      He did not.
18 Q.      Did Defendant Halcovage tell you that
19 there were rumors that he was having sex with Jane
20 Doe 1?
21 A.      He did not.
22 Q.      Did you ever hear Defendant Halcovage
23 make a comment about Jane Doe 1's physical
24 appearance?

Page 71

1  A.    I did not.
2  Q.    Did you ever hear Defendant Halcovage
3  tell Jane Doe 1 that she was gorgeous?
4  A.    I did not.
5  Q.    Every hear her tell -- ever hear him
6  tell Jane Doe 1 she was a jaw dropper?
7  A.    I did not.
8  Q.    Ever here Mr. Halcovage tell Jane Doe 1
9  she was beautiful?
10 A.    I did not.
11 Q.    Ever hear him tell her she was a head
12 turner?
13 A.    I did not.
14 Q.    Ever hear him say she has -- Jane Doe 1
15 has the wow or it factor?
16 A.    Did not.
17 Q.    Did you ever observe Defendant Halcovage
18 shut the door to his office at the courthouse when
19 he and Jane Doe 1 were the only ones in his
20 office?
21 A.    Repeat that first part.  Go ahead.
22 Q.    Did you ever observe Defendant Halcovage
23 shut the door to his office at the courthouse when
24 he and Jane Doe 1 were the only ones in his

Page 72

1  office?
2  A.    No, I did not observe him shutting the
3  door.  I do know that the door was shut on at
4  least two or three occasions.  Wendy Shlanta told
5  me, I went in, I -- I went up to the door,
6  knocked, and walked right in.
7  Q.    Okay.
8     So Ms. -- is it Shlanta?  How do you say
9  it?
10 A.    Yes.  S-H-L-A-N-T-A, Shlanta.
11 Q.    Okay.
12    Ms. Shlanta brought to your attention
13 that Jane Doe 1 was alone with Defendant Halcovage
14 in his office.
15    Is that what I understand?
16 A.    Yes.
17 Q.    And you went then to the office and
18 opened the door and went in, correct?
19 A.    Yes.  Yes.
20 Q.    Is that because it caused you concern or
21 hesitation why she would be in there with
22 Defendant Halcovage?
23 A.    It caused Wendy's some concern and I --
24 Q.    Okay.

Page 73

1  A.    -- didn't think it was appropriate.
2  Q.    You didn't think it was appropriate?
3  A.    I do not.
4  Q.    Okay.
5     At this time, were you county
6  administrator?
7  A.    I don't recall because I was in that
8  office from '13 to '16 before I became the
9  administrator.  I was in that same office, so it
10 could have been prior to --
11 Q.    But you were -- I'm sorry.  Go ahead.  I
12 didn't mean to interrupt you.
13 A.    It -- it could have been prior to me
14 being the administrator because I was in the same
15 office.
16 Q.    Okay.
17    So you don't recall, it -- it could have
18 been before your administrator or it could have
19 been when you were administrator?
20 A.    Correct.
21 Q.    All right.
22    Did Ms. Shlanta report to you as a
23 supervisor?
24 A.    Yes.

Page 74

1  Q.    Is that both as county administrator and
2  in prior roles or just as county administrator?
3  A.    No.  In -- in prior roles when I became
4  the director of economic development, Mark asked
5  me to oversee Wendy's, although he was a direct
6  response -- report, Wendy, and the chief clerk.
7  Q.    Did you continue to supervisor Ms.
8  Shlanta after you became county administrator?
9  A.    Yes.
10 Q.    Okay.
11 A.    Yeah, she was my executive secretary.
12    Okay.
13    And Jane Doe 1, do you know when these
14 two to three occasions occurred where she was in
15 Defendant Halcovage's office alone, was she a real
16 estate market analyst or --
17    MS. JONES:  Objection.  I'm sorry.
18 BY MS. SMITH:
19 Q.    -- or something else?
20    MS. JONES:  I'm sorry.  I object to
21 the form of the question.
22 BY MS. SMITH:
23 Q.    You can answer it.
24 A.    Okay.

Page 75

1    MS. JONES:  Sorry.  I'm sorry, yes,
2  you can.
3    THE WITNESS:  I don't recall.  I --
4  I don't recall the time frame.
5  BY MS. SMITH:
6    Q.    Can you extrapolate or articulate more
7  why you felt it was inappropriate for Jane Doe 1
8  to be -- let me -- let me clarify something.  This
9  might be why Marie objected.
10    When you walked into Defendant
11  Halcovage's office, was it just Jane Doe 1 and Mr.
12  Halcovage alone in that office?
13    A.    Yes.
14    Q.    Okay.
15    A.    Commissioner Halcovage was behind his
16  desk and she was at a table at the other end of
17  the record.
18    Q.    Any --
19    MS. JONES:  And for the record, my
20  objection was because you said two or three times
21  and I think you only asked him about one.
22  BY MS. SMITH:
23    Q.    Was she -- I -- well, let's clarify that
24  then, Mr. Bender.

Page 76

1    MS. JONES:  So that's why.
2  BY MS. SMITH:
3    Q.    On two or three occasions, I thought --
4  I thought that's what you testified to, that this
5  happened?
6    A.    Yes.
7    Q.    Okay.
8    And on those two or three times where
9  Jane Doe 1 and Mr. Halcovage were in his office
10  alone, you indicated that you thought it was
11  inappropriate.  Can you tell us why did you think
12  that?
13    A.    I just don't think it's appropriate to
14  have an employee in your office with the door
15  closed.  There's no reason to have the door closed
16  in there.  It just -- personal, I wouldn't do it.
17    Q.    Okay.
18    Did Ms. Shlanta inform you why -- why
19  she was concerned about it?
20    A.    It just made her uncomfortable.
21    Q.    Did she say why?
22    A.    She did not.
23    Q.    All right.
24    Did you ask her?

Page 77

1    A.    Ask her why she was uncomfortable?
2    Q.    Yes.
3    A.    I did not.  No, I just went back and
4  went in and told them, try to leave the door open.
5  I did mention it to --
6    Q.    Okay.
7    A.    -- to -- to Commissioner Halcovage.
8    Q.    You what?  I'm sorry.
9    A.    I mentioned it to Commissioner
10  Halcovage.
11    Q.    What did you say to him?
12    A.    I said it's not a good idea to have your
13  door closed with an employee in the office,
14  unless -- say if it were a very confidential
15  matter that was being discussed, but if it's -- if
16  it's just -- it just is not appropriate in my
17  opinion.  That's my personal thing.
18    Q.    Sure.  Understand.
19    And what was Mr. Halcovage's response?
20    A.    They were talking about insurance.
21    Q.    Insurance for the county or..?
22    A.    No.  Probably her personal insurance or
23  maybe insurance for -- I don't know.  It's an
24  insurance matter.  I'm sorry.  I don't -- it was

Page 78

1  an insurance matter.  And I said that's okay, but
2  it's still not -- it's not top secret.
3    Q.    Okay.
4    Did you report this to human resources
5  at all?
6    A.    At our -- at our daily meeting, it
7  depends what the time frame of this was.  I would
8  say perhaps not -- Martina Chaswiak and I did not
9  meet every day.  Ms. Twigg came on board in -- I
10  can't recall now.  I'm getting myself confused.
11    Q.    I think it was 2018 Ms. Twigg came on
12  board.
13    A.    Okay.  It would have been before that.
14    Q.    The two to three times you observed Jane
15  Doe 1 in Mr. Halcovage's office was before Ms.
16  Twigg became HR director?
17    A.    Yes.
18    Q.    And, again, so you said you and Martina
19  that did not meet --
20    A.    Daily.
21    Q.    -- every day?  But you did?  I'm sorry.
22    A.    We did not.

Page 79

1  Q.     Okay.
2         Did you and Ms. Twigg meet every day?
3  A.     We did.
4  Q.     All right.
5         So do you believe that you reported this
6  observation Ms. -- and Ms. Shlanta's comments to
7  you, to HR?
8  A.     I don't recall.  I mean, I don't want to
9  say yes if it was no and I don't want to say no if
10 it was yes, so I don't recall.
11 Q.     Okay.
12        Were you ever in Defendant Halcovage's
13 courthouse office with --
14        MS. JONES:  I'm sorry.  You -- you
15 blanked out.  Can you say that one more time.
16 BY MS. SMITH:
17 Q.     Were you ever in Defendant Halcovage --
18 in Defendant Halcovage's courthouse office with
19 him and Jane Doe 1?
20 A.     Only the times that I just mentioned, I
21 walked in so I would have been in the office for a
22 period of time and then I -- I went out, but I
23 wasn't in as a discussion, no.
24 Q.     Okay.

Page 80

1         So other than those two to three
2  times --
3  A.     Correct.
4  Q.     -- that we just discussed, you were
5  never in Defendant Halcovage's office for like a
6  meeting with Jane Doe 1?
7  A.     No.  No.
8         THE COURT REPORTER:  Can you let
9  counsel get her full question out.  I don't get
10 the end of it.  I know you can anticipate her
11 question --
12        THE WITNESS:  Okay.
13 BY MS. SMITH:
14 Q.     It's normal.  You'll get used to it
15 because you're -- you're used to conversation and
16 that -- so -- but you'll get used to it by the
17 end.
18        Mr. Bender, did you ever hear Defendant
19 Halcovage tell Mr. -- tell Jane Doe 1 that he had
20 her back as long as she stuck with him?
21 A.     I do not recall that.
22 Q.     Did you ever hear Defendant Halcovage
23 use the words inner-sanctum?
24 A.     Yes.

Page 81

1  Q.     Is that something he used quite often?
2  A.     It was a term he liked.
3  Q.     Can you tell us what context he would
4  use it in?  What was he saying was an
5  inner-sanctum?
6  A.     That's -- that's hard to answer.  I
7  never quite got it.  It's -- it's -- if we talked
8  about county policies or inner-sanctum, he felt
9  that we had confidence in each other that, you
10 know, we could talk about -- just about anything.
11 Q.     Okay.
12        I'm sorry.  I just want to ask you one
13 or two more questions about the times you observed
14 Defendant Halcovage and Jane Doe 1 in his office.
15        When you left Defendant Halcovage's
16 office, was Jane Doe 1 still in there with him?
17 A.     Yes.
18 Q.     Did you leave the door open or did you
19 --
20 A.     Yes.
21 Q.     -- shut --
22 A.     No.  I left it open.
23 Q.     Okay.
24        At any time thereafter, after you made

Page 82

1  this observation, the two to three observations of
2  Jane Doe 1 in Mr. Halcovage's office alone, did
3  you ever speak with Jane Doe 1 and ask her if she
4  was uncomfortable with that, if there was any
5  issues, or how she felt?
6  A.     I did not.
7  Q.     Did you ever hear -- now I am going,
8  sorry, back to the inner-sanctum.
9         Did you ever hear Defendant Halcovage
10 state that Jane Doe 1 was in his inner-sanctum?
11 A.     I did not.
12 Q.     Did Defendant Halcovage ever instruct
13 you to look out for, protect, be nice, something
14 along those lines, to Jane Doe 1?
15 A.     No.
16 Q.     Did you and Defendant Halcovage ever
17 discuss --
18        MS. JONES:  You --
19        THE WITNESS:  I lost part of that
20 sentence.
21        MS. JONES:  We couldn't get you
22 there.
23        MS. SMITH:  Sure.
24 BY MS. SMITH:

Page 83

1  Q.     Did you and Defendant Halcovage ever
2  discuss Jane Doe 1 in any capacity?
3  A.     I think when she was going into the
4  assessment office.
5  Q.     Okay.
6         What did you discuss?
7  A.     She was moving there as a union
8  position, I hadn't realized that she was a
9  certified appraiser and he had informed me of
10 that.
11 Q.     Was Jane Doe 1's move to the assessment
12 office Defendant Halcovage's idea?
13 A.     No.  It was a position that opened up.
14 You have to understand, the mailroom is probably
15 the lowest paid position in the courthouse or it
16 was until they changed it, and so the frustration
17 I always had with the mailroom is that people
18 always want to believe because it's the lowest
19 paid.  That position -- I think tax claim opened
20 up first.  I can't quite remember, but then
21 assessment opened up and -- and Ginny Murray
22 interviewed her and that's when he said she
23 already -- she already had an appraiser's license,
24 so she was a -- a good fit for this particular

Page 84

1  job.
2  Q.     Okay.
3         Did you discuss Jane Doe 1 with
4  Defendant Halcovage in any other capacity that we
5  haven't talked about yet?
6  A.     In terms of her helping in the campaign,
7  I would have, yes.  She was an avid campaigner.
8  She would be at events and -- and just a
9  supporter.  And she would come to committee
10 meetings from time to time, I think her boyfriend
11 at the time was a committee member, so I would see
12 her there.
13 Q.     And what exactly about her committee
14 membership or --
15 A.     She wasn't a committee member --
16 Q.     -- or campaign --
17 A.     I think her boyfriend was.
18 Q.     Okay.
19        So what about the committee or campaign,
20 as it relates to Jane Doe 1, did you discuss with
21 Mr. Halcovage?
22 A.     That they were pretty active in the
23 campaign.
24 Q.     They meaning?

Page 85

1  A.     Jane Doe 1 and Jane Doe 2.
2  Q.     Okay.
3         Did you ever hear Defendant Halcovage
4  tell Jane Doe 1 that she better be careful or she
5  might not have a job?
6  A.     I did not.
7  Q.     Did you ever hear Defendant Halcovage
8  explicitly or implicitly threaten Jane Doe 1's
9  job?
10 A.     Did not.
11 Q.     Ever hear him threaten either explicitly
12 or implicitly, any county employees' job?
13 A.     No.
14 Q.     Did you ever observe Defendant Halcovage
15 request that Jane Doe 1 work and/or attend a
16 political fundraiser or event?
17 A.     Repeat that.
18 Q.     Did you ever observe Defendant Halcovage
19 request that Jane Doe 1 work and/or attend a
20 political fundraiser or event?
21 A.     No.  I never heard him ask her to attend
22 one, no.
23 Q.     Did Defendant Halcovage ever tell you
24 whether he thought Jane Doe 1 was a hard worker?

Page 86

1  A.     I don't recall.  He probably did.  They
2  were good workers.
3  Q.     Did he -- when you say they, are you
4  referring to Jane Doe 1 and Jane Doe 2?
5  A.     Yes.
6  Q.     Okay.
7         Did he ever comment on Jane Doe 1's, he
8  being Defendant Halcovage, ever comment on Jane
9  Doe 1's work ethic?
10 A.     No.
11 Q.     Did you ever hear him say Jane Doe 1 was
12 going places?
13 A.     No.
14 Q.     Did you ever observe Defendant Halcovage
15 request that Jane Doe 1 obtain campaign petition
16 signatures?
17 A.     No.
18 Q.     Did Defendant Halcovage ever ask you to
19 obtain campaign petition signatures?
20 A.     Yes.
21 Q.     When did he ask you to do that?
22 A.     In each campaign --
23 Q.     So --
24 A.     -- and when he campaigned for

Page 87

commissioner.

Q.      So when he campaigned for commissioner before 2012, or his subsequent run?

A.      Probably beginning in '15.  I didn't really know him in the prior campaign.

Q.      Okay.

        Let's -- let me ask you a little bit about that then.

A.      Okay.

Q.      When did you meet Defendant Halcovage?

A.      Some time during the campaign season of 2011.

Q.      All right.

        But you don't recall if you were -- were requested or got Defendant Halcovage campaign petition signatures --

A.      I know I wouldn't have then.  I didn't know him then.

        MS. JONES:  Gary, you have to let her finish the question.  You have to let her finish the question because it just makes an ugly transcript.

        THE WITNESS:  I'm getting worse as the -- as the day goes on.

Page 88

BY MS. SMITH:

Q.      So you didn't -- you met him during that campaign, but you didn't know him enough to get signatures for him; is that what I understand?

A.      Correct.

Q.      Okay.

        But you do believe that for his 2015 run, you obtained petition signatures for him?

A.      Yes.

Q.      And he also ran for, was it, congress?

A.      Yes.

Q.      Did you obtain petition signatures for him for that congressional run?

A.      You know, I'm not certain.

Q.      Okay.

        Do you recall for the commissioner run in 2015, did you obtain the signatures at your own doing or Commissioner Halcovage's request?

A.      My own doing.

Q.      He never requested you obtain them?

A.      No.  I asked for a petition.

Q.      Did you ever observe Defendant Halcovage buy or provide Jane Doe 1 with alcohol?

A.      No.

Page 89

Q.      Did you ever observe Defendant Halcovage engage in behavior, in any behavior, with Jane Doe 1, that made you uncomfortable?  And we went through the office, so I don't want you to rehash that.  But any other times?

A.      No.

Q.      Did you ever observe Defendant Halcovage engage in any other behavior outside the -- the office times that we discussed, with Jane Doe 1 that you felt was inappropriate for the workplace?

A.      No.

Q.      Did you ever observe Defendant Halcovage make any comments to or about Jane Doe 1 that made you uncomfortable?

A.      No.

Q.      Did you ever observe Defendant Halcovage make any comments to or about Jane Doe 1 that you thought were inappropriate for the workplace?

A.      No.

Q.      Has Defendant Halcovage been to your home?

A.      Yes.  He brought his granddaughter there one time.

Q.      So he's been to your home only one time?

Page 90

A.      One time.

Q.      And he brought his granddaughter?

A.      And his wife.

Q.      Why -- was he invited or how did that come about?

A.      To my recollection, there was a parade in Tower City and they stopped over afterwards.

Q.      Did he call you before he stopped over or did he show up --

A.      No --

Q.      -- unannounced?

        So he showed up unannounced?

A.      Correct.

Q.      Were you aware that Defendant Halcovage was in Jane Doe 1's home on multiple occasions?

A.      No.

Q.      Are you now aware that he's been to her home on multiple occasions?

A.      Only from what I've read.

Q.      Okay.

        When you say what you've read, you mean in the complaint --

A.      Correct.

Q.      -- and discovery in this matter?

Page 91

1  A.     And during -- yes.  During the invest --
2  I'm sorry.  Yes, during the investigation.
3  Q.     Okay.
4      So prior to May of 2020 then at least,
5  it's fair to say you did not know that Defendant
6  Halcovage had been to Jane Doe 1's home?
7  A.     Correct.
8  Q.     At any point did you become aware that
9  Defendant Halcovage called and texted Jane Doe 1
10  on her personal cell phone outside of work hours?
11  A.     No.
12  Q.     Are you now aware of that?
13  A.     From the investigation, yes.
14  Q.     Okay.
15      Do you believe that it's appropriate for
16  a county commissioner to go to the home of a
17  subordinate employee?
18      MS. JONES:  Object to the form.
19      You can answer.
20      THE WITNESS:  Uninvited?
21  BY MS. SMITH:
22  Q.     Let's start with just generally, let's
23  start with invited.
24      Do you think that it's appropriate?

Page 92

1  A.     That's a difficult question, Ms. Smith.
2  It would depend -- like, I would be considered his
3  subordinate, I didn't think it was inappropriate
4  to come to my home.  We have a pond his daughter
5  wanted to look at.  If it's -- let's say if -- if
6  you were my employee would it be inappropriate for
7  me to go to your home, unannounced, yes, I would
8  say that that would be.
9  Q.     Okay.
10      So do you think that if Defendant
11  Halcovage did, in fact, go to Jane Doe 1's home
12  unannounced, that that would be inappropriate?
13  A.     And unwise, yes.
14  Q.     Okay.
15      Do you believe that that conduct, if it
16  happened, Defendant Halcovage going to Jane Doe
17  1's home unannounced or uninvited, would that
18  violate any county policy?
19  A.     I don't think so.
20  Q.     Do you believe it's appropriate for a
21  county commissioner to text or e-mail a county
22  employee at 11:00 p.m.?
23      MS. JONES:  Object to the form.
24      You can answer.

Page 93

1      THE WITNESS:  It would depend on
2  the employee.  If it were me, I would say yes.  I
3  correspond with people sometimes at 3:00 in the
4  morning, not directly, on an e-mail.  In other
5  words, if I get awake, sometimes I send e-mails at
6  3:00 in the morning.
7  BY MS. SMITH:
8  Q.     Are those e-mails work related?
9  A.     Yes.
10  Q.     All right.
11      Is it inappropriate for a county
12  commissioner to e-mail or text a county employee
13  at, let's go with, 11:00 p.m. 12:00 a.m.,
14  1:00 a.m., for non-county related business?
15      MS. JONES:  Object to the form.
16      You can answer.
17      THE WITNESS:  Yes.
18  BY MS. SMITH:
19  Q.     I'm sorry.  It's inappropriate or
20  appropriate?
21  A.     It is -- it is inappropriate in my
22  opinion.
23  Q.     Okay.
24      Do you believe it's a violation of

Page 94

1  county policy?
2  A.     I wouldn't think so.  Let me qualify
3  that statement, however.  If that employee came to
4  me the next day and said I received this text
5  at -- at 2:30 in the morning, yes, then -- then I
6  would -- I would certainly have a conversation
7  with that person and I would take it to HR and
8  did.
9  Q.     Okay.
10      Are you talking about Michelle
11  O'Connell?
12  A.     I am.  And I think you are too.
13  Q.     Actually I was talking about Jane Doe 1.
14  A.     I knew you were going to say that too.
15  Sorry.
16  Q.     Okay.
17      I was talking about Jane Doe 1, but I
18  was going to get to Michelle O'Connell.  So let's
19  talk about her.
20  Q.     Okay.
21  Q.     At some point, Ms. -- Ms. O'Connell did
22  bring to your attention that Defendant Halcovage
23  had -- I believe he texted her at roughly 2:00 in
24  the morning, correct?

Page 95

1  A.      Correct.
2  Q.      And do you remember -- so at some point
3  Ms. O'Connell brings this is to your attention and
4  actually shows you the text message, correct?
5  A.      Correct.
6  Q.      And do you remember when she showed you
7  the text message?
8  A.      Yes.
9  Q.      What year was that?
10  A.      Oh, jeepers.  The year she left, and
11  that would have been -- and I will tell you why I
12  know that, is that I had received someone at my
13  office to do an interview for Michelle for a
14  reference and I had gone over and I said, oh, I
15  hope you get the job.  She was going to go to the
16  prison, I wish you very well.  I said, it's -- she
17  did a great job for me when she was there.
18       And she said, now that I'm leaving, I
19  want to show you something.  So she got her phone
20  and showed me this text message.  And she said it
21  made her uncomfortable.  And it had been maybe a
22  year before or some time way before that.
23  Q.      Okay.  Let me just unpack that a little
24  bit, make sure I understand.

Page 96

1       So Ms. O'Connell -- shortly after this
2  conversation happened, Ms. O'Connell left
3  employment with the county for a job at federal
4  prison, right?
5  A.      That is correct.
6  Q.      Okay.
7       And so Ms. O'Connell says to you, now
8  that I'm leaving, let me show you that this?
9  A.      Yes.
10  Q.      Is that correct?
11       What did you take that to mean?  Why --
12  why was she waiting until she was leaving to show
13  you something?
14  A.      I did --
15       MS. JONES:  Objection to form.
16       You may answer.
17       THE WITNESS:  I wanted to know why
18  she didn't show it to me.  She could have showed
19  it to me at any time, and so I said if it made her
20  uncomfortable, she should have come to me and
21  showed it to me then.
22  BY MS. SMITH:
23  Q.      And did she say why she didn't come and
24  show it to you right then?

Page 97

1  A.      No.  She -- she didn't, but she kept it.
2  Q.      Did she make a comment about thinking
3  that George could fire her?
4  A.      I don't recall, but that's something
5  Michelle would have been worried about.
6  Q.      Why would Michelle be worried about
7  that?
8  A.      People have this odd feeling about
9  commissioners that they can somehow fire them and
10  they cannot.  They can collectively, but any one
11  commissioner can't do that.  And sometimes I get
12  flabbergasted and I think sometimes it's just what
13  people say, but I -- they can't.
14  Q.      And so Michelle in particular was
15  concerned that Defendant Halcovage could fire her?
16       MS. JONES:  I'm sorry.  Repeat
17  that, would you.
18  BY MS. SMITH:
19  Q.      So Michelle O'Connell voiced to you that
20  she was specifically concerned that Defendant
21  Halcovage would fire her?
22       MS. JONES:  Object to the form.
23       You can answer.
24       THE WITNESS:  I'm not so sure.  I

Page 98

1  just don't know why she didn't give it to me at
2  the time.
3  BY MS. SMITH:
4  Q.      Okay.
5       Did you ask her?
6  A.      She didn't really respond that well, she
7  just kept it.  But since she was leaving, she gave
8  it to me and -- and so I -- I addressed it.
9  Q.      Did you believe that there was some type
10  of fear that Ms. O'Connell had about reporting it
11  if she wasn't leaving the county?
12  A.      Don't know.
13  Q.      Do you remember what the text message
14  said?
15  A.      I think it said, no deck party tonight.
16  Q.      Okay.
17       Did Ms. O'Connell tell you what she
18  thought that meant or did you know what it meant?
19  A.      I asked what it meant and -- and she
20  just said sometimes she has deck parties and so
21  there was a text, no deck party tonight, and so it
22  seemed weird.
23  Q.      Did Ms. O'Connell tell you if she was --
24  she felt uncomfortable by the text message?

Page 99

1  A.      Yes.  She said she thought it was weird.
2  Q.      Okay.
3         Did you report Ms. O'Connell's -- this
4  conversation with Ms. O'Connell to HR?
5  A.      Yes.
6  Q.      Do you remember who was the HR director
7  at the time?
8  A.      Debra Twigg.
9  Q.      Do you know, was there any
10 investigation?
11 A.      Debra Twigg had called over to the
12 office and asked about it, yes.
13 Q.      And was there any action taken as it
14 relates to Mr. Halcovage?
15 A.      Disciplinary action, no.  Did I speak to
16 him about it, yes.  But I don't know if Debra
17 spoke to him about it, but I certainly did.
18 Q.      What did you talk with Defendant
19 Halcovage about related to this text message?
20 A.      I relayed that Michelle had shown me a
21 text message he sent about no deck party tonight.
22 And I said, George, don't you think that's a
23 little weird to text somebody at 2:00 in the
24 morning.  And he said, well, he was Facebook

Page 100

1  friends with other people and they usually have
2  these deck parties and hew as just texting or --
3  late at night and just said no deck party tonight,
4  so -- but I thought it was weird.
5  Q.      Did you tell him that despite what he --
6  how he justified it, that he still shouldn't
7  text --
8  A.      Yes.
9  Q.      -- county employees at 2:00 a.m.?
10 A.      Yes.
11 Q.      And what was his response is?
12 A.      Just said okay.
13 Q.      Was Defendant Halcovage -- was there any
14 documented written warning, verbal warning
15 regarding this?
16 A.      I would think not.
17 Q.      Was Defendant Halcovage required to
18 submit to additional training of any sort?
19 A.      No.
20 Q.      Did you ever observe Defendant Halcovage
21 ask any female employee to bounce up and down on
22 their ergonomic ball chairs?
23 A.      No.
24 Q.      Did you ever see Defendant Halcovage

Page 101

1  take photos with female employees at the county?
2  A.      No.
3  Q.      Did you ever see Defendant Halcovage hug
4  a female employee of the county?
5  A.      I think at Christmas time, Darlene
6  Lachman, as chief clerk, hugged him before
7  Christmas.  About the only time I saw that.
8  That's common place at Christmas time.
9  Q.      Okay.
10        Did you ever learn that Defendant
11 Halcovage was alone with Jane Doe 1 in the
12 courthouse when it was closed?
13 A.      Was I aware of that are you saying?  No.
14 Q.      Did you ever come to learn that?
15 A.      No.  Well, yes, when the complaint was
16 filed.
17 Q.      Okay.
18        So not until after May of 2020, at
19 least?
20 A.      Correct.
21 Q.      All right.
22        So you weren't aware that Defendant
23 Hal -- until May of 2020, you weren't aware that
24 Defendant Halcovage had pulled down his zipper and

Page 102

1  said to her, oral sex seems to be your thing?
2  A.      No.
3  Q.      Have you reviewed Ms. Twigg's
4  investigation report regarding this -- this case
5  or this matter?
6  A.      Yes.
7  Q.      And in -- have you reviewed her -- Ms.
8  Twigg's notes from her interviews with Defendant
9  Halcovage?
10 A.      I don't think I read the notes, but we
11 met; her, Glenn, and I met after each interview.
12 Q.      Okay.
13        So at some point, did you become aware
14 that Defendant Halcovage admitted to pulling his
15 zipper down while in the courthouse with Jane Doe
16 1 and saying, oral sex seems to be your thing?
17 A.      Yes.
18 Q.      As a result of that, what, if anything,
19 did you do to ensure that Jane Doe 1 felt safe and
20 comfortable in her work environment?
21 A.      Well, after May, Jane Doe 1 wasn't in
22 the building.
23 Q.      Okay.
24        Was that at your doing or..?

Page 103

A.    No.  As of May, she still would have
been on furlough or COVID-related furlough.
Q.    Okay.
       After learning this, was Jane Doe 1 ever
asked to come back to the courthouse to work?
A.    In the courthouse, no.  She -- she
worked at the 410 Building later on, but she
didn't come back to the -- to the courthouse
proper.
Q.    Was she ever asked to come back to the
courthouse?
A.    In -- in July -- in the beginning of
July, I asked everybody that was on furlough, that
they need to come back to work.
Q.    Okay.
       At that point, did you reach out to Jane
Doe 1 to determine what, if any, accommodations
could be made to ensure that she felt comfortable
and safe in her working environment?
A.    Did not.  What we had done during that
time is to limit Commissioner Halcovage's access
to the courthouse from 8:00 to 5:00, Monday
through Friday, and to not go out into the
courthouse unaccompanied.

Page 104

Q.    But Jane Doe 1 works -- if she were to
return to work in the courthouse, would have been
there between the hours of 8:00 and 5:00, correct?
A.    She would have been in the building,
yes.
Q.    So I just -- I want to make clear,
between the time you learned about this -- the
allegations, so May of 2020 and when Jane Doe 1
started working in the 410 building, did you ever
reach out to Jane Doe 1 and ask her what could be
done to make her feel comfortable and safe?
A.    I did not.
Q.    Did you ever hear Defendant Halcovage
singing into his phone while at the courthouse?
A.    Do what into his phone?
Q.    Sing into his phone?
       MS. JONES:  Sing.
       THE WITNESS:  No.
BY MS. SMITH:
Q.    Did you ever hear anyone refer to Jane
Doe 1 as a whore?
A.    No.
Q.    All right.  I want to now turn to Jane
Doe 2.

Page 105

       When did you meet Jane Doe 2?
A.    Some time after she was hired in the
treasurer's office.
Q.    Do you remember where you met Jane Doe
2?
A.    In the treasurer's office.
Q.    Do you know who introduced you?
A.    I do not.
Q.    Did you know anything about Jane Doe 2
before you met her?
A.    I did not.
Q.    What's your opinion of Jane Doe 2?
A.    Again, Jane Doe 2 I think is a bright
young woman, very friendly.  I thought she was a
good worker.  She had issues getting to work on
time, which is what created problems for her up in
the treasurer's office, but she had -- now, single
mom, she had a child that had some allergy
problems, but there were a number of issues with
her getting to work on time.
Q.    Did Defendant Halcovage ever say
anything to you about whether he thought Jane Doe
2 was a hard worker?
A.    I don't know that a hard -- that she was

Page 106

very bright.
Q.    Okay.
       Ever -- did Mr. Halcovage ever make any
comments about Jane Doe 2's work ethic?
A.    No.
       MS. SMITH:  I am going to mark for
today's purposes as 214, it's going to be --
actually, I'm sorry.  Strike that.
BY MS. SMITH:
Q.    So Jane Doe 2, I think you testified,
was initially hired in the treasurer's office; is
that correct?
A.    Correct.
Q.    Okay.
       And after she was hired and while you
were county commissioner -- I'm sorry -- county
administrator, Jane Doe 2 was transferred from the
treasurer's office into the tax assessment office;
is that correct?
A.    I would have to take a look at that PAR,
quite frankly, Ms. Smith.  I'm not sure what the
time was.  As I said before, I was in that office
from 2013 to '16, while I was just the director of
economic development.  There were a number of

Page 107

1  people I got to see, so I'm not quite sure when
2  she transitioned into the treasurers office.  You
3  may have that date.
4  Q.      Okay.
5          MS. SMITH:  It's -- I don't know if
6  it's in the stack of papers.  It might just be one
7  thing that can be projected on the screen.  It's
8  going to be 114, it will be -- it will be Exhibit
9  214 for today's purposes.
10                      - - -
11         (Bates Stamped 114 marked as Exhibit-214
12  for identification.)
13                      - - -
14         MS. SMITH:  And I'm sorry if you
15  have to look at the screen, but we can zoom in and
16  it will just be a minimal purview of a document,
17  so...
18         MS. JONES:  When you say Document
19  114, are you saying from some production, is that
20  why you used that number?
21         MS. SMITH:  It may be in that stack
22  and it's Bates stamped 114.  It will be today's
23  Exhibit-214.
24         MS. JONES:  That's fine.

Page 108

1          Can you see that, Gary?
2          THE WITNESS:  Yeah.  It says
3  approved on March 28, 2000, is that '18?
4          MS. JONES:  Yeah.
5          THE WITNESS:  Okay.
6  BY MS. SMITH:
7  Q.      Yeah.
8          This is a PAR from Jane Doe 2 -- this is
9  a PAR from Jane Doe 2 and it states -- assessment
10  office.
11  A.      Okay.
12  Q.      It's a transfer.  So is this when Jane
13  Doe 2 was transferred to the assessment office?
14  A.      It would appear so, yes.
15  Q.      Okay.
16          And you were a county administrator in
17  March of 2018, correct?
18  A.      That is correct.
19  Q.      All right.
20          Were you involved in Jane Doe 2's
21  transfer from the treasurers office to the tax
22  assessment at all?
23  A.      I was and I'll explain why, is that Jane
24  Doe 2 had come down to my office some time prior

Page 109

1  to this and in tears because she felt she was
2  being treat harshly by the other women in the --
3  in the treasurers office.  So we talked about that
4  for a bit.  And I just relayed to her, you know,
5  Jane Doe 2, part of the problem up there is that
6  there are five other women in there who get to
7  work on time and sometimes when you're not there,
8  it puts stress on everybody else, so I think that
9  created some of the problem?
10          And she felt she would be a better fit
11  down in the assessment office.  And I said, if
12  there's an opening that comes up, I'll see what I
13  can do.  And so I did talk to Ginny Murray, when
14  the opening came up, Jane Doe 2 did apply down
15  there.  And I did tell Ms. Murray that, I think
16  Jane Doe 2 is a good worker.  She has difficulty
17  getting to work on time.  And Ms. Murray said to
18  me, that won't be a problem here, so...
19  Q.      Did Jane Doe 2 share with you why she
20  thought the women in the treasurers office were
21  being harsh with her?
22  A.      Not really.  The -- felt that they were
23  just rude to her and just didn't talk to her.
24  But, again, it's -- when you put the burden on

Page 110

1  other employees, sometimes that happens.
2  Q.      Jane Doe 2 did mention to you that she
3  thought they were being harsh because of her
4  relationship with Defendant Halcovage?
5  A.      No.  No.
6  Q.      Jane Doe 2 -- I think if we scroll down
7  on this, it's the very bottom of the document
8  that's in front of you, it's right there.
9          Requested action is position interim
10  clerk typist one.
11          So it's my understand, and correct me if
12  I'm wrong, when some transfers into a new role
13  within the county, for a period of time, they are
14  interim in that position for training purposes;
15  isn't that right?
16  A.      Yes.  We like to keep the person, if
17  there's a person there before they leave, they
18  stay in the office, we will bring someone in as
19  interim to get the training, yes.
20  Q.      So the person who holds the position
21  kind of purports their knowledge on the interim
22  person and then they transition out and a new
23  person transitions in fully; is that right?
24  A.      Correct.

Page 111

1  Q.     Okay.
2         Jane Doe 2's interim position in the
3  assessment office ended and she became a clerk
4  typist one in the assessment office, correct?
5  A.     Correct.
6  Q.     Did anyone raise any issues or concerns
7  with Jane Doe 2's work performance during her
8  interim period?
9  A.     No.
10 Q.     Did you have any personal knowledge or
11 observations of issues or concerns of Jane Doe 2's
12 work performance during that interim period?
13 A.     I did not.
14 Q.     Okay.
15        Eventually Jane Doe 2 moved from clerk
16 typist one to field appraiser, still within the
17 assessment office, correct?
18 A.     Correct.
19        MS. SMITH:  Matt, you can take that
20 exhibit down.
21 BY MS. SMITH:
22 Q.     That was in March of 2019?
23 A.     Okay.  I mean, I'm -- I'm assuming you
24 know the date, so...

Page 112

1  Q.     Well, do you recall that sounds about
2  right?
3  A.     Probably.
4  Q.     Okay.
5         Were you involved in the decision --
6  strike that.
7         Is a move from a clerk typist to field
8  appraiser a promotion?
9  A.     It is.
10 Q.     Were you involved in the decision to
11 promote Jane Doe 2?
12 A.     I was not.
13 Q.     Okay.
14        Did you have any questions or concerns
15 regarding Jane Doe 2's work performance that would
16 have lead you to believe she shouldn't have been
17 promoted when she was?
18        MS. JONES:  Object to the form.
19        You can answer.
20        THE WITNESS:  No.  Although my
21 concern would have been sometime the field
22 appraisers get -- they don't report to the
23 courthouse regularly and they are sort of on their
24 own.

Page 113

1  BY MS. SMITH:
2  Q.     But that concern -- did you raise that
3  concern with anyone?
4  A.     No, because she would have been tested
5  in -- in doing her job.  If she was doing the job,
6  then that -- that wouldn't have been an issue, but
7  it was just a personal issue at the time.
8  Q.     Okay.
9         Did anyone prior to Jane Doe 2's
10 promotion to field appraiser -- had anyone raised
11 any issues or concerns with her being promoted or
12 her work performance?
13 A.     No.  And, again, Ms. Smith, when you
14 talk about promotions, you have to understand,
15 these are union positions, so people bump into
16 those positions.  So -- so -- and we're required
17 to give them the training.  So it's not as if
18 it's -- someone said I'm being promoted to this.
19 If the position opens up, people are eligible to
20 apply for it.  If someone other than Jane Doe 2
21 had applied that had more seniority, they would
22 have been given the position.
23 Q.     Okay.
24        But do you believe that when Jane Doe 2

Page 114

1  was promoted to field appraiser, that she was
2  qualified for the position of field appraiser?
3  A.     Well, you only know that after they take
4  the exam and they are out in the field for a
5  little bit.  Sometimes it's -- it's -- people
6  can't handle that.  It's the freedom of being away
7  from the courthouse that lures a lot of people to
8  the field appraiser and -- but it is difficult job
9  and it -- it requires a lot of training and so the
10 success is only realized maybe six months later.
11 Q.     Okay.
12        Did you have any pause or hesitation
13 about Jane Doe 2 being promoted?
14 A.     No.  I think she was certainly bright
15 enough to do that job.
16 Q.     Okay.
17        And, again, when she became field
18 appraiser, there was a period of time that she was
19 interim field appraiser, correct?
20 A.     That is correct.
21 Q.     And during that period of time, did you
22 have any personal knowledge of any issues or
23 concerns with her work performance as a field
24 appraiser?

Page 115

1  A.    I did not.
2  Q.    Did anyone raise any issues or concerns
3  to you about Jane Doe 2's work performance as a
4  field appraiser just, again, for that period, that
5  interim period?
6  A.    No.
7  Q.    So -- so I will represent to you that
8  Jane Doe 2's interim period as a field appraiser
9  ended July 3rd of 2019, so she became a field
10 appraiser then.
11 A.    Okay.
12 Q.    So it was July 3rd of 2019 and May of
13 2020, did you have any questions or concerns
14 regarding Jane Doe 2's work performance for that
15 period of time?
16 A.    I don't recall any concerns, no.
17 Q.    During that same period of time, July 3,
18 2019, until May of 2020, did you have any
19 issues -- I'm sorry -- did anyone raise any issues
20 or concerns to you about her work performance?
21 A.    No.
22        MS. SMITH:  All right.
23        We are now going to look at --
24 exhibit -- previously marked Exhibit-182, it's

Page 116

1  going to be in that giant binder there before you.
2        (Previously marked Exhibit-182.)
3  BY MS. SMITH:
4  Q.    It should be if my notes are correct, it
5  should be the job classification description for
6  the field appraiser position?
7  A.    If I can -- if I can just back up a
8  little bit, Ms. Smith.
9  Q.    Of course.
10 A.    Okay.  The -- the only concern that was
11 raised with Jane Doe 2, and I think it was still
12 when she was a clerk, is that for a period of a
13 few days that she was sort of incognito, Jane Doe
14 1 didn't know where she was and the -- Ms. Murray
15 had directed the sheriff to go to her home to find
16 out where she was, if she was okay.
17        And I know -- and the reason I bring
18 that up is in the interview with Jane Doe 2 after
19 May, she brought that up, she was not happy about
20 that.  But that is the only issue I had heard at
21 that time, that she did not report why she was not
22 coming to work and Jane Doe 1 didn't know where
23 she was.  So that was the only issue.  And it was
24 not work related, it was because she wasn't

Page 117

1  reporting, but not with her -- her job
2  performance.
3  Q.    Okay.
4        So as it relates to that incident, when
5  did you learn about sheriffs going to Jane Doe 2's
6  home or her failure to report to work?
7  A.    Probably around the time it happened.
8  Ms. Murray had called me about that and said
9  they -- that they -- she said she lost her phone
10 and there were a number of stories.  Anyway, the
11 sheriff went up to find her.  She was okay and
12 then she came back to work.
13 Q.    And you spoke with Ms. Murray about
14 this?
15 A.    She informed of that, yes.
16 Q.    And Ms. Murray informed you it was her
17 decision to send the sheriffs to Jane Doe 2's
18 home?
19 A.    That is correct.
20 Q.    Did she say whether she had discussed
21 Jane Doe 2's absence with Defendant Halcovage?
22 A.    She did not.  She did not relate that to
23 me.
24 Q.    Okay.  All right.

Page 118

1        So then looking at what was previously
2  marked as Exhibit-182, which I understand is now
3  in front of you and is also projected on or Zoom
4  screen, this is the county's job classification
5  description for the position of field appraiser,
6  correct?
7  A.    Correct.
8  Q.    If we look to the second page of this
9  document, it's dated February 2019.
10        Do you see that?
11 A.    Yes.
12 Q.    As I just represented to you, Jane Doe 2
13 was promoted to field appraiser, interim in
14 March of 2019, and field appraiser in July of
15 2019.  So that would mean that this job
16 description has been the job description for Jane
17 Doe 2's position since she became a field
18 appraiser, correct?
19 A.    Correct.
20 Q.    All right.
21        From the time that Jane Doe 2 became a
22 field appraiser until May of 2020, is there
23 anything in this job description that you believe
24 Jane Doe 2 was not qualified to perform?

Page 119

1  MS. JONES:  Object to the form.
2  You can answer.
3  THE WITNESS:  No, I'm not aware of
4 any.
5 BY MS. SMITH:
6 Q.    For the same time period, May of 2019 --
7 March of 2019 -- I'm sorry -- and May of 2020, is
8 there anything in this job classification
9 description that you are aware that Jane Doe 2 did
10 not do?
11 A.    Not that I am aware of.
12 Q.    And finally for that same time period,
13 did anyone bring to your attention that Jane Doe 2
14 during that time period, did not complete any of
15 the essential job duties or responsibilities
16 listed in this document?
17 A.    That was not brought to my attention,
18 no.
19 Q.    Is Jane Doe 2 still employed by the
20 county?
21 A.    No.
22 Q.    When was she terminated?
23 A.    She was not.  It was a job abandonment
24 and resignation.

Page 120

1 Q.    Okay.
2  Her resignation was put on to a --
3  MS. SMITH:  Matt, you can take that
4 exhibit down.
5 BY MS. SMITH:
6 Q.    Jane Doe 2's resignation was put on an
7 agenda for a commissioner's vote, correct?
8 A.    A resignation would be informational
9 only.
10 Q.    Okay.
11  Do commissioners not have to vote on the
12 resignation of a union employee?
13 A.    They do not.
14 Q.    Okay.
15  Were you made aware that Jane Doe 2 did
16 not, in fact, wish to resign from her position?
17 A.    Yes.
18 Q.    And what, if anything, have you done
19 regarding that?
20 A.    Well, we had meetings with her and --
21 and with the union and we considered it job
22 abandonment.
23 Q.    You met with Jane Doe 2 about --
24 A.    I did not.  Heidi Zula did.

Page 121

1 Q.    Ms. Zula met with Jane Doe 2 regarding
2 her alleged resignation?
3 A.    Correct.
4 Q.    When was that?
5 A.    I don't recall.  I mean, I can get the
6 information.  I don't recall it to this day.
7 Q.    Do you know who else was present in that
8 meeting?
9 A.    I would think the union rep.
10 Q.    And Jane Doe 2 filed a grievance
11 regarding her alleged resignation, correct?
12 A.    Not that I'm aware of.
13  VIDEOGRAPHER:  Catherine, if you
14 can find a good breaking point in the next 15
15 minutes, I need to change the --
16  MS. SMITH:  Yeah.  We can take a
17 quick break right now actually.
18  VIDEOGRAPHER:  That sounds good.
19  The time is now 11:16 a.m. and
20 we're going off the record.
21  - - -
22  (Whereupon, brief recess was held off
23 the record.)
24  - - -

Page 122

1  VIDEOGRAPHER:  The time is now
2 11:27 a.m. and we're back on the record.
3 BY MS. SMITH:
4 Q.    Mr. Bender, you indicated that Jane Doe
5 2 had some issues with getting to work on time.  I
6 believe you testified part of your understanding
7 of that was that her daughter had some allergies
8 and maybe it was related to that.
9  Is that a fair recollection of your
10 testimony?
11 A.    That was back when she was in the
12 treasurers office, yes.
13 Q.    Okay.
14  At that point, did you ever offer Ms. --
15 or speak with Jane Doe 2 about FMLA intermittent
16 leave?
17 A.    I -- I did not, no.
18 Q.    Did you ever hear Defendant Halcovage
19 make a comment about Jane Doe 2's physical
20 appearance?
21 A.    I have not.
22 Q.    Did you ever hear Defendant Halcovage
23 tell Jane Doe 2 that she's a jaw dropper?
24 A.    I have not.

Page 123

1  Q.      Ever hear him tell her that she was
2  beautiful?
3  A.      Have not.
4  Q.      Did you ever hear Mr. Halcovage tell
5  Jane Doe 2 she's a head turner?
6  A.      Have not.
7  Q.      Or that she had the wow or it factor?
8  A.      Have not.
9  Q.      Did you ever hear Defendant Halcovage
10 say whoa or whoa, look at that, in regard to Jane
11 Doe 2's appearance?
12 A.      No.
13 Q.      Did you ever hear rumors that Defendant
14 Halcovage was having sex with Jane Doe 2?
15 A.      Repeat that, please.
16 Q.      Did you ever hear rumors that Defendant
17 Halcovage was sleeping with Jane Doe 2 or having
18 sex with Jane Doe 2?
19 A.      I heard no such rumors.
20 Q.      Did Defendant Halcovage ever tell you
21 that there were rumors that he was sleeping or
22 having sex with Jane Doe 2?
23 A.      No.  That's not quite how he put it.  He
24 did say that people are saying that he had Jane

Page 124

1  Doe 2 in the clock tower.
2  Q.      Did you understand that to mean that he
3  was in the clock tower -- the rumors were that he
4  was in the clock tower having sex with Jane Doe 2?
5  A.      You could make that assumption.
6  Q.      Did you make that assumption?
7  A.      No.  I asked him who is saying that, who
8  is they, besides you.
9  Q.      And what was his response?
10 A.      He said some other people.  He didn't
11 name them.  And I said I don't think so.  And I
12 said you shouldn't be repeating it.
13 Q.      Okay.
14         Did you ever ask Jane Doe 2 about these
15 rumors?
16 A.      No.  But in the interview in -- in May,
17 she -- she brought that up that she was aware that
18 they were out there.  But I never asked --
19 Q.      All out --
20 A.      -- out -- outside of that particular
21 day, I have never asked her about it.
22 Q.      All right.  So let me just clarify.
23         When did this conversation between you
24 and Mr. Halcovage about these rumors occur?

Page 125

1  A.      I really couldn't give you a time frame.
2  I'm not sure.
3  Q.      Were you county administrator?
4  A.      Probably, yes.
5  Q.      Was it prior to May of 2020?
6  A.      Yes.
7  Q.      Okay.
8          And prior to May of 2020, you did not
9  discuss these rumors with Jane Doe 2?
10 A.      I did not.
11 Q.      Did you ever hear Defendant Halcovage
12 tell Jane Doe 2 something along the lines of, if
13 you and I were to get together, that would be
14 something?
15 A.      No.
16 Q.      Or that, if you and I were to get
17 together, that would ruffle some feathers?
18 A.      No.
19 Q.      Did you ever hear Defendant Halcovage
20 tell Jane Doe 2, if we got together, that would
21 really piss Jane Doe 1 off?
22 A.      No.
23 Q.      Did you ever hear any other, whether
24 from Defendant Halcovage or anyone else, that

Page 126

1  Defendant Halcovage was in the clock tower with
2  any other females?
3  A.      No.
4  Q.      Were there any rumors about anyone
5  having sex in the clock tower that you had ever
6  heard?
7  A.      There was an incident that I think a
8  woman was found up there a few years ago.  How she
9  got there, no one seemed to know.
10 Q.      Did it involve a sexual act of any sort?
11 A.      No.  That wasn't the allegation.  How
12 she got up there, no one seemed to know.
13 Q.      Okay.
14         So what was the rumor or discussion
15 about this woman being in the clock tower?
16 A.      No, it wasn't a rumor.  I guess she was
17 there and the sheriff had to -- the question was,
18 how she got up there.  And after that, we put
19 security locks on all the doors leading up to the
20 clock tower.
21 Q.      All right.
22         So when I -- when Defendant Halcovage
23 mentioned this rumor about him and and Jane Doe 2
24 in the clock tower, I had asked you if you took

Page 127

1 that to mean that they might have been having sex
2 in the clock tower.  I think you said that could
3 be something that could be inferred from it
4        Is that how I understand your testimony?
5 A.      Yes.
6 Q.      Why would there be an inference that
7 they could have been having sex in the clock
8 tower, come from him being in the clock tower with
9 her?
10 A.      There would be no reason for him to have
11 her up there.
12 Q.      When this other woman was found in the
13 clock tower, was anyone else with her?
14 A.      No.
15 Q.      Was she a county employee?
16 A.      No.  I don't know that much about it.
17 It could have -- and I don't -- people didn't
18 really know how she got in the building.  She
19 could have been there at a night meeting and just
20 had gone up there.
21 Q.      Do you know who this woman was?
22 A.      I do not.
23 Q.      Okay.
24        So you don't know if she was an employee

Page 128

1 or a non-employee?
2 A.      Do not.
3 Q.      Do you know when this was?
4 A.      No.
5 Q.      Was it before your employment or during
6 your employment with the county?
7 A.      Well, yes, it was during my employment.
8 Sorry.
9 Q.      Okay.  All right.
10        Did you ever hear any county employee
11 and/or Mr. Halcovage refer to Jane Doe 2 as one of
12 George's girls or one of his girls?
13 A.      No.
14 Q.      Did you ever hear anyone refer to Jane
15 Doe 2 as in George's inner-sanctum?
16 A.      No.
17 Q.      Did George -- did Defendant Halcovage
18 ever tell you that Jane Doe 2 was in his
19 inner-sanctum?
20 A.      No.
21 Q.      Were you ever made aware of the fact
22 that Defendant Halcovage made a comment to Jane
23 Doe 2's then husband along the lines of, thanks
24 for letting me use your wife for the last four

Page 129

1 hours?
2        MS. JONES:  Object to the form.
3        You can answer.
4        THE WITNESS:  No.  I heard that
5 that was said.  I was not there when it was said,
6 however.
7 BY MS. SMITH:
8 Q.      Okay.
9        So you were there when Defendant
10 Halcovage made such a comment?
11 A.      No, I was not.
12 Q.      Okay.  I'm sorry.
13        So where were you?
14 A.      Probably in my office.  It came -- or
15 maybe it was -- I had heard that and I was asked
16 about it by -- by Attorney Scott and I said I did
17 not hear that.
18        MS. JONES:  Okay.  First of all, do
19 not talk about what a lawyer spoke with you about,
20 please.
21        Move to strike the answer or claw
22 it back.
23        MS. SMITH:  Okay.
24        MS. JONES:  I didn't expect that,

Page 130

1 so I didn't jump in there.
2        Okay.  You understand, you cannot
3 --
4 BY MS. SMITH:
5 Q.      So prior to May of 2020, had you heard
6 that Defendant Halcovage had made a comment along
7 these lines --
8 A.      No.
9 Q.      -- to Jane Doe 2's then husband?
10 A.      No.
11 Q.      Okay.
12        So you never discussed this comment
13 being made with Defendant Roth?
14 A.      No.
15 Q.      I'm sorry.  I'm just going to go back.
16 I apologize to jump around.
17        When Defendant Halcovage told you
18 that -- about this rumor with the clock tower, did
19 you report this to human resources?
20 A.      Yes.
21 Q.      Who did you report it to; do you
22 remember who the HR director was?
23 A.      Debra Twigg.
24 Q.      Do you know if Ms. Twigg ever spoke with

Page 131

1 Jane Doe 2 about it?
2 A.    I don't know.
3 Q.    Did you ever follow up with Ms. Twigg to
4 find out if she had?
5 A.    I did not.
6 Q.    Did -- do you know if Ms. Twigg ever
7 spoke with Defendant Halcovage about it?
8 A.    I do not.
9 Q.    Was there any type of written or verbal
10 warning administered to Defendant Halcovage for
11 this rumor?
12 A.    No.
13 Q.    Or his -- or his -- I should say his
14 statements about this rumor?
15 A.    No.
16 Q.    Was Mr. Halcovage required to submit to
17 any additional training as a result?
18 A.    No.
19 Q.    Did you ever observe Defendant Halcovage
20 request Jane Doe 2 work and/or attend a political
21 fundraiser or event?
22 A.    No.
23 Q.    Did you ever observe Defendant Halcovage
24 request that Jane Doe 2 obtain campaign petition

Page 132

1 signatures for him?
2 A.    No.
3 Q.    Did you ever observe Defendant Halcovage
4 engage in any behavior with Jane Doe 2 that made
5 you uncomfortable?
6 A.    No.
7 Q.    Did you ever observe Defendant Halcovage
8 engage in any behavior with Jane Doe 2 that you
9 thought was inappropriate for the workplace?
10 A.    No.
11 Q.    Did you ever observe Defendant Halcovage
12 make any comment to or about Jane Doe 2 that we
13 haven't already discussed, that made you
14 uncomfortable?
15 A.    No.
16 Q.    Did you ever observe Defendant Halcovage
17 make any comments to or about Jane Doe 2 that
18 you -- that we haven't already discussed that you
19 thought were inappropriate for the workplace?
20 A.    No.
21 Q.    At any point did you learn that
22 Defendant Halcovage has been to Jane Doe 2's
23 pers -- personal or family home on multiple
24 occasions?

Page 133

1 A.    During the investigation.
2 Q.    Okay.
3      So after --
4 A.    After May 2020.
5 Q.    Okay.
6      So prior to May of 2020 then, you had no
7 knowledge that Mr. -- Defendant Halcovage had ever
8 been to any of Jane Doe 2's residences --
9 A.    No.
10 Q.    -- or family home?
11 A.    No.
12 Q.    At any point, did you come to learn that
13 Defendant Halcovage called and texted Jane Doe 2
14 on her personal cell phone outside of work hours?
15 A.    No.
16 Q.    Are you -- again, at any point, so even
17 after May of 2020?
18 A.    No.  Well, as part of investigation,
19 yes.
20 Q.    Okay.
21      But prior to May 2020, you were not
22 aware of that?
23 A.    Was not.
24 Q.    Were you aware or have you become aware

Page 134

1 of the fact that Defendant Halcovage took Jane Doe
2 2 to a picnic where they encountered a group of
3 male bikers?
4      MS. JONES:  Object to the form.
5      You can answer.
6      THE WITNESS:  No.  That's the first
7 I'm hearing that one.
8 BY MS. SMITH:
9 Q.    Okay.
10     Did you ever observe Defendant Halcovage
11 in his office alone with Jane Doe 2?
12 A.    No.
13 Q.    Did you ever observe Defendant Halcovage
14 in any room in the courthouse alone with Jane Doe
15 2?
16 A.    No.
17 Q.    Did you ever observe Jane Doe 2 in
18 Defendant Halcovage's office ever?
19 A.    No.
20 Q.    Were you ever present when Defendant
21 Halcovage would talk with another person on the
22 phone, on speaker, and when he would not inform
23 the other person that there were others in the
24 room listening?

Deposition of Gary Bender Vol. I - Revised                    Jane Doe, et al. v. Schuylkill County Courthouse, et al.

Page 135

1  A.    No.

2  Q.    Did you ever observe Defendant Halcovage

3  record any telephone conversations?

4  A.    No.

5  Q.    Did you ever observe the contents of

6  Defendant Halcovage's county-issued iPad?

7  A.    Okay.  Repeat that.

8  Q.    Have you ever observed the contents --

9  well, let's start with this:  Defendant Halcovage

10 has a county-issued iPad, correct?

11 A.    Correct.

12 Q.    All right.

13       Do you know, is the county-issued iPad

14 he is currently in possession of, the same one he

15 was in possession of in May of 2020?

16 A.    I think it is.

17 Q.    Have you ever observed the contents of

18 that iPad?

19 A.    No.  What I did see on the iPad, he had

20 a video -- of the Villanova basketball game on,

21 the ending shot, I did see that.

22 Q.    Anything else that you observed on that

23 iPad?

24 A.    No.

Page 136

1  Q.    Have you ever in your job as county

2  administrator, requested that Halcovage return

3  that iPad to secure the contents for purpose of --

4  purposes of this litigation?

5        MS. JONES:  Object to the question

6  to the extent it calls for communications with

7  counsel.

8        Otherwise, you can answer.

9        MS. SMITH:  I am just asking what

10 actions he took.

11       MS. JONES:  Yeah.

12       MS. SMITH:  If he ever had

13 Defendant Halcovage return that -- asked Defendant

14 Halcovage to return that iPad for purposes of this

15 litigation?

16       MS. JONES:  Same objection.

17       But he can answer.

18       THE WITNESS:  I didn't ask him to,

19 no.

20 BY MS. SMITH:

21 Q.    Are you aware of anyone else that did?

22 A.    Yes.

23 Q.    Okay.

24       Do you know who?

Page 137

1  A.    I thought you were objecting to that.

2        MS. JONES:  Well, you can't talk

3  about what counsel told you, but you can say if

4  you're aware of anyone who asked Halcovage for his

5  iPad.

6        Isn't that what you're asking,

7  Catherine?

8        MS. SMITH:  Yes, that's what I am

9  asking.

10       THE WITNESS:  Mr. Stan Nester,

11 our -- our MIS director had asked for it, yes.

12 BY MS. SMITH:

13 Q.    So I just want to make sure I understand

14 you correctly.

15       Stan Nester, MIS director --

16 A.    Correct.

17 Q.    -- of the county, asked Defendant

18 Halcovage to return the iPad?

19       MS. JONES:  Go ahead, you can

20 answer.

21       THE WITNESS:  Yes.

22 BY MS. SMITH:

23 Q.    And what was Defendant Halcovage's

24 response?

Page 138

1  A.    I wasn't there when he asked him, but I

2  know he had it.

3  Q.    Do you know if Stan Nester ever received

4  the iPad back from Defendant Halcovage?

5  A.    I would think so.  I don't know

6  positively, but I'm pretty sure.

7  Q.    Have you ever followed up with Stan

8  Nester to determine if he did receive the iPad

9  back?

10 A.    Well, let me turn the -- Stan never came

11 to me and said, hey, George didn't give me that

12 yet.

13 Q.    Did you ever ask Stan if George had, in

14 fact, given the iPad over?

15 A.    Not directly, no.

16 Q.    Okay.

17       Are know -- I know you didn't witness or

18 you testimony is that did not witness Defendant

19 Halcovage record any telephone conversations, has

20 anyone told you that they believe that he did or

21 that they saw him do that?

22 A.    Not to me, no.

23 Q.    Have you ever heard that rumor?

24 A.    Yes.

Page 139

Q.    From who?
       MS. JONES:  I only object to the
extent it calls for communications with counsel.
       Otherwise, he can answer.
BY MS. SMITH:
Q.    So I'll limit my question to:  Did
any -- who -- from whom, other than any attorneys,
did you hear that rumor?
A.    No one.
Q.    Okay.
       MS. JONES:  It was a little back
door, but I'll let that go.
BY MS. SMITH:
Q.    Mr. Bender, does Defendant Halcovage
have access to camera footage, either live feed,
recorded of the courthouse, in any capacity, in
the courthouse, office, home, on the iPad,
anywhere?
A.    No.
Q.    Does your courthouse office have access
to camera footage, either live or recorded of the
courthouse?
A.    Yes.
Q.    All right.

Page 140

       Does Defendant Halcovage have access to
your office?
A.    No.
Q.    Do you close your door every time you
leave your office?
A.    No.
Q.    Okay.
       If your office door is open -- strike
that.
       Your office currently, and since at
least May of 2020, has been situated directly
across the hall from Defendant Halcovage's office
in the courthouse, correct?
A.    Correct.
Q.    If your office door is open and you are
not in it, it would be accessible to anyone,
including -- well, I don't know about anyone, but
anyone who has access to the commissioners feed
would have access to your office, correct?
A.    That would be correct.
Q.    Okay.
       Are you able to tell me definitively
that Defendant Halcovage has never accessed your
office when you were not in it?

Page 141

       MS. JONES:  I'll object to the
form.
       But you can answer.
       THE WITNESS:  I cannot.
BY MS. SMITH:
Q.    Okay.
       Have you ever observed Defendant
Halcovage either explicitly or implicity threaten
Jane Doe 2's job?
A.    No.
       MS. SMITH:  Oh, and I'm sorry, I
should have put this on the record right when we
started, Jane Doe 1 has joined the call.  And I
would like to just put on the record that
Defendant Halcovage has been participating by
telephone for this deposition, but has also been
attending the commissioners meeting
telephonically.
       MS. JONES:  Boy, you got all the
information, don't you, Catherine.
       MS. SMITH:  I've got eyes and ears
everywhere.
       MS. JONES:  Apparently.
       MS. SMITH:  I see Gerry turned his

Page 142

video.  Mr. Geiger, would you --
       MR. GEIGER:  I mean, apparently so.
I'm not sure why it's relevant, but that's fine.
       MS. SMITH:  Well, there's a
confidentiality order and I don't know how Mr.
Halcovage is listening to both.
       MR. GEIGER:  He's not sharing
anything on this with the -- at the commissioners
meeting.
       MS. SMITH:  Okay.  Well, I just
like to put that on the record in case it was on
speak so that it's on record that he has been on
this Zoom as a participant during that
commissioners meeting.
       MR. GEIGER:  Well, the
commissioners meeting is also recorded, so you
would be able to see that.
       MS. SMITH:  Okay.
BY MS. SMITH:
Q.    Mr. Bender, did you ever hear from
anyone that Defendant Halcovage had explicitly or
implicitly threatened Jane Doe 2's job?
A.    No.
Q.    Have you ever observed Defendant

Deposition of Gary Bender Vol. I - Revised                    Jane Doe, et al. v. Schuylkill County Courthouse, et al.

Page 143

1  Halcovage yell at anyone?
2  A.      I have not.
3  Q.      Have you ever observed Defendant
4  Halcovage use profanities?
5  A.      I have not.
6  Q.      Has anyone told you that Defendant
7  Halcovage has ever yelled at anyone?
8  A.      I can't recall anyone telling me that.
9  Q.      Do you -- did you ever become aware of
10  the fact that Defendant Halcovage had Jane Doe 2
11  attend a rally for President Trump around
12  August of 2016?
13          MS. JONES:  I'll object to the
14  form.
15          You can answer.
16          THE WITNESS:  What sort of rally?
17  BY MS. SMITH:
18  Q.      Some sort of event in support of or for
19  President Trump?
20  A.      I'm not aware of that.
21  Q.      Did you ever observe Defendant Halcovage
22  instruct county employees, female county employees
23  to serve him food or drinks?
24  A.      No.

Page 144

1  Q.      Did you ever see Defendant Halcovage
2  take a picture of Jane Doe 2 without her
3  permission?
4  A.      No.
5  Q.      Did Jane Doe 2 ever tell you that
6  Defendant Halcovage had taken a picture of her
7  without her permission?
8  A.      No.
9  Q.      Are you aware of any time that county
10  commissioners sent county sheriffs to an
11  employees' home?
12  A.      No.
13  Q.      Do you recall an incident regarding Jane
14  Doe 2's jeans around April of 2019?
15  A.      Yes.
16  Q.      Okay.
17          What do you recall about it?
18  A.      I received an e-mail from Commissioner
19  Halcovage stating that Jane Doe 2 was in the
20  courthouse what they call -- what I call shredded
21  jeans.  I'm sure -- they're ones that look like --
22  yeah, you would know, and he said I should address
23  that.
24          So it was on a Saturday, so I simply

Page 145

1  e-mailed Jane Doe 2 I said, Jane Doe 2, it's brought
2  to my attention that you were in the building with
3  shredded jeans.  You know that's never
4  appropriate.  I'm certain we won't have to speak
5  of this again.  And that was it.
6  Q.      Did Jane Doe 2 tell you that Defendant
7  Halcovage, during her -- an interaction with --
8  strike that.
9          Did Jane Doe 2 tell you that during an
10  interaction she had with Defendant Halcovage, that
11  Defendant Halcovage stated, let me put my finger
12  in one of your holes?
13  A.      Only in the interview after May 20th or
14  whatever --
15  Q.      Okay.
16          So when you spoke with Jane Doe 2
17  regarding her jeans at the instruction of
18  Defendant Halcovage regarding the jeans, she
19  didn't bring it up then?
20  A.      No.  But it was not a conversation, it
21  was simply an e-mail.  Remember I said --
22  Q.      Okay.
23  A.      -- I e-mailed Jane Doe 2.
24  Q.      Was there ever an in-person

Page 146

1  conversation --
2  A.      No.
3  Q.      -- regarding the jeans?
4  A.      No.
5  Q.      Did you ever come to learn that Jane Doe
6  2 did work for the Pennsylvania Republican caucus?
7  A.      Only after the interview in May.
8  Q.      Do you know as you sit here today, if
9  Defendant Halcovage asked Jane Doe 2 to do that
10  work?
11  A.      I don't -- I don't -- I can't answer
12  that.  I don't know.
13  Q.      Okay.
14          Did you ever observe Jane Doe 2 and/or
15  Def -- I'm sorry.
16          Did you ever observe Jane Doe 2 and
17  Defendant Halcovage discussing Republican caucus
18  work?
19  A.      No.
20  Q.      Did you ever hear Defendant Halcovage
21  make any comments about Jane Doe 2's divorce or
22  custody matters?
23  A.      No.
24  Q.      Did you ever discuss Defendant Halcovage

Page 147

1  with Jane Doe 2?
2  A.      No.
3  Q.      Did you ever discuss Jane Doe 2 with
4  Defendant Halcovage?
5  A.      No.
6  Q.      So I think we can all remember around
7  March of 2020, businesses began closing due to the
8  global pandemic, COVID-19; are you aware of that?
9  A.      Yes.
10 Q.      Okay.
11         At some point thereafter, the county
12 furloughed some of its employee as a result of the
13 pandemic, correct?
14 A.      That is correct.
15 Q.      Do you recall when the first employee of
16 the county was furloughed?
17 A.      I do not.
18 Q.      In April of 2020, Jane Doe 1 and Jane
19 Doe 2 were furloughed, correct?
20 A.      Well, I -- I don't know sitting here.
21 If you says they were, I'll take your word
22 for it.  You're looking at something.  It was
23 around that time we would have done that, yes.
24 Q.      Okay.

Page 148

1         So I'll mark this just to refresh your
2  recollection.
3         MS. SMITH:  It's going to be the
4  stapled copy beginning of the packet, it's 102 and
5  242.  It will be 215 for today's purposes.
6                       - - -
7         (Bates Stamped 102 and 242 marked as
8  Exhibit-215 for identification.)
9                       - - -
10 BY MS. SMITH:
11 Q.      Mr. Bender, do you recognize these two
12 letters?
13         MS. JONES:  I think he's only seen
14 one, but, yeah, you can go ahead.
15         THE WITNESS:  Yup.
16 BY MS. SMITH:
17 Q.      Okay.
18         And these are both dated April 17th, one
19 being addressed to Jane Doe 2, one being addressed
20 Jane Doe 1, correct?
21 A.      Correct.
22 Q.      Does this refresh your recollection as
23 to when Jane Doe 2 and Jane Doe 1 were furloughed?
24 A.      Yeah.  Would have been that -- whatever

Page 149

1  it states in that letter, yes.
2  Q.      Okay.
3         And I think it's -- they're -- I'll
4  represent to you they're exactly the same.  And
5  that second paragraph there says, the furlough
6  will begin on April 20, 2020.
7  A.      Okay.  Yes.
8  Q.      Does that sound about right?
9  A.      Yes.
10 Q.      All right.
11         This letter -- again, I'm going to
12 represent to you that they're the same, so we'll
13 just keep one up here on -- on the screen for you.
14         It states that -- in this last sentence
15 of that first paragraph:  You are not authorized
16 to work during the furlough without advanced
17 written authorization from the commissioners.
18         Do you see that?
19 A.      Yes.
20 Q.      This letter also in the three -- on the
21 list of items, it talks about unemployment and
22 that they may be eligible, but that they need to
23 apply for unemployment benefits, correct?
24 A.      Correct.

Page 150

1  Q.      All right.
2         So some county employees were
3  furloughed -- were paid, but might have been able
4  to receive unemployment and COVID benefits during
5  that time; is that correct?
6  A.      That they were paid and eligible for
7  unemployment?
8  Q.      No.  They were not paid -- they were
9  furloughed, they didn't work, and they weren't
10 paid by the county, correct?
11 A.      Correct.
12 Q.      But they might have been -- if they
13 applied and were eligible, they could have
14 received unemployment and COVID pandemic benefits,
15 correct?
16 A.      Correct.
17 Q.      Okay.
18         Between March of 2020, when the pandemic
19 kind of started to close businesses and when the
20 county decided to furlough some of its employees,
21 including Jane Doe 2 and Jane Doe 1, was there
22 uniform policies or procedures on how the offices
23 should operate if there was a positive test or if
24 someone was exposed to someone who had tested

Page 151

1  positive?
2  A.     Yes.  The C -- CDC by that time had put
3  out guidelines, if someone had tested positive,
4  they had to be off, I think, for ten days.  And
5  then we had to do contact tracing and if anybody
6  had come in contact with and that was within 15
7  minutes and -- and 6 feet, that they also had to
8  quarantine for a period of time.
9  Q.     Okay.
10         MS. SMITH:  Matt, you can take
11 those exhibits down.
12 BY MS. SMITH:
13 Q.     So, I guess, Mr. Bender, my question is
14 between when the pandemic started and when Jane
15 Doe 1 and Jane Doe 2 were furloughed, was the
16 county simply just following whatever guidelines
17 the CDC was putting out at whatever day it was
18 that was at issue?
19 A.     Yes.
20 Q.     The county didn't issue any of its own
21 policies or procedures related to COVID, it just
22 that they were following the CDC guidelines?
23 A.     Well, not exactly.  Daily I had HR put
24 out every -- every day, the prime materials

Page 152

1  that -- that one has for any sort of flu season,
2  wash your hands, you know, avoid contact with
3  people, stay in your office, don't take your hands
4  to your nose or your -- or your eyes.  And every
5  day -- and I still think that was good protocol,
6  but that was the reminder every day.
7          And I think we did --
8  Q.     Okay.
9  A.     -- we did allow people to eat lunch in
10 their offices, we closed the canteen.  We informed
11 all the employees they were not to leave their
12 office to go to another office, unless it was
13 specifically for a business-related item, they
14 were to conduct the business and leave
15 immediately.
16 Q.     All right.
17         There are multiple school districts
18 within Schuylkill County, correct?
19 A.     Yes.
20 Q.     Do you know if the schools were either
21 closed or had the children working -- attending
22 remotely prior to the county furloughing
23 employees?
24         MS. JONES:  Object to the form.

Page 153

1          But you can answer if you know.
2          THE WITNESS:  I am not -- I assume
3  they did, I don't know what -- I don't know
4  specifically what they did.  But -- but schools
5  did close.  People were work -- kids were doing
6  virtual learning.
7  BY MS. SMITH:
8  Q.     Okay.
9          So if a director or supervisor of a
10 specific department had an employee who wanted to
11 work from home as a result of the pandemic, were
12 they permitted to allow their employees to do so?
13 A.     That would be reviewed by administration
14 and we would have to see a demonstration of a work
15 product.
16 Q.     Okay.
17         So between March of 2020 and April of
18 2020, every person who wanted to work from home as
19 a result of the pandemic, had to go -- the request
20 had to go through county administration?
21 A.     Yes.  And we did that for children and
22 youth agency, senior services agency, and drug and
23 alcohol, mental health agencies.  The children and
24 youth, as you probably know, they had to visit

Page 154

1  every day, so -- and so we took special
2  precautions and some of them went from home and
3  then came to the office to do their report to keep
4  the office as -- as empty as we could.
5  Q.     Okay.
6          Before March of 2020, how often would
7  you say you visited the tax claim bureau?
8  A.     Once or twice a week perhaps.
9  Q.     And would that be the same for tax
10 assessment office?
11 A.     No.  Probably less frequently there.
12 The tax claim office specifically deals with
13 private sales and -- and I would visit there in
14 the role of demolition coordinator.
15 Q.     Okay.
16         So I guess let me rephrase my question
17 or focus it more.
18         Prior to March of 2020, but while you
19 were county administrator, how often did you visit
20 the tax claim bureau?
21 A.     Once or twice a week.
22 Q.     Okay.
23         And still during that narrow time frame,
24 was it still less at the tax assessment office?

Case 3:21-cv-00477-MCC   Document 280-12   CONFIDENTIAL Filed 09/20/23   Page 247 of 373

Deposition of Gary Bender Vol. I - Revised                    Jane Doe, et al. v. Schuylkill County Courthouse, et al.

Page 155

A.   Yes.
Q.   Okay.
A.   Just as a reminder, Ms. Smith, is that
the responsibility for the demolition and CDBG and
other programs are still mine.
Q.   Okay.
     So you maintained them when you became
county administrator?
A.   Correct.
Q.   Okay.  Thank you for that clarification.
     Before March of 2020, how many times did
you observe Defendant Halcovage in the tax claim
bureau?
A.   I don't remember ever seeing
Commissioner Halcovage in the tax claim bureau.
Q.   How many times did you see him in the
tax assessment office prior to March of 2020?
A.   Perhaps once or twice, if that.
Q.   Okay.
     Now I would like to ask you some
questions related to Jane Doe 3.
     MS. SMITH:  Is everyone okay to go
forward?  Is everyone okay to go a little bit
longer before we break for lunch.  I will do Jane

Page 156

Doe 3 and then may -- maybe we'll break.
     MS. JONES:  Are you comfortable?
     THE WITNESS:  Yeah, I'm okay.
Everybody is nodding their heads.
     MS. IPPOLITO:  I'm fine with it.
BY MS. SMITH:
Q.   As it relates to Jane Doe 3, and, Mr.
Bender, how did you meet Jane Doe 3?
A.   When she became the director of the tax
claim bureau.
Q.   And at that time, you were not county
administrator, but you still had those other
responsibilities that you needed to interact with
the tax claim bureau for?
A.   Yes.
Q.   Okay.
     And do you remember where you met Jane
Doe 3?
A.   Probably in the tax claim bureau in her
office.
Q.   Do you know who introduced you or you
introduced yourself?
A.   I probably introduced myself.
     Did you get my answer?

Page 157

     MS. SMITH:  Let's go off the record
for a second.
     VIDEOGRAPHER:  The time is now
12:03 p.m. and we're going off the record.
                - - -
     (Whereupon a brief recess was held off
the record due to technical difficulties.)
                - - -
     VIDEOGRAPHER:  The time is now
12:04 p.m., we're back on the record.
BY MS. SMITH:
Q.   Okay.
     Sorry about that, Mr. Bender.
     Mr. Bender, what is your opinion of Jane
Doe 3?
A.   In relation to what?
Q.   Generally, what's your opinion of her?
A.   I think she's a very knowledgeable
employee at the county.
Q.   Any other opinion of her?
A.   I don't know what you're looking for.  I
mean, we are not social friends.  We're not
personal friends, we're just coworkers.
Q.   Do you think that -- do you have any

Page 158

reason to trust her truthfulness?
A.   To doubt her truthfulness, no.
Q.   Did you ever have any issues with her
job performance as tax claim director?
A.   No.
Q.   Would you say she did a -- a good job as
tax claim director?
A.   Absolutely.
     MS. SMITH:  All right.  So I would
like to look at her job description.  It's going
to be SC1221 through 1222.
                - - -
     (SC1221-1222 marked as Exhibit-216
for identification.)
                - - -
     MS. SMITH:  I believe this one is
in your stack of papers.  It will be 216 for
today's purposes.
BY MS. SMITH:
Q.   Do you have that document in front of
you now, Mr. Bender?
A.   I do.
Q.   All right.
     And this is the county's job

Case 3:21-cv-00477-MCC   Document 280-1   Filed 09/20/23   Page 248 of 373
Deposition of Gary Bender Vol. I - Revised
Jane Doe, et al. v. Schuylkill County Courthouse, et al.

Page 159

1  classification description for the position of tax
2  claim bureau director, correct?
3  A.      Correct.
4  Q.      All right.
5          And it's dated on the second page,
6  June 1994, with a revision date of March 4, 2008;
7  is that correct?
8  A.      Correct.
9  Q.      Great.
10         And Jane Doe 3 became the tax claim
11 director after -- she was already the tax claim
12 director when you became county administrator,
13 correct?
14 A.      That is correct.
15 Q.      All right.
16         Do you remember -- but she became the
17 tax claim director during -- after you were
18 already employed by the county, correct?
19 A.      Correct.
20 Q.      All right.
21         And then at some point, Jane Doe 3 took
22 on a -- what I'll call a dual role of tax claim
23 director and chief assessor, correct?
24 A.      Correct.

Page 160

1  Q.      And there is a job description for her
2  dual role; is that right?
3  A.      Yes.
4  Q.      Okay.
5          So from the time Jane Doe 3 became the
6  tax claim director until she took on the dual
7  role, this was Jane Doe 3's job classification
8  description, correct?
9  A.      Yes.
10 Q.      And then in March of 2021, the offices
11 were restructured, I think is the word that was
12 used, and Jane Doe 3 stopped holding the position
13 of chief assessor and became just tax claim bureau
14 director again, correct?
15 A.      Correct.
16 Q.      Okay.
17         So then since March of 2021, this again
18 is Jane Doe 3's job classification description,
19 correct?
20 A.      Correct.
21 Q.      All right.
22         So there's -- I'm going to kind of refer
23 to them as Stint 1 and Stint 2.  So Stint 1, her
24 first time being just tax claim bureau director

Page 161

1  until she became the dual role, which was in July
2  of 2019, correct?
3  A.      Yes.
4  Q.      Okay.
5          For -- for that time period, did you
6  have any -- is there anything in this job
7  classification description that you believe Jane
8  Doe 3 was not qualified to perform?
9  A.      No.
10 Q.      For that same time period, is there
11 anything in this job classification description
12 that Ms. -- Jane Doe 3 did not do, that you're
13 aware of?
14 A.      No, not that I'm aware of.
15 Q.      Okay.
16         And during that same time period, did
17 anyone bring to your attention that Jane Doe 3 did
18 not complete the essential job duties and
19 responsibilities listed in this job description?
20 A.      No.
21 Q.      Okay.  You can put that one aside.
22         And if I can turn your attention to
23 previously marked Exhibit-46.
24         (Previously marked Exhibit-46)

Page 162

1  BY MS. SMITH:
2  Q.      This is the PAR for Jane Doe 3's
3  promotion from tax claim director to that dual
4  role of director and chief assessor, correct?
5  A.      Correct.
6  Q.      This is the one to promote her to the --
7  the interim position that we kind of -- kind of
8  the training position that we talked about
9  earlier, correct?
10 A.      Yes.
11 Q.      So I want to talk about May 2019 or
12 roughly thereabouts.
13         How did the idea come about, if you
14 know, to combine the tax assessment office and the
15 tax claim bureau?
16 A.      Well, those discussions, if they were
17 held, did not include me because at the time,
18 Debra Twigg and I were working on the chief
19 assessor job description and the assistant chief
20 assessor job description, so we were prepared to
21 put those out and advertise them for posting for
22 jobs.  So at the last minute, Commissioner
23 Halcovage came in and -- and this idea of
24 combining the offices was brought up.  We have

Page 163

1  tried that in the past, I didn't agree with it.
2  Frank Stottlemyer didn't agree with it.  Gary Hess
3  didn't agree with it, but on it went.
4  Q.      Okay.  So let me just unpack that a
5  little, make sure I understand your testimony.
6         So the chief assessor around May of 2019
7  was Virginia Murray, correct?
8  A.      Correct.
9  Q.      Ms. Murray notified the county that she
10 intends to retire and -- and, therefore, the
11 county is going to need to fill her position,
12 correct?
13 A.      Correct.
14 Q.      And I think as I understand your
15 testimony, correct me if I'm wrong, as a result of
16 learning that Ms. Murray plans to retire, you and
17 Ms. Twigg start to look at the job description and
18 get the position ready for posting?
19 A.      Correct.  And we wanted to hire an
20 assistant chief assessor.  As I mentioned earlier,
21 there was not a chief -- assistant chief assessor
22 in the office at that time, so we were looking at
23 a new job description.
24 Q.      Okay.

Page 164

1         And was that idea floated as a result of
2  something Ms. Murray told you, that the office
3  needed more assistance, something that you
4  observed, or -- or -- how -- why did the decision
5  to potentially get an assistant chief assessor
6  come about?
7  A.      Well.  We knew we were going to have to
8  replace the chief assessor and we really liked the
9  idea of an assistant chief assessor, when the
10 other person is not there.  So it was something, I
11 guess, that was in -- that was utilized in the
12 past, maybe Helene O'Connell had held that.  I'm
13 not too sure, Ms. Smith, but I know it's something
14 we worked on and we were anticipating soliciting
15 applicants.
16 Q.      Okay.
17        Did you at any point during your
18 employment with the county, have any issues or
19 concerns with Ms. Murray's job performance as
20 chief assessor?
21 A.      No.
22 Q.      Did you ever learn that anyone had any
23 issues or concerns with her job performance as
24 chief assessor?

Page 165

1  A.      Not that I'm aware of.
2  Q.      So in the process when you -- you and
3  Ms. Twigg are starting to get the posting ready,
4  as I understand your testimony, Defendant
5  Halcovage comes to you and says, you know, I think
6  we should combine the tax claim bureau and the tax
7  assessment office?
8  A.      Yes.  Apparently he had some discussions
9  with Jane Doe 3 prior to that.
10 Q.      And Defendant Halcovage told you the
11 same, that he had had conversations with Jane Doe
12 3 about it?
13 A.      He did not, but apparently he did
14 because that's -- that's what he was proposing.
15 Q.      Okay.
16        So you just assumed that he had had
17 conversations with her?
18 A.      Yes.
19 Q.      Okay.
20        And he was proposing that when the
21 offices were combined, that Jane Doe 3 oversee
22 those two offices, correct?
23 A.      Correct.
24        MR. GEIGER:  He didn't say that

Page 166

1  earlier.
2         MS. SMITH:  What's that?  I'm
3  sorry.  I don't know who just spoke.
4         THE WITNESS:  I don't know either.
5         MS. JONES:  I think it was Jerry.
6         THE TECHNICIAN:  It was Mr. Geiger,
7  Counsel.
8         MS. SMITH:  I thought it was too,
9  but I don't know if it was an objection or what.
10        MR. GEIGER:  No.  No.  It was not
11 an objection.  I'm sorry.  I was not on mute.  I
12 was talking to someone in my room.
13        MS. SMITH:  Okay.  So I just wanted
14 to make sure it wasn't for us.
15        MR. GEIGER:  Sorry about that.
16        MS. SMITH:  No worries.
17 BY MS. SMITH:
18 Q.      Okay.
19        So when Defendant Halcovage floated the
20 idea or it was discussed about combining these two
21 offices and Jane Doe 3 overseeing it, did you have
22 any concern as to Jane Doe 3's ability or the
23 selection of Jane Doe 3 to be the one who oversee
24 the two offices?

Page 167

1  A.     If we were going to combine the two
2  offices, that would be an appropriate person to
3  hire.  I was not in favor of combining the
4  offices.
5  Q.     Okay.
6      Why were you not in favor of combining
7  the two offices?
8  A.     Because, as I had discussed, that had
9  been tried before.  It didn't really work out.
10 Although there's similarities in there, the two
11 very basic functions, they bring in the money to
12 the county, they are very important offices.  I
13 just -- we thought it was important to have just
14 one.
15      It was combined at one point in time
16 with -- I think with Darlene Delzoni that was
17 there, but Ginny Murray basically ran one side,
18 and -- and so it wasn't the fact it was combined
19 in a sense.  So I just didn't think it was good
20 policy for the county.
21 Q.     Okay.
22      When this prior attempt at combining the
23 offices had been attempted, were you employed by
24 the county?

Page 168

1  A.     No.
2  Q.     Okay.
3      So the success or failure of the offices
4  being combined, your knowledge of that was simply
5  from -- from others, correct?
6  A.     From Commissioner Stottlemyer, yes.
7  Q.     Okay.
8      And I think you testified, Commissioner
9  Stottlemyer and Commissioner Hess, who in March --
10 I'm sorry -- May of 2019, were the two other
11 commissioners, they were not favor of this -- the
12 combining of either -- of the offices, correct?
13 A.     Yes.  They didn't think it was a good
14 idea either.
15 Q.     Okay.
16      But Defendant Halcovage was in -- in
17 favor of it?
18 A.     Yes.  And apparently convinced them
19 to -- to give it a try.
20 Q.     Okay.
21      Do you know how Defendant Halcovage
22 convinced them to give it a try?
23 A.     Commissioner -- they probably sat down
24 and talked it out and -- and George probably

Page 169

1  indicated that it's worth a shot.  Jane Doe 3 was
2  a good tax claim director.  There's no doubt about
3  it.  She was willing to get her CPE.  She was
4  willing to take it on, so it went on the agenda
5  and was -- was passed.
6  Q.     Okay.
7      So if we look -- you should still have,
8  I believe, 47 in front of you, correct?
9  A.     Yup.  Yes.  Yes, ma'am.
10 Q.     Forty-seven, this is the PAR for Jane
11 Doe 3.
12      Okay.
13      You now have 47, which I think is 411 in
14 front of you.
15      And this is the PAR for Jane Doe 3's
16 interim position ending and her becoming chief
17 assessor.  If you look back at 46, it's about one
18 month later.  So she was interim for about one
19 month; would you agree?
20 A.     Yes.
21 Q.     Okay.
22      During that one month, during -- when
23 Jane Doe 3 held the interim positions, did you
24 have any issues or concerns with her work

Page 170

1  performance?
2  A.     No.
3  Q.     Did anyone raise any concerns or issues
4  to you regarding her work performance?
5  A.     No.
6      MS. SMITH:  Going to look at what
7  should be in the stack, it's 1223 to 1224, it
8  should be towards the back.  I'll mark it as 217
9  for today's purposes.
10                  - - -
11      (Bates Stamped 1223-1224 marked as
12 Exhibit-217for identification.)
13                  - - -
14      THE WITNESS:  Okay.  I have it in
15 front of me.
16 BY MS. SMITH:
17 Q.     Okay.
18      This is the county's job classification
19 description for Jane Doe 3's dual role as chief
20 assessor and director of tax claim, correct?
21 A.     Correct.
22 Q.     If we turn to the second page, it's
23 dated May of 2019, correct?
24 A.     That is correct.

Case 3:21-cv-00477-MCC   Document 280-1   Filed 09/20/23   Page 251 of 373
CONFIDENTIAL
Deposition of Gary Bender Vol. I - Revised     Jane Doe, et al. v. Schuylkill County Courthouse, et al.

Page 171

1  Q.    All right.
2       And that was when Jane Doe 3 took on
3  that dual role and offices were combined?
4  A.    Yes.  On -- on -- the effective date I
5  think was July 8th.
6  Q.    Right.
7       July 8th was when she became -- when the
8  interim position ended, but May 23rd, if we look
9  at 46, is when she was interim, correct?
10 A.    Oh, yeah.  Okay.  Yes.
11 Q.    So when the offices were combined, the
12 county had to draft a dual role description and
13 this was what was drafted, correct?
14 A.    Correct.
15 Q.    Do you know who drafted this?
16 A.    It would have been --
17 Q.    And when I say this, I'm referring to
18 Exhibit-217.
19 A.    It would have been Ms. Twigg.
20 Q.    Okay.
21      Were you involved in it at all?
22 A.    We probably discussed it, yes.
23 Q.    And given that you were already managing
24 the tax claim director and the chief assessor in

Page 172

1  your role as county administrator, the dual role
2  continued to report to you as well as we see on
3  Page 2, correct?
4  A.    Yes.
5           MS. JONES:  Object to the form.
6           You can answer.
7  BY MS. SMITH:
8  Q.    Is there anything in this job
9  classification description that you believe Jane
10 Doe 3 was not qualified to perform between May of
11 2019 and May of 2020?
12 A.    No.
13 Q.    From May of 2019 until May of 2020, is
14 there anything in this job description that you're
15 aware that Jane Doe 3 did not do?
16 A.    I'm not aware of anything, no.
17 Q.    Did anyone bring to your attention that
18 Jane Doe 3 did not complete the essential job
19 duties and responsibilities listed in this job
20 description between May of 2019 and May of 2020?
21 A.    They did not.
22      MS. SMITH:  All right.  We are
23 going to look at previously marked Exhibit-158.
24      (Previously marked Exhibit-158.)

Page 173

1           MS. JONES:  Got it.
2           MS. SMITH:  All righty.
3  BY MS. SMITH:
4  Q.    This is the county's job classification
5  description for the position of chief assessor,
6  correct?
7  A.    Correct.
8  Q.    And on the second page it's dated
9  November 2016; do you see that?
10 A.    I do.
11 Q.    Any reason to believe that this job
12 description has been updated since then?
13 A.    Not that I'm aware of.
14 Q.    So this is the county's job
15 classification for the position of chief assessor
16 currently, correct?
17 A.    Correct.
18 Q.    On the first page under education and
19 employment, it states:  Must have a certif --
20 certified evaluators license, certified
21 Pennsylvania evaluators license.
22      Do you see that?
23 A.    I do.
24 Q.    This is oft -- often also referred to as

Page 174

1  a CPE license, correct?
2  A.    Correct.
3  Q.    And is this -- you know, is this
4  requirement because of the 2016, consolidated
5  statute Title 53, which requires all chief
6  assessors for Pennsylvania Counties to hold a
7  valid CPE license?
8           MS. JONES:  Object to the form.
9           You can answer.
10          THE WITNESS:  I would think so,
11 yes.
12 BY MS. SMITH:
13 Q.    Are you aware that -- that there's a
14 Pennsylvania statute that requires any county
15 assessors, chief assessors to hold a CPE license?
16 A.    Yes.
17 Q.    Okay.
18      Did you ever hear Defendant Halcovage
19 make a comment about Jane Doe 3's physical
20 appearance?
21 A.    I have not.
22 Q.    Did you ever hear Defendant Halcovage
23 tell Jane Doe 3 that Jim McNulty thinks she is
24 really good looking or words to that effect?

Case 3:21-cv-00477-MCC   Document 280-1   Filed 09/20/23   Page 252 of 373
CONFIDENTIAL
Deposition of Gary Bender Vol. I - Revised                    Jane Doe, et al. v. Schuylkill County Courthouse, et al.

Page 175

1  A.     I have not.
2  Q.     Did Defendant Roth ever discuss with you
3  any concerns or issues Jane Doe 3 brought to his
4  attention about Defendant Halcovage?
5         MS. JONES:  Object to the form, to
6  the extent it would call for privileged
7  communication with counsel.
8         But, otherwise, you can answer.
9         THE WITNESS:  He has not.
10 BY MS. SMITH:
11 Q.     Did Jane Doe 3 ever discuss Defendant
12 Halcovage's behavior or comments with you?
13 A.     Discuss, no.  There was a time when Jane
14 Doe 3 -- Jane Doe 3 was in my office, we were
15 talking about -- it could have been before tax
16 claim and the tax -- I'm not sure when it was.
17 But Commissioner Halcovage had come in and said
18 something about people saying that -- that some --
19 and he and somebody else were dating.  And Jane
20 Doe 3 just laughed it off and -- like we always
21 did.
22        And when we left, I said to Jane Doe 3,
23 you know, some day he's going to say that in front
24 of the wrong person and she just laughed and

Page 176

1  agreed.  So my assumption was that she was not
2  that person.
3  Q.     Okay.
4         Let me just --
5         MS. SMITH:  And, Matt, you can take
6  the exhibit down.  Thank you.
7  BY MS. SMITH:
8  Q.     Let me just make sure I understand what
9  you were -- were just testifying to.
10        So there was a time that you and Jane
11 Doe 3 were in your office.  Is this in the same
12 office that you currently --
13 A.     Correct.
14 Q.     -- sit in?
15        Okay.
16        But you're not -- but you're not sure if
17 it was when you were county administrator or do
18 you know?
19 A.     I would be willing to bet that I was,
20 yes.
21 Q.     Okay.
22        So some time after September of --
23 A.     Yes.
24 Q.     -- 2016?

Page 177

1  A.     Yes.  Yes.  Yes.  Yes.
2  Q.     Okay.
3         And you and Jane Doe 3 are in your
4  office discussing work-related topics, I imagine?
5  A.     Correct.
6  Q.     And Defendant Halcovage comes into your
7  office and says something about him dating someone
8  or rumors of you dating someone.
9         Is that what I understand?
10 A.     Yes.  I can't remember the whole text of
11 the conversation, but it was -- it was like that.
12 Q.     Do you remember who the person he was --
13 A.     No.
14 Q.     -- rumored to be dating was?
15        Do you remember who the rumor was -- who
16 the person he was rumored to be dating was?
17 A.     No.
18 Q.     Okay.
19        And did you say anything to Defendant
20 Halcovage, that he should be careful who he said
21 something to?
22 A.     I don't recall if I said it that
23 particular day.
24 Q.     Okay.

Page 178

1         So you -- you don't know if you said
2  anything there during that conversation about that
3  he should be careful of what he says or to whom he
4  says anything?
5  A.     No.  He left and Jane Doe 3 and I
6  continued our conversation.
7  Q.     Okay.
8         And during that conversation with Jane
9  Doe 3, you said to her something along the lines
10 of that Defendant Halcovage might say something
11 wrong to the wrong person?
12 A.     Yes.
13 Q.     Did -- did you because say that because
14 you believed whatever conversation he just had
15 with you was inappropriate for the workplace or
16 could be inappropriate for the workplace?
17 A.     Yes.
18 Q.     Did you ever report this potentially
19 inappropriate conversation to human resources?
20 A.     Ms. Twigg and I would have discussed it
21 at our daily meeting.
22 Q.     Okay.
23        Are you sure that you discussed it with
24 Jane Doe 3?

Page 179

1 A.    Yes.
2 Q.    Okay.
3 A.    Yes.
4 Q.    So this conversation had to have
5 occurred after Ms. Twigg was employed by the
6 county?
7 A.    Yes.
8 Q.    Okay.
9     So let's just -- I want to establish
10 something.  When you became county administrator,
11 Ms. Twigg was not the HR director, right?
12 A.    That is correct.
13 Q.    There was a period of about two years or
14 maybe just -- just under two years that Martina
15 Chaswiak was the HR director when you were county
16 administrator, correct?
17 A.    Correct.
18 Q.    Okay.
19     Do you know if Ms. Twigg discussed this
20 conversation that Defendant Halcovage had with you
21 with Defendant Halcovage?
22 A.    I don't know.  I'm not aware of that.
23 Q.    Did you ever follow up with Ms. Twigg to
24 see if she addressed it with Defendant Halcovage?

Page 180

1 A.    I did not.
2 Q.    But I think you testified that you
3 believe that you may have at some point, discussed
4 it with Defendant Halcovage?
5 A.    Yes.
6 Q.    Okay.
7     And -- and do you recall what the
8 conversation was, what you said to him, what he
9 said to you?
10 A.    Would've said, you shouldn't say things
11 like that.
12 Q.    Do you know if the person he was rumored
13 to be dating was a county employee?
14 A.    No.  I think you misconstrued what I was
15 saying.  And he would say, oh, getting friendly
16 with someone, oh, people are going to start saying
17 we're dating because we've been friendly.  And it
18 doesn't --
19 Q.    Okay.
20 A.    Maybe not referring to anybody in
21 particular, no.  He wasn't saying he was dating
22 someone.  He said, people are going to say we are
23 dating.
24 Q.    Okay.

Page 181

1     When you -- so -- I appreciate you
2 clarifying that.  Now I'm just going to try and
3 clarify, make sure I do understand what you were
4 saying what happened.
5     So Defendant Halcovage was saying maybe
6 something along the lines of, there was
7 interaction between him and another person that
8 may cause others to start thinking he was dating
9 that person?
10 A.    I don't know how to answer that.
11 Q.    Okay.
12 A.    I know.  I know.
13 Q.    So Defendant Halcovage wasn't saying
14 that there was rumors that he was dating someone,
15 but that there was rumors that something occurred
16 that might have caused people to think he was
17 dating someone?
18 A.    Correct.  Yeah.
19 Q.    Okay.
20 A.    I would agree.
21 Q.    Okay.
22     So do you recall during this
23 conversation of Defendant -- that Defendant
24 Halcovage had in your office where Jane Doe 3 was

Page 182

1 present, did he mention a specific individual by
2 name?
3 A.    No.
4 Q.    Okay.
5     Did you ask him if he was referring to a
6 specific individual?
7 A.    No.
8 Q.    Did you ever hear Defendant Halcovage
9 make a comment about someone parking, referring to
10 engaging in a sexual act in a car with another?
11 A.    Well, yes -- yes and no.  I mean, what
12 he would say sometimes if I were leaving and me
13 and I were leaving, he'd say, oh, you guys going
14 parking.  What you assume from that is -- is up to
15 you, but, yes.
16 Q.    Okay.
17     Well, I would like to know what you
18 assumed from it.  What did think Defendant
19 Halcovage meant when he asked if you and your wife
20 were going parking?
21 A.    Personally, I thought it was just a
22 silly statement.  My wife wasn't insulted by it.
23 I wasn't insulted by it.
24 Q.    Well, I appreciate that you weren't

Page 183

1 insulted by it, but I'd like to know what you
2 thought he meant by the word parking. Did you
3 think he meant that you and your wife were just
4 going to park your car somewhere or did you think
5 he was implying that you and your wife were going
6 to kiss or engage in some sort of sexual act in
7 your car while it was parked?
8 A.      Yeah, we're well in our 60s, so I didn't
9 think he was thinking that. I -- I'm not sure
10 what he was thinking. He said it. It's just
11 something he said and we didn't think anything of
12 it.
13 Q.      Okay.
14      Did you ever hear Defendant Halcovage
15 ask Jane Doe 3 if she and her husband were
16 parking?
17 A.      I have not.
18 Q.      Did you ever hear Defendant Halcovage
19 ask Jane Doe 3, what's all over your lips, after
20 she return from lunch with her husband?
21 A.      I have not.
22 Q.      Did you ever observe Defendant Halcovage
23 engage in any conduct that disrupted the
24 operations of the tax claim bureau?

Page 184

1 A.      No.
2 Q.      Ever observe Defendant Halcovage engage
3 in conduct that disrupted the operations of the
4 tax assessment office?
5 A.      No.
6 Q.      Did Jane Doe 3 ever raise concerns about
7 Defendant Halcovage's conduct, disrupting either
8 of those offices?
9 A.      No.
10 Q.      Did you ever hear Defendant Halcovage
11 comment about refusing to talk with or him not
12 talking with Jane Doe 3?
13 A.      I mean, I think that came out of the
14 investigation, there was a period of time he
15 didn't talk with her.
16 Q.      Okay.
17      But before the investigation, did you
18 ever hear him say, I'm not talking with her or I
19 refuse to talk with her or anything along those
20 lines?
21 A.      He never said that specifically, no.
22 Q.      Did you -- prior to the investigation,
23 did you know that Defendant Halcovage was not
24 speaking with Jane Doe 3 for any reason?

Page 185

1 A.      No. I know he was unhappy because she
2 wanted a particular person in her job and she went
3 to Frank Stottlemyer instead because George didn't
4 give her an answer. And that's --
5 Q.      Did -- I'm sorry.
6 A.      I would do the same thing. I would do
7 the same thing. If you -- if you don't get an
8 answer from -- from one commissioner, you want to
9 bring it -- you want to make sure it's discussed.
10 Q.      So you -- when you said I would have
11 done the same thing, you would have done the same
12 thing that Jane Doe 3 had done?
13 A.      Yes.
14 Q.      Okay. I just wanted to make the record
15 clear. Thank you.
16      When you heard this issue that Jane Doe
17 3 didn't get a response from Defendant Halcovage,
18 went to another commissioner, and Commissioner
19 Halcovage was not happy about it, did you hear
20 Defendant Halcovage ever say something like Jane
21 Doe 3 is not loyal or questioning her loyalty?
22 A.      No.
23 Q.      Did you ever hear Defendant Halcovage
24 tell a joke that included Hillary Clinton or

Page 186

1 someone who looked like her and a reference to
2 oral sex?
3 A.      No.
4 Q.      Did you ever hear Defendant Halcovage
5 comment that Jane Doe 3 liked sex?
6 A.      No.
7 Q.      Did you ever observe Defendant Halcovage
8 request that Jane Doe 3 obtain campaign petition
9 signatures for him?
10 A.      No.
11 Q.      Were you county administrator when Jane
12 Doe 3 and Jane Doe 4 were assigned parking spaces
13 at the courthouse? And I'm talking about their
14 initial assignment, because I know they've been
15 moved and -- and things like that. Their initial
16 assignment?
17 A.      I would say no for Jane Doe 3 because
18 she started in 2011. She probably would have had
19 a spot around that time, that would have Mark
20 Scarbinsky. I did assign a spot to Jane Doe 4 and
21 I'm not sure if that was before I was the
22 administrator or -- or after.
23 Q.      Okay.
24      But at some point in your employment

Deposition of Gary Bender Vol. I - Revised

Jane Doe, et al. v. Schuylkill County Courthouse, et al.

Page 187

1 with the county, you became capable of assigning
2 parking spots, correct?
3 A.    Correct.
4 Q.    Sounds like based on your testimony,
5 that it might have been even before you were
6 county administrator; is that correct?
7 A.    It could have been.  I would -- just
8 would have gone to Mark Scarbinsky and said,
9 here's what I'd like to do.
10 Q.    Okay.
11     Do you know, was Defendant Halcovage
12 involved in parking -- the parking assignment
13 spots for Jane Doe 3 or Jane Doe 4 at any point?
14 A.    No.  The spot for Jane Doe 4 was -- is
15 an odd one.  There was -- can I digress a little
16 bit?
17 Q.    Sure.  Go ahead.  Yeah.
18 A.    Okay.  David Benolis was in the MIS
19 department and said that Jane Doe 4 goes home for
20 work every day.  Sometimes when she gets back, she
21 can't get a spot.  Is there any way I can get her
22 a parking place.  And one day on opened up and I
23 said to Jane Doe 4, Jane Doe 4, I heard that you
24 have a hard time getting a spot when you come back

Page 188

1 to work, would you like this spot.
2 Q.    Okay.
3 A.    And that's -- that's how it happened.
4 Sorry.  It was a long-winded answer, but that's
5 the answer.
6 Q.    It's okay.  I appreciate that.
7     All right.  So I'll get to some of the
8 later parking spot moves.
9 A.    Okay.
10 Q.    Trying -- trying to go in chronological
11 order here.  So I'll get to May 2020 and
12 thereafter at a later time, so we'll talk about
13 that.
14     MS. SMITH:  All right.  So this is
15 probably a good breaking point for lunch if we can
16 go off the record.
17     VIDEOGRAPHER:  The time is now
18 12:36 p.m. and we're going off the record.
19     - - -
20     (Whereupon, a luncheon recess was held
21 off the record.)
22     - - -
23     VIDEOGRAPHER:  The time is now
24 1:25 p.m. and we're back on the record.

Page 189

1     MS. SMITH:  All right.  And just
2 for the record right now, for the plaintiffs we
3 have myself, Plaintiff Doe 3 and 4, Jane Doe 3 and
4 Jane Doe 4, and then from my office my paralegal
5 Alyssa DeBise.  If Doe 1 or 2 should join, I will
6 put them on the record.  They are not on right
7 now.
8 BY MS. SMITH:
9 Q.    All right.
10     Mr. Bender, so now I want to move to
11 Jane Doe 4.  How did -- how did you meet Jane Doe
12 4?
13 A.    I guess in her office, probably not too
14 long after I took over the demolition program.
15 She was in tax claim office.
16 Q.    Okay.
17     And she was not the assistant director,
18 she was just a tax claim employee at that point,
19 correct?
20 A.    Correct.
21 Q.    And did you meet her in connection with
22 your work with the county and the subsequent work
23 that you did with the tax claim office in that
24 role?

Page 190

1 A.    Probably, yes.
2 Q.    Okay.
3     Did you know Jane Doe 4 before your
4 employment with the county?
5 A.    No.
6 Q.    What is your opinion of Jane Doe 4?
7 A.    She's a capable employee.  I think she's
8 bright.
9 Q.    Would you say she's a hard worker?
10 A.    I would.
11 Q.    Any reason to trust her truthfulness or
12 honesty?
13 A.    I would say probably not.
14 Q.    I should have asked you this first, I'm
15 sorry to jump around.
16     During the break, did you discuss your
17 deposition testimony at all with your attorney?
18 A.    I was scolded repeatedly for answering
19 before you're finished your question.  So I feel a
20 little intimated right now because I'm trying so
21 hard not to do that, Ms. Smith, I really am and
22 I'll try to do better.
23 Q.    Understood.  I appreciate that.
24 A.    Other than that -- other than that, no.

Page 191

1  Q.      Okay.  Thank you.

2        And Jane Doe 4, before you became county

3  administrator, she became the assistant director

4  of tax claim, correct?

5  A.      Correct.

6  Q.      Did you have any input or did you

7  participate at all in the decision to have Jane

8  Doe 4 become the assistant tax claim director?

9  A.      I did not.

10  Q.      And Jane Doe 4, for a period of time

11  after you became the administrator, which I think

12  we established was in September 2016, until about

13  2019, Jane Doe 4 was just the assistant tax claim

14  director, correct?

15  A.      Correct.

16  Q.      And then in 2019, when the offices were

17  combined, which we talked about earlier, Jane Doe

18  4 took on a dual rule of assistant tax claim

19  director and assistant or deputy chief -- deputy

20  assessor, correct?

21  A.      Correct.

22        MS. SMITH:  I'd like to mark for

23  today's purposes as 218.  It's going to be 1215 to

24  1216.  It should be in that stack of papers.  It's

Page 192

1  going to be tax claim bureau assistant director

2  job description.

3              - - -

4        (Bates Stamped 1215-1216 marked as

5  Exhibit-218 for identification.)

6              - - -

7  BY MS. SMITH:

8  Q.      I see you now have that document before

9  you, Mr. Bender.

10  A.      I do.

11  Q.      So is this the county's job

12  classification description for the position of tax

13  claimant bureau assistant director?

14  A.      It is.

15  Q.      Okay.

16        If you look to the second page of this

17  document, it's dated June 1994 with a revision

18  date of 3/4/2008; is that correct?

19  A.      Correct.

20  Q.      So this has been the county's job

21  classification description for the position of

22  assistant tax claim director for that -- for the

23  entire time that Jane Doe 4 held that position, at

24  least until she started holding the dual role,

Page 193

1  correct?

2  A.      Correct.

3  Q.      From the time you became county

4  administrator, actually -- I'm sorry -- because

5  Ms. -- Jane Doe 4 was already an assistant

6  director when you became county administrator.  So

7  when you became county administrator until May of

8  2020, can you tell me, was there anything in this

9  job classification description that you believe

10  Jane Doe 4 was not qualified to perform?

11  A.      No.

12  Q.      For the same time period, so

13  September 2016 to May 2020, is there anything in

14  this job classification description that you are

15  aware that Jane Doe 4 did not do?

16  A.      No.

17  Q.      And, again, for that same time period,

18  did anyone bring to your attention that Jane Doe 4

19  did not complete the essential job duties and

20  responsibilities listed in this job classification

21  description?

22  A.      No.

23  Q.      Would you say in your opinion, Jane Doe

24  4 was a good assistant director for the tax claim

Page 194

1  bureau?

2  A.      As far as I know, yes.

3  Q.      And then as we discussed earlier, in and

4  around May of 2019, there was a decision to

5  combine tax claim bureau and tax assessment.  And

6  Jane Doe 4 was selected for the assistant position

7  in both of those offices, correct?

8  A.      Correct.

9  Q.      Were you --

10        MS. SMITH:  Matt, you can take that

11  exhibit down.

12  BY MS. SMITH:

13  Q.      Mr. Bender, were consulted or asked your

14  opinion as to the decision regarding Jane Doe 4

15  holding that position in those offices?

16  A.      Yes.

17  Q.      And what was your opinion?

18  A.      Jane Doe 3 and I had discussed that and

19  we had looked at another person to do that.  And

20  Jane Doe 3 thought she would prefer to have Jane

21  Doe 4 in that role and I deferred to her.

22  Q.      Did you have any reason to believe that

23  Jane Doe 3 didn't have the knowledge to decide who

24  the best fit for that role would be?

Page 195

1  A.     No, not at all.  It was -- it was the
2  kind of thing that, as I told you earlier, we were
3  looking to -- to do two -- two new ones in there.
4  And we had looked and I talked to another
5  individual in the assessment office about that,
6  but I did approach Jane Doe 3 about that and she
7  felt Jane Doe 4 would be a better fit and I
8  concurred.
9  Q.     Okay.
10        Jane Doe 4, similar to Jane Doe 3, held
11 an interim dual role position right after the
12 offices were combined, correct?
13 A.     Well, I would think so.  If you're -- if
14 you're going to show me a PAR for that, then I
15 will -- I don't know that specifically, but if
16 we're going to go there next, that will be --
17 answer my question.
18 Q.     Okay.
19        I mean, I -- I can show you a PAR if
20 that will refresh your recollection.
21        MS. SMITH:  It's going to be -- it
22 should be previously marked Exhibit No. 48, I
23 believe.  Yeah, 48.
24        (Previously marked Exhibit-48.)

Page 196

1  BY MS. SMITH:
2  Q.     Do you have that document now in front
3  of you, Mr. Bender?
4  A.     I do.
5  Q.     Okay.
6        And this is a PAR for -- that you
7  completed for Jane Doe 4 to move from assistant
8  director of tax claim to an interim position --
9  interim dual role position, correct?
10 A.     I didn't complete it, no, I approved it.
11 Q.     Okay.
12        Well, it says at the top, from Gary
13 Bender.  So you didn't draft this?
14 A.     I understand what it says at the top,
15 Ms. Smith.  As I said earlier, generally someone
16 in HR prepares them and I approve them.  I have
17 never prepared one of these.
18 Q.     Okay.
19        So it says that, I guess, they prepared
20 it on your behalf.  You review it before it goes
21 out.  But it is you giving it to the
22 commissioners, so it's from you in that sense?
23 A.     That is correct.
24 Q.     Okay.

Page 197

1        And then after an interim position, Jane
2  Doe 3 -- I'm sorry -- Jane Doe 4 did, in fact,
3  become the dual assistant position in those
4  offices, correct?
5  A.     Correct.
6  Q.     Do you know how long Jane Doe 4 remained
7  in an interim position?
8  A.     How long she was -- she held that
9  position?
10 Q.     The interim position, correct.
11 A.     I would assume the same length of time
12 as -- as Jane Doe 3, for a month.
13 Q.     Okay.
14        In any event, regardless of how long she
15 held it, during that period of time when she was
16 interim, did you have any issues or concerns with
17 her work performance as the interim, I'm going to
18 call it, dual assistant role?
19 A.     I did not.
20 Q.     Okay.
21        Did anyone raise any concerns or issues
22 with Jane Doe 4's work performance during her
23 interim dual assistant role?
24 A.     Not to my knowledge.  Not me to, anyway.

Page 198

1        MS. SMITH:  I don't think that this
2  one is in the stack of papers, but it's going to
3  be SC1217 and 1218.  This might be one you have to
4  look at on the screen.
5              - - -
6        (SC1217-1218 marked as Exhibit-219 for
7  identification.)
8              - - -
9  BY MS. SMITH:
10 Q.     I apologize, Mr. Bender, but it won't be
11 too many questions about it.
12        Mr. Bender, this is the county's job
13 classification description for the dual assistant
14 role for the tax claim tax assessment offices,
15 correct?
16 A.     Correct.
17 Q.     If we can turn to the second page dated
18 May of 2019; is that correct?
19 A.     Correct.
20 Q.     So this similarly when the offices --
21 similar to Jane Doe 3's dual role job
22 classification description, this is something that
23 was draft as a result of the county's decision to
24 combine the two offices and have one assistant in

Page 199

1 both offices, correct?
2 A.      Correct.
3 Q.      Okay.
4        Were you involved at all in the drafting
5 of this job description?
6 A.      I probably reviewed it with Ms. Twigg.
7 Q.      Okay.
8        Do you know if you made any changes to
9 it?
10 A.      I did not suggest any.
11 Q.      Okay.
12        So I want to talk about Jane Doe 4's
13 interim period, interim dual role.
14        At that -- at any time during her
15 interim position, did you have any questions or
16 concerns about her qualifications related to this
17 classification job description?
18 A.      I did not.
19 Q.      At any time during her stint as an
20 interim dual assistant did you have any questions
21 or concerns regarding her job performance?
22 A.      I did not.
23 Q.      And during that same time, did anyone
24 bring to your attention that she did not complete

Page 200

1 the essential job duties and responsibilities
2 listed in this job description?
3 A.      They did not.
4 Q.      Okay.
5        Between when she became -- so May of
6 2019 is when she became interim.  It was about a
7 month later she became non-interim in the -- in
8 the actual assistant in both offices.
9        From the time she became the actual
10 assistant in both offices in May of 2020, did you
11 have any concerns about her qualifications as
12 required by this job classification description?
13 And when I say this, I mean 2/9/18.
14 A.      No.
15 Q.      For that same time period, so roughly
16 June of 2019 to May of 2020, did you have any
17 questions or concerns regarding Jane Doe 4's job
18 performance as the dual assistant?
19 A.      No.
20 Q.      All right.
21        And during that same time, so June 2019
22 to May of 2020, did you have any -- did anyone
23 bring to your attention any questions or concerns
24 regarding Jane Doe 4's job performance in her dual

Page 201

1 assistant role position?
2 A.      No.  The only question that came up,
3 Ms. Smith, was the CP -- CPE license, whether she
4 had her CPE license.  But it was not really
5 related to the job function, that was a just
6 question that had come up.
7 Q.      Okay.
8        And if we look at 219, on the first page
9 there at the very bottom, it says under education
10 employment, must have or obtain within three years
11 of employment, the Certified Pennsylvania
12 Evaluators License, correct?
13 A.      Correct.
14 Q.      Okay.
15        So Jane Doe 4, I think we established,
16 became chief assistant -- well, strike that.
17        This CPE requirement is more related to
18 her role as an assistant or deputy chief assessor,
19 correct?
20 A.      Correct.
21 Q.      Okay.
22        And so she didn't become that -- didn't
23 take over that role until May of 2019, in the
24 interim position, correct?

Page 202

1 A.      Correct.
2 Q.      So if I've got my math correct, that
3 would be May of 2022, was when she would have had
4 to obtain that license by, correct?
5 A.      Correct.
6 Q.      Okay.
7        And Jane Doe 4 transferred out of
8 that -- well, in March of 2021, Jane Doe 4 was --
9 when the offices were restructured, Jane Doe 4
10 remained only assistant or deputy assessor and was
11 no longer assistant tax claim director, correct?
12 A.      Correct.
13 Q.      And a few months after March of 2021,
14 Jane Doe 4 transferred back into the position of
15 only tax assistant, tax claim director, correct?
16 A.      Correct.
17 Q.      So she was -- she no longer held the
18 position of assistant or deputy chief assessor
19 before May of 2022, correct?
20 A.      Correct.
21 Q.      So at no point did she fail to meet this
22 requirement of holding a CPE license within three
23 years, correct?
24 A.      That is correct.

Page 203

Q.    Okay.  Great.
      Did you ever hear Defendant Halcovage
make a comment about how Jane Doe 4 ate freeze
pops or popsicles?
A.    I did not.
Q.    Did anyone -- go ahead.  I'm sorry.
A.    And the only reason I know that is
because of the investigation.
Q.    Okay.
      What about the investigation gave you
that knowledge?
A.    It was written in there that there was
talk about freezie pops.
Q.    Okay.
      So just your reading of an
investigation --
A.    Correct.
Q.    -- report?
      Okay.
      Did you ever hear Defendant Halcovage
say, I like the way your mouth is around that, to
Jane Doe 4?
A.    I did not.
Q.    Did you ever hear the defendant refer to

Page 204

a freeze pop or a popsicle as a big one or big
ones?
A.    I did not.
Q.    Did you ever say -- hear Defendant
Halcovage say that he had Jane Doe 4 trained?
A.    I did not.
Q.    Do you recall an incident involving Jane
Doe 4 receiving or not receiving compensation for
working the election poles?
A.    Yes.
Q.    Okay.
      Do you remember what year that was?
A.    I do not.  It was -- it was prior to my
being an administrator is what I -- what I
remember.
Q.    Okay.
      And tell me what you remember about it.
A.    Non-union exempt employees were not
entitled a compensation, were not given
compensation for working election day.  That was a
decision that was made by the commissioners and
the administrator.  Jane Doe 4 had called me about
that and I told her that that was -- Mark
Scarbinsky asked me to call and I said that was

Page 205

the ruling.
      And she said she would work there anyway
because she enjoyed doing that and we left it at
that.  And then after the election, there was a
complaint made that -- that she wasn't
compensated.  And so the ruling from
Mr. Scarbinsky was that she was not going to be
compensated.
Q.    Who did the complaint come from?
A.    From Jane Doe 4.
Q.    Was it directly to you or did --
A.    No, I think it --
      MS. JONES:  Go ahead, Catherine,
try again.  Ask that question again.
BY MS. SMITH:
Q.    Well, did -- did Jane Doe 4 make the
complaint directly to you or did it come from
someone else?
A.    From someone else.
Q.    Who was the someone else?
A.    It was Glenn Roth.
Q.    Okay.
      And did Glenn Roth tell you that Jane
Doe 4 had raised a concern about not being paid

Page 206

for the election to him?
A.    Correct.
Q.    And then Glenn Roth brought it to you?
A.    Correct.
Q.    And did you discuss it with Defendant
Halcovage in any capacity?
A.    No.
Q.    Did you discuss it with Mark Scarbinsky
though?
A.    Yes.
Q.    And Mark Scarbinsky informed you to
inform either Mr. Roth or Jane Doe 4 that Jane Doe
4 would not be paid?
A.    Correct.
Q.    And is that what you did?
A.    Yes.
Q.    Do you know, did Mark Scarbinsky consult
with anyone prior to telling you that Jane Doe 4
would not be paid?
A.    I don't -- I don't know.
Q.    Okay.
      Did you ever observe Defendant Halcovage
request that Jane Doe 4 obtain campaign petition
signatures for him?

Deposition of Gary Bender Vol. I - Revised                    Jane Doe, et al. v. Schuylkill County Courthouse, et al.

Page 207

1  A.     No.
2  Q.     We've now looked at a number of job
3  classification descriptions for positions within
4  the county.  I know you testified that you might
5  have reviewed them and discussed them with Deb
6  Twigg, but do you recall -- were you did draft at
7  any point during your employment, a job
8  classification description, did you yourself draft
9  one?
10  A.     No.
11  Q.     So it would get drafted, as I understand
12  then, by HR and you would review it?
13  A.     Correct.  And we would have discussions,
14  whether it was Martina Chaswiak or Debra Twigg or
15  Heidi Zula, we would discuss what's in there and
16  then a final draft would be prepared and I would
17  approve it.
18  Q.     Okay.
19         Do you know at any point during your
20  employment, did you recommend changes to any
21  drafts for job description classifications?
22  A.     I do not.
23  Q.     I want to go back a little to talk about
24  Ms. Murray a little bit.  I know we -- we touched

Page 208

1  on her somewhat.
2         But Ms. Murray was the county's chief
3  assessor when you became county administrator.  I
4  think we established that, correct?
5  A.     That is correct.
6  Q.     I think we established Ms. Murray
7  retired in July of 2019, correct?
8  A.     Ginny Murray in 2000 -- I don't think
9  so.  Ginny Murray is a long-time employee there.
10  Q.     Well, Ms. Murray retired at some point,
11  correct?
12  A.     Oh, I'm sorry.  I'm sorry, Ms. Smith.  I
13  thought you said hired.  You're saying retired.
14  Q.     Retired.
15  A.     Sorry.
16  Q.     She retired around July of 2019, when
17  the offices -- right after they were combined,
18  correct?
19  A.     Yes.
20  Q.     She kind of transitioned Jane Doe 4 and
21  Jane Doe 3 into their roles and then she retired,
22  correct?
23  A.     Correct.
24  Q.     Okay.

Page 209

1         During her employment at the time you
2  were county administrator, did you have any issues
3  with her job performance?
4  A.     I did not.
5  Q.     Did you ever observe Defendant Halcovage
6  state that he was going to make Ms. Murray or
7  Ginny, cry?
8  A.     No.
9  Q.     Did you ever hear Defendant Halcovage
10  comment on Ms. Murray's sexual orientation or his
11  perception of her sexual orientation?
12  A.     No.
13  Q.     Did you ever hear Defendant Halcovage
14  refer to Ms. Murray as a lesbian?
15  A.     No.
16  Q.     Did you ever hear Defendant Halcovage
17  refer to Ms. Murray as a carpet muncher?
18  A.     No.
19  Q.     Did Ms. Murray ever bring any concerns
20  about Defendant Halcovage's comments or conduct to
21  you?
22  A.     No.
23  Q.     There is a county employee by the name
24  of Heather Mataskavage or --

Page 210

1  A.     Mataskavage, yes.
2  Q.     Did you ever hear Defendant Halcovage
3  state that she had a wild side in the past or
4  words to that effect?
5  A.     No.
6  Q.     There is -- I think she's now a former
7  employee -- but her name is Tiffany, it might have
8  been Keel, it's been Myer at some point.
9         Do you know who that individual is?
10  A.     I do.
11  Q.     Did you ever Defendant Halcovage mention
12  she had lived with a man before she was married?
13  A.     No.
14  Q.     Do you know who Kelly McAlonis is?
15  A.     I do.
16  Q.     She was a county employee at some point,
17  correct?
18  A.     Correct.
19  Q.     Did you ever hear rumors that Defendant
20  Halcovage had had sex with Ms. McAlonis?
21  A.     No.
22  Q.     Did Ms. McAlonis raise any sexual
23  harassment concerns with the county at any point
24  that you're aware of?

Case 3:21-cv-00477-MCC   Document 280-12   Filed 09/20/23   Page 261 of 373
Deposition of Gary Bender Vol. I - Revised
Jane Doe, et al. v. Schuylkill County Courthouse, et al.

Page 211

1 A.      No.
2 Q.      Do you know who Deni Sandusky is?
3 A.      Yes.
4 Q.      And Ms. Sandusky is a female county
5 employee or at least was a county employee,
6 correct?
7 A.      Deni is a current employee in the tax
8 claim office.
9 Q.      Okay.
10       Did you ever hear Defendant Halcovage
11 state that she's not the smartest tool in the shed
12 or words to that effect?
13 A.      No.
14       MS. JONES:  What's the -- what was
15 the first name?
16       THE WITNESS:  Deni.
17       MS. SMITH:  Deni, DE-N-I.
18       MS. JONES:  Thank you.
19 BY MS. SMITH
20 Q.      Did you ever hear Defendant Halcovage
21 make any negative comments about women?
22 A.      I don't recall him making any
23 disparaging remarks, no.
24 Q.      Did you ever hear Defendant Halcovage

Page 212

1 make any negative comment about any specific
2 woman?
3 A.      No.
4 Q.      Did you ever hear Defendant Halcovage
5 make any comment that you -- you believed was
6 inappropriate for the workplace that we have not
7 yet discussed?
8 A.      I don't recall any, no.
9 Q.      Did you ever observe Defendant Halcovage
10 engage in any conduct that we have not discussed
11 that you believe was inappropriate for the
12 workplace?
13       MS. JONES:  Object to the form.
14       You can answer.
15       THE WITNESS:  Yes.
16 BY MS. SMITH:
17 Q.      Okay.
18       Can you tell me about that?
19 A.      I can.
20       The -- during the COVID, we had gotten a
21 supply of rubber gloves and one of the secretaires
22 out at the front desk had snapped a rubber glove,
23 they were tight fighting gloves and we were happy
24 to get them.  And Commissioner Halcovage turned

Page 213

1 and bent over.  And so I went back to my office
2 and called him back and I said that -- that's
3 inappropriate.  That's -- and I went to the two
4 women, I asked them if either one of them were
5 upset by what just happened, they said they were
6 not, and I did report that to Debra Twigg.
7 Q.      Who were the two women that were
8 present?
9 A.      Linda Dietrich.
10 Q.      And who was -- you said two?
11 A.      And I don't -- I don't recall right now
12 the second one.  It could have been one of two
13 women, but I don't know.
14 Q.      So the notes from that investigation
15 mention a Mary Beth.  Does that refresh your
16 recollection?
17 A.      Then it would have been -- Mary Beth
18 Hepner worked in the office, yes.
19 Q.      I was trying to figure out who -- what
20 her last name was.  Thank you.  Hepner.
21       Do you know if Ms. Twigg ever discussed
22 your report about this incident with Defendant
23 Halcovage?
24 A.      I'm not aware of that, no.

Page 214

1 Q.      Did you ever ask her if she -- follow up
2 and ask her if she had?
3 A.      I did not.
4 Q.      When you told -- when you brought
5 Defendant Halcovage into your office and -- and
6 told him it was inappropriate, what was his
7 response?
8 A.      He didn't mean anything by it.
9 Q.      What did you think he meant by it?
10 A.      Well, you have a rubber glove on and you
11 bend over, it would be a doctor's examination.
12 That's the inference of that.  And I thought that
13 was inappropriate.  I didn't care for it myself
14 and I don't think the women did.  But they -- they
15 expressed no -- when I talked to them, they said
16 they weren't offended by it.  Maybe I'm just a
17 prude.  I don't think so, but maybe I am.
18 Q.      Well, you said you didn't think the
19 women appreciated it either.  Is that based off of
20 what you observed, how they reacted?
21 A.      No, just on my feeling.  If I was upset,
22 maybe I thought they were, but they were not.
23 Q.      Okay.
24       Did you ever discuss any of Defendant

Case 3:21-cv-00477-MCC    Document 280-1    Filed 09/20/23    Page 262 of 373
CONFIDENTIAL
Deposition of Gary Bender Vol. I - Revised                    Jane Doe, et al. v. Schuylkill County Courthouse, et al.

Page 215

1  Halcovage's comments or conduct, other than what
2  you've already testified about, any other comments
3  or conduct of his with Defendant Roth in any --
4  like that you had concerns about he acted or what
5  he said?
6        MS. JONES:  I object to the extent
7  it calls for any communications that were
8  privileged.
9        So you can answer it, if you can
10 answer it without giving any priveledged --
11 without divulging that, you can answer.
12       THE WITNESS:  My comments were
13 generally directed to HR Director Twigg.
14 BY MS. SMITH:
15 Q.     Okay.
16       Well, so -- just so the record is clear,
17 because generally means that there was times that
18 it wasn't were to the HR director.
19       So were there ever conversations you had
20 with Defendant Roth about Defendant Halcovage --
21 concerns regarding Defendant Halcovage's behavior?
22 A.     I don't recall because it wouldn't have
23 been in that capacity.
24 Q.     Okay.

Page 216

1        Do you remember ever having a
2  conversation or engaging in a conversation with
3  Defendant Roth, similar to that you had with Jane
4  Doe 3, that one of these days, Defendant --
5  Defendant Halcovage is going to say something to
6  the wrong person?
7  A.     You know, I'm going to have to say we
8  may have and it may have been after that incident.
9  Q.     After the rubber glove incident?
10 A.     No.  After the incident with Jane Doe 3,
11 the conversation in my office.
12 Q.     Okay.  Gotcha.  Thank you for that
13 clarification.
14       Other than what you testified to so far,
15 was there any other time you can recall discussing
16 your concerns with Defendant Halcovage's conduct
17 or behavior with HR, whether it be Ms. Twigg, Ms.
18 Zula, Ms. Chaswiak?
19 A.     No.
20 Q.     The -- the rubber glove incident where
21 Defendant Halcovage said bend over, did -- I know
22 you said I think it's kind of inappropriate, did
23 you fine it offensive?
24 A.     I wouldn't say offensive, no.  Just

Page 217

1  inappropriate in the workplace.
2  Q.     Right.
3        Did you ever discuss any of the conduct
4  or behavior of Defendant Halcovage with any of the
5  other commissioners, whether it be former
6  Commissioner Stottlemyer, Hess, or Hetherington?
7  A.     On that incident, no.
8  Q.     On any incident --
9  A.     No.
10 Q.     -- did you ever -- okay.
11 A.     Let's jump forward to -- to the May 1,
12 that complaint came through, yes, then I did.
13 Q.     Okay.
14       But prior to May of 2020 --
15 A.     No.  No.
16 Q.     Let me just get my question out.
17       Prior to May of 2020, you did not
18 discuss any of Defendant Halcovage's behavior or
19 comments with any other commissioner?
20 A.     No.
21 Q.     In Ms. Twigg's notes concerning her
22 investigation and discussions with you relate
23 thereto, there's a -- a mention of Ms. O'Connell
24 being asked by Defendant Halcovage if she could

Page 218

1  get him signatures on his election petitions.  Do
2  you recall telling Ms. Twigg about that?
3  A.     That occurred in my office, yes.
4  Q.     Do you remember what year that was?
5  A.     I'm thinking 2015, in that campaign.
6  Q.     And as I understand it from Ms. Twigg's
7  notes, and correct me if I'm wrong as to what
8  happened --
9  A.     Well, it --
10 Q.     Go ahead.
11 A.     I'm sorry.  It couldn't have been '15
12 because Debra Twigg wasn't there in 2015.  So --
13 so had to be the '19 campaign.
14 Q.     Well -- so I don't -- I don't want to
15 confuse you, not trying to -- but I do want to try
16 and get the dates right.  If reported by Debra
17 Twigg and it's about her conversation with you,
18 but let me just take a look at it.  And I can
19 maybe pull it up for you, too.
20       MS. SMITH:  Matt, if you can put
21 Exhibit 71, Page 16.
22       (Previously marked Exhibit-71.)
23 BY MS. SMITH
24 Q.     It's the second paragraph from the

Page 219

bottom there, Mr. Bender, once you have it in
front of you.
A.     Yes.  So then I stand corrected because
Twigg wasn't there in the '15 campaign, so it
would have been the 2019 campaign year.
Q.     Okay.
       So are you saying that you remember that
Ms. Twigg was employed at the time that this
request was made by Mr. Halcovage to
Ms. O'Connell?
A.     Yes.
Q.     Okay.  All right.
       So reading this paragraph, and correct
me if I'm wrong, as I understand, you and
Ms. O'Connell, who was a county employee at the
time, were in your county office, correct?
A.     Correct.  If you recall, Michelle worked
for me.
Q.     Right.  Okay.
A.     Okay.
Q.     I am just trying to make sure I
understand and I want the record to be clear.
       And while you and Ms. O'Connell were in
your office, Defendant Halcovage came in and

Page 220

joined the conversation, correct?
A.     Correct.
Q.     And during that conversation, did
Defendant Halcovage ask Ms. O'Connell if she could
get him a couple signatures on his petition,
correct?
A.     Correct.
Q.     Ms. O'Connell told him she didn't have
time and Defendant Halcovage then said, how about
just one or two, correct?
A.     Correct.
Q.     So Defendant Halcovage didn't take her
first no as an answer, correct?
A.     Correct.
Q.     Okay.
       Michelle O'Connell again said she just
doesn't have time.  And the's when you stepped in
and you said, that's okay, Michelle, we're done
here and you ended the conversation, correct?
A.     That is correct.
Q.     Did you end the conversation because you
understood, as this last sentence says, that
Defendant Halcovage's request was illegal?
A.     I ended the conversation because

Page 221

Michelle was uncomfortable and I wanted to speak
to George and she didn't have to be present when I
did that.
Q.     Okay.
       So then, as this states, Michelle left.
So you and George -- Defendant Halcovage remained
in your office, correct?
A.     Yes.
Q.     And you told George that his request was
illegal, correct?
A.     She didn't want to do it, he shouldn't
have asked her to do it.
Q.     Well, this last sentence in this report
on Page 15 of 71 says, Gary then told George that
his request was illegal.
A.     And -- and it is.
Q.     Did you --
A.     Yes, it is.
Q.     Okay.
       So did you tell George that his request
was illegal after Ms. O'Connell left your office?
A.     Yes.
Q.     Okay.
       Did you believe that George Halcovage's

Page 222

request of Ms. -- Ms. O'Connell was illegal?
A.     It is.
Q.     Okay.
       What did you think -- what was illegal
about it?  Was it illegal because Michelle was
uncomfortable?  Was it illegal because it was on
county premises during county time?  What was
illegal about it in your mind?
A.     In my mind, it was pressuring an
employee to get signatures, which she didn't want
to get.
Q.     Okay.
       And this was on county property while
Michelle was on -- you and Michelle were on county
time, correct?
A.     Yes.
Q.     Did you report this to any election
officials?
A.     I did not.
Q.     Did you report this to any law
enforcement?
A.     I did not.
Q.     So now I want to talk a little bit about
Ms. Twigg.

Page 223

1  Ms. Twigg became the HR director after
2  Martina Chaswiak left, correct?
3  A.    Correct.
4  Q.    Were you involved in Ms. Twigg's hiring
5  process?
6  A.    Yes.
7  Q.    Okay.
8      How did you come to be involved?
9  A.    We formed a committee, when we I mean
10 Lisa Mayhall, the county engineer, Glenn Roth, and
11 myself conducted interviews.  We interviewed two
12 people for that position and as result of that, we
13 made a recommendation to the board of
14 commissioners and -- which was not Deb Twigg and
15 they hired Debra Twigg.
16 Q.    Okay.
17     So I want to unpack that one a little
18 bit.
19     You interviewed two individuals for the
20 position of HR director.  How did you come to know
21 to interview Ms. Twigg?  Did she fill out an
22 application?  Did someone tell you to interview
23 her?  How did that transpire?
24 A.    I think Commissioner Halcovage gave me

Page 224

1  the application.
2  Q.    Okay.
3      And so you interviewed Ms. Twigg because
4  Commissioner Halcovage gave you her application.
5  Where did the second individual come from?
6  A.    That was just one of the applications
7  that got sent to HR.
8  Q.    There was a posting somewhere for the
9  job position and someone submitted an application?
10 A.    Yes.
11 Q.    Okay.
12     And you interviewed -- you and this
13 committee interviewed both of those candidates?
14 A.    Correct.
15 Q.    And the committee collectively decided
16 to recommend the other candidate, not Ms. Twigg,
17 to the commissioners, correct?
18 A.    Correct.
19 Q.    How was that recommendation made?  Was
20 it in the form of a PAR or some other manner?
21 A.    No.  I discussed our findings -- Lisa
22 Mayhall and I saw George and we said, here's our
23 recommendation and they preferred Debra Twigg.
24 Q.    So you and Ms. Mayhall went to Mr.

Page 225

1  Halcovage and said we recommend --
2  A.    Yes.
3  Q.    -- the other candidate.  And what was
4  Defendant Halcovage's response?
5  A.    He didn't chastise, he just said that
6  they're going to hire Debra Twigg.
7  Q.    Okay.
8      And so then did you do a PAR for Ms.
9  Twigg as a result of Defendant Halcovage's
10 response to you?
11 A.    Yes.  And we went to the other two --
12 they were aware of the applications that were
13 there and we just developed a PAR for Ms. Twigg.
14 Q.    Okay.
15     And then she -- her PAR gets put on the
16 agenda, it's voted on, and she's hired as HR
17 director?
18 A.    Correct.
19 Q.    Okay.
20     Who decided the salary that was to be
21 offered to Ms. Twigg?
22 A.    Lisa Mayhall, Glenn Roth, and me, we
23 were with HR, we looked at what the previous HR
24 director was making, we came up with a figure that

Page 226

1  we thought was comparable, and we made that offer
2  to her.
3  Q.    Okay.
4      Did Ms. Twigg negotiate and try and --
5  or did she try and/or get more money than was
6  originally offered?
7  A.    Ms. Twigg asked if that was the final
8  offer.  And I said for us, for this -- us meaning
9  the three members of the committee, it was, but
10 she had the option of going to the commissioners.
11 Q.    Okay.
12     Do you know if she did go to the
13 commissioners?
14 A.    She did not.
15 Q.    Okay.
16     So the offer that you had originally
17 made her, the salary offered you had originally
18 made her is what she started at?
19 A.    That's what she accepted, yes.
20 Q.    Okay.
21     And then Ms. Twigg resigned from the
22 county in September of 2020, correct?
23 A.    Correct.
24 Q.    Between January 8th of 2018, which I'll

Case 3:21-cv-00477-MCC   Document 280-12   Filed 09/20/23   Page 265 of 373
Deposition of Gary Bender Vol. I - Revised
Jane Doe, et al. v. Schuylkill County Courthouse, et al.

Page 227

1  represent to you is when Ms. Twigg's PAR effective
2  date was and September 2020, did you have any
3  issues or concerns regarding her job performance?
4  A.      No.  As a matter of fact I was quite
5  impressed.  I thought the weakness of Ms. Twigg
6  was union negotiations and not working in
7  government.  But she made me eat my words, she was
8  very good at union negotiations.  And, again, we
9  met just about every day and so I found her
10 competent, a little more sensitive perhaps, but
11 very competent.
12 Q.      Okay.
13        So would it be fair to say that you
14 thought Ms. Twigg was good at her job?
15 A.      Yes.
16 Q.      Was there anything that Ms. Twigg did
17 that you feel called her honesty into question?
18 A.      Honesty, no.
19 Q.      Between January -- let me just go with
20 between when Ms. Twigg started for the county and
21 when she resigned, did anyone bring any issues or
22 concerns about her job performance to your
23 attention?
24 A.      In her job performance, no.

Page 228

1  Q.      Any non-job performance issues ever
2  brought to your attention about Ms. Twigg?
3  A.      Only at the end, there was a negotiation
4  down at the children and youth services and I had
5  a complaint from Lisa Stevens that Ms. Twigg was
6  unprofessional in that negotiation and they were
7  upset by that and the employee was going to file a
8  complaint.
9  Q.      As a result of learning this, did you do
10 anything?
11 A.      Yes.
12 Q.      What did you do?
13 A.      I asked Glenn Roth to go down, sit with
14 the employee, and make that complaint go away.
15 Q.      What do you mean, make the complaint go
16 away?
17 A.      She withdrew her complaint.  She
18 didn't -- she didn't file a formal complaint.
19 Q.      Okay.
20        So basically you asked Glenn Roth to
21 smooth it over, for lack of a better word?
22 A.      I'll accept that, yes.
23 Q.      Okay.
24        I mean, if it's not, I'd like --

Page 229

1  A.      No, that --
2  Q.      Is that essentially what you were asking
3  him to do?
4        Is that essentially what you were asking
5  him to do, to try and alleviate any concerns that
6  the employee had, to address it before it got to a
7  formal complaint?
8  A.      Yes.
9  Q.      All right.
10        If we can put on screen, and, Mr.
11 Bender, if you flip in the binder to Exhibit-81.
12        (Previously marked Exhibit-81.)
13        MS. SMITH:  And just for the
14 record, while Mr. Bender is flipping, Jane Doe 2
15 has joined the call or the Zoom, whatever, however
16 we want to refer to it.
17        THE WITNESS:  Okay.  I'm there.
18 BY MS. SMITH:
19 Q.      All right.
20        This is the county's job classification
21 description for HR, human resources director,
22 correct?
23 A.      Correct.
24 Q.      If we flip to Page 2 of this document,

Page 230

1  it is dated -- sorry -- Page 3, I apologize, it's
2  three pages, it is dated November of 2017,
3  correct?
4  A.      Correct.
5  Q.      Any reason to believe it has been
6  revised or updated since then?
7  A.      No.
8  Q.      Is there anything in this job
9  classification description that you believe Ms.
10 Twigg was not qualified to perform?
11 A.      No.
12 Q.      Is there anything in this job
13 classification description that you believe Ms.
14 Twigg did not do during her employment?
15 A.      No.
16 Q.      All right.  I want to look at one that
17 was previously marked, but I don't think you have
18 it in your stack, but it's SC1162 and 1163.
19        Can you see that, Mr. Bender?
20 A.      I can.
21 Q.      There's a to and it includes your name,
22 correct?
23 A.      Yes.
24 Q.      And there's a from and it has Ms.

Page 231

1 Twigg's name, correct?
2 A.     Yes.
3 Q.     All right.
4        And there's a stamp there to the right,
5 it says received August 14, 2020, by human
6 resources.
7        Do you see that?
8 A.     I do.
9 Q.     Do you recall receiving this letter from
10 Ms. Twigg on or about August 14th of 2020?
11 A.     Yes.
12 Q.     All right.
13       Prior to receiving this letter, did you
14 know that Ms. Twigg planned to resign?
15 A.     No.
16 Q.     After receiving this letter, did you
17 speak with Ms. Twigg about her decision -- her
18 decision to resign?
19 A.     We were at one of our regular meetings
20 and she handed it to me and I just felt she was
21 doing it because of the incident with -- with the
22 person down in children and youth.  She thought I
23 overstepped her authority or I somehow diminished
24 her authority.  That was not my reason.  I thought

Page 232

1 it was kind of childish she was -- I just did.
2 Q.     What was childish?
3 A.     The resignation.  I didn't think she had
4 to do that.
5 Q.     Okay.
6        Did you tell her that you didn't think
7 she needed to resign?
8 A.     Yes.
9 Q.     And what was her response?
10 A.     She thought about it.
11 Q.     But she still chose to resign?
12 A.     She did.
13 Q.     All right.
14       In this letter, in the second paragraph,
15 the first one is just once sentence, the second
16 paragraph in the third line, it says over the past
17 ten months, I've dreaded --
18       MS. SMITH:  Did I mark this as an
19 exhibit?  Sorry.  I don't think I did, but I am
20 going to mark it as Exhibit-220, so the record is
21 clear.
22               - - -
23       (SC 1162-1163 marked as Exhibit-220 for
24 identification.)

Page 233

1               - - -
2 BY MS. SMITH:
3 Q.     So anyway, it says:  Over the past ten
4 months, I have dreaded coming to work almost every
5 day.
6        Do you see that?
7 A.     Okay.
8 Q.     Did you ask Ms. Twigg what had occurred
9 to make her feel this way?
10 A.     We didn't really discuss it.
11 Q.     All right.
12       In the same paragraph she writes,
13 because I have not wavered -- it's the last
14 sentence -- because I have not wavered in my
15 principles, philosophies, and/or beliefs, I have
16 suffered instances of undermining, intimidation,
17 and manipulation.
18       Do you see that?
19 A.     I do.
20 Q.     Did you ask Ms. Twigg what had occurred
21 to make her feel this way?
22 A.     I did not.
23 Q.     All right.
24       So now I want to focus on May of 2020.

Page 234

1 At some point, you -- did you come to learn that
2 there were allegations being made regarding sexual
3 harassment and/or misconduct on the -- on the part
4 of Defendant Halcovage?
5 A.     Yes.
6 Q.     Do you recall when you first learned and
7 from whom about these allegations?
8 A.     Sometime between 8:20 and 8:30, I think
9 it was Friday, May the -- I think the 20th, but
10 could have been the 22nd, I'm confused on that.
11 But, yes, Debra Twigg stopped over to my office
12 and she needed to see me and she said there was
13 some serious allegations, that Jane Doe 3 met her
14 at the door that day in her office and indicated
15 that Jane Doe 1 had claimed that there was a
16 sexual relationship with Commissioner Halcovage
17 and it had been ongoing.  And that was the -- she
18 was going to meet with -- with Jane Doe 3 a little
19 bit further, but she wanted me to know that.
20 Q.     Okay.
21       What was your response to Ms. Twigg?
22 A.     My response is, we've got to get a team
23 together and do an investigation.  And -- and my
24 keyword was by the book.  This was now a sitting

Page 235

1  commissioner and didn't know if we were the right
2  ones to do it because of -- of being there, but we
3  were going to do it and it had to be by the book.
4  Whatever happens, happens.
5  Q.      Okay.
6        So did you compile a team, as you called
7  it, it investigate?
8  A.      Yes.  Initially the first day it was
9  there, it was Debra and I interviewed Jane Doe 2.
10 And then when Glenn came into the office, then
11 Glenn was -- so it was Glenn and Debra did the
12 rest of the investigations, I did not.  But we
13 reviewed them every day, any interviews that --
14 then they were reviewed, the three of us reviewed
15 them.
16 Q.      All right.
17        So let's focus on that first day, that
18 Friday that Ms. Twigg came to your office.  So she
19 comes to your office, she tells you about the
20 allegations.  You say we've got to do this by the
21 book?
22 A.      Right.
23 Q.      Do you know at that point, had Ms. Twigg
24 taken any notes or conducted any interviews at

Page 236

1  that point?
2  A.      No, not at the point.
3  Q.      Okay.
4        But she told you that she was then going
5  to speak with Jane Doe 3 and Jane Doe 4 further?
6  A.      Yes.
7  Q.      All right.
8        And she then -- it's your understanding
9  she then in fact did speak with Jane Doe 3 and
10 Jane Doe 4 further?
11 A.      Correct.
12 Q.      Were you in that initial, I will call I
13 interview, of Jane Doe 4 and/or Jane Doe 3?
14 A.      I was not.
15 Q.      All right.
16        After Ms. Twigg speaks with them, does
17 she then come back and speak with you?
18 A.      Yes.
19 Q.      And was that that same Friday or was
20 that a different day?
21 A.      Same Friday.
22 Q.      Later in -- later in the day, I imagine?
23 A.      Correct.
24 Q.      And what, if anything, does Ms. Twigg

Page 237

1  tell you at that point?
2  A.      Just that we were going to -- she
3  started to set up some interviews.  But -- well,
4  can we back up a little bit.  There's a lot more
5  that happened in between that morning and -- and
6  the second meeting.
7  Q.      Okay.
8  A.      Because I had taken -- I had gone over
9  then and informed Commissioner Hess.  Commissioner
10 Halcovage came into the building and Glenn Roth
11 was there.  And then Glenn and I told George
12 there was some very serious allegations made
13 against him of sexual misconduct and we were going
14 to do an investigation.
15        I called Commissioner Hetherington on
16 the phone, he wasn't in that day, told him that I
17 would have to visit his house on Saturday.  I
18 couldn't talk to him over to phone.  And then I
19 went up to the president judge and I told George,
20 we would have to interview him that afternoon.
21        So then when Debra came back over, then
22 she had set up the interviews -- when Debra came
23 back over, we had set up the interview with Jane
24 Doe 2 for the afternoon.  We were going to

Page 238

1  interview George that afternoon as well.  George
2  called later to say he was going to Philadelphia.
3  Q.      Okay.
4        So when you received the information
5  from Ms. Twigg and she went back to do some work
6  and you went and did this other stuff, at any
7  point on that Friday did you ask Commissioner
8  Halcovage to -- did you ask him or instruct him to
9  not come to the courthouse pending further
10 investigation?
11 A.      I did not.
12 Q.      Was that, on that Friday, the idea that
13 Commissioner Halcovage should refrain from coming
14 to the courthouse until further investigation, was
15 that discussed with you and anyone else?
16 A.      It was not.
17 Q.      All right.
18        So then you speak with, you said,
19 Commissioner Hess.  You left a message for
20 Commissioner Hetherington.  You spoke with the
21 president judge Defendant Halcovage.  And you said
22 Defendant Halcovage said he was going -- he was
23 supposed to be interviewed, but then he said he
24 was going to Philadelphia?

Case 3:21-cv-00477-MCC   Document 280-2   Filed 09/20/23   Page 268 of 373

Deposition of Gary Bender Vol. I - Revised                    Jane Doe, et al. v. Schuylkill County Courthouse, et al.

Page 239

A.    Yes.  He called later and said he was on his way to Philadelphia, that's where his wife was.

Q.    Okay.

Did you tell him that you -- that this was an important matter and he needed to come be interviewed?

A.    I told him we are going to have to interview him at some point, so it would have to be Monday then, so...

Q.    Did you find it odd or concerning that he wouldn't want to be interviewed that same day?

A.    Not really.  Ms. Smith, if it were me, I would go see my wife.

Q.    Okay.

You indicted that when you spoke with Ms. Twigg initially about conducting an investigation, there was, I guess, maybe some concern you had about if you guys were the right ones to conduct the investigation; is that what I understand?

A.    That was a concern.

Q.    Why was that your concern?

A.    Because I was the county administrator,

Page 240

Glenn was the county solicitor, Debra was the human resources director, and he was a commissioner.  We all work for him.  That might have the appearance that we wouldn't do our job.  I was confident I could do my job.  I was confident Ms. Twigg could do her job.

Q.    Okay.

A.    And I was confident Glenn Roth could do his.

Q.    Okay.

So you were concerned of an appearance of impropriety?

A.    Yes.

Q.    All right.

And that was because you were supervised by Commissioner Halcovage, correct?

A.    Correct.

Q.    Then later that Friday you, in fact, did, along with Jane Doe 3, Jane Doe 4, and Ms. Twigg, interview Jane Doe 2, correct?

A.    Correct.

Q.    And that was in the courthouse, correct?

A.    Correct.

Q.    It was in the Hoffmann room right?

Page 241

A.    Correct.

Q.    It was in the Hoffman Room, right?

A.    Correct.

Q.    All right.

Whose request was it that Ms. -- or whose decision or request was it that Jane Doe 3 and Jane Doe 4 be present?

A.    I would imagine -- I don't know.  I should say I don't know.  I don't want to image.  I don't know.

Q.    Okay.

So it wasn't your suggestion or request?

A.    It was not.

Q.    All right.

Can you walk me through what happened during that meeting or interview?

A.    Give it a shot.

Q.    What do you -- what do you recall from it?

A.    Yeah.  I just went in, my first question was -- was, in deed, Commissioner Halcovage and Jane Doe 1 having an affair and she said it was.  And can you tell me how long the affair's been going on and she said six years.  And I was absolutely flabbergasted.  And then --

Q.    I don't mean to interrupt you, but I'm going to stop you there for second.

A.    Okay.

Q.    When Jane Doe 2 told you that it was, in fact, true that Mr. Halcovage and Jane Doe 1 were having an affair and it had been going on for six years, did you have any reason at that point to disbelieve Jane Doe 2?

A.    I found it unbelievable, yes.

Q.    Did she come across as telling the truth though?  Was her body language, in --

A.    Yes.

Q.    Was her body language, in your opinion, one of someone telling the truth?

A.    Yes.

Q.    Okay.

So it was shocking news, but you did believe Jane Doe 2; is that fair?

A.    That is fair.

Q.    So it was you, in fact, I think you just testified, that asked those questions, correct?

A.    Yes.

Q.    Did you continue to ask questions or

Page 243

1 then did someone else take over the questioning?
2 A.    Debra Twigg took over.
3 Q.    All right.
4     Do you recall what was questioned or
5 what was discussed?
6 A.    I would have to read the notes anymore.
7 It's -- it's been a while.  It's -- a couple of
8 things I found out that were disturbing to me is
9 how she felt about my e-mail because it was meant
10 as nothing.  She also -- I also found out that
11 during unemployment, she was unable to draw
12 unemployment and I felt bad about that because
13 she -- she -- as a field appraiser, she certainly
14 could have easily worked from home or had made
15 some accommodations.  I wasn't -- I didn't realize
16 she couldn't draw unemployment, so it was kind of
17 hard.
18     So -- but I did -- you know, we were
19 friendly, we weren't social friends, but we were
20 friendly.  She's a young woman, so I did feel bad
21 about that?
22     But after the initial statement, I was
23 kind of in a -- in a fog.
24 Q.    All right.

Page 244

1     How long, if you recall about, did the
2 interview or discussion last?
3 A.    I don't recall.
4 Q.    Was it over an hour?
5 A.    Probably not.
6 Q.    Okay.
7     So give or take, roughly an hour-ish?
8 A.    Yes.
9 Q.    Okay.
10     During the interview, what was Jane Doe
11 2's demeanor?
12 A.    She was crying quite a bit.
13 Q.    During the meeting, did you have any
14 reason to disbelieve anything that Jane Doe 2 said
15 to you -- said during the meeting?
16 A.    I did not.
17 Q.    Did you apologize --
18     MS. JONES:  Can I -- can I
19 interrupt for a second.  Did I --
20     MS. SMITH:  Of course.
21     MS. JONES:  Did I misunderstand?  I
22 thought your first questions were about Jane Doe 1
23 and now you're asking about Jane Doe 2.  Did I
24 miss that transition?

Page 245

1     MS. SMITH:  So I asked him about
2 Jane Doe 2's interview he said he asked Jane Doe 2
3 if Jane Doe 1 and Mr. Halcovage were having an
4 affair and Jane Doe 2 confirmed it.
5 BY MS. SMITH:
6 Q.    Is that what I understand your testimony
7 just was, Mr. Bender?
8 A.    That's how I understand your question,
9 yes.
10     MS. JONES:  Okay.  Thank you.
11 Thank you.
12     I thought you said the first part was
13 when she -- he asked her, Jane Doe 1.  I wanted to
14 be clear on that.  Thank you.
15 BY MS. SMITH:
16 Q.    All right.
17     If I said Jane Doe 1 -- so right now,
18 Mr. Bender, let's just clear up the record.  I am
19 asking you about your interview with Jane Doe 3
20 Jane Doe 4 and Ms. Twigg of Jane Doe 2.
21     Am I correct in understanding that the
22 first question during Jane Doe 2's interview, to
23 Jane Doe 2 by you, was about Jane Doe 1 and
24 Defendant Halcovage's affair?

Page 246

1 A.    Correct.
2 Q.    And Jane Doe 2 confirmed that Mr. --
3 Jane Doe 1 and Mr. Halcovage's was, in fact, true
4 and had been occurring for six years?
5 A.    Correct.
6     MS. JONES:  Thank you.
7 BY MS. SMITH:
8 Q.    Okay.  All right.
9     At some point during the -- this -- I'm
10 going to call it an interview, just for lack of
11 better wording.
12     During this interview of Jane Doe 2, did
13 you say, I'm sorry or apologize to her?
14 A.    Not in the context perhaps that you
15 mean.  What that related to was she was upset
16 because of my e-mail about her shredded jeans and
17 she said that when George talked to her about, he
18 said, see, you thought Gary Bender was your friend
19 and look what he did.  And so I apologized for
20 that remark.  The remark was simply, you can't
21 wear that kind of clothing in the court.  It meant
22 nothing more than that and it was a -- just a very
23 simple e-mail.  It was no -- it was no written
24 warning.  It was no verbal warning.  It was just a

Page 247

1 simple e-mail concerning that.  So I said if he
2 said that, I apologize that he said that, it was
3 not my intent.
4 Q.     At any point during this interview with
5 Jane Doe 2, did anyone ask her what could be done
6 to ensure that she felt safe and comfortable in
7 her working environment?
8 A.     We did not, Ms. Smith.  But, you know, I
9 guess you have to give us a break, it was -- it
10 was the initial investigation and we were just
11 trying to focus on what happened at the time.  If
12 we were wrong on not asking that, okay, but we
13 didn't discuss that at that point in time.
14 Q.     Okay.
15       Was -- so let me ask this:  Does the
16 county have an employee assistance program, an EAP
17 program?
18 A.     We do.
19 Q.     Was that discussed during this meeting?
20 A.     Not at this meeting, no.
21 Q.     During this meeting though, would it be
22 fair to say that Jane Doe 1 -- Jane Doe 2, I'm
23 sorry, Jane Doe 2 raised concerns about Defendant
24 Halcovage's behavior related to her specifically?

Page 248

1 A.     Not in the sense, Ms. Smith, of any fear
2 of Mr. Halcovage.  It was more of an irritation.
3 If you would think of children in high school that
4 somebody has to make things right and it -- so not
5 of any fear, no.  It was just an -- an irritation
6 how things went.  She was always the in-between
7 person.
8 Q.     Did she indicate during the meeting
9 that -- or interview that she felt George or
10 Defendant Halcovage manipulated situations?
11 A.     Yes.
12 Q.     And did she indicate during the
13 interview that she was fearful that Defendant
14 Halcovage would manipulate a -- something -- a
15 situation that would effect her employment?
16 A.     Going forward?
17 Q.     Yes.
18 A.     No.
19 Q.     That she had that fear?
20 A.     No.
21 Q.     Did Jane Doe 2 during the interview,
22 inform you that -- inform the people in the
23 interview that George had -- Defendant Halcovage
24 had been calling her since her furlough, telling

Page 249

1 her that the offices are running at 75 percent,
2 and there's going to be layoffs and she took it
3 that he was implying that she would lose her job?
4 A.     I don't recall that being said, no.
5 Q.     Any -- if it's in Ms. Twigg's notes, is
6 there any reason to believe that that's not what
7 was said?
8 A.     I would have no reason -- what I meant,
9 I don't recall that being said.
10 Q.     Okay.
11       And, again, I'm just trying to clarify.
12 A.     Okay.
13 Q.     So -- so if I ask you a question,
14 it's -- I'm not trying to trip you up, I am just
15 trying to make sure the record is clear.
16       So let me ask this:  After -- so Ms.
17 Twigg at some point prepared a report, well, she
18 prepared a couple different items.  The one we
19 looked at, I think you may still have it in front
20 of you, it's Exhibit-71, it's the one we looked at
21 with some notes about her meeting with you and
22 Michelle O'Connell.
23       MS. JONES:  Got it.
24

Page 250

1 BY MS. SMITH:
2 Q.     Do you have it there in front of you?
3 A.     I do.
4 Q.     This is just a synopsis of her -- her
5 investigation and the interviews during the
6 investigation, correct?
7 A.     Correct.
8 Q.     At some point after this was drafted,
9 did you review it?
10 A.     Yes.
11 Q.     Okay.
12       And then she -- Ms. Twigg also issued a
13 final report.  And I think -- I don't think it's
14 been marked, but -- oh, wait.  It has been.  It
15 should be Exhibit-29.
16       THE TECHNICIAN:  Excuse me,
17 Counsel.  I don't have that one in my previously
18 marked.  I only have 34 up through --
19       MR. TOWNSEND:  It's also 68.
20       MS. SMITH:  Okay.
21       So I just put it -- are you guys
22 able to see my screen?
23       MR. TOWNSEND:  Yeah.  But if you
24 turn to 68 in the binder, I think that's what she

Case 3:21-cv-00477-MCC   Document 280-12   Filed 09/20/23   Page 271 of 373
Deposition of Gary Bender Vol. I - Revised
Jane Doe, et al. v. Schuylkill County Courthouse, et al.

Page 251

1  --
2         MS. JONES:  Off the record.
3              - - -
4      (Whereupon, discussions were held off
5  the record.)
6              - - -
7      (Previously marked Exhibit-68.)
8  BY MS. SMITH:
9  Q.     So this is a final -- Mr. Bender, this
10 one on the screen, Exhibit-68, is a final report
11 that Ms. Twigg issued after the conclusion of her
12 investigation, correct?
13 A.     Correct.
14 Q.     Okay.
15     So I want to just go back to 71 for a
16 moment.  As it relates to 71, did you review this
17 after it was drafted on -- I'm sorry if you
18 answered this question?
19 A.     I did.
20 Q.     Okay.
21     And was everything in it accurate that
22 you could tell or what you knew to be accurate?
23         MS. JONES:  Object to the form.
24     You can answer.

Page 252

1         THE WITNESS:  There were a couple
2  of changes that I suggested.  No. 1 is that Jane
3  Doe 2 asked that I be present, I didn't ask to be
4  present, Jane Doe 2 asked that I be present at
5  meeting.  And also is this apology that you
6  mentioned.  I didn't apologize for -- for sending
7  the e-mail.  What I apologized for is Mr.
8  Halcovage's interpretation.  So I just wanted that
9  clarified.
10     They may seem like moot points,
11 Ms. Smith, but it's something I wanted to clarify.
12 Q.     Yeah.  No, and I appreciate that.  I'm
13 asking you to just tell the truth, so that -- if
14 that's your truth, then that's what I'm asking you
15 to testify to.
16     But everything else as you knew, was
17 accurate in this?
18 A.     Yes.
19 Q.     This document, I don't -- investigation
20 notes, we'll call it, this investigation note
21 document?
22         MS. JONES:  Object to the form.
23     You can answer.
24         THE WITNESS:  I would agree, yes.

Page 253

1  BY MS. SMITH:
2  Q.     Okay.
3     At any point after this -- so we looked
4  to -- this doesn't have page numbers, I apologize.
5  One, two, three, four, five, it should be the
6  sixth page.  It's the one that -- at the top says
7  meeting with Jane Doe 2, Gary Bender, Jane Doe 3.
8  A.     What page number was that, Ms. Smith?
9  Q.     There's no pages numbers, but it's the
10 sixth page.
11 A.     Okay.  Okay.
12 Q.     Okay.
13     So this says at approximately 1:30 p.m.
14 Friday, May 22, 2020, Jane Doe 2 came into the
15 office and we met in the Hoffmann Room.  So it
16 was -- I think you weren't sure about the date
17 earlier, but Friday, May 22nd, when you interview
18 Jane Doe 2 or when this meeting happened, this
19 interview happened, that was the same day that you
20 had learned of the allegations generally, correct?
21 A.     That is correct.  And you can see it was
22 at 1:30 and we learned in the morning on Friday,
23 so same day.
24 Q.     Okay.

Page 254

1     Learned it pretty shortly after you came
2  into work that day, Friday, May 22nd?
3  A.     Yes.
4  Q.     And then between then and 1:30 is when
5  you spoke with the other commissioner -- well, you
6  spoke with Hess, left Hetherington a message,
7  spoke with Halcovage, and the president judge,
8  correct?
9  A.     Correct.
10 Q.     Okay.
11     At any point after Friday, May 22, 2020,
12 did you have any -- any conversation with Jane Doe
13 2?
14 A.     No.
15 Q.     Okay?
16         MS. JONES:  Just to be clear, did
17 you mean ever or did you mean --
18         MS. SMITH:  Ever.
19         MS. JONES:  Okay.  Is that how you
20 answered it?
21         THE WITNESS:  Yes.  I haven't
22 spoken to Jane Doe 2 since this date.
23         MS. JONES:  Okay.  Thank you.
24 Thank you.

Page 255

BY MS. SMITH:

Q.     After the meeting or interview with Jane Doe 2, what, if anything, did you do next?

A.     Well, we found out that Commissioner Halcovage was not going to be there for the afternoon meeting and then Debra and Glenn, Ms. Twigg and Glenn were to set up future interviews.

Q.     All right.

        If you turn two pages later, it's the one with some handwriting on it and circles.

A.     Okay.

Q.     Okay.

        Down the bottom there it starts a bolded portion.  It says, on Friday, May 22, 2020, Commissioner Halcovage hand delivered a copy of the letter he received concerning an alleged sexual harassment claim to first assistant Solicitor/risk manager Glenn Roth.

        So Commissioner Halcovage was in the courthouse at some point on Friday, May 22, 2020, correct?

A.     That is correct because I mentioned that to you that I did speak to him.

Q.     And that was in person that you spoke

Page 256

with him?

A.     Yes.

Q.     All right.

        Did you ever see a copy of that letter?

A.     I don't recall that I did.

        MS. SMITH:  All right.  I am going to ask that we put -- am I sharing my screen or..?

        THE TECHNICIAN:  No.  I am sharing my screen, Counsel.

        MS. SMITH:  Okay.  I couldn't tell.  Thanks, Matt.

        If we can put 55 on the screen.

BY MS. SMITH

Q.     And, Mr. Bender, if you can flip to 55.

        All right.  We can actually scroll to the second page of this.

        Do you recognize this letter, Mr. Bender?

A.     I do.

Q.     Okay.

        Have you -- so you've seen this before, correct?

A.     I do.  This is the preservation letter they called it, correct?

Page 257

Q.     That is what, yes, sometimes it's referred to as.

        Do you remember when you saw this letter?

A.     I do not.

Q.     Do you know if it was -- so it's dated May 29th of 2020.  Do you know if it was roughly around that time?

A.     I would think so.  I think Glenn would have brought it over to me.

Q.     Okay.

        As a result of seeing this letter -- well, let me strike that.

        Did you read the letter?

A.     Yes.

Q.     And as a result or after you read the letter, what, if anything, did you do?

A.     Well, we sent an e-mail to the MIS director that records had -- we all were aware that records had to be preserved.  We couldn't delete anything.  The commissioners all knew that.

Q.     Did you at any point after reading this letter, take any steps to retrieve from Defendant Halcovage, any county-issued electronic devices?

Page 258

A.     No.  We didn't seize them.

Q.     Okay.

        Did you take any steps to ensure that the contents of those devices was copied?

A.     Outside of e-mail preservation, I'm not aware of that.

Q.     Well, what do you mean by e-mail preservation?

A.     Well, Stanley Nester, our MIS director would make sure that all e-mails were preserved.

Q.     Okay.

        But so only e-mails, correct?

A.     Correct.

Q.     So any other file or document on a county-issued electronic device, was there any affirmative steps by you to ensure that those items were preserved?

A.     I'm not sure at what time that was done, but I know copies of the -- of the hard drive were made.

Q.     Does that include a hard drive of Defendant Halcovage's county-issued iPad?

A.     No.  I think just photos and files were taken from there.

Page 259

1 Q.      From the iPad?
2 A.      Correct.
3 Q.      Okay.
4        By the MIS department?
5 A.      Correct.
6 Q.      And I'm going -- I believe it's a
7 response to a previous discovery request, request
8 of any contents Defendant Halcovage's computer or
9 county-issued electronic devices be produced.
10        All right.
11        So any -- on Friday the 22nd, other than
12 what we've already discussed, was any -- did you
13 do anything else related to the investigation of
14 the complaints that had been raised up until that
15 point?
16 A.      Yes.  In the afternoon we sat around
17 and -- and talked about what steps we could take.
18 And we talked about moving the parking places of
19 Jane Doe 3 and -- and Jane Doe 4.  Not so much of
20 a fear that George would do anything, but we just
21 felt it would be uncomfortable for them, so we
22 were going to take steps to do that.
23        We did talk then about restricting
24 George's access, Glenn reminded we had no

Page 260

1 authority to do that.  So we -- we looked at that
2 initially and -- and laid out what -- who was
3 going to do the rest of the investigations and
4 when they were going to be conducted.
5        A follow up to that on Monday when
6 George came back to the office, then we did -- I
7 did ask Commissioner Halcovage if he would
8 restrict his access to the courthouse from 8:00 to
9 5:00 and that he not go into the courthouse
10 unescorted, he agreed to that.  Didn't have the
11 authority to back that up, but he agreed to it.
12 Q.      Okay.  All right.  I want to unpack that
13 one a little bit.
14        So you said on Friday at some point, I
15 believe it was after Jane Doe 2's interview, you
16 said we sat down, I think was the phrase you used.
17 Was that you, Ms. Twigg, and who else?
18 A.      The three were Ms. Twigg, Glenn Roth,
19 and myself.  And Ms. Twigg and Glenn Roth did the
20 rest of the investigation.
21 Q.      Okay.
22        I just want to talk about this Friday,
23 May 22nd, I am going to call it a meeting between
24 the three of you.

Page 261

1 A.      Yes.
2 Q.      During that meeting, it's your testimony
3 that there was discussions related --
4        MS. SMITH:  Matt, you can take the
5 exhibit down.  Thank you so much.  I apologize.
6 BY MS. SMITH:
7 Q.      There were conversations about Jane Doe
8 4 and Jane Doe 3's parking spot locations,
9 correct?
10 A.      Correct.
11 Q.      Who brought that up?
12        MS. JONES:  I just want to object
13 and instruct the witness not to divulge
14 information to the extent it's attorney-client
15 communication.  I will allow him to answer because
16 the questions have been posed relative to
17 investigative functions.  So I am just giving him
18 that instruction, but he can answer.
19 BY MS. SMITH:
20 Q.      So who bought up the -- Jane Doe 3 and
21 Jane Doe 4's parking locations?
22 A.      Well, Debra and I did.  We thought it
23 was a goo idea to move them out of their -- again,
24 no one was concerned about -- a fear that he would

Page 262

1 harm them in any way, but I didn't want -- we
2 didn't want them having a conversation,
3 interaction would take place, so we felt it best
4 to move them.  And so I went after finding a spot
5 to move them.
6 Q.      At the time, so Friday, May 22nd, they
7 were parking in the lower lot where Defendant
8 Halcovage also parked, correct?
9 A.      Correct.
10 Q.      Do you know had -- at the time that this
11 conversation between you and Ms. Twigg and
12 Defendant Roth was occurring, do you know, had
13 Jane Doe 3 or Jane Doe 4 requested that their
14 parking assignments be moved?
15 A.      They did not.
16 Q.      Okay.
17        Why did you make the decision that they
18 should be moved as opposed to moving Defendant
19 Halcovage's parking spot?
20 A.      I don't have the authority, Ms. Smith,
21 to move George's spot around.  George is a sitting
22 commissioner and Glenn was quite adamant that we
23 couldn't move him around.  I know.
24 Q.      Did Defendant Roth object to moving Jane

Page 263

1  Doe 3 and Jane Doe 4's parking spot?
2  A.      You know, that came out, but that's --
3  that's not quite true.  He just asked, do we think
4  it's necessary and we did.  We did think it was
5  necessary.  I don't -- I wouldn't classify that he
6  objected to it, he said do we think it's necessary
7  and we did think it was necessary.  And Glenn
8  agreed with that.
9  Q.      Did you tell Jane Doe 4 that you thought
10  the least that you could do is give her and Jane
11  Doe 3 a different parking place, unlike Glenn
12  Roth, who doesn't feel the same?
13  A.      I did not say that.  I know that's come
14  out, that -- that is not true, Ms. Smith.  What is
15  true and Jane Doe 4 said, which I agree with,
16  she's not afraid of George Halcovage, but she just
17  didn't want to put herself in a situation where he
18  would have a conversation with her.
19  Q.      Okay.
20       During this meeting of you, Ms. Twigg,
21  and Mr. Roth on that Friday afternoon, you also
22  discussed moving forward, who else would need to
23  be interviewed and that Ms. Twigg and Mr. Roth
24  would handle those interviews; is that correct?

Page 264

1  A.      That is correct.
2  Q.      Okay.
3       And I'm sorry, I don't recall if you
4  said this or not, during that Friday, May 22,
5  2020, afternoon meeting, was Defendant Halcovage's
6  access or freedom of movement within the
7  courthouse discussed?
8  A.      Yes.
9  Q.      Okay.
10       Now after I asked that question, I am
11  recalling that you did say that.
12       It was discussed and Glenn Roth advised
13  that you guys did not have the authority to do
14  that, correct?
15       MS. JONES:  Object to the form and
16  I object to the extent your -- the
17  characterization of advice.  But I am also
18  instructing you not answer if it's in the context
19  of attorney client, but you may answer otherwise.
20       MS. SMITH:  I think he testified
21  about it earlier.
22  BY MS. SMITH:
23  Q.      So I am just trying to clarify that
24  that's what your testimony earlier was, correct?

Page 265

1       MS. JONES:  I am objecting to the
2  form of that because I don't think I agree with
3  your characterization.  But I wanted to preserve
4  the other issue.
5       He can answer based on my
6  objections.
7  BY MS. SMITH:
8  Q.      Well, what did you testify to earlier?
9  Let me ask you it this way, Mr. Bender:  What did
10  you testify to earlier that Defendant Roth said
11  about restricting Defendant Halcovage's access to
12  the courthouse?
13  A.      None of us felt that we had the
14  authority to restrict George on our own.  It had
15  to be his own say so and so that's why I
16  approached him.  And he was agreeable to that.
17  And -- but I don't think we -- we don't have the
18  authority to have George locked out of the
19  courthouse.
20  Q.      Okay.
21       At this time, February -- I'm sorry --
22  May 22, 2020, Jane Doe 3 and Jane Doe 4 were --
23  actually at no point were they ever furloughed,
24  correct?

Page 266

1  A.      Correct.
2  Q.      And so they were still working
3  physically in the county's courthouse, correct?
4  A.      Correct.
5  Q.      All right.
6       And so can you tell me exactly what
7  requests you made to Defendant Halcovage on that
8  Monday, May 25, 2020, regarding his access and
9  movement in the courthouse?
10  A.      Okay.  Let -- let me just back up before
11  I answer that, Ms. Smith, if you would allow me to
12  do that.  Jane Doe 4 and Jane Doe 3, at this point
13  in time on Friday, made no allegations against
14  George at this point in time that I was aware of.
15  So let's -- so it wasn't -- again, moving the
16  spots was more for I didn't want an interaction
17  with them.
18       So repeat your question, I'll give
19  you -- I'll give you the answer.  As I was
20  speaking I forgot what it was.
21  Q.      Okay.
22       So let me -- I'm going to ask a
23  different question based off of what you just
24  shared with us.

Page 267

1  A.     Okay.
2  Q.     So the conversation in the afternoon
3  with Ms. Twigg and Mr. Roth, that occurred after
4  Ms. Twigg had already spoken with and interviewed
5  Jane Doe 3 and Jane Doe 4, correct?
6  A.     Well, that I am not sure of.  It was
7  after the interview with Jane Doe 2.
8  Q.     Well, I thought you said earlier that
9  after Ms. Twigg came to your office first --
10 pretty much first thing in the morning, she then
11 went -- went and spoke with Jane Doe 3 and Jane
12 Doe 4 while you went and reached out to the
13 commissioners and the president judge, correct?
14 A.     Correct.  And they got a hold of Jane
15 Doe 2 for an interview in the afternoon.
16 Q.     Okay.
17        Did you prior to this afternoon meeting
18 with you, Ms. Twigg, and Mr. Roth, did you ask Ms.
19 Twigg what, if anything, she learned from Jane Doe
20 3 or Jane Doe 4?
21 A.     I did not.
22 Q.     Okay.
23        When did you learn about -- well, so
24 then I guess my question is:  If you didn't know

Page 268

1  about any allegations by Jane Doe 3 or Jane Doe 4,
2  why did you suggest moving their parking spaces?
3  A.     Because Jane Doe 2 and Jane Doe 1 work
4  for them and I didn't want any discussions to take
5  place.  I just felt they would be more
6  comfortable.
7  Q.     Okay.
8        When did you learn that Jane Doe 3 or
9  Jane Doe 4 had made allegations against Defendant
10 Halcovage?
11 A.     You know, I can't recall that.  I know
12 when the complaint came out, they were in there,
13 but until that time, it was -- it was listening
14 to -- to Jane Doe 2, I knew what her complaint was
15 and I certainly knew Jane Doe 1's.  I was not
16 aware that there was a bigger complaint with Jane
17 Doe 3 and Jane Doe 4.
18 Q.     Okay.
19        So if we look back at, I think it was
20 68, the other report by Ms. Twigg, I am going
21 to -- you can pull it up or I can tell you, it
22 says -- it's dated June 24, 2020.  So at some
23 point before June 24, 2020, did you learn of Jane
24 Doe 3 and Jane Doe 4's -- their own complaints

Page 269

1  against George Halcovage or was it in the reading
2  of this report or something different?
3  A.     I don't know.  I can't answer.  I am
4  confused now.  I don't know.
5  Q.     Well, I'm trying to figure out when --
6  okay.  So if we look at 68, it's dated June 24,
7  2020, correct?
8  A.     Right.
9  Q.     Did you review this prior to it being
10 issued; did you review a draft of it?
11 A.     I looked over the draft, yes.
12 Q.     Okay.
13        Do you know how long before June 24,
14 2020?
15 A.     I don't.
16 Q.     All right.
17        Would you say that this report indicated
18 that Jane Doe 3 and Jane Doe 4 had their own
19 issues or complaints regarding Defendant
20 Halcovage?
21 A.     There's some things mentioned in here.
22 Yeah, in the final report there are some things
23 mentioned in here, you're right.
24 Q.     Okay.

Page 270

1        So by at least June 24th of 2020, you
2  had learned that Jane Doe 3 and Jane Doe 4 had
3  their own complaints against Defendant Halcovage?
4  A.     That's reasonable, yes, Ms. Smith.
5  Q.     Okay.
6        So -- and I am just trying to narrow it
7  done.  And if you can, you can, if you can't, you
8  can't.
9        Do you know if prior to reading this
10 report, you knew that Jane Doe 3 and Jane Doe 4
11 had their own complaints against Defendant
12 Halcovage?
13 A.     I really don't know.
14 Q.     Okay.  All right.
15        So then going back, I'm sorry, to
16 May 22, 2020 -- actually, I'm sorry, that
17 following Monday, so the 25th, May 25, 2020, you
18 had, I think, testified to this earlier, that you
19 had a conversation with Defendant Halcovage about
20 his access to the courthouse and his freedom of
21 movement within, correct?
22 A.     That is correct.
23 Q.     Okay.
24        And the conversation you had, was can

Page 271

1  you -- can you or will you agree to only come in
2  between 8:00 and -- and 5:00; is that right?
3  A.    That is correct.
4  Q.    And will you agree to either stay in
5  your office or be escorted through the courthouse,
6  correct?
7  A.    Correct.
8  Q.    Okay.
9         And that was something at that point
10 Defendant Halcovage agreed to, correct?
11 A.    Yes.
12 Q.    All right.
13        Was there any request at that point on
14 that Monday that -- after speaking with Jane Doe
15 2, that you made of him to refrain from coming
16 into the courthouse pending further investigation?
17 A.    I did not.
18 Q.    Let me ask this just because we can
19 probably avoid multiple questions on this topic:
20 At any point, did you ask Defendant Halcovage to
21 refrain from coming into the courthouse?
22 A.    I did ask him, and I really can't give a
23 date when I did this, but I ask him, would he
24 consider working from home.

Page 272

1  Q.    Do you think that was in the year 2020?
2  A.    Oh, yes.
3  Q.    Okay.
4         And just the least we can narrow it down
5  a little bit.
6  A.    I understand.
7  Q.    Was it -- do you think it was in the
8  summertime, fall, winter, or do you know?
9  A.    I don't want to say no, because it had
10 to be -- but it had to be some time after the --
11 the press release was made.
12 Q.    Okay.
13        So sometime after June of 2020?
14 A.    Yes.
15 Q.    Okay.
16        Do you know at the time that you had
17 this conversation with Defendant Halcovage, do you
18 remember where he was parking?  Was he parking in
19 the lower lot or had he been changed to the upper
20 lot?
21 A.    No.  Lower lot.
22 Q.    Okay.  All right.
23        So it was definitely before his parking
24 spot had been changed to the upper lot?

Page 273

1  A.    Correct.
2  Q.    Okay.  All right.  So that at least
3  narrows it down a little bit.  I appreciate that.
4  A.    I'm trying, Ms. Smith.
5  Q.    I understand.  Listen, it's been a long
6  time and there's a lot going on, so I -- we're
7  just trying to get to the bottom of what happened
8  and when it happened and the best you can answer,
9  that's what you can do.
10        MS. JONES:  Catherine?  Catherine,
11 could we take a little break?
12        MS. SMITH:  Sure.
13        VIDEOGRAPHER:  The time is now
14 2:54 p.m. and we're going off the record.
15                    - - -
16        (Whereupon, brief recess was held off
17 the record.)
18                    - - -
19        VIDEOGRAPHER:  The time is now 3:06
20 p.m. and we're back on the record.
21 BY MS. SMITH:
22 Q.    All right.
23        So, Mr. Bender, we were discussing
24 May -- end of May 2020.  So I want to go back to

Page 274

1  your -- this interview of Jane Doe 2 that
2  afternoon.
3         I think we've established, Jane Doe 3
4  and Jane Doe 4 were in -- in that interview,
5  correct?
6  A.    Correct.
7  Q.    And do you recall Jane Doe 3 and/or Jane
8  Doe 4 or Ms. Twigg telling you that, in fact, Jane
9  Doe 3 had received an e-mail from Jane Doe 1 the
10 night before, which she forwarded to Ms. Twigg and
11 that's what she alerted Ms. Twigg to the morning
12 of May 22, 2020?
13 A.    Yeah.  Ms. Twigg had told me that later,
14 yes.
15 Q.    Okay.
16        And do you recall in Jane Doe 2's
17 interview that Jane Doe 3 and/or Jane Doe 4 raised
18 the fact that given the e-mail that they had seen
19 from Jane Doe 1, the allegations and the fact that
20 the upper lot was empty due to employee furloughs,
21 that they that day, Friday May 22, 2020, had
22 parked in the upper lot to avoid Defendant
23 Halcovage?
24 A.    I do not.

Page 275

Q.     Okay.
       So I just want to make sure the record is clear, you don't recall, but is it that they could have told you that?
       MS. JONES:  Object to the form.
       You can answer.
       THE WITNESS:  Then their spots would have -- their spots would have already been moved.
BY MS. SMITH:
Q.     Well, they weren't formally moved, but I guess my question is:  Could it be possible that Jane Doe 2 and Jane Doe 3 told you that on that one day, Friday, May 22, 2020, they parked in the upper lot?
       MS. JONES:  Object to the form.
       You can answer.
       THE WITNESS:  I don't recall that. I'm not saying it's not beyond the realm of possibility because we discussed them moving the spots after that, so it would have been odd, but...
BY MS. SMITH:
Q.     Okay.

Page 276

       And did Jane Doe 3 or Jane Doe 4 during Jane Doe 2's interview, inform you that they were concerned about coming into contact with Defendant Halcovage given the allegations?
A.     Again, I don't remember that.
Q.     All right.
       I know you said sometime in 2020 and before Defendant Halcovage's spot was moved to the upper lot, you did ask him if he would work from home, correct?
A.     Correct.
Q.     Did you make that request because you believed it was possible for him to work from home?
       MS. JONES:  Object to the form.
       You can answer.
       THE WITNESS:  It would make everybody's life easier if he did.  He didn't think that he could, but there are a number of things that -- that he could have done.  It was just a suggestion I made, it was something that was -- was offered.
BY MS. SMITH:
Q.     And he refused or declined to work from

Page 277

home, correct?
A.     That is correct.
Q.     All right.
       At any point, did you offer Jane Doe 3 or Jane Doe 4 to work from home?
A.     I did not.
Q.     At any point did you offer Jane Doe 2 or Jane Doe 1 to work from home?
A.     They weren't coming to work as it was. They were still on furlough.
Q.     Well, at some point though they were recalled from furlough, correct?
A.     Correct.
Q.     All right.
       MS. SMITH:  So I want to -- actually on that note, it should be in that stack of papers, it's going to be 96 and 235.  And it will today's Exhibit-221.
       - - -
       (Bates Stamped 96 and 235 marked as Exhibit-221 for identification.)
       - - -
BY MS. SMITH:
Q.     Just going to generally start with do

Page 278

you recognize this document, this first page, which is 96?
       MS. JONES:  Could you scroll down a little bit, Matt, please.
       THE WITNESS:  Okay.
       MS. JONES:  Thank you.
BY MS. SMITH:
Q.     Do you recognize this document, Mr. Bender?
A.     Yes.
       MS. SMITH:  Okay.  And, Matt, if you can just scroll up to the next page, just momentarily.
BY MS. SMITH:
Q.     This page, I'll represent to you, Mr. Bender, just for ease, is the same as 96, except it's for Jane Doe 1 as opposed to Jane Doe 2.
       Do you recognize this one as well?
A.     Yes.
Q.     Okay.
       And, again, they're the same other than who it's addressed to.
       But in -- on June 30th, by letter, did you notify Jane Doe 2 and Jane Doe 1 that they

Deposition of Gary Bender Vol. I - Revised                    Jane Doe, et al. v. Schuylkill County Courthouse, et al.

Page 279

1  would be expected to return to work remotely on
2  July 6, 2020, at 8:30 a.m.?
3  A.      As all employees were that were
4  furloughed, yes.
5  Q.      Okay.
6          So that was going to be my next
7  question.  So this is not unique to Jane Doe 2 and
8  Jane Doe 1, it was any employee who was -- any
9  county employee who was furloughed at that time
10 was being recalled back to work, correct?
11 A.      Correct.
12 Q.      Were all furloughed employees recalled
13 back to remote work or were some recalled back to
14 in-person work?
15 A.      No.  Quite frankly I expected everybody
16 to come back to work.
17 Q.      Well, this letter states, you're
18 expected to work -- return to work, parenthesis,
19 remotely, closed parenthesis, on July 6, 2020, at
20 8:30 a.m.; does it not?
21 A.      Where does it say that?
22 Q.      It's the first paragraph, the -- the end
23 of Line 1.
24 A.      Okay.

Page 280

1  Q.      So were they being recalled into the
2  courthouse to work or were they being recalled to
3  just begin work in a remote location?
4  A.      Well, it would appear that it says
5  remotely.
6  Q.      Okay.
7          So, again, my question is:  Were all
8  furloughed employees recalled to a remote work
9  status or were some of the furloughed employees
10 recalled to an in-person work status?
11 A.      Yeah.  I would say most were in person.
12 Very few could work remotely.
13 Q.      Okay.
14         But Jane Doe 1 and Jane Doe 2 were
15 informed that they were recalled to a remote
16 status, correct?
17 A.      Uh-huh.
18 Q.      Is that a yes?
19 A.      That's what it says, yes.  I'm sorry.
20 Q.      It's okay.
21         At any point after this letter or these
22 letters were sent to Jane Doe 2 and Jane Doe 1, do
23 you recall ever sending or anyone ever sending
24 Jane Doe 2 and Jane Doe 1 a letter saying that

Page 281

1  they were to return to in-person work?
2  A.      Only at the end of the year.
3  Q.      And are you talking about when there was
4  discussions and/or accommodations made for them to
5  work from the 410 Building?
6  A.      That is correct.
7  Q.      Okay.
8          So from their return -- so between April
9  of 2020 when they were furloughed and June --
10 well, July 6th of 2020, when this letter was
11 issued, Jane Doe 2 and Jane Doe 1 were furloughed
12 and were not to conduct any work on behalf of the
13 county, correct?
14 A.      Correct.
15 Q.      Okay.
16         And then July 6, 2020, and the end of
17 2020 when there were discussions about the 410
18 Building, Jane Doe 2 and Jane Doe 1 were permitted
19 to work remotely, correct?
20 A.      That was the intention, yes.
21 Q.      All right.
22         So then going back to May of 2020, at
23 any point after Friday, May 22, 2020, did you talk
24 with Jane Doe 1 in any capacity?

Page 282

1  A.      No.
2  Q.      On May 22, 2020, or maybe that Monday
3  the 25th, did you go to Jane Doe 4's office and
4  discuss her parking with her?
5  A.      I don't recall that.  I did recall
6  talking to her outside in the -- in the lower
7  parking lot, saying that -- give me some time, but
8  I will find spots for them up there.
9  Q.      Do you remember when that was?
10 A.      Probably some time during that week.  I
11 don't recall the day.
12 Q.      Okay.  All right.
13         So I just want to clarify a few things.
14 So you testified earlier that after you spoke with
15 Ms. Twigg, she went to talk with Jane Doe 3 and
16 Jane Doe 4 and you -- that's when you reached out
17 to the other commissioners and the judge, the
18 president judge.  And then subsequent to that was
19 Jane Doe 2's interviews.
20         At any point before Jane Doe 2's
21 interview, did you speak with Ms. Twigg about her
22 discussions with Jane Doe 3 or Jane Doe 4?
23 A.      Did not.
24 Q.      After Jane Doe 2's interview, but before

Page 283

1 the end of the workday on the 22nd, did you speak
2 with Ms. Good -- Ms. Twigg about her conversations
3 with Jane Doe 2 or Jane Doe 4?
4 A.      Jane Doe 3 and Jane Doe 4, you mean?
5 Q.      Jane Doe 3 and Jane Doe 4.  I apologize.
6 Thank you.
7 A.      I don't recall.  There were a lot of
8 conversations that day.  I just don't recall.
9 Q.      The -- and I'm sorry if I asked this
10 question, at no point after May 22, 2020, did you
11 offer Jane Doe 4 or Jane Doe 3 to work from home,
12 correct?
13 A.      I did hot.
14 Q.      Do you know if anyone on behalf of the
15 county offered them that?
16 A.      I don't believe so, no.
17 Q.      Do you know why?
18 A.      Did they request it?  I mean, that's
19 a -- that's a question.  I'm sorry.  If they would
20 have requested it, we would have reviewed it.
21 Q.      So it your testimony that a request by
22 them to work from home was not posed to you?
23 A.      I do not recall that being posed to me,
24 no.

Page 284

1 Q.      So you don't remember having any
2 conversations regarding whether or not they could
3 work from home?
4 A.      I don't recall that.
5 Q.      During the -- the Friday May 22, 2020,
6 meeting of you, Ms. Twigg, and Mr. Roth, there
7 were discussions about, you know, the next steps
8 in the investigation and interviews to be
9 conducted; is that correct?
10 A.      Yes.
11 Q.      Were -- did the discussions include who
12 should be interviewed or who would be interviewed?
13 A.      That, Glenn and Debra were going to work
14 out.
15 Q.      Okay.
16       So there wasn't any list of witnesses or
17 people to be interviewed that was discussed during
18 that meeting, correct?
19 A.      Not at that time.
20 Q.      All right.
21       Did Ms. Twigg or Defendant Roth ever
22 discuss with you who they decided to interview?
23 A.      Well, I think at the time, Ms. Smith, we
24 were more concerned with interviewing Jane Doe 1

Page 285

1 and George Halcovage.
2 Q.      Okay.
3       Did anything else happen on Friday,
4 May 22, 2020, with regards to this investigation
5 or the allegations that you can recall, that we
6 haven't yet discussed?
7 A.      I can't recall.
8 Q.      Okay.
9       Other than speaking with Defendant
10 Halcovage on Monday about his access to the
11 courthouse, did you do anything or have any
12 conversations related to the allegations or this
13 investigation?
14 A.      With George?
15 Q.      At all, with anyone?
16 A.      No.
17 Q.      At any point did you have any
18 conversations with County Sheriff Groody about
19 Defendant Halcovage and his access to the
20 courthouse?
21 A.      On a personal level, no.  He and I
22 didn't discuss it.  He came down and met with me
23 and Debra Twigg, I think Brian Tobin was there and
24 I think Commissioner Hess and Hetherington were

Page 286

1 there.
2 Q.      Okay.
3       And what was discussed?
4 A.      He was going to move George's spot or he
5 was going to require George to be wanded each --
6 each day and I -- there was things he wanted to do
7 in terms of George -- I think his spot was still
8 going to be downstairs, but he would get in the
9 elevator and call upstairs and they come down and
10 wand him and wand his contents.  And I thought
11 that was -- he said he felt George was a -- was a
12 risk.
13       And that he said at the time, that he
14 was -- his wife was leaving him and that the
15 church didn't want him to attend services, those
16 turned out not to be true.  But I didn't think
17 George was a threat to bring anything harmful into
18 the courthouse, but -- but he did.
19       So then after that, then George got in
20 in the morning and had to call up to security and
21 get wanded before he came into the building.
22 Q.      There were, in fact, subsequent
23 interviews done by Ms. Twigg and/or Defendant
24 Roth, correct?

Page 287

1  A.     I would assume so, yes.
2  Q.     Okay.
3        And you did not participate in any of
4  those --
5  A.     I did not.
6  Q.     -- correct?
7  A.     I did not.
8  Q.     That includes the interview of Jane Doe
9  1, correct?
10  A.     Yes.
11  Q.     And it also includes the interview of --
12  interviews of Defendant Halcovage, correct?
13  A.     Correct.
14  Q.     How often would you speak with Ms. Twigg
15  about her ongoing investigation in this matter?
16  A.     Well, Ms. Twigg and I and Glenn would
17  come over, we'd probably meet daily just to see
18  where we were with different things and when an
19  interview was conducted, we would discuss in
20  general context what was said.
21  Q.     And at some point, I mean, we looked at
22  it earlier, there was a draft final report that
23  Ms. Twigg drafted in regards to her findings in
24  the investigation, correct?

Page 288

1  A.     Correct.
2  Q.     And based off of her findings, she
3  determined that Defendant Halcovage had violated
4  multiple county policies, correct?
5  A.     That is correct.
6  Q.     Did you agree with Ms. Twigg's
7  conclusion?
8  A.     I did.
9  Q.     Did you agree that Defendant Halcovage's
10  conduct as it relates to Jane Doe 3 and Jane Doe 4
11  was a violation of county policy?
12  A.     Yes.  If what they said was true, that
13  is true, yes, and so that was in her report as
14  well, so...
15  Q.     Okay.
16        Did you have any reason to disbelieve
17  any of the allegations that were made against
18  Defendant Halcovage?
19  A.     Don't know if I'd classify it as that,
20  Ms. Smith.  But it was -- it was certainly hard to
21  comprehend.  I mean, I was there every day,
22  Ms. Smith, and, you know, I -- I didn't -- I
23  didn't see what they were saying.  So it was kind
24  of hard to believe, but the whole thing was hard

Page 289

1  to believe.
2  Q.     But did you have any reason to
3  disbelieve or think that Jane Doe 3 or Jane Doe 4
4  would make any -- make up any of the allegations
5  against Defendant Halcovage?
6        MS. JONES:  Object to that form.
7        But you can answer.
8        THE WITNESS:  I did not.
9  BY MS. SMITH:
10  Q.     Okay.
11        Shortly after, I think it was the very
12  next day after Ms. Twigg's -- I think it was the
13  press release, so let me strike that.
14        There was a press release issued at some
15  point regarding the investigation, the
16  allegations, and the findings, correct?
17  A.     Correct.
18  Q.     And in that report, in the press
19  release, it indicated that Commissioner
20  Halcovage -- the county believed he had violated
21  multiple county policies, correct?
22  A.     That is correct.
23  Q.     And around that time either right after
24  Ms. Twigg's report or the press release, there was

Page 290

1  some allegations or reports that Defendant
2  Halcovage had climbed from the lower lot to the
3  upper lot, correct?
4  A.     That is correct.
5  Q.     Okay.
6        Do you remember when that was?
7  A.     The date, no.
8  Q.     Okay.
9        Do you remember when you learned of it?
10  A.     I do.
11  Q.     Was it the same day that he had
12  allegedly done that?
13  A.     Well, did you send an e-mail out about
14  that, Ms. Smith?  I'm trying to figure out how
15  I -- no, I'm not -- yes, I am asking you a
16  question.
17        Okay.  Let me rephrase that.
18        I said I had thought we had gotten an
19  e-mail from someone that George had done this.
20  And I called up Brian Tobin, the chief deputy
21  sheriff, and asked if he could get me a recording
22  of the camera on that particular day.
23  Q.     Okay.
24        Did he get you a recording of the

Case 3:21-cv-00477-MCC   Document 280-1   Filed 09/20/23   Page 281 of 373
Deposition of Gary Bender Vol. I - Revised
Jane Doe, et al. v. Schuylkill County Courthouse, et al.

Page 291

1  camera?
2  A.      He did.
3  Q.      Okay.
4          And did you view it?
5  A.      And what, ma'am?
6          MS. JONES:  Did you view it?
7  BY MS. SMITH:
8  Q.      Did you view the recording?
9  A.      We did, Debra Twigg and I.
10 Q.      Okay.
11         How many camera angles were there?
12 A.      One.
13 Q.      Right.
14         And did you see Defendant Halcovage
15 emerging in the video from what had to be the
16 embankment from the lower lot to the upper lot?
17         MS. JONES:  Object to the form.
18         You can witness.
19         THE WITNESS:  Yes.
20 BY MS. SMITH:
21 Q.      Okay.
22         That embankment, I'm going to -- I'm
23 going to call it for lack of a better word, would
24 you describe it as fairly steep?

Page 292

1  A.      Yes.
2  Q.      Would you describe it as dangerous?
3  A.      No.
4  Q.      Have there been conversations by county
5  officials about putting up a fence because of the
6  plain or the -- the incline of that?
7  A.      I'm not aware of that.  There are car
8  bumps right there, so for a car to go down over
9  it, not too many people walk along the edge of it,
10 they would slip and fall down.  And we haven't to
11 this date put one there.
12 Q.      Okay.
13         But are you aware that there's been
14 conversations about maybe putting a fence there?
15 A.      Not that I recall.
16 Q.      Okay.
17         And after you viewed the video what, if
18 anything, did you do?
19 A.      Well, we waited and we spoke to George
20 about it, you know.
21 Q.      Who is we?
22 A.      Debra and I.  Maybe I did first.
23 Q.      Okay.
24         What was the conversation that you

Page 293

1  recall with Defendant Halcovage about it?
2  A.      What are you doing, George.  What --
3  what -- what was the point of coming up the bank.
4  Q.      What was his response?
5  A.      That nobody was coming down to wand him,
6  to let him in, despite repeated calls.  So he
7  decided he would walk up the bank to come in the
8  courthouse.
9  Q.      Okay.
10         What was your assessment of that
11 justification?
12         MS. JONES:  Object to the form.
13         You can answer.
14         THE WITNESS:  Repeat that, please.
15 BY MS. SMITH:
16 Q.      What was your thoughts on that -- on
17 Defendant Halcovage's justification?
18         MS. JONES:  Object to the form
19 again.
20         But you can answer.
21         THE WITNESS:  I wouldn't have done
22 it.
23 BY MS. SMITH:
24 Q.      And why wouldn't you have done?

Page 294

1  A.      Because there's a -- there's a path that
2  goes up diagonal, that makes it less of an incline
3  and you can walk up the driveway, so...
4  Q.      Do you think -- I know we talked about
5  appearance of impropriety -- do you think it was
6  just something that could appear to be an issue,
7  given that allegations against him at that point?
8          MS. JONES:  Object to the form.
9          You can answer.
10         THE WITNESS:  I really don't know.
11 He wanted to get into the courthouse, that was the
12 quickest way up, I get that.  Would I have climbed
13 up that way, no, because for sure, my pants would
14 have gotten dirty.
15 BY MS. SMITH:
16 Q.      All right.  And I'm sorry I'm jumping
17 around a little bit.  I am trying to keep it as
18 sustained as possible.
19         But just going back to that Friday,
20 May 22, 2020, you did speak with Commissioner
21 Hess, correct?
22 A.      Yes.
23 Q.      And what did you speak with Commissioner
24 Hess about, what was the contents of the

Page 295

1  conversation?
2  A.     I told him basically what Debra had told
3  me, that there were serious allegations against
4  Commissioner Halcovage of a -- of a sexual
5  relationship with a county employee, including
6  inside the courthouse.
7  Q.     And what was his response?
8  A.     Like mine, you know, you're
9  flabbergasted.  I know that's not a good word to
10 use, Ms. Smith, but all I can tell you is that
11 this was incredible that nobody would have thought
12 this would happen and it was -- you know, he was
13 upset about it.
14 Q.     Okay.
15         Was he -- when you say upset, was he
16 angry, was he sad, what do you mean by upset; can
17 you further describe that?
18 A.     Well, until the investigation concluded,
19 you don't know for sure.  This was an allegation,
20 so, you know, he certainly was upset by it.  And I
21 told him what that we were doing and he was satisfied
22 with our procedure.
23 Q.     Okay.
24         Were there any discussions about

Page 296

1  retaining a third-party investigator to conduct
2  the investigation?
3  A.     There was not.
4  Q.     I think you said that you couldn't reach
5  Hetherington that day, you left him a message.
6  But you mentioned maybe going to be his house on
7  Saturday --
8  A.     Yes.
9  Q.     -- to discuss it?
10         Did you, in fact, go to his house on
11 Saturday to discuss it?
12 A.     Yes.  My wife and I drove up.
13 Q.     Okay.
14         And did you have a conversation with
15 Commissioner Hetherington about the allegations on
16 that Saturday?
17 A.     Yes.  My wife stayed in the car, I went
18 into his kitchen and laid it out, what all
19 happened and what the -- what we knew so far.
20 Q.     And what was Commissioner Hetherington's
21 response?
22 A.     He was angry.  He was only a
23 commissioner, understand, for what, a couple of
24 weeks.

Page 297

1  Q.     Right.
2  A.     And so the amazing thing was he was
3  worried that night that I was coming up to -- that
4  he did something wrong.  And I said, no, you
5  didn't do anything wrong, so I laid it out what
6  happened.  So I told him again where we were with
7  the investigation, what we planned to do, and he
8  was okay with that, with our procedure.
9  Q.     And were there any discussions about
10 hiring or retaining a third-party investigator to
11 conduct the investigation?
12 A.     There was not.
13 Q.     In your conversations with Commissioner
14 Hess or Hetherington, were there any conversations
15 about ensuring that Jane Doe 2, Jane Doe 1, Jane
16 Doe 3, and/or Jane Doe 4 safe and secure in their
17 working environment?
18 A.     We did not, no.
19 Q.     And you also had a conversation with
20 president judge, the president judge's last name
21 escapes me.
22 A.     William Baldwin.
23 Q.     Baldwin.  Yup.  Thank you.
24         The conversation you had with Judge

Page 298

1  Baldwin, where did that take place?
2  A.     In Judge Baldwin's office.
3  Q.     And that was that same Friday, May 22nd?
4  A.     Correct.
5  Q.     And how did that conversation go?
6  A.     About the same as the others, he was
7  just -- just incredulous that this would happen.
8  Q.     Okay.
9         Were there conversations about a
10 third-party investigator being retained?
11 A.     There was not.  Again, I reviewed with
12 Judge Baldwin what our thoughts were, what we
13 planned to do, how we can kind of conduct -- and
14 he was okay with that.
15 Q.     Any conversations about making sure any
16 of the plaintiffs felt secure and safe in their
17 working environment?
18 A.     No.
19 Q.     There are a fair number of people who
20 work in the tax assessment and/or tax claim bureau
21 offices who were not interviewed, correct?
22 A.     I don't know who all was interviewed.
23 Q.     Okay.
24         At the time, so May 2020, was

Page 299

1  Ms. Tiffany, I think it might have been Myer at
2  that time, Ms. Myer working in one of those
3  offices?
4  A.      Yeah.  I think she was still here and
5  she would have been in the -- in the tax
6  assessment office, she was a field appraiser.
7  Q.      Okay.
8          Was Michelle O'Connell still working for
9  the courthouse at that time?
10  A.      I can't recall 2020.  I would have to
11  look at her PAR.  I'm not going to help you today,
12  Ms. Smith.  I get that, but I can't recall.
13  Q.      Okay.
14          What about Deb Detweiler, was she
15  working for the county at that time?
16  A.      I don't believe so anymore.
17  Q.      All right.
18          Deb Dash?
19  A.      Yes.
20  Q.      Chrissy Zimmerman?
21  A.      Yes.
22  Q.      Helene O'Connor was still working for
23  the county at that time, correct?
24  A.      Yes.

Page 300

1  Q.      Do you know if they were not
2  interviewed, what the reason was that they were
3  not interviewed?
4  A.      I do not.
5  Q.      Do you know, and if you don't, it's
6  okay, do you know if at some point Ms. Twigg felt
7  that she had enough information and that she could
8  determine that there was violation of county
9  policy without interviewing any additional people?
10          MS. JONES:  Object to the form.
11          You can answer.
12          THE WITNESS:  We probably all felt
13  that.
14  BY MS. SMITH:
15  Q.      Okay.
16          So -- well, let me ask you -- you,
17  because you know how you felt, did you feel at
18  some point there was sufficient information to
19  come to a conclusion?
20  A.      Yes.
21  Q.      Okay.
22          And the conclusion, again, was that
23  Defendant Halcovage had, in fact -- had, in fact,
24  violated multiple county policies, correct?

Page 301

1  A.      In our opinion, that is true.
2  Q.      Okay.
3          But you felt, and correct me if I'm
4  wrong, you felt that you had no authority, given
5  he was an elected official, to take any action
6  related thereto, correct?
7          MS. JONES:  Object to the form.
8          You can answer.
9          THE WITNESS:  Correct.
10  BY MS. SMITH:
11  Q.      Okay.
12          Did you refer Defendant Halcovage to any
13  agency that might be able to take action?
14  A.      We forwarded the report to the county
15  district attorney, who then forwarded that to the
16  attorney general in Pennsylvania.
17  Q.      Who forwarded the report, if you know?
18  A.      The district attorney.
19  Q.      No.  No.  I'm sorry.
20          Who from the county forwarded it to the
21  district attorney?
22  A.      Mr. Roth.
23  Q.      Okay.
24          Was that -- at whose decision,

Page 302

1  instruction, request?
2  A.      Mine.
3  Q.      Who made the decision?
4  A.      Mine.
5  Q.      Did you believe Defendant Halcovage had
6  engaged in criminal conduct?
7          MS. JONES:  Object to form.
8          You can answer.
9          THE WITNESS:  I didn't know that,
10  but I felt for completeness, it had to go to the
11  district attorney.  If he felt it wasn't, he could
12  do what he wanted.  But we felt we had an
13  obligation to at least submit it to him.
14  BY MS. SMITH:
15  Q.      All right.
16          Did you ever reach out to any other
17  agency about Defendant Halcovage's conduct?
18  A.      I did not.
19  Q.      So there was no referral for potential
20  impeachment of Defendant Halcovage, given his
21  conduct?
22  A.      No.  We did not refer that down there.
23  Q.      I think Ms. Twigg's report or at least
24  her press -- the press release, the county's press

Page 303

1  release, indicated that if Defendant Halcovage had
2  been an employee and not an elected official, he
3  would have been terminated.
4       Is that a fair summary of -- of the
5  press release?
6  A.    Well, the language of the press release
7  goes more like that if he were a county employee,
8  he would have certainly been -- had some
9  disciplinary action, up to and including
10 termination.
11 Q.    Okay.
12      So if he had been an employee, would you
13 have recommended he be terminated?
14      MS. JONES:  Object to the form.
15      But you can answer.
16      THE WITNESS:  We would have had a
17 Loudermill hearing.  A decision would have been
18 made after that hearing, or a hearing first.
19 BY MS. SMITH:
20 Q.    Okay.
21      Well, a Loudermill hearing or a
22 hearing --
23 A.    Yeah.  You're not supposed to make a
24 decision until you have the hearing.

Page 304

1  Q.    Okay.
2       But a Loudermill hearing is a hearing
3  that is held to provide the opportunity for the
4  accused to present their side of the story,
5  correct?
6  A.    Correct.
7  Q.    Okay.
8       And Defendant Halcovage was essentially
9  afforded that when he was interviewed on two
10 occasions by Ms. Twigg, correct?
11 A.    Okay.  Yes, I'll accept that.
12 Q.    Okay.
13      So I'm asking you, based on your review
14 of the investigation that Ms. Twigg did, her final
15 report, her press release, or the press release,
16 based off of reviewing that, would you have
17 recommended that Defendant Halcovage be terminated
18 if he was an employee?
19      MS. JONES:  Object to the form.
20      You can answer.
21      THE WITNESS:  I don't want to be
22 argumentative, Ms. Smith, but I would have said
23 that the discipline up to and including
24 termination, and that would have been done by the

Page 305

1  board of commissioners.
2  BY MS. SMITH:
3  Q.    Okay.
4       And I'm not trying to be argumentative
5  either.  I am just trying to figure out what level
6  of discipline you believe Defendant Halcovage's
7  actions warranted if you had the ability to take
8  such action?
9       MS. JONES:  Object to form.
10      You can answer.
11      THE WITNESS:  That -- that's
12 difficult to answer, it really is.  And I probably
13 would have recommended termination, yes.
14 BY MS. SMITH:
15 Q.    Okay.
16      And it's difficult to answer because
17 termination is a -- a severe sanction, correct?
18      MS. JONES:  Object to the form.
19      You can answer.
20      THE WITNESS:  Well, based on the --
21 on the preponderance of all the evidence, I think
22 that was the conclusion it would have come to.
23 BY MS. SMITH:
24 Q.    Okay.

Page 306

1       Do you believe that Defendant Halcovage
2  committed misconduct while in office?
3  A.    He exhibited inappropriate behavior
4  for -- for an elected official.
5  Q.    Would you say inappropriate behavior is
6  misconduct?
7  A.    Someone else can make that determine.
8  It's inappropriate behavior for an elected
9  official.
10 Q.    I am asking you in your opinion, is
11 inappropriate behavior misconduct?
12      MS. JONES:  Object to the form.
13      THE WITNESS:  I can agree to that.
14 BY MS. SMITH:
15 Q.    At what point did you, if at all, become
16 involved in any conversations regarding relocating
17 Jane Doe 2 and Jane Doe 1 to the 410 Building?
18 A.    I would say probably sometime in January
19 of '21.
20 Q.    Okay.
21      So as I understand it -- so Ms. Twigg, I
22 think we established earlier, resigned in
23 September of 2020, correct?
24 A.    What was the question again, ma'am?

Case 3:21-cv-00477-MCC   Document 280-2   Filed 09/20/23   Page 285 of 373
Deposition of Gary Bender Vol. I - Revised
Jane Doe, et al. v. Schuylkill County Courthouse, et al.

Page 307

Q.    Ms. Twigg resigned, I think we established earlier, resigned in September of 2020?

A.    Yes.

Q.    Okay.
        And then after Ms. Twigg resigned, who became the HR director; who took her role?

A.    We hired a firm by the name of Hubric Resources and they assigned a woman, Doreen Kutzler, to be the HR director while we did a search for a new one.

Q.    Okay.
        And who, if you know, made the decision to retain Hubric Resources for interim HR services?

A.    Well, the board of commissioners. I had researched whose could provide that. That name came to me of Hubric. I called Mr. Hubric at his office, asked him to come up to the courthouse for a meeting. And then Glenn and I met with him and we probably pulled Lisa Mayhall into it at that time and interviewed him as well. And he agreed that he would -- would that. We were very upfront with him, what was going on in the courthouse and

Page 308

a contract was put together, which was approved by the board of commissioners.

Q.    Did that board of commissioners include Defendant Halcovage?

A.    Yes.

Q.    Do you think that given the pending allegations and investigation against him, that he should have been involved in that decision?

A.    He's a sitting commissioner, I had no authority to -- to prevent him from voting.

Q.    Did you think that he should vote, though?

A.    Yes.

Q.    Okay.
        And so as you testified, Doreen Kutzler gets assigned from Hubric Resources and begins being interim HR director shortly after Ms. Twigg resigned, correct?

A.    Yeah. I think they had a day or two together.

Q.    Okay.
        And did you have any discussions with Ms. Kutzler about the allegations and the investigation into -- into George Halcovage?

Page 309

A.    Yes. And -- and Deb -- Ms. Twigg, yes, we had a meeting over in the Hoffmann, they were brought completely up to day. They knew exactly the extent of the investigation and the allegations.

Q.    Okay.
        And that time, were there any discussions or did Ms. Kutzler ask any questions about what was being done to ensure that the plaintiffs felt safe and secure in their working environment?

A.    I think she was satisfied that Mr. Halcovage was limited to 8:00 to 5:00 and could not walk about the courthouse without an -- an attendant.

Q.    So what -- this 8:00 to 5:00, what concerns did that alleviate in your mind?

A.    We couldn't restrict Mr. Halcovage to come in, it was his volition. But 8:00 to 5:00 is -- the courthouse works from 8:30 to 4:30. 8:00 to 5:00 would allow him to have a workday.

Q.    Okay.
        But it would also allow him to overlap in the courthouse with at least Jane Doe 3 and

Page 310

Jane Doe 4, correct?

A.    Perhaps if he went out into the hallway, but he was restricted to go out into the hallway. They don't come into the commissioners office as a matter of their daily routine.

Q.    So as I understand it, sometime -- so -- strike that.
        Ms. Zula started -- the interim contract with Hubric ended and a full-time HR director, Ms. Zula, was selected and appointed in January 2021, correct?

A.    Correct.

Q.    And I think Ms. Zula and Ms. -- Ms. Kutzler or Hubric Resources had some overlap as well, similar to Ms. Twigg and Ms. Kutzler, correct?

A.    Correct.

Q.    It's my understanding that prior to Ms. Zula taking on the role, that there were discussions regarding Jane Doe 2 and Jane Doe 1 being assigned to the 410 Building, correct?

A.    Correct.

Q.    Okay.
        So if Ms. Kutzler started in January, is

Page 311

1 it possible that the 410 Building discussions
2 happened earlier?
3 A.      Perhaps, yes.
4 Q.      Okay.
5        But you don't -- maybe I misunderstood
6 your testimony.  Did you not get looped into the
7 conversations until January or were you kind of
8 looped in at the very beginning, you just don't
9 recall the exact date?
10 A.      Yeah, I probably initiated it.
11 Q.      Okay.
12        And why did you initiate it?
13 A.      Because there was no work product
14 being -- the work from home was not working.
15 Q.      And how did you come to that
16 determination?
17 A.      Well, towards the end of the year, there
18 were two things that happened, is that towards the
19 end of 2020, I received an e-mail from the state
20 saying that the STEB reports were not completed
21 from February, so the whole year from February on,
22 the STEB reports were not completed.  That pretty
23 much is -- is -- is Jane Doe 1's entire job.
24        So it would appear to me then that the

Page 312

1 working from home was not working out.  So -- and
2 she was paid for that whole last quarter with no
3 work product.  That's not acceptable.
4        So I went to Doreen and asked for what
5 would be -- is a reasonable accommodation putting
6 them in a building outside of the courthouse that
7 we can secure and she agreed that it would be a
8 reasonable accommodation.  So I asked the board to
9 make that decision and -- and when we did, we
10 found two offices down in the 410 Building and
11 they were going to be assigned, that was going to
12 be their office.
13        And then if-if a work product wasn't
14 produced or if they didn't come to work, they
15 wouldn't get paid, but for a whole year, a work
16 product wasn't produced.
17        We also discovered at that time that
18 Jane Doe 2 was not -- was also not producing a
19 work product.  So the working from home, although
20 was good is one sense, was not because a
21 product -- it wasn't working.
22 Q.      Okay.
23        I want to -- my favorite phrase, I want
24 to unpack that a little bit.

Page 313

1        So the STEB reports, how did you learn
2 or come to the conclusion that they weren't being
3 submitted?
4 A.      We got an e-mail from State of
5 Pennsylvania, State Tax Equalization Board sent an
6 e-mail to the commissioners or a letter to the
7 commissioners.
8 Q.      Okay.
9        At any point, did you go to Jane Doe 3
10 or Jane Doe 4 and ask them about the delinquent
11 STEB reports?
12 A.      They were aware of that.  They got their
13 own letter.
14 Q.      I'm -- I'm not asking if they got their
15 own letter.
16        I am asking, did you ever go to them and
17 ask them about the delinquency?
18 A.      I did not.
19 Q.      Did you ever go to Jane Doe 1 and ask
20 her about what was causing the delinquency?
21 A.      I did not.
22 Q.      Did you -- at the time that you proposed
23 this 410 Building alternative or had a discussion
24 with Ms. Kutzler about it and whether it was a

Page 314

1 reasonable accommodation, did you know that Jane
2 Doe 1 and Jane Doe 2 felt that they had not been
3 supplied or provided with adequate supplies to
4 complete their jobs from home?
5        MS. JONES:  Object to the form.
6        You can answer.
7        THE WITNESS:  That was not
8 communicated.  They had -- we had felt they had
9 sufficient devices to complete their tasks.
10 BY MS. SMITH:
11 Q.      What devices did they have that you
12 believe were sufficient for them to their tasks?
13 A.      Jane Doe 2 had an iPad and that's all
14 she needed to complete her work.  She could -- and
15 she was to meet people outside of the building to
16 hand in her work at the end of the day.  She was
17 not ding that?
18        Jane Doe 1 was provided a laptop.
19 Q.      Are you aware that Jane Doe 2 has -- had
20 requested a laptop to better perform her job
21 duties for the court -- for the county?
22 A.      I was not.  Everybody else in the field
23 appraiser was using an iPad.  And what she asked
24 for was a larger screen, which she was provided.

Page 315

1  Q.      Do you know how long after she requested
2  the larger screen that she was provided it?
3  A.      I do not.
4  Q.      Other than the delinquent STEB reports,
5  are you aware of any other issues with Jane Doe
6  1's work performance around the end of 2020?
7  A.      That was her prime function.
8  Q.      Okay.
9         So the answer might be no and if it is,
10 it is.  If it's not, please let me know.  But is
11 there any other issues with Jane Doe 1's job
12 performance?
13 A.      He wasn't performing her job.
14 Q.      So you don't believe she was performing
15 any job?
16 A.      No.  Her STEB reports was her job and
17 she wasn't completing them.
18 Q.      Well, is that the only job duty of a
19 real estate market analyst?
20 A.      Pretty when.  And the only thing she did
21 when she was in the courthouse, she also worked
22 the desk or, you know, worked the counter when
23 people would come in, she would work the counters.
24 Q.      Do you know if those STEB reports were,

Page 316

1  in fact, not provided to the state timely?
2  A.      Yes.
3  Q.      Well, there's a -- what is the deadline
4  for the STEB reports, do you know?
5  A.      They're due monthly.
6  Q.      But not for the month proceeding,
7  correct?
8  A.      I don't know off the top -- I don't
9  know.
10 Q.      Okay.
11        And there is -- are you aware a hard and
12 fast deadline for STEB reports at the end of the
13 year?
14        MS. JONES:  Object to the form.
15        You can answer.
16        THE WITNESS:  But they weren't
17 completed.
18 BY MS. SMITH:
19 Q.      Well, I'm asking, are you aware that
20 there's a hard and fast deadline at the end of the
21 year for STEB reports?
22        MS. JONES:  Object to the form.
23        You can answer.
24        THE WITNESS:  Perhaps, but you --

Page 317

1  you get communication from them if your report is
2  not due for the -- for the prior month, you get a
3  communication.  They want those reports.
4  BY MS. SMITH:
5  Q.      Okay.
6         But all of 2021 STEB reports were, in
7  fact, submitted by the state's hard and fast
8  deadline, correct?
9         MS. JONES:  Object to the form.
10        THE WITNESS:  They were, not by
11 Jane Doe 1.
12 BY MS. SMITH:
13 Q.      Okay.
14        By who?
15 A.      Jane Doe 3.
16 Q.      Okay.
17        Jane Doe 3 and Jane Doe 4?
18 A.      That's what they had indicated, yes.
19 Q.      Okay.
20        And, in fact, what they indicated was
21 that they had worked, despite -- so strike that.
22        Jane Doe 3 and Jane Doe 4 in 2020 were
23 exempt employees, correct?
24 A.      They did what?

Page 318

1  Q.      They were exempt employees, correct?
2  A.      That is correct.
3  Q.      Meaning that no matter the number of
4  hours they worked, they still made the same amount
5  of money, correct?
6  A.      That is correct.
7  Q.      And Jane Doe 3 and Jane Doe 4, in some
8  form, reported that they worked a significant
9  amount of overtime in 2020 to ensure that the
10 county met the STEB deadlines, correct?
11        MS. JONES:  Object to form.
12        You can answer.
13        THE WITNESS:  It was a drop-dead
14 deadline, yes, at February 28th, that is correct.
15 BY MS. SMITH:
16 Q.      And -- and Jane Doe 3 and Jane Doe 4
17 indicated that they worked significant amount
18 of -- I don't want to call it overtime because
19 it's not overtime because they don't get paid for
20 it -- but they worked significant hours beyond
21 their typical working hours to that ensure the
22 county met that deadline, correct?
23 A.      Correct.
24 Q.      And in your opinion, is that what a

Page 319

1  supervisor is supposed to do to ensure that their
2  office meets deadline in whatever way necessary?
3  A.      Correct.
4  Q.      So Jane Doe 3 and Jane Doe 4 stepped up
5  as supervisors during that time period while Jane
6  Doe 1 was having some issues, correct?
7          MS. JONES:  Object to the form.
8          You can answer.
9          THE WITNESS:  Yes.  But they could
10 have done that during the year.  You can get on a
11 computer and track every day what STEB reports
12 are.  You can track every day what page of the
13 report is finished.  So nobody must have looked at
14 anything from February to the -- to the following
15 February.
16 BY MS. SMITH:
17 Q.      Well -- so, Mr. Bender, are you aware
18 that as a result of the global pandemic COVID-19,
19 some of those deadlines for the STEB reports
20 were -- were stayed or -- or paused?
21 A.      That was not indicated in that letter.
22 Q.      Okay.
23         Did you ever discuss STEB reports with
24 Jane Doe 3 or Jane Doe 4?

Page 320

1  A.      I did not.
2  Q.      Okay.
3          In 2020, the tax assessment or tax
4  claim -- and/or tax claim office lost a few
5  employees, correct?
6          MS. JONES:  I'm sorry.  Could you
7  repeat that?
8  BY MS. SMITH:
9  Q.      In 2020, the tax claim bureau and/or the
10 tax assessment office lost some employees,
11 correct?
12 A.      In tax assessment I believe so, yes.
13 Q.      Okay.
14         And just so the record is clear, tax
15 assessment is where Jane Doe 1 and Jane Doe 2
16 worked, correct?
17 A.      Correct.
18 Q.      And that is the office that's
19 responsible for the STEB reports, correct?
20 A.      Jane Doe 1 specifically is responsible
21 for the STEB reports.
22 Q.      Okay.
23         Well, Jane Doe 1 is responsible for the
24 STEB reports, but she submits them for review to

Page 321

1  someone else, correct?
2  A.      She submits them to the state as far as
3  I know.
4  Q.      They don't have to be approved or signed
5  off by a supervisor within the office?
6  A.      That I don't know because the -- all I
7  know is that you submit them online to the state.
8  Q.      Okay.
9          Do you know, does Glenn Roth in his
10 role, have to approve them at all?
11 A.      No.
12 Q.      Okay.
13         The tax assessment office lost -- I
14 think Tiffany Myer left in 2020, correct, or was
15 on maternity leave at least in 2020?
16 A.      Correct.
17 Q.      And did Tiffany Myer hold a CPE license?
18 A.      She did.
19 Q.      Other than Ms. Myer and Ms. -- well,
20 strike that.
21         Jane Doe 1 also held a CPE license,
22 correct?
23 A.      She was not a field appraiser, however.
24 Q.      Right.

Page 322

1          But Jane Doe 1 held a CPE license,
2  correct?
3  A.      Okay.  Yes.
4  Q.      Okay.
5          And Jane Doe 3 held a CPE license,
6  correct?
7  A.      Correct.
8  Q.      Other than those three in the year 2020,
9  are you aware of any other assessment employees
10 who have held CPE licenses?
11 A.      I'm am not.
12 Q.      And then Ms. Myer left.  Did she resign
13 or did she go on maternity leave in 2020?
14 A.      She may have gone on maternity leave and
15 then she left the state.
16 Q.      So she did both in 2020?
17 A.      I don't know.  It could be 2021 --
18 Q.      Okay.
19 A.      -- but she has left the state, yes.
20 Q.      Okay.
21         But she was out for a period of time
22 leaving only Jane Doe 3 and Jane Doe 1 with CPE
23 license holders in the assessment office, correct?
24 A.      Yes.

Page 323

1  Q.    All right.
2       And do you know, does a real estate
3  market analyst or someone who completes STEB
4  reports, are they required to hold a CPE license?
5  A.    That I don't know.
6  Q.    But individuals within the assessment
7  office, some of the -- the job titles are requirer
8  to hold CPE licenses, correct?
9  A.    The field appraisers, yes.
10 Q.    Okay.
11      The field appraisers, is that what you
12 said?
13 A.    Yes.
14 Q.    Okay.
15      So at -- when Ms. Myer went out on
16 maternity leave or whenever she was out for
17 whatever reason during 2020, Jane Doe 3 was left
18 with no CPE-licensed field appraisers, correct?
19 A.    Correct.
20 Q.    Jane Doe 3 was also overseeing the tax
21 claim bureau at that time, correct?
22 A.    Correct.
23 Q.    All right.
24      Helene O'Connor, in 2020 she was a

Page 324

1  contractor, correct?
2  A.    That is correct.
3  Q.    Because she had been an employee, had
4  resigned, and had come back to do per diem
5  contract work, right?
6  A.    Correct.
7  Q.    Okay.
8       And do you remember when Ms. O'Connor
9  came back to do per diem contract work?
10 A.    I do not.
11 Q.    Do you know -- well, let me ask this:
12 Do you know when she resigned?
13 A.    I don't have the actual date, no.
14 Q.    Was it before COVID-19?
15 A.    Good question.  I don't know.
16 Q.    Okay.
17      In any event, there were some issues or
18 discussions regarding Ms. O'Connor's rate of pay,
19 correct?
20      MS. JONES:  I object to the form.
21      But you can answer.
22      THE WITNESS:  She never expressed
23 that, no.
24 BY MS. SMITH:

Page 325

1  Q.    Did someone else express that?
2  A.    There was a contract put in for 450 an
3  hour, she was making 40, the commissioners would
4  not approve that, but they approved it at $40 an
5  hour, her same rate she was getting.  On a
6  subsequent interview with Ms. Kutzler, Helene
7  indicated that she never asked for a raise.
8  Q.    Were you in the interview with Ms.
9  Kutzler and Ms. O'Connor?
10 A.    I was not, no.  Okay.
11 Q.    No, no, it's okay.
12 A.    All right.
13 Q.    I wasn't there either, so I am just
14 trying to clarify so I know what happened.
15      So someone told you that Ms. O'Connor
16 told Ms. Kutzler that she never asked for a raise?
17 A.    Correct.
18 Q.    Who told you that?
19 A.    Ms. Kutzler.
20 Q.    And you believe that Ms. Kutzler -- I'm
21 sorry -- you believe Ms. O'Connor was approved for
22 $40 an hour?
23 A.    I know she was, yes.
24 Q.    Okay.

Page 326

1       In any event, Ms. O'Connor eventually
2  declined to extend her contract, did she not?
3  A.    Well, she decided to just go into
4  retirement.  I think there were two -- two
5  contracts with -- with -- with Helene.
6  Q.    Right.
7       So there was -- so she comes back as a
8  per diem.  There's a contract for that.  That
9  contract ends and she -- I was under the
10 impression she didn't then sign a second one?
11 A.    I don't know.  I thought that she did.
12 They approved one at the commissioners meeting for
13 another $40.  And then after that one ended, she
14 left or maybe before then, but she left at some
15 point in '21.
16 Q.    She left in '21.
17      She left before the offices were
18 restructured, though, that we can agree on, right?
19 A.    Correct.
20 Q.    Okay.
21      And Deb Detweiler was employed in the
22 assessment office as well?
23 A.    Yes.
24 Q.    And she resigned in June of 2020,

Page 327

1 correct?
2 A.    2020, I don't know.  If you're looking
3 at something, then I'll take your word for it, but
4 she did resign, yes.
5        MS. SMITH:  Okay.  And I can mark
6 it as Exhibit-222.  It's going to be Bates stamped
7 SC467.
8        THE WITNESS:  We can agree that she
9 did resign.
10 BY MS. SMITH:
11 Q.    Okay.
12       Do you know if it was in 2020?
13       Let me say this, if the county has
14 produced a doc -- a resignation letter from her
15 dated June -- June 5, 2020, any reason to believe
16 that that's not when she resigned?
17 A.    That's good enough for me, Ms. Smith.
18 Q.    Okay.  All right.
19       So fair to say that Jane Doe 3 lost a
20 few employees in the assessment office in 2020,
21 correct?
22 A.    That is correct.
23 Q.    Okay.
24       There were a number of vacant positions

Page 328

1 in her office during that time, correct?
2 A.    Correct.
3 Q.    At any point, did you have any
4 discussions with Jane Doe 3 or Jane Doe 4 about
5 how to go about fulfilling the vacancies and
6 ensuring the efficient operations of the offices
7 they oversaw?
8 A.    There was an offer made in January of
9 2021, she had said she was going to reorganize the
10 office, do we have a problem with that.  And I
11 authorized Doreen to send her an e-mail stating
12 that we'd be willing to discuss any time.
13 Q.    At some point did Jane Doe 3 make a
14 request to you about county vehicles for the
15 assessment office field appraiser?
16 A.    In the last meeting that I had with --
17 with Jane Doe 3, she received the authority from
18 me to go out and get vehicles.
19 Q.    And she prepared the paperwork for those
20 vehicles, the purchase or release of those
21 vehicles, correct?
22 A.    She did not.
23 Q.    You're saying you never received a
24 request by Jane Doe 3 to authorize the paperwork

Page 329

1 that she had?
2 A.    She never -- she never put it on the
3 agenda before the board.  There was nothing I
4 could sign.  She had the authority from me to go
5 out and seek that, she didn't do that.  Then it
6 was then she complained to the commissioners and I
7 assigned Lisa Mayhall to do that.  Lisa Mayhall
8 then went out and reached out to a dealership to
9 get cars, but at no time were they put on the
10 agenda, so I didn't sign for any vehicles.
11 Q.    Well, I thought that everything that was
12 going to be on the agenda had to go through the
13 county administrator?
14 A.    It did, but nothing came through me.
15 Q.    Okay.
16       So, again, is it your testimony that
17 Jane Doe 3 never submitted --
18 A.    An agenda item.
19 Q.    Is it your testimony that Jane Doe 3
20 never submitted a request for you to approve or
21 place on the agenda, paperwork that she had
22 prepared regarding the purchase or lease of
23 vehicles for her field appraisers?
24 A.    I don't recall that.

Page 330

1 Q.    Okay.
2       Do you recall Jane Doe 3 communicating
3 with you regarding the purchase or lease or
4 contract for copiers and printers for her offices?
5 A.    No.  But I received an e-mail from Cyan
6 Sky that Michael Deprello, I think his name is,
7 about a contract with that.  I told him we are not
8 going to entertain that at this time.  There are a
9 number of -- of printers or copiers that were
10 going to be coming up the following year.  I said
11 we are going to be extending that contract for --
12 we went from Toshiba and we were looking to go to
13 another company.  So I wanted to maximize the
14 number of copiers that were going to be on that
15 list.
16       So we didn't renew the veterans affairs.
17 We didn't renew the one that were five or six down
18 in children and youth, nor did we renew the ones
19 in the tax claim office.  So I had a list and we
20 put those all up for a quote in '21.
21 Q.    Okay.
22       And were other -- were replacement
23 printers or copiers given to the tax claim office?
24 A.    They extended their current contract for

Page 331

1  another year and -- and, yes, they had received
2  new -- a copier.
3  Q.      When was the -- I thought you said that
4  the contract with Cyan Sky was not extended?
5  A.      It was -- no, no, they had a contract
6  with Digital Leasing Company for a Toshiba copier.
7  And they had proposed buying one from Cyan Sky and
8  I didn't want to do that at that time because we
9  had a number of Toshibas.  So I wanted to go out
10  in the market, we had about maybe 30 copiers that
11  we could get, we could get a better deal doing it
12  in bulk, so we did.
13        And then the next year I solicited a
14  quote from various companies and we signed a new
15  contract.  So instead of five years, they had
16  theirs six.
17        MS. SMITH:  Let's just take a
18  few-minute break real quick.  We can go off the
19  record.
20        VIDEOGRAPHER:  The time is now 4:06
21  p.m. and we're going off the record.
22                - - -
23        (Whereupon, brief recess was held off
24  the record.)

Page 332

1                - - -
2        VIDEOGRAPHER:  The time is now
3  4:18 p.m. and we're back on the record.
4  BY MS. SMITH:
5  Q.      Okay.
6        Mr. Bender, I want to cover a few things
7  that we -- we talked about.
8        So going back to May 22, 2020.  When you
9  spoke -- when numerous individuals spoke or
10  interviewed Jane Doe 2, did you take any notes
11  during her interview?
12  A.      I did not.
13  Q.      When you spoke with Defendant Halcovage
14  thereafter, did you take any notes?
15  A.      I did -- I did not.  When you say speak
16  with Mr. Halcovage, is about when his interview
17  was going to be, because I didn't interview Mr.
18  Halcovage.
19  Q.      No, I know you didn't --
20  A.      Okay --
21  Q.      -- interview him, but I though you said
22  you spoke with him, one thing was about his access
23  and then restrictions to his access to the
24  courthouse and -- and those conversations.  Did

Page 333

1  you talk any notes --
2  A.      I did not.
3  Q.      -- at that point?
4        Okay.
5        Subsequent to May 22, 2020, did you take
6  any notes in regards to the allegations or
7  investigations concerning Defendant Halcovage?
8  A.      I did not.
9  Q.      So that would include your conversations
10  that you had with Commissioner Hess, Commissioner
11  Hetherington, and President Judge Baldwin?
12  A.      Correct.
13  Q.      All right.
14        We had talked about or you had testified
15  about restrictions that Sheriff Groody had placed
16  On commissioner Halcovage.  And you talked about
17  wanding him and wanding -- Sheriff Groody or the
18  sheriffs wanding Defendant Halcovage and wanding
19  Defendant Halcovage's belongings.
20        Do you remember that testimony?
21  A.      Yes.
22  Q.      And at any point, were you made aware
23  that there was, at least allegations, that
24  Defendant Halcovage had circumvented Sheriff

Page 334

1  Groody's instructions or restrictions?
2        MS. JONES:  Object to the form.
3        You can answer.
4        THE WITNESS:  I'm not aware of
5  that.
6  BY MS. SMITH:
7  Q.      Okay.
8        So no one ever told you that Defendant
9  Halcovage was having other staff bring bags into
10  the courthouse for him?
11  A.      Yes.  He had asked --
12  Q.      Okay.
13  A.      -- Mary Beth Heffner, her had asked her
14  to go down and get his bags and she did it one
15  time, told her she's not to do that.
16  Q.      Did you ever speak with Defendant
17  Halcovage about that?
18  A.      Yes.
19  Q.      What was that conversation?
20  A.      I told him he's not to do that.
21  Q.      What was his response?
22  A.      That he would not.
23  Q.      At some point did you learn that the
24  plaintiffs had requested one or two days -- access

Page 335

1  to the courthouse one or two days per week --
2  actually, I should strike that.
3      At some point did you learn that Jane
4  Doe 2 and Jane Doe 1 specifically requested one or
5  two days per week that they could come to the
6  courthouse when Defendant Halcovage was not there
7  to work in the courthouse to get their job duties
8  done?
9  A.    I know Jane Doe 2 had -- had come into
10 the house on several occasions, yes.
11 Q.    Okay.
12     But were you aware that Jane Doe 1 and
13 Jane Doe 2 had made that request?
14 A.    I think they made a request to come into
15 the building.
16 Q.    One or two days per week when Defendant
17 Halcovage wasn't there?
18 A.    But I can't dictate when Commissioner
19 Halcovage comes in the building.
20 Q.    Okay.
21     But all I'm asking is were you aware --
22 A.    Yes.
23 Q.    -- that that was a request that they had
24 made?

Page 336

1  A.    Yes.
2  Q.    Okay.
3      And did you ever discuss that request
4  and option with Defendant Halcovage?  Did you ever
5  say to him, do you mind coming -- one or two days
6  per week not coming in?
7  A.    No.
8  Q.    Do you know anyone -- anyone on behalf
9  of the courthouse who asked him to do that?
10 A.    I do not.
11 Q.    At any point were you made aware that
12 there was a request, that the plaintiffs be
13 notified, specifically Jane Doe 2 and Jane Doe 1
14 or Jane Doe 2 and Jane Doe 1 through Ms. Twigg and
15 Jane Doe 4, of days that Defendant Halcovage had
16 business elsewhere so that they could rearrange
17 their schedules to come into the courthouse on
18 those days?
19 A.    I'm not aware of that.
20 Q.    So I'm assuming based on your answer,
21 that you then never discussed having Defendant
22 Halcovage notify someone so that the plaintiffs
23 could be notified of dates he would not be in the
24 courthouse?

Page 337

1  A.    Correct.
2  Q.    At any point during your employment with
3  the county, did you prepare -- and not related to
4  Defendant Halcovage or any of the plaintiffs, but
5  at any point did you prepare a statement or an
6  incident report regarding anything that ever
7  happened at the county?
8      MS. JONES:  I'm sorry.  Did he ever
9  in his career prepare an incident report?
10     MS. SMITH:  Correct.
11     MS. JONES:  I'll object to the
12 form.
13     You can answer it.  It seems overly
14 broad, but go ahead.
15     THE WITNESS:  I'm unaware.
16     MS. SMITH:  Okay.  I am going to
17 mark -- should be in this packet in front of you.
18 It's 14.  I'll mark this one as 222.  And just for
19 the record, I started to mark 222 earlier, but it
20 will not -- that one will not be 222, Bates
21 stamped 14 will, in fact, be 222.
22     - - -
23     (Bates Stamped 14 marked as Exhibit-222
24 for identification.)

Page 338

1      - - -
2      THE WITNESS:  Okay.  I see it.
3  BY MS. SMITH:
4  Q.    Okay.
5      Do you recognize this document?
6  A.    I do.
7  Q.    Is that your signature on, I don't want
8  to say the bottom, but the bottom of the
9  paragraph?
10 A.    It is.
11 Q.    Is that also your signature at the top
12 or is that someone else's handwriting?  Yes, I see
13 where you're pointing.  Yes, that's what -- to the
14 right of the confidential stamp.
15 A.    That's someone else's.
16 Q.    Okay.
17 A.    If you look at the G, you'll be able to
18 see that.
19 Q.    I thought they looked different, but one
20 is a signature, one is handwriting, so I just
21 wanted to clarify.
22     Do you know if -- the one that's not
23 your handwriting, is that potentially because this
24 is something that's in your personnel file?

Case 3:21-cv-00477-MCC   Document 280-1 CONFIDENTIAL Filed 09/20/23   Page 293 of 373

Deposition of Gary Bender Vol. I - Revised                    Jane Doe, et al. v. Schuylkill County Courthouse, et al.

Page 339

1  A.     I don't know.
2  Q.     Okay.
3         Do you know if this is a document that's
4  in your personnel file?
5  A.     I don't know that either.
6  Q.     Okay.
7         Did you prepare this report?
8  A.     I did.
9  Q.     Did you do this of your own volition or
10 at someone's request?
11 A.     At someone's request.
12 Q.     Do you know whose request?
13 A.     Commissioner Gerick Mantura Gallagher.
14 Q.     All right.
15        And do you know why Commissioner --
16 former Commissioner Gallagher requested you
17 prepare this?
18        MS. JONES:  Object to the form.
19        You can answer.
20        THE WITNESS:  Because Commissioner
21 Gallagher and Melinda Cantor hated each other and
22 I felt accosted by Ms. Cantor and I reported it
23 to Mark Scarbinsky who reported it to Commissioner
24 Gallagher who asked me to write something up and I

Page 340

1  did.
2  BY MS. SMITH:
3  Q.     Okay.
4         And in your employment with the county,
5  have you come to learn that it's important to
6  document incidents such as this one?
7  A.     I was not going to document this until
8  she asked me to do it.  But it is important to
9  document, yes, I will agree with that, Ms. Smith.
10 Q.     All right.
11        And so as of least June of 2008, you
12 were aware that an incident report such as this
13 one could be created and submitted to the county,
14 correct?
15 A.     Okay.  Yes.
16 Q.     All right.
17        And in this incident report in about the
18 middle, you indicate:  As another employee was in
19 the room at the time, I was embarrassed by my
20 treatment.
21        Do you see that?
22 A.     I do.
23 Q.     A couple sentences, I think two
24 sentences later, it says:  I felt humiliated and

Page 341

1  that I was forced to defend my words and actions,
2  which were well documented.
3         Do you see that?
4  A.     I do.
5  Q.     You have at this point, meaning today,
6  have reviewed the reports of Ms. Twigg regarding
7  the plaintiff's allegation against Defendant
8  Halcovage, correct?
9         MS. JONES:  I object to the form.
10        You can answer if you can.
11        THE WITNESS:  Would you repeat that
12 then, Ms. Smith.
13        MS. SMITH:  Sure.  Yeah, Matt, you
14 can take that exhibit down.
15 BY MS. SMITH:
16 Q.     My question was:  As you sit here today,
17 have you before today, reviewed the report, the
18 interview notes, and the final report of Ms. Twigg
19 regarding the investigation into the allegations
20 against Defendant Halcovage?
21 A.     Yes, I've reviewed it.
22 Q.     Okay.
23        So can we agree that you have an
24 understanding of what the plaintiffs allegations

Page 342

1  against Defendant Halcovage include?
2  A.     I do.
3  Q.     Do you believe that it is reasonable
4  that the plaintiffs felt embarrassed and
5  humiliated by Defendant Halcovage's conduct that
6  they allege happened?
7         MS. JONES:  I object to the form.
8         You can answer it if you can.
9         THE WITNESS:  I would have been.
10 BY MS. SMITH:
11 Q.     Okay.
12        Would you have been emotionally
13 distressed if what happened to them happened to
14 you?
15        MS. JONES:  Object to the form.
16        You can answer.
17        THE WITNESS:  I would suppose so.
18 BY MS. SMITH:
19 Q.     Throughout the day today, you have
20 testified about a number of times that
21 Halcovage -- Defendant Halcovage engaged in
22 conduct or made a comment that you addressed with
23 him; would you agree?
24 A.     Yes.

Page 343

Q.     Any of those times, did you prepare a
document similar to the incident report we just
looked at?
A.     I did not.
Q.     Why?
A.     Because I reported it to HR.
Q.     But you didn't feel the need to then
document it in a paper form in some manner?
A.     No.  It would have been documented by
HR.
Q.     Did you ever follow up to ensure that HR
documented it?
A.     I did not.
       MS. SMITH:  I am going to mark as
223 for today's purposes, it's 37.  It should also
be in that stack.
                    - - -
       (Bates Stamped 37 marked as Exhibit-223
for identification.)
                    - - -
BY MS. SMITH:
Q.     Do you recognize -- I'm sorry.  I can't
see on my end.  Actually, I don't know if you have
it in front of you.

Page 344

       MR. TOWNSEND:  He has it now.
       MS. SMITH:  Okay.  Perfect.  Now I
can see it.  Thank you.
BY MS. SMITH:
Q.     Do you recognize this document, Mr.
Bender?
A.     I do.
Q.     And did you prepare this document?
A.     No.
Q.     In the second to last paragraph it says:
Gary Bender suggested to Hank to file a complaint
with the Pottsville police department.  Gary also
said that he will notify Deputy Chief Brian Tobin
of the incident.
       Do you see that?
A.     I do.
Q.     After learning of any of the allegations
against Defendant Halcovage, at any point did you
suggest to any of the plaintiffs in this matter to
file a complaint with the Pottsville or other
police department?
A.     I did not.
Q.     At any point after learning of the
plaintiffs allegations against Defendant

Page 345

Halcovage, did you notify Deputy Chief Brian Tobin
or Sheriff Groody?
A.     They were well aware of these incidents.
Q.     Did you yourself speak with them about
what they knew?
A.     I had spoken to Brian Tobin, whether he
had any knowledge or any videos of George bringing
women into the courthouse.
Q.     What was Brian Tobin's response?
A.     That he did not.
Q.     Who has access --
       MS. SMITH:  Matt, you can take that
exhibit down.  Thank you.
BY MS. SMITH:
Q.     Who from the county has access to video
feed or recordings?
A.     The sheriff's department and my office.
Q.     At any point did you instruct the
sheriff's department to preserve any and all video
footage that could be preserved at that point, as
of May of 2020?
A.     Yes.
Q.     Who did you tell to do that?
A.     We contacted Sheriff Groody who

Page 346

contacted Johnson Controls to see what extent we
could save.  And there was a limited amount that
we could save.  And after two months I think it is
gone.  So he had got an estimate on that time, we
did not follow through on that.
Q.     So there was two months of video prior
to May of 2020 that could have been saved; is that
correct?
       MS. JONES:  Object to the form.
       But you can answer.
       THE WITNESS:  Well, in my opinion,
it goes overwritten then.
BY MS. SMITH:
Q.     Right.
       So at least when you contacted -- I'm
sorry, I forget who you said, but when you
contacted whoever -- contacted whoever regarding
the preservation, you were made aware that at
least -- or two months could be saved, correct?
A.     Well, at some time after that because we
got ahold of Johnson Controls to find out how much
is actually preserved.
Q.     Okay.
       Well, I guess my question is

Page 347

1  regarding -- regardless of what could be saved or
2  what was overwritten, was any video footage
3  preserved?
4  A.      I'm not aware of that.  I would have to
5  talk to the sheriff about that.
6  Q.      Okay.
7          But you said you never followed up after
8  that conversation with Johnson Controls, I think
9  is what you said?
10 A.      Yeah.  To preserve it, all it would have
11 unnecessarily costly.  We didn't have the ability
12 to do that.
13 Q.      All right.
14         I'm going to go back to the conversation
15 or testimony about the working from home of Jane
16 Doe 2 and Jane Doe 1.  And I think in your words,
17 it was not working out.
18         What specifically about Jane Doe 2's
19 working from home was not working out?
20 A.      Well, according to her supervisor, she
21 wasn't turning in her weekly reports.
22 Q.      When did you learn this?
23 A.      Probably in December of 2020.
24 Q.      So Jane Doe 2's supervisors would have

Page 348

1  been Jane Doe 4 and Jane Doe 3, correct?
2  A.      Well, I talked to Chrissy Zimmerman
3  after the fact.
4  Q.      Okay.
5          I'm asking about December of 2020.
6  A.      Uh-huh.
7  Q.      Jane Doe 2's supervisors would have Jane
8  Doe 3 and Jane Doe 4, correct?
9  A.      Yes.  I did not.
10 Q.      You did not what?
11 A.      I did not talk to them.
12 Q.      Okay.
13         So between July 2020 when Jane Doe 2 was
14 recalled from furlough and December of 2020, you
15 did not speak with Ms. Good -- with Jane Doe 3 or
16 Jane Doe 4 about Jane Doe 2's work performance?
17 A.      I did not.
18 Q.      Did you review Jane Doe 2's time records
19 to determine if she had utilized PTO, vacation, or
20 sick?
21 A.      Yes.  She had none to give.
22 Q.      She had vacation and sick as of July of
23 2020, correct?
24 A.      Right.

Page 349

1  Q.      And so did -- do you know how many days
2  she utilized to cover time that she did not work?
3  A.      I do not.
4  Q.      Do you know how many days she did not
5  perform work during which she did not utilize
6  banked time?
7  A.      I do not.
8  Q.      You indicated that you had a
9  conversation with Ms. Zimmerman after the fact.
10 What do you mean after the fact, when is this --
11 when did this conversation take place?
12 A.      After the offices were separated, I
13 wanted to know where the -- what work was being
14 performed.  And she had indicated at the time that
15 Jane Doe 2 turned in very, very little work.
16 Q.      So after the offices were restructured,
17 so March of 2021, you had a conversation with
18 Ms. Zimmerman about Jane Doe 2's work performance?
19 A.      Yes.
20 Q.      And was the conversation about Jane Doe
21 2's work performance post -- the conversation I
22 understand happened in post March of 2021, but
23 were you focused on Jane Doe 2's work
24 performance -- what period of time were you

Page 350

1  discussing that, since the restructuring or before
2  the restructuring or what time period was --
3  A.      Even in -- even in 2020, how long has it
4  been a problem.
5  Q.      Okay.
6          Ms. Zimmerman prior to the
7  restructuring, was not Jane Doe 2's supervisor,
8  correct?
9  A.      But she was well aware of the work that
10 was being performed.
11 Q.      How would she be well aware of the work
12 that was being performed?
13 A.      Because she worked in that office.
14 Q.      Was she privy to e-mails between Jane
15 Doe 2 and Jane Doe 3 or Jane Doe 4?
16 A.      I'm unaware of that.
17 Q.      Did Ms. -- strike that.
18         Did Ms. Zimmerman go into the field with
19 Jane Doe 2 at all?
20 A.      Not that I'm aware of.
21 Q.      Did Ms. Zimmerman have access to Jane
22 Doe 2's e-mails?
23 A.      I don't think so.
24 Q.      Okay.

Page 351

So tell me then how is it you believe Ms. Zimmerman was able to determine what work Jane Doe 2 was or was not doing?

A.    I can only tell you what she reported to me.

Q.    Okay.
Did you ever follow up with Jane Doe 3 or Jane Doe 4 to ask if Ms. Zimmerman's report were, in fact, accurate?

A.    I did not.

Q.    Did you ever speak with Jane Doe 2 about her work performance?

A.    I did not.

Q.    Post -- post May of 2020?

A.    I did not.

Q.    So Jane Doe 2 -- as I understand your testimony earlier, or roughly the end of 2020, maybe early 2021, you decided to speak with Ms. Kutzler about changing Jane Doe 2 and Jane Doe 1 from work from home to an alternate location in the county, correct, meaning the 410 Building?

A.    Correct.

Q.    And I thought you testified earlier that that was because of the work from home, and I want

Page 352

to focus on Jane Doe 2, the work from home was not working out, correct?

A.    Correct.  She wasn't reporting to work. There was no work product, so we figured if they have to come in every day, we could at least show a work product, that they were here.

Q.    Right.
But at that point when the 410 Building was brought up, you had not had any conversations with Jane Doe 2 or her supervisors about what work she was doing, correct?

A.    I did not.

Q.    Jane Doe 2's supervisors had not reported any concerns regarding her work product to you, had they?

A.    They did not.

Q.    So why is it that you believed at that point, not subsequent conversations you had with Ms. Zimmerman, but in late 2020, very early 2021, what basis did you have to believe that Jane Doe 2's work from home status was not working out?

A.    Well, it -- the bottom line was the -- the accommodation at 410 still a reasonable accommodation and it was.

Page 353

Q.    Not my question, Mr. Bender.
I'm asking, you testified that the reason that the 410 Building was discussed as an alternate location was because Jane Doe 2's work from home status was not working out.
Is that not what you testified to?

A.    Yes.

Q.    Okay.
So what information did you have when the conversation about the 410 Building was started, that Jane Doe 2's work from home status was not working out?

A.    Well, I guess it was just my desire to have that done.

Q.    Okay.
And why was it your desire to have Jane Doe 2 report back to a physical location?

A.    Because she would be there with Jane Doe 1, there would be two of them there, they might be more comfortable that way.

Q.    Well, did you asked Jane Doe 2 or Jane Doe 1 if that would make them more comfortable?

A.    I did not.

Q.    Did you ask them what would make them

Page 354

more comfortable?

A.    I did not.

Q.    Did you learn that, in fact, that the 410 Building made Jane Doe 1 and Jane Doe 2 less comfortable?

A.    I did not.  And why was that?  Well, nevermind.  Strike that question.

Q.    Did you learn that Jane Doe 2 and Jane Doe 1 had issues with the state, the physical state of their offices?

A.    I saw those complaints.  We had that office professionally cleaned before they moved in the offices -- both offices were occupied for a long period of time by someone else, so I didn't see an issue.

Q.    Okay.
So Jane Doe 1's office in 410 Building is in a separate location, it's not -- then Jane Doe 2's.  They're not -- they weren't in one office, they were in two separate offices, let's start with that.

A.    Correct.

Q.    And they weren't even next door to each other, correct?

Page 355

1  A.     That is correct.  Well, the offices are.
2  One -- one was a separate entrance.
3  Q.     Well, so I guess my -- I just want to
4  make the record clear, Jane Doe 2 and Jane Doe 1's
5  offices in the 410 Building didn't share a wall,
6  correct?
7  A.     Correct.
8  Q.     Ms. -- Jane Doe 1 was in the main
9  hallway of the main floor and you had to go
10 through, I think it's -- is it children and youth
11 or..?
12 A.     Human services.
13 Q.     Human services, past a few offices to
14 get to Jane Doe 1's, correct?
15 A.     Well, Jane Doe 1's was accessible right
16 from the hallway.  Jane Doe 2's was accessible in
17 the human services complex.
18 Q.     I think I said Jane Doe 1 twice.  I
19 think that's where I confused you.
20        Jane Doe 1's was accessible from the
21 main hall, you had to go into the services office,
22 past a few offices to get to Jane Doe 2's office,
23 correct?
24 A.     Correct.  That is correct.

Page 356

1  Q.     There's probably about, I would say
2  estimating, a football field distance between the
3  two?
4        MS. JONES:  Object to the form.
5        I was there too.
6  BY MS. SMITH:
7  Q.     Would you -- I mean, is my distance --
8  would you agree Mr. Bender, about maybe a little
9  less than a football field away?
10 A.     30 feet.
11 Q.     Okay.
12 A.     That's not a football field.
13 Q.     We may have to measure that because I'm
14 pretty bad with distances, but I think it's more
15 than 30 feet.  But, again, there's a number of
16 offices and even a -- I think somewhat of a lunch
17 area in between the two, correct?
18        MS. JONES:  I object to the form.
19        I mean, I actually object because I
20 was there too and I don't agree with your
21 characterization.  So object to the form, plus I
22 have to say, I don't think you're right, so you
23 just have to be careful because I think it's
24 misleading him.

Page 357

1        MS. SMITH:  Well, that's why I am
2  asking if he agrees with me.  I'm -- I'm -- if I'm
3  wrong, you can tell me I'm wrong.
4  BY MS. SMITH:
5  Q.     But there is -- you walk in through
6  the -- well, first let's start with this, there's
7  a door from the main hallway into the services
8  office that requires a keycard, correct?
9  A.     Correct.
10 Q.     Jane Doe 1 was not provided a keycard to
11 get into that office space, correct?
12 A.     Correct.
13 Q.     Okay.
14        There's, I think, a long table on the
15 right-hand side and then there's an area where
16 there's a coffeepot and a fridge, correct?
17 A.     I don't recall that.  It could be.  You
18 go in and directly into the -- to the right,
19 there's a receptionist sits there.  To the left
20 there's another receptionist.  You go into Sharon
21 Loves' office and I think Jane Doe 2's was the one
22 right after that.
23 Q.     Okay.
24        So there's two receptionists, an office,

Page 358

1  and then Jane Doe 2's office?
2  A.     Correct.
3  Q.     Okay.
4        So there was -- strike that.
5        Are you aware that Jane Doe 2 and Jane
6  Doe 1 raised concerns about the fact that there
7  was no sheriff or swipe card access required --
8  strike that.  That's -- I am going to ask them
9  separately.
10        Were you aware that Jane Doe 1 and Jane
11 Doe 2 had raised concerns with the fact that there
12 was no sheriff in that building?
13 A.     I was -- I'm not aware of that.  There
14 were a number of concerns with the cleanliness of
15 it, which we addressed.
16 Q.     Okay.
17        Are you aware that Jane Doe 2 and Jane
18 Doe 1 -- strike that.
19        At some point after the discussions
20 began regarding the 410 Building, there was an
21 attempt to have Jane Doe 1 and Jane Doe 2 start in
22 that building and then it was delayed and they
23 didn't actually start in the building until
24 January of 2021, correct?

Page 359

1  A.      Correct.
2  Q.      Okay.
3          Are you aware that Jane Doe 2 and Jane
4  Doe 1 raised concerns with the fact that the
5  public could access that building without a swipe
6  card?
7  A.      I do recall that, yes.
8  Q.      Okay.
9          And did you ever address that concern
10 with Jane Doe 2 or Jane Doe 1?
11 A.      I did not.
12 Q.      Are you aware that Jane Doe 1 and Ms.
13 Casey raised concerns regarding the fact that they
14 could not park in the parking lot for that
15 building?
16 A.      As many other employees can not, yes.
17 Q.      Okay.
18         But are you aware that Jane Doe 1 and
19 Jane Doe 2 raised concerns regarding that because
20 they felt that it could -- would expose them to
21 come into -- potentially come into contact with
22 Defendant Halcovage?
23 A.      They had requested parking, yes.
24 Q.      Okay.

Page 360

1          And you have the ability to assign
2  parking at that building?
3  A.      Sharon Love assigns parking at that
4  building.  The spots were filled.  I didn't
5  countermand her.
6  Q.      Can -- do you have the ability to --
7  A.      I probably could have, yes.
8  Q.      Let me just finish my question.
9          As it relates to parking at the 410
10 Building, do you have the ability to overrule
11 Sharon Love and assign Jane Doe 2 and Jane Doe 1
12 parking?
13 A.      I would think so, yes.
14 Q.      And you did not do that --
15 A.      I did not do that.
16 Q.      -- correct?
17 A.      That is correct.  Sorry.  Sorry.
18 Q.      Okay.  It's okay.  We're -- we're
19 heading towards the end of the day, so we're
20 almost there.
21         Did you ever reconsider assigning Jane
22 Doe 2 or Jane Doe 1 to another location given
23 their concerns related to the 410 Building?
24 A.      At one point I was going to move Jane

Page 361

1  Doe 1 over into the mental health, drug and
2  alcohol area, which is across the hallway.  I
3  spoke with Elaine Gilbert about that.  We decided
4  not to do that.
5  Q.      Why did you decide not to do that?
6  A.      Because it's space that she needs and I
7  didn't want to add another compilation to her,
8  so...
9  Q.      Okay.
10         Did you ever discuss with Jane Doe 2 or
11 Jane Doe 1 the fact that -- strike that.
12         Let me ask you:  Did you ever become
13 aware that Jane Doe 1 and Jane Doe 2 had a concern
14 with feeling ostracized from their colleagues in
15 the tax assessment office?
16 A.      Yes.
17 Q.      Okay.
18         Did you ever discuss that Jane Doe 1 or
19 Jane Doe 2?
20 A.      I did not, but I know Heidi Zula did.
21 Q.      Okay.
22         How do you know that Heidi Zula did
23 that?
24 A.      Because she told me when -- because

Page 362

1  Jane Doe 2 had come in on one of the times for a
2  write-up and she was concerned about that.  And I
3  agreed with that, Ms. Smith.  You know, when you
4  work in an office, there's part of the
5  camaraderie.  There's part of -- you don't -- you
6  are not with it.
7          And -- and she just felt that she wasn't
8  part of the team anymore, well she wasn't because
9  she wasn't in the office.  And I always felt
10 strongly that we could have protected them in the
11 courthouse.  They're in an office with -- with
12 other people, that -- that George couldn't have
13 gone in there.  I think there was sufficient
14 protocols in place that we could have protected
15 them.
16         Being in a different office and being --
17 working from home, is -- is not healthy, I would
18 agree with that.  And they should have been in --
19 in that office.  If they chose not to do that,
20 I -- but that's a long answer to your -- to your
21 question.  I'm sorry about that.  But, yes, I
22 think it's important that you're in an office with
23 other people.
24 Q.      I know.  And I appreciate that.

Page 363

And in fact, would you agree that given, at least that you felt there was some concerns with their work product, that working in the same office as their supervisor would have been preferable or more ideal?

A. Absolutely.

Q. Okay.

And can you understand or -- and/or appreciate how Jane Doe 2 and Jane Doe 1, given the timing of everything, might have felt that moving them to this ostracized location was retaliation for their complaints?

MS. JONES: Object to the form.

Don't answer that question. You're asking him to make a legal conclusion. I don't think he should.

MS. SMITH: I am asking him to -- to testify to his opinion. Can he understand why they --

MS. JONES: If you can rephrase the question, I'll consider it, but not the way that question was phrased, I am not going to let him answer.

BY MS. SMITH:

Page 364

Q. Do you understand or appreciate that Jane Doe 2 and Jane Doe 1 would have felt that the move to the other building was as a result of them filing -- making their complaints against Defendant Halcovage?

MS. JONES: Object to the form. But you can answer.

THE WITNESS: I do not.

BY MS. SMITH:

Q. Okay.

Do you understand that Jane Doe 2 or Jane Doe 1 could have felt that if they had never made those reports, they would have not have been moved?

MS. JONES: Object to the form.

THE WITNESS: I would agree with that, they wouldn't have been moved.

BY MS. SMITH:

Q. Okay.

Were any -- was there any offer by the county for Jane Doe 2 or Jane Doe 1 to work in any location other than the 410 Building?

A. They were offered to come back to the assessment office. We felt protocols were in

Page 365

place with the sheriff, with what we controlled of George Halcovage, that they could have worked in there and had the experience of working in an office.

Q. Okay.

So -- well, you testified kind of just then and earlier, just a moment ago about -- that you felt that you could have protected them from Defendant Halcovage, meaning -- I think the, we, was meaning the county?

A. Yes. I'm sorry, yes.

Q. At the time that the 410 Building was discussed and Jane Doe 2 and Jane Doe 1 were assigned there, Defendant Halcovage had climbed the embankment from the lower lot to the upper lot, correct?

A. Okay. Yes.

Q. Do you agree?

A. Yes.

Q. And you were made aware that Ms. Good -- I'm sorry -- Jane Doe 3 and Jane Doe 4 were seated in a vehicle where Defendant Halcovage emerged from the top of the embankment; is that correct?

A. I was told that, yes.

Page 366

Q. And in -- at the time that Jane Doe 2 and Ms. Ger -- Jane Doe 2 and Jane Doe 1 were assigned to the 410 Building, Defendant Halcovage had circumvented Sheriff Groody's instructions of having -- bringing in his own bags and having them wanded, correct?

MS. JONES: Object to the form. You can answer.

THE WITNESS: Circumvented how, by coming up the bank?

BY MS. SMITH:

Q. No. You had said that Ms. Mary Beth Heffner had brought his bag in?

A. On one -- okay. Yes.

Q. That had happened before Jane Doe 2 and Jane Doe 1 were assigned to the 410 Building, correct?

A. I would think so, yes.

Q. Okay.

And, in fact, once Mr. -- one Defendant Halcovage climbed the embankment on that particular day, he entered the front entrance of the building, correct?

A. That is correct.

Deposition of Gary Bender Vol. I - Revised                    Jane Doe, et al. v. Schuylkill County Courthouse, et al.

Page 367

1  Q.      And that was not what restrictions
2  Defendant -- Sheriff Groody had imposed upon him,
3  correct?
4  A.      Not at that time.
5  Q.      Okay.
6        Shortly after Jane Doe 2 and Jane Doe 1
7  were assigned to the 410 building, Jane Doe 2
8  raised an issue of being followed by Defendant
9  Halcovage in early January of 2021, correct?
10 A.      Yes, I'm aware of that.
11 Q.      Okay.
12       And are you aware that Jane Doe 3
13 observed Defendant Halcovage -- Jane Doe 3 or Jane
14 Doe 4 observed Defendant Halcovage on Jane Doe 2's
15 iPad when they were FaceTiming her?
16       MS. JONES:  Object to the form.
17       You can answer.
18       THE WITNESS:  That is not what they
19 said.
20 BY MS. SMITH:
21 Q.      Did you speak with them about it?
22 A.      I've never -- no, I've never seen a
23 photo.
24 Q.      I am not asking whether there was a

Page 368

1  photo.
2        Are you aware that Jane Doe 3 and --
3  and/or Jane Doe 4 during -- that Jane Doe 2,
4  during -- when she believed she was being followed
5  by Defendant Halcovage, FaceTimed Jane Doe 3 and
6  Jane Doe 4 and they observed Defendant Halcovage
7  and/or his car on the FaceTime chat?
8        MS. JONES:  Object to the form.
9        You can answer.
10       THE WITNESS:  I don't think that
11 was expressed to me by Sheriff Groody.
12 BY MS. SMITH:
13 Q.      Okay.
14       Did you ever speak with Jane Doe 2, Jane
15 Doe 3, and/or Jane Doe 4 about that incident?
16 A.      I did not, no.
17 Q.      Do you know if anyone else did?
18 A.      Yeah.  Certainly Heidi would have.
19 Q.      Okay.
20       Are you aware that -- I am going to take
21 you back in time, sorry, I apologize, May of 2020,
22 on the day of May 22, 2020, were you aware that
23 Defendant Halcovage, after receiving notification
24 of the allegations against him, went to Jane Doe

Page 369

1  2's parents' home where Jane Doe 2 resided?
2  A.      I think that was in the report, yes.
3  Q.      Okay.
4        Are you aware that Defendant Halcovage
5  attempted to communicate with Jane Doe 2 through
6  Facebook after he learned of the allegations
7  against him?
8        MS. JONES:  I am going to object to
9  the form.
10       But you can answer.
11       THE WITNESS:  If that was in the
12 report, yes.
13 BY MS. SMITH:
14 Q.      Sometime after May of 2020, Defendant
15 Halcovage stepped down from his position as
16 chairman of the commissioners, correct?
17 A.      Correct.
18 Q.      Does July 1, 2020, sound about right?
19 A.      Yes.
20 Q.      Okay.
21       Do you -- did you discuss that with
22 Defendant Halcovage?
23 A.      No.  That was discussed amongst the
24 three commissioners.

Page 370

1  Q.      Did you know he was going to step down
2  prior to his -- his announcement or it being
3  placed on the agenda?
4  A.      I did.
5  Q.      Okay.
6        Did you discuss that with anyone?
7  A.      No.
8  Q.      There has been a number of individuals
9  throughout the county, employees and non-employees
10 who have called for Commissioner Halcovage's
11 resignation.
12       Are you aware of that?
13 A.      I am.
14 Q.      Are you -- do you believe that
15 Commissioner -- Defendant Halcovage should step
16 down as a commissioner?
17 A.      That's up to Commissioner Halcovage.
18 Q.      If you were Commissioner Halcovage,
19 would you step down?
20       MS. JONES:  Object to the form.
21 That's -- that's really speculative.
22       MS. SMITH:  Are you instructing him
23 not to answer?
24       MS. JONES:  I'm thinking about it.

Page 371

1  Want to repeat it for me again?
2  BY MS. SMITH:
3  Q.      If you were Commissioner Halcovage,
4  would you step down?
5         MS. JONES:  I will object to the
6  form.
7         You can answer if you can.
8         THE WITNESS:  That's a decision
9  Commissioner Halcovage has to make.  I'm not in
10 that situation right now.  I don't want to make a
11 comment on that.
12 BY MS. SMITH:
13 Q.      One of the individuals who has called
14 for -- who has called for Commissioner Halcovage's
15 resignation is Commissioner Hess, correct?
16 A.      And Hetherington.
17 Q.      Okay.
18        Do you support their request for him to
19 step down?
20        MS. JONES:  Object to the form.
21        You can answer if you...
22        THE WITNESS:  They made the
23 decision based on how they best can see the
24 county.

Page 372

1  BY MS. SMITH:
2  Q.      Did you support their requests?
3  A.      They made the request.  They didn't come
4  to me for any consultation on that.
5  Q.      Well, I'm asking if -- if you support
6  their requests?
7         MS. JONES:  I am going to object to
8  the form base on his prior answer.
9         You can answer if you can.
10        THE WITNESS:  It -- again, it was
11 their decision to make that call, they're the
12 commissioners, I'm not.
13 BY MS. SMITH:
14 Q.      Are you asking Mr. Halcovage to step
15 down?
16 A.      I told Commissioner Halcovage at one
17 point, if he can't act as a commissioner, then I
18 think he should.
19        MS. SMITH:  Matt, if you can put on
20 the screen, prior marked -- priorly marked
21 Exhibit-85.
22        (Previously marked Exhibit-85.)
23 BY MS. SMITH:
24 Q.      Mr. Bender, if you can turn to that

Page 373

1  binder in front of you.
2  A.      What number was that?
3  Q.      Eighty-five?
4  A.      Eighty-five.  Okay.
5  Q.      Do you recognize this document?
6  A.      I do.
7  Q.      Did you write this letter?
8  A.      I did.
9  Q.      And did you write it at your own
10 volition or did someone -- did you discuss it with
11 someone or did someone tell you to write it?
12 A.      I felt it was important to put my
13 recollection of events to the three other -- to
14 the two commissioners.
15 Q.      Okay.
16        And was this letter drafted just from
17 memory or did you have notes from which -- on
18 which you relied to write it?
19 A.      I had called Glenn Roth and -- and Debra
20 Twigg in on a Saturday to help me with -- with the
21 recollection of this.
22 Q.      Did you review any notes in order to
23 compile this letter?
24 A.      Is reviews that I felt, yes.

Page 374

1  Q.      Were those notes you took or notes
2  others took?
3  A.      No.  Just daily -- at the end of the
4  day, things that were typed -- type up at the end
5  of the day.
6  Q.      Okay.
7         So you relied on things that you had
8  typed up in order to compile this letter?
9  A.      Yes.  And plus with the help of Debra
10 and Glenn.
11 Q.      Okay.
12        And where are those notes that you typed
13 up, maintained?
14 A.      In this letter.
15 Q.      But you said you relied on notes you
16 typed up to write this letter.  So there's
17 independent documents or -- whether they are
18 printed or on Word or whatever, that exist; is
19 that what I'm understanding?
20 A.      There might be, yes.
21 Q.      Okay.
22        And are those maintained on your county
23 computer or in a drawer or both?  Something else?
24 A.      I would have to look.

Page 375

1 Q.    Okay.
2       MS. SMITH:  We're going to ask
3 because I believe those are responsive to a prior
4 request that those be produced.
5 BY MS. SMITH:
6 Q.    There was a note -- I can't remember
7 where I saw it -- oh, in Ms. Twigg's report
8 regarding the interview of Jane Doe 2.  There's a
9 note about Jane Doe 3 bringing up that she didn't
10 want Defendant Halcovage to come into her offices
11 anymore, meaning the tax claim and tax assessment
12 office.
13       Do you recall that being discussed?
14 A.    Yes.
15 Q.    Okay.
16       Was Defendant Halcovage told that he was
17 not to go into the tax claim or tax assessment
18 offices?
19 A.    Yes.  He was told he was not to go
20 anywhere unaccompanied.
21 Q.    But was -- was he permitted to go to the
22 tax claim and tax assessment offices
23 unaccompanied?
24 A.    I don't think he would have gone there,

Page 376

1 no.
2 Q.    Okay.
3       What he would have done or wouldn't have
4 done, my question is:  Was he told that he was not
5 permitted in those offices?
6 A.    I don't recall specifically that.
7       MS. SMITH:  Matt, if you can put on
8 the screen Exhibit-59.
9       (Previously marked Exhibit-59.)
10 BY MS. SMITH:
11 Q.    And, Mr. Bender, if you can turn to the
12 previously marked Exhibit-59.
13 A.    Okay.
14 Q.    Do you recognize this document?
15
16 A.    I do.
17 Q.    And this is a letter that you wrote to
18 Defendant Halcovage, correct?
19 A.    It's not my signature, but I read it and
20 approved it.
21 Q.    Whose signature is it?
22 A.    Looks like DW, looks like Doreen's.
23       Do you see at the bottom there, it says
24 Gary Bender and then DWK.

Page 377

1 Q.    So did Doreen Kutzler sign your
2 signature at your approval?
3 A.    Yes.
4 Q.    Okay.
5       So who wrote this letter?
6 A.    I think Doreen.
7 Q.    Okay.
8       So she -- did she write it at your
9 request?
10 A.    Yes.
11 Q.    Did she write it in request -- hold on.
12 Did she write at your request or did she write --
13 did you request she write it?  Wait.  I think I
14 just --
15 A.    That was the same thing.
16 Q.    Did she -- did she come to you and say
17 she wanted to write the letter or did you request
18 she write the letter?
19 A.    No, we needed a letter written, yes, so
20 I authorized her to write this letter with some
21 language in it that would be unmistakable.
22 Q.    Okay.
23       And it's date --
24       MS. SMITH:  Matt, if you can scroll

Page 378

1 out.
2 BY MS. SMITH:
3 Q.    December of 2020, December 9th of 2020?
4 A.    Correct.
5 Q.    And it's regarding the 410 Building,
6 correct?
7 A.    Correct.
8 Q.    So at least as early as December 9th of
9 2020, there was discussions about assigning Jane
10 Doe 1 and Jane Doe 2 to that building; is that
11 fair?
12 A.    That is correct.
13 Q.    All right.
14       This letter states:  It is the
15 expectation of the county that you will not make
16 any attempt to enter or conduct any aspect of
17 face-to-face meetings with any individuals who are
18 working in that facility, meaning the 410
19 Building, correct?
20 A.    Correct.
21 Q.    Okay.
22       Do you agree with me that this is
23 restricting Defendant Halcovage's access to that
24 building?

Page 379

1  A.      Yes.
2  Q.      Why did you feel you could restrict his
3  access to the 410 Building, but not to the
4  courthouse?
5  A.      I didn't think I could, but I wanted the
6  language in there.
7  Q.      Okay.
8       Why didn't you put the language in the
9  letter -- similar language in the letter about the
10 courthouse?
11 A.      I have no answer for you.
12 Q.      Then next paragraph, it talks about
13 Defendant Halcovage utilizing other
14 technological -- if he needed to conduct
15 conversations with the 410 Building employees,
16 correct?
17 A.      Correct.
18 Q.      Did you ever send a similar letter to
19 Defendant Halcovage about using those same
20 alternative technological means to conduct
21 business in the courthouse?
22 A.      I did not.
23 Q.      Defendant Halcovage, at any -- at some
24 point, any point, has participated in

Page 380

1  commissioners meetings by telephonic means,
2  correct?
3  A.      Only when there's not going to be a
4  quorum.
5  Q.      What do you mean by that?
6  A.      In other words, the -- for someone --
7  like if there are two commissioners there and one
8  is just on the road, you can't call in.  But let's
9  say if Commissioner Hetherington is ill and
10 Commissioner Hess is the only one there, then one
11 of the two commissioners can call in to make a
12 quorum and that's the only circumstance they would
13 agree to.
14 Q.      Okay.
15      But Commissioner -- Defendant Halcovage
16 has participated telephonically in commissioners
17 meetings, correct?
18 A.      That's a good -- I don't know
19 specifically.  He may have at one point in time.
20 But those are the -- those are the requirements to
21 do that.
22 Q.      Commissioner -- defendant Halcovage has
23 missed commissioners meetings, or I should say,
24 has not been in attendance for every commissioner

Page 381

1  meeting since he's become commissioner, correct?
2  A.      That is correct.
3       May I -- may I say something?
4  Q.      Sure.
5  A.      For instance today, you had told me
6  today that he had called into the meeting, but
7  today if Commissioner Hetherington and Hess were
8  there, he could not participate, he could not
9  vote.
10 Q.      He could listen in to the meeting, but
11 not vote; is that what I understand?
12 A.      That is correct.
13 Q.      If -- if only one commissioner is
14 present at a meeting, then one of the non-present
15 commissioners could call in for purposes of
16 voting; is that what I understand?
17 A.      That is correct.
18 Q.      Okay.
19      Could both commissioners that weren't --
20 if one -- if only one is present, two are not
21 present, can both call in and vote?
22 A.      No.  We wouldn't have a meeting that
23 day.
24 Q.      Okay.

Page 382

1       You believe that this is a statutory
2  requirement, a county requirement, what -- what's
3  your understanding?
4  A.      It's a county requirement.
5  Q.      Is that an agreement by the
6  commissioners or is it a county policy or
7  something else?
8  A.      It was in agreement by the
9  commissioners.  At one point they wanted to revise
10 that and say if one commissioner was out of town,
11 he could still call in.  That was not acceptable
12 to the other members of the board.  It was only if
13 a quorum -- you need to make a quorum, could one
14 call in.
15 Q.      So you were employed by the county when
16 Frank Stottlemyer was commissioner, correct?
17 A.      Yes.
18 Q.      And you -- at some point both Frank
19 Stottlemyer and Commissioner Halcovage were
20 commissioners, correct?
21 A.      Correct.
22 Q.      Was there inner doors that connected
23 their offices at some point?
24 A.      And still.  It's still there.

Page 383

Q.    Okay.
      Did maintenance at some point close off
those doors?
A.    Yes.  They took the -- the key out of
the one side, yes.
Q.    Do you know why?
A.    It was at the direction of -- of
Commissioner Stottlemyer.
Q.    And do you know why that was
Commissioner Stottlemyer's request?
A.    I do.
Q.    Why?
A.    Because he had found a note in there
with some phone numbers on it and he accused
Commissioner Halcovage of going in and looking on
his phone for phone numbers.
Q.    Do you know what Commissioner
Halcovage's response to those allegations was?
A.    That he did, he was looking for a number
and he went in there to -- to take a number off
the phone.
Q.    Are you aware of -- are you familiar
with someone by the name of Melissa Kalyam --
A.    I am.

Page 384

Q.    K-A-L-Y-A-M?
A.    Yes.
Q.    She was a county employee, correct?
A.    Correct.
Q.    Where was she employed within the
county, what department?
A.    Drug and alcohol.
Q.    Was Ms. Kalyam terminated?
A.    She was.
Q.    Do you know why?
A.    At the request of her supervisor, Elaine
Gilbert, I guess for failing to file correct
reports with the state and just not conducting
herself appropriately in her office.
Q.    Are you aware that Ms. Kalyam has
asserted that Defendant Halcovage requested that
she give him a county iPad, a request which she
opposed?
      MS. JONES:  I'm sorry.  Who was the
she?  Can you say that again.
BY MS. SMITH:
Q.    Are you aware that Melissa Kalyam has
asserted that Defendant Halcovage asked her for a
county iPad, a request which she opposed?

Page 385

A.    I'm not aware of that.
Q.    Was there any instruction -- well,
strike that.
      Who holds possession of county
electrical devices such as an iPad?
A.    Outside of the individual that's using
them?
Q.    Yes.  Sorry.  Thanks for that
clarification.
A.    MIS.
Q.    Okay.
      Was Melissa Kalyam in her job, somehow
responsible for distribution of county-issued
devices?
A.    No.
Q.    Okay.
      Well, would she have the ability to give
a county-issued iPad to Defendant Halcovage?
A.    I think she would have had to check with
her supervisor, Ms. Gilbert.
Q.    Were county employees ever instructed to
not issue Defendant Halcovage any electronic
devices without approval of someone else?
A.    Not that I'm aware of.

Page 386

Q.    Do you know if Defendant Halcovage,
other than voting publicly, if he had any input of
Ms. Kalyam being terminated?
A.    He did not.
Q.    I want to talk now about the
restructuring of the tax claim and tax assessment
offices.
      Do you know whose idea that was?
A.    Yes.  It was mine.
Q.    All right.
      And why was that your idea?
A.    In my opinion, the office was -- needed
to be restructured.  I didn't have the confidence
that Jane Doe 3 or Jane Doe 4 could do that, based
on the fact that since June of 2020, they met with
the commissioners, they refused to work with me.
They met with Commissioner Hess and with
Commissioner Hetherington and told them that they
would not work with me.
      That's unacceptable.  And Commissioner
Hetherington came back to me and told me that and
he told Jane Doe 3 she has to, but she didn't want
to.  There was a suggestion made that I could work
through him with her and I said I wouldn't do it

Case 3:21-cv-00477-MCC   Document 280-1   Filed 09/20/23   Page 305 of 373
Deposition of Gary Bender Vol. I - Revised
Jane Doe, et al. v. Schuylkill County Courthouse, et al.

Page 387

1  that way.
2        With the -- in November of 2020, there
3  were -- well, let's back up a little bit because
4  this -- this involves you, Ms. Smith, is that one
5  of the -- again, we had a -- Ang and I had a good
6  relationship, so the last meeting we had, again,
7  was over those automobiles.
8        And she e-mailed me the one day about
9  coming over to talk -- about talking to her --
10  something in her office, a restructure.  And all I
11  sent back was stop over.  I got an e-mail back a
12  little bit later on that stated that, oh, she just
13  went for lunch and saw that Commissioner Halcovage
14  was there.  And so I said, well, I to leave at
15  2:00 today.  So I figured we'd meet the next day.
16        The next day though I received an e-mail
17  from you, and please don't take offense at this, I
18  did, but it stated that -- that I was trying to
19  lure -- I interpreted it this way, I was trying to
20  lure Jane Doe 3 over to the office to be accosted
21  by George Halcovage and -- and I was just highly
22  insulted by that.  And should I have called you
23  and addressed it?  Well, maybe so, but I did not.
24        And so you have to work with

Page 388

1  administration, you can't be that way.  So I felt
2  the -- to rebuild the office was not going to
3  happen with -- with Jane Doe 3, Jane Doe 4, and
4  me.  And so the -- we were working with Joan Price
5  at the time who happened -- if I am getting too
6  long in answering you, stop me.
7  Q.      No, you're good.  Thank you.
8  A.      On reassessment.
9        MS. JONES:  She won't stop you.
10  You should just answer her questions, though.
11        But go ahead, finish your answer.
12  It's okay.  Go ahead.
13        THE WITNESS:  So we brought Mr. Alu
14  in, Mr. -- Tony Alu was a -- a retired chief
15  assessor from Luzerne County.  So he came in and
16  talked to me about how you rebuild -- me, Glenn
17  Roth, and -- and -- and Heidi Zula, how to
18  restructure an office.  We felt it was a great
19  idea.  We listened to him and I thought it was
20  time to pull the trigger and -- and just
21  restructure the offices and so we could get ahold
22  and maybe rebuild the tax assessment office.
23  BY MS. SMITH:
24  Q.      Okay.  I want to unpack that a little

Page 389

1  bit.
2  A.      I know, that was a long explanation.  I
3  get it.
4  Q.      No.  No.  No.  It's okay.  I -- I
5  appreciate it.  And I'm just going to go through
6  some of the things you testified to so I make sure
7  I understand.
8        So let's start with Joan Price.  Joan
9  Price was an attorney who was county contracted
10  with for review of the assessment office.  Is
11  that -- do I understand that correctly?
12  A.      No.  She was contracted to help us with
13  the upcoming reassessment.
14  Q.      What do you mean by upcoming
15  reassessment?
16  A.      There was a -- a court case that we were
17  going to lose that was going to force us into a
18  reassessment, so we do to that, we had to answer
19  that.  And we now are in the throws of a -- the
20  beginning of the reassessment of properties in
21  Schuylkill County.  So Joan was hired as the
22  expert for us.
23  Q.      So if I -- if I read to you the PAR,
24  well, it's not the PAR, it's the agenda, it

Page 390

1  states:  Requested approval and authorization for
2  the execution of a real estate tax assessment
3  consultant -- it says consultation agreement with
4  Joan R. Price, Esquire, within the Law Firm of
5  Eastburn & Grey, P.C., at the hourly rate of 250
6  an hour, for the purpose of evaluating the
7  county's real -- real estate tax assessment
8  procedure and process as it relates to the pending
9  countywide reassessment litigation and to such
10  other matters deemed necessary by county
11  administration and the office of the county
12  solicitor.
13        So is it your testimony that that does
14  not mean that Ms. Price was conducting a review of
15  how the assessment office operated?
16  A.      That wouldn't be my interpretation.
17  Q.      Okay.
18        Did you work with Ms. Price during
19  her -- let me strike that.
20        Is Ms. Price or her law firm still
21  consulting with the county?
22  A.      Yes.
23  Q.      Okay.
24        From the time that the consultation

Page 391

1 agreement started until now, have you worked with
2 Ms. Price in -- for that consultation?
3 A.    Not directly.  I have been in the
4 meetings that we've had, but I haven't worked with
5 her directly.
6 Q.    Okay.
7       Okay.
8       So are you aware of Ms. Price ever
9 reviewing the operations of the assessment office?
10 A.    No.
11 Q.    All right.
12      Between May of 2020 and March of 2021
13 when the offices were restructured, are you aware
14 that there was an agreement by an attorney for the
15 county that Jane Doe 3 and Jane Doe 4 would only
16 be required to communicate with you through
17 e-mail?
18 A.    That was not my agreement, no.
19 Q.    Were you aware that an attorney on
20 behalf of the county made that agreement?
21      MS. JONES:  Object to the form.
22      You can answer.
23      THE WITNESS:  I have --
24      MS. JONES:  Wait.  Wait.  Wait.

Page 392

1 Except to the extent what you say would be
2 privileged with your communications with counsel.
3 But otherwise you can answer.
4      MS. SMITH:  Well, let me rephrase
5 it then.
6 BY MS. SMITH:
7 Q.    Are you aware that an attorney for the
8 county informed me that you had agreed that
9 they -- Jane Doe 3 and Jane Doe 4 only needed to
10 communicate with you in writing, e-mail or written
11 letter?
12      MS. JONES:  You can answer that.
13      THE WITNESS:  I had heard that.  I
14 was never privy to that.  In other words, I never
15 agreed to that.  I don't who did.  It certainly
16 wasn't me.
17 BY MS. SMITH:
18 Q.    Who did you hear it from?
19 A.    From that attorney.
20 Q.    And was that -- did you hear it from
21 Mr. Heinbach or Mr. Scott?
22 A.    Is that --
23      MS. JONES:  Well, okay.  So the --
24 Catherine's question earlier was about what she

Page 393

1 was informed and that you've now heard it from
2 him.  I don't want you to relay what you've
3 communicated with, I think that would be
4 privileged.  If you can answer it without doing
5 that, I'll allow you to answer.
6 BY MS. SMITH:
7 Q.    Well, who told you that they had
8 communicated to me that that would be an
9 agreement?
10      MS. JONES:  Well, I am going to
11 object if that calls for him to divulge
12 communications with counsel.
13      MS. SMITH:  Well, Counsel, I think
14 that if the county -- the attorney on behalf of
15 the county, and I understand this was before you,
16 but if they had conveyed a agreement to me that
17 something could be done, they as the attorney
18 binding the county, and then it was conveyed to
19 Mr. Bender and Mr. Bender didn't agree with it,
20 but the county binding the -- the attorney binding
21 the county agreed to it, we have an issue of
22 advice of counsel or refusal of advice of counsel.
23      MS. JONES:  Yeah.  That's not
24 advice of counsel issue.

Page 394

1      I think -- if you want to ask him,
2 did he agree, he's already answered that, he said
3 he didn't.  If you want to show us the letter and
4 I can interpret that, I might change my mind.  But
5 if it's a communication that says we'll agree for
6 some -- five seconds, a period of time, you know,
7 that might depend on what the letter says.
8      MS. SMITH:  Okay.
9      MS. JONES:  He can still say that
10 he doesn't agree, that's all I am saying, that he
11 didn't agree.
12 BY MS. SMITH:
13 Q.    All right.
14      So, Mr. Bender, let's -- let's clarify
15 this a little.
16      An attorney who represented the county
17 informed you that they had communicated something
18 to me about an agreement regarding Jane Doe 3 and
19 Jane Doe 4 communicating with you, correct?
20      MS. JONES:  No, I can't let him
21 answer the question about what the attorney
22 communicated with him.  He can just say whether he
23 agreed or didn't agree, but that's not the
24 communication.

Page 395

MS. SMITH:  Well, agree d or didn't agree with what?  That's the problem.  I need to establish for the record to say what he was agreeing or not agreeing to.

MS. JONES:  You asked him if he agreed not to communicate or that -- if he agreed it was okay for Jane Doe 3 and Jane Doe 4 not to communicate with him he said no, he didn't actually make that agreement.

MS. SMITH:  Okay.

BY MS. SMITH:

Q.     Mr. Bender, did you tell an attorney that you did not agree?

MS. JONES:  You can't ask him that. That's -- that's objectionable.

MS. SMITH:  I'm going to ask him. If you want to object and then we can -- we can readdress this, but if I need to come back tomorrow, we need to come back with a judge makes a decision, then I'll preserve the record.

MS. JONES:  Yeah.  I don't want him saying what the lawyer said.  If you want to pull the letter out that you had with the lawyer, maybe that will clean this up.  But the way the question

Page 396

is asked, you're asking him to report on a conversation with a lawyer.  That's pretty clearly privileged.

MS. SMITH:  Okay.  And I -- I believe that there's an exception to that privilege given the way the conversations went. So you can object.  We can instruct him not to answer.  I just want to make the record clear so that we can then address this with the judge.

MS. JONES:  Okay.

MS. SMITH:  At an appropriate time, once the brief on instruction of counsel.

BY MS. SMITH:

Q.     So, Mr. Bender, did an attorney come to you and tell you that there was an agreement made on behalf of the county and Jane Doe 3 and Jane Doe 4 would only communicate with you -- would only communicate with you through writing?

MS. JONES:  Objection; calls for privileged.

I instruct him not to answer that question.

BY MS. SMITH:

Q.     Mr. Bender, did you tell an attorney for

Page 397

the county that you would not agree to that?

MS. JONES:  Same objection.  I instruct him not to answer that question.

BY MS. SMITH:

Q.     Mr. Bender, at some point did you -- did you refuse to only communicate with Jane Doe 3 and Jane Doe 4 through e-mail?

MS. JONES:  Object to the form of that question.

You can answer that one.

THE WITNESS:  Yes.

BY MS. SMITH:

Q.     Why?

A.     That's not a way you conduct business in the county.  You have to meet face to face to discuss issues.  You cannot do it through e-mail all the time.

Q.     Did you ever discuss with Jane Doe 4 and Jane Doe 3 why they only wanted to communicate with you through e-mail?

A.     I did not.  They didn't want to communicate.

Q.     Did you ever -- at the point that they were refusing to communicate with you, you were a

Page 398

named respondent in an EEOC charge, correct?

A.     That is correct.

Q.     And at any point, did you offer Jane Doe 3 and Jane Doe 4 to communicate with you in person or by Zoom with a witness present?

MS. JONES:  I'm sorry.  I just didn't hear it.

BY MS. SMITH:

Q.     At any point did you offer Jane Doe 3 or Jane Doe 4 to communicate through Zoom or in person with a witness present?

A.     Did not.

Q.     When the offices were restructured in March of 2021, Jane Doe 4 remained in assessment, correct?

A.     Correct.

Q.     And Jane Doe 3 remained in tax claim, correct?

A.     Correct.

Q.     Both then still reported to you as a supervisor, correct?

A.     That is correct.

Q.     So how would restructuring the offices alleviate your issue with them not communicating

Case 3:21-cv-00477-MCC   Document 280-1   CONFIDENTIAL   Filed 09/20/23   Page 308 of 373

Deposition of Gary Bender Vol. I - Revised                    Jane Doe, et al. v. Schuylkill County Courthouse, et al.

Page 399

1  with you as your -- as their supervisor?
2  A.      I would have communicated with the chief
3  assessor.
4  Q.      For Jane Doe 4, correct?
5  A.      No.  After we -- we contracted with
6  Mr. Alu, became the chief assessor, Tony Alu
7  became the chief assessor.  We restructured the
8  office through him.
9  Q.      Right.  No.  No.
10         What I am saying is, you said I would
11  communicate through the chief assessor.  Well, you
12  communicated through the chief assessor for Jane
13  Doe 4's duties.  But Jane Doe 3 was still the
14  director of a department.  So to whom would you --
15  to whom would you communicate for issue regarding
16  that department, tax claim bureau?
17  A.      That had to be worked out.  That
18  wasn't -- that wasn't my plan, but that's -- we
19  had to go with that.
20  Q.      So, again, restructuring the offices did
21  not alleviate your concerns regarding
22  communication, or lack thereof, with Jane Doe 3,
23  correct?
24  A.      That is correct.

Page 400

1  Q.      At any point prior to March of 2021, had
2  you or had anyone on behalf of the county issued
3  any verbal, written warning, or suspension of any
4  type of disciplinary action to Jane Doe 3 or Jane
5  Doe 4?
6  A.      To what time?
7  Q.      At any point prior to the restructuring?
8  A.      I think there were.  Yeah, I think they
9  have a written warning in their file.
10  Q.      Well, there is a written warning in
11  their file from April of 2021 --
12  A.      Okay.
13  Q.      -- for their interactions with Mr. Alu.
14  Is that the one you're referring do?
15  A.      Okay.  Yes.
16  Q.      Okay.
17         Well, you would agree March comes before
18  April, correct?
19  A.      Correct.
20  Q.      Okay.
21         So prior to the restructuring, are you
22  aware of any disciplinary action against either
23  Jane Doe 3 or Jane Doe 4?
24  A.      I am not.

Page 401

1  Q.      Are you aware of anyone, prior to
2  March of 2021, going to Jane Doe 3 or Jane Doe 4
3  and asking them -- or getting a game plan
4  together, discussing what they -- what can be done
5  to achieve optimal operation of their offices?
6  A.      Yes.  Ms. Kutzler reached out to them
7  about having a meeting and they never got back to
8  her.
9  Q.      When was that?
10  A.      That would have been probably before
11  Heidi got hired, so that would have been in
12  December of -- of '20.
13  Q.      So are you aware that Jane Doe 3 and
14  Jane Doe 4 met with Ms. Kutzler?
15  A.      Not with me present they didn't, no.
16  Q.      Okay.
17         So are you -- it's your testimony Ms.
18  Kutzler never informed you that she had a meeting
19  about office operations with them?
20  A.      Don't know whether she did or she
21  didn't.
22  Q.      Okay.
23         So I thought you just said they never
24  got back to her?

Page 402

1  A.      I didn't think they did.
2  Q.      All right.
3         So if they had gotten back to her and
4  had had a conversation with her about what they
5  needed for the office and they did not receive
6  that, would that change your opinion as to whether
7  the offices should have before restructured?
8              MS. JONES:  Object to the form.
9              You can answer if you can.
10             THE WITNESS:  No.
11  BY MS. SMITH:
12  Q.      Ms. -- why was the decision made to put
13  Jane Doe 3 into tax claim and Ms. -- and not in
14  tax assessment?
15  A.      Tax assessment was the office that
16  needed to be -- to be overhauled and rebuilt.  So
17  if you have the chief assessor not willing to work
18  with administration, that's not going to happen.
19  Tax claim was operating quite -- quite well.  Jane
20  Doe 4 was kept over there because Mr. Alu, while
21  he had a knowledge of -- of the tax assessment, he
22  didn't have a knowledge of the Schuylkill County
23  in that office.  So she would be able to help
24  that, she would be able to work through him with

Deposition of Gary Bender Vol. I - Revised                    Jane Doe, et al. v. Schuylkill County Courthouse, et al.

Page 403

1  the employees, so it made sense at the beginning.
2  Q.     Why was it that you felt the tax
3  assessment office needed to be, I think your word,
4  was overhauled?
5  A.     Well, you had answered your own question
6  before, was that there were a lot of people
7  leaving that office.  We needed to -- develop a
8  line of succession that you come up from a clerk
9  and go into other positions, into the field
10  appraiser, maybe be the next chief clerk or
11  assistant chief assessor -- I'm sorry -- chief
12  assessor.  And so we wanted to set that up and so
13  you had to rebuild it from the ground up.  And I
14  felt Mr. Alu had a good plant I thought he could
15  help us.
16  Q.     So why wasn't the answer to the overhaul
17  to staff, fully staff the office as opposed to
18  change leadership?
19  A.     I -- I just felt that was what we had to
20  do.
21  Q.     And I'm asking what your basis for that
22  feeling was?
23  A.     Because the office had to be rebuilt.
24  It's not just recruiting staff.  It's getting

Page 404

1  staff, getting everybody training, getting
2  everybody on the same page.
3  Q.     Was the delinquency of the STEB reports
4  part of the reason you thought the assessment
5  office should be overhauled?
6  A.     Absolutely.  And the delay in the
7  certifications.
8  Q.     What certifications?
9  A.     There were certifications that need to
10  be done every year in November, that goes out to
11  the municipalities on which they -- they base
12  their budget on the millage.
13         So I received an e-mail from Jane Doe 3
14  in November saying that the certifications were
15  not going to be done and her and Jane Doe 4 were
16  going on vacation.  So I had a plan, I put a team
17  together to get them done.  We needed somebody
18  from inside the office to help us, so I think
19  Darlene Delzoni reached out to Helene O'Connor.
20  And the next day Jane Doe 3 and Jane Doe 4
21  suspended their vacations.
22  Q.     So it's your testimony the 2020
23  certification was delayed?
24  A.     It got finished.

Page 405

1  Q.     So it was not delayed, correct?
2  A.     It would have been.  They planned to go
3  on vacation I wrote back approved.
4  Q.     Did Jane Doe 3 and Jane Doe 4 submit
5  certification on time?
6  A.     I think so, yes.
7  Q.     That was in December of 2020?
8  A.     In November of 2020.
9  Q.     November of 2020.
10        So in March of 2021, when you decided to
11  restructure the offices, there was, in fact, no
12  delay in certification, was there?
13  A.     No.  But it took a struggle to get
14  there.
15  Q.     Okay.
16        And since Jane Doe 3 and Jane Doe 4 have
17  left the assessment office, Mr. Alu and
18  Mr. Hatter, at different times, have overseen that
19  office, correct?
20  A.     Correct.
21  Q.     And Jane Doe 1 has still been delayed in
22  submitting her STEB reports, correct?
23  A.     That is correct.
24  Q.     Was Mr. Hatter removed from his position

Page 406

1  as chief assessor?
2  A.     No.  He's working with the
3  administration to get things done.
4  Q.     But the STEB reports are still delayed
5  or delinquency, correct?
6  A.     Not -- not for a year, no.  We've
7  assigned -- he has some other people in there that
8  can do them.  That's -- that's not the right way
9  to do things.
10  Q.     They've been removed from Jane Doe 1's
11  job duties, correct?
12  A.     No.  They are still her job duties, but
13  if they're late, if they're a couple months late,
14  he has somebody who can do them.
15  Q.     Okay.
16        Well, Jane Doe 4 and Jane Doe 3 had
17  someone else who could do them, they did them,
18  correct?
19  A.     Not on a regular basis, no.
20  Q.     Well, once they learned that they were
21  late, they did them and made sure they were
22  timely, correct?
23  A.     At the end of the year, that's not
24  appropriate.

Page 407

Q.     At any point were there any conversations with Jane Doe 3 or Jane Doe 4 that if they did not start communicating with you directly, that they were going to be demoted?

A.     No.

Q.     Okay.

       I'm sorry, you -- did you say -- I didn't catch this, but you might have said it, did you say that moving Jane Doe 3 to tax claim director was not your plan or was your plan?

A.     Not originally.

Q.     What was your plan originally?

A.     To replace both of the directors.

Q.     And what was going to happen to Jane Doe 3?

A.     She would have been terminated.

Q.     Was your plan to terminate Jane Doe 4?

A.     Probably.

Q.     And who vetoed or nixed that plan?

A.     Well, when we met with the commissioners on the status of restructuring, they weren't in favor of termination, they were -- so -- but they would have been in favor of putting it on the agenda for the restructuring.

Page 408

Q.     I'm sorry. You said when we went to the commissioners?

A.     Yes. The review of the restructuring was -- was presented to the commissioners and -- because nobody wanted to talk about termination, so the next best thing was to restructure. So we met with them in there and they approved that putting it on the -- the chairman agreed to put it on the agenda.

Q.     Okay. So I just want to get some better understanding of how -- how the chain of events went.

       So it was your idea to restructure the office initially, correct?

A.     Correct.

Q.     Who did you first go to about your plan regarding restructuring?

A.     When we met with Anthony Alu.

Q.     Who is we?

A.     Heidi Zula, Glenn Roth, and myself.

Q.     Okay.

       So did you go to Heidi Zula and Glenn Roth and tell them we are going to meet with Tony Alu because I have an idea to restructure the

Page 409

offices?

A.     Yes. Joan Price introduced us to Tony Alu. She said here's a guy, he might be able to help you out. So I called him in for a meeting with me, Heidi Zula, and Glenn Roth.

Q.     And you gathered information from Mr. Alu and, as I understand it and correct me if I'm wrong, came up with a restructuring plan which was proposed to some of the commissioners or all of the commissioners?

A.     All of them.

Q.     Okay.

       And was this in an informational session or --

A.     Yes.

Q.     Okay.

       It was not publicly presented, it was in an executive session?

A.     Yes. It was just reviewed what was going to -- and nobody made decisions, but then we presented our findings on -- as an agenda item, that was placed on the agenda.

Q.     Jane Doe 4 and Jane Doe 3's termination was placed on the agenda?

Page 410

A.     No. No, the restructuring of the office, the separation of the offices.

Q.     How was it then that this plan, initial plan of yours to terminate Jane Doe 3 at the very least, maybe Jane Doe 4, was changed to a restructuring, moving Jane Doe 3 to tax claim director?

A.     Well, even Heidi didn't like that idea, Heidi Zula.

Q.     But that plan or idea was presented to the commissioners, correct?

A.     It was -- it was not. It was -- it was something I wanted to do. We didn't want to do that, so we went with the restructuring plan.

Q.     Who nixed your plan?

A.     Heidi.

Q.     I thought you testified that the commissioners didn't like the idea of termination?

A.     Well, they didn't. But that was never presented that -- something I wanted to put on the agenda. I just said, I think we're going to be going down this road in a few months any way.

Q.     So how is it that you believe that the commissioners did not like the idea of termination

Page 411

1 if your idea of termination was not presented to
2 them?
3 A.     They wouldn't allow it on the agenda.
4 Q.     Okay.
5       So they knew that that was your plan?
6 A.     Wasn't my plan.  It was my idea, but
7 Heidi and -- and Glenn didn't want to go down that
8 road.
9 Q.     Okay.
10       Mr. Bender, your plan was to terminate
11 Jane Doe 3, at the very least, correct?
12 A.     They were my options, yes.
13 Q.     And the commissioners did not allow Jane
14 Doe 3's termination to be placed on the agenda,
15 correct?
16 A.     Yeah.  That wasn't even a topic of
17 discussions then.  It came up, but nobody wanted
18 to talk about that.
19 Q.     There was a topic of discussion that
20 Jane Doe 3 would be terminated and they would not
21 discuss it?
22 A.     Correct.
23 Q.     So essentially they did not permit Jane
24 Doe 3 to be placed up for termination, correct?

Page 412

1 A.     It was not placed on the agenda.
2 Q.     So there was essentially a vote or a
3 decision made on Jane Doe 3's --
4 A.     No.
5 Q.     -- termination without it being put on
6 the agenda?
7 A.     No.  No, nobody wanted to discuss that.
8 Q.     But they prohibited you from putting it
9 on the agenda, correct?
10       MS. JONES:  Object to the form.
11       THE WITNESS:  It never went to an
12 agenda item.
13 BY MS. SMITH:
14 Q.     Because the commissioners told you not
15 to put it on an agenda, correct?
16 A.     No.
17 Q.     Okay.
18       Then why didn't you put it on an agenda
19 then?
20 A.     Because we liked the idea of
21 restructuring.
22 Q.     Who is we?
23 A.     Everybody in the room.
24 Q.     Including the commissioners?

Page 413

1 A.     We felt when we left that we had a plan
2 in place.
3 Q.     Were the commissioners in favor of
4 restructuring as opposed to termination?
5 A.     We put it before an agenda item and that
6 agenda was put on -- that item was put on the
7 agenda.
8 Q.     Not my question, Mr. Bender.
9       During the executive session, was there
10 discussions of termination versus restructuring
11 that the commissioners said, we're not talking
12 about termination?
13       MS. JONES:  Object to the form.
14       You can answer.
15       THE WITNESS:  Yes.  Nobody wanted
16 to talk about termination.
17 BY MS. SMITH:
18 Q.     Okay.
19       And was -- during that conversation was
20 termination of Jane Doe 4 also brought up?
21 A.     I believe so.
22 Q.     And at the time the offices were
23 restructured, Jane Doe 3 held a CPE license,
24 correct?

Page 414

1 A.     That is correct.
2 Q.     And Jane Doe 4 did not hold a CPE
3 license, correct?
4 A.     That is correct.
5 Q.     So why was the decision not made to have
6 Jane Doe 3 remain in the assessment office and
7 have Mr. Alu run it as interim or a consultant so
8 he could assist her in -- and she could assist him
9 on getting the office overhauled?
10       MS. JONES:  Object to the form.
11       You can answer.
12       THE WITNESS:  In my opinion that
13 would not have worked.
14 BY MS. SMITH:
15 Q.     Why?
16 A.     Because she wasn't communicating with
17 the administration, why was she going to
18 communicate with Mr. Alu.
19 Q.     Well, did you ever ask her why she
20 wasn't communicating with administration?
21 A.     I did not.
22 Q.     Did you understand that she wasn't
23 communicating with administration because she
24 wanted to do so by e-mail because you were a named

Page 415

1  respondent on an EEO charge and she wanted a paper
2  trail?
3          MS. JONES:  Object to the form.
4          You can answer.
5          THE WITNESS:  Repeat that then.
6  BY MS. SMITH:
7  Q.      Did you not understand that Jane Doe 3
8  wanted -- didn't want to communicate with
9  administration because she wanted to communicate
10 through e-mail because you were a named respondent
11 on an EEOC charge and she wanted a paper trail?
12         MS. JONES:  Object to the form.
13         You can answer.
14         THE WITNESS:  That's not the way we
15 do business at the county.  You must communicate.
16 BY MS. SMITH:
17 Q.      But did you understand that's why?
18         MS. JONES:  Object to the form.
19         You can answer.
20         THE WITNESS:  If that's her reason.
21 BY MS. SMITH:
22 Q.      I am asking if you understood that that
23 was her reason?
24         MS. JONES:  Same objection.

Page 416

1          You can answer.
2          THE WITNESS:  But a month before
3  that it was -- it was okay a month before that, so
4  sometime in June it changed.
5  BY MS. SMITH:
6  Q.      Okay.
7          Mr. Bender, I'm not asking about June or
8  before it.  I am asking if at any point did you
9  learn and understand that that was Jane Doe 3's
10 reason for wanting to communicate only through
11 e-mail?
12         MS. JONES:  Object to the form.
13         You can answer.
14         THE WITNESS:  All I understood was
15 she didn't want to communicate with me.
16 BY MS. SMITH:
17 Q.      But you felt that it was appropriate
18 that Mr. Alu be a go-between for you and Jane Doe
19 4, who also refused to communicate with
20 administration, correct?
21 A.      But I would be communicating with
22 Mr. Alu.
23 Q.      So why couldn't you have communicated
24 with Mr. Alu with Jane Doe 3 being the

Page 417

1  assessment -- chief assessor and him being an
2  interim or a contractor?
3  A.      Because I didn't --
4          MS. JONES:  Object to the form.
5          THE WITNESS:  -- think that would
6  work.
7          MS. JONES:  You can answer.
8  BY MS. SMITH:
9  Q.      Why didn't you think it would work?
10 A.      Because it wouldn't.
11 Q.      But it would work for your communication
12 with Jane Doe 4, who similarly refused to
13 communicate with you?
14         MS. JONES:  Object to the form.
15         You can answer.
16         THE WITNESS:  But Mr. Alu would and
17 he would be the chief assessor until he hired
18 another one.
19 BY MS. SMITH:
20 Q.      So why would Mr. Alu communicate with
21 you if Jane Doe 3 was still the chief assessor?
22         MS. JONES:  Object to the form.
23         You can answer.
24         THE WITNESS:  It was my opinion

Page 418

1  that it wouldn't work.
2  BY MS. SMITH:
3  Q.      Were you aware that Commissioner
4  Stottlemyer had informed Jane Doe 3 that if the
5  offices were ever disbanded, that she would remain
6  chief assessor?
7  A.      That wasn't Mr. Stottlemyer that said
8  that, that was me.
9  Q.      Okay.
10         So you had made Jane Doe 3 a promise
11 that if the offices were disbanded, she would
12 remain chief assessor?
13 A.      I did.  When we separated the offices, I
14 went over and met with the staff.  And I said,
15 look, this is a trial, it hadn't worked in the
16 past.  We are going to try it.  If it doesn't work
17 out, we're going to ask Jane Doe 3 to stay over
18 with -- with assessment.  That is true.  The
19 situation changed.
20         MS. SMITH:  I think we're at time.
21 Are we -- let's go off the record.
22         VIDEOGRAPHER:  The time is now
23 5:41 p.m. and we're going off the record.
24

Deposition of Gary Bender Vol. I - Revised                    Jane Doe, et al. v. Schuylkill County Courthouse, et al.

1            C E R T I F I C A T I O N

2

3

4            I, COLEEN TRIFUN, RPR and Notary Public,

5    do hereby certify that the foregoing is a true and

6    accurate transcript of the stenographic notes

7    taken by me in the aforementioned matter.

8

9                         - - -

10

11

12

13

14

15

16

17

18

19

20

21   DATE:August 31, 2023 _____

22                         COLEEN TRIFUN, RPR

23

24

## WORD INDEX

**< $ >**
**$15,000** 36:*11*
**$40** 325:*4, 22* 326:*13*
**$47,057** 37:*18*
**$51,420.45** 37:*20*

**< 1 >**
**1** 7:*13* 12:*21, 22*
17:*9* 18:*24* 48:*9*
53:*23* 62:*13, 17, 18*
63:*9, 20, 24* 64:*10*
65:*12, 23* 66:*5, 17, 18,*
*20, 22* 67:*3* 68:*15*
69:*3, 4, 11* 70:*1, 9, 12,*
*16, 20* 71:*3, 6, 8, 14,*
*19, 24* 72:*13* 74:*13*
75:*7, 11* 76:*9* 78:*16*
79:*19* 80:*6, 19* 81:*14,*
*16* 82:*2, 3, 10, 14*
83:*2* 84:*3, 20* 85:*1, 4,*
*15, 19, 24* 86:*4, 11, 15*
88:*23* 89:*3, 9, 13, 17*
91:*9* 94:*13, 17*
101:*11* 102:*16, 19, 21*
103:*4, 17* 104:*1, 8, 10,*
*21* 116:*14, 22* 125:*21*
141:*13* 147:*18*
148:*20, 23* 150:*21*
151:*15* 160:*23* 189:*5*
217:*11* 234:*15*
241:*22* 242:*6* 244:*22*
245:*3, 13, 17, 23*
246:*3* 247:*22* 252:*2*
268:*3* 274:*9, 19*
277:*8* 278:*17, 24*
279:*8, 23* 280:*14, 22,*
*24* 281:*11, 18, 24*
284:*24* 287:*9* 297:*15*
306:*17* 310:*20*
313:*19* 314:*2, 18*
317:*11* 319:*6* 320:*15,*
*20, 23* 321:*21* 322:*1,*
*22* 335:*4, 12* 336:*13,*
*14* 347:*16* 351:*19*
353:*19, 22* 354:*4, 9*
355:*8, 18* 357:*10*
358:*6, 10, 18, 21*
359:*4, 10, 12, 18*

360:*11, 22* 361:*1, 11,*
*13, 18* 363:*9* 364:*2,*
*12, 21* 365:*13* 366:*2,*
*16* 367:*6* 369:*18*
378:*10* 405:*21*
**1:00** 93:*14*
**1:25** 188:*24*
**1:30** 253:*13, 22* 254:*4*
**102** 4:*23* 148:*4, 7*
**107** 4:*22*
**11** 6:*3*
**11:00** 92:*22* 93:*13*
**11:16** 121:*19*
**11:27** 122:*2*
**114** 4:*22* 107:*8, 11,*
*19, 22*
**116** 5:*10*
**1162-1163** 5:*4* 232:*23*
**1163** 230:*18*
**12:00** 93:*13*
**12:03** 157:*4*
**12:04** 157:*10*
**12:36** 188:*24*
**1206** 67:*23*
**1206-1208** 4:*21* 68:*2*
**1208** 67:*23*
**1215** 191:*23*
**1215-1216** 5:*2* 192:*4*
**1216** 191:*24*
**1217-1218** 5:*3*
**1218** 198:*3*
**1221-1222** 4:*24*
**1222** 158:*11*
**1223** 170:*7*
**1223-1224** 5:*1* 170:*11*
**1224** 170:*7*
**1235** 46:*11*
**1235-1238** 4:*20* 46:*15*
**1236** 55:*11*
**1237** 57:*12*
**1238** 46:*11* 47:*8*
**13** 73:*8*
**14** 5:*6* 6:*13* 39:*15*
68:*19* 231:*5* 337:*18,*
*21, 23*
**148** 4:*23*
**14th** 39:*11* 231:*10*
**15** 4:*11* 6:*13* 44:*8,*
*10* 87:*4* 121:*14*

151:*6* 218:*11* 219:*4*
221:*14*
**150** 2:*9*
**15219** 2:*23*
**159** 4:*24*
**16** 1:*22* 7:*7* 35:*10*
73:*8* 106:*23* 218:*21*
**162** 5:*10*
**170** 5:*1*
**17108** 1:*21*
**172** 5:*11*
**17701** 2:*18*
**17th** 148:*18*
**18** 108:*3*
**18017** 3:*2*
**1835** 2:*3*
**18360** 2:*14*
**19** 4:*12* 44:*10*
218:*13*
**190** 3:*2*
**19103** 2:*4*
**192** 5:*2*
**196** 5:*11*
**198** 5:*3*
**1994** 159:*6* 192:*17*
**1996** 68:*18*
**1's** 63:*17* 66:*8*
67:*10, 14, 18* 70:*23*
83:*11* 85:*8* 86:*7, 9*
90:*15* 91:*6* 92:*11, 17*
268:*15* 311:*23* 315:*6,*
*11* 354:*17* 355:*4, 14,*
*15, 20* 406:*10*
**1st** 15:*11* 20:*12*

**< 2 >**
**2** 6:*3* 12:*22, 23*
53:*23* 62:*13* 66:*5*
85:*1* 86:*4* 104:*24*
105:*1, 5, 9, 12, 13, 23*
106:*10, 17* 108:*8, 9,*
*13, 24* 109:*5, 14, 16,*
*19* 110:*2, 6* 111:*15*
112:*11* 113:*20, 24*
114:*13* 116:*11, 18*
118:*12, 21, 24* 119:*9,*
*13, 19* 120:*15, 23*
121:*1, 10* 122:*5, 15,*
*23* 123:*5, 14, 17, 18,*
*22* 124:*1, 4, 14* 125:*9,*

*12, 20* 126:*23* 128:*11,*
*15, 18* 131:*1, 20, 24*
132:*4, 8, 12, 17*
133:*13* 134:*2, 11, 15,*
*17* 143:*10* 144:*2, 5,*
*19* 145:*1, 6, 9, 16, 23*
146:*6, 9, 14, 16* 147:*1,*
*3, 19* 148:*19, 23*
150:*21* 151:*15*
160:*23* 172:*3* 189:*5*
229:*14, 24* 235:*9*
237:*24* 240:*20* 242:*5,*
*9, 19* 244:*14, 23*
245:*2, 4, 20, 23* 246:*2,*
*12* 247:*5, 22, 23*
248:*21* 252:*3, 4*
253:*7, 14, 18* 254:*13,*
*22* 255:*3* 267:*7, 15*
268:*3, 14* 271:*15*
274:*1* 275:*13* 277:*7*
278:*17, 24* 279:*7*
280:*14, 22, 24* 281:*11,*
*18* 283:*3* 297:*15*
306:*17* 310:*20*
312:*18* 314:*2, 13, 19*
320:*15* 332:*10* 335:*4,*
*9, 13* 336:*13, 14*
347:*16* 348:*13*
349:*15* 350:*15, 19*
351:*3, 11, 16, 19*
352:*1, 10* 353:*17, 21*
354:*4, 8* 355:*4* 358:*5,*
*11, 17, 21* 359:*3, 10,*
*19* 360:*11, 22* 361:*10,*
*13, 19* 362:*1* 363:*9*
364:*2, 11, 21* 365:*13*
366:*1, 2, 15* 367:*6, 7*
368:*3, 14* 369:*1, 5*
375:*8* 378:*10*
**2/9/18** 200:*13*
**2:00** 94:*23* 99:*23*
100:*9* 387:*15*
**2:30** 94:*5*
**2:54** 273:*14*
**20** 4:*11* 15:*16* 149:*6*
401:*12*
**2000** 108:*3* 208:*8*
**20002** 2:*9*
**2005** 16:*23* 17:*3*
22:*13*

Case 3:21-cv-00477-MCC   Document 280-1   Filed 09/20/23   Page 315 of 373
CONFIDENTIAL
Deposition of Gary Bender Vol. I - Revised          Jane Doe, et al. v. Schuylkill County Courthouse, et al.

**2006**   13:9   16:*18*
17:*4, 6, 7, 9*   18:*24*
20:*8, 24*   21:*8*   22:*10,
23, 24*   23:*1*   27:21, *23*
**2008**   23:*5*   159:*6*
340:*11*
**2009**   68:*19, 23*
**2010**   24:*4*
**2011**   87:*12*   186:*18*
**2012**   87:*3*
**2013**   24:*18*   25:*14, 15*
27:*12, 17*   28:*12, 22*
29:*12*   31:*12, 21*
37:*16*   40:*13*   106:*23*
**2014**   65:*13, 15*
**2015**   32:*7, 18*   40:*24*
41:*2*   44:*7*   65:*15, 17*
88:*7, 17*   218:*5, 12*
**2016**   34:*6, 10, 13*
37:*19*   38:*15*   39:*11,
15*   47:*16, 21*   48:*1*
65:*10*   69:*9*   143:*12*
173:*9*   174:*4*   176:*24*
191:*12*   193:*13*
**2017**   44:*11*   230:*2*
**2018**   78:*11*   108:*17*
226:*24*
**2019**   40:*24*   41:*6*
44:*2*   50:*24*   51:*8*
111:*22*   115:*9, 12, 18*
118:*9, 14, 15*   119:*6, 7*
144:*14*   161:*2*   162:*11*
163:*6*   168:*10*   170:*23*
172:*11, 13, 20*   191:*13,
16*   194:*4*   198:*18*
200:*6, 16, 21*   201:*23*
208:*7, 16*   219:*5*
**2020**   61:*13*   62:*2*
64:*9, 10*   67:*9, 13, 17*
69:*9*   91:*4*   101:*18, 23*
104:*8*   115:*13, 18*
118:*22*   119:*7*   125:*5,
8*   130:*5*   133:*4, 6, 17,
21*   135:*15*   140:*11*
147:*7, 18*   149:*6*
150:*18*   153:*17, 18*
154:*6, 18*   155:*11, 17*
172:*11, 13, 20*   188:*11*
193:*8, 13*   200:*10, 16,
22*   217:*14, 21*   226:*22*

227:*2*   231:*5, 10*
233:*24*   253:*14*
254:*11*   255:*14, 20*
257:*7*   264:*5*   265:*22*
266:*8*   268:*22, 23*
269:*7, 14*   270:*1, 16,
17*   272:*1, 13*   273:*24*
274:*12, 21*   275:*14*
276:*7*   279:*2, 19*
281:*9, 10, 16, 17, 22,
23*   282:*2*   283:*10*
284:*5*   285:*4*   294:*20*
298:*24*   299:*10*
306:*23*   307:*3*   311:*19*
315:*6*   317:*22*   318:*9*
320:*3, 9*   321:*14, 15*
322:*8, 13, 16*   323:*17,
24*   326:*24*   327:*2, 12,
15, 20*   332:*8*   333:*5*
345:*21*   346:*7*   347:*23*
348:*5, 13, 14, 23*
350:*3*   351:*14, 17*
352:*19*   368:*21, 22*
369:*14, 18*   378:*3, 9*
386:*15*   387:*2*   391:*12*
404:*22*   405:*7, 8, 9*
**2021**   42:*23*   43:*24*
49:*16*   50:*3*   52:*19*
160:*10, 17*   202:*8, 13*
310:*10*   317:*6*   322:*17*
328:*9*   349:*17, 22*
351:*18*   352:*19*
358:*24*   367:*9*   391:*12*
398:*14*   400:*1, 11*
401:*2*   405:*10*
**2022**   1:*22*   7:*7*   202:*3,
19*
**2023**   419:*21*
**203**   15:*14*
**204**   19:*9*   22:*15*
**205**   21:*20*
**206**   26:*21*
**207**   30:*3*
**208**   35:*21*
**209**   37:*5, 16*
**20th**   145:*13*   234:*9*
**21**   6:*3*   306:*19*
326:*15, 16*   330:*20*
**210**   39:*18*

**211**   41:*23*
**212**   46:*13*   53:*22*
**213**   67:*22*
**214**   106:*7*   107:*9*
**215**   148:*5*
**216**   158:*17*
**217**   170:*8*
**218**   191:*23*
**219**   5:*12*   201:*8*
**22**   4:*13, 19*   41:*23*
42:*17*   253:*14*   254:*11*
255:*14, 20*   264:*4*
265:*22*   270:*16*
274:*12, 21*   275:*14*
281:*23*   282:*2*   283:*10*
284:*5*   285:*4*   294:*20*
332:*8*   333:*5*   368:*22*
**222**   337:*18, 19, 20, 21*
**22-23**   42:*2*
**223**   343:*15*
**228**   1:*20*   7:*9*
**229**   5:*12*
**22nd**   16:*17*   234:*10*
253:*17*   254:*2*   259:*11*
260:*23*   262:*6*   283:*1*
298:*3*
**23**   4:*19*   41:*24*   43:*9*
**233**   5:*4*
**235**   5:*5*   277:*17, 20*
**23rd**   171:*8*
**24**   4:*18*   39:*18, 22*
268:*22, 23*   269:*6, 13*
**242**   4:*23*   148:*5, 7*
**24th**   270:*1*
**25**   30:*3, 21*   31:*1*
266:*8*   270:*17*
**250**   390:*5*
**251**   5:*13*
**25th**   270:*17*   282:*3*
**26**   4:*15*   30:*5*
**26th**   16:*22*
**27**   4:*13, 14*   21:*20, 23*
22:*10*
**278**   5:*5*
**28**   4:*14*   26:*22, 24*
108:*3*
**28th**   318:*14*
**2950**   2:*3*
**29th**   257:*7*

**2's**   106:*4*   108:*20*
111:*2, 7, 11*   112:*15*
113:*9*   115:*3, 8, 14*
117:*5, 17, 21*   118:*17*
120:*6*   122:*19*   123:*11*
128:*23*   130:*9*   132:*22*
133:*8*   141:*9*   142:*22*
144:*14*   146:*21*
244:*11*   245:*2, 22*
260:*15*   274:*16*   276:*2*
282:*19, 20, 24*   347:*18,
24*   348:*7, 16, 18*
349:*18, 21, 23*   350:*7,
22*   352:*13, 21*   353:*4,
11*   354:*19*   355:*16, 22*
357:*21*   358:*1*   367:*14*
369:*1*

**< 3 >**

**3**   3:*8*   7:*21*   12:*23, 24*
18:*14*   38:*1, 5*   49:*3*
50:*23*   51:*11, 23*
52:*15*   53:*5, 7*   55:*10*
61:*15*   62:*8, 13*
115:*17*   155:*21*   156:*1,
7, 8, 18*   157:*15*
159:*10, 21*   160:*5, 12*
161:*8, 12, 17*   165:*9,
12, 21*   166:*21, 23*
169:*1, 11, 23*   171:*2*
172:*10, 15, 18*   174:*23*
175:*3, 11, 14, 20, 22*
176:*11*   177:*3*   178:*5,
9, 24*   181:*24*   183:*15,
19*   184:*6, 12, 24*
185:*12, 17, 21*   186:*5,
8, 12, 17*   187:*13*
189:*3*   194:*18, 20, 23*
195:*6, 10*   197:*2, 12*
208:*21*   216:*4, 10*
230:*1*   234:*13, 18*
236:*5, 9, 13*   240:*19*
241:*6*   245:*19*   253:*7*
259:*19*   261:*20*
262:*13*   263:*1, 11*
265:*22*   266:*12*   267:*5,
11, 20*   268:*1, 8, 17, 24*
269:*18*   270:*2, 10*
274:*3, 7, 9, 17*   275:*13*
276:*1*   277:*4*   282:*15,*

Case 3:21-cv-00477-MCC   Document 280-1   Filed 09/20/23   Page 316 of 373
CONFIDENTIAL
Deposition of Gary Bender Vol. I - Revised                    Jane Doe, et al. v. Schuylkill County Courthouse, et al.

**22** 283:*4, 5, 11*
288:*10* 289:*3* 297:*16*
309:*24* 313:9 317:*15,
17, 22* 318:*7, 16*
319:*4, 24* 322:*5, 22*
323:*17, 20* 327:*19*
328:*4, 13, 17, 24*
329:*17, 19* 330:2
348:*1, 8, 15* 350:*15*
351:*7* 365:*21* 367:*12,
13* 368:*2, 5, 15* 375:9
386:*14, 22* 387:*20*
388:*3* 391:*15* 392:9
394:*18* 395:*7* 396:*16*
397:*6, 19* 398:*4, 9, 17*
399:*13, 22* 400:*4, 23*
401:*2, 13* 402:*13*
404:*13, 20* 405:*4, 16*
406:*16* 407:*2, 9, 15*
410:*4, 6* 411:*11, 20,
24* 413:*23* 414:*6*
415:*7* 416:*24* 417:*21*
418:*4, 10, 17*
**3/4/2008** 192:*18*
**3:00** 93:*3, 6*
**3:06** 273:*19*
**3:21-CV-00477** 1:*4*
**30** 4:*15* 30:*9* 331:*10*
356:*10, 15*
**30th** 278:*23*
**31** 19:*10* 419:*21*
**310** 3:*2*
**31-36** 4:*12* 19:*12*
**33** 22:*16*
**338** 5:*6*
**34** 250:*18*
**3410** 2:*22*
**344** 5:*7*
**35** 4:*16*
**36** 19:*10*
**364** 6:*3*
**37** 4:*17* 5:*7* 343:*15,
18*
**373** 5:*13*
**377** 5:*14*
**39** 4:*18*
**397** 6:*3*
**398** 6:*3*
**3rd** 115:*9, 12*

**3's** 49:*8* 160:*7, 18*
162:*2* 166:*22* 169:*15*
170:*19* 174:*19*
198:*21* 261:*8* 409:*23*
411:*14* 412:*3* 416:9

**< 4 >**
**4** 3:*8* 7:*20, 21* 12:*24*
13:*1* 18:*14* 49:*23*
51:*23* 52:*11, 23*
62:*14* 159:*6* 186:*12,
20* 187:*13, 14, 19, 23*
189:*3, 4, 11, 12* 190:*3,
6* 191:*2, 8, 10, 13, 18*
192:*23* 193:*5, 10, 15,
18, 24* 194:*6, 14, 21*
195:*7, 10* 196:*7*
197:*2, 6* 201:*15*
202:*7, 8, 9, 14* 203:*3,
22* 204:*5, 8, 22*
205:*10, 16, 24* 206:*12,
13, 18, 23* 208:*20*
236:*5, 10, 13* 240:*19*
241:*7* 245:*20* 259:*19*
261:*8* 262:*13* 263:*9,
15* 265:*22* 266:*12*
267:*5, 12, 20* 268:*1, 9,
17* 269:*18* 270:*2, 10*
274:*4, 8, 17* 276:*1*
277:*5* 282:*16, 22*
283:*3, 4, 5, 11* 288:*10*
289:*3* 297:*16* 310:*1*
313:*10* 317:*17, 22*
318:*7, 16* 319:*4, 24*
328:*4* 336:*15* 348:*1,
8, 16* 350:*15* 351:*8*
365:*21* 367:*14* 368:*3,
6, 15* 386:*14* 388:*3*
391:*15* 392:*9* 394:*19*
395:*7* 396:*17* 397:*7,
18* 398:*4, 10, 14*
399:*4* 400:*5, 23*
401:*2, 14* 402:*20*
404:*15, 20* 405:*4, 16*
406:*16* 407:*2, 17*
409:*23* 410:*5* 413:*20*
414:*2* 416:*19* 417:*12*
**4:06** 331:*20*
**4:18** 332:*3*

**4:30** 309:*20*
**40** 325:*3*
**410** 103:*7* 104:*9*
281:*5, 17* 306:*17*
310:*21* 311:*1* 312:*10*
313:*23* 351:*21* 352:*8,
23* 353:*3, 10* 354:*4,
17* 355:*5* 358:*20*
360:*9, 23* 364:*22*
365:*12* 366:*3, 16*
367:*7* 378:*5, 18*
379:*3, 15*
**411** 169:*13*
**42** 4:*19*
**433** 2:*18*
**450** 325:*2*
**46** 4:*20* 169:*17*
171:*9*
**47** 37:*21* 169:*8, 13*
**48** 195:*22, 23*
**4's** 50:*3* 197:*22*
199:*12* 200:*17, 24*
261:*21* 263:*1* 268:*24*
282:*3* 399:*13*

**< 5 >**
**5** 327:*15*
**5:00** 103:*22* 104:*3*
260:*9* 271:*2* 309:*13,
16, 19, 21*
**5:41** 418:*23*
**51** 37:*22*
**511** 2:*13*
**53** 174:*5*
**55** 256:*12, 14*

**< 6 >**
**6** 4:*16* 35:*21, 23*
57:*11, 14* 58:*23*
151:*7* 279:*2, 19*
281:*16*
**60s** 183:*8*
**65** 35:*10*
**68** 4:*21* 250:*19, 24*
268:*20* 269:*6*
**6th** 20:*8, 14* 281:*10*

**< 7 >**
**707** 2:*22*

**71** 218:*21* 221:*14*
251:*15, 16*
**712** 2:*13*
**75** 249:*1*

**< 8 >**
**8:00** 103:*22* 104:*3*
260:*8* 271:*2* 309:*13,
16, 19, 21*
**8:20** 234:*8*
**8:30** 234:*8* 279:*2, 20*
309:*20*
**8th** 171:*5, 7* 226:*24*

**< 9 >**
**9** 4:*6, 17* 27:*12* 37:*5,
7, 11*
**9.932** 2:*9*
**9:11** 1:*22* 7:*8*
**9:36** 30:*12*
**9:43** 30:*19*
**96** 5:*5* 277:*17, 20*
278:*2, 16*
**9th** 378:*3, 8*

**< A >**
**a.m** 1:*22* 7:*8* 30:*13,
19* 93:*13, 14* 100:*9*
121:*19* 122:*2* 279:*2,
20*
**abandonment** 119:*23*
120:*22*
**abide** 20:*20* 40:*14*
**ability** 11:*24* 166:*22*
305:*7* 347:*11* 360:*1,
6, 10* 385:*17*
**able** 36:*23, 24* 45:*5*
140:*22* 142:*17* 150:*3*
250:*22* 301:*13*
338:*17* 351:*2* 402:*23,
24* 409:*3*
**absence** 117:*21*
**Absolutely** 158:*8*
242:*1* 363:*6* 404:*6*
**accept** 228:*22* 304:*11*
**acceptable** 312:*3*
382:*11*
**accepted** 15:*6, 8*
226:*19*

access 103:21 139:15, 20 140:1, 18, 19 259:24 260:8 264:6 265:11 266:8 270:20 285:10, 19 332:22, 23 334:24 345:11, 15 350:21 358:7 359:5 378:23 379:3
accessed 140:23
accessible 140:16 355:15, 16, 20
accommodation 312:5, 8 314:1 352:23, 24
accommodations 103:17 243:15 281:4
accosted 339:22 387:20
accurate 16:18 251:21, 22 252:17 351:9 419:6
accused 304:4 383:14
achieve 401:5
acknowledge 42:20
acknowledging 27:10 28:10 31:10 40:11
acknowledgment 22:11, 18 28:2 43:24 58:20
act 126:10 182:10 183:6 372:17
acted 215:4
Action 15:20 16:9 99:13, 15 110:9 301:5, 13 303:9 305:8 400:4, 22
actions 55:19, 24 56:6, 10 136:10 305:7 341:1
active 66:9, 12 84:22
activities 54:4
actual 35:6 200:8, 9 324:13
adamant 262:22
add 361:7
addition 57:6
additional 3:3 23:17 24:3, 16 25:1, 2 26:7 100:18 131:17 300:9

address 144:22 229:6 359:9 396:9
addressed 98:8 148:19 179:24 278:22 342:22 358:15 387:23
adequate 314:3
administered 131:10
administration 43:10 153:13, 20 388:1 390:11 402:18 406:3 414:17, 20, 23 415:9 416:20
administrative 16:8
administrator 14:23 23:23 25:18 35:4, 6, 15 36:15 38:16 44:18, 23 45:3, 8, 11, 21 46:5, 9 47:4, 13 48:6, 23 49:3, 7, 16, 22 50:2, 18 51:18 52:3 54:13, 16 55:23 56:12 57:7, 19 59:16 60:18 65:7 67:1 69:9 73:6, 9, 14, 18, 19 74:1, 2, 8 106:17 108:16 125:3 136:2 154:19 155:8 156:12 159:12 172:1 176:17 179:10, 16 186:11, 22 187:6 191:3, 11 193:4, 6, 7 204:14, 22 208:3 209:2 239:24 329:13
administrator/director 34:8
administrators 47:21
administrator's 55:14
admitted 102:14
advanced 149:16
advertise 162:21
advice 264:17 393:22, 24
advised 264:12
affair 241:22 242:7 245:4, 24
affairs 330:16
affair's 241:23
affect 9:24

affiliation 17:18 18:5
affirmative 258:16
afforded 304:9
aforementioned 419:7
afraid 263:16
afternoon 237:20, 24 238:1 255:6 259:16 263:21 264:5 267:2, 15, 17 274:2
agencies 153:23
agency 153:22 301:13 302:17
agenda 56:2, 4, 17, 20 57:1, 6 120:7 169:4 225:16 329:3, 10, 12, 18, 21 370:3 389:24 407:24 408:9 409:21, 22, 24 410:21 411:3, 14 412:1, 6, 9, 12, 15, 18 413:5, 6, 7
ago 126:8 365:7
agree 10:24 22:13, 20 26:4 33:10 38:20 40:13 47:22, 23 48:4 53:11 60:21 68:20 163:1, 2, 3 169:19 181:20 252:24 263:15 265:2 271:1, 4 288:6, 9 306:13 326:18 327:8 340:9 341:23 342:23 356:8, 20 362:18 363:1 364:16 365:18 378:22 380:13 393:19 394:2, 5, 10, 11, 23 395:1, 2, 13 397:1 400:17
agreeable 265:16
agreed 8:20, 23 14:3 20:20 176:1 260:10, 11 263:8 271:10 307:22 312:7 362:3 392:8, 15 393:21 394:23 395:6 408:8
agreeing 395:4
agreement 382:5, 8 390:3 391:1, 14, 18, 20 393:9, 16 394:18 395:9 396:15
agrees 357:2

ahead 19:18, 24 46:20 71:21 73:11 137:19 148:14 187:17 203:6 205:13 218:10 337:14 388:11, 12
ahold 346:21 388:21
al 1:2, 4 7:11, 12 9:10
alcohol 11:23 63:24 64:11 88:23 153:23 361:2 384:7
alcoholic 64:1, 7
ALEISHA 3:6 7:6
alerted 274:11
ALLAN 2:8
allan.townsend@usdoj.gov 2:10
allegation 126:11 295:19 341:7
allegations 104:8 234:2, 7, 13 235:20 237:12 253:20 266:13 268:1, 9 274:19 276:4 285:5, 12 288:17 289:4, 16 290:1 294:7 295:3 296:15 308:7, 23 309:5 333:6, 23 341:19, 24 344:17, 24 368:24 369:6 383:18
allege 342:6
alleged 121:2, 11 255:16
allegedly 290:12
Allen 8:2
allergies 122:7
allergy 105:18
alleviate 229:5 309:17 398:24 399:21
allow 152:9 153:12 261:15 266:11 309:21, 23 393:5 411:3, 13
allowed 11:8
alternate 351:20 353:4
alternative 313:23 379:20

**Alu** 388:*13, 14* 399:6
400:*13* 402:*20*
403:*14* 405:*17*
408:*18, 24* 409:*3, 7*
414:7, *18* 416:*18, 22,
24* 417:*16, 20*
**ALYSSA** 3:7 7:*23*
189:5
**amazing** 297:2
**AMBER** 2:8 7:*24*
**amber.fox@usdoj.gov**
2:*10*
**ambiguous** 10:*20*
**amount** 36:*18* 38:*3*
318:*4, 9, 17* 346:2
**analyst** 66:*23* 67:*11,
15, 19* 68:*15* 69:5
74:*16* 315:*19* 323:*3*
**and/or** 18:*14* 60:*10*
63:*24* 85:*15, 19*
128:*11* 131:*20*
146:*14* 226:5 233:*15*
234:*3* 236:*13* 274:7,
17 281:*4* 286:*23*
297:*16* 298:*20* 320:*4,
9* 363:8 368:*3, 7, 15*
**Ang** 387:5
**angles** 291:*11*
**angry** 295:*16* 296:*22*
**announcement** 370:2
**ANSWER** 6:*1* 11:*4,
7, 18* 12:9 21:6
44:*12* 49:*11* 50:6
51:*14* 53:*3, 18* 60:*11*
69:*13* 70:*4* 74:*23*
81:6 91:*19* 92:*24*
93:*16* 96:*16* 97:*23*
112:*19* 119:2 129:*3,
21* 134:5 136:*8, 17*
137:*20* 139:*4* 141:*3*
143:*15* 146:*11* 153:*1*
156:*24* 172:6 174:9
175:8 181:*10* 185:*4,
8* 188:*4, 5* 195:*17*
212:*14* 215:9, *10, 11*
220:*13* 251:*24*
252:*23* 261:*15, 18*
264:*18, 19* 265:5
266:*11, 19* 269:*3*
273:8 275:6, *17*

276:*16* 289:7 293:*13,
20* 294:9 300:*11*
301:8 302:8 303:*15*
304:*20* 305:*10, 12, 16,
19* 314:6 315:9
316:*15, 23* 318:*12*
319:8 324:*21* 334:*3*
336:*20* 337:*13*
339:*19* 341:*10* 342:8,
16 346:*10* 362:*20*
363:*14, 23* 364:7
366:8 367:*17* 368:9
369:*10* 370:*23* 371:7,
21 372:8, 9 379:*11*
388:*10, 11* 389:*18*
391:*22* 392:*3, 12*
393:*4, 5* 394:*21*
396:8, *21* 397:*3, 10*
402:9 403:*16* 413:*14*
414:*11* 415:*4, 13, 19*
416:*1, 13* 417:7, *15,
23*
**answered** 251:*18*
254:*20* 394:2 403:5
**answering** 10:*17*
190:*18* 388:6
**Anthony** 408:*18*
**anticipate** 80:*10*
**anticipating** 164:*14*
**antidiscrimination**
55:*3*
**anti-harassment**
42:*21*
**anybody** 151:5
180:*20*
**anymore** 243:6
299:*16* 362:8 375:*11*
**anyway** 20:*13*
117:*10* 197:*24* 205:2
233:*3*
**apologize** 130:*16*
198:*10* 230:*1* 244:*17*
246:*13* 247:2 252:6
253:*4* 261:5 283:5
368:*21*
**apologized** 246:*19*
252:7
**apology** 252:5

**Apparently** 141:*23*
142:2 165:8, *13*
168:*18*
**appear** 108:*14* 280:*4*
294:6 311:*24*
**appearance** 70:*24*
122:*20* 123:*11*
174:*20* 240:*4, 11*
294:5
**appearing** 7:*20, 22*
9:*22*
**appears** 16:*16*
**applicants** 38:*22*
164:*15*
**application** 14:*10, 19*
223:*22* 224:*1, 4, 9*
**applications** 224:6
225:*12*
**applied** 48:5 69:*4*
113:*21* 150:*13*
**applies** 69:*3*
**apply** 109:*14* 113:*20*
149:*23*
**appointed** 310:*10*
**appointment** 16:*15*
**appraiser** 83:9
111:*16* 112:8 113:*10*
114:*1, 2, 8, 18, 19, 24*
115:*4, 8, 10* 116:6
118:*5, 13, 14, 18, 22*
243:*13* 299:6 314:*23*
321:*23* 328:*15*
403:*10*
**appraisers** 112:*22*
323:9, *11, 18* 329:*23*
**appraiser's** 83:*23*
**appreciate** 28:7
29:*24* 181:*1* 182:*24*
188:6 190:*23* 252:*12*
273:*3* 362:*24* 363:9
364:*1* 389:5
**appreciated** 214:*19*
**approach** 195:6
**approached** 265:*16*
**appropriate** 73:*1, 2*
76:*13* 77:*16* 91:*15,
24* 92:*20* 93:*20*
145:*4* 167:2 396:*11*
406:*24* 416:*17*
**appropriately** 384:*14*

**approval** 55:*18, 23*
56:5, *16* 377:2
385:*23* 390:*1*
**approve** 196:*16*
207:*17* 321:*10* 325:*4*
329:*20*
**approved** 16:*17* 17:7
108:*3* 196:*10* 308:*1*
321:*4* 325:*4, 21*
326:*12* 376:*20* 405:*3*
408:7
**approximately** 7:8
38:*3* 253:*13*
**April** 144:*14* 147:*18*
148:*18* 149:6 153:*17*
281:8 400:*11, 18*
**area** 356:*17* 357:*15*
361:2
**areas** 46:*21*
**argumentative**
304:*22* 305:*4*
**articulate** 75:6
**aside** 20:*23* 43:*14*
161:*21*
**asked** 10:*15* 13:*20*
18:*4, 7* 23:*16* 24:*13*
74:*4* 75:*21* 88:*21*
98:*19* 99:*12* 103:*5,
10, 13* 124:7, *18, 21*
126:*24* 129:*15*
136:*13* 137:*4, 11, 17*
138:*1* 146:9 182:*19*
190:*14* 194:*13*
204:*24* 213:4 217:*24*
221:*12* 226:7 228:*13,
20* 242:*22* 245:*1, 2,
13* 252:*3, 4* 263:*3*
264:*10* 283:9 290:*21*
307:*19* 312:4, 8
314:*23* 325:7, *16*
334:*11, 13* 336:9
339:*24* 340:8 353:*21*
384:*23* 395:5 396:*1*
**asking** 18:2 69:*16*
136:9 137:*6, 9* 229:*2,
4* 244:*23* 245:*19*
247:*12* 252:*13, 14*
290:*15* 304:*13*
306:*10* 313:*14, 16*
316:*19* 335:*21* 348:5

Case 3:21-cv-00477-MCC   Document 280-1   Filed 09/20/23   Page 319 of 373
CONFIDENTIAL
Deposition of Gary Bender Vol. I - Revised                    Jane Doe, et al. v. Schuylkill County Courthouse, et al.

353:2  357:2  363:15,
17  367:24  372:5, 14
396:1  401:3  403:21
415:22  416:7, 8
**aspect**  378:16
**asserted**  384:16, 23
**assessment**  49:17
50:13, 17  51:17  52:3,
4  53:12  62:1  66:24
83:4, 11, 21  106:18
108:9, 13, 22  109:11
111:3, 4, 17  154:10,
24  155:17  162:14
165:7  184:4  194:5
195:5  198:14  293:10
298:20  299:6  320:3,
10, 12, 15  321:13
322:9, 23  323:6
326:22  327:20
328:15  361:15
364:24  375:11, 17, 22
386:6  388:22  389:10
390:2, 7, 15  391:9
398:14  402:14, 15, 21
403:3  404:4  405:17
414:6  417:1  418:18
**assessor**  50:18, 21, 24
51:6, 8, 11, 19  52:7,
16, 24  62:9  67:4, 5
159:23  160:13  162:4,
19, 20  163:6, 20, 21
164:5, 8, 9, 20, 24
169:17  170:20
171:24  173:5, 15
191:20  201:18
202:10, 18  208:3
388:15  399:3, 6, 7, 11,
12  402:17  403:11, 12
406:1  417:1, 17, 21
418:6, 12
**assessors**  174:6, 15
**assign**  186:20  360:1,
11
**assigned**  186:12
307:9  308:16  310:21
312:11  329:7  365:14
366:3, 16  367:7
406:7
**assigning**  187:1
360:21  378:9

**assignment**  186:14,
16  187:12
**assignments**  262:14
**assigns**  360:3
**assist**  414:8
**assistance**  164:3
247:16
**assistant**  45:6  49:19
50:4  51:19, 21  52:4,
7, 23  67:4  162:19
163:20, 21  164:5, 9
189:17  191:3, 8, 13,
18, 19  192:1, 13, 22
193:5, 24  194:6
196:7  197:3, 18, 23
198:13, 24  199:20
200:8, 10, 18  201:1,
16, 18  202:10, 11, 15,
18  255:17  403:11
**assume**  11:1  51:3
153:2  182:14  197:11
287:1
**assumed**  23:11  24:3
165:16  182:18
**assuming**  111:23
336:20
**assumption**  23:17
24:16, 24  25:2  26:6
38:11  65:15  124:5, 6
176:1
**assure**  44:14
**ate**  203:3
**attempt**  167:22
358:21  378:16
**attempted**  167:23
369:5
**attend**  27:15  28:22
85:15, 19, 21  131:20
143:11  286:15
**attendance**  380:24
**attendant**  309:15
**attended**  27:11
33:11, 15  43:19  58:7
**attending**  141:17
152:21
**attends**  33:23
**attention**  46:21
58:18  72:12  94:22
95:3  119:13, 17
145:2  161:17, 22

172:17  175:4  193:18
199:24  200:23
227:23  228:2
**attorney**  9:14  129:16
190:17  264:19
301:15, 16, 18, 21
302:11  389:9  391:14,
19  392:7, 19  393:14,
17, 20  394:16, 21
395:12  396:14, 24
**attorney-client**  261:14
**attorneys**  7:14  139:7
**Attorney's**  1:19
**audible**  10:12
**August**  16:22  17:2
40:24  41:5  143:12
231:5, 10
**authority**  231:23, 24
260:1, 11  262:20
264:13  265:14, 18
301:4  308:10  328:17
329:4
**authorization**  149:17
390:1
**authorize**  328:24
**authorized**  149:15
328:11  377:20
**automobiles**  387:7
**avid**  84:7
**avoid**  152:2  271:19
274:22
**awake**  93:5
**aware**  48:1, 2  50:20
64:7  68:24  69:11, 13,
19  70:5  90:14, 17
91:8, 12  101:13, 22,
23  102:13  119:3, 9,
11  120:15  121:12
124:17  128:21
133:22, 24  136:21
137:4  143:9, 20
144:9  147:8  161:13,
14  165:1  172:15, 16
173:13  174:13
179:22  193:15
210:24  213:24
225:12  257:19  258:6
266:14  268:16  292:7,
13  313:12  314:19
315:5  316:11, 19

319:17  322:9  333:22
334:4  335:12, 21
336:11, 19  340:12
345:3  346:18  347:4
350:9, 11, 20  358:5,
10, 13, 17  359:3, 12,
18  361:13  365:20
367:10, 12  368:2, 20,
22  369:4  370:12
383:22  384:15, 22
385:1, 24  391:8, 13,
19  392:7  400:22
401:1, 13  418:3

**< B >**
**back**  22:15  27:19
30:19, 21  33:1  34:1
41:2  43:23  48:9
53:22  67:23  77:3
80:20  82:8  103:5, 8,
10, 14  116:7  117:12
122:2, 11  129:22
130:15  138:4, 9
139:11  157:10
169:17  170:8  187:20,
24  188:24  202:14
207:23  213:1, 2
236:17  237:4, 21, 23
238:5  251:15  260:6,
11  266:10  268:19
270:15  273:20, 24
279:10, 13, 16  281:22
294:19  324:4, 9
326:7  332:3, 8
347:14  353:17
364:23  368:21
386:21  387:3, 11
395:18, 19  401:7, 24
402:3  405:3
**bad**  243:12, 20
356:14
**bag**  366:13
**bags**  334:9, 14  366:5
**Baldwin**  297:22, 23
298:1, 12  333:11
**Baldwin's**  298:2
**ball**  100:22
**bank**  293:3, 7  366:10
**banked**  349:6
**base**  372:8  404:11

Case 3:21-cv-00477-MCC   Document 280-1 CONFIDENTIAL Filed 09/20/23   Page 320 of 373
Deposition of Gary Bender Vol. I - Revised
Jane Doe, et al. v. Schuylkill County Courthouse, et al.

**based** 187:4 214:19
265:5 266:23 288:2
304:13, 16 305:20
336:20 371:23
386:14
**basic** 167:11
**basically** 167:17
228:20 295:2
**BASIL** 3:7 7:23
**basis** 62:4, 5 352:20
403:21 406:19
**basketball** 135:20
**Bates** 4:11, 12, 13, 14,
15, 16, 17, 18, 19, 21,
22, 23 5:1, 2, 3, 5, 6, 7
15:15 19:10, 12
21:23 26:24 30:5
31:1 35:23 37:7
39:22 42:2, 17 43:9
57:12 68:2 107:11,
22 148:7 170:11
192:4 277:20 327:6
337:20, 23 343:18
**beautiful** 71:9 123:2
**becoming** 46:4
169:16
**began** 13:9 147:7
358:20
**beginning** 61:19
87:4 103:12 148:4
311:8 389:20 403:1
**begins** 308:16
**behalf** 7:19, 22
196:20 281:12
283:14 336:8 391:20
393:14 396:16 400:2
**behavior** 89:2, 8
132:4, 8 175:12
215:21 216:17 217:4,
18 247:24 306:3, 5, 8,
11
**beliefs** 233:15
**believe** 8:14 30:23
31:20 32:10, 18
33:21 38:5 59:15, 19
60:17 66:6 68:22
69:24 79:5 83:18
88:7 91:15 92:15, 20
93:24 94:23 98:9
112:16 113:24

118:23 122:6 138:20
158:16 161:7 169:8
172:9 173:11 180:3
193:9 194:22 195:23
212:11 221:24 230:5,
9, 13 242:19 249:6
259:6 260:15 283:16
288:24 289:1 299:16
302:5 305:6 306:1
314:12 315:14
320:12 325:20, 21
327:15 342:3 351:1
352:20 370:14 375:3
382:1 396:5 410:23
413:21
**believed** 59:22
178:14 212:5 276:13
289:20 352:17 368:4
**belongings** 333:19
**bend** 214:11 216:21
**BENDER** 1:18 2:24
4:5 7:13 8:5 9:1, 7,
10, 13 12:19 13:8
16:3 17:11 22:4
27:5 30:23 36:4
42:7, 18 46:20 60:4
68:6 75:24 80:18
122:4 139:14 142:20
148:11 151:13 156:8
157:13, 14 158:21
189:10 192:9 194:13
196:3, 13 198:10, 12
219:1 229:11, 14
230:19 245:7, 18
246:18 251:9 253:7
256:14, 18 265:9
273:23 278:9, 16
319:17 332:6 344:6,
11 353:1 356:8
372:24 376:11, 24
393:19 394:14
395:12 396:14, 24
397:5 411:10 413:8
416:7
**Bender's** 14:15
**beneath** 54:5
**benefits** 149:23
150:4, 14
**Benolis** 187:18
**bent** 213:1

**best** 194:24 262:3
273:8 371:23 408:6
**bet** 32:7 176:19
**Beth** 213:15, 17
334:13 366:12
**Bethlehem** 3:2
**better** 38:23 85:4
109:10 190:22 195:7
228:21 246:11
291:23 314:20
331:11 408:10
**beyond** 275:19
318:20
**big** 204:1
**bigger** 268:16
**bikers** 134:3
**binder** 116:1 229:11
250:24 373:1
**binding** 393:18, 20
**bit** 27:19 87:7
95:24 109:4 114:5
116:8 155:23 187:16
207:24 222:23
223:18 234:19 237:4
244:12 260:13 272:5
273:3 278:4 294:17
312:24 387:3, 12
389:1
**blanked** 79:15
**board** 26:15, 16, 17
36:16, 18, 23 56:7
57:2 78:9, 12 223:13
305:1 307:16 308:2,
3 312:8 313:5 329:3
382:12
**boardroom** 27:12, 16,
22 28:3 43:21
**body** 242:12, 14
**bolded** 255:13
**book** 234:24 235:3,
21
**bottom** 27:8 31:1
47:8 53:24 110:7
201:9 219:1 255:13
273:7 338:8 352:22
376:23
**bought** 261:20
**bounce** 100:21
**BOX** 2:13

**Boy** 141:19
**boyfriend** 84:10, 17
**break** 12:7, 10
121:17 155:24 156:1
190:16 247:9 273:11
331:18
**breaking** 121:14
188:15
**Brian** 285:23 290:20
344:13 345:1, 6, 9
**brief** 30:15 46:20
121:22 157:6 273:16
331:23 396:12
**bright** 66:18 105:13
106:1 114:14 190:8
**bring** 56:15 58:17
59:7 94:22 110:18
116:17 119:13
145:19 161:17
167:11 172:17 185:9
193:18 199:24
200:23 209:19
227:21 286:17 334:7
**bringing** 345:7
366:5 375:9
**brings** 95:3
**broad** 337:14
**Brodhead** 3:2
**brought** 72:12 89:22
90:2 116:19 119:17
124:17 145:1 162:24
175:3 206:3 214:4
228:2 257:10 261:11
309:3 352:9 366:13
388:13 413:20
**budget** 404:12
**building** 57:9 102:22
103:7 104:4, 9
127:18 145:2 237:10
281:5, 18 286:21
306:17 310:21 311:1
312:6, 10 313:23
314:15 335:15, 19
351:21 352:8 353:3,
10 354:4, 17 355:5
358:12, 20, 22, 23
359:5, 15 360:2, 4, 10,
23 364:3, 22 365:12
366:3, 16, 23 367:7

Case 3:21-cv-00477-MCC  Document 280-1  Filed 09/20/23  Page 321 of 373
CONFIDENTIAL
Deposition of Gary Bender Vol. I - Revised                    Jane Doe, et al. v. Schuylkill County Courthouse, et al.

378:5, *10*, *19*, *24*
379:*3*, *15*
**bulk** 331:*12*
**bump** 113:*15*
**bumps** 292:*8*
**burden** 109:*24*
**bureau** 48:*18*, *22*, *23*
49:*17*, *18* 53:*12*
61:*13* 62:*10* 154:*7*,
*20* 155:*13*, *15* 156:*10*,
*14*, *19* 159:*2* 160:*13*,
*24* 162:*15* 165:*6*
183:*24* 192:*1*, *13*
194:*1*, *5* 298:*20*
320:*9* 323:*21* 399:*16*
**business** 93:*14*
152:*14* 336:*16*
379:*21* 397:*14*
415:*15*
**businesses** 147:*7*
150:*19*
**business-related**
152:*13*
**buy** 88:*23*
**buying** 331:*7*

**< C >**
**call** 13:*15*, *22* 23:*9*
36:*15* 90:*8* 141:*13*
144:*20* 159:*22* 175:*6*
197:*18* 204:*24*
229:*15* 236:*12*
246:*10* 252:*20*
260:*23* 286:*9*, *20*
291:*23* 318:*18*
372:*11* 380:*8*, *11*
381:*15*, *21* 382:*11*, *14*
409:*4*
**calling** 248:*24*
**calls** 136:*6* 139:*3*
215:*7* 293:*6* 393:*11*

396:*19*
**camaraderie** 362:*5*
**camera** 139:*15*, *21*
290:*22* 291:*1*, *11*
**campaign** 65:*2* 66:*9*,
*13*, *16* 84:*6*, *16*, *19*, *23*
86:*15*, *19*, *22* 87:*5*, *11*,
*15* 88:*3* 131:*24*
186:*8* 206:*23* 218:*5*,
*13* 219:*4*, *5*
**campaigned** 86:*24*
87:*2*
**campaigner** 84:*7*
**campus** 27:*24* 29:*6*
**candidate** 224:*16*
225:*3*
**candidates** 224:*13*
**canteen** 152:*10*
**Cantor** 339:*21*, *22*
**capable** 187:*1* 190:*7*
**capacity** 83:*2* 84:*4*
139:*16* 206:*6* 215:*23*
281:*24*
**caption** 7:*10*
**car** 182:*10* 183:*4*, *7*
292:*7*, *8* 296:*17*
368:*7*
**card** 358:*7* 359:*6*
**care** 214:*13*
**career** 337:*9*
**careful** 85:*4* 177:*20*
178:*3* 356:*23*
**carpet** 209:*17*
**cars** 329:*9*
**case** 7:*10* 9:*9* 64:*4*
102:*4* 142:*11* 389:*16*
**Casey** 359:*13*
**catch** 407:*8*
**CATHERINE** 2:*2*
7:*18* 9:*7* 30:*8*
121:*13* 137:*7* 141:*20*
205:*13* 273:*10*
**catherine@dereksmith
.com** 2:*4*
**Catherine's** 392:*24*
**CATTS** 3:*6* 7:*6*
**caucus** 146:*6*, *17*
**cause** 181:*8*
**caused** 72:*20*, *23*

181:*16*
**causing** 313:*20*
**CDBG** 23:*23* 45:*6*
155:*4*
**CDC** 151:*2*, *17*, *22*
**cell** 91:*10* 133:*14*
**certain** 41:*1* 88:*14*
145:*4*
**certainly** 61:*17* 94:*6*
99:*17* 114:*14* 243:*13*
268:*15* 288:*20*
295:*20* 303:*8* 368:*18*
392:*15*
**certif** 173:*19*
**certification** 404:*23*
405:*5*, *12*
**certifications** 404:*7*, *8*,
*9*, *14*
**certified** 83:*9* 173:*20*
201:*11*
**certify** 419:*5*
**chain** 53:*14* 408:*11*
**Chair** 23:*15* 24:*12*
**chairman** 56:*16*
57:*2*, *5* 369:*16* 408:*8*
**chairs** 100:*22*
**challenge** 14:*2*
**chance** 38:*22*
**change** 18:*15* 24:*23*
121:*15* 394:*4* 402:*6*
403:*18*
**changed** 16:*4* 23:*21*
38:*19* 83:*16* 272:*19*,
*24* 410:*5* 416:*4*
418:*19*
**changes** 38:*9* 199:*8*
207:*20* 252:*2*
**changing** 351:*19*
**characterization**
264:*17* 265:*3* 356:*21*
**charge** 398:*1* 415:*1*,
*11*
**chastise** 225:*5*
**Chaswiak** 78:*8*
179:*15* 207:*14*
216:*18* 223:*2*
**chat** 368:*7*
**check** 41:*2* 385:*19*
**chef** 67:*5*

**chief** 50:*18*, *21*, *23*
51:*6*, *7*, *11*, *19* 52:*15*
62:*9* 74:*6* 101:*6*
159:*23* 160:*13* 162:*4*,
*18*, *19* 163:*6*, *20*, *21*
164:*5*, *8*, *9*, *20*, *24*
169:*16* 170:*19*
171:*24* 173:*5*, *15*
174:*5*, *15* 191:*19*
201:*16*, *18* 202:*18*
208:*2* 290:*20* 344:*13*
345:*1* 388:*14* 399:*2*,
*6*, *7*, *11*, *12* 402:*17*
403:*10*, *11* 406:*1*
417:*1*, *17*, *21* 418:*6*,
*12*
**child** 105:*18*
**childish** 232:*1*, *2*
**children** 152:*21*
153:*21*, *23* 228:*4*
231:*22* 248:*3* 330:*18*
355:*10*
**chose** 232:*11* 362:*19*
**Chrissy** 299:*20* 348:*2*
**Christmas** 101:*5*, *7*, *8*
**chronological** 188:*10*
**church** 286:*15*
**circles** 255:*10*
**circumstance** 380:*12*
**circumvented** 333:*24*
366:*4*, *9*
**City** 90:*7*
**CIVIL** 1:*3* 2:*7*
**claim** 48:*18*, *21*, *23*
49:*4*, *8*, *17*, *18*, *19*
50:*4*, *8* 53:*12* 61:*12*
62:*10* 83:*19* 154:*7*,
*12*, *20* 155:*12*, *15*
156:*10*, *14*, *19* 158:*4*,
*7* 159:*2*, *10*, *11*, *17*, *22*
160:*6*, *13*, *24* 162:*3*,
*15* 165:*6* 169:*2*
170:*20* 171:*24*
175:*16* 183:*24*
189:*15*, *18*, *23* 191:*4*,
*8*, *13*, *18* 192:*1*, *22*
193:*24* 194:*5* 196:*8*
198:*14* 202:*11*, *15*
211:*8* 255:*17* 298:*20*
320:*4*, *9* 323:*21*

Case 3:21-cv-00477-MCC   Document 280-1   CONFIDENTIAL   Filed 09/20/23   Page 322 of 373

Deposition of Gary Bender Vol. I - Revised                    Jane Doe, et al. v. Schuylkill County Courthouse, et al.

330:*19*, *23*   375:*11*, *17*, *22*   386:*6*   398:*17*
399:*16*   402:*13*, *19*
407:*9*   410:*6*
**claimant**   192:*13*
**claimed**   234:*15*
**clarification**   155:*10*
216:*13*   385:*9*
**clarified**   252:*9*
**clarify**   75:*8*, *23*
124:*22*   181:*3*   249:*11*
252:*11*   264:*23*
282:*13*   325:*14*
338:*21*   394:*14*
**clarifying**   181:*2*
**classification**   47:*2*, *20*
48:*5*   68:*14*   69:*2*, *11*
116:*5*   118:*4*   119:*8*
159:*1*   160:*7*, *18*
161:*7*, *11*   170:*18*
172:*9*   173:*4*, *15*
192:*12*, *21*   193:*9*, *14*,
*20*   198:*13*, *22*   199:*17*
200:*12*   207:*3*, *8*
229:*20*   230:*9*, *13*
**classifications**   207:*21*
**classify**   263:*5*   288:*19*
**claw**   129:*21*
**clean**   395:*24*
**cleaned**   354:*12*
**cleanliness**   358:*14*
**clear**   104:*6*   185:*15*
215:*16*   219:*22*
232:*21*   245:*14*, *18*
249:*15*   254:*16*   275:*3*
320:*14*   355:*4*   396:*8*
**Clearly**   58:*17*   396:*2*
**clerk**   74:*6*   101:*6*
110:*10*   111:*3*, *15*
112:*7*   116:*12*   403:*8*,
*10*
**client**   264:*19*
**climbed**   290:*2*
294:*12*   365:*14*
366:*21*
**Clinton**   185:*24*
**clock**   124:*1*, *3*, *4*
126:*1*, *5*, *15*, *20*, *24*
127:*2*, *7*, *8*, *13*   130:*18*

**close**   140:*4*   150:*19*
153:*5*   383:*2*
**closed**   76:*15*   77:*13*
101:*12*   152:*10*, *21*
279:*19*
**closing**   147:*7*
**clothing**   246:*21*
**coffeepot**   357:*16*
**Coleen**   1:*22*   7:*16*
419:*4*, *22*
**colleagues**   361:*14*
**collectively**   97:*10*
224:*15*
**Columbia**   2:*9*
**combine**   162:*14*
165:*6*   167:*1*   194:*5*
198:*24*
**combined**   165:*21*
167:*15*, *18*   168:*4*
171:*3*, *11*   191:*17*
195:*12*   208:*17*
**combining**   162:*24*
166:*20*   167:*3*, *6*, *22*
168:*12*
**come**   23:*14*, *18*
24:*10*   56:*1*, *3*   61:*17*
63:*23*   84:*9*   90:*5*
92:*4*   96:*20*, *23*
101:*14*   103:*5*, *8*, *10*,
*14*   108:*24*   127:*8*
133:*12*   146:*5*   151:*6*
162:*13*   164:*6*   175:*17*
187:*24*   201:*6*   205:*9*,
*17*   223:*8*, *20*   224:*5*
234:*1*   236:*17*   238:*9*
239:*6*   242:*11*   263:*13*
271:*1*   279:*16*   286:*9*
287:*17*   293:*7*   300:*19*
305:*22*   307:*19*
309:*19*   310:*4*   311:*15*
312:*14*   313:*2*   315:*23*
324:*4*   335:*5*, *9*, *14*
336:*17*   340:*5*   352:*5*
359:*21*   362:*1*   364:*23*
372:*3*   375:*10*   377:*16*
395:*18*, *19*   396:*14*
403:*8*
**comes**   109:*12*   165:*5*
177:*6*   235:*19*   326:*7*
335:*19*   400:*17*

**comfortable**   102:*20*
103:*18*   104:*11*   156:*2*
247:*6*   268:*6*   353:*20*,
*22*   354:*1*, *5*
**coming**   33:*2*   116:*22*
233:*4*   238:*13*   271:*15*,
*21*   276:*3*   277:*9*
293:*3*, *5*   297:*3*
330:*10*   336:*5*, *6*
366:*10*   387:*9*
**command**   53:*15*
**comment**   70:*23*   86:*7*,
*8*   97:*2*   122:*19*
128:*22*   129:*10*   130:*6*,
*12*   132:*12*   174:*19*
182:*9*   184:*11*   186:*5*
203:*3*   209:*10*   212:*1*,
*5*   342:*22*   371:*11*
**comments**   79:*6*
89:*13*, *17*   106:*4*
132:*17*   146:*21*
175:*12*   209:*20*
211:*21*   215:*1*, *2*, *12*
217:*19*
**commissioner**   18:*1*
23:*15*   24:*12*   25:*16*
34:*13*   39:*10*   75:*15*
77:*7*, *9*   87:*1*, *2*   88:*16*,
*18*   91:*16*   92:*21*
93:*12*   97:*11*   103:*21*
106:*16*   144:*18*
155:*15*   162:*22*   168:*6*,
*8*, *9*, *23*   175:*17*   185:*8*,
*18*   212:*24*   217:*6*, *19*
223:*24*   224:*4*   234:*16*
235:*1*   237:*9*, *15*
238:*7*, *13*, *19*, *20*
240:*3*, *16*   241:*21*
254:*5*   255:*4*, *15*, *19*
260:*7*   262:*22*   285:*24*
289:*19*   294:*20*, *23*
295:*4*   296:*15*, *20*, *23*
297:*13*   308:*9*   333:*10*,
*16*   335:*18*   339:*13*, *15*,
*16*, *20*, *23*   370:*10*, *15*,
*16*, *17*, *18*   371:*3*, *9*, *14*,
*15*   372:*16*, *17*   380:*9*,
*10*, *15*, *22*, *24*   381:*1*, *7*,
*13*   382:*10*, *16*, *19*
383:*8*, *10*, *15*, *17*

386:*17*, *18*, *20*   387:*13*
418:*3*
**commissioners**   16:*17*
17:*7*   25:*13*, *19*   26:*14*,
*18*   34:*22*   36:*20*   39:*7*
47:*9*, *14*   48:*15*, *19*
50:*14*   55:*16*   56:*7*, *11*,
*21*   57:*2*   60:*14*   65:*2*
67:*6*   97:*9*   120:*11*
140:*18*   141:*17*   142:*8*,
*14*, *16*   144:*10*   149:*17*
168:*11*   196:*22*
204:*21*   217:*5*   223:*14*
224:*17*   226:*10*, *13*
257:*21*   267:*13*
282:*17*   305:*1*   307:*16*
308:*2*, *3*   310:*4*   313:*6*,
*7*   325:*3*   326:*12*
329:*6*   369:*16*, *24*
372:*12*   373:*14*   380:*1*,
*7*, *11*, *16*, *23*   381:*15*,
*19*   382:*6*, *9*, *20*
386:*16*   407:*20*   408:*2*,
*4*   409:*9*, *10*   410:*11*,
*18*, *24*   411:*13*   412:*14*,
*24*   413:*3*, *11*
**commissioner's**   120:*7*
**commitment**   38:*24*
**committed**   306:*2*
**committee**   35:*10*
84:*9*, *11*, *13*, *15*, *19*
223:*9*   224:*13*, *15*
226:*9*
**common**   101:*8*
**communicate**   369:*5*
391:*16*   392:*10*   395:*6*,
*8*   396:*17*, *18*   397:*6*,
*19*, *22*, *24*   398:*4*, *10*
399:*11*, *15*   414:*18*
415:*8*, *9*, *15*   416:*10*,
*15*, *19*   417:*13*, *20*
**communicated**   314:*8*
393:*3*, *8*   394:*17*, *22*
399:*2*, *12*   416:*23*
**communicating**   330:*2*
394:*19*   398:*24*   407:*3*
414:*16*, *20*, *23*   416:*21*
**communication**   58:*3*
175:*7*   261:*15*   317:*1*,

Case 3:21-cv-00477-MCC    Document 280-1    Filed 09/20/23    Page 323 of 373
CONFIDENTIAL
Deposition of Gary Bender Vol. I - Revised                    Jane Doe, et al. v. Schuylkill County Courthouse, et al.

*3* 394:*5*, *24*  399:*22*
417:*11*
**communications**
136:*6*  139:*3*  215:*7*
392:*2*  393:*12*
**community**  24:*20*
25:*8*  34:*7*  35:*14*
**companies**  13:*19*
331:*14*
**company**  330:*13*
331:*6*
**comparable**  226:*1*
**compensated**  205:*6*, *8*
**compensation**  204:*8*,
*19*, *20*
**competent**  227:*10*, *11*
**compilation**  361:*7*
**compile**  235:*6*
373:*23*  374:*8*
**complained**  329:*6*
**complaint**  64:*2*, *3*, *6*
90:*22*  101:*15*  205:*5*,
*9*, *17*  217:*12*  228:*5*, *8*,
*14*, *15*, *17*, *18*  229:*7*
268:*12*, *14*, *16*  344:*11*,
*20*
**complaints**  59:*1*, *4*,
*11*  259:*14*  268:*24*
269:*19*  270:*3*, *11*
354:*11*  363:*12*  364:*4*
**complete**  10:*15*
24:*23*  119:*14*  161:*18*
172:*18*  193:*19*
196:*10*  199:*24*  314:*4*,
*9*, *14*
**completed**  33:*19*
196:*7*  311:*20*, *22*
316:*17*
**completely**  11:*19*
309:*3*
**completeness**  302:*10*
**completes**  323:*3*
**completing**  315:*17*
**complex**  355:*17*
**compliance**  14:*1*
**comprehend**  288:*21*
**computer**  259:*8*
319:*11*  374:*23*
**concern**  72:*20*, *23*
112:*21*  113:*2*, *3*

116:*10*  166:*22*
205:*24*  239:*19*, *22*, *23*
359:*9*  361:*13*
**concerned**  35:*8*
76:*19*  97:*15*, *20*
240:*11*  261:*24*  276:*3*
284:*24*  362:*2*
**concerning**  217:*21*
239:*11*  247:*1*  255:*16*
333:*7*
**concerns**  20:*17*
28:*17*  31:*17*  41:*16*
43:*1*  67:*14*, *18*  111:*6*,
*11*  112:*14*  113:*11*
114:*23*  115:*2*, *13*, *16*,
*20*  164:*19*, *23*  169:*24*
170:*3*  175:*3*  184:*6*
197:*16*, *21*  199:*16*, *21*
200:*11*, *17*, *23*  209:*19*
210:*23*  215:*4*, *21*
216:*16*  227:*3*, *22*
229:*5*  247:*23*  309:*17*
352:*14*  358:*6*, *11*, *14*
359:*4*, *13*, *19*  360:*23*
363:*2*  399:*21*
**concluded**  295:*18*
**conclusion**  251:*11*
288:*7*  300:*19*, *22*
305:*22*  313:*2*  363:*15*
**concurred**  195:*8*
**conduct**  92:*15*
152:*14*  183:*23*  184:*3*,
*7*  209:*20*  212:*10*
215:*1*, *3*  216:*16*
217:*3*  239:*20*  281:*12*
288:*10*  296:*1*  297:*11*
298:*13*  302:*6*, *17*, *21*
342:*5*, *22*  378:*16*
379:*14*, *20*  397:*14*
**conducted**  223:*11*
235:*24*  260:*4*  284:*9*
287:*19*
**conducting**  239:*17*
384:*13*  390:*14*
**conference**  9:*22*  19:*5*
**confidence**  61:*16*, *21*
62:*7*, *9*  81:*9*  386:*13*
**confident**  240:*5*, *6*, *8*

**CONFIDENTIAL**
1:*10*  8:*17*, *18*  77:*14*
338:*14*
**confidentiality**  142:*5*
**confirmed**  245:*4*
246:*2*
**conflict**  59:*23*  60:*10*
61:*7*
**confuse**  218:*15*
**confused**  78:*10*
234:*10*  269:*4*  355:*19*
**congress**  88:*10*
**congressional**  88:*13*
**connected**  382:*22*
**connection**  30:*9*
33:*5*  189:*21*
**consider**  271:*24*
363:*21*
**considered**  92:*2*
120:*21*
**consolidated**  174:*4*
**Consult**  57:*22*  206:*17*
**consultant**  390:*3*
414:*7*
**consultation**  60:*14*
372:*4*  390:*3*, *24*
391:*2*
**consulted**  194:*13*
**consulting**  390:*21*
**consumed**  11:*22*
**contact**  151:*5*, *6*
152:*2*  276:*3*  359:*21*
**contacted**  345:*24*
346:*1*, *15*, *17*
**contents**  135:*5*, *8*, *17*
136:*3*  258:*4*  259:*8*
286:*10*  294:*24*
**context**  81:*3*  246:*14*
264:*18*  287:*20*
**continue**  74:*7*  242:*24*
**continued**  172:*2*
178:*6*
**contract**  308:*1*  310:*8*
324:*5*, *9*  325:*2*  326:*2*,
*8*, *9*  330:*4*, *7*, *11*, *24*
331:*4*, *5*, *15*
**contracted**  389:*9*, *12*
399:*5*
**contractor**  324:*1*

417:*2*
**contracts**  326:*5*
**controlled**  365:*1*
**controller**  26:*15*, *18*
36:*22*
**Controls**  346:*1*, *21*
347:*8*
**conversation**  80:*15*
94:*6*  96:*2*  99:*4*
124:*23*  145:*20*  146:*1*
177:*11*  178:*2*, *6*, *8*, *14*,
*19*  179:*4*, *20*  180:*8*
181:*23*  216:*2*, *11*
218:*17*  220:*1*, *3*, *19*,
*21*, *24*  254:*12*  262:*2*,
*11*  263:*18*  267:*2*
270:*19*, *24*  272:*17*
292:*24*  295:*1*  296:*14*
297:*19*, *24*  298:*5*
334:*19*  347:*8*, *14*
349:*9*, *11*, *17*, *20*, *21*
353:*10*  396:*2*  402:*4*
413:*19*
**conversations**  135:*3*
138:*19*  165:*11*, *17*
215:*19*  261:*7*  283:*2*,
*8*  284:*2*  285:*12*, *18*
292:*4*, *14*  297:*13*, *14*
298:*9*, *15*  306:*16*
311:*7*  332:*24*  333:*9*
352:*9*, *18*  379:*15*
396:*6*  407:*2*
**conveyed**  393:*16*, *18*
**convinced**  168:*18*, *22*
**coordinate**  59:*1*
**coordinator**  23:*6*, *22*,
*23*  154:*14*
**copied**  258:*4*
**copier**  331:*2*, *6*
**copiers**  330:*4*, *9*, *14*,
*23*  331:*10*
**copies**  21:*1*, *9*  258:*19*
**copy**  14:*15*  32:*23*
148:*4*  255:*15*  256:*4*
**correct**  11:*7*  13:*9*, *10*,
*12*, *13*  16:*12*, *13*
20:*14*, *21*, *22*  21:*18*
22:*7*  23:*7*, *8*, *24*  24:*5*,
*21*  25:*9*, *10*  26:*8*, *9*,
*19*  27:*14*  28:*12*, *13*,

Case 3:21-cv-00477-MCC    Document 280-1    Filed 09/20/23    Page 324 of 373
CONFIDENTIAL
Deposition of Gary Bender Vol. I - Revised                    Jane Doe, et al. v. Schuylkill County Courthouse, et al.

*15* 29:5 31:2, *3*, *12*, *15*, *16* 33:*11*, *13* 34:5, *9*, *13*, *14* 35:16 36:7, *8*, *11*, *12* 37:*13*, *14* 38:*16*, *17* 39:*13*, *16* 40:*14*, *15* 41:7 42:*18*, *19*, *23*, *24* 43:5, *11*, *12* 47:4, *5*, *14*, *15* 48:*19*, *20*, *24* 49:*1*, *4*, *5*, *19*, *20*, *23*, *24* 50:*14*, *15*, *18*, *19* 51:*1*, *8*, *9*, *15*, *19* 52:4, *5*, *12*, *13*, *16*, *19* 56:21 62:15 65:*14*, *16* 67:*1*, *7*, *8* 68:*15* 69:5, *6* 72:*18* 73:20 80:*3* 88:5 90:*13*, *23* 91:7 94:24 95:*1*, *4*, *5* 96:5, *10* 101:*20* 104:*3* 106:*12*, *13*, *19* 108:*17*, *18* 110:*11*, *24* 111:*4*, *5*, *17*, *18* 114:*19*, *20* 116:*4* 117:*19* 118:*6*, *7*, *18*, *19* 120:7 121:*3*, *11* 135:*10*, *11* 137:16 140:*13*, *14*, *19*, *20* 147:*13*, *14*, *19* 148:*20*, *21* 149:*23*, *24* 150:5, *10*, *11*, *15*, *16* 152:18 155:9 159:2, *3*, *7*, *8*, *13*, *14*, *18*, *19*, *23*, *24* 160:*8*, *14*, *15*, *19*, *20* 161:2 162:*4*, *5*, *9* 163:7, *8*, *12*, *13*, *15*, *19* 165:*22*, *23* 168:5, *12* 169:*8* 170:*20*, *21*, *23*, *24* 171:*9*, *13*, *14* 172:*3* 173:*6*, *7*, *16*, *17* 174:*1*, *2* 176:*13* 177:5 179:*12*, *16*, *17* 181:*18* 187:2, *3*, *6* 189:*19*, *20* 191:*4*, *5*, *14*, *15*, *20*, *21* 192:*18*, *19* 193:*1*, *2* 194:*7*, *8* 195:*12* 196:*9*, *23* 197:*4*, *5*, *10* 198:*15*, *16*, *18*, *19* 199:*1*, *2* 201:*12*, *13*, *19*, *20*, *24* 202:*1*, *2*, *4*, *5*, *11*, *12*, *15*, *16*, *19*, *20*, *23*, *24*

203:*17* 206:2, *4*, *14* 207:*13* 208:*4*, *5*, *7*, *11*, *18*, *22*, *23* 210:*17*, *18* 211:*6* 218:7 219:*13*, *16*, *17* 220:*1*, *2*, *6*, *7*, *10*, *11*, *13*, *14*, *19*, *20* 221:*7*, *10* 222:*15* 223:2, *3* 224:*14*, *17*, *18* 225:*18* 226:*22*, *23* 229:*22*, *23* 230:*3*, *4*, *22* 231:*1* 236:*11*, *23* 240:*16*, *17*, *20*, *21*, *22*, *23* 241:*1*, *3* 242:*22* 245:*21* 246:*1*, *5* 250:*6*, *7* 251:*12*, *13* 253:*20*, *21* 254:*8*, *9* 255:*21*, *22* 256:*22*, *24* 258:*12*, *13* 259:*2*, *5* 261:*9*, *10* 262:*8*, *9* 263:*24* 264:*1*, *14*, *24* 265:*24* 266:*1*, *3*, *4* 267:5, *13*, *14* 269:*7* 270:*21*, *22* 271:*3*, *6*, *7*, *10* 273:*1* 274:5, *6* 276:*10*, *11* 277:*1*, *2*, *12*, *13* 279:*10*, *11* 280:*16* 281:*6*, *13*, *14*, *19* 283:*12* 284:*9*, *18* 286:*24* 287:*6*, *9*, *12*, *13*, *24* 288:*1*, *4*, *5* 289:*16*, *17*, *21*, *22* 290:*3*, *4* 294:*21* 298:*4*, *21* 299:*23* 300:*24* 301:*3*, *6*, *9* 304:5, *6*, *10* 305:*17* 306:*23* 308:*18* 310:*1*, *11*, *12*, *16*, *17*, *21*, *22* 316:7 317:*8*, *23* 318:*1*, *2*, *5*, *6*, *10*, *14*, *22*, *23* 319:*3*, *6* 320:5, *11*, *16*, *17*, *19* 321:*1*, *14*, *16*, *22* 322:2, *6*, *7*, *23* 323:*8*, *18*, *19*, *21*, *22* 324:*1*, *2*, *6*, *19* 325:*17* 326:*19* 327:*1*, *21*, *22* 328:*1*, *2*, *21* 333:*12* 337:*1*, *10* 340:*14* 341:*8* 346:*8*, *19* 348:*1*, *8*, *23* 350:*8* 351:*21*, *22* 352:*2*, *3*,

*11* 354:*22*, *24* 355:*1*, *6*, *7*, *14*, *23*, *24* 356:*17* 357:*8*, *9*, *11*, *12*, *16* 358:*2*, *24* 359:*1* 360:*16*, *17* 365:*16*, *23* 366:*6*, *17*, *23*, *24* 367:*3*, *9* 369:*16*, *17* 371:*15* 376:*18* 378:*4*, *6*, *7*, *12*, *19*, *20* 379:*16*, *17* 380:*2*, *17* 381:*1*, *2*, *12*, *17* 382:*16*, *20*, *21* 384:*3*, *4*, *12* 394:*19* 398:*1*, *2*, *15*, *16*, *18*, *19*, *21*, *22* 399:*4*, *23*, *24* 400:*18*, *19* 405:*1*, *19*, *20*, *22*, *23* 406:5, *11*, *18*, *22* 408:*14*, *15* 409:*7* 410:*11* 411:*11*, *15*, *22*, *24* 412:9, *15* 413:*24* 414:*1*, *3*, *4* 416:*20*

**corrected** 219:*3*
**correctly** 137:*14* 389:*11*
**correspond** 93:*3*
**cost** 38:*6*
**costly** 347:*11*
**Counsel** 2:5, *11*, *15*, *19*, *24* 3:*3* 8:5 42:*13* 80:*9* 136:7 137:*3* 139:*3* 166:7 175:7 250:*17* 256:*9* 392:2 393:*12*, *13*, *22*, *24* 396:*12*
**count** 61:*20*
**counter** 315:*22*
**countermand** 360:*5*
**counters** 315:*23*
**Counties** 174:*6*
**COUNTY** 1:*3* 7:*11* 8:5 9:*10* 13:4, 5, *9* 14:22 15:9 16:*10* 17:15 18:*10*, *18*, *19* 19:*3* 21:*1*, *9*, *16* 22:12 23:*10* 25:7, *18* 28:24 29:*6*, *11* 31:*11*, *23* 34:2, *8*, *12* 35:*3*, *6*, *15* 36:*15* 38:*16* 39:*1*, *10* 43:22 44:7, *17*, *18*, *20*, *23* 45:2, *3*, *11*, *21*

46:4, *9* 47:*3*, *9*, *13*, *14*, *20* 48:*6*, *15*, *19*, *22* 49:2, *7*, *15*, *21* 50:*2*, *14*, *17*, *21*, *24* 51:*18* 52:*2* 54:*12*, *13*, *15* 55:*6*, *13*, *16*, *22* 56:*11*, *12* 57:*7*, *15*, *18*, *19*, *20* 58:*1*, *7*, *14* 59:*16* 60:*13*, *14*, *18* 62:*14*, *15* 65:*7*, *20* 66:*23* 67:*1* 68:*13* 69:*8* 73:5 74:*1*, *2*, *8* 77:*21* 81:*8* 85:*12* 91:*16* 92:*18*, *21* 93:*11*, *12* 94:*1* 96:*3* 98:*11* 100:9 101:*1*, *4* 106:*16* 108:*16* 110:*13* 119:*20* 125:*3* 127:*15* 128:*6*, *10* 136:*1* 137:*17* 143:*22* 144:*9*, *10* 147:*11*, *16* 150:*2*, *10*, *20* 151:*16*, *20* 152:*18*, *22* 153:*20* 154:*19* 155:*8* 156:*11* 157:*19* 159:*12*, *18* 163:*9*, *11* 164:*18* 167:*12*, *20*, *24* 171:*12* 172:*1* 174:*14* 176:*17* 179:*6*, *10*, *15* 180:*13* 186:*11* 187:*1*, *6* 189:*22* 190:*4* 191:*2* 193:*3*, *6*, *7* 207:*4* 208:*3* 209:2, *23* 210:*16*, *23* 211:*4*, *5* 219:*15*, *16* 222:*7*, *13*, *14* 223:*10* 226:*22* 227:*20* 239:*24* 240:*1* 247:*16* 279:*9* 281:*13* 283:*15* 285:*18* 288:*4*, *11* 289:*20*, *21* 292:*4* 295:5 299:*15*, *23* 300:*8*, *24* 301:*14*, *20* 303:7 314:*21* 318:*10*, *22* 327:*13* 328:*14* 329:*13* 337:*3*, *7* 340:*4*, *13* 345:*15* 351:*21* 364:*21* 365:*10* 370:*9* 371:*24* 374:*22* 378:*15* 382:*2*, *4*, *6*, *15* 384:*3*, *6*, *17*,

Case 3:21-cv-00477-MCC   Document 280-1   Filed 09/20/23   Page 325 of 373
CONFIDENTIAL
Deposition of Gary Bender Vol. I - Revised                    Jane Doe, et al. v. Schuylkill County Courthouse, et al.

*24* 385:*4, 21* 388:*15*
389:*9, 21* 390:*10, 11,*
*21* 391:*15, 20* 392:*8*
393:*14, 15, 18, 20, 21*
394:*16* 396:*16* 397:*1,*
*15* 400:*2* 402:*22*
415:*15*
**county-issued** 135:*6,*
*10, 13* 257:*24* 258:*15,*
*22* 259:*9* 385:*13, 18*
**county's** 24:*19, 20*
27:*11* 34:*7* 35:*14*
42:*21* 47:*2, 19* 48:*18,*
*21* 49:*3* 50:*13, 16*
55:*2, 5* 118:*4* 158:*24*
170:*18* 173:*4, 14*
192:*11, 20* 198:*12, 23*
208:*2* 229:*20* 266:*3*
302:*24* 390:*7*
**countywide** 54:*3*
390:*9*
**couple** 54:*20* 220:*5*
243:*7* 249:*18* 252:*1*
296:*23* 340:*23*
406:*13*
**course** 32:*8, 12, 20*
33:*6, 19* 43:*18* 116:*9*
244:*20*
**courses** 33:*23*
**COURT** 1:*2* 7:*1, 6,*
*16* 10:*1, 4, 9* 80:*8*
246:*21* 314:*21*
389:*16*
**COURTHOUSE** 1:*4*
7:*12* 19:*3, 5* 27:*13,*
*17* 41:*3* 43:*22* 71:*18,*
*23* 79:*13, 18* 83:*15*
101:*12* 102:*15* 103:*5,*
*6, 8, 11, 22, 24* 104:*2,*
*14* 112:*23* 114:*7*
134:*14* 139:*16, 17, 20,*
*22* 140:*13* 144:*20*
186:*13* 238:*9, 14*
240:*22* 255:*20* 260:*8,*
*9* 264:*7* 265:*12, 19*
266:*3, 9* 270:*20*
271:*5, 16, 21* 280:*2*
285:*11, 20* 286:*18*
293:*8* 294:*11* 295:*6*
299:*9* 307:*19, 24*

309:*14, 20, 24* 312:*6*
315:*21* 332:*24*
334:*10* 335:*1, 6, 7*
336:*9, 17, 24* 345:*8*
362:*11* 379:*4, 10, 21*
**court's** 8:*19*
**cover** 332:*6* 349:*2*
**COVID** 150:*4, 14*
151:*21* 212:*20*
**COVID-19** 147:*8*
319:*18* 324:*14*
**COVID-related** 103:*2*
**coworkers** 157:*23*
**CP** 201:*3*
**CPE** 169:*3* 174:*1, 7,*
*15* 201:*3, 4, 17*
202:*22* 321:*17, 21*
322:*1, 5, 10, 22* 323:*4,*
*8* 413:*23* 414:*2*
**CPE-licensed** 323:*18*
**create** 25:*11, 24*
44:*22*
**created** 25:*7* 105:*16*
109:*9* 340:*13*
**criminal** 302:*6*
**cry** 209:*7*
**crying** 244:*12*
**current** 211:*7* 330:*24*
**currently** 17:*11*
135:*14* 140:*10*
173:*16* 176:*12*
**custody** 146:*22*
**CV** 14:*12, 16*
**Cyan** 330:*5* 331:*4, 7*

**< D >**
**daily** 78:*6, 22*
151:*23* 178:*21*
287:*17* 310:*5* 374:*3*
**Dan** 14:*8*
**dangerous** 292:*2*
**Darlene** 101:*5*
167:*16* 404:*19*
**Dash** 299:*18*
**date** 7:*7* 20:*12*
28:*21* 29:*12* 39:*15*
47:*16* 68:*18, 19*
107:*3* 111:*24* 159:*6*
171:*4* 192:*18* 227:*2*
253:*16* 254:*22*

271:*23* 290:*7* 292:*11*
311:*9* 324:*13* 377:*23*
**DATE:August** 419:*21*
**dated** 16:*22* 20:*13*
22:*10* 118:*9* 148:*18*
159:*5* 170:*23* 173:*8*
192:*17* 198:*17* 230:*1,*
*2* 257:*6* 268:*22*
269:*6* 327:*15*
**dates** 218:*16* 336:*23*
**dating** 175:*19* 177:*7,*
*8, 14, 16* 180:*13, 17,*
*21, 23* 181:*8, 14, 17*
**Daub** 14:*8*
**D-A-U-B** 14:*8*
**daughter** 92:*4* 122:*7*
**David** 187:*18*
**day** 61:*19* 66:*15*
78:*9, 23* 79:*2* 87:*24*
94:*4* 121:*6* 124:*21*
151:*17, 24* 152:*5, 6*
154:*1* 175:*23* 177:*23*
187:*20, 22* 204:*20*
227:*9* 233:*5* 234:*14*
235:*8, 13, 17* 236:*20,*
*22* 237:*16* 239:*12*
253:*19, 23* 254:*2*
274:*21* 275:*14*
282:*11* 283:*8* 286:*6*
288:*21* 289:*12*
290:*11, 22* 296:*5*
308:*19* 309:*3* 314:*16*
319:*11, 12* 342:*19*
352:*5* 360:*19* 366:*22*
368:*22* 374:*4, 5*
381:*23* 387:*8, 15, 16*
404:*20*
**days** 116:*13* 151:*4*
216:*4* 334:*24* 335:*1,*
*5, 16* 336:*5, 15, 18*
349:*1, 4*
**day-to-day** 61:*12, 14,*
*18* 62:*1, 4, 5*
**deadline** 316:*3, 12, 20*
317:*8* 318:*14, 22*
319:*2*
**deadlines** 318:*10*
319:*19*
**deal** 331:*11*

**dealership** 329:*8*
**deals** 154:*12*
**Deb** 207:*5* 223:*14*
299:*14, 18* 309:*1*
326:*21*
**DEBISE** 3:*7* 7:*23*
189:*5*
**Debra** 99:*8, 11, 16*
130:*23* 162:*18*
207:*14* 213:*6* 218:*12,*
*16* 223:*15* 224:*23*
225:*6* 234:*11* 235:*9,*
*11* 237:*21, 22* 240:*1*
243:*2* 255:*6* 261:*22*
284:*13* 285:*23* 291:*9*
292:*22* 295:*2* 373:*19*
374:*9*
**December** 68:*18*
347:*23* 348:*5, 14*
378:*3, 8* 401:*12*
405:*7*
**decide** 194:*23* 361:*5*
**decided** 25:*11*
150:*20* 224:*15*
225:*20* 284:*22* 293:*7*
326:*3* 351:*18* 361:*3*
405:*10*
**decides** 36:*18*
**decision** 23:*13* 26:*12,*
*16* 36:*13* 39:*6, 8*
112:*5, 10* 117:*17*
164:*4* 191:*7* 194:*4,*
*14* 198:*23* 204:*21*
231:*17, 18* 241:*6*
262:*17* 301:*24* 302:*3*
303:*17, 24* 307:*13*
308:*8* 312:*9* 371:*8,*
*23* 372:*11* 395:*20*
402:*12* 412:*3* 414:*5*
**decisions** 46:*1* 409:*20*
**deck** 98:*15, 20, 21*
99:*21* 100:*2, 3*
**declined** 276:*24*
326:*2*
**deed** 241:*21*
**deemed** 390:*10*
**Def** 146:*15*
**defend** 341:*1*
**Defendant** 8:*8, 10*
17:*20* 18:*4, 9, 13*

Case 3:21-cv-00477-MCC    Document 280-2    CONFIDENTIAL    Filed 09/20/23    Page 326 of 373

Deposition of Gary Bender Vol. I - Revised                    Jane Doe, et al. v. Schuylkill County Courthouse, et al.

34:*12*  66:7  70:*10, 13,*
*15, 18, 22*  71:2, *17, 22*
72:*13, 22*  74:*15*
75:*10*  79:*12, 17, 18*
80:*5, 18, 22*  81:*14, 15*
82:*9, 12, 16*  83:*1, 12*
84:*4*  85:*3, 7, 14, 18,*
*23*  86:*8, 14, 18*  87:*10,*
*15*  88:22  89:*1, 7, 12,*
*16, 20*  90:*14*  91:*5, 9*
92:*10, 16*  94:22
97:*15, 20*  99:*18*
100:*13, 17, 20, 24*
101:*3, 10, 22, 24*
102:8, *14*  104:*13*
105:*21*  110:*4*  117:*21*
122:*18, 22*  123:*9, 13,*
*16, 20*  125:*11, 19, 24*
126:*1, 22*  128:*17, 22*
129:*9*  130:*6, 13, 17*
131:7, *10, 19, 23*
132:*3, 7, 11, 16, 22*
133:7, *13*  134:*1, 10,*
*13, 18, 20*  135:*2, 6, 9*
136:*13*  137:*17, 23*
138:*4, 18*  139:*14*
140:*1, 12, 23*  141:7,
*15*  142:*21, 24*  143:*3,*
*6, 10, 21*  144:*1, 6*
145:*6, 10, 11, 18*
146:*9, 17, 20, 24*
147:*4*  155:*12*  165:*4,*
*10*  166:*19*  168:*16, 21*
174:*18, 22*  175:*2, 4,*
*11*  177:6, *19*  178:*10*
179:*20, 21, 24*  180:*4*
181:*5, 13, 23*  182:*8,*
*18*  183:*14, 18, 22*
184:*2, 7, 10, 23*
185:*17, 20, 23*  186:*4,*
*7*  187:*11*  203:*2, 20,*
*24*  204:*4*  206:*5, 22*
209:*5, 9, 13, 16, 20*
210:*2, 11, 19*  211:*10,*
*20, 24*  212:*4, 9*
213:22  214:*5, 24*
215:*3, 20, 21*  216:*3, 4,*
*5, 16, 21*  217:*4, 18, 24*
219:24  220:*4, 9, 12,*
*23*  221:6  225:*4, 9*

234:*4*  238:*21, 22*
245:24  247:*23*
248:*10, 13, 23*  257:*23*
258:22  259:*8*  262:7,
*12, 18, 24*  264:*5*
265:*10, 11*  266:7
268:*9*  269:*19*  270:*3,*
*11, 19*  271:*10, 20*
272:*17*  274:22  276:*3,*
*8*  284:*21*  285:*9, 19*
286:*23*  287:*12*  288:*3,*
*9, 18*  289:*5*  290:*1*
291:*14*  293:*1, 17*
300:*23*  301:*12*  302:*5,*
*17, 20*  303:*1*  304:*8,*
*17*  305:*6*  306:*1*
308:*4*  332:*13*  333:7,
*18, 19, 24*  334:*6*
335:*6, 16*  336:*4, 15,*
*21*  337:*4*  341:7, *20*
342:*1, 5, 21*  344:*18,*
*24*  359:22  364:*5*
365:*9, 14, 22*  366:*3,*
*20*  367:*2, 8, 13, 14*
368:*5, 6, 23*  369:*4, 14,*
*22*  370:*15*  375:*10, 16*
376:*18*  378:*23*
379:*13, 19, 23*  380:*15,*
*22*  384:*16, 23*  385:*18,*
*22*  386:*1*
**Defendants**  1:*4*
**deferred**  194:*21*
**definitely**  41:*5*
*272:23*
**definitively**  140:*22*
**delay**  404:*6*  405:*12*
**delayed**  358:*22*
*404:23*  405:*1, 21*
*406:4*
**delete**  257:*21*
**delinquency**  313:*17,*
*20*  404:*3*  406:*5*
**delinquent**  313:*10*
*315:4*
**delivered**  255:*15*
**Delzoni**  167:*16*
*404:19*
**demeanor**  244:*11*

**demolition**  23:*6, 12,*
*22*  24:*1*  154:*14*
*155:4*  189:*14*
**demonstration**  153:*14*
**demoted**  407:*4*
**Deni**  211:2, 7, *16, 17*
**DE-N-I**  211:*17*
**DEPARTMENT**  2:7
*25:9*  62:8  153:*10*
*187:19*  259:*4*  344:*12,*
*21*  345:*17, 19*  384:*6*
*399:14, 16*
**departments**  48:*14*
*55:15*  56:*10*
**depend**  92:2  93:*1*
*394:7*
**depends**  78:7
**DEPOSITION**  1:*18*
*7:9*  8:*16*  9:*12, 15*
*10:5*  11:*5*  12:*14, 17,*
*20*  141:*16*  190:*17*
**Deprello**  330:6
**deputy**  51:*19*  52:7,
*24*  67:*4, 5*  191:*19*
*201:18*  202:*10, 18*
*290:20*  344:*13*  345:*1*
**DEREK**  2:2
**describe**  291:*24*
*292:2*  295:*17*
**DESCRIPTION**  4:*10*
*47:3, 20*  48:*5*  68:*14*
*69:3, 20, 24*  116:*5*
*118:5, 16, 23*  119:*9*
*158:10*  159:*1*  160:*1,*
*8, 18*  161:7, *11, 19*
*162:19, 20*  163:*17, 23*
*170:19*  171:*12*  172:*9,*
*14, 20*  173:*5, 12*
*192:2, 12, 21*  193:*9,*
*14, 21*  198:*13, 22*
*199:5, 17*  200:*2, 12*
*207:8, 21*  229:*21*
*230:9, 13*
**descriptions**  207:*3*
**designate**  8:*18*
**desire**  353:*13, 16*
**desk**  75:*16*  212:22
*315:22*
**despite**  100:*5*  293:*6*

**317:*21*
**determination**  311:*16*
**determine**  103:*17*
*138:8*  300:*8*  306:7
*348:19*  351:2
**determined**  288:*3*
**Detweiler**  299:*14*
*326:21*
**develop**  25:*8*  403:7
**developed**  225:*13*
**development**  24:*20,*
*22*  25:*9*  34:7, *9*
*35:14*  54:*10, 14*  74:*4*
*106:24*
**device**  258:*15*
**devices**  257:*24*  258:*4*
*259:9*  314:*9, 11*
*385:5, 14, 23*
**diagonal**  294:2
**DICKIE**  3:*1*
**dictate**  335:*18*
**diem**  324:*4, 9*  326:*8*
**Dietrich**  213:*9*
**different**  16:*11*
*236:20*  249:*18*
*263:11*  266:*23*  269:2
*287:18*  338:*19*
*362:16*  405:*18*
**difficult**  92:*1*  114:*8*
*305:12, 16*
**difficulties**  157:7
**difficulty**  109:*16*
**Digital**  331:6
**digress**  187:*15*
**diminished**  231:*23*
**ding**  314:*17*
**direct**  46:*21*  53:*14*
*54:3, 10, 14*  74:*5*
**directed**  116:*15*
*215:13*
**DIRECTION**  6:*1*
*48:14*  383:7
**directly**  50:*8*  56:*20,*
*24*  57:*5*  59:*12*  93:*4*
*138:15*  140:*11*
*205:11, 17*  357:*18*
*391:3, 5*  407:*4*
**director**  24:*19*  34:7
*35:13*  48:*23*  49:*4, 9,*
*19*  50:*4, 9*  51:*21**

Case 3:21-cv-00477-MCC   Document 280-1   CONFIDENTIAL   Filed 09/20/23   Page 327 of 373

Deposition of Gary Bender Vol. I - Revised                                    Jane Doe, et al. v. Schuylkill County Courthouse, et al.

56:15  57:4, 23  58:4
59:21, 24  60:6, 10, 22
61:2, 4  74:4  78:17
99:6  106:23  130:22
137:11, 15  153:9
156:9  158:4, 7  159:2,
11, 12, 17, 23  160:6,
14, 24  162:3, 4  169:2
170:20  171:24
179:11, 15  189:17
191:3, 8, 14, 19  192:1,
13, 22  193:6, 24
196:8  202:11, 15
215:13, 18  223:1, 20
225:17, 24  229:21
240:2  257:19  258:9
307:7, 10  308:17
310:9  399:14  407:10
410:7

**directors**  61:21, 22
407:13

**dirty**  294:14

**disbanded**  418:5, 11

**disbelieve**  242:9
244:14  288:16  289:3

**Disciplinary**  99:15
303:9  400:4, 22

**discipline**  304:23
305:6

**discovered**  312:17

**discovery**  90:24
259:7

**discuss**  46:8  59:8
82:17  83:2, 6  84:3,
20  125:9  146:24
147:3  175:2, 11, 13
190:16  206:5, 8
207:15  214:24  217:3,
18  233:10  247:13
282:4  284:22  285:22
287:19  296:9, 11
319:23  328:12  336:3
361:10, 18  369:21
370:6  373:10  397:16,
18  411:21  412:7

**discussed**  26:11
77:15  80:4  89:9
117:20  130:12
132:13, 18  166:20
167:8  171:22  178:20,

23  179:19  180:3
185:9  194:3, 18
207:5  212:7, 10
213:21  224:21
238:15  243:5  247:19
259:12  263:22  264:7,
12  275:20  284:17
285:6  286:3  336:21
353:3  365:13  369:23
375:13

**discusses**  55:13

**discussing**  146:17
177:4  216:15  273:23
350:1  401:4

**discussion**  36:21
45:4  79:23  126:14
244:2  313:23  411:19

**discussions**  25:24
34:20, 24  35:1  45:1
162:16  165:8  207:13
217:22  251:4  261:3
268:4  281:4, 17
282:22  284:7, 11
295:24  297:9  308:22
309:8  310:20  311:1
324:18  328:4  358:19
378:9  411:17  413:10

**disparaging**  211:23

**disrupted**  183:23
184:3

**disrupting**  184:7

**distance**  356:2, 7

**distances**  356:14

**distressed**  342:13

**distribute**  31:23

**distributed**  21:17
57:21

**distribution**  57:15
385:13

**DISTRICT**  1:2, 20
2:9  301:15, 18, 21
302:11

**districts**  152:17

**disturbing**  243:8

**DIVISION**  2:7

**divorce**  146:21

**divulge**  261:13
393:11

**divulging**  215:11

**doc**  327:14

**DOCKET**  1:3

**doctor's**  214:11

**document**  16:2, 19
22:3  27:4  28:9  31:5
32:7  33:12  36:3
40:2, 5  46:19, 23
47:8  51:2  58:23
68:7, 11, 18  107:16,
18  110:7  118:9
119:16  158:20  192:8,
17  196:2  229:24
252:19, 21  258:14
278:1, 8  338:5  339:3
340:6, 7, 9  343:2, 8
344:5, 8  373:5
376:15

**documented**  100:14
341:2  343:9, 12

**DOCUMENTS**  6:11
19:9, 16  20:4  22:23
42:6  57:24  374:17

**DOE**  1:2  3:8  7:11,
19, 20, 21  9:9  12:21,
22, 23, 24  13:1  18:14
49:3, 8, 23  50:3, 23
51:11, 23  52:11, 15,
23  53:4, 7  61:15
62:8, 13, 14, 17, 18
63:9, 17, 20, 24  64:10
65:12, 23  66:5, 7, 17,
18, 20, 22  67:3, 10, 14,
18  68:15  69:3, 4, 11,
24  70:9, 12, 16, 20, 23
71:3, 6, 8, 14, 19, 24
72:13  74:13  75:7, 11
76:9  78:16  79:19
80:6, 19  81:14, 16
82:2, 3, 10, 14  83:2,
11  84:3, 20  85:1, 4, 8,
15, 19, 24  86:4, 7, 9,
11, 15  88:23  89:2, 9,
13, 17  90:15  91:6, 9
92:11, 16  94:13, 17
101:11  102:15, 19, 21
103:4, 17  104:1, 8, 10,
21, 24  105:1, 4, 9, 12,
13, 22  106:4, 10, 17
108:8, 9, 13, 20, 24
109:5, 14, 16, 19

110:2, 6  111:2, 7, 11,
15  112:11, 15  113:9,
20, 24  114:13  115:3,
8, 14  116:11, 13, 18,
22  117:5, 17, 21
118:12, 17, 21, 24
119:9, 13, 19  120:6,
15, 23  121:1, 10
122:4, 15, 19, 23
123:5, 11, 14, 17, 18,
22  124:1, 4, 14  125:9,
12, 20, 21  126:23
128:11, 15, 18, 23
130:9  131:1, 20, 24
132:4, 8, 12, 17, 22
133:8, 13  134:1, 11,
14, 17  141:9, 13
142:22  143:10  144:2,
5, 14, 19  145:1, 6, 9,
16, 23  146:5, 9, 14, 16,
21  147:1, 3, 18, 19
148:19, 20, 23  150:21
151:15  155:21  156:1,
7, 8, 18  157:15
159:10, 21  160:5, 7,
12, 18  161:8, 12, 17
162:2  165:9, 11, 21
166:21, 22, 23  169:1,
11, 15, 23  170:19
171:2  172:10, 15, 18
174:19, 23  175:3, 11,
14, 20, 22  176:11
177:3  178:5, 9, 24
181:24  183:15, 19
184:6, 12, 24  185:12,
16, 21  186:5, 8, 12, 17,
20  187:13, 14, 19, 23
189:3, 4, 5, 11  190:3,
6  191:2, 8, 10, 13, 17
192:23  193:5, 10, 15,
18, 23  194:6, 14, 18,
20, 21, 23  195:6, 7, 10
196:7  197:2, 6, 12, 22
198:21  199:12
200:17, 24  201:15
202:7, 8, 9, 14  203:3,
22  204:5, 8, 22
205:10, 16, 24  206:12,
18, 23  208:20, 21
216:4, 10  229:14

234:13, 15, 18   235:9
236:5, 9, 10, 13
237:24   240:19, 20
241:6, 7, 22   242:5, 6,
9, 19   244:10, 14, 22,
23   245:2, 3, 4, 13, 17,
19, 20, 22, 23   246:2, 3,
12   247:5, 22, 23
248:21   252:3, 4
253:7, 14, 18   254:12,
22   255:3   259:19
260:15   261:7, 8, 20,
21   262:13   263:1, 9,
11, 15   265:22   266:12
267:5, 7, 11, 12, 15, 19,
20   268:1, 3, 8, 9, 14,
15, 17, 24   269:18
270:2, 10   271:14
274:1, 3, 4, 7, 8, 9, 16,
17, 19   275:13   276:1,
2   277:4, 5, 7, 8
278:17, 24   279:7, 8
280:14, 22, 24   281:11,
18, 24   282:3, 15, 16,
19, 20, 22, 24   283:3, 4,
5, 11   284:24   287:8
288:10   289:3   297:15,
16   306:17   309:24
310:1, 20   311:23
312:18   313:9, 10, 19
314:2, 13, 18, 19
315:5, 11   317:11, 15,
17, 22   318:7, 16
319:4, 6, 24   320:15,
20, 23   321:21   322:1,
5, 22   323:17, 20
327:19   328:4, 13, 17,
24   329:17, 19   330:2
332:10   335:4, 9, 12,
13   336:13, 14, 15
347:16, 18, 24   348:1,
7, 8, 13, 15, 16, 18
349:15, 18, 20, 23
350:7, 15, 19, 22
351:3, 7, 8, 11, 16, 19
352:1, 10, 13, 20
353:4, 11, 17, 18, 21,
22   354:4, 8, 9, 17, 19
355:4, 8, 14, 15, 16, 18,
20, 22   357:10, 21

358:1, 5, 6, 10, 11, 17,
18, 21   359:3, 4, 10, 12,
18, 19   360:11, 22
361:1, 10, 11, 13, 18,
19   362:1   363:9
364:2, 11, 12, 21
365:13, 21   366:1, 2,
15, 16   367:6, 7, 12, 13,
14   368:2, 3, 5, 6, 14,
15, 24   369:1, 5   375:8,
9   378:10   386:14, 22
387:20   388:3   391:15
392:9   394:18, 19
395:7   396:16, 17
397:6, 7, 18, 19   398:3,
4, 9, 10, 14, 17   399:4,
13, 22   400:4, 5, 23
401:2, 13, 14   402:13,
20   404:13, 15, 20
405:4, 16, 21   406:10,
16   407:2, 9, 14, 17
409:23   410:4, 5, 6
411:11, 14, 20, 24
412:3   413:20, 23
414:2, 6   415:7   416:9,
18, 24   417:12, 21
418:4, 10, 17
**doing**   61:20   88:18,
19   102:24   113:5
153:5   205:3   231:21
293:2   295:21   331:11
351:3   352:11   393:4
**dollars**   37:22
**door**   66:2, 14, 15
71:18, 23   72:3, 5, 18
76:14, 15   77:4, 13
81:18   139:12   140:4,
8, 15   234:14   354:23
357:7
**doors**   126:19   382:22
383:3
**Doreen**   8:11   307:9
308:15   312:4   328:11
377:1, 6
**Doreen's**   376:22
**doubt**   158:2   169:2
**downstairs**   286:8
**draft**   171:12   196:13
198:23   207:6, 8, 16
269:10, 11   287:22

**drafted**   171:13, 15
207:11   250:8   251:17
287:23   373:16
**drafting**   199:4
**drafts**   207:21
**draw**   243:11, 16
**drawer**   374:23
**dreaded**   232:17
233:4
**drinks**   143:23
**drive**   258:19, 21
**driveway**   294:3
**drop-dead**   318:13
**dropper**   71:6   122:23
**drove**   66:10   296:12
**drug**   153:22   361:1
384:7
**dual**   23:9   159:22
160:2, 6   161:1   162:3
170:19   171:3, 12
172:1   191:18   192:24
195:11   196:9   197:3,
18, 23   198:13, 21
199:13, 20   200:18, 24
**due**   147:7   157:7
274:20   316:5   317:2
**duly**   9:1
**duties**   23:11, 18   24:3,
16, 24   25:1, 4   26:7
38:11   55:14   119:15
161:18   172:19
193:19   200:1   314:21
335:7   399:13   406:11,
12
**duty**   55:6   58:6, 13
59:17, 19   60:5, 20
315:18
**DW**   376:22
**DWK**   376:24

**< E >**
**EAP**   247:16
**earlier**   11:5   34:2
38:18   61:1   162:9
163:20   166:1   191:17
194:3   195:2   196:15
253:17   264:21, 24
265:8, 10   267:8
270:18   282:14
287:22   306:22   307:2

311:2   337:19   351:17,
23   365:7   392:24
**early**   13:15   17:2
351:18   352:19   367:9
378:8
**ears**   141:21
**ease**   278:16
**easier**   276:18
**easily**   243:14
**Eastburn**   390:5
**eat**   152:19   227:7
**Economic**   24:22
25:8   34:9   74:4
106:24
**edge**   292:9
**education**   173:18
201:9
**EEO**   415:1
**EEOC**   398:1   415:11
**effect**   18:16   174:24
210:4   211:12   248:15
**effective**   171:4   227:1
**efficient**   328:6
**Eighty-five**   373:3, 4
**either**   65:15   85:11
139:15, 21   141:8
152:20   166:4   168:12,
14   184:7   206:12
213:4   214:19   271:4
289:23   305:5   325:13
339:5   400:22
**Elaine**   361:3   384:11
**elected**   301:5   303:2
306:4, 8
**election**   65:18   204:9,
20   205:4   206:1
218:1   222:17
**electrical**   385:5
**electronic**   257:24
258:15   259:9   385:22
**elevator**   286:9
**eligible**   113:19
149:22   150:6, 13
**else's**   338:12, 15
**e-mail**   92:21   93:4,
12   144:18   145:21
243:9   246:16, 23
247:1   252:7   257:18
258:5, 7   274:9, 18
290:13, 19   311:19

Case 3:21-cv-00477-MCC   Document 280-1   Filed 09/20/23   Page 329 of 373
CONFIDENTIAL

Deposition of Gary Bender Vol. I - Revised                    Jane Doe, et al. v. Schuylkill County Courthouse, et al.

313:*4, 6*  328:*11*
330:*5*  387:*11, 16*
391:*17*  392:*10*  397:*7,
16, 20*  404:*13*  414:*24*
415:*10*  416:*11*
**e-mailed**  145:*1, 23*
387:*8*
**e-mails**  93:*5, 8*
258:*10, 12*  350:*14, 22*
**embankment**  291:*16,
22*  365:*15, 23*  366:*21*
**embarrassed**  340:*19*
342:*4*
**emerged**  365:*22*
**emerging**  291:*15*
**emotionally**  342:*12*
**employed**  66:*22*
119:*19*  159:*18*
167:*23*  179:*5*  219:*8*
326:*21*  382:*15*  384:*5*
**employee**  18:*10*
44:*23*  45:*3*  57:*4*
62:*15*  76:*14*  77:*13*
91:*17*  92:*6, 22*  93:*2,
12*  94:*3*  100:*21*
101:*4*  120:*12*  127:*15,
24*  128:*10*  147:*12, 15*
153:*10*  157:*19*
180:*13*  189:*18*  190:*7*
208:*9*  209:*23*  210:*7,
16*  211:*5, 7*  219:*15*
222:*10*  228:*7, 14*
229:*6*  247:*16*  274:*20*
279:*8, 9*  295:*5*  303:*2,
7, 12*  304:*18*  324:*3*
340:*18*  384:*3*
**employees**  21:*17*
29:*6*  31:*24*  34:*3*
44:*20*  53:*14, 15*  58:*1,
7, 14, 20*  59:*11*  65:*20*
85:*12*  100:*9*  101:*1*
110:*1*  143:*22*  144:*11*
150:*2, 20*  152:*11, 23*
153:*12*  204:*18*  279:*3,
12*  280:*8, 9*  317:*23*
318:*1*  320:*5, 10*
322:*9*  327:*20*  359:*16*
370:*9*  379:*15*  385:*21*
403:*1*

**employment**  13:*8, 11*
14:*9, 19*  20:*21*  46:*2*
52:*2*  54:*12*  57:*18*
96:*3*  128:*5, 6, 7*
164:*18*  173:*19*
186:*24*  190:*4*  201:*10,
11*  207:*7, 20*  209:*1*
230:*14*  248:*15*  337:*2*
340:*4*
**empty**  154:*4*  274:*20*
**encountered**  134:*2*
**ended**  111:*3*  115:*9*
171:*8*  220:*19, 24*
310:*9*  326:*13*
**ends**  326:*9*
**enforcement**  222:*21*
**engage**  31:*23*  32:*4*
89:*2, 8*  132:*4, 8*
183:*6, 23*  184:*2*
212:*10*
**engaged**  302:*6*
342:*21*
**engaging**  182:*10*
216:*2*
**engineer**  223:*10*
**enjoyed**  39:*2*  205:*3*
**Ensure**  57:*15, 20*
58:*1, 7, 14*  102:*19*
103:*18*  247:*6*  258:*3,
16*  309:*9*  318:*9, 21*
319:*1*  343:*11*
**ensuring**  297:*15*
328:*6*
**enter**  378:*16*
**entered**  366:*22*
**entertain**  330:*8*
**entire**  10:*6*  48:*6*
66:*24*  69:*4*  192:*23*
311:*23*
**entirety**  8:*17*
**entitled**  204:*19*
**entrance**  355:*2*
366:*22*
**environment**  102:*20*
103:*19*  247:*7*  297:*17*
298:*17*  309:*11*
**Equalization**  313:*5*
**ergonomic**  100:*22*
**escapes**  297:*21*
**escorted**  271:*5*

**ESQUIRE**  2:*2, 8, 12,
17, 21*  3:*1*  390:*4*
**essential**  119:*15*
161:*18*  172:*18*
193:*19*  200:*1*
**essentially**  229:*2, 4*
304:*8*  411:*23*  412:*2*
**establish**  179:*9*  395:*3*
**established**  191:*12*
201:*15*  208:*4, 6*
274:*3*  306:*22*  307:*2*
**estate**  66:*23*  67:*11,
15, 19*  68:*15*  69:*5*
74:*16*  315:*19*  323:*2*
390:*2, 7*
**estimate**  11:*14, 20*
346:*4*
**estimating**  356:*2*
**et**  1:*2, 4*  7:*11, 12*
9:*10*
**ethic**  86:*9*  106:*4*
**evaluating**  390:*6*
**evaluators**  173:*20, 21*
201:*12*
**event**  52:*1*  64:*16, 24*
85:*16, 20*  131:*21*
143:*18*  197:*14*
324:*17*  326:*1*
**events**  84:*8*  373:*13*
408:*11*
**Eventually**  111:*15*
326:*1*
**Everest**  7:*6*
**everybody**  103:*13*
109:*8*  156:*4*  279:*15*
314:*22*  404:*1, 2*
412:*23*
**everybody's**  276:*18*
**evidence**  305:*21*
**exact**  311:*9*
**exactly**  84:*13*  149:*4*
151:*23*  266:*6*  309:*3*
**exam**  114:*4*
**Examination**  9:*4*
214:*11*
**examined**  9:*2*
**exception**  396:*5*
**Excuse**  250:*16*
**execution**  390:*2*

**executive**  74:*11*
409:*18*  413:*9*
**exempt**  204:*18*
317:*23*  318:*1*
**EXHIBIT**  4:*10*
15:*14*  19:*9*  55:*9*
57:*11*  67:*22*  107:*8*
111:*20*  115:*24*  120:*4*
176:*6*  194:*11*  195:*22*
218:*21*  232:*19*  261:*5*
341:*14*  345:*13*
**Exhibit-158**  5:*11*
172:*23, 24*
**Exhibit-182**  5:*10*
115:*24*  116:*2*  118:*2*
**Exhibit-203**  4:*11*
15:*20*
**Exhibit-204**  4:*12*
19:*13*
**Exhibit-205**  4:*13*
21:*23*
**Exhibit-206**  4:*14*
26:*24*
**Exhibit-207**  4:*15*
30:*5, 24*  44:*9*
**Exhibit-208**  4:*16*
35:*23*  37:*13*
**Exhibit-209**  4:*17*
37:*7*
**Exhibit-210**  4:*18*
39:*22*  44:*1*
**Exhibit-211**  4:*19*
42:*3*
**Exhibit-212**  4:*20*
46:*15*
**Exhibit-213**  4:*21*
68:*3*
**Exhibit-214**  4:*22*
107:*11, 23*
**Exhibit-215**  4:*23*
148:*8*
**Exhibit-216**  4:*24*
158:*13*
**Exhibit-217**  5:*1*
171:*18*
**Exhibit-217for**  170:*12*
**Exhibit-218**  5:*2*
192:*5*
**Exhibit-219**  5:*3*
198:*6*

Exhibit-220  5:4 232:20, 23
Exhibit-221  5:5 277:18, 21
Exhibit-222  5:6 327:6  337:23
Exhibit-223  5:7 343:18
Exhibit-29  250:15
Exhibit-42  5:10
Exhibit-46  161:23, 24
Exhibit-48  5:11 195:24
Exhibit-59  5:14 376:8, 9, 12
Exhibit-68  5:13 251:7, 10
Exhibit-71  5:12 218:22  249:20
Exhibit-81  5:12 229:11, 12
Exhibit-85  5:13 372:21, 22
exhibited  306:3
EXHIBITS  4:8  5:9 15:15  151:11
exist  374:18
existing  54:11
expect  129:24
expectation  378:15
expected  279:1, 15, 18
experience  365:3
expert  389:22
explain  108:23
explanation  389:2
explicitly  85:8, 11 141:8  142:21
expose  359:20
exposed  150:24
express  325:1
expressed  214:15 324:22  368:11
extend  326:2
extended  330:24 331:4
extending  330:11
extent  136:6  139:3 175:6  215:6  261:14 264:16  309:4  346:1

392:1
extrapolate  75:6
eyes  141:21  152:4

< F >
face  397:15
Facebook  99:24 369:6
FaceTime  368:7
FaceTimed  368:5
FaceTiming  367:15
face-to-face  378:17
facility  378:18
fact  27:15  38:16, 20 40:23  47:13  92:11 120:16  128:21  134:1 138:14  143:10 167:18  197:2  227:4 236:9  240:18  242:6, 21  246:3  274:8, 18, 19  286:22  296:10 300:23  316:1  317:7, 20  337:21  348:3 349:9, 10  351:9 354:3  358:6, 11 359:4, 13  361:11 363:1  366:20  386:15 405:11
factor  71:15  123:7
fail  202:21
failing  384:12
failure  117:6  168:3
fair  45:10  49:6  50:1 51:10  52:22  56:9 91:5  122:9  227:13 242:19, 20  247:22 298:19  303:4  327:19 378:11
fairly  41:1  291:24
fall  272:8  292:10
familiar  383:22
family  132:23  133:10
fantastic  66:21
far  194:2  216:14 296:19  321:2
fast  316:12, 20  317:7
favor  167:3, 6 168:11, 17  407:22, 23 413:3
favorite  312:23

fear  98:10  248:1, 5, 19  259:20  261:24
fearful  248:13
feathers  125:17
February  16:17  17:7 118:9  265:21  311:21 318:14  319:14, 15
federal  96:3
feed  139:15  140:18 345:16
feel  104:11  190:19 227:17  233:9, 21 243:20  263:12 300:17  343:7  379:2
feeling  97:8  214:21 361:14  403:22
feet  151:7  356:10, 15
felt  75:7  81:8  82:5 89:10  98:24  102:19 103:18  109:1, 10, 22 195:7  231:20  243:9, 12  247:6  248:9 259:21  262:3  265:13 268:5  286:11  298:16 300:6, 12, 17  301:3, 4 302:10, 11, 12  309:10 314:2, 8  339:22 340:24  342:4  359:20 362:7, 9  363:2, 10 364:2, 12, 24  365:8 373:12, 24  388:1, 18 403:2, 14, 19  413:1 416:17
female  100:21  101:1, 4  143:22  211:4
females  126:2
fence  292:5, 14
Fest  65:1, 13
few-minute  331:18
field  111:16  112:7, 21  113:10  114:1, 2, 4, 8, 17, 19, 23  115:4, 8, 9  116:6  118:5, 13, 14, 17, 22  243:13  299:6 314:22  321:23  323:9, 11, 18  328:15  329:23 350:18  356:2, 9, 12 403:9
fighting  212:23

figure  38:2  213:19 225:24  269:5  290:14 305:5
figured  352:4  387:15
file  228:7, 18  258:14 338:24  339:4  344:11, 20  384:12  400:9, 11
filed  64:2  101:16 121:10
files  44:14  58:16 258:23
filing  364:4
fill  14:9  163:11 223:21
filled  14:19  49:22 360:4
final  55:18, 23  56:5 207:16  226:7  250:13 251:9, 10  269:22 287:22  304:14 341:18
finally  119:12
find  116:15  117:11 121:14  131:4  239:11 282:8  346:21
finding  262:4
findings  224:21 287:23  288:2  289:16 409:21
fine  107:24  142:3 156:5  216:23
finger  145:11
finish  10:17  87:20, 21  360:8  388:11
finished  190:19 319:13  404:24
fire  13:19  97:3, 9, 15, 21
firing  45:12
firm  307:8  390:4, 20
first  9:1  11:16 13:11  42:10  46:22 68:10  71:21  83:20 129:18  134:6  147:15 149:15  160:24 173:18  190:14  201:8 211:15  220:13 232:15  234:6  235:8, 17  241:20  244:22 245:12, 22  255:17

Case 3:21-cv-00477-MCC    Document 280-1 CONFIDENTIAL Filed 09/20/23    Page 331 of 373

Deposition of Gary Bender Vol. I - Revised                           Jane Doe, et al. v. Schuylkill County Courthouse, et al.

267:9, *10*  278:*1*
279:22  292:22
303:*18*  357:6  408:*16*
**fit**  38:*23*  39:*4*  83:24
109:*10*  194:24  195:7
**five**  109:6  253:5
330:*17*  331:*15*  394:6
**flabbergasted**  97:*12*
242:*1*  295:9
**flip**  19:*24*  229:*11, 24*
256:*14*
**flipping**  229:*14*
**floated**  164:*1*  166:*19*
**floor**  355:9
**flu**  152:*1*
**FMLA**  122:*15*
**focus**  69:7  154:*17*
233:24  235:*17*
247:*11*  352:*1*
**focused**  349:*23*
**fog**  243:*23*
**follow**  131:*3*  179:*23*
214:*1*  260:5  343:*11*
346:5  351:7
**followed**  67:6  138:7
347:7  367:8  368:4
**following**  151:*16, 22*
270:*17*  319:*14*
330:*10*
**follows**  9:2
**food**  143:*23*
**footage**  139:*15, 21*
345:20  347:2
**football**  356:2, *9, 12*
**force**  9:*24*  389:*17*
**forced**  341:*1*
**foregoing**  419:*5*
**forget**  346:*16*
**forgot**  266:20
**form**  8:22  16:*10*
21:*4*  28:*1, 23*  29:*20,*
*21*  32:*13*  33:*10, 18*
49:*10*  50:5  51:*13*
53:*2, 17*  60:*1*  70:*3*
74:21  91:*18*  92:*23*
93:*15*  96:*15*  97:22
112:*18*  119:*1*  129:2
134:*4*  141:2  143:*14*
152:*24*  172:5  174:8
175:5  212:*13*  224:20

251:*23*  252:22
264:*15*  265:*2*  275:*5,*
*16*  276:*15*  289:6
291:*17*  293:*12, 18*
294:8  300:*10*  301:7
302:7  303:*14*  304:*19*
305:9, *18*  306:*12*
314:5  316:*14, 22*
317:9  318:8, *11*
319:7  324:20  334:2
337:*12*  339:*18*  341:9
342:7, *15*  343:8
346:9  356:*4, 18, 21*
363:*13*  364:6, *15*
366:7  367:*16*  368:8
369:9  370:20  371:*6,*
*20*  372:8  391:*21*
397:8  402:8  412:*10*
413:*13*  414:*10*  415:*3,*
*12, 18*  416:*12*  417:*4,*
*14, 22*
**formal**  14:*15*  228:*18*
229:7
**formally**  275:*11*
**format**  10:7
**formed**  223:9
**former**  23:*11*  210:6
217:5  339:*16*
**forms**  43:24  58:20
**Forty-seven**  169:*10*
**forward**  155:*23*
217:*11*  248:*16*
263:22
**forwarded**  274:*10*
301:*14, 15, 17, 20*
**found**  126:8  127:*12*
227:9  242:*10*  243:8,
*10*  255:*4*  312:*10*
383:*13*
**four**  15:*12*  44:9
128:24  253:5
**four-page**  46:*19*
**FOX**  2:8  7:*24*
**frame**  69:8  75:4
78:7  125:*1*  154:*23*
**Frank**  163:2  185:*3*
382:*16, 18*
**frankly**  106:*21*
279:*15*

**freedom**  114:6  264:6
270:20
**freeze**  203:*3*  204:*1*
**freezie**  203:*13*
**frequently**  154:*11*
**Friday**  103:*23*  234:9
235:*18*  236:*19, 21*
238:7, *12*  240:*18*
253:*14, 17, 22*  254:2,
*11*  255:*14, 20*  259:*11*
260:*14, 22*  262:6
263:*21*  264:4  266:*13*
274:21  275:*14*
281:*23*  284:5  285:*3*
294:*19*  298:*3*
**fridge**  357:*16*
**friend**  246:*18*
**friendly**  66:*19*
105:*14*  180:*15, 17*
243:*19, 20*
**friends**  100:*1*  157:22,
*23*  243:*19*
**front**  19:*21*  37:*3*
39:*18*  46:*12*  51:2
53:22  110:8  118:*3*
158:20  169:8, *14*
170:*15*  175:*23*  196:2
212:22  219:2  249:*19*
250:2  337:*17*  343:24
366:22  373:*1*
**frustration**  83:*16*
**fulfilling**  328:5
**full**  80:9
**full-time**  310:9
**fully**  110:*23*  403:*17*
**function**  64:*13, 22*
65:*21, 24*  201:5
315:7
**functions**  167:*11*
261:*17*
**fundraiser**  65:*1*
85:*16, 20*  131:*21*
**furlough**  103:2, *13*
149:5, *16*  150:20
248:*24*  277:*10, 12*
348:*14*
**furloughed**  147:*12,*
*16, 19*  148:*23*  150:*3,*
*9*  151:*15*  265:*23*

279:*4, 9, 12*  280:8, *9*
281:9, *11*
**furloughing**  152:22
**furloughs**  274:20
**further**  234:*19*  236:5,
*10*  238:9, *14*  271:*16*
295:*17*
**future**  255:7

**< G >**
**Gallagher**  23:*15*
24:*12*  339:*13, 16, 21,*
*24*
**game**  135:20  401:*3*
**GARY**  1:*18*  2:24
4:5  7:*12*  8:5  9:*1*
87:*19*  108:*1*  163:2
196:*12*  221:*14*
246:*18*  253:7  344:*11,*
*12*  376:24
**gathered**  409:6
**GEIGER**  2:*12*  8:7
142:*1, 2, 7, 15*  165:*24*
166:6, *10, 15*
**general**  48:*10*
287:20  301:*16*
**generally**  21:*15*
46:*23*  68:7  91:22
157:*17*  196:*15*
215:*13, 17*  253:20
277:24
**George**  2:*15*  3:9
97:*3*  99:22  128:*17*
138:*11, 13*  168:24
185:*3*  221:2, *6, 9, 14,*
*20, 24*  222:24  237:*11,*
*19*  238:*1*  246:*17*
248:9, *23*  259:20
260:6  262:*21*  263:*16*
265:*14, 18*  266:*14*
269:*1*  285:1, *14*
286:5, *7, 11, 17, 19*
290:*19*  292:*19*  293:2
308:24  345:7  362:*12*
365:2  387:*21*
**George's**  128:*12, 15*
259:*24*  262:*21*  286:*4*
**Ger**  366:2
**GERARD**  2:*12*

**Gerick** 339:*13*
**Gerry** 8:*7* 141:*24*
**getting** 28:*20* 78:*10*
87:*23* 105:*15, 20*
109:*17* 122:*5* 180:*15*
187:*24* 325:*5* 388:*5*
401:*3* 403:*24* 404:*1*
414:*9*
**ggeiger@newmanwilli**
**ams.com** 2:*14*
**giant** 116:*1*
**Gilbert** 361:*3*
384:*12* 385:*20*
**Ginny** 51:*20* 83:*21*
109:*13* 167:*17* 208:*8,*
*9* 209:*7*
**girls** 128:*12*
**give** 30:*8* 98:*1*
113:*17* 125:*1* 138:*11*
168:*19, 22* 185:*4*
241:*17* 244:*7* 247:*9*
263:*10* 266:*18, 19*
271:*22* 282:*7* 348:*21*
384:*17* 385:*17*
**given** 11:*4* 12:*14*
113:*22* 138:*14*
171:*23* 204:*19*
274:*18* 276:*4* 294:*7*
301:*4* 302:*20* 308:*6*
330:*23* 360:*22* 363:*1,*
*9* 396:*6*
**giving** 196:*21*
215:*10* 261:*17*
**Glenn** 2:*19* 3:*9*
8:*13* 102:*11* 205:*21,*
*23* 206:*3* 223:*10*
225:*22* 228:*13, 20*
235:*10, 11* 237:*10, 11*
240:*1, 8* 255:*6, 7, 18*
257:*9* 259:*24* 260:*18,*
*19* 262:*22* 263:*7, 11*
264:*12* 284:*13*
287:*16* 307:*20* 321:*9*
373:*19* 374:*10*
388:*16* 408:*20, 22*
409:*5* 411:*7*
**global** 147:*8* 319:*18*
**glove** 212:*22* 214:*10*
216:*9, 20*
**gloves** 212:*21, 23*

**Go** 19:*18, 24* 22:*15*
27:*19* 30:*10* 43:*23*
46:*20* 57:*7, 8* 59:*6*
61:*19* 62:*3* 71:*21*
73:*11* 91:*16* 92:*7, 11*
93:*13* 95:*15* 103:*23*
116:*15* 130:*15*
137:*19* 139:*12*
148:*14* 152:*12*
153:*19, 20* 155:*22, 23*
157:*1* 187:*17* 188:*10,*
*16* 195:*16* 203:*6*
205:*13* 207:*23*
218:*10* 226:*12*
227:*19* 228:*13, 14, 15*
239:*14* 251:*15* 260:*9*
273:*24* 282:*3* 292:*8*
296:*10* 298:*5* 302:*10*
310:*3* 313:*9, 16, 19*
322:*13* 326:*3* 328:*5,*
*18* 329:*4, 12* 330:*12*
331:*9, 18* 334:*14*
337:*14* 347:*14*
350:*18* 355:*9, 21*
357:*18, 20* 375:*17, 19,*
*21* 388:*11, 12* 389:*5*
399:*19* 403:*9* 405:*2*
408:*16, 22* 411:*7*
418:*21*
**go-between** 416:*18*
**goes** 87:*24* 187:*19*
196:*20* 294:*2* 303:*7*
346:*12* 404:*10*
**going** 10:*4* 11:*13, 19*
14:*14* 15:*13* 19:*9*
21:*19, 20* 26:*20* 28:*6*
30:*2, 3, 13* 34:*1*
35:*21* 37:*4* 39:*17, 18*
41:*22, 23* 46:*10, 22*
47:*8* 57:*11* 62:*17*
65:*14* 67:*21, 22* 68:*6,*
*8* 82:*7* 83:*3* 86:*12*
92:*16* 94:*14, 18*
95:*15* 106:*6, 7* 107:*8*
115:*23* 116:*1* 117:*5*
121:*20* 130:*15* 148:*3*
149:*11* 157:*4* 158:*10*
160:*22* 163:*11* 164:*7*
167:*1* 170:*6* 172:*23*
175:*23* 180:*16, 22*

181:*2* 182:*13, 20*
183:*4, 5* 188:*18*
191:*23* 192:*1* 195:*14,*
*16, 21* 197:*17* 198:*2*
205:*7* 209:*6* 216:*5, 7*
225:*6* 226:*10* 228:*7*
232:*20* 234:*18* 235:*3*
236:*4* 237:*2, 13, 24*
238:*2, 22, 24* 239:*8*
241:*24* 242:*3, 7*
246:*10* 248:*16* 249:*2*
255:*5* 256:*6* 259:*6,*
*22* 260:*3, 4, 23*
266:*22* 268:*20*
270:*15* 273:*6, 14*
277:*17, 24* 279:*6*
281:*22* 284:*13* 286:*4,*
*5, 8* 291:*22, 23*
294:*19* 296:*6* 299:*11*
307:*24* 312:*11* 327:*6*
328:*9* 329:*12* 330:*8,*
*10, 11, 14* 331:*21*
332:*8, 17* 337:*16*
340:*7* 343:*14* 347:*14*
358:*8* 360:*24* 363:*22*
368:*20* 369:*8* 370:*1*
372:*7* 375:*2* 380:*3*
383:*15* 388:*2* 389:*5,*
*17* 393:*10* 395:*16*
401:*2* 402:*18* 404:*15,*
*16* 407:*4, 14* 408:*23*
409:*20* 410:*21, 22*
414:*17* 418:*16, 17, 23*
**goo** 261:*23*
**good** 77:*12* 83:*24*
86:*2* 105:*15* 109:*16*
121:*14, 18* 152:*5*
158:*6* 167:*19* 168:*13*
169:*2* 174:*24* 188:*15*
193:*24* 227:*8, 14*
283:*2* 295:*9* 312:*20*
324:*15* 327:*17*
348:*15* 365:*20*
380:*18* 387:*5* 388:*7*
403:*14*
**gorgeous** 71:*3*
**Gotcha** 216:*12*
**gotten** 212:*20*
290:*18* 294:*14* 402:*3*

**government** 227:*7*
**GovU/CCAP** 40:*18*
**granddaughter** 89:*22*
90:*2*
**Grant** 2:*22* 13:*12,*
*16, 23, 24* 16:*16* 23:*5,*
*6, 22, 23*
**grants** 13:*18* 14:*2*
23:*12*
**great** 39:*2, 4* 95:*17*
159:*9* 203:*1* 388:*18*
**Grey** 390:*5*
**grievance** 121:*10*
**Groody** 285:*18*
333:*15, 17* 345:*2, 24*
367:*2* 368:*11*
**Groody's** 334:*1*
366:*4*
**ground** 403:*13*
**GROUP** 2:*2* 134:*2*
**guess** 32:*6, 21* 65:*5,*
*6* 126:*16* 151:*13*
154:*16* 164:*11*
189:*13* 196:*19*
239:*18* 247:*9* 267:*24*
275:*12* 346:*24*
353:*13* 355:*3* 384:*12*
**guidelines** 151:*3, 16,*
*22*
**Gulf** 2:*22*
**guy** 409:*3*
**guys** 182:*13* 239:*19*
250:*21* 264:*13*

**< H >**
**Hal** 34:*23* 101:*23*
**Halcovage** 2:*15* 3:*9*
8:*8* 17:*20* 18:*4, 9, 13*
25:*16, 19* 34:*12, 23*
64:*15, 19* 66:*5, 7, 16*
70:*10, 13, 15, 18, 22*
71:*2, 8, 17, 22* 72:*13,*
*22* 75:*12, 15* 76:*9*
77:*7, 10* 79:*17* 80:*19,*
*22* 81:*14* 82:*9, 12, 16*
83:*1* 84:*4, 21* 85:*3, 7,*
*14, 18, 23* 86:*8, 14, 18*
87:*10, 15* 88:*22* 89:*1,*
*7, 12, 16, 20* 90:*14*
91:*6, 9* 92:*11, 16*

94:22  97:15, 21
99:14, 19  100:13, 17,
20, 24  101:3, 11, 24
102:9, 14  104:13
105:21  106:3  110:4
117:21  122:18, 22
123:4, 9, 14, 17, 20
124:24  125:11, 19, 24
126:1, 22  128:11, 17,
22  129:10  130:6, 17
131:7, 10, 16, 19, 23
132:3, 7, 11, 16, 22
133:7, 13  134:1, 10,
13, 21  135:2, 9  136:2,
13, 14  137:4, 18
138:4, 19  139:14
140:1, 23  141:8, 15
142:6, 21  143:1, 4, 7,
10, 21  144:1, 6, 19
145:7, 10, 11, 18
146:9, 17, 20, 24
147:4  155:12, 15
162:23  165:5, 10
166:19  168:16, 21
174:18, 22  175:4, 17
177:6, 20  178:10
179:20, 21, 24  180:4
181:5, 13, 24  182:8,
19  183:14, 18, 22
184:2, 10, 23  185:17,
19, 20, 23  186:4, 7
187:11  203:2, 20
204:5  206:6, 22
209:5, 9, 13, 16  210:2,
11, 20  211:10, 20, 24
212:4, 9, 24  213:23
214:5  215:20  216:5,
21  217:4, 24  219:9,
24  220:4, 9, 12  221:6
223:24  224:4  225:1
234:4, 16  237:10
238:8, 13, 21, 22
240:16  241:21  242:6
245:3  248:2, 10, 14,
23  254:7  255:5, 15,
19  257:24  260:7
262:8  263:16  266:7
268:10  269:1, 20
270:3, 12, 19  271:10,
20  272:17  274:23

276:4  285:1, 10, 19
287:12  288:3, 18
289:5, 20  290:2
291:14  293:1  295:4
300:23  301:12  302:5,
20  303:1  304:8, 17
306:1  308:4, 24
309:13, 18  332:13, 16,
18  333:7, 16, 18, 24
334:9, 17  335:6, 17,
19  336:4, 15, 22
337:4  341:8, 20
342:1, 21  344:18
345:1  359:22  364:5
365:2, 9, 14, 22  366:3,
21  367:9, 13, 14
368:5, 6, 23  369:4, 15,
22  370:15, 17, 18
371:3, 9  372:14, 16
375:10, 16  376:18
379:13, 19, 23  380:15,
22  382:19  383:15
384:16, 23  385:18, 22
386:1  387:13, 21
**Halcovage's**  74:15
75:11  77:19  78:16
79:12, 18  80:5  81:15
82:2  83:12  88:18
103:21  134:18  135:6
137:23  140:12
175:12  184:7  209:20
215:1, 21  216:16
217:18  220:23
221:24  225:4, 9
245:24  246:3  247:24
252:8  258:22  259:8
262:19  264:5  265:11
276:8  288:9  293:17
302:17  305:6  333:19
342:5  370:10  371:14
378:23  383:18
**HALL**  2:17  140:12
355:21
**hallway**  310:2, 3
355:9, 16  357:7
361:2
**hand**  255:15  314:16
**handed**  231:20
**handing**  66:2

**handle**  61:8  114:6
263:24
**handout**  43:17
**hands**  152:2, 3
**handwriting**  20:5
255:10  338:12, 20, 23
**handwritten**  20:5
**Hang**  42:14
**Hank**  344:11
**happen**  285:3
295:12  298:7  388:3
402:18  407:14
**happened**  76:5
92:16  96:2  117:7
181:4  188:3  213:5
218:4  237:5  241:15
247:11  253:18, 19
273:7, 8  296:19
297:6  311:2, 18
325:14  337:7  342:6,
13  349:22  366:15
388:5
**happens**  110:1  235:4
**happy**  116:19
185:19  212:23
**harassment**  22:12
27:11, 16, 24  28:11,
24  29:11  31:11, 24
32:19, 24  34:3  40:12,
17  41:11  44:11  55:2
58:8, 15  59:5, 17
60:9, 19  61:2  210:23
234:3  255:17
**hard**  81:6  85:24
105:23, 24  187:24
190:9, 21  243:17
258:19, 21  288:20, 24
316:11, 20  317:7
**harm**  262:1
**harmful**  286:17
**Harrisburg**  1:21
7:10
**harsh**  109:21  110:3
**harshly**  109:2
**hated**  339:21
**Hatter**  405:18, 24
**head**  10:11  48:21
50:16  54:21  62:8
71:11  123:5

**heading**  360:19
**heads**  156:4
**health**  153:23  361:1
**healthy**  362:17
**hear**  18:9, 13  59:14
70:12, 22  71:2, 5, 11,
14  80:18, 22  82:7, 9
85:3, 7, 11  86:11
104:13, 20  122:18, 22
123:1, 4, 9, 13, 16
125:11, 19, 23  128:10,
14  129:17  139:8
142:20  146:20
174:18, 22  182:8
183:14, 18  184:10, 18
185:19, 23  186:4
203:2, 20, 24  204:4
209:9, 13, 16  210:2,
19  211:10, 20, 24
212:4  392:18, 20
398:7
**heard**  85:21  116:20
123:19  126:6  129:4,
15  130:5  138:23
185:16  187:23
392:13  393:1
**hearing**  134:7
303:17, 18, 21, 22, 24
304:2
**Heather**  209:24
**he'd**  182:13
**Heffner**  334:13
366:13
**Heidi**  2:24  8:6
120:24  207:15
361:20, 22  368:18
388:17  401:11
408:20, 22  409:5
410:8, 9, 16  411:7
**Heinbach**  392:21
**held**  30:15  39:14
51:11  52:11, 18, 23
121:22  157:6  162:17
164:12  169:23
188:20  192:23
195:10  197:8, 15
202:17  251:4  273:16
304:3  321:21  322:1,
5, 10  331:23  413:23

**Helene** 164:*12*
299:*22* 323:*24* 325:*6*
326:*5* 404:*19*
**help** 299:*11* 373:*20*
374:*9* 389:*12* 402:*23*
403:*15* 404:*18* 409:*4*
**helped** 66:*14*
**helping** 84:*6*
**Hepner** 213:*18, 20*
**hesitation** 72:*21*
114:*12*
**Hess** 25:*16, 20* 34:*22*
163:*2* 168:*9* 217:*6*
237:*9* 238:*19* 254:*6*
285:*24* 294:*21, 24*
297:*14* 333:*10*
371:*15* 380:*10* 381:*7*
386:*17*
**Hetherington** 217:*6*
237:*15* 238:*20* 254:*6*
285:*24* 296:*5, 15*
297:*14* 333:*11*
371:*16* 380:*9* 381:*7*
386:*18, 21*
**Hetherington's**
296:*20*
**hew** 100:*2*
**hey** 138:*11*
**high** 248:*3*
**highly** 387:*21*
**Hillary** 185:*24*
**hire** 28:*21* 29:*12*
45:*5* 163:*19* 167:*3*
225:*6*
**hired** 23:*4* 62:*14, 19*
105:*2* 106:*11, 15*
208:*13* 223:*15*
225:*16* 307:*8* 389:*21*
401:*11* 417:*17*
**hiring** 45:*12, 22*
223:*4* 297:*10*
**Hoffman** 241:*2*
**Hoffmann** 19:*4*
240:*24* 253:*15* 309:*2*
**hold** 174:*6, 15*
267:*14* 321:*17* 323:*4,*
*8* 377:*11* 414:*2*
**holders** 322:*23*

**holding** 160:*12*
192:*24* 194:*15*
202:*22*
**holds** 68:*15* 110:*20*
385:*4*
**holes** 145:*12*
**home** 89:*21, 24*
90:*15, 18* 91:*6, 16*
92:*4, 7, 11, 17* 116:*15*
117:*6, 18* 132:*23*
133:*10* 139:*17*
144:*11* 153:*11, 18*
154:*2* 187:*19* 243:*14*
271:*24* 276:*10, 14*
277:*1, 5, 8* 283:*11, 22*
284:*3* 311:*14* 312:*1,*
*19* 314:*4* 347:*15, 19*
351:*20, 24* 352:*1, 21*
353:*5, 11* 362:*17*
369:*1*
**honesty** 190:*12*
227:*17, 18*
**hope** 95:*15*
**hot** 283:*13*
**hour** 244:*4* 325:*3, 5,*
*22* 390:*6*
**hour-ish** 244:*7*
**hourly** 390:*5*
**hours** 91:*10* 104:*3*
129:*1* 133:*14* 318:*4,*
*20, 21*
**house** 237:*17* 296:*6,*
*10* 335:*10*
**HR** 44:*13* 56:*1, 3, 19*
57:*4* 60:*6, 10, 22*
61:*3, 4* 78:*17* 79:*7*
94:*7* 99:*4, 6* 130:*22*
151:*23* 179:*11, 15*
196:*16* 207:*12*
215:*13, 18* 216:*17*
223:*1, 20* 224:*7*
225:*16, 23* 229:*21*
307:*7, 10, 14* 308:*17*
310:*9* 343:*6, 10, 11*
**Hubric** 307:*8, 14, 18*
308:*16* 310:*9, 14*
**hug** 101:*3*
**hugged** 101:*6*
**human** 33:*17, 21*
56:*14* 57:*22* 58:*4, 16,*

*22* 59:*6, 21, 23* 78:*4*
130:*19* 178:*19*
229:*21* 231:*5* 240:*2*
355:*12, 13, 17*
**humiliated** 340:*24*
342:*5*
**husband** 128:*23*
130:*9* 183:*15, 20*

**< I >**
**idea** 23:*14* 77:*12*
83:*12* 162:*13, 23*
164:*1, 9* 166:*20*
168:*14* 238:*12*
261:*23* 386:*8, 11*
388:*19* 408:*13, 24*
410:*8, 10, 18, 24*
411:*1, 6* 412:*20*
**ideal** 363:*5*
**identification** 15:*21*
19:*13* 21:*24* 27:*1*
30:*6* 35:*24* 37:*8*
39:*23* 42:*3* 46:*16*
68:*3* 107:*12* 148:*8*
158:*14* 170:*12* 192:*5*
198:*7* 232:*24* 277:*21*
337:*24* 343:*19*
**identify** 7:*15*
**if-if** 312:*13*
**ill** 380:*9*
**illegal** 220:*23* 221:*10,*
*15, 21* 222:*1, 4, 5, 6, 8*
**image** 241:*9*
**imagine** 177:*4*
236:*22* 241:*8*
**immediate** 53:*5*
**immediately** 152:*15*
**impairs** 11:*24*
**impeachment** 302:*20*
**implicitly** 85:*8, 12*
142:*22*
**implicity** 141:*8*
**implying** 183:*5* 249:*3*
**important** 167:*12, 13*
239:*6* 340:*5, 8*
362:*22* 373:*12*
**imposed** 367:*2*
**impressed** 227:*5*
**impression** 326:*10*

**impropriety** 240:*12*
294:*5*
**inaccurate** 11:*5*
**inappropriate** 75:*7*
76:*11* 89:*10, 18* 92:*3,*
*6, 12* 93:*11, 19, 21*
132:*9, 19* 178:*15, 16,*
*19* 212:*6, 11* 213:*3*
214:*6, 13* 216:*22*
217:*1* 306:*3, 5, 8, 11*
**inaudible** 10:*10*
**in-between** 248:*6*
**incapable** 12:*4*
**incident** 117:*4* 126:*7*
144:*13* 204:*7* 213:*22*
216:*8, 9, 10, 20* 217:*7,*
*8* 231:*21* 337:*6, 9*
340:*12, 17* 343:*2*
344:*14* 368:*15*
**incidents** 340:*6* 345:*3*
**inclement** 54:*22*
**incline** 292:*6* 294:*2*
**include** 55:*17* 59:*4*
162:*17* 258:*21*
284:*11* 308:*3* 333:*9*
342:*1*
**included** 185:*24*
**includes** 230:*21*
287:*8, 11*
**including** 140:*17*
150:*21* 295:*5* 303:*9*
304:*23* 412:*24*
**incognito** 116:*13*
**incomplete** 11:*6*
**increase** 24:*15* 26:*12*
35:*15* 36:*10, 14*
**increased** 37:*17*
**increases** 26:*11*
**incredible** 295:*11*
**incredulous** 298:*7*
**independent** 374:*17*
**INDEX** 4:*2*
**indicate** 11:*1* 20:*8*
33:*11* 248:*8, 12*
340:*18*
**indicated** 14:*18*
38:*18* 60:*4* 61:*1*
76:*10* 122:*4* 169:*1*
234:*14* 269:*17*
289:*19* 303:*1* 317:*18,*

Case 3:21-cv-00477-MCC   Document 280-1   Filed 09/20/23   Page 335 of 373
CONFIDENTIAL
Deposition of Gary Bender Vol. I - Revised                              Jane Doe, et al. v. Schuylkill County Courthouse, et al.

*20* 318:*17* 319:*21*
325:*7* 349:*8, 14*
**indicates** 37:*17, 19*
40:*16* 68:*18*
**indicating** 16:*10*
**indicted** 239:*16*
**individual** 182:*1, 6*
195:*5* 210:*9* 224:*5*
385:*6*
**individuals** 12:*20*
223:*19* 323:*6* 332:*9*
370:*8* 371:*13* 378:*17*
**inebriated** 64:*14*
**inebriation** 66:*8*
**inference** 127:*6*
214:*12*
**inferred** 127:*3*
**inform** 76:*18* 134:*22*
206:*12* 248:*22* 276:*2*
**informal** 9:*22*
**information** 11:*12, 17*
33:*7, 16, 18* 41:*12*
121:*6* 141:*20* 238:*4*
261:*14* 300:*7, 18*
353:*9* 409:*6*
**informational** 120:*8*
409:*13*
**informed** 83:*9*
117:*15, 16* 152:*10*
206:*11* 237:*9* 280:*15*
392:*8* 393:*1* 394:*17*
401:*18* 418:*4*
**initial** 186:*14, 15*
236:*12* 243:*22*
247:*10* 410:*3*
**initially** 106:*11*
235:*8* 239:*17* 260:*2*
408:*14*
**initiate** 311:*12*
**initiated** 311:*10*
**inner** 382:*22*
**inner-sanctum** 80:*23*
81:*5, 8* 82:*8, 10*
128:*15, 19*
**in-person** 29:*14* 43:*5,*
*11* 145:*24* 279:*14*
280:*10* 281:*1*
**input** 191:*6* 386:*2*
**inside** 295:*6* 404:*18*

**instance** 12:*21* 381:*5*
**instances** 233:*16*
**instruct** 82:*12*
143:*22* 238:*8* 261:*13*
345:*18* 396:*7, 21*
397:*3*
**instructed** 385:*21*
**instructing** 264:*18*
370:*22*
**instruction** 145:*17*
261:*18* 302:*1* 385:*2*
396:*12*
**instructions** 9:*11*
12:*13* 334:*1* 366:*4*
**insulted** 182:*22, 23*
183:*1* 387:*22*
**insurance** 77:*20, 21,*
*22, 23, 24* 78:*1*
**intends** 163:*10*
**intent** 35:*5, 7* 247:*3*
**intention** 281:*20*
**interact** 156:*13*
**interaction** 145:*7, 10*
181:*7* 262:*3* 266:*16*
**interactions** 400:*13*
**interchangeable** 52:*8*
**interest** 59:*23* 60:*10*
61:*8*
**interested** 13:*20* 14:*3*
**interim** 34:*8* 35:*3,*
*12, 14* 36:*15* 39:*3*
50:*23* 51:*7* 110:*9, 14,*
*19, 21* 111:*2, 8, 12*
114:*19* 115:*5, 8*
118:*13* 162:*7* 169:*16,*
*18, 23* 171:*8, 9*
195:*11* 196:*8, 9*
197:*1, 7, 10, 16, 17, 23*
199:*13, 15, 20* 200:*6*
201:*24* 307:*14*
308:*17* 310:*8* 414:*7*
417:*2*
**intermittent** 122:*15*
**interpret** 394:*4*
**interpretation** 252:*8*
390:*16*
**interpreted** 387:*19*
**INTERROGATION**
4:*4*

**interrupt** 29:*23*
73:*12* 242:*2* 244:*19*
**interview** 14:*11, 20,*
*24* 15:*11* 17:*2* 95:*13*
102:*11* 116:*18*
124:*16* 145:*13* 146:*7*
223:*21, 22* 236:*13*
237:*20, 23* 238:*1*
239:*9* 240:*20* 241:*16*
244:*2, 10* 245:*2, 19,*
*22* 246:*10, 12* 247:*4*
248:*9, 13, 21, 23*
253:*17, 19* 255:*2*
260:*15* 267:*7, 15*
274:*1, 4, 17* 276:*2*
282:*21, 24* 284:*22*
287:*8, 11, 19* 325:*6, 8*
332:*11, 16, 17, 21*
341:*18* 375:*8*
**interviewed** 14:*21*
15:*3* 17:*4, 6* 83:*22*
223:*11, 19* 224:*3, 12,*
*13* 235:*9* 238:*23*
239:*7, 12* 263:*23*
267:*4* 284:*12, 17*
298:*21, 22* 300:*2, 3*
304:*9* 307:*22* 332:*10*
**interviewing** 284:*24*
300:*9*
**interviews** 102:*8*
223:*11* 235:*13, 24*
237:*3, 22* 250:*5*
255:*7* 263:*24* 282:*19*
284:*8* 286:*23* 287:*12*
**intimated** 190:*20*
**intimidation** 233:*16*
**introduced** 62:*23, 24*
63:*3* 105:*7* 156:*21,*
*22, 23* 409:*2*
**invest** 91:*1*
**investigate** 235:*7*
**investigation** 91:*2, 13*
99:*10* 102:*4* 133:*1,*
*18* 184:*14, 17, 22*
203:*8, 10, 16* 213:*14*
217:*22* 234:*23*
237:*14* 238:*10, 14*
239:*18, 20* 247:*10*
250:*5, 6* 251:*12*
252:*19, 20* 259:*13*

260:*20* 271:*16* 284:*8*
285:*4, 13* 287:*15, 24*
289:*15* 295:*18* 296:*2*
297:*7, 11* 304:*14*
308:*7, 24* 309:*4*
341:*19*
**investigations** 235:*12*
260:*3* 333:*7*
**investigative** 261:*17*
**investigator** 296:*1*
297:*10* 298:*10*
**invited** 90:*4* 91:*23*
**involve** 126:*10*
**involved** 25:*23*
34:*15* 44:*19* 45:*1, 4,*
*11* 46:*1* 55:*1, 5*
61:*18* 108:*20* 112:*5,*
*10* 171:*21* 187:*12*
199:*4* 223:*4, 8*
306:*16* 308:*8*
**involvement** 34:*18*
61:*11* 62:*1*
**involves** 387:*4*
**involving** 204:*7*
**iPad** 135:*6, 10, 13, 18,*
*19, 23* 136:*3, 14*
137:*5, 18* 138:*4, 8, 14*
139:*17* 258:*22* 259:*1*
314:*13, 23* 367:*15*
384:*17, 24* 385:*5, 18*
**IPPOLITO** 2:*17*
8:*12* 42:*11* 156:*5*
**irritation** 248:*2, 5*
**issue** 64:*6* 113:*6, 7*
116:*20, 23* 151:*18, 20*
185:*16* 265:*4* 294:*6*
354:*15* 367:*8* 385:*22*
393:*21, 24* 398:*24*
399:*15*
**issued** 250:*12*
251:*11* 269:*10*
281:*11* 289:*14* 400:*2*
**issues** 13:*23* 14:*1*
64:*11* 66:*20* 67:*18*
82:*5* 105:*15, 19*
111:*6, 11* 113:*11*
114:*22* 115:*2, 19*
122:*5* 158:*3* 164:*18,*
*23* 169:*24* 170:*3*
175:*3* 197:*16, 21*

209:2  227:3, 21
228:1  269:19  315:5,
11  319:6  324:17
354:9  397:16
**item**  56:2  152:13
329:18  409:21
412:12  413:5, 6
**items**  54:9  55:17
56:4  149:21  249:18
258:17
**its**  8:17  147:12
150:20  151:20

**< J >**
**JANE**  1:2  3:8  7:11,
19, 21  9:9  12:21, 22,
23, 24  13:1  18:14
49:3, 8, 22  50:3, 23
51:11, 22, 23  52:11,
15, 23  53:4, 7  61:15
62:8, 13, 14, 17, 18
63:9, 17, 20, 24  64:10
65:12, 23  66:5, 7, 17,
18, 20, 22  67:3, 10, 14,
18  68:14  69:3, 4, 11,
24  70:9, 12, 16, 19, 23
71:3, 6, 8, 14, 19, 24
72:13  74:13  75:7, 11
76:9  78:15  79:19
80:6, 19  81:14, 16
82:2, 3, 10, 14  83:2,
11  84:3, 20  85:1, 4, 8,
15, 19, 24  86:4, 7, 8,
11, 15  88:23  89:2, 9,
13, 17  90:15  91:6, 9
92:11, 16  94:13, 17
101:11  102:15, 19, 21
103:4, 16  104:1, 8, 10,
20, 23  105:1, 4, 9, 12,
13, 22  106:4, 10, 17
108:8, 9, 12, 20, 23
109:5, 14, 16, 19
110:2, 6  111:2, 7, 11,
15  112:11, 15  113:9,
20, 24  114:13  115:3,
8, 14  116:11, 13, 18,
22  117:5, 17, 21
118:12, 16, 21, 24
119:9, 13, 19  120:6,
15, 23  121:1, 10

122:4, 15, 19, 23
123:5, 10, 14, 17, 18,
22, 24  124:4, 14
125:9, 12, 20, 21
126:23  128:11, 14, 18,
22  130:9  131:1, 20,
24  132:4, 8, 12, 17, 22
133:8, 13  134:1, 11,
14, 17  141:9, 13
142:22  143:10  144:2,
5, 13, 19  145:1, 6, 9,
16, 23  146:5, 9, 14, 16,
21  147:1, 3, 18
148:19, 20, 23  150:21
151:14, 15  155:21, 24
156:7, 8, 17  157:14
159:10, 21  160:5, 7,
12, 18  161:7, 12, 17
162:2  165:9, 11, 21
166:21, 22, 23  169:1,
10, 15, 23  170:19
171:2  172:9, 15, 18
174:19, 23  175:3, 11,
13, 14, 19, 22  176:10
177:3  178:5, 8, 24
181:24  183:15, 19
184:6, 12, 24  185:12,
16, 20  186:5, 8, 11, 12,
17, 20  187:13, 14, 19,
23  189:3, 4, 11  190:3,
6  191:2, 7, 10, 13, 17
192:23  193:5, 10, 15,
18, 23  194:6, 14, 18,
20, 23  195:6, 7, 10
196:7  197:1, 2, 6, 12,
22  198:21  199:12
200:17, 24  201:15
202:7, 8, 9, 14  203:3,
22  204:5, 7, 22
205:10, 16, 23  206:12,
18, 23  208:20, 21
216:3, 10  229:14
234:13, 15, 18  235:9
236:5, 9, 10, 13
237:23  240:19, 20
241:6, 7, 22  242:5, 6,
9, 19  244:10, 14, 22,
23  245:2, 3, 4, 13, 17,
19, 20, 22, 23  246:2, 3,
12  247:5, 22, 23

248:21  252:2, 4
253:7, 14, 18  254:12,
22  255:2  259:19
260:15  261:7, 8, 20,
22  262:13, 24  263:1,
9, 10, 15  265:22
266:12  267:5, 7, 11,
14, 19, 20  268:1, 3, 8,
9, 14, 15, 16, 17, 23, 24
269:18  270:2, 10
271:14  274:1, 3, 4, 7,
8, 9, 16, 17, 19  275:13
276:1, 2  277:4, 5, 7, 8
278:17, 24  279:7, 8
280:14, 22, 24  281:11,
18, 24  282:3, 15, 16,
19, 20, 22, 24  283:3, 4,
5, 11  284:24  287:8
288:10  289:3  297:15,
16  306:17  309:24
310:1, 20  311:23
312:18  313:9, 10, 19
314:1, 2, 13, 18, 19
315:5, 11  317:11, 15,
17, 22  318:7, 16
319:4, 5, 24  320:15,
20, 23  321:21  322:1,
5, 22  323:17, 20
327:19  328:4, 13, 17,
24  329:17, 19  330:2
332:10  335:3, 4, 9, 12,
13  336:13, 14, 15
347:15, 16, 18, 24
348:1, 7, 8, 13, 15, 16,
18  349:15, 18, 20, 23
350:7, 14, 15, 19, 21
351:2, 7, 8, 11, 16, 19
352:1, 10, 13, 20
353:4, 11, 16, 18, 21
354:4, 8, 17, 18  355:4,
8, 14, 15, 16, 18, 20, 22
357:10, 21  358:1, 5,
10, 17, 21  359:3, 10,
12, 18, 19  360:11, 21,
22, 24  361:10, 11, 13,
18, 19  362:1  363:9
364:2, 11, 12, 21
365:13, 21  366:1, 2,
15, 16  367:6, 7, 12, 13,
14  368:2, 3, 5, 6, 14,

15, 24  369:1, 5  375:8,
9  378:9, 10  386:14,
22  387:20  388:3
391:15  392:9  394:18,
19  395:7  396:16
397:6, 7, 18, 19  398:3,
4, 9, 10, 14, 17  399:4,
12, 13, 22  400:4, 23
401:2, 13, 14  402:13,
19  404:13, 15, 20
405:4, 16, 21  406:10,
16  407:2, 9, 14, 17
409:23  410:4, 5, 6
411:11, 13, 20, 23
412:3  413:20, 23
414:2, 6  415:7  416:9,
18, 24  417:12, 21
418:4, 10, 17
**January**  13:15  15:12
17:4, 6  42:23  68:19
226:24  227:19
306:18  310:10, 24
311:7  328:8  358:24
367:9
**jaw**  71:6  122:23
**jeans**  144:14, 21
145:3, 17, 18  146:3
246:16
**jeepers**  95:10
**Jerry**  166:5
**Jim**  174:23
**Joan**  388:4  389:8, 21
390:4  409:2
**job**  47:2, 19  48:4
58:6, 12  61:21  66:21
68:13  69:2, 10, 20, 24
84:1  85:5, 9, 12
95:15, 17  96:3  113:5
114:8, 15  116:5
117:1  118:4, 15, 16,
23  119:8, 15, 23
120:21  136:1  141:9
142:22  158:4, 6, 10,
24  160:1, 7, 18  161:6,
11, 18, 19  162:19, 20
163:17, 23  164:19, 23
170:18  172:8, 14, 18,
19  173:4, 11, 14
185:2  192:2, 11, 20
193:9, 14, 19, 20

Case 3:21-cv-00477-MCC    Document 280-1    Filed 09/20/23    Page 337 of 373
CONFIDENTIAL
Deposition of Gary Bender Vol. I - Revised                    Jane Doe, et al. v. Schuylkill County Courthouse, et al.

198:*12*, *21*   199:*5*, *17*,
*21*  200:*1*, 2, *12*, *17*, 24
201:5  207:2, 7, *21*
209:*3*  224:9  227:*3*,
*14*, 22, 24  229:20
230:8, *12*  240:*4*, 5, 6
249:*3*  311:*23*  314:*20*
315:*11*, *13*, *15*, *16*, *18*
323:7  335:7  385:*12*
406:*11*, *12*
**jobs** 23:*21*  162:22
314:*4*
**Johnson** 346:*1*, *21*
347:*8*
**join** 189:5
**joined** 141:*13*  220:*1*
229:*15*
**joke** 185:*24*
**JONES** 2:*21*  7:3
8:*4*  19:*18*  21:2, *4*
30:8  45:*14*  49:*10*
50:5  51:*13*  53:2, *17*
58:9  60:*1*, *11*  70:2
74:*17*, *20*  75:*1*, *19*
76:*1*  79:*14*  82:*18*, *21*
87:*19*  91:*18*  92:*23*
93:*15*  96:*15*  97:*16*,
*22*  104:*17*  107:*18*, *24*
108:*4*  112:*18*  119:*1*
129:2, *18*, *24*  134:*4*
136:5, *11*, *16*  137:2,
*19*  139:2, *11*  141:*1*,
*19*, *23*  143:*13*  148:*13*
152:24  156:2  166:5
172:5  173:*1*  174:*8*
175:5  205:*13*  211:*14*,
*18*  212:*13*  215:6
244:*18*, *21*  245:*10*
246:6  249:*23*  251:2,
*23*  252:22  254:*16*, *19*,
*23*  261:*12*  264:*15*
265:*1*  273:*10*  275:*5*,
*16*  276:*15*  278:*3*, 6
289:6  291:6, *17*
293:*12*, *18*  294:*8*
300:*10*  301:7  302:7
303:*14*  304:*19*  305:9,
*18*  306:*12*  314:5
316:*14*, 22  317:9
318:*11*  319:7  320:6

324:*20*  334:2  337:8,
*11*  339:*18*  341:*9*
342:7, *15*  346:9
356:*4*, *18*  363:*13*, *20*
364:6, *15*  366:7
367:*16*  368:*8*  369:*8*
370:*20*, *24*  371:5, *20*
372:7  384:*19*  388:9
391:*21*, *24*  392:*12*, *23*
393:*10*, *23*  394:9, *20*
395:5, *14*, *21*  396:*10*,
*19*  397:2, *8*  398:6
402:*8*  412:*10*  413:*13*
414:*10*  415:*3*, *12*, *18*,
*24*  416:*12*  417:*4*, 7,
*14*, 22
**judge** 10:*1*  237:*19*
238:*21*  254:7  267:*13*
282:*17*, *18*  297:*20*, *24*
298:2, *12*  333:*11*
395:*19*  396:*9*
**judge's** 297:*20*
**July** 22:*13*  31:*12*
40:*13*  51:8  103:*12*,
*13*  115:9, *12*, *17*
118:*14*  161:*1*  171:5,
7  208:7, *16*  279:2, *19*
281:*10*, *16*  348:*13*, 22
369:*18*
**jump** 130:*1*, *16*
190:*15*  217:*11*
**jumping** 294:*16*
**June** 23:5  34:6, *10*,
*13*  38:*15*  47:*16*, *21*
159:6  192:*17*  200:*16*,
*21*  268:22, *23*  269:6,
*13*  270:*1*  272:*13*
278:*23*  281:9  326:*24*
327:*15*  340:*11*
386:*15*  416:*4*, 7
**jury** 10:*1*  55:6
**JUSTICE** 2:7
**justification** 293:*11*,
*17*
**justified** 100:6


< K >
**Kalyam** 383:*23*
384:*8*, *15*, 22  385:*12*

386:*3*
**K-A-L-Y-A-M** 384:*1*
**Keel** 210:*8*
**keep** 37:2  110:*16*
149:*13*  154:*3*  294:*17*
**keeps** 58:*16*
**Kelly** 210:*14*
**kept** 24:7  97:*1*  98:7
402:*20*
**key** 383:*4*
**keycard** 357:*8*, *10*
**keyword** 234:*24*
**kids** 153:5
**kind** 110:*21*  150:*19*
160:22  162:7  195:2
208:*20*  216:22  232:*1*
243:*16*, *23*  246:*21*
288:*23*  298:*13*  311:7
365:6
**kiss** 183:6
**kitchen** 296:*18*
**knew** 94:*14*  164:7
251:22  252:*16*
257:*21*  268:*14*, *15*
270:*10*  296:*19*  309:*3*
345:5  411:5
**knocked** 72:6
**know** 9:8  10:*21*
11:6, *11*, *12*, *18*  12:8
13:*21*  16:5, 22  18:*23*
22:24  25:*23*  26:*10*
27:22  28:2  29:*20*
34:*18*  36:*13*, *17*
37:*21*  44:*10*  54:*19*
55:*1*  62:*23*  63:*20*
64:*12*, *16*  72:*3*  74:*13*
77:*23*  80:*10*  81:*10*
87:5, *17*, *18*  88:*3*, *14*
91:5  95:*12*  96:*17*
98:*1*, *12*, *18*  99:9, *16*
105:7, 9, *24*  107:5
109:*4*  111:*24*  114:*3*
116:*14*, *17*, 22  121:7
126:9, *12*  127:*16*, *18*,
*21*, *24*  128:*3*  130:24
131:2, 6  135:*13*
136:*24*  138:2, *3*, 5, *17*
140:*17*  142:5  144:22
145:*3*  146:*8*, *12*
147:*20*  152:2, *20*

153:*1*, 3, 24  156:*21*
157:*21*  162:*14*
164:*13*  165:5  166:*3*,
4, 9  168:*21*  171:*15*
174:*3*  175:*23*  176:*18*
178:*1*  179:*19*, 22
180:*12*  181:*10*, *12*
182:*17*  183:*1*  184:*23*
185:*1*  186:*14*  187:*11*
190:*3*  194:2  195:*15*
197:6  199:8  203:7
206:*17*, *20*  207:*4*, *19*,
*24*  210:9, *14*  211:2
213:*13*, *21*  216:7, *21*
223:*20*  226:*12*
231:*14*  234:*19*  235:*1*,
*23*  241:8, 9, *10*
243:*18*  247:*8*  257:6,
7  258:*19*  262:*10*, *12*,
*23*  263:2, *13*  267:*24*
268:*11*  269:*3*, *4*, *13*
270:9, *13*  272:*8*, *16*
276:7  283:*14*, *17*
284:7  288:*19*, 22
292:*20*  294:*4*, *10*
295:8, 9, *12*, *19*, *20*
298:22  300:*1*, 5, 6, *17*
301:*17*  302:9  307:*13*
314:*1*  315:*1*, *10*, 22,
24  316:*4*, *8*, 9  321:*3*,
6, 7, 9  322:*17*  323:2,
5  324:*11*, *12*, *15*
325:*14*, *23*  326:*11*
327:2, *12*  332:*19*
335:9  336:*8*  338:22
339:*1*, *3*, 5, *12*, *15*
343:*23*  349:*1*, *4*, *13*
361:*20*, 22  362:*3*, 24
368:*17*  370:*1*  380:*18*
383:6, 9, *17*  384:*10*
386:*1*, *8*  389:2  394:6
401:*20*
**knowledge** 64:*10*
69:*17*  110:*21*  111:*10*
114:22  133:7  168:*4*
194:*23*  197:*24*
203:*11*  345:7  402:*21*,
22
**knowledgeable** 157:*18*

Case 3:21-cv-00477-MCC    Document 280-2 CONFIDENTIAL Filed 09/20/23    Page 338 of 373

Deposition of Gary Bender Vol. I - Revised          Jane Doe, et al. v. Schuylkill County Courthouse, et al.

**Kutzler** 8:*11* 307:*10*
308:*15*, *23* 309:*8*
310:*14*, *15*, *24* 313:*24*
325:*6*, *9*, *16*, *19*, *20*
351:*19* 377:*1* 401:*6*,
*14*, *18*

**< L >**
**labor** 54:*4*
**Lachman** 101:*6*
**lack** 228:*21* 246:*10*
291:*23* 399:*22*
**laid** 260:*2* 296:*18*
297:*5*
**language** 242:*12*, *14*
303:*6* 377:*21* 379:*6*,
*8*, *9*
**laptop** 314:*18*, *20*
**larger** 314:*24* 315:*2*
**late** 100:*3* 352:*19*
406:*13*, *21*
**laughed** 175:*20*, *24*
**LAW** 2:*2* 10:*1*
222:*20* 390:*4*, *20*
**lawsuit** 64:*4*
**lawyer** 129:*19*
395:*22*, *23* 396:*2*
**layoffs** 249:*2*
**lead** 112:*16*
**leadership** 403:*18*
**leading** 126:*19*
**learn** 13:*14* 63:*23*
101:*10*, *14* 117:*5*
132:*21* 133:*12* 146:*5*
164:*22* 234:*1* 267:*23*
268:*8*, *23* 313:*1*
334:*23* 335:*3* 340:*5*
347:*22* 354:*3*, *8*
416:*9*
**learned** 104:*7* 234:*6*
253:*20*, *22* 254:*1*
267:*19* 270:*2* 290:*9*
369:*6* 406:*20*
**learning** 103:*4* 153:*6*
163:*16* 228:*9* 344:*17*,
*23*
**lease** 329:*22* 330:*3*
**Leasing** 331:*6*
**leave** 77:*4* 81:*18*
110:*17* 122:*16* 140:*5*

152:*11*, *14* 321:*15*
322:*13*, *14* 323:*16*
387:*14*
**leaving** 95:*18* 96:*8*,
*12* 98:*7*, *11* 182:*12*,
*13* 286:*14* 322:*22*
403:*7*
**LEES** 3:*1* 8:*10*
**left** 10:*4* 13:*17*, *22*
16:*23* 35:*2* 42:*17*
81:*15*, *22* 95:*10* 96:*2*
175:*22* 178:*5* 205:*3*
221:*5*, *21* 223:*2*
238:*19* 254:*6* 296:*5*
321:*14* 322:*12*, *15*, *19*
323:*17* 326:*14*, *16*, *17*
357:*19* 405:*17* 413:*1*
**legal** 363:*15*
**length** 197:*11*
**lesbian** 209:*14*
**letter** 149:*1*, *11*, *20*
231:*9*, *13*, *16* 232:*14*
255:*16* 256:*4*, *17*, *23*
257:*4*, *12*, *14*, *17*, *23*
278:*23* 279:*17*
280:*21*, *24* 281:*10*
313:*6*, *13*, *15* 319:*21*
327:*14* 373:*7*, *16*, *23*
374:*8*, *14*, *16* 376:*17*
377:*5*, *17*, *18*, *19*, *20*
378:*14* 379:*9*, *18*
392:*11* 394:*3*, *7*
395:*23*
**letters** 148:*12* 280:*22*
**letting** 128:*24*
**level** 285:*21* 305:*5*
**license** 83:*23* 173:*20*,
*21* 174:*1*, *7*, *15* 201:*3*,
*4*, *12* 202:*4*, *22*
321:*17*, *21* 322:*1*, *5*,
*23* 323:*4* 413:*23*
414:*3*
**licenses** 322:*10* 323:*8*
**life** 276:*18*
**liked** 81:*2* 164:*8*
186:*5* 412:*20*
**likewise** 10:*16*
**limit** 103:*21* 139:*6*
**limited** 309:*13* 346:*2*
**Linda** 213:*9*

**LINE** 6:*2*, *12* 48:*13*
232:*16* 279:*23*
352:*22* 403:*8*
**lines** 82:*14* 125:*12*
128:*23* 130:*7* 178:*9*
181:*6* 184:*20*
**lips** 183:*19*
**Lisa** 223:*10* 224:*21*
225:*22* 228:*5* 307:*21*
329:*7*
**list** 54:*5* 55:*16*
149:*21* 284:*16*
330:*15*, *19*
**listed** 119:*16* 161:*19*
172:*19* 193:*20* 200:*2*
**Listen** 273:*5* 381:*10*
**listened** 388:*19*
**listening** 134:*24*
142:*6* 268:*13*
**litigation** 136:*4*, *15*
390:*9*
**little** 16:*11* 23:*20*
27:*19* 61:*15* 87:*7*
95:*23* 99:*23* 114:*5*
116:*8* 139:*11* 155:*23*
163:*5* 187:*15* 190:*20*
207:*23*, *24* 222:*23*
223:*17* 227:*10*
234:*18* 237:*4* 260:*13*
272:*5* 273:*3*, *11*
278:*4* 294:*17* 312:*24*
349:*15* 356:*8* 387:*3*,
*12* 388:*24* 394:*15*
**live** 139:*15*, *21*
**lived** 210:*12*
**living** 38:*6*
**local** 40:*17*
**located** 7:*9* 27:*12*
**location** 280:*3*
351:*20* 353:*4*, *17*
354:*18* 360:*22*
363:*11* 364:*22*
**locations** 261:*8*, *21*
**locked** 265:*18*
**locks** 126:*19*
**logged** 8:*8*
**logical** 63:*4*
**log-in** 33:*7* 41:*12*
**long** 15:*8* 80:*20*
189:*14* 197:*6*, *8*, *14*

241:*23* 244:*1* 269:*13*
273:*5* 315:*1* 350:*3*
354:*14* 357:*14*
362:*20* 388:*6* 389:*2*
**longer** 155:*24*
202:*11*, *17*
**long-time** 208:*9*
**long-winded** 188:*4*
**look** 19:*19* 22:*16*
37:*2* 38:*22* 44:*13*
46:*10*, *20* 56:*15*
67:*21* 68:*7* 82:*13*
92:*5* 106:*20* 107:*15*
115:*23* 118:*8* 123:*10*
144:*21* 158:*10*
163:*17* 169:*7*, *17*
170:*6* 171:*8* 172:*23*
192:*16* 198:*4* 201:*8*
218:*18* 230:*16*
246:*19* 268:*19* 269:*6*
299:*11* 338:*17*
374:*24* 418:*15*
**looked** 44:*1*, *6* 58:*21*
64:*14* 186:*1* 194:*19*
195:*4* 207:*2* 225:*23*
249:*19*, *20* 253:*3*
260:*1* 269:*11* 287:*21*
319:*13* 338:*19* 343:*3*
**looking** 13:*17* 19:*21*
53:*22* 118:*1* 147:*22*
157:*21* 163:*22*
174:*24* 195:*3* 327:*2*
330:*12* 383:*15*, *19*
**looks** 16:*11* 36:*9*
376:*22*
**looped** 311:*6*, *8*
**lose** 25:*4* 249:*3*
389:*17*
**lost** 24:*1* 30:*9* 82:*19*
117:*9* 320:*4*, *10*
321:*13* 327:*19*
**lot** 61:*16* 114:*7*, *9*
237:*4* 262:*7* 272:*19*,
*20*, *21*, *24* 273:*6*
274:*20*, *22* 275:*15*
276:*9* 282:*7* 283:*7*
290:*2*, *3* 291:*16*
359:*14* 365:*15*, *16*
403:*6*

Case 3:21-cv-00477-MCC    Document 280-1    CONFIDENTIAL    Filed 09/20/23    Page 339 of 373

Deposition of Gary Bender Vol. I - Revised                    Jane Doe, et al. v. Schuylkill County Courthouse, et al.

Loudermill  303:*17*,
*21*  304:*2*
Love  360:*3*, *11*
Loves  357:*21*
lower  262:*7*  272:*19*,
*21*  282:*6*  290:*2*
*291*:*16*  365:*15*
lowest  83:*15*, *18*
loyal  185:*21*
loyalty  185:*21*
lunch  152:*9*  155:*24*
*183*:*20*  188:*15*
*356*:*16*  387:*13*
luncheon  188:*20*
lure  387:*19*, *20*
lures  114:*7*
Luzerne  388:*15*

< M >
ma'am  169:*9*  291:*5*
*306*:*24*
machine  63:*1*, *8*, *14*
mail  63:*1*, *8*, *13*
mailroom  62:*20*, *22*
*63*:*10*, *13*  66:*21*
*83*:*14*, *17*
main  355:*8*, *9*, *21*
*357*:*7*
maintain  14:*12*
maintained  155:*7*
*374*:*13*, *22*
maintains  33:*22*
maintenance  383:*2*
making  211:*22*
*225*:*24*  298:*15*  325:*3*
*364*:*4*
male  134:*3*
man  210:*12*
management  55:*15*
manager  255:*18*
managerial  48:*14*
managing  171:*23*
mandatory  29:*8*
manipulate  248:*14*
manipulated  248:*10*
manipulation  233:*17*
manner  224:*20*  343:*8*
Mantura  339:*13*
March  15:*11*  17:*9*
*18*:*24*  20:*8*, *12*, *13*, *24*

*22*:*23*  49:*16*  50:*3*
*108*:*3*, *17*  111:*22*
*118*:*14*  119:*7*  147:*7*
*150*:*18*  153:*17*  154:*6*,
*18*  155:*11*, *17*  159:*6*
*160*:*10*, *17*  168:*9*
*202*:*8*, *13*  349:*17*, *22*
*391*:*12*  398:*14*  400:*1*,
*17*  401:*2*  405:*10*
MARIE  2:*21*  8:*4*
*75*:*9*
mark  15:*13*  21:*20*
*25*:*17*, *20*  26:*1*, *20*
*35*:*1*, *21*  37:*4*  39:*17*
*41*:*22*  46:*13*  67:*22*
*74*:*4*  106:*6*  148:*1*
*170*:*8*  186:*19*  187:*8*
*191*:*22*  204:*23*  206:*8*,
*11*, *17*  232:*18*, *20*
*327*:*5*  337:*17*, *18*, *19*
*339*:*23*  343:*14*
MARKED  1:*10*  5:*9*
*8*:*16*  15:*20*  19:*12*
*21*:*23*  26:*24*  30:*3*, *5*,
*24*  35:*23*  37:*7*  39:*22*
*42*:*2*  46:*15*  68:*2*
*107*:*11*  115:*24*  116:*2*
*118*:*2*  148:*7*  158:*13*
*161*:*23*, *24*  170:*11*
*172*:*23*, *24*  192:*4*
*195*:*22*, *24*  198:*6*
*218*:*22*  229:*12*
*230*:*17*  232:*23*
*250*:*14*, *18*  251:*7*
*277*:*20*  337:*23*
*343*:*18*  372:*20*, *22*
*376*:*9*, *12*
Market  2:*3*, *18*
*66*:*23*  67:*11*, *15*, *19*
*68*:*15*  69:*5*  74:*16*
*315*:*19*  323:*3*  331:*10*
married  210:*12*
Martina  78:*8*, *20*
*179*:*14*  207:*14*  223:*2*
Mary  213:*15*, *17*
*334*:*13*  366:*12*
Mataskavage  209:*24*
*210*:*1*

materials  32:*23*  33:*5*
*41*:*10*, *14*  43:*13*
*151*:*24*
maternity  321:*15*
*322*:*13*, *14*  323:*16*
math  37:*24*  202:*2*
Matt  30:*20*  111:*19*
*120*:*3*  151:*10*  176:*5*
*194*:*10*  218:*20*
*256*:*11*  261:*4*  278:*4*,
*11*  341:*13*  345:*12*
*372*:*19*  376:*7*  377:*24*
matter  9:*9*  13:*5*
*77*:*15*, *24*  78:*1*  90:*24*
*102*:*5*  227:*4*  239:*6*
*287*:*15*  310:*5*  318:*3*
*344*:*19*  419:*7*
matters  44:*19*
*146*:*22*  390:*10*
maximize  330:*13*
Mayhall  223:*10*
*224*:*22*, *24*  225:*22*
*307*:*21*  329:*7*
McAlonis  210:*14*, *20*,
*22*
MCCAMEY  3:*1*
MCNERNEY  2:*17*
McNulty  174:*23*
mean  44:*12*, *13*
*56*:*24*  59:*10*  66:*12*
*73*:*12*  79:*8*  90:*21*
*96*:*11*  111:*23*  118:*15*
*121*:*5*  124:*2*  127:*1*
*142*:*2*  157:*22*  182:*11*
*184*:*13*  195:*19*
*200*:*13*  214:*8*  223:*9*
*228*:*15*, *24*  242:*2*
*246*:*15*  254:*17*  258:*7*
*283*:*4*, *18*  287:*21*
*288*:*21*  295:*16*
*349*:*10*  356:*7*, *19*
*380*:*5*  389:*14*  390:*14*
meaning  84:*24*
*226*:*8*  318:*3*  341:*5*
*351*:*21*  365:*9*, *10*
*375*:*11*  378:*18*
means  215:*17*
*379*:*20*  380:*1*
meant  98:*18*, *19*
*182*:*19*  183:*2*, *3*

*214*:*9*  243:*9*  246:*21*
*249*:*8*
measure  356:*13*
medication  11:*23*
meet  62:*18*, *21*  78:*9*,
*21*  79:*2*  87:*10*  105:*1*
*156*:*8*  189:*11*, *21*
*202*:*21*  234:*18*
*287*:*17*  314:*15*
*387*:*15*  397:*15*
*408*:*23*
meeting  78:*6*  80:*6*
*121*:*8*  127:*19*  141:*17*
*142*:*9*, *14*, *16*  178:*21*
*237*:*6*  241:*16*  244:*13*,
*15*  247:*19*, *20*, *21*
*248*:*8*  249:*21*  252:*5*
*253*:*7*, *18*  255:*2*, *6*
*260*:*23*  261:*2*  263:*20*
*264*:*5*  267:*17*  284:*6*,
*18*  307:*20*  309:*2*
*326*:*12*  328:*16*  381:*1*,
*6*, *10*, *14*, *22*  387:*6*
*401*:*7*, *18*  409:*4*
meetings  84:*10*
*120*:*20*  231:*19*
*378*:*17*  380:*1*, *17*, *23*
*391*:*4*
meets  319:*2*
Melinda  339:*21*
Melissa  383:*23*
*384*:*22*  385:*12*
member  84:*11*, *15*
members  226:*9*
*382*:*12*
membership  84:*14*
memory  373:*17*
mental  153:*23*  361:*1*
mention  64:*15*  77:*5*
*110*:*2*  182:*1*  210:*11*
*213*:*15*  217:*23*
mentioned  64:*19*
*77*:*9*  79:*20*  126:*23*
*163*:*20*  252:*6*  255:*22*
*269*:*21*, *23*  296:*6*
mentioning  29:*4*
Mentor  23:*15*  24:*12*
message  95:*4*, *7*, *20*
*98*:*13*, *24*  99:*19*, *21*
*238*:*19*  254:*6*  296:*5*

**met** 63:*21* 88:*2*
102:*11* 105:*4*, *10*
120:*23* 121:*1* 156:*17*
227:*9* 234:*13* 253:*15*
285:*22* 307:*20*
318:*10*, *22* 386:*15*, *17*
401:*14* 407:*20* 408:*7*,
*18* 418:*14*
**Michael** 330:*6*
**Michelle** 45:*5* 94:*10*,
*18* 95:*13* 97:*5*, *6*, *14*,
*19* 99:*20* 219:*17*
220:*16*, *18* 221:*1*, *5*
222:*5*, *14* 249:*22*
299:*8*
**MIDDLE** 1:*2*, *19*
340:*18*
**millage** 404:*12*
**MILLIE** 2:*21* 8:*4*
**mind** 38:*20* 222:*8*, *9*
309:*17* 336:*5* 394:*4*
**mine** 155:*5* 295:*8*
302:*2*, *4* 386:*9*
**minimal** 107:*16*
**minute** 19:*21* 162:*22*
**minutes** 121:*15*
151:*7*
**MIS** 137:*11*, *15*
187:*18* 257:*18* 258:*9*
259:*4* 385:*10*
**misconduct** 234:*3*
237:*13* 306:*2*, *6*, *11*
**misconstrued** 180:*14*
**misleading** 356:*24*
**missed** 58:*10* 380:*23*
**misunderstand**
244:*21*
**misunderstood** 311:*5*
**mjones@jonespassodel**
**is.com** 2:*23*
**modification** 55:*2*, *6*
**modifications** 54:*10*
**mom** 105:*18*
**moment** 251:*16*
365:*7*
**momentarily** 278:*13*
**Monday** 103:*22*
239:*10* 260:*5* 266:*8*
270:*17* 271:*14* 282:*2*
285:*10*

**money** 167:*11* 226:*5*
318:*5*
**Monroe** 2:*13*
**month** 169:*18*, *19*, *22*
197:*12* 200:*7* 316:*6*
317:*2* 416:*2*, *3*
**monthly** 316:*5*
**months** 114:*10*
202:*13* 232:*17* 233:*4*
346:*3*, *6*, *19* 406:*13*
410:*22*
**moot** 252:*10*
**morning** 93:*4*, *6*
94:*5*, *24* 99:*24* 237:*5*
253:*22* 267:*10*
274:*11* 286:*20*
**mouth** 203:*21*
**move** 83:*11* 112:*7*
129:*21* 189:*10* 196:*7*
261:*23* 262:*4*, *5*, *21*,
*23* 286:*4* 360:*24*
364:*3*
**moved** 111:*15*
186:*15* 262:*14*, *18*
275:*9*, *11* 276:*8*
354:*12* 364:*14*, *17*
**movement** 264:*6*
266:*9* 270:*21*
**moves** 188:*8*
**moving** 83:*7* 259:*18*
262:*18*, *24* 263:*22*
266:*15* 268:*2* 275:*20*
363:*11* 407:*9* 410:*6*
**multiple** 90:*15*, *18*
132:*23* 152:*17*
271:*19* 288:*4* 289:*21*
300:*24*
**muncher** 209:*17*
**municipalities** 404:*11*
**Murray** 51:*20* 83:*21*
109:*13*, *15*, *17* 116:*14*
117:*8*, *13*, *16* 163:*7*, *9*,
*16* 164:*2* 167:*17*
207:*24* 208:*2*, *6*, *8*, *9*,
*10* 209:*6*, *14*, *17*, *19*
**Murray's** 164:*19*
209:*10*
**mute** 166:*11*

**Myer** 210:*8* 299:*1*, *2*
321:*14*, *17*, *19* 322:*12*
323:*15*

**< N >**
**name** 7:*6*, *12* 9:*7*
22:*6* 27:*7* 31:*7* 39:*4*,
*5* 40:*8* 42:*9*, *18*
124:*11* 182:*2* 209:*23*
210:*7* 211:*15* 213:*20*
230:*21* 231:*1* 297:*20*
307:*8*, *17* 330:*6*
383:*23*
**named** 398:*1* 414:*24*
415:*10*
**names** 66:*1*
**nametags** 66:*2*
**narrow** 154:*23*
270:*6* 272:*4*
**narrows** 273:*3*
**NE** 2:*9*
**necessary** 11:*12*, *18*
263:*4*, *5*, *6*, *7* 319:*2*
347:*21* 390:*10*
**need** 12:*7* 103:*14*
121:*15* 149:*22*
163:*11* 263:*22* 343:*7*
382:*13* 395:*2*, *18*, *19*
404:*9*
**needed** 18:*14* 156:*13*
164:*3* 232:*7* 234:*12*
239:*6* 314:*14* 377:*19*
379:*14* 386:*12* 392:*9*
402:*5*, *16* 403:*3*, *7*
404:*17*
**needs** 361:*6*
**negative** 211:*21*
212:*1*
**negotiate** 226:*4*
**negotiation** 228:*3*, *6*
**negotiations** 227:*6*, *8*
**Nester** 137:*10*, *15*
138:*3*, *8* 258:*9*
**never** 18:*7* 61:*19*
66:*19* 80:*5* 81:*7*
85:*21* 88:*20* 124:*18*,
*21* 130:*12* 138:*10*
140:*23* 145:*3* 184:*21*
196:*17* 324:*22* 325:*7*,
*16* 328:*23* 329:*2*, *17*,

*20* 336:*21* 347:*7*
364:*12* 367:*22*
392:*14* 401:*7*, *18*, *23*
410:*19* 412:*11*
**nevermind** 354:*7*
**new** 25:*8*, *11*, *24*
54:*10*, *14*, *19* 110:*12*,
*22* 163:*23* 195:*3*
307:*11* 331:*2*, *14*
**NEWMAN** 2:*12*
**news** 242:*18*
**nice** 82:*13*
**NICOLE** 2:*17* 8:*12*
**night** 100:*3* 127:*19*
274:*10* 297:*3*
**nippolito@mpvhlaw.co**
**m** 2:*19*
**nixed** 407:*19* 410:*15*
**nod** 10:*11*
**nodding** 156:*4*
**non-county** 93:*14*
**non-discrimination**
42:*22*
**non-employee** 128:*1*
**non-employees** 370:*9*
**non-interim** 200:*7*
**non-job** 228:*1*
**non-present** 381:*14*
**non-routine** 58:*24*
59:*11*
**Non-union** 204:*18*
**normal** 56:*23* 80:*14*
**normally** 61:*18*
**nose** 152:*4*
**Notary** 1:*23* 419:*4*
**note** 252:*20* 277:*16*
375:*6*, *9* 383:*13*
**notes** 102:*8*, *10*
116:*4* 213:*14* 217:*21*
218:*7* 235:*24* 243:*6*
249:*5*, *21* 252:*20*
332:*10*, *14* 333:*1*, *6*
341:*18* 373:*17*, *22*
374:*1*, *12*, *15* 419:*6*
**notification** 368:*23*
**notified** 163:*9*
336:*13*, *23*
**notify** 278:*24* 336:*22*
344:*13* 345:*1*

**November** 1:*22* 7:*7*
173:*9* 230:*2* 387:*2*
404:*10*, *14* 405:*8*, *9*
**NUMBER** 4:*10*
21:*12* 105:*19* 106:*24*
107:*20* 117:*10* 207:*2*
253:*8* 276:*19* 298:*19*
318:*3* 327:*24* 330:*9*,
*14* 331:*9* 342:*20*
356:*15* 358:*14* 370:*8*
373:*2* 383:*19*, *20*
**numbers** 253:*4*, *9*
383:*14*, *16*
**numerous** 332:*9*

**< O >**
**oath** 9:*18*
**Object** 21:*4* 49:*10*
50:*5* 51:*13* 53:*2*, *17*
60:*1* 70:*2* 74:*20*
91:*18* 92:*23* 93:*15*
97:*22* 112:*18* 119:*1*
129:*2* 134:*4* 136:*5*
139:*2* 141:*1* 143:*13*
152:*24* 172:*5* 174:*8*
175:*5* 212:*13* 215:*6*
251:*23* 252:*22*
261:*12* 262:*24*
264:*15*, *16* 275:*5*, *16*
276:*15* 289:*6* 291:*17*
293:*12*, *18* 294:*8*
300:*10* 301:*7* 302:*7*
303:*14* 304:*19* 305:*9*,
*18* 306:*12* 314:*5*
316:*14*, *22* 317:*9*
318:*11* 319:*7* 324:*20*
334:*2* 337:*11* 339:*18*
341:*9* 342:*7*, *15*
346:*9* 356:*4*, *18*, *19*,
*21* 363:*13* 364:*6*, *15*
366:*7* 367:*16* 368:*8*
369:*8* 370:*20* 371:*5*,
*20* 372:*7* 391:*21*
393:*11* 395:*17* 396:*7*
397:*8* 402:*8* 412:*10*
413:*13* 414:*10* 415:*3*,
*12*, *18* 416:*12* 417:*4*,
*14*, *22*
**objected** 75:*9* 263:*6*

**objecting** 137:*1*
265:*1*
**Objection** 74:*17*
75:*20* 96:*15* 136:*16*
166:*9*, *11* 396:*19*
397:*2* 415:*24*
**objectionable** 395:*15*
**objections** 8:*22* 265:*6*
**obligation** 9:*18*
302:*13*
**observation** 61:*9*
79:*6* 82:*1*
**observations** 61:*2*
82:*1* 111:*11*
**observe** 71:*17*, *22*
72:*2* 85:*14*, *18* 86:*14*
88:*22* 89:*1*, *7*, *12*, *16*
100:*20* 131:*19*, *23*
132:*3*, *7*, *11*, *16*
134:*10*, *13*, *17* 135:*2*,
*5* 143:*21* 146:*14*, *16*
155:*12* 183:*22* 184:*2*
186:*7* 206:*22* 209:*5*
212:*9*
**observed** 59:*16*
78:*15* 81:*13* 135:*8*,
*17*, *22* 141:*7* 142:*24*
143:*3* 164:*4* 214:*20*
367:*13*, *14* 368:*6*
**obtain** 58:*19* 86:*15*,
*19* 88:*12*, *17*, *20*
131:*24* 186:*8* 201:*10*
202:*4* 206:*23*
**obtained** 88:*8*
**occasions** 26:*2* 72:*4*
74:*14* 76:*3* 90:*15*, *18*
132:*24* 304:*10*
335:*10*
**occupied** 354:*13*
**occur** 124:*24*
**occurred** 74:*14*
179:*5* 181:*15* 218:*3*
233:*8*, *20* 267:*3*
**occurring** 246:*4*
262:*12*
**O'Connell** 45:*5*
94:*11*, *18*, *21* 95:*3*
96:*1*, *2*, *7* 97:*19*
98:*10*, *17*, *23* 99:*4*
164:*12* 217:*23*

219:*10*, *15*, *23* 220:*4*,
*8*, *16* 221:*21* 222:*1*
249:*22* 299:*8*
**O'Connell's** 99:*3*
**O'Connor** 299:*22*
323:*24* 324:*8* 325:*9*,
*15*, *21* 326:*1* 404:*19*
**O'Connor's** 324:*18*
**October** 22:*10*, *24*
23:*1* 27:*12*, *17*, *21*, *23*
28:*22* 29:*12* 31:*21*
65:*1*, *13*
**odd** 97:*8* 187:*15*
239:*11* 275:*21*
**offended** 214:*16*
**offense** 387:*17*
**offensive** 216:*23*, *24*
**offer** 122:*14* 226:*1*, *8*,
*16* 277:*4*, *7* 283:*11*
328:*8* 364:*20* 398:*3*,
*9*
**offered** 15:*4* 28:*24*
29:*11* 44:*14* 225:*21*
226:*6*, *17* 276:*22*
283:*15* 364:*23*
**Office** 1:*19* 7:*22*
23:*12* 24:*21*, *22* 25:*8*,
*11*, *24* 33:*17*, *22* 34:*8*
35:*2*, *14* 50:*13*, *17*
52:*3*, *4* 56:*1*, *4* 59:*7*,
*13* 62:*2*, *4* 66:*24*
71:*18*, *20*, *23* 72:*1*, *14*,
*17* 73:*8*, *9*, *15* 74:*15*
75:*11*, *12* 76:*9*, *14*
77:*13* 78:*16* 79:*13*,
*18*, *21* 80:*5* 81:*14*, *16*
82:*2* 83:*4*, *12* 89:*4*, *9*
95:*13* 99:*12* 105:*3*, *6*,
*17* 106:*11*, *18*, *22*
107:*2* 108:*10*, *13*, *21*,
*24* 109:*3*, *11*, *20*
110:*18* 111:*3*, *4*, *17*
122:*12* 129:*14*
134:*11*, *18* 139:*17*, *20*
140:*2*, *5*, *8*, *10*, *12*, *15*,
*19*, *24* 152:*3*, *12*
154:*3*, *4*, *10*, *12*, *24*
155:*17* 156:*20*
162:*14* 163:*22* 164:*2*
165:*7* 175:*14* 176:*11*,

*12* 177:*4*, *7* 181:*24*
184:*4* 189:*4*, *13*, *15*,
*23* 195:*5* 211:*8*
213:*1*, *18* 214:*5*
216:*11* 218:*3* 219:*16*,
*24* 221:*7*, *21* 234:*11*,
*14* 235:*10*, *18*, *19*
253:*15* 260:*6* 267:*9*
271:*5* 282:*3* 298:*2*
299:*6* 306:*2* 307:*19*
310:*4* 312:*12* 319:*2*
320:*4*, *10*, *18* 321:*5*,
*13* 322:*23* 323:*7*
326:*22* 327:*20* 328:*1*,
*10*, *15* 330:*19*, *23*
345:*17* 350:*13*
354:*12*, *17*, *20* 355:*21*,
*22* 357:*8*, *11*, *21*, *24*
358:*1* 361:*15* 362:*4*,
*9*, *11*, *16*, *19*, *22* 363:*4*
364:*24* 365:*4* 375:*12*
384:*14* 386:*12*
387:*10*, *20* 388:*2*, *18*,
*22* 389:*10* 390:*11*, *15*
391:*9* 399:*8* 401:*19*
402:*5*, *15*, *23* 403:*3*, *7*,
*17*, *23* 404:*5*, *18*
405:*17*, *19* 408:*14*
410:*2* 414:*6*, *9*
**offices** 49:*18* 53:*13*,
*16* 150:*22* 152:*10*
160:*10* 162:*24*
165:*21*, *22* 166:*21*, *24*
167:*2*, *4*, *7*, *12*, *23*
168:*3*, *12* 171:*3*, *11*
184:*8* 191:*16* 194:*7*,
*15* 195:*12* 197:*4*
198:*14*, *20*, *24* 199:*1*
200:*8*, *10* 202:*9*
208:*17* 249:*1* 298:*21*
299:*3* 312:*10* 326:*17*
328:*6* 330:*4* 349:*12*,
*16* 354:*10*, *13*, *20*
355:*1*, *5*, *13*, *22*
356:*16* 375:*10*, *18*, *22*
376:*5* 382:*23* 386:*7*
388:*21* 391:*13*
398:*13*, *23* 399:*20*
401:*5* 402:*7* 405:*11*

Case 3:21-cv-00477-MCC   Document 280-1   Filed 09/20/23   Page 342 of 373
CONFIDENTIAL
Deposition of Gary Bender Vol. I - Revised
Jane Doe, et al. v. Schuylkill County Courthouse, et al.

409:*1*  410:*2*  413:*22*
418:*5, 11, 13*
**official** 301:*5*  303:*2*
306:*4, 9*
**officials** 222:*18*  292:*5*
**oft** 173:*24*
**Oh** 18:*3*  19:*20*  28:*8*
40:*6*  95:*10, 14*
141:*11*  171:*10*
180:*15, 16*  182:*13*
208:*12*  250:*14*  272:*2*
375:*7*  387:*12*
**Okay** 11:*21*  14:*5*
15:*23*  16:*1, 7, 14, 21*
17:*1, 5, 10*  18:*3*
19:*24*  20:*2, 15*  21:*5,*
*14, 19*  22:*9*  23:*3*
28:*5, 8*  29:*2, 7, 24*
31:*4*  32:*9, 17*  33:*3, 9,*
*20*  34:*11*  37:*1, 15*
38:*4, 14*  39:*1, 20*
40:*7, 21*  41:*4*  43:*7*
44:*4, 16*  45:*9, 24*
47:*1, 12*  48:*3*  50:*12*
51:*5, 24*  52:*10, 20*
53:*10*  54:*24*  55:*12*
56:*8, 18*  57:*3, 13*
59:*9*  60:*11*  61:*6, 23*
62:*6, 12*  63:*6*  64:*18*
65:*9, 19*  69:*1, 15, 18,*
*22*  72:*7, 11, 24*  73:*4,*
*16*  74:*10, 12, 24*
75:*14*  76:*7, 17*  77:*6*
78:*1, 3, 13, 14, 19*
79:*1, 11, 24*  80:*12*
81:*11, 23*  83:*5*  84:*2,*
*18*  85:*2*  86:*6*  87:*6, 9*
88:*6, 15*  90:*20*  91:*3,*
*14*  92:*9, 14*  93:*23*
94:*9, 16, 20*  95:*23*
96:*6*  98:*4, 16*  99:*2*
100:*12*  101:*9, 17*
102:*12, 23*  103:*3, 15*
106:*2, 14*  107:*4*
108:*5, 11, 15*  111:*1,*
*14, 23*  112:*4, 13*
113:*8, 23*  114:*11, 16*
115:*11*  116:*10, 16*
117:*3, 11, 24*  120:*1,*
*10, 14*  122:*13*  124:*13*

125:*7*  126:*13*  127:*23*
128:*9*  129:*8, 12, 18,*
*23*  130:*2, 11*  133:*2, 5,*
*20*  134:*9*  135:*7*
136:*23*  138:*16*
139:*10*  140:*7, 21*
141:*6*  142:*10, 18*
144:*16*  145:*15, 22*
146:*13*  147:*10, 24*
148:*17*  149:*2, 7*
150:*17*  151:*9*  152:*8*
153:*8, 16*  154:*5, 15,*
*22*  155:*2, 6, 10, 19, 22,*
*23*  156:*3, 16*  157:*12*
160:*4, 16*  161:*4, 15,*
*21*  163:*4, 24*  164:*16*
165:*15, 19*  166:*13, 18*
167:*5, 21*  168:*2, 7, 15,*
*20*  169:*6, 12, 21*
170:*14, 17*  171:*10, 20*
174:*17*  176:*3, 15, 21*
177:*2, 18, 24*  178:*7,*
*22*  179:*2, 8, 18*  180:*6,*
*19, 24*  181:*11, 19, 21*
182:*4, 16*  183:*13*
184:*16*  185:*14*
186:*23*  187:*10, 18*
188:*2, 6, 9*  189:*16*
190:*2*  191:*1*  192:*15*
195:*9, 18*  196:*5, 11,*
*18, 24*  197:*13, 20*
199:*3, 7, 11*  200:*4*
201:*7, 14, 21*  202:*6*
203:*1, 9, 14, 19*
204:*11, 16*  205:*22*
206:*21*  207:*18*
208:*24*  211:*9*  212:*17*
214:*23*  215:*15, 24*
216:*12*  217:*10, 13*
219:*6, 12, 19, 20*
220:*15, 18*  221:*4, 19,*
*23*  222:*3, 12*  223:*7,*
*16*  224:*2, 11*  225:*7,*
*14, 19*  226:*3, 11, 15,*
*20*  227:*12*  228:*19, 23*
229:*17*  232:*5*  233:*7*
234:*20*  235:*5*  236:*3*
237:*7*  238:*3*  239:*4,*
*15*  240:*7, 10*  241:*11*
242:*4, 17*  244:*6, 9*

245:*10*  246:*8*  247:*12,*
*14*  249:*10, 12*  250:*11,*
*20*  251:*14, 20*  253:*2,*
*11, 12, 24*  254:*10, 15,*
*19, 23*  255:*11, 12*
256:*10, 20*  257:*11*
258:*2, 11*  259:*3*
260:*12, 21*  262:*16*
263:*19*  264:*2, 9*
265:*20*  266:*10, 21*
267:*1, 16, 22*  268:*7,*
*18*  269:*6, 12, 24*
270:*5, 14, 23*  271:*8*
272:*3, 12, 15, 22*
273:*2*  274:*15*  275:*1,*
*24*  278:*5, 11, 20*
279:*5, 24*  280:*6, 13,*
*20*  281:*7, 15*  282:*12*
284:*15*  285:*2, 8*
286:*2*  287:*2*  288:*15*
289:*10*  290:*5, 8, 17,*
*23*  291:*3, 10, 21*
292:*12, 16, 23*  293:*9*
295:*14, 23*  296:*13*
297:*8*  298:*8, 14, 23*
299:*7, 13*  300:*6, 15,*
*21*  301:*2, 11, 23*
303:*11, 20*  304:*1, 7,*
*11, 12*  305:*3, 15, 24*
306:*20*  307:*5, 12*
308:*14, 21*  309:*6, 22*
310:*23*  311:*4, 11*
312:*22*  313:*8*  315:*8*
316:*10*  317:*5, 13, 16,*
*19*  319:*22*  320:*2, 13,*
*22*  321:*8, 12*  322:*3, 4,*
*18, 20*  323:*10, 14*
324:*7, 16*  325:*10, 11,*
*24*  326:*20*  327:*5, 11,*
*18, 23*  329:*15*  330:*1,*
*21*  332:*5, 20*  333:*4*
334:*7, 12*  335:*11, 20*
336:*2*  337:*16*  338:*2,*
*4, 16*  339:*2, 6*  340:*3,*
*15*  341:*22*  342:*11*
344:*2*  346:*23*  347:*6*
348:*4, 12*  350:*5, 24*
351:*6*  353:*8, 15*
354:*16*  356:*11*
357:*13, 23*  358:*3, 16*

359:*2, 8, 17, 24*
360:*18*  361:*9, 17, 21*
363:*7*  364:*10, 19*
365:*5, 17*  366:*14, 19*
367:*5, 11*  368:*13, 19*
369:*3, 20*  370:*5*
371:*17*  373:*4, 15*
374:*6, 11, 21*  375:*1,*
*15*  376:*2, 13, 14*
377:*4, 7, 22*  378:*21*
379:*7*  380:*14*  381:*18,*
*24*  383:*1*  385:*11, 16*
388:*12, 24*  389:*4*
390:*17, 23*  391:*6, 7*
392:*23*  394:*8*  395:*7,*
*10*  396:*4, 10*  400:*12,*
*15, 16, 20*  401:*16, 22*
405:*15*  406:*15*  407:*6*
408:*10, 21*  409:*12, 19*
411:*4, 9*  412:*17*
413:*18*  416:*3, 6*
418:*9*
**Once** 154:*8, 21*
155:*18*  219:*1*  232:*15*
366:*20*  396:*12*
406:*20*
**ones** 24:*7*  57:*23*
58:*20*  71:*19, 24*
144:*21*  195:*3*  204:*2*
235:*2*  239:*20*  330:*18*
**ongoing** 234:*17*
287:*15*
**online** 32:*8, 22*  33:*8*
321:*7*
**open** 14:*7*  77:*4*
81:*18, 22*  140:*8, 15*
**opened** 72:*18*  83:*13,*
*19, 21*  187:*22*
**opening** 109:*12, 14*
**opens** 113:*19*
**operate** 150:*23*
**operated** 390:*15*
**operating** 402:*19*
**operation** 401:*5*
**operations** 61:*12, 14*
183:*24*  184:*3*  328:*6*
391:*9*  401:*19*
**opinion** 66:*17*  77:*17*
93:*22*  105:*12*  157:*14,*
*17, 20*  190:*6*  193:*23*

Case 3:21-cv-00477-MCC    Document 280-1    Filed 09/20/23    Page 343 of 373

CONFIDENTIAL

Deposition of Gary Bender Vol. I - Revised                    Jane Doe, et al. v. Schuylkill County Courthouse, et al.

194:*14, 17*  242:*14*
301:*1*  306:*10*  318:*24*
346:*11*  363:*18*
386:*12*  402:*6*  414:*12*
417:*24*
**opportunity**  304:*3*
**opposed**  262:*18*
278:*17*  384:*18, 24*
403:*17*  413:*4*
**optimal**  401:*5*
**option**  226:*10*  336:*4*
**options**  411:*12*
**oral**  102:*1, 16*  186:2
**order**  7:2  8:*19*
142:*5*  188:*11*  373:*22*
374:*8*
**orientation**  19:*6*
209:*10, 11*
**originally**  226:*6, 16,*
*17*  407:*11, 12*
**ostracized**  361:*14*
363:*11*
**outlined**  41:*20*
**outside**  89:*8*  91:*10*
124:*20*  133:*14*  258:5
282:*6*  312:*6*  314:*15*
385:*6*
**overhaul**  403:*16*
**overhauled**  402:*16*
403:*4*  404:*5*  414:*9*
**overlap**  309:*23*
310:*14*
**overly**  337:*13*
**overrule**  360:*10*
**oversaw**  328:7
**oversee**  74:*5*  165:*21*
166:*23*
**overseeing**  50:*9*
166:*21*  323:*20*
**overseen**  405:*18*
**overstepped**  231:*23*
**overtime**  318:*9, 18, 19*
**overwritten**  346:*12*
347:*2*

**< P >**
**P.C**  2:*12*  390:*5*
**p.m**  92:*22*  93:*13*
157:*4, 10*  188:*18, 24*

253:*13*  273:*14, 20*
331:*21*  332:*3*  418:*23*
**P.O**  2:*13*
**packet**  19:*8*  22:*16,*
*17*  46:*12*  148:*4*
337:*17*
**PAGE**  2:*17*  4:*4, 10*
5:*10, 11, 12, 13, 14*
6:*2, 12*  19:*22*  22:*17*
42:*10*  43:*8*  47:7
48:*9*  53:*23*  55:*9, 10*
57:*10*  68:*17*  118:*8*
159:*5*  170:*22*  172:*3*
173:*8, 18*  192:*16*
198:*17*  201:*8*  218:*21*
221:*14*  229:*24*  230:*1*
253:*4, 6, 8, 10*  256:*16*
278:*1, 12, 15*  319:*12*
404:*2*
**pages**  230:*2*  253:*9*
255:*9*
**paid**  83:*15, 19*  150:*3,*
*6, 8, 10*  205:*24*
206:*13, 19*  312:*2, 15*
318:*19*
**pandemic**  147:*8, 13*
150:*14, 18*  151:*14*
153:*11, 19*  319:*18*
**pants**  294:*13*
**paper**  343:*8*  415:*1,*
*11*
**papers**  19:*8*  22:*16*
107:*6*  158:*17*  191:*24*
198:*2*  277:*17*
**paperwork**  328:*19,*
*24*  329:*21*
**PAR**  16:*12, 15*  36:*6,*
*22*  37:*11, 12, 16, 18*
44:*22*  106:*20*  108:*8,*
*9*  162:*2*  169:*10, 15*
195:*14, 19*  196:*6*
224:*20*  225:*8, 13, 15*
227:*1*  299:*11*  389:*23,*
*24*
**parade**  90:*6*
**paragraph**  55:*13*
149:*5, 15*  218:*24*
219:*13*  232:*14, 16*
233:*12*  279:*22*  338:*9*
344:*10*  379:*12*

**PARALEGAL**  3:7
189:*4*
**paralegals**  7:*22*
**parenthesis**  279:*18,*
*19*
**parents**  369:*1*
**park**  183:*4*  359:*14*
**parked**  183:7  262:*8*
274:*22*  275:*14*
**parking**  182:*9, 14, 20*
183:*2, 16*  186:*12*
187:*2, 12, 22*  188:*8*
259:*18*  261:*8, 21*
262:*7, 14, 19*  263:*1,*
*11*  268:*2*  272:*18, 23*
282:*4, 7*  359:*14, 23*
360:*2, 3, 9, 12*
**part**  11:*16*  71:*21*
82:*19*  109:*5*  122:*6*
133:*18*  234:*3*  245:*12*
362:*4, 5, 8*  404:*4*
**participant**  142:*13*
**participate**  34:*3*
191:7  287:*3*  381:*8*
**participated**  379:*24*
380:*16*
**participating**  141:*15*
**particular**  83:*24*
97:*14*  124:*20*  177:*23*
180:*21*  185:*2*  290:*22*
366:*22*
**parties**  3:*3*  7:*15*
8:*17, 20, 23*  98:*20*
100:*2*
**party**  17:*21*  18:*15*
98:*15, 21*  99:*21*
100:*3*
**passed**  57:*1*  169:*5*
**PASSODELIS**  2:*21*
**path**  294:*1*
**PATRICIA**  3:7  7:*23*
**PAUL**  3:*1*  8:*10*
**pause**  114:*12*
**paused**  319:*20*
**pay**  23:*18*  24:*15*
26:*7, 10*  35:*15*  36:*10,*
*14*  324:*18*
**pending**  238:*9*
271:*16*  308:*6*  390:*8*
**Penn**  28:*1, 4*  29:*3, 5*

**PENNSYLVANIA**
1:*2, 20, 21*  2:*4, 14, 18,*
*23*  3:*2*  7:*10*  146:*6*
173:*21*  174:*6, 14*
201:*11*  301:*16*  313:*5*
**people**  83:*17*  93:*3*
97:*8, 13*  100:*1*  107:*1*
113:*15, 19*  114:*5, 7*
123:*24*  124:*10*
127:*17*  152:*3, 9*
153:*5*  175:*18*  180:*16,*
*22*  181:*16*  223:*12*
248:*22*  284:*17*  292:*9*
298:*19*  300:*9*  314:*15*
315:*23*  362:*12, 23*
403:*6*  406:*7*
**percent**  38:*1, 5*  249:*1*
**perception**  209:*11*
**Perfect**  344:*2*
**perform**  118:*24*
161:*8*  172:*10*  193:*10*
230:*10*  314:*20*  349:*5*
**performance**  67:*10,*
*15, 19*  111:*7, 12*
112:*15*  113:*12*
114:*23*  115:*3, 14, 20*
117:*2*  158:*4*  164:*19,*
*23*  170:*1, 4*  197:*17,*
*22*  199:*21*  200:*18, 24*
209:*3*  227:*3, 22, 24*
228:*1*  315:*6, 12*
348:*16*  349:*18, 21, 24*
351:*12*
**performed**  349:*14*
350:*10, 12*
**performing**  315:*13, 14*
**period**  29:*17*  37:*23*
52:*12*  79:*22*  110:*13*
111:*8, 12*  114:*18, 21*
115:*4, 5, 8, 15, 17*
116:*12*  119:*6, 12, 14*
151:*8*  161:*5, 10, 16*
179:*13*  184:*14*
191:*10*  193:*12, 17*
197:*15*  199:*13*
200:*15*  319:*5*  322:*21*
349:*24*  350:*2*  354:*14*
394:*6*
**periodically**  12:*19*

Case 3:21-cv-00477-MCC    Document 280-1    CONFIDENTIAL    Filed 09/20/23    Page 344 of 373

Deposition of Gary Bender Vol. I - Revised                    Jane Doe, et al. v. Schuylkill County Courthouse, et al.

**permission** 144:*3, 7*
**permit** 411:*23*
**permitted** 153:*12*
281:*18* 375:*21* 376:*5*
**pers** 132:*23*
**person** 13:*16, 22*
28:*23* 94:*7* 110:*16,*
*17, 20, 22, 23* 134:*21,*
*23* 153:*18* 164:*10*
167:*2* 175:*24* 176:*2*
177:*12, 16* 178:*11*
180:*12* 181:*7, 9*
185:*2* 194:*19* 216:*6*
231:*22* 248:*7* 255:*24*
280:*11* 398:*4, 11*
**personal** 16:*8* 69:*17*
76:*16* 77:*17, 22*
91:*10* 111:*10* 113:*7*
114:*22* 132:*23*
133:*14* 157:*23*
285:*21*
**Personally** 182:*21*
**personnel** 44:*19*
54:*3* 55:*18, 24* 56:*5,*
*10* 338:*24* 339:*4*
**petition** 86:*15, 19*
87:*16* 88:*8, 12, 21*
131:*24* 186:*8* 206:*23*
220:*5*
**petitions** 218:*1*
**Philadelphia** 2:*4*
238:*2, 24* 239:*2*
**philosophies** 233:*15*
**phone** 13:*15* 91:*10*
95:*19* 104:*14, 15, 16*
117:*9* 133:*14* 134:*22*
237:*16, 18* 383:*14, 16,*
*21*
**photo** 367:*23* 368:*1*
**photos** 101:*1* 258:*23*
**phrase** 260:*16*
312:*23*
**phrased** 363:*22*
**physical** 70:*23*
122:*19* 174:*19*
353:*17* 354:*9*
**physically** 266:*3*
**picnic** 134:*2*
**picture** 144:*2, 6*

**piss** 125:*21*
**Pittsburgh** 2:*23*
**place** 101:*8* 187:*22*
262:*3* 263:*11* 268:*5*
298:*1* 329:*21* 349:*11*
362:*14* 365:*1* 413:*2*
**placed** 9:*18* 333:*15*
370:*3* 409:*22, 24*
411:*14, 24* 412:*1*
**places** 86:*12* 259:*18*
**plain** 292:*6*
**Plaintiff** 1:*2* 2:*5*
7:*21* 189:*3*
**Plaintiffs** 2:*11* 7:*19*
9:*8* 45:*13, 14, 18*
46:*2* 189:*2* 298:*16*
309:*10* 334:*24*
336:*12, 22* 337:*4*
341:*24* 342:*4* 344:*19,*
*24*
**plaintiff's** 341:*7*
**plan** 38:*19* 399:*18*
401:*3* 404:*16* 407:*10,*
*12, 17, 19* 408:*16*
409:*8* 410:*3, 4, 10, 14,*
*15* 411:*5, 6, 10* 413:*1*
**planned** 231:*14*
297:*7* 298:*13* 405:*2*
**plans** 163:*16*
**plant** 403:*14*
**please** 10:*20* 11:*6,*
*12* 12:*7* 60:*23*
123:*15* 129:*20* 278:*4*
293:*14* 315:*10*
387:*17*
**plees@dmclaw.com**
3:*3*
**PLLC** 2:*2*
**plus** 356:*21* 374:*9*
**point** 17:*17* 18:*2*
20:*24* 21:*8* 52:*1, 2*
63:*23* 91:*8* 94:*21*
95:*2* 102:*13* 103:*16*
121:*14* 122:*14*
132:*21* 133:*12, 16*
147:*11* 159:*21*
164:*17* 167:*15* 180:*3*
186:*24* 187:*13*
188:*15* 189:*18*
202:*21* 207:*7, 19*

208:*10* 210:*8, 16, 23*
234:*1* 235:*23* 236:*1,*
*2* 237:*1* 238:*7* 239:*9*
242:*8* 246:*9* 247:*4,*
*13* 249:*17* 250:*8*
253:*3* 254:*11* 255:*20*
257:*22* 259:*15*
260:*14* 265:*23*
266:*12, 14* 268:*23*
271:*9, 13, 20* 277:*4, 7,*
*11* 280:*21* 281:*23*
282:*20* 283:*10*
285:*17* 287:*21*
289:*15* 293:*3* 294:*7*
300:*6, 18* 306:*15*
313:*9* 326:*15* 328:*3,*
*13* 333:*3, 22* 334:*23*
335:*3* 336:*11* 337:*2,*
*5* 341:*5* 344:*18, 23*
345:*18, 20* 352:*8, 18*
358:*19* 360:*24*
372:*17* 379:*24*
380:*19* 382:*9, 18, 23*
383:*2* 397:*5, 23*
398:*3, 9* 400:*1, 7*
407:*1* 416:*8*
**pointing** 338:*13*
**points** 252:*10*
**poles** 204:*9*
**police** 344:*12, 21*
**policies** 18:*19* 20:*10,*
*16* 21:*1, 9* 42:*22*
54:*18, 20* 57:*16, 20*
58:*2* 81:*8* 150:*22*
151:*21* 288:*4* 289:*21*
300:*24*
**policy** 21:*12, 15, 16*
22:*12, 19* 23:*1* 28:*11,*
*15* 31:*11, 15, 18* 32:*3,*
*15, 24* 40:*13, 14*
41:*11, 20* 43:*2, 14*
54:*11, 14, 19, 22* 55:*3,*
*7* 57:*6* 92:*18* 94:*1*
167:*20* 288:*11* 300:*9*
382:*6*
**political** 17:*18* 18:*5,*
*11, 15* 64:*16, 22*
65:*21, 24* 85:*16, 20*
131:*20*

**pond** 92:*4*
**pop** 204:*1*
**pops** 203:*4, 13*
**popsicle** 204:*1*
**popsicles** 203:*4*
**portion** 20:*5* 255:*14*
**portions** 8:*18*
**posed** 12:*9* 261:*16*
283:*22, 23*
**position** 13:*12, 14, 17*
14:*7* 15:*4, 6, 8* 16:*16*
39:*14* 44:*17* 47:*3*
51:*7, 11* 52:*11, 14, 23*
59:*15* 60:*17* 67:*3, 11*
68:*14* 83:*8, 13, 15, 19*
110:*9, 14, 20* 111:*2*
113:*19, 22* 114:*2*
116:*6* 118:*5, 17*
120:*16* 159:*1* 160:*12*
162:*7, 8* 163:*11, 18*
169:*16* 171:*8* 173:*5,*
*15* 192:*12, 21, 23*
194:*6, 15* 195:*11*
196:*8, 9* 197:*1, 3, 7, 9,*
*10* 199:*15* 201:*1, 24*
202:*14, 18* 223:*12, 20*
224:*9* 369:*15* 405:*24*
**positions** 113:*15, 16*
169:*23* 207:*3* 327:*24*
403:*9*
**positive** 33:*14*
150:*23* 151:*1, 3*
**positively** 138:*6*
**possession** 135:*14, 15*
385:*4*
**possibility** 275:*20*
**possible** 275:*12*
276:*13* 294:*18* 311:*1*
**possibly** 40:*24*
**post** 349:*21, 22*
351:*14*
**posting** 162:*21*
163:*18* 165:*3* 224:*8*
**potential** 302:*19*
**potentially** 164:*5*
178:*18* 338:*23*
359:*21*
**Pottsville** 344:*12, 20*
**precautions** 154:*2*

Case 3:21-cv-00477-MCC   Document 280-1   Filed 09/20/23   Page 345 of 373
CONFIDENTIAL
Deposition of Gary Bender Vol. I - Revised                                    Jane Doe, et al. v. Schuylkill County Courthouse, et al.

prefer  194:*20*
preferable  363:*5*
preferred  224:*23*
preliminary  9:*11*
premises  222:*7*
prepare  337:*3, 5, 9*
339:*7, 17*  343:*1*
344:*8*
prepared  162:*20*
196:*17, 19*  207:*16*
249:*17, 18*  328:*19*
329:*22*
prepares  196:*16*
preponderance
305:*21*
PRESENT  3:*6*
121:*7*  134:*20*  182:*1*
213:*8*  221:*2*  241:*7*
252:*3, 4*  304:*4*
381:*14, 20, 21*  398:*5,*
*11*  401:*15*
presented  36:*21*
408:*4*  409:*17, 21*
410:*10, 20*  411:*1*
preservation  256:*23*
258:*5, 8*  346:*18*
preserve  265:*3*
345:*19*  347:*10*
395:*20*
preserved  257:*20*
258:*10, 17*  345:*20*
346:*22*  347:*3*
President  143:*11, 19*
237:*19*  238:*21*  254:7
267:*13*  282:*18*
297:*20*  333:*11*
press  272:*11*  289:*13,*
*14, 18, 24*  302:*24*
303:*5, 6*  304:*15*
pressuring  222:*9*
pretty  43:*17*  63:*1*
84:*22*  138:*6*  254:*1*
267:*10*  311:*22*
315:*20*  356:*14*  396:*2*
prevent  308:*10*
previous  8:*15*
225:*23*  259:*7*
PREVIOUSLY  5:*9*
115:*24*  116:*2*  118:*1*
161:*23, 24*  172:*23, 24*

195:*22, 24*  218:*22*
229:*12*  230:*17*
250:*17*  251:*7*  372:*22*
376:*9, 12*
Price  388:*4*  389:*8, 9*
390:*4, 14, 18, 20*
391:*2, 8*  409:*2*
prime  151:*24*  315:*7*
principles  233:*15*
printed  22:*6*  27:*7*
31:*7*  40:*8*  42:*9, 17*
374:*18*
printers  330:*4, 9, 23*
prior  25:*5*  28:*4*
34:*21*  37:*12*  45:*3*
46:*4*  61:*13*  62:*2, 11*
64:*9*  65:*10*  67:*9, 13,*
*17*  73:*10, 13*  74:*2, 3*
87:*5*  91:*4*  108:*24*
113:*9*  125:*5, 8*  130:*5*
133:*6, 21*  152:*22*
154:*18*  155:*17*  165:*9*
167:*22*  184:*22*
204:*13*  206:*18*
217:*14, 17*  231:*13*
267:*17*  269:*9*  270:*9*
310:*18*  317:*2*  346:*6*
350:*6*  370:*2*  372:*8,*
*20*  375:*3*  400:*1, 7, 21*
401:*1*
priorly  372:*20*
prison  95:*16*  96:*4*
private  154:*13*
priveledged  215:*10*
privilege  8:*22*  396:*6*
privileged  175:*6*
215:*8*  392:*2*  393:*4*
396:*3, 20*
privy  350:*14*  392:*14*
Probably  15:*10, 12*
18:*24*  32:*24*  33:*16*
56:*22*  62:*22*  77:*22*
83:*14*  86:*1*  87:*4*
112:*3*  117:*7*  125:*4*
129:*14*  153:*24*
154:*11*  156:*19, 23*
168:*23, 24*  171:*22*
186:*18*  188:*15*
189:*13*  190:*1, 13*
199:*6*  244:*5*  271:*19*

282:*10*  287:*17*
300:*12*  305:*12*
306:*18*  307:*21*
311:*10*  347:*23*  356:*1*
360:*7*  401:*10*  407:*18*
problem  64:*17*
66:*11*  109:*5, 9, 18*
328:*10*  350:*4*  395:*2*
problems  105:*16, 19*
procedure  295:*22*
297:*8*  390:*8*
procedures  9:*14*
57:*16, 20*  150:*22*
151:*21*
proceed  7:*17*
proceeding  316:*6*
process  165:*2*  223:*5*
390:*8*
produced  44:*6*  259:*9*
312:*14, 16*  327:*14*
375:*4*
producing  312:*18*
product  153:*15*
311:*13*  312:*3, 13, 16,*
*19, 21*  352:*4, 6, 14*
363:*3*
PRODUCTION  6:*11*
107:*19*
profanities  143:*4*
professionally  354:*12*
program  45:*6*
189:*14*  247:*16, 17*
programs  155:*5*
prohibited  412:*8*
projected  107:*7*
118:*3*
promise  418:*10*
promote  112:*11*
162:*6*
promoted  18:*15*
23:*5*  24:*19*  34:*6*
112:*17*  113:*11, 18*
114:*1, 13*  118:*13*
promotion  34:*15*
35:*13*  36:*6, 10*  37:*11,*
*12, 16, 19, 20*  45:*12*
112:*8*  113:*10*  162:*3*
promotions  38:*8*
45:*2*  113:*14*

proper  103:*9*
properties  389:*20*
property  222:*13*
proposed  313:*22*
331:*7*  409:*9*
proposing  165:*14, 20*
protect  82:*13*
protected  362:*10, 14*
365:*8*
protocol  152:*5*
protocols  362:*14*
364:*24*
provide  48:*14*  88:*23*
304:*3*  307:*17*
provided  18:*19*
36:*19*  41:*10, 12*
314:*3, 18, 24*  315:*2*
316:*1*  357:*10*
prude  214:*17*
PTO  348:*19*
Public  1:*23*  359:*5*
419:*4*
publicly  386:*2*
409:*17*
pull  218:*19*  268:*21*
388:*20*  395:*22*
pulled  101:*24*  307:*21*
pulling  102:*14*
purchase  328:*20*
329:*22*  330:*3*
purports  110:*21*
purpose  26:*21*  136:*3*
390:*6*
purposes  15:*14*
21:*21*  31:*1*  35:*21*
46:*13*  106:*7*  107:*9*
110:*14*  136:*4, 14*
148:*5*  158:*18*  170:*9*
191:*23*  343:*15*
381:*15*
pursuing  14:*4*
purview  107:*16*
put  20:*23*  30:*20*
39:*4, 5*  56:*16, 20, 24*
109:*24*  120:*2, 6*
123:*23*  126:*18*
141:*12, 14*  142:*11*
145:*11*  151:*2, 23*
161:*21*  162:*21*  189:*6*
218:*21*  225:*15*

229:*10*  250:*21*  256:*7,*
*12*  263:*17*  292:*11*
308:*1*  325:2  329:*2, 9*
330:*20*  372:*19*
373:*12*  376:*7*  379:*8*
402:*12*  404:*16*  408:8
410:*20*  412:5, *15, 18*
413:*5, 6*
**puts**  109:*8*
**putting**  151:*17*
292:5, *14*  312:5
407:*23*  408:8  412:8

**< Q >**
**qualifications**  199:*16*
200:*11*
**qualified**  70:*1*  114:2
118:*24*  161:*8*  172:*10*
193:*10*  230:*10*
**qualify**  94:2
**quarantine**  151:8
**quarter**  312:2
**question**  10:*15, 17, 19,*
*21*  11:2, *18*  12:*9*
34:*1*  46:22  60:2, *8*
61:7, *24*  65:*23*  68:*10*
74:*21*  80:*9, 11*  87:*20,*
*21*  92:*1*  126:*17*
136:5  139:*6*  151:*13*
154:*16*  190:*19*
195:*17*  201:2, *6*
205:*14*  217:*16*
227:*17*  241:*20*  245:8,
*22*  249:*13*  251:*18*
264:*10*  266:*18, 23*
267:*24*  275:*12*  279:*7*
280:7  283:*10, 19*
290:*16*  306:*24*
324:*15*  341:*16*
346:*24*  353:*1*  354:*7*
360:8  362:*21*  363:*14,*
*21, 22*  376:*4*  392:*24*
394:*21*  395:*24*
396:22  397:*3, 9*
403:5  413:*8*
**questioned**  243:*4*
**questioning**  185:*21*
243:*1*
**questions**  9:*11*  12:*16*
20:*17*  28:*17*  31:*17*

41:*16*  43:*1*  67:*14*
68:8  81:*13*  112:*14*
115:*13*  155:*21*
198:*11*  199:*15, 20*
200:*17, 23*  242:22, *24*
244:22  261:*16*
271:*19*  309:8  388:*10*
**quick**  121:*17*  331:*18*
**quickest**  294:*12*
**quite**  81:*1, 7*  83:20
106:*21*  107:*1*  123:*23*
227:*4*  244:*12*  262:22
263:*3*  279:*15*  402:*19*
**quiz**  43:*9, 14*
**quorum**  380:*4, 12*
382:*13*
**quote**  330:*20*  331:*14*

**< R >**
**raise**  23:*18*  26:7
111:*6*  113:2  115:*2,*
*19*  170:*3*  184:*6*
197:*21*  210:22  325:*7,*
*16*
**raised**  67:*17*  113:*10*
116:*11*  205:*24*
247:*23*  259:*14*
274:*17*  358:*6, 11*
359:*4, 13, 19*  367:8
**raises**  38:*1, 6*
**rally**  143:*11, 16*
**ran**  88:*10*  167:*17*
**rate**  324:*18*  325:5
390:5
**reach**  103:*16*  104:*10*
296:*4*  302:*16*
**reached**  267:*12*
282:*16*  329:8  401:*6*
404:*19*
**reacted**  214:*20*
**read**  28:*11, 14*  32:*14*
42:*21*  64:5  90:*19, 21*
102:*10*  243:6  257:*14,*
*16*  376:*19*  389:*23*
**readdress**  395:*18*
**reading**  22:*23*
203:*15*  219:*13*
257:22  269:*1*  270:*9*
**ready**  163:*18*  165:*3*

**real**  66:*23*  67:*11, 15,*
*19*  68:*15*  69:5  74:*15*
315:*19*  323:2  331:*18*
390:*2, 7*
**realize**  11:*4*  243:*15*
**realized**  83:8  114:*10*
**really**  32:*14*  35:*10*
87:5  98:6  109:22
125:*1, 21*  127:*18*
164:8  167:*9*  174:*24*
190:*21*  201:*4*  233:*10*
239:*13*  270:*13*
271:22  294:*10*
305:*12*  370:*21*
**realm**  275:*19*
**rearrange**  336:*16*
**reason**  12:*3*  68:22
76:*15*  116:*17*  127:*10*
158:*1*  173:*11*  184:*24*
190:*11*  194:22  203:7
230:5  231:*24*  242:8
244:*14*  246:*6, 8*
288:*16*  289:2  300:2
323:*17*  327:*15*  353:*3*
404:*4*  415:*20, 23*
416:*10*
**reasonable**  270:*4*
312:5, *8*  314:*1*  342:*3*
352:*23*
**reassessment**  388:8
389:*13, 15, 18, 20*
390:*9*
**rebuild**  388:2, *16, 22*
403:*13*
**rebuilt**  402:*16*
403:*23*
**recall**  14:*21*  18:22
20:*18, 19*  21:*13*
29:*13*  35:*18*  43:*16*
44:*13*  51:20  54:20
63:4  64:*12*  73:7, *17*
75:*3, 4*  78:*10*  79:*8,*
*10*  80:*21*  86:*1*  87:*14*
88:*16*  97:*4*  112:*1*
115:*16*  121:5, *6*
143:8  144:*13, 17*
147:*15*  177:22  180:7
181:22  204:7  207:6
211:22  212:8  213:*11*
215:22  216:*15*  218:2

219:*17*  231:9  234:6
241:*18*  243:*4*  244:*1,*
*3*  249:*4, 9*  256:5
264:*3*  268:*11*  274:*7,*
*16*  275:*3, 18*  280:*23*
282:5, *11*  283:7, 8, *23*
284:*4*  285:5, 7
292:*15*  293:*1*  299:*10,*
*12*  311:9  329:*24*
330:2  357:*17*  359:7
375:*13*  376:6
**recalled**  277:*12*
279:*10, 12, 13*  280:*1,*
*2, 8, 10, 15*  348:*14*
**recalling**  264:*11*
**receipt**  22:*11, 18*
31:*10*
**receive**  21:*1, 8*  32:22,
*23*  36:*14*  38:8  43:*13*
59:*11*  138:8  150:*4*
402:5
**received**  13:*15*  19:2
20:*10, 16*  21:*11*
24:*15*  26:*11*  28:*10,*
*14*  29:*10*  31:*15, 18,*
*20*  33:4  38:6  42:20
43:2, *4*  58:2, *24*
60:*18*  61:*3*  94:*4*
95:*12*  138:*3*  144:*18*
150:*14*  231:5  238:*4*
255:*16*  274:*9*  311:*19*
328:*17, 23*  330:5
331:*1*  387:*16*  404:*13*
**receiving**  204:8
231:*9, 13, 16*  368:*23*
**receptionist**  357:*19,*
*20*
**receptionists**  357:*24*
**recess**  30:*15*  121:22
157:6  188:*20*  273:*16*
331:*23*
**recognize**  16:2  19:*16*
22:*3*  27:*4*  31:5  36:*3*
40:2, *4*  42:6  46:*23*
68:*11*  148:*11*  256:*17*
278:*1, 8, 18*  338:*5*
343:22  344:5  373:*5*
376:*15*
**recollection**  20:*9*
40:22  90:6  122:*9*

148:2, 22  195:20
213:16  373:13, 21
**recommend**  207:20
224:16  225:1
**recommendation**
223:13  224:19, 23
**recommendations**
55:18, 24
**recommended**  303:13
304:17  305:13
**reconsider**  360:21
**record**  7:6  15:17
30:11, 13, 16, 19
33:22  75:17, 19
121:20, 23  122:2
135:3  138:19  141:12,
14  142:11, 12  157:1,
4, 7, 10  185:14
188:16, 18, 21, 24
189:2, 6  215:16
219:22  229:14
232:20  245:18
249:15  251:2, 5
273:14, 17, 20  275:2
320:14  331:19, 21, 24
332:3  337:19  355:4
395:3, 20  396:8
418:21, 23
**recorded**  139:16, 21
142:16
**recording**  290:21, 24
291:8
**recordings**  345:16
**records**  257:19, 20
348:18
**recruiting**  403:24
**refer**  12:20, 21  13:4
104:20  128:11, 14
160:22  203:24
209:14, 17  229:16
301:12  302:22
**reference**  95:14
186:1
**referral**  302:19
**referred**  16:12  52:6
173:24  257:2
**referring**  86:4
171:17  180:20  182:5,
9  400:14

**refrain**  238:13
271:15, 21
**refresh**  20:9  40:22
148:1, 22  195:20
213:15
**refusal**  393:22
**refuse**  184:19  397:6
**refused**  276:24
386:16  416:19
417:12
**refusing**  184:11
397:24
**regard**  123:10
**regarding**  9:14
12:16  46:2  61:7
67:14, 18  100:15
102:4  112:15  115:14
120:19  121:1, 11
144:13  145:17, 18
146:3  170:4  194:14
199:21  200:17, 24
215:21  227:3  234:2
266:8  269:19  284:2
289:15  306:16
310:20  324:18
329:22  330:3  337:6
341:6, 19  346:17
347:1  352:14  358:20
359:13, 19  375:8
378:5  394:18  399:15,
21  408:17
**regardless**  197:14
347:1
**regards**  285:4
287:23  333:6
**registered**  17:12, 14
**registration**  17:21
18:11
**regular**  231:19
406:19
**regularly**  112:23
**rehash**  89:4
**relate**  117:22  217:22
**related**  55:15  93:8,
14  99:19  116:24
122:8  151:21  155:21
199:16  201:5, 17
246:15  247:24
259:13  261:3  285:12
301:6  337:3  360:23

**relates**  84:20  99:14
117:4  156:7  251:16
288:10  360:9  390:8
**relation**  157:16
**relations**  54:4
**relationship**  110:4
234:16  295:5  387:6
**relative**  261:16
**relay**  393:2
**relayed**  99:20  109:4
**release**  272:11
289:13, 14, 19, 24
302:24  303:1, 5, 6
304:15  328:20
**relevant**  142:3
**relied**  373:18  374:7,
15
**relief**  54:4
**relocating**  306:16
**remain**  8:18  414:6
418:5, 12
**remained**  197:6
202:10  221:6  398:14,
17
**remark**  246:20
**remarks**  211:23
**remember**  11:11, 17
14:6  18:21  19:1
28:3  29:16  43:19
63:9, 12  64:22  65:3
83:20  95:2, 6  98:13
99:6  105:4  130:22
145:21  147:6  155:14
156:17  159:16
177:10, 12, 15  204:12,
15, 17  216:1  218:4
219:7  257:3  272:18
276:5  282:9  284:1
290:6, 9  324:8
333:20  375:6
**remembered**  29:15
**reminded**  259:24
**reminder**  152:6
155:3
**remote**  279:13  280:3,
8, 15
**remotely**  8:9  9:23
152:22  279:1, 19
280:5, 12  281:19

**removed**  405:24
406:10
**renders**  12:4
**renew**  330:16, 17, 18
**reorganize**  328:9
**rep**  121:9
**Repeat**  11:16  58:10
60:23  71:21  85:17
97:16  123:15  135:7
266:18  293:14  320:7
341:11  371:1  415:5
**repeated**  293:6
**repeatedly**  190:18
**repeating**  124:12
**rephrase**  10:21  60:3
154:16  290:17
363:20  392:4
**replace**  164:8  407:13
**replacement**  330:22
**report**  50:8  53:8
59:17, 19  60:5, 9, 19,
20, 24  61:1, 3, 4, 8
73:22  74:6  78:4
99:3  102:4  112:22
116:21  117:6  130:19,
21  154:3  172:2
178:18  203:18  213:6,
22  221:13  222:17, 20
249:17  250:13
251:10  268:20  269:2,
17, 22  270:10  287:22
288:13  289:18, 24
301:14, 17  302:23
304:15  317:1  319:13
337:6, 9  339:7
340:12, 17  341:17, 18
343:2  351:8  353:17
369:2, 12  375:7
396:1
**reported**  53:6  79:5
218:16  318:8  339:22,
23  343:6  351:4
352:14  398:20
**REPORTER**  7:1, 16
10:4, 10  80:8
**Reporting**  7:7  13:24
14:1  98:10  117:1
352:3
**reports**  47:9, 14  67:3
290:1  311:20, 22

Case 3:21-cv-00477-MCC    Document 280-1    CONFIDENTIAL    Filed 09/20/23    Page 348 of 373

Deposition of Gary Bender Vol. I - Revised                     Jane Doe, et al. v. Schuylkill County Courthouse, et al.

313:*1*, *11*  315:*4*, *16*, *24*  316:*4*, *12*, *21*  317:*3*, *6*  319:*11*, *19*, *23*  320:*19*, *21*, *24*  323:*4*  341:*6*  347:*21*  364:*13*  384:*13*  404:*3*  405:*22*  406:*4*

**Reppy**  14:*22*  15:*1*, *3*

**represent**  7:*15*  9:*8*  44:*6*  115:*7*  149:*4*, *12*  227:*1*  278:*15*

**representation**  16:*18*

**represented**  118:*12*  394:*16*

**Republican**  17:*12*, *14*  146:*6*, *17*

**REQUEST**  6:*11*  12:*8*  14:*15*  15:*20*  16:*9*  39:*6*  85:*15*, *19*  86:*15*  88:*18*  131:*20*, *24*  153:*19*  186:*8*  206:*23*  219:*9*  220:*23*  221:*9*, *15*, *20*  222:*1*  241:*5*, *6*, *12*  259:*7*  271:*13*  276:*12*  283:*18*, *21*  302:*1*  328:*14*, *24*  329:*20*  335:*13*, *14*, *23*  336:*3*, *12*  339:*10*, *11*, *12*  371:*18*  372:*3*  375:*4*  377:*9*, *11*, *12*, *13*, *17*  383:*10*  384:*11*, *17*, *24*

**requested**  87:*15*  88:*20*  110:*9*  136:*2*  262:*13*  283:*20*  314:*20*  315:*1*  334:*24*  335:*4*  339:*16*  359:*23*  384:*16*  390:*1*

**requests**  266:*7*  372:*2*, *6*

**require**  29:*21*  286:*5*

**required**  29:*9*  56:*10*  58:*6*, *13*  60:*9*  100:*17*  113:*16*  131:*16*  200:*12*  323:*4*  358:*7*  391:*16*

**requirement**  174:*4*  201:*17*  202:*22*  382:*2*, *4*

**requirements**  380:*20*

**requirer**  323:*7*

**requires**  114:*9*  174:*5*, *14*  357:*8*

**researched**  307:*17*

**resided**  369:*1*

**residences**  133:*8*

**resign**  120:*16*  231:*14*, *18*  232:*7*, *11*  322:*12*  327:*4*, *9*

**resignation**  119:*24*  120:*2*, *6*, *8*, *12*  121:*2*, *11*  232:*3*  327:*14*  370:*11*  371:*15*

**resigned**  226:*21*  227:*21*  306:*22*  307:*1*, *2*, *6*  308:*18*  324:*4*, *12*  326:*24*  327:*16*

**resource**  58:*4*

**resources**  33:*17*, *21*  56:*14*  57:*22*  58:*16*, *22*  59:*7*, *21*, *23*  78:*4*  130:*19*  178:*19*  229:*21*  231:*6*  240:*2*  307:*9*, *14*  308:*16*  310:*14*

**respond**  98:*6*

**respondent**  398:*1*  415:*1*, *10*

**responding**  10:*16*

**response**  10:*12*  59:*1*  64:*20*  74:*6*  77:*19*  100:*11*  124:*9*  137:*24*  185:*17*  214:*7*  225:*4*, *10*  232:*9*  234:*21*, *22*  259:*7*  293:*4*  295:*7*  296:*21*  334:*21*  345:*9*  383:*18*

**responses**  10:*10*

**responsibilities**  24:*2*, *14*  25:*3*  35:*3*  41:*20*  46:*9*  55:*14*  62:*5*  119:*15*  156:*13*  161:*19*  172:*19*  193:*20*  200:*1*

**responsibility**  58:*6*, *13*  155:*4*

**responsible**  44:*19*  63:*1*, *7*, *13*  320:*19*, *20*,

*23*  385:*13*

**responsive**  375:*3*

**rest**  235:*12*  260:*3*, *20*

**restrict**  260:*8*  265:*14*  309:*18*  379:*2*

**restricted**  310:*3*

**restricting**  259:*23*  265:*11*  378:*23*

**restrictions**  332:*23*  333:*15*  334:*1*  367:*1*

**restructure**  387:*10*  388:*18*, *21*  405:*11*  408:*6*, *13*, *24*

**restructured**  49:*18*  160:*11*  202:*9*  326:*18*  349:*16*  386:*13*  391:*13*  398:*13*  399:*7*  402:*7*  413:*23*

**restructuring**  350:*1*, *2*, *7*  386:*6*  398:*23*  399:*20*  400:*7*, *21*  407:*21*, *24*  408:*3*, *17*  409:*8*  410:*1*, *6*, *14*  412:*21*  413:*4*, *10*

**result**  102:*18*  131:*17*  147:*12*  153:*11*, *19*  163:*15*  164:*1*  198:*23*  223:*12*  225:*9*  228:*9*  257:*12*, *16*  319:*18*  364:*3*

**resume**  14:*12*, *15*

**retain**  307:*14*

**retained**  298:*10*

**retaining**  296:*1*  297:*10*

**retaliation**  363:*12*

**retire**  163:*10*, *16*

**retired**  208:*7*, *10*, *13*, *14*, *16*, *21*  388:*14*

**retirement**  24:*11*  326:*4*

**retrieve**  257:*23*

**return**  104:*2*  136:*2*, *13*, *14*  137:*18*  183:*20*  279:*1*, *18*  281:*1*, *8*

**review**  32:*15*  55:*17*  57:*24*  67:*9*  196:*20*  207:*12*  250:*9*  251:*16*  269:*9*, *10*  304:*13*  320:*24*  348:*18*

373:*22*  389:*10*  390:*14*  408:*3*

**reviewed**  31:*14*  40:*12*  42:*21*  56:*11*, *13*, *14*, *19*  102:*3*, *7*  153:*13*  199:*6*  207:*5*  235:*13*, *14*  283:*20*  298:*11*  341:*6*, *17*, *21*  409:*19*

**reviewing**  304:*16*  391:*9*

**reviews**  373:*24*

**revise**  54:*20*  382:*9*

**revised**  22:*12*  28:*11*  31:*12*  40:*13*  42:*22*  54:*18*  58:*2*  68:*23*  230:*6*

**revision**  22:*22*  68:*19*  159:*6*  192:*17*

**revisions**  47:*24*

**right**  20:*3*  24:*6*  25:*22*  39:*12*  43:*8*  46:*7*  47:*6*  48:*8*  49:*14*  52:*21*  53:*21*  63:*16*  72:*6*  73:*21*  76:*23*  79:*4*  87:*13*  93:*10*  96:*4*, *24*  101:*21*  104:*23*  108:*19*  110:*8*, *15*, *23*  112:*2*  115:*22*  117:*24*  118:*20*  121:*17*  124:*19*, *22*  126:*21*  128:*9*  135:*12*  139:*24*  141:*12*  149:*8*, *10*  150:*1*  152:*16*  158:*9*, *23*  159:*4*, *15*, *20*  160:*2*, *21*  171:*1*, *6*  172:*22*  179:*11*  188:*7*, *14*  189:*1*, *2*, *6*, *9*  190:*20*  195:*11*  200:*20*  208:*17*  213:*11*  217:*2*  218:*16*  219:*12*, *19*  229:*9*, *19*  230:*16*  231:*3*, *4*, *12*  232:*13*  233:*11*, *23*  235:*1*, *16*, *22*  236:*7*, *15*  238:*17*  239:*19*  240:*14*, *24*  241:*2*, *4*, *14*  243:*3*, *24*  245:*16*, *17*  246:*8*  248:*4*

Deposition of Gary Bender Vol. I - Revised                    Jane Doe, et al. v. Schuylkill County Courthouse, et al.

255:8   256:3, 6, 15
259:10   260:12   266:5
269:8, 16, 23   270:14
271:2, 12   272:22
273:2, 22   276:6
277:3, 14   281:21
282:12   284:20
289:23   291:13   292:8
294:16   297:1   299:17
302:15   321:24   323:1,
23   324:5   325:12
326:6, 18   327:18
333:13   338:14
339:14   340:10, 16
346:14   347:13
348:24   352:7   355:15
356:22   357:18, 22
369:18   371:10
378:13   386:10
391:11   394:13   399:9
402:2   406:8
**right-hand**   357:15
**RIGHTS**   2:7   41:19
**righty**   173:2
**risk**   286:12
**Road**   3:2   380:8
410:22   411:8
**role**   23:9   35:12
38:21   49:8, 22   50:4
51:12   53:1   110:12
154:14   159:22   160:2,
7   161:1   162:4
170:19   171:3, 12
172:1   189:24   192:24
194:21, 24   195:11
196:9   197:18, 23
198:14, 21   199:13
201:1, 18, 23   307:7
310:19   321:10
**roles**   74:2, 3   208:21
**Room**   2:9   9:22   19:4
134:14, 24   166:12
240:24   241:2   253:15
340:19   412:23
**rooms**   19:5
**Roth**   2:19   3:9   8:13
130:13   175:2   205:21,
23   206:3, 12   215:3,
20   216:3   223:10
225:22   228:13, 20

237:10   240:8   255:18
260:18, 19   262:12, 24
263:12, 21, 23   264:12
265:10   267:3, 18
284:6, 21   286:24
301:22   321:9   373:19
388:17   408:20, 23
409:5
**roughly**   52:14   94:23
162:12   200:15   244:7
257:7   351:17
**routine**   310:5
**RPR**   1:23   419:4, 22
**rubber**   212:21, 22
214:10   216:9, 20
**rude**   109:23
**ruffle**   125:17
**rule**   191:18
**ruling**   205:1, 6
**rumor**   126:14, 16, 23
130:18   131:11, 14
138:23   139:8   177:15
**rumored**   177:14, 16
180:12
**rumors**   70:12, 19
123:13, 16, 19, 21
124:3, 15, 24   125:9
126:4   177:8   181:14,
15   210:19
**run**   87:3   88:8, 13, 16
414:7
**running**   249:1

**< S >**
**sad**   295:16
**safe**   102:19   103:19
104:11   247:6   297:16
298:16   309:10
**salary**   26:15, 16, 17
36:16, 17, 23   37:17,
20, 21   225:20   226:17
**sales**   154:13
**sanction**   305:17
**Sandusky**   211:2, 4
**sat**   168:23   259:16
260:16
**satisfied**   295:21
309:12

**Saturday**   144:24
237:17   296:7, 11, 16
373:20
**save**   346:2, 3
**saved**   346:7, 19
347:1
**saw**   101:7   138:21
224:22   257:3   354:11
375:7   387:13
**saying**   81:4   101:13
102:16   107:19
123:24   124:7   147:21
175:18   180:15, 16, 21
181:4, 5, 13   208:13
219:7   275:19   280:24
282:7   288:23   311:20
328:23   394:10
395:22   399:10
404:14
**says**   28:9   54:9   96:7
108:2   149:5   165:5
177:7   178:3, 4
196:12, 14, 19   201:9
220:22   221:14   231:5
232:16   233:3   253:6,
13   255:14   268:22
280:4, 19   340:24
344:10   376:23   390:3
394:5, 7
**SC**   4:20, 24   5:4
46:15   232:23
**SC1162**   230:18
**SC1217**   198:3
**SC1217-1218**   198:6
**SC1221**   158:11
**SC1221-1222**   158:13
**SC-2**   46:11
**SC467**   327:7
**Scarbinsky**   25:17, 20
26:1   35:2   186:20
187:8   204:24   205:7
206:8, 11, 17   339:23
**schedules**   336:17
**school**   152:17   248:3
**schools**   152:20   153:4
**SCHUYLKILL**   1:3
7:11   8:5   9:9   13:5, 9
29:6   152:18   389:21
402:22

**scolded**   190:18
**Scott**   129:16   392:21
**screen**   30:21   42:16
43:9   107:7, 15   118:4
149:13   198:4   229:10
250:22   251:10   256:7,
9, 12   314:24   315:2
372:20   376:8
**script-type**   10:7
**scroll**   110:6   256:15
278:3, 12   377:24
**search**   307:11
**season**   87:11   152:1
**seated**   365:21
**second**   42:14   118:8
149:5   157:2   159:5
170:22   173:8   192:16
198:7   213:12
218:24   224:5   232:14,
15   237:6   242:3
244:19   256:16
326:10   344:10
**seconds**   30:9   394:6
**secret**   78:2
**secretaires**   212:21
**secretary**   74:11
**secure**   136:3   297:16
298:16   309:10   312:7
**security**   126:19
286:20
**see**   16:5   40:19
42:11   47:10, 17
48:11, 16   54:1, 7
55:20   57:16   59:2
84:11   100:24   101:3
107:1   108:1   109:12
118:10   135:19, 21
141:24   142:17   144:1
149:18   153:14
155:16   172:2   173:9,
22   179:24   192:8
230:19   231:7   233:6,
18   234:12   239:14
246:18   250:22
253:21   256:4   287:17
288:23   291:14   338:2,
12, 18   340:21   341:3
343:23   344:3, 15
346:1   354:15   371:23

Deposition of Gary Bender Vol. I - Revised                    Jane Doe, et al. v. Schuylkill County Courthouse, et al.

376:23

**seeing** 155:14 257:12
**seek** 329:5
**seen** 52:6 148:13
256:21 274:18
367:22
**seize** 258:1
**selected** 194:6 310:10
**selection** 166:23
**selling** 66:1
**send** 33:1 57:4, 23
93:5 117:17 290:13
328:11 379:18
**sending** 252:6 280:23
**senior** 153:22
**seniority** 113:21
**sense** 167:19 196:22
248:1 312:20 403:1
**sensitive** 227:10
**sent** 99:21 144:10
224:7 257:18 280:22
313:5 387:11
**sentence** 82:20
149:14 220:22
221:13 232:15
233:14
**sentences** 340:23, 24
**separate** 354:18, 20
355:2
**separated** 349:12
418:13
**separately** 358:9
**separation** 410:2
**September** 24:18
25:15 28:12 39:11,
15 65:10 69:9
176:22 191:12
193:13 226:22 227:2
306:23 307:2
**serious** 234:13
237:12 295:3
**serve** 143:23
**service** 63:2
**services** 56:14
153:22 228:4 286:15
307:15 355:12, 13, 17,
21 357:7
**session** 409:13, 18
413:9

**set** 237:3, 22, 23
255:7 403:12
**severe** 305:17
**sex** 70:9, 13, 16, 19
102:1, 16 123:14, 18,
22 124:4 126:5
127:1, 7 186:2, 5
210:20
**sexual** 22:12 27:11,
15, 24 28:11, 24
29:11 31:11, 24
32:19, 23 34:3 40:12,
17 41:11 44:11 55:2
58:8, 14 59:4, 16
60:9, 19 61:2 126:10
182:10 183:6 209:10,
11 210:22 234:2, 16
237:13 255:17 295:4
**share** 109:19 355:5
**shared** 266:24
**sharing** 142:7 256:7,
8
**Sharon** 357:20
360:3, 11
**shed** 211:11
**sheriff** 116:15
117:11 126:17
285:18 290:21
333:15, 17, 24 345:2,
24 347:5 358:7, 12
365:1 366:4 367:2
368:11
**sheriffs** 117:5, 17
144:10 333:18
**sheriff's** 345:17, 19
**Shlanta** 72:4, 8, 10,
12 73:22 74:8 76:18
**S-H-L-A-N-T-A** 72:10
**Shlanta's** 79:6
**shocking** 242:18
**shortly** 17:8 96:1
254:1 289:11 308:17
367:6
**shot** 135:21 169:1
241:17
**show** 90:9 95:19
96:8, 12, 18, 24
195:14, 19 352:5
394:3

**showed** 90:12 95:6,
20 96:18, 21
**shown** 99:20
**shows** 95:4
**shredded** 144:20
145:3 246:16
**shut** 71:18, 23 72:3
81:21
**shutting** 72:2
**sick** 348:20, 22
**side** 167:17 210:3
304:4 357:15 383:5
**sign** 32:13 33:1
326:10 329:4, 10
377:1
**signature** 20:6 22:6
27:7 31:8 40:9 42:9,
18 338:7, 11, 20
376:19, 21 377:2
**signatures** 58:19
86:16, 19 87:16 88:4,
8, 12, 17 132:1 186:9
206:24 218:1 220:5
222:10
**signed** 23:1 27:10
28:10 29:20 31:10
32:8, 13 40:11 321:4
331:14
**significant** 318:8, 17,
20
**silly** 182:22
**similar** 62:9 195:10
198:21 216:3 310:15
343:2 379:9, 18
**similarities** 167:10
**similarly** 62:7
198:20 417:12
**simple** 246:23 247:1
**simply** 144:24
145:21 151:16 168:4
246:20
**Sing** 104:16, 17
**singing** 104:14
**single** 105:17
**sit** 146:8 176:14
228:13 341:16
**sits** 357:19
**sitting** 147:20
234:24 262:21 308:9
**situated** 140:11

**situation** 248:15
263:17 371:10
418:19
**situations** 248:10
**six** 54:5 114:10
241:24 242:7 246:4
330:17 331:16
**sixth** 253:6, 10
**Sky** 330:6 331:4, 7
**sleeping** 123:17, 21
**slightly** 64:14
**slip** 292:10
**smartest** 211:11
**SMITH** 2:2 4:6
7:18 8:14, 21 9:6, 7
14:14, 17 15:13, 24
19:7, 15, 23 21:3, 7,
19 22:2 26:20 27:3
29:19 30:2, 10, 20, 22
35:20 36:2 37:4, 10
38:1 39:17 40:1
41:22 42:5, 15 45:16,
17 46:10, 18 49:13
50:11 51:16 53:9, 20
58:11 60:4, 7, 16
67:21 68:5 70:7
74:18, 22 75:5, 22
76:2 79:16 80:13
82:23, 24 88:1 91:21
92:1 93:7, 18 96:22
97:18 98:3 104:19
106:6, 9, 21 107:5, 14,
21 108:6 111:19, 21
113:1, 13 115:22
116:3, 8 119:5 120:3,
5 121:16 122:3
129:7, 23 130:4
134:8 136:9, 12, 20
137:8, 12, 22 139:5,
13 141:5, 11, 21, 24
142:4, 10, 18, 19
143:17 148:3, 10, 16
151:10, 12 153:7
155:3, 22 156:6
157:1, 11 158:9, 16,
19 162:1 164:13
166:2, 8, 13, 16, 17
170:6, 16 172:7, 22
173:2, 3 174:12
175:10 176:5, 7

Case 3:21-cv-00477-MCC   Document 280-1   Filed 09/20/23   Page 351 of 373
CONFIDENTIAL
Deposition of Gary Bender Vol. I - Revised                    Jane Doe, et al. v. Schuylkill County Courthouse, et al.

188:*14*  189:*1, 8*
190:*2l*  191:22  192:7
194:*10, 12*  195:*2l*
196:*1, 15*  198:*1, 9*
201:*3*  205:*15*  208:*12*
211:*17, 19*  212:*16*
215:*14*  218:20, *23*
229:*13, 18*  232:*18*
233:*2*  239:*13*  244:*20*
245:*1, 5, 15*  246:7
247:8  248:*1*  250:*1,*
*20*  251:8  252:*11*
253:*1, 8*  254:*18*
255:*1*  256:6, *10, 13*
261:*4, 6, 19*  262:*20*
263:*14*  264:20, *22*
265:7  266:*11*  270:*4*
273:*4, 12, 21*  275:*10,*
*23*  276:*23*  277:*15, 23*
278:7, *11, 14*  284:*23*
288:20, *22*  289:*9*
290:*14*  291:7, *20*
293:*15, 23*  294:*15*
295:*10*  299:*12*
300:*14*  301:*10*
302:*14*  303:*19*
304:22  305:2, *14, 23*
306:*14*  314:*10*
316:*18*  317:4, *12*
318:*15*  319:*16*  320:8
324:*24*  327:*5, 10, 17*
331:*17*  332:*4*  334:6
337:*10, 16*  338:*3*
340:2, *9*  341:*12, 13,*
*15*  342:*10, 18*  343:*14,*
*21*  344:2, *4*  345:*12,*
*14*  346:*13*  356:6
357:*1, 4*  362:*3*
363:*17, 24*  364:*9, 18*
366:*11*  367:*20*
368:*12*  369:*13*
370:22  371:2, *12*
372:*1, 13, 19, 23*
375:2, *5*  376:7, *10*
377:*24*  378:2  384:*21*
387:*4*  388:*23*  392:*4,*
*6, 17*  393:6, *13*  394:*8,*
*12*  395:*1, 10, 11, 16*
396:*4, 11, 13, 23*
397:*4, 12*  398:8

402:*11*  412:*13*
413:*17*  414:*14*  415:*6,*
*16, 21*  416:5, *16*
*417:8, 19*  418:2, *20*
**smooth**  228:*21*
**snapped**  212:22
**social**  157:22  243:*19*
**solicited**  331:*13*
**soliciting**  164:*14*
**solicitor**  60:*15*  240:*1*
*390:12*
**Solicitor/risk**  255:*18*
**somebody**  99:*23*
*175:19*  248:4  404:*17*
*406:14*
**someone's**  339:*10, 11*
**somewhat**  208:*1*
*356:16*
**Sorry**  19:22  29:*23*
*39:9*  42:*13*  58:9
*73:11*  74:*17, 20*  75:*1*
*77:8, 24*  78:*23*  79:*14*
*81:12*  82:8  91:2
*93:19*  94:*15*  97:*16*
*106:8, 16*  107:*14*
*115:19*  119:7  128:8
*129:12*  130:*15*
*141:11*  146:*15*
*157:13*  166:3, *11, 15*
*168:10*  185:5  188:*4*
*190:15*  193:4  197:2
*203:6*  208:*12, 15*
*218:11*  230:*1*  232:*19*
*246:13*  247:*23*
*251:17*  264:*3*  265:*21*
*270:15, 16*  280:*19*
*283:9, 19*  294:*16*
*301:19*  320:6  325:*21*
*337:8*  343:22  346:*16*
*360:17*  362:*21*
*365:11, 21*  368:*21*
*384:19*  385:8  398:6
*403:11*  407:7  408:*1*
**sort**  33:22  66:*3*
*100:18*  112:*23*
*116:13*  126:*10*
*143:16, 18*  152:*1*
*183:6*
**sound**  149:8  369:*18*

**sounds**  112:*1*  121:*18*
*187:4*
**space**  357:*11*  361:6
**spaces**  186:*12*  268:2
**speak**  64:*21*  82:*3*
*99:15*  122:*15*  142:*12*
*145:4*  221:*1*  231:*17*
*236:5, 9, 17*  238:*18*
*255:23*  282:*21*  283:*1*
*287:14*  294:20, *23*
*332:15*  334:*16*  345:*4*
*348:15*  351:*11, 18*
*367:21*  368:*14*
**speaker**  134:22
**speaking**  184:*24*
*266:20*  271:*14*  285:9
**speaks**  236:*16*
**special**  154:*1*
**SPECIALIST**  3:6
**specific**  12:*20*  46:*21*
*68:8*  153:*10*  182:*1, 6*
*212:1*
**specifically**  21:*13*
*63:4*  97:*20*  152:*13*
*153:4*  154:*12*  184:*21*
*195:15*  247:*24*
*320:20*  335:*4*  336:*13*
*347:18*  376:6  380:*19*
**speculate**  11:*13, 19*
**speculative**  370:*21*
**spoke**  99:*17*  117:*13*
*129:19*  130:*24*  131:7
*145:16*  166:*3*  238:*20*
*239:16*  254:5, *6, 7*
*255:24*  267:*11*
*282:14*  292:*19*  332:*9,*
*13, 22*  361:*3*
**spoken**  9:*13*  254:22
*267:4*  345:6
**spot**  186:*19, 20*
*187:14, 21, 24*  188:*1,*
*8*  261:8  262:*4, 19, 21*
*263:1*  272:24  276:8
*286:4, 7*
**spots**  187:2, *13*
*266:16*  275:7, *8, 21*
*282:8*  360:*4*
**St**  2:*9*
**stack**  15:*15*  19:7
*21:20*  26:*21*  30:*3*

35:*20*  37:5  39:*18*
*41:24*  46:*12*  67:*23*
*107:6, 21*  158:*17*
*170:7*  191:*24*  198:2
*230:18*  277:*16*
*343:16*
**staff**  39:2  334:*9*
*403:17, 24*  404:*1*
*418:14*
**stamp**  31:*1*  43:*9*
*57:12*  231:*4*  338:*14*
**Stamped**  4:*11, 12, 13,*
*14, 15, 16, 17, 18, 19,*
*21, 22, 23*  5:*1, 2, 3, 5,*
*6, 7*  15:*15*  16:20
*19:12*  21:*23*  26:*24*
*30:5*  35:*23*  37:7
*39:22*  42:2, *17*  68:2
*107:11, 22*  148:7
*170:11*  192:4  277:*20*
*327:6*  337:*21, 23*
*343:18*
**Stan**  137:*10, 15*
*138:3, 7, 10, 13*
**stand**  219:*3*
**standing**  7:2
**Stanley**  258:*9*
**stapled**  19:8  46:*12*
*67:24*  148:*4*
**start**  20:*11*  62:*17*
*91:22, 23*  135:*9*
*163:17*  180:*16*  181:8
*277:24*  354:*21*  357:6
*358:21, 23*  389:8
*407:3*
**started**  15:*10*  17:*8,*
*15*  18:*18*  20:*12*
*52:14*  65:*12*  104:*9*
*141:13*  150:*19*
*151:14*  186:*18*
*192:24*  226:*18*
*227:20*  237:*3*  310:8,
*24*  337:*19*  353:*11*
*391:1*
**starting**  37:*19*  165:*3*
**starts**  255:*13*
**State**  28:*1, 4*  29:*3, 6*
*32:11*  33:*12*  82:*10*
*209:6*  210:*3*  211:*11*
*311:19*  313:4, *5*

Case 3:21-cv-00477-MCC   Document 280-1   Filed 09/20/23   Page 352 of 373
CONFIDENTIAL

Deposition of Gary Bender Vol. I - Revised                    Jane Doe, et al. v. Schuylkill County Courthouse, et al.

316:1  321:2, 7
322:15, 19  354:9, 10
384:13
stated  45:23  145:11
387:12, 18
statement  94:3
182:22  243:22  337:5
statements  131:14
STATES  1:2  8:1, 3
31:13, 14  47:5, 9, 16
48:13  54:3  57:15
58:24  108:9  149:1,
14  173:19  221:5
279:17  378:14  390:1
state's  317:7
stating  144:19
328:11
status  280:9, 10, 16
352:21  353:5, 11
407:21
statute  174:5, 14
statutorily  50:20
statutory  382:1
stay  110:18  152:3
271:4  418:17
stayed  296:17  319:20
STEB  311:20, 22
313:1, 11  315:4, 16,
24  316:4, 12, 21
317:6  318:10  319:11,
19, 23  320:19, 21, 24
323:3  404:3  405:22
406:4
steep  291:24
stenographic  419:6
step  370:1, 15, 19
371:4, 19  372:14
stepped  220:17
319:4  369:15
steps  257:23  258:3,
16  259:17, 22  284:7
Stevens  228:5
stint  36:14  160:23
199:19
stipulations  8:15, 21
stop  242:3  387:11
388:6, 9
stopped  90:7, 8
160:12  234:11

stories  117:10
story  304:4
Stottlemyer  25:17, 20
34:22  163:2  168:6, 9
185:3  217:6  382:16,
19  383:8  418:4, 7
Stottlemyer's  383:10
Street  1:20  2:3, 13,
18, 22  7:9
stress  109:8
Strike  106:8  112:6
129:21  140:8  145:8
201:16  257:13
289:13  310:7  317:21
321:20  335:2  350:17
354:7  358:4, 8, 18
361:11  385:3  390:19
strongly  362:10
Stroudsburg  2:14
struggle  405:13
struggled  63:24
stuck  80:20
stuff  238:6
submit  55:17, 23
100:18  131:16
302:13  321:7  405:4
submits  320:24  321:2
submitted  56:12
224:9  313:3  317:7
329:17, 20  340:13
submitting  405:22
subordinate  91:17
92:3
subpoena  55:7
subsequent  37:18
87:3  189:22  282:18
286:22  325:6  333:5
352:18
substance  11:23
success  114:10  168:3
succession  403:8
suffered  233:16
sufficient  300:18
314:9, 12  362:13
suggest  199:10
268:2  344:19
suggested  252:2
344:11
suggestion  241:12

276:21  386:23
Suite  2:3, 22  3:2
summary  48:10
303:4
summertime  272:8
supervised  67:4
240:15
supervisor  49:8  50:3
51:12  52:24  53:5, 11,
13, 15  63:18  73:23
74:7  153:9  319:1
321:5  347:20  350:7
363:4  384:11  385:20
398:21  399:1
supervisors  319:5
347:24  348:7  352:10,
13
supplement  11:7
supplied  314:3
supplies  314:3
supply  212:21
support  143:18
371:18  372:2, 5
supporter  84:9
suppose  20:11  21:10
342:17
supposed  32:4
238:23  303:23  319:1
Sure  17:24  18:20
23:19  27:20  29:13
43:17  60:2  77:18
82:23  95:24  97:24
106:21  107:1  125:2
137:13  138:6  142:3
144:21  163:5  164:13
166:14  175:16  176:8,
16  178:23  181:3
183:9  185:9  186:21
187:17  219:21
249:15  253:16
258:10, 18  267:6
273:12  275:2  294:13
295:19  298:15
341:13  381:4  389:6
406:21
suspect  65:17
suspended  404:21
suspension  400:3
sustained  294:18

swear  7:17
swipe  358:7  359:5
switch  17:17
sworn  9:2
synopsis  250:4

< T >
table  75:16  357:14
take  10:4  12:10
19:18  23:16  24:13
32:12  35:3, 12  38:21
44:11  46:20  94:7
96:11  101:1  106:20
111:19  114:3  120:3
121:16  144:2  147:21
151:10  152:3  169:4
176:5  194:10  201:23
218:18  220:12  243:1
244:7  257:23  258:3
259:17, 22  261:4
262:3  268:4  273:11
298:1  301:5, 13
305:7  327:3  331:17
332:10, 14  333:5
341:14  345:12
349:11  368:20
383:20  387:17
taken  1:19  40:17
58:14  99:13  144:6
235:24  237:8  258:24
419:7
talk  69:7  81:10
94:19  99:18  109:13,
23  113:14  129:19
134:21  137:2  162:11
184:11, 15, 19  188:12
199:12  203:13
207:23  222:23
237:18  259:23
260:22  281:23
282:15  333:1  347:5
348:11  386:5  387:9
408:5  411:18  413:16
talked  26:1  38:23
81:7  84:5  109:3
162:8  168:24  191:17
195:4  214:15  246:17
259:17, 18  294:4
332:7  333:14, 16
348:2  388:16

**talking** 36:7 45:*20*
64:*4* 77:*20* 94:*10, 13,*
*17* 166:*12* 175:*15*
184:*12, 18* 186:*13*
281:*3* 282:*6* 387:*9*
413:*11*
**talks** 149:*21* 379:*12*
**tasks** 314:*9, 12*
**tax** 48:*18, 21, 23*
49:*4, 8, 17, 18, 19*
50:*4, 8, 13, 16* 51:*17*
52:*3, 4* 53:*12* 61:*12*
62:*1, 10* 66:*23* 83:*19*
106:*18* 108:*21* 154:*7,*
*9, 12, 20, 24* 155:*12,*
*15, 17* 156:*9, 14, 19*
158:*4, 7* 159:*1, 10, 11,*
*17, 22* 160:*6, 13, 24*
162:*3, 14, 15* 165:*6*
169:*2* 170:*20* 171:*24*
175:*15, 16* 183:*24*
184:*4* 189:*15, 18, 23*
191:*4, 8, 13, 18* 192:*1,*
*1, 12, 22* 193:*24* 194:*5*
196:*8* 198:*14* 202:*11,*
*15* 211:*7* 298:*20*
299:*5* 313:*5* 320:*3, 4,*
*9, 10, 12, 14* 321:*13*
323:*20* 330:*19, 23*
361:*15* 375:*11, 17, 22*
386:*6* 388:*22* 390:*2,*
*7* 398:*17* 399:*16*
402:*13, 14, 15, 19, 21*
403:*2* 407:*9* 410:*6*
**team** 234:*22* 235:*6*
362:*8* 404:*16*
**tears** 109:*1*
**technical** 157:*7*
**TECHNICIAN** 42:*13*
166:*6* 250:*16* 256:*8*
**technological** 379:*14,*
*20*
**telephone** 135:*3*
138:*19* 141:*16*
**telephonic** 380:*1*
**telephonically** 141:*18*
380:*16*
**tell** 14:*6* 18:*14* 41:*3*
61:*11* 70:*8, 15, 18*
71:*3, 5, 6, 8, 11* 76:*11*

80:*19* 81:*3* 85:*4, 23*
95:*11* 98:*17, 23*
100:*5* 109:*15* 122:*23*
123:*1, 4, 20* 125:*12,*
*20* 128:*18* 140:*22*
144:*5* 145:*6, 9*
174:*23* 185:*24* 193:*8*
204:*17* 205:*23*
212:*18* 221:*20*
223:*22* 232:*6* 237:*1*
239:*5* 241:*23* 251:*22*
252:*13* 256:*10* 263:*9*
266:*6* 268:*21* 295:*10*
345:*23* 351:*1, 4*
357:*3* 373:*11* 395:*12*
396:*15, 24* 408:*23*
**telling** 143:*8* 206:*18*
218:*2* 242:*11, 15*
248:*24* 274:*8*
**tells** 235:*19*
**ten** 151:*4* 232:*17*
233:*3*
**term** 81:*2*
**terminate** 407:*17*
410:*4* 411:*10*
**terminated** 119:*22*
303:*3, 13* 304:*17*
384:*8* 386:*3* 407:*16*
411:*20*
**termination** 303:*10*
304:*24* 305:*13, 17*
407:*22* 408:*5* 409:*23*
410:*18, 24* 411:*1, 14,*
*24* 412:*5* 413:*4, 10,*
*12, 16, 20*
**terms** 84:*6* 286:*7*
**test** 150:*23*
**tested** 113:*4* 150:*24*
151:*3*
**testified** 9:*2* 76:*4*
106:*10* 122:*6* 168:*8*
180:*2* 207:*4* 215:*2*
216:*14* 242:*22*
264:*20* 270:*18*
282:*14* 308:*15*
333:*14* 342:*20*
351:*23* 353:*2, 6*
365:*6* 389:*6* 410:*17*

**testify** 9:*19* 11:*24*
252:*15* 265:*8, 10*
363:*18*
**testifying** 9:*24* 12:*4*
176:*9*
**testimony** 9:*23* 10:*6*
28:*21* 122:*10* 127:*4*
138:*18* 163:*5, 15*
165:*4* 187:*4* 190:*17*
245:*6* 261:*2* 264:*24*
283:*21* 311:*6* 329:*16,*
*19* 333:*20* 347:*15*
351:*17* 390:*13*
401:*17* 404:*22*
**text** 92:*21* 93:*12*
94:*4* 95:*4, 7, 20*
98:*13, 21, 24* 99:*19,*
*21, 23* 100:*7* 177:*10*
**texted** 91:*9* 94:*23*
133:*13*
**texting** 100:*2*
**Thank** 28:*7* 30:*1, 21*
56:*8* 155:*10* 176:*6*
185:*15* 191:*1* 211:*18*
213:*20* 216:*12*
245:*10, 11, 14* 246:*6*
254:*23, 24* 261:*5*
278:*6* 283:*6* 297:*23*
344:*3* 345:*13* 388:*7*
**thanks** 128:*23*
256:*11* 385:*8*
**theirs** 331:*16*
**thereabouts** 162:*12*
**thereof** 399:*22*
**thereto** 217:*23* 301:*6*
**the's** 220:*17*
**thing** 77:*17* 102:*1,*
*16* 107:*7* 185:*6, 7, 11,*
*12* 195:*2* 267:*10*
288:*24* 297:*2* 315:*20*
332:*22* 377:*15* 408:*6*
**things** 33:*2* 54:*5*
56:*23* 64:*5, 6* 66:*2,*
*16* 180:*10* 186:*15*
243:*8* 248:*4, 6*
269:*21, 22* 276:*20*
282:*13* 286:*6* 287:*18*
311:*18* 332:*6* 374:*4,*
*7* 389:*6* 406:*3, 9*

**think** 10:*20* 12:*3*
15:*5, 11* 16:*9* 20:*13*
27:*21* 29:*19* 32:*12,*
*22* 33:*14* 35:*9* 39:*2,*
*3* 43:*16* 48:*7* 50:*7*
51:*22* 54:*18* 55:*4*
58:*3* 61:*15* 62:*19, 24*
64:*24* 66:*14, 15, 18*
73:*1, 2* 75:*21* 76:*11,*
*13* 78:*11* 83:*3, 19*
84:*10, 17* 91:*24* 92:*3,*
*10, 19* 94:*2, 12* 97:*12*
98:*15* 99:*22* 100:*16*
101:*5* 102:*10* 105:*13*
106:*10* 109:*8, 15*
110:*6* 114:*14* 116:*11*
121:*9* 124:*11* 126:*7*
127:*2* 135:*16* 138:*5*
147:*6* 148:*13* 149:*3*
151:*4* 152:*5, 7*
157:*18, 24* 160:*11*
163:*14* 165:*5* 166:*5*
167:*16, 19* 168:*8, 13*
169:*13* 171:*5* 174:*10*
180:*2, 14* 181:*16*
182:*18* 183:*3, 4, 9, 11*
184:*13* 190:*7* 191:*11*
195:*13* 198:*1* 201:*15*
205:*12* 208:*4, 6, 8*
210:*6* 214:*9, 14, 17,*
*18* 216:*22* 222:*4*
223:*24* 230:*17* 232:*3,*
*6, 19* 234:*8, 9* 242:*21*
248:*3* 249:*19* 250:*13,*
*24* 253:*16* 257:*9*
258:*23* 260:*16* 263:*3,*
*4, 6, 7* 264:*20* 265:*2,*
*17* 268:*19* 270:*18*
272:*1, 7* 274:*3*
276:*19* 284:*23*
285:*23, 24* 286:*7, 16*
289:*3, 11, 12* 294:*4, 5*
296:*4* 299:*1, 4*
302:*23* 305:*21*
306:*22* 307:*1* 308:*6,*
*11, 19* 309:*12* 310:*13*
321:*14* 326:*4* 330:*6*
335:*14* 340:*23* 346:*3*
347:*8, 16* 350:*23*
355:*10, 18, 19* 356:*14,*

Case 3:21-cv-00477-MCC    Document 280-1 CONFIDENTIAL Filed 09/20/23   Page 354 of 373

Deposition of Gary Bender Vol. I - Revised                    Jane Doe, et al. v. Schuylkill County Courthouse, et al.

*16*, 22, *23* 357:*14*, *21*
360:*13* 362:*13*, *22*
363:*16* 365:*9* 366:*18*
368:*10* 369:*2* 372:*18*
375:*24* 377:*6*, *13*
379:*5* 385:*19* 393:*3*,
*13* 394:*1* 400:*8*
402:*1* 403:*3* 404:*18*
405:*6* 410:*21* 417:*5*,
*9* 418:*20*
**thinking** 97:*2* 181:*8*
183:*9*, *10* 218:*5*
370:*24*
**thinks** 174:*23*
**third** 22:*17* 48:*13*
232:*16*
**third-party** 296:*1*
297:*10* 298:*10*
**thought** 14:*2* 20:*12*
38:*23* 39:*4* 70:*9*
76:*3*, *4*, *10* 85:*24*
89:*18* 98:*18* 99:*1*
100:*4* 105:*14*, *22*
109:*20* 110:*3* 132:*9*,
*19* 137:*1* 166:*8*
167:*13* 182:*21* 183:*2*
194:*20* 208:*13*
214:*12*, *22* 226:*1*
227:*5*, *14* 231:*22*, *24*
232:*10* 244:*22*
245:*12* 246:*18*
261:*22* 263:*9* 267:*8*
286:*10* 290:*18*
295:*11* 326:*11*
329:*11* 331:*3* 338:*19*
351:*23* 388:*19*
401:*23* 403:*14* 404:*4*
410:*17*
**thoughts** 293:*16*
298:*12*
**threat** 286:*17*
**threaten** 85:*8*, *11*
141:*8*
**threatened** 142:*22*
**three** 15:*10*, *12* 72:*4*
74:*14* 75:*20* 76:*3*, *8*
78:*15* 80:*1* 82:*1*
149:*20* 201:*10*
202:*22* 226:*9* 230:*2*
235:*14* 253:*5* 260:*18*,

*24* 322:*8* 369:*24*
373:*13*
**three-year** 37:*23*
**throws** 389:*19*
**Tiffany** 210:*7* 299:*1*
321:*14*, *17*
**tight** 212:*23*
**time** 7:*8*, *14* 12:*7*
16:*5* 18:*1* 21:*9*
25:*13*, *18* 29:*17*
30:*12*, *18* 33:*2* 35:*7*,
*8* 38:*12*, *15* 39:*3*
43:*4* 45:*21* 48:*6*
49:*15* 52:*12*, *15*
54:*16* 63:*18* 64:*13*
66:*24* 69:*4*, *8*, *10*, *23*
73:*5* 75:*4* 78:*7*
79:*15*, *22* 81:*24*
84:*10*, *11* 87:*11*
89:*23*, *24* 90:*1* 95:*22*
96:*19* 98:*2* 99:*7*
101:*5*, *7*, *8* 103:*21*
104:*7* 105:*2*, *16*, *20*
106:*22* 108:*24* 109:*7*,
*17* 110:*13* 113:*7*
114:*18*, *21* 115:*15*, *17*
116:*21* 117:*7* 118:*21*
119:*6*, *12*, *14* 121:*19*
122:*1*, *5* 125:*1* 140:*4*
144:*9* 147:*23* 150:*5*
151:*2*, *8* 154:*23*
156:*11* 157:*3*, *9*
160:*5*, *24* 161:*5*, *10*,
*16* 162:*17* 163:*22*
167:*15* 175:*13*
176:*10*, *22* 184:*14*
186:*19* 187:*24*
188:*12*, *17*, *23* 191:*10*
192:*23* 193:*3*, *12*, *17*
197:*11*, *15* 199:*14*, *19*,
*23* 200:*9*, *15*, *21*
209:*1* 216:*15* 219:*8*,
*16* 220:*9*, *17* 222:*7*,
*15* 247:*11*, *13* 257:*8*
258:*18* 262:*6*, *10*
265:*21* 266:*13*, *14*
268:*13* 272:*10*, *16*
273:*6*, *13*, *19* 279:*9*
282:*7*, *10* 284:*19*, *23*
286:*13* 289:*23*

298:*24* 299:*2*, *9*, *15*,
*23* 307:*22* 309:*7*
312:*17* 313:*22* 319:*5*
322:*21* 323:*21* 328:*1*,
*12* 329:*9* 330:*8*
331:*8*, *20* 332:*2*
334:*15* 340:*19* 346:*4*,
*20* 348:*18* 349:*2*, *6*,
*14*, *24* 350:*2* 354:*14*
365:*12* 366:*1* 367:*4*
368:*21* 380:*19* 388:*5*,
*20* 390:*24* 394:*6*
396:*11* 397:*17* 400:*6*
405:*5* 413:*22* 418:*20*,
*22*
**timely** 316:*1* 406:*22*
**times** 45:*7* 75:*20*
76:*8* 78:*15* 79:*20*
80:*2* 81:*13* 89:*5*, *9*
155:*11*, *16* 215:*17*
342:*20* 343:*1* 362:*1*
405:*18*
**timing** 363:*10*
**title** 38:*9* 52:*18*
63:*10* 174:*5*
**titles** 52:*8* 323:*7*
**Tobin** 285:*23* 290:*20*
344:*13* 345:*1*, *6*
**Tobin's** 345:*9*
**today** 7:*7* 12:*1*, *5*
146:*8* 299:*11* 341:*5*,
*16*, *17* 342:*19* 381:*5*,
*6*, *7* 387:*15*
**today's** 15:*14* 21:*21*
26:*21* 30:*24* 35:*21*
46:*13* 106:*7* 107:*9*,
*22* 148:*5* 158:*18*
170:*9* 191:*23* 277:*18*
343:*15*
**told** 65:*12* 72:*4*
77:*4* 130:*17* 137:*3*
138:*20* 143:*6* 164:*2*
165:*10* 195:*2* 204:*23*
214:*4*, *6* 220:*8* 221:*9*,
*14* 236:*4* 237:*11*, *16*,
*19* 239:*8* 242:*5*
274:*13* 275:*4*, *13*
295:*2*, *21* 297:*6*
325:*15*, *16*, *18* 330:*7*
334:*8*, *15*, *20* 361:*24*

365:*24* 372:*16*
375:*16*, *19* 376:*4*
381:*5* 386:*18*, *21*, *22*
393:*7* 412:*14*
**Tom** 24:*11*
**tomorrow** 395:*19*
**tonight** 98:*15*, *21*
99:*21* 100:*3*
**Tony** 388:*14* 399:*6*
408:*23* 409:*2*
**tool** 211:*11*
**top** 16:*23* 19:*21*
32:*14* 48:*10* 54:*21*
55:*10* 57:*11* 78:*2*
196:*12*, *14* 253:*6*
316:*8* 338:*11* 365:*23*
**topic** 271:*19* 411:*16*,
*19*
**topics** 177:*4*
**Toshiba** 330:*12*
331:*6*
**Toshibas** 331:*9*
**touched** 207:*24*
**Tower** 2:*22* 90:*7*
124:*1*, *3*, *4* 126:*1*, *5*,
*15*, *20*, *24* 127:*2*, *8*, *13*
130:*18*
**town** 382:*10*
**TOWNSEND** 2:*8*
8:*2* 15:*17* 250:*19*, *23*
344:*1*
**township** 13:*20*
**tracing** 151:*5*
**track** 319:*11*, *12*
**trail** 415:*2*, *11*
**trained** 204:*5*
**training** 27:*11*, *16*, *24*
28:*22*, *24* 29:*10*, *14*,
*16*, *22* 31:*24* 32:*5*, *19*
33:*6*, *11*, *15*, *23* 34:*4*
40:*17*, *23* 41:*8*, *13*, *17*
43:*5*, *11*, *15*, *20* 44:*11*
58:*8*, *15* 100:*18*
110:*14*, *19* 113:*17*
114:*9* 131:*17* 162:*8*
404:*1*
**transcribe** 10:*10*
**transcribed** 10:*6*
**TRANSCRIPT** 1:*10*
8:*16* 87:*22* 419:*6*

transfer 45:*12*
108:*12, 21*
transferred 106:*17*
108:*13* 202:7, *14*
transfers 45:2, *22*
110:*12*
transition 110:*22*
244:*24*
transitioned 107:2
208:*20*
transitions 110:*23*
transpire 223:*23*
treasurers 107:2
108:*21* 109:*3, 20*
122:*12*
treasurer's 105:*3, 6,*
*17* 106:*11, 18*
treat 109:2
treatment 340:*20*
trial 418:*15*
tried 163:*1* 167:9
Trifun 1:*23* 7:*16*
419:*4, 22*
trigger 388:*20*
trip 249:*14*
true 242:6 246:*3*
263:3, *14, 15* 286:*16*
288:*12, 13* 301:*1*
418:*18* 419:5
Trump 143:*11, 19*
trust 158:*1* 190:*11*
truth 242:*11, 15*
252:*13, 14*
truthfully 9:*19*
11:*24* 12:5
truthfulness 158:*1, 2*
190:*11*
try 77:4 168:*19, 22*
181:2 190:*22* 205:*14*
218:*15* 226:*4, 5*
229:5 418:*16*
Trying 188:*10*
190:*20* 213:*19*
218:*15* 219:*21*
247:*11* 249:*11, 14, 15*
264:*23* 269:5 270:6
273:4, *7* 290:*14*
294:*17* 305:*4, 5*
325:*14* 387:*18, 19*

turn 47:7 57:*10*
68:*17* 104:*23* 138:*10*
161:*22* 170:*22*
198:*17* 250:*24* 255:9
372:*24* 376:*11*
turned 141:*24*
212:*24* 286:*16*
349:*15*
turner 71:*12* 123:*5*
Turning 48:*9* 55:9
347:*21*
twice 154:*8, 21*
155:*18* 355:*18*
Twigg 78:*9, 11, 17*
79:2 99:*8, 11* 130:*23,*
*24* 131:*3, 6* 162:*18*
163:*17* 165:*3* 171:*19*
178:*20* 179:*5, 11, 19,*
*23* 199:6 207:*6, 14*
213:*6, 21* 215:*13*
216:*17* 218:2, *12, 17*
219:*4, 8* 222:*24*
223:*1, 14, 15, 21*
224:3, *16, 23* 225:6, *9,*
*13, 21* 226:*4, 7, 21*
227:*5, 14, 16, 20*
228:*2, 5* 230:*10, 14*
231:*10, 14, 17* 233:*8,*
*20* 234:*11, 21* 235:*18,*
*23* 236:*16, 24* 238:*5*
239:*17* 240:*6, 20*
243:*2* 245:*20* 249:*17*
250:*12* 251:*11* 255:*7*
260:*17, 18, 19* 262:*11*
263:*20, 23* 267:*3, 4, 9,*
*18, 19* 268:*20* 274:*8,*
*10, 11, 13* 282:*15, 21*
283:2 284:*6, 21*
285:*23* 286:*23*
287:*14, 16, 23* 291:*9*
300:6 304:*10, 14*
306:*21* 307:*1, 6*
308:*17* 309:*1* 310:*15*
336:*14* 341:6, *18*
373:*20*
Twigg's 102:*3, 8*
217:*21* 218:6 223:*4*
227:*1* 231:*1* 249:*5*
288:6 289:*12, 24*
302:*23* 375:*7*

two 23:*4, 20* 31:*22,*
*24* 32:*4, 5* 33:*1* 34:*4*
44:*2* 58:*8, 15* 72:*4*
74:*14* 75:*20* 76:*3, 8*
78:*15* 80:*1* 81:*13*
82:*1* 148:*11* 165:*22*
166:*20, 24* 167:*1, 7,*
*10* 168:*10* 179:*13, 14*
195:*3* 198:*24* 213:*3,*
*7, 10, 12* 220:*10*
223:*11, 19* 225:*11*
253:*5* 255:*9* 304:*9*
308:*19* 311:*18*
312:*10* 326:*4* 334:*24*
335:*1, 5, 16* 336:*5*
340:*23* 346:*3, 6, 19*
353:*19* 354:*20* 356:*3,*
*17* 357:*24* 373:*14*
380:*7, 11* 381:*20*
type 32:*19* 98:*9*
131:*9* 374:*4* 400:*4*
typed 374:*4, 8, 12, 16*
typical 318:*21*
typist 110:*10* 111:*4,*
*16* 112:*7*

< U >
U.S 1:*19*
ugly 87:*21*
Uh-huh 54:*2* 280:*17*
348:*6*
unable 243:*11*
unacceptable 386:*20*
unaccompanied
103:*24* 375:*20, 23*
unannounced 90:*11,*
*12* 92:*7, 12, 17*
unaware 337:*15*
350:*16*
unbelievable 242:*10*
uncomfortable 76:*20*
77:*1* 82:*4* 89:*3, 14*
95:*21* 96:*20* 98:*24*
132:*5, 14* 221:*1*
222:*6* 259:*21*
undermining 233:*16*
understand 9:*17, 21*
10:*3, 9, 14, 19, 22*
11:*9, 15, 21* 12:*11, 13*
13:*2, 6* 41:*19* 60:*2*

72:*15* 77:*18* 83:*14*
88:*4* 95:*24* 110:*11*
113:*14* 118:2 124:*2*
127:*4* 130:*2* 137:*13*
163:*5, 14* 165:*4*
176:*8* 177:*9* 181:*3*
196:*14* 207:*11* 218:*6*
219:*14, 22* 239:*21*
245:6, *8* 272:*6* 273:*5*
296:*23* 306:*21* 310:*6*
349:*22* 351:*16* 363:*8,*
*18* 364:*1, 11* 381:*11,*
*16* 389:*7, 11* 393:*15*
409:*7* 414:*22* 415:*7,*
*17* 416:*9*
understanding 31:*22*
34:*2* 58:*5, 12* 122:*6*
236:*8* 245:*21* 310:*18*
341:*24* 374:*19* 382:*3*
408:*11*
understood 11:*2*
12:*12* 40:*12* 190:*23*
220:*22* 415:*22*
416:*14*
unemployment
149:*21, 23* 150:*4, 7,*
*14* 243:*11, 12, 16*
unescorted 260:*10*
unhappy 185:*1*
uniform 150:*22*
Uninvited 91:*20*
92:*17*
union 83:*7* 113:*15*
120:*12, 21* 121:*9*
227:*6, 8*
unique 279:*7*
UNITED 1:2 7:*24*
8:*3*
unmistakable 377:*21*
unnecessarily 347:*11*
unpack 95:*23* 163:*4*
223:*17* 260:*12*
312:*24* 388:*24*
unprofessional 228:*6*
unwise 92:*13*
upcoming 389:*13, 14*
updated 21:*11, 13, 16*
173:*12* 230:*6*
upfront 307:*23*

Deposition of Gary Bender Vol. I - Revised                                    Jane Doe, et al. v. Schuylkill County Courthouse, et al.

**upper** 272:*19*, *24*
274:*20*, *22* 275:*15*
276:*9* 290:*3* 291:*16*
365:*15*
**upset** 213:*5* 214:*21*
228:*7* 246:*15* 295:*13*,
*15*, *16*, *20*
**upstairs** 286:*9*
**use** 80:*23* 81:*4*
128:*24* 143:*4* 295:*10*
**uses** 16:*11*
**usually** 100:*1*
**utilize** 349:*5*
**utilized** 164:*11*
348:*19* 349:*2*
**utilizing** 379:*13*

**< V >**
**vacancies** 328:*5*
**vacant** 327:*24*
**vacation** 348:*19*, *22*
404:*16* 405:*3*
**vacations** 404:*21*
**valid** 174:*7*
**VANDERLIN** 2:*17*
**various** 331:*14*
**vehicle** 365:*22*
**vehicles** 328:*14*, *18*,
*20*, *21* 329:*10*, *23*
**verbal** 58:*3* 100:*14*
131:*9* 246:*24* 400:*3*
**versus** 7:*11* 61:*8*
413:*10*
**veterans** 330:*16*
**vetoed** 407:*19*
**VIDEO** 3:*6* 135:*20*
142:*1* 291:*15* 292:*17*
345:*15*, *19* 346:*6*
347:*2*
**VIDEOGRAPHER**
7:*5* 30:*12*, *18* 121:*13*,
*18* 122:*1* 157:*3*, *9*
188:*17*, *23* 273:*13*, *19*
331:*20* 332:*2* 418:*22*
**videos** 345:*7*
**VIDEOTAPE** 1:*18*
**view** 291:*4*, *6*, *8*
**viewed** 292:*17*
**Villanova** 135:*20*
**violate** 92:*18*

**violated** 288:*3*
289:*20* 300:*24*
**violation** 93:*24*
288:*11* 300:*8*
**Virginia** 163:*7*
**virtual** 28:*23* 29:*16*,
*21* 41:*8* 153:*6*
**visit** 153:*24* 154:*13*,
*19* 237:*17*
**visited** 154:*7*
**voiced** 97:*19*
**volition** 309:*19*
339:*9* 373:*10*
**VOLUME** 1:*8* 7:*13*
**voluntary** 29:*8*
**vote** 34:*19*, *21* 36:*23*,
*24* 120:*7*, *11* 308:*11*
381:*9*, *11*, *21* 412:*2*
**voted** 225:*16*
**voting** 308:*10*
381:*16* 386:*2*

**< W >**
**wait** 10:*14*, *16* 19:*20*
250:*14* 377:*13*
391:*24*
**waited** 292:*19*
**waiting** 96:*12*
**walk** 241:*15* 292:*9*
293:*7* 294:*3* 309:*14*
357:*5*
**walked** 72:*6* 75:*10*
79:*21*
**wall** 355:*5*
**Walnut** 1:*20* 7:*9*
**wand** 286:*10* 293:*5*
**wanded** 286:*5*, *21*
366:*6*
**wanding** 333:*17*, *18*
**want** 32:*6* 35:*10*
37:*2* 65:*6* 69:*7* 79:*8*,
*9* 81:*12* 83:*18* 89:*4*
95:*19* 104:*6*, *23*
137:*13* 162:*11* 179:*9*
185:*8*, *9* 189:*10*
199:*12* 207:*23*
218:*14*, *15* 219:*22*
221:*11* 222:*10*, *23*
223:*17* 229:*16*
230:*16* 233:*24*

239:*12* 241:*9* 251:*15*
260:*12*, *22* 261:*12*
262:*1*, *2* 263:*17*
266:*16* 268:*4* 272:*9*
273:*24* 275:*2* 277:*15*
282:*13* 286:*15*
304:*21* 312:*23* 317:*3*
318:*18* 331:*8* 332:*6*
338:*7* 351:*24* 355:*3*
361:*7* 371:*1*, *10*
375:*10* 386:*5*, *22*
388:*24* 393:*2* 394:*1*,
*3* 395:*17*, *21*, *22*
396:*8* 397:*21* 408:*10*
410:*13* 411:*7* 415:*8*
416:*15*
**wanted** 13:*21* 92:*5*
96:*17* 153:*10*, *18*
163:*19* 166:*13* 185:*2*,
*14* 221:*1* 234:*19*
245:*13* 252:*8*, *11*
265:*3* 286:*6* 294:*11*
302:*12* 330:*13* 331:*9*
338:*21* 349:*13*
377:*17* 379:*5* 382:*9*
397:*19* 403:*12* 408:*5*
410:*13*, *20* 411:*17*
412:*7* 413:*15* 414:*24*
415:*1*, *8*, *9*, *11*
**wanting** 416:*10*
**warning** 100:*14*
131:*10* 246:*24* 400:*3*,
*9*, *10*
**warranted** 305:*7*
**wash** 152:*2*
**Washington** 2:*9*
**wavered** 233:*13*, *14*
**way** 16:*20* 44:*21*
56:*23* 61:*9* 95:*22*
187:*21* 203:*21* 233:*9*,
*21* 239:*2* 262:*1*
265:*9* 294:*12*, *13*
319:*2* 353:*20* 363:*21*
387:*1*, *19* 388:*1*
395:*24* 396:*6* 397:*14*
406:*8* 410:*22* 415:*14*
**weakness** 227:*5*
**wear** 246:*21*
**weather** 54:*22*

**website** 40:*18*
**Wednesday** 1:*21*
**week** 15:*5* 154:*8*, *21*
282:*10* 335:*1*, *5*, *16*
336:*6*
**weeks** 15:*10*, *12*
296:*24*
**weird** 98:*22* 99:*1*, *23*
100:*4*
**well** 19:*20* 23:*12*
25:*12* 29:*20* 32:*6*, *16*
41:*2*, *12* 50:*7* 51:*20*
61:*15* 65:*7* 66:*9*
75:*23* 95:*16* 98:*6*
99:*24* 101:*15* 102:*21*
112:*1* 114:*3* 120:*20*
128:*7* 133:*18* 135:*9*
137:*2* 138:*10* 140:*17*
142:*4*, *10*, *15* 147:*20*
151:*23* 162:*16* 164:*7*
172:*2* 182:*11*, *17*, *24*
183:*8* 195:*13* 196:*12*
201:*16* 202:*8* 205:*16*
208:*10* 214:*10*, *18*
215:*16* 218:*9*, *14*
221:*13* 237:*3* 238:*1*
249:*17* 254:*5* 255:*4*
257:*13*, *18* 258:*7*, *9*
261:*22* 265:*8* 267:*6*,
*8*, *23* 269:*5* 275:*11*
277:*11* 278:*18*
279:*17* 280:*4* 281:*10*
284:*23* 287:*16*
288:*14* 290:*13*
292:*19* 295:*18*
300:*16* 303:*6*, *21*
305:*20* 307:*16*, *22*
310:*15* 311:*17*
315:*18* 316:*3*, *19*
319:*17* 320:*23*
321:*19* 324:*11* 326:*3*,
*22* 329:*11* 341:*2*
345:*3* 346:*11*, *20*, *24*
347:*20* 348:*2* 350:*9*,
*11* 352:*22* 353:*13*, *21*
354:*6* 355:*1*, *3*, *15*
357:*1*, *6* 362:*8* 365:*6*
372:*5* 385:*2*, *17*
387:*3*, *14*, *23* 389:*24*
392:*4*, *23* 393:*7*, *10*,

Case 3:21-cv-00477-MCC   Document 280-2   Filed 09/20/23   Page 357 of 373
CONFIDENTIAL

Deposition of Gary Bender Vol. I - Revised                    Jane Doe, et al. v. Schuylkill County Courthouse, et al.

*13* 395:*1* 399:*11*
400:*10, 17* 402:*19*
403:*5* 406:*16, 20*
407:*20* 410:*8, 19*
414:*19*
**Wendy** 72:*4* 74:6
**Wendy's** 72:*23* 74:*5*
**went** 23:22 37:*21*
51:*23* 66:*15* 72:*5, 17,*
*18* 77:*3, 4* 79:22
89:*3* 117:*11* 154:2
163:*3* 169:*4* 185:2,
*18* 213:*1, 3* 224:24
225:*11* 237:*19* 238:*5,*
*6* 241:20 248:6
262:*4* 267:*11, 12*
282:*15* 296:*17* 310:2
312:*4* 323:*15* 329:8
330:*12* 368:24
383:*20* 387:*13* 396:6
408:*1, 12* 410:*14*
412:*11* 418:*14*
**we're** 29:*9* 30:*13, 19*
113:*16* 121:*20* 122:2
157:*4, 10, 22, 23*
180:*17* 183:8 188:*18,*
*24* 195:*16* 220:*18*
273:6, *14, 20* 331:*21*
332:*3* 360:*18, 19*
375:2 410:*21* 413:*11*
418:*17, 20, 23*
**we've** 180:*17* 207:2
234:22 235:*20*
259:*12* 274:*3* 391:*4*
406:*6*
**whoa** 123:*10*
**whore** 104:*21*
**wife** 38:*24* 90:*3*
128:*24* 182:*19, 22*
183:*3, 5* 239:2, *14*
286:*14* 296:*12, 17*
**wife's** 39:*8, 9*
**wild** 210:*3*
**WILLIAM** 2:*12*
14:22 297:22
**Williamsport** 2:*18*
**willing** 24:*13* 32:7
35:2, *11* 169:*3, 4*
176:*19* 328:*12*

402:*17*
**winter** 272:*8*
**wish** 11:6 95:*16*
120:*16*
**withdrew** 228:*17*
**WITNESS** 4:*4* 6:*1*
7:*12, 17* 15:*23* 19:*20*
39:*20* 49:*12* 50:7
51:*15* 53:*4, 19* 60:*13*
70:*5* 75:*3* 80:*12*
82:*19* 87:*23* 91:*20*
93:*1, 17* 96:*17* 97:*24*
104:*18* 108:2, *5*
112:*20* 119:*3* 129:*4*
134:6 136:*18* 137:*10,*
*21* 138:*17, 18* 141:*4*
143:*16* 148:*15* 153:2
156:*3* 166:*4* 170:*14*
174:*10* 175:*9* 211:*16*
212:*15* 215:*12*
229:*17* 252:*1, 24*
254:*21* 261:*13* 275:*7,*
*18* 276:*17* 278:*5*
289:8 291:*18, 19*
293:*14, 21* 294:*10*
300:*12* 301:*9* 302:*9*
303:*16* 304:*21*
305:*11, 20* 306:*13*
314:*7* 316:*16, 24*
317:*10* 318:*13* 319:*9*
324:22 327:*8* 334:*4*
337:*15* 338:2 339:*20*
341:*11* 342:*9, 17*
346:*11* 364:*8, 16*
366:*9* 367:*18* 368:*10*
369:*11* 371:*8, 22*
372:*10* 388:*13*
391:*23* 392:*13*
397:*11* 398:*5, 11*
402:*10* 412:*11*
413:*15* 414:*12* 415:*5,*
*14, 20* 416:2, *14*
417:*5, 16, 24*
**witnesses** 284:*16*
**woman** 10:*3* 66:*19*
105:*14* 126:8, *15*
127:*12, 21* 212:2
243:*20* 307:*9*

**women** 109:2, *6, 20*
211:*21* 213:*4, 7, 13*
214:*14, 19* 345:8
**word** 147:*21* 160:*11*
183:2 228:*21* 291:*23*
295:*9* 327:*3* 374:*18*
403:*3*
**wording** 246:*11*
**words** 18:*16* 62:*3*
80:*23* 93:*5* 174:*24*
210:*4* 211:*12* 227:*7*
341:*1* 347:*16* 380:*6*
392:*14*
**work** 67:*10, 14, 18*
85:*15, 19* 86:*9* 91:*10*
93:*8* 102:20 103:*5,*
*14* 104:2 105:*15, 20*
106:*4* 109:*7, 17*
111:*7, 12* 112:*15*
113:*12* 114:*23* 115:*3,*
*14, 20* 116:22, *24*
117:*6, 12* 122:*5*
131:*20* 133:*14* 146:*6,*
*10, 18* 149:*16* 150:*9*
153:*5, 11, 14, 18*
167:*9* 169:*24* 170:*4*
187:*20* 188:*1* 189:22
197:*17, 22* 205:2
233:*4* 238:*5* 240:*3*
254:2 268:*3* 276:*9,*
*13, 24* 277:*5, 8, 9*
279:*1, 10, 13, 14, 16,*
*18* 280:2, *3, 8, 10, 12*
281:*1, 5, 12, 19*
283:*11, 22* 284:*3, 13*
298:*20* 311:*13, 14*
312:*3, 13, 14, 15, 19*
314:*14, 16* 315:6, *23*
324:*5, 9* 335:*7*
348:*16* 349:2, *5, 13,*
*15, 18, 21, 23* 350:*9,*
*11* 351:2, *12, 20, 24*
352:*1, 3, 4, 6, 10, 14,*
*21* 353:*4, 11* 362:*4*
363:*3* 364:*21* 386:*16,*
*19, 23* 387:*24* 390:*18*
402:*17, 24* 417:*6, 9,*
*11* 418:*1, 16*
**workday** 283:*1*
309:*21*

**worked** 61:*15* 63:*9,*
*12* 103:*7* 164:*14*
213:*18* 219:*17*
243:*14* 315:*21, 22*
317:*21* 318:*4, 8, 17,*
*20* 320:*16* 350:*13*
365:2 391:*1, 4*
399:*17* 414:*13*
418:*15*
**worker** 85:*24* 105:*15,*
*23* 109:*16* 190:*9*
**workers** 86:2
**working** 15:*9* 103:*19*
104:*9* 152:*21* 162:*18*
204:*9, 20* 227:6
247:*7* 266:2 271:*24*
297:*17* 298:*17* 299:*2,*
*8, 15, 22* 309:*10*
311:*14* 312:*1, 19, 21*
318:*21* 347:*15, 17, 19*
352:2, *21* 353:*5, 12*
362:*17* 363:*3* 365:*3*
378:*18* 388:*4* 406:2
**workplace** 89:*10, 18*
132:*9, 19* 178:*15, 16*
212:*6, 12* 217:*1*
**work-related** 177:*4*
**works** 104:*1* 309:*20*
**worried** 97:*5, 6*
297:*3*
**worries** 166:*16*
**worse** 87:*23*
**worth** 169:*1*
**Would've** 180:*10*
**wow** 71:*15* 123:*7*
**write** 339:*24* 373:*7,*
*9, 11, 18* 374:*16*
377:*8, 11, 12, 13, 17,*
*18, 20*
**writer** 13:*12, 17*
16:*16* 23:*5, 6, 22*
**writes** 233:*12*
**write-up** 362:2
**writing** 13:24
392:*10* 396:*18*
**written** 13:*18* 100:*14*
131:*9* 149:*17* 203:*12*
246:*23* 377:*19*
392:*10* 400:*3, 9, 10*

Deposition of Gary Bender Vol. I - Revised                    Jane Doe, et al. v. Schuylkill County Courthouse, et al.

**wrong** 65:*14* 110:*12*
163:*15* 175:*24*
178:*11* 216:6 218:7
219:*14* 247:*12* 297:*4*,
*5* 301:*4* 357:*3* 409:8
**wrote** 376:*17* 377:5
405:*3*

**< Y >**
**Yeah** 18:6 30:*10*
74:*11* 108:2, *4, 7*
121:*16* 136:*11*
144:22 148:*14, 24*
156:*3* 171:*10* 181:*18*
183:8 187:*17* 195:*23*
241:*20* 250:*23*
252:*12* 269:22
274:*13* 280:*11* 299:*4*
303:*23* 308:*19*
311:*10* 341:*13*
347:*10* 368:*18*
393:*23* 395:*21* 400:8
411:*16*
**year** 25:*14* 38:2
65:*3, 18* 95:9, *10, 22*
204:*12* 218:*4* 219:5
272:1 281:2 311:*17,*
*21* 312:*15* 316:*13, 21*
319:*10* 322:8 330:*10*
331:*1, 13* 404:*10*
406:*6, 23*
**years** 23:*4, 20, 21*
24:*18* 31:22 32:*1, 4,*
*5* 34:*4* 35:*11* 39:*1*
44:*3, 10* 58:8, *15*
126:8 179:*13, 14*
201:*10* 202:*23*
241:24 242:8 246:*4*
331:*15*
**yell** 143:*1*
**yelled** 143:7
**young** 105:*14* 243:*20*
**youth** 153:22, *24*
228:*4* 231:22 330:*18*
355:*10*
**Yup** 148:*15* 169:9
297:*23*

**< Z >**

**Zimmerman** 299:*20*
348:2 349:9, *18*
350:6, *18, 21* 351:2
352:*19*
**Zimmerman's** 351:8
**zipper** 101:*24* 102:*15*
**Zoom** 2:*5, 15, 20* 3:*4,*
*7, 8, 9* 7:*20* 8:*13*
107:*15* 118:*3* 142:*13*
229:*15* 398:5, *10*
**Zula** 2:*24* 8:6
120:*24* 121:*1* 207:*15*
216:*18* 310:*8, 10, 13,*
*19* 361:*20, 22* 388:*17*
408:*20, 22* 409:5
410:9

Deposition of Gary Bender Vol. I - Revised
Jane Doe, et al. v. Schuylkill County Courthouse, et al.

## WORD LIST

**< $ >**
**$15,000**  *(1)*
**$40**  *(3)*
**$47,057**  *(1)*
**$51,420.45**  *(1)*

**< 1 >**
**1**  *(173)*
**1:00**  *(1)*
**1:25**  *(1)*
**1:30**  *(3)*
**102**  *(3)*
**107**  *(1)*
**11**  *(1)*
**11:00**  *(2)*
**11:16**  *(1)*
**11:27**  *(1)*
**114**  *(5)*
**116**  *(1)*
**1162-1163**  *(2)*
**1163**  *(1)*
**12:00**  *(1)*
**12:03**  *(1)*
**12:04**  *(1)*
**12:36**  *(1)*
**1206**  *(1)*
**1206-1208**  *(2)*
**1208**  *(1)*
**1215**  *(1)*
**1215-1216**  *(2)*
**1216**  *(1)*
**1217-1218**  *(1)*
**1218**  *(1)*
**1221-1222**  *(1)*
**1222**  *(1)*
**1223**  *(1)*
**1223-1224**  *(2)*
**1224**  *(1)*
**1235**  *(1)*
**1235-1238**  *(2)*
**1236**  *(1)*
**1237**  *(1)*
**1238**  *(2)*
**13**  *(1)*
**14**  *(8)*
**148**  *(1)*
**14th**  *(2)*

**15**  *(10)*
**150**  *(1)*
**15219**  *(1)*
**159**  *(1)*
**16**  *(6)*
**162**  *(1)*
**170**  *(1)*
**17108**  *(1)*
**172**  *(1)*
**17701**  *(1)*
**17th**  *(1)*
**18**  *(1)*
**18017**  *(1)*
**1835**  *(1)*
**18360**  *(1)*
**19**  *(3)*
**190**  *(1)*
**19103**  *(1)*
**192**  *(1)*
**196**  *(1)*
**198**  *(1)*
**1994**  *(2)*
**1996**  *(1)*
**1's**  *(24)*
**1st**  *(2)*

**< 2 >**
**2**  *(203)*
**2/9/18**  *(1)*
**2:00**  *(4)*
**2:30**  *(1)*
**2:54**  *(1)*
**20**  *(4)*
**2000**  *(2)*
**20002**  *(1)*
**2005**  *(3)*
**2006**  *(16)*
**2008**  *(3)*
**2009**  *(2)*
**2010**  *(1)*
**2011**  *(2)*
**2012**  *(1)*
**2013**  *(13)*
**2014**  *(2)*
**2015**  *(11)*
**2016**  *(18)*
**2017**  *(2)*
**2018**  *(3)*
**2019**  *(34)*

**2020**  *(135)*
**2021**  *(25)*
**2022**  *(4)*
**2023**  *(1)*
**203**  *(1)*
**204**  *(2)*
**205**  *(1)*
**206**  *(1)*
**207**  *(1)*
**208**  *(1)*
**209**  *(2)*
**20th**  *(2)*
**21**  *(5)*
**210**  *(1)*
**211**  *(1)*
**212**  *(2)*
**213**  *(1)*
**214**  *(2)*
**215**  *(1)*
**216**  *(1)*
**217**  *(1)*
**218**  *(1)*
**219**  *(2)*
**22**  *(23)*
**222**  *(4)*
**22-23**  *(1)*
**223**  *(1)*
**228**  *(2)*
**229**  *(1)*
**22nd**  *(9)*
**23**  *(4)*
**233**  *(1)*
**235**  *(3)*
**23rd**  *(1)*
**24**  *(7)*
**242**  *(1)*
**24th**  *(1)*
**25**  *(5)*
**250**  *(1)*
**251**  *(1)*
**25th**  *(2)*
**26**  *(2)*
**26th**  *(1)*
**27**  *(5)*
**278**  *(1)*
**28**  *(4)*
**28th**  *(1)*
**2950**  *(1)*
**29th**  *(1)*

**2's**  *(55)*

**< 3 >**
**3**  *(200)*
**3/4/2008**  *(1)*
**3:00**  *(2)*
**3:06**  *(1)*
**3:21-CV-00477**  *(1)*
**30**  *(5)*
**30th**  *(1)*
**31**  *(2)*
**310**  *(1)*
**31-36**  *(2)*
**33**  *(1)*
**338**  *(1)*
**34**  *(1)*
**3410**  *(1)*
**344**  *(1)*
**35**  *(1)*
**36**  *(1)*
**364**  *(1)*
**37**  *(4)*
**373**  *(1)*
**377**  *(1)*
**39**  *(1)*
**397**  *(1)*
**398**  *(1)*
**3rd**  *(2)*
**3's**  *(14)*

**< 4 >**
**4**  *(150)*
**4:06**  *(1)*
**4:18**  *(1)*
**4:30**  *(1)*
**40**  *(1)*
**410**  *(29)*
**411**  *(1)*
**42**  *(1)*
**433**  *(1)*
**450**  *(1)*
**46**  *(3)*
**47**  *(3)*
**48**  *(2)*
**4's**  *(10)*

**< 5 >**
**5**  *(1)*
**5:00**  *(8)*

Case 3:21-cv-00477-MCC    Document 280-1    Filed 09/20/23    Page 360 of 373
CONFIDENTIAL
Deposition of Gary Bender Vol. I - Revised                    Jane Doe, et al. v. Schuylkill County Courthouse, et al.

**5:41** *(1)*
**51** *(1)*
**511** *(1)*
**53** *(1)*
**55** *(2)*

**< 6 >**
**6** *(10)*
**60s** *(1)*
**65** *(1)*
**68** *(5)*
**6th** *(3)*

**< 7 >**
**707** *(1)*
**71** *(4)*
**712** *(1)*
**75** *(1)*

**< 8 >**
**8:00** *(8)*
**8:20** *(1)*
**8:30** *(4)*
**8th** *(3)*

**< 9 >**
**9** *(6)*
**9.932** *(1)*
**9:11** *(2)*
**9:36** *(1)*
**9:43** *(1)*
**96** *(5)*
**9th** *(2)*

**< A >**
**a.m** *(11)*
**abandonment** *(2)*
**abide** *(2)*
**ability** *(8)*
**able** *(13)*
**absence** *(1)*
**Absolutely** *(4)*
**accept** *(2)*
**acceptable** *(2)*
**accepted** *(3)*
**access** *(24)*
**accessed** *(1)*
**accessible** *(4)*
**accommodation** *(5)*

**accommodations** *(3)*
**accosted** *(2)*
**accurate** *(6)*
**accused** *(2)*
**achieve** *(1)*
**acknowledge** *(1)*
**acknowledging** *(4)*
**acknowledgment** *(5)*
**act** *(4)*
**acted** *(1)*
**Action** *(11)*
**actions** *(7)*
**active** *(3)*
**activities** *(1)*
**actual** *(4)*
**adamant** *(1)*
**add** *(1)*
**addition** *(1)*
**additional** *(10)*
**address** *(4)*
**addressed** *(8)*
**adequate** *(1)*
**administered** *(1)*
**administration** *(12)*
**administrative** *(1)*
**administrator** *(73)*
**administrator/director** *(1)*
**administrators** *(1)*
**administrator's** *(1)*
**admitted** *(1)*
**advanced** *(1)*
**advertise** *(1)*
**advice** *(4)*
**advised** *(1)*
**affair** *(4)*
**affairs** *(1)*
**affair's** *(1)*
**affect** *(1)*
**affiliation** *(2)*
**affirmative** *(1)*
**afforded** *(1)*
**aforementioned** *(1)*
**afraid** *(1)*
**afternoon** *(11)*
**agencies** *(1)*
**agency** *(4)*
**agenda** *(34)*
**ago** *(2)*

**agree** *(50)*
**agreeable** *(1)*
**agreed** *(19)*
**agreeing** *(2)*
**agreement** *(12)*
**agrees** *(1)*
**ahead** *(14)*
**ahold** *(2)*
**al** *(5)*
**alcohol** *(7)*
**alcoholic** *(2)*
**ALEISHA** *(2)*
**alerted** *(1)*
**ALLAN** *(1)*
**allan.townsend@usdoj
.gov** *(1)*
**allegation** *(3)*
**allegations** *(33)*
**allege** *(1)*
**alleged** *(3)*
**allegedly** *(1)*
**Allen** *(1)*
**allergies** *(1)*
**allergy** *(1)*
**alleviate** *(4)*
**allow** *(9)*
**allowed** *(1)*
**alternate** *(2)*
**alternative** *(2)*
**Alu** *(19)*
**ALYSSA** *(3)*
**amazing** *(1)*
**AMBER** *(2)*
**amber.fox@usdoj.gov**
*(1)*
**ambiguous** *(1)*
**amount** *(6)*
**analyst** *(9)*
**and/or** *(24)*
**Ang** *(1)*
**angles** *(1)*
**angry** *(2)*
**announcement** *(1)*
**ANSWER** *(131)*
**answered** *(4)*
**answering** *(3)*
**Anthony** *(1)*
**anticipate** *(1)*
**anticipating** *(1)*

**antidiscrimination** *(1)*
**anti-harassment** *(1)*
**anybody** *(2)*
**anymore** *(4)*
**anyway** *(5)*
**apologize** *(11)*
**apologized** *(2)*
**apology** *(1)*
**Apparently** *(5)*
**appear** *(4)*
**appearance** *(7)*
**appearing** *(3)*
**appears** *(1)*
**applicants** *(2)*
**application** *(6)*
**applications** *(2)*
**applied** *(4)*
**applies** *(1)*
**apply** *(3)*
**appointed** *(1)*
**appointment** *(1)*
**appraiser** *(25)*
**appraisers** *(5)*
**appraiser's** *(1)*
**appreciate** *(12)*
**appreciated** *(2)*
**approach** *(1)*
**approached** *(1)*
**appropriate** *(13)*
**appropriately** *(1)*
**approval** *(7)*
**approve** *(5)*
**approved** *(12)*
**approximately** *(3)*
**April** *(8)*
**area** *(3)*
**areas** *(1)*
**argumentative** *(2)*
**articulate** *(1)*
**aside** *(1)*
**asked** *(60)*
**asking** *(33)*
**aspect** *(1)*
**asserted** *(2)*
**assessment** *(65)*
**assessor** *(52)*
**assessors** *(3)*
**assign** *(3)*
**assigned** *(11)*

Deposition of Gary Bender Vol. I - Revised   Jane Doe, et al. v. Schuylkill County Courthouse, et al.

**assigning** (3)
**assignment** (3)
**assignments** (1)
**assigns** (1)
**assist** (2)
**assistance** (2)
**assistant** (45)
**assume** (6)
**assumed** (4)
**assuming** (2)
**assumption** (10)
**assure** (1)
**ate** (1)
**attempt** (3)
**attempted** (2)
**attend** (8)
**attendance** (1)
**attendant** (1)
**attended** (5)
**attending** (2)
**attends** (1)
**attention** (17)
**attorney** (22)
**attorney-client** (1)
**attorneys** (2)
**Attorney's** (1)
**audible** (1)
**August** (7)
**authority** (12)
**authorization** (2)
**authorize** (1)
**authorized** (3)
**automobiles** (1)
**avid** (1)
**avoid** (3)
**awake** (1)
**aware** (100)

**< B >**
**back** (75)
**bad** (3)
**bag** (1)
**bags** (3)
**Baldwin** (5)
**Baldwin's** (1)
**ball** (1)
**bank** (3)
**banked** (1)
**base** (2)

**based** (11)
**basic** (1)
**basically** (3)
**BASIL** (2)
**basis** (5)
**basketball** (1)
**Bates** (43)
**beautiful** (2)
**becoming** (2)
**began** (3)
**beginning** (7)
**begins** (1)
**behalf** (10)
**behavior** (15)
**beliefs** (1)
**believe** (67)
**believed** (7)
**belongings** (1)
**bend** (2)
**BENDER** (74)
**Bender's** (1)
**beneath** (1)
**benefits** (3)
**Benolis** (1)
**bent** (1)
**best** (5)
**bet** (2)
**Beth** (4)
**Bethlehem** (1)
**better** (11)
**beyond** (2)
**big** (2)
**bigger** (1)
**bikers** (1)
**binder** (4)
**binding** (3)
**bit** (23)
**blanked** (1)
**board** (20)
**boardroom** (5)
**body** (2)
**bolded** (1)
**book** (3)
**bottom** (13)
**bought** (1)
**bounce** (1)
**BOX** (1)
**Boy** (1)
**boyfriend** (2)

**break** (9)
**breaking** (2)
**Brian** (6)
**brief** (7)
**bright** (5)
**bring** (19)
**bringing** (3)
**brings** (1)
**broad** (1)
**Brodhead** (1)
**brought** (19)
**budget** (1)
**building** (50)
**bulk** (1)
**bump** (1)
**bumps** (1)
**burden** (1)
**bureau** (29)
**business** (6)
**businesses** (2)
**business-related** (1)
**buy** (1)
**buying** (1)

**< C >**
**call** (28)
**called** (23)
**calling** (1)
**calls** (6)
**camaraderie** (1)
**camera** (5)
**campaign** (22)
**campaigned** (2)
**campaigner** (1)
**campus** (2)
**candidate** (2)
**candidates** (1)
**canteen** (1)
**Cantor** (2)
**capable** (2)
**capacity** (6)
**caption** (1)
**car** (7)
**card** (2)
**care** (1)
**career** (1)
**careful** (4)
**carpet** (1)
**cars** (1)

**case** (6)
**Casey** (1)
**catch** (1)
**CATHERINE** (10)
**catherine@dereksmith**
**.com** (1)
**Catherine's** (1)
**CATTS** (2)
**caucus** (2)
**cause** (1)
**caused** (3)
**causing** (1)
**CDBG** (3)
**CDC** (3)
**cell** (2)
**certain** (3)
**certainly** (11)
**certif** (1)
**certification** (3)
**certifications** (4)
**certified** (4)
**certify** (1)
**chain** (2)
**Chair** (2)
**chairman** (5)
**chairs** (1)
**challenge** (2)
**chance** (1)
**change** (6)
**changed** (9)
**changes** (4)
**changing** (1)
**characterization** (3)
**charge** (3)
**chastise** (1)
**Chaswiak** (5)
**chat** (1)
**check** (2)
**chef** (1)
**chief** (56)
**child** (1)
**childish** (2)
**children** (8)
**chose** (2)
**Chrissy** (2)
**Christmas** (3)
**chronological** (1)
**church** (1)
**circles** (1)

circumstance  (1)
circumvented  (3)
City  (1)
CIVIL  (2)
claim  (74)
claimant  (1)
claimed  (1)
clarification  (3)
clarified  (1)
clarify  (11)
clarifying  (1)
classification  (32)
classifications  (1)
classify  (2)
claw  (1)
clean  (1)
cleaned  (1)
cleanliness  (1)
clear  (13)
Clearly  (2)
clerk  (9)
client  (1)
climbed  (4)
Clinton  (1)
clock  (13)
close  (4)
closed  (7)
closing  (1)
clothing  (1)
coffeepot  (1)
Coleen  (4)
colleagues  (1)
collectively  (2)
Columbia  (1)
combine  (5)
combined  (9)
combining  (6)
come  (70)
comes  (7)
comfortable  (10)
coming  (16)
command  (1)
comment  (20)
comments  (13)
commissioner  (103)
commissioners  (80)
commissioner's  (1)
commitment  (1)
committed  (1)

committee  (10)
common  (1)
communicate  (24)
communicated  (8)
communicating  (8)
communication  (9)
communications  (5)
community  (5)
companies  (2)
company  (2)
comparable  (1)
compensated  (2)
compensation  (3)
competent  (2)
compilation  (1)
compile  (3)
complained  (1)
complaint  (21)
complaints  (11)
complete  (11)
completed  (5)
completely  (2)
completeness  (1)
completes  (1)
completing  (1)
complex  (1)
compliance  (1)
comprehend  (1)
computer  (3)
concern  (13)
concerned  (9)
concerning  (5)
concerns  (49)
concluded  (1)
conclusion  (7)
concurred  (1)
conduct  (26)
conducted  (5)
conducting  (3)
conference  (2)
confidence  (6)
confident  (3)
CONFIDENTIAL  (5)
confidentiality  (1)
confirmed  (2)
conflict  (3)
confuse  (1)
confused  (4)
congress  (1)

congressional  (1)
connected  (1)
connection  (3)
consider  (2)
considered  (2)
consolidated  (1)
Consult  (2)
consultant  (2)
consultation  (5)
consulted  (1)
consulting  (1)
consumed  (1)
contact  (5)
contacted  (1)
contents  (8)
context  (4)
continue  (2)
continued  (2)
contract  (15)
contracted  (3)
contractor  (2)
contracts  (1)
controlled  (1)
controller  (3)
Controls  (3)
conversation  (52)
conversations  (26)
conveyed  (2)
convinced  (2)
coordinate  (1)
coordinator  (4)
copied  (1)
copier  (2)
copiers  (5)
copies  (3)
copy  (5)
correct  (554)
corrected  (1)
correctly  (2)
correspond  (1)
cost  (1)
costly  (1)
Counsel  (23)
count  (1)
counter  (1)
countermand  (1)
counters  (1)
Counties  (1)
COUNTY  (257)

county-issued  (9)
county's  (29)
countywide  (2)
couple  (8)
course  (9)
courses  (1)
COURT  (11)
COURTHOUSE  (76)
court's  (1)
cover  (2)
COVID  (4)
COVID-19  (3)
COVID-related  (1)
coworkers  (1)
CP  (1)
CPE  (18)
CPE-licensed  (1)
create  (3)
created  (4)
criminal  (1)
cry  (1)
crying  (1)
current  (2)
currently  (5)
custody  (1)
CV  (2)
Cyan  (3)

< D >
daily  (7)
Dan  (1)
dangerous  (1)
Darlene  (3)
Dash  (1)
date  (22)
DATE:August  (1)
dated  (16)
dates  (2)
dating  (12)
Daub  (1)
D-A-U-B  (1)
daughter  (2)
David  (1)
day  (59)
days  (12)
day-to-day  (6)
deadline  (7)
deadlines  (2)
deal  (1)

Deposition of Gary Bender Vol. I - Revised    Jane Doe, et al. v. Schuylkill County Courthouse, et al.

| | | | |
|---|---|---|---|
| **dealership** *(1)* | **despite** *(3)* | **distributed** *(2)* | **early** *(6)* |
| **deals** *(1)* | **determination** *(1)* | **distribution** *(2)* | **ears** *(1)* |
| **Deb** *(6)* | **determine** *(6)* | **DISTRICT** *(8)* | **ease** *(1)* |
| **DEBISE** *(3)* | **determined** *(1)* | **districts** *(1)* | **easier** *(1)* |
| **Debra** *(28)* | **Detweiler** *(2)* | **disturbing** *(1)* | **easily** *(1)* |
| **December** *(9)* | **develop** *(2)* | **DIVISION** *(1)* | **Eastburn** *(1)* |
| **decide** *(2)* | **developed** *(1)* | **divorce** *(1)* | **eat** *(2)* |
| **decided** *(10)* | **development** *(10)* | **divulge** *(2)* | **Economic** *(5)* |
| **decides** *(1)* | **device** *(1)* | **divulging** *(1)* | **edge** *(1)* |
| **decision** *(33)* | **devices** *(8)* | **doc** *(1)* | **education** *(1)* |
| **decisions** *(2)* | **diagonal** *(1)* | **DOCKET** *(1)* | **EEO** *(1)* |
| **deck** *(6)* | **DICKIE** *(1)* | **doctor's** *(1)* | **EEOC** *(2)* |
| **declined** *(2)* | **dictate** *(1)* | **document** *(45)* | **effect** *(5)* |
| **deed** *(1)* | **diem** *(3)* | **documented** *(4)* | **effective** *(2)* |
| **deemed** *(1)* | **Dietrich** *(1)* | **DOCUMENTS** *(8)* | **efficient** *(1)* |
| **Def** *(1)* | **different** *(10)* | **DOE** *(809)* | **Eighty-five** *(2)* |
| **defend** *(1)* | **difficult** *(4)* | **doing** *(15)* | **either** *(19)* |
| **Defendant** *(323)* | **difficulties** *(1)* | **dollars** *(1)* | **Elaine** *(2)* |
| **Defendants** *(1)* | **difficulty** *(1)* | **door** *(22)* | **elected** *(4)* |
| **deferred** *(1)* | **Digital** *(1)* | **doors** *(3)* | **election** *(7)* |
| **definitely** *(2)* | **digress** *(1)* | **Doreen** *(7)* | **electrical** *(1)* |
| **definitively** *(1)* | **diminished** *(1)* | **Doreen's** *(1)* | **electronic** *(1)* |
| **delay** *(2)* | **ding** *(1)* | **doubt** *(1)* | **elevator** *(1)* |
| **delayed** *(5)* | **direct** *(6)* | **downstairs** *(1)* | **eligible** *(4)* |
| **delete** *(1)* | **directed** *(2)* | **draft** *(9)* | **else's** *(2)* |
| **delinquency** *(4)* | **DIRECTION** *(3)* | **drafted** *(7)* | **e-mail** *(33)* |
| **delinquent** *(2)* | **directly** *(14)* | **drafting** *(1)* | **e-mailed** *(3)* |
| **delivered** *(1)* | **director** *(77)* | **drafts** *(1)* | **e-mails** *(6)* |
| **Delzoni** *(2)* | **directors** *(3)* | **draw** *(2)* | **embankment** *(5)* |
| **demeanor** *(1)* | **dirty** *(1)* | **drawer** *(1)* | **embarrassed** *(2)* |
| **demolition** *(7)* | **disbanded** *(2)* | **dreaded** *(2)* | **emerged** *(1)* |
| **demonstration** *(1)* | **disbelieve** *(4)* | **drinks** *(1)* | **emerging** *(1)* |
| **demoted** *(1)* | **Disciplinary** *(4)* | **drive** *(2)* | **emotionally** *(1)* |
| **Deni** *(4)* | **discipline** *(2)* | **driveway** *(1)* | **employed** *(9)* |
| **DE-N-I** *(1)* | **discovered** *(1)* | **drop-dead** *(1)* | **employee** *(50)* |
| **DEPARTMENT** *(13)* | **discovery** *(2)* | **dropper** *(2)* | **employees** *(41)* |
| **departments** *(3)* | **discuss** *(40)* | **drove** *(2)* | **employment** *(26)* |
| **depend** *(3)* | **discussed** *(39)* | **drug** *(3)* | **empty** *(2)* |
| **depends** *(1)* | **discusses** *(1)* | **dual** *(23)* | **encountered** *(1)* |
| **DEPOSITION** *(12)* | **discussing** *(6)* | **due** *(5)* | **ended** *(7)* |
| **Deprello** *(1)* | **discussion** *(7)* | **duly** *(2)* | **ends** *(1)* |
| **deputy** *(13)* | **discussions** *(29)* | **duties** *(20)* | **enforcement** *(1)* |
| **DEREK** *(1)* | **disparaging** *(1)* | **duty** *(8)* | **engage** *(10)* |
| **describe** *(3)* | **disrupted** *(2)* | **DW** *(1)* | **engaged** *(2)* |
| **DESCRIPTION** *(50)* | **disrupting** *(1)* | **DWK** *(1)* | **engaging** *(2)* |
| **descriptions** *(1)* | **distance** *(2)* | | **engineer** *(1)* |
| **designate** *(1)* | **distances** *(1)* | **< E >** | **enjoyed** *(2)* |
| **desire** *(2)* | **distressed** *(1)* | **EAP** *(1)* | **Ensure** *(15)* |
| **desk** *(3)* | **distribute** *(1)* | **earlier** *(28)* | **ensuring** *(2)* |

enter *(1)*
entered *(1)*
entertain *(1)*
entire *(6)*
entirety *(1)*
entitled *(1)*
entrance *(2)*
environment *(6)*
Equalization *(1)*
ergonomic *(1)*
escapes *(1)*
escorted *(1)*
ESQUIRE *(8)*
essential *(5)*
essentially *(5)*
establish *(2)*
established *(7)*
estate *(11)*
estimate *(3)*
estimating *(1)*
et *(5)*
ethic *(2)*
evaluating *(1)*
evaluators *(3)*
event *(10)*
events *(3)*
Eventually *(2)*
Everest *(1)*
everybody *(8)*
everybody's *(1)*
evidence *(1)*
exact *(1)*
exactly *(5)*
exam *(1)*
Examination *(2)*
examined *(1)*
exception *(1)*
Excuse *(1)*
execution *(1)*
executive *(3)*
exempt *(3)*
EXHIBIT *(18)*
Exhibit-158 *(3)*
Exhibit-182 *(4)*
Exhibit-203 *(2)*
Exhibit-204 *(2)*
Exhibit-205 *(2)*
Exhibit-206 *(2)*
Exhibit-207 *(4)*

Exhibit-208 *(3)*
Exhibit-209 *(2)*
Exhibit-210 *(3)*
Exhibit-211 *(2)*
Exhibit-212 *(2)*
Exhibit-213 *(2)*
Exhibit-214 *(3)*
Exhibit-215 *(2)*
Exhibit-216 *(2)*
Exhibit-217 *(2)*
Exhibit-217for *(1)*
Exhibit-218 *(2)*
Exhibit-219 *(2)*
Exhibit-220 *(3)*
Exhibit-221 *(3)*
Exhibit-222 *(3)*
Exhibit-223 *(2)*
Exhibit-29 *(1)*
Exhibit-42 *(1)*
Exhibit-46 *(1)*
Exhibit-48 *(2)*
Exhibit-59 *(4)*
Exhibit-68 *(3)*
Exhibit-71 *(3)*
Exhibit-81 *(3)*
Exhibit-85 *(3)*
exhibited *(1)*
EXHIBITS *(4)*
exist *(1)*
existing *(1)*
expect *(1)*
expectation *(1)*
expected *(3)*
experience *(1)*
expert *(1)*
explain *(1)*
explanation *(1)*
explicitly *(4)*
expose *(1)*
exposed *(1)*
express *(1)*
expressed *(3)*
extend *(1)*
extended *(2)*
extending *(1)*
extent *(9)*
extrapolate *(1)*
eyes *(2)*

< F >
face *(2)*
Facebook *(2)*
FaceTime *(1)*
FaceTimed *(1)*
FaceTiming *(1)*
face-to-face *(1)*
facility *(1)*
fact *(44)*
factor *(2)*
fail *(1)*
failing *(1)*
failure *(2)*
fair *(16)*
fairly *(2)*
fall *(2)*
familiar *(1)*
family *(2)*
fantastic *(1)*
far *(4)*
fast *(3)*
favor *(7)*
favorite *(1)*
fear *(6)*
fearful *(1)*
feathers *(1)*
February *(9)*
federal *(1)*
feed *(3)*
feel *(10)*
feeling *(4)*
feet *(3)*
felt *(54)*
female *(5)*
females *(1)*
fence *(2)*
Fest *(2)*
few-minute *(1)*
field *(34)*
fighting *(1)*
figure *(6)*
figured *(2)*
file *(10)*
filed *(3)*
files *(3)*
filing *(1)*
fill *(3)*
filled *(3)*
final *(12)*

finally *(1)*
find *(7)*
finding *(1)*
findings *(5)*
fine *(4)*
finger *(2)*
finish *(5)*
finished *(3)*
fire *(5)*
firing *(1)*
firm *(3)*
first *(35)*
fit *(6)*
five *(5)*
flabbergasted *(3)*
flip *(4)*
flipping *(1)*
floated *(2)*
floor *(1)*
flu *(1)*
FMLA *(1)*
focus *(6)*
focused *(1)*
fog *(1)*
follow *(7)*
followed *(5)*
following *(5)*
follows *(1)*
food *(1)*
footage *(4)*
football *(3)*
force *(2)*
forced *(1)*
foregoing *(1)*
forget *(1)*
forgot *(1)*
form *(98)*
formal *(3)*
formally *(1)*
format *(1)*
formed *(1)*
former *(4)*
forms *(2)*
Forty-seven *(1)*
forward *(4)*
forwarded *(5)*
found *(9)*
four *(4)*
four-page *(1)*

Deposition of Gary Bender Vol. I - Revised                    Jane Doe, et al. v. Schuylkill County Courthouse, et al.

**FOX** *(3)*
**frame** *(5)*
**Frank** *(4)*
**frankly** *(2)*
**freedom** *(3)*
**freeze** *(2)*
**freezie** *(1)*
**frequently** *(1)*
**Friday** *(29)*
**fridge** *(1)*
**friend** *(1)*
**friendly** *(6)*
**friends** *(4)*
**front** *(22)*
**frustration** *(1)*
**fulfilling** *(1)*
**full** *(1)*
**full-time** *(1)*
**fully** *(2)*
**function** *(6)*
**functions** *(2)*
**fundraiser** *(4)*
**furlough** *(10)*
**furloughed** *(15)*
**furloughing** *(1)*
**furloughs** *(1)*
**further** *(7)*
**future** *(1)*

**< G >**
**Gallagher** *(7)*
**game** *(2)*
**GARY** *(16)*
**gathered** *(1)*
**GEIGER** *(11)*
**general** *(3)*
**generally** *(10)*
**George** *(46)*
**George's** *(5)*
**Ger** *(1)*
**GERARD** *(1)*
**Gerick** *(1)*
**Gerry** *(2)*
**getting** *(16)*
**ggeiger@newmanwilli
ams.com** *(1)*
**giant** *(1)*
**Gilbert** *(3)*
**Ginny** *(7)*

**girls** *(2)*
**give** *(19)*
**given** *(17)*
**giving** *(3)*
**Glenn** *(41)*
**global** *(2)*
**glove** *(4)*
**gloves** *(2)*
**Go** *(87)*
**go-between** *(1)*
**goes** *(7)*
**going** *(168)*
**goo** *(1)*
**good** *(28)*
**gorgeous** *(1)*
**Gotcha** *(1)*
**gotten** *(4)*
**government** *(1)*
**GovU/CCAP** *(1)*
**granddaughter** *(2)*
**Grant** *(10)*
**grants** *(3)*
**great** *(6)*
**Grey** *(1)*
**grievance** *(1)*
**Groody** *(7)*
**Groody's** *(2)*
**ground** *(1)*
**GROUP** *(2)*
**guess** *(18)*
**guidelines** *(3)*
**Gulf** *(1)*
**guy** *(1)*
**guys** *(4)*

**< H >**
**Hal** *(2)*
**Halcovage** *(344)*
**Halcovage's** *(47)*
**HALL** *(3)*
**hallway** *(6)*
**hand** *(2)*
**handed** *(1)*
**handing** *(1)*
**handle** *(3)*
**handout** *(1)*
**hands** *(2)*
**handwriting** *(5)*
**handwritten** *(1)*

**Hang** *(1)*
**Hank** *(1)*
**happen** *(6)*
**happened** *(27)*
**happens** *(3)*
**happy** *(3)*
**harassment** *(27)*
**hard** *(16)*
**harm** *(1)*
**harmful** *(1)*
**Harrisburg** *(1)*
**harsh** *(2)*
**harshly** *(1)*
**hated** *(1)*
**Hatter** *(2)*
**head** *(7)*
**heading** *(1)*
**heads** *(1)*
**health** *(2)*
**healthy** *(1)*
**hear** *(62)*
**heard** *(12)*
**hearing** *(9)*
**Heather** *(1)*
**he'd** *(1)*
**Heffner** *(2)*
**Heidi** *(16)*
**Heinbach** *(1)*
**held** *(26)*
**Helene** *(6)*
**help** *(8)*
**helped** *(1)*
**helping** *(1)*
**Hepner** *(2)*
**hesitation** *(2)*
**Hess** *(18)*
**Hetherington** *(14)*
**Hetherington's** *(1)*
**hew** *(1)*
**hey** *(1)*
**high** *(1)*
**highly** *(1)*
**Hillary** *(1)*
**hire** *(6)*
**hired** *(13)*
**hiring** *(4)*
**Hoffman** *(1)*
**Hoffmann** *(4)*
**hold** *(8)*

**holders** *(1)*
**holding** *(4)*
**holds** *(3)*
**holes** *(1)*
**home** *(45)*
**honesty** *(3)*
**hope** *(1)*
**hot** *(1)*
**hour** *(5)*
**hour-ish** *(1)*
**hourly** *(1)*
**hours** *(7)*
**house** *(4)*
**HR** *(39)*
**Hubric** *(7)*
**hug** *(1)*
**hugged** *(1)*
**human** *(20)*
**humiliated** *(2)*
**husband** *(4)*

**< I >**
**idea** *(23)*
**ideal** *(1)*
**identification** *(21)*
**identify** *(1)*
**if-if** *(1)*
**ill** *(1)*
**illegal** *(9)*
**image** *(1)*
**imagine** *(3)*
**immediate** *(1)*
**immediately** *(1)*
**impairs** *(1)*
**impeachment** *(1)*
**implicitly** *(3)*
**implicity** *(1)*
**implying** *(2)*
**important** *(7)*
**imposed** *(1)*
**impressed** *(1)*
**impression** *(1)*
**impropriety** *(2)*
**inaccurate** *(1)*
**inappropriate** *(26)*
**inaudible** *(1)*
**in-between** *(1)*
**incapable** *(1)*
**incident** *(19)*

Case 3:21-cv-00477-MCC   Document 280-1   Filed 09/20/23   Page 366 of 373
CONFIDENTIAL
Deposition of Gary Bender Vol. I - Revised                    Jane Doe, et al. v. Schuylkill County Courthouse, et al.

incidents (2)
inclement (1)
incline (2)
include (8)
included (1)
includes (3)
including (6)
incognito (1)
incomplete (1)
increase (5)
increased (1)
increases (1)
incredible (1)
incredulous (1)
independent (1)
INDEX (1)
indicate (6)
indicated (18)
indicates (4)
indicating (1)
indicted (1)
individual (6)
individuals (7)
inebriated (1)
inebriation (1)
inference (2)
inferred (1)
inform (6)
informal (1)
information (14)
informational (2)
informed (12)
initial (6)
initially (5)
initiate (1)
initiated (1)
inner (1)
inner-sanctum (7)
in-person (7)
input (2)
inside (2)
instance (2)
instances (1)
instruct (8)
instructed (1)
instructing (2)
instruction (5)
instructions (4)
insulted (4)

insurance (6)
intends (1)
intent (3)
intention (1)
interact (1)
interaction (5)
interactions (1)
interchangeable (1)
interest (3)
interested (2)
interim (45)
intermittent (1)
interpret (1)
interpretation (2)
interpreted (1)
INTERROGATION (1)
interrupt (4)
interview (56)
interviewed (26)
interviewing (2)
interviews (13)
intimated (1)
intimidation (1)
introduced (8)
invest (1)
investigate (1)
investigation (44)
investigations (3)
investigative (1)
investigator (3)
invited (2)
involve (1)
involved (20)
involvement (3)
involves (1)
involving (1)
iPad (23)
IPPOLITO (5)
irritation (2)
issue (17)
issued (6)
issues (35)
item (7)
items (6)
its (4)

< J >
JANE (807)

January (15)
jaw (2)
jeans (7)
jeepers (1)
Jerry (1)
Jim (1)
Joan (6)
job (108)
jobs (3)
Johnson (3)
join (1)
joined (3)
joke (1)
JONES (164)
judge (14)
judge's (1)
July (22)
jump (4)
jumping (1)
June (26)
jury (2)
JUSTICE (1)
justification (2)
justified (1)

< K >
Kalyam (6)
K-A-L-Y-A-M (1)
Keel (1)
keep (5)
keeps (1)
Kelly (1)
kept (4)
key (1)
keycard (2)
keyword (1)
kids (1)
kind (16)
kiss (1)
kitchen (1)
knew (12)
knocked (1)
know (234)
knowledge (13)
knowledgeable (1)
Kutzler (19)

< L >
labor (1)

Lachman (1)
lack (4)
laid (3)
language (7)
laptop (2)
larger (1)
late (5)
laughed (2)
LAW (5)
lawsuit (1)
lawyer (4)
layoffs (1)
lead (1)
leadership (1)
leading (1)
learn (21)
learned (10)
learning (6)
lease (2)
Leasing (1)
leave (12)
leaving (10)
LEES (3)
left (31)
legal (1)
length (1)
lesbian (1)
letter (46)
letters (2)
letting (1)
level (2)
license (19)
licenses (2)
life (1)
liked (4)
likewise (1)
limit (2)
limited (2)
Linda (1)
LINE (11)
lines (7)
lips (1)
Lisa (7)
list (6)
listed (5)
Listen (2)
listened (1)
listening (3)
litigation (3)

Deposition of Gary Bender Vol. I - Revised                              Jane Doe, et al. v. Schuylkill County Courthouse, et al.

| | | | |
|---|---|---|---|
| little *(34)* | male *(1)* | mental *(2)* | Murray's *(2)* |
| live *(2)* | man *(1)* | mention *(7)* | mute *(1)* |
| lived *(1)* | management *(1)* | mentioned *(10)* | Myer *(8)* |
| living *(1)* | manager *(1)* | mentioning *(1)* | |
| local *(1)* | managerial *(1)* | Mentor *(2)* | < N > |
| located *(2)* | managing *(1)* | message *(10)* | name *(24)* |
| location *(8)* | mandatory *(1)* | met *(23)* | named *(3)* |
| locations *(2)* | manipulate *(1)* | Michael *(1)* | names *(1)* |
| locked *(1)* | manipulated *(1)* | Michelle *(19)* | nametags *(1)* |
| locks *(1)* | manipulation *(1)* | MIDDLE *(3)* | narrow *(3)* |
| logged *(1)* | manner *(1)* | millage *(1)* | narrows *(1)* |
| logical *(1)* | Mantura *(1)* | MILLIE *(2)* | NE *(1)* |
| log-in *(2)* | March *(36)* | mind *(6)* | necessary *(9)* |
| long *(17)* | MARIE *(3)* | mine *(5)* | need *(12)* |
| longer *(3)* | mark *(32)* | minimal *(1)* | needed *(16)* |
| long-time *(1)* | MARKED *(46)* | minute *(2)* | needs *(1)* |
| long-winded *(1)* | Market *(12)* | minutes *(2)* | negative *(2)* |
| look *(37)* | married *(1)* | MIS *(7)* | negotiate *(1)* |
| looked *(18)* | Martina *(5)* | misconduct *(5)* | negotiation *(2)* |
| looking *(13)* | Mary *(4)* | misconstrued *(1)* | negotiations *(2)* |
| looks *(4)* | Mataskavage *(2)* | misleading *(1)* | Nester *(5)* |
| looped *(2)* | materials *(7)* | missed *(2)* | never *(35)* |
| lose *(3)* | maternity *(4)* | misunderstand *(1)* | nevermind *(1)* |
| lost *(8)* | math *(2)* | misunderstood *(1)* | new *(13)* |
| lot *(24)* | Matt *(16)* | mjones@jonespassodel | NEWMAN *(1)* |
| Loudermill *(3)* | matter *(14)* | is.com *(1)* | news *(1)* |
| Love *(2)* | matters *(3)* | modification *(2)* | nice *(1)* |
| Loves *(1)* | maximize *(1)* | modifications *(1)* | NICOLE *(2)* |
| lower *(7)* | Mayhall *(7)* | mom *(1)* | night *(4)* |
| lowest *(2)* | McAlonis *(3)* | moment *(2)* | nippolito@mpvhlaw.co |
| loyal *(1)* | MCCAMEY *(1)* | momentarily *(1)* | m *(1)* |
| loyalty *(1)* | MCNERNEY *(1)* | Monday *(8)* | nixed *(1)* |
| lunch *(6)* | McNulty *(1)* | money *(3)* | nod *(1)* |
| luncheon *(1)* | mean *(40)* | Monroe *(1)* | nodding *(1)* |
| lure *(2)* | meaning *(9)* | month *(9)* | non-county *(1)* |
| lures *(1)* | means *(3)* | monthly *(1)* | non-discrimination |
| Luzerne *(1)* | meant *(10)* | months *(9)* | *(1)* |
| | measure *(1)* | moot *(1)* | non-employee *(1)* |
| < M > | medication *(1)* | morning *(10)* | non-employees *(1)* |
| ma'am *(3)* | meet *(17)* | mouth *(1)* | non-interim *(1)* |
| machine *(3)* | meeting *(43)* | move *(13)* | non-job *(1)* |
| mail *(3)* | meetings *(8)* | moved *(10)* | non-present *(1)* |
| mailroom *(7)* | meets *(1)* | movement *(3)* | non-routine *(2)* |
| main *(4)* | Melinda *(1)* | moves *(1)* | Non-union *(1)* |
| maintain *(1)* | Melissa *(3)* | moving *(11)* | normal *(2)* |
| maintained *(3)* | member *(2)* | multiple *(8)* | normally *(1)* |
| maintains *(1)* | members *(2)* | muncher *(1)* | nose *(1)* |
| maintenance *(1)* | membership *(1)* | municipalities *(1)* | Notary *(2)* |
| making *(5)* | memory *(1)* | Murray *(24)* | note *(5)* |

Deposition of Gary Bender Vol. I - Revised                    Jane Doe, et al. v. Schuylkill County Courthouse, et al.

notes *(23)*
notification *(1)*
notified *(3)*
notify *(4)*
November *(9)*
NUMBER *(22)*
numbers *(4)*
numerous *(1)*

< O >
oath *(1)*
Object *(94)*
objected *(2)*
objecting *(2)*
Objection *(9)*
objectionable *(1)*
objections *(2)*
obligation *(2)*
observation *(3)*
observations *(3)*
observe *(33)*
observed *(14)*
obtain *(11)*
obtained *(1)*
occasions *(9)*
occupied *(1)*
occur *(1)*
occurred *(7)*
occurring *(2)*
O'Connell *(25)*
O'Connell's *(1)*
O'Connor *(8)*
O'Connor's *(1)*
October *(12)*
odd *(4)*
offended *(1)*
offense *(1)*
offensive *(2)*
offer *(11)*
offered *(10)*
Office *(204)*
offices *(72)*
official *(4)*
officials *(2)*
oft *(1)*
Oh *(16)*
Okay *(600)*
Once *(8)*
ones *(11)*

ongoing *(2)*
online *(4)*
open *(6)*
opened *(5)*
opening *(2)*
opens *(1)*
operate *(1)*
operated *(1)*
operating *(1)*
operation *(1)*
operations *(7)*
opinion *(21)*
opportunity *(1)*
opposed *(6)*
optimal *(1)*
option *(2)*
options *(1)*
oral *(3)*
order *(6)*
orientation *(3)*
originally *(5)*
ostracized *(2)*
outlined *(1)*
outside *(9)*
overhaul *(1)*
overhauled *(4)*
overlap *(2)*
overly *(1)*
overrule *(1)*
oversaw *(1)*
oversee *(3)*
overseeing *(3)*
overseen *(1)*
overstepped *(1)*
overtime *(3)*
overwritten *(2)*

< P >
P.C *(2)*
p.m *(12)*
P.O *(1)*
packet *(6)*
PAGE *(52)*
pages *(3)*
paid *(12)*
pandemic *(8)*
pants *(1)*
paper *(3)*
papers *(7)*

paperwork *(3)*
PAR *(27)*
parade *(1)*
paragraph *(12)*
PARALEGAL *(3)*
paralegals *(1)*
parenthesis *(2)*
parents *(1)*
park *(2)*
parked *(4)*
parking *(31)*
part *(12)*
participant *(1)*
participate *(4)*
participated *(2)*
participating *(1)*
particular *(8)*
parties *(7)*
party *(7)*
passed *(2)*
PASSODELIS *(1)*
path *(1)*
PATRICIA *(2)*
PAUL *(2)*
pause *(1)*
paused *(1)*
pay *(8)*
pending *(4)*
Penn *(4)*
PENNSYLVANIA *(16)*
people *(32)*
percent *(3)*
perception *(1)*
Perfect *(1)*
perform *(7)*
performance *(34)*
performed *(3)*
performing *(2)*
period *(36)*
periodically *(1)*
permission *(2)*
permit *(1)*
permitted *(4)*
pers *(1)*
person *(32)*
personal *(13)*
Personally *(1)*
personnel *(8)*

petition *(10)*
petitions *(1)*
Philadelphia *(4)*
philosophies *(1)*
phone *(15)*
photo *(2)*
photos *(2)*
phrase *(2)*
phrased *(1)*
physical *(5)*
physically *(1)*
picnic *(1)*
picture *(2)*
piss *(1)*
Pittsburgh *(1)*
place *(11)*
placed *(8)*
places *(2)*
plain *(1)*
Plaintiff *(4)*
Plaintiffs *(18)*
plaintiff's *(1)*
plan *(20)*
planned *(4)*
plans *(1)*
plant *(1)*
please *(11)*
plees@dmclaw.com *(1)*
PLLC *(1)*
plus *(2)*
point *(110)*
pointing *(1)*
points *(1)*
poles *(1)*
police *(2)*
policies *(17)*
policy *(33)*
political *(11)*
pond *(1)*
pop *(1)*
pops *(2)*
popsicle *(1)*
popsicles *(1)*
portion *(2)*
portions *(1)*
posed *(4)*
position *(69)*
positions *(6)*

positive *(4)*
positively *(1)*
possession *(3)*
possibility *(1)*
possible *(4)*
possibly *(1)*
post *(4)*
posting *(4)*
potential *(1)*
potentially *(4)*
Pottsville *(2)*
precautions *(1)*
prefer *(1)*
preferable *(1)*
preferred *(1)*
preliminary *(1)*
premises *(1)*
prepare *(7)*
prepared *(8)*
prepares *(1)*
preponderance *(1)*
**PRESENT** *(17)*
presented *(7)*
preservation *(4)*
preserve *(4)*
preserved *(6)*
President *(10)*
press *(12)*
pressuring *(1)*
pretty *(10)*
prevent *(1)*
previous *(3)*
**PREVIOUSLY** *(18)*
Price *(10)*
prime *(2)*
principles *(1)*
printed *(7)*
printers *(3)*
prior *(53)*
priorly *(1)*
prison *(2)*
private *(1)*
priveledged *(1)*
privilege *(2)*
privileged *(6)*
privy *(2)*
Probably *(42)*
problem *(8)*
problems *(2)*

procedure *(3)*
procedures *(5)*
proceed *(1)*
proceeding *(1)*
process *(3)*
produced *(6)*
producing *(1)*
product *(11)*
**PRODUCTION** *(2)*
profanities *(1)*
professionally *(1)*
program *(4)*
programs *(1)*
prohibited *(1)*
projected *(2)*
promise *(1)*
promote *(2)*
promoted *(10)*
promotion *(13)*
promotions *(3)*
proper *(1)*
properties *(1)*
property *(1)*
proposed *(3)*
proposing *(2)*
protect *(1)*
protected *(3)*
protocol *(1)*
protocols *(2)*
provide *(4)*
provided *(10)*
prude *(1)*
**PTO** *(1)*
Public *(3)*
publicly *(2)*
pull *(4)*
pulled *(2)*
pulling *(1)*
purchase *(3)*
purports *(1)*
purpose *(3)*
purposes *(16)*
pursuing *(1)*
purview *(1)*
put *(48)*
puts *(1)*
putting *(7)*

**< Q >**

qualifications *(2)*
qualified *(7)*
qualify *(1)*
quarantine *(1)*
quarter *(1)*
question *(68)*
questioned *(1)*
questioning *(2)*
questions *(25)*
quick *(2)*
quickest *(1)*
quite *(13)*
quiz *(2)*
quorum *(4)*
quote *(2)*

**< R >**

raise *(12)*
raised *(13)*
raises *(2)*
rally *(2)*
ran *(2)*
rate *(3)*
reach *(4)*
reached *(5)*
reacted *(1)*
read *(13)*
readdress *(1)*
reading *(6)*
ready *(2)*
real *(13)*
realize *(2)*
realized *(2)*
really *(20)*
realm *(1)*
rearrange *(1)*
reason *(27)*
reasonable *(6)*
reassessment *(6)*
rebuild *(4)*
rebuilt *(2)*
recall *(81)*
recalled *(10)*
recalling *(1)*
receipt *(3)*
receive *(11)*
received *(38)*
receiving *(6)*
receptionist *(2)*

receptionists *(1)*
recess *(6)*
recognize *(21)*
recollection *(10)*
recommend *(1)*
recommendation *(3)*
recommendations *(2)*
recommended *(3)*
reconsider *(1)*
record *(53)*
recorded *(3)*
recording *(3)*
recordings *(1)*
records *(3)*
recruiting *(1)*
refer *(13)*
reference *(2)*
referral *(1)*
referred *(4)*
referring *(6)*
refrain *(3)*
refresh *(6)*
refusal *(1)*
refuse *(2)*
refused *(4)*
refusing *(2)*
regard *(1)*
regarding *(49)*
regardless *(2)*
regards *(3)*
registered *(2)*
registration *(1)*
regular *(2)*
regularly *(1)*
rehash *(1)*
relate *(2)*
related *(19)*
relates *(8)*
relation *(1)*
relations *(1)*
relationship *(4)*
relative *(1)*
relay *(1)*
relayed *(2)*
release *(12)*
relevant *(1)*
relied *(3)*
relief *(1)*
relocating *(1)*

CONFIDENTIAL

remain  *(4)*
remained  *(5)*
remark  *(2)*
remarks  *(1)*
remember  *(43)*
remembered  *(1)*
reminded  *(1)*
reminder  *(2)*
remote  *(4)*
remotely  *(8)*
removed  *(2)*
renders  *(1)*
renew  *(3)*
reorganize  *(1)*
rep  *(1)*
Repeat  *(14)*
repeated  *(1)*
repeatedly  *(1)*
repeating  *(1)*
rephrase  *(6)*
replace  *(2)*
replacement  *(1)*
report  *(65)*
reported  *(10)*
REPORTER  *(5)*
Reporting  *(6)*
reports  *(30)*
Reppy  *(3)*
represent  *(8)*
representation  *(1)*
represented  *(2)*
Republican  *(4)*
REQUEST  *(54)*
requested  *(14)*
requests  *(3)*
require  *(2)*
required  *(12)*
requirement  *(6)*
requirements  *(1)*
requirer  *(1)*
requires  *(4)*
researched  *(1)*
resided  *(1)*
residences  *(1)*
resign  *(8)*
resignation  *(11)*
resigned  *(11)*
resource  *(1)*
resources  *(19)*

respond  *(1)*
respondent  *(3)*
responding  *(1)*
response  *(22)*
responses  *(1)*
responsibilities  *(14)*
responsibility  *(3)*
responsible  *(8)*
responsive  *(1)*
rest  *(3)*
restrict  *(4)*
restricted  *(1)*
restricting  *(3)*
restrictions  *(4)*
restructure  *(7)*
restructured  *(11)*
restructuring  *(19)*
result  *(15)*
resume  *(2)*
retain  *(1)*
retained  *(1)*
retaining  *(2)*
retaliation  *(1)*
retire  *(2)*
retired  *(7)*
retirement  *(2)*
retrieve  *(1)*
return  *(10)*
review  *(17)*
reviewed  *(21)*
reviewing  *(2)*
reviews  *(1)*
revise  *(2)*
revised  *(9)*
revision  *(4)*
revisions  *(1)*
right  *(154)*
right-hand  *(1)*
RIGHTS  *(2)*
righty  *(1)*
risk  *(1)*
Road  *(4)*
role  *(37)*
roles  *(3)*
Room  *(11)*
rooms  *(1)*
Roth  *(41)*
roughly  *(7)*
routine  *(1)*

RPR  *(3)*
rubber  *(5)*
rude  *(1)*
ruffle  *(1)*
rule  *(1)*
ruling  *(2)*
rumor  *(9)*
rumored  *(3)*
rumors  *(15)*
run  *(5)*
running  *(1)*

< S >
sad  *(1)*
safe  *(7)*
salary  *(11)*
sales  *(1)*
sanction  *(1)*
Sandusky  *(2)*
sat  *(3)*
satisfied  *(2)*
Saturday  *(6)*
save  *(2)*
saved  *(3)*
saw  *(7)*
saying  *(26)*
says  *(30)*
SC  *(5)*
SC1162  *(1)*
SC1217  *(1)*
SC1217-1218  *(1)*
SC1221  *(1)*
SC1221-1222  *(1)*
SC-2  *(1)*
SC467  *(1)*
Scarbinsky  *(12)*
schedules  *(1)*
school  *(2)*
schools  *(2)*
SCHUYLKILL  *(10)*
scolded  *(1)*
Scott  *(2)*
screen  *(18)*
script-type  *(1)*
scroll  *(5)*
search  *(1)*
season  *(2)*
seated  *(1)*
second  *(20)*

seconds  *(2)*
secret  *(1)*
secretaires  *(1)*
secretary  *(1)*
secure  *(5)*
security  *(5)*
see  *(57)*
seeing  *(2)*
seek  *(1)*
seen  *(5)*
seize  *(1)*
selected  *(2)*
selection  *(1)*
selling  *(1)*
send  *(8)*
sending  *(3)*
senior  *(1)*
seniority  *(1)*
sense  *(5)*
sensitive  *(1)*
sent  *(7)*
sentence  *(6)*
sentences  *(2)*
separate  *(3)*
separated  *(2)*
separately  *(1)*
separation  *(2)*
September  *(15)*
serious  *(3)*
serve  *(1)*
service  *(1)*
services  *(10)*
session  *(3)*
set  *(5)*
severe  *(1)*
sex  *(16)*
sexual  *(35)*
share  *(2)*
shared  *(1)*
sharing  *(3)*
Sharon  *(3)*
shed  *(1)*
sheriff  *(17)*
sheriffs  *(4)*
sheriff's  *(7)*
Shlanta  *(7)*
S-H-L-A-N-T-A  *(1)*
Shlanta's  *(1)*
shocking  *(1)*

Case 3:21-cv-00477-MCC    Document 280-1   CONFIDENTIAL   Filed 09/20/23    Page 371 of 373

Deposition of Gary Bender Vol. I - Revised          Jane Doe, et al. v. Schuylkill County Courthouse, et al.

shortly *(6)*
shot *(3)*
show *(10)*
showed *(5)*
shown *(1)*
shows *(1)*
shredded *(3)*
shut *(4)*
shutting *(1)*
sick *(2)*
side *(5)*
sign *(6)*
signature *(13)*
signatures *(14)*
signed *(10)*
significant *(3)*
silly *(1)*
similar *(8)*
similarities *(1)*
similarly *(3)*
simple *(2)*
simply *(5)*
Sing *(2)*
singing *(1)*
single *(1)*
sit *(4)*
sits *(1)*
sitting *(4)*
situated *(1)*
situation *(4)*
situations *(1)*
six *(7)*
sixth *(2)*
Sky *(3)*
sleeping *(2)*
slightly *(1)*
slip *(1)*
smartest *(1)*
SMITH *(319)*
smooth *(1)*
snapped *(1)*
social *(2)*
solicited *(1)*
soliciting *(1)*
solicitor *(3)*
Solicitor/risk *(1)*
somebody *(5)*
someone's *(2)*
somewhat *(2)*

Sorry *(76)*
sort *(10)*
sound *(2)*
sounds *(3)*
space *(2)*
spaces *(2)*
speak *(26)*
speaker *(1)*
speaking *(4)*
speaks *(1)*
special *(1)*
SPECIALIST *(1)*
specific *(7)*
specifically *(15)*
speculate *(2)*
speculative *(1)*
spoke *(21)*
spoken *(4)*
spot *(16)*
spots *(8)*
St *(1)*
stack *(20)*
staff *(7)*
stamp *(5)*
Stamped *(40)*
Stan *(6)*
stand *(1)*
standing *(1)*
Stanley *(1)*
stapled *(4)*
start *(15)*
started *(21)*
starting *(2)*
starts *(1)*
State *(21)*
stated *(4)*
statement *(4)*
statements *(1)*
STATES *(20)*
state's *(1)*
stating *(2)*
status *(7)*
statute *(2)*
statutorily *(1)*
statutory *(1)*
stay *(4)*
stayed *(2)*
STEB *(22)*
steep *(1)*

stenographic *(1)*
step *(6)*
stepped *(3)*
steps *(6)*
Stevens *(1)*
stint *(5)*
stipulations *(2)*
stop *(4)*
stopped *(4)*
stories *(1)*
story *(1)*
Stottlemyer *(13)*
Stottlemyer's *(1)*
Street *(6)*
stress *(1)*
Strike *(20)*
strongly *(1)*
Stroudsburg *(1)*
struggle *(1)*
struggled *(1)*
stuck *(1)*
stuff *(1)*
submit *(7)*
submits *(2)*
submitted *(7)*
submitting *(1)*
subordinate *(2)*
subpoena *(1)*
subsequent *(8)*
substance *(1)*
success *(2)*
succession *(1)*
suffered *(1)*
sufficient *(4)*
suggest *(3)*
suggested *(2)*
suggestion *(3)*
Suite *(3)*
summary *(2)*
summertime *(1)*
supervised *(2)*
supervisor *(21)*
supervisors *(5)*
supplement *(1)*
supplied *(1)*
supplies *(1)*
supply *(1)*
support *(4)*
supporter *(1)*

suppose *(3)*
supposed *(4)*
Sure *(45)*
suspect *(1)*
suspended *(1)*
suspension *(1)*
sustained *(1)*
swear *(1)*
swipe *(2)*
switch *(1)*
sworn *(1)*
synopsis *(1)*

< T >
table *(2)*
take *(54)*
taken *(9)*
talk *(32)*
talked *(19)*
talking *(16)*
talks *(2)*
tasks *(2)*
tax *(115)*
team *(4)*
tears *(1)*
technical *(1)*
TECHNICIAN *(4)*
technological *(2)*
telephone *(3)*
telephonic *(1)*
telephonically *(2)*
tell *(62)*
telling *(7)*
tells *(1)*
ten *(3)*
term *(1)*
terminate *(3)*
terminated *(8)*
termination *(18)*
terms *(2)*
test *(1)*
tested *(3)*
testified *(22)*
testify *(6)*
testifying *(3)*
testimony *(24)*
text *(14)*
texted *(3)*
texting *(1)*

Thank  (24)
thanks  (3)
theirs  (1)
thereabouts  (1)
thereof  (1)
thereto  (2)
the's  (1)
thing  (16)
things  (25)
think  (205)
thinking  (6)
thinks  (1)
third  (3)
third-party  (3)
thought  (53)
thoughts  (2)
threat  (1)
threaten  (3)
threatened  (1)
three  (22)
three-year  (1)
throws  (1)
Tiffany  (4)
tight  (1)
time  (192)
timely  (2)
times  (16)
timing  (1)
title  (4)
titles  (2)
Tobin  (5)
Tobin's  (1)
today  (13)
today's  (15)
told  (48)
Tom  (1)
tomorrow  (1)
tonight  (4)
Tony  (4)
tool  (1)
top  (14)
topic  (3)
topics  (1)
Toshiba  (2)
Toshibas  (1)
touched  (1)
Tower  (15)
town  (1)
TOWNSEND  (7)

township  (1)
tracing  (1)
track  (2)
trail  (2)
trained  (1)
training  (37)
transcribe  (1)
transcribed  (1)
TRANSCRIPT  (4)
transfer  (1)
transferred  (4)
transfers  (3)
transition  (2)
transitioned  (3)
transitions  (1)
transpire  (1)
treasurers  (5)
treasurer's  (5)
treat  (1)
treatment  (1)
trial  (1)
tried  (2)
Trifun  (4)
trigger  (1)
trip  (1)
true  (11)
Trump  (2)
trust  (2)
truth  (4)
truthfully  (3)
truthfulness  (3)
try  (11)
Trying  (22)
turn  (12)
turned  (4)
turner  (2)
Turning  (3)
twice  (4)
Twigg  (115)
Twigg's  (13)
two  (68)
type  (5)
typed  (4)
typical  (1)
typist  (4)

< U >
U.S  (1)
ugly  (1)

Uh-huh  (3)
unable  (1)
unacceptable  (1)
unaccompanied  (3)
unannounced  (5)
unaware  (1)
unbelievable  (1)
uncomfortable  (13)
undermining  (1)
understand  (63)
understanding  (12)
understood  (7)
unemployment  (8)
unescorted  (1)
unhappy  (1)
uniform  (1)
Uninvited  (2)
union  (7)
unique  (1)
UNITED  (3)
unmistakable  (1)
unnecessarily  (1)
unpack  (6)
unprofessional  (1)
unwise  (1)
upcoming  (2)
updated  (6)
upfront  (1)
upper  (9)
upset  (8)
upstairs  (1)
use  (5)
uses  (1)
usually  (1)
utilize  (1)
utilized  (3)
utilizing  (1)

< V >
vacancies  (1)
vacant  (1)
vacation  (4)
vacations  (1)
valid  (1)
VANDERLIN  (1)
various  (1)
vehicle  (1)
vehicles  (6)
verbal  (5)

versus  (3)
veterans  (1)
vetoed  (1)
VIDEO  (9)
VIDEOGRAPHER  (15)
videos  (1)
VIDEOTAPE  (1)
view  (3)
viewed  (1)
Villanova  (1)
violate  (1)
violated  (3)
violation  (3)
Virginia  (1)
virtual  (5)
visit  (4)
visited  (1)
voiced  (1)
volition  (3)
VOLUME  (2)
voluntary  (1)
vote  (11)
voted  (1)
voting  (3)

< W >
wait  (8)
waited  (1)
waiting  (1)
walk  (6)
walked  (3)
wall  (1)
Walnut  (2)
wand  (3)
wanded  (3)
wanding  (4)
want  (78)
wanted  (38)
wanting  (1)
warning  (8)
warranted  (1)
wash  (1)
Washington  (1)
wavered  (2)
way  (26)
weakness  (1)
wear  (1)
weather  (1)

website  *(1)*
Wednesday  *(1)*
week  *(8)*
weeks  *(3)*
weird  *(4)*
well  *(141)*
Wendy  *(2)*
Wendy's  *(2)*
went  *(47)*
we're  *(30)*
we've  *(8)*
whoa  *(2)*
whore  *(1)*
wife  *(12)*
wife's  *(2)*
wild  *(1)*
WILLIAM  *(3)*
Williamsport  *(1)*
willing  *(9)*
winter  *(1)*
wish  *(3)*
withdrew  *(1)*
WITNESS  *(113)*
witnesses  *(1)*
woman  *(10)*
women  *(10)*
word  *(9)*
wording  *(1)*
words  *(12)*
work  *(135)*
workday  *(2)*
worked  *(23)*
worker  *(5)*
workers  *(1)*
working  *(38)*
workplace  *(9)*
work-related  *(1)*
works  *(2)*
worried  *(3)*
worries  *(1)*
worse  *(1)*
worth  *(1)*
Would've  *(1)*
wow  *(2)*
write  *(14)*
writer  *(6)*
writes  *(1)*
write-up  *(1)*
writing  *(3)*

written  *(11)*
wrong  *(16)*
wrote  *(3)*

< Y >
Yeah  *(34)*
year  *(25)*
years  *(24)*
yell  *(1)*
yelled  *(1)*
young  *(2)*
youth  *(6)*
Yup  *(3)*

< Z >
Zimmerman  *(9)*
Zimmerman's  *(1)*
zipper  *(2)*
Zoom  *(18)*
Zula  *(17)*