# EXHIBIT

# P64

```
 1    _____

 2   JANE DOE, et al.,          : UNITED STATES
                Plaintiff       : DISTRICT COURT
 3         v.                   : MIDDLE DISTRICT OF
                                : PENNSYLVANIA
 4   SCHUYLKILL COUNTY          :
     COURTHOUSE, et al.,        : CIVIL DOCKET NO:
 5          Defendants          : 3:21-CV-00477
      _____

 6

 7                        ***

 8                     VOLUME II

 9                        ***

10            TRANSCRIPT MARKED CONFIDENTIAL

11                        ***

12

13

14

15

16

17

18            CONTINUED VIDEOTAPE DEPOSITION OF HEIDI

19   ZULA taken at the U.S. Attorney's Office, Middle

20   District of Pennsylvania, 228 Walnut Street,

21   Harrisburg, Pennsylvania 17108 on Thursday,

22   October 20, 2022 at 9:18 a.m. before Coleen

23   Trifun, RPR and Notary Public.

24
```

```
 1    A P P E A R A N C E S :

 2            DEREK SMITH LAW GROUP, PLLC
              BY:   CATHERINE SMITH, ESQUIRE
 3            1835 Market Street
              Suite 2950
 4            Philadelphia, Pennsylvania 19103
              catherine@dereksmith.com
 5            Counsel for the Plaintiffs

 6

 7            DEPARTMENT OF JUSTICE
              CIVIL RIGHTS DIVISION
 8            BY:   AMBER FOX, ESQUIRE
                    ALLAN TOWNSEND, ESQUIRE
 9            150 M St. NE Room 9.932
              Washington, District of Columbia 20002
10            amber.fox@usdoj.gov
              allan.townsend@usdoj.gov
11            Counsel for the Plaintiffs

12            NEWMAN WILLIAM, P.C.
              BY:   GERARD J. GEIGER, ESQUIRE
13            P.O. BOX   511
              712 Monroe Street
14            Stroudsburg, Pennsylvania 18360
              ggeiger@newmanwilliams.com
15            Counsel for George Halcovage

16            MCNERNEY PAGE VANDERLIN & HALL
              BY:   NICOLE IPPOLITO, ESQUIRE
17            433 Market Street
              Williamsport, Pennsylvania 17701
18            nippolito@mpvhlaw.com
              Counsel for Glenn Roth
19

20            JONES PASSODELIS
              MARIA N. PIPAK, ESQUIRE
21            Gulf Tower, Suite 3410
              707 Grant Street
22            Pittsburgh, Pennsylvania 15219
              mpipak@jonespassodelis.com
23            Counsel for Gary Bender and Heidi Zula

24
```

```
 1              DICKIE MCCAMEY
                BY:  PAUL G. LEES, ESQUIRE
 2              190 Brodhead Road, Suite 310
                Bethlehem, Pennsylvania 18017
 3              plees@dmclaw.com
                Counsel for additional parties
 4

 5              ALSO PRESENT:

 6              ALEISHA KATZ, VIDEO SPECIALIST
                ALYSSA DEBISE, PARALEGAL
 7              JANE DOE 1 (Via Zoom)
                JANE DOE 2(Via Zoom)
 8              JANE DOE 3(via Zoom)
                GEORGE HALCOVAGE
 9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24
```

```
 1                          - - -

 2                          INDEX

 3                          - - -

 4   WITNESS            INTERROGATION BY      PAGE

 5   HEIDI ZULA

 6                   By Ms. Smith            414

 7                   By Ms. Fox             727

 8                          - - -

 9                        EXHIBITS

10                          - - -

11   EXHIBIT NUMBER       DESCRIPTION          PAGE

12   Exhibit-140          Zula 280            416

13   Exhibit-141          Zula 1802           418

14   Exhibit-142          Zula 715            420

15   Exhibit-143          Zula 726            424

16   Exhibit-144          Zula 755            429

17   Exhibit-145          Zula 128            431

18   Exhibit-146          Zula 2513           438

19   Exhibit-147          SC307 & 177         442

20   Exhibit-148          Zula 2589           447

21   Exhibit-149          Zula 7184-7185      451

22   Exhibit-150          Zula 893            467

23   Exhibit-151          Zula 964-966        473

24   Exhibit-152          Zula 898-899        474
```

```
 1   Exhibit-153          Zula 929               480

 2   Exhibit-154          Zula 1116              484

 3   Exhibit-155          Zula 1217-1218         489

 4   Exhibit-156          SC634                  493

 5   Exhibit-157          SC618                  494

 6   Exhibit-158          SC619                  496

 7   Exhibit-159          Zula 2522              501

 8   Exhibit-160          Zula 2640              508

 9   Exhibit-161          Zula 2398 & 299-302    513

10   Exhibit-162          Zula 298               515

11   Exhibit-163          Zula 2764              526

12   Exhibit-164          Zula 305               529

13   Exhibit-165          Zula 2798              531

14   Exhibit-166          Zula 2826              532

15   Exhibit-167          Zula 1167              538

16   Exhibit-168          9/29/22 letter         550

17   Exhibit-169          Zula 933               553

18   Exhibit-170          Zula 942-943           554

19   Exhibit-171          Zula 417-418           561

20   Exhibit-172          (skipped)

21   Exhibit-173          Zula 956-957           569

22   Exhibit-174          Zula 958-959           571

23   Exhibit-175          Zula 1091-1098         572

24   Exhibit-176          Zula 1090              576
```

```
 1   Exhibit-177          Zula 1795              588

 2   Exhibit-178          Zula 1830              594

 3   Exhibit-179          Zula 1908              595

 4   Exhibit-180          Zula 1956-57           598

 5   Exhibit-181          Zula 2498              601

 6   Exhibit-182          SC1213-14              606

 7   Exhibit-183          Zula 2635-2637         610

 8   Exhibit-184          Zula 277               621

 9   Exhibit-185          Zula 1890              624

10   Exhibit-186          Zula 188-189           632

11   Exhibit-187          Zula 2510-2511         643

12   Exhibit-188          Zula 2586              644

13   Exhibit-189          Zula 2595              649

14   Exhibit-190          Zula 2684              659

15   Exhibit-191          Zula 2741&2723         661

16   Exhibit-192          Zula 1748              665

17   Exhibit-193          Zula 1761-62           666

18   Exhibit-194          Zula 1412-14           708

19                          - - -

20        PREVIOUSLY MARKED EXHIBITS MENTIONED

21   Exhibit-121    Page 490 Line 21

22   Exhibit-105    Page 567 Line 12

23                          - - -

24
```

Deposition of Heidi Zula Vol. II - Revised                    Jane Doe, et al. v. Schuylkill County Courthouse, et al.

1              DIRECTION TO WITNESS NOT TO ANSWER

2     PAGE    LINE              PAGE    LINE              PAGE    LINE

3     563     20

4

5

6

7

8

9

10

11         REQUEST FOR PRODUCTION OF DOCUMENTS

12    PAGE    LINE              PAGE    LINE              PAGE    LINE

13                             (None)

14

15

16

17

18

19

20

21

22

23

24

1            VIDEOGRAPHER:  Now on the record my
2    name is Aleisha Katz with Everest Court Reporting.
3    Today's date is October 20, 2022 and the time is
4    approximately 9:18 a.m.  This deposition is
5    located at 228 Walnut Street in Harrisburg
6    Pennsylvania caption case Jane Doe et al versus
7    Schuylkill County Courthouse et al.  The name of
8    witness is Heidi Zula Volume Number II.  At this
9    time attorneys will identify themselves and party
10   they represent after which our court reporter
11   Coleen Trifun will swear in the witness and we
12   will proceed.
13            MS. SMITH:  Catherine Smith on
14   behalf of the plaintiff Jane doe through Jane Doe
15   four.  Present with me is my paralegal Alyssa
16   DeBise.  We also have appearing by Zoom Jane Doe 1
17   and Jane Doe 4.  Should any of the other
18   plaintiffs join I'll notify on the record.
19            MS. FOX:  Amber Fox for the
20   department of justice.
21            MR. TOWNSEND:  Allan Townsend also
22   for the department of justice.
23            MS. PIPAK:  Maria Pipak for Heidi
24   Zula, Gary Bender and the county.

Page 414

1   MR. LEES:  Paul Lees for defendant
2   Kutzler.
3   MR. GEIGER:  Gerry Geiger for
4   defendant Halcovage who is also seated in the
5   room.
6   MS. IPPOLITO:  Nicole Ippolito for
7   defendant Glen Roth.
8   MS. SMITH:  Same stipulation that
9   the transcript be marked confidential in its
10  entirety?
11  (All parties agreed.)
12  MS. SMITH:  Same stipulation for
13  objections for form and privilege?
14  (All parties agreed.)
15  - - -
16  HEIDI ZULA, having been first duly
17  sworn, was examined and testified as follows:
18  - - -
19  Examination
20  - - -
21  BY MS. SMITH:
22  Q.     Good morning, Ms. Zula.  As you know
23  again, my name is Catherine Smith and I represent
24  the Jane Does in this matter.

Page 415

1   Ms. Zula, did you speak with your
2   attorney  between the end of yesterday deposition
3   and this morning?
4   A.     No.
5   Q.     Okay.
6   And did you do anything to prepare for
7   today's portion of the deposition?
8   A.     No.
9   Q.     Did you review any documents?
10  A.     No.
11  Q.     Have you consumed, in the last 24 hours,
12  any medication substance or alcohol that would
13  impair your ability to testify truthfully here?
14  A.     No.
15  Q.     Is there any reason you could think of
16  that impairs your ability to testify
17  truthfully here today?
18  A.     No.
19  Q.     Do you recall the instructions from
20  yesterday's deposition?
21  A.     Yes.
22  Q.     Any questions about today's deposition?
23  A.     No.
24  Q.     Ms. Zula, yesterday you briefly touched

Page 416

1   on this.  You testified about a report of an FLSA
2   violation someone stealing time.
3   Do you recall that?
4   MS. PIPAK:  I'll object to the
5   form.  But go ahead.
6   THE WITNESS:  I believe so, yeah.
7   MS. SMITH:  Okay.
8   I'm going to mark as 140, it's Zula
9   280.  I'm sorry, 2820.
10  - - -
11  (Zula 280 marked as Exhibit-140 for
12  identification.)
13  - - -
14  BY MS. SMITH:
15  Q.     Okay.
16  Ms. Zula, do you recognize this
17  document?
18  A.     Yes.
19  Q.     This is the first e-mail in this chain
20  on September 9th, 2021.  It's an e-mail from you
21  to -- from Jane Doe 3 to you regarding a potential
22  FLSA violation by tax assessment employee,
23  correct?
24  A.     Yes.

Page 417

1   Q.     And Jane Doe 3 indicated in her then
2   last e-mail in this chain, that she wasn't
3   comfortable providing the names and risk and
4   retaliatory action by the county toward the
5   individual who provided her the information,
6   correct?
7   A.     That's what she indicated, yes.
8   Q.     Okay.
9   Did you ever investigate or, as she
10  suggests, interview everyone in the tax assessment
11  office regard this matter?
12  A.     I investigated the issue, yes.
13  Q.     And how did you investigate the issue?
14  A.     I spoke with the supervisor, and then we
15  identified the employee who was working through
16  their lunch and beyond their quit time and not
17  noting that work on their time sheet and we
18  addressed the situation directly with the
19  employee.
20  Q.     Who was that employee?
21  A.     Colleen Warmcastle.
22  Q.     Was Ms. Warmcastle written up?
23  A.     No, she was not.
24  Q.     The supervisor at the time was Ken

Page 418

1  Hatter, correct?
2  A.     Yes.
3  Q.     Was Mr. Hatter disciplined in any way?
4  A.     No, he was not.
5  Q.     Did you inform Jane Doe 3 that you had
6  conducted an investigation at any point?
7  A.     No, I did not.
8  Q.     Okay.
9         Did you ever, if you know, respond to
10 her September 9th at 10:28 a.m. e-mail, that first
11 one on top of the page?
12 A.     No, I do not believe I did.
13 Q.     Okay.
14        So you never suggested to her to report
15 this issue through the Stop It Program?
16 A.     No.
17        MS. SMITH:  I'm going to mark Zula
18 1802 as 141.
19             - - -
20        (Zula 1802 marked as Exhibit-141 for
21 identification.)
22             - - -
23 BY MS. SMITH:
24 Q.     Ms. Zula, do you recognize this e-mail

Page 419

1  chain?
2  A.     Yes.
3  Q.     Do you remember this correspondence at
4  issue?
5  A.     Yes.
6  Q.     At any point did you informed Jane Doe 3
7  that she could make a anonymous report regarding
8  the concern through the Stop It Program?
9  A.     No, I did not.
10 Q.     Why not?
11 A.     The Stop It report would have come to me
12 indirectly.
13 Q.     Right.  But it would have been in an
14 anonymous report, correct?
15 A.     Yes.
16 Q.     Okay.
17        Do you know, did Jane Do 3, or Jane Doe
18 3, ever provide the details to Commissioner Hess
19 as she indicate she would be willing to do?
20 A.     I have no idea.
21 Q.     Okay.
22        Did Commissioner Hess ever come to you
23 with any concerns or questions about this issue?
24 A.     No, he did not.

Page 420

1  Q.     Okay.
2         So you never conducted any investigation
3  regarding this?
4  A.     I never received the details to conduct
5  an investigation.
6  Q.     Okay.
7         You can put that one aside.
8         All right.  So I think at the end of
9  yesterday we were talking about March of 2021, or
10 that time frame, after Jane Doe 3 and Jane Doe 4
11 were demoted.
12        MS. SMITH:  I'm going mark as 142
13 Zula 715.
14             - - -
15        (Zula 715 marked as Exhibit-142 for
16 identification.)
17             - - -
18 BY MS. SMITH:
19 Q.     Do you recognize this e-mail chain?
20 A.     Yes.
21 Q.     Jane Doe 3 -- so March 18th, 2021 Jane
22 Doe 3 had been demoted, correct?
23 A.     Yes.
24 Q.     And she request from you and others

Page 421

1  guidance as to whether how she was to request PTO,
2  what the process was going to be given her
3  demotion, correct?
4  A.     Yes.
5  Q.     And you then forwarded the e-mail to
6  Defendant Bender and said you're her supervisor,
7  can you tell me how you would like this to be
8  done, correct?
9  A.     Yes.
10 Q.     Did Mr. Bender ever instruct you or, if
11 you know, Jane Doe 3 how she was to request PTO?
12        MS. PIPAK:  Objection to the form,
13 but go ahead.
14        THE WITNESS:  He did not indicate
15 to me.  I'm not certain if he communicated with
16 Jane Doe 3.
17 BY MS. SMITH:
18 Q.     So did you ever communicate with Jane
19 Doe 3 as to how she was to request PTO moving
20 forward?
21 A.     No.  I forwarded the request to Mr.
22 Bender as her supervisor.
23 Q.     Okay.
24        Did you ever follow up with Mr. Bender

Page 422

1 to say did you speak with Jane Do 3 and give her
2 this guidance?
3 A.      I don't recall if I did or didn't.
4 Q.      Before the pars for Jane Doe 3 and Jane
5 Doe 4's demotions were voted on, was there any
6 communication with any of the tax assessment or
7 tax claim employees to notify them that demotion
8 would be occurring?
9 A.      No, I do not believe so.
10 Q.      Do you recall if and when the first time
11 was that anyone in administration or HR spoke with
12 the employees to give them any information with
13 the plan moving forward for the offices?
14 A.      I believe Mr. Bender had a meeting in
15 this tax assessment office with the employees
16 following the action that was taken.  I'm not
17 certain of what the exact date was.
18 Q.      You weren't there for it then?
19 A.      I don't believe I was present for the
20 tax assessment meeting, no.
21 Q.      Was there one held with the tax claim
22 employees as well?
23 A.      Not at that time, no.
24 Q.      Okay.

Page 423

1       So the tax -- so Mr. Bender held a
2 meeting with the tax assessment employees to give
3 them information on the plan moving forward, but
4 not the tax claim bureau?
5 A.      Yes, I believe so.
6 Q.      Do you know why that was?
7 A.      No, I don't.
8 Q.      Do you know if the meeting that you're
9 thinking of might have been the meeting with
10 Mr. Alu to introduce him as the interim kind of
11 chief assessment?
12 A.      I'm not certain.  I don't -- I believe
13 he had a meeting with them following the action,
14 and then I do know there was a meeting when
15 Mr. Alu came on board as well.
16 Q.      So you think they're two distinct
17 meetings?
18 A.      Yes, I believe so.
19 Q.      Okay.
20       And you weren't present in a meeting
21 with Mr. Alu either, were you?
22 A.      No, I was not.
23 Q.      Okay.
24       And Jane Doe 3 and Jane Doe 4's par were

Page 424

1 voted on on March 17th, correct?
2 A.      Yes.
3       MS. SMITH:  I'm going to mark Zula
4 726 as 143.
5       - - -
6       (Zula 726 marked as Exhibit-143 for
7 identification.)
8       - - -
9 BY MS. SMITH:
10 Q.      Do you recognize this e-mail?
11 A.      Yes.
12 Q.      It appears to be an e-mail from Jane Doe
13 3 to you, as well as others, on March 25th, 2021
14 in which you forwarded to Mr. Bender; is that
15 correct?
16 A.      Yes.
17 Q.      Did you ever respond to Jane Doe 3's
18 e-mail?
19 A.      No, I did not.
20 Q.      Did Mr. Bender ever give you any
21 information or instruction on how to address this
22 issue?
23 A.      The only information that we discussed
24 specifically was the posting of the assistant tax

Page 425

1 claim director position, and it was determined at
2 that time that we were not going to post that
3 position.
4 Q.      So are you aware of the structures of
5 the office prior to, for lack of a better word,
6 their combination?
7 A.      Yes, I believe there was a separate tax
8 claim director and assistant director, and there
9 was and separate chief assessor and deputy chief
10 assessor, yes.
11 Q.      Okay.
12       So before the offices were under both --
13 under the supervision of both Jane Doe 3 and Jane
14 Doe 4, tax claim had both a director and an
15 assistant director?
16 A.      Yes.
17 Q.      Who made the decision that the assistant
18 tax claim director position would not be posted in
19 March of 2021?
20 A.      Mr. Bender.
21 Q.      Did he tell you why?
22 A.      No.
23 Q.      Did you have an opinion as whether it
24 should be posted?

Page 426

1  A.    No.
2  Q.    Did he tell you -- did Mr. Bender give
3  you any direction or instruction on addressing the
4  questions that the assessment employees had
5  regarding future plans for the office?
6  A.    No. It's my understanding he addressed
7  those questions directly to the office.
8  Q.    Do you know if Mr. Bender ever
9  communicated with Jane Doe 3 that the position
10 would not be posted?  The assistant tax claim
11 director position would not be posted?
12 A.    I do not know.
13 Q.    Do you know if anyone spoke with Jane
14 Doe 3 to ask her if she felt she needed a position
15 to be filled?
16 A.    I don't know.
17 Q.    On the -- you testified yesterday about
18 -- I'm going to call it a compliment, I think is
19 what you called it, correct?
20 A.    Uh-huh.
21 Q.    On the compliment, do you know, does the
22 tax claim bureau have a position for assistant
23 director?
24 A.    Yes.  The position was recreated when we

Page 427

1  separated the offices.  So, yes, it was an
2  existing position on the compliment.
3  Q.    Okay.
4        And I'm sorry if we went over this
5  yesterday.  When you sent Jane Doe 4 her demotion
6  notification email, she was still on bereavement
7  leave, correct?
8  A.    Yes, it's my understanding that she was.
9  Q.    Do you know in the assessment office
10 what check request approvals would be utilized
11 for?
12 A.    I'm familiar with check request approval
13 process within the county.
14 Q.    Okay.
15 A.    I'm not familiar specifically with the
16 process within the assessment office.
17 Q.    Are you familiar with the fact that it's
18 the chief assessor who has the ability to approve
19 the check request for the employees within that
20 office?
21 A.    That would make sense as she -- that
22 position was the department head.  So that's
23 typically done by the department head.

Page 428

1  Q.    And if there was no department head or
2  anyone with the ability to approve check request
3  in the assessment office, do you know what
4  operations of the office that would effect?
5  A.    If the department head is unable to --
6  is not there, or for whatever reason is vacant,
7  that position is vacant, then Mr. Bender as the
8  county administrator has the ability to approve
9  check requests for all offices under his purview.
10 Q.    Okay.
11       But what I'm trying to figure out is,
12 what do employees in the assessment office request
13 checks for?
14 A.    I don't know.
15       MS. SMITH:  Okay.  Can we go off
16 the record for just a second?
17       VIDEOGRAPHER:  The time is
18 9:34 a.m. and we're going off the record.
19                 - - -
20       (Whereupon, brief recess was held off
21 the record.)
22                 - - -
23       VIDEOGRAPHER:  The time is now
24 9:40 a.m. and we're back on the record.

Page 429

1        MS. SMITH:  And just for the
2  record, Jane Doe 3 has joined the Zoom.
3  BY MS. SMITH:
4  Q.    All right.  Ms. Zula, I was asking you
5  about check requests before we had to go off the
6  record for technical issues.
7        Do you know if anyone at the county
8  communicated to the employees of the assessment
9  office as to whom check requests were supposed to
10 be submitted prior to Jane Doe 3 and Jane Doe 4's
11 demotion?
12 A.    I don't know.
13 Q.    But you didn't?
14 A.    I did not.
15 Q.    Okay.
16       MS. SMITH:  Mark 755, Ms. Zula 755
17 as 144.
18                 - - -
19       (Zula 755 marked as Exhibit-144 for
20 identification.)
21                 - - -
22 BY MS. SMITH:
23 Q.    Do you recognize this e-mail chain?
24 A.    Yes.

Page 430

1  Q.      This e-mail, the first one on -- in the
2  chain is March 25th, 2021 from Jane Doe 4 to you,
3  correct?
4  A.      Yes.
5  Q.      And she indicates that she is
6  essentially now sure of who check request
7  approvals need to be submitted to and request
8  guidance on it, correct?
9  A.      Yes.
10 Q.      Is there -- and it looks like you
11 forwarded this chain of -- or these two e-mails
12 from Jane Doe 4 do Mr. Bender, correct?
13 A.      Yes.
14 Q.      Any reason to believe that the
15 assessment office had been instructed to forward
16 check requests to Mr. Bender before March 25th,
17 2021?
18 A.      I'm not aware.
19 Q.      And do you know if Mr. Bender ever
20 addressed this issue with Jane Doe 4?
21 A.      I don't know.
22 Q.      Do you know if March 17, 2021 was in the
23 middle of a pay period?
24 A.      I don't know.

Page 431

1  Q.      The chief assessor, who is the head of
2  the assessment office, would be the one tasked
3  with completing payroll, correct?
4  A.      It depends who -- potentially for the
5  office, yes.  Or the deputy.  One of the
6  supervisors in the office would be responsible for
7  signing off on time sheets.
8  Q.      Do you know if after Jane Doe 3 was
9  demoted from her position as chief assessor, did
10 she still have access to assessment payroll?
11 A.      I don't know.
12         MS. SMITH:  Okay.
13         Mark 145 as Zula 128.
14                    - - -
15         (Zula 128 marked as Exhibit-145 for
16 identification.)
17                    - - -
18 BY MS. SMITH:
19 Q.      Do you recognize this chain of e-mails?
20 A.      Yes.
21 Q.      In Jane Doe 3's March 29th, 2021 e-mail
22 she states in the second sentence I had no access
23 to the assessment payroll because county
24 administration was in a hurry to put their plan in

Page 432

1  place, and for some reason couldn't at leasts wait
2  until end of the pay period to retaliate.  It had
3  to be in the middle of the pay period so they
4  could make it extra inconvenient for everyone.
5         Do you have any reason to believe that
6  the demotion on March 17th did not occur in the
7  middle of a pay period?
8  A.      Based upon Jane Doe 3's e-mail, it
9  appears as though it was.
10 Q.      Okay.
11         And any reason to believe that she no
12 longer had assessment payroll as she indicated?
13 A.      I would have no reason to believe
14 otherwise.
15 Q.      Was the fact it was going to be in the
16 middle of a pay period and could disrupt payroll
17 discussed during the restructuring or office
18 division meetings?
19 A.      No, it was not.
20 Q.      Did anyone give any thought to payroll
21 and how it could be affected?
22         MS. PIPAK:  Object to the form.
23 But go ahead.
24         THE WITNESS:  We did not discuss

Page 433

1  it.  However, I know that all employees were paid
2  timely.  So there was no disruption of payroll.
3  BY MS. SMITH:
4  Q.      And that's -- is that because Jane Doe
5  4, as she indicated in her email, did do a time
6  sheet for Ms. Detweiler?
7  A.      Well, either Ms. Detweiler or the
8  supervisor would have had to do the time sheet for
9  her to be paid.
10 Q.      Well, the supervisor, regardless of Ms.
11 Detweiler -- the supervisor, regardless of if Ms.
12 Detweiler did her time sheets, still had to sign
13 off on it, correct?
14 A.      We have at times paid employees if the
15 supervisor was unavailable to sign the time sheet.
16 Q.      Okay.
17         At sometime after Jane Doe 4 and Jane
18 Doe 3 were demoted, Ms. -- is it Christine
19 Zimmerman?  Or is Chrissy her first name?
20 A.      I believe her full name is Christine.
21 Q.      Okay.
22         But she goes by Chrissy Zimmerman?
23 A.      Yes.
24 Q.      Okay.

Page 434

1   Ms. Zimmerman was promoted to the
2  position of deputy or assistant chief assessor,
3  correct?
4  A.      Yes.  Jane Doe 4 had requested to
5  transfer into the assistant tax plan director
6  position, and after her deputy chief assessor
7  former position was posted, Ms. Ander -- Ms.
8  Zimmerman, excuse me, was selected for the
9  position.
10 Q.      So as I understand it, correct me if I'm
11 wrong, if a position becomes vacant in the county,
12 county -- it's posted to county employees first,
13 correct?
14 A.      The position is posted on the county
15 website, and then it's also posted on paper --
16 paper posting on bulletin boards.
17 Q.      So I guess maybe the difference is union
18 versus non-union.
19      Is there some agreement that if there is
20 a vacant position that a county employee has the
21 first opportunity at the position?
22 A.      That's a unionized position.
23 Q.      Okay.
24      Is the deputy chief assessor a union

Page 435

1  position?
2  A.      No.
3  Q.      Okay.
4      In any event, Ms. Zimmerman did apply
5  for the position, or was she asked to fill it?
6  A.      She applied for the position.  We did
7  have, I believe, a conversation with her.  We
8  believed he would be a good fit for the position
9  based upon her years of experience in the field
10 appraiser position.  So we did, you know, talk to
11 her about the position prior to her applying.
12 Q.      And we talked about this briefly
13 yesterday.
14      When the offices were divided,
15 Ms. Zimmerman was employed in the tax assessment
16 office, correct?
17 A.      Yes.
18 Q.      But it was decided that Jane Doe 4 had
19 more experience in supervisory experience, and
20 thus she was put into -- or left in the deputy
21 assessor position, correct?
22 A.      Yes.  She had the supervisory day-to-day
23 knowledge of the office operation.
24 Q.      So at that point would you say she was

Page 436

1  more qualified to hold that position than
2  Ms. Zimmerman?
3  A.      Yes, at that point, I guess.  Although
4  she didn't hold the CPE license.  From a
5  supervisory perspective, yes, she had supervisory
6  experience where Ms. Zimmerman did not.
7  Q.      Did Ms. Zimmerman hold CPE license?
8  A.      I believe she did, yes.
9  Q.      Do you know when she obtained that?
10 A.      No, I don't.
11 Q.      When Ms. Zimmerman applied for the
12 position, with whom did she -- I don't want to
13 call it interview, but whom did she talk with
14 about the position and what it entailed and what
15 she would be offered for her promotion?
16 A.      I don't recall the exact process
17 typically after a selection was made I would be to
18 person I believe I reached out to her and made her
19 a salary offer based upon discussions with county
20 administration.
21 Q.      And who ultimately, you or county
22 administration, made the determination as to what
23 the final number in salary is that she would be
24 offered?

Page 437

1  A.      The offer was made between discussions
2  between myself and Gary Bender.  The final
3  approval of the salary was by the salary board.
4  Q.      So you and Gary Bender have a
5  conversation, and that's the number that gets put
6  on the par, correct?
7  A.      Yes.
8  Q.      And then that's, the par, as you
9  recommend it to the salary board is what's voted
10 on, correct?
11 A.      Yes.  It's a recommendation.
12 Q.      Again between you and Mr. Bender, was it
13 one, the other or was it a collective
14 determination on what to offer her?
15 A.      We had a discussion regarding her prior
16 experience, and we reviewed the salary range and
17 we had a discussion as to what to offer her.
18 Q.      Ms. Zimmerman was offered $51,835
19 annually, correct?
20 A.      I don't remember the exact number.  But
21 potentially if it's on the par, yes.
22      MS. SMITH:  I'm going to show you
23 an email from Jane Doe 4.  It's Zula 2513.  Mark
24 it as 146.

Page 438

1        - - -
2        (Zula 251 marked as Exhibit-146 for
3    identification.)
4        - - -
5    BY MS. SMITH:
6    Q.      Do you recognize this e-mail?
7    A.      Yes.
8    Q.      Jane Doe 4 indicates in her e-mail to
9    you on June 8th, 2021 that Chrissy Zimmerman's
10   salary listed on the par was 51,835.
11       Any reason to believe she was wrong?
12   A.      No.
13   Q.      Jane Doe 4 also indicates to you that
14   she, as assistant and deputy in the tax claim and
15   assessment offices, so when she held both
16   secondary supervisory positions in the two
17   offices, she was only making $47,057.28.  So
18   roughly about 4,000 -- a little over $4,000 less
19   than Ms. Zimmerman was offered and paid for
20   holding one position.
21       Would you agree?
22   A.      Based upon this information, yes.
23   Q.      Okay.
24       Do you have any understanding or reason

Page 439

1    why Ms. Zimmerman was offered $4,000 than Jane Doe
2    4 when she held two positions -- when Jane Doe 4
3    was holding two positions?
4    A.      Ms. Zimmerman's current salary as a
5    field appraiser was pretty high at the point
6    because she had a number -- I believe she had like
7    20-plus years of -- probably more than that --
8    years of experience in the county.  So in order
9    to, you know, have her take on a supervisory role
10   within the office we needed to give her credit for
11   that years of service, and therefore the
12   determination for that salary was made.
13   Q.      Well, what about the consideration for
14   Jane Doe 4 holding two positions?
15   A.      I wasn't responsible for determining her
16   salary when the two positions were combined.
17   Q.      Well, what about Jane Doe 4's salary as
18   just the deputy chief assessor after her demotion,
19   were you involved in that?
20   A.      I discussed it with members of the
21   salary board, and it was determined we would take
22   her back -- the recommendation would be to take
23   her back to her former salary, and give her the
24   increases that were appropriate based upon the

Page 440

1    increases other management employees within the
2    county received.
3    Q.      Those are like cost of living increases?
4    A.      Yeah, the increases each year.
5    Q.      The standard like three percent I think
6    it is?
7    A.      I believe that's what they were, yes.
8    Q.      Okay.
9        And she had -- Jane Doe 4 had held the
10   dual role position for about -- I think it was --
11   it was in '19 I think she was brought in.
12       Does that sound right?
13   A.      I don't know.
14   Q.      It had been a couple years that she had
15   held that dual role, correct?
16   A.      Yes, I believe that -- yes.  I don't
17   exactly know the date.
18   Q.      So she was taken back.  Other than the
19   standard three percent raises, she was taken back
20   to her singular roles -- Jane Doe 4 was taken back
21   to her singular role salary without consideration
22   for the years that she had given to the county
23   holding two positions.
24       MS. PIPAK:  I'll object to the

Page 441

1    form.  Go ahead.
2        THE WITNESS:  No.  She was taken
3    back to the salary she had when she had the other
4    position, and given the appropriate increases on
5    top of that.  I did not reevaluate all of her
6    experience at that time.
7    BY MS. SMITH:
8    Q.      But Ms. Zimmerman's experience was
9    evaluated and considered when giving her her
10   salary, right?
11   A.      Yes.
12   Q.      So why was hers considered but Jane Doe
13   4's wasn't?
14   A.      Because the decision was made to take
15   Jane Doe 4 back to her former salary and give her
16   the increases she would have received had the
17   offices not been combined.
18   Q.      Who made that decision?
19   A.      The salary board made that decision
20   ultimately.
21   Q.      Who on the salary board discussed it?
22   A.      I discussed -- when I -- we separated
23   the offices, I discussed it with Ms. Yackenchick,
24   who is the controller who served on the salary

Page 442

1 board as to how I -- how we determined the
2 recommendation for the salary.  And then
3 ultimately that was the recommendation.  But
4 ultimately if the salary board didn't agree with
5 it, they didn't have to vote for it.
6 Q.     Okay.
7        But so you're saying that salary board
8 ultimately decided.  You mean they voted on it,
9 correct?
10 A.     No, they decided, because the vote is
11 how the salary is set.  If they voted it down,
12 then we would have had to go back and reevaluate
13 the salary and make a different recommendation.
14 Q.     Okay.
15        But the number -- the salary board
16 doesn't vote on the number until the number is put
17 in front of them?
18 A.     Yes, that's correct.
19 Q.     So who put -- who decided to put -- let
20 me just for clarification mark 147.
21        MS. SMITH:  SC307.
22             - - -
23        (SC307 and 147 marked as Exhibit-147 for
24 identification.)

Page 443

1             - - -
2        THE TECHNICIAN:  I'm sorry,
3 Counsel, you said SC307 and 147?
4        MS. SMITH:  Yeah, it should be in
5 one pdf.
6        MS. PIPAK:  So just one Exhibit?
7        MS. SMITH:  Yes.
8        MS. PIPAK:  Okay.
9 BY MS. SMITH:
10 Q.     Ms. Zula, this first page here, SC307,
11 is the par for Jane Doe 4's demotion, correct?
12 A.     Yes.
13 Q.     The $39,727.18 that is on this par for
14 her recommended new salary in her solo position of
15 deputy chief assessor to begin on March 18th, who
16 decided to write that number there?
17 A.     I wrote the number because I filled the
18 par out.  But there was discussion between myself,
19 Mr. Bender, as well as the controller who served
20 on the salary board as to the determination of
21 that number.
22 Q.     Okay.
23        And who ultimately made that decision
24 that would be the number to recommend to the

Page 444

1 salary board?
2 A.     I guess it was a collective decision
3 because we had a discussion about that, and that's
4 what was -- the form was submitted.
5 Q.     And the $39,727.18 is the salary that
6 Jane Doe 4 held prior to when she was -- before
7 Jane Doe 4 was promoted to the dual role, she was
8 just the assistant tax claim director, correct?
9 A.     Yes.
10 Q.     $39,727.18 is the salary that Jane Doe 4
11 held in the position of tax claim director, plus
12 however many years of three percent raises,
13 correct?
14 A.     Yes.
15 Q.     There was no consideration for the fact
16 that Jane Doe 4 had given whatever many years as a
17 dual -- serving in a dual role, correct?
18 A.     The consideration was already given
19 because she was already in a management role.  So
20 when she was selected as the assistant tax claim
21 director, when they set -- whoever set the salary,
22 it was not me, nor was it me when the salary was
23 set for that dual role, that consideration should
24 have been given at that time because it was

Page 445

1 management position.  In Ms. Zimmerman's case, she
2 moved from a union position to a management
3 position.
4 Q.     Did anybody ever respond -- going back
5 to 146.
6        Did anybody ever respond to Jane Doe 4's
7 pay discrimination complaint?
8        MS. PIPAK:  Object to the form.
9        THE WITNESS:  I did not respond to
10 her e-mail, no.
11 BY MS. SMITH:
12 Q.     Do you know if anyone did?
13 A.     I don't know.
14 Q.     Did you ever ask anybody if they did?
15 A.     No, I did not.
16 Q.     Okay.
17        I'm sorry.  Going back to 147,
18 commissioner -- defendant Halcovage was
19 commissioner on March 17th, 2021, correct?
20 A.     Yes.
21 Q.     Commissioner Halcovage voted on both 307
22 and 407, which make up Exhibit-147, correct?
23 A.     Yes, to my recollection he did vote.
24 Q.     He voted in the affirmative for them,

Page 446

1  Jane Doe 3 and Jane Doe 4, to be demoted, correct?
2  A.    Yes.
3  Q.    Did you think that was appropriate?
4        MS. PIPAK:  Object to the form.
5  You can answer.
6        THE WITNESS:  It's not my opinion.
7  I have no opinion.  If that's -- he, as a sitting
8  commissioner, he can make the decision if he votes
9  or he doesn't vote.
10 BY MS. SMITH:
11 Q.    I understand he can make the decision.
12 But I'm saying do you believe it was
13 appropriate -- as you sit here today, do you think
14 it was appropriate for him to vote on March 17th,
15 2021 on the demotion of two women who had accused
16 him of sexual harassment?
17       MS. PIPAK:  Same objection.  You
18 can answer.
19       THE WITNESS:  He was a
20 commissioner.  The job of the commissioner is to
21 vote on actions presented before the board.  So,
22 yes, he can vote.
23 BY MS. SMITH:
24 Q.    Well, he can is what he is able to do by

Page 447

1  statute, by law, whatever.  He also can recuse
2  himself, correct?
3  A.    Yes, that he could.
4  Q.    So is your opinion that he should have
5  voted or that he should have recused himself on
6  these votes?
7  A.    I believe as a sitting commissioner he
8  should have the right to vote, yes.
9  Q.    So you believe he should have voted on
10 these?  Not does he have the right to vote.  I'm
11 asking you for your opinion as to whether he
12 should have involved himself in this personnel
13 matter?
14 A.    Yes.
15       MS. SMITH:  Okay.  I'm going to
16 mark Zula 2589 as 148.
17       - - -
18       (Zula 2589 marked as Exhibit-148 for
19 identification.)
20       - - -
21 BY MS. SMITH:
22 Q.    Do you recognize this e-mail, Ms. Zula?
23 A.    Yes.
24 Q.    Deb Dash was the clerical supervisor for

Page 448

1  the assessment office prior to June 23rd, 2021,
2  correct?
3  A.    Yes.
4  Q.    That would be a management level
5  position, correct?
6  A.    No, it's a union level position.
7  Q.    Okay.
8        Why is Ms. Dash -- why was she approved
9  for an increase from 52 to 58,000 when Jane Doe 4
10 received $47,057 for dual roles, and Ms. Dash is
11 only completing one role?
12 A.    Again, given to Ms. Dash -- given Ms.
13 Dash's long tenure in the county and her movement
14 from a union to a supervisory role, there has to
15 be some additional compensation to compensate for
16 her added responsibilities in the tax claim
17 office.
18 Q.    How many years has Deb Dash been with
19 the county?
20 A.    I believe its like over 30, 35.  She has
21 extensive -- I don't know exactly the years, but
22 it's a lot.
23 Q.    How long had Ms. Zimmerman been with the
24 county?

