**DEREK SMITH LAW GROUP, PLLC**
CATHERINE W. LOWRY, ESQUIRE
Attorney ID #: 316291
1835 Market Street, Suite 2950
Philadelphia, PA 19103
Phone: (267) 857-0832
catherine@dereksmithlaw.com
*Attorneys for Plaintiffs*

## IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| JANE DOE, et. al., | |
| Plaintiffs, | |
| v. | Civil Action No. 3:21-CV-00477 |
| SCHUYLKILL COUNTY, et. al., | |
| Defendants. | |

## PLAINTIFFS' STATEMENT OF UNDISPUTED MATERIAL FACTS IN SUPPORT OF PLAINTIFFS' BRIEF IN OPPOSITION TO DEFENDANT BENDER'S MOTION FOR SUMMARY JUDGEMENT

I.    **PRE-MAY 2020**

a.   **GENERAL**

1.   Since 2008, Defendant Schuylkill County (hereinafter "Defendant SC") has utilized a Personal Action Request form (hereinafter "a PAR") as the official document for hiring, firing, promoting, and transferring employees, when employees resign, and for changes in employees pay.[1]

---

[1] See Deborah Twigg's September 30, 2022, Deposition at p. 25:1-26:13, a true and correct copy of which is attached hereto as Exhibit P1 (hereinafter "Ex. P1").

2. Anyone who is a supervisor, including Defendant SC's Administrator and Human Resources (hereinafter "HR"), can complete a PAR.[2]

3. Once a PAR is completed, it goes to HR for approval and then it is placed on the Commissioners meeting agenda. [3]

4. For a PAR to be placed on the agenda, it also requires the approval of the Administrator for Defendant SC and the Commissioner Chair. [4]

5. On September 14, 2005, Defendant SC implemented a Conduct and Disciplinary Action Policy. [5]

6. On September 14, 2005, Defendant SC's then Commissioners signed approving the implementation of the revised Defendant SC's Sexual Harassment Policy (Policy 2005-18). [6]

7. In March 2007, Defendant SC revised its Physical and Verbal Abuse Policy (Policy # 2007-02). [7]

8. On September 25, 2013, Defendant SC's then Commissioners, including Defendant George Halcovage (hereinafter "Defendant Halcovage"), signed approving the implementation of the revised Defendant SC's Sexual Harassment Policy (Policy 2005-18).[8]

---

[2] Id.

[3] Id. at p. 31:10-33:22 and 35:13-22.

[4] Id. at p. 35:13-36:4.

[5] See SCDOJRFP 000010-000015, a true and correct copy of which are attached hereto as Exhibit P2.

[6] See SC 1260-1265, a true and correct copy of which are attached hereto as Exhibit P3.

See Also, Defendant SC's 30(b)(6) Designee's March 30, 2023, Deposition at p. 52:8-53:17, a true and correct copy of which is attached hereto as Exhibit p4 (hereinafter "Ex. P4").

[7] See SCDOJRFP 000007-000009, a true and correct copy of which are attached hereto as Exhibit P5.

[8] See SC 1254-1259, a true and correct copy of which are attached hereto as Exhibit P6 (hereinafter "Ex. P6").

See Also, Ex. P4 at p. 53:23-55:14.

**9.** From at least May of 2012, until March 30, 2023, Defendant SC maintained an organizational chart. [9]

### b. DEFENDANT GARY BENDER (HEREINAFTER "DEFENDANT BENDER")

**10.** Defendant Bender's employment with Defendant SC began on March 1, 2006. [10]

**11.** On March 6, 2006: Defendant Bender signed acknowledging he had "received a copy of [Defendant SC's] 'Physical and Verbal Abuse Policy,'" and he had "reviewed and or received a copy of [Defendant SC's] 'Sexual Harassment Policy.'" [11]

**12.** On June 6, 2008, Defendant Bender submitted an incident report to Defendant SC's HR office, in which he reported negative comments, made by Defendant SC's then controller, about his recent promotion and raise, and the employee accusing him, Defendant Bender, of lying about a Defendant SC employee. [12]

**13.** Defendant Bender also reported that he felt "used" by the employee who he was reporting, "in her ongoing feud with other people in the Courthouse," "that [he] was now being dragged in to the whirlwind," that he felt

---

[9] See Zula RFP-002473, a true and correct copy of which is attached hereto as Exhibit P7.

See Also, Ex. P4 at p. 44:16-45:24.

See Also, Defendant Heidi Zula's (hereinafter "Defendant Zula") October 19, 2022, Deposition at p. 45:21-46:24, a true and correct copy of which is attached hereto as Exhibit P8 (hereinafter "P8").

[10] See Gary Bender's Personnel File Documents at p. 1, a true and correct copy of which is attached hereto as Exhibit P9 (hereinafter "Ex. P9").

See Also, Defendant Bender's November 16, 2022, Deposition at p. 13:8-10, a true and correct copy of which is attached hereto as Exhibit P10 (hereinafter "Ex. P10").

[11] See Ex. P9 at p. 2-3.

See Also, Ex. P10 at p. 18:18-20:22.

[12] See Ex. P9 at p. 4.

"humiliated in that he was forced to defend [his] actions," that he "considered her actions to boarder on verbal abuse" and that it was "insulting that a member of management [] at the Courthouse [did] not have the right to ask for assistance of other [Defendant SC] employees…"[13]

**14.** On October 9, 2013, Defendant Bender signed acknowledging that he "attended [Defendant SC's] Sexual Harassment Training" in Defendant SC's Board Room and that he received and read [Defendant SC's] Sexual Harassment Policy as revised September 2013.[14]

**15.** No Sexual Harassment Policy acknowledgement forms signed by Defendant Bender were produced for the period between October 27, 2006, and October 9, 2013, and Defendant Bender could not specifically recall attending any Sexual Harassment training between October 2006 and October 2013 and testified if he had attended such training, "there would have been a form signed for that…"[15]

**16.** On May 14, 2015, Defendant Bender signed acknowledging that he "reviewed and or received a copy of Defendant SC's 'Sexual Harassment Policy.'" [16]

**17.** On June 8, 2016, Defendant Bender was promoted to Interim Defendant SC Administrator/Director of Economic Development. [17]

**18.** On September 14, 2016, Defendant Bender was promoted from Interim Defendant SC Administrator/Director of Economic Development to County Administrator. [18]

---

[13] Id.

[14] See Ex. P9 at p. 5.

See Also, Ex. P10 at p. 26:24-27:18.

[15] See Ex. P10 at p. 26:24-29:22.

[16] See Ex. P9 at p. 6.

[17] See Ex. P9 at p. 7.

[18] See Ex. P9 at p. 8.

**19.** On August 28, 2019, Defendant Bender signed acknowledging that he had "reviewed and underst[ood] [Defendant SC's] Sexual Harassment Policy" and that he "agreed to abide by the Policy."[19]

**20.** No Sexual Harassment Policy acknowledgement forms signed by Defendant Bender were produced for the period between May 14, 2015, and August 28, 2019, and Defendant Bender testified if he had attended such training, "there would have been a form signed for that…"[20]

**21.** Prior to May 2020, Defendant Glenn Roth (hereinafter "Defendant Roth") discussed with Defendant Bender the fact that Defendant Halcovage needed to be careful with what he says.[21]

**22.** Prior to May of 2020, Defendant Roth talked to Defendant Bender about Defendant Halcovage's behavior and Defendant Bender indicated he had spoken with Defendant Halcovage.[22]

**23.** On two or three occasions, prior to 2018, Defendant Bender observed Doe alone in Defendant Halcovage's office with the door shut, something Defendant Bender thought was inappropriate, and which made another employee concerned and uncomfortable.[23]

**24.** Defendant Bender could not recall if he discussed this with Defendant SC's then HR Director.[24]

**25.** Defendant Bender did not discuss his observations, Doe being alone in Defendant Halcovage's office, with Doe.[25]

---

[19] See Ex. P9 at p. 9.
[20] See Ex. P10 at p. 26:24-29:22.
[21] See Defendant Glenn Roth's (hereinafter "Defendant Roth") September 28, 2022, Deposition at p. 194:14-22, a true and correct copy of which is attached hereto as Exhibit P11 (hereinafter "Ex. P11").
[22] Id.
See Also, Defendant Roth's September 29, 2022, Deposition at p. 434:17-435:7, a true and correct copy of which is attached hereto as Exhibit P12 (hereinafter "Ex. P12").
[23] See Ex. P10 at p. 71:22-79:10.
[24] Id.
[25] See Ex. P10 at p. 81:12-82:6.

**26.** A Defendant SC employee informed Defendant Bender that Defendant Halcovage had texted her at roughly 2:00 AM, something that made her uncomfortable, and Defendant Bender felt was inappropriate, but that the employee did not report it sooner because she was worried that Defendant Halcovage would fire her. [26]

**27.** The text message Defendant Halcovage sent this female employee was asking why the employee was not having a deck party at her home that night. [27]

**28.** Defendant Bender spoke with Defendant Halcovage about his behavior but there were no documented warnings of any type and Defendant Halcovage was not asked to submit to any additional training. [28]

**29.** On another occasion, Defendant Halcovage came into Defendant Bender's office and told Defendant Bender and Doe 3 that he, Defendant Halcovage, and someone else were dating. [29]

**30.** When Defendant Halcovage left Defendant Bender's office, Defendant Bender said to Doe 3 "[y]ou know, someday he's going to say that in front of the wrong person" and Doe 3 agreed. [30]

**31.** Defendant Bender said this to Doe 3 because he thought Defendant Halcovage's comment was inappropriate, but he did not, at that time, tell Defendant Halcovage that or that he, Defendant Halcovage, should be careful with what he says or to whom he says things to. [31]

**32.** Defendant Bender spoke to the HR Director about this incident but did not follow up with her to determine if she had spoken with Defendant Halcovage. [32]

---

[26] See Ex. P10 at p. 93:11-100:19.

