IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| JANE DOE, et al., | : | Civ. No. 3:21-CV-477 |
| | : | |
| Plaintiffs, | : | |
| | : | |
| v. | : | |
| | : | (Magistrate Judge Bloom) |
| SCHUYLKILL COUNTY | : | |
| COURTHOUSE, et al., | : | |
| | : | |
| Defendants. | : | |

## MEMORANDUM OPINION

### I.  Introduction

This is a civil action brought by four Jane Doe plaintiffs against Schuylkill County and several individual defendants. The claims in this case involve allegations of sexual abuse and harassment of the Doe plaintiffs by former County Commissioner, George Halcovage, over a period of several years while the plaintiffs were employed by the County. The plaintiffs assert that the County, as well as the other individual defendants, were aware of the ongoing harassment of the plaintiffs, and rather than intervene, they retaliated against the plaintiffs for reporting the abuse and harassment.

Pending before the court is a motion for partial summary judgment filed by one of the defendants, George Halcovage.[1] (Doc. 236). In this motion, Halcovage challenges the plaintiffs' retaliation, equal protection, and intentional infliction of emotional distress claims, arguing that the plaintiffs have not set forth sufficient factual support and evidence to support these claims against him.[2] The motion is fully briefed and ripe for resolution. (Docs. 257, 268, 299). After consideration, the motion will be denied.

## II.   <u>Background</u>[3]

The Doe plaintiffs, four women who were formerly or are currently employed by Schuylkill County, filed this lawsuit in March of 2021. The amended complaint names the County, Halcovage, Glenn Roth, Gary

---

[1] The individual defendants have all filed separate motions for summary judgment (Docs. 238, 239, 240, 243), which will be addressed in separate Memorandum Opinions.

[2] Halcovage's motion requests relief regarding the plaintiffs' PHRA retaliation and aiding and abetting claims, rather than the First Amendment Claim. While the brief in support of this motion vaguely mentions the First Amendment and addresses the retaliation claim generally in a conclusory fashion, we will address the motion as asserting a challenge to the PHRA claim, rather than the First Amendment claim.

[3] The factual background of this Memorandum Opinion is taken from the parties' submissions to the extent those submissions are consistent with the evidence in the record. (Docs. 257, 268, 285-86, 299).

Bender, Heidi Zula, and Doreen Kutzler as defendants. As to Defendant Halcovage, the plaintiffs assert claims of intentional infliction of emotional distress (Count IV); retaliation and aiding and abetting discrimination under the Pennsylvania Human Relations Act ("PHRA") (Counts VI, VII); discrimination and creation of a hostile work environment under the Fourteenth Amendment's Equal Protection clause (Counts VIII, IX); and retaliation in violation of the First Amendment. (Count XIII).[4]

### A. <u>Defendant Halcovage's Abuse and Sexual Harassment of the Doe Plaintiffs</u>

Jane Doe 1 began her employment with the County as a mailroom clerk in 2014. According to Doe 1, Halcovage almost immediately began making comments about her physical appearance. After assisting her with obtaining permanent County employment, Doe 1 contends that Halcovage made remarks to her that indicated he had control over her job, and that she should remain loyal to him. Around October 2014, after working at a political fundraising event that Halcovage asked her to

---

[4] Count X was misnumbered in the amended complaint as Count XIII. Therefore, to avoid confusion, we will refer to this count as Count XIII.

attend, Halcovage walked Doe 1 to her car and kissed her. Halcovage concedes that he kissed Doe 1 on this occasion.

In March of 2015, Doe 1 began working in the Tax Assessment Office. Doe 1 contends that she heard Halcovage making derogatory remarks about her supervisor, Virginia Murray, and that these comments were made in the presence of Defendant Roth, who did nothing to stop Halcovage. She also asserts that Halcovage would visit the Tax Assessment Office and demand her attention or call her into his office and shut the door so that she was alone with him. Others took notice of this behavior, as Commissioner Gary Hess told Doe 1 that she did not have to be alone in Halcovage's office with him. In fact, Commissioner Hess stated in his deposition that he believed this behavior—shutting the door with a subordinate in the office—was inappropriate.

It was shortly after Doe 1 started in the Tax Assessment Office that Halcovage began calling her personal cellular phone, text messaging her, and showing up at her home unannounced and uninvited. When he would go to Doe 1's home, he would ask her to come out to his car. On one occasion, while Doe 1 was in Halcovage's car, he unzipped his pants, exposed his genitals, and requested that Doe 1 perform oral sex on him.

Doe 1 contends that she felt that she had no choice but to submit to Halcovage's demands, as she was fearful of losing her job. Halcovage's requests became more frequent and intensified, ultimately resulting in Halcovage requesting sexual intercourse from Doe 1 on several occasions. Doe 1 asserts that she did not consent to these sexual encounters, and that they usually occurred after Halcovage had provided her with alcohol.[5] These encounters occurred at Halcovage's home, Doe 1's home, and one time at the Schuylkill County Courthouse, during which Halcovage pulled her into a room and attempted to force Doe 1 to perform oral sex on him.

