IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| JANE DOE, et al., | : | Civ. No. 3:21-CV-477 |
| | : | |
| Plaintiffs, | : | |
| | : | |
| v. | : | |
| | : | (Magistrate Judge Bloom) |
| SCHUYLKILL COUNTY | : | |
| COURTHOUSE, et al., | : | |
| | : | |
| Defendants. | : | |

## MEMORANDUM OPINION

### I.   Introduction

This is a civil action brought by four Jane Doe plaintiffs against Schuylkill County and several individual defendants. The claims in this case involve allegations of sexual abuse and harassment of the Doe plaintiffs by former County Commissioner, George Halcovage, over a period of several years while the plaintiffs were employed by the County. The plaintiffs assert that the County, as well as the other individual defendants, were aware of the ongoing harassment of the plaintiffs, and rather than intervene, they retaliated against the plaintiffs for reporting the abuse and harassment.

Pending before the court is a motion for summary judgment filed by one of the defendants, Gary Bender.[1] (Doc. 236). In this motion, Bender challenges the plaintiffs' retaliation and aiding and abetting claims under the Pennsylvania Human Relations Act ("PHRA"), their Equal Protection claims, and their First Amendment retaliation claims, arguing that the plaintiffs have not set forth sufficient facts and evidence to support these claims against him. The motion is fully briefed and ripe for resolution. (Docs. 250, 282, 300).[2] After consideration, the motion will be denied.

## II.   <u>Background</u>[3]

---

[1] The individual defendants have all filed separate motions for summary judgment (Docs. 236, 239, 240, 243), which will be addressed in separate Memorandum Opinions.

[2] Bender has also filed a motion to strike the plaintiffs' counterstatement of facts, arguing that it is an improper filing under Local Rule 56.1, and further, that the counterstatement of facts contains legal conclusions and unsupported factual assertions. (Doc. 295). However, rather than strike the plaintiffs' counterstatement of facts, we will simply disregard any factual assertions that are unsupported by the record or amount to mere legal conclusions. *See Rooney v. NVR, Inc.*, 2020 WL 1864609, at *1 n.1 (D.N.J. April 13, 2020) (denying the defendant's motion to strike the plaintiff's response).

[3] The factual background of this Memorandum Opinion is taken from the parties' submissions to the extent those submissions are consistent with the evidence in the record. (Docs. 250, 259, 282, 293-94, 300).

The Doe plaintiffs, four women who were formerly or are currently employed by Schuylkill County, filed this lawsuit in March of 2021. The amended complaint names the County, Halcovage, Glenn Roth, Gary Bender, Heidi Zula, and Doreen Kutzler as defendants. As to Defendant Bender, the plaintiffs assert claims of retaliation and aiding and abetting discrimination under the Pennsylvania Human Relations Act ("PHRA") (Counts VI, VII); discrimination and creation of a hostile work environment under the Fourteenth Amendment's Equal Protection clause (Counts VIII, IX); and retaliation in violation of the First Amendment. (Count XIII).[4]

## A. Allegations of Halcovage's Sexual Abuse and Harassment Prior to May of 2020[5]

Jane Doe 1 began working for Schuylkill County in 2014. She alleged that Defendant Halcovage subjected her to sexual abuse and harassment from the beginning of her employment. This abuse and

---

[4] Count X was misnumbered in the amended complaint as Count XIII. Therefore, to avoid confusion, we will refer to this count as Count XIII.

[5] For the sake of brevity, we limit this discussion to the factual allegations and supporting evidence involving Defendant Bender. Bender has asserted, and the plaintiffs do not dispute, that Bender was unaware of the sexual relationship between Doe 1 and Halcovage prior to Doe 1's report to her supervisor in May of 2020.

harassment included unannounced and uninvited visits to her home, incessant calls and text messages, visits to the tax offices to disrupt her workday, and eventually, requests for oral sex and sexual intercourse. Doe 1 has asserted that she felt compelled to submit to Halcovage's demands for fear of losing her employment with the County. Jane Doe 2, who worked at the County since late 2014, has also alleged that she was subjected to unannounced visits to her home by Halcovage, incessant calls and text messages, and that Halcovage propositioned her for sex on at least one occasion. As it relates to Defendant Bender, Bender contends that he was unaware of any of these allegations prior to the plaintiffs reporting Halcovage's behavior in May of 2020.

However, according to Does 3 and 4, who began their employment with the County prior to Does 1 and 2, Halcovage regularly subjected women in the tax offices to sexual harassment. Halcovage made comments to Doe 3 about her relationship with her husband and her appearance. He would also make derogatory remarks insinuating that some of the female employees were not intelligent. He also made comments about the how Doe 4 was eating freeze pops and told other inappropriate and sexually charged jokes. Does 3 and 4 recounted

Halcovage making derogatory statements about their then-supervisor, Virginia Murray, and starting rumors that she was a lesbian. Defendant Glenn Roth, the assistant solicitor for the county, was either present for or was aware of these comments made by Halcovage. In fact, Doe 3 contends that Roth remarked to her that he needed to speak to Halcovage about his behavior around the office. However, Roth never followed up or spoke to Halcovage about it.

