IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| JANE DOE, et al., | : | Civ. No. 3:21-CV-477 |
| | : | |
| Plaintiffs, | : | |
| | : | |
| v. | : | |
| | : | (Magistrate Judge Bloom) |
| SCHUYLKILL COUNTY | : | |
| COURTHOUSE, et al., | : | |
| | : | |
| Defendants. | : | |

## MEMORANDUM OPINION

### I.   Introduction

This is a civil action brought by four Jane Doe plaintiffs against Schuylkill County and several individual defendants. The claims in this case involve allegations of sexual abuse and harassment of the Doe plaintiffs by former County Commissioner, George Halcovage, over a period of several years while the plaintiffs were employed by the County. The plaintiffs assert that the County, as well as the other individual defendants, were aware of the ongoing harassment of the plaintiffs, and rather than intervene, they retaliated against the plaintiffs for reporting the abuse and harassment.

Pending before the court is a motion for summary judgment filed by one of the defendants, Doreen Kutzler.[1] (Doc. 240). In this motion, Kutzler challenges the plaintiffs' retaliation and aiding and abetting claims under the Pennsylvania Human Relations Act ("PHRA"), their Equal Protection claims, and their First Amendment retaliation claims, arguing that the plaintiffs have not set forth sufficient factual support and evidence to support these claims against her. The motion is fully briefed and ripe for resolution. (Docs. 256, 273, 302). After consideration, the motion will be denied.

## II.   Background[2]

The Doe plaintiffs, four women who were formerly or are currently employed by Schuylkill County, filed this lawsuit in March of 2021. The amended complaint names the County, Halcovage, Glenn Roth, Gary Bender, Heidi Zula, and Doreen Kutzler as defendants. As to Defendant Kutzler, the plaintiffs assert claims of retaliation and aiding and abetting

---

[1] The individual defendants have all filed separate motions for summary judgment (Docs. 236, 238, 239, 243), which will be addressed in separate Memorandum Opinions.

[2] The factual background of this Memorandum Opinion is taken from the parties' submissions to the extent those submissions are consistent with the evidence in the record. (Docs. 256, 258, 273, 287-83, 302).

discrimination under the Pennsylvania Human Relations Act ("PHRA") (Counts VI, VII); discrimination and creation of a hostile work environment under the Fourteenth Amendment's Equal Protection clause (Counts VIII, IX); and retaliation in violation of the First Amendment. (Count XIII).[3]

## A. Allegations of Halcovage's Sexual Abuse and Harassment Prior to May of 2020[4]

Jane Doe 1 began working for Schuylkill County in 2014 and has alleged that Defendant Halcovage subjected her to sexual abuse and harassment since the inception of her employment. This abuse and harassment included unannounced and uninvited visits to her home, continual calls and text messages, visits to the tax offices to disrupt her workday, and eventually, requests for oral sex and sexual intercourse. Doe 1 has asserted that she felt compelled to submit to Halcovage's demands for fear of losing her employment with the County. Jane Doe 2,

---

[3] Count X was misnumbered in the amended complaint as Count XIII. Therefore, to avoid confusion, we will refer to this count as Count XIII.

[4] For the sake of brevity, we limit this discussion to the factual allegations and supporting evidence involving Defendant Kutzler. It is undisputed that Kutzler did not begin her temporary, interim employment with the County until September of 2020, and it was at this point that she was informed of the allegations of abuse and harassment by Halcovage and others.

who worked at the County since late 2014, has also alleged that she was subjected to unannounced visits to her home by Halcovage, continual calls and text messages, and that Halcovage propositioned her for sex on at least one occasion.

Jane Does 3 and 4 have asserted that since their employment at the County and since Halcovage was elected as a county commissioner, he regularly visited their offices and subjected them and other female employees to sexual harassment. This harassment included jokes that were sexual in nature and starting rumors about himself having relationships with women in the office. The plaintiffs also assert that Halcovage regularly made derogatory remarks about women, including their supervisor, Virginia Murray. They also contend that some of the defendants, including Bender and Roth, were aware of Halcovage's conduct but did nothing to stop the behavior.

### B. The Plaintiffs' Reports Regarding Halcovage's Harassment

In March of 2020, Doe 1 and Doe 2, among other employees, were furloughed due to the COVID-19 pandemic. In May of 2020, after she had spent some time away from the courthouse and after she had been working under a new supervisor with whom she felt comfortable, Doe 1

disclosed the ongoing sexual abuse and harassment by Halcovage to her direct supervisor, Doe 3. Doe 3 then reported Doe 1's allegations to Debra Twigg, the Human Resources Director at the time, and Bender, who was the County Administrator and Doe 3 and 4's direct supervisor.