Page 449

1  A.    I believe it's close to 25 plus.
2  Q.    Ms. Dash was assigned -- received the
3  pay increase to hold the position of interim
4  assistant director, correct?
5  A.    Yes, correct.  This was when Jane Doe 4
6  and Jane Doe 3 went out on leave.
7  Q.    Okay.
8        And has anyone else ever, to your
9  knowledge, received a salary increase when holding
10 simply an interim position?
11 A.    Yes.
12 Q.    And then are they returned to their
13 former salary when they no longer hold that
14 position?
15 A.    Yes.
16 Q.    Was Ms. Dash returned?
17 A.    Yes.
18 Q.    Okay.
19       Did anyone investigate Jane Doe 4's pay
20 discrimination complaint in this e-mail?
21 A.    No.
22 Q.    Did anyone ever respond to Jane Doe 4?
23 A.    I did not.  I don't know if anyone else
24 did.

Page 450

1  Q.      Do you know why neither e-mails of Jane
2  Doe 4's containing pay discrimination complaints
3  were investigated?
4          MS. PIPAK:  Object to the form.
5  But go ahead.
6          THE WITNESS:  I don't believe this
7  was a pay discrimination complaint.  She's
8  complaining simply about her salary versus
9  Ms. Dash's.  And I didn't believe it's appropriate
10 for us to discuss Ms. Dash's or anyone else's
11 salary with Jane Doe 4.
12 BY MS. SMITH:
13 Q.      So you didn't think there was any
14 investigation to be done or explanation to be
15 given, such as the one you just gave here today to
16 Jane Doe 4?
17 A.      No.
18         MS. PIPAK:  Object to the form.  Go
19 ahead.
20 BY MS. SMITH:
21 Q.      Who made the decision regarding
22 Ms. Dash's salary increased?
23 A.      The salary board.
24 Q.      I get the two voted on it, but who put

Page 451

1  the number on the par?
2  A.      That was a discussion between myself and
3  Mr. Bender.
4  Q.      When an employee has a personnel matter
5  issue with another employee, is that something
6  that HR gets involved?
7  A.      It depends on the situation.  If it's
8  brought to our attention, sometimes employee
9  matters are dealt with at the supervisory level --
10 it depends on the situation.
11         MS. SMITH:  I'm going to mark Ms.
12 Zula 784 and 785 as 149.
13             - - -
14         (Zula 784-785 marked as Exhibit-149 for
15 identification.)
16             - - -
17 BY MS. SMITH:
18 Q.      Do you recognize this e-mail chain?
19 A.      Yes.
20 Q.      In your e-mail to Mr. Bender in the
21 second sentence you state, if possible, I believe
22 we should issue some sort of directive to Jane Doe
23 4 and Jane Do 3 that their interactions with
24 others in the county while performing in their

Page 452

1  official capacity need to be professional, and not
2  refer or to discuss the pending litigation of
3  claims.  These types of e-mails need to stop.
4          What type of e-mails needed to stop?
5  A.      The e-mails regarding all of their
6  claims, their unprofessional behavior towards
7  other employees in the courthouse.
8  Q.      So is referencing their claims what you
9  believe to be unprofessional?
10 A.      No, their behavior towards other people
11 was unprofessional.
12 Q.      What other unprofessional behavior in
13 March of 2021 had you observed either Jane Doe 3
14 or Jane Doe 4 engage in?
15 A.      There were e-mails to -- I don't recall
16 all of the situations.  I knew there was an
17 instance, while it was probably after this with
18 Mr. Alu -- I don't recall specific situations.
19 Q.      Okay.
20         Why did you believe they needed to stop
21 referencing their pending litigation of claims?
22 A.      Well, first off, they're identified as
23 Jane Does.  And so, you know, we're not allowed to
24 talk about it.  So I didn't think it's appropriate

Page 453

1  for them to be talking about it to other staff in
2  the courthouse.
3  Q.      Well, they're Jane Does because they
4  chose to be Jane Does.  But if they choose to out
5  their claims, what's wrong with them talking about
6  their claims against the county?
7          MS. PIPAK:  I'm going to object to
8  the form.
9          THE WITNESS:  I don't believe it
10 had anything to do with their day-to-day
11 operations with the treasurer's office.  Or other
12 employees in the courthouse in other departments.
13 BY MS. SMITH:
14 Q.      What if the litigation claims, as we've
15 reviewed in many documents so far in this
16 deposition, were impacting their ability to
17 operate and supervise their offices?
18         MS. PIPAK:  Object to the form.  Go
19 ahead.
20         THE WITNESS:  I just didn't feel it
21 was appropriate.
22 BY MS. SMITH:
23 Q.      Is there any county policy that says
24 that pending litigation of claims can't be

Page 454

1  discussed?
2  A.      Not to my knowledge.
3  Q.      In two sentences down you say there is
4  certainly a way for Jane Doe 4 and Jane Do 3 to
5  address her concerns without engaging in such
6  unprofessional behavior.
7          This is an e-mail sent to Alicia Beach
8  from Jane Doe 4, correct?
9  A.      Yes.
10 Q.      Jane Do 3 is not an author of this, is
11 she?
12 A.      She was part of the conversation, was my
13 understanding, when I talked to Ms. Griffin and
14 Ms. Beach from the treasurer's office.
15 Q.      Was an investigation done into this
16 incident?
17 A.      Yes.  I spoke with -- well, I don't know
18 if investigation is the right word.  I spoke with
19 Ms. Griffin and Ms. Beach when they came down to
20 my office, and they worked for an elected
21 official, Ms. Marchak.  And so I spoke with her.
22 And she indicated that she would address the
23 behaviors and deal with her staff and how to
24 interact with other departments in the courthouse.

Page 455

1  Q.      Were notes taken for any of the
2  conversations that you had?
3  A.      I don't recall.
4  Q.      When -- is there a decision or policy or
5  any guide as to when notes should be taken or when
6  notes shouldn't be taken regarding a personnel
7  issue.
8  A.      Oh, I don't think there is any policy
9  that says that.
10 Q.      So it's just discretionary?
11 A.      I guess.  Potentially I took notes.  I
12 don't remember.
13 Q.      Can you tell me what in Jane Doe 4's
14 email you believe is unprofessional behavior?
15 A.      I believe her unprofessional behavior
16 was when she came -- well, based upon the
17 discussions that she had with Ms. Griffin and Ms.
18 Beach about this interaction, that those were what
19 was unprofessional.
20 Q.      I'm sorry, you lost me.  So was -- other
21 than this e-mail, was there also in-person verbal
22 communication between Ms. Beach and Jane Doe 4?
23 A.      I believe so, yes.  Because they had
24 discussion about the letters I believe that were

Page 456

1  the subject of this e-mail.
2  Q.      Okay.
3          So then, I guess just to clarify, is
4  there anything in this e-mail from Jane Doe 4 to
5  Ms. Beach that you believe is unprofessional?  The
6  one in front of you.
7  A.      I believe the tone is unprofessional of
8  the e-mail.  Yes, I do.
9  Q.      So just the overall, what you call, tone
10 of an e-mail?
11 A.      Well, I believe also, like just her
12 indication perhaps you are too busy to handle this
13 workload.  I mean the tone is just very
14 condescending towards another employee.  If she
15 had a concern regarding the issue, she could have
16 addressed it in a professional manner, or with the
17 supervisor.
18 Q.      The next sentence in your e-mail states
19 we've completely lost control as it pertains to
20 the actions of Jane Do 3 and Jane Doe 4 and it
21 needs to be addressed.
22          What control had you lost of Jane Do 3
23 and Jane Doe 4?
24 A.      Their actions towards other employees.

Page 457

1  They just -- I mean we had issues with MIS, issues
2  with payroll.  There was a concern about their
3  voicemail.  There was -- every concern that
4  addressed an operational issue was addressed in
5  such an unprofessional manner towards others.  If
6  there was an issue regarding an operational
7  concern, there's no need to, you know, be very
8  condescending in your e-mails.  You can be
9  professional and ask the question.  I mean there's
10 a way to ask a question versus being
11 unprofessional about asking a question.
12 Q.      Did you consider that in March of 2021
13 it had been almost a year since the -- since Jane
14 Doe 1 had reported the sexual assaults and
15 harassment, and that -- and what had occurred
16 during that year, what attempts Jane Doe 3 and
17 Jane Doe 4 had made during that year to engage in
18 professional behavior with no response having been
19 given?
20          MS. PIPAK:  Object to the form.  Go
21 ahead.
22          THE WITNESS:  I'm not sure I
23 understand your question.  I've reviewed -- I've
24 considered that Jane Doe 4 and Jane Doe 3, Jane

Page 458

Doe 1 and Jane Doe 2, were still employees of
county and I understand they had claims.  The
county put provisions in place to address those
claims, but they were still employees of the
county and needed to be held to the same standard
of all other employees.  When other employees act
in an unprofessional manner their decisions --
their actions are dealt with appropriately.
BY MS. SMITH:
Q.      You just said the county put provisions
in place.
         What provisions did they put in place?
A.       There was no contact to be made with Mr.
Halcovage who seems to be the issue with their
claims.  And so they haven't had any contact with
him during their work product.  During their work
at the county.
Q.      Is that the only provision you believe
the county put in place?
A.       We put provisions in -- well, I mean
potentially, yes, I guess.  To make sure there was
contact with Mr. Halcovage.  And limited contact
with Mr. Bender was my understanding as well.
Q.      If an individual is making numerous

Page 459

attempts to have questions answered, concerns,
answered, issues dealt with and they receive no
response, do you understand that one could become
frustrated?
A.       All of their concerns related to their
operational work were addressed.  So their
voicemail issues, the check request issues, the
payroll issues they were all addressed, and we
took action.  Maybe not responding via e-mail, but
action was taken to address their concerns.
Q.      Were they informed of the action that
was taken?
A.       Well, yes, because they were accesses to
check requests, accesses to payroll, accesses to
their voicemail.  Yes, they were informed.  Maybe
not by me, but they were informed because the
issues were addressed and taken care of.
Q.      Was Jane Doe 4's questions about salary
ever addressed?
A.       No, that was not.  No.
Q.      What about for the period of time before
you were employed, did you consider any
non-answered requests from that period of time?
         MS. PIPAK: Object to the form.  Go

Page 460

ahead.
         THE WITNESS:  I don't know what
their non-answered request would have been prior
to my employment.
BY MS. SMITH:
Q.      Because you didn't look into it,
correct?
A.       Why would I look into requests that
weren't answered when I wasn't even there.  I
don't even know what those requests would have
been.
Q.      So if you don't know what requests they
made or what didn't go unanswered, how can you say
they shouldn't have been frustrated regarding
unanswered requests?
         MS. PIPAK: Object to the form.  Go
ahead.
         THE WITNESS:  I don't understand
how I would look into something that happened
prior to my even being employed and not being
aware of it.
BY MS. SMITH:
Q.      Did you speak with Ms. Kutzler to find
out if she had ever had any unanswered requests by

Page 461

these individuals?
A.       No.  I don't believe, no.
Q.      Did you ever speak with Jane Doe 3 and
Jane Doe 4 and say what do you guys need?
A.       No, I did not.
Q.      Did you ever speak with them and say --
I mean, let's start with this.  After exhibit 149,
when you -- after you talked with Ms. Griffin and
Ms. Beach and Ms. Marchak, did you ever go to Jane
Doe 4 and Jane Doe 3 and say, hey, guys why are
your e-mails unprofessional?  What's the issue?
Why are you so frustrated?  Why are you acting in
this manner?  And let them explain to you why this
was occurring?
         MS. PIPAK: Object to the form.  Go
ahead.
         THE WITNESS:  They wouldn't talk to
me.  They did not want to talk to me.
BY MS. SMITH:
Q.      Ms. Zula, we just went through numerous
e-mails where they were communicating with you
their concern.  Did you ever reply to them and
say, hey, what --
A.       Yes, eventually I did.

Page 462

1 Q.     When was that?
2          MS. PIPAK:  Let her ask the
3 question and then you can answer.
4          THE WITNESS:  Yeah, eventually I
5 did.  I don't remember.  But, yes, we did address
6 it.
7 BY MS. SMITH:
8 Q.     Was it after March 26, 2021?
9 A.     I don't recall.
10 Q.     Who was in that meeting that you
11 addressed it?
12 A.     It wasn't a meeting.  It was an e-mail.
13 Q.     And how did you address it?  What was
14 the topic or conversation that you --
15 A.     I believe there was an e-mail just
16 indicating that, you know, we're requesting that
17 your communication with others be professional.
18 Q.     Is that when they were written up for
19 their alleged unprofessional communication with
20 Mr. Alu?
21          MS. PIPAK:  Object to the form.
22          THE WITNESS:  No, it was I believe
23 prior to that.
24          MS. PIPAK:  Before you -- I want to

Page 463

1 just make a statement.  This is the first time
2 I've seen this document.
3          MS. SMITH:  What one?
4          MS. PIPAK:  The 149.  Or the first
5 time I realized that it was produced.  I want to
6 look into it -- but I let her answer the questions
7 about the underlying facts.  It just seems like
8 she might be reaching out to an attorney for some
9 thoughts.
10          MS. SMITH:  I mean he's cc'd on it,
11 but it's communication to Bender, so --
12          MS. PIPAK:  Right, at the very
13 bottom.  So I let you go ahead with questions, but
14 I just want to raise that issue now.
15 BY MS. SMITH:
16 Q.     Ms. Zula, you were indicating that if
17 other employees acted in an unprofessional
18 behavior they were disciplined and dealt with.
19          Do you recall that testimony?
20 A.     Potentially not -- I don't know if I
21 said disciplined.  But, yes, action was taken to
22 address their behavior.
23 Q.     Can you give me any examples?
24 A.     We had issues at the prison regarding

Page 464

1 employees who were acting unprofessional towards,
2 I believe, lieutenants that we dealt with.
3 Q.     What lieutenant was at issue?
4 A.     I don't recall.
5 Q.     Who were the employees?
6 A.     I believe that one was -- I forget his
7 name.  James Preneta, I believe.
8 Q.     Do you recall from that incident if
9 Mr. Preneta, or whoever was the subject of the
10 issue, was written up?
11 A.     Yes.  And I believe Mr. Oliver.  He was
12 ultimately terminated.
13 Q.     Is Mr. Oliver at the prison?
14 A.     He's at the prison.
15 Q.     Any others?
16 A.     I'm thinking.
17          We addressed situations in Children and
18 Youth regarding employee behavior towards their
19 supervisor.  One specific was the receptionist.  I
20 cannot recall her name.  And the supervisor there.
21 She was not formally disciplined, but a discussion
22 was had with her.
23 Q.     She was not formally disciplined?
24 A.     No.

Page 465

1 Q.     Let's start with the most recent, the
2 Children and Youth receptionist, do you recall
3 what had happened?
4 A.     There was an issue regarding her calling
5 in for the day.  She thought she put a sick leave
6 request in, however she didn't.  And then she
7 didn't show up to work on time and was pretty
8 excessively late.  So the supervisor reached out
9 to her and she kind of flipped.  Like was very
10 short and unprofessional with her supervisor in
11 her response.  So her supervisor contacted me to
12 determine, you know, what they should do.  So we
13 had a meeting with -- I had a meeting with the
14 employee and the supervisor to kind of discuss the
15 issue and what expectations were moving forward.
16 Q.     Why wasn't she formally disciplined?
17 A.     I don't believe it rose to that level at
18 that point in time.
19 Q.     What was Mr. Oliver terminated for?
20 A.     He was terminated for a number of
21 different incidents.  But one included his
22 interaction with -- I believe it was Lieutenant
23 Fair(ph) in the break room.
24 Q.     What happened between him and Lieutenant

Page 466

1  Fair?
2  A.       He made an off-comment about the
3  lieutenant.  I don't recall exactly what he said.
4  But there were a number of other issues that
5  resulted in his termination.  But that was one of
6  them.
7  Q.       What were the others?
8  A.       He had brought a cell phone into the
9  jail.  He also got into an altercation with
10 another employee.  And then he also had prior
11 discipline.
12 Q.       And do you know, the James Preneta
13 issue, what was he written up for?
14 A.       I believe his was again an interaction
15 with the lieutenant, but I don't recall the exact
16 specifics with that.
17 Q.       Mr. Oliver's physical altercation with
18 another -- it was another employee?
19 A.       He had --
20          MS. PIPAK:  Object to the form.  Go
21 ahead.
22          THE WITNESS:  It wasn't an
23 altercation.  He had basically an issue in the
24 lunchroom regarding lunch.  He grabbed -- I

Page 467

1  believe he grabbed somebody else's lunch, or
2  something like that, in the lunchroom.  But, yes,
3  it did involve another employee.
4  BY MS. SMITH:
5  Q.       But I think your testimony was it was an
6  altercation --
7  A.       Okay.  Well, maybe that wasn't
8  classified correctly.  But he had an issue -- I
9  guess we could call it an altercation.  It wasn't
10 like a physical, but he grabbed somebody else's
11 lunch and took it off of them.
12 Q.       Do you know, was it grabbing lunch off a
13 table or off the person?
14 A.       I think it was a table.
15 Q.       Okay.
16          MS. SMITH:  Zula 893 is going to
17 exhibit 150.
18          - - -
19          (Zula 893 marked as Exhibit-150 for
20 identification.)
21          - - -
22 BY MS. SMITH:
23 Q.       Do you recognize this e-mail?
24 A.       Yes.

Page 468

1  Q.       Did you ever investigate this e-mail
2  from Jane Doe 4 on April 5th, 2021?
3  A.       Yes, I informed Ms. Marchak of the
4  situation.
5  Q.       Any other action taken?
6  A.       I'm not aware.  As the treasurer's
7  office is an elected official's office, HR does
8  not have any control of what occurs in that office
9  as far as discipline.
10 Q.       Why do you believe that?
11 A.       Because the elected officials have the
12 right to hire, fire and supervise.
13 Q.       Where does your knowledge or belief of
14 that come from?
15 A.       From the county code.
16 Q.       Have you read the county code?
17 A.       No, not the whole thing.
18 Q.       Do you know what section of the county
19 code it is?
20 A.       I did.  I can't remember the exact
21 number now.  But, yes, it's referenced in our
22 Collective Bargaining Agreement that they reserve
23 the right to hire, fire and supervise their
24 employees.  That's part of the Collective

Page 469

1  Bargaining Agreement which Ms. Alisha Beach is
2  covered by.
3  Q.       Is it section 1620 of the county code?
4  A.       Sounds about right.
5  Q.       What's your understanding of what that
6  portion of the county code states?
7  A.       That the --
8          MS. PIPAK:  Object to the form.  Go
9  ahead.
10          THE WITNESS:  That the elected
11 official has the right to employ the employees
12 that they elect -- or they select.  They have the
13 right to terminate those employees that they
14 select.  And throughout their employment that they
15 have the right to, you know, appropriately
16 discipline employees.
17 BY MS. SMITH:
18 Q.       Did you ever speak with anyone to gain
19 knowledge specifically as to what the county code
20 allows or does not allow HR to do regarding
21 employees in elected officials' offices?
22 A.       Yes, the solicitor's office.  I was
23 advised by the solicitor's office what my ability
24 was as HR as it related to elected officials'

Page 470

employees.

Q.      And whom in the solicitor's office did you speak with?

A.      Al Marshall.

Q.      So, Ms. Zula, what's your understanding of what would happen if a elected -- an employee in an elected official's office refused to take sexual harassment training?

A.      It says we would discuss with the elected official that, you know, we need the employee to do this, and typically we've gotten cooperation.

Q.      What happens if you didn't get cooperation?

MS. PIPAK:  Object to the form.  Go ahead.

THE WITNESS:  I'm not certain.

BY MS. SMITH:

Q.      What would happen if an employee in an elected official's office punched another employee in the face?

MS. PIPAK:  Object to the form.  Go ahead.

THE WITNESS:  We would work with

Page 471

that elected official to address the situation and attempt to, you know, have them do the right thing as far as to deal with the situation.

BY MS. SMITH:

Q.      And what would happen if they wouldn't work with you and do the right thing?

MS. PIPAK:  Object to the form.

THE WITNESS:  I don't know.

BY MS. SMITH:

Q.      I'm sorry if you answered this.

Did ever reply to Jane Doe 4 and inform her that you had addressed the issue with Ms. Marchak?

A.      I don't believe I did.

Q.      Do you recall being informed that Ms. Marchak planned to speak on a local radio show, Step Up To the Mic?

A.      Yes.

Q.      Did you ever listen to Ms. Marchak's comments on that local radio show?

A.      No, I did not.

Q.      Do you recall Jane Doe 4 -- do you recall either and/or -- either Jane Doe 3 and/or Jane Doe 4 informing you that they believe Ms.

Page 472

Marchak's statements were defamatory towards their offices?

A.      Yes, I recall that.

Q.      Did you ever discuss it with Ms. Marchak?

A.      I informed Ms. Marchak of the information that they provided.  However, there was nothing I could do to address her as an elected official.

Q.      But you didn't listen to the --

A.      No, --

Q.      -- radio show, correct?

A.      I did not.

Q.      So you couldn't take Ms. Marchak through things that maybe she should or shouldn't do when speaking on a local radio show?

MS. PIPAK:  Object to the form.  Go ahead.

THE WITNESS:  No.

BY MS. SMITH:

Q.      Did you ever inform Jane Doe 3 or Jane Doe 4 that you had spoken with Ms. Marchak?

A.      No.

Q.      Do you recall when Mr. Alu's contract or

Page 473

consultant contract began?

A.      I don't recall the exact date, no.

Q.      I apologize.  I'm using a news article, but I don't have a copy of that consultation contract?

MS. SMITH:  Zula 964 to 966 will be Exhibit-151.

- - -

(Zula 964-966 marked as Exhibit-151 for identification.)

- - -

BY MS. SMITH:

Q.      Now again this is a news article.  So it may be wrong.  But do you have any reason to believe that Mr. Alu did not start working on March 29th as is indicated there on the first page?

A.      I don't know.  I don't know the exact date.  I'm not certain.  I'm sure it's part of public record, so potentially --

Q.      Okay.

A.      -- got it from there.

Q.      Okay.

And this would be in 2021?

Case 3:21-cv-00477-MCC   Document 280-1   Filed 09/20/23   Page 25 of 92
Deposition of Heidi Zula Vol. II - Revised
Jane Doe, et al. v. Schuylkill County Courthouse, et al.

Page 474

1  A.      Yes.
2  Q.      On the second page in the third
3  paragraph, it states that under the consulting
4  contract the county will pay Alu 40 per hour with
5  a limit of 105 hours per month, plus milage.
6          Do you know, was Mr. Alu paid $40 per
7  hour?
8  A.      To my knowledge, yes.
9          MS. SMITH:  I'm going to mark as
10 152 Zula 898 and 899.
11             - - -
12         (Zula 898-899 marked as Exhibit-152 for
13 identification.)
14             - - -
15 BY MS. SMITH:
16 Q.      Do you recognize this e-mail chain?
17 A.      Yes.
18 Q.      Any reason -- again it states here that
19 Mr. Alu's compensation for consulting is 40 an
20 hour.
21         Any reason to believe that that was not
22 true?
23 A.      I believe it was 40 an hour, yes.
24 Q.      And Jane Doe 3 indicates in her e-mail

Page 475

1  on April 6th, 2021 this is the specific wage that
2  was denied to Helene O'Connor, who incidentally
3  has the most Schuylkill County assessment
4  knowledge of anyone in existence.  She was only
5  paid 35 an hour.
6          Do you know why Mr. Alu was approved at
7  $40 an hour when the $5 pay increase Ms. O'Connor
8  requested when Jane Doe 3 and Jane Doe 4 ran the
9  office was denied?
10         MS. PIPAK:  Object to the form.
11 You can answer.
12         THE WITNESS:  No, I don't.  I
13 wasn't part of the discussion as to what his
14 hourly rate would be, other than to contact him
15 and tell him that this is what the offer was.
16 BY MS. SMITH:
17 Q.      Who made that decision?
18 A.      I'm not a hundred percent certain.  I
19 don't know.
20 Q.      Who told you to contact --
21 A.      Mr. Bender.
22 Q.      I'm sorry, I'm just going to finish my
23 question.  That's okay.
24         Who told you to contact Mr. Alu and tell

Page 476

1  him he would be paid 40 an hour?
2  A.      Mr. Bender.
3          I apologize.
4  Q.      That's all right.
5          The Contactor Consultation Agreement for
6  Mr. Alu, I think you talked about this yesterday,
7  wouldn't be on a par, but it would still be on the
8  commissioner's agenda, correct?
9  A.      Yes, it would have to be approved by the
10 commissioner.
11 Q.      Voted on, correct?
12 A.      Yes.
13 Q.      Does the consultation agreement or
14 hourly rate have to be voted on by the salary
15 board?
16 A.      No, because it's part of the agreement.
17 So it's not an employee.
18 Q.      Because it's not coming from salary
19 really.  It's coming from other county funds?
20 A.      I guess, yes.  But the salary board only
21 votes on actual employee actions.  Not the
22 approval of contracts.
23 Q.      In the last exhibit 152, in the last
24 paragraph of Jane Doe 3's e-mail she indicates

Page 477

1  that she believes the reason for Mr. Alu being
2  approved but not Ms. O'Connor can only be one of
3  two; she's a woman or the decision to deny her $40
4  an hour was retaliatory.
5          Would you agree that if a woman was paid
6  less than a man simply because they're a woman,
7  that that would be gender discrimination?
8          MS. PIPAK:  Object to the form.  Go
9  ahead.
10         THE WITNESS:  Yes.
11 BY MS. SMITH:
12 Q.      Okay.
13         So option one that Jane Doe 3 asserts is
14 she's asserting that there is potentially gender
15 discrimination going on, right?
16         MS. PIPAK:  Object to the form.
17 You can answer.
18         THE WITNESS:  That's her assertion,
19 yes.
20 BY MS. SMITH:
21 Q.      The other assertion she makes in the
22 alternative is that it's retaliation, which would
23 also be unlawful, correct?
24         MS. PIPAK:  Object to the form.

Page 478

1  You can answer.
2        THE WITNESS:  Yes.
3  BY MS. SMITH:
4  Q.     Both things of which -- so sexual
5  harassment -- or, I'm sorry, gender discrimination
6  or retaliation are two items that should be
7  investigated by HR, correct?
8  A.     Potentially, yes.
9  Q.     Did you ever investigate Jane Doe 3's
10 claims of gender discrimination on behalf of
11 Ms. O'Connor or retaliation?
12       MS. PIPAK:  Object to the form.
13 You can answer.
14       THE WITNESS:  No, I did not.
15 BY MS. SMITH:
16 Q.     Why?
17 A.     I didn't believe it was.  Based upon the
18 information I received from Mr. Bender, that was
19 the offer that was made, and I was not part of
20 that determination.
21 Q.     Well, if you weren't part of it, then
22 you didn't have all of the information, correct?
23       MS. PIPAK:  Object to form.  You
24 can answer.

Page 479

1        THE WITNESS:  Potentially, yes.
2  BY MS. SMITH:
3  Q.     So if you didn't have all the
4  information, why didn't you conduct an investigation
5  to gather all of the information?
6        MS. PIPAK:  Object to the form.
7  You can answer.
8        THE WITNESS:  I didn't believe it
9  was necessary.
10 BY MS. SMITH:
11 Q.     Again why didn't you think it was
12 necessary?
13 A.     I didn't.  I don't know.
14 Q.     Ms. Zula, do you recall testifying
15 yesterday that when Jane Doe 2 and Jane Doe 1's
16 requests from home -- were reasonable
17 accommodation requests, because they were kind of
18 hybrid requests came in in February and early
19 March, that you used the medical documentation
20 submitted and your knowledge of their job
21 positions to make a decision regarding those?
22       MS. PIPAK:  I'll object to the
23 form.  But you can answer.
24       THE WITNESS:  Yes, I believe that's

Page 480

1  what I testified to.
2  BY MS. SMITH:
3  Q.     And you testified that you had enough
4  knowledge of their positions at that time to make
5  a decision regarding their reasonable
6  accommodation requests?
7  A.     Yes.
8        MS. SMITH:  I'm going to mark as
9  929 -- I'm going to mark, I'm sorry, as 153 Zula
10 929.
11                - - -
12       (Zula 929 marked as Exhibit-153 for
13 identification.)
14                - - -
15 BY MS. SMITH:
16 Q.     Do you recognize this e-mail, Ms. Zula?
17 A.     Yes.
18 Q.     It states we recently received requests
19 for accommodation -- I'm sorry, it's on April 7th,
20 2021.
21       You would agree that's after February
22 and March of 2021, correct?
23 A.     Yes.
24 Q.     It states we recently received requests

Page 481

1  for accommodation from Jane Doe 1 and Jane Doe 2
2  requesting to work from home primarily.  I am not
3  very familiar with how the duties of their
4  positions are completed to know whether or not we
5  can reasonably accommodate their work -- their
6  requests.
7        How is it you had enough information in
8  February and March to make determinations when
9  they were supervised by Jane Doe 3 and Jane Doe 4,
10 but under Mr. Alu you didn't have enough
11 information and requested his input?
12 A.     I don't know.  I don't recall.
13 Q.     But you did seek Mr. Alu's input on this
14 request, didn't you?
15 A.     He actually came to us to talk about
16 wanting to work -- having them work from home as
17 well.  Yes, he did.
18 Q.     Well, Jane Doe 3 came to you and
19 requested for them to work from home, correct?
20 A.     Yes.
21 Q.     Jane Doe 3 asked to be involved in those
22 reasonable accommodation request considerations,
23 didn't she?
24       MS. PIPAK:  Object to the form.

Page 482

1  You can answer.
2        THE WITNESS:  Yes.
3  BY MS. SMITH:
4  Q.     Why then was Mr. Alu treated differently
5  than Jane Doe 3?
6  A.     Because he asked --
7        MS. PIPAK:  Object to the form.
8        THE WITNESS:  Sorry.
9        MS. PIPAK:  You can answer.
10       THE WITNESS:  Because he had fresh
11 eyes coming into the office and we wanted to get
12 his thoughts on the process.
13 BY MS. SMITH:
14 Q.     The next sentence says I would like to
15 review their job descriptions with you so I can
16 understand what is required of each task.
17       Why didn't you do that with Jane Doe 3?
18 A.     I don't know.
19 Q.     Did someone tell you not to do it with
20 Jane Doe 3?
21 A.     Not that I can recall.
22 Q.     Mr. Bender never told you it doesn't
23 matter, just deny it?
24       MS. PIPAK:  Object to the form.

Page 483

1  You can answer.
2        THE WITNESS:  No.
3        Well, let me clarify.  I think I
4  testified to this.  That he told me, yes, that we
5  are going to deny their requests to work from
6  home.  He did not tell me not to talk to Jane Doe
7  3.
8  BY MS. SMITH:
9  Q.     Do you know if prior to Mr. Bender
10 telling you to deny their work -- request to work
11 from home, this is Jane Doe 2 and Jane Doe 1's
12 request to work from home, correct?
13 A.     Yes.
14 Q.     I just want to make the record clear.
15 Sometimes we have to read these back later on and
16 it makes it easier if we delineate that.
17       Prior to Mr. Bender telling you that, do
18 you know, did he ever review Jane Doe 1 or Jane
19 Doe 2's medical provider's information?
20       MS. PIPAK:  Object to the form.
21       THE WITNESS:  I did not provide it
22 to him, so I'm not certain.  We had a discussion
23 regarding some of the information in it, but I
24 didn't share the document with him.

Page 484

1  BY MS. SMITH:
2  Q.     So you yourself never observed or have
3  knowledge of Mr. Bender ever reviewing the medical
4  documentation provided by Jane Doe 2 and Jane Doe
5  1's doctors?
6  A.     No, I do not.
7        MS. SMITH:  I'm going to mark Zula
8  1116 as 154.
9              - - -
10      (Zula 1116 marked as Exhibit-154 for
11 identification.)
12             - - -
13 BY MS. SMITH:
14 Q.     Do you recognize this e-mail, Ms. Zula?
15 A.     Yes.
16 Q.     This is -- well, the top one is an
17 e-mail from -- sorry.  The bottom e-mail is an
18 e-mail from you to Mr. Alu.  In the second
19 sentence, on April 30th, 2021 you say, yes, we can
20 approve Jane Doe 1 and Jane Doe 2 to work from
21 home based upon the documentation provided by
22 their doctors.
23       What changed from March of 2021 and
24 April of 2021 that they could now all of a sudden

Page 485

1  work from home?
2  A.     Well, that was my initial determination
3  after my discussions with Mr. Alu and put -- he
4  indicated we can put clear parameters in place as
5  to what exactly they needed to do.  But ultimately
6  that was turned down and I was not able to offer
7  that to them.
8  Q.     Okay.
9        Because they had -- this was actually
10 never communicated to --
11 A.     No, no.
12 Q.     -- Jane Doe 2 --
13 A.     Because it was turned down.
14 Q.     Hold on.
15 A.     Oh, I'm sorry.
16 Q.     -- Jane Doe 2 and Jane Doe 1, correct?
17 A.     That is correct.  It was turned down.
18 Q.     Who turned it down.
19 A.     Mr. Bender told me it would not be
20 permissible for them to work from home.
21 Q.     Ms. Zula, do you remember testifying
22 yesterday that part of the reason the
23 February/March work from home requests were turned
24 down was because of their work product?

Page 486

1  A.    Yes.
2  Q.    And part of that was Jane Doe 1's STEB
3  Report delinquency, correct?
4  A.    Yes.
5  Q.    That STEB delinquency led to Jane Doe
6  3's -- partially, at least, led to Jane Doe 3's
7  demotion, correct?
8  A.    Yes.
9  Q.    The STEB Reports and Jane Doe 1's
10 attendance issues were still occurring between
11 March 17th, 2021 and April 30, 2021, correct?
12 A.    I believe so, yes.
13 Q.    Why then did your opinion change
14 regarding the recommendation of approval or
15 non-approval of her work from home request?
16 A.    Because I believe that Mr. Alu would
17 hold Jane Doe 1 accountable, where Jane Doe 3 was
18 not.
19 Q.    What did you think he was going to do to
20 hold her accountable?
21 A.    That he was going to monitor her work
22 and her work product, and that she actually
23 submitted work.  Where based upon the information
24 that I had from Jane Doe 3's situation, she was

Page 487

1  not.  Because it was clear Jane Doe 1 was not
2  turning in her work.
3  Q.    What was Mr. Alu, in your opinion, going
4  to be able to do differently?
5  A.    That there was going to be expectations
6  and specific directions given as to what they were
7  to be doing during their workday.
8  Q.    Did you ever ask Jane Doe 3 if she had
9  given a specific direction to Jane Doe 1 who then
10 maybe didn't follow them?
11 A.    No, I did not ask her that question.
12 Q.    How do you know that -- did you ever ask
13 Jane Doe 1 if she been given specific directions
14 and had just not followed them?
15 A.    No.
16 Q.    How did you know that specific
17 instructions hadn't been given then?
18 A.    Because Jane Doe 3 never came to us to
19 address the situation with Jane Doe 1.  She just
20 basically allowed her to do whatever she did, and
21 it's clear the STEB Reports weren't submitted in a
22 timely manner.
23 Q.    Not coming to you is different than not
24 having given direction.

Page 488

1  Would you agree?
2          MS. PIPAK:  Object to the form.
3  You can answer.
4          THE WITNESS:  Well, potentially she
5  gave direction.  I don't know.  I didn't ask that
6  question.  But it was evident that she didn't come
7  to us to address Jane Doe 1's deficiencies in her
8  performance.
9  BY MS. SMITH:
10 Q.    And in April of -- April 30th, 2021 what
11 was Mr. Bender's reason for the denial of your
12 recommended approval of these work from home
13 requests?
14 A.    I don't recall.
15 Q.    Do you recall if he gave one and you
16 don't remember?  Or --
17 A.    I don't recall.
18 Q.    Was it ever communicated to Jane Doe 2
19 and Jane Doe 1 that this reasonable accommodation
20 request that you and Mr. Alu were communicating
21 about had been denied?
22 A.    I don't remember.
23        MS. SMITH:  I'm going to mark as
24 155 Ms. Zula 1217 and 1218.