[27] Id.

[28] Id.

[29] Id. at p. 175:11-182:7.

[30] Id.

[31] Id.

[32] Id.

**33.** Defendant Bender observed Defendant Halcovage make an inappropriate comment, in front of two female employees, insinuating someone perform a rectal exam on him, which Defendant Bender thought was inappropriate. [33]

**34.** Defendant Bender discussed this incident with the HR Director, but he never followed up with her to determine if she had spoken with Defendant Halcovage about it. [34]

**35.** Defendant Bender observed Defendant Halcovage engage in other inappropriate and unlawful behavior in 2015 when he observed Defendant Halcovage ask a female Defendant SC employee to obtain election petition signatures for him. [35]

**36.** During this incident, Defendant Halcovage would not take the female employees' "no" for an answer, which made the employees uncomfortable. [36]

**37.** Despite believing Defendant Halcovage's request was illegal, Defendant Bender did not report this to election officials or any law enforcement. [37]

**38.** Prior to May of 2020 Defendant Bender did not discuss any of Defendant Halcovage's comments or conduct that he was aware of with the other Defendant SC Commissioners. [38]

### c. PLAINTIFF DOE 4 (HEREINAFTER "DOE 4")

**39.** Doe 4's employment with Defendant SC began on March 31, 2008. [39]

---

[33] Id. 212:9-214:22.

[34] Id.

[35] Id. at p. 217:21-222:22.

[36] Id.

[37] Id.

[38] Id. at p. 217:3-20.

[39] See Doe 4's Defendant SC Personnel File Documents at p. 1, a true and correct copy of which are attached hereto as Exhibit P13 (hereinafter "P13").
See Also, Doe 4's January 12, 2023, Deposition at p. 12:20-25, a true and correct copy of which is attached hereto as Exhibit P14 (hereinafter "P14").

**40.** Doe 4 was hired as a Clerk Typist I in Defendant SC's Tax Claim Bureau office (hereinafter "Tax Claim"). [40]

**41.** Doe 4 was promoted to Assistant Director of Defendant SC's Tax Claim office, an exempt position, on May 25, 2016. [41]

**42.** Defendant SC had a "Job Classification" description for the position of Tax Claim Bureau Assistant Director at all times Doe 4 held that position. [42]

**43.** Between at least July 2012 and May 25, 2016, Doe 4 was regarded as a hardworking and talented employee, the best resource in the Tax Claim office, and deserving of her promotion to the position of Tax Claim Assistant Director.[43]

**44.** On May 13, 2019, Defendant Bender completed a PAR for Doe 4's promotion to the position of Interim Assistant Director of Tax Assessment/Tax Claim, an exempt position, which was effective on May 16, 2019. [44]

**45.** Defendant SC's Commissioners did not approve the PAR until after its effective date. [45]

**46.** Between May 25, 2016, and May 13, 2019, there were no issues with Doe 4's employment performance, she exerted the utmost professionalism and dedication, and knowledge required for the positions, and Defendant SC employees thought her promotion was a good decision. [46]

---

[40] See Ex. P13 at p. 1.
See Also, Ex. P14 at p. 12:20-25.
[41] See Ex. P13 at p. 2.
[42] See SC 1215-1216, a true and correct copy of which are attached hereto as Exhibit P15.
See Also, Ex. P4 at p. 113:4-114:2.
[43] See Ex. P11 at p. 96:7-25.
[44] See Ex. P13 at p. 3.
[45] Id.
[46] See Ex. P11 at p. 100:6-13.

**47.** On June 10, 2019, as there were no issues with Doe 4's work performance in her role as Interim Assistant Director of Tax Assessment/Tax Claim, Doe 4's interim status ended and she was promoted to Assistant Director Tax Assessment/Tax Claim, an exempt position. [47]

**48.** Defendant SC's Commissioners did not approve the PAR until after its effective date. [48]

**49.** Defendant SC had a "Job Classification" description for the position of Assistant Director – Tax Claim/Tax Assessment at all times Doe 4 held that position. [49]

### b.  PLAINTIFF DOE 3 (HEREINAFTER "DOE 3")

**50.** Doe 3's employment with Defendant SC began on April 18, 2011. [50]

**51.** Doe 3 was promoted to Tax Claim Director on November 14, 2011. [51]

---

See Also, Declaration of Deb Detweiler at ¶ 45-51, a true and correct copy of which is attached hereto as Exhibit P16 (hereinafter "Ex. P16").

See Also, Declaration of Dianne Ruscavage at ¶ 18, a true and correct copy of which is attached hereto as Exhibit P17 (hereinafter "Ex. P17").

See Also, Declaration of Tiffany Taylor at ¶ 31-38, a true and correct copy of which is attached hereto as Exhibit P18 (hereinafter "Ex. P18").

[47] See Ex. P13 at p. 4.

See Also, Ex. P11 at p. 100:6-21.

See Also, Ex. P16 at ¶ 45-51.

See Also, Ex. P17 at ¶ 18.

See Also, Ex. P18 at ¶ 31-38.

[48] See Ex. P13 at p. 4.

[49] See SC 1217-1218, a true and correct copy of which are attached hereto as Exhibit P19.

See Also, Ex. P4 at p. 114:7-115:12.

[50] See Doe 3's Defendant SC Personnel File Documents at p. 1, a true and correct copy of which is attached hereto as Exhibit P20 (hereinafter "Ex. P20").

See Also, Doe 3's January 9, 2023, Deposition at p. at p. 8:23-9:5, a true and correct copy of which is attached hereto as Exhibit P21 (hereinafter "Ex. P21").

[51] See Ex. P20 at p. 2.

See Also, Ex. P21 at p. 9:6-13.

52. Defendant SC maintained a "Job Classification" description for the position of Tax Claim Director at all times Doe 3 held that position. [52]

53. Defendant Roth on numerous occasions told Doe 3 that Defendant Bender did not like her and said "Don't make the county administration angry because you'll pay for it." [53]

54. Between July 2, 2012, and 2015, Doe 3 was regarded as an excellent employee, a hard worker, and dedicated to Defendant SC. [54]

55. On May 13, 2019, Defendant Bender completed a PAR for Doe 3's promotion to the position of Interim Chief Assessor/Tax Claim Director, and exempt position, which was effective on May 16, 2019. [55]

56. Defendant SC's Commissioners did not approve the PAR until after its effective date. [56]

57. Doe 3 was required to obtain her CPE license before taking on the additional role of Chief Assessor. [57]

58. Kent Hatter who replaced Doe 3 as Defendant SC's Chief Assessor did not have his CPE license when he was hired. [58]

---

[52] See SC 419-420, a true and correct copy of which are attached hereto as Exhibit P22.

See Also, SC 1221-1222, a true and correct copy of which are attached hereto as Exhibit P23.

See Also, Ex. P4 at p. 117:4-119:13.

[53] See Ex. P21 at p. 12:19-13:23.

[54] See Ex. P21 at p. 66:19-67:23.

[55] See Ex. P20 at p. 3.

[56] See Ex. P20 at p. 3.

[57] See Ex. P21 at p. 78:19-79:20.

[58] See Ex. P21 at p. 80:17-19.

See Also, SC 633, 631, and 634, a true and correct copy of which are attached hereto as Exhibit P24.

**59.** By statute, every Pennsylvania County is required to have a Chief Assessor and that Chief Assessor must hold a valid CPE license. [59]

**60.** Defendant SC's "Job Classification" description for the position of Chief Assessor also requires the person who holds that title to have a CPE license. [60]

**61.** On June 18, 2019, Defendant Bender completed a PAR for Doe 3's promotion to the position of Chief Assessor/Tax Claim Director, an exempt position, which was effective on July 8, 2019. [61]

**62.** Defendant SC had a "Job Classification" description for the position of Chief Assessor/Director of Tax Claim at all times Doe 3 held that position. [62]

**63.** Between 2015 and May of 2019, Doe 3 was regarded as a good, hard working, and dedicated employee to the point that Defendant Roth thought of her as "one of the most, if not the most, talented department head at Defendant SC. [63]

**64.** Prior to May of 2020, Doe 3 was not subject to any discipline by Defendant SC. [64]

**65.**

---

[59] See Title 53 P.S. Chapter 88 § 8831.

See Also, Defendant Halcovage's November 3, 2022, Deposition at p. 659:15-21, a true and correct copy of which is attached hereto as Exhibit P24 (hereinafter "Ex. P24").

[60] See SC 619-620, a true and correct copy of which is attached hereto as Exhibit P25 (hereinafter "Ex. P25").

[61] See Ex P20 at p. 4.

[62] See SC 1223-1224, a true and correct copy of which are attached hereto as Exhibit P26.

See Also, Ex. P4 at p. 120:8-121:6.

[63] See Ex. P11 at p. 83:1-84:2 and 86:1-24.

See Also, Ex. P16 at ¶ 45-51.

See Also, Ex. P17 at ¶ 17.

See Also, Ex. P18 at ¶ 31-38.

[64] See Ex. P11 at p. 92:10-93:20 and 146:23-147:12.

See Also, Doe 3's Declaration at ¶ 1, a true and correct copy of which is attached hereto as Exhibit 27 (hereinafter "Ex. P27").