When Doe 1 tried to reject Halcovage's advances, he began inserting himself into her personal life. He would continually call her or drive past her home, and joined the same gym that she attended. He also attempted to ruin her relationship with her then-boyfriend by continuously showing up at her home and calling her. Halcovage also made comments to Doe 1 that made her believe her job was contingent on her continued submission to his sexual advances. According to Doe 1, Halcovage's

---

[5] At the time, Doe 1 admitted she struggled with alcoholism, a fact that Halcovage conceded he knew.

requests for sexual favors occurred on a weekly basis and were often preceded by Halcovage giving her alcohol.

Jane Doe 2 began working for the County around December of 2014 in the Treasurer's Office. On the day she interviewed for the position, she met Halcovage, who instantly told her that she could use him as a reference for the job. She was introduced to Halcovage by her friend Doe 1. Ultimately, Doe 2 applied for and accepted a clerk position in the Tax Assessment office.

According to Doe 2, Halcovage was known for making crude and sexual comments around the office. These comments sometimes escalated to remarks insinuating that he and Doe 2 were having a sexual relationship. Doe 2 contends that these comments evolved into rumors that she was having sex with Halcovage, which caused a strain in her personal and working relationships with others at the courthouse. Halcovage also made remarks to Doe 2's then-husband, insinuating that he was having a sexual relationship with her. Halcovage would sometimes show up at her home unannounced under the guise of needing to discuss work.

At some time in 2015 or 2016, Doe 2 became aware that Halcovage and Doe 1 were engaging in a sexual relationship. After Doe 2 became aware of the relationship, Halcovage made comments to her insinuating that Doe 1 would be upset if he and Doe 2 had sex. Halcovage also would repeatedly call Doe 2 or show up unannounced at her home when Doe 1 would not answer his calls.   Although Halcovage's behavior was uninvited and unwanted, Doe 2 stated that she did not report Halcovage's behavior for fear of losing her job.

Jane Does 3 and 4 began employment with the County prior to Jane Does 1 and 2. In 2011, Doe 3 became the Tax Claim Director. Soon thereafter, Halcovage informed Doe 3 that if she ever wanted a promotion, she would need to change her political party to Republican. Doe 3 reluctantly changed her political party and, almost immediately after doing so, received a pay increase. Halcovage would then remind Doe 3 that she "owed him" for the pay increase and expected her loyalty. Halcovage also told Doe 4 she needed to change her political party, which she reluctantly did for the same reasons as Doe 3.

According to Does 3 and 4, Halcovage regularly visited the Tax Claim Office and subjected the female employees to sexual harassment.

Halcovage made comments to Doe 3 about her relationship with her husband, as well as remarks about her appearance. He would also make derogatory comments insinuating that some of the female employees were not intelligent. He further made comments about the how Doe 4 was eating freeze pops and told other inappropriate and sexually charged jokes. Does 3 and 4 also recounted Halcovage making derogatory statements about their then-supervisor, Virginia Murray, and starting rumors that she was a lesbian. Defendant Glenn Roth, the assistant solicitor for the county, was either present for or was aware of these comments made by Halcovage. In fact, Doe 3 contends that Roth remarked to her that he needed to speak to Halcovage about his behavior around the office. However, Roth never followed up or spoke to Halcovage about it.

Does 3 and 4 also recounted that Halcovage would often come into the Tax Claim and Tax Assessment offices toward the end of the day. He would position himself in front of their doors so that they could not leave the office until he was finished speaking with them. Halcovage also made a comment to Doe 4 while she was in the office about having a job for her while she was "down on her knees," which she took to mean he was

insinuating that she should perform oral sex on him. Another time, during an argument between Halcovage and Doe 4, Halcovage interrupted Doe 4 by suggesting that they have sex. He also made a comment to Doe 4 after they had taken a sexual harassment training, telling her she got the number 69 wrong, which Doe 4 took to be a reference to a sexual position. Does 3 and 4 repeatedly told Defendant Roth about Halcovage's behavior, but Roth never intervened or reported any of the behavior to Human Resources. When Doe 3 or Doe 4 objected directly to Halcovage's comments, he would retort by stating that he knew what he could get away with.

### B. The Plaintiffs' Reports Regarding Halcovage's Harassment

In March of 2020, Doe 1 and Doe 2, among other employees, were furloughed due to the COVID-19 pandemic. In May of 2020, after she had spent some time away from the courthouse and after she had been working under a new supervisor with whom she felt comfortable, Doe 1 disclosed the ongoing sexual abuse and harassment by Halcovage to her direct supervisor, Doe 3. Doe 3 then reported Doe 1's allegations to Debra Twigg, who was the Human Resources Director at the time, and

Defendant Gary Bender, the County Administrator and Doe 3 and 4's direct supervisor.

Ms. Twigg undertook an investigation into Doe 1's allegations. The investigation also included allegations by the other Doe plaintiffs regarding Halcovage's harassment. Ms. Twigg compiled a report after interviewing the Doe plaintiffs, Halcovage and other witnesses.  The report was sent to Defendants Roth and Bender, as well as the other county commissioners, Gary Hess and Barron "Boots" Hetherington. The report indicated that Doe 1 revealed she had been in a sexual relationship with Halcovage for seven years, but that it was not a consensual relationship, as she felt that she had to submit to his advances to keep her job. Halcovage admitted to being in a sexual relationship with Doe 1 but stated that it was consensual. Halcovage further admitted to the incident in which he called Doe 1 to the courthouse on a Saturday, took her into an office, and unzipped his pants implying she should perform oral sex on him. He denied some of Doe 1's other allegations of sexual abuse.