Does 3 and 4 also recounted that Halcovage would often come into the Tax Claim and Tax Assessment offices toward the end of the day. He would position himself in front of their doors so that they could not leave the office until he was finished speaking with them. Halcovage made a comment to Doe 4 while she was in the office about having a job for her while she was "down on her knees," which she took to mean he was insinuating that she should perform oral sex on him. Another time, during an argument between Halcovage and Doe 4, Halcovage interrupted Doe 4 by suggesting they have sex. He also made a comment to Doe 4 after they had taken a sexual harassment training, telling her she got the number 69 wrong, which Doe 4 took to be a reference to a sexual position. Does 3 and 4 repeatedly told Defendant Roth about

Halcovage's behavior, but Roth never intervened or reported any of the behavior to Human Resources. Any time Doe 3 or Doe 4 objected directly to Halcovage's comments, he would retort by stating that he knew what he could get away with.

While Bender asserted in his deposition that he was unaware of many of these instances of alleged harassment specific to the plaintiffs, he did testify that he knew Halcovage to behave inappropriately in the workplace. For example, he stated that on one occasion, a female employee showed him a text message she had received from Halcovage at 2:00 a.m., which he spoke to Halcovage about and informed him that it was inappropriate. He also stated that his secretary was concerned when she saw Doe 1 alone in Halcovage's office with the door shut. Bender testified that he went into Halcovage's office at that time and later spoke to Halcovage, stating that it was inappropriate to have the door shut with a subordinate in the office. Bender further recounted instances in which Halcovage would start rumors about himself dating certain individuals. Bender discussed these comments with Doe 3, stating his belief that one day, Halcovage would say something in front of the wrong person. Bender also recounted an incident for which he was

present involving Halcovage making an inappropriate comment using a rubber glove, which he reported to Debra Twigg, who at the time was the HR director.

### B. The Plaintiffs' Reports Regarding Halcovage's Harassment

In March of 2020, Doe 1 and Doe 2, among other employees, were furloughed due to the COVID-19 pandemic. In May of 2020, after she had spent some time away from the courthouse and after she had been working under a new supervisor with whom she felt comfortable, Doe 1 disclosed the ongoing sexual abuse and harassment by Halcovage to her direct supervisor, Doe 3. Doe 3 then reported Doe 1's allegations to Debra Twigg, and Bender, who at that time was the County Administrator and Doe 3 and 4's direct supervisor.

Ms. Twigg undertook an investigation into Doe 1's allegations. The investigation included allegations by the other Doe plaintiffs regarding Halcovage's harassment. Ms. Twigg compiled a report after interviewing the Doe plaintiffs, Halcovage and other witnesses. The report was sent to Defendants Roth and Bender, as well as the other county commissioners, Gary Hess and Barron "Boots" Hetherington. The report indicated that Doe 1 revealed she had been in a sexual relationship with

Halcovage for seven years, but that it was not a consensual relationship, as she felt that she had to submit to his advances to keep her job. Halcovage admitted to being in a sexual relationship with Doe 1 but stated that it was consensual. Halcovage further admitted to the incident in which he called Doe 1 to the courthouse on a Saturday, took her into an office, and unzipped his pants implying she should perform oral sex on him. He denied some of Doe 1's other allegations of sexual abuse.

Regarding Doe 2's allegations, Halcovage admitted to regularly texting Doe 2 and showing up at her home uninvited. He further admitted to showing up at Doe 2's parents' home on the day Doe 1 reported Halcovage's abuse and after Doe 2 did not answer his calls. However, he denied that he ever propositioned Doe 2 for sex or insinuated that they should have a sexual relationship.

As to Doe 3's allegations, Halcovage admitted to spending time in the tax offices but denied that he would turn conversations into a sexual nature. Defendant Roth corroborated some of the allegations made against Halcovage, including some of the sexual jokes that Halcovage told in the office that Roth stated he did not appreciate. Roth further conceded that Halcovage would also stop by his office toward the end of the day, at

which time Roth felt obligated to stay and talk with him. Roth also corroborated Doe 3's allegations regarding statements made by Halcovage concerning her "loyalty" to him.

Regarding Doe 4's allegations, Halcovage denied ever making comments about her eating freeze pops or interrupting their argument to suggest they have sex. Halcovage also denied that he told Does 3 and 4 to change their political parties if they wanted to be promoted. However, Roth indicated that Doe 3 informed him about the comments Halcovage made to Doe 4 about eating freeze pops and being "on her knees."