Ms. Twigg undertook an investigation into Doe 1's allegations. The investigation included allegations by the other Doe plaintiffs regarding Halcovage's harassment. Ms. Twigg compiled a report after interviewing the Doe plaintiffs, Halcovage, and other witnesses.  The report was sent to Defendants Roth and Bender, as well as the other county commissioners, Gary Hess and Barron "Boots" Hetherington. The report indicated that Doe 1 revealed she had been in a sexual relationship with Halcovage for seven years, but that it was not a consensual relationship, as she felt that she had to submit to his advances to keep her job. Halcovage admitted to being in a sexual relationship with Doe 1 but stated that it was consensual. Halcovage further admitted to the incident in which he called Doe 1 to the courthouse on a Saturday, took her into an office, and unzipped his pants implying she should perform oral sex on him. He denied some of Doe 1's other allegations of sexual abuse.

Regarding Doe 2's allegations, Halcovage admitted to regularly texting Doe 2 and showing up at her home uninvited. He further admitted to showing up at Doe 2's parents' home on the day Doe 1 reported Halcovage's abuse and after Doe 2 did not answer his calls. However, he denied that he ever propositioned Doe 2 for sex or insinuated that they should have a sexual relationship.

As to Doe 3's allegations, Halcovage admitted to spending time in the tax offices but denied that he would turn conversations into a sexual nature. Defendant Roth corroborated some of the allegations made against Halcovage, including some of the sexual jokes that Halcovage told in the office, which Roth stated he did not appreciate. Roth further conceded that Halcovage would also stop by his office toward the end of the day, at which time Roth felt obligated to stay and talk with him. Roth also corroborated Doe 3's allegations regarding statements made by Halcovage concerning her "loyalty" to him.

Halcovage denied ever making comments about Doe 4 eating freeze pops or interrupting their argument to suggest they have sex. Halcovage also denied that he told Does 3 and 4 to change their political parties if they wanted to be promoted. However, Roth indicated that Doe 3

informed him about the comments Halcovage made to Doe 4 about eating freeze pops and being "on her knees."

Ultimately, Ms. Twigg's report concluded that Halcovage had violated the County's Sexual Harassment Policy, the Conduct and Disciplinary Action Policy, and the Physical and Verbal Abuse Policy. The report further stated that because Halcovage was an elected official and was not subject to removal by the County Administration, it was recommended that he resign his position as commissioner. Additionally, if Halcovage insisted on remaining in his position, the report recommended that the County continue with the steps taken since the investigation for the safety of the complainants, which included moving Doe 3 and Doe 4's parking spots, permitting Doe 1 and Doe 2 to work from home, and prohibiting Halcovage from having any contact with the Tax Claim and Tax Assessment offices.

Following the results of Ms. Twigg's investigation, Bender wrote a letter to the other two county commissioners, Hess and Hetherington. This letter indicated that the investigation substantiated some of Doe 1's allegations, including the facts that Halcovage was engaged in a sexual relationship with Doe 1 for several years, that he engaged in

inappropriate sexual behavior at the courthouse on one occasion, and that Halcovage knew Doe 1 struggled with alcoholism and continued to provide her with alcohol. The letter further indicated that these actions, if taken by a County employee, would subject the employee to discipline up to and likely including termination, but that since Holcavage was an elected official, the County Administration had no authority to remove him from his position.

### C. The Aftermath of the Plaintiffs' Reporting

Following the plaintiffs' reports to HR and Ms. Twigg's findings, the Doe plaintiffs contend that they were subjected to significant backlash and retaliation at the hands of the defendants. Thus, when Does 1 and 2 returned from furlough, they were initially permitted to work from home to limit any interactions they might have with Halcovage. This was put into place because Halcovage not only refused to resign his position as commissioner, but refused to work from home, despite requests to do so from several County employees, including Bender and Commissioner Hess. Additionally, restrictions were initially placed on Halcovage's access to County buildings by Sheriff Joseph Groody, such as requirements that he be searched by security and escorted throughout

the buildings. Further, the County moved Doe 3 and Doe 4's parking spots to a different lot than Halcovage's assigned parking spot, so that they could limit their interactions with him. Bender voiced his opposition to some of these measures, indicating that he did not think the Sheriff, or the County had the authority to limit Halcovage's access to the courthouse since he was an elected official.