Page 489

1              - - -
2      (Zula 1217-1218 marked as Exhibit-155
3  for identification.)
4              - - -
5  BY MS. SMITH:
6  Q.    Do you recognize this e-mail chain, Ms.
7  Zula?
8  A.    Yes.
9  Q.    On May 12, 2021, Jane Doe 1 sent Mr. Alu
10 an e-mail that eventually that you're looped into.
11 Would you agree?
12 A.    Yes.
13 Q.    And if we looked at page 2 of this
14 document, which is that e-mail, she says last but
15 not least, where do you stand with the reasonable
16 accommodation request?  I've been told for months
17 now that this is in negotiation.  I would
18 appreciate an answer from you and the county so I
19 can gain more structure stability with my
20 employment status.
21        Did anybody ever tell Jane Doe 1 it was
22 denied?
23        MS. PIPAK:  Object to the form.  Go
24 ahead.

Page 490

1    THE WITNESS:  I don't -- I don't
2  recall.  I don't know.
3  BY MS. SMITH:
4  Q.      Did you ever, after reading this chain
5  of e-mails, reach out to Jane Doe 1 and say, I'm
6  sorry, but it's denied?
7  A.      I don't recall.
8          MS. SMITH:  If we can take just a
9  quick bathroom break.
10         VIDEOGRAPHER:  Time is now
11  10:46 a.m. We're going off the record.
12              - - -
13         (Whereupon, brief recess was held off
14  the record.)
15              - - -
16         VIDEOGRAPHER:  The time is now
17  11:04 a.m. and we're back on the record.
18  BY MS. SMITH:
19  Q.      I'm going to direct your attention to
20  what was previously marked as Exhibit-121?
21         MS. IPPOLITO:  I'm sorry, what was
22  that?
23         MS. SMITH:  121.
24         MS. DEBISE:  It's SC633.

Page 491

1  BY MS. SMITH:
2  Q.      Mr. Hatter, Ken Hatter, was appointed to
3  chief assessor for the county on May 12th, 2021,
4  correct?
5  A.      May 24th, 2021.
6  Q.      His position was approved on May 12th by
7  the commissioners, and his start date was
8  May 24th, 2021, correct?
9  A.      Yes.
10  Q.      I'm sorry, I apologize if we did go over
11  this.
12         But who decided Mr. Hatter's salary of
13  51,420?
14  A.      It was a discussion between myself and
15  Mr. Bender, and ultimately he provided me with the
16  final direction as to what salary to offer
17  Mr. Hatter.
18  Q.      He being Mr. Bender, correct?
19         MS. SMITH:  Can we go off the
20  record.
21         VIDEOGRAPHER:  The time is 11:05.
22  Going off the record.
23              - - -
24         (Whereupon, brief recess was held off

Page 492

1  the record.)
2              - - -
3         VIDEOGRAPHER:  Time is now
4  11:07 a.m. and we're back on the record.
5  BY MS. SMITH:
6  Q.      Sorry about that, Ms. Zula.
7          At the bottom of this exhibit there's
8  human resources review and there are some initial
9  there.
10         Do you see that?
11  A.      Yes.
12  Q.      Are those your initials?
13  A.      Yes.
14  Q.      Prior to initialing this par, did you
15  receive and review any employment application or
16  resume or similar document for Mr. Hatter?
17  A.      Yes.
18  Q.      Do you recall which?
19  A.      I believe he submitted a resume.
20  Q.      You can put that one back aside.  It
21  doesn't have to be in order.  We can figure that
22  out later.
23         MS. SMITH:  I'm going to mark as
24  156, it's -- it should be SC634.

Page 493

1              - - -
2         (SC634 marked as Exhibit-156 for
3  identification.)
4              - - -
5  BY MS. SMITH:
6  Q.      Ms. Zula, is this, if you recall, the
7  resume that you reviewed of Mr. Hatter?
8  A.      Yes.
9  Q.      Other than this resume prior to
10  initialing the par that we just looked at for
11  Mr. Hatter, which is Exhibit-121, did you review
12  any other documentation with regard to his
13  experience?
14  A.      I don't believe so.  I don't recall.
15  Q.      Okay.
16         And after Mr. Hatter's employment was
17  approved by the commissioners and salary board as
18  we saw on Exhibit-131, do you know, was Mr. Hatter
19  provided with county policies for review and
20  acknowledgment?
21  A.      Yes, I believe he would have been as a
22  new employee.
23  Q.      Do you know if you did that?
24  A.      No, I did not.

Page 494

1    MS. SMITH:  I'm going to mark as
2  157 SC618.
3          - - -
4    (SC618 marked as Exhibit-157 for
5  identification.)
6          - - -
7  BY MS. SMITH:
8  Q.    Ms. Zula, do you recognize this
9  document?
10 A.    I recognize the form, yes.
11 Q.    Okay.
12    I think we looked at one of these for
13 you.  It's the county's Job Description
14 Acknowledgment Form.
15    Would you agree?
16 A.    Yes.
17 Q.    Any reason to believe that Mr. Hatter
18 did not -- well, print and -- I guess technically
19 it says it's his signature -- and sign this
20 document?
21 A.    Yes.  No, no reason to believe
22 otherwise.
23 Q.    And before someone can start their
24 position with the county, are they required to

Page 495

1  acknowledge that they understand the essential job
2  duties and responsibilities required and confirm
3  that I'm qualified to perform them?
4  A.    Yes.
5  Q.    If they wouldn't acknowledge that or
6  couldn't perform the duties, they wouldn't be
7  permitted to start with the county, correct?
8  A.    I would assume so, yes.
9  Q.    Well, as HR director if -- let's strike
10 that.
11    Let's start with:  Who gives this to a
12 new employee?  Someone in HR?
13 A.    Yes.
14 Q.    Okay.
15    And what position in HR?
16 A.    The administrative assistant.
17 Q.    If the administrative assistant came to
18 you and said, hey, this new applicant or new hire
19 has said that they can't perform the duties, what
20 if anything would you do as HR director?
21    MS. PIPAK:  Object to the form.
22 You can answer.
23    THE WITNESS:  I would contact the
24 employee and have a discussion.

Page 496

1  BY MS. SMITH:
2  Q.    And if they, based on discussion, they
3  still couldn't perform the duties, what would be
4  done?
5    MS. PIPAK:  Object to the form.
6    THE WITNESS:  Then we would make a
7  determination as to whether or not the employee
8  could stay in the position.
9    MS. SMITH:  I'm going mark as 158
10 SC 619 and 620.
11          - - -
12    (SC619-620 marked as Exhibit-158 for
13 identification.)
14          - - -
15 BY MS. SMITH:
16 Q.    Ms. Zula, do you recognize this
17 document?
18 A.    Yes.
19 Q.    This is Schuylkill County's Job
20 Classification Description for the position of
21 chief assessor, correct?
22 A.    Yes.
23 Q.    And is this the job classification that
24 Mr. Hatter would have received?

Page 497

1  A.    Yes.
2  Q.    If we look towards the bottom of the
3  education employment paragraph, the last sentence
4  states must have certified Pennsylvania
5  evaluator's license.
6    Do you see that?
7  A.    Yes.
8  Q.    Is there anything about that that is
9  open to interpretation?
10 A.    No.
11 Q.    If we look back at Mr. Hatter's resume,
12 I think it was 156, is there anything in
13 Mr. Hatter's resume that indicates that he held a
14 certified Pennsylvania Evaluators License?
15 A.    No.
16 Q.    In fact, I think you testified yesterday
17 he didn't hold one.
18 A.    That's correct.
19 Q.    So how is it that he was able to
20 indicate that he was qualified to perform the
21 essential job duties?
22 A.    We allowed Mr. Hatter time to earn the
23 license, as we discussed yesterday.  Unless you've
24 worked for a previous county, typically that's not

Page 498

1  a certification that's held by individuals.
2  Q.      But the job description says must,
3  correct?
4  A.      Yes, that's what the job description
5  says.  However, we allowed him time to obtain his
6  license.
7  Q.      Who is we?
8  A.      Mr. Bender and I.
9  Q.      Are you aware that there is a
10 Pennsylvania statute that requires chief assessors
11 to hold a valid CPE licensed?
12         MS. PIPAK:  Objection.  You can
13 answer.
14         THE WITNESS:  I believe that's a
15 requirement, yes.  I don't know -- I'm not
16 familiar with the actual statute.
17 BY MS. SMITH:
18 Q.      You're not familiar with the number or
19 you're not familiar with the fact that there's a
20 statute that requires it?
21 A.      I believe there is a statute that
22 requires it.  I'm not familiar with the number or
23 the citation or exactly what it says.  But, yes,
24 that position does require a CPE license to sign

Page 499

1  off on the values.
2  Q.      Were you aware of the existence of a
3  statute in March of 2021?
4  A.      What statute?
5  Q.      Well, you said you were aware that there
6  was a statute, right?
7  A.      Yes, I was -- I'm aware that there is a
8  requirement that the CP -- the chief assessor
9  needs to hold a CPE license, yes.
10 Q.      In March of 2021 did you understand
11 that?
12 A.      Yes.
13 Q.      What was your understanding of where
14 that requirement came from?
15         MS. PIPAK:  Object to the form.  I
16 just didn't understand the question.
17 BY MS. SMITH:
18 Q.      Was it your understanding that it was a
19 county requirement?  That it was a state
20 regulation or statute requirement?  That it was
21 just something that the job description stated?
22 Like what was your understanding of who said that
23 that position had to hold a CPE license?
24 A.      It was a state requirement was my

Page 500

1  understanding, yes.
2  Q.      So you understood it was essentially a
3  law?
4  A.      Yes.
5  Q.      Why did you think that you could allow
6  Mr. Hatter to not hold a CPE license and violate a
7  law?
8          MS. PIPAK:  Object to the form.
9          THE WITNESS:  We believed that we
10 could allow Mr. Hatter to -- time to obtain that
11 certification base on Mr. Alu still being with the
12 county.
13 BY MS. SMITH:
14 Q.      So Mr. Alu at all times that Mr. Hatter
15 was a chief assessor was still with the county?
16 A.      Yes.  Well, he was with the county when
17 Mr. Hatter started, yes.
18 Q.      Okay.
19         And again who was the we you thought
20 that you could allow Mr. Hatter not to hold a CPE
21 license?
22 A.      Mr. Bender and I discussed it when we
23 did the interviews that none of the candidates had
24 a CPE license, and that we would have to go

Page 501

1  through the process to get to, whoever the
2  selected candidate was, the CPE license.
3  Q.      Was there any talk about bringing Jane
4  Doe 3 back since she had CPE license?
5  A.      No.
6  Q.      Did you think to consider her?
7          MS. PIPAK:  Object to the form.
8  You can answer.
9          THE WITNESS:  She didn't apply for
10 the position.
11         MS. SMITH:  Zula 2522, which I'll
12 mark as 159.
13              - - -
14        (Zula 2522 marked as Exhibit-159 for
15 identification.)
16              - - -
17 BY MS. SMITH:
18 Q.      Ms. Zula, do you recognize this
19 document?
20 A.      Yes.
21 Q.      And this is -- the first e-mail in this
22 chain of e-mails from Jane Doe 2 to you on
23 June 1st, 2021 correct?
24 A.      Yes.

Page 502

Q.     The second sentence -- well, the first
paragraph states this morning my supervisor
Mr. Hatter requested I report to the courthouse.
As such, I'm writing for clarification on the
status of my reasonable accommodation request
status.  As you know, I previously submitted a
reasonable accommodation request to work from
home.  The last correspondence I received in
regard to said request was an e-mail from you
dated March 3rd of 2021.
       Do you have any reason to believe that
between March of 2021 and June of -- June 1st of
2021, you communicated with Jane Doe 2 regarding
her work from home accommodation request?
A.     I believe I had yes.
Q.     When did you do that?
A.     I don't recall.
Q.     How many times?
A.     I don't recall.
Q.     Did you respond to Jane Doe 2's June 1st
e-mail?
A.     I don't remember.
Q.     On June 8th at the top of this document
Jane Doe 2 says, hi, just following up.  Do you

Page 503

know when this will be reviewed/considered?
       Any reason to believe you did, in fact,
respond to Jane Doe 2 during that seven-day
period?
A.     Apparently I did not.
Q.     Any reason that if Jane Doe 2 said you
last -- the last communication she received from
was March 3rd, 2021 that she was incorrect?
       MS. PIPAK:  Object to the form.
You can answer.
       THE WITNESS:  I don't recall.  If
she said I didn't, then apparently maybe I didn't.
I don't really remember.
BY MS. SMITH:
Q.     Do you recall looking, before the break
I think, at the April 30th e-mail regarding
Mr. Alu, between you and Mr. Alu about the
potential approval to approve Jane Doe 2 to work
from home?
A.     Yes.
Q.     And then you said eventually it was
denied by Mr. Bender, correct?
A.     Yes.
       MS. PIPAK:  Object to the form.

Page 504

BY MS. SMITH:
Q.     Any reason that between the denial by
Mr. Bender and June 1st you hadn't communicated
the denial to Jane Doe 2?
       MS. PIPAK:  Object to the form.  Go
ahead.
       THE WITNESS:  I don't recall if I
did or I didn't.
BY MS. SMITH:
Q.     Well, she states the last correspondence
was March 3rd, 2021.  I think you testified to it
earlier that you didn't communicate the denial.
A.     Yeah.  And apparently I didn't.  I
didn't, I guess.
Q.     Okay.
A.     I don't recall if I did or I didn't.
Q.     Okay.
       But is there any reason that you have to
believe that Jane Doe 2 wasn't indicating the
truth in her e-mail?
       MS. PIPAK:  Object to the form.
       THE WITNESS:  No.
BY MS. SMITH:
Q.     Okay.

Page 505

       Is there any reason why you wouldn't
have communicated the denial to Jane Doe 2?
A.     No specific reason, no.
Q.     Is it typical that the county
communicates denial of reasonable accommodation
requests to employees?
A.     Yes.  I would say that we would.
Q.     Is it typical, because the interactive
process may be if you're denied to work from home,
there might be something else in the interactive
process that could then be discovered to work for
all parties involved?
       MS. PIPAK:  Object to the form.
       THE WITNESS:  Yes, there's a
potential.
BY MS. SMITH:
Q.     So after the denial was there ever an
engagement in an interactive process with Jane Doe
2?
       MS. PIPAK:  Object to the form.
       THE WITNESS:  No.
BY MS. SMITH:
Q.     After you were hired by the county at
any point, did you engage in or assist in the

Page 506

1  preparation of an EEOC position statement?
2  A.     I don't remember.  I know I had to
3  provide documents.  I don't know -- I don't
4  believe I reviewed any position statements.  I
5  don't recall that.  I know I had to provide
6  documentation.
7  Q.     Okay.  But you don't --
8  A.     I don't know what it was for though.  I
9  don't exactly know if it was for an EEOC or for
10  the loss.  I don't know.  I was just told or asked
11  here, I need this information, this is what I
12  needed, and that's what I provided.
13  Q.     Okay.
14        Did you ever, if you know, review
15  anything for factual accuracy prior to it being
16  submitted to the EEOC?
17            MS. PIPAK:  I'm going to object to
18  the form to the extent this involves conversations
19  you had with counsel or any attorney.
20            THE WITNESS:  I don't know how to
21  answer that.
22  BY MS. SMITH:
23  Q.     I'm sorry, your answer is you don't
24  know?

Page 507

1  A.     I don't recall reviewing any kind of
2  position statement until just recently.
3  Q.     To one that was already prepared.  Not
4  for editing purposes?
5  A.     Yes.
6  Q.     Okay.
7  A.     No.
8  Q.     In the last paragraph, on the paragraph
9  on the first page, it states -- oh, I'm sorry.
10  It's the -- it's not even a full paragraph.  It's
11  the one sentence that runs onto the next page.
12  Additionally Schuylkill County's position
13  statement dated May 6th, 2021 in response to my
14  supplemental EEOC charge of discrimination states
15  on page 4 Schuylkill County has accommodated me to
16  allow me to work from home as to further ensure I
17  do not come into contact with Respondent
18  Halcovage.
19        In May of 2021 Jane Doe 2 has not been
20  approved to work from home, correct?
21  A.     She was approved prior.  She worked from
22  home I believe in 2020.  I don't know what that
23  statement is in response to in the EEOC charge.  I
24  don't know.

Page 508

1  Q.     But between January of -- your start
2  date January 11, 2021 and May 6, 2021, Jane Doe 2
3  was not approved to work from home, correct?
4  A.     No, she was not.
5  Q.     So if the county's position statement
6  indicates that she was, it would be incorrect?
7            MS. PIPAK:  Object to the form.
8            THE WITNESS:  I don't know what
9  this position statement is in response to.  I
10  don't know.  But if it's referring to working from
11  home between January and May of 2021, no, then
12  that would not be accurate as she was not
13  permitted to work from home.
14  BY MS. SMITH:
15        MS. SMITH:  Okay.  I'm going to
16  mark 2640 as 160.
17            - - -
18        (Zula 2640 marked as Exhibit-160 for
19  identification.)
20            - - -
21  BY MS. SMITH:
22  Q.     Do you recognize this e-mail chain?
23  A.     Yes.
24  Q.     Jane Doe 1 at the bottom on July 12,

Page 509

1  2021 sends you an e-mail, as well as her
2  supervisors, asking permission to work from home
3  the rest of today, being July 12, and possibly
4  tomorrow July 13, due to a health concern.  She
5  says Chrissy and Ken are aware of my -- of the
6  issue.  My condition requires me to keep my foot
7  elevated and soak several times throughout the --
8  there's not the second page.
9        But did you receive that e-mail from
10  Jane Doe 1?
11  A.     Yes.
12  Q.     You don't respond to Jane Doe 1 that
13  same day, do you?
14  A.     No, I did not.
15  Q.     Do you know why you didn't respond to
16  her?
17  A.     I don't know.  I don't know if I was out
18  of the office or not.
19  Q.     You don't know that you were, correct?
20  A.     I don't recall.
21  Q.     Okay.  On Tuesday, July 13, you do
22  respond to Mr. Hatter at 8:42 a.m. and say did you
23  touch base with Jane Doe 1 regarding her request?
24  I just want to be sure before I respond back to

Page 510

1 her.
2       I take this to mean had Mr. Hatter
3 responded to her and dealt with it you wouldn't
4 have needed to get involved, correct?
5 A.      Yes.
6 Q.      So Mr. Hatter could have approved Jane
7 Doe 1's work from home request in this e-mail?
8             MS. PIPAK:  Object to the form.  Go
9 ahead.
10            THE WITNESS:  Yes, that particular
11 day.  Yes, on that day he could have allowed her
12 to work from home potentially, yes.
13 BY MS. SMITH:
14 Q.      The rest of the day on the 12th and the
15 day on the 13th?
16 A.      Potentially.
17 Q.      Without HR's approval?
18 A.      Potentially.
19 Q.      What do you mean potentially?  Could he
20 or could --
21 A.      On that limited basis, yes.  I mean I
22 don't know what the rest of the e-mail said.  But
23 he dealt with the situation, so I didn't get
24 involved because her foot was better and she

Page 511

1 returned to work.
2 Q.      But would he have been permitted to
3 allow her to work from home as she requested that
4 day and the next day?
5             MS. PIPAK:  Object to the form.
6 You can answer.
7             THE WITNESS:  Not in and of it --
8 wait.  He would have probably allowed her to do
9 that just for that day, yes.
10 BY MS. SMITH:
11 Q.      Okay.
12       But I'm asking a specific question.
13 Jane Doe 1 says can I work from home the rest of
14 today and possibly tomorrow?  Could Mr. Hatter,
15 without talking to HR, have approved her work from
16 home for the rest of the 12th and the 13th?
17 A.      I mean he should not have.  He should
18 have contacted HR, yes.  However, it was after the
19 fact until, for whatever reason, I wasn't
20 available to address this e-mail, that I wanted to
21 know that he did.  I mean if he did allow her to
22 do it, there was nothing I was going to do to
23 change that decision at that point in time since
24 it was already the next day.

Page 512

1 Q.      Right.  You couldn't make Jane Doe 1
2 unwork from --
3 A.      Yes, --
4 Q.      -- home the day before?
5 A.      -- exactly.  So I don't know what he
6 did.  So potentially he could have approved in my
7 absence.  I don't know if he would have went to
8 Gary Bender.  But the process is that they
9 typically need to come through HR and
10 administration prior to approving work from home.
11 Q.      Do you know, did he approve Jane Doe 1
12 to work from home the rest of the 12th?
13 A.      I don't know.
14 Q.      Did you ever ask him if he did?
15 A.      I don't recall if I did or I didn't.  I
16 don't believe she did from what I can recall.  I
17 think she stayed in the office and then she came
18 back to work the next day and informed him that
19 her foot was better.
20 Q.      Did you ever speak with Mr. Bender to
21 see if he had approved Mr. Hatter approving Jane
22 Doe 1 working from home?
23 A.      No, I did not.
24 Q.      Any disciplinary action taken against

Page 513

1 Mr. Hatter for allowing Jane Doe 1 to work from
2 home without running it past HR administration?
3 A.      No.
4 Q.      In May of 2021 Jane Doe 3 applied for
5 FMLA, correct?
6 A.      I remember it was sometime around there.
7 I don't exactly know if it was May or June.
8             MS. SMITH:  161 will be Ms. Zula
9 2398 and then 299 to 302.
10            Matt, they should all be in one pdf.
11                    - - -
12       (Zula 2398 & 299-302 marked as
13 Exhibit-161 for identification.)
14                    - - -
15 BY MS. SMITH:
16 Q.      Ms. Zula, do you recognize these
17 documents?
18 A.      Yes.
19 Q.      On the first page it's an e-mail
20 exchange, correct?
21 A.      Yes.
22 Q.      If we look, there is an attachment.
23 It's called Scan One.
24       Do you know -- again the Bates numbers

Page 514

1  are not consecutive.  So I just want to make sure
2  I reconstructed the document correctly.
3         Was 299 through 302 the attachment
4  called Scan One?
5  A.     I don't know, because I know there was a
6  question regarding the paperwork that she sub --
7  originally submitted, and so I don't know if this
8  was the corrected document or if this is the
9  original document.  That, I don't know.
10 Q.     Okay.  Well, if we look at 299 to 302,
11 is this a correct document -- or correct paperwork
12 that Jane Doe 3 should have utilized when
13 requesting FMLA?
14        MS. PIPAK:  I'll object to the
15 form.  But go ahead when you're ready.
16        THE WITNESS:  Yes, this would --
17 appears to be the correct document to request
18 leave for a family member.
19 BY MS. SMITH:
20 Q.     And it appears that it was signed by
21 Jane Doe 3's medical provider in May of 2021 to be
22 consistent with the e-mail that you received 2398,
23 would you agree?
24 A.     Well, it should have been signed by her

Page 515

1  mother's physician, not hers.
2  Q.     Oh, this may be her mother's physician.
3  I don't know if it's --
4  A.     Yes, this is leave for her parents.  So
5  it should have been her mother's physician.
6  Q.     Okay.
7         Well, in any event it's signed by a
8  Doctor on May 25th, 2021, would you agree?
9  A.     Yes.
10        MS. SMITH:  I'm going to mark Zula
11 1404 to 1406 as 162.
12        We're going to take that one back.  It's
13 out of order.
14        I'm going to mark Zula 298 as 162.
15              - - -
16        (Zula 298 marked as Exhibit-162 for
17 identification.)
18              - - -
19 BY MS. SMITH:
20 Q.     Do you recognize this document, Ms.
21 Zula?
22 A.     Yes.
23 Q.     You approved Jane Doe 3's FMLA leave on
24 May 21st -- I mean May 26th, 2021, correct?

Page 516

1  A.     Yes.
2  Q.     Does -- do all applications for Family
3  Medical Leave have to be reviewed and approved by
4  a human resources individual?
5  A.     Yes.
6  Q.     Is it always the director?
7  A.     Well, what happens is the documentation
8  is submitted to one of the HR analysts.  She
9  reviews the documentation, gets everything in
10 line, and then once everything is ready to do
11 she'll present it to me for final review and sign
12 off.
13 Q.     And after you sign off on it, does
14 anyone else have to sign off on it?
15 A.     There is a supervisor form that's also
16 submitted, in addition to this application form,
17 and the supervisor signs off on -- I don't exactly
18 recall what the form is called.  It's just a
19 notification that the employee is applying for
20 FMLA.
21 Q.     So does the supervisor of the employee
22 applying for FMLA have to approve it?
23 A.     No, they don't approve it.
24 Q.     Okay.

Page 517

1         So the only person that has to be
2  involved in the approval process is -- or I guess
3  who had the approval authority, is the HR
4  director?
5  A.     The approval of the HR is done by the HR
6  director, yes.  But the supervisor -- there's a
7  form that the county requires the employee to sign
8  and have the supervisor sign to confirm that
9  they're aware the leave is going to be taken.
10 Q.     Okay.
11        So the ultimate decision to approve or
12 disapprove FMLA leave would lie with the HR
13 director?
14 A.     Yes.
15 Q.     Okay.
16        Anyone else involved in the approval or
17 denial of the FMLA?
18 A.     No.
19 Q.     Okay.
20        Based off of your approval, Jane Doe 3's
21 leave did commence on 6/7/2021 and she returned on
22 8/30/2021, correct?
23 A.     Yes, I believe those are the correct
24 dates.

Page 518

1  Q.      During Jane Doe 3's FMLA leave, who
2  supervised the tax claim bureau?
3  A.      For the first week I believe it was Jane
4  Doe 4 as the assistant tax claim director.  And
5  then after both Jane Doe 3 and Jane Doe 4 were on
6  FMLA leave that's when the county appointed
7  Ms. Deb Dash as the interim assistant.
8  Q.      Well, when Deb Dash was the interim
9  assistant director, was there a director?
10 A.      No.
11 Q.      Were Jane Doe 3's county e-mails
12 rerouted during the period of her FMLA leave?
13 A.      Yes, I believe they were.
14 Q.      To whom?
15 A.      I believe they were sent to Ms. Dash.
16 Q.      Do you know who instructed that had to
17 occur?
18 A.      I'm not certain exactly who instructed
19 it.  I believe it was Mr. Bender.
20 Q.      Do you know why?
21 A.      I believe that in order to ensure that
22 there was nothing missed during Jane Doe 3's
23 absence, that the decision was made to forward her
24 e-mails to Ms. Dash as it's a county e-mail to be

Page 519

1  utilized for county business.
2  Q.      Do you know prior to her -- Jane Doe 3's
3  return from FMLA, did the county arrange to have
4  her e-mails sent back to her e-mail address?
5  A.      Prior to her return?  I don't -- I mean
6  they've always come into her e-mail.  So they
7  never left her e-mail.  It's just those messages
8  were also forwarded to Ms. Dash so they always hit
9  her e-mail.
10 Q.      So it's your understanding that during
11 the period of forwarding we'll call it when the
12 e-mails that got sent to Jane Doe 3's county
13 e-mail address went to Ms. Dash, that they were
14 also appearing in Jane Doe 3's inbox?
15 A.      Yes, I believe they were.  I believe
16 that's the process.
17 Q.      Okay.
18 A.      That's not my realm.  So I could be
19 mistaken, but I believe that's the process that
20 they would still sit in her inbox, I believe.  But
21 they would also then be forwarded to whoever gets
22 whoever -- whoever the forwarding person.  So
23 similar I think too we walked about Ms. Kutzler --
24 I believe that is true, because when Ms. Kutzler

Page 520

1  came back to assist when I was leaving, she had a
2  boat-load of e-mails in her inbox from when she
3  was gone because they were -- but they were still
4  forwarded to me.
5  Q.      You compared the two sets of e-mails?
6  A.      No, I didn't.  But she had informed me
7  that she had a lot of e-mails in her inbox.
8  Q.      You don't know if they were the same?
9  A.      I don't know.
10 Q.      Do you know where Jane Doe 3's county
11 voicemails were rerouted during the period of her
12 FMLA leave?
13 A.      I believe that, yes, they were.  I don't
14 know if they were rerouted or if someone just had
15 access to access the voicemails on her phone.  I
16 don't know what the process was.  But, yes,
17 somebody else had access to her voicemails on her
18 county phone.
19 Q.      Well, who in the county is responsible
20 for e-mails and voicemails and -- when an employee
21 is out on FMLA leave?
22 A.      The MIS Department handles the e-mails
23 and the voicemails.  Typically I would assume it
24 was handled by the supervisors for the absent

Page 521

1  employee that provisions would be made.  I don't
2  know exactly what is done in other offices.  I
3  don't know.
4  Q.      Well, Jane Doe 3 was the supervisor of
5  the department, correct?
6  A.      She was the supervisor of the department
7  and Mr. Bender supervised her.
8  Q.      So do you know who notified MIS to
9  handle e-mail and voicemail rerouting, forwarding
10 while Jane Doe 3 was out on FMLA leave?
11 A.      I don't recall who that would have been.
12 Q.      Did you ever speak with Mr. Bender to
13 figure out if --
14 A.      I believe, yes, I believe he did --
15 sorry.
16 Q.      -- if those steps had been -- did you
17 ever speak with Mr. Bender to find out if those
18 steps had been taken?
19 A.      Yes, I believe I did have a conversation
20 with him about it.  I don't know if he was the one
21 who requested it or not of MIS.  But he was aware
22 or had directed potentially that that occurred,
23 that the e-mails be forwarded as well as the
24 voicemails.

Page 522

1  Q.      When Jane Doe 3 was set to come back
2  from FMLA, did you speak with Mr. Bender to ensure
3  that the e-mail forwarding and voicemail access
4  was restored for her so she could get back into
5  her duties?
6  A.      I don't recall.  I don't think I did
7  have a conversation prior to that.  I know there
8  was an issue when she did return, and I did
9  address that with Mr. Bender to get that
10 corrected.
11 Q.      But it was after she returned?
12 A.      Yes.  I believe -- I don't believe it
13 was done prior.
14 Q.      Who handles swipe card access for
15 employees?
16 A.      The swipe card access is either given by
17 the sheriff's office.  It could also be updated by
18 the HR office.
19 Q.      Is it common practice or policy that
20 swipe cards for FMLA leave employees are cut?
21 A.      It depends on the circumstances.  Some
22 people are only out for a day -- well, a day here
23 or there on an intermittent basis.  So in those
24 cases, no.  In other instances, if employees are

Page 523

1  going to be out long-term, yes, we have cut off
2  access for employees in certain circumstances
3  based upon the request of the supervisor.
4  Q.      Can you name an employee who was out on
5  an extended FMLA leave who had their swipe card
6  access cut?
7  A.      I don't know if it was a specific FMLA
8  leave, but we had I believe an employee in the
9  courts domestic relations, he was out for an
10 extended period of time and they requested to have
11 her access cut off.
12 Q.      Why was she out?
13 A.      It was an unpaid leave.  I don't believe
14 she qualified for FMLA, but she requested a leave
15 of absence, and that was approved by the court and
16 they did ask to have her time cut off, so similar
17 to an FMLA leave.
18 Q.      Who is this employee?
19 A.      I can't think of her name.
20 Q.      What was her position?
21 A.      She was in the domestic relations
22 office, a clerk typist.  I believe her name was --
23 I don't know what her name -- I can't think of her
24 name.

Page 524

1  Q.      And she didn't have the available time
2  for FMLA?
3  A.      Yes.
4  Q.      And she was approved for an extended
5  leave of unpaid --
6  A.      I believe, yes, she was approved for a
7  leave of absence by the courts.  The courts
8  approved their employees for leave.
9  Q.      What do you mean the courts approved
10 their employees?
11 A.      For a leave of absence, the courts
12 will -- they issue the approval as far as whether
13 or not an employee can take a leave of absence.
14 Q.      So a domestic relations employee is a
15 court employee?
16 A.      Yes.
17 Q.      Still a county employee?
18 A.      Well, they're paid through the county,
19 but they're under the courts, so the courts --
20 again Judge Baldwin I believe it was at the
21 time -- or, no, it might have actually been Judge
22 Russell, that they elected to have their 1620
23 rights availed to them, that they allow that they
24 basically again control the right to hire, fire

Page 525

1  and supervise employees.
2  Q.      Was this employee, the domestic
3  relations employee's leave, medical related?
4  A.      I don't recall.  I believe it was.  I
5  believe it was.  Not for her, but for a family
6  member.
7  Q.      Was Jane Doe 3's swipe card access cut
8  off when she was on FMLA?
9  A.      Yes, it was.
10 Q.      Do you know who made that decision?
11 A.      Mr. Bender.
12 Q.      Is there any policy that indicates that
13 someone on FMLA leave should have their swipe card
14 cut -- swipe card access cut?
15 A.      No.
16 Q.      Any other employees who you can think of
17 during FMLA, other than obviously the domestic
18 relations employee that we just spoke of, who had
19 their access card cut off?
20 A.      I'm not -- I don't recall.
21 Q.      Did you take steps to ensure that Jane
22 Doe 3's swipe card access was reinstated prior to
23 her return from FMLA?
24 A.      No, I did not.

Page 526

MS. SMITH:  I'm going to mark 2764
as Exhibit-163.
- - -
(Zula 2764 marked as Exhibit-163 for
identification.)
- - -
BY MS. SMITH:
Q.     Do you recognize this e-mail chain?
A.     Yes.
Q.     Jane Doe 3 on August 30th at 10:41, the
top e-mail there, asks you is it customary
procedure to cut access when someone goes out on
FMLA.  And she indicates to you it put her in a
position -- that not having access put her in a
position to have to use the main entrance, the one
used by Defendant Halcovage.
Did you ever reply to this e-mail?
A.     I'm not certain.  I don't recall if I
did or didn't.
Q.     Did you ever investigate -- other than
updating her access investigate why her access
wasn't reinstated before she returned from FMLA?
MS. PIPAK:  Object to the form.  Go
ahead.

Page 527

THE WITNESS:  No, I did not do an
investigation.
BY MS. SMITH:
Q.     Between Jane Doe 3's demotion in March
of 2017 and when she went out on FMLA, which we
established was June 7th of 2021, did you have any
issues with Jane Doe 3's job performance?
MS. PIPAK:  Object to the form.  Go
ahead.
THE WITNESS:  I believe we did have
an issue regarding her professionalism, yes.
BY MS. SMITH:
Q.     Other than her professionalism, any
other issues with the operations of the tax claim
bureau?
MS. PIPAK:  Object to the form.  Go
ahead.
THE WITNESS:  Not that I can
recall.
BY MS. SMITH:
Q.     Jane Doe 3 then came back from FMLA
we've established I think August 30th of 2021,
correct?
A.     Yes.