66. Prior to May of 2020, Doe 3 enhanced the success of the Tax Claim Bureau by making the office a better and more efficient office and recouping Defendant SC funds through various tax sales, including a judicial sale which prior to Doe 3's supervision Tax Claim had not held for approximately 10 years. [65]

67. At all times Doe 3 was Doe 4's supervisor, Dor 4 never engaged in any conduct that warranted discipline. [66]

### d. DEFENDANT GEORGE HALCOVAGE (HEREINAFTER "DEFENDANT HALCOVAGE")

68. Defendant Halcovage was elected Defendant SC Commissioner in December of 2011 and took office in January 2012. [67]

69. December 5, 2011: Defendant Halcovage signed a form acknowledging "that [he] had reviewed a copy of [Defendant SC's] 'Sexual Harassment Policy'" and that he had "received a copy of [Defendant SC's] 'Physical and Verbal Abuse Policy.'"[68]

70. On October 9, 2013, Defendant Halcovage signed a form acknowledging that he "attended [Defendant SC's] Sexual Harassment Training" in Defendant SC's Commissioners' Board Room and that he received and read [Defendant SC's] Sexual Harassment Policy as revised September 2013. [69]

71. No Sexual Harassment Policy acknowledgment forms signed by Defendant Halcovage were produced for the period between January 2012 and October

---

[65] See Ex. P11 at p. 92:10-93:18 and 146:23-147:4.

[66] See Ex. P27 at ¶ 2.

[67] See Defendant Halcovage's Defendant SC Personnel File at p. 1-2, a true and correct copy of which are attached hereto as Exhibit P28 (hereinafter "Ex. P28"). See Also, Ex. P25 at p. 664:4-17.

[68] See Ex. P28 at p. SC 5-6.
See Also, Defendant Halcovage's February 7, 2023, deposition at p. 797:5-18, a true and correct copy of which is attached hereto as Exhibit P29 (hereinafter "Ex. P29").

[69] See Ex. P28 at p. 7.
See Also, Ex. P25 at p. 663:1-22.

9, 2019, and Defendant Halcovage could not recall if he received any Sexual Harassment training from Defendant SC prior to October 2013. [70]

**72.** No Sexual Harassment Policy acknowledgement forms signed by Defendant Halcovage were produced after October 9, 2013, until June 22, 2020, and Defendant Halcovage testified that he believed every time he participated in a training, he signed an acknowledgment form. [71]

### e. DEFENDANT GLENN ROTH

**73.** On May 2, 2012, Defendant SC's HR office sent Defendant Roth a letter congratulating him on accepting the position of Assistant County Solicitor and scheduling his new hire orientation for June 26, 2012. [72]

**74.** Defendant Roth's appointment PAR, which was completed by Defendant SC's Solicitor Alvin Marshall, was not approved by Defendant SC's then Commissioners and HR department until June 27, 2012, with an effective date of July 2, 2012. [73]

**75.** At all times Defendant Roth has been employed by Defendant SC, his primary duty has been to represent in court, and provide legal advice to, Defendant SC's Tax Assessment office and Tax Claim Bureau. [74]

---

[70] See Ex. P25 at p. 663:24-664:2.
[71] See Ex. P25 at p. 664:12-665:2.
[72] See Defendant Roth's Defendant SC Personnel File Documents at p. 1-2, a true and correct copy of which are attached hereto as Exhibit P30 (hereinafter "Ex. P30").
See Also, Ex. P11 at p. 15:6-16:13.
[73] See Ex. P30 at p. 3.
See Also, Ex. P11 at p. 22:13-25:4.
[74] See Ex. P11 at p. 32:9-35:2.
See Also, Cnty.Defs.Supp 000078, a true and correct copy of which is attached hereto as Exhibit P31.

**76.** On June 26, 2012, Defendant Roth signed a form acknowledging receipt of Defendant SC's Safety Policy, Physical and Verbal Abuse Policy, and Sexual Harassment Policy. [75]

**77.** On October 9, 2013, Defendant Roth signed a form acknowledging that he "attended [Defendant SC's] Sexual Harassment Training" in Pottsville, PA and that he received and read [Defendant SC's] Sexual Harassment Policy as revised September 2013.[76]

**78.** On May 7, 2015, Defendant Roth signed a form acknowledging that he "reviewed and or received a copy of the 'Sexual Harassment Policy.'" [77]

**79.** On October 20, 2017, Defendant Bender completed a PAR for Defendant Roth's promotion to First Assistant [Defendant SC] Solicitor – Risk Manager, which was approved by the then SC Commissioners and effective on October 30, 2017. [78]

**80.** On October 30, 2017, Defendant Roth was promoted to the position of First Assistant Solicitor- Risk Manager. [79]

**81.** On October 10, 2019, Defendant Roth signed a form acknowledging that he had "reviewed and underst[ood] [Defendant SC's] Sexual Harassment Policy" and that he "agreed to abide by the Policy."[80]

**82.** No Sexual Harassment Policy acknowledgement or completion of training forms signed by Defendant Roth were produced for the period between May 7, 2015, and October 10, 2019, and Defendant Roth could only recall two (2) in persons trainings, which occurred in 2013 and 2021, and one (1) online training, which occurred in 2019. [81]

---

[75] See Ex. P30 at p. 4-6.
See Also, Ex. P11 at p. 27:13-28:15 and 29:19-30:7.
[76] See Ex. P30 at p. 7.
See Also, Ex. P11 at p. 38:10-41:4.
[77] See Ex. P30 at p. 8.
[78] See Ex. P30 at p. 9.
[79] See Ex. P30 at p. 9.
[80] See Ex. P30 at p. 10.
[81] See Ex. P11 at p. 36:4-42:18.

**83.** Between July 2, 2012, and May 2020, Defendant Roth frequented the Tax Claim and Tax Assessment offices on an almost, if not daily basis.[82]

**84.** Between July 2, 2012, and May 2020, Defendant Roth did not observe Commissioners Staudenmeier and Commissioner Hess in the Tax Claim and Tax Assessment offices but did observe Defendant Halcovage in those offices frequently and Defendant Halcovage's purpose for being there did not always include business. [83]

### f.  PLAINTIFF DOE (HEREINAFTER "DOE")

**85.** Doe's employment with Defendant SC began on March 10, 2014, as a temporary per diem office support general employee in Defendant SC's Human Resources (hereinafter "HR") office. [84]

**86.**  The PAR for Doe's first appointment with Defendant SC was completed and approved by Defendant SC's then HR Director. [85]

**87.** Doe was promoted to Real Estate Market Analyst in Defendant SC's Tax Assessment office on March 16, 2015. [86]

**88.** Defendant SC had a "Job Classification" description for the position of Real Estate Market Analyst at all times Doe held that position. [87]

---

See Also, Ex. P30 at p. 10.

The deposition transcript has a typo of "October 10, 2018," when the document discussed has a date of "October 19, 2019."

[82] See Ex. P11 at p. 79:19-80:2.

[83] See Ex. P11 at p. 130:3-134:25.

[84] See Doe's Defendant SC Personnel File at p. 1, a true and correct copy of which is attached hereto as Exhibit P32 (hereinafter "Ex. P32").

[85] See Ex. P32 at p. 1.

[86] See Ex. P32 at p. 6.

[87] See SC 1206-1208, a true and correct copy of which are attached hereto as Exhibit P33.

See Also, Ex. P4 at p. 109:22-111:3.

**89.** Defendant Halcovage's time in Defendant SC's Tax Assessment office increased in frequency and time after Doe began working in that office. [88]

**90.** Defendant Halcovage's visits to the Tax Assessment office would cause Doe emotional distress. [89]

**91.** While Doe worked in Defendant SC's Tax Assessment office, and before May 2019, when Doe 3 became the Chief Assessor and Doe's supervisor, Defendant Halcovage would summon Doe to his office for nothing except to see Doe. [90]

**92.** On April 17, 2020, Defendant SC notified Doe 2 that, as a result of the coronavirus (COVID 19), she was being furloughed and not authorized to work beginning on April 20, 2020. [91]

**93.** Prior to May of 2020, Doe was not subject to any discipline by Defendant SC. [92]

---

[88] See Ex. P21 at p. 32:1-35:2.

See Also, P16 at ¶ 7-10, 25-34 and 40-41.

See Also, P18 at ¶ 14-21.

[89] See Ex. Doe's Declaration at ¶ 1, a true and correct copy of which is attached hereto as Exhibit P34 (hereinafter "Ex. P34").

See Also, Ex. P21 at p. 32:1-35:2.

See Also, P16 at ¶ 7-10, 28-33 and 40-41.

See Also, P18 at ¶ 14-21.

[90] See Doe's September 20, 2022, Deposition at p. 111:24-112:4 and 346:9-349:10, a true and correct copy of which is attached hereto as Exhibit 35 (hereinafter "Ex. P35")

See P16 at ¶ 25-34.

[91] See SC 0241-0242, a true and correct copy of which are attached hereto as Exhibit P36 (hereinafter "Ex. P36").

[92] See Ex. P34 at ¶ 2.

See Also, Ex. P27 at ¶ 3.

See Also, Doe 4's Declaration at ¶ 1, a true and correct copy of which is attached hereto as Exhibit P37 (hereinafter "Ex. P37").

### g. PLAINTIFF DOE 2 (HEREINAFTER "DOE 2")

**94.** Doe 2's employment with Defendant SC began on December 1, 2014, in Defendant SC's Treasurer's office. [93]

**95.** Doe 2 was promoted on April 22, 2015. [94]

**96.** Doe 2 was again promoted on April 12, 2017. [95]

**97.** Doe 2 was transferred to the position of Interim Clerk Typist 1 in Defendant SC's Tax Assessment office on April 2, 2018. [96]

**98.** Doe 2's interim status ended on April 16, 2018. [97]

**99.** On April 1, 2019, Doe 2 was promoted to the position of Interim Field Appraiser in Defendant SC's Tax Assessment office. [98]

**100.** Around April of 2019, Doe 2 was walking in the Defendant SC Courthouse hallways wearing jeans that had holes in them, when she encountered Defendant Halcovage. [99]

**101.** Defendant Halcovage proceeded to remark "holy jeans," and asked Doe 2 to "let [him] put [his] finger in one of [your] holes." [100]

**102.** Doe 2 took Defendant Halcovage's comment to be sexual in nature and as if he was asking to put one of his fingers in her vagina. [101]

---

[93] See Doe 2's Defendant SC Personnel File at p. 1, a true and correct copy of which is attached hereto as Exhibit P38 (hereinafter "Ex. P38").
[94] See Ex. P38 at p. 2.
[95] Id. at p. 3.
[96] Id. at p. 4.
[97] Id. at p. 5.
[98] Id. at p. 6.
[99] See Doe 2's Declaration at ¶ 1, a true and correct copy of which is attached hereto as Exhibit P39 (hereinafter "Ex. P39") .
[100] Id. at ¶ 2.
[101] Id. at ¶ 3 .