Regarding Doe 2's allegations, Halcovage admitted to regularly texting Doe 2 and showing up at her home uninvited. He further

admitted to showing up at Doe 2's parents' home on the day Doe 1 reported Halcovage's abuse and after Doe 2 did not answer his calls. However, he denied that he ever propositioned Doe 2 for sex or insinuated that they should have a sexual relationship.

As to Doe 3's allegations, Halcovage admitted to spending time in the tax offices but denied that he would turn conversations into that of a sexual nature. Defendant Roth corroborated some of the allegations made against Halcovage, including some of the sexual jokes that Halcovage told in the office that Roth stated he did not appreciate. Roth further conceded that Halcovage would also stop by his office toward the end of the day, at which time Roth felt obligated to stay and talk with him. Roth also corroborated Doe 3's allegations regarding statements made by Halcovage concerning her "loyalty" to him.

Regarding Doe 4's allegations, Halcovage denied ever making comments about her eating freeze pops or interrupting their argument to suggest they have sex. Halcovage also denied that he told Does 3 and 4 to change their political parties if they wanted to be promoted. However, Roth indicated that Doe 3 informed him about the comments Halcovage made to Doe 4 about eating freeze pops and being "on her knees."

Ultimately, Ms. Twigg's report concluded that Halcovage had violated the County's Sexual Harassment Policy, the Conduct and Disciplinary Action Policy, and the Physical and Verbal Abuse Policy. The report further stated that because Halcovage was an elected official and was not subject to removal by the County Administration, it was recommended that he resign his position as commissioner. Additionally, if Halcovage insisted on remaining in his position, the report recommended that the County continue with the steps taken since the investigation for the safety of the complainants, which included moving Doe 3 and Doe 4's parking spots, permitting Doe 1 and Doe 2 to work from home, and prohibiting Halcovage from having any contact with the Tax Claim and Tax Assessment offices.

### C. The Aftermath of the Plaintiffs' Reporting

Following the plaintiffs' reports to HR and Ms. Twigg's findings, the Doe plaintiffs contend that they were subjected to significant backlash and retaliation at the hands of the defendants. When Does 1 and 2 returned from furlough, they were initially permitted to work from home to limit any interactions they might have with Halcovage. This was put into place because Halcovage not only refused to resign his position as

commissioner, but refused to work from home, despite requests to do so from several County employees, including Bender and Commissioner Hess. Additionally, restrictions were initially placed on Halcovage's access to County buildings by Sheriff Joseph Groody, such as requirements that he be searched by security and escorted throughout the buildings. Further, the County moved Doe 3 and Doe 4's parking spots to a different lot than Halcovage's assigned parking spot, so that they could limit their interactions with him as well.

However, in July of 2020, there was an incident in which Halcovage was seen climbing a steep embankment from the lower parking lot to get to the upper lot where Does 3 and 4 parked. Does 3 and 4 were seated in a car in the parking lot talking to their attorney on the phone at the time. When they returned to their offices, a colleague mentioned that he had seen Halcovage coming up into the parking lot and toward the car where Does 3 and 4 were seated. Several individuals deposed in this matter stated that the embankment is steep, and that there are other, safer ways to get from the lower to the upper lot. For his part, Halcovage stated that he went up the embankment because he needed access to the courthouse, and no one from the sheriff's office had answered his calls to escort him

into the building. Another incident occurred in August, after Does 3 and 4 conducted an assessment appeal hearing in the commissioners' boardroom. According to Doe 3, she had scheduled the room for the hearing for two hours. After the hearing had concluded but within the timeframe she had reserved the room, Doe 3 went back into the room because she had forgotten her laptop, and Halcovage was in the boardroom when she went in to retrieve it, despite the fact that he was not supposed to have contact with her.

Regarding Does 1 and 2, while they were initially permitted to work from home, they were subjected to several obstacles that did not allow them to perform their work. Doe 3, as their supervisor, asked Bender to supply Does 1 and 2 with the office supplies they needed to work from home. However, by October of 2020, they still did not have the necessary supplies to complete their work from home. Thus, the plaintiffs emailed the interim HR Director, Defendant Doreen Kutzler, and asked her how to get the necessary supplies. Kutzler eventually was able to order new laptop computers for Does 1 and 2. However, in her deposition, Kutzler stated that she did not believe that what was supplied by the County was sufficient for Does 1 and 2 to complete their work from home.

It was around this time in October or November of 2020 that an issue was brought to light regarding delinquent reports to the State Tax Equalization Board ("STEB"), which was a main part of Doe 1's job. Accordingly, Doe 3 reached out to Kutzler and Bender to determine a day that Doe 1 could come into the office to upload or complete the delinquent STEB reports, recognizing that Doe 1 did not want to be present at the courthouse if Halcovage was in the courthouse. However, Bender instructed Kutzler that the STEB reports were not an HR issue and, as such, she should not answer Doe 3's email. For her part, Kutzler stated in her deposition that she reminded Bender that Doe 1 still did not have the necessary equipment to complete her work from home.