Ultimately, Ms. Twigg's report concluded that Halcovage had violated the County's Sexual Harassment Policy, the Conduct and Disciplinary Action Policy, and the Physical and Verbal Abuse Policy. The report further stated that because Halcovage was an elected official and was not subject to removal by the County Administration, it was recommended that he resign his position as commissioner. Additionally, if Halcovage insisted on remaining in his position, the report recommended that the County continue with the steps taken since the investigation for the safety of the complainants, which included moving Doe 3 and Doe 4's parking spots, permitting Doe 1 and Doe 2 to work

from home, and prohibiting Halcovage from having any contact with the Tax Claim and Tax Assessment offices.

Following the results of Ms. Twigg's investigation, Bender wrote a letter to the other two county commissioners, Hess and Hetherington. This letter indicated that the investigation substantiated some of Doe 1's allegations, including the facts that Halcovage was engaged in a sexual relationship with Doe 1 for several years, that he engaged in inappropriate sexual behavior at the courthouse on one occasion, and that Halcovage knew Doe 1 struggled with alcoholism and continued to provide her with alcohol. The letter further indicated that these actions, if taken by a County employee, would subject the employee to discipline up to and likely including termination, but that since Halcovage was an elected official, the County Administration had no authority to remove him from his position.

### C. The Aftermath of the Plaintiffs' Reporting

Following the plaintiffs' reports to HR and Ms. Twigg's findings, the Doe plaintiffs contend that they were subjected to significant backlash and retaliation at the hands of the defendants. When Does 1 and 2 returned from furlough, they were initially permitted to work from home

to limit any interactions they might have with Halcovage. This was put into place because Halcovage not only refused to resign his position as commissioner, but refused to work from home, despite requests to do so from several County employees, including Bender and Commissioner Hess. Additionally, restrictions were initially placed on Halcovage's access to County buildings by Sheriff Joseph Groody, such as requirements that he be searched by security and escorted throughout the buildings. Further, the County moved Doe 3 and Doe 4's parking spots to a different lot than Halcovage's assigned parking spot, so that they could limit their interactions with him as well. Bender voiced his opposition to some of these measures, indicating that he did not think the Sheriff, or the County had the authority to limit Halcovage's access to the courthouse since he was an elected official.

In July of 2020, there was an incident in which Halcovage was seen climbing a steep embankment from the lower parking lot to get to the upper lot where Does 3 and 4 parked. Does 3 and 4 were seated in a car in the parking lot talking to their attorney on the phone at the time. When they returned to their offices, a colleague mentioned that he had seen Halcovage coming up into the parking lot and toward the car Does

3 and 4 were seated. Several individuals deposed in this matter stated that the embankment is steep, and that there are other, safer ways to get from the lower to the upper lot. For his part, Halcovage stated that he went up the embankment because he needed access to the courthouse, and no one from the sheriff's office had answered his calls to escort him into the building. Another incident occurred in August, after Does 3 and 4 conducted an assessment appeal hearing in the commissioners' boardroom. According to Doe 3, she scheduled the room for two hours. After the hearing had concluded, but within the two hour timeframe she had reserved the room, Doe 3 went back into the room because she had forgotten her laptop, and Halcovage was in the boardroom, despite the fact that he was not supposed to have contact with her. According to the plaintiffs, Bender was made aware of these issues and yet refused to provide the plaintiffs with accommodations for their safety.

Regarding Does 1 and 2, while they were initially permitted to work from home, they were subjected to several obstacles that did not allow them to perform their work. Doe 3, as their supervisor, asked Bender to supply Does 1 and 2 with the office supplies they needed to work from home. However, by October of 2020, they still did not have the necessary

supplies to work from home. Thus, the plaintiffs emailed the interim HR Director, Defendant Doreen Kutzler, and asked her how to get the necessary supplies. Kutzler eventually was able to order new laptop computers for Does 1 and 2. However, in her deposition, Kutzler stated that she did not believe that what was supplied by the County was sufficient for Does 1 and 2 to complete their work from home.

It was around this time in October or November of 2020 that an issue was brought to light regarding delinquent reports to the State Tax Equalization Board ("STEB"), which was a main part of Doe 1's job. Accordingly, Doe 3 reached out to Kutzler and Bender to determine a day that Doe 1 could come into the office to upload or complete the delinquent STEB reports, recognizing that Doe 1 did not want to be present if Halcovage was in the courthouse. However, Bender instructed Kutzler that the STEB reports were not an HR issue and, as such, she should not answer Doe 3's email. For her part, Kutzler stated in her deposition that she reminded Bender that Doe 1 still did not have the necessary equipment to complete her work from home. In fact, Bender was copied on many emails, sent either by Doe 3 or the plaintiffs' attorney, making

13

the County aware of the deficiencies that were hindering Does 1 and 2 from performing their jobs at home.