In July of 2020, there was an incident in which Halcovage was seen climbing a steep embankment from the lower parking lot to get to the upper lot where Does 3 and 4 parked. Does 3 and 4 were seated in a car in the parking lot talking to their attorney on the phone at the time. When they returned to their offices, a colleague mentioned that he had seen Halcovage coming up into the parking lot and toward the car where Does 3 and 4 were seated. Several individuals deposed in this matter stated that the embankment is steep, and that there are other, safer ways to get from the lower lot to the upper lot. For his part, Halcovage stated that he went up the embankment because he needed access to the courthouse, and no one from the sheriff's office had answered his calls to escort him into the building. Another incident occurred in August, after Does 3 and 4 conducted an assessment appeal hearing in the

commissioners' boardroom. According to Doe 3, she had scheduled the room for a hearing for two hours. After the hearing had concluded but within the timeframe she had reserved the room, Doe 3 went back into the room because she had forgotten her laptop.  Halcovage was in the boardroom, even though he was not supposed to have contact with her. According to the plaintiffs, Bender was made aware of these issues and yet refused to provide the plaintiffs with accommodations for their safety.

Regarding Does 1 and 2, while they were initially permitted to work from home, they were subjected to several obstacles that did not allow them to perform their work. Doe 3, as their supervisor, asked Bender to supply Does 1 and 2 with the office supplies they needed to work from home. However, by October of 2020, they still did not have the necessary supplies to complete their work. Thus, the plaintiffs emailed the interim HR Director, Defendant Doreen Kutzler, and asked her how to get the necessary supplies. Kutzler eventually was able to order new laptop computers for Does 1 and 2. However, in her deposition, Kutzler stated that despite her efforts at obtaining equipment for the plaintiffs, she did not believe that what was supplied by the County was sufficient for Does 1 and 2 to complete their work from home.

It was around this time in October or November of 2020 that an issue was brought to light regarding delinquent reports to the State Tax Equalization Board ("STEB"), which was a main part of Doe 1's job. Accordingly, Doe 3 reached out to Kutzler and Bender to determine a day that Doe 1 could come into the office to upload or complete the delinquent STEB reports, recognizing that Doe 1 did not want to be present if Halcovage was in the courthouse. However, Bender instructed Kutzler that the STEB reports were not an HR issue and, as such, she should not answer Doe 3's email. For her part, Kutzler stated in her deposition that she reminded Bender that Doe 1 still did not have the necessary equipment to complete her work from home. Kutzler further stated that she attempted to assist in getting the plaintiffs the equipment they needed to work from home. In fact, Doe 3 stated in her deposition that she believed Kutzler tried to help them, although she believed Kutzler should have tried to do more.

However, because of the delinquent reports, Bender ultimately made the decision to revoke Doe 1 and Doe 2's work from home status and move them into offices in another county building, the 410 Building. Bender stated in his deposition that he believed Does 1 and 2 could safely

work from the 410 Building and complete their work. While the STEB reports were Doe 1's responsibility, Does 3 and 4 ultimately finished and submitted the reports so that they were no longer delinquent. Additionally, around this same time, another employee made a statement to HR regarding Doe 2's behavior while out working on the road, alluding to possible illicit drug use. Kutzler and Roth met with this individual and had her sign a statement memorializing what she had told HR. According to the plaintiffs, this employee later expressed to them that she felt compelled by Roth and Kutzler to sign the statement.

Toward the end of 2020, Does 1 and 2 were informed by Kutzler that they were no longer permitted to work from home and would have to work from the 410 Building. The 410 Building is a Schuylkill County building that houses several offices, including the election bureau. Thus, the public had access to the building. However, the plaintiffs were told that Halcovage would not be permitted to access the 410 Building after Does 1 and 2 were relocated to the building. In fact, several individuals, including Kutzler and Bender, informed the plaintiffs that Halcovage could be arrested if he accessed the building, and that Halcovage was told the same. However, Kutzler stated in her deposition that Halcovage

pushed back, arguing with Bender that he was entitled to go anywhere he wanted. Bender also testified that Halcovage pushed pack on the restrictions imposed upon him. Sheriff Groody indicated in his deposition that while he did not think he could personally arrest Halcovage for entering the 410 Building, he would have informed the Pottsville Police, who could have arrested Halcovage in their discretion.

Kutzler arranged for Does 1 and 2 to meet with Bender to get the keys to their offices. However, the plaintiffs voiced a concern, given that a complaint had been filed with the Equal Employment Opportunity Commission ("EEOC") by that time and Bender was named in the complaint.  Ultimately, in December of 2020, Kutzler met with Does 1 and 2 to give them their office keys. Upon entering the assigned office spaces, Does 1 and 2 had concerns with the condition of the offices. These concerns included wet ceiling tiles, old food items, mouse droppings, lack of cabinet space and old computers taking up space. Given the plaintiffs' concerns, Kutzler tried contacting a cleaning service but ended up cleaning the offices herself. In addition to the cleanliness of the offices, the plaintiffs also voiced a concern regarding a lack of parking spaces at the building for Does 1 and 2. The plaintiffs assert that Kutzler was

copied on many emails with respect to these issues but ignored their requests and concerns.