Page 528

Q.     About a month or -- within the month of
September she was placed on indefinite suspension,
correct?
A.     Yes.
Q.     And that's for -- and we'll get to it,
but generally is for issues related to LexisNexis,
correct?
A.     Yes.
Q.     Other than what she was placed on
indefinite suspension for during her month return
that month of September, 2021, did you have any
issues with Jane Doe 3's job performance?
A.     From my perspective, not that I can
recall.
Q.     Any issues with the tax claim bureau's
operations during that month of September, 2021?
A.     Not that I can recall.
Q.     Jane Doe 4, I think we briefly touched
on it, also requested FMLA around the same time as
Jane Doe 3, correct?
A.     Yes.
MS. SMITH:  I'm going to mark Zula
305 at 164.
- - -

Page 529

(Zula 305 marked as Exhibit-164 for
identification.)
- - -
(Whereupon, discussions were held off
the record)
- - -
BY MS. SMITH:
Q.     Ms. Zula, do you recognize Exhibit-164,
which is Zula 305?
A.     Yes.
Q.     This is your approval of Jane Doe 4's
FMLA request in June of 2021, correct.
A.     Yes.
Q.     Jane Doe 4, according to this document,
her leave commenced on June 14, 2021 and
September 6th, 2021 correct?
A.     Yes.
Q.     Between her demotion in March of 2021
and June 14 when she went on leave, did you have
any issues with Jane Doe 4's job performance?
A.     Just from a professionalism perspective
from what I can recall.
Q.     She was in, during that period of time,
both partially in the tax assessment office and

Page 530

1 then partially in the tax claim bureau, correct?
2 A.      Yes.
3 Q.      She -- sorry, I should be more clear
4 about that.
5       She held position a position in tax
6 assessment  for a period of that time and then
7 transferred to a position in the tax claim bureau,
8 correct?
9 A.      Yes.
10 Q.      Okay.
11       During that period of time did you have
12 issues with the operation of either of those
13 offices when she was employed in them?
14 A.      Not that I can recall.
15 Q.      Similar to Jane Doe 3, Jane Doe 4
16 returned in -- well, Jane Doe 3 returned the end
17 of August.  Jane Doe 4 returned in September of
18 2021, correct?
19 A.      Yes.
20 Q.      She was also, Jane Doe 4, placed on
21 indefinite suspension in the month of September,
22 2021, correct?
23 A.      Yes.
24 Q.      Between when she returned from FMLA

Page 531

1 leave and when she was suspended, other than the
2 issues related to LexisNexis, did you have any
3 issues with Jane Doe 4's job performance?
4 A.      Not that I can recall.
5 Q.      Was Jane Doe 4's swipe card access to
6 the courthouse also cut off during Jane Doe 4's
7 FMLA leave?
8 A.      Yes, I believe it was.
9 Q.      Were there also issues with her access
10 being reinstated prior to her return?
11 A.      I don't recall if there was or there
12 wasn't.
13       MS. SMITH:  I'll mark as 165, it's
14 Zula 2798.
15             - - -
16       (Zula 2798 marked as Exhibit-165 for
17 identification.)
18             - - -
19 BY MS. SMITH:
20 Q.      Take a look at this document and let me
21 know if it refreshes your recollection.
22 A.      Yes, apparently there was issues.
23 Q.      Do you know if you took any steps prior
24 to her return, Jane Doe 4's return, from FMLA to

Page 532

1 ensure that she had swipe card access?
2 A.      I don't believe, no.
3 Q.      You don't believe you did?
4 A.      I don't believe I did, no.
5       MS. SMITH:  I'm going to mark Zula
6 2826 as 166.
7             - - -
8       (Zula 2826 marked as Exhibit-166 for
9 identification.)
10             - - -
11 BY MS. SMITH:
12 Q.      Do you recognize this document?
13 A.      Yes.
14 Q.      This is an e-mail from Jane Doe 4 to you
15 on September 10th, 2021 correct?
16 A.      Yes.
17 Q.      If you look to the paragraph that begins
18 with finally.  Jane Doe 4 says finally I believe
19 it was stated that Ms. Dash would be taking care
20 of judicial sale preparation.  As I understood
21 this increase in duties was the basis for her pay
22 increase that she received in Jane Doe 3's and my
23 absence.  I learned that she delegated my workload
24 to a clerk typist one and title searcher.  Please

Page 533

1 allow this e-mail to serve as notice that the
2 judicial sale is not even close to being
3 completed, the upset sale is also behind with
4 things being entered for accurate upset sale bid.
5 The petition to waive personal service hasn't even
6 been started, and also the list of bidders that
7 all municipalities will need to do to the new
8 statute.
9       Did you ever look into whether or not --
10 into the veracity of Jane Doe 4's statements in
11 this statement?
12 A.      I did provide the information to Mr.
13 Bender about the judicial sale as that's not
14 something that I was involved in, nor was it my
15 responsibility to review or oversee the judicial
16 sale.  I did look into the clerk typist one and
17 title searcher responsibilities.  Yes, that issue
18 was addressed with the union.
19 Q.      Let me unpack that.  So the first part
20 is you said the judicial sale information was
21 relayed to Mr. Bender because it was not your
22 responsibility to oversee that, correct?
23 A.      Yes.
24 Q.      Did Mr. Bender, like the STEB report,

Page 534

1 have you do an investigation to look into whether
2 or not it had been completed?
3          MS. PIPAK:  Object to form.  Go
4 ahead.
5          THE WITNESS:  No, I believe he was
6 part of the whole judicial sale process that
7 Ms. Dash was going through.  So he did not have me
8 do an investigation into that.
9 BY MS. SMITH:
10 Q.     Do you know if he did an investigation
11 into Ms. Dash completing or not completing the
12 work that she was supposed to --
13 A.     I do not know.
14 Q.     Do you know if Ms. Dash was disciplined
15 in any way for her -- for these allegations of
16 Jane Doe 4 in September, 2021?
17          MS. PIPAK:  Object to the form.  Go
18 ahead.
19          THE WITNESS:  I'm not aware of Ms.
20 Dash being disciplined.  I'm not certain what her
21 responsibilities were for the judicial sale
22 preparation.
23 BY MS. SMITH:
24 Q.     So then you talked about clerk typist

Page 535

1 one and title searcher position.  So Jane Doe 4's
2 allegation is that Ms. Dash delegated that work.
3 So what exactly did you look into regarding that
4 as you testified you did?
5 A.     So there was I guess concern brought
6 forth by the union regarding the work that was
7 assigned to the title searcher position.  We
8 discussed that work, and it was found that the
9 work was appropriately assigned to that
10 classification.  Even though it was work that was
11 performed by Jane Doe 3 -- excuse me, Jane Doe 4
12 in her position, it wasn't work that qualified to
13 be higher level work.  It was more of work that
14 was aligned with the responsibilities of the title
15 searcher position.
16 Q.     So Ms. Dash prior to becoming -- strike
17 that.
18          Remind me, Ms. Dash went from clerical
19 supervisor, a union position, correct?
20 A.     Yes.
21 Q.     To interim assistant assessor.
22 A.     Assistant tax claim director.
23 Q.     Director.
24          Which was or was not a union position?

Page 536

1 A.     That was not a union position.
2 Q.     And were the -- what were the duties or
3 what was the work that was delegated to the title
4 searcher that you spoke with the union employee
5 about?
6 A.     It involved typing information on a
7 spreadsheet.  I'm not -- I don't exactly recall
8 the entire process.  But there was a spreadsheet
9 prepared with going through different files.  I
10 don't know if they were electronic files or cards,
11 I'm not exactly -- I can't exactly recall, but it
12 involved typing information with names and
13 addresses on this form, on this spreadsheet that I
14 believe was then turned over to the sheriff's
15 office.
16 Q.     And what were the duties or work that
17 was delegated to the clerk typist one?
18 A.     Similar work to that as well.  The
19 preparation of the spreadsheet by typing the names
20 and the addresses on the spreadsheet.
21 Q.     Did you ever respond to this e-mail of
22 Jane Doe 4's?
23 A.     I'm not sure if I did or didn't.
24 Q.     So May of 2021, we briefly touched on

Page 537

1 this I think yesterday.  I'm sorry, real quick, I
2 think you indicated that you don't believe that
3 Ms. Dash was disciplined regarding what -- the
4 issues Jane Doe 4 raises in her e-mails, but was
5 anyone disciplined because of the delay in
6 completing these tasks?
7 A.     The judicial sale tasks?  Not to my
8 knowledge.
9 Q.     Or the upset sale tax?
10 A.     Not to my knowledge.
11 Q.     Going back to 2021.  I think we talked
12 about this a little bit yesterday.  You learn that
13 Jane Doe 1 and Jane Doe 2 had applied for what is
14 called an SVPO, or Sexual Violence Protection
15 Order, correct?
16 A.     Yes.
17 Q.     When was the first time you learned they
18 applied for such an order?
19 A.     I don't recall exactly when it was.  I
20 think we received some sort of notification at the
21 county.  I don't remember.
22 Q.     It's kind of a little bit convoluted,
23 but the SVPO order is actually applied for through
24 I think it's the Clerk of Courts, is that -- or --

Page 538

1  A.    I don't know.
2  Q.    Okay.
3      So you don't know if you got it, the
4  notification about it through the fact that it was
5  obtained from the county or some other means?
6      MS. PIPAK:  Object to the form.
7  But go ahead.
8      THE WITNESS:  I don't -- I didn't
9  get any -- I don't believe I got any documentation
10 or anything.  I believe I was told about it.  I
11 don't remember if it was from Gary or from
12 somebody else, but I don't recall when exactly
13 that was or how that transpired.
14     MS. SMITH:  I'm to mark Zula 1167
15 as 167.
16         - - -
17     (Zula 1167 marked as Exhibit-167 for
18 identification.)
19         - - -
20 BY MS. SMITH:
21 Q.    Do you recognize this chain of e-mails?
22 A.    Yes.
23 Q.    Jane Doe 3 on May 4th informed you that
24 she and Jane Doe 4 would be attending the SVPO

Page 539

1  hearing and asked if there's any issues.  To which
2  the same day you reply there is no issues with you
3  and Jane Doe 4 attending the hearing.  However,
4  given that it is not a work-related matter, you
5  will need to utilize your accrued vacation or
6  personal leave to cover your absence.
7      Did you understand what the SVPO hearing
8  that Jane Doe 4 and Jane Doe 3 were planning to
9  attend was related to?
10 A.    I believe it to be related to contact
11 with Commissioner Halcovage, yes.
12 Q.    And you believed that at the time of
13 your e-mail response on May 4th?
14 A.    Yes.
15 Q.    Defendant Halcovage is -- works in the
16 county courthouse, correct?
17 A.    Yes.
18 Q.    Jane Doe 4 -- I'm sorry, Jane Doe 2 and
19 Jane Doe 1 at the time were county employees,
20 correct?
21 A.    Yes.
22 Q.    And not having contact with them at work
23 was an issue that they had been raising for some
24 time, correct?

Page 540

1  A.    Yes.
2  Q.    Who made the decision then that this was
3  not a work-related matter?
4  A.    I did discuss it with Mr. Bender and it
5  was decided that they would have to use their
6  leave to attend the meeting.
7  Q.    So was it your decision, Mr. Bender's
8  decision or a joint decision?
9  A.    I would say it was a joint decision.
10 Q.    Jane Doe 1 and Jane Doe 2 were also
11 required to use accrued vacation, personal time or
12 take an unpaid day, correct?
13 A.    I believe so, yes.
14 Q.    In that last exhibit 167, the last
15 e-mail in this chain is on May 4th from Jane Doe 3
16 to you.  She questions the decision.
17     Did you ever reply to Jane Doe 3's
18 e-mail?
19 A.    I'm not certain.  I don't recall if I
20 did or didn't.
21 Q.    We, I think, briefly touched on this
22 yesterday.  During the SVPO hearing that took
23 place in the county courthouse, you and Mr. Bender
24 were asked to come to the SVPO courtroom to

Page 541

1  discuss parking options for Jane Doe 1 and Jane
2  Doe 2, correct?
3  A.    Yes.
4  Q.    You and Mr. Roth did come to the
5  courtroom, correct?
6  A.    Yes, we were ordered by the judge to
7  come to the courtroom.
8  Q.    Why do you believe you were ordered by
9  the judge?
10 A.    That's what I was told when the sheriff
11 came down and got me out of -- right after the
12 commissioner's meeting.  He told me that you are
13 ordered to be in the courtroom by the judge.
14 Q.    Did either you or Mr. Roth have to
15 utilize vacation or personal time for your
16 attendance at the hearing?
17 A.    No.
18 Q.    Why didn't you?
19 A.    Because I was ordered by the judge to
20 come.  It had -- it was apparently related to go
21 question regarding county business, but I was not
22 required to utilize that, no.
23 Q.    Did you ever ask anybody if you should
24 utilize it, given that Jane Doe 1, Jane Doe 2,

Page 542

1  Jane Doe 3 and Jane Doe 4 had to?
2         MS. PIPAK:  Objection to form.  You
3  can answer.
4         THE WITNESS:  No, I did not.
5  BY MS. SMITH:
6  Q.      Did you ever inform anyone that you had
7  gone to the courtroom, such as Mr. Bender?
8  A.      Yes, he was aware.
9  Q.      Did he tell you to utilize vacation or
10 personal time for your attendance?
11 A.      No, he did not.
12 Q.      You, Defendant Roth, Defendant
13 Halcovage's attorney at the hearing Amy Kruzel,
14 K-R-U-Z-E-L, and I discussed parking options for
15 Jane Doe 1 and Jane Doe 2, correct?
16 A.      A request was made, yes.  I don't know
17 if a discussion was had.  But a request was made
18 to provide a parking space for them outside of the
19 410 building.
20 Q.      Okay.
21         And do you recall what your response to
22 that request was?
23 A.      I said I would need to -- I believe I
24 said I would need too go back and discuss it with

Page 543

1  county administration because I didn't oversee the
2  parking spaces, nor did I have access to know who
3  had a parking space, what spaces were available.
4  That was not my determination to make.
5  Q.      Do you recall what Defendant Roth's
6  response was?
7  A.      I don't recall what he responded.
8  Q.      You don't recall him saying that they
9  would make those spots available for them?
10 A.      I don't know.
11        MS. PIPAK:  Objection to form.  Go
12 ahead.
13        THE WITNESS:  I don't know if
14 that's what he said or he didn't say.  I don't
15 recall.
16 BY MS. SMITH:
17 Q.      After the hearing what, if anything, did
18 you do to secure parking spaces or to attempt to
19 secure parking spaces for Jane Doe 1 and Jane Doe
20 2?
21 A.      I believe it was Mr. Roth and I, I think
22 that's what I testified to yesterday, went down to
23 talk to Mr. Bender about the request to provide
24 the parking spaces to Jane Doe 1 and Jane Doe 2.

Page 544

1  Q.      And what was Mr. Bender's response?
2  A.      That parking spaces were not available.
3  Q.      Did you ever check with the sheriff to
4  see if he could make spaces available?
5         MS. PIPAK:  Objection to form.  Go
6  ahead.
7         THE WITNESS:  No, I did not.
8  BY MS. SMITH:
9  Q.      After the SVPO hearing what, if
10 anything, did you do to ensure that Defendant
11 Halcovage complied with the SVPO order?
12        MS. PIPAK:  Object to the form.  Go
13 ahead.
14        THE WITNESS:  I don't -- I can't
15 recall when all of this -- like all of
16 restrictions were put into place.  But again Mr.
17 Halcovage's, I believe his parking -- I don't know
18 if this was right around the same time, but there
19 were provisions put into place where, you know,
20 when he came in the bottom entrance door he had to
21 be searched or had to go through the metal
22 detector.  Then his parking space was moved up to
23 the top parking lot.  I believe that was done by
24 the sheriff.  And he had to go through the metal

Page 545

1  detector when he came into the courthouse.  And
2  again he was, you know, recommended that he not go
3  into the courthouse unattended.  And he was also
4  instructed not to enter the 410 building by Mr.
5  Bender.
6  BY MS. SMITH:
7  Q.      Mr. Bender instructed Defendant
8  Halcovage to not go into the 410 building?
9  A.      Yes, I believe he did do that.
10 Q.      The restrictions by the sheriff
11 regarding entrance to the courthouse, access
12 within the courthouse, things of that nature,
13 those were at the sheriff's doing on his own,
14 correct?
15        MS. PIPAK:  Object to the form.
16        THE WITNESS:  Yes.
17 BY MS. SMITH:
18 Q.      They weren't as a result of you going to
19 him and saying what can we do?
20 A.      No, I did not go to him.
21 Q.      After the -- so on the day of the
22 hearing did anyone inform you as to the fact that
23 the order was actually issued?
24        MS. PIPAK:  Object to the form.

Page 546

THE WITNESS: I don't recall if -- I believe -- I -- I was made aware that the order was issued. I don't know when, if it was that day or another day. I don't recall that.

BY MS. SMITH:

Q. Do you know, was it close in time to when the hearing happened?

A. I recall when we were up in the courtroom the judge did have conversation that indicated that there was to be no contact, no phone calls, no text messages, no nothing like that, and that -- but I do recall him saying, you know, he couldn't control, you know, if you're in the grocery store and turn a corner that like -- or, for example, that is an example, I don't know if that's the example he gave, you know, he couldn't control that. But that you're to not have any contact with each other, even if you would run into each other, like you're -- you're kind of to go the other way. But as far as an official order or what it said, I don't recall if I ever got a copy of that.

Q. Did you ever reach out to Jane Doe 2 or Jane Doe 1 or anyone to obtain a copy of that?

Page 547

A. Not that I recall.

Q. Did you think it might be important to provide that to Jane Doe 1's supervisor?

MS. PIPAK: Objection to the form. You can answer.

THE WITNESS: I know it was very well known there was to be no contact between Jane Doe 1 and Defendant Halcovage.

BY MS. SMITH:

Q. Well, you didn't think that Jane Doe 1's and Jane Doe 2's supervisor should understand that there was a court order regarding Defendant Halcovage and his presence in their personal space?

MS. PIPAK: Object to the form.

THE WITNESS: I did not have a conversation with their supervisor, no, that I can recall.

BY MS. SMITH:

Q. You never informed Mr. Alu or Mr. Hatter there was an SVPO order that was issued?

MS. PIPAK: Object to the form.

THE WITNESS: I did not do that. However, I know that they are aware that that was

Page 548

issued. Or that there was some sort of order, whatever, restriction issued. I don't know if they have had a copy of it or not. I know I don't believe I gave them anything.

BY MS. SMITH:

Q. So if Jane Doe 1 and Jane Doe 2 needed to go to the assessment office for work, in addition to the 410 building, they needed to go over and speak with, let's say, Mr. Hatter or Mr. Alu, and Mr. Alu and Mr. Hatter didn't know that there was an SVPO order that stated Defendant Halcovage shouldn't be in their personal space, how is it that they -- it would increase the risk that they would run into each other?

MS. PIPAK: Object to the form.

THE WITNESS: There were provisions put in place because they did need to drop off work at times, specifically Jane Doe 2. That someone would go out and either meet with her or out in her car to obtain the documentation. Or if their presence in the office was needed, someone would go out and walk them into the courthouse.

BY MS. SMITH:

Q. Were Mr. Alu and Mr. Hatter made aware

Page 549

that Defendant Halcovage should not be in the tax claim or tax assessment offices?

A. Yes, I believe they were aware of that requirement -- that -- that restriction.

Q. Did you make them aware of it?

A. I don't recall if I did or I didn't.

Q. Do you know who did?

A. I don't recall.

Q. So are you -- as you sit here today, are you certain they knew of that restriction?

MS. PIPAK: Object to the form.

THE WITNESS: Yes, I do believe they knew of that restriction.

BY MS. SMITH:

Q. How -- well, you believe is not certain. So are you certain or you believe?

MS. PIPAK: Object to the form.

THE WITNESS: Without talking to Mr. Hatter or Mr. Alu to confirm that, but yes, I do believe that they were aware of that, that Mr. Halcovage was not to be visiting their offices if Jane Doe 1 and Jane Doe 2 were present.

BY MS. SMITH:

Q. Oh, so only if Jane Doe 1 and Jane Doe 2

Page 550

1  were present were they restricted?
2  A.      Well, no.  But they were -- he was not
3  to be in the courthouse unaccompanied, period.  So
4  if he would go to those offices he would be
5  accompanied by someone else.
6  Q.      So he was permitted to go to the tax
7  assessment and tax claim office if accompanied?
8  A.      I don't believe there was ever an
9  occasion that that had to occur to my knowledge.
10 But potentially I guess he could have, but I don't
11 believe that ever happened.
12 Q.      When you say you don't believe there was
13 ever an occasion, meaning that there was no real
14 legitimate business reason for Mr. Halcovage to go
15 to those offices, right?
16 A.      I don't believe so.  Anything that could
17 have needed to be done most likely could have been
18 done via phone or via e-mail.
19         MS. SMITH:  Okay.  It's part of
20 Sheriff Groody's production.  Mark it as an
21 Exhibit-168.
22              - - -
23         (9/29/22 letter marked as Exhibit-168
24 for identification.)

Page 551

1              - - -
2         MS. SMITH:  And for the record, it
3  is a letter dated September 29th, 2022 on
4  Schuylkill County Sheriff's office letterhead and
5  it is signed by -- signed by James --
6  BY MS. SMITH:
7  Q.      Do you know how to say his last name?
8  Bohorad?  Am I saying it right?
9  A.      That sounds about right.
10 Q.      Bohorad, B-O-H-O-R-A-D.
11         Ms. Zula, do you recognize this
12 document?
13         MS. PIPAK:  I'm going to object on
14 the basis of attorney/client privilege to the
15 extent your answer involves any discussion you had
16 with counsel.
17         THE WITNESS:  I was going to say I
18 don't recognize this document.
19         MS. SMITH:  I pulled the document
20 separate.  Can you pull -- we can come back to it.
21         This is their letter.  I pulled
22 the document, and Bates -- that's why its not
23 Bates stamped.  I pulled the document production.
24 Its called Document, that's why -- you can put

Page 552

1  that aside.  We can leave it marked as an exhibit,
2  but I don't have any questions about it.
3         We'll have to come back to that
4  line of questioning.
5         All right.  We're going to move on to
6  a separate line of questioning and I'll come back to
7  that.  Sorry trying to keep this chronological and
8  consistent.
9  BY MS. SMITH:
10 Q.      Do you recall receiving a report from
11 Maria Casey, the Clerk of Courts, that Defendant
12 Halcovage made a remark to Jane Doe 3 and Jane Doe
13 4 that he would like to stick a big one up Maria
14 Casey's ass?
15         MS. PIPAK:  Object to form.
16         THE WITNESS:  Yes.
17         MS. IPPOLITO:  Before we go on, did
18 you take --
19         MS. SMITH:  I didn't take it out as
20 an exhibit, just so we didn't confuse ourselves.
21 I left it in.  I'm just not asking any questions
22 about it.
23         MS. IPPOLITO:  Okay.
24 BY MS. SMITH:

Page 553

1  Q.      Do you recall if it was in about
2  April of 2021?
3  A.      Yes.
4  Q.      And Ms. Casey was the one that informed
5  you about it, correct?
6  A.      Yes, I believe so.
7         MS. SMITH:  I'm going to mark Zula
8  933 as Exhibit-169.
9              - - -
10         (Zula 933 marked as Exhibit-169 for
11 identification.)
12              - - -
13 BY MS. SMITH:
14 Q.      Do you recognize this document?
15 A.      Yes.
16 Q.      Okay.
17         And this is the e-mail that you receive
18 from Maria Casey regarding that comment by
19 Defendant Halcovage, correct?
20 A.      Yes.
21 Q.      In your e-mail to Mr. Bender, in which
22 you forwarded, you talk about -- or you say also I
23 received a very disturbing call from Mr. Alu
24 regarding an incident that occurred this morning

Page 554

1 when he called into the Tax Assessment office
2 requesting information.  Is the call that you're
3 referencing there the one that Jane Doe 3 and Jane
4 Doe 4 were written up for?
5 A.      Yes.
6 Q.      And you believe that to be a very
7 disturbing call?
8 A.      It was very disturbing to Mr. Alu, yes.
9 He was very upset regarding the call that he had.
10 Q.      But you didn't reference Ms. Casey's
11 allegations that a sitting commissioner said I
12 would like to stick a big one up her ass as
13 disturbing, did you?
14 A.      It is disturbing.  I didn't put it in
15 the e-mail.
16        MS. SMITH:  Okay.  I'm going to
17 mark as 170 Zula 942 to 943.
18              - - -
19        (Zula 942-943 marked as Exhibit-170 for
20 identification.)
21              - - -
22 BY MS. SMITH:
23 Q.      Ms. Zula, do you recognize this e-mail
24 chain?

Page 555

1 A.      Yes.
2 Q.      And this e-mail chain includes your
3 response to Maria Casey regarding her allegations
4 in that last e-mail that we looked at, and you ask
5 her please let me know your availability to meet
6 to discuss the information, correct?
7 A.      Yes.
8 Q.      Her e-mail is actually down at the
9 bottom.
10        She sent her e-mail April 9, 2021 at
11 10:14 a.m., and within just over an hour you
12 responded her to follow up and investigate the
13 claims, correct?
14 A.      Yes.
15 Q.      On April 9, 2021, the same day at 2:34
16 Ms. Casey responds to you and she says Halcovage
17 should not be allowed to enter the courthouse
18 without going through security.  Right now he
19 comes and goes at will, and carries a very large
20 bag with him that could contain weapons or God
21 knows what.
22        Did you address Ms. Casey's concerns
23 with the sheriff?
24 A.      No.  He was already under restrictions

Page 556

1 by the sheriff's office.
2 Q.      Did you notify the sheriff that Ms.
3 Casey believed that Defendant Halcovage was
4 carrying a bag that could contain weapons?
5 A.      No, I did not, because he was already
6 required to go through and be checked by the
7 sheriff's office.
8 Q.      Did you ask the sheriff's office if, in
9 fact, Mr. Halcovage wasn't going through the
10 medical detector being wanded?
11 A.      No, I did not.
12 Q.      Did you speak with anyone concerning
13 Defendant Halcovage's carrying a bag that could
14 contain weapons?
15 A.      No, I did not.
16 Q.      In April of 2021 what are your
17 understandings of what Defendant Halcovage was
18 required do to enter the building?
19 A.      I believe -- I wasn't -- I'm not sure if
20 it was down at the bottom of the courthouse yet or
21 at the top.  But he was, my understanding I
22 believe at that time, was required to go through
23 and either be wanded or go through the metal
24 detector.

Page 557

1        MS. SMITH:  Matt, there should be a
2 Bates Groody 1, 2.
3        THE TECHNICIAN:  Yes, got it,
4 Counsel.
5        MS. SMITH:  I don't have paper
6 copies.  I apologize to those, but it will be on
7 the Zoom.  So it's the first -- I Bates them.  I
8 can send out a Bates, but it's the first two
9 documents in the actual document production by
10 Groody.
11        It's a Letter dated 2021,
12 Schuylkill County Sheriff's office.  It states
13 hand delivered to George Halcovage, County
14 Commissioner, at the courthouse address.  It
15 starts with as you know, I serve as solicitor for
16 Sheriff Groody, Schuylkill County Sheriff's
17 office.  On Wednesday, May 12th, a meeting was
18 held with Sheriff Groody, the elected row offices.
19        MS. IPPOLITO:  I can't see it yet.
20 BY MS. SMITH:
21 Q.      Have you ever seen this letter before?
22 A.      I don't recall.  I'm not sure was I
23 copied on it.
24 Q.      In the letter it states you will recall

Page 558

1  when that when the Pennsylvania Office of Attorney
2  General initiated an investigation last year,
3  Sheriff Groody restricted your access to the
4  courthouse.  At that time you were required to
5  enter and exit the courthouse only through its
6  main entrance and pass through the metal detector
7  before accessing the rest of your building?
8         MS. SMITH:  Matt, if you can scroll
9  up one second for me.  Thank you.
10 BY MS. SMITH:
11 Q.     This letter is issued May 13th, 2021?
12        MS. SMITH:  So if you'll scroll
13 back down, Matt.
14 BY MS. SMITH:
15 Q.     So when the letter indicates last it was
16 last year that would be 2020, correct?
17 A.     Yes.
18        MS. PIPAK:  Object to the form.
19 BY MS. SMITH:
20 Q.     Is it your understanding that the
21 attorney general investigation into Defendant
22 Halcovage was in the year 2020?
23        MS. PIPAK:  Objection to form.  Go
24 ahead.

Page 559

1         THE WITNESS:  I believe so.  I'm
2  not thoroughly familiar with that investigation.
3  BY MS. SMITH:
4  Q.     Do you know if when you were employed
5  with the county if Defendant Halcovage was still
6  being investigated by the attorney general?
7  A.     I don't know.  I don't believe so,
8  because I don't believe there were criminal
9  charges filed.  So I don't believe.
10 Q.     It goes on to say your access was
11 limited to the hours of 8 a.m. to 5 p.m. Monday
12 through Friday.  Several months later the sheriff
13 relaxed the restrictions so you could enter and
14 exit through the commissioner's entrance on Laurel
15 Boulevard under the condition that you still agree
16 to be wanded by deputies when you enter.
17        Then it says when the attorney's office
18 -- when the office of attorney general chose not
19 to pursue criminal charges against you, Sheriff
20 Groody ended the requirement that you be wanded
21 prior to entering the courthouse.  However, your
22 access continued to be restricted weekdays from 8
23 to 5 p.m. Do you see that?
24 A.     Yes.

Page 560

1         MS. SMITH:  Matt, if you can scroll
2  down.
3  BY MS. SMITH:
4  Q.     So then this letter goes on to state
5  about Judge Ebby's order, which would be the SVPO
6  order, correct?
7         MS. PIPAK:  Object to the form.
8         THE WITNESS:  Yes.
9  BY MS. SMITH:
10 Q.     And then it talks in the next paragraph
11 Sheriff Groody mentions new restrictions as a
12 result of meeting between row officers and him,
13 correct?
14 A.     Yes.
15 Q.     So would you agree that between the time
16 the Office of Attorney General declined to
17 prosecute Mr. Halcovage and the time that the SVPO
18 order happened in May of 2021, that Defendant
19 Halcovage was not required to be wanded or go
20 through metal detector?
21        MS. PIPAK:  Object to the form.
22        THE WITNESS:  Yes, based upon this
23 communication.
24        MS. SMITH:  Okay.

Page 561

1         So I'm going to mark as 417-418, Zula
2  417-418 as 171.  I don't have copy of what will be
3  Exhibit-171.
4                    - - -
5         (Zula 417-418 marked as Exhibit-171 for
6  identification.)
7                    - - -
8  BY MS. SMITH:
9  Q.     Do you recall seeing this article?
10 A.     No, I don't.
11 Q.     Okay.
12        Well, in any event it's dated
13 February 8th of 2021, and it indicates that the AG
14 is not charging Schuylkill County Commissioner
15 Defendant Halcovage.
16        Do you see that?
17 A.     Yes.
18 Q.     Does this refresh your recollection as
19 to the timing of when the attorney general
20 declined to prosecute Defendant Halcovage?
21 A.     I guess so, yes.
22 Q.     So from February of 2021 till May of
23 2021 the sheriff had eased the restrictions of
24 going through the metal detector and/or being

Page 562

1  wanded on Defendant Halcovage, correct?
2  A.    Yes.
3  Q.    Okay.
4       So then if we look back to Ms. Casey's
5  e-mail, do you have that in front of you?
6  A.    Yes.
7  Q.    Exhibit...
8  A.    170.
9  Q.    Thank you.  170.  Her e-mail was
10 squarely within that time frame, was it not?
11 A.    Yes.
12 Q.    So did you ever go to the sheriff and
13 say can we put the restrictions back on Defendant
14 Halcovage to be wanded or go through the metal
15 detector?
16 A.    No, I did not.
17 Q.    Okay.
18       After you received the e-mail from Ms.
19 Casey regarding Defendant Halcovage, did you
20 discuss it with Defendant Bender?
21 A.    What e-mail from Defendant Halcovage?
22 Q.    I said the e-mail from Maria Casey
23 regarding Defendant Halcovage.
24 A.    Oh.

Page 563

1  Q.    If I didn't, that's what I meant.
2  A.    I'm sorry.
3  Q.    That's okay.
4  A.    Yes, I did.
5  Q.    Oh, you did discuss it with Defendant
6  Bender?
7  A.    Yes.
8  Q.    What was the discussion?
9  A.    I made him aware that we received the
10 complaint.
11 Q.    And what was his instruction to you, if
12 any?
13       MS. PIPAK:  Objection to the form.
14       THE WITNESS:  I -- we discussed my
15 next steps.  And then I reached out to our
16 attorney to have a discussion regarding --
17       MS. PIPAK:  I'm going to -- to the
18 extent you were asking the attorney for legal
19 advice, I'm going to advise you not to answer.
20 BY MS. SMITH:
21 Q.    So just as it relates to Mr. Bender,
22 what was the discussion regarding the next steps?
23 A.    We talked about discussing -- contacting
24 our attorney to determine the next steps.

Page 564

1  Q.    Any other suggestions or instructions
2  that Mr. Bender gave you?
3  A.    No, not that I can recall.
4  Q.    Okay.
5       And I don't want to know the content,
6  but did you speak with your attorney?
7  A.    Yes.
8  Q.    Okay.
9       After speaking with your attorney, what
10 if anything did you do?
11 A.    I contacted Ms. Casey to attempt to
12 schedule a time to meet with her.
13       MS. SMITH:  Is everybody good with
14 a lunch break now so I can get my documents?
15       MS. PIPAK:  Yeah.
16       MS. SMITH:  All right.  Let's go
17 off the record.
18       VIDEOGRAPHER:  The time is
19 12:32 p.m. and we're going off the record.
20              - - -
21       (Whereupon, luncheon recess was held
22 off the record.)
23              - - -
24       VIDEOGRAPHER:  The time is now

Page 565

1  1:26 p.m. and we're back on the record.
2  BY MS. SMITH:
3  Q.    Ms. Zula, before the break we were
4  talking about -- I thought what we were talking
5  about was Ms. Casey's report to you in April of
6  2021 that Defendant Halcovage had made some
7  inappropriate comments about her.
8       Do you recall that?
9  A.    Yes.
10 Q.    And we were looking at Exhibit-170.
11       We had established that Maria made the
12 report to you on April 9th at 10:14, and the same
13 day you reached out to her about the availability
14 within less than two hours, correct?
15 A.    Yes.
16 Q.    And the reason you were asking to know
17 her availability to meet with her was to conduct
18 an investigation into the allegations that she
19 had -- that Defendant Halcovage had made the
20 comment that he would like to stick a big one up
21 her ass, correct?
22 A.    Yes.
23 Q.    The comment, I would like to stick a big
24 one up someone else's ass, would be

Page 566

1 discrimination, correct?
2       MS. PIPAK:  Objection.  To the
3 extent you can answer, you can.
4       THE WITNESS:  I don't know if it's
5 discrimination.  It would be inappropriate if
6 someone made that comment about a coworker, yes.
7 BY MS. SMITH:
8 Q.     Okay.
9       And something inappropriate would be
10 within the purview of the Human Resources office,
11 correct?
12 A.     Yes.  Potentially, yes.  I can
13 investigate that issue, yes.
14 Q.     Okay.
15       That was going to be my next question.
16 It would be something that HR should investigate?
17 A.     Yes.
18 Q.     Okay.
19       And it's important to fully investigate
20 claims of inappropriate workplace conduct,
21 correct?
22 A.     Yes.
23 Q.     Is there -- do you have an understanding
24 of how quickly a complaint or report of

Page 567

1 inappropriate workplace conduct, how quickly they
2 should be investigated?
3       MS. PIPAK:  Object to the form.
4       THE WITNESS:  I don't believe there
5 is any standard that are written that it needs to
6 be investigated within a certain period of time.
7 BY MS. SMITH:
8 Q.     Do you know if the sexual harassment
9 policy states that it should be prompt?
10 A.     I don't recall what it says.
11       MS. SMITH:  If we can have 105.
12 BY MS. SMITH:
13 Q.     Do you have that exhibit in front of
14 you?
15 A.     Yes.
16       MS. PIPAK:  105?
17       MS. DEBISE:  Yes.
18 BY MS. SMITH:
19 Q.     If you take a look at that policy, does
20 it indicate the process, the investigation
21 process?
22 A.     Yes.
23 Q.     What does it say about it?
24 A.     Do you want me to go through the whole

Page 568

1 process.
2 Q.     Well, does it say anything about timing?
3 A.     There's a statement on the first page
4 the county will investigate all complaints
5 promptly to determine whether discrimination or
6 harassment has occurred, and will take prompt
7 remedial action to stop any improper workplace
8 behavior.
9 Q.     And I think we established this earlier,
10 but the only thing that changed between the
11 February revision of this policy and the May was
12 to remove Chris Hobbs as the EEO officer, right?
13 A.     Yes.
14       MS. PIPAK:  Object to the form.
15 BY MS. SMITH:
16 Q.     Since February of 2021 it's always been
17 the county's policy to promptly investigate and
18 take prompt remedial action to stop improper
19 workplace behavior, correct?
20 A.     Yes.
21 Q.     And you understood that as the HR
22 director, that individual test with investigating
23 sexual claims that you were to do so promptly?
24 A.     Yes.

Page 569

1 Q.     In fact, you did investigate Ms. Casey's
2 complaint promptly?
3 A.     Yes.
4       MS. PIPAK:  Object to the form.  Go
5 ahead.
6       THE WITNESS:  Yes.
7       MS. SMITH:  I'm going to mark as
8 173 Zula 956 and 957.
9       - - -
10       (Zula 956-957 marked as Exhibit-173
11 for identification.)
12       - -
13 BY MS. SMITH:
14 Q.     In Ms. Casey's report to you she
15 indicated that -- she indicated that Jane Doe 3
16 and Jane Doe 4 were the ones who had informed her,
17 Ms. Casey, that Defendant Halcovage made this
18 remark, correct?
19 A.     Yes.
20 Q.     And as a result Friday was April 9th
21 when Ms. Casey made the report, and then that
22 following Monday you reached out to Jane Doe 3 in
23 order to conduct a prompt investigation, correct?
24 A.     Yes.