**103.**     When Defendant Bender spoke with Doe 2 about this, she, Doe 2, informed Defendant Bender of the sexual comment that Defendant Halcovage made to her. [102]

**104.**      On July 1, 2019, Doe 2 was promoted to Field Appraiser in Defendant SC's Tax Assessment office. [103]

**105.**     On July 2, 2019, Defendant Bender complimented Doe 2's job performance. [104]

**106.**     Defendant SC had a "Job Classification" description for the position of Field Appraiser at all times Doe 2 held that position. [105]

**107.**     Prior to May of 2020, Defendant Halcovage said to Defendant Bender that he "had [Doe 2] in the clock tower," that others were spreading this rumor, and from that statement one could assume that Defendant Halcovage had sex with Doe 2 in the clock tower. [106]

**108.**     Defendant Bender never discussed Defendant Halcovage's statement, that he "had [Doe 2] in the clock tower," and the alleged rumors, with Doe 2. [107]

**109.**     There would be no reason for Defendant Halcovage to have had Doe 2 in the clock tower. [108]

**110.**     On April 17, 2020, Defendant SC notified Doe 2 that, as a result of the coronavirus (COVID 19), she was being furloughed and not authorized to work beginning on April 20, 2020. [109]

---

[102] Id. ¶ 4.

[103] See Ex. P38 at p. 7.

[104] See Doe Supplemental 000103-000104, a true and correct copy of which are attached hereto as Exhibit P40.

[105] See SC 1213-1214, a true and correct copy of which are attached hereto as Exhibit P41.

[106] See Ex. P10 at p. 123:20-125:10.

[107] Id.

[108] Id. at p. 126:22-127:11.

[109] See Ex. P38 at p. 8-9.

**111.**     Prior to May of 2020, Doe 2 was not subject to any documented discipline by Defendant SC. [110]

## II.   POST MAY 2020

**112.**     On May 21, 2020, Doe 3 forwarded Doe's email, reporting that she, Doe, was "a victim of sexual harassment" and that she had "been consistently subjected to a hostile work environment, while employed by [Defendant SC]," to Ms. Twigg.[111]

**113.**     Ms. Twigg had been Defendant SC's HR Director since January 8, 2018. [112]

**114.**     On May 21, 2020, at 5:28 PM, Defendant Halcovage was provided a letter regarding notice of representation and a demand for preservation of evidence. [113]

**115.**     Defendant Roth, on behalf of Defendant SC, was provided a letter regarding notice of representation and a demand for preservation of evidence on May 29, 2020.[114]

**116.**     Defendant SC's "Records Manual," requires that, "[r]ecords involved in any litigation must be retained until final disposition of the case even if they have met the minimum retention requirements." [115]

---

[110] See Ex. P39 at ¶ 5.

[111] See SC 466, a true and correct copy of which is attached hereto as Exhibit P42.

[112] See Ms. Twigg's Defendant SC Personnel File Documents at p. 1, a true and correct copy of which are attached hereto as Exhibit P43 (hereinafter "Ex. P43").

[113] See Doe Supplemental 000146 and 000138-000144, a true and correct copy of which are attached hereto as Exhibit P44.

[114] See Doe Supplemental 000147-000161, a true and correct copy of which are attached hereto as Exhibit P45.

[115] See Defendant SC's "Records Manual," a true and correct copy of which the relevant portions are attached hereto as Exhibit P46.

**117.**     On May 21, 2020, at 7:38 PM, Defendant Halcovage Facebook messaged Doe 2 and asked her to "[g]ive [him] a call whenever," and to "[t]ell everyone hello for [him]." [116]

**118.**     On May 21, 2020, at 8:43 PM, Defendant Halcovage texted Doe 2, "Hi. Was up in the area and stopped by your house and said hello to your parents. Surprised that you're not helping with the landscaping." [117]

**119.**     Defendant Halcovage's visit to Doe 2's residence was reported to Defendant Bender. [118]

**120.**     On the morning of May 22, 2020, Ms. Twigg informed Defendant Bender of Doe 2's report of sexual harassment and hostile work environment. [119]

**121.**     At 9 AM on May 22, 2021, Defendant Bender called Defendant Roth and Defendant Halcovage into his office and informed him of the complaint and the seriousness of the allegations. [120]

**122.**     Defendant Bender provided Defendant Halcovage with a copy of a letter that Defendant SC had received directing Defendant Halcovage and Defendant SC to preserve records. [121]

**123.**     Defendant Halcovage denied that anything sexual occurred in the Courthouse and admitted to having sex with Doe one time. [122]

---

[116] See Doe Supplemental 002355, a true and correct copy of which are attached hereto as Exhibit P47.

[117] See Doe Supplemental 004235, a true and correct copy of which is attached hereto as Exhibit P48.

[118] See Doe Supplemental 000166, a true and correct copy of which is attached hereto as Exhibit P49.

[119] See SCDOJRFP 000436-000438, a true and correct copy of which are attached hereto as Exhibit P50 (hereinafter "Ex. P50").

[120] Id.

[121] Id.

[122] Id.

**124.**     Defendant Bender then met with Commissioner Hess, Commissioner Heatherington, and the President Judge to advise them of the allegations. [123]

**125.**     Defendant Bender was present for Ms. Twiggs interview of Doe 2 regarding Doe's reports and Doe 2's own harassment claims. [124]

**126.**     Defendant Bender thought that Doe 2 seemed authentic and credible. [125]

**127.**     Defendant Bender then instructed Ms. Twigg and Defendant Roth to conduct the remainder of the investigation. [126]

**128.**     Between May 22, 2020, and June 23, 2020: Ms. Twigg and Defendant Roth investigated the Plaintiffs' claims, which all Plaintiffs participated and during which they, the Plaintiffs, apprised Defendant of the details of the discrimination and unlawful conduct to which they had been subjected. [127]

**129.**     On May 22, 2020, Defendant Halcovage was asked to make himself available for an interview that day and he suggested 1 PM, but later cancelled and the interview was rescheduled for that Monday, May 25, 2020. [128]

---

[123] Id.

[124] Id.

[125] Id.

[126] Id.

[127] See Doe Supplemental 000170-000180, a true and correct copy of which are attached hereto as Exhibit P51 (hereinafter "Ex. P51").
See also, SCDOJRFP 000551-000560, a true and correct copy of which are attached hereto as Exhibit P52 (hereinafter "Ex. P52").
See also, SCDOJRFP 000528-000551, a true and correct copy of which are attached hereto as Exhibit P53 (hereinafter "Ex. P53").
See also, Ms. Twigg's Investigation Notes (Deposition Exhibit 71), a true and correct copy of which are attached hereto as Exhibit P54 (hereinafter "Ex. P54").
See also, Ex. P11 at p. 255:1-256:11 and 259:5-8.
[128] See Ex. P50.

130.     Defendant Halcovage did not show for the Monday, May 25, 2020, interview and as a result was not interviewed until June 10, 2020. [129]

131.     On May 28, 2020, Doe 3 sent Ms. Twigg an email stating that she did not feel safe in the building with Defendant Halcovage there, nor did she feel safe in the parking space assigned to her as she didn't want Defendant Halcovage to have an opportunity to confront her since she had to pass his parking space to enter the building. [130]

132.     Doe 4 had similar conversations with Ms. Twigg. [131]

133.     Doe 3 and Doe 4's parking spaces were not moved from Defendant SC's Commissioners' lot (aka lower lot) to Defendant SC's upper lot until the first week in June of 2020. [132]

134.     On June 24, 2020, Ms. Twigg's Investigation Report was provided to Defendant Bender, Commissioner Heatherington, and Commissioner Hess. [133]

135.     Defendant Bender's June 27, 2020, letter also details a list of facts that were undisputed and which Defendant Halcovage admitted, such as being "in a multi-year sexual relationship with an employee of the Courthouse," which "began during the employee's first year with [Defendant SC] when she was a mailroom clerk," that the sexual relations, including intercourse, "[occurred] at the employees residence on numerous occasions," and "on a Saturday" "in the employee's work area file room, [when] he asked her to get on her knees and then unzipped his fly," that "he was aware that that this employee was wither an alcoholic or had a drinking problem," and despite this "he provided [her] alcohol" "at her residence" and "at his residence," that he would call "the employee on occasions and had her stand on her porch so

---

[129] Id. at p. 2.
[130] See Ex. P54 at p. 4-5.
[131] See Ex. P37 ¶ 3.
See also, Ex. P1 at p. 110:6-22 and 112:2-114:5.
[132] See Ex. P27 at ¶ 5.
See also, P37 at ¶ 4.
[133] See Ex. P51.

she could wave at him when he drove by her home," and that "he would park near [her] residence and wait for her to come home." [134]

**136.**     Defendant Bender's letter also states "[w]e also discussed accommodations for these employees, including working from home to ensure that they are comfortable working for [Defendant SC]." [135]

**137.**     These discussions did not include any of the Plaintiffs and Doe 3 and Doe 4 were never permitted to work from home. [136]

**138.**     June 30, 2020, Defendant SC's Office of the County Solicitor issued a Press Release, which was drafted by Defendant Roth, that stated "[u]pon receipt of the allegations, Cout Administrator [Defendant] Bender ("Administrator") was notified…in accordance with the County's Policies and Procedures."[137]

**139.**     The Press Release also stated, "After the initial interviews took place, the Administrator directed HR and the County's First Assistant County Solicitor/Risk Manager, [Defendant] Roth, Esquire ("RM") to conduct the remainder of the interviews." [138]

**140.**     The Press Release also stated, "[w]hile many of the allegations made by the Employees were denied by [Defendant] Halcovage, it is apparent, based on the [Defendant SC's] internal investigation, that [Defendant] Halcovage has violated the Sexual Harassment Policy #2005-18 (Revised September 2013), the Conduct and Disciplinary Action Policy #2005-19; and the Physical and Verbal Abuse Policy #2007-02 (Revised March 2007). If this investigation involved a [Defendant SC] department head, the department head would be suspended immediately pending investigation followed by a recommendation of employment termination." [139]

---

[134] See Ex. P50 at p. 2-3.