As a result of the delinquent reports, Bender ultimately made the decision to revoke Doe 1 and Doe 2's work from home status and move them into offices in another county building, the 410 Building. Bender stated in his deposition that he believed Does 1 and 2 could safely work from the 410 Building and complete their work. While the STEB reports were Doe 1's responsibility, Does 3 and 4 ultimately finished and submitted the reports so that they were no longer delinquent. Additionally, around this same time, another employee made a statement

15

to HR regarding Doe 2's behavior while out working on the road, alluding to possible elicit drug use. Kutzler and Roth met with this individual and had her sign a statement memorializing what she had told HR. According to the plaintiffs, this employee later expressed to them that she felt compelled by Roth and Kutzler to sign the statement.

Does 1 and 2 were informed toward the end of 2020 that they would have to work from the 410 Building and that they were no longer permitted to work from home. The 410 Building is a County building that houses several offices, including the election bureau. Thus, the public had access to the building. However, the plaintiffs were told that Halcovage would not be permitted to access the 410 Building after Does 1 and 2 were relocated there. In fact, several individuals, including Kutzler and Bender, informed the plaintiffs that Halcovage could be arrested if he accessed the building, and that Halcovage was told the same. However, Kutzler stated in her deposition that Halcovage pushed back, arguing with Bender that he was entitled to go anywhere he wanted. Sheriff Groody further indicated in his deposition that while he did not think he could personally arrest Halcovage for entering the 410 Building, he

would have informed the Pottsville Police, who could have arrested Halcovage if they chose to do so.

Kutzler arranged for Does 1 and 2 to meet with Bender to get the keys to their new offices. However, the plaintiffs voiced a concern, given that a charge had been filed with the Equal Employment Opportunity Commission ("EEOC") by that time and Bender was named in the charge, and ultimately Kutzler met with Does 1 and 2 to give them their office keys in December of 2020. Upon entering the assigned office spaces, Does 1 and 2 had concerns with the condition of the new offices. These concerns included wet ceiling tiles, old food items, and mouse droppings left about the space, as well as concerns that there was no cabinet space and old computers taking up other space. Given the plaintiffs' concerns, Kutzler tried contacting a cleaning service but ultimately ended up cleaning the offices herself. In addition to the cleanliness of the offices, the plaintiffs also voiced a concern regarding a lack of parking spaces at the building for Does 1 and 2.

Does 1 and 2 ultimately began working from the 410 Building in January of 2021, around the same time that Defendant Heidi Zula started as the County's HR Director. Around this time, the plaintiffs

reported several incidents to HR, including that Halcovage was using a door that he was explicitly told he could not use, and that Does 1 and 2 saw Halcovage lurking around outside of the 410 Building shortly after they began working from there. Additionally, Doe 3 received a call from Doe 2 that Halcovage was seen following her in her car while she was working in the field. This led Doe 3 to instruct Does 1 and 2 to work from home. However, Doe 3 received a notice from Bender and Zula shortly thereafter informing her that she did not have the authority to allow her employees to work from home.

During this time, Bender expressed frustration with Does 3 and 4 and their lack of communication with him as the County Administrator and their direct supervisor. Although he had been named in their EEOC complaint, he stated in his deposition that he believed they still needed to communicate with him on some level for the County's business to function properly and efficiently. According to Bender, it was a combination of the lack of communication with Does 3 and 4, as well as the delinquent STEB reports by Doe 1, that led to a discussion regarding

restructuring the tax office in 2021.[6] Zula stated in her deposition that

Bender directed her to look into issues with the Tax Assessment office,

and that prior to her conclusion that the offices should be separated,

there were discussions about removing Doe 3 from her position.

Ultimately, Zula recommended to Bender that the offices be restructured

and separated into Tax Claim and Tax Assessment, effectively removing

Doe 3 from her position over both offices. On March 17, 2021, the

restructuring was voted on at the board of commissioners meeting, and

the commissioners voted 2 to 1 to transfer Doe 3 to the position of Tax

Claim Director and Doe 4 to Deputy Chief Assessor. These transfers

resulted in a reduction in salary for Does 3 and 4. Halcovage was one of

the two "yes" votes to transfer Does 3 and 4. Does 3 and 4 were notified

by email of the transfer and restructure of the office.[7]

Following the vote, and after the time the plaintiffs filed the initial

complaint in this matter, the County hired Tony Alu as a consultant to

---

[6] The record indicates that prior to 2019, the Tax Claim and Tax
Assessment Offices were separate. In May of 2019, Halcovage brought up
the idea of combining the two offices and placing Doe 3 in charge of both
offices, which was ultimately approved by a vote of the commissioners.

[7] It appears that at the time Does 3 and 4 were notified of the transfer,
Doe 4 was out on bereavement leave following the death of her brother.

19

oversee the restructure. According to Bender, when Alu first visited the tax offices, Does 3 and 4 made unprofessional comments to Alu at some point that resulted in them receiving written reprimands after an HR investigation, which was conducted by Zula. Bender stated in his deposition that at the time the written reprimands were issued, he already felt that Does 3 and 4 should be terminated.