However, because of the delinquent reports, Bender ultimately made the decision to revoke Doe 1 and Doe 2's work from home status and move them into offices in another county building, the 410 Building. Bender stated in his deposition that he believed Does 1 and 2 could safely work from the 410 Building and complete their work. While the STEB reports were Doe 1's responsibility, Does 3 and 4 ultimately finished and submitted the reports so that they were no longer delinquent. Additionally, around this same time, another employee made a statement to HR regarding Doe 2's behavior while out working on the road, alluding to possible elicit drug use. Kutzler and Roth met with this individual and had her sign a statement memorializing what she had told HR. According to the plaintiffs, this employee later expressed to them that she felt compelled by Roth and Kutzler to sign the statement.

Does 1 and 2 were informed toward the end of 2020 that they would have to work from the 410 Building and that they were no longer permitted to work from home. The 410 Building is a Schuylkill County building that houses several offices, including the election bureau. Thus,

the public had access to the building. However, the plaintiffs were told that Halcovage would not be permitted to access the 410 Building after Does 1 and 2 were relocated to the building. In fact, several individuals, including Kutzler and Bender, informed the plaintiffs that Halcovage could be arrested if he accessed the building, and that Halcovage was told the same. However, Kutzler stated in her deposition that Halcovage pushed back, arguing with Bender that he was entitled to go anywhere he wanted. Bender also testified that Halcovage pushed back on the restrictions imposed upon him. Sheriff Groody further indicated in his deposition that while he did not think he could personally arrest Halcovage for entering the 410 Building, he would have informed the Pottsville Police, who could have arrested Halcovage if they chose to do so.

Kutzler arranged for Does 1 and 2 to meet with Bender to get the keys to their offices. However, the plaintiffs voiced a concern, given that a charge had been filed with the Equal Employment Opportunity Commission ("EEOC") by that time and Bender was named in the charge. Ultimately Kutzler met with Does 1 and 2 to give them their office keys in December of 2020. Upon entering the assigned office spaces, Does 1

and 2 had concerns with the condition of the offices. These concerns included wet ceiling tiles, old food items, mouse droppings, the lack of cabinet space and old computers taking up space. Given the plaintiffs' concerns, Kutzler tried contacting a cleaning service but ultimately ended up cleaning the offices herself. In addition to the cleanliness of the offices, the plaintiffs also voiced a concern regarding a lack of parking spaces at the building for Does 1 and 2. Bender was copied on emails with respect to these issues, and the plaintiffs assert that he ignored their requests and concerns.

Does 1 and 2 began working from the 410 Building in January of 2021, around the same time that Defendant Heidi Zula started as the County's HR Director. Around this time, the plaintiffs reported several incidents to HR, including that Halcovage was using a door that he was explicitly told he could not use, and that Does 1 and 2 saw Halcovage lurking around outside of the 410 Building shortly after they began working in the building. Additionally, Doe 3 received a call from Doe 2 that Halcovage was seen following her car while she was working in the field. This led Doe 3 to instruct Does 1 and 2 to work from home. However, Doe 3 received a notice from Bender and Zula shortly thereafter

16

informing her that she did not have the authority to allow her employees to work from home.

During this time, Bender expressed frustration with Does 3 and 4 and their lack of communication with him as the County Administrator and their direct supervisor. Although he had been named in their EEOC complaint, he stated in his deposition that he believed they still needed to communicate with him on some level for the County's business to function properly and efficiently. According to Bender, it was a combination of the lack of communication with Does 3 and 4, as well as the delinquent STEB reports by Doe 1, that led to a discussion regarding restructuring the tax office in 2021.[6] Zula stated in her deposition that Bender directed her to look into issues with the Tax Assessment office, and that prior to her conclusion that the offices should be separated, there were discussions about removing Doe 3 from her position. For his part, Bender stated that he never wanted to combine the offices in the first place, and that the decision was made by the commissioners.

---

[6] The record indicates that prior to 2019, the Tax Claim and Tax Assessment Offices were separate. In May of 2019, Halcovage brought up the idea of combining the two offices and placing Doe 3 in charge of both offices, which was ultimately approved by a vote of the commissioners.

Ultimately, Zula recommended to Bender that the offices be restructured and separated into Tax Claim and Tax Assessment, effectively removing Doe 3 from her position over both offices. On March 17, 2021, the restructuring was voted on at the board of commissioners meeting, and the commissioners voted 2 to 1 to transfer Doe 3 to the position of Tax Claim Director and Doe 4 to Deputy Chief Assessor. These transfers resulted in a reduction in salary for Does 3 and 4. Halcovage was one of the two "yes" votes to transfer Does 3 and 4. Does 3 and 4 were notified by email of the transfer and restructure of the office.[7]

Following the vote, and after the time the plaintiffs filed the initial complaint in this matter, the County hired Tony Alu as a consultant to oversee the restructure. According to Bender, when Alu first visited the tax offices, Does 3 and 4 made unprofessional comments to Alu at some point that resulted in them receiving written reprimands after an HR investigation, which was conducted by Zula. Bender stated in his deposition that at the time the written reprimands were issued, he already felt that Does 3 and 4 should be terminated, a sentiment that

---

[7] It appears that at the time Does 3 and 4 were notified of the transfer, Doe 4 was out on bereavement leave following the death of her brother.

appeared to be, at least in part, based on his frustrations with their lack of communication with him as their direct supervisor.