Around this same time, in December of 2020, Does 1 and 2 requested time off to speak with the Pennsylvania Attorney General's office about Halcovage. They were informed that they would either need to use their paid time off or not be paid for the day. According to Kutzler, Defendant Bender was the individual who determined that the plaintiffs would need to use their paid time off or not be paid, even after Kutzler informed him that the plaintiffs' requests related to their complaints against Halcovage.

Does 1 and 2 began working from the 410 Building in January of 2021, around the same time that Defendant Zula started as the County's HR Director. For her part, Zula stated in her deposition that she had been informed to some extent by Kutzler prior to her start date of the plaintiffs' complaints against Halcovage and the County. Around this time, the plaintiffs reported several incidents to HR, including that Halcovage was using a door that he was explicitly told he could not use, and that Does 1 and 2 saw Halcovage lurking around outside of the 410 Building shortly after they began working from there. Additionally, Doe 3 received a call

from Doe 2 reporting that Halcovage was seen following her in her car while she was working in the field. This led Doe 3 to instruct Does 1 and 2 to work from home. However, Doe 3 received a notice from Bender and Zula shortly thereafter informing her that she did not have the authority to allow her employees to work from home.

During this time, Bender expressed frustration with Does 3 and 4 and their lack of communication with him as the County Administrator and their direct supervisor. According to Bender, it was a combination of the lack of communication with Does 3 and 4, as well as the delinquent STEB reports by Doe 1, that led to a discussion regarding restructuring the tax office in 2021.[5] Bender directed Defendant Zula to investigate issues with the Tax Assessment office. Zula stated in her deposition that prior to her conclusion that the offices should be separated, there were discussions about removing Doe 3 from her position. At the conclusion of her investigation, Zula recommended to Bender that the offices be restructured and separated into Tax Claim and Tax Assessment,

---

[5] The record indicates that prior to 2019, the Tax Claim and Tax Assessment Offices were separate. In May of 2019, Halcovage brought up the idea of combining the two offices and placing Doe 3 in charge of both offices, which was ultimately approved by a vote of the commissioners.

effectively removing Doe 3 from her position over both offices. Zula stated that she based her recommendation primarily on the delinquent STEB reports. On March 17, 2021, the restructuring was voted on at the board of commissioners meeting, and the commissioners voted 2 to 1 in favor of transferring Doe 3 to the position of Tax Claim Director and Doe 4 to Deputy Chief Assessor. These transfers resulted in a reduction in salary for Does 3 and 4. Halcovage was one of the two "yes" votes in favor of transferring Does 3 and 4. Does 3 and 4 were notified by email of the transfer and restructure of the office.[6] The plaintiffs assert that Kutzler was one of the individuals who informed them of the restructuring or demotions, and that she took part in the discussions to restructure the office. Shortly after the restructuring of the tax offices, Kutzler's temporary employment with the County ended.

Following the vote, and after the time the plaintiffs filed the initial complaint in this matter, the County hired Tony Alu as a consultant to oversee the restructure. According to Bender, when Alu first visited the tax offices, Does 3 and 4 made unprofessional comments to Alu at some

---

[6] It appears that at the time Does 3 and 4 were notified of the transfer, Doe 4 was out on bereavement leave following the death of her brother.

point that resulted in them receiving written reprimands after an HR investigation conducted by Zula. Bender stated in his deposition that at the time the written reprimands were issued, he already felt that Does 3 and 4 should be terminated, a sentiment that appeared to be, at least in part, based on his frustrations with their lack of communication with him as their direct supervisor.

Thereafter, in May of 2021, Kent Hatter was appointed to the position of Chief Assessor for the Tax Assessment department. Under Hatter's supervision, Doe 1 was still having an issue submitting timely STEB reports. However, Bender did not question Hatter's operation of the Tax Assessment department as he did when Doe 3 headed the department. In July of 2021, Hatter issued a warning to Doe 2 regarding her lack of work product and her absences from work. Ultimately, the County determined that Doe 2 had abandoned her position and considered her to have resigned her position with the County. Doe 2 attempted to grieve this employment determination, but no one responded to her grievance.