Page 570

Q.      Okay.
        Jane Doe 3 asked in this e-mail chain to
be able to bring a witness.  Well, she asked at
first for her attorney to be present at the
meeting, and you denied that request, correct?
        MS. PIPAK:  Object to the form.
        THE WITNESS:  Yes.
BY MS. SMITH:
Q.      Why did you deny her request to have an
attorney present?
A.      Because it's a work-related matter.
That it was an investigation.  It's an
administrative employment-related process, so we
would not allow her attorney to attend.
Q.      But you did inform her that she could a
witness at the meeting, correct?
A.      Yes, we did allow her to bring a
witness.
Q.      Why was she permitted to bring a witness
to that meeting?
A.      I don't recall.
Q.      Is there any reason that a witness
wouldn't be permitted to come to a meeting?
A.      Typically, no, we wouldn't allow it, but

Page 571

we did allow it in this case.
Q.      Okay.
A.      We wouldn't allow it, I should say, for
management employees.  Union represented employees
were permitted to bring their certified
bargaining agent to meetings.
        MS. SMITH:  I'm going to look at
Exhibit-174.  It's Zula 958 to 959.
        - - -
        (Zula 958-959 marked as Exhibit-174 for
identification.)
        - - -
BY MS. SMITH:
Q.      That same day, Ms. Zula, you reached --
the same day you reached out to Jane Doe 3, you
also reached out to Jane Doe 4 to schedule a
meeting to speak with her about Defendant
Halcovage's comment concerning Ms. Casey, right?
A.      Yes.
Q.      And there was the same kind of
engagement regarding requests for an attorney and
a witness with Jane Doe 4 and you, correct?
A.      Yes.
Q.      And ultimately she was -- both Jane Doe

Page 572

3 and Jane Doe 4 were permitted to bring a witness
and did meet with you, correct?
A.      Yes.
Q.      Do you remember -- this e-mail indicates
10 a.m. tomorrow, meaning April 13th.  And same
for Jane Doe 3, it indicates tomorrow being
April 13.
        Do you recall if you did in fact meet
with them that very next day?
A.      I don't recall if that was the exact
date.
        MS. SMITH:  I'll mark as 175 Zula
1091 to 1092.
        - - -
        (Zula 1091-1092 marked as Exhibit-175
for identification.)
        - - -
BY MS. SMITH:
Q.      Ms. Zula, do you recognize this e-mail
communication?
A.      Yes.
Q.      And in fact on Friday, April 23rd, so by
my calculation is 14 days after Ms. Casey's
initial complaint, you had already conducted,

Page 573

concluded your investigation come to a conclusion
and informed Ms. Casey of what had occurred,
correct?
A.      Yes.
Q.      You would agree that that's pretty
prompt as per the policy, right?
A.      Yes.
        MS. PIPAK:  Objection to the form.
Go ahead.
BY MS. SMITH:
Q.      And would you say that the policy --
that your notification to Maria Casey about the
investigation, its conclusion and the outcomes,
was done pursuant to the county policy?
A.      Yes.
Q.      Because notifying a reporter, or victim,
a complainant about the status of their complaint
is important.
        MS. PIPAK:  Object to the form.
        THE WITNESS:  Yes, that is typical
protocol.  Yes.
BY MS. SMITH:
Q.      Ms. Casey responds to you and indicates
that she believes that Defendant Halcovage's

Page 574

1 comments rose to the level of threatening
2 non-consensual sodomy and asked you what
3 appropriate action had been taken to ensure that
4 this conduct does not occur in the future.
5        Did you ever inform -- respond to Ms.
6 Casey and inform her what the action --
7 appropriate action is that you had referred to?
8 A.    I don't recall if I responded to her or
9 not.
10 Q.   Do you recall what the appropriate
11 action -- because in your e-mail on Friday,
12 April 23rd, it says appropriate action had been
13 taken to ensure that such conduct does not occur
14 in the workplace in the future.
15        What appropriate action had been taken?
16 A.   Mr. Halcovage was advised that he needed
17 to make professional remarks regarding employees,
18 not inappropriate or unprofessional remarks in the
19 workplace.
20 Q.   Other than on this occasion regarding
21 the investigation into Maria Casey's complaint was,
22 did you ever inform Defendant Halcovage that he
23 was to engage in professional conduct?
24 A.   Yeah, I believe that's kind of what I

Page 575

1 just said.  Yes, that he was to not -- to be
2 professional towards other people in the
3 workplace.
4 Q.    Right.  I said other than on this -- you
5 spoke with him regarding Maria Casey's complaints
6 and told him to be professional, correct?
7 A.    Yes.
8 Q.    Other than in regards to Ms. Casey's
9 complaints, did you ever instruct Defendant
10 Halcovage to be professional?
11 A.   I don't recall anything.
12 Q.   Okay.
13        Did you -- sorry, I'm going back to that
14 one.  Ms. Casey appears, based on your remail,
15 requested that her complaint be forwarded to the
16 district attorney's office.
17        Did you ever do that?
18 A.   Yes.
19 Q.   And did you ever receive correspondence
20 from them?
21 A.   No, I did not receive correspondence
22 from the district attorney's office.
23 Q.   Did you receive any correspondence from
24 any other law enforcement body regarding the

Page 576

1 referral?
2 A.    I don't know if I received
3 correspondence.  I know that the -- I did have a
4 conversation with my Mike O'Pake, that he -- that
5 the information was forwarded to him.  What he did
6 with it, I don't know.
7 Q.    Did you ever follow up?
8 A.    No, I did not.  That I can recall, I
9 don't think I did.
10        MS. SMITH:  I'll mark Zula 1090 as
11 exhibit 176.
12                   - - -
13        (Zula 1090 marked as Exhibit-176 for
14 identification.)
15                   - - -
16 BY MS. SMITH:
17 Q.    Ms. Zula, do you recognize this e-mail?
18 A.    Yes.
19 Q.    Is this e-mail what you were referring
20 to when you said that you instructed Defendant
21 Halcovage to engage in -- to remind him to engage
22 in professional and appropriate conduct while in
23 the workplace?
24 A.    Yes.

Page 577

1 Q.    Other than this communication, did you
2 have any other conversations or communications
3 with Defendant Halcovage regarding Ms. Casey's
4 allegations?
5 A.    I interviewed him as part of the
6 investigation.
7 Q.    Okay.
8        So you interviewed Jane Doe 3, Jane Doe
9 4, Ms. Casey and Defendant Halcovage?
10 A.   Yes.
11 Q.   And those were all of the parties that
12 were involved in this report, correct?
13 A.   Yes.
14 Q.   Were interview notes taken?
15 A.   I believe they were, yes.
16 Q.   Was a memo or summary or conclusion
17 report drafted?
18 A.   I believe there was, yes.
19 Q.   Okay.
20        And that's typical protocol.  The county
21 and the HR office regarding investigations and
22 complaint is to interview all parties involved,
23 find out the facts, and then issue a conclusory
24 finding?

Case 3:21-cv-00477-MCC   Document 280-1   Filed 09/20/23   Page 51 of 92

Deposition of Heidi Zula Vol. II - Revised                    Jane Doe, et al. v. Schuylkill County Courthouse, et al.

Page 578

1    MS. PIPAK:  Object to the form.
2    THE WITNESS:  Yes.  For some
3  complaints, yes.  For inquiries that are made
4  regarding certain issues, a formal investigation
5  would not have been conducted in all situations,
6  and a formal investigation report would have
7  been -- would not have been prepared in all
8  situations.  In this situation it was.
9  BY MS. SMITH:
10 Q.      When you spoke with Defendant Halcovage,
11 was he made aware that Ms. Casey had made the
12 allegation report to you?
13 A.      Yes.  I believe so, yes.  I indicated
14 that I received this complaint, explained to him
15 the information, and -- well, asked him first if
16 he recalled making any comments such as this.  And
17 I don't know if I informed him that Ms. Casey told
18 me of the report.  That I don't recall.  But I
19 know we talked about the information that was
20 provided.
21 Q.      And that information that was provided
22 was that Jane Doe 4 and Jane Doe 3 had heard,
23 observed him make the statement about Ms. Casey,
24 correct?

Page 579

1    MS. PIPAK:  Object to the form.  Go
2  ahead.
3    THE WITNESS:  Yes, I interviewed
4  them first to obtain the information that they
5  had, and then I interviewed Mr. Halcovage last.
6  BY MS. SMITH:
7  Q.      Right.  What I'm asking is Mr. Halcovage
8  was made aware that Jane Doe 4 and Jane Doe 3 had
9  been the ones to observe him make the statement,
10 correct?
11 A.      I believe, yes, because it was a
12 conversation that he allegedly had between both of
13 them.  So, yes, I would have had conversations
14 with him as to whether or not he had these
15 conversations with Jane Doe 4 or Jane Doe 3.
16 Q.      And did you inform Defendant Halcovage
17 that you had interviewed Jane Doe 4 and Jane Doe
18 3?
19 A.      I don't recall if I told him that or
20 not.
21 Q.      And in your e-mail -- I'm sorry, going
22 back to this exhibit in the middle.  Based upon
23 the findings of the investigation, it has been
24 determined that sometime in June, 2019 or prior

Page 580

1  that you made a comment about Ms. Casey to county
2  employees that could be construed as being
3  inappropriate and unprofessional for the
4  workplace.
5    So based off of your investigation and
6  the interviews, you found that these comments by
7  Defendant Halcovage had been made?
8  A.      That some version of the comment had
9  been made.  I don't know -- I didn't find what the
10 exact comment was because there were differing
11 stories.  But I do believe and that an
12 inappropriate and unprofessional comment for the
13 workplace was made about Ms. Casey.
14 Q.      Ms. Casey wasn't actually there for the
15 comment, correct?
16 A.      To my knowledge, no.
17 Q.      Okay.
18    And so the belief that some version of
19 an inappropriate comment had been made came from
20 Jane Doe 4 and Jane Doe 3?
21 A.      Yes.
22 Q.      Did Defendant Halcovage deny it?
23 A.      He denied making the comment as it was
24 written.  I believe he said he may have been kind

Page 581

1  of venting to them as they were friendly at the
2  time, but he didn't recall making any kind of
3  comment as Ms. Casey had alleged.
4  Q.      So he denied having said I'd like to
5  stick a big one up her ass?
6  A.      Yes, from what I can recall.
7  Q.      Okay.
8    So you found that Jane Doe 3 and Jane
9  Doe 4 were more credible than Defendant Halcovage?
10    MS. PIPAK:  Object to the form.  Go
11 ahead.
12    THE WITNESS:  Yeah, I found that I
13 believe during their conversation that Mr.
14 Halcovage did make a comment that could be
15 construed as being inappropriate and
16 unprofessional.
17 BY MS. SMITH:
18 Q.      So you believed Jane Doe 3 and Jane Doe
19 4?
20 A.      Yes, I believed that during that
21 exchange that he did make such a comment.
22 Q.      Commissioners have personnel files,
23 right?
24 A.      I believe they do.  Yes, they do.

Case 3:21-cv-00477-MCC    Document 280-1    Filed 09/20/23    Page 52 of 92
Deposition of Heidi Zula Vol. II - Revised
Jane Doe, et al. v. Schuylkill County Courthouse, et al.

Page 582

1  Q.      Were the interviews -- interview notes
2  or anything connected with this investigation
3  placed in Defendant Halcovage's personnel file?
4  A.      No.
5  Q.      Where were they placed?
6  A.      They would have been kept in the HR
7  office in one of my files.
8  Q.      Why weren't they placed in Defendant
9  Halcovage's file?
10 A.      I don't typically put any kind of
11 investigatory information in personnel files.
12 Personnel files are for employment actions that
13 are taken against an employee.  Or in regards to
14 an employee.  So there would have been an
15 investigation file where those notes and documents
16 were kept.
17 Q.      Would the e-mail that you sent to
18 Defendant Halcovage have been placed in this
19 personnel file?
20 A.      It wasn't disciplinary action.  So, no.
21 Q.      Well, if somebody went back and looked
22 at Defendant Halcovage's personnel file to figure
23 out if any other allegations or reports had been
24 made against him, how would they know where to

Page 583

1  look?
2         MS. PIPAK:  Objection to form.  Go
3  ahead.
4         THE WITNESS:  The files are kept in
5  the HR office in a cabinet.
6  BY MS. SMITH:
7  Q.      And are they stored chronologically by
8  person?  By -- how are they stored?
9         MS. PIPAK:  Object to the form.  Go
10 ahead.
11        THE WITNESS:  Alphabetically.
12 BY MS. SMITH:
13 Q.      Alphabetically by a person's name?  By
14 --
15 A.      Yes.  So that I put all of my files in a
16 specific drawer related to topic, but most -- like
17 information, overall complaints or notes, they
18 would be kept together in, typically, by the
19 person's name.
20 Q.      The accused or the accuser?
21 A.      In this case I think it was under Maria
22 Casey and George Halcovage it was noted.
23 Q.      You placed a copy in both?
24 A.      No, it was one copy.

Page 584

1  Q.      So would it be under M, C, G, H?
2  A.      I don't recall.
3  Q.      So if a new HR director came in after
4  you, how would they know where to look for this
5  information?
6  A.      I don't know.
7  Q.      So how would they know as to what
8  happened prior to their start to figure out how to
9  handle the situation?
10        MS. PIPAK:  Object to form.
11        THE WITNESS:  They would have
12 access to all the files that they can look
13 through.
14 BY MS. SMITH:
15 Q.      Well, the county has how many employees?
16        MS. PIPAK:  Object.  Go ahead.
17        THE WITNESS:  Five hundred and
18 some.
19 BY MS. SMITH:
20 Q.      And how many files would you say exist
21 in the HR office regarding personal matters?
22 A.      I don't know.
23 Q.      And so an HR person would just have to
24 -- a new HR person would just have to guess to

Page 585

1  figure out where to look or --
2  A.      Um, no.
3         MS. PIPAK:  Objection to form.  Go
4  ahead.
5         THE WITNESS:  I believe that they
6  would be able to go into that file and review
7  those documents in that section of the file.
8  There are other sections related to benefits.
9  There's sections related to, you know, other HR
10 topics.  Salary information.
11 BY MS. SMITH:
12 Q.      Going back to 175.  Ms. Casey's e-mail
13 in response to yours regarding the conclusion of
14 the investigation on April 23rd states in the last
15 sentence, Halcovage should be banned from the
16 courthouse as he is a clear and present danger to
17 the victim, me and others.
18        Again in April of 2021 Defendant
19 Halcovage was not being wanded when -- or entering
20 through the metal detector, correct?
21 A.      Yes.  Based on the information today,
22 yes.  No, he was not.
23 Q.      Okay.
24        Did you at this point, April 23rd, 2021

Page 586

1  approach anyone in the sheriff's department and
2  ask that those restrictions be reinstated?
3  A.     No, I did not.
4  Q.     Did you know anyone who did?
5  A.     Not to my knowledge.
6  Q.     Did you make Defendant Bender aware of
7  the outcome of your investigation?
8  A.     Yes.  He was copied on the response.
9  Q.     And did you speak with him about it?
10 A.     Yes.
11 Q.     What was his position on it?
12 A.     I don't really know if he had a
13 position.  I informed him of the information that
14 I found.  I believe -- again I consulted with our
15 attorney, and took this action that was noted here
16 in the e-mail based upon my investigation and
17 consultation.
18 Q.     Based off of your findings regarding
19 Defendant Halcovage's behavior, did you reach out
20 to anyone to determine what could be done
21 regarding impeachment of Defendant Halcovage?
22 A.     No, I did not.
23 Q.     Do you understand what it takes to
24 impeach an elected official?

Page 587

1  A.     I've learned about that just recently,
2  yes.
3  Q.     Okay.
4         When is just recently?
5  A.     I guess when the whole process started
6  with Mr. Halcovage, it's currently ongoing.
7  Q.     The impeachment process?
8  A.     Yes.
9  Q.     So that was when you were still
10 employed, correct?
11 A.     Yes.  I believe it started when I was
12 still employed.
13 Q.     Okay.
14        And the impeachment process was not, at
15 least -- nothing you did initiated the impeachment
16 process, correct?
17        MS. PIPAK:  Object to the form.  Go
18 ahead.
19        THE WITNESS:  That's correct.
20 BY MS. SMITH:
21 Q.     Okay.
22        Do you know if anyone at the county ever
23 took any actions to seek to have Defendant
24 Halcovage impeached?

Page 588

1         MS. PIPAK:  Object to the form.  Go
2  ahead.
3         THE WITNESS:  I don't know the
4  actions that others took.  I don't know.
5  BY MS. SMITH:
6  Q.     But you don't have any knowledge of
7  actions that were taken to do so?
8  A.     As far as impeachment?
9  Q.     Yes.
10 A.     No, not that I'm aware of.
11        MS. SMITH:  Okay.
12        I'll mark as Exhibit-177, it's Zula
13 1795.
14               - - -
15        (Zula 1795 marked as Exhibit-177 for
16 identification.)
17               - - -
18 BY MS. SMITH:
19 Q.     Do you recognize this email, Ms. Zula?
20 A.     Yes.
21 Q.     In September of 2021 there was a meeting
22 held in which you, Sherry Ditzler, Ms. Casey and
23 Jane Doe 1 were all present at, correct?
24 A.     Yes.

Page 589

1  Q.     And it was a disciplinary meeting of
2  Jane Doe 1, correct?
3  A.     Yes.
4  Q.     Ms. Ditzler was there as representation
5  -- union representation for Jane Doe 1, correct?
6  A.     Yes.
7  Q.     And Ms. Casey was there because the
8  county permitted Jane Doe 1 to have an additional
9  witness present, correct?
10 A.     I don't believe we permitted Ms. Casey
11 to be there.  She showed up to the meeting, and we
12 indicated it was not appropriate for her to be
13 there because her union representative was there,
14 and that resulted in an exchange between Ms.
15 Ditzler and Ms. Casey at this meeting.
16 Q.     And that exchange with Ms. Ditzler
17 telling Ms. Casey, or in part Ms. Ditzler telling
18 Ms. Casey to bite her ass?
19 A.     Yes.
20 Q.     Would you say that's inappropriate and
21 unprofessional conduct?
22 A.     Yes.
23 Q.     Did you ever send Ms. Ditzler an e-mail
24 similar to that that you sent to Defendant

Page 590

1  Halcovage and remind her -- strike that.
2       Ms. Ditzler is an elected official?
3  A.    No, Ms. Ditzler is an employee of an
4  elected official.
5  Q.    Okay.
6       Did you ever send either Ms. Ditzler or
7  Ms. Ditzler's elected official's supervisor an
8  e-mail like you did Defendant Halcovage and remind
9  her that she should engage in appropriate and
10 professional conduct while in the workplace?
11 A.    I don't know if it was in an e-mail.
12 However, I know that I did communicate with Ms.
13 Sharoyn Yackenchick who was the controller
14 regarding the interaction and the comment that was
15 made by Ms. Ditzler, and she indicated she would
16 be dealing with the situation.
17 Q.    Did you ever inform Ms. Casey that was
18 what was going to occur?
19 A.    I did not, no.
20 Q.    Walk me through what exactly happened at
21 this meeting, or proceeding as Ms. Casey calls it?
22      MS. PIPAK:  Object to the form.  Go
23 ahead.
24      THE WITNESS:  From what I recall,

Page 591

1  we were to have a meeting.  I don't even remember
2  what the specifics were about the disciplinary
3  issue, or the -- what we were questioning Jane Doe
4  1 on.  However, upon scheduling it she had
5  Ms. Ditzler as union representative show up,
6  and then Ms. Casey also came, and I indicated it
7  would not be appropriate for Ms. Casey to be there
8  as she already had her certified bargaining agent
9  present.  And then the exchange -- that's when the
10 exchange happened between Ms. Ditzler and Ms.
11 Casey.  And after that I don't even recall what
12 occurred beyond that meeting.
13 BY MS. SMITH:
14 Q.    In the meeting did you tell Ms. Ditzler
15 that she was being inappropriate and
16 unprofessional?
17 A.    I believe I -- I don't know if I used
18 those terms, but I did indicate we need to watch
19 what we say and we can't be yelling.  Because they
20 were yelling and screaming at each other.  Both of
21 them.
22 Q.    Did you ever tell Ms. Yackenchick that
23 you thought that the comment Ms. Ditzler made was
24 inappropriate and unprofessional?

Page 592

1  A.    Yes, I did tell her exactly what she
2  said, and -- I mean we had that conversation, that
3  it was inappropriate and unprofessional.  We also
4  talked about like what her status in that meeting
5  was, whether it be as a union representative or as
6  an employee of the county.  So I did also inform
7  the business agent or -- I think they call them
8  staff representatives for AFSCME, which is the
9  union that Ms. Ditzler and Jane Doe 1 were part
10 of, of the occurrence of the situation as well.
11 Q.    And Ms. Yackenchick told you that she
12 would deal with it, correct?
13 A.    Yes, she said she would handle the
14 situation.
15 Q.    Did she tell you how she would deal with
16 it?
17 A.    I don't believe so.  I don't -- I know
18 we had discussions about whether she was there as
19 an employee of the county or an employee
20 representing the county, or whatever, a county
21 employee.  Or as a union representative.  But I
22 don't -- I think -- I think she may have sent an
23 e-mail back to Ms. Casey that I was copied on, but
24 I don't -- I don't believe she took any

Page 593

1  disciplinary action against Ms. Ditzler from what
2  I can recall.
3  Q.    Do you believe that disciplinary action
4  was warranted?
5  A.    I mean, I believe that she should have
6  been told that her actions were unprofessional and
7  inappropriate.  Whether that rose to some sort of
8  reprimand or not, I don't know.
9  Q.    If you had -- if she wasn't an employee
10 under an elected official, would you have written
11 her up?
12 A.    I would have put something in -- yeah, I
13 would have most likely issued her some sort of
14 reprimand.
15 Q.    Did you document your discussion with
16 Ms. Yackenchick?
17 A.    I don't know if I sent an e-mail or if
18 we just had a -- I know we had a conversation for
19 sure, but I don't recall if I sent any e-mail to
20 her.
21 Q.    Did you place it in any sort of file
22 anywhere?
23 A.    Not that I can recall.
24      MS. SMITH:  I'm going to mark as

Page 594

1  178, as Zula 1830.
2            - - -
3        (Zula 1830 marked as Exhibit-178 for
4  identification.)
5            - - -
6  BY MS. SMITH:
7  Q.     Let's look back at 177, Ms. Casey's
8  initial report to you is on September 14th, 2021,
9  and then we have 178 which is an e-mail from Ms.
10 Casey on September 17th, 2021.
11      Do you know if at any point between
12 September 14th and September 17th you spoke with
13 Ms. Casey to inform her that you had addressed the
14 issue with Ms. Yackenchick and the union, the
15 AFSCME employee or supervisor, I forget what you
16 call them.
17 A.     Well, the exhibit 177 was not addressed
18 to me.  It was addressed to Ms. Yackenchick.  I
19 was just copied on the communication.  The 17th
20 e-mail of exhibit 178 was directed to me, and I do
21 not believe that -- I believe I did at some point
22 respond to Ms. Casey's inquiry.  I don't exactly
23 recall when it was though.
24      MS. SMITH:  I'm going to mark Zula

Page 595

1  1908 as 179.
2            - - -
3        (Zula 1908 marked as Exhibit-179 for
4  identification.)
5            - - -
6  BY MS. SMITH:
7  Q.     This is an e-mail from Ms. Casey to you
8  on October 6th, 2021, correct?
9  A.     Yes.
10 Q.     Ms. Casey in her first sentence
11 indicates you have not responded to my complaints
12 about Sherry Ditzler for her violent and
13 aggressive behavior during the meeting with you
14 and Jane Doe 1.
15      Any reason to believe that, in fact,
16 between September 14th -- September 17th and
17 October 6th, 2021 you had, in fact, responded to
18 Ms. Casey?
19 A.     No.
20 Q.     In the last sentence of that paragraph
21 it states you were also there when she launched
22 into an expletive ladened exchange directed
23 against Jane Doe 1.
24      Do you contest Ms. Ditzler launched into

Page 596

1  an expletive ladened exchange?
2  A.     I don't think it was expletive ladened
3  from what I can recall.  She did as -- she was --
4  as she was talking to Maria, she was also talking
5  to Jane Doe 1 and she did, you know, have an
6  exchange with her.  I don't recall it being
7  expletive ladened though from what I can recall.
8  Q.     Was it unprofessional?
9  A.     I don't know if it was unprofessional.
10 I mean she was loud in her discussion, but it
11 wasn't expletive ladened.  Or I don't think she
12 made any comments such as she made to Ms. Casey.
13 Q.     Do you recall if she used any profanity
14 in speaking with Jane Doe 1?
15 A.     Not that I recall.
16 Q.     Do you believe that Ms. Ditzler during
17 that meeting was there representing Jane Doe 1's
18 interests to the best of her ability?
19      MS. PIPAK:  Objection to the form.
20 You can answer, if you can.
21      THE WITNESS:  That's not my call to
22 make.  I mean she was there on behalf of the union
23 representing that employee.
24 BY MS. SMITH:

Page 597

1  Q.     But based off of her conduct towards
2  Jane Doe 1, meaning based off Ms. Ditzler's
3  conduct towards Jane Doe 1, do you kneel that Jane
4  Doe 1 had adequate representation, union
5  representation?
6      MS. PIPAK:  Object to the form.
7  You can answer.
8      THE WITNESS:  I mean do I feel it
9  was appropriate for Ms. Ditzler to do what she
10 did?  No, I don't.  Whether or not it was adequate
11 union representation, I don't know.  I don't know
12 what the union, you know, expects of their
13 representatives from their perspective.
14 BY MS. SMITH:
15 Q.     Do you recall exactly what Ms. Ditzler
16 said to Jane Doe 1?
17 A.     No, I don't recall the exact exchange.
18 Q.     Do you recall -- I don't know if it was
19 that meeting or another meeting.  Do you recall
20 referring -- yourself referring to Jane Doe 1 as a
21 princess?
22 A.     Me?
23 Q.     Yes.
24 A.     No, I do not.

Page 598

MS. SMITH:  I'm going to mark Zula
1956 and 57 as 180.
- - -
(Zula 1956-1957 marked as Exhibit-180
for identification.)
- - -
BY MS. SMITH:
Q.     Do you recognize this e-mail exchange?
A.     Yes.
Q.     The last e-mail Ms. Casey sent to you
was on October 6th, 2021 regarding this matter,
and she then sends you another e-mail on
October 22nd, 2021 stating that many e-mails have
been sent to you regarding the hostile work
environment you are fostering with Ms. Ditzler and
others against me.
     Any reason to believe you replied to Ms.
Casey between October 6th and October 22nd?
A.     No.
Q.     Why didn't you?
A.     I didn't believe I needed to reply to
her.  The situation, as she's clearly aware,
Ms. Ditzler is an employee of an elected official
who handles her employees.  Ms. Casey, through her

Page 599

own accord, has told me on numerous occasions that
I have no control over what her employees do.
And, therefore, the same would apply to Ms.
Yackenchick.
Q.     You did eventually reply with those
exact sentiments on October 22nd, correct?
A.     Yes.
Q.     So why as of September 17th couldn't you
have just sent that e-mail to Ms. Casey?
A.     I don't know.  I didn't.
Q.     And then on October 6th why couldn't you
have just sent that same e-mail to Ms. Casey?
A.     I don't know.
Q.     Your response to Ms. Casey indicates
that prior -- or states prior to making this
request you had already provided this information
to Ms. Yackenchick who serves as Ms. Ditzler's
immediate supervisor.  And then goes on to state
essentially the 1620 rights and why you couldn't
take action, correct?
A.     Yes.
Q.     Nothing in this e-mail informs Ms. Casey
that in addition to the fact that you can't take
action, you at least had conversations with Ms.

Page 600

Yackenchick and the AFSCME individual, correct?
     MS. PIPAK:  Object to the form.  I
don't know if I understand.  I'm sorry, I just
didn't --
BY MS. SMITH:
Q.     Nothing in this e-mail to Ms. Casey
indicates, as you testified, that you had spoken
with Ms. Yackenchick and the AFSCME
representative, correct?
A.     Yes, that's not indicated in the e-mail.
Q.     Is it documented anywhere that you took
those alleged actions?
A.     I don't recall if I sent any e-mails to
anybody, but I know I had conversations with Ms.
Payne Rigby and Ms. Yackenchick.
Q.     So Ms. Rigby would the AFSCME
representative you spoke with?
A.     Yes.
Q.     Do you believe that Ms. Ditzler's
comments during the meeting violated a county
policy?
     MS. PIPAK:  Object to the form.
You can answer.
     THE WITNESS:  Yeah, I believe the

Page 601

Code of Conduct policy does reference about being
professional in the workplace.  So, yes, it could
be deemed as a violation of the policy.
     MS. SMITH:  I'm going to mark Zula
2498 as 181.
- - -
(Zula 2498 marked as Exhibit-181 for
identification.)
- - -
BY MS. SMITH:
Q.     Do you recognize this e-mail?
A.     Yes.
Q.     This is a e-mail from Jane Doe 2 to you
on June 3rd, 2021 about and incident involving her
and Jane Doe 1, and their citing of Defendant
Halcovage, correct?
A.     Yes.
Q.     Did you ever investigate this report?
A.     Yes.  I discussed the information that
she provided Deputy Tobin from the sheriff's
office.
Q.     Did you discuss it with anyone else?
A.     I'm not certain if I -- I believe I did
talk to both Jane Doe 1 and Jane Doe 2, because I

Page 602

1  think I went down to the office to determine, you
2  know, what they saw in addition to looking -- or
3  talking to Sher -- or Deputy Tobin regarding any
4  video footage that was available.
5  Q.      So let's start with that last part.
6         Was there video footage available?
7  A.      Not to my knowledge, no.
8  Q.      Okay.
9         And you said you do believe you spoke
10 with Jane Doe 1 and Jane Doe 2?
11 A.      Yes, I do believe I did.
12 Q.      Did you speak with Defendant Halcovage?
13 A.      I believe I did, yes.
14 Q.      Did you interview each of those
15 individuals?
16 A.      I know we had a conversation.  I guess
17 they could be deemed interviews.
18 Q.      Did you take notes?
19 A.      I don't recall.
20 Q.      Did you come to a conclusion and write a
21 report?
22 A.      I didn't write a report, no.
23 Q.      Did you come to a conclusion?
24 A.      I believe that Mr. Halcovage was driving

Page 603

1  down the road and he wasn't -- he's permitted to
2  drive down the road.  It's a public road.  I can't
3  stop him from doing that.  I don't know how.  Just
4  by looking out the window they saw him, but they
5  did.  So there was really to further action I
6  believe that the county needed to take at that
7  point.
8  Q.      Was there an investigation file placed
9  in that cabinet that's alphabetized as you were
10 indicating?
11 A.      I believe this document was kept on
12 file.
13 Q.      And what file or what cabinet would that
14 be?
15 A.      I don't recall.  I don't know if there
16 is an actual file in there with this documentation
17 in there.
18 Q.      Okay.
19         What was -- so other than saying he had,
20 in fact, driven down the road, I think is what you
21 indicated, what else did Defendant Halcovage tell
22 you?
23 A.      I don't recall.  I think the situation
24 was it's his eye doctor that's located behind that

Page 604

1  building, I believe.  I think this is that
2  situation.  Not exactly certain, but that he was
3  driving down the road and was there and that was
4  it.
5  Q.      Did you ask him if he had taken pictures
6  of 410 building?
7  A.      I don't rail.
8  Q.      Did you ask him if a few minutes later
9  he drove back the opposite way?
10 A.      I would have asked him about this
11 situation that was here, but I don't recall the
12 specifics of our conversation.
13 Q.      Do you recall if he denied having his --
14 or admitted to having his left arm fully extended
15 out the window with his phone in his hand?
16 A.      I believe he may have said he had his
17 arm out the window, not with his phone.  I don't
18 believe that was an issue, something that he had
19 admitted to, no.
20 Q.      Did he admit that he approached the
21 Giant lot where Jane Doe 1 and Jane Doe 2's cars
22 had been parked?
23 A.      If I'm recalling this situation
24 correctly, I believe this was a situation where I

Page 605

1  think his eye doctor was there, I think this is
2  the situation, and that's why he was in that
3  parking lot.
4  Q.      Do you know, is there an eye doctor in
5  that parking lot?
6  A.      Yes, there is.
7  Q.      What doctor?
8  A.      I think it's Dr. Lu's office, I believe.
9  Q.      And it's the same lot or shopping center
10 as the Giant?
11 A.      Yeah, there used to be a Giant and then
12 a big parking lot, and then I think it's the eye
13 doctor's office is in the back of the parking lot
14 which is behind the 410 building across the
15 street.
16 Q.      Did you believe Defendant Halcovage when
17 he was explaining his side of the story?
18 A.      Yes.  It seemed to make sense, yes.
19 Q.      Did you ever call the doctor, eye doctor
20 and see if he had eye appointment that day?
21 A.      No, I did not.
22 Q.      Did you ask Defendant Halcovage to
23 provide you paperwork that said he had an
24 appointment that day?

Page 606

1  A.      No.
2  Q.      Did you ever ask to see his phone to see
3  if there were any videos or photos of the 410
4  building or Jane Doe 1 or Jane Doe 2?
5  A.      No, I did not.
6  Q.      Were you involved in -- oh, let's go
7  through, before we get started on another topic.
8  Let's clarify a few questions, clarifying
9  questions.
10         MS. SMITH:  I'm going to mark
11  SC1213 and 1214 as 182.
12                    - - -
13         (SC1213-1214 marked as Exhibit-182 for
14  identification.)
15                    - - -
16  BY MS. SMITH:
17  Q.      Ms. Zula, do you recognize this
18  document?
19  A.      Yes.
20  Q.      This document is similar -- it's a
21  Schuylkill County Job Classification Description
22  for Field Appraiser, correct?
23  A.      Yes.
24  Q.      And we had looked at the chief assessor

Page 607

1  one before.  The chief assessor position
2  classification description stated must have a
3  certified Pennsylvania evaluator's license.
4         Do you recall that?
5  A.      Yes.
6  Q.      This one here, the field appraiser one,
7  says must have a certified Pennsylvania
8  evaluator's license, or be willing to obtain the
9  CPE license within three years of employment with
10  the county.
11         Do you see that?
12  A.      Yes.
13  Q.      So there is a very clear distinction of
14  a must do and an alternative option in this one,
15  correct?
16  A.      Yes.
17         MS. PIPAK:  Object to the form.  Go
18  ahead.
19  BY MS. SMITH:
20  Q.      That similar alternative language is not
21  in the chief assessor position, correct?
22  A.      Yes.
23  Q.      Yes, it's not, right?
24  A.      You're correct.

Page 608

1  Q.      Okay.
2         So, again, can you me why based off the
3  fact that this has that three-year grace period,
4  did you believe that it was sufficient -- that you
5  could permit Mr. Hatter to not hold a CPE license
6  when being hired?
7  A.      We did not have any certified applicants
8  for the position, and we did have Mr. Alu still
9  working at the county to serve in that capacity.
10  Q.      And when was Mr. Alu's employment or
11  contract with the county over?
12  A.      I don't recall.  I believe it was
13  extended.  I want to say it was probably sometime
14  the end of August, and then it was extended.  So
15  I'm not exactly sure when it actually ended.
16  Q.      Do you know when it was extended, how
17  long it was extended?
18  A.      No, I don't recall.
19  Q.      In July, 2021 do you recall the county
20  hiring a Jim Gustus?
21  A.      Yes.
22  Q.      Mr. Gustus was, in fact, hired by the
23  county, correct?
24  A.      Yes.

Page 609

1  Q.      Was he hired and then left?  Or was
2  there some gap in his employment at some -- not --
3  I'm sorry, in post 2021.  Because before that he
4  had been an employee of the county, correct?
5         MS. PIPAK:  Object to the form.  Go
6  ahead.
7         THE WITNESS:  So he was an employee
8  of county at some point.  I don't know when.
9  BY MS. SMITH:
10  Q.      Many years ago, right?
11  A.      He retired is my understanding.
12  Q.      Like many years ago, correct?
13  A.      Yes.
14  Q.      And then he came back in July, 2021?
15  A.      Yes.  I believe it was requested he come
16  back in July of 2021, yes.
17  Q.      Do you know who requested he come back?
18  A.      I don't recall who exactly was the one
19  requesting it.
20  Q.      He came back to help train field
21  assessors, correct?
22  A.      Field appraisers, yes.
23  Q.      Okay.
24         And do you know if he's -- at least when

Page 610

1  you left in May, 2022, was he still employed
2  there?
3  A.     I don't know.  I don't recall.  I don't
4  believe he worked much when he did come back, from
5  what I can recall.  I don't know how many hours he
6  worked and how many he didn't and if he was still
7  being utilized.  I believe he was still on the
8  payroll, yes.
9        MS. SMITH:  I'm going to mark Zula
10  2635 through to 2637 as 183.
11        - - -
12        (Zula 2635-2637 marked as Exhibit-183
13  for identification.)
14        - - -
15  BY MS. SMITH:
16  Q.     Flip to the last page, which is the
17  first e-mail.  The date is on the second page.  On
18  July 8th, 2021, Jane Doe 4 reported to you that
19  Jim Gustus had been inappropriate with her and
20  other woman, including Jane Doe 1, when he was a
21  field assessor.  And she was also aware that an
22  employee from the reassessment company had
23  complained about his inappropriate behavior.  Is
24  that correct?

Page 611

1  A.     Yes.
2  Q.     On July 13th, on page 2 you informed
3  Jane Doe 4 that you reviewed files in the HR
4  office and had been unable to find information, so
5  she -- you asked her some questions about whether
6  she reported it, to whom, and also asked her to
7  provide a detailed account of the inappropriate
8  behavior of Mr. Gustus; is that correct?
9  A.     Yes.
10  Q.     And Ms. Jane Doe 4 did, in fact, that
11  same day provide you with a detailed account.
12        Would you agree?
13  A.     Yes.
14  Q.     In that detailed account she indicates
15  that when he worked there he would constantly
16  stare at the chests of women when speaking with
17  them, and that Ms. Murray and Ms. Zimmerman could
18  confirm this.
19        Did you ever speak with Ms. Murray or
20  Ms. Zimmerman?
21  A.     I believe I spoke with Ms. Zimmerman,
22  yes.
23  Q.     And what did you indicate to you about
24  Mr. Gustus?

Page 612

1  A.     She indicated that there were some
2  complaints, to her knowledge.  However, she
3  doesn't believe that they rose to anything that,
4  you know, was -- any action was taken.  And then I
5  did do further research, and I believe I did find
6  a document, and I don't recall where it was, that
7  Jane Doe 4 was questioned, and she indicated she
8  had no concerns about Mr. Gustus.  I believe that
9  was the situation.
10  Q.     Did you speak with Mr. Murray?
11  A.     With who?
12  Q.     Ms. Murray.
13  A.     No, I did not.
14  Q.     Ms. Murray, in fact, at the beginning of
15  your employment, of your employment, was not
16  employed by the county, correct?
17  A.     No.
18  Q.     But during your employment she did come
19  back as a -- did she come back as a per diem or a
20  contractor?
21  A.     She came back, I believe, as a
22  contractor as well.
23  Q.     Do you recall when that was?
24  A.     No, I don't recall the dates.

Page 613

1  Q.     Do you remember if, in fact, at the time
2  of this July incident, or report I should call it,
3  was Ms. Murray an employee or contractor?
4  A.     I don't recall.
5  Q.     Okay.
6        In any event, when she did come back did
7  you ever speak with her about --
8  A.     No, I did not.  Not to my recollection.
9  Q.     Jane Doe 4 also speaks about Jane Doe 1
10  and her experience with Mr. Gustus, correct?
11  A.     Yes.
12  Q.     Did you ever speak with Jane Doe 1 about
13  Mr. Gustus?
14  A.     No, I did not.
15  Q.     Did you -- Jane Doe 1 also indicates
16  that there was a third party.  Helene O'Connor
17  would be able to provide the reassessment company
18  information Jane Doe 4 indicates, and that Helene
19  O'Connor knew a woman named Barbara who complained
20  to the then chief assessor.  Do you see that?
21  A.     Yes.
22  Q.     Did you ever speak with Ms. O'Connor?
23  A.     No.  But we did attempt to contact -- I
24  did -- I believe -- I think -- I don't know who,

Case 3:21-cv-00477-MCC   Document 280-1   Filed 09/20/23   Page 60 of 92
Deposition of Heidi Zula Vol. II - Revised
Jane Doe, et al. v. Schuylkill County Courthouse, et al.