[135] Id.

[136] Id.

[137] See Doe 001894-001895, a true and correct copy of which are attached hereto as Exhibit P55.

[138] Id.

[139] Id.

141.     Nothing involving the initial investigation, including the investigation interview questions and responses, the investigation findings report, the press release, or any documentation about discussions had with Defendant Halcovage, regarding his conduct, were placed in Defendant Halcovage's Defendant SC personnel file. [140]

142.     On June 26, 2020, Defendant Bender opposed the restrictions Sheriff Groody imposed on Defendant Halcovage regarding his access to and freedom of movement in the Courthouse. [141]

143.     On July 13, 2020, after a meeting with Defendant Bender, Commissioner Heatherington, and Commissioner Hess, Sheriff Groody decided to relax his restrictions on Defendant Halcovage. [142]

144.     On July 16, 2020, Doe 3 and Doe 4, by and through their undersigned counsel, notified Defendant Roth, Defendant Bender, and Ms. Twigg that their offices, Tax Claim and Tax Assessment, were understaffed which was impacting their ability to perform their job duties. [143]

145.     The Plaintiffs also, by and through their undersigned counsel, requested that Defendant Roth, Defendant Bender, and Ms. Twigg notify them of any changes to Defendant Halcovage's access to the building, as Defendant Halcovage's access significantly impacts them, and his limited access would make them much more comfortable reporting to work on a daily basis. [144]

146.     On July 16, 2020, Doe 3 and Doe 4 were seated in Doe 4's vehicle in Doe 4's assigned parking space, in Defendant SC's Courthouse's upper parking lot, when Defendant Halcovage climbed a steep and dangerous

---

[140] See Marie Jones, Esq.'s May 2, 2023, email to undersigned counsel, a true and correct copy of which is attached hereto as Exhibit P62 (hereinafter "Ex. P56").
[141] See Groody 0003-0004, a true and correct copy of which are attached hereto as Exhibit P57.
[142] Id.
[143] See Doe Supplemental 215, a true and correct copy of which is attached hereto as Exhibit P58.
[144] Id.

embankment from Defendant SC's Courthouse's lower lot, where he was assigned to park. [145]

147.     When Defendant Halcovage arrived at the top of the embankment, he emerged from a bushy area one to two spots away from where Doe 3 and Doe 4 were parked. [146]

148.     There were other safer alternatives for Defendant Halcovage to use if he needed to access Defendant SC's Courthouse's main entrance from the lower lot. [147]

149.     Defendant Bender, Defendant Roth, and Ms. Twigg were all informed of Defendant Halcovage's act of climbing up the steep and dangerous embankment. [148]

150.     On July 21, 2020, Doe 3 and Doe 4, by and through their undersigned counsel, notified Defendant Bender, Defendant Roth, and Ms. Twigg about Defendant Halcovage's act of climbing up the steep and dangerous embankment. [149]

---

[145] See Doe Supplemental 000223, a true and correct copy of which is attached hereto as Exhibit P59 (hereinafter "Ex. P59").
See also, Joseph Groody's February 1, 2023, Deposition at p. 64:8-69:22, a true and correct copy of which is attached hereto as Exhibit P60 (hereinafter "Ex. P60").
See also, Courthouse video surveillance for July 16, 2020, a true and correct copy of which is attached hereto as Exhibit P61 (hereinafter "Ex. P61").
[146] See Ex. P59.
See also, Ex. P60 at p. 64:8-69:22.
See also, Ex. P61.
See also, Doe 3's January 10, 2023, Deposition at p. 332:11-336:23, a true and correct copy of which is attached hereto as Exhibit P62.
See also, Ex. P 14 at p. 332:20-338:25.
[147] See Ex. P59.
See also, Ex. P60 at p. 64:8-69:22.
See also, Ex. P61.
[148] See Ex. P59.
See also, Ex. P1 at p. 320:2-325:16.
[149] See Ex. P59.

151.     Defendant Bender never spoke with Doe 3 or Doe 4 about Defendant Halcovage's act of climbing up a steep embankment.[150]

152.     In August of 2020, Plaintiffs each filed Charges of Discrimination with the EEOC and copy of the same were emailed to Defendant Halcovage's attorney and Defendant Bender, Defendant Roth, and Defendant SC's attorney.[151]

153.     On August 12, 2020, Doe 3 emailed Defendant Roth and Defendant Bender and reminded them that the Tax Assessment office was understaffed.[152]

154.     On September 4, 2020, Defendant Kutzler began working at Defendant SC as the Director of Human Resources.[153]

155.     On September 4, 2020, Doe and Doe 2, by and through their undersigned counsel, requested the supplies necessary to complete their job duties and Doe 3 and Doe 4 requested to work from home, or alternatively, to work from home a few days a week.[154]

156.     On October 8, 2020, a list of supplies that Doe and Doe 2 needed was provided to Defendant SC.[155]

---

[150] See Ex. P27 ¶ 10.
See also, Ex. P37 ¶9.

[151] See Undersigned's August 13, 2020, email, a true and correct copy of which is attached hereto as Exhibit P63.
See also, Doe Supplemental 000264-000265, a true and correct copy of which is attached hereto as Exhibit P64.
See also, Undersigned's August 27, 2023, email, a true and correct copy of which is attached hereto as Exhibit P65.

[152] See Doe Supplemental 000240, a true and correct copy of which is attached hereto as Exhibit P66.

[153] See Defendant Kutzler's January 25, 2023, deposition at p. 27:21-28:5, a true and correct copy of which is attached hereto as Exhibit P67.

[154] See Doe Supplemental 000283-000284, a true and correct copy of which are attached hereto as Exhibit P68.

[155] See Doe Supplemental 000349-000350, a true and correct copy of which are attached hereto as Exhibit P69 (hereinafter "Ex P69").

157.     On October 12, 2020, Doe 3 emailed Defendant Kutzler, Defendant Bender, Defendant Roth, and others to advise them she encountered Defendant Halcovage in the Courthouse, and he was unescorted, as she had been advised he was required to do. [156]

158.     Doe 3's email also advised the recipient that Doe 2 had been occasionally coming to the Courthouse to pick up work and that she, Doe 3, and Doe 4 need to access other offices at times to complete their work. [157]

159.     On October 15, 2020, Doe 3 emailed Defendant Kutzler, Defendant Bender, Defendant Roth, and others to follow up on the contract for the employee/contractor in her office whose had continued to work despite her contract having ended, something Doe 3 had previously requested be addressed and which went unanswered, and that without this employee, and the fact that the office went from 10 employees to 3 employees, Doe 3's offices would be unable to complete certain job duties. [158]

160.     Defendant Kutzler testified that this email was Doe 3 communicating with her supervisor, Defendant Bender, about what she, Doe 3, needed from Defendant SC, that she, Defendant Kutzler, had no knowledge of Defendant Bender speaking with Doe 3 about her concerns listed in her October 15, 2020, email, and she, Defendant Kutzler could understand why Doe 3 would feel it was futile to engage with Defendant Bender after he failed to respond to Doe 3's October 15, 2020, email. [159]

161.     On October 20, 2020, a follow up request, for Doe and Doe 2's supplies, was sent to Defendant SC's attorney, to which Defendant SC's attorney responded, "I am surprised to hear this. I immediately forwarded the list of requested supplies to the interim HR director who indicated she did not have any particular issue with supplying any of the requested supplies. I will follow up and find out where she stands on the issue." [160]

---

[156] See Doe Supplemental 000343, a true and correct copy of which is attached hereto as Exhibit P70.

[157] Id.

[158] See Doe Supplemental 000344, a true and correct copy of which is attached hereto as Exhibit P71.

[159] See Ex. P67 at p. 109:17-113:4.

[160] See Ex. P69.

162.     On October 22, 2020, Doe 3 sent an email to Defendant Bender, Defendant Roth, Commissioner Hess, and Commissioner Heatherington, about office operations issues/concerns. [161]

163.     Around October 22, 2020, Defendant Bender, Defendant Kutzler and Defendant Roth discussed and prepared a contract Addendum for the contract employee whose contract had expired and who had requested a pay increase without consulting Doe 3 or Doe 4. [162]

164.     Defendant Roth drafted the contract employee's contract Addendum which included additional duties and imposed additional duties on Doe 3 and Doe 4. [163]

165.     Defendant Kutzler testified that it was Defendant Bender who decided to impose, those additional duties. [164]

166.     Defendant Kutzler testified that given Doe 3's October 15, 2020, email about staffing concerns, it might not have been the appropriate time to impose additional duties on Doe 3 and Doe 4. [165]

167.     Doe 3 or Doe 4 were not shown the contract Addendum before it was executed, despite, according to Defendant Kutzler, that showing it to them would have been the "appropriate course of action." [166]

---

[161] See Doe Supplemental 000352-000353, a true and correct copy of which is attached hereto as Exhibit P72.

[162] See Doe Supplemental 000358-00360, a true and correct copy of which are attached hereto as Exhibit P73 (hereinafter "Ex. P74").