Thereafter, in May of 2021, Kent Hatter was appointed to the position of Chief Assessor for the Tax Assessment department. Under Hatter's supervision, Doe 1 was still having an issue submitting timely STEB reports, but Bender did not question Hatter's operation of the Tax Assessment department as he did when Doe 3 headed the department. In July of 2021, Hatter issued a warning to Doe 2 regarding her lack of work product and her absences from work. Ultimately, the County determined that Doe 2 had abandoned her position and considered her to have resigned her position with the County. Doe 2 attempted to grieve this employment determination, but no one responded to her grievance.

At some time during the summer of 2021, Does 3 and 4 were approved for leave under the Family and Medical Leave Act ("FMLA). In August, while on FMLA leave, Doe 3 accessed her County LexisNexis

account from her cellular phone to retrieve a bill that was due for the County. Deb Dash, who took over some of Doe 3's responsibilities while she was on leave and was receiving Doe 3's County emails, got a notification that someone had accessed the LexisNexis account from a cellular phone. Ms. Dash informed Roth, who contacted LexisNexis to determine who had accessed the account. After it was determined that Doe 3 had accessed the account, rather than reach out to Doe 3 and ask why she had accessed the LexisNexis account, Bender directed Zula to gather information on the account's search history dating back to January of 2020. During this time, in September of 2021, Does 3 and 4 were suspended without pay by Bender pending the results of the investigation. The initial investigation by Zula revealed a list of names that had been searched, including employees in the County. After sharing the list with Bender and the county commissioners, including Halcovage, and interviewing Does 3 and 4, Zula ultimately determined that the searches had not been conducted for an appropriate business purpose and violated LexisNexis protocols.

Following this initial investigation by Bender and Zula, Bender directed Zula to draft termination personnel action reports ("PARs") for

Does 3 and 4. In November of 2021, the commissioners met to vote on the termination PARs, and Commissioner Hess moved to table the terminations, expressing serious concerns regarding the termination of Does 3 and 4 based on an investigation performed by individuals who were named as defendants in the instant lawsuit. Accordingly, Hess called for an independent investigation into Doe 3 and 4's use of LexisNexis prior to a vote on their termination. The County then retained the law firm of Eckert Seamans to review Zula's investigation and provide an independent report.

Bender again proposed the termination of Does 3 and 4 in March of 2022, with the supporting recommendation of Zula and Roth. At the board of commissioners meeting, Halcovage moved to terminate Does 3 and 4 but abstained from the actual vote on their terminations, while Commissioner Hetherington voted yes, and Hess voted no. Commissioner Hess commented that he did not see enough evidence that Does 3 and 4 utilized LexisNexis with the intent to use any personal information or cause financial harm to anyone. Commissioner Hetherington made a closing statement indicating his disappointment in his fellow commissioners given the serious allegations against Does 3 and 4 and the

findings reported by Eckert Seamans, which he felt supported termination. In his deposition, Commissioner Hess indicated his belief that the County was looking to "build a case" against Does 3 and 4 and looking for reasons to discipline or terminate them. As of the filing of the instant motion, Does 3 and 4 remain suspended without pay from their County positions.

### D. Procedural History

The plaintiffs initially filed this action on March 16, 2021, and filed an amended complaint on October 29, 2021, which is currently the operative complaint. (Docs. 1, 63). The amended complaint names the County, Halcovage, Bender, Roth, Zula, and Kutzler as defendants. As it relates to the individual defendants, after they filed motions to dismiss, the Court dismissed the PHRA discrimination claims against them, but all other claims were permitted to proceed forward. (*See* Docs. 124, 126, 132, 134, 136).

As to Halcovage, the plaintiffs assert claims of intentional infliction of emotional distress (Count IV); retaliation and aiding and abetting discrimination under the Pennsylvania Human Relations Act (Counts VI, VII); discrimination and creation of a hostile work environment under

the Fourteenth Amendment's Equal Protection clause (Counts VIII, IX); and retaliation in violation of the First Amendment. (Count XIII). Halcovage has now filed a motion for partial summary judgment, arguing that the plaintiff's IIED claim, retaliation and aiding and abetting claims under the PHRA, and Equal Protection claims fail as a matter of law. (Doc. 236).

After consideration, we conclude that there are genuine issues of material fact that preclude summary judgment in favor of the defendant. Accordingly, the motion will be denied.

III.   <u>Discussion</u>

A. <u>Motion for Summary Judgment – Standard of Review</u>

The defendant has filed a motion for summary judgment pursuant to Rule 56 of the Federal Rules of Civil Procedure. Rule 56(a) provides that a court shall grant summary judgment "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The materiality of the facts will depend on the substantive law. *Anderson v. Liberty Lobby*, 477 U.S. 242, 248 (1986). Thus, "[o]nly disputes over facts that might affect the outcome of the suit under governing law" will

preclude summary judgment. *Id.* A dispute is only genuine if a reasonable juror could find in favor of the nonmoving party. *Id.*

The moving party bears the initial burden to "demonstrate the absence of a genuine issue of material fact," relying on pleadings, depositions, affidavits, and other evidence in the record. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). If the movant "successfully points to evidence of all of the facts needed to decide the case on the law," the nonmovant can still defeat summary judgment by pointing to evidence in the record which creates a genuine dispute of material fact and from which a jury could find in its favor. *El v. Southeastern Pennsylvania Transp. Auth. (SEPTA)*, 479 F.3d 232, 238 (3d Cir. 2007). However, "[i]f the evidence is merely colorable, or is not significantly probative, summary judgment may be granted." *Anderson*, 477 U.S. at 249-50 (citations omitted). A court may not make credibility determinations or weigh the evidence, but "must view the facts in the light most favorable to the non-moving party." *Hugh v. Butler County Family YMCA*, 418 F.3d 265, 267 (3d Cir. 2005).