In May of 2021, Kent Hatter was appointed to the position of Chief Assessor for the Tax Assessment department. Under Hatter's supervision, Doe 1 was still having an issue submitting timely STEB reports, but Bender did not question Hatter's operation of the Tax Assessment department as he did when Doe 3 headed the department. In July of 2021, Hatter issued a warning to Doe 2 regarding her lack of work product and her absences from work. Ultimately, the County determined that Doe 2 had abandoned her position and considered her to have resigned her position with the County. Doe 2 attempted to grieve this employment determination, but no one responded to her grievance.

At some time during the summer of 2021, Does 3 and 4 were approved for leave under the Family and Medical Leave Act ("FMLA). In August, while on FMLA leave, Doe 3 accessed her County LexisNexis account from her cellular phone to retrieve a bill that was due for the County. Deb Dash, who took over some of Doe 3's responsibilities while she was on leave and was receiving Doe 3's County emails, got a notification that someone had accessed the LexisNexis account from a

cellular phone. Ms. Dash informed Roth, who contacted LexisNexis to determine who had accessed the account. After it was determined that Doe 3 had accessed the account, rather than reach out to Doe 3 and ask why she had accessed the LexisNexis account, Bender directed Zula to gather information on the account's search history dating back to January of 2020. During this time, in September of 2021, Does 3 and 4 were suspended without pay by Bender pending the results of the investigation. The initial investigation by Zula revealed a list of names that had been searched, including employees in the County. After sharing the list with Bender and the county commissioners, including Halcovage, and interviewing Does 3 and 4, Zula ultimately determined that the searches had not been conducted for an appropriate business purpose and violated LexisNexis protocols.

Following this initial investigation by Bender and Zula, Bender directed Zula to draft termination personnel action reports ("PARs") for Does 3 and 4. In November of 2021, the commissioners met to vote on the termination PARs, and Commissioner Hess moved to table the terminations, expressing serious concerns regarding the termination of Does 3 and 4 based on an investigation performed by individuals who

were named as defendants in the instant lawsuit. Accordingly, Hess called for an independent investigation into Doe 3 and 4's use of LexisNexis prior to a vote on their termination. The County then retained the law firm of Eckert Seamans to review Zula's investigation and provide an independent report.

In March of 2022, Bender again proposed the termination of Does 3 and 4, with the supporting recommendation of Zula and Roth. At the board of commissioners meeting, Halcovage moved to terminate Does 3 and 4 but abstained from the actual vote on their terminations, while Commissioner Hetherington voted yes, and Hess voted no. Commissioner Hess commented that he did not see enough evidence that Does 3 and 4 utilized LexisNexis with the intent to use any personal information or cause financial harm to anyone. Commissioner Hetherington made a closing statement indicating his disappointment in his fellow commissioners given the serious allegations against Does 3 and 4 and the findings reported by Eckert Seamans, which he felt supported termination. In his deposition, Commissioner Hess indicated his belief that the County was looking to "build a case" against Does 3 and 4 and looking for reasons to discipline or terminate them. As of the filing of the

instant motion, Does 3 and 4 remain suspended without pay from their County positions.

### D. Procedural History

The plaintiffs initially filed this action on March 16, 2021, and filed an amended complaint on October 29, 2021, which is currently the operative complaint. (Docs. 1, 63). The amended complaint names the County, Halcovage, Bender, Roth, Zula, and Kutzler as defendants. As it relates to the individual defendants, after they filed motions to dismiss, the Court dismissed the PHRA discrimination claims against them, but all other claims were permitted to proceed forward. (*See* Docs. 124, 126, 132, 134, 136).

As to Bender, the plaintiffs assert claims of retaliation and aiding and abetting discrimination under the Pennsylvania Human Relations Act (Counts VI, VII); discrimination and creation of a hostile work environment under the Fourteenth Amendment's Equal Protection clause (Counts VIII, IX); and retaliation in violation of the First Amendment. (Count XIII). Bender has now filed a motion for summary judgment, arguing that the plaintiff's retaliation and aiding and abetting

claims under the PHRA, Equal Protection claims, and First Amendment retaliation claims fail as a matter of law. (Doc. 238).

After consideration, we conclude that there are genuine issues of material fact that preclude summary judgment in favor of the defendant. Accordingly, the motion will be denied.