At some time during the summer of 2021, Does 3 and 4 were approved for leave under the Family and Medical Leave Act ("FMLA). In

August of 2021, while on FMLA leave, Doe 3 accessed her County LexisNexis account from her cellular phone to retrieve a bill that was due for the County. Deb Dash, who took over some of Doe 3's responsibilities while she was on leave and was receiving Doe 3's County emails, received a notification that someone had accessed the LexisNexis account from a cellular phone. Ms. Dash informed Roth, who contacted LexisNexis to determine who had accessed the account. After it was determined that Doe 3 had accessed the account, rather than reach out to Doe 3 and ask why she had accessed the LexisNexis account, Bender directed Zula to gather information on the account's search history dating back to January of 2020. During this time, in September of 2021, Does 3 and 4 were suspended without pay by Bender pending the results of the investigation. Following this initial investigation by Bender and Zula, and following a subsequent outside investigation into the matter ordered by Commissioner Hess, Bender directed Zula to draft termination personnel action reports ("PARs") for Does 3 and 4. In November of 2021 and March of 2022, the commissioners met to vote on the termination PARs, but there was ultimately no action on the termination PARs. As of

the filing of the instant motion, Does 3 and 4 remain suspended without pay from their County positions.[7]

### D. Procedural History

The plaintiffs filed this action on March 16, 2021, and an amended complaint on October 29, 2021, which is currently the operative complaint. (Docs. 1, 63). The amended complaint names the County, Halcovage, Bender, Roth, Zula, and Kutzler as defendants. As it relates to the individual defendants, after they filed motions to dismiss, the Court dismissed the PHRA discrimination claims against them, but all other claims were permitted to proceed forward. (*See* Docs. 124, 126, 132, 134, 136).

As to Kutzler, the plaintiffs assert claims of retaliation and aiding and abetting discrimination under the Pennsylvania Human Relations Act (Counts VI, VII); discrimination and creation of a hostile work environment under the Fourteenth Amendment's Equal Protection clause (Counts VIII, IX); and retaliation in violation of the First

---

[7] Kutzler was hired to temporarily fill the HR Director position when Zula resigned in May of 2022. However, there are no allegations that Kutzler had any significant interaction with the plaintiffs during her second term of employment with the County.

19

Amendment. (Count XIII). Kutzler has now filed a motion for summary judgment, arguing that the plaintiff's retaliation and aiding and abetting claims under the PHRA, Equal Protection claims, and First Amendment retaliation claims fail as a matter of law. (Doc. 240).

After consideration, we conclude that there are genuine issues of material fact that preclude summary judgment in favor of the defendant. Accordingly, the motion will be denied.

## III.   Discussion

### A. Motion for Summary Judgment – Standard of Review

The defendant has filed a motion for summary judgment pursuant to Rule 56 of the Federal Rules of Civil Procedure. Rule 56(a) provides that a court shall grant summary judgment "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The materiality of the facts will depend on the substantive law. *Anderson v. Liberty Lobby*, 477 U.S. 242, 248 (1986). Thus, "[o]nly disputes over facts that might affect the outcome of the suit under governing law" will preclude summary judgment. *Id.* A dispute is only genuine if a reasonable juror could find in favor of the nonmoving party. *Id.*

The moving party bears the initial burden to "demonstrate the absence of a genuine issue of material fact," relying on pleadings, depositions, affidavits, and other evidence in the record. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). If the movant "successfully points to evidence of all of the facts needed to decide the case on the law," the nonmovant can still defeat summary judgment by pointing to evidence in the record which creates a genuine dispute of material fact and from which a jury could find in its favor. *El v. Southeastern Pennsylvania Transp. Auth. (SEPTA)*, 479 F.3d 232, 238 (3d Cir. 2007). However, "[i]f the evidence is merely colorable, or is not significantly probative, summary judgment may be granted." *Anderson*, 477 U.S. at 249-50 (citations omitted). A court may not make credibility determinations or weigh the evidence, but "must view the facts in the light most favorable to the non-moving party." *Hugh v. Butler County Family YMCA*, 418 F.3d 265, 267 (3d Cir. 2005).