Page 614

1  if it was Glenn Roth or whom, I was able to get
2  the assessment company's number, and I believe
3  we -- I did reach out to them and I was not able
4  to be find anyone who had any information
5  regarding that complaint that was filed.
6  Q.      When you spoke with Ms. Zimmerman, did
7  you take any notes?
8  A.      I don't recall.
9  Q.      When you -- did you compile an
10 investigation file to show that you made efforts
11 to check the veracity of these claims?
12 A.      No, I did not.
13 Q.      Is there any documentation that would
14 support your actions as it relates to the
15 investigation into these claims?
16 A.      I don't believe there was any report.  I
17 did not prepare a report that I can recall.  I
18 don't know if there's any e-mails or anything that
19 would be related to it.
20 Q.      Why didn't you speak with Jane Doe 1
21 about what Jane Doe 4 said Mr. Gustus did to her?
22 A.      I don't know.
23 Q.      After Mr. Gustus started with the
24 county, did you ever check in with assessment

Page 615

1  employees to find out if he, since being rehired,
2  had engaged in an appropriate manner?
3  A.      I didn't question the employees.  We did
4  speak with -- I did speak with Mr. Gustus, and
5  Mr. Hatter was made aware of the information that
6  was provided.  And we laid out -- I laid out what
7  the expectation was for Mr. Gustus and his
8  employment with the county as a per diem person.
9  Q.      Expectations, meaning just generally.
10 Not specific to these allegations?
11 A.      No, expectations regarding his conduct
12 towards other employees.  That he needed to remain
13 professional, and that he was not to be engaging
14 in any sort of unprofessional action or touching
15 other employees.
16 Q.      Was that -- were those expectations
17 memorialized in any sort of document or were they
18 verbal?
19 A.      No, they were verbal.
20 Q.      Who was present when you explained that
21 to Mr. Gustus?
22         MS. PIPAK:  Object to the form.  Go
23 ahead.
24         THE WITNESS:  I don't know if it

Page 616

1  was just me with him when he came in for his
2  badge.  Or if it was -- I don't believe Mr. Hatter
3  was there during that conversation.
4  BY MS. SMITH:
5  Q.      Did you ask Mr. Gustus if he had engaged
6  in the conduct that Jane Doe 4 alleges?
7  A.      No, I didn't discuss the details of it
8  with him.
9  Q.      Well, if he had engaged in the behavior,
10 would you still have permitted him to work for the
11 county?
12         MS. PIPAK:  Object to the form.  Go
13 ahead.
14         THE WITNESS:  I believe there was
15 -- some of these claims were investigated based
16 upon the information I found regarding Jane Doe 4
17 saying she didn't have an issue.  And so I didn't
18 believe there was any further need to go further
19 beyond what I did.
20 BY MS. SMITH:
21 Q.      Well, what if Mr. Gustus had admitted to
22 doing these things?
23         MS. PIPAK:  Object to the form.
24         THE WITNESS:  I didn't question

Page 617

1  him, so --
2  BY MS. SMITH:
3  Q.      Well, if he had engaged -- if he -- if
4  you had questioned him and he had admitted he
5  engaged in this behavior, what would your
6  recommendation have been regarding --
7         MS. PIPAK:  Object to the form.
8  BY MS. SMITH:
9  Q.      -- his employment with the county?
10        MS. PIPAK:  Object to the form.
11        THE WITNESS:  So if he would have
12 admitted to doing these things, I don't know.  I
13 would have to probably have a lot more specifics
14 regarding the situation before I would know what I
15 would have done.  But, I mean, I think I still --
16 he would have been told of what the expectations
17 were.  I don't know if we would have allowed him
18 to remain employed as a per diem person or not.
19 BY MS. SMITH:
20 Q.      Do per diems require a PARS?
21 A.      Yes.
22 Q.      So Mr. Gustus was placed on a par?
23 A.      Yes.
24 Q.      Do you know when?

Page 618

1  A.     I don't know the exact date.
2  Q.     Prior to -- so the par would have
3  required a vote by the commissioners, correct?
4  A.     Yes.
5  Q.     Were the commissioners informed of
6  these -- of Jane Doe 4's reports and any
7  subsequent investigation you did before they voted
8  on his par?
9  A.     I don't know when we voted on his par.
10  The commissioners, minus Commissioner Halcovage,
11  were included on Jane Doe 4's e-mails.
12  Q.     Did you inform them about your alleged
13  investigation?
14       MS. PIPAK:  Object to the form.  Go
15  ahead.
16       THE WITNESS:  I spoke to my
17  supervisor.  Typically he would be the one who
18  talked to the commissioners.  I, on a regular
19  basis, did not inform them of issues or incidents.
20  That was Mr. Bender who took care of that issue.
21  BY MS. SMITH:
22  Q.     At any point after Mr. Gustus began his
23  employment, did you check in with the field
24  appraiser's or the assessment office and ask if he

Page 619

1  had engaged in any inappropriate conduct?
2  A.     No, I did not question them.
3  Q.     I want to talk a little bit about the
4  process of filling a vacant position in a
5  non-elected official office.  So there's some
6  offices obviously within the -- in the courthouse
7  where the head -- the department head is an
8  elected official, correct?
9  A.     Yes.
10  Q.     And the filling of vacant positions in
11  their offices is different than ones such as tax
12  claim and tax assessment where the director or the
13  department head is not an elected official?
14  A.     Yes, slightly different.
15  Q.     Okay.
16       When there is a vacant position in a
17  non-elected official department, what's the
18  process?
19  A.     So the position, once we receive
20  approval to fill, it's posted.  Interviews are
21  typically conducted.  And then a recommendation
22  would come through via a par, and then those PARS
23  are typically reviewed by -- well, those pars come
24  in and we typically put them on the par report,

Page 620

1  which is then reviewed prior to putting it on the
2  commissioner's agenda.
3  Q.     Who conducts the interviews?
4  A.     Interviews are conducted -- it depends
5  on the position.  They typically include the
6  supervisor and potentially the next in the chain
7  of command.  It could include HR.  It just depends
8  on the position.
9  Q.     And who recommends the candidate that --
10  to be selected?
11  A.     Usually the Interview Committee.
12  Q.     Which would include the department head?
13  A.     Yes.  Usually, yes.
14  Q.     When wouldn't a department head be
15  included on a --
16  A.     Well, typically the department head
17  would be included for a position within their
18  department.  So if the department head wasn't
19  available or wasn't there, then potentially they
20  wouldn't be part of the process.
21       MS. SMITH:  Okay.  I'm going to
22  mark as 184 Zula 2779.
23                - - -
24       (Zula 2779 marked as Exhibit-184 for

Page 621

1  identification.)
2                - - -
3  BY MS. SMITH:
4  Q.     Do you, Ms. Zula, recall in September of
5  2021 a clerk typist one in tax claim becoming
6  vacant?
7  A.     Yes.
8  Q.     And in September of 2021 Jane Doe 3 was
9  the department head of that department, correct?
10  A.     Yes.
11  Q.     If a current employee applied for a
12  vacant position, are interviews done?
13  A.     So this is a union position, the clerk
14  typist one.  This position was posted why Jane Doe
15  3 and Jane Doe 4 were out on leave.  The -- under
16  the Collective Bargaining Agreement there are
17  rights to certain positions within the -- that are
18  covered by the union.  And so if there are rights
19  to the position, she was the only person that
20  applied for the position within the bargaining
21  unit, she would automatically get the position, so
22  we would not conduct interviews in those
23  situations.
24  Q.     Okay.

Case 3:21-cv-00477-MCC   Document 280-1   Filed 09/20/23   Page 62 of 92
Deposition of Heidi Zula Vol. II - Revised
Jane Doe, et al. v. Schuylkill County Courthouse, et al.

Page 622

1  A.    Because it's a contractual right.
2  Q.    But the contractual right is only as to
3  the right to the position, not to the terms of
4  what the position entails, correct?
5  A.    Well, the terms and conditions of the
6  position are set by the Collective Bargaining
7  Agreement.  So pay, benefits, all of those things.
8  Q.    Is whether it's a position that can work
9  from the courthouse, home or the 410 building part
10 of the Collective Bargaining Agreement?
11 A.    No.
12 Q.    Given that this position of clerk --
13 vacant position of clerk typist one was open in
14 Jane Doe 3's office, why was she not consulted
15 regarding whether or not Jane Doe 1 could have
16 accepted the position and worked from home?
17 A.    She was out on leave.
18 Q.    When she got back from leave did you
19 speak with her?
20 A.    Jane Doe 1 already declined the
21 position.
22 Q.    Had it been offered to anyone yet?
23 A.    I don't recall if it was or wasn't.
24 Q.    Could you have reoffered it to Jane Doe

Page 623

1  1 with the option to work from home?
2       MS. PIPAK:  Object to the form.  Go
3  ahead.
4       THE WITNESS:  Yes.  I guess we
5  could have, yes.
6  BY MS. SMITH:
7  Q.    Jane Doe 1, in fact, when applying for
8  it asked about the option to work from home,
9  correct?
10 A.    She asked about the requirements of the
11 position, and she was informed that the position
12 would need to work within the tax claim office.
13 Q.    Who made that decision that she would
14 have to work in the tax claim office?
15 A.    Well, I made -- I informed her of that
16 decision.  I know I discussed it with Mr. Bender,
17 as well as Deb Dash who was the acting assistant
18 tax claim director at that point.  Or interim.
19 Q.    Were these communications through e-mail
20 or in person?
21 A.    Usually our conversation were in person.
22 Q.    After Jane Doe 1 applied for the
23 position and declined it, in September -- maybe
24 that month, September 27th, 2021, did Jane Doe 1

Page 624

1  request her hours to determine if she was eligible
2  for FMLA?
3  A.    Yes.
4       MS. SMITH:  Okay.  I'll mark as 185
5  Zula 1890.
6            - - -
7       (Zula 1890 marked as Exhibit-185 for
8  identification.)
9            - - -
10 BY MS. SMITH:
11 Q.    And is this that request by Jane Doe 1
12 here down bottom of Ms. Zula 1890?
13 A.    This was not in reference to her FMLA.
14 This was in reference to her not working the
15 requisite number of hours to maintain benefits
16 during the measurement period for health care
17 coverage.
18 Q.    So your testimony is that -- well, let's
19 start with that.  Jane Doe 1 states I was wait --
20 I'm waiting for any information regarding my work
21 hours and benefits, employment status that was
22 discussed at the meeting you held for me.
23 First, what -- this is a different
24 meeting than the Sherry Ditzler meeting, correct?

Page 625

1  A.    I don't know if it was the same meeting
2  or not.  I don't recall.
3  Q.    But you -- do you recall if, in fact,
4  Jane Doe 1 requested her hours to determine if she
5  could apply for FMLA at that time?
6  A.    I don't know when it was.  At some point
7  in time she did request the hours.  I don't know
8  if it was during this time frame or not.  So she
9  did request -- I'm sorry -- she did request
10 whether or not she had completed work, the
11 requisite hours to qualify for FMLA.  But in
12 addition we also did inform her that you had --
13 she had to work a certain number of hours in order
14 to maintain her benefit coverage as a full-time
15 employee during the measurement period.  And that
16 we had a third-party company who does that, and we
17 believe that she was getting close to the point
18 where she wouldn't have qualified for benefits
19 based upon the number of hours that she worked
20 during the measurement period.
21 Q.    Well, I thought you testified yesterday
22 that there was no third-party company that
23 maintained records of employees' hours, that that
24 was the controller's office.

Page 626

1  MS. PIPAK: Objection to the form.
2  You can answer.
3  THE WITNESS: This is in reference
4  to -- so we have a third-party company who tracked
5  hours for the purpose of ACA, not who does
6  payroll. So those -- so we do have a third-party
7  that tracks hours for ACA purposes who does -- who
8  completes the 1095s and such. But they don't
9  process payroll.
10 BY MS. SMITH:
11 Q.    Well, in Jane Doe 1's first sentence
12 there she -- it's a conjunctive. It's work hours
13 and benefits employment status. So does that
14 refresh your recollection as to whether she was
15 asking for work hours related to her FMLA?
16 A.    No, that was not what she was asking.
17 She was asking -- because we discussed that she
18 did not -- she was getting close to not working
19 the number of hours required in order to maintain
20 her benefit eligibility. So how she worded it,
21 I'm not certain. But this was in reference to her
22 work hours as it related to her benefit
23 eligibility under ACA.
24 Q.    And are you sure that at the meeting she

Page 627

1  did request her hours for FMLA?
2  MS. PIPAK: Objection.
3  THE WITNESS: I don't know if this
4  was -- I know she -- at one point in time she did.
5  I don't know when that timing was.
6  BY MS. SMITH:
7  Q.    Okay.
8  Well this e-mail of Jane Doe 1's goes on
9  to talk about signing a disciplinary form
10 regarding Kent. I imagine Kent Hatter; is that
11 correct?
12 A.    Yes.
13 Q.    So was there a meeting around this time
14 between you, Jane Doe 1 and Mr. Hatter?
15 A.    I would believe so, yes.
16 Q.    Was that meeting where Jane Doe 1
17 received a verbal warning?
18 A.    I don't recall.
19 Q.    Okay.
20 Well, there was --
21 A.    It indicates here it was a written
22 reprimand.
23 Q.    There's at least some sort of
24 disciplinary action issued at this meeting,

Page 628

1  correct?
2  A.    Based on that, yes.
3  Q.    Did Jane Doe 1 have union representation
4  present?
5  A.    Yes, I believe she did.
6  Q.    Who was that?
7  A.    I don't recall. Well, I don't know --
8  I'm not sure exactly what meeting we're referring
9  to. But union representation is offered, and it
10 is her right or determination as to whether or not
11 she brings a union representative to the meeting.
12 Q.    So it's your testimony that before --
13 that whatever meeting this was, that you offered
14 Jane Doe 1 to be permitted to bring union
15 representation?
16 A.    Yes.
17 Q.    Then next sentence reads if you recall,
18 you wrote me up when you said you were taking over
19 the meeting. So doesn't your signature need to be
20 on that form?
21 Is this the meeting where Mr. Hatter
22 became angry?
23 MS. PIPAK: Object to the form.
24 You can answer.

Page 629

1  THE WITNESS: Mr. Hatter and Ms. --
2  I recall being in a meeting where Mr. Hatter and
3  Jane Doe 1 were yelling back and forth -- well,
4  not yelling. But they were going back and forth
5  and not allowing the other one to talk to each
6  other, and so I stopped the meeting at that point
7  in time.
8  BY MS. SMITH:
9  Q.    Is that the meeting where Mr. Hatter
10 slammed his first on the table?
11 MS. PIPAK: Object to the form.
12 THE WITNESS: I don't recall that.
13 BY MS. SMITH:
14 Q.    You don't recall Mr. Hatter ever
15 slamming his fist on the table during a meeting
16 with Jane Doe 1?
17 A.    I don't know if he slammed. I don't
18 recall. I don't -- I don't remember.
19 Q.    Do you recall Mr. Hatter telling Jane
20 Doe 1 to write an apology letter to the Board of
21 Commissioners for filing her complaint against
22 him?
23 MS. PIPAK: I'll object to the
24 form. But you can answer.

Page 630

1    THE WITNESS:  I don't know what
2  that's in reference to.
3  BY MS. SMITH:
4  Q.    Do you ever recall Mr. Hatter telling
5  Jane Doe 1 to write an apology to the Board of
6  Commissioners for filing her complaint against
7  him?
8  A.    I don't recall.
9  Q.    In your response to Jane Doe 1 in the
10  third paragraph at the bottom it states it's
11  technically the employee's responsibility to
12  request and secure representation for any
13  proceeding.  However, we have attempted to assist
14  employees with the process in an effort to
15  schedule appropriate times with all parties.
16    So at least on occasion HR will assist
17  employees with securing union representation,
18  correct?
19  A.    Yes.  So in the past -- or what would
20  typically happen a lot of times is when
21  supervisors would request to meet with employees,
22  they would also reach out to the union president
23  to determine, you know, hey is this a good time
24  for you guys to come.  And so that was what

Page 631

1  occurred in the past.  And I believe that's what
2  occurred in this situation with Mr. Hatter.  He
3  reached out to Ms. Ditzler.
4  Q.    Was Ms. Ditzler at the meeting?
5  A.    I don't know if she came or didn't come.
6  I don't recall.
7  Q.    The next sentence in your e-mail says
8  given the issues that were presented at the last
9  meeting we will allow you to schedule your own
10  AFSCME representation as you deem appropriate if
11  it would be needed.
12    What issues were presented at the last
13  meeting?
14  A.    I think the issues were the issues
15  between Jane Doe 1 and Ms. Ditzler as serving as
16  her union representative.
17    MR. TOWNSEND:  Off the record.
18    VIDEOGRAPHER:  The time is now
19  2:39.  We're going off the record.
20    - - -
21    (Whereupon, brief recess was held off
22  the record.)
23    - - -
24    VIDEOGRAPHER:  The time is now

Page 632

1  2:49 p.m. and we're back on the record.
2  BY MS. SMITH:
3  Q.    Ms. Zula, I'm going to mark as exhibit
4  186 Zula 188 and 189.
5    - - -
6    (Zula 188-189 marked as Exhibit-186 for
7  identification.)
8    - - -
9  BY MS. SMITH:
10  Q.    Do you recognize this?
11  A.    Yes.
12  Q.    This is a couple days within that last
13  e-mail where Jane Doe 1 said she's waiting for
14  information regarding her work hours, correct?
15  A.    Yes.
16  Q.    1250 is the exact number of hours that
17  an individual needs to be eligible for FMLA,
18  correct?
19  A.    Yes.
20  Q.    And Ms. Heather Garrity informed you
21  that Jane Doe 1, in fact, worked 1250 hours,
22  correct?
23  A.    She worked 1250 within the pay periods
24  that were pulled by Ms. Garrity.  She needed to

Page 633

1  look back from the date that the request was made
2  back 12 months on the specific days regarding the
3  hours worked.
4  Q.    Well, the 1250 is for consecutive pay
5  periods, correct?
6  A.    Yes.
7  Q.    And so at least on September 30, 2021
8  Jane Doe 1 was eligible for FMLA, correct?
9  A.    No.  Because the start dates of the pay
10  periods indicates 9/14/2020 through 9/12 of 2021,
11  we needed to look back to the exact dates that she
12  requested FMLA, which I don't recall what exactly
13  that date was.  But we need to go from that date
14  to the date of the request.  So if she were -- for
15  example, if she requested on September 20th we
16  needed to look at the days from September 20th of
17  2021 back to -- or September 19th, 2021 back to
18  September 20th, 2020.  So we can just pull the pay
19  periods.  You actually had to look at the exact
20  hours worked on each particular day.
21  Q.    Well, if she had applied for FMLA on
22  September 13th, 2021, she would have had the 1250
23  hours --
24  A.    Yes.

Page 634

1  Q.      -- correct?
2  A.      Yes.
3  Q.      Was Jane Doe 1 notified when she became
4  eligible for FMLA?
5  A.      She wasn't eligible based upon when she
6  requested the paperwork.
7  Q.      What I'm saying is on 9/13 when she hit
8  that 1250 hours, was she notified?
9  A.      No.
10 Q.      Why not?
11 A.      I don't believe she requested it until
12 after that date.
13 Q.      In June of 2021 Jane Doe 1 and Jane Doe
14 2 reported to you that Kent Hatter made
15 inappropriate comments to them, correct?
16 A.      Yes.
17 Q.      Did you interview Jane Doe 1, Jane Doe 2
18 regarding those reports?
19 A.      Yes.
20 Q.      Did you interview Mr. Hatter?
21 A.      Yes.
22 Q.      Was an investigation file opened?
23         MS. PIPAK:  Object to the form.  Go
24 ahead.

Page 635

1          THE WITNESS:  I believe I have a
2  file regarding the interviews that I did.  I don't
3  know if it's an investigation file.  But, yes,
4  there was a file created.
5  BY MS. SMITH:
6  Q.      Were notes taken during --
7  A.      Yes, I believe they were.
8  Q.      And in each of your conversations with
9  Jane Doe 1, Jane Doe 2 and Mr. Hatter?
10 A.      Yes, I believe -- well, I met with Jane
11 Doe 1 and Jane Doe 2 together.
12 Q.      Okay.
13         So, but there would be notes from that
14 --
15 A.      Yes, I believe there should be notes
16 regarding that.
17 Q.      Just let me finish my question so it's
18 clear for the record.  That's okay.
19         And was a finding memo or conclusion
20 written by you?
21 A.      I did not write a findings or conclusion
22 memo, no.
23 Q.      Why not?
24 A.      I don't know.

Page 636

1  Q.      What was your finding?
2          MS. PIPAK:  Object to the form.  Go
3  ahead.
4          THE WITNESS:  Based upon the
5  discussions that Mr. Hatter and Jane Doe 1 and
6  Jane Doe 2 had, I believe that he did make some
7  comments that were probably not appropriate for
8  the supervisor to be making.  And so Mr. Bender
9  and I both met with Mr. Hatter regarding, again,
10 the expectations of his interactions with both of
11 those employees and all of his employees.
12 BY MS. SMITH:
13 Q.      So he wasn't written up?
14 A.      He wasn't officially written up, no.
15 Q.      What were the comments that you thought
16 he made that were inappropriate?
17 A.      He was making comments -- I believe
18 that -- my understanding is that Jane Doe 1 and
19 Mr. Hatter have working relationship outside of
20 the county, because she served as a certified
21 appraiser and he owned a real estate agency and
22 they worked together in that capacity.  So he
23 believed that he was very friendly with her and
24 her family.  And I believe he was talking to her

Page 637

1  more like from a -- like a father figure, friend
2  type, than a supervisor.  And that was not how he
3  should be talking to her while he is an employee
4  of the -- or a supervisor employee of the county.
5  I think he made some comments, from what I
6  can recall, about like, Jane Doe 1, you know,
7  being portrayed -- because she's a very pretty
8  woman, about like -- like that she just reads
9  gossip magazines or something to that effect.
10 Where he made that comment.  But then in addition
11 to that, he said, you know, he knows that's not
12 like her.  She's very smart.  She brings a lot to
13 the table.  Those types of things.  Like those
14 types of things.  There's no reason for him to
15 kind of make those comparisons in his employment
16 as her supervisor.
17 Q.      Did Jane Doe 2 inform you that
18 Mr. Hatter made a comment about her deceased
19 boyfriend?
20 A.      I don't recall that.  I don't recall
21 that comment.
22 Q.      Okay.
23         MS. PIPAK:  I'm sorry, was it about
24 her.  Was that Jane Doe 2?

Page 638

1   MS. SMITH:  Jane Doe 2.
2   MS. PIPAK:  Okay.
3   BY MS. SMITH:
4   Q.      Yeah, Jane Doe 2's deceased boyfriend.
5   A.      I don't recall that comment.
6   Q.      Do you recall Jane Doe 2 informing you
7   that Mr. Hatter told her that she needs to get
8   over it?
9   A.      No, I don't recall that comment.
10  Q.      Were -- did Jane Doe 2 and/or Jane Doe 1
11  inform you that they didn't -- they wished to not
12  have to report no Mr. Hatter any longer given his
13  comments?
14  A.      Yes, I believe that was information that
15  was shared by them with me, and we did then put
16  Ms. Zimmerman kind of as their kind of go-to
17  person in the office so that Mr. Hatter wouldn't
18  have direct contact with -- or direct working
19  contact with them via -- they didn't need to
20  contact him for their work product.
21  Q.      But it was Mr. Hatter who then
22  subsequently wrote up both Jane Doe 2 and Jane Doe
23  1, correct?
24  A.      As the department head, yes.

Page 639

1   Q.      Who decided not to discipline
2   Mr. Hatter?
3   MS. PIPAK:  Object to the form.  Go
4   ahead.
5   THE WITNESS:  I believe -- well, I
6   had a discussion with Mr. Bender as Mr. Hatter's
7   supervisor, and as he being my supervisor I
8   discussed all of kind of the HR issues with him,
9   and I mean we collectively -- well, ultimately I
10  guess Mr. Bender didn't, as his supervisor, decide
11  to discipline him.  But we did speak with
12  Mr. Hatter regarding the expectations of his
13  position.
14  BY MS. SMITH:
15  Q.      Okay.
16  Mr. Hatter's comments to Jane Doe 1 and
17  Jane Doe 2, would you classify them as
18  unprofessional and inappropriate?
19  A.      Yeah, certain comments that he made
20  should not have been made in that setting.
21  Q.      Jane Doe 3 and Jane Doe 4 were written
22  up for comments being made to Mr. Alu, correct?
23  A.      Yes, they were.
24  Q.      For inappropriate, unprofessional

Page 640

1   comments, correct?
2   A.      Yes.
3   Q.      Can you tell me why Jane Doe 3 and Jane
4   Doe 4 were written up but Mr. Hatter was not?
5   A.      Because I believe that Jane Doe 3 and
6   Jane Doe 4's unprofessional conduct was
7   continuous, and that even after being told that
8   they needed to act in a professional manner they
9   continued to act the way they did, and that's why
10  they ultimately kind of moved to the next step of
11  the process which was a reprimand.
12  Q.      Who told them to -- what were your
13  words?  They were told what?
14  A.      I believe that in one of my
15  communications to them they were instructed that
16  they needed to act in a professional manner
17  towards other employees.
18  Q.      When was that?
19  A.      I don't recall.
20  Q.      What was that in response to?
21  A.      I don't recall.
22  Q.      And at the time that Jane Doe 1 and Jane
23  Doe 2 reported Mr. Hatter, do you recall them
24  requesting an independent witness at the meeting

Page 641

1   or the interview with you?
2   A.      Yes, I believe they did request an
3   independent witness, and they were told that they
4   could have their union representative.
5   Q.      But they weren't permitted to have
6   another witness present?
7   A.      No.
8   Q.      Why not?
9   A.      Because their union serves as their
10  certified bargaining agent who is responsible for
11  providing representation to employees as it
12  relates to work-related matters.
13  Q.      And what would be the harm of allowing
14  them to have an independent witness present?
15  MS. PIPAK:  Object to the form.
16  You can answer.
17  THE WITNESS:  I'm not sure there's
18  any harm.  It's just that their union
19  representative is the one who provides that
20  type -- serves that type of role for a union
21  covered employee.
22  BY MS. SMITH:
23  Q.      Who decided to not permit them to have
24  an independent witness present?

Page 642

1  A.    I believe I did.
2  Q.    Do you recall Kathleen Gillespie
3  reporting an issue with Jane Doe 4 and Jane Doe 3?
4  A.    Yes.
5  Q.    And do you recall that there was an
6  interview done with Ms. Gillespie?
7  A.    I don't know if it was -- it wasn't an
8  interview.  There was a meeting that was occurring
9  between Ms. Gillespie, Jane Doe 3 and Jane Doe 4
10 regarding some work-related matters, and I was
11 requested to come into the meeting.
12 Q.    By who?
13 A.    I believe Kathleen Gillespie came in
14 down and was talking to me about it, and so I went
15 down and sat in on the meeting.
16 Q.    And Ms. Gillespie was a union employee,
17 correct?
18 A.    Yes.
19 Q.    So why did you not instruct her that she
20 should have her union steward or representative --
21 A.    I believe I did, but she should have --
22 she could have -- ahh, sorry.
23 Q.    Her union steward -- why did you not
24 instruct Ms. Gillespie she should ask her union

Page 643

1  steward or representative to be present?
2  A.    I believe that I did.  That she
3  should -- that she could have her union
4  representative present.  But I was going there
5  because it was work-related type issue.  And I
6  actually believed that I sided with Jane Doe 3 and
7  Jane Doe 4 regarding some of their claims
8  regarding Ms. Gillespie's performance.
9         MS. SMITH:  I'm going to mark Zula
10 2510 and 2511 as 187.
11        - - -
12        (Zula 2510-2511 marked as Exhibit-187
13 for identification.)
14        - - -
15 BY MS. SMITH:
16 Q.    Do you recognize this communication?
17 A.    Yes.
18 Q.    And this indicates that on June 7th Jane
19 Doe 1 informed you about the comments Mr. Hatter
20 made to that we were just speaking of, correct?
21 A.    Yes.
22 Q.    I'm sorry, if I didn't say June 7th,
23 2021, correct?
24        MS. SMITH:  Okay.  Then I'm going

Page 644

1  to have you look at Zula 2586, which will be 188.
2         - - -
3         (Zula 2586 marked as Exhibit-188 for
4  identification.)
5         - - -
6  BY MS. SMITH:
7  Q.    This is an e-mail, at least the first
8  one is an e-mail from Jane Doe 1 to you on
9  June 21st, 2021, correct?
10 A.    Yes.
11 Q.    She says: Hi, Heidi, I haven't received
12 any feedback on your investigation into the
13 discriminatory comments made to me by my
14 supervisor Kent Hatter.  I reported this to you on
15 6/6 and am anxiously waiting on a response.  And
16 she also asked about her work from home status.
17        Is there any -- do you have any reason
18 to believe that between June 7th and June 21st of
19 2021 that you had given her feedback on her
20 discriminatory comments report?
21        THE WITNESS:  No, I don't
22 believe --
23        MS. PIPAK:  Object to the form.  Go
24 ahead.

Page 645

1         THE WITNESS:  No, I don't believe I
2  did.
3  BY MS. SMITH:
4  Q.    And do you believe at that point you had
5  informed her that -- I think we established
6  earlier it was April 30th with Mr. Alu that you
7  had thought about extending the right to work from
8  home to Jane Doe 1.
9         Do you recall that?
10 A.    I'm not --
11 Q.    Sorry.
12 A.    -- understanding what you're asking.
13 Q.    Do you recall looking at an April 30th,
14 2021 e-mail with Mr. Alu about potentially
15 approving Jane Doe 1 for work from home?
16 A.    Yes.
17 Q.    Any reason to believe between April 30th
18 and June 21st that you had communicated to Jane
19 Doe 1 that she was denied work from home?
20 A.    I believe that we did inform her that
21 she was not permitted to work from home.  I don't
22 know if that was in writing at all.  But I believe
23 that that conversation was had between Jane Doe 1
24 and Mr. Alu.

Page 646

1  Q.      You replied to Jane Doe 1 that same day
2  and said the investigation of the claim made
3  regarding your meeting with Mr. Hatter is still
4  ongoing.  You will be advised when the
5  investigation is completed.
6          June 23rd, 2021 you had already spoken
7  with Jane Doe 1 and Jane Doe 2, correct?
8  A.      Yes.
9  Q.      Had you spoken with Mr. Hatter?
10 A.      Yes.  We had spoken with Mr. Hatter,
11 yes.
12 Q.      So what investigation was still ongoing?
13 A.      There was a claim made by Mr. Hatter
14 that Jane Doe 1 had showed him and was -- a TikTok
15 video of her dancing in a very provocative manner,
16 and that he was making claims against Jane Doe 1
17 that her behavior was inappropriate during the
18 meeting that he had with both Jane Doe 1 and Jane
19 Doe 2.  And so I was waiting for additional
20 information regarding that to address those --
21 that information and chose out the full
22 investigation.
23 Q.      Information from where?
24 A.      From Mr. Hatter regarding this TikTok

Page 647

1  video that was shown to him.
2  Q.      What additional information would he be
3  able to provide you?
4  A.      He believed that he could provide me
5  with a copy of the TikTok video that was shown to
6  him.
7  Q.      Did you ask Jane Doe 1 to meet with you
8  so that you could ask her if she showed this
9  TikTok video?
10 A.      I don't know.  I believe they talked
11 about TikTok.  I don't believe I knew that she
12 showed him a video.  But, no, I did not.  I was
13 waiting for him to follow-up with information
14 before I followed up with her.
15 Q.      Did he ever provide you -- Mr. Hatter
16 ever provide you that video?
17 A.      No, I was not able to obtain that video.
18 Q.      Did you ever ask Jane Doe 1 or Jane Doe
19 2 if this video had been shown?
20 A.      No, I did not.
21 Q.      Do you know how long you thought that
22 you should give Mr. Hatter to provide this video?
23 A.      No, I didn't have a time frame.
24 Q.      So when was the ongoing investigation

Page 648

1  going to be concluded then?
2  A.      I don't recall when it was concluded.
3  Q.      Well, I guess I'm asking, how long were
4  you going to give Mr. Hatter to provide this video
5  before you said, okay, I haven't gotten it.  My
6  investigation has got to be concluded?
7          MS. PIPAK:  Object to the form.
8  You can answer.
9          THE WITNESS:  I didn't really have
10 a time frame in mind.  Honestly I didn't.  I don't
11 know how long I --
12 BY MS. SMITH:
13 Q.      So it was --
14 A.      -- would have given.
15 Q.      -- going to go on forever?
16         MS. PIPAK:  Object to the form.
17 You can answer.
18         THE WITNESS:  No, I don't believe
19 it would have went on forever.
20 BY MS. SMITH:
21 Q.      Was it going to go on for 13 months?
22         MS. PIPAK:  Object to the form.
23 You can answer.
24         THE WITNESS:  I don't believe, no.

Page 649

1  BY MS. SMITH:
2  Q.      Because 13 months wouldn't be prompt,
3  would it, pursuant to the policy?
4  A.      No.
5          MS. SMITH:  I'm going to mark as
6  189 Zula 2595.
7                 - - -
8          (Zula 2595 marked as Exhibit-189 for
9  identification.)
10                - - -
11 BY MS. SMITH:
12 Q.      This is another e-mail Jane Doe 1 --
13 includes another e-mail Jane Doe 1 to you on
14 June 28th, again asking for information on the
15 investigation into her complaint filed with you
16 over three weeks ago.
17         Do you see that?
18 A.      Yes.
19 Q.      Now during your investigation into the
20 complaint, Jane Doe 1 was still required to report
21 to Mr. Hatter, correct?
22 A.      Yes.  She still did report to
23 Mr. Hatter, yes.
24 Q.      And she still had to communicate with

Page 650

1  him for work-related issues, correct?
2  A.    I believe on occasion she did.  But for
3  the vast majority of the part I believe Chrissy
4  Zimmerman as the deputy did most of the
5  communication with Jane Doe 1 and Jane Doe 2.
6  Q.    Why was the investigation still ongoing?
7  A.    I was still waiting for Mr. Hatter to
8  provide that information regarding the video.
9  Q.    Was Jane Doe 1 ever informed of the
10 outcome of the investigation?
11 A.    I don't -- I don't recall.
12 Q.    Should she have been?
13 A.    Yes, she probably should have been.
14 Q.    And if she wasn't, would that be an
15 issue?
16       MS. PIPAK:  Objection to the form.
17 You can answer.
18 A.    I don't know if it would be an issue.
19 Her issues were investigated.  We did take action
20 with Mr. Hatter to address those complaints.  I
21 believe that there were -- there were then
22 subsequent communications between Mr. Hatter and
23 Jane Doe 1 where Jane Doe 1 had texted him and
24 apologized for her behavior towards him, and that

Page 651

1  she wanted to have a fresh slate with Mr. Hatter
2  and start other.
3  Q.    Did you ever take into consideration
4  that she maybe went back on her opinions or
5  position because she had been continued and forced
6  to report to the person who in her words in this
7  e-mail made her uncomfortable in an already bad
8  situation, and as she believed immediately decided
9  to revoke her privilege to work from home on an
10 as-needed basis?
11       MS. PIPAK:  Object to the form.
12 You can answer.
13       THE WITNESS:  No, I did consider
14 that.
15 BY MS. SMITH:
16 Q.    Did you consider, as she states here,
17 that she -- as a result of those things, she has
18 more frequent anxiety and panic attacks?
19 A.    No, I did not.
20 Q.    Did you ever ask Jane Doe 1 what you
21 could do for her regarding her anxiety and panic
22 attacks and discomfort as a result of her
23 workplace experiences?
24 A.    No, I did not.

Page 652

1  Q.    Did you care about anything Jane Doe 1
2  told you?
3        MS. PIPAK:  Object to the form.
4  You can answer.
5        THE WITNESS:  Yes, I did.
6  BY MS. SMITH:
7  Q.    Did you believe that Jane Doe 1 was
8  suffering as a result of her workplace
9  environment?
10 A.    No, I do not believe she was suffering.
11 Q.    You think she made it all up?
12       MS. PIPAK:  Object to the form.
13       THE WITNESS:  No, I'm not saying
14 she made it all up.  But I'm saying that when Jane
15 Doe 1 was provided an opportunity to work from
16 home that she did not produce any work.  And so we
17 provided her an environment in which she could be
18 productive, separated from the courthouse.  And
19 she still again did not consistently provide a
20 work product.
21 BY MS. SMITH:
22 Q.    Ms. Zula, let me ask you this question:
23 Are you aware that Jane Doe 1 has made allegations
24 and George Halcovage has admitted to engaging in

Page 653

1  sexual conduct with her?
2  A.    Yes, I'm aware of that.
3  Q.    Are you aware that Jane Doe 1 has made
4  the allegations that Jane Doe 1 did not want to
5  engage in those sexual encounters?
6        MS. PIPAK:  Object to the form.
7  You can answer.
8        THE WITNESS:  I'm not aware of what
9  Jane Doe 1's response was to that.  That I'm not
10 aware of, no.
11 BY MS. SMITH:
12 Q.    I'm asking you if you understand that
13 Jane Doe 1 has said that George Halcovage raped
14 her?
15 A.    No, I'm not aware of that.
16 Q.    Are you aware that George Halcovage has
17 admitted to pushing Jane Doe 1 down in a room in
18 the courthouse and pulling out his penis?
19       MR. GEIGER:  Object to the form.
20       MS. PIPAK:  You can answer.
21       THE WITNESS:  Yes.  I'm aware that
22 that is what has been alleged, yes.
23 BY MS. SMITH:
24 Q.    If that happened to you, would you feel

Case 3:21-cv-00477-MCC   Document 280-1   Filed 09/20/23   Page 70 of 92
Deposition of Heidi Zula Vol. II - Revised
Jane Doe, et al. v. Schuylkill County Courthouse, et al.