See also, Ex. P67 at p. 100:15-151:14.

See also, Doe Supplemental 003138, a true and correct copy of which is attached hereto as Exhibit P74 (hereinafter "Ex. P74").

[163] See, Ex. P67 at p. 100:15-151:14.

See also, Ex. P74.

See also, Ex. P73.

[164] See Ex. P67 at p. 100:15-151:14.

[165] See Ex. P67 at p. 100:15-151:14.

[166] See Ex. P67 at p. 100:15-151:14.

168.     Defendant Kutzler testified that it might not have been the right time to require this transfer of knowledge and that she did not consider that Doe and Doe 2 were still not set up to work from home, something she maybe should have considered.[167]

169.     Defendant Bender instructed Defendant Kutzler not to meet with Doe 3 and Doe 4 about the "transfer of knowledge," even though according to Defendant Kutzler, that was not advisable. [168]

170.     Defendant Bender declined to approve the contract employee's hourly rate of $40 and decided to give the contact employee $35 an hour. [169]

171.     On October 25, 2020, Doe 3 emailed Defendant Bender, Defendant Roth, Defendant Kutzler, and others regarding her concerns with the contract employee's contract Addendum and that as a result she, Doe 3, and Doe 4 were rescinding their vacation request so that they could ensure that the offices responsibilities were timely completed. [170]

172.     On October 26, 2020, Doe reached out to Defendant Kutzler about her work from home status and the status of the supplies she needed that still had not obtained. [171]

173.     Defendant Kutzler finally reached out to Doe and Doe 2 on October 27, 2020, regarding their requested supplies. [172]

174.     In her emails to Doe and Doe 2, Defendant Kutzler advised them that she had gathered some supplies and that others, including a laptop and printer, "were on order." [173]

---

[167] See Ex. P67 at p. 132:10-134:18.

[168] See Ex. P67 at p. 135:13-136:6.

[169] See Ex. P72 at p. 100:15-151:14.

[170] Id.

[171] See Doe Supplemental 000364-000365 at p. 2, a true and correct copy of which are attached hereto as Exhibit P75.

[172] See Doe 001118-001120 at p. 1, a true and correct copy of which are attached hereto as Exhibit P76 (hereinafter "Ex. P76").

See also, Doe Supplemental 000376-000377, a true and correct copy of which are attached hereto as Exhibit P77.

[173] Id.

175.     Defendant Kutzler testified that the laptops and printer were not in fact "on order" as her email had indicated. [174]

176.     This was Defendant Kutzler's first communication with Doe and Doe 2 since her employment with Defendant SC began. [175]

177.     Between October 27, 2020, and the middle of November 2020, Defendant SC did not provide Doe and Doe 2 a laptop or a printer to complete their job duties from home, and the supplies they had were not sufficient for them to perform their job duties from home. [176]

178.     On October 28, 2020, Doe 3 sent an email to Defendant Kutzler, Defendant Bender, and others regarding Doe's access to the Courthouse to complete work. [177]

179.     This email went unanswered. [178]

180.     On November 6, 2020, Doe and Doe 3 received an email from the State about the delinquency of the STEB reports, which Doe 3 forwarded to Defendant Bender, Defendant Kutzler, Defendant Roth, and others, and requested assistance in providing Doe with safe access to the Courthouse without fear of encountering Defendant Halcovage.[179]

181.     This email went unanswered. [180]

---

[174] See Ex. P67 at p. 156:2-4.

[175] See Ex. P67 at p. 50:1-10.

[176] See Ex. P67 at p. 75:5-76:17.

[177] See Doe Supplemental 0000373, a true and correct copy of which is attached hereto as Exhibit P78.

[178] See Ex. P27 at ¶ 12.

[179] See Doe Supplemental 000409-000411, a true and correct copy of which is attached hereto as Exhibit 79.

[180] See Ex. P27 at ¶ 14.
See Also, Doe 01126, a true and correct copy of which is attached hereto as Exhibit P80 (hereinafter "Ex. P80").

182.    Defendant Kutzler testified that Defendant Bender told her not to address issues related to STEB and let Doe 3 and Doe 4 figure it out. [181]

183.    On November 12, 2020, Doe 3 emailed Defendant Kutzler, Defendant Bender, Defendant Roth, and others, to obtain a copy of the Addendum that was approved for a contract employee in her office, and which imposed additional duties on Doe 3 and Doe 4, as she had not yet received it. [182]

184.    Doe 3's November 12, 2020, email also informed the recipients that the contract employee was owed approximately $9,200 for work that she continued to do despite not being paid and her contract Addendum not being signed. [183]

185.    In Doe 3's November 12, 2020, email she also addressed the fact that she had not heard anything regarding her November 9, 2020, email about coordinating safe access to the Courthouse for Doe on November 13, 2020, so that Doe could complete her STEB submissions. [184]

186.    On November 12, 2020, Doe still did not have a laptop or a printer. [185]

187.    On November 12, 2020, Doe 3 emailed Defendant Bender, Defendant Kutzler, Defendant Roth, and others, regarding an encounter with Defendant Halcovage and revoicing the Plaintiffs concerns that they do not feel safe in the building when Defendant Halcovage was there. [186]

188.    This email went unanswered. [187]

---

[181] See Ex. P67 at p. 177:3-179:14.

[182] See Doe Supplemental 000414, a true and correct copy of which is attached hereto as Exhibit P81.

[183] Id.

[184] Id.
See also, Ex. P80.

[185] See Ex. P67 at p. 180:16-181:13.

[186] See Doe Supplemental 000415, a true and correct copy of which is attached hereto as Exhibit P82.

[187] See Ex. P27 at ¶ 16.

189.     On November 16, 2020, Doe 3 emailed Defendant Kutzler, Defendant Bender, Defendant Roth, and others a copy of the "non-compliance letter" she had received from the State Tax Equalization Board. [188]

190.     In the body of the email, to which the State's letter was attached, Doe 3 requested they come up with a solution to address the issues that were the cause of the non-compliance. [189]

191.     This email went unanswered. [190]

192.     On November 23, 2020, Defendant Kutzler responded to Doe and informed her that her, Doe, and Doe 2's work locations were being moved to another Defendant SC building, the 410 Building, which would be ready for them on November 30, 2020, a decision that Defendant Bender had made. [191]

193.     The decision to move Doe 2 to the 410 Building was made due to the backlog in STEB reports which was not Doe 2's job responsibility. [192]

194.     At no time prior to assigning Doe and Doe 2 to the 410 Building offices did anyone on behalf of Defendant SC consult with any of the Plaintiffs. [193]

195.     Doe and Doe 2's office equipment from the Courthouse was eventually moved to their 410 Building offices and similarly could have been moved to their homes. [194]

---

[188] See Doe Supplemental 000423-000424, a true and correct copy of which are attached hereto as Exhibit P83.

[189] Id.

[190] See Ex. P27 at ¶ 18-19.
See Also, Ex. P67 at p. 211:15-215:17.

[191] See Doe Supplemental 000441-000442 at p. 1, a true and correct copy of which is attached hereto as Exhibit P84 (hereinafter "Ex. P84").

[192] See Ex. P67 at p. 242:5-18.

[193] See Ex. P67 at p. 227:20-228:22.

[194] See Ex. P67 at p. 223:2-22.

196.     Defendant Bender testified that if Doe and Doe 2 had not reported their concerns, they would not have been moved to the 410 Building. [195]

197.     Defendant Kutzler testified she did not believe it was fair that Doe and Doe 2, the victims, had to relocate their workspace as opposed to Defendant Halcovage, the perpetrator. [196]

198.     Defendant Kutzler testified that there was an empty office near the office Doe 2 was assigned, and behind a door which required key card access, which Doe could have been assigned, and it would have made sense to put both Doe and Doe 2 behind the door which required keycard access. [197]

199.     Defendant Halcovage was never asked to work from the 410 Building. [198]

200.     Doe and Doe 2 were never provided assigned parking for the 410 Building and their only options were to park at the Courthouse and walk down to the 410 Building, which was not reasonable, or pay for parking, which Defendant SC would not reimburse them for and something they did not have to do prior to reporting Defendant Halcovage in May of 2020. [199]

201.     On November 19, 2020, Defendant Kutzler met with Defendant SC Tax Assessment employee, Heather, and Doe 3, after Doe 3 requested Heather be permitted to transfer from the Tax Assessment office to the Tax Claim office because of the hostile work environment that existed in the Tax Assessment office. [200]

---

[195] See Ex. P10 at p. 362:1-17.

[196] See Ex. P67 at p. 254:20-255:10.

[197] See Ex. P67 at p. 239:14-240:24.

[198] See Ex. P25 at p. 555:23-556:1.

[199] See Ex. P67 at p. 249:17:254:9.

[200] See Doe Supplemental 000477-00479 at ¶¶ 2, a true and correct copy of which are attached hereto as Exhibit P85 (hereinafter "Ex. P85").
See also, Ex. P72 at p. 185:21-202:12.

202.    On November 25, 2020, after Heather filed a union grievance regarding the denial of her transfer request, Defendant Kutzler requested to meet with Heather to further discuss her, Heather's, issues and concerns. [201]

203.    On December 3, 2020, while the "reconsideration" of her transfer and her union grievance were outstanding, Heather was called into Defendant Kutzler's office to meet with Defendant Kutzler and Defendant Roth and Defendant Kutzler told Heather that she had "good news for [her] regarding the transfer." [202]

204.    Defendant Kutzler asked Defendant Roth to sit in on the interviews due to the concerns related to the Tax Assessment office. [203]

205.    During this meeting, Defendant Kutzler and Defendant Roth, pursuant to Defendant Bender instruction, presented Heather with an affidavit and recommended that she sign it. [204]

206.    On December 22, 2020, Heather met with Defendant Kutzler and Defendant Roth and attempted to provide them with a declaration related to the Affidavit Defendant Roth prepared for her. [205]

207.    On December 22, 2020, Doe 3 emailed Defendant Kutzler and informed her that Heather did not provide her declaration until after the meeting because she, Heather, felt uncomfortable during the meeting, and that Heather was extremely stressed and upset by the position she was put in.[206]

---

[201] See Ex. P85 at ¶ 2.