**B.** **The Defendant's Motion for Partial Summary Judgment will be Denied.**

As we have noted, Halcovage challenges the plaintiffs' IIED, PHRA retaliation and aiding and abetting, and Equal Protection claims. (Doc. 236). However, after a careful review of the record, we conclude that there are genuine issues of material fact with respect to these claims against Halcovage. Accordingly, the motion will be denied.

### 1. <u>Intentional Infliction of Emotional Distress</u>

Does 1 and 2 have asserted a claim for intentional infliction of emotional distress ("IIED") against Halcovage. This claim is based on Halcovage's alleged conduct, which includes the years-long sexual abuse of Doe 1 and the harassing and threatening behavior toward both Doe 1 and Doe 2, as well as the harassing behavior that occurred following the reporting of the abuse and harassment. For his part, Halcovage contends that the plaintiffs have not alleged conduct that constitutes extreme and outrageous behavior sufficient to impose liability for a claim of IIED.

A claim of IIED under Pennsylvania law requires that a plaintiff establish: (1) extreme and outrageous conduct by the defendant; (2) that the conduct is intentional or reckless; (3) that the conduct causes emotional distress; and (4) that the distress suffered is severe. *Hoy v. Angelone*, 691 A.2d 476, 481 (Pa. Super. Ct. 1997) (citations omitted). For

conduct to be considered extreme and outrageous, it must go "beyond all possible bounds of decency," so as to be "regarded as atrocious, and utterly intolerable in a civilized society." *DiSalvio v. Lower Merion High School Dist.*, 158 F.Supp.2d 553, 561 (E.D. Pa. 2001) (quoting *Kazatsky v. King David Memorial Park, Inc.*, 527 A.2d 998, 990-91 (Pa. 1987)).

As the Third Circuit has noted, "it is extremely rare to find conduct in the employment context that will rise to the level of outrageousness necessary to provide a basis for recovery" for an IIED claim. *Andrews v. City of Phila.*, 895 F.2d 1469, 1487 (3d Cir. 1990). The Court of Appeals further reasoned that allegations of sexual harassment, standing alone, are generally insufficient to establish the level of outrageousness necessary to support an IIED claim. *Id.* However, the Court noted at least one instance "in which courts applying Pennsylvania law have found conduct outrageous in the employment context is where an employer engaged in both sexual harassment and other retaliatory behavior against an employee." *Id.* (quoting *Cox v. Keystone Carbon*, 861 F.2d 390, 395 (3d Cir. 1988) (citing *Bowersox v. P.H. Glatfelter Co.*, 677 F.Supp. 307, 311 (M.D. Pa. 1988)). The Court reasoned that the "extra factor" of

"retaliation for turning down sexual propositions" was a key distinction.
*Id.*

In the instant motion, Halcovage's only challenge to the plaintiffs' IIED claim is that they have not shown the requisite extreme and outrageous conduct to sustain this claim. We disagree. The evidence produced indicates the presence of the "extra factor" recognized by the Court of Appeals—retaliation for turning down sexual propositions. Doe 1 has asserted that Halcovage engaged in a years-long, nonconsensual sexual relationship with her, and then retaliated against her when she reported the abuse and ceased to submit to his sexual requests. The record, taken in a light most favorable to the plaintiffs as the nonmovants, establishes that Doe 1 felt compelled to give in to Halcovage's requests for sexual propositions for fear of losing her job. After she stopped submitting to his requests and reported the abuse, Doe 1 asserts that Halcovage continued to harass her in a variety of ways, including but not limited to inserting himself in personnel decisions relating to her employment, refusing to work from home so that she could work in the courthouse, and harassing her supervisors who supported her in reporting the abuse, all of which she contends gravely affected her

ability to do her job. In fact, the evidence shows that Doe 1 was unable to complete much of her work in 2020, *i.e.*, the STEB reports, after she reported the abuse to HR, which she attributes to mental distress from the sexual abuse and harassment, as well as her belief that Halcovage inserted himself into decisions regarding her workspace.

As it pertains to Doe 2, there is a factual dispute regarding whether Halcovage sexually propositioned her—while Halcovage denies that he did, Doe 2 contends that on at least one occasion, Halcovage directly propositioned her for sex. Doe 2 asserts that she rebuffed Halcovage's sexual advances and sexual harassment, but that he then retaliated against her by harassing her and involving himself in her job and personal life. This retaliation included Halcovage having a hand in revoking her work from home status in 2020, following her while she was performing field work, and harassing her supervisors who were supporting her reports of harassment against Halcovage. She contends that this conduct by Halcovage led to emotional distress that caused her to miss work, which was ultimately the reason she was deemed to have abandoned her position and resigned from her job with the County.

Thus, the record contains evidence of ongoing sexual abuse and harassment, coupled with retaliation against the employees who were abused, harassed, and reported the behavior. As the Third Circuit reasoned in *Cox* and *Andrews*, this is a case in which a jury could find that Halcovage's behavior toward Does 1 and 2 constituted extreme and outrageous conduct in the employment context sufficient to establish liability for a claim of IIED. Accordingly, Halcovage's motion for partial summary judgment on the plaintiffs' IIED claim will be denied.