## III. <u>Discussion</u>

### A. <u>Motion for Summary Judgment – Standard of Review</u>

The defendant has filed a motion for summary judgment pursuant to Rule 56 of the Federal Rules of Civil Procedure. Rule 56(a) provides that a court shall grant summary judgment "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The materiality of the facts will depend on the substantive law. *Anderson v. Liberty Lobby*, 477 U.S. 242, 248 (1986). Thus, "[o]nly disputes over facts that might affect the outcome of the suit under governing law" will preclude summary judgment. *Id*. A dispute is only genuine if a reasonable juror could find in favor of the nonmoving party. *Id*.

The moving party bears the initial burden to "demonstrate the absence of a genuine issue of material fact," relying on pleadings,

depositions, affidavits, and other evidence in the record. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). If the movant "successfully points to evidence of all of the facts needed to decide the case on the law," the nonmovant can still defeat summary judgment by pointing to evidence in the record which creates a genuine dispute of material fact and from which a jury could find in its favor. *El v. Southeastern Pennsylvania Transp. Auth. (SEPTA)*, 479 F.3d 232, 238 (3d Cir. 2007). However, "[i]f the evidence is merely colorable, or is not significantly probative, summary judgment may be granted." *Anderson*, 477 U.S. at 249-50 (citations omitted). A court may not make credibility determinations or weigh the evidence, but "must view the facts in the light most favorable to the non-moving party." *Hugh v. Butler County Family YMCA*, 418 F.3d 265, 267 (3d Cir. 2005).

## B. <u>The Defendant's Motion for Summary Judgment will be Denied.</u>

As we have noted, Bender challenges the plaintiffs' PHRA retaliation and aiding and abetting, Equal Protection, and First Amendment retaliation claims. (Doc. 238). However, after a careful review of the record, we conclude that there are genuine issues of

material fact with respect to these claims against Bender. Accordingly, the motion will be denied.

### 1. PHRA Retaliation and Aiding and Abetting

Bender first challenges the plaintiffs' PHRA claims against him for retaliation and aiding and abetting discrimination. Section 955(d) of the PHRA prohibits any person from discriminating against an individual because the individual opposed an unlawful discriminatory practice under the PHRA. 42 P.S. § 955(d). PHRA retaliation claims follow the same framework as retaliation claims under Title VII of the Civil Rights Act—a plaintiff must show she engaged in protected activity, that she was subject to adverse employment action, and that there is a causal connection between her protected activity and the adverse action taken against her. *Fasold v. Justice*, 409 F.3d 178, 188 (3d Cir. 2005) (noting that PHRA retaliation claims follow Title VII's *McDonnell Douglas* framework).

In the instant case, it is undisputed that the plaintiffs engaged in protected activity when they reported Halcovage's sexual abuse and harassment, first to HR and the County, and then by filing a claim with the EEOC and eventually this federal civil rights lawsuit. Further, the

plaintiffs have shown that they were subjected to adverse employment actions by Bender. The evidence establishes that after the Doe plaintiffs reported Halcovage's conduct, Doe 1 and Doe 2 were hindered from doing their jobs at home due to the County not providing them with proper supplies. Bender was aware of these issues, and according to the plaintiffs, failed to ensure that the plaintiffs had the ability to perform their jobs from home. In fact, Kutzler stated in her deposition that she had to remind Bender that the employees were lacking supplies, and that when she received an email from Doe 3 regarding the STEB reports, Bender instructed her not to answer the email, as it was not an HR issue. Thereafter, Bender revoked Doe 1 and Doe 2's work from home privileges, and they were required to move into unsuitable offices in the 410 Building.

As it pertains to Does 3 and 4, they have asserted that they were subjected to discipline after reporting Halcovage's behavior, *i.e.*, write ups, investigations, and suspensions, which they had never received prior to reporting Halcovage's conduct. Specifically, Does 3 and 4 suffered demotions, including a reduction in pay, after the tax offices were restructured, which they attribute to their reporting of Halcovage's abuse

and harassment. Bender contends that he did not have the authority to demote Does 3 and 4, as the restructuring was put to a vote by the county commissioners. However, a jury could conclude, based on the evidence in the record, that Bender was the moving force behind the restructure of the tax offices. Following the issue with the delinquent STEB reports, Bender directed Zula to look into the tax offices, which ultimately led to the idea of restructuring the offices. He also conceded that at the time of the restructuring, he had been frustrated with Doe 3's lack of communication with him as her supervisor.

Further, Does 3 and 4 have been indefinitely suspended from their positions with the County. It is undisputed that Bender, as their supervisor and as the County Administrator, suspended Does 3 and 4 in September of 2021 pending the outcome of the LexisNexis investigation. According to Zula, Bender was the person who directed her to reach out to LexisNexis and obtain the plaintiffs' search history going back to January of 2020, rather than calling Doe 3 when it was discovered that she had accessed the LexisNexis account while on leave. Bender also twice prepared termination PARs for Does 3 and 4 regarding the LexisNexis investigation. The Doe plaintiffs also assert that the

LexisNexis investigation never would have occurred if they did not report Halcovage's behavior, an assertion that is supported by Commissioner Hess's deposition testimony that he believed the County was looking for reasons to suspend and/or terminate them. In fact, Bender conceded in his deposition that by the spring of 2021, when Does 3 and 4 were issued written reprimands for a separate issue and prior to the LexisNexis investigation, he had already determined that Does 3 and 4 should be terminated.