**B. The Defendant's Motion for Summary Judgment will be Denied.**

As we have noted, Kutzler challenges the plaintiffs' PHRA retaliation and aiding and abetting, Equal Protection, and First Amendment retaliation claims. (Doc. 240). After a careful review of the

record, we conclude that there are genuine issues of material fact with respect to these claims against Kutzler. Accordingly, the motion will be denied.[8]

### 1. PHRA Retaliation and Aiding and Abetting

Kutzler first challenges the plaintiffs' PHRA claims against her for retaliation and aiding and abetting discrimination. Section 955(d) of the PHRA prohibits any person from discriminating against an individual because the individual opposed an unlawful discriminatory practice under the PHRA. 42 P.S. § 955(d). PHRA retaliation claims follow the same framework as retaliation claims under Title VII of the Civil Rights Act—a plaintiff must show she engaged in protected activity, that she was subject to adverse employment action, and that there is a causal connection between her protected activity and the adverse action taken against her. *Fasold v. Justice*, 409 F.3d 178, 188 (3d Cir. 2005) (noting

---

[8] As we will explain further, these claims will proceed against Kutzler based on the plaintiffs' assertions that she was involved in the restructuring of the tax offices and demotions of Does 3 and 4, as well as the assertions that Kutzler was aware of the plaintiffs' complaints of harassment and retaliation but ignored their requests for help. However, the record does not establish Kutzler's involvement in the other adverse actions taken against the plaintiffs, and the plaintiffs may not proceed based on those allegations against Kutzler.

that PHRA retaliation claims follow Title VII's *McDonnell Douglas* framework).

In the instant case, it is undisputed that the plaintiffs engaged in protected activity when they reported Halcovage's sexual abuse and harassment, first to HR and the County, and then by filing a claim with the EEOC and eventually this federal civil rights lawsuit. Further, with respect to some of the allegations, the plaintiffs have shown that they were subjected to adverse employment actions by Kutzler. The evidence establishes that while Kutzler did not begin her employment with the County until September of 2020, a factfinder could conclude that she was involved in at least one adverse action taken against the plaintiffs—her involvement in the restructuring of the tax offices, resulting in the demotion of Does 3 and 4. At the very least, the record is unclear as to Kutzler's exact involvement, although it is undisputed that she met with the plaintiffs prior to the commissioners' vote on the restructuring, and she was one of the individuals who informed Does 3 and 4 of the restructuring. Thus, we find that a reasonable factfinder could conclude that Kutzler was involved, in some respect, in this decision, which would qualify as an adverse action against the plaintiffs.

23

However, with respect to the other adverse actions alleged by the plaintiffs, we conclude that no reasonable juror could find that Kutzler was involved in the decision-making process. As to the allegations that Kutzler revoked Doe 1 and 2's work from home status and failed to provide them with proper equipment, the record establishes that Bender was the individual responsible for moving Does 1 and 2 to the 410 building, and that Kutzler attempted to get the plaintiffs the supplies they needed while they were working from home. In fact, even Doe 3 conceded that Kutzler tried to help the plaintiffs, although she believed Kutzler should have done more. Similarly, the allegations that Kutzler denied Doe 1 and 2's time-off requests is not supported by the record, which indicates that Bender made the decision to deny the time off, even after Kutzler informed him of the reason for their requests. As to the allegation that Kutzler disciplined Doe 3 for permitting her employees to work from home, the record establishes that this discipline came from Bender and Zula, rather than Kutzler. Accordingly, the plaintiffs cannot rely on these allegations to establish a PHRA retaliation claim against Kutzler.

Finally, the plaintiffs have provided evidence from which a jury could find a causal connection to the plaintiffs' protected activity. While Kutzler did not begin her employment until after the plaintiffs made their complaints, she conceded in her deposition that she was informed of the plaintiffs' complaints by Debra Twigg when she began her employment in September of 2020. Additionally, the adverse action which Kutzler can be said to have been involved with took place after the plaintiffs made Kutzler aware that they believed she was involved in some way in the County's retaliatory actions toward them.

Accordingly, viewing the evidence in the record in a light most favorable to the plaintiffs, we find that a jury could conclude that the plaintiffs suffered certain adverse employment actions—such as the restructuring of the tax offices leading to the demotions of Does 3 and 4— at the hands of Kutzler after they reported Halcovage's and the County's unlawful, discriminatory behavior. Thus, the motion for summary judgment will be denied with respect to this claim. However, as we have noted, to the extent the plaintiffs base this claim on Kutzler's alleged involvement in revoking Doe 1 and 2's work from home status, failing to provide them with equipment, denying their time-off requests, and

25

disciplining Doe 3, we find that the record does not support these allegations against Kutzler with respect to the PHRA retaliation claim.