Page 654

1  discomfort going into your workplace where someone
2  pushed you down and pulled out their penis when
3  you didn't want it, causing you to run crying from
4  that room?
5       MS. PIPAK:  Object to the form.
6  You can answer.  If you can.
7       THE WITNESS:  I mean from my
8  perspective, Jane Doe 1 wasn't in that work
9  environment.  This is information that she was
10 dealing with with Mr. Hatter.  Not with Mr.
11 Halcovage.  Mr. Halcovage had nothing to do with
12 these issues that she's now experiencing with Mr.
13 Hatter.
14 BY MS. SMITH:
15 Q.     Would going back into a building where
16 something like that happened to you cause you
17 discomfort?
18      MS. PIPAK:  Object to form.  You
19 can answer if you can.
20      THE WITNESS:  My understanding is
21 that that didn't occur in her current office at
22 the 410 building.
23 BY MS. SMITH:
24 Q.    I'm not asking where it occurred.  I'm

Page 655

1  asking you, Ms. Zula, as a woman, as you sit here
2  if that had happened to you, would you have felt
3  discomfort going back into a building where
4  something like that happened to you?
5  A.     I don't know.
6       MS. PIPAK:  I'm going to object to
7  the form.
8       THE WITNESS:  I don't know.  It's
9  never happened to me, so I don't know how I would
10 feel.  Would I probably feel uncomfortable?  Yes,
11 but I don't know.  I've never been in that
12 situation.
13 BY MS. SMITH:
14 Q.     And then having another subsequent male
15 supervisor say the things that Mr. Hatter said to
16 her, would that -- is it understandable that Jane
17 Doe 1 felt anxiety and had panic attacks and was
18 uncomfortable?
19      MS. PIPAK:  I'm going to object to
20 the form.
21      Can you repeat the question one more
22 time?  I'm just worried that this is calling for
23 some kind of opinion that I don't know that I'm
24 comfortable with her answering.

Page 656

1       MS. SMITH:  She's not asking her
2  for a legal opinion.  She can give --
3       MS. PIPAK:  I actually don't think
4  it's a legal opinion.  I think you actually might
5  be asking about a medical opinion almost.  So I
6  just want to hear the question.
7       MS. SMITH:  I'm asking her if -- if
8  someone else -- the next subsequent male
9  supervisor that Jane Doe 1 had made comments such
10 as the ones that Jane Doe 1 said Mr. Hatter made,
11 can Ms. Zula understand why someone, a human, not
12 medical, just a human would feel uncomfortable and
13 maybe have panic attacks and feel anxious.
14      THE WITNESS:  I mean Ms. --
15 according to Jane Doe 1's own e-mail, it was a
16 direct insult to her intelligence.  It wasn't a
17 sexual comment in any way, shape or form.
18 BY MS. SMITH:
19 Q.     Jane Doe 1 in 187, I believe, indicates
20 to you when I went to my office to get something
21 he asked Jane Doe 2 something about if she watched
22 soft porn.  It was not there for the comment, but
23 she did tell me as soon as he left.  She also was
24 shocked by his comment.

Page 657

1       Would asking someone and Jane Doe 1
2  knowing that her male supervisor asked someone if
3  they watched soft porn not be sexual in nature?
4       MS. PIPAK:  Object to the form.
5       THE WITNESS:  The comment that was
6  asked, my understanding when I talked to all of
7  parties, was regarding TikTok.  And then the
8  comment regarding the soft porn came out that
9  regarding some of the videos that were posted.  It
10 was not asking her whether she watched soft porn.
11 It was asking her about TikTok.
12 BY MS. SMITH:
13 Q.     Soft porn was discussed in regards to
14 TikTok, correct?
15      MS. PIPAK:  Object to the form.
16      THE WITNESS:  It was discussed,
17 yes, that some videos posted could be soft porn.
18 But It wasn't directed at asking her did she
19 specifically watch soft porn.  It was in the
20 context of talking about TikTok videos.
21 BY MS. SMITH:
22 Q.     So you're telling me that someone who
23 has been through what Jane Doe 1 had been through,
24 then hearing a male supervisor discuss soft porn,

Page 658

1  doesn't cause you any reason to believe that she
2  would be uncomfortable?
3           MS. PIPAK:  Object to the form.
4  You can answer if you're able.
5           THE WITNESS:  I don't know if it
6  would make someone feel uncomfortable.  But we
7  took steps to ensure that she had limited contact
8  with Mr. Hatter as Ms. Zimmerman then served as
9  the person to provide her work.
10 BY MS. SMITH:
11 Q.      But never wrote Mr. Hatter up for
12 talking about soft porn?
13          MS. PIPAK:  Object to the form.
14          THE WITNESS:  No.
15 BY MS. SMITH:
16 Q.      But what you did take steps to do
17 regarding write-ups is have Jane Doe 2 written up
18 in August of 2021, correct?
19          MS. PIPAK:  Object to the form.
20          THE WITNESS:  I believe.  I'm not
21 sure.  I know she was written up.  I don't know
22 when.
23 BY MS. SMITH:
24 Q.      Who decided to write Jane Doe 2 up in

Page 659

1  August of 2021?
2  A.      I don't recall the specifics.
3           MS. SMITH:  I'm going to mark Zula
4  2684 as 190.
5                - - -
6           (Zula 2684 marked as Exhibit-190 for
7  identification.)
8                - - -
9           MS. SMITH:  You can just put 2684
10 up on the screen and we can separate them later.
11 BY MS. SMITH:
12 Q.      So, Ms. Zula, do you recognize this
13 document?
14 A.      Yes.
15 Q.      This one is not signed, but this was
16 administered to Jane Doe 2, correct?
17 A.      I'm not certain it was.  I know that
18 there was a meeting that was held with Jane Doe 2
19 and we had conversations about some of these
20 topics.  And I know there was a meeting where
21 Mr. Hatter intended to write her up.  And I said
22 that that would not be appropriate given the
23 information that we discussed.  So I'm not certain
24 that this was actually issued to her.

Page 660

1  Q.      What was the meeting that was -- or what
2  was the information that was discussed during the
3  meeting that made you reevaluate whether to write
4  her up?
5  A.      I don't recall the exact specifics.  But
6  I'm not sure if this was the specific situation.
7  If it's not signed, typically even the employee
8  doesn't sign it, the supervisor would sign off on
9  it.  So I'm not certain if this was the one that
10 was issued or not.
11          MS. SMITH:  I'm going to mark Zula
12 2741 and 2743 as 191.
13          THE TECHNICIAN:  You said 2741 and
14 2723, Counsel?
15          MS. SMITH:  Yeah, 2723.  Sorry.
16                - - -
17          (Zula 2741 and 2723 marked as
18 Exhibit-191 for identification.)
19                - - -
20 BY MS. SMITH:
21 Q.      Does this e-mail refresh your
22 recollection as to whether it was this
23 August 23rd, 2021 write-up or the August 4th, 2021
24 write-up that was not administered Jane Doe 2?

Page 661

1  A.      I don't know which one was and which one
2  wasn't.  I know that when we were at the meeting I
3  don't know if the 23rd one was issued or if this
4  one was issued.  I know one of them wasn't, so I'm
5  not certain.
6  Q.      Okay.
7           How many write-ups do you -- well, let's
8  see.  The one is a disciplinary written warning,
9  correct?
10 A.      Yes.
11 Q.      And the other is a suspension, correct?
12 A.      Yes.
13 Q.      How many times has Jane Doe 2 been
14 written up, to your knowledge?
15 A.      I don't recall.  I'm not certain.
16 Q.      Do you know who was the -- well, in this
17 one, the second exhibit 191, it appears that
18 Mr. Hatter was planning to give Jane Doe 2 this
19 write-up, correct?
20 A.      Yes.
21 Q.      And suspend her, correct?
22 A.      Yes.  That was his intention at that
23 point prior to meeting with her, but we needed to
24 meet with her to give her an opportunity to

Page 662

determine what had happened from her perspective.

Q.      And if a union employee is to be
suspended, are they not to be afforded a
Loudermill hearing?

A.      Yes.

Q.      Was Jane Doe 2 provided or offered a
Loudermill hearing?

A.      The meeting would have been the
Loudermill meeting with her.

Q.      And so there was a meeting regarding
this?

A.      I believe there was a meeting, yes,
regarding the August 23rd.  Based upon this there
would have been a meeting, yes.

Q.      And the entirety of this write-up is
that she did not contact the office at 8:30 as
instructed.  Did she -- well, it says she
contacted Christy Zimmerman later in the morning.
        Is there any other reason for Jane Doe
2's suspension?

A.      I don't believe she was suspended at
this time either.

Q.      Well, was there any other reason that
Mr. Hatter was recommending her suspension, to

Page 663

your knowledge?

A.      No.

Q.      A lot of the assessment office employees
work from the field, correct?

A.      The field appraisers do.

Q.      Okay.
        And they don't always start their day at
the courthouse, do they?

A.      Yes.  Everyone comes in in the morning.
They start their day at 8:30 typically in the
courthouse.  They go out and do their field work,
and then they report back to the office to
complete paperwork prior to the end of the day.
There are occasions where an employee, you know,
may have an appointment or something in the
morning, or they're going to certain area where
they would start out in the field or end out in
the field, but the practice was they come into the
office, they do the work, and go out to the field,
do the work, and then come back to the office.

Q.      And is it required that employees of the
assessment office who work in the field -- or just
I guess generally employees in the assessment
office, touch base with their supervisor the first

Page 664

thing in the morning?

A.      Yes.  That was a requirement.

Q.      Of all employees?

A.      Of all of the field appraisers, yes.
They would touch base with their supervisor, let
them know what the plan was for the day.  And
typically, as I said, they came into the office
before they started their work.

Q.      Mr. Hatter did not -- was he full-time?

A.      Yes.

Q.      Mr. Alu was not?

A.      Mr. Alu was not.

Q.      Mr. Alu was not there every morning, was
he?

A.      No.

Q.      So when Mr. Alu was the acting chief
assessor, for lack of a better word, what did the
field appraisers do?

A.      I believe they followed the same policy.

Q.      Well, who did they touch base with if
Mr. Alu wasn't in the office?

A.      When Ms. Zimmerman was appointed deputy
she typically oversaw the field appraisers.  She
was kind of their supervisor directly.

Page 665

Q.      Before she was deputy, what did they do?

A.      I don't know.

Q.      Jane Doe 2 was, in fact, at some point
suspended, correct?

A.      Yes.  Yeah, she was suspended.

Q.      Was Jane Doe 1 ever suspended?

A.      I believe that she was, yes.  I don't
recall when though.

        MS. SMITH:  I'm going to mark as
192 Zula 1748.

        - - -

        (Zula 1748 marked as Exhibit-192 for
identification.)

        - - -

BY MS. SMITH:

Q.      Do you recognize this e-mail chain?

A.      Yes.

Q.      In your e-mail to Ms. Zimmerman on
May 4th you informed her that you were looking to
schedule a meeting with the commissioners for
Friday to review the work performance of Jane Doe
1 and Jane Doe 2.

        Why were you looking to schedule a
meeting with the commissioners on Friday to review

Page 666

1  the work performance of Jane Doe 1 and Jane Doe 2?
2  A.      Because I believe when I had discussed
3  with my supervisor Mr. Bender some of the
4  performance issues that we were experiencing, that
5  he had requested that we hold a meeting with the
6  commissioners to apprise them of the situation.
7  Q.      Did you hold a meeting with
8  commissioners?
9  A.      I don't recall.  I'm not certain.
10        MS. SMITH:  I'm going to mark as
11 193 Zula 1761 and 1762.
12                 - - -
13        (Zula 1761-1762 marked as Exhibit-193
14 for identification.)
15                 - - -
16        THE WITNESS:  Now that I look at
17 the date.
18 BY MS. SMITH:
19 Q.      So the 193 is an e-mail from you to
20 Commissioner Hetherington, Hess and Defendant
21 Halcovage, correct?
22 A.      Yes.  So I didn't look at the dates on
23 exhibit 192.  So, yes, I do recall having a
24 meeting with the commissioners in May.  I noted it

Page 667

1  was -- I thought it was 2021.  But it was 2022.
2  So I apologize.  So, yes.  Yes, there was a
3  meeting.  I'm not sure if there was a meeting or
4  if I just then provided this synopsis of the
5  concerns regarding their performance.
6  Q.      Why did you feel it appropriate to
7  include Defendant Halcovage on this communication
8  regarding individuals who had ongoing federal
9  litigation against him?
10        MS. PIPAK:  Object to the form.
11 You can answer.
12        THE WITNESS:  As he's still a
13 sitting commissioner he is apprised of issues that
14 occur within the courthouse.
15 BY MS. SMITH:
16 Q.      So you thought it was appropriate if he
17 weighed in on employment disciplinary action
18 regarding two women who sued him and had ongoing
19 federal litigation?
20        MS. PIPAK:  Object to the form.
21 Sorry.  Now you can go ahead.
22        THE WITNESS:  It's not my
23 determination to determine if he's going to weigh
24 in on the facts about it.  He's a sitting

Page 668

1  commissioner, therefore he was informed of what
2  the issues were regarding her performance.  And
3  that after consultation with Mr. Bender, based
4  upon these issues, we were going to be looking to
5  recommend her termination as a field appraiser.
6  And, therefore, that would have to be placed on
7  the board agenda on the par report for approval by
8  the commissioners, and then it's Mr. Halcovage's
9  determination as to whether or not he takes any
10 action based upon that.
11 BY MS. SMITH:
12 Q.      Okay.
13        Again my question is though what's your
14 opinion regarding whether he should or should not
15 have participated or took action regarding Jane
16 Doe 1 and Jane Doe 2's employment?
17        MS. PIPAK:  Object to the form.  I
18 believe it's asked and answered.
19        If you want to ask her if she has
20 an opinion, I think she gave her opinion if she
21 had one.  Or she responded to the question.
22        MS. SMITH:  She didn't respond to
23 the question.  She said it's put on the par.  It's
24 up to him.

Page 669

1  BY MS. SMITH:
2  Q.      But I'm asking her:  Do you think in
3  your opinion that he should have weighed in on it?
4        MS. PIPAK:  And you can answer if
5  you have an opinion on this issue.
6        THE WITNESS:  I don't really have
7  an opinion.  It's his determination as a
8  commissioner whether he votes on it or not.
9  That's not for me to decide or not.  I provided
10 the information as he's a sitting commissioner.
11 BY MS. SMITH:
12 Q.      So as you sit here today, you have no
13 opinion as to whether he should weigh in?
14 A.      No, I have no opinion as to whether he
15 should weigh in or not.  If I would be in that
16 situation, I would have an opinion as to what I
17 would do.  But as far as what Mr. Halcovage would
18 do, I don't have an opinion.
19 Q.      Well, Ms. Zula, let's talk about whether
20 you were in that situation.
21        So over the course of your employment,
22 on numerous occasions the plaintiffs asked you to
23 not be involved in disciplinary action regarding
24 them, correct?

Page 670

1    MS. PIPAK:  Object to the form.
2 You can answer.
3    THE WITNESS:  I don't under -- I
4 don't believe they -- I'm not sure I understand
5 the question.
6 BY MS. SMITH:
7 Q.    On numerous occasions the plaintiffs
8 told you in e-mail, pretty much copy and pasted
9 each time, that they believed you, along with the
10 county, were engaging in retaliatory behavior in
11 some of the actions that you took, correct?
12 A.    Yes.
13    MS. PIPAK:  Object to the -- object
14 to the form.
15 BY MS. SMITH:
16 Q.    And did you not find it appropriate to
17 then recuse from matters involving the plaintiffs?
18 A.    I did not -- under certain circumstances
19 I did not take disciplinary action against them.
20 Q.    But you did not recuse from
21 investigations involving them, correct?
22    MS. PIPAK:  Object to the form.
23 You can answer.
24    THE WITNESS:  No.

Page 671

1 BY MS. SMITH:
2 Q.    Ms. Zula, how -- how hard would it have
3 been to have a third-party EEOC -- EEO officer
4 handle the plaintiffs' claims?
5    MS. PIPAK:  Object to the form.
6 You can answer.
7    THE WITNESS:  What claims are we
8 referring to?
9 BY MS. SMITH:
10 Q.    All of their reports to you that they
11 believed you were engaging in retaliation and that
12 the county was?
13    MS. PIPAK:  Object to form.  You
14 can answer.
15    THE WITNESS:  I guess we could have
16 outsourced every single e-mail that they sent
17 regarding retaliatory behavior.  Yes, we could
18 have done that.
19 BY MS. SMITH:
20 Q.    On any occasion did you suggest to Mr.
21 Bender or anyone else that you guys should
22 outsource these issues?
23 A.    Yes.  We did outsource one of the
24 issues, yes.

Page 672

1 Q.    Why was -- only one, correct?
2 A.    No, two.
3 Q.    Which two?
4 A.    So the issue regarding the discipline
5 that was issued to Jane Doe 3 I believe, and Jane
6 Doe 4.  I don't know if that was the Tony Alu
7 situation or not.  And then the LexisNexis
8 situation was outsourced.
9 Q.    Why did the county choose to outsource
10 those two issues?
11 A.    The first issue involved the direct
12 complaint against me.  And then the second issue
13 was based upon Mr. Hess' request regarding the
14 completion of the investigation.
15 Q.    And you're saying so that none of the
16 other e-mails that Jane Doe 4 and Jane Doe 3 sent
17 where they said they believed your actions were
18 retaliatory were complaints against you?
19    MS. PIPAK:  Object to the form.
20 You can answer.
21    THE WITNESS:  I don't know if they
22 were direct complaints against me, no.  But I know
23 they came -- yes, they came to me and they had
24 that language.

Page 673

1 BY MS. SMITH:
2 Q.    Let's talk about the LexisNexis
3 investigation.  Jane Doe 3 and Jane Doe 4 were
4 suspended in September of 2021, correct?
5 A.    Yes.
6 Q.    And they are still to this day on unpaid
7 suspension, correct?
8 A.    I believe so.  I'm not certain.
9 Q.    As of the day you left the county they
10 were still on unpaid suspension, correct?
11 A.    Yes.
12 Q.    What is your understanding of why the
13 LexisNexis investigation began?
14 A.    It was based upon e-mail communication
15 that was received from Jane Doe 3's county e-mail
16 address by Deb Dash indicating that someone had
17 accessed her account, or changed the password, I
18 don't recall the exact wording.  And that is when
19 she presented it to Mr. Roth and asked if he had
20 accessed the account because she hadn't accessed
21 the account, and so they were trying to determine
22 whom had accessed the account.
23 Q.    Okay.
24    And then so Ms. Dash goes to Mr. Roth;

Page 674

1  is that correct?
2  A.     Yes.
3  Q.     And then who does Mr. Roth go to?
4  A.     He came and talked to me about it.
5  Q.     Okay.
6  A.     And then he -- it was decided he and
7  Ms. Dash would reach out to LexisNexis to discuss
8  their -- to determine, you know, what occurred.
9  Because I think there was communication in the
10  e-mail indicating that they would need -- if
11  there's -- if the e-mail was received in error or
12  you didn't access the account you should contact
13  this number.
14  Q.     Well, the log-in information was Jane
15  Doe 3's, correct?
16  A.     Yes.
17  Q.     Did anyone ever pick up the phone and
18  say, Jane Doe 3, did you access your account?
19         MS. PIPAK:  Object to the form.  Go
20  ahead.
21         THE WITNESS:  No.  Not to my
22  knowledge.
23  BY MS. SMITH:
24  Q.     How do you know that there was

Page 675

1  unauthorized access to her account if she could
2  have been the one who did it?
3  A.     She was on FMLA leave, so she should not
4  have been accessing the account, and it was
5  determined -- well, that was after the fact, but
6  --
7  Q.     What was determined?
8  A.     It was determined that it was accessed
9  from an iPhone, which was then subsequently
10  determined to be Jane Doe 3's iPhone.
11  Q.     Did you ever talk to Russ Moscow and
12  find out that he had asked Jane Doe 3 for a bill
13  so the county could pay it and that's why she
14  accessed it?
15  A.     Yes, during the investigation we did.
16  Q.     After you had already called LexisNexis?
17  A.     Yes.
18  Q.     So if you had simply picked up the phone
19  and said, Jane Doe 3, why did you access your
20  account?  Or did you access your account?  And if
21  so, why did you do so on FMLA?  You would have
22  been made aware that it was her, there was no
23  unauthorized access, and it was simply so the
24  county could timely pay a bill, correct?

Page 676

1         MS. PIPAK:  Object to the form.
2  You can answer.
3         THE WITNESS:  Yes.  There was
4  potential we could have done that, yes.
5  BY MS. SMITH:
6  Q.     But instead you have launched into a 13
7  -- or the county has launched into a 13-month
8  investigation regarding Jane Doe 3's accessing her
9  account, correct?
10         MS. PIPAK:  I'm going to object to
11  the form.  You can answer if you're able.
12         THE WITNESS:  The investigation
13  that was launched into by me was completed in
14  approximately two months or so I did.  And then it
15  was basically reviewed and turned over, and
16  spurred into something that was way beyond my
17  control.
18  BY MS. SMITH:
19  Q.     Okay.
20         So -- I'm sorry.  Roth comes to you, and
21  then you reached out to LexisNexis?
22  A.     No, he reached out to LexisNexis.
23  Q.     Okay.
24         Do you know why he reached out to

Page 677

1  LexisNexis?
2  A.     Because the e-mail indicated that if you
3  are not -- this log-in was inappropriate or you
4  didn't change your password, I don't remember what
5  the exact verbiage was, that you were to contact
6  LexisNexis.  I don't know if it gave a number or
7  what it did.  But it said to contact them.
8  Q.     Okay.
9         And then at some point then after that
10  you conducted an investigation, correct?
11  A.     Yes.
12  Q.     What did your investigation entail?
13  A.     So after we discovered that Jane Doe 3
14  had accessed the LexisNexis site I guess we'll
15  call it, while she was on leave, when discussing
16  that with my supervisor, it was requested that we
17  get the history to see what was done.  When
18  LexisNexis gave the history, we -- I reviewed it
19  and found that there were people who I was
20  familiar with that it didn't make sense that she
21  would be searching those particular people.
22  Q.     So before you requested the search
23  history, you had already found out that Jane Doe 3
24  had accessed the site while on FMLA leave for

Page 678

1  purposes of paying a bill?  Or having the county
2  pay a bill?
3  A.      We didn't know it was for the purpose of
4  paying a bill at that point in time.
5  Q.      But you knew Jane Doe 3 had accessed it?
6  A.      Yes.
7  Q.      So did you contact Jane Doe 3 to ask her
8  why?
9  A.      No.
10 Q.      Instead you asked for a search history
11 back to January, 2020, correct?
12 A.      Yes.
13 Q.      Why?
14 A.      That was what I was requested to do.
15 Q.      By whom?
16 A.      By Mr. Bender.
17 Q.      Did you question it?
18 A.      No.
19 Q.      Did you say should we reach out to Jane
20 Do 3?
21 A.      No.
22 Q.      Why not?
23 A.      Because she was on leave.  And
24 regardless, she should not have been accessing the

Page 679

1  LexisNexis site while she was on leave.
2  Q.      Even to have the county pay a bill on
3  time?
4  A.      Yes.  She should not have been accessing
5  the site while she was on leave.
6  Q.      Do you think accessing the site while on
7  leave justifies a 13-month unpaid suspension?
8         MS. PIPAK:  Objection to the form.
9  You can answer.
10        THE WITNESS:  I don't believe
11 that's why she's continuing to be on unpaid
12 suspension.  The investigation is still ongoing is
13 my understanding.
14 BY MS. SMITH:
15 Q.      That's not my question.
16        Do you think if a simple fact that she
17 accessed the site while on leave for the purpose
18 of having the county timely pay a bill, would that
19 warrant a 13-month unpaid suspension?
20 A.      In and of itself, no.
21 Q.      So then you do eventually get a list
22 back from LexisNexis, correct?
23 A.      Yes.
24 Q.      That list -- the first list you got,

Page 680

1  that you viewed from LexisNexis, how many names
2  was it?
3  A.      I don't recall.
4  Q.      Was it a short list?  A long list?
5  A.      It was a fairly long list.  I don't
6  recall the number.  I don't recall the number of
7  people that were -- the searches that were
8  highlighted on that list.  I don't.
9  Q.      But it was all searches from January,
10 2020 through August of 2021, correct?
11 A.      Yes.
12 Q.      Okay.
13        So over a year's worth of searches,
14 correct?
15 A.      Yes.
16 Q.      Okay.
17        What was -- what did you do with that
18 list?
19 A.      So I reviewed the list first to
20 determine if there were any searches done around
21 the time that the password was changed, and found
22 that there were not.  And then reviewed the whole
23 list and found that there were a number of
24 searches that were conducted that did not seem to

Page 681

1  be appropriate usage of the LexisNexis system.
2  Q.      What is your understanding of why Jane
3  Doe 3 has access to LexisNexis?
4  A.      The -- my understanding, and I believe
5  this is what Jane Doe 3 and Jane Doe 4 told me,
6  was to search for addresses for people they needed
7  to touch base with regarding to serve notices for
8  delinquent taxes.  I believe it was in preparation
9  of like judicial sales, upset sales, those types
10 of sales that they needed to find people and
11 addresses for, you know, those specific properties
12 that were going up for sale.  And then I believe
13 they also utilized it if there was somebody who
14 was diseased to look for their next of kin.
15 Q.      Are you familiar with Retzel?
16 A.      No.
17 Q.      The real estate tax sale law?
18 A.      Oh.  Well, I'm familiar with what -- I
19 know it exists, yes.
20 Q.      Are you familiar were the fact that the
21 tax claim bureau has to comply with Retzel
22 regarding judicial sales and upset sales?
23 A.      Yes.
24 Q.      When you looked at that list, that

Page 682

1  initial list you got from LexisNexis, did you look
2  at Retzel to understand what Jane Doe 3 might
3  utilize LexisNexis for to comply with it?
4  A.      No.
5  Q.      Other than looking at the list and
6  thinking this name seems out of place, or maybe
7  unauthorized, did you do anything else do
8  determine if, in fact, those names were
9  unauthorized searches?
10  A.      Yes.  I met with Jane Doe 3 and Jane Doe
11  4 to question them as to why those names were ran.
12  Q.      And at any point during your meeting
13  with either of them, was any of the information
14  they conveyed to you, did it suggest that they
15  were unauthorized searches?
16  A.      Yes.
17  Q.      Which search?
18  A.      Ms. Casey, they had no recollection as
19  to why they would have run that search or for what
20  purpose.  And Halcovage, I believe that one they
21  had no recollection as to why.
22        My search, they did conduct a search on
23  my prior to my employment, and they indicated they
24  did so as part of my employment background, which

Page 683

1  is not an appropriate usage of the system.
2        Kathleen Gillespie I think was one of
3  them.  They had no explanation as to why they
4  searched her as related to their duties.  I can't
5  recall the others that were part of it.
6  Q.      Let's start with you, Ms. Zula.  There
7  was an allegation -- you were actually originally
8  on the par, I think we discussed this yesterday,
9  and removed, correct?
10  A.      I was on the par report for, yes, the
11  meeting in November.
12  Q.      The agenda, right?
13  A.      Yes.
14  Q.      Okay.
15        And then it wasn't voted on that day,
16  correct?
17  A.      No.
18  Q.      There was allegations that circulated
19  that you had delinquent taxes, correct?
20  A.      Yes.
21  Q.      And if an employee had delinquency
22  taxes, that's something that the commissioners
23  should know -- or strike that.  If a potential
24  employee had delinquent taxes, that's something

Page 684

1  the commissioners should know prior to voting on
2  that person's employment?
3        MS. PIPAK:  Objection to the form.
4  You can answer.
5        THE WITNESS:  That's not something
6  that we review when we go through our background
7  checks for new employees.
8  BY MS. SMITH:
9  Q.      I understand that's not something you go
10  through for your background checks.  But is it
11  something that is the commissioners should know
12  and are delinquent taxes within the purview of the
13  Tax Claim Bureau?
14  A.      Yes.
15  Q.      Okay.
16        So is finding out if you had delinquent
17  taxes something in the purview of Tax Claim
18  Bureau?
19  A.      Yes.
20  Q.      So if there were allegations that you
21  had delinquent taxes, would that search of you not
22  be authorized?
23  A.      The issue with the search on me was that
24  they searched it prior to that comment even being

Page 685

1  raised to the commissioners.  Prior to the board
2  meeting during the public comment section of the
3  meeting.
4  Q.      You -- but you don't know if they had
5  been told that there was -- that you had
6  delinquent taxes, do you?
7  A.      I believe Jane Doe 4 indicated that Jeff
8  Dunkel informed her that he believed I had
9  delinquent taxes.
10  Q.      So if someone had told them that you had
11  delinquent taxes, is that not within the purview
12  of the Tax Claim Bureau to look up?
13  A.      No, not for that purpose.  No.  I wasn't
14  being -- my property wasn't going up for sheriff
15  sale.  It wasn't going up for upset sale.  Nor did
16  I have delinquent taxes at that period of time.
17  They -- it would not be appropriate for them to
18  utilize the system to conduct a background check
19  on a new employee.
20  Q.      No one indicated that they conducted a
21  background check of you?  And in order to find out
22  if you had delinquent taxes, they would have to
23  search you, correct?
24  A.      Not on --

Page 686

1  MS. PIPAK:  Object to the form.
2  THE WITNESS:  Not on the LexisNexis
3  system.  They could clearly see that in the -- in
4  the -- I don't know if it's -- I guess it's all of
5  the Govern system, or the Smart Term system, they
6  could clearly see if I had delinquent taxes on
7  there.
8  BY MS. SMITH:
9  Q.    Only on the property you currently
10  owned, correct?
11  A.    No.  They can have -- they have history.
12  They have access to the history.  It's public
13  record that you can get all of that information.
14  Q.    And what properties you were previously
15  associated with, what properties you might have
16  interest in that owed delinquent taxes would not
17  be on Govern system, would it?
18  A.    They would be in the Smart Term system
19  that you can -- that they would have had access
20  to, yes, they would.
21  Q.    Are you sure of that?
22  A.    Yes.
23  Q.    Okay.
24  When Jane Doe 3 and Jane Doe 4 were

Page 687

1  questioned, were they permitted to look at any
2  documents, look at any return mailings, look at
3  any Smart Term or Govern or any other system to
4  determine why they conducted these searches?
5  MS. PIPAK:  Object to the form.
6  I'm not sure I understand what you're asking.  If
7  you understand it.
8  BY MS. SMITH:
9  Q.    You brought Jane Doe 3 and Jane Doe 4
10  separately into a room and gave them a list of
11  eight or ten names, correct?
12  A.    Yes.
13  Q.    Some basic information regarding the
14  searches that were conducted, correct?
15  A.    Yes.
16  Q.    Jane Doe 3 and Jane Doe 4 during those
17  interviews had access to no other documents or
18  systems to be able to determine if those searches
19  that happened months prior were -- could be
20  substantiated in any way, correct?
21  MS. PIPAK:  Object to the form.  Go
22  ahead.
23  THE WITNESS:  I did not provide
24  them with any documentation, nor did they request

Page 688

1  to review any additional documentation during the
2  meeting.
3  BY MS. SMITH:
4  Q.    Ms. Zula, they had never seen the list
5  of names before they got there, correct?
6  A.    No.
7  Q.    How would they know what documentation
8  they needed?
9  A.    They never requested it during the
10  meeting.  If they believed that they would have
11  documentation to support those searches or needed
12  more information, they could have indicated that.
13  However, they did not.
14  Q.    Ms. Zula, there was an unemployment
15  hearing, correct?
16  A.    Yes.
17  Q.    And documentation to substantiate their
18  unemployment as unlawful was requested, correct?
19  MS. PIPAK:  Object to the form.
20  You can answer.
21  THE WITNESS:  I don't know what
22  you're asking.
23  BY MS. SMITH:
24  Q.    Jane Doe 3 and Jane Doe 4 appealed --

Page 689

1  I'm sorry, the county appealed the granting of
2  their unemployment, correct?
3  A.    Yes.
4  Q.    And in doing so Jane Doe 4 and Jane Doe
5  3 requested documents from the county to support
6  their granting of unemployment?
7  A.    I don't know if they did or if they
8  didn't.  I wasn't involved in producing any
9  documents to them for their unemployment hearing.
10  Q.    Ms. Zula, you testified at the
11  unemployment hearing?
12  A.    Yes, I did.
13  Q.    Did you not hear them request the
14  documents during the unemployment hearing?
15  A.    That was a line of questioning, but they
16  didn't request them prior to the hearing to
17  produce them.
18  Q.    Did you ever produce the documents after
19  the hearing to them?
20  A.    No, I didn't.
21  Q.    Do you know if anyone did?
22  A.    I don't know.
23  Q.    So it's your testimony that an employee
24  has to request documents to be able to defend

Page 690

themselves against the county questioning them?

MS. PIPAK:  Objection to form.  You can answer.

THE WITNESS:  If they are indicating that there are documents that exist -- I didn't know there were documents that existed that can substantiate their searches.  So, yes, they would have had to say, yes, there's documents.  I need some time to get them.  But they didn't indicate that.

BY MS. SMITH:

Q.     Did you ever go and look at any of the assessment office work to figure out if any of the searches were justified?

MS. PIPAK:  Object to the form. You can answer.

THE WITNESS:  I reviewed information on Smart Term to determine if there was any searches -- any delinquent taxes in that time frame when the searches were conducted.

BY MS. SMITH:

Q.     Did you look to bankruptcies?

A.     No.

Q.     Did you look to Govern?

Page 691

A.     I looked on the Smart Term system which ties to the public system on the website.

Q.     Did you look to Govern?

A.     No, I don't have access to that.

Q.     Did look to return mailings?

A.     No, I did not.

Q.     Did you look to old lien holders or property holders?

A.     No.

Q.     Did you look to sale records to figure out if properties had been sold, but someone else back when the search was run was the actual property owner?

A.     Yes.  Well, I looked at -- in the system you could see history of a property, and when somebody owned a particular property.  So, yes I, did look at that to compare it to when the property -- when the person was searched and what properties they owned to determine if those properties had any delinquent taxes.

Q.     Ms. Zula, did you conduct this evaluation of the searches on your own?

MS. PIPAK:  Object to the form.

THE WITNESS:  I'm not sure I

Page 692

understand the question.

BY MS. SMITH:

Q.     Looking at Smart Term, did you do that on your own?

A.     Yes.

Q.     Do you believe you understood how LexisNexis is utilized in connection with Retzel enough to be the one to make that determination?

A.     Yes.

Q.     What does Retzel say?

A.     I don't know the exact terminology in the law.  I utilized what Jane Doe 4 and Jane Doe 3 told me that they utilized LexisNexis for as my basis for whether or not their searches were appropriate.

Q.     Did you look to Retzel when you were doing those searches?

A.     No, I did not.

Q.     Have you ever looked at Retzel?

A.     I've seen it, yes.

Q.     What does it say?

A.     I don't know.

Q.     Okay.
       The search list was provided to

Page 693

Defendant Halcovage, correct?

A.     Which search list?

Q.     Any of them.

A.     Yes.  There was search information that was provided, yes.

Q.     Why?

A.     So the initial searches, the few that were questioned initially were reviewed with the commissioners after my investigation was completed on that.  It was then determined that based upon the information that a full search history was requested from LexisNexis of Jane Doe 3's account. At that point after we received that, then the search history was provided to the commissioners, the solicitor's office.  Mr. Bender had an opportunity to review it to determine if there were others that potentially were not searched appropriately.

Q.     Do you knee if any of individual who were provided the list looked to Smart Term, Govern, Return Mailing to figure out if searches were in fact authorized?

A.     I don't know.

Q.     How were the -- strike that.

Page 694

1    So you get this initial list from
2  LexisNexis.  You look at it.  That -- is it that
3  list that's provided to commissioners?  Or based
4  on list then you request a larger list?
5  A.      Can you repeat that?
6  Q.      So you get the first list.
7  A.      Uh-huh.
8  Q.      You look at it.
9  A.      Yes.
10  Q.      You say I think there's some
11  unauthorized searches here?
12  A.      Yes.
13  Q.      Who do you go to then?
14  A.      Mr. Bender.
15  Q.      Who does Mr. Bender tell you?
16  A.      So he told me to look into it, and
17  that's what prompted my investigation of the
18  initial eight, or however many there were.  We
19  completed that investigation, and once that
20  investigation was completed it was decided to meet
21  with the commissioners to review that information
22  so --
23  Q.      I'm going stop you there just because I
24  want to ask you some question as we go along the

Page 695

1  way.
2  A.      Sure.
3  Q.      Okay.
4          So you meet with Bender.  Then you say
5  he instructs you to do your investigation, which
6  is interviewing Jane Doe 3 and Jane Doe 4?
7  A.      Jane Doe 3 and Jane Doe 4, yes.
8  Q.      Any other investigation?
9  A.      A review of the Smart Term system.  I
10  did -- I did a review with LexisNexis about the
11  information that's produced as part of the
12  searches that were run.  I met with their -- I
13  don't know if she's called -- I don't remember
14  what her title was.  But the woman that I worked
15  with with LexisNexis who provided me with the
16  information regarding the system, how it's
17  accessed.  So that was all included as part of my
18  investigation.
19  Q.      And is this documented in some type of
20  investigation report?
21  A.      Yes.
22  Q.      Okay.
23          As a result then of that, you said you
24  met with the commissioners and provided them the

Page 696

1  information?
2  A.      So we -- I reviewed along the way with
3  my supervisor the investigation.  And then at the
4  conclusion it was determined that we would meet
5  with the commissioners regarding the findings.
6  Q.      Do you recall when that was, give or
7  take?
8  A.      October-ish maybe.
9  Q.      Okay.  Within the same year?
10  A.      Yeah.  Oh, yeah, within -- yes, sometime
11  in October.  I think it was October.  I'm not
12  certain.
13  Q.      Okay.  And did you create a findings
14  report or did --
15  A.      Yes.
16  Q.      Did you create a findings report?
17  A.      Yes.
18  Q.      Okay.
19          And it was written?
20  A.      Yes.
21  Q.      And that was given to the commissioners?
22  A.      I don't know if they actually got a copy
23  of the report.  I don't -- I'm not certain if that
24  went to them.  I know that I provided it to my

Page 697

1  supervisor Gary Bender.  I'm not certain if it was
2  given to the commissioners or not.
3  Q.      You wrote a report.  You gave it to Mr.
4  Bender.  Did Mr. Bender make any changes?
5  A.      I don't recall him -- I don't remember.
6  Q.      But a final report was --
7  A.      A final report was prepared, yes.
8  Q.      Okay.
9          By you and you alone?
10  A.      I prepared the report.  The report was
11  reviewed by counsel, and then I finalized the
12  report.
13  Q.      Did the report have a conclusion?
14  A.      I believe that the conclusion was that
15  they violated the LexisNexis protocols regarding
16  the searches that were conducted.
17  Q.      And did it have a conclusion or
18  recommendation as to disciplinary action?
19  A.      I don't recall if that was part of the
20  report or not.
21  Q.      At that point were Jane Doe 3 and Jane
22  Doe 4 disciplined in any way?
23  A.      They were on suspension during the
24  investigation.