See also, Doe 000007-00010 at ¶ 28-34, a true and correct copy of which are attached hereto as Exhibit P86 (hereinafter "P86").

[202] See Ex. P85 at ¶ 2.

See also, Ex. P86 at ¶ 35-44.

See also, Ex. P67 at p. 185:21-202:12.

[203] See Ex. P67 at p. 185:21-202:12.

[204] See Ex. P86 at ¶ 35-44.

See also, Ex. P67 at p. 185:21-202:12

[205] See Doe Supplemental 000549, a true and correct copy of which is attached hereto as Exhibit P87.

[206] Id.

**208.**     After Defendant SC received Heather's December 22, 2020, declaration, Defendant Bender was not happy, expressed frustration, was a little loud, and rolled his eyes because Defendant SC could take no action against Doe 2. [207]

**209.**     On December 9, 2020, Defendant Bender sent Defendant Halcovage a letter which stated, Defendant SC's "inten[ds] to gainfully employ [Doe] and [Doe 2] at [Defendant SC's] 410 office building," and that it was "the expectation of [Defendant SC] that [Defendant Halcovage] [would] not make any attempt to enter or conduct any aspect of a face-to-face meeting with any individuals who are working in that facility."[208]

**210.**     Defendant Bender December 9, 2020, letter was sent after Defendant Kutzler's November 23, 2020, email, which indicated that Defendant Bender informed Defendant Halcovage that he would be arrested if he attempted to gain access to the 410 Building, and December 8, 2020, when Doe and Doe 2 were set to begin work at the 410 Building. [209]

**211.**     There is no mention that the Sheriff will arrest Defendant Halcovage if he attempts to access the 410 Building in Defendant Bender's December 9, 2020, letter. [210]

**212.**     On December 9, 2020, when Doe and Doe 2 were provided the keys to their 410 Building offices they justifiably raised numerous concerns about the equipment therein and the cleanliness of the offices and as such, did not begin working in the 410 Building offices at that time. [211]

---

[207] See Ex. P67 at p. 323:19-326:21.

[208] See SC 00189-00191, a true and correct copy of which is attached hereto as Exhibit P88 (hereinafter "Ex. P88").

[209] Id.

See also, Ex. P84 at p.1.

See also, Doe 001137-1140 at p. 4, a true and correct copy of which are attached hereto as Exhibit P89.

[210] See Ex. P88.

[211] See Doe Supplemental 000490, a true and correct copy of which is attached hereto as Exhibit P90.

See also, Ex. P39 at ¶ 6.

213.      On December 11, 2020, Defendant Kutzler was notified of the Plaintiffs collective time off requests to attend interviews with the Attorney General's office regarding Defendant Halcovage. [212]

214.      Defendant Kutzler conducted research and discussed the Plaintiffs paid time off requests with Defendant Bender and it was decided that their time off would be unpaid, despite the requests being related to the Attorney General's investigation of Defendant Halcovage. [213]

215.      Defendant SC's Sexual Harassment Policy that was in place at the time stated, "[Defendant SC] will compensate the employee for absences from work that were the result of the harassment." [214]

216.      Defendant Zula began working for Defendant SC as the HR Director on January 11, 2021. [215]

217.      Defendant Kutzler, Defendant Roth, and Defendant Bender, as part of the interviewing committee, interviewed and narrowed down the applicants for the position of HR Director. [216]

218.      Defendant Kutzler and Defendant Bender decided what salary Defendant Zula would be offered. [217]

---

See also, Ex. P34 at ¶ 3.

See also, Ex. P67 at p. 267:7-272:10.

[212] See Doe Supplemental 000511-000514, a true and correct copy of which are attached hereto as Exhibit P91 (hereinafter "Ex. P91").

See also, Doe Supplemental 000493-000494, a true and correct copy of which are attached hereto as Exhibit P92.

See also, Ex. P67 at p. 273:13-282:24.

[213] See Ex. P91.

See Also, Ex. P67 at p. 273:13-282:24.

[214] See Ex. P6 at p. 4.

[215] See Zula RFP 000024, a true and correct copy of which is attached hereto as Exhibit P93 (hereinafter "Ex. P93").

See Also, Ex. P8 at p. 14:21-24.

[216] See Ex. P67 at p. 352:16-356:21.

[217] See Ex. P67 at p. 356:23-358:5.

See also, Ex. P8 at p. 20:2-21:1.

**219.**     On January 13, 2021, Doe 3 emailed Defendant Kutzler and Defendant Roth about an encounter Doe 2 had with Defendant Halcovage.[218]

**220.**     On January 13, 2021, Doe 3 sent Defendant Kutzler a second email about the incident and informed her that Doe 2 was filing a police report. [219]

**221.**     Defendant Kutzler did not speak with Doe 2 and Defendant Roth did not prepare an Affidavit for Doe 2 about this incident. [220]

**222.**     Doe 2 prepared and submitted, to Defendant SC, her own Affidavit about the January 13, 2021, incident on January 18, 2021. [221]

**223.**     Defendant Halcovage and Sheriff Groody allegedly provided written statements about the events, but no statements were produced. [222]

**224.**     On January 15, 2021, at 10:50 AM, Doe 3 emailed Defendant Kutzler and Defendant Zula about Defendant Halcovage using the North door entrance to the Courthouse, the entrance that the Plaintiffs had been informed was the door they should use to avoid contact with Defendant Halcovage. [223]

**225.**     In her email Doe 3 advised Defendant Kutzler and Defendant Zula that "in light of [Defendant Halcovage using the North door that day] along with what transpired on [January 13, 2021]," the Plaintiffs were "working from home until further notice." [224]

---

[218] See Zula RFP 000320, a true and correct copy of which is attached hereto as Exhibit P94.

[219] See Doe Supplemental 00576, a true and correct copy of which is attached hereto as Exhibit P95.

[220] See Ex. P67 at p. 359:5-363:6.

[221] See Doe Supplemental 000579-000580, a true and correct copy of which are attached hereto as Exhibit P96 (hereinafter "Ex. P96").

See also, Ex. P4 at p. 86:2-11.

[222] See Ex. P4 at p. 85:11-22.

[223] See Doe Supplemental 000585, a true and correct copy of which is attached hereto as Exhibit P97.

[224] Id.

226.     Doe 3 was an exempt employee for whom an "Executive Exemption" checklist had been completed and which included having the ability to "set[] and adjust[ employees] …hours worked," "direct[] the work of employees," "handl[e] grievancse and complaints," "provid[e] safety and security of employees," and "exercise … discretion and independent judgment in respect to maters of significance." [225]

227.     On January 15, 2021, at 4:07 PM, Defendant Zula, on behalf of Defendant Bender, sent Doe 3 an email with a letter attached, regarding Doe 3's decision to work from home and allow the other Plaintiffs to work from home. [226]

228.     Defendant Zula's email with Defendant Bender's letter attached was sent before Defendant SC had received Doe 2's Affidavit regarding being followed by Defendant Halcovage. [227]

229.     On January 15, 2021, at 4:07 PM, Defendant Zula, on behalf of Defendant Bender, sent Doe 3 an email with a letter attached, regarding Doe 3's decision to work from home and allow the other Plaintiffs to work from home. [228]

230.     Defendant Kutzler, Defendant Bender, nor Defendant Zula spoke with Doe 3 and asked her if she had a concern for her employee's safety. [229]

---

[225] See Doe Supplemental 000596-000601, a true and correct copy of which are attached hereto as Exhibit P98 (hereinafter "Ex. P98").

[226] See Zula RFP 000324-000326, a true and correct copy of which are attached hereto as Exhibit P99.

[227] Id.
See also, Ex. P96.

[228] See Zula RFP 000325-000326, a true and correct copy of which are attached hereto as Exhibit P100.

[229] See Defendant Zula's October 19, 2022, Deposition at p. 201:24-202:2, a true and correct copy of which is attached hereto as Exhibit P101 (hereinafter "Ex. P101").

**231.**     Defendant Kutzler viewed video surveillance of the day and time in question, but no video surveillance was produced. [230]

**232.**     Based on Defendant Kutzler's review of the video surveillance, she determined that Defendant Halcovage was not escorted, as the letter states he was, and was potentially in violation of Sheriff Groody's orders at the time. [231]

**233.**     On January 27, 2021, Defendant Zula sent Doe 3, Doe 4, and Defendant Kutzler an email and requested to meet with Doe 3 to discuss the "interim" positions in Doe 3's offices. [232]

**234.**     On February 5, 2021, Doe 3, Doe 4, Defendant Zula, and Defendant Kutzler met to discuss the "interim" positions in Doe 3 and Doe 4's offices and to discuss the operations of the Tax Assessment office. [233]

**235.**     Prior to February 5, 2021, there were discussions between Defendant Bender, Defendant Roth, and Defendant Zula about the operations of the Tax Assessment office, restructuring the offices, and removing Doe 3 from her position. [234]

**236.**     On February 8, 2021, Defendant Zula sent Defendant Kutzler an email to which a memo was attached regarding Doe 3's work performance and Doe 3's removal from her position. [235]

**237.**     In the body of Defendant Zula's February 8, 2021, Defendant Zula stated, "I really struggled with putting this memo together." [236]

---

[230] See Ex. P67 at p. 371:9-375:7.

[231] See Ex. P67 at p. 371:9-380:10.

[232] See Zula RFP 000399-000402, a true and correct copy of which are attached hereto as Exhibit P102.