### 2. PHRA Retaliation and Aiding and Abetting

Halcovage also challenges the plaintiffs' PHRA claims against him for retaliation and aiding and abetting discrimination. Section 955(d) of the PHRA prohibits any person from discriminating against an individual because the individual opposed an unlawful discriminatory practice under the PHRA. 42 P.S. § 955(d). PHRA retaliation claims follow the same framework as retaliation claims under Title VII of the Civil Rights Act—a plaintiff must show she engaged in protected activity, that she was subject to adverse employment action, and that there is a causal connection between her protected activity and the adverse action taken against her. *Fasold v. Justice*, 409 F.3d 178, 188 (3d Cir. 2005)

(noting that PHRA retaliation claims follow Title VII's *McDonnell Douglas* framework).

In the instant case, it is undisputed that the plaintiffs engaged in protected activity when they reported Halcovage's sexual abuse and harassment, first to HR, and then by filing a claim with the EEOC and eventually this federal civil rights lawsuit. Further, the plaintiffs have shown that they were subjected to adverse employment actions by Halcovage. The evidence establishes that after the Doe plaintiffs reported Halcovage's conduct, Doe 1 and Doe 2 were hindered from doing their jobs at home due to the County not providing them with proper supplies. Thereafter, their work from home status was revoked, and they were forced to move into unsuitable offices in the 410 Building. While Halcovage contends that he had no part in these adverse actions against Does 1 and 2, it is undisputed that Does 1 and 2 were uncomfortable working in the courthouse if Halcovage was present, a fact that Halcovage knew. However, even after being asked by several County employees, Halcovage refused to alter his schedule or work from home so that Does 1 and 2 could work from their offices.

As it pertains to Does 3 and 4, they have asserted that they were subjected to discipline after reporting Halcovage's behavior, *i.e.*, write ups, investigations, and suspensions, which they had never received prior to reporting Halcovage's conduct. Specifically, Does 3 and 4 suffered demotions, including a reduction in pay, after the tax offices were restructured, which they attribute to their reporting of Halcovage's abuse and harassment.[8] Further, they have been indefinitely suspended from their positions with the County, and it is undisputed that Halcovage was involved in reviewing the plaintiffs' LexisNexis searches, which led to their suspensions. He also moved for a vote on their termination PARs,

---

[8] While Halcovage devotes several pages of his brief to arguing that he is entitled to legislative immunity for any vote taken as a county commissioner, specifically as it pertains to the restructure of the tax offices, we find that Halcovage has waived the defense of legislative immunity, as he failed to raise it as an affirmative defense in his answer or in his motion to dismiss. *See Powell v. Ridge*, 247 F.3d 520, 531 (3d Cir. 2001) (Roth, J., concurring) ("If the Legislative Leaders had been named as defendants in the first instance and had failed to assert their legislative immunity as an affirmative defense, they unquestionably could be deemed to have waived that immunity."). Further, we note that Halcovage also asserts the defense of qualified immunity with respect to his vote on the restructure of the tax claim offices. This immunity argument may be applicable to the plaintiffs' First Amendment retaliation claim; however, as Halcovage's motion and brief fail to assert any kind of substantive argument regarding this First Amendment claim, we decline to address Halcovage's argument concerning qualified immunity.

while technically abstaining from the vote. The Doe plaintiffs also assert that the LexisNexis investigation never would have occurred if they did not report Halcovage's behavior, an assertion that is supported by Commissioner Hess's testimony that he believed the County was looking for reasons to suspend and/or terminate them.

Accordingly, viewing the evidence in the record in a light most favorable to the plaintiffs, we find that a jury could conclude that the plaintiffs suffered adverse employment actions at the hands of Halcovage after they reported his unlawful, discriminatory behavior. Thus, the motion for summary judgment will be denied with respect to this claim.

With respect to the aiding and abetting claim, § 955(e) prohibits an employer or individual from aiding and abetting unlawful discrimination or retaliation under the PHRA. § 955(e). Typically, only supervisory employees are liable under the aiding and abetting provision of the PHRA. *McIlmail v. Pennsylvania*, 381 F. Supp. 3d 393, 415 (E.D. Pa. 2019). Here, the law of the case establishes that Halcovage, as a county commissioner, acted in a supervisory role over the plaintiffs, and thus is subject to liability under the PHRA's aiding and abetting provision. (Doc. 125 at 24-25). Further, it has been established that "sexual harassment

is actionable under the PHRA when the harassment 'is sufficiently "severe or pervasive" to alter the "terms, conditions, or privileges" of his or her employment.'" (*Id.*) (citations omitted).