Accordingly, viewing the evidence in the record in a light most favorable to the plaintiffs, we find that a jury could conclude that the plaintiffs suffered adverse employment actions at the hands of Bender after they reported Halcovage's unlawful, discriminatory behavior. Thus, the motion for summary judgment will be denied with respect to this claim.

With respect to the aiding and abetting claim, § 955(e) prohibits an employer or individual from aiding and abetting unlawful discrimination or retaliation under the PHRA. § 955(e). Typically, only supervisory employees are liable under the aiding and abetting provision of the PHRA. *McIlmail v. Pennsylvania*, 381 F. Supp. 3d 393, 415 (E.D. Pa.

2019). Here, while Bender contends that he had no authority to hire or fire the Doe plaintiffs, the undisputed facts show that as the County Administrator, he was Doe 3 and Doe 4's direct supervisor, as well as the direct supervisor of the HR employees, including Zula and Kutzler. He further conceded that he had supervisory authority over the employees in the tax offices, which included Does 1 and 2.

"Further, it has been established that "[w]hen a supervisory employee has knowledge of conduct which creates a hostile work environment, inaction by such an employee or failing to take prompt remedial action to prevent harassment rises to the level of individual aiding and abetting" under the PHRA. *Hewitt v. BS Transportation of Illinois, LLC*, 355 F. Supp. 3d 227, 238 (E.D. Pa. 2019) (citations and quotation marks omitted). In this case, we conclude that a reasonable jury could find for the plaintiffs on this PHRA aiding and abetting claim. While Bender argues that he had no authority to act against Halcovage, the plaintiffs' claims, in part, are based on Bender's *inaction* on the plaintiffs' requests for accommodations to remedy the harassment. These inactions include but are not limited to failing to provide Does 1 and 2 with proper equipment to work from home so that they would not

29

encounter Halcovage, subsequently forcing Does 1 and 2 to work from the 410 Building even though the building was accessible to the public and by Halcovage, and failing to respond to Doe 3 and Doe 4's concerns regarding Halcovage's actions after the plaintiffs reported his harassment. Thus, while Bender may not have had the authority to curb Halcovage's behavior directly, a reasonable juror could conclude that Bender had the authority but failed to assist the plaintiffs in a way that would remedy the hostile work environment of which they had informed him. Accordingly, Bender's motion for summary judgment on this claim will be denied.

## 2. <u>Equal Protection</u>

Bender also appears to challenge the plaintiffs' Equal Protection claims against him. He asserts that he was not responsible for some of the alleged adverse actions taken against the plaintiffs.

To state a claim for discrimination under the Equal Protection clause, the plaintiffs must show that they endured "'purposeful discrimination' because of [their] sex." *Robinson v. City of Pittsburgh*, 120 F.3d 1286, 1293 (3d Cir. 1997) (citation omitted). Accordingly, they must establish that they were subjected to "(1) disparate treatment in relation

to other similarly situated individuals, and (2) that the discriminatory treatment was based on sex." *Johnston v. Univ. of Pittsburgh of Com. System of Higher Education*, 97 F. Supp. 3d 657, 667 (W.D. Pa. 2015). To establish individual liability under § 1983, "there must be some affirmative conduct by the [individual] that played a role in the discrimination." *Foster v. Twp. Of Hillside*, 780 F. Supp. 1026, 1045 (D.N.J. 1992) (quoting *Andrews*, 895 F.2d at 1478) (alterations in original). Personal involvement can be shown "either 'through allegations or personal direction or of actual knowledge and acquiescence,' or through proof of direct discrimination." *Andrews*, 895 F.2d at 1478 (citations omitted).

Further, to state a hostile work environment claim, the plaintiffs must demonstrate (1) intentional discrimination based on their sex; (2) that "the discrimination was severe or pervasive"; (3) they were detrimentally affected by the discrimination; (4) that the discrimination "would have detrimentally affected a reasonable person in like circumstances"; and (5) employer liability. *Komis v. Sec'y of U.S. Dep't of Labor*, 918 F.3d 289, 293 (3d Cir. 2019).