Regarding the aiding and abetting claim, § 955(e) prohibits an employer or individual from aiding and abetting unlawful discrimination or retaliation under the PHRA. § 955(e). Typically, only supervisory employees are liable under the aiding and abetting provision of the PHRA. *McIlmail v. Pennsylvania*, 381 F. Supp. 3d 393, 415 (E.D. Pa. 2019). However, the PHRA does not define what qualifies as a supervisor, so we must look to Title VII for guidance. *Nelson v. Allan's Waste Water Serv., Inc.*, 2014 WL 109087, at *2 (W.D. Pa. Jan. 10, 2014). Under Title VII, an individual qualifies as a supervisor "if he or she is empowered by the employer to take tangible employment actions against the victim." *Vance v. Ball State Univ.*, 570 U.S. 421, 424 (2013). "Tangible employment actions" including actions that involve "a significant change in employment status, such as hiring, firing, failing to promote, reassignment with significantly different responsibilities, or a decision causing a significant change in benefits." *Id.* at 429, 431 (citations and quotations omitted). The issue of whether a person possesses supervisory authority "must be answered by reference to the power that the

26

individual actually holds, not by reference to his or her formal job title," and thus, is a question of fact. *Zurchin v. Ambridge Area Sch. Dist.*, 300 F. Supp. 681, 692 (W.D. Pa. 2018) (citations and quotations omitted).

Here, although we find this to be a close case, we conclude that at a minimum, there is an issue of fact regarding whether Kutzler had supervisory authority over the plaintiffs. As we have stated, Kutzler can be said to have been involved in certain adverse employment actions taken against the plaintiffs, such as the restructuring of the tax offices, which resulted in the demotions of Does 3 and 4. While the record indicates that she was not as involved as Defendant Zula in certain adverse actions, such as disciplining or suspending the plaintiffs, we conclude that a jury could find that Kutzler had the requisite supervisory authority over the plaintiffs to incur liability under the PHRA's aiding and abetting provision.

"Further, it has been established that "[w]hen a supervisory employee has knowledge of conduct which creates a hostile work environment, inaction by such an employee or failing to take prompt remedial action to prevent harassment rises to the level of individual aiding and abetting" under the PHRA. *Hewitt v. BS Transportation of*

*Illinois, LLC*, 355 F. Supp. 3d 227, 238 (E.D. Pa. 2019) (citations and quotation marks omitted). In this case, we conclude that a reasonable jury could find for the plaintiffs on this PHRA aiding and abetting claim. The plaintiffs have provided evidence that, if credited, establishes that Kutzler was aware of the harassment and retaliation of which the plaintiffs were complaining, and rather than intervene to attempt to remedy the harassment and retaliation, took part in tangible adverse employment actions taken against the plaintiffs. Accordingly, Kutzler's motion for summary judgment on this claim will be denied.

### 2. Equal Protection

Kutzler also challenges the plaintiffs' Equal Protection claims against her. She asserts that she was not responsible for some of the alleged adverse actions taken against the plaintiffs, and that she had no supervisory authority over her codefendants who are alleged to have acted in a discriminatory manner.

To state a claim for discrimination under the Equal Protection clause, the plaintiffs must show that they endured "'purposeful discrimination' because of [their] sex." *Robinson v. City of Pittsburgh*, 120 F.3d 1286, 1293 (3d Cir. 1997) (citation omitted). Accordingly, they must

28

establish that they were subjected to "(1) disparate treatment in relation to other similarly situated individuals, and (2) that the discriminatory treatment was based on sex." *Johnston v. Univ. of Pittsburgh of Com. System of Higher Education*, 97 F. Supp. 3d 657, 667 (W.D. Pa. 2015). To establish individual liability under § 1983, "there must be some affirmative conduct by the [individual] that played a role in the discrimination." *Foster v. Twp. Of Hillside*, 780 F. Supp. 1026, 1045 (D.N.J. 1992) (quoting *Andrews*, 895 F.2d at 1478) (alterations in original). Personal involvement can be shown "either 'through allegations of personal direction or of actual knowledge and acquiescence,' or through proof of direct discrimination." *Andrews*, 895 F.2d at 1478 (citations omitted).

Further, to state a claim for a hostile work environment, the plaintiffs must demonstrate (1) intentional discrimination based on their sex; (2) that "the discrimination was severe or pervasive"; (3) they were detrimentally affected by the discrimination; (4) that the discrimination "would have detrimentally affected a reasonable person in like circumstances"; and (5) employer liability. *Komis v. Sec'y of U.S. Dep't of Labor*, 918 F.3d 289, 293 (3d Cir. 2019).