Page 698

1  Q.      Was there -- were they put up for
2  termination at that point?
3  A.      I don't recall.  There was a termination
4  par submitted.  I don't exactly recall when.  And
5  then that was put forth to the commissioners at
6  the commissioner's meeting.  And then at that
7  point I believe the par was tabled.  I think it
8  was tabled.  And then Mr. Hess had asked for an
9  independent review of the investigation that I had
10 completed.
11 Q.      Well, Commissioner Hess' request for the
12 independent investigation was during the
13 commissioner's meeting, correct?
14 A.      Yes, I believe so.
15 Q.      During that initial meeting where you
16 gave -- well, I don't think you said you gave him.
17 But there was a meeting before the commissioner's
18 meeting about your findings regarding LexisNexis,
19 correct?
20 A.      Yes.
21 Q.      What was Mr. -- what was Commissioner
22 Hess' position or question at that meeting?
23 A.      I think he had questions at different
24 aspects of the investigation.  I don't really

Page 699

1  recall much more beyond that.
2  Q.      And who decided to draft a termination
3  par from Jane Doe 3 and Jane Doe 4?
4  A.      After Mr. Bender and I reviewed the
5  information, he asked me to draft the termination
6  par.
7  Q.      Do you believe that Jane Doe 3, Jane Doe
8  4's, what you believe was alleged -- what you
9  believe was unauthorized searches, warrants
10 termination?
11 A.      Yes.
12         MS. PIPAK:  I'm going to object to
13 the form.  But go ahead.
14         THE WITNESS:  Yes.
15 BY MS. SMITH:
16 Q.      Why?
17 A.      I believe that they misused their
18 authority and access to the system, which was
19 clearly given to them as result of their position,
20 and they utilized it for their own personal use.
21 Q.      What do you think they used the
22 information for?
23 A.      I don't know.
24 Q.      How do you know it was for personal use?

Page 700

1  A.      There was no information to support that
2  it was for a business purpose.
3  Q.      Again they could provide you with one,
4  but they had no access at that point to the
5  systems that may have permitted to them to provide
6  that, correct?
7          MS. PIPAK:  Objection to the form.
8  You can answer.
9          THE WITNESS:  Nor had they
10 requested any access to them.
11 BY MS. SMITH:
12 Q.      Again, the question again is they didn't
13 have access to them, correct?
14 A.      Not at that time.
15 Q.      Okay.
16         So they get put up for termination.
17 Hess asked for an independent investigation and it
18 gets tabled, correct?
19 A.      Yes.  At some point, yeah.  I don't
20 recall the date, but yes.
21 Q.      Eckert Seamans is then retained to
22 conduct an independent investigation of -- well,
23 Eckert Seamans is originally retained to just
24 conduct a review of your investigation and make a

Page 701

1  finding on that, correct?
2  A.      Yes.
3  Q.      They weren't at that point tasked with
4  doing their own interviews and investigation,
5  correct?
6  A.      No, they were not.
7  Q.      Did they then give the county a report
8  as to their findings?
9  A.      Yes, my understanding is they did.
10 Q.      Did you ever see it?
11 A.      I did see it.  I don't know if I have a
12 copy of it.  But it was not directed towards me.
13 I wasn't involved in that process.  I simply
14 turned my investigation over, answered the
15 questions and that was my involvement.
16 Q.      Okay.
17         Who was it given to?  The Eckert Seamans
18 report.
19 A.      I believe Mr. Bender is the one who
20 received it.
21 Q.      And -- but you said you did see it?
22 A.      Yes, I do recall seeing it.
23 Q.      And what did the report say?
24         MS. PIPAK:  I'm going to object on

Page 702

1  basis of attorney/client privilege.  And we can
2  discuss this to the extent that you're asking for
3  communications with counsel.
4         I think it's our position that we
5  are not relying on advice of counsel defense.
6  It's about the underlying fact.  She's testified
7  to all the underlying facts.  This is a legal
8  memo.
9         MS. FOX:  The Eckert Seamans
10 report?
11        MS. PIPAK:  Yes.  It's a legal
12 opinion.  So I think its covered by
13 attorney/client privilege.
14        MR. TOWNSEND:  Yeah, this is the
15 issue about whether you have to waive the
16 privilege when you're asserting -- when you're
17 using the investigation as part of your defense.
18 I think we disagree with your position on that,
19 but I don't know if we're going to resolve that
20 here.
21        MS. PIPAK:  Right.  And I think up
22 until what she testified up to this point, I don't
23 think it's an investigation by a law firm that
24 we're relying on as our defense.  I think she's

Page 703

1  testifying about her investigation.
2         MR. TOWNSEND:  I guess let's see --
3  can she ask further questions about not the
4  contents of that report, but how it's used in the
5  process after it was provided to the county?
6         MS. PIPAK:  I can hear the
7  question.  I don't know if I understand what's --
8  what's going to be asked or --
9         MR. TOWNSEND:  Right.  Well, I
10 guess continue and --
11 BY MS. SMITH:
12 Q.     So, Ms. Zula, as result of that report
13 did the county take any action?
14 A.     I don't recall if the report was -- I
15 don't recall the timing.  I'm not certain.  I
16 don't -- I don't recall the timing as far as if
17 the par -- another par was put on.  I don't
18 recall.  I don't remember the timing of it all.
19 Q.     Well, do you recall when the Eckert
20 Seamans report was received?
21 A.     No, I don't recall the time -- I don't
22 recall the timing.
23 Q.     Was it within the year 2021?
24 A.     Yes, I believe it was within the year

Page 704

1  2021.
2  Q.     And do you know if after that report
3  Jane Doe 4 and Jane Doe 3 were again put up for
4  termination?
5  A.     I don't recall the timing of the
6  termination part.  I don't recall when it was.
7  Q.     Who at the county reviewed the Eckert
8  Seamans report?
9  A.     I believe it was reviewed by Mr. Bender.
10 Q.     And after he reviewed it did he instruct
11 you to take certain actions?
12 A.     I don't recall.  I don't recall the
13 timing I don't.
14 Q.     Well, after the report was received you
15 did take subsequent actions regarding the
16 LexisNexis investigation, correct?
17 A.     I don't know the timing.  We did take
18 subsequent actions regarding the investigation,
19 but I don't know if the timing is associated with
20 the Eckert Seamans report.
21 Q.     Okay.
22        I'm sorry.  So let's just start with
23 this after the Eckert Seamans report, did the
24 county take any action regarding the LexisNexis

Page 705

1  investigation?
2  A.     I don't know if it was after receipt of
3  the LexisNexis report because -- or the Eckert
4  Seamans report, excuse me, because I don't recall
5  when we got that report.  The county did take
6  additional action beyond the investigation that
7  was conducted by me.
8  Q.     Well, I'm not asking -- maybe there's
9  some confusion.  I'm not asking if the termination
10 par was after the Eckert Seamans report, because
11 you testified you don't know.  But I'm asking any
12 action related to LexisNexis after the Eckert
13 Seamans report.
14        Was there any action taken?
15 A.     What action are you referring to?
16 Q.     I -- again I don't -- didn't work at the
17 county.  I wasn't privy at all.  So I'm trying to
18 find out from you because you worked there what
19 happened after the LexisNexis report.  Obviously
20 we know Jane Doe 4 and Jane Doe 3 weren't brought
21 back to work, correct?
22 A.     The LexisNexis or the Eckert Seamans
23 report?
24 Q.     I'm sorry, Eckert Seamans.

Page 706

1  A.     Okay.
2         That's what I'm saying.  I don't know
3  when the Eckert Seamans report was received to
4  know if the action that was taken by the county
5  was taken before the report was receive or after
6  the report was received.
7         MS. PIPAK:  Okay.
8         I don't want to coach the witness,
9  maybe we can clear this up and she can step out
10 real quick, and we can -- I don't know.
11        MS. SMITH:  I mean if you want to
12 go on a break and she wants to figure out when the
13 Eckert Seamans report was received, because I mean
14 --
15        MS. PIPAK:  I'm not going to
16 have --
17        MS. FOX:  Let's go off the record.
18        VIDEOGRAPHER:  The time is now
19 4:04 p.m. and we're going off the record.
20             - - -
21        (Whereupon, a brief recess was held off
22 the record.)
23             - - -
24        VIDEOGRAPHER:  The time is now 4:17

Page 707

1  p.m. and we're back on the record.
2  BY MS. SMITH:
3  Q.     Ms. Zula, I think you indicated that the
4  first Eckert Seamans report was received by
5  Defendant Bender, correct?
6  A.     Yes.
7  Q.     Did the commissioners each see that
8  report?
9  A.     I don't know.
10 Q.     And I think you said that was in
11 December, correct?
12 A.     I don't remember the timing.
13 Q.     Was it in 2021?
14 A.     I believe it was, yes.
15        MS. SMITH:  Okay.
16        I'm going to mark Zula 1412 through
17 1414 as 194.
18             - - -
19        (Zula 1412-1414 marked as Exhibit-194
20 for identification.)
21             - - -
22 BY MS. SMITH:
23 Q.     Ms. Zula, do you recognize these
24 documents?

Page 708

1  A.     Yes.
2  Q.     And these are two pars for Ms. -- one
3  for Jane Doe 3's and Jane Doe 4's termination in
4  March of 2022, correct?
5  A.     Yes.
6  Q.     So would -- does this refresh your
7  recollection as to whether or not action was taken
8  after that Eckert Seamans initial report was
9  received?
10 A.     So --
11        MS. PIPAK:  I'm going to object to
12 the form.  You can answer, if you can answer.  If
13 you know, you can answer.
14        THE WITNESS:  I believe the report,
15 the initial Eckert Seamans report was received
16 sometime in 2021.  And then, yes, based upon these
17 par reports, this -- a termination action was put
18 through and recommended on March 7th of 2022.
19 BY MS. SMITH:
20 Q.     Okay.
21        And who recommended or requested that
22 these PARS be written?
23 A.     Mr. Bender.
24 Q.     Do you know why?

Page 709

1  A.     I believe based upon the review of
2  investigation, and then --
3  Q.     Your investigation?
4  A.     Yes.
5  Q.     Okay.
6         So, Ms. Zula, you indicated -- I'm going
7  to stop you.
8         You indicated that your investigation
9  was  complete before the Eckert Seamans --
10 A.     Yes.
11 Q.     -- report, correct?
12 A.     Yes.
13 Q.     Okay.
14        And after your report, Jane Doe 3 and
15 Jane Doe 4 were put up for termination, correct?
16 A.     Yes.
17 Q.     Was their first termination before the
18 Eckert Seamans report?
19 A.     Yes.
20 Q.     So at that point, since they had already
21 been put up for termination, Mr. Bender had
22 already reviewed the -- your investigation?
23 A.     Yes.
24 Q.     Okay.

Page 710

1  So the only thing that changed between
2  the   first recommendation for termination and
3  this second one   on March 7, 2022 was the Eckert
4  Seamans report; is that correct?
5          MS. PIPAK:  I'm going to object to
6  the form.  You can answer if you're able.
7          THE WITNESS:  The Eckert Seamans
8  report was received, and then there was also
9  additional information requested from LexisNexis
10 at the request of Mr. Bender and the
11 commissioners.
12 BY MS. SMITH:
13 Q.      What was the additional information that
14 was requested?
15 A.      They requested a full search history of
16 Jane Doe 3's account.
17 Q.      Okay.
18         And did you conduct any review or
19 investigation of that full report?
20 A.      I received the report from LexisNexis
21 and distributed it, as I indicated, to the
22 commissioners, the solicitor's office and Mr.
23 Bender for their review.
24 Q.      And -- but you didn't look into any of

Page 711

1  the individual searches?
2  A.      I -- I reviewed them as well, yes.
3  Q.      Did you compare them to Smart Term like
4  you did the first one?
5  A.      Yes.
6  Q.      Okay.
7          And did you prepare a report?
8  A.      I did not prepare an official report,
9  no.
10 Q.      Did you speak with anyone regarding it?
11 A.      Yes, I did speak with Mr. Bender
12 regarding the information, and I believe we also
13 spoke to the commissioners as well.
14 Q.      All three commissioners?
15 A.      Yes.  There was a meeting that was held.
16 Q.      And what was discussed?
17 A.      During that meeting, after we reviewed
18 the information, it was then decided that we
19 needed to forward this information to legal
20 counsel for further review regarding the searches
21 that were conducted.
22 Q.      Legal counsel being Eckert Seamans, or
23 legal counsel being someone else?
24 A.      Eckert Seamans.

Page 712

1  Q.      And this meeting you were having was
2  post the initial Eckert Seamans report?
3  A.      Yes.
4  Q.      And this was not a commissioner's
5  meeting -- not a public commissioner's meeting,
6  correct?
7  A.      No, it was a meeting with the
8  commissioners regarding this investigation, this
9  issue.
10 Q.      Was it then forwarded to legal counsel?
11         MS. PIPAK:  I'm going to object on
12 basis of attorney/client privilege.
13 BY MS. SMITH:
14 Q.      Well, Commissioner Hess at the public
15 commissioner's meeting called for and independent
16 investigation, did he not?
17 A.      At the meeting in 2021 he requested that
18 an independent person review the investigation,
19 and so that's why LexisNexis was contacted, yes.
20 And then I believe when these pars were put in, he
21 then explained that he wanted a full review and
22 then an investigation conducted by an outside
23 party.
24 Q.      Okay.

Page 713

1  So in 2021 Jane Doe 3 and Jane Doe 4 are
2  put up for termination before any Eckert Seamans
3  report has been done, correct?
4  A.      Yes.
5  Q.      Eckert Seamans then has -- then at
6  commissioner's meeting says I want a third party
7  to conduct a report, correct?
8  A.      I don't recall his exact words, but as a
9  result of what he requested my investigation was
10 reviewed by Eckert Seamans.
11 Q.      Okay.
12         Then there was another LexisNexis --
13 more      thorough, full report by LexisNexis
14 requested and   received by the county, correct?
15 A.      Yes.
16 Q.      Then there's a meeting with you, Mr.
17 Bender and the three commissioners about that full
18 report, correct?
19 A.      Yes.
20 Q.      The LexisNexis report, just so the
21 record is clear.
22 A.      Yes.
23 Q.      Okay.
24         At that meeting there is a suggestion

Page 714

1 that      a -- it needs -- that full LexisNexis
2 report needs to go      to Eckert Seamans
3 correct?
4 A.      Not for the purposes of review regarding
5 their employment.  It was for a review regarding
6 the identity protections of the individuals who
7 were searched.
8 Q.      And then after that meeting of you, Mr.
9 Bender and the commissioners, there is a public
10 commissioner's meeting at which time Commissioner
11 Hess calls for Eckert Seamans to conduct its own
12 independent report?
13 A.      Yes.
14 Q.      Okay.
15      As of your date of separation from the
16 county, that report had not been provided?
17 A.      I'm not aware that that report was ever
18 provided --
19 Q.      Okay.
20      And --
21 A.      -- prior or my separation.
22 Q.      Do you know why defendant -- do you
23 know, did Defendant Bender rely on the Eckert
24 Seamans report to recommend this on March, 2022

Page 715

1 termination of Jane Doe 3 and Jane Doe 4?
2      MS. PIPAK:  I'm going object to the
3 form.  You can answer if you're able, and you're
4 not discussing communications with client -- with
5 counsel.
6      THE WITNESS:  I'm not sure how to
7 answer that then.
8 BY MS. SMITH:
9 Q.      Well, did you, Mr. Bender have a
10 conversation as to why he was putting Jane Doe 3
11 and Jane Doe 4 up for termination?
12 A.      Yes.
13 Q.      Was counsel present?
14 A.      Counsel was part of the conversation,
15 yes, they were.
16 Q.      Did you have any independent
17 conversations with Mr. Bender about it?
18 A.      Only that when I was directed to send
19 the pars through.
20 Q.      And did he tell you as to why you were
21 directed to put the pars through?
22 A.      He just told me put the pars through.
23 So, it's time to put the pars through, so put the
24 pars through.  So that's what I did.

Page 716

1 Q.      Did Mr. Bender tell you he was relying
2 on the Eckert Seamans report for Jane Doe 3 and
3 Jane Doe 4's termination?
4 A.      Not during that conversation, he did not
5 say those words.
6 Q.      At any point did he?
7 A.      I don't recall if that was -- I mean,
8 yes, we discussed the report, but those specific
9 words were not I'm solely relying on this to make
10 that determination for termination.
11 Q.      It was discussed that partially the
12 Eckert Seamans report was being relied on by the
13 county to recognize Jane Doe 3 and Jane Doe 4's
14 termination?
15      MS. PIPAK:  I'm going to -- if you
16 can answer without discussing any communications
17 with counsel, you can answer.
18      THE WITNESS:  Well, I did have
19 discussions with counsel.  We did have discussions
20 with counsel regarding that.
21      MS. PIPAK:  Any communications that
22 you had not involving counsel, you can answer.
23      THE WITNESS:  I think I addressed
24 that already, that we did -- you know, I was told

Page 717

1 put the pars through based upon the information
2 that we had.
3 BY MS. SMITH:
4 Q.      Including the Eckert Seamans report?
5 A.      Yes.  That was some of the information
6 that we had, yes.
7 Q.      Okay.
8      Ms. Zula, were you involved in the
9 referral of the -- of Jane Doe 3 and Jane Doe 4 to
10 law enforcement for purposes of criminal charges?
11 A.      I was not directly involved that, no.
12 Q.      You didn't call or refer them?
13 A.      No.  I was made aware.  That was part of
14 some of the discussions that were had at the
15 commissioner's meet -- with the meting with
16 commissioners, but I did not prepare a letter.  I
17 did not make that referral.
18 Q.      Who -- at the commissioner's meeting
19 when conversations happened, who started the
20 conversation about it?
21 A.      I don't recall.
22 Q.      Did anyone say that it should happen,
23 that you recall?
24 A.      Anyone say they -- what?

Page 718

1  Q.      That the referral should occur?
2  A.      I know there was discussion about that.
3  I don't recall who started that discussion or how
4  the discussion ended.
5  Q.      Did Defendant Bender participate in
6  that?
7  A.      Yes.
8  Q.      Did he support the referral?
9  A.      I believe so.
10 Q.      Did Defendant Halcovage participate in
11 that?
12 A.      I believe he was part of -- yes, he was
13 part of the meeting.
14 Q.      Did he support the referral of Jane Doe
15 3 and Jane Doe 4 to --
16 A.      I don't recall --
17 Q.      -- to law enforcement?
18 A.      Sorry.
19      I don't recall if he had any comments.
20 I  don't recall.
21 Q.      Did Commissioner Hetherington support
22 their referral?
23 A.      I believe he did.  I believe he is
24 actually the one who did prepare and sign the

Page 719

1  letter that was submitted.
2  Q.      Did Commissioner Hess?
3  A.      I don't recall.
4  Q.      Okay.
5      Do you know what criminal charge anyone
6  believed that Jane Doe 3 and Jane Doe 4 committed?
7      MS. PIPAK:  I'm going to object to
8  the form.  You can answer.
9      THE WITNESS:  I believe there was
10 some documen -- or some information that Mr.
11 Bender had shared with myself, and may I believe
12 Mr. Roth about some federal laws related to access
13 to information.  I don't know the specifics and I
14 don't recall the specifics.
15 BY MS. SMITH:
16 Q.      How did he share that -- Mr. Bender
17 share that information with you?
18 A.      I believe he -- I believe it may have
19 been via e-mail.  I believe.  I'm not certain.  Or
20 for a hard copy of information.
21 Q.      Okay.
22      Do you know if it was like a
23 theft-related charge?
24 A.      I don't recall.

Page 720

1  Q.      Would theft-related charges against an
2  employee who worked in an office with access to
3  information be an issue?
4      MS. PIPAK:  I'm going to object to
5  the form.  I'm not sure I understood that
6  question.
7      THE WITNESS:  Yeah, I don't --
8  BY MS. SMITH:
9  Q.      If an employee had a theft-related
10 criminal charge, would that be an issue?  Let's
11 just start with that.  Would that generally be an
12 issue?
13 A.      It depends on the situation, the person,
14 the position, the charge.  It would be
15 circumstantial.  We would have to review all of
16 that information.
17 Q.      If someone was convicted of theft, would
18 that be an issue?
19 A.      Depending on the position, yes.
20 Q.      If it was a position in the tax
21 assessment -- I'm sorry.  Yes, tax assessment
22 office?
23      MS. PIPAK:  I'm going to object to
24 the form.  You can answer if you're able.

Page 721

1      THE WITNESS:  I don't know.  They
2  don't necessarily deal with money.  So I'm not
3  certain if that would be a concern.
4  BY MS. SMITH:
5  Q.      What about the tax claim office?
6      MS. PIPAK:  Same objection.
7      THE WITNESS:  Same response.  I
8  don't know if that would certainly be an issue,
9  given that they don't have any access to funds.  I
10 don't think that would be -- potentially not
11 something that we would be -- concerned about.
12 BY MS. SMITH:
13 Q.      Do Tax Claim Bureau employees have
14 access to non-public information?
15 A.      I guess it depends on the employee and
16 what they have access to.  Yes, Jane Doe 3 and
17 Jane Doe 4 did have access to non-public
18 information through their access of LexisNexis.
19 Q.      Do you any who Judith Evangelista is?
20 A.      Yes.
21 Q.      Did you -- were you involved in the
22 hiring of Ms. Judith Evanglista in January of
23 2022?
24 A.      Yes.

Page 722

1  Q.      She was hired in the tax claims office,
2  correct?
3  A.      Yes.
4  Q.      What position was she hired for?
5  A.      Clerk typist one.
6  Q.      When you hired Ms. Evangelista, did you
7  learn that she had been charged with theft, a
8  misdemeanor of the second degree?
9  A.      I don't believe I was aware of that.
10  Q.      Did you do a background on her?
11  A.      We did do -- we would have done -- well,
12  the administrative assistant in my office would
13  have done a search of the docket sheets.
14  Q.      You were still employed by the county on
15  February 18th, 2022, correct?
16  A.      Yes.
17  Q.      Are you aware that Ms. Evangelista pled
18  guilty, was sentenced to 12-months probation for
19  theft and misdemeanor of the second degree?
20  A.      No, I was not aware of that.
21  Q.      Would that be an issue that would -- if
22  Ms. Evangelista did not notify the county that she
23  had pled guilty to a theft charge, would that be
24  an issue?

Page 723

1         MS. PIPAK: I'm going to object to
2  the form.  You can answer if you're able.
3         THE WITNESS:  Not necessarily.  I
4  don't think we had a requirement of people to
5  notify when they -- if they were involved in any
6  criminal charges.  I don't think that there is any
7  policy that said that that was the requirement.
8  BY MS. SMITH:
9  Q.      So if you were still the HR director and
10  you learned that she had been charged with and
11  convicted of a theft while employed, you would
12  take no disciplinary action against her?
13         MS. PIPAK:  Objection to the form.
14  You can answer.
15         THE WITNESS:  I'm not certain.  I
16  would need to have more details regarding the
17  situation.  I'm not familiar with her situation at
18  all.
19  BY MS. SMITH:
20  Q.      What about the situation would you need
21  to know?
22  A.      What the circumstances were.  If --
23  pretty much what the circumstances were and what
24  occurred.

Page 724

1  Q.      Regarding the theft?
2  A.      Yes.
3  Q.      What would it matter if she pled guilty
4  to theft?
5         MS. PIPAK:  Object to the form.
6         THE WITNESS:  I don't know what the
7  situation is.  I would have to make a
8  determination based upon that information as to
9  whether or not there would be any impact on her
10  employment.  As a clerk typist one she's not
11  dealing with any money, any funds, anything like
12  that.  So I don't know if it would have any
13  impact, and I was not made aware of those charges.
14  BY MS. SMITH:
15  Q.      Okay.
16         Ms. Zula, at some point during your
17  employment, I think you talked at this briefly
18  earlier,  there was an independent investigation
19  conducted by     human resources, correct?
20  A.      Yes.
21  Q.      That was in May of 2021, correct?
22  A.      Yes.
23  Q.      Human resources is Ms. Kutzler's
24  employer, correct?

Page 725

1  A.      Yes.
2  Q.      And at the time that human resources was
3  the third-party investigator, Ms. Kutzler was
4  already named as a respondent in the EEOC charge,
5  correct?
6  A.      I don't know.  I'm not certain.  I don't
7  know.
8  Q.      Well, do you recall Jane Doe 3 and Jane
9  Doe 4 objecting to human resources being the
10  independent investigator as they were the employer
11  of someone they named in a lawsuit --
12         MS. PIPAK:  Object --
13  BY MS. SMITH:
14  Q.      -- or an EEOC charge?
15         MS. PIPAK:  Object to the form.
16  You can answer.
17         THE WITNESS:  I'm not certain if
18  they did.  They may have.  I don't know.
19  BY MS. SMITH:
20  Q.      And, in fact, human resources conducted
21  an investigation, correct?
22  A.      Yes.
23  Q.      And they issued a report, correct?
24  A.      Yes.

Page 726

1  Q.      And in that report it was suggested that
2  Jane Doe 3 and Jane Doe 4's written write-ups be
3  converted to verbal warnings.
4         Do you recall that?
5  A.      Yes, it was a suggestion.
6  Q.      And it was -- the suggestion was not
7  followed, correct?
8  A.      Correct.
9  Q.      Who made the decision not to follow
10 that?
11 A.      Mr. Bender indicated that the
12 disciplinary action that was issued would stand as
13 a written reprimand.
14 Q.      What was Mr. Bender's reason?
15 A.      I didn't ask.
16        MS. SMITH:  Let's take a quick
17 break.  I'm probably going to pass you over to the
18 DOJ.  So let's just go off the record for a
19 minute.
20        VIDEOGRAPHER:  The time is now
21 4:36 p.m. and we're going off the record.
22        - - -
23        (Whereupon, brief recess was help off
24 telephone record.)

Page 727

1         - - -
2         VIDEOGRAPHER:  The time is now
3  4:46 p.m. and we're back on the record.
4         - - -
5         Examination
6         - - -
7  BY MS. FOX:
8  Q.      Hi, Ms. Zula.  My name is Amber Fox.
9  I'm with the Department of Justice.  We've met
10 before, yesterday.  And I just wanted to go over a
11 couple of things.  I know Ms. Smith has covered a
12 lot of ground, so I'll just be doing kind of a
13 little bit of jumping around.  But first I just
14 want to remind you you're under oath and do you
15 understand what it means to be under oath?
16 A.      Yes.
17 Q.      Okay.
18        You understand it's the same oath you
19 would    take in a courtroom?
20 A.      Yes.
21 Q.      And you understand you cannot lie when
22 you're under oath?
23 A.      Yes.
24 Q.      So earlier, just a few minutes ago, you

Page 728

1  were talking with Ms. Smith about the Eckert
2  Seamans report.
3  A.      Yes.
4  Q.      And did you see the Eckert Seamans
5  report?
6  A.      Yes, I believe I did see it.  I don't
7  know if I got -- I don't believe I got -- I'm not
8  sure if I got a copy of it, but I did -- I did
9  review it.
10 Q.      Okay.
11        You reviewed it.  And what did it say?
12        MS. PIPAK:  I'm going to object on
13 the basis of attorney/client privilege.
14        MS. FOX:  Okay.  Ms. Zula, can you
15 leave the room for a moment?
16        THE WITNESS:  Sure.
17        MS. FOX:  We're going to go off the
18 record.
19        VIDEOGRAPHER:  All right.  The time
20 is now 4:47 p.m. and we're going off the video
21 record.
22        MS. FOX:  Okay.  So, are you
23 planning to put the Eckert Seamans report into
24 evidence?

Page 729

1         MS. PIPAK:  As of now I'm saying
2  no.  I just don't want to waive any position.
3         MS. FOX:  But you don't know for
4  sure?
5         MS. PIPAK:  I don't know.  I don't
6  know.
7         MS. FOX:  Okay.  So our position is
8  that we are entitled to those reports, to the
9  conversations around those reports, and I
10 understand that you take the opposite position; is
11 that right?
12        MS. PIPAK:  Yes.
13        MS. FOX:  Okay.
14        So I think then that we need to
15 brief this with the court because obviously our
16 positions are different and we do believe that
17 we're entitled to this, the Eckert Seamans
18 investigation, Eckert Seamans report, the
19 LexisNexis investigation, et cetera.
20        MS. PIPAK:  I understand your
21 position as well.
22        MS. FOX:  Sure.
23        MS. PIPAK:  So, okay.  And I think
24 I don't want to waive attorney/client privilege

Page 730

here today.  I don't think anything we've done so far has waived attorney/client privilege on this issue.

MS. FOX:  I think we disagree, but sure.

MS. PIPAK:  I think the record has been clear that we have not waived attorney/client privilege on anything Ms. Zula has testified to here today.

MS. FOX:  Okay.  We disagree.  I mean --

MS. PIPAK:  How do you think that that's been waived?

MR. TOWNSEND:  With the Eckert Seamans report?

Go ahead, Amber.

MS. FOX:  No, I think that with the Eckert Seamans report it's -- she has said that they relied on it in making decisions, and so we think that that's been -- that's been put at issue.

MS. PIPAK:  I don't think she testified that she relied on it.  I think she testified that other witnesses may have seen it.

Page 731

MS. FOX:  Relied on it, too.

MS. PIPAK:  And that I think that you can ask other witnesses about that.  But as of today I'm not going to let her answer --

MS. FOX:  That's okay.  I understand your position.

MS. PIPAK:  And if you think that if it becomes an issue that additional discovery is needed on the issue, we can revisit that.

MS. FOX:  Sure.  Okay.

I just want to also note for the record   that we take the same position as to Ms. Zula has testified numerous times, especially yesterday, that she consulted with Mr. Heinbach regarding the work from home request and a few different other things.  So we do take the position that those instances where she reference discussions with counsel, that we're entitled to know what those conversations were.

MS. PIPAK:  I think the difference in what I'm saying is I don't think that she has at any point said what those conversations were.  So a waiver in that sense where she gave up something, I think your position is if she's going

Page 732

to -- if the position of the case is going to be she relied on attorneys in making her decision, that you would be entitled to that.  But not in the waiver as in the cat is out of the bag.

MS. FOX:  I'm not necessarily -- I think --

MS. PIPAK:  Are we correct on that?

MS. FOX:  We're talking over each other.  But I just think, for the record, that we wanted to make clear that we think because she has testified to that, she has opened the door to those conversations.  Unless all defense counsel stipulate that will not be introduced into evidence.

MS. PIPAK:  I don't think we're going to stipulate to that today, and I don't think --

MS. FOX:  Understood.

MS. PIPAK:  -- defense counsel is going to.

MS. FOX:  Understood.

MS. PIPAK:  And the reason that I let her answer those questions was because of Catherine's position that a meeting or a

Page 733

conversation with counsel is not privileged.  It's what was --

MS. FOX:  I understand what you're saying.

MS. PIPAK:  -- the -- what was discussed during those conversations.

MS. SMITH:  Right.  But I think that Amber's point is that Ms. Zula yesterday testified that meetings were held with counsel, and after those meetings action was taken.  So if the action that was taken was done so in reliance at all on the meetings with counsel, this is how I think of it the easiest way.  Since we're lawyers we don't think about lawyer things, but we think about regular things.  If I file my taxes based off an accountant telling me what to do and get audited, I can go after my accountant.  If Ms. Zula is going to say she took her actions simply because of that meeting with Mr. Heinbach, and throw Mr. Heinbach under the bus essentially, we get to know what those conversations were to know if, in fact, it wasn't Mr. Heinbach's suggestion, or if it was not his suggestion.  So if Ms. Zula is going to rely on -- and as she has testified,

Page 734

there were meetings and an action. If Ms. Zula or any of the defendants are going to rely on the advice of counsel for -- to support the basis for their decision, then we're entitled to those -- to the information that was communicated.

MS. PIPAK: And I don't -- and if this is the difference, I don't think that what -- I think that she testified to there was a meeting and all the actions she took, and I'm not necessarily sure that the record reflects she relied on counsel. I'm pretty sure she stuck to her -- the reason for her decision and set forth the facts for the reasons that she made the decision, absent any communications with counsel. And so I do think --

MS. IPPOLITO: Here's the question, right? I don't think -- I don't think we're going to have a meeting of minds today.

MS. FOX: That's my point.

MS. IPPOLITO: Are you trying to reserve the remainder of your time for Ms. Zula until after the completion of your briefing.

MS. FOX: Our whole point was that we're in disagreement. We just want that on the

Page 735

record. We want it clear to the extent it can be, and hads been clarified, and will now be briefed.

MR. GEIGER: Well, would it make sense then to delay the rest of your questioning until the judge decides the issue? Because we're going to bring her back anyway when we have our turn.

MS. IPPOLITO: Yeah, we have about an hour and 20 minutes.

MS. FOX: I don't think I need to delay the rest of my questioning. I can proceed on several other grounds, and we're going to have some time remaining.

MR. GEIGER: Okay.

Because if you take up all your time and then the judge says, well, you could have asked about this information, then you're getting over the 14 hours.

MS. PIPAK: And we would -- we would not agree that she'd be entitled to more hours absent a ruling from the judge on that issue.

MR. TOWNSEND: I want to add one more point to the privilege thing and then we

Page 736

should probably take a break.

MS. FOX: Yeah.

MR. TOWNSEND: The other thing about if we -- I mean we take the position also that if you're going to enter into evidence just the mere fact that Ms. Zula spoke to counsel and made a decision after speaking to counsel, if you're going to introduce that evidence, it implies that the lawyer blessed the decision, you know so to speak, and we would then argue that we're entitled to find out what -- that opens the door basically to us finding out what the -- what the lawyer said. So that's -- that's part of our position, too. So it's not so we think if you are not prepared to stipulate that you are not going to introduce that evidence, we believe we'd be -- we're entitled to question her about that. So I just wanted to put that on the record, too. But let's -- I think we should take a break and talk about this --

MS. PIPAK: I agree. I understand that that's --

MS. FOX: Suggestion for time.

MS. PIPAK: I understand that

Page 737

that's where you're coming from.

MR. TOWNSEND: Okay.

MS. SMITH: At this point this is discovery depositions. We're just going to come into trial what we're going to offer.

MR. TOWNSEND: Right. Okay.

MS. FOX: We just don't want to lose the chance to ask about it if the judge says we can.

- - -

(Whereupon, brief recess was held off the record.)

- - -

VIDEOGRAPHER: The time is now 5:01 p.m. and we're back of record.

MS. FOX: Okay.

In light of conversation with counsel, we have decided that we will reserve the rest of our time to proceed with the deposition on a later date after we  have briefed the issue, or we have further information about whether we can question the witness on privilege, and we will obviously coordinate that date with opposing counsel, because as we understand counsel also

Page 738

1  wants to question Ms. Zula.

2          MR. GEIGER:  Would you do your

3  portion by Zoom or back in person?

4          MS. FOX:  I'm not sure.  I think we

5  could probably do it by Zoom, but we'll just

6  figure it out at that time.  It may also depend on

7  what kind of ruling we get and what we want to do

8  with that.

9          MR. GEIGER:  Okay.

10          Can we agree on how much time we

11  have left?

12          VIDEOGRAPHER:  One hour and 24

13  minutes.

14          MS. PIPAK:  I think if we look at

15  the case management order, there is a way to bring

16  an issue before the court on the discovery --

17          MS. SMITH:  We can go off the

18  record.

19          MS. FOX:  No further questions.

20          VIDEOGRAPHER:  Going off the record

21  at 5:02 p.m.

22                  - - -

23          (Whereupon, deposition concluded at

24  5:02 p.m.)

1                    C E R T I F I C A T I O N

2

3

4            I, COLEEN TRIFUN, RPR and Notary Public,

5     do hereby certify that the foregoing is a true and

6     accurate transcript of the stenographic notes taken

7     by me in the aforementioned matter.

8

9                              - - -

10

11

12

13

14

15

16

17

18

19

20

21     DATE:August 31, 2023 _____

22                              COLEEN TRIFUN, RPR

23

24