[233] See Zula RFP 000413-00415 at p. 2, a true and correct copy of which are attached hereto as Exhibit P103 (hereinafter "Ex. P103").
See also, Defendant Kutzler's January 26, 2023, Deposition at p. 33:13-21, a true and correct copy of which is attached hereto as Exhibit P104 (hereinafter "Ex. P104").

[234] See Ex. P104 at p. 35:18-46:1.

[235] See Ex. P103.

[236] Id.

238.    Defendant Zula's memo indicated that three (3) to four (4) months of 2020 STEB reports were completed as of the time of the meeting. [237]

239.    At the time Defendant Zula authored this memo, she had never worked with an Assessment office or County before, and her only knowledge of STEB reports came from her employment with Defendant SC which began twenty-eight days prior on January 11, 2021. [238]

240.    Defendant Kutzler testified that in her four (4) months of employment she did not gain enough knowledge about the STEB reports and the Tax Assessment office to make a determination about their operations and that Defendant Zula did not have enough time to really understand what the Tax Assessment office did. [239]

241.    Defendant Kutzler testified that Defendant Zula's memo was not entirely accurate as Doe 3 did in fact provided information regarding operation staffing issues in the Tax Assessment office and voiced specific needs that the Tax Assessment office had that Defendant SC could assist them with during the meeting, Defendant SC did not provide additional assistance to the Tax Assessment office, and Doe 3 had communicated with her direct supervisor, Defendant Bender, regarding the STEB report issue. [240]

242.    By February 12, 2021, four STEB reports were completed and uploaded, an additional 3 were completed, and one more was set to be completed the next day, which left only four (4) that were outstanding.[241]

243.    On February 18, 2021, Doe 3 email Defendant Kutzler and Defendant Zula and reiterated her concerns about Doe and Doe 2's working environment and their emotional distress, mentioned the effect Doe's furlough and lack of supplies had on the report submissions, and noted that

---

[237] Id.

[238] See Ex. P101 at p. 218:8-219:1.

[239] See Ex. P104 at p. 32:1-19.

[240] See Ex. P104 at p. 34:20-46:1.

[241] See Doe Supplemental 000653-006054, a true and correct copy of which are attached hereto as Exhibit P105.

ten (10) months had fully approved and the other two were completed but needed to be uploaded and approved. [242]

**244.**     Doe 3's email also indicated that the completion of the STEB reports was done by her and Doe 4, which required they work a combined 81 hours of overtime and requested Doe be permitted to work from home for portion of her hours. [243]

**245.**     STEB reports were the responsibility of Doe who was not disciplined, at this time, for her failure to timely submit the reports. [244]

**246.**     On March 12, 2021, Defendant SC was notified that the Plaintiffs intended to file supplemental charges of discrimination with the EEOC. [245]

**247.**     On March 12, 2021, Defendant Zula completed PARs for the demotion of Doe 3 and Doe 4. [246]

**248.**     On March 15, 2021, Defendant Zula emailed Doe 4, and cc'd Defendant Kutzler and Defendant Bender, to notify her, Doe 4 that "on Wednesday, March 17, 2021, the administration w[ould be recommending to the Board of Commissioners that the Tax Assessment and Tax Claims Offices be restructured into separate offices under separate leadership…" and that "[d]ue to this recommended restructuring, [Doe 4] would be transferred to the position of Deputy Chief Assessor" with a reduce annual salary. [247]

---

[242] Id.

[243] Id.

[244] See Ex. P101 at p. 226:7-229:15 and 240:23-241:14.

[245] See Doe Supplemental 000750, a true and correct copy of which is attached hereto as Exhibit P106.

[246] See SC 0307 and 407, a true and correct copy of which are attached hereto as Exhibit P107.

See also, Ex. P101 at p. 134:15-19 and 368:23-369:11.

[247] See Zula RFP 000701, a true and correct copy of which is attached hereto as Exhibit P108.

249.     Doe 4 was on bereavement leave for the untimely death of her brother when she received this email. [248]

250.     On March 16, 2021, Plaintiffs filed Supplemental Charges of Discrimination with the EEOC. [249]

251.     On March 16, 2021, Plaintiffs filed the Civil Action Complaint. [250]

252.     On March 17, 2021, the PAR for Doe 3's demotion was recommended to the Salary Boad by Defendant Zula. [251]

253.     Defendant Zula testified she completed the PARs and recommended Doe 3 and Doe 4's demotion per Defendant Bender's instruction. [252]

254.     Doe 3's salary was reduced from $68,852.41 to $53,732.36. [253]

255.     Doe 3's job duties significantly changed as a result of the restructuring. [254]

---

[248] See Ex. P101 at p. 397:14-398:23.
See also, Zula RFP 000755, a true and correct copy of which is attached hereto as Exhibit P.
[249] See Doe Supplemental 000774, a true and correct copy of which is attached hereto as Exhibit P110.
[250] See ECF No. 1.
[251] See Doe Supplemental 000790-000798 at p. 8, a true and correct copy of which is attached hereto as Exhibit P111.
See also, Ex. P101 at p. 134:15-19, 368:23-369:11, and 399:3-13.
[252] See Ex P8 at p. 399:3-23.
See also, Ex. P101 at p. 134:15-19, 368:23-369:11, and 399:3-13.
[253] See Doe Supplemental 000790-000798 at p. 9, a true and correct copy of which are attached hereto as Exhibit P112 (hereinafter "Ex. P112").
See also, Ex. P107 at p. 2.
[254] See SC 1223-1234, a true and correct copy of which are attached hereto as Exhibit P113.
See also, Ex. P22.

**256.**     On March 17, 2021, the PAR for Doe 4's demotion was recommended to the Salary Boad by Defendant Zula. [255]

**257.**     Doe 4's salary was reduced from $47,057.28 to $39,727.18.[256]

**258.**     Doe 4's job duties significantly changed as a result of the restructuring. [257]

**259.**     As result of the restructuring, Doe 3 was no longer Doe, Doe 2, or Doe 4's supervisor. [258]

**260.**     On April 7, 2021, Defendant SC's Board of Commissioners voted on Defendant Bender's request to approve a consulting contract with Anthony Alu.[259]

**261.**     The contract was for Anthony Alu to provide oversight to the Tax Assessment office, provide training to new and existing employees, assist in hiring and transition to a new Chief Assessor and to serve as the interim Chief Assessor. [260]

**262.**     Anthony Alu's contract included that he would be paid an hourly rate $40 per hour, the rate that was previously requested and denied for a female contract employee in the Tax Assessment office when the office was supervised by Doe 3. [261]

---

[255] See Ex. 112 at p. 9.
See also, Ex. P8 at p. 134:15-19, 368:23-369:11, and 399:3-13.
[256]  See Ex. P112 at p. 9.
See also, Ex. P107 at p. 1.
[257] See Ex. P119.
See also, SC 1219-1220, a true and correct copy of which is attached hereto as Exhibit P114 (hereinafter "Ex. P114").
[258] See Ex. P27 at ¶ 20.
[259] See April 7, 2021, Commissioner Meeting Minutes at p. 9, a true and correct copy of which are attached hereto as Exhibit P115 (hereinafter "Ex P115").
[260] Id.
[261] Id.

263.     Defendant Halcovage and Commissioner Heatherington voted in favor of Anthony Alu's consultation contract and Commissioner Hess voted no. [262]

264.     At the April 7, 2021, Commissioners Meeting, Defendant Roth made a statement that Defendant SC's Solicitor's office determined that there is nothing to preclude Defendant Halcovage from voting on the restructuring of the Tax Claim and Tax Assessment offices, nor on the Anthony Alu's consultation contract. [263]

265.     In May of 2021, Doe and Doe 2 obtained SVPO Orders against Defendant Halcovage.[264]

266.     On May 24, 2021, Kent Hatter was appointed the Chief Assessor for Defendant SC. [265]

267.     Kent Hatter did not hold a CPE license as required by Defendant SC's "Job Classification" and Pennsylvania Statute.[266]

268.     Plaintiffs were each evaluated and diagnosed with emotional distress as a result of what they endured in their work environment. [267]

---

See also, Doe 000001-000006 at ¶ 31-36, a true and correct copy of which is attached hereto as Exhibit 116.

See also, Ex. P67 at p. 101:5-102:24.

See also, Zula RFP 000898-000899, a true and correct copy of which are attached hereto as Exhibit P117.

[262] See Ex. P15 at p. 9.

[263] Id.

[264] See Doe Supplemental 001085-00192, a true and correct copy of which are attached hereto as Exhibit P118.

[265] See Ex. P24 at p. 1.

[266] Id. at p. 3.

See also, Ex. P102 496:12-497:18.

See also, Title 53 P.S. Chapter 88 § 8831.

[267] See Independent Psychological Evaluation Reports for Doe, Doe 2, Doe 3, and Doe 4, a true and correct copy of which is attached hereto as Exhibit P119.

269.　　　Defendant Bender testified that he would have been embarrassed,
humiliated, and emotionally distressed if he had been subjected to the
conduct that the Plaintiffs reported Defendant Halcovage subjected them
to.[268]

270.　　　Defendant Roth testified that if what Doe reported was true, which he
believed it was, he would feel for Doe emotionally and that what Doe
reported in her May 2020 interview made him "sick to [his] stomach." [269]

271.　　　Defendant Roth testified that being on unpaid indefinite suspension
for a year with limited communication would emotionally impact someone
and that he could understand that the indefinite suspension has been
extremely difficult for Doe 3 and Doe 4. [270]

**DEREK SMITH LAW GROUP, PLLC**

By: */s/ Catherine W. Lowry, Esq.*
Catherine W. Lowry, Esq.
18435 Market Street, Suite 2950
Philadelphia, Pennsylvania 19103
(267) 857-0832

---

[268] See Ex. P10 p. 341:16-342:17.
[269] See Ex. P11 at p. 253:22-255:20.
[270] See Ex. P12 at p. 392:6-17.