In this case, we have no trouble finding that a jury could conclude that Halcovage, as the plaintiffs' supervisor, engaged in a pattern of rampant sexual harassment of all four plaintiffs, as well as other female County employees, that was sufficiently severe or pervasive to alter the terms or conditions of their employment. The plaintiffs have asserted that since the inception of their employment at the County, Halcovage routinely visited their offices and subjected them to sexually harassing comments and jokes. With respect to Does 1 and 2, the record shows that Halcovage engaged in continued harassment of these plaintiffs, including allegations of a coerced sexual relationship with Doe 1, coupled with Halcovage's concession that he would show up at Doe 1 and Doe 2's homes unannounced and uninvited. Moreover, after the plaintiffs reported Halcovage's abuse and harassment, they assert that he continued to harass them and took part in subjecting them to adverse employment decisions, including altering Doe 1 and Doe 2's workspace and

investigating and suspending Does 3 and 4. Accordingly, Halcovage's motion for summary judgment on this claim will be denied.

### 3. <u>Equal Protection</u>

Finally, Halcovage challenges the plaintiffs' Equal Protection claims against him. The plaintiffs have asserted that Halcovage subjected them to discrimination because of their sex and created a hostile work environment in violation of the Fourteenth Amendment's Equal Protection clause. Curiously, Halcovage appears to rely on the same arguments made against the retaliation claims—that he did not directly participate in any of the retaliatory actions taken against the plaintiffs.

To state a claim for discrimination under the Equal Protection clause, the plaintiffs must show that they endured "'purposeful discrimination' because of [their] sex." *Robinson v. City of Pittsburgh*, 120 F.3d 1286, 1293 (3d Cir. 1997) (citation omitted). Accordingly, they must establish that they were subjected to "(1) disparate treatment in relation to other similarly situated individuals, and (2) that the discriminatory treatment was based on sex." *Johnston v. Univ. of Pittsburgh of Com. System of Higher Education*, 97 F. Supp. 3d 657, 667 (W.D. Pa. 2015).

Further, to state a claim for a hostile work environment, the plaintiffs must demonstrate (1) intentional discrimination based on their sex; (2) that "the discrimination was severe or pervasive"; (3) they were detrimentally affected by the discrimination; (4) that the discrimination "would have detrimentally affected a reasonable person in like circumstances"; and (5) employer liability. *Komis v. Sec'y of U.S. Dep't of Labor*, 918 F.3d 289, 293 (3d Cir. 2019). As this Court noted previously, "it is well settled that '[t]he intent to discriminate on the basis of sex in cases involving sexual propositions, innuendo ... or sexual derogatory language is implicit, and thus should be recognized as a matter of course.'" (Doc. 125 at 28) (citing *Andrews*, 895 F.2d at 1482 n.3). Additionally, "[s]exual assault is the most severe form of harassment, and severe harassment is actionable under a hostile work environment claim." *Vandegrift v. City of Phila.*, 228 F. Supp. 3d 464, 485 (E.D. Pa. 2017).

Here, we conclude that a reasonable juror could find that Halcovage discriminated against the plaintiffs because of their sex and subjected them to a hostile work environment. As we have already discussed at length, the evidence shows that Halcovage repeatedly subjected the

plaintiffs, as well as other female County employees, to harassing comments and jokes of a sexual nature. Regarding Does 1 and 2, Halcovage is alleged to have sexually abused Doe 1 and sexually propositioned Doe 2, although Halcovage disputes some of these assertions. As it pertains to all the Doe plaintiffs, they have asserted that Halcovage engaged in a pattern of rampant sexual harassment since they began working with the County. Examples of this harassment include comments about their appearance, making jokes of a sexual nature toward them, and even propositioning them for sex. Again, while Halcovage disputes some of these assertions, at the summary judgment stage, we may not make credibility determinations or weigh the evidence; rather, we must simply view the facts in a light most favorable to the plaintiffs as nonmovants. *Hugh*, 418 F.3d at 267. Accordingly, we conclude that the plaintiffs have shown that Halcovage subjected them to severe and pervasive discriminatory sexual harassment.

Further, the plaintiffs have established that the harassment detrimentally affected them and would likely affect a reasonable person in similar circumstances. The plaintiffs have asserted that Halcovage's harassment of Does 1 and 2 caused them to request to work from home

and refuse to work in the same building as Halcovage. Additionally, Does 1 and 2 contend that the mental toll of Halcovage's sexual abuse and harassment caused them to miss work often, which ultimately resulted in Doe 2's forced resignation from the County. As to Does 3 and 4, they requested that their parking spaces be moved so as not to encounter Halcovage. They further assert that due to Halcovage's harassing behavior and their subsequent report of the behavior, they were written up, investigated, and suspended from their jobs, all of which detrimentally affected them.

Finally, there is a basis for employer liability in this case. Employer liability may be found where a supervisor creates a hostile work environment; in such cases, "[an] employer is subject to vicarious liability to a victimized employee for an actionable hostile environment created by a supervisor with immediate (or successively higher) authority over the employee." *Faragher v. City of Boca Raton*, 524 U.S. 775, 807 (1998). As we have already determined, Halcovage had a supervisory role over the plaintiffs in his role as a county commissioner. Accordingly, a basis for employer liability exists, and we find that the plaintiffs have sufficiently set forth evidence from which a jury could find in their favor

on their Equal Protection claims. Accordingly, Halcovage's motion for summary judgment will be denied.

## IV.   Conclusion

For the foregoing reasons, Defendant Halcovage's motion for partial summary judgment (Doc. 236) will be DENIED.

An appropriate order follows.

Submitted this 7th day of March 2024.

*s/ Daryl F. Bloom*
Daryl F. Bloom
United States Magistrate Judge