Here, the plaintiffs have set forth evidence from which a jury could find that Bender engaged in purposeful discrimination of the plaintiffs and contributed to the hostile work environment. It is undisputed that Bender was made aware of the plaintiffs' complaints of sexual harassment as early as May of 2020. While Bender contends that he had virtually no authority to discipline Halcovage, the plaintiffs have set forth evidence indicating that Bender did have the authority and ability to help remedy the discrimination in other ways but failed to do so. For example, Bender revoked Doe 1 and Doe 2's work from home privileges despite knowing that these plaintiffs did not want to encounter Halcovage at work. Additionally, although Bender was made aware of several instances in which Halcovage had violated the restrictions placed on him by the County, Bender seemingly ignored the plaintiffs' concerns. In fact, Bender admonished Doe 3 for permitting Does 1 and 2 to work from home after Halcovage was found to have violated the County's restrictions and was alleged to have followed Doe 2 while she was doing field work. The Doe plaintiffs contend that their work, as well as their personal health, suffered greatly due, in part, to Bender's and others' lack of support for their concerns of harassment and abuse.

Thus, we conclude that the plaintiffs have provided enough support at this stage to show that they were subjected to intentional discrimination by Bender, that the discrimination was severe or pervasive and detrimentally affected them, and that this discrimination would detrimentally affect a reasonable person. Further, there is a basis for employer liability in this case. Employer liability may be found where a supervisor creates a hostile work environment; in such cases, "[an] employer is subject to vicarious liability to a victimized employee for an actionable hostile environment created by a supervisor with immediate (or successively higher) authority over the employee." *Faragher v. City of Boca Raton*, 524 U.S. 775, 807 (1998). As we have already determined, Bender had a supervisory role over the plaintiffs as the County Administrator. Accordingly, a basis for employer liability exists, and we find that the plaintiffs have sufficiently set forth evidence from which a jury could find in their favor on their Equal Protection claims. Accordingly, Bender's motion for summary judgment on the plaintiffs' Equal Protection claims will be denied.

### 3. <u>First Amendment Retaliation</u>

Finally, Bender appears to challenge the plaintiffs' First Amendment retaliation claim against him, asserting that he did not have the requisite authority to engage in the alleged retaliatory acts, specifically regarding the demotion of Does 3 and 4.

To assert a First Amendment retaliation claim, the plaintiffs must show: (1) that they engaged in constitutionally protected conduct; (2) that they suffered "retaliatory action sufficient to deter a person of ordinary firmness from exercising h[er] constitutional rights"; and (3) a causal connection between the protected activity and the retaliatory act. *Thomas v. Independence Twp.*, 463 F.3d 285, 296 (3d Cir. 2006).

Here, it is undisputed that the plaintiffs engaged in constitutionally protected activity. Not only did they file internal complaints about the sexual harassment and retaliation they were experiencing, but they also filed a charge with the EEOC in 2020 and ultimately this federal civil rights lawsuit in 2021, naming the County and the individual defendants. *See e.g.*, *Falco v. Zimmer*, 767 F. App'x 288, 307 (3d Cir. 2019) (finding that police chief's lawsuit alleging retaliation by his employer constituted protected activity under the First Amendment). Further, the plaintiffs have shown that they were subjected to adverse

actions by Bender. As discussed above, the plaintiffs have provided evidence showing Bender's involvement in a host of retaliatory actions that occurred after the plaintiffs reported Halcovage's harassment, and later, the County's ongoing discrimination and retaliation of the plaintiffs. These include but are not limited to revoking Doe 1 and Doe 2's work from home status and failing to provide them with protections from Halcovage after they reported his abuse and harassment, demoting Does 3 and 4 when the tax offices were restructured, and suspending Does 3 and 4 indefinitely in September of 2021 following the LexisNexis investigation. All these actions would be sufficient to deter a person of ordinary firmness from exercising her rights.

Finally, we conclude that there is a casual connection between the plaintiffs' protected activity and the retaliatory actions taken against them. A causal connection may be shown by either (1) "an unusually suggestive temporal proximity" between the adverse action and protected activity, or (2) "a pattern of antagonism coupled with timing." *Lauren W. ex rel. Jean W. v. DeFlaminis*, 480 F.3d 259, 267 (3d Cir. 2007) (citations omitted). Here, the plaintiffs have provided evidence from which a jury could conclude that their reports of sexual harassment and abuse, and

later filings of an EEOC charge and a federal lawsuit, were causally connected to the adverse employment actions taken against them. The plaintiffs assert, and the defendant has not disputed, that they had never been subject to any adverse employment actions prior to May of 2020. However, following the reports of harassment and abuse in May of 2020, Doe 1 and Doe 2's work from home privileges were revoked, and Does 3 and 4 were demoted, written up, and eventually suspended without pay indefinitely. Thus, the evidence, if credited by a jury, shows at the very least a pattern of antagonism by Bender following the plaintiffs' protected activity. Accordingly, summary judgment will be denied as to the plaintiffs' First Amendment claim.

## IV.   Conclusion

For the foregoing reasons, Defendant Bender's motion for summary judgment (Doc. 238) will be DENIED.

An appropriate order follows.

Submitted this 7th day of March 2024.

*s/ Daryl F. Bloom*
Daryl F. Bloom
United States Magistrate Judge