29

Here, the plaintiffs have set forth evidence from which a jury could find that Kutzler engaged in purposeful discrimination of the plaintiffs and contributed to the hostile work environment. It is undisputed that Kutzler was made aware of the plaintiffs' complaints of sexual harassment and retaliation as of at least September of 2020. The plaintiffs continued to complain harassment and retaliation, and instead of assisting the plaintiffs or attempting to intervene, Kutzler appears to have been involved in at least some of the adverse actions that were taken against the plaintiffs. These actions include the restructuring of the tax offices and the demotions of Does 3 and 4. Further, the plaintiffs have alleged that Kutzler was aware of their complaints of retaliation and harassment, and rather than intervene, ignored their requests for help.

Thus, we conclude that the plaintiffs have provided enough support at this stage to show that they were subjected to intentional discrimination by Kutzler, that the discrimination was severe or pervasive and detrimentally affected them, and that this discrimination would detrimentally affect a reasonable person. Further, there is a basis for employer liability in this case. Employer liability may be found where

a supervisor creates a hostile work environment; in such cases, "[an] employer is subject to vicarious liability to a victimized employee for an actionable hostile environment created by a supervisor with immediate (or successively higher) authority over the employee." *Faragher v. City of Boca Raton*, 524 U.S. 775, 807 (1998). As we have already determined, there exists a question of fact regarding whether Kutzler had a supervisory role over the plaintiffs as the interim HR director. Accordingly, if a jury concludes that Kutzler is a supervisor, a basis for employer liability exists, and we find that the plaintiffs have sufficiently set forth evidence from which a jury could find in their favor on their Equal Protection claims. Accordingly, Kutzler's motion for summary judgment on the plaintiffs' Equal Protection claims will be denied.

### 3. First Amendment Retaliation

Finally, Kutzler challenges the plaintiffs' First Amendment retaliation claim against her, asserting that she did not have the requisite authority to engage in the alleged retaliatory acts taken against the plaintiffs.

To assert a First Amendment retaliation claim, the plaintiffs must show: (1) that they engaged in constitutionally protected conduct; (2) that

they suffered "retaliatory action sufficient to deter a person of ordinary firmness from exercising h[er] constitutional rights"; and (3) a causal connection between the protected activity and the retaliatory act. *Thomas v. Independence Twp.*, 463 F.3d 285, 296 (3d Cir. 2006).

Here, it is undisputed that the plaintiffs engaged in constitutionally protected activity. Not only did they file internal complaints about the sexual harassment and retaliation they were experiencing, but they also filed a charge with the EEOC in 2020 and ultimately this federal civil rights lawsuit in 2021, naming the County and the individual defendants. *See e.g.*, *Falco v. Zimmer*, 767 F. App'x 288, 307 (3d Cir. 2019) (finding that police chief's lawsuit alleging retaliation by his employer constituted protected activity under the First Amendment). Further, the plaintiffs have shown that they were subjected to an adverse action by Kutzler. As discussed above, the plaintiffs have provided evidence showing Kutzler's involvement in at least some retaliatory actions that occurred after the plaintiffs reported Halcovage's harassment, and later, the County's ongoing discrimination and retaliation of the plaintiffs. These include but are not limited to failing to investigate the plaintiffs' complaints of harassment and retaliation, as

well as participating in the demotions of Does 3 and 4. These actions would be sufficient to deter a person of ordinary firmness from exercising her rights.

Finally, we conclude that there is a causal connection between the plaintiffs' protected activity and the retaliatory actions taken against them. A causal connection may be shown by either (1) "an unusually suggestive temporal proximity" between the adverse action and protected activity, or (2) "a pattern of antagonism coupled with timing." *Lauren W. ex rel. Jean W. v. DeFlaminis*, 480 F.3d 259, 267 (3d Cir. 2007) (citations omitted).  Here, the plaintiffs have provided evidence from which a jury could conclude that their reports of sexual harassment and abuse, and later filings of an EEOC charge and a federal lawsuit, were causally connected to the adverse employment actions taken against them. The plaintiffs assert, and the defendant has not disputed, that they had never been subject to any adverse employment actions prior to May of 2020. However, as we have discussed, after Kutzler's employment began in 2020 and following the reports of harassment and abuse, the plaintiffs were subjected to a variety of adverse employment actions that Kutzler appears to have been involved with, although her involvement may have

been more limited than her codefendants. Thus, the evidence, if credited by a jury, could show at a pattern of antagonism by Kutzler following the plaintiffs' protected activity. Accordingly, summary judgment will be denied as to the plaintiffs' First Amendment claim.

## IV.  Conclusion

For the foregoing reasons, Defendant Kutzler's motion for summary judgment (Doc. 240) will be DENIED.

An appropriate order follows.

Submitted this 12th day of March 2024.

_s/ Daryl F. Bloom_
Daryl F. Bloom
United States Magistrate Judge